UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                     .    Case No. 01-01139 JKF
                           .
W. R. GRACE & CO.,         .
et al.,                    .    USX Tower - 54th Floor
                           .    600 Grant Street
                           .    Pittsburgh, PA 15219
          Debtors.         .
                           .    July 19, 2007
. . . . . . . . . . . . ..       1:07 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          By:  JANET BAER, ESQ.
                               SAM BLATNICK, ESQ.
                          Aon Center
                          200 East Randolph Drive
                          Chicago, IL 60601


For Debtors:              Kirkland & Ellis, LLP
                          By:  THEODORE L. FREEDMAN, ESQ.
                          Citigroup Center
                          153 East 53rd Street
                          New York, NY  10022
                          (Telephonic Appearance)


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For Debtors:              Kirkland & Ellis, LLP
                          By:  LISA G. ESAYIAN, ESQ.
                               DAVID BERNICK, ESQ.
                          Aon Center
                          200 East Randolph Drive
                          Chicago, IL  60601
                          (Telephonic Appearance)

For Debtors:              Kirkland & Ellis, LLP
                          By:  AMANDA C. BASTA, ESQ.
                          655 15th Street, N.W.
                          Suite 1500
                          Washington, DC  20005
                          (Telephonic Appearance)

For the Debtors:          Reed Smith, LLP
                          By:  DOUGLAS E. CAMERON, ESQ.
                               JAMES RESTIVO, ESQ.
                               TRACI S. REA, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA 15219
                          (Telephonic Appearance)

For W. R. Grace:          W. R. Grace & Co.
                          By:  JAY HUGHES
                          (Telephonic Appearance)

For National Union        Zeichner Ellman & Krause, LLP
Fire Insurance Company    By:  MICHAEL DAVIS, ESQ.
of Pittsburgh, PA:        575 Lexington Avenue
                          New York, NY  10022

For Reaud, Morgan &       Stutzman, Bromberg, Esserman & Plifka
Quinn and Environmental   By:  SANDER L. ESSERMAN, ESQ.
Litigation Group:              VAN J. HOOKER, ESQ.
                          2323 Bryan Street
                          Suite 2200
                          Dallas, Texas 75201

For Reaud, Morgan &       Stutzman, Bromberg, Esserman & Plifka
Quinn and Environmental   By:  DAVID J. PARSONS, ESQ.
Litigation Group:         2323 Bryan Street
                          Suite 2200
                          Dallas, Texas 75201
                          (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Reaud, Morgan &          Reaud Morgan & Quinn
Quinn:                       By:  CHRISTOPHER M. PORTNER, ESQ.
                             801 Laurel
                             Beaumont, TX  77701

For Equity Committee:        Kramer Levin Naftalis & Frankel, LLP
                             By:  JESSICA J. GLASS, ESQ.
                             1177 Avenue of the Americas
                             New York, NY 10036
                             (Telephonic Appearance)

For Future Claimants         Orrick, Herrington, & Sutcliffe LLP
Representative:              By:  KATHERINE THOMAS, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, DC 20007
                             (Telephonic Appearance)

For the Asbestos             Campbell & Levine, LLC
Claimants Committee:         By:  MARK T. HURFORD, ESQ.
                             1700 Grant Building
                             Pittsburgh, PA 15219
                             (Telephonic Appearance)

For Certain Cancer           Montgomery, McCracken, Walker & Rhoads
Claimants:                   By:  NATALIE D. RAMSEY, ESQ.
                                  NOEL C. BURNHAM, ESQ.
                                  LEONARD A. BUSBY, ESQ.
                             123 South Broad Street
                             Avenue of the Arts
                             Philadelphia, PA 19109
                             (Telephonic Appearance)

For Firemen's Fund           Stevens & Lee, P.C.
Insurance Company:           By:  DAVID R. BEANE, ESQ.
                             111 North Sixth Street
                             Reading, PA 19603
                             (Telephonic Appearance)

For Lehman Brothers:         Lehman Brothers
                             By:  ANDREW CHAN, ESQ.
                             New York, NY
                             (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

```
For London Market        Mendes & Mount, LLP
Companies:               By:  ALEXANDER MUELLER, ESQ.
                         750 Seventh Avenue
                         New York, NY  10019-6829
                         (Telephonic Appearance)


For the Asbestos         Caplin & Drysdale
Claimants Committee:     By:  WALTER B. SLOCOMBE, ESQ.
                         One Thomas Circle, N.W.
                         Washington, DC 20005
                         (Telephonic Appearance)


For State of             Hahn & Hessen
California:               By:  CHRISTINA J. KANG, ESQ.
                         488 Madison Avenue
                         New York, NY  10022
                         (Telephonic Appearance)


For Interested Party:    Ford Marrin Esposito Witmeyer & Gleser
                         By:  SHAYNE W. SPENCER, ESQ.
                         Wall Street Plaza
                         New York, NY  10005
                         (Telephonic Appearance)


For Official Committee   Speights & Runyan
Asbestos Property        By:  DANIEL A. SPEIGHTS, ESQ.
Damage Claimants:             MARION C. FAIREY, JR., ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924
                         (Telephonic Appearance)


For Official Committee   Bilzin, Sumberg, Baena, Price & of
Asbestos Property        Axelrod
Damage Claimants:        By:  MATTHEW KRAMER, ESQ.
                         200 South Biscayne Boulevard
                         Suite 2500
                         Miami, FL  33131
                         (Telephonic Appearance)


For Halcyon Asset        Halcyon Asset Management, LLC
Management, LLC:         By:  JOHN GREENE, ESQ.
                         New York, NY
                         (Telephonic Appearance)
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Official Committee Asbestos Property Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630<br>(Telephonic Appearance) |
| For Tocqueville Asset Management: | Tocqueville Asset Management<br>By:  PETER SHAWN, ESQ.<br>New York, NY<br>(Telephonic Appearance) |
| For American Legion: | Motley Rice, LLC<br>By:  ANNE M. KEARSE, ESQ.<br>     FREDERICK J. JEKEL, ESQ.<br>28 Bridgeside Boulevard<br>Mount Pleasant, SC 29464<br>(Telephonic Appearance) |
| For Travelers Casualty Insurance | Simpson Thatcher & Bartlett, LLP<br>By:  BARBARA SENIAWSKI, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017<br>(Telephonic Appearance) |
| For Silverpoint Capital: | Silverpoint Capital<br>By:  JOHN KU, ESQ.<br>(Telephonic Appearance) |
| For the Official Unsecured Creditors' Committee: | Stroock & Stroock & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982<br>(Telephonic Appearance) |
| For Murray Capital Management, Inc.: | Murray Capital Management, Inc.<br>By:  MARTI MURRAY, ESQ.<br>New York, NY<br>(Telephonic Appearance) |
| For the Official Committee of Asbestos Claimants: | Anderson, Kill & Olick, P.C.<br>By:  ROBERT HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1182<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Ad Hoc Committee of Equity Secured Creditors: | Weil Gotshal & Manges LLP<br>By:  JARRAD WRIGHT, ESQ.<br>     DAVID HICKERSON, ESQ.<br>1300 Eye Street, NW<br>Suite 900<br>Washington, DC 20005<br>(Telephonic Appearance) |
| For David Austern: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19801<br>(Telephonic Appearance) |
| For Official Committee Asbestos Property Damage Claimants: | Ferry, Joseph & Pearce, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market Street, Suite 904<br>Wilmington, DE  19899<br>(Telephonic Appearance) |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054<br>(Telephonic Appearance) |
| For Royal Indemnity: | Wilson Elser Moskowitz Edelman<br> & Dicker LLP<br>By:  CATHERINE CHEN, ESQ.<br>150 East 42nd Street<br>New York, NY  10017<br>(Telephonic Appearance) |
| For Interested Party: | Dune Capital Management<br>By:  GUY BARON<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.  This is the matter of

3  W. R. Grace, Bankruptcy Number 01-1139.  The participants I

4  have listed by phone, John Greene, Anne Kearse, Alex Mueller,

5  Shayne Spencer, Marti Murray, Jessica Glass, Barbara Seniawski,

6  Andrew Craig, Jay Hughes, Theodore Freedman, Arlene Krieger,

7  Guy Baron, John Ku, Lisa Esayian, Amanda Basta, Sam Blatnick,

8  Christina Kang, David Bernick, James Restivo, Catherine Chen,

9  Peter Shawn, David Parsons, Daniel Speights, Marion Fairey,

10 David Beane, Traci Rea, Douglas Cameron, Andrew Chan, Jarrad

11 Wright, Theodore Tacconelli, David Hickerson, Natalie Ramsey,

12 Leonard Busby, Noel Burnham, Martin Dies, Robert Horkovich,

13 Mark Hurford, Walter Slocombe, John Phillips, Katherine Thomas,

14 and Matthew Kramer.

15          MS. KEARSE:  Your Honor, this is Anne Kearse.  I also

16 have Fritz Jekel in my office on the other line.  He will be

17 actually handling the hearing on the 30th.

18          THE COURT:  All right.  Thank you.

19          MR. ESSERMAN:  Your Honor, this is Sandy Esserman.  I

20 believe Chris Portner from the Reaud, Morgan & Quinn firm is

21 also on the line, P-o-r-t-n-e-r.

22          THE COURT:  B-o-r?

23          MR. ESSERMAN:  P-o-r-t-n-e-r.

24          THE COURT:  All right.  Thank you.  I'll take entries

25 in court, please.

1          MS. BAER:  Good afternoon, Your Honor.  Janet Baer on

2 behalf of W. R. Grace.

3          MR. BLATNICK:  Good afternoon, Your Honor.  Sam

4 Blatnick on behalf of W. R. Grace.

5          MR. DAVIS:  Good afternoon, Your Honor.  Michael

6 Davis on behalf of National Union Fire Insurance Company of

7 Pittsburgh, PA.

8          MR. ESSERMAN:  Good afternoon, Your Honor.  Sander L.

9 Esserman and Van Hooker on behalf of Reaud Morgan & Quinn and

10 Environmental Litigation Group.

11          MS. BAER:  Your Honor, there are three matters on the

12 agenda today, and I just wanted to talk about the order in

13 which we're going to take them, if it's okay with you.

14          THE COURT:  That's fine.

15          MS. BAER:  The first matter on the agenda is the

16 property damage pretrial with respect to the Motley Rice claims

17 that are set to go to trial on June 30th -- or July 30th, and I

18 -- that matter will go first.  Second, Your Honor, are the two

19 -- two and three are matters related to the RMQ adversary

20 proceeding with National Union, and on those, Your Honor, the

21 first issue on the agenda, which is agenda item Number 2, is

22 the issues with respect to Bankruptcy Code Section 108 and the

23 legal argument on that.  The other matter that's up, Your

24 Honor, matter Number 3 on the agenda, is a status to address

25 what additional rights, if any, Grace and National Union shall

1 have to investigate and take discovery regarding whether any

2 submissions made under the settlement agreements were

3 fraudulent.  What we'd like to do, Your Honor, is to flip the

4 argument on those two so that once the property damage matter

5 is done, Mr. Bernick, who's on the telephone and has a time

6 crunch on the other end, would like to address that issue, and

7 then when that concludes we will address the Bankruptcy Code

8 108 issues.

9            THE COURT:  That's fine.

10            MS. BAER:  The other thing, Your Honor, is

11 preliminarily I wanted to just indicate to you that last night,

12 actually very early this morning, the debtors filed a brief in

13 further support of opposition to motions for protective orders

14 to preclude law firm discovery.  This is the issue with respect

15 to the third set of interrogatories that's set for hearing next

16 Monday before the Court.  As you may recall, three, or actually

17 four, law firms were to respond by last Friday to the third set

18 of interrogatories and then the debtor was to file a brief or a

19 status indicating what happened as a result of that and where

20 we go from here.  That's the brief we filed very early this

21 morning.

22            Your Honor, the brief was filed on the public record.

23 I have a copy for Your Honor here, and, Your Honor, it was

24 filed with a motion for an order permitting us to file the

25 exhibits under seal.  The exhibits, Exhibit A and Exhibit B,

1 relate to each law firm's answers to the interrogatories, and

2 what we are doing today is we're sending out by e-mail to the

3 law firm involved their portion of the exhibit that relates to

4 them only that they're, of course, entitled to see, but not

5 what was filed by the other law firms, and each law firm will

6 only get what is filed related to them.  However, Your Honor,

7 we do have for you in court today the sealed envelope that

8 contains the full exhibits of Exhibits A and B.

9        THE COURT:  All right.  Do you have an order that

10 lets the -- with you that permits the filing under seal that I

11 can just get docketed?

12        MS. BAER:  It is here with the motion.

13        THE COURT:  If you'll just pull that order out, I'll

14 just take care of getting that docketed today.

15        MS. BAER:  Great.  I'll do that right away.

16        THE COURT:  Are there any other sealed matters that I

17 need to address with respect to that -- to the law firm issues,

18 Ms. Baer?  I just want to make sure that they're all entered

19 before -- so that the firms can file anything they need to file

20 under seal and the debtors, too.

21        MS. BAER:  Your Honor -- Your Honor, not that I'm

22 aware of, and I was just informed by my colleague that there

23 was not a proposed order with respect to the filing under seal.

24 The proposed order is with respect to the relief requested,

25 apparently --

1          THE COURT:  Oh, oh.  Okay.

2          MS. BAER:  -- in the underlying motion.

3          THE COURT:  That's fine.  I'm not going to sign an

4  order on the merits --

5          MS. BAER:  Yes.

6          THE COURT:  -- only on the seal.

7          MS. BAER:  Right.

8          THE COURT:  Okay.  All right, thank you.

9          MR. HURFORD:  Your Honor?

10          THE COURT:  Yes.

11          MR. HURFORD:  It's Mark Hurford for the ACC.  I

12  haven't seen that motion yet, but I would ask -- I'm curious as

13  to whether or not the debtors plan to send both of those

14  exhibits that they're filing under seal to the ACC.

15          THE COURT:  Ms. Baer?

16          MS. BAER:  Your Honor, I am not completely familiar

17  with the terms of the protective order, and we do not want to

18  run afoul of the terms of the protective order.  So, I

19  instructed people today to be e-mailed only to the three firms

20  involved, their portions.  With respect to the official

21  committees, they do, in fact, have confidentiality agreements

22  with the debtor.  I just don't know whether or not under that

23  protective order we are permitted to give it to them.  We

24  certainly wouldn't have a problem on the debtor's side.  I know

25  Mr. Esserman represents I think Baron & Budd, and he may be

1  much more familiar with the protective order than I am.

2           MR. HOOKER:  Your Honor, Van Hooker.  We looked at

3  that order, and I believe the way it's drafted, the parties,

4  all the parties that got those interrogatories, and any other

5  party such as the committee and the FCR who are parties to the

6  estimation proceeding, I think would be protected if we sent

7  them the materials, and they are bound by the order not to

8  reveal the materials because they are under seal.  I think that

9  everybody that got the interrogatories and the parties to the

10 estimation proceeding can get it.  That's the way -- that's the

11 way we read it.

12           THE COURT:  Can get the full set of documents.

13 Rather than just sending the -- each firm their own portions,

14 you think all firms can get all portions.

15           MR. HOOKER:  That's the way I read it, yes, and the

16 Court's --

17           THE COURT:  Maybe it would be advisable for the -- I

18 take it there are three firms involved.

19           MS. BAER:  There are.

20           THE COURT:  Maybe it would be advisable for the three

21 firms to get together and decide that you don't mind sharing

22 that information among yourselves, just to make sure that there

23 is not a violation of the protective order pending that

24 hearing.

25           MR. HOOKER:  I know we have already done that with

1  the two firms we represent.  They've said they don't have a

2  problem sharing it with the others, and, in fact, we have done

3  that.  We shared ours with the other firms after they were

4  filed.

5          THE COURT:  All right.  And are they sharing the same

6  information with you?

7          MR. HOOKER:  I believe so, yes.

8          THE COURT:  Okay.  Then I think, Ms. Baer, you're

9  probably safe, if that's the case, then sending it out -- at

10 least I think you're hearing from Reaud Morgan & Quinn at least

11 that their firms, it's okay to send their information to

12 everyone, correct?

13         MR. HOOKER:  No.

14         MR. ESSERMAN:  They're not part --

15         MR. HOOKER:  They're not part of this.

16         MS. BAER:  It's Baron & Budd.

17         THE COURT:  Oh, it's a Baron & Budd issue.

18         MR. HOOKER:  Baron & Budd.

19         THE COURT:  I'm sorry.  That's -- I apologize.

20         MS. BAER:  It's Baron & Budd, Kelley & Ferraro and

21 Motley Rice.

22         THE COURT:  All right.  Well, Ms. Kearse, is Motley

23 Rice in agreement to exchange your information and get every --

24 I'll get the three firms' information?

25         MS. KEARSE:  Your Honor, I would have to check with

1  John Herrick who's actually handling that side of the

2  litigation on that.  I'm not prepared to respond to that --

3         THE COURT:  All right.  Well, I'll just have the

4  debtor do what the debtor was proposing then, just send each to

5  the firms -- to the firm involved, and if you choose to share

6  it, you may.  But with respect to the committees, I think the

7  committees are entitled to at least have a -- the ACC, the

8  personal injury committee, is at least entitled to have a look

9  at this under the confidentiality agreement because I think

10 they are a party to this process.  So, I believe they should

11 get that information.  But to keep under seal, maybe that's an

12 issue the firms ought to address as well.  So, just send it to

13 the firms, let the firms deal with the committee.

14         MS. BAER:  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MS. BAER:  And again, we'd be happy to accommodate,

17 but I think it's a much better idea if they want to send it to

18 the committees, that's fine with the debtor obviously.

19         THE COURT:  Okay.  All right.

20         MS. BAER:  And I think we're ready to proceed on the

21 property damage matter, Your Honor, and I believe that Doug

22 Cameron from Reed Smith is on the telephone to handle that.

23         THE COURT:  Mr. Cameron?

24         MR. CAMERON:  Yes, Your Honor.  Doug Cameron on

25 behalf of the debtor.  Hopefully, just a short report.  A week

1  ago Monday, July 9, we filed on behalf of the debtor our

2  exhibit list, our witness list and our trial brief, and we

3  provided copies of the pre-marked exhibits to claimants'

4  counsel this past Monday, the 16th.  Claimants' counsel filed

5  their exhibit list, witness list, trial brief and objections to

6  our exhibits and also provided copies of their pre-marked

7  exhibits to us, and I believe yesterday our office delivered

8  the binders with those materials to your chambers.  There are

9  -- pursuant to the scheduling order, there are a couple of

10 additional materials that will be filed over the next couple of

11 days.  Our motions in limine, if any, are due tomorrow.  Our

12 reply trial brief and our objections to claimants' exhibits are

13 due on Monday, and claimants' response to debtors' motions in

14 limine, if any, are due on Tuesday, and those supplemental

15 materials pursuant to the scheduling order will be provided to

16 Your Honor in binders and delivered to chambers by 3:00 p.m.

17 next Wednesday, the 25th.

18         Earlier today I spoke with Ms. Kearse and Mr. Jekel,

19 and we plan to meet and confer once those materials are filed

20 to see what we can agree to concerning exhibits and witnesses

21 and hopefully either eliminate or at least narrow any disputes

22 we have, and we'll be doing that early next.

23         But one issue that I told Ms. Kearse and Mr. Jekel I

24 was going to raise is that in putting together our supplemental

25 materials that are due on Monday, the current draft, it looks

1  like our trial brief that's due on Monday, will exceed the

2  five-page limit that the Court has for reply briefs.  It's

3  running about ten pages, and, if necessary, we intend to file

4  tomorrow a motion to exceed the five-page limit, requesting

5  that we have ten pages to address the issues in that trial

6  brief.  And I don't believe that we have any -- you know, any

7  current issues that the parties have or that need the Court's

8  attention.

9          THE COURT:  All right.  I'm sorry, Ms. Kearse, you

10 had mentioned some -- I apologize -- someone else is going to

11 address this issue?

12         MS. KEARSE:  Yes, Your Honor.  Fritz Jekel in my

13 office will actually be attending the hearing on the 30th and

14 will present for the Motley Rice claimants.

15         THE COURT:  All right.  Mr. Jekel?

16         MS. KEARSE:  We did have a call earlier with Mr. --

17 with Doug Cameron, and we will be meeting next week to meet and

18 confer and see what we can streamline for Your Honor.

19         THE COURT:  All right.

20         MR. CAMERON:  So, I don't believe, Your Honor, at

21 this time we have any issues other than that for the pretrial

22 conference, and if we are unable to -- if we are unable to

23 resolve objections, disputes, early next week, I guess we can

24 take that up with the -- you know, with the Court at the start

25 of the hearing on the -- on the 30th.  Unless the Court would

1 like to, you know, have, you know, some sort of conference

2 before then, I think we could cover that Monday morning before

3 the hearing.

4          THE COURT:  No, I think that should be fine.  I

5 really don't think that the issues will need an earlier

6 hearing.  Ms. Kearse, are you going to have any objection to

7 the debtor exceeding the reply brief by five pages?

8          MS. KEARSE:  No, Your Honor.

9          THE COURT:  All right, ten pages, but no more, Mr.

10 Cameron.

11          MR. CAMERON:  Yes, Your Honor.  Thank you.

12          THE COURT:  All right, thank you.  If --

13          MR. CAMERON:  Might we be excused, Your Honor?

14          THE COURT:  Yes.

15          MR. CAMERON:  Thank you.

16          MS. KEARSE:  Thank you, Your Honor.

17          MR. JEKEL:  Thank you.

18          THE COURT:  Thank you.

19          MS. BAER:  Your Honor, I think that then takes us to

20 the RMQ/ELG adversary proceeding, and before Mr. Bernick

21 addresses the fraud, just maybe to put things in context, as

22 you might recall, this involves two settlement agreements, one

23 for the State of Texas, one for the State of Alabama, with the

24 RMQ/ELG firms.  The settlement agreements were signed on August

25 25th, 2000.  The total amount of claims involved was 10,156

1 claims.  The total amount of settlement dollars involved was

2 $81,570,000.

3         Pursuant to the settlement agreements, there were

4 four settlement payments owed.  The first and second payments

5 were made pre-petition on November 1st of 2000 and January 15th

6 of 2001.  The third payment, January 15th, 2002, was not made.

7 The debtors filed Chapter 11, of course, in April of 2001.

8 Thereafter, during the course of this adversary proceeding an

9 agreement was entered into by which the Alabama portion of the

10 third installment was made via the surety bond posted by

11 National Union.  The Texas portion of that payment was not

12 made.  There were issues about Texas.  Apparently there was a

13 settlement that was previously done that took care of many of

14 those claims and, as a result, the parties agreed there would

15 be no payment on that Texas portion.

16         Your Honor, what we now have remaining is the final

17 installment payment, which is a total of $11 million for

18 Alabama and $2.5 million for Texas.  Pursuant to the --

19                         (Pause)

20         MS. BAER:  Well, we can't seem to get the Elmo to

21 show this, but pursuant to the settlement agreements, and I

22 have the Alabama settlement agreement in front of me, Your

23 Honor, and I can tender a copy to you, Section 8 of the Alabama

24 agreement, which is the same as the Texas agreement, gave Grace

25 60 days upon receipt of any settling plaintiffs' qualifying

1  materials to review them and identify whether or not they

2  complied with the settlement agreements.

3          The total amount of, as I said, outstanding payments

4  owed here is $13.5 million.  The 108 issue that we will address

5  shortly relates to the materials that were submitted 60 days

6  before the Chapter 11 filing, and there were also post-petition

7  materials submitted.  The amount of money involved there, Your

8  Honor, is approximately two and a half million dollars.  The

9  remaining $11.5 million due under the last installment is what

10  otherwise would be at issue in the event that we would proceed

11  on any fraud or other argument along those lines.  And with

12  this, Your Honor, I believe Mr. Bernick would like to address

13  the fraud issue.

14          THE COURT:  All right.  Mr. Bernick?

15                  (Pause)

16          THE COURT:  Mr. Bernick?  Maybe not.

17          MS. BAER:  Well, he's supposed to.  My colleague has

18  just gone out to call him, because we don't know why he

19  wouldn't be on.

20          THE COURT:  Is the CourtCall operator on?

21          THE OPERATOR:  Yes, I'm here, Your Honor.

22          THE COURT:  Do you have David Bernick on?

23          THE OPERATOR:  No, we do not have him on the line at

24  this time.

25          THE COURT:  All right.  Well, why don't we go forward

1 with the first argument then.

2      MS. BAER:  Right.  That's just fine, Your Honor.

3 Your Honor, with respect to the first argument, frankly, I'm

4 not sure who should be going first here, but maybe with a

5 little background we can figure that out and get into it.  Your

6 Honor, as you might recall, when we filed this complaint we

7 were seeking to enjoin National Union from paying on the surety

8 bond.  National Union then joined RMQ and ELG, essentially

9 asking for declaratory relief as to whether or not it needed to

10 pay.  Grace had in its original papers indicated that National

11 Union and -- I'm sorry, that RMQ and ELG had not complied with

12 the terms of the settlement agreement and that excused payment.

13 If payment wasn't due, obviously the surety did not have to

14 pay.

15      Why do we care, Your Honor?  It's very obvious why we

16 care.  If the surety pays, the surety has collateral.  The

17 surety will reimburse itself with the collateral and

18 effectively an unpaid pre-petition settlement installment that

19 was due that did not get paid because we filed bankruptcy will

20 get paid in real dollars using effectively our money and will

21 have converted this unpaid personal injury claim into a fully

22 secured paid-up claim.  Your Honor, we felt it was our

23 fiduciary duty to try to enjoin this from occurring if, in

24 fact, we didn't believe the settlement payment should be paid.

25      Your Honor, in the course of arguing this very long,

1  now drawn out, adversary proceeding, we've been back here a

2  couple of times.  What you determined in 2004 when we were here

3  was that the debtor would have the opportunity to review the

4  claims that had been submitted in the 60 days before the

5  filing, as well as post-petition, to see whether or not the

6  materials that had been submitted were, in fact, qualifying

7  materials and, therefore, the payments should be made under the

8  settlement agreements.

9          You also gave National Union the opportunity to

10 review more claims.  National Union was making the argument

11 that claims were paid where the settlement materials were not

12 qualifying materials and they believed that that was

13 inappropriate and they wanted to investigate to see what they

14 were going to conclude.  Your Honor, for a variety of reasons,

15 that review did not happen for quite awhile.  It eventually did

16 happen, and as a result of that review, Your Honor, the debtors

17 did, in fact, conclude that certain of the qualifying materials

18 did not, in fact, qualify and should not be paid.

19                          (Pause)

20          MS. BAER:  And, Your Honor, the writing's on the

21 other side.  Turn the paper over.  There we go.  Your Honor,

22 this is the results of the Grace review, and please understand

23 we have provided this information to RMQ and ELG.  We have

24 provided them what was required under the settlement agreement,

25 which was an outline of what claims we believe did not provide

1 qualifying materials, what was wrong with them. We have not

2 had a hearing on that. We have not had a discussion on that.

3 We have not had discovery. If you look at the settlement

4 agreement, you could see that under the settlement agreement,

5 we were required to meet and confer on that, if we could not

6 resolve issues that actually called for arbitration. But, Your

7 Honor, the point -- the only point I'm trying to make is that

8 we did this review and we concluded as a result of this review

9 that of the 305 claims that are at issue, 2.5 of them did not

10 -- I'm sorry, read that -- 2.8 did not qualify and

11 approximately a million did qualify as having provided

12 appropriate qualifying materials. Therefore, the debtor

13 informed National Union that it was rejecting $1.9 million of

14 claims, or value for claims, 247 claims.

15         When we came back to Your Honor and indicated to the

16 Court and to National Union that we had done this -- I'm sorry,

17 to RMQ -- that we had done this review and had the -- and

18 concluded this, for the first time RMQ then raised Section 108

19 of the Bankruptcy Code and indicated that the debtor should no

20 longer be permitted to review these claims because it did not

21 do so 60 days after the bankruptcy case was filed. The debtor

22 responded, indicating that it did not believe this was governed

23 by Section 108. You asked for briefing. And that's why we're

24 here today. That is really what we're arguing today.

25         Your Honor, if you look at Section 108, I believe the

1  case law suggests we've got a little bit of a square peg in a

2  round hole.  108 covers affirmative acts by the debtors, such

3  as filing a pleading, curing a default, taking action during a

4  grace period.  It actually outlines these types of

5  circumstances in the statute.  It doesn't speak to contractual

6  defenses to pre-petition claims, which is really what this is.

7  This settlement agreement provided that RMQ had to provide

8  qualifying materials.  Grace had the opportunity to review

9  those materials to determine whether or not effectively we have

10  an allowed claim.  It did not do that for these claims that

11  came in close to the bankruptcy filing or post-petition.

12        Your Honor, Grace wasn't in default.  It -- Grace was

13  well within time when the bankruptcy petition was filed.  We

14  were not -- we were not exercising a grace period.  We're not

15  exercising an option.  There's no statutory period that governs

16  this.  What it is, Your Honor, is they have submitted claims

17  and they're seeking to have the claims paid.  We're in

18  bankruptcy.  Once we file bankruptcy, 362 goes into effect.  It

19  stays parties from seeking to collect claims.  It stays parties

20  from providing information to seek to collect claims.

21        Instead, Your Honor, we're out of 108.  We're into

22  the claims adjudication process.  That's what bankruptcy is

23  about.  When claims are submitted, pre-petition claims are

24  submitted, and the debtor is to pay those, under Section 502

25  and under Bankruptcy Rule 3007, we have the opportunity to

1 review those claims, we have the opportunity to object to those

2 claims.  When those claims are allowed they'll be paid pursuant

3 to a Chapter 11 plan.

4          The way the statute works, 108 does certainly govern

5 certain circumstances, but it doesn't govern a circumstance

6 that's -- circumstances dealt with somewhere else.  It doesn't

7 govern a circumstance here where 362 effectively stayed the

8 payment of the claims, stayed the providing of additional

9 materials, and Section 507 -- I'm sorry, Section 502 in

10 conjunction with 3007 deals with what you do with claims, what

11 you do with pre-petition claims and how do you adjudicate them.

12 Effectively, Your Honor, 108 is trumped by 362 and 502.

13          Your Honor, if you look at the case law that's cited,

14 frankly, in both briefs, you will find nothing similar to this

15 circumstance.  You'll find three types of cases that courts

16 deal with under Section 108, and it's a mess.  They're not

17 particularly clear sometimes, and one court goes one way, one

18 the other way, and they talk about how it's a mess.  They very

19 much acknowledge it's a mess.  But what you see is a pattern in

20 the types of claims that the courts find are, in fact, governed

21 by 108, and they fall into three categories.

22          The first one, the statutory redemption cases, scores

23 and scores of cases where a debtor, generally speaking a

24 Chapter 13 debtor, but not always, has defaulted on a mortgage,

25 has had its real estate foreclosed and owes on real estate

1  taxes, and what the courts generally say is 108 gives these

2  debtors a breathing spout and it gives them 60 days after the

3  filing to figure out what to do, whether or not they can redeem

4  their property.  It does not -- it essentially recognizes the

5  statutory redemption period, but then, if you will, closes off

6  that statutory redemption period at 60 days, which is generally

7  longer than the statutory redemption period itself.

8         The second pattern, the second kind of cases, are the

9  grace period cases.  This isn't a statutory redemption.  It's

10 more of the contractual right to cure a default type situation.

11 Again, the same -- similar fact pattern almost every time.

12 Debtor's in default, oftentimes, but not always, a Chapter 13

13 debtor.  They have enough opportunity to cure.  If they don't

14 cure, there's automatically a termination of a right.

15 Generally speaking, it happens in the insurance cases.  That's

16 the classic example where I think courts actually do agree,

17 that if your insurance policy has been terminated, you have a

18 grace period to cure, and you don't cure within the grace

19 period, you have the time under Section 108, but that's it.

20 When it -- when it expires, it expires and there's nothing you

21 can do.

22        There is an exception, however, and that is there is

23 case law that would suggest that in a circumstance where there

24 is another affirmative act that needs to be taken, that it's

25 just not an automatic ending to whatever the situation is that

1 the grace period was posted for, but instead, Your Honor, it's

2 a situation where now there needs to be an affirmative act,

3 that's governed by 362 and that's enjoined, and the creditor

4 cannot go forward and do the next affirmative act to terminate

5 whatever rights the debtor had.

6       The third set of 108 cases, Your Honor, are the

7 option cases, where there's an option contract like an option

8 for the debtor to purchase real estate at a certain price.  The

9 cases there indicate that 108 will extend for 60 days, but not

10 beyond.

11       Then there's, of course, an exception to all of the

12 exceptions because that's our Bankruptcy Code, and that

13 essentially is usually found in the statutory redemption cases

14 that says there are exceptional circumstances that will permit

15 the court to extend the period beyond 60 days, and I'll address

16 that in a moment.

17       The fact of the matter is, Your Honor, none of these

18 fact patterns apply to our situation.  There's no statutory

19 time period here that we're trying to extend.  There has not

20 been a default.  We're not talking about curing a default under

21 some grace period, and this is clearly not an option contract.

22 Grace is current.  Grace has not reviewed the qualifying

23 materials that are at issue.  Bankruptcy was filed before they

24 could do that, and now we're in bankruptcy.  Because we're in

25 bankruptcy, Section 362 enjoins further actions to collect on

1  claims.  502 governs filing of claims and claims objections,

2  and Section 3007 and 502 say that the debtor has essentially

3  until a court order tells them they need to, or unless a

4  Chapter 11 plan provides some sort of a deadline, to review

5  claims, to adjudicate claims, to object to claims and

6  ultimately to have the claims allowed.

7           These claims have not been allowed, Your Honor.  The

8  debtor has not reviewed the materials.  Or, it actually has

9  now.  It hadn't at the time.  And it had not determined whether

10  claims should be allowed or not allowed.  The debtor has now

11  determined that of these claims, a great many of them, in fact

12  the majority, should not be allowed, and therefore National

13  Union doesn't have to pay under the surety bond.  The

14  qualifying materials have not been approved.  Our opportunity

15  to review those stopped when the bankruptcy was filed.  We now

16  have the opportunity under the Bankruptcy Code and the claims

17  adjudication process to review those claims, and until it's

18  determined that those claims should be allowed, National Union

19  does not have an obligation to pay under the bond.

20           THE COURT:  Well, what about the claims that the

21  debtor has reviewed and has determined are allowed, or should

22  be allowed?

23           MS. BAER:  Your Honor, the claims that the debtor

24  determined under the settlement agreements should be allowed

25  would be payable, and in this particular case it's about a

1 million dollars, unless exceptional circumstances apply.  And

2 then we get into what is exceptional circumstances, and the

3 case law essentially says that exceptional circumstances is

4 fraud, mistake, accident or erroneous conduct.  And, Your

5 Honor, it's the debtors' position that with respect to this

6 last installment payment our claims review suggests that there

7 has been fraud, or there may be fraud, and --

8          THE COURT:  As to the claims that the debtor would

9 allow?

10         MS. BAER:  As to the materials that were submitted

11 that -- although the materials submitted on their face appear

12 to qualify as qualifying materials, that is under the

13 assumption that the materials are, in fact, true.  That turns

14 out apparently not to be the case in our investigation.  And

15 again, I know that Mr. Bernick wants to address this, and I

16 kind of wanted to conclude the other things and then get into

17 the exception.

18         THE COURT:  All right.

19         MR. BERNICK:  Jan -- I'm sorry, Your Honor.  I wasn't

20 -- I didn't join until late because I had another hearing, but

21 I am on and I can address that very briefly at Your Honor's

22 convenience.

23         THE COURT:  All right.  Let Ms. Baer finish and then

24 I'll get to you, Mr. Bernick.  Go ahead, Ms. Baer.

25         MR. BERNICK:  Thank you.

1          MS. BAER:  Very briefly, Your Honor, with respect to

2    108, there is case law out there and, in fact, the case --

3    believe it or not, there's actually a Circuit Court case on one

4    of these crazy issues, and that is the Moody case out of the

5    Seventh Circuit deals with 108 and 365.  And what the case law

6    says there is in a circumstance where you've got an executory

7    contract, Section 365 governs whether or not you have the time

8    to assume or reject and whether you have the time to cure, and

9    365 provides that you have until confirmation of the plan to

10   decide whether to assume or reject, and if you decide you're

11   going to assume, you have until you decide to assume to cure.

12   And Moody said that in that circumstance 108 doesn't apply

13   because there's another provision of the Bankruptcy Code that

14   governs the timing, and that timing says that you have until

15   confirmation of the plan.

16          Your Honor, this is very much like that circumstance

17   for two reasons.  Reason number one is by analogy.  Here, we've

18   got other provisions of the Bankruptcy Code that govern.

19   Specifically, Section 362 stays the collection of the claims

20   and any more submissions of materials, and 502 deals with

21   claims adjudication.  Under 502 and under the Bankruptcy Rules

22   --

23          THE COURT:  Why does 362 stay additional submission

24   of materials?  I mean, there -- just because there's no bar

25   date set doesn't mean that creditors can't file claims.

1  There's no prohibition for submitting a claim.

2         MS. BAER:  What they can't do is they can't move to

3  collect their claim.

4         THE COURT:  They can't move to collect, but they can

5  certainly submit materials.

6         MS. BAER:  Oh, but by submitting materials they're

7  arguing that under the settlement agreement they then are

8  entitled to collect from National Union.

9         THE COURT:  Well, I don't know whether they're

10  entitled to collect from National Union.  They may not be

11  entitled to collect from the debtor, buy why else does the

12  debtor have a surety contract?

13         MS. BAER:  Well, the debtor had a surety contract for

14  the circumstance where they defaulted, but, again, this is a

15  circumstance where these claims got caught up in the review

16  process and it wasn't completed before we filed bankruptcy.

17         THE COURT:  Well, I understand, but I don't -- I just

18  -- I can't buy the argument that 362 bars the submission of

19  materials.  I can buy the argument that 362, as against the

20  debtor, would bar any collection activity without relief from

21  the stay, but I cannot see that 362, in a claims adjudication

22  process, would bar the submission of materials.

23         MS. BAER:  Well, I guess it really doesn't matter

24  since we have the materials anyway, but I think it's part of

25  the process, and then the point is under 502 that's what

1  governs the claims adjudication process.  That gives us an

2  opportunity to review claims.  It gives us an opportunity to

3  object to claims.  It gives us an opportunity to ultimately

4  have the claim allowed or disallowed, and then we would pay

5  under our Chapter 11 plan.  That's what we're talking about

6  here.  We're talking about reviewing the claims and allowing

7  the claims, and in this particular circumstance, we do not have

8  to review those claims in any time frame.  The Bankruptcy Code

9  indicates we have to do that when the Court enters an order

10  telling us we have to do that or a Chapter 11 plan would

11  provide a time by which all claims need to be adjudicated.

12        Your Honor, the other reason why _Moody_ is very

13  important here is because there is a very good argument that

14  this is an executory contract.  Under the Countryman

15  definition, you essentially look at whether there are

16  significant performance due on each side.  In this particular

17  case, there was.  The performance on RMQ's side was to submit

18  qualifying materials.  They submitted qualifying materials

19  pre-petition.  They submitted qualifying materials up until we

20  filed and they submitted materials post-petition.

21        What the Court needs to look at is at the time of the

22  filing of the bankruptcy was there significant performance

23  still due on both sides.  There was.  They still had qualifying

24  materials they had not submitted.  So, therefore, as an

25  executory contract, they still did, in fact, have an obligation

1  to do something significant.  On the debtor's side, the debtor

2  has to review the claims, has to contact RMQ to indicate to

3  them whether or not certain claims meet the qualifying material

4  standards or not, and if they do not then there needs to be a

5  discussion and potentially an arbitration over the allowance of

6  the claims.  Your Honor, we submit that's an executory

7  contract, and, as I've indicated, with executory contracts we

8  have up until the time of the confirmation of the plan to

9  determine whether or not to assume or reject this contract.

10        Another reason why, Your Honor, 108 does not apply is

11  this claims adjudication.  We have the opportunity to review

12  this claim and we have the opportunity to review this contract

13  and decide whether or not to assume or reject it, which we have

14  not yet done.  We have now reviewed the claims.  We know where

15  we're at on that, but under those circumstances 108 did not

16  preclude us from doing so, only the 60 days after we filed.

17        THE COURT:  Okay.  But -- all right, even if I buy

18  all of that argument, even if I do, what benefit is it to the

19  debtor to wait until the end of the case to assume or reject?

20  I can understand the need to take a look at the documentation

21  and make sure that, in fact, the debtor is paying only claims

22  that are documented, according to what the contract says.  But

23  to the extent that there is a surety bond out there, if the

24  debtor rejects and that's a breach, then the debtor is in

25  default, because the one thing a rejection would be is a

1  breach, and that's a default.  Now there's a surety bond that

2  stands to pay these claims, which essentially means that

3  they're secured claims.  They're in a different -- they're

4  treated like secured claims.  They're in a different category

5  than the other personal injury claims.  There is now a

6  requirement of the surety to pay.  So, what have you gained?

7          MS. BAER:  Because, Your Honor, if we assume it, we

8  have the opportunity to review these claims, and --

9          THE COURT:  Well, but you have reviewed them.

10          MS. BAER:  Right.  The point is they're saying we

11  don't get to -- that review doesn't count.  That's what they're

12  really saying, is that review does not count.  You had to do it

13  60 days after the filing.  You didn't, and therefore it's

14  irrelevant now that you've done the review, and these claims do

15  not meet the qualifying material standard.

16          THE COURT:  Okay.

17          MS. BAER:  Your Honor, I think at this point, if you

18  want to hear from Mr. Bernick on the fraud issue --

19          THE COURT:  All right.  Mr. Bernick?

20          MR. BERNICK:  Yes, just very briefly, Your Honor.

21  This is a little bit confusing and difficult, but I just wanted

22  to be clear and candid with the Court on where it is that we

23  stand on all of this.  Obviously, with respect to the unsettled

24  claims, we're drawing toward the end, but are not quite yet at

25  the end of the process of unpacking what lies behind a lot of

1 these claims.  As Your Honor knows from the other proceedings,

2 there's active discovery, and, Your Honor, we'll talk about

3 that again on Monday, and a lot of that relates to fraud.  The

4 issue, though, that makes this difficult is that the fraud that

5 we're dealing with in this context is somewhat different in

6 that the issue is really whether there was fraudulent

7 inducement with respect to this agreement or with respect to

8 the payments of the plan.

9 　　　　THE COURT:  Mr. Bernick --

10 　　　　MR. BERNICK:  Yes.

11 　　　　THE COURT:  -- I'm sorry, are you either on a cell

12 phone or a speaker phone?

13 　　　　MR. BERNICK:  No, I'm not a cell phone.  I'm not on

14 the speaker phone.  I'm on the phone in my office.

15 　　　　THE COURT:  All right.  Just a minute, then.  I'm

16 going to ask the CourtCall operator if perhaps they can turn

17 your microphone up, because we're --

18 　　　　MR. BERNICK:  Well, I can try to -- I can try to

19 speak up a little bit if that will help.

20 　　　　THE COURT:  Okay.  Thank you.

21 　　　　MR. BERNICK:  Is this better?

22 　　　　THE COURT:  Yes.  Thank you.

23 　　　　MR. BERNICK:  Okay.  I'm not going to be very long.

24 The issue here, though, is similar but it's also somewhat

25 different because the issue here is fraudulent inducement.  So,

1  beyond the question of the -- whether there is fraud either in

2  the underlying data for these claims or the way that these

3  claims have been presented, there is the question of whether

4  Grace knew about these problems or didn't know about these

5  problems, and obviously Grace has known about problems,

6  including the possibility of there being fraudulent claims, for

7  sometime.  And I know because I've had the benefit of seeing in

8  advance Mr. Esserman's potential slides.  The significant issue

9  here would be what did Grace know and when did it know it, and

10  that makes this problem different and more complicated than the

11  problem that attaches to claims that were not settled.  Claims

12  that were not settled the issue is not fraudulent inducement.

13  The issue is whether the data is good, you know, whether the

14  data is fraudulent in and of itself.

15        Now, out of an abundance of caution, we raised the

16  fraud issue in part because we knew that if we had to go

17  forward and pay these claims it diminishes the estate.  We felt

18  obliged to raise this issue.  But I would have to say in

19  candor, Your Honor, that although all of what we've done and

20  determined with respect to the unsettled claims may well have

21  direct application substantively to the underlying merits of

22  these claims, these claims are in a settled context and they

23  therefore present the issue of fraudulent inducement that we

24  don't have elsewhere and we have not parsed through to what

25  extent what we determined with respect to these claims

1    generally, that is personal injury claims generally that were

2    processed in volume.  We've not really determined with

3    precision to what extent those problems are different in-kind

4    from the kinds of problems that we were already aware of in the

5    tort system.  We've learned an awful lot more, and we've

6    learned it in much more detail, but we really haven't -- I'm

7    not in a position today to represent to Your Honor that we can

8    make out a clean fraudulent inducement case.  I believe that we

9    may be able to make out that case within a relatively short

10   period of time as we get to the end of the discovery that we're

11   conducting with respect to the unsettled claims, but I can't

12   represent that we're there today.  And we are concerned, and

13   I'll just, again, state this very candidly, we are concerned

14   that this issue, because it overlaps with the issues that we

15   have in estimation, introduces an element of confusion and

16   difficultly here and is a further burden on the court.

17          So, what I wanted to get on the phone just to say is

18   that we've looked at their claims.  We see a lot of the same

19   flags that we've seen with respect to the unsettled claims that

20   we're litigating.  We think that these claims provide evidence

21   of the pervasive problems that we're going to be bringing to

22   the Court's attention in connection with the estimation, but we

23   can't represent to the Court today that we're in a position to

24   make out a fraudulent inducement case.  And I know that this

25   has been in litigation for a while, and I think that we've done

1 our obligation to raise this problem with the Court, but I

2 don't want to overstate what it is that we're actually prepared

3 to demonstrate at this time.

4            THE COURT:  All right.

5            MR. BERNICK:  That's separate and apart from the

6 issue of sufficiency of documentation.  That's a different

7 issue.  I'm simply addressing the special circumstances issue.

8            THE COURT:  Okay.  Thank you.  Ms. Baer, anything

9 else?

10           MS. BAER:  No, Your Honor.

11           THE COURT:  Mr. Bernick, anything else?

12           MR. BERNICK:  No.

13           THE COURT:  All right.  Thank you.  I'm not sure -- I

14 guess, Mr. Davis, maybe --

15           MR. DAVIS:  I'll be happy to make a few remarks.

16           THE COURT:  All right.

17           MR. DAVIS:  I think I'll start by reminding Your

18 Honor that we had extensive argument and ruling, which has not

19 been reduced to an order or a judgment, on the issue of whether

20 the surety is relieved from obligation if the underlying

21 contract is altered, and you ruled against us on that issue.

22 But it seems to me that we shouldn't lose sight of the fact

23 that that issue is compounded if the execution of the

24 underlying contract has fraudulent activity behind it, either

25 in the inducement of the contract initially, which Mr. Bernick

1 just informed the Court he's investigating, or in the

2 individual execution of claims one-by-one.  In either instance,

3 I'm confident that a surety should be relieved of its

4 obligation if either the underlying contract was fraudulently

5 induced or the individual component parts were executed through

6 fraudulent documentation.

7         And with that I'll turn what I have to say about the

8 108 issue.  Concerning the 108 issue, I think the argument that

9 we're hearing from the claimants proves too much because if --

10 108 has a Part (b) and Part (c), and 108(b) has to do with

11 protecting the debtor when time periods are running out at the

12 beginning of a case, and 108(c) has to do with suspending all

13 obligations of the debtor in litigated matters.

14         When Congress drafted 108(c) they spoke of in a civil

15 court, but you know it couldn't possibly be truly intended to

16 be limited that way because otherwise a debtor would continue

17 to have all its obligations to proceed in an arbitration.  We

18 all know that arbitrations stop the same as lawsuits stop.  And

19 the circumstance we have here, I submit, really does -- is a

20 hybrid circumstance because if you look at the settlement

21 agreements, they speak both of arbitration and of the

22 continuation of the litigation.  The -- both agreements say

23 that if there's a rejection it shall be submitted to binding

24 arbitration, and ultimately the arbitrator is chosen by the

25 Court in which the case was proceeding.  So the court is not

1 done.  The civil litigation is not over.  Moreover, in the

2 event of rejection, the case gets reinstated in the court from

3 which it was dismissed.  So, for that reason also the civil

4 litigation is not over.  The civil litigation still has

5 vitality.

6         And I think that the correct analysis here is not

7 108(b), which I think, as very amply demonstrated by Ms. Baer,

8 should not be applied in this circumstance anyway because it

9 clearly was not intended to restart a defensive mechanism of

10 the kind the debtor had, but rather this is a 108(c) situation

11 where what you have are claims being asserted against the

12 debtor both by arbitration and by resuming litigation, and

13 those kinds of claims are stopped cold, permanently, until the

14 case is over under 108(c).

15         Now, that being said, the other notion that kind of

16 proves too much is can you imagine the practical consequences

17 of what's being asserted by the claimants?  There are mass tort

18 bankruptcies throughout the country.  Your Honor has many of

19 them.  And this is, I think, the only instance, that I'm aware

20 of, where claimants have walked into court and said the debtor

21 has to keep its mass tort defensive mechanism functioning.

22 That's what they're really calling on the debtor to do.

23         The debtor had an office in Boca Raton -- I've been

24 there to look at documents -- with lots and lots of people,

25 many paralegals, lawyers, and what were they doing?  They were

1  engaging in a defensive mechanism.  It's their -- I guess you'd

2  call it their war room, but it's more than a war room.  It was

3  an entire war facility, an entire facility to carry on the

4  defense of these claims.  And the debtor, I submit, is entitled

5  and has a reasonable expectation of shutting that down when

6  they file and giving it a different function, and that

7  different function is to deal with claims under 502 of the

8  Bankruptcy Code.

9         Here the claimants would say, no, you have to keep

10 that running because you have to check and see whether each and

11 every instance where you have a deadline, you have to check and

12 see whether that deadline is a 108(b) deadline or a 108(c)

13 deadline.  And moreover it's not obvious whether you've got a

14 108(b) deadline or a 108(c) deadline.  Here, I think under this

15 agreement, I would submit it is a 108(c) deadline.  But just to

16 have to parse through each and every one of those claims to

17 keep the operation going is entirely contrary to the reasonable

18 expectations of debtors who say I'm filing so I can focus my

19 attention in a different direction, and that's what struck me

20 as trying to prove too much, by saying that 108(b) is the

21 governing statute here.  I think, frankly, all of us people who

22 labor in the bankruptcy world on a daily basis were surprised

23 to hear that somehow W. R. Grace had an obligation to keep its

24 defensive mechanism up and running and going in order to

25 respond to claims that plainly are claims of the kind that are

1 protected by 362 and that become claims against the estate.

2 And that's the observation I had and I thank you.

3          THE COURT:  All right, thank you.  Mr. Esserman?

4          MR. ESSERMAN:  Your Honor, Sandy Esserman for Reaud,

5 Morgan & Quinn and ELG.  First, on behalf of everyone here in

6 the courtroom and the people on the phone, we want to thank you

7 for being here.

8          THE COURT:  Oh, well, I did my best.  Ms. Baer, too,

9 I guess got stuck in all this.  I'm not sure who else did, so

10 -- U.S. Air got me here.

11          MR. ESSERMAN:  I was only on the runway for two and a

12 half hours.  I considered myself to be lucky.  But we know that

13 with a little bit of rain and -- travel is not easy, and we

14 appreciate you being here because we had this once before on

15 this case.

16          THE COURT:  Yes, we did.

17          MR. ESSERMAN:  I think the easiest place to start is

18 -- let's take a trip down memory lane, and let's see where we

19 are in this case --

20          THE CLERK:  you need to speak into a mic. I'm sorry.

21          MR. ESSERMAN:  I'm sorry -- where we are in this

22 case, where we've been in this case, what needs to be done to

23 this case, what rulings we need from the Court, should the

24 Court be so inclined.

25          First of all, I think it's helpful -- I'm not nearly

1  as skilled as Ms. Baer on the Elmo -- but to sort of see what

2  we're talking about here.  If I was Mr. Bernick, I'd have that

3  walking mic, but I can't figure it out.  If you look at what's

4  due, the total remaining due for all claims submitted before

5  2/1/01, for the Alabama settlement it's 9.7 and for the Texas

6  settlement it's 1.9.  What we're talking about for -- let me

7  start over, that sentence.  What that amount due is, all claims

8  that had been accepted under the settlement agreement.  That

9  is, claims were submitted, claims were sent in, claims

10 materials were sent to Grace, Grace had 60 days to either

11 object or not.  Sometimes they objected.  Sometimes they

12 didn't.  Sometimes they requested further information.  And

13 some claims were even not approved.  But what this was was a

14 settlement, as Your Honor well knows, with very defined

15 settlement criteria.  So what's owed is 9.7 for Alabama, 1.1

16 (sic) for Texas.

17         Now we're talking about this 108 and post-petition

18 claims issues.  Out of that, that sort of columns -- the second

19 column down, the total amount owed, claims submitted in the 60

20 days pre-petition, that's between 2/2/01 and 4/2/01, is five oh

21 six, and the total for claims owed post-petition is seven

22 sixty-eight for Alabama, and in the first column the total owed

23 for claims submitted 60 days pre-petition under the Texas

24 settlement is 585,000.  The post-petition amount is 783,000.

25 So, you add those up.  That's about 2.5 of the nearly $12

1  million, approximately, that's owed.  And so I think it's

2  important for the Court to understand that we need to address

3  these in sort of buckets, and the Court has pretty much

4  addressed the submitted claims under the settlement agreement

5  before debtors started yelling, well, there may be fraud here,

6  therefore, whoa, stop everything.  So, we think what we're

7  talking about is the 60 day pre-petition claims and the

8  post-petition claims, which are really -- I don't think there's

9  much dispute on the numbers.  It looks like it's about 2.5 or

10  so of the total that's due, 2.5 of the approximately $12

11  million.  So that's what we see at issue here, and we really

12  covered all the ground with whether it's a payment bond or not

13  a payment bond and all those defenses that were raised and

14  those obstacles that were put up for the claims that were

15  submitted say prior -- just to be safe, prior to the 60 days

16  prior to the bankruptcy.

17          Now, let's sort of go down a little bit of a timeline

18  because what we're here on is a summary judgment motion, and

19  the first timeline is -- I've got is April 2, 2001.  That's

20  Grace files bankruptcy.  January 2, 2002 Grace filed this

21  adversary proceeding.  I've got the wrong slide up.  I'm sorry.

22  Let me start over.  David, I'm sorry I'm confusing.  I started

23  on the wrong slide.  I'm not as adept at these slides as your

24  team.

25          MR. BERNICK:  You should consult with me in advance.

1             MR. ESSERMAN:  I will, and take lessons.  But anyway,

2    this is -- what this timeline is, Grace's assertion of this

3    potential fraud, or fraud that could be asserted, because these

4    were very late allegations.  These were not in the original

5    complaint.  These were sort of -- Your Honor was about to --

6    well, I think did enter judgment, and then all of a sudden

7    Grace stood up at the hearing and said, Judge Jacks (sic) --

8    which is their favorite case, among others -- but Judge Jacks,

9    there's fraud, this whole system is broke, the tort system is

10   broke, the Constitution is broke.  They say whatever they want

11   to say about all those things that are broke, but that there's

12   fraud here, therefore the fact that this was a settlement

13   agreement, that these cases were submitted and they were

14   dismissed from the tort system, and furthermore we've got a

15   security bond, there's fraud here.  This was all raised very

16   late in the day.

17            So we sort of took a look at what Grace is talking

18   about here, and in the late 1980s Grace is all of a sudden

19   becoming increasingly concerned over this potential for

20   fraudulent claims.  In June of '98, they filed a brief in the

21   Third Circuit, and one of the keys to the brief here is it was

22   filed by Jay Hughes, who is counsel to Grace, who's on the

23   phone now, and who is a party to this settlement agreement.  He

24   was the signatory to the settlement agreement that we're

25   talking about here.  So, three years before he signs off on

1  this settlement agreement, he's filing papers in the Third

2  Circuit talking about attorney-sponsored asbestos screening

3  programs creating incentive for fraud and abuse,

4  attorney-sponsored asbestos screening claims creating incentive

5  for fraud an unreliable testing results, the risk of

6  inaccurate, unsupported or fraudulent test results is

7  unacceptably high, the temptation to commit fraud is proven too

8  strong.  He goes on to say that, "Tests are performed in

9  violation of known and established testing guidelines.  Doctors

10  are paid very little per examination but are expected to do

11  exams quickly, without personal interviews, with a hundred to

12  150 workers being examined in a single day, and then, as such,

13  close scrutiny is not only justified, but imperative."  These

14  are all quotes from Grace's briefs in 1998.

15       Then what happens?  Well, in March -- March 28th,

16  2000, Grace goes to trial against Reaud, Morgan & Quinn, and

17  they say, okay, Reaud, Morgan & Quinn, you put on your

18  evidence, we'll put on your (sic) defense and see what happens.

19  Well, that was the Edwards case.  The Edwards case was tried on

20  behalf of five plaintiffs, with a total award of $38 million.

21  Obviously, Grace had a litigation issue and they lost, and they

22  lost big.

23       So, they basically decided, smartly, that these are

24  people that we need to deal with.  That is, we need to settle

25  their cases, get them out.  We can't face any more $38 million

1   judgments for five plaintiffs.  Let's do, in essence, an

2   inventory deal, which is what they did with Reaud Morgan.  So,

3   in August of -- 25 of 2000, they did a settlement agreement

4   that was signed by Jay Hughes and Reaud Morgan and ELG.  As

5   part of that settlement agreement -- once again, this is all

6   old history, but -- a bond was required, a payment bond was

7   required, for the reason that we wanted to make sure Grace was

8   going to pay.

9          So, 2002 -- 2001, April 2, Grace files this

10  bankruptcy.  On January 2, 2002, Grace files this adversary

11  proceeding that we're here on today.  So, it was filed almost

12  five and a half years ago against National Union.  In May of

13  that year, May 20th, 2002, there was a stipulation that was

14  agreed to approved by this Court, and that stipulation

15  authorized a draw-down under the National Union bond of $9.729

16  million, which has been paid by National Union, and that is not

17  included in the total amount due.

18         December 1, 2006 -- now we skip forward.  We've had

19  litigation.  We've got an adversary proceeding.  We've had

20  discovery.  We've had interrogatories.  There's been

21  depositions in this case.  I believe both sides have propounded

22  written discovery that's been answered.  And there was a

23  cutoff.  December 1st, 2006, there was a cutoff.  There was a

24  discovery cutoff pursuant to Your Honor's order, and Grace and

25  National Union, at that point in time, submitted

1  interrogatories confirming that they have no evidence of any

2  fraudulent submissions, but, and this is a quote, they have --

3  "The debtors and National Union have reason to believe that

4  many of these claims may be fraudulent -- "  and you heard that

5  today; you heard that from Ms. Baer; you heard that -- sort of

6  a permutation of that from Mr. Bernick -- and further discovery

7  is necessary to determine which claims, in fact, if any, are,

8  in fact, fraudulent."  And so all discovery was concluded

9  December 1 pursuant to court order.

10        We then had a hearing after the cutoff, and -- on

11  December 12th, 2006, and Your Honor raised some of the same

12  concerns you've raised today, and -- but on the other hand when

13  someone uses the fraud word, there may be fraud, it's something

14  that everybody sits up and takes notice.  And this firm, in

15  particular, takes notice because they're very proud of the way

16  they've done their work.  They're proud of what they've done,

17  and someone using that in connection with them, they react very

18  hostilely because these people are the call your first witness

19  type of people.  They've proven that in litigation time and

20  time again.

21        And so, Your Honor, we think reluctantly, but that's

22  in the eyes of the beholder -- thought that maybe if they

23  wanted to review their files for some evidence, that they

24  could.  This was last December.  This was six and a half months

25  ago.  And you used the phrase, if you've got some evidence in

1  the file, if you want to go back and take a look at the

2  evidence in the file, take a look at what you have, if it

3  satisfies the settlement agreement, I don't know how you're

4  going to open those up -- which brings us to where we are

5  today.

6         And where we are today is there is no evidence of

7  fraud.  There are no written allegations of fraud.  There are

8  no written allegations under the federal or bankruptcy rules,

9  which are required to prove fraud with specificity, to prove

10 fraud with -- to allege fraud with specificity and with

11 specific facts and circumstances.

12        What you heard was, Grace's slide was, well, we did

13 examine these claims, we did examine some of the claims, and

14 looking at the post-petition claims that we've looked at -- the

15 post-petition, 60-day claims, which covers they say 2.8 million

16 -- it didn't seem to me that it was that high, but I don't know

17 that that's that big of a dispute, but they did accept, they

18 found acceptable 58 claims under their own settlement

19 agreement, which they signed, which has a value of $972,000.

20 So, is there an offer to pay that $972 (sic) or an agreement

21 whereby a bonding company should be paying 972,000?  No, we

22 don't have that, nor do we have the balance of the

23 approximately nine million plus of unpaid amounts due under the

24 settlement agreement, taking out what I'll call "the noise

25 factor," the noise factor being the post-petition submissions

1  and the 108, which we'll talk about in a little bit.

2           So, in sum, Your Honor, there's been a lot of noise

3  here, and there's been a not of noise that has gotten a lot of

4  people, particularly my clients, very upset, because they don't

5  take kindly to being accused of fraud.  Not only that, but

6  we've had five and a half years of this -- in this case, in

7  which they can -- can and should have done all the

8  investigation into the Reaud, Morgan & Quinn/Environmental

9  Litigation claims that were settled claims.

10          Now, let me talk about some of the post-petition

11 submissions because, frankly, Reaud, Morgan & Quinn did submit

12 papers post-petition to W. R. Grace, and part of that we've got

13 some correspondence on, and the correspondence is dated August

14 31st, 2002.  It's to Jay Hughes.  It's from Reaud, Morgan &

15 Quinn's paralegal.  It says, "I have 56 people that returned

16 their releases to you that were part of our settlement

17 agreement.  Does W. R. Grace have any objection to us paying

18 them their settlement out of funds we already have?"  Because,

19 if you remember, this was staged funds that are waiting for the

20 approved claims.  These 56 people were all submitted

21 post-petition.

22          We got a response not from Jay Hughes, but from

23 Kirkland & Ellis, and Kirkland & Ellis said -- a gentleman by

24 the name of Christian Lane, who was in this case.  I don't know

25 if he still is or not, but he responded to Ms. Danielle

1  Chatognay (phonetic).  I apologize to Danielle, that was her

2  maiden name, but -- copying Jay Hughes.  "Dear Danielle, this

3  letter will confirm that Grace does not have any objection to

4  payment of the 56 people out of the settlement funds held by

5  Reaud, Morgan & Quinn.  Grace takes this position in reliance

6  on your representation that all 56 individuals were qualified

7  to receive payment under the terms of the applicable settlement

8  agreement."  Once again, applicable settlement agreement, 56

9  people post-petition, submissions, copying Jay Hughes.

10          This was responded to in October of 2002, once again,

11  well after the Grace bankruptcy was filed, and not just by a

12  few days.  The next correspondence is, "Dear Mr. Lane, in

13  response to your letter --

14          MS. BAER:  Your Honor -- Your Honor, I really don't

15  mean to be rude and interrupt, but none of these materials have

16  been provided to us by Mr. Esserman.  We have this rule about

17  providing materials you're going to show the day before.  We

18  haven't seen any of these.  I do not know -- and this is the

19  first time I'm seeing this.

20          THE COURT:  Mr. Esserman?

21          MR. ESSERMAN:  I had thought they were provided, but

22  they were not.  I just confirmed that with Mr. Hooker, and I

23  apologize.  I'll give you my only copy.

24          MR. DAVIS:  For the record, I haven't seen them

25  either.

1          MR. ESSERMAN:  And I apologize.  I thought they had

2  been provided, but I was just --

3          MR. HOOKER:  Well, Your Honor, they have been

4  provided, I believe, to debtor, but we didn't tell them we were

5  going to use them as slides.  I think that decision was made

6  this morning.  But I think the debtor has been provided these

7  materials.

8          MS. BAER:  Your Honor, I have not.  I mean,

9  obviously, if there are letters from Kirkland & Ellis, I'm sure

10 they're somewhere in a very large file, but this is the first

11 time I'm seeing these in the context of this case.

12         THE COURT:  All right.

13         MR. ESSERMAN:  Okay.  So, where are we?  I think you

14 can carve out the -- carve out from this case the post-petition

15 which -- that's related to the 60-day pre-petition, all the

16 numbers here, and the total amounts which are remaining to be

17 paid under the claims.  The -- if, in fact, Your Honor holds

18 that 108 is -- does not operate as we have alleged that it does

19 and the post-petition claims are post-petition claims and we

20 have to hold that open for another day and Ms. Baer has to

21 search her file on that as to whether they were submitted and

22 whether there was any kind of response and whether there was

23 any waiver issues, I understand that.  But holding those two

24 issues aside, and I'll talk about 108 in a second, we're still

25 talking about a considerable amount of money that we think Your

1  Honor can order to be paid now, and that would be the 9.7

2  million for the Alabama settlement, subject to your ruling on

3  108, five oh six, and the post-petition amount of 768,000.  For

4  the Texas amount, it'd be 1.196 million.  Actually, if the 108

5  ruling goes against us, with the post-petition it would pretty

6  much eat up what would be due under the Texas settlement, if

7  not completely, but we're still talking about a considerable

8  amount of money, regardless of the 108 and the post-petition

9  issues, which we think are due.

10          So, we're here on summary judgment.  We're here on

11  summary judgment.  We've had no amendment to the pleadings.

12  We've had no seeking of leave to amend the pleadings.  We've

13  got a five year old case, and we've got suspicions.  We've got

14  no knowledge.  We've got approvals.  We've got submission to

15  Grace and we've got approvals.  We think it's time for

16  judgment.

17          Now, let's talk a little bit about the 108 issue,

18  because Your Honor is going to have to rule on the 108 issue.

19  And this area has been briefed, and Your Honor has our briefs

20  and replies on it.  But we think 108 operates to extend to the

21  debtor an extra 60 days to consider these claims, and, as Mr.

22  Davis saw, Grace has considered these claims.  His comment that

23  there's a mass tort defense mechanism functioning is correct.

24  There is down at Boca Raton.  There are a lot of people running

25  around looking at claims, looking at these claims, and, in

1  fact, they did.

2          We think the law is clear that for a claim filed

3  within 60 days, the debtor gets 60 days.  We've cited several

4  cases which we think are applicable, but, Your Honor, we have

5  found no case, like Ms. Baer had said and agrees with me on

6  this, that there's no case that's directly -- they're all sort

7  of square peg/round holes to a certain extent, or we think that

8  they're -- they can be analyzed in a similar vein to this, just

9  like Ms. Baer does, and we've cited those case, the <u>In re</u>

10 <u>Marklus</u> (phonetic) case, where the debtor had agreed to pay a

11 certain amount of money.  If it wasn't paid by a certain date,

12 that amount was increased.  The debtor filed bankruptcy during

13 that term period.  The Bankruptcy Court said 108 applies, they

14 get an extra 60 days.  The insurance cases, frankly, are

15 consistent and basically if you don't pay your premium within

16 an extended period of 108, you've lost your rights.  Contract

17 for deed where it wasn't redeemed during a 90-day period

18 following after a foreclosure judgment, 60 days afterwards the

19 debtor lost its interest in the real estate.

20         And focusing on the claims submitted within the

21 60-day period, the debtor had 60 days to review those claims,

22 and if -- under the settlement agreement, if they were not

23 reviewed they were accepted, and we think -- looking at 60

24 days, we think that they were accepted.  We think the law is

25 that they have 60 days.  We think that 362 is trumped by 108 in

1 this section and in this case, and we've cited materials, we've

2 cited Collier's, and we've cited other cases that we think are

3 applicable that make sense, that they had 60 days under this

4 contract to review --

5         THE COURT:  Well, do you agree this is executory?

6         MR. ESSERMAN:  Well, I was just going to turn to

7 that.  I don't, and to the best of my knowledge, there's been

8 no motion to reject this contract filed.  Not only that, but

9 we've got a bond.  I'm not so sure, one, that they could reject

10 it if it was an executory contract, but we've got security for

11 this contract, and we have performed and done everything we

12 need to do under this contract.  We've made the submissions.

13 We've made the cures.  The only thing remaining is payment, and

14 that's what we're here for today.

15         THE COURT:  Yes, but the date that would be -- the

16 date for the test as to whether it would be executory is the

17 date of the filing of the bankruptcy, and as of that date, the

18 contract clearly was not fully performed.  The debtors hadn't

19 made the third payment and the post-petition submissions at

20 least had not been submitted.

21         MR. ESSERMAN:  The post-petition -- the post-petition

22 had not been submitted.  The debtor had not made full payment,

23 but we have a third party to make payment, and going back to

24 the slide, for the vast majority of the money that we're

25 talking about here, all those had been submitted and the 60-day

1  period had run and payment not made.  That is, for nearly all

2  of this money, or a substantial portion of this money,

3  especially the nine million under the Alabama, if, in fact,

4  they had 60 days and if, in fact, the post-petition submissions

5  could not occur under the agreement and if, in fact, they could

6  reject it, let's play all the cards for them, they would still

7  owe 9.7 million, less five hundred and six thousand, less

8  768,000.

9          THE COURT:  No, I think it's -- I think the 9.7 is

10  the pre-petition --

11          MR. ESSERMAN:  I made a misstatement.  I'm sorry.

12  The 9.7 is a net number, not a gross number.

13          THE COURT:  Right.

14          MR. ESSERMAN:  So, I made an error on that, and I'd

15  like the record to reflect that, that it's 9.7 --

16          THE COURT:  Plus five oh six, plus seven sixty-eight

17  on the Alabama, and --

18          MR. ESSERMAN:  And on the Texas it's 1.1, plus five

19  eighty-five, plus 783.

20          THE COURT:  Right.

21          MR. ESSERMAN:  I'm sorry.  That was an error that I

22  made in my argument and it was my fault.  So, basically, in any

23  event, what we have here regardless is a fully performed

24  contract, at least in part, giving them every benefit of the

25  doubt, would require them to pay 9.7 million in the Alabama

1  settlement and 1.196 under the Texas settlement.

2  THE COURT:  Well -- okay, they -- but I'm not sure

3  it's not executory for this reason.  On the date of filing --

4  let me just put aside everything that happened pre-petition and

5  just look at the obligations that were not yet due for the

6  post-petition periods.  There were claims -- so I just look at

7  the last box on the chart.  There were claims that were

8  submitted after April 2nd of '01, and for Alabama those total

9  the 768,000 and for Texas those total the $783,000.

10  MR. ESSERMAN:  Yes.

11  THE COURT:  Those claims were not submitted

12  post-petition, but there -- I guess there's an obligation on

13  behalf of the law firms to submit those claims because they're

14  part of the inventory for which the settlement agreement was

15  executed, and, therefore, there's an obligation on behalf of

16  the debtors to review the claims to make sure that, in fact,

17  they comply with the agreement, and, if so, if they do, to pay

18  them, and, if not, to carry out the rest of the terms of the

19  agreement to resolve the issue as to whether they should or

20  should not be paid.

21  MR. ESSERMAN:  Yes.

22  THE COURT:  That -- and then to make the payment.  So

23  that seems to me to be pretty executory.  There is substantial

24  performance due on both sides.  So, putting aside the 502 issue

25  for a moment, it seems to me that this really is an executory

1  contract, and, if it's executory, then why doesn't the debtor

2  get until the end of the case to decide whether or not to

3  assume or reject it?

4          MR. ESSERMAN:  Well, this issue was just raised in

5  the last round of papers.

6          THE COURT:  Yes.

7          MR. ESSERMAN:  And it was something that was

8  basically focused on in the last paragraph, I believe, of their

9  papers, the last page.  And regardless of whether or not they

10 can reject this contract -- and, once again, let's assume that

11 they can reject it for our argument today -- they would still

12 owe -- the only thing left to be paid for 9.7 million of

13 Alabama claimants and 1.9 million of Texas claimants, is a

14 payment.  That's the only thing left to do.  Those claims have

15 been submitted.  They've been reviewed under the contract.

16 Performance is complete.  The only thing lacking for those

17 particular claims --

18         THE COURT:  Is money.

19         MR. ESSERMAN:  -- is money.

20         THE COURT:  Is payment.  Right.

21         MR. ESSERMAN:  Is money, and --

22         THE COURT:  And so your position there is that the

23 surety bond stands for the payment, because if the debtor were

24 to reject this contract, that's a breach and that's what the

25 surety is there to do, to pay the claims.

1           MR. ESSERMAN:  Exactly.

2           THE COURT:  Okay.  So, let's assume the debtor

3 assumes the contract.  Then the debtor is not in breach.

4           MR. ESSERMAN:  Correct.

5           THE COURT:  And now what we have is a pre-petition

6 contract which is just that, a pre-petition contract that the

7 debtor has to reconcile in the plan.

8           MR. ESSERMAN:  Well, except either way money is now

9 due from the surety, because we've got a guarantor.  We've got

10 a guarantor that basically said in the contract -- under the

11 contract, Grace said if we don't pay you for whatever reason,

12 National Union will pay you.  So, whether it's accepted or

13 rejected, we should --

14           THE COURT:  Because it's a pure payment bond.

15           MR. ESSERMAN:  Yes.  We should be allowed to collect

16 those monies from National Union, and, in fact, Grace would

17 accept that contract and National Union makes payment, there

18 may be some issues as between National Union and Grace as to

19 who owes what for those payments made, but it should have

20 nothing to do with the claimants.  The claimants' role was very

21 simple.  They submit their materials.  Grace reviews them.

22 Grace pays them.  Okay?  In this case, for the vast bulk of the

23 claims, claims were submitted.  Grace reviewed them.  Grace

24 didn't pay them.

25           THE COURT:  All right.  Now, let me assume for a

1  moment that you're correct and this isn't an executory contract

2  and all it is is a claims resolution mechanism, then in that

3  case why isn't Ms. Baer's position that 502 trumps everything

4  else?  Because to the extent that the Bankruptcy Code has a

5  specific provision to deal with an area of the law such as

6  claims resolution, why wouldn't that trump everything else?

7  And 502 and the rules that implement it certainly seem to

8  suggest that the Court ought to follow the 502 claims

9  resolution procedures.

10         MR. ESSERMAN:  Well, because these particular claims

11  and the resolution of these particular claims were all -- let's

12  focus on the easy ones first, the pre-petition ones -- were all

13  done and settled pre-petition.

14         THE COURT:  Yes.

15         MR. ESSERMAN:  So, we think there is an obligation

16  for 9.7 million that Grace didn't pay and filed bankruptcy.

17  Okay?  And we've got a surety for that amount of money, and so

18  there should be nothing in bankruptcy law or a claims a process

19  that should affect that obligation as between our claimants and

20  -- our claimants' entitlement to receive that 9.7 and $1.19

21  million regardless.

22         THE COURT:  And the -- well, because you're looking

23  actually to the surety for that payment.

24         MR. ESSERMAN:  And that was contemplated in the

25  agreement with Grace.

1          THE COURT:  All right.  What about, though, the 60

2    day and the post-petition claims?  Because those haven't been

3    paid, and that's where, if there's a claim resolution

4    mechanism, I'm a little hard pressed to say that that whole

5    mechanism ought to be set aside willy-nilly.

6          MR. ESSERMAN:  Well, Your Honor, to be perfectly

7    candid with the Court, as I always try and be, those are more

8    dicey.  I concede that.  Those are a little more edgy.  And the

9    108 issue is -- is, frankly, an issue that if Your Honor

10   decides to issue a ruling on or an opinion, both of us,

11   regardless of which way you rule, are going to be able to claim

12   a distinguishment or say that you followed our cases.  So, it's

13   something that is a little more of a slippery slope, but,

14   frankly, that's the -- that's the tail of the dog here.  That's

15   the tail of the amounts owed.  I don't mean to minimize $1.2

16   million for Alabama and 1.2 or $1.3 million for Texas, but if

17   Your Honor rules that those have to be sorted out in the claims

18   process, rejection/acceptance process, the plan process, that

19   is relatively -- that's something I think the claimants can

20   deal with in the ordinary course, but their 9.7 and their 1.2

21   million, we think that there's no impediment that's been raised

22   in pleadings, no impediment in law, no impediment in fact to

23   prevent those amounts being paid by the surety now.  And it's

24   been five and a half years since this litigation has been going

25   on.  It's time to get those claims paid.

1          THE COURT:  Yes.  I'm kind of troubled by -- the

2   60-day claims, it seems to me 108 does give the debtor an

3   additional 60 days to figure out a resolution mechanism for --

4   even if this is an executory contract.  Whether or not it's an

5   executory contract, I think 108 is going to extend whatever

6   time period would have expired, if there was a time period that

7   was going to expire, so --

8          MR. ESSERMAN:  We agree with that.

9          THE COURT:  I know.  I don't really think that's an

10  issue --

11         MR. ESSERMAN:  No.

12         THE COURT:  -- that anybody has really challenged,

13  but I'm not even sure that I need to go that far because I

14  really do think that 502 is going to govern the claims

15  resolution mechanism for claims that are, I'll call it "in the

16  pipeline somehow."  They're claims that have not been fully

17  settled, resolved, adjudicated, whatever the -- finished.  My

18  grandmother, who was Lithuanian and didn't speak a lot of --

19  didn't speak English very well used to call it "finished gum

20  boots," and when I'm at a loss for words that -- gum boots were

21  her word for what the miners, coal miners, used to wear over

22  their shoes, and when they were done, they were done.  There

23  was nothing you could do to save them, and so when something

24  was really at an end, it was finished, gum boots.  Well, that's

25  what I'm trying to say here.  When there's nothing left to be

1  done to the claims, they're just finished, and as to those I'm

2  not sure that the claims resolution processes of the Bankruptcy

3  Code really apply.  But as to something that's in the pipeline

4  that the debtor has not fully resolved, it seems to me that

5  that's what the whole 502 basis in the Bankruptcy Code is all

6  about, and I really am troubled by the 60-day pre-petition

7  claims that the debtor had not had an opportunity as of the

8  date of filing to finish resolving and the post-petition

9  claims.  It seems to me that those are governed by the 502

10  process, and they are just going to have to wait.

11         As to the pre-petition claims, however, it seems to

12  me -- I've looked at what National Union submitted.  I've

13  looked at what the debtor has submitted.  I'm not seeing

14  anything that's changed my mind from what happened back in

15  2004, and I have looked at the cases that have been submitted.

16  I really think those are simply done deals.  I believe that

17  there's a surety that stands to pay those claims.  I think they

18  were finished and submitted pre-petition.  To the extent that

19  the debtor had approved the payment of those claims, I don't

20  think the debtor gets a second bite at the apple.  They were

21  done.  They should have been paid at the time, and they should

22  be paid now.  And I'm not sure I'm thrilled with that result.

23         To the extent that there is, you know, a suggestion

24  somewhere that there might be some fraud, I don't like that

25  suggestion on this record, but nonetheless a suggestion does

1  not proof make, and if the debtor at this point in time has

2  proof of fraudulent claims, the debtor should be advocating it.

3  Five and a half years really is a long time, and discovery in

4  this adversary has been going on for quite sometime.  So, by

5  now if the debtor had hard and fast evidence so as to amend the

6  complaint and make specific allegations, I would have expected

7  to have seen it.  The debtor hasn't been shy about raising

8  fraudulent allegations where the debtor has hard and fast

9  evidence in other contexts, and I don't see it here.

10         So, although there may be some suspicion and although

11  the debtor does have a fiduciary obligation to attempt to treat

12  all creditors equally, I think the debtor has exercised that

13  fiduciary obligation and there simply is smoke but not fire in

14  this instance.  If there were fire, I would have expected by

15  now that the debtor would have produced some hard and fast

16  evidence of that fire so that we would have something more to

17  talk about other than mere suspicion.  I simply don't see a

18  basis at this point for doing anything that I said back

19  whenever we had this round of arguments the last time, which I

20  don't remember when it was, but was quite sometime ago.  I

21  believe the surety stands to pay those claims, and then the

22  debtor is going to have to deal with the surety on the

23  pre-petition claims that were processed by debtor and accepted.

24  As to the ones the debtor rejected, obviously they're rejected.

25  They're not entitled to payment.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. ESSERMAN:  Right.  Your Honor, why don't we take

2    the first crack and see if we can do an order that'll be

3    acceptable to the surety and Grace, and at least attempt that

4    and, if not, we can submit competing orders.

5          MS. BAER:  Your Honor --

6          THE COURT:  Ms. Baer?

7          MS. BAER:  -- if I could address that for a moment?

8          UNIDENTIFIED ATTORNEY:  Mr. Esserman, could you leave

9    that exhibit up there, please?

10         MR. ESSERMAN:  Yes.

11         MS. BAER:  Your Honor, what was before you today was

12   not Mr. Esserman's summary judgment motion.  What was before

13   you today was the 108 issue, and you have made your ruling and

14   we understand that and we appreciate that, and that was the

15   main focus of today.  The other thing that was before Your

16   Honor was simply a status.  We were not asking to put on proof

17   today of our fraud, and we have not done so.

18         Based on what you've said today, Your Honor, we have

19   the issue of the remaining payment.  My concern here is that

20   doesn't close out the adversary.  There's a very significant

21   issue here, and that is in the event that you find that on the

22   claims we have accepted we have to pay them, you are not

23   finding extraordinary circumstances that would excuse our

24   payment, we have an issue with National Union, a very

25   significant one, and that is the subject of the initial

1  adversary proceeding that was filed here.

2         THE COURT:  Yes.

3         MS. BAER:  National Union is holding some security

4  backing this surety bond, but National Union has also informed

5  us that it is holding other Grace security on unrelated letters

6  of credit for unrelated bonds that have been posted by National

7  Union or its affiliates, and National Union has indicated that

8  if it has to pay this judgment it is going to use that money to

9  pay this judgment, and we are asking for, in our adversary, an

10 injunction enjoining them from doing so.  We believe it is

11 highly inappropriate for them to use monies for other bonds,

12 with other letters of credit, to pay this obligation.

13        THE COURT:  Well, I think at this point the only

14 letter -- the only bonds that can be tapped are the bonds -- if

15 there are collateralized bonds specifically posted for this

16 purpose, those are the bonds that can be tapped.  I don't think

17 anything else can be tapped, but I don't know -- I don't know

18 that I've seen the bonds to know whether they're generalized

19 bonds or whether they're collateralized.  I don't know that.

20        MS. BAER:  Actually, Your Honor, I think what you're

21 going to need is you're going to need evidence on this.

22        THE COURT:  Maybe I will.

23        MS. BAER:  You have not seen this evidence.  You've

24 seen some bonds at one point in time, but you have not seen

25 evidence on this, and there's a very significant legal issue as

1  to whether or not they have the right to use the other

2  security.

3         THE COURT:  Okay.

4         MR. DAVIS:  It may help to just clear up what we're

5  talking about in that regard.  National Union has identified at

6  least two sources of security for its reimbursement claim under

7  the surety bonds.  The bonds are not -- there's no confusion as

8  to which bond covers this claim.  The issue that Ms. Baer is

9  raising is which security backs that bond.  And what we hold is

10 two letters of credit, one of which Ms. Baer concedes directly

11 applies to these bonds, the other of which on its face has no

12 restriction whatsoever, and we believe that because it is an

13 unrestricted letter of credit, it can be applied to any

14 obligation of W. R. Grace.  We think that's the law.  It is

15 what is commonly referred to as a "clean letter of credit."  No

16 evidence has been presented, no argument's been made, no

17 pleadings have been filed to try and make a showing that that

18 letter of credit can't be used in precisely the manner

19 described because it is a clean letter of credit on its face,

20 no restriction.

21        That being said, I would also just note for the

22 record that we have additional security in that we owe W. R.

23 Grace up to -- I don't want -- a number vastly in excess of the

24 amounts we're discussing here.  It might be 60 million.  It

25 might be 70 million.  It might be 80 million.  But it's

1  considerably more than these numbers.  That's an insurance

2  obligation owed by -- in part by National Union, but -- and the

3  amount owed by National Union materially exceeds the amount of

4  this bond, and that obligation is an obligation directly to

5  W. R. Grace because a settlement agreement converted that

6  obligation from an insurance policy to an obligation to W. R.

7  Grace.  It's a classic setoff.  However, it's not necessarily

8  ripe chronologically because our time to pay is being stayed by

9  the bankruptcy case.

10         But, in any event, we see ourselves as fully secured

11  between the letter of credit and the policy setoff rights, and

12  I think it is in all respects premature to address the question

13  right here, right now as to what we can and can't do with that

14  security.  It certainly hasn't been presented to Your Honor.

15         THE COURT:  What's the amount of the security that

16  everyone concedes backs up this bond?

17         MR. DAVIS:  There is about -- $780,000 I think is the

18  number, but -- it's less than a million that's conceded to back

19  up these bonds, and it's a letter of credit, and there's -- it

20  -- that's not disputed.

21         THE COURT:  All right.

22         MR. DAVIS:  Its amount can be looked up, but the

23  number 780,000 is in the back of my mind, and I know that's the

24  order of magnitude.

25         THE COURT:  All right.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. DAVIS:  The other reason I stood up at this

2     moment is to point out, and I guess this is really what Mr.

3     Esserman was addressing when he was saying that perhaps the

4     parties could work out a form of judgment, is that the numbers

5     aren't crystal clear, at least not to me.  I look at the

6     spreadsheet that Mr. Esserman put up, and I look at the

7     spreadsheet that Ms. Baer has put up, and the numbers don't --

8          THE CLERK:  Speak into the microphone.

9          MS. BAER:  Your Honor, in fact --

10         MR. DAVIS:  The numbers don't match.

11         MS. BAER:  We did not get a copy of Mr. Esserman's

12    spreadsheet either, and I -- we certainly would have to

13    reconcile our numbers.

14         MR. DAVIS:  So that's just an issue that either

15    requires conversation or something more than that, and that's

16    the reason I rose at this time.  Lastly, I'm not sure this is

17    pertinent in any way, but my client is very much concerned

18    about the alteration of the bond issue, and once judgment is

19    issued, of course, we will consider what we're going to do

20    next, which may not be payment at this time.

21         THE COURT:  Alteration of the bond?

22         MR. DAVIS:  Yes, the argument we had before where we

23    pointed out that the obligation underlying the bond was, in

24    fact, altered.  Mr. Hughes testified at his deposition that he

25    accepted non-qualifying material --

1           THE COURT:  Oh.

2           MR. DAVIS:  -- for business reasons of W. R. Grace.

3  We argued to Your Honor that that relieves the surety.  Your

4  Honor didn't agree with us.  That issue is a very important

5  issue to sureties, and we have to deal with it.

6           MR. ESSERMAN:  Your Honor, let me just clear up

7  something promptly.  Ms. Baer and I will work together to

8  figure out the exact number.  If there are some discrepancies

9  between my slide and her slide, we'll get that worked out.  And

10 these slides were given at the last hearing, the previous

11 hearing, so they've been on -- in the possession of Grace for

12 three or four months.

13          THE COURT:  Okay.  Well, you know, to the extent that

14 you can come to an agreement on the numbers, and I'm confident

15 that you can, because I'm only going to sign an order to the

16 extent that you can come to an agreement on the numbers, so I

17 think you will be able to resolve them.

18          MR. ESSERMAN:  Yes.

19          THE COURT:  I think, Mr. Davis, I have a slight, but

20 not perfect, recollection of the issue with respect to the

21 alteration of the bond, the argument about the alteration --

22          MR. DAVIS:  The alteration of the underlying

23 obligation.

24          THE COURT:  Yes.  In that this was a payment bond,

25 not a performance bond, and I think that was the basis for my

1  ruling.

2          MR. DAVIS:  And we disagree with that --

3          THE COURT:  Yes, well --

4          MR. DAVIS:  -- respectfully.

5          THE COURT:  Right, that's -- and I think that was the

6  whole basis on which I made that ruling, that this appears to

7  be a payment bond, not a performance bond, and so I think

8  whatever the debtor's obligation is to pay, the surety has to

9  pay.  If it were a performance bond, I may have a different

10 construction, but I think it's a payment bond, not a

11 performance bond, so --

12         MR. DAVIS:  I understand that that's the basis of

13 Your Honor's decision.

14         THE COURT:  Okay.  All right.  Well, I'll wait, I

15 guess, to get an order from you folks.  What do you want to do

16 about the next issue, then?

17         MS. BAER:  That's what I wanted to just address, Your

18 Honor, which is that although Mr. Davis says that it's

19 premature to address what collateral he uses, it's in this

20 adversary.  I have asked for an injunction, and I am asking for

21 an injunction, enjoining him from drawing any of our security,

22 other than the one letter of credit that we agree is posted as

23 security for this obligation.

24         MR. DAVIS:  Well, that's a motion that's being made,

25 obviously, without any opportunity to -- prior notice, and I

1 would respectfully argue that first of all there's no showing

2 as to -- and a basis for that motion, number one, and number

3 two, there's -- we haven't been provided with the basis for the

4 motion, so because there's no showing and no basis, I

5 respectfully request that it be denied.

6       THE COURT:  I think it's part of the complaint.

7       MS. BAER:  It is, Your Honor.  It's -- we have an

8 adversary complaint and we have a motion for preliminary

9 injunction.

10       MR. DAVIS:  Right, but there's -- there is no showing

11 that the letter of credit is other than -- we're talking about

12 a $6 million letter of credit, which is clean on its face.

13 There is no restriction in any document that the debtor has put

14 forward that restricts its use, and if the debtor is going to

15 seek an injunction the debtor has to make a showing.

16       MS. BAER:  There's been no showing of that letter of

17 credit.  I do not know what letter of credit he is speaking of

18 and what its terms are.

19       THE COURT:  All right.  This --

20       MR. DAVIS:  I'll be happy to give you a copy.

21       THE COURT:  All right.  This is what I'm going to do.

22 With respect to the 780 whatever thousand, whatever that letter

23 of credit is, that letter of credit may be used to satisfy the

24 judgment whenever the judgment gets entered.  With respect to

25 anything else, no additional surety is to be used until we get

1 back here so that National Union can produce a copy of the

2 letter of credit to the debtor so that the debtor can see what

3 it is that National Union intends to use as the surety,

4 security, pardon me, to back up this payment.  So, Ms. Baer,

5 you can take a look at it.  If, in fact, it's a clean letter of

6 credit, I don't know what type of basis you're going to have to

7 make a showing for an injunction, but if you've got one, you're

8 going to have to do it on an expedited basis, and whatever

9 showing you've got, you'll have to make that showing.  But for

10 now I'm not going to permit it to be used because once it's

11 gone, it's gone.  So, I will, I guess, enter a preliminary

12 injunction, order Mr. Davis to produce a copy to the debtor so

13 everybody is on the same page about what document it is that

14 we're talking about, and then require the debtor, if, in fact,

15 you have some objection, to raise it promptly upon seeing what

16 this document is.  I'm sure it's going to take you awhile to

17 get this judgment negotiated back and forth anyway, so you'll

18 have some time to do this.  I don't think it's something that's

19 going to have to be done overnight, but nonetheless you've got

20 your marching orders.  So, Mr. Davis, promptly, as soon as

21 possible, get Ms. Baer a copy of --

22          MR. DAVIS:  Understood, Your Honor.

23          THE COURT:  All right.  Ms. Baer, just put this back

24 on for status conference at the next omnibus hearing and we'll

25 see where you stand.

1          MR. DAVIS:  You don't mean the next omnibus on

2 Monday?

3          MS. BAER:  You mean in August.

4          THE COURT:  The one after.  August --

5          MS. BAER:  August 29th.

6          THE COURT:  Yes, the August, and we'll see where you

7 stand with it by then.  Hopefully I'll have at least an order

8 from you folks by then.

9          MS. BAER:  Thank you, Your Honor.

10          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11          THE COURT:  Okay, thank you.

12          MR. HURFORD:  Your Honor?

13          THE COURT:  Yes.

14          MR. HURFORD:  Your Honor, I'm sorry.  It's Mark

15 Hurford again.  I hate to do this.  I know the parties would

16 like to probably head out of town, but I need to readdress the

17 issue that we first discussed earlier with regard to the

18 debtor's briefs.  While the hearing continued, I was trying to

19 figure out as much as I could regarding these three sets of

20 interrogatories, and I've been advised that we have already

21 seen the interrogatories prepared by -- let's see here -- Baron

22 & Budd, Kelley & Ferraro and Motley Rice.  So I think the only

23 issue left is whether or not we can see the debtor's

24 appendices.  I understand there's two appendices to this

25 motion, or brief --

1          THE COURT:  All right.  Ms. Baer?

2          MR. HURFORD:  -- that is, you know, going to be

3 considered at Monday's hearing, and I'd ask Your Honor to

4 direct the debtors to serve us with that brief since we only

5 have basically one business day left before the hearing.

6          MS. BAER:  Your Honor --

7          MR. HURFORD:  At this point --

8          THE COURT:  Just a minute.  Ms. Baer?

9          MS. BAER:  There are two appendices.  One is the

10 interrogatory answers themselves, which apparently Mr. Hurford

11 has.  The second appendices is the debtor's discussion of those

12 various interrogatories, and that's the -- that's the document

13 which is divided up in terms of each firm, and we only gave

14 each firm their particular portion.  Base don what was said in

15 court today, it sounds to me like Baron & Budd wouldn't have a

16 problem with us giving this to the committees, but I did not

17 hear that from Natalie -- from Ms. Ramsey, and I --

18          THE COURT:  From Ms. Kearse --

19          MS. BAER:  No, Ms. Ramsey --

20          THE COURT:  -- from Motley Rice.

21          MS. BAER:  I'm sorry, Ms. Kearse represents Motley

22 Rice.  Excuse me.  I did not hear her indicate that we could

23 provide that.  What I would suggest is that each firm could

24 certainly give it to the creditors' committee if they want to

25 --

1              THE COURT:  That's what I think I ordered.

2              MS. BAER:  -- and that's what I thought you had

3 ordered.

4              THE COURT:  I did.

5              MR. HURFORD:  Well, Your Honor, that's the issue.

6 This -- the filing apparently was made about four o'clock this

7 morning.  It's now quarter of 3:00, and we are going to have to

8 go out to these other firms and try to find the appropriate

9 people to send us these briefs ahead of a hearing that's less

10 -- at least we have one business day to do that.

11             THE COURT:  You'll get the briefs.  You just --

12             MR. HURFORD:  And we have the interrogatory responses

13 from everybody else.  The only thing we don't have are the

14 debtor's analysis of that.  So, that's -- the debtor's

15 analysis, it's not the discovery.  We have the discovery.  It

16 sounds like we don't need that one appendix, but we really need

17 the debtor's analyses so we can start to prepare for Monday's

18 hearing.

19             MS. BAER:  Your Honor, we sent out the appendix, the

20 portion of the appendix relevant to Motley Rice, Kelley &

21 Ferraro and Baron & Budd to Motley Rice, Kelley & Ferraro and

22 Baron & Budd.  They each have their section.  Three e-mails

23 would solve the problem.  Baron & Budd clearly doesn't have a

24 problem with sharing it.  What I don't know is if Motley Rice

25 has a problem, and I can't share it with the committee if

1  Motley Rice is going to claim that that's a violation of the

2  protective order.

3          MR. HURFORD:  Well, first of all, Your Honor, there's

4  been no specific allegation of how it violates the protective

5  order.  Your Honor did say in connection -- we discussed this

6  --

7          THE COURT:  Mr. Hurford, I can't address this.  I'm

8  sorry, I can't address this today.  I haven't even seen it

9  myself.  You can have Baron & Budd's.  They've agreed to send

10 it to you.  They will forward it.  Ms. Baer, call someone on

11 your staff and get them to forward Baron & Budd's to the

12 committee now.  Mr. Kearse was on the phone earlier.  I think

13 she disconnected.  She said she had to check with someone in

14 her office.  She would -- I asked her for permission to

15 disclose it.  She would not give it.  Call her and ask her if

16 you can get it, and do the same thing with the other firm.  I

17 can't solve that problem, Mr. Hurford.  I'm sorry.  I haven't

18 seen it myself.  I don't even know what you're talking about

19 yet --

20         MR. HURFORD:  Well, I --

21         THE COURT:  -- so I can't solve the problem.  Mr. Van

22 Hooker?

23         MR. HOOKER:  Your Honor, Van Hooker.

24         THE COURT:  Van --

25         MR. HOOKER:  I think when you do see the order and

1 | when counsel is able to look at it again, I think that
2 | certainly the committee, as a party to the estimation
3 | proceeding, is covered under that order, and they are going to
4 | be required to keep those interrogatories confidential, and --
5 |          THE COURT:  I think you're probably right, but I
6 | don't have the order here.  I have entered so many orders, and
7 | they change on an almost daily basis.  I simply cannot address
8 | it now.  I haven't even seen it.  I don't know what we're
9 | talking about.  If you folks can't work out something this
10 | simple, frankly, you don't belong in a courtroom.  So, go work
11 | it out.
12 |          MS. BAER:  Thank you, Your Honor.
13 |          THE COURT:  Anything else?
14 |          MR. ESSERMAN:  I'm headed to the airport.  Thank you.
15 |          THE COURT:  We're adjourned.
16 |                    *  *  *  *  *
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

C E R T I F I C A T I O N

        I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.


/s/ Denise M. O'Donnell

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.        Date:  July 25, 2007

**J&J COURT TRANSCRIBERS, INC.**