# Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JKF) |
| | Jointly Administered |
| Debtors. | [Related to Docket No. 16319] |
| | Hearing Date: August 1, 2007 |

## RESPONSE OF BARON & BUDD, P.C.
## AND OTHER CERTAIN LAW FIRMS TO
## GRACE'S REQUEST FOR DEPOSITIONS AND TO SERVE ADDITIONAL
## INTERROGATORIES

Baron & Budd, P.C. ("Baron & Budd") hereby files this response to the

request by W.R. Grace, et al. ("Grace" or "Debtors") to take the deposition of Baron

& Budd, and the law firms of Foster & Sear, L.L.P., LeBlanc & Waddell, L.L.P.,

Provost Umphrey, L.L.P., Reaud Morgan & Quinn, L.L.P., Silber Pearlman, LLP,

Weitz & Luxenberg, P.C., and Williams Kherkher, L.L.P. (f/k/a Williams Bailey,

L.L.P.) (collectively, the "Other Certain Law Firms") hereby file this response to the

request by Grace to serve additional interrogatories on the Other Certain Law

Firms[1] and would respectfully show as follows:

### I.   INTRODUCTION

Ignoring this Court's directive to meet and confer before seeking court relief

over discovery matters, Grace has filed a so-called "brief" (the "Brief/Motion"), in

---

[1]   Grace's request to take depositions and serve additional interrogatories is contained in Debtor's
Brief in Further Support of Opposition to Motions for Protective Orders to Preclude Law Firm
Depositions [attached as Exhibit "A" to Docket No. 16319].

-1-

which Grace asks the Court to grant the following relief: (i) to allow Grace to take depositions of certain law firms, and (ii) to allow Grace to serve 70-question sets of interrogatories on 16 other law firms (reserving the right to take depositions of those law firms later).

Getting back to first principles, this entire exercise was designed to obtain information for use at the estimation hearing. It was never intended as a means to obtain information for use in evaluating individual's claims. Significantly then, neither the depositions nor the interrogatories seek the discovery of any factual matter to be used in the estimation proceeding. At this point in the proceedings, *how* and *why* the claimants' lawyers responded to the W.R. Grace Asbestos Personal Injury Questionnaire (the "PI Questionnaire") in the way they did is simply not relevant to any issue in the case. No claim objections are being litigated, and none of the information sought by Grace is needed by its experts for the estimation. Grace does not contend otherwise in its Brief/Motion.

At the June 26 hearing concerning this matter, Baron & Budd and three other firms agreed to answer certain interrogatories in lieu of depositions. The Court ruled at that time that if the interrogatories were answered fully and completely, no depositions would go forward. Baron & Budd answered the interrogatories timely, fully and completely.[2] A review of Grace's artfully worded "analysis" of Baron & Budd's responses reveals that Grace's actual position is not

---

[2]   In fact, as described below, Baron & Budd even agreed to answer the entirely new set of interrogatories that were never shown to or approved by the Court, and which contained more than double the number of questions originally agreed to in and contemplated by the Court.

that Baron & Budd failed to fully answer the interrogatories, but instead that the answers purportedly raise even more questions "where further inquiries by way of focused depositions are necessary."[3] This, of course, is not really true -- except in the sense that any lawyer as talented as those employed by the Debtor could keep asking follow-up questions until either exhaustion sets in, or until Congress or the Court says, "enough is enough."

Grace appears to view discovery fights similar to how Will Rogers viewed his fellow man: Grace has never met a discovery dispute it didn't like. It is not surprising that Grace filed the Brief/Motion without a meet and confer, because Grace has no interest in ending its battles with the law firms. As described below, had Grace simply picked up the phone and called on a meet and confer, all of its newly crafted "questions" about Baron & Budd's answers to the Third Set of Interrogatories could have been answered. In any event, Baron & Budd complied with its obligation to fully answer the interrogatories and thus no deposition should be allowed. Any such deposition – of an opposing counsel in the middle of pending litigation – will yield absolutely no factual evidence useable Grace's in estimation of its asbestos liabilities and will almost certainly lead to even more collateral discovery litigation from Grace.

## II.   BACKGROUND

A short look back at the history of Grace's discovery behavior in this case reveals a classic example of the idiom, "give someone an inch and they will take a

---

[3]   Grace's Brief/Motion, p. 2 [Docket No. 16319].

mile." The Court must not lose sight of the fact that this current dispute over interrogatories and law firm depositions started as a request by Grace for a privilege log of B-reads withheld under the consulting expert privilege. Over the last several months, however, Grace has step-by-step expanded that simple inquiry into a full-blown fishing expedition by serving more and more overreaching and irrelevant discovery on the law firms, notwithstanding the Court's ruling almost two years ago that general law firm discovery would not be allowed.[4]

A.      The First Set Of Interrogatories Was Approved By The Court.

On February 21, 2007, Grace for the first time requested a privilege log from certain law firms who were withholding privileged consulting expert B-reads.[5] Before the Court could rule on such request, Grace abandoned it and announced that it would serve interrogatories seeking the same information.[6]

Before the interrogatories were served, Grace expanded the scope of the information sought in the interrogatories by adding one additional question – Question 6 – which sought information on how the law firms responded to the PI

---

[4]     Hr'g Tr. 81-82, October 24, 2005 (Docket No. 10949).

[5]     The request was first made in a form letter from Barbara Mack Harding to claimants' firms. About a month later, Grace sought the compulsion of such a log. *See* Motion to Compel Compliance with Supplemental Order Regarding Motions to Compel Claimants to Respond to the W.R. Grace & Co. Asbestos Personal Injury Questionnaire (Docket No. 14929). A privilege log was not required under terms of the PI Questionnaire, no reference to a privilege log is made in the questionnaire, instructions, or accompanying CMO, and Grace made no request prior to Ms. Harding's letter.

[6]     Hr'g Tr. 68-69, April 13, 2007 (Docket No. 15270).

Questionnaire. This was opposed by the law firms on various grounds.[7] The Court approved the interrogatories for service, but specifically did not approve Question 6.[8, 9] Grace announced to the Court and the parties that it might serve Question 6 anyway. [10]

B.    Grace Serves The Second Set of Interrogatories Without Court Approval.

Grace served the First Set of Interrogatories (which had been approved by the Court) on May 15, 2005. Then without Court approval, Grace served the Second Set of Interrogatories on May 19, 2007.[11] Instead of simply serving Question 6, however, Grace again expanded its inquiry to 9 questions (4 questions plus 5 subparts). These questions were, to a one, invasive of the attorney work product and attorney-client privileges, so the law firms properly asserted such objections in their responses.

C.    Grace Serves Deposition Notices On 21 Law Firms.

Before receiving responses to either the First or Second Set of Interrogatories, Grace served deposition notices (but not Rule 45 subpoenas) on 21

---

[7]    Hr'g Tr. 188, May 9, 2007 (Docket No. 15786). .

[8]    Hr'g Tr. 195, May 9, 2007 (Docket No. 15786).

[9]    Apparently Grace sought court approval to serve the interrogatories mindful of the fact that interrogatories cannot be served on non-parties such as the law firms. Fed. R. Civ. P. 33(a).

[10]   Hr'g Tr. 202-203, May 9, 2007 (Docket No. 15786).

[11]   A copy of the Second Set of Interrogatories is attached hereto as Exhibit "A". *See*, variously, Docket Nos. 15704, 15706, 15708, 15710, 15712, 15714, 15716, 15718, 15720, 15722, 15724, 15725, 15726, 15727, 15728, 15729, 15731, 15733, 15736, 15737, 15742, 15743, 15745, 15747,and 15749.

law firms. [12]  The notices requested that the law firms produce the attorney from

the firms "most knowledgeable concerning the activities undertaken by the firm to

respond to the [PI Questionnaire] ..."[13]  Before filing a motion for protective order,

the law firms requested a meet and confer with Grace's counsel.  It was learned

then that Grace intended to explore at the depositions the same subject areas as to

which it had inquired in the Second Set of Interrogatories (which had not yet been

answered at that time).  Grace also stated that it would not entertain any other

method of obtaining such information other than through oral depositions.

Accordingly, because such subject areas are clearly privileged the law firms had no

choice but to file motions for protective orders. [14]

D.      Grace Withdraws The Deposition Notices To All But 6, Then 4, Law Firms.

        Before the hearing on the firms' motions for protective orders, Grace

withdrew all of its deposition notices except as to 6 firms.  When questioned at the

hearing, Grace's counsel confirmed that the notices had been "formally withdrawn"

and that Grace was no longer "pursuing" them.[15]  At this time Grace had received

the firms' privilege objections to the Second Set of Interrogatories.

---

[12]   *See*, variously, Docket Nos. 15703, 15705, 15707, 15709, 15711, 15713, 15715, 15717, 15719, 15721, 15723, 15730, 15732, 15734, 15735, 15738, 15740, 15741, 15744, 15746, 15748.

[13]   *Id.* at 1.

[14]   *See* Memorandum in Support of Motley Rice LLC's Motion for Protective Order (Docket No. 15950), Motion of the Official Committee of Asbestos Personal Injury Claimants and David T. Austern, Legal Representative for Future Asbestos Claimants for Protective Order (Docket No. 15955), Motion of Certain Law Firms to Quash Deposition Notices and for a Protective Order (Docket No. 15966), Motion of the MMWR Cancer Firms for a Protective Order with Respect to Notices of Deposition Served on Them by W.R. Grace (Docket No. 15987), and Memorandum in Support of Cooney and Conway's Motion for Protective Order (Docket No. 15850).

[15]   Hr'g Tr. 67-68, June 26, 2007 (Docket No. 16208).

At the hearing on the motions for protective orders, Grace further withdrew two more deposition notices, reducing the number of depositions sought to 4 firms.[16]

E.     The Court Rules That Interrogatories Should Be Served In Lieu of Depositions.

At the hearing on the law firms' motions for protective orders, the four remaining firms offered to answer limited interrogatories in lieu of depositions.[17] Such offer was made on the condition that the Court enter an order requiring the answers remain confidential and not constitute a waiver of any privilege.[18]  The Court ruled that interrogatories would be allowed in lieu of depositions and instructed the parties to agree upon the actual interrogatories to be served.[19] During a break in the hearing, counsel for the law firms drafted a set of interrogatories that followed the Second Set of Interrogatories.  Grace requested an opportunity to review them and the Court went into recess to allow Grace to review what was proposed.

After the hearing resumed, Grace presented to the Court a completely re-drafted, handwritten set of interrogatories.  Instead of the four questions propounded in the Second Set of Interrogatories, Grace had expanded the interrogatories to 24 questions (10 questions with 24 subparts).  Attached hereto as Exhibit "B" is a copy of the handwritten interrogatories presented to the Court.

---

[16]   *Id.*

[17]   *Id.* at 21.

[18]   *Id.* at 56.

[19]   *Id.* at 83-84.

-7-

(For the Court's reference, attached as Exhibit "C" are the same interrogatories in typewritten form.) The Court then again went into recess to allow the Court and the law firms to review Grace's draft of the interrogatories.

After Court resumed, the four law firms announced that, although Grace had greatly expanded the number and complexity of the interrogatories originally proposed, in a good faith effort to move forward on this issue, the firms would nevertheless answer the interrogatories in lieu of depositions.[20] The Court instructed Grace to have those handwritten questions typed and served on the four law firms by 2:00 p.m. the next day.[21] The Court also ruled that, if the interrogatories were answered fully and completely, the depositions would not go forward.[22]

F.    Grace Pulls A "Bait and Switch" With The Third Set Of Interrogatories.

Instead of simply typing the handwritten interrogatories that Grace had submitted to the Court and cleaning up the typos and obvious errors, and to which the four law firms had agreed to respond, Grace pulled a "bait and switch" at the last moment. The Third Set of Interrogatories that Grace actually served on the law firms bore little resemblance to what had been presented to the Court the previous day. Instead, Grace once again greatly expanded the scope and number of the interrogatories. While the interrogatories that were presented to the Court contained 10 questions, with 24 subparts, the interrogatories actually served by

---

[20]    *Id.* at 107.

[21]    *Id.* at 114.

Grace included a total of 71 questions (including subparts). The breadth and complexity of the questions was increased as well, delving much deeper into substantive areas protected by the work product and attorney-client privileges.

G.      Baron and Budd Fully Answer the Third Set of Interrogatories.

Rather than simply call out Grace on its bad faith ploy and return to Court for an additional hearing, and although the interrogatories served by Grace were nothing at all like what was presented to the Court the day before and agreed to by Baron & Budd and the other three firms, Baron & Budd elected to engage in unilateral good faith and answer the Third Set of Interrogatories in order to put the matter to an end. Fully cognizant of the Court's statement that depositions would not be allowed if the interrogatories were fully answered, Baron & Budd answered the interrogatories and timely served its responses on July 13, 2007.

H.      Without A Meet And Confer, Grace Files the Instant Brief/Motion Seeking Depositions And Another Round Of 71-Question Interrogatories.

Because Baron & Budd's answers were full and complete, this matter should have been at an end at that point. However, a few days later Baron & Budd's counsel noticed in the Agenda filed for the July 23 Omnibus Hearing that Grace had, with no prior notice, set the matter for another hearing. Grace had not contacted Baron & Budd's counsel to discuss the interrogatory responses, nor to inform counsel that Grace intended to seek affirmative relief at the hearing.

---

[22]    *Id.* at 83-84.

## II.    DISCUSSION

A.    Grace Ignores Local Rule 9006-1(b) And This Court's Directive to "Meet and Confer" Before Bringing Discovery Disputes To The Court.

As explained above, Grace disregarded its obligation to meet and confer before seeking the relief under its current Brief/Motion.  Grace may contend that it had no obligation to meet and confer because this is just a continuation of a prior hearing.  However, the prior hearing had been concluded with a definite ruling, where the Court held that there would be no depositions unless the interrogatories were not answered.[23]  After Baron & Budd served its answers to the interrogatories, there was nothing left to do *unless* Grace decided it wanted to compel Baron & Budd's depositions due to incomplete interrogatory answers.  That is what Grace is doing in the Brief/Motion. [24]

This kind of gamesmanship is indicative of Grace's goal of creating as many collateral discovery disputes as possible to hopefully create prejudice in the Court's eye toward the asbestos claimants.  If Grace had raised its new "questions" about Baron & Budd's answers in a meet and confer conference, Grace's questions could have been answered (see discussion in Section II.C below) and this hearing avoided.

---

[23]    Hr'g Tr. 83-84, June 26, 2007 (Docket No. 16208). .

[24]    The Brief/Motion unquestionably seeks affirmative discovery relief from this Court.  It asks the Court (i) to compel Baron & Budd and two other firms to give their depositions, and (ii) to authorize sending interrogatories to the 16 firms as to which Grace had previously withdrawn its request for depositions.  See Brief/Motion, p. 8 ("Grace requests that [the] Court order the following law firms produce an attorney to appear for depositions ... within 21 days:  Motley Rice, Kelly & Ferraro and Baron & Budd."), and p. 12 ("Grace respectfully requests that the Court direct the remaining law firms to promptly respond to the Third Set of Interrogatories.")

The reality is, however, Grace wants these depositions regardless of the answers given to the Third Set of Interrogatories.

Local Rule 9006-1(b) of the Delaware Bankruptcy Court requires a party seeking discovery relief to file a statement certifying that the attorney "has made a reasonable effort to reach agreement with the opposing attorneys on the matters set forth in the motion." Del. Bankr. L.R. 9006-1(b). Grace did not file any such certificate, because no such effort was made after receipt of Baron & Budd's answers and before filing the Brief/Motion. This Court has also reminded the parties on numerous occasions that it expects this rule to be followed.

Due to Grace's blatant disregard of the Court's directive and the local rules, the Court should deny the relief sought in the Brief/Motion with prejudice. The Court will otherwise continue to be burdened with unnecessary and irrelevant discovery fights, wasting the resources of the Court and the parties and further delaying this estimation proceeding beyond the numerous delays already suffered.

B.    Baron & Budd Fully Answered The Third Set Of Interrogatories.

The only issue under consideration by the Court is whether Baron & Budd fully answered the Third Set of Interrogatories. The fact that Grace may have more questions, or that Grace may not like the answers that were given, does not change the Court's prior ruling. Baron & Budd offered to answer interrogatories in lieu of, not as a precursor to, sitting for a deposition. The Court ruled that depositions would go forward only if the interrogatories were not answered fully and completely.

-11-

A review of Baron & Budd's answers to the interrogatories reveal that they were all answered and were answered fully. Many of the interrogatories asked for a yes or no answer as to steps taken by the firm in responding to the PI Questionnaire. Baron & Budd answered the questions with a yes or no answer wherever appropriate. In other places, Baron & Budd answered the questions with very detailed explanations as to what it did (and why it did it) in answering the PI Questionnaire. The answers reveal attorney work product and disclose privileged information that Grace would never be entitled to obtain in normal litigation. Baron & Budd agreed to provide such confidential information in reliance on the Court's ruling that if the information was provided the depositions would not be allowed (and that the information would be strictly protected by the Court's order).

It is presumed that Grace's counsel carefully and precisely developed the questions to obtain the information it wanted, <u>knowing it would not be able to take a deposition if the questions were answered</u>. Indeed, <u>if</u> there is a possibly benign explanation for why Grace transformed a 24 question set at the June 26 hearing into the 71 question set served the next day – that is it, Grace knew then and knows now that it was there one and only shot. At some point discovery must stop and harassment must end.

C.    <u>The Answers To The Interrogatories Are Not Inconsistent And Do Not Raise More Questions.</u>

Notwithstanding the fact the Baron & Budd fully answered the interrogatories, Grace contends that the answers raise even more questions. The fact that Grace has come up with more questions, however, does not change the fact

that the questions which Grace asked in the interrogatories were answered. Grace does not contend that the questions were not answered, but instead asserts that the answers raise "inconsistencies" and "conflicts" such that "further inquiries by way of focused depositions are necessary.[25]

# REDACTED

---

[25] Grace's Brief/Motion, p. 7, p. 2 [Docket No. 16319].

REDACTED

REDACTED

# REDACTED

Although it has been stated numerous times, the Court again must not overlook that this is an estimation proceeding. It is not individual claims allowance or determination. When answering thousands of personal injury questionnaires, and assembling evidence for thousands of claimants at once, and assembling thousands of pages of data, there are going to be a few inconsistencies. It is undisputed that these claimants' cases are not "trial ready." Indeed, the Court acknowledged that the claims "are not worked up for trial."[26] Nothing that Grace has referenced in its Brief/Motion could possibly have any material effect on the estimation proceeding. The deposition of Baron & Budd would be nothing more or less than continuing harassment. Baron & Budd answered the Third Set of Interrogatories as fully and completely as possible. A deposition is not going to get Grace any more information than it already has or answer any more questions than have already been answered.

---

[26] Hr'g Transcript, June 26, 2007, at 75 [Docket No. 16208].

D.    Depositions Will Inevitably Lead To Even More Questions (In Grace's Mind)
      And More Discovery Disputes.

Baron & Budd agreed to disclose privileged and confidential information in

response to the Third Set of Interrogatories only in lieu of a deposition and only on

the condition that the Court order that disclosure is not a waiver of any privilege.

Baron & Budd has not, and will not, make any such offer with regard to a

deposition and will thus be fully entitled to assert any and all objections to

questions that intrude upon privileged matters.  It takes little effort to foresee the

objections that will be properly lodged to the various questions posed to an opposing

counsel about how and why that counsel prepares his case.  The deposition will

likely be an exercise in futility, as it will bear little fruit beyond what was disclosed

in the interrogatory answers.  It will, however, provide Grace yet another

opportunity to return to Court complaining about discovery matters.

Baron & Budd thoroughly briefed the issue of attorney depositions and why

the subject areas that Grace proposes to investigate are violative of privilege in the

Motion of Certain Law Firms to Quash Deposition Notices and for a Protective

Order (the "Motion to Quash"), and that argument will not be repeated here.  The

Court should not overlook, however, the extensive case law authority cited in the

Motion to Quash, including authority directly on point from the Third Circuit,

which holds that the internal processes by which a law firm responds to discovery

requests are protected by the work product privilege.  *See, e.g., Sporck v. Peil,* 759

F.2d 312, 315 (3rd Cir. 1985) ("We believe that the selection and compilation of

documents by counsel in this case in preparation for pretrial discovery falls within

the highly-protected category of opinion work product."); *Uinta Oil Refining Co. v. Continental Oil Co.,* 226 F. Supp. 495, 506 (D. Utah 1964) (inquiry into an attorney's "pattern of investigation and exploration" is "a direct violation of the principles announced in *Hickman* [*v. Taylor*]"); *Commonwealth of Massachusetts v. First National Supermarkets, Inc.,* 112 F.R.D. 149, 152-53 (D. Mass. 1986) ("[There is a] distinction between asking the identity of persons with knowledge, which is clearly permissible, and asking the identity of persons contacted and/or interviewed ..., which is not [and which] is protected against discovery from an adverse party."); *Besley-Welles Corp. v. Balax,* 43 F.R.D. 368, 371 (E.D. Wisc. 1968) (asking for a statement detailing the efforts made to locate witnesses "goes to the attorney's preparation of his case for trial and therefore comes under the rule of *Hickman v. Taylor*"); *Board of Education v. Admiral Heating,* 104 F.R.D. 23, 32 (N.D. Ill. 1984) (to make such inquiries "is to give [the opposing party] no more knowledge of substantive relevant facts, but rather to afford them the potential for significant insights into the [ ] lawyers' preparation of their case (and thus their mental processes).") [27]

---

[27]    The inherent dangers in allowing the depositions of opposing counsel are well-recognized by the courts. It has been noted that such a deposition "provides a unique opportunity for harassment; it disrupts the opposing attorney's preparation for trial, and could ultimately lead to disqualification of opposing counsel if the attorney is called as a trial witness." *Prevue Pet Prods., Inc. v. Avian Adventures, Inc.,* 200 F.R.D. 413, 418 (N.D. Ill. 2001) (quoting *Marco Island Partners v. Oak Dev. Corp.,* 117 F.R.D. 418, 420 (N.D. Ill. 1987)). In addition, courts have expressed the concern that depositions of opposing counsel could lead to collateral litigation over peripheral issues, such as privilege, immunity, and harassment claims, and place additional burdens on both the court and the parties. *Kaiser v. Mutual Life Ins. Co. of New York,* 161 F.R.D. 378, 381 (S.D. Ind. 1994). Such concerns have certainly come true in this case, where the Court is being required to become involved in more and more fights over less and less relevant issues.

Depositions of the lawyers in this case will inevitably raise (in Grace's mind) more questions that Grace will declare need further investigation. The depositions will provide Grace with no substantive information for its experts to use in the estimation, but will provide Grace with yet another platform to seek additional discovery and delay. This could go on forever. This Court should not for one minute believe that depositions will help, rather than hinder, the ultimate resolution of this case. At some point, Grace's insatiable appetite for discovery fights must come to an end.

E.    The Court Should Not Allow Additional 70-Question Interrogatory Sets To Be Served On The Other Certain Law Firms.

Grace characterizes the extraordinary discovery consented to by four firms as "the template created by the Court" for dealing with discovery directed to the wider group of law firms. Grace Brief/Motion at 2. It is, of course, nothing of the sort,[28] but upon this distortion of the facts, Grace seeks to build a further round of invasive, unwarranted and overreaching discovery addressed to its law firm adversaries. This Court should recognize the Third Set of Interrogatories for it is – a double concession by the four law firms to avoid the burden and futility of depositions inevitably intruding upon privileged matters. The first concession being the answering of interrogatories in lieu of depositions at which perfectly legitimate

---

[28]    Grace quotes, selectively, from the June 26 Transcript and references this Court's statement that "whatever these rulings are unless there is a significantly different issue that pops up at some point in the future, these rulings will undoubtedly be the same unless somebody can show me why they should not apply to other circumstances." June 26 Transcript at 70. Grace neglects to note that this statement occurred during an exchange on a very specific, identified request for further discovery targeted at the Early Ludwick firm, and does not, taken in context, reflect a general statement of principle. Certainly, the entire notion of a "template" is undercut by a straightforward examination of the record.

privilege and work product objections could have and would have been asserted. The second concession was, of course, agreeing to allow Grace to expand its two dozen questions proffered in Court to the 70 questions the set morphed into by the next day. This Court should decline Grace's invitation to extend, by force, a consensual discovery mechanism to 16 more law firms without a shred of evidence that further discovery from these firms is either warranted or necessary.

As a preliminary matter, Grace has ignored the procedural protections due to the law firms it now seeks to serve with the Third Set of Interrogatories. In this Court's Modified Second Newly Amended Case Management Order for the Estimation of Asbestos Personal Injury Liabilities (Docket No. 16260) (the "Estimation CMO"), parties seeking to have a matter heard on an expedited basis are required to file a motion to which responses must be filed within 14 days of the motion and replies within 7 days of the response, after which time a hearing will be scheduled. Here, Grace filed the Brief/Motion on July 19, seeking entirely new relief against the Other Certain Law Firms at a hearing two business days thereafter. Even with the hearing continued, over Grace's strenuous objection, until Wednesday, August 1, and responses to the Brief/Motion due on Friday, July 27th, the firms have had only half the time allotted to respond to even expedited motions. Of course, as referenced above, Grace stands in flagrant disregard of this Court's requirement that parties meet and confer before seeking relief on discovery matters, and did not contact the counsel for the firms to discuss any such matters prior to

filing the Brief/Motion.  Law firms in respect of which discovery has been sought

have had neither the requisite notice nor the time to respond to the relief sought by

Grace.

Grace's disregard for this Court's announced practices and the Rules of Civil

Procedure is further illustrated by a chief justification posited for the issuance of

the Third Set of Interrogatories – that firms objected to the Second Set of

Interrogatories rather than providing "substantive responses."  Brief/Motion at 12.[29]

If Grace believes that the Other Certain Law Firms should have answered, rather

than objecting to, the Second Set of Interrogatories, it has a ready procedural

remedy – the filing of a motion to compel (after, of course, seeking a meet and confer

with the firms).  To argue that this Court should approve the service of the Third

Set of Interrogatories because Grace did not like the responses received to the

Second Set is puzzling and, frankly, unpersuasive.

Grace adds little by way of further justification for expanding the reach of the

Third Set of Interrogatories to 16 more law firms.  It does, rather fleetingly,

insinuate that "other law firms have engaged in similar discovery violations" and

offers, by way of support, two examples.  Brief/Motion at 13.  At least one of these is

fundamentally flawed and is yet another example of what can be accomplished with

a meet and confer.  Grace alleges that LeBlanc & Waddell's questionnaire

submissions "reflect flagrant and continuing violations of the Attachment Order" in

---

[29]  If Grace serves objectionable discovery, they are likely to receive objections by way of response.
The responses to the Second Set of Interrogatories are, undoubtedly, as substantive as Grace is
entitled to and are, in any event, perfectly proper under the Federal Rules.

that "the law firm's submissions often directed Grace to a purportedly attached "Claimant's Affidavit," but ... Grace has been unable to locate any such affidavit." Brief/Motion at 13. This accusation came as a great surprise to LeBlanc & Waddell. In its original questionnaire submissions, LeBlanc & Waddell had mistakenly sent unexecuted affidavits, along with an attorney-client cover letter. In June, when LeBlanc & Waddell realized this error it informed Grace and resent the submissions, after removing the unexecuted affidavits and the attorney-client cover letter and asked Grace to return the original submissions due to the inadvertent disclosure of attorney-client privileged documents. LeBlanc & Waddell, however, inadvertently failed to add the executed affidavits with those re-submissions. Grace, for its part, failed to return the original submissions to LeBlanc & Waddell.

After Grace's accusation of a "flagrant and continuing violation" in the Brief, LeBlanc & Waddell immediately investigated and discovered what had transpired, and has now sent Grace a copy of the executed Claimant Affidavits. See Letter of Jena LeBlanc Duncan dated July 26 attached hereto as Exhibit "D". Grace, therefore, has played fast and loose with the facts before this Court – at the time of filing the Brief/Motion it had, in its possession, copies of each Claimant Affidavit, albeit unexecuted ones. Grace's misstatement also highlights the consequences of its failure to act in accordance with Local Rule 9006-1(b) and seek to meet and confer with opposing counsel before seeking relief from this Court. As soon as it became aware of the omission, LeBlanc & Waddell rectified it. Had Grace complied

with the rules of procedure and raised the issue before filing their Brief/Motion, LeBlanc & Waddell would have, similarly, provided the executed affidavits.

Fourteen of the sixteen law firms that Grace now wants to serve with the Third Set are the same firms as to which Grace formally withdrew its deposition notices at the last hearing and announced that it was no longer pursuing. [30] Grace's only basis for its reversal of position is that it has "continued its review" of the discovery responses of such firms.[31] Grace offers no further justification for the extreme relief of this Court's approving the service of a 71-question set of interrogatories upon non-party witnesses. For 14 of the 16 firms, Grace offers no particularized reason for seeking any further discovery. Grace rests upon what is little more than a naked request for an extreme remedy based upon a unique, consensual resolution to the disputed deposition notices for four firms, unsubstantiated suggestion of "discovery violations" and the perfectly proper service of objections to a patently objectionable Second Set of Interrogatories. As it was for Baron & Budd, Kelley & Ferraro, and Motley Rice, this is clearly the thin end of the wedge. Grace wants to depose anything that moves in this case, and seeks this Court's assistance in this quest through the approval of foisting its bloated Third Set of Interrogatories upon another 16 law firms. This Court should decline to permit this farce to proceed any further and summarily deny the relief Grace seeks.

---

[30]    Hr'g Transcript, June 26, 2007, at 67-68 (MR BERNICK: "Yes, we have formally withdrawn the request for all but the six, not to say that we won't make a request in the future but we are not pursuing that and with respect to the six, we have taken two off.... We're only pursuing the four.")

[31]    Grace's Brief/Motion, p. 1 [Docket No. 16319].

III.    CONCLUSION

Baron & Budd fully and completely answered the Third Set of

Interrogatories.  Pursuant to the ruling of the Court, therefore, a deposition should

not be allowed.  Any so-called "questions" that Grace had with the answers to the

interrogatories most likely could have been resolved in a meet and confer session,

but we will never know because Grace played its cards right up against its chest

until it filed the Brief/Motion.  The information that Grace seeks is not for the

purposes of estimation, but simply for harassment.  A deposition will not lead to the

discovery of any evidence and will in all likelihood only create more discovery

disputes.  Moreover, there is absolutely no basis to serve the other 16 firms a new

set of 71-question interrogatories, which are designed solely to continue this fight

all over again.

WHEREFORE, the Baron & Budd and the Other Certain Law Firms pray

that the Court deny the relief sought by Grace in the Brief/Motion, and for such

other and further relief to which they may be entitled.


Dated: July 26, 2007                          /s/ Daniel K. Hogan
                                              Daniel K. Hogan (ID no. 2814)
                                              THE HOGAN FIRM
                                              1311 Delaware Avenue
                                              Wilmington, Delaware 19806
                                              Telephone:  (302) 656-7540
                                              Facsimile:  (302) 656-7599
                                              E-mail:  dkhogan@dkhogan.com

                                              Sander L. Esserman
                                              Van J. Hooker
                                              David A. Klingler
                                              David J. Parsons

STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

COUNSEL FOR BARON & BUDD,
P.C. AND THE OTHER CERTAIN
LAW FIRMS

# EXHIBIT "A"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
                                          )
                                          )    Case no. 01-01139 (JFK)
W.R. GRACE & CO., *et al.*,[1]             )    Jointly Administered
                                          )
                    Debtors               )
                                          )

### DEBTORS' SECOND SET OF INTERROGATORIES TO CERTAIN ASBESTOS
### PERSONAL INJURY PRE-PETITION LITIGATION CLAIMANTS' LAW FIRMS

W. R. Grace & Co. ("Grace") serves this second set of interrogatories pursuant to Federal

Rules of Civil Procedure 26 and 33, Federal Rules of Bankruptcy Procedure 7026 and 7033, The

interrogatories must be answered in writing to counsel for Grace within 30 days.

### DEFINITIONS

1.      The "Action" shall mean the Chapter 11 cases styled *In re W.R. Grace & Co., et

al.,* Case No. 01-1139 (JFK) currently pending in the United States Bankruptcy Court, District of

Delaware including, without limitation, the pending estimation proceeding.

2.      "Grace" shall mean and include any of the following entities, either individually

or collectively:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-

---

1    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn, A-1
     Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.),
     CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc.,
     Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace
     Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN
     Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical
     Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace
     Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn
     International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon
     Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal,
     Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
     Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management,
     Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA
     Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc.
     (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass,
     Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal
     Company, H-G Coal Company.

Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

2

3.    "Asbestos PI Pre-Petition Litigation Claim" shall mean and include any asbestos personal injury claim against Grace for which litigation was commenced prior to April 2, 2001 and for which no enforceable judgment or settlement was rendered or reached before April 2, 2001.

4.    "Claimant" shall mean and include any and all Persons who hold or purport to hold an Asbestos PI Pre-Petition Litigation Claim against the Debtors and any agents, attorneys, consultants, representatives and other persons acting or purporting to act for, on behalf of, in conjunction with, or who are subject to the direction and control of, any of them, at any time.

5.    "Medical Services" shall mean and include any and all tests or examinations which are used in the diagnosis of pulmonary disease including Asbestos-Related Disease, Silica-Related Disease or any other form of pneumoconiosis, as well as the interpretation of such tests or examinations.  Such tests or examinations include, but are not limited to, "B-reading," chest x-ray reading or interpretation, performing, administering or interpreting PFTs, performing or administering a physical examination, diagnosing, or otherwise evaluating a Claimant.

6.    "B-reader" shall mean and include, without limitation, a Doctor of Medicine or Doctor of Osteopathy who is or who has been certified by the National Institute of Occupational Safety & Health ("NIOSH") to interpret a chest radiograph using the classification system devised by the International Labor Organization ("ILO") or any other person who purports to perform or interpret B-reads.

7.    "B-read" shall mean and include, without limitation, for purposes of these interrogatories, any document or report that provides the results of an interpretation of a chest radiograph using the classification devised by the ILO whether in narrative form or in the form prescribed by the ILO for the recordation of interpretations performed in accordance with its

3

classification system.

8.    "Asbestos-Related Disease" shall mean any bodily injury, sickness, disease or impairment alleged to have been caused by exposure to asbestos or asbestos-containing products.

9.    "Claimant's possession custody or control" shall mean and include, without limitation, documents or things in the Claimant's personal possession, the possession of any doctor who has provided Medical Services to the Claimant at any time (whether in person or through a review of the Claimant's records), and/or in the possession of any law firm retained by the Claimant or purporting to act on behalf of the Claimant to provide legal services related to asbestos- or silica-related personal injury litigation during the period 1990-2007.

10.    "Document" is defined as broadly as permitted under Rule 34 of the Federal Rules of Civil Procedure, and includes all materials and things, in whatever form recorded or maintained, subject to production under that Rule.

11.    The word "and" includes "or" and "or" includes "and." The word "any" is also used in the inclusive sense, such that "any" means "any and/or all."

12.    "You" and "Your" refers to the law firm of **Reaud, Morgan & Quinn** as well as any employee, representative, predecessor, agent, or attorney of any of the aforesaid, including all persons acting or purporting to act for, on behalf of, in conjunction with, or who are subject to the direction and control of, any of them.

13.    "Consulting Expert" means  an expert who was retained or specially employed in anticipation of litigation or preparation of trail and who is not expected to testify at trial, as defined in the Order entered by the Court on December 22, 2006 (Docket No. 14150).

## INSTRUCTIONS

1.    Each request set forth herein refers to all documents, information and property in

your custody, control, and possession, as well as documents and property in the Claimants' possession, custody and control.

2.    These requests are continuing to the full extent required and/or permitted under the Federal Rules of Civil Procedure, so as to require supplementary production when you obtain knowledge of, access to, or possession, custody, or control of any documents or information not previously produced which are responsive to one or more of these requests.

## INTERROGATORIES

### INTERROGATORY NO. 1:

In responding to the W. R. Grace Asbestos Personal Injury Questionnaire (the "Questionnaire") what steps, if any, did you take on behalf of the Claimants for whom you filed responses to the Questionnaire to find any and all responsive documents or information in the possession or control of the following:

(a)    other law firms that have represented the Claimants;

(b)    all doctors that have seen, examined, tested or provided other Medical Services with respect to the medical conditions or Asbestos Related Disease claimed by the Claimants.

### RESPONSE TO INTERROGATORY NO.1

### INTERROGATORY NO. 2

Submit any documents reflecting the activities described in your response to Interrogatory No. 1 above for each Claimants.

### RESPONSE TO INTERROGATORY NO. 2

### INTERROGATORY NO. 3

To comply with the requirements of the Order Concerning Debtors' Motion to Compel Asbestos Personal Injury claimants to Respond to the W. R. Grace Asbestos Personal Injury Questionnaire, dated October 12, 2006 (Docket No. 13393), did you, in fact, verify if a response was made by way of an attachment, the following:

(a) the attachment had "the answer to the question;"

(b) the answer was "in a recognizable, legible format that [was] either numbered (whether by Bates number or some other appropriate numbering system or method) or otherwise identified (such as behind an exhibit tab);" and

(c) the response "reference[d] clearly the specific pages(s) of the attachment so that the Debtors understand which page(s) of the attachment provides th[e] answer to a specific Question in the Questionnaire."

## RESPONSE TO INTERROGATORY NO. 3

## INTERROGATORY NO. 4

In asserting the consulting expert privilege with respect to any documents withheld on that basis, describe what steps, if any, were taken to identify and obtain the first B-Read performed for each Claimant for whom you filed a response to the Questionnaire.

## RESPONSE TO INTERROGATORY NO. 4

Dated: May 18, 2007

Respectfully submitted,

_Janet S. Baer_

KIRKLAND & ELLIS LLP
David M. Bernick
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601-6636
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Barbara M. Harding
David E. Mendelson
Amanda Basta
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

6

*and*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

7

# EXHIBIT "B"

1. Pursuant to the Dec 20, 2006 Order, have you determined the date on which a B-read was first performed for each claimant as to whom a consultant privilege has been the assoc...
    (a) What steps did you use to determine the date of the first B-read.
    (b) Has the first B-read been produced to Grace.


2. How did you determine for each claimant the date on which B-readers were retained specifically for that claimant.
    (a) What steps did you take to determine that date the B-reader was retained.
    (b) Were any documents gathered that reflect the date of retention.
    (c) How did you determine when a doctor was retained as to any individual claimant.


3. How did you determine the date on which each claimant was retained by your firm?
    (a) What steps did you take to determine the date the claimant retained your firm.
    (b) Did you review any documents to make this determination.
    (c) Did you pull for any individual claimant any documents reflecting retention.

4. In answering the PIQ, have you contacted all Doctors (Known to the claimant, your firm or any other counsel) to obtain documents that either support or conflict with the diagnosis supporting the claim.

(a) What steps did you take to determine the identity of each Doctors.

(b) What process did you follow to contact the Doctors.

(c) Have you determined all Doctors who may have evidence that supports or conflicts with the diagnosis supporting claimants claim.

5. In answering the PIQ, have you contacted all prior counsel (Known to the claimant, your firm or any other counsel) to obtain documents that either support or conflict with the diagnosis Supporting the claim.

(a) What steps did you take to determine the identity of each counsel.

(b) What process did you follow to contact counsel.

(c) Have you determined all counsel who may have evidence that supports or conflicts with the diagnosis supporting claimants claim.

6. Have you contacted all prior counsel to obtain documents that reflect exposure to Grace asbestos products or other asbestos products.

(a) What steps did you take to determine who prior counsel was.

(b) What process did you follow to contact prior counsel. to

(c) What steps did you to obtain documents from prior counsel regarding exposure to Grace asbestos products or other asbestos products.

7. Did you review all files ~~at~~ you from or obtained from other firms to determine if the actual ~~exposure~~ answers to the questions regarding exposure outlined in sections III, IV and V of the PIQ were contained in the documents.

8. ~~Where were the~~ Where the file did not provide answers to parts III, IV and V of the PIQ, did you ~~answer the questions~~ or indicate that the information was not known. ——— State

9. Did you determine for each individual claimant:

(a) Whether they were actually exposed to a Grace product.

(b) The date of [and duration] such exposure

(c) the place / job description for each exposure

(d) Proximity for each exposure.
(e) Specify the Grace product involved
in each exposure

10. For each claimant submitting a
PIQ, did the claimant review the PIQ prior to
its submission.
 (a) Were claimants required to affirm the
accuracy and completeness of the completed PIQ's.
 (b) Is there any documentation that
reflects such an attestation or proof of
claimant review.

# EXHIBIT "C"

1      Pursuant to the December 22, 2006 Order, have you determined the date in which a B-read was first performed for each claimant as to whom a consultant privilege has been assessed.

a) What steps did you use to determine the date of the first B-read.

b) Has the first B-read been produced to Grace.


2      How did you determine for each claimant the date on which B-readers were retained specifically for that claimant.

a) What steps did you take to determine the B-reader was retained.

b) Were any documents gathered that reflect the date or fact of retainer.

c) How did you determine when a doctor was retained as to any individual claimant.


3.      How did you determine the date on which each claimant was retained by your firm.

a) What steps did you take to determine the date the claimant retained your firm.

b) Did you review any documents to make the determination.

c) Did you pull for any individual claimant any documents reflecting retention.


4      In answering the PIQ, have you contacted all doctors (known to claimant, your firm or other counsel) to obtain documents that either support or conflict with the diagnosis supporting the claim.

a) What steps did you talk to determine the identity of such doctors.

b) What process did you follow to contact the doctors.

c) Have you determined all doctors who may have evidence that supports or conflicts with the diagnosis supporting claimants claim.


5      In answering the PIQ, have you contacted all prior counsel (known to claimant, your firm or any other counsel) to obtain documents that either support or conflict with the diagnosis supporting the claim.

a) What steps did you take to determine the identity of each counsel.

b) What process did you follow to contact counsel.


1

c) Have you determined all counsel who may have evidence that supports or conflicts with the diagnosis supporting claimants claim.

6      Have you contacted all prior counsel to obtain documents that reflect exposure to Grace Asbestos products or other asbestos products.

a) What steps did you take to determine who prior counsel was.

b) What process did you follow to contact prior counsel.

c) What steps did you to obtain documents from prior counsel regarding exposure to Grace asbestos products or other asbestos products.

7      Did you review all files at your firm or obtained from other firms to determine the actual answers to the questions regarding exposure outlined in sections III, IV and V of the PIQ were contained in documents.

8      Where the file did not provide answers to parts III, IV and V of the PIQ, did you state that the information was not known.

9      Did you determine for each individual claimant:

a) Whether they were actually exposed to a Grace product.

b) The date and duration of such exposure.

c) The place/job description for each exposure.

d) Proximity for each exposure as required in Part V.

e) Specify the Grace product involved in each exposure.

10     For each claimant submitting a PIQ, did the claimant review the PIQ prior to its submission.

a )Were claimants required to affirm the accuracy and completeness of the completed PIQs.

b)  Is there any documentation that reflects such an attestation or process of claimant review.

2

# EXHIBIT "D"

LAW OFFICES

# LEBLANC & WADDELL, LLP

### ATTORNEYS AT LAW

6955 PERKINS ROAD, SUITE 100
BATON ROUGE, LOUISIANA 70808
(225) 768-7222    FAX: (225) 768-7999
TOLL-FREE: 800-988-3514

BANK ONE CENTER, SUITE 3204
201 ST. CHARLES AVENUE
NEW ORLEANS, LOUISIANA 70170-3204
(504) 523-9900    FAX: (504) 522-9300
TOLL-FREE: 800-292-1470

July 26, 2007

VIA FEDERAL EXPRESS

David Bernick, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636

     Re:   *In re WR Grace & Co.*, No. 01-01139-JKF

Dear Mr. Bernick:

In the paper you filed on July 19, 2007 titled "Debtors' Brief in Further Support of Opposition to Motions for Protective Orders to Preclude Lawfirm Depositions," you seek affirmative relief from LeBlanc & Waddell, LLP ("L&W"). Specifically, you ask the Court to order L&W to answer a third set of interrogatories, presumably identical to the third set already served on four other firms. In support of that relief, you claim in your papers at pp. 12-13 "flagrant and continuing violations of the Attachment Order" by L&W. In particular, you advise the Court that personal injury questionnaires submitted by L&W "often directed Grace to a purportedly attached 'Claimant's affidavit,' but in its reviews thus far, Grace has been unable to locate any such affidavit in the supplemental PIQ or anywhere else for either the cited Claimant and or for any of the other 279 Claimants referencing this mystery affidavit."

Seeking relief based on the supposed absence of any Claimant's Affidavit, aside from being a misleading statement to the Court, violates Local Rule 9006-1(b) of the Delaware Bankruptcy Court, since prior to filing your paper you failed to certify that you made a "reasonable effort to reach an agreement with the opposing attorneys on the matters set forth in the motion." You did not make such a certification because you could not do so – as you did not even bother to discuss this matter with us or with our counsel prior to the filing of your paper. Had you called or written, we would have done as we are doing now; sending the enclosed CD which contains executed versions of the Claimant Affidavits to replace the unexecuted versions of the Claimant Affidavits which you have had in your possession for over six months now.

David Bernick, Esq.
July 26, 2007
Page 2 of 2

Had you called or written, we would also have explained to you how this inadvertent omission happened, much of which you already know (but, astonishingly, none of which you informed the Court in your papers). In particular, when supplemental PIQ responses were submitted by L&W to WR Grace in January, 2007, L&W inadvertently sent to you, due to a computer programming error, unexecuted Claimant Affidavits attached to cover letters from L&W to its clients. In June of 2007, when we realized that our submissions contained this inadvertent production of attorney-client communications, I sent WR Grace a letter informing it of the inadvertent production and demanding the return of the original production. At that time, L&W also resent WR Grace our PIQ submissions – without the unexecuted Claimant Affidavits and the privileged cover letters. While we believe you were and are legally bound to return the privileged documents, you never have. Incredibly, even though you have never returned the unexecuted Claimant's Affidavits to us, you failed to inform the Court that you had and still have a full compliment of unexecuted Claimant Affidavits; indeed the Court was told the very opposite – that you had no Claimant's Affidavits at all, "in the supplemental PIQ or anywhere else." This was a highly misleading statement to make, and it is hard to believe that it was anything other than deliberate, since the Court's natural reaction to such a disclosure would have been to ask you whether you've asked us for the executed versions. Instead, it was in your interests to paint us as "flagrant violators" of the Attachment Order.

The bottom line is this: Until the filing of your papers on July 19, we were unaware that our re-submissions failed to include the *executed versions* of the Claimant Affidavits. You now have them, and we expect you to file a proper certificate under Rule 9006-1(b) *and* to correct the misstatements you made to the Court.

Very truly yours,

Jená LeBlanc Duncan

**NO POUCH NEEDED.**
See back for peel and stick application instructions.

FedEx Express

**US Airbill**

8534 4979 9896

0215

SE-A21

**FedEx Copy**

1 From
Date 1-26-07

Sender's FedEx
Account Number

1975-4873-8

Sender's
Name  Nicole Lane

Company  LEBLANC & WADDELL, LLP

Address  5955 PERKINS RD

City  BATON ROUGE   State LA   ZIP 70808

Phone 225 768-7222

2 Your Internal Billing Reference  WR GRACE

3 To
Recipient's
Name  DAVID BERWICK

Company  KiRkLand & Ellis

Address  200 E. Randolph Drive   Floor 54

Phone 312 861-2000

City  CHICAGO   State IL   ZIP 60601

0316194477

4a Express Package Service

FedEx Copy

Total Charges   519