# EXHIBIT B

# UNREPORTED DECISIONS

Westlaw.

Slip Copy

Slip Copy, 2006 WL 2927519 (D.Kan.)
(Cite as: Slip Copy)

Page 1

C
Hulse v. Suburban Mobile Home Supply Co.
D.Kan.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Kansas.
Carol J. HULSE, Plaintiff,
v.
SUBURBAN MOBILE HOME SUPPLY
COMPANY, et al., Defendants.
Case No. 06-1168-WEB.

Oct. 12, 2006.

Norman R. Kelly, Norton, Wasserman, Jones &
Kelly, L.L.C., Salina, KS, for Plaintiff.
Shannon D. Wead, Foulston Siefkin LLP, Wichita,
KS, for Defendants.

## MEMORANDUM AND ORDER
DONALD W. BOSTWICK, Magistrate Judge.
*1 Before the Court is Defendants' Motion for an
Order Granting *Ex Parte* Interviews with Treating
Physicians (Doc. 16), filed on September 18, 2006.
Plaintiffs filed a Response in Opposition (Doc. 19)
[FN1] on October 2, 2006, followed by Defendants'
Reply (Doc. 21) on October 4, 2006. After careful
consideration of the briefing of the parties, the
authorities stated therein, and the numerous exhibits
submitted, the Court is prepared to rule on
Defendants' motion.

> FN1. Plaintiff also filed a supplement to
> her response which attached a copy of an
> unpublished opinion cited in the brief.
> (Doc. 22.)

### BACKGROUND

This case arises out of an motor vehicle accident
that resulted in personal injury to Plaintiff requiring
medical care and treatment. (Doc. 1.) Plaintiff filed
her Complaint (Doc. 1) on June 12, 2006, alleging

negligence by Defendant Ward. Plaintiff alleges
Defendant Suburban Mobile Home Supply is also
liable under the doctrine of respondeat superior in
that it allegedly employed Ward at the time of the
accident. Plaintiff claims past and future medical
expenses, past and future pain and suffering, and
loss of earnings. In their Answer, Defendants
generally deny Plaintiffs' allegations of negligence.
(Doc. 5.)

Defendants filed the present motion requesting that
the Court enter an Order "that counsel may conduct
*ex parte,* or private interviews with treating
physicians who are not designated as expert
witnesses, but only after informing those treating
physicians of their right to decline to be privately
interviewed and providing them with a copy of the
Court's Order." (Doc. 16 at 2.) Plaintiff responded
that she is not seeking to prevent the disclosure of
information by her treating health care providers,
only the "method by which defense counsel is
permitted to collect that information." (Doc. 19 at
4.) Plaintiff argues that the *ex parte* interviews
requested by Defendants are prohibited by HIPAA,
which preempts "less stringent Kansas laws,
specifically K.S.A. § 60-247." *(Id.* at 1.)
Defendants replied, arguing that a
HIPAA-compliant order "does not stand as a bar to
*ex parte* communications sought by Defendants."
(Doc. 21 at 1.)

### DISCUSSION

#### 1. Ex Parte Contact With Treating Physicians.

In making claims for personal injury, Plaintiff has
clearly placed her medical condition at issue.
Therefore, Plaintiff cannot claim that her treating
physicians are prevented from disclosing
information concerning her medical condition by
the physician-patient privilege which is codified in
K.S.A. 60-427. [FN2] Subsection (d) of that statute

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 2

Slip Copy, 2006 WL 2927519 (D.Kan.)
**(Cite as: Slip Copy)**

specifically states:

> FN2. Fed.R.Evid. 501 provides that in
> civil proceedings, where state law provides
> the rule of decision concerning a claim or
> defense, the privilege of a witness or
> person is to be determined in accordance
> with state law. Here the parties agree that
> Kansas law is the basis for the wrongful
> death and personal injury claims by
> Plaintiffs.

There is **no privilege** under this section **in an
action in which the condition of the patient is an
element or factor of the claim** or defense of the
patient or of any party claiming through or under
the patient or claiming as a beneficiary of the
patient through a contract to which the patient is or
was a party. (Emphasis added).

Thus, there is no issue of waiver of the privilege in
the present case; the privilege simply does not exist.
*See Bryant v. Hilst,* 136 F.R.D. 487, 491
(D.Kan.1991) (holding "[t]he issue is not waiver or
partial waiver, there is simply no privilege available
to the plaintiff."). Judges in this District consistently
have held that *ex parte* communications with
treating physicians are permissible in cases, such as
the present one, in which the medical condition of
the plaintiff is an issue. *See G.A.S. v. Pratt Regional
Medical Center, Inc., et al.,* No. 05-1267-JTM,
June 8, 2006, Memorandum and Order (Magistrate
Judge Karen Humphreys), at 2-3 (attached as Ex. 3
to Defendants' Joint Motion, Doc. 29) (collecting
decisions from this District). *See also Lake v.
Steeves,* 161 F.R.D. 441 (D.Kan.1994) (District
Judge Sam A. Crow); *McGee v. Stonebridge Life
Insurance Co.,* No. 05-4002-JAR, June 28, 2005,
Memorandum and Order (Magistrate Judge K. Gary
Sebelius). While the Court appreciates Plaintiff's
citation to decisions from various jurisdictions and
has reviewed and considered these cases, it finds no
reason to part with the well-reasoned line of
decisions from *this* District. The Court also finds
that an extended discussion of those prior decisions
would not add anything substantive to the legal
scholarship on this topic.

**2. Provisions of HIPAA and 42 C.F.R., Part 2.**

**\*2** Plaintiffs argue that HIPAA, the Health
Insurance Portability and Accountability Act, has
changed the landscape for production of medical
information and that HIPAA preempts any state
provisions on this topic unless the state law
provisions are "more stringent" than the rules and
regulations under HIPAA. (Doc. 19 at 6-11.) The
Court, however, does not need to delve into the
intricacies of this argument because it finds that
Defendants, by filing the present motion seeking a
court order allowing the production of medical
information and an *ex parte* contact with the
treating physicians, has complied with the HIPAA
regulations.

The Court is satisfied that Defendants have
followed all the relevant procedural requirements
and safeguards imposed by HIPAA. Those
requirements are set out in 45 C.F.R. §
164.512(e)(1), and that section allows disclosure of
protected health information
"in the course of any judicial or administrative
proceeding: (i) In response to an order of a court or
administrative tribunal, provided that the covered
entity discloses only the protected health
information expressly authorized by such order...."

That is precisely what Defendants have done in this
case by filing the instant motion and seeking a
Court order allowing disclosure of Plaintiffs'
medical information. The proposed Order (Doc. 21,
Exh. B) clearly state what medical information is
covered by the Orders thus allowing any medical
providers to assure themselves that they are in
compliance with the HIPAA requirements.

Plaintiffs argue that other subsections of section
164.512(e)(1) also govern in this case and that
Defendants have not complied with those
requirements. (Doc. 36 at 10-11.) The Court does
not agree. Section 164.512(e)(1) sets out two
*separate and alternative* ways to obtain protected
health information: one is by court order under
subsection (i), and the other is by subpoena,
discovery request, or other lawful process "that is
*not* accompanied by an order of a court ...."
(emphasis added) under subsection (ii). Plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2927519 (D.Kan.)
**(Cite as: Slip Copy)**

discuss several things that are required if a party proceeds under subsection (ii) by subpoena or discovery request, including the requirement that the party whose records are being sought is given notice under subsection (ii)(A), or that the party seeking the information secure a "qualified protective order" as described in subsections (ii)(B) and (v). Any such "qualified protective order" is to include provisions that prohibit use of the information for any purpose other than the litigation and require the return of the information to the covered entity at the end of the litigation. *See* 164.512(e)(1)(v)(A) and (B). However, the provisions of subsections 164.512(e)(1)(ii), (iii), (iv) and (v), all apply *only* where the information is sought by subpoena or document request under subsection (ii), and *not* where the documents are to be provided in response to a court order for disclosure under subsection (i).[FN3] Also, the proposed Order clearly informs any treating physician of their right to decline any request for *ex parte* communication. (Doc. 21, Exh. B, at 2.) As such, the Court finds Defendants' proposed Order to be consistent with the practice in this District.

> FN3. Even if the Court were to apply the requirements of section 164 .512(e)(1)(v)(A) and (B) in this case, the Order proposed by Defendants specifically states that the Court is entering a "qualified protective order" and also contains the requirements of these subsections.

*3 Finally, the proposed Order is consistent with the provisions of the Drug Abuse Prevention, Treatment, and Rehabilitation Act, 21, U.S.C. § 1175, which were later transferred into the Public Health Service Act, 42 U.S.C. § 290dd-2. *See* 42 C.F.R. § 2.1 and 2.2. (Doc. 21., Exh. B, at 2.) As indicated in the proposed Order, the statute and regulations apply *only* to records of substance abuse treatment programs which are federally conducted, regulated or supported in a manner which constitutes Federal assistance under the regulations. [FN4] *Id.; see also* 42 C.F.R. § 2.12(a)(2); *Beard v. City of Chicago,* 2005 WL 66074 at * 4 (N.D.Ill.2005) (Section 290dd-2 does not create a privilege that covers any and all records of

substance abuse treatment but only those records of programs which are conducted, regulated or directly or indirectly assisted by an agency of the United States). *See also, Center for Legal Advocacy v. Earnest,* 320 F.3d 1107 (10th Cir.2003) (holding as a matter of law that a specific hospital's emergency department does not qualify as an alcohol or drug abuse "program" under the Part 2 regulations and therefore the hospital could not refuse production of the records in reliance on the statute and regulations).

> FN4. Nothing in this Memorandum and Order should be construed to prohibit Defendants from seeking an order in the future concerning production of substance abuse records which would be covered by 42 U . S.C. § 290dd-2 and 42 C.F.R., Part 2 if such records exist and if Defendants can satisfy the requirements of the statute and regulations.

### CONCLUSION

Defendants' Motion (Doc. 15) is hereby **GRANTED**. The Court shall contemporaneously enter the proposed Order for Inspection and Reproduction submitted by defense counsel. (Doc. 21, Ex. B.)

**IT IS SO ORDERED.**

D.Kan.,2006.
Hulse v. Suburban Mobile Home Supply Co.
Slip Copy, 2006 WL 2927519 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in Cl.Ct.                                                                                  Page 1

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

c
McNerney v. Secretary of Dept. of Health and
Human Services
Cl.Ct.,1992.
Only the Westlaw citation is currently available.
United States Claims Court, Office of the Special
Masters.
Judith C. MCNERNEY, as legal representative,
next friend, and natural parent of Christine A.
McNerney, a minor, Petitioner,
v.
SECRETARY OF THE DEPT. OF HEALTH AND
HUMAN SERVICES, Respondent.
**No. 90-1689V.**

May 5, 1992.

Lon S. Babby, Washington, D.C., with whom
appeared Betsy Wanger, for petitioner.
James M. Moore, United States Department of
Justice, Washington, D.C., for respondent.

ORDER
PAUL T. BAIRD, Special Master.
*1 Respondent has moved under Vaccine Rule 7 for
an order directing the petitioner to sign a release
giving the respondent access to the doctors who
have treated Christine McNerney for the purpose of
obtaining information and opinions. Petitioner has
objected to the motion, claiming that informal *ex
parte* conferences between respondent's counsel and
doctors who have treated Christine are improper
and violative of the fiduciary relationship which
exists between a patient and her physician, and has
moved either to preclude the statements which have
already been filed of treating doctors who spoke
with respondent *ex parte* or, in the alternative, for
an order allowing the petitioner to take the
depositions of such doctors at respondent's expense.

A brief review of the procedural history is in order.
On December 12, 1991, respondent's counsel sent
petitioner's counsel a letter seeking the voluntary

exchange of information pursuant to Vaccine Rule 7
[FN1], listing eight specific items of information
respondent was seeking, and indicating that "[i]n
addition to the information requested above, I may
be contacting medical personnel and other fact
witnesses identified in materials that have already
been filed with the Claims Court." A response was
sent on January 3, 1992, addressing each of the
eight specific items mentioned in the December 12
letter, but making no comment with respect to
respondent's statement that "medical personnel"
would be contacted. Apparently petitioner's
counsel either overlooked the statement in the
December 12 letter or understood it to refer to
medical personnel other than treating physicians.

Thereafter, respondent's counsel set out to speak
with and obtain statements from doctors who had
treated Christine, obtaining statements from four of
five doctors contacted. The fifth doctor refused to
talk to respondent's counsel without the written
consent of the petitioner. Without telling
petitioner's counsel that he had already talked to and
obtained statements from four treating physicians,
respondent's counsel then requested from
petitioner's counsel a waiver of confidentiality
signed by the petitioner, so that he could gain
access to the fifth doctor. Petitioner's counsel
refused to provide such a document, claiming that
informal, *ex parte* communications between
respondent's counsel and doctors who had treated
Christine were prohibited in Illinois as a matter of
public policy and would constitute an improper
breach of the physician-patient relationship.
Petitioner's counsel indicated that petitioner would
agree to informal interviews of Christine's treating
physicians with regard to their care and treatment of
Christine, as long as petitioner's counsel was present
and respondent did not seek the physician's opinions.

Respondent refused to agree to those terms-perhaps
because statements had already been obtained from
four treating physicians-and, on April 8, 1992, filed
a motion seeking an order allowing the desired

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cl.Ct.

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

informal discovery. The matter was discussed with the court at a status conference requested by the respondent on April 6, before the formal motion was filed. The court did not decide the issue at that time, giving the petitioner two weeks to respond to the forthcoming motion and the respondent a week to reply to the response, but did urge the parties to attempt to reach a mutually acceptable resolution of the matter. During the course of discussions, petitioner's counsel was informed, on April 15, 1992, that respondent had already obtained statements from four treating physicians. This knowledge prompted petitioner to file a motion for a continuance and for an order either precluding use of the doctors' statements allegedly improperly obtained or allowing petitioner to take the depositions of the said doctors at respondent's expense.

*2 The motion for continuance was granted at a status conference held on April 24, 1992. The respondent's reply to petitioner's response to respondent's motion for an order allowing *ex parte* contacts was filed on May 4, 1992.

### DISCUSSION

### a. There is no physician-patient evidentiary privilege in Vaccine Compensation Program proceedings.

While the standards of admissibility of evidence in National Vaccine Injury Compensation Program [FN2] [hereinafter the Program or the Act] proceedings are flexible and informal as mandated by § 300-aa(12)(d)(2)(B), the Federal Rules of Evidence (FRE) have been looked to for guidance and have been applied when considered appropriate. *See, e.g., Carter v. Secretary of HHS,* No. 89-80V, slip op. at 7 (Cl.Ct.Spec.Mstr. June 27, 1990); *Potter v. Secretary of HHS,* No. 90-2V, Order Denying Motion for Summary Judgment at 5 (Cl.Ct.Spec.Mstr. Sep. 18, 1990) (applying FRE 702 in determining whether expert testimony should be admitted). FRE 501 provides that in cases where State law supplies the rule of decision, privileges should be determined in accordance with State law.

In all other cases not otherwise provided for, privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

Since the substantive law which applies to Program proceedings is wholly federal, under FRE 501 the federal courts' interpretation of the common law of privilege would apply to questions of privilege. The physician-patient privilege was not recognized under the common law and has not been recognized by the federal courts. *Whalen v. Roe,* 429 U.S. 589, 602 n. 28 (1977); *United States v. Lindstrom,* 698 F.2d 1154, 1167 n. 9 (11th Cir.1984). Considering the Congressional mandate regarding admissibility of evidence in Program proceedings, it would be inappropriate to apply a harsher evidentiary rule here than applies generally in federal proceedings. Therefore, the court must conclude that there is no physician-patient evidentiary privilege in Program proceedings.

### b. Informal *ex parte* contacts between respondent's counsel and a petitioner's treating physicians are not improper in Program proceedings.

That evidence held by doctors who have treated Christine should be admissible in a proceeding in which physical injuries are claimed should not be a surprise to the petitioner. Even in States which recognize a physician-patient privilege, the privilege is often considered waived with respect to medical conditions which are the subject of a lawsuit filed by the patient. It would be contrary to the pursuit of justice to preclude doctors who have knowledge concerning Christine's condition from sharing what they know with the court. [FN3] The more difficult issue is how that knowledge should be revealed.

The petitioner argues that because the relationship between a doctor and a patient is a fiduciary one, *ex parte* communications between the doctor and a legal adversary violate the fiduciary obligation of the doctor to the patient, contrary to public policy. As authority, the petitioner cites numerous cases, including *Yates v. El-Deiry,* 513 N.E.2d 519, 523

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cl.Ct.

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

Page 3

(Ill.App.Ct.1987), *appeal denied,* 520 N.E.2d 394 (1988), in which it was stated:

**\*3** Prejudice and improper conduct can be implied from the fact that the plaintiff's treating physician has violated his ethical and fiduciary obligations owed the patient by engaging in ex parte conferences concerning the patient with the patient's legal adversary, and without the patient's consent.

The petitioner also cites *Hammonds v. Aetna Casualty and Surety Company,* 243 F.Supp. 793, 800 (N.D. Ohio 1965), which held:

We recognize that the institution of a suit for the compensatory value of personal injury will necessarily lead to the ultimate waiver of privilege; thus it has been held that the privilege will not prevent pre-trial discovery of medical evidence with respect to which it is expected that the plaintiff would waive the privilege at trial. The accelerated disclosure of the treating physician's opinion as to the extent of a plaintiff's injury does not permit a clandestine conference between that doctor and the lawyer for his patient's adversary. (Emphasis added.)

Petitioner considers the Illinois and Ohio decisions to be particularly relevant because the doctors who have been contacted here practiced in those States at the time they treated Christine. But the petitioner has also cited cases from other jurisdictions. In *Alexander v. Knight,* 177 A.2d 142, 146 (Pa.Super.Ct.1962), the court stated that a doctor's fiduciary relationship to his patient " includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty of conscience to speak the truth; he need, however, speak only at the proper time." [FN4]

Respondent, on the other hand, citing *Sipes v. United States,* 111 F.R.D. 59 (S.D.Cal.1986), argues that informal *ex parte* contacts between respondent's counsel and a petitioner's treating physicians are perfectly all right. In *Sipes,* the plaintiff sought a protective order precluding informal contacts by the defense counsel with plaintiff's treating physicians. The United States

argued, in response, that "treating physicians who were viewers to the transactions or occurrences giving rise to the lawsuit are to be treated as ordinary fact witnesses. Accordingly, ... [they] should be equally accessible to both parties." 111 F.R.D. at 61. The court agreed with the defendant. After discussing FRE 501 and the fact that the physician-patient privilege was unknown at federal common law, the court held that treating " physicians are percipient fact witnesses, and as such, the information and opinions they possess should be freely accessible to both parties to the present litigation, as would be the case with any other ordinary fact witness." *Id.* The *Sipes* court directed plaintiff's counsel to serve on physicians a copy of an order informing them that they were neither precluded from discussing nor obligated to discuss the care and treatment rendered by them to the plaintiff with representatives of the United States.

Other federal courts have issued similar decisions. *See, e.g., Filz v. Mayo Foundation,* 136 F.R.D. 165 (D.Minn.1991), in which the district court set aside the order of a federal magistrate judge denying the defendants' motion for an order compelling the plaintiff to sign a medical authorization permitting defendants to conduct *ex parte* interviews with her treating physicians, but allowing them to interview her physicians in the presence of her counsel; *Doe v. Eli Lilly & Company, Inc.,* 99 F.R.D. 126, 128 (D.D.C.1983), in which it was held that plaintiffs could be required to execute appropriate written forms addressed to their various physicians authorizing them to engage in *ex parte* interviews with the defendant's representatives:

**\*4** Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting on some notion of allegiance.... Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows if other appropriate conditions the witness alone may impose are satisfied.... And there are entirely respectable reasons for conducting discovery by interview *vice* deposition: it is less costly and less likely to entail logistical or scheduling problems; it is conducive to spontaneity and candor in a way

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cl.Ct.

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

Page 4

depositions can never be; and it is a cost-efficient means of eliminating non-essential witnesses from the list completely.

*See also MacDonald v. United States,* 767 F.Supp. 1295 (M.D.Pa.1991) (denying a motion to strike the testimony of a treating physician based in part on the argument that the United States violated the public policy of the Commonwealth of Pennsylvania by conducting *ex parte* interviews with him); *Sklagen v. Greater Southeast Community Hospital,* 625 F.Supp. 991 (D.D.C.1984).

However, the federal decisions are not uniform on this issue. Some have denied *ex parte* contacts, particularly in diversity actions. Thus, in *Hammonds* and in *Manion v. N.P.W. Medical Center of N.E. Pennsylvania, Inc.,* 676 F.Supp. 585 (M.D.Pa.1987), the federal courts concluded that to permit *ex parte* contacts with treating physicians would be contrary to the public policy considerations underlying the State laws recognizing the physician-patient privilege. *See also Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989). In *Garner v. Ford Motor Company,* 61 F.R.D. 22 (D.Alaska 1973), *Weaver v. Mann,* 90 F.R.D. 443 (D.N.D.1981), and *Alston v. Greater Southeast Community Hospital,* 107 F.R.D. 35 (D.D.C.1985), the courts concluded that *ex parte* contacts with treating physicians were not contemplated by the discovery scheme set out in the Federal Rules of Civil Procedure (F.R.C.P.).

None of the decisions denying *ex parte* contacts is particularly persuasive in the context of this proceeding. In the first place, since this is not a diversity action, State law public policy considerations in recognizing the physician-patient privilege are of doubtful significance. Beyond that, when one realizes from comparing *MacDonald* with *Manion* that two federal judges sitting in the same district in the same State cannot agree as to what that State's public policy is, it would be too much to expect special masters dealing with cases from all 50 States-plus the District of Columbia and U.S. territories-to make appropriate determinations concerning the public policies of these jurisdictions; and it would be counterproductive and impractical

to apply different rules to different cases. Further, Program procedures are governed by the Vaccine Rules, not by the F.R.C.P. or the analogous Rules of the United States Claims Court (RUSCC), so decisions which rely on the F.R.C.P. are not particularly pertinent.

**\*5** Congress mandated in § 12(d)(2) of the Act that the rules governing Program proceedings:

(A) provide for a less-adversarial, expeditious and informal proceeding for the resolution of petitions,

(B) include flexible and informal standards of admissibility of evidence,

.... and

(E) provide for limitations on discovery and allow the special masters to replace the usual rules of discovery in civil actions in the United States Claims Court.

Congress also set very short time limits for issuing decisions on petitions. The objective of the Program is to get all the relevant information before the special master as quickly and as flexibly as possible without the formalities and restraints of formal discovery-and without the other litigative tactics which counsel so frequently engage in to obfuscate and delay-so that an informed decision can be issued within the time allowed. Section 11(c)(2) of the Act furthers this objective by requiring the petition to include detailed and comprehensive medical records. Allowing informal *ex parte* contacts between respondent's counsel and treating physicians also furthers this objective and should be permitted. The court is persuaded that when Congress mandated limitations on discovery, it had in mind formal discovery under the RUSCC and did not intend to limit access to relevant information. Rather, it intended that the special masters should substitute expeditious informal means of discovery for the procedures set out in the discovery rules. Vaccine Rule 7 appears to be based on a similar understanding of Congress' intent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cl.Ct.

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

c. The parties have an obligation under this
Program to work together cooperatively to facilitate
the discovery of the truth in order to fulfill the
purposes of the Act.

As noted above, Congress wanted this Program to
be less-adversarial than traditional litigation. That
means, in part, that counsel should be candid and up
front with one another and that the parties should
cooperate in producing a complete, unbiased record
for the consideration of the special master. In the
context of the issues presented in the instant
motions, [FN5] it means that respondent's counsel
should tell petitioners' counsel specifically who they
intend to contact and for what purpose. They
should not make vague references to "medical
personnel" and then proceed to contact specific
doctors without informing petitioners' counsel. It
also means that petitioners' counsel should obtain
and provide authorizations to facilitate the contacts
between respondent's counsel and treating doctors.
And it means that joint meetings should be arranged
when feasible to assure that any statement which
results from the contact is fair and complete. All
activities relating to a petition should be conducted
in the same spirit.

IT IS THEREFORE ORDERED AS FOLLOWS:

1. The petitioner's motion is denied.

2. The respondent's motion is granted. Within ten
days of the date hereof, petitioner shall provide an
appropriate release form to respondent. The
release shall state both that the physician is
authorized by the petitioner and by applicable
federal law to discuss with respondent's counsel
petitioner's medical history as it relates to the claim
set out in the petition and that, in the absence of a
subpoena or court order, the physician is not
required to talk to respondent's counsel. The
release shall provide that if interviewed orally, the
physician may, if he prefers, provide a written
response. The release shall also state that the court
has indicated that it would appreciate any
contribution the physician might make toward
assisting it in determining whether the petitioner
qualifies for an award of compensation under the
National Vaccine Injury Compensation Program,

consistent with his view as to his professional duties
to his patient, balanced always with the
ascertainment of truth, the ultimate object of the
Program. *See Sipes,* 111 F.R.D. at 62. [FN6]

FN1. Vaccine Rule 7 reads as follows:
There shall be no discovery as a matter of
right.
(a) *Informal discovery preferred.* The
informal and cooperative exchange of
information is the ordinary and preferred
practice.
(b) *Formal discovery.* If a party considers
that informal discovery is not sufficient, it
may seek to utilize the discovery
procedures provided by RUSCC 26-36 by
filing a motion indicating the discovery
sought and stating with particularity the
reasons therefor, including an explanation
why informal techniques have not been
sufficient. Such a motion may also be
made orally at a status conference.

FN2. The National Vaccine Injury
Compensation Program comprises Part 2
of the National Childhood Vaccine Injury
Act of 1986, *as amended,* 42 U.S.C.A. §
300aa-1 *et seq.* (West 1991). For
convenience, individual sections of the Act
will be cited herein without reference to 42
U.S.C.A. § 300aa.

FN3. The court often finds the testimony
of treating physicians very helpful in its
quest to find the truth. One of the most
frustrating aspects of this position for the
undersigned is hearing only from retained
experts when it appears that the physicians
who observed the child around the time of
the alleged vaccine-related injury could
provide testimony of much greater value to
the court. If the petitioner is not going to
seek out such testimony, the respondent
ought to be permitted to do so.

FN4. For a good discussion of *Alexander,*
its progeny, and other cases discussing the
issue, *see Manion v. N.P.W. Medical*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cl.Ct.

Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)
**(Cite as: Not Reported in Cl.Ct.)**

*Center of N.E. Pennsylvania, Inc.,* 676 F.Supp. 585, 587-593 (M.D.Pa.1987), and *MacDonald v. United States,* 767 F.Supp. 1295 (M.D.Pa.1991) (rejecting the notion of a public policy in Pennsylvania prohibiting *ex parte* contact with treating physicians, as set forth in *Manion* ).

FN5. The full implications are, of course, much broader and should, in the opinion of the undersigned, affect the full range of activities of the parties, including, for example, the putting together of the petition documents, the respondent's attitude and approach in reviewing petitions, the search for and selection of expert witnesses, and the examination and cross-examination of witnesses.

FN6. Parties in other cases assigned to this special master are expected to act in a manner consistent with this order without being ordered to do so.

Cl.Ct.,1992.
McNerney v. Secretary of Dept. of Health and Human Services
Not Reported in Cl.Ct., 1992 WL 120345 (Cl.Ct.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
New Park Entertainment L.L.C. v. Electric Factory
Concerts, Inc.
E.D.Pa.,2000.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
NEW PARK ENTERTAINMENT L.L.C.
v.
ELECTRIC FACTORY CONCERTS, INC.
andSPECTRUM ARENA LIMITED
PARTNERSHIP
andPAVILION PARTNERS d/b/a the Blockbuster
Sony Music Entertainment Center
**No. Civ.A. 98-775.**

Jan. 13, 2000.

Robert E.J. Curran, Curran & Byrne, P.C., Media,
PA, for New Park Entertainment Ltd., Plaintiff.
Robert E.J. Curran, John G. McCormick, James J.
Rodgers, Dilworth, Paxson, LLP, Phila, PA,
Edward T. Lawlor, Jr., (See above), for New Park
Entertainment Ltd., Plaintiff.
Wendelynne J. Newton, Buchanan Ingersoll
Professional Corp., Pittsburgh, PA, Charlotte E.
Thomas, Alan C. Kessler, Wolf, Block, Schorr and
Soliscohen LLP, Philadelphia, PA, for Electric
Factory Concerts, Inc., Defendant.
Richard P. McElroy, Ann B. Laupheimer, Brian S.
Paszamant, Blank Rome Comisky & McCauley
LLP, Philadelphia, PA, for Spectrum Arena Limited
Partnership, Defendant.
Wilbur L. Kipnes, Wendy Beetlestone, Rolin Plumb
Bissell, Diane L. Lisowski, Schnader, Harrison,
Segal & Lewis, Philadelphia, PA, for Pavillion
Partners d/b/a the Blockbuster/Sony Music
Entertainment Center, Defendant.

*MEMORANDUM OF DECISION*
RUETER, Magistrate J.
*1 Presently before the court are Plaintiff's Motion
to Compel Discovery (Document No. 45),
Defendants' Opposition thereto (Document Nos. 46

and 48), Defendants' Joint Motion for Protective
Order [FN1] (Document No. 37), Plaintiff's
Memorandum of Law in Opposition thereto
(Document No. 38), and Defendants' Reply.
(Document No. 40).[FN2] The motions concern
numerous objections to (1) plaintiff's interrogatories
addressed to defendants; (2) its request for
documents to defendants; and (3) subpoenas duces
tecum to six nonparties.[FN3] There are
approximately eleven objections or issues that are
applicable to these discovery requests. These are as
follows: 1) much of the information requested is
irrelevant because it concerns conduct of the
defendants prior to 1997, when plaintiff came into
existence; 2) the interrogatories exceed the limit of
Fed.R.Civ.P. 33(a); 3) defendants have no standing
to challenge the subpoenas issued to six nonparties;
4) many of the documents requested from third
parties have already been provided by the
defendants; 5) documents requested from
defendants' accountants are protected by
accountant-client privilege recognized by
Pennsylvania law; 6) certain of the information
sought from the defendants and nonparties
constitutes trade secrets; 7) information relating to
events other than concerts is irrelevant; 8) plaintiff's
request for contracts, between the cities of Camden,
New Jersey and Philadelphia, Pa, and certain
arenas, should be denied because the information is
irrelevant; 9) plaintiff's request that defendants
identify "all formal claims or lawsuits which have
been filed against" Electric Factory Concerts, Inc. ("
EFC") "involving antitrust issues" should be denied
because the information is irrelevant; 10) plaintiff's
request that EFC identify the computer programs it
uses in its business should be denied because this
information is irrelevant; and 11) some of the
requested documents or information are protected
by the attorney-client privilege or the work product
doctrine.

FN1. Defendants filed the instant motion
for a Protective Order pursuant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Fed.R.Civ.P. 26(c).

FN2. The Honorable Jan E. DuBois referred these motions to this court for disposition by order dated December 10, 1999. (Document No. 44.)

FN3. Plaintiff served subpoenas upon ARA Leisure Services, Kinney Parking Services, Deloitte and Touche, Ticketmaster of Delaware Valley, Inc., Stephanie L. Franklin-Suber on behalf of the City of Philadelphia, and the City of Camden.

In the interest of achieving an expeditious resolution of the present discovery disputes, the court now addresses these eleven issues, instead of proceeding line by line through each interrogatory and document request. As further explained below, the court will order the parties to meet within ten (10) days of the date of this order as required by Loc. R. Civ. P. 26.1(f) to attempt to resolve any remaining objections, such as objections stating that certain requests are overly broad, or that compliance with specific requests would be burdensome or oppressive.[FN4] Should there remain any outstanding disputes between the parties, the plaintiff shall promptly send a letter to the court outlining those disputes, and, if necessary, the court will schedule a hearing.

FN4. The defendants have attacked specific interrogatories and requests for production of documents arguing that they are overly broad and production would be oppressive. *See e.g.* EFC's Memo. in Opposition to Motion to Compel Discovery at 13-17. It appears that the parties have not dedicated time to resolve these discrete issues, but rather have focused on the more general objections, which are addressed by the court today. The court is hopeful that this court's disposition of some of the larger issues will cause the parties to be more disposed to work out their differences with respect to the specific interrogatories and

document requests. The parties must use their best efforts to resolve these issues, rather than burdening the court with such minutia.

The court makes the following rulings on the eleven issues:

### 1. *Pre-1997 Conduct*

On February 17, 1998, plaintiff, New Park Entertainment, Ltd. ("plaintiff") filed a complaint against Spectrum, EFC, and Pavilion (collectively, " defendants") alleging claims based on the Sherman Act. 15 U.S.C. §§ 1, 2.[FN5] On or about August 18, 1998, plaintiff filed an Amended Complaint (Doc. No. 14.) In the Amended Complaint, plaintiff alleges that defendants conspired to restrain trade and commerce in the market for the promotion of popular music concerts in the Philadelphia area.

FN5. 15 U.S.C. §§ 1 and 2 provide:
§ 1. Trusts, etc., in restraint of trade illegal; penalty
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
§ 2. Monopolizing trade a felony; penalty
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

**\*2** As a result, plaintiff contends that EFC has developed a monopoly in the relevant market, and that plaintiff has been unable to compete since it attempted to enter the market in 1997. Specifically, plaintiff alleges that Spectrum and Pavilion gave EFC more favorable access to their venues than that given to plaintiff. Plaintiff further avers that defendants have conspired to put plaintiff at a competitive disadvantage to EFC, with the ultimate goal of forcing plaintiff out of business. (Amended Complaint at ¶ 33.) In support of its allegations, plaintiff maintains that Spectrum has performed the following acts in furtherance of the conspiracy: (1) offered concert dates to EFC which were previously denied to plaintiff; (2) failed to respond in a timely fashion to requests by plaintiff for price and date availability; (3) charged plaintiff prices higher than those charged to EFC for the use of Spectrum-owned facilities; (4) informed promoters and acts in 1997 that the charges for use of the Spectrum would increase if plaintiff co-produced the acts; and (5) refused to provide plaintiff with advances. (Amended Complaint at ¶ 35.)

Plaintiff further avers that in an attempt to monopolize popular music promotion, defendants conspired to restrain trade, and have prevented plaintiff from promoting concert events. (Amended Complaint ¶¶ 51-52, 56, 68.) Moreover, plaintiff alleges that the actions of Spectrum substantially reduced the profit margins for the few concert events which plaintiff was able to promote at a facility owned by Spectrum. (Amended Complaint at ¶¶ 53, 60, 70.)

On June 23, 1999, plaintiff served a Request for Production of Documents and Interrogatories on each defendant. On or about October 22, 1999, plaintiff issued third-party subpoenas to the custodian of records of the following nonparties: ARA Leisure Services ("ARA"), Kinney Parking Services ("Kinney"), Deloitte and Touche, L.L.P. ("

Deloitte"), Ticketmaster of Delaware Valley, Inc. (" Ticketmaster"), Stephanie L. Franklin-Suber on behalf of the City of Philadelphia, and the City of Camden (hereinafter "Third-Party Subpoenas"). Each of the subpoenas requested the production of numerous documents.

Defendants object to the production of any information regarding their activities prior to 1997, when plaintiff first entered the market. Plaintiff requests information from ARA, Kinney, Ticketmaster and the City of Camden dated from January 1, 1994 until the present; from Deloitte, information dated from 1990 to present; and from the City of Philadelphia, information dated from the year the First Union Spectrum was constructed through the present. Defendants argue that "any information sought which predates January 1, 1997, the date on which Plaintiff was formed, can shed absolutely no light on the issues in this case." (Spectrum's Mem. Of Law Opp. Pl.'s Mot. To Compel Disc. at 8.)

Even though the injury plaintiff complains of occurred in 1997 and forward, the activities of the defendants prior to 1997, during which time plaintiff alleges defendant EFC obtained its monopoly power, are relevant to the proof of plaintiff's claim. Although the contracts between the defendants and their related activities may be themselves be legal, they may be illegal should plaintiff be able to show that the arrangements among the defendants prior to 1997 created a monopoly which stifled competition. The history of the defendants' activities will shed light upon their illegality. Justice Brandeis made this point when he set forth the criteria for scrutinizing the legality of a restraint on trade under the "rule of reason":
**\*3** The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

purpose or end sought to be attained, are all relevant facts.

*Bd. of Trade of City of Chicago v. United States,* 246 U.S. 231, 238 (1918).

In *Caldwell-Clements, Inc. v. McGraw Hill Pub. Co., Inc.,* 12 F.R.D. 531 (S.D.N.Y.1952), the court rejected an argument identical to that made by the defendants here. In *Caldwell-Clements,* defendant made a motion to strike interrogatories served upon it by the plaintiff, in an action where defendant was accused of monopolization. Plaintiff was founded in 1935. Plaintiff sought information on defendant's activities from 1910. Defendant objected to any information which pre-dated 1935 when plaintiff entered the relevant market. When rejecting defendant's objection, the district court stated the following:
Defendant's suggested time limit of 1935 is perhaps based on the fact that plaintiff came into being at about that time. Information antedating plaintiff's existence, however, is relevant in this type of action and can very well be admissible at the trial. Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 72 F.2d 236, 239, certiorari denied 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 683, made it clear that evidence of transactions occurring long before the injury complained of and of the history of an organization is admissible upon the trial of mo nopolization cases.
....
In dealing with a similar problem Judge Rifkind has said that 'The asserted history of the conspiracy and not the scope of plaintiff's damage provides the temporal boundary for the discovery.' Hillside Amusement Co. v. Warner Bros. Pictures, Inc., D .C., 7 F.R.D. 260, 262.

12 F.R.D. at 536. Accordingly, for all the above reasons, defendants' objection to the production of information predating 1997 is meritless. The pre-1997 conduct is relevant and defendants and third-parties cannot withhold information solely on this basis. This court is mindful that producing the pre-1997 information may be onerous, but as one court has noted, "discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a

consideration than in other cases." *United States v. Int'l Bus. Mach. Corp.,* 66 F.R.D. 186, 189 (S.D.N.Y.1974) (quotation omitted). *See also Callahan v. A.E.V. Inc.,* 947 F.Supp. 175, 179 (W.D.Pa.1996) ("[d]iscovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citations omitted).

### 2. *Number of Interrogatories*

*4 Defendants object to the interrogatories propounded by the plaintiff because they exceed the number permitted by Federal Rule of Civil Procedure 33(a), which provides that interrogatories shall not exceed "25 in number including all discrete subparts." The court finds that plaintiff has propounded only 24 interrogatories, including any subparts. The court does not view subsidiary instructions to the interrogatories as propounding additional interrogatories, but merely specifying to the defendants the type of information plaintiff is eliciting in the interrogatories. Defendants' Rule 33(a) objection is therefore overruled.

### 3. *Defendants' Standing to Challenge Subpoenas Issued to Nonparties*

Plaintiff contends that defendants do not have standing to object to the issuance of the subpoenas served upon the nonparties. Typically, a motion for a protective order or a motion to quash subpoenas served on nonparties should be made by the party from whom the documents are sought. Fed.R.Civ.P. 45(c)(3)(A). However, an exception to this rule exists where a party claims that it has some personal right or privilege with respect to the subject matter sought in the subpoena directed to a nonparty. *Davis v. Gen. Accident Ins. Co.,* 1999 WL 228944, at *2-3 (E.D. Pa. April 15, 1999). Defendants further argue that a party has standing to seek a protective order if it believes that its interests are " jeopardized by discovery sought from a third person. " 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

§ 2035 (2d ed.1994); *Norris Mfg. Co. v. R.E. Darling Co.,* 29 F.R.D. 1 (M.D.Md.1961).

Defendants initially argue that the third party subpoenas are overly broad and seek information and documentation that are not reasonably calculated to lead to the discovery of admissible evidence. Specifically, defendants aver that the documents sought from the cities of Philadelphia and Camden bear no relevance whatsoever to any of the allegations in the Complaint, and are not calculated to lead to the discovery of admissible evidence. Defendants contend that the documents sought from the suppliers will be or have been provided to plaintiff in summary form by defendants, and the requests, therefore, are unnecessary, unduly burdensome, overly broad, expensive, and harassing. Defendants further aver that the documents sought from Deloitte are irrelevant, overly broad, confidential, and are subject to the accountant-client privilege. In their reply brief, defendants also argue that the information sought by the subpoenas contains confidential research, development and commercial information. [FN6]

> FN6. Defendants argue that the documents sought, such as advertisement and marketing materials which describe Spectrum's capabilities, are "precisely the type of trade secrets, confidential research, development and commercial information afforded protection by Rule 26(c)." (Defs.' Reply Br. at 5-6.)

Plaintiff counters that defendants have no standing to object to third party subpoenas since the reasons cited for a protective order are not grounds upon which a party may move to quash a subpoena directed to a nonparty. Therefore, plaintiff argues that defendants have no standing to challenge the subpoenas.

*5 After a review of the submissions of the parties, this court finds that defendants allege some personal right in the requested documentation, i.e., that the documents contain confidential research, development and commercial information.

Accordingly, this court is satisfied that defendants have standing to challenge the subpoenas issued by plaintiff. *See Davis v. Gen. Accident Ins.,* 1999 WL 228944, at *3.[FN7]

> FN7. The court further rejects plaintiff's argument that defendants' motion for a protective order is untimely. The fourteen day requirement for the service of a written objection to a subpoena duces tecum applies to the parties subject to the subpoena, not to the opposing party in the litigation. Neither Fed.R.Civ.P. 26(c) nor Rule 45, contains any fourteen day requirement for service of a motion for protective order.

### 4. *Documents Requested from Third Parties Have Been Provided to Plaintiff*

Defendants have moved to quash the subpoenas because many of the documents plaintiff seeks from the third parties have allegedly been supplied previously to plaintiff by defendants. This objection is meritless. While there may be some duplication between defendants' and the third parties' production of documents, there are sure to be many other documents in the possession of the third parties not in the possession of the defendants. Practically, there is no way for the plaintiff to frame its request to eliminate the possibility of duplication and at the same time ensure that it receives all of the documents it seeks from third parties. Moreover, plaintiff asserts that the defendants have not produced all of the documents it requested. Thus, plaintiff claims that it needs the third parties' documents, not only as a supplement to defendants' productions, but also to test the veracity of defendants' assertions that they have produced all the documents they were required to produce.

Finally, the defendants will not be over burdened by any duplication of production. Any prejudice with respect to time or cost will not be borne by defendants. The defendants are not producing duplicate documents, rather, the defendants are producing the documents and the third parties are producing some of them again. While plaintiff may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

have to bear the burden of paying for certain documents to be copied and produced more than once, plaintiff is obviously willing to assume that cost. For all of these reasons, defendants' motion to quash the subpoenas because some of the production might be duplicative, is denied.

### 5. Accountant-Client Privilege

Defendants contend that the documents requested from Deloitte should not be produced because they are protected by the accountant-client privilege recognized by Pennsylvania law. 63 Pa. Cons.Stat. Ann. § 9.11a (West Supp.1999). However, since this action is based solely on this court's federal question jurisdiction, and no accountant-client privilege exists under federal law, Deloitte cannot refuse production of the documents on the grounds of Pennsylvania's accountant-client privilege. *See United States v. Arthur Young & Co.,* 465 U.S. 805, 817, *cert. denied,* 466 U.S. 936 (1984); *Couch v. United States,* 409 U.S. 322, 335 (1973); *Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc.,* 671 F.2d 100, 103-04 (3d Cir.1982); *United States v. Keystone Sanitation Co., Inc.,* 899 F.Supp. 206, 208 (M.D.Pa.1995); *Am. Health Sys., Inc. v. Liberty Health Sys.,* 1991 WL 42310, at *2 (E.D.Pa. March 26, 1991).

### 6. Trade Secrets

*6 Defendants argue that production of documents by the third parties subpoenaed by the plaintiff should be precluded because some of the documents constitute "trade secrets." Before this court can bar discovery, the defendants must demonstrate that the information requested constitutes trade secrets, and that disclosure of the information would be harmful. *Smith v. Bic Corp.,* 869 F.2d 194, 199 (3d Cir.1989) ; *Kaufman v. Nationwide Mut. Ins. Co.,* 1997 WL 703175, at *2 n. 3 (E.D.Pa. Nov. 12, 1997). " Actually, orders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel or to the parties." *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 362 n. 24 (1979).

Defendants have pointed to broad categories of the requested documents that, in their view, constitute trade secrets. Assuming that some of the materials requested are trade secrets, the court will require plaintiffs and defendants to agree to the terms of a protective order, if defendants believe the existing confidentiality agreement is insufficient to protect their interests. The provisions of the protective order shall be agreed upon by counsel and approved by the court, to provide adequate safeguards for the defendants' confidential materials. As set forth below, the court will require the parties to meet within ten (10) days from the date of this order to agree upon the language of the protective order. After the agreement is executed, and approved by the court, the third parties shall promptly produce the documents to plaintiff in accordance with the protective order.

### 7. Events Other Than Concerts

In its Amended Complaint, plaintiff states that New Park was a new entity that sought to establish its presence in the Philadelphia Metropolitan area "in the business of promotion of concerts of popular music, including rock and roll, country western, rhythm and blues, folk and other popular music. The popular music concert promotion business is the relevant market in this litigation." (Amended Complaint ¶ 9.) Plaintiff does not allege any other market. Notwithstanding this narrow definition of the relevant market set forth in its pleadings, plaintiff seeks information from the defendants regarding "all entertainment events, including but not limited to ice shows, monster truck shows, dance shows, rodeos and circuses." (Pl.'s Req. for Production of Documents at ¶ 8.) This court agrees with the defendants that information regarding nonmusical events is not relevant to plaintiff's allegations. If it has some marginal value, the burden and expense of producing the information outweighs the likelihood of finding relevant material. Fed.R.Civ.P. 26(b)(2); *City of Waltham v. U.S. Postal Serv.,* 11 F.3d 235, 243 (1 st Cir.1993) ( "The court has broad power to control discovery. In doing so, it can weigh discovery burdens against the likelihood of finding relevant material.") (citation omitted). Accordingly, plaintiff's request for these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

materials is denied.

### 8. *Plaintiff's Requests to the Cities of Camden, NJ and Philadelphia, PA*

**\*7** As noted earlier, plaintiff has served subpoenas duces tecum upon the City of Philadelphia and the City of Camden. The documents sought relate to the two Spectrum facilities and the E-Center from the dates of their construction. In response to defendants' motion for a protective order, plaintiff argues that the documents requested from the cities are relevant in that "to the extent these venues received public funds, they may be obligated to provide open and equal access to promoters of entertainment events." (Pl.'s Br. Opp. Mot. For Prot. Order at 8.) Plaintiff alleges that these documents may establish that the defendants violated these municipalities' equal opportunity policies. Defendants correctly point out that plaintiff has filed a pure antitrust case, and advances no claim "for equal opportunity policy or violation of any city ordinance or law requiring equal access." (Reply Mem. Supp. Mot. For Prot. Order at 3.) Accordingly, this court is constrained to agree that the reasons advanced by plaintiff to justify its broad document requests to the two cities is not sufficient to overcome defendants' relevance objections. Accordingly, the subpoenas issued to the City of Philadelphia and the City of Camden are hereby quashed.

### 9. *Plaintiff's Request that EFC Identify All Formal Claims or Lawsuits Asserted Against EFC Involving Antitrust Issues*

Plaintiff seeks information regarding other formal claims or lawsuits filed against EFC involving antitrust issues. Defendants argue that the antitrust allegations in this litigation are specific to plaintiff, and that the identification of other lawsuits, if any, would not impact on the acts which led to plaintiff's claimed damages. This court finds that information regarding other claims or lawsuits involving antitrust issues, if any, are relevant to the antitrust action before this court. First, plaintiff's discovery request is narrow. Plaintiff asks only for the

identification of "formal claims or lawsuits which have been filed against" EFC involving antitrust issues. Moreover, in order to establish its conspiracy claim against EFC, plaintiff must prove that EFC acted with a specific intent to destroy competition or to build a monopoly. The Supreme Court has held that the intent which a plaintiff must show to warrant a finding of attempt to monopolize is not merely an intent to do acts which can be objectively analyzed as tending toward monopoly, but a specific intent to destroy competition or to build a monopoly. *Times-Picayune Pub. Co. v. United States,* 345 U.S. 594, 626 (1953). In that case, the Supreme Court stated that while monopolization "demands only a general intent to do the act, 'for no monopolist monopolizes unconscious of what he is doing,' a specific intent to destroy competition or build a monopoly is essential" before a defendant can be found guilty of an attempt to monopolize. *Id.* (citations omitted). *See also Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 153-54 (3d Cir.1981), *cert. denied,* 455 U.S. 1019 (1982). Information concerning other formal claims and lawsuits brought against EFC involving antitrust issues is relevant to its intent to engage in improper business conduct, and may lead to the discovery of other relevant evidence concerning the allegations raised by plaintiff. Plaintiff's motion is granted with respect to this area of discovery.

### 10. *Plaintiff's Request for Identification of Computer Programs*

**\*8** Plaintiff seeks to ascertain which computer programs EFC uses in its business. Defendants argue that the request should be denied because the identification of EFC's software is irrelevant. Defendants contend that while this information may be relevant in certain types of cases, such as intellectual property cases asserting ownership of computer software, it is not relevant in this case. This court agrees with defendants. Plaintiff has offered no reason why this information would be relevant, nor can this court imagine one. *See Harris Mkt. Research v. Marshall Mktg. Communications, Inc.,* 948 F.2d 1518, 1526 (10th Cir.1991) (in a breach of license agreement and copyright

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

infringement case, court affirmed denial of discovery of information concerning the "internal workings of [party's] computer program"). Plaintiff's motion is denied with respect to its request for information concerning the software used by EFC in its business.

### 11. *Defendants' Claims of Attorney-Client Privilege and Work Product Doctrine*

Defendants claim that certain of the documents and information requested by plaintiff are subject to the attorney-client privilege and/or the work product doctrine and, therefore, need not be produced. It does not appear that defendants have provided plaintiff with the information required by Fed.R.Civ.P. 26(b)(5) which states as follows:
When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

Courts in this district have held that parties must comply with the requirements of Fed.R.Civ.P. 26(b)(5) by providing a privilege log. *See Northwood Nursing & Convalescent Home, Inc. v. The Continental Ins. Co.,* 161 F.R.D. 293, 299 (E.D.Pa.1995). The court will order defendants to provide the privilege log.

An appropriate order follows.

### ORDER

AND NOW, this 13th day of January, 2000, upon consideration of Plaintiff's Motion to Compel Discovery, (Document No. 45), Defendants' Opposition thereto, (Document Nos. 46 and 48), Defendants' Joint Motion for Protective Order (Document No. 37), Plaintiff's Memorandum of Law in Opposition thereto (Document No. 38), and

Defendants' Reply, (Document No. 40), it is hereby

### ORDERED

1. Plaintiff's motion to compel discovery (Document No. 45) is GRANTED IN PART and DENIED IN PART;

2. Plaintiff's motion to compel is DENIED in the following respects:

(a) Defendants need not respond to Interrogatory no. 23 which seeks information relating to computer programs used by EFC in its business as this material is irrelevant;

(b) Defendants need not produce information outside of plaintiff's narrow definition of the relevant market, i.e., the popular music concert promotion business (Amended Complaint ¶ 9);

**\*9** (c) Defendants need not produce documents subject to the attorney-client privilege or work product doctrine. Defendants must produce a privilege log in accordance with Fed.R.Civ.P. 26(b)(5) to plaintiff within ten (10) days of the date of this order. This order is without prejudice to plaintiff's right to contest any claim of privilege or protection asserted by defendants;

(d) Within ten (10) days of the date of this order, the parties shall agree to the terms of a protective order, to be approved by the court, to provide adequate safeguards for the defendants' confidential materials, including materials which defendants contend constitute trade secrets; and

(e) In all other respects, and consistent with the accompanying Memorandum of Decision, plaintiff's motion to compel is GRANTED;

3. Defendants' joint motion for protective order is GRANTED IN PART and DENIED IN PART;

4. Defendants' joint motion for protective order is GRANTED to the extent that the subpoenas issued by plaintiff to the City of Philadelphia and the City of Camden are hereby QUASHED. In all other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

respects, and consistent with the accompanying Memorandum of Decision, defendants' joint motion for protective order is DENIED;

5. The parties shall meet with ten (10) days from the date of this order to resolve any remaining discovery disputes as required by Local Rule 26.1(f). The court cautions the parties that Local Rule 26.1(f) requires the parties to make a reasonable effort to resolve their disputes. Courts have held that "[t]his Rule is not merely a formalistic requirement', but was in fact 'intended to reduce the unnecessary burden on the Court' and opposing counsel." *Clymer v. Attorney General's Office,* 1999 WL 269930, at *3 (E.D. Pa. April 21, 1999) (quoting *Crown Cork & Seal Co., Inc. v. Chemed Corp.,* 101 F.R.D. 105, 106-07 (E.D.Pa.1984)). Also, the parties are reminded that discovery in an antitrust action is "most broadly permitted" and the cost or burden of providing the requested information is less weighty a consideration than in other cases. Should there still remain any outstanding discovery disputes between the parties, plaintiff shall promptly send a letter to the court outlining those disputes, and, if necessary, the court will schedule a hearing.

6. Plaintiff's request for sanctions and an award of attorneys' fees against defendants for failure to respond to the discovery requests is DENIED WITHOUT PREJUDICE, and plaintiff may renew the request should defendants fail to comply with this court's order.

E.D.Pa.,2000.
New Park Entertainment L.L.C. v. Electric Factory Concerts, Inc.
Not Reported in F.Supp.2d, 2000 WL 62315 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

✉ Send this document to a colleague                    Close This Window ·

·
**Opinion issued July 26, 2007**



In The
## Court of Appeals
For The
## First District of Texas

_____

**NO. 01-05-00132-CV**

_____

**GEORGIA-PACIFIC CORPORATION, Appellant**

**V.**

**FRED STEPHENS AND BETTY STEPHENS, Appellees**

**On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Cause No. 22045-1 BH02**

## OPINION

In this asbestos case, Georgia-Pacific Corporation seeks reversal of a judgment on a jury verdict against it and in favor of appellees, Fred and Betty Stephens. The Stephenses sued Georgia-Pacific and other defendants after Fred developed mesothelioma, alleging that he contracted the disease in part as a result of his exposure to Georgia-Pacific joint compound during the years he worked as a commercial painter. On appeal, Georgia-Pacific contends (1) the evidence is legally insufficient to support the jury finding of causation, (2) the trial court erred in excluding an affidavit from Fred detailing his exposure to asbestos gloves manufactured by codefendant Guard-Line, (3) the evidence is legally and factually insufficient to support the jury award of mental anguish damages, and (4) the evidence is legally insufficient to support the jury finding of malice. In a cross-issue, the Stephenses contend that the trial court erred in calculating prejudgment interest. Following the Texas Supreme Court's decision in *Borg-Warner Corporation v. Flores*, we conclude that the expert testimony presented in this case is legally insufficient to support the jury's causation finding. *See* No. 05-0189, 2007 WL 1650574, at *4–5 (Tex. June 8, 2007). We therefore reverse and render.

## I. FACTS

For over thirty years, Fred was employed in occupations that exposed him to asbestos and asbestos-containing materials. Fred served in the Navy from 1944 to 1946. During his service, he was exposed to asbestos and asbestos-containing products, including boilers, pipe covering, insulation, gaskets, packing, and pumps. He subsequently worked for the Washington State Bureau of Reclamation on the Grand Coulee Dam, from 1946 to 1954, where he was further exposed to asbestos and asbestos-containing products, including turbines, generators, insulation, gaskets, and pumps.

After finishing work on the dam, Fred became a commercial painter. He worked for Finrow Painting from 1954 until 1977 and then started his own business, Stephens Painting. Fred painted various commercial buildings, including schools, universities, hospitals, paper mills, saw mills, grocery stores, and automobile dealerships. At each of these sites, he was responsible for painting the entirety of the building, including the exterior and interior walls, the boiler room and pipes, and any equipment located within the building. During these years, Fred was exposed to asbestos and asbestos containing products.

Some of the buildings Fred painted were new or were under renovation. Before Fred and his crew began to paint the interior walls in a new building or one under renovation, sheetrockers and tapers applied joint compound to connect adjoining pieces of sheetrock. The joint compound usually came in a powdered form that the workers mixed with water before applying it to the walls. Once the compound dried, the sheetrockers sanded it to smooth the walls in preparation for painting. The mixing and sanding processes created a great deal of dust, and Fred was often present in the room while the sheetrockers performed their tasks. Once the sheetrockers finished sanding, Fred swept the dust from the walls and floor and proceeded to paint. Occasionally, Fred mixed and sanded joint compound himself.

Bestwall Company manufactured the joint compound at issue in this case. Georgia-Pacific acquired Bestwall via merger in 1965. The Georgia-Pacific/Bestwall joint compound contained between two and eight percent chrysotile asbestos. Georgia-Pacific began manufacturing an asbestos-free joint compound in 1977. As discussed further below, Fred and his coworkers from Finrow Painting recalled seeing the Georgia-Pacific brand of joint compound, among other brands, at some of their job sites.

Asbestos exposure is a commonly recognized factor that increases the risk of developing mesothelioma, a form of lung cancer. In January 2003, doctors diagnosed Fred with a right pleural biphasic mesothelioma. He died of the disease shortly after this trial.

## II. PROCEDURAL HISTORY

The Stephenses sued 106 named defendants and 100 John Doe defendants in Brazoria County, alleging, among other things, negligence, gross negligence, and strict liability. By the time of trial, the Stephenses, who reside in Washington State, had settled their claims with all but three defendants: Georgia-Pacific (a Georgia corporation), Kaiser-Gypsum (a Washington corporation), and Guard-Line (a Texas corporation). Kaiser-Gypsum settled after opening statements, leaving complete diversity of citizenship. Georgia-Pacific removed the case to federal court, alleging that Guard-Line, the Texas defendant, was fraudulently joined because the Stephenses had no evidence against it. *See* 28 U.S.C. § 1441(b) (2000) (prohibiting removal based on diversity jurisdiction when defendant is resident of forum state). Fred responded with an affidavit averring that he had breathed the dust from Guard-Line's asbestos gloves "repeatedly and continuously throughout [his] career as a painter which spanned over thirty years." After finding that Georgia-Pacific had failed to show fraudulent joinder, the federal court remanded the case back to state court.

When trial resumed, Georgia-Pacific moved to strike the Stephenses' experts, contending that their opinions were insufficiently reliable because they did not show that "Mr. Stephens' exposures to Georgia-Pacific's joint compound increased his risk of developing mesothelioma to at least twice the risk that he would have had otherwise if not exposed to Georgia-Pacific compound." [2] After conducting a *Robinson* hearing,

the trial court overruled Georgia-Pacific's motion and allowed the experts to testify.

At the close of the evidence, the court directed a verdict for Guard-Line. The court then submitted a jury charge inquiring about marketing defects and negligence as to the joint compound sold by Georgia-Pacific, together with the products of ten settling defendants. The jury found six of the eleven defendants, including Georgia-Pacific, liable for both a marketing defect and for negligence. It apportioned responsibility at twenty percent for Georgia-Pacific and sixteen percent for each of the other five liable settling defendants. The jury awarded Fred $1.5 million for past and future physical pain and impairment and $1 million for past and future mental anguish. It awarded Betty $1 million for loss of consortium and household services. It also found that Georgia-Pacific acted with malice and awarded $2.5 million in exemplary damages.

After making appropriate settlement credits and applying the punitive damages cap, the trial court signed a final judgment against Georgia-Pacific for $1,903,878. This appeal followed.

### III. CAUSATION ANALYSIS

Georgia-Pacific contends that the evidence is legally insufficient to support a finding of specific causation. Georgia-Pacific relies on the general rule that, in a products liability case, the plaintiff must prove that the defendant's product caused his injury. *See Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989). Georgia-Pacific notes that the Stephenses do not know—and did not prove—which asbestos product caused Fred's mesothelioma or contributed to an increased risk of his developing it; rather, they relied on expert testimony that any exposure to asbestos contributes to cause mesothelioma. Georgia-Pacific challenges this expert testimony on the ground that it does not comport with the requirements for expert testimony set forth by the Texas

Supreme Court in *Merrell Dow Pharmaceuticals, Inc. v. Havner*, and the general jurisprudence of the Texas Supreme Court that requires that exposure to a defendant's product be a "substantial factor" in causing a plaintiff's injury. *See* 953 S.W.2d 706, 717 (Tex. 1997).

## A.    Standard of Review

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

## B.    Specific Causation in an Asbestos Case

### 1.    *General versus Specific Causation*

Causation in toxic tort cases is often discussed in terms of general and specific causation. *See Havner*, 953 S.W.2d at 714. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.*

Georgia-Pacific does not mount a general causation challenge. That is, for the purposes of this appeal, Georgia-Pacific does not dispute that inhalation of chrysotile

asbestos fibers (the type of fibers found in Georgia-Pacific joint compound) can lead to the development of mesothelioma. Rather, Georgia-Pacific asserts that the Stephenses produced no evidence of specific causation. Georgia-Pacific asserts that "[t]he plaintiffs did not prove that Georgia-Pacific joint compound, or any comparable joint compound, caused mesothelioma in Mr. Stephens."

> 2.    *Competing Specific Causation Standards*

"A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury." *Gaulding*, 772 S.W.2d at 68. In *Gaulding,* the petitioners conceded that they were unable to identify the specific manufacturer of an asbestos-containing board that caused their mother's mesothelioma. *Id.* at 67. Their father had purchased the board at a salvage yard and had converted it into a vanity cabinet for their mother. *Id.* Because the petitioners did not know who had manufactured the board, they sued five companies that allegedly "'dominated the market of asbestos-containing wallboard' at the time of [their mother]'s exposure." *Id.* at 68. The Texas Supreme Court rejected each of the collective liability theories advanced by the petitioners, including the concert of action, enterprise, alternative, and market share liability theories. *Id.* at 68–71.

The Stephenses do not ask that we adopt any of the collective liability theories rejected by the Texas Supreme Court in *Gaulding*. Thus, the parties here agree that Texas law requires that a plaintiff must prove that the defendant's product specifically caused his asbestos-related injury. The parties disagree about the way in which a plaintiff can prove specific causation in an asbestos case.

> 3.    Celotex Corp. v. Tate*: The "Any Exposure" Test*

Until June 2007, the Texas Supreme Court had not considered specific causation

standards in an asbestos case since *Gaulding*, but a few of our sister courts had. In *Celotex Corp. v. Tate*, the Corpus Christi Court of Appeals recognized that an asbestos case in which the plaintiff alleges that the products of several defendants caused his injury presents a unique situation. 797 S.W.2d 197, 203–05 (Tex. App.—Corpus Christi 1990, writ dism'd by agr.). In *Tate*, the plaintiff knew which three defendants had supplied the raw asbestos to which he was exposed while working at a wallboard and plaster plant for nearly thirty years. *Id.* at 200, 204. Tate's problem was that none of his medical experts could determine which particular exposure to asbestos dust had resulted in his mesothelioma. *Id.* at 204.

The *Tate* court devised the following causation rule for multi-defendant asbestos cases: "If there was sufficient evidence presented by appellees showing that [appellant] supplied *any* of the asbestos to which Tate was exposed, then appellees have adequately met their burden of proof." *Id.* (emphasis in original). In other words, evidence of *any* exposure to a defendant's product, no matter the amount, was legally sufficient evidence to support a causation finding. *Id.* This causation standard presumes harm from exposure to the product, with the burden of apportioning that harm then placed among the defendant manufacturers. *See id.* The Corpus Christi court reaffirmed the applicability of this asbestos causation principle in *Borg-Warner Corporation v. Flores*. *See* 153 S.W.3d 209, 213–14 (Tex. App.—Corpus Christi 2004), *rev'd*, 2007 WL 1650574, at *8. The Texarkana Court of Appeals also adopted the *Tate* rule. *See* *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 691–92 (Tex. App.—Texarkana 1991, writ denied).

4.    Lohrmann: *The Frequency-Regularity-Proximity Test*

But not all courts agreed that "any exposure" sufficiently proved causation under

Texas law. One year after the Corpus Christi Court of Appeals issued the *Tate* decision, the United States Court of Appeals for the Fifth Circuit considered the asbestos causation issue. *See Slaughter v. S. Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). In *Slaughter*, the court applied "the most frequently used test for causation in asbestos cases[:] the 'frequency-regularity-proximity' test," first announced by the United States Court of Appeals for the Fourth Circuit in *Lohrmann v. Pittsburgh Corning Corp.*, as the appropriate causation test under Texas law. *Id.* at 171; *see also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986). Under the frequency-regularity-proximity test, a plaintiff must prove that, "more probably than not, he actually breathed asbestos fibers originating in defendants' products. This proof can be made by showing that plaintiff frequently and regularly worked in proximity to defendants' products such that it is likely that plaintiffs inhaled defendants' asbestos fibers." *Slaughter*, 949 F.2d at 171.

The Dallas Court of Appeals considered the frequency-regularity-proximity test in *Keene Corp. v. Gardner*. *See* 837 S.W.2d 224, 227 (Tex. App.—Dallas 1992, writ denied). The court declined to expressly adopt the test because it found no case in which a Texas state court had applied the test. *Id.* The court nonetheless relied on it to find that appellees had produced some evidence of causation. *Id.* at 227–28.

Several years later, the Fourteenth Court of Appeals similarly considered the frequency-regularity-proximity test, in *Click v. Owens-Corning Fiberglass Corp. See* 899 S.W.2d 376, 378 (Tex. App.—Houston [14th Dist.] 1995, no writ). It noted that the Dallas Court of Appeals had "applied" the test, while specifically declining to "adopt" it. *Id.* The Fourteenth Court reversed a directed verdict because the evidence showed that Click had insulated pipes for an extended period of time; appellees' products, which

contained asbestos, were used by his company for many years to insulate pipes; and appellees' products were seen near Click. *Id.* The court held that it was possible for a reasonable jury to conclude that Click more probably than not inhaled asbestos fibers from appellees' products, which led to his mesothelioma. *Id.* Hence, although our sister court did not expressly adopt the frequency-regularity-proximity test, it effectively applied the test in reaching its disposition. *Id.*

     *5.*    Havner*: Epidemiological Studies and Specific Causation Requirements*

Meanwhile, in toxic tort cases not involving asbestos, the Texas Supreme Court set forth guidelines for assessing the adequacy of exposure in *Merrell Dow Pharmaceuticals, Inc. v. Havner. See* 953 S.W.2d at 714–15. In *Havner*, the Texas Supreme Court held that, in cases in which no direct evidence of specific causation exists, plaintiffs may rely on studies showing an increased risk of their particular injury resulting from exposure to the substance at issue to raise a fact question on causation. *Id.* Specifically, the court held:

> In the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury [by relying on epidemiological studies]. The finder of fact is asked to infer that because the risk is demonstrably greater in the general population due to exposure to the substance, the claimant's injury was more likely than not caused by that substance. Such a theory concedes that science cannot tell us what caused a particular plaintiff's injury. It is based on a policy determination that when the incidence of a disease or injury is sufficiently elevated due to exposure to a substance, someone who was exposed to that substance and exhibits the disease or injury can raise a fact question on causation.

*Id.* at 715.

Use of an increased risk to prove causation comes with an important caveat: when a plaintiff relies on epidemiological studies to prove specific causation, he must show

that he is "similar" to the individuals in the study. *Id.* at 720. This includes:

> proof that the injured person was exposed to the same substance, that the
> exposure or dose levels were comparable to or greater than those in the
> studies, that the exposure occurred before the onset of injury, and that the
> timing of the onset of injury was consistent with that experienced by those
> in the study. Further, if there are other plausible causes of the injury or
> condition that could be negated, the plaintiff must offer evidence excluding
> those causes with reasonable certainty.

*Id.* (citation omitted); *see also Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d
591, 602 n.21 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("The supreme court
recognizes that it is possible that a toxic-tort plaintiff may not be able to find reliable
direct evidence of specific causation. A plaintiff in such a situation may be able to prove
specific causation circumstantially by taking general-causation evidence, such as
epidemiological studies, and showing he is similar to the studies' subjects." (citation
omitted)).

Thus, in the years since *Gaulding*, Texas courts developed different tests for
specific causation—each an effort to strike an appropriate balance between the
competing concerns in an asbestos case—namely, on the one hand, the difficulties
encountered by plaintiffs with asbestos-related diseases, who were exposed to multiple
asbestos-containing products, in proving which products caused their injury, and, on the
other, "the concept deeply imbedded in our jurisprudence that a defendant cannot be
found liable for an injury unless the preponderance of the evidence supports cause in
fact." *Havner*, 953 S.W.2d at 718; *see also Jackson v. Anchor Packing Co.*, 994 F.2d
1295, 1301 (8th Cir. 1993) ("Courts across this country have struggled with the
appropriate quantum of proof that asbestos plaintiffs should be required to produce in
order to submit the issue of causation to a jury. The courts have recognized that, given
the nature of asbestos exposure in large industrial settings and the long latency periods

for asbestos-related diseases, plaintiffs (especially bystanders) face a formidable task in showing, after many intervening years, exposure to a particular defendant's asbestos product and that exposure's causation of the plaintiff's injuries. On the other hand, the courts have also recognized the countervailing interest that states and defendants have in retaining the longstanding requirement of proximate cause in tort law." (citations omitted)).[3]

    6.    *The Texas Supreme Court Settles the Issue:* Borg-Warner v. Flores

It is within this framework that the Texas Supreme Court decided *Borg-Warner*, rejecting the "any exposure" test for specific causation and adopting a *Lohrmann/Havner* substantial-factor causation standard. *See* 2007 WL 1650574, at *4–5.

The asbestos containing product in *Borg-Warner* was brake pads. *Id.* at *1. Flores was a retired brake mechanic who developed asbestosis. *Id.* During his thirty-five year career, Flores used Borg-Warner brake pads on five to seven of the roughly twenty brake jobs he performed per week. *Id.* The Borg-Warner brake pads contained seven to twenty-eight percent asbestos fibers. *Id.* Grinding the brake pads generated clouds of dust that Flores inhaled while working in an eight by ten-foot room. *Id.*

Flores's experts opined that Borg-Warner brake pads caused Flores's asbestosis due to the asbestos dust he inhaled while grinding the brake pads. *Id.* First, Flores's pulmonologist noted that Flores's lungs showed scarring associated with asbestos fibers. *Id.* Second, Flores's expert as to exposure level noted that research involving the brake industry showed that "levels of exposure [to asbestos fibers] . . . could be significant," and pointed to OSHA studies and warnings regarding increased levels of asbestos exposure among brake mechanics. *Id.* at *2. Yet, Flores's experts conceded that "everyone is exposed to asbestos in the ambient air" and that they did not research Borg-

Warner's brake pads in particular to determine whether grinding them resulted in an increased risk of exposure to asbestos. *Id.* at *1–2. The jury found for Flores, apportioning thirty-seven percent of the liability for his asbestos-related injury to Borg-Warner. *Id.* at *3. The Corpus Christi Court of Appeals, applying the "any exposure" test announced in *Tate*, affirmed. *Id.*

The Texas Supreme Court reversed and rendered, concluding that Flores's expert testimony was legally insufficient proof of substantial-factor causation. *Id.* at *8. First, the Texas Supreme Court adopted the *Lohrmann* "frequency, regularity, proximity" standard but noted that, at its inception, the *Lohrmann* court's analysis went further than this tripartite test: the essence of *Lohrmann* is that the exposure must "be a 'substantial factor' in causing the disease." *Id.* at *4. Thus, a plaintiff must not only show that he was exposed to the asbestos-containing product on a regular basis, but also that such exposure was in sufficient amounts so as to increase his risk of developing an asbestos-related disease. *Id.* at *4–5. As the court observed, toxicologists agree that it is the dose of a potentially toxic substance that makes it poison. *Id.* at *5. As asbestosis is a dose-responsive disease, "so that the more one is exposed, the more likely the disease is to occur," the record must contain evidence as to the quantity of respirable asbestos for the jury to evaluate. *Id.* Relying on its *Havner* decision, the court reaffirmed the principle that "epidemiological studies are without evidentiary significance if the injured person cannot show that 'the exposure or dose levels were comparable to or greater than those in the studies.'" *Id.* (quoting *Havner*, 953 S.W.2d at 720–21).

The court thus concluded that the *Lohrmann* frequency-regularity-proximity test is necessary to prove causation, but alone is not sufficient. *Id.* at *4–5. To prove substantial-factor causation, a plaintiff must show both frequent, regular, and proximate

exposure to the product *and* reasonable quantitative evidence that such exposure increased the risk of developing the asbestos-related injury. *Id.* at *4–7. It is not adequate to simply establish that "some" exposure occurred. *Id.* at *8.

## B.    Application of the *Borg-Warner* Specific Causation Analysis

With the principles set forth in *Borg-Warner* in mind, we turn now to an analysis of the lay and expert testimony that the Stephenses presented at trial regarding the Georgia-Pacific joint compound as a cause of Fred's mesothelioma.

### 1.    *The Lay Testimony*

We first clarify the relevant timeframe for our analysis. Georgia-Pacific began manufacturing an asbestos-free joint compound in 1977. Thus, the relevant timeframe for our analysis is 1965, the year Georgia-Pacific acquired Bestwall, through 1977, the year Fred stopped working as a painter, and Georgia-Pacific removed all asbestos from its joint compound.

Fred testified live at trial and through a videotaped deposition played for the jury. During his deposition, Fred initially testified that he did not think he had personally worked with any Georgia-Pacific products, and that the only Georgia-Pacific product he ever worked around was sheetrock. Unlike Georgia-Pacific joint compound, Georgia-Pacific sheetrock did not contain asbestos. Later in the deposition, however, Fred clarified that he personally used Georgia-Pacific joint compound during the 1960s and 1970s: "Well, I have used that [Georgia-Pacific joint compound] quite a bit on jobs. In fact, I've gone into some small jobs and done the taping [applying joint compound] myself in a room. . . . I never was classified as a taper myself, but I've done quite a bit of taping." He also testified that after other workers applied and sanded Georgia-Pacific joint compound, he and his crew cleaned up by sweeping the dust off the floor with a

broom, which "put dust up into the air where you could see it." Moreover, during his live trial testimony, Fred responded in the affirmative to counsel's question, "[D]o you remember seeing Georgia-Pacific joint compound on a substantial number of jobs you worked on?"

Several of Fred's coworkers also testified regarding Fred's exposure to joint compound. Roger Lenius testified by videotaped deposition that he worked with Fred from 1968 until 1977. He stated that fifty to seventy-five percent of their job duties involved painting new construction and being around sheetrock work. When asked which joint compound products he observed during those years, he testified as follows: "Kaiser Gypsum. There was a Best Wall or Better Wall. I think later they were using— it was Georgia-Pacific. And then there was Flintkote and Gold Bond, but—these were some of the ones that seemed to be used more prevalently than others." When asked whether he noticed any particular brand more than another, he responded that "the jobs that seemed to have more of the particular products would be Kaiser Gypsum and Gold Bond. I noticed a lot of those. Flintkote was a fair amount . . . ."

Lenius testified that he and Fred were often in the same room, probably twenty to thirty feet away from the workers who mixed the dry joint compound with water. He testified that the mixing process was dusty, as was the sanding process: "When they sand a wall, of course, there's a big cloud of dust and a lot of times it drifts. . . . And then, of course, it falls to the ground, lays on the wall. So there's . . . quite a bit of dust everywhere." Lenius stated that he and Fred were "generally pretty close" to the sanders because they painted "right behind" them. When they spray painted, they stood a maximum of six feet away from the wall, and the pressure from the spray paint would reintroduce the asbestos dust into the air—in fact, it would "raise clouds of dust."

Lenius stated that he and Fred did "a little bit of taping but not very much. Very little."

Mack Stephens, Fred's brother, worked with Fred at Finrow Painting from 1964 until 1977. He testified via videotape that twenty percent of their jobs involved painting pipes, one-third involved painting the outside of buildings, fifteen to twenty percent involved painting concrete walls, twenty percent involved painting equipment, and the remainder (seven to twelve percent) involved painting interior walls. He further testified that seventy percent of those jobs involved sheetrock work. He recalled the following brands of joint compound at their job sites: Georgia-Pacific Ready-mix, Georgia-Pacific dry powder, Flintkote patching, Kelly Moore patching, and Bestwall. Mack did not personally observe Fred using any Georgia-Pacific dry powder product.

Mack testified that he and Fred were often in the same room with the workers who mixed and sanded the joint compound. Both of these processes caused dust to fly everywhere. Before Fred and his crew could paint, Fred cleaned the floor by sweeping the dust with a broom. It would be "so dusty you couldn't hardly see the room." Mack also testified that, although it was not a regular part of their job to do sheetrock patch work, he observed Fred personally apply and sand joint compound while at Finrow. He recalled seeing Fred sand the joint compound more than once, but could not recall how often.

Michael Stephens, Fred's son, worked at Finrow Painting during the summers of 1968 through 1970, full-time starting in 1971 until the end of 1972, and then again from 1975 until 1977. During the summers of 1964 through 1968, Michael visited Fred at job sites a couple of times each week for a few hours. Michael recalled seeing the following joint compounds at job sites: "I can remember Bestwall, I can remember Flintkote.

Those two, I can remember them in the dry. I can remember Georgia-Pacific, I can remember Paco. There's some others I can remember, like Durabond, USB. Those are the ones I can remember." Michael testified that his father personally used Bestwall joint compound at a Safeway job site. Specifically, Fred mixed, applied, and sanded the Bestwall compound and breathed the resulting dust. Bestwall was the product that the crew carried in their vehicle, so they used it for patch work at other job sites, as well.

Michael also testified that Fred and his crew were often in the same areas where sheetrock work was being done. They were around the workers who mixed and sanded the joint compound, and there would be dust in the air and on their persons from these processes. Fred cleaned the dust with a broom before spray painting. Both the cleaning and painting processes were dusty, as well.

### 2.    *The Expert Testimony*

The Stephenses called Jerry Lauderdale, an industrial hygienist, Samual Hammar, M.D., a pathologist, and Alice Boylan, M.D., a board-certified specialist in pulmonary disease, internal medicine, and critical care, as expert witnesses on the causation issue. Lauderdale opined, "with respect to Georgia-Pacific joint compounds . . . [Fred's] exposures were at a level and of the type that are known by industrial hygienists to contribute to the development of asbestos-related disease." He based his opinion on a review of the deposition testimony of the lay witnesses, Fred's medical records, and literature relating to asbestos exposure. The literature upon which Lauderdale relied, as discussed in greater detail below, detected asbestos fibers in excess of OSHA's permissible exposure limits during joint compound mixing and sanding operations.[4] Lauderdale thus concluded, "it is possible to say . . . that [Fred] would have from time to time been exposed to concentrations above permissible exposure limits . . . ."

Lauderdale conceded, however, that he could not "come up with a range of likely doses that Mr. Stephens would have had to joint compound asbestos." With respect to estimating dosage, Lauderdale testified, "It is my opinion that in a scientific sense, I don't believe that it can be done due to the fact there is not enough information about [Fred's] exposures; and it would be involving more guesswork than science to come up with estimates or guesses for those type of numbers." Nor could Lauderdale estimate the amount of time Fred was exposed to joint compound generated asbestos dust in excess of OSHA permissible levels.

Lauderdale did not testify as to the minimum level of exposure to asbestos dust from joint compound that could lead to an increased risk of mesothelioma. Instead, he observed that "asbestos-related diseases are based on cumulative exposures and there is no way to separate out what exposure, in fact, causes development of the disease." It was Lauderdale's opinion "that every exposure does contribute to the development of—potential to develop mesothelioma."

Dr. Hammar opined that chrysotile asbestos, the kind found in the Georgia-Pacific joint compound, "cause[s] dose-related asbestos disease, which means that you can see cases of all types caused by chrysotile asbestos at different doses in different individuals." He further opined that the level of exposure it takes to cause mesothelioma "could be any level above what is considered to be background, which, from my definition, would be anything greater than .1 fiber cc years." In sum, he stated: "I'm going to express an opinion that each and every exposure that an individual has in a bystander occupational setting causes their mesothelioma." Like Lauderdale, Dr. Hammar relied upon various studies concerning asbestos exposure and asbestos-related disease as the foundation for his opinion. Dr. Hammar also testified that mesothelioma

is a dose-responsive disease, and that a threshold exists "above which you may be at risk, below which you may not be at risk" for developing the disease.

Dr. Boylan testified that Fred's mesothelioma developed as a result of asbestos exposure, but had no information about the particular asbestos-containing products to which Fred was exposed. She did not express an opinion "as to which of those specific products . . . actually caused his disease." Dr. Boylan testified that people who live in a normal urban environment will have asbestos fibers in their lungs as a result of breathing asbestos in the air. In her opinion, mesothelioma, like other asbestos diseases, is a dose-responsive disease—the lower one's exposure to asbestos, the less likely one is to develop mesothelioma. She could not offer an opinion as to the level of exposure that would be low enough such that the exposure could not be considered a cause of mesothelioma in an individual. Similar to Dr. Hammar, Dr. Boylan observed that "our understanding of the development of cancer as it stands today is that all exposures to a carcinogen contribute to the development of a malignancy, and you can't say just one because it isn't just a one-hit injury that will cause cancer. You have to have multiple genetic alterations to lead to a malignant cell, so I would say all [exposures] do."

Georgia-Pacific objected that the literature relied upon by Lauderdale and Hammar does not support an "any exposure" link between Georgia Pacific's asbestos-containing joint compound and mesothelioma. Thus, we examine the literature presented in connection with this trial.[5]

     a.    *Quantitative Evidence of Increased Risk*

The Stephenses' experts relied on numerous studies showing that chrysotile asbestos is capable of causing mesothelioma generally, thus providing some evidence of general causation. For example, Dr. Hammar cited one study that concluded as follows:

> In contrast to amphibole forms of asbestos, chrysotile asbestos is
> often claimed to be only a minor cause of malignant pleural mesothelioma .
> . . . Reported data[, however,] do[es] not support widely quoted views
> regarding the relative inertness of chrysotile fibers in mesothelioma
> causation. In fact, examination of all pertinent studies makes it clear that
> chrysotile asbestos is similar in potency to amphibole asbestos. Since
> asbestos is the major cause of mesothelioma, and chrysotile constitutes 95%
> of all asbestos use world wide, it can be concluded that chrysotile asbestos
> is the main cause of pleural mesothelioma in humans.

In another study, Dr. Yasunosuke Suzuki examined the lung and mesothelial tissues of

151 individuals diagnosed with mesothelioma and found that in sixty-eight percent of

the cases, the mesothelial tissue contained only chrysotile fibers—that is, there was a

complete absence of amphibole fibers. This observation led Dr. Suzuki to conclude that

"chrysotile fibers [a]re capable of inducing human malignant mesothelioma." Georgia-

Pacific did not call any expert witnesses, or rely on any studies reaching the opposite

conclusion.

To support their claim of specific causation, the Stephenses' experts relied on four

studies addressing occupational exposure to joint compound among tapers and sheetrock

workers. Three of these studies measured the average levels of airborne asbestos fibers

from joint compound products to which sheetrock workers are exposed on a daily basis.

For example, one study found that the mean asbestos fiber concentration during pole

sanding, which typically consumes ten to fifteen percent of a worker's day, was ten

fibers per cubic centimeter. [6]     The same study found that a worker standing eight feet

away from the individual doing the pole sanding would be exposed to 8.6 fibers per

cubic centimeter on average, while a worker standing twenty-five feet away would be

exposed to 4.8 fibers per cubic centimeter. The study also found that a worker mixing

dry joint compound, which typically takes sixty to ninety seconds, would be exposed to

47.2 fibers per cubic centimeter on average. Someone standing ten to twenty feet away would be exposed to 5.8 fibers per cubic centimeter, while someone standing sixteen to thirty-five feet away would be exposed to 2.6 fibers per cubic centimeter. Finally, the study found that, fifteen minutes after a worker finished sweeping dust from joint compound off the floor, he would be exposed to 41.4 fibers per cubic centimeter on average. The average exposure decreased to 26.4 fibers per cubic centimeter thirty-five minutes after sweeping. The study authors noted that many of these exposures exceeded the then-existing OSHA "threshold limit value" of five fibers per cubic centimeter.[7]

A second study found similar, but generally lower, mean asbestos fiber concentrations. For instance, it found that a worker mixing dry joint compound would be exposed to 11.2 fibers per cubic centimeter on average. An individual pole sanding would be exposed to 4.6 fibers per cubic centimeter, while an individual hand sanding would be exposed to 11.5 fibers per cubic centimeter. A worker sweeping would be exposed to 19.6 fibers per cubic centimeter. The third study reached similar conclusions. These three exposure studies, however, dealt solely with potential exposures during the mixing and sanding processes—they did not attempt to correlate the exposures to any incidence of mesothelioma or asbestos-related disease among the study subjects.

While the fourth study investigates mesothelioma among workers exposed to asbestos, the authors did not measure exposure levels—rather, they undertook a mortality analysis involving 12,873 deceased members of the Operative Plasterers' and Cement Masons' International Association, a union composed of plasterers, cement masons, and shophands. The study described plasterers' job duties as follows:

Plasterers, in general, are responsible for all interior and exterior plastering

[8]
of drywall, cement, stucco, and stone imitation as well as the taping   and
pointing of all joints, nail holes and bruises on wallboard or drywall.
Plasterers are also responsible for the preparation, installation, and repair of
all interior and exterior insulation systems, and the fireproofing of steel
beams and columns. Approximately 10% of the plasterers' duties involve
insulation work . . . .

The study thus noted that plasterers are exposed to asbestos from a variety of sources,
including spray insulation, plastering, taping, asbestos removal during demolition
projects, and fireproofing mixture. Plasterers comprised about one-third of the study
population.

The authors conducted a proportionate mortality ratio ("PMR") analysis by
comparing the number of deaths in the study population attributable to a certain disease
with the number of deaths expected from that disease. For example, there were 1,157
observed deaths from diseases of the respiratory system generally, compared with 1,155
expected deaths, leading to a PMR of 100. For asbestosis specifically, there were fifteen
observed deaths, compared with only two expected, leading to a PMR of 693.

With respect to mesothelioma, the study concluded as follows: "Mesothelioma, a
relatively rare cancer death, was observed for four members and the risk was elevated,
PMR=188, but not statistically significant." The authors later explained, however, that
mesothelioma is frequently misdiagnosed. Consequently, the authors "manually
reviewed all hard copy death certificates in [thei]r possession (N=9,449) to obtain a
more accurate assessment of mesothelioma-related deaths in this cohort. [They]
identified 40 mesothelioma deaths; even though only one-third of [the] cohort were
plasterers, 50% of those who died of mesothelioma worked in this trade."

The study's ultimate conclusion is that the PMR for mesothelioma resulting from
the cohort's exposure to a variety of asbestos-containing products is 188 (which we

[9]

assume is synonymous with a relative risk of 1.88),    but the study authors
[10]
observed that such an increase is not statistically significant.    And, although the
study authors manually reviewed 9,449 death certificates and identified thirty-six
additional cases of mesothelioma, they did not calculate a new PMR (i.e., relative risk)
[11]
using this revised data or discuss its statistical significance.    They noted, however,
that "deaths [due to mesothelioma] are considered to be quite rare in the general
population."

      *b.*    *Evidence of Frequent-Regular-Proximate Contact*

The Stephenses' expert witnesses were unable to estimate Fred's exposure to
Georgia-Pacific joint compound. For example, Jerry Lauderdale, the Stephenses'
industrial hygiene expert, testified that Fred "was exposed to joint compounds, including
Georgia-Pacific, on numerous occasions. As far as how much, I can't give you a
quantitative estimate of how much he was exposed to. . . . It's not scientifically possible
to come up with a meaningful estimate of what that was." In fact, he conceded that "it
would be a guess rather than a scientific exercise" to determine "how many times [Fred]
was actually exposed to joint compound."

Fred and his crew painted interior walls about seven to twelve percent of the time,
and other workers were doing sheetrock work on about fifty to seventy-five percent of
these jobs. They worked in close proximity to the sheetrock workers, who mixed and
sanded joint compound, both of which were dusty processes. Before Fred and his crew
could paint, they had to sweep dust off the floor. Moreover, the spray painting process
itself stirred up asbestos dust. The record does not reveal, however, how frequently this
dust came from Georgia-Pacific's joint compound, as opposed to one of the other joint
compound products Fred's coworkers recalled seeing on their job sites. Fred's

coworkers recalled seeing ten different joint compound products: Kaiser Gypsum, Bestwall, Flintkote, Gold Bond, Georgia-Pacific Ready-mix, Georgia-Pacific dry powder, Kelly Moore patching, Paco, Durabond, and USB. Lenius testified that Kaiser Gypsum, Gold Bond, and Flintkote were used most frequently.

In this record, there is no evidence concerning the percentage of Georgia-Pacific joint compound used in comparison to the quantity of other products used on Fred's job sites, nor any quantitative estimate of the number of times Georgia-Pacific joint compound was used on Fred's job sites. On the other hand, there is evidence that three other joint compounds were used more frequently than Georgia-Pacific's product. Thus, although there was evidence that Fred was exposed to asbestos-containing joint compound generally, there was no quantitative evidence presented upon which Fred's experts could rely to determine that he was exposed to Georgia-Pacific's product in sufficient quantities to have increased his risk of developing mesothelioma. *See Borg-Warner*, 2007 WL 1650574, at *6 ("[A]bsent any evidence of dose, the jury could not evaluate the quantity of respirable asbestos to which Flores might have been exposed or whether those amounts were sufficient to cause asbestosis. Nor did Flores introduce evidence regarding what percentage of that indeterminate amount may have originated in Borg-Warner products.").

Other courts that have considered similar factual scenarios have reached the same conclusion. For example, the Eastland Court of Appeals recently decided a case in which a brake worker had inhaled asbestos dust from installing the brake products of six different manufacturers. *Vaughn v. Ford Motor Co.*, 91 S.W.3d 387, 393 (Tex. App.— Eastland 2002, pet. denied). When Vaughn was asked whether he had used the various products equally, one more than another, or one less than another, he replied that he did

not know. *Id.* The court, applying Illinois law regarding the frequency-regularity-proximity test, concluded that, "[a]lthough there was evidence from which a jury could have found that Vaughn's exposure to asbestos-containing brake products was a cause of his [mesothelioma] and evidence that each exposure contributed to his disease, there was no evidence from which a jury could have found that Vaughn was frequently exposed to any particular defendant's brake product." *Id.* at 392, 394.

Likewise, the United States Court of Appeals for the Eighth Circuit decided a case in which several witnesses testified that they had either seen or installed Owens-Corning Kaylo insulation at a tire plant. *See Jackson*, 994 F.2d at 1304. The evidence indicated that numerous other insulation products were also in use at the plant. *See id.* at 1299. The court found that the plaintiffs had failed to meet the frequency-regularity-proximity test, stating as follows:

> With respect to the bystander plaintiffs, we find that the evidence . . . is insufficient to support a jury finding that Owens-Corning's products were more likely than not a proximate cause of the plaintiffs' injuries. The plaintiffs' witnesses have not stated how much Kaylo insulation was used at the Mohawk plant, how often it was used, and where in the plant it was used. They have not given an estimate as to the amount of Kaylo used in relation to the other insulation products installed in the plant. They have, therefore, failed to show the frequency and regularity of the use of Kaylo insulation.

*Id.* at 1305.

Other products at issue in the case were gaskets and packing materials manufactured by a company called Chesterton. *Id.* at 1307. With respect to a particular plaintiff's frequency and regularity of exposure, the Eighth Circuit observed as follows:

> Carr testified that he had worked with gaskets and packing "many times" during his years as a mechanic. Thus, it appears at first glance that Carr has satisfied the "frequency, regularity and proximity" test. Carr's case has a missing link, however. Although Carr said that he had used gaskets and packing many times, the record contains no evidence that he used

> Chesterton gaskets and packing many times. We have no way of knowing
> whether Carr selected Chesterton products for two jobs or two hundred jobs.

*Id.* at 1308; *compare Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir. 1990)
(frequency-regularity-proximity test not met where, although several witnesses were able
to place defendant's asbestos-containing product in plant, no witness was able to say how
much of product was used and how many times it was used in given area), *and
Lohrmann*, 782 F.2d at 1163 (exposure to asbestos-containing pipe covering on ten to
fifteen occasions of between one and eight hours duration insufficient to satisfy
frequency-regularity-proximity test), *with Rotondo v. Keene Corp.*, 956 F.2d 436, 442
(3d Cir. 1992) (frequency-regularity-proximity test met where evidence showed that
plaintiff worked in boiler room at least two days per week for at least three to four
months, and pipecoverers used defendant's asbestos-containing product in boiler room
fifty percent of time), *and Goss v. Am. Cyanamid, Co.*, 650 A.2d 1001, 1006 (N.J. Super.
Ct. App. Div. 1994) (frequency-regularity-proximity test met where plaintiff testified that
"most" asbestos pipe covering he used was manufactured by defendant, and coworker
testified that he used defendant's pipe covering approximately ninety percent of time and
installed it in areas where plaintiff regularly worked). *But cf. Owens-Corning Fiberglas
Corp. v. Garrett*, 682 A.2d 1143, 1156–57 (Md. 1996) (holding that frequency-
regularity-proximity test was satisfied by coworkers' general testimony that they used
variety of asbestos-containing products at plant, including defendant's product, and their
testimony was corroborated by invoices showing purchase of defendant's product).

### 3.    *Legal Sufficiency of the Evidence Presented*

*Borg-Warner* requires that, for a plaintiff to prove specific causation by relying on
epidemiological studies showing an increased risk of developing mesothelioma, he must

show that the frequency and regularity of his exposure to the asbestos-containing product is comparable to or greater than that of the individuals in the studies upon which he relies. *See* 2007 WL 1650574, at *5. As discussed above, the evidence of Fred's exposure to Georgia-Pacific's joint compound is legally problematic because it lacks the quantitative element that *Lohrmann* and *Borg-Warner* require. *See id.* at *6. Without quantifying Fred's exposure to Georgia-Pacific joint compound, the Stephenses' experts inferred causation by opining that every exposure to an asbestos-containing product "contributes to cause" mesothelioma. That is, the experts posited that all asbestos fibers cause mesothelioma because all asbestos fibers have the ability to cause cancer-inducing mutations in cells and it is not possible to pinpoint which particular fibers actually caused the mutations. Dr. Hammar summarized the theory as follows: "I think you would have to say that . . . any exposure that [Fred] had to asbestos from when he first started working up until, say, 1986, is causative of his mesothelioma."

The Stephenses' experts failed to show, however, that the "any exposure" theory is generally accepted in the scientific community—that *any* exposure to a product that contains asbestos results in a statistically significant increase in the risk of developing mesothelioma. Each of the experts acknowledged at trial that mesothelioma, like asbestosis, is dose responsive—some non de minimus occupational exposure must occur to increase one's risk of developing the disease. Although the lay testimony presented at trial is sufficient to show that Fred worked in close proximity to asbestos-containing joint compound generally, it is legally insufficient to show that Fred frequently and regularly worked in close proximity to *Georgia-Pacific* joint compound so as to be exposed to enough of its asbestos to increase his risk of developing mesothelioma. The record does not contain any quantitative estimate of Fred's exposure to Georgia-

Pacific's joint compound, as the Stephenses' experts conceded.[12]   Moreover, although the literature and scientific studies the Stephenses' experts relied upon support a reasonable inference that exposure to chrysotile asbestos can increase a worker's risk of developing mesothelioma, none of the studies undertake the task of linking the minimum exposure level (or dosage) of joint compound with a statistically increased risk of developing of the disease. The experts in this case, which was tried before the *Borg-Warner* decision, instead relied upon the "any exposure" theory of causation that the Texas Supreme Court has rejected.[13]   Without quantitative evidence of exposure and any scientific evidence of the minimum exposure level leading to an increased risk of development of mesothelioma, we hold that the opinions offered by the Stephenses' experts in this case lack the factual and scientific foundation required by *Borg-Warner* and thus are legally insufficient to support the jury's causation finding.

## IV. CONCLUSION

Applying the Texas Supreme Court's test in *Borg-Warner* for specific causation in asbestos cases, we conclude that the expert testimony regarding causation presented at trial is legally insufficient proof of substantial-factor causation necessary to support the jury's negligence and strict liability marketing defect verdicts against Georgia-Pacific. We therefore reverse and render.

Jane Bland
Justice

Panel consists of Justices Alcala, Hanks, and Bland.

[2]
    *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

[3]
    We note that courts in every circuit but the D.C., First, and Second, as well as courts in several states, including Arkansas, Illinois, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, Oklahoma, Pennsylvania, and Washington, have adopted the frequency-regularity-proximity test.

[4]
    Lauderdale relied on the literature admitted as plaintiffs' exhibits 43, 566–68, and 635–38. Georgia-Pacific objected to the introduction of the literature, contending among other grounds that none of it linked asbestos-containing joint compound with mesothelioma. The trial court overruled the objections and admitted the literature into evidence.

[5]
    The Stephenses also called Dr. Barry Castleman, who testified in *Borg-Warner* as an expert as to "what is in the public domain in medical literature." *See Borg-Warner Corp. v. Flores*, No. 05-0189, 2007 WL 1650574, at *2 (Tex. June 8, 2007). Dr. Castleman did not testify in this case about causation. He stated, however, that at the time of trial, there had not been studies done to determine whether a link exists between exposure to joint compound and mesothelioma.

[6]
    Pole sanding involves the use of a five-foot pole with a steel plate to which a piece of sandpaper is attached.

[7]
    Jerry Lauderdale, the Stephenses' industrial hygiene expert, testified in detail about OSHA's threshold limit values ("TLVs") for asbestos exposure. He explained that OSHA implemented both a "time-weighted average" TLV and a "short-term exposure" TLV. The time-weighted average TLV takes into account a worker's asbestos exposure over the course of an entire eight-hour work day, whereas the short-term exposure TLV measures the number of asbestos fibers to which a worker is exposed when undertaking a single activity (e.g., mixing or pole sanding), even though that activity might last only a few minutes. In 1971, OSHA imposed a time-weighted average TLV of twelve fibers per cubic centimeter. A year later, it reduced the time-weighted average TLV to five fibers per cubic centimeter and imposed a new short-term exposure TLV of ten fibers per cubic centimeter. In 1976, OSHA further reduced the time-weighted average TLV to two fibers per cubic centimeter, but retained the short-term exposure TLV of ten fibers per cubic centimeter. Ten years later, OSHA reduced the overall TLV to 0.2 fibers per cubic centimeter, and then to 0.1 fibers per cubic centimeter in 1994.

[8]
    "Taping" refers to the application of joint compound.

[9]
    None of the Stephenses' experts discussed the mortality study in detail, and no one explained how PMR relates to relative risk. After reviewing the study, however, it is our understanding that PMR and relative risk are synonymous.

[10]
    The relative risk value is important because the *Havner* court held that "there is a rational basis for relating the requirement that there be more than a 'doubling of the risk' [i.e., a relative risk of 2.0] to our no evidence standard of review and to the more likely than not burden of

proof." 953 S.W.2d 706, 717 (Tex. 1997). Although the court expressly refused to decide whether "epidemiological studies with relative risks of less than 2.0 might suffice if there were other evidence of causation," it rejected many of the Havners' studies on the grounds that the relative risk did not exceed 2.0 and/or the results were not statistically significant. *See, e.g., id.* at 719, 725 ("One study . . . had a relative risk of 1.18 and a confidence interval of 0.65 to 2.13. However, the relative risk would need to exceed 2.0, and the confidence interval could not include 1.0, for the results to indicate more than a doubling of the risk and a statistically significant association between Bendectin and limb reduction birth defects.").

[11]
    The *Havner* court rejected similar "data reanalysis" that did not identify a significance level or confidence interval. *See, e.g., id.* at 726 ("There is no explanation [in the data reanalysis] . . . of the significance level used to obtain the 2.8 [relative risk] result. The result may well be statistically inconclusive at a 95% confidence level. We simply do not know from this record. Without knowing the significance level or the confidence interval, there is no scientifically reliable basis for saying that the 2.8 result is an indication of anything.").

[12]
    Fred answered affirmatively at trial that Georgia-Pacific joint compound was used on a "substantial" number of jobs. But, as Lauderdale conceded, none of the lay witnesses attempted to provide a quantitative estimate regarding usage of Georgia-Pacific joint compound.

[13]
    This is not to suggest that the levels of exposure evidenced in this case could never be proved to increase the risk of developing mesothelioma. In *Borg-Warner*, the supreme court notes a treatise that links mesothelioma with "low levels of asbestos exposure." 2007 WL 1650574, at *5. Here, however, the experts and studies upon which they relied did not attempt to correlate low exposures with increased risk, but used instead an "any exposure" test. If "any exposure" leads to an increased risk of mesothelioma, then the testimony in this case proved that Fred was sufficiently exposed. The studies admitted in this trial record, however, do not link "any exposure" to asbestos with an increase in the risk of developing mesothelioma.