UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
           Debtors.  .
                          .    July 5, 2007
. . . . . . . . . . . . ..      8:39 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis
                          By:  DAVID M. BERNICK, ESQ.
                               SAM BLATNICK, ESQ.
                               LISA ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Reed Smith
                          By:  JAMES J. RESTIVO, ESQ.
                               DOUG CAMERON, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA  15219


Audio Operator:           Lynn Wallace


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For W.R. Grace:                 W.R. Grace
                                By:  RICHARD FINKE, ESQ.
                                7500 Grace Drive
                                Columbia, MD  21044

For the Debtors:                Kirkland & Ellis
                                By:  JANET BAER, ESQ.
                                     MICHAEL DIERKES, ESQ.
                                200 East Randolph Drive
                                Chicago, IL  60601
                                (Telephonic appearance)

For the PD Committee:           Speights & Runyan
                                By:  DANIEL SPEIGHTS, ESQ.
                                     MARION FAIREY, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924

For the PD Committee:           Bilzin Sumberg Baena Price &
                                  Axelrod LLP
                                By:  SCOTT BAENA, ESQ.
                                     JAY SAKALO, ESQ.
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131
                                (Telephonic appearance)

For UC, CSU:                    Brandi Law Firm
                                By:  TERENCE EDWARDS, ESQ.
                                44 Montgomery St., Suite 1050
                                San Francisco, CA  94104
                                (Telephonic appearance)

For the Roman Catholic          Dies & Hile LLP
Church Archdiocese of           By:  MARTIN DIES, ESQ.
New Orleans:                    (Telephonic appearance)

For the Official Committee      Stroock & Stroock & Lavan
Unsecured Creditors'            By:  ARLENE KRIEGER, ESQ.
Committee:                      180 Maiden Lane
                                New York, NY  10038-4982
                                (Telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For the Official              LECG
Committee of Asbestos         By: ALAN MADIAN, ESQ.
Property Damage Claimants:        SEAN WALSH, ESQ.
                              (Telephonic appearance)

For the PD Committee:         Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                              By:  JAY SAKALO, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131
                              (Telephonic appearance)

For the PD Committee:         Ferry, Joseph & Pearce, P.A.
                              By:  THEODORE J. TACCONELLI, ESQ.
                              824 Market Street, Suite 19899
                              Wilmington, DE  19899
                              (Telephonic appearance)

For Fireman's Fund:           Stevens & Lee, P.C.
                              By:  DAVID R. BEANE, ESQ.
                              111 North Sixth Street
                              P.O. Box 679
                              Reading, PA  19603
                              (Telephonic appearance)

For Allstate Insurance:       Cuyler Burk, LLP
                              By:  ANDREW CRAIG, ESQ.
                              Parsippany Corporate Center
                              Four Century Drive
                              Parsippany, NJ  07054
                              (Telephonic appearance)

For Murray Capital            Murray Capital Management, Inc.
Management, Inc.:             By:  MARTI MURRAY
                              (Telephonic appearance)

For Creditor, Shareholder     Tocqueville Asset Management
for W.R. Grace & Co.:         By:  PETER SHAWN
                              (Telephonic appearance)

For David T. Austern,         Phillips, Goldman & Spence, P.A.
the Future Claimants'         By:  JOHN C. PHILLIPS, ESQ.
Representative:               1200 North Broom Street
                              Wilmington, DE  19806
                              (Telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee<br>of Asbestos Personal<br>Injury Claimants: | Anderson Kill & Olick, P.C.<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020<br>(Telephonic appearance) |
| For Committee of Asbestos<br>Personal Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701<br>(Telephonic appearance) |
| For Asbestos Property<br>Damage Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>(Telephonic appearance) |
| For the Official<br>Committee of Asbestos<br>Personal Injury<br>Claimants: | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>      NATHAN FINCH, ESQ.<br>One Thomas Circle, N.W.<br>Washington, D.C.  20005<br>(Telephonic appearance) |
| For Shayne Spencer: | Ford Marrin Esposito Witmeyer &<br>  Gleser, L.L.P.<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005<br>(Telephonic appearance) |
| For One Beacon America<br>Insurance Company: | Drinker, Biddle & Reath LLP<br>By:  DAVID PRIMACK, ESQ.<br>1100 N. Market street, Suite 1000<br>Wilmington, DE  19801<br>(Telephonic appearance) |
| For Citadel Investment<br>Group: | Citadel Investment Group<br>By:  BEAU HARBOUR<br>(Telephonic appearance) |

APPEARANCES (CONT'D):

For Official Committee of        Duane Morris, LLP
Unsecured Creditors:             By:  MICHAEL LASTOWSKI, ESQ.
                                 1100 orth Market Street
                                 Suite 1200
                                 Wilmington, DE  19801
                                 (Telephonic appearance)

**I N D E X**

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| Exhibit 25 | Letter from Judge Hayes to Mr. Speights - 5/7/01 | | 213 |
| Exhibit 26 | Order | | 213 |
| Exhibit 64 | Proofs of Claim | | 214 |
| Exhibit 116 | Document | | 109 |
| Exhibit 117 | Document | | 109 |
| Exhibit 118 | Document | | 109 |
| Exhibit 119 | Document | | 109 |
| Exhibit 120 | Document | | 107 |
| Exhibit 121 | Document | | 107 |
| Exhibit 122 | Document | | 107 |
| Exhibit 125 | Bar Date Order | | 70 |
| Exhibit 126 | Bar Date Order | | 70 |
| Exhibit 127 | Bar Date Order | | 70 |
| Exhibit 133 | Document | | 195 |
| Exhibit 134 | Document | | 195 |
| Exhibit 137 | Document | | 195 |
| Exhibit 138 | Document | | 195 |
| Exhibit 140 | Deposition Designation of M. Corn | | 111 |
| Exhibit 141 | Chart | | 112 |
| Exhibit 142B | Document | | 114 |
| Exhibit 147 | Letter to Judge Fitzgerald from Mr. Bernick - 3/13/02 | | 196 |
| Exhibit 151 | Document | | 120 |

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-1139.  Today is the time set for the

3    Anderson Memorial hearing regarding class certification.  The

4    participants I have listed by phone are Alan Madian, Andrew

5    Craig Marti Murray, Arlene Krieger, Theodore Tacconelli, Scott

6    Baena, Jay Sakalo, Martin Dies, Darrell Scott, Mark Hurford,

7    Walter Slocombe, Nathan Finch, Robert Horkovich, Terence

8    Edwards, Janet Baer, Michael Dierkes, Sean Walsh, John

9    Phillips, Shayne Spencer, David Primack, Beau Harbour, Michael

10   Lastowski, and David Beane.  I'll take entries in Court,

11   please.

12          MR. BERNICK:  Yes.  David Bernick for Grace, Your

13   Honor.

14          MS. ESAYIAN:  Lisa Esayian for Grace, Your Honor.

15          MR. BLATNICK:  Sam Blatnick for Grace, Your Honor.

16          MR. SPEIGHTS:  Dan Speights for Anderson Memorial

17   Hospital, Your Honor.

18           MR. FAIREY:  Marion Fairey for Anderson Memorial

19   Hospital.

20          THE COURT:  Folks, for purposes of scheduling today,

21   I apologize for the emergency that hit.  I'm going to have to

22   leave the bench at quarter after -- I'm sorry -- quarter 'til

23   11, and we will reconvene at 1:15 this afternoon, and then I'll

24   stay until we're finished, but I will need that recess to deal

25   with my family situation today.  Okay.  Mr. Speights?

                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. SPEIGHTS:  May it please the Court.  Dan Speights

2   for Anderson Memorial Hospital.  We are, of course, here to

3   argue, finally, Anderson Memorial Hospital's motion to certify

4   class action, motion to certify what Grace has at sometimes

5   rather disparagingly called the worldwide class action, but a

6   term I'm going to use some today because it's just a term

7   everybody understands, although we understand there are

8   limitations in Anderson's class action.  In the alternative, we

9   will argue that the Court should recognize a previously

10  certified Anderson statewide class action, but I will start,

11  when I get to the thrust of my argument, with the so-called

12  worldwide class action.

13        Your Honor, there are a myriad of factual and legal

14  disputes that have been thrown out in various briefs and

15  multiple hearings involving this matter.  At the end of the day

16  I understand what you have told me on several occasions, at

17  least several occasions -- numerosity, numerosity, numerosity.

18  And I will get to numerosity, I assure you.  In fact, I will

19  spend less time on the other issues involved in class

20  certification than I will in numerosity.  I will say at the

21  outset, just for the record, that while we appreciate the time

22  you've given us today, and while I understand it's the day to

23  dance, Speights will put up or shut up.  We did make various

24  requests over the last year or two for some discovery.  Your

25  Honor granted some of our discovery requests.  Your Honor

1  denied some of our discovery requests, and of course we reserve

2  our positions on that.

3       I also want to say, especially in light of your

4  comment a minute ago about scheduling, Your Honor, that at the

5  end of the day I am going to probably propose, and we don't

6  have to have a discussion about it now, but I am going to

7  probably propose that both sides should submit you either

8  memoranda or probably proposed findings of fact and conclusions

9  of law with specific references to the record that will be made

10 before you today, with a binder, and specific references, of

11 course, to any case law or authority.  I say that because it's

12 now been since 2005 since we've both filed our motions, or I

13 filed my motion and they filed their response, and I think,

14 hopefully for the Court's convenience, hopefully the Court

15 would take this matter under advisement and have it in some

16 compact way that's not consisting of 50 or 100 boxes, but in a

17 relatively small binder, and a brief, or memorandum, or

18 proposed findings which actually attach what it is we're trying

19 to pull out of these various sources, of course in the event of

20 any Appellate review it would be far better to have it in a

21 concise way than it would be for us trying to weigh the

22 evidence based on poundage that's been brought to the courtroom

23 today.  In any event, I'll take that up at the end of the day,

24 after I go through my argument.

25       I'd like to start off with a brief overview, Your

1 Honor, and I'd like to go down history lane, not simply because

2 I was a history major in college, but because I believe in

3 order to place Anderson's motion to certify in context, we must

4 have five or ten minutes of history dealing with the asbestos

5 property damage litigation, and dealing with the Anderson

6 history in the South Carolina Court.  And after doing that, I

7 will then proceed to my argument in support of the worldwide

8 class, and lastly, I will end up with my alternative argument

9 that Your Honor should recognize South Carolina state class.

10         When I go down history lane, it's almost like it's

11 the history of my professional life because I was involved in

12 that history beginning in the early 1980's.  It appears to me

13 that the asbestos building litigation is really divided in

14 three periods.  And this will be reflected, by the way, in the

15 record before you and in the case law where many of these

16 issues are discussed, and in the rules and regulations of the

17 Environmental Protection Agency.  I'm not just pulling this out

18 of my memory bank.

19         The first phase of the building litigation was

20 roughly from 1982 or three until '87 or '88.  And we called

21 that back then the school litigation.  And there were hundreds

22 of cases that Grace settled.  I say that because Mr. Bernick

23 has often said, well, we put this to bed because we settled

24 hundreds of cases.  They certainly settled hundreds of school

25 cases in the '80's.  But what happened was that the EPA issued

1  a rule in 1982 that said every school district in the nation

2  should inspect for asbestos, for friable asbestos, and if they

3  found that asbestos they had to do one of two things, either

4  remove it or notify the parents.  And you can imagine what

5  happened.  Grace has raised great Cain back then about EPA's

6  policy, and I am not totally unsympathetic to their argument,

7  because when they told the parents they removed it, or else

8  they removed it without telling the parents in many instances,

9  and therefore school districts spent a lot of money, and a lot

10  of lawsuits ensued.

11          Well, I want to make the point, however, that the

12  regulation did not apply to commercial buildings, to private

13  buildings.  It only applied to school districts, because

14  Anderson's class, as I will discuss in a few minutes, is a

15  private building class.  That's what we want you to certify.

16  And that litigation roughly ended in the end of '87 with a

17  couple of things.  First of all, at least as far as Grace is

18  concerned, Grace settled hundreds of cases.  They settled a

19  couple of hundred cases with me in more than 30 states, and Mr.

20  Westbrook, my co-counsel at the time, we were running all over

21  the country.  It settled all of Mr. Dies' school cases back

22  then, and it settled a bunch of others.  In fact, I don't

23  believe Grace ever tried but -- I may be mistaken -- one school

24  case, and that case actually was reversed on appeal and settled

25  on retrial.

1          The other thing, however, was that in 1983, after the

2    school rule was published, a class action firm in Philadelphia

3    filed a class action complaint and a motion to certify class on

4    behalf of all the schools in America.  And interestingly, Grace

5    supported that classification.  They were in favor of a class

6    as to put a cap on their litigation.  And there's a long

7    history reflected in the cases, but ultimately the case went to

8    the Third Circuit, and the Third Circuit affirmed a voluntary

9    class action, a nationwide class action on behalf of schools.

10   And the Court below, Judge Kelly at that time, had an opt out

11   date of December 1987, so Grace had everybody in that class

12   versus the individual cases of Mr. Dies, and Westbrook, and me,

13   and some others, and dealt with that litigation.

14          Then we got to phase two.  Grace was a lot more savvy

15   than I was back at that time, because Grace recognized it had a

16   bigger problem than I had perceived it.  Schools are small.

17   They are -- if you take -- I learned this in a school district

18   where I had 35 schools, and the total damages were three

19   million, and then I had a big building, one building, the

20   damages maybe five, or ten, or 20, or 30 million.  And Grace

21   recognized there were a lot of large buildings in the country

22   with a lot of its product.  So, Grace did a couple of things,

23   again, reflected in the cases.  Grace formed an organization

24   called the Safe Building Alliance with several of its co-

25   defendant, including U.S. Gypsum, for example, which was before

1  Your Honor.  And Grace pushed its view that asbestos should not

2  be removed until building demolition, until major renovations

3  in the building.  It might be suggested that Grace's interest

4  in that was to slow down removal, not from a health standpoint,

5  but because it wanted the statute of limitations to run on all

6  of these commercial buildings, and postpone the problem, and

7  maybe eliminate the problem in the future.  And the second

8  thing is that Grace pushed actively, there are appeals of

9  regulations going to the D.C. Circuit Court of Appeals, where

10 Grace, through the Safe Building Alliance, which the Third

11 Circuit said is Grace's alter-ego, the Safe Building Alliance,

12 there are cases in which -- or situations in which Grace tried

13 to put its view of science into place so that people would not

14 remove asbestos but would postpone that, both its view of

15 science privately, and its intense lobbying, with the

16 Environmental Protection Agency.  And that brings us to,

17 really, in 1987, again, no regulations are applied, no EPA

18 regulations --

19                         (Pause)

20          MR. BERNICK:  Your Honor, while Mr. Speights is

21 pausing here, I didn't mean to interrupt before, could we have

22 a standing objection?  All of these matters that Mr. Speights

23 is going into are not before the Court in the context of the

24 motion for class certification.  I don't even know if they are

25 of record in this case at all.  And none of them have any

1 relevance here.  I don't -- Mr. Speights has got his time, a

2 lot of time today, and I don't want to keep on interrupting,

3 but I do want to preserve the record objection that all these

4 matters are outside the scope of the briefs, outside the scope

5 of the motion, and they are simply a long recitation by Mr.

6 Speights.

7         THE COURT:  That's fine.  Your objection is

8 preserved.  I'm going to hear, I think, everything, unless --

9 and put it all together at the end, Mr. Bernick.  And if it's

10 necessary to strike something later, I will.  But I am taking

11 this as preparatory toward the presentation of the argument,

12 and to set the history and the stage, and for nothing else at

13 this point.  Go ahead, Mr. Speights.

14         MR. SPEIGHTS:  Thank you, Your Honor.  I paused

15 because I misplaced my glasses.  One of the exhibits which we

16 will be offering is 137, which is the EPA study of asbestos

17 containing materials in public buildings.  And this came up in

18 '87, '88, when the issue came up as to whether EPA should

19 expand its regulation of asbestos and buildings beyond just

20 schools, and expand it, as well, to commercial buildings and

21 private building owners.  And, of course, Grace was very active

22 on that committee, a member of the Safe Building Alliance.

23         But what I want to refer to here, and it deals

24 directly with the numerosity issue that we will deal with, is

25 the fact that EPA did a survey to get the extent of asbestos

1  containing -- friable asbestos containing materials in

2  buildings.  And what EPA found was, it is estimated that

3  friable ACM is present in 20 percent, 733,000 of all public and

4  commercial buildings covered by the survey.  Five percent,

5  192,000 of all buildings have sprayed or trowel on asbestos

6  surfacing material, representing a total of 1.2 billion square

7  feet.  And that, of course, is the type of material that Grace

8  made, that surfacing treatment material, 192,000 buildings.  So

9  that, if EPA had extended its regulation to public and private

10 buildings, it would have been a major issue, so that, like the

11 schools in response to the '82 regulation, there would have

12 been a great deal of removal.  Well, I'm not going to go

13 through everything that happened between the second period, '82

14 to '92, but I will congratulate Grace, because they were very

15 effective in what they did, and according to their expert,

16 whose deposition I have designated in the record, Dr. Morton

17 Corn (phonetic), who has been Grace's expert since the early

18 1980's, there was a C-change in science which occurred from

19 that period, '87 to '92, the Safe Building Alliance put on

20 seminars at Harvard.  The Harvard Symposium.  Their principle

21 author, their principle expert, Dr. Corn, published

22 extensively, including a co-authorship of an article in

23 science, and ultimately, in 1990 in a document that's also

24 marked as an exhibit, is the so-called green book, which is

25 EPA's new guidance document, July 1990, Managing Asbestos in

1  Place, a Building Owner's Guide to Operations and Maintenance

2  Programs for Asbestos-Containing Materials.  Your Honor, that

3  is the document that Dr. Corn refers to in his deposition, and

4  Dr. Corn is correct that it represents a C-change.

5         So, you have all these private building owners who

6  are not under a regulation to do anything before demolition, or

7  substantial renovations, and a new document that EPA issues

8  which, in its five facts in the document suggest that in many

9  instances the materials should be managed in place until that

10 renovation or demolition takes place, which means that the

11 substantial monies and costs that building owners would

12 inevitably incur when they demolish or renovate the building,

13 will be postponed until sometime down the road.  And as of 1990

14 when this was published, no private building owner had obtained

15 a verdict in the country.  The first private building owner's

16 verdict was either December 1990 or January 1991.  There were

17 hundreds of school cases settled, but this new litigation was

18 just percolating, and as a result of this, a huge issue arose,

19 a huge issue arose about the statute of limitations.

20         And that brings me to the third and final phase,

21 which I would call in the litigation, and that is the MDU

22 phase.  MDU refers to Montana-Dakota Utilities, which was a

23 case tried --

24         THE COURT:  I'm sorry.  Refers to what?

25         MR. SPEIGHTS:  Montana-Dakota Utilities versus W.R.

**J&J COURT TRANSCRIBERS, INC.**

1  Grace, a case tried in the United States District Court of

2  North Dakota in 1992.  And the Lower Court, it's the first case

3  I ever lost against Grace, the very experienced, distinguished

4  District Court Judge in that case dealt with Grace's defense,

5  of course, of the green book, that MDU did not need to remove

6  the asbestos because nothing should be done until renovation or

7  demolition, but more importantly, accepted Grace's argument

8  that the statute of limitations started back in 1980 when MDU

9  knew that it had asbestos, had this product of Grace's, and

10 that asbestos was hazardous, and that someday it would have to

11 remove that asbestos-containing product.  And that was the

12 decision of the Lower Court, and that was the decision of the

13 jury, that the statute of limitations had run, and that was a

14 case that went to the Third Circuit, and that was the case that

15 triggered my filing the Anderson class action.

16         THE COURT:  It went to the Third Circuit?

17         MR. SPEIGHTS:  Excuse me.  The Eighth Circuit.  And

18 that's the case which triggered my filing the class action, so

19 that as of the end of 1992 -- if that case had been the law of

20 the land, you know, we would not be arguing statute of

21 limitations starts at some postponement down the road.  It

22 would be trying to defend arguments, you knew you had asbestos,

23 you knew you had Grace's product, and you knew that ultimately

24 you would have to remove it.  That was Judge Van Sickle's

25 ruling, the Eisenhower-appointed District Court Judge in North

1 Dakota.

2          Well, I came back, then, and I'm going to get to

3 Anderson in less than five minutes, and filed the Anderson case

4 in South Carolina.  And the Anderson complaint, which I may

5 show on the board in a few minutes, was for all buildings with

6 asbestos-containing surfacing material, and surfacing material,

7 I probably should just say right up front what it is, and the

8 easiest way to show you is to skip ahead a number of years, and

9 this is the ultimate order of Judge Hayes in which he defined

10 surfacing material, which is asbestos-containing surfacing

11 treatment material in Footnote 1 of his final opinion is

12 defined for purposes of the certification as material that was

13 sprayed, or troweled, or otherwise applied to surfaces such as

14 acoustical plaster, ceiling texture, fireproofing materials,

15 attic insulation, and masonry fill.  That's what we filed a

16 class action for, or proceeded to seek certification of in

17 South Carolina.  And, of course, initially we sought it without

18 geographic boundary.  In fact, we always sought it without

19 geographic boundary, but we had a little problem with the door

20 closing statute several years later.

21          But that complaint in the case, more importantly than

22 defining what buildings and what type of material, is the fact

23 that in the complaint itself, which is marked as an exhibit

24 here, Anderson sought to recover not only for those whose

25 properties had already been damaged or injured, but for

1 building owners whose properties would be damaged or injured in

2 the future, a point which I am going to return to when we talk

3 about numerosity.  It was for both past and present injury to

4 asbestos -- to buildings with asbestos-containing surface

5 treatment.

6          THE COURT:  But the complaint was amended after the

7 initial ruling that talked about the door closing statute,

8 wasn't it?  So this initial complaint that is an exhibit is not

9 the complaint that actually had the class certification face on

10 it.

11          MR. SPEIGHTS:  You are correct, Your Honor, that the

12 complaint was amended by order of the Court based on the door

13 closing.  We, of course, reserved our previous position and the

14 Court right here recognized that.  In this same opinion the

15 Court recognizes -- reserved our position.  But the fact that

16 it dealt with asbestos-containing surfacing material was the

17 same definition that we wanted to -- the class action was

18 always for asbestos-containing surfacing material.

19          THE COURT:  Okay.

20          MR. SPEIGHTS:  For instance, in the schools class,

21 and in the colleges class, which I'm going to discuss in a few

22 minutes, they had 50, 60, 70, 80 defendants.  We had a distinct

23 group of manufacturers of surfacing material, four of whom had

24 been before you in the Wilmington bankruptcies, Grace, USG,

25 Federal Mogul, and U.S. Mineral.

1          THE COURT:  All right.

2          MR. SPEIGHTS:  But in any event, that sort of ended

3  '92, sort of like the beginning with Star Wars, and '87 to '92

4  was the Empire Strikes Back, Grace gets its science, Grace gets

5  its green book, Grace gets no application to private buildings,

6  and Grace wins on the statute of limitations going to the

7  Eighth Circuit.  And now, in 1993 we have the third phase, the

8  Return of the Jedi.  We obtained, that is property damage

9  claimants obtained a major decision in the MDU case and some

10 other cases.  And I would urge Your Honor to consider the MDU

11 case.  The Eighth Circuit unanimous opinion authored by Chief

12 Judge Arnold, who was one of three candidates for the Supreme

13 Court, and Justice Breyer got the nomination, I believe perhaps

14 Justice Ginsberg, and it established what has now followed

15 throughout the country, that the statute of limitations on an

16 asbestos building case is not commenced to run until the

17 building has been contaminated.  Well, we can talk for hours

18 about what contamination is, and Your Honor had quite a flavor

19 of that during the ZAI litigation.  But whatever it is, it's

20 when the building owner is injured.  So, in effect, what Grace

21 did, some would say brilliantly, in saying that, well, you

22 shouldn't do anything until you actually have an injury at

23 renovation or demolition, effectively postponed the statute of

24 limitations because Judge -- Chief Judge Arnold made it clear

25 in that decision that if you could not bring a lawsuit until

1 your building had been contaminated or injured, or prevented a

2 hazard, or however which Court might say it, then the statute

3 of limitations does not commence to run until the building

4 owner knew or should have known that that occurred.  So that

5 the fact that Grace settled hundreds of cases in the 1980's,

6 and had a few cases after then really means nothing.  This is a

7 long explanation to deal with that constant refrain I have

8 heard in this case since the informational brief filed at the

9 time of the petition.  The fact that they settled hundreds of

10 cases in the '80's didn't end the litigation, and in effect,

11 the litigation was going forward.  But, as a result of Anderson

12 there was pending a class action on behalf of all building

13 owners with Grace's friable asbestos-containing products.

14         And that brings me to Anderson.  I am not going to

15 give a lengthy spiel on Anderson because I'm anxious, as I am

16 sure you are, to get to the Rule 23 issues that are before the

17 Court today.  But I do think it's important that we have the

18 record before Your Honor now to show what happened in Anderson.

19 Anderson was actively litigated from 1992 against Grace until

20 Grace filed its petition for reorganization.  The record will

21 reflect enormous efforts on the part of my law firm and W.R.

22 Grace, which was the lead defendant, and as the record

23 reflects, did most of the work, did most of the examination of

24 witnesses, did most of the briefing, did most of the argument.

25 And that case had its ups and its downs.  We won a big victory,

1 that is, Anderson did, when the Court said that Grace had

2 waived venue and we could proceed in Hampton County, South

3 Carolina, which was the forum of our choice.  Grace won a big

4 victory, although I suggest to you only an interlocutory

5 victory, when it persuaded Judge Howard, who then had the case,

6 not on a motion for certification, as the record will reflect,

7 but on a motion to strike from the complaint allegations

8 seeking recovery for non-South Carolina building owners.  Judge

9 Howard reconsidered his decision and left it in place, so in

10 '94 or '95, those cases were stricken.  However, we could not

11 appeal that decision.  It would have been an interlocutory

12 appeal in South Carolina, so that we still had a putative class

13 on behalf of the so-called world, and we still were able to

14 maintain our statewide class against Grace and its co-

15 defendants.  That decision, as we all now know, stayed that way

16 until after the bankruptcy, and, in fact, is that -- that is

17 the state of the record that is before you today that the

18 decision of Judge Howard to strike the out-of-state defendants

19 is an order that has never been appealed from.

20          Now, we all know what would happen if we appealed

21 that order today.  The Supreme Court of South Carolina, if we

22 were back there, would say, Judge Howard, you were right and

23 you were wrong.  It would say to Judge Howard that if a

24 defendant properly raises the door closing statute, it is a

25 capacity to sue issue, and we will rule with that defendant.

1  However, it is not subject matter jurisdiction, Your Honor,

2  that is, Judge Howard, and therefore you were wrong in your

3  reasoning.  And the supreme Court also said something else

4  which is significant, as we stand in this Federal Bankruptcy

5  Court.  The Supreme Court also said in that decision that <u>Bell</u>

6  <u>v. Monsanto</u> case, the cotton seed case which I happen to have

7  argued, as well, it said that this door closing statute only

8  applies to the State Circuit Court, therefore the Fourth

9  Circuit Court of Appeals was right in the colleges class action

10  in not applying the door closing statute in that litigation.

11          So, as a result we do know that, the door closing

12  statute is not a bar here in this Court, because we are in a

13  Federal Court, and <u>Central Wesleyan</u> and the Supreme Court of

14  South Carolina have recognized that in the Federal Court the

15  door closing statute is not a bar.  In any event, we litigated

16  Anderson, after that.  We had a two day evidentiary hearing.

17  We had a knock-down, drag-out.  In September Grace asked for

18  more briefing time.  You can't get a transcript.  Judge Hayes

19  says in his final order that he wanted to rule on the principle

20  issue at the time of the hearing in September.  The record will

21  now reflect, I'm not just saying this anymore, we have a record

22  here of the South Carolina proceedings, that Grace persuaded hi

23  to permit additional briefing -- it sort of sounds like what I

24  want today -- additional briefing and citation to the record,

25  and it was not until January or February until a transcript was

1  supplied, and the court reporters in South Carolina are a

2  little more -- move a little more slowly than they do in

3  Pittsburgh and Wilmington, and immediately upon that record

4  being provided we moved for the Judge to go ahead and

5  conditionally certify us to Grace, admittedly because we knew

6  that Grace was threatening to go into bankruptcy.  The Court

7  certified ex parte, and then provided Grace an opportunity to

8  be heard and left a certification order in place.

9         That's history.  That's -- hopefully I've covered all

10  I need to cover, and perhaps more, to place Anderson in

11  context.

12         Now, why should Your Honor certify a class action?  I

13  think, for purposes of this argument, I can accept the way

14  Grace describes what it is Your Honor should do.  I'm not sure

15  I would describe it precisely the way Grace says, but I think

16  reading all the cases, or a lot of the cases, and understanding

17  how the Courts have struggled with this in Bankruptcy Court, I

18  think Grace is pretty close to being accurate when it says

19  that, at least as to a putative class, which the worldwide

20  class is, the Court should look at Rule 23 and decide whether

21  the case should be certified under Rule 23, plus the Court

22  should examine whether the certification of a class would be in

23  the interest of the bankruptcy.  And that's the way I will

24  approach it for the argument.  And I will start with Rule 23.

25         It's almost like assume we didn't have a bankruptcy.

1  Assume we were in a Federal Court arguing for certification of

2  the so-called worldwide class action on behalf of Anderson.

3  And we all know the Rule 23 standards.  I would tell Your

4  Honor, or whoever was hearing that, that I cannot imagine -- I

5  really cannot imagine any lawyer ever arguing a class action

6  with more precedent than I would present to Your Honor, and I

7  do present to Your Honor today, in favor of certifying an

8  asbestos property damage class action.  It's remarkable.  Even

9  cases in other fields, even cases in asbestos personal injury

10 cases which decline to certify a class always distinguish the

11 asbestos building cases, the asbestos building cases which have

12 been certified.  Your Honor, there are three nationwide

13 certified class actions, all of which Grace was a major party,

14 if not the number one defendant in each of those cases.  I

15 don't know if anybody has stood before a Court and said I've

16 got three nationwide classes which have found all of the

17 elements of Rule 23.  The schools case, which I referred to

18 earlier, which was decided by the Third Circuit on April 1,

19 1986, of course the Court of Appeals, which governs this Court,

20 and the District Court of Delaware, certified a class action

21 and did so on a number of grounds, and found -- the only

22 problem they had was they were a little concerned there were

23 too many buildings in it for the manageability purposes, and

24 plus, there were, I believe, 72 defendants in that case.  And

25 the Court certified and found certain issues, including

1 conspiracy, a subject I will return to later.  The Court said

2 one of the common issues was conspiracy, did the defendants in

3 that case enter into a conspiracy to conceal the hazards of

4 asbestos?  Another was the hazards of asbestos.  Your Honor,

5 conspiracy is a recognized cause of action in South Carolina

6 and many other states.  Cases have gone to trial, and asbestos

7 cases have gone to trial on conspiracy, and again, it is a

8 common issue which the Third Circuit Court of Appeals found in

9 upholding certification.

10        But we don't just have the Third Circuit.  We have

11 right up the road, if I was arguing in Wilmington, a case out

12 of Philadelphia in which there was another nationwide class

13 called the PGC, or lessors' class, which we've cited to Your

14 Honor, in which the Court there certified a class action on

15 behalf of all buildings leased to the Federal Government for a

16 period of time, also an early class action, also certified, and

17 also as a schools case, settled by W.R. Grace some time a few

18 years later.

19        Then there is a third nationwide class action, Your

20 Honor, and that is the colleges case, the Central Wesleyan

21 case, which the South Carolina Federal Court certified, and

22 which the Fourth Circuit Court of Appeals, which is reported to

23 be the most conservative Court of Appeals in the nation, upheld

24 that certification.  Interestingly, Your Honor, that

25 certification, and it might well be the best one for me to rely

1  on in this case because it not only accepted the Third

2  Circuit's decision, but it certified, the South Carolina Court

3  did, and the Fourth Circuit upheld the certification of certain

4  issues, Rule 23 provides that you don't have to certify

5  everything.  You can certify certain issues, including, by way

6  of example in the Fourth Circuit case, the issue of hazard

7  being one of the eight or ten issues that the Court certified

8  as a class action.  So, we have three certified class actions.

9  Grace supported the first class action in Philadelphia.  Grace

10  opposed the last two.  In fact, Grace sought to decertify the

11  last one, the colleges case, and later Grace settled all three

12  of those cases.

13          In addition, Your Honor, there have been three State

14  Court class actions certified.  One is the Michigan class

15  action certified by schools, one is the Kirbyville class

16  action, a published opinion affirming that out of the Texas

17  Court of Appeals.  That was Mr. Dies' class action.  And, of

18  course, Your Honor, the Anderson case.  I'm not arguing here,

19  yet, at least, that Judge Hayes' final decision June 29, a

20  couple of months after Grace filed bankruptcy, is binding.

21  We'll discuss the effect of that later.  But without question,

22  it is another decision out there where a very conscientious

23  Court, giving Grace I would say almost more time than I wanted

24  it to, to have an evidentiary hearing and to present all this

25  evidence, and to make all these arguments, and to brief and

1  rebrief, and re-rebrief all of the issues.  The Court in that

2  case concluded that a class action was appropriate, that all

3  the standards of Rule 23 were met.

4          So, we have three nationwide and three statewide

5  certifications, all of which, I believe, involve Grace.

6  There's also a case that we've cited, a Puerto Rico case.  It's

7  sort of the other end of the spectrum from these cases,

8  involving, you know, school situation, 37,000 buildings, or

9  colleges, maybe 3,000 colleges, down to the Puerto Rico case,

10 known as the <u>Robles</u> (phonetic) case, in which the certification

11 was on behalf of duplex apartment owners down in an area of

12 Puerto Rico.  That was not a case against Grace.  It was a case

13 against U.S. Gypsum, but still another certification.

14         So, I start off, Your Honor, and say that without

15 even looking at anything else, the precedent is overwhelming in

16 favor of a Rule 23 certification, but, Your Honor, we don't

17 just have precedent here.  We've got something else.  We've got

18 Grace's arguments in this case.  Mr. Bernick, I believe, has

19 really been, and for reasons that were important to him for

20 issues beyond Anderson, in the managing of this case on behalf

21 of the debtors, Mr. Bernick has repeatedly made arguments which

22 I think are the essence of arguments for class certification.

23 We have marked the various transcripts.  We've marked the

24 various CMO motions, the various -- the informational brief,

25 etcetera, and if it's one thing Mr. Bernick has been consistent

1  about from day one, there are common issues which this Court

2  should try.  He has said that from April, when the case was

3  filed, until whenever the last hearing was when we were before

4  Your Honor arguing the case management order.  And I understand

5  that.  He's got a big problem in trying to herd all these

6  cases, asbestos P.I., and asbestos P.D., and ZAI, all this mass

7  of litigation, to try to herd it and get it in some fashion so

8  that Your Honor can come to grips with a plan of reorganization

9  that properly determines liability for solvency purposes and

10 properly tries to estimate what we are dealing with in this

11 case.  And so, I'm not suggesting Mr. Bernick made a mistake.

12 It was a logical way for him to proceed to try to get this case

13 resolved.  But I suggest to you that Grace can't have it both

14 ways.  Mr. Bernick has succeeded in convincing Your Honor that

15 you should have common issues trial at this moment on hazard

16 and on constructive notice.  Both of those are raised in the

17 terms of claims objections, but we are going forward on the

18 common issue, that is the issue of whether there is a hazard

19 from Grace's product, and we're going forward with constructive

20 notice objections where we have Grace's expert, Mr. Morris, and

21 P.D. claimants have hired experts, etcetera, etcetera.

22      In addition we have what I think is the ultimate

23 common issue of estimation.  So, I would suggest to Your Honor,

24 then, in addition to the Rule 23 cases, it makes great sense to

25 deal with -- let's just take hazard, as a common issue, which

1  Mr. Bernick said from day one is a common issue, and try it in

2  the name of Anderson rather than in the name -- rather than

3  having 75 or 80 building owners, or many more, if I convince

4  Your Honor we're not limited to the 75 or 80, but even if it's

5  the 75 or 80, it makes eminent sense to try that.  Anderson is

6  ready, willing, and able as a class representative to try the

7  hazard issue as the Fourth Circuit would have had Central

8  Wesleyan do on behalf of all colleges, to try the hazard issue

9  when that issue is tee'd up on behalf of all of these clients,

10 all of these claimants, and Anderson is ready, willing, and

11 able to deal with constructive notice, which is the issue Mr.

12 Bernick says when did building owners know?  Anderson can

13 litigate that, and you only face one claimant rather than 75 or

14 80, or if I'm right, hundreds of thousands -- hundreds or

15 thousands.  I didn't say hundred thousands.  And, Your Honor,

16 dealing with, down the road, the whole issue of estimation, it

17 makes eminent sense that we can speak to you as Anderson, a

18 certified representative on behalf of these building owners,

19 and proceed that way.

20        So, Your Honor, that brings me to estimation --

21 excuse me, to numerosity.  I could argue a lot more about the

22 other issues, but I'm going to put them aside until I hear Mr.

23 Bernick plead about commonality and all the other issues, and I

24 do note for the record that no longer in the case is the issue

25 of any question of adequacy of counsel or adequacy of Anderson

1 as a class representative, which, again, goes to Anderson being

2 the perfect one to be the representative of this class, and

3 litigating common issues before Your Honor.  And I say, again,

4 if I wasn't explicit enough, we are asking you to certify only

5 the common issues which is what was done by the <u>Central</u>

6 <u>Wesleyan</u> Court, and -- the common issues that have been

7 identified as of now, and common issues which the Court

8 believes it needs to resolve in this litigation.

9        Numerosity.  We have an exhibit there, and I believe

10 Mr. Bernick has got some blow up that he's going to present,

11 listing the claims that are still in the case if the Anderson

12 certification does not extend beyond those claims which are

13 individually filed with individual authority, executed before

14 March 31.  Of course, there are --

15        THE COURT:  I'm sorry.  Say that again?  There's an

16 exhibit that lists the rest of the claims?

17        MR. SPEIGHTS:  Yes, Your Honor.  In fact, I think I

18 have it here.

19                    (Pause)

20        MR. SPEIGHTS:  It's Exhibit 141, Your Honor.

21        THE COURT:  Okay.

22        MR. SPEIGHTS:  What 141 represents, and you can see,

23 this is just a list of the buildings, the state, the building

24 name, the location, the claim number, and the product.  And at

25 the last page -- actually, which has a total of 80, but the

1 last two are actually the class claims, so there are 78 claims

2 before Your Honor that Your Honor -- that have survived the

3 authority issues.  However, Your Honor --

4          THE COURT:  These are the claims you filed on behalf

5 of your clients?

6          MR. SPEIGHTS:  That's correct, Your Honor.

7          THE COURT:  Okay.

8          MR. SPEIGHTS:  These are -- but not all the claims we

9 filed on behalf of our clients.  These are the claims we filed

10 on behalf of clients within the definition of the Anderson

11 class.

12          THE COURT:  Okay.

13          MR. SPEIGHTS:  We also have the California claims,

14 University of California, etcetera, with co-counsel in those

15 cases.  And these claims, this is, again, Exhibit 149, Your

16 Honor, this is an example, merely, of the proof of claim form,

17 and this one was filed by -- this particular one is by K.A.R.

18 TV in Little Rock, Arkansas.  This is only for illustration

19 purposes.  It's one of the 78 on the list I just showed you on

20 Exhibit 141.  And this one, like I believe all of the claims,

21 specifically, Your Honor, has any asbestos-related property

22 damage lawsuit, it refers to other lawsuits, and the box says

23 yes.  And then it says, "Please provide the following

24 information about each asbestos property damage lawsuit."  And,

25 of course, the Anderson Memorial Hospital is listed.

1          And I need to stop a minute and say something, since

2  we're talking about the facts of these claims.  The fact that

3  we were filing claims under the Anderson umbrella is a fact

4  known by W.R. Grace since the beginning of this bankruptcy.

5  First of all, Anderson itself was known.  Anderson itself was

6  known because we have exhibits marked which are -- consist of

7  correspondence with the United States Trustee in which we

8  sought committee membership, in which we provide information.

9  Grace opposed it.  And that correspondence between the trustee

10  and Grace which acknowledges that correspondence in which we

11  attempted to be a member of the committee, and ultimately were

12  made a member of the committee -- that is, Anderson was made a

13  member of the property damage committee.  And that

14  correspondence, from day one, shows that, for example, the

15  record in South Carolina contained over 1,600 shipments of

16  asbestos-containing materials to South Carolina.  This was not

17  off the radar screen.

18          There are records here before the bar date was ever

19  used, before the bar date was ever entered by this Court -- Mr.

20  Bernick acknowledged on the record that Anderson was a

21  certified class, and he even said -- he said ex parte,

22  certified class, and he even suggested it might be a nationwide

23  class.  That's at an early 2002 hearing.  And then we have

24  these claims which were filed in 19 -- excuse me, in 2003, in

25  which all of the claims under the Anderson umbrella recite

34

1  Anderson as being the source of that authority, or that

2  previous lawsuit.  We also have, in the record before you

3  today, a statement by Grace in 2004 that it had studied all of

4  these claims, therefore it knew.  And finally, Your Honor, we

5  have the 2019 which we filed, I believe in December '04, if I'm

6  not mistaken, in which Anderson is listed as the authority for

7  these.  So that, Anderson, despite all of the rhetoric, despite

8  all the lawyer talk, the record will show, and hopefully we'll

9  get a chance to cite chapter and verse in some sort of proposed

10 memorandum or findings to you, the fact that Grace knew from

11 the outset that Anderson was a significant player and we were

12 not hiding the ball about what we were doing.

13         But, Your Honor, when we argued -- and right now we

14 are at 78 of these claims.  We also have a number on appeal to

15 the District Court that Your Honor rejected our ratification

16 argument, cases for which we had authority but Your Honor said

17 you cannot go back and ratify.  So, they are also -- whether

18 they are here today or in the District Court, they are still

19 part of this class which we are representing, so it's really

20 not correct that it's simply 78 that we are representing here.

21 It is not correct that 78 plus -- I think the order says 71.

22 There are actually less than that dealing with ratification,

23 but there are more, as well.  Because Your Honor has

24 recognized, although you have provided great scepticism, you

25 have recognized that although you didn't think we had authority

1  to file individual claims based upon the Anderson class action,

2  that it would be a new day when we argued whether Anderson

3  itself, as a class proof of claim, could assert claims on

4  behalf of people who did not file individual bar date claims.

5  I understand that's the mound in front of me that I've got to

6  climb up, but I have never tried to climb up that mound.

7  Hopefully it's just a mound and not a mountain.  I've never

8  tried to climb up that mound before today.  And that's what I

9  want to start my climb on now.  First of all I would say, Your

10  Honor, that 78 is enough.  Newburg, who is the authority on

11  class actions, of course, says that clearly that 40 is enough.

12  There are cases around the country where as few, at least as we

13  have found, as 14 are enough.  There is not some magic number

14  that you need thousands and thousands of claimants for a Court

15  to say I would like to handle this as a class action.  There

16  are advantages to handling common issues as a class action,

17  whether they are 14 cases and you don't have to -- you have 14

18  sets of witnesses, or 78 cases, or a hundred and whatever cases

19  if the so-called 71 come back in the case.  So, I believe

20  there's numerosity there to handle this on these common issues

21  without any extension of what is there.

22         But, Your Honor, I believe there are more cases, and

23  I believe there are more cases under the Anderson umbrella for

24  several reasons.  First of all, I would like to go to your bar

25  date order.  My purpose today -- I'm going to repeat this

1  probably ten times.  My purpose today is not to set aside the

2  bar date order.  My purpose today is to help the Court.  I want

3  to be the Court's best friend.  I want to deal with any

4  possible gaps in the bar date order through the certification

5  of Anderson as a class action, gaps which would be a problem

6  for the estate, which would be a problem for the claimants if

7  I'm right that there are real gaps, or even potential gaps that

8  could create litigation in the future.  And I want to start off

9  with the bar date order itself, and look at it and say to Your

10 Honor, respectfully, that it doesn't cover everything that the

11 Anderson class action complaint covers, the class action

12 complaint on the definition of what's in the purported class on

13 behalf of Anderson.

14         The bar date orders and the attachments are marked,

15 and I want to go straight to that portion of the bar date order

16 --

17         THE COURT:  What's the exhibit number?

18         MR. SPEIGHTS:  11, I think, Your Honor.

19         THE COURT:  Thank you.

20         MR. SPEIGHTS:  Actually, I think it's 11 and 12.

21         THE COURT:  Okay.

22         MR. SPEIGHTS:  And I think what I'm showing you is

23 the 12, which is definitions of claims subject to bar date.

24 And over here on the next page is the definition of what an

25 asbestos property damage claim is, Your Honor.

1          And the first thing that's obvious from here is --

2    the first sentence, "Asbestos property damage claims are

3    claims," and this is bold, "as of the time immediately

4    preceding the bar date."  And as I read it, and I think the

5    fair reading of it, that what Grace wanted, and what Your Honor

6    agreed with, was to have a bar date for claims that existed as

7    of the bar date.  In other words, this bar date order does not

8    cover future demands.  I understand future demands, future

9    claims, etcetera, there's a whole body of law discussing what

10   all that means, but whatever it means, this bar date order, as

11   I view it, and I think a good faith interpretation which could

12   present the estate some problems, does not cover claims that,

13   under that MDU decision, does not cover buildings whose claims

14   had not yet accrued; whose claims, because of Grace's great

15   work in the scientific and EPA communities, who did not even

16   have claims, perhaps, because they had not undertaken

17   renovation, or demolition, or, as we asbestos P.D. lawyers say,

18   claims where there was no contamination or the building owner

19   did not know of contamination.  And this is not a theoretical

20   problem, Your Honor.  The problem came up in another one of

21   your bankruptcies.  The problem came up in the U.S. Mineral

22   bankruptcy.  There wasn't a whole lot of money involved in U.S.

23   Mineral, but there were concerns in that among the plan

24   proponents are reflected in the U.S. Mineral plan of

25   reorganization, which is marked as an exhibit in this

1 proceeding, that, hey, if we're setting aside this money for

2 property damage, and there is a property damage trust created

3 in that which incidently recognizes the Anderson putative class

4 and the Anderson statewide class in that plan of reorganization

5 Your Honor confirmed, but in that plan it sets aside money for

6 future demands.  It's a recognition as to another defendant in

7 the Anderson case that there are such things as future demands

8 in asbestos litigation.  And so, Your Honor, the first thing I

9 say to Your Honor is that Anderson could cure that problem, if

10 it's a problem, if you agree it's a problem, even if you agree

11 it's a potential problem -- I think it's a real problem -- by

12 certification of Anderson because Anderson seeks to represent

13 not only those with existing claims as of the bar date, but for

14 future demands, as well.  And all of those property damage

15 claimants, within the definition, past and future.

16         The second concern that I raise about the bar order,

17 Your Honor, I don't think it's quite as unequivocal, frankly,

18 as my first concern, is I'm not sure your bar order covers

19 conspiracy claims.  In fact, I think there's a strong argument

20 that it does not cover conspiracy claims, because if you will

21 read in the same definition, Your Honor, it has caused by

22 asbestos and products manufactured by the debtors of

23 vermiculite mine-milled or processed by the debtors.  By the

24 debtors.

25         Now, conspiracy does not involve the debtor's

products.  It involves a debtor's conduct.  The debtor's

conduct in conspiring to conceal the knowledge of asbestos

makes it responsible for products made by other people with

whom it conspired.  That's conspiracy.  That's what the Third

Circuit in the schools case found as a common element in the

asbestos building cases.  Mr. Bernick can address whether he

thinks it covers it or not.  I don't recall a discussion on the

record of that precise point, but clearly Grace's conduct in

this case from day one, at least from the bar date, has been

we're dealing with Grace's products.  The claim form itself,

Grace has represented, requires product i.d., the so-called

gateway objections, where show me product i.d., all of the

motion that have been filed, show me product i.d.  And if you

look here, it suggests product i.d.  So that the second thread,

which I want to be the friend of the Court and take care of, is

the fact that there may be conspiracy claims out there which

are not barred by this bar date order that could come out of

the woodwork.  And again, Anderson's complaint concludes a

conspiracy count.  Conspiracy had been upheld down below in

South Carolina.  So, that's the second issue with the complaint

-- with the bar date order.

        Of course, Your Honor, and I mention this only in

passing, because I don't want to get cross-wise with my friends

that are representing the ZAI claimants, Anderson also

represented -- also had a ZAI component in its definition, and

1  also had -- the reason I bring it up now, if Your Honor

2  recalls, one of the definitions in there was masonry field,

3  asbestos-containing surfacing treatment we think of as

4  fireproofing, ceiling texture, acoustical plaster.  It says ZAI

5  -- I'm staying away from that while you all are litigating

6  right now, else way, and masonry fill.

7        Masonry fill is, in essence, I don't know if Your

8  Honor has had a masonry fill discussion, but it's, in essence,

9  the same thing --

10        THE COURT:  I have.

11        MR. SPEIGHTS:  -- but it's, in essence, the same

12  thing as ZAI, but it goes in different places in buildings,

13  probably harder to get to, but it's out there.  It's asbestos-

14  containing masonry fill.  And if Grace takes the position that

15  it's in the bar order, then I think there are serious questions

16  as to whether that's been adequately communicated to people to

17  file masonry fill claims, or perhaps it's not in the bar order

18  and Grace can clarify, and then it can go down that ZAI track

19  for a while, and at least I don't need to discuss it further

20  today.

21        In any event, Your Honor, the first thing I would say

22  is, we're not limited to the 78, or the 78 -- I'm going to add

23  this up because I'm tired of not knowing the number -- 78 and

24  71, 149.  I don't think we are limited to the 78, but 78 is

25  enough.  I don't think we're limited to the 149, but 149 is

1 enough, because Anderson also represents people in the -- who

2 have future demands and also represents those with conspiracy,

3 and also represents those with products such as masonry fill.

4        But that's not all, Your Honor.  I believe even

5 without that bar date order as it is, if Your Honor certifies a

6 class action, we are not limited to just those for whom we

7 file, or somebody filed individual proofs of claim.  Here we

8 have the tug of war between the bankruptcy rules and Rule 23, a

9 tug of war that started many years ago, and a tug of war which

10 I've read about more in the last week than I ever thought I

11 would read about anything.  And up until the <u>American Reserve</u>

12 case, a case which Mr. Bernick has cited innumerable times,

13 it's out of the Seventh Circuit, so I'm sure he has certain

14 affection for it, the Bankruptcy Courts were, to say the least,

15 wary of class actions as being sort of inconsistent with

16 bankruptcy procedures.  But since <u>American Reserve</u>, the

17 overwhelming majority of cases, including other Appellate

18 Courts, the Eleventh Circuit <u>In Re Charter</u> is one of my

19 favorite cases, other Appellate Courts, other District Courts,

20 and other Bankruptcy Courts have wrestled with this, and the

21 overwhelming majority have recognized not only can Rule 23 be

22 used in bankruptcy context, but it actually can be very helpful

23 to the bankruptcy context.  You know, when Grace goes out with

24 a bar date order, or any creditor, first of all, historically,

25 that was in a commercial setting, where you'd know of the

1  commercial dealers who know the people who have -- you have

2  paper with, and you would give a bar date notice and you would

3  do the best you can.  You would give, you know, direct notice

4  where you had direct notice, publication when you couldn't give

5  direct notice.  Everybody knows that's the law.  Now we have

6  these tort cases and these building owners who had no direct

7  connection with W.R. Grace around there.  And the cases

8  suggest, Your Honor, that while Grace has -- Grace's

9  understandable desire, whether I agree with it or not, it's

10 understandable desire is to cut off people from making claims

11 by giving a minimum notice that comports with due process, a

12 class action representative is interested in protecting all

13 claimants out there who might have claims, so that we want to

14 make sure those claimants get to participate fully in this

15 bankruptcy.

16         In addition, Your Honor, as I keep saying, we want to

17 prevent problems from occurring to the future which would

18 particularly occur in a tort claimant type situation where no

19 matter how great the bar notice is, no matter how much it

20 comports with due process, and even if it was impossible to

21 give direct notice to these claimants, there is an argument

22 recognized in the Courts that that's the fairer, more

23 appropriate thing to do in some situations to have a class

24 action to protect that unknown group of people.

25         Now, I thought I was going to have to come before

43

1  Your Honor and try to analyze all these cases, but I realized,

2  just in the last few days, what I had forgotten.  What I had

3  forgotten is we have a case which Your Honor has already cited

4  to us, and which Your Honor has already recognized as being a

5  decision that you have great respect for, and having attended

6  that seminar in Philadelphia a few years ago, I know you have

7  respect for the other Court, and that's the <u>Inter-Regional</u>

8  case, Judge Gambardella's decision dealing with class actions,

9  a case Your Honor has spoken about on the record, and case

10 which before the bar date ever occurred Your Honor said

11 something to the effect, well, that's the case that makes sense

12 to me, or something to that effect.

13        And when I read that case in preparation, or re-read

14 that case in preparation today, I realized that I really need

15 to go no farther than discussing with you Judge Gambardella's

16 ruling in that case, because she was faced with the precise

17 issue that this Court has struggled with, and it's the first

18 time Ms. Browdy and I appeared before you discussing class

19 certification.

20                         (Pause)

21        THE COURT:  I can't believe I lose my glasses every

22 two minutes.  This is the <u>Inter-Regional</u> case, which Your Honor

23 is thoroughly familiar with.  It's a 1998 case, a somewhat

24 confusing fact situation.  It's come up on other issues before.

25 But I want to turn to Page 13, the end of the case.  And I have

1 yellow highlighted several paragraphs, but I think that these

2 paragraphs get to the crux of the Court's concern about the

3 interplay between Rule 23 and the bar date order.  In that case

4 there was a bar date order, and reported in the case there were

5 2,000-plus potential claimants, only 371 of which -- I believe

6 my number is wrong -- a number of which did not file proof of

7 claims in the bankruptcy.  And, of course, some people argued

8 in that case, as Grace does here, whatever class there might

9 be, or whether there should be a class, should be affected by

10 that reality that only a certain number filed proofs of claim.

11 The SIPA, S-I-P-A, trustee, and SIPA both argued that the

12 putative unnamed class members in this case have received

13 actual or constructive notice of the claims bar date, which bar

14 date has passed, and that a class proof of claim would

15 unjustifiably extend the bar date with respect to lease

16 investors who have not timely filed proofs of claims and is

17 unnecessary.

18        The Bankruptcy Court, _In Re Sacred Heart_, a case that

19 Grace has cited to you today, and it has the cite there,

20 recognized that even if the requirements of Federal Rule of

21 Civil Procedure Rule 23 are met, the Bankruptcy Court must

22 weigh the issue of whether it is appropriate to give the class

23 members what may amount to an additional opportunity to meet an

24 otherwise applicable bar date.  The _Sacred Heart_ noted that if

25 the unnamed class members are largely a group which a debtor

45

1  has refused to notify individually, then the class device may

2  provide the only form of notice to such parties and may be

3  advisable to utilize.  On the other hand, if the putative

4  unnamed class members have clearly received -- clearly received

5  actual or constructive notice of the bankruptcy case, and the

6  bar date denial of the implementation of the class proof of

7  claim device appears advisable, citing another case.  In

8  response to this suggestion, the movant suggests that this

9  Court could define the class as limited to those individual

10  claimants who had filed individual proofs of claim within the

11  bar order.  And then skipping -- in response to these arguments

12  this Court will not place such limitation on the defined class.

13  This Court here agrees with the analysis of the Bankruptcy

14  Courts in In Re Wang Laboratories, which Court noted that the

15  Eleventh Circuit has called the requirement for individual

16  claims illogical and contrary to important class action policy

17  considerations.  And the Court goes on to discuss, Judge

18  Gambardella does, as why it rejected, or why Wang rejects the

19  Seventh Circuit view, which is different from the Eleventh

20  Circuit view in In Re Charter, the case that I keep putting

21  before Your Honor.

22       If the Court certifies a class, however, a self-

23  appointed agent has become authorized and the original filing

24  is effective for the whole class, the principle.  Well, I hope

25  Your Honor would agree with me, at least I'm not entirely off

1 the reservation.  There are other cases, and if Your Honor

2 gives us an opportunity to cite chapter and verse in some

3 pleading we give to you, we will cite those other cases, but

4 since Your Honor has cited Judge Gambardella's opinion, I

5 suggest to you that clearly in her opinion if Your Honor

6 certifies a class action, and the elements are present here,

7 then the class certification can be for more people than just

8 those who file individuals claims.  And again, Your Honor, I

9 want to be the friend of the Court.  I think that helps the

10 Court.  I'm not trying to set aside the bar date order.  I

11 think that that will eliminate questions concerning these

12 absent class members who did not file claims.  That doesn't

13 mean that claims are worth a nickel or 50 million.  It simply

14 means that they are part of a class to be dealt with, and the

15 class, I must hasten to add, that does not mean all of a sudden

16 we have unlocked the gates to more litigation, etcetera,

17 etcetera.

18        THE COURT:  Well, but I think it does in a way,

19 because you're asking for a class certification that's an opt

20 out class, and I think that is fraught with peril in a

21 bankruptcy context, and I think that's the tension between Rule

22 23 and the bar date order that is not resolvable, because, you

23 know, the debtor, particularly if there is going to be a trust

24 mechanism, if there is, and I recognize this plan that's on

25 file now doesn't go that direction, but just speaking

1  hypothetically, if this debtor or any debtor were to set up a

2  trust to deal with property damage demands in the future, then

3  I don't know how you could have an opt out.  Perhaps the opt

4  out can be something like if you go through the trust process

5  and you don't like the resolution, then there can be some fall

6  back elsewhere, but it seems to me that if the whole purpose is

7  to get the debtor to resolve all claims, and that's what you

8  are now arguing to me, that if there is a problem with the bar

9  date order that somehow the debtor, to deal with that problem

10  in the future, should take care of it now by having a class

11  certified so that that class can include everybody who somehow

12  or other got missed in the bar date order, then it can't be an

13  opt out class.  So, how do I resolve that?

14          MR. SPEIGHTS:  I think I can resolve that very

15  simply, Your Honor, and I think it may be resolved in another

16  case that's before Your Honor.  And I think the answer is, and

17  I need to be very careful with my fiduciary duties here to all

18  members of the class, but the answer is if somebody is not

19  proceeding as a member of the class, then the debtors are going

20  to suggest to you that they are barred by the bar date order.

21  The class claim was filed for everybody, but if they want to

22  opt out and proceed outside of the class and not having filed

23  an individual claim, again, I have a very candid view of that.

24  I have to be careful because they are members of my class, but

25  I am sure the debtors would say do so at your own peril.  Go

1  back to see Judge Fitzgerald and tell her I opted out of the

2  class and I did not file an individual proof of claim, and I

3  want to litigate.  I don't think it's going to be a problem,

4  Your Honor.  I think that the bar date order will be argued

5  before you strenuously as taking care of any opt out, so the

6  two fold together, the Bankruptcy Rules and the Rule 23 rules,

7  so I don't see that happening.  And I also see, Your Honor, not

8  bogging this case down in litigation because Anderson is

9  already a claimant.  Anderson is going to have to litigate

10 hazard, constructive notice.  At some point, as I understand

11 it, there's going to be an estimation of damages.  Anderson

12 would represent -- you will only see Anderson.  It is a class

13 representative.  It is the essence of a certified class that

14 you try the case in the name of the class representative.  If

15 you decide Anderson has no hazard and there's no problem with

16 that product, and therefore it's entitled to zero, the class is

17 going to get zero.  I don't think Your Honor is going to do

18 that, but that's the part of being a member of a class.  And,

19 Your Honor, we will try that in the name of Anderson, and we

20 get to estimation, I'm sure that Mr. Bernick will say I don't

21 care that you have a class, this is class is not worth a red

22 cent because members of this class are, in the state of

23 Virginia, and the statute of repose in Virginia, which was

24 presented to you in another bankruptcy, prohibits asbestos

25 (indiscernible) cases, as the argument will be made, and Your

1  Honor might say, okay, I'm not estimating those.  I'm throwing

2  out Virginia, and I'm not picking on Virginia, I'm just saying

3  that's one which another debtor threw out initially, and that's

4  one that asbestos defendants get excited about, the statue of

5  repose of Virginia.

6          So, I don't see that.  I see us protecting the rights

7  of those people.  I see us protecting the estate and other

8  creditors.  And I see us getting an estimated amount for what

9  this class is after we try the common issues if we are to

10 continue down that path, or, again, you know, I always think we

11 ought to go just straight to estimation and get rid of all

12 this.  But that's another story for another day.  But we have a

13 perfect vehicle in Anderson, which without question has been

14 litigated on behalf of people since 1992.

15         THE COURT:  Okay.  But, to make sense out of that

16 argument, then I have to make the next leap, which is that in

17 any case -- in this case I guess it happens to be a fact, but

18 nonetheless, looking at it again from the theoretical

19 perspective, it would have to always be the case that a class

20 proof of claim would have to be of record within the bar date

21 in order to make your assertion valid, which is that the debtor

22 would have the -- I'll call it defense to the proof of claim

23 preserved, or to the opt out claimants preserved, that either

24 you're subject to the bar date order, or you're subject to the

25 class proof of claim order that you don't get it both ways,

1  because if you don't have a class proof of claim filed within

2  the bar date, and there are issues with respect to the bar

3  date, then the class proof of claim isn't going to protect the

4  people who have problems with respect to the bar date.  So, as

5  a theoretical proposition I think there are holes that I can't

6  fill in with an opt out.  I mean, this case -- I'm not sure

7  that this case presents them, because there is a class proof of

8  claim that was filed, as I recall, within the bar date.  I'm

9  pretty sure Anderson was filed within the bar date.  I don't

10  believe --

11         MR. SPEIGHTS:  It was.

12         THE COURT:  -- that's an issue.  Okay.  So -- but

13  nonetheless, if I'm looking at how Rule 23 meshes with the bar

14  date, it's an issue that I've got to look at, because if, in

15  fact, there is a problem with looking at those two statutes, my

16  -- I believe my oath requires me to apply the Bankruptcy Code.

17  If there is a more specific statute in place, that more

18  specific statute may govern.  I don't know how Rule 23 -- and

19  I've done some of the same reading you've done on this issue,

20  Mr. Speights, about the tension between the two.  I don't know

21  how those two things will mesh, but I'm concerned about the opt

22  out nature.  I just don't see how, in the context of a

23  bankruptcy, you have an opt out.  That's the whole purpose for

24  having a bankruptcy.

25         MR. SPEIGHTS:  Well, Your Honor, let me respond in

**J&J COURT TRANSCRIBERS, INC.**

1 several ways.  The first response I'll make is, you know, one

2 thing I want to get done today is to get --

3        THE COURT:  Pardon me.  May I restate that just a

4 minute?  I apologize for interrupting.  The purpose for having

5 the proof of claim process in the bankruptcy is that if you

6 want to share in the distribution from an estate you have to

7 file a proof of claim.  Let me put it that way.  So, the bar

8 date notice is there to compel you to come before the Court.

9 If you want to share in the debtor's assets, then you've got to

10 prove up your claim in this estate.  So, if there's a problem

11 with the bar date notice, then -- and/or you choose not to

12 prove up your claim, I think the general proposition in

13 bankruptcy is you've chosen not to come before the Court and

14 prove up your claim.  If there's a problem with the bar date

15 notice, then you -- when you discover that you've got some

16 reason to come before the Court, approach the Court's equitable

17 power, and say here's the problem with the bar date notice, and

18 here's my reason why I didn't comply, so let me comply with a

19 late-filed claim.  That would be the context in which the

20 Bankruptcy Court would typically get a request to have a late-

21 filed claim.  But to date I don't have anybody asking to file a

22 late-filed claim and this bar date notice expired years ago,

23 after a several million dollar notice program that the debtor

24 went out with.  And so, I don't understand the opt out context.

25        MR. SPEIGHTS:  And I've got about ten responses in my

1 head --

2          THE COURT:  All right.

3          MR. SPEIGHTS:  -- and let me see if I can proceed

4 somewhat logically.  The first response is that we build the

5 record today, we had the arguments today, and that's another

6 example of why I hope you will allow us to submit something

7 supplementally, because you will identify that and other issues

8 which concern you, and we can, like a laser beam, look at that

9 issue.  It's not an issue I haven't looked at already, but, you

10 know, I came here worried about convincing you on numerosity,

11 now I see that your concern is there, and I would like to

12 address it that way.  Secondly, I will talk to Mr. Fairey when

13 we take our break and Your Honor goes about some other

14 arguments.

15          But my initial reaction is as follows.  That's what

16 Inter-Regional faced.  That's what Judge Gambardella faced,

17 those arguments.  And she said, in that case, that she's got

18 to, of course, honor both, both Rule 23, which is part of the

19 Bankruptcy Rules, and the whole concept of a bar order and opt

20 out.  So, it's not like, Your Honor, this had never been

21 thought of before.  A lot of Courts have done it in the other

22 cases besides Judge Gambardella's decision which have done it,

23 and it said, oh, we think -- we think it's consistent with

24 everything to have a class action.  However --

25          THE COURT:  But they haven't all been opt outs.

53

1           MR. SPEIGHTS:  Pardon me?

2           THE COURT:  The class actions in Bankruptcy Court

3 have not all been opt outs.  In fact, most -- well, I don't

4 know about most, some of those I'm familiar with have not been

5 opt outs.

6           MR. SPEIGHTS:  And I understand that, Your Honor, and

7 I'm not sitting here arguing on behalf of people who don't want

8 to participate in my class action.  I'm here arguing that you

9 should certify and allow us to proceed, and I'm suggesting to

10 Your Honor if you did have an opt out those people are going to

11 face an argument that they are in great peril if they try to

12 proceed individually in light of everything that's happened in

13 this case to date.

14           However, I just don't want to talk about it, or brief

15 it, or cite Judge Gambardella, or cite the other cases.  I

16 think that I have done a disservice to the Court in mixing up

17 some of my arguments today on this point.

18           THE COURT:  No.  You haven't mixed up your arguments.

19           MR. SPEIGHTS:  Well, let's assume for a minute that I

20 had no criticism of the bar date, and I haven't gotten to the

21 bar date, actually.  I am going to step back three steps and

22 say a couple of things about the bar date that I -- I disagree

23 with, respectfully.  But let's assume that I would stand before

24 you and say this is a perfect bar date, the definitions are

25 perfect, they cover everything.  Okay?  That's not the argument

1  I made a minute ago, but let's assume that, then I would tell

2  you that we -- we would deal with Judge Gambardella's decision

3  and that the -- the opt out wouldn't be a problem because you

4  had a perfect bar date order, and nobody can complain about it,

5  and if they come along later and don't want to participate in

6  this class, they are facing not just a mountain, they are

7  facing Mt. Everest.

8          The reason I said that I mixed it up a little bit,

9  that I gave us two variables in that time, because when I also

10 said the bar date does not cover certain claims, such as future

11 P.D. demands, Your Honor correctly says, well, how about those

12 people coming in, whether you certify or not and dealing with

13 those issues?  And I tell Your Honor again that I believe that

14 a certified class action, even if you allow opt outs, and even

15 if people -- I don't think anybody would opt out and take the

16 risk of that, and it protects that.  I mean, if you give

17 notice, provide that we can give notice to the class, who is

18 going to opt out of a class just on its face, that didn't file

19 a bar date order?  It's just -- I understand, theoretically,

20 you are concerned about it, but I don't see a practical problem

21 in that.

22         THE COURT:  But they already had notice of the bar

23 date.  Why wouldn't they have just filed a proof of claim in

24 the first place?

25         MR. SPEIGHTS:  Well, Your Honor, I guess that leads

1 me to the bar date.

2          THE COURT:  I mean, how much notice do they need?

3          MR. SPEIGHTS:  Respectfully, a lot more than Grace

4 provided, and let me tell you why.  Let's start off and go back

5 to the first document I showed you today, which was a document

6 that said there are 119,000 buildings with asbestos-containing

7 surface treatment in the country.  Let's assume Grace did not

8 have one piece of paper suggesting where any of its products

9 were.  You have a bar date order that I don't care how many

10 Todd Hills (phonetic) are testifying, how many Catherine

11 Kinsellas (phonetic) testify, nobody would ever suggest to you

12 that the majority of those people read about the bar date

13 notice.  <u>Mullaney</u> requires due process.  You do the best you

14 can.  I'm not attacking the bar date order as I stand here, but

15 the reality is you can never, by publication, get the notice

16 that you can that is favored in <u>Mullaney</u>, and <u>Shimmerton</u>

17 (phonetic), and other cases.  You can never get the notice as

18 good as direct notice if you can give direct notice.  Direct

19 notice is always favored.  It is always favored because when

20 you are giving -- and in a bankruptcy setting that's all you

21 can do if you don't have any way of doing anything else is to

22 give notice by publication.

23          THE COURT:  Well, sure.  You're not suggesting that

24 that 119,000 buildings were all Grace's buildings?

25          MR. SPEIGHTS:  Even I wouldn't suggest that, Your

1  Honor.

2             THE COURT:  Okay.

3             MR. SPEIGHTS:  Okay?  But what I am suggesting to

4  Your Honor, and it's an issue that we argued a year or two ago

5  before Your Honor before you on a discovery dispute, and Your

6  Honor would not permit me to have discovery about giving direct

7  notice to building owners that Grace reasonably knew about.

8             THE COURT:  Well, I had an affidavit filed, I

9  believe, as to the buildings that Grace had given direct notice

10 about, as I recall.

11            MR. SPEIGHTS:  Well, Your Honor, I believe the record

12 reflects that, as far as asbestos building cases, and the

13 record is somewhat convoluted because Grace gave notice to

14 other types of claimants, subject to the bar order, beside

15 asbestos property damage claimants --

16            THE COURT:  That's right.

17            MR. SPEIGHTS:  But I believe the record will reflect

18 that its asbestos property damage claimants it gave direct

19 notice only to the so-called seven or eight building owners

20 through counsel who had sued it prior to the bar date.

21            THE COURT:  Okay.

22            MR. SPEIGHTS:  And if that's correct, Your Honor, I

23 find that somewhat extraordinary.  Now, while I continue to

24 believe that if I had had some discovery, there is a reasonable

25 chance that Grace had summaries of documents, computer lists,

1  and other things.  Any defendant who is subject to all the

2  asbestos litigation Grace has been subject to over the years

3  presumably would have some of its records organized in some

4  fashion to identify buildings, if for no other reason if

5  somebody sues them for mesothelioma claiming that he or she

6  worked in the Sears Tower, to say, well, we didn't have

7  Monokote in the Sears Tower.

8          But leaving aside the discovery issue, leaving aside

9  that, Your Honor, we had marked, and that's when I got in hot

10 water with the Court, we had marked all of these what I'll call

11 sales records.  Now, these sales records consist of primarily

12 Grace documents which are invoices showing where Grace's

13 product went to by specific street address, and other documents

14 which identify specific buildings.  And I believe, and I

15 urgently ask Your Honor to consider this argument, not to set

16 aside the bar date order, but again, so I can be a friend of

17 the Court, that there are gaps in that process because Grace

18 decided not to serve those people, and I think it was

19 reasonable for Grace to have done so.  Why do I say it was

20 reasonable?  First of all, Your Honor, if we look at the

21 invoices themselves, we see the addresses.  Secondly, we know,

22 and this is part of the record, and I don't want to start

23 pulling out documents and getting bogged down at this point,

24 but we know as part of the record when the war broke out in

25 2005 between Kirkland & Ellis and Speights & Runyan, it

1  immediately noticed depositions of building owners for whom we

2  had, under your ruling -- later ruling, no authority.  We filed

3  under the Anderson umbrella.  And it filed notices and

4  subpoenas, and served those subpoenas on people whom we hadn't

5  talked to, because it had the sales information to show where

6  those people were located.  It was able to issue a subpoena,

7  for example, to a building owner in South Carolina, in Laurens,

8  South Carolina, that I had never spoken to.  I'm going to get

9  to the state class in a while.  I think I had the authority

10 under the state class to file the claim on behalf of that

11 building owner, but they filed and served.  And if they can get

12 an address to serve a subpoena, why can't they give direct

13 notice?  So, I would say, and this, again, is if we are allowed

14 to present this by way of illustration in a supplemental

15 pleading, will illustrate to you the various kinds of

16 information that Grace had which would have permitted it to

17 give direct notice.  I'm not suggesting Your Honor would agree

18 with me that every one of these pieces of paper contained in

19 these ten or 15 boxes of documents, of Grace documents

20 primarily, would provide direct notice, but I'm telling you,

21 first of all, that these pieces of paper show you the mammoth

22 amount of material that Grace sold, and gave them an

23 opportunity.  But the biggest point I want to make is this --

24         THE COURT:  Well, but as I recall with respect to

25 some of the lawyers -- and again, I apologize if I've got this

1  case and other cases confused -- but it seems to me that my

2  recollection about serving the attorneys in this case was that

3  the debtor had asked that the attorneys provide some

4  certificate that indicated that they, in turn, had forwarded

5  the proof of claim form and the notice on to their clients, and

6  the -- the property damage committee balked at that, asserting

7  that they were officers of the Court, they didn't have to do

8  that, and they basically took great umbrage with that

9  suggestion, and so, I didn't demand it.  Now, if I have to go

10 back and have them assert that, in fact, they served their

11 clients because the debtor wanted proof that that had been done

12 so that if it wasn't done the debtor could, in turn, make that

13 direct proof, and since the property damage committee convinced

14 me that it shouldn't have to do that, there may be a gap in the

15 record.  That's the property damage committee of which Anderson

16 sits, on which Anderson sits.  So, if the property damage

17 committee didn't want to certify through the lawyers who had

18 been served that it -- that those lawyers did not serve their

19 own clients, that's not Grace's fault.  That's -- and the blame

20 shouldn't be on debtors.  If I need to go back and get those

21 lawyers to certify that they made the direct notice, I will.

22 And if they didn't, I think there's a nice little jail cell

23 sitting across the street that maybe those lawyers can spend a

24 little bit of time in for a while, since they agreed to accept

25 that notice, and then ask not to have anything filed before

1  this record that indicated that they complied with that direct

2  notice.  Mr. Speights, you know, there's only so much that the

3  debtor can do under those circumstances.  That's just not

4  reasonable on behalf of the property damage committee.  If

5  there is a gap, I am willing, on this record, to go back and

6  get that gap fixed.

7          MR. SPEIGHTS:  Your Honor, I think we are trains

8  passing in the night on that issue.

9          THE COURT:  I'm not sure we are.

10          MR. SPEIGHTS:  If I have a class action filed in the

11  name of Anderson, I have notice and I file a class action

12  claim.  Grace says I have no authority because it's uncertified

13  in that situation on the putative class to file on behalf of

14  people who were not in the class, and therefore I filed the

15  claim on behalf of my client, Anderson Memorial Hospital as

16  class representative.  I don't think the record will suggest

17  that whatever happened then, and I'd have to review it,

18  Anderson is a member of the property damage committee, no

19  question about that.  I don't --

20          THE COURT:  This is not an issue about filing the

21  claim.  This is an issue about giving notice to the lawyer of

22  the claimants that Grace had record of in its files saying that

23  those claimants were represented by counsel, and its obligation

24  as counsel is to serve counsel.  So, it did.  It served counsel

25  for the claimants directly, and those counsel, in turn, Grace

1  wanted to file an affidavit saying tell us what you sent the

2  notices on to the claimants directly, and if you didn't, then

3  we'll do it after you tell us that you didn't do it.  The

4  property damage committee lawyers came in with great umbrage,

5  saying we shouldn't have to do that.  We're officers of this

6  Court.  You know, we know what our obligations are.  We'll

7  comply.  And I said, fine, you're officers of the Court.  You

8  comply.  So, the debtor never got that piece of information.

9  This is all about serving the notice, nothing more, not filing

10  the proofs of claim, just giving the direct notice.  So, if

11  those lawyers, in fact, served their clients, then their

12  clients got the direct notice.  And if they didn't, it's not

13  the debtor's fault.  The debtor served the lawyers.  And if the

14  lawyers, in turn, didn't file -- or, didn't serve their

15  clients, they're the people who are at fault.  That's not the

16  debtor's issue, so if we need to get that thing fixed, then I

17  guess we need to get it fixed.  It's all about service.  This

18  is not a filing of a claim issue.  It's about direct service.

19  That's what you're talking about, direct notice.

20       MR. SPEIGHTS:  I am talking about direct notice, Your

21  Honor, and I would like to review the history of that, and

22  frankly, talk about it with Mr. Baena, and -- exactly what

23  occurred at that point.  But my point is, I don't believe that

24  Anderson was supposed to serve every building owner in the

25  putative class action.  It has a lot of records, but not all of

1 the records, and it was not one of the cases that -- Grace

2 wanted to file these -- there were seven cases, eight cases,

3 and Anderson was one of them.  And Anderson -- there was no

4 need to file an affidavit that Anderson -- that I would notify

5 Anderson.  I did notify Anderson.  Okay?  Anderson is the class

6 representative, and I notified Anderson.  I don't -- my

7 recollection is, and again, there's been a lot of water under

8 the bridge --

9             THE COURT:  There has.

10            MR. SPEIGHTS:  Okay.  Is that it was never suggested

11 that Anderson should then take and locate without Grace's

12 records, or all of Grace's records, an attempt to notice

13 everybody within that definition of the class from every piece

14 of scrap of paper it could find, or every information it had,

15 and notify every one.  Now, Anderson did a great deal to try to

16 notify people within the class, to try to get claims in, and we

17 filed a lot of claims Your Honor said, well, we didn't even

18 have authority to file claims for.  Okay?  But we -- you know,

19 I hasten to add, we were very active in doing everything we

20 could to protect the Anderson class and membership, but I never

21 thought it was my obligation give the bar notice to everybody

22 as a part of the bar notice process to absent class members,

23 and if I'm mistaken I will be the first to tell you after I

24 review the record I'll go ahead and talk to Mr. Baena about it.

25            But where I'm headed with this is, Your Honor, I

1  think it's the debtor's obligation to give direct notice.  The

2  debtor is the one that should give direct notice.  And if it

3  has building owners, especially of an uncertified class,

4  putative class, if it had a computer readout and had all the

5  names, addresses, and phone numbers, and everything else, it

6  should give direct notice.  But let me tell you why I think

7  that's right, among other reasons.  Grace is the only defendant

8  in the Anderson case whose bankruptcy is currently or has been

9  before Your Honor that did not give direct notice to building

10  owners.  The only direct notice that Grace gave that I'm aware

11  of, and I'm sure Mr. Bernick will not hesitate to correct me if

12  I'm wrong, is to counsel for the so-called seven or eight, nine

13  cases.  What happened in the other cases?  I've got cases

14  against U.S. Mineral -- excuse me -- I have claims against U.S.

15  Mineral, Anderson does, U.S. Gypsum, (indiscernible) Federal

16  Mogul.  Anderson has -- Anderson filed the same thing against

17  those defendants, a statewide class claim and a worldwide class

18  claim against those defendants based upon its complaint down

19  below in the state.

20          THE COURT:  But they were certified, and so -- but

21  they were certified and notice went out, correct?  I mean, in

22  this instance the debtor filed bankruptcy there was no notice

23  and the debtor didn't participate in that process.  Isn't that

24  correct?

25          MR. SPEIGHTS:  Actually not, Your Honor.  First of

64

1  all, they were certified, and I say Grace is certified, which

2  I'm going to get to today, too, for the state case.  But as to

3  everything out of South Carolina, there was no certification as

4  to those, and then notice had not gone out down below because

5  the bankruptcies ensued before -- out notice was given in South

6  Carolina.

7          THE COURT:  Okay.

8          MR. SPEIGHTS:  But that's not my point.  I mean, I'll

9  be happy to answer that.  My point is that -- let's just take

10 Federal Mogul, because it's the easiest one.  Okay?  Federal

11 Mogul has a lot of the same type of information that Grace has,

12 a lot of invoices and a lot of sales data.  They don't have the

13 market share in this country that Grace had, but they have a

14 lot of it.  And what does Federal Mogul do?  Well, Your Honor

15 knows Clint Fisher, who has testified before Your Honor, and

16 has represented Mogul for many years, and Mr. Fish creates the

17 lipid book -- a lipid is like Monokote.

18         MR. BERNICK:  Your Honor, at this point I would

19 object to Mr. Speights's descriptions.  We're now beyond the

20 record in the Grace case.  He's referring to another record.

21 We are not involved in that case.  I'm not counsel in that

22 case.  And whatever may or may not have happened in that case,

23 if you wanted to be able to bring these matters before the

24 Court, under the Federal Rules he should have done so by

25 affidavit, or in the alternative, to a record of deposition and

**J&J COURT TRANSCRIBERS, INC.**

1 testimony in which we had an opportunity to participate.  And

2 he hasn't done it.  That is exactly what the Federal Rules

3 require in the event that there is a matter as to which a

4 record must be created on motion, is that it has to be done by

5 affidavit or in that fashion.

6        MR. SPEIGHTS:  Your Honor, we have listed the Federal

7 Mogul bar date, Federal Mogul pleadings, and I have in my hand,

8 which is an exhibit, I'll get the exhibit number in a moment,

9 the affidavit from Wayne L. Pines (phonetic), which is an

10 exhibit submitted in the Mogul case, served on Mr. Bernick,

11 supporting what Mogul did in its case concerning the same type

12 of records that Grace has in its case.

13        MR. BERNICK:  Your Honor, if that's a proffer of the

14 exhibit, we object to that proffer.  There is not a proper

15 foundation for establishing its admissibility or its use in

16 this record.  It's an affidavit, as Mr. Speights just

17 indicated, that was offered for a different purpose, not for

18 purposes of this motion, and in a different proceeding.  If he

19 wanted to get that into the record in this case, he should have

20 filed an affidavit in this case, and given us notice of that so

21 that we would have an opportunity, if we needed to, to take the

22 deponent's testimony.  Indeed, he raised the possibility of

23 having live testimony here, and declined to produce that live

24 testimony.  You can't substitute for the live testimony an

25 affidavit from a declarant offered in a different case for a

1  different proceeding.

2           THE COURT:  Yes.  I --

3           MR. BERNICK:  And it's irrelevant.

4           THE COURT:  Well, I don't know that it's irrelevant,

5  but I do agree that procedurally it is not being offered in the

6  correct format for use in this case.  I am familiar with it

7  because although you didn't participate in that proceeding, I

8  did, so I am aware of what the affidavit said and the purpose

9  for which it was used in Federal Mogul, but this is not Federal

10 Mogul, this is a different case, and I do agree that it is not

11 being proffered properly in this case.  I think if you need to

12 do this you're going to have to give Mr. Bernick an opportunity

13 to go back and do depositions, and today was the day, I

14 believe, to do the -- to get this case in a process for trial,

15 and there were to be no live witnesses, so I don't think I can

16 accept that proffer, or that affidavit for that purpose.  So,

17 the objection is sustained.

18          MR. SPEIGHTS:  I understand the ruling, Your Honor,

19 and -- let me find the exhibit number so I can identify it for

20 the record.

21                          (Pause)

22          MR. SPEIGHTS:  It is Exhibit 126, which I would

23 proffer for the record.  I understand the Court's ruling.  My

24 understanding was in all of our discussions that affidavits

25 would be considered, and this is a matter of public record, of

1 course, in the Mogul proceeding, but if Mr. Bernick wants to

2 have a deposition concerning this, I understand that, but I do

3 believe it's highly relevant.

4        MR. BERNICK:  Mr. Bernick's desire to have a

5 deposition is in timely basis, and we are now at the final

6 moment and the final day of a two-year process, so it is --

7        THE COURT:  I am not -- I am not admitting the

8 affidavit.  I agree that procedurally it is not being proffered

9 in a fashion that comports with the Rules of Evidence in this

10 proceeding, so I am not admitting that affidavit in this case.

11                     (Pause)

12        MR. SPEIGHTS:  Your Honor, I assume that your ruling

13 will be the same with respect to the proofs of claim for U.S.

14 Gypsum and U.S. Mineral, in which I have listed their bar dates

15 -- their bar date orders and what was done in those cases.  And

16 I'm looking for the exhibit numbers now.

17        MR. BERNICK:  I have no objection to the bar date

18 orders.  I think that those are, A, to the extent that the bar

19 date orders resulted in a bar date notice, those are probably

20 matters of which the Court can take judicial notice in any

21 event.  What I have a problem with is the underlying affidavit,

22 which, if it's being proffered for the truth of the matter,

23 should have been in the form of an affidavit in this case.

24 Again, Your Honor, I think that there's a misapprehension about

25 the nature of how to create a record on a motion for class

68

1 certification. I don't believe it's necessary, and I don't

2 think the rules require that there actually be the

3 admissibility of evidence under the Federal Rules of Evidence,

4 a full stop as if this matter were a trial. It's not a trial.

5 At the same time, the rules specifically call out that in the

6 event that you have motion and the motion does raise matters

7 that do have to be made a matter of record, the record has to

8 be made in -- either affidavits or some kind of testimony. An

9 affidavit itself would not be admissible under the Federal

10 Rules of Evidence, but it sufficient for purposes of creating a

11 record in the case on motion. But we don't even have an

12 affidavit made in support of the motion. It just wasn't done.

13          MR. SPEIGHTS: Could I have one moment?

14          THE COURT: Yes.

15                    (Pause)

16          THE COURT: All right. Yes. With respect to the bar

17 date orders themselves, in USG and USM, I am certainly willing

18 even to take judicial notice, and Mr. Bernick I think correctly

19 points out I can do that. I would do that. They were my

20 orders, anyway, so I don't think there's much way that I -- I

21 mean, I'm familiar with them. I can't really put that aside.

22 Anyhow, I can take judicial notice, I will take judicial notice

23 of those two orders, but it would be helpful if you can point

24 the exhibit numbers out for me.

25          MR. SPEIGHTS: Well, Your Honor, before we leave the

  
1  Federal Mogul Exhibit 126, the affidavit of Wayne L. Pines is

2  Exhibit E to that bar date order.

3          THE COURT:  The bar date order itself, though, is the

4  order proper.  The affidavit that is an exhibit to it that

5  you're offering for the truth, the problem is that that's a

6  hearsay statement.  The order was based on, and accepts, for

7  purposes of Federal Mogul, that that is the process that the

8  case went through, but that is not in support of your motion

9  for class certification in Grace.  They are offered for

10  different purposes, so the bar date order that sets the dates

11  and the process that was employed I can take judicial notice

12  of.  I can take judicial notice of the fact that there is an

13  affidavit attached to the bar date order, but I can't accept it

14  for the truth of the proposition attached.  Judicial notice

15  doesn't let me go that far.  So, I -- my ruling is still the

16  same.  Exhibit 126, to the extent that it is the bar date

17  order, I will admit, but not the affidavit that's attached, if

18  that's -- I apologize.  I thought when you offered 126 it was

19  just the affidavit.

20          MR. SPEIGHTS:  I won't prolong it, Your Honor, but

21  just so the record is clear, first of all, this was Judge

22  Newsome's bar date order.

23          THE COURT:  In Federal Mogul?

24          MR. SPEIGHTS:  In Federal Mogul.

25          THE COURT:  Yes.  Um-hmm.

1          MR. SPEIGHTS:  And actually, of all three, Federal

2    Mogul, USG, and U.S. Mineral.

3          THE COURT:  Okay.  That's fine.

4          MR. SPEIGHTS:  You later got all three cases, but --

5          THE COURT:  But he entered the orders?

6          MR. SPEIGHTS:  He entered the orders.

7          THE COURT:  Okay.  That's fine.

8          MR. SPEIGHTS:  And in the orders themselves he refers

9    to an incorporates some of the exhibits as to how notice should

10   be given, etcetera, etcetera, but I understand Your Honor's

11   ruling on it.  And the others are -- U.S. Gypsum is Exhibit

12   125, and U.S. Mineral is 127.

13         THE COURT:  Okay.  Again, I will admit all three,

14   125, 126, and 127 insofar as they are bar date orders.  Insofar

15   as the affidavits are attached, clearly they're attached, but

16   with respect to this case I do not believe that the truth of

17   the matters asserted are appropriate in this case.  They

18   certainly are attached, and they, you know, the bar date orders

19   entered in those cases were entered in reliance on that

20   information.

21         MR. SPEIGHTS:  Well then, Your Honor, I go back to

22   Grace itself, in its sales records, and I will proffer them,

23   the sale records of Grace, which are all those boxes, and

24   before we, you know, address them individually, just to say

25   that those are documents which I believe would give rise to

1  Grace's obligation to give direct notice to prepare a Monokote

2  list, or surface treatment list, and to give direct notice to

3  building owners with street addresses or other information they

4  have which could be reasonably required under the Shimmerton

5  (phonetic) decision, and under the Mullaney decision.

6          In addition to that, Your Honor, I would proffer a

7  whole different set of sales information, and these are called

8  the billing registers.  And the billing registers have been

9  provided on CD ROM.  I actually have a hard copy across the

10 street which I can proffer in hard copy if the Court prefers

11 that.  But the billing registers are Grace documents

12 maintained, and they are not to specific job site, per se, they

13 are not like invoices.  I think there are seven boxes of

14 billing registers for a period of time which are computer

15 readouts by which Grace could find out where all of the

16 Monokote was shipped, or all of the ZAI was shipped, or all of

17 the Zonolite acoustical plaster was shipped to a specific

18 state, to a specific county, to a specific salesman, so that it

19 had enormous amount of information where its products went,

20 which would enable it to give more direct notice, and indeed,

21 even better publication notice, really, if you knew it was sold

22 in Allegheny County you'd want to make sure Allegheny County

23 was served of those.  And I do that, Your Honor, because,

24 again, I'm not trying to set aside the bar date, but everybody

25 knows that no matter how good a publication you get -- give, it

1  will -- you still need to make your best efforts to give direct

2  notice where it is reasonable, and I believe that Grace, unlike

3  the other three, which the bar orders are being accepted, I

4  think that Grace was deficient in not giving direct notice to

5  building owners where it knew the product, and I believe that

6  could be a subject of later problems for the Court, which we

7  don't need in this bankruptcy.  We need to wrap it up and be

8  done with it, and Anderson will deal with that.

9        MR. BERNICK:  Is that a proffer of all those exhibits

10  --

11        MR. SPEIGHTS:  It is.  That is a proffer of all of

12  the sales records and all of the --

13        MR. BERNICK:  If we could have the record reflect the

14  exhibit numbers for what's being proffered?  I believe they're

15  bulk exhibits.  And then I'd have a response to the proffer,

16  Your Honor.

17                        (Pause)

18        MR. SPEIGHTS:  That would be Exhibits 153 through and

19  including 166.

20        THE COURT:  Those are the sales records?

21        MR. SPEIGHTS:  Yes, Your Honor.

22        THE COURT:  All right.  And the billing register?

23        MR. SPEIGHTS:  Yes, Your Honor.

24        THE COURT:  That's included?

25        MR. SPEIGHTS:  153 through 159 are the sales records,

1 and 160 through 166 are the billing registers.

2        MR. BERNICK:  Your Honor, we would object to the

3 admission of any of those materials into the record on three

4 different grounds.  Number one, it's an improper proffer.

5 These documents were shipped to us wholesale over the --

6 whatever it was, the weekend.  They comprise literally

7 thousands of pieces of paper.  It's directly contrary to the

8 instructions that you gave to Mr. Speights last week that this

9 kind of last minute proffer, and certainly in that form, was

10 not in compliance with a proper process for litigating this

11 issue, and he proceeded anyhow.

12        Secondly, the proposition for which these are

13 offered, which is that somehow there was Grace product in all

14 those buildings, and therefore all those people should have

15 received direct notice, they are invoices.  They are building

16 registries.  They don't establish the actual presence of the

17 product in the building, and therefore they don't really go to

18 the issue that's being raised.

19        And then, finally, and this is really a threshold

20 matter that is of tremendous importance.  The first two

21 objections are objections that Your Honor could consider really

22 as evidentiary matters in the course of a contested proceeding

23 where Your Honor is making those decisions as the Trial Court.

24 We are not operating in the context of a proceeding that's

25 designed to determine whether notice is adequate.  These

1   documents are all being used to attack the adequacy of notice.

2   This is a collateral attack on a determination that Your Honor

3   already has made.  There was a final order that was issued

4   approving the notice.  There was no appeal with respect to the

5   sufficiency of the notice.  Your Honor has previously told Mr.

6   Speights on numerous occasions that you're not going to

7   entertain what is, in fact, an improper collateral attack on

8   the adequacy of the notice.  By allowing these documents now to

9   come into the record, he effectively is supplementing the

10  record in this case with respect to the notice issue.  An

11  effort to supplement the record in this case with respect to

12  the notice issue has to follow the rules for amendment and

13  supplementation.  He hasn't followed the rules for amendment

14  and supplementation.  Nor, if he had, would the motion be

15  proper, because the time for doing all that is long gone.  He

16  didn't even prosecute an appeal.  So, we have, today, under the

17  banner of dealing with whether his class should be certified, a

18  direct attack on the adequacy of notice.  That is the law of

19  this case, indeed, it is res judicata, and he should not be

20  permitted either to raise it or to supplement the record in

21  this case.  That is an improper effort.

22          MR. SPEIGHTS:  Your Honor, they are really being

23  offered for at least two reasons, and perhaps more than that.

24  The first reason has nothing whatsoever to do with an attack on

25  the bar date order.  It has to do with showing the wisdom of

1  Judge Gambardella's ruling.  Because what this shows is that
2  despite the publication notice, and even assuming that it was
3  the best publication notice possible, there is a lot of Grace
4  product out there in buildings, and buildings within the
5  definition of the class, and Judge Gambardella, in that portion
6  that I read to the Court, deals with this tension between the
7  bar date and people who would not get direct notice, and other
8  cases do and come down on the side of, well, it's consistent
9  with Rule 23 to be inclusive, and that demonstrates why, even
10  if the bar notice was perfect, even if they didn't fail to give
11  direct notice, it shows that there are a lot more buildings out
12  there than with this type of material that would be covered by
13  this class, and those who either, number one, who, number one,
14  read the bar date notice, and two, understood it and filed a
15  claim in accordance with the bar date notice.  So, leaving
16  aside the arguments about the collateral attack, that's the
17  first ground.

18          The second ground is, yes, Your Honor, I am pointing
19  out that there could be a problem with the bar date notice, and
20  I know that's a sensitive subject with the Court.  But Grace
21  did not, I do not believe, throughout the proceedings on the
22  bar date notice, disclose all of this information that it had
23  upon which it could have given direct notice to building
24  owners, and I want to protect the attacks that might come down
25  the road.

1          The other point, Your Honor, is, Mr. Bernick said,

2    the time to appeal has passed.  Well, the property damage

3    committee attempted to appeal the bar date notice, and Judge

4    Wolin, and it's an exhibit here that we've marked, ruled that

5    the appeal was interlocutory, so there was no way to attack it.

6    But again, I'm not trying to attack it to get you to set aside

7    it, I'm trying to say that here is a problem, and Anderson can

8    solve that problem because there are a lot more people out

9    there who I believe should have gotten direct notice but if you

10   certify Anderson as a class, that deals with all those people

11   who are in the definition of the class, and we don't have to go

12   through that process of when and if it comes up.

13          THE COURT:  Okay.  I believe that this really is a

14   collateral attack on the bar date order for the reasons that I

15   went into when we had an argument about the bar date order, and

16   I'm not going to admit the documents for that reason.  So, the

17   objection will be sustained.  I think, however, that your point

18   with respect to other entities out there who did not get direct

19   notice is -- is essentially a self-effectuating one.  That's

20   the reason why you have constructive notice in the first place,

21   because the debtor can't give direct notice to everyone.

22   That's why the Court approves a constructive notice, and

23   publication in the first place, because the debtor knows that

24   it can't reach everyone.  So, I don't think it's a contested

25   issue that there are, should be, would be, will be -- I'll even

1  go so far as to say will be, entities with property damage

2  claims that would not, did not get direct notice from the

3  debtors.  So, I will accept that proposition without the need

4  for these documents because if I didn't accept that proposition

5  I wouldn't have approved the expenditure of several million

6  dollars to go out with a bar date notice and the publication

7  for constructive notice in the first place.  So, these

8  documents, in that sense, are not necessary to prove that

9  point.  The point is already proven by the fact that the Court

10  approved the bar date notice that includes a constructive

11  notice provision.  So, the objection is sustained, but I think

12  your point is made anyway, without the need for those

13  documents, and at this point we're going to take a recess until

14  1:15.

15          MR. BERNICK:  Can I ask Your Honor --

16          MR. SPEIGHTS:  Thank you, Your Honor.

17          MR. BERNICK:  -- I'm mindful of Your Honor's

18  schedule.  1:15 we'd come back.  Can we get an indication from

19  counsel about how much longer they're going to go?  I am very

20  anxious to have a succinct argument this afternoon, but it

21  would help out a lot if I knew --

22          MR. SPEIGHTS:  Well, Your Honor, I'm doing everything

23  I can to -- I need to work backwards with the math a minute,

24  but let me tell you what, at the end of the day -- Your Honor

25  previously said that you were shutting the courthouse doors and

1  sending your staff home at 5:30.

2          THE COURT:  I think when I had my staff call I

3  indicated that we would stay as long as we need to because of

4  this problem that I created this afternoon, Mr. Speights.  So

5  --

6          MR. SPEIGHTS:  But I don't believe we've lost any

7  time, Your Honor.  We were starting at 10:30.

8          THE COURT:  Yes, but --

9          MR. SPEIGHTS:  Now we're starting at 8:30.

10          THE COURT:  Okay.  Whatever.  I need to leave in

11  three minutes, Mr. Speights, so please --

12          MR. SPEIGHTS:  My only point is I have to be in Court

13  in South Carolina tomorrow with a bunch of other lawyers

14  involved.

15          THE COURT:  All right.

16          MR. SPEIGHTS:  And I really do need to leave at 5:30

17  --

18          THE COURT:  All right.

19          MR. SPEIGHTS:  And I'll discuss with Mr. Bernick

20  dividing the time, as you told us to --

21          MR. BERNICK:  That's fine.

22          MR. SPEIGHTS:  -- understanding I have the last.  But

23  I really need to leave at 5:30.

24          THE COURT:  All right.  That's fine.  We'll leave at

25  5:30.  You two figure out what you need to do to divide the

1  time up this afternoon.  Okay.  Thank you.  We'll be in recess

2  until 1:15.

3         MR. BERNICK:  Thank you.

4                    (Recess)

5         THE COURT:  Mr. Speights?

6         MR. SPEIGHTS:  Your Honor, just a couple of house

7  cleaning measures before I get to where I want to head for

8  about 30 minutes, and that is the Anderson state class.  On the

9  opt out issue, I continue to want to look at that, and do a

10 little more research on it.  Mr. Fairey had pointed out to me

11 that if it is a hundred cent plan which Grace proposes, 23

12 requires an opt out, and I rely again on the arguments I made,

13 but I think that would be rather extraordinary if we had a

14 class and some people decided not to be in the class but to

15 seek to file individual claims.  But I understand the Court's

16 concern and would like to research it.  If it's a -- not a

17 hundred cents plan, which, for what it's worth, I doubt it will

18 be, but then Rule 23 does not require an opt out.  Of course,

19 we don't know the answer to that question until, among other

20 things, we deal with all those personal injury cases.

21        On the numerosity issue, which we were discussing,

22 Your Honor, I understand the Court's ruling.  I accept the

23 Court's ruling excluding those sales documents.  I want to make

24 it clear that we offer them not only for questions about

25 whether there were gaps in the bar order itself, but also to

1 show that numerosity does exist, and also to point out, Your

2 Honor, that many of these are shipping records which show

3 product going to specific job sites, but others are internal

4 documents of Grace where it knows that its products are, and

5 some letters, in fact, to Grace by building owners in the past

6 concerned about what to do about asbestos in the buildings.

7        Lastly, just by -- at least partial confirmation by

8 telephone call, I believe I am right.  I'm sure Mr. Bernick

9 will correct me quickly if I am mistaken, but I believe that

10 the only -- that there was no direct notice given to any

11 building owners.  The only direct notice was given to the eight

12 or ten counsel involved in the preexisting cases, so I believe

13 I am right when I made the argument that only in this case did

14 the debtor not give direct notice to building owners.

15        And I suppose finally, before I move to the state

16 case, I have a question for my very worthy opponent on the

17 national class action, or as they call it, the worldwide class

18 action.  Does Grace take the position that Anderson and its

19 counsel should have contacted all of the members of the

20 putative class and inform them of the bar date order?  I'm not

21 sure what Grace's position is on that, and I think that it's

22 something that I would be interested in, and perhaps would help

23 all of us struggle with one of those issues.

24        Let me talk about the state class action --

25        THE COURT:  You said something I need to back up to,

1  Mr. Speights.  With respect to shipping records for products

2  going either to specific job sites, or letters to Grace by

3  building owners in the past that are concerned to do -- about

4  what to do with asbestos in their building, what I think I

5  indicated on the phone conference the other day was, if you

6  have specific documents that are related to particular claims,

7  you can mark those separately.  What I'm not going to do is

8  admit a wholesale group of several thousand documents and

9  billing records without knowing specifically what those

10  documents are and what the relevance is to a particular issue

11  in class certification.  So, if you've got something that

12  effects numerosity, and you want to specifically mark, within

13  that group, what that is, that's fine.  But what I'm not going

14  to do is admit the wholesale group of exhibits and try to

15  figure out whether just because Grace sent a shipment of

16  product to a distributor, that means that it ended up in a

17  particular building, because I think that's a leap of faith.

18  So, I want clear what my ruling was about.  I think that to the

19  extent it is offered to sort of counter-attack the bar date

20  order, I don't think that's proper at this point in time for

21  reasons that have been gone into in other transcripts and other

22  hearings.  To the extent that you're offering them with respect

23  to an element in the class certification motion, the ruling I

24  made on the record last week still stands.  Okay.

25          MR. SPEIGHTS:  And I'm frankly a little confused of

**J&J COURT TRANSCRIBERS, INC.**

1  that, Your Honor.  I understand what I can't offer and pull.

2  I'm not confused about that at all.  For example, if I have an

3  invoice showing Grace product was shipped to the Thomas

4  Jefferson building in Missouri, shipped product to it, and I

5  don't have an individual claim for that building in the

6  bankruptcy, can I still put in the invoice showing that

7  shipment to the building?

8         THE COURT:  Well, I believe what I said on the record

9  was that if it's related to a proof of claim, because as of

10 when I was on the phone last week I thought the issue was

11 related to proofs of claim that are filed.  I now understand

12 your argument today to be that your view is that the Rule 23

13 class certification would get you beyond the proofs of claim.

14 I don't know that I'm totally accepting of that argument.  I'll

15 have to take a look at it and see it in light of your briefs.

16 But nonetheless, if you want to make that proffer as relevant

17 to something, you need to specifically identify the documents

18 and mark them, and then I'll hear Mr. Bernick's objection to

19 whatever you marked, but I am not admitting thousands of

20 documents unenumerated and without any indication of what they

21 are relevant to, except some offer with respect to the bar

22 date, which I have sustained the objection to.  So, if you've

23 got some exhibit specifically identified with an element

24 related to the class certification, you need to point out what

25 it is, mark it specifically, and then I'll hear whatever

1 objections there are.  I'm not going to have a group exhibit

2 just offered wholesale with thousands of pages when I can't

3 figure out what it is.

4        MR. SPEIGHTS:  I understand, Your Honor.  And we

5 probably, although I can't do it while I sit up here and argue,

6 we probably can make some subsets from that group which deal

7 with different situations.  And I'll talk to Mr. Fairey about

8 it during the break.

9        THE COURT:  All right.

10       MR. SPEIGHTS:  The statewide class.  I find myself in

11 the remarkable position, Your Honor, and hopefully a

12 sympathetic position with the Court of having litigated a case

13 from 1992 and really to the present, 15 years, including from

14 1992 to 2000 below, put in an enormous amount of effort, an

15 enormous amount of expenses and time, and as the record now

16 reflects, and that's why I wanted the record, a vigorously,

17 hotly contested piece of litigation that involved discovery,

18 and hearings, and briefs, and everything else, in which Grace

19 was the lead defendant in it, and having devoted all of that

20 time and energy on behalf of the state of South Carolina, for

21 which the documents will show there were over 1,600 shipments

22 of asbestos-containing material of the type we are involved

23 with today to the state of South Carolina, and yet, Grace is

24 arguing that for whatever reason it's saying it's too late, you

25 have nothing but a hospital.  I think that the record will show

1  we have far more, and I think that the time and energy of Judge

2  Hayes and Judge Howard who put in this case, and came to a

3  conclusion ultimately about this case, were entitled to great

4  weight and respect.

5        Now, let me start with this proposition, Your Honor.

6  There is a certification of the Anderson statewide class.  It

7  was initially an ex parte certification.  There was an

8  opportunity, then, for Grace to brief the matter, and the

9  order, and to be heard on the matter, and that order was in

10  place at the time of the bankruptcy.  Your Honor, I have seen

11  no authority for the proposition that that order just

12  evaporates once there's a filing of a petition for plan of

13  reorganization.  It is something, and I would say it's a whole

14  lot, because by the time Judge Hayes did that, he had had this

15  case for years.  He had had an evidentiary hearing.  He had had

16  submissions of not only a massive number of documents, but

17  testimony, as well.  He had heard arguments of the parties,

18  and, in fact, he had given Grace -- that's why I wanted the

19  discovery to see what Grace was up to when it got all that

20  extra time, additional time to file additional briefs months

21  after the certification hearing.  But it means something.

22        And I'm going to make several arguments, but some of

23  the cases suggest, and the cases -- the cases are very clear on

24  this -- the cases are very clear that a certified class walks

25  into a bankruptcy with a different set of clothes on than a

1 putative class.  I mean, it does.  And all of the cases

2 recognize that.  And this was a certified class.

3         Some of the cases, or at least one of them, and it's

4 the <u>Sacred Heart</u> case, which I think Grace relies on

5 extensively, says the state class may be res judicata.  Well,

6 thinking about this over the weekend, it appears to me that we

7 have approached this a little bit backwards.  All

8 certifications are conditional under Rule 23.  This

9 certification by Judge Hayes of the Grace portion of the case

10 was conditional.  Judge Hayes it was conditional.  There is no

11 question in anybody's mind in the world that had Grace waited

12 another month they would be under the lengthy order of Judge

13 Hayes as to everybody else.  And his analysis rejects all of

14 the arguments Grace made before him on behalf of all of the

15 defendants.  But it means something.  And my suggestion is,

16 Your Honor, and I'm not going to sit down after I say it, but

17 my suggestion at the starting point is it should be for Grace

18 to come in here and move to decertify the class if it doesn't

19 think Your Honor should accept this class.  That's the reality.

20 They have now withdrawn these personal attacks on the South

21 Carolina Court system and on me.  They are not suggesting that

22 this was some sort of put up job.  If it was they can make that

23 a ground.  What they are really saying is there are changed

24 circumstances now that should lead this Court to decertify the

25 class.  And if they want to come in and file that motion, as

1  you can in any class action to decertify it, and they can say

2  whatever it is they're going to argue in a few minutes.  For

3  example, they say, well, there's not numerosity in this case

4  anymore.  There may have been 1,600 shipments in South

5  Carolina, but, Your Honor, we suggest to you there's only one

6  building in South Carolina now, and that's the Anderson

7  Hospital.  And I will vigorously contest that for some of the

8  reasons I'm going into in a few minutes.  But just as a

9  procedural matter, I think to do anything with Judge Hayes's

10 order just because it's ex parte, I mean, it wasn't some drive-

11 by certification.  This is by a Judge who had this case for

12 years, and ultimately issued a very lengthy opinion analyzing

13 all of the factors.  I think to do anything else would be

14 proceeding backwards, so I would urge, Your Honor, at the end

15 of the day on the statewide class to say to Grace if it doesn't

16 want to accept the order, it just doesn't get evaporated.  It's

17 an order and Grace should move to set it aside.

18        Now, having said that, Your Honor, there's something

19 else I need to say about the Anderson state certification case.

20 It also means something to the lawyers for Anderson.  Whatever

21 you might think about our responsibilities, John Freeman's

22 affidavit, and Mr. Bernick's arguments, and everything else

23 about what to do about the putative class, I was class counsel

24 for the Anderson certified class.  I did have a certified case,

25 and I simply could not ignore that, and I filed a class claim

1  on behalf of the state.  Now, I believe that I had clear

2  authority to do that.  I mean, the Judge had said, you are the

3  class counsel, and Anderson is the class representative of a

4  certified class.  I did not think then, and I honestly, Your

5  Honor, I don't think now, it was incumbent upon me to file

6  individual claims for the state of South Carolina.  There were

7  a few filed, I think, but we did not make anything like the

8  effort we did for out of state claims in the putative class

9  because our thinking was that we represent the class, the

10 certified class, and I suggest to you that, Your Honor, if we

11 did have authority, and again, you may decide to decertify the

12 class, and you may not like some things about the class, but if

13 we did have that authority, then if Your Honor for any reason

14 should not allow the others in the class to participate in this

15 class, I really think there are issues that are going to come

16 back up as to whether those people should have another

17 opportunity, because those people were in the class that was

18 certified by Judge Hayes, those people in South Carolina.

19         Your Honor, the issue, as I see it, in the Anderson

20 class, is the same --

21         THE COURT:  Excuse me.  I'm sorry.  I'm a step behind

22 because I have to process this a little bit.  If -- I realize

23 that this is a hypothetical that's a little difficult to state

24 because as a factual premise it probably would never carry

25 itself out, but if Judge Hayes had entered this conditional ex

88

1  parte order, and it never became final for whatever reason, and

2  I can't necessarily, but for the bankruptcy come up with a

3  reason, but just for some reason other than the bankruptcy it

4  would never become final, there would not have been the notice

5  and the opportunity to be heard, and there wouldn't have been

6  any action, any activity taken in that class action because it

7  would have been an ex parte, conditionally certified class.

8  There would not have been a final class certification order, so

9  there wouldn't have been need for anybody to try to decertify

10 it because the class would never have been certified.  It would

11 have been conditionally certified, but never certified, so I

12 think it -- I think although it wears -- maybe it wears half

13 the set of clothes that the certified class would wear in a

14 bankruptcy, but it doesn't have the full complement, the whole

15 regalia is not there, because it was not certified as of the

16 time that the debtor filed bankruptcy, even though it became a

17 certified class as to other defendants it did not become a

18 certified class as to Grace.  So, I don't think that that

19 argument -- I don't think, procedurally, that argument works,

20 because there was no certified class, and I don't think there's

21 a mechanism for moving to decertify a conditionally certified

22 class.

23         MR. SPEIGHTS:  And I respectfully disagree with you,

24 Your Honor.

25         THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  And the basic point of out

2    disagreement is is that all certifications are conditional.

3          THE COURT:  Yes.

4          MR. SPEIGHTS:  That's under the rule.  The <u>USG</u>

5    certification, that case is gone now, that was only a

6    conditional certification by Judge Hayes.  The lengthy order is

7    a conditional certification.

8          THE COURT:  But the one that -- the thing that's

9    different about this one is that it was entered ex parte with

10   an opportunity for the debtor to brief, and then the Court

11   essentially to consider whether, after the debtor's position

12   was made known, the Court would actually, I guess, consider

13   whether that order was meritorious.  And this process did not

14   follow the normal certification for class actions, and so, this

15   order entered ex parte is a highly unusual process to go

16   through.  There isn't a mechanism in Rule 23 that I know of to

17   enter an ex parte class certification to start with.  What's

18   the danger in this kind of process?  The case had been pending

19   since 1992, so there's nothing equivalent to a TRO, or a

20   preliminary injunction standard, or anything like that that can

21   be argued.  The Judge just decided, I guess, that because there

22   was an allegation that Grace might file bankruptcy he'd enter

23   an ex parte order.  Well, I mean, how does that comport with

24   due process?  And so, you can't put the cart before the horse

25   and then say that because the Judge decided to do an ex parte

1  order that suddenly all the rules change and that the burden

2  that should have been on the class plaintiffs now becomes the

3  debtor's burden.

4           MR. SPEIGHTS:  Where do I start?

5           THE COURT:  Okay.

6           MR. SPEIGHTS:  First of all, Your Honor, there are ex

7  parte class action certifications highly criticized.  In fact,

8  in CAFA, the new law on attacking some state certifications,

9  that's one of the concerns was the drive-by-night

10 certifications.  This was far different from that to begin

11 with.  This has a much higher standing than that, because this

12 was not some newly filed case.  This was a case that not only

13 had been filed before Judge Hayes for years, but for which the

14 record was closed.  Judge Hayes had heard all the evidence.

15 There was nothing more for him to hear.  The petition was filed

16 for rule to show cause after Grace's final brief was in, and

17 nothing ever was submitted, again, by any party.  So, we can

18 argue where it sits in the scale between running by the

19 courthouse at midnight and getting a certification, and having

20 a case certified and over.  It certainly was not on the extreme

21 of drive-by certifications.  It was something that Judge Hayes

22 knew more about than any Judge, probably, when certifying a

23 case.  He had already heard it.  Secondly, Your Honor, while it

24 was ex parte, that doesn't mean it wasn't an order, it was an

25 order of the State Court, and under South Carolina procedure,

which Judge Hayes cites in his order, it was one of those

exceptions when you can have an ex parte.  He not only gave

Grace an opportunity to brief it, but he had a hearing with

Grace present and represented before Grace declared bankruptcy.

So, any questions about due process were negated by they had

the hearing, he kept his order in place, he knew everything

about the case because he had the record.  So, would I have

liked it better if Grace had waited another month to declare

bankruptcy so I'd have the lengthy opinion issued afterward?

Sure.  Or even the letter from Judge Hayes?  Sure.  But this

certified order is of substance.  It is not, again, something

that just evaporates.  You asked the question but what if, you

know, it may remain conditional forever?  Well, that's what

happens.  Certifications remain conditional for years and

years, and what happens is cases are tried based upon a

conditional certification.  Cases are appealed based upon a

conditional certification.  In fact, the Third Circuit in the

school asbestos litigation in the leading case in this Circuit

said, through Judge Kelly after he certified it, well, you've

got a big thing on your hands, Judge Kelly, but we'll let you

run with it because all certifications are conditional.

THE COURT:  Well, when I'm talking the difference

between conditional and final, I didn't mean to imply that

something isn't a conditional certification under Rule 23.

What I guess I'm trying to get to the difference between what

1  happened in this case with the ex parte order and the

2  opportunity for the debtor to brief it, and Judge Hayes hearing

3  the argument and essentially telling the debtor that an order

4  would be issued after that argument, that would then determine

5  whether this conditional certification would, in fact, a

6  certification, which, I guess, would still be a conditional

7  certification, but would be a class certification.  So, I don't

8  know what Judge Hayes viewed the initial one to be, but it

9  seems that he would not have reconsidered it, which is

10 essentially what he did, by giving the debtor another chance to

11 brief and argue it, if he thought that he didn't need to do

12 that to comport with due process.  So, it still seems to me

13 that to say that that ex parte order somehow or other switches

14 the burden of proof around when Judge Hayes himself recognized

15 that the debtor hadn't had a chance to brief the issue and to

16 argue it, and that he, himself, was going to do something after

17 that argument, that's what I'm trying to get to.  I recognize

18 that after that order had been entered after the argument, then

19 maybe a decertification motion by Grace may be the way to go,

20 but this case came up in a highly unusual context, and I'm just

21 wondering if that doesn't flip-flop the burdens.

22         MR. BERNICK:  Your Honor, if I could just interject

23 here for a moment?  We did have a discussion on the break about

24 how much time was going to be allotted and I think I've done

25 very little during the course of this process to inject myself

1 in it, and Mr. Speights has now gone on for quite some time,

2 and I now look at the clock, and by my count, at least, he has

3 spent just a couple minutes shy of two-and-a-half hours making

4 an argument.  Your Honor did say, when we talked about timing,

5 that, A, we would have the day, and that, B, that Mr. Speights,

6 because he is the movant, gets more time than we do.  And I

7 defer to the Court.  I'm not sure why that would be.  He

8 usually gets to go first and last, but Your Honor gave him more

9 time.  If Mr. Speights were to stop now and I were to go for

10 two-and-a-half hours, God forbid, I'd done something like

11 around -- I guess it's one -- it's quarter to two, so it would

12 be 4:15, and then he would have an hour left to go to 5:15.  To

13 the extent --

14          THE COURT:  Well, how long is your argument going to

15 take?

16          MR. BERNICK:  Well, I don't know.  I hope it doesn't

17 take that long at all, but it really then becomes even more

18 unbalanced.  To the extent that I don't go very long and Mr.

19 Speights then goes on for a long, long time --

20          THE COURT:  All right.

21          MR. BERNICK:  What I want to avoid is the idea that

22 we're sitting there at the end of the day quarreling about who

23 gets what kind of time left, and I really think that --

24          THE COURT:  Okay.  Mr. Speights, how much longer are

25 you going to be, because I think Mr. Bernick is correct that

1 you have had pretty much the time. And, yes, I have asked

2 questions, but that is the purpose of an oral argument, so --

3        MR. SPEIGHTS: I'm hoping to be sitting down before

4 two o'clock, Your Honor.

5        THE COURT: All right. Go ahead.

6        MR. SPEIGHTS: And, you know, I had planned to finish

7 up in 30 minutes, but I -- I don't want to discourage questions

8 because I want to know what to address.

9        Your Honor, my point is, and I can keep going back to

10 it, and maybe we've gotten bogged down in something that's

11 really unnecessary, but my point is that the record was closed.

12 Judge Hayes said because I'm doing this on an ex parte order

13 you can come in and tell me why I shouldn't do it on an ex

14 parte order, and Grace had that opportunity, but on the merits

15 of the case itself Judge Hayes had everything, and he decided

16 to continue the order, and while nobody knows everything that's

17 in Judge Hayes' mind, he did say in his final order that he had

18 decided on the principle issue at the September certification

19 hearing that Grace wanted more time, and it's pretty obvious

20 that Judge Hayes couldn't write -- I can't remember how long

21 this order was, he couldn't issue an opinion that would reflect

22 the tie and effort that he put into the case, you know, in

23 three days or five days. He got it out pretty quickly, a

24 lengthy order. But because of the limitation of time let me

25 say that was sort of Speights' idea about decertifying.

1 Whether you agree with that or not, and I really think I'm

2 right on that, it -- it is something, it is an order, and it

3 does not evaporate.  And Grace can make all these arguments,

4 then.  We also know that it's different from a putative class

5 because I did have an order.  Whatever the circumstances, I did

6 have an order, and I had the authority of the Court in South

7 Carolina to represent that class.  And therefore, I did what I

8 believe is correct in filing a class claim for all of the

9 buildings in South Carolina.

10        And, Your Honor, I believe that what I did is clearly

11 supported by the <u>Interregional</u> case, because I am not limited

12 to just the bar date, the class claim and the bar date.  I

13 think the Court there recognized that.  I have the right, even

14 for putative, to represent the class.  But clearly in a case

15 where I have a Court order, and clearly in a case in which

16 since '94 or '95 I've litigated around the clock on behalf of

17 the claimants in the State of South Carolina.  I don't think it

18 was incumbent upon me to go out and call everybody in the state

19 of South Carolina, or spend, you know, $50,000 to send out a

20 special notice in South Carolina if I could have gotten the

21 Court's permission to lift the stay to do that for some special

22 notice to try to encourage people to participate in the class.

23 The bar date order is a sort of opt in provision.  The class

24 action notice, if it had gone out, would have been an opt out

25 provision.  I was representing already these people.  There had

1  been no opt out provision yet, and there scarcely would have

2  been any opt outs.  So, I mean, it's an entirely different

3  situation, and there we have -- there we have me making a

4  judgment which I think is sound under the case you directed us

5  to, the <u>Interregional</u> case, that we could represent members of

6  the class.

7          Now, we have -- if that's not it, I mean, if I'm

8  wrong on that, if it's just no difference between the state

9  case and the putative case, then, Your Honor, we're still back

10 to all the arguments we made this morning, although I think

11 even more forceful because of the history of the South Carolina

12 case.  I think all of the cases say, you know, you make these

13 distinctions.  For example, Your Honor, we have in the record,

14 and I'm going to offer these exhibits in a few minutes, and we

15 may bog down a few minutes, but I'm trying to get through the

16 argument first, but we have, through the record, the number of

17 job sites in South Carolina.  We have Grace not giving, again,

18 any notice to any members of the South Carolina class.  And we

19 have in this record a situation where, for example, Grace has

20 invoices for one of -- for the buyer's company in Laurens,

21 South Carolina, which is a post office box, it gave no notice

22 to, but the minute the bankruptcy war broke out in 2005, Grace

23 sends out a subpoena on buyers.  If they can subpoena buyers

24 for a deposition in South Carolina concerning whether I ever

25 talked to them or not, I did not, to try to attack authority,

1 | or whatever, clearly they could have sent out a notice to

2 | buyers.  So, forgetting everything on the national class

3 | action, or the worldwide class action, every argument I made

4 | should be incorporated here that they should have given direct

5 | notice that they were not going to honor the -- if they were

6 | not going to honor the authority I had from Judge Hayes.  And I

7 | know, Your Honor, that U.S. Trustees' decisions are not binding

8 | on this Court, and I'm not suggesting they are.  But we had a

9 | preliminary battle in this case in which Grace made many of the

10 | same arguments, and we have marked the correspondence as an

11 | exhibit, which I'll address in a minute, in which Grace tried

12 | to fight Anderson being on the committee and we went through

13 | that entirely with Frank Perch, who was the acting U.S. Trustee

14 | in the case, and he appointed Anderson a certified class action

15 | as a member of the committee, and we acted that way, as well.

16 | So, Your Honor --

17 | MR. BERNICK:  Your Honor, at this point I would --

18 | we've already been through this, I believe, in connection with

19 | discovery requests --

20 | MR. SPEIGHTS:  I'm about to leave it, so --

21 | MR. BERNICK:  But I would move to strike the comment

22 | made about the deliberations of apparently a staff attorney for

23 | the U.S. Trustee's Office.  That is not in the record in this

24 | case.  It's inappropriate to have stated on the record in the

25 | case.  There's been no affidavit or evidentiary proffer.  It's

1 simply Mr. Speights's say so together with some correspondence

2 that he wants to supply.  But that is inappropriate commentary

3 and would have a significant chilling effect on the process of

4 communication --

5          THE COURT:  Well, I will strike any comments related

6 to what the discussion is.  There is no affidavit and no

7 witness.  I do have filed of record notice of who the appointed

8 representatives of the committee are, and I take judicial

9 notice of the fact that Anderson is appointed as a

10 representative of the committee.

11          MR. SPEIGHTS:  May I have one moment, Your Honor?

12          THE COURT:  Yes.

13                         (Pause)

14          MR. SPEIGHTS:  Your Honor, that's essentially what I

15 want to say on Anderson.  And do I get a rebuttal on Anderson's

16 state -- I think clearly under the <u>Interregional</u> case, there is

17 clearly numerosity here because we are entitled to represent

18 absent class members if Your Honor certifies the case, and

19 then, as Your Honor often says, you're a Court of Equity.  If

20 ever there has been equity, it's for a ten year-old case that

21 was litigated like this, and we all know would have been

22 certified to proceed as a class action in this bankruptcy as a

23 state class action.

24          Your Honor, I've arrived at the exhibit time.  I told

25 Mr. Bernick I'd try to finish by two, and it's five 'til two.

1  And I'm a little -- before I start offering additional exhibits

2  I guess I need an exchange with the Court.  We have proffered

3  exhibits and Your Honor some and Your Honor has denied the

4  admissibility of some.  Where do we put the exhibits?  Who

5  keeps the exhibits, both those into Evidence and those

6  proffered --

7            THE COURT:  Well, the ones that are --

8            MR. SPEIGHTS:  -- because we have to have a record.

9            THE COURT:  The ones that are proffered and not

10  accepted would not become part of the record.  Those that are

11  proffered and accepted if you'll give to one of my law clerks

12  we'll have them marked.

13            MR. SPEIGHTS:  I'm concerned, and maybe we can

14  discuss while Mr. Bernick is doing his presentation, that some

15  Appellate Courts would say that even documents which are

16  proffered must be maintained by the Court in order to be part

17  of the appeal, or else the Appellate Court will not look at

18  them.  And --

19            MR. BERNICK:  Your Honor, it seems to me --

20            THE COURT:  They shouldn't look at them because

21  they're not part of the record.

22            MR. BERNICK:  Yes --

23            MR. SPEIGHTS:  But if I want to challenge Your Honor,

24  and hopefully I'm not going to be in a position of challenging

25  anything, but if I had to challenge Your Honor on the exclusion

1  of exhibits, the Court would have to have the exhibits that I

2  proffered before them in order to rule on those issues.

3          THE COURT:  Well, I can only tell you what the --

4  what my understanding of the law in this Circuit is, that we do

5  not generally -- in fact, I don't know that we ever have taken

6  exhibits that are not made part of the record because the basis

7  for the Court's ruling is based on the evidence that has been

8  admitted.

9          MR. SPEIGHTS:  Well, clearly they have a different

10 status than those you didn't consider, and it's not for Your

11 Honor's consideration, while you hopefully take additional

12 briefing, but I do think I need to -- and I'll discuss that

13 with Mr. Fairey, but at this time, Your Honor, I can do it now,

14 or I can do it after Mr. Bernick.  I just don't want to give up

15 the podium here and have some suggestion that I failed to move

16 exhibits.  I would move the balance of our exhibits into

17 Evidence that Your Honor has not ruled on, and we can go over

18 them now.  We can go over them after Mr. Bernick.  We can go

19 over them in additional briefs that we submit to and rule that

20 way.  I don't care, but we would formally move the -- and some

21 of them, frankly, maybe Mr. Bernick will have a weak moment and

22 concede something, and I might not need a few of the exhibits,

23 but I don't expect that to happen, but it could be that we

24 would not need everything, but I'm afraid not to put everything

25 into the record because there's so many issues that have

1 cropped up from time to time, so we would offer the balance of

2 our exhibits into Evidence, Your Honor.

3         MR. BERNICK:  Your Honor, that is not a proper

4 proffer.  Move to strike the proffer.  Proffers should be with

5 respect to specific documents and should provide the Court with

6 what the proffer is specifically, that is, the purpose for

7 which the documents are offered.  There has to be, then, an

8 evidentiary foundation for its coming in.  So, that is not a

9 proper proffer.  I would say that, in service of trying to

10 expedite this matter, as I indicated this morning I don't

11 believe that so-called exhibits, which are really excerpts from

12 things that were already of record in this case previously, I

13 don't believe that there is the necessity to somehow make an

14 offer, or proffer them into Evidence.  This is not an

15 evidentiary proceeding.  This is a Rule 23 proceeding on

16 motion.

17         To the extent that the materials are already a matter

18 of record in the case, they can be referred to by Your Honor.

19 They can be referred to in connection with appeal.  That's what

20 a designation of record is.  This is the bankruptcy case.  All

21 of those are matters in the bankruptcy case.  And to that

22 extent, a lot of the exhibits that Mr. Speights has listed on

23 his exhibit list are simply pleadings or other events that have

24 taken place in this case, and Your Honor can make reference to

25 them.  He can make reference to them.  But I don't see that

1  there is some need to make them part of the record in

2  connection with this motion.  The record is in the case.  This

3  motion is in the case.

4        To the extent that there are materials that are not

5  found in the record in this case, then, as I indicated this

6  morning, it seems to me that it's necessary for a proper

7  proffer to be made and for a foundation to be laid.  Under the

8  rules, that requires that there be an affidavit.  I'm not aware

9  of any affidavit that covers any of the things that Mr.

10  Speights has to offer.  So, I think that that makes it easy, to

11  the extent that most of the exhibits, as I understand it, are

12  exhibits that are really references to the record in this case.

13  If Mr. Speights has some other things that he wants to

14  specifically proffer in, I have no objection to his doing that,

15  but that should be part of his time.  It was not our choice to

16  have, or the Court's choice to have, you know, nine, ten boxes

17  of materials used as evidence, or as exhibits in this case.

18  That's -- it's just kind of wacky.  But that's his problem.

19  He's been -- he's known about this forever.  So, I think it's

20  really up to Mr. Speights as part of his argument to make a

21  specific proffer, and then we'll deal with it as the proffer is

22  made.

23        THE COURT:  To the extent -- I think that the

24  appropriate ruling, just to get through some of the global

25  issues, to the extent that the pleadings and/or documents,

1 transcripts, are part of either this bankruptcy case file or

2 the case file of the South Carolina proceeding that the Court

3 previously marked documents for, and I do mean pleadings, and

4 transcripts, and Court orders, I believe those documents I -- I

5 don't think they're substantive evidence, but actually they're

6 a help to have marked as exhibits so that everybody has the

7 same set of numbers to use, and so, for that purpose I would,

8 in quote, admit them for purposes of this proceeding because I

9 think it would be helpful for everyone to use the same

10 designation from the record.  And, Mr. Speights, I think you're

11 putting your idea about after this hearing is over putting

12 everything together in a -- I'll call it a post-trial briefing

13 binder so that everybody is using the same set of documents, is

14 probably a good one, and maybe that's the way to deal with this

15 issue.

16        To the extent that you're proffering something that

17 is not a Court document from something, then I agree with Mr.

18 Bernick.  You need to make an offer so that I know what exhibit

19 you're referring to and can make a ruling.

20        MR. BERNICK:  With respect to the proceedings in the

21 South Carolina case, there's only one exception that I would

22 ask Your Honor to make, and it's for a very specific reason.

23 There was, at some point, a pleading that was filed in the

24 Anderson Memorial case.  I believe it was a reply brief.  And

25 in that brief Anderson Memorial thought it was appropriate to

1 include as an exhibit what's called Exhibit J, a series of

2 documents that were purportedly filed under seal that reflect a

3 bunch of settlement discussions.  And there has been colloquy

4 about this before.  That was not a proper submission when it

5 was made.  That material should not be part of the record in

6 this case.  It is a specific violation of, first of all,

7 confidentiality, but secondly, the rules, because it relates to

8 settlement discussions.  I don't think Your Honor would want to

9 have a record that Your Honor has been responsible for that

10 contains the substance of settlement discussions.  So, we would

11 ask that the Court make an exception for that.  We can supply,

12 for the record, the particular document number coming out of

13 South Carolina for the Court's record here, but we would ask to

14 have that excluded from what Your Honor has just said.

15          MR. SPEIGHTS:  Your Honor, on that last point, that

16 document came into Evidence without objection down below.

17 Secondly, Your Honor, there was testimony, which I'm going to

18 offer the testimony in a few minutes.  For some reason the

19 transcripts are not part of the Common Pleas Court record.  The

20 Court reporter hadn't sent them to the clerk down there.  And

21 there was also testimony which Grace did not object to

22 concerning that.  And lastly, Your Honor, that subject matter,

23 or those settlement discussions, was addressed by Judge Hayes.

24 And, in fact, that's directly relevant, Your Honor, to the

25 issues.  It's unobjected to testimony, and there's been clear

1  waiver.  How can Grace contend that there should not be a class

2  action when it agreed to settle the case as a class action,

3  which, under <u>Georgine</u> you have to -- a case must be certifiable

4  as a class action for trial purposes if it's certified for

5  settlement purposes.  So, all of that went on down below.  It

6  was not objected to.  It's part of Judge Hayes' order, and we

7  would oppose their objection to it.  If Your Honor wants to --

8  that will be part of whatever submission we make, and argument

9  on that point, but this is not just some settlement discussion

10  that's floating out there that hadn't been addressed in detail.

11          THE COURT:  Okay.  I think what I'm going to do is

12  this.  That issue is preserved for the post-trial briefing.

13  Specifically address this in the post-trial briefing, because

14  I'm not going to be able to make a ruling on this right now,

15  sitting here today.  Otherwise we won't get through the rest of

16  the argument while I look at this document and we search this

17  out.  So, identify this issue specifically, and the pleading,

18  and I will take this issue under advisement and see how it

19  comes out at that time.

20          MR. BERNICK:  Could Your Honor leave a little time

21  for us to talk about the need for this post-trial briefing?  I

22  mean, that is a request that was made, and we strenuously

23  object to yet another round of briefs.  We can assure the Court

24  that there's going to be more statements, more documents, more

25  facts, more arguments, more law.  We're going to go into round

1  three.  And remember very specifically, I just would urge Your

2  Honor to recall --

3          THE COURT:  Well, I don't know how much -- how many

4  issues I'm going to want briefed, but I do want this one, Mr.

5  Bernick.

6          MR. BERNICK:  I understand that.  That's fine.

7          THE COURT:  Because I just simply can't rule on the

8  basis of this record --

9          MR. BERNICK:  Fair enough.

10          THE COURT:  -- if you want to get out of here by 5:30

11 tonight.

12          MR. BERNICK:  I was not suggesting otherwise.  I

13 thought that Your Honor was embracing a broader process.  But

14 that's fine.  We would be happy to brief Exhibit J of Exhibit

15 76, which I think is the -- where the documents lie.

16          THE COURT:  Exhibit 76?  It's Speights Exhibit 76,

17 Appendix J.

18          THE COURT:  All right.

19          MR. SPEIGHTS:  All right.  I understand Your Honor's

20 ruling on the Grace filings and the record from South Carolina.

21 I understand Your Honor's ruling on the sales records, which

22 were a portion of our exhibit list, and that leaves us with

23 those exhibits which start with Number 116 and go through 152.

24 On those you have admitted several of those already.  I believe

25 you've admitted the Grace bar date order.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  125, 126, and 127 have been admitted with

2  the limitations expressed earlier.

3                    (Pause)

4          MR. SPEIGHTS:  Did you say 125, 126, and 127, Your

5  Honor?

6          THE COURT:  Yes.

7          MR. SPEIGHTS:  Okay.  And in addition, the Grace bar

8  date order, although I listed it on the -- from the docket

9  sheet.  I've also had it down here because one of the Grace

10  date package from downloading from the web site and versus from

11  the docket sheet, there's some distinction there, and I can't

12  remember what it is, but that's 120, 121, and 122.  It may be

13  entirely duplicative.  There may be a few semicolons different.

14  But that's the same.  We would offer those, 120, 121, and 122

15  to complete the bar date order set.

16          THE COURT:  All right.  They're admitted for the same

17  --

18          MR. BERNICK:  I'm sorry.  He just gave a long list of

19  exhibits, Your Honor.  There are a variety of different

20  exhibits that are in that, and I can go -- is the proffer of

21  116 through 152?

22          MR. SPEIGHTS:  Actually, right then was 120, 121, and

23  122.

24          MR. BERNICK:  I'm sorry.  So, the only proffer that

25  is being made with respect to Exhibits -- there is no proffer

1 of 116 through 152, at least not right now?  You have proffered

2 120, 121, and 122?

3           MR. SPEIGHTS:  Yes.

4           MR. BERNICK:  Yes.  I have no objection to those.

5           MR. SPEIGHTS:  And then, backing up, I would proffer,

6 I guess we'll take them one at a time, 116, 117, 118, and 119

7 are exhibits specifically related to the Anderson Hospital

8 itself, demonstrating that Anderson has Grace's Monokote

9 product in it, chain of custody for that, and certain

10 responses, discovery responses to Grace, setting forth

11 information about the Anderson building itself.

12           MR. BERNICK:  Yes.  I don't know what the purpose of

13 the proffer is.

14           MR. SPEIGHTS:  Well, even though Grace is not

15 contesting adequacy, I think it's probably something for the

16 Court -- needs to have something in the record to show that,

17 you know, Anderson does have the type of stuff that is the

18 subject of this lawsuit as the class representative.

19           THE COURT:  All right.  I'll admit them for that

20 purpose.

21           MR. BERNICK:  Well, Your Honor, I, again, would

22 object.  That is not class certification discovery.  We have

23 not contested whether Anderson is an adequate representative of

24 the class, and I don't know for what other purpose this might

25 be used on the record.  I -- you know, this is very unusual.  I

1 know that Mr. Speights has tried a lot of cases, but where I

2 come from you make a proper proffer that's specific to an

3 exhibit, and you give the reason why it's relevant to the issue

4 that is before the Court.  And I don't think it's right to now

5 go through these kind of where the Court is under pressure now,

6 and everybody is under pressure and say I offer it.

7        THE COURT:  Well, would you prefer to have these

8 proffers done in writing afterwards --

9        MR. BERNICK:  No, Your Honor.

10        THE COURT:  -- and you can respond in writing?  Would

11 you prefer to have --

12        MR. BERNICK:  Your Honor, what I would have preferred

13 was what I asked for originally, which is to have the rules

14 followed, which is a proffer is timely made, that is, it's made

15 during --

16        THE COURT:  Mr. Bernick, would you prefer to have

17 this done after?  Otherwise I've already admitted these for the

18 purpose of showing that there is some product of the debtor in

19 the Anderson building and for no other purpose to show that

20 Anderson has a basis to represent a class if a class is

21 certified.  For no other purpose than that.

22        MR. BERNICK:  Okay.  Well, that's Your Honor's

23 ruling, that's fine, Your Honor.

24        MR. SPEIGHTS:  I'm going to skip down to 128, Your

25 Honor, a document I mentioned earlier, which is the U.S.

1  <u>Mineral</u> plan of reorganization to show that this Court

2  previously found that there should be a category -- there is a

3  category of P.D. demand claimants.  That's in support of the

4  argument that the authority in this case does not cover that

5  group of claimants and there are such things as, for lack of a

6  better term, future P.D. claimants.

7          MR. BERNICK:  I don't -- that purpose is plainly

8  improper.  To that extent, this is being used as a hearsay

9  statement that is an attestation of the fact that there are

10 future claimants, and that is not a proper proffer of a plan of

11 reorganization.  Plan of reorganization is simply an agreement

12 that simply recites what the parties are doing in order to

13 conclude the case.  It is not an attestation of fact to say

14 nothing of an attestation of fact that relates to potential

15 future Grace claimants.

16         MR. SPEIGHTS:  It's a judgment of the Court that this

17 Court reviewed and --

18         THE COURT:  I did.  I did confirm the <u>U.S. Minerals</u>

19 plan that had a trust that dealt with asbestos property future

20 claims.  I vigorously objected to the use of the term demands,

21 but nonetheless, I don't get a line item veto over the concept

22 of the construct of a plan.  The parties had essentially no

23 objection to that plan.  It was their plan.  I didn't see a

24 basis not to confirm the plan because they used a word that I

25 disagree with the construction of.  Nonetheless, I think Mr.

1  Bernick's objection is correct.  Just because <u>U.S. Minerals</u> may

2  have had what it refers to as demands does not mean that Grace

3  does, or vice-versa, or that it -- and it also doesn't mean

4  that Grace won't have demands.  So, yes, <u>U.S. Minerals</u> plan is

5  confirmed.  Yes, the Court will take judicial notice of the

6  fact that there is a confirmation order, but it is not -- there

7  is no basis to assert that because <u>U.S. Minerals</u> had a demand

8  class of property damage claims, that this debtor will, so the

9  objection is sustained.  But I do take judicial notice of the

10 fact that there is a confirmation order of the <u>U.S. Minerals</u>

11 case.

12         MR. SPEIGHTS:  Your Honor, if I can skip down, I'm

13 going to come back on some of these in a few minutes.  I'd like

14 to get Mr. Bernick up there going, and Mr. Fairey and I can

15 deal with some of these while he's talking.  But 140 is a

16 deposition of Morton Corn taken in this case defended by W.R.

17 Grace.  I assume he doesn't have an objection to that.

18         MR. BERNICK:  No objection to that.  I think that, in

19 fairness, it's not a very long deposition.  We would want to be

20 able to add anything that is related to the same subject matter

21 on the rule of completeness.  Essentially, it's a deposition

22 designation, and under the rules we should have the opportunity

23 to supply any relevant counters.  So, subject to that caveat,

24 we don't have an objection.

25         THE COURT:  All right.  The designation is admitted.

1          MR. SPEIGHTS:  141 is a chart of the Anderson

2    claimants who filed individual claims.

3          MR. BERNICK:  We have no objection to that, if

4    there's no objection to our parallel chart.

5          MR. SPEIGHTS:  I --

6          THE COURT:  I'm sorry.  I couldn't hear you.

7          MR. BERNICK:  We have no objection to that.  This is

8    his version of who are the Anderson claimants.  We're not

9    signing on to its accuracy, but we have no objection, provided

10   that there will not be an objection to the parallel chart that

11   we have.

12         MR. SPEIGHTS:  I'll have to see his chart, Your

13   Honor.  I'm not negotiating here.  I'm offering it.  If they

14   want to object, they can object, and --

15         THE COURT:  It seems to me that this is the movant's

16   version of what the status of the record is, and as the summary

17   of that version it's appropriate.  It's admitted for that

18   purpose.

19         MR. SPEIGHTS:  Your Honor, the next, 143, 144 --

20         THE COURT:  I'm sorry.  143 and 4?

21         MR. SPEIGHTS:  Actually, let me back up, Your Honor.

22   142 is a Central Wesleyan proof of claim in this bankruptcy and

23   the order where Your Honor allowed that class claim in this

24   bankruptcy.

25         MR. BERNICK:  Well, I -- first of all, Your Honor, I

1  have to go back.  Your Honor's order with regard to <u>Central</u>

2  <u>Wesleyan</u> is a matter of record in this case.  We have no

3  objection to that.  It doesn't have to be offered.  To the

4  extent that this is a proof of claim, I don't know that any

5  predicates have been supplied demonstrating that what's set

6  forth in that claim is true, accurate, or whatever.  And again,

7  there's no affidavit that provides that kind of foundation.

8  It's not even Mr. -- I think it was Mr. Westbrook's client, and

9  I think it was for purposes of dealing with to assure that this

10 settlement, the pre-bankruptcy settlement, was going to be

11 fulfilled in some fashion.  But I don't know why -- this is

12 just a proof of claim.  If they want to have Your Honor's order

13 with respect to that, I don't have a problem.

14        MR. SPEIGHTS:  Let's just do the order for now, Your

15 Honor.  I'm trying to get through this.

16        THE COURT:  So, you're withdrawing Exhibit 142?

17        MR. SPEIGHTS:  I'll probably offer it after Mr.

18 Bernick is through, when I get to rebuttal, because I

19 anticipate it will be directly relevant to that.  But if we

20 need to expedite matters, I'll just offer the order at this

21 point.

22        THE COURT:  And what exhibit is the order?

23        MR. SPEIGHTS:  Well, it's 142.  It will be 142B, I

24 guess.

25        THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. SPEIGHTS:  It should be on the docket sheet, but

2 we could not find it.

3           MR. BERNICK:  If it's to be included in the post-

4 trial binder, you know, fine.  Just include it in the post-

5 trial binder as whatever docket order it is.  I don't --

6           THE COURT:  All right.  That's fine, too.  For now

7 I'll just make the list of it as Exhibit 142B.

8           MR. SPEIGHTS:  If I can skip down to the last four,

9 149 is what I showed the Court earlier.  It was an example of

10 how claimants claim under the Anderson umbrella.  That was that

11 Arkansas television station, I think, claim --

12           THE COURT:  KARK t.v.?

13           MR. SPEIGHTS:  Yes, Your Honor.  Just as an example

14 to show that.

15           MR. BERNICK:  This is a claim form filed in this

16 case?

17           MR. SPEIGHTS:  In this case.

18           MR. BERNICK:  No objection.

19           MR. SPEIGHTS:  And then 150, 151, and 152, are

20 transcripts from the Anderson hearing.  As I mentioned a minute

21 ago, for some reason the transcripts were not filed in the

22 Clerk's Office.

23           THE COURT:  I'm sorry.  What were those numbers,

24 please?

25           MR. SPEIGHTS:  150, 151, and 152.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  They're transcripts that aren't filed?

2        MR. SPEIGHTS:  They were not filed with the Clerk of

3  Court there because the transcripts were prepared.  They were

4  sent to Judge Hayes.

5        THE COURT:  Oh.

6        MR. SPEIGHTS:  Judge Hayes did the order, but he

7  apparently never sent them down.  Judge Hayes is 200 miles away

8  from where this case is filed, and apparently he never sent

9  them to the clerk to file.

10        MR. BERNICK:  Your Honor, my understanding is that

11  these all deal, at least in principal part, with the adequacy

12  of counsel, that we declined to pursue that as an issue.  It

13  was never a proper subject for discovery.  And it's not a

14  proper subject to have laid into this record here, particularly

15  because all of these transcripts are, in fact, hearsay, to the

16  extent that they contain statements made by others -- other

17  people than Grace.  To the extent that they contain statements

18  by Grace, we again would need an affidavit about telling us.

19  What is the relevance of what Grace said in those hearings to

20  some matter at issue in this proceeding?  And I don't hear that

21  in any proffer.

22        THE COURT:  Well, is the only purpose to show that

23  counsel is adequate?  Because if that's the case there's no

24  objection to that any longer.

25        MR. SPEIGHTS:  No, Your Honor, that's not the sole

J&J COURT TRANSCRIBERS, INC.

purposes.  There's several purposes.  The first purpose is to
show the extent of the proceedings below, how Judge Hayes dealt
with this case during these transcripts to get away from this
fly-by-night sort of certification.  So, just the entire
transcript will show that.  In addition, Your Honor, the
transcript deals with many issues besides simply the adequacy
issue.  I could designate which portions deal with non-adequacy
and which portions deal with adequacy, although I think the
entire transcript that the certification below are relevant,
and I can't imagine Grace arguing hearsay.  It was represented
-- anticipated in the hearing, and it's the record below which
I am asking Your Honor to accept, and at least accept the
certification below based upon the extensive record Judge Hayes
made.

          MR. BERNICK:  Well, no.  I --

          MR. SPEIGHTS:  But for -- but for the attack on
counsel, which you don't have here, that order would have been
out months before.  I think it will be obvious from that
transcript, as well.

          MR. BERNICK:  We would strenuously object to that.
There's no way in which it's appropriate to ask any this Court
to somehow adopt the determination that was made by the Judge
in the Anderson Memorial case as if it's somehow up to this
Court to determine whether that was a thorough determination or
not.  Your Honor has been very clear that we're not here to

1  relitigate the Anderson Memorial case in terms of how it

2  happened historically.  This all converges on the effect that

3  Mr. Speights wants to give to the ex parte order.  Whether that

4  order has an effect or not does not depend in any way, shape,

5  or form, on the detail or diligence of the proceedings in South

6  Carolina, otherwise we would have had massive discovery and

7  massive proceedings on exactly how that case went.  We never

8  pursued it.  The Court never expressed an interest in it.

9  That's not why we're here.  And there may be all kinds of

10  things in these transcripts that we would take issue with

11  because at that point they were being offered for a different

12  purpose.  We are here for a different purpose in this case, so

13  the fact that Grace was a participant is not germane.  This is

14  all part of the same problem, which is what constitutes a

15  proper proffer for purposes of a contested motion in the

16  Federal Court under the Federal Rules.  And again, we do not

17  have a proper proffer.

18          THE COURT:  All right.  This one is another one,

19  unfortunately, that I'm going to ask you to brief, because I

20  don't know how the debtor participating in a State Court trial

21  raises a hearsay objection when the transcript is offered in a

22  case later in Federal Court, so I don't -- I am not sure I'm

23  following that objection.  I'm also not sure why that

24  transcript is not relevant except for the fact that the lay of

25  the land has changed.  And so, it may not be relevant any

1  longer because the issues facing the parties at the time that

2  the arguments took place in those prior transcripts may not at

3  all be either the issues or the facts that are facing this

4  Court now, but I can't put all that together at this point, so

5  that's another issue, Mr. Bernick, on your objection, I'll

6  simply reserve ruling until I have a chance to take a look at

7  the transcripts and analyze them in connection with our

8  objection.

9       MR. SPEIGHTS:  Let me have one moment, Your Honor?

10      THE COURT:  And we'll address, at the end, a schedule

11 for doing that.

12                          (Pause)

13      MR. SPEIGHTS:  Your Honor, I want to look over the

14 balance while Mr. Bernick has got the floor.  I imagine there

15 will be a few more.  Hopefully I can eliminate some of the

16 others --

17      THE COURT:  All right.

18      MR. SPEIGHTS:  And I'll let Mr. Bernick start, and --

19      THE COURT:  Okay.  Mr. Bernick?  Mr. Speights is

20 going to double check his --

21      MR. BERNICK:  That's the third one?  To obviate the

22 need for him to -- quivering -- having to parse through

23 multiple days of transcripts for purposes of having an argument

24 about relevance, we would be prepared to go with the idea --

25 apparently the first two transcripts deal with a bunch of

1 matters relating to adequacy of counsel and again, I don't know

2 how, in the course of any post-trial briefing, we're going to

3 parse out for days of testimony a proffer like this.  But we

4 would maintain our objection to December 3, 1996, and September

5 5-6, 2000.

6          THE COURT:  Wait.  I'm sorry.  December 3?

7          MR. BERNICK:  I'm sorry.  Exhibit 152 and 150.  With

8 respect to Exhibit 151, this apparently is the transcript of

9 the hearing after the ex parte order, and I would believe that

10 that would fall somewhat within the ambit of the issues that we

11 have here because it would bear upon the question of the ex

12 parte order.  So, we're prepared to have that come in.  But

13 again, Your Honor, I would ask that Your Honor -- if we're

14 going to have post-trial briefing on these two things, that we

15 confine that to, you know, a couple, three, maybe five pages a

16 side, because otherwise we're going to have, you know, long

17 documents dealing with long transcripts.

18          THE COURT:  All right.  Well, I'll get to that when I

19 find out what it is that we're going to be actually arguing

20 about.  For now, Exhibit 151 is admitted, and we'll discuss 150

21 and 152 again after your argument, Mr. Bernick, so that I can

22 find out what it is specifically that they're being offered

23 for, other than adequacy, because I don't think what Judge

24 Hayes did or did not do with respect to the hearing that he had

25 is relevant to what I have to do in this case.  So, if it's

1 offered for that purpose I don't think I need a brief on that

2 score, but I'll address it after you have your argument.  So,

3 the objection to 151 is withdrawn, and that document is

4 admitted.

5          MR. SPEIGHTS:  And just for the record, Your Honor, I

6 do think that 150 especially deals with other issues such as

7 commonality, and numerosity, etcetera, as well as adequacy.

8          THE COURT:  150?

9          MR. SPEIGHTS:  150 of the transcript of the hearing.

10 All of the issues were argued below, although I will admit that

11 adequacy consumed the largest portion of time.

12    **(Mr. Bernick difficult to discern - not near microphone)**

13          MR. BERNICK:  Well, that just highlights the problem.

14 It's commonality (indiscernible) from South Carolina

15 (indiscernible).  Your Honor, I will try to go through this

16 relatively quickly.  If it's all right I'd like to stand.

17          THE COURT:  Yes.

18          MR. BERNICK:  (Indiscernible).  I'd like to begin by

19 talking about the law --

20          THE COURT:  Lynn, can you turn that microphone up?

21 It's a little -- over this -- it's a little hard to hear.

22                              (Pause)

23          THE COURT:  Not too well.  He tried to turn it off,

24 but -- okay.

25          MR. BERNICK:  Maybe if I could move --


**J&J COURT TRANSCRIBERS, INC.**

1  (indiscernible).  I want to talk, first of all, about the non-

2  bankruptcy class action law, and then get to the bankruptcy

3  cases (indiscernible) because Mr. Speights (indiscernible) this

4  morning, and the history that he gave the Court, unfortunately

5  is a history lesson that only covered part of the history, what

6  I -- I probably believe that he and others regard as the golden

7  age of class certification.  It is true that the Federal Court

8  level he described three different cases that have been

9  certified on the State Court level, but also described three or

10 two cases that were certified --

11         THE COURT:  What's the feedback?  Is that from

12 turning that up?

13         MR. BERNICK:  It's always been in there, Your Honor,

14 on the telephone.

15         THE COURT:  Has it been?  I couldn't hear it, I

16 guess, from the microphone.  Is this a Court Call proceeding?

17         UNIDENTIFIED SPEAKER:  Yes.

18         THE COURT:  Is the Court Call operator on, please?

19         THE OPERATOR:  Yes, Your Honor.  I'm here.

20         THE COURT:  I'm sorry.  We have really terrible

21 feedback.  I guess some of the parties could hear it before,

22 but I couldn't because of the air conditioning system.  Can you

23 check to see what that might be caused by, please?

24         THE OPERATOR:  I sure can.

25         THE COURT:  Thank you.  I'm sorry, Mr. Bernick.  Go

1  ahead.

2         MR. BERNICK:  That's all right, Your Honor.  There's

3  no point in my talking if you can't hear me.  The schools case

4  was the first one federal, then I believe that there was the

5  Dayton case, the one down in Texas, and then there was the case

6  in 1993, which is the Central Wesleyan case.  Schools was '86,

7  I believe.  Dayton was '89.  Central Wesleyan, '93.

8  Interestingly, Mr. Speights never talked about any federal case

9  after 1993, almost, I guess that is seven plus seven, 14 years

10  ago.

11         At the State Court level he talked about the Detroit

12  case.  He talked about the -- I think it's the Prince George

13  case, and he talked about a third case, and I know

14  (indiscernible), it was the National Gym (sic) case.  Again,

15  you often have different rules that apply in State Court

16  (indiscernible) South Carolina, so there's not too much

17  relevance there.  But in any event, you're talking '85, '89,

18  and '92.  So, the big question that all this leaves open is,

19  well, what is it that happened?  What happened to the non-

20  bankruptcy class action law after the cases that he has cited

21  to the Court?  Where is that part of the history?  And the fact

22  of the matter is that part of the history, as you probably --

23  even (indiscernible), because there were a whole rash of class

24  certifications in the late 1980's, and the early 1990's, which

25  is precisely what precipitated a backlash from the Courts of

1  Appeal, appeals all over the country in 1999, and ultimately

2  the decisions in <u>Georgine</u>, and again <u>AmChem</u> (phonetic), that

3  took place in the back end of the 1990's.  By 1995 you had the

4  <u>Rhone-Poulenc</u> decision out of the Seventh Circuit.  You had the

5  <u>American Medical Systems</u> decision out of the Sixth Circuit.

6  You had the <u>Toscano</u> (phonetic) case out of the Fifth Circuit.

7  I believe you also had the <u>Fiberboard</u> case out of the Fifth

8  Circuit.  A whole series of cases, all of which denied class

9  certification, and specifically in the context of -- <u>Fiberboard</u>

10 was asbestos, <u>Toscano</u> was smoking, <u>American Medical Systems</u> was

11 medical devices, and <u>Rhone-Poulenc</u> was a hemophiliac case.

12 They then converged on what the Supreme Court did itself, now

13 specifically in the context of asbestos, at the back end of the

14 1990's, which was to reverse class certification.

15        So, by the time we come into 2001, which is when

16 Grace filed for Chapter 11, the whole idea that mass torts

17 equals class action was a dead idea, and everybody knows that.

18 And that's why you don't get massive asbestos class

19 certifications thereafter.  Indeed, by the time April of '01

20 comes along, you have yet a new round of efforts to make mass

21 torts and class actions by making them commercial class

22 actions, and that, too, has been rebuffed.  The Seventh Circuit

23 decision in the <u>Bridgestone Firestone</u> cases.  So, we have zero

24 treatment by counsel for the movants here of what actually the

25 state of law is in the non-bankruptcy class action cases and

1  instead we have the trip down memory road that deals with cases

2  that are absolutely and totally (indiscernible).

3      At the state level, where was the action?  All we get

4  mentioned at the state level was Anderson Memorial itself,

5  which is in '01.  We know that Anderson Memorial itself worked

6  with a different standard.  The basis for the decertifications

7  (indiscernible) level, the state has satisfied the predominance

8  requirement of Rule 23(a) -- or, 23(d)(3).  That is the federal

9  law.  It's -- apparently in South Carolina you don't have a

10 predominance requirement, so I guess (indiscernible) case in

11 South Carolina, but it is a requirement at (indiscernible)

12 cannot be satisfied.

13     What was happening with the cases?  What was

14 happening with the cases?  Mr. Speights has got a theory.

15 Claimant's counsel says, well, gee, after Grace was successful

16 in somehow distorting the science and creating new issues of

17 risk, that after all were actually endorsed and adopted by the

18 scientific and regulatory community, well, everybody kind of

19 sat back and decided they weren't going to file lawsuits

20 anymore.

21     Now, I don't know whether -- I don't know what the

22 ultimate dynamics were for driving the prosecution of

23 individual property damage cases, but I do know that by the

24 time that Grace filed for Chapter 11, there were only seven

25 cases left, and Mr. Speights, after filing purported

1  (indiscernible) hundreds and thousands of additional claims,

2  just had to withdraw hundreds and thousands of additional

3  claims even after the bar date because you can't get people who

4  are interested in filing in these cases.  So, this is a

5  situation where by the time that Grace was filing for Chapter

6  11, class action was a dead letter in the mass tort area, and

7  indeed, individual cases were down to a trickle.

8        We then come to the question of, well, what is the

9  law that actually governs in this proceeding?  Now, this

10  proceeding we're now working in bankruptcy, and in the context

11  of bankruptcy all of the law that he's has talked about here is

12  of some historical interest, but it doesn't address the square

13  matter that is before the court, which is what are the

14  standards that govern under class certification in the context

15  of bankruptcy?  After we're done with the historical lesson we

16  can talk about what it is that the case law actually requires,

17  whether the present motion satisfies those requirements.  And

18  I've divided the world into two basic questions.  They are

19  posed in the reverse order to the order that was suggested by

20  Mr. Speights, but it doesn't make a tremendous difference

21  except that this really is the threshold question.  The

22  question, first question is whether to apply the Rule 23

23  (indiscernible).  And the second question is whether the Rule

24  23 tests are met.  And in both cases, the fact of the motion

25  being filed in the bankruptcy proceeding is of enormous

1  importance.  It is the bankruptcy context.  The bankruptcy

2  context totally drives the first question, whether to apply

3  Rule 23.  That is a question unique to bankruptcy, and it also

4  informs the application of the tests themselves, particularly

5  as we're going to talk about it, the superiority test.

6  Superiority, under Rule 23(e)(3), is an issue that is heavily

7  influenced by the fact that the motion is made in the context

8  of a bankruptcy case.  Superiority asks the question, well, is

9  class certification the preferable or superior way to go?  And

10 obviously it buys the question of superior to what, and the

11 alternatives to class certification as compared to in

12 bankruptcy are much different than the alternative that it is

13 compared to outside of bankruptcy.  So, wherever we go in

14 asking these two questions, the key question is going to be

15 what is the bankruptcy context that we're working in?

16         Now, the law in this area is mature.  The law in this

17 area is not thin.  There are a whole series of cases, and we

18 will list them for the Court before we finish for the day.

19 There are a whole list of cases that actually address the very

20 same issue that's now before the Court, and therefore how these

21 questions get asked and how they get answered is not something

22 in which the Court needs (indiscernible) upon a new cite,

23 because the cite is already pretty heavily inscribed with

24 decisions that have been reached by other Courts.

25         This first step here, and the first question, whether

J&J COURT TRANSCRIBERS, INC.

1 to apply Rule 23 is discretion, and that's what the cases say

2 (indiscernible).  Essentially, the <u>American Reserve</u> says that

3 the other cases (indiscernible).  But the factors that are the

4 relevant factors for determining how to exercise that

5 discretion are factors that are fairly cut and dry, and with

6 the exception of the last factor, both (indiscernible) ruling

7 for judgment at least as how we believe the cases properly

8 should be read, the first factor, and we can go, Your Honor, to

9 many places to find these laid out, as Your Honor probably

10 already has done.  One place to go is <u>In Re Music Land Holding</u>

11 <u>Corp.</u>  That is 62 Bank. 644 (March 2007).  That was a case

12 coming out of the Southern District of New York.  And I'll just

13 put this up on the screen.  The first issue is -- there are

14 several factors informed in the parts of the decision, whether

15 to extend the application of Rule 23 to include the claim.

16 These include one, whether the class was certified pre-

17 petition.  (Indiscernible) question of the pre-petition

18 certification.  The second question is was there -- whether

19 members of the putative class received notice of the bar date.

20                              (Pause)

21        MR. BERNICK:  And, Your Honor, I want to -- I'm going

22 to come back to both of these in the context of responding to

23 some of the questions that Mr. Speights has raised, but we

24 should note right now that this is a two-pronged matter.

25 Whether people received the bar date notice has due process

1  implications.  And the due process implications are a two-way

2  street, not a one-way street.  Why?  Well, if people -- if

3  there was not an adequate bar date notice, then that is a

4  consideration where due process lays in favor of class

5  certification as a way of providing effective notice.  So, a

6  fundamental defect in the bar date notification and program

7  would implicate due process as being a reason for having class

8  certification.  But if the notice wasn't adequate, the due

9  process shoe moves to the other foot in the sense that if

10 people were on proper notice, to now have class certification

11 as a way of bringing in people who didn't act on the basis of

12 notice would create a due process problem in the sense that it

13 would provide unequal treatment for those who did satisfy their

14 obligations and (indiscernible) response to the bar date.  So,

15 due process is a two-way street.  If there was adequate notice

16 -- if there was inadequate notice, that would favor class

17 certification.  If there was adequate notice, it would be

18 unfair to (indiscernible) certification as a mechanism for

19 allowing people whose rights have been relinquished to somehow

20 get them back through a class action mechanism.  Very, very

21 key.  The only time you talk about doing something more, taking

22 an additional step by reason of due process, you have to ask

23 yourself, well, what is that doing with respect to people who

24 already acted on the basis of (indiscernible) decision.

25         The third issue is whether there has been -- whether

1 there's going to be an impact on the Chapter 11 case.  So,

2 these are the three basic factors kind of stated here.  The

3 Sacred Heart decision, which is a decision that came out of the

4 Eastern District of Pennsylvania in the late 1990's, I believe

5 that was 1995 or 1998, probably down some here -- somewhere

6 here, but I can't find it, is actually cited during the course

7 of the Southern District (indiscernible) testing whether class

8 certification will adversely affect the administration of the

9 case (indiscernible).

10        Now, the first two factors are said by this Court to

11 be -- that is the -- the Southern District, the critical

12 factors.  This is the (indiscernible) -- the first

13 (indiscernible) that raises pre-petition certification knows

14 that the bar dates are critical.  And, in fact, that was not

15 simply the language that is used by this Court.  It is what the

16 cases actually reflect.  And there are a whole series of cases.

17 Indeed, we'd have to say the typical case, where class

18 certification is denied precisely because there was no pre-

19 petition certification and a bar date has been used.  We see

20 that again, and again, and again.  That's exactly what occurred

21 in the Sacred Heart case out of the Eastern District of

22 Pennsylvania, the Jamesway case out of the Southern District,

23 and Music Land out of the Southern District.  Once it was clear

24 that the pre-petition certification did not exist and the bar

25 date had been used, that was the end of the show.  That's why I

1  say the discretion is there, that given these factors there's

2  actually a rather limited or fairly cut and dry kind of

3  analysis that takes place.  Why is that significant?  Well, we

4  all know that class certification is a mechanism to be used in

5  many (indiscernible).  There's always been a controversy.  And

6  the Third Circuit is still not formally decided what

7  (indiscernible) class action practice in the context of a

8  bankruptcy.  What these cases are doing is they're asking the

9  question, once a bankruptcy is filed, and the usual kinds of

10 things happen, you get a bar date, and you get a bar date

11 notice, they ask themselves why are we going through the

12 trouble now of having a certified class when all the right

13 things have been done, and there was no certified class pre-

14 petition.  In other words, for people who come into a

15 bankruptcy case (indiscernible), a certified class pre-

16 petition, and then there's a bar date, and say, oh, we don't

17 care about the bar date, or the bar date wasn't good enough, we

18 want to use this non-bankruptcy procedure.  You knew that this

19 was a bankruptcy, you kind of say, well, what in the world is

20 the purpose of that?  You don't go into whether there are

21 details of impacts of a Chapter 11 case, because the

22 (indiscernible) impact.  You're using -- you've used a

23 procedure that is absolutely part of (indiscernible) Chapter

24 11, now you're going to do something, the effects of that

25 procedure, using class certification.  Of course there's an

**J&J COURT TRANSCRIBERS, INC.**

1  impact on the Chapter 11 case.  But when we see decision after

2  decision that go no further than to ask was the certification

3  pre-petition, and has there been a bar date notice, or are we

4  seeing this Court saying there is no point in going through the

5  torturous process of class certification and all the interests

6  that flow from that if we're in a bankruptcy case, and the

7  usual bankruptcy procedures are being (indiscernible) followed.

8          Now, what do we have here.  Here we have one of these

9  typical cases.  There was no pre-petition certifications as to

10 Grace.  It was a permanent certification and we'll come back to

11 Anderson Memorial and whether the something, Mr. Speights says,

12 well, the ex parte order that I obtained ex parte means

13 something, does that satisfy this requirement at all?  And I'm

14 going to come back to that.  On cases of the case law that we

15 see, there is no such authority that says that somehow an ex

16 parte certification obtained deliberately on the threshold of

17 bankruptcy somehow that obviates the need to go through this

18 discretionary analysis when nowhere in the case

19 (indiscernible).  Was there a bar date notice?  The answer is

20 of course there was a bar date notice here.  That notice was

21 filed.  That notice was executed.  The appeal was -- there was

22 a suggestion here the date of appeal being adequacy of the

23 notice, and that Judge (indiscernible) was interlocutory.

24 There was an appeal from the bar date.  Three was not an appeal

25 that challenged the adequacy of that notice.  The adequacy of

1  that notice is the law of the case.  It is res judicata.  It is

2  everything you can possibly imagine by virtue of their own

3  failure to take any steps to question the adequacy of the

4  notice on appeal.

5          So, what is the only difference between this case and

6  all of the other cases like <u>Jamesway</u>, like <u>Sacred Heart</u>, like

7  <u>Music Land</u>, and say, A, I'm not going to go any further.  No

8  pre-petition certification, bar date, Your Honor

9  (indiscernible) class certification.  The only difference, Your

10 Honor, in this case, is that these folks have decided to mount

11 a collateral attack on the adequacy of the notice.  After the

12 fact collateral attack.  All of their different contentions

13 ultimately go to the question of whether the notice was

14 adequate, and all of them fail.  But they're all collateral

15 (indiscernible).  That is the only reason why this case is

16 being distinguished by them is this kind of a self-fulfilling

17 prophesy.  They distinguish it by saying, okay, well, now I'm

18 going to attack something that we let pass before.

19         But I want to respond to all of these different

20 issues.  First they say the notice didn't reach everybody.  Mr.

21 Speights says, look, you know, nothing is perfect, there are

22 always going to be things that aren't perfect.  Let's sweep

23 them up.  Well, we all know that's not best.  That's

24 (indiscernible).  You're always going to be able to find

25 (indiscernible).  If the proposition that he advances was

1  correct, then you have a class certified in every single case,

2  because after all, whatever bar date notice you had to begin

3  with is always going to miss some people.  You then ask the

4  question, well, why does the notice (indiscernible) with

5  respect to the class action notice?  It's the same notice

6  requirement.  It's (indiscernible) requirement.  It's

7  reasonable notice.  This was all approved as being reasonable

8  before, why wouldn't it be (indiscernible) as being reasonable

9  notice?  So, the question of whether it reaches everybody is

10  not the right question.  The question is whether it was

11  reasonable for the common parties.  Mr. Speights says, well,

12  gee, it would have been better if we had more direct notice

13  going out to customers of Grace.  Well, what actually the law

14  says, you don't have an obligation to give direct notice to all

15  customers.  You have an obligation to give direct notice to the

16  customers, or direct notice should be considered with respect

17  to customers whether some indication that they may have an

18  interest in filing a suit.  That is precisely why Grace

19  proposed that notice be given by counsel, because counsel are

20  the best to know who is out there.  You can't tell from the

21  address of a building who the claimant is.  Your Honor has

22  observed that before.  So, counsel would be in absolutely the

23  best position, just like counsel for the personal injury

24  claimants go out and find out who it is that's out there who

25  might actually have a claim that they want to pursue.  But

1  counsel specifically declined the objective to that

2  (indiscernible), so as Your Honor has pointed out, the ship

3  sailed, we gave notice, only direct notice to certain people.

4  But, again, as Your Honor has recognized, there was

5  constructive notice given on a much, much broader basis.

6  Everybody was happy.  No appeal.  Now is not the time for a

7  collateral attack.

8           We then get to the question the claimants made, gee,

9  does the notice cover -- the bar date cover conspiracy?  That

10 was one of the other arguments that he has made.  Well, there

11 was no argument that was made, no position that was taken in

12 the motion itself that even mentioned the word conspiracy, that

13 conspiracy was not a theory that drove the original prosecution

14 of this motion.  But in any event, the bar date was actually

15 quite clear, because the bar date covers -- let me zoom away

16 from it -- not only claims arising out of damage that was

17 caused by -- that is arising out of Grace product, but also

18 arising out of indirectly or directly from acts or omissions of

19 one or more of the debtors, acts or omissions.  So, this is a

20 question.  It is obviously the claim of -- one would call out,

21 that says, if you suffer property damage and the property

22 damage resulted from acts or omissions of Grace, it's included,

23 and that would (indiscernible) conspiracy.

24          Then the question is raised, well, does it include

25 masonry fill?  Well, all products that were manufactured by

1  Grace or supplied by Grace containing asbestos materials are

2  (indiscernible) only -- the only suggestion that I think is

3  being made is that somehow masonry fill was excluded.  Well,

4  it's not excluded.  The only exclusion is for asbestos personal

5  injury claims, Zonolite attic insulation claims, settled

6  asbestos claims, non-asbestos claims, or medical monitoring

7  claims.  There's no exclusion for masonry fill.  So, the

8  conspiracy theory is wrong.  Masonry fill theory is wrong.

9        We then finally come to the last point, which is

10 probably the most remarkable.  That is the one that says, and I

11 -- (indiscernible) mean very much, but I haven't heard the

12 argument before.  I haven't heard the argument before.  I've

13 never even seen the argument made before, that when a lawyer

14 goes into Court on an ex parte basis, that means not with other

15 people being there and says, if you've got an (indiscernible)

16 now specifically so that we can avoid the effect of a

17 bankruptcy filing and do this, that that somehow means some

18 recognition by the law in the context of a bankruptcy case.

19 That is a remarkable position.  The position is not only

20 remarkable, it is one that kind of -- it just -- just blinks

21 away the actual sequence of events.  The sequence of events is

22 that the ex parte order was obtained in February of 2001.  The

23 bankruptcy case was filed in April 2001.  The Judge down in

24 South Carolina issued his ultimate order in June or July of

25 2001.  Now, when was the bar date?  The bar date was in March

1  of '03.  When were the so-called class claims filed?  They were

2  filed in March of '03.  As of the time that the class claim was

3  filed was the ex parte order still outstanding?  Oh, I don't

4  think so.  We had a final order.  Was Mr. Speights authorized

5  to do anything in this case by a South Carolina Judge in March

6  of '03?  I don't think so.  The ex parte order, did it

7  evaporate?  It absolutely did evaporate by the operation of the

8  proceedings in South Carolina.  So, you have this ex parte

9  order that's on the books for several weeks.  It does not have

10  the status of being a proper final order of any Court that I'm

11  aware of.  It's now being said to bind this Court somehow.

12  They can't act.  I don't see that anywhere.  They're saying

13  that it authorized something.  It authorized nothing that has

14  to do with the bar date that was filed two years later.

15          And I want to then add to the equation an element

16  that not only focuses on the ex parte issue, which is, I think,

17  the most difficult thing to countenance here, that somehow an

18  ex parte order that does evaporate within a few months then

19  provides eternal authorization for Mr. Speights to do things in

20  this case that he didn't have the -- this Court said in

21  February of '02, you want to file a class notice, you've got to

22  come to me.  And I have Your Honor's statement to that effect.

23  Well, he didn't come to Your Honor.  Instead, he said that the

24  ex parte order that existed back in '01 somehow authorized him

25  to add, in March of '03, without coming before Your Honor, and

1  actually seeking permission, and then it gets even worse,

2  because when he filed this order in March of '03, he still

3  didn't come to Your Honor.  The class action motion wasn't

4  filed until October of 2005, so he now asks Your Honor's

5  permission, two years after the claim form, to have a class

6  certified on the basis that when he filed the claim form he was

7  authorized, indeed obliged to do so by ex parte order that had

8  lapsed four years ago, three years ago.  That's an amazing,

9  amazing proposition.  What Mr. Speights should have done is to

10 come before this Court to seek class certification at or about

11 the time the claim form was actually submitted, but certainly

12 promptly after that, but instead he just decided to say, you

13 know, I don't really have to do that because I can argue to the

14 Court later on that that ex parte order was all that I still

15 needed to do.

16        But there's a more fundamental point.  There's not

17 just a point about whether Mr. Speights was late or not,

18 although he admitted (indiscernible) Your Honor's instructions.

19 You've got to come back to due process.  Mr. Speights suggests

20 that the issue is only whether there was an order, any kind of

21 order, conditional, ex parte, we'll take any kind of order

22 outstanding as of the time that the company filed for Chapter

23 11.  He would say pre-petition certification is satisfied no

24 matter what the on-going integrity or liability of the order

25 is, plus the fact that there was an order.  What he misses out

J&J COURT TRANSCRIBERS, INC.

1 on from that is what the Courts are getting at, with the fact

2 that pre-petition certification is important.  (Indiscernible).

3 If you take a look at the cases, Your Honor, as I know you have

4 and will, the issue is if there has been pre-petition

5 certification, and the notice has gone out to the class

6 members.  That would be relevant in considering whether there

7 might have been a reason not to file by the bar date.  The due

8 process (indiscernible), so that if you have got a pre-petition

9 certification and notice has gone out to everybody, now, gee,

10 maybe we should let that certification stand because we can't

11 unscramble the egg.  Everybody has now gotten the notification.

12 We believe there are no class.  And as a result if there's a

13 bar date they may not file in time for the bar date because

14 they're still relying upon the fact that they saw that prior

15 notice.  This is actually very carefully and properly set out

16 in the Jamesway Corporation decision.  In asking the question

17 about, as in Sacred Heart, how we must weigh the effect of

18 extending the bar date for the former employees who had not

19 filed proofs of claim by rendering them unnamed members in the

20 plan.  In this case the balance tips decidedly in favor of

21 denying class on the status to the complaint.  Jamesway gave

22 adequate notice of these Chapter 11 proceedings, and the bar

23 date.  No class was pre-certified as such that purported class

24 members who did not choose to file a proof of claim should or

25 could have had any reasonable expectation if they did not

1  comply with the bar date order.  As such, this is not a case

2  justifying an exception to the enforcement of the bar date

3  order in accordance of these express and unequivocal terms.

4  Indeed, he goes on to say to do so would be an unwarranted,

5  unfair, and possibly violate due process rights of other

6  creditors.

7          So, the question is not whether they excluded

8  (indiscernible) that ex parte order, the question is whether

9  notice got out such that it would be unfair and a violation of

10 due process to hold people to a bar date because they might or

11 could -- they could or should have had a reasonable expectation

12 that they didn't have to file by the bar date.  So, all of this

13 argument about whether it's a pre-bankruptcy certification,

14 etcetera, etcetera, etcetera, is not only wrong according to

15 what happened in South Carolina, it has absolutely no bearing

16 on the fundamental due process issue which is what these

17 requirements that apply to the Court's discretion that are

18 designed to preserve.

19         So, we go through the analysis, and the analysis is

20 straightforward.  No pre-petition certification.  There was a

21 bar date notice.  That bar date notice has been found by the

22 Court to be adequate, and this is not the opportunity,

23 appropriate opportunity for a challenge to that order

24 collaterally.

25         And what is the result (indiscernible)?  What is says

J&J COURT TRANSCRIBERS, INC.

1 is that the two critical features have not been met.  Your

2 consideration of them says you don't certify a class, that's

3 what the case law says.  What would happen, though, if we were

4 to unwind (indiscernible) of a Chapter 11 case?  Okay.  We're

5 not going to have a notice process and a class certification.

6 We're going to kind of sweep around in the corners for other

7 claims that might be out there on the theory that somebody was

8 missed.  Obviously there would be an impact.

9         First of all, let's talk about the opt out

10 opportunity.  (Indiscernible).  They wouldn't necessarily --

11 claimants wouldn't necessarily opt out of the bankruptcy

12 process, but they would have to be given the opportunity to say

13 I don't want to be part of the Anderson Memorial class.  So,

14 now, what is the impact of that opt out?  Well, the impact of

15 that opt out is now going to be (indiscernible).  If anybody

16 new shows up, if there is one person, two people, three people,

17 five people who show up and say, oh, well, gosh, now that you

18 sent me that notice, yeah, I want out, and I want to be part of

19 this case, or if there's anybody who was actually in that class

20 who doesn't opt out, but who failed to file in time for the bar

21 date, you've got your due process problem.  The same problem

22 that was pointed out in the <u>Jamesway</u> case, the language that I

23 just cited, because what you've now done is that you have -- to

24 do so would be an unwarranted, unfair, and possibly violated

25 the due process rights of other creditors.  Everybody else that

1  followed along, and now has made decisions, including

2  settlement decisions, and to participate in the litigation,

3  would now be in the position of being treated unequal, so the

4  other side of the due process street, which is designed to

5  protect people who did comply with the order, (indiscernible)

6  due process (indiscernible) to say wait a minute, we've got a

7  problem with due process.  But it doesn't stop there.  The

8  whole idea of Rule 23 can revive rights that are lost by

9  operation of law under Bankruptcy Code poses a very, very

10 fundamental question.  And this question has not been given, I

11 think, any emphasis in any of the discussions that have taken

12 place so far.  And it is the (indiscernible) problem.  To the

13 extent that you have a procedure that is used to effect

14 substantive rights, you have gone an enabling act problem.

15 Enabling act says, Your Honor well knows, that the rules are

16 passed only on condition that they do not violate a substantive

17 right, or change a substantive right.  And the Court -- the

18 Superior Court in the <u>AmChem</u> case said it best.  We must,

19 therefore, follow the path taken by the Court of Appeals,

20 mindful that Rule 23's requirements must be interpreted in

21 keeping with Article 3 constraints and what the rules enabling

22 act which instructs that rules of procedure shall not abridge,

23 enlarge, or modify any substantive right.  To the extent that

24 this rule, Rule 23, is used to now revive, therefore give

25 greater rights to people who failed bo file by the time the bar

1 date, you have a huge enabling act problem, and a violation of

2 the statute.

3        And then, finally, you have bankruptcy policy.

4 (Indiscernible) conduct bankruptcy policy and after the fact

5 folks come in and say, well, you know, you did a pretty good

6 job, and we don't want to be critical of Your Honor, we don't

7 want to be critical of anybody.  We want to be friendly about

8 it all, but the fact of the matter is that we need to certify a

9 class every single time just to make sure that we're doing the

10 right thing.  What does that do to the whole idea of getting

11 people to show up on time for the bar date?  Your Honor well

12 knows what the answer is, it basically undercuts that policy.

13 Bankruptcy policy says the bar date is to be respected.  The

14 whole purpose of the requirements that there be a -- the

15 question -- (indiscernible) the question whether to use Rule

16 23, the whole purpose of that is to protect the integrity of

17 the bankruptcy process against the very kind of argument that's

18 being made here, which is that somehow we're going to use Rule

19 23 to undercut the force of the bar date and the incentive that

20 it creates for people to show up and do what they're supposed

21 to do --

22        THE COURT:  Well, but Mr. Speights' contention in

23 response to that, and I might as well raise it, because I might

24 as well hear what you have to say about it now, I'm sure would

25 be that at least as to the state class, that he contends was

1  certified by this ex parte order, I don't know about the

2  notices having been given as to the ex parte order, but I guess

3  as to the -- I keep calling it final order, he keeps correcting

4  me that it's a conditional order, but for purposes of this

5  record to distinguish it from the ex parte order, the final

6  order, the ultimate order, that was entered, I guess there was

7  some notice that was given.  But I think what you're telling me

8  is that order was issued after the bar date in this case.

9        MR. BERNICK:  That order was issued before the bar

10 date.  It was issued with respect to people who were claiming

11 (indiscernible), not Grace, the other defendant.

12       THE COURT:  Well, yes.  I understand that.  But the

13 issue -- the question would be that the notice would have gone

14 out, that they are part of a class in South Carolina, although

15 it would not have had Grace in it, but it would have had Mr.

16 Speights as the class counsel.

17       MR. BERNICK:  And it could well have been, but that's

18 the whole show.  We could have all kinds of classes that are

19 out there, but the notice that counts is notice of a claim

20 against Grace.

21       THE COURT:  Well, I just --

22       MR. BERNICK:  And there was no notice of any class

23 that went out anywhere saying you are now part of a Grace class

24 action, you are part of a USG class action, or whatever.

25       THE COURT:  Federal Mogul, or whatever.  Well, I

1 guess that's the point, that if -- are they -- are those folks

2 who are part of the class in which Grace was initially a

3 defendant, but as to which the class was not certified, because

4 Grace filed bankruptcy, somehow, in quote, misled, by virtue of

5 the fact that Mr. Speights is class counsel, and Mr. Speights

6 filed a class proof of claim in this case, I don't know what

7 notice is given to the putative class members.

8        MR. BERNICK:  The proof of claim that was filed by

9 the Speights firm in this case was a class claim.  It wasn't

10 generalized, constructed, or any other -- it was filed on

11 (indiscernible).  So, again, the case law that focuses on the

12 significance of a pre-petition (indiscernible) case deals with

13 the reasonable expectation aspect.  But I don't think there's

14 any argument that can be made that somehow the fact that

15 they're being -- pre-petition certification as to another

16 company means that that's a reason for people to ignore a bar

17 date for this case, I don't think that that argument -- I don't

18 think that that argument would hold water.  The opt out

19 problem, though, Your Honor, is only the beginning.  But now

20 that we have the opt out problem, that is huge.  But they have

21 no problem (indiscernible) take an appeal, because of the

22 (indiscernible).

23        And then, even while the appeal is pending, you have,

24 I'll call it the reconciliation.  Once that class is certified

25 for any purpose and any way, shape, or form, we call can know,

1  on the basis of the experience of this case that we will then

2  have brief after brief, issue after issue about how now to take

3  whoever might be involved in this opt out class who hasn't

4  opted out.  There are unknown proofs (indiscernible) and an opt

5  out class.  When you send out that notice you don't know who is

6  in the class -- in the class, I mean, by individual.  You won't

7  know that until you found the judgment on -- people then say I

8  want to participate in (indiscernible).  So, we'll have a bunch

9  of unknown claimants.  We'll have counsel arguing that those

10  unknown claimants are X in number, or Y in number for

11  estimation purposes, even though none of them showed by the bar

12  date.  We will have those unknown people we'll have to

13  determine, well, gee, do they have to relitigate any issue

14  that's already been litigated in the context of the case?  What

15  about the common issues that we're litigating now?  What about

16  determinations that Your Honor makes with respect to <u>Daubert</u>?

17  What about risk?  What about all these different things?  All

18  of a sudden we're now going to have a bunch of people, and

19  we're going to have a new lawsuit.  This is what Mr. Speights

20  (indiscernible).  This is now a new lawsuit with people with

21  new rights.  These are the very people who were unknowns.  They

22  haven't come forward.  And I'm entitled to represent them and

23  vigorously pursue all of their claims.  We'll have this -- the

24  whole case on the property side will do a freeze frame, and we

25  will have an absolutely enormous and unbelievable mess.  And

1 this is exactly what this analysis was designed to foreclose.

2 And the Seventh Circuit in <u>American Reserve</u> (indiscernible)

3 decision.  It was a very technically (indiscernible) decision,

4 find some way of putting Rule 23 back into the Bankruptcy Code,

5 but having been technically successful in doing that, they then

6 took a step back and say that is not to say it's appropriate to

7 use Rule 23, and that was an enormous caveat.  And as I said,

8 all the cases that have come out since that time that have

9 taken a look at this thing, with the exception of

10 <u>Interregional</u>, that we'll come back to when I'm done here, they

11 have all said, I can't even get into that stuff.  The whole

12 purpose of Rule 23 is not to trump bankruptcy procedure, it's

13 to enhance or facilitate bankruptcy procedure if it's

14 appropriate.  In this case, late in the day, years after the

15 claim form is filed, years and years after the ex parte order

16 is, in fact, evaporated, we see Rule 23 used, and it would

17 destroy -- a lot of people have worked very, very hard over the

18 last several months and years, particularly Your Honor, in

19 trying to create (indiscernible) of this proceeding.

20        Now, what this means from our point of view, Your

21 Honor, is that this case does not close.  The collateral

22 attacks on the bar date notice are exactly that.  They're

23 collateral attacks.  Your Honor doesn't even need to reach the

24 right side of the board, which is where the Rule 23 tests are

25 met.  And I do want to go through them a little bit because I

1  want to deal with what I think is an important road map, bear

2  in mind as we think about the practicality of this case.

3          There has been something of a moving target about who

4  is the Anderson class.  I had thought by the time that we had

5  kind of gotten through the first two arguments that the

6  Anderson class was, in fact, a South Carolina class.  And then

7  the question was, number one, was the South Carolina class

8  something that has to be recognized (indiscernible)?  Number

9  two, could it be broadened to include other people?  That's

10  exactly how Your Honor put it in this transcript.  This is Page

11  69 of the October 23, '06 transcript.  That's October of last

12  year, during one of our numerous discussions.  You said, "I had

13  been under the assumption that the issue was going to be

14  whether or not there should be recognition of the South

15  Carolina class as the first step, and then secondly, I suppose,

16  whether since this is a Bankruptcy Court as opposed to a South

17  Carolina Court, the class can be broadened somehow to include

18  other claimants that Anderson might be representing above in

19  the class -- claims, as opposed to just looking at the South

20  Carolina issue."

21          So, the first question is, is the South Carolina

22  class to be recognized?  And only then can you get to the

23  (indiscernible).  Well, if that's true, then the answer is no,

24  it can't be recognized.  It can't be recognized for a whole

25  host of reasons, beginning with different South Carolina law,

**J&J COURT TRANSCRIBERS, INC.**

1  the fact that it's an ex parte order, the untimeliness of Mr.

2  Speights's proceeding here, and the law of due process,

3  enabling act, and bankruptcy policy questions that wold accrue

4  to it.  So, that's a (indiscernible) one.  But now we get under

5  the theory.  And the other theory, I can recall the Speights

6  only theory, and that's not -- (indiscernible), but that is how

7  essentially he thought he was a class, because remember, the 78

8  claims.  If we talk about active cases, then we talk about

9  other current cases.  Active cases divided into Speights &

10 Runyan, and then other folks.  And as a result of the work

11 that's been done so far, a lot of progress has been made, Your

12 Honor.  There are, in the other category, essentially two

13 firms, the Motley Rice firm has got 17 claims, and the Hahn and

14 somebody firm -- I think has 16, and then there are a total of

15 three other claims.  They're really down to a relatively small

16 universe of claims.

17          Speights & Runyan now has approximately 162 active

18 claims.  Now, of those active claims Speights & Runyan is sole

19 counsel in approximately -- we'll go S&R only -- and

20 approximately 80 claims.  There are, then, S&R plus others, and

21 that's an additional -- I guess this is -- about an additional

22 80 claims.  Now, as the motion for class certification was

23 originally filed, Mr. Speights was careful, although he says

24 today we'll speak on anybody's behalf, that's not what the

25 motion (indiscernible) has been.  The motion actually has an

1  appendix to his (indiscernible), exclude people who are being

2  represented by other counsel, and also to exclude people where

3  there was a joint representation as there is the case of some

4  of the cases out of California.  So, we have Speights & Runyan

5  only (indiscernible) about 80 claims, and of those 80 claims,

6  you have one, Anderson Memorial claim in South Carolina, you

7  have about nine that are other U.S.  And you have about 70,

8  they're all Canadian.  So, the actual exhibit that Mr. Speights

9  put together as Exhibit 141 really works with mostly Canadian

10  claims, overwhelmingly Canadian claims.  Then, a

11  (indiscernible), I think you've got three New York claims,

12  maybe six claims from a variety of other jurisdictions, you

13  know, Arkansas, California, different places.  And then one

14  South Carolina claim.

15        What about all of the other current cases?  Well, all

16  the other current cases are not listed.  These are the ones

17  that are the 80.  The other current cases would include ones

18  that have been dismissed, withdrawn by Mr. Speights, or never

19  filed.  They are not listed in the 78 or 80.  And the problem

20  obviously with allowing the class to proceed to these other

21  claims, it's the same ones that we've just talked about.  You

22  have a due process problem.  Is there reviving rights?  Do you

23  have an enabling act problem?  We have a bankruptcy policy.

24  And they are all exacerbated to the extent that if you do this

25  in the forum of an opt out class, you (indiscernible) who it is

1 (indiscernible).  So, we then come back to these folks here,

2 and I want to go through the test under Rule 23, then I'll be

3 done.

4         With respect to the 70 Canadian claimants, these are

5 already subject to the statute of limitations (indiscernible).

6 With respect to three New York claims out of nine, again, the

7 statute of limitations.  This is further information

8 (indiscernible).  With respect to all of the non-South Carolina

9 cases, every single one of them, you have the problem of the

10 door closing statute.  Now, this is kind of remarkable.  The

11 South Carolina Court says, as a matter of policy, we are not

12 going to permit people from outside the state of South Carolina

13 to proceed inside South Carolina with respect to their claims

14 against non-South Carolina companies.  And that door closing

15 statute has been recognized by the Supreme Court in the

16 Monsanto decision.  And the Supreme Court in the Monsanto

17 decision said this doesn't apply in the Federal Court.  With

18 due respect to the Supreme Court of South Carolina, that was

19 not a decision that was in their hands.  And the Court in --

20 the Fourth Circuit in the Central Wesleyan case said there is

21 an overriding federal policy that is probably applicable here,

22 and that is the overriding federal policy of the consolidation

23 of asbestos cases.  There's just one problem.  Central Wesleyan

24 was decided in 1993.  There hasn't been the same consolidation

25 recognized since.  Indeed, it's gone exactly in the opposite

1 direction.  That is, the Federal Courts have moved away from

2 consolidation and aggregation of asbestos claims under the

3 rules.  We have denials.  We have certification (indiscernible)

4 settlement classes.  We have denials of certification for

5 litigation claims.  But while <u>Central Wesleyan</u> may have

6 articulated the policy of the Federal Courts in 1993 with

7 regard to asbestos, it doesn't articulate -- it doesn't stand

8 for what those policies are here today.  So, the <u>Central</u>

9 <u>Wesleyan</u> Fourth Circuit Court says, well, not that Federal

10 Courts don't apply the door closing statute, but they can

11 decide not to apply the door closing statute if it stands in

12 the surface of an overriding federal policy.  The case that Mr.

13 Speights doesn't talk about, of course, is the more recent

14 decision out of the (indiscernible) Court of South Carolina in

15 the Tuttle (phonetic) case, which says there's no issue but

16 that the door closing statute is applied in Federal Court

17 subject to there being a contrary and overriding federal

18 policy.  So, w do have a door closing problem.  The door

19 closing problem is a significant problem.  We don't believe

20 it's appropriate to include any of these other claims in a

21 class action that was filed and still being pursued by Anderson

22 Memorial, a South Carolina claim.

23        At the end of the day, though, Your Honor, we know

24 (indiscernible) said, which is that as you go now with the

25 benefit of this kind of analysis that (indiscernible), back to

1 what it is that we're dealing with here, we are either dealing

2 with a South Carolina case that was certified in South Carolina

3 pre-petition, and today is comprised of one claim.  We disagree

4 with that.  We think there wasn't (indiscernible) for

5 certification.  We think it shouldn't be considered.

6        Or, if you don't consider that, and we're open to all

7 these other claims, the other 79 claims, then you don't have a

8 preexisting South Carolina class, and we don't go past the

9 first square of our analysis which says is there prepetition

10 certification?

11        So Mr. Speights is now saying gosh, that theory, that

12 is the South Carolina theory, is one I still argue, but I don't

13 want to defend them on it.  And then say well, I'd like to have

14 a bunch of other people who have current claims, even though

15 there are due process issues, enabling act issues, bankruptcy

16 policy issues, and then he says well, but even that's not

17 enough.  What I'll try to do is get a third theory that I

18 didn't leave room for on my (indiscernible).

19        And the third theory of a class certification says

20 that you know what, I want to represent everybody from the

21 futures claim.  So the third argument is forget about South

22 Carolina or include South Carolina, but I now want to talk

23 about futures.  We don't think that there is really a futures

24 issue within this case.  And the reason we don't think there's

25 a futures issue is fairly straightforward.  And that is that

1 once you send out a notice, this is Exhibit 50A, that says if

2 you own or operate a commercial or residential or public

3 building constructed with asbestos containing products you may

4 have a claim in the W. E. Grace bankruptcy.  We have all kinds

5 of evidence that the prepetition is notice.  Your Honor, is

6 familiar with courts that have found there is constructive

7 notice going back into the late 1980's, early 1990's.

8         But you don't have a bar date notice sent out

9 pursuant to a paid notice program specifically approved by the

10 Court and it says everybody, you may have a claim.  So they're

11 now on notice that they have a claim.  Under the law they have

12 an obligation to make inquiry.  Inquiry notice says you must

13 then make an inquiry to determine well, we have an issue.  And

14 Mr. Speights says well, their claim doesn't accrue until there

15 is contamination.

16         The fact of the matter is that Mr. Speights and all

17 the other members of the PD committee argued to this Court and

18 then they argued to Judge Buckwalter that what is

19 contamination?  Contamination is a risk.  Contamination is not

20 a huge problem.  Contamination is any disturbance of

21 distribution (indiscernible).  So we're talking about asbestos

22 that's now been in place for, let's see, 2003.  Probably the

23 better part of at least 30, if not 40 years.  We know that

24 their experts can go almost anywhere to find dust particles

25 someplace.  That is what drives their theory is that the dust

1  particles are somewhere other than in the asbestos itself and

2  therefore there is contamination.

3        And that's why they cared so much about going before

4  Your Honor, and to Judge Buckwalter saying it's wrong to look

5  at risk.  It's only necessary to look for contamination.  So if

6  anybody gets this notice, which they do, and they then make

7  inquiry to determine whether they have a claim (indiscernible)

8  that every plaintiff's lawyer who's in this business will of

9  course file a claim so long as they have any evidence of any

10  fibers that are distributed anywhere other than on the product

11  itself.  So as of today we don't think that we have a futures

12  issue in this case.

13        But the issue that the Court must decide today

14  because Mr. Speights has raised it isn't even that question.

15  The issue that Mr. Speights has put before the Court is that he

16  wants to be the representative.  He wants to certify a class of

17  all people who may be future claimants.  That's what he said to

18  Your Honor.  Now, I've even put that on the chart in part

19  because I kind of saw some indications of it.  I said to myself

20  is that really going to be done?  What's the precedent for it?

21  The answer is very evident (indiscernible).

22        The law does not permit the prosecution of a class

23  action on behalf of unknown people who don't yet have claims.

24  We don't have a Rule 23 -- Rule 23 doesn't create viable claims

25  out of claims that are not filed.  A claim brought by somebody

1  who hasn't sustained an injury the Court doesn't even know that

2  he's going to sustain an injury is not a cognizable claim under

3  Article 3 of our Constitution.  It doesn't even belong in court

4  to say nothing of being certified on a class basis.

5          So the whole problem of the futures claim or the

6  futures demand or whatever it is in our jurisprudence is driven

7  by the fact that they're not amenable to be representative of

8  (indiscernible).  So why do we have a Rule 23 motion saying oh,

9  guess what, we're now here in the year 2007 in the Grace

10  bankruptcy case and guess what, we're going to have futures

11  being represented after all complete with due process

12  requirements under Rule 23.  Give me a break.  That's the whole

13  reason that 524G wasn't amended.  It was to try to provide a

14  bridge so that there could be some representation in the sense

15  of the futures representative for futures claimants because

16  there can't be litigation.

17          And that futures representative has stood in this

18  court with counsel and repeatedly said I don't represent a

19  particular claimant.  I can't find a particular claimant.

20  (Indiscernible) Mr. Speights and he says I'm going to be class

21  counsel for the futures and to say I'm going to litigate their

22  claims and they're going to be bound by the result?  There's no

23  such thing in our jurisprudence as we sit here today as a

24  certifiable class when peoples whose claims don't yet exist.

25  That's a fundamental issue in our jurisprudence.  We're not

**J&J COURT TRANSCRIBERS, INC.**

1  going to solve it through granting a motion in this courtroom

2  filed years after it should have been brought to the Court's

3  attention.

4         So we then go to the tests that have to be addressed

5  here.  And this I think will be clearly (indiscernible).  First

6  of all, there's numerosity.  Numerosity you can pick.  Many of

7  the numbers we're talking about you can pick.  You can pick the

8  '80's.  You can pick -- he says well, we got the late people

9  and I'll include them.  That's still not going to get you

10  numerosity.  Your Honor, I could cite Your Honor

11  (indiscernible) I could have a thousand claims we could still

12  deal with them.  So we don't have numerosity being satisfied

13  here.  It doesn't take much argument.  Things have not included

14  the record there for the movants.

15         What about common issues in predominance?  Well,

16  predominance may not be a requirement in South Carolina, but it

17  is a requirement under Rule 23.  What that means is that not

18  only must there be common issues, but they must predominate.

19  Now, it has been said before earlier in this case well, Mr.

20  Bernick makes the argument that there are common issues in this

21  case.

22                          (Pause)

23         MR. BERNICK:  And the answer is this.  I said that

24  there are common issues.  There are two rules in a civil

25  procedure rules that deal with common issues.  One is Rule 42,

1  the other is Rule 23.  And the reason there are two rules is

2  they both deal with common issues, but they deal with two

3  different sets of circumstances.  You can have Rule 42

4  consolidation and common issue litigation if there is even one

5  common issue.  You can't get a class action if there is one

6  common issue or a couple common issues.  It has to be

7  predominant.  In all the cases that we've talked about

8  decertifying mass tort cases under Rule 23, they don't find

9  that there's no common issue.  They find common issues don't

10  predominate.

11          So when we have argued that there are common issues

12  that warrant common issue treatment that is in no way

13  inconsistent with our position here (indiscernible) plaintiff's

14  contention that this case should be certified because they have

15  to show predominance.  There's been no demonstration of

16  predominance that we have here.

17          Number two is you're talking about two different

18  kinds of predominance.  You're talking about factual, you're

19  talking about legal.  On the factual side plaintiff's counsel

20  themselves in this case have insisted that we have a

21  proliferation of not common issues, but individual issues.

22  This is Mr. Dyes' November 14, 2005 --

23          MR. SPEIGHTS:  Your Honor, I really don't know what

24  another plaintiff's lawyer representing another plaintiff, what

25  he says has anything to do with this case.  This is Anderson's

1  here.

2          THE COURT:  I think this is the same objection that

3  you made.

4          MR. BERNICK:  It's a mistake.

5          THE COURT:  Yes, but it's still another attorney on a

6  different claimant, isn't it?

7          MR. BERNICK:  No, it's Mr. Dyes standing up -- this

8  is a hearing --

9          MR. SPEIGHTS:  But Mr. Dyes is not representing my

10 clients, Your Honor.  I'm not bound by what Mr. Dyes says.  Can

11 I put up what Mr. Lockwood says?

12         MR. BERNICK:  In this case, Your Honor, this is a

13 question of what is the record with this case.  These are all

14 statements that were made as part of the record in this case.

15 I just got done agreeing that anything that was said on the

16 record in this case is part of the record in this case.  You

17 can't expunge it.  And Mr. Dyes actually stood up on the 14th

18 of November of 2005 -- he wasn't standing just arguing for

19 himself.  That was the day that they all came in and they made

20 a presentation about why there shouldn't be this buckets in the

21 process.

22         Mr. Dyes spoke generally to the question of whether

23 there should be this kind of comic issue type of process.  And

24 nobody stood there at that time from PD committee, and Mr.

25 Speights certainly didn't stand up at that time and say he's

1  not speaking for me.  Because they all took their turns in

2  making the arguments that they wanted to make in support of the

3  overall proposition that Mr. Baena (indiscernible) which is we

4  shouldn't do any kind of common issue litigation here at all.

5  I could have Mr. Baena's own statement as counsel for the

6  committee do exactly the same effect.

7          MR. SPEIGHTS:  And I would object to it too, Your

8  Honor.  This is Anderson -- my client Anderson arguing a motion

9  for certification and I don't think anything in the record that

10 anybody has ever said whether it's a California lawyer or Mr.

11 Brandy or Mr. Lockwood or Mr. Rice or anybody else is

12 automatically come in to be held against my client.

13         THE COURT:  I think this is the --

14         MR. SPEIGHTS:  I object.  Your Honor, can rule, but I

15 object to it all.

16         THE COURT:  I think this is the same argument you

17 were making.  I agree that this is in the record of this case,

18 but I think as to the issue that I'm being asked to adjudicate

19 here it's the same relevancy argument that you made with

20 respect to what was happening in the South Carolina courts even

21 though there was no -- because there was no affidavit that

22 showed why Grace's statements in that case were relevant to

23 what's happening here even though Grace was a party there.

24 Now, I've said that you can brief that issue because I'm not

25 sure how that interplays.  And if you want I'll give you an

1  opportunity to brief this issue.  Otherwise, I think that this

2  is going a bit far afield from what I need to have argued here

3  and I will sustain the objection.  If you want to brief it I'll

4  reconsider.

5          MR. BERNICK:  Your Honor, I -- very limited proffer.

6  When you say that I just got done agreeing that anything and

7  everything in the record of this case could be before Your

8  Honor for this purpose.

9          THE COURT:  Yes.

10          MR. BERNICK:  Now do I have to go back and say well,

11  no, I now have to parse out what  Mr. Speights specifically

12  said?

13          MR. SPEIGHTS:  He didn't agree to that, Your Honor.

14  He suggested that he would do that.  We don't have an agreement

15  that everything in the record is in this case.

16          MR. BERNICK:  Mr. Speights should not be raising his

17  voice (indiscernible).

18          THE COURT:  I thought that the offer at one point,

19  Mr. Speights, was that the transcripts of the proceedings in

20  this case were essentially coming in so that the parties could

21  use them in whatever arguments and whatever fashion you deemed

22  relevant for this class certification motion and then I would

23  consider them in that regard.  So that's what I thought the

24  understanding was when you made that offer and Mr. Bernick said

25  he had no objection to it.

1          Nonetheless, it seems to me that your position is

2   correct.  What Mr. Dyes argues on behalf of his clients is not

3   necessarily what you're going to argue on behalf of your

4   clients and the class certification issues, and I am prepared

5   to sustain the objection.  I will reconsider it.  I'm going to

6   give you this chance to argue a couple of these issues that I

7   don't feel comfortable making rulings about today anyway Mr.

8   Bernick.  You can argue this and I'll reconsider it at that

9   time.

10          MR. BERNICK:  I don't want to -- I'm not pushy, but

11  (indiscernible).  It is stunning that all of the claimants'

12  lawyers can stand up and take positions on who speaks for what

13  and whom.  Mr. Baena sometimes speaks for everybody, sometimes

14  he speaks for nobody.  They take turns, but yet we are the ones

15  who then can't -- we can't use any of it.

16          THE COURT:  No, that's true, Mr. Bernick, that does

17  happen.  The problem is I don't have a recall of what happened

18  on the transcript of a hearing in November 14th of 2005.  And

19  if in this brief you can show that in fact Mr. Dyes was

20  standing up speaking for all people who were on the property

21  damage side and no one objected then I will reconsider the

22  sustaining of the objection.  But I simply -- that's one of the

23  things I can't do on the record today.

24          MR. BERNICK:  That's fine.  What bothers me is

25  (indiscernible) with what Your Honor just said it's now a

**J&J COURT TRANSCRIBERS, INC.**

1 language that's out there that if it's going to be used by Mr.

2 Speights in this proceeding then say that nothing that anybody

3 else says unless it's what Anderson Memorial says can now be

4 used on the record in this case because it wasn't

5 (indiscernible).

6         THE COURT:  Oh, I see.

7         MR. BERNICK:  So at that point I now have the entire

8 record of this case which I was prepared to say could be used

9 and I have Mr. Speights now is going to make an argument with

10 what Your Honor just said (indiscernible) as to Grace that's

11 true --

12         THE COURT:  Okay.

13         MR. BERNICK:  -- but as to Anderson Memorial --

14         THE COURT:  You're correct.  I'm being inconsistent.

15 What I did earlier was say that I would reserve the ruling

16 until I got the briefs.  I will reserve this ruling until I get

17 the briefs.  My preliminary assessment is that unless you can

18 show me that Mr. Dyes was speaking for all claimants I will

19 sustain the objection.  But I will reserve the ruling so you

20 can finish your argument so I have the record complete at this

21 time.  But my preliminary assessment is that I will sustain the

22 objection.  You may argue this in the post-trial briefs so that

23 I have the record and then I'll address this in the post-trial

24 briefs.

25         MR. SPEIGHTS:  I don't want to interrupt Mr. Bernick,

163

1  and I just need to clarify, Your Honor, and I will address it

2  later and we can argue about it after he finishes.  But I did

3  -- Mr. Bernick proposed that he was not going to object to any

4  of the transcripts of the record.  I did -- do not think I

5  agreed nor do I believe I agreed that anything and any record

6  in this bankruptcy could come in as evidence in this bankruptcy

7  proceeding.  I appreciate the fact that there is a record and

8  you can refer to transcripts.  And I listed the transcripts I

9  wanted to refer to specifically which Your Honor said was

10  helpful and I'm sure there's a great deal of material that Mr.

11  Bernick can rely on in the record including discussions with me

12  and Grace, et cetera.  But just for the record, I haven't

13  agreed that anything in the record is relevant or admissible on

14  the certification matter.

15          MR. BERNICK:  I'd like to respond to --

16                    (Pause)

17          THE COURT:  Mr. Bernick, go ahead.

18          MR. BERNICK:  Your Honor, I'd like to respond to that

19  (indiscernible).  At this point I think that the -- I think the

20  process (indiscernible).  But I want to finish my argument

21  (indiscernible) this issue with regard to (indiscernible).

22  Factual commonality on predominate basis is not

23  (indiscernible).  We know that Mr. Speights has, I believe,

24  taken the position himself and can confirm it on the record

25  that these are building by building issues (indiscernible) the

1  mantra of this case.  These are building by building issues and

2  therefore our buckets approach (indiscernible) to begin with.

3       That is in a sense a very point about predominance

4  which is we would agree there are a lot of individual issues.

5  We have always said there are some common issues (individual)

6  very careful on which ones get chosen.  That does not establish

7  predominance.  It is their burden to establish predominance,

8  they haven't done that.

9       In response to legal issues as well we now have not

10  just one state we actually have a hodge podge of different

11  states.  They get different rules (indiscernible) very

12  important decision because what happened was coming out of all

13  of these decertification (indiscernible) I indicated, Your

14  Honor, tort cases where we claim as commercial cases.  And so

15  then the issue came back to the Seventh Circuit well, what if

16  we're not claiming the personal injury we're just claiming in

17  tort commercial loss?  That was the <u>Bridge Stone Fire Stone</u>

18  cases.  Seventh Circuit came back with a decision that says not

19  only has to be factual commonality, but it has to be legal

20  commonality where you have disparate state laws that are

21  involved as Mr. Eastbrook said or Judge Eastbrook said

22  (indiscernible) case esperanto or esperante and instruction.

23       I'm going to turn finally to superiority.

24  Superiority inevitably brings to bear a question of what the

25  alternative is.  In this case the Court has worked hard, we've

1 worked hard, everybody's worked hard to develop a very

2 important alternative.  That alternative is the common issue

3 proceeding.  That common issue proceeding is now substantially

4 advanced.  What we now have is what I'll call (indiscernible)

5 plus situation.  (Indiscernible) established a proposition,

6 this was the (indiscernible) that where you have an individual

7 that's prosecuting a claim and the individual litigation is

8 working out fine you don't certify a huge class, because

9 individual litigation (indiscernible) the proper result.

10      In this case we have the same thing.  This is not a

11 securities case.  This is not a situation where you have people

12 all over who don't even have counsel but are in a sense need

13 the class in order to proceed.  This is a case where everybody

14 has got counsel.  Mr. Speights represented people

15 (indiscernible) individual claims can in fact be valuable.  So

16 this is a classic (indiscernible) situation.  But it's with a

17 plus.  And the reason it's a plus is that you have again that

18 bankruptcy context.

19      Bankruptcy context is key, because the Courts have

20 specifically recognized that bankruptcy was designed to afford

21 or in effect does afford what might be a much better and more

22 viable alternative than class certification.  This is a quote

23 from the Ephedra Products liability litigation in Southern

24 District of New York, 2005.

25      It says, "However, this superiority of the class

1  action (indiscernible) with the other available method is

2  bankruptcy which consolidates all claims (indiscernible) allows

3  claimants to file proofs of claims without counsel and

4  virtually at no cost.  Inefficiency bankruptcy is superior to a

5  class action because (indiscernible) small claims are often

6  (indiscernible) allowed under 502A or (indiscernible) in which

7  case discovery of fact finding are avoided altogether.  As for

8  careless although the notice requirements of Rule 23

9  (indiscernible) than the usual bankruptcy notice by publication

10  this shortcoming is easily remedied by bankruptcy

11  (indiscernible) class range."  Of course we went through that

12  whole discussion.

13       The point is that bankruptcy because of the

14  consolidation process and because of the bar date process is a

15  particularly effective mechanism for achieving exactly what

16  class action does without many of the problems (indiscernible)

17  class actions.  In this particular case we've seen this

18  illustrated because the Court has worked for the better part of

19  three years to create just that alternative procedure only now

20  to have a belated motion made that says we now want to

21  introduce into this very carefully structured process opt outs,

22  appeals, reconciliation issues, due process issues, enabling

23  act issues and bankruptcy policy issues.

24       This is by no stretch of the imagination

25  (indiscernible).  The only benefit that actually

1  (indiscernible) is that of course we know that once there's a

2  class certification there'll be a request for fees.  That

3  highlights another bankruptcy policy.  Under the bankruptcy law

4  individual claims fees associated with the claims are paid by

5  individuals or whatever arrangement they have with counsel.  As

6  soon as we get class we're going to get your class for fees

7  that are associated with whatever it is that comes up out of

8  that class (indiscernible).

9          So from all points of view, Your Honor, when you take

10  a look at the questions that are threshold questions around the

11  base of Rule 23 one of the questions under Rule 23 itself in

12  this case is not even close.  Now, I want to close by saying

13  that there are a wide variety of issues that have been raised.

14  Mr. Speights has used this opportunity the last two years to

15  raise a whole series of issues.  We've seen the collateral

16  cash, we've seen the future claimants, we've seen everything

17  come to pass.  But in fact most of those issues are simply

18  academic.

19          We have at this point as a result of a lot of hard

20  work a total of 80 claims that are actually the subject of the

21  motion that's been filed.  All claimants are represented, all

22  their claims have been and are still in litigation.  They are

23  being litigated pursuant to common issues.  Most of the claims,

24  virtually all of the claims are now the subject of summary

25  judgment motion practice.  You get now in the space of this so

168 of 228

1 well controlled and well structured litigation process we get a

2 proposal that comes in and says do what's never been done

3 before in the bankruptcy context where this kind of alternative

4 is available, indeed is no longer being done even outside of

5 bankruptcy.  Put the whole thing back into this basket of opt

6 outs, appeals, reconciliation, because not even close this is

7 an academic dispute.  It's not a practical dispute.  In this

8 case it's class certification process (indiscernible).

9        I'm going to hand up to the Court, this is a copy

10 that counsel made, a list of a whole series of cases that

11 strictly dealt with the issue of class certification in the

12 context of bankruptcy.  In re Music Land Holding, In re

13 Computer Learning, In re (indiscernible) Liability, In re

14 Kraft, In re First Plus, In re First Interregional Equity, In

15 re Jamesway Corporation, In re Sacred Heart Hospital of

16 Norristown.  A whole series of decisions, different courts,

17 different districts, different (indiscernible).

18        The First Interregional Equity case is the case that

19 -- the only one of these cases (indiscernible) -- the First

20 Interregional case is really a very, very different kind of

21 case.  I would urge the Court to take a look at this and ask

22 the question about whether the Court adequately considered the

23 two way street that is a due process impact (indiscernible)

24 have a negative (indiscernible) on people who play by the rule

25 (indiscernible).  If the Court considered the enabling

1 (indiscernible), if the Court considered the bankruptcy policy

2 problem.  The Court did not consider the bankruptcy policy

3 problem.

4         But much more importantly or equally importantly to

5 all of that is that that case was a very different case in

6 terms of (indiscernible) bankruptcy.  In that case it was first

7 of all a securities case.  And in securities cases there's an

8 overwhelming policy for (indiscernible) indeed Judge

9 Gambardella specifically pointed that out in connection with

10 (indiscernible).

11         And secondly, there was no other alternative because

12 it was already underway to handle the same problem.  So you

13 basically had 2000 people who were already there.  You had

14 counsel preparing to represent them and on a class basis and

15 there was no other alternative that really had been explored.

16 Here is exactly the opposite.  It's not a securities case.  You

17 don't have one lawyer representing everybody.  You've got a

18 bunch of (indiscernible).  You've got a very mature process

19 that's designed to address exactly the issues and that process

20 is well underway.

21         The Interregional case is very (indiscernible) to the

22 facts of this case.  In every single other case, not one of

23 which was set in accord or distinguished by Mr. Speights.

24 Music Land, Class Cert denied.  Computer Learning denied,

25 denied, denied.  They're all denied.  What does that tell you?

1 It tells you again what that -- that fundamental point about

2 whether Rule 23 really belongs in the case.  Maybe sometimes it

3 does, but it's the vast exception.  And in a case like this

4 where we've worked so hard to develop procedures already well

5 underway succeeded and produced in settlements, resolutions,

6 all of this is, Your Honor, I hate to say it but it's a game.

7 It is designed to introduce a new era of work on

8 (indiscernible) controversy is directly contrary to

9 (indiscernible) on this period of time.

10       With respect to exhibits, Your Honor, I don't really

11 know what to do.  I've never been involved in a case where the

12 same motion has been argued at least three or four different

13 times.  But certainly by the time you have a hearing the

14 purpose of the hearing is to resolve this matter and do so in

15 accordance with the rules.  To have this problem with the

16 exhibits of record is just remarkable.  And I sat here and said

17 I'm prepared because this is a case.  The bankruptcy case is a

18 case and we can see how interwoven the case in this particular

19 motion is.  I'm prepared to say it's all a matter of record

20 used for whatever purpose (indiscernible).

21       Mr. Speights is not taking the position that that's

22 not so when it comes to Anderson although I agree about that

23 for Grace that he would agree for Anderson.  What does that

24 mean?  It means that he's going to take the position that he

25 doesn't agree therefore he's now going to seek to use as an

1  additional issue for whatever purposes suits the idea that Your

2  Honor somehow has led him down the garden path and is now using

3  things against his client that his client (indiscernible).

4         And what does that mean?  It means that I don't know

5  -- I don't think the Court can know what the record is that Mr.

6  Speights has agreed to.  I certainly don't.  And if he was

7  going to take the position unless the words slipped from his

8  lips or somebody that had his authority has (indiscernible)

9  everybody else that it's not useful, and I think it was

10 incumbent upon Mr. Speights to tell us long before this hearing

11 began what particular parts of the record he was accounted for,

12 the statements that he made and which ones are on behalf of his

13 client and that he could take the position that nothing else in

14 this case come in as against the Anderson Memorial even though

15 Anderson Memorial (indiscernible) on the committee as Mr.

16 Speights has done so (indiscernible).

17        So at this point I don't think I really have much of

18 a choice.  We are not agreeing to any of Mr. Speights'

19 (indiscernible) he has a proffer, he had a limited proffer

20 earlier today that he can make that proffer and we'll respond

21 to it in due course.  I don't have any other alternative right

22 now because I can't embrace a record that then will be used

23 selectively that suits his purposes.  And I don't even know

24 what it is I'm agreeing to.  So any proffer that he makes we'll

25 respond to.

**J&J COURT TRANSCRIBERS, INC.**

1          I think there were certain proffers (indiscernible)

2   and answer any of those proffers, but I will take back the idea

3   of our being willing to (indiscernible) get the record in this

4   case in because he won't agree to that.  I don't know what else

5   to do, Your Honor.  You tell me what you would like to have

6   happen and I'll do it.  I just want to get this thing done with

7   and done with properly (indiscernible) I want to stop

8   (indiscernible) this disaster.

9          THE COURT:  I can do one -- this Court has the

10  ability to take judicial notice of pleadings and documents that

11  are filed of record in this case and other cases that are

12  matters of public record and of the South Carolina record

13  because you folks provided it to me -- or actually the clerk of

14  the court did pursuant to the order that you agreed to have me

15  enter on Mr. Speights' motion.  I can take judicial notice.

16          To the extent that there is an order or there has

17  been an adjudication or I have made findings of fact or there

18  have been stipulations I can also accept those as whatever they

19  were, findings of facts, stipulations and so forth.  To the

20  extent that all I can do is say yes they're of record and this

21  is what they say that's the extent of the judicial notice.  If

22  you folks can't agree to what the record is then you can't

23  agree.  You know, all I can do is whatever you say the record

24  is that's what the record is.

25          I thought there was an agreement that the record

1  would constitute the pleadings and so forth that were before me

2  in the bankruptcy case and in the South Carolina case as well,

3  Mr. Bernick.  That's what I thought the agreement is or was.

4  If that's not the agreement, fine, then Mr. Speights will have

5  to go through it document by document and so will you.

6          MR. BERNICK:  Well, then we'll just have to have Mr

7  Speights tell us how he wants to consume the rest of the day.

8          MR. SPEIGHTS:  Your Honor, I'd like to consume the

9  rest of the day by taking a five minute break.

10          THE COURT:  All right.

11          MR. SPEIGHTS:  And then I'll respond.  And I'll

12  respond to the records thing, too.  I don't think it's that

13  complicated.

14          THE COURT:  All right.

15          MR. SPEIGHTS:  Thank you.

16          THE COURT:  We'll be in recess until four.

17                      (Recess)

18          THE COURT:  Mr. Speights.

19          MR. SPEIGHTS:  Your Honor, I first want to address

20  Mr. Bernick's arguments and then I want to deal with documents.

21  As a lawyer I admire Mr. Bernick's performance, but

22  unfortunately I think he's wrong in a number of ways and I am

23  sure that I will not get to address every point I disagree with

24  him about, but at least I can highlight the fundamental

25  problems and hopefully in some supplemental piece of paper I

1 can be a little more complete.

2        Your Honor, one of the things that always happens in
3 this bankruptcy, and it's understandable in this case -- in
4 this situation often, criticism is that we file brief and Mr.
5 Bernick comes to the hearing and argues something new.  We did
6 that one with whether something was protected by the Federal
7 Rules of Evidence settlement negotiations and I wasn't prepared
8 to address it.  And today much of what Mr. Bernick argued, a
9 lot of it, was not in the brief that was filed.  But the brief
10 was filed in 2005 so I'm not critical of that.  A lot of water
11 had gone under the dam since then including some of the cases
12 he cites and I notice that are on his list here, and some of
13 the other points he makes.  I feel like we have not done a
14 great service to the Court in getting you good briefs that
15 really hone in on these crucial issues.  I will address some of
16 them now, but I tell you again that I don't think that they're
17 in any of the briefs that are presently before the Court.

18        One of the arguments, and I've just jotted down notes
19 and I'm going to go through them as quickly as I can based upon
20 my chronological notes to the extent that I can read them.  But
21 one of the arguments is well, all of these old cases should be
22 ignored because they -- '80's cases although one of them was
23 '93 and I think a motion to decertify was made several years
24 after that.  The fact of the matter is, number one, they are
25 still good cases, good law.

**J&J COURT TRANSCRIBERS, INC.**

1          Number two, that in this new era of cases which are

2    asbestos personal injury cases by and large the Courts, for

3    instance, in the Casano case and others have pointed out this

4    is quite different than the asbestos building cases that had

5    been certified by the Third Circuit and Fourth Circuit, et

6    cetera.  So those cases have gone out of their way to

7    distinguish asbestos building cases.  And I can understand why

8    the Courts have shied away from certifying personal injury

9    class actions involving a large number of personal injury

10   victims with various diseases, exposures, et cetera.  But that

11   does nothing to diminish the impact of these class actions.

12          I would also say that essentially these class actions

13   covered the world of asbestos building bases and resolve

14   asbestos building cases in the '90's except for the state cases

15   which are a separate group and are being litigated many of

16   which have nullum tempest except for the bankruptcies of some

17   defendants like Celotex and National Gypsum which have dealt

18   with these cases and as I suggest in a while had dealt with

19   class proofs of claim in them, and except for the private

20   buildings which were filed in '92.  If our case had been

21   allowed to rule all the way with a worldwide class that would

22   have essentially wrapped up Grace's liability on the asbestos

23   world.  So that was the last piece of the pie and unfortunately

24   we got interrupted by this bankruptcy.

25          Now, Mr. Bernick, I probably shouldn't even point

**J&J COURT TRANSCRIBERS, INC.**

1 this out because I'm letting him get under my skin a little bit

2 when he does things like this.  But he says he couldn't get

3 even people interested.  They have withdrawn all these cases,

4 et cetera, et cetera.  Well, as Your Honor knows on the left

5 side of the margin there I have not tried to take over these

6 cases.  Motley Rice represents among others the State of

7 Washington which are government buildings not within the

8 definition of Anderson.  The Hahn Firm represents California

9 state buildings which are not in the definition of Anderson.

10 The S&R 80 on the left or 79 of which are California colleges

11 and universities which are not in the definition of Anderson.

12 So it means nothing that he says well, Mr. Speights has now

13 abandoned those.  We never had those in our class action.

14         Your Honor, it's also true that the withdrawals in

15 this case were done, of course, by agreement with counsel and

16 most all of those dealt with conspiracy which I'm going to get

17 to because I still don't believe that the ball ought to cover

18 conspiracy, and that's something that we would like to point

19 out to Your Honor in a brief to compare the language which Mr

20 Bernick quoted and which I quoted.  At least there is a real

21 issue about it and certainly Grace has taken the position with

22 its bar date and all its arguments with Mr. Restivo up here

23 arguing the claims objections that if you don't have product

24 identification your claim fails.

25         As to the appealability of the bar date order,

1  regardless of what issue was presented to Judge Wolin he

2  decided that the appeal of the bar order was interlocutory.

3  That is the important point.  We are not parties, of course,

4  Anderson, to the process which led to the bar order.  At some

5  point it will be presented to somebody.  It could be in the

6  sense of this matter, the Anderson certification, it could be

7  in the matter of somebody filing a late file claim and

8  addressing it that way, I don't know how it will come up.  It

9  may be after this case is over there's a final judgment and

10 then you can appeal everything.

11          And again, Your Honor, I believe that the problems

12 with the bar order as I perceive them to be, and I know Your

13 Honor's very protective of the bar and I understand that.  I

14 also understand Grace is the one that -- I hope you understand

15 Grace is the one I'm fussing at for not giving you all of the

16 information on those invoices, et cetera, but at some time that

17 will be resolved.

18          Now, Your Honor, the other thing that the bar order

19 does not address, Mr. Bernick tried to take my argument to

20 another level, a level which I did not make, did not intend to

21 make, and will not make.  And that's the whole issue of future

22 claims and bankruptcies.  Future asbestos property damage

23 claims.  The problem is not whether there are future asbestos

24 PD cases or not.  That's a subject that could be discussed at

25 length.  The problem is not even whether there are unknown

1  cases.  Mr. Bernick said unknown cases without injury.  Well,

2  it's possible to have known cases without injury.  The whole

3  idea of a future claimants representative normally deals with

4  the unknown claimants without injury or at least unknown

5  claimants.

6         Here the problem is it's not the known or unknown --

7  I know it's late in the day to be --

8         THE COURT:  No, I was just thinking the future claims

9  representative also deals with known claimants -- with people

10  who know that they have been exposed to a claim, but who don't

11  yet know that they have an injury.

12        MR. SPEIGHTS:  Or may not be injured.  Grace takes

13  the position they're not injured now.

14        THE COURT:  Right.

15        MR. SPEIGHTS:  And my point that I should --

16        THE COURT:  But that's a future claims rep, not a

17  class action representative.

18        MR. SPEIGHTS:  I'm getting feedback.

19        THE COURT:  Yes, so am I.

20                    (Pause)

21        MR. SPEIGHTS:  My point was not what Grace had to do.

22  I was not making an argument for or against future asbestos PD

23  claims.  At some point in my life I may address that point.  My

24  point is Grace created this problem.  Grace created a problem

25  where in it's bar date order it had you define an asbestos

1  property damage claim as those that existed as of the bar date.

2  Now, it didn't have to define it that way, but it did and I

3  suggest to you that if we look at the other bar dates which are

4  now in evidence that's not always the way it is defined.

5          It's a product of not my trying to be the

6  representative for future claimants around the world, it's a

7  product of Grace has a gap.  There are claimants out there

8  whose injury did not occur before the bar date or did not know

9  they're injury occurred before the bar date that are not barred

10 by this bar date.  And Anderson can take care of that group of

11 people that Grace missed in its bar date.  And if it -- if I am

12 right on this, and I believe I am, that can be of help to this

13 estate by taking care of something Grace overlooked when it

14 defined -- it's not what this letter was that went to

15 claimants, it's what the definition of an asbestos property

16 damage claim is.  And under their definition it's not until

17 there has been an injury before the bar date.

18         Then, Your Honor, I get to something I should leave

19 for the end because it's of most interest to me, but I'm afraid

20 I'll forget it.  And that is Mr. Bernick, what he did not

21 address.  I asked one question of counsel before I sat down and

22 Mr. Bernick did not answer that.  And that is whether Anderson

23 -- was Grace of the view that Anderson should have contacted

24 all the members of the punitive class and give them notice of

25 the bar date?  Is that Grace's position?  And I don't know the

1  answer to that.  It's either yes or no as far as I'm concerned.

2  But I did not hear the answer.  And I think that's telling when

3  we get to the argument about whether somehow by giving counsel

4  notice that's all they needed to do.  I take the position that

5  Grace could not get out of their obligations to give notice.

6  Whether they did or did not, or whether I should have or should

7  not have, we've not even crossed the ruby con of does Grace

8  take the position that as a result of these proceedings that I

9  can hardly remember years ago between the committee and the

10 Court and Grace, Grace has not even taken the position whether

11 it meant that Mr. Speights representing the punitive Anderson

12 class should have gone out and given notice to all of the

13 people across the country and into Canada.

14         Now, Your Honor, I get to the issue of the so-called

15 ex parte order in South Carolina.  First of all, it was ex

16 parte for the order itself.  It was then given immediately in

17 February to Grace.  I believe the record will show that Grace

18 wanted an extension to respond which is perfectly okay and then

19 there was a hearing.  So whatever problems there were, and I

20 don't concede there are any, with it being ex parte once Grace

21 got it, briefed it, had notice and opportunity to be heard and

22 was heard I think that transfers that order somewhere.  It may

23 not have gotten a hundred grade, but it's far from down here of

24 being a just ex parte order.

25         Having Grace there argued, briefing the issue I think

1  takes us to a different situation with respect to that order.

2  And Your Honor, that order, to respond to Mr. Bernick did not

3  evaporate with the so-called final order.  Because in that

4  order Judge Hayes specifically said that he was not dealing

5  with Grace because he did not want to deal -- violate the

6  automatic stay of this Court.  He was very careful in that.  So

7  in order that by definition did not deal with Grace he could

8  not in anyway change the outstanding Grace order at the time of

9  the bankruptcy.

10         Your Honor, next is something that I thought that Mr.

11  Bernick may have abandoned, really.  But I guess that was some

12  wishful thinking on my part.  In the brief in response to the

13  initial briefing in 2005 Mr. Bernick suggested that Your Honor

14  had said we have to get permission to file a proof of claim and

15  we had failed to do so and therefore too late.  Well, I was

16  worried about that.  I believe that the hearing was in

17  February, if I'm not mistaken.  It could have been in March

18  when Your Honor had some things to say.

19         And as a result of that I spent a substantial amount

20  of time going back and researching that and having an answer

21  for that when we appeared somewhere in 2006.  And I never got

22  to say it, but I still have my notes on that.  And I had

23  exhibits on that on this exhibit list today which I did not

24  offer a while ago because I thought Mr. Bernick may have

25  abandoned that.  So what do I say?  I think I've got 11

1  responses today.

2          Number one, and in a brief period of time I'm going

3  to just essentially list them, Your Honor.  I can cite the

4  cases.  Number one, with new respect to whatever the Court said

5  that's not the law.  The law is I re Charta and the American

6  Reserve which say the process is you file a proof of claim.  If

7  it's objected to that triggers your obligation to file a motion

8  to certify.

9          Number two, we -- respectfully, Your Honor, I really

10  mean this, you are not the only Judge in the country, in fact,

11  you are  great majority of Judges in the country that when you

12  hear matters from the bench you think out loud and voice

13  various views at the time.  And so whatever you said was in

14  that context of what was going on at that day.  But what was

15  being argued on that day was the bar date order.  That was the

16  matter before Your Honor.  And as a result of that you issued a

17  bar date order.  And that's the order, that's your ruling I

18  assume that Kirkland & Ellis prepared the bar date order so

19  that the bar date order governs and whatever ruling you made is

20  in the bar date order not what you might have said on the

21  record.

22          Thirdly, Your Honor, Mr. Bernick, at that hearing,

23  argued exactly as I argue today, that American Reserve governs

24  and that you don't need permission to file a class proof of

25  claim.  He didn't do that because he likes Mr. Baena or likes

1 property damage claims, he had a great interest in doing that.

2 And that interest was revealed in a transcript that I have now

3 located which I was not aware of at that time, a transcript and

4 maybe two transcripts on the ZAI matter, because the same issue

5 was floating around in ZAI about whether to file a class proof

6 of claim or not.  Or whether you needed permission to file a

7 class proof of claim.  And Mr. Bernick vehemently said you do

8 not need to do that.

9        The last thing he wanted, and he expressed it very

10 well as he always does, was to have somehow teed up in advance

11 the whole issue of class rather than having somebody file a

12 claim and later on objected to it and litigating it.  He didn't

13 want to create a monster.  And in fact he had a partner in that

14 exercise and his partner was Peter Lockwood, also in the

15 transcript marked now on my exhibits.  Mr. Lockwood kept

16 saying, Your Honor, you don't need permission to have a class

17 proof of claim citing <u>Armstrong</u> and some other case and went

18 round and round because at that time before the split deal Mr.

19 Lockwood was not a friend of ZAI.  It was a hundred pound

20 gorilla in the attic.  So he also wanted to push that off.  And

21 ultimately, Your Honor, and I can cite it to you, ultimately

22 Your Honor agreed with them a month or either the next omnibus

23 or two omnibuses after this February transcript that you agreed

24 that Judge Newsome had the right idea you could file the class

25 proof of claim and later on do it.

1          Your Honor, in addition to that just recently I

2    became aware of a document that I was not aware of which was a

3    letter from Mr. Bernick to you dated March 13, 2002 which I

4    will now offer into evidence as Exhibit 147.  The whole concept

5    that we've been discussing here today, and this is why I really

6    thought that this issue was (indiscernible).  And what Mr.

7    Bernick argues the ZAI claimants (indiscernible) this result

8    dramatically deviates both from the path currently being

9    followed by the Court and from the case law.

10         Motions for class certification were filed last fall

11   at the omnibus hearing on February 25, 2002.  The Court decided

12   to proceed the certification -- to proceed with the bar date

13   first.  And separation of class certification was

14   (indiscernible) and no date for response to this certification

15   motion was even set.  This sequence, bar date is set, claims

16   are filed, bar date passes and class certification is then

17   heard, and last of all is reflected in the ZAI claimant's own

18   citations, and then he cites In re American Reserve

19   (indiscernible) original case.

20         So if anything except with respect to me Mr. Bernick

21   has been totally consistent that you don't need permission to

22   file a class proof of claim and in fact that is law.  And I

23   hope finally we have driven that issue out of this

24   certification process.

25         Your Honor, Mr. Bernick then says, a rather

**J&J COURT TRANSCRIBERS, INC.**

185

1  remarkable statement, that, "All of the cases since except

2  Interregional which he, as I understand his argument says well,

3  the Court in Interregional just had a bad day and really didn't

4  understand the case when it ruled the way she did."

5         THE COURT:  No, I think Judge Gambardella was looking

6  at a SIPA case if I recall and it was a securities issue.  And

7  I think Mr. Bernick is just pointing out that in securities

8  cases the issue of class certification where you are dealing

9  with thousands of investors is somewhat different than some of

10 the other cases.  But he didn't say all the other cases.  He

11 said all the cases on this list.

12        MR. SPEIGHTS:  Well, he did present the list and I

13 interpreted Mr. Bernick to say that well, essentially that we

14 have all these cases out there a number of which we did not see

15 beforehand and they are all on his side of the aisle.  I

16 recognize that Judge Gambardella's decision was a securities

17 case.  I don't think that's a distinction on the basic

18 fundamental point of whether the class is limited to those who

19 file claims under the bar date order.  The answer there would

20 have -- she could have said tough luck, the bar date order

21 governs as Mr. Bernick wants you to do here.

22        But there are a number of cases which are consistent

23 with that view and consistent with the recognition of how class

24 actions are important despite bar dates.  Of course, the first

25 of these cases is the American Reserve case itself.  One of the

1 cases on the list Mr. Bernick just gave you which I did not

2 cite is the <u>Kraft</u> case decided in 2005.  And here's what the

3 Court actually said in the <u>Kraft</u> case.

4     The Court believes, "Class proof of claims are

5 consistent with the code and the rules and concludes that class

6 proofs of claim are a necessary device to ensure that the

7 relief afforded by the code is as complete as possible.

8 Denying the ability to present claims by class may be

9 detrimental to the debtor.  The problem of notice to class

10 members may complicate a debtor's efforts to resolve all of its

11 debts.  Reliance on published notice to reach a class of

12 claimants may not be adequate.  It will not always reach every

13 class member such that the rules of due process are satisfied.

14 Even in cases such as <u>Kraft</u> where the class is apparently

15 clearly identifiable actual notice may prove insufficient."

16     Your Honor, the <u>Kraft</u> case which is on Mr. Bernick's

17 list is actually very supportive of our position on that.  Then

18 there is another case which Mr. Bernick does not cite.  It's

19 the <u>First Alliance Mortgage Company</u> case, a case out of

20 California of September 24, 2001.  And this is what the Court

21 says there.

22     "<u>American Reserve</u> also rejects the notion that

23 allowing class members that did not file individual proofs of

24 claim would unfairly reduce the share that creditors who did

25 file proofs of claims.  Other creditors have no right to the

1 higher share the debtor's assets they achieve by excluding

2 rival predators at the threshold.  The Seventh Circuit's own

3 words on this matter require little alteration to be relevant

4 to this point.  If on the date of filing it's petition <u>American</u>

5 <u>Reserve</u> or <u>First Alliance</u> had say $10 million in assets and was

6 facing a class suit in state or district court with a probable

7 value of $2 million its other creditor's interests were worth

8 eight million.  They should receive that payoff in bankruptcy

9 that most policyholders or borrowers would not learn of the

10 bankruptcy and the need to file proof of claim forms is not a

11 good reason why the other creditors should receive $10 million

12 in the bankruptcy."

13         Now, Your Honor, that is the problem, and that's why

14 I didn't address a bunch of cases today.  There are a lot of

15 cases on both sides of this issue.  I believe the weight of

16 authority, and I believe I can demonstrate that to you, is on

17 my side of the ledger.  But the reason I only cited one was

18 that that was the case Your Honor had said back before -- at

19 the bar date hearing that was a case that Your Honor told al PD

20 claimants that you thought was sort of -- you didn't say guide

21 post, but I'll use that term -- the guide post for handling

22 class proofs of claim.  So, Your Honor, I believe that on

23 balance of law, and we'll show you again is on our side on this

24 and it's consistent with Judge Gambardella's case.

25         Your Honor, I'm not even sure why Mr. Bernick brought

1  up the door closing ruling.  You know that's one of my favorite

2  subjects having argued it for a number of years in a number of

3  courts.  But whatever the door closing ruling does or does not

4  do we're now in a Federal Court in Delaware and for the life of

5  me I don't know what the door closing statute has to do with

6  it.  We're not in a District Court in South Carolina arguing as

7  in the Tuttle case what the effect of the door closing state

8  case is after the Monsanto case we're in a Federal Case in

9  Delaware.  The door closing statute doesn't apply here.

10      And in addition, Your Honor has not authority nor did

11  Tuttle presume to overrule the Central Wesleyan case which Your

12  Honor did not rely just on federal policy, but said where the

13  name class plaintiff is a resident of South Carolina the door

14  closing statute does not apply.  I will tell Your Honor that I

15  just happen to know this because there's a lawyer that I'm

16  litigating against tomorrow on a nonasbestos matter I might

17  add.  Just argued on the Fourth Circuit either last week or the

18  week before last on the door closing statute.  So I think there

19  will be further authority presumably helpful to my position

20  coming out very soon.

21      MR. BERNICK:  I think, Your Honor, at this point

22  there really is a process issue.  I think Mr. Speights took two

23  hours and 45 minutes before I stood up.  I took an hour and 45

24  minutes.  He's already had more than an hour than I have had,

25  and I don't know when he is going to end, but I'm again

1  concerned about this running out of time this afternoon before

2  people are going to want to start to get to their planes.  I'm

3  free to seven o'clock, but I think Mr. Speights wants to leave.

4  So I want to make sure that we have the opportunity to finish

5  up on these other things.  He's now gone for more than an hour

6  and a half beyond what I had.  I got time to say what I wanted

7  to say.  I'm not complaining about my time.  I'm just talking

8  about happening now.

9         MR. SPEIGHTS:  I think I'll be less than ten minutes,

10 Your Honor, and then I'll get to documents.  I'm going to have

11 to tell the other people involved in the litigation that Mr.

12 Bernick has accused me of being long-winded.  I think they will

13 get a certain joy out of that.  But I"m going to be less than

14 ten minutes.  I'm just going down -- I mean, I could take a lot

15 longer, but I want to get out of here.  I've got to be in court

16 tomorrow.

17        Your Honor, the other issue that I think needs to be

18 said, and maybe the final issue, I'll wrap up with this, is the

19 whole idea of how will a class action help us, what are the

20 common issues et cetera, et cetera.  The common issues are set

21 in this case.  It's not a question of what people argued when

22 you were considering all these case management orders.  I don't

23 think that's admissible anyway for reasons I've said a few

24 minutes ago.  Your Honor entered the case management orders and

25 those are the law of the case and Your Honor is dealing with

1  hazard and is dealing with constructive notice on a common

2  issue basis.

3       And the question is -- and neither one of those have

4  been addressed by the Court.  Hazard has been indefinitely

5  postponed.  There will be a lot of work to do before we go

6  forward with hazard.  And constructive notice has not been as

7  I'm aware of yet scheduled as I recall Mr. Restivo said

8  recently when Mr. Baena objected to the Morris affidavit that

9  he hadn't even decided whether to use that at the next hearing,

10  I think, in late July.

11       The point is that now is the perfect time for

12  Anderson to be involved as a class representative.  Who will it

13  help?  Why does it predominate?  It will help Your Honor.  It

14  will help me, too, frankly, but it'll have Your Honor having to

15  try a case of one building owner, Anderson, rather than dealing

16  with 80 building owners.  Now, it's true it's the same lawyer

17  for one as to 80, but it's one building.  If we want to decide,

18  for example, whether Monokote is hazardous or not we can try

19  the Monokote in the Anderson Hospital and not the Monokote in

20  Manitoba, and not the Monokote in Saskatchewan, and not the

21  Monokote in New York.

22       We can try the Monokote in the Anderson building.

23  And those people have agreed for Anderson to be the class

24  representative and to go forward.  And it would greatly

25  simplify matters for Your Honor to try that in the name of

1 Anderson.  It would also greatly simplify Your Honor to deal

2 with constructive notice just in the name of Anderson, on

3 building owner, and one law firm.

4          So for the life of me I don't understand how Mr.

5 Bernick who has achieved his goal of getting Your Honor to

6 agree that there are common issues can object to common issues

7 being tried as a part of the class certification.  I was going

8 to comment on fees, Your Honor, but I won't.  I guess everybody

9 knows in order to get fees you've got to win.  And just because

10 Your Honor certifies a class action on limited issues or across

11 the full board -- bar does not mean you've decided that the

12 class representative is going to win.  You could rule against

13 Anderson on hazard or constructive notice or a variety of other

14 reasons on the merits of the case.  The important point is

15 giving people that day in court.

16          Anderson and those 80 and those others, especially

17 those who may not be covered by the bar date order, but more

18 importantly, Your Honor, it's especially important if you

19 follow Judge Gambardella and the Texas case and the <u>First</u>

20 <u>Alliance</u> case and other cases we point out to recognize the

21 fairness of the process of allowing people with claims against

22 the debtor who will never get actual notice in total because of

23 the problems of giving notice to anybody.  It's not unique to

24 this bar or anything else, allowing them to participate in the

25 case.

1           Your Honor, I do need to move some additional

2    exhibits, but before doing it I guess I'll address the subject

3    matter that came up prior to the break.  Number one, the

4    record.  What I thought I said, what I meant to say, and what I

5    feel strongly about is parts of the record can come into

6    evidence which are designated by the parties.  What I have

7    opposed from day one and why I have not argued many of these

8    positions is walking into court with no record and lawyers just

9    making arguments and then using those arguments later on, it's

10   a self-fulling sort of thing.

11           For example, if Your Honor says or Mr. Bernick says I

12   want all the record in this case, all the transcripts -- let's

13   just start with the transcripts -- all of the transcripts to be

14   a part of the record, first of all, that puts in transcripts of

15   hearings where Anderson nor its counsel were ever there.  It

16   puts in transcripts where we had no opportunity to argue.  For

17   instance, if you're arguing on one of those questionnaire

18   hearings that I don't attend about a matter that I'd have some

19   relevance or arguing even in the ZAI hearing about some matter,

20   I cannot allow my client to be bound by what's going on there.

21           I can't even allow Your Honor on a record that may

22   result in an appeal to open the door if Mr. Bernick wants to

23   say well I want to put in all that stuff we went into in 2005

24   while Mr. Speights was on the way to California concerning the

25   whole authority stuff.  And he'll dump that into the record.

1  And then if we have to go up to the District Court hopefully

2  with Mr. Bernick appealing, and not me I can say now before the

3  District Judge you'll be having that brawl well, Mr. Speights

4  said this and Mr. Speights did that.  So I'm not trying to

5  fight the record entries relevant to any inquiry before you get

6  any evidence.  I don't have a technical objection.  It's a

7  relevancy objection.  Anything to do with the arguments between

8  Mr. Bernick and me on Anderson certification I have no

9  objection to coming into record.

10         But I simply cannot agree carte blanch to say

11  anything that's every been discussed or anything in any brief

12  made by any person at any times comes into evidence against my

13  client.  With that said I'm pretty liberal when it comes to

14  documents coming into evidence.  I know Your Honor knows these

15  cases whether it's U.S. Mineral or this et cetera, you have

16  judicial notice of a whole lot after the number of years you've

17  been here.  So I think we're making a mountain out of a mole

18  hill.

19         Now, with respect to additional exhibits, Your Honor,

20  --

21         MR. BERNICK:  Additional exhibits?  I think the only

22  exhibits that have been received into evidence at this point

23  are the ones that were specifically proffered this morning and

24  were admitted after Your Honor heard discussion.  So when you

25  say additional we're talking about --

1          THE COURT:  He reserved the right to take a look at

2 the exhibits while you were making your argument.  I think you

3 were conferring with counsel while that happened and I said

4 that that would be appropriate so that you could get started

5 with your argument.

6          MR. SPEIGHTS:  Your Honor, do you have a copy of my

7 exhibit list?

8          THE COURT:  I have on.  I don't have it in front of

9 me.

10          MR. SPEIGHTS:  It might be more efficient.

11          THE COURT:  I did have one.

12                    (Pause)

13          THE COURT:  (Indiscernible) I apologize.

14          MR. SPEIGHTS:  Well, I can do it without that, Your

15 Honor.

16          MR. BERNICK:  Do you need an exhibit list, Your

17 Honor?

18          THE COURT:  I need Mr. Speights'.

19          MR. BERNICK:  Yes.

20          THE COURT:  Okay.  Thank you.  All right.  Now I have

21 one, Mr. Speights.

22          MR. SPEIGHTS:  Your Honor, I'm on Page 7 under other

23 documents excluding sales records.

24          THE COURT:  All right.

25          MR. SPEIGHTS:  And some of those were admitted this

1    morning, but we get to 123 which is Affidavit of John Freedman.

2            THE COURT:  Okay.

3            MR. SPEIGHTS:  I'm not offering that.  I'm going to

4    tell you why it's on here.  The reason it's on here is if Mr.

5    Bernick can put his whole record in --

6            MR. BERNICK:  Your Honor, in fairness, I have things

7    to say in response to Mr. Speights' last argument on the

8    substance of it.  We're now running out of time as predicted.

9    So I think we should probably just focus on what it is that he

10   wants to proffer into evidence and he can just give us a list

11   of the exhibits, we can look at it very quickly and determine

12   which ones we're going to object to or with respect to which a

13   proffer might be helpful.  Otherwise I'm going to run out of

14   time this afternoon.

15           THE COURT:  All right.  That's fair enough.

16           MR. SPEIGHTS:  That's fair, Your Honor.  The only

17   point I wanted to make is I am designating these exhibits based

18   upon the arguments and evidence offered here today not what's

19   in other records at other places.

20           THE COURT:  All right.

21           MR. SPEIGHTS:  I'll just read out the numbers and

22   then Mr. Bernick can let us know whether he objects.  129, 130,

23   131, 132, 133, 134, I'm not sure if I offered 137 this morning

24   or not, Your Honor.

25           THE COURT:  I don't believe so.

1              MR. SPEIGHTS:  I did refer to it.  137.

2              THE COURT:  I don't think you offered 138 either

3    although you referred to that, too.

4              MR. SPEIGHTS:  Okay.  138 I would offer.  I would

5    offer, I think I had it up there showing you and I didn't hear

6    an objection 147 which was Mr. Bernick's letter to Your Honor.

7    And I think that's it.  Let me ask Mr. Fairs just to make sure

8    I didn't miss one.

9                        (Pause)

10             MR. SPEIGHTS:  That's it.  And finally, Your Honor,

11   Mr. Bernick had indicated I think he wants to argue a little

12   more.  This is a great ping pong match should we have it every

13   hearing.  But I was pretty short and Your Honor, had said I

14   could have an hour rebuttal and we can all count time

15   differently.  I was pretty short, but you said that you get

16   more time, Mr. Speights, et cetera.  I don't know what all Mr.

17   Bernick wants to go into now, but I tried to be just clearly

18   responsive to what Mr. Bernick's argument was and with that --

19             THE COURT:  I will only hear argument that's

20   responsive to your response -- reply.  Whatever we're up to.

21             MR. SPEIGHTS:  Whatever it is.  Thank you, Your

22   Honor.

23             THE COURT:  Okay.  I have the exhibits that you've

24   just offered as 129 through 134, 137 and 139 and 147.  Is that

25   correct?

1          MR. SPEIGHTS:  Yes.

2          THE COURT:  Okay.  Mr. Bernick.

3          MR. BERNICK:  Yeah, we'd object to 129, 130, 131,

4    132.  These are all orders or actually only one is an order

5    which is a Celotex order on voting rights.  It's an order

6    entered in another case.  I don't know if that's Your Honor's

7    order or what.  But I just don't know anything about that case

8    or the purpose for the proffer and it is in another case that

9    Grace wasn't a party to.  But with respect to the distribution

10   procedures which are 130, 131, 132, those are all other cases

11   and they're not even court orders.

12          With respect to 133 which are Grace discovery

13   responses I have no problem with that being part of the record.

14   Same thing with respect to 134 assuming that that's not

15   excerpts.  So 133 and 34 are not a problem.  137 which is the

16   EPA study of asbestos containing products in public places I

17   don't know the purpose for that proffer.  I don't know why it's

18   relevant to class certification.  We'd object to it on

19   relevance grounds.  It's a government document so it would

20   ordinarily come in as an exception to the hearsay rule.

21          But I don't think again this is an evidentiary

22   matter.  It's a question of what's the record in this case, and

23   what's the purpose of the proffer.  138 -- so we'd object to

24   137 although I suppose at the end of the day, Your Honor, if

25   you want to consider it do it.  I won't object to that.  Save

**J&J COURT TRANSCRIBERS, INC.**

1  us time.  138, same thing.  No objection.  147, my letter to

2  Your Honor, I don't have an objection to that either, but that

3  then is going to be part of our proffer which is that our

4  proffer is in fact going to be that because this matter is

5  taken -- well, I'll make my proffer in a little bit.  So I

6  don't have an objection to 147.

7              THE COURT:  Okay.  I'm sorry, I wrote the number down

8  wrong here.  I apologize.  All right.  So the response to 122

9  to -- I'm sorry, 129 to 132 I'm not sure what the proffer is

10  for.

11              MR. SPEIGHTS:  Your Honor, as I sit here and look it

12  may be that some of these are in published orders.  These are

13  parts of plans produced in those three bankruptcies which were

14  confirmed plans of reorganization Celotex, Manville and NGC,

15  and those plans provide for PD trust distribution procedures.

16  And with respect to the Celotex and NGC plans they provide for

17  the treatment of class claims including an NGC a class that was

18  not certified prior to the bar date order, and in Celotex

19  provides for treatment of class claims.

20              The Manville PD Trust and along with the other two

21  would also demonstrate that claimants in other bankruptcies are

22  permitted to recover without product identification.

23              THE COURT:  Okay.  I don't know what the relevance is

24  to class certification for those issues.

25              MR. SPEIGHTS:  Well, I guess the question would be is

1 it good to have class actions and asbestos bankruptcies at

2 least with respect to building claims?  And I would show you

3 that with respect to both Celotex and with respect to National

4 Gypsum NGC and of course with respect to U.S. Mineral having

5 class action has facilitated the bankruptcy by providing

6 distribution procedures which deal with claims in a format or

7 in a manner as class claims allowing an efficient use of Rule

8 23 to resolve class claims and bankruptcies.  There are

9 precedents for that happening in other bankruptcy cases.  And

10 those are two of the cases which involve surface treatment like

11 we're dealing with in this case.  I'll be glad to brief that on

12 the individual issue if you want to, Your Honor, and tell you

13 exactly what it is it will show.  It's not the end of the

14 world, but it does show that the idea of having class actions

15 and PD bankruptcies is not just some foreign idea.  Celotex and

16 NGC were both confirmed in the 1990's.

17          MR. BERNICK:  Your Honor, to the extent that they're

18 introduced for a proposition of law there ought to be an

19 opinion and an order issued so that it's a case.  If it's not a

20 case it's not a decision, it's not a decision it's irrelevant

21 and it's all again hearsay and it is outside of the context of

22 this proceeding.  So if Mr. Speights wants to establish a

23 proposition of law there are all kinds of cases out there that

24 can be cited.  We don't have to make a record of those cases,

25 you can just cite the cases, because there are decisions out

1 there that may have precedential value.  These are not

2 decisions.

3        MR. SPEIGHTS:  Well, they are part of plans of

4 reorganization that had been approved by Courts and I suppose I

5 could offer the whole plan of reorganization of Manville,

6 Celotex and NGC, but you're talking about enormous amount of

7 paperwork to prove a very distinct point.  But I don't mind

8 doing that.

9        THE COURT:  Well, 129 is a voting rights order.  That

10 doesn't --

11        MR. SPEIGHTS:  Right.  That's different, Your Honor.

12 That is an order of which -- an order of Judge Baynes in the

13 Celotex bankruptcy.  You might recall on August 29, 2005 I used

14 that in defending myself where Judge Baynes dealt with Anderson

15 issued an order and gave Anderson the maximum amount of votes

16 in that bankruptcy for voting on the plan of reorganization

17 even though it was not certified at that time.  He referred to

18 is as a nationwide class action and gave it the maximum amount

19 of votes.

20        These are all -- Your Honor, these are a bunch of

21 snippets from other cases where Mr. Speights has been

22 successful at least on his attestation to this Court in

23 obtaining various things in connections with plans and

24 otherwise.  That has zero precedential value.  It's not case

25 law, it's not decisional law.  They're all bound up in the

1 dynamics of those cases.  There is no proper proffer in this

2 case that establishes anything of what Mr. Speights is saying.

3 It's all his say so in court here this afternoon.  It is

4 completely contrary to the rules which is -- this is making a

5 mockery of the rules about how proceedings should be handled.

6          THE COURT:  I don't understand, because I don't know

7 the context of those cases, frankly, what the relevance is to a

8 class certification here.  The fact that Judge Baynes may have

9 determined for purposes of that case, I don't even know if it

10 was a contested issue.  It may have been something the parties

11 agreed to and there's no reason in that context if that's the

12 case to not go along with the parties if it's not a contested

13 issue for certain purposes if he feels it doesn't violate the

14 law.  It's a voting issue.  If no one cares, you know, then the

15 plan in his view is confirmable and the voting rights issue is

16 in accord with bankruptcy code there are lots of ways that you

17 can get to votes and bankruptcy contexts.

18          So I don't think that it's going to have particular

19 relevance or if it does have relevance I don't think it's going

20 to have much bearing on any weight that this Court can accord

21 it because it'll be taken out of context.  And I think that's

22 going to be the problem with 129.  So Exhibit 129 will not be

23 admitted.  I do not believe it will have relevance or be

24 significant to the class certification issue that's before me

25 now.

1            With respect to the trust distribution procedures

2    which are Exhibits 130 as to Celotex, 131 as to Manville, 132

3    as to NGC, again, I'm sure that they must be of record in those

4    particular bankruptcy cases and I can take judicial notice of

5    the fact that they are of record in those bankruptcy cases

6    because you also have them here as exhibits.  But in terms of

7    the weight to be accorded here in this case as to how they

8    would relate to a class certification motion here and whether

9    the standards in those cases were met as opposed to whether the

10   standards in this case is met, I don't think the issues are the

11   same because you've got to shoe the numerosity, the

12   superiority, the commonality in a class by class, case by case

13   basis.

14           So I think that the answer is going to be that you

15   still need to make the showing in this case regardless of

16   whether you made the showing in Celotex.  The claimants there

17   would be different, the debtor was different, the buildings

18   were different.  So I think that the -- although the law that

19   applies may be the same that the facts would not be and

20   therefore that the facts will not be relevant.  I will take

21   judicial notice of the fact that there are trust distribution

22   procedures and that they are of record.  I'm not sure what

23   other purpose you're offering them for.

24           MR. SPEIGHTS:  Your Honor, I don't think I can prove

25   my case entirely by giving you something from National Gypsum

1  or Celotex, and I agree that there are distinctions in every

2  cases -- every bankruptcy case.  My point is Mr. Bernick has

3  argued that the use of class actions with respect to asbestos

4  property damage cases is inconsistent with the bankruptcy rules

5  despite American Reserve, despite Interregional --

6          THE COURT:  I see.

7          MR. SPEIGHTS:  -- and I --

8          THE COURT:  So you're arguing that there are cases

9  that are different.

10          MR. SPEIGHTS:  -- I'm saying it's used by other

11  courts having the same problems have dealt with their

12  bankruptcies and plans of reorganization by recognizing class

13  actions as you did in U.S. Mineral.  And I understand it was a

14  consensual plan in U.S. Mineral --

15          THE COURT:  Yes.

16          MR. SPEIGHTS:  -- but if you said no way would I have

17  allowed something like this it wouldn't have been in there.

18          MR. BERNICK:  But that's the whole problem, Your

19  Honor, is that basically there's now kind of -- it's becoming

20  -- it is that these other cases stand for a convention.  They

21  are not opinions, they are not rulings on the law, but because

22  they were adopted by courts either by agreement or otherwise

23  without a published opinion they become citeable as being

24  precedent.  There is no provision in any rule that I am aware

25  of, there is no -- indeed there is controversy about whether

1 even official opinions by the courts that are not published can

2 even be cited.

3       And yet we have now citations without any background

4 to these other materials and other cases and under

5 circumstances, Your Honor, where we got these things days ago

6 and now we're being held to these being used to establish the

7 acceptance of this by other courts, that is just plain --

8 that's a rouge process.  It's not consistent with, it's not

9 supported by any rule of evidence or any rule of procedure.

10 And all we have before the Court by way of explaining this

11 relevance is the statements of counsel not under oath here

12 today.  That's it.  No affidavit, no nothing.

13       THE COURT:  It seems to me that the purpose is simply

14 to rebut the contention that Rule 23 is inconsistent with the

15 bankruptcy code.  But I believe that the cases are already of

16 the view that Rule 23 is not inconsistent with the bankruptcy

17 code and even Mr. Bernick has cited <u>American Reserve</u> in other

18 context which itself says that Rule 23 is not inconsistent with

19 the bankruptcy code.  And I don't think Rule 23 is inconsistent

20 with the bankruptcy code.  There are other questions as to

21 whether it ought to be applied in a particular case, and that

22 is one of the issues that this Court has to find.

23       Therefore, I don't think that there is need for this

24 Court to get into the very complicated legal issues that will

25 be required to be examined if I were to accept Exhibits 130,

1  131, and 132 without published opinions and a contested legal

2  matter behind them.  So I will refuse Exhibits 130, 131, and

3  132 for that basis.  I don't think you need to convince me by

4  virtue of those trusts that Rule 23 is inconsistent with -- I'm

5  sorry, is not inconsistent with the bankruptcy code.  I don't

6  think it is inconsistent so I'm not going to make a finding

7  that says that it's automatically as a matter of law

8  inconsistent with the bankruptcy code.  So 130, 131, and 132

9  are not admitted.  And I believe that's it.

10          MR. SPEIGHTS:  Thank you, Your Honor.

11          THE COURT:  All right.  Mr. Bernick.

12          MR. BERNICK:  Yes, just very briefly.  I just have a

13  couple follow up points to Mr. Speights' argument

14  substantively, and then I want to turn to the exhibits.  First,

15  as to whether the bar date was designed to cover conspiracy.

16  This morning the argument was that it didn't cover conspiracy

17  claims and that was one of its defects.  We just heard Mr.

18  Speights say that he himself filed conspiracy claims on behalf

19  of his clients as a result of the bar date and then decided to

20  withdraw them.  So apparently at least as far as all the

21  clients that he represented, and I think that there were

22  hundreds, perhaps thousands of these so-called conspiracy

23  claims apparently all of them together with Mr. Speights

24  believed that the bar date did apply to conspiracy claims.

25          We then heard him say that he was not party to the

1  appeal that was taken of the bar date order.  Now, we know that

2  the appeal taken from the bar date order did not contest the

3  adequacy of notice.  We now find that Mr. Speights who's

4  insisting that he alone and his client alone are the only

5  measures of the compass of what has happened in this case.

6  Apparently their decision was not to take any appeal at al.

7           Third, he says that while there is still some utility

8  to the class because there may be people who did not know as of

9  the bar date that they had claims.  The point being the bar

10 date did apply to those claims, the claim is a right to payment

11 liquidated, contingent or otherwise, that it only applied to

12 those claims that existed as of the bar date.  Well, of course

13 so.  I mean, you can't ask somebody who doesn't have a claim at

14 all file a claim by a bar date that's designed to cover claims.

15 So of course it spoke to those claims that were current claims

16 as of that point in time.

17          Obviously if there are other claims that arise

18 thereafter people do have the ability to come in and file a

19 claim.  And Your Honor knows nobody has done that

20 notwithstanding all the time that's passed in this case.  But

21 as to the people who did have current claims as of the bar date

22 he says well, they may not have know they had those claims.

23 That's not how the bar date works.

24          The bar date is designed to produce orderliness and

25 closure in the context of bankruptcy in a discharge.  If people

1  are not aware because of the notice or because of some other

2  circumstance, if the notice was a reasonable notice they are

3  charged with that knowledge and they are charged with the

4  responsibility of coming forward and filing their claims and we

5  don't have class actions that are filed again every day of the

6  week saying well, this class action is on behalf of all those

7  people who for whatever reason did not know of their claims by

8  the bar date.  Then we should not only have Rule 23 being

9  consistent with bankruptcy, we have Rule 23 being absolutely

10 mandatory in bankruptcy.  In fact, I'm not sure why we would

11 have bar dates at all because nobody would really need them in

12 order to protect their rights.  If we didn't have bar dates we

13 wouldn't have orderly process.

14        Then he says well, and it's Grace's position that

15 they had to be injured before they file a claim and therefore

16 all people who didn't really know that they had an injury were

17 not obliged by the bar date.  Grace's views about whether or

18 not people can prosecute a claim without injury are not

19 particularly relevant.  The question is whether as the law says

20 and whatever law it is that applies to their claim did they

21 have a right to payment or not?  What we do know, however, is

22 that the claimants as represented by counsel in this case

23 consistently have taken the position that there can in fact be

24 an injury even though there is no real demonstrable risk.  From

25 their point of view a claim can be filed if there is any kind

1  of contamination whatsoever.

2        The only point that I made in talking about the

3  futures issues was that if people got the notices they are

4  deemed to have gotten the notice or notice is reasonable as the

5  Court found it was reasonable it says you may have a claim,

6  there's no obstacle to their filing a claim because we know

7  that the plaintiffs who are represented by counsel here

8  repeatedly have filed claims under the representation of their

9  counsel is argued both here and before Judge Buckwalter that

10 those claims do not have to be associated or accompanied by any

11 demonstration of risk.

12       So we don't believe that there's a significant

13 futures issue here, but under any circumstances our views about

14 whether there is a futures issue or not are irrelevant to the

15 adequacy of the bar date.  The bar date took place pursuit to

16 proper notice.  People may not have known, may not have had the

17 notice, but it was reasonable, it was suitable under the

18 Court's determination and that is not a basis for now saying we

19 have to have class certification.  It's an issue of proving too

20 much.

21       But I really wanted to focus on though very -- it's

22 the last point, but very critically is that -- oh, the case.

23 The case that was cited, Mr. Speights kind of made a big deal

24 about, the Kraft case.  The Kraft case was actually consistent.

25 The Kraft case is completely as we indicated, it's yet another

1  case in which certification was denied.  And it says, "If a

2  class is certified and its representation established

3  prepetition the preceding analysis is sufficient.  But if the

4  class is not yet certified or the class representatives

5  approved the Court faces different issues in deciding whether

6  to recognize a claim filed on behalf of a punitive class by a

7  punitive class representative.  The Merant cases fall into this

8  category.  This was a case where there was not a prepetition

9  class.  And class certification in this case as we represented

10  to the Court was denied.

11         The letter that I sent to the Court talking about the

12  need to have the bar date first and then have litigation over

13  class was with specific reference to ZAI.  And the issue back

14  in March of '02 as Your Honor, will recall is there was a very

15  active debate on whether in fact there should be a class

16  certification process or a bar date process.  Your Honor

17  determined that there was to be a bar date process.  Not the

18  bar date process, Your Honor determined that there was to be a

19  science trial in order to resolve that fundamental question of

20  whether we should be proceeding by bar date or whether we

21  should be proceeding by way of class certification.

22         But in the flurry there was a proposal that was being

23  made to actually have the class claim form litigated as an

24  issue at that time, that is in March of '02.  And basically I

25  wrote to the Court saying no, no, no, the first thing you have

J&J COURT TRANSCRIBERS, INC.

1  to decide is is there going to be a bar date?  Then you can

2  deal with the issue of class certification.

3       Now, it's true that class certification under

4  American Reserve is something that can follow the bar date

5  process.  And I suppose this might have been the different

6  kettle of fish if Mr. Speights had come in in '03 and taken the

7  position that he wanted his class claim recognized.  But he

8  didn't even do that.  He didn't even file the motion until

9  October of '05.  That fact remains by October of '05 we were

10 way, way down the road of dealing with the claims that had come

11 in and a variety of different context and the ship in fact had

12 sailed as a result of the prolonged litigation itself it's not

13 '05 anymore, it's now '07.

14      So our real compass is taking '07 and doing something

15 in '07 that absolutely, nothing was said in response to any of

16 this.  The absolute mess and chaos that is going to occur if we

17 have to deal with an opt out class where we don't even know who

18 they are, don't even know -- and then everyone says oh, it's X

19 number, Y number, going to do about the due pros, nothing said

20 in response to the enormous impact that would take place.

21      Finally, I come back to the ZAI class and I actually

22 read Exhibit 151.  151 was the transcript of March 9 of 2001

23 from Anderson.  Your Honor, will recall that initially I

24 objected to it, but I then said well, look this does relate to

25 the ex parte order so let's let it come in.  Mr. Speights has

repeatedly said that all was kind of made good, that yes, it

was an ex parte order but this Judge knew everything and it was

just a question of time and he was going to issue this order.

So the ex parte order that's not that big a deal.  After all

there was an objection to it, there was a hearing and, you

know, he did not withdraw it.

But actually, if you take a look at the March 9, 2001

transcript it's actually very revealing.  He didn't do anything

to endorse the ex parte order and to say that it represented

what Mr. Speights says it does which is the prophesy or

foretelling of what he was going to do in the case.  In fact,

he did exactly the opposite.  This is the Court at Page 5.  It

says, "So, I'm going to turn the matter over, first to counsel

for plaintiff just for an opening statement and then counsel

for defendant, really, just to kind of go over what I have

encapsulated and see if you want to make any opening remarks

and then hear arguments.

"First, as to whether or not this order should remain

in effect or whether or not I should set it aside and wait and

resolve the whole matter after I've consumed all that has been

sent to me.  I will address up front one concern that W. R.

Grace had and that's what I call the inertia factor.  I assure

you, assure everyone that I have not even come close to making

a decision in this, because -- a final decision, because I have

not had a chance to digest again the quite voluminous matter,

1  nor have I reviewed the transcript.  So there's still issues

2  out there.

3          "The fact that this Court has taken the action it has

4  at this point I in my mind personally find that to have no

5  precedential value is to what I'll ultimately find.  And I can

6  tell you, each side, that to the extent it is humanly possible

7  I feel that it would have absolutely no influence on me.

8  Again, having been issued only what I consider to be exigent

9  circumstances."

10         So we have an ex parte order issued, it's not made

11 bilateral by virtue of the fact that there's a subsequent

12 hearing.  It was ex parte, it will ever be ex parte.  It will

13 always be ex parte.  The Judge in the subsequent proceeding now

14 having the parties there did not say oh, well, I am continuing

15 that order because I still stand by it and think it's correct.

16 And he certainly did not say that it was the predictor of what

17 he ultimately was going to do.  In deed, he said exactly the

18 opposite.

19         So we have an ex parte order that ought to have had

20 zero effect other than to maintain the status quo to the extent

21 that was the purpose.  We have the Judge saying it has no

22 precedential value.  And then when his final order issues he

23 says exclude Grace.  And yet that is now the basis for saying

24 everything that happened in the South Carolina case means that

25 we should have the South Carolina class here.  This is squarely

1  and completely directly contrary to what was represented to you

2  as being the purpose and intendment and force of this order.

3  The March 9 transcript absolutely completely undercuts the

4  argument that somehow that should be determined and held to be

5  a preexisting class.

6        We would also offer the letter that was issued, it's

7  Exhibit 25, and the opinion that was issued, Exhibit 26.

8  Exhibit 25 is a letter that was issued by the Judge in South

9  Carolina, Judge Hayes to Mr. Speights.  It says, "Please draw

10 an order for my review granting plaintiff's motion for class

11 certification as requested."  This is May 7, 2001.  "The order

12 should specifically state that the order affects only the three

13 remaining defendants due to the stay as to Grace."  Mr.

14 Speights then recognizes that Exhibit 26 which is the final

15 order was not an order that did relate to Grace.

16       So we have an ex parte detour that lasts for all of a

17 period of a couple of weeks, and thereafter Grace is out of the

18 picture, the matter doesn't have precedential value, that case

19 is not a preexisting class by any stretch of the imagination.

20       Now, as to the exhibits, Your Honor, I'm in kind of a

21 quandary here and I guess the only way I can figure out of the

22 quandary is to make a proposal.  We have offered in the

23 exhibits that we think are not a matter of record.  Oh, there's

24 one more.  I have -- I had 25 and 26 which are the letter and

25 the order and then we --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  I have no objection to 25 and 26.

2          THE COURT:  All right.  They're admitted.

3          MR. BERNICK:  And then I would also offer the proofs

4   of claim that are actually picked up by the Speights list of

5   what's in his class.  They are our group 64, Exhibit 64.  These

6   are the proofs of claim for the 78 or 80 people that are part

7   of what he says are the folks that remain within the -- the

8   individual folks that remain within the class that he's

9   described, and we would offer those because they are claims in

10  the case, but they're not part of the record in this case yet.

11         THE COURT:  Mr. Speights.

12         MR. SPEIGHTS:  I have no objection to the claims

13  coming in, Your Honor, but in light of the claims coming in I

14  have at least one claim I want to come in, and I'm looking for

15  it on my desk here of another claim we filed on behalf of the

16  Byers, B-y-e-r-s, Company.  I'm looking for it, and when I find

17  it I'll bring that up to you.

18         THE COURT:  All right.  Exhibit 64 is admitted.

19         MR. BERNICK:  With respect to the balance of what we

20  would proffer, Your Honor, I guess what I would say is as

21  follows.  I don't believe it's necessary for Grace to proffer

22  as exhibits here things that are a matter of record in this

23  case.  This is a motion made in this case.  When the record

24  goes up on appeal, if it goes on appeal, people will be able to

25  designate other parts of the record in this case.  And I don't

1 take anything that Your Honor has said to mean that somehow we

2 are foreclosed from doing that or that Your Honor should be

3 taken to say unless we have specifically proffered something,

4 "into the record in connection with this hearing or with this

5 motion," that we are thereby limited or barred from doing so.

6        THE COURT:  Oh, no.  Certainly not.

7        MR. BERNICK:  Yeah, with respect to any appeal that's

8 taken in the case.  The record in the case is the record in the

9 case.  And if Your Honor would make that -- I think utter those

10 words, that is that the record in the case the W. R. Grace

11 bankruptcy is the record for purposes of any and all motions

12 that we're dealing with here for purposes of appeal I don't

13 think I really need to offer in or make a matter of record

14 anything else.

15        THE COURT:  Well, I mean, the record of this case is

16 the record of this case and the parties will designate if there

17 is an appeal whatever you choose to designate.  The Appellate

18 Court will determine what to be done of that record.

19        MR. BERNICK:  Okay.  But I just want to make sure

20 that Your Honor is not by virtue of this process which I don't

21 think Your Honor actually is the architect of this whole

22 business of making these evidentiary -- so-called evidentiary

23 proffers.  I don't take this process to mean that somehow if we

24 don't specifically right now proffer in a transcript from this

25 case or a pleading from this case that Your Honor is saying

1  that it's not part of the record for appellate purposes.

2         THE COURT:  No.  This is the problem, Mr. Bernick.  I

3  thought when this process began the reason I gave Mr. Speights

4  until last -- I forget the day now, and I'm sorry, Monday, I

5  believe to get the exhibits to you and you to get your exhibits

6  back on such a short time frame before this trial started was

7  because from both of your representations I understood that

8  most of the exhibits were going to be comprised of documents

9  that were filed of record in this bankruptcy case and documents

10 that were filed of record in the South Carolina class action

11 case.

12        And as a result everybody had those documents

13 already.  There was need only to file a list of what we needed

14 to look at to pull up those documents which in the bankruptcy

15 case everything's filed on the electronic docket and in the

16 Anderson case we all have copies of those documents.  And so

17 there wasn't need to make another set of documents and transmit

18 them.  And as a result since everybody agreed that that record

19 -- those two records are those records that that could expedite

20 the document production process and the rest of the documents

21 could then be addressed by the two of you in a shorter time

22 frame.

23        So my understanding was that both of you were of the

24 view that the record here that I would be essentially required

25 to look at in order to understand the arguments that you were

1  going to be making would include something to do whatever you

2  were going to point out to me in the record of this bankruptcy

3  case and whatever you were going to point out to me in the

4  record of the South Carolina case plus whatever other exhibits

5  you were going to proffer.  That's what I understood the

6  process to be.  And if I'm in error then straighten me out.

7  That's what I thought we were doing.

8          MR. BERNICK:  But just so that any reviewing court I

9  don't think Your Honor has ever ordered or intends to order

10 that somehow the failure to point out today or by virtue of

11 these lists something that's in the record of this case or for

12 that matter of the South Carolina case, but certainly this case

13 somehow then precludes us from -- means that Your Honor

14 believes its not part of the record that would be useable in

15 any appellate process.

16         THE COURT:  I think I said all I can say on that

17 which is that in any appeal parties designate a record on

18 appeal.  You're going to designate the record on appeal.  I

19 think an Appellate Court's pretty much going to ask you if you

20 didn't show me a document how are you going to show it to them?

21 You know, that's up to the Appellate Court to ask.  It's not up

22 to me.

23         MR. BERNICK:  I understand that.  I'm not trying to

24 ask you to say that.  What I'm trying to get to is the absence

25 of your intent to in some fashion limit us in this way.

1 There's a lot of stuff that's happened in the record of this

2 case that's germane.  And the briefs have referred to god knows

3 how many other transcripts, citations, whatever, briefs on

4 class certification.

5       THE COURT:  Which is why I think Mr. Speights' idea

6 of getting you all to put together what you want this Court to

7 consider in making a ruling so that there is a record for

8 appeal is a good one.  And then everybody, me and whoever else

9 has to look at this in the future will have a set of documents

10 and everybody will know what that record is.  Because frankly

11 right now I don't know what the record is.  I don't know what

12 you've agreed to and what you haven't.  I mean, one minute yes,

13 there was no objection to exhibits, and then you withdrew

14 everything that you've agreed to, and I don't know if you've

15 reagreed that the exhibits are admittable.

16       MR. BERNICK:  Your Honor, I think you understand

17 where I came from on that particular problem.  Well, you know,

18 I thought that there was going to be the same kind of spirit of

19 not turning this into a technical issue of who's proffering

20 what and that turned out not to be so.  I'm perfectly happy to

21 have the entire record of this case be useable for this purpose

22 and I think I've said that before.

23       THE COURT:  Well, I think that the rulings that I've

24 already made with respect to the documents that have been

25 proffered are the correct rulings, and that's how I intend to

1  rule.  But for those three issues that I've asked you to brief,

2  because I cannot on the basis of today sort of process by which

3  the arguments went through I just don't have the time to be

4  able while you're here today to go over those documents to look

5  to determine the admissibility.

6          MR. BERNICK:  And that was the exhibit or Appendix J

7  --

8          THE COURT:  Yes.

9          MR. BERNICK:  -- to the brief in South Carolina.  It

10  was also the Dyes' -- Mr. Dyes' statements before the Court in

11  November, I think, of '05.

12          UNIDENTIFIED ATTORNEY:  Two of the South Carolina

13  transcripts.

14          MR. BERNICK:  And then two of the South Carolina

15  transcripts that related to what we think is basically adequacy

16  of representation issues.

17          THE COURT:  That's correct.

18          MR. BERNICK:  I'm not aware of anything else, and I

19  guess that then means that I think Mr. Speights is going to ask

20  you to have us submit briefs on other issues, as kind of post-

21  trial briefs.  I don't know how Your Honor's inclined on that.

22  We would be very, very much against that.  Not because we mean

23  to hamper obviously Your Honor's consideration of all of this,

24  but because we have been through brief after brief after brief

25  after brief and Your Honor will recall that I think we were the

1  ones that actively pushed to get this hearing to take place

2  just to get the thing done with and there was no proposal that

3  somehow there'd be briefs in connection with this process.

4  This is supposed to be it.

5          THE COURT:  Yes.  There has not been a proposal for

6  additional briefs.  My only concern, Mr. Bernick, I believe the

7  last round of briefs was filed, if I recall correctly, in 2005.

8  There have been some additional cases.  If you feel the need --

9  you've argued some today, if you feel the need to put some

10 additional argument together in a brief, fine.  I can assure

11 you that I've read these cases, not in this past weekend, but

12 in connection with other matters at some point in time.

13 Nonetheless, I am not going to foreclose because of the length

14 of delay an opportunity to brief.  But I am imposing very

15 strict limits.

16         It seems to me that 15 pages each and a brief that

17 can be submitted simultaneously is appropriate.  You both know

18 the issues at this point in time, you've had your arguments, I

19 don't see the need to have briefs and then response briefs and

20 reply briefs.  It seems to me that you both know the issues as

21 to the exhibits, you both know the issues as to the cases, you

22 know the standards.  I've asked the questions that I thought

23 needed to be explored further so I think 15 pages and

24 simultaneous briefing is the way to do it.

25         MR. BERNICK:  Does that include the three issues?

1          THE COURT:  Well, no.  Actually I was talking about

2  anything supplemental.  How much do you need on those three

3  issues?

4          MR. BERNICK:  I think that they're mostly really --

5  well, I think that probably an additional five pages per side

6  just to put an end to it.  I mean, I don't think you even need

7  that, but.

8          THE COURT:  Mr. Speights, 20 pages altogether?

9          MR. SPEIGHTS:  I'm sorry, I didn't hear the question,

10  Your Honor.

11          THE COURT:  Is 20 pages of briefing on all issues,

12  anything you want to add in terms of new cases that have come

13  up since the prior briefs, anything as a result of questions

14  I've asked today, the three issues I've asked about the

15  evidentiary rulings for proffers I didn't feel comfortable

16  ruling on today, is 20 pages enough?

17          MR. SPEIGHTS:  I'm comfortable with that Your Honor.

18  I'd like a little more, but if you want 20 you're the one that

19  has to read it and I'll be very concise.

20          THE COURT:  Well, how much do you want, Mr. Speights?

21  Because, yes, I really, right now frankly I am so inundated

22  with briefs and I have read these briefs.  I'm not sure how

23  much more there is to say.

24          MR. SPEIGHTS:  This is going to seem so -- how about

25  20 pages plus five on the other issues that you've got.  Total

1 of 25 pages.

2          THE COURT:  All right.  Fine.  Twenty-five pages,

3 briefs due from both sides limited -- you don't have to do 25

4 pages.

5          MR. SPEIGHTS:  Oh, I understand.  I had a Judge in

6 North Dakota rule one time, Your Honor says you can have the

7 briefs as long as you want, but I stop at Page 10.

8          THE COURT:  Well, that's what I mean.  And I'm not

9 going to stop at Page 10, but you know, you don't need to feel

10 compelled -- you're not going to be paid by the word I assure

11 you, and I'm not going to be ruling based on the fact that you

12 fill up 25 pages as opposed to five.  If you can say it in five

13 you're ahead of the game.  How much time do you need?

14          MR. SPEIGHTS:  My only concern is on July 16th our

15 briefs are due in the District Court on the appeal of the 71

16 order.  And Mr. Restivo's also trying to get us to go to Canada

17 with another expert.  So that's --

18          THE COURT:  Mr. Speights, I have so much to do

19 between now and the end of the year that I don't really care,

20 because I'm going to get to it as soon as I can.  I promise.

21 But you can have as much time as you like.  The sooner, the

22 better from my perspective because I am familiar with the

23 issues, I understand your arguments, I can put it in context,

24 and I would appreciate getting it sooner rather than later

25 because it's less work for me.  But if you need until, you

1 know, sometime in August that's fine.

2          MR. SPEIGHTS:  Thirty days, Your Honor?

3          MR. BERNICK:  That's fine with me.

4          THE COURT:  How about August 10th?  That's a little

5 longer than 30 days, but that should be --

6          MR. SPEIGHTS:  Good, Your Honor.

7          THE COURT:  All right.  Then briefs due from both

8 sides limited to 25 pages by August 10th.  If you have any

9 citations to the record that would be helpful to include in an

10 appendix to this brief I think it would be helpful for me not

11 to send me back to this big volume of documents.  You may put

12 that in an appendix.  I will not count that as part of the 25

13 pages.  I don't want you to put the whole Exhibit 150 in.  I

14 don't need that.  But if you've got three lines on Page 5 you

15 can put that in an appendix.

16          MR. BERNICK:  You've talked a little bit about having

17 post-hearing binders, I'm trying again to figure out a way to

18 make it useful for Your Honor.  Maybe the best idea is to have

19 those binders but then to supply something to Your Honor that

20 -- I guess these last briefs should draw specific attention to

21 anything that we really want to have Your Honor read.

22          THE COURT:  Yes.  That's what I'm trying to say.

23          MR. BERNICK:  And that's what you're kind of getting

24 at.  Okay.  And then so we would provide a list and maybe a

25 little binder for you that goes along with the briefs.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  I have all of the debtors' exhibits

2     on the CD.  It's very easy to read.  So, you know, if you want

3     to simply say look at Exhibit 1 -- I don't know the numbers,

4     just to pick one, 156 Page 3, I can certainly do that.  I have

5     Mr. Speights' exhibits in these three binders.  I don't have

6     the sales records in those documents though, that's the

7     problem.  I only have these three green binders.  And none of

8     these include all of the documents -- well, the debtors so.

9     The debtors include the hearing transcripts and so forth.  I'm

10    not sure that Mr. Speights did.  There's a portion of them.  I

11    don't know if they're complete.  It would be better just to

12    create binders, new binders with what it is you want me to look

13    at.  That way the record would be complete.  So each side to

14    attach a binder.

15          MR. SPEIGHTS:  Your Honor, I didn't have my sur

16    surrebuttal and I said I was going to be out of here by 5:30

17    which is one minute and a half.  And I just want the record to

18    note that as Your Honor knows it's so silly to say it that I

19    disagree with most of what Mr. Bernick came back with including

20    his summary of what happened in South Carolina and the reasons

21    for withdrawing conspiracy and that there's going to be some

22    Armageddon if you do this.  But since you've given us 30 days

23    to do a 25 page brief I will address those points in the brief.

24    I did say I wanted to -- since he offered the claim records I

25    want to offer the claim of the Byers Machine Company which I

1  had not premarked, and the letter of Mr. Derkis which I believe

2  -- I don't need the letter just the claim form of Byers Machine

3  Company.  That's the South Carolina claim we filed and referred

4  to during the argument.

5          MR. BERNICK:  I have no idea -- I can't respond to

6  this, Your Honor, I don't know if this has been filed or

7  anything about it.  I'm not in the position to respond.

8          MR. SPEIGHTS:  Well, I'm just responding to his

9  putting in claims.  And if he wants to put in claims I just

10  want to put in one South Carolina claim.

11          THE COURT:  Okay, this is not part of the claims

12  exhibit that was already introduced by the debtors?

13          MR. SPEIGHTS:  No, it's not.  It's a claim that we

14  filed in South Carolina.  We didn't file many an individual

15  claim and they objected to the claim, I believe.

16          THE COURT:  Okay.  It was part of the South Carolina

17  claim, but not filed in this bankruptcy case.

18          MR. SPEIGHTS:  Yes.  Yes, Your Honor.

19          MR. BERNICK:  This is, I believe, a claim where we

20  ended up subpoenaing these people and they said that Mr.

21  Speights didn't represent them.  And again, if we want to go

22  back into the record and deal with the whole issue of

23  authorizations I suppose we can.  If Your Honor wants to admit

24  this I suppose we'll just respond to it in the briefs.

25          MR. SPEIGHTS:  I'm just offer --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  This is the issue that they could have

2 found this entity to give direct notice.

3          MR. SPEIGHTS:  Right.  That's the only reason for it.

4          THE COURT:  That the purpose is to say that the

5 debtor had some information as to where this claimant could be

6 located so as to give direct notice that indirect notice was

7 not sufficient because the debtor knew how to get direct

8 service of notice on this entity.

9          MR. BERNICK:  But if proffered for that purpose Your

10 Honor has already ruled that materials are not coming in for

11 purposes of a collateral attack on notice.  The only materials

12 that come in with respect to these claims are materials that

13 are relevant to a class certification matter.  Your Honor

14 already ruled on that in connection with all these invoices.

15 So I don't think that that proffer is an appropriate proffer.

16          THE COURT:  I think it's not an appropriate proffer

17 because I have ruled that this is not a collateral attack on

18 the bar date, and I'm not sure how it relates to the

19 certification issues, Mr. Speights.

20          MR. SPEIGHTS:  Well, it deals with the state of South

21 Carolina.  Succinctly stated it shows that already into

22 evidence you have the notices of deposition and subpoenas where

23 they served this person.  This simply refutes an argument that

24 well, they go the address from the claim form and you won't

25 find the address on the claim form so they went out and found

227

1  out where this person was and served them with a subpoena.

2  You've already allowed in the other half of the equation and it

3  goes to the -- we talked a lot today about the worldwide class,

4  but it goes to the point that there are a lot of people in this

5  state that would be covered by the certified Anderson class who

6  did not get direct notice and could have gotten direct notice

7  to obviate this problem.  But I understand if Your Honor wants

8  to exclude it you exclude it.  I just think it fills in the gap

9  with the other exhibit.

10         THE COURT:  All right.  What I'm going to do, I don't

11  know, this one has not been marked.  Put an exhibit number on

12  it, please so I know what I'm dealing with it, hand it up and

13  include this as the fourth issue to be briefed.  Because,

14  again, I'm not sure what the relevance is, but since I am

15  taking the difficult issues and giving you a chance to brief it

16  you can add this in the brief.  I don't see how this is going

17  to be relevant at this time but I will give you an opportunity

18  to argue that in your brief, Mr. Speights.

19         MR. SPEIGHTS:  I think the next number would be 167,

20  but I packed my exhibit list.

21         THE COURT:  I'm sorry.  I have it here.  Yes, 167.

22  So this is the proof of claim form of Byers Machine?

23                      (Pause)

24         THE COURT:  Thank you.  Okay.

25         MR. SPEIGHTS:  Thank you very much, Your Honor.  I

1 appreciate your patience.

2         THE COURT:  Anything further, Mr. Bernick?

3         MR. BERNICK:  No, Your Honor.  Thank you.

4         THE COURT:  And, Mr. Speights, is that all?

5         MR. SPEIGHTS:  Yes, Your Honor.

6         THE COURT:  Okay.  We're adjourned.  Thank you.

                    * * * * *

### C E R T I F I C A T I O N

        We, TAMMY DeRISI and KIMBERLY UPSHUR, court approved

transcribers, certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter, and to the best of

our ability.


/s/ Tammy DeRisi_____
TAMMY DeRISI


/s/ Kimberly Upshur                 DATE:  July 20, 2007
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**