UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
W.R. GRACE & CO.,                   .    Case No. 01-01139(JKF)
*et al.,*                           .    (Jointly Administered)
                                    .
            Debtors.                .    July 23, 2007 (2:18 p.m.)
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: W.R. Grace, 01-1139.  The parties I have

2   listed by phone are David Parsons, Jay Hughes, Anne Kearse,

3   John Phillips, Robert Phillips, Rob Halder, Catherine Chen,

4   Shayne Spencer, Debra Felder, Richard Wyron, Jonathan

5   Brownstein, Jason Solganick, John Herrick, Stephen Blauner,

6   Michael Davis, Robert Guttmann, Tiffany Cobb, Christina Kang,

7   Marc Casarino, Paul Matheny, Christopher Candon, Robert

8   Horkovitch, Walter Slocombe, Marti Murray, James Wehner,

9   Brian Kasprzak, Michael Joyce, Mark Plevin, Leslie Epley,

10  Jacob Cohn, David Liebman, Curtis Plaza, Irwin Zandman,

11  Sander Esserman, Van Hooker, David Klingler, Dale Cockrell,

12  Igor Volshteyn, V-o-l-s-h-t-e-y-n, Arlene Krieger, Andrew

13  Hain, Barbara Seniawski, Peter Shawn, Janet Baer, Barbara

14  Harding, Lisa Esayian, Sam Blatnick, Theodore Freedman, Alex

15  Mueller, Guy Baron, Pamela Zilly, Paul Norris, David Siegel,

16  Mark Schelnitz, Brian Mukherjee, John Greene, Alan Runyan,

17  David Beane, John Demmy, David Hickerson, Jarrad Wright,

18  Daniel Chandra, Richard Levy, Terence Edwards, Douglas

19  Cameron, James Restivo, Sean Walsh, Matthew Kramer, Daniel

20  Speights, Martin Dies.  I'll take entries in court, please.

21          MR. BERNICK: Good afternoon, Your Honor.  David

22  Bernick for W.R. Grace.

23          MS. BAER: Good afternoon, Your Honor.  Janet Baer

24  for W.R. Grace.

25          MR. KRUGER: Good afternoon, Your Honor.  Louis

1    Kruger for the Unsecured Creditors Committee.

2              MR. O'NEILL: Good afternoon, Your Honor.  James

3    O'Neill for Grace.

4              MS. SINANYAN: Good afternoon, Lori Sinanyan for the

5    debtors as well.

6              MR. FRANKEL: Good afternoon, Your Honor.  Roger

7    Frankel on behalf of David Austern, the Future Claims

8    Representative.

9              MS. COLEMAN: Good afternoon, Your Honor.  Magdeline

10   Coleman from Buchanan Ingersoll & Rooney -

11             THE COURT: I'm sorry, I couldn't hear you.

12             MS. COLEMAN: Magdeline Coleman from Buchanan

13   Ingersoll & Rooney on behalf of the Equity Committee.

14             THE COURT: Thank you.

15             MR. MANGON: Your Honor, Kevin Mangon from Womble

16   Carlyle on behalf of the State of Montana.

17             MR. FINCH: Nathan Finch and Peter Lockwood on

18   behalf of the Grace ACC, Your Honor.

19             MR. ANSBRO: Good morning, Your Honor.  John Ansbro

20   also for the FCR.

21             MR. HURFORD: Good afternoon, Your Honor.  Mark

22   Hurford, Campbell & Levine for the ACC.

23             MR. BAENA: May it please the Court, good afternoon,

24   Judge.  Scott Baena and Jay Sakalo for the Property Damage

25   Committees.

1          MR. DEMMY: Good afternoon, Your Honor.  John Demmy

2     from Stevens & Lee for Fireman's Fund Insurance Company.

3          MR. HEALY: Good afternoon, Your Honor.  Dan Healy

4     for the United States.

5          MR. BUSBY: Good afternoon, Your Honor.  Leonard

6     Busby and Noel Burnham for the MNWR firms.

7          MS. AARONSON: Good afternoon, Your Honor.  Anne

8     Aaronson from Pepper Hamilton for BNSF Railway.

9          MS. LEHR: Rachel Jeanne Lehr, Deputy Attorney

10    General for the State of New Jersey, Department of

11    Environmental Protection, and I have John Dickinson with me,

12    also a Deputy Attorney General for the State of New Jersey,

13    Department of Environmental Protection.

14          THE COURT: Thank you.

15          MR. KLAUDER: Good afternoon, Your Honor.  David

16    Klauder for the United States Trustee.

17          MR. COHN: Daniel Cohn of Kerri Mumford for the

18    Libby claimants.

19          MR. ESSERMAN: Sander Esserman, Van Hooker, and Alan

20    Rich of Baron & Budd are also here.  We're, of course, with

21    Stutzman Bromberg representing Baron & Budd in various roles,

22    thank you.

23          THE COURT: Anyone else?  Okay, Mr. Bernick.

24          MR. BERNICK: Your Honor, I think this afternoon we

25    have a very full agenda.  We intend to proceed in the order

1    of the agenda, at least for the first several items and then

2    probably just skip around a little bit in order to get things

3    done that are of a time-sensitive nature, and also involve

4    people who may or may not have an interest in staying for the

5    balance of the agenda.  I think that there are several items

6    at the outset that can be taken up at the conclusion of the

7    hearing, don't require argument, and Ms. Baer will be

8    handling those at an appropriate point in time, but I think

9    that probably the best idea is to proceed with item number 6

10   first, which is our motion for another extension of the

11   exclusivity period.  I'm very mindful in talking about

12   exclusivity of Your Honor's caution/instruction/urging that

13   we only focus on new things and that we try to get through

14   this in a prompt fashion, and in order to try to maintain our

15   discussions within those guidances, I'm just going to keep my

16   initial remarks very, very short, and I know that others will

17   then rise to oppose the motion, and I'd like to have Your

18   Honor's indulgence so that after they're all done, I'm going

19   to need a little bit of time to kind of pick up on some of

20   the detail, if that's all right.

21          THE COURT: It's a 20-minute rule, Mr. Bernick.

22          MR. BERNICK: Yes, well, I was wondering whether you

23   were going to remind me of that one in particular, but I had

24   that in mind.  In any event, at the last extension, Your

25   Honor granted the motion for an extension based upon a

1    handful of relatively simple findings, very important

2    findings, but they were fairly straightforward.  Beyond

3    commenting on the long history and the different factors that

4    have been responsible for the fact that the case has gone on

5    for sometime and there have been a series of motions and a

6    series of extensions regarding exclusivity, you made some

7    very specific findings.  The first finding was that there was

8    really almost, I think, no disagreement but that estimation

9    was the first order of business in order to continue the case

10   on towards its ultimate hoped-for resolution.  I believe that

11   everybody believed that there was a necessity to have an

12   estimation take place.  Number two, that with regard to that

13   estimation, progress had been made.  Indeed, substantial

14   progress had been made in pushing the estimation proceeding

15   along.  Third, that while the estimation proceeding was

16   underway, it was best to proceed in an environment where

17   there were as few distractions as possible, and from that

18   point of view, Your Honor was not persuaded that there would

19   be gain in opening exclusivity up and in having competing

20   plans filed and litigated, and I think that those were really

21   the principal holdings that Your Honor made.  I know that

22   there were many caveats, as always in a case like this, and

23   maybe there's no other case exactly like it, but Your Honor's

24   decision was very much hemmed in by the circumstances then

25   present to the Court, and I'm not going to reiterate all the

1    caveats and all the other language in thinking, the one

2    client, the determination, that, I think, was the heart and

3    sole of it, a relatively simple series of propositions.  That

4    argument or that decision by Your Honor was appealed to Judge

5    Buckwalter, District Judge, and there was actually a fairly

6    extended proceeding before Judge Buckwalter so that Judge

7    Buckwalter can become familiar with the same basic dynamics,

8    and he considered exactly the same factors as the Court did

9    and decided to affirm Your Honor's determination focusing

10   very, very much on exactly the same factors.  Those factors,

11   those three basic factors are still sound today, and the

12   findings are still sound today, and I don't mean to minimize

13   the fact that we're in here asking for another extension, but

14   those same basic predicates are every bit as true today as

15   they were before.  Indeed, I would urge the Court to focus on

16   the many, many additional facts that have come into existence

17   since that time that really underscore the wisdom of still

18   maintaining the period of exclusivity while we plod forward

19   and strain to go forward and get to the estimation process

20   which is the landmark that we all agree has to be reached

21   before we really can have a full and fruitful plan

22   discussion.  So, on that score, Your Honor, I won't review

23   all those different facts.  There are a number of them.  I

24   suppose that many of them will come up during the course of

25   discussion, but with Your Honor's indulgence, I will sit

1    down, having used, I hope, very few minutes, and await the

2    results of the arguments that will be made by others.

3              THE COURT: All right.  Mr. Frankel.

4              MR. FRANKEL: Your Honor, may I approach?

5              THE COURT: Yes, sir.  Thank you.

6              MR. FRANKEL: What I've handed Your Honor are the

7    demonstrative exhibits, some of which I will use today that

8    were distributed to the parties Friday afternoon.  Your

9    Honor, we have heard what you said the last time this issue

10   came up.  I'm not going to cover the traditional legal

11   arguments.  You've heard them not only in this case but in a

12   lot of cases.  It's more the posture of the case, and the

13   debtors' request that I want to address.  There is one

14   concept that I do want to remind the Court of, and that is

15   that the case law is clear.  With each succeeding request for

16   an extension, and this is number 10, the burden on the debtor

17   does get harder.  I think from Mr. Bernick's opening

18   argument, it's clear that all he wants to do is rebuttal.

19   The burden is on the debtor, however, every time they request

20   an extension of exclusivity.  The debtors' 10th request brings

21   a new meaning to the word "hutzpa".  They actually ask this

22   Court to approve an extension to a time which is 90 days

23   after a final order on estimation.  We have tried to chart

24   out what that actually means, and if Your Honor will look at

25   the chart -

1        THE COURT: You have to turn the button on the

2   bottom.

3        MR. FRANKEL: I'm not sure how this focuses.  Oh, I

4   see, okay.  I appreciate that.

5        THE COURT: Mr. Bernick's second career.

6        MR. FRANKEL: I wish it was his first career, Your

7   Honor.

8        MR. BERNICK: Make me an offer.

9        MR. FRANKEL: Your Honor, this chart begins to

10  explain what our primary concern is, which is the timeline if

11  the debtors' exclusivity rights continue.  We have the

12  estimation hearing January through April of 2008, and nobody

13  is arguing that we will not have that estimation hearing.

14  That clearly is a bellwether hearing.  Your ruling on that is

15  going to be a critical ruling.  We are not suggesting that

16  somehow our plan is going to avoid that.  What we are

17  suggesting, however, is that under the debtors' request, and

18  I'll now go to what happens after the ruling, there are bound

19  to be appeals, one side or the other is not going to like

20  Your Honor's ruling, maybe both -

21        THE COURT: Mr. Frankel, I'm distressed.

22        MR. FRANKEL: And during that time period, there

23  still will be exclusivity.  So, any negotiations, why would

24  the debtor be negotiating after there's an appeal and there's

25  essentially a stay of the case?  We then get to the timeline

1  for a Chapter 11 exit.  I'm not going to go through all of

2  the different possibilities, but the real problem is at this

3  point, and we're now in the fourth quarter of 2009 and after

4  we've heard from the Third Circuit, the debtor still has an

5  un-confirmable plan.  Your Honor is then ruling on a plan

6  that either will be confirmed or not confirmed sometime in

7  the first quarter of 2010.  Based on the plan that we know

8  the debtor has right now, we would be starting over at square

9  one, starting in 2010.  The debtor says, Your Honor, that no

10 new issues have really been raised, and as I said, clearly,

11 estimation has to happen first.  The debtors have no real

12 incentive to get the critical plan issues resolved right now.

13 The debtors can see what the expert estimation reports say.

14 The FCR's expert, the Tellinghast organization indicates a

15 present value of about $3.7 billion for personal injury

16 liabilities.  The ACC's expert has the number at 5.7 billion.

17 Of course, these numbers don't even include property damage.

18 If the asbestos experts are even close to right, then the

19 equity in this company is severely at risk or will simply be

20 wiped out.  The debtors' expert, with very specific criteria

21 determined by the debtors, says that the liability is merely

22 $712 million.  If the debtors and the equity holders really

23 believe that, what are we doing here?  In that case the

24 debtors don't need a 524(g) plan.  They don't need a plan

25 with an artificial cap on asbestos.  They can just file a

1   plan that leaves asbestos claims truly unimpaired so they can

2   pursue their claims in the tort system.  Future claims will

3   do the same thing.  Certainly, the debtor can handle less

4   than a billion dollars of asbestos liability without a

5   channeling injunction.  The Court actually reflected on this

6   at the December 19, 2005 hearing, and I'm quoting from the

7   transcript at page 32, "And I think the debtor may have

8   somewhat of a choice.  Maybe it's not as much a black and

9   white issue as I'm going to make it, but just to sort of

10  illustrate the point, it seems to me that if the debtor is

11  convinced that there's equity, then I really question whether

12  the debtor is looking at a 524(g) injunction at all."  That's

13  the close of the quote.  The problem is, the debtors have no

14  reason to file such a plan or to fix their un-confirmable

15  plan because there is no threat of a competing plan being

16  filed.  Now let me spend a few moments on what the debtors

17  describe as the negotiations.  First of all, the results

18  really speak for themselves.  The debtor has filed a plan in

19  2004 with the Equity Committee and with the commercial

20  creditors and since then there's been no further changes to

21  their plan, certainly no changes to accommodate asbestos.  We

22  were close in October of 2004 when they were required by this

23  Court to file a plan.  At that time the FCR, Mr. Roster made

24  a proposal to bridge the gap.  We never heard back, but at

25  the December '05 exclusivity hearing we did hear why.  And

1   now I'm quoting Mr. Bernick at the transcript on page 97,

2   quote, "Mr. Frankel says, Well, gee, we never got back to

3   them on the FCR's proposal.  The FCR's proposal came at the

4   end of the day in an effort to try to bridge gaps that had

5   emerged elsewhere in the negotiations, and it wasn't a

6   productive proposal because it not only did it not bridge

7   those gaps, it made them worse.  So we didn't respond to it

8   because it wouldn't have been productive.  The negotiations

9   were dead in the water.  They weren't going anywhere."  After

10  that, there was a mediator.  The mediator could not bring the

11  parties together.  The mediation failed.  After the

12  mediation, on December 14th, 2006, Mr. Austern, Mr. Shelnitz,

13  who's the general counsel in-house at Grace, Mr. Bernick by

14  phone, and myself met, so that Mr. Austern could deliver yet

15  another proposal to settle the asbestos liabilities.  Mr.

16  Austern later heard back from the debtor that our offer was

17  rejected, and we would not be receiving a counter-proposal.

18  We strongly urge, Your Honor, that until the playing field is

19  leveled by allowing competing plans, there will be no serious

20  negotiations by the debtor.  What I want to walk through with

21  the Court is the timeline that we think makes sense for

22  lifting exclusivity.  And, Your Honor, this the chart called,

23  The Asbestos Constituents Timeline for Chapter 11 Exit.

24  Exclusivity would be terminated at this time, but that does

25  not mean that we have a plan ready to be filed.  We're not

1    suggesting that.  We haven't been working on that.  What we

2    do have is serious issues that this Court could rule on to

3    guide all of the parties with respect to a confirmable plan.

4    These are issues that we think makes the debtors' plan not

5    confirmable.  One is, under 524(g): Are the present asbestos

6    claimants entitled to vote?  It appears to be a 75 percent

7    affirmable vote requirement.  And number two, when you

8    channel asbestos claims to a trust including future claims

9    aren't they impaired?  And if they're impaired, doesn't that

10   implicate all of the provisions of 1129 including the vote.

11   These are critical issues in the debtors' plan that we

12   believe make it un-confirmable.  Once we have direction on

13   that, and that, Your Honor, we believe could be briefed and

14   argued this year, we then have the estimation hearing.   We

15   then have, hopefully, a court ruling on the estimation

16   hearing in the middle of 2008, and then in the fall or in

17   August of 2008 we have competing plans on file.  We have a

18   disclosure statement hearing, and we have a confirmation

19   hearing, either at the end of '08 or early '09.  We have a

20   process in place to actually get this case out of bankruptcy.

21   What we have right now in front of us, Your Honor, is no

22   process to get this case out of bankruptcy.  We have a lot of

23   litigation, and we have a case that is stalled.  The

24   negotiations are stalled.  The plan process is stalled.

25   We're just trying to make a difference here so that we

1    actually get this case out of bankruptcy sometime in the near

2    future.  Thank you very much, Your Honor.

3         MR. FINCH:  Your Honor, I'll just reserve the

4    balance of our time for any sur-rebuttal from what Mr.

5    Bernick may say.

6         THE COURT: All right.  Mr. Klauder.

7         MR. KLAUDER: Thank you, Your Honor.  David Klauder

8    for the United States Trustee's Office.  We're kind of a new

9    player to this dispute in the sense that this is the first

10   time we've actually filed some paperwork related to the

11   debtors' extension of exclusivity.  Of course, we've been

12   involved in the case monitoring it from the beginning, and we

13   did so after some considerable thought of whether it's

14   appropriate for the debtor to have another extension of

15   exclusivity and from a - what I would hope everyone would

16   believe to be a neutral party in these matters, we believe

17   that another extension of exclusivity is not warranted here.

18   I want to focus in on the hearing that was held on the 9th

19   motion back in September, and in particular, Your Honor's

20   ruling with regard to granting of that extension, which was

21   10 months ago.  The Court ruled in favor of the debtor and

22   permitted another extension of exclusivity.  At that time,

23   though, the Court made it clear that the parties were to

24   continually meet and confer, possibly meaningful negotiations

25   would develop from that in the hopes of resolving all the

1    issues amongst the parties.  The Court also made it clear

2    that the debtor, and in particular their counsel, was to be

3    the initiator of those discussions.  I think the term the

4    Court used was "The debtor is to take up the laboring oar

5    with regard to those meet and confers."  I'm sure this Court

6    had other cases in mind, some of the other asbestos cases,

7    where major disputes were resolved, acrimonious relationships

8    were mended after such negotiations.  So, I feel confident in

9    saying that this Court contemplated global negotiations even

10   though the debtor in their reply brief takes the position

11   that such negotiations are pointless.  Also when that ruling

12   was made, it was the belief that the estimation proceeding

13   would be tried and resolved by July 2007, and that the plan

14   process would follow shortly thereafter.  At that time, the

15   debtor argued strenuously as they do today, that the

16   estimation proceeding was moving forward in a positive

17   manner.  Yet, here we are today, 10 months later, and we are

18   no closer to the estimation trial then we were back then.  We

19   are no closer to confirmation than we were back then, and

20   there are no negotiations being held that would serve to get

21   this case to a consensual resolution.  I suspect that that

22   was not what the Court contemplated 10 months ago when Your

23   Honor made her ruling extending exclusivity.  The Court made

24   that ruling under the direct of future negotiations and with

25   a believe that a plan could be brought forth by the summer of

1    2007.  The question I asked then is how's it possible for the

2    debtors to credibly show that a feasible plan within a

3    reasonable time is possible for that is the standard, and the

4    debtors must show that.  I would argue that such a showing is

5    not currently possible.  It is unreasonable to believe that

6    the standard has been met when the debtors present a request

7    for an indefinite exclusivity extension that appears to

8    benefit only their interests and will cause this case to

9    proceed without a confirmable plan for well over another year

10   and probably longer.  Because it is, the United States

11   Trustee believes that another exclusivity extension is not

12   warranted.  Briefly, Your Honor, as we noted in our

13   objection, a couple of major issues that we see in this case

14   and as it relates to this extension request, there are no

15   negotiations being had and there appear to be none on the

16   horizon.  There's a lot of back and forth as to whose fault

17   that is, but that's really not the - that's not the important

18   point.  The important point and bottom line is that those

19   negotiations are not currently being had.  The status quo in

20   this case is litigation.  There's no question about that.

21   This case is very litigious and very acrimonious, but it's

22   important to note that in that current posture, negotiations

23   are not being fostered.  The United States Trustee believes

24   that the current state needs to change.  Six and a half years

25   this debtor has remained in bankruptcy with exclusivity is

1    far too long without having presented a confirmable plan to

2    this Court.  I would note, as we noted in our objection, Your

3    Honor, the current congressional mandate is 18 months for a

4    debtor to have exclusivity.  Now I understand that those

5    amendments don't apply to this case, but it is instructive.

6    It is persuasive that Congress looks at it under 1121,

7    Debtor, you get 18 months, and then the playing field is even

8    and other parties can weigh in and file competing plans.

9    There is a believe, certainly, the asbestos group has

10   expressed this belief, that terminating exclusivity may get

11   us closer to confirmation and may foster negotiations that

12   are currently non-existing.  One other issue, Your Honor, as

13   we noted in our objection and is of serious concern in our

14   office, is the professional fees that have been incurred in

15   this case.  Most recently at incredibly high levels, the

16   monthly burn rate on professionals fees continues to

17   increase.  A quick review of the docket on the last interim

18   fee application requests that were approved, which was from

19   October '06 to December of '06, 17 million in allowed fees

20   were approved by this Court.  Creditors wait for money.

21   Professionals continue to get paid consistently, and that is

22   a concern to our office.  Your Honor, we take this position

23   as a means to change the status quo and get this very old

24   case to resolution.  Terminating exclusivity puts other

25   parties on equal footing to either foster a consensus or have

1    this case put on a track to a swift resolution.  It is the

2    United States Trustee's position that the debtors have not

3    met their burden here, and that exclusivity should not be

4    extended.  Thank you.

5         THE COURT: Anyone else?  Mr. Bernick?

6         MR. BERNICK: If I could ask for a little bit of

7    clarification.  I know that there were others who submitted

8    oppositions to our motion for extension.  I know, for

9    example, that the Asbestos Claimants Committee has done that.

10   I know that the PD Committee has done that.  I know the

11   individual PD claimants have done that, and I guess I'm just

12   a little concerned that what's going on is that I'll deliver

13   my remarks and then we'll finally hear from all these people,

14   and then I'll have to stand up again.

15        THE COURT: Well, Mr. Finch asked to speak after

16   you.  So I gave him that opportunity, and he's the only one

17   who's asked.  So, as far as I know, he's the only one who

18   will speak after you.  Anyone else wish to be heard before

19   Mr. Bernick speaks?  Okay, Mr. Bernick, you and Mr. Finch.

20   That will be -

21        MR. BERNICK: There are a number of things that have

22   been said in a relatively short period of time that I don't

23   believe are fully germane here, and I'm not going to spend a

24   good deal of time really responding to them.  There were some

25   arguments that you heard from Mr. Frankel about the

1    estimation reports themselves and whether there's a need for

2    524(g).  I guess all those things will be dealt with in due

3    course, and I know Your Honor's familiar with the expert

4    reports, but I don't think those are really before the Court

5    here.  What's happened to the expert reports is pretty much

6    what Your Honor has predicted, which is there are

7    significantly different visions of how to deal with the

8    problem of estimating liabilities and depending upon how hard

9    Your Honor comes out on that, both on the law and on the

10   facts, that is precisely the kind of clarification I think

11   everybody has to agree is going to be extremely important in

12   determining the future of the case.  So I'm not going to

13   dwell on that.  I would like to respond briefly to some of

14   the statements that have been made about the negotiation

15   process, and you've heard from the U.S. Trustee and we've

16   heard from the Futures Claimant Representative.  The U.S.

17   Trustee, with all due respect, has not been involved, I

18   think, in any of the negotiations that have taken place for

19   very good reasons, that so, and I'm not being critical.  I'm

20   just saying that that's information that's not known to the

21   U.S. Trustee.  The reports that have been made to this Court

22   on the progress of negotiations have been deliberately

23   circumspect so that we don't get into a lot of the substance

24   and detail of those discussions, and for that reason as well,

25   the U.S. Trustee would not be familiar with a lot of the

1    details of those negotiations.  We have heard from the

2    Futures Claimant Representative, and the FCR has from time to

3    time been involved, but it's interesting that we always hear

4    from the Futures Claimant Representative at the time of

5    exclusivity and we hear essentially the same thing, which is

6    the Mr. Austern's being a good guy, and he's going to bridge

7    the gap, and it's just that others are just sitting there and

8    they're saying, Well, gee, that's interesting, but we're not

9    going to respond.  And that is an extremely partial,

10   incomplete, and misleading characterization of the facts.

11   The fact of the matter is that this is a multi-party

12   negotiation process and an extraordinary complex one for all

13   kinds of reasons that Your Honor already is familiar with and

14   probably for more that you haven't had the pain of having to

15   deal with, and I hope never shall, but there are many, many

16   different parties to this negotiation.  There have in fact

17   been efforts to have global resolution as our papers point

18   out.  They've pretty much not come to rest, and they've not

19   come to bear any fruit, and for probably a pretty good

20   reason, which is that if you put one constituency in charge

21   of somehow developing a consensus view of what the answer

22   should be as against the other major constituency, lo and

23   behold, all of the people who are of like mind that the

24   debtor has no equity, they all agree that the debtor

25   shouldn't have any equity, and the only question is how to

1   whack up the pot.  And so, all of the tensions between them,

2   that is, how much their claims are worth, what they should be

3   paid and the like, are all resolved by saying, Well, it's the

4   debtor's problem, the debtor must be wrong.  And as a result,

5   you end up with a global number and the global number is way

6   too large.  It's not something the debtor agrees with or the

7   equity agrees with or the unsecureds agree with or, for that

8   matter, that the marketplace agrees is an appropriate

9   valuation of the asbestos liabilities here.  So that process

10  was given a run both before the mediation and during the

11  mediation and since the mediation, and it hasn't worked.  So,

12  what the debtor has done, and with the acquiescence of those

13  who have participated in these discussions, is to work with

14  the PD claims, principally, by way of negotiation.  Indeed,

15  the information that the debtor received was that it was the

16  PD claims that were driving the number to the realm of not

17  being appropriate.  So, we have focused very heavily on the

18  PD claims, and one of the important changed facts that has

19  emerged for the better since the last extension was granted

20  is that 4,000 PD claims have now gone down to something like

21  over 200 claims that have yet to be resolved.  There are

22  active settlement discussions.  There are settlement

23  agreements that have been reached, and there's been very

24  active litigation that we believe will come to an end at a

25  relatively near point in time.  Indeed, it is our observation

1    that with the motions for summary judgment that have been

2    filed, depending upon Your Honor's disposition of those

3    motions, we may be very much towards the end of the PD

4    process itself.  Your Honor also has looked at ZAI.  There's

5    an opinion on ZAI that's very instrumental, and you would

6    think that with those developments that would do something to

7    break the logjam on the overall number, and unfortunately,

8    this is what I'll say in response to Mr. Frankel's remarks,

9    Mr. Frankel thought it was appropriate to say that Mr.

10   Austern made a second offer and a second demand, kind of,

11   here's where we think the overall numbers are, and that there

12   was a follow-up conversation.  The result of that was that we

13   would not be making a response, and that's just not really

14   quite true.  What it was, was that in the interim, indeed,

15   very shortly after that proposal had been made, Your Honor

16   ruled on ZAI, and the question is, now that Grace is going

17   forward and litigated PD claims, traditional claims, and ZAI

18   claims and those were part of the overall number, what impact

19   did Your Honor's rulings have on that number, and the answer

20   coming back from the PI people, was nothing.  It had no

21   impact.  Now maybe that's because they still adhere to their

22   8515 deal, which basically says, they get all of Grace's

23   equity, and they then whack it up 8515, and if they don't

24   recognize in that deal that if Your Honor disallows claims or

25   finds that they're not meritorious claims, that that has an

1    impact on the allocation, and we've talked to Your Honor

2    briefly about that on several occasions.  Your Honor's been

3    very clear that Your Honor's orders are the orders, they're

4    the rulings, and that deals call for the payment of claims

5    that are disallowed or substantially impaired on the merits

6    in some fashion, those ruling are designed to be material to

7    the process of this bankruptcy, not simply advisory opinions

8    by the Court.  I don't know why after all of the efforts and

9    all of the litigation and all of the resolutions have been

10   done, the PI constituency continues to believe,

11   notwithstanding what they told us historically, that it has

12   no impact on their position.  Maybe it is the 8515 deal.

13   Maybe we ought to focus on that because apparently Your

14   Honor's comas have, and I'm sure they've been seriously

15   considered, but they haven't had much impact.  But the point

16   is, this is all complicated stuff, and because it's

17   complicated stuff, we tried to pursue contacts wherever we

18   can, and Your Honor told me that I was responsible for taking

19   the laboring oar on that.  I could take Your Honor through

20   literally a list that goes into pages of communications,

21   contacts, and meetings involving a variety of individual

22   players and players acting together over a period of time to

23   keep these discussions alive.  They don't necessarily involve

24   the Future Claimants Representative, in part because he told

25   us that the people to deal with best on the current claims

```
 1   would be the PI people.  So we focused on the PI people for
 2   the current claims.  PI people, of course, want to talk about
 3   the overall value of the deal as well.  So, it's not always
 4   Mr. Austern, although we've reached out to Mr. Austern.  It's
 5   not always Mr. Baena.  It's maybe people who are constituents
 6   in his Committee, and of course, the U.S. Trustee is not
 7   going to know about any of that.  No, we think that that is
 8   the best way to go.  We think that that is the best way to
 9   produce resolution of different parts of the case, and we
10   have actively pursued that.  We pursue it.  We have
11   conversations every single week.  We're not waiting for
12   exclusivity, and I've been asked not to go into the details
13   of these conversations in part because people don't want to
14   have names named.  So, I'm not gong to name any of them, but
15   it's inappropriate to be arguing, as has been said here, that
16   somehow the debtor has hutzpa because we're coming in and
17   asking for more time while what's happening behind the scenes
18   is that people are taking positions that are not necessarily
19   consistent, but in any event, we're talking with everybody
20   who is willing to talk with us.  There is a central truth at
21   the bottom of all the negotiations, very, very simple, and
22   that is what people have said in their papers is true.  What
23   have they said?  They have said that they disagree about the
24   value of PD claims, so we have to litigate those, and we're
25   now in settlement, and we're now coming to understand what
```

1    that nut is.  People have disagreements about the value of

2    the personal injury claims.  That's why they're not reaching

3    agreement.  Well, the best way to cut that, the best way to

4    get to the core and get this think off the mark is in fact,

5    to have the litigation to determine what the value of those

6    claims is.  We're prepared to sit down at anytime.  We're not

7    waiting for the result of that.  At the same time, just like

8    any piece of litigation, the best way to explore options for

9    settlement is to keep the people on track for a trial.  God

10   knows it is a difficult process.  It's taking a toll, I

11   think, on everybody, but right now there does not seem to be

12   another answer.  The suggestion that somehow we ought to go

13   back and focus on issues of impairment in 524(g), and, you

14   know, the idea that somehow because the debtor believes

15   there's equity and the market believes there's equity, well,

16   we don't need 524(g) - Well, that doesn't go anywhere at all.

17   The question is, what is the reliability of the ability of

18   the debtor or any other constituent to actually deliver on a

19   number.  It has to be recognized in the law, otherwise the

20   marketplace is not going to pay any attention to it.  So, to

21   say, Well, we don't really need it because our expert reports

22   say that we're solvent doesn't really advance the cause.

23   What about the issues of impairment and the vote?  They

24   haven't changed.  Your Honor's commented about them before.

25   Commented on how long it would take to actually get those

1    matters resolved.  Once the estimation is over, it wouldn't

2    take very long.  The fact of the matter is that those are

3    issues that don't really have traction until we have the

4    backdrop for the numbers of what these plans actually look

5    like.  The plans have not come to rest.  The last time we

6    argued exclusivity Mr. Frankel was saying, Gee, they probably

7    modified their plan in light of what Your Honor was saying.

8    They might not stand by the 8515 deal.  Well, if the plans

9    aren't coming to rest, the legal structure is not coming to

10   rest, and the facts are not coming to rest, what's the point

11   in having an academic debate about a bunch of legal issues?

12   It is a distraction.  Your Honor said it was a distraction

13   before Judge Buckwalter agreed.  We have to stay the course.

14   Get done with the PD litigation which happened this year.

15   Get done with the estimation, and all the while, look for

16   options in order to explore an answer to the case.  What

17   about timing?  And, Your Honor, if I can approach just

18   briefly -

19        MR. FRANKEL: Your Honor, if I could just be heard a

20   moment on these.  These were just circulated last night.  We

21   do have a rule in this case that they're supposed to be

22   circulated the business day before the hearing.  I just want

23   to point this out.  The rules should be the same for the

24   debtor as for everybody else.  We circulated ours on Friday.

25        MR. BERNICK: Your Honor, with due respect to Mr.

1   Frankel, we did get theirs on Friday.  All that these are are

2   markups in order to have Your Honor see how an issue is

3   joined on different parts of their timeline.  Where I come

4   from, just because you've got one set of demonstratives

5   doesn't mean that they can't be questioned or dealt with in

6   the course of the hearing.

7          THE COURT: All right, Mr. Bernick, go ahead.

8          MR. BERNICK: Thank you.  And I don't really think

9   that this is a particularly big deal.  This is the

10  demonstrative that they show you as their timeline and that

11  is very consistent with what they've said before.  All that

12  we pointed out here is that that demonstrative and that

13  timeline is fundamentally inconsistent with what it is that

14  Your Honor has said before, which is, instead of having these

15  hearings here, we've got to have estimation first before you

16  can even come to rest on what the plan is that's at issue.

17  The progress has been made, and it's important - more

18  important to focus on resolving the outstanding issues.  As

19  to amendments, the amendments are not that difficult to make

20  under any set of circumstances.  But what I'm focused on

21  here, and maybe - and we'll take responsibility for being

22  less than clear about this, is that there's a lot of ink

23  that's been spilled on these charts to show, Oh, well, my

24  God, we're going to be in exclusivity forever, and that's not

25  what our intent is.  We said, We should wait for the Court to

1    issue a final ruling.  Now, we use the word "final", and I

2    leaned over to Ms. Baer and said, Do you mean final in the

3    sense of all appeals are exhausted?  That was not our intent.

4    What we said, what we meant to say was that once the Court

5    rules, once Your Honor rules on the personal injury estimate

6    that at that time, as Your Honor always has contemplated,

7    there would be an opportunity for the debtor to file plans in

8    order to make a proposal.  Maybe at that time Your Honor

9    would say, as you created the latitude to do the last

10    extension of exclusivity, then you'd allow other plans to be

11    filed as well.  We're not foreclosing that possibility.  So,

12    what we're asking for is exclusivity until Your Honor issues

13    your final ruling on the estimate, and at that point in time,

14    there are options.  Maybe that does go on appeal at that

15    time.  They've assumed that it does not.  Well, why wouldn't

16    it?  Maybe it should, maybe it shouldn't.  And then whatever

17    is going to happen - there may be competing plans.  Maybe

18    there's no appeal on the estimate, and we have hearings on

19    competing plans, and then the appeal is taken of all matters

20    that go into whatever order of confirmation or whatever order

21    Your Honor determines.  All that we're looking for in this

22    hearing is essentially exactly what we asked for the last

23    time around, which is to let the estimation process run its

24    course, to do so with some semblance of peace, and then come

25    back and be able to modify our plans, which Your Honor can

1    deal with the legal issues in the context of concrete plan

2    proposals.  The only other thing that I'll add, Your Honor,

3    is that as I indicated, there has been a lot of - there had

4    been a lot of developments, and I want to make sure that they

5    are a matter of record.  What has happened since the last

6    time?  Well, obviously, the exclusivity decision was

7    affirmed.  They took the choice to appeal that, and they're

8    still appealing that exclusivity position all the way to the

9    Third Circuit.  I guess they're interested in having the

10   Third Circuit take a bird's-eye view of the case.  We'll see

11   what happens with that, but they did make that determination,

12   and Judge Buckwalter agreed fourscore with Your Honor.

13   Number two, there's been very substantial progress on

14   estimation.  The questionnaire objections were litigated yet

15   again.  The PIQs were supplemented over an extended period of

16   time.  There's litigation over the need - the desirability

17   and entitlement for discovery purposes of bringing the x-

18   rays, actual x-rays to bear.  We asked for 6,000 x-rays

19   associated with those people who had lung cancer and claimed

20   it was asbestos related.  We litigated that.  Your Honor

21   ordered that they be produced.  We got about half of those,

22   and we've now had the opportunity to have a double blind

23   review of all those x-rays, those people who don't know for

24   whom they're doing it.  Don't know where the x-rays come from

25   to see if the plaintiffs' results are even replicable, which

1   is exactly what the ILO B-read standard requires, which ought

2   to be a threshold matter.  That's been done.  The B-reads

3   have been litigated.  Some of them have been submitted, many

4   others have not been submitted.  We're pursuing that.  Expert

5   reports have been submitted.  The ZAI appeal was taken, and

6   in the context of that appeal, Your Honor, the central - what

7   they characterize as a central legal issue, which is whether

8   in the City of Grenville case, it was enough to show simple

9   contamination in order for a case to proceed or whether, as

10  we argued, that asbestos property damage is a product

11  liability claim like any other.  There has to be defect.  The

12  defect has to risk related, has to be some risk.  They argued

13  that.  They chose to take that issue to Judge Buckwalter

14  knowing that he'd reject the appeal, but he rejected the idea

15  that City of Grenville was consistent with their position and

16  inconsistent with ours.  The PD litigation has been advanced.

17  There's been, obviously, litigation over lack of authority,

18  product ID, statute of limitations, motions for summary

19  judgment have been filed and briefed.  We do believe we're

20  towards the end.  PD claims have been resolved, 4,000 goes to

21  260 plus.  PD settlement discussions continue.  PI settlement

22  discussions, less progress, but they do continue, and I'll

23  say that they're not just the debtors participating in this.

24  Equity representatives are also participating directly in

25  these discussions.  Negotiations over Libby cleanup costs

1   continue, and non-asbestos claim resolution continues.  So,

2   we've made very substantial progress on a number of fronts.

3   It is very difficult sledding, but we believe that these

4   facts underscore the wisdom of Your Honor's prior decision to

5   extend exclusivity, and we ask for a parallel extension

6   through the end of Your Honor's final ruling - with respect

7   to Your Honor's final ruling with respect to PI estimation.

8          THE COURT: Mr. Finch.

9          MR. FINCH: Briefly, Your Honor.  The fact is, we

10  haven't said what kind of plan we would file, but the

11  timeline laid out by Mr. Frankel would resolve this case far

12  quicker than whatever the debtor is proposing.  Secondly, the

13  difference between this and a big piece of litigation where

14  you, you know, there's a big gap that bridges the parties,

15  and a big piece of litigation, you can get to a trial, and if

16  the plaintiff wins, you get a judgment, you get some money

17  out of the defendant.  Here, as long as exclusivity is tying

18  this case up, the fact is that the debtors have the asbestos

19  constituents in an uneven bargaining position, and that's

20  what Congress deliberately chose to not have a debtor be

21  allowed to do indefinitely.  And that's exactly what's

22  occurred here.  There is a gap, but the debtor by actions and

23  conduct has made it very clear that it is perfectly happy to

24  sit in bankruptcy, and the commercial creditors and the

25  equity aren't disadvantaged by that.  If they get tired of

1   waiting for their money, they can sell their shares or sell

2   their debt on the open market.  My constituency, the personal

3   injury claimants, they can't sell their shares.  I mean, they

4   are injured by the exposure to debtors' asbestos products,

5   and they are stuck.  They're involuntary creditors, and they

6   cannot leave this bankruptcy by any virtue other than the

7   bankruptcy ending, and therefore, it is fundamentally unfair

8   to continue exclusivity in the face of that, particularly

9   when Congress has made it clear again and again that

10  exclusivity should only be continued for a very short period

11  of time, and it's been clear in whatever negotiations have

12  happened, which have been far less on the PI side than Mr.

13  Bernick would have you believe, that unless and until

14  exclusivity terminates, there's not an equal bargain

15  position.  That's the difference between this and a big piece

16  of litigation that is not in bankruptcy, Your Honor.  In

17  order to have a level bargaining table between the plaintiffs

18  and the defendant, you can't have exclusivity as a big huge

19  cloud over the whole picture.

20          THE COURT: Mr. Frankel, do you have anything you

21  want to add.  I'm going to give you and Mr. Klauder a short

22  opportunity to speak since Mr. Bernick addressed your

23  remarks, and then I'll give Mr. Bernick the last word.

24          MR. FRANKEL: Your Honor, the only thing I want to

25  say is, we have said nothing in any of our papers in this

1  recent round about our agreement with PD or what our plan

2  would look like.  I think Mr. Bernick wants to keep harping

3  back to that because he would prefer to attack a plan that

4  may not be confirmable when he has one on file that is not

5  confirmable.  We don't know what the - I've said it before,

6  Your Honor, just now.  We don't know what the plan would look

7  like.  We think the right to file the plan though is what's

8  before Your Honor, and it's what Your Honor should grant

9  today.

10         THE COURT: Well, Mr. Frankel, I guess my concern

11  still is the concern I expressed before, and that is, I still

12  think you and everybody else are of the same mind, that we

13  need to get this estimation issue resolved.  And once this

14  estimation issue is resolved, then I'm not so sure that the

15  concept of a level playing field, one way or another, and I

16  don't know exactly what that means at the moment, but, yes,

17  the doors at some point need to be opened, but I'm not really

18  sure anybody can actually file - I'll use your words, a

19  "confirmable plan" until we know what that estimation number

20  is going to be.  So, I guess the question is, harm.  What's

21  the harm in keeping exclusivity going until that number is

22  determined at least by me.  I mean, you know, maybe everybody

23  will decide that I'm this brilliant jurist and no one will

24  appeal that issue.  Otherwise, maybe everybody will appeal

25  because what usually happens in the bankruptcy world, my

1   number won't make anybody happy, which is what generally

2   convinces me that I've got it right, because everyone

3   appeals.  So -

4          MR. FRANKEL: Your Honor, I would say two things in

5   response to that: First of all, it is clear that what

6   Congress intended is that there should be a level playing

7   field in the negotiation process.  For whatever reason, and

8   we don't have to point fingers here, for whatever reason, six

9   and a half years later there is no consensual plan.  That

10  alone, I would suggest to Your Honor, would be a basis for

11  lifting exclusivity at this point.  Secondly, Your Honor, I

12  think that the level playing field will continue - the

13  absence of a level playing field will continue beyond the

14  estimation order if we do not have the right to file a plan,

15  and I say that because, at this point -

16         THE COURT: Wait, I'm sorry, state that again,

17  please.

18         MR. FRANKEL: If exclusivity is not lifted.

19         THE COURT: Yes.

20         MR. FRANKEL: We would not be able to file a plan

21  even after the order on estimation.  Right now, if

22  exclusivity were lifted, even if we did not file a plan

23  tomorrow, which we will not, we would file a plan and have it

24  ready so that once the estimation is decided, whichever way

25  it's decided, there's a confirmable plan that can go forward.

1    Right now, what we have is the debtors' plan.    Your Honor
2    rules on estimation.   Let's say that Your Honor agrees more
3    with us than with them.   They certainly will appeal.   We will
4    not have a plan on file.   The case will be stalled again.   If
5    they are right and the estimation is closer to their number,
6    their plan will go forward, but it's not confirmable.   Mr.
7    Bernick says it's a simple matter to amend it.   Well, it's
8    been two years, and they have not amended it.   We don't
9    believe they're going to amend it to make it confirmable
10   because that would require a vote.   That's what they're
11   seeking to avoid.   We need to have a plan on file that will
12   also change the negotiations.
13           THE COURT: But, as I understood it, maybe there is
14   not a complete plan in that maybe there is not a complete
15   term sheet with all constituents, but I thought, based on the
16   representation that's been made several times on the record
17   that at least between the futures, the personal injury, and
18   the property damage, which from your side of the courtroom,
19   is the largest constituency in the case, there was some
20   consensus.   So, you know, if I open exclusivity, as I
21   understand what you would try to do, you would try to get
22   somebody on the other side of the table to start talking with
23   you, which is exactly what Mr. Bernick, sitting on the other
24   side of the table is saying he's trying to do, you know, with
25   your side of the courtroom.   Basically, what I have is three

1    parties aligned on one side and three parties aligned on

2    another, and having appointed a mediator and charged Mr.

3    Bernick with trying to get this logjam broken and everything

4    else that's gone on, nothing has happened.  I still have the

5    same alignment that has happened since the outset of the

6    case.  I'm not sure why terminating exclusivity is going to

7    make any difference in that.  The debtor and the equity are

8    convinced that there is something for equity, and the rest of

9    you are convinced there isn't, and until there is a number

10   that determines estimation one way or another, at least at my

11   level, regardless of what happens on appeals, at least at my

12   level so that there can be a number that people can at least

13   start to work with, if you can't negotiate because you folks,

14   all of you, negotiate all the time.  That's what Chapter 11

15   is.  It's a bargaining tool, and you all work your way out of

16   these logjams in every other case that I've seen you in -

17   Well, that's not quite true.  In almost every other case that

18   I've seen you in, you've worked your way out of these

19   logjams, but in this one, because this estimation issue is so

20   fractious, you have not been able to work your way out of it.

21   I don't think lifting exclusivity is going to have a thing to

22   do with that.

23        MR. FRANKEL: Your Honor, I respectfully disagree.

24   I think that the exclusivity is one of the obstacles that we

25   have to a consensual plan right now because we do not have

1    the threat of filing a plan.  All that we have is

2    negotiations over negotiations, and if we had the right to

3    file a competing plan, we think that would change the

4    dynamics of the negotiations.  Would it result in a

5    consensual plan?  I don't know.  I know that that's what we

6    would attempt to do, and I do believe that the dynamics would

7    change with all of the parties that are in the courtroom if

8    there was a right to file a competing plan.  With respect to

9    what Your Honor said earlier about the agreement between PI

10   and PD, a lot of things have happened since that agreement

11   was announced, including Your Honor's ZAI decision.  I do

12   know this, if we had the right to file a plan, we would be

13   sitting down with the PD Committee, the PI Committee, the

14   Futures Rep.  It would not take long to either decide that

15   that's the agreement, to decide what the right agreement is,

16   but at this point, we have not even discussed that issue

17   because again, we do not have the right to file a plan.  It

18   will change the dynamics dramatically, I believe.  I also

19   think, Your Honor, that that is exactly what Congress had in

20   mind.  I'm not talking about the recent amendments, that's

21   obvious, but all of the issues with respect to when you raise

22   exclusivity, when it's enough is enough relates to the

23   negotiating posture of the case, and we're at a point where

24   there is clearly a stalemate.  There is no doubt, nobody

25   would say differently.

1          THE COURT: Okay.

2          MR. FRANKEL: Thank you, Your Honor.

3          THE COURT: Mr. Klauder, anything else on behalf of

4    the U.S. Trustee?  No.  All right.  Mr. Bernick?

5          MR. BERNICK: Just very briefly, and I appreciate

6    the dialogue that Your Honor has had with Mr. Frankel, and I

7    appreciate the candor of Mr. Frankel's remarks.  I think that

8    a lot of what he says is - I know it very clearly expresses

9    the view of his side of the courtroom, and I think his

10   remarks are thoughtful.  I guess the statement that there

11   really is an impasse, that is a truthful statement in a lot

12   of respects.  I, though, believe that we tend, obviously

13   given the adversarial nature of this process in many

14   instances, can take a snapshot of where we are, really

15   believe that nothing can really change, and I think that

16   actually history has shown that that's not so.  History says

17   that we were extremely close at the end of '04, very, very

18   close.  It didn't work out for reasons that are still not

19   overwhelming clear to the debtor, but it didn't work out, and

20   I think that people thought at that time that it was close

21   enough that it would work out at some point fairly soon.  It

22   turns out the change there was for the worst.  That didn't

23   happen.  It didn't get back together again.  We then had the

24   mediation, and there was hope that the mediation would

25   produce a result, and it did produce a result, but it was a

1    result that was nothing like where we had been in '04/'05.

2    It was one side being together with the 8515 rule, and at

3    that point, everybody showed up in court, indeed it was this

4    court, and talked about how, Well, this is the best thing

5    that's going.  This is a major development in the case.  It

6    really ought to drive everything going forward.  And indeed,

7    it drove the arguments that took place on exclusivity.  Well

8    we now know today, this is where again Mr. Frankel's been

9    very candid, that that turned out not to be true either.  He

10   very candidly says, they would have to have a discussion

11   about whether the 8515 deal is really viable any more,

12   presumably in principal part as a result of comments that

13   Your Honor has made, but also because of the progress that's

14   been made in the case, that things have in fact changed.  So

15   what seemed to be an un-breach able wall, no handholds, no

16   nothing, 8515 deal, we're going on and getting it done, turns

17   out not to have been the case, but this time for the benefit,

18   that is, in other parts of the case, have come closer to

19   resolution.  So, if the 8515 deal is not the deal, we've

20   heard from Mr. Speights that he believes that the 8515 deal,

21   I think he said so here in court, is still very much what

22   they believe governs the case.  Why shouldn't there be a

23   discussion to see whether that really is true?  It doesn't

24   have to have a termination of exclusivity to have a candid

25   discussion between the PI and PD constituency so that it's

1   not a barrier.  So that if it's not there anymore, it's not

2   there anymore, and we can pick up and go on from there.  I

3   also believe that the same thing applies to Your Honor's

4   estimation proceedings as we get close to this trial.  I

5   think everybody is learning a lot, not necessarily things

6   that they didn't suspect, but it's being put down on the

7   record, and while Your Honor candidly acknowledges that there

8   may well be appeals by both sides, we don't know what that

9   process actually is going to produce, and it may be that

10  where Your Honor comes out, which nobody can really predict,

11  we'll end up having some significant effect on the logjam,

12  and maybe we won't have an impasse.  Nobody is that good at

13  making all these predictions.  All you can do is to keep the

14  process going and then hope that by cracking the whip and

15  making sure that people are doing their jobs that the

16  discussions continue.  And I know that the debtor and I know

17  that the other plan proponents regard it that way.  They are

18  open to any and all changes that take place, but I do think

19  that there's no reason why at the very least we should stand

20  by what is now, you know, an artifact, which is the 8515

21  deal.  If that's no longer the deal, we should know it's no

22  longer the deal, and maybe that will have some effect in

23  freeing up the discussions.  The last thing I would say is

24  that there really is still, I think, a major disconnect on -

25  also on the law.  Their assumption is - they don't have a

1   plan, their assumption is that if exclusivity were

2   terminated, that they'd be able to propose a plan that would

3   be in something like its final form even before estimation,

4   and it would be confirmable whereas the debtors' would not.

5   And I think that there still really is a disconnect here.

6   Unless there is a consensual plan, it is very difficult to

7   see that any plan will be confirmable in the sense that it

8   will not be subject to any kind of challenge.  Whatever

9   happens, they will say that can outvote the debtor and its

10   constituency, and whatever happens, if there's not agreement,

11   the debtor will say only and to the extent that you can

12   demonstrate that the claims are being neither overpaid nor

13   underpaid.  So, we're always, from a legal point of view

14   going to end up being focused on the question of what is the

15   value of these claims.  So, I don't mean to dwell on that.

16   What I really got up to say is, I don't think that anyone is

17   so smart that they can make predictions about how long this

18   is going to go on or how hopeless one path is or another.

19   We'll continue to work.  We will not abuse the privilege of

20   having more time in exclusivity.  I do think it would be

21   important to get some feedback on whether the 8515 deal is

22   not - but in any event, we should not have distractions

23   before the estimation is done, and I thank you, Your Honor.

24         THE COURT: Okay.  I'm going to think about this at

25   least until the end of today's hearings and maybe a little

1    bit longer, but I will give you a ruling later.  Let's get

2    onto another issue.

3            MR. BERNICK: Your Honor, we would go forward - I

4    believe I'll turn the podium over to Ms. Baer.  We intend to

5    follow the basic order of the agenda up through item 11, and

6    I think that leaves us with 8, 9, 10, and 11, and then we do

7    lawyer discovery.  So it will be the New Jersey matter, item

8    8; Washcoat sale, item 9; and then we'll have something that

9    will probably take a little time which is the terms of Your

10   Honor's stay order on BNSF.

11           THE COURT: All right.

12           MS. BAER: Your Honor, as agenda item 8 is New

13   Jersey's motion, I will let them take the podium first.

14           THE COURT: Yes, thank you.  Good afternoon.

15           MS. LEHR: Good afternoon, Your Honor.  If ever

16   there was a case where a late proof of claim should be

17   allowed, this is it.  There is really excusable neglect here

18   - Excuse me, I'm so sorry, I have such a bad cold.  The

19   debtors' own actions are what caused us not to have a claim

20   in time for the bar date.  Of course, if it weren't for the

21   debtors' own actions, there wouldn't have been a claim

22   anyway.  New Jersey depends on self-reporting in our

23   environmental laws.  The certifications that come at the end

24   of questionnaires that responsible parties, owners and

25   operators fill out, it's not a joke.  It's what we depend on.

1    We cannot be everywhere at all times.  We don't have the

2    resources either human or financial.  And to lie on a

3    certification, to swear that you've given true information

4    that no hazardous substance was used above a certain level,

5    is a crime of the fourth degree, which we're just doing

6    civilly for civil penalty, but there was no way that we could

7    have know about this at the time of the debtors' bar date.

8    We only found out what when the EPA did some investigating at

9    sites that were using vermiculite ore from the Libby, Montana

10   plant where they had found great problems, and the EPA did

11   this investigation.  The EPA discovered this, and even after

12   the EPA discovered it, it took time before we put together

13   that the debtor had lied on the certification.  The objection

14   that the debtors have filed to our motion is hard to believe

15   they could have read our motion and written that objection.

16   There's hardly any relevant fact in it or there are some

17   things that are just clear misstatements.  In the very first

18   paragraph the debtor claims that we never claimed in our

19   motion excusable neglect.  That was all we talked about was

20   excusable neglect in our motion.  The claim that we are

21   making is not for the contamination at the site, it is for

22   lying about the contamination at the site whereas the debtor

23   claims that the contamination is the basis of the - it isn't.

24   We're not cleaning it up.  We're not looking for Grace to

25   clean it up.  The EPA has taken over the whole site.  We are

1    only assessing a penalty for lying, swearing, perjury is what

2    it is, and of course, the debtor used that old standby that

3    we filed the complaint in violation of the automatic stay.

4    There is so much case law on the fact especially in the Third

5    Circuit, that filing our complaint in state court under our

6    police power is not a violation of the automatic stay.  We

7    can litigate for the money for the penalty, just as we could

8    litigate for the money to fix liability for cost recovery.

9    That's all it is.  It's a trial to fix liability just like

10   your estimation hearing.  We will not try to grab the money

11   out of the debtors' hand.  We know we have to wait along with

12   all the other creditors, but it is not a violation of the

13   automatic stay to sue to fix liability, and the debtor also

14   filled 18 pages with irrelevant facts.  It talks about having

15   spent $4 million making sure that everybody was noticed about

16   the bar date.  The State of New Jersey has never claimed not

17   to know about the bar date.  It has never claimed not to know

18   the debtor was in bankruptcy, and the in the objection they

19   used so much time and energy, and as the U.S. Trustee pointed

20   out, money, writing things that have no relevance to our

21   motion.  They do point to a memo that was received by Robert

22   VanCausen (phonetical), an assistant director of emergency

23   response elements.  It was an internal EPA motion - EPA memo,

24   rather, saying that from one EPA person to another, just copy

25   to Bob VanCausen among 20 other people saying that they

1   wanted to do sampling and investigation of the Hamilton Grace

2   site.  That was a great leap they made that the DEP receiving

3   that memo, a copy of that memo, we see thousands of these

4   things every day, should have alerted us to the fact that

5   Grace had lied and certified to false information on their

6   ISRA submissions.  We did not find the ISRA submissions until

7   at least another six months.  That date isn't sure, but it

8   was six months after the bar date when somebody was asked to

9   comment on a report by the Department of Health - Human and

10  Senior Services, I guess is what it's called now, to comment

11  on a report of testing that was done at the Grace Hamilton

12  site.  That was when they first put two and two together or

13  began to, and that was in the fall of 2003, six months after

14  the bar date.  I also don't think they read the complaint

15  carefully as well as not having read our proof of claim or

16  our motion, our briefs in support of our motion because they

17  talk about $800 million.  Our proof of claim is for $31

18  million.   I don't know where they got $800 million from.

19  There's something about this case that reminds me of the

20  story about the little boy, or the little girl, I guess,

21  child is what I should say, who killed his parents and threw

22  himself on the mercy of the Court because he was an orphan.

23  Grace concealed this information from us and now says it's

24  too late for us to file a proof of claim.

25            THE COURT: Well, you found out about the bar date

1    in 2003, but I'm getting a motion to file a late proof of

2    claim in 2007.

3          MS. LEHR: That's right, because for awhile there we

4    thought we filed the complaint in state court and thought we

5    would fix liability.  We didn't think about filing a proof of

6    claim.  We thought of fixing liability, the bar date was

7    over.  Actually, it's an informal proof of claim because the

8    debtors now had notice of the claim against it by us since

9    the day we filed the complaint which was two years ago.

10         THE COURT: Informal proofs of claim if you filed an

11   adversary in this Court maybe, but by filing a proof of claim

12   in a state court that doesn't constitute a proof of claim

13   before this Court.

14         MS. LEHR: No, no entirely, but it does give the

15   debtor notice of our claim.

16         THE COURT: But that's not the relevant standard for

17   filing a proof of claim.  That has, you know, whatever notice

18   the debtor has, that doesn't subject you to the jurisdiction

19   of this Court.

20         MS. LEHR: I understand that, Your Honor.

21         THE COURT: Filing of the claim does.

22         MS. LEHR: But one of the important reasons for any

23   filing of a claim is to give the debtor notice.  And the

24   debtor has had notice for two years even though at the time

25   we may have been two years late.  I mean, the filing of - it

1   isn't prejudicial to the debtor because they're nowhere near

2   having a plan.

3              THE COURT: Well, the debtor has a plan on file.

4              MS. LEHR: It seems like it's going to be three

5   years - Pardon?

6              THE COURT: Well, the debtor has a plan on file.

7   The others contend - some other parties contend it's not

8   confirmable but there is a plan on file.

9              MS. LEHR: Well, it hasn't been confirmed.

10             THE COURT: No, it hasn't.

11             MS. LEHR: And it doesn't seem to be near being

12  confirmed.  So I don't see any prejudice to the debtor at

13  all.  It's just that - the first thing that we thought of,

14  unfortunately, and I guess that's where the excusable neglect

15  comes in is that in the first minute that we found out we

16  didn't automatically file a proof of claim.  It took time to

17  write the complaint.  It took - Things don't happen overnight

18  here in the Division of Law in the Attorney General's Office

19  or in the DP, and that's why it took that long to file the

20  complaint, and then we really thought that we'd either

21  litigate it, get a judgment, and file the proof of claim, or

22  really what we thought was that we would settle it.  We

23  thought the case would settle.  We didn't think it would

24  really be litigated.  And if we had settled, and the debtor

25  had not objected, you know, that would have made - we would

1  have filed a proof of claim at the time that we fixed the

2  penalty.

3          THE COURT: Well -

4          MS. LEHR: But see, I don't think excusable neglect

5  comes into not knowing.  We couldn't possibly have known on

6  the day of the bar date, we could not possibly have known

7  that we had a claim, but so the excusable neglect really

8  comes in, as far as I can see, in not having done it all a

9  lot faster once we found out.

10         THE COURT: Well, the debtor says that you were

11  listed in New Jersey - not you, I apologize, that New Jersey

12  was listed as a creditor and identified as having a

13  contingent disputed and unliquidated claim.

14         MS. LEHR: Debtors do this all the time, Your Honor.

15   We do not consider -

16         THE COURT: But that's what -

17         MS. LEHR: No -

18         THE COURT:  - puts you on notice.

19         MS. LEHR: No.  We don't - Oh, but we had no claim.

20  No we knew about the bar date.  We knew we were listed, in

21  fact, I've had this very argument with Ms. Baer years ago

22  because we have case law, the Torweka (phonetical) case of

23  the Third Circuit under ISRA, where there's no alternate

24  payment, no alternate right of payment, that is not a claim.

25  It is the debtors' obligation to comply.  In this case they

1  had financial assurance which we used to clean up the site

2  that we were interested in, in 2001.  So, whatever we had

3  left after that, other ISRA cases, I don't know whether we

4  had them or not because we had no problems with Grace over

5  them.  They are not claims.

6          THE COURT: But then, you have a claim.  You're

7  filing a claim for civil penalties.

8          MS. LEHR: Now, I'm filing a claim for a penalty -

9          THE COURT: Right.

10         MS. LEHR:  - but we had no reason to think that

11 Grace had done anything that would warrant a penalty back at

12 the time of the bar date.

13         THE COURT: But that's what getting notice of a

14 bankruptcy requires you to do.  It requires the creditor who

15 gets the notice to investigate the claim.  That's the purpose

16 for listing the creditor in the bankruptcy schedule.

17         MS. LEHR: But that is not the claim, Your Honor,

18 that they listed us for.  They listed us because they thought

19 we - because of their contaminated sites.

20         THE COURT: Well, it's the same thing.  You're -

21         MS. LEHR: No, it isn't, Your Honor.

22         THE COURT:  - claiming a penalty because of the -

23         MS. LEHR: A cleanup - A remediation we do not

24 consider a claim.  Either we want you to do the remediation,

25 which is not a claim, it's injunctive relief.  We do not file

1    a proof of claim -

2            THE COURT: No, I'm sorry -

3            MS. LEHR:  - for remediation.

4            THE COURT: Yes, I understand, I'm sorry.  I did not

5    understand that the schedules listed the claim as a

6    remediation claim.  Is that what it says?

7            MS. LEHR: It did - I don't remember what it said,

8    but it certainly wasn't for this penalty because we didn't

9    know about the penalty.  They wouldn't have admitted to the

10   penalty back then.

11           THE COURT: But -

12           MS. LEHR: I mean, that didn't come to us and say,

13   We lied.  We swore to facts that weren't true, you'd better

14   file a proof of claim.

15           THE COURT: If they list the appropriate agency as

16   having, I guess, an unidentified - pardon me, disputed,

17   unliquidated, and contingent claim, if that's all it says,

18   there is a duty to investigate what that claim is.

19           MS. LEHR: Well, I'm sure -

20           THE COURT: But I don't know what the schedules say,

21   so I think somebody's going to have to tell me what the

22   schedules say.

23           MS. LEHR: Well we know that - Every debtor does

24   that, Your Honor, and we know that they're just trying to

25   make a claim out of their obligation to clean up.

1          THE COURT: But that's not necessarily the case.

2    They're telling the creditor that from their books and

3    records, they understand that there is a claim that you may

4    have against them.  It's then your client's obligation to

5    investigate.  It's not their obligation to investigate, it's

6    the creditor's obligation to investigate.

7          MS. LEHR: Well, they were not thinking of this

8    penalty when they wrote that.  They were thinking of

9    remediations that were required on sites that they operated

10   on.

11         THE COURT: Well, I need to see the - somebody has

12   to tell me what the schedules says.  If it lists remediation,

13   then I think that's a different issue.  If it simply lists

14   potential claim, I think the state's on inquiry notice.

15   That's what the law in this circuit says, and if you're on

16   inquiry notice, then you're on inquiry notice, and the state

17   -

18         MS. LEHR:  Your Honor -

19         THE COURT: - is not in any different position from

20   any other creditor in that case.

21         MS. LEHR: In other words you think they knew they

22   violated the law and that we were going to penalize them for

23   it?

24         THE COURT: I don't think it matters what they knew.

25   The question is, what did your client know.  Your client is

1   the one that wants to file the late proof of claim and has to

2   show the excusable neglect.

3           MS. LEHR: But not for anything that they knew in

4   March of 2003 or whenever those schedules were issued.

5           THE COURT: Yes, as of the time that they got the

6   first notice of the bankruptcy.  That's when you're on

7   inquiry notice.

8           MS. LEHR: And we knew they had a site that they

9   sold and that they were obligated to comply with ISRA.  We

10  had a meeting about it.  Letters passed back and forth about

11  it, and I think finally in the one site that was my case, the

12  new owner used Grace's financial assurance and did the

13  cleanup for them, and that, I'm sure is what they meant when

14  they filed for bankruptcy because those schedules must have

15  appeared before we had this meeting and the letters went back

16  and forth about the ISRA compliance at this particular site,

17  but that was a different site, that was not this site, and

18  that was the site that's already been cleaned up and taken

19  care of.  Whenever they put our name - I'm used to debtors

20  putting us down all the time for things that we argue and so

21  far have won, are not claims.

22          THE COURT: Well, to the extent that their issue is

23  the remediation, I don't know that the issue is that's it's

24  not a claim, but I do agree with respect to the Third Circuit

25  law and the issues concerning the automatic stay and the fact

1    that you're going to be able to pursue remedies and so forth,

2    so, I'm not so sure that I can say that it's not a claim, but

3    I don't think it matters because of the dischargeability

4    issues and the way they've been defined in the Third Circuit,

5    but this is an entirely different issue.  This is not even

6    looking at remediation.  I'm not even sure that this fits

7    within the police powers to the extent that you're defining

8    them because it's a civil penalty claim that isn't even

9    looking at cleaning up.

10            MS. LEHR: Of course -

11            THE COURT: It's pure onerous penalty and for

12    nothing, no purpose because it's not directed at enforcing

13    the environmental law.  It's simply looking at what you said

14    as an alternative to a criminal sanction, in essence.  It's a

15    civil penalty and the nature of a criminal penalty because

16    the debtor lied.  It does not - looking at the environmental

17    to a Torweka type of situation.

18            MS. LEHR: That's right, but there are just as many

19    cases as I've cited in my response that say the penalties -

20    Judge Garrett Brown's decision in Madison Industries where he

21    said that filing the complaint in state court and asking for

22    a penalty was not a violation of the automatic stay because

23    penalties give teeth to our environmental laws.  And this is

24    important.  It has to be more expensive for an owner or an

25    operator of contaminated property to ignore the law than to

1    comply with it.  That's where a penalty serves a good purpose

2    because we cannot be everywhere, and perjury is a serous

3    crime.

4         THE COURT: Well, but you're not arguing that

5    there's a criminal sanction or -

6         MS. LEHR: No, I'm not, I'm not.  We're arguing it's

7    civil penalty.

8         THE COURT: But that -

9         MS. LEHR: But it says right on the paper that they

10   signed that swearing to this false information is a crime of

11   the fourth degree.

12        THE COURT: I am not disagreeing that perjury is a

13   serious penalty.  That's not what this is about, however.

14   You're not arguing that this is not in violation of the stay

15   because there's a criminal action that's being undertaken

16   against someone.

17        MS. LEHR: No, no, but I'm arguing that it's not in

18   violation of the stay because it is an enforcement under the

19   police power of the State of New Jersey.

20        THE COURT: Yes.

21        MS. LEHR: And there is enough case law showing that

22   whatever we do except grab the money out of their hands, is

23   not subject to the automatic stay.  After it's litigated,

24   after we fix liability, and the amount of liability, then we

25   wait in line with everybody else.  That we would never argue,

1    but up until that point, we are exempt from the automatic

2    stay.

3              THE COURT: Okay.  I understand your argument.

4              MS. LEHR: Thank you, Your Honor.  Will I get a

5    chance to respond again?

6              THE COURT: Oh, yes, surely.

7              MS. LEHR: Thank you.

8              MS. SINANYAN: Good afternoon, Your Honor.  Lori

9    Sinanyan on behalf of the debtors.  The State of New Jersey

10   made several comments that I'd like to address, and I'll try

11   to focus the argument on the factors that you focused on,

12   Your Honor.  The State of New Jersey states that with all of

13   its resources, it should be excused from having filed a proof

14   of claim when it first knew about its alleged claim when

15   individuals with no resources are held to the same exact bar

16   date rules.  I don't understand, first of all, why there

17   should be any kind of different standard because it's the

18   State of New Jersey, and it's a bureaucracy that they have to

19   deal with.  Second of all, Your Honor, you - Well, let me

20   rephrase.  The New Jersey State Department had three distinct

21   clear opportunities to file a claim.  One was prior to the

22   bar date.  In November of 2002, as the debtors' objection

23   clearly states, they received the EPA memorandum.  The State

24   of New Jersey mischaracterizes this as an internal memoranda.

25   It was sent to several agencies including the New Jersey

1    Department of Environmental Protection.  It clearly states

2    and it quotes the alleged fraudulent statements that New

3    Jersey based its complaint on, and it clearly states that

4    based upon this 1995 report, the New Jersey Department of

5    Environmental Protection issued a no-further action letter,

6    and it continues with an expressed statement by the EPA that

7    Grace's representations in the 1995 report were false and

8    states the EPA's reasoning for why those statements were

9    false.  All any person receiving a copy of this EPA

10   memorandum would have to do is read it.  It was in black and

11   white that the EPA believed that the representations that

12   Grace made in its 1995 report were false, and that New Jersey

13   relied on those in submitting a no action letter.  This EPA

14   memoranda was sent to two different officials at the State.

15   In their response, they only addressed that one person

16   received it and dismissed it.  They don't even address that

17   there was yet another employee, Janet Smalinsky (phonetical)

18   who received a copy of this EPA memoranda and did not take

19   any action on it.  In several places in their response,

20   indeed, New Jersey states that the EPA memoranda did not

21   alert them to the existence of a potential claim.  In fact,

22   they say, it shouldn't have immediately jumped into one's

23   mind.  It's actually quite irrational for it to have jumped

24   into one's mind, but again, and I can quote you the specific

25   language, it clearly states in this memoranda that the EPA

1    believed the assertions made by Grace in the 1995 report were

2    false.  And one side note, because Grace has gotten in a way

3    personally attacked here.  Grace employees made these

4    certifications based on an expert report that was a third-

5    party expert report that was provided to them, and Grace made

6    its certifications based on that.  The fact that in the end

7    it turned out to be false statements, I understand.  We're

8    not disputing that issue at this point.  That's not what's in

9    front of the Court, it's just New Jersey's way of trying to

10    shift this Court's focus.  Even if you ignore this EPA

11    memoranda, which again, gives notice of the claim clear as

12    day, in the fall of 2003, New Jersey has by its own repeated

13    admission stated that it knew about its claim, and indeed,

14    there's no explanation to say why they figured it out in the

15    fall of 2003 as opposed to why they couldn't have figured it

16    out based on the EPA memoranda.  All they had to do at that

17    point in time is say, Well, we're not sure exactly what kind

18    of a claim we have, but we think we have something, a one-

19    page proof of claim, something in front of the Court.  It

20    wouldn't have taken much effort on their part, yet they

21    failed to do that as well.  As the Court correctly pointed

22    out, whatever they filed in the 2005 state court action, does

23    not constitute an informal proof of claim because that case,

24    the one case that they cite was a Chapter 7 case.  It was

25    based on a pleading that the creditor had filed in the

1    Bankruptcy Court, subjecting themselves to the jurisdiction

2    of the Bankruptcy Court.  Here, in fact, New Jersey tried to

3    avoid the Bankruptcy Court's jurisdiction by filing something

4    in New Jersey State Court, again, we'll maintain in violation

5    of the automatic stay, but the automatic stay issue is not in

6    front of the Court today and should not be argued.  I believe

7    that New Jersey wasted several pages in their response

8    arguing the automatic stay.  So what we have is their third

9    opportunity to have filed a claim in this Court when they

10   filed the state court action in 2005.  They still did not

11   file a claim.  They waited several years, two years in fact,

12   to file the current motion.  Counsel said that if all they

13   were doing was waiting to get to some kind of a number and

14   they would have immediately filed a claim, well, when the

15   debtors filed an objection, and it became clear they weren't

16   going to reach some kind of an immediate resolution, why not

17   file a claim then.  There have been repeated opportunities

18   where New Jersey could have filed a claim.  The one case that

19   New Jersey cites in favor of its, quote/unquote, "excusable

20   neglect", is an unpublished case from the Southern District

21   of New York, in Enron.  And in the Enron case, the claimant,

22   once it found out about the billing irregularities and that

23   it actually had a claim in that case, filed a claim within

24   less than a month and a half.  A month and a half is

25   completely different than the several years that it has taken

1  New Jersey to have filed this motion for approval to file a

2  late claim.  There can be no excusable neglect in this case.

3  I'd be happy to run through the excusable neglect factors,

4  but I'm cognizant of this Court's schedule, and would ask you

5  if you want me to run through the Pioneer factors.

6          THE COURT: No, what I want to know is these

7  schedules, how the schedules list this claim?

8          MS. SINANYAN: I'm not sure.  The information - I

9  don't have a copy of the schedules.  I have it as an

10  environmental claim.  The debtors aren't here relying on the

11  schedules.  Perhaps it is in our - We can certainly get a

12  copy of the schedules and submit it to the Court, Your Honor,

13  but whether it's the schedules or the EPA memorandum in

14  November of 2002 or the fact that they admit that in the fall

15  of '03 they knew about the claim or the state court action in

16  '05, I don't understand how we get to a motion being filed in

17  2007, and that constitute excusable neglect.

18          THE COURT: Okay.  Thank you.

19          MS. SINANYAN: Thank you, Your Honor.

20          MS. LEHR: Your Honor, if we had filed the proof of

21  claim the minute that we found out in October of - whatever

22  the - the fall of 2003, the debtors would have objected the

23  same way.  Once we missed the bar date and once we decided to

24  try to file a late proof of claim, I don't think the debtors

25  - I think the debtors would have objected whether it was one

1    year late, or two years late, or four years late -

2              THE COURT: Yes, but -

3              MR. LEHR:  - but we didn't do it because we thought

4    we would litigate this, settle it, or at least have the

5    damages fixed, have the penalty fixed before we came to this

6    Court since we had already missed the bar date.

7              THE COURT: Well, you know, whether that's true or

8    not, and I don't have any way of knowing, I mean, I'll

9    assume, just for purposes of this discussion that that's the

10   case.  Even if the debtors had objected to a claim that's

11   filed six months late and New Jersey's position is we filed

12   it now, six months after the bar date because we just found

13   out that we had a claim.  That seems to me to make an

14   argument for excusable neglect because you filed the claim

15   within what New Jersey would contend is a very short time

16   after you found out about the claim, but the problem I have

17   now is, it's four years down the road, and I don't see what

18   takes four years to put together the fact that you have a

19   claim when you've had several opportunities within that time

20   frame, including filing a state court action on the very same

21   subject matter to file that proof of claim.  That's the

22   problem.  The one thing that I am not sure about on this

23   record, quite frankly, is prejudice to the debtor, and if the

24   debtor is not - the estate is not prejudiced by this late

25   filed claim because the plan hasn't been confirmed and all of

1    the factors for Pioneer are not met, all of the other

2    factors, I think, weigh very heavily against New Jersey.  I

3    just cannot see any way, shape, or form that New Jersey can

4    meet those factors.  The only issue I have is prejudice, and

5    I think what I'm going to do is ask the debtors to address

6    that factor.  I did not ask the debtors to do it and then

7    give you a chance to respond.  I should have taken the

8    debtors up on that opportunity when counsel asked to do that,

9    so I apologize for that interruption, but I am going to have

10   the debtor address that factor and then give you a chance to

11   respond.

12           MS. LEHR: All right, thank you, Your Honor.  Now

13   one reason that we filed the proof of claim when we did is,

14   that on March 5th, 2007, we had a meeting with the debtors to

15   try to reach some agreement and agree on a penalty and be

16   done with it, and we saw we couldn't, that that was not going

17   to happen, so that's when we immediately filed the proof of

18   claim -

19           THE COURT: All right.

20           MS. LEHR:  - or filed the motion -

21           THE COURT: Motion.

22           MS. LEHR:  - for the proof of claim, but we really

23   thought before that that it would be settled and solved.

24           THE COURT: All right, thank you.

25           MS. LEHR: Thank you, Your Honor.

1          MR. BERNICK: Your Honor, would it be appropriate

2     to, in the submission that we make to the Court, use that as

3     the vehicle for providing Your Honor the information that you

4     asked for on the schedules -

5          THE COURT: Sure.

6          MR. BERNICK:  - so that it will be one document

7     that comes to Your Honor that deals with the schedule and

8     prejudice?

9          THE COURT: Oh, well, okay.  I thought it might just

10    be easier to take five minutes and do the argument on

11    prejudice now since I've got counsel here and end that, just

12    get the argument finished.

13         MR. BERNICK: I don't know if we're going to be able

14    to find out about the -

15         THE COURT: Schedules, no, you may have to submit

16    that information -

17         MR. BERNICK: Okay.

18         THE COURT:  - to me in a document and the schedule

19    will be whatever the schedule is.  I can probably find it on

20    line myself, so, but -

21         UNIDENTIFIED SPEAKER: (Microphone not recording.)

22         THE COURT: Oh, it was a pre-ECMECF, okay, yes, it

23    would be helpful to have you send me the part of the schedule

24    that deals with this claim.  Tell me what the prejudice is to

25    the debtor in filing this claim and allowing a motion to file

1   a late claim.

2            MR. BERNICK: Maybe in order to expedite this, I'll

3   just address that myself, Your Honor.  Obviously, we have had

4   a very extensive process in dealing with the non - in a

5   sense, the non-mainstream claims.  This is a significant

6   claim.  It started out, as we had heard at least, an $800

7   million claim.  So, there's been an extensive course of

8   conduct, an extensive period of time.  No claim was filed,

9   and $30 million, if that's where they're at now, is still not

10  insignificant, and we have to deal with all of these things

11  in the course of developing an overall economic picture to

12  use in connection with our negotiations and the like.  If

13  Your Honor allows them now to make this late claim filing

14  then, in a sense, we kind of begin back at the beginning.  We

15  don't know if we're going to be able to resolve it or not.

16  It may have to be litigated.  This is now very, very late in

17  relationship to all of the other matters that we're handling,

18  and, you know, New Jersey, we've heard, I mean the most

19  amazing admissions about how long they've known about this,

20  and it is the prejudice that we face in trying to develop

21  closure on all of our different externalities, and this is

22  now a late arising externality, and we don't know whether

23  it's going to be resolvable or not, but to change the status

24  quo, I mean there have been discussions about resolving it,

25  they'll continue, but to change the status quo now, it

1   basically gives them a piece of leverage that they didn't

2   have before because they didn't file in time, actually makes

3   me more pessimistic about whether we'll be able to resolve

4   it.  So, I guess our sense is, status quo is status quo.

5   There will be discussions with these folks.  We'll see if it

6   can be resolved, but I think it's inappropriate for the

7   Sovereign State of New Jersey to come in and now ask Your

8   Honor for what is essentially leave to enhance their position

9   by giving them something that frankly they don't have right

10  now.

11          MS. SINANYAN: Your Honor, if I may also add

12  something to what Mr. Bernick said.  As you correctly pointed

13  out, this is a four-factor test in that it has been

14  established by Pioneer, and all three of the other factors

15  clearly weigh against New Jersey.  We believe that this

16  factor weighs against New Jersey as well.  This isn't a one-

17  factor test.  If you were to only look at this one factor,

18  completely in a vacuum, then any other claimant who failed to

19  file a timely proof of claim can just show up after the bar

20  date and say, Oh, there's no prejudice to the debtors and

21  just file a proof of claim.  It has to be a four-factor

22  totality of the circumstances test, and not only does this

23  factor weigh against them, but clearly the other three

24  factors weigh against them as well.

25          THE COURT: All right, thank you.  Okay.

1          MS. LEHR: I still must renew my assertion that

2     there's no prejudice to the debtor.  There have been no

3     estimation hearings.  There's no way that they know what

4     their creditors are going to get.  This is no different than

5     anything else, and as far as - I agree that $31 million is

6     not nothing, but it's still -

7          THE COURT: It's certainly not nothing.

8          MS. LEHR: It's not nothing, but it is only

9     according to the U.S. Trustee twice a three-month

10    professional fee in this case.   So it's like a six-six month

11    professional fee instead of three months.  Thank you, Your

12    Honor.

13         THE COURT: Okay.  That was only for one quarter

14    when a lot of plan progress in terms of estimation was going

15    on.  It wasn't quite that bad through some of the other

16    quarters.

17         MS. LEHR: Well, the objections that I received

18    where almost every word was irrelevant or a misstatement,

19    even and and the was a waste of money.  Thank you very much,

20    Your Honor, for being so patient.

21         THE COURT: Thank you.  Okay.  I do not see a basis

22    for permitting this late proof of claim.  I agree that it is

23    a totality of the circumstances test.  I think the three

24    factors other than prejudice, are clearly against the State

25    of New Jersey.  The state is on inquiry notice as of the time

1    that the bankruptcy petition is filed.  I'm not using that as

2    a factor.  I do not know what the schedule says with respect

3    to this bankruptcy petition.  I will have the debtor submit

4    that so that I can take a look at it, but at this point, I

5    have no reason to doubt that it is related to an

6    environmental claim.  I simply don't know, and if it is

7    indeed related to a remediation, then I do agree with counsel

8    for the State of New Jersey that that would be a totally

9    different perspective than looking at a civil penalty,

10   although, even in an environment remediation claim, under New

11   Jersey statutes may give rise to a civil penalty under some

12   circumstances, and I'm not sure that that ameliorates the

13   inquiry notice that would otherwise arise, but I'm not using

14   that as a factor in this determination simply because I do

15   not have the schedule here to be able to make that assessment

16   one way or the other.  I'm just simply noting it for the

17   record because I've made this inquiry on the record.  I

18   believe the other three Pioneer factors, however, weigh

19   clearly against the State of New Jersey.  This is a very long

20   time between the notices that arose in 2002 and 2003 and the

21   time of the filing of the complaint in 2005 for the state to

22   come forward and make this request to file a late proof of

23   claim, and I've heard nothing that indicates why there was

24   not some action to come forward in the Bankruptcy Court

25   before this other than the fact that the state hoped to come

1   to some liquidation of the claim through some settlement

2   process.  But that is still not a reason not to file a proof

3   of claim even to set out an unliquidated amount and then to

4   conduct the negotiations and to amend it to set out a

5   liquidated claim later.  So, I think that that is not a basis

6   for establishing excusable neglect under the Pioneer factors.

7   With respect to prejudice, although there is not a confirmed

8   plan, the debtor has been working to resolve claims.  We have

9   had numerous objections, omnibus objections to claims

10  processes.  We have been indeed litigating property damage

11  primarily at this stage of the game, objections to claims.

12  Most of the others have been settled.  There have been some

13  adversary actions that have gone on to some stages of

14  litigation and some objections to claims that have gone into

15  some portions of litigation but most have been settled.

16  However, this could indeed throw a monkeywrench even into the

17  commercial creditor distributions that are provided even

18  under the current plan, and I'm not making assessments as to

19  whether this plan is or is not confirmable, but the reality

20  is that there is a plan on file, and that has been bargained

21  for by the supporters to the plan.  Yes, this may be a claim

22  that will have to be reconciled somewhere.  It clearly would

23  not fit into the - Well, no, I shouldn't say that.  It may

24  fit into the asbestos claim pool.  I don't really know where

25  it would fit, I guess, at this point if it were to be allowed

1    as a civil penalty claim.  I don't know.  I haven't looked at

2    this plan carefully enough to know where it would go.  In any

3    event, if it were to be allowed in the amount of $31 million,

4    that is a substantial claim no matter what classification it

5    would end up in in a plan, and as a result, I think it would

6    be prejudicial to this estate if it were to be allowed in

7    that amount.  Having said that, I am certainly not opposed to

8    parties continuing to bargain to see whether or not this

9    could not be resolved outside the context of this late proof

10   of claim, and I encourage the parties to continue to see

11   whether or not it cannot be resolved in some expeditious

12   fashion.  I'll take an order from the debtors that denies

13   this motion for the reasons that I've stated on the record,

14   after you run it by counsel.

15          MR. BERNICK: We're at the Court's pleasure at this

16   point.  I know we've been going for awhile.  Would Your Honor

17   want to go through a couple more items?  We have the Washcoat

18   sale, and I don't know if that's going to take a long time.

19   Very short, I'm told.  Then we have the Burlington -

20          THE COURT: Is that number 9?

21          MR. BERNICK: That's number 9.

22          THE COURT: Let's do number 9 and then we'll take a

23   short recess.

24          MR. BERNICK: That's fine, thank you.

25          MS. SINANYAN: Your Honor, I will keep this very

1   short.  The debtors filed a motion to sell their Washcoat

2   business for approximately $22 million.  Believe it or not,

3   this is actually the debtors' first sale motion in this case.

4   We've done *de minimis* asset sales before.  The sale is in the

5   best interest of the estate.  We've cited numerous reasons in

6   our motion why this sale makes sense and the dollar amount

7   for which we're selling it is a good deal.  We have had

8   several informal and formal objections, all of which we have

9   resolved by inserting additional language into the sale

10  order, and I have a copy of the sale order redlined against

11  the filed version except for one objection which is the

12  objection of the U.S. Trustee.  The U.S. Trustee has objected

13  to the breakup fee that the debtors have asked for, and even

14  the U.S. Trustee's objection was couched as one that perhaps

15  might be mooted if no other buyer showed up to the table, and

16  we've had discussions with the U.S.T.  No other buyer has

17  shown an interest to overbid on the assets, but technically,

18  as we explained to the U.S. Trustee, this does not moot the

19  provision for the breakup fee.  The asset purchase agreement

20  calls for a very limited circumstance in which the breakup

21  fee can still survive.  If a sale of the business happens to

22  some other buyer within a six-month period, again, under very

23  limited circumstances, a breakup fee could be awarded out of

24  the proceeds of this alternative transaction, and again, I'd

25  be happy if Your Honor wants for me to explain what those

1    very limited circumstances are.  So it doesn't necessarily

2    moot out the U.S.T.'s objection, but what I want to

3    concentrate on is the fact that this breakup fee is and

4    always was an essential part of the deal, and that is exactly

5    what the O'Brien test - the Third Circuit test calls for.

6          THE COURT: Well, no, it calls for showing me how

7    the costs of the breakup fee is related to the amount of the

8    breakup fee, and there's nothing, there's no evidence before

9    me that shows why this particular number is chosen as a

10   breakup fee.  That's number one, and number two, I'm not sure

11   I quite understand the alternative sale.  If you close on

12   this deal to this buyer -

13         MS. SINANYAN: I'm sorry, it is not in a scenario

14   where we close to this buyer.  It's in a scenario where we

15   failed to close to this buyer because certain closing

16   conditions aren't met, and we end up selling to - and both

17   parties agreed to walk away from the deal, and we close to an

18   alternative buyer within a six-month period, and there's a

19   cap on that.  The buyer was in a situation where if Grace

20   wanted to kind of do away with the deal, walk away, we would

21   use all of their time and effort, we would use the fact that

22   they had laid the groundwork and essentially had acted as a

23   stalking horse to turn around and do a deal with someone

24   else.  So they negotiated up front that this breakup fee was

25   an essential part of the deal and something that induced them

1    to bid.  The fact that at the end of the day, no other

2    alternate bidder showed up to submit an overbid, does not in

3    any way change the analysis that the breakup fee was

4    essential at the time we negotiated the asset purchase

5    agreement, and we heavily negotiated the 2.5 percent.  The

6    typical range that's approved in many bankruptcy sales is two

7    to three percent plus an expense reimbursement fee, and this

8    is capped at 2.5 percent, no expense reimbursement fee.  So

9    we believe that the percentage is very much in the range, in

10   fact perhaps on the low end, and no other party, other than

11   the U.S.T. has submitted an objection to the amount of the

12   percentage, and again, the percentage would only come out of

13   an alternative transaction sale once that second sale was

14   consummated within 30 days, is when the breakup fee is

15   approved.  So, it really wouldn't be any money out of the

16   debtors' pocket, and it would have allowed us the opportunity

17   to have put the asset forth, market it, and sold it to

18   someone else.

19           THE COURT: It won't come out of the debtors' pocket

20   because you're going to charge any second purchaser at least

21   as much as you charge this purchaser plus the breakup fee.

22           MS. SINANYAN: Presumably, Your Honor, yes.

23           THE COURT: Well -

24           MS. SINANYAN: There could be a scenario in which if

25   this deal died, the asset would sell for less than the $21.9

1  million purchase price, but the breakup fee would come out of

2  the proceeds of that sale.

3        THE COURT: Right.  So it will come out of the

4  debtors' pocket.

5        MS. SINANYAN: But, Your Honor, unless we had the

6  $21.9 million deal that we currently have on the table, we

7  could not get another deal.  So to judge a second deal by

8  this standard, this is what the standard is that has been

9  set.

10        THE COURT: That was what the issue was in O'Brien

11  and as I recall the U.S. Trustee was the only party that

12  objected there too.

13        MS. SINANYAN: Well, there's several points where I

14  would distinguish this case from O'Brien.  First, Calpine

15  Corporation, which was the stalking horse bidder and lost out

16  to NRG, interestingly both of whom are Kirkland & Ellis'

17  clients, Calpine Corporation went to a bid procedures

18  hearing, was denied the breakup fee, and decided to move

19  forward with the auction anyway.  This is not the scenario in

20  which we face ourselves.  The buyer has never been denied the

21  breakup fee.  Unfortunately, because the parties both require

22  an expeditious sale, we didn't have the opportunity to put

23  this in a two-step process in front of this Court because as

24  you normally know, you would have a bid procedures hearing,

25  get approval of the breakup fee, and then walk into a sale

1    hearing knowing that you have that breakup fee in hand.  So,

2    I would certainly distinguish this case on those grounds, and

3    the Court in the Third Circuit heavily relied on the fact

4    that Calpine was denied that yet decided cautiously to go

5    forward and that they went forward for some other reason, and

6    then the Court goes into what those potential other reasons

7    would be.  The other note that I would like to make in the

8    O'Brien case is that the U.S.T. in that case suggested that

9    perhaps the buyer, Calpine, could seek a breakup fee at the

10   end of the process if the situation ever arose that it needed

11   the breakup fee when they were denied that breakup fee.

12   That's the same suggestion that the U.S.T. made in this case,

13   and the Third Circuit found that that wasn't a viable

14   suggestion, and in fact said that that is - used it in

15   denying the breakup fee to Calpine and that's not something

16   we wanted to go forward with here.  I basically come back to

17   the fact that it's a 503(b) test of whether the breakup fee

18   was a necessary element to get the deal done, and when you

19   have a buyer that says, I'm not willing to even submit $21.9

20   million and subject this to a sale process unless you ask for

21   the breakup fee and we get this breakup fee.  I don't know

22   that the debtor has really any other choice to get this

23   acquisition done, and as we've said in our papers, we've been

24   marketing this business for several months, almost a year,

25   and the business, because it's out for sale, has had certain

1   - It's had some instability and some economic ramifications

2   to the business and one of the main points that Grace wants

3   to do is to get the sale done and to get it done

4   expeditiously and the same from the buyers, and everyone

5   wants to get this deal wrapped up and wrapped up now.

6            MR. ENGMAN: Your Honor, Richard Engman from Jones

7   Day on behalf of the buyer here.  If Your Honor will allow, I

8   am a New York admitted attorney.  I don't have local counsel

9   here today, and I haven't been admitted *pro hac*, but -

10           THE COURT: All right, that's fine.

11           MR. ENGMAN: Thank you, Your Honor.  I just wanted

12   to rise in essence to second what counsel was saying.  I

13   think that the reality here is that both parties did the

14   right thing and acted in good faith.  From the buyer's

15   perspective, they were being asked to pursue a sale on a very

16   tight and short time frame, undergo much time and expense in

17   order to get there in time, and from the debtors' standpoint,

18   they did not want to give up the, almost in a fiduciary way,

19   ability to continue to talk to other parties and continue to

20   look for a better deal for the estate.  From my client's

21   perspective, they were willing to move forward,

22   notwithstanding the type of time frame if they were given

23   assurance that the debtors would seek approval of their

24   breakup fee should there be an alternative transaction.  I

25   think the fact that there hasn't - that we're here today and

1    there isn't an alternative transaction before you, but we're

2    seeking approval of the asset purchase agreement, I would - a

3    couple of points on that.  One, that is the complete

4    agreement, and in a provision in that agreement is this

5    breakup fee.  It's at this stage almost a technical matter.

6    The parties, I can represent, intend on closing by the end of

7    the month.  The only way that the breakup fee becomes even

8    relevant is if there is a failure to close for some reason.

9    If there's a failure to close on account of a buyer breach,

10   there is no breakup fee.  If there's a failure to close on

11   account of a debtor breach, candidly the breakup fee is

12   probably the smallest issue since they would - if Your Honor

13   approves the APA they would be bound by it, and we'd get

14   super damages and specific performance and the like.  And

15   only under very - so we're really talking about only if a

16   closing condition doesn't occur that's in neither party's

17   control, and candidly, Your Honor, I'm not aware of any at

18   this stage.  I think we're in theory talking only in theory,

19   but I especially in this case, I actually think that theory

20   is important in that our client - counsel brought up the

21   norm, that with Your Honor, that the norm is there's a

22   bidding procedures hearing, there's a bidding process after

23   that, and that gives both my client comfort that it doesn't

24   have to engage in those costs and expenses until it knows

25   that its breakup fee is going to be approved.  It also gives

1   the rest of the process the normal bidding procedures, we've

2   seen it.  I think in situations like this where time was of

3   the essence, we were - the buyer was happy to go through the

4   normal process, but there wasn't enough time.  I think we

5   tried to do the right thing, recognizing that there would be

6   risks, that our worst - today was not our worst case

7   scenario.  Our worst case scenario was if in fact the debtors

8   did find an alternative buyer, we would be here before Your

9   Honor having invested the time and resources but the debtor

10  already has a better deal, and we don't have an approved

11  breakup fee, and we're just relying on everybody's good faith

12  in asking Your Honor to approve that.  We believe that good

13  faith would have been important, not just to this deal, but

14  to the bankruptcy process and the sale process in situations

15  like this that when parties with open eyes, recognizing that

16  there's always risk until it's approved, but unless there is

17  real prejudice or a reason other than it had not yet been

18  approved, that it will be approved when the parties do the

19  right thing.  I think that's best for the process.

20          THE COURT: All right, thank you.  Mr. Klauder?

21          MR. ENGMAN: Thank you.

22          MR. KLAUDER: David Klauder for the United States

23  Trustee.  Your Honor, I'll be brief on this.  We've kind of

24  been engaging here in somewhat of an academic discussion

25  because you're dealing with a potential future deal that it

1    seems all the parties believe is very unlikely to happen, and

2    the only point we made in discussing this with the debtors

3    and the buyer before and we'll make today is, when analyzing

4    this, which you have to analyze under O'Brien and as an

5    administrative expense whether it's an appropriate

6    administrative expense, why don't we do it if this potential

7    happens, meaning if there's an alternative transaction that's

8    brought forth and the buyer feels that they're entitled to a

9    breakup fee they can come back in front of this Court at that

10   time when we know the whole scenario, and they can submit

11   their request at that point, and that's what we're arguing

12   here.  We think that's consistent with O'Brien.  I do agree

13   with counsel for the debtor in a sense that this is different

14   than what happened in O'Brien but for different reasons.

15   Here we're not dealing with bidding procedures.  We're not

16   dealing with stalking horse purchasers.  We're not dealing

17   with an auction.  This was a private sale, and that kind of

18   was the impetus behind our original objection for the breakup

19   fee at all.  If you look at O'Brien and O'Brien goes through

20   some analysis of other case law and other standards out there

21   with regard to breakup fees, it always deals with stalking

22   horse, it always deals with bidding procedures, it always

23   deals with auction procedures.  So, the Third Circuit

24   analyzed the breakup fees in that scenario which isn't

25   happening here, so I don't believe they've met the O'Brien

1    standard, and Your Honor had a point that being that they

2    have to justify the actual fee and which they haven't done

3    here either, but we threw out the alternative that it be kept

4    open, taken out of the, I guess the APA for today, kept open

5    and come back if this particular alternative transaction

6    happens, which just seems like it's not, but if it does

7    happen and we address this at a later time.  Thank you.

8            THE COURT: Since everyone seems to think this isn't

9    likely to happen, what about this to try to satisfy the U.S.

10   Trustee's objection, what about amending the order to say

11   that a breakup fee not to exceed the two and a half percent

12   will be allowed, but the exact amount will be determined on

13   appropriate motion filed with the Court after this

14   alternative bid procedure or bid is confirmed.  So that I

15   will award in advance the fact that there will be a breakup

16   fee, but the amount will have to be subject to some showing

17   that in fact it's related to whatever the actual out-of-

18   pocket costs and expenses were.

19           MR. ENGMAN: I think if it's related to our out-of-

20   pocket costs and expenses, I don't believe that I have a

21   problem with that.  The concern that I had in the U.S.

22   Trustee's formulation of necessity is that the necessity was

23   in order to have a deal now.

24           THE COURT: Well, I am convinced from the recitation

25   of facts on the record that the breakup fee is necessary to

1    get this deal done now, and because your client has served as

2    the stalking horse in the event that this transaction does

3    not close and the debtor finds another purchaser and closes

4    within 6 months, which are the conditions under this asset

5    purchase agreement, then I find your client would be entitled

6    to a breakup fee, but the amount of that fee not to exceed

7    2.5 percent would be determined upon appropriate motion filed

8    with the Court at a later date.

9            MR. ENGMAN: Thank you, Your Honor.

10           THE COURT: Mr. Klauder, would that satisfy the U.S.

11   Trustee?

12           MR. KLAUDER: I don't know.  Yeah, that's fine.  I

13   think it satisfies it but I understand what Your Honor is

14   saying.

15           THE COURT: Okay.  All right, if you will amend the

16   order, the sale order - if you want to even handwrite one out

17   if you need an order today.  I'm going to take just a ten-

18   minute recess.  If you want to do it over the recess, I'll

19   sign it now.  If you want to submit it on a certification of

20   counsel, I'll take it.  You can let me know at the end of the

21   recess.  All right, we'll be in recess for ten minutes.

22   Okay, thank you.

23           (Whereupon at 4:19 p.m., a recess was taken in the

24   hearing in this matter.)

25           (Whereupon at 4:36 p.m., the hearing in this matter

1    reconvened and the following proceedings were had:)

2             THE COURT: Do you have an order?

3             MS. SINANYAN: Yes.

4             THE COURT: All right.

5             MS. SINANYAN: Your Honor, Mr. Klauder is reading it

6    right now.

7             THE COURT: Okay.

8             MS. SINANYAN: In the meantime, I did get a copy of

9    the schedules that listed the New Jersey Department of

10   Environmental Protection, there's a couple of pages of it,

11   and it lists them as having an environmental claim.   If you

12   want, I can hand it up to the Court.

13            THE COURT: Sure, thank you.  Thank you very much.

14            MS. SINANYAN: And, Your Honor, we also have the

15   sale order.  We interlineated some language.  I'd like to

16   hand that up to the Court as well.

17            THE COURT: All right.

18            MS. SINANYAN: I don't know if you need a redline.

19   It does not contain this interlineation or we could file one

20   separately if you wanted or -

21            THE COURT: A redline of -

22            MS. SINANYAN: The sale order from the order that we

23   filed comparing it from the order that we filed originally

24   with the asset purchase agreement.

25            THE COURT: Yes.

1          MS. SINANYAN: Okay.

2          THE COURT: Okay, all right.  That's fine, thank

3    you.  Okay, does anyone else wish to be heard on the matter

4    of the sale?  Does the new order that I've been handed up

5    resolve everyone else's objections?  Okay, no one else wishes

6    to be heard.  I will sign this order that contains the change

7    made with respect to what I ordered on the record concerning

8    the stalking horse fee -

9          MS. SINANYAN: Thank you, Your Honor.

10         THE COURT:  - that order is signed.

11         MS. SINANYAN: Thank you, Your Honor.

12         THE COURT: Mr. Bernick?

13         MR. BERNICK: The next item, actually, is two items

14   that are related which are items 10 and 11 on the agenda, and

15   they relate to the terms of the stay.  I rise only because I

16   know that others have motions or requests that are being made

17   of the Court, and I tried on the break to see if we couldn't

18   come to a more precise understanding of exactly where

19   everybody stood so that maybe we could expedite this.  I

20   don't know if it yielded any fruit.  I know that others are

21   going to want to probably speak on their own.  From the

22   debtors' perspective, we were content with an order that

23   would stay the claims against the State of Montana and the

24   claims against BNSF insofar as they rose out the exposures to

25   asbestos in and around Libby.  Your Honor then entered an

 1   order that was somewhat broader and in looking at it, I tried

 2   to ask myself, Well what was Your Honor getting at?  And I

 3   went back to the transcript and you actually had expressed a

 4   little bit of frustration, maybe a little bit more

 5   frustration than that with the fact that, well, how many

 6   times do we have to keep on going through this.  Isn't there

 7   a way just to have language that solves all the problems.

 8   From the debtors' point of view, we're also content with Your

 9   Honor broader language but given how broad it is, we think it

10   is important to have a qualifier there that basically says to

11   the extent that the claims arise out of exposure to asbestos

12   in or around Libby.  On the break I asked Mr. Cohn whether

13   there was a problem with that, and he indicated that he has a

14   sensitivity, I know he can speak for himself, a sensitivity

15   to what impact that might have on the Workman's Comp cases,

16   and from my client's point of view, we understand the

17   Workman's Comp cases are proceeding.  We have no desire to

18   get in the way of that.  So, to the extent that we can make

19   that representation, we're not seeking to have that order

20   apply to Workman's Comp cases.  I'm not sure who else is out

21   there, but from the debtors' point of view, so long as the

22   effect of the stay or the terms of the stay cover the State

23   of Montana, BNSF, and any other causes of action that arise

24   out of exposure to asbestos in or around Libby, we're fine

25   with that.  We're also fine with not having that extra

1   language, but we'd kind of like to know if there's somebody

2   else out there that people already know about so that we can

3   include them.  We just don't want to go through the process

4   again needlessly.  So, the debtor has flexibility on this.  I

5   think that the issue really is what are the terms that the

6   order should read out, and we will defer to whatever it is

7   that Your Honor chooses to do with this ultimately.

8          THE COURT: All right, Mr. Lockwood.

9          MR. LOCKWOOD: Well, Your Honor, Mr. Bernick has put

10  his finger on it to some extent in saying, you know, he'd

11  like to know what else is out there.  I mean, the problem

12  with this order is that it enjoins whatever else is out there

13  without any factual record of either what it is that's being

14  enjoined or for that matter, any notice to the persons who

15  are being enjoined.  The debtors' papers are interestingly

16  schizophrenic on this whole issue because on the one hand,

17  for example, in paragraph (12) of their response brief, they

18  say, Instead the debtors and estate sought to enjoin actions

19  essentially filed - I'm not sure what essentially means when

20  it modifies filed, but anyway, essentially filed with respect

21  to exposure to the debtors' asbestos-related materials in and

22  around the Libby, Montana area.  Later on, however, in the

23  very same thing, they talk about with respect to the Libby

24  things, wanting to enjoin actions against third parties that

25  the Libby claimants have sought to proceed against including

1    the debtors' insurers, Montana vermiculite, both of whom were

2    the subject of previous orders, the State of Montana, and

3    BNSF who have asserted contractual or common law indemnity

4    claims.  Everybody, I think, with all respect to the Court,

5    agrees that the modified order that you entered with the

6    language in it which has no reference to any defendant, any

7    and all causes of action, is hard to know exactly who it's

8    going to cover and why, and Mr. Bernick just said that he

9    wouldn't object to some modification of that.  The State of

10   Montana explicitly stated that they had no objection to the

11   Committee's proposed order which would have limited the stay

12   order to those requests for injunctive relief which were the

13   only ones pending before the Court as to which

14   reconsideration was being sought, namely the State of Montana

15   and BNSF.  BNSF has joined the Libby claimants' motion to

16   alter or amend so I take it we an assume that at a minimum

17   BNSF would be happier with a less inclusive order.  The

18   problem with the debtors' proposal, frankly, is that while it

19   limits to some extent the breadth of the original order that

20   Your Honor entered, it still says after staying the actions

21   against the State of Montana, BNSF, it then goes on to say,

22   "And all actions arising out of alleged exposure to asbestos

23   in or around the Libby mine and Montana, Libby, Montana area,

24   indirectly or directly caused by the debtors."  When it says,

25   "and all actions" it doesn't say against whom.  So that

1    theoretically, we've started with the situation where the

2    Court has had relief requested by motion on notice to protect

3    two companies.

4            THE COURT: Yeah, Mr. Lockwood, let me just stop it.

5    Yes, I think the order was overly broad, and yes, I am

6    frustrated by the continual actions that contend that that

7    seemed to be end runs around the automatic stay that are

8    efforts to get to the same transactions without getting the

9    debtor involved in the case because the debtor can't be

10   involved in the case, and yes, I am getting - I think annoyed

11   is probably the right word to use because from a legal

12   perspective, and that's how I mean this, and I think it's

13   inappropriate to continue to look for new defendants when you

14   can't get to the primary defendant that you're trying to sue

15   and get behind the scenes essentially by claiming against a

16   new defendant when you can't get the primary defendant in the

17   action, and it involves the same types of witnesses and

18   activities that that primary defendant is going to have to be

19   involved in at some stage in that litigation.  And, yes, I

20   think that is the purpose why I was attempting to get this

21   order to say more than it probably should have said.  So, I

22   agree with everyone that it was too broad, and it should be

23   limited to the particular defendants involved in the actions

24   before me, and I will accept that modification.  I will

25   accept it with a warning.  I hope not to see any more of

1   these types of actions because if they continue to be

2   brought, then I am going to issue a very broad injunction,

3   and I don't know what kind of notice I'll require to be

4   given, if I have to notify every company, every entity, every

5   household, every post office box, every vacant lot, and

6   everything else that's in the Libby, Montana area that

7   they're subject to an injunction, maybe that's what we'll

8   have to do.

9            MR. LOCKWOOD: Well, Your Honor, two points.  First,

10   I think Mr. Cohn should probably respond to that before we -

11           THE COURT: I don't need a response.  I do not need

12   a response.

13           MR. LOCKWOOD: And secondly, I would just mention

14   that Your Honor did after all rule, and we believe correctly,

15   and we continue to contend correctly that you lack

16   jurisdiction to issue the order with respect to the State of

17   Montana, and I hope Your Honor is not ruling on that issue

18   today.

19           THE COURT: I'm not changing my mind with respect to

20   what I do and don't have jurisdiction over.

21           MR. LOCKWOOD: Thank you, Your Honor.

22           THE COURT: But I believe I need an order that will

23   amend my prior order to put it into the appropriate scope.

24   So -

25           MR. BERNICK: I think we can undertake and do that

1    and just to be clear so that everybody knows what will be

2    circulating.  It will be an order that is specific to the

3    State of Montana, and to BNSF, and I think it will probably

4    look a lot like the order that the ACC has tendered, but

5    we'll take another look at it and -

6              MR. LOCKWOOD: And now I would turn the podium over

7    to Mr. Cohn, if he has any additional remarks, Your Honor.

8              THE COURT: Mr. Cohn?

9              MR. COHN: I'm not going to respond to the remarks

10   of the Court.  When I'm invited not to, I don't think I'm

11   smart enough to rise to the occasion or sink to the occasion

12   as the case may be.  I am, however, here to revisit the

13   question of, and when I say "revisit", this is the first time

14   I've had a chance to address this, the question of whether

15   there should be a temporary stay at all of the BNSF actions

16   and of the State of Montana actions.  I understand that

17   that's all that's now before us because there will be as

18   stated no broader than that, but as to these you might recall

19   that the procedural sequence was that this was not asked for

20   by anyone at the time that the broader motions were argued.

21   That I had at the conclusion of those arguments, I asked to

22   be excused on the basis that matters that affected the Libby

23   claimants appeared to be done for the day, was excused, and

24   then later on that night it turned out that there was a

25   colloquy among counsel when I wasn't present which led to the

1    circulation of these temporary stay orders and ultimately the

2    entry of a temporary stay order.  So, under those

3    circumstances, I respectfully submit that I should be heard

4    with an open mind on the whole question of whether there

5    should be a temporary stay at all.

6              THE COURT: All right.

7              MR. BERNICK: Your Honor, just so that the record is

8    clear.  There was a discussion about the stay on the record.

9    This was not something that took place after the court was

10   closed down and all the rest.  Your Honor indicated that you

11   would be issuing a stay, and I'm not sure - I have no problem

12   - Your Honor, obviously, is going to hear from Mr. Cohen, but

13   I'm not sure what the real posture of this is.  If it's a

14   motion for reconsideration, if it's a motion for some kind of

15   an amendment.  Your Honor indicated that this is after all

16   preliminary temporary status quo related.  That's all that it

17   is.  It just preserve the status quo until the next time

18   around.  Now, I don't know if Mr. Cohn chose to leave, that

19   was fine, but this is something that came up in the ordinary

20   course of the Court's business.  So, Mr. Cohn, I know is

21   going to be heard out here, but it is the debtors' view that

22   it is late to be arguing somehow there's something wrong with

23   there being any kind of stay at all, a position that nobody

24   else is arguing here.

25             MR. COHN: I should be flattered that Mr. Bernick

1    feels the need for a preemptive strike of this type, but let

2    me continue with what I was going to say, Your Honor.  Point

3    number one, when any stay is entered, then one of the

4    criteria that needs to be satisfied is a weighing of the

5    harms and in this case, Your Honor, the imposition of these

6    stays results in terrible harm to the people of Libby who

7    continue to die and go through the end stages of life with no

8    access to 24-hour care.  You talk about irreparable harm,

9    that is the very definition of irreparable harm.  There's

10   nothing that will ever be able to be done for these people in

11   the last year of their life to provide them with the care

12   that they need if this stay is entered now such that they

13   can't pursue the defendants to whom they do have access

14   because they're not protected by the automatic stay.  The

15   second point, Your Honor -

16          THE COURT: I'm sorry.  I understood the words, but

17   I don't understand why.

18          MR. COHN: Well, because, Your Honor, we acknowledge

19   we were crossed down by the automatic stay.  We have no - we

20   can get no relief from Grace for the foreseeable future,

21   until the whole -

22          THE COURT: Right.

23          MR. COHN:  - Chapter 11 process plays itself out.

24   There are, however, these other defendants, BNSF, for

25   example, there have been settlements reached and there are

1    settlement discussions of BNSF cases.  So to the extent that

2    those case aren't stayed, there will be settlements and some

3    people will, those people whose cases are settled will get,

4    if they're still alive, they'll still get that financial

5    ability to get 24-hour care that they need in the last months

6    of their lives.  So that - and same if we're, you know, we're

7    allowed to pursue the state, there's a possibility that there

8    would be settlement of that litigation on such terms as we

9    provide these people, while they're still alive and while

10   they still need this care, with the opportunity to obtain

11   this type of care.  That's what this is all about for the

12   Libby claimants at this particular moment.  That's the

13   urgency of it from their perspective.

14          MR. BERNICK: Your Honor, at this point I do object.

15   That is an argument that goes to whether the Court should

16   decide in their favor the ultimate merits of a matter that's

17   been taken under submission by the Court.  The only issue

18   that brings us here today is a temporary stay, a temporary

19   stay to preserve the status quo pending Your Honor's decision

20   with regard to the merits of whether this litigation against

21   BNSF should go forward at all.

22          MR. COHN: I actually agree.  I actually agree with

23   Mr. Bernick's -

24          MR. BERNICK: Excuse me, so the only issue that - if

25   any issue is to be addressed is why the Court doesn't have

1    the power or should not issue a stay to preserve the status

2    quo until you rule on the merits.  And the argument that's

3    been made is - doesn't really address that.  The argument

4    that's been made is yet another argument with respect to the

5    ongoing issue of whether this kind of litigation should go

6    forward at all.

7          MR. COHN: First of all, Mr. Bernick is right that

8    the sole issue that is now before the Court is the issuance

9    of a temporary stay.  The point that I'm making is that the

10   law is clear that under - whenever any stay is issued, the

11   balancing of the harms and the existence of irreparable harm

12   are before the Court, and that's true of a temporary stay and

13   it's true of a long-term stay, so, it's true of any stay.

14   That's one of the criteria, and in this case, as it effects

15   the Libby claimants, that's a very drastic criteria on a very

16   human level.  These people are suffering.  They need relief.

17   Their only hope for relief is to get settlements from non-

18   Grace defendants and a temporary stay in fact is going to

19   preclude that from happening.  And if it last for

20   quote/unquote "only a few months" there are people who are,

21   you know, for whom those few months are going to result in

22   agony and a kind of indignity and pain, unnecessary

23   suffering, that we hope could be prevented if there were no

24   stay.  So that's the point that I'm making, Your Honor,

25   applicable to any stay of any duration.  The second point,

1    Your Honor, has to do with probability of success because of

2    course that's another criteria you would need to consider

3    before the issuance of any stay, and in this case where

4    you've already ruled that you do not have jurisdiction in the

5    context of the State of Montana litigation, the burden, of

6    course, is on the state to come before you and seek

7    reconsideration, which they've done, but given that they have

8    the burden, given that you already ruled that you don't have

9    jurisdiction, it strikes me that it would be very difficult

10   to find it possible for the state to satisfy, to make any

11   showing that it has a probability of success on the merits,

12   and as I say, that applies to any stay no matter how

13   temporary.

14        THE COURT: But that is not the same with BNSF

15   though.  I have not ruled that I don't have jurisdiction with

16   respect to BNSF.

17        MR. COHN: That is true, Your Honor, that is true,

18   and as to BNSF I would add, but I'm just really going to say

19   this because Mr. Bernick is right, that it would not be fair

20   for me to stand here and argue again on the overall merits,

21   but I do believe that it's clear from the papers that they're

22   basically similar situations and that to the extent that you

23   don't have jurisdiction to enjoin the state, you almost

24   certainly have jurisdiction to enjoin actions against BNSF,

25   but I'll say no more on that because that would be rearguing

1    the merits of the argument that you already heard at great

2    length the other day.

3            THE COURT: All right.

4            MR. COHN: One more point, Your Honor, about

5    temporary stays.  There is no such thing under the law as a

6    temporary stay which is not either a TRO or a preliminary

7    injunction.  We have Rule 65.  Rule 65 has time limits.  The

8    Supreme Court of the United States has said in the <u>Sampson</u>

9    case which we cited in our papers that any stay that lasts

10   beyond the 10 or 20-day period, provided by Rule 65, is by

11   definition a preliminary injunction no matter how it is

12   labeled.  So to the extent that this Court in order to, for

13   whatever reason, whether, you know, it's quote/unquote "on

14   the merits" or whether, you know, it's quote/unquote "to have

15   more time to decide" while the matter's under advisement, but

16   for whatever reason a stay is entered, if it exceeds the 10

17   or the 20-day period, it is a preliminary injunction and must

18   meet the standards for a preliminary injunction, and there

19   has been no demonstration that that standard has been met.

20   When we were here to argue on the merits, Your Honor, one of

21   the things that became clear in our procedural discussion is

22   that Grace has not introduced any of the evidentiary

23   foundation that it would need to obtain a preliminary

24   injunction, and your thought on that subject was, Well, why

25   don't I first look at the legal issues, and we'll get to the

1   evidence only if we need to get to the evidence later on.  So

2   right now we're in a position where there has been no

3   evidentiary showing whatsoever, and so there's no basis for a

4   preliminary injunction and hence, we respectfully submit no

5   basis for a stay that lasts longer than the 10 or 20-day

6   period permitted by Rule 65, and so we opposed a temporary

7   stay greater than the 10- or 20-day duration on that basis as

8   well.  Thank you.

9           THE COURT: All right.

10          MS. AARONSON: Your Honor, Anne Aaronson on behalf

11   of BNSF Railway.  I concur in the statements of the State of

12   Montana's counsel.  BNSF also believes that there's no basis

13   for a preliminary injunction in this case.  I understand that

14   you have a temporary stay in place just until you decide the

15   merits, but the status quo of the cases involving BNSF was

16   not a stay before Your Honor, the temporary stay, and -

17          THE COURT: Was not what?  I'm sorry.

18          MS. AARONSON: Those cases were not stayed.  Those

19   cases were proceeding at the time, and so, BNSF wouldn't

20   oppose a short temporary stay, but in the long run, as well

21   as the plaintiffs, BNSF will be harmed by the delay in the

22   litigation, and these are independent claims against BNSF.

23   The debtors are not a defendant in any of these cases except

24   four that were filed pre-petition.  The rest are all post-

25   petition claims, do not involve the debtor, and they're

1    independent claims, and we don't believe there's a basis for

2    a preliminary injunction here, and that's all that I have to

3    say on that.

4              THE COURT: All right.

5              MR. MANGON: Good afternoon, Your Honor.  Kevin

6    Mangon on behalf of the State of Montana.  I rise to indicate

7    our - as the Committee had indicated, the state does not

8    oppose their relief.  Specifically, we're asking that the

9    Court continue the temporary stay as to maintain the status

10   quo relating to causes of action against the State of Montana

11   pending resolution of the various injunction motions as well

12   as the motions for reconsideration, which you heard

13   considerable argument on May 21st, and it was at that hearing

14   that the Court ruled that the temporary status quo would stay

15   in place until the Court had an opportunity to address the

16   motions for reconsideration.  Your Honor, we would again

17   request that this temporary status quo stay in place pending

18   your decision.

19             THE COURT: Okay.  Is the briefing and everything

20   now - the arguments are all done, is everything finished on

21   the motions for reconsideration?

22             MR. BERNICK: Yes, I believe that that's correct.  I

23   think that they were actually completed -

24             THE COURT: At the argument.

25             MR. BERNICK: I think what Your Honor suggested was

1    that we have the stay that you - I think it was, withdraw the

2    prior order but that you were going to issue an opinion on

3    the matter.  That is, that you wanted, and I think that we

4    can get the transcript, but that you wanted to address the

5    order that was the subject of reconsideration, you wanted to

6    address that in an opinion.

7         THE COURT: Well, I thought what was going to happen

8    was that Mr. Monaco's client was withdrawing a motion.  I

9    don't know if that's happened, and that I was, once that

10   happened, going to reconsider the other order, but I think

11   I've lost track of -

12        MR. MANGON: Your Honor, procedurally, we had filed

13   two motions, the State of Montana.  A motion for

14   reconsideration of the Court's April 16th order denying the

15   extension of the preliminary injunction to the State of

16   Montana, as well as your April 16th order denying the motion

17   for relief from the automatic stay that the State of Montana

18   had.  It was at that hearing that it was agreed that the

19   State of Montana would withdraw its motion for relief without

20   prejudice.

21        THE COURT: Right.

22        MR. MANGON: And that has been done -

23        THE COURT: Okay.

24        MR. MANGON:  - pursuant to the order, and that's

25   where we stand now, Your Honor.  It has been withdrawn and

1    the Court vacated its opinion and order with regard to the

2    motion for relief.

3            THE COURT: Okay.

4            MR. BERNICK: But then you said, "I'll deal with the

5    opinion on my own and the adversary".  I think that's your

6    prior opinion, "but I think that the stay order will provide

7    a temporary stay just to be sure that nothing happens that

8    anyone's prejudiced in Montana while I've got these other

9    issues under advisement".

10           THE COURT: Okay.

11           MR. BERNICK: I have only one thing to add in

12   response to Mr. Cohn's comments which is, I don't think

13   that's actually - he's recited actually in accurate fashion

14   what the law is.  The Court has very broad powers, as I know

15   that Your Honor is very familiar under § 105, and the real

16   litmus test for relief under 105 is impact on the

17   reorganization, and it's not necessarily the traditional

18   balancing, although, obviously as a court of equity Your

19   Honor could always consider all those different factors.  But

20   105 is a little bit different from ordinary TRO and

21   preliminary injunction proceedings in that it provides more

22   flexibility to the Court, but I think we have nothing further

23   to add on the subject.

24           THE COURT: Okay.  Mr. Cohn, I think it's still

25   appropriate to keep in place the preliminary injunction.  I

1   will attempt to get an opinion out very promptly.  I'm

2   calling this a temporary stay.  I really have not been

3   looking at this either as a temporary restraining order or as

4   a preliminary injunction.  I've really been looking at this

5   as simply a stay of litigation not under Rule 65 standards

6   but more under 105 standards for that reason until I have an

7   opportunity to take a look at the opinion and the

8   reconsideration motions that have been filed, and I think it

9   is still appropriate to keep that stay in place.  Having said

10  that, to the extent that BNSF wants to continue to negotiate

11  with the plaintiffs, with the Libby claimants, to attempt to

12  get some form of settlement done, I certainly have no

13  intention of standing in the way of your efforts to try to

14  settle cases.  So, to the extent that you've got plaintiffs

15  who are in extremis and BNSF wants to attempt to negotiate

16  some resolution, I don't think this stay order is intended -

17  let me state that positively.  The stay order is not intended

18  to prohibit you from entering into settlement agreements.  It

19  is intended to stop the discovery issues and the litigation

20  from going forward in the state court, but if you and BNSF

21  want to go forward with settling cases so that you can, you

22  know, provide some comfort to those people who may

23  unfortunately be dying, this Court's not going to stand in

24  the way of doing that.

25          MR. COHN: And we can add some language to the order

1    that makes it clear that, for example, if we need to do a

2    dismissal or, you know, get Court approval out there in the

3    context of settlement agreements, that we're able to do that

4    notwithstanding the temporary stay?

5         THE COURT: With BNSF?

6         MR. COHN: Yes.

7         MR. BERNICK: Well, sure.  BNSF wants to spend its

8    own money to resolve its own liability.  Far be it from us to

9    get in the way if you would be happy with that, but I think

10   that the reason we're here and if the debtor does have a

11   concern, it's not simply gratuitous, it is that there's the

12   potential for a claim over by BNSF against Grace, and again,

13   if they want to pay out of their own pocket and forgo any

14   possible claim against us, that's fine, but to the extent

15   that the Court approval in Montana then has some effect under

16   Montana law of either creating a foundation for or otherwise

17   implicating the ability to make a claim over against Grace,

18   we would have no choice but to then participate in that

19   proceeding.  They then would have no choice but to ask Your

20   Honor's permission to lift the stay for purposes of having

21   that determination go forward.

22        THE COURT: Well, I mean, to the extent that BNSF

23   thinks it has a claim, it's going to file a claim, and to the

24   extent that the debtor disputes it, the debtor is going to

25   dispute it.

1          MR. BERNICK: It's just like - It's just a little

2     bit like, although I hate to say it, the insurance companies

3     are always very concerned about proceedings that take place

4     here that may have some collateral affect against them

5     elsewhere, and by and large, they have been successful and

6     perhaps with good reason in getting protection against that

7     eventuality through obtaining relief by this Court.  It's the

8     same kind of thing.  We don't - If they want to go to get

9     relief from a Montana court in some fashion, that's fine, but

10    we want it to be completely neutral, no affect on us

11    whatsoever.  So what we're really saying is, we would object

12    to putting it in the order at this point in time, I think

13    that it would take a little bit more work to think about how

14    that actually works out, and if they want to then make

15    representations that they're not going to come after us for

16    the money, we're not going to have any issue, but if they

17    fail to make those representations, then we're kind of back

18    at the beginning.

19         THE COURT: Well, BNSF has said that, you know, it

20    doesn't mind a temporary stay, but its position has been that

21    these are direct claims against BNSF and as to which the

22    debtor isn't involved, if it's a direct claim, that's what

23    counsel just said on the record.

24         MR. BERNICK: Well, it's very careful and I don't

25    mean to suggest that there's kind of a parsing of words here.

1  They're saying that there is a direct liability claim against

2  them.  That's what they're saying, but they're not saying

3  that they will not seek on the basis of the outcome of that

4  claim relief against Grace.

5          THE COURT: Well, but they're permitted to settle

6  their direct liability claim whether or not they decide at

7  some point to seek against Grace.

8          MR. BERNICK: They can go settle if the want -

9          THE COURT: Yes.

10         MR. BERNICK:  - but they can't go to a Montana

11 court and get some kind of determination that may have some

12 effect with regard to them perfecting a right against Grace.

13         MR. LOCKWOOD: Your Honor, Your Honor -

14         MR. BERNICK: Excuse me -

15         MR. LOCKWOOD:  - non-debtor defendants in across -

16 Mr. Bernick, you interrupt people constantly.

17         THE COURT: Just a minute, gentlemen.

18         MR. LOCKWOOD: Your Honor -

19         THE COURT: Look, it's getting late, and if you want

20 to stop we'll adjourn for the day.

21         MR. LOCKWOOD: No, no, no, I just -

22         THE COURT: Otherwise don't interrupt, Mr. Lockwood.

23         MR. LOCKWOOD: Will you apply that rule to Mr.

24 Bernick?

25         THE COURT: I will apply that rule to Mr. Bernick.

1          MR. LOCKWOOD: Thank you, Your Honor.

2          THE COURT: Mr. Bernick, go ahead.

3          MR. BERNICK: Yeah, I was just saying that to the

4     extent that the proceeding in the Montana court then has some

5     implications with respect to a Grace exposure to a claim at

6     some point in time, we would then, presumably, have some need

7     to show up in Montana and deal with that, and I don't know

8     the answer to these questions right now, but I would object

9     in taking this up as kind of an ancillary issue that is after

10    all associated with a much narrower question and that is

11    whether there should be an interim stay.  Your Honor has said

12    that.  Your Honor, we talked about the prongs of that stay,

13    let's leave that alone.  If they want to come back or come to

14    us and say they want to be free to make application to a

15    Montana court for some purpose, maybe we'll be satisfied that

16    there's no need to seek any relief from Your Honor, but I

17    don't think we should have this issue addressed and somehow

18    resolved without any real process at all at this point in

19    time.  I don't know enough about what their position is going

20    to be.  I don't know enough about what the Montana courts

21    would do and what effect that would have on the debtors'

22    rights.

23          MR. LOCKWOOD: Your Honor, Mr. Bernick and his

24    client are in the same state of ignorance in fifty state

25    courts around this nation where co-defendants who could

1    potentially bring contribution claim against Grace are

2    settling cases by the dozens if not the hundreds and the

3    thousands.  Your Honor has taken a humanitarian approach here

4    to say that, you know, you're not going to interpret an

5    injunction against litigation with quote - remember the

6    rationales that Mr. Bernick has asserted for this.  Automatic

7    indemnity, identity of interest, record taint - all of those

8    things happen in litigated actions and decisions by courts.

9    They don't happen in settlements.  Now he's speculating that

10   if somebody got an approval of a settlement in a Montana

11   court, all of a sudden something that court would start

12   making findings of fact about the merits of whether there's a

13   contribution claim against Grace?  That just doesn't happen.

14        THE COURT: Well, I think I can make it clear that

15   no findings against Grace are being unstayed.  Is that the

16   right word.  The stay is not being lifted with respect to any

17   findings with respect to Grace.  What I will permit, however,

18   to the extent that BNSF and a particular plaintiff are able

19   to settle a claim and it requires some action to dismiss or

20   otherwise terminate an action in a Montana state court, then

21   the stay will not apply - this temporary stay will not apply

22   to taking that action in the Montana state court so that you

23   can terminate the litigation based on your settlements.  I

24   don't see why it would take an order of a state court to

25   approve the settlement.  It should only take an order of the

1    state court to dismiss or terminate the action.  So I'm not

2    lifting the stay for the state court to approve the

3    settlement.  You folks can enter into whatever the settlement

4    is that you need to enter into, but then take the action to

5    terminate the litigation in the state court.  Is that clear

6    enough?  That should take care of what you need.

7         MS. AARONSON: Yeah, I think that what Mr. Bernick

8    was asking for is for essentially BNSF to waive an indemnity

9    claim against, you know, as a result of us settling cases,

10   which is something that -

11        MR. BERNICK: We're not asking for any waiver at

12   all.  We're just asking for - Well, Your Honor, I think -

13        MS. AARONSON: Well, I mean, you were saying that if

14   an order was entered in the Montana court then essentially

15   we'd be paying out of our own money and not have a claim to

16   get back against Grace, which that has to do with the

17   contracts between BNSF and Grace.  It has nothing to do with

18   the -

19        THE COURT: All right.  I think we've got it

20   straightened out.  I think the order at this point is clear.

21   Somebody get it from the transcripts so that we know what

22   it's going to say.

23        MS. AARONSON: Thank you, Your Honor.

24        MR. BERNICK: It's dismissal versus approval.

25        THE COURT: Well, some termination.  Dismissal or

1    whatever the appropriate termination of the litigation action

2    is.  Okay, so on items 10 and 11, I will get an order from

3    the debtor after the debtor runs it through all counsel

4    including counsel to BNSF and counsel to the Libby plaintiffs

5    that will keep the stay in place on a temporary basis, but

6    with this caveat concerning settlements between BNSF and the

7    Libby plaintiffs and the need to terminate litigation as a

8    result of a settlement if it's achieved, and hopefully that

9    will solve the immediate problem.

10             MR. BERNICK: Thank you, Your Honor.  I think we're

11   going to at this point turn to item 19 which relates to the

12   law for discovery, and I guess I would suggest that the way

13   to proceed here, we did - I don't want to revisit all the

14   history here, but Your Honor will recall that the last time

15   we were before the Court with respect to what to do to follow

16   up on some of the problems that the debtor had identified in

17   the information that had been provided from the law firms,

18   and we came in to ask for or I believe we noticed up

19   depositions.  There was a motion for a protective order and

20   the alternative proposal that was made at that time by the

21   law firms was to go with interrogatories and no depositions.

22   So in a sense there were two positions that were established.

23   One said interrogatories, general interrogatories, the other

24   said depositions.

25             THE COURT: But what agenda item number are we on?

1          MR. BERNICK: This is 19, I'm sorry.

2          THE COURT: I'm sorry.

3          MR. BERNICK: I really apologize this is item 19.  I

4    think that there is - I'm not sure if there's any other item.

5          THE COURT: Okay.

6          MR. BERNICK: And at that time, Your Honor kind of

7    chose a middle course, and the middle course was to kind of

8    phase it.  So the idea was that there would be first of all

9    interrogatories and then the motions for protection on the

10   depositions would be held in suspense, and we'd see where we

11   were.  There was an effort to actually craft the

12   interrogatories at the conference in the conference room in

13   Pittsburgh.  We came back in.  There was further colloquy and

14   the long and short of it was that during the course of the

15   rest of the ensuing days, there was discussion of how to

16   proceed in order to get a better set of interrogatories and

17   ultimately an agreement was reached pursuant to which the

18   four law firms that were at issue, that is Motley, Rice,

19   Kelly & Farraro, Baron & Budd, and DiAngelo's firm agreed to

20   answer the interrogatories that we had drafted and to then

21   take the matter up with the Court at this time.  So,

22   essentially we got, this was the third set of

23   interrogatories.  Answers to those interrogatories were

24   provided on the 13th as the debtor promised a report was then

25   made to the Court and to the other side, the following week,

1    which was last week, basically taking up the question of

2    whether the information that had been provided pursuant to

3    those interrogatories was sufficient to obviate the need for

4    depositions.  So, that report was turned out and this matter

5    was then set on the agenda for today to take up the question

6    - with the carryover question about wether the depositions

7    should proceed in light of the interrogatory answers that had

8    been provided to the third set of interrogatories.  So,

9    that's the posture, I'm not going to go further back in the

10   history.  My intention this afternoon, Your Honor, was two-

11   fold.  One was to talk about the need for depositions which

12   we believe is still there with respect to the law firms that

13   have now answered the third set of interrogatories.  And the

14   second is to ask now that process has been completed

15   with respect to these firms, and actually it has taken place

16   relatively quickly, all the deadlines have been met, we want

17   the same set of interrogatories to be answered by the other

18   firms. Your Honor will recall that the last time that we took

19   the matter up, we had made the decision to focus on the four

20   firms in order to get a live issue before Your Honor.  Your

21   Honor then indicated, and I think we can talk about the

22   transcript if need be.  Your Honor indicated that whatever

23   was going to happen with the four firms would then - that the

24   Court hoped that it would be able to provide a template so

25   that there would be consistency in dealing with the other

1    firms.  So, two areas: One is what to do with the four firms.

2    The other is what to do with the balance of the firms.  I'll

3    also note for the record that Ms. Ramsey, as I understand is

4    down in the friendly confines of Costa Rica and pursuant to

5    the agreement that we reached last time, none of what we talk

6    about today is designed to address either Early, Ludwick or

7    Brighton Purcell.  We, in respect for Ms. Natalie's vacation

8    - Ms. Ramsey's vacation schedule, we've deferred that issue

9    until she gets back and that's a fairly specific issue as

10   well.  So, I'm happy to proceed law firm by law firm or do

11   the whole group and then Your Honor can take the responses,

12   whatever you believe is most appropriate, happy to do it.

13   Maybe we should go through at least one firm, and then kind

14   of see how it goes, and then take that issue up again.

15   Whatever Your Honor would like.  We have made progress.

16   We're no longer seeking depositions with respect to

17   D'Angelo's firm at all.  We think that the information that

18   was provided in the interrogatory answers together with other

19   information that D'Angelo's firm has provided is adequate to

20   give us the factual background that we need for purposes of

21   the estimation.  With respect to the other three firms, I'm

22   going to begin with Motley, Rice.  We have gotten important

23   information.  It is not the object of my report today to talk

24   about the implications of any of this information with

25   respect to the estimation that is a subject that's going to

1    require probably a significant brief that we would file,

2    talking about what does all of this mean, and that's not what

3    we're seeking to take up today.   What we're taking up today

4    are the gaps that remain in the information that has been

5    provided, and why it is that the depositions are necessary to

6    cure those gaps.  I'm going to go through all of the three

7    firms that remain, and in each case, what I'm going to end up

8    talking about is really two major areas.  If we talk about

9    Motley, Rice, we're first of all going to be talking about

10   the B-reads, and then talking about the personal injury

11   questionnaires because effectively the reason that we've

12   asked for the law firm discovery and Your Honor has approved

13   that as an approach is that there have been a series of

14   issues that have related to whether B-reads are still being

15   withheld under an incorrect assertion of the consultant's

16   privilege and with respect to the personal injury

17   questionnaire whether in fact the information that the

18   questionnaire requires has been provided and also the related

19   question about whether all of the information that will be

20   used in connection with the estimation process has been

21   provided.  So, it's really kind of on parallel tracks.  Both

22   the B-reads and the PIQs are the subject of specific orders

23   of this Court.  So we're not asking for any further orders to

24   support or to give bite to the requirements for asserting the

25   consultant's privilege or giving bite to the requirements of

1    the PIQ, they've already been the subject of outstanding

2    orders and their plans.  It's only a question of assuring

3    compliance with those orders.  With respect to Motley, Rice

4    and beginning with the B-reads.  Does this - Okay.

5          MR. ESSERMAN: David -

6          MR. BERNICK: Yeah.

7          MR. ESSERMAN: Before you get into the details of

8    each firm, all of these questionnaires were filed under seal,

9    I believe or supposed to be filed under seal.  They were

10   subject to a confidentiality order, and I don't think that

11   they should be put on the public record.  I don't know what

12   you intend to say and perhaps this is overly cautious, but -

13         MR. BERNICK: Well, that's a fair point.  I

14   appreciate your raising that.  At some point we will want to

15   describe and indeed show some of the answers, but I don't

16   believe at any point we are going to be disclosing any

17   information that is personal to any claimant, any information

18   that relates to some kind of litigation strategy, and I don't

19   really think that there is - I understand you filed it under

20   seal, but I don't believe that it was the intendment of this

21   Court to have the whole process of finding out whether

22   there's been compliance with court order, which is all that

23   this deals with, is compliance with court order, now be the

24   subject of a proceeding that's not open to public scrutiny.

25   This is just discovery from clients.  So, we're very

1  cognizant of the concern with somehow the waiver of some

2  privilege, but none of the facts that I'm going to go into

3  today deal with any kind of work product at all or show work

4  product.

5       THE COURT: Well, I think you need to show counsel

6  what it is that you're planning to put up because my

7  understanding of the confidentiality order is that it was

8  essentially not going to be used on the public record.  I

9  don't think it should be disclosed on the public record

10 unless there's an agreement that it will in fact not violate

11 a confidentiality privilege.  You know, to the extent that an

12 answer without an identification of who it came from is put

13 out, that may not cause a problem, but -

14      MR. BERNICK: It's all the answers are - and I'll

15 just say, we're - I think that there is virtually not a

16 single answer that we received from any client in response to

17 - any law firm in response to these requests that has any

18 identifying information with respect to any claimant.

19      THE COURT: Well, as I said, you need to show it to

20 counsel before you put anything up on the public record.

21      MR. BERNICK: Well, then, what I would propose - I'm

22 sorry.  What I would propose - I'm happy to do that, I mean,

23 it's just - it's all of the answers.

24      MR. ESSERMAN: It's easier just to seal the

25 courtroom because I think we're getting in there by

1    indirection versus direction.

2          MR. BERNICK: That's fine.  I think if they want to

3    do that, Your Honor, that's fine, and then -

4          MR. ESSERMAN: Well, I don't know what you're going

5    to say.

6          MR. BERNICK: Well, I'm going to say whatever is in

7    the interrogatory answers.

8          MR. ESSERMAN: Well, the interrogatory answers have

9    been filed under seal is the problem.

10          MR. BERNICK: I understand.  It was at your - Your

11   Honor, it was at their request, you acceded to their request.

12   We said that it's not necessary.  It's going to have exactly

13   the effect that we're talking about now, but if Your Honor

14   wants to clear the courtroom so that we can have an open

15   discussion about what we believe to be their substantial

16   discovery problems, happy to do it, and Your Honor can

17   consider what to do with the record.  I don't have a dog in

18   the fight over whether we have other people in the courtroom.

19   I just want to get on with the business of the day.

20          MR. ESSERMAN: We've got an order on the subject.

21   It just seems to me that rather than risk an inadvertent

22   disclosure by Mr. Bernick, it just is easier -

23          MR. BERNICK: Just to be clear.  There's no

24   inadvertent disclosure that Mr. Bernick is going to make.

25   I'm going to read from their interrogatory answers.

1          THE COURT: That are filed under seal.

2          MR. BERNICK: I understand that, over -

3          THE COURT: You're not going to read from them on

4    the record.

5          MR. BERNICK: Well, then, I -

6          THE COURT: You can point to them and tell me which

7    interrogatory answer to read, I have them, and we can handle

8    it that way because everybody who needs them has them, and

9    that will certainly be an adequate representation without

10   disclosing what they are, then -

11         MR. ESSERMAN: Or describing what they are.

12         MR. BERNICK: Well, Your Honor, at that point that

13   is - I mean, it is almost unthinkable that discovery

14   compliance could require the sealing of the courtroom, but if

15   Your Honor - emptying the courtroom.  I do not want to be

16   impaired in my ability to point out to the Court and argue to

17   the Court what our position is.

18         THE COURT: Mr. Bernick, I don't usually have

19   arguments on discovery issues, so, you know, I'm not even

20   sure why I'm having an argument on this one, but nonetheless

21   -

22         MR. BERNICK: Well, that's fine, Your Honor.  We're

23   happy to have the depositions go forward.  I don't know what

24   else I can do.  We submitted it to Your Honor.  We submitted

25   it under seal.  We've described what it is we're going to do.

1    If - We'll proceed any way that Your Honor wants.

2              THE COURT: I think at this point it's probably best

3    that I simply have the courtroom cleared of anyone who is not

4    counsel to a party in the case, make sure that everyone who

5    is here is subject to a confidentiality agreement.  You will

6    have to assure me on the record that you are.  I will

7    terminate the Court Call proceedings so that there is no one

8    on the phone for a period of roughly, what, Mr. Bernick?

9    Twenty minutes?

10             MR. BERNICK: I'm happy to get through it in 20

11    minutes.  I doubt that it will take 20 minutes.

12             MR. HERRICK (TELEPHONIC): Your Honor, this is John

13    Herrick with Motley, Rice.  As it appears that my firm is the

14    target of this request here today, it's going to be very

15    difficult for me to respond if you terminate the Court Call.

16             THE COURT: Well, then, perhaps I need to do this on

17    another day where we set up a separate conference call to do

18    nothing but this because otherwise I don't know how else I

19    can manage with people who are on the phone and not

20    identified.  So, perhaps we need to do it - I have time

21    Thursday afternoon because Pittsburgh Corning and Narco Injet

22    (phonetical) all canceled.  So -

23             MR. LOCKWOOD: That makes sense to the ACC, Your

24    Honor.

25             MR. BERNICK: Well, whatever it is that you want to

1    do.  I think that it - What's going to happen if you seal

2    this, it is undoubtedly going to be - I don't say

3    "undoubtedly", nothing is undoubted, as I said this

4    afternoon.  I think it is likely that there's going to be

5    some request to unseal this and all that this does, again, I

6    would be very interested to learn for what other proceeding,

7    this is a discovery dispute over privilege.

8         THE COURT: Mr. Bernick, here's your choice: I'll do

9    it on the papers, and I won't have an argument, and then it

10   will be easy, because I already have the information under

11   seal.  So if that's how you wish to proceed, I'll do it that

12   way because I don't have to have an argument on a discovery

13   dispute.  I've got the papers.  I can handle it that way.

14        MR. BERNICK: Let me take that up with my - We may

15   be prepared to do that in the interest of getting this thing

16   to go forward.

17        THE COURT: All right.

18        MR. HERRICK (TELEPHONIC): Your Honor, in that

19   regard - this is John Herrick again.  If the Court decides

20   that they would like to make a ruling on the papers, then I

21   need to have the opportunity to respond to Mr. Bernick's

22   submission which we just received very late last week.

23        MR. ESSERMAN: Yeah, the response, the debtors'

24   papers were received by all the parties Friday night, and

25   think there was 50-some pages.  None of the firms have had a

1    chance to respond to those, and we'll be happy to submit this

2    on papers, Your Honor, but we would like a chance to respond.

3         THE COURT: Yes, well, you'd have to have a chance

4    to respond, but frankly I'd like a response in any event so

5    that I can have a more reasoned argument anyway.

6         MR. BERNICK: Well, Your Honor, that's fine.  We can

7    just take this off, and we'll proceed however it is that Your

8    Honor wants.  We can have this in a sealed courtroom.   The

9    issue is not going to go away, it will just take up more

10   time, and then we're going to be asked for relief from the

11   schedule so that we can get the information that we need and

12   to the reports that we want -

13        THE COURT: Mr. Bernick, I am not giving relief from

14   the schedule -

15        MR. BERNICK: Well, then, Your Honor, I -

16        THE COURT:  - not to anybody, not for any reason.

17   I'm not doing it.  I've given every bit of relief from the

18   schedule that I'm giving to anybody for any reason.  I'm not

19   doing it.

20        MR. BERNICK: Then Your Honor has to - I

21   respectfully ask for Your Honor to explain to the debtor how

22   it can be that we don't get relief from the schedule when we

23   are not getting the information that we need.  Your Honor

24   said specifically that it was set over for today.  They now

25   have said, Well, it's sealed so we can't proceed.  We're

1    prepared to proceed today.

2         MR. LOCKWOOD: Your Honor, I object to this -

3         THE COURT: Well, Mr. Bernick, we're having

4    something on Friday.  You may be able to proceed, but if the

5    other parties haven't received the information -

6         MR. BERNICK: No, they got it on Thursday.

7         THE COURT: Well -

8         MR. BERNICK: No, they got it on Thursday pursuant

9    to - Your Honor set a specific schedule, very specifically.

10   We agreed on an expedited basis to respond to their

11   submission of last week.  We agreed - We worked around the

12   clock to get this submission done as a further report so we

13   could meet Your Honor's schedule for having it done today so

14   that we could take up the depositions today.  So, the idea

15   that somehow we were dilatory is, I think -

16        MR. ESSERMAN: No one's saying you're dilatory.

17        THE COURT: Gentlemen, stop.  I am not going to put

18   up with this.

19        MR. BERNICK: Your Honor, we're prepared to -

20        THE COURT: Mr. Bernick.

21        MR. BERNICK: Yes.

22        THE COURT: What's the schedule tomorrow, Mona?

23        (Microphone not recording.)

24        THE COURT: I thought that was canceled.

25        (Microphone not recording.)

1          THE COURT: Okay, I thought the status conference

2    was canceled.  Is it back on?

3          (Microphone not recording.)

4          THE COURT: What time is that?

5          (Microphone not recording.)

6          MR. BERNICK: If I can make a suggestion, Your

7    Honor.  If Your Honor would go back to the paper that we

8    filed, we have an Appendix A to it, and you will see the

9    quotations that we have from the interrogatories, and maybe

10   we can take a few minutes to do that, and maybe Your Honor

11   then can determine whether this matter really is so sensitive

12   as to require the lengths to which we're talking about.  If

13   it is, it is, but I really think that if Your Honor looks at

14   that you'll find that it's the kind of stuff that you have

15   every day of the week in dealing with privileged litigation

16   matters.  Answers to interrogatories, answers to document

17   requests, it's the same old stuff.

18         THE COURT: Well, I am not willing at this point in

19   this proceeding to take on the risk that there will be some

20   even inadvertent disclosure of information that should remain

21   confidential.  I'm not totally sure because I don't know

22   where this discussion is going to go that there won't be

23   something that will - even inadvertently and not even

24   necessarily from the debtor become or violate that

25   confidentiality privilege.  It would be just easier to make

1   sure that it doesn't happen in that context, Mr. Bernick.

2   So, the choices are these: Either I get briefs filed very

3   shortly, and I deal with it in chambers on my own or, I can

4   schedule an argument tomorrow morning after I have half an

5   hour status conference on a disclosure statement hearing.

6   So, we can do it at 10:30.  I honestly don't know what time

7   my flight is out of here, so I can't tell you how long you

8   have, probably not more than two hours, but frankly I'm not

9   going to let you argue this for two hours anyway.  And/or

10  Thursday afternoon.

11          MR. ESSERMAN: I've got an important meeting in San

12  Francisco that I've got to leave tomorrow.  I can take an

13  all-night flight and get in Thursday morning, and so I can be

14  here Thursday, but I cannot be here tomorrow or Wednesday.

15          THE COURT: Well, Thursday it can be by phone too.

16  I mean we could do it by phone.

17          MR. ESSERMAN: I'll be here on Thursday.

18          THE COURT: Well, it will be in Pittsburgh.

19  Thursday we'll be in Pittsburgh.

20          MR. BERNICK: Thursday - I'm sorry, Sandy.  Is that

21  Thursday morning or Thursday -

22          THE COURT: Afternoon.

23          MR. BERNICK: So that would make - I could probably

24  do it Thursday afternoon.  I have to get from San Francisco

25  back as well on Thursday, and I have to be in Michigan on

1   Friday, but I -

2          THE COURT: It can be by phone.  It can be by phone,

3   if that's, you know, something that we can arrange because I

4   will have the Court Call operator, I will simply want an

5   assurance from those of you who are signed up on this Court

6   Call that you will have no one with you or you will identify

7   who is with you, that's all.  I will not permit anybody but

8   counsel to the various constituent parties to participate.

9          MR. BERNICK: Yeah, I - at least from the debtors'

10  point of view, the matter is of such great importance that

11  I'm fairly confident that my clients will want me wherever

12  Your Honor's going to be.  In fairness, there is - It would

13  go faster if we have the ability to show some of the

14  materials, and it would just make it quicker.

15         MR. ESSERMAN: I would like a chance to respond in

16  papers.  I have no objection to oral argument.  I think that

17  that's fine, but it would be nice to have a week to get some

18  papers in in response so that -

19         THE COURT: Well, if I give you a week, then I'd

20  have to back off what I just told Mr. Bernick about the

21  schedule.

22         MR. ESSERMAN: Well, we just haven't had a chance to

23  respond to a very thick paper the debtor has just filed and

24  in fact it had - because the papers were filed under seal,

25  the debtor did not file a certain section under seal, and we

1   had a bunch of go-arounds to get the sections that were under

2   seal, we had to get permission from all the firms involved to

3   get it under seal, because they were properly not producing

4   those except after proper formalities.  So, I would suggest a

5   paper on a relatively short time period.  I think we will

6   need - the firm will need a week, and I'll make myself

7   available, like Mr. Bernick will on relatively short notice

8   in wherever Your Honor wants to have this.

9           MR. BERNICK: Your Honor, let me make a proposal.  I

10  know we have the 1st of August as a day that's a personal

11  injury thing.

12          THE COURT: July 30 and August 1, I think are

13  property damage days.

14          LAW CLERK: The 30th is set for two hours first thing

15  in the morning for PI status, it's a just-in-case.  The 31st

16  is set all day for property damage.

17          THE COURT: Oh, 31st, that's right.  I skipped a day.

18          LAW CLERK: Well, the 30th is set for property damage

19  too, and the 1st is set for property damage from 9 to 11 to

20  argue the Canadian statute of limitations.

21          MR. BERNICK: I guess it's a question of whether

22  Your Honor has time in the afternoon on the 1st or -

23          THE COURT: I don't know.

24          MR. ESSERMAN: I can do it any of those three days.

25  Either 30th, 31st,  or the 1st.

1          MR. BERNICK: I can do it the 30th, but then if we do

2     on the 30th, I think it will be reasonably prompt -

3          MR. RESTIVO (TELEPHONIC): Your Honor, Jim Restivo,

4     on the phone.  I think what the schedule is right now is on

5     the 30th and 31st there's a trial of 10 Motley, Rice cases.  I

6     believe the Court was holding Wednesday, August 1 as a

7     possible date for argument on the Canadian statute of

8     limitations.  When I give you my report, I will indicate to

9     you that the debtor and Speights & Runyan have agreed to move

10    that to the September 10 date which the Court is still

11    holding for us, and so Wednesday, August 1 is no longer

12    needed for property damage at all.

13         THE COURT: Okay, well, the question is, if we argue

14    this August 1st, and I believe I leave August 1st in the

15    afternoon, it's either August 1st or August 2nd, I'm teaching

16    in a seminar.  I just don't remember offhand what the trial

17    schedule is.

18         MR. ESSERMAN: August 2nd is out for me.  I've got to

19    be in D.C., but August 1st anytime, anytime the 31st or August

20    1st is fine.

21         THE COURT: The question is, on August 1st, if I give

22    you two hours in the morning, and I am not going to spend

23    more than one second more than two hours on this issue, so,

24    if I give you August 1st and give you rulings that day, how

25    much slippage is there in this schedule, because I am not

1    changing the trial schedule for this estimation.

2            MR. BERNICK: Your Honor, if we went forward that

3    morning -

4            THE COURT: I can't hear you Mr. Bernick.

5            MR. BERNICK: Oh, I'm sorry.  If we went forward

6    that morning, and Your Honor were to rule from the bench, I

7    think that what we would need to do is to assure that the

8    arguments are essentially done in an hour and a half.  In

9    order to make sure that they're done in an hour and a half,

10   we'd have to have some real regulation of the amount of time

11   that people spend per total side.  So if we go an hour and a

12   half and we split it right up the middle, 45 minutes a side,

13   then we could then get done, Your Honor then has the

14   opportunity, there's always a certain amount of dialogue, and

15   we then don't need to worry about submitting an order after

16   the fact, you just rule from the bench, I think that that

17   would probably work out.  We would also need to get the

18   briefs from the other side.  I would suggest by Friday at

19   noon so that we know what it is that we're dealing with.  We

20   had to respond in extremely short order to their submissions,

21   I think it's only appropriate, and then with respect to the

22   slippage in the schedule, depending upon how tight the

23   schedule is for them completing whatever depositions need to

24   be taken, et cetera, et cetera.  I don't know that there will

25   have to be a slippage.  I don't want - What I'm concerned

1    about, obviously, is we have briefs, then we have a hearing,

2    and then it takes at least about 10 days to 2 weeks if not

3    another hearing to get the order settled, and so, if Your

4    Honor rules from the bench and we have an order right then

5    and we set a very prompt timetable for completing the

6    discovery, I don't know that we'll have to have any schedule

7    slippage.

8           THE COURT: All right, I will rule from the bench.

9    So, when will I get the briefs in response for the -

10          MR. ESSERMAN: Well, Your Honor, we would prefer to

11   have them on the 30th, which would be two days before the

12   argument.  If that's too tight for Your Honor, we'll get them

13   by the end of the day on Friday, July 27th.

14          MR. BERNICK: Apart from Your Honor's burden, which

15   I know is greater than ours, we certainly don't want to have

16   to deal with the brief that we get on Monday for purposes of

17   a hearing on Wednesday.  We have submissions from three

18   different firms, and we'll probably hear from at least two

19   different committees and perhaps from others who are not

20   among the firms.  That's what's happened before.  It's a

21   massive compilation effort.

22          MR. ESSERMAN: Let's just do the end of the day on

23   the 27th.

24          MR. BERNICK: Yeah.

25          MR. ESSERMAN: That's fine.

1        THE COURT: All right, they're due Friday, the 27th.

2   Okay, the argument's going to start at 8:30 on August 1st in

3   Pittsburgh.  There will be no phone participation.   It's

4   going to be in court only, and only counsel to parties will

5   be present.  The record will be sealed.

6        MR. ESSERMAN: And, Your Honor, Mr. Bernick

7   suggested 45 minutes a side.  I think that that's fine.

8        THE COURT: All right.  Okay, item 19 then is

9   continued to August 1st in Pittsburgh.

10       MR. RESTIVO (TELEPHONIC): Thank you, Your Honor.

11       MR. BERNICK: I believe that that brings us to the

12   PI status which is item 20.  I don't know that there is

13   anything from the debtors' point of view that was important

14   to take up except that there were some scheduling adjustments

15   that did not affect ultimate end dates, and I don't really

16   know, frankly, given the hour whether we really have to -

17   Well, is there something that - I guess I'd ask whether the

18   ACC needs to do anything. - Okay, that's fine, but I think

19   Mr. Finch wants to put on the record, which is fine with us.

20       MR. FINCH: The Libby claimants had requested a one-

21   week extension of the deadline for the non-estimation expert

22   reports, which Grace, the ACC, and the FCR agreed not to

23   propose.  It won't have any effect on the overall schedule.

24   Basically instead of expert reports being due tomorrow,

25   they'll be due on July 31st for the non-estimation experts.

1    There is also an issue with respect to -

2            THE COURT: For non-estimation?

3            MR. FINCH: Non-estimation experts.  There was also

4    an issue with respect to the estimation experts for the

5    rebuttal report, which again won't affect the end date, and I

6    don't know - I can't recall exactly the date we agreed - Ms.

7    Baer has that date in front of her.  I believe it was

8    September 11th - moving the August 8th date to September 11th

9    which all parties had agreed which would again not affect the

10   Court's schedule other than the submission and the rebuttal

11   reports.  And then there's something that we haven't

12   discussed but Ms. Baer just raised with me now.  I don't have

13   any problem with it.  The current order has an August 20th

14   deadline for identification of fact witnesses who would

15   testify at the hearing and the debtor has proposed September

16   24th, 2007 for that date.  I don't have any problem with that

17   date.  That still gives us about 60 days to finish any

18   cleanup fact witness depositions.  Do you have a problem with

19   that, John?

20           UNIDENTIFIED SPEAKER: No.

21           MR. FINCH: So, with those three non-material

22   changes to the schedule, that's all we have on the PI side.

23           THE COURT: All right, that's fine.  Is there an

24   order to that effect?

25           MR. FINCH: I assume the debtor is preparing one.

1          MS. BAER: We haven't typed one yet, Your Honor.

2    I've marked up a current order, and we'll submit it later

3    today.

4          THE COURT: All right.

5          MR. FINCH: Thank you, Your Honor.

6          MR. BERNICK: That would then - I don't know if

7    there's anything else that Your Honor would like to take up

8    in connection with item 20.

9          THE COURT: No, I think I'm fine.  Ms. Baer seems to

10   be keeping us sort of straight on what's going forward when,

11   so -

12         MR. BERNICK: Okay.  Item 13 is a status report on

13   PD and -

14         THE COURT: I'm sorry what were you back to?

15         MR. BERNICK: Yes, we'll go back to item 13.

16         THE COURT: Thirteen, thank you.

17         MR. BERNICK: Yeah, I'm sorry, Your Honor, and

18   that's a PD status report, and we would then proceed with 13,

19   14, 18, and those are all Mr. Restivo, so I would just turn

20   the matter over to him.  I know that he's on the phone.

21         THE COURT: All right, Mr. Restivo?

22         MR. RESTIVO (TELEPHONIC): Good afternoon, Your

23   Honor.  With respect to item 13, the debtors' status report

24   on PD claims is as follows, and I'll try to be very quick.

25   We have approximately 194 claims left that are in play, Your

1    Honor.  Of those, four New York statute of limitations

2    claims, three Minnesota statute of repose defenses to claims,

3    98 California statute of limitations defenses, and two other

4    statute of limitations defenses.  All of those, Your Honor,

5    are *sub judice* before Your Honor, and I'm not quite sure if

6    the Court has given an estimate as to rulings, but 107 of the

7    194, Your Honor, are in your bailiwick not the debtors'.

8    That leaves, Your Honor, a number of other cases.  Ten of

9    those - ten Motley, Rice cases will be tried next Monday and

10   Tuesday on statute of limitations grounds.  The parties have

11   agreed to talk later this week after all of the papers were

12   filed to see if we can't reach some stipulations or at least

13   minimize any differences with respect to exhibits and

14   witnesses and that will happen after our filings today.  Of

15   the remaining cases, Your Honor, 59 of those are covered are

16   from Canada.  They are covered by our motion for summary

17   judgment on statute of limitations grounds.   Last time we

18   were before the Court, August 1 was a possible date for

19   arguing those motions.  I believe we have negotiated with

20   Speights & Runyan to have that argument on September 10 which

21   the Court has been holding for property damage.  Both sides

22   appreciate that we have to have a pretrial schedule.  We're

23   going to get their expert report or reports today, and then

24   we're going to talk about some depositions, but all of which

25   will allow the parties to have that argument on the Canadian

1    cases on September 10.  The only other aspect of the report I

2    should cover, Your Honor, is one of the California cases not

3    subject to our motion on statute grounds is Pacific

4    Freeholds.  Trial is set for that case on September 6th and

5    7th.  I believe the parties are going to talk tomorrow, I

6    believe, have very different views as to what discovery if

7    any needs to take place, and if the Court does have Thursday

8    available this week, if the parties could have a 15-20 minute

9    pretrial conference or discovery conference with Your Honor,

10   I think the parties are going to need the Court's input as to

11   what it that can be done or cannot be done so that we can try

12   Pacific Freeholds on September 6th and 7th.

13            THE COURT: Well, I think I scheduled a Federal-

14   Mogul issue at 2 o'clock on Thursday.  How about 1:30?  Is a

15   half an hour going to do it?

16            MR. RESTIVO (TELEPHONIC): I would think so, Your

17   Honor.  I think Mr. Runyan's on the phone, but 1:30 would be

18   okay for the debtor.

19            THE COURT: Mr. Runyan?  I guess he's not there any

20   longer.  Will you notify him, 1:30 -

21            MR. RESTIVO (TELEPHONIC): I will notify him and

22   confirm to the court's staff that that's okay with Mr.

23   Runyan.

24            THE COURT: That will be in Pittsburgh.  He can

25   participate by phone though, Mr. Restivo.  I don't see any

1   reason why - especially if it's just the two of you, you

2   don't even probably need Court Call, you can just call into

3   chambers and we can connect him into the conference call.

4          MR. RESTIVO (TELEPHONIC): Okay, I will tell him

5   that and we will do that.  So that's traditional property

6   damage status, Your Honor, I'd like to jump if I could to the

7   status conference on the ZAI Science issues.  Mr. Westbrook

8   and I have had a number of conversations.  We have given each

9   other a number of things to think about, and we need to talk

10  some more and rather than have both sides give the Court a

11  status report today, we would like the Court's permission to

12  give the Court a status report at the August 29 omnibus

13  because we need to do some more talking among ourselves to

14  see if we can come up with a consensus suggestion for the

15  Court.

16         THE COURT: All right, do you want that continued to

17  when?  I'm sorry.

18         MR. RESTIVO (TELEPHONIC): That's to the next

19  omnibus which I believe is August 29.

20         THE COURT: All right.

21         MR. RESTIVO (TELEPHONIC): And so that takes care of

22  item 18.   With respect to item number 14, I think the Court

23  signed an order on the leave for filing a report of Dr.

24  Elizabeth Anderson.

25         MS. BAER: Your Honor, we filed a certification of

1    counsel on the 13th, it's at item 1629 on the agenda - I've

2    not seen an actual signed order, but I do have a copy to hand

3    up to the Court.

4         MR. RESTIVO (TELEPHONIC): With respect to that, and

5    I stand corrected, with respect to the order, Mr. Speights,

6    who I think is on the line, wanted to have input as to -

7    there's a blank in the order, Your Honor, for a date for the

8    PD claimants to file rebuttal reports, and Mr. Speights, I

9    think, wants to make a suggestion or a comment on that date.

10        THE COURT: Mr. Speights?

11        MR. SPEIGHTS (TELEPHONIC): Actually, Your Honor, I

12   think Mr. Baena might have a general comment on behalf of all

13   PD claimants as to that date, and I may well join in what Mr.

14   Baena says.  Just while I have the floor, I will say from the

15   first time that Mr. Restivo addressed the Court and brought

16   this to the attention of the Court, I said that I would not

17   have an objection to that provided we had adequate time to

18   get our own rebuttal expert or experts with respect to this

19   witness, and as to how long that should be, I would like as

20   long as possible, but hazard hasn't even been set yet, and

21   perhaps Mr. Baena has some suggestions for PD claimants as a

22   whole.

23        THE COURT: All right, Mr. Baena.

24        MR. BAENA: May it please the Court, Scott Baena on

25   behalf of the Property Damage Committee.  Your Honor, just to

1  give you a little context, as I understand it, Dr. Anderson's

2  report has been submitted in respect of the lack of hazard

3  issue, which as you know, has not even been scheduled as of

4  yet for hearing.  The report is accompanied by the motion

5  because the debtor didn't file the report by the deadline

6  that was set by the existing CMO.  I suspect that nobody's

7  objected in large part because as it hasn't been scheduled

8  yet and for that very same reason we don't see the rush for

9  the requirement of rebuttal reports.  In addition I'd add

10  that at this juncture requiring those who are embroiled in

11  claims objections based upon the other sorts of claims or

12  objections that have been asserted, this is a real

13  distraction for them to now go out, get an expert of their

14  own, and file a rebuttal.  Moreover, as the motion itself

15  points out, if any of the objections that are asserted other

16  than lack of hazard are successful, those claimants won't

17  even get to that next stage.  So, in addition to everything

18  else, we're exposing them to the incremental expense of other

19  witnesses when they may not even need it.  And so, for all

20  these reasons, we think that the Court ought to put off that

21  deadline as far into the future to accommodate a resolution

22  of the other objections in respect of those claimants who are

23  implicated by this report.

24          THE COURT: Well, okay.  I guess the question is how

25  to facilitate that because I agree, to the extent that we

1    haven't gotten through the statute of limitations issues, but

2    I'm sure an order to tee up the lack of hazard issues, some

3    of these things have to work in tandem to a certain extent, I

4    am working at the moment on two of the opinions, Minnesota

5    and Arkansas, and I hope to have Arkansas done shortly.

6    Minnesota's maybe going to take a little bit longer for

7    reasons that I, at the moment, can't go into, but I hope at

8    least to get those two opinions out soon, but that's not

9    going to help with the bulk of these issues.  If I can get to

10   California next, that should take care of the larger bulk of

11   claims, but then you still have Canada and some other issues

12   to deal with, so, you know, it's still going to be awhile.

13        MR. BAENA: What if we - You allowed the late filing

14   of the report.  Nobody has objected.  You reserve on when the

15   rebuttal report is due.  We have another status report -

16   another omnibus, excuse me, August 29.  Let's revisit that

17   issue then.

18        THE COURT: That's fine.  I think it could probably

19   even safely be revisited in September and maybe even in

20   October, frankly.

21        MR. BAENA: That would be fine with us, but I didn't

22   want to shock you by suggesting it.

23        MR. RESTIVO (TELEPHONIC): So, Your Honor.  Jim

24   Restivo, we do not object to not having a date in this order.

25   We would ask that we revisit the issue of rebuttal reports at

1    the omnibus hearing in August.  We may know more in terms of

2    what claims are still alive and which was aren't and let's

3    revisit it in August.  We may decide in August not to revisit

4    until a later date, but I'd rather keep the pressure on all

5    of the parties including the debtor.

6         THE COURT: Including the Court, I think, is the

7    issue there, because the Court has these under submission,

8    but frankly, Mr. Restivo, I don't think - based on the fact

9    that I am actually going to be on vacation, and I am not

10   working on these opinions on vacation, for two weeks in

11   August, I really don't think that you're going to have enough

12   information from me by that August 29th report, and I don't

13   want to lose track of these either.  I don't care if the

14   debtor just continues to carry these month by month, but I

15   really don't think in August that I'm going to be prepared to

16   give you dates by which you're going to get to any trials

17   that you may need to try or know that you don't need to try

18   the rest of the cases.  I don't think the bulk of them will

19   be done by then.  I think realistically, the September date

20   would make more sense.

21        MR. RESTIVO (TELEPHONIC): Okay.  So on this order,

22   would the Court simply put a period after "asbestos PD

23   claimants crossed out on the proposed order have until blank

24   to file rebuttal reports, and we would revisit the issue of

25   rebuttal reports at the September omnibus".

1          THE COURT: What I'm saying is that the PD claimants

2    shall have until a date to be determined to file rebuttal

3    reports and a status conference will be held at the September

4    omnibus on this issue.

5          MR. RESTIVO (TELEPHONIC): That's okay with the

6    debtor, Your Honor.

7          THE COURT: Mr. Baena, is that okay?

8          MR. BAENA: That's fine, Judge.  I'm just getting

9    lost into which omnibus is which since we have two in August.

10   I don't know if one of them is September's or -

11         THE COURT: Oh, well, I think -

12         MR. BAENA: But you intend to refer to the status or

13   the omnibus hearing that is scheduled to be held in

14   September.

15         THE COURT: That's correct.

16         MR. BAENA: Okay.

17         THE COURT: If somebody knows the date, I'll put the

18   date in.

19         MS. BAER: September 24.

20         THE COURT: All right September 24th, 2007 omnibus

21   hearing.

22         MR. BAENA: Obviously, Judge, if in September it's

23   determined that we're forging ahead next with hazard, I don't

24   wish for it to be a surprise to anybody that people will need

25   time to go out at that point and get experts and prepare

1    reports, et cetera.

2              THE COURT: And I understand that, but I think you

3    should be determining now who that expert may be because I

4    don't necessarily know that you need to go hire someone, but

5    you should certainly not assume September 24th if that's the

6    day that you haven't yet started to talk about it.  So, if

7    you haven't already got somebody in mind, start thinking

8    about it.

9              MR. BAENA: Thank you, Your Honor.

10             THE COURT: Okay, that was with respect to item

11   number 14.

12             MR. RESTIVO (TELEPHONIC): Item number 14, and I

13   think Your Honor at this point I can give the podium back to

14   Mr. Bernick because I don't believe I'm involved on item

15   number 15.

16             THE COURT: All right.

17             MR. SPEIGHTS (TELEPHONIC): Your Honor, please.

18   This is Dan Speights.  Before Mr. Restivo gives up the

19   podium, could we have our monthly report on the status of the

20   settlements and principals?

21             THE COURT: Yes, Mr. Restivo.

22             MR. RESTIVO (TELEPHONIC): Mr. Bernick.

23             MR. BERNICK: What?  This is what's going on with

24   the settlements?

25             THE COURT: Yes, settlements and particularly the

1    Prudential issues in New York.

2         MR. BERNICK: Maybe Ms. Baer can handle that.  Maybe

3    I can figure out somebody else to pass it off to, but I think

4    Ms. Baer probably knows the answer.

5         MS. BAER: Your Honor, late last week, we received

6    revised versions of the settlement agreement from the Dies

7    group as well as from Prudential.  We have gone through those

8    and we are in the process of providing what we believe are

9    final comments to Mr. Dies.  He has a number of clients that

10   all will have to sign off on this but we are very, very close

11   to completing this.

12        THE COURT: All right.  Isn't the Prudential issue

13   still outstanding too?

14        MS. BAER: The Prudential and Mr. Dies spoke to each

15   other and the goal is to have a form of agreement that will

16   be essentially the same for both of them.  So once we're able

17   to get through the last few things with Mr. Dies, we hope

18   that that will also resolve Prudential.

19        THE COURT: All right, Mr. Speights?

20        MR. SPEIGHTS (TELEPHONIC): Yes, Your Honor.

21        THE COURT: Anything more?

22        MR. SPEIGHTS (TELEPHONIC): No, Your Honor.

23        THE COURT: Okay.  Mr. Bernick.

24        MR. BERNICK: Yes, I guess the last items that I

25   think warrant any argument are 15 through 17.  Fifteen is a

1    little bit different from 16 and 17.  Sixteen and 17 pertain

2    to Mr. Speights specifically.  Number 15 is the order that is

3    to be entered with respect to the supplementation of claims.

4    Your Honor will recall the motion practice about what

5    procedure would be adopted in the supplementation of claims,

6    that there was an exchange of orders, and the certifications

7    of counsel that you've received come both from the debtor and

8    from the asbestos property damage claimants, and I think that

9    there are essentially two issues.  One is the recycle in the

10    proposed order that relates to the fact that notice was

11    provided, and there's an objection that Mr. Baena has on

12    behalf of his constituency that there was not in fact

13    sufficient notice to the individual claimants.  There may

14    have been notice to the Committee but where the proposed

15    order says, "It appearing that good and sufficient notice of

16    the motion having been given", is inappropriate because he

17    believes that there was not adequate notice to the individual

18    claimants.  The second issue is a procedural one, I guess

19    they're both procedural in a way, but the second issue

20    relates to what happens in the event that leave is granted

21    for the supplementation of a claim?  Is it necessary for the

22    debtor to come back and file a motion asking for the

23    opportunity to supplement its response so as to be able to

24    object or otherwise respond to the claim?  And I believe it's

25    the position of the Property Damage Committee that the debtor

1    should have to make that application whereas it is the

2    debtors' view that just like any amendment to a claim or a

3    pleading, a complaint, gives rise as a matter of due process

4    to the opportunity to make then a response.  We shouldn't

5    have to make application to the Court in order to be able to

6    have the right to make a response.  So, those are the two

7    remaining issue.  I don't know if Your Honor's had an

8    opportunity to take a look at these certifications of

9    counsel.  I -

10           THE COURT: I saw them, but I saw them - I don't

11   know, a week ago.  I'm not sure exactly when they were filed,

12   and I haven't looked at them yesterday or today in

13   preparation for this hearing, so -

14           MR. BERNICK: Yeah.  Well, if you take a look at the

15   - in the certification of counsel that comes from the debtor,

16   the PD Committee asks that the words "to the PD Committee" be

17   inserted in a couple of places so that the notice, the

18   statement regarding sufficiency of notice is confined to the

19   PD Committee.  Our response points out that there was in fact

20   fairly extensive notice, and the certification of counsel

21   says that when we filed the motion, remember as an emergency

22   motion relating to supplementation, we filed the motion on

23   April the 6th.   We served the motion via first class mail on

24   the 6th of April, and proposed an April 17 objection date.

25   The Court issued an order shortening the notice, and then we

1    served the order shortening those on April 18 with an

2    objection deadline that was now moved back to April 23, again

3    by first class mail.  No claimant has filed any objection to

4    the motion except for the PD Committee in a subsequent

5    joinder from Prudential.  No PD claimants sought leave of

6    Court to file an objection after April 23, which is the

7    objection deadline.  No PD claimants spoke on this issue at

8    the May 30 court hearing.  All PD claimants had notice of the

9    motion more than one month before the May 21 omnibus hearing

10   when the motion was initially on the agenda and when the

11   Court directed that it be taken up again on May 30, and all

12   PD claimants had the opportunity to participate in those

13   hearings.  No PD claimant has complained about any service

14   issues regarding this motion despite that background.  So,

15   our view, Your Honor, is that there were multiple notice.

16   There's been a lot of time that's been able to pass, and

17   perhaps what's even more important in this case is that we're

18   kind of down to the short hairs of what's going on in this

19   courtroom.  We're not dealing with an overwhelming number of

20   counsel for the claimants.  They certainly have an obligation

21   to pay attention to these proceedings on a very regular and

22   diligent basis, and not the least of the reasons for which

23   is, that the Committee now, in a sense, has somewhat divided

24   loyalties.  There are some folks who have settled or are

25   settling, and are interested in moving forward with the case

1    to an ultimate conclusion, there are others who are not yet

2    settled and are still interested in the litigation process,

3    so it's a period of time in which the claimants have an

4    obligation to be diligent, they can't simply rely upon

5    Committee counsel.  And against that backdrop, given the

6    notice that did take place and it's not as if there was an

7    order that was entered immediately after the first notice by

8    mail, we believe that there's been more than adequate notice.

9         THE COURT: Well, your certificate of service, who

10   was served by first class mail -

11        MR. BERNICK: It's the whole - all claimants'

12   counsel - yeah, we sent it out to all claimants' counsel.

13        THE COURT: On both occasions.

14        MR. BERNICK: I'm sorry?

15        THE COURT: On both of the occasions when the first

16   class -

17        MR. BERNICK: On both of the occasions, yes.

18        THE COURT: Okay.

19        MR. BERNICK: I'm just looking at the long list that

20   we have here.  It's the usual long list.  I see Mr. Speights

21   is very prominently featured there, of course, and Motley -

22   the Motley, Rice firm is on there, Mr. Westbrook - all the

23   people that represent the individual claimants.  The second

24   issue - and I know that Mr. Mango will want to respond or

25   maybe Mr. Sakalo will elbow him out of the way so that he can

1   respond this afternoon.  Again, Your Honor has already

2   recognized, and I think we have a transcript page here,

3   although I don't have it readily at hand, that there should

4   be, obviously if the complaint, i.e., the claim is modified

5   on motion, to then go through and say there may be leave

6   sought to respond simply waters down what clearly is a due

7   process right, which is if the claim is modified, we should

8   have the opportunity to also modify our response.  So, we

9   don't think it should be necessary for us to come back in and

10  make an application for an opportunity to respond.  We know

11  that as this rule really effectively has been applied to us,

12  it has been a foregone conclusion that where we've been

13  allowed to supplement or to supplement a defense, the other

14  side has been given the opportunity to come in and designate

15  for their witnesses and the like, so this also falls under

16  the sauce rule, and for those reasons, we would ask the Court

17  enter the order as we drafted it, and so that the notice is -

18  the adequacy of notice representation is not confined to the

19  PD Committee and so that we do not have to have the need to

20  come back in and make application for the opportunity to

21  respond to amended claims that should be as a matter of

22  right.

23          THE COURT: All right.  Mr. Sakalo?

24          MR. SAKALO: Good afternoon or good evening, Your

25  Honor.  Jay Sakalo on behalf of the Property Damage

1   Committee.  Mr. Bernick fairly characterized the dispute that

2   the PD Committee and the debtors have in respect of the

3   order.  I just want to address a couple of points on notice

4   which Mr. Bernick glossed over.  When the debtors served the

5   motion to shorten notice and the emergency motion, he did it

6   by first class mail.  The Court entered the order shortening

7   notice on April 17th with a return date of April 23rd.  The

8   debtors then served that motion on April 18th by first class

9   mail.  Claimants were not deemed to have received that by

10  first class mail until April 23rd, which was the deadline that

11  the Court set to respond to the underlying emergency motion.

12  So claimants by the time they received the order shortening

13  notice, which was again only sent by first class mail, would

14  have received that order on the day an objection to the

15  underlying motion is due.

16          THE COURT: Well, they'd get it April 21st -

17          MR. SAKALO: Your Honor, attached to our

18  certification of counsel, and I can put it up on the Elmo if

19  it's still plugged in.  I'm not sure if it is.  We attached

20  an exhibit that showed the timeline, and the order was

21  entered April 17th, which was a Tuesday.  It was served April

22  18th on a Wednesday.  It would have been received over the

23  weekend, under federal rules, that's Monday when they

24  actually would have deemed to have received it.  So -

25          THE COURT: No, the federal rule extends the

1   deadline for filing something.  It doesn't extend the

2   deadline for receipt of something.  There's mail delivery on

3   Saturday, so that -

4          MR. SAKALO: Correct, there's mail delivery on

5   Saturday, but -

6          THE COURT: That means, April - Thursday and Friday,

7   so they would have gotten it - or I'm sorry, Wednesday,

8   Thursday, and Friday.  They would have gotten it on Friday.

9          MR. SAKALO: I think actually, under the federal

10  rules it's if it's deemed put in the mail Wednesday, it's

11  deemed to have been received on Saturday.

12         THE COURT: All right, even -

13         MR. SAKALO: But in any event, on Saturday, I don't

14  now if claimants were or were not in their office on that

15  Saturday and received that.

16         THE COURT: Oh, it's to lawyers, sent to the

17  lawyers.

18         MR. SAKALO: That's correct.  They weren't serving

19  individual claimants under the procedures that we've

20  established most of these papers have been served on

21  claimant's counsel.  So, to the extent they would have

22  received it, it would have been Saturday at the earliest,

23  under the rules it would have been on Monday.  That was the

24  deadline to file an objection.  So what we're simply looking

25  for, Your Honor, in that respect is under those circumstances

1    notice was probably given to the PD Committee because we had

2    objected to the order shortening notice.  We were actively

3    watching the docket because we knew what days the debtors

4    were seeking -

5            THE COURT: But the other thing is, most of these,

6    if not all of these firms are getting electronic notice.

7            MR. SAKALO: These are not served electronically,

8    Your Honor, unless you're a Delaware lawyer, you do not - We

9    don't, for instance, receive these through ECF because we're

10   not Delaware counsel.

11           THE COURT: You don't have - You have everyone who's

12   filing electronically is either on the electronic service

13   list or has Delaware counsel filing for them electronically.

14   So, as soon as the Court entered an order on the docket, on

15   April 17th, either local counsel or the counsel who actually

16   files pleadings got the electronic service.  So even though

17   the debtor made service of the order on the 18th and it got

18   there whichever day, you know, counsel actually saw it, they

19   got the electronic copy of the Court's order the day it was

20   docketed, which was Tuesday.  So, I don't see why there's a

21   problem.  That's number one.  Number two, this case of any

22   other case I have ever seen has more motions filed on an

23   emergency basis and on a prompt basis, even if not on an

24   emergency basis, there is no way that if counsel had some

25   indication that they had gotten an order the day that a

1    response was due that I wouldn't have had something from

2    those counsel saying, I don't have time to respond.  I need

3    an extra day because I just got the order today, and I don't

4    have time to answer it.  So, that's the other thing that I

5    simply cannot track in this case.  This is a very vocal case.

6              MR. SAKALO: I understand that, Your Honor.  The

7    debtors in this case as we've been dealing with the PD claims

8    objection process, have continually served these types of

9    papers either by fax service or by email service out to

10   claimants and the PD Committee, other interested parties.

11   None of that occurred in this case with this particular

12   order.  So, even though claimants would have ordinarily been

13   receiving these from the debtors, it's not required under

14   your administrative case management order.  That's the

15   process that's been employed.  The debtors chose not to do it

16   in this case, and the PD Committee questioned the debtors'

17   motives to some extent because they served the original

18   emergency motion only by first class mail.  And then served

19   the order granting the emergency - the motion to shorten time

20   by first class mail, yet they were seeking to abridge the

21   time from the 25 days that we normally have to about 15 days.

22   I'm not sure why the debtors would have chosen to do that,

23   and -

24             THE COURT: I don't know.

25             MR. SAKALO:  - and as a result, claimants were

1    hampered in their ability to respond to the motion.

2         THE COURT: Well, I may accept that if I was hearing

3    that from a claimant, but I haven't heard that from a

4    claimant, and with respect to the Committee, I'm not sure

5    that the Committee which continues to tell me that it doesn't

6    represent individual claimants has standing to raise that

7    issue on behalf of the individual claimants who haven't

8    argued that they didn't have an adequate opportunity to be

9    heard.  If I heard that from an individual claimant, then I

10   would think I would have something that I needed to address,

11   but I haven't heard that from an individual claimant, and I

12   don't have an affidavit attached to the Committee's response

13   that indicates that you've heard it from an individual

14   claimant either.  So I don't have a basis on which to say

15   that notice was inadequate in this case.

16        MR. SAKALO: There is no affidavit attached to our

17   certification of counsel, that is correct.  I can attest to

18   the Court that I have heard it from claimants.  I understand

19   that's not an affidavit for the Court's purposes, but we were

20   advised by claimants that they did not receive it until the

21   23rd.

22        THE COURT: Well, okay, then if that's the case, and

23   that was the response date, I think they know how to file

24   motions with this Court.  They've done it before.  I

25   certainly would not attempt to prejudice anybody, in fact, I

1  still wouldn't attempt to prejudice anybody.  If they've got

2  a position that they think they need to state, I'd be happy

3  to hear that position, but I don't think that acting through

4  the Committee for this purpose is the appropriate thing.  It

5  appears to me that notice was adequate.  Once I get this

6  order entered, if they want to see reconsideration because

7  they didn't get appropriate notice, I'll hear them.

8          MR. SAKALO: Understood, Your Honor, and just one

9  last point on that.  We did raise in our papers, in our

10  objection to the underlying motion, the inadequacy of the

11  notice and that the hearing on May 30th, the debtors didn't

12  address that.  They didn't put any evidence or testimony in

13  to address our objection regarding the inadequacy of notice.

14          THE COURT: Well, I still think the issue is that

15  any one who has filed something electronically whether on

16  their own or through local counsel has gotten the order of

17  the Court as soon as it's docketed, and I believe at this

18  point, that applies to nearly, if not every, counsel who's

19  representing plaintiff here because they've all filed 2019

20  statements electronically.  So in order to do that, they have

21  to be on the Court's electronic docket entry, so they should

22  have all gotten the electronic notice.  They may not have

23  gotten it from the debtor, but they should have gotten it

24  from the Court.  So unless I see some motion for

25  reconsideration, I think this notice is adequate.  If some

1    counsel tells me to the contrary, I will certainly not

2    attempt to prejudice the counsel's rights and opportunity to

3    be heard before this Court, but I don't see any evidence of

4    that on this record.

5          MR. SAKALO: Understood, Your Honor.

6          MR. BERNICK: Your Honor, if - we're you  going to

7    the next issue or -

8          MR. SAKALO: Yes.

9          MR. BERNICK: Yeah, I would just note that this was

10    ultimately not heard for another several weeks, so during

11    that period of time, if somebody wants to come forward

12    presumably they'd be able to explain how it is they didn't

13    learn about it from April 23 all the way until the hearing in

14    May.

15          THE COURT: Okay, but regardless, the response date

16    was still April 23rd.  So, I mean, yes, there are those

17    issues, but the issue I'm addressing here is simply the

18    adequacy of notice, and I don't see any reason on this record

19    why notice was inadequate for the reasons I've expressed.  If

20    somebody has a gripe because they really didn't get either

21    the Court's order or the appropriate notice, then I'll hear

22    it if it's filed, but I don't see a basis for it on the

23    record right now.  Okay, next one, Mr. Sakalo.

24          MR. SAKALO: The second point of disagreement, Your

25    Honor, is the requirement that the debtors, if the Court

1    allows an amendment to a proof of claim, that the debtor be

2    required to come back to the Court to seek leave to amend

3    their existing fifteenth omnibus objection to the proof of

4    claim.

5         THE COURT: Well, how is the claimant going to amend

6    the claim?  By filing a motion to amend?

7         MR. SAKALO: Under the order, a claimant would have

8    to move to amend.  The way we envisioned it, the debtors

9    would respond, presumably object to that motion, and in that

10   response or objection the debtors would file, they can

11   address at that point any need they would have to have to

12   file a supplemental objection.  If you recall that the

13   fiftieth omnibus objection includes forty some odd categories

14   of objections.  They're not specific as to particular claims.

15   The facts aren't specific as to particular claims, there's a

16   schedule that lists which claims are subject to which

17   objection.  The claim that was to amend a response on its

18   proof of claim seek to add additional evidence that addresses

19   perhaps statute of limitations objections or something along

20   those lines.  Those objections are already pending.  We just

21   want to make sure that we're not back before this Court

22   arguing over the debtor's attempting without coming to the

23   Court to have leave to amend, filing an amended objection

24   that goes beyond the scope of the permitted amendment that

25   you would allow under the proof of claim.  So we think from

1    an efficiency standpoint, it makes sense for the debtors to

2    advise the Court and claimants what additional objections

3    they think they need to file.

4         THE COURT: I think it may make more sense to do it

5    this way, to take care of it in any order that allows an

6    amended claim to be filed, to simply set a deadline for the

7    debtor or any other party to file an amended objection to the

8    claim assuming one has already been filed to address the

9    changes, and that should take care of this whole issue.

10        MR. BERNICK: That's fine with us, Your Honor.

11        THE COURT: That way it's clear that they're to

12   address new issues only, and it should limit the issues, and

13   it should limit the time.  So, how about if we just do an

14   order that says if somebody files a motion to amend the claim

15   that any proposed order has to include a paragraph that sets

16   a blank space for a date by which amendments to any pending

17   objections to the claim are to be filed to address the new

18   issues.

19        MR. BERNICK: Actually, Your Honor, our proposal I

20   think says pretty much that.  It says if an asbestos PD

21   claimant and other counsel is granted leave to amend

22   supplement and/or otherwise change the asbestos PD claim,

23   then the debtors have leave to amend supplement and/or change

24   their objections to such claims asserted in the fifteenth

25   omnibus objection solely to address the PD - the asbestos PD

1    claimants' amendment, supplement, or change.

2            THE COURT: I think it does.  I think we just need

3    to set a time frame.  It would be easier just to do it all in

4    one order that allows the amendment to be filed within a

5    certain time and sets the time frame to address any

6    amendments that the party wants to state.

7            MR. BERNICK: Right, so that we can add a sentence

8    that says this shall be done at a time to be set in the order

9    -

10           THE COURT: Fine or pick a period of time.  You

11   know, 20 days, whatever you folks can negotiate is fine, but

12   I think it should set the time frame.

13           MR. SAKALO: Thank you, Your Honor.

14           THE COURT: Okay.  So, Mr. Bernick, are you going to

15   submit an order after you talk to Mr. Sakalo?

16           MR. BERNICK: Yes, I think that should resolve

17   everything that we've got.

18           THE COURT: All right.

19           MR. BERNICK: That then I think brings us last of

20   all to items 16 and 17.  These relate to claims that were the

21   subject of the late authority litigation.  Your Honor will

22   recall that Your Honor entered an order expunging some 68, I

23   think it was, late claims and in the course of doing - not

24   late claims, just late in the day, I'm sorry, Your Honor,

25   expunging claims for lack of authority and in that order

1    address the issue of the ratification issue, that is, whether

2    approval or authority given after the bar date could relate

3    back.  Mr. Speights filed a motion seeking to amend or alter

4    that judgment in order to carve out three claims.  And with

5    respect to those three claims, the argument was that Your

6    Honor had only ruled on ratification, and he still should be

7    afforded the opportunity to argue that there was a timely,

8    that is a before the fact authorization and in connection

9    with that motion, he submitted some additional documentation

10   which he said established that there had in fact been

11   authority before the bar date.  There was extensive argument

12   on that issue last time.  Your Honor ruled last time, and the

13   only issue that remains, as I recall, and you've got the

14   transcript here, was that Your Honor wanted to know whether

15   there was anything in the January 2006 transcript, which is

16   when the ratification issue was argued, or a transcript later

17   on that year, I believe in August, that would have preserved

18   or held the door open to the claimants to argue that

19   notwithstanding ratification there was in fact evidence that

20   there had been authority before the petition.  We went back

21   and forth with this, Your Honor.  It was the debtors'

22   position that the record had been closed, that the matter had

23   been fully briefed, that Your Honor had ruled.  The only

24   reason that Your Honor reached ratification was due to the

25   absence of evidence that there had been authority before the

1    fact, but Your Honor wanted to know what those transcripts

2    said.  We now have a motion that's been filed by Mr. Speights

3    seeking -

4            MR. SPEIGHTS (TELEPHONIC): If I might say so, Your

5    Honor, this is my motion.

6            MR. BERNICK: Yeah, that's fair enough.  Well, then,

7    I'll sit down and Mr. Speights can take up his motion.

8            THE COURT: Mr. Speights.

9            MR. SPEIGHTS (TELEPHONIC): Thank you, Your Honor.

10   I know Mr. Bernick must be tired because he misstated exactly

11   what happened at the last hearing.  This is not a complicated

12   matter.  Your Honor ruled on 71, actually 68 claims on the

13   authority issue where we had authority, executed, written

14   authority but Your Honor ruled that in those cases in which

15   the authority was not executed before the bar date you would

16   not permit ratification.  We filed a motion to alter or amend

17   with respect to three claims, and attached to our motion to

18   alter or amend ratifications which were executed before the

19   bar date.  Grace took the position in response to that, Well,

20   it was too late.  And that was essentially the record when we

21   came and argued this motion in full before you at the last

22   omnibus hearing.  Your Honor did not rule.  You took it under

23   advisement.  I made certain arguments about the history of

24   the matter which occurred during the January 2006 hearing

25   about how we got in that position, and Your Honor said you

1    wanted to rule - read the transcript before ruling on the

2    matter.  I am prepared to, but I'm not going to unless Your

3    Honor wants, to reargue the motion that we argued for almost

4    an hour at the last omnibus hearing.  What is pending now,

5    Your Honor, is a motion I filed, and I alerted Your Honor and

6    Grace to it at a telephone conference on, I believe when we

7    were discussing Anderson certification, was a motion to

8    supplement the record on that motion to alter or amend

9    pending before you, and I filed that motion to supplement the

10   record and Grace has responded, and the supplementation

11   simply attempts to attach an affidavit which explains those

12   three documents provided to the Court in the motion to alter

13   or amend in light of arguments which Grace has made, and

14   essentially the motion to supplement says that despite what

15   Grace said at that hearing, in fact, two of those

16   authorizations were served on it prior to that January

17   hearing and more importantly, we had all three of those

18   authorizations with us at the January 2006 hearing to hand up

19   to the Court if we had not decided to go down the separate

20   trail of ratification.  Your Honor, we can argue about this

21   for another hour, but essentially all I'm asking now is, to

22   allow me to supplement the record to add that to what you're

23   already considering.  You have the matter under advisement,

24   and you can decide whether to accept or reject this while you

25   are considering it, but I thought it important to get the

1    record straight since the supplementation disputes Grace's

2    version of what occurred and disputes Grace's representation

3    that it did not have at least two out of the three written

4    authorizations prior to the January - or prior to the ruling

5    and prior to the January 2006 hearing.  At the end of the

6    day, all three of these clients provided my law firm written

7    authorizations before the bar date, and we would ask Your

8    Honor to allow them to proceed in the bankruptcy and throw

9    them in Mr. Restivo's hopper and let him make his motions and

10   we will litigate them on the merits.  Thank you, Your Honor.

11           MR. BERNICK: Your Honor, here's the - If I could, I

12   just got the quote from the last hearing, because the page

13   109 essentially Mr. Speights made the pitch that he is making

14   today.  He said, "I would urge Your Honor again, you know, to

15   set it down.  Can we show you that we have authority for

16   these claims?  And Mr. Bernick can say you can't consider

17   those three pieces of paper, and I'll argue with him.  But

18   I'll say, even if you don't consider those three pieces of

19   paper, I'm prepared to give you the evidence that we have the

20   authority, oral authority from these three people."  I then

21   say, "That is a suggestion that assumes what is now before

22   the Court.  He wants to have further evidentiary hearing

23   where we then have to argue against the admission of the

24   evidence."  And this is what's key: Your Honor, motion for

25   alteration or amendment, and the rules say specifically under

1   what circumstances that's appropriate and there are only

2   three circumstances, and here's what I say, "We don't get to

3   that theory", that is the new admissible evidence, unless the

4   Court were to find that Your Honor (a) committed a mistake,

5   which Your Honor did not do (b) there's been a change of law,

6   which there has not been, and ©) the information was

7   unavailable, which is plainly not so, it was clearly

8   available.  And those are the tests for alteration or

9   amendment and there's nothing about, How, well, gee, let's

10  kind of shuffle on forward that changes those requirements.

11  And none of those requirements have been met.  Your Honor

12  then goes on to say, "Well, okay, I've got to look at the

13  January transcript again. Was it submitted because if it was,

14  I just didn't see it in the papers. It may be," and there's a

15  colloquy about that transcript.  And you go on to say at line

16  24, "I'll have her pull both the August and the January

17  transcripts."  I then say, "And I think I remember the August

18  hearing because by that time Ms. Fry had gone off to greener

19  pastures, and I argued it in October."  And we go on to say,

20  this is the last thing that was said that day and this is at

21  page 111, "All right. I'll take a look at these, Mr.

22  Speights, and see what the transcripts say.  Mr. Bernick, I'm

23  going to ask the debtor to put these on to the next July

24  omnibus for a status conference.  Hopefully I can make a

25  ruling at that hearing, if I can't, I'll let you know.  If I

1    think I need some evidentiary submission, I'll address it at

2    that time, but I will read the transcripts between now and

3    then and see if I can address it at the July hearing."  We

4    then go on to talk about the next item.  So the posture of

5    the matter was, they had asked for an amendment or

6    alteration.  We had argued that the standard had not been

7    met.  There was an effort by Mr. Speights to say, Well,

8    here's what we would say if we were given permission, and

9    Your Honor never provided for that submission to be made,

10   never provided for any motion to be made.  The only thing

11   that remained to be done was to focus on these transcripts to

12   see if in fact Mr. Speights was correct in his

13   characterization that somehow the Court had left it open,

14   that these matters could be pursued.  Now, it may be that we

15   haven't had the opportunity to take a look at the

16   transcripts.  There's nothing in Mr. Speights' submission

17   that addresses the content of those transcripts, but they

18   have this motion filed now, basically, again, assumes away

19   the ruling, which is whether or not the requirements for

20   alteration or amendment had been met.  So, we object to that

21   motion.  We think it is again too late for all the reasons

22   that have been indicated.  If Your Honor wants to get the

23   transcripts, we can pull them ourselves and provide them to

24   the Court, but God knows, you have a lot of things to read

25   anyhow, so, we stand at Your Honor's convenience, how you

1   want to proceed.

2          THE COURT: Well, I think I actually did have

3   somebody pull the transcripts, but I confess that I didn't

4   read them, but I believe I did have someone take a look -

5   actually pull those transcripts, but I just didn't get that

6   far to read them.  So, I don't know what they say with

7   respect to whether this issue was left open.  Frankly, I

8   thought that this whole thing was going to be - I thought it

9   was going to be coming up for argument today, because of the

10  fact that I knew from something that Mr. Speights was filing

11  this motion.  Something indicated that Mr. Speights was going

12  to be filing this motion so somehow or another I thought that

13  it was going to be coming up today for another argument, and

14  I sort of pushed to the back of my agenda the fact that I had

15  to read these transcripts, I guess.  I thought it was

16  something that was going to wait until after today's hearing.

17  I guess I forgot that I was supposed to do it before today's

18  hearing.

19         MR. BERNICK: But the posture - again, as I - we

20  already argued this whole thing the last time.

21         THE COURT: Yes, no, you argued that, but not the

22  motion with respect to filing these additional papers, and I

23  thought that somehow or other that portions of the transcript

24  would be coming in as part of this motion for the alteration

25  to supplement the record.

1          MR. BERNICK: I have no quarrel, Your Honor, if it's

2     appropriate to carry this over to yet the next conference so

3     that Your Honor can take a look at the hearing transcripts.

4     The threshold matter is whether the requirements have been

5     met for alteration or amendment, and if the answer to that is

6     that they have and Your Honor then wants to consider the

7     possibility of a submission in order to then take the matter

8     up again, that's appropriate, but I -

9          THE COURT: I think this is the issue the way I

10    would take a look at the issue, Mr. Bernick, and you may

11    disagree, but if in fact there was authority submitted before

12    the bar date but somehow or other it wasn't made evident to

13    me in the process of going through the documents because the

14    documents that I went through did not in my view show me

15    authority that was submitted before the bar date, but if in

16    fact there was authority that was submitted before the bar

17    date but I didn't see it for some reason or other, I'm not

18    sure where it was.

19         MR. BERNICK: I would agree with that, but I think

20    you have three different authorizations or three different

21    pieces of paper that were submitted by way of demonstrating

22    pre-petition authorization.  They were not found.  They

23    didn't - They were either undated or unsigned or something,

24    but they are not the evidence of pre-bar date authority upon

25    which Mr. Speights is now relying.  He wants to submit three

1    new pieces of paper that are not in evidence.

2            MR. SPEIGHTS (TELEPHONIC): That's absolutely

3    incorrect, Your Honor.

4            MR. BERNICK: The only issue is the state of the

5    record as of the bar date does it demonstrate authority?  Any

6    piece of paper, any evidence oral or otherwise, that was not

7    made available prior to the time of Your Honor's ruling,

8    whether it's oral or written or anything falls into the scope

9    of the alteration or amendment rule.  This is not a

10   situation, Your Honor, where anyone's claiming that you

11   failed to look at something.  This is a situation where Mr.

12   Speights says he wants to provide additional evidence in

13   order to be able to say that those claims should not have

14   been expunged.  To do so, he's got to satisfy the rule.

15   That's what the issue is.

16           MR. SPEIGHTS (TELEPHONIC): Your Honor, I disagree

17   with Mr. Bernick, but I have a more fundamental problem than

18   just my disagreement with him.  The matter was set down - The

19   matter was argued previously.  It was set down pursuant to

20   your instructions for status conference today.  What's before

21   you today is whether we can supplement the record or not.

22   But if we want to talk about the merits, which Mr. Bernick

23   wants to, we need to decide whether we're going to talk about

24   the merits some more today or Your Honor, I'll have

25   absolutely no problem with you carrying it over if we want to

1    hear additional argument after you've read the transcript at

2    the August omnibus.  I'm going to be there in person and do

3    it, but if Mr. Bernick wants to go back and argue the merits,

4    I really need to be heard because I now understand what

5    happened there, and I believe, in light of the transcripts

6    I've read, and in light of the supplementation that I've

7    provided, I believe it's crystal clear what happened, and we

8    had authority that pre-date March 31, 2003, and I believe I

9    can convince you that we should be - that your order as to 3

10    of 68 claims should be amended.  I don't know what I want,

11    Your Honor.  Do you want argument on the merits again today

12    or is this a matter that you want to read the transcript

13    first and then hear from us again?

14            THE COURT: No, I don't think I need argument on the

15    merits of the claim again, Mr. Speights, I think what I need

16    is a reference to the portions of the transcript that people

17    are relying on.  That's the problem.  That's what I haven't

18    looked at.  Either the January or August transcripts, if

19    those are the two places where this issue came up before.  I

20    thought from the one argument, and I apologize for not

21    knowing the dates, but I don't know the dates, I thought from

22    one argument on this issue that what you were contending was

23    that the issue with respect to essentially these three claims

24    was somewhat left open because in your view, and I don't mean

25    to mischaracterize this so if I am, then please restate this

1    when I'm finished but, in your view, if you had authority,

2    then it wasn't a ratification issue at all, and so, what the

3    debtor was objecting to was the fact that as to these 71

4    claims there was no evidence of authority issued before the

5    bar date.  So the debtor filed the objections, and you filed

6    in response whatever authority you felt you had.  I thought

7    as to all 71 of these claims that the issue was whether or

8    not the authority was executed in writing before the bar date

9    and then if not, whether the ratification principles would

10   apply and for the reasons that I went into in the opinion I

11   thought ratification didn't apply - did not apply, and so,

12   that's why I came out the way I came out.  Then I got this

13   motion for reconsideration with respect to these three

14   claims, and I thought your argument was that somehow in

15   either the January or August 2006 transcripts that these

16   three claims were somehow sort of carved out of the mix

17   because in fact there was authority and that the issue as to

18   whether there was authority was kind of preserved somewhere,

19   and that I needed to go back and look at those transcripts,

20   which I haven't done.  Now, if I've misunderstood the

21   argument, then you need to straighten me out about the

22   argument.

23        MR. SPEIGHTS (TELEPHONIC): Well, Your Honor, I

24   think you are very close to understanding the position that I

25   tried to make at the last hearing, but let me just try to

1    distinctly say it again.  At the January '06 hearing one of

2    Grace's authority objections, and there were many authority

3    objections, but one of them pertained to what they called 71

4    claims where the authority was executed after the bar date

5    order, and when we started to argue that - and they filed

6    their objection on that ground, and we were there in an

7    evidentiary hearing where I was prepared to address each of

8    those one by one as we did with other issues at that hearing,

9    but when we got to that subset, and I think the transcript

10   will reflect this, we went through and started arguing

11   ratification, and it's reflected in the record that we don't

12   agree with that characterization of 71, we think they're

13   different, plus we have some that oral, no writing but oral

14   ratification which Your Honor recognized would be sufficient,

15   but we don't need to get to the specific number if Your Honor

16   accepts ratification, because if Your Honor accepts

17   ratification it doesn't matter.  So, we had there, and this

18   is what the supplement will show among other things, we had

19   there all the ratifications including the 3 at issue here.

20   We had them in the courtroom to show you that the

21   authorization was executed prior to March 31, but when we

22   argued ratification we never went through them one by one.

23   So that now, the motion to amend is simply to say that, Your

24   Honor.  We need to go back, you would recognize that you

25   could have oral ratification - oral authorization, for

1   example, we'd never gotten to them individually, and we

2   believe you put - of the 71, we think you put 3 in the wrong

3   bucket because these 3 had authority.  And I think the

4   transcript is clear on that, and we've asked you to move to

5   reconsider it because we had the authorization executed

6   before March 31.  Grace has no evidence that they were not

7   executed before March 31.  Now, let me say one other thing,

8   that's where we were at the last hearing at least when I

9   stood up, but Grace took the position at the last hearing

10  that somehow that it never had seen these authorizations

11  before the January - or before our motion to alter or amend,

12  and what this also does is, is to show that in fact Grace

13  already had 2 of these, 2 out of the 3 of the written

14  authorizations, dated before March 31 before the hearing.

15  Grace is just trying to engage in a gotcha game here, Your

16  Honor, because we never got to the individual consideration

17  of these authorizations and the 71 set he's trying to say

18  gotcha because we didn't discuss that even though they were

19  executed before March 31, it's too late, and I'm more than

20  happy for Your Honor to review the January '06 transcript.  I

21  really don't think it came up in the August transcript, but

22  of course Your Honor can review that.  I think the January

23  '06 transcript will support what I'm saying.

24          THE COURT: Okay, Mr. Speights, I think it may be

25  helpful if you would simply do a supplement to this motion to

1    alter or amend and attach the pages of the January transcript

2    that you want me to review, and I'll give the debtor the same

3    opportunity, to attach the pages that the debtor wants me to

4    review, and that will somewhat expedite this process.  So,

5    how long will it take you to do that, Mr. Speights?

6            MR. SPEIGHTS (TELEPHONIC): A week, Your Honor.

7            THE COURT: All right.

8            MR. BERNICK: That's fine, Your Honor, and then we

9    can set it down for the next hearing.  If we have some other

10   part of the transcript to point to then we can certainly do

11   that.  I've just been paging through it, but it doesn't

12   really make too much difference what my observations are now.

13   We'll just allow Mr. Speights to file whatever he wants to

14   file on that transcript.

15           THE COURT: Yes, on the transcript and then how much

16   time after Mr. Speights files his -

17           MR. BERNICK: Oh, a week, but I mean, this is a

18   question of making sure that it makes its way into the paper

19   queue.

20           THE COURT: I think if you simply attach it and file

21   it in the JKF box, I'll get it and that way I believe between

22   now and the next hearing, it will come to me in the JKF box.

23   I'll review it.

24           MR. BERNICK: You know, the thing of it is, Your

25   Honor, I'm looking at it right here.  It's all of, you know,

1    maybe 30 pages altogether.  Maybe the best idea is -

2              THE COURT: What are the pages?

3              MR. BERNICK: The pages are pages 20, as I see it,

4    and Mr. Speights can correct me.  This is the January 25

5    hearing, it's pages 20 - It's even less than that.

6              MR. SPEIGHTS (TELEPHONIC): I don't have it in front

7    of me, Your Honor.  I'll be happy to submit it within a week.

8              MR. BERNICK: Yeah, I think it goes up at most to

9    page 39.  I think it's actually even less than that.

10             MR. SPEIGHTS (TELEPHONIC): We were there for two

11   days, Your Honor, and I will have to review the whole thing

12   and make sure that all of it's there.

13             THE COURT: All right, that's fine, Mr. Speights.

14   If you will just submit, then if the debtor has any

15   additional to supplement the debtor can do that within an

16   additional week, and hopefully then, at the August hearing, I

17   really can address this issue.  So, this will be continued to

18   the August hearing for that purpose.

19             MR. SPEIGHTS (TELEPHONIC): Thanks, Your Honor.

20             MR. BERNICK: Yeah, that's fine.  Anything else that

21   we have until - I think we need a - exclusivity does expire

22   today, I'm told by Ms. Baer.

23             THE COURT: Oh, all right.  Well, exclusivity will

24   be extended until I get an order out that deals with

25   exclusivity.  I hope to do - It probably will not come

1    tomorrow because I'll be traveling, but I hope to do it

2    Wednesday if not tomorrow.  So, there will be an order

3    shortly, exclusivity will be extended for this brief period

4    until I can get an order done on the motion to extend

5    exclusivity.

6          MR. BERNICK: I - Did you have something - All that

7    the debtor has are some miscellaneous orders at this point,

8    Your Honor, but I don't think there's anything else that we

9    need to take up.  Mr. Kruger wants to -

10         MR. KRUGER: Your Honor, just a question.  I'm sorry

11   I didn't raise it earlier, but the reply that we received

12   from the debtor with respect to the motions that had been

13   made by the law firms via Mr. Esserman was a redacted

14   version, and I wonder if there's any reason why the

15   Committee, at least counsel, which are bound by

16   confidentiality cannot receive the unredacted version?

17         THE COURT: I intended to ask the individual firms

18   whether they would agree to submit the portions that were

19   filed under seal by the debtor directly to the Committees,

20   and Mr. Esserman was at that hearing and indicated that for

21   Baron & Budd's purposes he agreed.  Ms. Kearse was on the

22   phone for Motley, Rice, she said she had to check with her

23   client, and I don't believe anybody else from the other firms

24   was present and as a result I don't know the answer to the

25   other - what happened with respect to the other firms.

1        MS. BAER: Your Honor, what happened was, Baron &

2   Budd did in fact agree that the Futures Rep and the PI

3   Committee could have it.  They then subsequently agreed that

4   the Property Damage Committee can it when they requested it.

5   The same thing happened with respect to Baron & Budd.  We

6   never heard from Kelley & Farraro.  We never provided Kelley

7   & Farraro's exhibit to anybody, and Mr. Kruger hadn't

8   contacted us, and we didn't raise it with them so we never

9   got a blank yes, give it to all of the Committees.  So we

10  only gave it to who they told us we could give it to.

11       THE COURT: You mean Motley, Rice and Baron Budd are

12  the two who agreed to give it to the entities you just

13  recited?

14       MS. BAER: That's correct.

15       THE COURT: Okay, so, Mr. Kruger, I suggest you

16  contact Ms. -

17       MR. KRUGER: I'm at a loss to understand why an

18  official committee cannot get whatever it is that's been

19  filed under seal with this Court.

20       THE COURT: I am at a loss to understand that

21  myself, but this was the issue: There was a specific

22  confidentiality order that I entered, and I don't have it in

23  front of me now.  I didn't have it in front of me then, and

24  as a result, I don't know who all the parties were to that

25  order, and that's why I was being cautious about stating who

1    it should be delivered to, Mr. Kruger.  So, to the extent

2    that the order covers the Committee, it should certainly be

3    disclosed, but I just can't make that representation, I just

4    don't recall.

5         MR. FRANKEL: I believe that the concerns of the

6    order only apply to the debtor and the four law firms at

7    issue, and subsequent to that order the four law firms at

8    issued agreed that the PI Committee and the FCR could, at

9    least two of the four law firms, Baron & Budd and Motley,

10   Rice agreed that the PI Committee and the FCR could get

11   access to the interrogatory answers and the portion of the

12   pleading that Grace had redacted and it's filed under seal.

13   That is the state of the record of -

14        THE COURT: Well, then, perhaps somebody needs to

15   file a motion then and serve it on those entities to get that

16   order expanding to cover the Committees so that we don't have

17   to deal with this, if that's the problem, because there was a

18   specific order and I don't - as I said, I didn't have then,

19   and I don't have now a copy of that order.  I expected that

20   the parties were going to work this out, Mr. Kruger, I didn't

21   -

22        MR. KRUGER: Well, my only concern is the August 1st

23   hearing and I'm not sure we can have a motion heard and done

24   prior to that hearing, so we'll be at the hearing, but we'll

25   be unable to really understand what's going on.

1           THE COURT: Well, I think at least from the

2    perspective of Baron & Budd, based on the fact that they have

3    disclosed it to the others, it's likely - I would suspect

4    that they will be willing to disclose so why don't you

5    contact Mr. Esserman, I don't know for sure, but he seemed

6    willing to disclose it to the other parties, but I think to

7    the extent that this is hamstringing the Committee's roles

8    then that order probably is too narrowly crafted, but I

9    signed the order as it was presented - well, I made a

10   modification to it, but essentially I signed it the way it

11   was presented by the law firms to make sure that the

12   confidentiality was protected, and perhaps if it's not quite

13   broad enough, maybe it needs to be broadened, but a notice

14   has to go out if that's what's going to happen.

15           MR. BERNICK: What I propose, Your Honor, we have

16   concerns along the same line, although obviously, we are

17   included to a limited extent in the scope of the order, and

18   my principal concern on behalf of the debtor is to assure

19   that we continue this process, don't lose time, but Mr.

20   Kruger is raising a problem that doesn't have a sharp edge to

21   it in a sense that they're probably a number of others, and I

22   think it may be appropriate to deal with Mr. Kruger's issue

23   perhaps more *ad hoc* by seeking the permission of these other

24   firms, but I do think that at some point we are probably

25   going to want to take up the question of what is the

1    appropriate kind of protection for this information because I

2    think that this matter has a lot of interest in the

3    marketplace and elsewhere and -

4            THE COURT: Well, I'm not concerned about the

5    interest in the marketplace, and that's not going to be a

6    basis for expanding the confidentiality protection, but with

7    respect to the Committees that have to participate in the

8    estimation and the fact that this information is being

9    provided for purposes of participating in the estimation, it

10   seems to me that the Committees may have some interest.  With

11   respect to the marketplace, they may, you know, this

12   information -

13           MR. KRUGER: They'll take care of themselves.

14           THE COURT: Well, not necessarily that, but their

15   marketplace isn't going to be participating in the estimation

16   hearing as a party in interest, and the purpose of this order

17   is to make sure that the parties get prepared for the

18   estimation hearing, so -

19           MR. BERNICK: I understand that and I, believe me I

20   don't want to quarrel with Your Honor about this.  We want to

21   get the information, but this is the kind of thing where it

22   creates a cloud and a break, and in ordinary civil

23   litigation, this is a situation that has developed - brought

24   a lot of attention as to what kinds of matters really can be

25   kept under seal given the interest not just in the

1    marketplace but people in the open process of the courts.

2            MR. FRANKEL: Your Honor, the debtor has stamped all

3    kinds of documents confidential and precluded me from

4    carrying them to the marketplace and the Wall Street Journal,

5    and there is no difference between -

6            MR. BERNICK: I'm not focused on the Wall Street

7    Journal -

8            THE COURT: No, I've said three times on this

9    record, I'm really not going to get into this type of conduct

10    in this case.  I'm just not going to do it.  There is a basis

11    in my view to maintaining these documents under seal or I

12    wouldn't have put them under seal in the first place.  There

13    is confidential information that will be necessary to protect

14    the privacy interests of certain plaintiffs involved in the

15    cases, otherwise I wouldn't have ordered the information

16    under seal.  I expect it to remain under seal until it's

17    necessary not to have it under seal.  The debtor doesn't need

18    this information in a piece-by-piece basis.  This is not

19    plaintiff litigation.  It's estimation work.  So to the

20    extent that it's going to be aggregated into some collective

21    data base at a certain point in time for purposes of the

22    estimation hearing, that portion of it will not need to be

23    sealed, but to the extent that the debtor wants to make use

24    of specific bits of that information on a public record, that

25    may in fact invade a privacy interest, that is going to be

1    kept under seal.  Now, I don't know how much more I can -

2              MR. BERNICK: There's nothing more, there's nothing

3    more.

4              MR. KRUGER: Your Honor, I don't disagree it's just

5    that I think from the Committee's perspective we should be

6    entitled - I would also press the nation purposes.

7              THE COURT: Yeah, and I think, Mr. Kruger, that

8    that's a concern, and I'm concerned about it as well, but I

9    also, because of not having the order here, think that the

10   best way to go about it now is to contact those four firms

11   and see if for purposes of the hearing on August 1 and

12   preparing for estimation the Committee can't get access to

13   those documents.

14             MR. KRUGER: That's what we'll do, Your Honor, thank

15   you.

16             THE COURT: All right.  Ms. Baer.

17             MS. BAER: Your Honor, we just have some

18   miscellaneous orders to hand up to finish the agenda.  Item

19   number 12 was the Sempra settlement.  That was a property

20   damage settlement.  We filed a certification of no objections

21   on July 13th at Docket No. 16291.  I have that order here.

22   Then, Your Honor we have orders with respect to agenda items

23   1 through 5, which are continued claims, and lastly we have a

24   stipulation with the IRS.  That's agenda item number 7.  It

25   relates to an objection to their claim.  The stipulation

1    effectively gets rid of duplicate claims, preserves the

2    remaining claims, and preserves their right to claim joint

3    and several liability in the event that we don't have a

4    consolidated estate at the end of the day.  So, I would like

5    to hand up all of those orders.

6            THE COURT: All right.  Mona, were any of those

7    order CNOs were they entered?  Not yet?  Okay.  All right, I

8    will enter these orders.  I have orders with respect to item

9    12, 1 to 5, and 7.  I will enter those orders now.  You need

10   to be careful to make sure that in fact they're not in

11   transit and haven't been entered today to be sure that there

12   are duplicates.  I'll try to make sure that doesn't happen.

13           (The remainder of this page is intentionally left

14   blank.)

15

16

17

18

19

20

21

22

23

24

25

1          MS. BAER: Thank you, Your Honor, I appreciate that,

2     and according to my count, that's all the items on the

3     agenda.

4          THE COURT: Okay, anybody else?  We're adjourned.

5     Thank you.

6          MR. BERNICK: Thank you very much, Your Honor.

7          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

8          (Whereupon at 6:55 p.m., the hearing in this matter

9     was concluded for this date.)

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan                        July 30, 2007
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221