UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .      Case No.  01-1139 (JKF)
                            .
                            .
W.R. GRACE & CO.,           .      USX Tower - 54th Floor
et al.,                     .      600 Grant Street
                            .      Pittsburgh, PA  15219
             Debtors.  .
                            .      June 25, 2007
. . . . . . . . . . . . ..         1:09 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:         Reed Smith LLP
                         By:  JAMES RESTIVO, ESQ.
                              DOUGLAS CAMERON, ESQ.
                         435 Sixth Avenue
                         Pittsburgh, PA  15219

For Anderson Hospital:   Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

Audio Operator:          Janet Heller

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**
**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Debtors:               W.R. Grace
                               By:  RICHARD FINKE, ESQ.
                                    WILLIAM SPARKS, ESQ.
                               7500 Grace Drive
                               Columbia, MD  21044

                               Kirkland & Ellis LLP
                               By:  JANET S. BAER, ESQ.
                                    DAVID BERNICK, ESQ.
                               200 East Randolph Drive
                               Chicago, IL  60601

                               Pachulski, Stang, Zeihl, Young,
                                Jones & Weintraub
                               By:  JAMES O'NEILL, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE  19899-8705

For the Equity                 Kramer Levin Naftalis & Frankel,
Committee:                        LLP
                               By:  PHILLIP BENTLEY, ESQ.
                               919 Third Avenue
                               New York, NY  10022

For the ACC:                   Caplin & Drysdale, Chartered
                               By:  NATHAN FINCH, ESQ.
                               One Thomas Circle, N.W.
                               Washington, D.C.  20005

For the ACC:                   Campbell & Levine, LLC
                               By:  MARK T. HURFORD, ESQ.
                               800 N. King Street, Suite 300
                               Wilmington, DE  19801

For PD Committee:              Bilzin Sumberg Baena Price &
                                  Axelrod LLP
                               By:  SCOTT L. BAENA, ESQ.
                                    JAY SAKALO, ESQ.
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131

For the Official               Stroock & Stroock & Lavan
Unsecured Creditors'           By:  KENNETH PASQUALE, ESQ.
Committee:                     180 Maiden Lane
                               New York, NY  10038-4982

APPEARANCES (CONT'D):

For FCR:                    Orrick, Herrington, & Sutcliffe,
                              LLP
                            By:  RAYMOND MULLEDY, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

For Maryland Casualty:      Connolly Bove Lodge & Hurtz, LLC
                            By:  JEFFREY C. WISLER, ESQ.
                            1007 North Orange Street
                            Wilmington, DE 19899

For the ZAI Claimants:      The Scott Law Group
                            By:  DARRYL SCOTT, ESQ.
                            2712 Middleburg Drive
                            P.O. Box 2665
                            Columbia, SC  29206

                            Richardson Patrick Westbrook
                             & Brickman, LLC
                            By:  EDWARD J. WESTBROOK, ESQ.
                            174 East Bay Street
                            Charleston, SC 29401

**TELEPHONIC APPEARANCE:**

For the Debtors:            Kirkland & Ellis LLP
                            By:  LISA ESAYIAN, ESQ.
                                 SAM BLATNICK, ESQ.
                                 AMANDA BASTA, ESQ.
                                 BARBARA HARDING, ESQ.
                                 THEODORE FREEDMAN, ESQ.

                            Montgomery, McCracken, Walker &
                             Rhoads, LLP
                            By:  NOEL C. BURNHAM, ESQ.
                                 NATALIE D. RAMSEY, ESQ.

                            Pachulski, Stang, Zeihl, Young,
                             Jones & Weintraub
                            By:  TIMOTHY P. CAIRNS, ESQ.

                            Cohn Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.

For W. R. Grace & Co.:      W. R. Grace & Co.
                            By:  MARK SHELNITZ, ESQ.
                                 DAVID SIEGEL, ESQ.
                                 PAUL J. NORRIS, ESQ.

**TELEPHONIC APPEARANCE:** (cont'd)

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity | Weil, Gotshal & Manges LLP<br>By: M. JARRAD WRIGHT, ESQ.<br>DAVID HICKERSON, ESQ. |
| For Prudential<br>Insurance Company: | Riker, Danzig, Scherer, Hyland &<br>Perretti LLP<br>By: CURTIS M. PLAZA, ESQ. |
| Asbestos Property Damage<br>Claimants: | Pryor Cashman LLP<br>By: RICHARD LEVY, ESQ. |
| For State of Montana,<br>Dept. of Environmental<br>Quality: | Monzack & Monaco<br>By: FRANCIS A. MONACO, JR., ESQ. |
| | Christensen, Moore, Cockrell<br>By: DALE R. COCKRELL, ESQ. |
| Baron & Budd, et al.: | Hogan Firm Attorneys at Law<br>By: DANIEL HOGAN, ESQ. |
| For One Beacon America<br>Insurance Company: | Drinker Biddle & Reath LLP<br>By: DAVID PRIMACK, ESQ. |
| For Fireman's Fund<br>Insurance Company: | Stevens & Lee, P.C.<br>By: DAVID R. BEANE, ESQ. |
| For Anderson Hospital: | Speights & Runyan<br>By: MARION FAIREY, ESQ. |
| For the ACC: | Caplin & Drysdale, Chartered<br>By: WALTER SLOCOMBE, ESQ. |
| For PD Committee: | Ferry, Joseph & Pearce, P.A.<br>By: THEODORE J. TACCONELLI, ESQ. |
| For the Official<br>Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan<br>By: ARLENE KRIEGER, ESQ. |
| Roman Catholic Church<br>Archdiocese of New<br>Orleans: | Dies, Handerson & Cafona<br>By: MARTIN DIES, ESQ. |
| For CNA: | Goodwin Procter, LLP<br>By: DANIEL GLOSBAND, ESQ. |
| For American Legion: | Motley Rice, LLC<br>By: ANNE N. KEARSE, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

**TELEPHONIC APPEARANCE:** (cont'd)

| | |
|---|---|
| For David Austern: | Orrick, Herrington, & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>  ROGER FRANKEL, ESQ.<br>  RICHARD H. WYRON, ESQ. |
| | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ. |
| | Piper Jaffray & Co.<br>By:  JONATHAN BROWNSTEIN, ESQ.<br>  JASON SOLGANICK, ESQ. |
| For London Market<br>Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ. |
| For Interested Parties: | Credit Suisse First Boston<br>By:  JOHN R. WOLLEN, ESQ. |
| | The Blackstone Group<br>By:  JOHN O'CONNELL, ESQ. |
| | Ford Marrin Esposito Witmeyer &<br>  Gleser, L.L.P.<br>By:  ELIZABETH DeCRISTOFARO, ESQ. |
| | Avenue Capital Group<br>By:  CHELSEA CLINTON |
| For National Union<br>Fire Insurance: | Zeichner Ellman & Krause, LLP<br>By:  ROBERT GUTTMANN, ESQ. |
| For AIG: | Zeichner Ellman & Krause, LLP<br>By:  MICHAEL DAVIS, ESQ. |
| For Scotts Company: | Vorys Sater Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ. |
| For Travelers<br>Casualty Insurance: | Simpson Thacher & Bartlett, LLP<br>By:  BARBARA SENIAWSKI, ESQ. |
| For John Ku: | Silverpoint Capital<br>By:  JOHN KU |
| For ZAI Claimants: | William D. Sullivan, LLC<br>By:  WILLIAM SULLIVAN, ESQ. |

**TELEPHONIC APPEARANCE:**

| | |
|---|---|
| For Lehman Brothers: | Lehman Brothers<br>ANDREW CHAN, ESQ. |
| For the Official<br>Committee of Asbestos<br>Claimants: | Anderson, Kill & Olick, P.C.<br>By:  ROBERT HORKOVICH, ESQ. |
| For the Official<br>Committee of Asbestos<br>Property Damage<br>Claimants: | Bilzin Sumberg Baena Price & Axelrod<br>  LLP<br>By:  MATTHEW KRAMER, ESQ. |
| For Everest<br>Reinsurance Co. and<br>McKinley Insurance: | Marks, O'Neill, O'Brien & Courtney,<br>  P.C.<br>By:  BRIAN KASPRZAK, ESQ.<br>      MICHAEL J. JOYCE, ESQ. |
| For ZAI Claimants: | Crowell & Moring LLP<br>By:  MARK PLEVIN, ESQ.<br>      LESLIE EPLEY, ESQ. |
| For the Trade<br>Committee: | Duane Morris<br>By:  MICHAEL LASTOWSKI, ESQ. |
| For Murray Capital<br>Management: | By:  MARTI MURRAY |
| For Tocqueville<br>Asset Management: | By:  PETER SHAWN, ESQ. |
| For Levin Capital<br>Strategies: | Levin Capital Strategies<br>By:  JOHN P. MACKIN, ESQ. |
| For Local 310: | Rotatori Bender Gragel Stoper &<br>  Alexander Co.<br>By:  CARA L. SANTOSUOSSO, ESQ. |
| For MMWR Firms, et al.: | Montgomery McCracken Walker &<br>  Rhoads, LLP<br>By:  LEONARD A. BUSBY, ESQ. |

1           THE COURT:  This is the matter of W. R. Grace, 01-

2  1139.  The parties I have listed appearing by phone are Terence

3  Edwards, Debra Felder, Roger Frankel, Richard Wyron, Jonathan

4  Brownstein, Jason Solanick, Dale Cockrell, David Beane, Andrew

5  Chan, Hohn Mackin, Alex Mueller, Christopher Candon, Andrew

6  Hain, Timothy Cairns, Warren Smith, Christina Kang, Elizabeth

7  DeCristofaro, Marion Fairey, Matthew Kramer, John Greene,

8  Martin Dies, David Klauder, Curtis Plaza, Sander Esserman, Van

9  Hooker, David Klingler, David Parsons, Brian Kasprzak, Michael

10 Joyce, Mark Plevin, Leslie Epley, John Wollen, Peter Shawn, Sam

11 Blatnick, Amanda Basta, Lisa Esayian, Barbara Harding,

12 Theordore Freedman, Daniel Glosband, Anne Kearse, Mark

13 Sheinitz, Michael Davis, Robert Guttmann, Tiffany Cobb, Barbara

14 Seniawski. John Ku, Arlene Krieger, John O'Connell, Marti

15 Murray, Robert Horkovich, Francis Monaco, Walter Slocombe, Cara

16 Santosuosso, Noel Burnham, Natalie Ramsey, Leonard Busby,

17 Chelsea Clinton, David Siegel, Paul Norris, Richard Levy,

18 William Sullivan, Daniel Hogan, David Primack, Jarrad Wright,

19 David Hickerson, John Phillips, Beau Harbour, Michael

20 Lastowski, Theodore Tacconelli and Michael Brown.

21           I'll take entries in court.  Good afternoon.

22           MR. BERNICK:  Good afternoon, Your Honor.  David

23 Bernick for Grace.

24           MS. BAER:  Janet Baer for Grace.

25           MR. RESTIVO:  James Restivo for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. O'NEILL:  Good afternoon, Your Honor.  James

2  O'Neill for Grace.

3           MR. PASQUALE:  Good afternoon, Your Honor.  Ken

4  Pasquale for the unsecured creditors committee.

5           MR. BENTLEY:  Good afternoon, Your Honor.  Phillip

6  Bentley for the equity committee.

7           MR. BAENA:  Good afternoon, Your Honor.  Scott Baena

8  on behalf of the property damage committee.

9           MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo

10 on behalf of the property damage committee.

11          MR. HURFORD:  Good morning, Your Honor.  Mark

12 Hurford, Campbell, Levine on behalf of the ACC.

13          MR. FINCH:  Good afternoon, Your Honor.  Nathan Finch

14 on behalf of the ACC.

15          MR. MULLEDY:  Raymond Mulledy on behalf of the FCR.

16 Good afternoon, Your Honor.

17          MR. SPEIGHTS:  Good afternoon, Your Honor.  Dan

18 Speights on behalf of the Speights and Runyon claimants.

19          MR. SCOTT:  Good afternoon, Your Honor.  Darrell

20 Scott on behalf of ZAI claimants.

21          MR. WESTBROOK:  Good afternoon, Your Honor.  Ed

22 Westbrook, ZAI, Special Counsel.  And, Your Honor, I'd like to

23 introduce to the Court three summer law clerks I brought up

24 with me to see some of these excellent lawyers at work.  Mr.

25 Andrew Wonderlie, Mr. Chris Moore, and Ms. Sarah Gibb are here

**J&J COURT TRANSCRIBERS, INC.**

1 with us today.

2          THE COURT:  Welcome.

3          MR. BERNICK:  Now we're really nervous.

4          THE COURT:  That is kind of scary when you get the

5 young law clerks and they're the people who do the work and

6 they're so familiar with the current law.  It' a little

7 intimidating.  So okay, Mr. Bernick, we'll expect your best

8 today.

9          MR. BERNICK:  Your Honor, I think we've got a number

10 of different matters on for this afternoon, and with the

11 Court's permission we'd like to vary a little bit the order in

12 which they're taken up basically in order to accommodate a

13 request that we received for a different order so that people

14 can basically get off and do other things.  And at the top of

15 the list is the request to have the fee matters heard first of

16 all.  I think that they are Items 6 and 18 on the agenda.  And

17 then we would go into a status conference with respect to the

18 property damage claims.  Mr. Restivo would like to address the

19 Court and give us the latest flavor of the multi-color

20 presentation.  And I think that will segue into some of the

21 specific issues relating to ZAI and the traditional property

22 damage claims.  All that would be basically done before we turn

23 to any of the PI matters.  I think there's really only one

24 significant PI matter for this afternoon.  I'm not sure if it's

25 overwhelming significant, but is the application relating to

1  Lexicon.  I don't think that there are any other PI matters on

2  for this afternoon.  I think there are then probably some

3  administrative odds and ends that will round out the day.  So

4  our proposed order would then be take up the fee issue first

5  and do property, then do personal entry and then finish up with

6  any other business that's on the agenda.  And with that said I

7  guess I'll turn it over to our fee auditor.

8               THE COURT:  Mr. Smith?

9               MR. BERNICK:  Yes.

10              THE COURT:  Mr. Smith.

11              MR. SMITH:  Yes, Your Honor.  This is the 23rd

12  quarterly interim applications, and we filed final reports on

13  all these applications, Your Honor, and a draft order has been

14  submitted that reflect our proposed reductions, Your Honor,

15  that's been submitted under certificate of counsel.

16              THE COURT:  All right.  I have the COC on Number 6.

17  I wasn't aware that there was an issue with respect to fees, I

18  guess, on 18?

19              MS. BAER:  Your Honor, Janet Baer on behalf of W. R.

20  Grace.  I believe you actually entered the order on Number 6.

21  Your clerk contacted us and asked us to put Number 18 on the

22  agenda.  It's stated as a status conference on compliance with

23  the administrative fee order.  The genesis, Your Honor, is we

24  filed the certification of counsel with respect to the Forman

25  Perry application of the certification of counsels located at

1  15999.  The certification of counsel represents an agreement

2  among the asbestos claimants, the debtor and Forman Perry that

3  the application they filed which is catch up for all of those

4  back months where they exceeded the $50,000 OCP limit they

5  would be permitted to get paid like the other professionals 80

6  percent in fees, 100 percent of expenses pending Mr. Smith's

7  review of the application.  He would then go through the

8  application, make his recommendations and once his

9  recommendations were completed then the asbestos committees

10 would have an opportunity if they still objected to some of the

11 fees being requested to file those objections and have this

12 matter put on for a hearing before Your Honor.  The U.S.

13 Trustee was also in agreement with that process.

14       So, Your Honor, what we would like to do is get the

15 order entered that we provided on the certification of counsel

16 and then Mr. Smith and I spoke this morning and he indicated

17 that he could review the application in substance and have this

18 matter put on for a hearing at the September fee hearing which

19 is the next time fees are up.

20       THE COURT:  Okay.  My concern with Forman and Perry

21 was I wasn't able to tell when, if at all, they're going to get

22 caught up and start to get into compliance with the fee case

23 management order.

24       MS. BAER:  They are in compliance, Your Honor.

25 They're caught up and in fact they filed an April application

1  for just April of '07.  Certificate of no objections is filed,

2  so it is right on schedule.

3           THE COURT:  All right.  Well, that was my concern and

4  I wasn't able to tell from this.  That's the reason I asked for

5  the status conference on that.  Okay.  Then I will have the

6  order entered at Item 18, too.

7           MS. BAER:  Your Honor, I have a copy of the order

8  here if it would be convenient.

9           THE COURT:  I'll take it.  Sure.

10          MS. BAER:  Thank you.

11          THE COURT:  Okay.  That's signed.

12          MS. BAER:  Then Your Honor with that I believe we're

13  going to now turn to Item Number 17 on the agenda which is the

14  property damage settlement that Mr. Restivo will address.

15          MR. SMITH:  Your Honor, this is Warren Smith the fee

16  editor.  That concludes the fee editor matters, Your Honor, --

17  fee matters.  If I could be excused.

18          THE COURT:  Yes.  Anyone who is only interested in

19  fee processes is excused.  Thank you.

20          MR. SMITH:  Thank you.

21          THE COURT:  Mr. Restivo.

22          MR. RESTIVO:  Good afternoon, Your Honor.  I would

23  like to begin this over at the witness stand if I might using

24  that microphone.

25          THE COURT:  Sure.

1          MR. RESTIVO:  Your Honor, I'm going to give a quick

2   status report which will then lead into some areas where we

3   need some guidance from the Court.  As the Court knows we began

4   on this property damage expedition with about 4200 asbestos

5   property damage claims in or around March of this year.  We had

6   627 remaining claims and we started the summary judgment and

7   trial resolution mechanism.

8          On May 2, Your Honor, I showed the Court this board

9   that I have in the courtroom which indicated that the number of

10  remaining property damage cases after taking into account

11  settlements or potential settlements, voluntary dismissals and

12  expungements was down to 213.  Your Honor, there have been a

13  further reduction since May 2nd.  With respect to New York

14  statute of limitations, Your Honor, there are only four cases

15  left involved with that.  One of the cases we had counted was

16  the Solo case which is a New York case, but that's subject to

17  New York proceedings, was not part of our motion and we simply

18  had counted that in remaining claims.  That was a double count.

19         With respect to Your Honor, too, California and to

20  Canada through discussions with Speights and Runyon there's

21  been one voluntary dismissal or there will be.  I can't tell

22  you exactly which orders have been assigned yet, out of

23  California bringing that number to 103.  Thirteen out of Canada

24  bringing that number to 60.  The Court dismissed one Motley

25  Rice claim for lack of product ID bringing that to 14.  And

1  then, Your Honor, the remaining claims by our count which is a

2  little bit arbitrary is eight.  And by that we mean remaining

3  claims this Court has to deal with.  We believe you entered an

4  order on Central Wesleyan a Mr. Westbrook settlement.  We

5  believe Solo at some point has to go back to the New York

6  courts and so we don't count that as a remaining claim you need

7  to deal with.

8          And Mr. Speights has three claims for Anderson

9  Memorial Hospital.  One for the hospital, one for the state of

10  South Carolina and one for the World.  For our purposes we

11  count that as one rather than three.  There may be other

12  reasons to count it multiple.  And so with a little bit of

13  arbitrary count we now have for the Court to deal with 194

14  claims.  And I would remind the Court that New York is sub

15  judicia, we've argued that.  That's before the Court.  Ninety-

16  nine of the 103 California claims have been argued on statute

17  of limitations, and Your Honor, that is before you.  The three

18  remaining statute of repose is before you.  And Canada we have

19  yet to argue, but approximately or exactly 168 of the 194 are

20  subject to motions for summary judgment, 26 are not.

21          With respect, Your Honor, to the 26 claims which are

22  not subject to summary judgment the Court will recall that you

23  required the debtor to file a list of those claims.  Some of

24  those claims as the Court can see are Motley Rice claims.  We

25  will try certain of those Motley Rice cases on statute of

1 limitation grounds beginning on Monday, July 30.  We did

2 negotiate with Motley Rice a pretrial schedule.  It was

3 submitted, and I believe the Court signed that this morning.

4 And that spells out when certain things need to be done and

5 when we will get the Court it's books.  There was, Your Honor,

6 a blank in that order, a date for a telephonic final pretrial

7 conference if one was needed after July 25 and I couldn't tell

8 whether that was filled in or not.

9      THE COURT:  I think it was put in for July 19 when

10 the RMQ or whatever the initials are now for the summary

11 judgment that's been pushed off, that argument, I put it on at

12 the same time.  I figured that the status conference would only

13 take a few minutes.  I believe that's the right date.  Mona, is

14 July 19th the right date?  Yes.  I'm being told yes.

15      MR. RESTIVO:  And it's not even clear to the parties

16 that we will need a final pretrial, but we ought to schedule it

17 we tell the Court if there's no need for it.

18      THE COURT:  I think it would probably be helpful even

19 for me just to know for sure what the length of time that

20 you're expecting and how many witnesses and so forth.  So I

21 probably wouldn't mind a few minutes of your time that morning

22 or afternoon.  I think it's at 2:00, I believe.

23      MR. RESTIVO:  That'll be fine, Your Honor.  Another

24 case in the not subject to summary judgment motion is a case

25 known as Pacific Freehold, Your Honor.  We are unable to try

1  that case on statute of limitations grounds at the same time

2  because Mr. Runyon has another trial and has a conflict.  And

3  what we need from the Court, what I believe the parties need

4  from the Court is some indication of available trial time to

5  try Pacific Freehold.  Out best estimate is we may need two

6  days more or less, but he is unable to try that in the time the

7  Court gave us, July 31 to August 1 because of another

8  previously scheduled commitment.  And I believe Mr. Runyon is

9  on the line.

10         THE COURT:  In which are we looking for dated,

11  Mr. Restivo?  If it's 2008 and past maybe we'll get there.

12         MR. RESTIVO:  We were kind of hoping that since

13  bodily injury had slipped a little bit until after the first of

14  the year that there might be some time in the fall.

15         THE COURT:  Do you know the dates that have been

16  canceled?  Because I think the problem is from my looking at my

17  calendar I don't believe I've released any of those dates on my

18  calendar because frankly I just -- every time I release a date

19  I end up putting it back on.  So I'm just not sure what's

20  available and what Grace is actually going to use.  So I

21  probably do have dates, but I honestly don't maybe know when

22  they are because I'm not sure what dates Grace is and isn't

23  using.

24         MR. RESTIVO:  Would it be permissible for us to

25  contact your scheduling clerk, find out what the dates are, and

1  we'll talk to Mr. Runyon and see what makes sense and see

2  whether or not the Court's calendar will accommodate us.

3          THE COURT:  I think that may make more sense than my

4  trying to sift through these dates today.  Because probably

5  doing that will just take everybody's time and may not lead to

6  a satisfactory resolution anyway.  So if you contact Winnie or

7  Mona after court today that probably would make the best sense.

8          MR. RESTIVO:  We will do so, Your Honor, and will

9  talk to Mr. Runyon and make a proposal.

10          THE COURT:  Mr. Runyon, are you on the phone?

11          MR. RUNYON:  Yes, Your Honor, I am.

12          THE COURT:  Okay.  Is that acceptable to you, sir?  I

13  think I will probably spend less of your time if we can try to

14  work through the dates not on the phone today and let perhaps

15  Mr. Restivo make a proposal or contact you and you can both

16  talk to my scheduling clerk at the same time if you want to do

17  that.  I don't care.  But I won't be involved in that

18  discussion.  My scheduling clerk will try to pull together two

19  days for you for trial.

20          MR. RUNYON:  Yes, Your Honor, that's quite

21  acceptable.

22          THE COURT:  All right.  Thank you.

23          MR. RESTIVO:  And next, Your Honor, and it may be an

24  item we cannot handle today, but I thought I'd try it.  Your

25  Honor, issued an order with respect to the state of California,

1  Department of General Services that in effect ruled that they

2  had established product ID by a preponderance of the evidence.

3  You overruled or dismissed our objections.  In that order your

4  order uses language which allows those claims.  We think that

5  may be in error because we still have with respect to those

6  claims our summary judgment -- motion for summary judgment

7  which the Court has before it, and, of course, we still have

8  the no hazard hearing.  And so we don't believe those claims

9  are allowed for all purposes.  We believe simply that our

10 product identification objections have been rejected by the

11 Court.  We contacted counsel for the State of California,

12 Department of General Services.  We were unable to agree on an

13 amended order.  I believe California has time to respond to our

14 motion, but at least to me it seems so self evident that these

15 claims are not allowed for all purposes, that you haven't ruled

16 on summary judgment or no hazard.  I was hopeful we could just

17 get agreement.  You could take the word "allowed" out and say

18 you dismissed our objections.

19         THE COURT:  Is someone present on the phone

20 representing the State of California?  Because if not I'm not

21 getting into an issue without counsel.

22         MR. RESTIVO:  No, I appreciate that, Your Honor.

23         THE COURT:  Okay.  So I think you need to either file

24 a motion or something.

25         MR. RESTIVO:  Well, the motion's filed.  I was just

1 hopeful someone would be on the phone and we could wrap it up.

2         THE COURT:  Is anyone in presence for the State of

3 California?

4         MS. KANG:  Yes.  This is Christina J. Kang of Hahn &

5 Hessen representing the State of California.

6         THE COURT:  Have you seen what Mr. Restivo is talking

7 about, Ms. Kang?

8         MS. KANG:  I have seen a proposed order on which we

9 could not come to an agreement.  And the last I spoke W. R.

10 Grace's counsel represented that they would file a motion which

11 I have not seen yet.

12         THE COURT:  Okay.  Well, apparently the motion's been

13 filed, but I haven't seen it either.  So I think what will

14 happen is it'll just get sent to you and you'll have an

15 opportunity to respond and I'll address it.  It sounds as

16 though, however I probably should not have allowed the claims

17 in full if there is still other objections pending that I was

18 perhaps not aware of.  I was only aware of the statute of

19 limitations objections in that proceeding.  So if there are

20 other claims objections that would have probably been an error

21 on my part.  So perhaps you two can take a look at this and

22 see.  If in fact there were no other claims objections pending

23 then I should have allowed it.  So I don't know the answer.

24         MR. RESTIVO:  I think that comment may help us work

25 on an agreed upon order.  Thank you, Your Honor.

1          THE COURT:  Right.

2          MR. RESTIVO:  Moving kind of from the easiest to the

3 less easy the Court may recall that we had a hearing here on

4 May 30.  The hearing dealt with, among other things, whether or

5 not the debtor could amend certain objections to certain

6 property damage claims.  The Court issued certain rulings,

7 asked the parties to prepare an order.  The parties attempted

8 to do that, but we and Mr. Speights have been unable to agree

9 either on the order or what the Court did or what the Court

10 said and what it means.  We know what the Court said.  We have

11 the transcript, I believe.  And Mr. Speights can address this.

12          I think there's three issues.  I think one issue is

13 we believe you rules that we did not need to amend or you were

14 not going to grant us amendment on Canadian statute of

15 limitations because statute of limitations included ultimate

16 statute of limitations.  I believe Mr. Speights argued to you

17 that that wasn't right because that was part of his objection

18 to our motion for summary judgment.  I believe the transcript

19 makes it pretty clear that the Court did say statute of

20 limitations includes ultimate statute of limitations.  Mr.

21 Speights, I think, wants to argue that again.  We're trying to

22 close the loop so we have a disagreement on that point.

23          I think secondly we have a disagreement on Mr.

24 Pinchon.  We thought what was discussed was that we could test

25 Pinchon's opinion.  We believe based upon the information in

1  the claim file Mr. Speights may believe Mr. Pinchon can now

2  look at new material.  That's an issue.

3        And then lastly we disagree on whether or not the

4  Court ruled that amendments to conform to the evidence at trial

5  are proper.  And so we have kind of three issues and we have

6  submitted to the Court two competing orders, one of which or a

7  combination of one of which needs to be entered to close the

8  May 30 hearing, and we've been unable to disagree and I would

9  turn to my friend Mr. Speights to explain to you where the

10 order we submitted was incorrect.

11        THE COURT:  I did just today see that order, but I

12 haven't had a chance to look at it.  I was not -- I can tell

13 you this, the reason I put it aside was because I saw Paragraph

14 2.  It had something to do with Dr. Pinchon -- Mr. Pinchon, and

15 it made no sense to me.  I don't have any recollection of

16 having made the rulings that paragraph said I made.  So until I

17 go back and take a look at the transcript and my notes I'm not

18 signing that order.  Because it just didn't make any sense to

19 me.  I didn't even understand it.  So if I made those rulings I

20 may have made them, but they must have been in a context and

21 they didn't make sense.

22        With respect to the issue of the ultimate statute of

23 limitations -- ultimate limitations period, pardon me, being

24 included within the statute of limitations in Canada I did

25 definitely say that the debtor did not have to amend because

1  the ultimate limitations period is included within the statute

2  of limitations as I understand the Canadian law and that that

3  was fairly encompassed within the debtor's original objection.

4  So that much I was agreed on.

5         And the third issue?

6         MR. RESTIVO:  We thought the Court ruled that

7  amendments to conform to the evidence at trial are permitted by

8  the federal rules and we --

9         THE COURT:  I wasn't making any rulings about that.

10 There was a discussion that led to something about amending

11 pleadings and when you can do it, and that was a side comment.

12 I'm certainly not issuing any order that says that you can

13 amend pleadings that conform to evidence that hasn't even been

14 heard yet.  So if that's part of that order I haven't focused

15 on that order enough.  If it is I'm not going to sign any such

16 order.

17        MR. RESTIVO:  My suggestion subject to Mr. Speights'

18 comments to the Court is I think both sides would be more than

19 happy if the Court looked at the competing order, struck out

20 whatever the Court wanted to strike out, added whatever the

21 Court wanted to add without further argument.  Obviously Your

22 Honor once you review it you will know what it is you ordered

23 and whatever you write up is fine with the parties, I think.

24        THE COURT:  Okay.  Mr. Speights.

25        MR. SPEIGHTS:  That might be okay once I have equal

1 time here, Your Honor.  And I don't think we're far apart.  I

2 don't think I'm far apart with what -- where the Court is.

3 Taking them in reverse order, you did not make such a ruling

4 and the exception he wants would swallow up all the rulings if

5 it could just come in later and conform to the evidence.  So

6 that takes care of that one.

7 　　　　　On the first one there is no question that you ruled

8 as you just said you ruled, that they did not need to amend the

9 claims, because in your view their objections encompass the

10 ultimate limitations.  The sentence I added in, and it's

11 something I discussed with you at the hearing, was just simply

12 say that because that issue is before you on the motion for

13 summary judgment, that is, our first response to the motion for

14 summary judgment is that they did not timely object, that it

15 would be without prejudice to make that argument.  I know how

16 you're going to rule, Your Honor.  I just think that that's

17 where the issue is technically teed up as well as now you've

18 ruled this way on the motion to amend the objections.

19 　　　　　THE COURT:  But I think they did timely raise the

20 statute of limitations issue with respect to Canadian claims,

21 didn't they?  I may have gotten --

22 　　　　　MR. SPEIGHTS:  They did raise the statute of

23 limitations and we argued in response to the motion for summary

24 judgment that they did not timely raise an objection to the

25 statue of repose.

1          THE COURT:  Okay.  I see.

2          MR. SPEIGHTS:  You have ruled now that as to the --

3          THE COURT:  He did because it's encompassed within

4    the statute of limitations.

5          MR. SPEIGHTS:  Insofar as that motion to amend the

6    objection is concerned, but there are briefs right now before

7    you that have not been argued on motions for summary judgment

8    and I added a sentence.  And again, you can look at both

9    versions or we can have a telephone conference call.  But I

10   added the sentence solely to be able to say when we argue those

11   motions for summary judgment, Your Honor, we also have this

12   ground and I'm not going to spend over 30 seconds on it because

13   I know the way you feel about it.  But I'm protected from my

14   record that I made that objection on that issue which is all I

15   was trying to do with that sentence.

16         THE COURT:  All right.  I'll take a look at it.

17         MR. SPEIGHTS:  Now, the middle one is Dr. Pinchon.

18   And that came up, if you recall, that I said I'll be glad to

19   withdraw claims for which Dr. Pinchon has changed his mind

20   where he, quote, made a mistake, end quote.  And I have done

21   that already with some working with Mr. Restivo.  And if he

22   points out others I will be glad to look at those as well.  But

23   there may be other basis for summary judgment besides Dr.

24   Pinchon's opinion, and I don't want an order to be entered to

25   say that if Dr. Pinchon doesn't support product identification

1 then the claim automatically goes out.  I think we are making

2 much ado about nothing.  I think Mr. Restivo and I have been

3 able to deal with those claims which Dr. Pinchon says are not

4 Monokote and there's no other evidence.  And I think if there

5 are any others I'll be glad to deal with Mr. Restivo on those.

6 I'll be glad to do it based upon -- there is a redline

7 attached., other two versions.  We'll be glad for Your Honor to

8 take those two and rule or we'll be glad to do it by telephone

9 if Your Honor has more questions.

10         THE COURT:  So the Paragraph 2 has to do with the

11 fact that Mr. Pinchon was looking at the claims files and from

12 that making a determination whether there was or wasn't

13 Monokote 3 in the product?

14         MR. SPEIGHTS:  No, I think Dr. Pinchon -- it didn't

15 come up in context of the claims files.  It came up because Dr.

16 Pinchon had done work on these buildings.  He was the advisor

17 to these building owners in dealing with asbestos.  And Mr.

18 Cameron in taking his deposition got Dr. Pinchon to readily

19 acknowledge that on several of those the product would not be

20 Monokote.  And Mr. Restivo being the great lawyer he is made

21 great hay of that when we were arguing that motion.  I said,

22 Your Honor, I'll withdraw those where Dr. Pinchon is not of

23 that view.  We didn't get down to whether it was in the claims

24 file or not the claims file.  It was Dr. Pinchon's opinion

25 based upon what he knew about the buildings and the files that

1  he had.  Most probably all that information was in the claims

2  file.  I simply don't know.

3        THE COURT:  But it's his files -- his opinion is from

4  his files not from the debtor's claims files.

5        MR. SPEIGHTS:  Well, it's from his files most if not

6  all of which was submitted to the debtor in support of the

7  claims.  But there may have been some piece of paper -- we have

8  found in all of the dealings sometimes -- before we withdrew

9  claims before Mr. Restivo withdrew objections before we found

10 other paper and we resolved those issues.  I just think this is

11 getting too confusing, Your Honor.  I think I'll do what I said

12 and I have done what I said and I'll continue to do what I say

13 if Dr. Pinchon is no of the view.  And if he wants to make an

14 objection that something is not in the claim file he can say

15 that.

16       THE COURT:  All the paragraph has to say is that

17 you've agreed that you'll withdraw the claims as to which Mr.

18 Pinchon has acknowledged that Monokote is not the product.

19       MR. SPEIGHTS:  Yes, Your Honor.  And in fact, I think

20 in my order I even gave Mr. Restivo a little more and I said

21 that Dr. Pinchon cannot -- well, I'm not sure which is my

22 language and his without reading these, but essentially that's

23 correct, Your Honor.  Where that's all we had and Dr. Pinchon

24 is no longer of that view I'll withdraw the claims.  And I'll

25 continue to do so if there are any others.  I don't know if

1 there are any others.

2        THE COURT:  Are not these claims numbered?  Can't you

3 simply put in this order which buildings you're withdrawing the

4 claims as to?  Or you don't know that right now until you go

5 back and talk to Dr. Pinchon?

6        MR. SPEIGHTS:  We've already submitted that in a

7 separate, Your Honor.

8        THE COURT:  Okay.  Then why do I need this in this

9 order at all?

10        MR. SPEIGHTS:  I don't know that you do, but I think

11 Mr. Restivo might want that.

12        MR. RESTIVO:  I believe there was a representation

13 and a direction that if Pinchon cannot support his one-page

14 letter the claim will be withdrawn.

15        THE COURT:  That's what Mr. Speights agreed to do.

16 Yes.

17        MR. RESTIVO:  Mr. Speights and I have talked and he

18 has dismissed 13 Canadian claims that I -- I can't remember if

19 I pointed out 13 or 15 or whatever.  But there are others and

20 the rule ought to be the same that if Pinchon cannot support

21 his one-page letter based upon what's in the claim file the

22 claim ought to be dismissed.  I'm not pushing hard for our

23 language versus his language.  I just want an order to close

24 this issue so we can go to the next step.  You did say we could

25 depose Pinchon.  If we have to do that we'll do that.  And so

1 whatever language the Court is comfortable with on Paragraph 2

2 frankly, Your Honor, is just fine with us so we move on to the

3 next step.

4        THE COURT:  All right.  At least I understand what

5 Paragraph is intended to do now.  After court today I'll go

6 back and take care of this order.  All right.

7        MR. SPEIGHTS:  My only caution was that Pinchon is no

8 longer of that view.  But right there there's an affidavit from

9 (indiscernible) or somebody that doesn't keep the claim out.  I

10 don't think there are any like that.  I think we're arguing

11 about nothing.  But I just wanted to protect that.

12        THE COURT:  Okay.  All right.  As I said I think at

13 this point I understand it.  So at least I can go back and

14 figure out what Paragraph 2 is about now.

15        MR. RESTIVO:  The next area of discussion or

16 argument, Your Honor, is we have filed a motion on the Canadian

17 statute of limitations that deals with 59 now of the remaining

18 60 Canadian claims.  The numbers were different when we filed

19 it, but that's the number.  We've really been trying to argue

20 that motion since I believe April 9.  Mr. Speights has done a

21 masterful job interposing one reason after another why it's not

22 right for argument.  We either didn't properly interpose an

23 objection or he needed to depose Mue which he's now done.  Last

24 time he needed to consider getting his own expert.  The Court

25 said he could do that.  We don't have an objection with that

1  although clearly we're going to want to take the expert's

2  deposition.  We believe that the only way we're ever going to

3  be able to get to the argument on the Canadian motion frankly

4  is for the Court to give us an argument date.  If Mr. Speights

5  gets an expert he'll have to tell us who it is.  If we need to

6  depose him we'll have to depose him.  And our suggestion is

7  that you set down for argument our motion on the Canadian

8  statute of limitations and ultimate statute of limitations for

9  August 1.  The Court has set aside for us July 30, 31, and

10 August 1, and tell us that -- tell the parties that's when

11 we're going to argue the Canadian motion for summary judgment.

12 And whatever needs to be done between now and then the parties

13 will have to do it.  Otherwise we may not argue this motion in

14 our lifetime, Your Honor.

15        THE COURT:  Okay.  Right now that is the day that I

16 have listed for Pacific Freeholds.

17        MR. RESTIVO:  And, again, Mr. Runyon is unavailable

18 and so that day has opened up.

19        THE COURT:  Okay.  And I don't have anything else in

20 Grace listed that day.  So Ms. Baer that's right?

21        MS. BAER:  That's correct.

22        THE COURT:  Okay.  Mr. Speights, are you available

23 August 1st to do the argument on the Canadian limitations

24 issues?

25        MR. SPEIGHTS:  Number one, Your Honor, I am available

1  that date.  So that's not a problem.  And number two, I hope we

2  can get everything done by that date.  I have no problem with

3  Your Honor setting it down for that date.  We have got to get

4  this discovery done and the ball has been in our court.  Mr.

5  Ferry is handling that.  And as Your Honor knows he was out a

6  little bit.  But we are talking to an expert and we'll try to

7  get that expert's identity to Mr. Restivo shortly and then

8  we've got to work out taking his deposition.  Whether that

9  necessitates another new deposition is an issue floating around

10  once he hears our expert.  And as I've said before I will want

11  some -- may want some additional discovery, but I'm happy to

12  work with Mr. Restivo in doing that probably from July 5 until

13  August 1.  We have a little matter before you on July 5.

14        THE COURT:  All right.  You two need to submit an

15  order that's going to schedule this or if I just give you

16  August 1 and rely on the fact that you're going to work out the

17  discovery details.

18        MR. RESTIVO:  I would say tell us we're going to

19  argue August 1.  Mr. Speights and I will try to work out the

20  discovery details.  If one side or the other thinks we're

21  running into problems we'll ask for a telephonic conference

22  with the Court.

23        THE COURT:  All right.  Just a second.  Starting at

24  nine o'clock in Pittsburgh argument on all Canadian statute of

25  limitations, statute to repose, ultimate limitations, whatever

1  you choose to call them issues.  How much time do you think

2  you're going to need?  This is just argument.  Correct?  You're

3  not attempting to try anything.

4          MR. RESTIVO:  No, this is just argument, Your Honor.

5  No more than two hours.

6          THE COURT:  For both sides?

7          MR. RESTIVO:  For both sides.  Yes.

8          THE COURT:  All right.  I'll reserve until 11.  Okay.

9          MR. RESTIVO:  Your Honor, that really concludes, I

10  think, the status report on traditional product damage claims.

11          THE COURT:  Pardon me, Mr. Restivo, I'm sorry for

12  interrupting, but the only dog I have in this fight is when I'm

13  going to get the binder with whatever other materials I may

14  need to see in advance of the argument.  Are you going to be

15  doing additional briefs or submit any expert reports or

16  anything in advance of the argument?  You or Mr. Speights.

17          MR. RESTIVO:  Yes.  If Mr. Speights retains an expert

18  we'll have to talk about an expert report.  We'll take the

19  expert's deposition.  Yes.  There may be an additional

20  submission.  I think the Court should simply tell us when do

21  you want your binder and we'll work back from that.

22          THE COURT:  I would like the binder -- is it possible

23  to get it Thursday night July 26th?

24          MR. RESTIVO:  Your Honor, if you order us to do so we

25  will do so.

1          THE COURT:  I'd take it Friday morning July 27th, if

2   possible.  But I want it that weekend because there's going to

3   be so much going on the 30th, 31st, and 1st that I would like

4   that weekend to be able to have the binders.

5          MR. RESTIVO:  We will do so, Your Honor.

6          THE COURT:  All right.  Ten o'clock in the morning on

7   July 27th then.

8          MR. RESTIVO:  Moving from traditional product --

9   traditional property claims, Your Honor, to ZAI property damage

10  claims I'd like to deal with the ZAI claimant's motion for

11  discovery concerning W. R. Grace's conduct in ZAI summary

12  judgment proceedings.

13         THE COURT:  Mr. Restivo, I think Mr. Baena has

14  something before you get there.

15         MR. RESTIVO:  Oh, I'm sorry.

16         MR. SPEIGHTS:  And I had something.

17         THE COURT:  And Mr. Speights, too.

18         MR. RESTIVO:  I'm sorry.

19         MR. SPEIGHTS:  Mine is very brief before you leave

20  traditional, Your Honor.  As I do every -- at every omnibus

21  hearing I ask for a status report on the --

22         THE COURT:  Credentials.

23         MR. SPEIGHTS:  Well, I always put it generically on

24  the settlements that have been discussed I think as far back as

25  March or April and where are we on those?

1        MR. RESTIVO:  I'm going by memory.  I believe

2 settlement agreements have been filed and approved on a number

3 of cases -- two cases.

4        MS. BAER:  Your Honor, two settlement agreements were

5 filed and approved by orders you entered last week.  One new

6 one has been set for a hearing for approval at the July

7 hearing.  On the Die settlement and on the Prudential

8 settlement we are still negotiating the terms of the settlement

9 agreements with the other side.  Those negotiations are

10 ongoing.  We're expecting comments back from them, and then we

11 have one more settlement that is very close to being done.

12 Another one of the one claim settlements.

13        THE COURT:  What is taking so long with respect to

14 Prudential and the Dies issues?

15        MS. BAER:  Your Honor, there are issues about what we

16 can and cannot agree to vis-a-vis the allowance of the claim.

17 You may have noticed in the other settlement agreements

18 essentially they're assuming 100 cents on the dollar.  If the

19 plan does not call for that then the what ifs.  And the what

20 ifs are what have caused people problems that they are dealing

21 with and we're trying to structure.

22        THE COURT:  Mr. Baena.

23        MR. BAENA:  May it please the Court, Scott Baena on

24 behalf of the property damage committee.  Your Honor, I'm

25 reminded that there is a housekeeping item that has to be dealt

1  with in connection with some of these claims objections.  Just

2  to remind you of the painful past  back in October of '05 the

3  debtor was promoting that the Court have a Phase I estimation

4  process which would include a determination of a constructive

5  notice date that would, you know, on an omnibus basis be

6  applicable to all claims.  And they were focused on three key

7  states at that point in time.

8          In November of '05 the Court agreed with the property

9  damage committee that you can't really approach this on that

10 basis and it has to be done on a claim by claim basis.  When

11 the debtor was seeking to do it on an omnibus basis they filed

12 a report of a Mr. Morris who is an architect.  And he was to be

13 their expert on constructive notice.  After the Court disagreed

14 with the approach they filed their 15th omnibus and included

15 objections in respect of virtually all claims including

16 constructive notice objections.  And those objections were

17 supported by, in part, again the report and testimony of Mr.

18 Morris.

19         The Court had indicated that the property damage

20 committee could weigh in even on individual claims objections

21 where there was an overarching issue.  And we perceived the use

22 of Morris as an overarching issue and we filed a motion in

23 limine to strike and exclude the report of Mr. Morris and to

24 keep Mr. Morris out of the picture, so to speak.  And that

25 objection is applicable to all property damage claims which are

1  subject of objections based upon constructive notice.

2          The first batch of property damage claims, I believe,

3  that include constructive notice as a base objection come

4  before you on July 30th.  That's the Motley Rice claims.  I

5  believe that constructive notice is implied in those

6  objections, too.  Then we have the 103 California claims, and

7  the 60 Canadian claims.  Because they subsequently filed

8  supplemental report for Mr. Morris, same tenor, you know, this

9  omnibus constructive notice approach in respect of Canadian

10  statute of limitation objections.

11          And so the question that arises now is when are we

12  going to get to that motion?  And obviously it's an in limine

13  motion and it ought to be dealt with before the witnesses are

14  put on.  That raises a procedural issue, I guess, because I'm

15  sure other claimants would like to participate if they're

16  claims are also subject of that sort of an objection.  Several

17  claimants have joined in our objection.  In fact, Motley Rice

18  did, I believe, as an example.  And so I raise the fact of that

19  motion is out there, it needs to be dealt with in connection

20  with the Motley Rice claims.  It needs to be dealt with in

21  respect to all the other PD claims that are likewise going to

22  be heard in respect of constructive notice.

23          THE COURT:  Okay.  I haven't seen either that motion

24  in limine or the joinders.  Have they been responded to?

25          MR. BAENA:  Oh, well, that's the problem.  We filed

1  the motion in March 20th 2007.  And you will recall we went off

2  track along the way, Judge.  And what you did was you put this

3  motion on the shelf back then and didn't set a briefing

4  schedule.  And so we need to have dates for brief from the

5  debtor in response, and then our reply brief as well as anybody

6  else that's participating in the process.

7          THE COURT:  Okay.  Is there -- I don't know the

8  schedule off hand.  Mr. Baena, is there time to get it onto the

9  omnibus for July?

10         MR. BAENA:  That would be too soon, I think, right?

11         UNIDENTIFIED ATTORNEY:  It's too late to get it on.

12         THE COURT:  Well, the motion's already filed with the

13 briefs.  Right?  So it's just a matter of getting the responses

14 and the reply in.  And is it too late for that?

15         MR. RESTIVO:  Might I respond to that?

16         THE COURT:  Mr. Restivo.

17         MR. RESTIVO:  I don't dispute the time frame Mr.

18 Baena had given the Court.  I do dispute whether or not there

19 is something today to fight about.  That is, the next series of

20 cases we are going to try are the Motley Rice cases beginning

21 on July 30.  And the pretrial order that this Court has issued

22 requires the debtor, in turn Motley Rice, to list what

23 testimony or witnesses or experts or exhibits we are going to

24 sue.  We have not made a decision that Mr. Morris is needed or

25 necessary.  It is true Mr. Morris did file a report.  He filed

1  one for Canada, one for U.S.  But until the debtor discloses

2  for a particular trial that Mr. Morris is an issue I think the

3  Court was right to put this on the back burner and I'm not sure

4  why we would argue about it vis-a-vis the Motley Rice cases to

5  be tried unless and until the debtor says yes, we're going to

6  use the Morris report.

7          THE COURT:  Well, that makes sense.  I mean, if he's

8  not going to be called there's no need for a motion in limine.

9          MR. BAENA:  I certainly did jump to the conclusion

10  that they were going to use him because they didn't tell us

11  otherwise.  If they choose not to we obviously don't wish to

12  argue the motion.  But the procedural quandary you'll be in

13  when they finally decide is that there won't be enough time for

14  briefing and argument in anticipation of a July 30th hearing.

15  But that's their problem.

16          MR. RESTIVO:  The schedule for the July 30th hearing

17  does contain time for motions in limine, objections, and so the

18  schedule already contemplates if we list a particular witness

19  or a particular document or the other side does for the Court

20  to adjudicate that.  It's all on the schedule, Mr. Baena.

21          THE COURT:  And I take it that the time frame for

22  those arguments will simply be before the trial starts or when

23  the witness is called.  It's not a separate hearing date?

24          MR. RESTIVO:  That's correct, Your Honor.

25          THE COURT:  Okay.  I guess that's how we'll do it

J&J COURT TRANSCRIBERS, INC.

1 then.

2      MR. BAENA:  The only other piece of this -- I don't

3 want to belabor this, Judge, I just want to make sure that the

4 record's clear.  The only other piece is we'll have to consider

5 the interest of other claimants in participating in that

6 process so that we don't have to do this more than once.  I

7 would think that that would be an efficient use of the Court's

8 time.  But we can wait to see if they're going to use him at

9 all and have a discussion with them about that and come back to

10 the Court.

11      THE COURT:  Well, the motion in limine, I guess I'm

12 going to have to wait to see what the reports are, because the

13 report -- to the extent that there are separate reports, one

14 for the U.S., one for Canada it may be a different issue for

15 the U.S. claims and the Canadian claims.

16      MR. BAENA:  There are separate reports.  I'm not

17 going to argue that motion here today, Judge.  It would be too

18 easy and too tempting to do so.  But I'm not going to do it.

19 There are two separate reports.  There are differences.  But we

20 do have California which is the same report as the Motley Rice

21 claimants.

22      THE COURT:  Okay.  All right.  I think, Mr. Baena,

23 you just simply better monitor what's happening on the Motley

24 Rice case management order so that when -- if in fact the

25 debtor decides that it's going to call Mr. Morris that you can

1  refile that motion or resume that motion process.  And if you

2  think other claimants need to get notice make sure they get

3  notice.

4          MR. BAENA:  Judge, I will follow very carefully.  But

5  I would ask you to reconsider the words that you just used

6  about us having to refile the motion.

7          THE COURT:  Or reinstitute I think I said.

8          MR. BAENA:  I think the process ought to be we file

9  the motion whatever the process under their CMO is for

10 responding to it -- to a motion in limine that ought to be the

11 kickoff point.  I don't think that we ought to have to file it

12 again.

13         THE COURT:  Well, you probably don't if it's still on

14 point for what they're going to call Mr. Morris for.  I mean,

15 it's hard for me to say that a motion filed in March is going

16 to be relevant to a trial that's starting in a month.  Sitting

17 here I just don't know.

18         MR. BAENA:  It's an expert.  But I hear your point,

19 Judge.  Thank you.

20         THE COURT:  Okay.

21         MS. KEARSE:  Anne Kearse, can you hear me?

22         THE COURT:  Hello.

23         MR. BAENA:  I believe that's Ms. Kearse.  Motley

24 Rice.

25         THE COURT:  Ms. Kearse.

1          MS. KEARSE:  I know you couldn't hear me.  I'm not

2  sure if you can hear me now.

3          THE COURT:  Yes.  We can hear you now.

4          MS. KEARSE:  I apologize.  I was trying to chime in

5  earlier.  Your Honor, I raised the issue with Ms. Baer simply

6  because it is an overarching issue and we don't know to date

7  whether or not Mr. Morris will be called.  But to the extent he

8  is I wanted to ensure that other claimants --

9          THE COURT:  We lost you, Ms. Kearse.  Ms. Kearse.  Is

10  the court call operator there?  Did we lose everybody?  Jan.

11          COURT OPERATOR:  No, I'm still here, Your Honor.

12          THE COURT:  Can you find out what happened to Ms.

13  Kearse.  We can't hear her any longer.

14          COURT OPERATOR:  Okay.  Yeah, her line is still

15  connected.  I don't know -- it's something on her end as to why

16  you can't hear her.  It's not on our end.

17          THE COURT:  Okay.  Ms. Kearse.

18          MS. KEARSE:  I can hear you.

19          THE COURT:  Are you on a speaker phone or a cell

20  phone?

21          MS. KEARSE:  Yes, I was on a speaker phone.  Can you

22  hear me now, Your Honor?

23          THE COURT:  You have to pick up, Ms. Kearse.

24          MS. KEARSE:  Okay.  Can you hear me?

25          THE COURT:  Yes.

1          MS. KEARSE:  Okay.  Your Honor.

2          THE COURT:  Yes.

3          MS. KEARSE:  Okay.  I've done it before with -- Your

4   Honor, I mentioned earlier I brought this issue up to Mr. Baena

5   earlier this week primarily because we don't know if Mr. Morris

6   will be called yet, and if in fact he is this is an overarching

7   issue that other claimants would want to be involved in.  I

8   just wanted to give notice enough that other people could

9   participate in those hearings and in the trial on cross

10  examination of Mr. Morris should that occur.  So it's more of a

11  timing issue to know when and if they plan to call Dr. Morris

12  and making sure that others were aware of that.  And as soon as

13  I know whether or not they're going to call I'll certainly let

14  everyone know.  I just want to make sure that it will be a

15  convenient time for those people who'd want to participate as

16  well.

17         THE COURT:  Well, hopefully at this point in time

18  everybody who's involved in property damages is monitoring this

19  docket.  Because if they're not then they're taking their own

20  risks in their own hands.  I don't know what else at this point

21  we can say.  I've been having Mr. O'Neill put orders on the

22  docket.  What I suppose I will do, Mr. O'Neill, is have you put

23  a notice on the docket that indicates that the case management

24  order that refers to the motions in limine for this Motley Rice

25  trial will apply to all parties, all property damage claimants

42

1  who choose to file a motion in limine as to any expert that may

2  be called by the debtor so that if anybody chooses to see it

3  they'll have it.  Then again, I apologize I keep forgetting

4  this fact.  I know that somebody is making service on the

5  creditors who are not getting electronic notice, but I never

6  remember who that is.  Is that you, Mr. O'Neill?

7          MR. O'NEILL:  Yes, Your Honor, we do.

8          THE COURT:  Okay.  Then serve those entities with a

9  paper copy of that notice so that they simply have that

10 information available and then we will have done what we can

11 do.  And while you're at it put a notice in as well that tells

12 them that it is now their responsibility to continue to monitor

13 this docket for upcoming notices and orders.  I will continue

14 to have you serve paper copies, but nonetheless I want them to

15 know they have an affirmative responsibility to monitor this

16 docket because I don't want to forget to provide notice.  And

17 at this point which what's at stake in this case they can

18 certainly afford to either log on to PACER or look at a

19 creditor -- look to the creditor's committee for some

20 assistance or the debtor for some assistance.  So I want the

21 notice to say that all creditors involved in property damage

22 litigation have a responsibility to monitor the dockets for

23 upcoming orders.  Mr. Baena.

24         MR. BAENA:  Judge, we have no objection to you

25 requiring that the notice say that if they have any questions

1 they are to contact us.

2          THE COURT:  Fine.  Then it can say that.  If they

3 have any questions contact Mr. Baena.  Put his phone number,

4 Mr. Baena?

5          MR. BAENA:  Yes.  I'll give you Mr. Sakalo's number.

6          THE COURT:  All right.  Tell them to contact Mr.

7 Sakalo then.

8          MS. KEARSE:  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.  All right.  Mr.

10 Restivo, go ahead.

11          MR. RESTIVO:  Item Number 13, Your Honor, deals with

12 ZAI and deals with a motion by the ZAI claimants for discovery

13 concerning W. R. Grace's conduct in the ZAI summary judgment

14 proceedings.  And I will turn the podium over to the ZAI

15 claimants since it's their motion and they should go first.

16 But to put it in context this deals with something known as the

17 ATSTR study.

18          THE COURT:  I'm familiar with it.

19          MR. RESTIVO:  It's something that we utilized and I

20 addressed in argument in the ZAI proceedings here.  I believe

21 their attack, and I'm going to use the word attack advisedly.

22 I believe their attack on counsel here is that we did something

23 inappropriate or sneaky either with respect to Your Honor, or

24 with respect to the Federal Judge handling the criminal

25 indictment.  And our answer is we have not done anything in

1 terms of playing fast and loose with the Court.  We told both

2 Courts this was not an epidemiological study.  We never

3 advertised it as such.  There's nothing inconsistent with our

4 positions, and we haven't mislead this Court or violated any

5 rules of ethics or done anything wrong with respect to this

6 study.  But I'll let them make their argument first and then

7 I'll respond.

8           THE COURT:  You get to go first.

9           MR. WESTBROOK:  I get to go first second, Your Honor.

10 Your Honor, first let me say something and I mean it very

11 sincerely.  Mr. Restivo and I have litigated for over a decade

12 now and if you read our motion you will see that we are not

13 accusing anyone of anything.  It's a motion for discovery.  I'm

14 an advocate for my clients, but I'm also an officer of the

15 court.  And to say the least, Your Honor, this is an unusual

16 situation in my legal career.  We had a study presented to this

17 Court in the science trial proceedings, the summary judgment

18 proceedings whereas a baseline of course we have to have good

19 reliable science.  We must have said that a thousand times on

20 that day in October.

21           The Court relied on the offer of that study, and the

22 Court ruled in its order that these ATSTR study approximately a

23 complete epidemiological study.  Unknown to the Court --

24           THE COURT:  What I think I said is that it was not an

25 epidemiological study, that it did not contain a control group,

1  and that it did approximate a study to the extent that it had

2  some overlap with such a study, but that it was not one.  And

3  my finding was that it was not one.

4          MR. WESTBROOK:  That's correct, Your Honor, you --

5          THE COURT:  So in case my opinion wasn't clear, which

6  frankly I think it was clear, because I went back and read it

7  again today, and I'm not sure how I could have made it any more

8  clear.  I did not rely on it as an epidemiological study.  In

9  fact, I specifically found that it was not one.  Okay.

10         MR. WESTBROOK:  That's correct, Your Honor.  And you

11 said it was not an epidemiological study because it didn't have

12 the control group, but it approximated a complete

13 epidemiological study, unquote.  That's from Page 35 to 37 of

14 your opinion where you discussed that.  Out in Montana,

15 however, Your Honor, the same litigate took the position that

16 not only was it not an epidemiological study, but it wasn't a

17 study, it wasn't good science.  It not only lacked control

18 group, but and importantly to the ZAI proceedings Grace's

19 papers in Montana told the Montana Court after Grace had done

20 discovery of the ATSTR they were in litigation with the

21 government out there, of course in a criminal case, they said

22 that people who had limited exposure who could include people

23 with ZAI in the homes would likely not have shown up for the

24 study.  And they said at the time same time people who are

25 already sick would likely not have shown up for the study

1 because it wouldn't do them any good to be studied when they're

2 already sick.  So those people were not in the study.

3        THE COURT:  But that doesn't make sense based on the

4 composition of the study itself.  I mean, the study itself

5 showed you who showed up.  Not by name, but by category and it

6 contains the percentages of people who were exposed and not

7 exposed and where.  And the ultimate conclusion of that study

8 was that people who had no exposure had the same likelihood of

9 disease incidence and exposure pathways as the people who had

10 ZAI in their homes.

11        MR. WESTBROOK:  But, of course, that was based on the

12 people who showed up to be studied.

13        THE COURT:  Right.  That's part of the reason why it

14 wasn't an epidemiological study.

15        MR. WESTBROOK:  One of the reasons Grace told the

16 Court in Montana why the study was not scientifically based is

17 that the population that needed to be studied was not

18 adequately studied.  And I said the people of light exposure

19 Grace said wouldn't show up.  And the people with heavy

20 exposure would likely not show up.  But the purpose of our

21 motion, Your Honor, is to see how it came to be that Grace got

22 this study excluded in Montana not on the grounds that it was

23 just irrelevant to a criminal proceeding, but that it was not

24 good science.  They got it excluded on Daubert grounds that it

25 was not good science.  That the readings of the ex-rays were

1  done improperly, not according to the proper protocol.

2          THE COURT:  That's not what the opinion said as to

3  this.  The opinion says that it's not relevant to the time

4  frame within which the Clean Air Act charges that we're still

5  within the statute of limitations were brought.  Judge Malloy

6  was very clear that the study was for people who had exposure

7  pathways from, I believe, 1990 and earlier, and that the

8  statute of limitations for the Clean Air Act criminal

9  violations were from 1999 and more recent.  So the time frames

10 were wholly irrelevant.  That's what he found.

11         MR. WESTBROOK:  That is part of the holding out in

12 the case, Your Honor.  But the basic holding, the basic holding

13 under <u>Daubert</u>, Your Honor, was that the study was unreliable.

14         THE COURT:  And it is for that purpose.  The time

15 frames are totally unreliable for the purpose for which the

16 government offered it.

17         MR. WESTBROOK:  I think the Court was talking more

18 broadly, because the opinion speaks for itself.  But, Your

19 Honor, good science is good science regardless of courts.  I

20 think Grace said that in its papers.  And out in Montana in

21 arguing to Judge Malloy Grace told Judge Malloy that this study

22 would never come in in a civil proceeding to show risk.

23         THE COURT:  Well, to show causation.  I don't know

24 what they said to Judge Malloy.  But it surely won't come in to

25 show causation.  The whole purpose of it is to show exposure

1 pathways.

2          MR. WESTBROOK:  Your Honor, arguing in front of Judge

3 Malloy Grace's counsel on July 20th 2006 said, "It's absolutely

4 certain that this study would not come in in a civil case to

5 demonstrate risk."

6          THE COURT:  Okay.

7          MR. WESTBROOK:  It's on Page 248 of the transcript.

8 But, Your Honor, my purpose today is not to move for

9 reconsideration on the science trial proceedings, not to attack

10 the ATSTR admissibility here.  It's simply to seek discovery.

11 Now, my bankruptcy lawyer said we could have filed the

12 discovery and then we didn't need permission of the Court.  But

13 this is a sensitive matter.  I recognize it's a sensitive

14 matter when litigants take different positions regarding the

15 same study in two different courts.  They say they did it for

16 appropriate reasons.  That may very well be so.  It may be that

17 they made a conscious decision.  They didn't need to say

18 anything to this Court about the exclusion except that Mr.

19 Bernick had mentioned it in passing as we pointed out during an

20 all day omnibus hearing.  But didn't point out, I think, to

21 anybody's recognition that it was the same study that they'd

22 offered in connection with this proceeding.

23          But putting that aside today we're simply seeking

24 discovery.  That is, to put a little sunshine on the matter to

25 see if it is in fact correct that there's nothing amiss about

1  what happened, if in fact the two --

2          THE COURT:  What difference would it make whether

3  debtor's counsel had something amiss in terms of having

4  misrepresented something either to this Court or to the

5  criminal court with respect to why it was or wasn't offering a

6  particular study?

7          MR. WESTBROOK:  Well, Your Honor, I think it --

8          THE COURT:  I mean, a study is a study.

9          MR. WESTBROOK:  It would make a difference to the

10 system of justice, number one.  But with respect to the

11 litigation posture we argued to Your Honor that you should not

12 put weight on the ATSTR study to support Grace's position.  We

13 argued the study could not support a claim that there was no

14 risk to ZAI claimants.  They argued well, it's not an

15 epidemiological study, but it's a pretty good substitute Mr.

16 Restivo said.  And Your Honor found it's not an epidemiological

17 study, but you found that it's an approximation of a complete

18 epidemiological study and therefore we had the burden of

19 producing an epidemiological study.

20         You recall, Your Honor, we had a very long colloquy

21 about why the ZAI claimants had not produced an epidemiological

22 study.  And I argued to the Court that it would be difficult if

23 not impossible epidemiologically to study people with ZAI in

24 their homes.

25         THE COURT:  Well, in that I totally disagree with for

1 the reasons that I went into at length.  But not just on your

2 behalf on the debtor's behalf, too.  An epidemiological study

3 in my view is perfectly capable of being conducted based on the

4 fact that from 30,000 homes, 3,000,000 people, over 80 years

5 have now been subjected to ZAI.  Surely there is a population

6 from which an epidemiological study can now be conducted

7 regardless of who wants to do it.  It's out there, folks.

8          MR. WESTBROOK:  My purpose in bringing that up, Your

9 Honor, is that you cited the ATSTR study.

10          THE COURT:  I did.

11          MR. WESTBROOK:  And you said that once Grace had

12 produced that that then as part of our Rule 56 burden that we

13 had the burden of coming forward with contrary evidence.  And

14 I'm saying that if the ATSTR study is in fact not good science,

15 should never be admitted in a civil case in the issue of risk,

16 if it has all the flaws identified by Grace in the Libby case

17 then I think it does cast some doubt on its use here in the

18 science trial proceedings.

19          THE COURT:  No.  Well, I disagree.  I read Judge

20 Malloy's opinion this morning, and I read my opinion this

21 morning, and quite frankly I was sort of impressed that the two

22 of us acting totally independently, and in my case without any

23 knowledge whatsoever of Judge Malloy's opinions came up with

24 such very consistent analyses of the same study.  They're

25 almost we cited the same cases without having had any as far as

1  I know reason to do so.  We cited the same studies, we used

2  them for the same purpose, we excluded the same type of

3  information.  I don't see any differences although we're using

4  them for totally different purposes.  But the conclusions that

5  we drew from looking at these studies seem to be virtually the

6  same.  It was an observational study.  It was conducted only on

7  Libby residence who apparently chose to self report.  It lacked

8  a control group.  It's perfectly distinguishable from an

9  experimental study.  Both of us said the same thing.  It did

10 have some overtones of looking at a study.  It was never for

11 the purpose of determining causation, but it was for the

12 purpose of determining exposure pathways.  And that is why it

13 was relevant to what I was doing.  Because exposure pathways in

14 Libby determining whether ZAI in a home attic posed an

15 unreasonable risk of harm, that was a significant issue whether

16 there were other exposure pathways to which people in that area

17 would otherwise be exposed.  And for that purpose this study is

18 relevant.  And that's why the ZAI claimant's had some duty to

19 come forward with some additional evidence.  Not because of the

20 causation issue, because of the risk, the exposure pathway

21 issues.

22         MR. WESTBROOK:  Your Honor, I understand, and I

23 certainly appreciate the way Your Honor reads her opinion.  You

24 wrote your opinion -- our looking at it is that there is some

25 significant inconsistency between saying that a study is not

1 reliable science, not that it was just studying something

2 different, not that it was just studying causation there and

3 association here, but it was not reliable science that the

4 study in the words of Grace, "Ignored scientific standards,

5 inexplicably cut corners, and failed to use the level of rigor

6 that a reliable study should be able to boast."  That's Grace's

7 motion at Page 17.

8          But, Your Honor, if Your Honor is not obviously

9 troubled by what we see as inconsistencies then the discovery

10 would not serve any purpose.  Our purpose in making the motion

11 rather than serving the discovery was to bring it to your

12 attention so that you could take a look at the situation and

13 make a ruling on it.  If Your Honor reads it as having no

14 inconsistency we certainly appreciate Your Honor's opinion.  We

15 don't agree, but we appreciate what Your Honor is saying about

16 it.

17          THE COURT:  Judge Malloy stated the issue this way,

18 "The defendants argue that the study is inadmissible under

19 Federal Rule of Evidence 702 because it is irrelevant and not

20 scientifically reliable.  The defendants say the study should

21 also be excluded because its probative value is outweighed by

22 the risk of prejudice and jury confusion, and because the data

23 underlying the study has not been properly disclosed to the

24 defense.  The Government argues that the study is admissible to

25 prove that Libby asbestos causes asbestos related lung

1  abnormalities which in turn proves endangerment.  For the

2  reasons that follow I find that the ATSTR screening program's

3  findings are inadmissible under Federal Rule of Evidence 702

4  and 403."  And then he goes into an analysis concerning the

5  indictment and the reasons why that evidence does not fit the

6  allegations in the indictment.  But the terms of the indictment

7  and the knowing violations of the Clean Air Act post 1999 and

8  the allegations that the ZAI claimants are making with respect

9  to whether or not ZAI in the home attic posed an unreasonable

10  risk of harm are two entirely different allegations and so are

11  the time periods that are involved.  And I think that the two

12  uses of the study are entirely different.

13       MR. WESTBROOK:  Your Honor, I'm going to close

14  because I see where Your Honor is on this, but I will say that

15  the 1999 time periods, that's an issue of relevance and we're

16  not arguing relevance here.  We're arguing about the basic

17  scientific fundamental flaws where Grace said that the study

18  ignored the scientific standards, inexplicably cut corners, and

19  was not reliable and said it was inadmissible for any purpose

20  and told the Federal Judge in Montana that the study would

21  never come in in a civil proceeding on the issue of risk.

22  That's what we were arguing about.  But I understand Your

23  Honor's viewpoints.

24       THE COURT:  Well, I want to hear about this because

25  the issue of risk is somewhat different from the issue of

1  causation.  I don't understand the concept of risk because the

2  study itself was not created for the purpose of determining

3  causation.  But looking at exposure pathways and therefore to a

4  certain degree risk is the whole purpose for the study.  So I

5  do want to hear from the debtors.

6          MR. WESTBROOK:  And Mr. Restivo can respond to my

7  response to his opening argument.

8          THE COURT:  All right.  You get a reply, I think.

9          MR. WESTBROOK:  Thank you, Your Honor.  It might be a

10  surrebuttal by the time we get done.

11          MR. RESTIVO:  I think it's correct, Your Honor, that

12  your opinion and Judge Malloy's opinion are fully consistent.

13  I mean, he calls it a -- I think he calls ATSTR a health study.

14  You call it an observational study.  Neither court calls it an

15  epidemiological study.  He states that under Daubert this study

16  is not admissible to prove causation.  When he says that he

17  says "this study."  Well, perhaps useful for other purposes.

18  Can't be used in the criminal case to prove causation.

19          THE COURT:  But that's not the point.  Mr. Westbrook

20  is telling me that the debtor stood up in a federal criminal

21  court and told the Judge that the study would never be admitted

22  in a civil trial because it was not scientifically reliable to

23  show risk.  And that's the very point that you offered it in

24  the case before me.  Now that is a problem.

25          MR. RESTIVO:  I would -- I guess I would have to see

1  that reference.  Is it attached to your motion?

2          MR. WESTBROOK:  It is not.  We had borrowed the oral

3  argument transcript, Your Honor.  I'll put it up here on the

4  screen and maybe everybody can see it.  Melissa, can you turn

5  this on?

6                          (Pause)

7          THE COURT:  Who was counsel that was making the

8  argument, Mr. Westbrook?

9          MR. WESTBROOK:  Your Honor, this is counsel --

10          COURT CLERK:  You have to get closer to the

11  microphone.

12          MR. WESTBROOK:  This is, I believe, Barbara Harding,

13  Esquire from Kirkland & Ellis.

14          THE COURT:  All right.  Thank you.

15          MR. WESTBROOK:  It's hard to see, Your Honor.  I'll

16  read it for those who cannot see it.  "It's absolutely certain

17  that this study would not come in in a civil case to

18  demonstrate risk.  And the only reason it's being offered here

19  is to, and the Government doesn't disagree, is to let the jury

20  infer risk.  It doesn't meet <u>Daubert</u> standards, Your Honor."

21  And she goes on.

22          MR. RESTIVO:  My simple answer to the Court is he's

23  referring to Page 248 of a transcript the pages of which begin

24  on Page 223 and go to 250.  I did read the briefs submitted

25  that he had attached.  I did read Judge Malloy's opinion.  In

1 all candor with the Court I have not read this before and I

2 don't know in what context that was stated.  Clearly Judge

3 Malloy says that what Grace said was you cannot use the ATSTR

4 study to prove causation and it would confuse the jury.  And

5 the other arguments that Judge Malloy summarizes he believed he

6 heard from Grace.

7 　　　　　With respect to those arguments we can all read Judge

8 Malloy's decision, and I did, and I see nothing inconsistent

9 with his findings on ATSTR and this Court's findings, and I see

10 nothing inconsistent with what he found Grace to be arguing,

11 and what this Court held in our opinion.  And I think very

12 importantly both sides in this case relied upon ATSTR.  The

13 admission of that study, it was not objected to by the ZAI

14 claimants.  We disagreed about the inferences to be drawn, and

15 they claimed that that study showed that ZAI was a problem in

16 the attic.  We responded that's not what the study showed.  But

17 you really do have a document that was not in dispute in terms

18 of admissibility, only in terms of the inferences to be drawn.

19 And how they can now wrap around a charge of playing fast and

20 loose with the Court the admission of a document that A, they

21 didn't object to, and B, they used themselves, to me is an

22 attack not justified by the arguments before and the briefing

23 before both Courts and both decisions are fully consistent.  If

24 one sat back one would think Your Honor and Judge Malloy had a

25 long conversation before you wrote each of your respective

1 opinions.

2      And so we simply think this motion for discovery

3 isn't going to move any ball forward anywhere.  The study is

4 what the study is.  And if we are now saying, and I want to

5 look at this transcript, someone said something to Judge Malloy

6 they shouldn't have said, I don't believe that's true.  But I

7 can't answer Your Honor because I haven't seen it.  No one on

8 behalf of Grace said anything to this Court that they shouldn't

9 have said.

10      THE COURT:  Well, I think that's probably the case.

11 I don't recall anybody in this court making representation that

12 the study was used for an improper purpose.  And so if the

13 allegation is that the study wouldn't come in in a civil case,

14 number one, that wasn't a civil case, it was a criminal case.

15 Number two, I don't know whether it would be admissible for

16 what purpose in an actual trial here.  I think this Court make

17 appropriate use of it.  Both sides argued the study to a

18 certain degree.  I don't think that the study showed that there

19 was a higher degree of risk by having ZAI in the home attic.

20 In fact, I think the study was pretty clear that having ZAI in

21 the home attic made an equal risk with not having exposure to

22 ZAI anywhere, to having asbestos exposure anywhere.  The

23 statistics were virtually equal according to that study

24 although it is not an epidemiological study which is why I went

25 into great detail and what took me so long about writing this

1  opinion to have to go through all of the other standards

2  because this was not an epidemiological study.  So I don't

3  think that this is the place where redress to the extent that

4  redress is required.  And I'm not suggesting that it is.  To

5  the extent that it is I don't think this is the court where

6  redress is appropriate.  Mr. Bernick.

7          MR. BENICK:  With the Court's indulgence, and I

8  hesitate to rise on this one, but it looks like the focus we're

9  shifting to one of my partners who also is involved in this

10  case.  And I think that it's important to again bear in mind

11  the context in which this all occurred.  Because I think

12  there's a common denominator fact here that has not been the

13  focus of the discussion so far.  Your Honor, discussed the

14  ATSTR study as being a study about exposure pathways, and

15  that's correct.  The ATSTR study basically is a screening study

16  or a survey and that does have a place in the scientific

17  process.  Generally speaking before you go and conduct a full

18  blown epidemiological study you need to get a baseline on what

19  the exposures are and whether in fact there is a problem that

20  is even worth studying.  The ATSTR did precisely that.  It went

21  out and gathered information, there was not a control group, it

22  didn't purport to satisfy the requisites as Your Honor has well

23  recognized of being a full blown rigorous epidemiological

24  study, but it was a study that kind of addressed the threshold

25  question about whether an epidemiological study in the sense

1  would even be worth while.  And it concluded that there was no

2  point in conducting an epidemiological study, at least at that

3  point in time, based upon the information that had been

4  obtained.

5        That is a central fact that bears upon this study,

6  and then it helps explain what happened in Montana and what

7  happened here.  In Montana it was the government who sought to

8  use the ATSTR study in a sense to try to prove what should have

9  been proven through an epidemiological study.  That is, it's

10 the government that wanted to use the ATSTR study to suggest

11 that there was a problem in Montana instead of having an

12 epidemiological study which was the proper scientific

13 methodology to use in order to prove that there was a problem

14 in Montana.

15        When the government made that proffer Grace objected

16 and sought to exclude on Daubert grounds and on 403 grounds

17 from having the government be able to use this study to make

18 the argument to a jury that there was actual proven risk.

19 That's why the word "risk" was used.  That there was actual

20 proven scientific risk.  That's ordinarily what would come out

21 of an epidemiological study, is proof of a risk.  Causation is

22 excess risk to some extent.  You have to have the excess risk

23 before you can begin to say causation.

24        So the government was trying to use a survey that

25 could not actually prove risk to suggest that there was risk.

1   And it is for that reason that Grace came in and said it is not

2   appropriate under <u>Daubert</u>, it's not appropriate under Rule 403,

3   and for all the reasons especially that Your Honor has

4   indicated it doesn't even address the relevant period of time.

5   And we took the position in connection with that argument that,

6   yes, in a civil context that same study could not be used to

7   argue to a jury in a civil context that that study actually

8   established risk scientifically.  In a criminal context it

9   could certainly not be used because of course the rules in a

10  criminal context are designed to be even more protective.

11      So the argument that was made by Ms. Harding was a

12  totally appropriate argument.  If you want to establish cause

13  you have to establish risk.  If you want to establish risk you

14  have to do so scientifically.  To do so scientifically requires

15  an epi study.  This is not an epi study.  Indeed, this suggests

16  that an epi study is not even necessary because there's no

17  problem.  Completely consistent with what happened here.

18      Here, in the context of a summary judgment and

19  <u>Daubert</u> motion prior to the time of trial, this study was used

20  to suggest and to argue to the Court that although it was not

21  an epidemiological study it didn't even show that there was a

22  problem that was worth studying.  It was a survey that was kind

23  of like what an epi study would do, and it didn't even show

24  that it was a problem.  And if it didn't even show that there

25  was a problem then the burden should logically and completely

1  shift to the other side to say okay well, show me the actual

2  epi that does say that there was a problem.  Those arguments

3  are entirely and completely consistent.

4       In Montana the government in order to bear its burden

5  should have to prove risk, that is, that there was an excess

6  risk scientifically.  This study did not establish that.  In

7  the context of this proceeding here the burden's on the other

8  side at the end of the day on summary judgment to actually

9  demonstrate that there is evidence to say causation and risk.

10 We use this study to say in part, because there was no issue

11 about admissibility here, that look the survey was done, turned

12 up with a zip.  Tell us what the real epi is that supports your

13 claim.  They didn't have it.  Your Honor's analysis was

14 entirely consistent and the arguments that were entirely

15 consistent.  And I want to make sure that there's no suggestion

16 here that somehow different arguments were made in these courts

17 based upon a misrepresentation of the study.  That study was

18 never represented in either context.

19       THE COURT:  Okay.  Mr. Westbrook.

20       MR. WESTBROOK:  Your Honor, just very briefly because

21 I do understand the Court's views.  The transcript which I gave

22 Mr. Restivo starts at Page 223 with the Court saying, "The next

23 motion is the defendant's motion to exclude any evidence

24 relating to the ATSTR screening, and that's Docket Number 500."

25 And it ends at the conclusion of the argument on Page 250 the

62

1  Court says, "All right.  We'll take a 15 minute recess."  And

2  Ms. Harding's statement that it's absolutely certain that this

3  study would not come in in a civil case to demonstrate risk is

4  on Page 248.  So that is the discussion of ATSTR at the oral

5  argument.  There was no excerpting of it.

6       Your Honor, bad science does not become good science

7  when the courtrooms change.  Grace in it's reply brief in the

8  ZAI proceedings in this case said exactly that.  "Good science

9  is good science irrespective of the type of case involved."

10 Grace did not simply move in Montana to keep out the ATSTR

11 study because it was a screening program and not an

12 epidemiological study.  As Grace said, "ATSTR departed from

13 medically accepted methodology for conducting a medical

14 screening.  That is, it was not good science."  That's on Page

15 5 of their motion to exclude.

16      On Page 14, "The results of a screening program

17 cannot assist the trier of fact in determining a factor at

18 issue such as endangerment or risk from environmental

19 exposure."  Page 14.  Your Honor, I understand them trying to

20 parse the issues and say that was criminal, 1999, this is

21 civil.  That's Libby, this is ZAI.  Your Honor, I think we have

22 a difference in how we view the two -- the effect of the two

23 studies.  We see it as being inconsistent.  We don't think bad

24 science becomes good science.  We have done our duty bringing

25 it to the attention of the Court.  We understand the Court's

1 views on it, and we've made the record on it.  Thank you, Your

2 Honor.

3         THE COURT:  Okay, Mr. Westbrook.  Thank you.  I don't

4 see that getting discovery on this issue is going to advance

5 anything any further at this point in time.  I understand how

6 looking at the bald words of the transcript there could be an

7 argument that something inconsistent is being argued.  I don't

8 think there is anything inconsistent.  I think simply the

9 different context of the criminal case and the civil case mean

10 that perhaps sometimes the same words can be used to mean

11 different things.  But in this instance I don't think anything

12 was misrepresented to this Court.  I certainly did not ever

13 understand that either side was using this as a complete

14 epidemiological study and I never interpreted it that way.  Not

15 from day one.  So I did not ever look at it that way.

16         Whatever the criminal court did is up to the criminal

17 court.  Obviously that's not any part of my bailiwick.  So I am

18 content with the opinion that I've issued, and I think at this

19 point in time I do not feel misled in any respect by any

20 counsel.  I certainly had more than adequate opportunity to go

21 through the record which I did several times and I think at

22 this point there would not be any purpose served to opening

23 discovery on this issue.  So I will deny that motion.

24         MR. RESTIVO:  Next, Your Honor, is --

25         THE COURT:  Just a minute, Mr. Restivo.  I want to

1  see if I have an order here that I can modify or if I need to

2  get one submitted.  I think it may be better if I get one

3  submitted, because this one sets a discovery schedule.  So Mr.

4  Westbrook, can you work with the debtor and simply submit an

5  order that will deny the motion for the reasons I've expressed?

6  Okay.  Thank you.

7          MR. RESTIVO:  Next, Your Honor, is ZAI status report

8  or really discussion, I think, of what happens next.  We've

9  given this a good bit of thought, Your Honor, and reasonable

10  minds clearly could differ on what happens next.  Hindsight

11  shows that the Court clearly was correct to say let me

12  determine what science says about ZAI before we get bogged down

13  and litigate for another year these issues.  And we now know

14  that science has determined that ZAI does not pose an

15  unreasonable risk in an attic.

16          Where do we go from here?  Obviously one suggestion

17  people have made is to go back where we were.  That is, let's

18  go back now and litigate, maybe litigate our brains out over

19  whether there should be a bar date and a proof of claim form.

20  It would be a lot easier now because now we don't have to say

21  go up and worry about what's in your attic.  But then we'll get

22  into a big litigation about can you do this by way of a class

23  or a class claim form, and we can go back where we were and we

24  certainly have heard the suggestion that maybe that's what

25  happens next.

1  I guess another suggestion is to forget about this, worry about

2  it later.  You know, somehow when the plan comes out it'll be

3  handled.  And, there's some merit to that.  Our own view, and

4  again reasonable minds could differ and I don't know how strong

5  we feel about it, there clearly is an issue as to what, if any,

6  causes of action or claims or theories of liability, if any,

7  exist today with respect to ZAI.  The ZAI claims have been

8  stated, and I believe this is in the Court's opinion, either as

9  strict liability, negligence, warranty, consumer protection,

10 misrepresentation -- I'm not trying to list all of them but

11 there are a number of claims and theories that ZAI wears here.

12 We believe that if ZAI does not pose an unreasonable risk or a

13 unreasonable hazard, or an unreasonable danger, that as a

14 matter of law there can not be a strict product liability claim

15 or a negligence claim, or a warranty claim or consumer

16 protection claim, or misrepresentation of a material fact

17 claim.  But that has not been briefed to this Court.  What we

18 have briefed and discovered and argued about and eventually got

19 a ruling on was what does science show.  And so, our suggestion

20 to the Court is before we go back to arguments on class action

21 or notice or what the notice says, perhaps the Court should

22 give the parties a briefing schedule so that the parties can

23 brief what, if any causes of action could remain given the

24 Court's decision.  That would give Mr. Westbrook and his side

25 the ability to argue that they all remain.  Give us the ability

1  to research and argue that.  If you don't have a potential

2  danger, if it's not unreasonably harmful, none of these can

3  remain.  And, we can at least figure out what causes of action

4  are we dealing with, and once we know that then we can go back

5  and fight among ourselves about bar notices and what it would

6  say and class action.  And so, again, while reasonable minds

7  might differ, our leaning is to have a briefing schedule, to

8  have the parties brief what is left of the various causes of

9  action given what science tells us about ZAI.

10          THE COURT:  Mr. Westbrook.

11          MR. WESTBROOK:  Thank you, Your Honor.  Your Honor,

12  we have as well given some thought to the issue and we may have

13  a bit of agreement with Grace, maybe in modified form.  I have

14  here, Your Honor, something that I provided to Grace counsel

15  the last time we were going to take a look at this, a ZAI

16  roadmap.  And, I'm going to give them a nice color copy of it.

17  Your Honor, may I hand one up to the Court, too?

18          THE COURT:  Please.  Thank you.

19          MR. WESTBROOK:  I'm going to bring this up just a

20  little bit, so I can get some more on there.  Is that possible?

21  Okay, that would be better.  That's fine.  Your Honor, we have

22  stepped back as well and given the thought to, how do we get

23  from Page 53 of your ZAI opinion where you said, "The next

24  issues to be decided are what legal claims exist after this

25  ruling, and once those claims have been determined, whether it

1 would be appropriate and helpful to treat those as a class

2 action." Your Honor, ZAI is unique in my experience in the

3 mass tort bankruptcies in that this is the only bankruptcy that

4 I know of where a very large potential group of creditors had

5 not had a trial record or even a motions for summary judgment

6 record out in the legal system before the bankruptcy were

7 filed. In most of the other bankruptcies the cases have been

8 litigated for years and the company comes in and files for

9 bankruptcy because of those case results.

10 Here, what we have what some would call in some

11 respects an immature claim. There has not been that experience

12 out in the State Court system. So, we find ourselves in a bit

13 of agreement with Mr. Restivo that the next step does need to

14 be to get some definitiveness about what are the legal claims

15 that exist for ZAI claimants in light of the Court's <u>ZAI</u>

16 <u>Science</u> opinion?

17 Your Honor, I've been on the phone in a number of

18 these hearings and in person, and know that the Court is very,

19 very busy, not only with this case but a number of other

20 bankruptcies. And, we think it may be wise -- and, I'd like to

21 have the opportunity to first discuss it with Grace and then

22 provide some briefing to the Court, about this Court taking

23 advantage of the resources that are available in other courts

24 that are familiar with their State tort laws, and get some of

25 that percolation of legal views about what claims under State

1  tort law would be appropriate in light of the ZAI Science trial

2  opinion.

3          And, Your Honor, you'll see in the first laying of

4  the roadmap, on the top, "Definitive rulings on substantive

5  issues," and this is a four-lane highway, so to speak, Your

6  Honor, with the most productive lane being the final one, of

7  course, mediation and some kind of resolution that we all hope

8  will come in our lifetime.  But, going to what needs to be

9  looked at first, first lane, "Definitive rulings on substantive

10  issues," we would like to brief to the Court the advisability

11  of the Court perhaps lifting the stay to allow a representative

12  ZAI claims in a couple of jurisdictions to go out to those

13  courts and with the Court's Science trial opinion as part of

14  the record, supplemented by whatever we might need, and get

15  some rulings while this Court's busy on all these other things,

16  on what legal claims exist for ZAI.  And, we could certainly

17  discuss with Grace the representative claimants to send out

18  there.  We have a bunch.  As Your Honor knows, we have the

19  Barbanty case in Washington with Judge O'Connor is there.

20  Judge Saris has three or four in the MDL proceeding.  But, we'd

21  like to brief to you the advisability of, maybe that's a wise

22  use of judicial resources.

23          Connected with that, Your Honor, is we would look at,

24  maybe when we got to those courts -- instead of going a long

25  way and get through trial courts, and where are they going,

1 this and that -- have those Courts certify some of these issues

2 right to the State Appellate Courts.  Let's get some definitive

3 rulings so we don't have to come back and say, "Well, we have

4 the interlocutory appeal from Judge Fitzgerald, and we have

5 some trial court rulings.  Where are we?"  Let's see if we can

6 get this pinned down and try to compress what most mass torts

7 have in the years that they build up to bankruptcy, and use

8 some of this time, I know the Court is busy through January

9 with the PI estimation.  Maybe by the time Grace and the PI

10 folks exhaust themselves we will have some rulings that could

11 be very informative about ZAI.  So, we'd like the opportunity

12 to brief that to the Court before we jump in and brief these

13 legal issues to the Court, brief whether it isn't more

14 advisable and a better use of this Court's resources, and

15 everybody's resources, to go right into the horse's mouth, so

16 to speak.  The Supreme Court told us in March in the recent

17 case specific gas and electric case that the Bankruptcy Courts

18 have got to decide these claims just as the State Courts would

19 that are out there.  Well, let's take advantage of that if we

20 can and see if that doesn't make some sense.

21          I have not had an opportunity to discuss it with Mr.

22 Restivo, though he's had my roadmap for a couple of months,

23 he's been busy, understandably, on other things, Your Honor.

24          Another thing we have thought about, Your Honor,

25 right under certified issues, is perhaps -- and, I can discuss

1 this with Grace -- we look at getting a representative case or

2 two, getting a final order in one of those cases and letting it

3 go up to the Third Circuit.  See if we can get some rulings

4 right from the Third Circuit which would inform us.  We'd like

5 to -- I guess from our perspective, Your Honor, we'd like to

6 have some definitive rulings so that there's not a question

7 left open when this Grace bankruptcy eventually moves to some

8 resolution that, "Well, ZAI was dismissed.  But, wait, we

9 confirmed a plan.  And now, ZAI's got an appeal."  It doesn't

10 make sense for anybody, we'd like to try to get some revisions

11 where we can get some definitive rulings.

12         I get down now to the second lane, Your Honor.  Those

13 are sort of the places we think those decisions might usefully

14 go.  My second lane is really Mr. Restivo's lane he discussed.

15 We agree we need to get decisions on issues such as, "I'll

16 strike ATSDR out now," and strict liability, negligence,

17 warranty, because, Your Honor, I think -- I'm not going to

18 argue it now, but I think we will show the Court that in actual

19 real world situations you can lose on a strict liability claim

20 and win on a negligence claim, because I did that against Grace

21 precisely in a Monokote case out in our State Farm case in

22 Illinois.  So, the theories of cause of action are not

23 coincident, but that's briefing, and the question is where do

24 we brief that?

25         Your Honor, we think the next step, the third lane on

1  our four-lane highway is obviously class certification

2  consideration.  The Court has indicated that that should await

3  the ruling on what claims remain.  We agree.  We think that's

4  certainly something that needs to be looked at after that.

5         And then, our fourth lane, Your Honor, is the

6  mediation lane, Your Honor.  Mr. Bernick on occasion once or

7  twice has had occasion to say, "Well, ZAI would never talk to

8  us.  You know, they went and made a deal with the personal

9  injury folks."  And, Your Honor, the first part of that's not

10 exactly accurate.  The second part is accurate.  We do have a

11 deal, as far as I know, in place with the personal injury folks

12 so that if exclusivity ever terminates for Grace and personal

13 injury can propose a plan, I think we're taken care of.  I

14 mean, we may have to have some adjustments, but I think ZAI,

15 subject to everybody approving it, would be taken care of.

16        But, the purpose of Lane 1 and Lane 2, and eventually

17 Lane 3 is to get ZAI in a situation where when this bankruptcy

18 is finally going to wrap up that ZAI will be in a mature

19 situation as opposed to what may be immature right now.

20        THE COURT:  Well, you know, if you've got a

21 settlement with the personal injury folks, does that include

22 the property damage, too?

23        MR. WESTBROOK:  Your Honor, we had a settlement which

24 was split.  We have a ZAI piece of the settlement.  And, I'm

25 not sure the status of the property damage.  But, --

1          THE COURT:  Oh, I see.  You've just got -- assuming

2  that there is a plan and a personal injury distribution, then

3  you've got an agreement that a certain portion of the personal

4  injury would go to ZAI.

5          MR. WESTBROOK:  Correct.  Correct, Your Honor.  And,

6  that's why, you know, I guess it's almost cart before the

7  horse, but that is no way to get the personal injury plan up

8  for consideration until they get all their other problems

9  worked out.  So, I guess it may be that this all proves to be

10  the useless work somewhere down the road, but one way or

11  another we try to move this along so which ever way it goes

12  we're positioned to be resolved as well.

13          THE COURT:  Well, I don't know enough about the

14  settlements because, of course, they've never come up.  But, I

15  guess the question is this, if your settlement is only on the

16  assumption that exclusivity is terminated and the committees

17  propose a plan, then I suppose this doesn't work.  If your

18  agreement is that regardless of who proposes a plan, assuming

19  that a plan's confirmed and the personal injury folks get some

20  distribution, that you get a percentage of whatever that

21  distribution is, then why don't you simply run that flag up the

22  pole and see if it flies?

23          MR. WESTBROOK:  Well, Your Honor, that's not a bad

24  idea.  We have not had discussions along those lines for a

25  number of months but we certainly are willing to engage in

1  discussions along those lines with both of our friends at both

2  of these tables here.  But, Your Honor, for today's purposes

3  what I really would like to do and in a sincere hope to move

4  this thing along is to see if we could get some time to have

5  some discussions with Grace and then a briefing schedule on how

6  should these legal issues be decided.  And, whether it doesn't

7  make sense for the Court to look at lifting the stay -- and,

8  I'm not talking about somebody collecting a verdict out there.

9  I'm talking about getting rulings on these legal issues.  The

10 Court will recall that you conditionally lifted the stay in the

11 Central Wesleyan case simply to let it go back to get some

12 rulings from the Court back there.  And, that worked out very

13 successfully.  So, I'm talking about that, not slipping in with

14 some verdict somewhere, so that we can get some rulings, some

15 definitive rulings, and I'd like to brief to the Court because

16 we've had some of these bright minds that the Court has been

17 talking, has seen in the courtroom, take a preliminary look at

18 some of this and there are some cases that seem to give us some

19 hope that that may be a very wise use of resources to -- or,

20 especially while this Court is busy into the fall and January

21 with these other things, rather than burden this Court with

22 mountains of summary judgment motions or motions to dismiss

23 about these various legal theories in courts, take them out to

24 the courts that are dealing with them every day.  That's our

25 suggestion, Your Honor.

1          THE COURT:  All right.  I like my option the best.

2   If you've got a settlement agreement I'm not sure why we're not

3   starting with whether or not that settlement agreement might

4   not be acceptable to everyone.  Because if it's essentially

5   sharing a pot, then, you know, --

6          MR. WESTBROOK:  Your Honor, without getting into any

7   substance of any discussions, that is something that I believe

8   I can discuss with somebody on the other side and see if we get

9   some bite there on that hook.

10          THE COURT:  All right.  Mr. Restivo.

11          MR. RESTIVO:  One comment and one suggestion.  The

12   comment is, I'm not sure there's any more of a State Court

13   history on ZAI than this Court has.  The only decision I know

14   of is Barbanty which was on a, you know, preliminary

15   injunction.  And so, you know, maybe there's some merit to what

16   Mr. Westbrook's saying, but his roadmap gives me a headache, it

17   looks like an awful lot of stuff.

18          Our suggestion, Your Honor, is, I have had this

19   roadmap for a couple months but I didn't hear the explanation

20   of it.  I don't know whether there's any settlements out there

21   or potential settlements out there, I'm not quite sure what Mr.

22   Westbrook's talking about.  Our suggestion is to set this down

23   for a status conference at the next omnibus, allow us to have

24   some dialogue with Mr. Westbrook and his people.  Let us find

25   out, let me find out what is it he can tell us about whatever

1 settlements he's had on his side.  I don't know whether it's

2 confidential or not -- I don't know whether they exist, don't

3 exist.  But, we really have litigated with each other for a

4 number of years so we know how to talk to each other.  Let us

5 take his ideas, our ideas, the roadmap, his settlement, let us

6 dialogue a little bit and see if we can't come up with more of

7 a joint sort of suggestion at the next omnibus.

8        THE COURT:  Mr. Westbrook?

9        MR. WESTBROOK:  Your Honor, that's acceptable.

10       THE COURT:  All right.  Mr. Baena, the property

11 damage committee have anything you want to add to this mix?

12       MR. BAENA:  Mess or mix?

13       THE COURT:  I said mix, but I'll take the other word.

14       MR. BAENA:  No, Your Honor.

15       MR. BERNICK:  Your Honor, just again by way of a

16 little footnote here, there's another little drive-by here

17 which is that there's a settlement that's out there and this is

18 a question of whether, you know, all the money's there and,

19 gee, won't that fly.  This is not, -- again, the comments made

20 and it tends to have some resonance and people tend to remember

21 it.  This is the same so-called settlement that was announced

22 in principle about a year and a half ago.

23       THE COURT:  Yes, I understand.

24       MR. BERNICK:  And, it's not -- there are, frankly, in

25 the discussions, at least references made to discussions, there

1  are no discussions that I'm aware of that are based upon that

2  agreement.  There are discussions that are taken place, and we

3  would, of course, welcome the continuation of discussions with

4  the ZAI people and with the traditional property damage people

5  and with the PI people.  And, again, Your Honor enjoined me to

6  make sure that we're taking every effort to assure that those

7  discussions are continuing.  And, again, as I've said before,

8  all I can say now is that that's exactly what Grace is trying

9  to do, not necessarily with me involved but with the client

10 involved and different people, this is a very active process.

11 And, to the extent that Mr. Westbrook is suggesting that that

12 continue in particular with the ZAI people, I know there's a

13 lot of desire and willingness to have that happen.  Frankly,

14 the announcement last year of the 85/ 15 split and all the

15 different bells and whistles has been more of a hindrance than

16 it's been a help to the process of moving things along.

17         So, again, I don't want the Court to have a

18 misimpression, not that Mr. Westbrook was attempting to create

19 a misimpression, but a misimpression that there's some easy

20 path here that can be pursued and that's not being pursued.

21 We're trying to do everything we can to keep the discussions

22 going.

23         THE COURT:  No, I don't think Mr. Westbrook gave me

24 or intended to give me any idea that there was an easy path.  I

25 think I was the one who suggested that if, in fact, some groups

1 have gotten together and have agreed that to the extent that

2 there is a pot, whatever the pot is, that at some point in time

3 there's a pot and there is an agreement as to how that pot's

4 going to be divided up among the personal injury folks, that to

5 the extent that that piece can be pinned down, let's get it

6 pinned down.  It wouldn't hurt to start knocking these issues

7 down one at a time.

8          MR. BERNICK:  But, the difficulty, Your Honor, is

9 that we're now have gone substantially down the road -- this

10 was the difficulty that was pointed out last year when this

11 thing first was announced with much fanfare -- is it was used

12 as an opportunity to have no discussions with the debtor, it

13 was reached among the claimants, inter-say, and it purported to

14 give no effect to any ruling that the Court made, and therefore

15 we now have seen as the march has taken place to establish ever

16 since then, well, what PD claims are really there.  We've seen

17 a tremendous amount of progress made and we've seen settlements

18 come out of the process that Mr. Restivo has so ably managed

19 with the cooperation of Mr. Speights, and other folks.  If you

20 go back to the idea that there's a guaranteed split and the

21 people get paid regardless of whether Your Honor has determined

22 that their claims have merit or not, it actually constitutes a

23 substantial impediment to making progress as progress has been

24 made with respect to traditional PD, and we expect that it will

25 be made with respect to -- it has been with respect to ZAI and

1  others.

2         So, the idea of there already being kind of a split-

3  up that takes care of people, actually is a problem that we

4  began with, and since a large part has been overcome as we've

5  started to go down the road in taking chunks of claims, dealing

6  with chunks of claims without trying to aim, shoot the moon,

7  and get the whole thing all wrapped up in one nice, neat

8  package, it doesn't work so simply in reality.

9         THE COURT:  Well, I'm assuming that settlement

10  discussions that divide up a pot divide up a pot -- I'll use a

11  bankruptcy term as opposed to a trust term --

12         MR. BERNICK:  Okay.

13         THE COURT:  -- because I don't know what the division

14  would be, so I'll put it in bankruptcy terms.

15         MR. BERNICK:  Sure.

16         THE COURT:  Would talk about allowed claims.  To the

17  extent that there are going to be distributions in the

18  bankruptcy context to claims, they have to be on allowed

19  claims.

20         MR. BERNICK:  That's --

21         THE COURT:  So, if it's a trust distribution process

22  that's a horse of a different color and then different words

23  have to apply to different types of claim structures.  But, to

24  the extent that there is going to be some sort of bankruptcy

25  true-up process then it would have to be on allowed claims, and

1 certainly this Court's not about to approve now or in the plan

2 process a process that would permit a distribution to claimants

3 who don't have allowed claims in that bankruptcy process.

4        So, if that's part of the settlement, folks, go back

5 to the drawing board because it won't be approved, I can't

6 approve it, it would violate the law.  And, the one thing that

7 I can't knowingly do is violate the law.  So, --

8        MR. BERNICK:  Thank you, Your Honor.

9        MR. MONACO:  Your Honor, this is Frank Monaco.  Would

10 this be an appropriate time to address the Court on this issue

11 on behalf of Canada?

12        THE COURT:  One second, Mr. Monaco.  Let me, Mr.

13 Baena was going to say something first, and then I'll get to

14 you.

15        MR. MONACO:  All right.  Thank you.

16        THE COURT:  Mr. Baena.

17        MR. BAENA:  May I please the Court, on behalf of the

18 property damage committee, Scott Baena.  Your Honor, again, I'm

19 not here to start a debate but I do feel constrained to say

20 that, you know, there are negotiations in the negotiations.

21 And, in the bankruptcy context, in this bankruptcy context,

22 there are negotiations, obviously, that are going on about, you

23 know, one-off negotiations about the allowance or disallowance

24 of claims.  That's a very important process.  That's the

25 process which has largely contributed to what's happened in

1 respect to property damage.  But, that's a very different

2 process than settlement negotiations about a confirmable plan.

3          THE COURT:  Sure.

4          MR. BAENA:  And, I just winced a little bit when I

5 heard this discussion by Mr. Bernick about all these

6 discussions that are going, these negotiations that are going

7 on, these settlement attempts that are going on.  Either I am

8 wholly uninformed or kept out of this process, or he is

9 misinformed.  We don't believe that there are settlement

10 discussions going on about a plan process.  There may be

11 discussions, again, about one-off discussions about claims.

12 Totally different.  Surely, resolution of claims advances the

13 reorganization of the debtor in many cases, but these cases are

14 very different than most other cases, and even after you

15 resolve all the property damage, all the personal injury

16 claims, you still may be -- like the atheist said at his own

17 funeral -- all dressed up with nowhere to go.  Because we

18 haven't had those recent and meaningful settlement discussions

19 about a plan.

20          We're going to be talking about exclusivity again.

21 This issue is very, very much tied into exclusivity.  The

22 frustration of asbestos constituencies is the same frustration

23 that this Court spoke about in prior hearings.  It's about the

24 lack of progress towards a plan being confirmed.  It's not

25 about this chart with the velcro and these things flying around

1  here with, every time that we have a hearing about how we've

2  moved stuff from one color to another color.  In the case of

3  property damage or the answers to questionnaires in the case of

4  personal injury.  It's a different process.

5        So, I just want to tell the Court that I'm not sure

6  what I just heard, but to the extent that it left you with the

7  impression that we're all out there toiling in the vineyard of

8  settling this case, I think there's a lot of idle workers in

9  that vineyard right now.

10       THE COURT:  Okay.  Well, that was the impression that

11  I had, yes.  Mr. Monaco.  Mr. Monaco.  Mr. Monaco?

12       MR. MONACO:  Your Honor, can you hear me?

13       THE COURT:  Are you on a speaker phone?  Folks, gees,

14  I don't know how many times we have to say you can't be on a

15  speaker phone.  Go ahead.  You know, Mr. O'Neill, that's the

16  next thing you need to put on this docket, no speaker phones.

17       MR. MONACO:  I apologize, Your Honor.

18       THE COURT:  Okay, Mr. Monaco.

19       MR. MONACO:  I apologize, Your Honor.  Your Honor, I

20  just wanted to provide the Court with a brief update on the

21  risk assessment being performed by Health Canada which I first

22  mentioned to you back in August the last year.  Just some brief

23  background.

24       Canada's been named as defendant in over 13 class

25  actions.  Grace entities, including W.R. Grace and Company,

1  Canada, LPD, are co-defendants in most of these class actions.

2           THE COURT:  Mr. Monaco, I'm sorry, I know now you're

3  not on a speaker phone but I'm still having difficulty hearing

4  you.

5           MR. MONACO:  Your Honor, I took it off the speaker

6  phone, can you hear me now?

7           THE COURT:  Yes, if you would just try to speak

8  directly into the speaker portion of the headset, please?  The

9  handset, please.

10          MR. MONACO:  Thank you.  Your Honor, I was mentioning

11 that there were certain class actions filed in Canada.  One of

12 these class actions involves Aboriginal Canadians living on a

13 reserve in Manitoba who claim to have developed a cancer

14 related disease from exposure to ZAI.  And, some of these

15 individuals have died since the filing of the class actions.

16 Canada is alleged to have failed to ban ZAI product.  Canada is

17 also being sued on the basis of an alleged breach of fiduciary

18 obligation owed to Aboriginal plaintiffs.  In defending this

19 litigation Canada is wearing different hats.  Canada is an

20 alleged fiduciary of the Aboriginal Canadians.  It's also an

21 employer and alleged fiduciary of DND employees who lived in

22 houses insulated with ZAI, and a regulator like the EPA, and

23 regulated the use of dangerous products.

24          Given the various roles played by the Canadian

25 Government Canada decided in November of 2005 to undertake an

1  extensive health risk assessment related to the exposure to

2  ZAI.  The risk assessment will be peer reviewed by experts in

3  the field and is aimed at determining whether the risk posed by

4  ZAI is acceptable from a public health perspective.

5        Health Canada's risk assessment is looking at the use

6  of ZAI in residential homes, including Indian reserves and on

7  military bases.  It does not study commercial exposure to ZAI.

8  The debtor's been aware and informed of Canada's decision to

9  proceed with the health risk assessment since March of '06 and

10 the debtor has been providing and continues to provide the

11 Canadian Government with useful information in connection with

12 this health risk assessment.  It is expected that the air

13 sampling will be completed by the end of this month, with the

14 risk assessment being finalized by the end of the summer or

15 early fall.  And, at that time the results of this risk

16 assessment will be made public.

17        The risk assessment is at too early a stage for us to

18 advise the Court as to the likely conclusion but we will

19 undertake to provide the Court with further updates as we get

20 them and we will seek direction from the Court as to what

21 effect if any it has on the existing proceedings when the

22 results are available.  I just wanted to make that brief

23 statement to let the Court know where we are with this process.

24        THE COURT:  All right.  Thank you.

25        MR. RESTIVO:  Other than a note for the record that

1  my boards are magnetic, not velcro, I have nothing further to

2  say on property damage or ZAI.

3         THE COURT:  All right.  Well, I think the idea of

4  putting this on to the next omnibus for a status report and to

5  see whether we can come up with some sort of an order to

6  adjudicate or to deal with how to adjudicate the rest of these

7  issues is probably a good idea.  With respect to the plan

8  negotiation process I am still a little bit I guess troubled by

9  the concept that I am not sure how any final negotiations are

10 going to get concluded until the liability on the personal

11 injury side and probably on the property damage side are known.

12 But, now that you're getting the reports filed and you're

13 getting some of the property damage issues actually litigated

14 and some more settlements in, I'm starting to think that maybe

15 it's time to get some plan negotiation processes heated up

16 again.

17        MR. BERNICK:  I didn't have it -- I'm sorry, Your

18 Honor, if I can just address that very briefly.  I didn't have

19 a chance to respond to Mr. Baena in light of the length of the

20 proceedings today and, as you know, the lively debates that

21 often take place between Mr. Baena and myself, I wasn't going

22 to address that.  But, I was concerned with Your Honor's

23 reaction.  And, when I did indicate that the Grace people are

24 involved as often as they can be involved in discussions

25 relating to the resolution of different parts of the case, that

1  is an accurate statement.

2           There have been discussions, obviously, as you can

3  see, we're not talking about one-off PD claims, we're talking

4  about actually the major chunk of the PD claims are in the

5  negotiation process right now and we remain very optimistic

6  that they will be resolved.  There have been efforts to have

7  discussions specifically with Mr. Westbrook and his folks.

8  And, I've not been privy to those discussions but I've been

9  informed of them, indeed I've seen pieces of paper that relate

10 to them.

11          And, with respect to the personal injury side, there,

12 again, have been a whole series of contacts with a view to

13 seeing whether the personal injury side of this case could be

14 resolved.  In our view it is much more productive to try to

15 deal with the three major parts of this case.  I guess there's

16 really two major parts to this case, PD and PI.  And, to do so,

17 to see if we can reach agreement on the different aspects of

18 those cases, rather than to try to have everybody sit around

19 the table and agree on some kind of grand overall scheme.  We

20 spent a lot of time trying to do that last year and it came to

21 absolutely no avail.

22          Now, at a certain point in time it does have to be

23 wrapped up into a plan.  There's no question about that.  I

24 know that all sides have thought about what that plan would

25 look like.  But, until we can come to terms on the economics of

1 the different pieces of the pie you're not going to have a plan

2 unless you have economics.  And, it's on the economics that the

3 discussions have been focused.

4          Again, Your Honor, in connection with exclusivity I'd

5 be happy to make a more thorough report to the Court on each of

6 the different elements that I've discussed.  But, if Your Honor

7 had the impression that there were active discussions, there

8 are active discussions.  And, of course, a lot, there has been

9 an impact of the expert report process, that's not been lost on

10 the discussions either.  We now, -- because we do have most of

11 the expert reports, and we'll have the rest of them shortly,

12 there's no question but the table has been set and there's no

13 desire on the part of Grace to simply hold off on the

14 discussions until we have an estimation.  So, I can't think as

15 I sit here of anything further that can be done to advance the

16 discussions other than to have them continue as they are

17 continuing.  And, to the extent that we seek to impose some

18 kind of grand process where the parties are ordered to do this

19 or that, again, history doesn't indicate that that's going to

20 be terribly productive.  It's kind of like, you know, ordinary

21 litigation in a way, is that people tend to make more progress

22 when they know more about the respective strengths and

23 weaknesses of each side and become a little bit more accustomed

24 to one another in the negotiation process.  They tend to make

25 perhaps a little less progress when they're part of a huge

1  process where everybody's got to even agree to show up on the

2  same day to have the discussions take place.

3       And, again, I'd be happy to report further to the

4  Court.  I know that there will be difference of view.  Mr.

5  Baena will have a different view.  Mr. Westbrook will have a

6  different view.  I think we only got into this today because

7  there happened to be some mention -- again, I think for very

8  good reasons that were understandable at the time by Mr.

9  Westbrook regarding, you know, his own sense of what might

10 happen with an old arrangement.  And, I think that the right

11 time to address all these things is in connection with the

12 exclusivity hearing that I think is going to take place in

13 July.  Which is right around the corner and we're very mindful

14 of that fact, Your Honor.

15      MR. BAENA:  May I please the Court, Scott Baena

16 again.  Judge, as long as Mr. Bernick brought up the "e" word,

17 exclusivity, and the hearing in July, Judge, it would be a

18 gross understatement for me to say that we are unalterably

19 opposed to an extension of exclusivity.  And, when I say "we",

20 I mean the FCR, the ACC, and the PD Committee.  We are.

21      This latest motion that was filed does not engender

22 any new reason or ground we think for further extensions.  I am

23 not here to argue that either right now, however, we are very

24 concerned that that motion -- at this point in the game, Judge,

25 it's really important that we have an idea of where the landing

88

1  field is for this case.  We may not be ready to touch down but

2  we'd like to have a sense of where it is.  And, we'll remind

3  the Court about that awful day last time when we finally got to

4  exclusivity at like 5 o'clock in the afternoon and Mr. Sakalo

5  and I spent the night roaming the halls of an airport because

6  we couldn't get out of here, it took so long.

7        We would urge the Court that in July we advanced this

8  issue which is the centerpiece issue at this point, as far as

9  we're concerned in this case, to the beginning of the hearing,

10 the July omnibus hearing, with the understanding that we are

11 opposing the extension.  We think that the matter needs to be

12 fully aired by the Court and that it would take at least two

13 hours to do so.  And, we would ask you to do that early on in

14 that hearing.

15        THE COURT:  All right.  This is what I'm going to do.

16 I will require that it be put first on the list, unless there

17 are just orders that are being handed up that for some reason

18 or other haven't been filed.  So, first on the contested list.

19 But, no one will argue more than 20 minutes.  So, that will be

20 it.  And, when I say no one, I expect that the committees, to

21 the extent you have a unified approach will be one entity.

22 And, the plan proponents, ie. the debtor, the equity committee,

23 to the extent they're on one side, will be the other entity.

24 So, I expect that the whole argument shouldn't take more than

25 an hour, and that will include rebuttals.

1          MR. BERNICK:  Would that be then also though with

2   equal time in the event that there is -- I mean, obviously I

3   think we're going to have a pretty easy time as the proponent

4   speaking as one.  I don't know that it's going to make a

5   tremendous difference, Your Honor, whether we have exactly

6   equal time.

7          THE COURT:  I don't think it's --

8          MR. BERNICK:  If we're all held to an hour I suppose

9   it doesn't really make a difference.

10          THE COURT:  Frankly, I think right now sitting here

11  right this minute I could probably make each of your arguments

12  for you.  If you have a thing to say that I will be surprised

13  about I'll confess that fact when I hear your argument.  I have

14  very grave doubts that you're going to say anything that I

15  either haven't heard before or that if it is something brand

16  new I will have read it in your papers in advance.

17          MR. BERNICK:  Fair enough.

18          THE COURT:  Twenty minutes.

19          MR. BERNICK:  Fair enough.

20          MR. BAENA:  Judge, we've had private detectives on

21  this.  We've got photographs we want to show you.

22          MR. BERNICK:  Well, this could be interesting.

23          THE COURT:  As I said, I will confess anything that I

24  have not thought of or seen before, Mr. Baena, 20 minutes.  I

25  don't see how you're going to surprise me very much with

1 respect to these arguments.  And, you can even make it easier

2 for me if you have a new point put it in bold in all capital

3 letters in your brief and I'll know it's new, and then I'll

4 even be able to make sure that I pay special attention to it.

5 If it's a brand new point never stated before I'll definitely

6 know it when I see that.  And, I'm willing to bet that there

7 won't be any of those either in the briefs.

8 　　　　MR. BERNICK:  Your Honor, I know that we've been here

9 for awhile and you may be under the impression that there

10 aren't any other PD matters that have yet to be argued here

11 today.  There are a couple.

12 　　　　THE COURT:  Then let's take a recess.

13 　　　　MR. BERNICK:  Let's take, that's just what I thought.

14 　　　　THE COURT:  Yes.  Ten minute recess.

15 　　　　　　　　　(Recess)

16 　　　　THE COURT:  Please be seated.  Mr. Bernick.

17 　　　　MR. BERNICK:  Thank you, Your Honor.  I think the

18 next two items are the last of the property items.  They are

19 Items 10 and 15.  Fifteen is a pretrial conference with respect

20 to the Anderson Memorial certification argument.  And then, 10

21 is a motion that's been brought on behalf of three of Mr.

22 Speights' clients relating to the expungement of claims as to

23 which there was a late authority ruling by the Court.  So, I

24 guess Mr. Speights is up first on that matter, and then we can

25 go with the Anderson Memorial.  And then, I believe we're on to

1 the one personal injury item which is up, which is Lexicon.

2 And then, I'm not sure if there's really anything else for

3 today, at least to my knowledge.

4          THE COURT:  All right.  Mr. Speights.

5          MR. SPEIGHTS:  May I please the Court.  Your Honor,

6 by the way I entered my August 1 date for the Canada argument

7 on my calendar during the break and I realized again it was on

8 a Wednesday, so we're being consistent.

9          THE COURT:  I think of Tuesday in Wilmington, so you

10 can think of Wednesday in Pittsburgh, Mr. Speights.

11          MR. SPEIGHTS:  Your Honor, on January 25, 2006 in

12 this courtroom we argued authority objections.  I note that I

13 believe the only three people in the courtroom then who are

14 here today, other than your staff, are Your Honor, me, and Mr.

15 Baena.  And, I say that because I believe that counsel for

16 Grace is probably unaware or has not gone back to read that

17 transcript, among many others, of what occurred at that hearing

18 back in January when Your Honor dealt with all of the authority

19 objections.  I believe we were there two days, we were supposed

20 to be there three, but I was sick the first day.  And, Ms.

21 Browdy handled the matter for Grace.  And, I made an argument

22 and I have the transcript here, and I can put it on the board

23 if there's any dispute about it, I made the argument that as to

24 those claims where the authority occurred afterward or

25 allegedly occurred after the bar date notice, that we were

1 protected by the doctrine of ratification.  And, we heard

2 arguments that day, and during the arguments it was explicitly

3 represented by me and understood by Your Honor that we were not

4 exactly sure what was in that bucket that the ratification

5 argument if made successfully by me would eliminate having to

6 go through claims one by one and deciding what was the

7 authority that existed before March 31.  However, if I lost on

8 ratification then Your Honor explicitly said that you could

9 deal with those issues and that, frankly, the exchange was, we

10 might be able to work that out with Grace.

11        Well, that was back in January and afterward, of

12 course, Your Honor had a plan mediation which took everything

13 off the rails for a long period of time, and then the

14 ratification issue was argued again with Mr. Bernick and Your

15 Honor took it under advisement and issued an opinion on

16 ratification and decided that these claims could not be

17 ratified and dismissed those claims, which you characterized as

18 71 claims.  And, most of those that have survived other

19 objections are on appeal to the District Court.

20        However, three of them we believe, Your Honor, that

21 we did have authority, written authority, before March 31.

22 Your Honor also recognized at that January 2006 hearing that we

23 might also have oral authority, that you would consider that.

24 And, again, we could deal with those issues after the

25 ratification issue was decided because if I won on ratification

1  why I have to go on a claim by claim.

2         But, fortunately, Your Honor, there are only three of

3  the claims that you ruled on that we believe that we did have

4  written authority and we have not brought any oral authorities

5  to Your Honor, and they're attached to our order to alt or

6  amend.  We believe that this is just a situation where the

7  motion was -- the argument was so long before that somehow

8  these three claims got caught up because Your Honor clearly

9  recognized a process by which we would discuss with the debtor

10  what falls into this category if, in fact, Your Honor rules

11  against us on ratification.

12         And, that, I believe, deals with the debtor's only

13  objection that I read in their response here that we're just

14  too late on these to show authority.  I think clearly you said

15  we could, I'll be glad to listen to the debtor, I'll also be

16  glad to sit down with the debtor and go over these three claims

17  with him in detail and tell them why I don't think there's any

18  dispute that we had authority before March 31.  But, to the

19  extent that the debtor wants to hide behind the written order

20  and argue that it's too late I would ask Your Honor to review

21  the transcript of January 25, 2006 wherein I believe it's clear

22  that you anticipated that we would deal with claim by claim

23  basis after Your Honor ruled on ratification.  Thank you, Your

24  Honor.

25         THE COURT:  Mr. Bernick.

1          MR. BERNICK:  I don't think this has to turn or

2   indeed can turn on the ins and outs of that transcript and what

3   occurred on that date because the dye was cast on this record a

4   long time ago.  And, I just want to list or want to recite for

5   the Court the basic sequence pursuant to which the record was

6   set.  First of all, the 71 claims were 71 claims that were

7   listed in a specific schedule as not having -- having had

8   authority that was too late.  And, that took place I believe

9   almost two years ago that the schedule of 71 was set out.  This

10  is referenced in our briefs.

11          Those 71 claims or 71 claims as to which the debtor

12  pursuant to the 15th omnibus objection had lodged claim by

13  claim objections.  So, we have the claim by claim objection

14  process, we have what is in the claim files, we have the filled

15  out claim forms, and we have specific objections, all done

16  before we get to the list of 71 and the 71 obviously is derived

17  from that backdrop of the claim by claim objections and

18  responses.  Importantly, with respect to each of the claims as

19  to which there was an objection, Mr. Speights on behalf of his

20  clients filed a response to the objections.  Those responses

21  would be 25 and 30 pages long.  In the context of that record

22  that is our specific objection and his specific response, at no

23  point in time was the documentation that he is now tendering to

24  the Court put in place.  At no point in time.  So, we went

25  through the process as it's supposed to occur.  We have an

1  objection.  The basis for the objection -- we had objection

2  with the claim form, the objection, the basis for the

3  objection, his opportunity to supplement and respond, and

4  indeed we've seen supplementation as Your Honor knows of these

5  claim files on an ongoing basis, and at no point in time during

6  that entire process did he produce the materials that he is now

7  producing.

8         But, it gets worse yet.  We then had a very extended

9  period of time for argument about all of these matters.  This

10 matter was actually argued twice.  Most recently it was argued

11 in August of '06.  So, we now have literally years taking place

12 where our objection has been logged, the claim file has been

13 made a matter of record, that record has been supplemented,

14 it's been briefed, it's been argued, and all as of August of

15 '06, again, these documents never, ever appear.  And, that is

16 the record in this case.  Whatever may have happened in

17 connection with the hearing we'll see, I'm sure how it's going

18 to be characterized.  The record was not there that's supposed

19 to be there under the bankruptcy procedures whereby a claim is

20 made, it's supported, an objection is made, it's supported, and

21 there has to be a response.

22        So, we made the objection that there was no adequate

23 documentation to support the authority, the timely authority

24 for these claims.  He had the obligation to come forward and

25 supplement the record so that we could fairly and completely

1 litigate the issue, and it was never done.  It never got done

2 until after Your Honor issued the ruling very recently that we

3 now have these additional documents coming to light.

4         So, we're now seeking to open a record that took the

5 better part of two or three years to create.  And, the rules

6 are very clear.  The rule is 59(e) of the Federal Rules of

7 Civil Procedure, which are incorporated into the Bankruptcy

8 Code in Rule 9023.  There could be a motion for reconsideration

9 granted or an amendment or alteration to the judgment, which is

10 what we have here, as a request to alter or amend the judgment

11 if a movant can show one of three things.  One, there's been an

12 intervening change in the controlling law.  That's not even

13 argued.  Two, there's newly discovered evidence which was not

14 available to the moving party.  We don't have that here either.

15 These new documents were clearly available to the moving party

16 throughout.  Or, three, there's a need to correct a legal or

17 factual error which has resulted in a manifest injustice.

18 There is no legal or factual error that Your Honor made.  There

19 was nothing that Your Honor got wrong.  Your Honor got it all

20 right.  The record was as it was.  The request here is for

21 relief based upon a principle that is not in those three.  And,

22 the principle says that after the ruling, what purports to be a

23 final judgment is made, it can be opened up and a new record

24 created based upon evidence that was always available so long

25 as counsel can point out that there was some expectation that

1  the Court would rule in a certain order.  That is not a mistake

2  that Your Honor made, that is a mistake that Mr. Speights or

3  his client made.  It's a mistake that said that Your Honor was

4  going to basically allow the record to remain open for really

5  until whenever Your Honor ruled, and then thereafter.  Well,

6  Your Honor never did that, never actually issued an order,

7  never granted some kind of instruction that says, okay, because

8  I'm going to rule on ratification first the record will remain

9  open with respect to all of the matters that might be

10  considered.  And, indeed, the time deadlines that had passed

11  previously for objecting to claims and then responding to the

12  objections, because I'm only going to rule on ratification, all

13  of what the rules would require by way of supplementation,

14  that's all now being revisited.  There's nothing that says

15  that.

16       Because Your Honor ruled on ratification first, Your

17  Honor, clearly, was of the view that that was the only issue

18  that really had to be resolved as to these claims.  But,

19  because that is now so, and has been done, what they're -- Mr.

20  Speights is essentially saying is, "Okay, well the record

21  remains open as to all other matters."  And, there's nothing

22  that actually says that.

23       THE COURT:  Well, but I think the issue is whether or

24  not in the January of 2006 argument in setting up a structure

25  to deal with what would happen in the event that ratification

1  was either allowed or not allowed as a legal construct, how

2  would I know which claims were subject to that ruling?  Because

3  I thought that was the problem back then.  And, I recall

4  working with my clerk, looking at the issue of how many claims

5  were actually subject to this ratification order and coming up

6  with the 71 based on what I thought was the updated set of

7  information before the Court at the time.

8            MR. BERNICK:  It was.  That's correct.  The

9  settlement is 71.  And, be clear, the 71 claims that we're

10 dealing with were originally scheduled by the debtor as part of

11 the debtor's motion to expunge for lack of authority.

12           THE COURT:  Right.  That's right.  Well, there were

13 some pluses and minuses at some point in that.

14           MR. BERNICK:  There were three that were taken out,

15 not these three.  There were three that were taken out, not

16 these three.  But, that fundamental schedule was a schedule

17 always that was the subject of the question of whether late

18 authority was good enough.  Okay?  And the motion was to

19 expunge these claims because that's all there was.  I think

20 that the objection was late authority, that is where it was

21 clear that it was late, or where the authority that was

22 provided was undated, which is what we have in some of these

23 cases.  The record was created as to that objection long ago.

24 That was the record that was created when the objections were

25 made and the responses were offered, these 30-page responses

1 were offered.  That's the essence of what I'm saying is, we

2 made the objection, they then made a 30-page response.  That

3 30-page response to the absence of documentation never included

4 these documents.

5         We then go forward and ask to have these claims

6 expunged.  We then provided the list of the claims that were

7 going to be expunged, on the basis of those objections, and

8 those are broad -- the absence of authority in a timely

9 fashion.  At no point in the process did Mr. Speights come

10 forward and introduce this evidence to say that there was

11 authority, which is the evidence that he should have introduced

12 in responding to our objection way back when.  We then move to

13 expunge, and we move to expunge where there's the absence of

14 documentation, or the ratification is after the fact.  And,

15 that motion was filed and Your Honor ruled on that and in the

16 process of ruling on that granted the relief that we asked for

17 which is the expungement of the claim.

18         And, the key thing here is that it is too late no

19 matter what could have been said in January, and I don't -- you

20 know, my point is it doesn't turn on the parson of the

21 transcript in January.  That's a transcript for a hearing.

22 There's a hearing after all the  briefing has been completed

23 and after the record has been completed.  Even if Your Honor

24 were to have said, "Oh, well, we're just going to take up

25 ratification first," that does not excuse or provide really

1  relief that reopens the record on everything else.  And, he

2  never, ever in this whole process said, "Oh, there is really

3  co-temporaneous (sic) documentation and it's different from

4  what I've already given you."  If we had co-temporaneous (sic)

5  documentation, and it's different, it said, "These claims were

6  actually authorized before the bar date," they would never had

7  them subject to -- ratification would be irrelevant.  You don't

8  need ratification.

9           And, that's the problem here is that he went

10 throughout this whole period of time and his clients went

11 throughout this whole period of time and they never

12 supplemented the record such that we could know that there was

13 some other potential basis for saying these are not

14 ratification claims, these were claims where there was

15 appropriate documentation.  Because our objection was no

16 appropriate documentation.  Ratification was a sub-category of

17 that.  At no point in responding to the overall objection of no

18 documentation did he provide this information.  And, it's now

19 just too late.  And, Your Honor has ruled, in fact, that -- you

20 know, as we saw now in a different context in the PD, the

21 process of having to make the objection and having to respond

22 timely to the objection in creating the record is a meaningful

23 process, it doesn't -- we're not sitting here with an unlimited

24 ability to come and supplement claim files.  And, that's

25 essentially what he's -- so, we now got three new documents.

1          I could go through all three new documents, they all

2 have got their own issues and their own problems and we're now

3 going to litigate after Your Honor has ruled expunging these

4 because there was an absence of co-temporaneous (sic) authority

5 at the time that Your Honor ruled, we're now going to have

6 discovery with respect to these claims that are now going to

7 get wrapped into the multi-issue process?  That is antithetical

8 to the whole situation that we have here, which is that we had

9 to have a record, it was a complete record, we filed the motion

10 that sought the ultimate relief, which was expungement.

11          At no point in time ever, even before January, when

12 the record was being created did Mr. Speights come forward with

13 this additional documentation so that we could even look at it

14 or conduct discovery about it.  And, that's the whole idea of

15 finale and that's why the rule reads the way it does.  And,

16 there is no category.  Your Honor is not in error.  The order

17 is not in error.  There is nothing that Your Honor missed.

18 There's no newly discovered evidence, it's only old evidence

19 the movant already had.  And, there's been no intervening

20 change in the law.  And, the reason that those limitations are

21 -- that the avenues for alteration or amendment are limited is

22 precisely to assure that you do have finality, that people do

23 the work that they're supposed to do while the matter is

24 pending and before the judgment ultimately is issued.  And,

25 that wasn't done here.

1           MR. SPEIGHTS:  That's not the way it happened, Judge.

2           THE COURT:  I'm sorry?

3           MR. SPEIGHTS:  That's not the way it happened.  First

4    of all, it was not the 15th objection, it was the 13th

5    objection.  The 13th objection is the authority objection, was

6    not an item by item.  They objected to the authority of every

7    claim we filed, contracts for the State of California,

8    etcetera, etcetera, etcetera.  That's the objection we were

9    dealing with.  That's the objection we said, "Sure, let's tee

10   it up earlier."  And, that's the objection you heard on those

11   two days in January.  And, there were various buckets we placed

12   them in as we went through them on that day.

13          The largest bucket, of course, was those where our

14   only authority was Anderson, about 600 and something claims,

15   and Your Honor ruled on those.  And then, there were -- put

16   aside ratification a minute -- those in which we had written

17   authority and Your Honor very carefully went through them one

18   by one on a claim by claim basis with Ms. Browdy and me.  And,

19   you ruled on those, I can't remember how many of them on her

20   column and how many in my column, but you ruled and sometimes

21   we'd say we've got another piece of paper and we handed that to

22   you, and sometimes she'd say, "Well, we got this question about

23   it," and we'd clarify it.  And, they were -- you remember they

24   didn't realize there were all these duplicate claims out there.

25   But, we made progress and we got to deal with all the

1 authority, the big issue of the 600 and something, I think

2 actually the month before, and the individual claim by claim.

3         And then, we were left with these 71 I think, I

4 assume that's the correct number, where we had, clearly we have

5 authority, the question was simply whether we had the authority

6 before March 31.  And, Your Honor, I said, and it's in the

7 transcript and I urge you to read it, I said, "Your Honor, we

8 can do those like we've done these others on that painstaking

9 path, item by item, however, there are two reasons why we may

10 never have to reach those where we do have authority.  We have

11 authority.  Number one is, there's a certification issue

12 floating around, if Your Honor certifies we have authority.

13 Number two, there is ratification."  They filed their response

14 on ratification the night or two days before that hearing.

15 And, Your Honor, I had not had a chance to file a response.

16 You identified that as a key issue on whether or not these

17 claims could be dealt with in that one bucket.  And, you

18 directed us to file additional briefs on ratification, which we

19 did.

20         And, during that hearing it was understood, there was

21 no record made on these 71 like the others where we pull out

22 paper, here it is, here it is, you never looked at these

23 individually to see whether or not the paper that did exist as

24 of January 2006 was sufficient or not because Your Honor

25 recognized that if I was right on ratification we wouldn't have

1  to go through that process.  All that we would -- we relied on

2  certification.  But, leaving that aside, we did not go by them,

3  go through them one by one on the record.  And, most

4  importantly, Your Honor, Your Honor recognized -- I think it's

5  at Page 34 if I'm not mistaken -- that you could probably have

6  oral authority, you said something like, "That's not normally

7  the way it's done but authority is authority," and I've been

8  before Your Honor enough now to know that if we had oral

9  authority you might have wanted me to verify that we had oral

10 authority in some other way.  Okay, I mean, that's sort of like

11 when the 2003, you said, "Well, go back and get some more

12 stuff."  But, that's where we left it that day.  So, as we sit

13 here today on these three claims, we've never had a record,

14 I've never had a chance to show you that we have oral

15 authority, even though we also have written authority.

16        So, all we are asking, we are back where we were

17 then, you -- out of 71 there are three that we believe that we

18 had authority before March 31, and my suggestion, Your Honor,

19 is that we have an opportunity to show the authority on these

20 three, we can do it in 15 minutes, we can do it at the next

21 omnibus, but I urge you to read the transcript, if I'm in left

22 field you'll tell me I'm in left field.  Otherwise, -- and, in

23 the meantime, discuss the matter with counsel and see if we

24 can't add some sanity to this because these are three that we

25 believe we did have authority for and they should not be kicked

1  out.

2          THE COURT:  Okay.

3          MR. BERNICK:  Your Honor, would it be all right if I

4  address the Court sitting here?  Not to, I -- I think Your

5  Honor has heard argument on this.  I think, again, the problem

6  is that Mr. Speights has focused on, in a sense, a fact which I

7  believe is not a fact, but is not the fact that is material to

8  our position.  Mr. Speights believes that somehow coming out of

9  that hearing in January of '06 there was a determination that

10  Your Honor was going to rule on ratification and that somehow

11  having ruled on ratification there was still the possibility

12  that there might be other avenues that he could pursue in order

13  to establish that there was actual authority.  That's

14  essentially what he is arguing and what he just did argue,

15  which is that the January '06 hearing was a watershed.  Your

16  Honor said I'm going to rule on ratification, and the question

17  of whether there really was co-temporaneous authority, other --

18  oral or otherwise, is reserved for another day.  I have two

19  things to say about that.  One, I don't believe that that is

20  accurate.  In fact, if you take a look at the transcript as

21  quoted in their briefs, you have Ms. Browdy saying with respect

22  to the 68 claims that remained at issue as of that time, that

23  71 less three, they are a different three, and our papers have

24  clearly laid that out.  As to all of these 68, she says they

25  were not timely, did not timely receive authorization.  She

1  says that at Page 21 to 22, and then at 26, "So getting back to

2  where these started, these 68 claims we've challenged them, we

3  put the burden back to the claimant, and the Speights firm has

4  not established that it had authority as of the time, so we

5  would ask that the 68 claims be disallowed." And that was the

6  issue that was to be decided, which is the disallowance of

7  those claims. Your Honor takes on the issue of ratification

8  why? Because the issue of ratification is the only issue based

9  upon that record that was their hope of establishing

10 timeliness, because as of that time there was no record of

11 timely authorization before the bar date. All of the claims

12 has a common denominator that the only way that they could have

13 been timely was through ratification. That was a statement

14 about the existence of the record at that time, which was that

15 there's no evidence that had been afforded to the Court of

16 timely authorization before the bar date. That's why

17 ratification was an issue. Now, if at that point in time Your

18 Honor had said, look, I'm going to take up the issue of

19 ratification, but pursuant to, Mr. Speights, your suggestion

20 that there may be other avenues of authority, I'm going to

21 reopen the record, the factual record, to allow you to make an

22 additional submission to the Court that would establish that

23 there was not just ratification, there was timely

24 authorization. If Your Honor had issued an order, or given a

25 specific instruction saying that I'm going to reopen the record

1    for that purpose -- and if that's in the transcript I will be

2    educated, but I believe that that would have been the form of

3    some kind of order, that's one proposition.  But that's not the

4    fact.  The fact is that the record was closed of that as of

5    that time, that we had put the, in the sense, the fat in the

6    fire, both through the 13th and the 15th, about the absence of

7    the documentation of authorization.  That's why we moved to

8    expunge those 68 claims.  And the only route that was left to

9    Mr. Speights was the ratification route, and that's why that

10   issue got resolved, and the record was not reopened with

11   respect to co-temporaneous or timely authorization.  That's the

12   problem, and I don't believe that turns on the nuances of the

13   transcript.  That's the whole record that had been created

14   before, where, as Ms. Browdy said, we put the burden back to

15   the claimant, and the Speights firm has not established that it

16   had the authority as of the time.  That was the state of the

17   record, and we had followed precisely the procedures that were

18   adopted by this Court to assure that the record would be

19   complete by the time the Court had to rule on these kinds of

20   things.  And again, what they're now saying is that somehow

21   this was all an error.  It is not an error.  It is the very

22   basic procedure that was followed throughout this process where

23   people made objections, and then the burden shifted back to Mr.

24   Speights to provide the documentation.  And throughout all of

25   this time, with all of -- this is not just a one-hearing deal,

1  throughout this entire period of time, these documents that

2  were in his own files, apparently, or in his clients files,

3  somehow mysteriously never materialized.

4         THE COURT:  Okay.  Final word.

5         MR. SPEIGHTS:  The final word.  It's not what Ms.

6  Browdy said that's important.  It's what Judge Fitzgerald is

7  important.  It has more authority besides written authority.

8  They are attacking us on written authority.  We were there.

9  Your Honor said that there was oral authority even though it's

10 not written authority.  I'm not so convinced that's not

11 authority.  Authority is authority.  We never went there with

12 that because Your Honor went from ratification, and one of

13 these clients, for example, has been a client of ours since

14 before the Grace bankruptcy.  If we did not have written

15 authority on it, or did not know it at the time, we still would

16 have shown we had oral authority as a regular client.  We just

17 didn't get there, Your Honor.  That's all I can say, and I'd

18 urge you to read the transcript.

19        THE COURT:  Okay.  But these three claims you're

20 alleging that you had written authority for.

21        MR. SPEIGHTS:  We -- and that's really a separate

22 issue.  Okay?  Apparently, and we'll still checking, apparently

23 these three documents were recently discovered as written

24 authority somewhere buried in all of that.  But even if we

25 didn't have the three documents we still had oral authority.

1  We still have not had our day in Court on whether we had the

2  authority, specific authority, for these three claims, because

3  we skipped that step of going over them claim by claim.

4         Now, when I have that day, and I don't know that this

5  is the day to present that evidence, which, again, is 15

6  minutes worth of evidence that we had authority on these, the

7  same thing that we could have done back in January, Mr. Bernick

8  may well say it's too late to use these documents that were not

9  part of the record before, and I will say, well, Your Honor, we

10  think we should be able to use these documents for these

11  reasons.  But the point of the motion is is that Your Honor did

12  not reach the claim by claim basis of authority on that day in

13  January of 2006.  We just didn't get there.  You skipped that

14  to go to ratification.  In fact, out of 71 there are only three

15  that are at issue, so it wasn't this huge vacuum, but it was

16  why I said at the time, Your Honor, there are various buckets

17  here, maybe we don't need to go one by one, because we can deal

18  with ratification first.  I would urge Your Honor, again, you

19  know, to set it down, can we show you that we have authority

20  for these claims, and Mr. Bernick can say you can't consider

21  those three pieces of paper.  And I'll argue with him, but I'll

22  say even if you don't consider those three pieces of paper I'm

23  prepared to give you evidence that we had the authority, oral

24  authority, from these three people.

25         MR. BERNICK:  That is a suggestion that assumes what

1  is now before the Court, he wants to have the further

2  evidentiary hearing where we then have to argue against the

3  admission of the evidence.  We don't get to that theory unless

4  the Court were to find that Your Honor, A, committed a mistake,

5  which Your Honor did not do, B, there's been a change of law,

6  which there has not been, and C, the information was

7  unavailable, which is plainly not so.  It was clearly

8  available.

9          THE COURT:  Okay.  I have to look at the January

10  transcript again.  Was it submitted?  Because if it was, I

11  didn't see it in the papers.  It may be there and I just

12  glossed by it somehow.

13          MR. BERNICK:  I think that there was some references

14  to it, but I don't know that the entire transcript was

15  submitted.

16          UNIDENTIFIED ATTORNEY:  It was not.

17          THE COURT:  You have one -- okay.  I'll get it.  We

18  have it on line, so I can get it there.  Mona, can you just

19  pull it up for tomorrow?  Okay.

20          MR. BERNICK:  There was a further hearing, Your

21  Honor, just so the -- Your Honor has got the full pallette.

22  There's a further hearing that took place in August of '06.

23  There were actually two different hearings.

24          THE COURT:  I'll have her pull both, the August and

25  the January transcripts.

1         MR. BERNICK:  And I think I remember the August

2 hearing because by that time Ms. Browdy had gone off to greener

3 pastures, and I argued it in October.

4         THE COURT:  All right.  I'll take a look at these,

5 Mr. Speights, and se what the transcripts say.  Mr. Bernick,

6 I'm going to ask the debtor to put these on to the July omnibus

7 for a status conference.  Hopefully I can make a ruling at that

8 hearing.  If I can't, then I'll let you know.  If I think I

9 need some evidentiary submission I'll address it at that time.

10 But I will read the transcripts between now and then and see if

11 I can address it at the July hearing.

12         MR. BERNICK:  Thank you, Your Honor.  The next item,

13 Your Honor, is Item 15, which is the pretrial conference as to

14 Andersen Memorial.  I don't know that there's a great deal that

15 has to be gone over in connection with that.  Your Honor will

16 recall that we have the hearing on the -- at long last, the

17 hearing on the Andersen Memorial class certification set for

18 the fifth of July, and there was a brief pretrial conference

19 telephonically a little while ago.  The purposes of that, I

20 think, principally, were, number one, to determine whether Mr.

21 Speights intended to call any witnesses, and for that matter

22 whether the debtor intended to call witnesses.  I think that

23 Mr. Speights, although I know he will certainly speak for

24 himself, indicated that at that time he did not think that he

25 was going to call witnesses, but he reserved the right to

1  revisit that question based upon our discovery responses.  Of

2  course, based on that representation we also indicated that we

3  didn't -- we didn't intend to call witnesses.

4         That further discovery, the further responses were

5  furnished through correspondence, I think the 13th through the

6  15th of June, if my notes here are correct.  Your Honor had

7  told us to supplement some of our discovery responses.  We did

8  that.  And so, I guess we're now back before the Court to

9  determine where it is that we stand with respect to the hearing

10 that's going to take place on the fifth of July.  From our

11 point of view as the debtor, we do not intend to call any

12 witnesses.  Obviously that depends upon whether Mr. Speights is

13 going to pursue the same approach.  The only request that we

14 would make with respect to the upcoming hearing is that any

15 exhibits that are to be used in connection with that hearing be

16 exchanged between both sides at least a couple days in advance

17 of it.  I just don't know how many Mr. Speights has in mind,

18 but I don't want to have a deluge of them the night before or

19 the day of, so we would suggest that we just have an exchange

20 of exhibits I would say the prior Monday, Monday the second, by

21 noon, that is morning delivery, essentially, so that we can see

22 what exhibits each side is intending to use, and be in a

23 position to address them.  And if there are then some

24 supplemental exhibits I think that those -- that probably a

25 late -- the hearing or the night before.  That's the only

1  pretrial process that we would see would be necessary in light

2  of the long history that's already developed concerning this

3  particular motion.

4      THE COURT:  Mr. Speights?  Actually, I'm a little

5  concerned about exhibits, too, because I realized after the

6  pretrial I wasn't sure that we had really dealt with that

7  issue, so I'd like an opportunity if there are going to be lots

8  of exhibits, to see them, too.  Have you changed your mind

9  about witnesses, or are you still not intending to call live

10  witnesses?

11      MR. SPEIGHTS:  We do not intend to call live

12  witnesses, Your Honor.  Two out of three statements I'm going

13  to make are very simple.  We do not intend to call live

14  witnesses.  We do not have any more discovery motions.  Grace

15  has responded, again, to discovery, and asserts, of course,

16  that it's complied with Your Honor's directives.  We don't know

17  what's behind the hidden doors, but they have represented that

18  they have complied with what you've said, and we have no more

19  discovery motions to make prior to the certification hearing.

20      That brings us to documents.  I say this not as a

21  gotcha statement, but Grace has not -- has chosen now for a

22  year-and-a-half, not to do any discovery.  I'm really glad.  I

23  -- we've had plenty to do besides putting up with Grace

24  discovery.  So, we have not had to respond to questions about

25  what are you going to do?  What documents are you going to use?

1    Etcetera, etcetera.  We're ready to go on -- or will be ready

2    to go on July 5.  There will be a lot of documents.  I'm a

3    little concerned about how we manage all those documents, and

4    list, and copy them, and get them out with only -- there are

5    only seven working days between now and the hearing on July 5,

6    and I want to be getting ready for the hearing and getting

7    documents as I go through preparing getting these documents

8    done, and I'm concerned about even that Monday before the

9    exchange of documents.  I mean, frankly, I was planning to do

10   it the old fashioned way, and maybe Your Honor doesn't want me

11   to do it the old fashioned way.  I'm more concerned with Your

12   Honor than I am with Mr. Bernick, frankly, but was to show it

13   to the Court and present to you, and have you an extra copy of

14   the documents that we intend to rely on, and show them to you

15   as we go through the presentation in support of the case.  To

16   the extent we have to get off that track and start making

17   copies, etcetera, it is a time-consuming process.  I will say

18   that I don't believe there are any major surprises.  The bulk

19   of the documents would be documents from the Andersen record

20   made in South Carolina, which Your Honor has and which Mr.

21   Bernick sent me a copy of.  I certainly would like to think

22   that with those, you know, at most I would have to identify

23   which ones of those, rather than this enormous copying process

24   going out again, and documents in this Court, perhaps briefs,

25   perhaps statements by Grace about common issues and things of

1  that sort, which are already in this Court.  So, I don't --

2  it's not a question of trying to surprise the opponent.  It's a

3  question of trying to get this done in seven days, and there's

4  just a lot going on.  And I'm concerned about that.  But we can

5  get it done by the hearing, and if Your Honor says you want

6  them by Monday, I'll have no choice but to get them by Monday.

7           THE COURT:  Well, to the extent that what you're

8  going to do is identify documents from the document numbers

9  that actually I have my staff put onto the South Carolina

10  docket sheets because they did not include document numbers

11  when we were sending them for copying, and I was concerned that

12  we get back the entire record, and so, we added the document

13  numbers.  To the extent that you're going to identify things by

14  document number, either document numbers in this Court or

15  document numbers from the South Carolina Court, this Court

16  doesn't need another copy of them.  Mr. Bernick, I assume you

17  wouldn't need those, either, if you can just get a list of what

18  the document numbers are, correct?

19           MR. BERNICK:  Yes.  If we're talking about the record

20  in this Court, obviously that's fairly straightforward.  Ms.

21  Baer tells me that we do have the copy with the numbers that

22  were supplied by Your Honor, and we don't need to have a bunch

23  of hard copy paper being circulated, or even electronic copies

24  be circulated if we get accurate sets of numbers.  I don't -- I

25  haven't heard from Mr. Speights about whether or not he intends

1 to use documents that go beyond that.  In fact, we did have a

2 short discussion where I said that typically in connection with

3 contested matters where there aren't witnesses we'd work with

4 the materials that have been cited in the briefs because that

5 way everybody knows essentially what's in play.  I was

6 unsuccessful in getting Mr. Speights to commit at that time,

7 but of course that was a little while ago, so it may be that

8 his thinking has become a little bit more refined.  So, the

9 problem is not, I think, really the hard copies insofar as

10 we're talking about the Andersen record and the common issues.

11 The problem really is if we go beyond that I don't know how

12 comprehensive the numbering actually is.

13         I certainly don't -- the purpose of my raising this

14 is not to cause a flurry of copies to be exchanged.  The

15 purpose of raising this is to develop greater certainty on what

16 we're going to be doing that day.  And it seems to me that

17 regardless, generally speaking, you don't need contention

18 interrogatories to get a determination in advance of the

19 hearing of what documents are going to be used.  So, I think

20 that by this point in time, after this matter has been pending

21 for a couple of years, Mr. Speights, I'm sure, has got a pretty

22 good idea of what he's going to use, and if it's a large

23 volume, I have, I guess, a reaction to whether that's

24 necessary, but Your Honor is not going to determine that in

25 advance.  But if it is a large volume, then I think it becomes

1  even more important to have the exchange in advance, and I

2  would suggest that it not be that Monday, but it be the prior

3  Friday.  There's no point in ruining absolutely everybody's

4  Fourth of July pawing through a bunch of documents.  We just

5  thought I'd get them the prior week, so I would suggest that

6  Your Honor tell both sides to exchange either number

7  identifications, or absent number identifications electronic

8  images of documents that will be used at noon on the prior

9  Friday, which I guess would be, what, the 28th --

10         MR. SPEIGHTS:  That's this Friday, Your Honor.  I

11  just can't do that.  I mean, I don't --

12         THE COURT:  Well, to the extent that what you're

13  going to exchange are documents from -- that are already in

14  this Court's file, filed of record, that have a document

15  number, because if they're deposition exhibits somehow I won't

16  have them, you folks may, but I won't, so I'd need those.  And

17  I'm not even sure that all the parties will have the exact same

18  copies, so they probably do need to be actually copied and

19  exchanged.  To the extent that what you're going to exchange

20  will be actual documents that are filed of record in this Court

21  and have a document number, or from the South Carolina record

22  that have a document number, I think you could just make a

23  list.

24         MR. SPEIGHTS:  And I could make the list.  What I was

25  saying -- by Friday, even that would be -- Mr. Bernick says,

1 well, he already obviously knows, well -- I don't.  I mean, I

2 have some ideas about what I will put into the record, but

3 three days is not enough time to decide.  Your Honor may not

4 know it, but I was in Pittsburgh again last week, sequestered

5 because of the Mogul hearings, in case my issues came up there,

6 and I will get back some time hopefully late tonight, and will

7 go to work immediately on this and nothing else.  I would

8 suggest that if, Your Honor, that I provide Mr. Bernick a list,

9 and the Court, on Monday, and to the extent Your Honor will

10 identify that by docket number, or -- I'm not sure if it's a

11 Bate stamp number on the documents from there, and have on that

12 the additional documents which I in good faith believe I would

13 use by that time, and hopefully Mr. Bernick can file such a

14 list on Monday, as well, and then we can talk about, you know,

15 the hard copies, or electronic copies of things, if you want

16 that Monday, as well, for the non-Grace materials, the non-

17 dockets, the non -- I believe I can do that by Monday, as well.

18 But I will be working next weekend.  I know what's entailed in

19 this record, and it will take next weekend, and for those on

20 the phone, they know they will be working next weekend, too, in

21 my office.

22          THE COURT:  Yes.  I --

23          MR. BERNICK:  Your Honor, I -- this is -- this is a

24 problem, unfortunately, waiting to happen.  This hearing

25 actually -- we, as Your Honor knows, have been seeking this for

1 a long, long time.  It actually was going to take place in the

2 last week of June, or the second week of June, and was then

3 deferred to July the 5th, so it's not as if this is some kind

4 of surprise.  I can find something that's in this Court's

5 docket, although this Court will also have docket entries that

6 will have voluminous attachments.  I won't even know -- I hate

7 to say the word attachment again -- I won't even know what

8 particular item in that docket entry is at issue.

9        THE COURT:  I expect that the attachment would be

10 listed.  I mean, if it's going to be -- I'll just make up a

11 document number -- 11999, then it should say attachment to, or

12 all attachments, or whatever.  You can't just say document

13 number 11999, you can't get -- that doesn't give you much

14 information.

15        MR. BERNICK:  Yes.  But I -- again, this is, with all

16 due respect to Mr. Speights, it cannot be that much of a

17 mystery.  And the difficulty is that if we don't get these

18 lists until Monday, and then they are lists that include

19 materials from other proceedings, it is not self-evident what

20 all those different things are.  We can then -- we'll then have

21 a whole team of people scrambling around just to find what it

22 is that he has.  That doesn't make any sense, either.  So, if

23 we're not going to get the documents -- and I'll take Mr.

24 Speights at his word -- that he's not going to get to it until

25 Monday, or be done by Monday, then we need the hard copies,

1  because we cannot go searching around for something in the

2  record.  I would take a docket list for the Grace case if the

3  docket listing included the particular attachment, and if it's

4  within the attachment, you know, the pages that are going to be

5  used, because we then don't have to worry about what it's going

6  to be.  I would take a list of Your Honor's numbers for the

7  South Carolina case because I know that that's a limited

8  population of documents.  But with respect to everything else,

9  we cannot be at risk of searching around on Monday afternoon

10 and on Tuesday, and on Wednesday, or whatever, for something

11 that he's got in his hands.  We need the hard copy.  So, if we

12 got electronically the hard copy on Monday, we would make due.

13 I mean, the burden is going to be on us.  He's moving, so we're

14 going to have to search through all this stuff and try to

15 figure out, well, what is it that's really being gotten at, and

16 if -- I mean, can Mr. Speights tell us how many just documents,

17 just even roughly we're talking about, how many exhibits?

18         MR. SPEIGHTS:  I can guess.

19         MR. BERNICK:  Sure.

20         MR. SPEIGHTS:  I just want to -- it would be an

21 honest guess, but it's a guess, I think that other than what's

22 of record in this case already, and what is in the boxes from

23 South Carolina, the stack of documents would probably be eight

24 inches.

25         MR. BERNICK:  Well --

1          MR. SPEIGHTS:  I mean -- and it could be a foot, or

2    one inch, but I'm just saying that, more or less.  I -- as I

3    stand here I don't think there are a huge number of documents

4    outside of documents that the debtor has generated itself.

5          MR. BERNICK:  Well, that --

6          MR. SPEIGHTS:  And --

7          MR. BERNICK:  I'm sorry.  Go ahead.

8          MR. SPEIGHTS:  And filed, and they're on the docket,

9    and you actually can forward them.  You know, this is -- but

10   you have as access as I to -- when I get those documents I go

11   to Pacer.

12         MR. BERNICK:  If it's eight to ten inches of

13   additional documents, then I think we should get -- that's not

14   a small number to read.

15         MR. SPEIGHTS:  I --

16         MR. BERNICK:  It's not a --

17         MR. SPEIGHTS:  I --

18         MR. BERNICK:  I'm sorry?

19         MR. SPEIGHTS:  I agree -- I said that, that those

20   that are not part of the Grace record -- first of all, I

21   accepted Monday, which was your suggestion.  Secondly, I agreed

22   to give those that are not Grace documents, that is, not in the

23   South Carolina boxes, and not on file in this case, hard copies

24   to you on Monday.

25         MR. BERNICK:  Noon.

1          THE COURT:  Right.  When you say --

2          MR. SPEIGHTS:  And I want to know when they're going

3  to give me -- I'm sure they probably know what exhibit they're

4  going to use against me --

5          MR. BERNICK:  We --

6          MR. SPEIGHTS:  -- filing, as well, on Monday -- and

7  if people have to supplement in light of the others, I

8  understand that.

9          MR. BERNICK:  I'm prepared to -- whatever it is that

10 we think we would use on our own today, or as of Monday, we

11 will provide the numbers from the Grace docket, including the

12 attachment and including the pages, and we will then identify,

13 to the extent that we have documents that are -- that come from

14 the set that Your Honor was provided, we will provide those

15 numbers, as well, also by noon.  And to the extent that we got

16 other documents that we think that we want to use, we will give

17 an electronic image of those by noon, on theory that all this

18 is reciprocal.  Then, at that point, everyone is going to have

19 to read everything, and I think that we're then into the

20 question of what we're going to have by way of response.  And I

21 can't really commit to doing that before the end of the day on

22 Monday because I don't think we're going to be done.

23          THE COURT:  Okay.  The -- when you say you're going

24 to provide hard copies of the non-bankruptcy, non-South

25 Carolina documents, Mr. Speights, you're talking electronic

1  images?

2         MR. SPEIGHTS:  Yes, Your Honor.

3         THE COURT:  Okay.  So, you're going to file those

4  with the Court electronically, too?

5         MR. SPEIGHTS:  If that can be done I will do it, if

6  you want it.

7         THE COURT:  Mona, how is that -- is that going to tie

8  up the system?  If we've got 12 inches of paper -- there's some

9  restriction on the Delaware filing, and frankly, I never know

10  what that is.  That's going to tie up --

11                (The Court and the Clerk confer)

12         THE COURT:  How about Fed Ex-ing, or hand delivering,

13  whichever, a set to me by Tuesday -- wait, that's the Fourth of

14  July, because that's --

15         THE CLERK:  The third.

16         THE COURT:  Third.  How about hand-delivering, or Fed

17  Ex-ing, so that I have, by Tuesday morning, a set of whatever

18  you give to Mr. Bernick?  And Mr. Bernick, the same thing for

19  you.

20         MR. BERNICK:  Right.

21         THE COURT:  Frankly, for my purposes, at least for

22  the hearing, I don't think I need them in advance.  But for the

23  hearing, even the documents that are on the Bankruptcy Court

24  record, if you're actually going to use them as exhibits I'd

25  either like them on disk, or I'd like them in paper.  Disk is

124

fine, if you want to put them on a disk format I'd be happy to take all the documents on disk.  That would be great.  If you want paper, that's okay, too.  Whichever is easier is fine with me.  But I think that way everyone will have the same set of documents, and it will make sure that we're all looking at the same universe.

MR. SPEIGHTS:  Yes, Your Honor.

THE COURT:  All right.  Now, responses?  Do you need to exchange response documents in advance of the trial itself, on the fifth?

MR. BERNICK:  The responsive documents?  Yes.  I think that the responsive documents ought to be turned over let's say at noon on the third.  That way maybe there's some chance that people will be able to take some time off on the fourth.

THE COURT:  The next day?  You're going to get to them that soon?

MR. BERNICK:  I think we've got no choice.  I mean, this is not my -- this is not Grace's preference, Your Honor, but we're trying to keep this thing on schedule to get done.

MR. SPEIGHTS:  My preference was to show up with your documents, but if we have to do it in advance, that's -- you know, the third is the only day.  Again, it would be the same -- the non-Grace documents, share those electronically, and supplement a list.

1           MR. BERNICK:  Yes.  Of the others, yes.

2           THE COURT:  All right.  Then, the documents, either

3    the list or the documents, as we've already identified on this

4    record, by noon on July 3rd, and the responses, either the list

5    or the documents, by noon on July -- I'm sorry.  I think I said

6    that wrong.  I apologize.  The documents and the list will be

7    due by noon on July 2nd.  That's Monday.  And the responses,

8    either the list or the documents, by noon on July 3rd, which is

9    Tuesday.  For my purposes, I think you might as well just bring

10   the response documents to Court.  I will undoubtedly not have

11   an opportunity to see them, unless you have only a few that you

12   can actually image in.  It depends on the volume.  Again, I

13   apologize, but I don't know the local rule in Delaware with

14   respect to what will and won't tie up their system.  Mr.

15   O'Neill, you use it for documents more than I do.

16          MR. O'NEILL:  Your Honor, James O'Neill.  You could

17   put anything on.  We would just have to break it up, depending

18   on the size of the document.  So, it would just be multiple

19   docket entries which would appear, so it depends on how Your

20   Honor wants it.  I mean, the parties could file their lists --

21   and have the lists filed, and then just provide Your Honor with

22   the hard copies of the documents and not put the other

23   documents on the docket, if that's what would work best.

24   Whatever Your Honor would prefer.

25                         (Pause)

1          THE COURT:  I think it would be better just to do the

2  lists on the public record and not attach the documents, to

3  bring the documents -- I'm talking about the responses now.

4  Bring the documents to Court on a disk.   If need be, we'll

5  just make the disk part of the record.  And for my purposes, if

6  you will electronically file the lists, but send me, as I

7  indicated earlier, by -- for delivery on Tuesday morning, the

8  documents that you're exchanging on Monday, just in hard copy,

9  that's sufficient.  I don't see why trial exhibits need to be

10  filed on the public record.  The list should be sufficient.

11  And then bring the copies with you that are your response

12  documents on the fifth.  That should be sufficient.

13          MR. SPEIGHTS:  Thank you, Your Honor.

14          MR. BERNICK:  Your Honor, before we leave Andersen,

15  that argument, I think, is scheduled to begin at 10:30.  Can we

16  get some basic time allocations so that we have some guidance

17  from the Court?  I guess what I would propose -- I won't

18  propose anything.  Can we have some time limits set for

19  argument so that we know what the Court's pleasure in that

20  regard is?

21          THE COURT:  All right.  One second until I finish

22  this note.

23                    (Pause)

24          THE COURT:  All right.  You apparently have the rest

25  of the day for that hearing, so, Mr. Speights, how long do you

1 think your certification argument will take?

2        MR. SPEIGHTS:  A long time is the short answer, but

3 let me give you a little background, Your Honor.  The -- Your

4 Honor, two or three times, has set it for all day, and we've

5 moved it to 10:30 at the last telephone conference as an

6 accommodation to Mr. Bernick, who wanted to travel on the

7 fifth.  I understand that.  I have to travel, anyway, on the

8 fourth.  And so, I think we'll need, frankly, most of the day.

9 I didn't know that we were going to say do you have two hours,

10 or, two-and-a-half hours, or what.  I don't -- but I can see

11 that -- I would predict that I probably would be up here no

12 more than Mr. Bernick will be up here, but I can see a very

13 extensive argument on a number of issues, and a number of

14 documents that we will be putting into Evidence and drawing

15 attention to.  So, because we had all day I haven't thought

16 about what time limits we have.  I understand we're not working

17 past working hours, and hopefully we can get out of here a

18 little early.

19        MR. BERNICK:  Your Honor, I -- just because the day

20 has been allotted, I, at least, never realized that because we

21 had scheduled for a day that that meant we're going to -- we

22 have to use the day.  This matter has been extensively briefed.

23 It's already been argued fully once, and in pieces on several

24 other occasions.  And I don't think that Your Honor has been --

25 and the opinions that you have issued, extremely diligent in

1  looking through the documentation that is submitted to the

2  Court.  I don't know why we have to take up Court time

3  reviewing documents, you know, in real time.

4        THE COURT:  Well, it depends.  If it's necessary for

5  part of your argument, then I think you're going to have to do

6  it as part of the argument, but otherwise I -- you can rely on

7  the fact that if you point me to a document that at some point

8  before I issue an opinion I'll look at the document.

9        MR. SPEIGHTS:  Oh, I understand that.

10        MR. BERNICK:  I --

11        MR. SPEIGHTS:  I would just ask Mr. -- somebody in

12  the courtroom about the ZAI argument, which was an all day

13  argument.  I -- this is less than all day because we're not

14  starting until 10:30, and hopefully we'd get finished in mid

15  afternoon, and I know Your Honor will shut me up if I'm being

16  repetitious or I'm going on down a path that you're not

17  interested in.  But I want to have the time to do it thoroughly

18  because obviously it's something I've worked on since 1992.

19        THE COURT:  Well, if we're going to stop at -- let's

20  say we stop at 5:30?  Why don't you two divide up the time?  I

21  think you should be able to effectively divide up the time

22  within that construct and figure out how to do it.  Mr.

23  Speights, I'm sure you're going to want a little bit of

24  rebuttal time in there, so perhaps you can add one extra hour

25  on your side than whatever the debtor is going to need for his,

1  something like that.  I'm not making rulings, I'm just making a

2  suggestion, that as the moving party behind this class

3  certification you will undoubtedly need a little more time than

4  the debtor will, so, you know, maybe you get four -- four hours

5  plus one, and he'll get four hours.  But don't forget, you'll

6  need a lunch recess in there.  I'll have to let my staff have a

7  short break for lunch, at least a half an hour, preferably an

8  hour, but at least a half an hour.

9            MR. SPEIGHTS:  Yes, Your Honor.

10           MR. BERNICK:  I'm sure we can do that.

11           THE COURT:  So, we'll plan to leave at 5:30, earlier

12  if you think you don't need that much time.

13           MR. BERNICK:  I can't imagine we'll go that much

14  time, but I understand Your Honor's approach, and I hope we can

15  get out sooner.

16           THE COURT:  Well, Mr. -- are you still coming in that

17  day, Mr. Bernick?

18           MR. BERNICK:  Yes.  I'm coming in that day.  I --

19  there's no way that I can -- well -- I don't think that the

20  issue is going to be our need for all that time.  Mr. Speights

21  needs that time, and he wants to read through those documents.

22  That's fine.  It's very difficult for me to predict how much

23  time I'll need, but I would be shocked if I needed four hours

24  for my argument, so I think we'll get done sooner.  So, that's

25  all I'm saying.

1          THE COURT:  Okay.  Well, I mean, you can agree to

2     two, and he can agree to four, and that will be fine.

3     Something -- I mean, you know, whatever you folks can agree to

4     is fine, but my rule is we'll go from 10:30, we'll leave at

5     5:30.  We need at least a half an hour for lunch.  If you can

6     terminate earlier, fine.  Other than that I'll rely on you to

7     divide the time up if you're not able to.  You can tell me that

8     that morning, and I'll give you some rulings, which will

9     probably be along the lines of Mr. Speights will get an extra

10    hour, so if you want something different, then talk to each

11    other.

12         MR. BERNICK:  We'll be there for the duration, Your

13    Honor, as Your Honor will be, so, whatever works out --

14         THE COURT:  All right.

15         MR. BERNICK:  I think that that would then conclude

16    the property damage side of the equation, and Mr. Baena is

17    obviously perky and alert, and ready to tell us if there's

18    anything more on the property damage side here to take up,

19    otherwise we'll go to personal injury.

20         MR. BAENA:  No, Your Honor.

21         THE COURT:  Okay.  Personal injury it is.

22         MR. BERNICK:  On personal injury I think that there's

23    only one contested matter that we'll actually be taking up this

24    afternoon.  I'm sorry.  Go ahead.

25         MR. WESTBROOK:  Your Honor, I'm sorry to interrupt

1  Mr. Bernick.  May we be excused --

2        THE COURT:  Yes, sir.

3        MR. WESTBROOK:  -- to catch a plane?  My clerks and

4  I?

5        THE COURT:  Yes.

6        MR. WESTBROOK:  Thank you, Your Honor.

7        THE COURT:  Yes.  Thank you.

8        MR. BERNICK:  That's the Lexicon issue, which is Item

9  9.  I think beyond that, and my colleagues at the other table

10 will again correct me.  I don't believe that there's anything

11 else to be taken up that is a contested matter regarding

12 personal injury today.  I know we're here on personal injury

13 tomorrow, and at that time we have really two items.  One is

14 the motions for protective order that have been filed by

15 various law firms, and then, secondly is the two issues that I

16 believe remain with respect to the case management order.  I've

17 had some discussions with -- I guess we can call them

18 discussions -- I've had some exchanges of a very terse and

19 proposal-oriented nature with Mr. Finch and Mr. Mullady about

20 trying to resolve the case management order issues, but we'll

21 have to see where that is.  I don't think that's going to take

22 a long time tomorrow in any event.  And then we have the

23 motions for protective order.  I guess, on that, we would ask

24 the Court to set some kind of time limit for the arguments that

25 are going to be made there.  We have, I think, four or five

1 different firms, and I think that it's -- it's very important

2 for that to proceed in an orderly process.  This is, at the end

3 of the day, a discovery issue.  Your Honor has told us that you

4 would like to have discovery issues take less time rather than

5 more time.  But it's a very, very critical issue, and I know

6 that people are going to want to spend some time on it.  Again,

7 if we could get Your Honor's guidance on --

8            THE COURT:  Twenty minutes.

9            MR. BERNICK:  Twenty?

10           THE COURT:  Twenty minutes per side.

11           MR. BERNICK:  Per side?  So, that means that all of

12 the movants are going to take 20 minutes?

13           THE COURT:  Twenty minutes.

14           MR. BERNICK:  That's fine.

15           THE COURT:  You asked for time limitations last time

16 after a marathon six-hour argument.  I think it was exactly

17 right.  If you can't say it after I've read all your briefs,

18 basically word-for-word, in 20 minutes, you probably don't

19 really have much more to add to your briefs.  I've read the

20 briefs, so, 20 minutes ought to do it.

21           MR. BERNICK:  There's only one thing that I would --

22 well, go ahead.

23           MR. FINCH:  My only suggestion, Your Honor, is that

24 we take up the scheduling matter after the argument on the

25 depositions, because they might inform that.

1          THE COURT:  Okay.

2          MR. BERNICK:  The argument on what?

3          MR. FINCH:  The depositions.  Take up the schedule

4    second.  Do the deposition argument first, schedule second.

5          MR. BERNICK:  Oh.  Sure.

6          THE COURT:  All right.

7          MR. BERNICK:  I don't know who else is -- whether

8    anyone is on the phone for all these firms, so they know what

9    the time limits are.  I know Natalie was here.

10          THE COURT:  Good afternoon.

11          MS. RAMSEY:  Good afternoon, Your Honor.  Dan Hooker

12   from Sandy Esserman's office is here, as am I.  We are two of

13   the movants tomorrow.  We are going to be participating in a

14   conference call later this evening with representatives from

15   Motley Rice and from Cooney & Conway.  We can inform them about

16   the Court's instructions.  And we were intending to attempt to

17   coordinate, anyway, so I don't believe that the time limitation

18   will be of concern.  But I guess, on behalf of those who aren't

19   here, I would like to ask the Court's indulgence that that

20   issue be presented tomorrow if other parties have a different

21   view.

22          THE COURT:  All right.  Well, there are an awful lot

23   of responses in this -- to this particular motion, but frankly,

24   they really do all say the same thing.  So, that's why I don't

25   really know that much more than 20 minutes is necessary. But

1 because of that, if you absolutely have to vary it, I'll make a

2 one-time good deal only.  I'll allow 40 minutes for the

3 responders.  You divide it up however you choose.  I'll give

4 the debtor a little bit of reply time, like ten minutes.  So,

5 the debtor will have 20 minutes to argue, ten minutes to reply.

6 The other side will get a total of 40 minutes.  That should do

7 it.

8          MR. BERNICK:  Actually, it's their motion --

9          THE COURT:  Their motion.  Yes.  But -- that's true.

10 It's your motion.  Nonetheless, I'll give you, I guess, 40

11 minutes.  You can divide up the reply time however you like.

12 I'll give the debtors 30 minutes.  So, the movants will have

13 ten extra minutes.  That should be more than enough.

14          MS. RAMSEY:  Thank you, Your Honor.  Yes.  I think

15 that will --

16          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

17          MR. BERNICK:  As long as there's no new material

18 raised on rebuttal.

19          THE COURT:  Well, there's -- we'll see.

20          MR. BERNICK:  This is, unfortunately, the -- part of

21 the reason that we have these long exchanges for a lot of

22 reasons, but one of them is that new things tend to get raised,

23 and there's a lot of factual material here, Your Honor,

24 including new factual material, but --

25          THE COURT:  Well, if there are new facts, then we'll

1  defer that issue until another time, like the July omnibus,

2  but, you know, if somebody hasn't had an opportunity to respond

3  to it.  But I have read all of the pleadings that have been

4  filed with respect to this, and there really is not that much

5  of a substantial difference in anybody's positions on the

6  moving party's side, so --

7            MR. BERNICK:  If Your Honor would --

8            THE COURT:  -- 30 minutes should be enough.

9            MR. BERNICK:  I would maybe ask Your Honor, if Your

10 Honor has some inclinations about what it is that both sides

11 share in common, I'd be happy to -- I'd be happy to hear about

12 them and sit down and talk with the other side, because that's

13 one of the issues that we have is we haven't heard -- we

14 haven't had much of an exchange.  I don't know if Your Honor

15 would be interested --

16           THE COURT:  Share in that motion?

17           MR. BERNICK:  No.  I mean, the -- I thought you said

18 the -- your -- I thought your impression was the parties were

19 not necessarily --

20           THE COURT:  On the moving party's side?

21           MR. BERNICK:  Oh.  On the moving party's?

22           THE COURT:  Yes.

23           MR. BERNICK:  Oh.  Okay.  Now I understand.

24           THE COURT:  Oh.  You thought I meant on the -- on

25 both sides?

1          MR. BERNICK:  I thought -- yes, there was some common

2  ground.

3          THE COURT:  Yes.  You have a disagreement.  That's

4  the common ground.

5                         (Laughter)

6          THE COURT:  Okay.

7          MS. RAMSEY:  Thank you, Your Honor.

8          THE COURT:  All right.  Lexicon?  Ah.  Yes.

9                          (Pause)

10          MR. BENTLEY:  Good afternoon, Your Honor.  Philip

11  Bentley for the equity committee, here on the motion to modify

12  Your Honor's order from almost two-and-a-half years ago,

13  approving the retention of Lexicon, LLC, subject to a fee cap

14  of $10,000 per month, without prejudice to the committee's

15  ability to come back and seek to lift the fee cap.  The purpose

16  of the motion, Your Honor, the reason we're here asking to lift

17  the fee cap, is up to now Lexicon has played a very limited

18  role in the case per -- as Your Honor contemplated.  Mainly

19  they have advised the equity committee in connection with the

20  asbestos values so that we could participate in negotiations

21  over possible consensual plans.  Your Honor may recall at the

22  time we initially retained Lexicon it appeared that there might

23  be a consensual plan.

24          We now propose, Your Honor, we now believe it's

25  critical for us to put on an expert witness who was affiliated

1  with Lexicon, Dr. James Heckman.  He is a Nobel prize winning

2  economist at the University of Chicago who works through

3  Lexicon.  And we believe that his testimony would be of great

4  assistance to the Court in the estimation hearing, and that it

5  would not in any way duplicate the expert testimony of the

6  debtor's experts or any other party's experts.

7          What I'd like to do, Your Honor, in my remarks, is

8  touch on two topics, first, to briefly go back and review the

9  terms and the circumstances of the February '05 Lexicon

10  retention order and explain why what we're seeking today is

11  entirely consistent with what Your Honor ruled back then, and

12  secondly, to briefly explain to Your Honor what Dr. Heckman is

13  going to address in his testimony, and why we believe it would

14  be so valuable to the Court, and so critical to the equity

15  committee's ability to participate in a meaningful way in the

16  estimation hearing that's coming up.

17          To turn, first, Your Honor, to the February '05

18  order, Your Honor will recall that at that stage in the case,

19  almost two-and-a-half years ago, a contested estimation process

20  had not yet begun, and when we moved to retain Lexicon as our

21  asbestos consultant, Your Honor observed that that might be

22  premature -- that it might be premature for us to use Lexicon,

23  to retain them at that time in connection with estimation

24  litigation because those proceedings had not yet begun.  So,

25  the resolution that was set forth in the order was that we

1 would retain Lexicon for the limited purpose I described of

2 advising the committee with respect to asbestos values and

3 potential consensual plan, that they would be subject to a very

4 limited budget, $10,000 a month, which they have adhered to

5 from that point up to now.  But the order expressly stated that

6 this was, quote, without prejudice to the right of the equity

7 committee to seek to modify the order as changing circumstances

8 may dictate, and the notes to the budget that was annexed to

9 the order expressly indicated that the changing circumstances

10 that the Court had in mind were that once an estimation process

11 was put in place, you envisioned that we might come back as we

12 have now done.

13          We're now, of course, in the middle of an estimation

14 process, and, Your Honor, up to this point, as I think the

15 Court is well aware, the equity committee has been extremely

16 careful to conserve estate resources.  In our view, Your Honor,

17 we are the residual security, and every dollar paid to every

18 one of the lawyers in this courtroom, as well as their experts,

19 comes out of our pocket.  So, we have been extremely mindful of

20 not duplicating the debtor's efforts, not running up fees.  And

21 I think Your Honor is aware, my firm's fees have been extremely

22 modest.  We have not yet retained a financial advisor in the

23 case.  We've avoided that very substantial expense up to now.

24 And we've kept Lexicon's fees to a very modest level, provided

25 for by the budget.

1          We have been working closely with the debtor, and we

2    have been coordinating with the creditors' committee with

3    respect to estimation.  And we have been looking very carefully

4    at the question of is it necessary for us to come in, bring in

5    our own expert to supplement the debtor's efforts, and on the

6    one hand, Your Honor, we would have preferred not to because we

7    don't want to increase expense, but the reason we're here

8    today, Your Honor, is we -- we came to the conclusion that in

9    the past few months that Lexicon, and specifically Dr. James

10   Heckman, that Dr. Heckman is uniquely positioned to add

11   something that would be very valuable to the Court in the

12   estimation process that the other parties' experts are not

13   going to be providing.  So, let me address that.

14          Dr. Heckman is not an asbestos expert of the sort

15   that the others you'll be hearing from provided by the folks on

16   this side of the room, and also the debtors, and the commercial

17   committee will be providing.  He won't be testifying as to the

18   nuts and bolts of asbestos claiming rates, or the future

19   incidents of disease.  His expertise is quite different.  He

20   has spent his career studying what makes a scientific

21   methodology scientifically valid, what distinguishes between a

22   scientifically valid method and one that's not scientifically

23   valid.  And that's, in fact, what he was awarded the Nobel

24   prize for his work in that area.  That has been the focus of

25   his life's work.  And in this case, Your Honor, he has looked

1 at the methodology that Mark Peterson, the P.I. committee's

2 expert employs.  He's looked at Mr. Peterson's report, and he

3 will testify, Your Honor, that Mr. Peterson's methodology is

4 fundamentally flawed from a scientific perspective, that it is

5 not scientifically valid, that it doesn't satisfy the

6 admissibility standards applicable to expert testimony set

7 forth by the Supreme Court in the <u>Daubert</u> case.  That is not

8 something that the other parties' experts are going to be

9 addressing.  We believe it will be extremely valuable to the

10 Court.  And just to flesh that out briefly, Your Honor, Your

11 Honor is aware that a number of estimation expert reports were

12 filed quite recently, and I expect Your Honor is well aware

13 that the range of numbers addressed in those reports -- or

14 opined on in those reports is extremely wide.  For Your Honor

15 to be able to make the most informed assessment that you can as

16 to which of those numbers is valid you will be looking, Your

17 Honor, not only at the accuracy of the assumptions made in the

18 different reports, but you will also be looking at the fact

19 that the different reports rest on different methodologies.

20 And Dr. Heckman's role, Your Honor, will be to assist the Court

21 in advising on what makes one of those methodologies more valid

22 and another methodology less valid.  We think that that would

23 be very valuable to the Court.

24        From the standpoint of my committee, Your Honor, we

25 believe that we are a key player in this case, that we're

1 entitled to participate, and this is the one area, as I've

2 said, we've held ourselves back and not used estate resources

3 substantially.  This is the one area where we think it's

4 absolutely critical that we be entitled to participate in a

5 meaningful way, and for that reason, Your Honor, we ask that

6 the fee cap on the Lexicon retention order be removed.

7        THE COURT:  And what do you want it lifted to be?

8        MR. BENTLEY:  We would ask, Your Honor, that Lexicon

9 be treated the same way that all of the other parties' experts

10 are treated, that is, with no expense fee cap, but rather

11 subject to the reasonableness standards that everybody is

12 subject to.  We think being an official committee like

13 everybody else, it's only fair, not to mention the fact that,

14 as I said, the fees come out of our pocket, so we have a very

15 direct financial interest in keeping the fees moderate.

16        THE COURT:  Well, I guess what I'm not clear, I

17 didn't go back to look at the February 2005 order,

18 specifically.  Are there hourly rates being charged?  I mean,

19 would that process stay in place?

20        MR. BENTLEY:  Absolutely, Your Honor.  They each have

21 hourly rates, and they are hourly rates, and the -- the

22 reasonableness of the number of hours they put in will all be

23 subject to the usual standards.

24        THE COURT:  All right.  Thank you.

25        MR. BENTLEY:  Thank you, Your Honor.

1            THE COURT:  Good afternoon.

2            MR. FINCH:  Nathan Finch for the asbestos claimants'

3  committee.  I was going to argue that the report of the equity

4  committee's expert was cumulative, but since I haven't received

5  it yet, I don't know whether it's cumulative or not.  The fact

6  is we've received the expert and exchanged expert witness

7  reports, and there are three experts who have put a dollar

8  figure on what Grace's liability is to present and future

9  asbestos person injury claimants, Mark Peterson for the ACC,

10  Jennifer Biggs for the future claimants' representative, and

11  Tom Florence for the debtor.

12            THE COURT:  Was Mr. Florence's report filed?  That's

13  the one I haven't seen.

14            MR. FINCH:  It should have been filed.  I thought it

15  was filed.  It's ARPC.

16            THE COURT:  Yes.  I haven't seen that one.

17            MR. BERNICK:  But I know that Your Honor was

18  furnished copies by a letter of the FCR's experts.  I don't

19  know that Grace furnished Your Honor a --

20            MS. BAER:   Your Honor, I don't think we --

21            THE COURT:  I apologize, Mr. Finch.

22            MS. BAER:  I don't think we separately provided Your

23  Honor copies.  What happened was all of the reports that Mr.

24  Finch referred to, as well as Nero's report, were filed on the

25  Court's docket.  They are electronically available, but we are

1  happy to get separate copies to you.

2         THE COURT:  Yes.  I'd appreciate, I think, hard bound

3  copies, because the charts, and the graphs, and things, really

4  don't print very well in black and white, and they're much

5  better to see in color anyway, so I would appreciate that.  So,

6  I do -- I have the ACC's.  I have the FCR's.  I've read them

7  already.  I don't have the debtor's.  Okay.  I'm sorry, Mr.

8  Finch.

9         MR. FINCH:  So, my first objection was going to be

10 cumulative, but since I now have a representation that equity

11 committee's expert is not going to be putting in a number, I

12 guess I won't know until we get the report on August the 8th

13 whether it's cumulative or not.  I think, frankly, what he has

14 described is a report that invades the province of the Court to

15 decide whether the testimony is admissible or not, or whether

16 it meets scientific principles or not.  You just heard Tom

17 Florence testify last week about the generally accepted by

18 Courts methodology of estimating asbestos liabilities, and that

19 it is to take the past settlement history and project that

20 forward.  You heard a half a day of testimony.  You heard

21 Francine Rabinovitz testify about that.  That's the same

22 methodology that Tom Florence follows in every case where he's

23 not working for Grace, and that the ACC's expert and the future

24 claimant's experts followed, so I think that this report would

25 be cumulative of the Court's function, and therefore I guess

1  what my suggestion would be, I don't have a problem with them

2  paying this guy to write whatever report he writes subject to

3  my motion to strike it as either cumulative or to Daubertize

4  it, and the right of the ACC to reserve asking for disgorgement

5  of Lexicon's fees if, in fact, the Court doesn't admit the

6  expert report into Evidence.  So, that's the -- I think that's

7  a fair resolution of this issue.

8          THE COURT:  Well, I don't know that it's fair to

9  expect that somebody is going to write a report subject to

10  having his fees disgorged if, in fact, the Court determines

11  that the expert report somehow or other wasn't admissible for

12  whatever reason.  I don't know that the expert is a lawyer to

13  have an opinion about whether the report is going to be

14  admitted into Evidence, so I don't think that's an acceptable

15  compromise from the Court's point of view, Mr. Finch.  I --

16          MR. FINCH:  Well, then, I guess my -- what I would

17  suggest is that when I get the report in August I can come

18  back, if I do believe it's cumulative of what the debtor has

19  done, then I'll object and seek to strike it, and seek to have,

20  you know, no more fees from Lexicon after that.  I think the

21  fees --

22          THE COURT:  That's fine.

23          MR. FINCH:  -- we're talking about here are mostly

24  going to be in preparing the guy for deposition if he shows up

25  at trial and writing the report.  You know, it sounds like he's

1  already well under way in writing the report, and from what I

2  understand they had about a $250,000 unspent portion of the cap

3  left over.  So, that would be my approach, Your Honor.

4          THE COURT:  Obviously, just because the Court raises

5  the cap doesn't mean that the purported expert would not be

6  subject to <u>Daubert</u> motions and motions in limine, and

7  everything else that you choose to raise, so --

8          MR. FINCH:  Including motions based on the fact that

9  it would be cumulative --

10          THE COURT:  Yes.

11          MR. FINCH:  -- I mean, there -- ultimately, at some

12  point we're going to have to have a discussion with the Court

13  about the number of experts per side.  I don't know when the

14  Court would like to do that, but that's -- the problem -- not

15  so much the problem, but Mr. Mullady and I are extremely

16  concerned about the ability to depose all these experts on the

17  other side and defend all of our own expert's deposition, and

18  adding one other to the mix when Grace's equity's interests

19  are, in my view, you know -- being fully protected by able

20  counsel from Kirkland & Ellis here, I think is an issue the

21  Court must consider.

22          THE COURT:  All right.  Thank you.  Mr. Mullady?

23          MR. MULLADY:  Good afternoon, Your Honor.  Raymond

24  Mullady for the FCR.  I have an additional issue, which is a

25  fairness issue, with respect to the way this report is going to

1  be served, and with respect to the report that we have

2  received, which essentially was just a placeholder, that this

3  gentleman would be identified.  We've now heard a

4  representation that he is an expert on the scientific method,

5  whatever that may be.  We, I guess presumably we'll have to

6  wait to see what his expert opinion is on the proper scientific

7  method, and then have to approach the Court with the ability to

8  respond to that, but I would say that it's a bit of -- I think

9  there's a bit of gamesmanship going on here, because the -- if

10 it's an expert report on the scientific method, the proper

11 scientific method, I would assume that the Nobel prize winning

12 economist would know and be able to tell us now what the proper

13 scientific method is that should be used.  There is ample

14 evidence of the method that Dr. Peterson has used, or Mr.

15 Peterson has used in prior cases.  So, I'm not sure why we

16 don't have the report now, filed on the same schedule that all

17 other expert reports were to be filed, and instead, we're

18 holding back this report so that it can now be an attack on the

19 existing estimation expert reports as opposed to the report of

20 Dr. Heckman in his own capacity.

21      THE COURT:  Well, I suppose the answer to that is

22 going to be that he waited until he got the other reports so he

23 could analyze those reports, but I'll hear and see if my guess

24 is correct.

25      MR. MULLADY:  But, Your Honor, with all due respect,

1 we could have done the same thing.  We could have held experts

2 back on the proper methodology for use in estimating asbestos

3 liability in a bankruptcy case, and waited for Dr. -- or Mr.

4 Florence's report, and then sprung that report on the Court.

5 There should be a procedure -- we argued strenuously, and we

6 spent a lot of time in these omnibus hearings about how this

7 schedule was going to be set up.  And we had a system worked

8 out that is going to work very effectively.  This throws a

9 monkey wrench into that protocol, and it's unfair to us, it's

10 unfair to the FCR.  And by the way, I would like to know, if

11 counsel can tell us, whether this attack on the proper

12 scientific method will involve the FCR's expert.  I didn't hear

13 him mention Jennifer Biggs, but if she's going to be part of

14 the subject of his attack, I would like to hear that today.

15          THE COURT:  Yes.  I mean, it isn't as though there

16 aren't other expert reports that have been filed in other

17 asbestos cases, and some by the same witnesses, so that is a

18 fair concern.  Mr. Bernick?

19          MR. BERNICK:  Yes.  Let me, from the debtor's

20 perspective, a couple additional facts.  One is that I suppose

21 that the issue of whether it's cumulative or not is something

22 that can always be raised.  I don't know that Your Honor is

23 going to be able to address that issue on a fully-informed

24 basis until you understand, in a sense, what the record as a

25 whole is going to be.  I don't believe that that's going to be,

1 in a sense, ripe when the expert reports are submitted,

2 although if counsel wants to raise it they can always raise it.

3 　　　　From the debtor's perspective, and we are the ones

4 who are supplying the other expert reports in the case, Dr.

5 Heckman's testimony is not cumulative, not cumulative, and

6 having discussed this matter with counsel, we obviously, as

7 plan proponents, together with equity, and together with the

8 unsecured, talk all the time about the posture of the case, and

9 I think we have an understanding of the role that Dr. Heckman

10 is to fill, as well as a role that, for example, Dr. Chambers,

11 who is an expert for the unsecureds, may decide to fill.  And

12 it's part of our mutual obligation to assure that they are not

13 cumulative and not wasteful.

14 　　　　From the debtor's point of view, Dr. Heckman's

15 testimony is not cumulative, it is not going to be covered by

16 any other witness that the debtor is calling, and for that

17 matter I'm not sure that any other witness is going to perform

18 this function.  The debtor's approach, as set forth in Dr.

19 Florence's report, is a different approach than what Dr.

20 Peterson has used.  It is a different report, in many respects,

21 than what Dr. Florence himself has used, and that is due to the

22 additional information that is available in this case, and the

23 different assumptions, some of which are legal assumptions,

24 that we have asked Dr. Florence to make.  It is also different

25 because it doesn't purport to do and to render scientific

1  things that we don't believe, in fact, are scientific.  Our

2  position in this case would be that Dr. Peterson's methodology

3  attempts to explain not disease, but human behavior, claiming

4  behavior.  We don't believe that Dr. Peterson's model is based

5  upon a rigorous scientific approach.  Your Honor already heard

6  some of those concerns in the CE case, where we cross examined

7  Dr. Wyant, who presented a behavioral model on behalf of

8  certain objectors in the CE case.  We cross examined him and we

9  moved on Daubert grounds, and Your Honor will recall that at

10 the end of the day, based upon the record in that case, you did

11 not attribute a lot of weight to Dr. Wyant's testimony.

12         This is not new.  This has been -- this is an issue

13 that's been out there for a long time, but we have the

14 information in this case to really bring home what these

15 concerns are.  Dr. Heckman is going to address that question,

16 the question of whether what purports to be a behavioral model

17 in fact follows the precepts of science with respect to

18 behavioral modeling.  His Nobel laureate is in the empirical

19 analysis of behavioral activities, human choices, human

20 conduct.  For example, in this case, deciding whether to pursue

21 a claim.  So, he occupies a different role.  We don't have any

22 other expert who is going to perform that role.  His testimony

23 is not necessarily supportive of Dr. Florence's approach

24 because Dr. Florence's approach is not based upon a behavioral

25 analysis.  It's based upon underlying science and facts of

1 exposure as provided  by the other experts in the case.  So,

2 Dr. Florence is going to present our model, supported by

3 scientific testimony from other experts in his analysis of the

4 claims.  That's our theory of the case.  And it will be

5 packaged with what we believe to be the appropriate legal

6 standards in the case.  That's over here.  That is what we

7 submitted as our report, our analysis of the numbers.  It is

8 our estimation case.

9         They are submitting a different model.  They are

10 submitting a behavioral model, a Dr. Peterson model.  That is

11 not our model for the case.  We will now, in the context of

12 rebuttal, be rebutting that model.  We have no obligation to

13 say in advance what all of our criticisms of that model are so

14 that they, in fact, can respond to them.  Our obligation was in

15 rebuttal, to give our criticisms of their model.  Dr. Heckman

16 is being called in rebuttal to their model, and the debtor is

17 fully supportive of that, indeed, the debtor is depending upon

18 Dr. Heckman to offer opinions on what constitutes a reliable

19 scientific method and to offer those opinions and criticism of

20 the behavioral model that Dr. Peterson has chosen to offer up.

21 There will be other people who are called in rebuttal,

22 presumably, the ACC and the FCR will call rebuttal witnesses

23 with respect to what it is that we have to offer, and that is

24 the whole way this thing got set up, is that we have different

25 approaches.  There has always been different approaches here,

1  set out in the initial reports, and then the opportunity for

2  rebuttal.  So, we're not waiting in the bushes with Dr.

3  Heckman, or anybody else.  The appropriate time was after we

4  have got their model, in rebuttal, to be able to offer that

5  testimony and offer that evidence, as they also have the same

6  opportunity.

7         As far as Daubert is concerned, Dr. Heckman's

8  analysis will be very relevant to Daubert.  We're not asking

9  Dr. Heckman, or they won't be asking Dr. Heckman, I presume, to

10 be offering legal opinions to the Court.  But the whole

11 question about what is a reliable scientific methodology is

12 exactly the core of Daubert, and it's one of the respects in

13 which Dr. Heckman's testimony is going to, we believe, we

14 particularly important, because he basically, we believe, will

15 be talking about the same principles that drove our cross

16 examination before Dr. Wyant, drove our cross examination of

17 Dr. Peterson in the Babcock & Wilcox case.  This has been out

18 there before.  It's not our model.  It's our rebuttal of their

19 model, and it supports a Daubert attack.  So, we would be fully

20 supportive.  We don't know why Dr. Heckman should be treated

21 differently from anybody else.  He's being offered by a

22 constituency in this case that's been approved, that's been an

23 active participant, and that's been a proponent, and their only

24 witness.  Why do we all of a sudden get restrictions with

25 respect to them, particularly when this is the first time that

1  we've had significant expenditures by that committee in

2  connection with an expert to begin with.  So, the debtor is

3  very supportive of this, and we will assure that there's not a

4  problem with cumulation, and we believe it's proper rebuttal.

5        MR. MULLADY:  Your Honor, not to belabor the point,

6  but we disagree that this is rebuttal.  It's not rebuttal

7  because these experts on -- for the ACC and the FCR have

8  provided an estimation to the Court that provides an estimate

9  as to the number, value, etcetera, of the claims in the case.

10 What I heard Mr. Bernick just say is that a predicate of Mr.

11 Florence's work is that the scientific model, the so-called

12 behavioral model that he's labeled our approach as taking, and

13 I don't accept that for purposes of his argument.  He's called

14 it the behavioral model, I assume that Dr. Heckman has already

15 informed Grace, and the debtor, and Mr. Florence, that that's

16 not an acceptable approach, and that one of the reasons that

17 Mr. Florence adopted a different approach is because he was

18 advised by this other expert and informed by him that that was

19 not a proper scientific basis upon which to proceed.  Now,

20 that's just my speculation, but the point is we had a milestone

21 built into this schedule for non-estimation expert reports.

22 There's no difference between what Dr. Heckman is doing and any

23 other non-estimation expert is doing and has done.  The only

24 difference is that the on-estimation experts, except for Dr.

25 Heckman, have produced reports.  We do not have Dr. Heckman's

1  report.  He could have written it.  If it's about the

2  scientific method, that's a non-estimation opinion by an expert

3  on something that could be relied upon by the estimation

4  experts.  In fact, you heard Mr. Bernick just say that Dr.

5  Heckman -- they endorse his work, they support it.  Of course

6  they support it.  They knew he was going to be giving that

7  opinion, and that's why he's giving the opinion, so Dr. -- Mr.

8  Florence can say I have the imprimatur of the Nobel laureate

9  economist who says this is the proper way to proceed.  Your

10  Honor, this is just out of sequence, out of order.  It's

11  prejudicial.  There's no reason why we shouldn't have this

12  report now, and we object to it.  At a minimum we would

13  respectfully ask the Court that if it is permitted, that we be

14  given the opportunity to submit a rebuttal to Dr. Heckman's

15  report, because that would only be fair.

16        MR. BERNICK:  Your Honor, just to correct the

17  speculation, Dr. Florence, to my knowledge, has not been

18  informed of anything to do with Dr. Heckman's work.  It is not

19  a predicate for his analysis.  I don't believe that Dr.

20  Florence will testify that his methodology is endorsed by a

21  Nobel laureate.  Dr. Florence did his work, and his work has

22  been on-going for a long time, as Your Honor is very familiar.

23  His work pursues a different set of assumptions.  We are

24  bringing in, equity is bringing in, the proponents are bringing

25  in Dr. Heckman solely in rebuttal to the Peterson model.  I

1  don't even believe that Dr. Heckman will endorse what Dr.

2  Florence is doing.  It is purely a response to a different kind

3  of model, and whether it follows the rules, they've been well

4  established rules in economics and science for a long, long

5  time.  So, it is speculation, and if they believe that -- well,

6  I think that what they should actually wait and do is to see

7  what Dr. Heckman has to say, and if it's not proper rebuttal,

8  they can make an application to the Court at that time.  But I

9  think this has always been in the cards.  We have always had

10  the opportunity for rebuttal, and we have decided, proponents

11  have decided to call witnesses in rebuttal.  That's not

12  shocking.  That happens all of the time.

13          MR. BENTLEY:  Very briefly, Your Honor.  It's simply

14  not true, factually, that Dr. Heckman or we have been waiting

15  in the weeds, and that he's been whispering in the ear of the

16  debtor's counsel or the debtor's experts.  For one thing, that

17  simply wasn't -- that's not something he could have done with

18  his budget to date, Your Honor.  He is getting started now.  He

19  is going to really get started, once Your Honor signs the

20  order, if Your Honor does, and so, the speculation of the other

21  side that we've been waiting in the weeds and trying to sandbag

22  them is simply not true.  And I would second what Mr. Bernick

23  said, that to the extent they do believe that it's not proper

24  rebuttal, the proper time to raise that will be down the road

25  once the report comes in.  They can raise it.  I think Your

1 Honor will conclude at that point that it is very proper

2 rebuttal.

3        THE COURT:  Doesn't this -- didn't the order that

4 appoint them, though, say that to the extent that the $10,000

5 per month wasn't used up, that it was cumulative and could be

6 used?

7        MR. BENTLEY:  Absolutely, Your Honor.

8        THE COURT:  Okay.  And the $250,000 that's aggregated

9 wasn't enough to get started on a report?

10        MR. BENTLEY:  Let me explain.  I would say a little

11 bit more than half, about two thirds of it, my understanding is

12 about two thirds of it had been used up by monitoring activity

13 that Lexicon has been engaged in throughout the case.  They've

14 been keeping abreast of the various developments in the case,

15 advising us, and they've actually -- they've been able to keep

16 that down to a quite modest amount.  Over the past few weeks, I

17 think they've probably gotten very close to the total that's

18 accumulated -- over the case just in the course of reading the

19 reports that have been filed by the other side.  They have not

20 actually -- we have not asked them yet to start cranking on a

21 report because we thought it was necessary to come to Your

22 Honor first.

23        MR. BERNICK:  Your Honor, I'm just watching a little

24 bit of -- maybe it's dangerous to watch Your Honor's --

25        THE COURT:  Yes, it is.  If it's going to cost an

1 expert $250,000 to read the expert reports that have been filed

2 so far, it just occurred to me that Bankruptcy Judges are way

3 underpaid.

4 　　　　　MR. BERNICK:  Well, that could -- I would agree with

5 that under any set of circumstances, and I would further

6 observe that firms like Lexicon and others are not cheap.  But

7 the fact of the matter is that what we're really dealing with,

8 as Your Honor probably has divined to a certain extent, is that

9 we have -- Dr. Heckman is a, obviously a very mainstream

10 economist, and the -- the area of estimation as it's evolved

11 over the years, and indeed, reference was made to it just now,

12 that, yeah, for a variety of purposes different kinds of

13 estimates have been, quote, accepted by the Courts.  Asbestos

14 estimation is an enterprise that has kind of sprinkled through

15 the years and has actually become a fairly deep history.  You

16 ask, well, to what extent has that -- are those estimation

17 models, those behavior models ever been subjected to a rigorous

18 analysis by an economist for scientific validity?  That's what

19 Dr. Heckman is going to do.  But it certainly is a deep

20 history, and for somebody like Dr. Heckman, who is not one of

21 the people who has been a participant in this process, to come

22 in and begin to understand how asbestos claiming behavior

23 works, is not an easy thing to do.  So, it's not a cheap

24 enterprise to take somebody who is not steeped and versed in

25 this and come in and say, okay, we now want to bring the usual

1 scientific rules to bear, how economists usually deal with

2 behavior, and ask are they being followed here, that is not

3 simply reading a bunch of expert reports and saying, well,

4 here's what I think.  There's a lot of stuff that is underneath

5 the surface.  I mean, Dr. Peterson has probably testified in,

6 you know, a score of cases, maybe even more.  So, there's a lot

7 of learning to be done.  A lot of the lawyers have become

8 students in this process over the years.  But they have a

9 newcomer, which Dr. Heckman is, a newcomer to this process.

10 You know, it takes some time, and it's going to take some

11 money.  I'm frankly a little bit surprised, given how expensive

12 I know some of these firms are, that it hasn't risen a little

13 bit more quickly.

14            THE COURT:  All right.  I think the equity committee

15 at this point in time is entitled to have an expert.  I don't

16 know whether the testimony will be cumulative, or helpful, or

17 meet the _Daubert_ standards at this point.  Obviously it's too

18 premature for me to tell.  To the extent that there is some

19 analysis that can be employed to help determine whether a

20 particular form of expert analysis meets a scientific standard,

21 that would be helpful to the Court.  Whether a report can be

22 created that does just that, I don't know.  I guess we'll find

23 out.  So, it's certainly without prejudice to anybody's raising

24 _Daubert_ motions, to objecting to fee applications, and any of

25 the other objections that will go along with objecting to

1  experts in the context of this case, but I think the equity

2  committee is entitled to have an expert at this stage of this

3  case, and I will approve this application.  I don't understand,

4  from reading -- or, from hearing the argument, reading the

5  papers, or hearing the argument, that this will be cumulative.

6  If it turns out that it is, I'll hear the objections.  I don't

7  understand from the paperwork that it will be, and that's the

8  basis on which I am approving this application.

9       MR. BENTLEY:  Your Honor, as far as the order is

10  concerned, we have agreed to make several minor essentially

11  technical changes to satisfy the U.S. Trustee's Office.  We

12  will submit a revised order with a certificate of counsel.

13       THE COURT:  All right.  That's fine.

14       MR. BENTLEY:  Thank you.

15       THE COURT:  He may, however, begin work.  Now, the

16  issue that you need to address, Mr. Mullady, about the report,

17  because this report is coming very late, so when is it going to

18  be submitted?

19       MR. BENTLEY:  It's going to be submitted at the same

20  deadline as all of the other rebuttal reports which currently

21  is August 8th.

22       THE COURT:  Is there, I don't recall, in the case

23  management --

24       MR. MULLADY:  There's no date after that for expert

25  reports.  So, their plan is to drop this report on us on the

1 very last day when expert reports can be filed, and we just

2 have to live with it.  Now, what I'm suggesting is that that's

3 entirely unfair to the FCR and the ACC, and that at a minimum

4 we should be given the opportunity to file a rebuttal to that

5 report, which, again, we do not believe to be a rebuttal

6 report.  It's a non-estimation report.

7        UNIDENTIFIED ATTORNEY:  Your Honor, before -- we have

8 gone down this process relying on this process and how it's

9 been set up, including the idea of rebuttal.  Everybody gets

10 the opportunity for rebuttal.  I expect to see rebuttal expert

11 reports from the ACC and the FCR that we will not have the

12 opportunity to submit sur rebuttal reports to.  I mean, it's

13 just a fact that at the end of the day you've got the reports,

14 and you've got rebuttal reports.  And the only thing that's

15 different about Dr. Heckman is that he happens to be a Nobel

16 laureate.  So, that is the way that it goes.

17        THE COURT:  Well, I think the difference may be that

18 until now he probably has not been identified as an expert by

19 anybody, or -- he has been?

20        UNIDENTIFIED ATTORNEY:  His firm, Lexicon, was

21 identified all along and I believe that Dr. Heckman, himself,

22 was identified.  So, all that's happened is that we've come

23 here today for the application for permission to raise the --

24 raise the ceiling.  But this is not like all of a sudden they

25 woke up to Dr. Heckman.

1          THE COURT:  I think you need an opportunity to see

2  this report, Mr. Mullady.  You know, you may or may not decide

3  that you need some sur rebuttal, and if you do I think some

4  appropriate motion may be necessary if there is some sur

5  rebuttal that's going to be necessary.  Obviously, at trial

6  you're going to have the right to sur rebuttal.  If there's no

7  process built into this order that doesn't stop you from sur

8  rebuttal witnesses.

9          To the extent that you need a deposition, is there

10  depositions built in?

11          UNIDENTIFIED ATTORNEY:  Yes.  The -- all these people

12  will be deposed.  We're going to have -- I mean, obviously Your

13  Honor is going to decide whatever is appropriate, they're going

14  to make whatever motion is appropriate.  But this is a two-way

15  street, and if we now start to get, well, we're going to get

16  sur rebuttal to Dr. Heckman, you know, we'll then want to have

17  sur rebuttal with respect to everything that's said, on the

18  reports that are delivered on April 8th, on August 8th by

19  everybody, potentially.  And that's not a threat.  I'm just

20  saying that now -- we've set this whole thing up to be a two-

21  tiered deal.  Actually, it's three-tiered.  We had the non-

22  estimation experts.  We had their rebuttals.  We then have the

23  estimation experts and their rebuttals.  And he is a rebuttal

24  to the estimation model, nothing else, the estimation model

25  that is the behavioral model.  So, we open the door to sur

1  rebuttals.  We can always do that, Your Honor.  We'd be happy

2  to address that at the appropriate time.  But there's nothing

3  different about this one from anything else that's said in the

4  context of the August 8th reports.  They will all be the last

5  report.  And that's the way it works.

6          THE COURT:  Okay.  I think the --

7          MR. MULLADY:  We will look at the report, Your Honor,

8  and we'll file whatever we think we need to file when we see

9  it.

10          THE COURT:  Yes.  I think that's the thing to do at

11  this point in time, because you may or may not decide you need

12  something.  And if he's available for deposition, that may

13  solve some of the issues that you have, too.  Okay.  I'll take

14  an order when you get it filed on a certification of counsel.

15          MR. BENTLEY:  Thank you, Your Honor.

16          MS. BAER:  Your Honor, on Agenda Items 1 through 4 I

17  have orders of continuance that I'll just hand up to you.

18          THE COURT:  All right.  And I'll take them.

19                      (Pause)

20          THE COURT:  Anything else?

21          MR. BERNICK:  Not from the debtor's point of view.

22  We are now going to adjourn for the evening, which I hope will

23  be a less labor-intensive evening now that we only have half an

24  hour tomorrow -- we've all we've got, 40 minutes, we should be

25  done fairly promptly tomorrow.

1          THE COURT:  Is every -- oh, no.  I take it the other

2 firms need to be one the phone for tomorrow.  Okay.  All right.

3 I'll see you tomorrow morning, if that's the case.

4          MR. BERNICK:  Just -- we also have given notice of

5 some of the exhibits that we intend to use tomorrow.  There's

6 one that may have slipped through, which is the privilege log

7 that we've now gotten from the LeBlanc and Waddell firm.  Just

8 the first couple three pages of it.

9          THE COURT:  Okay.  We're adjourned.  Thank you.

10                      *  *  *  *  *

### C E R T I F I C A T I O N

          We, KIMBERLY UPSHUR, MOLLY FATTORE, and TAMMY DeRISI,

court approved transcribers, certify that the foregoing is a

correct transcript from the official electronic sound recording

of the proceedings in the above-entitled matter.


/s/ Kimberly Upshur          Date:  June 28, 2007

KIMBERLY UPSHUR


/s/ Molly Fattore            Date:  June 28, 2007

MOLLY FATTORE


/s/ Tammy DeRisi             Date:  June 28, 2007

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.