IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| W.R. GRACE & CO., *et al.*, | ) Case No. 01-1139 (JKF) |
| Debtors. | ) Jointly Administered |

**CERTIFICATION OF BRADLEY M. RAPP IN SUPPORT OF APPLICATION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS FOR AN ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF CHARTER OAK FINANCIAL CONSULTANTS, LLC, AS FINANCIAL ADVISOR**

BRADLEY RAPP, pursuant to 28 *U.S.C.* § 1746, hereby states as follows:

1. I am a Member of Charter Oak Financial Consultants, LLC ("Charter Oak").

2. I make this Certification in support of the Application of the Official Committee of Asbestos Personal Injury Claimants (the "Committee") to retain Charter Oak as financial advisor to the Committee in the chapter 11 case of W.R. Grace & Co., *et al.*, and related proceedings (the "W.R. Grace Case").

3. James Sinclair, Robert Lindsay and the undersigned are the only Members of Charter Oak. Each of the three Members of Charter Oak was formerly employed by L Tersigni Consulting, P.C. ("LTC"). I resigned from LTC on June 7, 2007. Upon information and belief, Mr. Sinclair and Mr. Lindsay also resigned from LTC on or about June 7, 2007.

4. I am informed and believe that the sole owner of LTC during all relevant time periods was Loreto (Larry) Tersigni. I have never held any stock or other equity position in LTC.

DOC #288065

5.  In late April 2006 I was informed by an LTC colleague who later left the firm that, in preparing LTC's fee applications in various bankruptcies, Mr. Tersigni had arbitrarily increased time entries submitted to him by LTC professionals.

6.  Upon receiving this information, I accessed LTC's fee applications off the online PACER docket system and checked the filed fee applications against copies of the time records I had submitted.

7.  My review confirmed to me that, in fact, time entries for my work appearing in the fee applications were often higher than the corresponding entries in my own records. It appeared to me that where my time entries had been marked-up, the increases fell in the range of 5% to 15%.

8.  Upon confirming what appeared to be billing irregularities consisting of the overstatement of hours in LTC's filed fee applications, I immediately retained my own counsel. With the assistance of counsel, I promptly brought this matter to the attention of both the United States Attorney for the District of New Jersey and the United States Trustee for the District of New Jersey.

9.  I was informed that the Department of Justice opened an investigation into the matter. I was advised by the Assistant United States Attorney assigned to the matter not to disclose the billing irregularities to any other persons, including but not limited to the other Committee professionals, during the investigation.

10. Mr. Tersigni died on May 30, 2007. When informed that Mr. Tersigni's death was imminent, and believing that the United States Attorney's investigation was therefore coming to a close, I advised Mr. Sinclair of the billing irregularities described above. Upon information and belief, Mr. Lindsay was made aware of the same shortly after Mr. Tersigni's death.

11. On May 31, 2007, James Sinclair and I advised Elihu Inselbuch, Esq. of Caplin & Drysdale, lead counsel to the Committee, of the marked-up time entries. On the same day, Mr. Sinclair and I made the same disclosure to Anthony Tersigni, brother of Loreto Tersigni, who I understood had been performing certain administrative functions for LTC during the period immediately preceding Loreto Tersigni's death.

12. I have never been a corporate officer of LTC. Although I was nominally a "Senior Managing Director" of LTC, I had no corporate authority at LTC nor did I have access to LTC's financial information, financial statements or financial books and records. I did not engage in activities relating to the internal administration of LTC nor did I have any check-signing authority. I did not prepare any LTC fee applications. It is my understanding that Mr. Sinclair and Mr. Lindsay are submitting their own certifications attesting that their respective roles, activities, and legal capacity in LTC were likewise limited.

13. LTC compensated me at an hourly rate based upon my actual hours, not on the basis of any marked-up hours reported by Mr. Tersigni in the fee applications. The payments I received were consistent with actual time spent by me and those payments did not in any way put me on notice of any billing irregularities. I never received any payments, distributions, or bonuses from LTC that were tied to the profitability of the company. It is my understanding and belief that LTC paid its other professional employees in the same way it paid me, i.e., as hourly employees on the basis of actual hours worked.

14. I can state categorically that I was not aware and had no reason to be aware of any billing irregularities at LTC until I was so advised by my colleague as set forth in paragraph 5 above. It is my understanding that the certifications of Mr. Sinclair and Mr. Lindsay will attest

that they had no knowledge of or reason to suspect billing irregularities until advised of the issues near the time of Mr. Tersigni's death.

15.  I believe that LTC owes me $569.50 in hourly compensation and $199.38 in expense reimbursement. None of those unpaid amounts relates to work performed in connection with the W.R. Grace Case. I make no claims, directly or indirectly, against the Debtors or the estate, with respect to services performed or disbursements made during LTC's engagement by the Committee.

Pursuant to 28 *U.S.C.* §1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 3, 2007

*Bradley M. Rapp*
Bradley M. Rapp