# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FEE APPLICATION OF FORMAN PERRY WATKINS KRUTZ & TARDY LLP
## FOR THE TWENTY-FOURTH INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee Application of Forman Perry Watkins Krutz & Tardy LLP for the Twenty-Fourth Interim Period.

## BACKGROUND

1.      Forman Perry Watkins Krutz & Tardy LLP ("Forman Perry")was retained as counsel to the Debtors and Debtors-in-Possession.  In the Application, Forman Perry seeks approval of fees totaling $1,763,152.50 and costs totaling $253,394.42  for services in excess of the Ordinary Course Professional Cap for the period from April 1, 2006, through March 31, 2007[1].

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule

---

[1]Forman Perry was retained as an Ordinary Course Professional through a retention order entered October 31, 2005.  In this application, Forman Perry seeks compensation of services in excess of the OCP cap for the fee periods April 1, 2006 through March 31, 2007.  This is Forman Perry's first application.

2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2006, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals. We served on Forman Perry an initial report based on our review, and received a response from Forman Perry, portions of which response are quoted herein.

## DISCUSSION

3.        We note that on March 1, 2007, the Debtors filed an application to employ Forman Perry *nunc pro tunc* to April 1, 2006 (the "Retention Application"). In the Retention Application, the Debtors stated that Forman Perry was performing services as an ordinary course professional and that its fees had exceeded the caps the Court had in place for ordinary course professionals. Both the United States Trustee (Docket No. 15940) and the Official Committee of Asbestos Personal Injury Claimants (Docket No. 15944) objected to the Retention Application on various grounds. The Debtors subsequently withdrew the Retention Application and all parties reserved their rights related to any future application Forman Perry would file in this case. On June 25, 2007, an order was entered recognizing the objections but granting Forman Perry 80% of the requested interim fees and 100% of the requested interim expenses outlined in its application. The order further stated that the objectors were to reserve all of their objections pending the outcome of the fee examiner's examination and recommendations. In the event that the Objectors agree with the fee examiner's recommendations, the Objectors will then file a notice with the Court within 10 days of the filing

of the fee examiner's final report indicating their withdrawal of the Objections.  However, if the Objectors do not agree with the recommendations of the Fee Examiner with respect to the Forman Perry Fee Application, then within 10 days of the filing of the final report by the fee examiner, the Objectors will be required to file a further objection identifying what specific portions of the Forman Perry Application they continue to object to and the matters will be placed on the hearing agenda at the next scheduled Omnibus Hearing to be addressed by the Court.

4.   We note that in its objection to the Forman Perry application, the United States Trustee raised four major points of objection.

*Forman Perry's proposed *nunc pro tunc* status

*The lateness of Forman Perry's filing of its fee application

*Unreasonably high level of staffing by Forman Perry

*Generic and duplicative fee entries

We note that the first issue listed above, that of Forman Perry's proposed *nunc pro tunc* status, and the second issue listed above, the lateness of the filing of Forman Perry's fee application, have been adequately briefed and argued by the United States Trustee.  Thus, we did not perform any independent research regarding these issues and will not comment upon them.

5.   In our initial report, we noted pervasive duplication of identically worded time entries throughout the application for both attorneys and paralegal staff. Most of the time entries for both attorneys and paraprofessionals are vague and seemingly lumped into canned descriptions such as, "...Attend and participate in document production";..."Continue to evaluate and compare thousands of claimant and screening records..";..."Continue to strategize and determine logistics and necessary procedure for document production..."  These time entries are

listed in Exhibit "A." We asked Forman Perry to explain how so many firm employees could be engaged in exactly the same activities reporting exactly the same time entries. Forman Perry's response is provided as Response Exhibit 1. We appreciate the response. We believe we understand Forman Perry's role, and we are sensitive to both the scope and the proprietary nature of the firm's work. However, it appears to us that repeated duplication of the same time entries verbatim by numerous professionals calls into question the validity of the work performed and is, at the very least, an indication of inaccurate and sloppy timekeeping. The repetition of identical time entries makes it impossible to determine which tasks are performed on any given day, and how long each task took. *See In re 1095 Commonwealth Avenue Corp.,* 204 B.R. 284, 301 (Bankr.D.Mass. 1997). Most entries are totally lacking in citing specific work product, and fail to differentiate the work done by attorneys and that done by paraprofessionals. Simply, firm attorneys should not be doing exactly the same work as the paraprofessionals they employ. "(T)he fee application must provide sufficient detail for the court to determine what work was done, by whom it was done, how long it took to do, whether there was any duplication of effort, and what results were achieved." *In re Office Products of America, Inc.*, 136 B.R. 964, 976 (Bankr.W.D.Tex. 1992). Forman Perry's application fails in this respect, and, thus, we must recommend a reduction because of the vagueness and repetition of the time entries. The case law gives little guidance as to the appropriate percentage reduction which should be applied to such repetitive time entries. In *In re 1095 Commonwealth Avenue Corp.,* 204 B.R. at 302, the applicant billed 74.80 hours of time and $21,692.50 in fees repeatedly recording the same lengthy time entry verbatim. But, in that case, the applicant voluntarily agreed to deduct the repetitive time entries from its application, thereby obviating a fee reduction imposed by the court. In *In re*

*ACT Mfg., Inc.,* 281 B.R. 468, 487 (Bankr.D.Mass. 2002), the court noted that lender's counsel billed 28 time entries and $61,000.00 in fees using the same time entry and that such billing practices did not conform to bankruptcy rules.   Nevertheless, the court elected not to reduce the firm's fees because it had been unclear to lender's counsel that it would be required to submit fee applications to the court.   The court *did* impose a fee reduction in *In re Finlasen,* 250 B.R. 446, 448 (Bankr.S.D.Fla. 2000), amounting to 40% of the fees sought by the Applicant.   However, this case is somewhat distinguishable from that of Forman Perry in that the court determined the applicant was copying time entries billed in other cases and repeating them verbatim in the *Finlasen* case, such that the fee entries were contrived to support the amount of fees requested. This fact may have played a part in the severity of the 40% penalty imposed in *Finlasen.*

"In the Third Circuit, courts have held 'that only time entries separately listed and explained in detail are compensable.' " *In re Younger,* 360 B.R. 89, 96-97 (Bankr.W.D.Pa. 2006), citing *In re American Metallurgical Prods. Co., Inc.,* 228 B.R. 146, 162 (Bankr.W.D.Pa.1998), citing *In re Meade Land & Dev. Co., Inc.,* 527 F.2d 280, 283 (3d Cir.1975), *superseded by statute on other grounds;  see In re Busy Beaver Building Centers, Inc.,* 19 F.3d at 849 n. 20. Thus, in instances in which time entries are so vague or inadequately detailed as to preclude meaningful review, it appears that the proper remedy would be complete disallowance.   However, it can be argued that just one of Forman Perry's time entries, if evaluated on an individual basis, provides much of the information required by the Local Rules and is, thus, not totally deficient in a technical sense.   Rather, it is the fact that the majority of its time entries are repeated verbatim throughout the Application by several timekeepers of varying levels of skill and experience which calls into question the meaningfulness and accuracy of the

time entries.  Thus, cases which stand for complete disallowance of vague or inadequately

detailed time entries do not appear to be directly on point with the present case.  Moreover,

Forman Perry argues forcefully regarding the overall necessity of the services it performed, the

magnitude of the task which it faced, and the appropriateness of the number of staff it assigned to

the matter (See Response Exhibit 2, *infra),* and, thus, complete disallowance of all of Forman

Perry's repetitive time entries appears to us to be an unduly severe remedy.  Instead, we

recommend a reduction of 25% of the fees billed in such time entries.  The repetitive time entries

listed in Exhibit "A" include both fees billed under and over Forman Perry's OCP limit.  Thus,

before applying the 25% reduction, we would reduce our total of the repetitive time entries

proportionately to account for those time entries which are under the OCP limit.[2]  We have

calculated that portion of the repetitive or "generic" time entries above the OCP limit at

$1,495,559.42[3] in fees, 25% of which would be $373,889.85.  Thus, we recommend a reduction

of $373,889.85 in fees.

6.      In keeping with the above issue, we noted that the application lists 20 attorneys

and 99 paraprofessionals billing time to this bankruptcy action.  While we understand from the

application that much of the time billed involves document production and analysis, this still

---

[2]Forman Perry supplied us with fee detail reflecting total time entries of $2,013,152.50.
However, this fee detail included fees billed both over and under its OCP limit.  The fees billed
in Forman Perry's Application, totaling $1,763,152.50, constitute 0.87581666068 of Forman
Perry's total fees.  Thus, we have multiplied the total of the repetitive time entries listed on
Exhibit "A" by this same fraction and arrived at total repetitive time entries exceeding the OCP
limit of $1,495,559.42.

[3]Excluded from our fee calculation are any repetitive time entries billed for preparation for and/or
attendance at the deposition regarding a third-party screening doctor, referenced in Paragraph 7,
*infra.*  We have recommended a separate reduction for those fees on other grounds.

seems to be an extraordinary number of people to be involved.  Forman Perry paraprofessionals listed 17,387.50 hours and billed $1,652,357.50 in this application.  We asked Forman Perry to provide a detailed explanation for the processes involved in this production and analysis, demonstrating both the need for this level of staffing and the ultimate benefit to the Estate resulting from such a level.  The firm's response is provided as Response Exhibit 2.  We appreciate the response and believe the recommended reduction in the prior paragraph covers this issue as well.

7.      We noted that during the Application Period, 23 Forman Perry professionals prepared for and/or attended a deposition regarding a third-party screening doctor. The time spent on this matter totals 528.1 hours, with fees of $130,039.50. (See Exhibit B.)  Most of the entries regarding the preparation are vague.  We asked Forman Perry to explain why preparation for this deposition required the work of so many firm professionals and the specific role of each in that preparation.  The firm's response is provided as Response Exhibit 3.  We appreciate the response, but we remain unconvinced that it required this many people and this much time to secure a single deposition.  We further note that the Debtor was represented at the deposition by three attorneys from Kirkland & Ellis and another from Socha Perczak, along with the two Forman Perry attorneys.  Both K&E and Socha Perczak also billed hours for preparation regarding this deposition.  We thus recommend a reduction of one-half of the Forman Perry fees, totaling $65,019.75.

8.      We noted that on November 19, 2006, D. Toigo traveled to and from Biloxi, Mississippi.  The total time spent was 10.50 hours for a total fee of $997.50.  The entry is provided below.

| 11/19/06 | DT | 10.50 | Delivery of exhibits to third party screening doctor deposition in Biloxi, Mississippi and return to Jackson, Mississippi. |

Pursuant to the Local Bankruptcy Court Rules for the District of Delaware, any time spent traveling when no work is done is to be billed at 50%.   We asked Forman Perry to explain why the billing for this time should not be reduced by 50%.  Forman Perry responded as follows:

> This delivery of exhibits was travel-only and no additional work was done. Therefore, this charge should be reduced by 50%.

We appreciate the response and thus recommend a reduction of $498.75 in fees.

9.    We noted three charges totaling $5,105.36 related to the deposition of a third party expert.  The entries are provided below.

| 11/28/2006 | $1,352.00 | Deposition of third party expert |
| 11/29/2006 | $368.30 | Deposition of third party expert |
| 12/5/2006 | $3,385.06 | Deposition of third party expert on 11/20/06 |

We asked Forman Perry to provide specific supporting detail regarding the cited expenses.

Forman Perry's response is provided as Response Exhibit 4.  We appreciate the response and offer no objection to these expenses.

10.    We noted a number of airfares that may be excessive.  The entries are provided below.

| 11/16/2006 | $1,641.40 | Fred Krutz, Airfare-Attorney, November 8-9, 2006, Washington, D.C. |
| 10/26/2006 | $1,404.20 | Daniel Mulholland, Airfare-Attorney, October 16-18, 2006, Charleston, West Virginia |
| 12/28/2006 | $1,299.70 | Daniel Mulholland, Airfare-Attorney, December 17-18, 2006, Cleveland, Ohio |
| 2/14/2007 | $1,510.60 | Walter G. Watkins, Jr., Airfare-Attorney, February 5-6, 2007, Washington, D.C. |

| 2/14/2007 | $1,592.80 | Marcy Croft, Other Travel-Airfare, February 5-6, 2007, Washington, D.C. |
| 2/14/2007 | $1,153.00 | Mary Margaret Ratliff, Other Travel-Airfare, February 2-8, 2007, Washington D.C., Denver, Colorado |
| 3/15/2007 | $1,498.30 | Joshua Metcalf, Airfare-Attorney, March 8-9, 2007, Denver Colorado |

Paragraph II.E.1. of the Guidelines states, ". . .[f]actors relevant to a determination that the expense is proper include the following: 1.  Whether the expense is reasonable and economical.  For example, first class and other luxurious travel mode or accommodations will normally be objectionable."  We asked Forman Perry to provide documentation that each cited airfare was booked at coach or economy class.  Forman Perry's response is provided as Response Exhibit 5.  We appreciate the response and thus recommend a reduction of $705.49 for these expenses.

## CONCLUSION

11.    Thus, pending the Court's ruling on the United States Trustee's procedural objections, we recommend approval of fees totaling $1,323,744.15 ($1,763,152.50 minus $439,408.35 ) and costs totaling $252,688.93 ($253,394.42 minus $705.49) for Forman Perry's services in excess of the Ordinary Course Professional Cap for the period from April 1, 2006, through March 31, 2007.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
       Warren H. Smith
       Texas State Bar No. 18757050

Republic Center
325 N. St. Paul, Suite 1270
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

       **FEE AUDITOR**


**CERTIFICATE OF SERVICE**

       I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 22nd day of August, 2007.

_____
       Warren H. Smith

**SERVICE LIST**
<u>Notice Parties</u>

**The Applicant**
Marcy B. Croft
Forman Perry Watkins Krutz & Tardy LLP
200 South Lamar St., Suite 100
Jackson, Mississippi 39201

**The Debtors**
David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue
New York, NY 10152-3500

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**Official Committee of Equity Holders**
Gary M. Becker
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Teresa K.D. Currier, Esq.
Buchanan Ingersoll
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

Exhibit B

| 10/04/06 | DM | 2.00 | Review documents received from subpoenaed third party screening doctor in preparation for deposition of same in Biloxi, Mississippi on November 20, 2006. |
|---|---|---|---|
| 10/05/06 | DM | 2.50 | Continue preparation for upcoming deposition of subpoenaed third party screening doctor in Biloxi, Mississippi scheduled for November 2006 |
| 10/10/06 | DM | 4.20 | Draft and revise outline for third party screening doctor deposition in Biloxi, Mississippi scheduled for November, 2006 |
| 10/10/06 | FK | 3.00 | Telephone conference with co-counsel regarding preparation for third party screening doctor deposition and review and revise same. |
| 10/11/06 | DM | 5.00 | Draft and revise outline for examination of third party screening doctor deponent for upcoming deposition of same in Biloxi, Mississippi. |
| 10/12/06 | DM | 3.00 | Continue to work on outline for November deposition of subpoenaed third party screening doctor. |
| 10/16/06 | DM | 1.50 | Continue to draft and revise outline for deposition of third party screening doctor in November 2006 |
| 11/01/06 | DM | 4.10 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/03/06 | DM | 6.90 | Prepare for upcoming deposition of third party screening doctor scheduled for November 2006 and participate in telephone conference with co-counsel regarding same. |
| 11/03/06 | FK | 1.50 | Prepare for and participate in conference call with co-counsel regarding upcoming deposition of third party screening doctor. |
| 11/06/06 | DM | 6.80 | Prepare for deposition of third party screening doctor on November 20, 2006. |

| | | | |
|---|---|---|---|
| 11/06/06 | FK | 6.00 | Continue preparation for third party deposition of screening doctor and multiple electronic correspondence regarding same. |
| 11/07/06 | DM | 8.00 | Continue to prepare for deposition of third party screening doctor on November 20, 2006. |
| 11/07/06 | FK | 9.00 | Prepare for meeting at co-counsel tomorrow concerning third experts and upcoming depositions of subpoenaed third party screening doctors and screening companies. |
| 11/08/06 | DM | 7.50 | Continue to prepare for deposition of third-party screening doctor scheduled for November 20, 2006. |
| 11/08/06 | FK | 8.00 | Prepare for and attend meeting in Washington D.C. with co-counsel to discuss experts and deposition preparation for depositions of third party screening companies and doctors |
| 11/09/06 | DM | 8.00 | Prepare and review documents for third party screening doctor deposition on November 20, 2006. |
| 11/10/06 | DM | 8.00 | Plan and prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/10/06 | FK | 8.00 | Plan and prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | DM | 8.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | FK | 8.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | DM | 8.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | FK | 8.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06 | DM | 8.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06 | FK | 9.00 | Continue to prepare for deposition of subpoenaed third |

|            |    |       |                                                                                                      |
|------------|----|-------|------------------------------------------------------------------------------------------------------|
|            |    |       | party screening doctor scheduled for November 20, 2006.                                              |
| 11/16/06   | DM | 8.00  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06   | FK | 12.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06   | DM | 10.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06   | FK | 12.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/18/06   | DM | 6.80  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/18/06   | FK | 9.00  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/19/06   | DM | 10.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/19/06   | FK | 11.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/20/06   | DM | 12.20 | Attend and participate in deposition of subpoenaed third party screening doctor in Biloxi, Mississippi. |
| 11/20/06   | FK | 14.00 | Attend and participate in deposition of subpoenaed third party screening doctor in Biloxi, Mississippi. |
| 11/20/06   | SG | 10.00 | Continue in final preparations for deposition of subpoenaed third party screening doctor in Biloxi, Mississippi. |

| 11/01/06 | BS | 4.00 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/01/06 | BH | 3.00 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/02/06 | BS | 4.50 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/02/06 | BH | 0.70 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/03/06 | BS | 4.50 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/03/06 | DM | 2.00 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/06/06 | BH | 5.30 | Continue to prepare for deposition of subpoenaed third-party screening doctor on November 20, 2006. |
| 11/08/06 | BH | 0.50 | Telephone conference with co-counsel regarding preparation for deposition of third-party screening doctor scheduled for November 20, 2006. |
| 11/08/06 | BH | 4.70 | Prepare for deposition of third party screening doctor scheduled for November 20, 2006. |
| 11/09/06 | DM | 4.00 | Continue to prepare for November 20, 2006 deposition of third party screening doctor. |
| 11/10/06 | BH | 1.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/10/06 | HC | 3.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/10/06 | SG | 3.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | BH | 1.80 | Continue to prepare for deposition of subpoenaed third |

|  |  |  | party screening doctor scheduled for November 20, 2006. |
|---|---|---|---|
| 11/13/06 | CS | 0.70 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | HC | 6.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | MH | 8.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/13/06 | TB | 2.90 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | AB | 3.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | BD | 3.10 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | BH | 3.30 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | HC | 3.60 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | KMc | 2.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | MH | 4.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | SK | 5.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | SMc | 4.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | SP | 7.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/14/06 | TB | 7.90 | Continue to prepare for deposition of subpoenaed third |

|           |     |       |                                                                                                         |
|-----------|-----|-------|---------------------------------------------------------------------------------------------------------|
|           |     |       | party screening doctor scheduled for November 20, 2006.                                                 |
| 11/15/06  | AB  | 4.00  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | BD  | 4.00  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | BH  | 4.40  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | CJ  | 4.40  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | DT  | 11.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | DA  | 4.00  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | KW  | 1.30  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | KMc | 4.70  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | MH  | 5.50  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | PH  | 7.50  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | RT  | 4.60  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | SK  | 2.50  | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/15/06  | SB  | 10.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |

| 11/15/06 | TB | 8.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
|---|---|---|---|
| 11/16/06 | BD | 5.10 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | BH | 0.60 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | CJ | 2.20 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | CB | 10.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | PW | 7.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | PH | 5.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | SG | 1.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/16/06 | TB | 4.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | BD | 7.20 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | BH | 3.20 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | CJ | 2.70 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | PH | 10.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | SG | 10.00 | Continue to prepare for deposition of subpoenaed third |

|          |     |      |                                                                                                              |
|----------|-----|------|--------------------------------------------------------------------------------------------------------------|
|          |     |      | party screening doctor scheduled for November 20, 2006.                                                      |
| 11/17/06 | TB  | 2.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/17/06 | WGW | 1.20 | Multiple conferences with co-counsel regarding the preparation for deposition of third party screening doctor scheduled for November 20, 2006. |
| 11/18/06 | PH  | 5.50 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |
| 11/19/06 | SB  | 1.00 | Continue to prepare for deposition of subpoenaed third party screening doctor scheduled for November 20, 2006. |

Response Exhibit 1

Forman Perry Watkins Krutz & Tardy LLP ("Forman Perry") was retained by the Debtors to fill a very specialized role in the preparation of the Debtors' estimation case. Put simply, Forman Perry was hired to: (1) collect documents and materials from entities such as third party screening companies and screening doctors responsible for the screening and diagnosis of tens of thousands of Debtors' asbestos personal injury claimants; (2) put those materials into a usable electronic format; (3) analyze the screening company and screening doctors patterns of practice with respect to screening and diagnosis of Debtors' claimants; and, (4) work with Debtors' counsel and experts to both prepare for and take the depositions of these entities and assess the legitimacy of Debtors' asbestos personal injury claimants in light of our findings.

The Debtors selected Forman Perry to advise them in all matters relating to the Debtors' acquisition and analysis of discovery from third parties such as screening companies and screening doctors because of Forman Perry's longstanding work and its extensive experience and expertise in obtaining and analyzing third party discovery relating to the creation, screening, diagnosis, and handling of asbestos and silica claims. To date, Forman Perry has issued thirty-four (34) subpoenas and has collected, normalized, and analyzed over 1.5 million documents for Debtors. Debtors have used this material to assess the patterns of practice and methodology employed in the diagnosis of Debtors' asbestos personal injury claimants and to depose over eighteen (18) witnesses related to same.

Though Forman Perry can provide some detailed insight into the processes and analyses employed by its lawyers and paraprofessionals in performing this work, how much we can share publically is limited given the proprietary nature of the work. The methods that allow Forman Perry to uncover the fraudulent and/or suspect practices and methodologies employed in the screening and diagnosis of asbestos and silica plaintiffs, including tens of thousands of Debtors' asbestos personal injury plaintiffs, will become less effective if they are revealed in a public forum. In other words, the entities responsible for this suspect diagnostic activity will only become more skilled at disguising *fraudulent* diagnoses as *valid* diagnoses if they are able to learn the methods by which Forman Perry detects their patterns of practice and potential abuses. Thus, the summary below is a sincere attempt to balance the needs of the Fee Auditor to evaluate the work completed against the realities and nature of Forman Perry's work. If additional information is required, Forman Perry respectfully requests that the information be presented to the Fee Auditor and the Court in some sort of *in camera* review.

### Summary of Work Completed for Debtors

Forman Perry is working with Debtors to obtain and analyze certain discovery from persons and companies involved in the asbestos litigation screening industry which has fueled the filing of tens of thousands of asbestos personal injury cases against Debtors. A proper estimation of Debtors' future liabilities can only be determined by appropriately evaluating the legitimacy of its present claims. Thus, the information gathered by Forman Perry on behalf of Debtors serves as a vehicle for the estimation of the number, amount, and value of the present and future asbestos personal injury claims against Debtors.

Asbestos, like silica and other mass tort litigation, has long been plagued with rumors of

corruption, with no aspect of the litigation more in question than mass medical screenings. Troubled by an exponential increase in new claim filings, defendants, insurance companies, and bankruptcy trusts are now placing a greater focus on investigating and revealing the potential fraud and abuse ostensibly inherent in mass tort litigation.

Medical screening in this context is the process by which plaintiffs' law firms conduct chest X-ray screenings of individuals allegedly exposed to asbestos or silica for the purpose of determining whether the individuals' X-rays reveal any possible evidence of such exposure. Unlike in legitimate medical screenings, the purpose of which is to detect a potential disease early so that treatment might be more effective, asbestos and silica screenings are simply massive recruitment programs established for the sole purpose of finding potential litigants in an effort to tap into the perceived multi-billion dollar asset pools controlled by defendants and insurance companies involved in the litigation.

Mass asbestos and silica screenings all function in the same basic manner. A plaintiffs' lawyer typically initiates an asbestos or silica screening by hiring a screening company and placing an advertisement in a local newspaper setting forth certain demographic information as the threshold requirement for the screening. Members of the public are directed to call the number listed in the advertisement and arrange an appointment to have chest X-rays taken. These potential litigants then travel to a hotel, motel, union hall, parking lot (or some other equally unsuitable site) and have chest X-rays taken in an assembly line process using equipment brought in on a mobile van or truck. Upon completion of the X-rays, films are turned over for review and analysis by a radiologist and/or B-reader ("screening doctor") selected by the plaintiffs' lawyer and the screening company. Unlike in legitimate medical screenings where the recording of patient information such as current medications, age, race, medical history and exposure history is crucial to prevent errors in the interpretation of X-rays, the asbestos and silica screening companies typically hire persons who lack any qualifications or training to gather this vital information. Moreover, the screening doctor's compensation for his medical expertise and interpretation is often increased if there is a positive finding of asbestosis or silicosis. Such incestuous relationships between some lawyers, screening companies and screening doctors have always been a topic of speculation and concern in asbestos and silica litigation. The increasingly obvious result of their close-knit association is that individuals with minimal or non-existent exposure to asbestos/silica, who do not exhibit any signs of a related pneumoconiosis, will be "diagnosed positive" by the chosen screening doctor simply because it will result in a higher fee for the plaintiff, his lawyer, the screening company, and the screening doctor.

Collusion in the medical screening process has enabled some plaintiffs' lawyers to generate tens of thousands of asbestos and silica litigants. It has become apparent that the screening enterprises, screening doctors and certain plaintiffs' lawyers have defrauded defendants and courts throughout the United States by, among other things, manipulating plaintiffs' medical records, administering tests through methods that violate medical standards, coaching false exposure testimony, colluding with one another to obtain positive diagnoses, and even generating reports diagnosing both silicosis and asbestosis from a single X-ray film. This potential for widespread corruption was noted as early as 1997 when Supreme Court Justice Stephen Breyer wrote in an opinion that "up to half of asbestos claims are now being filed by people who have little or no physical impairment." *Amchem Prods., Inc. v. Winsor*, 521 U.S. 591, 631 (1997). In January 2002,

Judge Charles Weiner of the federal asbestos MDL No. 875 executed Administrative Order No. 8, which effectively dismissed the claims of all non-malignancy "screened" plaintiffs who do not show some level of physical impairment.  Judge Weiner found that "the filing of mass screening cases is tantamount to a race to the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs."

More recently, U.S. District Judge Janice Graham Jack issued a 249 page opinion in June 2005 criticizing the procedures and methodology employed by two of the nation's largest screening companies and six of its most prolific screening doctors.  *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005).  Judge Jack, at the time, was presiding in ninety-nine (99) lawsuits, mostly from Mississippi and Alabama, which were consolidated in Corpus Christi, Texas into the federal silica MDL No. 1553.  On motion from Forman Perry in the Fall of 2004, Judge Jack ordered that all 10,000 silica plaintiffs produce the diagnosing reports on which they based their lawsuit.  In addition, Forman Perry subpoenaed over 5,000 records from the Manville Trust.  To deal with the massive number of medical documents at issue, Forman Perry developed an electronic method by which it could easily cross-reference, access and analyze the materials produced on a case-by-case basis, while still preserving its ability to evaluate the global methodology behind the silica screening process.  Forman Perry gathered into useable format extensive empirical evidence indicating a pattern of false diagnoses in silica cases.  In addition to a number of other fraudulent practices, the research revealed that the screening enterprises had: (1) previously provided over half of the plaintiffs in the Silica MDL with an asbestosis diagnoses; (2) produced diagnoses for plaintiffs at an alarming rate, e.g., one every three minutes from some B-readers; and, (3) had "shopped" specific and identifiable X-rays to numerous B-readers until receiving positive readings.

Forman Perry has used this information to file motions for partial summary judgment and *Daubert* motions challenging the credibility of the screening/diagnosing doctors and, thus, the credibility of the claim of each screened plaintiff.  Moreover, Forman Perry conducted the MDL 1553 depositions of each of the major silica screening/diagnosing doctors in the Fall of 2004 and the Spring of 2005 with excellent results.  Most of the testifying experts revoked their diagnosis of silicosis in these cases; several now consistently assert their Fifth Amendment privilege against self-incrimination when questioned about any aspect of their screening practice.  Based on these depositions, Judge Jack, described the screening processes as "fraudulent," "distressing" and "shocking," and invited the defendants to file motions for sanctions.

Given the extensive nature of the fraud evidenced in the Silica MDL, it was only logical that defendants and courts next examine those asbestos plaintiffs diagnosed as a result of the screening process.  According to the Rand study, out of the 700,000 asbestos plaintiffs' claims filed in the past thirty (30) years, over 500,000 were filed after the inception of the screening enterprises in the early 1990s.  It is currently estimated that ninety percent (90%) of all filed asbestos claims are screened, non-malignancy cases.

Debtors have retained Forman Perry to obtain and analyze third party discovery from entities such as screening companies and screening doctors in order to determine whether or not the suspect screening and diagnostic activity noted in MDL 1553 and in various asbestos litigation also exists in the Debtors' present asbestos personal injury claimants.  Forman Perry is executing this mandate by identifying, subpoenaing, and analyzing the documents and materials related to potentially suspect

screened claims made against Debtors already on file.

The actual work performed by Forman Perry attorneys and paraprofessionals is repetitive in nature in that the scope of our representation of Debtors is limited.  Forman Perry was retained to perform three basic tasks: (1) collect and organize information from third parties involved in the screening and diagnosis of Debtors' asbestos personal injury plaintiffs; (2) place those materials into a useable format; and, (3) analyze those materials for fraudulent, suspect activities and practices. Forman Perry professionals have attended document productions where they were gathering, organizing, scanning, dis-assembling, and re-assembling over 1.5 million documents on behalf of Debtors in over six states.  The work performed at these document productions, along with the logistics and strategy for conducting and completing same so that the overall goal of collection and analysis is best served, is to some extent proprietary in nature.  However, on a basic level, each document production requires coordination with the subpoenaed party, its attorney, local copying/scanning services, and multiple paraprofessionals to determine the best location for the production, the resources necessary to complete the production, the current level of organization and condition of the files and materials produced, the resources necessary to dis-assemble, organize, and re-assemble all materials, requisite quality control procedures, and a myriad of other production-specific tasks that are required when organizing and planning for the production of hundreds of thousands of documents and materials.  This work is typically described as "Continue to strategize and determine logistics and necessary procedure for document production..." by subpoenaed third party [screening company/screening doctor/person] in [City, State]" on Forman Perry invoices. Attendance and participation in the document production itself is often described in just that way - "Attend and participate in the production of documents and materials by [insert entity] in [City, State."  This time description is used when paraprofessionals and attorneys are physically present at the off-site location at which documents and materials are being produced and those professionals are gathering, organizing, dis-assembling, copying, scanning, re-assembling, and returning documents and materials to their proper location.  Depending upon the volume and condition of the documents and materials produced, this process can take a matter of days for only a few paraprofessionals or a matter of weeks for a number of paraprofessionals.  It is vital to the ultimate review and analysis of these materials, however, that they are collected, organized, and scanned in a very precise and very specific manner for, in our experience, the very nature of the condition in which they are discovered and produced may reveal important clues as to their ultimate legitimacy.

Response Exhibit 2

As described above, Forman Perry was retained to identify, subpoena, collect, organize, and scan over 1.5 million documents and materials related to the screening and diagnosis of Debtors' asbestos personal injury claimants. Once these materials are placed into a useable format by Forman Perry, we are charged with analyzing same for indicators of fraud and suspect screening/diagnostic activity as they relate to Debtors' asbestos personal injury plaintiffs. This requires, at a minimum, a paraprofessional to physically inspect and analyze, at least once, each and every document, of the 1.5 million documents, produced to Debtors by third parties. Thus, the reasons for the large number of paraprofessionals working on this project are: (1) the volume of materials needed to be analyzed within the discovery timelines set by the Court; and, (2) the electronic nature and method by which Forman Perry accomplishes this task  - (each are described below).

First and foremost, the timing of when documents are produced under subpoena varies widely depending on whether the production occurs immediately after the service of the subpoena or whether counsel must pursue lengthy negotiations to obtain the documents and materials at issue. Therefore, the collection of documents, in conjunction with the deadlines set by the Court for pre-estimation discovery, often required that Forman Perry collect, code, and analyze large volumes of documents in short periods of time. For example, the Court previously set a trial date of June 13, 2007, as well as dates for depositions of experts, April 2, 2007, and pre-trial motions, May 4, 2007. Thus, Forman Perry was faced with a short time period during which it had to collect and analyze as many relevant documents and materials it possibly could in order to provide Debtors and, most importantly its experts, with enough information to properly determine the legitimacy of the Debtors present asbestos-personal injury claimants and, thus, an accurate estimation of its future liabilities. Although these deadlines have been extended, during the time periods in which they were in force, Forman Perry was under extreme pressure to obtain and analyze as much information as possible so that Debtors might have the most accurate picture possible of its present and future liabilities.

In short, time has always been of the essence with respect to Forman Perry's work for the Debtors. If the Debtors lacked the ability to determine which of its present asbestos-personal injury claimants possessed legitimate versus suspect or fraudulent claims, it would be absolutely impossible for an accurate, fair estimation of Debtors' future liabilities to be calculated. Without Forman Perry's work determining the existence of fraudulent and suspect screening practices in the diagnosis of Debtors' claimants, the analysis of the present claimants and, thus, the estimation of future liabilities simply could not occur.

With respect to the number of paraprofessionals who billed time to Debtors during the twelve month period covered by the Fee Application at issue, it is important to note that Forman  Perry  has a department consisting of over eighty paraprofessionals who have been trained in the art of reading and analyzing each type of screening/diagnostic report and document for indicia of fraudulent or suspect screening activity. (Typically, each document has between 10 and 25 potential indicators of fraudulent activity that must be reviewed and considered.). These paraprofessionals are located in one area of the firm dedicated solely to the review and analysis of screening documents and materials. Documents collected via subpoenas issued by the Debtors and/or from other sources are called up on the computer screens of the paraprofessionals at random from what is considered

a 'virtual assembly line' of materials.  (This method also helps insure better quality control as repetition from reviewing and analyzing similar documents may lead to a higher level of initial errors that must be caught and reviewed by our quality control department.)  Until recently, there was no mechanism in place to control the flow and distribution of these documents and materials to specific paraprofessionals by source.  Therefore, any given paraprofessional may have one of Debtors' documents appear on his/her screen for analysis at any given time.

In other words, an individual analyst may, by luck of the draw, only review 5 to 10 of Debtors' documents in a day (as opposed to documents and materials relating to another claim or client) while another analyst may spend the majority of a particular day reviewing thousands of Debtors' documents.  For that reason, it is impossible to predict how many individual paraprofessional document analysts will appear on any given invoice of the Debtors.  The division of document images and analytical work among them is done solely by electronic means, i.e. random selection and distribution.  Thus, although there are a significant number of paraprofessional timekeepers on the Forman Perry Fee Application, the vast majority actually billed very few hours to Debtors during the relevant time periods.  For example, certain paraprofessionals billed a total of only 2.6 hours, 8.5 hours, 7.2 hours, .6 hour, 4.7 hours, 5.8 hours, 1.0 hour, 8.1 hours, and 9.4 hours, respectively, during the entire 12 month period.  This is because the "virtual assembly line" of documents and materials simply called up very few of the Debtors' documents and materials on their particular screens for analysis and consideration.  Other paraprofessionals, by luck of the "electronic" draw, spent a larger portion of their time on Debtors' documents.[4]  Even those paraprofessionals, however, did not average more than two hours per day during the twelve month period on Debtors' work. Thus, the nature of the electronic/random selection and method by which all screening documents and materials are reviewed inherently leads to a high number of individual timekeepers on any invoice; however, the total hours worked would be the same whether it was 15 paraprofessionals or 50 as the volume of work (the number of documents to review) is a constant.

Even assuming, however, that each of the eighty  paraprofessionals  trained  in this type of analysis  worked  only  on  the  documents and materials produced  by  the Debtors during this time period (which they did not), each paraprofessional would have had to individually analyze over 18,750  documents  each in order to complete only  the  initial step in our review of the discovery produced  to  the  Debtors.  Obviously, not all of our screening-analyst  paraprofessionals  worked on  the  review  and  analysis  of  the  documents produced to Debtors  all  day every day during this time period (as described above), so the  actual  ratio  of documents to paraprofessionals is much more that 18,750 to one.  Given the deadline under which  this third party screening discovery had to take place  and  the  amount  of  material  produced by each entity,  Forman  Perry had no choice but to allocate an appropriate  number  of  paraprofessionals and other resources to the completion of Debtors discovery in a timely  manner.  The  collection,  review, and initial analysis of over 1.5

---

[4]  This program aspect has been altered so that random selection does not occur and paraprofessionals' work will now be parceled out based on the source/client at issue.  For example, for the May 1 - May 30, 2007 Fee Application period, there are only 6 Forman Perry attorneys, 5 paralegals, and 19 document analysts who worked on Debtors' documents.

million documents in such a short time period required the resources of a majority of our paraprofessionals trained in that area.   When one considers the time spent in light of the volume of documents reviewed, Forman Perry paraprofessionals analyzed an average of 80+ documents per hour (anywhere between 160 and 240 pages per hour) at an average cost in hours billed of anywhere between $0.35 and $0.50 per page.

The number of attorneys included on invoices to Debtors for the 12 month period at issue is addressed in response to the Fee Auditor's question below.

Response Exhibit 3

The third-party screening doctor at issue diagnosed thousands of Debtors' asbestos personal injury claimants and has fought vigorously to keep Debtors and others from obtaining his screening and diagnostic records.  Throughout this doctor's prolific career, he has created over 40,000 positive diagnoses for plaintiffs with pneumoconiosis – a number equal to over eight positive diagnoses per eight hour day, seven days per week, 365 days a year.  This screening doctor was able to achieve this high volume in large part due to his close business relationships with Respiratory Testing Services, Inc. and N&M, Inc.  (The owners of these two entities now plead the Fifth Amendment against self incrimination in lieu of testifying about their screening practices and were both excoriated for their fraudulent screening practices in the Silica Multi-District Litigation Court No. 1553.).  In light of his prior testimony and refusal to provide substantive documentation to Debtors even in the face of the Court's subpoena, the analysis and work-up of this particular screening doctor required additional effort on the part of Forman Perry.

The time spent analyzing the activities and practices of this doctor yielded information vital to his potential discreditation.  For example, in prior deposition testimony this third party doctor has disclaimed a physician-patient relationship with any of the plaintiffs for whom he issued diagnoses for lawsuits.  Further, when creating these diagnoses, he crossed at least 23 states' lines to diagnose thousands of potential claimants with no medical license and in direct violation of state laws.  Forman Perry also determined that this third party doctor created at least hundreds of diagnostic reports that fail to include: (1) exposure or work histories prepared by the third party doctor; (2) frequency, proximity, and regularity information; (3) medical histories; or (4) personal medical examinations by the doctor.  In hundreds of those reports, the doctor did not review the x-rays, but instead relied upon x-ray reports by other B-readers.

To ascertain the suspect practices and flawed methodology employed by this screening doctor in anticipation of his deposition, the following tasks were developed, performed, and reviewed by Forman Perry attorneys and paraprofessionals:

1.  Analyze prior trial and deposition testimony in state and federal litigation

2.  Analyze prior trial and deposition testimony in state and federal litigation of screening companies and litigation physicians who have created diagnoses in conjunction with third party doctor to be deposed, who have created diagnoses relied upon by the doctor, and/or who have relied upon diagnoses created by the doctor.

3.  Analyze diagnostic patterns of the doctor in other litigation to identify potential patterns of fraudulent and/or inadmissable diagnostic methodology including the following categories of research and analysis:

    A.  Research all data sources to determine the third party doctor's positive and negative rates for asbestosis diagnoses.

    B.  Research all data sources to determine the third party doctor's

positive and negative diagnostic rates for diseases other than asbestosis.

C.  Determine all other doctors who relied upon third party doctor's diagnoses to assess the implication of other physicians' methodology in the creation of diagnoses that were submitted to Grace.

D.  Determine all other doctors who the third party doctor relied upon himself to assess the implication of other physicians' methodology in the creation of diagnoses that were submitted to Grace.

E.  Analyze data submitted to asbestos bankruptcy trusts, including Debtors, to more accurately determine the total volume of diagnoses created by the third party doctor throughout the doctor's medical-legal career.

F.  Analyze data submitted to asbestos bankruptcy trusts, including Debtors, to identify rates of diagnoses as compared to the standards required by the trust to determine whether the doctor changed patters of diagnosing when changes in submission standards were about to change.

G.  Analyze all correspondence related to the third party doctor, including correspondence with other litigation physicians, screening enterprises, and attorneys involved in mass tort litigation, to identify fraudulent or inadmissable bases for the issuance of prescriptions for x-rays, pulmonary function tests, and the taking of hemoglobin.

H.  Analyze all correspondence related to the third party doctor and attorneys that the doctor worked with to determine whether the doctor created diagnoses based on what would be paid for my attorneys.

I.  Analyze ILOs and diagnostic reports to identify patterns in diagnoses that show when/how plaintiffs were upgraded to higher diagnoses with no basis for doing so, to show that some days the doctor diagnosed one disease while on others the doctor only diagnosed another disease, and to analyze other patterns that suggest fraudulent (at worst) unreliable (at best) methodology and practices.

4.  Read medical literature published by the doctor and analyze the doctor's training to establish lack of credentials and experience required to make accurate diagnoses.

5.  Analyze financial records to identify firms, doctors, and screeners the doctor worked with to identify all diagnoses tainted by the growing number of persons and entities who now plead the Fifth Amendment with respect to the asbestos diagnoses they created.

6.  Analyze financial records as another source to determine volume and rates of

diagnoses created by the doctor.

7.      Analyze financial records to show on which days and for which claims the doctor was paid more for positive than for negative diagnoses.

Some doctors are, of course, reluctant to readily produce information and materials that might assist in the types of analysis and review described above- such is the case with the doctor at issue in November 2006.  Thus, even more time and attention was necessary to develop the answers to these research queries/questions than is typically required as Forman Perry had to work without the benefit of a document production made directly by this screening doctor

Overall, this type of in-depth and detailed analysis must be performed on each and every screening company and screening doctor at issue.  Because of the complex nature of this type of research, Forman Perry has teams, or groups of professionals and paraprofessionals, that concentrate on analyzing specific screening companies and doctors.   For example, the attorneys and paraprofessionals most familiar with the intricate nature and work performed by the screening doctor referenced above would have performed work for the Debtors during the time period surrounding that doctor's deposition and only as it relates to preparing for that screening doctor's deposition.  Once the deposition and follow up work were complete, that team of professionals would then have no reason to bill additional time to Debtors, and did not do so.

In other words, there are teams of attorneys and paraprofessionals at the firm who have spent months, and in some cases years, analyzing and researching specific screening doctors and companies.  When one or more of these companies or doctors are at issue in Debtors' bankruptcy then that team of professionals "steps in" to provide Debtors' counsel assistance in the work-up and deposition of that entity.  The team of professionals and paraprofessionals then "steps back out"of the firm's work for the Debtors after their particular doctor-specific project is complete.  This practice, although it may have increased the actual number of timekeepers on Debtors' invoices, in reality reduced the overall hours billed to Debtors as it allowed Debtors to have the benefit of the expertise of those professionals most familiar with the screening doctors at issue during the time period in which Debtors needed that knowledge the most.

Response Exhibit 4

11/28/2006    $1,352.00    Deposition of third party expert
This charge is for the expenses of the court reporter for the transcript, exhibit reproduction, ASCII, and video of the deposition of a third party doctor whose deposition began on October 18, 2006.

11/29/2006    $368.30    Deposition of third party expert
This charge is for the expenses of the court reporter for the transcript, exhibit reproduction, and ASCII of the deposition of the owner and director of a third party screening company taken on October 27, 2006.

12/5/2006    $3,385.06    Deposition of third party expert on 11/20/06
This charge is for the expenses of the court reporter for the transcript, exhibit reproduction, and ASCII of the deposition of a third party doctor whose deposition began on November 20, 2006.

Response Exhibit 5

Flights from Jackson, Mississippi to cities throughout the United States are generally more expensive than flights taken from larger cities by virtue of the laws of supply and demand. Connecting flights must be typically be made through Georgia, Texas, Tennessee, or Ohio in order to get to any major city. It is extremely rare for there to be a direct flight available to most major cities from Jackson. After examination of the records, however, it appears that several of the flights listed above were, in fact, booked at a first class rate and this differential should not have been billed to Debtors. First class tickets are typically purchased when the difference in rates between refundable first class and refundable economy class is small. Additional detail regarding the flights above, and the total dollar amount to be reduced from the Fee Application based on these expenses, $705.49, is listed below:

|  |  |  |
|---|---|---|
| 11/16/2006 | $1,641.40 | Fred Krutz, Airfare-Attorney, November 8-9, 2006, Washington, D.C. |
|  |  | A portion of Fred Krutz's flight was booked as a refundable "economy" faire and a portion was booked as a refundable "first class" fare. The travel agency was able to provide records regarding the "first class" portion of this flight. |
|  |  | 11/9/2007 Flight: First Class - $806.50; Coach was $606.50 |
|  |  | Due to the accounting records of the travel agency, these prices are computed without the taxes and fees that were applied upon purchase. The difference between the first class and coach fares is $200.00. This expense should be reduced by $200.00. |
| 10/26/2006 | $1,404.20 | Daniel Mulholland, Airfare-Attorney, October 16-18, 2006, Charleston, West Virginia |
|  | *Response:* | Daniel Mullholland's flight was booked as a refundable "economy" flight with Delta airlines. |
| 12/28/2006 | $1,299.70 | Daniel Mulholland, Airfare-Attorney, December 17-18, 2006, Cleveland, Ohio |
|  | *Response*: | Daniel Mulholland's flight was booked as a refundable "economy" flight with Delta and Northwest airlines. |
| 2/14/2007 | $1,510.60 | Walter G. Watkins, Jr., Airfare-Attorney, February 5-6, 2007, Washington, D.C. |

|  |  | *Response:* | Walter G. Watkins, Jr.'s flight was booked as a refundable discounted "first class" flight with Delta airlines. |

      *Response:*      Walter G. Watkins, Jr.'s flight was booked as a refundable discounted "first class" flight with Delta airlines.

2/5/2007 Flight: First Class - $701.50; Coach was $651.51
2/6/2007 Flight: First Class - $786.50; Coach was $681.50

Due to the accounting records of the travel agency, these prices are computed without the taxes and fees that were applied upon purchase. The difference between the first class and coach fares is $150.49. This expense should be reduced by $150.49.

2/14/2007    $1,592.80    Marcy Croft, Other Travel-Airfare, February 5-6, 2007, Washington, D.C.

      *Response:*      Marcy Croft's flight was booked as a refundable discounted "first class" flight with Delta airlines.

2/5/2007 Flight: First Class - $731.50; Coach was $681.50
2/6/2007 Flight: First Class - $786.50; Coach was $681.50

Due to the accounting records of the travel agency, these prices are computed without the taxes and fees that were applied upon purchase. The difference between the first class and coach fares is $155.00. This expense should be reduced by $155.00.

2/14/2007    $1,153.00    Mary Margaret Ratliff, Other Travel-Airfare, February 2-8, 2007, Washington D.C., Denver, Colorado

      *Response:*      A portion of Mary Margaret Ratliff's flight was booked as a refundable "economy" flight and a portion was booked as a refundable "first class" flight

Comparative rates were unavailable from the travel agency used to book these flights. Therefore, since we are unable to confirm the exact price differential for this flight had it been booked entirely as an "economy" flight, Forman Perry respectfully requests that the price of this flight be reduced by $200.00 which is the highest difference in price of all flights included in this question.

| | | |
|---|---|---|
| 3/15/2007 | $1,498.30 | Joshua Metcalf, Airfare-Attorney, March 8-9, 2007, Denver Colorado |
| | *Response:* | Joshua Metcalf's flight was booked as a refundable "economy" flight with Delta and Northwest airlines. |