UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .    Case No. 01-01139(JKF)
                            .    Chapter 11
                            .    Jointly Administered
W.R. GRACE & CO., at al.,.
                            .    USX Tower - 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
                            .
          Debtors.          .    August 29, 2007
. . . . . . . . . . . . . ..     1:11 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:              Kirkland & Ellis, LLP
                              By:  DAVID M. BERNICK, ESQ.
                                   JANET S. BAER, ESQ.
                                   AMANDA C. BASTA, ESQ.
                              200 East Randolph Drive
                              Chicago, IL 60601


For the Debtors:              Reed Smith, LLP
                              By:  JAMES J. RESTIVO, JR., ESQ.
                                   TRACI S. REA, ESQ.
                              435 Sixth Avenue
                              Pittsburgh, PA 15219


For the Debtors:              Pachulski, Stang, Ziehl, Young,
                                 Jones & Weintraub, P.C.
                              By:  JAMES E. O'NEILL, ESQ.
                              919 Market Street, 16th Floor
                              P.O. Box 8705
                              Wilmington, DE 19899


Audio Operator:               Janet Heller

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (cont.):

For the Equity Committee:          By:  PHILIP BENTLEY, ESQ.

For the Asbestos Claimants         Caplin & Drysdale
Committee:                         By:  NATHAN D. FINCH, ESQ.
                                   1 Thomas Circle, N.W.
                                   Washington, DC 20005

For the Future Claimants           Orrick, Herrington & Sutcliffe
Representative:                       LLP
                                   By:  RAYMOND G. MULLADY JR., ESQ.
                                   Washington Harbour
                                   3050 K. Street, N.W.
                                   Washington, DC 20007

For Official Committee             Bilzin, Sumberg, Baena, Price &
of Asbestos Property                  Axelrod, LLP
Damage Claimants:                  By:  MATTHEW I. KRAMER, ESQ.
                                   Wachovia Financial Center
                                   200 South Biscayne Blvd.,
                                     Suite 2500
                                   Miami, FL 33131

For the Asbestos                   Campbell & Levine, LLC
Personal Injury                    By:  MARK T. HURFORD, ESQ.
Committee:                         800 N. King Street, Suite 300
                                   Wilmington, DE 19801

For Celotex Trust:                 Young, Conaway, Stargett & Taylor
                                   By:  MARIBETH L. MINELLA, ESQ.
                                   The Brandywine Building
                                   1000 West Street, 17th Floor
                                   P.O. Box 391
                                   Wilmington, DE 19899-0391

For Celotex Trust:                 Keating, Muething & Klekamp
                                   By:  DANIEL J. DONNELLON, ESQ.
                                        PATRICK R. DEWINE, ESQ.
                                   One East Fourth St., Suite 1400
                                   Cincinnati, 45402

For Official Committee             Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:            By:  KENNETH PASQUALE, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038-4982

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (cont.):

| | |
|---|---|
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Ferry, Joseph & Pearce, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market Street, Suite 904<br>P.O. Box 1351<br>Wilmington, DE 19899 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Dow Jones News<br>Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY, ESQ. |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ. |
| For Committee of<br>Asbestos Personal<br>Injury: | Caplin & Drysdale<br>By:  PETER LOCKWOOD, ESQ. |
| For State of Montana: | Christensen, Moore, Cockrell<br>By:  DALE R. COCKRELL, ESQ. |
| For State of California: | Hahn & Hessen<br>By:  CHRISTINA J. KANG, ESQ. |
| For Ford, Marrin,<br>Esposito, Witmeyer &<br>Gleser, LLP: | Ford, Marrin, Esposito, Witmeyer<br> & Gleser, LLP<br>By:  SHAYNE SPENCER, ESQ. |
| For DII Industries<br>Asbestos Trust: | Hughes & Luce, LLP<br>By:  BETH W. BIVANS, ESQ. |
| For DII Industries, LLC: | Cross & Simon<br>By:  TARA DIROCCO, ESQ. |
| For Ad Hoc Committee<br>of Equity Security<br>Holders: | Weil, Gotshal & Manges, LLP<br>By:  JARRAD WRIGHT, ESQ. |
| For Official Committee<br>of Asbestos: | Anderson, Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ. |
| For Ad Hoc Committee of<br>Equity Security<br>Holders: | Weil, Gotshal & Manges, LLP<br>By:  DAVID HICKERSON, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONE APPEARANCES (cont.):

For Fireman's Fund            Stevens & Lee, P.C.
Insurance Company:           By:  DAVID R. BEANE, ESQ.

For David T. Austern:        Orrick, Herrington & Sutcliffe
                             By:  DEBRA FELDER, ESQ.
                                  JOHN ANSBRO, ESQ.
                                  RICHARD H. WYRON, ESQ.

For David T. Austern:        Piper Jaffray & Co.
                             By:  JONATHAN BROWNSTEIN, ESQ.
                                  JASON SOLGANICK, ESQ.

For JP Morgan Chase          JP Morgan Chase Bank
Bank:                        By:  MITCHELL HUANG, ESQ.

For Ace Insurance            White & Williams, LLP
Company:                     By:  MARC CASARINO, ESQ.

For BNSF Railway             Pepper Hamilton, LLP
Company:                     By:  ANNE MERIE AARONSON, ESQ.

For Royal Indemnity Co:      Wilson Elser
                             By:  CATHERINE CHEN, ESQ.

For Travelers Casualty       Simpson, Thacher & Bartlett
Insurance:                   By:  SUNG CHOI, ESQ.

For Fireman's Fund           Stevens & Lee, P.C.
Insurance Company:           By:  JOHN D. DEMMY, ESQ.

For Creditor Shareholder     Tocqueville Asset Management
for W.R. Grace:              By:  PETER SHAWN, ESQ.

For Creditor MMWR Firms      Montgomery, McCracken, Walker
& Grace Certain Cancer       By:  NATALIE D. RAMSEY
Claimants:                        LEONARD A. BUSBY, ESQ.
                                  NOEL C. BURNHAM, ESQ.
                                  SIMON FRASER, ESQ.

For Creditor Iowa            Department of Revenue
Department of Revenue:       By:  JOHN WATERS, ESQ.

For Creditor Official        Duane Morris, LLP
Committee of Unsecured       By:  MICHAEL LASTOWSKI, ESQ.
Creditors:

For London Market            Mendes & Mount
Insurers:                    By:  ALEX MUELLER, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONE APPEARANCES (cont.):

For Debtor W.R. Grace:          W.R. Grace & Co.
                                By:  PAUL J. NORRIS, ESQ.
                                     MARK SHELNITZ, ESQ.

For Debtor W.R. Grace:          Kirkland & Ellis
                                By:  LORI SINANYAN, ESQ.
                                     BARBARA HARDING, ESQ.
                                     SAM BLATNICK, ESQ.
                                     DAVID MENDELSON, ESQ.
                                     THEODORE FREEDMAN, ESQ.

For Debtor W.R. Grace:          Drinker, Biddle & Reath
                                By:  DAVID PRIMACK, ESQ.

For Debtor W.R. Grace:          W.R. Grace & Co.
                                By:  DAVID SIEGEL, ESQ.

For Allstate Insurance          Cuyler Burk, LLP
Company:                        By:  ANDREW CRAIG, ESQ.

For Official Committee          Caplin & Drysdale
of Asbestos Personal            By:  WALTER SLOCOMBE, ESQ.
Injury Claimants:

For AIG:                        Zeichner, Ellman & Krause, LLP
                                By:  MICHAEL DAVIS, ESQ.
                                     ROBERT GUTTMANN, ESQ.

For Scotts Company:             Vorys, Sater, Seymour & Pease LLP
                                By:  TIFFANY COBB, ESQ.

For Latigo Partners:            Latigo Partners
                                By:  STEPHEN BLAUNER, ESQ.

For Everest Reinsurance         Marks, O'Neill, O'Brien &
Company:                          Courtney
                                By:  BRIAN L. KASPRZAK, ESQ.
                                     MICHAEL J. JOYCE, ESQ.

For Official Committee          Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:         By:  ARLENE KRIEGER, ESQ.
                                     LEWIS KRUGER, ESQ.

For Property Damage             Bilzin, Sumberg, Baena, Price
Committee:                      By:  JAY SAKALO, ESQ.


**J&J COURT TRANSCRIBERS, INC.**

TELPHONIC APPEARANCES (cont.):

For Dune Capital                 Dune Capital Management
Management:                      By:  GUY BARON, ESQ.

For David T. Austern:            Phillips, Goldman & Spence, P.A.
                                 By:  JOHN C. PHILLIPS, JR., ESQ.

For Various Claimant             Stutzman, Bromberg, Esserman
Firms:                           By:  SANDER L. ESSERMAN, ESQ.
                                      VAN J. HOOKER, ESQ.
                                      DAVID J. PARSONS, ESQ.

For CNA:                         Goodwin Procter, LLP
                                 By:  DANIEL GLOSBAND, ESQ.

For Official Committee           LECG
of Asbestos Property             By:  SEAN WALSH, ESQ.
Damage Claimants:

For State of Montana             Womble, Carlyle, Sandridge & Rice
Dept. of Environmental           By:  FRANCIS MONACO, ESQ.
Quality:

For Murray Capital               Murray Capital Management, Inc.
Management, Inc.:                By:  MARTI MURRAY, ESQ.

For The Prudential               Riker, Danzig, Scherer, Hyland
Insurance Company of             By:  CURTIZ PLAZA, ESQ.
America:

For Everest Reinsurance          Crowell & Moring, LLP
Company:                         By:  MARK PLEVIN, ESQ.

For Millennium Partners:         Millennium Partners
                                 By:  IGOR VOLSHTEYN, ESQ.

For Daniel Chandra:              Brencourt Advisors
                                 By:  DANIEL CHANDRA, ESQ.

For the US Trustee:              United States Trustee Department
                                 By:  DAVID KLAUDER, ESQ.

For the Official                 Dies & Hile, LLP
Committee of Asbestos            By:  MARTIN DIES, ESQ.
Property Damage
Claimants:

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (cont.):

For Lehman Brothers:                Lehman Brothers
                                    By:  ANDREW CHAN, ESQ.

For Barren & Budd:                  Hogan Firm
                                    By:  DANIEL HOGAN, ESQ.

For W.R. Grace:                     W.R. Grace & Co.
                                    By:  JAY HUGHES, ESQ.

For Official Committee              Scott Law Group
of Asbestos Property                By:  DARRELL SCOTT, ESQ.
Damage Claimants:

For Financial Advisor               The Blackstone Group
to the Debtor:                      By:  JOHN O'CONNELL, ESQ.

For Official Committee              Law Office of Thomas J. Brandi
of Asbestos Property                By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:

For Everest Reinsurance             Crowell & Moring, LLP
Company:                            By:  LESLIE A. EPLEY, ESQ.

For Official Committee              Bilzin, Sumberg, Baena, Price
of Asbestos Property                By:  MATTHEW KRAMER, ESQ.
Damage Claimants:                        SCOTT L. BAENA, ESQ.

For Cartus Corporation:             Morris, James, Hitchens &
                                       Williams
                                    By:  THOMAS HORAN, ESQ.

For W.R. Grace:                     Kirkland & Ellis
                                    By:  ELLEN AHERN, ESQ.

For Asbestos Property               Pryor Cashman, LLP
Damage Claimants:                   By:  RICHARD LEVY, ESQ.

For Co-Counsel to                   Cohn, Whitesell & Goldberg, LLP
Libby Claimants:                    By:  CHRISTOPHER M. CANDON, ESQ.

For Asbestos Property               Speights & Runyan
Damage Claimants:                   By:  DANIEL A. SPEIGHTS, ESQ.
                                    200 Jackson Avenue East
                                    Hampton, SC 29924

1          THE COURT:  This is the matter of W.R. Grace,

2  bankruptcy number 01-1139.  The participants I have listed by

3  phone -- well, okay -- Peg Brickley, Jacob Cohn, Peter

4  Lockwood, Dale Cockrell, Christina Kang, Theodore Tacconelli,

5  Shayne Spencer, Beth Bivans, Tara DiRocco, Jarrad Wright,

6  Robert Horkovich, David Hickerson, David Beane, Debra Felder,

7  John Ansbro, Richard Wyron, Jonathan Brownstein, Jason

8  Solganick, Mitchell Huang, Marc Casarino, Anne Marie Aaronson,

9  Catherine Chen, Sung Choi, John Demmy, Peter Shawn, Natalie

10  Ramsey, Leonard Busby, Noel Burnham, Simon Fraser, John Waters,

11  Michael Lastowski, Alex Mueller, Paul Norris, Mark Shelnitz,

12  Lori Sinanyan, Barbara Harding, Sam Blatnick, David Mendelson,

13  David Primack, Theodore Freedman, David Siegel, Andrew Craig,

14  Walter Slocombe, Michael Davis, Robert Guttmann, Tiffany Cobb,

15  Stephen Blauner, Brian Kasprzak, Arlene Krieger, Jay Sakalo,

16  Guy Baron, John Phillips, Sander Esserman, Daniel Glosband, Van

17  Hooker, Sean Walsh, Francis Monaco, David Parsons, Lewis

18  Kruger, Marti Murray, Curtis Plaza, Michael Joyce, Mark Plevin,

19  Igor Volshteyn, Daniel Chandra, David Klauder, Martin Dies,

20  Andrew Chan, Daniel Hogan, Jay Hughes, Darrell Scott, John

21  O'Connell, Terence Edwards, Leslie Epley, Matthew Kramer,

22  Thomas Horan, Ellen Ahern, Richard Levy, Christopher Candon,

23  and Scott Baena.

24          I'll take entries in court please.

25          MR. BERNICK:  David Bernick for Grace, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Janet Baer for Grace.

2          MS. BASTA:  Amanda Basta for Grace.

3          MR. RESTIVO:  Jim Restivo and Traci Rea for Grace.

4          MR. O'NEILL:  James O'Neill for Grace, Your Honor.

5          MR. BENTLEY:  Philip Bentley for the Equity

6 Committee.

7          MR. FINCH:  Nathan Finch for the Asbestos Claimants

8 Committee, Your Honor.

9          MR. MALADY:  Good afternoon, Your Honor.  Raymond

10 Malady for the FCR.

11          MR. KRAMER:  Good afternoon, Your Honor.  Matt Kramer

12 for the PD Committee.

13          MR. HURFORD:  Good afternoon, Your Honor, Mark

14 Hurford from Campbell Levine for the ACC.

15          MS. MINELLA:  Good afternoon, Your Honor.  Maribeth

16 Minella from Young, Conaway, Stargett & Taylor on behalf of the

17 Celotex Trust.  With me is I also have Dan Donnellon and Pat

18 DeWine from the law firm of Keating, Muething & Klekamp also

19 for the Celotex Trust.

20          THE COURT:  I'm sorry.  Would you say the names again

21 please?

22          MS. MINELLA:  Dan Donnellon and Pat Dewine.

23          THE COURT:  Okay.  Thank you.

24          MS. MINELLA:  Their pro hoc motions have been filed

25 and entered.

1           THE COURT:  Thank you.  Thank you.

2           MR. PASQUALE:  Your Honor, in Wilmington, Ken

3  Pasquale from Stroock for the Unsecured Creditors Committee.

4           MR. TACANELLI:  Good afternoon, Your Honor.  Theodore

5  Tacanelli for the Property Damage Committee in Wilmington.

6           THE COURT:  Anyone else?  Okay.  Ms. Baer?

7           MS. BAER:  Your Honor, I'll quickly hand up some

8  orders with respect to agenda items one, two, three, four, and

9  five.  These, Your Honor, are claims related matters.  All but

10  number three is being continued.  Agenda item number three

11  we're actually resolving that one.

12           A couple of claims are withdrawn -- or, I'm sorry --

13  a couple of objections are withdrawn, one is reduced and

14  allowed, and there's a stipulation with respect to one more.

15           THE COURT:  All right.  Thank you.  All right.  I

16  will sign those at the end of the hearing so that we can keep

17  proceeding now, Ms. Baer.

18           MS. BAER:  Thank you, Your Honor.  Agenda item number

19  six was the debtor's annual motion to approve the long term

20  incentive plan.  A certification of no objection was filed,

21  Your Honor, but we have not yet seen an order entered on that.

22  I do have it in court if that would be more convenient.

23           THE COURT:  It was entered?  It will enter?  Okay.  I

24  did instruct staff to enter that order.  It may not have hit

25  the docket yet.

1          MS. BAER:  So should I not hand up another one, Your

2    Honor?

3          THE COURT:  No.

4          MS. BAER:  Okay.

5          THE COURT:  Because I did instruct staff to get that

6    one entered.

7          MS. BAER:  Thank you, Your Honor.  Agenda item number

8    seven, Your Honor, is the ACC's motion to appoint a new

9    financial consultant, Charter Oak.  The debtor's do not have an

10   objection to that.

11         The debtor's did raise an issue with respect to

12   whether an investigation was going to be done of the former

13   financial consultant and I do note that the US Trustee has now

14   filed a motion which is set for the September hearing to

15   appoint an examiner to do that investigation.

16         THE COURT:  Mr. Finch?

17         MR. FINCH:  Nathan Finch for the Asbestos Claimants

18   Committee.  Thank you, Your Honor.  Our -- the basis for our

19   motion is set forth in the paper.

20         We agree with Grace and the US Trustee that there

21   should be an investigation into the billing practices of Larry

22   Tersigni Consulting (phonetic).

23         The US Trustee out of the Wilmington office and also

24   the US Trustee out of the New Jersey office have each file

25   motions for the appointment of an examiner which will be heard

1  by Your Honor in September and by the judge in New Jersey in

2  September as well.

3          The position of the Grace ACC and the ACC in the

4  other cases and the agency -- any case in which Caplin &

5  Drysdale is involved is at the very -- there should be an

6  examiner appointed to investigated this.

7          What we would suggest and to try to coordinate is

8  that there be one examiner as opposed to an examiner every

9  single case.

10         THE COURT:  Well I saw this motion and, frankly, I

11 mean I don't normally see motions a whole month in advance, but

12 I saw this one.  But I'm a little confused.  If the Department

13 of Justice was nearly finished with a criminal investigation,

14 what on earth do we need an examiner for?

15         MR. FINCH:  Well I will leave it to the -- to the US

16 Trustee to respond to that.  I -- my supposition is that while

17 the Department of Justice may have done an investigation, Mr.

18 Tersigni is now dead and the results of that may or may not

19 have been turned over the US Trustee's Office and it may or may

20 not, you know, have been the type of detail that the US

21 Trustee's Office would want.

22         THE COURT:  Well --

23         MR. FINCH:  My only --

24         THE COURT:  -- wasn't -- as I understood the

25 affidavits, the original complaint was made to the United

1   States Trustee's Office who then took it to the United States

2   Attorney.  They're all part of the Department of Justice.

3           MR. FINCH:  That's true, Your Honor, but I guess

4   you'll have to ask them at the appropriate time.  My goal here

5   is to get the Charter Oak firm retained so that they can begin

6   working for the Asbestos Claimants Committee.

7           Our position on the examiner or some investigation of

8   this by the US Trustee's Office is that we agree that that

9   should be done.

10           We would like two things.  One, if possible, that it

11   be done once by one examiner; and, number two, that some

12   safeguards be put in place so that whatever documents and

13   materials that are in the possession of the Tersigni Consulting

14   Firm that would be privileged or work product under sort of --

15           THE COURT:  Yes.

16           MR. FINCH:  -- privilege as to the relevant committee

17   be protected so that, you know, and that isn't getting turned

18   over to our adversaries in cases when we're involved in

19   litigations.

20           THE COURT:  Well I agree that that type of

21   protection's going to have to be employed regardless of who is

22   doing the investigation.  I just am concerned about why we

23   would be duplicating a -- state resources if that's what's

24   required if, in fact, there was a full scale investigation

25   going on before.

1          And if I understood this investigation -- the

2    affidavits correctly, this investigation's been going on since

3    sometime in 2006, April of 2006.  I mean that's a heck of a

4    long investigation on fee issues to be going on.  Nobody knew

5    about this for this whole time?

6          MR. FINCH:  Well no --

7          THE COURT:  We've been paying fees since April of

8    2006 --

9          MR. FINCH:  -- noone --

10          THE COURT:  -- and nobody came forward?

11          MR. FINCH:  Noone at Caplin & Drysdale or the

12    relevant official committees knew about this until the day

13    after Mr. Tersigni died.

14          THE COURT:  Well yes --

15          MR. FINCH:  None of the former --

16          THE COURT:  -- and one of the people you want to

17    appoint is the person who had the information and didn't come

18    forward and that causes me some concern.  He did go to the US

19    Trustee's Office, but he did not come forward to either the

20    debtor, the Committee or the Court and now you want to put him

21    in place again.

22          MR. FINCH:  My understanding is he was advised by the

23    -- by both his counsel and by the government prosecutors he was

24    talking to not to tell anyone about what they were doing.

25          THE COURT:  Well and he didn't and so now we've been

1  paying fees for a year that -- knowing with somebody get --

2  benefitting from those fees knowing that they were padded.

3       I mean as I understand the disciplinary rules, at

4  least from the Commonwealth of Pennsylvania, that could be

5  grounds for disbarment if he were a lawyer.

6       MR. KLAUDER:  Your Honor, this is David Klauder for

7  the United States Trustee's Office.  May I be heard?

8       THE COURT:  Yes, sir.

9       MR. KLAUDER:  The -- the investigation that we refer

10 to in our motion that you're discussing here from April of '06

11 was -- and ongoing -- was a criminal investigation.  And we'll

12 address all of this at the appropriate time at the September

13 hearing.

14      But the criminal investigation was completely

15 separate from any -- any civil investigation and civil remedies

16 that we're seeking through this particular motion.  And as is

17 policy through the Department of Justice, criminal and civil

18 are completely separated and there's no overlap between those.

19      So I just want to make it clear that it was a

20 criminal investigation by the -- by the FBI, the US Attorney's

21 Office, and -- and we're not hiding the ball by saying that he

22 was instructed or the people who came forward initially to

23 start that investigation were instructed not to -- not to

24 divulge any details of -- of that investigation and what was

25 going on.

1        Now as far as on the civil side as far as the fees,

2   as we indicate in our motion, there was some preliminary --

3   there was a preliminary investigation by our office in

4   conjunction with -- with the FBI and the US Attorney and that

5   was as -- as we -- as the criminal investigation wound down,

6   but that was just preliminary and it wasn't a full scale

7   analysis that we are -- we are talking about for our motion for

8   an examiner.

9        But, once again, we'll be prepared to address all

10  those issues because it implicates many cases both, you know,

11  in Delaware and outside of Delaware that -- that this firm was

12  involved in.

13       THE COURT:  Yes, I know.  You know another one, just

14  for your information, is Combustion Engineering.  I just had

15  that issue addressed this morning with the -- with the members

16  of the trust and counsel for the reorganized debtor.  So you

17  perhaps better add that one to your list and discuss that

18  matter with Mr. Rich.

19       MR. KLAUDER:  Your Honor, we're -- we are aware and

20  the cases that are confirmed present probably somewhat of a

21  different issue and we're -- we're on top of that and trying to

22  best see how to move forward with regard to that.

23       THE COURT:  That one presents a significantly

24  different issue since Mr. Tersigni was one of the trustees of

25  the trust in that case.

1          MR. KLAUDER:  Right.

2          THE COURT:  So I don't know.  I am somewhat

3 distressed by the concept that someone who was involved to the

4 extent that there was knowledge did not come forward before the

5 Court or even to his client, the represented, with the

6 information that there was some problem going forward and is

7 now expected to have the trust of that Committee and the Court

8 going forward as a representative of this estate.  I am very

9 troubled by that concept.

10          MR. FINCH:  Your Honor, we -- we were certainly

11 troubled by that, too.  But Mr. Wrap was, you know, met with

12 the US Trustee's Office and met with the US Attorney's Office

13 and has signed an affidavit under oath that he had no

14 involvement of this.  He was instructed by both his counsel and

15 by the -- it's my understanding -- by the prosecutors not to

16 divulge the information.

17          And so he was, I mean, if I were in his shoes I would

18 not want to, you know, ignore the directive of the US attorneys

19 that were investigating this.  And so, you know, Mr. Wrap is --

20 and Mr. Sinclair are two of the former employees of Tersigni

21 Consulting who have created this -- this new vehicle.

22          The fact is we don't want to burden the estate with

23 the additional downtime and startup caught time of bringing up

24 to speed new financial advisors.  I mean there's a six year

25 history not only of Grace's finances and various transactions,

 1  but a negotiating history, an evaluation history that, you

 2  know, estimating the asbestos liability, you know, the facts

 3  are fixed.

 4      There's a difference of opinion about what that is,

 5  but the financial evaluation of the company changes -- it

 6  doesn't change on a daily basis other than the stock price, but

 7  the intrinsic value changes relatively, you know, as things

 8  happen in the market, the EBIDTA multiple or DCF cash flow

 9  analysis, there's going to be changes and we need a financial

10  advisor.

11      These are the people that, you know, they have sworn

12  under oath to this Court, they have sworn under oath to us,

13  they have made representations to federal prosecutors, you

14  know, they -- if they're not telling the truth they're

15  violating 18 U.S.C. 1001.  They have, you know, sworn on a

16  stack of Bibles they had nothing to do with this.

17      And I understand your concern about Mr. Wrap, but he

18  was kind of stuck between obligations that he was imposed upon

19  by the government and -- and telling us.  And I am not here to

20  speak to what he did, but I do think that the Charter Oak firm

21  needs to be retained.  We need a financial advisor here.

22      THE COURT:  Well I don't disagree that you need a

23  financial advisor.

24      MR. BERNICK:  Yes, I just have a question, Your

25  Honor.  David Bernick for Grace.  And Ms. Baer has expressed

1 our -- the absence of an objection that the debtor has.  We

2 don't have any real basis to object.

3        But if, in fact, there was a fairly advanced

4 investigation by the criminal side of justice, and the

5 statement's been made by the US Trustee's Office that they were

6 not involved in it, my understanding from talking with Ms. Baer

7 is that the US Trustee does not have an objection to the

8 retention of the new financial advisor.

9        Maybe an appropriate question to ask, or maybe it's

10 not an appropriate question, but it just seems that -- a pretty

11 good indicator whether there really is an issue is whether the

12 US Trustee's Office now has the benefit of what was learned

13 from the criminal investigation and whether they can represent

14 to the Court that that investigation was sufficiently mature

15 and the results of it were sufficiently clear.

16        That they really do believe that the individuals who

17 are now being proposed to take Mr. Tersigni's place really are

18 not involved.  And that is that beyond the affidavit that

19 they've submitted, justice is convinced that there's not a

20 problem with their playing a role here.

21        THE COURT:  Yes, and that's probably a good

22 indication at this stage of the game that may solve a lot of

23 problems.  So, Mr. Klauder, perhaps that is a good question.

24 Is the US Trustee's Office in a position to answer it?

25        MR. KLAUDER:  We are, Your Honor.  We did not file an

20

1  objection to this application and we do not have an issue with

2  this firm and the particular people associated with this firm

3  in being retained.

4         We -- it was -- it was completely vetted internally

5  and we've -- our office, US Trustee Office, had met with --

6  with Mr. Wrap and the other individuals or with Charter Oak and

7  are comfortable with their retention.

8         It should be noted that Charter Oak was retained in

9  the New Jersey case of G.I. Holdings recently which is -- which

10 was the other case in which we filed the examiner motion.  And

11 -- and we did the same investigation with regard to that case

12 as well.

13        THE COURT:  Well yes, I understand but -- I

14 understand that you haven't taken -- you haven't filed an

15 objection on behalf of the US Trustee and that Charter Oaks has

16 been retained in another case, but that is not the question.

17        The question is did anything come up in the criminal

18 investigation to justify that belief on behalf of the US

19 Trustee?  Not what is your investigation, but what is the

20 criminal investigation substantiating?

21        MR. KLAUDER:  And I'm comfortable saying no.  And if

22 it had, we would have -- we would have noted that with the

23 Court.

24        THE COURT:  All right.  So you do have some access to

25 the results of the criminal investigation?

**J&J COURT TRANSCRIBERS, INC.**

1            MR. KLAUDER:  Yes, the criminal investigation is --

2    is over.  Mr. Tersigni's death has ended that.

3            THE COURT:  Well --

4            MR. FINCH:  Your Honor, just by way of background.

5    As soon as my firm found out abut this we immediately setup

6    meeting with the US Trustee's Office, the US Attorney's Office,

7    and we said if anybody has a problem with this course of

8    action, we won't do it.  We want to make darn sure that these

9    people had no implication in this, no involvement in this, and

10   a clean bill -- bill of health.

11           And it was not that we are, you know, trying to do

12   this because we like these people, we don't want to just waste

13   a ton of -- of money, estate money, through getting new people

14   up to speed.

15           And if there had been any suggestion from any court

16   or either the US Trustee or the US Attorney's Office or the

17   Court of New Jersey that no you can't do this, we wouldn't be

18   proposing them here.

19           And it's my understanding and it was my partner Mr.

20   Inselbuch and Mr. Swett who were at those meetings with Ms.

21   Stapleton who is the US Trustee for -- for the region, but it's

22   my understanding that, you know, this was -- this was vetted to

23   the satisfaction of the criminal side of the US Department of

24   Justice and the US Trustee's Office and that they have no

25   objection to this course of action.

1          THE COURT:  All right.  Well I agree that the

2     Committee needs financial advisors otherwise I would not have

3     scheduled this on an expedited basis.  I -- and I think that

4     the Committee acted very promptly upon learning the

5     information.  So it -- this is certainly no criticism in that

6     respect and I don't want the comments that I've made to be

7     taken that way.  It's not intended that way.

8          So I'm going to approve the motion.  If anything in

9     the future comes to light that indicates that any member of

10    this new firm is involved in any way, either in past or present

11    of future padding of any bills in any respect, then I am to be

12    -- I, personally, by way of some public document filed, am to

13    be immediately notified.

14         Noone, not the US Trustee, not the US Attorney, not a

15    prosecutor, noone is to prohibit that contact and that

16    information being transmitted to this Court forthwith and

17    immediately.  That is a Court order and I expect everyone to be

18    bound by it.

19         That is an absolute improper thing to have happened

20    in this Court.  It has potentially cost this estate millions of

21    dollars and I don't have any idea how the government intends to

22    reimburse this estate for it so --

23         MR. FINCH:  I understand that, Your Honor.  We have

24    prepared an order.  Would you like for me to modify the order

25    to capture Your Honor's comments just a moment ago and resubmit

1  it?

2           THE COURT:  No, I think this transcript will be

3  sufficient, Mr. Finch.

4           MR. FINCH:  Okay.  Then I'll -- may I approach the

5  bench with the proposed --

6           THE COURT:  Have no doubt that I'll recall my

7  feelings on that matter.

8           MR. FINCH:  Your Honor, if something like that comes

9  to light, not only will Your Honor -- will we notify the Court

10 instant or we would, you know, fire that firm in a New York

11 minute so to speak so.

12          THE COURT:  All right.  Okay.  That's fine.

13          MR. FINCH:  May I approach the bench, Your Honor?

14          THE COURT:  Yes, please.  Thank you.  All right.

15 That order's signed.

16          MS. BAER:  Your Honor, that takes us to agenda item

17 number eight which is a motion by the state of Iowa with

18 respect to a late proof of claim.  That matter is being

19 continued to the September hearing.  The parties --

20          THE COURT:  All right.

21          MS. BAER:  The parties are discussing that issue.

22 Your Honor, at this point we'd like to take the property damage

23 matters, or some of them, out of order so that Mr. Restivo can

24 do his thing and -- and move on.

25          And before that, Your Honor, though, the first

1 property damage item is actually number 12 which is a

2 certification of no objection we filed with respect to

3 settlement of the Philadelphia claim.

4          THE COURT:  That one also is -- I've already

5 instructed staff to enter an order.  If it hasn't yet made it

6 to the docket, it will.

7          MS. BAER:  Thank you, Your Honor.  That actually

8 prompts a report on where we stand on settlements.  And since I

9 have the podium I will do that right now and then move on to

10 Mr. Restivo's matters.

11          Your Honor, with the City of Philadelphia settlement,

12 all of the ones that are currently on file have now been signed

13 and entered.  But, Your Honor, the good news is we have final

14 agreements with Prudential.

15          Prudential involves six claims that are still pending

16 and two on which you decided and they're on appeal.  That

17 document has been signed by the debtor, it's been finalized by

18 the debtor, and Prudential has the motion for its approval.  We

19 are waiting for the signature from the appropriate person at

20 Prudential and we will then immediately file the motion.

21          Since we've missed the deadline for September, that

22 matter will come on -- since we've missed the deadline for the

23 September hearing, that matter will come on at the October

24 hearing.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Your Honor, we also are proud to announce

2  that we have reached final agreement with the Dies claims.

3  This is 258 property damage claims.  The debtor has signed that

4  agreement.  The final agreement is with Mr. Dies and he is

5  soliciting the signatures of his claimants.  He has a number of

6  governmental entities and it simply takes time to get the

7  signatures.

8          Again, we've missed the deadline for the September

9  hearing.  So once we have those signatures, we will file and

10 anticipate that that would come up at the October hearing.

11         THE COURT:  All right.

12         MS. BAER:  Your Honor, we have settled in principal

13 with Motley Rice which we were -- previously had informed you

14 of.  We have sent a copy of essentially the same form of

15 settlement agreement to Motley Rice that we have just executed

16 with Prudential and with the Dies claimants.  We are waiting to

17 hear back from Motley Rice on that.

18         And that resolves the grand bulk of the claims other

19 than the Speights related claims.  We have a few miscellaneous

20 still out there, the state of California, 16 of those, and one

21 or two others.  But that essentially takes care of the bulk of

22 all of the non-Speights property damage claimants.

23         THE COURT:  Good.

24         MS. BAER:  With that, Your Honor, I'd like to turn

25 the podium over to Mr. Restivo who's going to address a few

1  issues with respect to those that still pend.

2          THE COURT:  All right.

3          MR. DIES:  Your Honor, before Mr. Restivo takes the

4  podium, is there -- is it -- would it be possible since it

5  sounds like the Dies claims and Motley Rice claims are done but

6  for signature, for the debtor -- maybe not in open court -- but

7  to share with the official committees the aggregate dollar

8  value of those settlements.

9          MS. BAER:  Your Honor, it will be in the application

10 when it's filed.  I would hesitate without having the consult

11 -- without consulting Prudential and Mr. Dies to give them the

12 number before we actually file the application.

13         It will not be confidential at that point, but the

14 agreement of the parties is -- until we file the motion it is

15 confidential.

16         THE COURT:  Mr. Finch?

17         MR. FINCH:  I feel like I'm waiting for godough

18 (phonetic) here, but if Mr. -- if Mr. Dies insists on the

19 confidentiality, then I'm not the person to, you know, jump in

20 the middle of that.

21         On the other hand if he agrees to waive it, then I

22 would like the information as soon as he would agree to waive

23 it.

24         THE COURT:  Why -- why don't you contact Mr. Dies?

25         MR. DIES:  Your Honor --

1            MR. FINCH:  Sure, I'll contact --

2            MR. DIES:   -- this is Martin Dies.  The only issue is

3  that we always want to keep it confidential in a government

4  lending process because you don't want it coming out before

5  they act on it.  It may be detrimental to their actual decision

6  if somebody else gets it.

7            But it's, as recorded, that process is ongoing and I

8  would expect in very short time we're going to be able to

9  disclose it.

10            THE COURT:  Okay.  That's fine, Mr. Dies.  We'll -- I

11  think we'll wait until the motions come out.  Thank you.  Mr.

12  Restivo?

13            MR. RESTIVO:  Good afternoon, Your Honor.  Mr.

14  Bernick tells me I've missed the first five minutes of the

15  Court's happy time, but I'm going to give --

16            THE COURT:  No, actually when I have an opportunity

17  to say that we're going to have a, you know, we're turning of

18  charts again, I'm back to happy time, Mr. Restive, so.

19                         (Laughter)

20            MR. RESTIVO:  Your Honor, item 13 on the agenda is a

21  status report on the property damage claims.  As the Court is

22  well aware there were over 4200 property damage claims filed

23  pursuant to this Court's bar date, 2976 of them I'm told were

24  filed by Speights & Runyon.

25            When we first started this board, which I believe was

1 at the May 2 hearing, we had 627 property damage claims that

2 this Court is going to have to deal with.  Of those claims, 11

3 were expunged as not involving a Grace product, 6 were the

4 Prudential claims that Ms. Baer just talked about and they were

5 settled, 121 were Louisiana claims, 120 of those we settled

6 with Mr. Dies.  One was a Speights claim dismissed for lack of

7 authority.

8         There were a number of claims, Your Honor, objected

9 to as a result of the statute of repose.  Some of those claims

10 were expunged for lack of authority.  The remaining three

11 statute of repose claims are resolved under the settlement with

12 Motley Rice.

13         Fifty-two Libby claims were expunged.  And as Ms.

14 Baer said, another 138 claims of Mr. Dies out of Arkansas,

15 Oregon, Oklahoma, Arizona, and Texas were resolved.

16         And, finally, the remaining 15 Motley Rice claims are

17 subject to settlement.

18         As a result, Your Honor, that leaves us with a total

19 on our board of 177 asbestos property damage claims for the

20 debtor and the Court to deal with.  As I think I've mentioned

21 before, that number is a little bit inflated because in the 12

22 remaining claims, that includes Central Wesleyan where I think

23 the Court issued an order admitting that claim, it includes the

24 solo case which at some point is going to have to go back to

25 the New York appellate court.

1          And in that there are three claims for Anderson

2    Memorial which whatever the claim is, is probably only one

3    claim.  So we're really probably at 173.

4          Of the 173 claims, Your Honor, I would note that in

5    your July 26th order denying an extension of exclusivity, while

6    you noted progress in the form of resolution of some of the

7    property damage cases, you also commented on the lack of

8    progress with respect to certain asbestos related property

9    damage claims.  And I think those must be the claims left on

10   the board.

11         With respect to those claims, Your Honor, the vast

12   bulk of the claims are the 103 California claims, 99 of which

13   have been the subject of summary judgment, argued, and are sub

14   judice before Your Honor.

15         That is the big bulk to the -- to the extent the

16   Court and the court staff is trying to determine what is most

17   important on this board.  Obviously 99 California claims are

18   more significant than two claims and four claims.

19         But, in any event, that's before the Court and the

20   debtor is doing nothing further on them and can do nothing

21   further on them until the Court rules.

22         The same is true for two Arkansas claims under the

23   statute of limitations.  And the same is true for four New York

24   claims under New York statute.  Again, those are under

25   submission to the Court and there's nothing further the debtor

1  is going to do or can do until rulings are reached on that.

2          And so those can come off the board so that I can

3  address what is really the main problem with respect to a

4  status report and with respect to progress on property

5  damage.

6          You'll -- you can see, Your Honor, that 56 Canadian

7  claims are left.  Of those, we have moved for summary judgment

8  on 55 of them and happy time might be over because therein lies

9  a story that I have to -- to lay out because we now have new

10 disputes with Speights & Runyon over whether Mr. Speights can

11 take the deposition of Graham Mew (phonetic), our expert, for a

12 third time and over the fact that today with respect to their

13 expert, Mr. Irvine, they elected to walk out of the deposition

14 on the grounds that Ron Haley (phonetic), who we asked to

15 handle the deposition so Mr. Cameron could take his son to

16 college, was a substitution for which we didn't seek approval

17 and, therefore, the deposition couldn't go forward.

18         Putting all this in context, the Court will recall,

19 Your Honor, that on December 21, 2006, more than eight months

20 ago, we filed Graham Mew's expert report.  He addressed the

21 running of both the normal and the ultimate statutes of

22 limitations in Canada.

23         Mr. Speights's expert's reports were due under your

24 CMO on January 17, 2007.  And he elected not to file any expert

25 reports to counter the Mew report.  On February 16, more than

1   16 months -- 6 months ago -- more than six months ago, we filed

2   our motion for summary judgment on these Canadian claims.

3          At that time there were more Canadian claims, some

4   have been resolved, some have been dismissed for lack of

5   authority, and we're down to 55.

6          At the risk, Your Honor, of gross over simplification

7   using the Province of Alberta as an example where 33 of the

8   remaining 55 claims come from, under the ultimate statute of

9   limitations you look at the date of the installation of the

10  product, you could ten years.  And if the claim hasn't been

11  filed in ten years, it's barred by the ultimate statute of

12  limitations.  It's as simple as that.

13         Grace stopped selling MK3 in Canada in 1975 or 1976.

14  You add ten years and it's 1985 or 1986.  Those claims are

15  barred.

16         We have yet, Your Honor, to be able to make that

17  argument to this Court.  Mr. Speights is one of the most

18  accomplished trial attorneys I've ever met.  He has

19  successfully avoided argument on our Canadian motion for

20  summary judgment for months and months.

21         We initially had April 9th, more than four months

22  ago, to argue it.  Although he had already taken Mr. Mew's

23  deposition on March 15 in Toronto, he was able to convince this

24  Court that he needed to have another deposition of Mew to deal

25  with whether or not Anderson Memorial polled the running of the

1 Canadian statute of limitations.

2          He also took the position at that time that we had
3 not raised as an objection the ultimate statute of limitations.
4 Because in describing that objection we said the ultimate
5 statute of limitations in Canada operates like the United
6 States statute of repose.  And his position was we did not
7 assert statute of repose as an objection.

8          The Court will recall we went through a drill of
9 amended objections, a motion to strike, a motion for leave to
10 amend, and further deferrals of the argument that had been set
11 for April 9.

12          On May 30, you ruled that, in fact, we did raise as
13 an objection the ultimate statute of limitations.  And at that
14 hearing on May 30 Mr. Speights responded by saying that may
15 mean he has to get his own expert and maybe he has to depose
16 Mr. Mew a third time.

17          At May 30 we asked the Court, some would say we
18 begged the Court, for a June 26th argument date so we could
19 finally argue our motion for summary judgment.  Mr. Speights
20 successfully resisted that and eventually we were given August
21 1 as the argument date.

22          On June 26th when Mr. Speights conceded he was
23 available to argue on August 1, he warned the Court and us that
24 he may have to do some discovery and maybe he would have to
25 take the deposition of Mew a third time.  Obviously June 26th

1 was over two months ago.

2          Eventually he did retain an expert, a Mr. Irvine.  He

3 gave us the expert report on July 23.  We scheduled the

4 expert's deposition for August 14.  Unfortunately Mr. Fairey

5 ran into a family medical issue and we voluntarily agreed to

6 move August 14 to August 22nd.

7          Mr. Cameron went to now take the deposition of Mr.

8 Irvine with respect to Mr. Irvine's expert report.  On August

9 22nd Mr. Irvine showed up with a brand new draft of a brand new

10 report that he testified he was still working on and he hadn't

11 finalized.

12          They promised to send us the report when it was

13 finalized.  And I understand on Monday evening, this Monday, we

14 got the new report of Mr. Irvine.

15          On August 24 we said, all right, you are where you

16 are.  We will take Irvine on his new report in Canada on August

17 29 and we proposed that both sides exchange supplemental

18 materials on September 4 and that we give those materials to

19 the Court on September 5.

20          On Monday Mr. Speights responded to that by saying he

21 wanted another deposition of Mr. Mew.  Note, Your Honor, that

22 the last report of Mew was dated March 23, 2007.  He's done

23 nothing new since then.

24          At that point, Your Honor, we frankly said enough is

25 enough.  He had all of June, all of July, and almost all of

1  August if he really wanted another deposition of Mew, he had

2  the Mew reports, he was aware of his testimony.  He's had our

3  summary judgment brief since February 16.  If he elected not to

4  ask certain questions to Mew the two times he deposed him, that

5  was his decision.

6        Basically it's too late for a third deposition of Mew

7  and we want to argue our motion for summary judgment, finally,

8  on September 10, the date the Court has gotten us.

9        In addition, today when -- when we were there for the

10  deposition, everyone was in Canada.  Mr. Haley, in fact, had

11  defended one of the Mew depositions when the Kirkland & Ellis

12  attorney who was going to defend it had a baby.

13        They walked out of the deposition after spreading on

14  the record that it was inappropriate for us to have an attorney

15  there without a substitution of counsel.

16        It's pretty clear, Your Honor, that Mr. Speights's

17  goal -- and he's an outstanding attorney and I have the highest

18  respect for him -- is to have a prominent role at the table

19  when the assets are divided.  That's why he filed thousands of

20  claims.

21        The more of his claims that he can keep alive, the

22  larger a piece of the pie he can demand.  Obviously, to the

23  extent he has a valid product damage claim, he's entitled to a

24  piece of the pie.  But he is not entitled to a larger piece

25  based on having invalid property damage claims.

1          All we have been trying to do on this board and in

2    our efforts is to winnow out the good from the bad, the

3    legitimate from the illegitimate.  And the only way we can do

4    that is to move for, argue, and hopefully obtain summary

5    judgment on cases that are legally barred by the statute of

6    limitations or cases that simply do not involve a Grace

7    product.

8          And, frankly, Mr. Speights never wants to get to that

9    judgment day because it will cause him to be entitled to a much

10   smaller piece of the pie.

11         Ergo, as part of our status report, one, we want the

12   Court to reaffirm that we're going to argue our summary

13   judgment motion finally on September 10.

14         THE COURT:  You're going to argue on September 10.

15         MR. RESTIVO:  Secondly, we'd like the Court to tell

16   the parties that we should exchange any supplemental materials

17   on September 4 and that we should deliver them to the Court the

18   next day on September 5.

19         THE COURT:  You should exchange them September 4 and

20   get them to me by September 5.

21         MR. RESTIVO:  Third, that the deposition of Mr. Mew

22   does not have to be taken a third time.

23         THE COURT:  Well I don't have any motions to --

24   before me to take depositions of Mr. Mew so I don't think I

25   have that -- I don't think I have a need for that purpose.  I

1 don't see any need to take a third deposition.  I think in

2 order to schedule one a third time, somebody needs to file a

3 motion.

4          I need to know why a third deposition has to be

5 taken.  I thought it was extraordinary to take two, but I

6 thought there was grounds for it.

7          MR. RESTIVO:  And, fourth, that the deposition of Mr.

8 Irvine should go forward this afternoon in Canada

9 notwithstanding the fact that it's not Mr. Cameron who took the

10 first deposition and is taking his child to college, but is Mr.

11 Haley who was involved in the Mew deposition.

12          They're all there.  We're trying to get all this done

13 for September 10 and that deposition ought to go forward.

14          THE COURT:  All right.  Well that one I don't know

15 the answer to.  Frankly I have never seen an issue where

16 counsel's been substituted in the middle of a deposition and

17 somebody has walked out of the deposition as a result.  So I

18 honestly have never read a case about it, I've just never seen

19 it happen.

20          So I guess I need to know whether there are cases

21 that address the legal issue.  I'm just not familiar with that

22 concept.

23          MR. RESTIVO:  Well the factual issue, Your Honor, is

24 had we had the expert's report when the deposition was

25 scheduled and when Mr. Cameron was there, putting aside the

1  family emergency that caused it to be delayed for a week, then

2  the deposition would have been taken, would have been done, and

3  Mr. Cameron would have started it and finished it.

4           THE COURT:  Well --

5           MR. RESTIVO:  It wasn't Mr. Cameron's fault.  The guy

6  shows up with a brand new draft of a report that we finally get

7  the final of on Monday and Mr. Haley who was involved before is

8  there.  We can get it done by September 10.

9           THE COURT:  Well that issue in terms of the

10  circumstances and having to take your child back to college,

11  I'm certainly sympathetic with respect to that.  I don't know

12  whether there is some legal basis on which to walk out of a

13  deposition because of a substitution of counsel.  I just -- I

14  honestly just have never seen the issue come up, Mr. Restivo.

15           I don't know whether there is case law on the subject

16  one way or another.  I don't think there is a rule that governs

17  it.  If there is, I'm not familiar with the rule so somebody

18  should point me to one.  If, in fact, there's a rule, I could

19  read that quickly.  I'm not aware of one if there's a rule.

20           And I just simply have never seen any cases on it.

21  It's never been pointed out to me before.

22           MR. RESTIVO:  I would represent to the Court that I

23  tried to see if there was anything in -- that I had missed in

24  the Federal Rules of Civil Procedure and I don't believe

25  there's a Federal Rule of Civil Procedure that creates whatever

1  this thing is.

2          MR. BERNICK:  Yes, Your Honor, I would that -- and I

3  guess this is just a matter of experience -- this is usually

4  with something that if there's anything there's a local rule

5  that would govern who can present a witness or cross examine a

6  witness at trial and we're not even in trial.

7          And I asked Mr. O'Neill if he was familiar with any

8  local rule in Delaware that would say somehow in the

9  deposition, particularly one that's gone on for a period of

10  time, whether there's any rule to foreclose another lawyer

11  asking questions provided that it's not of a back and forth,

12  back and forth kind of thing that would be harassing to the

13  witness.

14          I don't think Mr. O'Neill is aware of any.

15          MR. O'NEILL:  I'm not aware of any, Your Honor.  I

16  haven't -- I haven't addressed the issue before, but I'm not

17  aware of any prohibition about that.

18          THE COURT:  Okay.  I am not aware of any rules.  So,

19  as I said, if somebody can point me to a rule I'd be happy to

20  read it.  But I'm not aware of any rules so I don't want to be

21  missing something.  I'm just not aware of any.  But I'm also,

22  likewise, not familiar with any cases.

23          This is truly, you know, in my experience it's just

24  never come up.  I've just never had to do any research on this

25  issue so.

1          MR. RESTIVO:  Your Honor, we indicated by email prior

2 to the hearing when this occurred this morning both to Mr.

3 Fairey, who is in Canada, and to Mr. Speights, who I'm not sure

4 where he was, that we would raise this issue with the Court

5 today as part of the status conference.

6          If either of them are on the phone, I'd like them to

7 try to justify why we can't do the deposition this afternoon

8 when everyone's in Canada.

9          THE COURT:  All right.  That's a fair proposition.  I

10 think oral motions of this nature are clearly proper before the

11 Court so I'll hear that motion if -- and expect a response if

12 somebody's there to address it.  Is someone on the phone?  Mr.

13 Fairey, Mr. Speights?

14          MR. SPEIGHTS:  Your Honor, can you hear me?

15          THE COURT:  I can, Mr. Speights, but not very well.

16 I'll ask whether the operator perhaps can turn the system up a

17 bit.

18          MR. SPEIGHTS:  I had to get in through Mr. Baena's

19 line.  For some reason I was not on the list this time and I

20 apologize.

21          But I do need to be heard on this and I did -- I did

22 hear Mr. -- Mr. Restivo's presentation.  Can you hear me well

23 enough?

24          THE COURT:  Yes, you're very clear now, Mr. Speights,

25 thank you.

1          MR. SPEIGHTS:  Can you hear me now, Your Honor?

2          THE COURT:  I can hear you very clearly now, Mr.

3  Speights, thank you.

4          MR. SPEIGHTS:  Thank you, Your Honor.  Number one, I

5  was not in town.  I have not been handling that witness.  Mr.

6  Fairey has been in town and went all the way to Winnipeg to try

7  to conclude this matter.  I did not get an email or did not

8  read an email from counsel about the possibility of this matter

9  coming up until after this telephone call started today.

10          I've understood a number of things.  With due respect

11  I believe Mr. Restive went far beyond a mere status report.

12  But what I was going to suggest to Your Honor and without

13  making all of the arguments now, we're filing -- let me say at

14  the outset that we are not trying to get this matter continued

15  beyond September 10th.

16          September 10 is set, we've set it.  We're trying to

17  get everything done in order to have it heard on September 10.

18  And Mr. Fairey is the one who's now traveled to Winnipeg where

19  he encountered a problem.

20          Mr. Fairey advised me briefly of the problem.  He

21  told me that he's going to file a motion for protective order

22  in the morning -- or, let me correct that -- sometime tomorrow.

23  He's doing it -- I believe he's on the way back from Canada

24  now.  He does not have email on his Blackberry in Canada.

25          I did call him when I got the email from Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Restivo's partner and I could not get him which indicates to me

2  he may be on the plane.  I don't know.

3          But in any event, he's going to file a motion for

4  protective order tomorrow and I would ask Your Honor to hear it

5  on an expedited basis by telephone on Friday if Your Honor is

6  available.

7          THE COURT:  I'm taking my daughter back to college on

8  Friday so I'm not going to be available that day.

9          MR. SPEIGHTS:  Well I assure you there are two sides

10 to this story and I assure you we want to get the discovery

11 done.  And, in fact, I wish Mr. Restivo had simply picked up

12 the phone and called me to say I appreciate that

13 (indiscernible) sent me an email.

14          But Mr. Restivo and I had been trying to talk and I

15 thought we were going to talk on general matters later today.

16 But in any event, I don't think there's any matter outstanding

17 that the Court is going to have to deal with other than the

18 question of my expert's deposition in Canada and we're filing a

19 motion for protective order so the facts regarding that will be

20 queued up for Your Honor and we're happy to give that matter as

21 quickly as Your Honor wants to hear.

22          THE COURT:  Mr. Speights, the deposition's going to

23 go forward or you're not going to have an expert testify.  I am

24 going to permit a deposition of your expert witness.

25          Now you folks can figure out how and when, but I am

1 not going to have an expert witness preparing a report -- a

2 supplemental report this close to trial, turning it over the

3 day of a deposition without an adequate opportunity for the

4 opposing counsel to have an opportunity to take a deposition on

5 that report.

6          Now I don't know what the grounds for the protective

7 order will be and I may very well say that today's deposition

8 isn't appropriate.  But I am not going to have an expert

9 witness here to testify with respect to these issues without a

10 deposition opportunity.

11          So whatever the basis for the --

12          MR. SPEIGHTS:  Your Honor --

13          THE COURT:  -- protective order is, that's fine.  But

14 I'm telling you in advance what my ruling ultimately is going

15 to be.  There will be a deposition.  I suspect that you and Mr.

16 Restivo should talk after this hearing and set it up

17 appropriately somewhere.  And if it has to be here in

18 Pittsburgh, fine.  I don't care where.  But there will be a

19 deposition or that witness will not testify.

20          MR. SPEIGHTS:  But, Your Honor -- and I respect where

21 Your Honor's coming from, I agree where Your Honor's coming

22 from.  You've heard just Mr. Restivo give her version of what's

23 happened and just by way of example, we want the deposition, we

24 want to question the witness also when they finish with him.

25 We are not trying to stop the deposition.

1        But we do have a motion for protective order and
2   we'll file it tomorrow and I will discuss it with Mr. Restivo
3   of how we can get this done without a hearing if at all
4   possible.

5        But I assure you we want an expert, I assure you
6   they've already deposed him for I believe up to seven hours,
7   and I assure you that they have a right to finish their
8   deposition.  You gave them that right for a limited period of
9   time subject to the rules.  And we then want to ask the witness
10  some questions also.

11       (Indiscernible) without any notice and I"m sorry that
12  you've only seen one side.  But I believe when you get the
13  motion for protective order you'll understand the other side.

14       THE COURT:  That's fine.  And I'm happy to take a
15  look at the protective order and understand the other side.
16  I'd appreciate that opportunity.  But there will have to be a
17  deposition on this supplemental report.

18       MR. RESTIVO:  And it will have to occur before
19  argument on September 10th.

20       THE COURT:  Yes, it will have to occur before
21  argument on September 10th.  So that's fine.  I think rather
22  than -- I mean, Mr. Speights, I'm happy to see whatever your
23  position is.  In terms of the positions, frankly, it doesn't
24  really matter to me too much what the positions are of the
25  parties.

1        What I am concerned about is making sure that the

2  parties have an adequate opportunity to do the deposition.  So

3  I think you two should talk so that you can arrange for that

4  adequate opportunity for both sides on the supplemental report.

5        MR. RESTIVO:  Your Honor, I would move quickly to

6  agenda item 16.  Agenda item 16 was our motion to amend the

7  order relating to some state of California cases.  We filed a

8  motion to amend.  There was a response by the state of

9  California that in effect said you could enter the orders.

10        THE COURT:  I -- I also instructed my staff to enter

11  that order, Mr. Restivo.  So that one also will be getting on

12  the docket at some point soon.  Okay.

13        MR. RESTIVO:  Finally, Your Honor, agenda item 17 is

14  a ZAI status report which will be much shorter and much

15  quicker.  Mr. Westbrook and I have had continuing discussions

16  about ZAI and what the next steps in this court might be.

17        We would like to have some further discussions and we

18  would like to report to the Court at the September omnibus.

19        THE COURT:  All right.

20        MR. RESTIVO:  Thank you, Your Honor.

21        THE COURT:  Thank you.  Mr. Bernick?

22        MR. BERNICK:  Good afternoon, Your Honor.  We have a

23  series of matters.  I don't know what Your Honor's pleasure is

24  -- I think that we're probably going to conclude all of these

25  within about 45 minutes to an hour -- if you wanted to take a

1  break or if you wanted to just go through them and take care of

2  them, that's fine.

3            THE COURT:  Anybody looking for a break?

4            MR. BERNICK:  They're riveted.

5            THE COURT:  That's fine.  Let's keep going for awhile

6  then.

7            MR. BERNICK:  Okay.  Items 9 and 10 on the agenda

8  relate to matters that are under submission to Your Honor.

9  These are -- these relate to motions to compel that we filed

10 with respect to information in the hands of the Celotex Trust

11 and the -- the DII Trust.

12           The matters are fully briefed and submitted to Your

13 Honor.  That was so as of the 27th of July.  And we just put

14 them on the agenda today for a status conference to remind Your

15 Honor about them.  The -- the matter does have some time

16 criticality because we need the date entered to complete the

17 work that we're -- that's underway.

18           THE COURT:  I apologize.  I actually thought they

19 were on for argument today.

20           MR. BERNICK:  Oh, well I'm -- I know that counsel is

21 here from Celotex Trust and he probably would like to argue

22 them today.  I'm happy to argue them today if that's

23 appropriate.

24           THE COURT:  I think I am not -- I don't think I

25 really am clear about the issues.  I just thought that they

1  were on for argument.

2             MR. BERNICK:  Okay.  Fine.

3             THE COURT:  So if you have a few brief remarks you'd

4  like to make, I'm happy to hear them.

5             MR. BERNICK:  Very brief remarks.  I'm not going to

6  recite all the background.  I know Your Honor's familiar with

7  it and this is reiterating it.  That I think that there are

8  basically three issues that have been raised by the Celotex

9  Trust and I know that they're not really very unusual issues.

10 This is basically a fairly standard matter of third party

11 discovery.

12            But let me just observe that the issues the have been

13 raised with respect to burden.  We are focused now on

14 electronic data, electronic discovery, so we're not really

15 talking about a significant burden.

16            The -- the heart of the concerns that have been

17 expressed by the trust really are driven by two things.  One is

18 confidentiality and the second is the proprietary -- the

19 proprietary elements that they say pertain to this data and

20 that in turn both of those in turn drive their query about

21 whether there has been a sufficiently robust showing of need to

22 warrant the third party discovery.  So I'd just like to touch

23 on those three items very briefly.

24            With respect to confidentiality, we don't really

25 think there's a confidentiality issue.  All these individuals

1 as to whom we are seeking data are individuals who have placed

2 their -- their health condition at issue.  As a standard set of

3 circumstances under which discovery is permitted, the

4 confidentiality is not an issue under any set of circumstances.

5        We know that if Your Honor issues an order that says

6 that this information is in fact important to the discovery

7 process in this case, that trumps confidentiality concerns.

8        In any event and circled around the whole thing is

9 the notion that there will, in fact, be protection that's

10 available for this information under a protective order.

11        So for all those reasons we don't believe that the

12 confidentiality issue is really a serious issue.  Much more

13 time is spent talking about the proprietary nature of this

14 information.

15        And for purposes of the argument today, we're not

16 going to go in and question the bona fides of that claim or the

17 merits of that claim.  We think that there are a lot of issues

18 that relate to it, but they're not really germane.

19        Nor is it germane to argue or proper to argue, as the

20 trust does, that the simple fact of there being proprietary

21 information that they believe would be compromised if there

22 were public dissemination of that information, nor is that

23 issue a proper issue before the Court.

24        The issue of proprietary information and the

25 dissemination of that information is always framed in the

1 context of whether there is a protective order and what threat

2 there is, if any, to the proprietary nature of this information

3 if it is released not publically, but released within the

4 confines of protective order.

5        So the real issue that's teed up by proprietary

6 claims is whether the dissemination of this information for the

7 sole purpose of being used in this case subject to the

8 protective order in this case.  Whether that dissemination

9 somehow would fundamentally compromise the proprietary nature

10 of this information.

11        And clearly the answer to that is it would not.  It

12 can only be used for purposes of this case.  It is not being

13 used for purposes of competing with the Celotex Trust for some

14 business that the trust may later pursue, although today it's

15 not pursuing anything.

16        So we don't think that there's any evidence that's

17 been proffered to the Court that says that there's a prospect

18 of use if the information is provided to the necessary parties

19 pursuant to the protective order.

20        The case that says this most clearly is the -- is the

21 Cash case.  I think it's actually denominated.  Cash Today of

22 Texas.  And the relevant language appears in W.L. 314 14138 and

23 it is I guess at 2 -- I don't even have -- it's very hard to

24 figure out these West Law pages -- I think that it's Page 3 as

25 it's been printed out says, "In determining if disclosure would

1  be harmful, the Court must consider 'not the injury that would

2  be caused by public disclosure, but the injury that would

3  result from disclosure under an appropriate protective order.'"

4          This is a decision out of the District of Delaware in

5  2002 by -- I don't see the Court's name right here.  But in any

6  event, that's the relevant test and there's not been any kind

7  of showing that somehow there's going to be a threat to the

8  proprietary nature of this information if, in fact, it is

9  disclosed pursuant to protective order.

10          So for those reasons that we don't believe that the

11  circumstances that have been elicited by Celotex are different

12  from the circumstances that would be present for other trusts

13  -- incidentally there are -- the Manville Trust is already in

14  the course, in the process of producing its data.

15          And in that respect we don't think that it's even

16  necessary to address the issue of need.  The issue of need

17  itself is also a non-issue.  And as Your Honor can well

18  appreciate from recalling the history of efforts that the

19  debtor has undertaken to obtain information about exposure

20  history, this matter has been discussed on several different

21  occasions.  And the need for this information was -- was very

22  well recognized long ago.

23          In the personal injury questionnaire itself there was

24  a specific area of examination or a specific area of inquiry

25  that was focused on exposure to non-Grace product.  Of course

1  that section of the questionnaire, like all the other sections

2  of the questionnaire, were heavily scrutinized on multiple,

3  multiple occasions and approved by the Court on multiple

4  occasions.

5          So the questionnaire itself dealt with and asked for

6  evidence of exposure to non-Grace products.  And that was felt

7  to be important to this case and it still is felt to be

8  important by Grace.

9          In response to that query, there has been massive

10  silence.  I can tell Your Honor these are -- these data are set

11  forth in tables that are attached to the expert report of Dr.

12  Anderson in this case that of all of the mesos who responded to

13  the personal injury questionnaire, of all of the mesothelioma

14  on the claims that responded, only 16 percent of those

15  claimants in the PIQ actually filled out the questionnaire with

16  respect to non-Grace exposures or referred to attachments.

17  Only 16 percent.

18          By contrast, the number of those -- the percentage of

19  those meso claimants who responded who said that they were

20  pursuing litigation against companies other than Grace, i.e.,

21  were saying with respect to litigation they were exposed to

22  non-Grace product, was 92 percent.

23          So virtually all of these people claimed exposure to

24  a non-Grace product litigation and very, very few of them, only

25  16 percent, actually told Grace in responding to the

1 questionnaires that they were exposed to non-Grace exposure --

2 a non-Grace product at all.

3        We now know that there is further confirmation of the

4 fact that these folks have claimed exposure to non-Grace

5 product.  A full 74 percent of the meso claimants who responded

6 to the Grace questionnaire, 74 percent also are picked up by

7 the Manville database as having claims of exposure to Manville

8 product.

9        So -- so in the same fashion that they were pursuing

10 litigation, we now have evidence through the Manville Trust in

11 fact they were exposed to non-Grace asbestos.

12        With respect to the Celotex Trust, we're not working

13 with the same population of data because we're not able to

14 gauge right now exactly who and what kinds of people match up.

15 But we are told that upwards of 72,000 of the people who have

16 filed -- were filed claims against Grace in this case.  Seventy

17 two thousand matches exist with the Celotex Trust and we're not

18 sure what the total population is with respect to which the

19 72,000 exists.  We don't have enough data.

20        We know that there's a very, very substantial

21 population of claimants and data that indicate exposure to

22 Celotex product and also Grace product.

23        So we now know, as we suspected before, that, number

24 one, the -- there is, in fact, exposure to non-Grace product

25 among the claimants whose claims are being estimated here.  We

**J&J COURT TRANSCRIBERS, INC.**

1 know that there is exposure in these other data sets.  And we

2 also know that the only source of information with respect to

3 that now given the non response to PIQ is, in fact, information

4 from these other trusts.

5          So there's a need for the information, there's a

6 relevance for it, a need for it, and it's a serious need

7 because there really isn't a feasible alternative at this

8 stage.

9          Mr. Herrick actually on behalf of Motley Rice made

10 this very point in the course of a dialogue with the Court in

11 September of '06.  Mr. Herrick said at that time -- and this is

12 at Page 215 of the transcript on September 11 of 2006 -- he

13 says, "And you know it seemed as I thought about this issue and

14 the subpoenas from the other trusts, it would be a whole lot

15 easier and a whole lot less burden on everybody here if Grace

16 had simply subpoenaed the other trusts for all the information

17 that they have requested and for all of the claimants,

18 potential claimants, that they sent these questionnaires to.

19          "The other trusts can easily provide that information

20 electronically and it's going to include all of the medical

21 that establishes the diagnosis.

22          "So that's why the burden is unfair, Your Honor.  And

23 you got my response of my firm and the time we've spent and the

24 time we estimate spending.  And I won't take up the Court's

25 time any further.  Thank you, Your Honor."

1          It turns out, of course, that Motley Rice didn't, in

2    fact, provide the information perhaps expecting that we would

3    get it from the trust.  Your Honor then picked up with exactly

4    the same comment as we got into 2007, May 21 of 2007, at Pages

5    209 and 210.

6          And we talked about that we -- Your Honor and -- and

7    I had a dialogue about what was going on with the trusts.  You

8    observed at the top of Page 10, "You've got subpoenas

9    outstanding to the other trusts."

10          Answer.  "Sure, if we got all that then that's hunky

11    dorey, but I'll reserve on that.  And then if we have a

12    problem, maybe we'll come back to that in the interest of

13    time."  And Your Honor said, "All right.  I think that's -- I

14    mean that's appropriate.  I think you've got subpoenas

15    outstanding as to them."

16          I say, "Okay."  And then you go on, Your Honor goes

17    on, "You should be getting that information that will not

18    hopefully violate a comp or compromise an attorney client

19    relationship."

20          So everybody's recognized that the trusts are

21    important.  What's turned out to be prophetic, however, and I

22    didn't think it was going to be this clear a prophecy, is that

23    when Mr. Herrick made his remark in September, you then turned

24    to me -- the Court turned to me and says well, why can't you

25    get it from the trusts?

**J&J COURT TRANSCRIBERS, INC.**

1       And I said well, maybe we can get it from the trusts.

2  And maybe that actually is something that is feasible.  You

3  asked, Your Honor, you said, Mr. Bernick -- and this is at Page

4  259, why aren't you doing what somebody suggested and that is

5  subpoenaing some of this information from the trusts?

6       And the answer that I gave that says, "That, Your

7  Honor, I can just assume as you involve a third part in this

8  case, immediately they have their own counsel.  We execute on

9  the subpoena for trust records, we won't even have the lawyers

10  in this court for three months."

11       So what's happened?  Well the prophecy turned out to

12  be wrong in part.  We did get cooperation, have gotten

13  cooperation, from the Manville Trust and that has a lot to do

14  with Mr. Austern who's the futures representative in this case.

15       We've also gotten cooperation from some of the other

16  trusts.  But we have not gotten any kind of answer from the

17  Celotex Trust that they're prepared to produce any electronic

18  data, nor are they prepared to produce any files information.

19       And at this point it's very, very late in the day.

20  We really need this information in order to complete our

21  analysis.  So we would ask that the motion be granted.

22       With respect to the DII Trust, it's a newer trust, so

23  their history of overlap is much more limited and, of course,

24  they're now operating in an environment where, you know,

25  mesothelioma claims are the non -- the malignant claims are

1  much more dominant.

2          So our request of them was just confined to the meso

3  claims.  They didn't have the same kind of extensive history.

4  And we would ask the same relief with respect to them, that is

5  that our motion to compel be granted.

6          Thank you.

7          THE COURT:  Good afternoon.

8          MR. DONNELLON:  Good afternoon, Your Honor.  Ms.

9  Minella introduced me earlier.  I'm Dan Donnellon from Keating,

10  Muething & Klekamp in Cincinnati, Ohio, and I represent the

11  Celotex Trust.

12          This matter was listed on the agenda today for a

13  status conference, but since I am here and can address many of

14  these arguments I'm happy to do so if Your Honor would like

15  that today.

16          THE COURT:  Please.

17          MR. DONNELLON:  But I do understand Ms. Bivans, who's

18  representing the DII Trust, we spoke and she had the

19  understanding it was only a status conference and she's

20  available only on the telephone.  I don't know if -- if she has

21  any additional thoughts to add.

22          First let me correct a misnomer from Mr. Bernick and

23  that is that the Celotex Trust has not refused to produce

24  information in response to the subpoena.  In fact, this is laid

25  out in the briefing papers which I'm sure Your Honor has read.

1        We've offered to produce at least one witness,

2    possibly two, in response to the subpoena.  We've offered to

3    produce information from the electronic database regarding the

4    most prolific diagnosticians and other information that they've

5    asked for.

6        But we've drawn the line at the entirety of the

7    Celotex electronic database and it's simply not fair.  And

8    there's something somewhat Orwellian about this particular

9    discovery request.

10        Rule 45, particular when it comes to a non-party to

11    the proceeding, is for fact gathering.  Gathering information,

12    gathering testimony.  And it's not to be used to piggyback on

13    the work of another entity that has done work for over almost

14    ten years now and invested 612 thousand person hours developing

15    its own electronic database that is has invested substantial

16    sums of money in and it is sought and undertaken tremendous

17    measures to protect.

18        Mr. Bernick stood before you and conceded the

19    proprietary value of this particular database.  In fact, as

20    Your Honor is aware, the Manville Trust, through a CRMC,

21    licenses similar data.

22        It has collected the data over many years just like

23    Celotex and it has recognized that this data can be so valuable

24    in the marketplace that it sells its data and recoups $100,000

25    or more every year for over a decade because of the very value

1  of the man hours involved in putting together in electronic

2  format that the trust has from its submissions from claimants.

3          The Celotex Trust has chosen not to do so.  It has

4  chosen to protect that data and recoup its value elsewhere and

5  it has been successful in doing that through the Delaware

6  Claims Processing facility attracting at least five new trusts

7  to be able to come to its facility.

8          So, Your Honor, the focus here and the cases that

9  we've cited, is that once the party objecting, particularly a

10  non-party such as the Celotex Trust, establishes that the

11  information requested in the subpoena has proprietary value,

12  the burden then shift to Mr. Bernick and to his client to

13  establish two things.  Necessity, that's beyond simple

14  relevance, but necessity, the inability to get this information

15  from another source.  And, number two, that there will not be

16  resulting injury to the party producing the documents or

17  information in this particular context.

18          And I'll submit to you.  They have not established

19  necessity and there will be demonstrable injury to the Celotex

20  Trust if it is forced to turn over its electronic database.

21  And I'll get to both of those in turn.

22          THE COURT:  Well, okay, what I don't understand about

23  the database, because I'm absolutely no expert on databases, is

24  can information be culled from the database that responds to

25  the information without producing the proprietary information

1  or the database?

2          MR. DONNELLON:  No, and I'll tell you why.

3  Particularly Mr. Bernick has said they're not interested in the

4  information relating to medical and the analysis of the reviews

5  on medical.

6          But when it comes to the exposure data, what comes

7  into the reviewer is a claim form asking for exposure to

8  Celotex and Kerry Canada product.  And the claimant must list

9  their job list -- their work history as it relates to exposure

10 to Celotex and Kerry Canada product.

11         The reviewer then has to analyze the claim, look at

12 what's in the claim form, and then enter that into the

13 electronic database.  The fact that Celotex maintains it and

14 the way that it has chosen to by having the reviewers key in

15 data and preserving it in that form and expending thousands,

16 tens of thousands of dollars to do so, has its proprietary

17 value.

18         Let's look at the case on -- cited in our brief,

19 American Preferred Prescription.  In that case it wasn't even

20 data that's submitted and reviewed and analyzed, it was simply

21 public domain data that was gathered about physicians and

22 physicians assistants, and locations.

23         But the sheer fact that the party who is asked to

24 produce that database had expended the time and effort to

25 gather it, collate it, and keep it in that fashion for its own

1 purposes in electronic searching, made it proprietary and made

2 it not subject to discovery under a protective order.

3        THE COURT:  You mean you can't run a report of, you

4 know, for example, we're saying 72,000 overlapping claims.  The

5 Celotex Trust can't simply run a report that says here are

6 even perhaps let's pick several fields of data, the name, a

7 Social Security number, and run a report of those names, this

8 Social Security number, and the exposure place, location, and

9 date without -- without disclosing how that information has

10 been input into the system or how it's maintained in the

11 system?

12        MR. DONNELLON:  I think we're not connecting on each

13 other here and let me skip ahead to the part about the damage

14 to the Celotex Trust.

15        As I said, and you have to recognize, that Manville

16 has made a substantial amount of money, over a million dollars

17 if you look at a decade's worth of resources, licensing that

18 data.

19        If Celotex were required to produce just in this

20 Grace case and just under the confines of a protective order

21 its own database similar to what Manville licenses every year,

22 just what you said, name, Social Security number, date of

23 employment, and work history and exposure history in that

24 context.

25        If Celotex is forced to produce that for all of its

1 claimants, then the ability for Celotex to go out and similarly

2 license that material, if it so choose like Manville does and

3 recoup hundreds of thousands of dollars doing so, has been

4 forever lost.

5          Any bankruptcy court, any defendant in the court

6 system, could rely upon Your Honor's order to say here's a Rule

7 45 subpoena, give us that data.  We don't want to pay for it.

8 Judge Fitzgerald ordered you to produce --

9          THE COURT:  Well I'm --

10          MR. DONNELLON:  -- it and I'm ordering you to produce

11 it.

12          THE COURT:  Well I'm not saying that it has to be

13 produced without some payment in advance, you know, payment for

14 the production if that's the issue, but I'm asking not for the

15 disclosure of the proprietary aspect, I'm asking why are a

16 report of data that's available can't be run?

17          I mean most -- most, not all, databases can run

18 reports.  Why can't a report in, even if it's in paper copy,

19 without electronic database -- without disclosing the

20 electronic database, why can't a paper copy of a report that

21 generates the information that the debtor contends it needs be

22 generated that's responsive to the subpoena at the cost of the

23 debtor subject to use only in the case to be turned back over

24 to the Celotex Trust at the end of the estimation process so

25 that there is no further use that can be made of it by any

 1  party other than in this case at the cost of the estate?

 2          MR. DONNELLON:  That report can be run, I'm not

 3  saying it can't be run.

 4          THE COURT:  Okay.

 5          MR. DONNELLON:  But I'm saying the risk of even

 6  producing that report in paper value -- paper copies of it to

 7  be used eyes only or however it's used, still runs the risk of

 8  -- of causing damage to Celotex by its inability to license

 9  that material to other users who may want similar information

10  on exposure.

11          THE COURT:  Why?

12          MR. DONNELLON:  Because they can get it for free from

13  -- in pursuant to subpoena.

14          THE COURT:  But I'm saying that it won't be free.  It

15  will be at the cost of whatever the cost is of the estate.

16          MR. DONNELLON:  Your Honor, let me draw an analogy.

17  It's similar to saying a customer list which are very well

18  known to be proprietary.

19          THE COURT:  Oh, this isn't a customer list.  I mean

20  the debtor already knows what claimants it's looking for and

21  Celotex apparently already knows it's got a list because it's

22  already told the debtor it has a list.

23          MR. DONNELLON:  We have a list of the claimants, but

24  what we're talking about that's proprietary that's more akin to

25  the customer list is what the exposure is that they claimed.

1  And -- and we still haven't reached the issue of necessity.

2  But let me backup for just a moment.

3        I raised in conversations with Mr. Bernick, not that

4  I discussed with my client that I have authority to do so, but

5  why wouldn't this meet us both ways is if we say if you're

6  interested in finding out if persons who are claimants in the

7  Grace case have also established to your satisfaction exposure

8  to a Celotex product, why can't we give you a list of those

9  claimants who have established exposure?  We'll simply give you

10  a list, these are the claimants.

11        And that should suffice.  Now you know this is a

12  person who although they claim exposure to Grace has also

13  demonstrated to our satisfaction that they were exposed to a

14  Celotex or Kerry Canada product.  That seemed unacceptable.

15        What Mr. Bernick wants is the entirety of the

16  database with everything that Celotex has gathered save the

17  medical information that it has input.

18        And -- and I simply don't see that -- that any

19  shorter compromise doesn't serve the needs.  This is an

20  aggregate estimation.  We're not talking about --

21        THE COURT:  Yes, it is.

22        MR. DONNELLON:  -- we're not talking about individual

23  claim disposition.  Perhaps if one claimant had told Celotex I

24  worked at these 15 locations and that one claimant had told

25  Grace I worked at a completely different 15 locations, perhaps

1  that could be used on a case by case basis to impeach that

2  claimant.  But we're not talking about that here.

3      What we're talking about is an entirety of a database

4  that incorporates only the Celotex, Kerry Canada exposure and

5  whether our reviewers in going through the claim information

6  are satisfied that, yes, working at this location during this

7  time satisfies Celotex's exposure requirement, I've established

8  product ID, this is a claim that should be paid assuming it's

9  medical.

10      THE COURT:  Well it seems to me that ought to be a

11  start because at least that ought to winnow down the list.

12      MR. DONNELLON:  A start of what I said.  It will give

13  you a list of the claimants who -- who have adequately

14  established Celotex exposure.

15      THE COURT:  Right.  That at least ought to be a start

16  because at least that way the debtor can match up the list to

17  see whether or not those entities on the debtor's list are

18  duplicate somewhere on Celotex's list.

19      MR. DONNELLON:  And where I disagree with Your Honor

20  is only this.  To me that would be an end, not a start.

21      THE COURT:  Well I don't know if it's an end, but it

22  should surely be a start.

23      MR. DONNELLON:  Because there's no necessity that

24  they can establish from the data beyond the fact that, okay,

25  claimant A says they're exposed to Celotex, says they're

1  exposed to Grace.  Yes, Celotex says to their satisfaction

2  they've proven that exposure.

3        THE COURT:  Well, yes, but the difference, you know,

4  the difference in -- in the estimation process is still the

5  need to prove exposure to a Grace product and the issue could

6  still be whether or not in the gross estimation process --

7  because I agree, we are looking at gross estimation -- that

8  nonetheless in the process of looking at gross estimation

9  you're still basing it, to a certain extent, on the known

10  claims.

11        And the known claims still have to prove exposure to

12  a Grace product and the exposure to the Grace product is

13  somewhat informed by whether or not that particular claimants

14  in that database have shown that they had the appropriate

15  exposure, i.e. worked at a facility where a Grace product was

16  used, you know, were in an industry where a Grace product was

17  disseminated, and so forth.

18        MR. DONNELLON:  As established in the materials we

19  supplied in the Winner declaration, there is likely nothing in

20  the Celotex electronic database that would tell them anything

21  about an exposure to a Grace product.

22        THE COURT:  Well I understand, but what it -- what it

23  will show -- may show, not will -- may show if there are

24  duplicates in the lists.  And I don't know how many lists.  But

25  let's just say for the moment Celotex and Grace.

1          Say, you know, John Smith -- just to make up a name

2  -- John Smith has been proven from the Celotex Trust's point of

3  view to have had exposure and was paid by Celotex based on that

4  exposure for a claim.

5          So you disclose John Smith to Grace and John Smith

6  shows up on Grace's list.  Well then the issue is where was

7  John Smith suddenly exposed to both a Celotex product and a

8  Grace product.

9          MR. DONNELLON:  And respectfully, Your Honor, why is

10 that a concern to my client as a non-party?

11          THE COURT:  It isn't --

12          MR. DONNELLON:  Why don't they ask Mr. Smith?

13          THE COURT:  -- and it is a -- well -- well it isn't a

14 concern to your client.  And, number one, I don't know whether

15 Mr. Smith is even still alive or has heirs or whatever.  I mean

16 I don't know the answer to that.

17          MR. DONNELLON:  We have somebody making a claim in

18 Grace.

19          THE COURT:  That's what I said about why it's a good

20 start because I don't know the answer to why they don't ask Mr.

21 Smith.  There may be an answer to that question, there may not.

22 I don't know.  But at least it's a good start to know whether

23 or not there are duplicate entities on that list.

24          And then, for example, if John Smith shows up on the

25 Manville list and perhaps John Smith shows up on the DII list,

1 then suddenly there are some issues about why John Smith is

2 claiming perhaps the same claim in four different locations

3 against four different entities possibly.

4        I mean it may -- it's possible that there are

5 legitimate claims by John Smith in four entities.  But it also

6 may be leading to some questions as to whether the aggregate

7 database has some problem with it because of the duplication of

8 claims from one -- one single entity to the next depending on

9 the basis of the claims.  I think that's the debtor's theory.

10        I'm not attempting to make findings.  I think that's

11 the debtor's theory.

12        MR. DONNELLON:  And to help me in understanding that.

13 I've been doing work with the Celotex Trust since 1998 and have

14 a good understanding of the product base.  And it's highly

15 likely that a claimant who worked as -- and established

16 exposure to a Kerry product, because Grace made similar

17 products, was also exposed to a Grace product.

18        THE COURT:  Okay.

19        MR. DONNELLON:  Because it's -- it's the -- the

20 products were fairly interchangeable in the marketplace so --

21        THE COURT:  And that may be the answer.

22        MR. DONNELLON:  And -- and that's why we would not

23 have recorded that in the Celotex database and so from our

24 standpoint the only thing relevant and necessary to them is are

25 there duplicative claimants and we can tell you who they are

1  potentially.

2        But we still believe that we're entitled to

3  remuneration for that because it is valuable data and -- and I

4  offered to produce a witness who could explain what is

5  contained in the database so that we don't have to go beyond

6  anything that would reach into the proprietary nature of that

7  and potentially cost Celotex loss of the proprietary value of

8  the database it has spent over a half million person hours

9  developing which is quite substantial.

10        THE COURT:  Okay.  Well it seems to me, as I said

11  earlier, that's a good start.  It may also be a good end, but

12  it's certainly I think a start.  Mr. Bernick, why isn't that at

13  least a good beginning?

14        MR. BERNICK:  I was looking for a case, if you could

15  just give me a moment.  I wanted to point it out to the Court

16  if I can find it.  I may not be able to get it here.

17                          (Pause)

18        MR. BERNICK:  If not I'll just talk about it a little

19  bit.  Your Honor, let me begin with the answer to that question

20  and then get back to a couple other comments because I think

21  that this is -- there's obviously always a desire when it comes

22  to discovery disputes to try to work out a middle course and

23  Your Honor's encouraged us to do that.

24        But we have spent the last months trying to work out

25  a middle course on this.  I can show you correspondence where

1  there was no middle course offered.  I personally called

2  yesterday in order to see if there was some kind of middle

3  course and the only middle course that was offered was we will

4  let you -- on the list we will let you know whether or not they

5  were -- these people were exposed to non-Grace product.

6          And that was the only offer that was made.  There was

7  not an offer made for anything else.  So the -- to the extent

8  that this is an issue of negotiation, we've taken very

9  seriously Your Honor's injunction that we try to resolve

10  issues.  As you'll see later on there are multiple issues that

11  we have successfully resolved on other matters that we're going

12  to be reporting to the Court.

13          The difficulty with trying to negotiate a middle

14  course here in court is that inevitably their insistence upon a

15  demonstration of need interferes with or encroaches upon the

16  detail level exactly what our strategy is for the use of the

17  information.

18          And it doesn't seem to me that it really is incumbent

19  upon the Celotex Trust coming in here as a third party to this

20  case to be able to kind of speak to why it is that our models

21  can be run and our analysis can be run at this late date in the

22  process based upon what they chose to say, gee, we're prepared

23  to give them.

24          So I will address this issue, but I think the issue

25  is not really a legally appropriate issue.  We have

1  demonstrated the need to get this data.  There is no other

2  source for this data.

3           THE COURT:  Well there is.  There's the claimants

4  themselves.  But, you know, I -- the debtor has attempted

5  through counsel numerous times to get this data and has not

6  been successful through the efforts that have been propounded

7  so far in getting it.

8           MR. BERNICK:  Correct.

9           THE COURT:  But there is another source.

10           MR. BERNICK:  But as a practical matter it's

11  availability at the very least is highly questionable at this

12  late date and after so much sweat has been poured out in this

13  courtroom over the process.

14           THE COURT:  But the -- but I think the point that

15  counsel makes that is the valid point it this is an aggregate

16  estimation process.

17           MR. BERNICK:  Correct.

18           THE COURT:  And to the extent that this -- that the

19  Celotex Trust is willing to give you the aggregate data, i.e.,

20  here are the claimants that have proven that they've had

21  exposure to a Celotex product and the debtor can match that up

22  against the claimants that it has who are alleging exposure to

23  a Grace product, I mean that's the information you're looking

24  for.

25           MR. BERNICK:  Well I understand. If it were that --

**J&J COURT TRANSCRIBERS, INC.**

1  if it were -- if, in fact, this information were exactly what

2  it is that we needed, we wouldn't be here arguing about it

3  today.

4          And all that I'm saying is that as kind of a going in

5  proposition for us to have to prove to Celotex's satisfaction

6  the detailed respect in which the information in the form that

7  we've asked for, the scope that we've asked for, really is

8  necessary is arguing with somebody who is frankly very closely

9  tied in the Celotex Trust is effectively run by lawyers for the

10 -- from the asbestos bar.

11         I mean this is a fact.  They have a different

12 obligation, but there's an advisory committee of lawyers that

13 act with respect to this trust, there are trustees.  It is

14 very, very much, you know, we haven't pursued any of that, but

15 the party that's coming in here and objecting is objecting for

16 a very good reason which is --

17         THE COURT:  Oh, of course.

18         MR. BERNICK:  -- which is the other claimants don't

19 want us to have the information.

20         THE COURT:  But there is still a proprietary aspect.

21         MR. BERNICK:  Well the proprietary aspect I want to

22 get to in answer to Your Honor's question.  But the proprietary

23 aspect is very specific that's cognizable.

24         It is not the simple fact that this information has

25 value that gives rise to a barrier or even a hurdle for

1  discovery.  All kinds of information that's obtained from third

2  parties has tremendous value.

3         Every time you subpoena the business records of any

4  third party organization, all of those business records, no

5  matter what the circumstances are or were, have treatment --

6  have required probably tremendous resources to produce in the

7  first instance.

8         In many cases you can have scientific disputes or

9  antitrust disputes that implicate business plans of the most

10 sensitive nature, plans that will dwarf in value the entire

11 value of the Celotex Trust and yet the fact that they have

12 value is not a barrier to the discovery.

13        The question is whether the discovery will in some

14 fashion impair that value, diminish that value.  And the first

15 question there is well how is it going to be used?  And the

16 answer is it can't be licensed out.  The people who are getting

17 it here can't use it for any purpose and it is, after all, a

18 very limited set of information.  It is solely with respect to

19 the Grace case.

20        And I would venture to say that there aren't a heck

21 of a lot of -- of cases that are still -- that stand before

22 Your Honor in anywhere that present the possibility of some

23 subpoena for a broad population of data.  And then critically

24 the data that's being sought, Your Honor, is not the same kind

25 of data that is being licensed out for value by, for example,

1 the Manville Trust.

2          The Manville Trust licenses out a data set.  And
3 we're not talking about that data set.  The Manville Trust also
4 has exposure data.  That's the exposure data that we're seeing
5 here.  The Manville Trust doesn't license out this exposure
6 data.  There's not a marketplace that we're aware of today for
7 exposure data.

8          So they're saying -- Celotex Trust comes in here and
9 says we're not going to tell you that these guys are going to
10 license it because they're not, we're not going to tell you
11 that we're in the market for licensing because we're not, and
12 in fact we can't even tell you that there is a market to be had
13 for exposure information because thus far there is no such
14 market.

15          So the idea that somehow the exposure information as
16 opposed to the medical information which is licensed out and
17 which we are not seeking with respect to the Celotex Trust, the
18 whole idea that the exposure information is proprietary and is
19 threatened in some dramatic sense is made up.  There's no
20 market, there's no participation in the market, there's no
21 sweat to participation in the market.

22          So what it really comes down to is they say it costs
23 us money to make -- to gather this data and it is of value to
24 you.  That is the specific factual and legal proposition that's
25 being advanced.  It costs us money to create and it is valuable

1  to you, therefore means it's protectable and that's just not

2  so.

3           The cases don't say that.  All information costs

4  money, all information that's being sought through a subpoena

5  has value otherwise people wouldn't want it.  And it's the

6  nature of the legal process that that kind of information is,

7  in fact, available in order to acquit the purposes and

8  functions of the United States courts.

9           And the rules do not say that Celotex can say (a) I

10  think it has value because we made it, (b) because you want it,

11  and then even though we're not licensing it, we just don't want

12  to give it to you.  That's really the proposition that's being

13  advanced is not that oh, we're licensing and you're going to

14  hurt our licensing business, it is that it somehow one day may

15  be licensable and therefore we decided that Grace should not

16  have it in this case.  That is not a proper argument under the

17  law.

18           But to get back to Your Honor's question, what are we

19  asking for.  I've got Exhibit O to what I think was our motion

20  which is the individualized claim form, review claim form, that

21  the Celotex's Trust uses to screen and -- the light here's not

22  so great.

23           There's several occasions, it actually has in total

24  of 11 pages with the signature page, so it's 10 pages and

25  there's I think five of five pages.  So it's a multi-page

1  document.

2         And the whole big part of this deals with medical

3  information.  We're not interested in that.  There's a specific

4  part of the data that we are interested in, it's part four,

5  occupational exposure to Celotex or Kerry Canada products or

6  operations.  It's one page.

7         And it says not simply were you exposed, but just

8  like our questionnaire did it asks what was the job -- what was

9  the industry code of your occupation which we also did.  And

10 then it says specifically describe how -- describe how injured

11 party was exposed to Celotex or Kerry Canada products or

12 operations.  Name of Celotex or Kerry Canada products to which

13 the injured party was exposed.

14        It is the very, very specific question of what was

15 the nature of your exposure.  That is not revealed by yes, no,

16 I was exposed.  That is how were you exposed, i.e., with the

17 durations that are involved which are also here and what we're

18 trying to get at is how significant quantitatively was the

19 exposure to Celotex, Kerry Canada product.  That's the question

20 that's being posed.

21        That's the question that we want the answer to.

22 That's the same question that Your Honor approved in our

23 questionnaire that the claimants didn't answer.  And that takes

24 us back to need.

25        We need exactly what we asked for in the PIQ.  We

1 need what the extent of exposure was to Grace product

2 quantitatively and what was the extent of exposure to non-Grace

3 products quantitatively on an aggregate basis.

4        That information can only, only, only come from here

5 at this point.  And for Celotex on the basis of what we really

6 think is a false argument about value, false legally argument

7 about value, for them to say well we'll give you a little bit,

8 but we're not going to give you what we -- what you think your

9 model really needs.

10        THE COURT:  Well do you want to -- you want to pay

11 for copies of Page 4, Page 1 and Page 4?

12        MR. BERNICK:  We --

13        THE COURT:  Because if that's the case, I mean

14 Celotex has absolutely no proprietary information as to -- as

15 to information that's copied -- provided by the plaintiffs.

16        MR. BERNICK:  Here's the -- here's the problem.  This

17 is why it's much, much, much easier, less burdensome, less

18 expensive to the state and much more accurate.

19        As in our case we did have -- they apparently saw

20 this practice that Your Honor is very familiar with where

21 people attach or submit.  So what the database reflects is what

22 it is that the readers who look through those attachments saw

23 by way of answers to these questions.

24        Now it can -- that's what we're going to see.  Now

25 the argument can be made well, that's not the claimant

1 themselves, that's an interpretation.  And the answer's that's

2 correct.  Somebody went through the process and did the

3 interpretation and to that extent -- to that extent it is not

4 the witness himself or herself.  But again for estimation

5 purposes it's pretty darn good because what you're talking

6 about is the same kind of reader following the same kind of

7 protocol going and getting the aggregated data.

8         For us to do it with respect to these documents would

9 cost a lot of money.  And it has already been done.  It does

10 have value, although it has value uniquely to us, uniquely to

11 us, and to this Court.

12         Now why is that necessary for legal purposes?  It's

13 very simple.  Your Honor, one day we'll be going through some

14 of these cases, <u>Georgia Pacific v. Fred Stevens and Betty</u>

15 <u>Stevens</u>, Court of Appeals for the District of Texas -- First

16 District of Texas -- and this opinion was issued July 26th,

17 just a couple weeks ago.

18         Goes through the whole question of what it means to

19 say that something is a substantial cost.  And the defect that

20 we have with -- that we see in the data that's been provided,

21 the limitation I should say, on the ability of claimants who

22 are -- whose claims are going to be estimated here to prove up

23 causation which is a requirement in every jurisdiction in this

24 country under <u>Dowber</u> which is a requirement of the rules that

25 apply in this court.

1          The problem they're going to have is that they are
2    not able to say that there was causation on a claim by claim
3    basis, that is to meet the requirements of specific causation
4    they're not going to be able to do it because they can't
5    quantify any exposure by Grace and say it was a substantial
6    exposure, it was substantially causal.

7          And under these decisions, and the decisions at the
8    federal level are no different, that's exactly what you have to
9    do.  You can't satisfy a causation requirement by saying, oh, I
10   saw Grace asbestos when I was on the job.  That's not enough.
11   You have to be able to say I was substantially exposed.  I
12   worked for this period of time, with this product, in this job
13   occupation.

14         Most of the claimants are not able to do it.  They
15   don't have the data.  Now there's a quarrel about whether they
16   could ever have had the data, somehow that Grace stopped them
17   from getting it.  We're totally onto that and we'll address
18   that with the Court.  There's very, very simple answers to it.

19         But the fact of the matter is that this data
20   establishes, we believe it will establish, that you got a lot
21   of people who did have substantial exposure in working with
22   non-Grace products that were made by Manville and by Celotex.
23   And for the claimants to say that the mere fact that they
24   worked at a facility that had Grace product establishes
25   causation will fly in the face of what they themselves

J&J COURT TRANSCRIBERS, INC.

1   submitted to these other trusts by way of non-Grace exposure.

2         But very simply.  You got somebody who worked with

3   Manville insulation for 20 years in connection with the naval

4   shipyards doesn't reveal that in the Grace questionnaire, but

5   reveals that in the course of making a claim against Manville.

6         It's not simply the inconsistency, it is the

7   additional fact that we get from the Manville database that

8   says this guy was a shipyard worker for 20 years so when he

9   says I was exposed to Grace high temperature cement for two

10  years in 1987, 1988, that doesn't mean anything scientifically.

11        And our expert reports which have been submitted to

12  the Court layout in chapter and in verse a traditional toxic

13  tort analysis that deals with quantitative exposure,

14  quantitative risk and the issue of substantial causation under

15  science and under laws.  Very, very traditional.  It's now been

16  recognized for over 30 years for scientific requirements for

17  proving causation.

18        So this information is not only relevant, it's highly

19  relevant, it's uniquely accessible here and we can't have

20  Celotex basically saying well, you know, if you -- we'll give

21  you this.

22        It is we need this information and we don't believe

23  that there is any legal basis --

24        THE COURT:  All right.

25        MR. BERNICK:  -- for saying no.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Does the Celotex -- the Celotex -- did

2    the Celotex Trust have a standard rate of payment, for example

3    --

4              MR. BERNICK:  Yes.

5              THE COURT:  -- if someone was paid by a meso claim

6    then it would -- it paid X dollars?

7              MR. BERNICK:  They all have TDP -- what's called

8    trust distribution procedures.

9              THE COURT:  Yes.

10             MR. BERNICK:  You probably have heard of this from

11   time to time.  It is a set of designated medical conditions,

12   the criteria that are necessary to satisfy the condition, and

13   then the payout per claimant under that TDP.

14             THE COURT:  All right.  Then if the debtor were to

15   get the name of the -- of the claimant and the payout in

16   addition to what the standards were, then the debtor would know

17   from the Celotex Trust's position having gone through its

18   requirements, that the Celotex Trust was satisfied, that that

19   particular claimant met its standards for proof of a particular

20   level of exposure of a substantial exposure to Celotex product

21   --

22             MR. BERNICK:  Not --

23             THE COURT:  -- because otherwise --

24             MR. BERNICK:  That's the problem, Your Honor.

25             THE COURT:  -- they wouldn't be paying for meso or

1 asbestos cancer or whatever.

2         MR. BERNICK:  Another day we'll have the -- but

3 that's -- that is the -- precisely the problem with the system

4 is that all of these trusts, the TDPs, and I've negotiated them

5 personally on a number of occasions.  All of these TDPs are

6 setup by agreement.  These are all part --

7         THE COURT:  Sure.

8         MR. BERNICK:  -- where the money's there and the

9 question is who gets the money and for the most part it's a

10 question of negotiations even involving the debtor or the Court

11 involves the claimant's inter se because they're dividing up

12 the pie according to disease and according to --

13         THE COURT:  Well, yes.

14         MR. BERNICK:  But --

15         THE COURT:  But you still have to meet the exposure

16 criteria.

17         MR. BERNICK:  No, no.  There's absolutely -- it's

18 totally -- this is totally a matter of contract.  That is the

19 money is there, the TDP defines exactly what the conditions are

20 that you have to meet and it is a condition of, I venture to

21 say, none of these trusts.  That you have to meet for

22 settlement purposes of a claim against a trust pursuant to a

23 TDP.  These are all being agreed to.  None of them will require

24 that somehow you meet a standard for substantial contributing

25 factor.

1              The way that you satisfy these requirements
2    essentially is that you submit documentation, you fill out the
3    form saying I did this work, I was at a job, the job site had
4    the product and I worked -- I worked at the job site.  That's
5    pretty much what is required to get paid.
6              These -- these -- you're looking at me skeptically.
7              THE COURT:  No, no, no.  I'm not looking at you
8    skeptically.
9              MR. BERNICK:  The TDPs -- these assessors don't sit
10   there --
11             THE COURT:  No.
12             MR. BERNICK:  -- and review TDPs and say oh, well,
13   gee, was a substantial or not.
14             THE COURT:  No, no.  I'm not looking at you
15   skeptically for that reason.  What I'm --
16             MR. BERNICK:  Something else?
17             THE COURT:  Yes.  I'm being skeptical about the
18   utility of getting to the bottom of the information if on the
19   one hand it's totally unreliable.
20             MR. BERNICK:  No, what -- that's -- that could be,
21   that is to say, not totally unreliable.  Is it going to be
22   limited?  Yes, it's going to be limited.  There's no question
23   about it.  But whatever it is, whatever the nature of the
24   information was, at least we'll have it.  So that when they're
25   presenting their claim as they did in the PIQ and there's no

1 information about exposure to non-Grace products in the picture

2 that's presented to the Court, is solely that of Grace

3 exposure.

4         And not only that, but they'll say, I mean in these

5 job descriptions we'll show them to you in detail.  They'll be

6 I worked at Bethlehem Steel Shipyards from 1968 to 1987.

7 Period.  That's all we'll know.  And there's Grace product

8 there.  There's almost nothing.

9         Well then if it turns out that they worked at

10 Bethlehem Shipyards and they say that they worked with and

11 their -- whatever materials they have, Celotex product for that

12 entire period of time or they worked as insulators before that

13 and were exposed to Celotex, you now have a world different

14 picture of what their actual ability is to prove the Grace

15 exposure (a) was real and (b) was a substantial contributing

16 factor.

17         THE COURT:  Well you may or may not.

18         MR. BERNICK:  Well we -- we have now done the

19 sampling -- we have done the sampling analysis, Your Honor.  We

20 have looked through all of the documentation for all of the

21 meso claims and that is the information that now is animating

22 the --

23         THE COURT:  All right.

24         MR. BERNICK:  -- the final reports that you're going

25 to be getting and we have a quantitative analysis of fiber

1 concentrations and years that people would have been exposed to

2 from Grace product.  We have it.

3          And -- and the only question then is to balance out

4 the equation, well what is the history of exposure to other

5 product?

6          THE COURT:  Well I think --

7          MR. BERNICK:  And it's the same kind of information.

8 This is the only place to get it.

9          THE COURT:  Well it seems to me that from the

10 debtor's perspective of what it is attempting to do to prove

11 what the -- the limitations I suppose of its asbestos personal

12 injury liability are going to be that this information is

13 necessary.

14          I'm satisfied that the debtor has substantiated that

15 from its perspective the information's necessary.  The issue is

16 how to get it in a fashion that is not going to damage whatever

17 proprietary information the Celotex Trust has.

18          I agree with you, Mr. Bernick.  I do not believe the

19 cases ever have said that the fact that somebody has invested

20 time, effort, and money into putting together information is a

21 reason to stop discovery because I agree that if that were the

22 standard, no discovery would ever take place.

23          But I do believe protective measures are necessary

24 and I do believe that it is appropriate for the debtor's estate

25 to bear the cost of putting together the -- whatever the

1  expense is going to be to the Celotex Trust in having to cull

2  through certain bits of information.

3        I don't think the debtor is entitled to wholesale

4  massive delivery of the Celotex database and I'm not going to

5  order that.

6        MR. BERNICK:  No I, Your Honor, we would be very

7  prepared -- first of all, we're not ask -- we're only asking

8  for part of the database.  But whatever the costs are to

9  extract the data that we're talking about which is the data

10 that pertains to that Page -- Page 5a of the questionnaire, the

11 data that pertains to it including the underlying data, what --

12 it's already gathered electronically.  In other words people

13 don't have to re-review underlying documents.

14       We're satisfied to get whatever actually has been

15 captured in the way of information electronically that they

16 have.  But to extract from that what is relevant to Page 5a we

17 would recognize the cost of the extraction are costs that we

18 should have to bear and we're more than happy to sit down and

19 talk about what those costs are and get that resolved.

20       That has not been -- we've not gotten to that point

21 in any of the discussions because we had these other threshold

22 issues.

23       THE COURT:  All right.  The other issue is protecting

24 the data.

25       MR. BERNICK:  Correct.

1          THE COURT:  The data would be solely for use in this

2    estimation and I do mean in the estimation, not for any other

3    purpose --

4          MR. BERNICK:  Right.

5          THE COURT:  -- in these proceedings.  At the end of

6    that time all of the data would be returned to the Celotex

7    Trust.  There would be no other use to be made of it by any

8    party in this proceeding period.  That's the end.  Not an

9    insurance company, noone else.

10          Any expert that's given access to it will have to

11    scrub their databases, all their records, and return the

12    information to the Celotex Trust.  So to the extent that they

13    have to setup special systems to do it, they'll have to do it.

14    They'll have to file an affidavit indicating that they have set

15    that system up before they get access to it -- to the data.

16          MR. BERNICK:  Yes, that's fine, Your Honor.  We

17    anticipated that and we understand how this --

18          MS. BIVANS:  Your Honor, if I could.  This is Beth

19    Bivans on behalf of the DII Investors Trust and I have --

20    apologize for being on the phone today.  I have been sitting

21    quietly by and obviously our -- our papers have addressed the

22    issues that are of most concern to DII which primarily is that

23    our TDP requires us to keep claimant information such as it is

24    absolutely confidential to not release it to third parties

25    absent a court order and to notify claimants if, in fact, court

1 order is granted.

2         And so from our perspective our hands were somewhat
3 tied with respect to the subpoena and, you know, absent a court
4 order ordering us to cooperate with the debtor's desire to get
5 this.

6         I do think that the subpoena as stated is far broader
7 than the information we've been talking about in court and so
8 based on the assurance that has been made that we're looking
9 for really exposure related information only and not a broader
10 amount of information related to medical and all of that, that
11 resolves some of the DII Trust's concerns with respect to that
12 and the fact that there will be a protective order.

13         And then the burden and cost was our third concern in
14 this time.  Seems to me based on the conversation that the
15 Court is very amenable to us discussing with the debtors the
16 cost of not only extracting the data on behalf of the DII
17 Trust, but also the costs that we'll have to incur in order to
18 notify our claimants that it's going on.

19         This -- the subset of claimants that the DII Trust
20 has been asked to -- to review the information for is much
21 smaller than that that Celotex had to address and is, as I've
22 indicated earlier, related solely to mesothelioma claimants.

23         So there will be some burden on the trust in order to
24 access the information that's being discussed, but the burden
25 concern is relieved if, in fact, their -- the costs are going

1 to be borne by the debtors.

2        THE COURT:  Okay.  Yes, the cost will be have -- have

3 to be borne by the debtor.  I think you folks will need to get

4 together and to -- to discuss specifically how and what because

5 I think the -- to the extent that the debtor wants to limit the

6 access to the information based on that fact, the debtor can

7 certainly do that if you choose.  But the cost will have to be

8 borne by the debtor.

9        MR. DONNELLON:  Absolutely, Your Honor.  If I may be

10 heard on a couple of points here.  I sort of had the podium

11 wrestled away from me, but since it was at the invitation of

12 Your Honor for Mr. Bernick to answer a question --

13        THE COURT:  Yes.

14        MR. DONNELLON:  -- I certainly yield.  But throughout

15 the entire time I don't think I heard Mr. Bernick answer that

16 question out of either side of his mouth when he was saying on

17 the one hand that if someone tells us they looked at a Celotex

18 product they get paid, and on the other hand saying we really

19 need to know the details of the exposure they're saying to

20 Celotex.

21        He went on and on about Page 5 of the -- of the claim

22 form and things of that nature, but what I heard Your Honor

23 saying is that you felt the necessity in aggregate estimation

24 was to say these claimants with these Social Security numbers

25 have established to Celotex's satisfaction under their CRP --

1  which is our version of the TDPs in other trusts -- that they

2  were exposed to Celotex product.

3        That's not out of the realm of possibility and we can

4  offer a witness to explain anything else that's in the

5  database.  But I think I simply want to offer an analogy to

6  bring this down to earth a little bit.

7        Suppose I have a library full of case books and I sit

8  there and I think it would take me hours and hours to go

9  through all those case books and try to find out how many of

10  them deal with aggregate estimation in asbestos 544g cases.

11  I've got an idea, West Law has a database of all of those

12  cases.  I'm going to issue a subpoena to West Law and I'm going

13  to tell West Law give your entire database and let me search it

14  on my own.

15        And when West Law objects that it's proprietary and

16  it has too much, they'll say well, okay, give me -- give me

17  this search.  Tell me every case with the words asbestos and

18  524g and aggregate estimation and -- and just print out those

19  cases for me.

20        We're talking about something that has proprietary

21  value not just to the trust, but is saving resources and money

22  in large sums for this debtor.  And Celotex has to be able to

23  be in the position to -- to receive appropriate remuneration

24  for that.

25        And I also think, and I heard Mr. Bernick saying,

1 that they're confining their own internal work right now to

2 mesothelioma cases only.  And I understand at least from Ms.

3 Bivans that their subpoena is for mesothelioma case only and my

4 firm also represents one of the other or two of the other

5 trusts that have received similar subpoenas and those are

6 confined to mesothelioma cases only.

7 And I would submit if we're talking about issuing an

8 order here to the Celotex Trust because we have the same

9 confidentiality concerns that we agreed to protect our

10 claimant's submissions, if we're -- if we're talking about an

11 order that would say Celotex tell them the Grace claimants who

12 have also told -- who have established to your satisfaction

13 exposure to Celotex product, shouldn't we appropriately

14 confining this to mesothelioma claimants so that we're not

15 going farther and broader than the limited search that I used

16 as an analogy asbestos in 524g?

17 THE COURT:  Well let me find out whether the debtor

18 is just limiting the whole thing to meso cases.

19 MR. BERNICK:  No, and I tried -- I did advert to

20 spending time focusing on -- again this is now all stuff that

21 could have been covered before.  But be that as it may, we made

22 a distinction, that is, with respect to the older trusts who

23 have been in business longer, will have a more substantial

24 overlap with Grace and operated at a time when non-malignant

25 claims were kind of robust and at a peak, we sought all of the

1  claims.

2          THE COURT:  Right.

3          MR. BERNICK:  And we did the same thing with respect

4  to Manville.

5          THE COURT:  You did say that.

6          MR. BERNICK:  Yes.

7          THE COURT:  I guess the question though is whether at

8  this point the debtor is limiting its focus to the meso claims.

9          MR. BERNICK:  No, we are with respect to trusts where

10 we think that (a) they're not as mature and (b) they're

11 operating at a different point in time.  But with respect to

12 the old trusts including Manville, we're -- we're covering what

13 we -- what we really have to do as well which is lung cancer

14 and also the non-malignant claims.

15         What we're talking about in terms of burden, of

16 course, is just a question of, you know, what's the swath of

17 people that you -- that you pull off electronically.

18         But, yes, it's very important.  And the reason --

19 there has not been a decision to limit anything to meso in this

20 case.  What we've done is that because of the -- there being --

21 the meso claims being valuable and because there's a limit on

22 how much time we have, when it comes to file by file review of

23 the backup for the claims that are going beyond the PIQ itself

24 to the backup, what I said was that with respect to meso, we've

25 reviewed all of that backup.

1        We don't have the time, we don't have the money to go

2   ahead and review it with respect to everybody else.  And that

3   backup review incidentally includes many, many other things

4   besides exposure.

5        So there is not a limitation of this case to meso.

6   This is very important information for us with respect to lung

7   cancer which is a valuable claim and non-malignance.  And

8   that's why we cast it as broadly as we did.

9        MR. DONNELLON:  And if I can offer the same analogy.

10  What Mr. Bernick basically just said is our subpoena to West

11  Law wants all cases dealing with aggregate estimation because

12  they have a much more mature database.  But our subpoena to the

13  internet company Lois Law that's only been around for three

14  years, well then we're going to narrow the scope to 524g only.

15       And we're simply -- it's a necessity that they have

16  not established yet.  Mr. Bernick stood here and said that they

17  shouldn't have to establish necessity to the satisfaction of

18  the Celotex Trust and even made some indication that somehow

19  I'm here as a representative of the plaintiff's tort bar which

20  I assure you I'm not.  I'm here representing the Celotex Trust.

21       THE COURT:  I think he has to substantiate necessity

22  to me and he has substantiated necessity to me.  So as the fact

23  finder, I'm finding that he has substantiated necessity.  I --

24  I'm sorry if the Celotex Trust disagrees, but I think under the

25  debtor's theory of this case he has substantiated the

1 necessity.

2          I don't know how it's going to shake out.  That's not

3 findings of fact on my part.  That's an issue dealing with

4 discovery.  I see a need for the debtor to get the information

5 that the debtor says it needs from the Celotex Trust.

6          MR. DONNELLON:  And I understand that.  And I just

7 want to make sure you and I are on the same page with that.

8 What I understand you saying is he established the necessity to

9 get the information from Celotex in the aggregate.

10          THE COURT:  Yes.

11          MR. DONNELLON:  Not the detail on every -- each and

12 every claim.  And if they want that, they can go to the hard

13 copy files but --

14          MR. BERNICK:  Wait --

15          THE COURT:  No, what I've said is the -- the debtor

16 has substantiated the need for the exposure data that it has

17 asked for as reflected on Page -- I thought it was 4 -- but

18 Page 5, whatever the exposure, one page, information sheet or

19 the backup documentation to the extent that a claimant did not

20 fill out that sheet but instead attached a document and a --

21 some employee of the Celotex Trust or independent contractor

22 for the Celotex Trust input the data into a computer system by

23 virtue of reading it.

24          There is a -- there is apparently an e-file, a data

25 file, that contains a name, I guess a Social Security number to

1   match up against a name, and an exposure history, work exposure

2   or -- pardon me -- product exposure history.

3          That's what the debtor is asking for, reduced to its

4   essence, that's what I'm order to be produced.  I'm not

5   ordering that it be produced in a fashion that will violate the

6   Celotex Trust's proprietary database.  But it has to be

7   produced.

8          The debtor has substantiated that it has a need for

9   it given the debtor's theory of this case.  I agree with the

10  debtor that it has substantiated that need and the debtor has

11  been unsuccessful despite actually over a year of effort in

12  attempting to get that from other sources.

13         So at this point I am satisfied that this is the

14  need.  On behalf of the debtor it has substantiated that this

15  is the place where it has to go to get this information.

16         MR. DONNELLON:  And can that be produced in hard copy

17  form?

18         THE COURT:  Well I don't -- I, you know, I'm ordering

19  that it -- that all -- all files that -- of anybody that use it

20  be returned back to Celotex at the end of the estimation

21  hearing anyway.  So I think to the extent -- and I did order in

22  one case recently that information not be produced

23  electronically and I think that was a big mistake.

24         So I -- I think at this point in time probably

25  electronic data is a much preferred way to do it.  Is there a

1 way that this data can be produced in a fashion other than, you

2 know, whatever the software is that Celotex has developed?

3        I -- I don't -- I'm not even familiar with the words

4 to use to describe it so I can't, you know, let's say your

5 database is called X.  Is there a way to produce it in some

6 database other than X?

7        MR. DONNELLON:  I think it's in Microsoft Sequel

8 Server which Microsoft Sequel is fairly ubiquitous.  So I --

9        THE COURT:  So it can be produced in that fashion.

10        MR. DONNELLON:  I think it's --

11        THE COURT:  But the expense is to be borne by the

12 debtor and I've already indicated that anybody that's going to

13 make use of that, an expert witness, you know, a committee

14 counsel, a committee member, anybody that is going to make use

15 of that data must sign an affidavit that indicates that they

16 will maintain the proprietary nature of it, they will produce

17 no copies that are not to be returned to the Celotex Trust at

18 the end of the estimation hearing.

19        So you will get all your data back from everybody at

20 the end of the estimation process.

21        MR. DONNELLON:  And does this obviate the need to

22 produce a witness or to produce any hard copy files of the 73

23 -- 75,000 claimants?

24        THE COURT:  Well I don't know why you need a hard

25 copy file.

Case 01-01139-AMC   Doc 16747   Filed 09/05/07   Page 95 of 121

1          MR. BERNICK:  I don't think that we're going to need

2   hard copy files.  The whole point of this is to avoid that.

3   I'm assuming that just like all the other things that we're

4   talking about, counsel's asking for guidance with respect to

5   something that we're the devils in the details.

6          I think we have to work on that and make sure that

7   this -- the debtor has an interest only in getting the

8   aggregate data that it needs.  If we have a disagreement, I

9   guess we'll have to come back to the Court.

10          But my expectation will be that if we get the data

11   that they've entered from these documents in a form that is

12   readable and usable by us, we won't have a need for hard copies

13   of the claims -- excuse me -- of the claims data.

14          With respect to the deposition, the deposition will

15   be -- there are a couple of topics that are covered here.  One

16   of them is what we've been talking about, another is decisions

17   that they made about what doctor's reports to accept.

18          We are going to need a deposition of somebody to talk

19   to us about -- to authenticate this data so that we're sure

20   that we're not going to run into admission problems and to talk

21   about basic procedural things that are necessary to make sure

22   that we properly characterize this information.

23          This is not a huge deal and that is the purpose of

24   the deposition.

25          MR. DONNELLON:  I'm not trying to sidestep anything.

**J&J COURT TRANSCRIBERS, INC.**

1  The subpoena was much broader than what Your Honor's

2  articulated you're ordering to produce and I'm just trying to

3  coverup all the other issues that --

4         MR. BERNICK:  Well --

5         MR. DONNELLON:  The deposition we understand.  We'll

6  have to produce a witness on that.

7         MR. BERNICK:  Yes.

8         MR. DONNELLON:  But we have made objections that I

9  have not heard are an issue with.

10         MR. BERNICK:  Again, I came here today to deal with

11  the issue that is framed by the motion to compel and the

12  responses to the motion to compel.  My understanding is that

13  there are agreements that we have already reached to narrow the

14  scope of the original subpoena in certain respects and in other

15  respects I believe that -- that Celotex -- the Celotex Trust

16  has agreed to give us certain things like documents that were

17  associated with the decision to change the procedures for

18  accepting certain doctors and I don't want to take any of that

19  off the table.

20         I have addressed with the Court what's covered by our

21  motion and I've not sought to displace any other agreements

22  that have been reached to narrow the scope of the -- of the

23  subpoena.

24         THE COURT:  Yes, I'm not entertaining any issues that

25  the parties have already agreed to.  I was only looking today

1  for some argument with respect to issues that were not agreed

2  upon.

3         MR. DONNELLON:  Absolutely.  And with all due

4  respect, Your Honor, Mr. Bernick said he came here prepared to

5  address the one -- the one narrow issue on the motion.  I came

6  here for a status conference.

7         THE COURT:  Yes --

8         MR. DONNELLON:  So I'm just trying to cover the other

9  issues that are on that and if you leave those --

10        MR. BERNICK:  I'll --

11        MR. DONNELLON:  Let me finish.  If we leave those to

12 what we've already resolved and worked out I think we can -- we

13 can resolve that.

14        THE COURT:  All right.

15        MR. DONNELLON:  The only thing we would need to have

16 a court order on is this issue on the electronic database so

17 that we will produce it.

18        THE COURT:  All right.  Well my order which I will

19 try to state on the record but I will -- I know the devil's in

20 the details and I will hope that you folks can work out an

21 order because I don't know all of the appropriate words to the

22 extent that you need to identify databases and so forth if you

23 need to do that.

24        But what I'm ordering to be produced in electronic

25 format is the name of the claimant, some identification number

1  such as the last four digits of the Social Security number so

2  that the debtor can match up a claimant, especially claimants

3  with duplicate names, against its file.

4         You folks can work out an identifier if that is not

5  an appropriate one.  It seems to me that that may be.  But if

6  there is some better identifier, you can work out an

7  identifier.

8         And the exposure history that the debtor is asking

9  for in the subpoena.  That's what I'm ordering to be

10  produced.

11         MR. DONNELLON:  Which would be as we understand, and

12  I have it up here on the elmo, Page 5a, Part 4, occupational

13  exposure.

14         THE COURT:  I'm sorry.  I don't have -- okay, I'm

15  sorry.

16         MR. BERNICK:  I believe that counsel's correct.  I

17  have it down as Page 5a--

18         MR. DONNELLON:  Yes.

19         MR. BERNICK:  -- Part 4 and -- and, again, I am much

20  less familiar with this than my partner, Ms. Hearn, but I do

21  believe that that is the page that deals with occupational

22  exposure.

23         MR. DONNELLON:  It is.

24         MR. BERNICK:  Yes.

25         MR. DONNELLON:  And --

1          MR. BERNICK:  And so if we have that and we have the

2    identifying information sufficient to tell us it's the same

3    person that we already know about from the Grace database, then

4    obviously there's a lot of information that that has that we

5    already have and we don't need to get the parallel information

6    from Celotex.

7          MR. DONNELLON:  And in complete candor there's a

8    companion component Part 5 that deals with persons who claimed

9    secondary exposure, if they were exposed to a person who's

10   occupational exposed.  I would think both -- that would only be

11   appropriate in certain instances, but both of those would be

12   what Your Honor's ordering.

13         MR. BERNICK:  Yes.

14         THE COURT:  All right.  That's fine.  Yes.

15         MR. DONNELLON:  That's fine.

16         MR. BERNICK:  And then we will -- we'll draft up an

17   order and circulate it to counsel for both Celotex and for the

18   other trust Mr. Finch has.

19         THE COURT:  Yes, Ms. -- just a minute, Mr. Finch --

20   Ms. Bivans, is there anything about what I've just ordered that

21   is of concern to DII?  And of course part of this will -- order

22   will be that this is at the expense of the debtor.

23         MS. BIVANS:  No, Your Honor.  Based on what we

24   discussed, our claim form, the parts may be slightly different

25   from the Celotex claim form that you guys are looking at in the

1  courtroom, but I understand the substance of what Your Honor's

2  ordering us to produce and I will -- I think we won't have any

3  problem subject to the -- to the concerns that we'll need, you

4  know, to deal with the costs with the debtor and then obviously

5  under our GEP we will need to inform those claimants that are

6  impacted that the Court's ordered us to do so.

7          THE COURT:  All right.  Thank you.  Mr. Finch?

8          MR. FINCH:  Nathan Finch for the Grace Asbestos

9  Claimants Committee.  In my capacity as counsel for the Grace

10 Asbestos Claimants Committee all I would ask is that the order

11 also provide that the debtor will produce to counsel for the

12 FCR and counsel for the ACC in electronic format whatever it

13 receives from Celotex or the Dresser Trust within three

14 business days of receipt by the debtor.

15         MR. BERNICK:  That's fine.  We'll just make sure that

16 a copy, subject to of course the agreement of counsel, but a

17 copy just of whatever we get goes out to you guys.

18         MR. FINCH:  Right.  I was just asking that we get it

19 within like three days you they don't sit on it for some

20 reason.

21         MR. BERNICK:  Like we're thinking of sitting on it

22 for awhile but then --

23         THE COURT:  Yes, you can have it within three

24 business days subject to the same confidentiality --

25         MR. FINCH:  Same confidentiality protectives that are

**J&J COURT TRANSCRIBERS, INC.**

1  in the order already.

2           THE COURT:  Exactly.

3           MR. DONNELLON:  Right.

4           MR. FINCH:  Thank you, Your Honor.

5           MR. PASQUALE:  Your Honor, if I may?  Ken Pasquale

6  for the Official Creditors Committee.  That -- that same

7  information should go to all of the parties to the estimation

8  proceeding.

9           THE COURT:  It should go to all the parties to the

10 estimation proceeding subject to the same confidentiality

11 provision which I've already addressed, yes.

12          MR. PASQUALE:  Of course, Your Honor.  Thank you.

13          THE COURT:  Well when I say to all the parties, that

14 is the committees because I don't know who else is going to be

15 participating.  If anybody else wants it, I -- you can -- they

16 can sign the appropriate confidentiality provisions and file

17 the appropriate affidavit.

18          Someone else was going to speak?  No?  Okay.  Mr.

19 Bernick?

20          MR. BERNICK:  Yes, I -- going on to the remainder of

21 the agenda which I think will be fairly short, there's a item

22 11 on the agenda is a status report with respect to personal

23 injury claims.  And then items 14 and 15 relate to three claims

24 by -- that are represented -- three claimants that are

25 represented by Mr. Speights.

**J&J COURT TRANSCRIBERS, INC.**

1          Your Honor issued an order with respect to those
2    items earlier today and I just want to spend a moment touching
3    on that order.  We've received it, we've read it, and we -- I
4    think we understand it.
5          On the status with respect to personal injury, there
6    have been a variety of matters that have been addressed and
7    resolved.  And from the bottom line is that a lot of progress
8    is being made and it's -- and it's relatively smooth.  And I'll
9    simply confine my remarks to a couple basic areas of work.
10          First with respect to law firm discovery.  Your Honor
11    is very familiar with that.  Where we're at now is dealing with
12    what are essentially -- what's essentially the same task for
13    everybody which is are they going to respond to the third set
14    of interrogatories.
15          And Your Honor knows that we have as a result of the
16    hearings that took place the three firms that were the first
17    firms that -- as to which we moved, they are answering -- they
18    are further answering the interrogatories and the answers are
19    due I believe at the end of August.  We see no particular
20    problem there.
21          We then sought to have the same interrogatories
22    answered by the balance of the firms as to whom we had
23    requested originally depositions.  We had a meet and confer,
24    fairly extended discussion, and I believe that I've now
25    received representations from at least most of the firms that

1 they will, in fact, be answering a third set of

2 interrogatories.  The due date for those answers was the 7th of

3 September.  There have been -- there has been a request by at

4 least Ms. Ramsey to delay that somewhat and we are amenable to

5 that so there's no issue there.

6         We have further raised with counsel for the ACC and

7 the FCR whether that delay is going to lead to some objection

8 that our experts then can't rely upon them because the expert's

9 reports have already been submitted.  That's been resolved.

10 It's not going to be an issue.

11        They want their experts so that their experts have

12 the same access to the interrogatory answers and the same

13 agreement and we've given them that.

14        The last two law firms that we've always carved out

15 and set to one side are the Erley Ludwig firm and the Breighton

16 Purcell firm.  We've had a fairly extended discussion with

17 counsel representing those firms as well and Ms. Ramsey and the

18 folks at the Lowenstein firm.  And that's going to take a

19 little bit longer to resolve, but I think the good progress has

20 been made there as well.

21        So the bottom line is that with respect to law firm

22 discovery, we believe that that task is coming to a close.  We

23 don't believe -- this is also based obviously on Your Honor's

24 determinations with respect to the depositions that we did

25 seek.  We've looked broadly at the question of do we need to

1 take depositions of people from the law firms and we've

2 concluded that we don't need to unless something very

3 significant changes.

4          And indeed I've represented informally on the meet

5 and confers that I've had that once the third set of

6 interrogatories is answered, of course assuming that they are

7 answered completely and that we could reach agreement on that,

8 that the discovery against the law firms will have come to a

9 close.  So we'll be done with that part of the case and the

10 information to the extent that it's been afforded to us will be

11 used by our experts.  So that's where we stand on that.

12          With respect to the expert work that's taking place,

13 obviously it's very, very busy times.  There was a deadline of

14 September the 11th for the submission of rebuttal estimation

15 reports and we have two small wrinkles in the timing for those

16 reports that I believe have been worked out.

17          One is that because certain of the reliance

18 information for one of the experts for one of the committees,

19 because that information was produced to us over a period of

20 time and there was an issue about, you know, whether it should

21 have been -- but I'm not going to get into any of that.  It

22 doesn't really make any difference anymore because the

23 information, most of the information, has been produced.

24          Because it's taking place over a period of time we

25 approached the committees to ask whether they would agree to

1 extend the time, the deadline, for the submission of our

2 rebuttal estimation expert reports by two weeks from September

3 the 11th until September the 25th.

4       That agreement has now been forthcoming.  That is

5 that the reports will -- will be delayed by two weeks.  It does

6 not affect the deposition schedule which is now a very busy

7 schedule as we get into October and November.  So that -- that

8 will -- that has been agreed to.

9       In the same fashion the FCR has sought to bring a new

10 expert to bear in rebuttal, apparently a law professor who's

11 going to respond to certain aspects of Dr. Dunbar's report.  We

12 had a timeliness objection with respect to that designation.

13 We've agreed to withdraw that -- that objection on timeliness.

14 There may be other objections, but the objection on timeliness

15 has been withdrawn.

16       There's been an undertaking to provide us that

17 expert's report next week.  And based upon that, we will then

18 have until the 25th of September to determine whether any

19 rebuttal, including by a law professor, is appropriate with

20 respect to their law professor's report.

21       And, again, there is an agreement that they won't

22 raise an issue of timing, but also a preservation of any other

23 objections that they may have.  So effectively there are

24 parallel agreements to allow for more time, but at the same

25 time recognition that there may, in fact, be other objections

1  that are raised with respect to these different reports that

2  are -- that are being submitted.

3        So that is effectively where we are on expert

4  discovery.  It's pretty much on track, got a lot of work to do,

5  but nobody -- nothing has surfaced so far that would say that

6  the schedule fundamentally is going to be altered in some

7  fashion.

8        The last area is the -- the question of a cap on fact

9  depositions.  Now that's been raised on a couple of occasions

10 before the Court and there's been some commentary by the Court

11 that there has been a fairly extended set of discussions that

12 have taken place.

13       And I think where we have come out and I've -- I just

14 today circulated the proposed stipulation that would effectuate

15 this agreement -- is that we've been able to drop -- the basic

16 proposal was to divide the discovery allocation of the

17 deposition allocation or caps into two groups, essentially the

18 folks on this side of the room and the folks on that side of

19 the room, and to have a total cap with respect to each side.

20       We've looked through our list, and as I've indicated

21 we've dropped many of the witnesses that we thought we would

22 otherwise need to -- to depose.  So we have agreed to a cap of

23 25.  I believe the language is -- the language that had

24 previously been agreed to that said it might rise on some

25 application to like 30, but nothing more than that.  And that

1  is per group.  We don't even think, frankly, at this time we're

2  going to get to 25.

3           There are two major caveats that are built into the

4  stipulation and of course counsel has not had the opportunity

5  to look at the stipulation, so we've -- we've not yet finalized

6  it and this may -- maybe there will be some more discussion, I

7  don't know.

8           The two caveats though are fairly important also for

9  the process of thinking about this case coming to trial.  One

10 caveat deals with testimony that may be necessary in order to

11 provide a predicate for the admission of evidence.

12          We've got all kinds of documents, all kinds of data

13 that's been obtained during discovery.  There are depositions,

14 there are subpoenas that have been served on doctors, on the

15 screening companies.  Many of those doctor and screening

16 company employees have taken the Fifth Amendment.

17          So we have a situation where we have a lot of

18 material that's been obtained by third parties as well as from

19 the law firms and we want to make sure that we can get it into

20 evidence.

21          To get it into evidence if there are objections on

22 grounds of authenticity or foundation as business records and

23 those objections are pressed, we would need to go ahead and

24 take custodial depositions.  Our hope and expectation I think

25 is shared by other counsel is that won't be necessary that

1 basically documents that have been produced pursuant to

2 subpoena that are documents that are essentially ordinary

3 business records will be fully admissible subject to obviously

4 other objections like, you know, relevance or prejudice Rule

5 403.  But the basic foundational requirements won't be objected

6 to.

7         We don't know how that's going to turn out and,

8 therefore, those kinds of depositions are not subject to the

9 cap.

10        Secondly, the date for the exchange of final lists of

11 fact witnesses to be called at trial is September 24th and as a

12 consequence we don't yet know, no side really knows, exactly

13 what the final list is going to look like.

14        I think, again, there's a shared desire to have lists

15 that are real lists as opposed to, you know, well here's who we

16 might call.  There are lists of who we really will call.

17        But to the extent that the lists include people whose

18 depositions have not been taken, we want to make sure that we

19 can take depositions of those people and I'm sure that they

20 feel the same way.

21        As a consequence, that is the second caveat.  Those

22 types of depositions, to the extent they become necessary, are

23 not subject to the cap of 25.  So that's the agreement that

24 we've reached.  We hope that it comports with Your Honor's

25 sense of -- of what's appropriate.  And if the stipulation is

1 made, we'll then submit it to the Court and we think that we

2 got that matter resolved as well.

3         And beyond that I'm not aware of anything that the

4 debtor needs to raise with respect to personal injury, but I'll

5 turn it over to my colleagues here in the event that they want

6 to differ with what I say or raise any other issue.

7         THE COURT:  Mr. Finch?

8         MR. FINCH:  No, Your Honor.

9         THE COURT:  Mr. Mullady?

10         MR. MULLADY:  Nothing further from the FCR.

11         THE COURT:  Anyone?

12         MS. RAMSEY:  Your Honor, yes, this is Natalie Ramsey

13 on the phone.  I just want to clarify one point.  There is one

14 remaining obstacle that we expect will be worked out

15 satisfactorily to the agreement by my firm to provide

16 substantiative responses to the interrogatories and I just

17 wanted to clarify the record on that point.

18         THE COURT:  Okay.

19         MR. BERNICK:  Yes, I think there's been some

20 discussion and correspondence and I, of course, remain

21 optimistic that it will be resolved in part because it doesn't

22 pertain to the debtor for once.

23         The last two items on the agenda are the matters that

24 are covered by the order that Your Honor just issued that

25 relate to three of the claims that were expunged by order of

1  the Court.  These are the claims that the debtor said were late

2  claims and should be expunged.  Your Honor issued an opinion on

3  ratification and various pleadings have been filed seeking to

4  except from the order that resulted from that opinion three

5  particular claims.

6          And we've read the order, we think we understand the

7  order, and I would only ask that the Court, among the issues

8  that are listed to be addressed going forward, that the --

9  which I think they're on Pages 4 and 5, they're basically kind

10  of going forward things that we need to do -- that a very

11  particular issue be added to the list because I think that to a

12  certain extent it's been under the radar so far and really is I

13  think where a lot of this turns.

14          And if Your Honor will just indulge me for a moment

15  I'll try to identify it very quickly.  Your Honor suggests that

16  having looked at the transcripts for the hearings on January 25

17  and January 26 of 2006 that -- I think Your Honor's language

18  was the testimony from the January 25 hearing indicates that

19  Speights postpone an argument over the authorization for these

20  three claims because it would have been moot had this Court

21  allowed ratification.

22          And I take it that's a fairly important predicate

23  finding for Your Honor then opening the door to having further

24  discourse with the Court.  Now obviously the debtor -- the

25  debtor's view and position is that postponement, the argument

1  that really had been made, was that Your Honor determined that

2  there was not an obligation on the part of these claimants to

3  have completed the record of whatever authorization they had

4  prior to the time that Your Honor ruled.

5          And we would submit the fact that Mr. Speights

6  postponed an argument doesn't really in a sense go directly to

7  the question of whether the Court relieved Mr. Speights's

8  clients of the obligation to perfect the record.

9          But be that as it may, there -- it does implicate a

10 fairly fundamental question and that is beyond the question of

11 whether Mr. Speights postponed his argument, was there an

12 obligation that Mr. Speights had that he was relieved of to

13 submit to the debtor whatever it was that comprised the record

14 of authorization prior to the time that Your Honor ruled?

15         That is to say Mr. Speights may have decided not to

16 argue the matter at that time in January of '06.  The problem

17 is not just the argument, the problem is the first time that

18 these particular versions of these documents emerged was after

19 Your Honor had ruled based upon a closed record.  And in that

20 respect --

21         THE COURT:  Well I thought that was the reliability

22 issue that the debtor was raising.

23         MR. BERNICK:  It was not -- it was not -- did not

24 relieve the reliability issue because it's clear that the

25 copies that we were furnished are not the same copies as the

1  copies that were subsequently furnished.

2         They may be copied in a different way.  They -- they

3  look different.  The facts lines are different or they're more

4  visible, whatever it is.  The evidence that we had as of the

5  time that the record was closed is now of images of documents

6  that are different from the record that is now sought to be

7  expanded.

8         And -- and what we're getting at is that that

9  evidence, whatever it's value is, whether it's reliable

10 evidence or not, is post-fact.  The question is, is there

11 something that relieved the claimants of the obligation to

12 submit that evidence pre-fact and pre-bar date.

13        And the one thing that really, as I said, kind of has

14 gotten under the radar a little bit, is that there was an

15 order, there's a September 23, 2005 order that said very

16 specifically at Page 2 that by September 23 -- that actually --

17 this was issued on September the 23rd itself because it was an

18 -- it basically reflected a deadline that had been imposed --

19 that Speights & Runyon shall provide the debtors with the

20 following information.  Not a question of whether it gets

21 argued, it's the debtors.

22        And the little six is a list of all pending claims

23 filed by Speights & Runyon for which the claimant has provided

24 express written authorization to file the claim and, beyond the

25 list, a copy of the document or if redacted the portion of the

1  document that contains such proof of express written authority.

2          In fact, the -- the first day of the hearings on --

3  on January 25 of 2006 was not only devoted to ratification, it

4  was devoted to talking about the basis for there being a claim

5  of authorization with respect to the whole series of individual

6  claims.

7          The three claims were not addressed because

8  apparently Mr. Speights decided to "postpone the argument

9  because of ratification," but there were many other claims that

10 were addressed claim by claim by claim.  And the real problem

11 is that once Your Honor ruled on a ratification, you can't

12 alter or amend, the rules don't permit altering or amending,

13 unless there was evidence not available at the time.

14         The idea being you've got to produce before the

15 ruling all the evidence that's available.

16         THE COURT:  Okay.  My understanding --

17         MR. BERNICK:  Well clearly this was available.

18         THE COURT:  I think I'm not on the same track and

19 that's the problem and that's why I think we need to go back

20 and that's why I want --

21         MR. BERNICK:  That's fine.

22         THE COURT:  -- that's why I issued the order.

23         MR. BERNICK:  Right.

24         THE COURT:  My understanding from taking a look at

25 the transcripts was that everyone, I thought including the

1  debtor and Mr. Speights and the Court, agreed that the thing to

2  do was to look at the issue of ratification first because if

3  all of the claims were ratified then whether or not there was

4  express written authorization before the bar date was

5  irrelevant.

6          Because if it came after and you could ratify, then

7  having it before or after didn't make any sense and it didn't

8  make any difference -- pardon me.

9          MR. BERNICK:  And you could --

10          THE COURT:  And so I didn't look at the claims for

11  which Mr. Speights may have had written authorization before

12  the bar date because I didn't need to if, in fact, they were

13  ratified after.

14          MR. BERNICK:  Right.

15          THE COURT:  And so -- and so it simply didn't come

16  up.  All right.  So then I issued the order because after doing

17  the research I don't think I can find that you can ratify after

18  the fact.

19          But that left open these three claims which according

20  to some other transcript Mr. Speights contends that he had

21  proof in court that day but didn't offer it because we never

22  got to that issue that he had the express written authorization

23  before the bar date, but didn't offer it because we didn't get

24  there because we were looking at ratification rather than

25  authorization.

1          I'm not going to prohibit somebody from attempting to

2   prove or proving, in fact, that there was authorization to

3   produce a claim when I never gave that opportunity at a

4   hearing.

5          And so I'm -- I am going back to the January hearing

6   and looking at the authorization.  Then what happened, as I

7   understood the transcripts after the fact, at whatever hearing

8   after that -- and I apologize, I don't have the transcripts

9   here so I don't know the dates -- Mr. Speights had a document

10  that showed in his view that there was written authorization

11  but the debtor in looking at it said, wait a minute, this isn't

12  the same document you produced before.  And the debtor said

13  there is some reliability problem.

14         Well I don't know the answer to the reliability

15  problem so now I'm faced with two fact -- two fact issues; one,

16  was there written authorization before the bar date and; two,

17  if so, what -- is it reliable?  Is it the same information that

18  was produced, I thought, to the debtor?

19         So that's what I'm looking at.

20         MR. BERNICK:  Right.  And I understand what Your

21  Honor's saying.  We differed a little bit on whether the

22  ratification -- the idea of the ratification going first and

23  essentially postpone the prior issue or not.

24         But whatever that is, this is why, in my view, the

25  issue has not been framed as precisely as it perhaps could have

1 been and we take responsibility for that.  The -- the thing

2 that Your Honor identified that is key is whether the documents

3 that are now being furnished, the copies that are now being

4 furnished, say that there was pre-bar date authorization are

5 the same pieces of paper that we got before.

6           THE COURT:  Right.

7           MR. BERNICK:  Because if --

8           THE COURT:  So I've opened discovery on that issue.

9           MR. BERNICK:  On that -- on that issue.  And -- and

10 the reason -- and the reason that's key is less to do with the

11 order of argument and decision on ratification because Your

12 Honor could decide he could decide not to make an argument or

13 Your Honor could decide to take something up first.

14           But the key thing is that the September 23, 2005

15 order that got this whole thing going saying you've got to show

16 express authorization said if you've got express authorization

17 you've got to -- you've got to give it to the debtor.

18           And the problem is not that he decided not to argue,

19 Mr. Speights decided not to argue on January 25th or Your Honor

20 decided not to take that matter up with respect to these claims

21 on January 25th.

22           The problem is that the documents that we were

23 furnished pursuant to the September 2005 order as being the

24 documents that supported the authorization were not the same

25 documents that he now wants to put in the record now that Your

1 Honor has ruled.

2        And so the issue is was he or were his clients

3 relieved in some fashion of the obligation to submit the copies

4 that he now wants to rely upon when the order that was entered

5 three years ago said that they should have been done three

6 years ago?

7        That's -- that -- all I'm suggesting is not that we

8 resolve that today, although I think it's fairly clear, but

9 that that specifically be something that the parties address in

10 this briefing process so that we don't have yet another go

11 round on this.  That is that --

12        THE COURT:  Okay.  That's fine.  I'm happy to add

13 that issue to be addressed to this order.  I actually thought

14 that was part of the reliability issue that you were raising.

15        MR. BERNICK:  And I'll -- that's fine.  I just want

16 to make sure it was explicit so that we now finally have all

17 the cards on the table about what people are going to talk

18 about and I hope we can come to closure relatively promptly.

19        THE COURT:  All right.  That, Mr. Bernick, I think

20 what I'll do is ask you to submit on a certification of

21 counsel for me a proposed order that will amend the order I

22 entered today to add as an issue the issue of what -- I guess

23 how you stated it -- whether or not Mr. Speights or his clients

24 were relieved from submitting the documents that he's now

25 offering by virtue of the order -- that was required by virtue

1  -- that were required by virtue of the order of September

2  23rd.

3          I don't know whether he did or didn't submit them.

4  I'm not making findings as to whether he did or didn't, but

5  that issue can be added to the list of issues to be addressed.

6          MR. BERNICK:  Thank you, Your Honor.

7          THE COURT:  I already thought it was included by

8  virtue of the reliability issue anyway.

9          MR. BERNICK:  And I think that from the debtor's

10  point of view, Dan, is there anything else --

11          THE COURT:  And then if Mr. Speights has anything to

12  be added I, you know, Mr. Speights is certainly free to -- to,

13  I don't know, Mr. Speights, are you still on the phone?  If you

14  are, you're certainly free to request that I add additional

15  things to this order, too, if I'm missing something from your

16  perspective.

17          MR. SPEIGHTS:  Your Honor, can you hear me?

18          THE COURT:  Very, very faintly.

19          MR. SPEIGHTS:  I'm going to have to try to shout

20  again.  If I get too loud, let me know.

21          THE COURT:  You're fine now, sir.  Thank you.

22          MR. SPEIGHTS:  Frankly I'm not prepared to argue this

23  (indiscernible) --

24          THE COURT:  Can you turn him up, Jeff, please?  Mr.

25  Speights, just a minute.  Is the court call operator on please?

1          UNIDENTIFIED SPEAKER:  Yeah, I'm on.

2          THE COURT:  Oh, my goodness.  Oh.

3                         (Laughter)

4          UNIDENTIFIED SPEAKER:  Sorry, I didn't mean that.

5          THE COURT:  That woke everyone up.

6          UNIDENTIFIED ATTORNEY:  We're all awake now.

7          THE COURT:  Is it possible to --

8          UNIDENTIFIED SPEAKER:  That's good because I was

9  falling asleep.

10          THE COURT:  Is it possible to turn the -- wherever

11  Mr. Speights is, phone is up and yours down?

12          UNIDENTIFIED SPEAKER:  Well the good news is I won't

13  be talking anymore.  I will turn it up as loud as I can, Your

14  Honor.

15          THE COURT:  Okay.  Thanks.  Mr. Speights, if you

16  could start again.  I heard that you weren't prepared to argue

17  and I'm not looking for an argument.  I'm just trying to

18  understand what the issues are from your point of view to make

19  sure that I've included everything.

20          I don't want to get down the road to an argument date

21  and find out that you think that I've missed an issue.

22          MR. SPEIGHTS:  I appreciate that, Your Honor, and I

23  hope you can hear me better now.

24          THE COURT:  Yes, a little.

25          MR. SPEIGHTS:  First of all I violated the rule that

**J&J COURT TRANSCRIBERS, INC.**

1  I'm not in Pittsburgh and I'm not in Pittsburgh because when I

2  looked at the agenda I didn't think I was going to have

3  anything to argue.

4        I honestly have not (indiscernible) to Your Honor's

5  order today not because I knew the order was going but because

6  (indiscernible) I have not read your order.  Counsel -- local

7  counsel advised me shortly before the call they entered your

8  orders, but I was not in a position to open them up yet.

9        So I ask the specific question of whether there's

10 something else I would like Your Honor to address

11 (indiscernible) this week if there is I would be happy to do

12 that.  I appreciate the opportunity.

13       THE COURT:  That's fine, Mr. Speights.  If you can

14 let me know I guess by the end of the week if there is

15 something else that you -- or contact Mr. Bernick and he can

16 include it in one proposed order to be filed by Friday so that

17 I have a list of all the issues to be addressed.  I think that

18 would make sense.

19       MR. SPEIGHTS:  Thank you, Your Honor.

20       THE COURT:  Okay.  Thank you.

21       MR. BERNICK:  That's all from the debtor's point of

22 view today, Your Honor.

23       THE COURT:  Okay.  Anyone else?  Okay.  We're

24 adjourned.  Thank you.

25       MR. BERNICK:  Thank you.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You're all free to leave.  I just want to

2   finish making a note about this last issue so I know something

3   is coming.  Thank you.

4                          * * * * *

5

6

7                    **C E R T I F I C A T I O N**

8          I, JANET D. PERSONS, court approved transcriber,

9   certify that the foregoing is a correct transcript from the

10  official electronic sound recording of the proceedings in the

11  above-entitled matter, and to the best of my ability.

12

13  /s/ Janet D. Persons              DATE:  September 4, 2007

14  JANET D. PERSONS

15  J&J COURT TRANSCRIBERS, INC.

16

17

18

19

20

21

22

23

24

25