JOHN C. IRVINE
M.A., (Juris), B.C.L. (Oxon.)
Professor of Law in the University of Manitoba

Opinion on Canadian Tort Law as it relates to Economic Loss caused by Defective or Dangerous Products; and as to the Diverse Provincial Limitation Rules governing such claims.

## Introduction

(a) The Scope of the Report.

I have been engaged by counsel representing certain Canadian litigants who have filed claims in the W.R. Grace & Co. bankruptcy proceedings, in respect of injuries allegedly sustained in certain of the "common law" provinces of Canada. I have undertaken to express a considered and objective opinion as to the viability of their respective claims in light of the developing tort doctrines of those Canadian jurisdictions; and likewise to consider the operation and effect upon those claims of the various Statutes of Limitation and of repose, in place in those various jurisdictions.

In doing so, I have been favoured with the opportunity to examine the Expert opinions prepared at the behest of W.R. Grace & Co. by two other Canadian scholars, Professor Lewis Klar, Q.C., and Mr. Graeme Mew. I have found their opinions, as to the tort and liability issues in this case, to be scholarly, objective and helpful, even at those points where, as is to be expected in areas as complex as these, we do not entirely agree.

I reserve the privilege, subject to any contrary direction as the Court may consider fit, to augment or amend this report as seems from time to time appropriate and helpful to the Court.

(b) Qualifications.

I am presently a full-time academic lawyer and teacher in the Faculty of Law at the University of Manitoba, in Winnipeg, Canada. I have held my post here, save for one brief engagement at the University of Birmingham, England since 1970: that is, for the full period of thirty-seven years – for the last quarter-century as a tenured full professor.

I have throughout that period specialized in teaching the law of torts, with equal responsibilities, too, for our courses in Real Property, Personal Property and Jurisprudence.

My degrees are from Oxford University in my native England, where I gained the degrees of B.A. (Jurisprudence) in 1967, the B.C.L. (a graduate

degree considered to be Oxford's equivalent of a J.S.D.) in 1970, and my M.A. in 1971. A Scholar of Lincoln College in the University of Oxford, I was also an exhibitioner (scholar) of Gray's Inn.

In Appendix C to this report, I provide a succinct and hastily compiled curriculum vitae, in the hope that it may give some idea of the diversity of my scholarly commitments over the years, the eclectic range of my writings (especially in the realm of tort law), my extensive commitments as a Law Reform Commissioner, and my other long-term contributions to the legal community in Canada, and to society at large. I would point in particular to my twenty-seven years as Editor-in-Chief of Canadian Cases in the Law of Torts, a series devoted to drawing the attention of the Canadian legal community to current developments in the law of torts. It is a job which gives me both the duty and the opportunity of reading every case germane to the law of torts which is decided in this country, from every province and territory and from every court, from the humblest district court to the Supreme Court of Canada. That function serves to give me a unique and always current perspective on the patterns of development and areas of current interest in this wide and diverse area of the law, across this equally huge and diverse country.

I am co-author, with my colleague Professor P. Osborne and my late colleague Prof. B. Sneiderman, of a well-regarded textbook on medical law, presently in its second edition. This and my other publications – or a selection of them – are listed in Appendix C.

I have for decades been called upon regularly to present papers – usually on the law of torts, the tort-contract interface, aspects of medical law or (especially in recent years) construction law – to bodies as august as the Canadian Bar Association, the Law Society of Upper Canada, the Bar Association of Manitoba, the Law Society of Manitoba, the Advocate's Club of Toronto, the Isaac Pitblado lectures (a Manitoban legal lecture series of long standing and immense prestige), the Canadian Institute for the Administration of Justice (the judiciary) the Continuing Education programmes of the Manitoba Court of Queens Bench, the College of Physicians and Surgeons of Manitoba, and professional associations serving every area of specialization from Cardiology to Dentistry.

I have taught courses in professional law and ethics in the Faculties of Dentistry and Nursing in this University, and from time to time lectured on discrete topics of medical law in the Faculty of Medicine.

Since 1984 I have been continually appointed, by governments of varied political complexion, as one of this province's five law reform commissioners, and have had in consequence the privilege of contributing to many diverse reforms of this province's laws.

Finally, I am proud of my other long-term commitment as a member, for the last 30 years, of the Manitoba Rhodes Scholarship Selection committee, for the last 25 years as its chairman.

Much more information of this embarrassing and self-congratulatory kind may be found in Appendix C.

(c) Factual Context.

I have been informed of the following facts and assume them to be true. W.R. Grace & Co., through its subsidiaries, for some years produced and marketed products containing asbestos, to be used mainly in the commercial construction industry. One such product, Mono-Kote 3 ("MK-3"), described as a wet-spray applied cementitious fireproofing product, was widely used to add fire-protection to the interior steel members of large, mainly commercial, buildings. The claimants involved in these proceedings are the owners of buildings located in several provinces of Canada, who contend that their buildings contain, or have in the past contained, MK-3 or related asbestos-containing products manufactured by W.R. Grace & Co. They allege that these materials generate potential hazards to those who use and occupy the buildings, particularly custodial, maintenance and construction personnel. The real and substantial dangers so generated have, they say, caused them or will cause them to incur necessary and heavy expenditures to abate those dangers. It is those costs which the claimants now seek to recover.

As previously mentioned, I have enjoyed the advantage of reading the opinions prepared by Professor Lewis Klar and Mr. Graham Mew, relating to the present litigation. Not surprisingly, I find myself frequently in agreement with their analyses of the relevant Canadian law. To the extent that my analysis is not entirely congruent with theirs, or my conclusions less dismissive of the Canadian creditors' claims in this matter, I offer my thoughts with what I hope is appropriate diffidence. The legal issues involved are far from easy, and the authorities leave room for considerable differences of opinion.

The legal issues essentially devolve, it would seem, into two interlocking, but for present purposes severable, areas of complexity. First, there is the fundamental issue of whether the losses sustained by the claimants were of a kind redressible in Canadian tort law, or more specifically by the Canadian law of negligence. Secondly, if that question be answered affirmatively, do the various Canadian Limitation Acts, including such "statutes of repose" as may be found in some of them, constitute a bar to such tort claims?

The former set of questions, dealing in essence with tort liability for defective or dangerous buildings or other products, is essentially a common law question, dealing with an area actively developed in very recent times by the Canadian judiciary. And while there is always the possibility of divergent advancement of the law as between province and province, the leading role taken by the Supreme Court in this area strongly suggests that for the

3

foreseeable future, absent any legislative intervention, the state of the common law in this area is likely to be strongly consistent from province to province.[1]

That cannot be said of the limitations question, for as Mr. Mew's opinion abundantly shows, the "Balkanization" of Canadian limitation statutes, and the range of differences they embody, seems almost perversely complex, and defies almost any useful attempt at generalized analysis.

Before looking more closely at either the "tort liability" or "limitations issues", I must acknowledge that a good deal of the essential background knowledge, required for the examination of both areas, has been so carefully done by Professor Klar (on the tort liability issues) and Mr. Mew (as to limitations) that no good purpose would be served by my re-ploughing of the same fields.

So although I shall find it necessary, here and there, to embody a précis of their texts – for instance, as to the evolution of economic loss liability in Canadian tort law – I shall try to concentrate on issues or questions which their opinions may have overlooked, or on those matters in which my opinions or conclusions may differ from theirs.

## [a] *Canadian tort liability for Negligence in the making of Defective or Dangerous Buildings and other products.*

Let me first try to refine and give focus to the nature of the claims involved in the present case, as Canadian law would view them. All the building owners in this litigation would be seen as having prospective remedies in tort, and only in tort, since there would seem to be no privity of contract between them and the "Grace companies"; and in Canada, as elsewhere in the Commonwealth, the warranty concept does not transcend the bounds of contractual privity, as has happened so generally in the United States. We are dealing then, as far as Canadian common law is concerned, exclusively with tort law and more specifically, with negligence law. Narrowing the focus still further, we are looking at that application of negligence law which Canadians (who have a more narrow conception of this term than their American counterparts), would call "products liability" negligence. This is an area which has undergone profound and abrupt change in recent years. Another area of huge importance in negligence law, which has also undergone a veritable revolution in the last couple of decades, has been the field of negligence liability for purely economic loss. From a Canadian perspective, all the Canadian claims presently advanced would be characterized as negligence claims for pure economic loss arising from the construction of buildings with defective components.

Just thirteen years ago, such claims as these would have been regarded as speculative if not entirely unarguable in Canadian courts; heterodox in the extreme, if not indeed hopeless of success. Everything changed on 26th January 1995, when a unanimous Supreme Court of Canada handed down its decision in

---

[1] With the exception of Quebec, to which I shall refer later.

*Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.*[2]    That decision sent shock-waves through the law profession and the profession of architecture alike, as well as through all branches of the construction industry. Its implications are still, twelve years on, imperfectly understood and ripe for contentious litigation. In large measure, it lies at the heart of the present claims. *Winnipeg Condominium* (as I shall henceforward refer to it) remains the basic text and main point of reference for claims of the present kind, and demands close scrutiny.

For decades prior to the *Winnipeg Condominium* case, Canadian tort law had acknowledged that the manufacturers of a product[3] might be liable if, as a result of negligence on their part, the product in question caused physical or tangible harm to the person or property of another, typically the "consumer" of that product. What the law did *not* allow was a tort action against that manufacturer for the cost of remedying the defect in the product itself. If my new car (lacking, as it transpired, any effective brakes) ran over my cat, or my wife, or demolished my garage, these consequential losses were redressible in negligence: but *not* the cost of getting the brakes installed, replaced or repaired. Such a claim would only lie, if at all, in contract, against the retailer who had sold me the car. The contention that I should be compensated by the manufacturer also for the cost of putting the defective thing right was characterized by the law as a claim for "purely economic loss", because (it was argued) the essence of my complaint was that I had received something less valuable that I had paid for; it was my pocket-book or bank-balance alone that had been injured.

Now until a very late date, both Canadian and English law simply denied any possibility of liability in tortious negligence for purely economic loss (not consequential upon injury to person or property) in any circumstances whatever;[4] sometimes reinforcing this dogmatism (not always convincingly) with reference to Justice Cardozo's famous warning against the spectre of liability "in an indeterminate amount for an indeterminate time to an indeterminate class."[5]

Efforts by progressive judges to erode this stance failed repeatedly until the monumental decision of the House of Lords in *Hedley Byrne & Co. v. Heller and Partners*[6] in 1963. In that case, their Lordships declared unanimously (if technically obiter) that economic loss caused by the negligent giving of information or advice to one whom foreseeably relied upon it would be actionable in the tort of negligence. It was not long before the Bar reflected that if this was so, then by parity of reasoning (so it seemed) actions might lie for pure economic loss inflicted by other negligent behaviours too. And so began roughly twenty years of ultimately futile endeavour, as Courts throughout the Commonwealth searched for a principle of universal application which would allow such claims

---

[2] [1995] 1 S.C.R. 85, 23 C.C.L.T. (2d) 1, [1995] 3 W.W.R. 85, 121 D.L.R. (4th) 193.

[3] Initially, chattels, the rule later expanding to embrace real property.

[4] Usually citing *Cattle v. Stockton Waterworks*, (1875) L.R. 10 Q.B. 453 and *S.A. de Remorquage á Hélice v. Bennetts*, [1911] 1 K.B. 243

[5] Cardozo C.J. in *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. Ct. App., 1931)

[6] [1964] A.C. 465, [1963] 2 All E.R. 575 (H.L.)

when politic, and deny them when the spectre of indeterminate liability, or perhaps other public concerns, seemed to menace the Court. This is not the place to relate that wild-goose chase; for those days have passed and a newer and more constructive enterprise is under way, particularly in Canada, where economic loss claims in negligence are concerned.

The primary catalyst for change has been the scholarly work of an academic lawyer, Professor Bruce Feldthusen, presently Dean of the Faculty of Law at the University of Ottawa. In a series of publications, and particularly in his masterly "Economic Negligence"[7], he put forward and carefully analyzed a whole new approach to the topic. In short, it asserted that the main mistake had been to treat economic loss as a unitary problem with a "one-size-fits-all" solution. The proper approach was to acknowledge the diversity of the topic, isolate the various categories of economic loss claim into five more or less self-contained cubicles, and develop a set of principles for each, using the duty of care concept, in each of them, as the instrument whereby claims might be controlled. By the mid-nineties, the Supreme Court of Canada had adopted the 'Feldthusen approach' and endorsed the categories he identifies; and has done so consistently ever since. Since these categories are now well-entrenched in Canadian Law, and since I cannot hope to improve on Bruce Feldthusen's descriptions of them, I shall just quote in a footnote the synopsis from the 4th edition[8], noting that at each stage, examples are provided to convey the flavour or "pith and substance" of each category.

---

[7] Now in its 4th edition (Carswells, 2000) this book's first edition appeared in 1983. See also, Feldthusen: 'Economic Loss in the Supreme Court of Canada', (1999) 17 Can. Bus. L.J. 356.

[8] Ibid, p. 2:-

    (1) *Negligent Misrepresentation*: An investor relies on negligently prepared financial accounts to invest in a company which subsequently goes bankrupt. Had the accounts been properly prepared the bankruptcy would have been predictable and the investor would not have lost money. The investor sues the accountant.

    (2) *Negligent Performance of a Service*: A lawyer negligently draws a will in violation of the Wills Act, and in consequence the intended beneficiary is deprived of his inheritance. The frustrated beneficiary sues to recover the lost gift, even though he had not been aware of the intended gift, and had not otherwise relied on it.

    (3) *Defective Products or Building Structures*: The defendant negligently manufactures a tractor which will not start in damp weather. The tractor defect neither causes nor poses a risk of causing physical harm. The owner bypasses the immediate seller and sues the manufacturer directly for damages such as those which would be awarded in an action based on the breach of the implied warranty of merchantability. A builder constructs a home with faulty foundations such that the home poses a risk of collapsing. The non-privity owner sues the builder for the cost of remedying the defect.

    (4) *Relational Economic Loss* (consequent on physical damage to a third party): A negligent motorist strikes an electricity pole causing a power outage which shuts down an entire industrial park. Firms in the park, and their employees who were sent home without pay, sue to recover their financial losses.

    (5) *Public Authority's Failure to Confer an Economic Benefit*: A statutory public authority is given discretion to inspect building construction. It either fails altogether to inspect, or inspects in a manner which the court finds unreasonable. As a result, a latent defect goes undiscovered. When the defect is discovered, the owner sues the authority to recover the cost of remedying the defect.

It is, of course, to the third of Professor Feldthusen's categories that the claims now under scrutiny belong. Any doubt on that score was explicitly resolved by the Supreme Court in the *Winnipeg Condominium* case in 1995. Professor Klar's brief summary of that case[9] is entirely accurate, but I hope I may be forgiven for giving my own version, since the case is pivotal to all the Canadian jurisprudence on this topic. The facts alleged in that case – and it is worth remembering that no negligence was ever actually proven against any of the defendants named in the suit – were as follows. In 1972, a contractor (Bird) erected a high-rise residential building designed by a firm of architects (S.C.Partners). Much of the actual construction work was done by sub-contractors, in particular, the stone-cladding work on the exterior. In 1978, the plaintiff corporation became registered owner of the land and building. Not until 1989 did any serious or obviously menacing structural problems manifest themselves. Then a huge section of masonry cladding detached itself suddenly from the ninth story of the building and fell to the ground beneath. No one was hurt, and no consequential property damage was complained of, but further inspection revealed further defects in the masonry work, and the owners – who, remember, were successors in title of the original owners, and not in privity with any of the defendants – removed and replaced the exterior stone cladding in its entirety, at a cost in excess of $1.5 million. The case proceeded to the Supreme Court of Canada on pure issues of law, the contractor and masonry subcontractor having sought to strike out the claims as disclosing no reasonable cause of action. The Supreme Court rejected those motions to strike, but lucid though the Court's judgment was, it left unanswered several questions of great importance, as we shall see presently.

The very first point of decision was to refer this case, as a case of pure economic loss,[10] unambiguously to the Feldthusian category of "Defective (or Shoddy) Products or Building Structures.[11] Were defects incorporated therein, resulting in a substandard structure, actionable in law, enabling the building owner to recover in tort against the party responsible? The Court had decided by a majority, twenty-two years previously in the *Rivtow case*,[12] that the answer to that question was "no"; but Laskin J.'s dissent[13] in that case, arguing that the costs of repairing a deficient product should be actionable against its maker when reasonably undertaken to avert danger to life, limb or property, had since attracted much favourable commentary, both judicial and academic. Now, in the *Winnipeg Condo* case, the Supreme Court of Canada "came over" en masse to the Laskin view. In a centrally important passage of the Court's judgment, LaForest J. expressed himself in this way:-

---

[9] At p. 13 of his opinion
[10] An attempt to argue otherwise, using the "Complex structure" theory, was firmly rejected by the Supreme Court: see LaForest J. @ 23 C.C.L.T (2d) p. 14 ff, at paras. 14-15.
[11] See the categories listed at fn. 8 *supra*.
[12] *Rivtow Marine v. Washington Iron Works*, [1974] S.C.R. 1189, 40 D.L.R. (3d) 530
[13] Hall J. with him.

> I conclude that the law in Canada has now progressed to the point where it can be said that contractors (as well as subcontractors, architects and engineers) who take part in the design and construction of a building will owe a duty in tort to subsequent purchasers of the building if it can be shown that it was foreseeable that a failure to take reasonable care in constructing the building would create defects that pose a *substantial danger* to the health and safety of the occupants. Where negligence is established and such defects manifest themselves before any damage to persons or property occurs, they should, in my view, be liable for the reasonable cost of repairing the defects and putting the building back into a non-dangerous state.[14]

A number of points need to be emphasized here. While architects, engineers and other hands-on participants in the construction of a particular building are plainly caught within the embrace of this momentous new principle, it is not made explicit whether or in what circumstances the manufacturers of *materials* to be incorporated in the structure are so caught. Secondly, as the Court stresses repeatedly, their ruling extends only to those defects which cause a *substantial danger* to the health and safety of occupants (or, it would seem, their property other than the defective building itself). What constitutes a "substantial danger" is not elaborated upon. Certainly the facts of the *Winnipeg Condo* case involved a "substantial danger" on anyone's definition, so we can forgive the Court for leaving further refinement of definition to subsequent judicial development. Thirdly – it is really the same point – non-dangerous defects, merely qualitative deficiencies – are not within the scope of this decision. It is not that the Court in *Winnipeg Condo* declares them non-actionable. It just stresses that they raise different concerns, not presently before the Court, and best reserved for adjudication at another time. I shall look briefly at this question presently.

All the issues raised in the preceding paragraph are of potentially crucial relevance in our present litigation. Before I address them – the inevitable uncertainties which attend any major innovation in the law – there is another general issue which I should explain, if the bedrock decision in *Winnipeg Condominium* is to be properly understood. The decision in the *Winnipeg Condominium* case was arrived at by way of an approach which has become the uniform template for decisions on negligently-caused economic loss over the last decade. LaForest J. employed the two-stage test offered by Lord Wilberforce, as the touchstone of a legal duty of care and skill, in *Anns v. Merton Borough Council*,[15] in the House of Lords in 1978. In accordance with this approach,[16] the first task of the Court is to ask whether a relationship of proximity exists between the parties, sufficient to engender a *prima facie* duty of care; then the Court is to ask whether any residual arguments of policy exist which would warrant denial or modification of that duty of care. The first stage of this *Anns* test presented no difficulty in the *Winnipeg Condo* case, since it was manifestly foreseeable that

---

[14] 23 C.C.L.T. (2d) 1 at 30, para. 43.

[15] [1978] A.C. 728, [1977] 2 All E.R. 492 (H.L.)

[16] More recently re-asserted and refined by the Supreme Court of Canada in *Cooper v. Hobart et al* (2002) 277 N.R. 113 and in *Edwards v. Law Society of Upper Canada*, (2002) 277 N.R. 145.

latent defects contained in the building due to the carelessness of the defendants would be highly likely to cause physical harm or crippling expense not just to the original owners of the building, but to successors in title too, such as the present plaintiffs.  Therefore a *prima facie* duty of care arose.  Was it negated, at the second stage of the *Anns* test, by countervailing considerations of policy?  The main such countervailing argument advanced was the fear of "indeterminacy" – that is, liability " in an indeterminate amount for an indeterminate time to an indeterminate class" but this inveterate bogey-man held no fears for LaForest J. in the case at hand.  There was, he noted[17] "no risk of liability in an indeterminate amount because the amount of liability will always be limited by the reasonable cost of repairing the dangerous defect in the building and restoring that building to a non-dangerous state."  The fear of an "indeterminate class" was equally unreal, "because the class of claimants is limited to the very persons for whom the building is constructed; the inhabitants of the building.  The fact that the class of claimants may include successors in title who have no contractual relationship with the contractors does not ... render the class of potential claimants indeterminate".[18]  Nor was there any real prospect of liability for an indeterminate time, "because the contractor will only be liable for the cost of repair of dangerous defects during the useful life of the building.  Practically speaking ... "he added ... "the period in which the contractor will be exposed to liability for negligence will be much shorter than the full useful life of the building.  With the passage of time it will become increasingly difficult for owners of a building to prove ... that any deterioration in the building is attributable to the initial negligence of the contractor and not simply to ... inevitable wear and tear suffered by every building".[19]  So much for that familiar and overworked policy objection.

LaForest J.'s judgment indeed surveyed a broad range of other policy objections to the course he proposed, finding none of them insuperable.  He considered who, as between contractors, builders and design professionals on the one hand, and current users of a now-dangerous building on the other, was best equipped to bear "the risk of the emergence of latent defects"; and concluded that on balance, the former group should do so.[20]

I make no apology for spending so much ink on the *Winnipeg Condo* case, for it remains the ultimate source and reference in this area of Canadian law, and furnishes the doctrinal matrix within which the cause of the Canadian claimants must stand or fall.  To come to grips with their concerns, it is nevertheless necessary to address some of the questions, listed above, [page 8, para. 1] which were left unresolved by the *Winnipeg Condo* case.

The first question which suggests itself in the present litigation is whether the "Grace defendants" were within the ambit of the *Winnipeg Condo* doctrine at all:  whether, that is, as manufacturers of a component ultimately incorporated in

---

[17] *Winnipeg Condominium, supra* n. 52, 23 C.C.L.T. (2d) 1, p.33 at para. 49
[18] Ibid., p.32 at para. 48
[19] Ibid., p.33 at para. 50
[20] Ibid., at pp. 34-5

the buildings in question, they stand in the same position (when considered as potential defendants) as the architects, designers, contractors and subcontractors whose potential liability was considered in the *Winnipeg Condo* case? It is, I would suggest, an error to leap too quickly to a facile conclusion on this issue. It is true that in a series of cases (including at least one which precociously seemed to anticipate the *Winnipeg Condo* case by a few years,[21] and a few which have been decided since[22]) that on occasion, the non-privity[23] suppliers of component parts of buildings or other products, which turned out to be dangerously defective as a result, have been held accountable for the resultant losses. But in every instance, the manufacturer-defendant was intimately involved in the process of construction, either because the flawed component they manufactured was custom-made, or because the manufacturer was at least aware of the specific project in which his product was to be used, and of the dangers, therefore, to which any inherent vice in the product would expose the ultimate structure. To show the "proximity" of relationship necessary to raise even a *prima facie* duty of care in such a case as this, I would suggest that it must be shown that the defendant manufacturer must have stood in such a relationship, vis-à-vis the building-owner or his agents, that he should have realized that his skill and care were being relied upon in relation to that specific project, so that any deficiency or vice in the component he had manufactured might foreseeably render the building (or other ultimate project) dangerous. Such a conclusion would of course depend upon a careful assessment of the factual evidence in every case.

I do not say that it would be impossible to argue that the manufacturer of a flawed product, who simply puts it on the market, might not be liable in tort to the owner of a building rendered dangerous by the use of such defective product, fortuitously purchased by a contractor from an ordinary retail outlet. I only say that the existing Canadian jurisprudence does not yet go so far.

This point, obvious as it may be, cannot be stressed too strongly. It is not a tort in itself to manufacture or to place on the market goods which are, or may be, dangerous. Guns, knives and axes, chainsaws and pesticides, pharmaceuticals and automobiles, may all be deadly in their effects, but even if they could with minimal ingenuity or effort be made more user-friendly, their makers and or sellers owe no tort duty to those they harm unless it can be shown that some further dimension of fault or blameworthiness – a failure to warn of latent dangers, or a misrepresentation of their safety, or misleading reassurance as to the appropriateness of using the products … or some other such misbehaviour must be in evidence before negligence liability will be imposed. And to recover for "pure economic loss", under the aegis of *Winnipeg Condo*, it is neither necessary nor sufficient to show that the product is "defective", in the

---

[21] *University of Regina v. Pettick*, [1991] 77 D.L.R. (4th) 615, 6 C.C.L.T. (2d) 1 (Sask. C.A.)

[22] *Plas-Tex Canada Ltd. v. Dow Chemical (Canada) Ltd.*, (2004) 245 D.L.R. (4th) 650 (Alta C.A.), leave to appeal to S.C.C. refused [2004] S.C.C.A. No. 542: *Privest Ppties Ltd. v. Foundation Co. of Canada*, (1997) 33 C.L.R. (2d) 29 (B.C.C.A.), leave to appeal to S.C.C. refused [1997] S.C.C.A. No. 216.

[23] That is, not in privity of contract with the building owner, or his successor in title, or whoever is now advancing a tort claim.

sense of ill-designed or mis-manufactured. *Danger* inherent or latent in the product is what matters.

Indeed, the very next difficulty, spawned and left unresolved by the *Winnipeg Condo* case, is the question of what amounts to a "substantial danger." Both Professor Klar and Mr. Mew acknowledge this issue to be pivotal and determinative for the present litigation, and I respectfully agree with them. The almost agitated vehemence with which this prerequisite was stressed in the *Winnipeg Condominium* case itself is inescapable. But what sort of "danger" will count? These issues are dealt with only "between the lines" in *Winnipeg Condo* itself. After all, the prospect that another gigantic slab of masonry might fall off this tall building at any moment was a "substantial danger" by any definition. So was the prospect in *Plas-Tex Canada v. Dow Chemical* [24] that the gas pipe-lines, constructed with the defendants' special resins, might, as the defendants themselves conceded, fail with lethally explosive consequences anywhere and at any time. It is true that in *Blacklaws v. 470433 Alberta Ltd.*[25] in the Alberta Court of Appeal, Fraser C.J.A., explaining the limits of negligence law in a case which suggested no "danger" whatever, observed that "The *Winnipeg Condo* case requires physical harm to the plaintiffs or imminent risk of it", but there is no suggestion that this reference to "imminence" represents a considered and deliberate qualifier to the formula put forward by LaForest J.A. in *Winnipeg Condo* itself, or that it is really anything more than a reflection cast by the facts of that case. Anyone who would insist upon the imminence of a threatened peril, as prerequisite to liability (and so lay themselves open to an inquiry about what "imminence" might mean), should reflect on *Hughes v. Sunbeam Corp. (Canada) Ltd.*,[26] in the Ontario Court of Appeal. As Justice Linden puts it,[27] "The decision of the Court of Appeal for Ontario in *Hughes v. Sunbeam Corp. (Canada) Ltd.* illustrates the fine line between dangerous and non-dangerous defects. The action concerned defective smoke alarms. In and of themselves, the defects posed no danger to person or property. However, unknowingly relying on a defective smoke alarm did pose a substantial safety risk of the sort that justified recovery in the dangerous defect cases. Accordingly, the court declined to strike the action on a preliminary motion. No suggestion there that "imminence" is in issue. Rather I would suggest that the issue is whether the perceived danger is one which a reasonable building owner would regard as foreseeably likely to materialize, at some unpredictable moment in the future and perhaps under certain foreseeable circumstances, *and represents, to the mind of such a reasonable building owner, the prudence and reasonableness of prompt remedial and preventative intervention*.

Such a formula, as it seems to me, represents the intent of all significant judicial reasoning on this issue since the dissenting judgment of Laskin J. in

---

[24] *Supra*, n 22

[25] (2000) 84 Alta L.R. (3d) 270 (C.A.)

[26] (2002) 61 O.R. (3d) 433, (C.A.), leave to appeal refused (2002) S.C.C.A. No 446.

[27] Linden & Feldthusen, Canadian Tort Law (8th ed., 2006) p. 476.

*Rivtow Marine*[28] in 1973, through the amazingly prescient judgment of LaForest J.A. (for the New Brunswick Court of Appeal) in *J. Maryon Ltd. v. N.B. Telephone Co.*[29] in 1983, to that same judge's pronouncements in the Supreme Court in *Winnipeg Condo*[30] itself. Any reflection upon the latter case yields the conclusion that the potential tort liability of a negligent designer or contractor for the costs of remedying defects to eliminate perceived dangers is a liability which will last for the expectable life of the building, and applies whenever it is reasonable to perceive and "head off" such dangers as a matter of prudence, economy and good management. It is the seriousness of the danger should it transpire, combined with the likelihood of its occurrence (whether now, or years hence) which make a danger substantial; not the immediacy of its anticipated descent.

It will be noted that I have not yet addressed the case of *Privest Properties Ltd. v. Foundation Co. of Canada,*[31] a decision conspicuously relevant to all the issues which now concern us, and turning specifically upon the dangerousness or otherwise of a building which incorporated MK 3, the very asbestos-impregnated fireproofing at issue in these cases. Both Professor Klar and Mr. Mew treat it as crucially important. Rightly noting the comprehensiveness of Drost J.'s first-instance judgment, and the great length of its reasons delivered after six months of unrelenting argument, Professor Klar notes the rush by Canadian Plaintiffs to settle their claims, soon after *Privest* was decided. Professor Klar and Mr. Mew alike describe *Privest* as "the leading decision on liability for asbestos-containing products" in Canada, which it certainly is, being the only one, it seems, ever to reach trial stage. And in the circumstances one can hardly blame the conclusion of those gentlemen that *Privest* should be invested with especially numinous significance in all aspects of the litigation now at Bar.

Yet in the last analysis, what does *Privest* really represent? Drost J.'s first instance judgment is lengthy, careful and elaborate in the sense that it deals with a multiplicity of discrete issues, difficult questions of law, several of which will be considered in this paper. But it is the first and critical grouping of questions which must first be addressed: the set of issues which enabled Drost J., had he so chosen, to dismiss the case without more; the set of issues directly raised by the doctrine in *Winnipeg Condo* and which alone was dispositive of *Privest's* main appeal to the British Columbia Court of Appeal,[32] and its attempt to appeal still further to the Supreme Court of Canada. Drost J. concluded that based on the limited evidence presented to him MK-3 was not an inherently dangerous product, and as the Court of Appeal concluded[33]:-

---

[28] *Rivtow Marine Ltd. v. Washington Ironworks,* [1974] S.C.R. 1189 (S.C.C.)

[29] (1982) 24 C.C.L.T. 146 (N.B.C.A.), esp. p. 192.

[30] (1995) 23 C.C.L.T. (2d) 1, esp. at paras. 36,43.

[31] (1995) 11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385 (B.C.S.C): affirmed in part [1997] 31 B.C.L.R. (3d) 114 (1997) 31 B.C.L.R. (3d) 114, supplementary reasons [1997] 36 B.C.R. (3d) 155 (B.C.C.A.); leave to appeal refused [1997] 224 N.R. 152 n.

[32] (1997) 143 D.L.R. (4th) 635, 33 Constr. L.R. (2d) 29.

[33] (1997) 143 D.L.R.(4th) 635 @ 637, [para. 4]

For the reasons which follow, we have concluded that Mr. Justice Drost did not err in finding, *on the evidence before him*, that MK-3 was *not* an inherently dangerous product. Since our conclusion in that regard is determinative of the appeal, it is unnecessary for us to deal with the other issues raised. We would, therefore, dismiss the appeal. (Emphasis supplied)

That disposition is entirely typical of the way in which Canadian appellate courts, on a day-to-day basis, deal with appeals which they perceive to be appeals on the facts. Great deference to the trial-level judge has been the timeless practice, and factual findings will not be disturbed unless they betray on their face some "palpable and overriding error" necessitating intervention. Otherwise, only errors of law will prompt reversals of trial judgments.[34] Under such circumstances, it was virtually inevitable that Drost J.'s judgment in *Privest*, in the pivotal issue of dangerousness would be affirmed – as a finding of *fact*. But as such, quite obviously, it binds no subsequent tribunal.

That does not mean, of course, that Drost J.'s conclusions on the issue of "dangerousness" can be disregarded. For we must consider whether they cast as propositions of *law*, any light on the *concept* of danger to be applied. Do they add anything to our understanding of that idea, as discussed earlier in this paper?[35] I believe they do. At paragraph 551 of his judgment, Drost J. acknowledges that the sorts of "danger" which may count for the purposes of litigation of this kind are two-fold:-

(a) The danger which might arise to occupants from the continual release of fibres in the day-to-day use of the building: and

(b) The danger presented by further releases "whenever the material was disturbed in the ordinary course of building maintenance and renovation."

In the British Columbia Court of Appeal, when the appellants complained that Drost J. had considered only the former kind of danger and neglected the other, this charge was emphatically rejected by the Court: Drost J. had considered *both* sorts of alleged danger.

We cannot conclude from the reasons that the trial judge overlooked a major feature of the case. In our view, his general conclusions about dangerousness must be taken to embrace the alleged hazards from MK-3 in place and when disturbed.

That shows to my mind a broad and comprehensive understanding of the concept of "danger" in these situations, and as a proposition of law endorses it.

But there, in my opinion, the utility of *Privest*, and its importance as a source of legal principle on the issue of tort liability for economic loss for

---

[34] This posture is not a matter merely of judicial convention, but of positive law, firmly laid down by the Supreme Court of Canada: see *Stein v. The Ship "Kathy Kay,"* [1976] 62 D.L.R. (3d) 1 (S.C.C.)

[35] *Supra*, at p.

supposedly dangerous products, is entirely exhausted.[36]    *Privest*, as the disposition in the Court of Appeal shows, is a decision on its facts: on the evidence. Carefully and skillfully sifting and evaluating that evidence, Drost J. concludes that the plaintiffs in that case have failed to prove their case, to carry the burden of proving on the facts that the MK-3 was a dangerous substance which justified laying to the charge of the defendant the cost of its removal.

Dispositions of fact, however carefully arrived at, establish no proposition or norm binding on subsequent courts, anywhere. They may be discouraging to other litigants in similar cases. They may prompt the weary, or those worn down by the stress and expense of such litigation, to settle their claims[37] or even to abandon them. But though a plaintiff's task may seem more daunting in the aftermath of *Privest*, in truth a plaintiff's burden is no more formidable than it was before that case. Indeed, it may be seen as less so, since, as we have seen, the Court of Appeal approves a broad and inclusive definition of "danger", and Drost J.'s meticulous commentary upon the evidence gives clear and ample guidance to would-be plaintiffs of where the deficiencies lay, in *Privest*, in the plaintiff's presentation of its case.[38]

My conclusions, then, upon the basic liability issues in the present litigation, are less pessimistic and dismissive than those arrived at by Professor Klar. Professor Klar's observation that "Canadian courts are likely to be interested in discouraging the re-litigation of the identical issues determined in *Privest*, especially when the trial was so lengthy and the evidence so complex" also demands a response. Canadian trial courts do not get to decide what causes they shall and shall not preside over, nor are they at liberty, however burdensome an impending trial may be, to "discourage" litigation for that or any other reason. Should another "asbestos–in–buildings" case come before a Canadian court I am confident that the judge will treat it as patiently and scrupulously as did Justice Drost in the *Privest* case.[39] Certainly, in the wake of *Privest*, litigation of the kind here in issue, conducted in a Canadian court, would be arduous and difficult, for both parties; the doctrinal difficulties for both sides very great; and the task of adducing evidence sufficient to tip the evidentiary scale, very hard for the plaintiff. Litigation of such a kind would certainly be protracted, complex, and of internecine expense. In such circumstances, if my advice were sought by either side, it would be that the prudential and economic

---

[36] I do not of course mean, in saying this, that I disregard the legal significance of Drost J.'s pronouncements (not commented on by the Court of Appeal) upon such ancillary issues as Limitations or contributory negligence.

[37] The anecdotal material cited by Professor Klar (opinion, p. 18) to this effect, quoting from G. Miller's note at 6 Can. Ins. Law Review 173 @ 175, is not surprising given the discouragement of such an outcome against such a doughty and experienced adversary.

[38] In particular, Canadian plaintiffs will be at pains to eschew in future any excessive reliance on learned treatises. In *Privest*, one consequence of this error was that, as Drost J. put it (para. 331) "The plaintiff's case rested primarily on the testimony of one expert medical witness, whose opinion ... I did not find persuasive."

[39] And the spectre of a indeterminable trial may be eased by superior case-management practices, as suggested by Huddart J.A. for the B.C.C.A. in *Harrington v. Dow Corning* (2000) 82 B.C.L.R. (3d) 1at 23

interests of both parties would be better served by directing their resources to the achievement of a fair and timely settlement.

Before moving on to address the difficult questions of limitations law, which beset this case, I must stress once again the crucial nature of the "dangerousness" component of the plaintiff's case under current Canadian tort law. However defective, shoddy and substandard a building may be, no Canadian defendant will be liable in tort for the cost of remedying it unless and until it can be shown to be dangerous to life, health or property. It is interesting to note that in New Zealand[40] and in Australia,[41] Courts of the highest authority have dispensed with this requirement and have allowed actions by non-privity homeowners against the builders of decrepit but non-dangerous houses. But though the Supreme Court in *Winnipeg Condo* expressly declined to foreclose the possibility of one day taking this huge extra step: and while the province of Québec did do so, years since by legislation,[42] I agree entirely with Professor Klar's conclusion, citing Linden and Feldthusen at page 15 of his Opinion, that "the recent trend is simply towards disallowing recovery for non-dangerous defects as a matter of law." [43] If the claimants can show that MK-3 poses a "real and substantial danger," they may win: if they cannot, they will probably lose.

## [b] *The impact upon the present litigation of Canadian Limitations Acts and Legislation of Repose*

To consider the application, in all its complexity, of the distinctly varied Limitation Acts of six jurisdictions[44] is no small undertaking. I am grateful that I can to some extent adopt the analysis undertaken by Mr. Mew, in describing the salient features of at least the current Canadian limitations régimes, and spare myself the reader much quotation from these motley and generally inelegant statutes. With a few qualifications, which will become apparent very soon, I would respectfully indorse his explanation of "Normal limitation periods," the "Discoverability Principle", and the rule that all such questions are governed, under Canadian conflict-of-laws jurisprudence, by the *lex loci delicti*.[45] I naturally agree also with Mr. Mew's overview of the Canadian Legal System, and for the most part with his brief introduction to Economic Loss litigation in Canadian negligence law. However, it will already be obvious that I do not consider *Privest* to be quite as "definitive" as he claims. I cannot and do not accept his blanket assertion that (supposedly everywhere in Canada) causes of action always "arise" "on the date of installation of the allegedly defective product," and his statement that (everywhere and always), unless postponed by the discoverability principle, that is the date on which ultimate limitation periods begin to run.

---

[40] [1977] 1 N.Z.L.R. 394 (C.A.)

[41] (1995) 182 C.L.R. 609 (H.C. Australia)

[42] Quebec Civil Code Arts, 1442, 2118-20.

[43] In support of this view, note that the Australian courts have latterly retreated from their position in *Bryan v. Maloney* - *C. Woolcock v. C.D.G. Ltd.,* [2004] H.C.A. 16.

[44] Newfoundland-and-Labrador; Nova Scotia; Ontario; Manitoba; Alberta; and British Columbia

[45] *Tolofson v. Jensen,* [1994] S.C.R. 1022.

Indeed I must confess that on nearly every issue, other than those listed above, I find myself in potential disagreement with the argument or thesis advanced by Mr. Mew.

One root cause of most, though not all, of our differences is to be found on the very first page of Mr. Mew's opinion, where he writes:-

> I am informed that on April 2, 2001, Grace filed for bankruptcy. For the purposes of this opinion, I have taken that date as the date from which the limitation consequences of Canadian law with respect to the Claims should be viewed. In doing so, I do not preclude the possibility of a court holding that the appropriate date, for limitations purposes, would in fact be a later date than that.

As I understand this, Mr. Mew is saying that the Canadian claimants in this case should be treated as if they had commenced civil proceedings against Grace, for the first time, on April 2, 2001; and if, by that date, the facts upon which they base their claims have receded so far into the distant past that they have exceeded the time allowed by their respective (domestic) limitation statutes back in Canada, they should be treated as statute-barred. On such a thesis, not surprisingly, Mr. Mew concludes that all of them *are* indeed barred by the effluxion of time.

I take a very different view of the present proceedings. The Canadian claimants (as I understand it) are not Johnny-come-latelys who have only entered the lists when their adversary has fallen into the toils of bankruptcy. All of them can claim to have commenced civil proceedings against the Grace companies by involvement in the Anderson Memorial Hospital class action, many years before the bankruptcy supervened. All of them asserted claims, rights of action, against Grace. Those claims, of course, would be devoid of value if statute-barred, and the claimants must show that they advanced them in a timely fashion, within the time allotment provided for by their domestic limitation statutes. But once that was achieved – if indeed it was achieved – their claims became vested legal rights, immune from that point on from any threat of being time-barred. Once filed in compliance with the relevant Limitation Act, such claims might enjoy a very long "shelf-life" indeed if the law's delays so ordained it. Such vested rights of action would of course be of uncertain monetary value until adjudicated upon or settled, and might in some circumstances be vulnerable to court-ordered extinction for any culpable failure to prosecute the action with due diligence. But no such claim need fear any continuing vulnerability to the Limitations Acts. It is claims (rights) such as these which the Canadian claimants are now asserting in the hope of having their claims satisfied from the debtor's assets.

On this view, it is in every case the date representing the outermost limit of the claimants' domestic limitation period (under the *lex loci delicti*) which should determine the timeliness and validity (or otherwise) of each claim. The date which Mr. Mew repeatedly asserts as critical, April 2, 2001, *would have absolutely nothing to do with it.*

16

Unfortunately, as counsel for Grace would no doubt interject, "it isn't as simple as that." A claim instituted by one's involvement in a class action suit is a vulnerable and potentially ephemeral thing. It seems to be a universal and salutary feature of class action suits that the running of limitation periods is suspended (as against class-members) once the class proceedings be instituted: but that time begins to run again against such a class member should the class-proceedings come to an end through discontinuance, decertification or his exclusion from the class. Apart from its obvious effects in "restarting the clock," such an event would, I submit, create another vulnerability for the claimant, in that any supervening changes in the limitation rules of his or her jurisdiction (e.g. the belated enactment of an ultimate limitation period) might grievously effect or extinguish the viability of the claim.

It is my understanding that the *locus standi* of the Canadian claimants in the 1992 class action is at the present time a matter of vigorously contested and so far unresolved dispute in the present case. This will force me, in considering the limitations law of every relevant province, to consider the problem upon alternative hypotheses – bluntly, on the supposition (a) that the Canadian claimants are still engaged in the class litigation, and (b) that they are not. I fear that this will inevitably enlarge the bulk and tedium of what follows.

Because of these pervasive uncertainties, then, as we plunge into the detail of each province's limitation rules, the preliminary question will repeatedly suggest itself – as of what *date* should those provincial rules be examined and assessed? For the time-span covered by the matters now in dispute covers decades, and many provincial limitations rules have undergone substantial amendment over that period of time.

In examining the law, province by province, there is I believe, wisdom in following Mr. Mew's approach of looking at the "Ultimate limitation periods" first. If these are offended, after all, all debate as to the effect of "normal" or ordinary limitation periods is neither here nor there.

### Ultimate Limitation Periods

At the outset, it is well to remind ourselves of the universal function of ultimate limitation periods. It has for centuries been recognized[46] that the public interest is not served, nor justice achieved, by allowing potential law suits to "hang fire" interminably, unresolved and indeed uncommenced. With the advent of the "discoverability principle", there arose just such a spectre of indefinitely protracted litigation, and the enactment in some jurisdictions of "statutes of repose" or ultimate limitation periods was a direct response to that threat. In crude terms, such ultimate limitation periods are specifically designed to cut short limitation periods after the elapse of a certain period of time, even though the discoverability concept might otherwise allow the claimant more time in which to

---

[46] 'Interest reipublicae ut finis sit litium', says an ancient maxim, cited by Chief Justice Coke in the late 16th century, but probably much older.

commence his suit.  This must be borne in mind when construing those statutes which impose these ultimate or "long-stop" limitation periods.

As Mr. Mew points out, just four Canadian provinces have enacted these "ultimate" or "long stop" limitation periods.[47]  They are British Columbia, Manitoba, Newfoundland-and-Labrador and Alberta.  The specified period is 10 years in Alberta, 30 years in British Columbia, Manitoba and Newfoundland.  That raises, of course, the question "ten years or thirty years *from what*?  When does such an ultimate limitation period start to run?   The formulae used in the respective statutes are irritatingly diverse.  In British Columbia, it is "the date on which the right to do so [i.e. to institute proceedings] arose." [R.S.B.C. 1996 s.8(1)(c)].  In Alberta, it is ten years after "the conduct, act or omission occurs", [R.S.A. 2000, s.3(1)(b), as explained in s.3(3)(b)].  In Manitoba, similarly, the ultimate limitation period begins with "the acts or omissions that gave rise to the cause of action" [R.S.M. 1987 s. L-150, s.14(4)]; while in Newfoundland the clock starts to tick when the "event which gave rise to the cause of action last occurred" [S.N. 1995, s.22].  It seems that the "triggering events" contemplated by Manitoba, Alberta and Newfoundland may be prior (both logically and in point of real time) to those envisaged in British Columbia, where a "claim" or "cause in action" would not be complete until damage resulted from the careless act, omission or event.

Now to pretend that all these ultimate limitation periods, so differently expressed in their respective statutes, all begin to run at the same conceptual point; and to add that that point is in every instance the "date of installation of the allegedly defective product" as Mr. Mew states at page 15 of his opinion, is not self-evidently right.   To be sure, Mr. Mew does cite a couple of supporting authorities.   One is the judgment of the British Columbia Court of Appeal in *Armstrong v. West Vancouver (District)*, (2003) 10 B.C.L.R. (4th) 305.[48]  Since Mr. Mew bases such a sweeping conclusion upon that judgment, it behoves me briefly to examine what it really stands for.  *Armstrong* was, certainly, a case involving a defective building, and it did involve a claim by the owner of that building, seeking to recover economic losses.  But it was *not* an economic loss claim of the same type or category as that involved in our present litigation.  It was not an action against a negligent architect, designer, builder or supplier of building components.   It did not, in short, belong to the same "Feldthusen category"[49] as our present disputes, nor would it be governed by *Winnipeg Condo. Corp. No. 36 v. Bird Construction*, as discussed earlier in this opinion.  It is a quite different, though entirely familiar sort of claim, of a kind that was well

---

[47] Manitoba (R.S.M.) 1987 c.L. 150 s. 7(5); and British Columbia (R.S.B.C.) 1979 c. 236 s. 8(7) have had ultimate limitation periods at all relevant times: but Newfoundland did not legislate its ultimate limitation period until 1995 (S.N.Cl-16.1, s.22), and Alberta not till 1996 (S.A. 1996 c. L 15(1) s 3(1):  so on one of the hypotheses explained above — if the Canadian claimants are still "in the game" vis-à-vis the class action suit — both the Newfoundland and Alberta ultimate limitation periods were enacted too late to affect calculations in the issues now under consideration

[48] The other is a decision of Slatter J. of the Alberta Court of Queen's Bench, in *Dean v. Kociniak*, (2001) A.J. 643, 92 Alta. L.R. (3d) 92.  It is not an economic loss claim, and does not appear to discuss ultimate limitation periods in that or any other context, so far as I can see.

[49] See the Discussion *supra*, pp. 5-6, and especially footnote 8.

understood in Canadian courts some years before the *Winnipeg Condo* line of authorities began. It is, in brief, a case of negligent inspection by a public authority exercising statutory powers; and as such would quite uncontroversially be characterized under the *fifth* of Professor Feldthusen's categories, as listed on page 6, footnote 8, earlier in this opinion.[50] The seminal cases which famously govern cases like *Armstrong* are *Anns v. Merton London Borough Council*, [1978] A.C. 728 [House of Lords] and *Neilsen v. Kamloops (City of)*, [1984] 2 S.C.R. 2 {Sup. Ct. of Canada]. The underlying philosophy of such actions for careless inspection, the policy concerns in play, and the mechanism whereby injury or loss is inflicted in such cases, are wholly foreign to the "shoddy construction" category of case, with which we are concerned. In other words, *Armstrong* is clearly distinguishable, and *not* a legitimate basis for concluding that in cases of the *Winnipeg Condo* type, such as ours, the cause of action is complete immediately upon installation of the allegedly defective product, as Mr. Mew would contend.[51]

At the risk of sowing further confusion, I would argue that even within a particular Feldthusen category of economic loss claim – specifically, even within the *Winnipeg Condo*, defective-building category with which we are now concerned – identification of the proper "triggering event" which should mark the commencement of the ultimate limitation period must depend as a matter of common sense on what it is that the particular defendant is said culpably to have done or omitted, and how and when such act or omission can be said on the facts to have caused the plaintiffs' economic loss. I find support for this view in another (and for our purposes much "closer") judgment of the British Columbia Court of Appeal, in *410727 B.C. Ltd. v. Dayhu Investments*, (2004) 241 D.L.R. (4th) 467.

Unfortunately these conclusions so far drawn leave one with scant guidance as to how the ultimate limitation periods should properly be interpreted in each jurisdiction, and in particular, when a cause of action should be deemed to have reached the point necessary to start the ultimate limitation period running. One very obvious guiding principle is to defer to the clear wording respectively used in each of the statutes, which makes it unlikely that each of the four provinces will yield the same conclusion, given the diverse formulae favoured by their legislators. Another consideration which may indeed explain some of the challenging statutory expressions used, is that logically, in provinces where "discoverability" is a built-in ingredient of the "normal" or "ordinary" limitation period, the starting-point for the ultimate limitation period cannot be the same as for the "normal" one. For as argued earlier, the whole point of ultimate

[50] Indeed, Prof. Feldthusen's text, there quoted, gives as a paradigmatic example of this category a fact-situation very like *Armstrong* itself.

[51] Even if considered in its own proper context, the conclusion so reached by the B.C. Court of Appeal in *Armstrong* seems open to question. It is axiomatic that a cause of action in negligence is complete only when damage resulting from the defendant's acts or omissions is shown. How can the damage, supposedly resulting from a negligent failure of inspection, be said to have occurred immediately on installation of a defective component – which must, surely, be something that occurs *before* the inspectors get an opportunity to do their work?

limitation periods is to dock, toll, guillotine or curtail a limitation period which otherwise might stretch out to infinity because of the discoverability rule.  If the start of the ultimate limitation period were itself postponed until the time of discoverability, the result would be nonsensical.

So, I would suggest, there is no simple and unified answer as to when an ultimate limitation period will run.  In each affected province, the Courts must identify a point in time when "the right to institute proceedings arose", or "the claim arose", or "the acts or omissions that gave rise to the cause of action" happened, or "the event which gave rise to the cause of action last occurred." The Courts must identify these critical points in time as best they can, bearing in mind that (for the reasons given) no relevance can be accorded, when making such a determination, to what the claimant knew or did not know, or ought or ought not to have discovered.  Where claims of the *Winnipeg Condo* type are concerned, the judicial task of identifying these critical times has scarcely been undertaken.

It would seem clear, however, that if thirty years have elapsed after the elusive "triggering event", (whether in British Columbia, Manitoba or Newfoundland): or if 10 years have so passed (in Alberta); and if at such time action has still not been instituted by the claimant; then, *subject to what follows concerning the suspensory effect of class actions, the claims from those provinces will be statute barred, finally and completely*.

That brings us back to when indeed the claims actually being advanced by these plaintiffs should be considered as having been commenced. On one hypothesis – that is, if the Canadian claimants are still "in" the class action – the answer is clear enough.  It was not in April 2001, as Mr. Mew would contend.  It was in December 23, 1992, when the Anderson Memorial Hospital class litigation was filed against Grace.  All existing Canadian and other *Class Proceeding Acts* of which I am aware expressly provide for the tolling, at that point in time at which class proceedings are commenced, of any limitation period then running against any putative or potential class member.   These provisions, which may inadvertently have been overlooked by Mr. Mew in his opinion and his otherwise very useful book, should in principle stop the effluxion of all limitation periods, including ultimate limitation periods, "dead in their tracks" in December 1992. I have not been able to find any legislative provision, still less any judicial authority, which would exclude "ultimate" limitation periods from the tolling or suspensory effects of the class action legislation.

If that is correct, as I verily believe it is, the ultimate limitation periods will have **no effect** on the viability of claims by owners from British Columbia whose rights to institute proceedings arose (whether discovered, discoverable or not) after December 23rd 1962 : nor will it affect those from Newfoundland[52*] who can show that the "event giving rise to the cause of action" last occurred on or after that same date. Alberta claimants should likewise be unembarrassed by ultimate

---

[52* and 52**] Again, though, for reasons repeatedly given earlier, I would be prepared to argue that the ultimate limitations periods for Newfoundland and Alberta can have no legitimate place in this litigation

limitation periods if their "claim arose" after December 23rd 1982, while those from Manitoba will enjoy the same immunity in respect of "acts or omissions" committed by Grace subsequent to December 1962.

If, on the other hand, the Canadian claimants have been exiled from the class proceedings, the ultimate limitation periods, in provinces where they apply, would be counted back from the much later date of April 2, 2001, just as Mr. Mew's analysis would contend:  for the running of time would have recommenced at the moment of their exclusion, and continued until commencement of the present bankruptcy litigation.

### "Normal" or "Ordinary" Limitation Periods

None of the foregoing can give any help or encouragement to the claimant who has "run out of time" under his province's ordinary or basic limitation period, long before the "ultimate" limitation period has run its course.  In considering these rules, the diversity of approach, from jurisdiction to jurisdiction, is even more perplexing.

This "normal" limitation period, in every common law province of Canada, consists of two components.  There is a basic period of years, set out in the statute, which runs from the time when the cause of action "arises":  and there is a potential extension of that time in that various rules, sometimes of common law, sometimes of statute, provide that a cause of action in tort may not be deemed to have arisen, and the limitation clock activated, until the claimant discovers, or should with reasonable diligence have discovered those facts suggesting that he or she has a viable claim to pursue.[53]  This approach, born of a bold (even heretical) judicial initiative among English common law judges,[54] and initially received into many Canadian jurisdictions by a welcoming judiciary,[55] was in due course to be reflected in the Limitation Acts of many provinces.  But here a cautionary note must be entered.

In two provinces, Manitoba and British Columbia, the legislatures actually *anticipated* the judicial initiative, and endorsed the discoverability principle in their statutes before the judges could act.  Manitoba, in 1967 (provision extended, 1980);[56] and British Columbia in 1976, expressly incorporated a discoverability principle into their *Limitation Acts*.  Several consequences (of no present moment) flow from this historical circumstance.  But one must be noted.  In Manitoba, the extending of limitation periods by use of discoverability principles *is not automatic*, nor can it be asserted as of right by a plaintiff.  In Manitoba *uniquely*, once the specific term of years, allotted by the statute for a particular

---

[53] The Devil, of course, is in the details, and case-law aplenty dissects and discusses what kind of knowledge must be shown to have existed.

[54] See *Sparham-Souter v. Town & Country Developments (Essex) Ltd.,* [1976] Q.B. 858 (C.A.)

[55] The process of reception is well explained by Mr. Mew in his text "The Law of Limitations" (2nd ed., 2004) at pp. 49-50. It may be said to have begun in 1982 with the New Brunswick C.A. decision *in N.B. Telephone v. J. Maryon Ltd.* and was put beyond doubt by two S.C.C. decisions, *Kamloops v. Nielsen* (1984) 29 C.C.L.T. 97, and *Central & Eastern Trust v. Rafuse,* [1986] 2 S.C.R. 147.

[56] S.M. 1966-7, c. 32, extended S.M. 1980 c. 28

type of claim, has run its course and a plaintiff complains that it had so expired before he was even aware of his right to sue, he must bring an *ex parte* application before the Court, under s. 14 (1) of the *Limitations Act*, to have the limitation period re-opened on that account:  and the Court has a discretion to allow or deny such a request.  Worse, such a litigant has just one year, after he becomes actually or constructively aware of his potential claim, in which to make such application to the Court.  Otherwise, "he must forever hold his peace."

This daunting and convoluted scheme, mercifully unique to Manitoba, and imminently to be overhauled by the province's Law Reform Commission, has resulted in doctrinal contortions so complex and protracted that to catalogue them in the main body of the text would distort the whole balance of this opinion. Accordingly (and because for Manitoba claimants they are of obvious and critical importance) I annexe to this paper [as Appendix A] a lucid and succinct excerpt from an article by Professor Philip Osborne,[57] which accurately sets out the pattern of Manitoba law on the subject.  Moreover, in Appendix B, I attempt my own, essentially identical analysis of the position in the "mutant" jurisdictions of Manitoba and British Columbia.

Under the Manitoba legislation, the "normal" limitation period - six years for actions of the present kind – will only be extended by or postponed to a discoverability principle when an *ex parte* application has been made to the court to that end within one year of the discovery of the salient facts.  To the best of my knowledge, no application has ever been made by any of the Manitoba claimants to that effect, and it is difficult to believe that it would not be too late now to do so. Indeed, it could be argued – with what degree of plausibility I will not presume to judge – that in relation to the Manitoba claimants, the date of such discovery could not be considered anyway as having been later than December 1992, the date on which their claim should be deemed to have commenced.  After all (so the argument would run), in associating themselves with a claim founded on the assertion of certain elements, one of which is the existence of a dangerous defect, the claimants must be taken to have acknowledged their awareness of such a danger at that point in time.  But such an argument may be perceived not only as harsh, but as advancing too far into the realms of fiction, to command any support.  For the role of the Canadian claimants in a class proceeding such as this is in its inception (and perhaps for years after the filing of the claim) an entirely passive and unconscious one.  And to "fix" the claimant with "deemed" knowledge, at the time of filing of the elements of his claim, so as  to compel him to re-open the Manitoba limitation period, might be considered an affront to commonsense and justice alike.  If acceded to, this very approach would inevitably entail the consequence that no discoverability extension had ever become available to the Manitoba claimants, and that conclusion would go far – subject to what immediately follows and is elaborated in Appendix B – to dictating that the Manitoba claims are statute-barred and hopeless of success under Manitoba law.  The only qualifier I would make to this grim conclusion is that Manitoba plaintiffs, lacking access to the discoverability rule (for the reasons

---

[57] Of the Faculty of Law, University of Manitoba; the author of a leading text book on Canadian Tort Law.

given) might be able to avail themselves of a different device for extending the limitation period governing their claims, by exploiting the malleable and uncertain rules in Manitoba as to when, for limitation purposes, a cause of action should be deemed to have "arisen" in cases of this kind.[58]

There is some consistency, a limited measure of "sameness", in the rules governing the other six provinces of interest to us. In all of them, the "normal" limitation period (whether or not it will be potentially subject to the guillotine of an ultimate limitation period) consists of two elements:  A basic term of years, ordained by statute, which runs from the time "when the cause of action arose"; and a potentially long extension of that period, the discoverability period,[59] which may in appropriate cases postpone the commencement of the basic period until the plaintiff is considered to have actual or constructive knowledge of information relevant to his or her claim.

Even such an analysis as this is open to technical objection, for it may be taken to suggest that a cause of action "arises" before being "postponed" *ex post facto* by the discoverability principle.  At common law, certainly, that is not the favoured analysis.  Rather, the "discoverability principle" (this belated arrival in our law) is perceived merely as a principle of *interpretation*, helping us to identify when, indeed, a cause of action may be said truly to "arise".  Whereas under the old common law, a cause of action "arose" when (though only when) damage resulted from the breach of duty, after the genesis of the discoverability principle that was not enough.  Now, the cause of action would not be deemed to have arisen at all until damage was both (a) inflicted, and (b) discoverable to the eye of ordinary vigilance.  On this analysis, it is not a matter of identifying the time when the cause of action arose and then "adding" an extra period to allow for discoverability: discoverability is rather an inherent element in the identification of when the cause of action arose.[60]

Now *most* Canadian jurisdictions embraced this common law discoverability principle enthusiastically soon after its emergence in the English Court of Appeal in the *Sparham-Souter*[61] case, as already discussed.  And in later years, as the various provinces [or most of them] came to affirm and codify the discoverability doctrine in their respective Limitation Acts, the analysis remained the same.  Summing up the position in the Nova Scotia case of *Central & Eastern Trust Co.* v. *Rafuse*,[62] the Supreme Court of Canada pronounced, through Le Dain J., that "A cause of action arises for the purpose of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence".  And that is how the law now stands, as it has stood for more than 20 years, in most Canadian jurisdictions.

---

[58] Anyone doubting their malleability and uncertainty will find their doubts dispelled in Appendix B.

[59] Which may still be ordained by common law, though most provinces have by now (i.e. at the time of writing) expressly subsumed this element in their limitation statutes.

[60] Klar, Rainaldi, et al. Remedies in Tort c.27, Para. 218, and *Peixeiro v. Haberman* [1997] 3 S.C.R. 549

[61] [1976] Q.B. 858 (C.A.).

[62] (1986) 37 C.C.L.T. 117 (S.C.C.), at p.180.

As to what it is that must have been "discovered" or become "discoverable" before the cause of action will thus arise, I will stand by what I said earlier. The present kind of negligence action only arrived on the Canadian legal scene in 1995, as we have seen, and in consequence there are very few cases which consider when, for limitation purposes, such a cause of action arises. However, fundamental principle and the very rationale underlying the *Winnipeg Condo* case, irresistibly dictate that in **most** Canadian provinces (that phrase again), *the cause of action should be deemed to "arise" when and only when a perceivable[63] danger has arisen, which a reasonable building owner would recognize as demanding, as a matter of reasonable prudence, the undertaking of prompt remedial and preventative intervention.*

All of this may lead one to question how, on p.10 of his opinion, Mr. Mew can claim, as he does, that "the date upon which the cause of action arises is the date of installation of the allegedly defective product." As I have tried to show (and indeed the general content of Mr. Mew's paper would tend to confirm), the date when a cause of action "arises" cannot (in most Canadian provinces) be identified without inquiry as to what the building owner knew or ought to have known and when. I believe the explanation for the stark and dogmatic proposition thus advanced by Mr. Mew is that he has presumed to generalize from a line of British Columbia authority which should properly be regarded as of entirely parochial relevance, being explicable only by reference to that province's legislative history. His principal supporting reference, to *Armstrong v. District of West Vancouver*,[64] should put one on one's guard to this is effect. For one thing, it was concerned principally with the starting-date applicable to *ultimate* limitation periods, as discussed earlier in this opinion. But while there were indicia, both in the *Armstrong* case and in various other (first instance) British Columbia cases, that the same principles govern the starting-point of ordinary limitation periods too, and that the "date of installation" is indeed the relevant date in this class of case, it is obvious that these conclusions are the by-products, again, of a special, local and aberrant doctrinal evolution forced upon the British Columbia courts by the format of the 1975 Limitations Act which first introduced a discoverability principle in that province. The matter is fully though critically explained in Appendix B, (as is the *Armstrong* case and some cognate British Columbia authority). The authorities emanating from that province most emphatically do *not* warrant the conclusion that elsewhere in Canada, the date of installation of MK-3 marks the start of the ordinary limitation period.

One sometimes meets with arguments that suggest that the moment when a cause of action "arises" is a fluid and malleable notion, giving to the limitation period a measure of elasticity additional to, but conceptually distinct from, the protractive potential afforded by the discoverability principle as such. I confess to finding that argument elusive and unpersuasive, and can find no real support for it in the authorities, except for some of those emerging from the provinces of

---

[63] That is, again, apparent to the eye of ordinary vigilance on the part of a sensible and responsible building owner.

[64] 10 B.C.L.R. (4th) 305.

Manitoba and British Columbia.  At some risk of tedium, I must in due course explain why this has occurred.  But for now, let me merely say that I can conceive of no additional element or circumstances short of discoverability which, if insisted upon as a necessary precaution to the triggering of the limitation period, could imaginably extend the available time for the bringing of an action more generously than the discoverability concept itself would do.  Only in jurisdictions[65] where the "discoverability extension" is for some reason unavailable to a plaintiff, might it be found profitable to engage in speculation as to what further element, over and above the infliction of harm, might fairly be insisted upon as a precondition to "starting the clock".

Which brings me to the curious situation obtaining in Manitoba and (formerly at least) in British Columbia.  I have already related how Manitoba and British Columbia, in 1967 and 1975 respectively, "jumped the gun" and introduced statutory discoverability rules even before the common law, first in England and then in Canada, took such a step.  In Manitoba, though, the plaintiff's right to postpone or extend the available time for bringing suit was not automatic, nor a matter of strict entitlement.  Any extension of time to allow for damage to be discovered or become discoverable was a discretionary matter, to be sought from the Court in accordance with the mechanism ordained by the statute, and sought, moreover, within one year after the plaintiff's discovery of his or her "cause of action."

Under such a regime, no Court could identify the moment at which the cause of action "arose" as being the point in time at which it became "discoverable", because to do so would be to render s.14(1) of the Manitoba Act (and indeed the whole of Part II of that statute) utterly redundant.  No, the date when the "cause of action arose" had to be fixed at some point without reference to the discovery or discoverability of the facts supporting the action, so raising the spectre that a plaintiff might face losing his right of action before even becoming aware of its existence.  The resultant injustice could then be addressed through the judicial mechanism set up under s.14(1) for the re-opening of limitation periods.

In British Columbia, where the 1975 Act[66] adopted a "discovery" postponement mechanism without the need for any judicial approval, the Courts consistently adopted the view that the statutory scheme was all-sufficient and exclusive, affording no opportunity for the reception of common-law developments in identifying when the cause of action "arose".  So it is that in British Columbia and Manitoba alike, unique province-specific jurisprudence has emerged as to when, indeed, a cause of action "arises" in those provinces.  Because these two provinces have adopted paths divergent from those otherwise favoured across Canada on this point, I have relegated them to a separate appendix (Appendix B) to avoid undue disruption of whatever coherence this narrative possesses.

---

[65]  I refer, frankly, to Manitoba.  See Appendix B.

[66]  *Limitations Act*, S.B.C. 24 Eliz. II c.37, s.6.

We are now in a position to assess the viability, in terms of limitation law, of all the Canadian claims. I shall do so on a province-by-province basis.

**British Columbia**

Calculations would begin by identifying the time "when the cause of action arose". There is some trial level authority,[67] footnoted below, which appears on its face, to endorse Mr. Mew's view that the relevant moment would be that when the MK-3 was installed in each of the affected buildings : [a question of fact, to be decided on the evidence in each instance]. Then the Court would consider, if the plaintiff claimed that he or she was unaware at that date of the crucial facts, at what date such plaintiff did become or ought reasonably to have become aware of them: [Another question of fact]. If required, the judge would delay commencement of the six year basic limitation period until that time of actual or constructive discovery. If, with the addition of that six year period, it appears that the limitation period had not expired by the critical date, nor been cut short by the 30 year "ultimate" limitation period decreed since 1976 by the British Columbia statute, the claim of the British Columbia claimants will be viable. Otherwise, it should be considered statute-barred. For reasons given above, the "critical date" must be regarded as a hotly contested issue. As previously explained, the claimants would assert that it is December 23rd, 1992: the debtor would insist that it is April 2nd, 2001.

In the *Privest* case,[68] of course, Drost J. struck out the plaintiff's claim for various reasons, among them being his conclusion that the British Columbia limitation period barred the claims. The Court of Appeal was not seized of this issue, nor did it feel any need to comment upon it. That said, if the British Columbia claimants are understandably discouraged by the ruling in *Privest*, they should reflect on the reasons for Justice Drost's ruling. At paragraph 176 he explained the applicable law just as I have done, and concluded, at para. 184:-

> The plaintiff's argument under this section is premised on the assertion that they simply did not know that the fireproofing contained asbestos and, therefore, the running of time should be postponed until their "discovery". For the reasons given in the "Knowledge" section, I have rejected that assertion. The plaintiffs were aware of the controversies surrounding asbestos and, in my opinion, they either knew or ought to have known that MK-3 contained asbestos. All of the factors necessary to an action regarding the MK-3 existed as of the date of completion of its installation. Accordingly, the limitation period began to run as of that date, without postponement.

> It follows, therefore, that the plaintiffs' claims are barred by the provisions of the *Limitation Act.*

---

[67] *Privest Properties Ltd. v. Foundation Co.,* (1995) 23 Constr. L. Rep. (2d) 1 at 47, para. 158 (Drost J., B.C.S.C.); *Emms v. Prince George* (1999) 3 M.P.L.R. (3d) 106 (Loo J., B.C.S.C.) : They are evaluated, not uncritically, in Appendix B.

[68] (1995) 23 Constr. L.R. (2d) 1.

To state the obvious, these conclusions, whether right or wrong, welcome or the reverse, are conclusions *of fact*, premised upon the evidence adduced in *Privest* as to what the plaintiffs in that case knew or ought to have known – and when they ought to have known it. Such conclusions serve to remind the British Columbia claimants that the evidentiary hurdle confronting them is a formidable one (especially since in that province, the onus of showing that they are entitled to postponement under the discoverability principle rests upon them).[69]    It tells them that they must be prepared vigorously and cogently to convince a court that they remained ignorant of the dangers immanent in their buildings for decades after the MK-3 was installed.    But *Privest* certainly represents no doctrinal impediment to their claims, such as might warrant summary dismissal on legal grounds.

I feel that I should leave it at that, since no commentary by me upon the constructive or imputed knowledge issues, so elaborately debated in *Privest* (and again in Mr. Mew's opinion) would be within the scope of my professed expertise, and I am not in any case called upon to "assess the odds" in this litigation.    I would simply conclude of *Privest* that it warns us that the British Columbia claimants face a severe evidentiary challenge in showing, as they must, that the date of discoverability so delayed the commencement of the six-year period that it had not expired before the critical date.    But what *is* that critical date?    That I must now consider.

Unfortunately, it seems to me that the disputed status of all the Canadian claimants, in relation to the December 1992 class action, is of critical, perhaps dispositive, importance in this case.    If as a matter of law, the Canadian claimants are to regarded as still privy to that class action, the suspensory effects of the Class Proceedings statutes will still be deemed in effect, "freezing" the running of time as of *December 23, 1992*, and necessitating that all limitations issues be adjudged according to the amount of time elapsed, and the rules in place, as of that date.

If, on the other hand, it is decided that as a matter of law, the Canadian claimants have, at some given date, been finally and definitively excluded or expelled from the class action, it follows that as of that moment the limitation freeze is lifted, and time again continues to run against them, forcing them, at best, to institute new proceedings against the Grace defendants "before time runs out on them."    The only proceedings so instituted (after 1992, that is) by the Canadian claimants are their claims in the present bankruptcy litigation, commenced on April 2nd, 2001.    So if the Canadian claimants are now to be regarded as "out" of the class action, the "critical date" is indeed April 2nd, 2001 – just as Mr. Mew adamantly insists.

On *that* hypothesis, the prospect for every Canadian claimant seems to me, from a limitation perspective, to be more bleak, regardless of their home jurisdiction.    For if, at any time after 1992, the limitation period again started to

---

[69] R.S.B.C. 1996, s. 6 (7). The burden of proof rules governing limitations issues vary radically in Canada from province to province, sometimes being governed by statute, sometimes not.

run, the Canadian claimants would potentially find themselves at two new disadvantages:-

(a) They would be at the mercy, now, of any adverse changes to the limitation period, enacted while they were safely "cocooned" in the class litigation; but far more calamitously …

(b) It could conceivably be argued against them, again that they should be denied access to any discoverability period and estopped from claiming that there remains any residual power to postpone the basic six-year limitation period, because they had been innocently unaware of the danger. The defence would contend that on the contrary, by joining the class litigation in December 1992, they had impliedly acknowledged that they *did* know of the danger. That would leave them, as soon as they were expelled from the class litigation, with just the bare six years, at most, in which to commence some other claim. And if the onset of the bankruptcy litigation, in April 2001, was more than that six years after they exited the class action, that would seem to compel the conclusion that all their claims were indeed statute-barred before they sought to involve themselves in that 2001 litigation. I have already raised this issue, and rejected it (not without some trepidation) as unduly harsh and extravagantly artificial : supra, page 21: and the viability of such an argument, given the passive role of the Canadian claimants as there mentioned, would surely depend upon the adducing of factual evidence as to what each such claimant knew of the state of proceedings, and when.

In summary, I am forced to the conclusion that if indeed the Canadian claimants are still "in" the class action, they have a chance (depending on the factual evidence adduced) of defeating the limitations defence. If it be authoritatively determined that they are "out" of the class litigation, their position under the law of limitations will be distinctly more precarious.

## Alberta

As in the case of British Columbia, the relevant rules governing those claims relating to structures in Alberta require differential analysis, depending on the date at which it is deemed appropriate to make one's calculations. If, as Mr. Mew contends, the key date is April 2nd 2001, then the current Limitations Act of Alberta, [R.S.A. 2000 c.L-12] applies; if, on the other hand, the Alberta claimants are still to be deemed in law to be participants in the Anderson Memorial Hospital class action, instituted on December 23rd 1992, the Limitations law of Alberta as of *that* date should govern: which means that no "ultimate" limitation period would be applicable (that was not enacted until 1996); and the discoverability period would be as ordained by the common law, rather than the more formalized provision introduced, again, by the 1996 legislation.

Again, then, before any calculation can confidently be made as to the limitation rules properly to be applied to the Alberta claimants, it will be necessary

for the court of competent jurisdiction to determine authoritatively whether these Alberta claimants are "in" or "out" of the class action suit at this stage in the game. Being both unable and disinclined to prejudge that question, I shall address the Alberta claims on alternative hypotheses.

    *(a) If the Alberta claimants are still in law members of the class embraced by the class action suit.*

        If this is the case, and the claimants' case is still firmly vested, the relevant date is December 23, 1992, when the class action was instituted: and the question is whether, under the limitation rules *then* in effect in Alberta, the claim had been filed in time. At that date, the Limitations Act, R.S.A. 1980 c.L-15 was in effect. It provided for a six year basic limitation period for claims of the present kind (s. 4(1)(g)): but said nothing about postponement for "discoverability;" nor did it provide any "ultimate" limitation period. By December 1992, however, the common law had introduced its own "discoverability" rules, postponing the commencement of statutory basic periods in those provinces where this had not explicitly been done by statute.

        Therefore, if the Alberta claimants are still to be deemed participants in the class litigation, we ask ourselves first, when they should with reasonable diligence first have been aware of a substantial danger; then we add six years to that date. If that time has *not* fully elapsed by December 23rd, 1992, the claims are *not* statute barred.

    *(b) If the Alberta claimants should be deemed in law to have been expelled, irretrievably, from the class action suit.*

        If this is the case, the only lingering effect of the claimants' participation in the class litigation will be to have suspended the effluxion of the applicable limitation period for the duration (only) of their involvement in that litigation. The critical date for making limitations calculations will be April 2, 2001, as favoured by Mr. Mew and by the Grace defendants. And accordingly the applicable rules will be those of the "reformed" Alberta *Limitations Act*, R.S.A. 2000, c. L-12, equipped as it is both with a statutory "discoverability" provision (s.3 (a)) and an ultimate limitation period of 10 years (s.3(b)). These changes were introduced in 1996, at which time the "basic" limitation period was reduced for cases like this from six years to two. And if the claimants were by the time of these amendments no longer safely "locked into" valid proceedings, the suspensory effect of class litigation would have ceased, and the claimants be fully exposed to such adverse changes in the limitation rules as might supervene (as happened in 1999, when the 1996 statute was proclaimed in force) to affect them.

        Therefore, if Alberta claimants are deemed in law now to be outside the class action, their situation is perilous. The limitation "clock" resumes running as soon as they are excluded from the class. They may also be exposed to the unattractive argument fixing them with "deemed" knowledge of the damage sustained by them, as of December 1992 : an argument which I have already repeatedly addressed and, I hope, disposed of.

To anyone who has managed to bear with the argument this far, it will be apparent that a pattern or theme, grimly consistent in its implications, has emerged. The fate of all Canadian litigants[70] depends in large measure on whether they are still to be considered as participants in the Anderson Memorial Hospital class action. If they *are*, then the critical date for limitation purposes is in December 1992, and the fate of their claims will depend on the *factual* evidence as to the date when they knew or should have known that MK-3 was dangerous. If they are *not* still involved in the class action, then for the reasons given above, their claims seem less likely of success.

This thesis dictates everything that follows, as I address the remaining provinces. Only for the sake of completeness do I attempt these tedious calculations.

## Nova Scotia

In Nova Scotia, as Mr. Mew helpfully points out, all the limitations statutes over the years, culminating in the Limitation of Actions Act, 1989, now in effect (R.S.N.S. 1989 c. 258) to express themselves in antique and mysterious language, so far as the characterization of actions is concerned. But I agree with him that claims such as those presently in issue amount to one of those "causes which would formerly have been brought in the form of action called trespass on the case"; and are accordingly governed by a *six year* basic limitation period [s. 2(1)(e)]. I agree further with Mr. Mew that despite the absence in the Nova Scotia act of any statutory postponement (or discoverability) rule, that absence is supplied, as in several Canadian jurisdictions by the common law discoverability principle, as introduced into Canada in the eighties by the process described earlier in this opinion (at p. 20 *supra*, and at fn.55), and latterly confirmed by the Nova Scotia Court of Appeal in *Burt v. LaLacheur*, (2000) 189 D.L.R. 4th 193.[71]

There is no "ultimate" limitation period in effect in Nova Scotia.

Accordingly, and consistently with the pattern that has emerged in this paper, we must ask ourselves first, whether the Nova Scotia claimants are to be considered privy to the class litigation, so 'freezing' the limitation process as of 23rd December, 1992. If so, the Nova Scotia claimants have to show, by appropriate evidence, that they did not discover, and should not reasonably be required to have known of the dangers of asbestos treated buildings until a date after 23rd December 1986, so that the six-year period added to the date of discoverability would not expire before the magic date of 23rd December 1992.

However, if the Nova Scotia claimants are determined to have been excluded in law from the class action, their cause seems more vulnerable, for (as discussed above) they could conceivably be deemed to have known of the

---

[70] Save for those in Manitoba, whose claims, as I have argued, are in all cases uniquely disadvantaged for want of any "automatic" discoverability mechanism under the Manitoba Statute.

[71] One might have thought the issue had been sufficiently laid to rest by the Supreme Court of Canada 14 years earlier in *Central Trust v. Rafuse* [1986] 37 C.C.L.T. 117

danger since December 1992, so the discoverability principle will not avail them further; and it seems probable on that hypothesis that the bare six year period, all that remains to them, would have elapsed before they entered into the bankruptcy proceedings of April 2001.

## Newfoundland and Labrador

As Mr. Mew points out, the current Limitations Act of this province, S.N.L. 1995, c. L-16.1, is confusingly expressed so far as the proper characterization of the present claims is concerned.  But I fully agree with him that it must be the "residual" provision, s. 9, which governs, rather that s. 5 (a), which seems on a fair reading not to refer to claims for "pure economic loss", but to derivative economic losses flowing from physical injuries to persons or property.  That means that the applicable "basic" limitation period is six years after the cause of action arose; and further, as Mr. Mew points out, that the claim is subject to no "ultimate" limitation as is provided for certain other types of claims under s. 14 (3).

Prior to 1995, the relevant statute was Newfoundland's Limitation of Personal Actions Act, R.S.N. 1990 c.L-15, remarkably antique in expression and even more delphic in meaning, but seemingly, by virtue of s. 2(d), providing for the same six year basic limitation period as its successor.  There being no explicit postponement ("discoverability") principle, the common law discoverability rules would apply, just as in Nova Scotia.

This being the case, we ask, yet again, how *these* claimants stand in relation to the class action of December 23rd 1992.  If they are still privy to that action, they need only to show on the evidence that six years prior to that date (i.e. on December 23rd 1986) they had still not discovered, despite reasonable diligence and alertness, that danger from asbestos was present in their buildings. If they can show that, their cause is untroubled by limitation concerns.

But once again, if they have in law dispositively ceased to be privy to those class proceedings then, (depending on the date of their exclusion), their claims could face that further limitations challenge, already discussed in relation to the other jurisdictions.  They might again have to face the argument, artificial thought it might be, that in joining (or, more accurately, being passively joined) to the class action of December 1992, they might thereby be deemed to have acknowledged the existence at that date of all elements asserted in that claim, awareness of actionable damage included.  That would make it difficult indeed to argue that their claims were not statute-barred.

## Ontario

Yet again, as would be expected, I find myself in agreement with Mr. Mew as to the applicable statutory provisions, which (whatever view one takes of the case, and whichever of the competing dates one treats as crucial) are certainly

those ordained by the former *Limitations Act* of Ontario, R.S.O. 1990 c.L-15. That act provided a basic period of "six years after the cause of action arose" for all "actions on the case" other than slander.  But no postponement provision was enacted, its absence being supplied, as in so many provinces, by the common law discoverability doctrine.  No ultimate limitation period is to be found.  Thus far, Mr. Mew and I are in total agreement, but this is the point where, as concerns Ontario and all the other provinces, our analysis diverges to some extent.

Mr. Mew contends, very vigorously and lucidly, that concerns about the dangers of asbestos were so notorious among the general Canadian public (and building owners especially) at such an early date, that the discoverability principle can avail these Canadian claimants nothing.  I say that I am not at all convinced that Grace's self-serving contentions to this effect are sufficiently made out; but feel that in any case, there are issues of fact, pure but far from simple, and not meet for discussion in an expert opinion as to the law.

Furthermore, and for the last time in this opinion, I do not share Mr. Mew's conviction that April 2nd 2001 is necessarily the key date for determining whether these Ontario claims were or were not statute-barred.  Tiresome though it may be for me to reiterate this, but on my analysis "it all depends."  It all depends on whether the Ontario claimants are still in good standing in the class action, instituted in December 1992.  If they are, their present claims will escape destruction if they can show on the evidence that they neither knew nor ought to have known of the substantial danger posed by asbestos in their buildings until on or after December 23rd, 1986.

If on the other hand they are now to be regarded in law as having been severed from the class action, the key date for calculations becomes April 2, 2001, and the limitations hurdle for these litigants becomes considerably more difficult, for the reasons repeatedly adverted to in relation to the other provinces.

## Manitoba

I have already argued, at pages 20-21 of this Opinion, that due to the unique history and format of the Manitoba statute, which denies to plaintiffs in that province any automatic access, as of right, to the "discoverability principle", [and affords them only a brief opportunity under s.14(1) to seek redress by judicial fiat when such a situation threatens injustice], the Manitoba claimants in our present proceedings face a peculiarly daunting challenge in regard to limitations issues.  Some consolation or latitude in applying the limitation rules in Manitoba may, perhaps, be found on reflection to inhere in the uncertain and malleable state of authority in Manitoba, as to when a cause of action "arises" in cases of the present kind.  This is elaborately discussed in Appendix B.

SUMMARY OF CONCLUSIONS

In the earlier pages of this report, I have analyzed the Canadian common law governing tort liability for financial losses, sustained by owners who have felt compelled to undertake asbestos abatement programs, to remove the product MK-3 from their buildings. Such claims would unquestionably sound exclusively in negligence, and would be characterized more particularly as product liability negligence claims for purely economic loss. Canadian law would require that the plaintiffs show a duty of care arising from a demonstrated relationship of proximity between the plaintiffs and the manufacturer; and a breach of that duty by conduct, on the part of the manufacturer, which goes beyond the mere production of a potentially harmful product and introducing it into the general marketplace. Furthermore, before the Canadian courts would recognize any duty of care in such a case, the claimants would have to show that incorporation of MK-3 into their buildings resulted in something more than a merely "shoddy" or defective building. They would have to show that it represented a real and substantial danger to life, health or other property.

I do not believe that my analysis of the law differs significantly or indeed at all from that set forth in the expert opinion of Professor Lewis Klar. The only issue on which my views differ from his relates to the significance in law of Canada's sole decided case of this kind, *Privest Properties Ltd. v. Foundation Co. of Canada*, a British Columbia decision discussed in this paper at Pages 11-14. I take a less apocalyptic view of that decision than does Professor Klar. Justice Drost's careful and doctrinally sound judgment rejected the plaintiff's claim *on the facts* as dictated by the evidence adduced in that case. That is not just my view. It was explicitly the view of the Court of Appeal, and, it would seem, of the Supreme Court of Canada in that case. It would bind no Canadian court to reach a similar result, and is actually of value to future plaintiffs in asbestos litigation, in that it expressly gives a pointed lesson as to how evidence should be more effectively presented.

That is not to say that the Canadian claimants, any more than their American cousins, face an easy task in making good their claims, either in terms of law or fact. But their challenge is neither hopeless of success, nor obstructed by authority.

The problems suggested by Canada's various Limitations Acts, which occupy the latter half of this paper, seem far less straightforward. Again, I would endorse much of the legal analysis in Mr. Mew's expert opinion, as far as it goes. But that document fails, for some reason, to advert in any way to the significance in law of the Class Action, commenced in South Carolina, to which the Canadian claimants are, or were (the question is contested) associated. It is my thesis that this element is critically important in various ways.

First, the institution of a class must (as a principle of seemingly universal application) be taken to "toll" the effluxion of any limitation period, affecting any class member, at the moment the class action is so commenced. At that point, a claimant's rights are, so to speak, "vested" and immune from further limitations

concerns, and the "critical date" for the assessment of such limitations issues is the date of such institution – not April 2001, the date upon which Mr. Mew predicates all his calculations, but January 1992. Thus if the Canadian claimants became and remained in law privy to the class proceedings, their claims are not self-evidently statute-barred, as Mr. Mew concludes.

However, should it be determined that the Canadian claimants have been eliminated from the class action in question, the "tolling" effects of the governing legislation will prove not to have been final and conclusory, but only temporary and suspensory, and this, I believe, for reasons more fully elaborated in the text, could lead to their claims being dismissed as statute-barred.

My opinion, therefore, is that the fate of the Canadian claimants' rights of action may depend in great measure on their continued status (or lack thereof) vis-à-vis the Anderson Memorial Hospital class action. The only exception I would make relates to the Manitoba claimants, since as I explain in the text, the unique scheme of the Manitoba statute denies to those claimants any automatic right to assert the "discoverability" principle available everywhere else in Canada; and this will make it more difficult to make a persuasive argument enabling any Manitoba claimant to overcome a limitations defence. Their best chance of doing so would seem to lie in making use of the unsettled rules governing when a cause of action arises in Manitoba in cases founded upon the ruling in *Winnipeg Condo v. Bird Construction*, an area of law I discuss more elaborately in Appendix B.