# APPENDIX B

## (FOR SIGNATURE)

FINAL TEXT

## Appendix B:  Complexities attending identification of the time "when the cause of action arose":  the aberrant jurisprudence of *British Columbia* and of *Manitoba* particularly considered.

As the main text attempts to show (at page 22) I would maintain that in most provinces, the date when a cause of action "arises", for the purposes of the kind of negligence litigation presently under consideration, is the date when a plaintiff becomes aware, or ought with reasonable diligence to have become aware, that his or her building presents a situation of actual or impending danger, a danger sufficiently substantial to warrant, as a matter of reasonable prudence, the undertaking of prompt remedial and preventative intervention.  Only at that point will time begin to run.

In two provinces, however, as the main text has again explained in a preliminary way, development of the case-law as to when the cause of action "arose" has been distorted by historical circumstance.  The two provinces are Manitoba and British Columbia, and the historical circumstance in question was the enactment in those two jurisdictions, in 1967 and 1975 respectively, of amendments to their Limitations Acts, introducing "discoverability" mechanisms for delaying the start of the limitation period in certain situations where justice might seem to require it.  The effects of those legislative initiatives, undertaken before the acceptance in all other Canadian jurisdictions of a *common law* discoverability doctrine, must now be examined, with this cautionary proviso.  Because of their distinctive history in these matters, decisions from both British Columbia and Manitoba should be regarded as of little relevance in other jurisdictions, so far as the identification of "when the cause of action arose" is in issue.[1]

British Columbia

Until British Columbia introduced the 1975 version of its Limitation Act, there could be no doubt that its law as to "when a cause of action arose" in negligence cases was perfectly straightforward and identical, moreover, with that of every other common law province of Canada.  Regardless of the kind of negligence involved, or the kind of harm complained of, a cause of action was complete, and complete only : in other words, it "arose" : only when the last of the three indispensable ingredients of a negligence action – duty of care, breach of duty, *and resultant damage* – came into existence.  Then the clock would start running.  And the allotted time might very well run out, and leave a deserving but hapless plaintiff without remedy, even though he or she had been completely and quite pardonably unaware of the damage until it was too late.  That was the

---

[1] This is unfortunate, because as it happens, the great preponderance of authorities on this issue, since it first suggested itself with the advent of *Winnipeg Condo No. 36 v. Bird Construction Ltd.* in 1995, has emerged from precisely these two provinces.

position at common law throughout the Commonwealth, and that was the injustice which the 1975 Act (like the Manitoba statute a few years earlier) was designed to erase.

Where, it might be asked, was the discoverability principle, so familiar to us today? Apart from the law reform agendas which were making themselves felt in Manitoba and now in British Columbia, the discoverability principle was merely the talking-point of academics, and an idea germinating in the mind of Lord Denning. It is essential to realize, in other words, that British Columbia's 1975 statute (and á fortiori Manitoba's) was enacted *before* Lord Denning's momentous initiative to change the common law, in *Sparham-Souter v. Town & Country Developments*, [1976] Q.B. 858.

That is why, when both the Manitoba and British Columbia judges came to interpret their reforming statutes of 1967 and 1975 respectively, they could not escape the conclusion that the philosophy and intent of those statutes were essentially the same as those underlying the new common law developments in England, *but* at the same time, that having pre-dated those developments, the statutes could not be interpreted with reference to them. So when the British Columbia act of 1975 spoke of a cause of action "arising", it must be construed in accordance with the meaning borne by those words in the courts of British Columbia for decades before the statute was passed – and decades, too, before *Sparham-Souter*. The injustice of the old common law would be remedied by the introduction of a statutory discoverability mechanism, postponing the commencement of the allotted term of years : but when the statute, in setting up the mechanism, referred to a cause of action "arising", it did so in the time-honoured sense of that word, which in itself connoted absolutely nothing to do with what a plaintiff had known, or what such a plaintiff ought to have known. The "arising" of a cause of action was an event which could still, as before, be identified without any reference to the plaintiff's state of mind, awareness or knowledge, actual or imputed.

That this is indeed still the law of British Columbia seems firmly established by authority stretching back for decades. The cases which assert this view are from various areas of the law of negligence, some involving personal injury (esp. *Bera v. Marr*, (1986) 1 B.C.L.R. (2d) 1, 37 C.C.L.T. 21 (B.C.C.A.), *Karsanjii Estate v. Roque*, (1990) 43 B.C.L.R. (2d) 235 (B.C.C.A.)) and *Wittman v. Emmott*, [1991] 4 W.W.R. 175 (B.C.C.A.): cases of defective buildings and other property : *Ridley Terminals v. Mitsubishi Canada*, (1993) 16 C.L.R. (2d) 86 (B.S.C.S.), *Privest Properties v. Foundation Co.* (1995) 11 B.C.L.R (3d) 1 (B.S.C.S.) and *Strata Plan VR 2000 v. Shaw*, (1999) 55 B.C.L.R (3d) 103 (B.S.C.S.);and claims for losses sustained in consequence of negligent inspections by statutory public authorities : *Emms v. Prince George*, (2001) 18 M.P.L.R. (3d) 200 (B.C.C.A.) and *Armstrong v. West Vancouver* (2003) 10 B.C.L.R (4th) 305.

It should be noted that at one stage, doubt was felt about the veracity of this conclusion in view of what had been said by Madam Justice Wilson, for a majority of the Supreme Court of Canada, in the leading building-inspection case of *Nielsen v. City of Kamloops*, [1984] 2 S.C.R. 2, 29 C.C.L.T. 97. Her words might be taken to say that in such cases, a cause of action does not "arise" in British Columbia until relevant damage becomes discoverable. But in *Bera v. Marr* (*supra*), just a year and a half later, the British Columbia Court of Appeal explained away those observations as only musings upon the common law then developing in England, and of no real help in interpreting the British Columbia statute after 1975. On mature reflection, and in view of the phalanx of authorities above cited, I find it impossible to doubt that the law of British Columbia is as they state it. A cause of action in negligence "arises", for the purpose of interpreting the British Columbia legislation, on the date when the damage occurs – whether known or unknown, actually or constructively to the plaintiff.

Another way of describing the legal position in British Columbia, resulting from the foregoing history, is to say, as the province's Court of Appeal expressly did more than 20 years ago[2] that the "balanced legislative scheme" embodied in the province's 1975 Limitation Act precluded consideration of the common law discoverability rule which was fast being received into the law of other provinces. The 1975 Act was treated, in effect, as representing a closed logical system. Within that system, however, by dint of s.6 of the Act, the start of the limitation period for certain broad categories of negligence action might be postponed until critical facts, suggestive of a viable cause of action, were known to the plaintiff or reasonably discoverable by him. In the course of its decision in what is still a leading case on this statutory arrangement, the British Columbia Court of Appeal stressed that logically, the "arising" of the cause of action must, given the structure of the statute, be deemed to be an event anterior to the dawning of discoverability, contemplated by s.6. As Esson J.A. put it[3]

> The *Limitations Act*, as appears from ss.3(2) and 8(1), defines the beginning of the period of limitation as being the date on which the right to bring action arose. That must mean the date upon which the cause of action was complete; the date upon which all the elements of the cause of action had come into existence, <u>whether or not the person entitled to the cause of action was aware of all the facts upon which its existence depended</u>.

Any prospective injustice resulting from this position is of course addressed in the legislation itself, which provides in s. 6 for a statutory discoverability period. But that discoverability postponement does *not* extend to

---

[2] *Bera v. Marr*, (1986) 1 B.C.L.R. (2d) 1 (C.A.).

[3] *Ibid*, at p.14. The same view was again endorsed by the B.C. Court of Appeal in *Karsanjii Estate v. Roque* (1990) 43 B.C.L.R. (2d) 234, and later by Drost J. in the *Privest* case, (1996) 23 C.C.L.R. (2d) 1. See also *Wittman v. Emmott*, (1991) 53 3 C.L.R. (2d) 228 (C.A.).

the ultimate limitation period decreed in s. 8, which is designed, indeed, to curtail, where necessary, any limitation period which might be unduly protracted in consequence of the discoverability principle.  The *ultimate* limitation period in British Columbia, accordingly, runs from the date of occurrence of the damage, whether or not at that time the plaintiff was aware of it.

With the advent in 1995 of liability in negligence for "pure economic loss" resulting from dangerously defective structures,[4] dilemmas confronted the British Columbia courts.  For one thing, such actions had (quite pardonably) not been foreseen by the statutory draftsman, and consequently found no mention in the Act.  Could they be deemed cases of "damage to property", so as to enable invocation of s.6(3) and its rather specific postponement provisions?  And if so, when should such damage be deemed to have *occurred*?  For that, under the prevailing British Columbia rules, would be acknowledged as the time when the cause of action "arose" – not, as in other provinces, the time when such damage might be discovered.

Such questions are far from "academic."  They may well prove to be the decisive ones in dealing with some of the Canadian claimants in this bankruptcy.  If the date of occurrence of the damage is potentially critical in some provinces (and important and relevant in all of them) in assessing the starting time for ordinary limitation periods and for ultimate limitation periods too, what is meant, in this context, by "damage"; and when can it be said to have occurred in this class of case?

To state the obvious, different areas or applications of the tort of negligence yield, on close examination, a very different analysis.  The kinds of harm which these different sorts of negligent claims seek to redress reflect different mechanisms for the infliction of injury or loss, and require in consequence that we take care in assessing when the cause of action has been completed by the infliction of such harm.  Cases of personal injury and death will often, but not always, involve obvious hurts immediately resulting from the defendant's breach of duty.  Cases of "nervous shock" may involve long-festering emotional discomforts resulting from the initial trauma, and it may be years before these finally resolve themselves into the nervous shock phenomenon which Canadian law regards as actionable.  But these variables and difficulties are slight, compared with the uncertainties that attend the identification of damage in the fledgling Canadian law of negligently inflicted economic loss.

What *is* the harm for which a plaintiff seeks compensation in "our" category of economic loss claims – that is, the *Winnipeg Condominium* category?  It is, I would suggest – for the leading case is very coy on this issue – a financial

---

[4] In the *Winnipeg Condominium* case, extensively discussed in the main text.

prejudice[5] sustained by a building owner who finds himself "stuck" with a building that is dangerous and consequently in need of urgent and costly repair. It is not enough as the law presently stands, that the building is qualitatively deficient or disappointing. It must (as I show in the opinion) be positively *dangerous*. When that stage is reached, or when it is discovered to be so (depending on which province we are talking about, and whether it is the ordinary or the ultimate limitation period we are considering), the clock starts to tick.

It is at this point that I am forced to acknowledge myself in flat disagreement with Mr. Mew, who repeatedly and consistently declares that the time when damage occurs in these cases, and when the cause of action arises for limitation period purposes, is always and everywhere "the *date of installation* of the allegedly defective product." He asserts this, with varying degrees of generality, at pages 4, 5, 10, 12, 15 and perhaps elsewhere. When he cites authority for this blanket proposition, he cites *Armstrong v. West Vancouver* (2003, B.C.C.A.) and at one point *Dean v. Kociniak* (2002) 92 Alberta L.R. (3d) 92 (Q.B.) a personal injury case of no obvious relevance to our concerns. Let me outline the reasons for my disagreement, while acknowledging, with respect to Mr. Mew, that his deductions from *Armstrong* are understandable, given the inescapable ambiguities of Mackenzie J.A.'s judgment in that case, and in particular, one especially Delphic remark therein. My own view, expressed above, is nevertheless that Mr. Mew misconstrues *Armstrong*, and mis-states its meaning not only in British Columbia law, but more extravagantly, as a proposition of law valid for all provinces. Again, then, let me explain the reasons for my disagreement.

    (a)    Given the multiplicity of limitation statutes across Canada, and their divergent history especially in relation to discoverability issues, it is surely counterintuitive to suppose that the law would yield a simple "one-size-fits-all solution" : counterintuitive too, to suppose that such a solution would entirely ignore the concept of "danger", pivotal to liability in the *Winnipeg Condo* case.

    (b)    The issues of what counts as damage; and when; and when (perhaps the same question) the relevant "danger" has reared its head; are new issues in Canadian tort law, and the Supreme Court in *Winnipeg Condo* has given no direct evidence as to how to address them. Caution should surely be the watchword, not dogmatism.

    (c)    *Armstrong* is a British Columbia case, and as such, we should be hesitant to generalize from it, and impose it on provinces with divergent legislative histories. To take the most obvious point,

---

[5] One cannot call it a "loss", for as often as not, the necessary expenditure may not yet have been made when the matter comes to trial, nor the inevitable loss of value of the property have been made explicit through a sale; nor can one call it a "liability", when the unfortunate property owner owes nothing, but is the sole victim. Yet the financial burden, the diminution of value, is a very real one.

discoverability is a built-in ingredient of when the cause of action arises in all but two Canadian provinces (the exceptions being British Columbia and Manitoba).  So as it stands, Mr. Mew's dogmatic assertion can only be arguably right in those two aberrant jurisdictions.

(d)     If in fact we <u>do</u> look at what *Winnipeg Condo* has to teach us on this question – and *Winnipeg Condo* is, after all, unquestionably the leading case in this context – we find that Mr. Mew's "date of installation" solution *cannot be right.*   In *Winnipeg Condo* the defective tiles and masonry were installed in the period 1972-4.[6] Proceedings were commenced in 1990.  If indeed the cause of action had arisen upon installation of the defect, this would have doomed the action as statute-barred beyond all hope or argument. But as we have seen, the Supreme Court and thereafter the Manitoba courts were not inclined to be so dismissive.

(e)     Still considering the *Winnipeg Condo* case in the Supreme Court of Canada, it is important to note that the Court, while not addressing the limitations issue directly, do so *obliquely*, in that LaForest J., while disposing of any defence argument of indeterminacy, clearly indicated that the kind of liability he was expounding, might arise at diverse times as dangerous defects emerged during the expectable useful life of the building (which might cover decades), though as time passed it would be more difficult to prove that such problems were in truth attributable to the "initial negligence of the contractor." Such reflections would be quite irrational if indeed the date of initial "installation" started the limitations clock running!

(f)     In sister jurisdictions where the substantive law governing liability for "shoddy building" negligence causing economic loss may be narrower (as in England) or wider (as in New Zealand), the Courts have been consistent in *rejecting* arguments that the time of installation of the latent defect was the time when the cause of action arose : see *Invercargill City Council v. Hamlin*, [1996] A.C. 624 (Privy Council).

(g)     *Armstrong does not, in truth, say what Mr. Mew contends it says.* What Mackenzie J.A., writing for the Court, actually says, is [para. 23] that Rogers J. "correctly concluded that time ran from 1963."   Why?    Because, as Rogers J. had said, (quoted by Mackenzie J.A. at para. 5), "Time commenced to run for the purposes of the ultimate limitation period *from the date of the completion of construction and the issuance of the certificate of occupancy in 1963.*"   That is not the same thing as the "date of

---

[6] Before, in fact, the plaintiff corporation even came into existence.

installation," even if any relevant "installation" was involved in *Armstrong* – which it wasn't. For what it is worth, I agree with what Rogers J., and now the Court of Appeal, said in *Armstrong*. But it is very different from what Mr. Mew asserts.

(h)    A case which does seem to support Mr. Mew's position – I think the only one – is Drost J.'s trial judgment in *Privest Properties v. Foundation Co.*, (1995) 11 B.C.L.R. (3d) 1. But it is worth remembering that Drost J.'s views on limitations matters were not the subject of discussion, still less approval, when the matter went on appeal; nor did that province's Court of Appeal endorse them in *Armstrong*, five years later; despite what Mr. Mew's opinion [at page 12] might be taken to imply.

(i)    *Armstrong* is a case about the negligent discharge of statutory inspection powers and duties by a public authority. It is squarely within the lineage of *Anns v. Merton London Borough Council*, [1978] A.C. 728 (House of Lords) and of *Nielsen v. City of Kamloops*, (1984) 2 S.C.R. 2, 29 C.C.L.T. 977, the case in which the Supreme Court of Canada adopted so many aspects of the *Anns* case into Canadian law. These two cases are still the ultimate point of reference for all Canadian debate on the tort liabilities of public inspectors, and it is blatantly obvious that this line of authority, to which *Armstrong*[7] properly belongs, involves a wholly different line of analysis to that involved in the *Winnipeg Condominium* line of cases, which did not emerge until more than a decade later, presents different issues of law and policy, and is nowadays placed firmly in a different Feldthusian category[8] from "our" type of defective building claim.

One obvious distinction between the two lines of cases relates to the nature of the economic loss which is contemplated by each. In the *Winnipeg Condo* line of cases, the loss inheres in the cost of putting right a dangerous defect in the building. In the *Nielsen v. Kamloops* line of cases, no danger need be shown to exist : a mere deficiency in quality is quite enough. The loss, for which the negligent inspection authority has to pay, was more broadly conceived, for the duty of the inspector was to prevent any avoidable expense to a building owner, which might otherwise result from the negligent behaviour of its builder. As Wilson J. put it in *Nielsen v. Kamloops* (C.C.L.T. p. 125) the defendant inspectors' duty:-

> was imposed to ensure that proper foundations would be under his house from the outset. I suppose it is arguable that the damage the duty was designed to prevent was injury to the occupants from the collapse of the house or damage caused by the house sliding down the hill. But it seems

---

[7] And *Emms v. Prince George* (2001) 18 M.P.L.R. (3d) 200 (B.C.C.A.) too.

[8] See Opinion, p. 6, fn. 8 – category 5.

to me that this is too narrow an approach to the protection the statute was designed to provide.  The purpose of the by-law in this case was to prevent the construction of houses on defective foundations.

As she had expressed it earlier (at p.111) the city's negligence in this case was its breach of duty in failing to "protect the plaintiff against the builder's negligence."  So the remedy afforded is one which reflects the cost of putting right deficiencies (dangerous or not) which would not have been present had the inspectors performed their duty of oversight and prevention with due care.

It may in hindsight seem remarkable that the Courts should have been prepared to make economic loss awards against negligent building inspectors years before they felt bold enough to make such awards against the builders themselves.  But as Wilson J. explains at p.126,[9] inspection cases involve defendants outside the contractual chain of manufacture and distribution, and so present no threat to settled doctrines of contractual privity.  Again, cases against careless public inspectors are entirely different from cases against careless builders, and it is simply not legitimate to argue across the divide, as if they were the same.  I fear that the British Columbia courts have fallen prey to this error, from time to time.  But in *Armstrong*, I would respectfully suggest that the Court of Appeal, dealing with a case of negligent *inspection*, arrived at a defensible position when they identified the moment of damage (the "arising of the cause of action") with the point when the inspectors, having finished their (substandard) work, caused an occupancy permit to issue for the deficient building.  That was the point in time at which the plaintiff's opportunity, to have the latent flaws in his building identified and corrected before it was too late, was irretrievably lost.  The damage was, in fact, the loss of the opportunity.

The position taken by Drost J. in *Privest* (and *not*, as Mr. Mew would have it, adopted in *Armstrong*), is that damage resulted in that case (a *Winnipeg Condo* type case, be it noted, not an inspection case) at the moment of installation of the defective material.  To that, I would point out that Drost J. asserts this position without explanation or authority.  In fairness, his argument on limitations is arguably *obiter* in its entirety, or at best a second-string "back-up" ratio.  It might, by the severe, be considered a little half-hearted, since the judge's findings on liability issues had already proven fatal, on his analysis, to the plaintiff's case.  Arguably that is exactly why the Court of Appeal in *Privest* found it "unnecessary" to deal with limitations issues at all.

There is, I would argue, one way in which the "building inspection" line of cases is, obliquely, but importantly, relevant to identifying the moment of relevant damage [the moment when "danger" arises] in our type of case.  It emerges, indeed, from the analysis offered by Wilson J. for the majority of the Supreme Court in *Nielsen v. Kamloops* itself.  Her ladyship portrays a scenario in which the builders are doing a slipshod piece of work, covering up the evidence of their

---

[9] And I explain more simply in my case-comment, 29 C.C.L.T. 185 at 188.

delinquency as they go.  The municipal inspectors culpably fail to detect this, and as a result, fail to protect the building owner from harm which will now almost certainly be visited upon him at some later date.  It is not just that the harm will become apparent, it seems, in the future.  The harm which the inspectors have wrought (a lost opportunity of prevention) has already been done once an occupancy permit is allowed (or dispensed with) : but the harm the *builders* have done, it seems, has not yet come to pass.  That will only happen as the building starts to deteriorate, perhaps years later.

Whether or not I am right in that interpretation of *Nielsen v. Kamloops* (and its interpretation is confounded in some measure by Wilson J.'s flirtation with the history and theory of discoverability doctrines in that case), the crucial question has now to be confronted.  What does the ruling in *Winnipeg Condominium* mean when it says that the liability of builders is predicated upon a showing of "substantial danger to the health and safety of occupants"?

As noted in the Opinion (p.8), the Supreme Court of Canada in *Winnipeg Condo* itself gave little guidance as to how a "substantial danger" might be defined, since in that case, the alarming threat posed by the building satisfied the criterion on any definition.  The same has been true of other Canadian authorities since then.  But the judicial elaboration of this concept is proving difficult as the years advance.

The concept of danger is a protean one.  It may, without doing violence to the language, be taken to include the potential (even if arguably slight) of long-term harm.  ("A child of such genetic background is in danger of developing such-and-such a syndrome in later life.)  Yet it would seem hyperbolic, even in that context, to speak of that child as being "in danger" here and now.  To take another example, closer to our own facts, an underdesigned building may be in danger of collapse or of "becoming dangerous," forty years from now, as wear, tear and metal fatigue set in.  Is that building, now, "dangerous" in the *Winnipeg Condo* sense?  One way of summarizing the issue is to ask ourselves whether, in this context, the law recognizes a distinction between "danger" and "the threat of a danger."  I am reluctant to pursue the metaphysical analysis any further than this, interesting though it might be, for the further one enters into it, the less the exercise seems to be one of objective opinion, and the more it takes on the appearance of partisan advocacy, which I decline.  However, all these analytical problems associated with the "danger" concept are encapsulated in this brief passage in a leading Canadian textbook[10]:–

> The *Bird* case has done much to clarify the law in respect of defects that create a real and substantial danger to the occupants of a building.  Every new development of negligence law, however, ushers in a new set of issues and the *Bird* decision is no exception.  In *Bird* there was a great deal of emphasis on the degree of danger of the defect.  This condition was clearly met on the facts of the case.  The danger was extreme and,

---

[10] Prof. P.H. Osborne, The Law of Torts (2nd ed., 2003, Irwin Law Book Co.), p. 192.

given the fact that part of the cladding had already fallen off the building, the danger was imminent. Some of the occupants might have been killed. This is not, however, the typical situation that will present itself to the courts. The typical case involves a building that has an inadequate foundation which causes it to lean, sag, and crack, or a defective roof that leaks, or poor construction leading to premature rotting of the structure. There is no immediate danger but postponing the repairs will increase their ultimate expense and at some indeterminable time in the future, the building or part of it may collapse. In these cases, it will not be easy to draw the line between dangerous and non-dangerous defects. It may be anticipated, however, that the courts will generous in their interpretation of the requisite danger.

A spate of "leaky condominium" litigation, arising largely out of hastily constructed developments in British Columbia[11] and elsewhere, attests to the difficulty of pinning down the relevant meaning of "danger". So too does the sorry little procession of Manitoba cases which have followed the *Winnipeg Condo* litigation and which I shall try to summarize below, meandering and inconclusive though their overall message may be. When those cases have been examined, some general observations will be offered.

## Manitoba

Equally parochial in its limitation rules is the province of Manitoba. As we have seen, in this province, too, the history of Limitations legislation has driven the courts to adopt a conception of when a course of action "arises" which excludes any element of discoverability, any regard to the plaintiff's state of actual or constructive awareness. And here too, the question of when "damage" should be deemed to have occurred is fraught with particular difficulty where the action is one for economic loss arising from a defective building. I will try to summarize the faltering path of the authorities, a path which started with the decision of the *Winnipeg Condo*[12] case itself in 1995.

As we have seen, the Supreme Court in that case decided as an abstract proposition of law that a negligence action might lie at the suit of a building owner against persons whose involvement in the construction process had resulted in a building which was not merely qualitatively inferior, but presented a real and substantial danger. Shortly after the Supreme Court's ruling, the same litigation erupted again in the Manitoba Court of Queen's Bench, where Oliphant A.C.J. Q.B. was asked to dismiss the plaintiffs' claims as being statute-barred. Had their cause of action "arisen" when the defective stone cladding was installed? Or at the later date when minor problems with the cladding first began to appear? Or at the still later time when the major collapse of the cladding finally gave notice of grave impending danger requiring immediate and radical attention?

---

[11] Typified by *Strata Plan VR 1534 v. Regent Development Corp.*, [1996} B.C.J. 6.
[12] [1995] 1 S.C.R. 85, 23 C.C.L.T. (2d) 1 (S.C.C.).

Oliphant J. dismissed the application to strike out the claim, taking the view, it seems, that the time of accrual of the cause of action should be identified as the date of the plaintiffs' discovery that their building posed a significant danger – and not before.   The Court of Appeal promptly reversed him,[13] predictably rejecting his view that any discoverability element could be considered when assessing when a cause of action "arose" in Manitoba.  When, then, did an action of this kind "arise"?  Their Lordships declined to say, in this context of an interlocutory motion, in the absence of further and better evidence as to the process whereby the flaws in the building had progressively revealed themselves, or had come to the attention of the parties.  The unhelpfulness of this conclusion was compounded when the parties comprehensively settled their litigation very shortly thereafter.

Two years later, the issue resurfaced in *Winnipeg Condo Corp. No. 266 v. 3333 Silver Developments*,[14] before Wright J., on an application by the defendant developers for summary judgment.  Explicitly rejecting all invitations to fix the accrual of the cause of action by reference to the "discoverability" of harm, Wright J. identified the problem as one of determining 'when the damages came into existence," which in economic loss cases of this kind would require something more than nominal or minimal harm - a showing, indeed, of that "real and substantial danger" on which actions of this kind are predicated.  Once such danger was present (regardless, it would seem, of whether the plaintiffs had reason to be aware of it), the cause of action would be complete – and only then.  The motion for summary judgment was dismissed.

That was not to be the end of the matter, for within a couple of years after Wright J's judgment, another defective-building economic loss claim found its way to the Manitoba Court of Appeal, namely *Sentinel Self-Storage Corp. v. Dyregov*.[15]  The alleged negligence of the defendants in this case lay in their supposed provision of careless engineering advice, which had led to the construction of a defective building foundation.   The plaintiffs, belatedly discovering this problem, had to make application under s.14 of Manitoba's Limitation Act to have the limitation period "re-opened", since, they said, they had not had a reasonable opportunity to discover the defect until after the basic limitation period had expired.   That squarely raised the issue of when, for limitation purposes, the cause of action had arisen.  But in this case there was the added complexity that the plaintiffs' action might be characterized in more than one way – as an action for negligent construction of shoddy buildings (like all the others we have mentioned): or as an action for negligent misrepresentation or advice (a quite distinct Feldhusen category – see main text at pages 5-6, especially footnote 8).  That aspect of the case concerns us only insofar as it enabled the Motions Court judge (MacInnes J.), by characterizing the case as one of negligent misrepresentation, completely to sidestep the issue of

---

[13] (1999) 131 Man R. (2d) 283, overruling 130 Man R. (2d) 203.
[14] (2000) 155 Man R. (2d) 164.
[15] (2003) 180 Man R. (2d) 85.

when, in "negligent construction" cases of the kind discussed above, the cause of action is properly deemed to arise. When the case came before the Court of Appeal, the majority (at para. 16) took the same (evasive) line, saying that in their opinion the plaintiff's statement of claim had really only raised the issue of negligent misrepresentation, so that the vexed question of when a cause of action "arose", should one regard the case as one of negligent construction (a *Winnipeg Condo*-type case) need not be considered.

That said, the opportunity to clarify the law on the latter issue – our issue – was not completely spurned, since Madam Justice Steel, in a concurring judgment, was inclined to take a more expansive view of the pleadings, and to regard the case before her as potentially and plausibly assignable to the "defective structure" (*Winnipeg Condo*) category: so presenting, as she put it, a "much more difficult" problem of determining when damage was inflicted and the limitation period began to run: (para. 43). What is striking about Steel J.A.'s judgment is that unlike her colleagues she does not shy away from this challenge, but confronts it head-on. At paragraph 70, we find this lucid statement:-

> [70] If this action is categorized as one of economic loss due to defective structure, the damage is not inflicted until the building is found to contain defects which pose a real and substantial danger to the occupants of the building or other property. It is only when a defect poses a real and substantial danger or there is an imminent possibility of such danger that the cause of action is complete.

There being no evidence suggestive of substantial danger in this case, Steel J.A. agreed that the action must fail. But the foregoing pronouncement was easily the most direct and intelligible response to date, as to when the cause of action in this class of case "arises" for limitation purposes.

And so it has remained. For although there has since the *Sentinel* case been yet another opportunity for the Manitoba Court of Appeal to settle the issue, that opportunity too has been squandered. That was in the case of *Valley Agricultural Society v. Behlen Industries.*[16]

In this case, the defendants had been the designers and engineers of a large steel building, meant to serve as an exhibition hall and curling-rink in rural Manitoba. Nine years after its completion, the roof collapsed under the weight of snow, evidently because it had been significantly under-designed. Shulman J. considered the action statute-barred, on the basis that time began to run as soon as the "real and substantial danger" presented by the building was "manifest" – a term, he decided, which did <u>not</u> mean "discoverable". This building had been in danger of collapse since the day it was completed, and the action had been barred three years before the roof fell in. The Court of Appeal declined again to

---

[16] (2004) 184 Man R. (2d) 263, reversing (2003) 172 Man R. (2d) 248.

pass a concluded opinion on these questions, though Scott C.J.M. did quote, without comment, the above-cited passage from Steel J.A.'s judgment in the *Sentinel* case. It would be better, said the Court on this occasion, to address such questions on another occasion, in the context of a more full-developed factual or evidentiary matrix.

> [20] As we have seen, to be actionable the defect must pose a "substantial danger" to the health and safety of the occupants of the building. This raises the question whether a structure that is "susceptible to failure" from the very beginning, as Behlen and Deniset argue, can be considered a substantial danger. The Gibbs report does not deal with this question. Clearly, additional evidence is needed.

As shown above, Steel J.A. in *Sentinel* thought that the cause of action "arose" in these cases as soon as a substantial danger was posed by the structure. In *Valley Agricultural Services*, Shulman, J. at least took the further view, that the existence of such danger was enough: it need not be shown that the danger was also overt and discoverable, to start the limitation period running. Absent any further clarification from the Manitoba Court of Appeal (or of any apparent enthusiasm on their part to engage the issue further, or at all), I respectfully agree with the position cumulatively presented by Steel J.A. and Shulman J. in their respective judgments.

Accordingly, I conclude that in Manitoba, where tort liability for economic loss resulting from the negligent construction of dangerous buildings is concerned, the cause of action "arises" for limitation purposes when, and only when, those buildings become substantially dangerous: whether or not such danger be apparent to the diligent and alert owner of the building. If that results in the owner's action being statute-barred before he is even constructively aware of the danger, his only consolation, under Manitoba's unique statute, is to apply within one year after the danger becomes so discoverable, to have the limitation period re-opened under s.14(1) of the statute.

---

The forgoing analysis of the rules in British Columbia and Manitoba presents, by common consent, a confused and confusing picture. Nonetheless, a few observations may usefully be offered.

(a)     What counts as a "real and substantial danger" will obviously be question of degree and judgment, factoring in the statistical likelihood of the danger materializing, the gravity of expectable injury should it so materialize, and the perceived imminence of such catastrophe; none of these factors will be individually dispositive.

(b)     Courts may be expected, whether explicitly or not, to govern their judgments with considerations of proportionality. Extravagant over-

13

reaction and lavish expenditure will not be encouraged as a response to relatively minor dangers.

(c)    As Professor Osborne notes in the passage above quoted, Courts may be expected to show "generosity in their interpretation of the requisite danger." By this, I take him to mean that a Court will look favourably upon the claim of a building owner who takes the remedial measures and makes the necessary expenditures which a reasonable and prudent man or woman would undertake to correct a danger at an early stage, rather than waiting until the danger has grown more imminent, more extensive and vastly more expensive to correct.

(d)    In making these varying judgment calls, the Courts *will be influenced crucially by the specific fact-situation of each particular case.* I do not say this merely as a matter of personal impression, or as an observation upon the universal behavioural patterns of Canadian judges in negligence litigation generally. Rather, I would point to the persistent stance favoured by the Manitoba Court of Appeal in addressing (or declining to address) the very issue now under consideration. Frustrating though it may be to commentators and academics seeking doctrinal clarity, there is surely a measure of wisdom in those judgments (canvassed in Appendix B), like *Winnipeg Condo. No. 36 v. Bird Construction (No. 2)*[17]; *Sentinel Self-Storage Corp. v. Dyregov*[18] and *Valley Agricultural Society v. Behlen Industries*[19], in all of which the Court of Appeal declines to elaborate on whether a "real and substantial danger" is present in the absence of a complete picture of the evidence adduced at trial. As Chief Justice Scott put it on behalf of the Court, in relation to this very issue in the *Valley Agricultural Society* case[20]

> In my opinion, this is not an appropriate case for summary judgment based on affidavit evidence alone. This is because there is a lack of evidence to establish the essential factual background to enable the court to decide the complex and unresolved point of law that this case raises.

---

[17] (1999) 131 Man. R. (2d) 283, overruling 130 Man R. (2d) 203.
[18] (2003) 180 Man R (2d) 85.
[19] (2004) 184 Man. R. (2d) 263, reversing (2003) 172 Man. R. (2d) 248.
[20] (2004) 184 Man. R. (2d) 263 at 267, para.12.