# TAB C

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          CHAPTER 11

W.R. GRACE & CO., et al.,       Case No. 01-01139(JFK)
                                (Jointly Administered)
                 Debtors.       Re: Docket No. 13406

DEPOSITION OF

GRAEME STEUART MEW

May 11, 2007

11:00  a.m.

600 Peachtree Street

Atlanta, Georgia

Abigail M. Pace, RPR, CCR-B-1484

JOHN PAYNE & ASSOCIATES, LLC
1776 PEACHTREE STREET
SUITE 230 SOUTH

ATLANTA, GEORGIA  30309

(404)  853-1811

APPEARANCES OF COUNSEL


On behalf of the Debtors:


    DOUGLAS E. CAMERON, Esq.

    Reed Smith, LLP

    435 Sixth Avenue

    Pittsburgh, Pennsylvania  15219


On behalf of Speights & Runyan Claimants:


    DANIEL A. SPEIGHTS, Esq.

    MARION C. FAIREY, JR., Esq.

    Speights & Runyan

    200 Jackson Avenue, East

    Hampton, South Carolina  29924


- - -

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Cameron | 5 |
| Examination by Mr. Speights | 42 |

- - -

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | CV of Graeme Mew | 7 |
| 2 | Published articles, papers, texts of Graeme Mew | 9 |
| 3 | Instances of Canadian Court citations of Graeme Mew, The Law of Limitations | 11 |
| 4 | Graeme Mew's opinion on Canadian Limitation Issues | 14 |
| 5 | Canadian Regulations Re: Asbestos-containing materials in buildings | 34 |
| 6 | Court of Appeals document | 54 |

(Original Exhibits 1 through 6 have been attached to the original transcript.)

1          (Reporter disclosure made pursuant to

2     Article 8.B. of the Rules and Regulations of the

3     Board of Court Reporting of the Judicial Council

4     of Georgia.)

5          MR. SPEIGHTS:  Mr. Cameron, before you

6     start this deposition I had agreed on the record

7     at a previous hearing that I did not object to

8     your taking a deposition of Mr. Mew for purposes

9     of the summary judgment motion that you had

10    filed in light of objections I raised about a

11    report which was not notarized.  I just want to

12    confirm for the record that we have agreed that

13    this deposition is not to be used in the event

14    that the summary judgment motion is denied and

15    we proceed to a trial on the statute of

16    limitations in light of the court's ruling that

17    experts must testify live at trial.

18         MR. CAMERON:  I believe that he will

19    clearly be there live for cross-examination.  We

20    would expect him to be there live for direct

21    also but as you know there was some talk in the

22    procedures of submitting declarations in lieu of

23    live testimony on direct.  That's not been

24    decided but if the parties go that route he will

25    be there live, certainly be there live for

1       cross.  I just don't know how it's going to

2       shake out.

3              But if your concern is that by not

4       crossing him now you wouldn't have the

5       opportunity to cross him at that hearing, I

6       agree with you in that regard, he would be there

7       live for cross-examination in a hearing if

8       summary judgment is not granted.

9              MR. SPEIGHTS:  Thank you, sir.

10                  GRAEME STEUART MEW,

11  having been first duly sworn, was examined and

12  testified as follows:

13                    EXAMINATION

14  BY MR. CAMERON:

15      Q.    Mr. Mew, would you state your name for the

16  record, please.

17      A.    Yes, it's Graeme Steuart Mew.

18      Q.    Where are you employed?

19      A.    I'm a partner with Nicholl Paskell-Mede in

20  Toronto.

21      Q.    And how long have you been practicing law?

22      A.    I've been practicing law since -- I was

23  called to the bar in 1982 in England and Wales but

24  didn't start practicing as a barrister until January

25  '84, so I guess that's 23 years now.

1      Q.    And how long have you been practicing law

2  in Canada?

3      A.    20 years.

4      Q.    And can you tell the court generally what

5  type of law you have practiced over the last 20 years

6  in Canada?

7      A.    Yes.  The focus of my practice has been

8  civil and commercial litigation with an emphasis on

9  work that is generated by insurers and indeed

10 insurance contract law.  I have also done some

11 criminal litigation.  I've done some administrative

12 litigation and I've developed a practice in sports

13 law.  I've covered most fields of insured activity

14 whether it be products liability, fiduciary

15 responsibilities, directors and officers, professional

16 liability, class action defense, those sorts of

17 things.  And I've also got an active practice as an

18 intermediary as an arbitrator and mediator.

19     Q.    And have you received any recognition from

20 peers or professional organizations as a lawyer?

21     A.    Yes, I've been ranked by a couple of

22 commercial entities that do these things.  One is

23 called Lexpert.  They have a directory of leading

24 practitioners in various fields and they have ranked

25 me as a leading practitioner in commercial insurance

1    litigation and quite recently the Canadian sister of

2    an American publication has been established called

3    Best Lawyers in Canada and I've been ranked in the

4    field of insurance lawyer as one of the, quotes, best

5    lawyers in Canada.

6              (Exhibit 1 was marked for identification.)

7         Q.    (By Mr. Cameron)  Okay. Mr. Mew, I show

8    you what's been marked as Exhibit 1.  Is that a true

9    and correct copy of your current CV?

10        A.    Yes, the Best Lawyers in Canada thing

11   happened after this was prepared but other than that

12   it's pretty much up to date.

13        Q.    Okay.  Could you briefly describe for the

14   court your educational background.

15        A.    Yes, I graduated from high school in

16   England in 1977 and went as is the custom in that

17   country directly to law school.  I did a three-year

18   honors degree in law at what is now as Kingston

19   University.  I then took a sabbatical year and after

20   that I went to the Inns of Court School of Law, which

21   at that time was the place that one had to go in order

22   to become a barrister.  That was a ten-month

23   vocational course in law and the practice of law.  I

24   then undertook pupilage, which is a process of

25   internship at the English bar a total of 12 months,

Page 8

1    and as a result of doing that was entitled to call

2    myself and practice as a barrister at law.

3         Q.   And when was that?

4         A.   I was called to the English bar in 1982 by

5    the Honourable Society of the Middle Temple, which is

6    one of the bodies that has the right to call someone

7    to the bar.  But this is a quirk of the English

8    practice you're not entitled to practice as a

9    barrister even though you have the title of barrister

10   until you have done that period of internship or

11   pupilage as we call it. 'And I did that between 1982

12   and 1984 and actually spent some of that time in

13   Canada, which didn't count towards my pupilage.

14              I then immigrated to Canada largely for

15   personal reasons at the end of 1984.  Despite our

16   common legal heritage I was not automatically entitled

17   to practice law in Canada and had to, in fact, do some

18   more Canadian legal training.  I obtained a bachelor

19   of laws degree from the University of Windsor,

20   Ontario, in 1986 and then undertook a short period of

21   what in Canada is called articles of clerkship for

22   four months and then I went to the bar admission

23   course at the Law Society of Upper Canada, which is a

24   six-month vocational training course and was called to

25   the Ontario Bar in April of 1987.

1    Q.    Do you have any other legal training after

2  becoming a member of the bar in Canada?

3    A.    Yes.  I've undertaken formal training as

4  an arbitrator and a mediator.  I did the international

5  special fellowship course of the Chartered Institute

6  of Arbitrators in the Netherlands and I took a course

7  in the Netherlands in 1993 and then I enrolled in

8  courses validated by the University of Windsor in

9  alternative dispute resolution in 1996 and I also did

10  some further mediation training in England in 1999 at

11  the Center for Effective Dispute Resolution who

12  certified me as a mediator.

13    Q.    And following those courses do you receive

14  a certification or accreditation?

15    A.    Yes.

16    Q.    Have you written or published on legal

17  issues in Canada?

18    A.    Yes, I've written quite a number of

19  articles over the years.

20        (Exhibit 2 was marked for identification.)

21    Q.    (By Mr. Cameron)  I show you what's been

22  marked as Exhibit 2 and is that a true and correct

23  copy of your list of publications?

24    A.    Yes.

25    Q.    And is this the list that was attached to

1    your expert report in this case?

2         A.    Yes.

3         Q.    Have you written and spoken on law

4    limitations in various Canadian provinces and

5    territories?

6         A.    Yes.

7         Q.    And can you give the court some examples?

8         A.    I've spoken at, I lose count of the

9    number, but many continuing legal education programs

10   administered by either the Canadian Bar Association,

11   the Ontario Bar Association, the Law Society of Upper

12   Canada, the Advocate Society and indeed the Ontario

13   Trial Lawyers Association, which is the Canadian

14   branch of the American Trial Lawyers Association, the

15   plaintiff's bar.  I've spoken at various conferences

16   and continuing legal education programs put on by

17   those entities.

18        Q.    And how about publications?  Do you have

19   any publications?

20        A.    On limitations?

21        Q.    Yes.

22        A.    I've written a book The Law of

23   Limitations, which has gone through two editions and

24   a number of the articles that I've written for

25   publication have been on the subject of limitations.

1        Q.      And what was the first edition of the book

2   you wrote?

3        A.      It was published in 1991.

4        Q.      And when was the second edition?

5        A.      It was published in 2004.

6        Q.      And are you working on a third edition?

7        A.      I'm about to.

8        Q.      Okay.  And is that textbook used

9   throughout Canada?

10       A.      Except in Quebec, yes.

11       Q.      Okay.  Are there other textbooks in print

12  in Canada on the law of limitations?

13       A.      There are none of national scope.  There

14  is a publication in Ontario that the Ontario Bar

15  Association has put out which deals with Ontario law

16  of limitations and there are various loosely

17  limitation services that are not texts as such but

18  reference sources for limitations.  But I believe mine

19  is the only one of national scope.

20       Q.      And has your textbook been cited by

21  Canadian courts?

22       A.      Yes.

23               (Exhibit 3 was marked for identification.)

24       Q.      (By Mr. Cameron) I show you what's been

25  marked as Exhibit 3.  Is that a true and correct copy

1    of the list of cases in which your book has been

2    cited?

3         A.    It is as of the date that I prepared my

4    report.  I asked for a shepardizing or a database

5    search at any rate to be run of where my book had been

6    cited and this was the result of that.

7         Q.    And is Exhibit 3 what was attached to your

8    expert report in this case?

9         A.    Yes.

10         Q.    Can you also tell the court about

11   instances where you've been retained to consult on

12   limitations issues?

13         A.    Yes.  I've always done professional

14   indemnity work as an advocate and I have been

15   regularly retained by the Professional Indemnity

16   Insurer of Lawyers in Ontario to assist lawyers and

17   their insurer with problems that they have run into on

18   limitation issues.  That's resulted in often assisting

19   in what are called repair actions where I have gone to

20   court to try and repair the effects of a missed

21   limitation period or limitation oversight and

22   obviously I've also written opinions for the clients

23   for the insurers on limitation issues.

24         Q.    Okay.  Have you encountered limitation

25   issues in your practice as a mediator and arbitrator?

1      A.    Frequently.

2      Q.    Mr. Mew, can you tell the court what you

3  were retained to do in this matter?

4      A.    I was asked to provide an opinion on the

5  Canadian Law of Limitations as it pertained to a fact

6  scenario that was presented to me.  And in particular

7  to consider how the Canadian Law of Limitations would

8  affect the claims that had been advanced against Grace

9  by or on behalf of various Canadian claimants.

10      Q.    Can you tell the court what general

11  assumptions you made in rendering your opinions?

12      A.    Well I was given a number of assumptions.

13  I'm not sure I can accurately recall all of them

14  without looking at my report.  But one was the

15  assumption of when the proceeding would be, what the

16  date was when a proceeding would have been commenced

17  or would have been deemed to have been commenced.  And

18  I believe that was April the 2nd, 2001, which was the

19  date that Grace filed for bankruptcy.

20          The other assumption that I was asked to

21  assume that the impugned product Mono-Kote 3 had been

22  applied and put into buildings in Canada and I was

23  given some information as to when that was done.  You

24  may remind me of other things, other assumptions I

25  made that are set out in my opinion.

1          · Q.    Did you reach any conclusions or opinions

2     to a reasonable degree of professional certainty based

3     on your review?

4          A.    I did, yes.

5          Q.    And did you prepare, sign and issue an

6     expert report?

7          A.    Yes, I did.

8               (Exhibit 4 was marked for identification.)

9          Q.    (By Mr. Cameron)  I'm going to show you

10    what's been marked as Exhibit 4 and is that a true and

11    correct copy of the report that you prepared and

12    executed in this case?

13         A.    Yes, it is.

14         Q.    And when is that report?  Is that report

15    dated?

16         A.    Yes, it was the 21st of December 2006.

17         Q.    Okay.  Can you tell the court generally

18    what opinions you have reached concerning the

19    application of the law of limitations in Canada to the

20    asbestos property claims in this bankruptcy?

21         A.    I have concluded based on the information

22    provided to me that the claims, all of the claims and

23    I accept -- I haven't proffered an expert opinion on

24    the law of the province of Quebec but with that caveat

25    I've expressed the opinion that all of the claims

Page 15

1    would be statute barred under Canadian law.

2        Q.    And under what limitations would they be

3    barred?

4        A.    Well, in my report I describe two types of

5    limitation periods that are contained in our statutes

6    of limitation and each province has its own statute of

7    limitations.  Most of those statutes of limitations

8    contain what's called an ultimate or longstop

9    limitation period.  And I've conclude that those

10   provinces where there is an ultimate limitation period

11   that the claims would be barred by those ultimate

12   limitation periods.

13            All of the Canadian limitation statutes

14   also contain what I have described as normal

15   limitation periods, sometimes in the cases you seem to

16   refer to as general limitation periods, and I have

17   concluded that all of the claims would also be barred

18   by operation of those general limitation periods.

19            MR. SPEIGHTS:  I'm going to object and

20        move to strike at this moment, although I really

21        don't think it's required under the rules.  I'm

22        going to move to strike the testimony relating

23        to the ultimate statute of limitations on the

24        grounds that that is not the subject of Grace's

25        objection.  We previously discussed that on the

1            record at the deposition immediately preceding

2            this present deposition.  And I will object to

3            all further testimony about the ultimate statute

4            of limitations and incorporate by reference my

5            comments at that previous deposition where I

6            reserved the right to depose Mr. Mew again in

7            the event that Grace's motion to amend its

8            objections is granted.

9                 And, again, while that's not the form of

10           the question I just want to make it clear for

11           the record and that objection will continue

12           throughout the line of testimony in which

13           Mr. Mew is going to address the ultimate statute

14           of limitations.

15           Q.    (By Mr. Cameron)  Mr. Mew, does your

16      report address the issue of ultimate limitations?

17           A.    Yes, it does.

18           Q.    And when was that report issued?

19           A.    As I've already indicated it was signed on

20      the 21st of December 2006.

21           Q.    Okay.  Do you recall participating in a

22      deposition taken by Mr. Speights with respect to your

23      report?

24           A.    I remember it well.

25           Q.    And when was that taken?  Do you recall?

1      A.      It was taken in March or was it taken in

2  February?  It was taken in March, yes, in Toronto.

3      Q.      Now with respect to the ultimate

4  limitations period do you have an opinion as to when

5  those periods begin to run?

6      A.      Yes, I do.

7      Q.      What is that opinion?

8      A.      In the provinces that have ultimate

9  limitation periods those limitation periods begin to

10  run on the date on which the wrong occurs.

11      Q.      And for the asbestos in building claims do

12  you have an opinion as to when those ultimate

13  limitation periods would begin to run?

14      A.      Yes, I do.

15      Q.      What is that opinion?

16      A.      They would begin to run on the date of

17  installation.

18      Q.      Which Canadian provinces that you

19  addressed have ultimate limitation periods in their

20  limitation statutes?

21      A.      At the material term it would have been it

22  was British Columbia, Alberta, Manitoba and

23  Newfoundland.  Ontario now has an ultimate limitation

24  period but it did not until January the 1st, 2004.

25      Q.      Okay.  With respect to Alberta do you have

Page 18

1    an opinion as to which claims would be barred by the

2    ultimate limitations period?

3         A.    Any claim where the installation was more

4    than ten years before the date of commencement of

5    proceedings or the date on which proceedings are

6    deemed to have been commenced that would be barred.

7         Q.    And by the date of commencement are you

8    using the April 2, 2001 date?

9         A.    Yeah.

10        Q.    So using that date which claims in your

11   opinion in Alberta would be barred by the ultimate

12   limitations period?

13        A.    Any installation prior to the 2nd of April

14   1991.

15        Q.    Okay.  With respect to the other provinces

16   that you identified do you have an opinion as to which

17   claim would be barred by the ultimate limitations

18   periods in their limitation statutes?

19        A.    Yes, in each of those other statutes the

20   ultimate limitation period is 30 years so that going

21   back 30 years from April the 2nd, 2001, would take you

22   to April the 2nd, 1971.

23        Q.    And so which claims in your opinion would

24   be barred by the ultimate limitations periods in those

25   respective provinces statutes?

1        A.      Any claim in which is installation was

2    before the 2nd of April 1971.

3        Q.      Did you come to a conclusion or opinion

4    with respect whether the normal limitations periods in

5    the provinces limitations statutes would bar any of

6    the Canadian claims?

7        A.      Yes, I did.

8        Q.      Can you tell me what opinions you reached

9    with respect to those?

10       A.      It was my opinion that -- well, in each of

11   the provinces except Alberta the applicable limitation

12   period, most likely applicable limitation period is

13   six years.  So my conclusion was that any installation

14   that occurred before six years prior to April the 2nd,

15   2001, would be statute barred.  So any installation

16   prior to the 2nd of April 1995 would be statute barred

17   with the exception of the province of Alberta where

18   the limitation period is two years.  So that would be

19   any installation prior to the 2nd of April 1999.

20       Q.      And could you provide to the court a brief

21   overview of the Canadian legal system the way it's set

22   up and the way it works?

23       A.      Yes.  It's somewhat different to the U.S.

24   legal system although like in the U.S. we have a

25   federal system of government.  Our courts in each

1    province have judges who are federally appointed by

2    the government of Canada so that a judge in the

3    Superior Court, that is, a trial court in Newfoundland

4    or in British Columbia or anywhere else in Canada is

5    appointed by the federal government is tenured and

6    holds very much the same position as I understand the

7    federal judge would hold in the United States.

8         Q.    Do judges in the Canadian legal system --

9    I'm sorry, are those superior court judges?

10        A.    Different names in different provinces.

11   In Ontario it's the Superior Court.  In British

12   Columbia it's called the Supreme Court.  In Alberta

13   and Saskatchewan it's called the, and I think

14   Manitoba, it's called the Court of Queens Bench.

15   Newfoundland it's called the Supreme Court so

16   different names but, yes, Superior Court would be the

17   sort of general nomenclature.

18        Q.    And are those courts that you just

19   referenced are those what we refer to as the trial

20   court level?

21        A.    Yes.

22        Q.    And is there an appellate, I assume

23   there's an appellate system in Canada?

24        A.    Yes.  Each province has a Court of Appeal

25   and the judges of that court are similarly appointed

1    by the federal government.  And, indeed, it's possible

2    for a judge appointed to the Superior Court to sit at

3    ad hoc as a member of the Court of Appeal.

4         Q.    So is that an intermediate appellate

5    court?

6         A.    In 99.9 percent of cases the Court of

7    Appeal of the province is the final Court of Appeal.

8    As in United States we have a Supreme Court of Canada

9    but the Supreme Court of Canada is highly selective in

10   the cases that it hears.  You have to seek leave to

11   have a case heard in the Supreme Court of Canada and

12   statistically it's rarely granted.

13        Q.    Now can you explain just generally how

14   limitation periods in the Canadian limitation statutes

15   work in Canada?

16        A.    Yes.  The limitation period is a period of

17   time within which a plaintiff must commence an action

18   so that it if a plaintiff fails to commence an action

19   within a period of limitation the plaintiff is

20   thereafter barred from obtaining a remedy.

21        Q.    And within the Canadian limitation

22   statutes generally how many types of limitation

23   periods are there?

24        A.    There are general limitation periods which

25   apply to define causes of action or define classes of

1    claims and there are ultimate limitation periods which

2    generally apply across the board regardless of what

3    the underlying general limitation period is.

4        Q.    Okay.  And what's the general difference

5    between the two?

6        A.    Well, one is much longer than the other.

7    The ultimate limitation period is 10 years in Alberta,

8    15 years in Ontario and 30 years elsewhere.  But the

9    other important distinguishing feature is when time

10   starts to run from.  The ultimate limitation period

11   runs from the date of the wrong whereas the general

12   limitation period will in some cases run from a later

13   date than the date of the wrong.  I'm sure we'll

14   discuss the discoverability principle, which is

15   usually a factor of delaying the running of time but

16   there are others.

17       Q.    And are the normal limitation periods in

18   Canada set forth in individual provinces limitations

19   acts?  Is that the way it's set up?

20       A.    Yes, for the most part it is.  There are

21   in some provinces special acts, you know, a Municipal

22   Act or an act that applies to a particular

23   municipality or a particular profession.  For example,

24   they may have a different limitation period but the

25   general limitation periods are stated in the statutes

1    of limitation.

2        Q.    And are the ultimate limitation periods in

3    Canada also set forth in those same limitation acts?

4        A.    Yes.

5        Q.    Okay.  Do you have what is referred to as

6    statutes of repose in Canada?

7        A.    It's not a Canadian term so strictly

8    speaking, no, we don't have separate statutes of

9    repose.

10        Q.    Mr. Mew, can you explain to the court how,

11    if at all, the characterization of the asbestos

12    property damage claims against Grace would impact the

13    application of the statute of limitations in Canada?

14        A.    Yes.  There are within, as I just

15    mentioned, within the limitations acts at least some

16    of the limitation acts different limitation periods

17    depending on the cause of action whether it's a

18    contract action, tort action or defamation action or

19    different provinces have different degrees of breaking

20    down particular causes of action.  But the

21    characterization classification of the cause of action

22    has an impact on how long the limitation period is for

23    the normal limitation periods.  It's not of any

24    significance with respect to the ultimate limitation

25    period.

1        Q.    And can you tell the court in your opinion

2    how claims like the asbestos property damage claims at

3    issue in the Grace bankruptcy would be characterized

4    in Canada?

5        A.    Yes.  Since the Supreme Court of Canada's

6    decision in what's known as the Winnipeg Condominium

7    case, which firmly established the concept of pure

8    economic losses of tort, cases such as the claims

9    against Grace have been characterized as pure economic

10   loss cases.

11       Q.    Okay.  And you referred to the Winnipeg

12   Condominium case?

13       A.    Yes.

14       Q.    And what's that?  What is that case?

15       A.    It's a decision of the Supreme Court of

16   Canada and it dealt with whether or not a plaintiff

17   could recover damages, prosecute an action and recover

18   damages for the installation of allegedly hazardous or

19   allegedly, yeah, allegedly hazardous material in a

20   building without the need to prove actual damage or

21   injury, damage to property or injury to persons.

22       Q.    Okay.  And has the holding of the Supreme

23   Court of Canada in Winnipeg Condominium been applied

24   to an asbestos in buildings case?

25       A.    Yes, it has.

1        Q.    What case is that?

2        A.    It's the Privest case in British Columbia.

3        Q.    Can you tell me what claims were involved

4    in the Privest case?

5        A.    Well it bore some similarities to the

6    claims that are made here.  It was a claim that

7    involved the installation of asbestos-containing

8    fireproofing application in a building and a claim by

9    the building owner for the damages resulting from the

10   ripping out of and replacement of that product.

11       Q.    And do you know who was alleged to have

12   manufactured that product that was involved in

13   Privest?

14       A.    I believe it was your client.

15       Q.    Do you know what types of claims or causes

16   of action were brought in the Privest case?

17       A.    Yes, there was a fairly sort of broad

18   range of causes of actions:  misrepresentation,

19   failure to warn, sort of straightforward negligence

20   nuisance.  I believe there were others.

21       Q.    Okay.  Did the Privest case involve a

22   limitations period defense that was asserted by Grace?

23       A.    Yes.

24       Q.    And did the Privest court characterize the

25   case for purposes of examining limitations period

1    issue?

2        A.    I'm sorry, can you repeat the question.

3        Q.    Did the court characterize what type of

4    claim it was to analyze the limitations period issue?

5        A.    Yes.  The court essentially said

6    regardless of what nomenclature you use or what tag

7    you use that all of the claims boiled down to claims

8    for pure economic loss.

9        Q.    And did the Privest court determine when

10   the limitations period began to run?

11       A.    Yes.

12       Q.    And what did the Privest court determine?

13       A.    It determined that the limitation period

14   began to run on the date of installation.

15       Q.    And this was at the trial court level; is

16   that correct?

17       A.    Yes.

18       Q.    And when was the Privest case decided at

19   the trial court level, do you recall?

20       A.    1994 or '5.

21       Q.    You can refer to your report if you need.

22       A.    I am referring to my report.  1995.

23       Q.    And to your knowledge, Mr. Mew, is the

24   Privest court's conclusion or the conclusion at the

25   Supreme Court of Canada is a pure economic loss

1    analysis in Winnipeg Condominium applies to the claims

2    involving asbestos-containing materials in buildings

3    ever been rejected by any Canadian court?

4            MR. SPEIGHTS:  I'm going to object to the

5        compound question.  You asked if Privest and

6        Winnipeg.  You've asked him a compound question.

7        I object to the form as being compound.

8        Q.    (By Mr. Cameron)  To your knowledge,

9    Mr. Mew, has the Privest court's conclusion, okay,

10   that the Supreme Court of Canada's pure economic loss

11   analysis in Winnipeg Condominium applied to claims

12   involving asbestos-containing materials in buildings

13   has ever been rejected by any Canadian court?

14       A.    I'm not aware of any case in which it's

15   been rejected.

16       Q.    Was the Privest court's decision affirmed

17   by the British Columbia Court of Appeal?

18       A.    Yes, it was.

19       Q.    And what action, if any, did the Supreme

20   Court of Canada take?

21       A.    The plaintiffs sought leave to appeal to

22   the Supreme Court of Canada.  That application was

23   denied.

24       Q.    Could you explain briefly, Mr. Mew, what

25   the discoverability principle you referred to earlier

1    in the Canadian limitation law is?

2        A.    Yes.   It's essentially a rule of statutory

3    construction which holds that limitation period

4    doesn't start to run against a plaintiff or a claimant

5    until the material facts upon which the claim or the

6    cause of action is based on or been discovered or

7    brought with the exercise of reasonable diligence to

8    have been discovered.

9        Q.    Is the discoverability principle

10   applicable to postpone the running of an ultimate

11   limitations period?

12       A.    No.

13       Q.    Can you explain why not?

14       A.    Well the language of the ultimate

15   limitation periods the ultimate limitation statutes

16   themselves and the legislative intent is that time

17   starts to run from the date of the event so that the

18   statutory, either the common law statutory

19   discoverability principles, which are used as I

20   indicated as aids to construction, don't apply in an

21   ultimate limitation situation.   I think it's important

22   to note that in each statute in which there is an

23   ultimate limitation period the discoverability

24   principle which evolved originally as a common law

25   principle, has been reformulated into statutory

1  language and the legislation in each case makes it

2  clear that the discoverability principle has no impact

3  on the ultimate limitation.

4       Q.    Prior to the legislative enactments when

5  it was just under common law was the discoverability

6  principle applicable to ultimate limitation periods?

7       A.    I can answer that by saying that with the

8  exception of British Columbia there were no ultimate

9  limitation periods at the time that the common law

10  discoverability rule evolved.  It really only evolved

11  as a rule of construction in the mid eighties with two

12  decisions of the Supreme Court of Canada.  British

13  Columbia has always had something called postponement,

14  which is their version of the discoverability

15  principle.

16       Q.    Is the discoverability principle

17  applicable to postpone the riding of the normal

18  limitations period?

19       A.    Yes.

20       Q.    Okay.  And in cases where the

21  discoverability principle can be invoked can you

22  explain generally what the defendant must do to

23  establish the limitations defense in Canada?

24       A.    Yes.  The defendant must plead the

25  limitations defense and will typically do so in any

1    case where the action has been commenced more than --

2    has been commenced after the limitation period has

3    appeared to have expired.  And typically what will

4    happen if the limitation period is six years and the

5    claim has been commenced the action has been commenced

6    more than six years after the events giving rise to

7    the claim the defendant will plead a limitation

8    defense.

9        Q.    Okay.  With our claims at issue here what

10   would Grace have to show to establish a limitations

11   defense in Canada?

12       A.    They would simply have to plead that the

13   installation occurred, if it was in Alberta, more than

14   two years before the action was commenced and if it

15   was in any other province more than six years before

16   the action was commenced.

17       Q.    Now once that showing is made does the

18   burden shift to the plaintiff or the claimant?

19            MR. SPEIGHTS:  Objection to leading.  You

20       can go ahead and answer.

21       Q.    (By Mr. Cameron)  You can answer.

22       A.    If a plaintiff wishes to defeat a

23   limitation defense the plaintiff should deliver a

24   pleading called a reply and the plaintiff would be

25   required to establish that through the operation of

1    the discoverability principle or some other aspect of

2    the law of limitations.  But the running of time

3    should be taken to have started later than the date of

4    the wrong giving rise to the claim.

5         Q.    Whose burden is it to establish the

6    applicability of the discoverability principle?

7         A.    It's the plaintiff's burden.

8         Q.    And has the reasonable diligence standard

9    been applied to claims for pure economic loss

10   involving asbestos in buildings?

11        A.    Yes.

12        Q.    And what case was that in?

13        A.    Well Privest obviously.

14        Q.    Can you explain what the Privest court

15   concluded with respect to this issue?

16             MR. SPEIGHTS:  Excuse me, counsel, which

17        court?

18             MR. CAMERON:  Pardon?

19             MR. SPEIGHTS:  Which court?  The trial

20        court?

21             MR. CAMERON:  The court in which -- what's

22        the objection?

23             MR. SPEIGHTS:  The objection to your

24        question is unclear.  You asked him what the

25        court did and he has talked about both the trial

1          court and the supreme court and I want to know

2          which court.

3          Q.     (By Mr. Cameron)  Do you understand,

4     Mr. Mew, my question?

5          A.     Well, you said the Privest court.  There

6     were two levels of decision in the Privest court:  The

7     Supreme Court of British Columbia and the Court of

8     Appeal.  Both courts dealt with the limitation issue

9     and the conclusion ultimately of both courts was that

10    the trial court made a finding which was upheld by the

11    court of appeal.  And the finding that the trial court

12    made was that the date of installation was taken to be

13    the date on which the limitation period started to

14    run, not withstanding the protest of the plaintiffs

15    that they didn't -- they said that they didn't

16    actually know of the qualities of the product that was

17    installed.  The court rejected that on the basis that

18    the qualities of the products were notorious and well

19    known by the plaintiffs or could have been had they

20    exercised due diligence.

21         Q.     And did the Privest trial court rely on

22    any legal authority for that conclusion?

23         A.     Yes.  One of the cases the Privest court

24    looked at was a decision of the Supreme Court of

25    Canada in an insurance case called Johns-Manville

1   around 1970, I believe.  And that was a case that had

2   held in the context of an application for insurance

3   where the insurers, by an asbestos company where the

4   insurers purported to say you should have disclosed,

5   you should have made full disclosure concerning the

6   qualities of your product that an insurer in Quebec at

7   that time would have known or would be deemed to have

8   known everything they needed to know about asbestos

9   and its qualities and the risks associated therewith.

10       Q.    Okay.  Now do you have an opinion,

11   Mr. Mew, as to whether a Canadian claim in this

12   bankruptcy could successfully avoid a limitations

13   defense by arguing its claim was not discoverable?

14       A.    It seems to me highly unlikely that a

15   tenable argument could be made to that effect given

16   the notoriety not only because of the Johns-Manville

17   decision, which is clearly out there, but in every

18   province.  And I've made references of this in my

19   report.  There is extensive legislation, health and

20   safety legislation, occupational legislation, workers'

21   compensation legislation, building regulations and

22   standards that deal with the use of asbestos, the

23   installation of asbestos in different environments.

24   It would be very difficult to ignore the existence of

25   that widely available and disseminated information.

1                    (Exhibit 5 was marked for identification.)

2         Q.    (By Mr. Cameron)  Show you what's been

3    marked as Exhibit 5.  Is that a true and correct copy

4    of the compilation of the applicable regulations that

5    you just referenced?

6         A.    Yes.

7              MR. SPEIGHTS:  I believe you need to lay a

8         better foundation than that, Mr. Cameron.  I

9         don't know if he prepared this.  I object to the

10        foundation.

11        Q.    (By Mr. Cameron)  Is Exhibit 5 the

12   compilation that you had attached to your expert

13   report?

14        A.    It is.

15        Q.    And is Exhibit 5 was that compiled by you?

16        A.    It was compiled on my instructions.

17        Q.    Okay.  As part of your expert report?

18        A.    Yes.  I didn't personally compile it.  I

19   reviewed it after researchers in my office had done

20   the necessary database and statutory searches.

21        Q.    Okay.  And after your review did you

22   include it within your expert report?

23        A.    Yes.

24             MR. CAMERON:  Okay.  Let's take a couple

25        of minutes break.

1          (Recess from 11:46 a.m. to 11:57 a.m.)

2          Q.    (By Mr. Cameron)   Mr. Mew, do you have an

3     opinion as to the state of the law in Canada with

4     respect to whether a claim seeking a recovery of cost

5     to remove or manage asbestos-containing materials in a

6     building is a claim for pure economic loss?

7          A.    Yes, I have a view.

8          Q.    And what is that opinion?  And you can

9     refer to Page 10 of your report if you would like.

10         A.    My view is that such claims are indeed

11    properly characterized as claims of pure economic

12    loss.

13         Q.    And what's the basis for that?

14         A.    It's the Winnipeg Condominium and the

15    Privest cases are the source of that view.

16         Q.    Are you aware of any contrary authority in

17    Canada?

18         A.    No.

19         Q.    Do you have an opinion as to the state of

20    the law in Canada as to when the limitation periods

21    would begin to run for such claims?

22         A.    Yes.  Such claims, claims of pure economic

23    loss in both, well, in respect to the ultimate

24    limitation period and the normal limitation periods

25    the time would start to run from the date of

1    installation.

2         Q.    And you're aware of any contrary authority

3    for that position?

4         A.    No, I'm not aware of any contrary

5    authority.  I'm aware of attempts that have been made

6    as they were in Privest to say that time starts to run

7    from a later date because of the application of the

8    discoverability principle but I'm not aware of any

9    cases in which plaintiffs have succeeded in making

10   that argument.  They certainly didn't in Privest.

11        Q.    I would like to turn to the application of

12   the normal limitations period to several of the

13   statutes.  And looking first at the limitations

14   statute for Alberta what is the normal limitations

15   period in that statute?

16        A.    Since the current Alberta Act came into

17   force in 1999 it's been two years.

18        Q.    Okay.  And to avoid the running or to

19   postpone the running of the two-year statute from the

20   date of installation what would the claimant have to

21   show in your opinion?

22        A.    The claimant would have to show that they

23   had not discovered or could not with the exercise of

24   reasonable diligence have discovered the existence of

25   a claim or a cause of action.

1        Q.    And does the statute provide what they

2   would have to show --

3        A.    Yes.  The statute --

4        Q.    -- specifically?

5        A.    Yes.  The statute has a formulation.  It

6   says that, and it's Section 3, Subsection (1), that

7   the limitation period is two years after the date on

8   which the claimant first knew or in the circumstances

9   ought to have known that the injury for which the

10  claimant seeks a remedial order had occurred, that the

11  injury was attributable to the conduct of the

12  defendant, and that the injury assuming liability on

13  the part of the defendant warrants bringing a

14  proceeding.  They would have to show that they knew or

15  that they did not know or should not be deemed to have

16  known those three things.  One of those three things.

17       Q.    And do you have an opinion whether in a

18  Canadian court a claimant would be able to meet that

19  burden here?

20       A.    In my opinion it's highly unlikely.

21       Q.    I would like to turn to the limitations

22  statute in Ontario, if you would.  Does Ontario's

23  limitation statute have an ultimate limitations

24  period?

25       A.    It did not at the time.

Page 38

1      Q.    Okay.

2      A.    It did not in 2001.

3      Q.    And what is the normal limitations period

4   in the Ontario statute?

5      A.    Six years.

6      Q.    Six years from when?

7      A.    Six years from when the cause of action

8   arises.

9      Q.    Okay.  And for the pure economic loss

10   claim involving asbestos in buildings when would that

11   period begin to run?

12      A.    It would be six years from the date of

13   installation in my opinion.

14      Q.    And is the discoverability principle

15   available to a claimant in Ontario?

16      A.    As a matter of common law of construction,

17   yes.

18      Q.    It's not by statute?

19      A.    No.

20      Q.    And what would a claimant in Ontario have

21   to show to postpone the running of the statute?

22      A.    Essentially the same thing as any other

23   provinces.  They would have to show that they either

24   did not know or through the exercise of reasonable

25   diligence could not have known the existence of the

1    cause of action.

2        Q.    Okay.  And do you have an opinion whether

3    in a Canadian court an Ontario claimant would be able

4    to meet that burden here?

5        A.    Again in my view it's highly unlikely.

6        Q.    And could you look at the British Columbia

7    limitation statute?

8        A.    Yes.

9        Q.    And what is the normal limitation period

10   in that statute?

11       A.    Six years.

12       Q.    Six years from when?

13       A.    It's six years from the date on which the

14   right to bring the action arose.

15       Q.    And what would the defendant have to show

16   to establish a limitations defense?

17       A.    Well, in British Columbia the

18   discoverability principle is -- sorry, what would the

19   defendant have to do?

20       Q.    Defendant, yes.

21       A.    A defendant would simply plead that more

22   than six years had passed between the time that the

23   wrong occurred and the commencement of the proceeding.

24       Q.    And did the Privest decision address this

25   normal limitations period in the British Columbia

1   statute?

2       A.     Yes, it did.

3       Q.     And what did the Privest court conclude --

4   trial court conclude on this issue?

5       A.     The trial court concluded that time

6   started to run from the date of the installation.

7       Q.     And is the discoverability principle

8   available to the claimant in British Columbia?

9       A.     Effectively yes, through a mechanism known

10  in the British Columbia statute as postponement.

11      Q.     Is that a separate statute?

12      A.     No, it's part of the limitation statute.

13      Q.     And what does the postponement part of the

14  limitation statute provide a claimant has to

15  demonstrate to postpone the running of the normal

16  limitations period?

17      A.     It requires a plaintiff to demonstrate

18  that the plaintiff did not know the identity of the

19  defendant and the facts within the plaintiff's means

20  of knowledge were not such that a reasonable person

21  knowing those facts and having taken the appropriate

22  advice that a reasonable person would seek on those

23  facts would regard those facts as showing that a cause

24  -- that an action on a cause of action would have a

25  reasonable prospect of success.

1                    So in other words, I'm looking at Section

2    6, Subsections (3) and (4) of the act, but in essence

3    it's the same standard as the discoverability rule.

4    The plaintiff would have to show that they didn't know

5    and shouldn't reasonably have known that they could

6    maintain a claim.

7         Q.    And then further on I think on the next

8    page of your report you go on to give the opinion of

9    what a claimant in this matter would have to show to

10   invoke the postponement provision?

11        A.    The claimant would have to have

12   demonstrated that it could not reasonably have known

13   that Grace was a potential defendant and the facts

14   from which it could be concluded that a successful

15   action could be brought against Grace were not

16   reasonably within the claimant's knowledge prior to

17   April the 2nd, 1995, which would be six years before

18   the bankruptcy filing.

19        Q.    Okay.  And do you have an opinion as to

20   whether discoverability argument under the British

21   Columbia statute would be successful here?

22        A.    I have an opinion and my opinion is that

23   it would not be successful.  Postponement cannot

24   successfully invoked in this case or these cases.

25        Q.    And is that the opinion that's provided in

1    your December 21, 2006 report?

2          A.    Yes, on Page 24.

3          Q.    And the opinions that you've provided here

4    today are those opinions also contained in your

5    December 21, 2006 report?

6          A.    Yes, they are.

7                MR. CAMERON:  That's all I have.

8                          EXAMINATION

9    BY MR. SPEIGHTS:

10         Q.    Mr. Mew, I have a few questions for you

11   but in order to expedite matters I want to tell you

12   that I am not endeavoring to question you or

13   cross-examine you on the ultimate statute of

14   limitations.  So if I trespass into that area quickly

15   tell me that I have trespassed and I will quickly move

16   away.  It's not my intent to do so.  You said early on

17   that a factual situation was presented to you and then

18   shortly thereafter you said you were given a number of

19   assumptions.  Were either these facts or these

20   assumptions given to you in writing?

21         A.    As I sit here I can't recall.  Unless I

22   faithfully transcribed something that was essentially

23   dictated to me over the phone I would have to assume

24   that at some point in time that this was reduced to

25   writing, the instructions were reduced to writing but

1    I don't recall as I sit here.

2        Q.    Let me make sure you understand my

3    question.  I'm not inquiring as to whether you

4    recorded something that was orally given to you.  My

5    question is did somebody give you something in writing

6    either as to facts or assumptions?  Do you believe

7    that it is possible that somebody actually gave you

8    something in writing related to facts or assumptions

9    they were asking you to assume or have?

10       A.    It's possible but I don't have a specific

11   recollection.

12       Q.    Well for the record if anything was given

13   to, Mr. Mew, as an expert either assumptions or facts

14   in writing I would request a copy of that, of those

15   pieces of paper.  Would it be fair to say that

16   whatever facts or assumptions were given to you were

17   given to you by Grace's attorneys?

18       A.    Yes.

19       Q.    And that would include both one or more

20   lawyers from Kirkland And Ellis and one or more

21   lawyers from Reed Smith?

22       A.    Yes.

23       Q.    You said early that there were some

24   similarities to the claims here and the claims in

25   Privest.  Do you recall that?

1       A.    Yes.

2       Q.    Have you examined the claims here?

3       A.    I have seen some of the claims forms that

4   your clients filled out but have I examined each one,

5   no.

6       Q.    Have you reviewed any expert reports

7   provided by the Canadian claimant's experts in this

8   matter?

9       A.    No.

10      Q.    Have you examined any trial briefs or

11  summaries prepared by counsel representing the

12  Canadian claimants as to the basis of their    claims?

13      A.    Trial briefs, no.  I have seen various --

14  I'm not sure what you would call them.  I would call

15  them interlocutory submissions that have been made by

16  both sides but I haven't seen anything that

17  comprehensively sets out.

18      Q.    Have you seen any trial transcript or

19  published case or speech or anything else from me or

20  members of my firm describing what the basis of our

21  Canadian claims are going to be when we go to trial in

22  this case?

23      A.    Certainly haven't read any of your

24  speeches.  Other than the sources that I've just

25  referred to were some briefing documents I don't

1    believe I have seen.  There aren't -- one of the

2    disabilities we suffer under in this case there aren't

3    pleadings in the way that, certainly in the format

4    that I would be familiar with and I haven't seen

5    anything like that.

6         Q.    Would it be fair to say, and I'm not being

7    critical when I say this, but would it be fair to say

8    that when you testify that there are similarities

9    between the claims here and the claims in Privest you

10   are relying upon what's been provided to you by

11   Grace's counsel to characterize and describe the

12   claims of the Canadian claimants here?

13        A.    That and my understanding of the Privest

14   case, yes.

15        Q.    Okay.  Now would you agree with me that

16   the Privest case did not involve the ultimate

17   limitations?

18        A.    I would agree with you.

19        Q.    Would you agree with me that Winnipeg did

20   not involve the ultimate limitations?

21        A.    I agree with that, too.

22        Q.    Are you telling me that if a building

23   owner had Grace's material placed in its building in

24   1970 that it should have brought a lawsuit, let's take

25   it where there's a two-year statute of limitations, by

1    1972 in economic loss?

2         A.    Yes.

3         Q.    And if a building --

4         A.    I say yes but there's a slight caveat to

5    that because, of course, the Winnipeg Condominium case

6    hadn't been handed down by then.  And certainly

7    attempts have been made since, attempts have been made

8    to argue.  The Winnipeg Condominiums represented a

9    change in the law and that that should give plaintiffs

10   a second chance because they hadn't realized they

11   could pursue this claim for pure economic loss before

12   the Winnipeg Condominium case came down.  The

13   plaintiffs who made those arguments have not been

14   successful with them so the answer is yes.

15        Q.    Well let's look at it both ways.  Suppose

16   a clairvoyant plaintiff's lawyer in Canada brought a

17   case before 1972 claiming that what would turn out to

18   be the Winnipeg decision was the law back then, what

19   would it have to prove to recover?  The case is now

20   timely brought.  What would it have to have proof to

21   recover?

22        A.    They would have to prove that a wrong had

23   occurred and that a compensable injury had resulted.

24        Q.    And what kind of injury would they have

25   shown before 1972 or what kind of injury were they

1  required to show before 1972 if Winnipeg was the law

2  at that period of time?

3      A.    Well, if Winnipeg was the law at that

4  period of time they would have to show a potentially

5  injurious product had been installed and that economic

6  consequences would flow from that.

7      Q.    So they could have prevailed if it was

8  just a potential injury and not an actual injury; is

9  that your testimony?

10     A.    Well the whole of the Winnipeg Condominium

11  is that you don't have to prove actual damage to

12  property or injury to persons in order to recover

13  damages.

14     Q.    I understand that but, again, is all that

15  the plaintiff back in 1972 all he had to do was to

16  show there was a potential injury under Winnipeg?

17     A.    Well, you have to show the product as

18  harmful and you would have to satisfy the court that

19  there was a basis for remedying that harm.

20     Q.    Well if you had to show it is harmful

21  wouldn't you kick in the rest of the Winnipeg decision

22  that recognized in Winnipeg that you did not have to

23  bring the case within, we'll say two years, two years

24  of installation?

25     A.    Well the difference with the products that

1    .we're dealing with is that the court has, the court in

2    Privest has held applying the discoverability

3    principles that the date of installation and the date

4    on which time would be deemed to run are one in the

5    same.

6        Q.    Well, we're going to get to Privest, I'll

7    assure you.  I will not let you leave and return to

8    Canada without discussing Privest a few minutes but

9    I'm back at Winnipeg.  I'm not in an asbestos building

10   case.  I'm just with Winnipeg and economic loss cases.

11   Doesn't the Winnipeg case hold that where there is

12   harm where you can prove the product is harmful the

13   statute of limitations is either suspended or delayed

14   until some point in time past installation?

15       A.    Well Winnipeg, that's not my understanding

16   of Winnipeg but I would be happy to be referred by you

17   to the case.

18       Q.    Well, is it your understanding without

19   pulling out the case that under Winnipeg in all

20   circumstances cases in economic loss must be brought

21   within a certain period of time from installation?

22       A.    The main holding with Winnipeg is the

23   sustainability of the claim for pure economic loss.

24   And the reason it's a leading authority is because of

25   that not because of any limitation issues that may or

1    may not have been associated.   It's not primary.   It's

2    not really a limitations case per se.

3         Q.    Well under the Winnipeg case does the

4    court provide authority for bringing a case, an

5    economic loss where the product is shown to be

6    harmful?

7         A.    Yes.

8         Q.    And in that situation in your opinion are

9    you telling me that the statute of limitation still

10   runs from installation?

11        A.    It depends on what the product is.   It

12   depends on what the circumstances are.

13        Q.    Are you telling me that in all the

14   situations where you have a case of economic loss

15   where the product is harmful that the statute

16   commences to run upon installation?

17        A.    No.

18        Q.    Thank you.   Then we get to Privest.   I

19   believe in Privest the plaintiff tried to both show

20   economic loss and property damage; is that correct?

21        A.    I think that is correct, yes.

22        Q.    And obviously the plaintiff lost at the

23   trial level.   Now for the record the trial level was

24   one judge, Judge Drost, trying a lawsuit involving the

25   plaintiffs and Grace; is that correct?

1       A.      That's correct.

2       Q.      And Judge Drost issued a lengthy opinion;

3   correct?

4       A.      He did.

5       Q.      And that opinion went to the Court of

6   Appeals for British Columbia; correct?

7       A.      It did.

8       Q.      And you have reviewed the Court of Appeals

9   decision both in connection with your affidavit and

10  probably in preparation for this deposition, haven't

11  you?

12      A.      I have to confess I have not read it again

13  since we last met but I have reviewed it on numerous

14  occasions over the years.

15      Q.      I'm going to mark a copy of the Court of

16  Appeals decision for the record after you identify it

17  unless you have one with you.  Do you have one with

18  you?

19      A.      I do not.

20              MR. SPEIGHTS:  This copy, Mr. Cameron, I'm

21          going to just have her mark it Exhibit 6 but I

22          don't want it actually placed on the exhibit yet

23          because there is some yellow highlighting on it

24          and when we copy it the yellow highlighting

25          won't come out and I want one that's pure when

1          we actually mark it.

2          Q.    (By Mr. Speights)   I'm going to give you

3     the one with the yellow highlighting.   Do you

4     recognize that as the Court of Appeals decision in

5     Privest?

6          A.    Yes, I do.

7          Q.    Now if you would turn to me on page --

8     actually it doesn't have a page but Paragraph 29.   The

9     top line says:   Did the plaintiffs prove that MK-3 is

10    a dangerous product when disturbed?   Do you see that?

11         A.    Yes, I do.

12         Q.    And would you agree with me that about

13    another line or two down there that the court says,

14    this is the Court of Appeals said:   Air sample during

15    renovations would have reduced the evidence one way or

16    the other but the plaintiffs did not perform those

17    tests.

18         A.    That's what it says.

19         Q.    Okay.   And then if you would refer to the

20    very last page on the opinion under the heading of 35

21    the Court says:   There is evidence on both sides of

22    the issue.   Drost J. found that the plaintiffs had not

23    proven their case.   Did I read that correctly?

24         A.    You did.

25         Q.    And that was the finding of the Court of

1    Appeals that the plaintiffs down below did not prove

2    their case; isn't that correct?

3         A.    On the issue that's under discussion, yes.

4         Q.    Well, in the next sentence it says in our

5    opinion the plaintiffs are asking us to reweigh the

6    evidence and make a different choice as to expert

7    opinion.  This we cannot do.  As we have said the

8    plaintiffs had the opportunity to sample the air and

9    demonstrate conclusively that when disturbed the MK-3

10   is a dangerous product.  In the end, the trial judge

11   was not persuaded by the methods of proof adopted by

12   the plaintiffs on this crucial issue of fact.  We are

13   unable to find that he committed any palpable or

14   overriding error in his conclusion on dangerousness.

15   Did I read that correct?

16        A.    Yes, you did.

17        Q.    And that was a holding of the Court of

18   Appeals in the Privest case; correct?

19        A.    Yes.

20        Q.    You're not telling the court today are

21   you, Mr. Mew, that the court of appeals for Canada

22   decided that not one inch of Mono-Kote anywhere in

23   Canada is unsafe, are you?

24        A.    No.  The Court of Appeal, which reviews

25   the decision of a trial court, it's the Court of

1   Appeal of British Columbia, not the Court of Appeal in

2   Canada.  But it reviewed the decision of the trial

3   court.  It the applied a threshold of review, which I

4   assume is similar to the threshold of review that

5   appellate courts in this country apply, where they

6   essentially decline to retry cases unless there has

7   been a palpable or overriding error made by the trial

8   judge and that's what they're doing here.

9          Q.    And certainly in this case the court did

10  not even consider either the trial court or the Court

11  of Appeals did not consider other Grace asbestos

12  containing products besides MK-3, did they?

13         A.    Trying to recall whether there was any

14  product other than MK-3 that was the subject of the

15  trial court's decision but I think the answer to your

16  question is that's right.  They did not consider other

17  Grace products; correct.

18              MR. SPEIGHTS:  I don't want to take a

19          break because you'll break.  I'm just stepping

20          down the hall.

21              (Off the record.)

22              MR. SPEIGHTS:  Thank you, Mr. Mew.

23              THE WITNESS:  That's it?

24              MR. SPEIGHTS:  That's it.  Again, I

25          reserve my right.

Page 54

1          MR. CAMERON:  Even though he asked you

2     questions on it and he's waived it but he's

3     going to reserve his right again.

4          MR. SPEIGHTS:  I reserve my right again to

5     examine Mr. Mew on ultimate limitations should

6     the motion of Grace be granted to amend its

7     objections.

8          MR. CAMERON:  And our position is the same

9     that ultimate limitations has been raised.  He

10    has been deposed on this previously and we'll

11    deal with that with the court if and when

12    Mr. Speights raises that argument.

13         MR. SPEIGHTS:  Thank you.

14         (Exhibit 6 was marked for identification.)

15         (Whereupon, the deposition was concluded

16    at 12:26 p.m.)

17                       - - -

18

19

20

21

22

23

24

25

Page 55

1

2                          C E R T I F I C A T E

3

4    STATE OF GEORGIA:

5    COUNTY OF FULTON:

6

7              I hereby certify that the foregoing

8         transcript was taken down, as stated in the

9         caption, and the questions and answers thereto

10        were reduced to typewriting under my direction;

11        that the foregoing pages 1 through 54 represent

12        a true, complete, and correct transcript of the

13        evidence given upon said hearing, and I further

14        certify that I am not of kin or counsel to the

15        parties in the case; am not in the regular

16        employ of counsel for any of said parties; nor

17        am I in anywise interested in the result of said

18        case.

19              This, the 15th day of May, 2007.

20

21

22              Abigail M. Pace, RPR, CCR-B-1484

23

24

25

1

2                    COURT REPORTER DISCLOSURE

3

4          Pursuant to Article 8.B. of the Rules and
   Regulations of the Board of Court Reporting of the
5  Judicial Council of Georgia which states: "Each court
   reporter shall tender a disclosure form at the time of
   the taking of the deposition stating the arrangements
6  made for the reporting services of the certified court
   reporter, by the certified court reporter, the court
7  reporter's employer, or the referral source for the
   deposition, with any party to the litigation, counsel
8  to the parties or other entity.  Such form shall be
   attached to the deposition transcript," I make the
9  following disclosure:

10         I am a Georgia Certified Court Reporter.  I am
   here as a representative of John Payne &
11 Associates, LLC.  John Payne & Associates was
   contacted to provide court reporting services for the
12 deposition.  John Payne & Associates will not be
   taking this deposition under any contract that is
13 prohibited by O.C.G.A. 15-14-37(a) and (b).

14         John Payne & Associates has no
   contract/agreement to provide reporting services with
15 any party to the case, any counsel in the case, or any
   reporter or reporting agency from whom a referral
16 might have been made to cover this deposition.  John
   Payne & Associates will charge its usual and customary
17 rates to all parties in the case, and a financial
   discount will not be given to any party to this
18 litigation.

19

20

21                    Abigail M. Pace, RPR, CCR-B-1484

22

23

24

25