period. By December 1992, however, the common law had introduced its own "discoverability" rules, postponing the commencement of statutory basic periods in those provinces where this had not explicitly been done by statute.

Therefore, if the Alberta claimants are still to be deemed participants in the class litigation, we ask ourselves first, when they should with reasonable diligence first have been aware of a substantial danger; then we add six years to that date. If that time has *not* fully elapsed by December 23rd, 1992, the claims are *not* statute barred.

*(b) If the Alberta claimants should be deemed in law to have been expelled, irretrievably, from the class action suit.*

If this is the case, the only lingering effect of the claimants' participation in the class litigation will be to have suspended the effluxion of the applicable limitation period for the duration (only) of their involvement in that litigation. The critical date for making limitations calculations will be April 2, 2001, as favoured by Mr. Mew and by the Grace defendants. And accordingly the applicable rules will be those of the "reformed" Alberta *Limitations Act*, R.S.A. 2000, c. L-12, equipped as it is both with a statutory "discoverability" provision (s.3 (a)) and an ultimate limitation period of 10 years (s.3(b)). These changes were introduced in 1996, at which time the "basic" limitation period was reduced for cases like this from six years to two. And if the claimants were by the time of these amendments no longer safely "locked into" valid proceedings, the suspensory effect of class litigation would have ceased, and the claimants be fully exposed to such adverse changes in the limitation rules as might supervene (as happened in 1996) to affect them.

Therefore, if Alberta claimants are deemed in law now to be outside the class action, their situation is perilous. The limitation "clock" resumes running as soon as they are excluded from the class. They may also be exposed to the unattractive argument fixing them with "deemed" knowledge of the damage sustained by them, as of December 1992 : an argument which I have already repeatedly addressed and, I hope, disposed of.

To anyone who has managed to bear with the argument this far, it will be apparent that a pattern or theme, grimly consistent in its implications, has emerged. The fate of all Canadian litigants[69] depends in large measure on whether they are still to be considered as participants in the Anderson Memorial Hospital class action. If they *are*, then the critical date for limitation purposes is in December 1992, and the fate of their claims will depend on the *factual* evidence as to the date when they knew or should have known that MK-3 was dangerous. If they are *not* still involved in the class action, then for the reasons given above, their claims seem less likely of success.

This thesis dictates everything that follows, as I address the remaining provinces. Only for the sake of completeness do I attempt these tedious calculations.

---

[69] Save for those in Manitoba, whose claims, as I have argued, are in all cases uniquely disadvantaged for want of any "automatic" discoverability mechanism under the Manitoba Statute.

## Nova Scotia

In Nova Scotia, as Mr. Mew helpfully points out, all the limitations statutes over the years, culminating in the Limitation of Actions Act, 1989, now in effect (R.S.N.S. 1989 c. 258) to express themselves in antique and mysterious language, so far as the characterization of actions is concerned. But I agree with him that claims such as those presently in issue amount to one of those "causes which would formerly have been brought in the form of action called trespass on the case"; and are accordingly governed by a *six year* basic limitation period [s. 2(1)(e)]. I agree further with Mr. Mew that despite the absence in the Nova Scotia act of any statutory postponement (or discoverability) rule, that absence is supplied, as in several Canadian jurisdictions by the common law discoverability principle, as introduced into Canada in the eighties by the process described earlier in this opinion (at p. 20 *supra*, and at fn.55), and latterly confirmed by the Nova Scotia Court of Appeal in *Burt v. LaLacheur*, (2000) 189 D.L.R. 4th 193.[70]

There is no "ultimate" limitation period in effect in Nova Scotia.

Accordingly, and consistently with the pattern that has emerged in this paper, we must ask ourselves first, whether the Nova Scotia claimants are to be considered privy to the class litigation, so 'freezing' the limitation process as of 23rd December, 1992. If so, the Nova Scotia claimants have to show, by appropriate evidence, that they did not discover, and should not reasonably be required to have known of the dangers of asbestos treated buildings until a date after 23rd December 1986, so that the six-year period added to the date of discoverability would not expire before the magic date of 23rd December 1992.

However, if the Nova Scotia claimants are determined to have been excluded in law from the class action, their cause seems more vulnerable, for (as discussed above) they could conceivably be deemed to have known of the danger since December 1992, so the discoverability principle will not avail them further; and it seems probable on that hypothesis that the bare six year period, all that remains to them, would have elapsed before they entered into the bankruptcy proceedings of April 2001.

## Newfoundland and Labrador

As Mr. Mew points out, the current Limitations Act of this province, S.N.L. 1995, c. L-16.1, is confusingly expressed so far as the proper characterization of the present claims is concerned. But I fully agree with him that it must be the "residual" provision, s. 9, which governs, rather that s. 5 (a), which seems on a fair reading not to refer to claims for "pure economic loss", but to derivative economic losses flowing from physical injuries to persons or property. That means that the applicable "basic" limitation period is six years after the cause of action arose; and further, as Mr. Mew points out, that the claim is subject to no "ultimate" limitation as is provided for certain other types of claims under s. 14 (3).

---

[70] One might have thought the issue had been sufficiently laid to rest by the Supreme Court of Canada 14 years earlier in *Central Trust v. Rafuse* [1986] 37 C.C.L.T. 117

Prior to 1995, the relevant statute was Newfoundland's Limitation of Personal Actions Act, R.S.N. 1990 o.L-15, remarkably antique in expression and even more delphic in meaning, but seemingly, by virtue of s. 2(d), providing for the same six year basic limitation period as its successor. There being no explicit postponement ("discoverability") principle, the common law discoverability rules would apply, just as in Nova Scotia.

This being the case, we ask, yet again, how *these* claimants stand in relation to the class action of December 23rd 1992. If they are still privy to that action, they need only to show on the evidence that six years prior to that date (i.e. on December 23rd 1986) they had still not discovered, despite reasonable diligence and alertness, that danger from asbestos was present in their buildings. If they can show that, their cause is untroubled by limitation concerns.

But once again, if they have in law dispositively ceased to be privy to those class proceedings then, (depending on the date of their exclusion), their claims could face that further limitations challenge, already discussed in relation to the other jurisdictions. They might again have to face the argument, artificial thought it might be, that in joining (or, more accurately, being passively joined) to the class action of December 1992, they might thereby be deemed to have acknowledged the existence at that date of all elements asserted in that claim, awareness of actionable damage included. That would make it difficult indeed to argue that their claims were not statute-barred.

**Ontario**

Yet again, as would be expected, I find myself in agreement with Mr. Mew as to the applicable statutory provisions, which (whatever view one takes of the case, and whichever of the competing dates one treats as crucial) are certainly those ordained by the former *Limitations Act* of Ontario, R.S.O. 1990 c.L-15. That act provided a basic period of "six years after the cause of action arose" for all "actions on the case" other than slander. But no postponement provision was enacted, its absence being supplied, as in so many provinces, by the common law discoverability doctrine. No ultimate limitation period is to be found. Thus far, Mr. Mew and I are in total agreement, but this is the point where, as concerns Ontario and all the other provinces, our analysis diverges to some extent.

Mr. Mew contends, very vigorously and lucidly, that concerns about the dangers of asbestos were so notorious among the general Canadian public (and building owners especially) at such an early date, that the discoverability principle can avail these Canadian claimants nothing. I say that I am not at all convinced that Grace's self-serving contentions to this effect are sufficiently made out; but feel that in any case, there are issues of fact, pure but far from simple, and not meet for discussion in an expert opinion as to the law.

Furthermore, and for the last time in this opinion, I do not share Mr. Mew's conviction that April 2nd 2001 is necessarily the key date for determining whether these

Ontario claims were or were not statute-barred. Tiresome though it may be for me to reiterate this, but on my analysis "it all depends." It all depends on whether the Ontario claimants are still in good standing in the class action, instituted in December 1992. If they are, their present claims will escape destruction if they can show on the evidence that they neither knew nor ought to have known of the substantial danger posed by asbestos in their buildings until on or after December 23rd, 1986.

If on the other hand they are now to be regarded in law as having been severed from the class action, the key date for calculations becomes April 2, 2001, and the limitations hurdle for these litigants becomes considerably more difficult, for the reasons repeatedly adverted to in relation to the other provinces.

### Manitoba

I have already argued, at pages 20-21 of this Opinion, that due to the unique history and format of the Manitoba statute, which denies to plaintiffs in that province any automatic access, as of right, to the "discoverability principle", [and affords them only a brief opportunity under s.14(1) to seek redress by judicial fiat when such a situation threatens injustice], the Manitoba claimants in our present proceedings face a peculiarly daunting challenge in regard to limitations issues. Some consolation or latitude in applying the limitation rules in Manitoba may, perhaps, be found on reflection to inhere in the uncertain and malleable state of authority in Manitoba, as to when a cause of action "arises" in cases of the present kind. This is elaborately discussed in Appendix B.

### SUMMARY OF CONCLUSIONS

In the earlier pages of this report, I have analyzed the Canadian common law governing tort liability for financial losses, sustained by owners who have felt compelled to undertake asbestos abatement programs, to remove the product MK-3 from their buildings. Such claims would unquestionably sound exclusively in negligence, and would be characterized more particularly as product liability negligence claims for purely economic loss. Canadian law would require that the plaintiffs show a duty of care arising from a demonstrated relationship of proximity between the plaintiffs and the manufacturer; and a breach of that duty by conduct, on the part of the manufacturer, which goes beyond the mere production of a potentially harmful product and introducing it into the general marketplace. Furthermore, before the Canadian courts would recognize any duty of care in such a case, the claimants would have to show that incorporation of MK-3 into their buildings resulted in something more than a merely "shoddy" or defective building. They would have to show that it represented a real and substantial danger to life, health or other property.

I do not believe that my analysis of the law differs significantly or indeed at all from that set forth in the expert opinion of Professor Lewis Klar. The only issue on which my views differ from his relates to the significance in law of Canada's sole decided case of this kind, *Privest Properties Ltd. v. Foundation Co. of Canada*, a British Columbia decision discussed in this paper at Pages 11-14. I take a less apocalyptic view of that decision than does Professor Klar. Justice Drost's careful and doctrinally sound

judgment rejected the plaintiff's claim *on the facts* as dictated by the evidence adduced in that case. That is not just my view. It was explicitly the view of the Court of Appeal, and, it would seem, of the Supreme Court of Canada in that case. It would bind no Canadian court to reach a similar result, and is actually of value to future plaintiffs in asbestos litigation, in that it expressly gives a pointed lesson as to how evidence should be more effectively presented.

That is not to say that the Canadian claimants, any more than their American cousins, face an easy task in making good their claims, either in terms of law or fact. But their challenge is neither hopeless of success, nor obstructed by authority.

The problems suggested by Canada's various Limitations Acts, which occupy the latter half of this paper, seem far less straightforward. Again, I would endorse much of the legal analysis in Mr. Mew's expert opinion, as far as it goes. But that document fails, for some reason, to advert in any way to the significance in law of the Class Action, commenced in South Carolina, to which the Canadian claimants are, or were (the question is contested) associated. It is my thesis that this element is critically important in various ways.

First, the institution of a class must (as a principle of seemingly universal application) be taken to "toll" the effluxion of any limitation period, affecting any class member, at the moment the class action is so commenced. At that point, a claimant's rights are, so to speak, "vested" and immune from further limitations concerns, and the "critical date" for the assessment of such limitations issues is the date of such institution – not April 2001, the date upon which Mr. Mew predicates all his calculations, but January 1992. Thus if the Canadian claimants became and remained in law privy to the class proceedings, their claims are not self-evidently statute-barred, as Mr. Mew concludes.

However, should it be determined that the Canadian claimants have been eliminated from the class action in question, the "tolling" effects of the governing legislation will prove not to have been final and conclusory, but only temporary and suspensory, and this, I believe, for reasons more fully elaborated in the text, could lead to their claims being dismissed as statute-barred.

My opinion, therefore, is that the fate of the Canadian claimants' rights of action may depend in great measure on their continued status (or lack thereof) vis-à-vis the Anderson Memorial Hospital class action. The only exception I would make relates to the Manitoba claimants, since as I explain in the text, the unique scheme of the Manitoba statute denies to those claimants any automatic right to assert the "discoverability" principle available everywhere else in Canada; and this will make it more difficult to make a persuasive argument enabling any Manitoba claimant to overcome a limitations defence. Their best chance of doing so would seem to lie in making use of the unsettled rules governing when a cause of action arises in Manitoba in cases founded upon the ruling in *Winnipeg Condo v. Bird Construction*, an area of law I discuss more elaborately in Appendix B.

## APPENDIX A

The Manitoba authorities as to when a Cause of Action shall be deemed to "arise",
for the purposes of the Limitations Act, R.S.M. 1987 c. L150.

- An excerpt from Osborne, P.H., "Manitoba Tort Cases Since the Turn of the Century,"
(2005) 31 Manitoba Law Journal 25.

Ninth: in recent years, the Manitoba Court of Appeal has performed well in terms of appeals from its decisions to the Supreme Court of Canada. In previous decades, the Manitoba Court was among the more frequently reversed courts; now, the affirmation rate of its decisions is comparable to that of the Ontario Court of Appeal. Appeals from the Court are almost exclusively criminal law cases.

Tenth: the Manitoba Court of Appeal is not often cited by higher court; there is no indication that the Court has staked out any kind of leadership role within specific areas of law, either for the Court as a whole or for specific individuals.

The Manitoba Court of appeal remains an interesting point of access for a study of the "complex and delicate" role of a provincial appellate court in Canada. These courts are sometimes said to be the "prisoners" of the fact-finding trial courts on one side and the law-finding Supreme Court on the other,[48] but the shrinking of the Supreme Court caseload in recent years suggests that they are not in fact being squeezed particularly hard, and they still have some scope for dealing with important issues in a novel way that can ripple further—K.L.W.[49] and Blais[50] are possible examples from the terms under consideration. Statistical studies such as this one provide the foundation for a further consideration of the creative albeit contained role of intermediate courts of appeal in a hierarchical system, and elucidate an important part of the broader judicial role in this the age of judicial power.

---

48 Comments are from Robert J. Sharpe & Kent Roach, Brian Dickson: A Judge's Journey (Toronto: University of Toronto Press, 2003) at 115.

49 Winnipeg Child & Family Services v. K.L.W. [1998] M.J. No. 254 (Q.L.)—dealing with the apprehension without prior judicial approval of a child at risk.

50 2001 MBCA 55—dealing with status of Métis people under the constitution.

---

# Manitoba Tort Cases Since the Turn of the Century

PHILIP H. OSBORNE*

## I. INTRODUCTION

This article comments on some of the tort cases decided in Manitoba between 1 January 2000 and 1 July 2004[1] and on an important tort-related amendment of the Limitation of Actions Act.[2] The cases discussed have been selected on the basis of the importance and interest of the issues involved rather than the level of the Court. The article begins with an analysis of a line of Court of Appeal decisions dealing with the applicability of the limitation of actions legislation to economic negligence actions. This is followed by a consideration of a Court of Appeal decision that led to an amendment of the limitation legislation in the field of sexual and physical abuse claims. A series of cases dealing with the application of the tort of negligence to pure economic loss, to psychiatric harm, to school accidents and to a number of medically related issues are then discussed. The article ends by reviewing a case dealing with the rejuvenated tort of nuisance in public office and a case that reaches an important lesson about the tort of defamation.

## II. ECONOMIC NEGLIGENCE AND THE LIMITATION OF ACTIONS

In 1964 the decision of the House of Lords in Hedley Byrne & Co., Ltd. v. Heller & Partners, Ltd.[3] established that liability may be imposed for a negligent mis-

---

* Professor, Faculty of Law, University of Manitoba. Professor Osborne gives his thanks to colleagues Professor John Irvine and Trevor Anderson who read a draft of this article and made helpful comments. The views contained herein and errors are solely his.

1 Two earlier cases are included because of their importance to a number of the post-2000 cases: Rizzo v. Maxwell (1998), 131 Man. R. (2d) 184 (C.A.) and Winnipeg Condominium Corp. No. 36 v. Bird Construction Co. (1999), 131 Man. R. (2d) 283 (C.A.).

2 S.M. 2002, c. 5, s. 2.

3 [1964] A.C. 495 (H.L.).

representation causing pure economic loss. Since then, a much wider scope of responsibility for negligently inflicted pure economic loss has been recognized. It is now established that there are at least five categories of cases where pure economic loss may be recoverable. They are *negligent misrepresentation, negligent performance of a service, defective products or buildings, relational economic loss and the negligent exercise of governmental powers.* A great deal of judicial time and effort has been spent defining the legal requirements of liability in each of these categories and there is still much to be done. Less attention has been paid to the attendant practical and procedural issues that inevitably arise in any expansion of tortious liability. One important issue that the Court of Appeal has spent considerable amount of time addressing is the application of Manitoba's *Limitation of Actions Act*[4] to economic negligence claims. Some of the issues have arisen because of disagreements about the application of first principles to economic negligence cases. Others have arisen because of the unusual nature of the pertinent provisions of the *Limitation of Actions Act*.

## A. The Cause of Action in Negligence

In order to appreciate fully the issues that have arisen in respect of the interpretation of the *Limitation of Actions Act* it is useful to recall some common law principles relating to the completion of the cause of action in negligence and limitation periods.

In the tort of negligence, the cause of action is not complete until the plaintiff has suffered harm. This is in contrast to the position in the law of contract where the cause of action is complete on breach of the contractual obligation, whether or not harm has been suffered. One consequence of this rule is that there may be a significant time lag between the negligent act or omission and the completion of the tortious cause of action. Thus, the negligent design of an aircraft may cause an aircraft to crash with a consequent loss of life many years after its manufacture; the negligent exposure of persons to carcinogenic substances may cause illness decades later. In these situations the cause of action is not complete until the adverse consequences caused by the negligent conduct have occurred.

This rule is of special significance in the context of limitations of actions because many provisions of limitation statutes, including those of Manitoba, use the completion of the cause of action as the moment from which time runs. There are good reasons for this. A plaintiff should not lose a compensatory remedy before the need for compensation has arisen. Furthermore, the quantum of damages can only be calculated with some certainty when the harm has occurred.

Some situations present an additional complication. The plaintiff may not be aware of the harm and, furthermore, may not have been in a position to dis-

---

4   R.S.M. 1987, c. L150.

cover the harm through the exercise of reasonable diligence before the limitation period expired. The loss of a right of action before the plaintiff is aware of its existence is an injustice that courts seek to avoid. The common law solution in those jurisdictions where there is no legislative guidance on the point has been found in the development of a judicial rule of interpretation known as the "discoverability" principle. In Canada it was established by the Supreme Court in *Kamloops (City of) v. Nielsen*[5] (*Kamloops*) and confirmed in *Central Trust Co. v. Rafuse.*[6] In the latter case Le Dain J., speaking for the Court, held that for the purposes of the limitations of actions the cause of action is deemed to arise "when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence". This rule sometimes results in a very significant time lag between the negligent act and the completion of the cause of action.

## B. The Manitoba Limitation of Actions Act

The limitation period for economic negligence claims in Manitoba is not immediately apparent from a reading of the *Limitation of Actions Act*. The limitation period for actions in negligence depends upon whether the harm suffered is personal injury,[7] damage to land,[8] or damage to chattels.[9] Time runs in each case from the completion of the cause of action. There is no reference to actions in negligence for pure economic loss since such actions were not recognized when the Act was drafted. Consequently resort must be had to s. 2 (1)(e) of the Act which states that where no statutory provision is made for the action under consideration the limitation period is six years after the *cause of action arose*.

This provision is complemented by statutory discoverability rules which are applicable where the plaintiff has missed the limitation period because of a lack of knowledge of the harm. This Part contains a very detailed slate of provisions for *of Ac-tion Act*. This Part contains a very detailed slate of provisions but its central proposition is that a plaintiff may make an ex parte application to the court for leave to commence an action if not more than twelve months have elapsed be-

---

5   [1984] 2 S.C.R. 2.

6   [1986] 2 S.C.R. 147.

7   *Limitation of Actions Act*, s. 2(1)(e) actions for malicious prosecution, seduction, false imprisonment, trespass to the person, assault, battery, wounding or other injuries to the person, whether caused by misfeasance or nonfeasance and whether the action be founded on a tort or on a breach of contract or any breach of duty, within two years after the *cause of action arose* (emphasis added).

8   Ibid., s. 2(1)(f) actions for trespass or injury to real property, whether direct or indirect, within six years after the *cause of action arose* (emphasis added).

9   Ibid., s. 2(1)(g) actions for trespass or injury to chattels, whether direct or indirect, within two years after the *cause of action arose* (emphasis added).

tween the date on which the applicant first knew or ought to have known of all the material facts of a decisive character upon which the action is based, and the bringing of the application to extend time.[10] The applicant must support this application with evidence that in the absence of any evidence to the contrary is sufficient to establish the cause of action on which the action is to be founded.[11] There is also a final long-stop provision; leave to commence an action cannot be given more than 30 years after the occurrence of the *acts or omissions* that gave rise to the cause of action.[12]

In a series of cases the Court of Appeal has addressed two contentious issues that arise in the context of economic negligence claims. The first is the relationship between the common law discoverability rule and the statutory discoverability rule. The second is when does "harm" arise for the purpose of completing the cause of action in the various categories of economic negligence claims.

## C. The Relationship between the Statutory and Common Law Discoverability Rules: Rarie v. Maxwell

In *Rarie v. Maxwell*[13] (*Rarie*) the Court of Appeal (Scott C.J.M., Philp J.A. and Twaddle J.A.) considered the statutory discoverability rule and its relationship to the common law discoverability rule. The case dealt with a lawyer's negligent performance of *services* which caused pure economic loss to the plaintiff. The plaintiff had two complaints. First the defendant lawyer missed a limitation period for an action in damages for injuries to the plaintiff arising out of a motor vehicle accident that took place on 21 January 1985. Secondly, the defendant failed to carry out instructions given by the plaintiff in April 1986 to secure the transfer of title to land owned by a debtor of the plaintiff to the plaintiff. It was intended that the land would be sold and the debt repaid to the plaintiff with the balance of the proceeds to be shared between the debtor and the plaintiff. After some delay the transfer of title was submitted for registration in July 1987. It was not accepted because another creditor had registered a certificate of judgment against the land in question on 5 September 1986.The property was ultimately sold under a judicial sale of which the plaintiff was informed on 24 September 1987. The plaintiff failed to recover the amount of the debt and other associated costs. The plaintiff alleged that the defendant had failed to protect his interest by not filing a caveat against the title to the property and not registering a transfer of the property prior to the registration of the certif-

---

10    *Ibid.*, s. 14(1).

11    *Ibid.*, s. 15(3).The evidentiary burden on the applicant is discussed in *Johson v. Johnson*, [2001] M.J. No. 542. (C.A.).

12    *Ibid.*, s. 14(4).

13    *Supra* note 1.

icate of judgment. The action against the defendant lawyer was commenced on 16 August 1993. The trial judge held that both actions were brought within the limitation period.

The Court of Appeal allowed the appeal. Philp and Twaddle JJ.A. wrote concurring judgments. They held that the cause of action in respect of the defendant's failure to bring the action for damages for personal injuries was complete on 21 January 1987, the date on which the two-year limitation period expired. At that date the claim was barred and economic harm equal to the value of the claim was suffered. The cause of action against the defendant expired six years later on 21 January 1993 eight months before the action under consideration was brought. The cause of action in respect of the real estate transaction was held to be complete on 5 September 1986 when the certificate of judgment was registered against the property by another creditor. The plaintiff's claim, which was brought more than six years later on 16 August 1993, was also out of time.[14]

The Court considered the applicability of the common law "discoverability" rule which, it will be remembered, affects the date upon which the cause of action arises. Under that rule it was argued that the plaintiff was not aware the defendant had failed to institute the personal injury action until October 1987 (within six years of commencing an action against the defendant lawyer). In respect of the land transaction it was argued that the plaintiff was not aware, and could not reasonably be expected to be aware, of the judicial sale proceedings until 24 September 1987 (less than six years before the action against the defendant lawyer was commenced). The Court, however, held unanimously that in light of the "comprehensive and detailed code" of statutory discoverability provisions found in Part II of the *Limitation of Actions Act*, the common law rule of discoverability in *Kamloops* was *inapplicable* in Manitoba. In support of that conclusion the Court opined that the statutory provisions provide a reasonable solution to the potential injustice arising from the plaintiff's lack of knowledge of harm before the limitation period expires. In the Court's view the provisions of Part II of the *Limitation of Actions Act* address the certainty, evidentiary and diligence rationales that underline limitation legislation and provide an appropriate balance between the conflicting interests of plaintiffs and defendants. While *leave* to commence an action is required, the evidentiary burden, in the Court's opinion, is not severe. There was, consequently, every reason to defer to the supremacy of the legislature and recognize that Part II is an exclusive code. The correct course of action, therefore, was for the plaintiff to make a s. 14(1) application to extend time within twelve months of becom-

---

14    One could argue that the harm was not suffered until the completion of the judicial sale that irreversibly thwarted the plaintiff's plans for debt repayment but that issue was not explored by the Court.

30  MANITOBA LAW JOURNAL VOL 31 NO 1

ing aware of the harm he had suffered as a consequence of the defendant's negligence.

## D. Economic Harm and the Completion of the Cause of Action

The second issue, which takes on added importance given the inapplicability of the common law discoverability principle in Manitoba, is when, in the variety of economic negligence cases, does harm arise for the purpose of completing the cause of action? There is no suggestion in *Kane* that this created any particular difficulty or called for any special consideration. Twaddle J.A. in his judgment merely referred to the conventional rule.

> In the present case, as my brother Philp so well points out, the Legislature has made it clear by enacting Part II of the Limitation of Actions Act ... that the words "cause of action accrues" used in Part I were intended to refer to the completion of the cause of action by the occurrence of damage.[15]

Since *Kane*, however, there has been a line of decisions of the Court of Appeal indicating that there is considerable difficulty in resolving this question in the economic negligence cases. The result has been some uneven decision making and a degree of confusion. A consideration of the cases in chronological order will identify the contentious issues and the evolution of the Court's thinking on this important matter.

The first case, Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.[16] (*Winnipeg Condo II*) dealt with a limitation issue arising after the well-known decision of the Supreme Court of Canada,[17] who refused to strike out an action in negligence brought by the second owner of a high-rise apartment block against a builder for the cost of repairing defects in the building which gave rise to a real and substantial danger to its occupants. The claim was characterized as one for economic loss arising in a *dangerous or shoddy building*.

In subsequent pre-trial proceedings the defendant argued that the claim was out of time. There were a number of critical dates. The building was completed in 1974. In 1982, some minor flaws in the exterior stone cladding arose and some remedial work was done. A large piece of the cladding fell off the premises on 8 May 1989. The statement of claim was issued in April 1990. The motion, seeking to have the action dismissed on the grounds that the limitation period had expired, was brought in July 1998.

The defendant asserted that the cause of action was complete in 1974 because the premises contained a dangerous latent defect at that time. The limitation period consequently expired in 1980. The appropriate course of action, in

---

15 Supra note 1 at 7 [emphasis added].

16 (1998), 131 Man. R. (2d) 283 (C.A.).

17 Winnipeg Condominium Corp. No. 36 v. Bird Construction Co., [1995] 1 S.C.R. 85.

---

Manitoba Tort Cases  31

the defendant's view, would have been for the plaintiff to apply for leave to bring an action under s. 14(1) of the *Limitation of Actions Act* within 12 months of either 1982 (the discovery of minor flaws) or 1989 (the discovery of a more serious problem).

Oliphant A.C.J.Q.B. rejected this argument[18] He held that the cause of action was not complete until 8 May 1989 when the piece of cladding fell off. That was when the damage occurred and the claim was clearly in time.

The Court of Appeal was unwilling to subscribe fully to the view of either the defendant or the motions judge. Huband J.A., speaking for the Court (Huband, Twaddle and Monnin JJ.A.), stated:

> At this stage we do not know the nature of the flaws in the wall or who was responsible for them. We do not know who knew what when. We do not know if the work done in 1982 was of significance or not.[19]

Consequently the Court dismissed the appeal leaving the question to be resolved on a full consideration of proved facts at trial. It may be argued that the Court implicitly rejected 1974 as the date when the cause of action was complete since further evidence would not be needed if the critical date was the completion of a building with a latent dangerous defect.[20] This interpretation would avoid a further complication that would arise if the cause of action was complete in 1974. On that date the plaintiff corporation was not in existence; it was created to take title to the condominium in 1978. This might suggest that the choice left to the trial judge was between when the initial problems with the cladding arose in 1982, in which case the action was brought out of time, or when a portion of the cladding fell off in 1989, in which case the action was brought in time. That question was not resolved before the case was settled.

The second case is Burke v. Greenberg[21] (*Burke*). This case was characterized by the Court (Kroft, Monnin and Steele JJ.A.) as one involving the *negligent performance of a service causing economic loss*. The defendant lawyer was retained in 1979 to plan, advise, structure and prepare legal documents to allow plaintiffs to secure title to investment properties in Florida. The faulty manner in which the transactions were structured permitted a third party to commit a fraud which led to the loss of their investments. The legal work was completed by 31

---

18 Winnipeg Condominium Corp. No. 36 v. Bird Construction Co. (1998), 130 Man. R. (2d) 203 (Q.B.).

19 Supra note 16 at para. 13.

20 See also the subsequent decision of Wright J. in Winnipeg Condominium Corp. No. 266 v. 3333 Silver Developments Ltd. [2000] M.J. No. 600 (Q.B.) at para. 11. The Court clearly rejected the date of completion of the defective building as the time when the cause of action was complete. It was necessary to determine at trial when it could be said that a level of defect or damage had been reached that was more than minimal or nominal.

21 (2003), 177 Man. R. (2d) 213 (C.A.).

December 1981. The fraudulent mortgage of the Florida properties engineered by the third party and its receipt of the fraudulently obtained proceeds occurred on December 1984. Title to the properties was lost when the Florida mortgage foreclosed on the properties on 14 October 1986. The issue is clear. If the cause of action was commenced on 19 July 1988.[22] The issue is clear. If the cause of action was commenced in December 1981 the cause of action expired six months before the action was commenced. If, on the other hand, the cause of action was not complete until the harm occurred, at either the time of the fraudulent mortgage or at the time of the foreclosure, the action against the lawyer was in time. The defendant brought a motion to have the action dismissed as being statute-barred. The decision of the Master[23] allowing the motion was reversed by the motions judge[24] who took the intuitively correct position that the cause of action was complete when the properties were foreclosed in 1984.

The Court of Appeal, however, in a judgment written by Monnin J.A., allowed the appeal and held that the loss to the plaintiff occurred not when the fraud occurred nor when the foreclosure took place but at the time when the legal services were provided.[25] The cause of action arose at the end of 1981. The correct course of action was for the plaintiff to make an application under s. 14(1) of the *Limitation of Actions Act* when the fraud was discovered.

The next case, *Sentinel Self-Storage Corp. v. Dyregrov*,[26] (*Sentinel*) dealt with negligent advice of a professional soils consultant and a structural engineer in relation to the proposed construction of a self-storage facility. The advice was given in 1987. The work was substantially completed by 15 December 1988. It was alleged that the professional services provided by the defendants were deficient and caused instability in the foundations. The statement of claim was filed on 31 May 1996. On 8 December 2000 the Master granted a motion to dismiss the statement of claim on the ground that the limitation period had expired before the statement of claim was issued. Ironically, the plaintiff failed to file a notice of appeal within the appointed time period. An application to extend time to file an appeal raised, inter alia, the question of whether there was "an arguable ground of appeal." The defendant argued that there was no arguable ground of appeal because the original claim was clearly statute-barred. A mo-

22  The action was solely in negligence. Claims for breach of contract and breach of fiduciary duty were abandoned.

23  *Burke v. Hanson*, [2001] M.J. No.318 (Q.B.).

24  *Burke v. Hanson*, (2002) 180 Man. R. (2d) 85 (Q.B.).

25  If the action had been brought within six years following the provision of the services the plaintiff would have recovered nominal damages, a very unusual remedy in the tort of negligence.

26  (2003),180 Man. R. (2d) 85 (C.A.).

tions judge dismissed the application[27] and the Court of Appeal dismissed the appeal.

The judgment of the majority (Monnin and Freedman JJ.A.) was delivered by Monnin J.A. He reiterated the claim as one for the *negligent performance of a service causing economic loss* and, following *Burke*, held that the cause of action was complete at the time the service was provided.[28] When the plaintiff realized that there was a problem with the foundations an application should have been made under s. 14(1) of the *Limitation of Actions Act* for leave to bring an action. Steele J.A. persuasively characterized the claim as a case for economic loss arising in a dangerous or shoddy product calling for an application of the principles in *Winnipeg Condominium*. She held that in the absence of proof that the defect caused a real and substantial danger to its occupants no liability could arise. Consequently, the limitation issue need not be addressed. Nevertheless, she made the point that if the case were analysed as one involving the *negligent performance of a service causing economic loss* she would agree with the majority that the cause of action arose on the completion of the services and, furthermore if it were analysed as a *negligent advice* (negligent misrepresentation) case the cause of action would be complete "when the construction work itself was executed."[29] Her Ladyship continued, "The damage is inflicted when the negligent design is relied upon to its detriment by the plaintiff."[30] The *obiter* statement of Steele J.A. in respect of the completion of the cause of action for negligent misrepresentation is significant. Her Ladyship's words suggest, for example, that time will run as soon as an investor acts in reliance on negligent financial advice not when the investment turns sour.

The final case is *Valley Agricultural Society v. Behlen Industries Inc.*[31] (*Valley Agricultural*). This was a case of economic loss arising from a shoddy or defective building which all parties agreed called for the application of the principles in *Winnipeg Condominium*. The defendants were the designers of the Morris curling club and exhibition hall. The two buildings were joined at a concrete block firewall. The construction was complete in 1997. The roof of the exhibition hall collapsed in 1996. There was no discernible weakness of the roof before its collapse. The collapse was caused by the uneven elevations of the roofs of the two

27  [2001] M.J. No. 690 (Q.B.).

28  Supra note 26 at para. 18.

29  Ibid at para. 40.

30  Ibid (emphasis added). MacInness J. who heard the motion to extend time categorized the case as a negligent misrepresentation case and held that the cause of action was complete when the plaintiff relied on the advice to its detriment which on the facts was when the building was constructed.

31  [2004] M.J. 204 (C.A.).

buildings, an unusually large accumulation of snow on the roof of the exhibition hall, and the use of inadequate pin-bolts securing the roof of the hall to the firewall. The defendants Behlen Industries Inc, who designed and provided the components for the building, and Denter, a professional engineer who certified the plans, sought summary judgment on the grounds that the claim was barred under s. 2(1)(o) of the *Limitation of Actions Act*. The central issue was, once again, when did the harm that completed the cause of action arise? Was it on completion of the building with a latent dangerous defect, on its collapse or at some intermediate point? The Courts at all levels agreed that the cause of action was complete when the dangerous defect "manifested itself".

The Master held that the dangerous defect became manifest when there was some external indication of the defect.[32] Since there was no evidence that the defect in the building was manifest before its collapse the defendant's motion for summary judgment was dismissed.

Justice Schulman reversed the Master.[33] He held that the dangerous defect was manifest as soon as the building was completed, not when the defect became apparent nor when it collapsed. The action was out of time. An application under s. 14(1) of the *Limitation of Actions Act* to extend time should have been brought within twelve months of the building collapsing.

These competing views presented the Court of Appeal with an opportunity to resolve not only when a defect becomes "manifest" for the purposes of *shoddy and defective buildings* cases but also to provide some explanation and synthesis of its recent decision making determining when the cause of action is complete in other economic negligence cases.

The Court (Scott C.J.M., Twaddle and Steele JJ.A.) chose not to take advantage of these opportunities. Scott C.J.M. delivered a short judgment for the Court. His Lordship acknowledged the difference of opinion in the Courts below on the meaning of the word "manifest" but he did not offer an opinion on the point. He chose to follow *Winnipeg Condominium II* holding that this was not an appropriate case for summary judgment because of "a lack of evidence to establish the essential background to decide the *complex and unresolved point of law* that this case raises".[34] The Court noted that there was no evidence of the state of the building between the time it was built until its collapse and there was no evidence as to when the building could be considered dangerous. Jurisprudence in other Commonwealth jurisdictions suggesting that the cause of action arises when defects become known and apparent was not adopted because

---

32  (2002), 164 Man. R. (2d) 156 (Q.B.).

33  (2003), 172 Man R. (2d) 248 (Q.B.).

34  *Supra* note 31 at para. 12 (emphasis added).

of the "uniqueness" of the decision in *Winnipeg Condominium*.[35] No reference was made to the judgments of Monnin J.A. in *Burke* or the judgments of Monnin and Steele JJ.A. in *Sentinel*.[36]

This judgment must have been a considerable disappointment to the litigants in particular and civil litigators in general. Both the Master and Schulman J. had provided clear reasons for their computing views on what was in the express opinion of the Court of Appeal a question of law. After four months of deliberation the Court concluded that the matter must be resolved by the trial judge. Expensive and time consuming pre-trial procedures left the parties where they began.

There are a number of conclusions that may be drawn from this line of cases.

First, the interpretation of the concept of harm or loss sufficient to complete a cause of action in a negligence action for pure economic loss is, in Manitoba, in a state of great uncertainty and is often counter-intuitive. In claims for negligent performance of a service causing economic loss the cause of action is complete when the services have been performed (*Burke* and *Sentinel*). In claims for economic loss arising from a negligent misrepresentation the cause of action may be complete on reliance albeit that actual loss may arise in the future (*Sentinel* per Steele J.A.). The cause of action for dangerous premises causing economic loss is complete when the dangerous defect "manifests itself". On two occasions (*Winnipeg Condominium* and *Valley Agriculture*) the Court has declined to provide guidance on the meaning of that phrase. The cause of action may be complete on the completion of a defect or when such a defect has manifested itself at the first sign of some dangerous defect or when such a defect has manifested itself in tangible adverse consequences. This creates severe difficulties for any practitioner whose client seeks a remedy for economic loss suffered more than six years after the negligent conduct of the defendant. In some situations the loss will complete the cause of action from which time runs. In other cases a s. 14(1) application is called for. This uncertainty is exacerbated by a lack of consistency in the classification of economic negligence cases. *Winnipeg Cond. II*, *Sentinel* and *Valley Agriculture*

---

35  The Court also observed without comment that the danger of loss may need to be imminent to establish a claim under *Winnipeg Condominium*. There is, however, little support for this view in the Supreme Court decision and the authorities relied upon declare that "it is only where a defect poses a real and substantial danger or there is an imminent possibility of such danger that the cause of action is complete".

36  Of particular relevance was the following passage of Steele J.A's judgment in *Sentinel* at para.70: "If this action is characterized as one of economic loss due to defective structure, the damage is not suffered until the building is found to contain defects which pose a real and substantial danger to the occupants of the building or other property. It is only when a defect poses a real and substantial danger or there is an imminent possibility of such danger that the cause of action is complete."

would appear to be the same kind of cases (defective buildings). *Semmel*, was, however, created by a majority of the Court as a case of negligent performance of a service.

Secondly, the recent decisions of the Court of Appeal, particularly in *Burke* and *Sandral* and possibly in *Winnipeg Condo II* and *Valley Agriculture*, have diluted the conventional view that there is a significant difference between the time when the cause of action arises in contract and when it arises in negligence. It is difficult to discern the policy foundations for this trend other than a judicial distaste for the long-tail actions that may arise in economic negligence cases. Such a concern, however, would appear to be met by the need to prove that the loss was caused by a wrongful act and by the long stop provisions of the *Limitation of Actions Act*.

Thirdly, the interpretation of when the harm arises in these cases suggests that it will not be uncommon in economic negligence cases for the cause of action to have lapsed before the plaintiff is aware of the consequences of the negligent conduct. In these cases recourse must be made to the statutory discoverability rules found in Part II of the *Limitation of Actions Act*. This need for reliance on an application to extend time under Part II of the *Limitation of Actions Act* gives rise to a number of problems. It will be remembered that the one-year period will begin when the *applicant* – not his or her lawyer – knows or ought to know of the material facts upon which the action is based. It may be assumed that a plaintiff will not seek legal advice immediately but will attempt to resolve the matter informally with the defendant, who will have an incentive to drag his feet and consume some of the twelve months. If so, the plaintiff's lawyer will have much less than twelve months to investigate the claim, evaluate its merit (which may require the services of professional consultants) and prepare legal strategy, evidence and legal arguments sufficient to satisfy the burden under s. 15(2) to bring evidence which is, in the absence of evidence to the contrary, sufficient to establish the cause of action on which the action is to be founded.[37] This situation is fraught with risk for even the most conscientious of busy legal practitioners unless they are ever mindful of the unexpected time constraints of this kind of litigation. An increase in s. 14 applications also adds to the delay, complexity and expense of a litigation system that is already subject to criticism on all of those grounds.

In the absence of legislative reform these difficulties can only be lessened by a return to first principles. The cause of action in *Donoghue v. Stevenson*[38] did not arise when the ginger beer was manufactured. It arose when the plaintiff became ill as a consequence of drinking it. Harm arises when there are tangible

---

37 See *Johnson v. Johnson*, *supra* note 11, for the burden resting on the applicant.

38 [1932] A.C. 562 (H.L.).

adverse consequences arising from the negligent conduct. There is no reason to question or depart from that rule in economic negligence cases.

It is submitted that the cause of action in *Winnipeg Condo II* was complete when the large section of cladding fell off the building, in *Burke* when the bank foreclosed on the investment properties, in *Semmel* when the foundations became unstable and in *Valley Agriculture* when the building fell down. The plaintiff then had six years to file their statements of claim. A s. 14(1) application should be required only when the plaintiff was unaware of such adverse consequences for more than six years.

## III. RESIDENTIAL SCHOOL CLAIMS AND THE LIMITATION OF ACTIONS

The decision of the Court of Appeal in *M.M. v. Roman Catholic Church of Canada*[39] is of particular significance because it triggered an important legislative amendment to the *Limitation of Actions Act*.[40] In that case the respondents alleged that they had suffered physical and emotional harm as a consequence of tortious conduct when they were students at a Indian Residential School run by the appellants. The appellants sought to have the various actions dismissed on the grounds that they were barred by the long stop provision of the *Limitation of Actions* legislation. The alleged abuse ended when the respondents left the school which was well over thirty years before the Statement of Claim was filed. The Court of Appeal undertook an exhaustive and comparative analysis of the 1931 *Limitation of Actions Act*,[41] which was in force at the time of the tortious conduct, and the current legislation. The Court concluded that the actions were barred by the long stop provision of the 1931 Act. Under that Act no action may be brought more than thirty years after the right to take proceedings accrued. Since the right to take proceedings arose prior to the respondents leaving school,[42] the claims were barred.

This decision negated a significant number of potential claims for historic abuse in the residential school system in Manitoba. The government responded quickly. It amended the current Act to insure the continued viability of these claims and others arising from similar circumstances. The amendment is set out in full here.

s. 2.1(1) In this section "assault" includes trespass to the person and battery.

---

39 (2001), 160 Man. R. (2d) 265 (C.A.).

40 *Supra* note 4.

41 S.M. 1931, c. 30, as am. by S.M. 1932, c. 24.

42 The language of the thirty-year long stop provision of the current Act is somewhat different but the result would be no different.

APPENDIX B

## Professor John Irvine

Address:          Faculty of Law
                  Robson Hall
                  University of Manitoba
                  Winnipeg, Manitoba
                  CANADA  R3T 2N2

Telephone:       (204) 474-6150
Fax:             (204) 474-7580
Email:           irvinejc@cc.umanitoba.ca
Date of Birth:   June 13, 1946
Place of Birth:  Leamington, England
Citizenship:     United Kingdom

### Educational Background

Warwick School and Oxford University

1967   B.A., (Juris)   Lincoln College, Oxford
1970   B.C.L.          Lincoln College, Oxford
1971   M.A.            Lincoln College, Oxford

Scholar of Lincoln College
Lord Justice Holker Exhibition, Gray's Inn

### Academic Positions

1974-1975              Lecturer, (Assistant Professor)          University of Birmingham,
                                                                England
1970-1974, 1975 –present     Professor of Law, University of Manitoba.
Tenured since 1975, Full professor since 1989.

Senator, University of Manitoba, 1999 - present.

Numerous University and Faculty Committees.

Member Rhodes Scholarship Committee, 1976 – present.
Chairman Rhodes Scholarship Committee, 1980 – present
Manitoba Law Reform Commission, 1984 – present
[As one of 5 Commissioners -- a Crown appointment renewed under successive
provincial governments of varying political stripe, have participated actively in the
research and preparation of fifty-six reports on a wide range of law reform projects, many
subsequently implemented by legislation.]

The Manitoba Law Reform Commission is an independent agency of the Government of Manitoba established by *The Law Reform Commission Act*. The Commission's duties are to inquire into and consider any matter relating to law in Manitoba with a view to making recommendations for the improvement, modernization and reform of law, including:

- the removal of provisions of the law that are outdated or inconsistent;
- the maintenance and improvement of the administration of justice;
- the review of judicial and quasi-judicial procedures under any Act;
- the development of new approaches to, and new concepts of, law in keeping with and responsive to the changing needs of society and of individual members of society; and
- any subject referred to it by the Minister.

## PUBLICATIONS

The list of publications which follows does not pretend to completeness. It is perhaps worthy of mention that many of my notes and articles have been mentioned, approved or adopted in judgments of the superior courts, including the Supreme Court of Canada.

### Books, Articles

- Sneiderman, Irvine & Osborne, <u>Canadian Medical Law: An Introduction for Physicians & Other Health Care Professionals</u> (3rd ed., 2003, Thomson-Carswell Ltd.).

- "The Physician's Duty in the Age of Cost Containment" (1994) 22 Manitoba Law Journal 345

- "Radon and Tortious Liability for Indoor Health Hazards": in Radon and the Law, Interdisciplinary Perspectives, Occasion Papers No 2., Legal Research Institute, University of Manitoba

- The Appropriation of Personality: in Gibson R.D. (ed.), Aspects of Privacy Law [Butterworths, 1980]

- *A.G. Man. v. Adventure Flight Centre Ltd.* ........................................25 C.C.L.T.295

- *Barbour v. G.H. Heating & Air Conditioning Ltd.* ........................... 15 C.C.L.T. 169

- *Black v. Zager* ...........................................................................22 C.C.L.T. 231

..........................................................................................................................

- Case Comment – An Overview of Collateral Benefits: *Pettipas v. Roop*..................
...........................................................................................13 C.C.L.T.289

- Case Comment: Can. Western Natural Gas Co. v. Pathfinder Surveys Ltd. ..............
...........................................................................................12 C.C.L.T. 256

- Case Comment: John Maryon Int. Ltd. V. N.B. Telephone Col and Ward v. Dobson Const. Ltd. ...............................................................................24 C.C.L.T. 213

- Case Comment: Kamloops v. Nielsen ............................................29 C.C.L.T. 185

- Case Comment: M. v. Sinclair c.o.b. Sinclair's Riding Stables .........15 C.C.L.T. 68

• Case Comment:  Metson v. R.W. DeWolfe Ltd.; The Changing Face of Nuisance and Rylands v. Fletcher ..................................................................14 C.C.L.T. 225
• Case Comment:  Speed & Speed Ltd. V. Finance Amer. Realty Ltd. ........................
.............................................................................................12 C.C.L.T. 29
• Case Comment:  Surrey v. Carroll-Hatch & Associates Ltd. ............10 C.C.L.T. 266
• Central & N.S. Trust Co. v. Rafuse  ................................................25 C.C.L.T. 226
• Chamberland v. Fleming ...............................................................29 C.C.L.T. 215
• Cherrey v. Steinke ............................................................................13 C.C.L.T. 51
• Contract and Tort:  Troubles Along the Border ...............................10 C.C.L.T. 281
• Davidson v. Connaught Laboratories ............................................14 C.C.L.T. 252
• Dom. Securities Ltd. v Glazerman ................................................29 C.C.L.T. 195
• Frank Flaman Wholesale Ltd. v. Firman ........................................20 C.C.L.T. 246
• Fraser v. U-Need-A Cab Ltd. .........................................................26 C.C.L.T. 311
• Hart v. Bell Telephone Co. of Can. ................................................10 C.C.L.T. 335
• Hopp v. Lepp  ...................................................................................13 C.C.L.T. 68
• Inland Feeders Ltd. v. Virdi  ...........................................................12 C.C.L.T. 179
• Jacks v. Davis ..................................................................................12 C.C.L.T. 299
• Lewis v. Oeming ...............................................................................24 C.C.L.T. 82
• Maxey v. Can. Permanent Trust Co. ...............................................26 C.C.L.T. 150
• Moffett v. Downing; Downing v. Moffett  ......................................16 C.C.L.T. 313
• Munro v. Toronto Sun ....................................................................21 C.C.L.T. 261
• Nelson Lbr. Co. v. Koch .................................................................13 C.C.L.T. 202
• Nielsen v. City of Kamloops ...........................................................19 C.C.L.T. 147
• Page v. Dick ....................................................................................12 C.C.L.T. 44
• Poppe v. Tuttle ...............................................................................14 C.C.L.T.116
• Power v. Halley ...............................................................................17 C.C.L.T. 183
• Ross v. Wall ....................................................................................14 C.C.L.T. 243
• Russell v. Kostichuk  .......................................................................15 C.C.L.T. 247
• Saccone v. Orr  ..................................................................................19 C.C.L.T. 37
• Stermer v. Lawson ............................................................................11 C.C.L.T.77
• The Action Per Quod Servitium Amisit in Canada ...........................11 C.C.L.T. 241
• The Insurance Agent and His Duties  .............................................10 C.C.L.T. 108
• Toews v. MacKenzie ........................................................................12 C.C.L.T. 264
• Viscount Machine & Tool Ltd. v. Clarke  .......................................19 C.C.L.T. 53
• Andronyk v. Williams ......................................................................35 C.C.L.T. 40
• Banyasz v. K-Mart Can. Ltd ..........................................................39 C.C.L.T. 266
• Brain v. Mador ...............................................................................32 C.C.L.T. 158
• Case Comment:  Reidy v. McLeod, Gervais v. Richard, and Borland v. Muttersbach
.............................................................................................30 C.C.L.T. 205
• Case Comment:  Rose v. Belanger and Lawrence v. Good ..............31 C.C.L.T. 248
• Case Comment:  Ruzicka v. Costigan ...............................................31 C.C.L.T. 306
• Chappell v. Barati ...........................................................................30 C.C.L.T. 137
• Dolphin Delivery Ltd. v. R.W.D.S.U., Loc. 580 .............................38 C.C.L.T. 186
• Franks v. Sanderson ........................................................................35 C.C.L.T. 307
• Letnick v. Metropolitan Toronto (Municipality) ..............................44 C.C.L.T. 70
• Mongovius v. Marchand ...................................................................44 C.C.L.T. 19
• Hasenclever v. Hoskins  ..................................................................47 C.C.L.T. 225
• Robertson v. Butler .........................................................................32 C.C.L.T. 209
• Scarff v. Wilson ...............................................................................39 C.C.L.T. 22
• Sevidal v. Chopra............................................................................41 .C.C.L.T. 181

• Some Thought on Trespass to "Airspace (Case Comment:  Didow v. Alta. Power Ltd. ...........................................................................................................37 C.C.L.T. 99
• Strike v. Ciro Roofing Products U.S.A. Inc.......................................46 C.C.L.T. 209
• Szarfer v. Chodos............................................................................36 C.C.L.T 182
• "The Limitations of Prosecutorial Immunity in Tort:, Case Comment:  German v. Major and Levesque v. Picard" .................................................................34C.C.L.T. 286
• The Resurrection of Tortious Abuse of Process .................................47 C.C.L.T. 217
• Timmersmans v. Buelow ..................................................................38 C.C.L.T 137
• Triangle Steel & Supply Co. v. Korean United Lines Inc. .................32 C.C.L.T. 106
• Case Comment:  Law Estate v. Simice .....................................21 C.C.L.T. (2d) 259
• Freeman v. Sutter.....................................................................29 C.C.L.T. (2d) 215
• Mochinski v. Trendline Industries Ltd...........................................29 C.C.L.T. (2d) 1
• Misfeasance in Public Office:  Reflections on Some Recent Developments.............. .................................................................................................13 C.C.L.T (3d) 247

**Papers presented (a selection):-**

• Canadian Bar Association:  "The Leading Edge:  C.B.A. National Construction Law Conference, 2002:  "Liability of Design Professionals."

• Canadian Bar Asssociation:  Winter Conference, 2004, St. John, New Brunswick: "Reflections on N.B. Telephone v. J. Maryon Ltd": (as part of panel presentation with Hon. Mr. Justice G. LaForest)

• Canadian Bar Association – Ontario, Toronto, June 1985  Protecting Business Assets: Paper on Protection of Reputation and Marketable Personality


In addition to the above, I have for decades been called upon regularly to present papers – usually on the law of torts, the ort-contract interface, aspects of medical law or (especially in recent years) construction law – to bodies as august as the Canadian Bar Association, the Law Society of Upper Canada, the Bar Association of Manitoba, the Law Society of Manitoba, the Advocate's Club of Toronto, the Isaac Pitblado lectures ( a Manitoban legal lecture series of long standing and immense prestige), the Canadian Institute for the Administration of Justice ( the judiciary) the Continuing Education programmes of the Manitoba Court of Queens Bench, the College of Physicians and Surgeons of Manitoba, and professional associations serving every area of specialization from Cardiology to Dentistry.

### Appendix B: Complexities attending identification of the time "when the cause of action arose": the aberrant jurisprudence of *British Columbia* and of *Manitoba* particularly considered.

As the main text attempts to show (at pages 20-21) I would maintain that the date when a cause of action "arises", for the purposes of the kind of negligence litigation presently under consideration, is the date when a plaintiff becomes aware, or ought with reasonable diligence to have become aware, that his or her building presents a situation of actual or impending danger, a danger sufficiently substantial to warrant, as a matter of reasonable prudence, the undertaking of prompt remedial and preventative intervention. Only at that point will time begin to run.

In two provinces, however, as the main text has again explained in a preliminary way, development of the case-law as to when the cause of action "arose" has been distorted by historical circumstance. The two provinces are Manitoba and British Columbia, and the historical circumstance in question was the enactment in those two jurisdictions, in 1967 and 1975 respectively, of amendments to their Limitations Acts, introducing "discoverability" mechanisms for delaying the start of the limitation period in certain situations where justice might seem to require it. The effects of those legislative initiatives, undertaken before the acceptance in all other Canadian jurisdictions of a *common law* discoverability doctrine, must now be examined, with this cautionary proviso. Because of their distinctive history in these matters, decisions from both British Columbia and Manitoba should be regarded as of no relevance in other jurisdictions, so far as the identification of "when the cause of action arose" is in issue.[1]

#### British Columbia

In British Columbia, that province's Court of Appeal recognized more than 20 years ago[2] that the "balanced legislative scheme" embodied in the province's 1975 Limitation Act precluded consideration of the common law discoverability rule which was fast being received into the law of other provinces. The 1975 Act was treated, in effect, as representing a closed logical system. Within that system, however, by dint of s.6 of the Act, the start of the limitation period for certain broad categories of negligence action might be postponed until critical facts, suggestive of a viable cause of action, were known to the plaintiff or reasonably discoverable by him. In the course of its decision in what is still a leading case on this statutory arrangement, the British Columbia Court of Appeal stressed that logically, the "arising" of the cause of action must, given the

---

[1]    This is unfortunate, because as it happens, the great preponderance of authorities on this issue, since it first suggested itself with the advent of *Winnipeg Condo No. 36 v. Bird Construction Ltd.* in 1995, has emerged from precisely these two provinces.

[2]    *Bera v. Marr*, (1986) 1 B.C.L.R. (2d) 1 (C.A.).

structure of the statute, be deemed to be an event anterior to the dawning of discoverability, contemplated by s.6. As Esson J.A. put it[3]

> The *Limitations Act*, as appears from ss.3(2) and 8(1), defines the beginning of the period of limitation as being the date on which the right to bring action arose. That must mean the date upon which the cause of action was complete; the date upon which all the elements of the cause of action had come into existence, <u>whether or not the person entitled to the cause of action was aware of all the facts upon which its existence depended</u>.

With the advent in 1995 of liability in negligence for "pure economic loss" resulting from dangerously defective structures,[4] dilemmas confronted the British Columbia courts. For one thing, such actions had (quite pardonably) not been foreseen by the statutory draftsman, and consequently found no mention in the Act. Could they be deemed cases of "damage to property", so as to enable invocation of s.6(3) and its rather specific postponement provisions? And if so, when should such damage be deemed to have *occurred*? For that, under the prevailing British Columbia rules, would be acknowledged as the time when the cause of action "arose" – not, as in other provinces, the time when such damage might be discovered.

In *Armstrong v. West Vancouver*,[5] a case devolving principally upon the effects of "ultimate" limitation periods, the British Columbia Court of Appeal nonetheless took the opportunity of addressing these more general issues, and decided[6] that economic loss claims should be regarded as claims for "damage to property" when construing the Act; and that the "damage" should be deemed to have occurred at the time of the defective construction – that is, when the defect was first incorporated in the building (seemingly, whether any danger was apparent at that time, or not: see para 18 of MacKenzie J.A.'s judgment).

On this latter point, at least, the Court of Appeal sees eye to eye with Drost J. in the *Privest* case, eight years earlier. Hence on authority, one must conclude that in British Columbia:

(a)     The cause of action in this class of case arises not when damage becomes discoverable, but as soon as it is inflicted; and

(b)     In economic loss cases, founded ultimately on *Winnipeg Condo No. 36 v. Bird Construction*, it will be deemed to have been inflicted as

---

[3]     *Ibid*, at p.14. The same view was again endorsed by the B.C. Court of Appeal in *Karsanjii Estate v. Roque* (1990) 43 B.C.L.R. (2d) 234, and later by Drost J. in the *Privest* case, (1996) 23 C.C.L.R. (2d) 1. See also *Wittman v. Emmott*, (1991) 53 3 C.L.R. (2d) 228 (C.A.).

[4]     In the *Winnipeg Condominium* case, extensively discussed in the main text.

[5]     (2003) 10 B.C.L.R. (4th) 305.

[6]     Overruling in the process Drost J's contrary opinion on this issue in *Privest, inter alia!*

soon as the defective element is incorporated in the building, whether or not at that time it threatens danger.

I would only note that the latter point would be more persuasively presented had either Drost J. (in *Privest*) or the Court of Appeal in *Armstrong* overtly directed their minds to the unique character of a *Winnipeg Condo*-type economic loss claim, and the central significance in such a claim of the concept of danger.

One feels that the issue of "when a cause of action arises" in such claims, though quiescent for the time being in British Columbia, has not been settled for all time.

## Manitoba

Equally parochial in their application and relevance are the decided cases from Manitoba. In this province, too, the history of Limitations legislation has driven the courts to adopt a conception of when a cause of action "arises" which excludes any element of discoverability, any regard to the plaintiff's state of actual or constructive awareness. And here too, the question of when "damage" should be deemed to have occurred is fraught with particular difficulty where the action is one for economic loss arising from a defective building. I will try to summarize the faltering path of the authorities, a path which started with the decision of the *Winnipeg Condo*[7] case itself in 1995.

As we have seen, the Supreme Court in that case decided as an abstract proposition of law that a negligence action might lie at the suit of a building owner against persons whose involvement in the construction process had resulted in a building which was not merely qualitatively inferior, but presented a real and substantial danger. Shortly after the Supreme Court's ruling, the same litigation erupted again in the Manitoba Court of Queen's Bench, where Oliphant A.C.J. Q.B. was asked to dismiss the plaintiffs' claims as being statute-barred. Had their cause of action "arisen" when the defective stone cladding was installed? Or at the later date when minor problems with the cladding first began to appear? Or at the still later time when the major collapse of the cladding finally gave notice of grave impending danger requiring immediate and radical attention? Oliphant J. dismissed the application to strike out the claim, taking the view, it seems, that the time of accrual of the cause of action should be identified as the date of the plaintiffs' discovery that their building posed a significant danger -- and not before. The Court of Appeal promptly reversed him,[8] predictably rejecting his view that any discoverability element could be considered when assessing when a cause of action "arose" in Manitoba. When, then, did an action of this kind "arise"? Their Lordships declined to say, in this context of an interlocutory motion, in the absence of further and better evidence as to the

---

[7]     [1995] 1 S.C.R. 85, 23 C.C.L.T. (2d) 1 (S.C.C.).

[8]     (1999) 131 Man R. (2d) 283, overruling 130 Man R. (2d) 203.

process whereby the flaws in the building had progressively revealed themselves, or had come to the attention of the parties. The unhelpfulness of this conclusion was compounded when the parties comprehensively settled their litigation very shortly thereafter.

Two years later, the issue resurfaced in *Winnipeg Condo Corp. No. 266 v. 3333 Silver Developments*,[9] before Wright J., on an application by the defendant developers for summary judgment. Explicitly rejecting all invitations to fix the accrual of the cause of action by reference to the "discoverability" of harm, Wright J. identified the problem as one of determining 'when the damages came into existence," which in economic loss cases of this kind would require something more than nominal or minimal harm - a showing, indeed, of that "real and substantial danger" on which actions of this kind are predicated. Once such danger was present (regardless, it would seem, of whether the plaintiffs had reason to be aware of it), the cause of action would be complete – and only then. The motion for summary judgment was dismissed.

That was not to be the end of the matter, for within a couple of years after Wright J's judgment, another defective-building economic loss claim found its way to the Manitoba Court of Appeal, namely *Sentinel Self-Storage Corp. v. Dyregov*.[10]   The alleged negligence of the defendants in this case lay in their supposed provision of careless engineering advice, which had led to the construction of a defective building foundation.    The plaintiffs, belatedly discovering this problem, had to make application under s.14 of Manitoba's Limitation Act to have the limitation period "re-opened", since, they said, they had not had a reasonable opportunity to discover the defect until after the basic limitation period had expired.    That squarely raised the issue of when, for limitation purposes, the cause of action had arisen.   But in this case there was the added complexity that the plaintiffs' action might be characterized in more than one way – as an action for negligent construction of shoddy buildings (like all the others we have mentioned): or as an action for negligent misrepresentation or advice (a quite distinct Feldhusen category – see main text at pages 5-6, especially footnote 8).   That aspect of the case concerns us only insofar as it enabled the Motions Court judge (MacInnes J.), by characterizing the case as one of negligent misrepresentation, completely to sidestep the issue of when, in "negligent construction" cases of the kind discussed above, the cause of action is properly deemed to arise.   When the case came before the Court of Appeal, the majority (at para. 16) took the same (evasive) line, saying that in their opinion the plaintiff's statement of claim had really only raised the issue of negligent misrepresentation, so that the vexed question of when a cause of action "arose", should one regard the case as one of negligent construction (a *Winnipeg Condo*-type case) need not be considered.

---

9       (2000) 155 Man R. (2d) 164.
10      (2003) 180 Man R. (2d) 85.

That said, the opportunity to clarify the law on the latter issue – our issue – was not completely spurned, since Madam Justice Steel, in a concurring judgment, was inclined to take a more expansive view of the pleadings, and to regard the case before her as potentially and plausibly assignable to the "defective structure" (*Winnipeg Condo*) category: so presenting, as she put it, a "much more difficult" problem of determining when damage was inflicted and the limitation period began to run: (para. 43). What is striking about Steel J.A.'s judgment is that unlike her colleagues she does not shy away from this challenge, but confronts it head-on. At paragraph 70, we find this lucid statement:-

> [70] If this action is categorized as one of economic loss due to defective structure, the damage is not inflicted until the building is found to contain defects which pose a real and substantial danger to the occupants of the building or other property. It is only when a defect poses a real and substantial danger or there is an imminent possibility of such danger that the cause of action is complete.

There being no evidence suggestive of substantial danger in this case, Steel J.A. agreed that the action must fail. But the foregoing pronouncement was easily the most direct and intelligible response to date, as to when the cause of action in this class of case "arises" for limitation purposes.

And so it has remained. For although there has since the *Sentinel* case been yet another opportunity for the Manitoba Court of Appeal to settle the issue, that opportunity too has been squandered. That was in the case of *Valley Agricultural Society v. Behlen Industries.*[11]

In this case, the defendants had been the designers and engineers of a large steel building, meant to serve as an exhibition hall and curling-rink in rural Manitoba. Nine years after its completion, the roof collapsed under the weight of snow, evidently because it had been significantly under-designed. Shulman J. considered the action statute-barred, on the basis that time began to run as soon as the "real and substantial danger" presented by the building was "manifest" – a term, he decided, which did not mean "discoverable". This building had been in danger of collapse since the day it was completed, and the action had been barred three years before the roof fell in. The Court of Appeal declined again to pass a concluded opinion on these questions, though Scott C.J.M. did quote, without comment, the above-cited passage from Steel J.A.'s judgment in the *Sentinel* case. It would be better, said the Court on this occasion, to address such questions on another occasion, in the context of a more full-developed factual or evidentiary matrix.

---

[11]    (2004) 184 Man R. (2d) 263, reversing (2003) 172 Man R. (2d) 248.

> [20] As we have seen, to be actionable the defect must pose a "substantial danger" to the health and safety of the occupants of the building. This raises the question whether a structure that is "susceptible to failure" from the very beginning, as Behlen and Deniset argue, can be considered a substantial danger. The Gibbs report does not deal with this question. Clearly, additional evidence is needed.

As we have seen, Steel J.A. in *Sentinel* thought that the cause of action "arose" in these cases as soon as a substantial danger was posed by the structure. In *Valley Agricultural Services*, Shulman, J. at least took the further view, that the existence of such danger was enough: it need not be shown that the danger was also overt and discoverable, to start the limitation period running. Absent any further clarification from the Manitoba Court of Appeal (or of any apparent enthusiasm on their part to engage the issue further, or at all), I respectfully agree with the position cumulatively presented by Steel J.A. and Shulman J. in their respective judgments.

Accordingly, I conclude that in Manitoba, where tort liability for economic loss resulting from the negligent construction of dangerous buildings is concerned, the cause of action "arises" for limitation purposes when, and only when, those buildings become substantially dangerous: whether or not such danger be apparent to the diligent and alert owner of the building. If that results in the owner's action being statute-barred before he is even constructively aware of the danger, his only consolation, under Manitoba's unique statute, is to apply within one year after the danger becomes so discoverable, to have the limitation period re-opened under s.14(1) of the statute.

APPENDIX C

## Professor John Irvine

Address:        Faculty of Law
                Robson Hall
                University of Manitoba
                Winnipeg, Manitoba
                CANADA  R3T 2N2

Telephone:      (204) 474-6150
Fax:            (204) 474-7580
Email:          irvinejc@cc.umanitoba.ca
Date of Birth:  June 13, 1946
Place of Birth: Leamington, England
Citizenship:    United Kingdom

### EDUCATIONAL BACKGROUND

Warwick School and Oxford University.

| 1967 | B.A., (Juris) | Lincoln College, Oxford. |
| 1970 | B.C.L. | Lincoln College, Oxford. |
| 1971 | M.A. | Lincoln College, Oxford. |

Scholar of Lincoln College.
Lord Justice Holker Exhibition, Gray's Inn.

### ACADEMIC POSITIONS

1974-75         Lecturer (Assistant Professor), University of Birmingham, England.

1970-74, 1975–present
                Professor of Law, University of Manitoba.  Tenured since 1975.
                Full professor since 1989.

Senator, University of Manitoba, 1999 - present.

Numerous University and Faculty Committees.


Member Rhodes Scholarship Committee, 1976 – present.
Chairman Rhodes Scholarship Committee, 1980 – present.

Manitoba Law Reform Commission, 1984 – present

    [As one of five Commissioners – a Crown appointment renewed under successive
    provincial governments of varying political stripe, have participated actively in the
    research and preparation of fifty-six reports on a wide range of law reform projects, many
    subsequently implemented by legislation.]

The Manitoba Law Reform Commission is an independent agency of the Government of Manitoba established by *The Law Reform Commission Act*. The Commission's duties are to inquire into and consider any matter relating to law in Manitoba with a view to making recommendations for the improvement, modernization and reform of law, including:

- the removal of provisions of the law that are outdated or inconsistent;
- the maintenance and improvement of the administration of justice;
- the review of judicial and quasi-judicial procedures under any Act;
- the development of new approaches to, and new concepts of, law in keeping with and responsive to the changing needs of society and of individual members of society; and
- any subject referred to it by the Minister.

## PUBLICATIONS

The list of publications which follows does not pretend to completeness. It is perhaps worthy of mention that many of my notes and articles have been mentioned, approved or adopted in judgments of the superior courts, including the Supreme Court of Canada.

### Books, Articles

• Sneiderman, Irvine & Osborne, <u>Canadian Medical Law: An Introduction for Physicians & Other Health Care Professionals</u> (3rd ed., 2003, Thomson-Carswell Ltd.).

• "The Physician's Duty in the Age of Cost Containment" (1994), 22 Manitoba Law Journal 345.

• "Radon and Tortious Liability for Indoor Health Hazards": in Radon and the Law, Interdisciplinary Perspectives, Occasional Papers No. 2, Legal Research Institute, University of Manitoba.

• "The Appropriation of Personality": in Gibson R.D. (ed.), Aspects of Privacy Law [Butterworths, 1980]

• A.G. Man. v. Adventure Flight Centres Ltd. ................................................. 25 C.C.L.T. 295
• Andronyk v. Williams ....................................................................... 35 C.C.L.T. 40
• Banyasz v. K-Mart Can. Ltd ............................................................ 39 C.C.L.T. 266
• Barbour v. G.H. Heating & Air Conditioning Ltd. ....................................... 15 C.C.L.T. 169
• Black v. Zager.............................................................................. 22 C.C.L.T. 231
• Brain v. Mador ............................................................................. 32 C.C.L.T. 158
• Case Comment: An Overview of Collateral Benefits: Pettipas v. Roop ...... 13 C.C.L.T. 289
• Case Comment: Can. Western Natural Gas Co. v. Pathfinder Surveys Ltd.. 12 C.C.L.T. 256
• Case Comment: John Maryon Int. Ltd. v. N.B. Telephone Co. and Ward v. Dobson Const. Ltd. ................................................................................... 24 C.C.L.T. 213
• Case Comment: Kamloops v. Nielsen ....................................................... 29 C.C.L.T. 185
• Case Comment: Law Estate v. Simice ............................................... 21 C.C.L.T. (2d) 259
• Case Comment: M. v. Sinclair c.o.b. Sinclair's Riding Stables ...................... 15 C.C.L.T. 68
• Case Comment: Metson v. R.W. DeWolfe Ltd.; The Changing Face of Nuisance, and Rylands v. Fletcher .......................................................................... 14 C.C.L.T. 225
• Case Comment: Reidy v. McLeod, Gervais v. Richard, and Borland v. Muttersbach ............................................................................................. 30 C.C.L.T. 205
• Case Comment: Rose v. Belanger and Lawrence v. Good ........................... 31 C.C.L.T. 248
• Case Comment: Ruzicka v. Costigan ...................................................... 31 C.C.L.T. 306
• Case Comment: Speed & Speed Ltd. v. Finance Amer. Realty Ltd. ............. 12 C.C.L.T. 29
• Case Comment: Surrey v. Carroll-Hatch & Associates Ltd. ........................ 10 C.C.L.T. 266
• Central & N.S. Trust Co. v. Rafuse ....................................................... 25 C.C.L.T. 226

• Chamberland v. Fleming ............................................................... 29 C.C.L.T. 215
• Chappell v. Barati ........................................................................ 30 C.C.L.T. 137
• Cherrey v. Steinke ...................................................................... 13 C.C.L.T. 51
• Contract and Tort: Troubles Along the Border .............................. 10 C.C.L.T. 281
• Davidson v. Connaught Laboratories ............................................ 14 C.C.L.T. 252
• Dolphin Delivery Ltd. v. R.W.D.S.U., Loc. 580 ........................... 38 C.C.L.T. 186
• Dom. Securities Ltd. v Glazerman ................................................ 29 C.C.L.T. 195
• Frank Flaman Wholesale Ltd. v. Firman ....................................... 20 C.C.L.T. 246
• Franks v. Sanderson .................................................................... 35 C.C.L.T. 307
• Fraser v. U-Need-A Cab Ltd. ...................................................... 26 C.C.L.T. 311
• Freeman v. Sutter ....................................................................... 29 C.C.L.T. (2d) 215
• Hart v. Bell Telephone Co. of Can. .............................................. 10 C.C.L.T. 335
• Hasenclever v. Hoskins ............................................................... 47 C.C.L.T. 225
• Hopp v. Lepp .............................................................................. 13 C.C.L.T. 68
• Inland Feeders Ltd. v. Virdi ......................................................... 12 C.C.L.T. 179
• Jacks v. Davis ............................................................................. 12 C.C.L.T. 299
• Letnick v. Metropolitan Toronto (Municipality) ........................... 44 C.C.L.T. 70
• Lewis v. Oeming ......................................................................... 24 C.C.L.T. 82
• Maxey v. Can. Permanent Trust Co. ............................................ 26 C.C.L.T. 150
• Misfeasance in Public Office: Reflections on Some Recent Developments ..........................
.................................................................................................. 13 C.C.L.T. (3d) 247
• Mochinski v. Trendline Industries·Ltd. ......................................... 29 C.C.L.T. (2d) 1
• Moffett v. Downing; Downing v. Moffett ..................................... 16 C.C.L.T. 313
• Mongovius v. Marchand .............................................................. 44 C.C.L.T. 19
• Munro v. Toronto Sun ................................................................. 21 C.C.L.T. 261
• Nelson Lbr. Co. v. Koch .............................................................. 13 C.C.L.T. 202
• Nielsen v. City of Kamloops ........................................................ 19 C.C.L.T. 147
• Page v. Dick ............................................................................... 12 C.C.L.T. 44
• Poppe v. Tuttle ........................................................................... 14 C.C.L.T. 116
• Power v. Halley .......................................................................... 17 C.C.L.T. 183
• Robertson v. Butler ..................................................................... 32 C.C.L.T. 209
• Ross v. Wall ............................................................................... 14 C.C.L.T. 243
• Russell v. Kostichuk .................................................................... 15 C.C.L.T. 247
• Saccone v. Orr ............................................................................ 19 C.C.L.T. 37
• Scarff v. Wilson .......................................................................... 39 C.C.L.T. 22
• Sevidal v. Chopra ....................................................................... 41 C.C.L.T. 181
• "Some Thoughts on Trespass to Airspace", Case Comment: Didow v. Alta. Power Ltd.
.................................................................................................. 37 C.C.L.T. 99
• Stermer v. Lawson ...................................................................... 11 C.C.L.T. 77
• Strike v. Ciro Roofing Products U.S.A. Inc. ................................. 46 C.C.L.T. 209
• Szarfer v. Chodos ........................................................................ 36 C.C.L.T. 182
• The Action Per Quod Servitium Amisit in Canada ........................ 11 C.C.L.T. 241
• The Insurance Agent and His Duties ............................................. 10 C.C.L.T. 108
• "The Limitations of Prosecutorial Immunity in Tort", Case Comment: German v. Major
and Levesque v. Picard ................................................................. 34 C.C.L.T. 286
• The Resurrection of Tortious Abuse of Process ............................. 47 C.C.L.T. 217
• Timmersmans v. Buelow .............................................................. 38 C.C.L.T. 137
• Toews v. MacKenzie .................................................................... 12 C.C.L.T. 264
• Triangle Steel & Supply Co. v. Korean United Lines Inc. ............. 32 C.C.L.T. 106
• Viscount Machine & Tool Ltd. v. Clarke ...................................... 19 C.C.L.T. 53

**Papers presented (a selection):-**

• Canadian Bar Association:  The Leading Edge:  C.B.A. National Construction Law Conference, 2002: "Liability of Design Professionals."

• Canadian Bar Association:  Winter Conference, 2004, St. John, New Brunswick: "Reflections on N.B. Telephone v. J. Maryon Ltd": (as part of panel presentation with Hon. Mr. Justice G. LaForest)

• Canadian Bar Association:  Ontario, Toronto, June 1985:  "Protecting Business Assets: Paper on Protection of Reputation and Marketable Personality"


In addition to the above, I have for decades been called upon regularly to present papers — usually on the law of torts, the ort-contract interface, aspects of medical law or (especially in recent years) construction law — to bodies as august as the Canadian Bar Association, the Law Society of Upper Canada, the Bar Association of Manitoba, the Law Society of Manitoba, the Advocate's Club of Toronto, the Isaac Pitblado lectures ( a Manitoban legal lecture series of long standing and immense prestige), the Canadian Institute for the Administration of Justice (the judiciary) the Continuing Education programmes of the Manitoba Court of Queens Bench, the College of Physicians and Surgeons of Manitoba, and professional associations serving every area of specialization from Cardiology to Dentistry.