# TAB E

1          IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF DELAWARE

2

                                ORIGINAL

3   IN RE:                  )

4                          )  Chapter 11

5   W.R. GRACE & CO., et al.,  )  No. 01-01139 (JFK)

6                          )

7           Debtors.     )

8

9

10

11           VOLUME I - Pages 1 - 248

12

13         The deposition of JOHN C. IRVINE,

14   called for examination pursuant to the Rules of

15   Civil Procedure for the United States District

16   Courts pertaining to the taking of depositions,

17   taken before Margaret M. Kruse, Certified

18   Shorthand Reporter for the State of Illinois, at

19   10 South Wacker Drive, Suite 4000, Chicago,

20   Illinois, on the 22nd day of August, 2007, at

21   the hour of 9:34 a.m.

22

23   REPORTED BY:  Margaret M. Kruse, CSR, RPR

24   LICENSE NO:  084-003036



Kruse Associates, Ltd.
A McCorkle Affiliate
www.krusereporters.com
312-345-1500

```
 1   misread Armstrong independently, partly because
 2   I was finding Armstrong a hard case to read.
 3   There seemed to be a logical discontinuance
 4   within it.
 5       Q.   But your opinion and Mr. Mew's opinion,
 6   which both were that the cause of action accrued
 7   or arose at the date of installation, was
 8   entirely consistent with Judge Drost in Privest;
 9   was it not?
10       A.   It was certainly consistent with Judge
11   Drost in Privest.  Yes, it still is.
12       Q.   And that's the only case in British
13   Columbia or anywhere in Canada, to your
14   knowledge, that addresses this kind of Winnipeg
15   Condo case; is that correct?
16       A.   No.
17       Q.   Is there another asbestos buildings case
18   in Canada?
19       A.   No.
20       Q.   It's the only case that addresses this
21   issue in the asbestos and building context,
22   correct?
23       A.   With that degree of specificity in the
24   asbestos context, that is quite true.  And that
```



1  is understandably why both Mr. Mew and Professor

2  Klar laid such stress on the Privest case.

3          I've got to tell you as well that if I

4  were Mr. Justice Drost, confronted with the

5  evidence with which he was confronted, as it was

6  presented to him in that case, I probably would

7  have reached the same conclusion, though not on

8  this point relating to when the cause of action

9  arose.

10      Q.    His determination of when the cause of

11  action arose was a legal determination; was it

12  not?

13      A.    It was indeed.  It was very much that

14  was an issue of law.

15      Q.    Can you tell me what your opinion is, if

16  it's not installation, as to when the cause of

17  action arises for purpose of the normal

18  limitations period in British Columbia in a case

19  of this nature?

20      A.    It is difficult to do this with

21  confidence without having really satisfactory

22  and well-argued case material from that province

23  to have.

24          But if I'm permitted to ad lib on this,

1    a foot thick falling nine stories from a

2    high-rise building is dangerous on any

3    definition of that term.  And so the court did

4    not feel it necessary to define what a real and

5    substantial danger is.  But I do assert this,

6    that until there is a showing by a claimant or

7    until a plaintiff can show that a real and

8    substantial danger resulted from the alleged

9    breach of duty of a defendant, he cannot assert

10    a cause of action.  A cause of action has not

11    arisen.

12        Q.   In this type of case, what is the real

13    and substantial danger that would trigger the

14    statute; do you have an opinion?

15        A.   I have an opinion, but it leads to

16    circularity as so much does in this area.  I

17    think there would be a real and substantial

18    danger where a building owner of prudence and

19    common sense would say to himself we're going to

20    have problems of safety here.  It is time we put

21    it right.  It is time we put an abatement

22    program in place.

23        Now, with regard to asbestos, I'm not

24    going to express an opinion for the very good

1    and sufficient reason that I don't know anything

2    about asbestos.

3          I am perfectly prepared to believe,

4    however, and I believe Mr. Fairey has told me

5    this from time to time, that a building with

6    Mono-Kote 3 in it isn't immediately, in any

7    realistic sense, dangerous.

8          It may become dangerous under certain

9    circumstances.  It may sit dormant doing its

10   job.  It may, in fact, be essentially harmless

11   and entirely satisfactory until the date comes,

12   as it may never come, when that material is

13   disturbed and when its friable character may

14   result, so I'm told, in loose asbestos being

15   released into the atmosphere.

16         But what do I know of these matters?

17   That's not a legal issue.  I shouldn't

18   pontificate upon it.  So I can't give you a

19   fact-specific asbestos-related answer to your

20   question, A, because the cases don't give me

21   much guidance -- I'm always forced back on

22   Winnipeg Condo itself -- and, B, because I'm not

23   qualified to talk about asbestos injury.  I lack

24   your unenviable expertise in that area.

1   But I thought I'd mention it in passing just for

2   the sake of completeness.

3           So I've got two legal mistakes on

4   Mr. Justice Drost's part at the moment, one

5   that's established by authority in the Armstrong

6   case and the other, which is a mere musing which

7   you can take or leave on my part, with regard to

8   agency to know.

9       Q.   I've been taking or leaving a lot of

10  this.  So give me number three.

11      A.   Number three is the question of cause.

12  We come back to this again and again, when the

13  cause of action arose, when relevant damage was

14  done.

15          And Mr. Justice Drost, as we know, did

16  undoubtedly say, unequivocally, that for

17  purposes of this kind of action, in his opinion,

18  damage is done as soon as the Monokote is

19  installed in the building.

20          He did say that.  I respectfully

21  disagree with him.  And I've already said a good

22  deal about this.  I will be saying a good deal

23  more in writing.  Obviously, if at some stage

24  you wish to pursue that, I'll be happy to do my

however, in other what we call common law torts,
from the old action of trespass, which is still
very much alive, nuisance, some aspects of
strict liability.  That's about it.  Time is
always limited and we have to pick and choose
our topics.

I don't think there's a tort course in
North America which covers everything from A to
Zed, and it would have to skate very thinly if
it did.

But very largely we deal with
negligence, and particularly with the more
difficult areas with negligence, such as that
with which we are currently concerned today.

Economic loss has taken up a
disproportionate amount of time, of course, in
recent years because it's so difficult and so
important and because leading cases keep coming
along.

Q.   And you were educated in England; is
that correct?

A.   Yes.

Q.   Were you ever called to the bar in
England?

1    A.   No, I never was.  I was on the cusp of

2    doing so when I got a job offer here, and it

3    never came to be.

4         The process for qualifications for the

5    bar in England is exceedingly time-consuming and

6    peculiar, and I just had to make a decision

7    where my career was going to be.  So I was never

8    called to the bar, though I was and I suppose

9    remain a member of Gray's Inn.

10   Q.   Is it fair to say you've spent your

11   entire professional career as a law professor?

12   A.   Yes.

13   Q.   And would it be fair to say

14   concentrating in the area of tort law?

15   A.   A predominance of tort law, with a

16   respectable degree of attention to other issues.

17        I have, for instance, been engaged as an

18   expert witness, my second engagement as such, in

19   a very major Manitoba controversy at the moment

20   concerning the law of easements and a very large

21   agreement between the government and certain

22   native communities.

23        So it isn't entirely tort law, but I

24   think it fair to say that that has been my

1    predominant concern and preoccupation over the

2    last 30-odd years.

3        Q.    And within tort law, would it be fair to

4    say that your primary area of expertise is in

5    the medical setting?

6        A.    I don't think really so.  I try to be

7    more of a generalist than that, though I am

8    extremely interested in the medical setting.

9            And I have, of course, participated in

10    this book, now in its third edition, in which I

11    provided really the tort law components, the

12    difficult bioethical issues which also feature

13    in the book, although written by others.

14        Q.    Have you ever published a textbook or

15    treatise or a monograph on tort low as a whole

16    or on products liability?

17        A.    No, I have not.

18        Q.    And you're not a scholar of American

19    law; is that correct?

20        A.    Oh, I would certainly say not.

21        Q.    Is it fair to say you don't hold

22    yourself out as an expert on American law?

23        A.    I do not.

24        Q.    And you would not be able, I take it, to

1    give an opinion on any aspect of American law,

2    would that be correct, expert opinion?

3        A.    I'm trying to be fair to myself here,

4    and I would say that is a perfectly fair

5    opinion.  It would be utterly presumptuous.

6        Q.    You're a commissioner of the Manitoba

7    Law Reform Commission?

8        A.    I am, since 1984.

9        Q.    What is your role as a commissioner?

10       A.    It's a good question, actually.

11           The Manitoba Law Reform Commission is a

12   body financed, in part, by the Manitoba

13   government, appointed by the government of

14   Manitoba, the provincial government.

15           Actually, it's the Governor General in

16   Consulate of the provincial cabinet who appoints

17   and reappoints members.

18           It's charged with the job of constantly

19   reviewing and revising all aspects of provincial

20   law in Manitoba, with an eye to modernizing the

21   law, erasing anachronisms and useless survivals

22   from another age, keeping the law abreast and,

23   if possible, sometimes ahead of the front lines

24   of development in the law across North America.

1    no, I've never written a textbook or major

2    article on these issues.

3        I must say, quite freely, that very few

4    people have.  You're lucky in securing the

5    services of Mr. Mew, who has written what is now

6    the only Canadian textbook on the subject.  And

7    I don't think people would be easy to find

8    anywhere else in Canada who have spent so much

9    of their time on the limitation periods, because

10   limitation periods are not the subject of any

11   nominate course of any law school in Canada, nor

12   does anyone in Canada that I'm aware of hang up

13   their shingle as specializing in limitation

14   periods.  I think that would be a bad business

15   move.

16       So expertise in that area -- my claim to

17   expertise in this area would be a very difficult

18   one and it would reflect that I have been

19   counting limitation periods regularly and often,

20   consistently from all jurisdictions of Canada

21   for more than 30 years.  I have had occasion to

22   think long and hard about what they involve.

23       One exposure to limitation periods, of

24   course, which is constant and unremitting, is



1    are now rather grievously out of date.

2        Q.    If they do not touch at all on

3    limitations, I'm not interested.  If they touch

4    in whole or in part on limitations, I'm

5    interested in seeing these because I'd like to

6    see what it is that you've put out there.

7            In our courts, ordinarily when you do an

8    expert report you need to provide a list of

9    publications in the relevant area for five or

10   ten years or whatever.  I can't remember the

11   period, but it's a long period.  I don't have

12   those, and I would like to see what you have out

13   there by way of presentations, papers or what

14   have you, but only if they touch on limitations

15   law.

16       A.    In fairness to you both, if Mr. Fairey

17   has no objections.

18       Q.    I'm requesting them of him.

19            Have you ever taught civil procedure?

20       A.    No.

21       Q.    Is it often the case where limitation

22   periods are taught in Canadian law schools in

23   civil procedure courses?

24       A.    I believe that that is the case.

1    Q.   Are those courses usually taught by
2  practitioners as opposed to professors?
3    A.   In our law school, that is invariably
4  the case.  They're taught by sessionals,
5  practitioners of many years standing who do
6  provide a very important component in their
7  teaching body, yes.
8    Q.   And you've never, prior to this matter,
9  offered expert testimony on Canadian limitations
10  periods, correct?
11    A.   That is true.
12    Q.   And prior to this engagement, you have
13  never written an expert report on Canadian
14  limitations; is that true?
15    A.   I never have.
16    Q.   Do you consider yourself an expert in
17  the Canadian law of limitation periods?
18    A.   I must phrase my answer to that
19  carefully.
20      I don't think that there is anyone in
21  Canada who could claim to be an expert in
22  limitation periods or an expert in limitation
23  periods to the same degree, for example, as
24  Professor Klar would claim to be an expert in



1    enact legislation accommodating modern class

2    action proceedings in their court.  That was

3    duly passed into law by the government of

4    Manitoba in, I believe, 2002.  It is that

5    recent.

6          So no, I do not profess detailed

7    knowledge of this area.  It's just that the

8    mention of class actions in this context did

9    flag a concern for me and I did my poor best to

10   reflect that in my opinion.  But I'm not going

11   to dogmatize about it because I am neither

12   qualified nor confident enough to do so.

13        Q.   The Manitoba Law Reform Commission

14   report, was that the one in January of 1999?

15        A.   I think that would be right.

16        Q.   And you didn't author that; is that

17   correct?

18        A.   I did not author it, no.  It was

19   authored by a colleague, Professor Karen Busby,

20   B-U-S-B-Y.

21        Q.   So based on what you had said earlier,

22   you don't consider yourself an expert in class

23   action tolling; is that correct?

24        A.   No, I do not.

1        MR. FAIREY:  I'm sorry.  I think your

2   question --

3   BY MR. CAMERON:

4        Q.   You indicated earlier you do not

5   consider yourself an expert on class action

6   tolling; is that correct?

7        A.   On class action tolling?

8        Q.   Yes.

9        A.   No, I do not consider myself an expert

10  on class action tolling.

11       Q.   Is it fair to say you're not offering an

12  opinion in this report on class action tolling?

13       A.   It is fair to say that I am raising a

14  question which I think may have been disregarded

15  by other expert witnesses.

16            In the interest of alerting the court,

17  which I think is one of my functions in this

18  regard, but if expertise be needed in order to

19  raise a flag or give a head's up to interested

20  parties, then I must decline to claim any such

21  expertise.

22            I merely thought when I saw this issue

23  that it needed to be addressed, because without

24  addressing that issue, one is deprived of any

1    leaving it to others better qualified than I to

2    resolve that divergence of hypotheses.

3        Q.    I think you may have addressed these.

4    You have not been called to the bar in the

5    Province of Manitoba; is that correct?

6        A.    No.

7        Q.    And you've not been called to the bar in

8    any other Canadian provinces?

9        A.    No.

10        Q.    And you don't have any practical

11    experience with either Canadian limitations

12    periods or class action tolling, correct, as a

13    practicing lawyer?

14        A.    As a practicing lawyer?

15        Q.    Yes.

16        A.    No.

17        Q.    This is now just your second expert

18    engagement; is that correct?

19        A.    Yes.

20        Q.    And how are you charging for your work

21    here?

22        A.    No guidance was given to me as to what I

23    should charge.  So taking my queue from the

24    opinions of Mr. Mew and Mr. Klar, I suggested an

1    found a number of startling things.

2        Q.   In fact, you found everybody was wrong.

3    You found Drost was wrong, too, right?

4        A.   I still believe Drost was wrong on this,

5    but, of course, that matter was never

6    re-examined in the court of appeal.  For the

7    limitations period, they should have never went

8    to the court of appeal.

9        Q.   But that is what Drost found, correct?

10       A.   Undoubtedly.

11       Q.   And you think he is wrong?

12       A.   I think he's wrong.  We don't say wrong

13   very much in Canada.  We tend to say his

14   Lordship was poorly assisted by counsel.  It's

15   more diplomatic.

16       Q.   You said wrong four or five times in the

17   deposition, so I thought I'd follow up with

18   that.

19       A.   Fair enough.

20            I think he's wrong, but certainly there

21   is the authority of Mr. Justice Drost, and

22   arguably that of Madam Justice Loo as well,

23   which supports this proposition.

24       Q.   Privest is the only case, is it not,

1    that involves asbestos-containing materials in a

2    building where the claim is for pure economic

3    loss; is that right?

4        A.    Yes, absolutely right.

5            So Mr. Justice Drost's opinion

6    represents an impediment to my view.  Since he

7    doesn't cite any authority for it but merely

8    asserts it, I'm somewhat embarrassed in tracking

9    the course of his thoughts.  So I just have to

10   acknowledge that Mr. Justice Drost stands

11   against me on this and I acknowledge it.

12           What worries me more though -- well, it

13   doesn't worry me.  What has caused me this

14   change of view and is now causing us so much

15   inconvenience, for which I apologize, is that

16   when I look at the Armstrong case, I find a

17   number of very curious things.

18           First of all, it isn't a case about the

19   incorporation of defective materials in

20   buildings at all.  It is not a case about

21   defective input in buildings.  It isn't, in

22   other words, a Winnipeg Condo-type case at all.

23   It is a case about negligent building

24   inspectors.

1    and tort might theoretically be brought.

2        Q.    There would have to be privity, correct?

3        A.    There would have to be privity always

4    for a contract action.

5        Q.    If you look at page 4 of your report,

6    tell me if I'm reading this correctly, where you

7    say, "All the building owners in this litigation

8    would seem as having prospective remedies in

9    tort and only in tort since there would seem to

10   be no privity of contract between them and the

11   Grace Company.  And in Canada, as elsewhere in

12   the commonwealth, the warranty concept does not

13   transcend the bounds of contractual privity as

14   has happened so generally in the United States."

15            Did I read that accurately?

16       A.    You read it accurately, and I stand by

17   that.

18       Q.    And you stand by that?

19       A.    Yes.

20       Q.    Under those circumstances, there would

21   be no breach of warranty claim; is that correct?

22       A.    I believe that is correct.

23       Q.    Is it your opinion that all of the

24   claims in this litigation would be negligence

1   claims for pure economic loss?

2       A.   Yes.

3       Q.   They would specifically be negligence

4   claims for pure economic loss arising from the

5   construction of buildings with defective

6   components, correct?

7       A.   Yes.  And that is intended as a

8   descriptor of the precise technical category

9   into which these claims fall.  It isn't merely a

10  general observation.  I'm attaching a label to

11  these claims here.

12      If I might qualify myself just for the

13  sake of complete accuracy, there have been a few

14  cases in Manitoba involving shoddy buildings in

15  which the court of appeal has flirted with the

16  possibility of advancing other headings of

17  economic lost negligence claims, such as

18  negligent misrepresentation and the negligent

19  provision of services.

20      My own view, like that of Professor

21  Klar, is that that is an unprofitable avenue of

22  inquiry, and these should be treated as Winnipeg

23  Condo-type claims, shoddy or defective

24  building-type claims, and belong to that

1    category and, for the best part, argued within

2    that category.

3        Q.    And that's your opinion as you sit here

4    today?

5        A.    That's my opinion.

6        Q.    And the controlling case, as you

7    recognize, is the 1995 Supreme Court of Canada

8    case of Winnipeg Condominium, correct?

9        A.    Yes.

10       Q.    Up to this point, these opinions are

11    consistent with the opinions of Professor Klar

12    and Mr. Mew on these issues, correct?

13       A.    Absolutely.

14       Q.    Because they also categorize the claims

15    at issue in this proceeding as negligence claims

16    for pure economic loss?

17       A.    I agree entirely with that.

18       Q.    Now, prior to Winnipeg Condominium,

19    these claims for pure economic loss were not

20    actionable, were they?

21       A.    This is a very good question.   Can I

22    spend a couple of minutes on that?

23       Q.    Why not.

24       A.    You know I'm going to.



1    and undisturbable finding on the evidence

2    presented in that case, as it was presented.

3         And to that extent, it is entitled to

4    our respect and it will be treated with respect

5    by subsequent courts across Canada.  But it will

6    not necessarily be followed because it turns so

7    much on the matrix of evidence which was

8    presented in that case, and perhaps, to some

9    degree, upon the intemperate and not all

10   together optimal manner in which that evidence

11   was presented by the plaintiffs in that case.

12       Q.    Done?

13       A.    Yes.

14       Q.    It's the only such case on liability for

15   asbestos-containing products that's even reached

16   the trial stage; is that true?

17       A.    That is true.

18       Q.    Do you agree that Judge Drost in Privest

19   carefully and skillfully evaluated the evidence

20   that was present?

21       A.    Very skillfully and in a very

22   workmanlike and professional way.

23       Q.    And you agree that the court's judgment

24   is lengthy, careful and elaborate in the essence

1    that it deals with a multiplicity of discrete

2    issues and difficult questions of law; is that

3    correct?

4         A.    Yes.

5         Q.    And you are aware that Privest was one

6    of the longest trials in the history of British

7    Columbia?

8         A.    I'm not sure about that.  I haven't

9    studied the litigation practices of British

10   Columbia, except to say that it is an extremely

11   litigious province and I'm sure has generated

12   many, many long, long judgments.

13            It is certainly an elaborate and lengthy

14   and meticulous judgment by any standard.

15        Q.    Have you reviewed the entirety of the

16   Privest decision?

17        A.    I have read the entire thing with

18   varying degrees of interest at different phases.

19            There were, for instance, sections to

20   which I must confess I perhaps paid less respect

21   than I should have done, for instance, that

22   relating to the use of supposed works of

23   authority in evidence, which said nothing but

24   which was, I think, helpful and instructive for

1   with this qualification, that the courts there,

2   as I understand here, do have the power under

3   rules of court in various jurisdictions, to

4   grant summary judgment or exclude a claim on the

5   basis it discloses no reasonable and probable

6   cause of action.  That, I think, is familiar to

7   all common law jurisdictions, but it isn't

8   simply a matter of judicial fiat.

9          Even there, these jurisdictions, which

10  will be very sparingly exercised, will at least

11  involve a judicial process in which the judge

12  gives reasons why he thinks the particular claim

13  is, in realistic terms, hopeless of success.

14     Q.    With respect to your statement, can you

15  tell me on what practical experience you base

16  that conclusion?

17     A.    You know I do not practice.  I merely

18  watch what happens in the courts.

19          As all academics do, we watch what the

20  practitioners and the judges do and we try to

21  document and observe their courses of behavior

22  and make generalizations from them.  So do the

23  textbooks on civil procedure which deal with

24  such things as applications for summary judgment

1      Subject to those detailed
2  qualifications, my understanding of these things
3  or phenomena, as general propositions, is the
4  same as that shown by Mr. Mew.  So yes, there is
5  a measure of agreement between us.
6      Q.   And you agree with Mr. Mew's assessment
7  that the governing law would be the law where
8  the property is located, correct?
9      A.   I think that is unarguable.  I'm not, as
10 I remarked before, any kind of authority on
11 conflict of laws, but I did note and indeed have
12 at one time given a lecture on Tolofsen and
13 Jensen.
14      I think that that proposition is, for
15 the time being at least, beyond argument across
16 Canada.
17     Q.   And you're not offering any opinion on
18 conflicts of law; is that correct?
19     A.   No, I'm certainly not, except on that
20 one point where Mr. Justice LaForest expressed
21 himself very clearly and emphatically.
22     Q.   What is that?
23     A.   Lex loci delicti.  He said in tort
24 claims, the lex loci delicti, the place where

1    the discoverability principle?

2             MR. FAIREY:  Object to the form.

3             THE WITNESS:  I would take the view that

4    a person or litigant who wishes to rely upon a

5    limitations defense has the burden of persuading

6    the court that he is entitled to the shelter of

7    the Limitations Act.  I don't assert that as a

8    matter of dogmatism.

9             I would like to have the opportunity of

10   revisiting that question when I've given it

11   further consideration.  But my view would be on

12   ordinary principles that a litigant who seeks

13   the benefit of the statutory defense has the

14   overall burden of establishing his entitlement

15   to it.

16            That does not mean that on questions of

17   evidence the burden may not shift, the so-called

18   tactical burden of proof, with the ebb and flow

19   of evidence in the case.  So I am unwilling to

20   dogmatize on that question.

21       Q.   Do you agree that the court in Privest

22   held that the limitations period began to run

23   from the date of installation?

24       A.   Yes.

1    Q.    And that was a legal determination made

2    by the court, correct?

3    A.    It was.

4    Q.    And you're not aware of any other case

5    where a Canadian court has adopted a different

6    trigger for a limitations period for an asbestos

7    property damage claim, are you?

8    A.    For asbestos property damage?

9    Q.    Correct.

10    A.    No, I'm aware of no other case involving

11    that issue.

12    Q.    I think that, at least in the report I

13    was provided earlier, you had two primary

14    disagreements with Mr. Mew, one his application

15    of a date of installation trigger --

16    A.    Yes.

17    Q.    -- for the limitations period?

18    And, two, his conclusion that for

19    purposes of determining when the lawsuit was

20    commenced, so to determine whether the

21    limitations period has run, the claimants

22    commenced their claim on April 2, 2001, the date

23    of the bankruptcy?

24    A.    That's rather a long question, but I

1    my purview.

2        Q.    Did you review any of the hearing

3    transcripts?

4        A.    No, indeed.

5        Q.    Is it fair to say you're not offering an

6    opinion on the effect of the South Carolina

7    action?

8        A.    Absolutely fair and I think a very

9    prudent decision on my part.

10        Q.    What you do is your report seems to --

11    if I understand correctly, you offer basically

12    two opinions relating to the Canadian limitation

13    periods.  One opinion, if the Canadian claimants

14    are members of the Anderson Memorial class, and

15    that class action tolls the applicable Canadian

16    limitations periods and in a different opinion

17    if it does not; is that correct?

18        A.    It is, I thought, the most helpful way

19    to proceed.

20        Q.    You believe this issue to be one of

21    critical, perhaps dispositive, importance?

22        A.    I can manage circumstances where it

23    might be, yes, because it will certainly effect

24    sheer calculation as to whether the available



1    Anderson Memorial case tolls the applicable

2    Canadian limitation periods?

3        A.    No.    That would depend in large measure

4    on the North Carolina statute which I have not

5    seen.    I think it is an argument that counsel

6    would do well to examine.    That is all I can say

7    on that.

8        Q.    Is it also dependent on the class

9    proceeding acts in Canada?

10       A.    That is a very good question.

11            It might be regarded as a question of

12   conflict of laws.    Again, I would think myself

13   that that might depend on the jurisprudence of

14   the South Carolina courts.

15            But I am not, as I say, expert in the

16   minutia of class litigation, nor have I ever

17   professed to be so.    I appreciate the force of

18   your argument, I know where it is going, but I

19   cannot assist you with an answer with any degree

20   of confidence.

21            I have not, I confess, looked at this

22   question, nor do I think you will find very

23   clear guidance from the available Canadian

24   textbooks on that question.

1       Q.    At page 19 of your report you state,
2    "All existing Canadian and other Class
3    Proceedings Act of which I am aware expressly
4    provide for the tolling at that point at which
5    class proceedings are commenced on any
6    limitation period then running against any
7    putative or potential class member."
8       A.    Yes.
9       Q.    Can you tell me what class proceeding
10    you're referencing there?
11       A.    I'm looking at the Manitoba one.  I did
12    look briefly at one or two others.  I didn't
13    attempt, because I was not going to profess any
14    depth of expertise on this issue.  I did look at
15    one or two other class proceeding acts, not
16    including the Quebec one.
17          I am not sure that I can recollect now
18    what they were.  But I did, and I hope this is
19    not regarded as dirty pool or foul play.  I did
20    consult a colleague, Professor Busby, who is in
21    many ways the authoress of the Manitoba law of
22    home commission report, and thence, I suppose
23    indirectly, the authoress of our statute, and
24    asked her what her response was to that

```
1    question.  And it is in line with what I've
2    recorded there.
3         I do not want to convey the impression
4    that I've exhaustively scoured the statutes of
5    the common law provinces for an answer to that
6    question because it would be beyond my province
7    and beyond my expertise and would indeed be
8    calculated intentionally to mislead.
9         Q.   You've done no analysis of any of those
10   class proceedings?
11        A.   No, indeed, I haven't.
12        Q.   At page 32 of your report you state,
13   "First, the institution of a class must (as a
14   principle of seemingly universal application) be
15   taken to 'toll' the effluxion" -- I don't know
16   what that word is.
17        A.   Effluxion.
18             Where are we, on page 32?
19        Q.   Page 32.
20        A.   How far down are we?  Oh, the effluxion,
21   the flowing away.  It's a favorite word of
22   Canadian --
23        Q.   (Continuing) -- "effluxion of any
24   limitation period, affecting any class member,
```

1   at the moment the class action is or commenced."

2   Correct?

3       A.    Yes.  I did write that.

4       Q.    Can you tell me what the basis for that

5   statement is?

6       A.    Very fragile.

7             It is just my understanding from talking

8   with people like Professor Busby, and I have

9   never heard it contradicted.  I have, as I say,

10  perused the case books.

11            I repeat, I do not set myself up as an

12  expert on Canadian class litigation.  Therefore,

13  you can take what I say on these questions with

14  appropriate weight, which may not be much.

15            I merely thought it necessary, not only

16  in respect of this but in respect of another

17  issue, to raise the issue and put it in

18  contention.

19            Perhaps I have an inflated view of the

20  importance of these depositions.  I thought the

21  issue should be raised just to put it on the

22  table and to show that I knew it was there,

23  because Professor Mew had, to my mind,

24  overlooked it.  Perhaps he had very good reasons

1    identified in your report as it being a

2    potential issue; is that correct?

3        A.    Yes, I think that is true.

4        Q.    And you've made no analysis of that

5    issue and don't intend to provide any expert

6    opinion on that issue?

7        A.    That is an entirely reasonable inference

8    from what I've said.

9        Q.    So you haven't examined the language in

10   the legislative history of the class proceeding

11   act; is that correct?

12       A.    Of which jurisdiction?

13       Q.    Of the Canadian provinces.

14       A.    Of all of them, no.  Only that of

15   Manitoba.

16       Q.    Had you read the Manitoba class

17   proceeding act prior to being asked to write

18   this report?

19       A.    Yes, I had.  I had to because the law

20   reform commission had a good deal of input on

21   its content, but it had been sometime before.

22       Q.    Do you have any familiarity with the

23   case law in the class action area?

24       A.    Only on a casual basis with regard to



1    things I looked up in the available rather

2    meager Canadian text on this issue as part of

3    this interesting exercise.

4        But then, as I say, I am professing no

5    expertise on class litigation whatever.  And I

6    don't think there would be much point in my

7    pretending to be adept in all the minutia of

8    class litigation or even in Canada where the

9    field is relatively new.  It might for that

10   reason relatively quickly mastered.

11       I have not done so and I do not propose

12   to do so or indeed to offer any other input on

13   this issue.  I have stated my concern.  I think

14   it needed to be stated and I stand by that.

15       Having stated it, and provoked it may

16   be, some reaction from Mr. Mew, I am happy to

17   leave the resolution of all issues concerning

18   class proceedings to persons other than myself.

19   Q.    Do you know when each of the Canadian

20   provincial class action statutes were enacted?

21   A.    Mostly very recently.

22       The only exception, as I say, I did not

23   intend to answer multitudinous questions about

24   class actions, because I do not profess

1    expertise in them.    But I do know that Quebec
2    got off to a very early start back in the 1960s,
3    certainly many years ahead of the others.
4        Q.    Can you look at Exhibit No. 7, the Mew
5    affidavit?
6        A.    The Mew affidavit, No. 7.    Yes, here I
7    have it.
8        Q.    In paragraph 4 in the footnote on the
9    bottom of page 2.
10       A.    Yes.    Footnote 4, yes.
11       Q.    Do you have any reason to dispute the
12   dates that Mr. Mew has there for when these
13   class proceeding acts came into play?
14       A.    They strike me as approximately correct.
15   I have not verified that, so my opinion on that
16   is of no value.    I think they sound extremely
17   plausible.    They also sound extremely recent.
18       Q.    Do you know whether the terms of the
19   class action proceeding acts apply to actions,
20   class actions that were started before the
21   statutes were enacted?
22       A.    I cannot recollect that.    As I say, I do
23   not profess expertise in this area.    And I must
24   confess I'm not entirely sure that I can

1    usefully answer questions along these lines.   I

2    have indicated my nonexpertise in class actions

3    and I'm content that it should remain so.

4                          (Whereupon, Irvine Deposition

5                          Exhibit No. 8 was marked for

6                          identification.)

7    BY MR. CAMERON:

8        Q.   I'm going to show you what's been marked

9    as Exhibit No. 8.   Is this the Class Proceedings

10   Act for Manitoba?

11       A.   I assume it is, yes.

12       Q.   And this is the one that you say you did

13   review, correct?

14       A.   I looked at it.

15       Q.   If you turn back to page 22 of 22.

16       A.   Uh-huh.

17       Q.   Which is, I believe, the last page.

18       A.   22.

19       Q.   22 of 22, last page.

20       A.   Yes.

21       Q.   Do you see Section 41 there?

22       A.   Uh-huh.

23       Q.   "This act does not apply to. . .a

24   representative proceeding commenced before this



Kruse Associates, Ltd.
A McCorkle Affiliate
www.krusereporters.com
312-345-1500

1    Act comes into force."  Is that correct?

2        A.    Section 41 or 42?

3        Q.    Section 41.

4        A.    This is quite correct.  It does say

5    that.

6        Q.    And this class proceeding act came into

7    force on January 1, 2003, correct?

8        A.    Yes, I believe that is correct.

9        Q.    And the Anderson Memorial class action

10    was filed when, in 1992; is that correct?

11        A.    So I'm told.

12        Q.    You don't address this issue in your

13    report, do you?

14        A.    Indeed, I do not.

15        Q.    You didn't compare the effective dates

16    in the class proceeding acts and compare them to

17    the date the Anderson Memorial class action was

18    filed, did you?

19        A.    No.  I can see that this raises a most

20    interesting issue which I cannot help you in

21    resolving.

22        Q.    Okay.  So you didn't investigate whether

23    the class proceeding act applies retroactively,

24    did you?

1    A.    No, I didn't.

2        To tell you the truth, if I would have

3    done that I would have felt I was trespassing

4    far beyond my professed expertise in relation to

5    this.

6        I undertook to give opinions generally

7    about the tort liability, which I believe I've

8    done, and generally about limitation periods,

9    and I believe I've done that.

10        It's just that inevitably, the law being

11    a seamless web, it throws up tangential issues

12    which may take one into areas which are not

13    encompassed by as much expertise.  And this is

14    an instance where I'm candidly telling you I'm

15    getting out of my depth, I'm getting out of my

16    own territory, I'm not comfortable and I'm

17    unlikely to be able to help you.

18    Q.    Do you have any basis to dispute

19    Mr. Mew's conclusion that the class proceeding

20    acts would not apply to class actions filed

21    before their enactment?

22    A.    I have no bases on which to contest that

23    nor any basis on which to support it.

24        I haven't even read Mr. Mew's opinion.



1    And even if I did, my limited knowledge of class

2    proceedings would not enable me to give a

3    meaningful critique of it.  Nor have I any

4    evidence as to what is the prevailing

5    credibility or weight of Mr. Mew's expertise in

6    this area.

7         I make that not as a negative statement

8    or a criticism of Mr. Mew.  I'm just saying

9    frankly I do not know.

10        Q.   Do you know whether the Class

11   Proceedings Act in each of the provinces applies

12   only to proceedings commenced in the appropriate

13   court in that province?

14        A.   Whether which?  I'm sorry.

15        Q.   Do you know whether the Class

16   Proceedings Acts in each of these provinces

17   applies only to proceedings commenced in the

18   appropriate court in that particular province?

19        A.   I would think that was -- if I

20   understand the question correctly, I would

21   imagine that is so.

22        But, again, I must protest I do not set

23   myself up as an expert on Canadian or any other

24   class proceedings.  I would have thought that

1    opinion on limitations period?

2        A.    I thought it was important that I raise

3    the issue but leave its determination to persons

4    presumptively more learned in the area than I am

5    and that I contentedly do now.

6            I don't see how I could have avoided,

7    however, raising the issue of class proceedings,

8    because without knowing for sure when the

9    relevant date is for the making of limitations

10   calculations, I couldn't give a single

11   undifferentiated answer to that question while

12   this issue -- and I perceive it to be an issue

13   -- remains unresolved.  Whether it is

14   unresolved, I know not.

15       Q.    Would you agree with me that if each of

16   the Class Proceedings Acts at issue were enacted

17   and effective after the filing of the Anderson

18   Memorial class action, and that each of those

19   proceedings acts provides that they do apply to

20   actions filed before the effective date of those

21   proceedings acts, would it be fair to say that

22   the one prong of your opinion is no longer

23   relevant?

24           MR. FAIREY:  Object to the form.

1    for determining whether or not the limitations

2    periods have run is the April 2, 2001,

3    bankruptcy filing date?

4         A.    I don't think it could be any other

5    date.

6         Q.    Let me turn to the ultimate limitation

7    period, that part of your opinion.

8              Do I understand correctly from your

9    opinion that the ultimate limitations periods

10   are specifically designed to cut short

11   limitation periods after the lapse of a certain

12   period of time, even though the discoverability

13   concept might otherwise allow the claimant more

14   time?

15        A.    Yes.

16        Q.    Stated differently, as you said in your

17   report, when determining when the ultimate

18   limitation periods begin to run, no reliance can

19   be accorded to what the claimant knew or did not

20   know or ought or ought not to have discovered;

21   is that correct?

22        A.    I believe that that is true.  I don't

23   think it is beyond argument, but that is my

24   opinion and belief.

1    A.    Yes, and it was wrong.

2    Q.    Armstrong's not in there, is it?

3    A.    No, it isn't.

4    Q.    Did you read the authority in footnote

5    67 before issuing this report?

6    A.    I read all these cases and I'm afraid

7    that I simply confused myself at that point.

8    I've got it sorted out since.

9    Q.    Was there change in the case law from

10   the time you issued the first report until the

11   time you brought it in to me today?

12   A.    None.  I made a mistake.

13   Q.    When did you realize you made a mistake?

14   A.    When I was reading the Manitoba

15   authorities with greater attention on a

16   subsequent date, I went back and looked.

17   Q.    So you realized you made a mistake in

18   British Columbia when you were reading the

19   Manitoba cases?

20   A.    Yes, because they raised very similar

21   sorts of issues.

22   Q.    So, in your mind, you place weight on

23   Manitoba cases for what may happen in British

24   Columbia, but you wouldn't place weight on

here.  It may be that is indeed a legislative
response to the kinds of difficulty to which the
Manitoba courts and potentially the British
Columbia courts have become embroiled in
determining when the starting date is.

       I thank you for bringing it to my
attention, but I really do need to --

    Q.   And that's for ultimate limitations?

    A.   Yes.  I really need to read the statute
before I can say I agree with you or I don't
agree with you.  You make, of course, a
perfectly valid point.

    Q.   And by process the ultimate limitations
concept is different than the normal
limitations?

    A.   It has to be for the reasons you
described.  It has to be.

       Even though it isn't always obvious on
the face of the statute because of the function
of an ultimate limitation period, its only
intelligible function is curtail or guillotine
limitation periods because discoverability would
otherwise potentially drag on forever, which is
a social evil.

1    starting date for the ultimate limitations

2    period in Manitoba?

3         A.    I'm not prepared to dogmatize about it.

4              MR. FAIREY:   Object to the form.

5    BY MR. CAMERON:

6         Q.    There's one remaining Manitoba claim in

7    this case, that's it.  In that claim, the

8    asbestos-containing material was installed in

9    the building in 1956, 36 years prior to the

10   filing of Anderson Memorial and, what is that,

11   42 years prior to the filing of the bankruptcy.

12        A.    Yes.

13        Q.    Based on those facts, can you give an

14   opinion as to whether or not that claim is

15   barred by the ultimate limitations period?

16        A.    By the ultimate limitations?

17        Q.    Yes, sir.  Not normal, ultimate.

18        A.    That would depend upon any residual

19   function retained by the Grace defendants after

20   the installation.

21             I think by the way you set up the

22   question that it seems inherently implausible,

23   but I never like saying things are impossible

24   until I've got a full and credible set of facts.

1        I don't say it is impossible, but, of

2    course, the way you've set up the question makes

3    it inherently unlikely and implausible.

4        Q.    Inherently unlikely and implausible

5    what?

6        A.    It's inherently unlikely and implausible

7    that the fact situation and the evidence as to

8    what were the acts and omissions of the Grace

9    defendants would have endured so long after the

10   initial installation of the material that they

11   would still support an action which would not be

12   cut short by the ultimate limitation period.

13       I think in those circumstances it is

14   very, very likely that the ultimate limitation

15   period would cut short this action.  It is

16   difficult to imagine the limitation period, even

17   if -- we're talking Manitoba here -- even if a

18   discoverability principle were in play which

19   would have required some initiative on the part

20   the plaintiff in the Manitoba court.  It is very

21   unlikely there will be anything left to be cut

22   short, very unlikely, by the time the ultimate

23   limitation period comes into play.

24       I think I have perhaps trespassed



Kruse Associates, Ltd.
A McCorkle Affiliate
www.krusereporters.com
312-345-1500