# TAB F

16675bROUGH DRAFT Irvine john083107.TXT

UNCERTIFIED ROUGH DRAFT

1

1     IN THE UNITED STATES BANKRUPTCY COURT
2          FOR THE DISTRICT OF DELAWARE
3
4  IN RE:  W. R. GRACE &        Chapter 11
5  COMPANY, ET AL.,             Case number 01-01139 (JFK)
6           Debtor,             Jointly Administered
7  ~~~~~~~~~~~~~~~~~~~~~~~
8
9              DEPOSITION OF
10         PROFESSOR JOHN C. IRVINE
11              10:35 a.m.
12             July 31, 2007
13          1740 Peachtree Street
14             Atlanta, Georgia
15   Colleen B. Seidl, RPR, CCR, CSR-B-1113
16
17
18
19
20
21
22
23
24
25

UNCERTIFIED ROUGH DRAFT

2

16675bROUGH DRAFT Irvine john083107.TXT
UNCERTIFIED ROUGH DRAFT

10

1     A.    Sale of wages and that kind of thing.
2     Q.    Right. Replevin and so on.
3           Now, can you turn to the common law
4     briefly?
5     A.    It will have to be brief, because when I
6     turn to the common law, I must confess that in the
7     brief window of opportunity available to me, I have
8     found nothing in the Canadian books. Perhaps with a
9     little more diligent researching, I could.
10          But when I turn to the position in
11    England, I find that the matter has been a matter of
12    some discussion. The leading case, it appears to me
13    to be a case in the English Court of Appeal in 1988.
14    It is called Congregational Union against Harris, two
15    r's and one s, and the reference to that case is 1988
16    one or England, page 15. It is an elaborate judgment
17    involving three law lords -- well, not law lords, law
18    justices of appeal who trace the history of this
19    issue as best they can a long way.
20          It appears that some judges of an older
21    generation still adhere to the view that I expressed
22    briefly, while I was trying to think of an answer for
23    the benefit of Mr. Cameron, that the burden of proof
24    of bringing oneself within a defense is upon the
25    defendant. And that is true of most defenses, but it

UNCERTIFIED ROUGH DRAFT

11

16675bROUGH DRAFT Irvine john083107.TXT

1 does appear that over the years attitudes certainly
2 in the English court have changed. The issue has not
3 been one of common occurrence. But the best
4 explanation given, and it is not very elucidating,
5 seems to be that of Sir Robin Buckley, who says that
6 nowadays the burden of proof is upon the defendant to
7 bring himself, no matter what the precise issue in
8 relation to limitations, within the benefit of the
9 statute by establishing a prima facie case.
10        Q.    So you're saying traditionally the burden
11 was on the plaintiff?
12        A.    I'm sorry, I'm getting this wrong.
13        Q.    You are mixing?
14        A.    No, I'm confusing myself under pressure
15 here.
16              Traditionally the burden of proof was upon
17 the defendant, at least in the minds of some, to
18 bring himself within the benefit of the defense.
19 Nowadays it appears the burden of proof is upon the
20 plaintiff -- thank you for correcting me on that --
21 to bring himself within the benefit of the statute of
22 offense to show a prima facie case that he has
23 brought his action in a timely fashion, whereupon the
24 burden of proof shifts to the defendant to rebut
25 that.

                    UNCERTIFIED ROUGH DRAFT

                                                      12

1              Quite how that works, I have not remotest
2 idea, but that is what Sir Robin Buckley says and it
3 is all, to tell you the truth, that I have been able
4 to find.

16675bROUGH DRAFT Irvine john083107.TXT
22  the station so long that it will be too late if it is
23  not too late already to make the kind of esoteric
24  argument I've made.
25            I make a further concession. The argument

UNCERTIFIED ROUGH DRAFT

36

1   I based on Section 1-E does after all relate to a
2   specific definition, that of an injury and the word
3   injury does not occur in Section 3.3.B. So it may be
4   that this argument could be regarded as a misuse of
5   the definition section in this instance.
6            I merely raise the point, because it
7   seemed to me that Mr. Cameron was after rather more
8   than an obvious interpretation of 3.3.B; and since
9   this rather academic argument is there, I thought it
10  honest and necessary to raise it.
11       Q.   No, quite right with respect to your
12  trying to give your full understanding and
13  explanation of the issue. But I want to just
14  understand your process for a moment before we
15  dissend more into details on the issue itself.
16            My understanding of your function as an
17  expert in this case is to prove foreign law in a case
18  according to conflicts of law principles.
19       A.   No.
20       Q.   No, no, not as an expert in conflicts of
21  law, but when you're in a case where foreign law is
22  becoming a substantive law of the case by normal
23  conflicts of law principles, it's necessary for an
24  expert from the foreign jurisdiction to prove foreign
25  law and that that expert is to state what the law is.

16675bROUGH DRAFT Irvine john083107.TXT
UNCERTIFIED ROUGH DRAFT

37

1      And I think, as I understand what you are
2 doing, Professor Irvine, and no doubt shrewdly and
3 with your considerable imaginative and rational
4 powers, what I think you're doing is analyzing what
5 the law could be in the future or should be in the
6 future.
7      But would you agree with me on this point
8 that the law today as stated by the cases and as
9 interpreted by the drafters of the legislation, the
10 Alberta Law Reform Institute, that the law is as was
11 stated by Mr. Cameron when he put the question to
12 you; that is, the act or omission commences the
13 ultimate limitation period and it does not have to
14 wait for damage. Damage is irrelevant.
15 A.   That is certainly the intendment of
16 3.3.B., but that is a very new provision. Its
17 interpretation is still, though decreasingly, open to
18 evaluation by the courts. I merely feel it necessary
19 to raise any -- not for the future, but for now, any
20 alternative interpretation which must be put on it
21 because of its oddity, because of the curious way in
22 which it seems entirely to supplant on its clear
23 wording 3.1.B.
24 Q.   You would agree with me, Professor Irvine,
25 would you not, that Alberta is a very conservative

UNCERTIFIED ROUGH DRAFT

38

Page 33

16675bROUGH DRAFT Irvine john083107.TXT

1    jurisdiction. They don't like litigation in that
2    jurisdiction, isn't that true?
3        A.    I never lived in Alberta. I wouldn't
4    presume to generalize about their jurisdiction.
5        Q.    Doesn't it have the most conservative
6    class action legislation of any jurisdiction in the
7    country?
8        A.    I'm not an expert on class actions. I
9    would defer to your views on that, sir. But I will
10   say this, I don't want to be an advocate in this
11   case, still less do I want to usurp the functions of
12   a judge. So I'm very reluctant to do that. But if I
13   had to be a betting man and as between the two
14   interpretations I have put forward of Section 3.3.G,
15   my own preference, because I happen to be a strict
16   constructionist, would favor the way the case law
17   appears at the moment to be developing.
18              But my views on that are of no real value,
19   because no doubt due to the inscrutable workings of
20   providence, I am not a judge.
21       Q.    All right. I'm going to, because of time
22   constraints, just very lightly point to some of these
23   cases which I'm sure you have read.
24              The first is a Court of Appeal decision.
25       A.    Of?

UNCERTIFIED ROUGH DRAFT

39

1        Q.    An Alberta Court of Appeal decision, and
2    bear with me for a second.
3        A.    Is that a case called Mack?
4        Q.    It's Meek.

Page 34

```
                16675bROUGH DRAFT Irvine john083107.TXT
 8    order to commence the ultimate limitation period?
 9         A.     Well, I'm not going to concede that
10    because it is not my job to concede that or to say
11    what the law is.  But I certainly agree with you that
12    the train has left the station and appears to be
13    headed in that direction as things stand at the
14    present.  There I think I must insist on leaving that
15    issue.
16         Q.     I don't want to leave the record that I
17    said I was going to show you something in the
18    December 1999 report and then not do it.
19         A.     You kept your word to the letter.
20         Q.     If we could just go to page 70 and in
21    paragraph 47, a very short paragraph, "It is now
22    glossing," paragraph or Section 3(b) and if you turn
23    back a few pages, you'll see that on page 63 all this
24    is called comment.  This is comment on the draft
25    legislation.  And there under paragraph 47 on page 70
                       UNCERTIFIED ROUGH DRAFT
                                                             50

 1    it states the following:  "The ultimate period for a
 2    claim based on the breach of a duty may expire before
 3    the claim has even accrued for the damage may not
 4    have occurred by that time and even if it has, the
 5    claim may not have accrued under the discovery rule.
 6    This problem of legal principle is inescapable
 7    because there's no feasible alternative consistent
 8    with limitation policy."
 9               It's very similar language to what we saw
10    in both the cases and the previous report?
11         A.     Once again I entirely agree with that
                              Page 44
```

```
                  16675bROUGH DRAFT Irvine john083107.TXT
 1    you said you were working on a new report and that
 2    you would bring it or give it the following Monday,
 3    which you did.
 4         A.    Which I did, indeed.
 5         Q.    That was Monday of this week.
 6         A.    Yes.
 7         Q.    So now I'm here wanting to examine you on
 8    that report.
 9         A.    Now I understand where we are.
10         Q.    Fair enough. But you don't have anything
11    that would help me. Were there other changes and so
12    on, it would make it easier for me, I've tried to go
13    and read the two reports side by side as you can
14    appreciate, but --
15         A.    Are we talking about the main opinion or?
16         Q.    We're talking about both Appendix B where
17    I understand you've made significant changes and also
18    the main report, and I just want to make sure that I
19    haven't missed anything, so maybe you could just help
20    me. If I'm more pointed about it, are there any
21    changes in the main report other than the page 25 in
22    the original, which is now I believe page 26 in the
23    new report. One would have expected there's other
24    changes because the pagination has changed.
25         A.    If there are any changes, I'm certain we
                        UNCERTIFIED ROUGH DRAFT
                                                              57

 1    changed the font, which may have affected the
 2    pagination. I do not want to mislead you on this.
 3    My impression is that I made no further changes to
 4    the main body of the report which was in
                              Page 50
```

16675bROUGH DRAFT Irvine john083107.TXT

5    Mr. Cameron's possession other than one, and I'm not
6    sure, it must have been after we met, other than one
7    amendment designed to reflect something which
8    Mr. Cameron had pointed out to me which was in
9    relation to the burden of proof issue again under the
10   British Columbia statute.
11        Q.    Okay. Well, I may have even missed that,
12   so I would be grateful if we could -- have you got
13   the report, the new report with you?
14        A.    I have a version which I'm prepared to
15   sign off on today.
16        Q.    It's another?
17        A.    No, this is it.
18        Q.    This is the same one that you gave to your
19   counsel and they gave to us on Monday?
20        A.    I hope I'm correct. I was on the cusp, I
21   must confess, because I like to get things right and
22   I'm an academic unlettered in these proceedings. I
23   was on the cusp of making another amendment friendly
24   to Mr. Cameron's interest, but then having spoken to
25   Bud about this and told him that I was trying to

UNCERTIFIED ROUGH DRAFT

58

1    produce a final clean copy, he said words to the
2    effect, that for God's sake, don't change it anymore,
3    even if you think it's wrong in some details. And I
4    in fairness thought, well, that's right, because
5    sooner or later Mr. Cameron and his team are entitled
6    to a static rather than a moving target.
7         Q.    Can I just question you on that for a

Page 51

16675bROUGH DRAFT Irvine john083107.TXT

19  at page 47, "I think it is clear that all of the
20  elements necessary to the plaintiff's cause of action
21  came into existence during the period 1973 to 1975
22  when the MK3 was installed in the building.
23  Accordingly, the limitation period began to run in or
24  about the month of September 1975 when the
25  installation was completed."

UNCERTIFIED ROUGH DRAFT

71

1           If you just drop down to paragraph 11, she
2  comments on those first couple of sentences.
3      A.   Yes.
4      Q.   She says, "In this case, all of the
5  elements necessary to the plaintiff's cause of action
6  and on which its claim is founded, including
7  constructing the building on organic soil without a
8  proper foundation and the failure, if any, to tie the
9  wall to the roof arose between the fall of 1971 and
10 the spring of 1972. The plaintiff's actions was
11 therefore statute barred before it commenced this
12 action in March 1997, whether the limitation period
13 was two or six years.
14          This is, of course, a case that is dealing
15 with the so-called normal limitation period?
16     A.   Yes.
17     Q.   This is not a ULP, an ultimate limitation
18 period case?
19     A.   No.
20     Q.   And I will get to some of those, but it
21 seems to me that this case which refers to Privest,

Page 63

```
              16675bROUGH DRAFT Irvine john083107.TXT
22   it does so for good reason.  The judge is suggesting
23   that it's on all fours with that cases dealing with a
24   building that has caused problems and has led to
25   dangerous conditions.  It's concerning a claim that
                    UNCERTIFIED ROUGH DRAFT
                                                        72

1    the construction was done poorly and the materials
2    were poor and also that the inspection was not done
3    right and, therefore, the building was occupied
4    because of all of that to the detriment of the
5    occupants and the owner of the building.
6              Do you see that?  Am I being fair in that
7    assessment?
8         A.   Yes, I think that that is a reasonable
9    summary of the issues in play, and you correctly
10   point out there are two defendants.  And on the
11   analysis offered by Madame Justice L'Heureux-Dubé's
12   here, it will be of no real matter given the facts,
13   on those factual assumptions.  Whether we're talking
14   about the time of commencement of the limitation
15   period for the inspector, the time of commencement of
16   the limitation period for the contractors on those
17   assumed facts.
18        Q.   I'm not trying to suggest; though, I just
19   want you to understand this.  My point is not to make
20   you agonize over these detailed facts, but if you
21   want to take the time to reread the case.  I'm simply
22   trying to, given the shortness of the time, trying to
23   underscore what I think are the main legal points
24   that come out of this judgment.
25        A.   And I thank you for that.  Perhaps I won't
                           Page 64
```

16675bROUGH DRAFT Irvine john083107.TXT
1  just have concerns, which I felt it fit to raise,
2  because the issue is such an important one in terms
3  of what the plaintiffs knew.
4      Q.  But would you agree that Privest has never
5  been disagreed with, any doubt cast on the case with
6  respect to its conclusions on the Agents to Know
7  issue?
8      A.  I agree entirely.
9      Q.  All right. And I want to also ask you
10 this. Do you recall in reading the Privest case that
11 Mr. Justice Drost decided that he did not even need
12 to reach a conclusion with respect to the design
13 professionals, the architects, engineers,
14 specification writers' knowledge and whether or not
15 that was as a matter of law implied to the building
16 owners, because he found that the building owners had
17 either actual or constructive knowledge? Do you
18 recall in the decision?
19     A.  Yes. I find that passage and his judgment
20 admittedly rather difficult to follow. But in any
21 case, that was not an aspect of the case in which I
22 am particularly interested since it seems to me
23 essentially an evidentiary point, what the plaintiffs
24 knew and did not know and how they could be said to
25 have known what they are supposed to have known, did

UNCERTIFIED ROUGH DRAFT

120

1  not primarily interest me. I was interested in the
2  underlying doctrine of liability rather than the
3  considerable province of proof, which you overcame in
4  that case.

16675bROUGH DRAFT Irvine john083107.TXT

5    Q.    Okay, fair enough. So just to round off
6   this point. So with respect to his judgment on Johns
7   Manville, the Canadian Indemnity versus Johns
8   Manville decision of the Supreme Court of Canada and
9   its finding on the fact that in the insurance
10  industry, there was notoriety about the asbestos
11  controversy, and Justice Drost then applies that, he
12  says, to building developers.
13     A.    He's saying it was an analogy, yes.
14     Q.    He actually says he's applying -- that's
15  an issue of law, is it not?
16     A.    He's saying the same principles of law
17  which fixed knowledge in the insurance underwriter in
18  that case, a case with which it would be very
19  difficult to disagree in fact.
20     Q.    Right.
21     A.    Should in his view conduce to the same
22  result in relation to the -- my mind is failing -- in
23  relation to the contractors and, indeed, the building
24  owners in this case, yes, in Privest.
25     Q.    Right. And I take it that you haven't

UNCERTIFIED ROUGH DRAFT

121

1   tried to analyze that. You don't disagree with that?
2     A.    I don't disagree with that at all. I
3   don't know whether it's right or wrong, but it was a
4   finding he was perfectly entitled to make.
5        MR. FAIREY: I think you have about 14
6     minutes.
7        MR. HAYLEY: That's what I thought, too.

Page 107

16675bROUGH DRAFT Irvine john083107.TXT

8    Can you give me a moment and if you want
9    to just have a minute break, I'll see if I can
10   wind up well within our time frame. Not that I
11   wouldn't like to spend more time with you,
12   Professor Irvine, and your interesting views.
13        Q.    (By Mr. Hayley)  I noted that in reading
14   your new report that you had made some changes in
15   light of your thought process and even in light of
16   the last deposition, as I understand it.
17        A.    In relation, yes, very, very slight ones,
18   in deference to points validly made by Mr. Cameron.
19   Yes, very small.
20        Q.    But you didn't give any acknowledgment to
21   Professor Buzbee and I'm wondering why that was the
22   case. Wasn't she the person that you said had got
23   you onto your idea of the tolling of limitation
24   periods via the Class Proceeding Acts?
25        A.    No, that wasn't, I think, what I intended
                    UNCERTIFIED ROUGH DRAFT

                                                      122

1    to say.
2              I intended to say when the idea did occur
3    to me, and it isn't a particularly obscure idea, I
4    had after all been involved not as an author, but as
5    a signer to the Manitoba Law Reform Commission Report
6    on class actions, I thought I would indeed have a
7    consultation with a colleague about this and
8    determine whether there was indeed an issue here and
9    in no very profound way, but as a colleague does, she
10   said a few things to me about it. And the result is
11   that the report is -- as I say, I raised the issue.