. . .

(3)    For the purposes of subsection (1)(b),

    (a)    a claim or any number of claims based on any number of breaches of duty, resulting from a continuing course of conduct or a series of related acts or omissions, arises when the conduct terminates or the last act or omission occurs;

    (b)    a claim based on a breach of a duty arises when the conduct, act or omission occurs;

(5)    Under this section,

    (a)    the claimant has the burden of proving that a remedial order was sought within the limitation period provided by subsection (1)(a), and

    (b)    the defendant has the burden of proving that a remedial order was not sought within the limitation period provided by subsection (1)(b).

**131**    The City suggests that, if it acted negligently in issuance of the development or building permits, its negligence occurred at the time the permits were issued. Accordingly, it argues that s. 3(1)(b) of the Act applies to bar the Plaintiffs' claims in negligence against it. There is no dispute that, if the City is liable for nuisance, which I will address next, there is no limitations defence available.

**132**    There was a dispute between the parties as to whether the City could shelter under s. 2(2) of the Act, also known as the "transition section." Section 2(2) would only apply if the Plaintiffs knew or ought to have known of their claims prior to March 1, 1999. If they did, the earlier of the limitation period provided for in the Limitations of Actions Act, R.S.A. 1980, c. L-15 or March 1, 2001 would apply. If not, the limitation period in s. 3(1)(a) of the Limitation Act or the ultimate limitation of 10 years set out in s. 3(1)(b) would apply.

**133**    In determining whether the Plaintiffs knew of ought to have known of their claims prior to March 1, 1999, consideration must be given to whether they knew by that time that the injury for which they seek a remedial order had occurred, that the injury was attributable to conduct of the Defendant, and that the injury, assuming liability on the part of the Defendant, warranted bringing a proceeding: Neal v. Kozens, 2004 ABCA 394.

**134** The Plaintiffs argue that they did not know and could not have known that they had sustained an injury until they became aware of the 1977 Hardy report after the occurrence of the slide. The City does not take issue with that suggestion. The City contends that the Plaintiffs did not realize that the harm they had suffered was relatively serious nor did the economics warrant bringing a proceeding until well after March 1, 1999. The City submits that, as the Plaintiffs were unaware of the existence of the 1977 Hardy report until shortly after the slide, they could not know of the causal link to the City until that time.

**135** I agree. The evidence does not merit a finding that the Plaintiffs knew of the claims prior to March 1, 1999. The only conclusion realistically supported by the evidence is that they did not know or suspect that anything more than settling of their properties was occurring until the summer or fall of 1999 and that they were not aware of the 1977 Hardy report before that time. In my view, s. 2(2) has no application to the facts in this case, notwithstanding Veit J.'s conclusion in Bowes v. Edmonton (City) (2003), 333 A.R. 332, 2003 ABQB 492.

**136** Her decision related to an application brought by the Eric Douglass Estate in these actions to obtain summary dismissal of the Plaintiffs' claims against it. The application was successful. Veit J.'s focus on the application was on Mr. Douglass' alleged use of fill on the properties. She concluded that the Plaintiffs had the requisite knowledge of Mr. Douglass' use of fill and the repercussions of that fact more than ten years before they sued Mr. Douglass. In the result, their claims were statute barred as against the Douglass Estate. Madam Justice Veit did not rule on the factual circumstances applicable to the City's duty to the Plaintiffs. Those circumstances were not before her. Her conclusion that the Plaintiffs' claims were statute barred as against Mr. Douglass for his failure to warn them of the unstable geological condition of the lots is not helpful in resolving the Plaintiffs' claims against the City.

**137** As I have said, it is not realistic to conclude that the Plaintiffs knew they had suffered the requisite injury until their land gave way and they discovered the City had kept relevant information from them. In these circumstances, the only relevant limitation period is the ultimate period in s. 3(1)(b) of the Act. The issue then is whether s. 3(1)(b) cloaks the City with immunity.

**138** Section 3(3)(b) states that, for the purposes of s. 3(1)(b), a claim based on a breach of duty arises when the conduct, act or omission occurs. The omissions complained of in this case were the City's failure to consult and to disclose the 1977 Hardy report prior to issuing the development and building permits to the Plaintiffs. With that in mind, it is apparent that the ten-year limitation, if retrospective, would have expired on or before June 13, 1994 in terms of Ms. Skinner, the fall of 1997 in terms of the Bowes, and October 24, 1997 in terms of Ms. Reid.

**139** Prior to introduction of the Limitations Act, there was no ultimate limitation period in this province. If s. 3(1)(b) of the Act applies retrospectively, as the City argues that it does, the City had immunity to suit by the Plaintiffs as of March 1, 1999. If s. 3(1)(b) applies prospectively, the City is not entitled to immunity.

**140**    It is trite that there is a presumption against retroactive application of a statute. The presumption may be overcome by sufficiently unambiguous language so as to make it clear that the legislation is intended to have that affect. The reason for the presumption and the concomitant need for clear unambiguous language of intent is that reaching back into time to rearrange consequences has a distasteful arbitrariness about it. The potential unfairness is obvious. However, the appropriate analytical structure for determining whether a statute was intended to have retroactive or retrospective application is less certain.

**141**    Mr. Justice Iacobbuci in Benner v. Canada (Secretary of State), [1997] 1 S.C.R. 358 at para. 39 offered these comments on the difference between retroactive and retrospective legislation:

> The terms, "retroactivity" and "retrospectivity", while frequently used in relation to statutory construction, can be confusing. E. A. Driedger, in "Statutes: Retroactive Retrospective Reflections" (1978), 56 Can. Bar Rev. 264, at pp. 268-69, has offered these concise definitions which I find helpful:

>> A retroactive statute is one that operates as of a time prior to its enactment. A retrospective statute is one that operates for the future only. It is prospective, but it imposes new results in respect of a past event. A retroactive statute operates backwards. A retrospective statute operates forwards, but it looks backwards in that it attaches new consequences for the future to an event that took place before the statute was enacted. A retroactive statute changes the law from what it was; a retrospective statute changes the law from what it otherwise would be with respect to a prior event.

**142**    It may be that the presumption against retroactivity also applies to retrospectivity. However, Ruth Sullivan, in her text Sullivan and Drieger on the Construction of Statutes, 4th ed. (Markham, Ont.: Butterworths Canada Ltd., 2002), footnote 5 at p. 559 suggests that: "Such a presumption would be much weaker than the presumption against retroactive application and in circumstances involving long-term relationships or conditions, would probably be easy to rebut." Sullivan indicates at p. 562, footnote 5 that the presumption against retroactive [and, presumably retrospective] application of legislation can be rebutted by express words or necessary implication that it is "meant to apply not only to ongoing and future facts but also to facts that are past."

**143**    It is clear that the Limitations Act has elements of retrospectivity given the language of s. 2(1), which makes the Act applicable to all claims commenced after March 1, 1999, whether the claim arose before, at or after the coming into force of the new legislation.

**144**    What is not so clear is whether s. 3(1)(b) is also necessarily retrospective. The answer depends on the clarity of the language used by the legislators and the context of the legislation.

**145** The Act was the considered product of the Alberta Law Reform Institute (ALRI). That body produced a report for discussion in 1986 and its final report in 1989. The Act was passed in 1996 and proclaimed in force on March 1, 1999.

**146** The transitional provisions of the Draft Act as set out in the 1986 report are as follows:

> 9(1) Notwithstanding this Act, if a claim which arose before this Act came into force is commenced in time to satisfy either
>
> > (a)   the provisions of law governing the commencement of actions which would have been applicable but for this Act, or
> >
> > (b)   the provisions of this Act,
>
> whichever time is later, the defendant is not entitled to immunity from liability under the claim.
>
> (2)   Nothing in this Act
>
> > (a)   deprives a defendant of entitlement to immunity from liability under a claim, or
> >
> > (b)   deprives one of rights in property,
>
> if the entitlement to immunity or the rights in property existed at the time this Act came into force and arose under provisions of law governing the commencement of actions which would have been applicable but for this Act.

**147** The Draft Act suggested in the 1989 report was structured differently. The salient portion of that draft is as follows:

> 13(1) Subject to subsection (2), this Act applies where a claimant seeks a remedial order in a proceeding commenced after the date the Act comes into force.
>
> (2)   A defendant is not entitled to immunity from liability in respect of a claim of which the claimant knew, or in his circumstances ought to have known before this Act came into force and in respect of which a remedial order is sought

> (a)    in time to satisfy the provisions of law governing the
>         commencement of actions which would have been applicable
>         but for this Act, and
> (b)    within 2 years after the date this Act comes into force.

**148**    There is no question that the ALRI was alive to the effect of an ultimate limitation period.
The 1986 draft would have allowed a plaintiff with a claim that arose before the new proposed Act
came into effect the longer of the limitation periods under the old Limitation of Actions Act or the
new Act. The ultimate limitation date under the new Act would have applied only if it favoured the
plaintiff.

**149**    The changes made to the 1989 draft and the accompanying commentary suggest that there
was a concern that the time period for filing an older claim should be reduced while still allowing
some time after passage of the Act for the plaintiff to commence proceedings. In the commentary to
s. 13 of its 1989 draft, the ALRI stated that s. 13(1) would benefit defendants in those cases in
which the time available to a claimant to commence a proceeding under the Limitation of Actions
Act was reduced. However, it also noted that s. 13(2) offered a countervailing concession to
claimants in that it assured that every claimant whose claim would be within time under the
Limitation of Actions Act would have no less than two years after the new Act took effect within
which to seek a remedial order in respect of the claim. In other words, the coming into force of the
Act would operate like discovery and would trigger a two year limitation period.

**150**    This commentary did not clarify whether the proposed transition provision in s. 13(2) applied
only where a claimant knew or ought reasonably to have known of their claim prior to proclamation
of the Act. In fact, its reference to the coming into force of the Act operating like discovery suggests
that the transitional provision may have been meant to apply to claims of which the claimant was
unaware prior to the Act coming into force.

**151**    In the commentary to s. 3 of the 1989 draft, the ALRI recognized that:

> 47.    The ultimate period for a claim based on the breach of a duty may expire
>        before the claim has even accrued, for the damage may not have occurred
>        by that time, and even if it has, the claim may not have accrued under the
>        discovery rule. This problem of legal principle is inescapable because there
>        is no feasible alternative consistent with limitation policy.

**152**    There is nothing in this commentary or in ss. 3 to suggest whether the ultimate limitation
period was intended to apply to all or any claims arising before the coming into force of the Act.

**153**    It is clear that the Commission's goal was to rationalize limitations law and to strike a fair
balance between the need for repose for prospective defendants and the need to provide prospective
plaintiffs with some time to act. At the heart of the balancing of these competing interests is
discoverability.

**154** The legislators subsequently debated the principles and language of the proposed new statute. Their debates offer no assistance in understanding the intended reach of the present s. 3(1)(b). In the result, we are left with the words of the statute to be considered in light of the general principles of statutory interpretation.

**155** Up until March 1, 1999 a negligence claim did not arise until an injury had occurred. However, at common law, the limitation period for negligence did not start to run until discovery of the injury. The new Act made itself applicable to all suits launched after March 1, 1999, whether or not the act or omission on which the suit was based occurred before or after that date. Pursuant to s. 3(3) of the new Act, a negligence claim is now said to arise for purposes of s. 3(1)(b) when the act or omission on which it is based occurs. Discoverability does not apply to the ultimate limitation period.

**156** The Plaintiffs argue that use of the present tense "occurs" in s. 3(3)(b) indicates that the legislator wanted s. 3(1)(b) to have prospective effect only, as otherwise it would have used the word "occurred,"just as the ALRI did in its 1989 proposed draft. I do not find this argument compelling. As indicated in Sullivan and Drieger on the Construction of Statutes at p. 620, it is a preferred legislative drafting technique to employ the present indicative unless the context requires otherwise. Legislation is said to speak at all times after it comes into force. Presumably, it was for that reason and to accord with the verb "arises," which also appears in s. 3(3)(b), that the word "occurs" was used.

**157** Section 2(2) applies only where the claimant knew, or in the circumstances ought to have known, of a claim but has not sought a remedial order. The claimant is given the earlier of the limitation period under the old Act or two years after the coming into force of the current Act within which to sue.

**158** In Maull v. Rodnunsky (2001), 287 A.R. 343, 2001 ABQB 309, Master Breitkreuz concluded that the ultimate limitation period in s. 3(1)(b) does not apply in situations covered by s. 2(2). He disagreed with Master Quinn's decision in Alberta (Alberta Infrastructure) v. Komant (2000), 269 A.R. 168, 2000 ABQB 940 that s. 3 must apply to claims predating proclamation of the Act where a proceeding had not been commenced prior to that date as Master Quinn did not appear to have considered the transitional limitation period in what is now s. 2(2). He noted that, on appeal (2000), 290 A.R. 323, 2000 ABQB 433 (Q.B.), Marceau J. applied the limitations period set out in the present s. 2(2), not the period set out in s. 3. In addition, he took into account that the court in Manufacturers Life Insurance Co. v. Husky Oil Marketing Co. (1999), 249 A.R. 305 (Q.B.) and in Stengel v. Mabbott (2000), 272 A.R. 296 (Q.B.), both of which dealt with claims arising before the Act was proclaimed, did not consider the effect of s. 3, albeit in Stengel counsel expressly agreed to that interpretation of the Act.

**159** Master Breitkreuz remarked that s. 3 makes no reference whatsoever to the old Act and is clearly not a transitional provision. He reasoned that it would lead to confusion and uncertainty to

hold that both the transitional provision and the ultimate limitation period apply as there is no mechanism in the Act to determine which limitation period will prevail. The same concern would not arise in situations where the claimant was unaware of the claim prior to proclamation of the new Act as s. 2(2) would not apply.

**160**    Master Breitkreuz noted in Maull that the Alberta Court of Appeal has confirmed in Campbell v. Fang (1994), 155 A.R. 270 that limitation statutes are to be strictly construed. While he agreed that the objectives of the ultimate limitation period are to bring potential liability to an end after a reasonable period of time so that people can order their affairs, to keep insurance premiums down, and to prevent old claims from going to trial where the evidence may be stale, he remarked that what is now s. 2(2) also provides an ultimate limitation period of March 1, 2001 which has many of the same objectives. There is no similar provision covering situations where the claimant was unaware of the claim before the new Act came into force. Therefore, in order for the objectives of the legislator to be met, s. 3(1)(b) must be interpreted as having retrospective effect. To apply it only prospectively would be to frustrate those objectives and would fly in the face of s. 2(1).

**161**    In Neal v. Kozens, the Court of Appeal implied that the ultimate limitation period in fact does apply in a situation such as this. The plaintiff in that case alleged that she had been sexually assaulted by the defendant between 1980 and 1987. She testified that she first learned that she might have a claim against the defendant in the spring of 2000. It was not until 2001 that she filed her suit. Both levels of court found that the actions of the defendant constituted fraudulent concealment pursuant to s. 4 of the Limitations Act, which had the effect of postponing the ten year limitation period. The Court of Appeal stated at para. 38 of its decision that: "On this record, we are of the view that the learned summary trial judge did not err in holding that fraudulent concealment by the appellant [defendant] overcame the ten year limitation in s. 3(1)(b)." This comment would not have been necessary if the ten year limitation period did not otherwise apply.

**162**    In 410727 B.C. Ltd. v. Dayhu Investments Ltd, 2004 BCCA 379, the defendants applied to have the action against them dismissed on the basis that the 30 year ultimate limitation period, first enacted in British Columbia in 1975, had expired prior to issuance of the plaintiff's writ. The summary trial judge concluded that a cause of action against the defendants for pure economic loss had arisen in 1968 and was out of time, but that the plaintiff had a further cause of action for injury to property which did not accrue until 2002. On appeal, the court held at para. 39 that:

> The 30-year "ultimate" limitation, which applies expressly notwithstanding the fact that the cause of action in question may not be discoverable, mandates that there be a point after which such prospective defendants may not be sued. In the case at bar, that point was reached, at the latest, in 1998 - four years before the issuance of the plaintiffs' writ.

**163**    The court concluded that the 30 year limitation period began to run from the time that the action accrued, not from the date when the ultimate limitation period was first enacted.

**164**    I have concluded that the intent of the new Act is that the ultimate period is to have retrospective effect.

**165**    The Plaintiffs in the present case argue that the City cannot rely on limitations immunity because it fraudulently concealed the fact that injury had been and was being suffered by them. They contend that fraudulent concealment for the purpose of limitations law does not constitute an allegation of common-law fraud and therefore does not attract the obligation of special pleading or the risk of costs. They rely on Photinopoulos v. Photinopoulos (1988), 54 D.L.R. (4th) 372, in which Stratton J.A., for the Alberta Court of Appeal, stated at p. 376:

> It has long been settled that "fraud" in this context does not necessarily involve any moral turpitude: see Beaman v. ARTS Ltd. It is sufficient if what was done was unconscionable: see Kitchen v. Royal Air Forces Association, a test which was applied in the case of a building contract in Clark v. Woor. Those cases show that "fraud" is not used in the common law sense. It is used in the equitable sense to denote conduct by the defendant or his agent such that it would be "against conscience" for him to avail himself of the lapse of time. The section applies whenever the conduct of the defendant or his agent has been such as to hide from the plaintiff the existence of his right of action, in such circumstances that it would be inequitable to allow the defendant to rely on the lapse of time as a bar to the claim. Applied to a building contract, it means that if a builder does his work badly so that it is likely to give rise to trouble thereafter, and then covers up his bad work so that it is not discovered for some years, then he cannot rely on the statute as a bar to the claim. The right of action is concealed by "fraud" in the sense in which "fraud" is used in this section.

**166**    The court in that case rejected the argument that an overt act of concealment by the defendant was necessary.

**167**    In my view, the evidence here falls far short of establishing wilfulness on the part of the City or any effort to hide its negligence or the injury suffered by the Plaintiffs. Rather, this is a case of oversight, which does not justify the fraud moniker. Accordingly, the Defendant is entitled to immunity from liability for negligence on the basis of the ultimate bar contained in s. 3(1)(b) of the Act.

### 5.    Damages

**168**    In the event that I am wrong and the City is not entitled to immunity, it is necessary to consider the appropriate award of damages.

#### (a)    General Damages

**169**    The parties agreed that, exclusive of interest and costs, the damages suffered by the Plaintiffs

are as follows:

| | | |
|---|---|---|
| Bowes | Land & Home | $708,000.00 |
| | Contents | $ 1,868.00 |
| | | |
| | Total | $709,868.00 |
| | | |
| Skinner | Land & Home | $561,000.00 |
| | Contents | $ 10,989.53 |
| | | |
| | Total | $572,489.53 |
| | | |
| Reid | Land & Home | $605,500.00 |
| | Contents | $26,121.97 |
| | | |
| | Total | $631,621.97 |

**170**   I understood the parties to be agreed that if the City was liable then subject to contributory negligence, contribution and its claim against Douglass, the City was liable for damages in these amounts.

**171**   I have not been advised as to the basis upon which the parties came to their agreement upon damages. I have not heard any argument on the subjects of quantification or the heads of damage. It

seems to me that this is really a case of loss of chance as the applicable head of damage. This case was presented on the basis that had the City disclosed the Hardy report, the Plaintiffs may not have built or may not have been allowed to build. The notion of an award of damages for loss of chance is not without controversy. However, the parties' argument makes resolving that controversy unnecessary.

**172**    The Plaintiffs also seek punitive damages.

> (b)    Punitive Damages

**173**    The Plaintiffs have each claimed punitive damages on the basis that the City's failure to disclose the 1977 Hardy report, was a wilful and deplorable determination to extract taxes from the Plaintiffs and to use their lands to support the City's Whitemud Road.

**174**    While the loss of the Plaintiffs' homes was unfortunate, the City was merely negligent. It did not act outrageously, maliciously or egregiously. As such, punitive damages have no place in this action.

**175**    The high handed manner in which the City ultimately obtained access to the slide area, over the lands and protests of the Plaintiffs, and the City's lawsuit against the land owners for the costs involved in demolishing their homes, while in poor taste, do not fall within the categories of behaviour which would justify punitive damages. Those actions may have been inconsiderate and even rude, but they are not punishable.

> 6.    Contributory Negligence

**176**    The City argues that each of the Plaintiffs was contributorily negligent in purchasing the subject lands and building on those lands. Part of the City's argument in this regard is that the Plaintiffs knew or ought to have known that the land would slide or subside and built their homes there anyway.

**177**    The problem with the City's argument is that contributory negligence is not an apt concept for the facts of this case. In fact, the proper notion is the voluntary assumption of risk. In my view, the City's claim to shield against the Plaintiff's damages is based upon the fact that the Plaintiffs were or ought to have been alert to the risk of a slide or slides and went ahead anyway.

**178**    The BBT report did make it clear that the bank was only marginally stable. However, that report also suggested that the most reasonable scenario was one in which many years could pass before any loss of land would occur and the loss would be minimal when it did occur. Therefore, a reasonable person could have considered that the risk assumed in building, while tangible, was minimal. However, since the Plaintiffs had access to the BBT report prior to building their homes, either directly or as referenced in the 1980 caveat they must bear some responsibility for their loss as they were aware of and assumed some risk.

**179**    That risk included the fact that the report noted but discounted the possibility of a large block slide. In all the circumstances, given the knowledge possessed by the Plaintiffs, I am of the view that the risk voluntarily assumed by them of a deep translational slide is 5%. I would reduce the agreed damages by that amount.

### 7. Contribution

### (a) Shelby Engineering and G.G. Hunter

**180**    The Bowes retained Shelby Engineering Ltd. to report on geotechnical considerations in the construction of their home and to recommend the appropriate distance from the top of the bank that the house should be constructed. Shelby's report effectively reiterated the report results of BBT. The City did not provide Shelby with the 1977 Hardy report, nor did Shelby have access to that report from any other source. The Bowes sued Shelby and the City and the City sought contribution and indemnity from Shelby for any liability it might have to the Bowes.

**181**    The Bowes' claim against Shelby and Hunter was settled at the commencement of the trial of this action. The settlement agreement was filed as an exhibit.

**182**    In my view, the Bowes' claim against Shelby was rooted in the notion that Shelby was one of the parties which should have protected them from harm, the other party being the City. Their responsibilities to the Bowes were independent and based on different duties. The Bowes instructed Shelby to assess the bank stability. Shelby regurguitated the BBT report. Simple regurgitation without extensive independent analysis may have been negligent. Of course, that would depend on the nature of the retainer between the Bowes and Shelby. We know nothing of the terms of that retainer. Whatever the circumstances, it is clear that there was only one loss suffered by the Bowes. That loss resulted from the bank subsiding. The subsidence was at the heart of the claim by the Bowes against both Shelby and the City. It follows, that the City is entitled to a contribution from Shelby and Hunter towards its liability to the Bowes in an amount equal to the amount that they agreed to accept from Shelby and Hunter as general damages in settlement of their claim.

### (b)    Douglass Estate

**183**    The City claims contribution and indemnity from the Douglass Estate pursuant to its Rule 77 Notice (statutorily) and pursuant to its Third Party Notice (contractually).

### (i)    Statutory Contribution

**184**    The City issued a Notice to the Estate pursuant to Rule 77 at a time when the Estate was still a Defendant in the actions taken by the Plaintiffs. As indicated earlier, the Estate successfully moved to have the Plaintiffs' claims against it summarily dismissed. Veit J.'s decision in that regard was issued in June 2003. She concluded that all of the Plaintiffs' claims against the Estate were statute barred.

**185**    The Estate argues that the result of Madam Justice Veit's order is that it is not liable to the Plaintiffs and, absent such liability, cannot be liable to assist the City in compensating the Plaintiffs. I agree. The Supreme Court of Canada in Parkland (County) No. 31 v. Stetar, [1975] 2 S.C.R. 884, [1975] 1 W.W.R. 441 provided the answer, although in a completely different factual situation. Mr. Justice Dickson offered the following opinion at p. 449:

> The second question is whether the Poiriers and Car Rentals can recover 100 per cent of their damages from Stetar having regard to (a) the attribution of fault 75 per cent to Stetar and 25 per cent to the county; (b) the nonsuit of the Poiriers and Car Rentals in their actions against the county for their failure to give timely notice; (c) the authorities which support the proposition that s. 4(1)(c) of The Tort-Feasors Act, R.S.A. 1955, c. 336 (now R.S.A. 1970, c. 365) and its English counterpart, s. 6(1)(c) of the Law Reform (Married Women and Tortfeasors) Act, 1935, do not admit of a claim for contribution by one tort-feasor against another when that other has been sued by the injured person and held not liable: George Wimpey & Co. v. British Overseas Airways Corporation [ [1954] 3 All E.R. 661]; Aleman v. Blair and Canadian Sugar Factories Ltd. [(1963), 44 W.W.R. 530]; Hart v. Hall and Pickles, Ltd. [[1968] 3 All E.R. 291]. Section 4(1)(c) of the Tort-Feasors Act of Alberta provides:
>
> > 4.    (1) Where damage is suffered by any person as a result of a tort, whether a crime or not, ...
> >
> > > (c)    any tort-feasor liable in respect of that damage may recover contribution from any other tort-feasor who is or would, if sued, have been liable in respect of the same damage, whether as a joint tort-feasor or otherwise ...
>
> In Hart v. Hall and Pickles, Ltd., supra, the Court of Appeal had occasion to consider the meaning of s. 6(1)(c) of the Law Reform (Married Women and Tortfeasors) Act, 1935. Lord Denning M.R. commented on this section and the Wimpey case at p. 293:
>
> > This point depends on the interpretation of the Act of 1935. Before that Act when there were separate tortfeasors causing one damage, the plaintiff could sue them each in turn till he got the total amount of his damages: and neither of the tortfeasors had any right of contribution from the other. Now this statute gives a right of contribution. Section 6(1) provides that:

> "Where damage is suffered by any person as a result of a tort ... (c) any tortfeasor liable in respect of that damage may recover contribution from any other tortfeasor who is, or would if sued have been, liable in respect of the same damage ..."

> That is all I need read. Those words as construed by the House of Lords cover two situations: (i) where a tortfeasor has been sued and has been held liable; and (ii) where a tortfeasor has not been sued, but, if he had been sued, he would have been held liable. The words do not cover a third situation; (iii) where a person who is alleged to be a tortfeasor has been sued and has been held not liable. If he has been held not liable on the merits of the case, clearly he cannot be sued for contribution. If he has been saved from liability by reason of the Statute of Limitations, again he cannot be sued for contribution, see George Wimpey v. British Overseas Airways Corpn.

**186**    Dickson J. concluded that Poirier could recover fully from Stetar. For the purposes of this case, what is significant is the court's seeming adoption of the principles espoused in the quoted segment of Lord Denning's judgment in Hart v. Hall & Pickles Ltd., [1969] 1 Q.B. 405.

**187**    The Supreme Court of Canada addressed the issue again in Giffels Associates Ltd. v. Eastern Construction Co., [1978] 2 S.C.R. 1346. Again, the circumstances differ from those here. However, then Chief Justice Laskin, speaking for the court, offered comment on the issue in these words:

> Similarly, I am of the view that it is a precondition of the right to resort to contribution that there be liability to the plaintiff. I am unable to appreciate how a claim for contribution can be made under s. 2(1) by one person against another in respect of loss resulting to a third person unless each of the former two came under a liability to the third person to answer for his loss.

**188**    The City's reliance on Master Funduk's decision in Wurtz v. Nobis (1980), 28 A.R. 574 is misplaced. That was a case where the plaintiff discontinued its action against the prospective contributor. In the present case, as in Parkland and Giffels, there was a judicial determination that the claimed contributor was not liable to the Plaintiff. Accordingly, the City's claim for contribution from the Estate pursuant to its Rule 77 Notice fails.

(ii)    Contractual Contribution

**189**    The 1978 caveat arose from the development agreement between Eric Douglass and the City of Edmonton. That agreement is the foundation of the City's Third Party Notice claim against the

Estate.

**190**    The Estate raised a number of cogent arguments against the City's claim. In the end result, however, it is only necessary to interpret the agreement in the context of Mr. Douglass' death to resolve this issue.

**191**    The agreement was clearly directed at protecting the City from claims by Mr. Douglass for any loss he might suffer as a result of bank slippage. Furthermore, it was clearly intended that those who succeeded Mr. Douglass in title would be bound by the agreement. However, the City does not rely on the agreement in its defence to the Plaintiffs' claims. Rather, it seeks indemnity from the Estate. Ultimately, the City's Third Party claim against the Estate fails because the claim, even if meritorious, died with Mr. Douglass. The words of the agreement are that Mr. Douglass commits himself, his successors, successors-in-title and assigns. He does not commit his heirs. It is apparent that once there are successors or assigns, they become liable. Since Mr. Douglass' heirs are not specified as being bound, I conclude that the parties did not intend to bind them. As a result, the Estate cannot be liable to the City pursuant to the agreement in relation to the lots ultimately transferred to the Plaintiffs.

**192**    Accordingly, the City's Third Party Notice against the Estate is dismissed. As there is no liability against the Estate, there is no foundation for the Estate's Fourth Party Notice against the Plaintiffs and it also is dismissed.

B.    Nuisance

**193**    The Plaintiffs have also claimed that the City is liable in nuisance. The City owns the lands both immediately east and west of the Plaintiffs' lands, comprising the adjacent riverbank and road allowance, respectively. The Plaintiffs argue that the use to which the City put its lands constituted a nuisance. Additionally, they submit that the City is liable in nuisance because it failed to ameliorate a risk which it knew existed. This latter claim is based on Leakey and others v. National Trust for Places of Historic Interest or Natural Beauty, [1980] 1 Q.B. 485 (C.A.) and will be referred to here as the Leakey claim.

1.    Use Nuisance

**194**    The Plaintiffs claim that the City's use of the property on their eastern boundary for Whitemud Road was a use which increased the groundwater percolating under the Plaintiffs' lands. They contend that, as softening was in part the genesis of the Whitemud Road slide the City is responsible for this nuisance.

**195**    The Plaintiffs also argue that the City used its lands to the west of the Plaintiffs' properties as a berm to shore up the soils supporting its road allowance.

**196**    The evidence does not support the argument that construction of the road in any way

contributed to the subsurface water which ultimately played a role in the slide. The 1977 Hardy report makes it plain that surface drainage of the upland area to the east of the bank is in a southeasterly direction, which is away from the Plaintiffs' lands. That report also noted that road construction tends to improve surface drainage and therefore reduce absorption of water into the subsurface. However, the author also commented that roads tend to increase the rate of snow melt in the spring. In any event, the report contained a series of recommendations designed to ensure that the surface water would drain to the south and east of the Plaintiffs' properties.

**197**   It would appear from the 1977 Hardy report that the roads' impact is on surface water, not subsurface water. There is nothing in the evidence to suggest that the road caused the accumulation of surface water or added to the subsurface water. In fact, the report recommended measures to move the surface water away from the Plaintiffs' lands and there is no evidence to suggest that those recommendations were not followed. Therefore, I conclude that construction of the road and the City's use of the land for that purpose has not been shown to have caused any damage to the Plaintiffs' lands.

**198**   Similarly, the suggestion that the City's "use" of the riverbank as a berm constituted a nuisance also fails. The Plaintiffs' complaint is not that the City actually did anything, rather the complaint is that the City did not do what it should have done to make the bank capable of supporting the Plaintiffs' lands. However, even if it is accepted that the City intended the bank to buttress the lands to the east, the complaint is not about use nuisance but about a failure to remedy a potential problem; that is, a form of Leakey claim.

**199**   The distinguishing feature between classic or use nuisance and a Leakey claim is that the former involves some action taken in relation to the lands. Inaction, whatever the motivation, is one of the defining characteristics of a Leakey claim.

2.   Leakey Claim

**200**   Leakey involved a claim by the plaintiffs for damage which occurred when a significant portion of the Burrow Mump, National Trust's property, slid onto the Leakey's property. The Court of Appeal framed the issue before it as one of whether the owner or occupier of land can be liable for damage caused to his neighbour's land as a result of a naturally occurring phenomenon on his lands. The headnote of the decision adequately summarizes the conclusion of the court as follows:

> . . . A person on whose land a hazard naturally occurred, whether in the soil itself or in something on or growing on the land, and which encroached or threatened to encroach onto another's land thereby causing or threatening to cause damage, was under a duty, if he knew or ought to have known of the risk of encroachment, to do what was reasonable in all the circumstances to prevent or minimise the risk of the known or foreseeable damage or injury to the other person or his property, and was liable in nuisance if he did not. Where a substantial expenditure was required to prevent or minimise the risk of damage

> the occupier's financial resources, assessed on a broad basis, were a relevant
> factor in deciding what was reasonably required of him to discharge the duty, and
> the neighbour's ability, similarly assessed on a broad basis, to protect himself
> from damage might also be a relevant factor to be taken into account, depending
> on the circumstances.

**201**    In Leakey, there was no question that the landslide was a completely foreseeable
consequence and a natural occurrence. It was known that a slide was possible and likely to cause
damage if it occurred. The action was framed in nuisance but not in negligence. National Trust took
the position that the claim was properly one of negligence, which had not been pleaded. Megaw L.J.
had this to say on the subject at p. 25:

> The judgment of the Board in Goldman v. Hargrave, [1966] 2 ALL ER 989 at
> 991 was delivered by Lord Wilberforce. It was held that the risk of the
> consequence which in fact happened was foreseeable. This, it is said, 'was not
> really disputed'. The legal issue was then defined:
>
> > '. . . the case is not one where a person has brought a source of danger on to
> > his land, nor one where an occupier has so used his property as to cause a
> > danger to his neighbour. It is one where an occupier, faced with a hazard
> > accidentally arising on his land, fails to act with reasonable prudence so as
> > to remove the hazard. The issue is therefore whether in such a case the
> > occupier is guilty of legal negligence, which involves the issue whether he
> > is under a duty of care, and, if so, what is the scope of that duty.'

**202**    Megaw L.J. went on to analyze the nature of the obligation in terms of the principles in
Rylands v. Fletcher (1868), L.R. 3 H.L. 330 and concluded that the obligation is not one of strict
liability. He further discussed and dismissed the notion that Rylands v. Fletcher stands for the
proposition that there can be no liability for naturally occurring phenomena. Rather, he concluded
that there cannot be strict liability for naturally occurring phenomena. He held that the obligation is
one which requires the occupier to use reasonable care in relation to risks he is either aware of or of
which, as a reasonably careful landowner, he ought to be aware.

**203**    Having determined that a duty of care could be imposed, the court concluded that there were
no policy reasons which precluded recognition of the duty because the scope of the duty was
limited, not only by the usual limits associated with determining liability in negligence but also by a
consideration of economic reasonableness. Megaw L.J. outlined the limit of the occupier's duty in
these words (at p. 35):

> This leads on to the question of the scope of the duty. This is discussed, and the
> nature and extent of the duty is explained, in the judgment in Goldman v.
> Hargrave. The duty is a duty to do that which is reasonable in all the

circumstances, and no more than what, if anything, is reasonable, to prevent or minimise the known risk of damage or injury to one's neighbour or to his property. The considerations with which the law is familiar are all to be taken into account in deciding whether there has been a breach of duty, and, if so, what that breach is, and whether it is causative of the damage in respect of which the claim is made. Thus, there will fall to be considered the extent of the risk. What, so far as reasonably can be foreseen, are the chances that anything untoward will happen or that any damage will be caused? What is to be foreseen as to the possible extent of the damage if the risk becomes a reality? Is it practicable to prevent, or to minimise, the happening of any damage? If it is practicable, how simple or how difficult are the measures which could be taken, how much and how lengthy work do they involve, and what is the probable cost of such works? Was there sufficient time for preventive action to have been taken, by persons acting reasonably in relation to the known risk, between the time when it became known to, or should have been realised by, the defendant, and the time when the damage occurred? Factors such as these, so far as they apply in a particular case, fall to be weighed in deciding whether the defendant's duty of care requires, or required, him to do anything, and, if so, what.

**204**   He further commented at p. 36 on the policy arguments raised by the defendants in that case:

> ... The difficulties which are foreseen, arising out of the passage which I have quoted, include unpredictability of the outcome of litigation, delay in reaching decisions (which in everyone's interest ought to be made promptly) as to protective measures to prevent damage and the increased complexity, length and expense of litigation, if litigation is necessary. All this, and other disadvantages, would arise, it is suggested, because the parties and their advisers, before they could form a fair and confident view of their respective rights and liabilities, and before they could safely ask the court to decide these matters, whether finally or at an interlocutory hearing, would find it necessary, or at least desirable, to put themselves in a position to ascertain and compare the respective financial resources of the parties. This might involve detailed, embarrassing and prolonged investigation, even before the stage of discovery in an action.

**205**   Megaw L.J. rejected this argument, however. He concluded that the extent of the defendant's duty is to do what is reasonable for him to do, having regard, amongst other things, to his means, broadly assessed, where a serious expenditure of money is required to eliminate or reduce the danger, or to his age and physical condition, where physical effort is required to avert an immediate danger. Similarly, a broad assessment of the neighbour's capacity to protect himself from damage, whether by way of some form of physical barrier on his land or by way of providing funds for agreed works on the land of the defendant, may be required.

**206**    Somewhat surprisingly, this reasonably novel cause of action has had little consideration in Canada. Both parties offered decisions which purported to adopt or to reject the conclusions in Leakey. However, none of those decisions specifically addressed, critically analyzed, applied, rejected or distinguished the decision. There are no reported Alberta decisions that I am aware of which have considered Leakey.

**207**    My first concern with this supposed cause of action is the imprecision with which it was defined by the Court of Appeal. Is it a negligence action or a claim in nuisance? While Lord Justice Megaw suggested categorization would be a "regrettable modern instance of the forms of action successfully clanking their spectral chains," in the context of limitations, statutory protections and predictability, categorization is crucial. For instance, in this case, the Plaintiffs' negligence claim against the City is barred by the ultimate limitation period set out in s. 3(1)(b) of the Limitations Act. A Leakey claim would also be barred if founded on negligence. Of course, if a Leakey claim is based on nuisance, as the nuisance continued unabated until the Whitemud Road slide, there would be no limitations issue. Furthermore, taking all reasonable care, ordinarily is not a defence to a claim in nuisance, although it is in negligence. However, a Leakey claim as defined by the Court of Appeal embraces the exercise of reasonable care by the occupier defendant. Megaw L.J.'s characterization of the cause of action suggests that the victim of the nuisance could come to the nuisance or voluntarily assume the risk of loss. Those are notions wholly foreign to the law of nuisance, but common to negligence actions.

**208**    It would seem that the definition offered by the Court of Appeal has more in common with negligence than with nuisance. However, even that suit is ill fitting as the scope of the duty to act is not limited solely by factors of risk and foreseeability but also includes financial considerations.

**209**    It seems to me that private nuisance remains a tort separate from negligence out of necessity. The tort of nuisance allows the court to construct a compromise between competing but lawful uses of neighbouring properties. In my view, the tort of nuisance is not so much concerned with land occupation, other than as a basis to justify intervention, rather the focus is upon ameliorating the conflicts inevitably resulting from socialization and private property ownership. In that sense, the Leakey claim fits a gap because the alleged tortfeasor would otherwise be entitled to use his land as he sees fit and do nothing as it slips-slides away. The categorization of the Leakey claim as one of nuisance makes the difficult task of assessing causation less important. If the lands' condition has the reasonable potential to create or cause a nuisance to the neighbouring land, it constitutes a nuisance until such time as the condition is ameliorated. However, one could also skirt causation issues by characterizing non action as a perpetually recurring negligence until such time as the foreseeable event occurs.

**210**    It seems to me that categorization of non-action in this context as either nuisance or recurring negligence has the potential to substantially undermine limitations law in this province and to return us to the unacceptable uncertainty which marked litigation prior to proclamation of the Limitations Act.

**211** I am of the opinion that the Leakey claim is better seen as a negligence action than a nuisance action. I would characterize it as a special kind of tort, a tort of non-feasance where the tortfeasor's neighbour is his neighbour in the concrete physical sense rather than in the figurative sense only.

**212** Does this tort have a place in the law of this province? I think Lord Justice Megaw's reasoning compelling. It seems to me that there is room in our law for another tool which will serve to balance the interests of neighbours when one is pursing a lawful but potentially harmful course of action on his land relative to the land of his neighbour. Furthermore, it seems to me that his formulation of the scope of the duty is both sophisticated and flexible, thus providing the greatest likelihood of striking the most appropriate balance in what will be an essentially local dispute.

**213** Categorizing the Leakey claim as one which sounds in negligence serves to focus the attention of the Court on the action or inaction of the occupier as opposed to the artificial and arbitrary distinction based on land occupation. Again, occupation merely establishes the necessary proximity but knowledge and action or inaction is the foundation for intervention.

**214** Applying the Leakey principles to this action, it is clear that the City was aware of the marginal stability of the riverbank. It is clear that the City had been told not to allow any building west of the extended Whitemud Road. The City's knowledge included the foreseeable risk that there could be a loss of property if building was allowed to occur on the unstable bank.

**215** The City's knowledge as to the kind of instability that might become manifest is contained within the report by BBT. The Hardy report did not offer comment on the kind of slide that might be expected to occur. The BBT report concluded that, while the bank was in a state of marginal stability, the focus of foreseeable risk was surficial. While a deep seated bedrock initiated slide was possible, it was implied in the BBT report that such an event was unlikely enough to be discounted. Therefore, the focus was on the more probable surface soils slide.

**216** As indicated earlier, foreseeability and risk assessment in the engineering context differs from the common law treatment of those issues. However, in this instance, it seems to me that the two disciplines are precisely aligned. Both from an engineering perspective and a legal perspective the risk of a bedrock slide, while foreseeable, was too insignificant or remote to justify specific action to address the risk.

**217** Therefore, it is unnecessary to finally decide whether the Leakey claim properly sounds in negligence or in nuisance. Whatever the categorization, it is clear that foreseeability and remoteness limit liability and are necessarily part of the duty analysis. In this case, the City did not owe a Leakey duty in relation to a bedrock initiated slide. The City lacked the requisite proximate knowledge. That knowledge did not become sufficiently proximate until some time late in 1999 when it became apparent that a substantial deep seated slide was occurring. By that time, there was no realistic action that could have been taken to limit or abate the slide.

**218**    I accept that horizontal and vertical wells are both post-slide measures designed to reduce the water content in the slide mass and thus protect against further movement. Neither, however, was a realistic nor economic option prior to the slide occurring, given the knowledge which existed, the degree of risk, the difficulties in accessing the lands and constructing such wells, and the prohibitive expense associated with either initiative.

**219**    The Plaintiffs' Leakey claims required that they prove that reasonable steps could have been taken by the City to prevent or minimize the damage. The Plaintiffs have not met that onus. Accordingly, their Leakey claims fail.

VI.    Conclusion

**220**    The Plaintiffs' actions against the City are time barred and therefore their claims are dismissed. The Third Party proceedings launched by the City against the Douglass Estate are dismissed. The parties may speak to costs on appointment.

CLACKSON J.

cp/e/qw/qlsmw

e/drs/qlbms/qljxb/qljal

# Court of Queen's Bench of Alberta

**Citation: Bowes v. Edmonton (City of), 2005 ABQB 502**

**Date:** 20050707
**Docket:** 0003 12407, 0003 12408, 0003 12409
**Registry:** Edmonton

Between:

Action No.: 0003 12407

### Kenneth Bowes and Ruth Bowes

Plaintiffs

- and -

### The City of Edmonton, Shelby Engineering Ltd., and G.G. Hunter

Defendants

- and -

### Helena Mary Douglass, C. Hugh Fraser, and Carl H. Rolf, Personal Representatives of the Estate of Eric Douglass

Third Parties

- and -

### Constance Reid, Muriel Skinner (formerly Muriel Bryant), Kenneth Bowes and Ruth Bowes

Fourth Party

**Action No.: 0003 12408**

**And Between:**

### Muriel Skinner (formerly Muriel Bryant)

Plaintiff

- and -

### The City of Edmonton

Defendant

2005 ABQB 502 (CanLII)

Page: 2

- and -

**Helena Mary Douglass, C. Hugh Fraser, and Carl H. Rolf,
Personal Representatives of the Estate of Eric Douglass**

Third Parties

- and -

**Constance Reid, Muriel Skinner (formerly Muriel Bryant),
Kenneth Bowes and Ruth Bowes**

Fourth Parties

And Between:

Action No.: 0003 12409

**Constance Reid**

Plaintiff

- and -

**The City of Edmonton**

Defendant

- and -

**Helena Mary Douglass, C. Hugh Fraser, and Carl H. Rolf,
Personal Representatives of the Estate of Eric Douglass**

Third Parties

- and -

**Constance Reid, Muriel Skinner (formerly Muriel Bryant),
Kenneth Bowes and Ruth Bowes**

Fourth Parties

---

**Reasons for Judgment
of the
Honourable Mr. Justice T.D. Clackson**

---

Page: 3

I.    **Summary**

[1]    The City negligently failed to consider and disclose a geotechnical report which may have resulted in a denial of the Plaintiffs' application to develop and build or resulted in the Plaintiffs exercising other choices in relation to the development of their river bank properties. However, the claim of the Plaintiffs is time barred by the ultimate limitation contained in s. 3(1)(b) of the *Limitations Act*, RSA 2000 c. L-12.

[2]    The Plaintiffs' claims is nuisance based upon ***Leaky and others v. National Trust for Places of Historic Interest or Natural Beauty***, [1980] 1 QB 485 (CA) also fails on the basis that if actionable nuisance exists in Canada for the failure to prevent one's land from naturally occurring subsidence, that result was not reasonably foreseeable nor economically remediable.

[3]    The filing of the caveat against the land titles of the Plaintiffs did not constitute an act of kindness nor offer of succour such as to engage the principles of good samaritan negligence.

[4]    The third party estate is not liable to the City because its liability to the Plaintiffs was judicially dismissed in a pre-trial application. Nor is the estate liable to the City on the basis of the development agreement as the agreement does not purport to find the heirs of the estate.

II.    **Background**

[5]    On October 23, 1999, the earth collapsed beneath three homes adjacent to Whitemud Road in the City of Edmonton. By the time that dusk settled that day, the Skinner home had been completely destroyed and the Bowes and Reid homes were severely compromised. Both were later demolished as unsafe. This event will be referred to as the Whitemud Road slide.

[6]    The land on which the Plaintiffs' homes were built had previously been owned and subdivided by Eric Douglass, who built his first home on the northern edge of the property between 1967 and 1968. At that time, the lands in question were the subject of Subdivision Plan No. 6135 K.S. and encompassed four lots. Mr. Douglass' house was built on Lot 2.

[7]    In 1978, Mr. Douglass received approval to construct a new house on Lot 3 which was the southern edge of his property. On May 25, 1978, he executed a development agreement with the City in relation to Lot 3. The agreement specifically provided that:

> 3.  The Developer recognizes that there is a potential danger of slippage or subsidence of the river bank adjacent to the development site and in consideration of the issuing of the development permit for the development on the development site, he shall indemnify and hold the City harmless from any cause of action or damages arising out of slippage or subsidence of the bank adjacent to the development site.

2005 ABQB 502 (CanLII)

Page: 4

4. This agreement shall be deemed to be a covenant running with the
development site, to be binding upon the Developer, his successors in title, and
assigns; and pursuant to Sections 52 and 134 of *The Land Titles Act*, being
Chapter 196 of the Revised Statutes of Alberta, 1970, it is understood that the
City may file a caveat at the Land Titles Office in protection of such covenant.

[8]    Mr. Douglass built and occupied his house on Lot 3 sometime in 1978 to 1979.

[9]    Late in 1978, Mr. Douglass applied to the Municipal Planning Commission to subdivide
Lots 2 and 3. The application was approved on October 11, 1979 and Lots 2 and 3 became Lots 5
through 1, south to north under Block 1, Plan 802 2038. Lot 11 included Mr. Douglass' first
home, and Lot 5 his second. On May 8, 1980, Mr. Douglass entered into another development
agreement with the City in respect to that subdivision. The agreement stipulated that:

Article 1

... the conditions, terms and provisos in this Agreement shall be deemed to be
covenants running with the lands and to be binding upon the Owner and his
successors in title. The Owner shall extract the same covenants as herein
contained from any person to whom he may in any way convey the said lands or
any part thereof so that the said covenants shall run with the said lands, and the
terms, conditions and provisos of this Agreement shall be enforceable by the City
in the same manner and to the same extent as any other restrictive covenant, filed
by way of caveat, ...

Article 5

The Owner acknowledges and agrees that the following development restrictions
shall apply to the said lands in order that the stability of the bank of the North
Saskatchewan River may be maintained, and agrees that the City may file a
Caveat against the said lands in order to extract the same covenants as herein
contained from any person to whom the Owner may in any convey the said lands,
or any party thereof:

(a)    No permanent lawn watering systems shall be constructed on the said
lands;

(b)    No swimming pools, fish ponds or similar reservoirs shall be constructed
on the said lands, with the exception of Lot 11;

(c)    There shall be constructed around any residence constructed on the said
lands a weeping tile foundation which drains into the sewer system to be
constructed by the City;

2005 ABQB 502 (CanLII)

Page: 5

2005 ABQB 502 (CanLII)

    (d)    All drainways from roof tops shall be connected to the City sewer system at the expense of the Owner;

    (e)    There shall be no cutting of trees to the west of the top-of-the bank line, which is shown marked on Schedule "A" attached hereto, and no work shall be carried out west of the top-of-the-bank line other than as will preserve the natural vegetation of the area;

    (f)    No garbage, fill or other excess material shall be dumped, deposited or placed to the west of the top-of-the-bank line;

    (g)    No drainage ditches or canals of any kind shall be constructed to the west of the development line.

[10]    The newly subdivided lots were located next to the western edge of Whitemud Road. There was a 25-foot wide city easement on the western border of the lots. The top of the riverbank comprised the western edge of the easement. The remainder of the land between the river and the top of the bank was City land, including a portion set aside as reserve and a portion designated as environmental reserve.

[11]    When Mr. Douglass built his first home, the edge of the city lay well to the east. By the time he built his second home, houses were being built immediately east and north of Whitemud Road. The area immediately north of the Douglass lands became known as the Glamorgan Subdivision while the area immediately to the east became known as the Ramsay Heights Subdivision.

[12]    Geotechnical investigations of the soils and stability in the nearby areas were undertaken during that period. On December 11, 1975, R.M. Hardy and Associates ("Hardy"), at the request of the City of Edmonton, reported in relation to stability of the east bank of the river and that part of the Glamorgan Subdivision extending between 45th Avenue and 53rd Avenue. At the request of one of the developers of the Ramsay Heights Subdivision, Hardy reported on February 10, 1977 on the proposed extension of Whitemud Road from 45th Avenue south. On April 22, 1997, Hardy again reported on the nature of the soils and their potential impact on above and below ground structures in the Ramsay Heights Subdivision. In April 1978, E.B.A. Engineering Consultants Ltd., at Mr. Douglass' request, reported on the subsurface soil conditions of Lots 2 and 3 of the Douglass lands.

[13]    BBT Geotechnical Consultants Ltd. submitted a report to Mr. Douglass on August 27, 1979 concerning the stability of the riverbank adjacent to Lots 2 and 3. The report was commissioned by Mr. Douglass in support of his application to subdivide lots 2 and 3 into lots 5 through 11.

Page: 6

[14]    All of these reports came to the City's attention and into its possession either because the City had commissioned the report or had received the report as an attachment to a development application. The applications and supporting geotechnical reports received by the City generally were forwarded to the City's geotechnical engineers for comment. The reports were then preserved in a library along with other technical consulting reports received by the geotechnical engineering section of the City's administration. At all material times, copies of the foregoing reports were in the City's possession.

[15]    In 1976, a significant landslide occurred in the Glamorgan Subdivision, approximately 400 metres north of Lot 7. This slide continued to propagate, resulting in further slumping of the riverbank. The slide was well known to the City's geotechnical section.

[16]    The development agreements between Mr. Douglass and the City in relation to his house on Lot 3 and the subsequent subdivision of Lots 2 and 3 into Lots 5 through 11 resulted in two caveats being registered against those lands. The caveat registered against Lot 3 was referred to by the parties as the 1978 caveat. A copy of the 1978 development agreement was attached to the caveat. The June 2, 1980 caveat that resulted from subdivision of Lots 2 and 3 into Lots 5 through 11 was referred to by the parties as the 1980 caveat. Attached to it was a copy of the 1980 development agreement, which included conditions suggested in the BBT report as necessary to guard against instability of the adjacent riverbank.

[17]    The development agreement relating to development of the Ramsay Heights lands resulted in caveats being registered in 1978 against approximately 30 lots immediately east of the Douglass lands, adjacent to and in the vicinity of the eastern edge of Whitemud Road. The caveats attached the development agreement and also appended the salient portions of the February 10, 1977 R.M. Hardy report.

[18]    All of the foregoing occurred before any of the Plaintiffs bought their lands and built their homes.

[19]    In 1984, Ms. Muriel Skinner bought Lot 7 from Mr. Douglass. The details of the lot purchase and construction of their home were handled by Ms. Skinner's then husband, Alan Bryant. Prior to closing the transaction, Mr. Bryant obtained copies of and reviewed the 1978 and 1980 caveats and the BBT report. Ms. Skinner was granted a development permit by the City on June 6, 1984. A building permit was issued to her by the City for construction of a house on Lot 7 on June 13, 1984. The couple moved into their new home in 1985. Ms. Skinner was aware at the time she acquired Lot 7 or at the time of construction of her house that development restrictions had been placed on the property because of concerns with stability of the riverbank.

[20]    In 1984, Dr. and Mrs. Bowes purchased Lot 8 from Mr. Douglass. They obtained copies of the 1978 and 1980 caveats and received and made careful study of the BBT report before the transaction closed. Dr. and Mrs. Bowes were aware at the time they acquired title to Lot 8 or before the construction of their home that there was some risk that the riverbank would slide or subside.

2005 ABQB 502 (CanLII)

Page: 7

[21]    Dr. Bowes knew that the BBT report indicated that the riverbank in the area was in a state of marginal stability, but apparently took comfort from the fact that Mr. Douglass had built two homes on the lands. As well he felt that the riverbank slope near the lot was much gentler than the slope present in Glamorgan and there was extensive mature tree cover on the riverbank slope. He understood from the BBT report that the worst case scenario was that they would lose a maximum of 30 feet of their property in a period of 50 years. However, Dr. Bowes also concluded from his review of the report that as long as he followed its recommendations, which were also the conditions stipulated in the 1980 caveat, the risk of instability would be reduced.

[22]    In 1986, the Bowes retained Dub Architects Ltd. to design their home and Shelby Engineering Ltd. to assess the subsurface soils of Lot 8. Shelby prepared a report, dated March 16, 1987. On March 18th of that year, the Bowes applied to the City for a development permit, including a request to relax the required 35 foot setback from the top-of-the-bank. At the request of Dub, Shelby prepared a second report, dated April 29, 1987, recommending a reduction of the setback to 29 feet. The City granted the development permit on July 2, 1987 and the setback was relaxed to 29 feet. The Bowes applied for and, on September 10, 1987, were granted a building permit by the City for the construction of their home. Construction began in the fall of 1987 and was completed in 1988. Only a portion of the residential premises encroached beyond the 35 foot setback.

[23]    In 1985, Mr. Douglass sold Lot 6 to the Sulymas, who sold it to Ms. Reid in 1986. After the purchase, the Reids obtained a copy of the 1978 and 1980 caveats. Ms. Reid understood that the development restrictions contained in the 1980 caveat had been imposed because there was a concern with the stability of the riverbank in the area of Lot 6. The Reids had looked at property in the Glamorgan Subdivision but preferred Lot 6 because the riverbank slope was more gentle and had plentiful mature vegetation. The Reids noted at the time that the top of the riverbank in the Glamorgan area was sloughing or moving. At the time that she purchased the lot from the Sulymas and not later that the fall of 1987 when construction of their house began, Ms. Reid knew that the stability of Lot 6 was in question and that there was potential for the riverbank in the area to slide or to subside.

[24]    Ms. Reid applied for and was granted a development permit by the City on September 24, 1987. A building permit was issued by the City to Ms. Reid for construction of a house on Lot 6 on October 24, 1987. Construction on the house began in 1987 and was completed in 1988. In the course of construction, they came across some filler soil which required adjustment of the footings used as foundations for their home.

[25]    All of the Plaintiffs were aware at the time they were constructing their homes that the riverbank was potentially unstable and that it might slide or subside.

[26]    In late 1998 through to the spring of 1999, the Plaintiffs began to notice unusual damage to their homes. Initially, none of them concluded that anything more than settling was occurring, although the settling was severe enough for them to seek advice from third party professionals.

2005 ABQB 502 (CanLII)

Page: 8

Ultimately, in the summer of 1999, it became apparent that the riverbank was in the process of sliding. The slide continued at an accelerated pace until the land immediately west of and under the residences suddenly collapsed on October 23, 1999. The vertical collapse of the supporting land that day was approximately 18 metres and involved some 250,000 cubic metres of soil.

[27]    The Plaintiffs' uninsured loss was agreed by the parties to be as follows:

      (a)      The Bowes - $709,868.00

      (b)      Muriel Skinner - $572,489.53

      (c)      Constance Reid - $631,621.97

[28]    The Plaintiffs' have sued separately, basing their claims on negligence and nuisance. The only remaining Defendant in the actions is the City of Edmonton, the Bowes having settled with Shelby Engineering Ltd. and G.G. Hunter prior to trial. The Douglass Estate previously succeeded in having the Plaintiffs' claims against it dismissed as time barred. In each action, the City has issued a Third Party Notice against the Estate of Mr. Douglass, which has issued Fourth Party Notices to the Plaintiffs.

[29]    Determination of the Plaintiffs' claims depends on first determining what actually occurred in terms of the bank soils and what triggered or caused the failure of the bank.

### III.    Geotechnical Facts

[30]    The Plaintiffs presented the expert opinion of Dr. Norbert Morgenstern while the City offered the opinion of J. Peter Barlow. The Douglass Estate presented the expert opinions of Dr. Dominque Borneuf and Robin Tweedie.

[31]    All of the experts agreed on the general geology of the Glamorgan, Whitemud Road and Ramsey Heights areas. Vertical drilling of the area soils would generally uncover a clay-like cap of varying thickness, then a sand layer of varying thickness, followed by glacial clay till and, finally, sandstone or mudstone interspersed with bentonite. The sandstone/mudstone is commonly referred to as the area's bedrock. Bentonite is a compressed volcanic ash which is normally encountered at various depths in various thicknesses throughout the bedrock in the Edmonton area.

[32]    The river, stream and creek banks in the Edmonton area commonly experience surface landslides. The location at which a slide occurs is a function of a variety of factors, including the steepness of the bank slope, the extent and nature of the vegetative cover on the slope, the presence of surface water, the presence of subsurface water, and whether the bank is on a straight section or an inwardly or outwardly bending section of the water course.

2005 ABQB 502 (CanLII)

Page: 9

[33]    It is common ground that landslides occur because the lateral support or resistance of the bank's soils is insufficient to resist the lateral pressure on those soils. When vertically loaded, soils seek to move laterally. The resistance to that natural tendency is a function of the cohesion and friction characteristics of the soils involved and the weight of the soils which would have to move.

[34]    In assessing slopes which might or have failed, geotechnical engineers undertake a stability analysis process which involves measuring the forces resisting movement and the forces of movement. The ratio of those forces is called the safety factor. A safety factor of 1 means that the forces resisting movement are equal to the forces of movement. A safety factor of 1.4 or 1.5 is the effective equivalent of permanent structural stability. The term "safety factor" is also used to describe a bank's shear strength, where "shear" describes the forces of movement and "strength" is the soil's resistance to movement.

[35]    It is important in this case to understand the impact of groundwater and surface water on soil movement. Groundwater, or subsurface water, serve to make the soils above it more buoyant when unabsorbed, and softer when absorbed. In either event, it reduces the soil's natural resistance to forced sideways movement. Surface water has a tendency to erode the surface soils, which reduces the amount or weight of material available to resist lateral movement. Of course, the actual physical process is a complicated and dynamic blend of all factors.

[36]    After the Whitemud Road slide, Mr. Barlow undertook a stability analysis of the area based on the test data obtained from boreholes drilled immediately to the west of Whitemud Road, adjacent to the east boundary of slide area, and from holes drilled in the actual slide mass. It is clear from the drilling data, and the experts agree, that the slide was a translational or block slide of materials along a bentonite seam in the bedrock. It was not simply a slide of surface materials. It was a deep seated large block of material that was involved. The seam of bentonite at the base of the slide block was in the upper reaches of the bedrock, approximately 25 metres above the river and 40 metres below the deck of the Skinner home.

[37]    The exact nature of what occurred to produce this landslide is not certain. The process was a dynamic one involving multiple parameters. The uncertainty as to the process is exacerbated by the presence of water. However, in this case, Mr. Barlow and Dr. Morgenstern agree that it was most likely a softening of the bentonite layer by reason of groundwater which, either alone or in conjunction with softening of the clay till, caused a reduction in the cohesion of those soils and their ability to withstand the forces of movement. The experts agree that, as a result of that softening, there was a safety factor of 1 or of unity immediately before the slide. Again, a safety factor of 1 means that the opposing forces are equal but the balance can be lost at any time. If lost, a slide will occur.

[38]    The experts differ as to whether the Whitemud Road slide was a reasonably foreseeable event.

2005 ABQB 502 (CanLII)

Page: 10

[39]    An engineer, when faced with the need to design for stability, must ensure that the forces of resistance exceed the forces of movement. As I have said, the ratio of those opposing forces is expressed as a safety factor. With a safety factor of 1.2, the forces of resistance are 20 percent greater than the forces of movement, whereas with a safety factor of 0.9, the forces of movement are 10 percent greater than the forces of resistance. The degree of design safety is a function of the nature of the forces of movement, their likelihood of occurrence, the cost tradeoff between protecting against all risks no matter how remote and protecting against reasonable risks, and the accurate identification and quantification of possible forces of movement.

[40]    A perfect design will withstand all possible forces of movement. However, designing to that standard may be ridiculously excessive, having regard to the likelihood of occurrence. For instance, while it would be reasonable, and perhaps essential, to design an office tower in San Francisco to withstand an earthquake, insisting on the same design in Edmonton would likely be unreasonable and expensively so. Accordingly, there is always some tradeoff in designing structures with respect to foreseeable events, likelihood of occurrence, maximum negative effect of the occurrence, and expected effect of the occurrence. An earthquake in Alaska might cause a tremor in Edmonton, but it is an unlikely occurrence and, if it did occur, it is unlikely that it would be a significant structurally compromising event. Therefore, it may be discounted.

[41]    The foregoing serves to illustrate that designing a structure involves risk analysis and judgment. It is a process of gauging foreseeable events and consequences, of assessing the likelihood of occurrence, and estimating the magnitude of the forces that might be generated by the occurrence.

[42]    Safety factors are also used to describe the ability of natural materials to withstand natural or manmade stresses. For instance, an engineer might be called on to assess the ability of a riverbank slope to support a structure to be built on or in close proximity to the slope. The engineer would undertake an analysis of the slope's ability, without structural modification, to withstand the naturally occurring forces of movement. Usually, this analysis would include a safety factor estimation, which would involve consideration of the nature of the soils, the dynamic interaction between those soils, the dynamic interaction of surface water and groundwater, the likely consequences in the event the soils were unable to resist the forces of movement, and the physical and temporal likelihood of more uncommon phenomena. The geo-technical reports previously mentioned were of this genre.

[43]    Obviously, calculating a safety factor is a matter of some judgment. Even though the engineer would not be designing a structure, the process of assessing the stability of an existing structure (here, the riverbank) would involve a very similar process of risk analysis and judgment. It is foreseeability in that sense which was at issue between the experts here, not foreseeability in the legal sense. It was in that vein that I received the expert opinions, even though at first blush it appeared the experts were offering opinion as to legal foreseeability, a subject outside of their expertise.

2005 ABQB 502 (CanLII)

Page: 11

[44]    The dispute between the experts respecting foreseeability centred on whether, looking back in time, a large translational landslide (such as the one that did occur) was an imminent event which could occur at any time.

[45]    Dr. Morgenstern's opinion on the subject was based on his review of various documents, including the Hardy, BBT, EBA, and Barlow reports. In his December 2000 Rule 218.1 Statement of Expert Opinion, Dr. Morgenstern concluded:

    1.    The landslide was deep-seated, with a basal shear plane about 7 m below the top of the clay shale bedrock.

    2.    The slope had been close to failure for a significant period of time. Natural processes such as long-term softening and progressive failure were, in all probability, the proximate cause.

    3.    Water within the slope also contributed to the failure. The increased water in the slope, in all probability, was as a result of climatic variation (rainfall had been above the long-term average for the past 10-20 years) as well as unrestricted urbanization in and around the immediate slide area.

    4.    The February 10, 1977 Hardy Report provides that "No further construction activity should be permitted between the westerly limit of Road Plan 6708 KS and the line of the North Saskatchewan River." If this condition were imposed, there would have been no development on this site.

    5.    Geotechnical studies, including calculations, indicated that bank failure was imminent.

[46]    Dr. Morgenstern opined in his October 2004 Rebuttal Opinion that:

    1.    The projections made by Mr. Barlow with respect to the timing of the translational block slide are incomplete.

    2.    Mr. Barlow's interpretations of studies of this site that proceeded [preceded] his own are inaccurate and do not reflect the information that was available at the time of approval of the development.

    3.    I am of the opinion that the large scale transitional [translational] slide could have occurred at any time and would have been expected as a likely occurrence at the site where it occurred.

[47]    Neither of Dr. Morgenstern's reports contained any supporting calculations or reasoning in terms of the conclusions offered.

2005 ABQB 502 (CanLII)

Page: 12

[48]    Mr. Barlow, in his July 2004 report, offered the following opinion as to foreseeability of this slide:

> It should be noted that large scale, translational block slides based in the bedrock of the type that occurred at Whitemud Road in 1999 are not a common or regular occurrence in the City of Edmonton, compared to more surficial slides and flows. Remnant features of the deep translational block slides exist at various places along the North Saskatchewan river valley and the deeper tributary creek valleys, but many of these past slides would have occurred at some point in the formation of the existing valleys, which have been developing over several thousand years. There have been other documented cases of translational block slides based in the bedrock over the past century, but there are over 200 kilometres of valley slopes in the Edmonton area where this mechanism is theoretically possible. The bedrock strata that exist in the lower sections of valley slopes throughout the city are subject to the long term processes of strength loss discussed above, but a very low proportion of the slopes have failed by deep translational sliding over the life of the community. Therefore, while various physical factors existed at this site that made bedrock based instability possible, it is not considered reasonable to think that a failure of the type and magnitude that occurred could have been expected within the time frame of the subdivision development.

> The position expressed above, that a deep landslide, based in the bedrock would not have been expected as a likely occurrence at this site is supported by the geotechnical assessments conducted at the time of the subdivision development. EBA Engineering Consultants (1978) and BBT Geotechnical Consultants (1979) conducted geotechnical assessments related to proposed residential development at the Whitemud Road site. The studies were based on a sufficient level of geotechnical data, and provided an appropriately thorough assessment of the slope stability issues. In both of the studies, there was an acknowledgement of the risk of surficial instability of the soil strata overlying bedrock. However, the possibility that deep seated slides could develop in the bedrock strata was considered unlikely in both studies. A geotechnical assessment was also conducted in the area at the time of development for the roadway. R.M. Hardy & Associates (1977) drilled 3 test holes in the soil strata above the bedrock along the road right-of-way to provide recommendations for the proposed southerly extension of Whitemud Road. While no specific stability calculations were conducted as part of this assessment, the risks associated with erosion and instability of the steep surficial soil materials was highlighted, but with no mention of the potential for deeper based sliding in the bedrock of the type that occurred in 1999.

[49]    In his testimony, Dr. Morgenstern agreed with Mr. Barlow that softening of the mudstone/bentonite was the cause of the failure. Both experts agreed that the softening occurred

2005 ABQB 502 (CanLII)

Page: 13

as a result of an increase in groundwater pressure in the area of failure. The effect of an increasing presence of water is very complex. The precise manner in which the resulting soil softening occurs is poorly understood. For our purposes, however, there is no doubt that water caused the soil softening, which means the friction mobilized by the soils was reduced to the point where the forces of movement surpassed the remaining forces of resistance.

[50]    Dr. Morgenstern and Mr. Barlow identified increased rainfall and water infiltration from development in the Ramsey Heights area as sources of groundwater. Dr. Morgenstern agreed with the analysis conducted by Mr. Barlow and his assumptions in relation to the status of the materials in the slope prior to the slide. He concluded that the bank had been in a state of unity with a safety factor of 1 for a lengthy period of time before the actual slide occurred.

[51]    At trial, Mr. Barlow elaborated on his opinion, testifying that there are over 200 kilometres of valley slope in the Edmonton area where translational block slides theoretically could occur because there is exposed bedrock in the lower portion of the slope. Bentonite is common in Edmonton and seepage is a natural occurrence along the valley slopes. However, there have been relatively few documented events approaching the scale of the Whitemud slide. Mr. Barlow acknowledged that there was a risk of such a slide occurring, but reiterated that it would not have been reasonable to say that it was likely to occur within the time frame of the developments; that is, within 100 years.

[52]    Mr. Barlow emphasized that the EBA and BBT reports explicitly dealt with slope stability in the context of subdivision development and, while both spoke of the potential for a deep seated slide in the bedrock, they both indicated that such an occurrence was unlikely. He considered it reasonable for BBT to have estimated the sheer strength of the bedrock as between peak and residual, given that operative strength of the shale and bentonite was unknown and it was uncertain how that might change as the slip surfaces went deeper into the bank.

[53]    Mr. Barlow noted that the 1977 Hardy report was directed at the roadway extension rather than the subdivision development. He conceded that the report recommended that there be no development in the area of the Plaintiffs' homes, but suggested that the study was not as rigorous in terms of the approach that was taken in assessing instability. No calculations were actually done and, in his view, the Hardy report was focussed on surficial instability of surface soils. In his view, much of the report centred on the potential for movement of the overburden soils in the upper part of the slope.

[54]    Mr. Barlow explained that there would have been more micro-fissures and cracks in the exposed bedrock near the edge of the valley wall, which would have created pathways for water in the sand above to infiltrate the bentonite and bedrock. He confirmed that groundwater was the major contributor to bedrock softening and was the primary trigger of the slide. He advised that groundwater had been seeping out along the bank in this area since long before there was any development there. However, development likely produced more groundwater, that would have accelerated the natural process of softening.

2005 ABQB 502 (CanLII)

Page: 14

[55]    Mr. Barlow indicated that one of the causes of bank failure is erosion by the river, another is erosion on the slope, and a third is seepage. He indicated that the primary driving mechanism of bank failures in the Glamorgan and Whitemud areas was seepage.

[56]    The experts agreed that a factor of safety of 1 or unity means that ". . . failure is inevitable and can occur, and can occur at any time," to use Dr. Morgenstern's words.

[57]    As previously indicated, there were other geotechnical reports prepared between 1975 and 1979 which were tendered as agreed exhibits. These reports were accepted as accurately reflecting the observations and opinions of the authors. However, they were not accepted as true or accurate observations or opinions. All of these reports apparently were discovered in the archives kept by the City's engineering department. The City acknowledges that the reports were accessible to those employees engaged in considering development and building applications from a geotechnical engineering prospective.

[58]    On December 11, 1975, R.M. Hardy & Associates Ltd. provided the City with a report on slope stability in Glamorgan Heights, authored by G. McCormick. The investigation and report were undertaken at the request of the City. The author discussed the effect of water on the slope's stability and indicated that groundwater was the most significant agent of instability. He stated that it was neither necessary nor economical to attempt any direct measures to protect the exposed bedrock slope. He suggested that it be assumed that the bank slope would degrade and erode until it reached an angle of 26 degrees. Based on this assumption, he recommended that development not encroach beyond an imaginary line drawn at an angle of 26 degrees from the point where the upper surface of the bedrock was exposed on the valley wall to the top of the bank. The author suggested a further buffer or setback of 25 feet and that the natural tree cover be augmented where possible. The author also recommended that rain and snow melt be channelled into storm sewers and that underground sprinklers and swimming pools be prohibited.

[59]    The Hardy report of February 10, 1977, to which I have already referred, was prepared for the Abbey Glen Property Corporation Ltd. Hardy had investigated the geotechnical conditions of the area proposed for a southerly extension of Whitemud Road. The road extension was constructed before the subdivision of Lots 2 and 3 and before the Plaintiffs' homes were built on the property. Their homes were situated immediately west of and adjacent to the road extension. As with the previous report, this report was based in part on a program of test drilling, soils testing, and aerial photograph analysis. Again, G. McCormick was the author of this report. He opined that:

> These slopes are relatively steep for surficial soil materials but cannot be considered to be excessive for competent bedrock.
>
> Evidence of surficial sloughing on the valley wall indicates that the sand is in a condition very close to its angle of repose. Experience with similar slopes in this area would lead to the conclusion that the condition of the total slope is one where

2005 ABQB 502 (CanLII)

Page: 15

the overall factor of safety must be very close to unity. Therefore, any disturbance of the natural conditions affecting the slope must be avoided or severely restricted.

[60]    Mr. McCormick reiterated his opinion that groundwater was the most significant factor affecting slope stability, stating as follows:

> ... there are several factors which influence the groundwater conditions in any area of which the influence of man's activities is most important.
>
> The construction of streets affects the drainage of an area and usually leads to improved surface drainage and a consequent decrease of the supply of water to the subsurface. On the other hand, the construction of roads and buildings accelerates the rate of snow melt in the spring. The construction of buried services is sometimes of influence also.
>
> The most significant factors arising from construction activities are those associated with clearing of the natural vegetation, irrigation of landscaped areas and the concentration of runoff due to pavements. Related to these factors are leakage of water from water lines and automatic sprinkler systems.
>
> An examination of the lower part of the valley slope revealed several areas of icing where ground-water seepage from the slope had emitted about 30 feet above river water level. The emission of groundwater seepage from the slope above the bedrock surface appears to be sufficient to support the tree growth but not sufficient to cause any visible flow on the surface.

[61]    Mr. McCormick recommended that every effort be made to ensure that the slopes of the existing valley wall were left in their natural condition. Significantly, he also recommended that: "No further construction activity should be permitted between the westerly limit of Road Plan 6708 KG and the line of the North Saskatchewan River." This recommendation, if followed, would have precluded the Plaintiffs from building on the lots, which they subsequently purchased.

[62]    Mr. McCormick also made a number of recommendations with respect to handling rainwater, snow melt and other water on the land to the east of the proposed road extension. In my view, these recommendations were designed to reduce the impact of the anticipated increase in groundwater associated with that development on the slope to the west of the proposed road extension.

[63]    Mr. Barlow testified that he reviewed Mr. McCormick's two reports and concluded that Mr. McCormick was primarily concerned with surface sloughing and surface water. I disagree with Mr. Barlow's assessment of Mr. McCormick's opinion. Considered in context with his opinion on Glamorgan Heights, it is obvious that Mr. McCormick was concerned with both

2005 ABQB 502 (CanLII)