surface and subsurface water and therefore with both surface and block slides. After all, the road allowance was far enough removed from the riverbank to be unaffected by multiple surface bank slides. Since the stability of the road extension was the only engineering issue of concern to Mr. McCormick, he must be taken to have been commenting on the danger of large block or translational slides such as the one which occurred here.

[64]    In 1977 Hardy's report was not brought to the attention of the Plaintiffs until after they had lost their homes.

[65]    As I have said, EBA Engineering Consultants Ltd. prepared a geotechnical evaluation of Lots 2 and 3 at the request of Mr. Douglass in support of his application to build a home on Lot 3. EBA's investigation did not involve a test hole drilling program and its focus was mainly on the southwest corner of Lot 3, which, as it happens, was not compromised in the Whitemud Road slide. Although the investigation undertaken was not as involved as those associated with the Hardy reports, it is clear that EBA considered the same factors which were noted to be of concern in those reports.

[66]    EBA concluded that slow but continuing erosion was occurring on the slope in question. The author indicated that the terrace approximately half way up the bank was created by major slumps in the past that might have been deep seated or occurred where groundwater exited at the bedrock surface. EBA advised that future movement could be expected on a geological time scale, but stated that the slope between the terrace and the upland area appeared to have eroded to a stable configuration. It suggested that the slope area beneath the subject site appeared to be well drained and stable. EBA recommended that, to maintain stability, upland development proceed in a manner that maintained or enhanced then current conditions. The author concluded that the proposed development area would likely remain stable for some time to come.

[67]    EBA noted that a guideline had been developed to identify allowable building sites adjacent to slopes in Edmonton. This guideline, which had been applied by the City, assumed that bedrock was stable and that the overlying soil would erode back to a stable configuration that was 1 vertical to 2 horizontal. The place where a line, drawn at a 2:1 slope from the bedrock surface, intersected the ground surface was called the "development line." Building was not allowed inside 25 feet inland from the development line. EBA pointed out that application of the guideline illustrated that the proposed building site lay on the river side of a development line drawn from the toe of the upper slope, with the edge of the building coinciding with the development line itself.

[68]    EBA indicated that each site must be judged on its own merits and on the risk that the property owner was willing to live with. However, site conditions must be taken into account in considering the advisability of developing the property. Favourable factors at the subject site included: (1) the documented stable history of the slope at adjacent building sites; (2) the apparent stability of the upper slope based on observations of vegetative cover; (3) favourable surface drainage conditions; (4) the apparent lack of groundwater discharge points in this area; (5) the apparent overall stability of the terrace; and (6) the presence of a terrace to act as a buffer

2005 ABQB 502 (CanLII)

Page: 17

zone between the river and the upper slope. Factors that favoured caution included: (1) the small distance from the proposed building to the crest of the slope (33'); and (2) the unknown effect that urbanization of the surrounding area would have.

[69]     EBA acknowledged that long-term readjustments could be expected on the slope, and than these would pose a threat to the proposed residence. However, it could not predict the time frame within which adverse movements might occur. In evaluating the relative risk of development, it considered the negative effect that development might have on the natural conditions and the probability of instability developing in the natural slopes irrespective of development. It advised that the adverse effects of development could be minimized if disturbance was kept to a minimum and changes were made to enhance stability, including maintaining protective surface vegetation, avoiding loading of the slope, directing surface water away from the slope, and controlling seepage outlets. It cautioned that water access to the sand layers must be restricted. EBA noted that water infiltration could be expected with increased use of water in the area, and from trenches for service lines breaking the continuity of the protective surface cover. There might also be leakage from service lines and infiltration from excavations such as the depressed Whitemud Freeway. EBA advised that increased infiltration from these sources would accelerate the rate of erosion wherever concentrated groundwater discharge occurred.

[70]     EBA stated that long term changes induced by development of the upland area (the Ramsay Heights area) would probably be detrimental to slope stability. It noted that there was no evidence of concentrated groundwater discharge in the immediate slope area.

[71]     In assessing natural factors affecting slope stability, EBA considered the risk of unstable zones spreading, the risk to life, the risk to structures, and the risk to property value. It noted that:

    1.    The river erodes material from the toe of the slope and thus removes
          support. Usually this is a surficial or surface skin effect but it can result in
          deep seated failures in the bedrock. Continued surface adjustment can be
          expected as long as the river erodes material from the toe of the slope.

    2.    Instability of the upper soil layers is initiated by loss of support from the
          underlying bedrock. When part of the bedrock support is removed, the
          overlying soils will slump until a stable profile is reached. If the loss of
          bedrock support is not deep-seated, readjustments in the upper soils will
          probably only affect a shallow zone and so will not be serious.

    3.    Sliding destroys the protective vegetation cover and exposes material in
          the slope to other agents of erosion (wind, running water, etc.). The highly
          erodible soils can be adversely affected until protective vegetation is re-
          established.

2005 ABQB 502 (CanLII)

Page: 18

2005 ABQB 502 (CanLII)

4.  Sand layers are highly susceptible to erosion by discharging groundwater. Erosion from this source can undermine the slope and initiate movement similar to that described in item 1 above. If the amount of groundwater discharge increases (for example as a result of increased water infiltration in the upland area) erosion would be very difficult to halt and the failure could progress inland rapidly.

[72]    EBA advised that slide processes 1 to 3 were natural processes, which were active on the slope but generally shallow and not likely to spread. It cautioned that slide process 4 was capable of spreading adversely, and was a source of concern for future behaviour. It predicted that, if erosion accelerated due to groundwater seepage, the building could be affected during its planned life time. However, EBA concluded that it was likely the site would remain stable for many years. Although there was a risk associated with development, if the owner understood and accepted that risk, development could proceed.

[73]    The next report of note is the report of BBT Geotechnical Consultants Ltd., dated August 27, 1979. Mr. Bryan and Dr. Bowes both had access to this report at the time they purchased and built on the lots in question. The report was commissioned by Mr. Douglass in relation to his subdivision of Lots 2 and 3 into Lots 5 through 11.

[74]    In addition to soil sampling and a review of aerial photographs, the BBT investigation included test hole drilling. The first test hole was drilled on Lot 9, which is just north of the Bowes lot, and the second on Lot 7, the Skinner lot. The author of the report felt that the Whitemud Road bank was more stable than the Glamorgan bank because there was less surface water than in the Glamorgan slide area. The author noted that, even given the additional surface runoff in the Glamorgan area, there had been only two major slides in the space of 50 years, and only 12 feet of land had been lost from the top of the bank.

[75]    The following summary of the conclusions reached in this report was offered in BBT's covering letter to Mr. Douglass:

It is concluded from the evaluation that the present valley slopes are in a state of marginal stability and, retrogressive sliding of the valley walls along this reach of the river can be expected to continue in the future. On the basis of the history of actual slide development just north of the proposed subdivision area, it is estimated that a period between 43 to 52 years or more will be required to cause a retrogression of the river valley slope to encroach on the valley wall by about 15 feet. Although this estimated time period can be significantly affected by natural or man made conditions, it is considered that a minimum set-back of 35 feet from the top of bank line for all buildings and fill in the subdivision area is expected to provide a reasonable "buffer" zone. The element of risk involved in adopting this recommendation must be clearly made to future landowners .

Page: 19

[76]    The report ended with a series of recommendations to minimize potential contributions to slope instability. These recommendations became the meat of the 1980 caveats registered against the newly subdivided Lots 5 through 11.

[77]    Interestingly, the BBT report did consider a failure originating in the bedrock and intersecting the uplands at a point 35 feet back from the established top of the bank line. The factor of safety allocated by the report to that occurrence was 1.09, meaning that the forces of resistance were estimated to be 10 percent greater than the forces of movement. Of course, the assumption was made, for purposes of that analysis, that bedrock resistence strength was between peak and residual . The safety factor would have been different with an altered assumption of bedrock strength. The author described the slope to be in a state of marginal stability. Nonetheless he concluded that: "Initiation of massive slump movements along this valley wall by the described retrogressive action is considered highly improbable, as significantly more active processes of valley formation were in action during the geological time period in which large block instabilities were initiated."

[78]    I note that it was this highly improbable event which in fact occurred, and on Lot 7 encroached much more than 35 feet from the crest of the top of the bank.

## IV.    Issues

[79]    The foregoing circumstances form the basis for three separate claims by the Plaintiffs against the City. The Plaintiffs argue that the City was negligent in issuing building permits without regard to the 1977 Hardy report and without disclosing the report to the Plaintiffs. They also contend that the City took on the role of a good samaritan by its insistence on registration of the 1980 caveat against the lands and that this caveat represents a continuing act of volunteer kindness. The Plaintiffs maintain that the City is responsible for the losses which they have suffered because the caveat caused them to believe in false circumstances to their detriment.

[80]    Finally, the Plaintiffs argue that the City was and continues to be responsible for their losses in nuisance as the City did not take steps to secure the lands supporting the Plaintiffs' properties or otherwise protect the Plaintiffs from loss should the City's lands subside. The Plaintiffs also contend that the City's use of its lands to the east of their properties (Whitemud Road) constituted a nuisance.

[81]    The City argues that it cannot be held liable in negligence for issuance of building permits. Alternatively, if the City can be negligent, it was not. In any event, the City maintains that the *Limitations Act*, R.S.A. 2000, c. L-12, s. 3(1)(b) entitles it to immunity from the Plaintiffs' actions. Further, the City contends that the good samaritan negligence alleged by the Plaintiffs cannot or does not apply in these circumstances.

[82]    The City also denies that it could be held liable for nuisance in circumstances such as this.

2005 ABQB 502 (CanLII)

Page: 20

[83]    The City pleaded but did not argue nor seek to avoid liability to the Plaintiffs on the basis of the development agreement of 1980 between Douglass and the City.

[84]    The City claims that, if it is liable to the Plaintiffs, the Third Party is liable to indemnify the City for that obligation as a result of the caveats filed and the agreements between the City and Mr. Douglass. The Douglass Estate denies that it is liable to the City. The Third Party argues that the terms of the development agreements between it and the City do not cover the alleged negligence or nuisance relied on by the Plaintiffs. It maintains that, in any event, the death of Mr. Douglass foreclosed any claim by the City against him and therefore his Estate cannot be liable. It argues that, as it has been established that it is not liable to the Plaintiffs, it cannot be liable for contribution as a tortfeasor.

## V. Analysis

### A.    Negligence

[85]    The City issued permits that allowed the Plaintiffs to build single detached homes on the subject lots. The City also issued permits approving the actual homes ultimately constructed by the Plaintiffs. At the time the City issued these permits, it had the two Hardy reports, the EBA report, and the BBT report. The second Hardy report advised that nothing should be built in the area where the City permitted the Plaintiffs to build. The report was prepared at the request of the City in relation to the proposed extension of Whitemud Road southward. The focus of the study was on whether the road could safely be extended and on what needed to be done to ensure its stability. The EBA report was less conservative than the second Hardy report, but was not based on an actual drilling or testing program. It was commissioned by Mr. Douglass, who simply wanted to build a second home on the southern edge of his property (Lot 3). In order to obtain permission to do that, he was required by the City to provide a detailed soil survey and a finished grading plan. The EBA report concluded that, assuming continuing favourable conditions, the proposed site of Mr. Douglass' second home would likely remain stable for many years.

[86]    As a result of the EBA report, the City entered into a development agreement with Mr. Douglass which incorporated the suggestions in the EBA report and which allowed him to build a new home on Lot 3.

[87]    Later in 1978, Mr. Douglass made application to subdivide Lots 2 and 3. Prior to the determination of that application, the City insisted on a detailed technical engineering report on the stability of the riverbank in the area and the factors which might affect it, as the City was of the view that development hinged on the issue of soil stability. The City wanted to ensure general safety of the riverbank and of the properties that might be developed in particular.

2005 ABQB 502 (CanLII)

Page: 21

[88]    After some wrangling with City departments and the Municipal Planning Commission, Mr. Douglass commissioned the BBT report. That report concluded that the bank was in a state of marginal stability.

[89]    There is no evidence that the Municipal Planning Commission was made aware of the 1977 Hardy report or that the City considered that report in approving development and building by the Plaintiffs. I have concluded that, in fact, the City did not refer to or consider the 1977 Hardy report either at the time of the subdivision application or when the Plaintiffs applied for their development permits.

[90]    The Plaintiffs claim that the City was negligent in issuing the development and building permits in respect to their properties and that it was negligent in failing to warn them of the full risk of bank instability, having undertaken to give a partial warning through caveats placed against the title to their lands.

### 1.    Did the City Owe the Plaintiffs a Duty of Care in Approving Applications to Develop and to Build?

[91]    The Supreme Court of Canada in *Cooper v. Hobart,* [2001] 3 S.C.R. 537 clarified the analysis to be undertaken in determining whether a duty of care should be recognized in any particular situation.

[92]    The analysis may be stated as follows:

(a)    the process involves a two stage analysis;

(b)    the first stage requires consideration of two issues;

(c)    the first issue is whether the harm that occurred was a reasonably foreseeable consequence of the defendant's act;

(d)    the second issue is proximity;

(e)    proximity can be found if the defendant was in a close and direct relationship with the plaintiff such that it is just to impose a duty of care on that defendant in relation to that plaintiff;

(f)    alternatively, proximity can be established if it has previously been found in a category of cases which encompasses the same or an analogous situation as the case being considered;

2005 ABQB 502 (CanLII)

Page: 22

    (g)     if foreseeability and proximity are established, a *prima facie* duty of care arises;

  (h)    the second stage of the analysis requires consideration of whether there are residual policy considerations, outside of the relationship of the particular plaintiff and defendant, which negate imposing a duty of care in such circumstances

      (i)    where the duty of care asserted falls within a recognized category of recovery, the court would generally be satisfied that there are no overriding policy considerations that would negative the duty of care.

      (j)    residual policy considerations may include:

          (i)    the effect of recognizing a duty of care on other legal obligations, the legal system, and society generally;

          (ii)    whether the law already provides a remedy;

          (iii)    whether recognizing a duty of care would create unlimited liability to an unlimited class;

          (iv)    whether finding a duty of care would amount to imposing an obligation on legislators for policy decisions where to do so would amount to second guessing the policy decisions of those legislators;

    (k)    in the event that residual policy considerations are such that imposing a duty of care would be unwise, the duty of care will not be imposed.

[93]    In this case, the parties are *ad item* that foreseeability existed. It is clear that it was reasonably foreseeable that the Plaintiffs would suffer injury if the City was not appropriately careful in issuing the permits in question.

[94]    However, the City argues that proximity did not exist. It maintains that the Plaintiffs' claim is based on equating the permitting process to a guarantee or warranty that their homes would last a lifetime. The City submits that the Plaintiffs' claim does not fall into any category of existing cases where a duty of care has been found to exist and that it would be unjust to otherwise impose a *prima facie* duty of care.

[95]    The City relies on *Holtslag v. Alberta* (2004), 350 A.R. 161, [2004] ABQB 268, in which Belzil J. concluded that the *Building Code* provides a set of standards meant to ensure the health

2005 ABQB 502 (CanLII)

and safety of buildings that are constructed, but that it does not amount to product liability legislation. He expressed the view that the *Code* does not warrant fitness as to purpose or constitute a representation relative to durability.

[96]    In my view, *Holtslag* has no application here. Unlike the plaintiffs in *Holtslag*, the Plaintiffs in the present proceedings had a direct relationship with the City resulting from the applications which they submitted for development and building permits. The permitting process is in place to ensure that proposed developments fit within the zoning and land use bylaws, comply with any restrictions in development agreements or caveats that might apply, and are constructed in compliance with the *Alberta Building Code*. Having implemented such a process, the City owes a duty to those applying for permits to ensure that it uses reasonable care in considering their applications.

[97]    I agree with the Plaintiffs that there is a category of cases where a duty of care has been recognized in circumstances such as these. What the Supreme Court of Canada meant in *Cooper* was not that a category of cases for purposes of proximity will be found only where all of the cases involve precisely the same factual circumstances. Rather, a category of cases will be found where the duty of care in each case is based on the same underlying principle.

[98]    The Court in *Copper* at para. 36 listed a number of categories of cases in which proximity previously has been recognized, including cases where a municipality owes a duty of care to prospective purchasers of real estate to inspect housing developments without negligence (*Anns v. Merton London Borough Council*, [1977] 2 All E.R. 492 (H.L.); *Kamloops (City) v. Nielsen*, [1984] 2 S.C.R. 2) and cases where a governmental authority which has undertaken a policy of road maintenance owes a duty of care to execute the maintenance in a non-negligent manner (*Just v. British Columbia*, [1989] 2 S.C.R. 1228; *Swinamer v. Nova Scotia (Attorney General)*, [1994] 1 S.C.R. 445).

[99]    *Kamloops* involved a failure by the City's building inspector to prevent the continuation of construction of a building and occupancy of that building when he was aware that the foundations were structurally unsound. The basis of the duty of care found by the Court was that the City had decided to specifically regulate building by reviewing applications and developments to ensure the plans and subsequent structures complied with its bylaws. The Court held that, in such a case, the ultimate owner of the structure was sufficiently proximate to the City to be owed a duty of care.

[100]    In the present case, as in *Kamloops*, the City assumed the role of development regulator. In my view, the same principle applies as in *Kamloops*. When a municipality elects to act, its actions must be undertaken with reasonable skill and care. The Plaintiffs here are more proximate than in *Kamloops*. In any event, this case falls within the *Kamloops* category of cases. Edmonton, here, owed the Plaintiffs a duty to use reasonable care and skill in considering their development and building applications and in issuing permits for those activities. The words of LaForest J. in *Rothfield v. Manolakos*, [1989] 2 S.C.R. 1259 at 1266, 63 D.L.R. (4th) 449 at 453 appear to settle the matter:

2005 ABQB 502 (CanLII)

Page: 24

> . . . the city, once it made the policy decision to inspect building plans and
> construction, owed a duty of care to all who it is reasonable to conclude might be
> injured by the negligent exercise of those powers.

[101]    The City argued that the cases which pre-date *Cooper* must be viewed cautiously in terms
of the "category of case" issue because *Cooper* changed the law on that subject. I disagree.
*Cooper* was based on *Anns v. Merton London Borough Council*, [1977] 2 All E.R. 492 (H.L.).
It was *Anns* which underpinned the decisions in *Kamloops* and *Rothfield*. The Supreme Court of
Canada in *Cooper* was simply confirming that *Anns* was good law and adding guidance on the
nature of the proximity analysis in situations where a duty has not previously been recognized.

[102]    The Court in *Cooper* at para. 34 indicated that in evaluating a relationship to determine
whether it is one of sufficient proximity for a duty of care to arise, consideration should be given
to the "expectations, representations, reliance, and the property or other interests involved."

[103]    In my view, the proximity between permit applicants and the City is sufficiently close
that a duty arises on the part of the City to exercise care in approving developments. The
existence of a duty is even more compelling in this case, given that the City circulated each
Plaintiff's development applications through its departments for comment. As a result, the City's
geotechnical engineers would have been asked to consider the applications and to advise of any
concerns that might need to be addressed. That process would or should have involved a review
of archived geotechnical engineering reports, including the Hardy, EBA and BBT reports.

[104]    I note that in *Papadopoulos v. Edmonton (City)* (2000), 260 A.R. 223 at para. 82, 2000
ABQB 171, Edmonton "conceded that its actions in issuing the development and building
permits were operational in nature and could, in an appropriate case, found an action against it in
negligence. It further conceded that it owed a duty of care to the Papadopouloses in regard to the
issuance of the development permit." While the City resiled from that position in the present
case, I am of the view that its concession in *Papadopoulos* is telling.

[105]    The City in that case had issued a development permit to a landowner when it knew or
ought to have known that the proposed development encroached on the designated setback from
the crest of Blackmud Creek. The setback had been recommended due to concerns with bank
instability. Bielby J. concluded that the City owed a duty of care to the landowner which was
like that found to exist on the part of the defendant municipality in *Tarjan v. Rockyview No. 44
(Municipal District)* (1992), 130 A.R. 181 (Q.B.), rev'd. on appeal for other reasons (1993) 145
A.R. 73 (C.A.). She also indicated that, because of its special knowledge, the City was under a
duty to warn the landowner of the risk of irrigating the property or not providing proper
drainage.

[106]    In my view, a duty of care existed on the part of the City in the present case as there was
both foreseeability and proximity based on an established category of cases. However, to the
extent that proximity can only be found on the broad policy basis that the City was in such a

2005 ABQB 502 (CanLII)

Page: 25

close and direct relationship with the Plaintiffs that it would be just to impose a duty of care, the second stage of the *Cooper* analysis must be undertaken.

[107]   The City argues that the land use bylaw provisions which gave the development officers authority to prohibit development called for policy rather than operational determinations. It contends that the development officers had considerable discretion and that their decisions were either *quasi* judicial or legislative. As such, the *prima facie* duty of care must fail as falling under the definition of a policy decision which should not be second guessed. Alternatively, the City argues that the imposition of a duty of care would result in indeterminate liability.

[108]   In *Cooper,* the Court explained at para. 38 that government bodies are not liable in negligence for policy decisions, as these relate to its legislative function, or for quasi-judicial decisions (***Edwards v. Law Society of Upper Canada,*** [2001] 3 S.C.R. 562, 2001 SCC 80). Rather, they are liable only for operational decisions; that is, for the manner in which their policy or quasi-judicial decisions are carried out.

[109]   Under the ***Municipal Government Act,*** R.S.A. 2000, c. M-26, s. 639, and similar provisions in the *Planning Act,* R.S.A. 1980, c. P-9 which preceded it, the City was obliged to pass a land use bylaw. Section 640 of the Act provides that the "land use bylaw may prohibit or regulate and control the use and development of land and buildings" in the municipality. The City was required in the land use bylaw to establish a method for making decisions on development permit applications, including the discretion that the development authority might exercise with respect to a development permit. The Act specifies that a land use bylaw may provide for the development of buildings on land subject to subsidence or that is unstable or on land adjacent to or within a specified distance of the bed and shore of any lake, river, stream or other body of water. When a person applies for a development permit for development that may be permitted in the discretion of the development authority, the development authority may issue a development permit, with or without conditions.

[110]   The Land Use Bylaw in effect prior to February 26, 1985 (Bylaw 5996) provided that:

> 16.1(2) Notwithstanding anything contained herein, no development permit shall be issued for the construction of any development adjacent to the River Valley or its ravine system or at such other location within the City which, in the opinion of the Development Officer, has unstable soil conditions, until the Applicant has submitted a certificate from a qualified, registered Professional Engineer certifying that the foundations proposed for the development were designed with full knowledge of:
>
> (a)     the soil conditions, and
>
> (b)     the proposed siting of the development upon the parcel of land of the applicant.

2005 ABQB 502 (CanLII)

Page: 26

[111]   After February 26, 1985, Bylaw 5996 read:

> 16.1(2) Notwithstanding anything contained herein, the Development Officer may require a detailed Engineering Study of the soil conditions prepared by a qualified, registered Professional Engineer prior to the issuance of a Development Permit or the construction of any development abutting, or partially or wholly contained within, the North Saskatchewan River Valley or its ravine system as defined on the North Saskatchewan River Valley and Ravine System Overlay Schedule.

[112]   The Bylaw specified that the detailed engineering study was to include test borings, ground water piezometer testing, slope indicators, where necessary, identification of any sub-surface mining operations, a river erosion analysis, and a surface erosion analysis. The Professional Engineer responsible for the study was to certify that the proposed foundations for the development were designed with full knowledge of the soil conditions and the proposed siting of the development on the site.

[113]   Section 16.1(3) of the Bylaw specified that:

> 16.1(3) The Development Officer may require the submission of a detailed Engineering Study as outlined in Section 16.1(2) of this Bylaw prior to the issuance of a Development Permit at any location within the City which in the opinion of the Development Officer has unstable soil conditions.

[114]   The City in the present case made a policy decision to control development. Once that decision was made, the City was under a duty to exercise reasonable care in its review of development applications. The City's failure to consult an available study which advised against development in the area due to instability of the soils and its failure to disclose the existence of that study to the applicants were operational rather than policy failures.

[115]   The duty to take reasonable care in issuing development and building permits would not lead to indeterminate liability. Nor would the duty to disclose information in its possession which might raise a concern with a proposed development.

[116]   Therefore, in my view, there are no residual policy considerations which would negate imposing a duty of care on the City in these circumstances. That duty was to use reasonable care and skill in determining whether to approve the Plaintiffs' applications to develop and build. If the City opted to allow development at the owners' risk, it was under an obligation to disclose to the applicants any information possessed by the City which might reasonably bear on the risk associated with their proposed developments.

2005 ABQB 502 (CanLII)

Page: 27

## 2.    Did the City Owe the Plaintiffs a Duty of Care as a Result of the Caveat it Insisted on Registering against the Plaintiffs' Lands?

[117]    The Plaintiffs argue that, when a volunteer, a "good samaritan," undertakes a task, the volunteer must perform the undertaking with reasonable care so as to avoid harming those who might foreseeably be affected.

[118]    There is no question that a volunteer can be held liable in negligence. The issue is whether the City's actions are properly characterized as those of a volunteer or good samaritan. The Plaintiffs' position is that the City, in insisting on registration of a caveat against their lands, was advising or assisting them and that it did so negligently.

[119]    The 1980 caveat stated:

> The owner acknowledges that the following development restrictions shall apply to the said lands in order that the stability of the bank of the North Saskatchewan River may be maintained. [Emphasis added.]

[120]    That general statement was followed by the specific recommendations which had been made in the BBT report. The BBT report, however, did not suggest that those specific measures would enhance stability of the bank, rather they were intended to prevent additional sources of instability.

[121]    The Plaintiffs submit that the words used in the 1980 caveat suggest that bank stability will be improved if there is compliance with the development restrictions. In my view, the words of the caveat cannot reasonably bear that interpretation. The caveat, at most, might be taken to suggest that the bank was then stable and that stability of the bank could be maintained by compliance with the development restrictions.

[122]    However, the City, in this caveat, was not suggesting a method for keeping these Plaintiffs safe. Rather, it was restricting their use of the property so as to prevent their actions from detracting from the bank stability. The real complaint of the Plaintiffs is that the City should have advised them in the 1980 caveat that they could not safely build on the properties. With respect, that is simply rehashing their argument respecting the City's issuance of the permits and its failure to advise them of the Hardy report.

[123]    In my view, the argument that the 1980 caveat was a warning is fundamentally flawed. The City was not a volunteer in the good samaritan sense at all. Rather, it was a development and use regulator. The City, by caveat, acted to limit the owners' freedom of use. As I have said, it owed a duty of care to the Plaintiffs in approving the developments. The City was not acting to warn by its caveat (other than to warn of the development restrictions), but rather to restrict what could be done. The caveat neither represented an offer of succour nor a warning of doom, but was a manifestation of an administrative decision to prohibit activities which might detract from

the bank's stability. Again, the impugned words were not, in context, more than the stated justification for the restrictions. Therefore, the City, as regulator, was not a good samaritan.

[124]   Even if the caveat could be said to be a representation, none of the Plaintiffs raised negligent misrepresentation as a cause of their action.

### 3.       Did the City Breach its Duty?

[125]   The City argues that there was no reasonable way it could have known that a deep seated slide originating in the bedrock would occur. Nothing it did or could have done, nothing it referred to or could have referred to, would change that fact. The City therefore maintains that it has not breached its duty of care to the Plaintiffs.

[126]   It is important to remember that the City's duty was to take reasonable care in the issuance of the permits to develop and build. A reasonably careful municipality would have reviewed the material in its possession which might bear on the granting or refusal of the applications.

[127]   That does not mean that the City is a guarantor of the safety or suitability of a proposed development. It does not mean that the City is responsible for every potential latent defect, no matter how foreseeable. The City is obliged to conduct itself carefully in granting or refusing permits. In this case, it should have reviewed the materials in its possession bearing on the Plaintiffs' applications. It should have uncovered the 1977 Hardy report and disclosed it to the applicants. That report would have caused a careful municipality to require a more detailed geotechnical opinion which would justify ignoring the 1977 Hardy opinion. Even if a decision might have been made to allow the developments at the owners' risk, such a decision would require that the City disclose any information in its possession which might bear on that risk

[128]   Here, the City failed in both respects and therefore breached its duty to be careful in issuing permits because it failed to consult and disclose the 1977 Hardy opinion.

### 4.       Limitations

[129]   The three claims in this matter were filed on June 23, 2000. Since the Plaintiffs' claims were commenced after March 1, 1999, the *Limitations Act*, R.S.A. 2000, c. L-12 applies by virtue of s. 2(1) of that Act.

[130]   The following are the relevant provisions of the *Limitations Act*:

  2(1) This Act applies where a claimant seeks a remedial order in a proceeding commenced on or after March 1, 1999, whether the claim arises before, on or after March 1, 1999.

2005 ABQB 502 (CanLII)

Page: 29

(2) Subject to sections 11 and 13 [not relevant here], if, before March 1, 1999, the claimant knew, or in the circumstances ought to have known, of a claim and the claimant has not sought a remedial order before the earlier of

    (a) the time provided by the *Limitation of Actions Act*, R.S.A. 1980 c. L-15, that would have been applicable but for this Act, or

    (b) two years after the *Limitations Act*, SA 1996 cL-15.1, came into force [two years being March 1, 2001],

the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim.

3(1) Subject to section 11 [not relevant here], if a claimant does not seek a remedial order within

    (a) 2 years after the date on which the claimant first knew, or in the circumstances ought to have known,

        (i) that the injury for which the claimant seeks a remedial order had occurred,

        (ii) that the injury was attributable to conduct of the defendant, and

        (iii) that the injury, assuming liability on the part of the defendant, warrants bringing a proceeding,

  or

    (b) 10 years after the claim arose,

whichever period expires first, the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim.

. . .

(3) For the purposes of subsection (1)(b),

    (a) a claim or any number of claims based on any number of breaches of duty, resulting from a continuing course of conduct or a series of related acts or omissions, arises when the conduct terminates or the last act or omission occurs;

2005 ABQB 502 (CanLII)

Page: 30

(b) a claim based on a breach of a duty arises when the conduct, act or
omission occurs;

(5) Under this section,

(a) the claimant has the burden of proving that a remedial order was
sought within the limitation period provided by subsection (1)(a), and

(b) the defendant has the burden of proving that a remedial order was not
sought within the limitation period provided by subsection (1)(b).

[131]   The City suggests that, if it acted negligently in issuance of the development or building
permits, its negligence occurred at the time the permits were issued. Accordingly, it argues that
s. 3(1)(b) of the Act applies to bar the Plaintiffs' claims in negligence against it. There is no
dispute that, if the City is liable for nuisance, which I will address next, there is no limitations
defence available.

[132]   There was a dispute between the parties as to whether the City could shelter under s. 2(2)
of the Act, also known as the "transition section." Section 2(2) would only apply if the Plaintiffs
knew or ought to have known of their claims prior to March 1, 1999. If they did, the earlier of
the limitation period provided for in the *Limitations of Actions Act*, R.S.A. 1980, c. L-15 or
March 1, 2001 would apply. If not, the limitation period in s. 3(1)(a) of the *Limitation Act* or the
ultimate limitation of 10 years set out in s. 3(1)(b) would apply.

[133]   In determining whether the Plaintiffs knew of ought to have known of their claims prior
to March 1, 1999, consideration must be given to whether they knew by that time that the injury
for which they seek a remedial order had occurred, that the injury was attributable to conduct of
the Defendant, and that the injury, assuming liability on the part of the Defendant, warranted
bringing a proceeding: *Neal v. Kozens*, 2004 ABCA 394.

[134]   The Plaintiffs argue that they did not know and could not have known that they had
sustained an injury until they became aware of the 1977 Hardy report after the occurrence of the
slide. The City does not take issue with that suggestion. The City contends that the Plaintiffs did
not realize that the harm they had suffered was relatively serious nor did the economics warrant
bringing a proceeding until well after March 1, 1999. The City submits that, as the Plaintiffs
were unaware of the existence of the 1977 Hardy report until shortly after the slide, they could
not know of the causal link to the City until that time.

[135]   I agree. The evidence does not merit a finding that the Plaintiffs knew of the claims prior
to March 1, 1999. The only conclusion realistically supported by the evidence is that they did not
know or suspect that anything more than settling of their properties was occurring until the
summer or fall of 1999 and that they were not aware of the 1977 Hardy report before that time.
In my view, s. 2(2) has no application to the facts in this case, notwithstanding Veit J.'s
conclusion in *Bowes v. Edmonton (City)*, (2003) 333 A.R. 332, 2003 ABQB 492.

2005 ABQB 502 (CanLII)

[136]   Her decision related to an application brought by the Eric Douglass Estate in these actions to obtain summary dismissal of the Plaintiffs' claims against it. The application was successful. Veit J.'s focus on the application was on Mr. Douglass' alleged use of fill on the properties. She concluded that the Plaintiffs had the requisite knowledge of Mr. Douglass' use of fill and the repercussions of that fact more than ten years before they sued Mr. Douglass. In the result, their claims were statute barred as against the Douglass Estate. Madam Justice Veit did not rule on the factual circumstances applicable to the City's duty to the Plaintiffs. Those circumstances were not before her. Her conclusion that the Plaintiffs' claims were statute barred as against Mr. Douglass for his failure to warn them of the unstable geological condition of the lots is not helpful in resolving the Plaintiffs' claims against the City.

[137]   As I have said, it is not realistic to conclude that the Plaintiffs knew they had suffered the requisite injury until their land gave way and they discovered the City had kept relevant information from them. In these circumstances, the only relevant limitation period is the ultimate period in s. 3(1)(b) of the Act. The issue then is whether s. 3(1)(b) cloaks the City with immunity.

[138]   Section 3(3)(b) states that, for the purposes of s. 3(1)(b), a claim based on a breach of duty arises when the conduct, act or omission occurs. The omissions complained of in this case were the City's failure to consult and to disclose the 1977 Hardy report prior to issuing the development and building permits to the Plaintiffs. With that in mind, it is apparent that the ten-year limitation, if retrospective, would have expired on or before June 13, 1994 in terms of Ms. Skinner, the fall of 1997 in terms of the Bowes, and October 24, 1997 in terms of Ms. Reid.

[139]   Prior to introduction of the *Limitations Act*, there was no ultimate limitation period in this province. If s. 3(1)(b) of the Act applies retrospectively, as the City argues that it does, the City had immunity to suit by the Plaintiffs as of March 1, 1999. If s. 3(1)(b) applies prospectively, the City is not entitled to immunity.

[140]   It is trite that there is a presumption against retroactive application of a statute. The presumption may be overcome by sufficiently unambiguous language so as to make it clear that the legislation is intended to have that affect. The reason for the presumption and the concomitant need for clear unambiguous language of intent is that reaching back into time to rearrange consequences has a distasteful arbitrariness about it. The potential unfairness is obvious. However, the appropriate analytical structure for determining whether a statute was intended to have retroactive or retrospective application is less certain.

[141]   Mr. Justice Iacobbuci in *Benner v. Canada (Secretary of State)*, [1997] 1 S.C.R. 358 at para. 39 offered these comments on the difference between retroactive and retrospective legislation:

> The terms, "retroactivity" and "retrospectivity", while frequently used in relation to statutory construction, can be confusing. E. A. Driedger, in "Statutes:

2005 ABQB 502 (CanLII)

Page: 32

Retroactive Retrospective Reflections" (1978), 56 Can. Bar Rev. 264, at pp. 268-69, has offered these concise definitions which I find helpful:

> A retroactive statute is one that operates as of a time prior to its enactment. A retrospective statute is one that operates for the future only. It is prospective, but it imposes new results in respect of a past event. A retroactive statute operates backwards. A retrospective statute operates forwards, but it looks backwards in that it attaches new consequences for the future to an event that took place before the statute was enacted. A retroactive statute changes the law from what it was; a retrospective statute changes the law from what it otherwise would be with respect to a prior event.

[142]   It may be that the presumption against retroactivity also applies to retrospectivity. However, Ruth Sullivan, in her text *Sullivan and Drieger on the Construction of Statutes*, 4th ed. (Markham, Ont.: Butterworths Canada Ltd., 2002), footnote 5 at p. 559 suggests that: "Such a presumption would be much weaker than the presumption against retroactive application and in circumstances involving long-term relationships or conditions, would probably be easy to rebut."

Sullivan indicates at p. 562, footnote 5 that the presumption against retroactive [and, presumably retrospective] application of legislation can be rebutted by express words or necessary implication that it is "meant to apply not only to ongoing and future facts but also to facts that are past."

[143]   It is clear that the *Limitations Act* has elements of retrospectivity given the language of s. 2(1), which makes the Act applicable to all claims commenced after March 1, 1999, whether the claim arose before, at or after the coming into force of the new legislation.

[144]   What is not so clear is whether s. 3(1)(b) is also necessarily retrospective. The answer depends on the clarity of the language used by the legislators and the context of the legislation.

[145]   The Act was the considered product of the Alberta Law Reform Institute (ALRI). That body produced a report for discussion in 1986 and its final report in 1989. The Act was passed in 1996 and proclaimed in force on March 1, 1999.

[146]   The transitional provisions of the Draft Act as set out in the 1986 report are as follows:

> 9(1) Notwithstanding this Act, if a claim which arose before this Act came into force is commenced in time to satisfy either
>
> > (a) the provisions of law governing the commencement of actions which would have been applicable but for this Act, or

2005 ABQB 502 (CanLII)

Page: 33

(b) the provisions of this Act,

whichever time is later, the defendant is not entitled to immunity from liability under the claim.

(2) Nothing in this Act

(a) deprives a defendant of entitlement to immunity from liability under a claim, or

(b) deprives one of rights in property,

if the entitlement to immunity or the rights in property existed at the time this Act came into force and arose under provisions of law governing the commencement of actions which would have been applicable but for this Act.

[147]   The Draft Act suggested in the 1989 report was structured differently. The salient portion of that draft is as follows:

13(1)   Subject to subsection (2), this Act applies where a claimant seeks a remedial order in a proceeding commenced after the date the Act comes into force.

(2)   A defendant is not entitled to immunity from liability in respect of a claim of which the claimant knew, or in his circumstances ought to have known before this Act came into force and in respect of which a remedial order is sought

(a) in time to satisfy the provisions of law governing the commencement of actions which would have been applicable but for this Act, and

(b) within 2 years after the date this Act comes into force.

[148]   There is no question that the ALRI was alive to the effect of an ultimate limitation period. The 1986 draft would have allowed a plaintiff with a claim that arose before the new proposed Act came into effect the longer of the limitation periods under the old *Limitation of Actions Act* or the new Act. The ultimate limitation date under the new Act would have applied only if it favoured the plaintiff.

[149]   The changes made to the 1989 draft and the accompanying commentary suggest that there was a concern that the time period for filing an older claim should be reduced while still allowing some time after passage of the Act for the plaintiff to commence proceedings. In the commentary to s. 13 of its 1989 draft, the ALRI stated that s.13(1) would benefit defendants in those cases in which the time available to a claimant to commence a proceeding under the

Page: 34

*Limitation of Actions Act* was reduced. However, it also noted that s. 13(2) offered a countervailing concession to claimants in that it assured that every claimant whose claim would be within time under the *Limitation of Actions Act* would have no less than two years after the new Act took effect within which to seek a remedial order in respect of the claim. In other words, the coming into force of the Act would operate like discovery and would trigger a two year limitation period.

[150] This commentary did not clarify whether the proposed transition provision in s. 13(2) applied only where a claimant knew or ought reasonably to have known of their claim prior to proclamation of the Act. In fact, its reference to the coming into force of the Act operating like discovery suggests that the transitional provision may have been meant to apply to claims of which the claimant was unaware prior to the Act coming into force.

[151] In the commentary to s. 3 of the 1989 draft, the ALRI recognized that:

> 47. The ultimate period for a claim based on the breach of a duty may expire before the claim has even accrued, for the damage may not have occurred by that time, and even if it has, the claim may not have accrued under the discovery rule. This problem of legal principle is inescapable because there is no feasible alternative consistent with limitation policy.

[152] There is nothing in this commentary or in ss. 3 to suggest whether the ultimate limitation period was intended to apply to all or any claims arising before the coming into force of the Act.

[153] It is clear that the Commission's goal was to rationalize limitations law and to strike a fair balance between the need for repose for prospective defendants and the need to provide prospective plaintiffs with some time to act. At the heart of the balancing of these competing interests is discoverability.

[154] The legislators subsequently debated the principles and language of the proposed new statute. Their debates offer no assistance in understanding the intended reach of the present s. 3(1)(b). In the result, we are left with the words of the statute to be considered in light of the general principles of statutory interpretation.

[155] Up until March 1, 1999 a negligence claim did not arise until an injury had occurred. However, at common law, the limitation period for negligence did not start to run until discovery of the injury. The new Act made itself applicable to all suits launched after March 1, 1999, whether or not the act or omission on which the suit was based occurred before or after that date. Pursuant to s. 3(3) of the new Act, a negligence claim is now said to arise for purposes of s. 3(1)(b) when the act or omission on which it is based occurs. Discoverability does not apply to the ultimate limitation period.

[156] The Plaintiffs argue that use of the present tense "occurs" in s. 3(3)(b) indicates that the legislator wanted s. 3(1)(b) to have prospective effect only, as otherwise it would have used the

Page: 35

word "occurred,"just as the ALRI did in its 1989 proposed draft. I do not find this argument compelling. As indicated in *Sullivan and Drieger on the Construction of Statutes* at p. 620, it is a preferred legislative drafting technique to employ the present indicative unless the context requires otherwise. Legislation is said to speak at all times after it comes into force. Presumably, it was for that reason and to accord with the verb "arises," which also appears in s. 3(3)(b), that the word "occurs" was used.

[157] Section 2(2) applies only where the claimant knew, or in the circumstances ought to have known, of a claim but has not sought a remedial order. The claimant is given the earlier of the limitation period under the old Act or two years after the coming into force of the current Act within which to sue.

[158] In *Maull v. Rodnunsky*, (2001) 287 A.R. 343, 2001 ABQB 309, Master Breitkreuz concluded that the ultimate limitation period in s. 3(1)(b) does not apply in situations covered by s. 2(2). He disagreed with Master Quinn's decision in *Alberta (Alberta Infrastructure) v. Komant* (2000), 269 A.R. 168, 2000 ABQB 940 that s.3 must apply to claims predating proclamation of the Act where a proceeding had not been commenced prior to that date as Master Quinn did not appear to have considered the transitional limitation period in what is now s. 2(2). He noted that, on appeal (2000), 290 A.R. 323, 2000 ABQB 433 (Q.B.), Marceau J. applied the limitations period set out in the present s. 2(2), not the period set out in s. 3. In addition, he took into account that the court in *Manufacturers Life Insurance Co. v. Husky Oil Marketing Co.* (1999), 249 A.R. 305 (Q.B.) and in *Stengel v. Mabbott* (2000), 272 A.R. 296 (Q.B.), both of which dealt with claims arising before the Act was proclaimed, did not consider the effect of s. 3, *albeit* in *Stengel* counsel expressly agreed to that interpretation of the Act.

[159] Master Breitkreuz remarked that s. 3 makes no reference whatsoever to the old Act and is clearly not a transitional provision. He reasoned that it would lead to confusion and uncertainty to hold that both the transitional provision and the ultimate limitation period apply as there is no mechanism in the Act to determine which limitation period will prevail. The same concern would not arise in situations where the claimant was unaware of the claim prior to proclamation of the new Act as s. 2(2) would not apply.

[160] Master Breitkreuz noted in *Maull* that the Alberta Court of Appeal has confirmed in *Campbell v. Fang* (1994), 155 A.R. 270 that limitation statutes are to be strictly construed. While he agreed that the objectives of the ultimate limitation period are to bring potential liability to an end after a reasonable period of time so that people can order their affairs, to keep insurance premiums down, and to prevent old claims from going to trial where the evidence may be stale, he remarked that what is now s. 2(2) also provides an ultimate limitation period of March 1, 2001 which has many of the same objectives. There is no similar provision covering situations where the claimant was unaware of the claim before the new Act came into force. Therefore, in order for the objectives of the legislator to be met, s. 3(1)(b) must be interpreted as having retrospective effect. To apply it only prospectively would be to frustrate those objectives and would fly in the face of s. 2(1).

Page: 36

[161]   In *Neal v. Kozens*, the Court of Appeal implied that the ultimate limitation period in fact does apply in a situation such as this. The plaintiff in that case alleged that she had been sexually assaulted by the defendant between 1980 and 1987. She testified that she first learned that she might have a claim against the defendant in the spring of 2000. It was not until 2001 that she filed her suit. Both levels of court found that the actions of the defendant constituted fraudulent concealment pursuant to s. 4 of the *Limitations Act*, which had the effect of postponing the ten year limitation period. The Court of Appeal stated at para. 38 of its decision that: "On this record, we are of the view that the learned summary trial judge did not err in holding that fraudulent concealment by the appellant [defendant] overcame the ten year limitation in s. 3(1)(b)." This comment would not have been necessary if the ten year limitation period did not otherwise apply.

[162]   In *410727 B.C. Ltd. v. Dayhu Investments Ltd*, 2004 BCCA 379, the defendants applied to have the action against them dismissed on the basis that the 30 year ultimate limitation period, first enacted in British Columbia in 1975, had expired prior to issuance of the plaintiff's writ. The summary trial judge concluded that a cause of action against the defendants for pure economic loss had arisen in 1968 and was out of time, but that the plaintiff had a further cause of action for injury to property which did not accrue until 2002. On appeal, the court held at para. 39 that:

> The 30-year "ultimate" limitation, which applies expressly notwithstanding the fact that the cause of action in question may not be discoverable, mandates that there be a point after which such prospective defendants may not be sued. In the case at bar, that point was reached, at the latest, in 1998 - four years before the issuance of the plaintiffs' writ.

[163]   The court concluded that the 30 year limitation period began to run from the time that the action accrued, not from the date when the ultimate limitation period was first enacted.

[164]   I have concluded that the intent of the new Act is that the ultimate period is to have retrospective effect.

[165]   The Plaintiffs in the present case argue that the City cannot rely on limitations immunity because it fraudulently concealed the fact that injury had been and was being suffered by them. They contend that fraudulent concealment for the purpose of limitations law does not constitute an allegation of common-law fraud and therefore does not attract the obligation of special pleading or the risk of costs. They rely on *Photinopoulos v. Photinopoulos* (1988), 54 D.L.R. (4th) 372, in which Stratton J.A., for the Alberta Court of Appeal, stated at p. 376:

> It has long been settled that "fraud" in this context does not necessarily involve any moral turpitude: see *Beaman v. ARTS Ltd.* It is sufficient if what was done was unconscionable: see *Kitchen v. Royal Air Forces Association*, a test which was applied in the case of a building contract in *Clark v. Woor*. Those cases show that "fraud" is not used in the common law sense. It is used in the equitable sense

to denote conduct by the defendant or his agent such that it would be "against conscience" for him to avail himself of the lapse of time. The section applies whenever the conduct of the defendant or his agent has been such as to hide from the plaintiff the existence of his right of action, in such circumstances that it would be inequitable to allow the defendant to rely on the lapse of time as a bar to the claim. Applied to a building contract, it means that if a builder does his work badly so that it is likely to give rise to trouble thereafter, and then covers up his bad work so that it is not discovered for some years, then he cannot rely on the statute as a bar to the claim. The right of action is concealed by "fraud" in the sense in which "fraud" is used in this section.

[166]    The court in that case rejected the argument that an overt act of concealment by the defendant was necessary.

[167]    In my view, the evidence here falls far short of establishing wilfulness on the part of the City or any effort to hide its negligence or the injury suffered by the Plaintiffs. Rather, this is a case of oversight, which does not justify the fraud moniker. Accordingly, the Defendant is entitled to immunity from liability for negligence on the basis of the ultimate bar contained in s. 3(1)(b) of the Act.

### 5.    Damages

[168]    In the event that I am wrong and the City is not entitled to immunity, it is necessary to consider the appropriate award of damages.

### (a)    General Damages

[169]    The parties agreed that, exclusive of interest and costs, the damages suffered by the Plaintiffs are as follows:

| | | |
|---|---|---|
| Bowes | Land & Home | $708,000.00 |
| | Contents | $   1,868.00 |
| | **Total** | $709,868.00 |
| Skinner | Land & Home | $561,000.00 |
| | Contents | $ 10,989.53 |
| | **Total** | $572,489.53 |

2005 ABQB 502 (CanLII)

Page: 38

| Reid | Land & Home | $605,500.00 |
|------|-------------|-------------|
|      | Contents    | $26,121.97  |
|      | **Total**   | $631,621.97 |

[170]  I understood the parties to be agreed that if the City was liable then subject to contributory negligence, contribution and its claim against Douglass, the City was liable for damages in these amounts.

[171]  I have not been advised as to the basis upon which the parties came to their agreement upon damages. I have not heard any argument on the subjects of quantification or the heads of damage. It seems to me that this is really a case of loss of chance as the applicable head of damage. This case was presented on the basis that had the City disclosed the Hardy report, the Plaintiff's may not have built or may not have been allowed to build. The notion of an award of damages for loss of chance is not without controversy. However, the parties' argument makes resolving that controversy unnecessary.

[172]  The Plaintiffs also seek punitive damages.

### (b)    Punitive Damages

[173]  The Plaintiffs have each claimed punitive damages on the basis that the City's failure to disclose the 1977 Hardy report, was a wilful and deplorable determination to extract taxes from the Plaintiffs and to use their lands to support the City's Whitemud Road.

[174]  While the loss of the Plaintiffs' homes was unfortunate, the City was merely negligent. It did not act outrageously, maliciously or egregiously. As such, punitive damages have no place in this action.

[175]  The high handed manner in which the City ultimately obtained access to the slide area, over the lands and protests of the Plaintiffs, and the City's lawsuit against the land owners for the costs involved in demolishing their homes, while in poor taste, do not fall within the categories of behaviour which would justify punitive damages. Those actions may have been inconsiderate and even rude, but they are not punishable.

### 6.    Contributory Negligence

[176]  The City argues that each of the Plaintiffs was contributorily negligent in purchasing the subject lands and building on those lands. Part of the City's argument in this regard is that the Plaintiffs knew or ought to have known that the land would slide or subside and built their homes there anyway.

[177]  The problem with the City's argument is that contributory negligence is not an apt concept for the facts of this case. In fact, the proper notion is the voluntary assumption of risk. In

Page: 39

my view, the City's claim to shield against the Plaintiff's damages is based upon the fact that the Plaintiff's were or ought to have been alert to the risk of a slide or slides and went ahead anyway.

[178]   The BBT report did make it clear that the bank was only marginally stable. However, that report also suggested that the most reasonable scenario was one in which many years could pass before any loss of land would occur and the loss would be minimal when it did occur. Therefore, a reasonable person could have considered that the risk assumed in building, while tangible, was minimal. However, since the Plaintiffs had access to the BBT report prior to building their homes, either directly or as referenced in the 1980 caveat they must bear some responsibility for their loss as they were aware of and assumed some risk.

[179]   That risk included the fact that the report noted but discounted the possibility of a large block slide. In all the circumstances, given the knowledge possessed by the Plaintiffs, I am of the view that the risk voluntarily assumed by them of a deep translational slide is 5%. I would reduce the agreed damages by that amount.

### 7.    Contribution

### (a) Shelby Engineering and G.G. Hunter

[180]   The Bowes retained Shelby Engineering Ltd. to report on geotechnical considerations in the construction of their home and to recommend the appropriate distance from the top of the bank that the house should be constructed. Shelby's report effectively reiterated the report results of BBT. The City did not provide Shelby with the 1977 Hardy report, nor did Shelby have access to that report from any other source. The Bowes sued Shelby and the City and the City sought contribution and indemnity from Shelby for any liability it might have to the Bowes.

[181]   The Bowes' claim against Shelby and Hunter was settled at the commencement of the trial of this action. The settlement agreement was filed as an exhibit.

[182]   In my view, the Bowes' claim against Shelby was rooted in the notion that Shelby was one of the parties which should have protected them from harm, the other party being the City. Their responsibilities to the Bowes were independent and based on different duties. The Bowes instructed Shelby to assess the bank stability. Shelby regurguitated the BBT report. Simple regurgitation without extensive independent analysis may have been negligent. Of course, that would depend on the nature of the retainer between the Bowes and Shelby. We know nothing of the terms of that retainer. Whatever the circumstances, it is clear that there was only one loss suffered by the Bowes. That loss resulted from the bank subsiding. The subsidence was at the heart of the claim by the Bowes against both Shelby and the City. It follows, that the City is entitled to a contribution from Shelby and Hunter towards its liability to the Bowes in an amount equal to the amount that they agreed to accept from Shelby and Hunter as general damages in settlement of their claim.

Page: 40

### (b) Douglass Estate

[183]   The City claims contribution and indemnity from the Douglass Estate pursuant to its Rule 77 Notice (statutorily) and pursuant to its Third Party Notice (contractually).

#### (i)    Statutory Contribution

[184]   The City issued a Notice to the Estate pursuant to Rule 77 at a time when the Estate was still a Defendant in the actions taken by the Plaintiffs. As indicated earlier, the Estate successfully moved to have the Plaintiffs' claims against it summarily dismissed. Veit J.'s decision in that regard was issued in June 2003. She concluded that all of the Plaintiffs' claims against the Estate were statute barred.

[185]   The Estate argues that the result of Madam Justice Veit's order is that it is not liable to the Plaintiffs and, absent such liability, cannot be liable to assist the City in compensating the Plaintiffs. I agree. The Supreme Court of Canada in *Parkland (County) No. 31 v. Stetar*, [1975] 2 S.C.R. 884, [1975] 1 W.W.R. 441 provided the answer, although in a completely different factual situation. Mr. Justice Dickson offered the following opinion at p. 449:

> The second question is whether the Poiriers and Car Rentals can recover 100 per cent of their damages from Stetar having regard to (a) the attribution of fault 75 per cent to Stetar and 25 per cent to the county; (b) the nonsuit of the Poiriers and Car Rentals in their actions against the county for their failure to give timely notice; (c) the authorities which support the proposition that s. 4(1)(c) of The *Tort-Feasors Act*, R.S.A. 1955, c. 336 (now R.S.A. 1970, c. 365) and its English counterpart, s. 6(1)(c) of the *Law Reform (Married Women and Tortfeasors) Act*, 1935, do not admit of a claim for contribution by one tort-feasor against another when that other has been sued by the injured person and held not liable: *George Wimpey & Co. v. British Overseas Airways Corporation* [[1954] 3 All E.R. 661]; *Aleman v. Blair and Canadian Sugar Factories Ltd.* [(1963), 44 W.W.R. 530]; *Hart v. Hall and Pickles, Ltd.* [[1968] 3 All E.R. 291]. Section 4(1)(c) of the *Tort-Feasors Act* of Alberta provides:
>
>> 4. (1) Where damage is suffered by any person as a result of a tort, whether a crime or not, ...
>>
>>> (c) any tort-feasor liable in respect of that damage may recover contribution from any other tort-feasor who is or would, if sued, have been liable in respect of the same damage, whether as a joint tort-feasor or otherwise ...
>
> In *Hart v. Hall and Pickles, Ltd.*, *supra*, the Court of Appeal had occasion to consider the meaning of s. 6(1)(c) of the *Law Reform (Married Women and*

2005 ABQB 502 (CanLII)

Page: 41

*Tortfeasors) Act*, 1935. Lord Denning M.R. commented on this section and the
*Wimpey* case at p. 293:

> This point depends on the interpretation of the Act of 1935. Before that
> Act when there were separate tortfeasors causing one damage, the plaintiff
> could sue them each in turn till he got the total amount of his damages:
> and neither of the tortfeasors had any right of contribution from the other.
> Now this statute gives a right of contribution. Section 6(1) provides that:
>
> > "Where damage is suffered by any person as a result of a tort ... (c)
> > any tortfeasor liable in respect of that damage may recover
> > contribution from any other tortfeasor who is, or would if sued
> > have been, liable in respect of the same damage ..."
>
> That is all I need read. Those words as construed by the House of Lords
> cover two situations: (i) where a tortfeasor has been sued and has been
> held liable; and (ii) where a tortfeasor has not been sued, but, if he had
> been sued, he would have been held liable. The words do not cover a third
> situation; (iii) where a person who is alleged to be a tortfeasor has been
> sued and has been held not liable. If he has been held not liable on the
> merits of the case, clearly he cannot be sued for contribution. If he has
> been saved from liability by reason of the *Statute of Limitations*, again he
> cannot be sued for contribution, see *George Wimpey v. British Overseas
> Airways Corpn.*

[186] Dickson J. concluded that Poirier could recover fully from Stetar. For the purposes of this
case, what is significant is the court's seeming adoption of the principles espoused in the quoted
segment of Lord Denning's judgment in *Hart v. Hall & Pickles Ltd.*, [1969] 1 Q.B. 405.

[187] The Supreme Court of Canada addressed the issue again in *Giffels Associates Ltd. v.
Eastern Construction Co.*, [1978] 2 S.C.R. 1346. Again, the circumstances differ from those
here. However, then Chief Justice Laskin, speaking for the court, offered comment on the issue
in these words:

> Similarly, I am of the view that it is a precondition of the right to resort to
> contribution that there be liability to the plaintiff. I am unable to appreciate how a
> claim for contribution can be made under s. 2(1) by one person against another in
> respect of loss resulting to a third person unless each of the former two came
> under a liability to the third person to answer for his loss.

[188] The City's reliance on Master Funduk's decision in *Wurtz v. Nobis* (1980), 28 A.R. 574
is misplaced. That was a case where the plaintiff discontinued its action against the prospective
contributor. In the present case, as in *Parkland* and *Giffels*, there was a judicial determination

2005 ABQB 502 (CanLII)

that the claimed contributor was not liable to the Plaintiff. Accordingly, the City's claim for contribution from the Estate pursuant to its Rule 77 Notice fails.

### (ii)    Contractual Contribution

[189]   The 1978 caveat arose from the development agreement between Eric Douglass and the City of Edmonton. That agreement is the foundation of the City's Third Party Notice claim against the Estate.

[190]   The Estate raised a number of cogent arguments against the City's claim. In the end result, however, it is only necessary to interpret the agreement in the context of Mr. Douglass' death to resolve this issue.

[191]   The agreement was clearly directed at protecting the City from claims by Mr. Douglass for any loss he might suffer as a result of bank slippage. Furthermore, it was clearly intended that those who succeeded Mr. Douglass in title would be bound by the agreement. However, the City does not rely on the agreement in its defence to the Plaintiffs' claims. Rather, it seeks indemnity from the Estate. Ultimately, the City's Third Party claim against the Estate fails because the claim, even if meritorious, died with Mr. Douglass. The words of the agreement are that Mr. Douglass commits himself, his successors, successors-in-title and assigns. He does not commit his heirs. It is apparent that once there are successors or assigns, they become liable. Since Mr. Douglass' heirs are not specified as being bound, I conclude that the parties did not intend to bind them. As a result, the Estate cannot be liable to the City pursuant to the agreement in relation to the lots ultimately transferred to the Plaintiffs.

[192]   Accordingly, the City's Third Party Notice against the Estate is dismissed. As there is no liability against the Estate, there is no foundation for the Estate's Fourth Party Notice against the Plaintiffs and it also is dismissed.

## B.    Nuisance

[193]   The Plaintiffs have also claimed that the City is liable in nuisance. The City owns the lands both immediately east and west of the Plaintiffs' lands, comprising the adjacent riverbank and road allowance, respectively. The Plaintiffs argue that the use to which the City put its lands constituted a nuisance. Additionally, they submit that the City is liable in nuisance because it failed to ameliorate a risk which it knew existed. This latter claim is based on *Leakey and others v. National Trust for Places of Historic Interest or Natural Beauty*, [1980] 1 Q.B. 485 (C.A.) and will be referred to here as the *Leakey* claim.

### 1.    Use Nuisance

[194]   The Plaintiffs claim that the City's use of the property on their eastern boundary for Whitemud Road was a use which increased the groundwater percolating under the Plaintiffs'

Page: 43

lands. They contend that, as softening was in part the genesis of the Whitemud Road slide the City is responsible for this nuisance.

[195]   The Plaintiffs also argue that the City used its lands to the west of the Plaintiffs' properties as a berm to shore up the soils supporting its road allowance.

[196]   The evidence does not support the argument that construction of the road in any way contributed to the subsurface water which ultimately played a role in the slide. The 1977 Hardy report makes it plain that surface drainage of the upland area to the east of the bank is in a southeasterly direction, which is away from the Plaintiffs' lands. That report also noted that road construction tends to improve surface drainage and therefore reduce absorption of water into the subsurface. However, the author also commented that roads tend to increase the rate of snow melt in the spring. In any event, the report contained a series of recommendations designed to ensure that the surface water would drain to the south and east of the Plaintiffs' properties.

[197]   It would appear from the 1977 Hardy report that the roads' impact is on surface water, not subsurface water. There is nothing in the evidence to suggest that the road caused the accumulation of surface water or added to the subsurface water. In fact, the report recommended measures to move the surface water away from the Plaintiffs' lands and there is no evidence to suggest that those recommendations were not followed. Therefore, I conclude that construction of the road and the City's use of the land for that purpose has not been shown to have caused any damage to the Plaintiffs' lands.

[198]   Similarly, the suggestion that the City's "use" of the riverbank as a berm constituted a nuisance also fails. The Plaintiffs' complaint is not that the City actually did anything, rather the complaint is that the City did not do what it should have done to make the bank capable of supporting the Plaintiffs' lands. However, even if it is accepted that the City intended the bank to buttress the lands to the east, the complaint is not about use nuisance but about a failure to remedy a potential problem; that is, a form of *Leakey* claim.

[199]   The distinguishing feature between classic or use nuisance and a *Leakey* claim is that the former involves some action taken in relation to the lands. Inaction, whatever the motivation, is one of the defining characteristics of a *Leakey* claim.

## 2.   *Leakey* Claim

[200]   *Leakey* involved a claim by the plaintiffs for damage which occurred when a significant portion of the Burrow Mump, National Trust's property, slid onto the Leakey's property. The Court of Appeal framed the issue before it as one of whether the owner or occupier of land can be liable for damage caused to his neighbour's land as a result of a naturally occurring phenomenon on his lands. The headnote of the decision adequately summarizes the conclusion of the court as follows:

2005 ABQB 502 (CanLII)

Page: 44

... A person on whose land a hazard naturally occurred, whether in the soil itself
or in something on or growing on the land, and which encroached or threatened to
encroach onto another's land thereby causing or threatening to cause damage, was
under a duty, if he knew or ought to have known of the risk of encroachment, to
do what was reasonable in all the circumstances to prevent or minimise the risk of
the known or foreseeable damage or injury to the other person or his property,
and was liable in nuisance if he did not. Where a substantial expenditure was
required to prevent or minimise the risk of damage the occupier's financial
resources, assessed on a broad basis, were a relevant factor in deciding what was
reasonably required of him to discharge the duty, and the neighbour's ability,
similarly assessed on a broad basis, to protect himself from damage might also be
a relevant factor to be taken into account, depending on the circumstances.

[201]    In *Leakey,* there was no question that the landslide was a completely foreseeable
consequence and a natural occurrence. It was known that a slide was possible and likely to cause
damage if it occurred. The action was framed in nuisance but not in negligence. National Trust
took the position that the claim was properly one of negligence, which had not been pleaded.
Megaw L.J. had this to say on the subject at p. 25:

The judgment of the Board in *Goldman v. Hargrave,* [1966] 2 ALL ER 989 at
991 was delivered by Lord Wilberforce. It was held that the risk of the
consequence which in fact happened was foreseeable. This, it is said, 'was not
really disputed'. The legal issue was then defined:

'... the case is not one where a person has brought a source of
danger on to his land, nor one where an occupier has so used his
property as to cause a danger to his neighbour. It is one where an
occupier, faced with a hazard accidentally arising on his land, fails
to act with reasonable prudence so as to remove the hazard. The
issue is therefore whether in such a case the occupier is guilty of
legal negligence, which involves the issue whether he is under a
duty of care, and, if so, what is the scope of that duty.'

[202]    Megaw L.J. went on to analyze the nature of the obligation in terms of the principles in
*Rylands v. Fletcher* (1868), L.R. 3 H.L. 330 and concluded that the obligation is not one of strict
liability. He further discussed and dismissed the notion that *Rylands v. Fletcher* stands for the
proposition that there can be no liability for naturally occurring phenomena. Rather, he
concluded that there cannot be strict liability for naturally occurring phenomena. He held that the
obligation is one which requires the occupier to use reasonable care in relation to risks he is
either aware of or of which, as a reasonably careful landowner, he ought to be aware.

[203]    Having determined that a duty of care could be imposed, the court concluded that there
were no policy reasons which precluded recognition of the duty because the scope of the duty
was limited, not only by the usual limits associated with determining liability in negligence but

Page: 45

also by a consideration of economic reasonableness. Megaw L.J. outlined the limit of the occupier's duty in these words (at p. 35):

> This leads on to the question of the scope of the duty. This is discussed, and the nature and extent of the duty is explained, in the judgment in *Goldman v. Hargrave*. The duty is a duty to do that which is reasonable in all the circumstances, and no more than what, if anything, is reasonable, to prevent or minimise the known risk of damage or injury to one's neighbour or to his property. The considerations with which the law is familiar are all to be taken into account in deciding whether there has been a breach of duty, and, if so, what that breach is, and whether it is causative of the damage in respect of which the claim is made. Thus, there will fall to be considered the extent of the risk. What, so far as reasonably can be foreseen, are the chances that anything untoward will happen or that any damage will be caused? What is to be foreseen as to the possible extent of the damage if the risk becomes a reality? Is it practicable to prevent, or to minimise, the happening of any damage? If it is practicable, how simple or how difficult are the measures which could be taken, how much and how lengthy work do they involve, and what is the probable cost of such works? Was there sufficient time for preventive action to have been taken, by persons acting reasonably in relation to the known risk, between the time when it became known to, or should have been realised by, the defendant, and the time when the damage occurred? Factors such as these, so far as they apply in a particular case, fall to be weighed in deciding whether the defendant's duty of care requires, or required, him to do anything, and, if so, what.

[204]    He further commented at p. 36 on the policy arguments raised by the defendants in that case:

> ... The difficulties which are foreseen, arising out of the passage which I have quoted, include unpredictability of the outcome of litigation, delay in reaching decisions (which in everyone's interest ought to be made promptly) as to protective measures to prevent damage and the increased complexity, length and expense of litigation, if litigation is necessary. All this, and other disadvantages, would arise, it is suggested, because the parties and their advisers, before they could form a fair and confident view of their respective rights and liabilities, and before they could safely ask the court to decide these matters, whether finally or at an interlocutory hearing, would find it necessary, or at least desirable, to put themselves in a position to ascertain and compare the respective financial resources of the parties. This might involve detailed, embarrassing and prolonged investigation, even before the stage of discovery in an action.

[205]    Megaw L.J. rejected this argument, however. He concluded that the extent of the defendant's duty is to do what is reasonable for him to do, having regard, amongst other things, to his means, broadly assessed, where a serious expenditure of money is required to eliminate or

2005 ABQB 502 (CanLII)

Page: 46

reduce the danger, or to his age and physical condition, where physical effort is required to avert an immediate danger. Similarly, a broad assessment of the neighbour's capacity to protect himself from damage, whether by way of some form of physical barrier on his land or by way of providing funds for agreed works on the land of the defendant, may be required.

[206]   Somewhat surprisingly, this reasonably novel cause of action has had little consideration in Canada. Both parties offered decisions which purported to adopt or to reject the conclusions in *Leakey*. However, none of those decisions specifically addressed, critically analyzed, applied, rejected or distinguished the decision. There are no reported Alberta decisions that I am aware of which have considered *Leakey*.

[207]   My first concern with this supposed cause of action is the imprecision with which it was defined by the Court of Appeal. Is it a negligence action or a claim in nuisance? While Lord Justice Megaw suggested categorization would be a "regrettable modern instance of the forms of action successfully clanking their spectral chains," in the context of limitations, statutory protections and predictability, categorization is crucial. For instance, in this case, the Plaintiffs' negligence claim against the City is barred by the ultimate limitation period set out in s. 3(1)(b) of the *Limitations Act*. A *Leakey* claim would also be barred if founded on negligence. Of course, if a *Leakey* claim is based on nuisance, as the nuisance continued unabated until the Whitemud Road slide, there would be no limitations issue. Furthermore, taking all reasonable care, ordinarily is not a defence to a claim in nuisance, although it is in negligence. However, a *Leakey* claim as defined by the Court of Appeal embraces the exercise of reasonable care by the occupier defendant. Megaw L.J.'s characterization of the cause of action suggests that the victim of the nuisance could come to the nuisance or voluntarily assume the risk of loss. Those are notions wholly foreign to the law of nuisance, but common to negligence actions.

[208]   It would seem that the definition offered by the Court of Appeal has more in common with negligence than with nuisance. However, even that suit is ill fitting as the scope of the duty to act is not limited solely by factors of risk and foreseeability but also includes financial considerations.

[209]   It seems to me that private nuisance remains a tort separate from negligence out of necessity. The tort of nuisance allows the court to construct a compromise between competing but lawful uses of neighbouring properties. In my view, the tort of nuisance is not so much concerned with land occupation, other than as a basis to justify intervention, rather the focus is upon ameliorating the conflicts inevitably resulting from socialization and private property ownership. In that sense, the *Leakey* claim fits a gap because the alleged tortfeasor would otherwise be entitled to use his land as he sees fit and do nothing as it slips-slides away. The categorization of the *Leakey* claim as one of nuisance makes the difficult task of assessing causation less important. If the lands' condition has the reasonable potential to create or cause a nuisance to the neighbouring land, it constitutes a nuisance until such time as the condition is ameliorated. However, one could also skirt causation issues by characterizing non action as a perpetually recurring negligence until such time as the foreseeable event occurs.

Page: 47

[210]  It seems to me that categorization of non-action in this context as either nuisance or recurring negligence has the potential to substantially undermine limitations law in this province and to return us to the unacceptable uncertainty which marked litigation prior to proclamation of the *Limitations Act*.

[211]  I am of the opinion that the *Leakey* claim is better seen as a negligence action than a nuisance action. I would characterize it as a special kind of tort, a tort of non-feasance where the tortfeasor's neighbour is his neighbour in the concrete physical sense rather than in the figurative sense only.

[212]  Does this tort have a place in the law of this province? I think Lord Justice Megaw's reasoning compelling. It seems to me that there is room in our law for another tool which will serve to balance the interests of neighbours when one is pursing a lawful but potentially harmful course of action on his land relative to the land of his neighbour. Furthermore, it seems to me that his formulation of the scope of the duty is both sophisticated and flexible, thus providing the greatest likelihood of striking the most appropriate balance in what will be an essentially local dispute.

[213]  Categorizing the *Leakey* claim as one which sounds in negligence serves to focus the attention of the Court on the action or inaction of the occupier as opposed to the artificial and arbitrary distinction based on land occupation. Again, occupation merely establishes the necessary proximity but knowledge and action or inaction is the foundation for intervention.

[214]  Applying the *Leakey* principles to this action, it is clear that the City was aware of the marginal stability of the riverbank. It is clear that the City had been told not to allow any building west of the extended Whitemud Road. The City's knowledge included the foreseeable risk that there could be a loss of property if building was allowed to occur on the unstable bank.

[215]  The City's knowledge as to the kind of instability that might become manifest is contained within the report by BBT. The Hardy report did not offer comment on the kind of slide that might be expected to occur. The BBT report concluded that, while the bank was in a state of marginal stability, the focus of foreseeable risk was surficial. While a deep seated bedrock initiated slide was possible, it was implied in the BBT report that such an event was unlikely enough to be discounted. Therefore, the focus was on the more probable surface soils slide.

[216]  As indicated earlier, foreseeability and risk assessment in the engineering context differs from the common law treatment of those issues. However, in this instance, it seems to me that the two disciplines are precisely aligned. Both from an engineering perspective and a legal perspective the risk of a bedrock slide, while foreseeable, was too insignificant or remote to justify specific action to address the risk.

[217]  Therefore, it is unnecessary to finally decide whether the *Leakey* claim properly sounds in negligence or in nuisance. Whatever the categorization, it is clear that foreseeability and remoteness limit liability and are necessarily part of the duty analysis. In this case, the City did

2005 ABQB 502 (CanLII)

Page: 48

not owe a *Leakey* duty in relation to a bedrock initiated slide. The City lacked the requisite proximate knowledge. That knowledge did not become sufficiently proximate until some time late in 1999 when it became apparent that a substantial deep seated slide was occurring. By that time, there was no realistic action that could have been taken to limit or abate the slide.

[218]   I accept that horizontal and vertical wells are both post-slide measures designed to reduce the water content in the slide mass and thus protect against further movement. Neither, however, was a realistic nor economic option prior to the slide occurring, given the knowledge which existed, the degree of risk, the difficulties in accessing the lands and constructing such wells, and the prohibitive expense associated with either initiative.

[219]   The Plaintiffs' *Leakey* claims required that they prove that reasonable steps could have been taken by the City to prevent or minimize the damage. The Plaintiffs have not met that onus. Accordingly, their *Leakey* claims fail.

## VI.    Conclusion

[220]   The Plaintiffs' actions against the City are time barred and therefore their claims are dismissed. The Third Party proceedings launched by the City against the Douglass Estate are dismissed. The parties may speak to costs on appointment.

Heard on the 9th day of March, 2005.
**Dated** at the City of Edmonton, Alberta this 7th day of July, 2005.


**T.D. Clackson**
**J.C.Q.B.A.**

**Appearances:**

R.B. White, Q.C., M.A. Kirk, D.A. Wells and Jeremy D. Schick
    for the Plaintiffs and Fourth Parties

D. Lopushinsky and L. Fenger
    for the Defendants

D.C. Rolf
    for the Third Parties

S. Hammel
    for Shelby Engineering and G.G. Hunter

2005 ABQB 502 (CanLII)

# TAB 4



18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

▷
1988 CarswellQue 279

Canadian Indemnity Co. v. Canadian Johns-Manville Co.
Canadian Johns-Manville Company, Limited (defendant-appellant) v. The Canadian
Indemnity Company (plaintiff-respondent)
Quebec Court of Appeal
Rothman, Tourigny and Dugas (ad hoc), JJ.A.
Judgment: October 25, 1988
Docket: C.A. Montreal, No. 500-09-000780-858

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Counsel: Graham Nesbitt and Thomas Davis, for the appellant.

J. Vincent O'Donnell and Odette Jobin-Laberge, for the respondent.

Subject: Insurance

Insurance --- Disclosure of risk -- Misrepresentation -- Liability insurance.

Rothman, J.A.:

1    The critical issue in this appeal is whether or not appellant, an insured under an insurance policy covering
products liability, failed to disclose material facts showing the nature and extent of the products liability risk.

**The Facts**

2    Appellant, Canadian Johns-Manville Company Limited, was in the business of mining, manufacturing and
selling asbestos and asbestos products.

3    In 1970, respondent, The Canadian Indemnity Company, issued to Johns-Manville a Comprehensive General
Liability Policy providing insurance coverage against various liability claims including products liability. The policy
was renewed in 1973 and cancelled in 1975.

4    In 1979, Canadian Indemnity took an action in nullity asking that the Policy be declared null ab initio by reason
of Johns-Manville's failure to disclose to the insurer the very high frequency of asbestosis, cancer of the lung and
mesothelioma caused to workers in the insulation and other manufacturing industries by inhalation of asbestos fibre.
In particular, Canadian Indemnity alleged that Johns-Manville had in its possession but failed to disclose to the
insurer three studies made in 1965, 1968 and 1969 by Dr. Irving Selikoff of the Mount Sinai School of Medicine in
New York, and his associates, all indicating a very high incidence of pulmonary asbestosis among asbestos
insulation workers, the frequency of the disease varying directly with the duration of their exposure to the product.

5    The Superior Court maintained the insurer's action in nullity and declared the policy and its renewal null ab
initio. The trial judge concluded that Johns-Manville was aware of the Selikoff reports and of the hazardous nature
of asbestos fibres when it applied for the insurance, that these facts were material, and that they should have been