18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

disclosed. The trial judge further concluded that the insurer, although negligent in failing to make inquiries about the risk, had no knowledge and was not to be presumed to have had knowledge of the high risk of asbestosis and other diseases to workers exposed to asbestos fibres:

> To conclude on this chapter, the Court is therefore of the view that the contract of insurance herein did not attach, notwithstanding the apparent negligence of the plaintiff which under our law had no duty in the circumstances to investigate the facts and circumstances disclosed to it by the insured and which had no knowledge, constructive or otherwise, of the facts herein deemed to be material which, therefore had to be fully and fairly disclosed by the defendant.

6    It was admitted by Johns-Manville that the Selikoff reports were in its possession when the insurance was requested and it can hardly be doubted that Johns-Manville was then aware that exposure to asbestos fibres over a period of time involved a serious health risk, at least among insulation workers, which increased with the duration of the exposure. The trial judge's conclusion in this regard is amply supported by the reports.

7    Nor does Johns-Manville dispute that it did not specifically disclose to the insurer the contents of the Selikoff reports or any serious health hazards suggested in the reports. The only information given to the insurer indicating, in any way, the possibility that asbestos might cause health problems was a note contained in Johns-Manville's annual report for 1969. Any suggestion of health risks in this information was very oblique indeed:

### HEALTH RESEARCH

> Johns-Manville is cooperating with and, in many instances, sponsoring scientific research projects to identify and control occupational exposure to health risks, especially those involving asbestos.

> One of these activities, the Insulation Industry Hygiene Research Program, is the nation's first cooperative effort by labor, industry, science and government to conduct a health research program for industrial workers.

> Under the direction of Dr. Irving J. Selikoff of Mount Sinai School of Medicine of the City University of New York, this program launched in October 1968, has made considerable progress in developing improved methods of minimizing the exposure to dust and fumes of men who apply and remove pipe and equipment insulations in buildings, industrial plants and ships.

> Field study of insulation work practices on construction jobs has resulted in the development of devices that sharply reduce the dust created by sawing insulation materials.

> Johns-Manville research scientists have developped a new and more efficient filtering media for disposable face masks to be worn by insulation workers. Several leading mask manufacturers have been licensed by J.-M.

8    But if the Selikoff reports and the existence of asbestos-related health hazards were not specifically disclosed to Canadian Indemnity Company, there had been numerous reports and articles on asbestos-related diseases published in Canadian and foreign scientific journals and many papers delivered at conferences held throughout the world prior to 1970 on the biological effects of asbestos. These papers were available in Montreal at the Institute of Occupational and Environmental Health which had been set up by the Quebec Asbestos Mining Association.

9    In addition, a large number of newspaper articles had been published in many Canadian cities, prior to 1970 and thereafter, on the health hazards of asbestos, including those mentioned in the Selikoff reports, not to mention similar newspaper and magazine articles published in U.S. publications including the New York Times, the Wall Street Journal and The New Yorker Magazine. The risk of asbestosis from inhalation of asbestos fibres was mentioned in the 1963 edition of the Encyclopedia Britannica, and it was included in the *Workmen's Compensation Act* as an industrial disease as early as 1943.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

10    Notwithstanding the existence of this published material prior to the issuance of the Policy, Canadian Indemnity's underwriters testified, in substance, that they were not aware of it. They testified that they had no knowledge of the asbestos industry and they were unaware of the seriousness of the health risks involved.

**The Issues**

11    The principal questions raised in this appeal by the parties are the following:

1) Was the incidence and frequency of asbestosis and other health problems mentioned in the Selikoff reports material to the risk undertaken in the insurance policy?

2) Were these facts known to the insured?

3) Were the facts fully and fairly disclosed to the insurer?

4) If these facts were not disclosed, were they

a) known to the insurer or

b) presumed to be known to the insurer?

5) Does the negligence of the insurer's employees disentitle it to complain of the insured's non-disclosure?

6) If the policy was null for non-disclosure, has the insurer, by its conduct, nonetheless waived the non-disclosure and confirmed the policy?

**Civil Code provisions**

12    In 1970, when the policy was issued and in 1973 when it was renewed, the relevant provisions of the *Civil Code* then in force read as follows:

Art. 2485. L'assuré est tenu de déclarer pleinement et franchement tout fait qui peut indiquer la nature et l'étendue du risque, empêcher de l'assumer, ou influer sur le taux de la prime.

Art. 2486. L'assuré n'est pas tenu de déclarer des faits que l'assureur connaît, ou qu'il est censé connaître d'après leur caractère public et leur notoriété; il n'est pas non plus obligé de déclarer les faits qui sont couverts par la garantie expresse ou implicite, excepté en réponse aux questions que l'assureur peut lui faire.

Art. 2487. Les fausses représentations ou réticences par erreur ou de propos délibéré sur un fait de nature à diminuer l'appréciation du risque, ou à en changer l'objet, sont des causes de nullité. Le contrat peut, en ces cas, être annulé, lors même que la perte ne résulterait aucunement du fait mal représenté ou caché. - C. 2514, 2518, 2538, 2546.

Art. 2488. Les fausses représentations ou réticences frauduleuses de la part de l'assureur ou de l'assuré sont dans tous les cas des causes de nullité du contrat que la partie qui est de bonne foi peut invoquer.

Art. 2489. L'obligation de l'assuré en ce qui concerne les déclarations est suffisamment remplie si le fait est en substance tel que représenté et s'il n'y a pas de réticence importante.

Art. 2503. Les règles relatives aux déclarations et à l'effet des fausses représentations et réticences sont énoncées au chapitre premier, section deuxième. C. 2485 S.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

> Art. 2485. The insured is obliged to represent to the insurer fully and fairly every fact which shows the nature and extent of the risk, and which may prevent the undertaking of it, or affect the rate of premium.

> Art. 2486. The insured is not obliged to represent facts known to the insurer or which from their public character and notoriety he is presumed to know; nor is he obliged to declare facts covered by warranty express or implied, except in answer to inquires made by the insurer.

> Art. 2487. Misrepresentation or concealment, either by error or design, of a fact of a nature to diminish the appreciation of the risk or change the object of it, is a cause of nullity. The contract may in such case be annulled although the loss has not in any degree arisen from the fact misrepresented or concealment. - C. 2514, 2518, 2538, 2546.

> Art. 2488. Fraudulent misrepresentation or concealment on the part either of the insurer or of the insured, is in all cases a cause of nullity of the contract in favor of the innocent party.

> Art. 2489. The obligation of the insured, with respect to representation is satisfied when the fact is substantially as represented and there is no material concealment.

> Art. 2503. The rules concerning representation, and the effect of misrepresentation or concealment are declared in chapter one, section two. C. 2485 s.

**Materiality and Disclosure**

13    In agreement with the trial judge, I do not think there can be much doubt that the serious health problems related to exposure to asbestos fibre indicated in the Selikoff reports and the very high frequency of asbestosis found among insulation workers were material to the risk of product liability which was to be undertaken by the insurer under the policy. The trial judge described the findings in the Selikoff reports in the following manner:

> The authors summarized the first study as follows at page 152:

>> An investigation involving 1522 asbestos insulation workers in the New York-New Jersey metropolitan area has been conducted. Among 392 individuals examined more than 20 years from onset of exposure, radiological evidence of asbestosis was found in 339. In half of these, the asbestosis was moderate or extensive. In individuals with less than 20 years of exposure, radiological evidence of asbestosis was less frequent and when present, much less likely to be extensive.

>> Neoplastic complications of asbestos exposure were studied among 307 consecutive deaths in this group of men. Lung cancer was found to be at least seven times as common as expected and cancer of the gastrointestinal track three times as common as expected. There were ten instances of mesothelomia of the pleura or peritoneum.

>> Of the 1258 men alive at the start of the survey, 1117 were examined. Eleven cancers of the lung or pleura were found during this survey of the living members, all among the 392 men with more than 20 years from onset of exposure. No cancers were found in those men, the onset of whose work experience was less than 20 years.

>> We may conclude that asbestosis and its complications are significant hazards among insulation workers in the United States at this time.

> The researchers' analysis of their findings indicated to them that radiologically evident pulmonary asbestosis varied directly with the duration of the exposure as appeared from the radiological changes noted in the examined individuals and outlined in Table 5 of the report from which the following can be gleaned:

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

-out of the 1117 insulation workers radiologically examined 542, or 48.5% showed radiological abnormality of asbestosis;

-out of this group, of the 771 whose exposure had begun ten years or more before the examination, 506 or 65.6% showed radiological abnormality of the same disease;

-of those whose exposure had begun between 20 and 29 years before the examination, the incidence of abnormality was 72.8%;

-of those whose exposure had begun 30 to 39 years before the incidence was 87.1% while it was 94.2% for those whose onset of exposure was 40 years or more.

The second paper is a follow-up done four years later of the same group of workers. Of the 1522 members, 404 had died by December 31st, 1968, and 'analyses of these deaths demonstrate that serious risks have been associated with work in this trade'.

They concluded also that their data suggested that it would be prudent to regard all asbestos fibre varieties as potentially hazardous. The data considered indicated that amongst the 380 individuals who had died out of the 632 original members of the Union, one in five deaths was caused by lung cancer. This finding indicated an overall lung cancer death rate of seven times that expected on the basis of the United States Mortality data. The computations further suggested that compared with an individual who neither worked with asbestos nor smoked cigarettes, an asbestos worker who smoked cigarettes had 90 times the risk of dying of lung cancer.

In the third report which also dealt with the same workmen, the authors' conclusions are:

We conclude that, under the conditions of exposure associated with asbestos insulation work in the United States, a serious increased risk of death due to various neoplasms and asbestosis is present, including bronchogenic carcinoma, pleural mesothelioma, peritoneal mesothelioma, and possibly gastrointestinal cancer. We conclude further that for bronchogenic carcinoma, but not necessarily for other neoplasms associated with asbestos explosure, cigarette smoking has an important cocarcinogenic effect. We have inadequate data to this point to determine whether this will or will not prove to be true with regard to pleural mesothelioma.

14    Nor is there any doubt that these risks were known to the insured prior to the issuance of the policy. Johns-Manville admits that it had copies of the Selikoff reports prior to 1970 and, in its factum, it asserts that "...it was common knowledge in the asbestos industry that asbestos could be hazardous". The evidence establishes that its executives were well aware of the studies and research that had been done on the hazards of asbestos products when it requested the insurance.

15    As to the adequacy of the disclosure contained in the 1969 Annual Report, the trial judge concluded:

In the Court's opinion, even if they had read the quoted section, it would not have told them anything about the serious dangers of handling asbestos because it seems to have been carefully worded to avoid raising fears in the mind of those reading it. In the circumstances, the Court cannot accept defendant's contention that this section of the 1969 Annual Report gave a substantially complete picture of the real situation. Nothing in the report even hints at the severity and frequency of injuries as disclosed by the Selikoff reports, which of course were well known to defendant.

16    I agree. If Johns-Manville was obliged to declare the facts contained in the Selikoff reports, the information it did disclose in the 1969 Annual Report was a long way from the full and fair disclosure required under art. 2485 C.C.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

### Knowledge and Presumed Knowledge of the Insurer

17    The critical issue, however, is whether Johns-Manville was obliged to disclose these specific facts to an insurer, given the facts that were then publicly known about the health hazards of exposure to asbestos fibre.

18    Article 2486 *C.C.* exempts an insured from disclosing facts, even facts material to the risk, which are "...Known to the insurer or which, from their public character and notoriety, he is presumed to know...".

19    As to any actual knowledge of the contents of the Selikoff reports or the frequency of asbestosis, the uncontradicted evidence of the underwriters who testified on behalf of Canadian Indemnity was that they did not have actual knowledge of the frequency of asbestosis mentioned in the Selikoff reports. It may well be that this was common knowledge in the asbestos industry; it may well be that Canadian Indemnity could easily have become aware of the facts had it made the most elementary and superficial inquiry, and it may well be that its employees were negligent in not making further inquiry. But, on the evidence, I think it must be taken that the insurer had no *actual* knowledge of the facts as to frequency.

20    Was the insurer *presumed* to know these facts by reason of their "public character and notoriety"?

21    Counsel for Canadian Indemnity contends that the facts in question did not have the "public character and notoriety" sufficient to presume knowledge by the insurer and that even if the hazards of asbestos fibre were common knowledge in the asbestos industry, this did not give the facts relative to those hazards the "public character and notoriety" required under art. 2486 *C.C.* To the extent that English law presumes that an insurer is aware of the circumstances and practises of the trade it insures, or imputes constructive knowledge when the insurer fails to inform itself where it could have done so, counsel for respondent contends that English authorities on the question are not part of Quebec law.

22    The trial judge examined these questions carefully and at some length. He concluded that the facts relative to the risk of asbestos related disease did not have the public character and notoriety from which knowledge of the insurer could be presumed under art. 2486 *C.C.* He further concluded that English law with respect to the presumed knowledge of an insurer of the practises of the trade insured and the common law duty to inquire did not apply:

> A simple reading of our codified law indicates that the duty to enlighten clearly rests on the insured (2485 *C.C.*) and that nowhere in the *Code* is there a limitation of this duty to be found based on the insurer's presumed knowledge because the material facts are part of the general course or practice of the trade he insures or because of a deemed constructive knowledge, unless of course such general course or practice is notorious. The only codified limitations are those found at articles 2486 and 2489 *C.C.*

> When the codifiers drafted these articles, they were no doubt aware of British law on constructive knowledge and on the common-law duty to inquire. Yet, as can be seen from the above, they did not retain these rules, contrary to what was done by the U.K. parliament which, when in 1906 it adopted an Act to codify the Law relating to Martine Insurance (37) included therein article 18 which reads in part as follows:

> > 18(3). In the absence of inquiry the following circumstances need not be disclosed, namely:

> > a) ...

> > b) Any circumstance which is known or presumed to be known by the insurer. The insurer is presumed to know matters of common notoriety or knowledge, *and matters which an insurer in the ordinary course of his business, as such, ought to know;*

> > c) ...

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

      d) ...

      (emphasis added)

      Such being the case, it is the Court's opinion that the principles found in the line of British jurisprudence cited earlier are not part of Quebec law.

23    With great respect, I do not agree that the facts involved in asbestosrelated health risks were not of a kind that the insurer should be presumed to have known.

24    Quite apart from the many studies and reports on asbestos-related health hazards published in various medical and scientific journals prior to the issuance of the policy, there were numerous articles published in newspapers across Canada and in the United States dealing with asbestos-related health hazards, including those mentioned in the Selikoff reports. Many of these were published prior to the issuance of the policy in 1970 and its renewal in 1973. By the time the present proceedings in nullity were taken by the insurer in 1979, there were hundreds of articles dealing with asbestos-related health hazards published in Canada.

25    Nor, with respect for the opinion of the trial judge, do I believe we can ignore the articles published in American newspapers and magazines when assessing the public character and notoriety of the facts in question. There may well be a question of weight or appreciation of the likely impact of those publications on an insurer in Canada, but the evidence would certainly be relevant and admissible.

26    In this case, some of the articles in question were published not in obscure publications. These were prominent articles in the New York Times, the Wall Street Journal, The New Yorker Magazine, The Washington Post and others.

27    On October 12, 1968, for example, The New Yorker carried a lengthy article by Paul Brodeur describing in some detail the work of Dr. Selikoff and his associates and the very high frequency of asbestosis among asbestos insulation workers. A news story appeared in the New York Times on the cancer risk as early as October 7, 1964, again quoting Dr. Selikoff. Canadians, and Canadian insurers in particular, are not isolated from the mainstream of news and knowledge in North America and, in my respectful opinion, these American articles were relevant to the issue of the public character of asbestos fibre hazards, at the very least as a complement to the Canadian material that was put in evidence.

28    These articles in the media were not all concerned with the high frequency of asbestosis mentioned in the Selikoff reports. Many were concerned with lung cancer and other diseases. And not all suggested that the health hazards of asbestos were serious. But taken together, they indicate that there was widespread public discussion of asbestos-related health hazards and considerable indication of very high frequency of lung disease among insulation and other workers exposed to asbestos fibres over long periods.

29    Does all of this lend to the facts a public character and notoriety within the meaning of art. 2486 *C.C.*?

30    The trial judge acknowledged that, today, the exception contained in art. 2486 *C.C.* would probably apply:

      Today, very few residents of this province and probably of this continent would not be aware of the existence of some health hazard related to asbestos and such existence would, in all probability, fall within the exception of article 2486 *C.C.* Of course, the question must not be asked as of today, but as of the exception [sic] of the policy and as of its later renewal.

31    He concluded, however, that in 1970 and 1973 that was not the case:

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

> When the Canadian clippings are read one after the other, as was done by the Court, the first reaction one has is that this was something that was of common knowledge and notorious. However, when one considers them seriatim and sees that it is quite often the same story which is repeated in the different newspapers with most persons probably reading only one of those newspapers with the possibility, not to say the probability, as the clippings do not appear to have generally been front page material, that such individual might have missed the story in his one newspaper, it cannot be said that defendant has established that there was knowledge by public character and notoriety which would excuse the insured from informing the insurer of the peculiar information data which it had itself in a manner much more extensive and precise than could be gleaned from the newspapers and which, if conveyed, would have represented fully and fairly every material fact to the insurer - who, it will be recalled, issued the policy in Montreal with the approval of the Winnipeg main office.

> In the Court's opinion, it can hardly be said on the basis of the evidence that the facts about asbestos-related hazards that are known today were in 1970 in Black's words 'generally known and talked of, well or widely known, forming part of common knowledge, or universally recognized' as would have been, as suggested by Simard 'l'état de guerre, l'émeute, le cataclysme de St-Jean-Vianney, les normes scientifiques universellement acceptées'.

32    It is doubtless true that the public in general and insurance underwriters in particular are more aware of the health risks of asbestos fibre today than they were in 1970 when the policy was issued or in 1973 when it was renewed.

33    But with respect, even then, these risks and the Selikoff reports were common knowledge in the asbestos industry. Beyond the asbestos industry, the risks, and the Selikoff reports themselves, had been widely and publicly discussed in the media. Given the public discussion at the time, insurance underwriters ought to have been alerted to the health risks of asbestos fibre. They may not have been aware of the precise statistical data contained in the Selikoff reports, but they certainly ought to have known that serious asbestos-related health risks had been reported.

34    The Selikoff reports were not confidential or private reports prepared on behalf of Johns-Manville or any of the asbestos producers. They were publicly available reports published by a research team at a major U.S. teaching hospital. They were easy to obtain by anyone interested and just as easy to read and understand.

35    Did all of this lend a "public character" and "notoriety", within the meaning of art. 2486 C.C., to the asbestos-related health risks that existed in 1970 and 1973? In my respectful opinion, it did.

36    As a starting point, I do not think one can ignore the fact that the health risks were common knowledge in the asbestos industry itself, an industry of some importance in Quebec. An insurance underwriter may not be presumed to know all of the technical intricacies of all of the trades and industries he insures, but surely he ought to know something of a serious health risk that was common knowledge in a major industry and was widely reported in the public media as well. As Professor Jean-Louis Baudouin observes (*Réflexions sur l'article 2487 C.c.*, (1960) 20 R. du B. 330), a minimum of diligence and professionalism should be expected of the insurer:

> L'étendue de l'obligation de déclaration du risque est limitée par ce qu'on pourrait appeler le minimum de diligence professionnelle dont doit faire preuve tout assureur sérieux. La philosophie générale de ce texte repose sur cette idée que l'assureur doit tout de même, dans une certaine mesure, s'enquérir par lui-même du risque qui lui est déclaré. La connaissance de ces faits mentionnés à l'art. 2486, ou leur notoriété publique, se rattachent naturellement à l'activité professionnelle de l'assureur, à celle de ses agents et représentants auxquels le métier et l'intérêt commandent de renseigner correctement l'assureur avec lequel ou pour lequel ils travaillent. Indépendamment donc du point de savoir dans quelle mesure la connaissance de ces faits, par un agent d'assurance, peut être considérée comme équivalant à leur connaissance par l'assureur lui-même, la loi entend exiger de tout assureur un minimum d'activité et de conscience professionnelle.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

37    Respondent contends that, unlike English law, art. 2486 *C.C.* does not allow one to presume that an insurer had knowledge of the risks in a particular industry it insured except to the extent that these risks were of a "public character" and "notorious". It contends that even if a risk is generally known in the industry that would be insufficient to presume knowledge by an insurer unless it were also publicly known and notorious.

38    But whatever the merits of respondent's argument as to the distinction between art. 2486 *C.C.* and English law, we need not, in my view, deal with that issue to decide this case. For even assuming that art. 2486 *C.C.* does not permit one to presume that an insurer has knowledge of facts except to the extent that the facts have a public character and notoriety, I am satisfied that the risks in this case did have a sufficient public character and notoriety to meet the test of art. 2486 *C.C.*

39    I acknowledge that what is common knowledge in any given trade or industry is not, on that account alone, always notorious and it may not always have a public character. But here, knowledge of the asbestos-related health risks went far beyond the asbestos industry.

40    The risks of asbestosis were prominently reported in scores of newspaper and magazine articles across Canada and the United States prior to the issuance and the renewal of the policy. The Selikoff findings were widely reported. While it is true, as the trial judge suggests, that these reports may not have appeared with great frequency in the same city, that, in my respectful view, does not diminish the public character or notoriety of the facts reported. How many newspaper and magazine articles does it take to lend a "public character" and "notoriety" to the fact that a product presents serious health risks? Surely, in some circumstances, even one prominent report might suffice.

41    Apart, from newspaper and magazine articles, moreover, the risks of asbestosis were mentioned in publications as diverse as the Encyclopedia Britannica, 1963 edition, and "Business Insurance", January 3, 1972, to say nothing of the hundreds of articles in scientific journals that were available to anyone seriously interested in the technical aspects of these health problems. Asbestosis was included as an industrial disease in the *Workmen's Compensation Act* as early as 1943 (7 Geo. VI c. 27).

42    Counsel for Canadian Indemnity, on the hearing of this appeal, did not suggest that asbestosis, itself, was not generally known as a risk caused by exposure to asbestos fibre. He stressed, however, that the *seriousness* of the risk and the *frequency* of the incidence of asbestosis in insulation workers described in the Selikoff reports were not generally known and certainly not notorious.

43    That is a difficult argument to make (and just as difficult to refute) on a retrospective basis. Perhaps it is true that in 1970 some people would only have had the vaguest notion of the hazards of exposure to asbestos fibre. Perhaps others would have known it was a serious health risk without knowing how serious. Some may have known the details of the Selikoff reports. That is a matter of speculation.

44    But the important point is that all of the facts, including the statistical data contained in the Selikoff reports, had been made public throughout North America. All of this material was at hand and available to anyone who was interested in the details.

45    In my view, all of this published material on the health risks of exposure to asbestos fibre made those risks sufficiently public and notorious so that an insurance underwriter ought to have known of their existence and their seriousness. If the media accounts left him in any doubt as to the precise extent of the risk or as to the details contained in the Selikoff reports, any inquiry within the industry or even the most superficial research outside of it would have brought forward this information. But no inquiry of any kind was made by the underwriters, either inside or outside the industry.

46    In these circumstances, I do not believe the insured should be reproached for failing to disclose the kind of detail contained in the Selikoff reports. The insured was entitled to presume, in my view, that the insurer had a basic professional knowledge of the risks of asbestosis and that if more detail was required, the underwriters would ask for it.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

47    That the risk was assessed by inexperienced or negligent underwriters in this case is not really the issue here. That may explain why the underwriters were unaware of the nature or extent of the risk. But if the facts were public and notorious, the insurer is presumed to have known them however inexperienced or negligent the underwriters were.

48    This, of course, is the purpose of the test of presumed knowledge under art. 2486 C.C. Where the facts are generally and publicly known, although there may be no actual knowledge, the insurer may be presumed to have had knowledge of those facts. An insurer cannot repudiate his obligation under an insurance policy by invoking the negligence, lack of experience, or the involuntary or wilful blindness of his own underwriters.

49    I am mindful that, in the absence of clear and identifiable error, a court of appeal should not intervene in decisions of the trial judge on questions of law or on his appreciation of the evidence as a whole. But that is not the problem here. The facts are not really in dispute and there is certainly no question of credibility involved. It is essentially a matter of reviewing the legal conclusion of the trial judge on the facts as found by him. On the facts, as found by the trial judge, were the risks of asbestosis sufficiently public and notorious so that the insurer should be presumed to have known them? That is not simply a question of fact or interpretation of the evidence. It is a question of the legal conclusion to be drawn from the facts.

50    In *Desgagné v. La Fabrique de la Paroisse de St-Philippe d'Arvida*, [1984] 1 S.C.R. 19, 51 N.R. 241, Mr. Justice Beetz made the distinction in the following manner [at page 31 (S.C.R.)]:

> [French language version]
>
> Les procureurs des intimés et de l'appelante Lauréanne Harvey Desgagné ont soutenu que le caractère graduel de la manifestation des vices de construction est une question de fait qui relève de l'appréciation souveraine du juge de première instance. Ce n'est pas mon avis. Il s'agit plutôt d'une question de qualification et par conséquent de bien plus qu'une simple question de fait. Il faut en effet appliquer aux faits le concept juridique de manifestation graduelle de l'art. 2259, au même titre par exemple que dans une affaire de responsabilité civile, il faut qualifier ou non de faute au sens de l'art. 1053 l'acte ou l'abstention d'une personne. C'est là porter un jugement essentiellement normatif. Il ne s'agit donc pas de substituer ma propre appréciation de la preuve à celle du premier juge, mais de tirer des conclusions en droit à partir des faits qu'il a lui-même considérés comme établis. Lorsqu'une juridiction d'appel accepte toutes les conclusions de fait proprement dites du premier juge, comme je le fais, elle est en aussi bonne position que lui pour qualifier ces faits.
>
> [English language version]
>
> Counsel for the respondents and appellant Lauréanne Harvey Desgagné argued that the gradual appearance of the construction defects is a question of fact which is within the exclusive province of the trial judge. That is not my view. Rather, I think it is a question of characterization and so considerably more than a simple question of fact. It is necessary to apply to the facts the legal concept of gradual emergence under art. 2259, just as, for example, in a civil liability case the Court has to decide whether a person's act or omission should be characterized as fault within the meaning of art. 1053. This requires making an essentially normative judgment. It therefore does not entail substituting my own view of the evidence for that of the trial judge, but drawing conclusions in law based on the facts which she herself considered to have been established. When an appellate court accepts all the conclusions of fact as such made by the trial judge, as I do, it is in as good a position as he is to characterize those facts.

51    Having come to the conclusion that the insurer must be presumed to have known of the asbestos-related health risks when it was renewed, and that the insured had therefore no duty to declare the facts mentioned in the Selikoff reports, I do not consider it necessary to decide the remaining grounds of appeal raised by the insured.

Copr. © West 2007 No Claim to Orig. Govt. Works

18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651,
[1988] R.R.A. 827

52    I would maintain the appeal with costs, set aside the judgment appealed from, and dismiss plaintiff's action
with costs.

*Appeal      allowed/Appeal
accueilli.*

Solicitors of record:

*Clarkson, Tétrault & Ass.*, for the appellant.

*Lavery, O'Brien & Ass.*, for the respondent.

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works



50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

1990 CarswellQue 124

CANADIAN INDEMNITY CO. v. CANADIAN JOHNS-MANVILLE CO.
CANADIAN INDEMNITY CO. v. CANADIAN JOHNS-MANVILLE CO.
Supreme Court of Canada
La Forest, L'Heureux-Dubé, Sopinka, Gonthier and Cory JJ.
Heard: December 7, 1989
Judgment: September 13, 1990
Docket: Doc. 21265

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Counsel: J. Vincent O'Donnell, Alain Dagenais and Odette Jobin-Laberge, for appellant.

Graham Nesbitt and Thomas R.M. Davis, for respondent.

Subject: Insurance; Corporate and Commercial

Insurance --- Disclosure of risk -- Misrepresentation -- Liability insurance.

Insurance -- Representation and concealment -- Public character and notoriety exception -- Insured failing to disclose material facts relating to health risks associated with asbestos -- Constructive knowledge -- Insurer's duty to inquire -- Uberrimae fidei nature of insurance contract -- Confirmation of contract -- Civil Code of Lower Canada, art. 2485, 2486, 2489.

In 1970, the plaintiff issued to the defendant, a company involved in the mining and selling of asbestos and the manufacturing and selling of asbestos products, a general liability policy providing coverage against products liability. The policy was renewed in 1973 and cancelled in 1975. In 1979, the plaintiff brought an action in the Quebec Superior Court seeking a declaration of nullity ab initio of the policy. The plaintiff also requested compensation for the difference between sums disbursed and premiums received ($9,935.33).

The plaintiff alleged that the defendant had failed to disclose material facts within its knowledge relating to health risks associated with the inhalation of asbestos fibres. In particular, the plaintiff claimed that the defendant failed to bring to the plaintiff's attention medical research papers (the "Selikoff Reports") containing data relating to both the incidence of respiratory disorders among workers in asbestos-related industries and to the mortality rate of such workers. These reports were

The defendant admitted having the Selikoff Reports in its possession prior to the issuance of the policy but stated by way of defence that it had fully and fairly represented every fact which showed the nature and extent of the risk. Subsidiarily, the defendant claimed that any material facts which the plaintiff alleged were misrepresented or concealed were facts actually known to the plaintiff or facts which the plaintiff was presumed to know as a result of their public character and notoriety. On this point, the defendant also noted that the custom and usage of the asbestos trade were common knowledge and that the plaintiff, if uninformed for whatever reason, was under a duty to inquire. If the plaintiff failed to inquire, it was negligent in not doing so. Finally, the defendant stated that the 1975 intervention by the plaintiff on the defendant's behalf pursuant to the terms of the policy in a court proceeding in the

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

United States barred the plaintiff from seeking avoidance of the policy at a later date. By assuming its
responsibilities under the policy the plaintiff had waived or renounced any alleged rights to avoid the policy, and
could now be met with a fin de non-recevoir.

The action was allowed in the Quebec Superior Court. In the Court's view, the Selikoff Reports disclosed facts
which showed the nature and extent of the risk and which may have prevented the undertaking of it, or affected the
premiums; in other words, facts material to the risk. The trial Judge was of the view that the mere reference to
Selikoff's work indicated nothing about the serious dangers of handling asbestos. Consequently, the substantially full
and fair representation required by art. 2485 of the Civil Code of Lower Canada or ["C.C."] could not be said to
have been provided. With respect to presumed or constructive knowledge, the trial Judge was of the opinion that this
broader definition of "knowledge", drawn mainly from the English common law, was not part of the law in Quebec,
where only those facts which are public and notorious can be deemed to be part of the plaintiff's knowledge. He also
rejected the argument based on an insurer's alleged duty to inquire, observing that the defendant had failed to cite
any Quebec cases in support of such a duty. Dealing with the argument that the plaintiff had breached its obligation
of acting with the utmost good faith by relying on the information provided by the defendant, and then blaming the
defendant for the gaps in knowledge of the risk, the trial Judge observed that the argument is based on the idea of the
"reasonably-competent underwriter", an idea supported in Quebec doctrine. In his view, however, it was not possible
to find jurisprudential support for this approach. The trial Judge also rejected the defence of fin de non-recevoir. The
conditions for confirmation of an act which is voidable dictate that the plaintiff have knowledge of the defect and an
intent to rectify it. To prove knowledge of the defect, the defendant would have to show that the plaintiff had
acquired not only knowledge of health risks associated with exposure to asbestos but also knowledge of
concealment of such facts by the defendant in 1970 and 1973. The defendant had not proven such knowledge and
therefore no confirmation of the policy could be said to have occurred. The trial Judge concluded that the good faith
of the defendant did not render the contract valid. Concealment of material facts, whether in good or bad faith,
vitiated the consent required in the formation of a valid contract. Accordingly, the insurance policy was in fact a
nullity, due to error as to the substance of the thing which is the object of the contract (art. 992 C.C.). The Court
ordered compensation for the difference between premiums paid by the defendant and payments from the plaintiff to
the defendant for losses covered by the policy ($9,935.33).

The judgment was set aside on appeal. The initial issue before the Court of Appeal was whether the defendant was
obliged to disclose the facts contained in the Selikoff Reports, given the extent at that time of public knowledge
about the health hazards associated with exposure to asbestos fibres. The Court did not feel obliged to decide
whether English common law notions of presumed knowledge were part of the law of Quebec. It was satisfied that
the risks did have a sufficient public character and notoriety to meet the test of art. 2486 C.C. In determining the
scope of public knowledge, the Court was of the opinion that material published both in the United States and
Canada could be taken into account. The Court concluded that the defendant was entitled to presume that the
plaintiff had a basic professional knowledge of the risks of asbestosis and that if more detail was required, the
plaintiff would ask for it. The defendant had no duty to declare the facts mentioned in the Selikoff Reports.

The plaintiff appealed to the Supreme Court of Canada.

Held:

The appeal was dismissed.

The defendant had an obligation to disclose all the facts that were material to the risk. However, it was not obliged
under art. 2486 C.C. to disclose facts known to the plaintiff or which from their "public character and notoriety"
might be presumed to be known. The concept of "public character" refers to availability or accessibility of
information. There is no doubt that the Selikoff Reports and the other relevant evidence in the case were in this
sense "public". The concept of "notoriety" was not linked to the notion of general public knowledge. The proper
standard of knowledge, as it appears from the pre-codification authorities, is that of a reasonably competent
underwriter insuring similar risks in the industry covered by the policy. A reasonably competent underwriter would
be expected to keep abreast of information regarding the particular industry it insures, but it would not be expected

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

to know facts which are known only by those inside the industry, and which are only available through a process of
detailed research or in-depth investigation.

The defendant was incorrect in arguing that the English common law doctrine of presumed knowledge applied in
Quebec law, despite the codification of the notion of "public character and notoriety." Any notion such as presumed
knowledge exists only insofar as it has been incorporated into the text of art. 2486 C.C.

There was some question as to the type of facts which can be considered notorious for the purpose of art. 2486 C.C.,
particularly detailed or technical information. Article 2489 C.C. describes the precision with which an insured will
be expected to represent a fact. The description used by the insured must be substantially accurate and without
material concealment. Accordingly, an insurer cannot fault the insured for failing to disclose all the detailed
information in its possession where the information provided substantially represents the facts.

Foreign materials were relevant in considering "public character and notoriety", given the North American
operations of the plaintiff and the worldwide coverage of the policy.

A review of the evidence indicated that a reasonably competent insurer in the asbestos industry in 1970 would have
been aware of the type of risks alluded to in the Selikoff Reports. It was clear from the relevant Canadian and
American material that information about asbestos-related health risks had spread well beyond the boundaries of
industry knowledge and was by then in wide public circulation. Insurance underwriters may not have been aware of
the precise statistical data con tained in the Selikoff Reports, but it was clear that a reasonably competent
underwriter would certainly have been aware that serious asbestos-related health risks had been reported.
Accordingly, the defendant was not bound to disclose the Selikoff Reports to the plaintiff because the latter was
presumed to know the same or substantially the same information by virtue of its public character and notoriety.

As regards the plaintiff's duty to inquire, an insured is entitled to assume that it is dealing with a reasonably
competent, and hence knowledgeable, insurer. If the insurer does not have the requisite level of knowledge prior to
considering an insurance risk, it will be expected to acquire the requisite level of knowledge by means of inquiry or
investigation. This duty to inquire does not flow in Quebec law from the principle of constructive knowledge. It is
the logical consequence of the rule of art. 2486 C.C. that the insured need not disclose those facts which its insurer is
presumed to know; facts which, by virtue of their public character and notoriety, would be known to the reasonably
competent underwriter insuring similar risks in the industry.

Both parties were required by law to treat the contract of insurance as an uberrimae fidei contract. The insured will
disclose fully and fairly, or risk having the contract annulled, and the prudent insurer will ensure that it acquires a
good knowledge of the industry in which it insures, or fail to do so at its peril. An insurer underwriting certain risks
for the first time will have to find ways to bring its knowledge up to the minimum level expected. It cannot simply
rely on the insured and later place the blame on that insured for the gaps in its knowledge of the risk. To do so would
not be fraudulent, but would certainly amount to bad faith. It is the insurer who must bear the burden of its failure to
inform itself properly.

Finally, the plaintiff did not implicitly confirm the policy by taking up the defendant's defence in a 1975 law suit
filed in the United States. The conditions necessary for the confirmation of a voidable contract -- knowledge of the
defect and intent to rectify it -- were not met. In light of the evidence, the finding of the trial Judge as to the absence
of knowledge by the plaintiff of the defect until the end of 1978 was not manifestly in error.

Cases considered:

> Alliance Insurance Co. of Philadelphia v. Laurentian Colonies & Hotels Ltd. , [1953] Que. Q.B. 241,
> [1953] I.L.R. 547 (C.A.) -- referred to
>
> Aslop v. Commercial Insurance Co., 1 Fed. Cas. 564 (C.C.D. Mass. 1833) (No. 262) -- referred to

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

Angelillo v. Prévoyance, Cie d'assurances, [1983] C.A. 305 (Que.) -- referred to

Bertrand v. Racicot, [1979] 1 S.C.R. 441, 25 N.R. 181 -- referred to

Carter v. Boehm (1766), 3 Burr. 1905, 1 Wm. Bl. 593, 97 E.R. 1162 -- referred to

Casey v. Goldsmid (1851), 2 L.C.R. 200 (Que. S.C.), rev'd (1854), 4 L.C.R. 107 (Q.B.) -- referred to

Century Insurance Co. of Canada v. Case Existological Laboratories Ltd. , [1983] 2 S.C.R. 47, 2 C.L.L.I.
172, 48 B.C.L.R. 273, 49 N.R. 19, 150 D.L.R. (3d) 9, [1983] I.L.R. 1-1698 -- referred to

Cie J.A. Gosselin Ltée v. Péloquin, [1957] S.C.R. 15 -- referred to

De Longuemere v. New York Fire Insurance Co., 10 Johns. 120 (N.Y. 1813) -- referred to

Fidelity & Casualty Co. of New York v. General Structures Inc., [1977] 2 S.C.R. 1098, [1977] I.L.R. 1-
826, 12 N.R. 571 -- referred to

Green v. Merchants' Insurance Co., 27 Mass. (10 Pick.) 402 (1830) -- referred to

Moses v. Delaware, 17 Fed. Cas. 891 (C.C.D. Pa. 1806) (No. 9,872) -- referred to

Norwich Union Fire Insurance Society Ltd. v. Gaudreau, [1953] Qué. Q.B. 753 -- referred to

Q.N.S. Paper Co. v. Chartwell Shipping Ltd., [1989] 2 S.C.R. 683, 62 D.L.R. (4th) 36, 26 Q.A.C. 81, 101
N.R. 1 -- referred to

Statutes considered:

Act respecting insurance S.Q. 1974, c. 70 --

s. 2

Act to amend the Workmen's Compensation Act S.Q. 1943, c. 27 --

s. 5

s. 6

Act to protect workmen suffering from silicosis S.Q. 1938, c. 89 --

s. 1

Civil Code of Lower Canada

s. 992

s. 1024

s. 2485 [former]

s. 2485 [re-en. S.Q. 1974, c. 70, s. 2; re-en. S.Q. 1979, c. 33, s. 44]

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

s. 2486 [former]

s. 2487 [former]

s. 2488 [former]

s. 2489 [former]

s. 2500 [re-en S.Q. 1974, c. 70, s. 2; re-en. S.Q. 1979, c. 33, s. 47]

s. 2613 [former]

Workmen's Compensation Act R.S.Q. 1964, C. 159 --

Appeal from judgment of Quebec Superior Court of Appeal, reported at [1988] R.J.Q. 2651 and 54 D.L.R. (4th) 468, reversing judgment of Superior Court, reported at [1985] C.S. 719 declaring null ab initio a contract of insurance/POURVOI contre un arrêt de la Cour d'appel du Québec, rapporté à [1988] R.J.Q. 2651 et 54 D.L.R. (4th) 468, infirmant un jugement de la Cour supérieure, rapporté à [1985] C.S. 719, declarant un contrat d'assurance nul ab initio.

**The judgment of the Court was delivered by *Gonthier J.*:**

1    At issue in the present case is the extent of the insured's duty to disclose as well as the scope of the exception relating to facts which from their public character and notoriety the insurer is presumed to know. We are guided by the general provisions of the *Civil Code of Lower Canada* ["C.C."] on insurance and, in particular, by the articles dealing with representation and concealment (arts. 2485 to 2489 C.C.) as they appeared before the 1974 alterations to the Code.

**I The Facts**

*Procedural History and the Insurance Policy*

2    This matter comes to this Court from the Quebec Court of Appeal which overturned the decision of Boudreault J. who had ruled in favour of the appellant, the Canadian Indemnity Company (the "Insurer").

3    In the Superior Court of Quebec, the appellant took proceedings which sought a declaration of nullity ab initio of both its policy number 4L 46787 (the "policy") issued on June 30, 1970 and the renewal of that same policy, dated June 30, 1973 and valid for a further 3 years. The appellant also requested compensation between the sums which it had disbursed and the premiums which it had received.

4    The impugned policy is referred to as a Comprehensive General Liability Policy ("CGL Policy"). It affords coverage to Canadian Johns-Manville Company (the "Insured") whose operations are described in the policy as "consisting principally of, but not limited to, mining, manufacturing and sale of asbestos". The policy provides coverage for the following risks, as labelled in the policy: "Bodily Injury or Illness"; "Damage to Property of Others"; "Contractual Damage to Property of Others"; "Products Bodily Injury"; and "Products Damage to Property of Others". By endorsement, the territory of the Policy with respect to "Products Bodily Injury" and "Products Damage to Property of Others" was extended to "Worldwide" provided the suits or actions were brought in Canada or the continental United States of America. By exclusion number 2, the coverage given by the policy was not to apply to "[t]he liability imposed upon the Insured by any Workmen's Compensation Plan or Agreement or for bodily injury to or the illness or death of any employee of the Insured while engaged in the business operations of the Insured".

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

5    The policy was cancelled in May of 1975 for reasons unrelated to this appeal. In August of 1979, the appellant
instituted the present proceedings.

6    In its statement of claim, the appellant alleged that the Insured had failed to disclose material facts within its
knowledge relating to health risks associated with the inhalation of asbestos fibres. In particular, the appellant
claimed that the Insured failed to bring to the Insurer's attention medical research papers (the "Selikoff Reports")
which contained data relating to both the incidence of respiratory disorders among workers in asbestos-related
industry and to the mortality rate of such workers.

7    By way of defence, the respondent admitted that it had the Selikoff Reports in its possession prior to the
issuance of the policy but stated nonetheless that it had fully and fairly represented every fact which showed the
nature and extent of the risk. Subsidiarily, the respondent claimed that any material facts which the appellant alleges
were misrepresented or concealed were actually facts known to the appellant or which the appellant was presumed
to know as a result of their public character and notoriety. On this point, the respondent also noted that the custom
and usage of the asbestos trade were common knowledge and that the appellant, if uninformed for whatever reason,
was under a duty to inquire. The alleged hazards arising from the use of asbestos were said to be equally open to the
knowledge of both appellant and respondent. If the appellant failed to inquire, it was negligent in not doing so. In
any event, the respondent claimed to have fulfilled its obligations by responding to the general questions put to it
regarding the nature of the risk to be insured. Finally, the respondent stated that by intervening in 1975 on the
respondent's behalf pursuant to the terms of the policy in a court proceeding in the United States, the appellant was
barred from seeking avoidance of the policy at a later date. By assuming its responsibilities under the policy, the
appellant had waived or renounced any alleged rights to avoid the policy and could now be met with a fin de non-
recevoir.

### The Asbestos Industry and the Selikoff Reports

8    As noted above, the respondent is and was at all relevant times involved in the mining and selling of asbestos
and the manufacturing and selling of asbestos products. The dangers associated with the use of these products are
now well known and have been documented in medical publications since 1907 when the first known case of
asbestosis was reported. The first description of the disease and its concomitant pathological changes was published
in 1927. However, the most important studies of asbestos-related diseases were published in the 1960s by Drs. I.J.
Selikoff and J. Churg of the Mount Sinai School of Medicine of New York. These studies reported a very high
incidence of such diseases among asbestos insulation workers. The authors summarized the results of their first
study as follows:

> An investigation involving 1522 asbestos insulation workers in the New York-New Jersey metropolitan
> area has been conducted. Among 392 individuals examined more than 20 years from onset of exposure,
> radiological evidence of asbestosis was found in 339. In half of these, the asbestosis was moderate or
> extensive. In individuals with less than 20 years of exposure, radiological evidence of asbestosis was less
> frequent and when present, much less likely to be extensive.

> Neoplastic complications of asbestos exposure were studied among 307 consecutive deaths in this group of
> men. Lung cancer was found to be at least seven times as common as expected and cancer of the
> gastrointestinal tract three times as common as expected. There were 10 instances of mesothelioma of the
> pleura or peritoneum.

> Of the 1258 men alive at the start of this survey, 1117 were examined. Eleven cancers of the lung or pleura
> were found during this survey of the living members, all among the 392 men with more than 20 years from
> onset of exposure. No cancers were found in those men, the onset of whose work experience was less than
> 20 years.

> We may conclude that asbestosis and its complications are significant hazards among insulation workers in
> the United States at this time.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

9    In their third report, Drs. Selikoff and Churg concluded as follows with respect to the carcinogenic effects of asbestos:

> We conclude that, under the conditions of exposure associated with asbestos insulation work in the United States, a serious increased risk of death due to various neoplasms and asbestosis is present, including bronchogenic carcinoma, pleural mesothelioma, peritoneal mesothelioma, and possibly gastrointestinal cancer. We conclude further that for bronchogenic carcinoma, but not necessarily for other neoplasms associated with asbestos exposure, cigarette smoking has an important cocarcinogenic effect. We have inadequate data to this point to determine whether this will or will not prove to be true with regard to pleural mesothelioma.

10    The respondent admitted that the Selikoff Reports had been in its possession before the policy was first issued in 1970.

11    It also emerges from the evidence that both the Insured and other members of the asbestos industry were not only in possession of the Selikoff Reports but also aware of the matters contained therein. The Quebec Asbestos Mining Association and the Institute of Occupational and Environmental Health, in which Canadian Johns-Manville executives participated along with others, sponsored studies dealing with asbestos-related diseases. Executives also attended several international conferences on the biological effects of asbestos held between 1964 and 1970.

### The Relationship Between Insurer and Insured

12    The Insurer complains that the information contained in the Selikoff Reports should have been disclosed by the Insured before the policy was initially issued because of the materiality of the information contained therein. The product liability coverage offered by the policy is only part of the "comprehensive" coverage it provided, and, accordingly, the disclosure made by the respondent dealt in general with its business activities and with its past claims experience. The trial Judge described the exchange of information which actually took place between the appellant and the respondent as follows [[1985] C.S. 719 at p. 722]:

> The agency which negotiated the risk on behalf of the insured was Marsh & McLennan Limited. No written application was made by Johns-Manville nor was any requested by the plaintiff. The policy was issued upon the brokers supplying the plaintiff with an outline of the required coverage, a placement slip labelled 'Canadian General Liability Questionnaire' which listed the insured's manufacturing, mine and sales locations, the description of its operations, the estimated payrolls and sales, the number of its employees, a short description of its railway operations and of its hospital and nuclear energy exposure. Plaintiff's underwriting department was also supplied with a list of the insured's claims' experience from July 1946 to March 1970, together with a short description of the claims made against the insured between February 1964 and October 1969. All of the described losses, excepting a few instances, were property damage losses for amounts of less than one thousand dollars. None of the losses appears to have arisen from any products' liability coverage. The underwriters were also supplied with a copy of the 1969 Annual Report of Johns-Manville Corporation, which is the insured's parent company.

13    After receiving the preliminary information, the Insurer did not ask for any information regarding asbestos and asbestos products. The follow-up was described by the trial Judge, at pp. 722-723:

> Upon receipt of this information, plaintiff only asked for the following: a) a copy of the expiring policy, b) a nuclear energy risk application and c) applications for the persons to be protected by the requested malpractice coverage.

> On the basis of the information which was supplied, an underwriting trainee of the plaintiff's Montreal office issued the policy with the authorization of the Head Office underwriter.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

According to the trial Judge, there was no evidence as to whether any additional information was requested or supplied upon the renewal of the policy in 1973.

14    The information actually provided to the appellant in 1970 does make reference to the Selikoff research. In the 1969 Annual Report of the Johns-Manville Corporation, the insured's parent company disclosed that it was cooperating in scientific studies concerning the health effects of asbestos and specifically referred to the Selikoff research:

### HEALTH RESEARCH

Johns-Manville is cooperating with and, in many instances, sponsoring *scientific research projects to identify and control occupational exposure to health risks, especially those involving asbestos.*

One of these activities, the Insulation Industry Hygiene Research Program, is the nation's first cooperative effort by labor, industry, science and government to conduct a health research program for industrial workers.

*Under the direction of Dr. Irving J. Selikoff at Mount Sinai School of Medicine of the City University of New York, this program, launched in October, 1968, has made considerable progress in developing improved methods of minimizing the exposure to dust and fumes of men who apply and remove pipe and equipment insulations in buildings, industrial plants and ships.*

Field study of insulation work practices on construction jobs has resulted in the development of devices that sharply reduce the dust created by sawing insulation materials.

Johns-Manville research scientists have developed a new and more efficient filtering media for disposable face masks to be worn by insulation workers. Several leading mask manufacturers have been licensed by J.-M. [Emphasis added.]

15    None of the members of the Insurer's underwriting department who testified indicated that they had read this extract, and all claimed that they knew very little or nothing about asbestos and nothing whatsoever about asbestosis. The trial Judge found that the Insurer had been negligent in investigating the general liability risk it was underwriting and stated, at pp. 735-736 [[1985] C.S. 719]:

The facts established in this connection are:

a) the risk was assessed by an underwriting trainee without experience;

b) none of the plaintiff's underwriters in Montreal where the risk was written or in Winnipeg, where the company's chief underwriter accepted it, had any knowledge about asbestos as such nor about any of the risks involved in the handling of this product;

c) no research as simple as looking up an encyclopedia was done by any of them.

In short, the proof leaves little doubt that plaintiff accepted the risk almost blindly as far as its possible product liability ex posure was concerned, none of the underwriters concerned having stated that they had completely read the 1969 Annual report.

*Proof Regarding Public Character and Notoriety*

16    A vast amount of evidence was adduced during the trial in order to show that the risks associated with the use of asbestos were sufficiently public and notorious to fall within the exception to the rule that the insured must

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

disclose all material facts. The trial Judge listed the various sources, at pp. 729-730:

> The relevant proof regarding notoriety up to June 30th, 1970, date of the renewal, can be generally summarized as follows:

> > a) numerous reports on asbestos-related diseases published from 1924 to 1970 in Canadian and foreign medical and scientific journals ...;

> > b) large numbers of papers delivered at sundry conferences held throughout the world prior to 1970 in connection with the biological effects of asbestos and which could be found together with some of the reports mentioned above in Montreal at the office of the Institute of Occupational and Environmental Health ('I.O.E.H.') which had been set up by the Quebec Asbestos Mining Association ('Q.A.M.A.');

> > c) a large number of articles dealing with asbestos-related health matters published in several Canadian cities, including Montreal and Winnipeg

> > d) an extract from Best Loss Control and Underwriting Manual, which is an American publication which purports to outline the degree of hazard and an exposure index relating to different industries or products. The extract ... relate[s] to Asbestos Goods manufacturing as of 1968. It states the degree of hazard and its exposure index to be high for Workmen's compensation and low for products liability. In the chapter entitled 'Exposure' under the subheading 'Accidents' asbestosis is mentioned in the case of Workmen's compensation coverage;

> > e) extracts from the 1963 edition of the Encyclopedia Britannica which included ...:

> > > i) its index which under 'asbestos' refers inter alia to 'dangerous occupations' and 'asbestosis';

> > > ii) the text under the word 'Asbestos';

> > > iii) the text under 'Dangerous occupations' which mentions asbestos and states 'Evidence strongly indicates that there is a significant increase in lung malignancy in men with asbestosis';

> > > iv) the text under 'Pneumonoconiosis' referred to various industrial diseases of the lung which *inter alia* under the subheading 'Diagnosis and Treatment' says 'Once established, the majority of the severe pneumonoconioses are irreversible. Some syndromes may be arrested on cessation of exposure but others, such as silicosis and asbestosis, progress inexorably'; and

> > > v) the text under 'Respiratory system, Diseases of' which states *inter alia* 'Asbestosis may develop in those exposed to inhalation of asbestos fibres. Over a protracted course, it involves the pleurae and pericardium -- the coverings of the lungs and heart -- and causes heart failure. Prevention of inhalation of such dusts is important, since there are no successful cures once the fibroses have developed.' [Exhibit references omitted.]

The trial Judge deliberately excluded from this list the non-Canadian articles (mainly from the *New Yorker* and *New York Times*) published during the same period. He was of the opinion that notoriety could not be measured with reference to foreign media material.

17    The Quebec *Workmen's Compensation Act*, R.S.Q. 1964, c. 159, was noted by the trial Judge. In 1938, the existing *Workmen's Compensation Act* was amended, and the new version specified that "silicosis" was an industrial disease and that the same word also included "the similar pathological condition which may result from the inhalation of siliceous or other dust from the extracting, isolating or treating of asbestos" (see *An Act to protect workmen suffering from silicosis*, S.Q. 1938, c. 89, s. 1). The *Act to amend the Workmen's Compensation Act*, S.Q. 1943, c. 27, ss. 5 and 6, provided that the expression "siliceous dust" shall mean "silica dust or other compounds of

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

silicon, including asbestos" and that "asbestosis" itself be covered by the Act.

## II Judgments of the Courts Below

### *The Superior Court*

18    The judgment of Boudreault J. at first instance is a thorough treatment of the subject. He discussed the English, French and American cases and commentaries which might be said to impact on the law of insurance of Quebec, and, though I disagree with his conclusions, I am indebted to him for his clear presentation of the issues.

19    He first noted that art. 2488 C.C. is not engaged in this case because there were no allegations of fraud, and the Insured's good faith was never even put into question. He then dealt with the issue of the materiality of the facts allegedly not disclosed by the Insured at the time of the application for the policy. Drawing on the wording of art. 2485, Boudreault J. stated, at p. 722, that an insured's duty of disclosure applies with regard to

> [E]very fact which shows the nature and extent of the risk, and which may prevent the undertaking of it, or affect the rate of premium; and it is the misrepresentation or concealment of a fact of a nature to diminish the appreciation of the risk or change the object of it that can be a cause of nullity of the contract. All such facts are labelled 'material' both in the legal terminology and in the insurance industry.

After reviewing the contents of the Selikoff Reports, he concluded, at p. 725:

> In the Court's view, this evidence leads to the conclusion that the Selikoff reports disclosed facts and not opinions and that these facts showed the nature and extent of the risk and which may have prevented the undertaking of it or affected the premium, or in other words facts material to the risk.
>
> In the Court's opinion, it would be difficult to imagine anything more material to a products liability insurer than the knowledge of the serious danger of an insured's main product causing severe injury to a large number of workers whose work calls upon them to handle such product for a period of time.

He also stated that the Insured was in possession of the Selikoff Reports and was aware of their contents.

20    Boudreault J. then turned to the question of whether the Insured had discharged the duty of disclosure with respect to the hazardous nature of asbestos fibres. The Insured's sole basis for claiming that it had fulfilled this duty was the "Health Research" section of the Annual Report in which a passage referred to Selikoff's work. The trial Judge was of the view that this passage said nothing about the serious dangers of handling asbestos because it appeared to have been carefully drafted to avoid raising fears in the minds of those reading it. Consequently, "the substantially full and fair representation required by the civil code" could not be said to have been provided (p. 726).

21    Boudreault J. found that the Insurer had no actual knowledge of the facts in question and went on to deal with whether or not an insurer has a duty to inquire or be informed, by virtue of presumed knowledge, constructive knowledge, and common knowledge or public notoriety.

22    With respect to presumed or constructive knowledge, the trial Judge rejected the respondent's contention that an insured need not disclose to its insurer matters which the insurer in the normal course of its business ought to know. In the opinion of Boudreault J., this broader definition of knowledge, drawn mainly from the English common law, is not part of the law in Quebec where only those facts which are public and notorious are deemed to be part of the insurer's knowledge. He also rejected the argument based on an insurer's alleged duty to inquire, observing that the respondent had failed to cite any Quebec cases in support of such a duty. The trial Judge added that the Supreme Court of Canada decision in *Fidelity & Casualty Co. of New York v. General Structures Inc.,* [1977] 2 S.C.R. 1098, [1977] I.L.R. 1-826, 12 N.R. 571, and the Quebec Court of Appeal decision in *Angelillo c. Prévoyance, Cie d'assurances,* [1983] C.A. 305, appeared to indicate that no such duty exists.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

23    On the question of "public character and notoriety", Boudreault J. acknowledged that those words cover a wider range of facts than the concept of judicial notice. He adopted a definition of "public character and notoriety" which pointed to common or public knowledge, and he accepted that such knowledge might be acquired through certain information media, including specialised gazettes and general interest newspapers. He could not endorse, however, the view that health hazards relating to asbestos were public knowledge in 1970. In reaching this conclusion, he ruled that American newspapers, trade journals and other instruments were relevant to the question of the Insurer's actual knowledge of a material fact contained therein, but that these materials could not be part of the consideration of public character and notoriety in this case. The same was said of materials available at the Institute of Occupational and Environmental Health ("IOEH") in Montréal, given that there was no evidence that these materials were known either to the Insurer or to the general public. He did not consider the evidentiary weight that should be given to references to asbestos and asbestosis found in the *Encyclopedia Britannica*. In concluding this section of his analysis, Boudreault J. stated, at p. 731, that "it is a principle of insurance law and of the sources considered by our codifiers that when a contract of insurance is entered into, the insurer should have a knowledge of the risk assured, real or presumed, equal to that of the insured".

24    Boudreault J. then dealt with the argument that the Insurer had breached its own obligation of acting with the utmost good faith and was for that reason prevented from seeking the invalidation of the policy. After setting out the various facts which bore on this argument, the learned trial Judge observed that the argument is based on the idea of "the reasonably-competent underwriter", an idea which is supported in Quebec doctrine and which the Judge qualified as "seductive", especially in a case as here where the insurer was negligent. In his view, however, it was not possible to find jurisprudential support for this approach, and the Insured's failure to disclose material facts therefore remained the determining factor in the case.

25    It was on this failure to disclose material facts, then, that Boudreault J. decided the case. He reasoned, citing art. 2487 C.C., that the good faith of the Insured does not render a contract valid. Concealment of material facts, whether in good or bad faith, vitiates the consent which is required in the formation of any contract. Accordingly, the insurance policy was in fact a nullity, due to error as to the substance of the thing which is the object of the contract (art. 992 C.C.). He summarized his reasons in the following way, at pp. 739-740 [C.S.]:

> To conclude on this chapter, the Court is therefore of the view that the contract of insurance herein did not attach, notwithstanding the apparent negligence of the plaintiff which under our law had no duty in the circumstances to investigate the facts and circumstances disclosed to it by the insured and which had no knowledge, constructive or otherwise, of the facts herein deemed to be material which, therefore had to be fully and fairly disclosed by the defendant.

26    He then disposed of a final, subsidiary defence raised by the Insured. According to this defence, the Insurer had shown by its action that it had confirmed the insurance contract and thereby renounced any rights it might have had to avoid the policy. The Insurer had intervened on the Insured's behalf, pursuant to the terms of the policy, in an American suit (*Foxworthy*) where asbestos-related hazards were alleged, and in so doing, according to the view proposed by the Insured, had acquired actual knowledge of the health hazards associated with exposure to asbestos fibre.

27    Boudreault J. rejected this defence, or fin de non-recevoir. He noted that the conditions for confirmation of an act which is voidable dictate that the Insurer have knowledge of the defect and an intent to rectify it. Accordingly, in the opinion of the trial Judge, to prove knowledge of the defect, the Insured would have to show that the Insurer had acquired not only knowledge of health risks associated with exposure to asbestos but also knowledge of concealment of such facts by the Insured in 1970 and 1973. Only such full knowledge would have made the Insurer aware that the Insured had breached its obligation under art. 2485 C.C. The respondent had not proven such knowledge and therefore no confirmation of the policy could be said to have occurred. The confirmation of the defect, in his view, had to be unequivocal.

28    Dealing with the defence of fin de non-recevoir based on negligence, Boudreault J. stated that to succeed with

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C. 161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

this defence, the Insured would have to show that it had been prejudiced by the Insurer's negligence in not investigating in any way further the allegations in the U.S. *Foxworthy* action. In his view, the evidence did not show that the Insured had in any way modified its conduct as a result of the Insurer's own actions.

29    Boudreault J. concluded that the policy should be declared null ab initio and ordered compensation between premiums paid by the Insured under the policy and payments from Insurer to Insured for losses covered by the policy. In the circumstances, he considered that it would be "just and reasonable" to sanction the Insurer's employees' negligent conduct by not awarding any court costs.

### The Court of Appeal

30    The reasons of the Quebec Court of Appeal were written by Rothman J.A. and concurred in by Tourigny J.A. and Dugas J. (ad hoc): [1988] R.J.Q. 2651, 18 Q.A.C. 99, 54 D.L.R. (4th) 468, [1989] I.L.R. 1-2414 (hereinafter cited to R.J.Q.).

31    The Court of Appeal agreed with the trial Judge that there could be little doubt that the serious health problems associated with exposure to asbestos fibre indicated in the Selikoff Reports and the very high frequency of asbestosis found among insulation workers were material to the risk of product liability which was to be undertaken by the Insurer under the policy. The Court also stated that there was no doubt that the facts contained in the Selikoff Reports were known to the Insured prior to the issuance of the policy. It also agreed that if the Insured had been under an obligation to disclose these facts, the information it did disclose in the 1969 Annual Report fell well short of the full and fair disclosure required under art. 2485 C.C.

32    Dealing in turn with art. 2486 C.C., Rothman J.A. stated that the evidence was clear to the effect that the Insurer had no actual knowledge of the specific facts contained in the Selikoff Reports. The critical issue, then, was whether the Insured was obliged to disclose these facts to the Insurer, given the extent at that time of public knowledge about the health hazards associated with exposure to asbestos fibres. On this last point, he expressed an opinion contrary to that of the trial Judge. He considered that in determining public knowledge, material published in the United States was to be taken into account together with Canadian material and, taking this larger pool of evidence into account, he concluded, at p. 2657 [R.J.Q.]:

> [E]ven then [1970 and 1973], these risks and the Selikoff reports were common knowledge in the asbestos industry. Beyond the asbestos industry, the risks, and the Selikoff reports themselves, had been widely and publicly discussed in the media. Given the public discussion at the time, insurance underwriters ought to have been alerted to the health risks of asbestos fibres. They may not have been aware of the precise statistical data contained in the Selikoff reports, but they certainly ought to have known that serious asbestos-related health risks had been reported.

33    Rothman J.A. described the extent of the knowledge that can be ascribed to an insurance underwriter, at pp. 2657-2658:

> An insurance underwriter may not be presumed to know all of the technical intricacies of all the trades and industries he insures, but surely he ought to know something of a serious health risk that was common knowledge in a major industry and was widely reported in the public media as well. As Professor Louis Baudouin observes: a minimum of diligence and professionalism should be expected of the insurer.

34    He then dealt with the appellant's argument that English common law notions of the insurer's presumed knowledge of the risks in a particular industry are not part of the law of Quebec, except insofar as those risks are of a "public character" and "notorious" as provided in art. 2486 C.C. Rothman J.A. stated that the incorporation of these notions of English law in art. 2486 C.C. was not vital to the determination of this case and put the matter in the following way, at p. 2658:

> But whatever the merits of [the Insurer's] argument as to the distinction between *Article 2486 C.C.* and

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> English law, we need not, in my view, deal with that issue to decide this case. For even assuming that *Article 2486 C.C.* does not permit one to presume that an insurer has knowledge of facts except to the extent that the facts have a public character and notoriety, I am satisfied that the risks in this case did have a sufficient public character and notoriety to meet the test of *Article 2486 C.C.*

Rothman J.A. acknowledged that facts which are well known in a particular trade or industry are not, on that account alone, notorious and may not always have a public character. The deciding factor, then, was that in this case it could be said that knowledge of asbestos-related health risks went far beyond the asbestos industry. His conclusion was as follows, at pp. 2658-2659:

> [T]he important point is that all of the facts, including the statistical data contained in the Selikoff reports, had been made public throughout North America. All of this material was at hand and available to anyone who was interested in the details.

> In my view, all of this published material on the health risks of exposure to asbestos fibres made those risks sufficiently public and notorious so that an insurance underwriter ought to have known of their existence and their seriousness. If the media accounts left him in any doubt as to the precise extent of the risk or as to the details contained in the Selikoff reports, any inquiry within the industry or even the most superficial research outside of it would have brought forward this information. But no inquiry of any kind was made by the underwriters, either inside or outside the industry.

> In these circumstances, I do not believe the insured should be reproached for failing to disclose the kind of detail contained in the Selikoff reports. The insured was entitled to presume, in my view, that the insurer had a basic professional knowledge of the risks of asbestosis and that if more detail was required, the underwriters would ask for it.

> . . . . .

> Having come to the conclusion that the insurer must be presumed to have known of the asbestos-related health risks when it issued the policy and when it was renewed, and that the insured had therefore no duty to declare the facts mentioned in the Selikoff reports, I do not consider it necessary to decide the remaining grounds of appeal raised by the insured.

35    Accordingly, the Court of Appeal set aside the judgment of the Superior Court and dismissed the action with costs.

**III Civil Code Provisions**

36    The relevant provisions of the Civil Code concerning representation and concealment read as follows:

> Des déclarations et réticences

> 2485. L'assuré est tenu de déclarer pleinement et franchement tout fait qui peut indiquer la nature et l'étendue du risque, empêcher de l'assumer, ou influer sur le taux de la prime.

> 2486. L'assuré n'est pas tenu de déclarer des faits que l'assureur connaît, ou qu'il est censé connaître d'après leur caractère public et leur notoriété; il n'est pas tenu non plus obligé de déclarer les faits qui sont couverts par la garantie expresse ou implicite, excepté en réponse aux questions que l'assureur peut lui faire.

> 2487. Les fausses représentations ou réticences par erreur ou de propos délibéré sur un fait de nature à diminuer l'appréciation du risque, ou à en changer l'objet, sont des causes de nullité. Le contrat peut, en ces cas, être annulé, lors même que la perte ne résulterait aucunement du fait mal représenté ou caché.

> 2488. Les fausses représentations ou réticences frauduleuses de la part de l'assureur ou de l'assuré sont dans

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> tous les cas des causes de nullité du contrat que la partie qui est de bonne foi peut invoquer.

> 2489. L'obligation de l'assuré en ce qui concerne les déclarations est suffisamment remplie si le fait est en substance tel que représenté et s'il n'y a pas de réticence importante.

> Of Representation and Concealment

> 2485. The insured is obliged to represent to the insurer fully and fairly every fact which shows the nature and extent of the risk, and which may prevent the undertaking of it, or affect the rate of premium.

> 2486. The insured is not obliged to represent facts known to the insurer or which from their public character and notoriety he is presumed to know; nor is he obliged to declare facts covered by warranty express or implied, except in answer to inquiries made by the insurer.

> 2487. Misrepresentation or concealment either by error or design, of a fact of a nature to diminish the appreciation of the risk or change the object of it, is a cause of nullity. The contract may in such case be annulled although the loss has not in any degree arisen from the fact misrepresented or concealed.

> 2488. Fraudulent misrepresentation or concealment on the part either of the insurer or of the insured, is in all cases a cause of nullity of the contract in favour of the innocent party.

> 2489. The obligation of the insured, with respect to representation is satisfied when the fact is substantially as represented and there is no material concealment.

37    These provisions were replaced by the present arts. 2485 to 2488 C.C. which were adopted by *An Act respecting insurance*, S.Q. 1974, c. 70, s. 2. The 1974 revisions do not, however, apply to this appeal.

**IV The Issues**

38    The appellant's arguments are based on the proposition that the "public character and notoriety" exception provided by art. 2486 C.C. must be interpreted restrictively and in a manner compatible with the general rule set out in art. 2485 C.C. which requires "full and fair" disclosure by the insured of material facts. Thus, according to the appellant, because the word "notoriety" refers to facts generally known by all, only in rare circumstances will the insured be relieved of its duty to disclose material facts.

39    The particular material fact which the respondent is alleged to have failed to disclose is the "exceptionally high frequency" of pulmonary disease among workers in asbestos and asbestos-related industries. This information was contained in the Selikoff Reports which were in the respondent's possession, and it could not be said that this information was known to the public. In this respect, the appellant relies heavily on the finding of the trial Judge concerning the materiality of the facts as contained in the Selikoff Reports and on a definition of notoriety which relates to general or common knowledge.

40    Before the courts below, the respondent raised eight separate defences which are said to be independent one from the other. The respondent sets out these defences as follows:

> a) Respondent disclosed all material facts;

> b) Appellant was deemed to know of the alleged hazards of asbestos, and of the Selikoff reports, under the doctrine of public character and notoriety because of the enormous mass of publicly available material in the media and elsewhere stretching back for years;

> c) The Selikoff reports were common knowledge in the asbestos industry, and Appellant was deemed to know of the existence of the reports under the doctrine of presumed knowledge;

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> d) Respondent gave Appellant sufficient information, and if it wished to have any more information it had only to make inquiries under the doctrine of constructive knowledges;

> e) The custom and usage of the insurance industry concerning the underwriting of policies such as the one in question bound Appellant, and the Policy was issued pursuant to the disclosure requirements of such custom and usage;

> f) Respondent warranted that its business operations concerned the mining, manufacture and sale of asbestos; the Selikoff reports were covered by the warranty, and as Appellant asked no questions concerning that warranty, Respondent was not obliged to make any further disclosures;

> g) Appellant's negligence and lack of professionalism in underwriting the Policy barred it from seeking to void the Policy on grounds of non-disclosure;

> h) At the time Appellant cancelled the Policy and later when Appellant took up the defence of a case against Respondent, Appellant knew that Respondent had been aware for about 20 years of the alleged hazards of asbestos. Appellant exercised its rights and performed its duties under the Policy without any reserve or disclaimer, thereby confirming the Policy.

41    In my opinion, the defence based on the common law doctrine of presumed knowledge is similar in nature to the defence based on the notoriety of the facts alleged to have been concealed since they are both based on the presumed knowledge of the Insurer. I will therefore analyse these defences together.

42    Similarly, the defences based on the adequacy of the respondent's actual disclosure, the common law doctrine of constructive knowledge, the customary practices adopted by the insurance industry and the warranty as to the respondent's activities all deal with the issue of the Insured's duty to disclose and the Insurer's duty to inquire. These defences will therefore be analysed together.

43    The balance will be dealt with separately, namely the issue of the Insurer's negligence and the uberrimae fidei nature of the contract of insurance, and the issue of the Insurer's confirmation of the contract.

44    As I will explain later in these reasons, I agree with the courts below that the disclosure made by the Insured was not by itself sufficient to qualify as full and fair disclosure under art. 2485 C.C. The respondent must therefore rely to a considerable extent on art. 2486 C.C. and the considerations which I have grouped together under the general description of presumed knowledge. I turn now to that issue.

## V Defences Based on Presumed Knowledge of the Insurer

### *Public Character and Notoriety*

45    Article 2486 C.C. sets out exceptions to the rule that the insured must disclose fully and fairly all facts which are material to the assessment of the risk and provides that the insurer is presumed to have knowledge of certain facts by reason of their public character and notoriety. The appellant argues that the effect of arts. 2485 and 2486 C.C. is to require the disclosure of all material facts unless they are notorious in the sense that they are known by the general public. According to the appellant, [Translation] "public notoriety is a concept which covers facts *known to all*, so that a person would only be unaware of them in exceptional cases." [Emphasis added.] Natural and political perils are cited as examples. The respondent counters with the assertion that the concept of public notoriety refers to facts which are both accessible to the public and within the ambit of what a reasonably competent underwriter should know. According to the respondent, the underwriter can be presumed to know the industry which it insures.

46    Although art. 2486 C.C. is clearly an exception to the general rule of full and fair disclosure of material facts, I

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

disagree with the appellant's argument that the expression "public character and notoriety" must necessarily be given
a narrow meaning. The issue raised by this case is one of interpretation, and this Court must give to the words of the
Civil Code their proper meaning. While exceptions are not generally intended to outgrow general rules, they need
not be so weakened as to deprive them of their reasonable meaning.

47    It should be noted that art. 2486 C.C. does not link the notion of notoriety to the knowledge of the public at
large. An insurer will be presumed to have knowledge of a fact if it has a "public character" and if it is "notorious".
In my opinion, there is no need to merge these two concepts so as to produce a criterion based on notoriety in the
general public or public notoriety, despite the currency of the latter formulation. The distinct nature of these
concepts is most clear in the French text which refers to "*des faits que l'assureur [...] est censé connaître d'après
leur caractère public et leur notoriété*." [Emphasis added.]

48    Taken by itself, public character clearly refers to the availability or accessibility of information. There is no
doubt that the Selikoff Reports and the other relevant evidence in this case were "public" in this sense, and the
appellant does not challenge this factual conclusion. It is the more elusive concept of "notoriety" which presents
difficulties in this appeal.

49    In my opinion, the proper interpretation of "notoriety" lies in the answer to the question "notorious to whom?"
As noted above, the appellant's position is that "notoriety" is determined with reference to the general public. The
respondent in turn argues that "notoriety" is related to that which is common knowledge in a particular milieu, or, as
here, a particular industry. With respect, I find myself unable to accept either of these interpretations, though my
interpretation is closer to that of the respondent.

50    I have little difficulty concluding that the "notoriety" of art. 2486 C.C. must be interpreted with reference to
the insurer. Article 2486 C.C. does not refer to notorious facts which the general public is presumed to know, nor
does it refer to notorious facts which those in the industry in which the risk is being insured are presumed to know; it
expressly states that the notoriety in question is that which "he [the insurer] is presumed to know". I note that the
*Vocabulaire Juridique*, Paris: P.U.F., 1987, published by the Association Henri Capitant defines "notoriété" as
something [Translation] "more or less widespread", while "notoire" is said of a fact that is [Translation] "in the
public knowledge of *the group it concerns*, which takes its legal effect ... from its diffusion *within that group*." (p.
529) [Emphasis added.] In the context of insurance, it is the insured and the insurer who are most interested, and,
with respect to notoriety, the latter is particularly concerned.

51    It is still possible to argue that that which is notorious to the insurer is identical to that which is notorious to the
general public or, alternatively, to those in a particular industry. In my opinion, however, such arguments lack
credibility. Instead, according to my view of this matter, the Court is required to focus on the insurer and to
determine what it can or should be presumed to know. The Civil Code does not provide us with a clear answer to the
question whether this determination must be made by reference to the insurer in a particular case or to the
reasonably competent insurer insuring a similar risk.

52    The parties have discussed in considerable detail the precodification authorities which are said to provide some
perspective on principles of insurance which were common to all commercial nations and later codified in the *Civil
Code of Lower Canada*. I believe that these authorities support the conclusion, arrived at earlier, to the effect that
notoriety in art. 2486 C.C. goes beyond the minimum content of public knowledge but stops short of all facts known
to those in the milieu or industry of the insured risk. I believe that they also indicate that the usual standard is not the
insurer in a particular case but rather a reasonably competent underwriter insuring similar risks, and it is this
standard which would certainly have been adopted in the Code.

*Pre-codification Authorities*

53    A large number of the authorities presented by the parties were those referred to by the Commissioners who
drafted the *Civil Code of Lower Canada*. These authorities are said to circumscribe the interpretations which can be

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

attached to the provisions of the Civil Code concerning representation and concealment, i.e. arts. 2485 C.C. et seq.
Many of the authorities are taken from foreign sources, reflecting what L'Heureux-Dubé J. in *Q.N.S. Paper Co. v.
Chartwell Shipping Ltd.*, [1989] 2 S.C.R. 683 at p. 728, 62 D.L.R. (4th) 36, 26 Q.A.C. 81, 101 N.R. 1, referred to as
the Commissioners' "comparative law methodology". Indeed, the Commissioners did consult many commentators
from foreign jurisdictions when they drafted the Civil Code provisions on insurance, as appears clearly from the
following extract from the Codifiers Report [*Civil Code of Lower Canada: Sixth and Seventh Reports and
Supplementary Report* (Quebec: George E. Desbarats, 1865) at p. 241.]:

> The chief sources of authority upon which the articles have been framed, are: in the ancient law, the
> *Ordonnance de la Marine* -- with Valin's commentary upon it -- and the treatises of Emérigon and Pothier;
> in the English and American law, which almost always coincide, the works of Marshall, Arnould, Ellis,
> Phillips, Kent, Duer and Angell; and in the modern French law, Pardessus, Boulay-Paty, Boudousquié,
> Quenault and Alauzet. Much valuable aid has been derived from Bell's Commentaries on the laws of
> Scotland, and some useful articles have been suggested by the Draft of a civil code for the State of New-
> York.

Further along, at p. 242, the Commissioners noted that the draft provisions on representation and concealment, later
incorporated without changes into the Civil Code, contain "rules common to the law of in surance in all countries,
although less rigor has prevailed in France than in England and the United States in the construction and
enforcement of them".

54     The varied authorities taken from other jurisdictions that are cited by the Commissioners and discussed in
some detail by the parties in this case cannot be conclusive as to the proper interpretation of the Civil Code. It is
clear, however, that the Code acknowledges certain general principles. For example, the Code indicates clearly that
it is the primary duty of the insured party to disclose all the facts that are material to the risk. Various restatements of
this principle can be found in the authorities that were consulted by the Commissioners.

55     The classic exposition of the principle can be found in the old English case of *Carter v. Boehm* (1766), 3 Burr.
1905, 1 Wm. Bl. 593, 97 E.R. 1162, which was mentioned in James Kent, *Commentaries on American Law*, Vol. III,
6th ed. (New York: William Kent, 1838) at p. 285. Samuel Marshall, *A Treatise on the Law of Insurance*, Vol. I.,
3rd ed. (London: Butterworth, 1823) at pp. 474 and 478, and Joseph Arnould, *A Treatise on the Law of Marine
Insurance and Average*, Vol. I., 2nd ed. (Boston: Little & Brown, 1850), at pp. 563 and 569, all of which were cited
in the Commissioners' notes to what was to become arts. 2485 to 2489 C.C. The significance of this case has been
argued at length by the parties, and, accordingly, I will examine it in some detail.

56     In *Carter v. Boehm*, Lord Mansfield made the following statement regarding the insured's duty of
representation, at p. 1164 [E.R.]:

> Insurance is a contract upon speculation.
>
> *The special facts, upon which the contingent chance is to be computed, lie most commonly in the knowledge
> of the insured only;* the underwriter trusts to his representation, and proceeds upon confidence that he does
> not keep back any circumstance in his knowledge, to mislead the underwriter into a belief that the
> circumstance does not exist, and to induce him to estimate the risque, as if it did not exist.
>
> The keeping back [of] such circumstance is a fraud, and therefore the policy is void. Although the
> suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is
> deceived, and the policy is void; because the risque run is really different from the risque understood and
> intended to be run, at the time of the agreement. [Emphasis added.]

I note that Lord Mansfield stressed the need for full disclosure of facts which are known only to the insured. The
rules on representation in *Carter v. Boehm* have been cited with approval in this century in *Alliance Insurance Co. of
Philadelphia v. Laurentian Colonies & Hotels Ltd.*, [1953] Que. Q.B. 241, [1953] I.L.R. 547 (C.A.) (per McDougall

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C. 161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

J.A.).

57    It is the exception to this general rule which interests us, and the appellant claims that *Carter v. Boehm* is also useful authority in this respect. I choose to quote brief excerpts of the text which precedes the passage quoted by the appellant. Lord Mansfield stated at pp. 1164-1165 that "[t]here are many matters, as to which the insured may be innocently silent -- he need not mention what the under-writer knows ... The insured need not mention what the under-writer ought to know; what he takes upon himself the knowledge of; or what he waves being informed of." Lord Mansfield then provided examples of what the underwriter ought to know, and these, according to the appellant, constitute the whole public notoriety exception of art. 2486 C.C. The appellant makes this claim despite the fact that there is no such indication in the Code, and despite the fact that Lord Mansfield provided examples, rather than an exhaustive list of exceptions. Lord Mansfield stated, at p. 1165, that the underwriter "needs not to be told general topics of speculation: as for instance -- ", and here the appellant begins to quote:

> The under-writer is bound to know every cause which may occasion *natural perils*; as, the difficulty of the voyage -- the kind of seasons -- the probability of lightning, hurricanes, earthquakes, &c. He is bound to know every cause which may occasion *political perils*; from the ruptures of States from war, and the various operations of it. He is bound to know the probability of safety, from the continuance or return of peace; from the imbecility of the enemy, through the weakness of their counsels, or their want of strength, &c. [Emphasis added.]

From this extract, the appellant argues that notorious facts are facts which are as well known as the existence of natural and political perils. This concept of notoriety leads to a very strict rule of full disclosure according to which the only facts which need not be disclosed are those known to all.

58    Lord Mansfield's decision in *Carter v. Boehm* was one of the earliest statements of the rules concerning representation and concealment in the formation of insurance contracts and, in particular, of the exceptions to the general rule that the insured must disclose all material facts. In my opinion, the appellant misapprehends this decision by concluding that a notoriety exception was to cover only natural and political perils, and generally matters known to all. In fact, *Carter v. Boehm* did not deal specifically with the concept of notoriety. It did, however, establish exceptions to the rule of full disclosure which go well beyond the natural and political perils stressed by the appellant.

59    In *Carter v. Boehm*, the insured had obtained insurance against the loss of Fort Marlborough, a manufacturing settlement which, despite its name, was not a military fortification which could repel an attack by European forces. It was merely designed to withstand attacks from the native tribes of Sumatra. The state and condition of the fort had not been disclosed to the insurer. The fort was taken by French troops, and it was subsequently alleged that failure to disclose the weakness and vulnerability of the fort constituted material concealment. Lord Mansfield dismissed this argument on the basis that the underwriter either knew or ought to have known about the state of the fort. First, Lord Mansfield accepted the contention that the general condition and state of Fort Marlborough was "in general well known, by most persons conversant or acquainted with Indian affairs, or the state of the Company's factories or settlements; and could not be kept secret or concealed from persons who should endeavour by proper inquiry, to inform themselves" (p. 1166). Lord Mansfield dismissed the allegations of concealment because the insurer did not use the "various ways" by which he could inform himself (p. 1167). The final remarks in the case cautioned that if the insurer's view had been allowed to prevail, the rule on concealment would have been "turned into an instrument of fraud" employable by the insurer to blame the insured for failure to disclose facts which were in fact readily available to the insurer (p. 1169).

60    In my opinion, Lord Mansfield's decision in *Carter v. Boehm* is not as definitive as the appellant maintains regarding the proper interpretation of the notoriety exception codified in art. 2486 C.C. The case does, however, provide a useful example of the dynamics involved in the gathering of material information by the insurer and the insured. The Civil Code provisions on representation and concealment show a sensitivity to those dynamics. I will return to the codal solution after considering the appellant's other arguments based on pre-codification authorities.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

61    Having asserted that the notion of public notoriety is limited to natural and political perils, the appellant has to find a way to explain and incorporate other cases which are cited in the authorities referred to by the Commissioners and which appear to extend the notion to include "[g]eneral news stated in the newspapers and open to all" and "the ordinary marine intelligence appearing in the gazettes". See Kent, op. cit., at p. 285, Willard Phillips, *Treatise on the Law of Insurance*, Vol. II. (Boston: Hilliard, Gray and Co., 1834) at p. 85, and *Green v. Merchants' Insurance Co., 27 Mass. (10 Pick.) 402 (1830)*, cited in Kent, op. cit., at p. 285. The appellant claims that these authorities do not permit the conclusion that an insurance underwriter is presumed to know all that is published in newspapers without regard to their origin, their temporal connection to the insurance application and the specificity of the information found therein. Instead, the appellant extracts the principle that an insurance underwriter has no obligation to search in newspapers for general information which might eventually be relevant to a risk which has not yet been proposed. I draw a different conclusion from the pre-codification authorities cited by the appellant. Taken together, these authorities indicate that an insurer was expected to know facts which went beyond political and natural perils and generally matters known to all and included a certain amount of information regarding the activity which was being insured.

62    In *Green v. Merchants' Insurance Co.*, supra, a case which was cited in many of the authorities referred to by the Commissioners (see Arnould, supra, at p. 568; John Duer, *The Law and Practice of Marine Insurance*, Vol. II. (New York: John S. Voorhies, 1846) at pp. 481 and 554; Kent, op. cit., at p. 285) the Court held that the underwriters were presumed to know the marine intelligence concerning the movement of ships which appeared in the papers. Shaw C.J. stated at pp. 406-407 [27 Mass. (10 Pick.) 402 (1830)]:

> It may be very true, that underwriters are not, under all circumstances, to be presumed to be acquainted with all the intelligence contained in the papers taken at their office. But the general presumption is, that the agents of the office will examine, with some care, those items of *marine* intelligence which are expressly designed speedily to diffuse information upon a subject so immediately interesting to them, especially in relation to vessels belonging to their own port.

The appellant argues that this case involved actual knowledge on the part of the insurer, and there is some basis for that conclusion. However, it also seems clear to me that the Court's decision was consistent with the general proposition that the insurer should exercise care in keeping abreast of affairs in the milieu it insures.

63    Other cases discussed by the appellant are not inconsistent with this principle. In *Moses v. Delaware Ins. Co., 17 Fed. Cas. 891 (C.C.D. Pa. 1806)* (No. 9,872), the evidence indicated that there had been several storms off the Carolina coastline and that this fact was known to the insurer. The insurer was not, however, aware of a particularly violent storm which had done great damage in the port to which the insured's ship was destined. Only the insured himself had this information, having obtained it by means of a letter. The Court held that the insured was bound to provide the information to the insurer. Washington J. stated the following rule, at p. 892:

> The rule is that the insured must disclose every fact, material to the risk, within his own knowledge, which the insurer does not know, *or is not bound to know. They were not bound to know of the particular storm mentioned in this letter*; and there is no evidence which brings home to them, in any respect, a knowledge of it. [Emphasis added.]

This result seems normal and proper given that the insured in that case had received particular information in a letter and naturally the insurer could not have access to the same. Presumably, if the "particular information" had been more readily accessible to the insurer the decision of the Court would have been different.

64    In *Alsop v. Commercial Insurance Co., 1 Fed. Cas. 564 (C.C.D. Mass. 1833)* (No. 262), a question arose as to whether the insured had misrepresented or concealed a material fact, namely the arrival of the ship which was the object of the insurance policy. In considering the insurer's claim of misrepresentation or concealment, the Court made the following observations, at p. 567:

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> That a misrepresentation or a concealment, to avoid the policy, must be of some fact, material to the risk, and important to guide the underwriter, not only as to the premium he should ask, but also whether he should underwrite at all. In regard to a concealment, there was this additional ingredient, that the fact must be of such a nature, as that the underwriters must be presumed to trust to the assured for information respecting it; and the concealment must be of facts not equally open to the knowledge of both parties, but peculiarly or exclusively within the knowledge of the assured. Facts of a public nature, such as the length of voyages, the course of trade and navigation, the chances of peace and war, the different effects of different seasons of the year on the risk, and other circumstances of a political or general nature, however material they might be to the risk, were supposed to be equally within the reach of both parties; and therefore the assured, even if he had superior skill, was not bound to disclose any thing respecting them. The underwriters are not presumed to trust him in such matters, but to rely on their own means of information and judgment.

65    This case reveals once again the importance of notions such as public availability of information and the presumption that the underwriter will be assumed to have taken the necessary steps to obtain such information. As in *Carter v. Boehm*, the information which was at the underwriter's disposal went beyond political and natural perils and included matters relevant to the particular trade, milieu or industry. Put another way, the Court considered the knowledge of and availability of information from the point of view not of the general public but of the underwriter. In the *Alsop* case, supra, at p. 567, the Court stated that the information regarding arrivals and departures in the ports was available to the underwriter in the daily newspaper and that it was natural for the insured to assume that the underwriters were informed:

> What could be more natural, then, for a person desirous of procuring insurance in Boston, than to presume the underwriters acquainted with arrivals at Boston, and the neighbouring ports, it being usual to publish such facts, and for the underwriters to take notice of them.

66    In my view, the appellant's conclusions based on the pre-codification authorities are not warranted. I can find no consensus in those authorities regarding a notoriety exception which is limited to natural and political perils, nor can I see that the exception must be measured according to that which is known to the general public.

67    The respondent sets out numerous pre-codification authorities which were consulted by the Commissioners and which support the conclusion that notoriety is judged from the point of view of an underwriter and that it generally takes in well-known facts which are open to or available to those who are particularly interested in them.

68    Marshall, op. cit., at p. 270, stated:

> Every underwriter may fairly be presumed to be fully conversant in the usual course of the trade, on which he becomes an insurer; and he will be bound by the usage of such trade, as much as if it were particularly inserted in the policy.

Marshall, op. cit., at p. 473, expressed himself similarly in stating that "the underwriter is bound to take notice of the general usage of trade, even though it be not uniform; and therefore the insured need not communicate it". Arnould, op. cit., at p. 556, was also of the view that in addition to the political state of the world, the underwriter could be presumed to know something of the "standing mercantile regulations" in particular countries as well as "the risk and embarrassment affecting the course of trade contemplated by the insurance". The most elaborate treatment of this subject can be found in Duer, op. cit., at pp. 557-558:

> The assured is not bound to make any communication, in the first instance, respecting facts which the underwriter ought to know, and of which, for this reason, the law imputes to him the actual knowledge. The presumption of law, in the cases comprehended by this rule, is conclusive and absolute.... The facts to be considered, are truly said to be such, as the underwriter *ought* to know, since they constitute that species of knowledge, which, in the exercise of ordinary diligence, he must acquire, as essential to an intelligent discharge of the appropriate duties of his business, or profession. As the assured has a right to believe, that

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> the underwriter possesses this knowledge, it would be plainly unjust, to permit the latter to defeat the contract, by an averment of his ignorance. The errors that, in such cases, may arise from his ignorance, are justly attributable to his own negligence, to the want of that ordinary care and diligence, that the nature of his employment requires; and not to any intentional deceit or violation of duty on the part of the assured.

Duer then elaborated on what the underwriter could be expected to know. He began with the political and natural perils that were intended to be covered by the policy, and here he cited the opinion of Lord Mansfield in *Carter v. Boehm* as authority. He then stated that there was a "third class", which grouped together some of the matters identified in the authorities discussed above (at p. 562):

> There is a third class of cases, not exclusively referable to either of the preceding [i.e. political and natural perils], in which the facts, as general, permanent, and notorious, are equally presumed to be known to the underwriter. I refer to the usages of trade.

69    Though the authorities referred to above were consulted by the Commissioners and presumably formed part of the "rules common to the law of insurance in all countries", the appellant is correct in pointing out that the Commissioners referred specifically to only two authorities -- Kent and Phillips -- in the notes to what eventually became art. 2486 C.C. If one consults the pages to which the Commissioners referred, one finds statements similar to those quoted above regarding the presumption as to what underwriters could be expected to know. In particularly, Kent stated, at pp. 285-286:

> *The underwriter is bound to know the nature and general course of the trade and of the voyage, and he assumes that kind of knowledge at his peril.* The general rule is, that all facts material to the risk, and known to the one party and not to the other, must be disclosed when the policy is to be effected; and they must be fully and fairly disclosed. But if the subject on which disclosures would otherwise be requisite, be covered by a warranty, either express or implied, in that case it need not become a matter of representation. It is likewise sufficient in the case of a representation, that it be equitably and substantially complied with. [Emphasis added.]

70    The appellant does not discuss Phillips. Phillips' comments were similar to those of Kent, although the former provided more detailed examples of the facts which an underwriter might be expected to know. Phillips began with the general statement that "[t]he underwriter is presumed to know the particular usages of the trade and the local situation and circumstances of the ports comprehended within the voyage" (Willard Phillips, *Treatise on the Law of Insurance* (Boston: Wells & Lilly, 1823) p. 88). He cited, by way of example, the case of *De Longuemere v. New York Fire Insurance Co., 10 Johns. 120* (N.Y. 1813), where an underwriter was expected to know that the port of Sisal did not have a harbour, and this despite the fact that "trade was recent at the time of making the insurance" (p. 88). Phillips quoted the Judge in that case who stated that "the assured was not bound to communicate to the underwriters his knowledge of Sisal. This was a matter of general notoriety, equally open to the knowledge of both parties, and which both must be presumed equally to know" (p. 88). Phillips also cited a case where the underwriter was "bound ... to take notice of the usage" in a foreign port involving the practice of loading ships outside the port bar, and yet another where the underwriter should have inquired as to the usual mode of landing goods in Jamaican ports. The most striking example in Phillips is the case of a vessel, insured for one voyage, which made an intermediate voyage about which the insurer was not informed. This was apparently the practice which prevailed in Newfoundland voyages, and Phillips quoted passages from two cases where it was decided that the insured was not bound to state this to the underwriters (at p. 89):

> Lord Ellenborough said, 'The underwriter must refer himself to the usage of the trade, which he is bound to know;' 'Is it notorious that ships in this trade upon their arrival at Newfoundland, are either employed in *banking*, or take an intermediate voyage? If so, it must be presumed to be equally in the knowledge of both parties. [Citations omitted.]

***The Test in Art. 2486 C.C.***

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

71    The authorities consulted by the Commissioners point to an interpretation of notoriety which does not sit easily with the definition proposed by the appellant. Questions of notoriety were dealt with from the point of view of the underwriter and the insured, not merely from the point of view of the general public, even a well-informed public. Knowledge regarding the construction of forts in Sumatra, the custom of the trade in faraway ports such as Sisal, Jamaica and Newfoundland, and even the marine intelligence as found in the specialised and daily papers were not matters considered in terms of what the well-informed member of the public would know. These matters were specially relevant to the particular insured and its underwriter, and, in my opinion, it is from that point of view that "notoriety" in art. 2486 C.C. is to be considered.

72    The matter of public availability was also viewed in this narrower context. As the authorities indicate, the equal availability of facts to the insured and to the underwriter justified the rule that the latter be expected to know such facts. Private or more obscure facts required different treatment. Without full and fair disclosure by the insured of these facts, even the diligent underwriter would be inadequately informed of facts material to the risk. The appellant seems to suggest that the Civil Code provisions on insurance require that both parties have *actual* knowledge of material facts, and that the public notoriety exception simply states that matters which are known by all are also considered known to the insurer. This does not, in my view, give an accurate picture of "public character and notoriety".

73    The pre-codification authorities indicate that it is not a general principle of insurance that both insured and insurer must possess equal actual knowledge. On the contrary, it appears that if the insurer does not keep abreast of facts which are available and customary or well known in the field which it insures, then it ignores these facts at its peril, and the law does not require the insured to make up for the insurer's lack of diligence. Of course, the insurer is not actually engaged in the trade or activity which it insures, and there is a natural limit to that which should be well known to the insurer. In my view, art. 2486 C.C. represents an attempt to define that limit. It appears to me to be quite clear that this limit includes but extends beyond that which is notorious to the general public or even to the well-informed individual. However, it stops short of information which is perhaps notorious to those within the trade, industry or activity which is being insured but not normally accessible or available to those who operate on the periphery.

74    It is difficult to define the limits of the art. 2486 C.C. exception with great precision, and I do not think that there is any need to do so. The "public character and notoriety" of art. 2486 C.C. provides a flexible test which can apply to different types of risks and which can also keep step with the evolution of the insurance business.

75    How, then, is the broad, adaptable test in art. 2486 C.C. to function? It seems clear that the insured need not say what everybody knows but that it must disclose material facts which are only known by the insured itself. There is a continuum between those two types of facts and a point at which disclosure by the insured becomes unnecessary. This Court is called upon to interpret the test set out in Civil Code art. 2486 and to determine whether the information contained in the Selikoff Reports falls beyond the point where disclosure by the insured is no longer necessary.

76    In my opinion, the "notoriety" in art. 2486 C.C. provides a standard by which to measure the level of knowledge which should exist between interested parties. The provisions governing insurance contracts in the Civil Code are clearly intended to regulate the contractual relationship between the insurer and the insured. A fact may very well be notorious amongst insurers who manage particular risks in any given industry without achieving such a degree of notoriety in the general population. The interpretation proposed by the appellant is certainly incongruous because it would cause facts which should be known by a competent insurer to be excluded from the sphere of presumptive knowledge prescribed by art. 2486 C.C. I cannot agree with this interpretation.

77    In my opinion, art. 2486 C.C. was intended to alleviate the evidentiary problems which would be caused by a requirement that the insured prove that the insurer had actual knowledge of a fact that the insured failed to disclose. Article 2486 C.C. requires an evaluation of what an insurer can be presumed to know about the risk covered by the

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C. 161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

policy. This article must also be interpreted in light of the principle that the contract of insurance is an uberrimae fidei contract. The expression "public character and notoriety" was certainly not intended to allow insurers to complain about non-disclosure of a widely known fact where the insurer underwrites the risk blindly or without adequate knowledge of the industry.

78    On the other hand, it would be unreasonable to require an insurer to have knowledge of every technical aspect of an industry notwithstanding the notoriety of such facts in the industry itself. Article 2486 C.C. is intended to reach a proper balance between the insured's duty to disclose all relevant facts and the insurer's duty to act in good faith in acquiring the level of knowledge which can be reasonably expected of an insurer.

79    In my opinion, the relevant standard by which the notoriety of the undisclosed fact must be assessed is that of the reasonably competent underwriter insuring similar risks in the industry covered by the policy. Thus, art. 2486 C.C. protects the insured against the ignorance of an insurer who enters a new market without the most basic, publicly available and generally known information about the risks covered by the policy.

80    In the present case, this Court must determine whether the na ture and severity of the risks associated with the use of asbestos and revealed in the Selikoff Reports should have been known, as a result of their notoriety, to a reasonably competent underwriter covering product liability risks in the asbestos industry. Such an underwriter, would of course, pay more attention to any public information concerning asbestos-related diseases than would the ordinary citizen reading or hearing the same news. It is important to note that an insurer can only be presumed to know facts as a result of their public character and notoriety and not as a result of their availability through a process of detailed research or in-depth investigation.

81    However, the respondent argues that the Insurer is expected to be aware of much more than what is prescribed by art. 2486 C.C. because the common law doctrine of presumed knowledge dictates that "the underwriter is presumed to know the industry he insures". The respondent claims that this presumption is irrebuttable, juris de jure. As noted earlier, Boudreault J. rejected this argument entirely. Rothman J.A. preferred to express no firm opinion on the matter.

82    The respondent argues that the Civil Code is not exhaustive of Quebec civil law and that if the Commissioners had intended to exclude "such an ancient, universal and fundamental rule as that of presumed knowledge" then they would have said so clearly. This rule or doctrine is said to be recognized in many of the authorities that were consulted by the Commissioners and in the only case on the duty to disclose that was cited by them (*Casey v. Goldsmid* (1851), 2 L.C.R. 200 (Que. S.C.), rev'd (1854), 4 L.C.R. 107 (Q.B., Appeal Side)).

83    In *Casey*, the plaintiff brought an action against the defendant insurance company claiming indemnification for losses sustained as a result of a fire. The defendants refused to indemnify, claiming that the premises insured were improperly and insufficiently described in the insurance policy, and that the policy was therefore null. In the Superior Court, Duval J. rejected the plaintiff's action, stating that the insured must "communicate all facts that are material to the risk, and which are not known, or *presumed to be known* to the insurers" (p. 207). [Emphasis added.] The decision turned on the failure to disclose, and there was no further mention of presumed knowledge. Meredith J. agreed and spoke in similar terms regarding the insured's duty "to disclose all material facts known to him, and of which the insurers may be presumed to be ignorant" (p. 209). Arnould, Boudousquié and Quenault, all authors referred to by the Commissioners, were cited by Meredith J., but only on the question of how to decide which facts are material. Later in the judgment, Meredith J. indicated that the facts which the plaintiff failed to disclose "must have been known to him, and cannot be supposed to have been known to the Defendants" (p. 210). Meredith J. noted that the consequences of failure to disclose material facts are the same "whether the suppression of the truth arise *from fraud*, or merely from negligence, mistake or accident" (p. 210). He noted that the law of France and the law of England agree on this point and cited Arnould, Alauzet, Phillips and Quenault, all of whom were later cited by the Commissioners as authority for this same point. The issue of presumed knowledge was not discussed in any detail nor was any authority mentioned which related to the doctrine. In the Court of Appeal, the decision was reversed, the Court holding that there had not been an inaccurate description of the insured premises. Nothing was said regarding the doctrine of presumed knowledge. I conclude that the respondent cannot rely on this case as proof that

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

a legal doctrine of the insurer's presumed knowledge existed in Quebec prior to the codification.

84    I have also consulted the commentaries and cases which are referred to by the respondent, and I can find no distinct rule or doctrine of presumed knowledge which is as far-reaching as the respondent claims and which can be said to have survived intact despite the codification of a rule based on "public character and notoriety" in art. 2486 C.C. In any event, the final provisions of the Civil Code indicate that the laws as they stood prior to the codification are replaced by an express provision on the particular matter to which such laws related (art. 2613 C.C.). As I have stated above, I read art. 2486 C.C. as providing a flexible solution to the problem of presumed knowledge based on the test of the reasonably competent underwriter insuring risks in the industry covered by the policy. Any notion such as presumed knowledge exists only insofar as it has been incorporated into this test.

85    Accordingly, the insurer will not be presumed always to know a fixed level of information regarding any and all industries which it might insure. The insurer will be presumed to know only those facts which are publicly available and which would be notorious to the reasonably competent underwriter insuring similar risks in that industry. It may be that in an industry which is relatively new and secretive, such as the nuclear industry in the early years of its existence, a reasonably competent underwriter would be presumed to know little, and the insured will not be entitled to assume that the underwriter knows facts which may be commonly known in the industry but hidden from those outside. As insurers become more familiar with the industry and as information becomes publicly available, the insured will be able to assume that the underwriter is already aware of certain facts which are material to the risk, specifically those facts which would be notorious to the reasonably competent insurer.

86    In the maritime insurance field of the nineteenth century, we have seen that courts expected that the insurer would be aware of certain facts which were notorious to those in the activity of shipping and trade. The insuring of shipping interests had by then gone on for over a century, and the information regarding the risks involved could be obtained by well-known means. A marine insurer ignored such information at its peril. In my opinion, the same would be true of an insurer of asbestos industry risks who ignored information which was publicly available and well known to insurers in that industry.

87    There are two other subsidiary points which I propose to deal with before discussing how art. 2486 C.C. applies to the facts in this case.

88    The appellant raises a question as to the type of facts which can be considered notorious for the purpose of art. 2486 C.C. The appellant argues that even if certain information is notorious, the insured is not relieved of its duty to disclose information of a similar nature which is more detailed and therefore more relevant. I note first that the appellant has in mind a test of notoriety which extends no further than facts which are known by all. It seems obvious that such a limited definition would give rise to a great number of cases in which the factual picture as depicted by (public) notoriety would be less detailed than that which could be provided by an insured. When, instead, notoriety is considered from the point of view of the reasonably competent underwriter, a situation of differing degrees of detail will arise less frequently. If a fact is publicly available and material to the types of risks that the insurer habitually covers or intends to cover in the future, then the information will no doubt be retained in whole and in the detail which is there provided, or, failing that, the source of the information will be noted.

89    In the present case, the appellant complains that it was unaware of the severity of the risks associated with the use of asbestos and that the detailed information in the Selikoff Reports was not notorious. In my opinion, art. 2486 C.C. properly interpreted, does not require that all of the statistics in the reports be widely known; it merely requires that the health hazard, and to a certain extent its severity, be well known to reasonably competent underwriters insuring similar risks. I hasten to point out that the trial Judge did not consider all the detailed contents of the Selikoff Reports to be material. It was the "serious dangers of handling asbestos" (p. 726) that were said to be relevant. Once it can be said that the reasonably competent underwriter would have been aware that the handling of asbestos and asbestos products involves a serious danger, then it is up to the Insurer to consult, if it wishes, the publicly available information in order to find the exact statistics on the actual severity of the risk.

90    The appellant argues nonetheless that the insured must represent all facts which are not revealed in the picture

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

depicted by public notoriety, interpreted, in the appellant's terms, as that which is known to all. I agree with the
respondent that this argument would effectively eliminate any defence based on the notoriety of the facts which
were not disclosed by the insured because it would, in this case, require that the Selikoff Reports be published in
their entirety in the media. The notoriety of technical information would almost never be achieved if this type of
information had to be widely known in its every detail.

91     I find that the section of the Civil Code on representation and concealment contains an indication of how the
question of detailed or technical information should be treated. Article 2489 C.C. is particularly relevant, and it will
be helpful to reproduce it here:

> 2489. The obligation of the insured, with respect to representation is satisfied when the fact is substantially
> as represented and there is no material concealment.

This provision describes the precision with which an insured will be expected to represent a fact. The description
used by the insured must be substantially accurate and without material concealment. In my opinion, it is entirely
appropriate to apply the same standard to the notoriety exception. There is no reason to assume that the insured's
duty to disclose in relation to this exception is set at a higher level of precision that it is generally. I conclude that the
insured will be relieved of its duty to disclose where material facts are substantially as depicted by virtue of public
character and notoriety. Accordingly, an insurer cannot fault the insured for failing to disclose all the detailed
information in its possession where the picture, open and well known to a reasonably competent insurer,
substantially represents the facts.

92     If the Selikoff Reports were themselves notorious *or* if the facts regarding the serious dangers of asbestos were
substantially as depicted by that which was publicly available and notorious to the reasonably competent
underwriter, then the Insurer will have no basis for annulling the insurance policy.

93     Another subsidiary issue must be dealt with at this stage as it formed an important part of the trial Judge's
reasons. Boudreault J. ruled that notoriety in this case could not be gleaned from foreign media material. I
respectfully disagree with that ruling and adopt the approach taken by the Court of Appeal. There are numerous
reasons in this case which justify a preliminary assumption that the reasonably competent insurer would be very
interested in foreign, especially American, newspapers, magazines, reports and manuals. The Policy provided for
world-wide coverage for suits brought in Canada and continental United States. The Insured was a subsidiary of a
U.S. company, and the great majority of its production was for the U.S. market. All of this would have been
apparent from a cursory reading of the Policy and the Annual Report, the latter document being that of the U.S.
parent of the Insured. Furthermore, it is not surprising that the type of insurer which is capable of taking on such
large risks as that of asbestos mining and manufacturing with world-wide distribution is also an insurer with
international connection or offices. The Insurer in the present case had offices in Canada and the United States.

94     I agree with the trial Judge that the Court cannot assume that the Insurer has read and noted all of the
"staggering" quantity of reading material which was put in evidence by the Insured. Rather, the Court must judge
whether and to what extent the material is evidence of that which would have been notorious to a reasonably
competent underwriter, and whether such material as was relevant would have rendered the Selikoff Reports
notorious or provided a reasonably clear picture of the nature and severity of asbestos-related health risks.

95     With these considerations in mind, it will now be possible to consider the materials which have been placed in
evidence and to assess the extent to which these contain facts which should have been notorious to the reasonably
competent underwriter underwriting similar risks in the same industry in 1970 when the Policy was first formed.

96     As noted earlier, the trial Judge based his assessment of "public notoriety" on the basis of a test which limited
the exception to matters which were publicly available and notorious to the general public. Rothman J.A. did not
expressly reject this test although his analysis seems clearly to have been based on the idea that a minimum of
diligence and professionalism should be expected of the insurer. He stated that facts which were well-known within
the industry were not notorious by that reason alone. The notoriety had to extend beyond the industry so as to be the