50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C. 161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

type of information which could be well known to insurance underwriters as well. Rothman J.A. felt that all of the North American materials were potentially relevant, and in the end he concluded that the material in the Selikoff Reports was sufficiently public and notorious that an insurance underwriter ought to have known of its existence. If any precisions or details contained in the Reports had been required, the most superficial research would have brought forward such information. I am generally in agreement with the approach taken by Rothman J.A., and I have already set out my reasons for applying a test of notoriety from the point of view of the reasonably competent underwriter rather than the well-informed member of the general public. I turn now to the application of test to the facts of this case.

### Application of the Test in Art. 2486 C.C. to the Facts

97    What would have been notorious to the reasonably competent underwriter insuring risks in the asbestos industry in 1970? The record indicates that none of the employees of the appellant who were called to testify at trial were at all aware of the health dangers associated with exposure to asbestos in 1970. The trial Judge summarized this testimony at pp. 726-727 of his judgment [[1985] C.S. 719]:

> All plaintiff's employees involved in the underwriting of the risk testified that in 1970 and in 1973 they knew little about the asbestos industry and even less about the existence and extent of any asbestos-related health-hazards. While the Court is dismayed by these employees' lack of attempts to fill in the gaps of their ignorance particularly considering the large coverage requested, it has no real reason to not accept their testimony in this regard.

Earlier in the judgment, Boudreault J. attributed even less knowledge to the appellant's underwriting team: "they all testified that they knew very little about asbestos and nothing whatsoever about asbestosis" (p. 726). The appellant's independent expert witnesses also stated that they had no knowledge of asbestos-related health risks in 1970.

98    The experts called by the respondent provided a different picture. The medical experts and officials within the asbestos industry could be expected to have specific knowledge regarding such health risks, but the insurance experts also professed to have had some knowledge of asbestos and asbestosis in 1970. One expert stated that he had first heard of asbestosis in the 1930s.

99    After reviewing the evidence, I find it difficult to believe that a reasonably competent insurer in the asbestos industry in 1970 would not have been aware of the type of risks alluded to in the Selikoff Reports. It seems clear from the journals, newspapers, magazines and manuals which are discussed in detail in the courts below that asbestos-related health risks had spread well beyond the boundaries of industry knowledge and were in wide public circulation. As stated earlier, the reasonably competent underwriter cannot be expected to know matters which are known only by those inside the industry. Naturally, even when information has moved into the public sphere it does not immediately acquire the status of notoriety even amongst competent underwriters in that industry. However, notoriety in that group will normally be reached well before it has been achieved in the public as a whole.

100    Boudreault J. was only concerned with notoriety in the public at large. Writing in 1985 he could say that by then the health hazards relating to asbestos were notorious even to the general public (C.S., at p. 729):

> Today, very few residents of this province and probably of this continent would not be aware of the existence of some health hazard related to asbestos and such existence would, in all probability, fall within the exception of article 2486 C.C. Of course, the question must not be asked as of today, but as of the inception of the policy and as of its later renewal.

Returning to 1970, then, the trial Judge felt obliged to conclude that public notoriety, as he defined it, did not exist.

101    I have noted a number of problems that I have with the test as set out by the trial Judge and with the way he applied it. The relevant group is not the public but the reasonably competent underwriter providing insurance in the

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

industry. Accordingly, the sources of information which are relevant in determining what such an insurer would have known are those which are relevant to the types of risks which were insured. As stated earlier, there are very good reasons why the reasonably competent underwriter would be very interested in American as well as Canadian media materials.

102    Taking this larger pool of information into consideration and applying the test of the reasonably competent insurer in the industry, I must agree with a unanimous Court of Appeal. I adopt the conclusions of Rothman J.A. on this point, at pp. 2656-2658 [[1988] R.J.Q. 2651]:

> With great respect, I do not agree that the facts involved in asbestos-related health risks were not of a kind that the insurer should be presumed to have known.
>
> Quite apart from the many studies and reports on asbestos-related health hazards published in various medical and scientific journals prior to the issuance of the policy, there were numerous articles published in newspapers across Canada and in the United States dealing with asbestos-related health hazards, including those mentioned in the Selikoff reports. Many of these were published prior to the issuance of the policy in 1970 and its renewal in 1973.
>
> . . . . .
>
> Nor, with respect for the opinion of the trial judge, do I believe we can ignore the articles published in American newspapers and magazines when assessing the public character and notoriety of the facts in question. There may well be a question of weight or appreciation of the likely impact of those publications on an insurer in Canada, but the evidence would certainly be relevant and admissible.
>
> In this case, some of the articles in question were not published in obscure publications. These were prominent articles in the *New York Times*, the *Wall Street Journal, The New Yorker Magazine, The Washington Post* and others.
>
> On October 12, 1968, for example, *The New Yorker* carried a lengthy article by Paul Brodeur describing in some detail the work of Dr. Selikoff and his associates and the very high frequency of asbestosis among asbestos insulation workers. A new [sic] story appeared in the *New York Times* on the cancer risks as early as October 7, 1964, again quoting Dr. Selikoff. Canadians, and Canadian insurers in particular, are not isolated from the mainstream of news and knowledge in North America and, in my respectful opinion, these American articles were relevant to the issue of the public character of asbestos fibre hazards, at the very least as a complement to the Canadian material that was put in evidence.
>
> These articles in the media were not all concerned with the high frequency of asbestosis mentioned in the Selikoff reports. Many were concerned with lung cancer and other diseases. And not all suggested that the health hazards of asbestos were serious. But taken together, they indicate that there was widespread public discussion of asbestos-related health hazards and considerable indication of very high frequency of lung disease among insulation and other workers exposed to asbestos fibres over long periods.
>
> . . . . .
>
> It is doubtless true that the public in general and insurance underwriters in particular are more aware of the health risks of asbestos fibres today than they were in 1970 when the policy was issued or in 1973 when it was renewed.
>
> But, with respect, even then, these risks and the Selikoff reports were common knowledge in the asbestos industry. Beyond the asbestos industry, the risks, and the Selikoff reports themselves, had been widely and publicly discussed in the media. Given the public discussion at the time, insurance underwriters ought to have been alerted to the health risks of asbestos fibres. They may not have been aware of the precise statistical data contained in the Selikoff reports, but they certainly ought to have known that serious asbestos-related health risks had been reported.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

The Selikoff reports were not confidential or private reports prepared on behalf o[f] Johns-Manville or any of the asbestos producers. They were publicly available reports published by a research team at a major U.S. teaching hospital. They were easy to obtain by anyone interested and just as easy to read and understand.

Did all of this lend a 'public character' and 'notoriety', within the meaning of *Article 2486 C.C.*, to the asbestos-related health risks that existed in 1970 and 1973? In my respectful opinion, it did.

As a starting point, I do not think one can ignore the fact that the health risks were common knowledge in the asbestos industry itself, an industry of some importance in Quebec. An insurance underwriter may not be presumed to know all of the technical intricacies of all the trades and industries he insures, but surely he ought to know something of a serious health risk that was common knowledge in a major industry and was widely reported in the public media as well. As Professor Louis Baudouin observes: a minimum of diligence and professionalism should be expected of the insurer [L. Baudouin, 'Reflexions sur l'article 2487 C.C.' (1960), 20 *R. du B.* 330].

. . . . .

I acknowledge that what is common knowledge in any given trade or industry is not, on that account alone, always notorious and it may not always have a public character. But here, knowledge of the asbestos-related health risks went far beyond the asbestos industry.

The risks of asbestosis were prominently reported in scores of newspaper and magazine articles across Canada and the United States prior to the issuance and the renewal of the policy. The Selikoff findings were widely reported. While it is true, as the trial judge suggests, that these reports may not have appeared with great frequency in the same city, that, in my respectful view, does not diminish the public character or notoriety of the facts reported. How many newspaper and magazine articles does it take to lend a 'public character' and 'notoriety' to the fact that a product presents serious health risks? Surely, in some circumstances, even one prominent report might suffice.

Apart from newspaper and magazine articles, moreover, the risks of asbestosis were mentioned in publications as diverse as the *Encyclopedia Britannica*, 1963 edition, and *Business Insurance*, January 3, 1972, to say nothing of the hundreds of articles in scientific journals that were available to anyone seriously interested in the technical aspects of these health problems. Asbestosis was included as an industrial disease in the *Workmen's Compensation Act* as early as 1943.

103    I conclude, therefore, along with the Court of Appeal, that the insured was not bound to disclose the Selikoff Reports to the insurer because the latter was presumed to know the same or substantially the same information by virtue of its public character and notoriety. It is also clear in this case that the Insurer fell well short of the standard that could be expected of a reasonably competent underwriter insuring the asbestos industry.

104    The case can be decided on this point alone. I propose, however, to deal with the other defences raised by the insured in this case, and to address the larger questions of adequate disclosure and the good faith nature of the insurance contract. I will then conclude with a consideration of the argument based on fin de non-recevoir.

**VI Adequacy of Disclosure Made by the Insured and the Insurer's Duty to Inquire**

105    In this section I will deal with the defences based on the adequacy of the respondent's actual disclosure, on the customary practices adopted by the insurance industry, on the common law doctrine of constructive knowledge and on the warranty regarding the insured's business operations.

*Adequacy of Disclosure*

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

106    The trial Judge found that the information regarding the serious dangers associated with asbestos was material to the assessment of the risk, and the Court of Appeal agreed on this point. Unless an exception could be said to apply, it followed from art. 2485 C.C. that this type of information should normally have been disclosed to the Insurer. While it cannot be disputed that reference was made in the Johns-Manville Annual Report to the Selikoff research, I agree with the lower courts' conclusion that such references fall short of substantially full and fair disclosure of the serious risks associated with asbestos. The argument based on the adequacy of the disclosure could not succeed, then, unless the respondent could show that a lesser standard of disclosure applied in this case, either as a result of the art. 2486 C.C. exception already examined, or in accordance with a legally recognizable custom.

### Customary Practices in Insurance

107    It is quite clear from the evidence presented at trial that the disclosure actually made by the Insured met the usual standards applicable to a Comprehensive General Liability Policy ("CGL Policy") in the early 1970s. The Insured did not make a written application and was not requested to do so by the Insurer. Instead, the Insurer received a placement slip which set forth a general description of the Insured's operations, a list of the insured's claims experience and the Annual Report referred to above. The Insured's experts indicated that a custom had developed which called for a lower level of disclosure from the Insured. Mr. Russell provided the following explanation:

> Q. *Now why was it not the custom to give any more information at the start,* always bearing in mind that this is a comprehensive general liability policy that you are supposedly writing or doing something about and in 1970?

> A. Well you mean here you are inquiring about the whole process of getting the insured and the insurer together, and *following again along the lines of a comprehensive general liability concept you would start off by giving the insurer general information and then allow the insurer to come back with more detailed questions,* because oftentimes the risks are so varied and quite spread that it is more on the side of the expert, the insurer to ask the questions and it makes it easier. Or it is fairer rather than expect the insured to dream up the kind of detailed information that might be required by the underwriter to assess the risk. [Emphasis added.]

The testimony of the Insured's other expert witnesses is consistent with this view.

108    At the oral hearing, counsel for the Insurer presented notes in reply to the argument based on custom. The Court was referred to parts of the testimony in which it was stated that it was not the custom to inspect or investigate the risks which were to be insured. This testimony came from witnesses who were associated with the Insurer, Canadian Indemnity Company. The Insurer's independent expert did not comment on the existence or non-existence of such a custom.

109    Whatever the true state of customary practices with respect to CGL Policies in early 1970s, we must consider the question whether the rules imposed by the Civil Code concerning the formation of insurance contracts can be modified by custom. Article 1024 C.C. already recognizes that a contract includes obligations which are not expressed but are nevertheless binding by reason of equity or usage:

> 1024. The obligation of a contract extends not only to what is expressed in it but also to all the consequences which, by equity, usage or law, are incident to the contract, according to its nature.

By contrast, art. 2485 C.C. does not deal with the consent of a contract but deals instead with the necessary prerequisites to its formation. The issue before this Court then is whether this provision is of public order such that parties may not by derogation or waiver reduce the amount of disclosure necessary for the formation of an insurance contract.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

110    The respondent has cited a number of authorities for the proposition that business persons are presumed to be aware of customs of the trade which may in certain circumstances create exceptions to the generally applicable rules of law. For example, M. Balthazard-Marie Émérigon noted in his eighteenth-century *Traité des assurances et des contrats à la grosse*, t. II, Marseille, Jean Mossy, 1783, that customary practices have force of law between insurers and insureds, at pp. 352-353:

> [TRANSLATION] In deciding cases between Insured and Insurers, we must look at custom established in the business.
>
> In such matters, custom has the force of law.

Duer, op. cit., expressed the same view in his nineteenth-century text, at pp. 581-582:

> It remains only to state that the question whether it was the duty of the assured to communicate the facts, in the first instance, or that of the underwriter to seek the information by a proper inquiry, may in some cases depend upon the existing usage, as between the underwriters and the assured. That is, the usage may create an exception from the general rule of law, that the court would otherwise apply, if the existence of the usage has been affirmed by the verdict of the jury.

More recently, in *Century Insurance Co. of Canada v. Case Existological Laboratories Ltd.*, [1983] 2 S.C.R. 47 at p. 56, 2 C.C.L.I. 172, 48 B.C.L.R. 273, 49 N.R. 19, 150 D.L.R. (3d) 9, [1983] I.L.R. 1-1698, Ritchie J., speaking for the Court, stated:

> Finally, the appellants contend that the insured failed to disclose to them circumstances which were material to the risk as required by ss. 19 and 20 of the *Insurance (Marine) Act (supra)*. In the circumstances of this case regard must be had to the custom of the marine insurance business which is in my view accurately described by Lambert J.A. in the following paragraph of his reasons for judgment:
>
> > In accordance with custom, the ship owner asked an agent to obtain the insurance and, again in accordance with custom, the agent retained a marine surveyor whose report was provided to the insurance underwriter. In this case the particular marine surveyor was proposed by the underwriter and there is no doubt that the owners of the Bamcell II made complete disclosure of all material circumstances to him.

That case came to the Court from the province of British Columbia.

111    The difficulty with these statements is that provisions such as art. 2485 of our Civil Code may have been intended to put an end to customary practices which were perhaps seen to be inappropriate. Article 2485 C.C. is one expression of the principle that the contract of insurance is an uberrimae fidei contract. The insured must disclose all facts relevant to the acceptance of the risk because it is in the best position to know these facts. The acceptance of customary practices could dilute this principle.

112    However, it must also be noted that the rule in art. 2485 C.C. is imposed for the benefit of insurers who may wish to waive the strict rule and to adopt practices which are less stringent but more practical. In this case, the custom of requiring only general information from the insured where a proposal is made for a CGL policy was based on a desire to avoid an information overload. In his testimony, Mr. Russell noted that it is more practical to let an expert underwriter determine what information is necessary to assess the risk rather than to let a lay person decide what parts of a huge array of information are material to this assessment. For example, the Insured could have provided all the studies made by its engineers on the stability of the soil in its mines as well as all the research done with respect to its manufacturing endeavours. The reasons which give rise to such a custom of reduced disclosure for CGL policies are obvious, and the courts should not interfere with established commercial practice unless the Code calls for a hard and fast rule.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C. 161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

113    In my opinion, even though the obligation to disclose is part of the obligation to act with the utmost good faith, I do not believe that art. 2485 C.C. is of absolute public order. It is noteworthy that the present article dealing with disclosure (art. 2485 C.C. as adopted by S.Q. 1974, c. 70) is of relative public order in that any stipulation to the contrary is without effect "[e]xcept to the extent that it is more favourable to the policyholder or to the beneficiary" (art. 2500 C.C.). I do not think that the reform of insurance law adopted in 1974 was meant to change the law with respect to the duty to disclose and the right of the parties, insurers in particular, to alter the strict provisions on disclosure.

114    I do not, however, feel that it is appropriate in this case to come to any firm conclusion on this point. The point was not argued in any detail, and the trial Judge does not appear to have found it necessary to deal with the argument, indicating perhaps that the argument was developed at a later stage in the appeal process. The respondent's expert witnesses spoke convincingly regarding the existence of a custom requiring a lesser degree of disclosure. I would, ideally, require more firm evidence on this point in order to address the appellant's argument to the effect that the usage in question must be [Translation] "uniform, public, of long duration and frequent". In any event, it is not necessary to decide this matter, owing to the success of the Insured's argument based on art. 2486 C.C.

### Constructive Knowledge

115    I would like now to touch on the Insured's argument regarding the existence of a principle to the effect that an insurer will be deemed to have constructive knowledge of facts which it has the means of discovering but which it fails to investigate by means of questions, inspections, etc.

116    The respondent once again cites various pre-codification authorities in support of this proposition. Duer, op. cit., at pp. 566-567, set out the principle, citing British and French cases as authority:

> Where, from the facts communicated to the underwriter, he is bound to infer the existence of other facts, not disclosed; his omission to make the inquiry, is an implied waiver of a more explicit disclosure.

Another of the Commissioners' authorities, Isidore Alauzet, *Traité général des assurances*, t. 2, Paris, Cosse, 1844, expressed a similar view regarding the principle of constructive knowledge, at p. 412:

> [TRANSLATION] In submitting something for insurance, the owner is required to make exact and specific statements so as to give the insurer complete information about the subject-matter of the contract, its value and the risks to which it is exposed. Uniqueness is the general rule in an insurance contract; it is thus necessary to describe what the contract covers. However, an insufficient description would not be a basis for cancelling the contract if the insurer otherwise had sufficient knowledge of the subject-matter, or if there were in the policy certain statements which, though incomplete, could be used to establish what the subject-matter was or determine its identity.

Whatever the status of this principle prior to the codification, and whatever its practical merits, I cannot agree that it, any more than the doctrine of presumed knowledge, survived the codification and can now be recognized as an independent principle of insurance in the law of Quebec. If it exists at all, it has been wrapped up, along with the principle of presumed knowledge, into art. 2486 C.C. and the concepts of public character, notoriety and the reasonably competent underwriter.

117    Following the test in art. 2486 C.C., I do not see how an insurer can be expected to make inquiries based merely on clues which might be present in the facts provided by the insured. In the present case, the respondent claims that by not investigating the "clues" in the Annual Report regarding the health risks associated with asbestos, the Insurer waived any right it might have had to more information. Taken by itself, I cannot accept this proposition. Article 2485 C.C. indicates that the insured must provide more than clues; it must show the utmost good faith in providing full and fair disclosure of the facts which are material to the risk.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

118    However, even full and fair representation will not usually provide an insurer with all precise specifications and details regarding a material fact. As noted earlier, art. 2489 C.C. indicates that the insured fulfils its duty of disclosure when the fact is "substantially as represented and there is no material concealment". If the insurer wishes to have more precise information then it must inquire or investigate. The same is true in cases where the material fact is substantially as depicted by its public character and notoriety. If the insurer requires more detail, then it will have to look more closely at details which are by definition open to it.

119    It may be that in normal circumstances the insurer will not have to inquire or investigate at all beyond the preliminary gathering of basic information. As long as the material facts are available through the insured's representations or through public character and notoriety, the insurer will be equipped to evaluate the nature and ex tent of the risk and to set the rate of premium. If additional detail is desired, the insurer may wish to make further inquiries, but it is of course not required to do so, and likewise it cannot fault the insured for not providing such details.

120    The situation will be somewhat different, however, where an insurer is underwriting risks in an industry for the first time. If other insurers regularly cover risks of that type in that industry, then the insurer will be expected to have the general knowledge of the reasonably competent underwriter in that industry. Accordingly, a first-time insurer will be expected to acquire by various means that minimum level of knowledge. It may do so in whatever way it chooses.

121    It may have been too late by 1970 for the Insurer to take advantage of most of the various media sources which were described in detail by the courts below. Nonetheless, the first-time Insurer was not without resources. Encyclopedias, journals and manuals were available, not to mention the wealth of information in the IOEH library. It is not for this Court to suggest to the Insurer how it should run its business. It is sufficient to say that an insurer must find various means by which it can bring itself up to the level of the reasonably competent underwriter providing insurance in the industry in question.

122    The most potentially fruitful source of information for the insurer is the insured. The insured is already required to represent fully and fairly every fact which shows the nature and extent of the risk. This requirement may in certain circumstances be modified by custom or contract. I have left these considerations aside for the purposes of this appeal. The requirement of full and fair disclosure will also be modified to take into account facts known to the insurer and facts which it can be presumed to know by virtue of public character and notoriety. Normally, then, the insurer will already have a considerable amount of information on which to base its decision to undertake the risk and the setting of the premium. It is only with respect to such information as the reasonably competent underwriter is presumed to know that the first-time insurer may require help, either from reference sources or from the insured itself. The insured may be asked questions and will be required to answer diligently. The insurer may also decide to make up for its lack of familiarity with a particular type of risk by conducting inspections.

123    It is not surprising, given the public character and notoriety of the information in question, that only a minimum of questioning or a brief inspection would have informed this Insurer of the nature and severity of asbestos-related risks which it was about to underwrite for the first time. The Insured stated clearly that it was involved in the mining, manufacturing and sale of asbestos, pointing the Insurer to a series of useful questions on the nature of asbestos and asbestos products. While the Annual Report was not sufficient on its own to amount to full and fair disclosure, it did mention the Selikoff research in association with health risks, and a question pointed in this direction would surely have produced useful information. An inspection of the premises would have revealed large numbers of bags of asbestos, each labelled (since 1968) with a caution which read as follows:

**CAUTION**

This bag contains chrysolite asbestos fibre. Persons exposed to this material should use adequate protective devices as inhalation of this material over long periods may be harmful.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

124    Again, my purpose is not to suggest that the Insurer need have used any particular method. It is sufficient to
state that there were many means at its disposal in order to bring itself to the minimum level of knowledge of
asbestos industry risks which was expected of a reasonably competent underwriter insuring similar asbestos industry
risks.

125    The idea that an insurer might have to inquire or inspect in order to become familiar with a new risk is not a
novel concept in the insurance industry. References to such a way of proceeding can be found in much of the
literature presented in evidence and in some of the documents provided by Canadian Indemnity to its employees.

126    In an article entitled "Current problems and trends in products liability" (1967), 34 Canadian Underwriter 24,
at pp. 24 and 26, Len Harding wrote the following:

>  It is imperative for the underwriter of products liability to have a complete understanding of the risk he is
>  assuming in order that he can determine the limits of liability he is prepared to grant and to develop an
>  adequate rate for the risk.
>
>  . . . . .
>
>  In considering application for products liability insurance from a manufacturer, the underwriter should
>  consider the following points
>
>  . . . . .
>
>  *1. The process of manufacture ...*
>
>  *2. Enquiries should also be made as to the source of supply of the raw materials or components which
>  are to form part of the product being manufactured ...*
>
>  . . . . .
>
>  Apart from obtaining a complete description of the proposer's products, it would be prudent to ask the
>  following general questions:
>
>  *1. Are the products inherently dangerous?*
>
>  *2. Can the products create damage by unexpected use or mixture with another product?*
>
>  *3. If the products are for human consumption or application to the human body, what are the
>  possibilities of claims for allergy?*
>
>  *4. Have the products been properly researched, and approved by the appropriate authorities?*
>
>  *5. Are the products properly labelled?*
>
>  *6. What method is used for distribution of the products?*
>
>  *7. Are the products likely to be repackaged by another party before they reach the ultimate consumer?*

127    In the course of the examination in chief of Mr. Armour, an expert witness for the Insured, selected passages
were quoted from the 1971 version of the Canadian Indemnity *Casualty Liability Manual*. In the section entitled
"Introduction: Liability Insurance", the purpose of the manual was stated:

>  The purpose of these instructions is to outline our various forms, pointing out the intention of the policy,
>  the coverages, the exclusions, and outlining our Company's attitude toward the various classes of risks and
>  to the underwriting practices to be followed.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

The section on "Branch Office Authorizations" concluded with the following statement:

> It is the responsibility of the Branch Offices to order inspections, either by our Company Inspectors or
> Retail Credit Reports, depending on the circumstances, on all risks where there is an unusual or increased
> exposure and copies of such reports are to be forwarded to Head Office.

Most significantly, the manual provided some words of caution regarding new risks:

> No automatic facilities for those risks unfamiliar to the underwriter. The underwriter is the best person to
> decide whether or not he has some experience with the class of risk in question. Better that he should make
> a nuisance of himself in terms of discussing rates with others in the branch or with head office than to be a
> hero and perhaps unwittingly commit the Company to an undesirable underwriting situation.

128    I include these excerpts simply to show that an insurer will sometimes make its own inquiries rather than rely
on the facts provided by the insured. In many cases, the law will not require such added precautions. The insurer
may make additional inquiries simply in order to avoid any possibility of confusion. It may even probe areas of
concern which are legally subject to the insured's duty of representation. Caution is no doubt a good policy, but the
law does not require it in all situations. In my view, the Civil Code does, however, require that an insurer make
inquiries in a situation where it is for whatever reason less informed on matters which, because of their public
character and notoriety as seen from the point of view of a reasonably competent underwriter, this insurer is also
presumed to know. As stated earlier, the Court will not insist that the insurer acquire such knowledge by any
particular means; however, it will assume in such circumstances that the insurer has the knowledge by the time it
decides to underwrite a risk.

129    In this case, both the trial Judge and the Court of Appeal found that the appellant knew little about the
asbestos industry. The record reveals that the underwriting trainee who handled most of the case treated the matter
as a mining risk and did not turn his mind to product liability factors. The assistant casualty manager at the
Winnipeg Head Office of Canadian Indemnity who eventually provided authorization to the underwriting trainee
first inquired whether this was a "new biz", which he later interpreted in his testimony to mean a new client. Despite
the fact that Canadian Johns-Manville was a new client and asbestos a new industry risk the file was authorized in
under 1 hour.

130    In cases such as the present where the underwriter has never before insured a particular type of risk, the
insured is nonetheless entitled to assume that it is dealing with a reasonably competent underwriter. If the
underwriter does not have the requisite level of knowledge prior to considering an insurance risk, it is not
disqualified from assuming the risk, but it will naturally be expected to ask a greater number of questions or find
other means of acquainting itself with the industry. This does not flow from the principle of constructive knowledge;
it is the logical consequence of the rule in art. 2486 C.C. that the insured need not disclose those facts which his
insurer is presumed to know, that is, those facts which, by virtue of their public character and notoriety, would be
known to the reasonably competent underwriter insuring risks in the industry.

131    The appellant claims that an insurer has no duty to inquire and cites three relatively recent cases in support of
this proposition. The appellant first cites the case of *Alliance Insurance Co. of Philadelphia v. Laurentian Colonies
& Hotels Ltd.*, supra, at p. 256 [Que. Q.B.], where McDougall J.A. made the following statement:

> Where no inquiry is made by the insurer, there is still a duty on the part of an assured to disclose the
> material facts. This is clearly implied from the rule laid down by Lord Mansfield in *Carter v. Boehm*.

McDougall J.A. was stating a fundamental rule with respect to the insured which has been codified in art. 2485 C.C.
He does not appear to be providing a comprehensive statement regarding the duties of the insured. In the paragraph
which follows the one quoted above, he does, however, give some indication that the insurer's behaviour may
influence the duties of the insured (at p. 256):

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

> Where questions are asked by the insurer, the applicants' duty of disclosure may be altered. In *Joel v. Law Union and Crown Insurance Co.*, Vaughan Williams L.J. put the point this way: If the proposer is asked to state how many fires he has had in the last three years, the specification of a precise period will relieve him from the duty of disclosing a fire which happened five years before.

It seems to me that this case supports the view, expressed earlier, that the insurer may be seen in certain circumstances to have lessened the burden on the insured otherwise imposed by art. 2485 C.C. This case cannot support the conclusion sought by the appellant to the effect that the insurer has no duty to inquire under any circumstances. The case is at best silent on that point.

132    Stronger authority for the appellant's argument can be found in two other recent cases: *Fidelity & Casualty Co. of New York v. General Structures Inc.*, supra, and *Angelillo v. Prévoyance, Cie d'assurances*, supra. In the *Fidelity* case, the insurer alleged that certain answers given by the insured in the proposal amounted to misrepresentations. The insurer therefore contended that the policy was null and void. In particular, the insurer was informed that there was a partnership between the insured and another party when in fact the partnership had ceased to exist. The insured claimed that the insurer knew of the real nature of the business relationship. De Grandpré J. stated that if the insurer had any knowledge it could only have come from the documents provided by the insured, and that these documents were far from sufficient. Clearly, this case involved neither substantial representation nor public nature and notoriety, and it cannot therefore be said to deny the existence of a duty to inquire in those situations. It emerges clearly from the passage quoted by the appellant that the absence of a duty to inquire was particular to the circumstances of this case. De Grandpré J. somewhat sarcastically referred, at p. 1109 [S.C.R.], to the insured's address as the sole fact which provided a means for the insurer to discover this particular information:

> The most one can say in favour of respondent's argument, in view of the fact that the address of the insured is given in the policy as c/o respondent, 50 Place Crémazie, is that this document could have prompted appellant to seek further information. There was no obligation to do so in the circumstances, and I entirely agree with the following extract from the reasons of the trial judge:
>
>> [TRANSLATION] The fact that the garnishee [insurer] would have been wiser to conduct a detailed inquiry cannot prevent him from seeking that annulment of the contract.
>
>> The questions which the insured must answer are put so as to avoid subjecting business transactions to excessively long and burdensome inquiries.
>
> *Neither in law nor in fact did the insurer know the real situation.* Accordingly, he did not waive the possible effects of these false statements noted by the trial judge. [Emphasis added.]

The appellant did not quote this last paragraph. I take de Grandpré J. to be suggesting there that the situation might have been different if by the terms of art. 2486 C.C. the insurer either knew or could be presumed to know the real situation. In such circumstances, it would have been quite normal for the insurer to ask questions if it wished or was required by law to supplement its knowledge.

133    The appellant also cites the *Angelillo* case in support of its contention that the insurer has no duty to inquire. The appellant quotes the following passage from the reasons of Kaufman J.A., at p. 310 [[1983] C.A. 305]:

> Unfortunately for the Appellant, the law as it existed in 1974 'obliged' the insured 'to represent to the insurer fully and fairly every fact ...', and I am unable to say, particularly in the light of the amendments, that, in 1974, the insured was entitled to withhold information simply because the insurer (or its agent) had failed to ask the 'right' questions.

Kaufman J.A. was referring to the 1974 changes to the Civil Code which require that both the policy holder and the insured must fully and fairly disclose all material facts. The information withheld in *Angelillo* was a threat of arson

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

which was known to the insured and could not be known to the insurer. Seen in this light, Kaufman J.A.'s statement to the effect that it is not up to the insurer to ask the right question is both logical and legally sound. It is a simple application of the rule in art. 2485 C.C. Kaufman J.A. made no statement as to the duty of the insurer to inquire where the insurer is unfamiliar with the risk and is insuring that type of risk for the first time, or where the insurer already has substantial knowledge of the facts through disclosure or public notoriety and can be expected to ask further questions if further details are required.

### Warranty as to the Insured's Business Operations

134    The Insured claims that it was not obliged to disclose serious dangers associated with asbestos because these were facts concerning the operation of the business, a matter which was declared in the form of express warranty. The Insured further argues that because asbestos (and consequently asbestos dangers) was covered by the warranty and because the Insurer failed to ask any questions, the Insured was not obliged to make any further disclosures.

135    The argument is based of course on art. 2486 C.C. which states in part:

> nor is [the insured] obliged to declare facts covered by warranty express or implied, except in answer to inquiries made by the insurer.

In the policy, the Insured identified its business operations, and warranted that the declarations were true, as follows:

> The following Declarations are warranted by the Insured to be true, and the Policy is issued in consideration thereof.
>
> . . . . .
>
> 3. Business Operations
>
> All operations of the Insured, consisting principally of, but not limited to, mining, manufacturing and sale of asbestos.

136    The Insured then argues that on the authority of *Norwich Union Fire Insurance Society Ltd. v. Gaudreau*, [1953] Que. Q.B. 753, such declarations also take in all facts which are notorious in the industry, and that failure on the part of the Insurer to ask follow-up questions will result in acceptance of the risk. In the *Norwich* case, St-Jacques J.A. affirmed the decision of the lower court in which it had been decided that the insured, the owner of an establishment, described in the policy as a [Translation] "retail grocery and butcher's shop", was not required to inform the insurer that the shop allowed customers to grind their own meat. The insurer had sought to nullify the policy, arguing that the insured was obliged to disclose this fact in accordance with art. 2485 C.C. St-Jacques J.A. quoted the trial Judge's response to this argument, at p. 757 [C.S.]:

> The Court finds that it is not such a fact [as must be disclosed in accordance with art. 2485 C.C.]. The practice of allowing persons to hash their own meat in butcher shops in and about the vicinity of the public market in Magog is, according to the proof, general enough as to be public in character and notoriety in the trade and which the defendant in warranty is presumed to know (C.C. 2486). Here the insurer asks no questions which would help the insured in determining what the insured has in mind with respect to the meaning of the phrase ['retail grocery and butcher's shop'], but has chosen to rely on the general declarations as to the occupation of the premises as a butcher shop. This declaration is in fact true and therefore the defendant in warranty must take the risk involved.

137    It seems to me that the *Norwich Union* reasoning is based primarily on the notion of public character and notoriety discussed earlier. It is consistent with the view that if a fact is substantially as depicted by public character and notoriety, properly interpreted, then where the insurer requires more specific or detailed information it must ask questions or investigate. The *Norwich Union* case also appears to add the point that the insurer cannot simply rely on

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

a declaration even in the form of a warranty. The warranty must of course be true, but it does not relieve the insurer of the responsibility of taking note of facts which the insurer is presumed to know according to the notoriety test in art. 2486 C.C.: the meat grinding system in *Norwich* and the nature and severity of the asbestos-related health risks in the present case.

138    Accordingly, I do not feel that the respondent's argument on the warranty adds anything to the analysis which has been developed thus far.

### VII The Uberrimae Fidei Nature of the Contract of Insurance and the Issue of the Insurer's Negligence

139    It would not be appropriate in these reasons to embark on an elaborate discussion of the principle of uberrimae fidei in the contract of insurance. The point was argued only briefly by the parties.

140    The notion of uberrimae fidei is often rightly mentioned in the context of the insured's duty to disclose. The corresponding duties of the insurer receive less frequent mention, and I propose to make a few general comments here on that subject.

141    Both of the lower courts noted that the parties acted in good faith. The trial Judge made this point very clear but also added, at p. 739 [C.S.], some observations regarding the negligence of the Insurer, plaintiff at first instance:

> In the same manner that the insured's good faith is not, by these proceedings, put in question, that of the plaintiff is not either. Notwithstanding that the plaintiff's underwriters, in the Court's opinion, did not show in accepting the risk the care which one would have expected in the premises, there is no evidence whatsoever of fraud or fraudulent intent. Thus the presumption of good faith of our law must prevail.

Elsewhere in the reasons of the trial Judge, the negligence of the Insurer was described in greater detail. Boudreault J. found, at p. 736 [C.S.], that it was

> difficult to comprehend how an extensive comprehensive general liability policy covering for very large sums almost every type of claims could have been allowed by plaintiff to be underwritten basically by an underwriting trainee whose recommendation appears to have been almost rubber stamped by more senior personnel whose knowledge of the asbestos industry was as deficient as his.

142    Other parts of the judgment at first instance make clear that the Insurer was "negligent"; that its underwriters had little or no knowledge of the asbestos industry; that they made no attempt "to fill in the gaps of their ignorance particularly considering the large coverage requested" (p. 727); that they did not show in accepting the risk "the care which one would have expected" (p. 739); that the Insurer asked no questions and requested no additional information regarding asbestos; that it did not conduct even the most simple research; that it "accepted the risk almost blindly" (p. 736); that it showed "negligence in issuing the policy" (p. 737); and that it did all this despite the fact that the policy was the first asbestos risk that it had ever underwritten.

143    The appellant and the trial Judge were quite justified in stating that it is not the negligence per se which deprives the Insurer of its right to demand the nullity of the contract. A more diligent attitude certainly decreases the chances of being caught unaware, but the law will not forgive the insured its failure to disclose material facts unless the insurer knew of such facts (and here it clearly did not) or can be presumed to know because the matter is of the type that would be notorious to the reasonably competent underwriter. As stated earlier, an insurer which is underwriting risks in an industry for the first time will have to find ways to bring its knowledge up to minimum level. It cannot simply rely on the insured and later place the blame on that insured for the gaps in knowledge of the risk. To do so would not be fraudulent, but it would certainly amount to bad faith.

144    Articles 2485 and 2486 of the Civil Code provide separate indications as to the uberrimae fidei nature of the insurance contract. The taking on of an insurance risk is made very difficult if the insurer cannot rely on the full and fair disclosure of the insured regarding facts material to the risk. Without such information, the insurer will be

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

unable properly to decide whether to accept the risk and, if so, at what rate to set the premium. It would be unfair to require the insurer to take on the risk without all the relevant facts.

145    Likewise, it must be said that the consequences of the annulment of an insurance contract are very serious for the insured. The insured has almost certainly relied on the validity of the contract and cannot at a later date acquire coverage for a risk which is now perhaps realised. Accordingly, it is in the interests of stability of such contracts that the insured be able to rely on the diligence and professionalism of the insurer so as to avoid having the insurance contract annulled on the basis of facts which were not disclosed but which should have been notorious to the insurer had it acquired the level of knowledge of a reasonably competent underwriter.

146    Articles 2485 and 2486 C.C. are therefore part of a scheme which encourages the insured to disclose fully and the insurer to know the industry which it insures.

147    In most cases, the system works. However, the courts see the pathology of the insurance business, and, accordingly, justice must be done in cases where the confusion might have been avoided by the diligent action of both parties. In the present case, it is clear that the Insured was in possession of the Selikoff Reports and could have provided the information to the Insurer. The Insurer for its part had at its disposal many different means of acquiring the minimum level of knowledge expected of a reasonably competent underwriter and ap pears to have taken advantage of none of them. Because such material facts as were contained in the Selikoff Reports were substantially as depicted by that which was publicly available and notorious to the reasonably competent underwriter, it is the Insurer who must bear the burden of its failure to inform itself properly. Had the asbestos-related risks been less well-known in 1970, the Insured would have had to bear the burden, and the insurance contract would have been annulled. The same result would have occurred if it had been established that the Insured fraudulently misrepresented or concealed these facts. There was no such allegation in this case, nor did the trial Judge make any suggestion to that effect.

148    Clearly, both parties are required by law to treat the contract of insurance as an uberrimae fidei contract. The insured will disclose fully and fairly or face the annulment of the contract, and the prudent insurer will ensure that it acquires a good knowledge of the industry in which it insures or fail to do so at its peril.

**VIII Confirmation of the Contract**

149    The respondent argues in the alternative that the Insurer has confirmed the policy by taking up the Insured's defence in the *Foxworthy* case, a law suit filed in the United States in 1975. The case involved allegations as to the medical consequences of prolonged exposure to asbestos fibres, and, accordingly, the Insured claims that at that point the Insurer had knowledge of the health risks associated with asbestos. The respondent claims that when the Insurer continued to defend the Insured in the *Foxworthy* case, the Insurer tacitly confirmed the policy.

150    This type of defence is better known as a fin de non-recevoir. In this case, the appellant is said to have renounced the right to claim a remedy. The conditions which must be met in order for a party to avail itself of this defence have been set out by Pratte J. in *Bertrand v. Racicot, [1979] 1 S.C.R. 441* at pp. 451-452, 25 N.R. 181:

> Two conditions are necessary for the confirmation of an act which is voidable, knowledge of the defect and intent to rectify it:
>
> > [TRANSLATION] Confirmation whose objective is to eliminate the defect inherent in the obligation requires, by its very nature, that the person from whom it emanates fulfil the two conditions of knowledge of the defect and intent to rectify it. This is true of tacit confirmation as well as of express confirmation.
>
> Aubry and Rau, 5th ed., v. 4, No. 337, p. 438.

Copr. © West 2007 No Claim to Orig. Govt. Works

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

151    Thus, the policy may have been confirmed tacitly by the appellant when it took up the respondent's defence in the *Foxworthy* case. In *Bertrand v. Racicot*, Pratte J. noted that the two conditions precedent to a confirmation may be proved by ordinary means, including presumption drawn from the facts, at p. 452:

> The two factors of confirmation, knowledge of the defect and intent to eliminate it, are facts which can be proved by ordinary means. In the case of tacit confirmation, the evidence clearly cannot be direct but must be indirect or by presumption 'du fait de l'homme'. In this case, the Court infers the existence of the facts to be established from the facts that have been proven. Thus, as Aubry and Rau observe (*ibid.* No. 337, p. 443):
>
>> [TRANSLATION] ... tacit confirmation may be inferred from any act whatever involving intent on the part of the person who could bring an action in nullity or rescission to waive such action and cause the voidable or rescindable agreement to take effect, provided that this intent is certain and not ambiguous.

Confirmation may be presumed where a party to a voidable contract performs the contract or exercises rights established by the contract with full knowledge that the contract is voidable: *Cie J.A. Gosselin Ltée v. Péloquin*, [1957] S.C.R. 15 at p. 17.

152    The trial Judge dismissed this confirmation defence because he found that the appellant did not have knowledge of the defect until November of 1978, the time at which the action in nullity was filed. All of the appellant's representatives at trial denied having knowledge of any actionable concealment of the content of the Selikoff Reports and the trial Judge accepted that evidence. The trial Judge also pointed to authority which indicated that the tacit confirmation must be unequivocal.

153    The respondent argues that this finding of fact was manifestly unreasonable because the evidence shows that the appellant knew at the time it defended the *Foxworthy* case that the respondent had concealed the content of the Selikoff Reports. The respondent refers to newspaper articles which were in the appellant's underwriting file and which state that the respondent knew about the health risks associated with asbestos. The trial Judge rejected this inference as follows, at p. 742 [C.S.]:

> Everyone of plaintiff's representative [sic] denied having such direct knowledge. While the *Toronto Star* article of February 18th, 1975 ... read by Mr. Mussell, who placed it in the head office underwriting file, does indicate serious health hazards arising from the handling of asbestos fibres, it would not in the Court's view necessarily indicate to an ordinarily perspicacious reader of the articles taken as a whole that defendant had, at inception and/or renewal, such extensive knowledge of the dangers associated with asbestos fibres that the breach herein can be inferred to have been known to plaintiff.

154    I am of the opinion that the trial Judge's finding with respect to the appellant's knowledge was not manifestly in error. I am particularly influenced by the trial Judge's distinction between the Insurer's subsequent knowledge of the health hazards associated with asbestos and its subsequent knowledge of the concealment of such information by the respondent. It is the Insurer's knowledge and intent to waive this defect that is the basis for the argument based on confirmation of the contract. Boudreault J. noted that the *Foxworthy* proceedings did not provide the Insurer with any firm information regarding knowledge that the Insured might have had with respect to the asbestos risks. Interrogatories were in fact filed asking the Insured questions which, if answered, would have provided the Insurer with firm information. The action was settled, however, and the interrogatories were never answered. In these circumstances, I hesitate to disagree with the trial Judge. In any event, the success of the Insured's other defences makes a decision on this matter unnecessary.

## IX Conclusion

155    I would dismiss the appeal with costs.

Page 40

50 B.L.R. 1, [1990] 2 S.C.R. 549, 72 D.L.R. (4th) 478, 115 N.R. 161, 33 Q.A.C.
161, 50 C.C.L.I. 95, [1990] R.R.A. 1038 (headnote only), [1990] I.L.R. 1-2650

*Appeal dismissed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

# TAB 5

*Indexed as:*
**Emms v. Prince George (City)**


**Between**
**Jack Emms, Fred Vos and K. Miller Enterprised Ltd.,**
**carrying on business as Bow Mac Truck Rentals, plaintiffs, and**
**City of Prince George, R.J. Cooper Construction Ltd.,**
**Robert James Cooper, carrying on business as**
**Cooper Construction, John Doe, John Doe Construction Ltd.,**
**defendants, and**
**Joseph Zettl, Zettl Masonry Ltd. and City of Prince George,**
**third parties**


[1999] B.C.J. No. 1627


Prince George Registry No. 00372


British Columbia Supreme Court
Prince George, British Columbia


**Loo J.**
**(In Chambers)**


Heard: June 14, 1999.
Judgment: June 21, 1999.


(11 pp.)


*Limitation of actions -- Actions in tort -- Negligence -- When time begins to run -- Actions against municipalities.*


This was an application by the City and the others to have the action dismissed on the basis that it was statute barred. Emms and Vos alleged that the City and the others had been negligent by allowing their building to be built on unstable ground. The building was built in 1972. At the time that Emms and Vos purchased the building, they relied on a visual inspection. They claimed they did not become aware of the support problems until 1996, and that it was not until that time that they realized the involvement of the various defendants. Emms and Vos commenced this action in 1997.

HELD: Application allowed. All of the elements necessary to the action and on which the claim was founded, arose between 1971 and 1992. The action was therefore statute barred before it was com-

menced in 1997. Emms and Vos could not rely on their ignorance of the facts or their failure to take any steps other than a visual inspection at the time of purchase. With reasonable diligence they could have obtained all the necessary information. The limitation period did not start to run each time there was a new owner.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 18A.

Limitation Act, R.S.B.C. 1996, c. 266, ss. 3, 6(4), 6(5)(a), 6(5)(c).

Municipal Act, R.S.B.C. 1996, c. 323, ss. 285, 286.

**Counsel:**

G. Nicholson, for the petitioner.
B.D. Jordan, for the defendants, R.J. Cooper, Construction Ltd. and Robert James Cooper carrying on business as Cooper Construction.
R.A. Foulston, for the defendant City of Prince George.

---

[Ed. note: A Corrigendum was released by the Court July 29, 1999, the correction has been made to the text and the Corrigendum is appended to this document.]

**1   LOO J.:**-- This is a Rule 18A application by the defendants for an order that the plaintiffs' claim be dismissed on the basis that it is statute barred pursuant to s. 3 of the Limitation Act, R.S.B.C. 1996, c. 266 and ss. 285 and 286 of the Municipal Act R.S.B.C. 1996, c. 323.

**2**   The claim concerns a building constructed in 1971 to 1972 and purchased by the plaintiffs in 1988. The plaintiffs allege the defendants were negligent in allowing the building to be built on unstable ground and 'with an unsound roof and wall structure" causing the building to collapse and on or about October 17, 1996, it "blew apart". This action was commenced in March 1997.

**3**   The single storey building which is in the First Avenue industrial area of Prince George, B.C. is of concrete masonry block construction. The defendant R.J. Copper Construction Ltd. started construction in the fall of 1971 and construction was completed in the spring of 1972. Over the years there have been a number of owners of the building which has been used for automotive related businesses. By the early 1980's, stair like cracks which followed the concrete blocks became quite visible on the east wall of the building. The cracks progressed from the bottom of the wall upwards and became worse over time. Previous occupants and owners of the building caulked the cracks to cut down on drafts that came through the wall. The cracks were large enough to accommodate the end of a caulking gun. The cracks would occasionally widen and have to be recaulked. By the early 1980's there was also a large crack several feet long, and more than a thumb width wide inside the building and the interior concrete floor pulled away from the exterior foundation wall. The east wall cracks were large enough to be seen by anyone passing by the outside of the building. The rows of concrete blocks did not make a straight horizontal line but were crooked and tended to undulate.

**4**   The plaintiffs Emms and Vos purchased the building in November 1988 to operate a truck rental business. They were aware of the obvious cracks in the east wall. They were provided with a

copy of an appraisal by Ivan Jorgensen, dated January 8, 1987 prepared for one of the vendors. While the appraisal stated that the building was in good repair and had an estimated remaining economic life of 25 years, the appraisal also stated that no responsibility was assumed for any soil or sub-soil conditions, engineering or other technical matters affecting the value of the building. The plaintiffs only visually inspected the building before they decided to purchase it.

5    Emms says that he noticed the inside concrete slab settling in 1994 or earlier. It is not clear whether that is when he first noticed the inside settlement which had occurred in the early 1980's, or whether he became aware of new settlement taking place. Emms also noticed the cracks on the east wall getting worse in the spring of 1996. The plaintiffs then sought advice from the building inspector who informed them that it was the owner's duty to make sure the building was safe. The plaintiffs turned to a building contractor who retained Doug Gairns, a structural engineer, to examine the building, and AGRA Earth & Environmental Limited, to carry out a subsurface investigation. Mr. Gairns found the east wall extensively cracked as a result of a major foundation settlement which caused settlements of about 6 1/2 inches between the middle and the ends of the wall. Before the geotechnical investigation was concluded, some time between October 10 to 17, 1996, wind blew through an open bay door on the west side of the building and pushed the middle of the east wall laterally approximately six inches, and moved the wall away from the roof. Mr. Gairns then saw that the wall had not been tied to the roof with any structural supporting connection.

6    The plaintiffs claim damages for the cost of jacking up the foundation on the east side of the building with a screw anchor system and rebuilding the east wall.

7    There is no dispute that the east wall was built on loose organic fill and that the wall started to settle as soon as the building was constructed, or within a short time afterwards. There is disagreement among the experts as to whether the applicable building code required the east wall to be tied to the roof. Mr. Gairns says it is required. Mr. Tkachuk, who is also a structural engineer, says it is not required because the east wall is a fire wall. For reasons which follow, in my view, it does not matter whether the building code did or not require a connection between the east wall and the roof.

WHEN DID THE CAUSE OF ACTION ARISE?

8    The first issue to be decided is when the cause of action arose. The defendants say that time started to run at or about the time construction was completed in early 1972, and whether the limitation period under s. 3 of the Limitation Act is two years or six years, the action was statute barred long before the plaintiffs commenced this action on March 7, 1997.

9    In Bera v. Marr (1986), 1 B.C.L.R. (2d) 1 (B.C.C.A.), Esson J.A. stated at page 14:

> The Limitations Act, as appears from ss. 3(2) and 8(1), defines the beginning of the period of limitations as being the date on which the right to bring action arose. That must mean the date upon which the cause of action was complete; the date upon which all the elements of the cause of action had come into existence, whether or not the person entitled to the cause of action was aware of all the facts upon which its existence depended.

in Levitt v. Carr (1992), 66 B.C.L.R. (2d) 58 (B.C.C.A.), the B.C. Court of Appeal referred to the postponement provisions in s. 6(3) and (4) of the Act as 'intended to provide for deserving exceptions to a statutory bar of general application'. As to the reasons for the statutory bar the Court of Appeal stated at pages 66 to 67:

> The reasons for the bar itself are well known: society has an interest in putting an
> end to the process of litigation which from its nature is rendered susceptible to
> abuse and injustice with the passage of time.

**10**     The issue of when the cause of action arose was considered in Privest Properties Ltd. v. Foundation Company of Canada (1995), 11 B.C.L.R. (3d) 1 (B.C.S.C.); (affirmed on other grounds (1997), 31 B.C.L.R. (3d) 114 (B.C.C.A.)). In that case, a fireproofing asbestos containing material known as MK-3 was applied during an extensive office building renovation between 1972 and 1975. After citing the passage above in Bera v. Marr, Drost J. stated at page 47:

> I think it is clear that all of the elements necessary to the plaintiffs' cause of action came into existence during the period 1973 to 1975, when the MK-3 was installed in the Building. Accordingly, the limitation period began to run in or about the month of September 1975, when the installation was completed. I need not fix an exact date because, regardless of whether the applicable limitation period is two years or six years, it had expired when this action was commenced, unless the plaintiffs can establish that the postponement provisions of the Limitation Act apply.

**11**     In this case, all of the elements necessary to the plaintiffs' cause of action, and on which its claim is founded, including constructing the building on organic soil without a proper foundation, and the failure, if any, to tie the wall to the roof, arose between the fall of 1971 and the spring of 1972. The plaintiffs' action was therefore statue barred before it commenced this action in March 1997 whether the limitation period was two years or six years.

**12**     The plaintiffs did not provide written notice of their claim to the City until December 5, 1996. It follows that the plaintiffs failed to meet either the 6 month limitation period, or the 2 month notice requirement in ss. 285 and 286 of the Municipal Act.

DO THE POSTPONEMENT PROVISIONS OF THE LIMITATION ACT APPLY?

**13**     The next issue to be decided is whether the postponement provisions of the Limitation Act apply. Section 6(3)(b) of the Act provides that the limitation period for damage to property is postponed as provided in subsection(4).

Sections 6(4), (5)(a) and (c) of the Act provide:

> 6(4)    Time does not begin to run against a plaintiff with respect to an action referred to in subsection (3) until the identity of the defendant is known to the plaintiff and those facts within the plaintiff's means of knowledge are such that a reasonable person, knowing those facts and having taken the appropriate advice a reasonable person would seek on those facts, would regard those facts as showing that
>
>    (a)    an action on the cause of action would, apart from the effect of the expiration of a limitation period, have a reasonable prospect of success, and

    (b)    the person whose means of knowledge is in question ought, in the person's own interests and taking the person's circumstances into account, to be able to bring an action.

  (5)    For the purpose of subsection (4),

    (a)    "appropriate advice" in relation to facts, means the advice of competent persons, qualified in their respective fields, to advise on the medical, legal and other aspects of the facts, as the case may require.

. . .

    (c)    if a person claims through a predecessor in right, title or interest, the knowledge or means of knowledge of the predecessor before the right, title or interest passed is that of the first mentioned person, and

**14**    The plaintiffs say it was only when Emms noticed a crack in the foundation under the east wall that it became necessary for them to seek professional advice, which they did in the spring of 1996. The plaintiffs further say it was not until October 1996 when the wind caused the east wall to move that they became aware that the wall lacked proper lateral support. Until then, they did not know the defendants were in any way involved with the building, nor had they received appropriate advice that there had been negligence or a failure to comply with a building code.

**15**    In my view the plaintiffs cannot rely on their ignorance of the facts, or their failure to take any steps other than a visual inspection of the building before they purchased it.

**16**    With reasonable diligence the plaintiffs or any previous owner of the building could have obtained the name of the building contractor, and copies of the plans for the building, by reviewing the records maintained by the City. This would have disclosed the building permit issued in November 1971, the name of the contractor, and the fact that there was no structural connection between the top of the east wall and the roof.

**17**    The plaintiffs argue that the lack of proper foundation which caused the building to settle, is a different claim from the lack of a structural connection between the top of the east wall and the roof. I do not agree. But for the vertical settlement of the wall, the wind would not have caused the wall to move laterally. In any event, during jacking operations to raise the floor, the east wall became so deformed that even if it had been tied to the roof, the wall had to be replaced.

**18**    More importantly, the plaintiffs cannot overcome s. 6(5)(c) of the Act. The knowledge of or means of knowledge of any previous owner is attributed to any subsequent owner. The limitation period does not start to run each time there is a new owner. Any duty of care owed by the defendants to the plaintiffs as owners of the building, is owed to the building owners as a class, so that if time commences to run against one owner, it continues to run against all subsequent owners until it expires. (see Nielson v. Kamloops (City) [1984] 2 S.C.R. 2 at pages 38 to 43; [1984] 5 W.W.R. 1 (S.C.C.) at pages 47 to 51; Strata Plan No. VR 2000 v. Shaw (1998), 19 R.P.R. (3d) 305 (B.C.S.C.) at page 320.)

**19**    The plaintiffs proposed to rely on the June 1999 opinion of Robert A. Vickars. The defendants objected to the opinion being admitted into evidence on the basis that it was attached as an exhibit

to an affidavit by counsel for the plaintiffs. They rely on Porchetta v.Santucci, [1998] B.C.J. No. 348, 16 February 1998, Vancouver Registry No. C972683 (B.C.S.C.): where an expert has not filed an affidavit adopting the contents of his report, the opposing party is entitled to take the position that the report is inadmissible.

**20**    I agree that the report of Mr. Vickars is inadmissible. However, if I am wrong, his opinion would not have changed my conclusion on the issues.

**21**    I conclude that the plaintiffs' claim against the defendants is statute barred and the action is therefore dismissed. Counsel for the defendant City of Prince George stated that he wished to address the issue of costs. The parties may therefore make submissions on the issue of costs. Otherwise, I see no reason to depart from the normal rule that costs follow the event, and the defendants should be entitled to their costs.

LOO J.

\* \* \* \* \*

CORRIGENDUM

The following changes should be made to my Reasons for Judgment dated 21 June 1999:

Paragraph 4: "November 1998" should read "November 1988" and "January 8, 1997" should read "January 19, 1987".

Paragraph 11:          The year "1992" should read "1972".

Paragraph 18:          The word "owned" in line 6 should read "owed".

LOO J.

cp/i/drk/jjl

*Indexed as:*
**Emms v. Prince George (City)**

**Between**
**Jack Emms, Reed Vos and K. Miller Enterprises Ltd.**
**carrying on business as Bow Mac Truck Rentals,**
**plaintiffs (appellants), and**
**City of Prince George, R.J. Cooper Construction Ltd.,**
**Robert James Cooper carrying on business as Cooper**
**Construction, John Doe and John Doe Construction**
**Ltd., defendants (respondents)**

[2001] B.C.J. No. 396

2001 BCCA 120

Vancouver Registry No. CA026082

British Columbia Court of Appeal
Vancouver, British Columbia

**McEachern C.J.B.C., Lambert and Huddart JJ.A.**

Oral judgment: January 26, 2001.
Released: March 7, 2001.

(6 paras.)

*Limitations of actions -- Postponement or suspension of statute -- Discoverability rule.*

Appeal by the plaintiffs Emms, Voss and K. Miller Ltd. from a decision dismissing their action for damages resulting from a faulty construction of a concrete block building in 1972. The trial judge found that the cause of action was known to Emms much earlier than when the action was commenced.

HELD: Appeal dismissed. There was ample evidence to support the finding that the complete cause of action was known to the plaintiffs and that the action could have been brought much earlier.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 18A.

Limitation Act, s. 6(4), 6(5)(c).

**Counsel:**

G. Nicholson, for the appellant.
R.J. Stewart, Q.C., for the City of Prince George.
B. Jordan, for Cooper Construction and R.J. Cooper.

---

The judgment of the Court was delivered by

**1    HUDDART J.A.** (orally):-- This appeal concerns the application of the postponement provisions in s. 6(4) of the Limitation Act to a claim founded on defective construction of a concrete block building in Prince George during the winter of 1971-1972. The question it raises is whether the trial judge who heard the matter under rule 18A erred in her application of the discoverability rule to dismiss the claims. The trial judge's decision is reported at (1999), 3 M.P.L.R. (3d) 106 so I need not discuss the facts.

**2**    Despite the best efforts of counsel for the appellants to convince us otherwise, I am persuaded there was ample evidence to support the conclusion that the complete cause of action was within the plaintiffs' means of knowledge as that phrase is explained in Levitt v. Carr. (1992), 66 B.C.L.R. (2d) 58 (leave to appeal to the S.C.C. dismissed (1992), 70 B.C.C.R. (2d) xxxiii). Once the appropriate advice was sought on the basis of those facts within their means of knowledge in that sense, it would follow that the owner would have a reasonable prospect of success, just as the appellant recognized in late 1996 after he had noticed further damage to the building.

**3**    In the circumstances of this case I can see no need to consider s. 6(5)(c) of the Limitation Act. I prefer not to do so. I would dismiss the appeal.

HUDDART J.A.

**4**    McEACHERN C.J.B.C.:-- I agree.

**5**    LAMBERT J.A.:-- I agree.

**6**    McEACHERN C.J.B.C.:-- Appeal is dismissed.

cp/i/qldrk/qltlm

# TAB 6

*Case Name:*

# Ford Motor Co. of Canada, Ltd. v. Ontario Municipal Employees Retirement Board

**IN THE MATTER OF Ford Motor Company of Canada, Limited
AND IN THE MATTER Of an Application Under Section 190 of the
Canada Business Corporations Act and Section 185 of the
Business Corporations Act (Ontario)
Between
Ford Motor Company of Canada, Limited, plaintiff, and
Ontario Municipal Employees Retirement Board and the persons
set out in Schedules "A" and "B",\* defendants
And between
Ontario Municipal Employees Retirement Board and the persons
set out in Schedule "B",\* plaintiffs by counterclaim, and
Ford Motor Company of Canada, Limited and Ford Motor Company,
defendants by counterclaim**

[2004] O.J. No. 191

Court File No. 98-CL-3075

Ontario Superior Court of Justice
Commercial List

**Cumming J.**

Heard: April 29-30, May 1, 6-9, 13, 15-16, 21-23, June 3-6,
10-13, 17-20, July 2, 4, October 8-10, 15-16, December 12-13
and 16-19, 2002, January 6-10, 13-17, 21-22, 2003.
Judgment: January 22, 2004.

(497 paras.)

*Company law -- Sale of Shares -- Valuation -- Adjustments -- Fundamental changes and shareholders' rights -- Rights of minority or dissenting shareholders -- Oppression, what constitutes -- Right to valuation of shares by court, evidence -- Right to valuation of shares by court, calculation of fair value -- Actions by or on behalf of shareholders -- Actions against corporations or directors -- Action for oppressive conduct -- When available (incl. time for) -- Oppression, prejudice or disregard of interests.*

Action by the plaintiff Ford Motor Company of Canada for a declaration fixing the value of the shares owned by the defendant dissenting minority shareholders as of September 11, 1995. Ford Canada was originally incorporated under the Canada Business Corporations Act; it had an agreement with Ford US which set out a transfer-pricing system. Ford US set the prices it would pay for vehicles manufactured by Ford Canada for sale to the US. In September, 1995, Ford Canada passed a resolution to begin a going-private transaction, the minority shareholders' shares would be terminated. The shares were independently valued at between $170 and $200. Ford Canada offered the minority shareholders $185 per share. An amalgamation resolution was passed at a shareholders' meeting, although 53 per cent of the minority shareholders dissented. Ford Canada completed the amalgamation process in October, 1995, becoming a wholly-owned subsidiary of Ford US. Ford claimed that the fair value of the shares was $185; the minority shareholders proposed a fair value was $642.50. The minority shareholders counter-claimed, arguing that the transfer-pricing system used by Ford US historically oppressed Ford Canada's minority shareholders, and that the transfer-price should be adjusted accordingly. Ford Canada had significant losses from 1985 to 1995. Both sides presented expert evidence on the issue of the transfer-pricing system, and as to the fair market value of the shares. Ford's experts claimed that Ford Canada's losses were attributable to market factors alone. Ford also argued that the historical oppression claim was statute-barred by the Limitations Act.

HELD: Action allowed; counter-claim allowed. The adjusted fair market value of the shares was set at $259.36. The oppression claim was an action on the case, and therefore the six-year limitation period in the Limitations Act applied to bar the oppression claims except for the period following January, 1994. The structure of the transfer-pricing system was a relevant consideration in setting the fair market value of the minority shareholders' shares. Market factors alone would not account for the losses suffered by Ford Canada from 1977 to 1995; the transfer-pricing system was a significant factor. The transfer-pricing agreement was unfairly prejudicial to the minority shareholders; if Ford US and Ford Canada had been operating as if at arm's length, the agreement would not have been acceptable to Ford Canada. The claim for oppression was therefore made out, and an adjustment in the fair market value of the shares was appropriate. The adjustment would apply according to the length of time after January, 1994 the individual shareholders had owned their shares.

**Statutes, Regulations and Rules Cited:**

Canada Business Corporations Act, R.S.C. 1985, c. C-44, ss. 2(2)(a), 2(5)(a), 102(1), 190(1), 190(2), 190(3), 190(15), 190(19), 190(23), 238, 238(a), 238(d), 239(1), 241, 241(1), 241(2), 241(2)(a), 241(b), 241(3).

Courts of Justice Act, R.S.O. 1990, c. C-43, ss. 128(1), 128(3), 128(4)(b), 128(4)(g), 130.

Directors' Liability Act, 1890 (U.K., 53 & 54 Vict.), c. 64.

Income Tax Act, R.S.C. 1985, c. 1 (5th Supp.), s. 247.

Insurance Act, R.S.O 1990, c. I-8.

Internal Revenue Code, 1994 (US), (26 U.S.C.), s. 482.

Limitations Act, R.S.O. 1990, c. L-15, s. 45, 45(1)(g).

Negligence Act, R.S.O. 1990, c. N-1, s. 2.

Ontario Business Corporations Act, R.S.O. 1990, c. B-16, ss. 132, 176(2),
185, 185(18), 185(23), 245, 248, 248(1).

Ontario Rules of Civil Procedure, Rule 54.02(1)(b), 54.03(1), 54.04(1).

**Counsel:**

James A. Hodgson, Hugh M. DesBrisay and Jason Squire, for the plaintiff.
Francis J. C. Newbould Q.C., Christopher D. Bredt and Benjamin T. Glustein, for the defendants.

---

[Editor's note: A corrigendum was released by the Court February 13, 2004; the corrections have been made to the text and the corrigendum is appended to this document.]

[* Schedules A and B were not attached to the copy received by LexisNexis Canada and therefore are not included in the judgment.]

Table of Contents

Introduction
 Background
 The Issues
 The "fair value" issue
 The oppression issue
 The Valuation of Ford Canada's shares
 The Ford Transfer Price System
 Ford's Operations: The Three Functional Divisions within each of Ford Canada and Ford U.S.
 The Inter-Corporate Arrangements
 Historical Economic Factors affecting Ford Canada
 Historical Factors Affecting the Automobile Industry
 Transfer Pricing and the Tax System
 The Transfer Pricing Analysis and Report of Dr. Wright
 The Report of Dr. Ballentine
 Ford's Agreements with Third Party Manufacturers
 The Valuations in respect of "Fair Value"
 The Law relating to the Statutory Oppression Remedy
 The Business Judgment Rule'
 Bad Faith Not Required
 Standing
 Does the Limitations Act apply?
 Discoverability
 The Scope of Section 45
 The Evidence as to Oppression

The Nature of the Ford U.S./Ford Canada Relationship
Ford U.S. Benefited from the Relationship
The Horst Frisch Inc. Transfer Pricing Report
The Deloitte & Touche Transfer Pricing Analysis
The Reply Evidence to the Transfer Pricing Analyses prepared by Horst Frisch and Deloitte & Touche
Disposition: The Fair Value of a Ford Canada Share
The Historical Oppression Component of Compensation
The "go-forward" component in Fair Value
Prejudgment Interest
Costs

CUMMING J.

Introduction

**1** The trial in this very complex proceeding raises difficult and unique issues in respect of the valuation of shares and the alleged oppression of minority shareholders. The trial consisted of some 49 days of evidence and oral submissions, accompanied by comprehensive written submissions.

**2** There were several witnesses, including four expert witnesses for each side, extensive expert reports and voluminous documentary evidence of some 22 bankers boxes with 132 Exhibits and 49 volumes of joint books of documents (Exhibit #1 - the joint books of documents being referred to hereafter as "JBD"). All experts are eminently qualified in their respective areas of expertise. The great complexity of the extensive transactional and economic data under analysis, and of the many issues at play, led to ongoing revised expert evidence and reports throughout the trial.

Background

**3** Ford Motor Company of Canada, Limited ("Ford Canada") was established in 1904 under the predecessor legislation to the present Canada Business Corporations Act, R.S.C. 1985, c. C.44 ("CBCA") as a separate legal entity from the Ford Motor Company, which had been incorporated in the United States in 1903. Ford Canada was a public company with shares offered to, and held by the public at large.

**4** Historically, the parent corporation, Ford Motor Company ("Ford U.S.") owned sufficient shares to control its subsidiary, Ford Canada. Over the years Ford U.S. increased its ownership of Ford Canada's shares from 75%, through purchases in the open market. On September 12, 1995 Ford U.S. owned approximately 93.83% of the shares of Ford Canada. Ford U.S. has various subsidiaries in different countries. (I shall refer to the combined multinational enterprise of the Ford Motor Company as simply "Ford", using the term "Ford U.S." to distinguish the Ford Motor Company as an entity from the Canadian subsidiary, Ford Canada.) Some 6.17%, or 511,319 of the shares of Ford Canada were widely held, that is, by persons other than Ford U.S. as of September 12, 1995.

**5** The defendant Ontario Municipal Employees Retirement Board ("OMERS") is a corporation responsible for the management of a pension fund. OMERS was the beneficial owner of 28,717 common shares of Ford Canada as of September 12, 1995.

**6** Ford Canada has two subsidiaries, Ford Australia and Ford New Zealand, but it is in respect of the Canadian operations that the issues arise.

**7**    The necessary corporate resolutions were passed September 12, 1995 to effectuate a so-called "going-private" or "squeeze-out" transaction, whereby Ford Canada would become the wholly-owned subsidiary of Ford U.S. That is, Ford U.S. would acquire the approximate six percent of Ford Canada which it did not then own. Going-private transactions are amalgamations or other forms of transactions that cause the interest of a shareholder in the shares of a corporation to be terminated without the consent of the shareholder and without the substitution of an interest of equivalent value in a participating security. See generally "Notice of Revised Policy on Going-Private Transactions, Policy Statement 11.21" in Consolidated Canada Business Corporations Act and Regulations, 19th ed. (Toronto: Carswell, 2000) at 447.

**8**    To accomplish this, Ford decided to export Ford Canada from the regime of the CBCA and continue the entity under the Ontario Business Corporations Act, R.S.O. 1990, c. B.16 ("OBCA"). Accordingly, a sequence of step transactions was undertaken through a "Continuance Resolution" and an "Amalgamation Resolution". Ford Canada became a company continued under the OBCA, having its registered office in Oakville, Ontario. Ford Canada was then amalgamated on October 1, 1995 with Ford Investment Holdings Inc., an indirect wholly-owned subsidiary of Ford U.S., and with Ensuite Limited ("Ensuite"), a wholly-owned Canadian subsidiary of Ford U.S. Hence, Ford Canada became a wholly-owned subsidiary of Ford U.S.

**9**    On April 25, 1995 Ford had announced its intent to offer the minority shareholders of Ford Canada $150.00 per share. (Monetary references are expressed in Canadian dollars unless otherwise stated.) Salomon Smith Barney provided a valuation range of $110.00 to $150.00 per share June 15, 1995. The Board of Directors of Ford Canada formed a Special Committee to review and evaluate the proposal. The Special Committee retained CIBC Wood Gundy (now CIBC World Markets, referred to herein as "CIBC Wood Gundy") to provide a valuation.

**10**    CIBC Wood Gundy informed the Special Committee June 15 and July 5, 1995 of its preliminary opinion of a value range of $170.00 to $200.00 per share. There was a formal valuation of the shares (the "Original CIBC Valuation") by CIBC Wood Gundy presented July 25, 1995, which concluded that the fair value of the shares was in the range of $170.00 to $200.00 per share.

**11**    In a later "Valuation as at September 11, 1995" dated March 2001 (Exhibit #44) (with "Draft Working Papers for Revised Valuation as at September 11, 1995 dated May, 1999, filed as Exhibit #125) ("CIBC Wood Gundy Final Valuation") prepared in the context of this court action, CIBC Wood Gundy concluded that the value of Ford Canada's shares was in the range of $160.00 to $200.00 per share.

**12**    The CIBC Wood Gundy valuations were prepared by taking the Ford Canada financial statements as reflecting its financial position as of September 11, 1995 and determining an enterprise value by projecting future financial forecasts of earnings and cashflows. These projections were premised upon the existing Ford U.S. - Ford Canada inter-corporate transfer price system (hereafter referred to as the "transfer pricing system") remaining in place. The CIBC Wood Gundy Final Valuation is based upon management's expectation of future profits in all aspects of the Canadian operations through the existing business structure and transfer pricing system.

**13**    The Special Committee was also advised by its Chairperson to be vigilant because there was no additional market check on any recommendation the Committee might make as to a fair price, given that Ford U.S. had sufficient votes to ensure passage of the transaction. Ford U.S. refused the

request of the Special Committee to provide that a majority of the minority would have to approve of the forced sale.

**14**    Ford increased its offer to $185.00 per share July 5, 1995 and the Special Committee of Ford Canada recommended acceptance. On July 25, 1995 Ford Canada issued a Notice of Special Meeting of Shareholders and Management Proxy Circular that sought approval of the intended "going private" transaction. Two Special Resolutions, being a "Continuance Resolution" under the laws of Ontario and an "Amalgamation Resolution" proposing the amalgamation of Ford Canada with an indirect wholly owned subsidiary of Ford U.S. would be voted on at a special meeting of shareholders.

**15**    A special shareholders meeting of Ford Canada was held September 12, 1995 at which the proposed transaction was approved, with some 53.3% of the minority shareholders dissenting in respect of the price to be paid for the minority shares. Given the requisite 90% plus approval by shareholders due to the Ford U.S. votes, the "going private" transaction was completed.

**16**    The effect of the transactions was to convert the common shares of Ford Canada to either $185.00 capital preference shares or $185.00 deemed dividend preference shares. All such shares held by the former common shareholders were then redeemed October 2, 1995.

**17**    Under ss. 190(1), (2) and (3) of the CBCA, a shareholder has the right to dissent from a continuance in another jurisdiction, and also to dissent from an amalgamation, and to require that the dissenter's shares be purchased by the corporation for the "fair value", determined as of the close of business on the day before (September 11, 1995) the pertinent resolution was adopted (September 12, 1995).

**18**    Minority shareholders (OMERS and the Schedule "A" and "B" defendants in the action at hand) holding some 275,000 shares, dissented in respect of the resolutions.

**19**    Similarly, ss. 176(2) and 185 of the OBCA provide for a right of dissent in respect of an amalgamation. A statutory appraisal remedy is made available to the minority shareholders to protect their interests.

**20**    Minority shareholder approval was not required because Ford U.S. owned at least 90% of the shares at the time the "going-private" transaction was initiated. Ford U.S. also decided not to proceed, as was its legal right, on the basis of a prerequisite approval by a majority of the minority shareholders being a requirement.

**21**    Thus, the dissenting shareholders dissented in respect of both the export from the CBCA and in respect of the forced buy-out under the OBCA. They arguably are entitled to a valuation under both statutes. Ford Canada brings this Amended Statement of Claim dated October 31, 1995 for the purpose of declaratory relief pursuant to s. 190(15) of the CBCA and s. 185(18) of the OBCA, to fix a fair value for the common shares of OMERS and other dissenting shareholders. The Valuation Date for this purpose is September 11, 1995.

**22**    Ford Canada seeks a determination by the court as to fair value per share in respect of the dissenting defendant shareholders, being OMERS and the persons set out in schedules "A" and "B" of the pleading. Ford Canada has joined in the action all dissenting shareholders in accordance with s. 190(19) of the CBCA (and s. 185(23) of the OBCA). As will be apparent, there is a significant disagreement between the parties as to the fair value of the shares. OMERS asserts that $642.50 per share constitutes fair value.

**23**    There is common ground that the relevant provisions of both statutes would have the same impact upon the issues at hand. For simplicity, and ease of reference, the parties have agreed that the provisions of the CBCA alone can be considered and referred to as the governing corporation statute.

**24**    This is appropriate because the essence of the dissenting shareholders' position is that the minority shareholders were unlawfully oppressed through the inter-corporate transfer price system, which alleged oppression commenced while the CBCA was applicable. Moreover, the OMERS defendants and the Schedule "B" defendants bring a counterclaim for what can be referred to as alleged historical oppression.

**25**    As mentioned above, Ford initially offered $150.00 per share. The Special Committee of Ford Canada's Board of Directors, made up of independent board members (i.e. other than Ford U.S. nominees), sought expert legal and valuation advice and received submissions from minority shareholders. Minority shareholders were ultimately offered $185.00 per share. The Special Committee recommended acceptance of this price, but as stated above, under the CBCA regime, the minority shareholders had to give up their shares in all events, whether or not they accepted the price.

**26**    The defendants OMERS and persons set out in Schedule "B" filed a Fresh As Amended Statement Of Defence And Counterclaim January 11, 2000, with leave of the Court. These defendants submit that the valuation of $185.00 utilized by Ford Canada is inadequate and understates the fair value. They also advance a claim of oppression.

**27**    Ford Canada's statutorily required fair value offer did not constitute an admission, and no admission of fair value was made in its pleadings. A corporation's fair value offer, unlike an admission in a pleading, does not establish the minimum fair value of the shares. The court may set a fair value which is below the fair value offer made by a corporation. Ford Motor Co. of Canada Ltd. v. Ontario Municipal Employees Retirement Board et al. (1997), 36 O.R. (3d) 384 (C.A.).

The Issues

**28**    The defendant OMERS and the defendants listed in Schedule B, owning some 202,000 shares (collectively referred to hereafter simply as "OMERS" or the "dissenting shareholders") allege in their counterclaim that their interests as shareholders were oppressed. They allege that Ford U.S. and Ford Canada had engaged in improper and unfair "transfer pricing" historically over the period from 1965 through 1995. They claim in their counterclaim that the transfer pricing system used by Ford Canada and Ford U.S. since January 1, 1966 to September 11, 1995 was oppressive or unfairly prejudicial to the interests of Ford Canada and its minority shareholders. These defendants seek an order pursuant to s. 241 of the CBCA (and s. 248 of the OBCA) for an accounting and to compensate these defendants for their proportionate share of the losses to Ford Canada as a result of the alleged oppressive conduct. They limit their claim for historical oppression to the period from January 1, 1985 - September 11, 1995.

**29**    The defendant shareholders also plead that the "fair value" of their shares is greater than the offer of $185.00 per share made by Ford Canada and that the CIBC Wood Gundy valuation significantly understates the fair value of the common shares.

**30**    Thus, the claim of the dissenting shareholders embraces two components: first, a claim for alleged past oppression by looking backward to the period 1985 to September 11, 1995; and second, a go-forward element, to be taken into account in considering the value as of September 11, 1995.

The "fair value" issue

**31**    There are two interrelated issues in this proceeding. The first issue, raised by the counterclaim, is whether there has been oppression such that the statutory remedy for oppression is operative. The second issue, raised by the amended statement of claim, is a determination of the fair value of the common shares of Ford Canada as of the Valuation Day, September 11, 1995. The second issue must be determined in all events; however, the quantification of overall "fair value" will differ markedly depending upon whether or not there is a finding of historical oppression with consequential compensation due to the dissenting shareholders. To determine both issues, there is truly a host of complex underlying sub-issues to be examined.

The oppression issue

**32**    OMERS submits that Ford Canada was disadvantaged historically to the benefit of Ford U.S. because of the transfer pricing system employed. OMERS seeks a declaration that the transfer pricing system was oppressive or unfairly prejudicial or unfairly disregarded the interests of Ford Canada and its minority shareholders. OMERS seeks an order pursuant to s. 241 of the CBCA (and s. 248 of the OBCA) for an accounting to compensate OMERS for its proportionate share of the losses to Ford Canada as a result of the oppressive conduct.

> The sub-issues include:
>
> (1)    Does the evidence establish that the transfer pricing system employed between January 1, 1966 and September 11, 1995 was contrary to the Income Tax Act, R.S.C. 1985, c. 1 (5th Supp.), and the principles of the Organization for Economic Cooperation and Development ("OECD") guidelines?
>
> (2)    Does the evidence establish that the dissenting shareholders have been oppressed or unfairly prejudiced or that their particular interests have been unfairly disregarded by virtue of the transfer pricing system?
>
> (3)    If so, are the dissenting shareholders proper "complainants" within the meaning of Part XX and, in particular, s. 241 of the CBCA, such that they have grounds to pursue the claim for historical oppression and receive a remedy?
>
> (4)    If so, is any part of the oppression claim statute-barred because of a limitation period?
>
> (5)    Is one component of the remedy for a successful oppression claim a notional adjustment to the value for shares to be fixed as of September 11, 1995 by adding an amount reflecting transfer pricing adjustments retroactively, coupled with notional compounded returns forward to the valuation date?
>
> (6)    Does a finding of oppression impact upon the determination of the forward-looking discounted future earnings calculation in fixing "fair value"?

The Valuation of Ford Canada's shares

**33**    There is common ground that fair value is to be defined as the pro rata share to the defendant shareholders of the notional en bloc value of Ford Canada shares without any minority discount. The normative determination of fair value looks to the highest price available in an open and unrestricted market between informed and prudent parties acting at arm's length. Brant Investments Ltd. v. KeepRite Inc. (1991), 3 O.R. (3d) 289 at 329 (C.A.). In fixing fair value, adjustments may be required to that normative approach in given circumstances. New Quebec Raglan v. Blok-Andersen (1993), 9 B.L.R. (2d) 93 at 103 (Ont. Gen. Div.).

**34**    In the case at hand, a trading value is not apparent because the shares were very thinly traded.

**35**    The valuation experts on both sides of the case at hand employed a discounted cash flow analysis to determine the capitalized value of Ford Canada's projected stream of maintainable earnings, with certain adjustments for fine-tuning.

**36**    OMERS submits that a transfer price adjustment is appropriate on two bases. First, OMERS submits this is required because of the alleged non-compliance of the transfer pricing system with tax law requirements.

**37**    Second, OMERS submits that in any event fairness is an inherent prerequisite to the transfer pricing system in the determination of "fair value". If either or both bases are operative, then the reported operating results and the shareholders' equity would be arguably materially understated.

**38**    Dr. Deloris R. Wright, a Vice President of Charles River Associates Incorporated of Boston, Massachusetts, testified as an expert on transfer pricing on behalf of Ford Canada and Ford U.S. Dr. John P. Brown, a transfer pricing expert formerly with KPMG LLP, Mr. James Mateyka and Mr. Philip Evershed of CIBC Wood Gundy also testified as experts for Ford. Considerable expert evidence was put forward on behalf of OMERS. Dr. Richard Clark of Deloitte & Touche LLP, Dr. Thomas Horst of Horst Frisch Inc. and Dr. Gregory Ballentine of Bates, White & Ballentine LLC gave transfer pricing evidence and Mr. Ian R. Campbell of Campbell Valuation Partners Limited provided a valuation based upon their evidence.

**39**    OMERS submits that the fair value for a share for a dissenting shareholder as of September 12, 1995 was $642.50, and that the plaintiffs by counterclaim should receive compensation on this basis, together with interest at 12.5%, from September 11, 1995. OMERS arrives at this amount by looking to the ranges of values of its expert, Mr. Ian Campbell.

**40**    Mr. Ian Campbell places a total per share value in the $555.00 to $670.00 range based upon the evidence of Dr. Thomas Horst of Horst Frisch Inc. He places a value in the $500.00 to $615.00 range based upon the evidence of Dr. Richard Clark of Deloitte & Touche LLP. His valuation embraces two components, being an "oppression component" and a "forward looking" or "go-forward" discounted cash flow component. The OMERS calculation of a fair value of $642.50 per share is the mid-point of the upper limit of these two ranges.

**41**    Mr. Campbell's opinion on valuation for the historical "oppression component" includes an estimate of Ford Canada's forgone profits due to the impact of the alleged transfer pricing system prior to the Valuation Date. This includes a notional compound annual rate of return (12.5% after tax) on such forgone profits. Mr. Campbell concludes that based upon Dr. Horst's analysis the historical oppression component has a value of $3.410 billion or about $410.75 per share (at the midpoint of estimates); based upon Dr. Clark's analysis the amount is $2.830 billion or $341.24 per share (at the mid-point).

**42**    Mr. Campbell opines also as to the forward-looking discounted cash flow component. He takes the forecasted earnings based upon the Horst/Clark analyses. This go-forward component is calculated as $199.00 per share (at the mid-point) based upon the analysis of Dr. Horst; and $214.00 per share (at the mid-point) based upon the analysis of Dr. Clark.

**43**    Mr. Campbell did not provide an opinion as to what a valuation would be based upon an acceptance of the existing financial statements and transfer pricing system of Ford Canada, being the premises underlying the CIBC Wood Gundy valuation.

**44**    OMERS does not appear to quarrel with the methodology and calculation of CIBC Wood Gundy if the major assumption underlying the CIBC Wood Gundy valuation were to be accepted, namely, that there is no oppression or loss of value due to the operation of the structure of the existing transfer pricing system. The existing financial statements reflect the cumulative results of that historical transfer pricing system. However, OMERS does not accept the underlying major assumption of the CIBC Wood Gundy valuation. That is, the defendant shareholders take the position that the true fair value of Ford Canada's shares must reflect necessary adjustments to the transfer pricing system. This is the major point of contention between the parties and reflects the fundamental difference in viewpoint by the group of experts testifying for each side.

The Ford Transfer Price System

**45**    The transfer pricing system for Ford's North America operations was in place from the introduction of the Canada-United States Auto Pact in 1965, through September 11, 1995, the end-date for valuation purposes of the dissenting minority shareholders' shares.

**46**    After 1965 and the Auto Pact there was a single, integrated market for vehicles made and sold in Canada and the United States. Ford U.S. became the manufacturer and assembler of most of the Ford vehicles sold into Canada. With greater manufacturing (in particular, the Essex engine plant in 1982) and assembly located over time in Canada, Ford Canada became the manufacturer of some components and the assembler for some vehicles sold into the U.S. market as well as into the Canadian market. (Exhibit #15 provides an overview of Ford's extensive North America operations as of 1985. The 1986 Annual Report of Ford Canada mentions that Ford Canada assembles cars and trucks at two plants in Oakville, Ontario and one in St. Thomas, Ontario; produces engines at the Essex Engine Plant in Windsor, Ontario; produces aluminium engine parts at the Essex Aluminium Plant in Windsor; and produces iron castings at the Windsor Casting Plant and automobile glass in Niagara Falls, Ontario.)

**47**    Ford Canada did reasonably well until the mid-70's when Canada began to experience a declining exchange rate and adverse market conditions due to declining disposable personal incomes and a shift to smaller, more fuel-efficient Asian built cars.

Ford's Operations: The Three Functional Divisions within each of Ford Canada and Ford U.S.

**48**    There are four basic business functions in the operation of Ford's automobile business: (1) design and engineering development; (2) manufacturing components; (3) assembling the manufactured components; and (4) selling the assembled vehicles.

**49**    Ford Canada has three functional divisions, being "Assembly", "Manufacturing" and the "Canadian Vehicle Division" ("CVD").

**50**    The fourth business function is carried on by CVD in Canada and the United States Vehicle Decision ("USVD") in the U.S. Ford refers to these divisions as being the residual risk taker, in that