each is credited with the profit if market prices for the given country are strong and each takes the risk of being debited for the losses if market forces are adverse for that country.

**51**    CVD is the division which sells the assembled vehicles to the independent Ford dealers in Canada. The design and engineering development business function is performed by Ford U.S.; however, CVD is charged with a portion of the cost of this function. CVD is considered to own the intellectual property of Ford for the purposes of the Canadian market. The revenue and expenses from the sale of vehicles and parts in Canada to dealers, the warranty expenses in the Canadian market, a proportionate share of the design and development expenses, called "tooling, engineering, launch and obsolescence" ("TELO") expenses, and a portion of the administrative head office expenses, accrue and are charged to CVD. As such, CVD is notionally assigned responsibility for the risks and opportunities for reward in the Canadian market.

**52**    Ford U.S. has three like functional divisions, being "Assembly", "Manufacturing" and the "United States Vehicle Division" ("USVD"), being the U.S. counterpart to the Canadian CVD.

**53**    The Manufacturing divisions for each of Ford Canada and Ford U.S. (along with outside suppliers) sell component parts to the Assembly divisions in both countries at prices (fixed by Ford U.S.) with a profit to the Manufacturing divisions. The Assembly Divisions sell at prices (fixed by Ford U.S.) to both CVD and USVD with a profit to the Assembly divisions. CVD and USVD bear the risks of the marketplace for the assembled vehicles and parts sold onward to independent dealers of Ford vehicles. (see Exhibit #23 for a chart of the "Attribution of Divisional Profit and Loss.")

**54**    The independent dealers are not going to sell vehicles unless a reasonable profit is obtainable, at least as determined over a reasonable period of time. The retail market for vehicles is very competitive. To maintain the dealer network and Ford's position as a viable seller in the retail market, CVD is generally obliged to sell at a loss to its dealers in the Canadian market. USVD sometimes sells at a loss in the U.S. market. Indeed, CVD had a loss in each year from 1977 to 1995.

**55**    North America is an integrated market. Some 85% of vehicles assembled in Canada are sold into the American market. Thus, if the market for sales of the Canadian-assembled Ford Windstar vehicle falls in the U.S., volumes assembled in Canada will correspondingly decrease. That is, Ford Canada shares the risks related to the volume of sales in the U.S. market. And vice-versa in respect of Ford vehicles assembled in the U.S. and sold into Canada. As the volume of sales decreases there will be a decrease in the total profits to assembly operations. However, declining market prices, and the inability through market prices to recover the price paid to assembly operations, always fall upon CVD and USVD.

**56**    If CVD has a loss, that loss is, of course, reflected within the overall determination of profit or loss on a combined basis for all three of Ford Canada's operational divisions, for Ford Canada is a single corporate entity.

The Inter-Corporate Arrangements

**57**    The two entities, Ford Canada and Ford U.S., have operated in an integrated North American market (United States and Canada) since the inception of the Canada-United States Auto Pact in 1965. The removal of tariff barriers resulted in the incremental integration of Ford's manufacturing and assembly operations in the two countries so as to achieve specialization and economies of scale. The Auto Pact brought free trade (subject to certain "safeguards") to this specific sector of the economy and was a precursor to the more general Canada-United States' Free Trade Agreement or

"FTA" which came into force January 1, 1989. With the North American Free Trade Agreement or "NAFTA" coming into force January 1, 1993, this integrated market was expanded to include Mexico.

**58**   The "North American Automotive Operations" of Ford is viewed by Ford as a self-sufficient, vertically integrated business responsible for product development, manufacturing, marketing, sales and after sales service in Canada, Mexico and the United States.

**59**   Northbound/southbound agreements form the basis of the inter-corporate Ford transfer pricing system for Ford Canada and Ford U.S. Given the corporate parent-subsidiary relationship, Ford Canada and Ford U.S. are not at arm's length in their dealings. An issue then raised in this case is: was the transfer pricing system employed for vehicles and parts the equivalent to that which would be seen in an arm's length relationship?

**60**   The Court heard evidence from Mr. Roy Bennett, President and Chief Executive Officer of Ford Canada between 1970 and 1981. Mr. Bennett was also a director of Ford Canada until 1995. Mr. Mark Hutchins, President and Chief Executive Officer of Ford Canada from 1994 to 1997 also testified. Mr. George Sharp, Vice-President of Finance for Ford Canada from 1992 to 1995 testified as well. Mr. William Davis, an independent member of Ford Canada's board of directors and the Chair of the Audit Committee from 1985 to 1995, also testified.

**61**   An agreement dated December 20, 1962 between Ford Canada and Ford U.S., sometimes referred to as the "relationship agreement", sets forth the basic relationship between the two entities as it applies to the sales of vehicles both northbound and southbound. This agreement incorporates amendments at various points of time to an earlier agreement dated May 1, 1949, which in turn refers to earlier agreements as far back as August 10, 1904, pursuant to which Ford Canada was first organized (Exhibit #1, tabs 159 and 160, vol. 10, JBD).

**62**   The relationship agreement obliged Ford Canada to pay Ford U.S. a fair share of Ford U.S.' development costs in exchange for territorial rights and to sell Ford products therein. By paragraph 15, the agreement continues in force so long as Ford U.S. owns at least 30% of Ford Canada's voting stock and for 10 years thereafter.

**63**   Various agreements as to transfer pricing followed upon the inception of the Auto Pact in 1965. (Exhibit #1, tabs 162-168, 171, 173, vol. 10, JBD) These agreements are known as the "U.S.-Canadian Transfer Price Agreement" (Exhibit #1 tabs 184-186, vol. 10, JBD) The agreement dated August 15, 1965 provides that the same interdivisional price as paid by the Ford U.S. sales division, USVD, to assembly plants shall be paid by Ford Canada's sales division, CVD, in respect of northbound vehicles. Ford U.S. also agreed to pay CVD the Ford U.S. interdivisional price for southbound vehicles. By paragraph 10 the agreement may be terminated upon 30 days notice by either party. (Exhibit #1, tab 168, vol. 10 JBD) Subsequent transfer price agreements appear to have this same termination clause. (See Exhibit #1, tabs 175, 177, 184 and 188, JBD)

**64**   The U.S.-Canada transfer price agreement dated March 28, 1979 reiterates the existing relationship seen in the earlier agreements. It deals with the sale of vehicles, both northbound and southbound, from the assembly plants to the respective sales divisions of Ford Canada and Ford U.S. A main provision is that the same price will be paid, in U.S. dollars, by both USVD and CVD, for any given finished vehicle from any assembly plant from which the vehicle comes, whether located in Canada or the U.S. This principle can be referred to as the "price parity" principle. Schedule #1 to the agreement provides for sharing TELO on a unit sales basis.

**65**   The price parity principle is further clarified by an agreement dated January 1, 1981 which provides that the price payable to Ford Canada for southbound vehicles will be based upon the Ford U.S. interdivisional price. When there are model lines assembled in Canada, the interdivisional transfer price will be imputed and "constructed with elements comparable to what was described' in the earlier agreement. (Exhibit #1, tab 189, vol. 10, JBD) The overall effect is that the parties use a U.S. cost base to determine the interdivisional transfer price, even when vehicles are assembled in Canada.

**66**   Thus, Ford Canada is a price-taker, with CVD bound to accept the same prices set by Ford U.S. for USVD. Those prices are based on fully-allocated costs, including mark-ups for manufacturing and assembly. They are set by Ford U.S. The prices and mark-ups are not negotiated with Ford Canada.

**67**   It is noted as an aside at this point that this approach means that there is a comparatively greater realised profit margin on vehicles assembled in Canada, given a lower labour cost, due to the exchange rate and due to much of the costs of health care in Canada being borne by governments, in contrast to the U.S. where the cost is borne principally by the employer/employee. This phenomenon can be referred to as the labour cost saving' inherent in Canadian assembly plant operations.

**68**   The agreements provide that Ford U.S. will allocate to Ford Canada a fair proportion of the vehicles available in the North American market. Schedule 1 to the 1979 agreement provides that TELO expenses will be shared between Ford Canada and Ford U.S. based upon their respective unit sales. (As will be seen, the TELO calculation was changed in 1995 whereby charges to CVD and USVD were based upon vehicle model sales rather than simply unit sales.)

**69**   The inter-corporate agreement regime last formulated in 1979 (with only minor subsequent clarifications and changes) remained in place through September 11, 1995.

**70**   Ford's Finance Manual excerpt entitled "Intra-Company Pricing Principles", issued October 26, 1978 provided that base prices would approximate competitive levels through looking to prices of outside suppliers for identical products, derived prices from outside prices for similar parts and through formula prices i.e. establishing base prices on the cost of an efficient producer plus a profit mark up. Ford Canada assumed the standard warranty obligations on vehicles sold in Canada.

**71**   There is common ground that Ford Canada grew rapidly and prospered significantly following the Auto Pact in 1965. As with the later FTA and NAFTA, Canadian producers gain significant advantages of specialization and scale through access to the ten-fold larger American market and the overall integrated single market. However, a number of factors adversely affected Ford Canada from about 1977 to 1995.

**72**   As discussed above, under the inter-corporate agreements in place, the pricing for assembled vehicles and manufactured component parts is fixed in United States' currency by Ford U.S., whether manufactured and assembled in Canada or in the United States.

**73**   The sales in these goods of Ford has been significantly in favour of Ford U.S. with respect to the Canadian Market. That is, more total value in intangibles (TELO), manufactured component parts and assembled vehicles has been exported by Ford U.S. from the United States to Canada than has been supplied by Ford Canada for the Canadian market.

**74**    The current account deficit of Ford Canada for the goods in question steadily worsened with the general decline in the relative value of the Canadian dollar from the late 1970's through 1995. The effective price paid by CVD (whether for vehicles from USVD or for Canadian assembled vehicles), following "price parity" in U.S. dollars, and the total cost to CVD for the vehicles and parts it purchases, rises as the exchange rate falls for the Canadian dollar. Somewhat paradoxically, at the same time, Ford Canada Assembly and Ford Canada Manufacturing have greater revenues (because they are selling at prices fixed in U.S. dollars). The declining exchange rate also adversely affected CVD in respect of its TELO payments.

**75**    CVD had an operating loss in every year from 1977 to 1995, with its largest loss being $803 million in 1992. The cumulative total of CVD losses for the 11 year period 1985-1995 was $5.954 billion. (See Sheet "C", Exhibit #4) (CVD operated at a loss for 19 consecutive years from 1977, with a total cumulative loss of almost $7.5 billion for 1977-1995.)

**76**    Canadian Manufacturing had a cumulative operating profit over that 11 year period of 1985-1995 of $1.076 billion, the highest year being $143 million in 1993. Assembly had a significant profit in every year, the highest being $649 million in 1986, with a cumulative total of $4.221 billion for 1985-1995. The overall result for the period of 1985-1995 resulted in an approximate operating loss for the combined three divisions of $497 million to Ford Canada.

**77**    The sales of vehicles and parts with respect to the Canadian market favours Ford U.S. Sales (priced in U.S. dollars) by Canadian Assembly to CVD, with resulting increased profits to Canadian Assembly due to the exchange rate decline for the Canadian dollar, will be offset by corresponding losses within CVD (unless the increase in price due to exchange rate decline can be passed on entirely to dealers, and as will be seen, this has not been possible).

**78**    Sales by Canadian Assembly to USVD and by Canadian Manufacturing to U.S. Assembly will increase Canadian revenues and income (in Canadian dollars terms) with a declining exchange rate. However, these amounts will generally be more than offset by the increasing cost of sales of U.S. manufactured components to Canadian Assembly, by the increasing cost of the sale of vehicles from US Assembly to CVD and by the increasing cost of TELO expenses charged to CVD. That is, the overall balance of trade in the integrated Canada - U.S. market favours Ford U.S. As the Canadian dollar falls relative to the U.S. dollar, the overall impact is that Ford Canada loses money.

**79**    A fundamental of the existing system is that manufacturing and assembly operations in both countries sell vehicles and replacement parts at the same prices, in U.S. dollars, to both CVD and USVD. While the volume of Ford Canada's manufacturing and assembly relative to the Canadian population is a higher percentage than that of Ford U.S. relative to the American population, the total volume of manufacturing and assembly production in the United States is significantly higher than that seen in Canada. As well, as discussed, if the Canadian currency falls in relation to the U.S. dollar, Ford Canada's profits will decrease or its losses will increase. The internal structure of Ford Canada is such that this risk of currency depreciation (and any other risks associated with the Canadian market, such as, for example, an economic recession) falls upon CVD.

**80**    Ford Canada's manufacturing and assembly operations benefit overall with a decline in the value of the Canadian dollar because sales (whether to CVD or USVD) are in U.S. dollars. However, operating costs increase somewhat (70% to 75% of operating costs arise from related transactions with Ford U.S.). More significantly, the increases in price in vehicles and parts to CVD cannot be recovered entirely through the wholesale selling of vehicles and parts by CVD to Canadian deal-

ers (and forward by them through retail sales to Canadian consumers). From an accounting stand-point, CVD is the division which reaps the residual profit, or conversely sustains the residual loss, resulting from sales of vehicles and replacement parts and warranty costs in the Canadian market. As stated above, the residual impact upon CVD is that it has suffered very significant losses every year since 1977.

**81**    Ford suffered a cumulative loss of some $2.16 billion in the Canadian market for the period 1985 to 1995. (Exhibit #71) This is determined by taking the total profits of Ford Canada and Ford U.S. from manufacturing and assembly sales into the Canadian market, being $3.793 billion, and subtracting the total losses of CVD, being $5.954 billion. An isolation of the Canadian market establishes that the sales into that market were at a substantial loss to Ford Canada, as I have said, being some $2.16 billion over 1985-1995.

**82**    Given that Ford Canada shares the U.S. market in the integrated North American market, Ford Canada profits from the sales by Canadian Manufacturing and Assembly to Ford U.S and into the American market. However, the overall balance of trade between Ford Canada and Ford U.S. favours the latter. This is mainly because of the significant losses of CVD through being unable to recover its costs of parts and vehicles purchased for sale in the Canadian market, coupled with its transfer payments for TELO to Ford U.S. TELO for 1985-1995 amounted to $3.586 billion. (Exhibit #4-sheet "A")

**83**    The overall result is that Ford Canada had a reported loss from its North American operations of some $709 million for 1985 to 1995. This is determined by adding the total component Manufacturing and Assembly profits of Ford Canada ($598 million in the Canadian market plus $4.647 billion in the U.S. market) and subtracting the total losses of CVD (of $5.954 billion). (Exhibit #71, prepared by Horst Frisch Incorporated)

**84**    To summarize, the essence of the Ford Canada - Ford U.S. relationship has been as follows. Ford Canada manufactures some components and assembles vehicles. Ford U.S. manufacturers some components and assembles vehicles. The manufacturing divisions in each country sell to the assembly divisions in each country. All sales are in U.S. dollars.

**85**    Canadian Assembly sells finished vehicles in Canada to its distribution division, CVD, and sells into the U.S. through sales to the US distribution division, USVD. All sales are in U.S. dollars. CVD also pays significant amounts in U.S. dollars to Ford U.S. in respect of TELO, being payments for the intangibles conferring the right to market and sell Ford products in Canada.

**86**    Sales of assembled vehicles by Canadian Assembly into the U.S. ($4.647 billion) exceeded sales by U.S. Assembly into Canada ($3.195 billion) for 1985-1995 (Exhibit #71). However, it is to be noted that the assembled vehicles contain more components that are manufactured in the U.S. than are manufactured in Canada. Similarly, U.S. manufactured vehicles contain considerably more components that are manufactured in the U.S. than are manufactured in Canada. Most significantly, there are substantial losses in the Canadian market by Ford Canada ($2.16 billion for 1985-1995 with corresponding profits to Ford U.S.) Therefore, there is an overall trade balance in U.S. dollars in favour of Ford U.S. On balance, Ford Canada suffered a cumulative loss of some $709 million for 1985-1995.

**87**    In 1994, Ford U.S. operated some 37 manufacturing plants. Ford Canada owned 50% of Essex (Ford U.S. having the other 50%), which operated an engine and aluminium casting plant in Can-

ada. Ford Canada had three assembly operations while Ford U.S. had some 15 assembly and 13 power train operations.

**88** CVD and USVD can be looked upon as the divisions to which are notionally assigned the business risks as to market price in the respective countries. The mark-ups by Manufacturing and Assembly are fixed and certain. That is, both CVD and USVD purchase at a price that includes the value-added by the manufacturing and assembly divisions. Thus, the manufacturing and assembly divisions are assured a profit although a decline in the volume of vehicles assembled will reduce the quantity of that profit.

**89** Given the allocation of risk as to price, and burden of the fixed costs, the distribution divisions, CVD and USVD, are not assured a profit and indeed, may well suffer a loss. The distribution divisions are assigned a number of significant costs, including warranty costs and variable marketing costs, beyond the cost of purchasing assembled vehicles and replacement parts, and TELO (See Exhibit #4 - Sheet "A").

**90** Second, the distribution divisions bear all the risks associated with the competitive marketplace. This includes the risks of consumer product preferences (such as to makes, models, type and size of cars) and consumer disposable incomes (which in turn depends upon a multitude of macro- and micro-economic circumstances, including fiscal and monetary policies, productivity and GNP growth, employment, and interest rates).

Historical Economic Factors affecting Ford Canada

**91** The selling price of a vehicle is, of course, dependent upon the market, which in turn is influenced by a myriad of factors.

**92** Mr. James Mateyka, an automotive markets and industry expert, testified as to the history of events which affected the North American automobile industry and markets from the inception of the Auto Pact in 1965 to 1995. He prepared a comprehensive 126 page report, "How Unanticipated External Events Have Affected Ford of Canada's Profitability: A Reply To the Transfer Pricing Analyses Of Deloitte Touche Tohmatsu and Horst Frisch Incorporated" dated May 31, 2001, as revised January 28, 2002 (Exhibit #7A) (the "Mateyka Report"); (Exhibit #7B was the original May 31, 2001 report, with "Supporting Figures" dated May 31, 2001 filed as Exhibit #10B; see also Exhibit #9). Mr. Mateyka also prepared "A Reply To Certain Issues In The Report Of J. Gregory Ballentine, Bates White & Ballentine LLC, December 18, 2001", dated February 14, 2002 (Exhibit #8). Dr. Ballentine in turn prepared a reply thereto, dated March 4, 2002 (Exhibit #81).

**93** Horst Frisch Inc. ("Horst Frisch") provided a "Reply To Mateyka Report dated August 7, 2001 (Exhibit # 69). Horst Frisch points out that the OMERS experts do not dispute the claim of Mr. Mateyka that the combined income of Ford Canada and Ford U.S. derived from vehicles sold in Canada 1985-1995 was adversely affected by economic events. Rather, the OMERS experts assert that these adverse economic events had a very disproportionate, and unfair, impact upon Ford Canada. Horst Frisch also disputes the claim of Mr. Mateyka that the events were entirely unforeseeable and unanticipated. Most significantly, Horst Frisch disputes the un-stated, underlying major premise of the Mateyka argument that Ford Canada alone would have borne the impact of these adverse economic factors if Ford Canada had been an independent party dealing at arm's length from the parent company.

**94**    The Mateyka Report calculates that Ford Canada's cumulative profit would have been $5.813 billion higher if Ford Canada had charged the same prices in Canada that Ford U.S. charged in the United States. The Mateyka Report includes this $5.813 billion shortfall in its tables showing the profit impact on Ford Canada of "unexpected" events.

**95**    Horst Frisch points out that the critical assumption underlying the Mateyka calculations is that Ford Canada continued to expect that its Canadian vehicle sales prices would be the same as the Ford U.S. vehicle prices after 1977, as they had been before 1978, and that this expectation was never adjusted in the 1977-1995 period.

**96**    This is not a reasonable assumption as to the expectations of a rational entrepreneur in Ford Canada's position. Expectations about the future are more likely to be based upon an updated combination of recent history and current and prospective economic conditions than upon conditions of some increasingly distant historical period (i.e. pre-1978). Indeed, it is not the actual expectations as viewed by the management of Ford Canada over the years in question.

**97**    Deloitte & Touche LLP filed a "Reply to James Mateyka Report" dated July 31, 2001 (Exhibit #90) ("Deloitte & Touche"). The observation of Deloitte & Touche is that external economic events cannot rationalize and justify Ford Canada's 19 consecutive years of losses on vehicles imported from Ford U.S. Deloitte & Touche conducted a transfer pricing analysis project for OMERS (Exhibit # 87, discussed below), concluding that the transfer pricing for transactions between Ford U.S. and Ford Canada did not truly reflect arm's length results. That is, if Ford Canada had acted as an independent business entity, it would not have tolerated losses on its sales of vehicles purchased from the U.S. over 1977-1995. The analysis of Mr. Mateyka ignores the fact that parties acting rationally in their self-interest adjust their business relationships in the face of changing economic and business conditions and a consequential change in risks.

**98**    I agree with the opinions of the OMERS experts that external economic events cannot be used by themselves, as the Mateyka Report asserts, to justify 19 years of losses in Ford Canada's sales operations. I also agree with the view of Deloitte & Touche that Ford Canada's operations must be separately analyzed by a breakdown into the functional divisions to isolate the nature of the transfer pricing system and its impacts. The Mateyka Report incorrectly looks simply at the overall profitability of Ford Canada, which does not expose the alleged inherent flaws in Ford's North American transfer pricing system.

**99**    The Mateyka Report identifies adverse economic events which the report claims might have impacted negatively upon Ford Canada's profitability. However, the Mateyka Report fails to recognize that Ford Canada, if it were truly operating at arm's length, would not accept foreseeable losses on an ongoing basis year after year, knowing that the continuing adverse economic events (in particular, the unfavourable exchange rate), coupled with the historical static transfer pricing system in place, made continuing losses inevitable. The Deloitte & Touche analysis in its "Reply to James Mateyka Report" effectively demonstrates that the Mateyka Report's estimates of the impact of economic events on Ford Canada's profits are simplistic and not credible.

**100**    There have been very significant historical and continuing economic factors over the time period in question, some of which have had specific impacts upon Canada and which have affected adversely Ford Canada relative to Ford U.S. In my view, the only certainty that is evident from looking back at this history with the benefit of hindsight is that there is very little certainty, if any at all, to the future course of economic events. Hence, any business must have the ability to be flexible

in its business arrangements and be able to respond to changes in market conditions to be profitable. Let us now look briefly at some of the seminal historical factors relevant to the automobile industry.

Historical Factors Affecting the Automobile Industry

**101** First, as discussed above, the fall in the value of the Canadian dollar as against the United States dollar has had a very significant negative impact upon CVD and hence, Ford Canada, since 1977. This adverse factor has been the most significant phenomenon in looking to the comparative performances of the two companies over the period in question. But there are other, interrelated, factors as well.

**102** Second, the purchasing power of the Canadian consumer has generally declined, and the Canadian personal disposable income deficit has increased, relative to that of the United States' consumer over the period under consideration. This phenomenon reflects not only the exchange rate issue, but also the underlying reality of a relatively less productive economy in Canada. As well, at the beginning of the 1980's, high interest rates resulted in an automobile affordability gap', as measured by personal disposable incomes, between the U.S. and Canada.

**103** Third, Canadian consumers have shown a greater preference for smaller, fuel efficient vehicles than their American counterparts. Smaller vehicles generally have a lower profit margin than larger vehicles for manufacturers. Given the two Organization of Petroleum Exporting Countries ("OPEC") induced energy crises of October, 1973 (the imposition of cartel restrictions on the supply of oil to capture monopoly rents resulting from an inelastic demand curve) and 1979 (the Iranian revolution and the consequential enhancement of the cartel's ability to restrict supply through the temporary removal of Iran, the world's third largest supplier), with escalating oil prices (more than ten-fold), there was a movement in Canada toward smaller, less fuel-consumptive vehicles. This market change was met largely by Asian manufacturers, with the North American manufacturers left with excess capacity and responding only slowly with design and engineering changes to meet the new demand.

**104** Fourth, the Canadian automobile market faced earlier and greater competition from Asian auto makers than did the U.S. market.

**105** Fifth, Ford Canada faced exceptional increased warranty costs, in part from product quality problems and in part from the costs of extended warranties offered to consumers as a result of competitive pressures.

**106** Sixth, Ford Canada faced increased engineering costs in the late 1980's and early 1990's because of legislated vehicle emission and safety requirements.

**107** Seventh, Canada endured a prolonged economic recession from 1990 to 1995, well beyond the economic downturn experienced by the United States in the early 1990's.

Transfer Pricing and the Tax System

**108** A concern for taxation authorities arises when a business enterprise with subsidiary or affiliated operations in different jurisdictions has non-arm's length transactions between the enterprise's entities. The enterprise may try to price transactions artificially so as to place its expenses in high tax jurisdictions (thereby understating profits and consequentially lowering taxes) and raise profits in low or zero tax jurisdictions (thereby reducing or eliminating the taxes which would otherwise be imposed upon its profits).

**109**    Tax regimes, including that of Canada and the United States, have an elaborate regulatory structure to try to counter this phenomenon. Thus, the transfer pricing system in parent-subsidiary cross-border dealings is scrutinized by the tax authorities of each jurisdiction to determine whether there is attempted tax avoidance in the scrutinizing jurisdiction through the inter-corporate transfer pricing system employed.

**110**    Section 247 of Part XVI.1 of the Income Tax Act sets forth the regime for regulating transfer pricing to ensure protection of Canadian tax revenues. The objective of the tax statute is to ensure that a taxpayer makes reasonable efforts to determine and use arm's length transfer prices in a transaction with a non-resident person with whom the taxpayer does not deal at arm's length. The objective is to ensure that the prices present in respect of such a transaction are those that would be the case if the participants had been dealing at arm's length with each other. See generally Carl F. Steiss and Luc Blanchette, "The International Transfer-Pricing Debate" (1995) 43 Can. Tax J., No. 5, 1566 (Exhibit #76).

**111**    As discussed above, Ford Canada and Ford U. S. have inter-corporate agreements which set transfer prices and allocate costs (such as TELO) for their operations. Revenue Canada, now Canada Customs and Revenue Agency ("CCRA"), reviewed the transfer pricing methodology at various points over the time period of 1965 to 1995, and raised various queries (with some relatively minor reassessments in respect of expense allocations to Canada for the 1986 and 1987 taxation years) but did not attack the fundamentals of the transfer pricing system. The evidentiary record indicates the tax authorities in both jurisdictions generally have not been dissatisfied with the fundamentals of the transfer pricing regime in place over the period of time in issue.

**112**    As stated above, the operations of each of Ford Canada and Ford U.S. have been divided into three broad functional divisions. The Manufacturing divisions manufacture core components such as engines as well as some non-core components, such as mufflers. The Assembly divisions purchase components from the Manufacturing divisions, as well as from third party component manufacturers, and assemble the components into finished vehicles. There are more than 100,000 components to any given vehicle. The Manufacturing and Assembly divisions are compensated as arm's length contractors and bear volume risk.

**113**    For the internal component manufacturing, prices are reportedly set to approximate those paid to external manufacturers, based upon comparable uncontrolled prices ("CUPS") or comparable mark-ups on total manufacturing costs. The assembler, whether a plant in Canada or the United States, earns a mark-up on the labour and overhead costs associated with assembling the vehicle. That is, there is a mark-up for the value -added services.

**114**    CVD in Canada and the USVD in the U.S. purchase the assembled vehicles, and such component replacement parts as may be necessary, and sell the finished vehicles and independent parts to networks of independent dealers throughout the two countries. There are two articulated functions performed by CVD: distribution through marketing and the exploitation of Ford's intellectual property.

**115**    The vehicle divisions (CVD and USVD) absorb warranty expenses incurred in their respective countries as well as sharing TELO and certain other expenses.

**116**    CVD and USVD bear the risk that the purchase price paid to them by dealers in their respective markets may be less than the built-up costs in each vehicle, which costs include the costs of

components, the assembly costs, the costs associated with developing and engineering the vehicle, and the general and administrative costs associated with selling into their respective markets.

**117** OMERS' allegations of oppression through the transfer pricing system emphasize two main factors, given the nature of the Canadian market: first, that Ford Canada unfairly bore the currency exchange risks in the overall operation of the transfer price system; and second, that the TELO component of transfer pricing was unfairly allocated to Ford Canada.

**118** In all events, the record establishes that Ford's transfer pricing methodology is acceptable to the tax authorities in each country. However, the record also establishes that neither CCRA nor the U.S. Internal Revenue Service ("IRS") have done a full scale audit of Ford's transfer pricing. Rather, they have looked at the transfer pricing system only in a very broad-brush manner.'

**119** CCRA recommends in its Information Circular No. 87-2 (M.N.R., Information Circular IC-87-2, "International Transfer Pricing" (27 February 1987)) (Exhibit #1, tabs 638 and 641, vol. 34, JBD) the adoption of an approach of comparable uncontrolled prices ("CUPS"), or prices derived from CUPS, where available, as the primary method. Where CUPS are not available, the secondary method recognised is a "cost plus" pricing approach using external arm's length comparables from open market transactions.

**120** Income tax authorities do not restructure transfer pricing arrangements. Rather, they seek to ensure that the prices for the product and service transfers are within an acceptable arm's length price range and if they are not, then the prices are adjusted to bring them within the arm's length range.

**121** It is apparent that the transfer pricing regime of Ford is complex and sophisticated. There are more than a 100,000 components that go into a vehicle, some being manufactured by Ford and others being purchased from outside suppliers. (see Exhibit #12 as illustrative of the Ford components, and the components by outside suppliers, in respect of the 1995 Mustang.) There is a myriad of diverse factors to take into account in transfer pricing as illustrated by Dr. Wright's voluminous report on transfer pricing for Ford U.S., following upon her team's two year analysis (see Exhibits #6, #8, #10, #11) ("Dr. Wright's report" or "Charles River Associates' report").

**122** Both the plaintiff and the defendants perceive a central issue in this dispute to be that of the lawfulness of the transfer pricing system of Ford U.S. and Ford Canada from the standpoint of complying with tax law. Much of the very considerable expert evidence and extensive submissions went to the issue as to whether or not the structure of the existing transfer pricing system was consistent with the normative tax regulatory regime requirements.

**123** Ford U.S. hired Dr. Deloris R. Wright, a transfer pricing expert consultant, and Charles River Associates, to do a very extensive study of Ford U.S.'s North American transfer pricing arrangements between 1993 and 1995. Dr. Wright's report resulted in some changes to the inter-corporate prices charged (in particular, in the manner of determining TELO charges), but no changes were recommended in respect of the basic structure of the transfer pricing system.

**124** Following Dr. Wright's 1994 report, TELO charges were changed from a unit sales basis to a specific vehicle model basis. Historically, the two corporations each paid a pro rata share of TELO costs based upon the volume of units sold by each as compared to the total volume of units sold. Dr. Wright's 1994 report on transfer pricing recommended a change, later adopted commencing with the 1995 fiscal year, whereby TELO continued to be allocated pro rata but on a new basis, whereby

TELO is charged on a model by model basis (or on the basis of the relative volume of dollar sales in each country). As there are relatively more of the inexpensive models sold in Canada and relatively more of the expensive vehicles sold in the U.S., this approach results in a reduction in the TELO charged to Ford Canada of some $30 million per year. (This change was taken into account in the valuation of Ford Canada's shares formulated by CIBC Wood Gundy.)

**125**    Drs. Horst and Clark opine that historic assembly and manufacturing returns were too high for both Ford Canada and Ford U.S. They would restructure the transfer pricing system whereby Ford Canada would in effect share profits with Ford U.S. in a consolidated market. Dr. Clark would incorporate a "Market Adjustment Factor"; Dr. Horst would include a form of asset-based profit-split methodology. However, whatever the merits of such proposals, no evidence was introduced that either of these approaches is required for transfer pricing structures by either CCRA or the I.R.S.

**126**    The fact that General Motors and Chrysler, with wholly-owned subsidiaries in Canada, have adopted different structural approaches to their respective transfer pricing systems as compared to that of Ford does not alter the fact that Ford's approach is acceptable to the tax authorities as being consistent with the taxation regimes.

**127**    Evidence was also led to establish that in agreements between Ford U.S. and Mazda, and between Ford U.S. and Kia, the risks have been allocated differently from the approach seen in the Ford Canada and Ford U.S. arrangements. However, such differing arrangements do not in themselves mean that the transfer pricing system between Ford Canada and Ford U.S. is unlawful from the standpoint of tax regulatory requirements.

**128**    The Court views the fundamental issue of this case somewhat differently from the parties and expressed this view at different points in the course of the trial. In the Court's view, the matter of the lawfulness of the transfer pricing system from a tax regime standpoint is properly a matter between the corporations and the tax authorities. Ford Canada should be able to follow a transfer pricing system that meets with the approval of the tax authorities; provided however, the transfer pricing system cannot be unfair to minority shareholders such as to constitute actionable oppression within the meaning of s. 241 of the CBCA.

**129**    That is, it is not sufficient for a taxpayer to simply have a transfer pricing regime that does not find objection with the tax authorities. The transfer pricing system must not result in unfairness to minority shareholders such as to constitute oppression within the ambit of the CBCA. A transfer pricing system must meet the requirements of the tax regulators and also be fair to minority shareholders. There is nothing contradictory about these dual requirements for a transfer pricing system.

**130**    Finally, in my view, the structure of a transfer pricing system (even if found acceptable to the tax authorities and even if there is not actionable oppression under s. 241 of the CBCA) is a relevant factor for consideration in determining the "fair value" of shares. It may well be that an independent, arm's length purchaser of a business would ascribe an additional value because the purchaser reasonably contemplates being able to change the structure of the existing transfer pricing system.

**131**    The Special Committee of Ford Canada examining the proposed "going private" transaction in July, 1995 did not retain a transfer pricing expert but rather, as with CIBC Wood Gundy, relied upon the position of Ford U.S. that the transfer pricing system resulted in the equivalent of arm's length prices. However, the fact that a transfer pricing regime is acceptable to the tax authorities as being within the range of arm's length prices does not mean the system provides the actual arm's

length prices that would be seen in real and differing markets. Nor does the fact that a transfer pricing system is acceptable to the tax authorities necessarily mean the system provides prices that are not unfair to minority shareholders of a corporate party.

**132**    The Ford transfer pricing system is extremely complex and esoteric. It may well satisfy U.S. tax authorities on its merits (and also perhaps because, if it is flawed, it errs on the side of overstating the source of income as being the United States). The record indicates that the transfer pricing system has never been given a comprehensive evaluation by CCRA. The only transfer pricing audit apparently done by CCRA in respect of Ford Canada was of Essex engine transfer prices at some point between 1991 and 1993.

**133**    The Canadian market was not profitable during the period 1985-1995 because of the nature of the adverse factors in the market coupled with the structure of the transfer pricing system in place. In my view, this observation is not made simply with the easy benefit of hindsight. Rather, arguably any independent entrepreneur would have reasonably forecast in advance the results each year as a probability because of the known economic factors, coupled with the static transfer pricing system.

**134**    The Canadian market would reasonably have been seen as a profitable incremental market. Transfer pricing policy allows for the sale of a product into a market in which the arm's length price is lower than fully-allocated costs. Ford's transfer pricing system did not allow for this. However, a market is still profitable to a vendor, provided the incremental costs are recovered and some contribution is made to fixed costs. It is in the mutual self-interest of an arms length vendor and purchaser to negotiate such an agreement, because it constitutes a win-win' situation, that is, both will profit.

**135**    TELO costs are fixed costs to Ford U.S., with no incremental costs by selling into the Canadian market. Dr. Greg Ballentine noted that Ford Canada contributed some $3.586 billion towards TELO costs over 1985-1995, a period in which Ford Canada was accumulating a Canadian market loss of $2.16 billion. No reasonable arm's length entrepreneur would make that investment in intangible assets given the negative return and little prospect of any significant change for the future. Taking into account only Ford Canada's contribution to TELO costs, Canadian sales increased Ford U.S.'s profits significantly.

**136**    Both General motors and Chrysler have treated Canada as a profitable incremental market. Vehicles are sold to the Canadian operations on a discount to dealer basis, that is, at less than fully-allocated costs. (Exhibit #1, tab 628, vol. 34, JBD) Provided that a sale is at an arm's length price, transfer pricing theory and policy permits a sale at less than a fully-allocated cost or at different prices in different markets. (GM Canada and Chrysler Canada had operating profits from automotive operations in each year for the period 1985-1995 - Exhibit #4 - Sheet "C").

**137**    Dr. Clark opined that a fair allocation of TELO costs between Ford Canada and Ford U.S. would be on the basis of the pre-TELO operating profit generated in each of the two different markets. This approach is more consistent with an arms length relationship between parties. It is very doubtful that an arms length Ford Canada would agree to pay Ford U.S. $3.586 billion over 1985-1995 for fixed TELO costs when over the same period the overall reasonably foreseeable loss in the Canadian market for Ford Canada would be in the order of $1.77 billion (CVD loss of $5.954 billion less TELO charges of $3.586 billion = $2.368 billion loss against profits from sales by the manufacturing and assembly of cars by Ford Canada and sold in Canada by Ford Canada of only $598 million). (See Exhibit #71)

**138**    Even if one takes into account as well the profits from the sale of Ford Canada manufactured parts and vehicles into the American market over 1985-1995 of $4.647 billion, Ford Canada would be paying out TELO to earn an overall loss of about $709 million (i.e. CVD total loss of $5.954 billion minus total profits from manufacturing and assembly of $5.245 billion for the North American operations). (Exhibit #71)

**139**    At the same time as this cumulative loss was reasonably foreseeable to Ford Canada, Ford U.S. would have reasonably foreseeable cumulative profits of $6.781 billion over 1985-1995 in the Canadian market from manufacturing and assembly plus sales into the Canadian market of $3.195 billion plus TELO charges payable by Ford Canada of $3.586 billion. (Exhibit #71)

**140**    I emphasize that this is not an exercise simply with the too easy benefit of hindsight. While these amounts would not be known with any precision through foresight, the probability each year of results for the next year which would ultimately lead to overall cumulative results of this magnitude, would be reasonably foreseeable.

**141**    There is a fundamental issue in the dispute at hand. Were Ford Canada and/or Ford U.S. acting unfairly because of acts or omissions which effected a result that was oppressive or unfairly prejudicial to, or that unfairly disregarded the interests of, minority shareholders of Ford Canada through the inter-corporate transfer pricing system such that the statutory oppression remedy of s. 241 of the CBCA is operative?

**142**    Transfer pricing is only one aspect of the overall relevant evidence in answering this issue. Even then, the issue is not simply whether transfer pricing was or was not consistent with tax norms. This is a matter between the taxpayer and the tax authorities. As has been stated, the existing transfer pricing system has met with the approval of the tax authorities in both countries or, at least, has not met with disapproval.

**143**    A transfer pricing system that is found to be unlawful from the standpoint of the tax authorities might well not be oppressive to shareholders. Indeed, a transfer price system that meets with tax problems is usually to the benefit of the narrow, private self-interest of all the shareholders while being at the expense of the public interest through the loss of tax revenue. Conversely, a transfer pricing system that meets the criteria of the tax authorities does not in itself necessarily establish that there cannot be a finding of oppression in respect of shareholders. Rather, the proper question is: does the overall evidence of the corporate operations of Ford Canada establish oppression in respect of the minority dissenting shareholders within the ambit of s. 241 of the CBCA?

**144**    Leaving aside the analysis as to whether there is a sustainable oppression claim under the CBCA, a factual finding of structural flaws being inherent in the transfer pricing system may nevertheless possibly impact upon the determination of the fair value as of the valuation date, September 11, 1995. Counsel to the Special Committee of Ford Canada stated at its June 9, 1995 meeting:

> [I]f the Committee concludes that the transfer pricing or other inter-corporate arrangements at Ford are unfairly disadvantageous to [Ford Canada], it would be appropriate for the Committee to instruct Wood Gundy to take that into account in reaching their valuation by adjusting to reflect fair arrangements.

**145**    Mr. Bennett recognized the importance of the Special Committee satisfying itself that the transfer pricing arrangements were fair. CIBC Wood Gundy also recognized that transfer pricing was a critical issue in valuing Ford Canada shares because transfer pricing would directly impact

the free cash flow that Ford Canada would earn going forward. Nevertheless, CIBC Wood Gundy simply accepted the existing transfer pricing system without any real investigation or critical analysis.

**146**    CIBC Wood Gundy relied upon the fact the established transfer pricing system had been in place for some 30 years and that the review being completed by Dr. Wright for Ford U.S. reported that the system was sound. However, the Ford U.S. review by Dr. Wright was solely for the purpose of determining whether the transfer pricing system met the criteria of the U.S. tax regulatory authorities. The mandate of that review did not include any consideration, or even awareness, of the latent issue as to whether the transfer pricing system was fair to the minority shareholders in Ford Canada.

**147**    As discussed above, even though a transfer pricing system meets with tax regulatory approval, there is considerable room for adjustment within that transfer pricing system, and within the range of pricing chosen, without violating tax regulatory requirements. That is, as long as the pricing reflects arms length standards in a competitive market, there is considerable room for flexible pricing so as to take into account differing market conditions. Both the U.S. and Canadian tax authorities accept business transactions as they are structured by the parties unless the structure lacks economic substance or is for the purpose of avoiding taxes.

**148**    There is considerable flexibility allowed by tax authorities in determining transfer pricing. The OECD recognizes that a member of a multinational enterprise may, like any independent enterprise, sustain genuine losses whether from mismanagement, from unfavourable economic conditions or because of other reasons, in its own particular market or more generally (para. 49 of OECD, Report on Transfer Pricing and Multinational Enterprises, (Paris: OECD, 1979) at p. 22).

**149**    The OECD Transfer Pricing Guidelines For Multinational Enterprises And Tax Administrations, (Paris: OECD, 1995) at para. 1.30 ("OECD Transfer Pricing Guidelines") (Exhibit #1, tab 642, volume 35, JBD) recognizes that arm's length prices may vary across different markets, even for transactions involving the same property or services. Therefore, achieving comparability in prices requires that the markets in which the independent and associated enterprises operate are comparable, and that differences do not have a material effect on price or that appropriate adjustments can be made. The varying economic circumstances of different markets must be taken into account. See OECD Transfer Pricing Guidelines, supra, chapter I, paras. 1.6 to 1.54. (Exhibit #1, tab 645, volume 35, Joint Book of Documents) See generally R. Feinschreiber, Transfer Pricing Handbook, vol. 1., 3d ed. (Hoboken: John Wiley & Sons Inc., 2001) at 30.3 (Exhibit #33).

**150**    Dr. Horst testified that U.S. tax authorities and the OECD Transfer Pricing Guidelines support the use of a profit split method to determine a transfer pricing adjustment where there are no closely comparable transactions or where it is less likely that either party will be left with an improbable profit result. See OECD Transfer Pricing Guidelines, supra at paras. 3.5 to 3.25; U.S. Department of the Treasury, A Study of Intercompany Pricing, October 1988, chapter 11.

**151**    Clearly, the specific transfer pricing system in place has had an overall negative impact upon Ford Canada. The point is, if there was oppression through unfairness to the minority shareholders by reason of the structure of Ford Canada's overall business operations, then the s. 241 CBCA protective regime should be activated. The fact that the existing transfer pricing is acceptable from the standpoint of the tax authorities (or more precisely, has not been challenged) does not mean in itself that there cannot be a finding of oppression.

**152**    Mr. Ian Campbell also correctly rejected the view that transfer pricing is to be seen narrowly as simply an oppression issue with an adjustment called for only if the oppression claim is successful. In his view, an arm's length purchaser of Ford Canada would take into account the inherent values dependent upon transfer pricing adjustments, just as a purchaser would in respect of any other asset or liability that had not been recognized on the company's books. Mr. Campbell premises his view upon acceptance of the opinions of Drs. Clark and Horst as to the proper commercial result in considering Ford Canada and Ford U.S.'s combined operations.

**153**    Leaving aside legal arguments, Mr. Campbell opines a balance sheet adjustment for Ford Canada recognizing the Clark/Horst commercial result to be an appropriate valuation accrual in a notional valuation context. The premise underlying the Horst/Clark theories is that an unrelated, independent Ford Canada would have wanted to renegotiate the historical arrangements with Ford U.S. The self-interest of both entities would have driven the negotiations to a successful conclusion.

**154**    Dr. Wright's report was prepared for U.S. tax purposes. Section 482 of the Internal Revenue Code came into force July 1, 1994 (26 U.S.C. subsection 482), as well as penalty provisions contained in s. 6662 (26 U.S.C. subsection 6662) and related regulations. If a corporation has a report and contemporaneously prepared written documentation supporting its transfer pricing system, a penalty otherwise consequential upon a reassessment for tax years after October, 1994 can be avoided.

**155**    Dr. Horst agreed with Dr. Wright's divisional approach to proper transfer pricing analysis, as it is more accurate and easier to find appropriate comparables. However, Dr. Wright's report did not review the pricing of vehicles into the Canadian market. Nor did it consider that the U.S. price parity principle resulted in CVD purchasing vehicles at prices higher than they could be sold at arm's length to Ford Canada's independent dealers. Her approach assumed that if the Assembly and Manufacturing mark-ups were arm's length, then the residual profits in sales must also be at arm's length. The 1994 report did not contain any reference to the historical losses of CVD or an analysis of the reasons for those losses. As mentioned above, CVD had a loss of $5.954 billion for 1985 - 1995. Sales by Manufacturing and Assembly of cars by Ford of $3.793 billion in the Canadian market resulted in an overall loss in the Canadian market of $2.16 billion for the period. (Exhibit #71)

**156**    The counterclaim alleges (at paras. 19 and 24) that Ford was in breach of the arm's length transfer pricing requirements of s. 247 of the Income Tax Act and of the OECD guidelines. A great deal of the evidence and argument at trial was related to an analysis of this specific issue. Both parties emphasised throughout the trial the asserted adequacy, or inadequacy, of the transfer price system as meeting tax law criteria and tended to assert this as the main issue. Ford argues that the transfer pricing system met the requirements of tax law: hence, Ford argues the claim for oppression is not sustainable on this ground alone. OMERS tended to base its argument in the main on the assertion that the transfer pricing system ran afoul of the tax law and therefore, oppression was proved.

**157**    The Court's view of the evidence and issues differs somewhat from the expression of the issues by the parties during the hearing. In my view, the matter of whether or not a transfer pricing regime of an enterprise meets the criteria of the tax authorities does not, in itself, form either the basis for a cause of action or the basis for a defence to an oppression action.

**158**    A transfer pricing system is a matter between the tax authorities and the taxpayer. Commonly, a transfer pricing system that is advantageous to the company, and hence the shareholders,

by reducing taxes, is attacked by the tax authorities as contravening tax regulations on the basis that the public interest though the tax system is being defeated.

**159**    However, the transfer pricing system is relevant to a claim for oppression if any of the grounds of s. 241(2) of the CBCA are operative. That is, the transfer pricing system may be oppressive or unfairly prejudicial to or unfairly disregard the interests of shareholders, even though it meets the requirements of tax law. In my view, this is a fundamental issue in the case at hand. The language of the counterclaim (paras. 15, 18, 20, 21, 22, 23, 25 and 26) is visible and sufficient in its articulation of the claim on this basis.

**160**    Put simply, OMERS alleges that the minority shareholders have a valid oppression claim because of the operation of the transfer pricing system maintained by Ford over the period 1985-1995. OMERS also alleges that the fair value of Ford Canada's shares must take into account adjustments to the transfer pricing system because a truly independent, arms length entity in the position of Ford Canada would insist upon those adjustments with Ford U.S. and it would be in the mutual best interests of the bargaining parties to agree upon such adjustments.

**161**    Hereafter, I use the phrase "transfer pricing system" in a broader sense than simply as a tax regulatory issue. The phrase refers to the overall inter-corporate pricing structure employed between Ford Canada and Ford U.S. in respect of interdivisional and cross-border exchanges, including as between the manufacturing, assembly and sales functional divisions and in respect of TELO.

**162**    If there is a sustainable ground of oppression by the minority shareholders then, in my view, it is not any answer by Ford to say that the existing transfer price system is satisfactory to the tax authorities. The unlawful oppression must be addressed. If it is necessary to modify the transfer price system to remove the basis of the oppression, then it is logical, even necessary, to ask whether the intended manner of modification is consistent with the criteria of a transfer pricing system as recognised by taxation authorities. However, one would certainly expect that a transfer pricing system can be both consistent with the tax statutes and, at the same time, not oppressive within the meaning of s. 241 of the CBCA toward a minority group of shareholders. That is, there is nothing inconsistent in these two objectives and indeed, one would expect them to be realised easily without conflict.

**163**    The phrase "transfer pricing system" was really used in two senses by the defendants. First, in its pristine sense it means the transfer pricing system for inter-corporate transfers between affiliates as viewed by the tax authorities. Second, it is used in a broader sense, to mean the pricing structure for product as determined by management to be charged by the Manufacturing and Assembly divisions, or so-called supplier divisions (for each of Ford Canada and Ford U.S.), to the respective CVD and USVD, and from those divisions to the dealerships for sale to the public. It also includes the TELO charge for the intangibles.

**164**    The defendant shareholders measure the transfer pricing system in this broader sense against a standard of fairness. This standard of fairness is determined by considering what structural changes a truly independent entity in the position of Ford Canada would insist upon before carrying on business, and be able to negotiate in an arm's length relationship with Ford U.S.

The Transfer Pricing Analysis and Report of Dr. Wright

**165**    The Ford Finance Manual issued October 26, 1978 deals with transfer pricing. The evidence establishes that it is Ford U.S. who determines the transfer pricing regime for Ford vehicles. Ford

U.S. seeks to rationalise its transfer pricing regime for the tax authorities by adhering to normative standards. The Manual claims to determine prices based upon the prices that were charged or quoted by outside suppliers for identical products. Such outside prices would be CUPS (being the preferred method under tax rules). For similar parts, the outside prices would be regarded as so-called design CUPS. Another approach is to base prices on the cost of an efficient producer plus a profit mark-up, called a formula price or "cost plus" method.

**166**    Dr. Wright conducted a functional analysis, that is, she determined how the business was divided structurally and operated through divisions and then looked at the prices for each product family of those divisions. She considered the prices for components produced by the manufacturing divisions. There are some 100,000 parts in an automobile of which by 1994 40% to 45% were manufactured internally by Ford. Dr. Wright then analysed the fees charged by the assembly divisions for assembling the finished vehicles.

**167**    For example, the component manufacturing division "Powertrain Operations" has three divisions: Engine, Transmission and Chassis and Casting. The Automotive Components Group has five separate divisions; Body and Assembly is broken down into two divisions, and so on.

**168**    Dr. Wright personally spent some 2500 hours on the project, for the most part in the first nine months of 1994, and was aided by a team of 10 to 15 people working full time, together with the five to seven people in the pricing group for each division. The background documents (invoices, purchase orders, third party contracts and spreadsheets) comprised some 30 to 35 bankers' boxes.

**169**    Dr. Wright employed transaction-based methods to determine transfer prices within the Ford enterprise. The objective is to recognise individual prices that are the equivalent of arm's length results. She looked primarily for a "comparable controlled price" or "CUPS" for a component, being the price seen in a transaction between two unrelated parties. She also used "cost plus" which refers to a price of a component derived from a mark-up on cost observed at independent, comparable businesses. Because of the volatility of profits in the automobile industry and because component manufacturers tend to be given long-term contracts, Dr. Wright computed the mark-up on costs as an average over an entire business cycle.

**170**    As there were no uncontrolled comparable companies, the "cost plus" approach was also used to calculate prices for assembly. Dr. Wright aggregated the individual prices and looked to the overall profits generated by those prices to see whether or not the results seemed consistent with arm's length results. Ultimately, Dr. Wright computed a fee for labour and overhead costs of 29% for the value-added through assembly.

**171**    Dr. Wright undertook seven steps in her analysis. First, she conducted a functional analysis to characterise the functions that are being performed. Second, she looked at the legal entities to understand how they deal with each other. Third, she selected the pricing method that she considered consistent with the way transactions would have been priced between unrelated parties. Fourth, she looked to CUPS or the "cost plus" approach, by identifying comparable uncontrolled prices and comparable companies. In using the comparables, she took an average based over a full cycle (10-11 years) in the automotive industry.

**172**    Fifth, she aggregated the individual prices (including taking account of overhead, selling, general and administrative costs) for each component to the division level. Sixth, she tested the reasonableness of the results by looking at the profit and loss statement for each division to see

whether or not the profitability for that division was within an arm's length range. Finally, Dr. Wright took the actual results and compared them with the results achieved by her six-step process to ascertain whether the actual results were within the arm's length range.

**173** Some divisions (for example, Powertrain Operations) operate like contract manufacturers who do not own component designs but simply act as makers and suppliers of given products specifically ordered. A contract manufacturer generally has less risk than a full-fledged manufacturer because its risk is limited to volume risk. Hence, the contract manufacturer's price will take into account the lower risk.

**174** Dr. Wright recommended that Ford use a 10% mark-up on cost of goods sold to calculate transfer prices of core components. She then performed a test of reasonableness using the comparable profits method ("CPM") approach. She observed two measures of profitability in her comparables: first, operating income (earnings before interest and taxes, or "EBIT") divided by net fixed assets; and, second, operating income (EBIT) divided by sales. With the exception of Casting, all the basic manufacturing divisions produced results at 1994 budget conditions within the arm's length ranges derived from the comparables. She was able to rationalise the results for the Casting Division as being attributable to antiquated plants. Accordingly, she concluded that the transfer prices for the basic manufacturing divisions were arm's length at 1994 budget projections. Finally, she later compared the 1994 actual results to the budgeted results to confirm her conclusions.

**175** The function of the Assembly divisions is to bring together components from internal and external suppliers and to assemble them into a finished vehicle. The value added by the Assembly divisions is comprised of the labour and assembling expense to assemble the vehicles. The intangible owned is the assembly know-how.

**176** Dr. Wright derived a mark-up on the value added by Ford's Assembly divisions from 13 cost plus comparables. Ford does not charge a mark-up on materials (as this has been done already through the mark-up on components by the Manufacturing divisions) but only on labour and overhead i.e. the value-added through the assembly of the finished vehicle. Dr. Wright recommended that the transfer price for assembly services be a 29% mark-up on the value-added services, taking into account Assembly know-how and Assembly labour. The 1994 actual results for the Assembly divisions produced an operating margin of 3.8% for the Ford U.S. Assembly division and 3.9% for the Ford Canada Assembly division. Dr. Wright concluded that the transfer pricing involving Assembly operations provided an arm's length result.

**177** The sales divisions, being CVD and USVD, bear the cost of vehicle engineering and most component engineering, paying for the product development cost (TELO); in exchange they own the intangibles, including the trademark, and the Ford name and logo in their respective markets. On the basis that the sales divisions are considered to own the intellectual property, the sales divisions are treated as the residual profit takers.

**178** There are long development lead times of typically five to seven years to get a new product to market, with the cost of development, engineering and re-tooling for a new vehicle being several billion dollars. There is a significant risk of intervening changes in market conditions, such as an economic recession, changing governmental standards or changing consumer preferences as the result of unexpected events such as rising oil prices.

**179** Notionally, the sales divisions ask the component manufacturers to make components at a computed arm's length price, and ask the Assembly plants to assemble the vehicles for a computed

assembly service fee. CVD and USVD notionally purchase the vehicles from the Assembly plants at the given, computed price, following the price parity principle and based upon the interdivisional transfer pricing system.

**180**    However, it is to be noted that in reality, to the point of the notional purchase by the sales divisions, it is the Ford enterprise itself making internally all of the decisions relating to its business, and budgeting accordingly for the forthcoming year, as to product, volume and price.

**181**    The sales divisions then sell the vehicles to their independent dealers and earn the residual profit (or suffer a loss). It is at this point that there is a competitive, arm's length market transaction, with a residual profit or loss to the sales divisions (CVD and USVD).

**182**    The discipline of the competitive marketplace means that the price to the independent dealers must necessarily be such as to allow the dealers to make a profit on the retail sales to the consumer public. Otherwise, the dealers would not stay in business or would switch to selling the vehicles of other manufacturers.

**183**    Dr. Wright recognised the continuing losses suffered by CVD. However, she did not question the results for CVD as she accepted the underlying premise that CVD (and USVD for Ford U.S.) was the risk-taker for Ford Canada and therefore received the residual profit or loss.

**184**    Consistent with this premise, Dr. Wright recommended that the foreign exchange component of Ford Canada's Assembly Division be placed in CVD as it was the repository of the risk and reward associated with exchange rate fluctuations. This recommendation had a logical aspect but was only an adjustment as between Ford Canada's divisions and would not change the bottom line for the company. She also recommended acceleration in the timing of payment for southbound cars by Ford U.S., but this was a minor, ameliorative measure. Finally, she recommended that TELO be calculated on a vehicle line basis rather than a unit basis so the cost sharing in respect of new product development would more closely accord with the specific product sold. These changes were adopted. The TELO change was a positive difference to Ford Canada of almost $30 million in 1994.

**185**    Thus, the transfer pricing study of Dr. Wright was done for the important, but limited, specific purpose of rationalizing the internal transfer pricing system of Ford to meet the requirements of s. 482 of the U.S. Internal Revenue Code which came into force July 1, 1994 (26 U.S.C. subsection 482). (U.S. Reg. 1.482-1 (26 C.F.R. subsection 1.482-1) was extensively revised and updated for taxable years commencing after October 6, 1994 - Exhibit #1, tab 639, vol. 34, JBD). One cannot fault the thorough and excellent report of Dr. Wright in respect of the limited objective of the task given to her.

**186**    However, her report did not address at all the issues that arise in respect of the litigation at hand. Dr. Wright was not asked to analyze the structural nature of the transfer pricing system from the standpoint of its overall historical and continuing impact upon Ford Canada's profit/loss and whether the structure of the system was fair to Ford Canada and, in particular, to its minority shareholders. Her 1994 report did not review the impact of the Ford transfer pricing regime for years prior to 1994.

**187**    Accordingly, the study did not consider what structural changes might be made which would bring fairness, if unfairness was seen to exist in the structure, so as to result in a transfer pricing system that complies with both the requirements of U.S. and Canadian tax statutes and also achieves the objective of fairness. Dr. Wright's 1994 report did not identify the structural problems in the ex-

isting transfer price system because the issue of oppression and unfairness to the minority share-holders of Ford Canada from the operation of that system was not seen or identified as an issue for consideration within the mandate given to her. It simply was not a live issue.

**188**    Dr. Wright also prepared a report, "Ford Motor Company Transfer Pricing Practices and the Profitability of Ford Motor Company Canada, Limited: An Evaluation" dated May 13, 1999 (Ex-hibit# 16) for the purposes of the litigation at hand. She also prepared a "Transfer Pricing Reply Re-port" dated May 31, 2001 (Exhibit #18).

**189**    In these two reports, Dr. Wright concludes that the structure of Ford's transfer pricing system is consistent with arm's length transactions. She concludes that Ford Canada's functional responsi-bilities and financial results are wholly consistent with the ownership of the product-related intellec-tual property and hence, Ford Canada's absorption of the risk of the Canadian marketplace is appro-priate. She concludes that Ford's transfer pricing structure passes the internal consistency checks commonly used by tax authorities to judge the legitimacy of a transfer pricing system. Her criticism of the opinions of OMERS experts is based in the main on her view that they are inappropriately judging the legitimacy of Ford's transfer pricing system on the basis that in hindsight Ford Canada was insufficiently profitable. However, her report does not directly address the issue of fairness to the minority shareholders and, if there was unfairness, whether changes could be made to the struc-ture of the transfer pricing system which would rectify the problem of unfairness while being ac-ceptable to the tax authorities.

**190**    Dr. Wright opined at trial that the transfer pricing system was fair to Ford Canada. However, Dr. Gregory Ballentine, testifying for OMERS, pointed out that if one were to accept Dr. Wright's conclusion, the relative rates of return for CVD and USVD implied under her analysis would be demonstrably unreasonable.

The Report of Dr. Ballentine

**191**    Dr. Ballentine prepared a report dated December 18, 2001 (Exhibit #80) and a "Reply to the report of Dr. Deloris R. Wright, February 14, 2002", dated March 4, 2002 (Exhibit #81). Dr. Ballen-tine computed the level of arm's length operating profits for Ford Canada's business segments other than CVD, accepting Dr. Wright's premise that CVD is the risk taker. He used his calculation of the arm's length profit of the Manufacturing and Assembly segments of Ford Canada to calculate the level of income for CVD implied by Dr. Wright's premise that Ford Canada's profit was consistent with arm's length pricing.

**192**    Dr. Ballentine stated that on Dr. Wright's analysis the average rate of return on investment for CVD would be negative 23.5% over 1985 to 1995 while the average rate of return for USVD would be a 26.8% return on investment. (Exhibit #80) Neither rate of return on investment over 11 straight years is reasonable by objective standards of the marketplace. Dr. Ballentine concluded as well, correctly in my view, that such a disparity cannot be justified by the statistics concerning the circumstances in the U.S. and Canadian markets.

**193**    The 1994 transfer pricing study of Dr. Wright was comprised of a multi-volume brief of documentation describing the mechanics of Ford's North American transfer pricing methodology. There was no presentation of this documentation to Ford Canada's board of directors. Other than the Manager Financial Services Ford Canada, the management of Ford Canada did not review in a de-tailed manner the transfer pricing methodology as between Ford U.S. and Ford Canada.

Ford's Agreements with Third Party Manufacturers

**194**    Dr. Clark reviewed Ford U.S.'s dealings with unrelated third parties. Ford U.S. entered into agreements with Mazda and KIA for the distribution and sale of those companies' small vehicles in North America under the Ford name. (See Exhibit #1, tabs 396 and 397 vol. 21; tabs 414 and 415 vol. 23, JBD)

**195**    The guiding principles under the Ford-Mazda agreement were that both the manufacturer (Mazda) and distributor (the Ford dealers) would each receive a reasonable margin and profit, and prices would be competitive in each market. The result is that vehicles sold in Canada were priced differently than in the U.S. A discount to the wholesale dealer price in each jurisdiction was the price-setting mechanism. The agreement provided that if the guiding principles could not be adhered to, the parties would renegotiate pricing in an attempt to meet the principles. If this could not be achieved, the agreement could be terminated. Hence, in effect there was a sharing of risk and reward.

**196**    The Ford-KIA agreement employed somewhat different language but was to the same effect. There was a market basket adjustment factor which provided that pricing in Canada was based on the unique market conditions in Canada. The agreement provided that if the parties believed they were not making a reasonable profit, or if conditions changed, they could renegotiate the agreement.

**197**    Indeed, Dr. Clark's review determined that Ford Canada profited advantageously in its resale of Mazda and KIA vehicles as compared to vehicles purchased from Ford U.S.

**198**    Dr. Clark testified that agreements between Ford and Mazda for New Zealand, between Ford and Nissan for Australia, and the dealings between Jaguar (a Ford affiliate in the United Kingdom) and its European distributors, between Ford Europe and its distributors and between Ford U.S. and Ford Mexico with respect to heavy trucks all reflected these pricing principles. The normative approach in arm's length dealings is for pricing to be determined on a discrete market-by-market basis.

**199**    For example, changes in exchange rates and market conditions would result in Ford New Zealand requesting Mazda in Japan for a price concession. Mazda knows Ford New Zealand has to be price competitive. There is a relationship commonly seen between any company and a supplier. The two parties have to work together to make sure that both make a profit. There was considerable documentation put in evidence as to Ford-Mazda dealings. (See Exhibit #1, tabs 711 to 728, vol. 49; tab 412, vol. 22; tabs 396, 399 to 402, vol. 21; tabs 414 to 416, vol. 22; see also vehicle assembly and supply agreements with KIA, tabs 409 and 410, vol. 22; and with Nissan, tabs 388 to 395 and 398, 399, vol. 21; tabs 403 to 408, vol. 22; tab 413, vol. 23, JBD)

The Valuations in respect of "Fair Value"

**200**    CIBC Wood Gundy's valuation was based on an adjusted 1994 Ford Canada business plan, the "1994 Canadian Operations' Business Plan", prepared for management purposes with a forecast period of 1995 to 1999. CIBC Wood Gundy based its valuation on Ford Canada as a going concern, using various approaches, including employing an unlevered discounted cash flow methodology as its primary methodology. The cash flows were discounted by CIBC based on a weighted average cost of capital ("WACC") of 12.9% determined by CIBC using the capital asset pricing model ("CAPM") for determining an appropriate cost of equity.

**201**    CIBC Wood Gundy employed its own exchange-rate forecasts. The valuation looked to the highest price in a free market ignoring any downward adjustments to reflect problems of liquidity in

respect of the common shares and the fact that the minority shares in issue were outside of the control block of Ford U.S. The valuation followed the approach seen in Policy 9.1 of the Ontario Securities Commission ("OSC") (now OSC rule 61-501).

**202**    CIBC Wood Gundy computed a terminal value at the end of the forecast period by incorporating a perpetual growth rate of 3% to 4% (including components for both inflation and real growth) in the terminal cash flows. The Original CIBC Valuation concluded that the shares had a value of between $170.00 and $200.00 per share.

**203**    CIBC Wood Gundy also prepared a valuation opinion, dated March 2001, the CIBC Wood Gundy Final Valuation, for the purpose of this litigation, using updates to the business plans, and making various adjustments, arriving at a valuation range of $160.00 to $200.00 per share or $180.00 at the midpoint.

**204**    In each instance, the CIBC Wood Gundy valuation was a "go-forward" valuation. The existing transfer price system was accepted without adjustment.

**205**    Mr. Campbell's valuation for OMERS is based upon an acceptance of the opinions of Dr. Clark and Dr. Horst. Mr. Campbell's valuation is divided into two components.

**206**    First, there is an oppression component, being a backward-looking notional adjustment to Ford Canada's balance sheet. This would result in a value per share of about $341.24 based upon Dr. Clark's analysis and about $410.75 based upon the analysis of Dr. Horst. (Exhibit #96; Schedules A-HF-11 and A-D&T-12; see also Exhibit #109)

**207**    Second, there is a go-forward component based upon a discount of future cash flows, again premised upon the analysis of returns properly due to Ford Canada as calculated by Drs. Horst and Clark. This results in a mid-point valuation calculation based on the opinion of Dr. Clark of $214.00 and a mid-point figure of $199.00 in accordance with the opinion of Dr. Horst. (Exhibit #103, determining equity value less incremental cash resulting from transfer price adjustments.)

**208**    In preparing a discounted cash flow analysis the forecasted earnings (earnings before interest and taxes, or "EBIT") must be converted into forecasted cash flows. This necessitates adding back non-cash expenses, being depreciation and amortisation, and deducting forecasted capital expenditures (being a cash drain on the business but not being deducted in EBIT).

**209**    Mr. Campbell takes the notional adjustments to Ford Canada's returns, premised upon the transfer pricing adjustments of Drs. Clark and Horst, and then has the adjustments grow by applying a 12.5% compounded notional after-tax return.

**210**    Mr. Campbell's analysis demonstrated that the CIBC Wood Gundy embedded value for Ford Canada's Canadian operations was a negative of $143.8 million (due to a negative embedded value for CVD of $1.95 billion). At the same time, Ford Canada's smaller Australian operations were valued at $1.405 billion and the miniscule New Zealand operations at $97.7 million. Mr. Philip Evershed of CIBC Wood Gundy acknowledged in his evidence that without a transfer pricing adjustment there was negative value in the Canadian operations. He acknowledged that CVD had a material negative value in the CIBC Wood Gundy valuation.

**211**    Mr. Campbell concluded that a negative equity for Ford Canada's Canadian operations makes no sense given the underlying economic factors seen with Ford Canada's position in the Canadian market. I agree with this conclusion. Ford Canada had more than 20% of the new car and truck market share in Canada; the proprietary right to one of the world's best known brands; an extensive

dealer network of some 640 dealers; an installed base of vehicles which generates a significant continuing income from parts sales; had spent substantial amounts on capital expenditures through the 1990 to 1995 period, with commitments to the spending of very substantial amounts between 1996 and 2000; a new plant in Oakville that was the only assembler in the world of the Windstar; successful assembly operations in St. Thomas for the Crown Victoria and Grand Marquis cars; and had amongst the highest revenues and number of employees of any business in Canada.

The Law relating to the Statutory Oppression Remedy

**212**    Ford Canada and Ford U.S. adopted a transfer pricing system in 1965 and maintained that system thereafter. The OMERS and Schedule "B" shareholders, as plaintiffs by counterclaim, allege that this transfer pricing system became oppressive and they seek a remedy for this oppression for the period 1985 to September 12, 1995. They do not claim that the system was changed at any point in time to their detriment. They claim it was to their detriment from the mid-1970's when the exchange rate went against the Canadian dollar and, in particular, was to their detriment for the eleven-year period from 1985 to 1995. They claim oppression because the system was unchanged and appropriate adjustments were not made to the transfer price system and inter-corporate arrangements. Consequently, OMERS is seeking to invoke the oppression remedy.

**213**    The oppression remedy enables "any type of corporate activity to be the subject of judicial scrutiny" (Dennis Peterson, Shareholder Remedies in Canada (Markham: Butterworths, 1989) at 18.1). Corporate stakeholders can seek relief when they believe corporate activity is improper or unfair.

**214**    The nature of the oppression remedy is set forth in s. 241 of the CBCA:

> (1)    A complainant may apply to a court for an order under this section.
> (2)    If, on an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates
>
>> (a)    any act or omission of the corporation or any of its affiliates effects a result,
>> (b)    the business or affairs of the corporation or any of its affiliates are or have been exercised in a manner
>
> that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, the court may make an order to rectify the matter complained of.

**215**    Section 241(3) confers upon the court the power to make "any interim or final order it thinks fit", including an order compensating an aggrieved person.

**216**    The oppression remedy is a statute-based remedy rooted in the equitable concept of fairness. As such, the analysis will necessarily be facts-specific. Brooke J.A., in an oft-quoted passage from Re Ferguson and Imax Systems Corp. (1983), 43 O.R. (2d) 128 at 137 (C.A.), wrote, "each case turns on its own facts. What is oppressive or unfairly prejudicial in one case may not necessarily be so in the slightly different setting of another." And according to Kerans J.A., "[t]he test then is always facts-specific, and cases decided on other facts offer only a limited guide." (Westfair Foods Ltd. v. Watt (1991), 79 D.L.R. (4th) 48 at 55 (Alta. C.A.))

**217**    The onus of proof is upon the applicant; in this case, the onus lies with OMERS and the dissenting shareholders. See Brant Investments Ltd. v. KeepRite Inc. (1987), 60 O.R. (2d) 737 at 755, [1987] O.J. No. 574 (H.C.J.), aff'd (1991), 3 O.R. (3d) 289, [1991] O.J. No. 683 (C.A.). The standard of proof is on a balance of probabilities in which the court must be satisfied that a claim exists under the enumerated grounds of section 241(2) of the CBCA. See Re Ferguson and Imax Systems Corp., supra at 138.

**218**    As set out in s. 241 of the CBCA, the conduct that will trigger the oppression remedy is conduct, or the absence of conduct, that "effects a result ... that is oppressive or unfairly prejudicial to or that unfairly disregards the interests" of a shareholder.

**219**    Fairness is not susceptible to precise definition. Regard should be had to all the surrounding circumstances. As McDonald J. states in First Edmonton Place Ltd. v. 315888 Alberta Ltd., [1988] A.J. No. 511 (Q.B.):

> In deciding what is unfair, the history and nature of the corporation, the essential nature of the relationship between the corporation and the [complainant], the type of rights affected and general commercial practice should all be material. More concretely, the test of unfair prejudice or unfair disregard should encompass the following considerations: the protection of the underlying expectation of a [complainant] in its arrangement with the corporation, the extent to which the acts complained of were unforeseeable or the [complainant] could reasonably have protected itself from such acts, and the detriment to the interests of the [complainant]. The elements of the formula and the list of considerations as I have stated them should not be regarded as exhaustive.

**220**    The legislative intent of the remedy is to balance the competing interests of shareholders, creditors and the public against the ability of management to conduct business efficiently. See Peterson, supra at 18.1. However, there is also strong jurisprudential emphasis on the protection of shareholders' reasonable expectations. See Bruce Welling et al., Canadian Corporate Law, 2d ed. (Toronto: Butterworths, 2001) at 479.

**221**    Justice Farley has articulated this concern, stating "[s]hareholders interests would appear to be intertwined with shareholder expectations" and that "[t]hey must be expectations which could be said to have been (or ought to have been considered as) part of the compact of the shareholders" (820099 Ontario Inc. v. Harold E. Ballard Ltd. (1991), 3 B.L.R. (2d) 113 at 186, [1991] O.J. No. 266 (Gen. Div.), aff'd [1991] O.J. No. 1082 (Div. Ct.)). See also Naneff v. Con-Crete Holdings Ltd. (1995), 23 O.R. (3d) 481 at 489, [1995] O.J. No. 1377 (C.A.); Themadel Foundation v. Third Canadian Investment Trust Ltd. (1998), 38 O.R. (3d) 749 at 753-54, [1998] O.J. No. 647 (C.A.).

**222**    The reasonable expectation analysis has become the standard analytical tool. See Peterson, supra at 18.49. Shareholder expectations must be reasonable in the circumstances. Reasonableness is a question of fact, to be determined on an objective basis. See Maple Leaf Foods Inc. v. Schneider Corp. (1999), 42 O.R. (3d) 177 at 201, [1998] O.J. No. 4142 (C.A.). The shareholders' interests are typically intertwined with the expectations that have been created by the company's principals. See Maple at 201-02.

The Business Judgment Rule'

**223**    The affairs of a corporation are to be managed by or under the direction of its board of directors: section 102(1) of the CBCA. See also s. 132 of the OBCA. Directors and officers must be given some considerable latitude in exercising their business judgment in the handling of a corporation's affairs. The courts must recognize and respect the autonomy and integrity of the corporation and the expertise of its management.

**224**    Absent bad faith, or some other improper motive, business judgment that, in hindsight, has proven to be mistaken, misguided or imperfect, will not give rise to liability through the oppression remedy. The so-called business judgment rule' operates to shield business decisions that have been made honestly, in good faith and on reasonable grounds from judicial intervention. See Brant, supra at 319-320 (cited to O.R.).

Bad Faith Not Required

**225**    Although bad faith is not an integral element of oppressive conduct, "its presence may be valuable in establishing the existence of oppression" (Karen Ulmer, "Business Issues: The Oppression Remedy" (1989) Sask. L.R. 209 at 219). In Themadel, supra, Carthy J.A. held that "the emphasis is upon the effect of the conduct or acts complained of and not upon the motive of the actors" (at 754). It is, therefore, the result that is important, not the intent.

**226**    Farley J. elaborated on the idea of intention and bad faith in Ballard, supra when he adopted a passage from Gomery J. in Sparling c. Javelin International Ltée, [1986] R.J.Q. 1073 at 1077 (C.S.):

> [i]t is not necessary that the oppression and unfair treatment be caused by the deliberate act of the corporation and its directors, nor is it necessary for the unfairness to have its source in management of the corporation at all. What is important is the result, not the intent. Thus an applicant does not have to establish bad faith on the part of the corporation's directors or management in order to convince the Court to make an order.

**227**    McKinlay J.A. in Brant, supra at 305, held "that evidence of bad faith or want of probity in the actions complained of is unnecessary in an application under [OBCA] s. 234." The language of the Ontario statute very closely mirrors that of the CBCA. See also Downtown Eatery (1993) Ltd. v. Ontario (2001), 54 O.R. (3d) 161, [2001] O.J. No. 1879 at para. 56 (C.A.).

Standing

**228**    "Complainant" is defined in s. 238 of the CBCA as including:

> (a)    a registered holder or beneficial owner, and a former registered holder of a security of a corporation or any of its affiliates,
>
> .... or
>
> (d)    any other person who, in the discretion of a court, is a proper person to make an application under this Part.

[emphasis added]

**229**    To advance a claim for oppression, a shareholder must be a "complainant" who was oppressed by the conduct in question: CBCA ss. 238, 241(1). See also OBCA ss. 245, 248(1). Ford Canada, however, argues that the complainant must be a shareholder at the material time, that is, at the time of the impugned actions. See e.g. LSI Logic Corp. of Canada, Inc. v. Logani, 2001 A.B.Q.B. 710, [2001] A.J. No. 1083 at paras. 126-128 (Q.B.); Hendin v. Cadillac Fairview Corp., [1983] O.J. No. 239 at para. 6 (H.C.J.). See also Royal Trust Corp. of Canada v. Hordo (1993), 10 B.L.R. (2d) 86, [1993] O.J. No. 1560 (Gen. Div.). See obiter dicta in Millgate Financial Corp. v. BF Realty Holdings Limited, [1997] O.J. No. 4020, (Gen. Div.).

**230**    There is no evidence as to when OMERS or the other dissenting shareholders became shareholders. A reasonable inference is that many, if not all, have been shareholders for much less than the almost eleven year claimed period of oppression, 1985-September 11, 1995.

**231**    In LSI, supra, Fruman J. emphasized that the date of acquiring shares is particularly relevant to determining whether a shareholder is a proper complainant. This seems appropriate and fair from a policy standpoint. The oppression remedy is protective of reasonable expectations by shareholders while considering the relevant circumstances. A shareholder should not be able to claim oppression in respect of an asserted reasonable expectation if it did not exist at the time of his or her share purchase. Arguably, the reasonable expectations of a new shareholder generally pertain to the future decision-making of management unless there are past and continuing misrepresentations, which create false expectations at the point of purchase of the shares.

**232**    Justice Farley in Hordo, supra stated that a "complainant" in an oppression application must be in that capacity at the time of the acts complained of. He observed that the sale of shares from someone who may have been oppressed does not logically transfer to the purchaser the right to collect damages for such oppression (at para. 15). I agree with this view.

**233**    OMERS, on the other hand, submits that the minority shareholders have standing to bring an oppression claim, regardless of when they purchased their shares. They rely upon the comment of Farley J. in PMSM Investments Ltd. v. Bureau (1995), 25 O.R. (3d) 586 at 591, [1995] O.J. No. 2611 (Gen. Div.) that the Court of Appeal in Richardson Greenshields of Canada Limited v. Kalmacoff (1995), 22 O.R. (3d) 577:

> has clearly indicated that if one falls within the wording of the [statutory] definition of "complainant" ... then no matter what the circumstances, it would seem one is qualified as a complainant.

**234**    Richardson involved an appeal from the decision of Farley, J. in this court. There is an important difference between Hordo and Richardson. The former involved an oppression application: the latter involved an application by a complainant shareholder for leave to commence a derivative action in the name of a corporation.

**235**    Robins J.A. in the Court of Appeal decision in Richardson, supra at 579 disapproved of Farley J.'s conclusion in the court below, saying of Farley J.'s finding:

> Relying on his decision in [Hordo] ... he concluded that in a derivative action, as in an oppression action, "persons who acquire shares after the facts which were the facts which were the subject of the complaint were known should not be treated as a complainant."

**236**    The Richardson case involved a derivative action which involves a claim on behalf of the corporation. In a derivative action it is the corporation that has the cause of action, not the shareholders. Robins J.A.'s comments and the ratio of Richardson were directed at the derivative action before the Court of Appeal and at Farley J.'s finding in the court below in respect of that derivative action, not at Farley J.'s finding in Hordo relating to an oppression action.

**237**    Whether a complainant shareholder can pursue the oppression remedy for an oppression that relates to a time period before the complainant became a shareholder remains an open question at the appellate level. In my view, it cannot be said that Richardson stands for the proposition that whenever a person fits within the definition of "complainant" as set forth in s. 238, that no matter what the circumstances that person is qualified as a complainant to pursue the oppression remedy afforded by s. 241. That is dependent upon the complainant coming within the reach of s. 241 in respect of grounds.

**238**    The question of being able to qualify as a "complainant" by meeting the requirements of the definition provided in s. 238 is a separate and distinct matter from that of having sustainable grounds of oppression within the meaning of s. 241. In my view, that requires a connection between the aggrieved shareholder(s) and the actions/inactions that are oppressive or unfairly prejudicial to or that unfairly disregard the interests of that shareholder(s). Did the aggrieved shareholder(s) have reasonable expectations in the circumstances which were not met by reason of oppressive actions/inactions?

**239**    It is acknowledged that an after-the-fact shareholder can be a proper "complainant" for the purpose of a derivative action under section 239(1) of the CBCA. See Richardson, supra.

**240**    However, the situation of an oppression action is different from that of a derivative action. The latter allows the complainant to sue in the name of the corporation for a loss sustained through a wrong to the corporation. There is no requirement that the status of the complainant shareholder be contemporaneous with the impugned conduct because the court proceeding would be on behalf of the corporation, rather than being a personal action. In contrast, an oppression action is a personal remedy premised upon there being prejudice to the interests of the complainant shareholder.

**241**    Conduct which may result in harm to a company and may therefore be the subject of a derivative claim may also result in oppression to minority shareholders. The presence of a derivative action remedy does not preclude minority shareholders from pursuing their personal remedy under s. 241. The two are not mutually exclusive. (Jabalee v. Abalmark Inc., [1996] O.J. No. 2609 at para. 5 (C.A.); Ontario Securities Commission v. McLaughlin (1988), 11 O.S.C.B. 442, [1987] O.J No. 1247 (H.C.J.))

**242**    In Palmer v. Carling O'Keefe Breweries of Canada (1989), 67 O.R. (2d) 161, [1989] O.J. No. 32 (Div. Ct.), Southey J. held (at 169-170) that purchasers of shares, after an intention to amalgamate became known, could pursue an oppression remedy in respect of the proposed resolution to amalgamate. At first reading, Justice Southey's comments seem to support the view that it does not matter if the act of oppression is not time-related to the complainant:

> I am unimpressed with the argument that no relief should be given in respect of shares purchased after the intention to amalgamate became known. The submission was that, in respect of those shares, the purchasers "bought into the oppression". If relief is given to anyone in these proceedings, it will mean that the ap-

plicant correctly appreciated the legal rights of the preference shareholders. If the applicant and others could not take advantage of those rights with respect to the shares they were bold enough to purchase while those rights were still in dispute, it would mean that less sanguine owners would be deprived of the advantage of selling their shares during the pending litigation at prices reflecting the purchasers' estimate of the chance of success. Any such rule would place a new and, in my view, unwarranted restriction on the price of shares that are traded on a stock exchange.

**243** However, in Palmer it appears the complainants were purchasers prior to the act of amalgamation, which was the actual impugned act of oppression. The comments of Southey J. cannot be extrapolated to situations where a complainant shareholder does not have a right that is time-related to the act of oppression. The comments are applicable when there is an oppressed legal right at issue, that is, when there is a time-related act of oppression in respect of the legal rights of the particular shareholder complainant. Such a complainant has actionable grounds within the ambit of s. 241.

**244** Although not directly on point with the present matter, there is a line of cases dealing with take-over bids. Dissenting shareholders who have acquired their shares after the announcement of a proposed fundamental change, but before its adoption by resolution, have a right to dissent in respect of the compulsory acquisition provisions regardless of when the shares were purchased. See Silber v. BGR Precious Metals Inc. (1998), 41 O.R. (3d) 147 (Gen. Div.), aff'd (2000), 46 O.R. (3d) 255 (C.A.); Shoom v. Great-West Lifeco Inc. (1998), 42 B.L.R. (2d) 25 (Ont. Gen. Div.), aff'd (1998), 42 B.L.R. (2d) 40 (C.A.). This situation is analogous to that seen in Palmer, supra. The right to dissent arises via statute with the act consummating the fundamental change.

**245** The proper question in an oppression action is whether the shareholder "complainant" has grounds that bring the shareholder's application within section 241(2). In my view, this requires that the impugned act or omission is oppressive in respect of the complaining shareholder. This will generally be so from a factual standpoint only if the complainant was a shareholder at the time of the act of oppression.

**246** Clearly, the statutory definition of "complainant" in s. 238 includes any registered shareholder, no matter when the shares were purchased. However, in my view, the proper question is not whether a new shareholder is a "complainant". Rather, the proper question is whether the "complainant" shareholder has sustainable grounds of oppression that bring the shareholder within section 241. This requires a time-related factual nexus between the complainant and the oppression complained of.

**247** Why is a former shareholder included within the definition of "complainant" and allowed to claim oppression if the statutory right of oppression is to be considered as transferred to the subsequent holder of those shares in respect of the earlier oppression related to the earlier, former shareholder? That is, it is not logical that a succession of shareholders is each allowed to complain for a time-related act of oppression in respect of the same shares sequentially held. As Farley J. observed in Hordo, supra at para. 15, a sale "of shares from a holder who may have been oppressed does not carry with it the right to collect damages for such oppression."

**248**    The shareholder at the time of the oppression (the "former registered holder") and the new shareholder who has purchased those shares should not both be able to claim compensation for the same act of oppression. This would result in a double recovery for the same wrong.

**249**    OMERS submits that a new shareholder would purchase his or her shares under the implicit representation that Ford Canada's transfer pricing system was not oppressing the minority shareholders. I agree.

**250**    While the new shareholder would, in my view, have a sustainable action for the act of oppression and resulting damages from that point forward, there would be no sustainable action relating to harm and loss to minority shareholders prior to the point of share purchase.

**251**    The date of share acquisition is important in the determination of who is a proper complainant. See LSI, supra at para. 126. When the oppression is alleged to be ongoing, it is only from that point forward that a complainant could recover damages.

**252**    It is also to be noted that the effect of any past oppression would be reflected in the current market price for Ford Canada shares. The losses of Ford Canada, reflective of the alleged unfair transfer pricing regime, impacted negatively upon its financial position. The value of shares traded in the market would reflect the fact of the alleged oppression relating to the transfer pricing system.

**253**    In particular, the transfer pricing regime affected the bottom line of Ford Canada's income statements, which in turn would be seen and reflected in the price paid for its publicly traded shares. The financial performance of Ford Canada was generally known and the year-end position would be communicated to shareholders annually.

**254**    There were no fundamental changes in the transfer pricing system after 1965. Any purchase in respect of Ford Canada shares after that time was at a market price that implicitly reflected the publicly reported earnings of Ford Canada under the transfer pricing structure to that point in time.

**255**    Investors and analysts would have access to the publicly reported financial results of Ford Canada and of the overall Ford enterprise. (Indeed, a Canadian investor could purchase Ford U.S. shares.)

**256**    For the reasons given, I find that there is no evidence that the dissenting shareholders were shareholders throughout the material time of the alleged acts, or omissions to act, of oppression, being 1985 to 1995.

**257**    It is recognized, of course, that the allegation of oppression is that it was continuing so that all the dissenting shareholders would be subject to the alleged oppression for some period of time, however short or long that period of time may have been for any given shareholder.

**258**    It is noted that many U.S. jurisdictions have enacted similar forms of the oppression remedy. See Peterson, supra at 18.11. Peterson notes that "[e]ven in the absence of a statutory oppression remedy, American law is generally more hospitable to the interests of corporate stakeholders" (at 18.11). In fact, U.S. law, unlike Ontario, adopts the view that majority shareholders have a fiduciary duty to minority shareholders; see Perlman v. Feldman, 219 F. 2d 173 (U.S. Ct. Apps. 2d Cir. 1955). The fiduciary duty to minority shareholders has been used to resolve many problems for relief that, in Canada, have been sought under the oppression remedy. See e.g. Donahue v. Rodd Electrotype Co. of New England Inc., 328 N.E. 2d 505 (S.C. 1975).

**259**    A corporation is an independent person, separate and apart from its shareholders. See Meditrust Healthcare Inc. v. Shoppers Drug Mart (2002), 61 O.R. (3d) 786, [2002] O.J. No. 3891 at paras. 12, 13 (C.A.); Salomon v. Salomon, [1897] A.C. 22 (H.L.). Therefore, a shareholder can receive enhanced share value if a corporation recovers funds or receives compensation arising from a successful application for oppression in respect of the corporation relating to a time period prior to that person becoming a shareholder. See Regal (Hastings), Ltd. v. Gulliver, [1942] 1 All E.R. 378 at 394 (H.L.); Abbey Glen Property Corp. v. Stumborg (1978), 85 D.L.R. (3d) 35 at 63-64 (Alta. C.A.).

**260**    OMERS says that in one sense it seeks derivative relief, saying that compensation is payable to Ford Canada but that payment on a pro rata basis to minority shareholders is the practical result. OMERS submits that it seeks the pro rata share of such compensation that accrues to the benefit of minority shareholders, to be paid out to them because of the forced buy-out. OMERS submits that this claimed derivative right should not be defeated by Ford U.S.'s unilateral decision to buy out the minority.

**261**    There are two problems with this position. First, there is a procedural hiatus in that Ford Canada is not named a plaintiff through OMERS obtaining leave to commence a derivative action pursuant to s. 239(1) of the CBCA. A former shareholder qualifies as a complainant to seek such leave.

**262**    Second, the submission by OMERS that in essence it is pursuing a derivative proceeding assumes that Ford Canada has a claim for oppression against Ford U.S. However, there is no evidence that Ford U.S. unilaterally imposed the transfer-pricing system upon Ford Canada. Ford Canada is an independent entity with its own board of directors who were charged with acting in the best interests of Ford Canada i.e. all of Ford Canada's shareholders. The inter-corporate agreements are time-limited and give Ford Canada considerable latitude in respect of the transfer pricing regime. There is no evidence that the directing mind of Ford Canada ever contemplated seeking a change to the transfer pricing system.

**263**    It may well be that Ford U.S. expressly or implicitly dictated the transfer pricing regime and all of the historical acts of relevant decision-making by Ford Canada's directors. One need not be naïve as to the probable nature of the vertical relationship of a U.S. parent and Canadian subsidiary where the widely-held minority interest is only some 6% of the total shares in the subsidiary. However, a majority shareholder cannot treat a subsidiary corporation with minority shareholders as its wholly-owned subsidiary. The majority shareholder cannot direct corporate decisions which enure to its benefit to the detriment of minority shareholders. Palmer, supra at 172.

**264**    One can have the reasonable impression that in reality Ford U.S treated Ford Canada as a wholly-owned subsidiary and that the puppet subsidiary would simply carry out the dictates of the parent. However, there was no evidence given as to the role of Ford U.S. in terms of Ford Canada's board of directors' decision-making. That is, the record indicates that Ford Canada's board of directors was passive, simply accepting the actions of Ford U.S. in determining the elements and structure of the transfer pricing system and the inter-corporate arrangements.

**265**    In 1995 former President, then director, Roy Bennett, brought forward to the senior management of both corporations his claim of unfairness to the minority shareholders because of Ford Canada's continuing financial structure. His action triggered the buy-out of the minority interest by Ford U.S. Hence, one cannot claim from the very limited evidentiary record that Ford U.S op-

pressed Ford Canada such that Ford Canada has a claim for oppression against its parent that could be pursued through a derivative action by the minority shareholders of Ford Canada.

**266**    If there is a viable action for oppression in the case at hand, it is by the dissenting minority shareholders against Ford Canada. Clearly, by s. 241(1) of the CBCA, the directing mind of Ford Canada cannot cause Ford Canada to act, or allow Ford Canada to omit to act, if such effects a result that is oppressive or unfairly prejudicial to, or unfairly disregards the interests of any shareholder. The directing mind cannot carry on the business or affairs of Ford Canada in a manner that is oppressive or unfairly prejudicial to, or that unfairly disregards the interests of the minority shareholders.

Does the Limitations Act apply?

**267**    The relevant provision of the Limitations Act, R.S.O. 1990, c. L.15 is as follows:

> 45(1) The following actions shall be commenced within and not after the times respectively hereinafter mentioned,
>
> ...
>
> (g)    an action for trespass to goods or land, simple contract or debt grounded upon any lending or contract without specialty, debt for arrears of rent, detinue, replevin, or upon the case other than for slander.

within six years after the cause of action arose[.]

[emphasis added]

**268**    Ford Canada submits that s. 45(1)(g) of the Limitations Act, applies to applications for an oppression remedy, as "an action ... upon the case" within the meaning of that provision. See Superior Propane Inc. v. Tebby Energy Systems (1992), 9 O.R. (3d) 769, [1992] O.J. No. 1169 (Gen. Div.); York Fire & Casualty Co. v. Co-operators, [1999] O.J. No. 4172 (S.C.J.).

**269**    In York Fire, supra, Somers J. was called upon to interpret the meaning of "action on the case" in relation to a right of arbitration prescribed by the Insurance Act, R.S.O. 1990, c. I.8. Somers J. adopted the reasoning used in Superior Propane, supra and found that the right of arbitration as prescribed by the provincial act was a "creature of recent statute" not included in the historical forms of writ and was therefore an "action on the case" subject to the six year limitation period stipulated by s. 45(1)(g) of the Limitations Act (at para. 16).

**270**    In Superior Propane, supra, Austin J. (as he then was) found that actions under s. 2 of the Negligence Act, R.S.O. 1990, c. N.1, are compensatory in nature and are properly considered "actions on the case" for the purposes of s. 45(1)(g) of the Limitations Act. Therefore, the six year limit applies to actions brought under s. 2 of the Negligence Act.

**271**    Both York Fire and Superior Propane cite Thomson v. Lord Clanmorris, [1900] 1 Ch. 718 (C.A.). In Thomson, the U.K. Court of Appeal was asked to determine whether an action brought by

a dissident shareholder under the Directors' Liability Act, 1890 (U.K., 53 & 54 Vict.), c. 64 was an action on the case, bound by a six year limitation or whether it was a punitive action bound by a two year limitation. The shareholder had suffered damages because of an untrue statement made in the company's prospectus. Vaughan Williams L.J. held that the six year limitation was apposite. He wrote (at 727) that "what the section really does is give a new action on the case. It creates a new negative duty ... a new statutory duty to abstain from inaccurate and untrue statements[.]"

**272**    The OMERS counterclaim alleging oppression was issued January 11, 2000. If section 45(1)(g) applies, any claim that pre-dates January 11, 1994 (six years prior to the issuance of the counterclaim) is statute barred, subject to the principle of discoverability. If discoverability is an issue, the onus lies upon OMERS to prove that its alleged cause of action was not discoverable. However, there is no evidence directly from shareholders on this point.

Discoverability

**273**    The principle of discoverability may postpone the running of the statutory limitation period until a plaintiff knows or through reasonable diligence could have known the material facts upon which to bring an action. See e.g. Findlay v. Holmes, [1998] O.J. No. 2796 (C.A.). A limitation period will not run until the material facts on which a cause of action is founded have been discovered or ought to have been discovered by the exercise of reasonable diligence. See Central Eastern Trust Co. v. Rafuse, [1986] 2 S.C.R. 147 at 224.

**274**    OMERS asserts that the oppression was not discoverable, and therefore, no limitation period can be applicable.

**275**    Shareholders of Ford Canada would not know the details of the structure of the transfer pricing system of Ford Canada. Mr. Bennett agreed that neither the components of the transfer pricing system nor its effect on Ford Canada's operations were disclosed in the annual reports. Specifically, Ford Canada's shareholders were not told that Ford U.S. was making profits on vehicles sold in Canada while CVD had annual losses, totalling almost $7.5 billion since 1976.

**276**    The financial reports told Ford Canada shareholders that prices for products would be negotiated between Ford Canada and Ford U.S. when apparently there was no such negotiation. The public documents about the transfer pricing system suggested that prices were determined at arm's length. Shareholders have the right to rely upon the public pronouncements of public corporations as promises, with resulting reasonable expectations. Themadel at 753.

**277**    However, in my view, the consequences (if not the esoteric, complex details of the structure) of the transfer pricing system and the impact of the Ford Canada and Ford U.S. inter-corporate relationships upon Ford Canada's profits and losses were discoverable and would reasonably be known to analysts within the financial community for many years and certainly by 1984. The annual reports of Ford Canada referred to the negative impact of depreciation of the Canadian dollar upon Ford Canada. It would be apparent to analysts and attentive investors that Ford Canada was not making up the shortfall due to the unfavourable exchange rate from purchases by Ford Canada in U.S. dollars.

**278**    This is not a case of a closely-held corporation with unsophisticated minority shareholders. The minority shareholders included institutional investors such as OMERS which would have had access to professional financial advice. Financial documents and disclosures were made on a regular

basis and were subject to careful analysis and close scrutiny. Both the auto industry as a whole and Ford as a major part of it were the subject of sophisticated analysis, speculation and discussion.

**279** Therefore, I find that the material facts on which this claim for oppression remedy is founded ought to have been discovered by the exercise of reasonable diligence on the part of the minority shareholders by 1984 at the latest.

The Scope of Section 45

**280** Section 45 of the Limitations Act applies only to those specific causes of action listed therein and cannot be extended to other causes of action. See M.(K.) v. M(H.) (1992), 96 D.L.R. (4th) 289 at 329 (S.C.C.).

**281** OMERS submits that the proceeding at hand cannot be identified as covered by the Limitations Act. OMERS submits that the phrase "action upon the case" relates to personal actions for damages for a breach of duty. See Perry, Farley & Onyschuk v. Outerbridge Management Ltd. (2001), 54 O.R. (3d) 131 at 137, 140, 142, [2001] O.J. No. 1698 (C.A.).

**282** The Court of Appeal in Perry pointed out that the Limitations Act contains no residual provision (at 140). Therefore, "action upon the case" in s. 45(1)(g) cannot be considered as a residual provision that captures all personal actions not otherwise specified in the Limitations Act. The Court of Appeal viewed two essential elements to an "action upon the case" to be that of an action sounding in damages and the allegation of a legal breach of duty (at 140).

**283** Both elements are present in the action for oppression at hand. In A.M. Smith & Co., Ltd. v. The Queen (1981), 20 C.P.C. 126, 120 D.L.R. (3d) 354 (Fed. C.A.) Ryan J.A. stated, as quoted with approval in Perry, supra, by Sharpe J.A. at 141, that "actions for unliquidated sums based on causes of action provided by statute" (at 139) are included in the category of actions upon the case. See also Thomson v. Lord Clanmorris, supra. In my view, the instant oppression action is in the nature of a personal action for damages for breach of a statutory and common law duty to act fairly in the best interests of the corporation, i.e. in the best interests of all the shareholders.

**284** For the reasons given, I find that the oppression remedy is an action on the case. It follows, then, that s. 45(1)(g) of the Limitations Act applies. For the reasons also given above, I find that the material facts upon which the oppression remedy claim are founded were discoverable by 1984. Hence, the oppression claim is limited to the six year period preceding January 11, 2000.

**285** The OMERS claim for historical oppression embraces the period 1985 to September 11, 1995, inclusive. Therefore, on my analysis, given the application of the Limitations Act, the claim is limited to the 20 month period between January 11, 1994 to September 11, 1995. Consequently, all claims relating to the period before January 11, 1994 are statute barred.

The Evidence as to Oppression

**286** OMERS asserts that Ford U.S. and Ford Canada maintained a transfer pricing structure that was oppressive, unfairly prejudicial to and unfairly disregarded the interests of Ford Canada and its shareholders. Paragraph 20 of the counterclaim asserts that Ford Canada was not independent of Ford U.S. Paragraph 21 asserts that because of the transfer pricing system Ford Canada incurred costs that should have been borne by Ford U.S. Paragraph 22 of the counterclaim alleges that the transfer pricing system, including the assignment of exchange rate risk, was dictated by Ford U.S and that the transfer price results did not meet either arm's length standards or normative standards

as seen in the European market or in respect of the pricing regime of the other two major North American manufacturers, General Motors and Chrysler.

**287**    OMERS claims "fair value" must take into account a transfer pricing adjustment to reflect the incremental cash that would have been available to Ford Canada had the transfer pricing system provided arm's length results.

**288**    The annual operating results of Ford do not at first impression readily reveal the inherent problems of the transfer pricing system. For example, both Ford Canada and Ford U.S. from 1980 to 1982 had reported operating losses, being a period of economic recession. Both entities had operating profits from 1983 to 1989. In the period 1991 and 1992, both entities lost money during the economic downturn, with Ford Canada continuing to have operating losses in 1994 and 1995 as the recession continued in Canada.

**289**    Sales by Ford Canada Manufacturing and Assembly to Ford U.S. at the substantial mark-ups inherent to the transfer price system tend to ameliorate Ford Canada's overall disadvantaged position. Sales into that market are at substantial profits. Indeed, Ford Canada earned overall profits on its Canadian operations between 1983 and 1990, because of its sales of vehicles and parts to Ford U.S. Moreover, to some extent Ford Canada may benefit at the expense of USVD because of USVD's inability to always recoup its costs from its dealers. USVD had losses in all years from 1985 to 1995 except for 1986, 1987 and 1994. (Exhibit #4-Sheet "C")

**290**    However, four points are to be made. First, Ford U.S. does not argue, of course, that Ford Canada's profits on manufacturing and assembly sales to Ford U.S. were unreasonable or unfair because of the mark-ups. Second, given the relative advantages of higher pricing in the American consumer market, coupled with all transactions being in U.S. dollars, USVD does not face nearly the same disadvantages that CVD confronts in the Canadian market. (CVD purchases in U.S. dollars and receives Canadian dollars on its sales into a Canadian consumer market with relatively weaker prices.) It is not at all uncommon for a business to employ different pricing for different markets because of different market conditions. It is not an answer to the problems of the transfer price system for Ford Canada to say that Ford Canada did well in its sales to USVD. While the prices by CVD to Ford's dealers of necessity reflected the reality of lower prices in the Canadian market, the Ford transfer pricing system ignored this reality in the prices charged to CVD.

**291**    Third, Ford Canada's profits on sales to Ford U.S. at most have simply ameliorated (but not eliminated) Ford Canada's disadvantageous position overall under the transfer pricing system. The major problems for Ford Canada result from the relatively weaker prices available in the Canadian market coupled with the exchange rate differential. Finally, if the claim for oppression is established with compensation payable, the calculation of compensation should appropriately take into account the factor of such amelioration of damages through sales by Ford Canada Manufacturing and Assembly to USVD.

**292**    USVD can sell to its dealers at substantially higher prices than can CVD to its dealers in Canada. The U.S. consumer market for vehicles is considerably more profitable than the Canadian market. The U.S. consumer market will pay substantially higher prices for Ford cars than is seen in the consumer market in Canada. As such, the mark-ups to Manufacturing and Assembly have at most had only an occasional and relatively limited adverse impact upon USVD. In contrast, the adverse impact of the transfer price system upon CVD is severe and continuing. If one isolates the

Canadian market it is apparent that the transfer pricing system has an inordinate and disadvantageous impact upon Ford Canada.

**293** The claim of oppression is based upon the alleged unfairness of the transfer pricing system to Ford Canada given the disadvantages of the Canadian market as compared to the U.S. market. As discussed above, Ford suffered a cumulative loss of some $2.16 billion in the Canadian market for the period 1985 to 1995. This is determined by taking the total profits of Ford Canada and Ford U.S. from Manufacturing and Assembly sales into the Canadian market through CVD, being $3.793 billion, and subtracting the total losses of CVD, being $5.954 billion. CVD was charged $3.586 billion for TELO (with an average annual TELO charge of 6.87% of revenue). CVD also lost $2.368 billion on its sales. CVD was unable to make up the very significant gap between revenues and expenses. The expenses to CVD, beyond the purchase of vehicles and parts at the interdivisional prices established under the transfer price system, and the outlays for TELO, included marketing costs of $4.224 billion and warranty costs of $3.710 billion. (Exhibit #4 - Sheet "A") An isolation of the Canadian market establishes that the sales into that market were at a substantial loss to Ford Canada.

**294** Given that Ford Canada shares the U.S. market in the integrated North American market, Ford Canada profits from the sales by Canadian Manufacturing and Assembly to Ford U.S. However, the overall balance of trade between Ford Canada and Ford U.S. favours the latter. The overall result is that Ford Canada had a reported loss from its North American operations of some $709 million for 1985 to 1995. This is determined by adding the total component Manufacturing and Assembly profits by Ford Canada ($598 million in the Canadian market plus $4.647 billion in the U.S. market) and subtracting the total losses of CVD (of $5.954 billion).

**295** There is a trade surplus in favour of Ford Canada if one looks simply to manufacturing and assembly profits resulting from the sale of tangible goods. Over 1985-1995 Ford Canada had a total Canadian market loss of $2.161 billion while the actual legal entity loss was only $709 million. The difference is accounted for by the amount by which the total Canadian manufacturing ($984 million) and assembly profits ($3.657 billion) of about $4.641 billion for sales into the U.S. market exceeded the total U.S. manufacturing ($1.995) and assembly ($1.194) profits of $3.189 billion for sales into the Canadian market. Therefore, the trade surplus in simply tangible goods favoured Ford Canada by some $1.452 billion. However, the trade in intangibles, i.e. TELO, at a cost to Ford Canada of $3.586 billion meant that the overall trade balance favoured Ford U.S. by about $2.134 billion and left Ford Canada with an overall loss from North America operations of about $709 million.

**296** In contrast, Dr. Horst calculates that there was an overall profit in the U.S. market of $30.609 billion over 1985 to 1995. The impact of the transfer pricing system has been to place some costs and resulting losses with Ford Canada unfairly, in the sense that those losses are not real to the overall Ford enterprise, but rather are matched by offsetting revenues and resulting profits to Ford U.S. For the Ford enterprise, there is an overstatement of the losses (or understatement of the income) properly attributable to the Canadian market to Ford Canada and a corresponding overstatement of income to Ford U.S.

**297** Drs. Horst and Clark propose a profit split between Ford Canada and Ford U.S. (See Exhibit #71). This approach would divide the total profits or losses of the separate entities within the overall enterprise.