**298**   Ford Canada submits that, to succeed in the case at hand, the dissenting shareholders must establish on a balance of probabilities that they had reasonable expectations that the historic structural transfer pricing arrangements between Ford Canada and Ford U.S. would be changed to a profit-sharing arrangement. I disagree.

**299**   The Canadian market is not as profitable as the United States market and a profit-sharing arrangement would not be fair to shareholders of Ford U.S. without taking into account appropriate adjustments for this phenomenon. However, the existing transfer system is arguably unfair to Ford Canada. The status quo is not the answer, given the fact of minority shareholders.

**300**   The premise underlying the Horst/Clark/Ballentine opinions is that an unrelated Ford Canada would have insisted upon renegotiating the historical transfer pricing arrangements with Ford U.S. I accept this submission. The reality of the differences in the Canadian market would have dictated this. This is apparent from the historical data. Why would the management of any truly independent entity in Ford Canada's position continue to tolerate an inter-corporate pricing arrangement that leaves it with a staggering aggregation of losses carried forward and with the only reasonable expectation for the future being that of continuing mammoth losses? The impact of the transfer pricing system is to understate profits or overstate losses earned from the Canadian market for Ford Canada. This realization does not arise from the benefit of hindsight. The results would be reasonably foreseeable to the management of Ford Canada from, at least, 1984 onwards.

**301**   In my view, an independent, arm's length party in the position of Ford Canada would have demanded reformulation of the inter-corporate arrangements or to be bought out at a fair price that reflected the true situation. There were several alternative approaches available to redress the situation: a reformulation of the TELO regime and/or modifications to the transfer pricing system would provide immediate redress. The placement of more manufacturing and assembly in Canada in the longer term would also ameliorate the problem.

**302**   In my view, at arm's length, Ford Canada would have insisted on negotiating fundamental changes to the inter-corporate pricing system by 1984. The mark-ups for Manufacturing and Assembly and the TELO charges of the existing transfer pricing system, coupled with the requirement of U.S. price parity, ignored the ongoing realities of the relative disadvantages of the Canadian marketplace. The operating results of Ford Canada over 1985-1995 are not consistent with arm's length results. No arm's length purchaser would agree to buy vehicles, parts and intangibles (TELO) at a higher cost than the reasonably anticipated revenue from the sale of those vehicles and parts in the Canadian market. Yet that was the essential position Ford Canada faced after 1977 and such position would certainly be visible by 1984 when the Canadian dollar had fallen to an average of US $0.772 for the year.

**303**   No one may have recognized the problem in the short term after 1977 and the vagaries of economic conditions and exchange rates always make forecasting the future uncertain. Hindsight is easier than foresight. However, it should have been clear by 1984 that there was a serious problem in the transfer pricing system in terms of fairness to Ford Canada and, in particular, to its minority shareholders.

**304**   From 1978 through to 1995 the Canadian dollar was in general decline as against the American dollar. The actual average annual exchange rate in 1978 was US $0.877/CA $1.00. In 1995 it was US $0.729/CA $1.00. From 1986 there was a rise from US $0.720/CA $1.00 to US $0.873/CA $1.00 in 1991 with the decline resuming to US $0.729/CA $1.00 in 1995. The internal opinions of

Ford Canada's Budget Reviews as to expectations regarding foreign exchange were pessimistic in each year from 1978 to 1995, with the forecasted expectation each year for the next year generally anticipating the dollar to remain weak and unlikely to strengthen significantly. Losses were budgeted for CVD each year and often for the Canadian automotive operations (Manufacturing, Assembly and CVD). While some operating profits were earned on the Canadian automotive operations from 1983 to 1989, the CVD results for each year had a very significant negative impact upon the operating net income/loss results.

**305**    The simple reality is that Ford Canada could not pass on all of its increased costs (imposed by the transfer price system) to its dealers because the dealers had to remain competitive in the very competitive Canadian market. If the ability of dealers to make profits were to be endangered, it would mean dealers might sever their relationship with Ford Canada and seek to franchise with a different car manufacturer or cease to carry on business.

**306**    Mr. Bennett agreed in his evidence that the price in the Canadian market could have been reduced by such measures as having different prices for northbound and southbound vehicles, decreasing TELO charges, or having Ford U.S. sell vehicles to CVD at discount to dealer wholesale price. In all such alternatives, the Ford enterprise would profit so long as Ford U.S. was covering its incremental costs and some part of its fixed costs. In an arms length relationship the dynamics of self-interest would lead the negotiations to a successful conclusion employing one or more of these or some other approach.

**307**    The problems inherent to the transfer pricing system would have been recognized by the senior management of both Ford Canada and Ford U.S by 1984. From 1977 onwards, Ford Canada generally budgeted losses for CVD. There was no apparent sentiment on the part of management to change the regime, at least until Mr. Bennett voiced his concerns in 1995. Even then there was no detailed analysis made by the board of directors to explain and understand clearly the problem from the standpoint of determining fair value for the minority shares. The existing regime was satisfactory to Ford U.S.

**308**    As the mark-ups and prices were raised for the Manufacturing and Assembly divisions, greater profits were realized within those divisions. To the extent that CVD purchases from Canadian Assembly and CVD cannot pass on its increased costs relating solely to the assembling of the cars to dealers in the Canadian market, there is no net loss to Ford Canada. That is, Ford Canada makes up in Assembly profits what it loses in CVD sales. However, to the extent the increased costs relating to Canadian Assembly arise from rising prices for imported U.S. manufactured components which cannot be passed on by CVD to dealers in the Canadian market, there is a loss to Ford Canada.

**309**    As well, when the increased costs to CVD, which cannot be passed on to dealers in the Canadian market, arise from the purchase of cars from U.S. Assembly, Ford U.S. profits at the expense of Ford Canada. Prior to September 12, 1995, Ford U.S, in effect, nominally would bear 94% of the resulting losses to CVD from such purchases (because Ford U.S. owned 94% of the shares of Ford Canada). In reality, Ford U.S. had no losses because of the offsetting increased revenues to U.S. Assembly. Rather, Ford U.S. gained overall, given that 100% of the profits from assembly accrue to U.S. Assembly. The minority shareholders in Ford Canada do not recoup their 6% share of the loss to CVD. Indirectly, there was an implicit transfer of money from the minority Canadian shareholders to Ford U.S.

**310**    Ford Canada's management recognized the problem but did not act to adjust the transfer pricing system. For example, the 1992 Annual Report of Ford Canada stated:

> There are two major external factors which are largely out of management's control: fluctuations of the Canadian dollar relative to other currencies and overcapacity in the auto industry. These factors can have a significant impact on operating results.
>
> A large portion of the company's costs are denominated in U.S. dollars. As a result, a decline in the Canadian dollar adversely affects the profitability of operations. In 1992, the Canadian dollar on average declined about 4 cents or 4% against the U.S. dollar compared to 1991 generating a significant unfavourable exchange effect. (Exhibit #1, tab 28, vol. 2, JBD)

**311**    Similarly, the 1994 Annual Report stated:

> The profitability of the Company's Canadian operations is especially sensitive to the value of the Canadian dollar because a large portion of its costs are denominated in U.S. dollars. The Canadian dollar has declined by about 14 cents against the U.S. dollar since 1991 and declined 4 cents in 1994. (Exhibit #1, tab 30, vol. 2, JBD)

**312**    Ford Canada's management could not, of course, control the external factor of the exchange rate. But Ford Canada's management, if an independent decision-maker in fact, could determine to purchase parts, vehicles and intangibles at prices agreeable to Ford Canada or not at all. Ford Canada's management knew that the Canadian market could not be profitable under the pricing dictated by the Ford transfer pricing system. Yet in the face of increasing losses, management took no initiatives to make adjustments to the transfer pricing regime.

**313**    In 1995, virtually all Ford vehicles had a significant price gap between the U.S. and Canadian consumer markets. The exchange rate was US $0.7286/CA $1.00. There was a significant revenue differential per unit. On a weighted average basis, a Ford unit which sold for US $16,556.00 in Canada sold in the U.S. for US $18.305.00. The revenue differential to Ford Canada was US $1,749.00, or 9.6% of the weighted average U.S. price of US $18,305.00. (Exhibit #1, tab 596, vol. 33 JBD)

**314**    Ford's assertion that CVD is the entrepreneur because it owns the intangibles (i.e. TELO) and thereby appropriately bears the risk of prices in the Canadian market is an artificial construct. The term "entrepreneur" was introduced in this case by Dr. Wright, in describing her findings from her transfer price system study. It is true that the inter-corporate arrangements placed the risk for the price of vehicles in the Canadian market with CVD. In reality, this is simply an accounting approach, assigned by Ford U.S. internally through the transfer price system.

**315**    However, there is no doubt that Ford is an integrated manufacturer, assembler and seller of vehicles in an integrated North American market. In reality, Ford is the single entrepreneur in the ordinary, classic sense of the term, i.e. the risk-taker in the marketplace. The real entrepreneur is the Ford enterprise (that is, Ford, consisting of Ford Canada together with Ford U.S.).

**316**    Decisions as to transfer pricing, research and development, models, plant locations and production are made by the head office of Ford as an integrated entity. Included in this decision-making is the allocation of the cost of TELO as between parent and subsidiary, which is reflected in the inter-corporate agreements. That is, the allocation of the cost of TELO is an internal decision, reflected of course in the accounting entries seen in the financial statements. However, there is no inherent necessity for this structure. The cost of TELO does not have to be coincidental with the assigned ownership of intangibles. Nor does the risk associated with market price have to correspond with the divisional ownership of TELO.

**317**    Ford Canada submits that the financial results of Ford Canada are the result of decisions made by Ford Canada's management and directors, coupled with market and industry conditions. As discussed above, the structure of the transfer pricing system adopted in 1965, and continued thereafter, was the product of inter-corporate agreements between Ford Canada and Ford U.S. Ford Canada submits that there is no evidence that the business decisions made by Ford Canada in this regard were made other than with a view to the best interests of Ford Canada.

**318**    As discussed above, the Ford Canada transfer pricing system was based upon a series of agreements entered into in 1966, 1969, 1970, 1973 and 1979 and continuing thereafter with only minor adjustments. A key feature of the inter-corporate agreements (for example, para. 2 of the 1966 agreement) was that CVD of Ford Canada paid the same price for vehicles in U.S. dollars as paid by USVD of Ford U.S. As discussed, this is referred to as the "U.S. price parity principle". The price was based on fully-allocated costs, including mark-ups for manufacturing and assembly. Thus, Ford Canada was a "price taker". TELO costs were allocated on the basis of unit sales, until changed after Dr. Wright's 1994 transfer pricing report.

**319**    The transfer pricing agreements could be terminated on 30 days notice. However, there was no new transfer pricing agreement after 1979. The mark-ups to manufacturing and assembly were negotiated within Ford U.S.'s divisions without input from Ford Canada.

**320**    Ford Canada could not necessarily pass on to its dealers the price paid by CVD and was generally unable to do so. Canadian market demographics simply did not support the same price (in U.S. dollar equivalence) in Canada as in the United States. The dealers had to remain competitive or they could not stay in business or would leave Ford Canada for a competitor.

**321**    The transfer pricing system was flawed in requiring CVD to acquire vehicles from Ford U.S. Assembly at the same fully-allocated cost paid by USVD. Ford Canada could not sell vehicles at a profit in the Canadian market under this "U.S. price parity" approach simply because Ford Canada's 640 dealers could not pay the same price as U.S. dealers paid to USVD.

**322**    Similarly, Ford Canada Assembly would pass on to CVD the rising costs of imported U.S. manufactured components. However, CVD could not always recoup these additional costs in the sale to dealers in the Canadian market.

**323**    OMERS submits that at arm's length, CVD would not have agreed to purchase a product at a price whereby it would reasonably foresee the probability, indeed, the near-certainty, of a loss. OMERS also submits that a reasonable person manufacturer in the position of Ford U.S., acting in its self-interest, would have agreed to sell its vehicles to CVD at less than fully-allocated costs if it recovered its incremental costs and some contribution toward its fixed costs. I agree.

**324**    OMERS points out that Ford's agreements with third parties took this approach, as did General Motors and Chrysler in their dealings with their Canadian subsidiaries.

**325**    There are, of course, many risks to the business of manufacturing, assembling and selling automobiles. For example, if there is a strike by workers in Canadian assembly operations, that will affect sales in the U.S. market. And so on. The point is, given the integrated North American market, both Ford U.S. and Ford Canada share all the significant risks in respect of the respective domestic markets except as to price. None of the risks other than in respect of price are assigned to the respective entities alone. Given the inflexible structure of the inter-corporate arrangements (price parity) and the declining exchange rate, resulting continuing losses (or diminutions of profits) were reasonably foreseeable for Ford Canada by 1984.

**326**    By 1984 the management and directing minds of both entities would have realized two realities: first, that for the foreseeable, indefinite future CVD would have significant losses. (This realization is evidenced by the annual budgets of Ford Canada in 1984-1995, each of which forecasts a loss to CVD for the next fiscal year.) The risk of loss for the next year from the Canadian market as foreseen in each budget was a reasonable certainty and hence, was forecasted. Such a risk cannot properly be described as an entrepreneurial risk. A self-interested, independent entrepreneur, acting reasonably, would not accept the certainty of endless losses.

**327**    Second, the directing minds would realize that the TELO allocation could not be rationally supported upon an entrepreneurial risk-taking premise. A rational entrepreneur would not agree to pay significant money for intangibles that would very probably result in continuing, sizeable losses.

**328**    It is reasonable in value determination to include a consideration of advantages that can reasonably be expected to accrue to the corporation whose shares are the subject of valuation. If the opinions of Drs. Clark and Horst have force in portraying a commercial result as between Ford Canada and Ford U.S. through negotiation or litigation (i.e. based upon oppression), then it is appropriate to make a corresponding balance sheet adjustment.

**329**    The experts testifying on behalf of OMERS were of the opinion that the sales divisions in both Canada and the United States incurred massive losses because the mark-ups on manufacturing and assembly were too high. As a result, CVD incurred continuing losses for some 19 years, with a cumulative loss between 1985 and 1995 of some $5.954 billion with an operating margin of approximately negative 11.9% on sales to independent dealers.

**330**    Ford Canada's Manufacturing and Assembly operations reported a cumulative profit of $5.245 billion ($598 million in the Canadian market plus $4.647 billion in the U.S. market) between 1985 and 1995 (Exhibit #71). The average operating margin for Assembly was 29.8% and for component Manufacturing was 14.4%.

**331**    USVD lost some $14.184 billion between 1985 and 1995 (Exhibit #71), with a negative operating margin of 2.3% and a return on net fixed assets of negative 95.7%.

**332**    Ford U.S.'s Manufacturing and Assembly divisions earned $43.341 billion between 1985 and 1995 (Exhibit #71) with a 10.1% operating margin for Manufacturing and a 19.7% operating margin for Assembly.

**333**    Overall, Ford Canada had a cumulative operating loss of $709 million with an operating margin of negative 1.1%. In contrast, Ford U.S., reported operating profits of $29.157 billion, with

an operating margin of 4.3% (Exhibit #71). The record establishes that the stated objective in each country was a 5% average return on sales over an 11 or 12 year business cycle.

**334** Dr. Ballentine stated that if Dr. Wright's conclusion implies that the transfer pricing system was fair to Ford Canada, then the relative rates of return for CVD and USVD implied under her analysis for 1985 to 1995 would be unreasonable. Placing the estimates for the arm's length income of the Manufacturing and Assembly segments of Ford Canada at $121 million per year, with a loss of $171 million per year to CVD, CVD would have an average rate of return over the period of negative 23.5%. However, the average rate of return for USVD would be positive 26.8%. (Exhibit #86 - see also Exhibit #80)

**335** OMERS submits that at arm's length, parties respond to unexpected economic changes by adjusting their transfer pricing arrangements (or otherwise changing their business arrangements). The premise underlying the evidence of Mr. Mateyka and the submission of Ford is that Ford Canada had a fixed expectation of "market price realization". That is, Ford Canada had an unchanging expectation that it would obtain the same price (in U.S. dollars) for vehicles in the Canadian market as was obtained in the U.S. market. Dr. Horst's evidence was that a more reasonable expectation would be that Ford U.S. and Ford Canada would continually update their expectations to reflect changes in economic conditions.

**336** The evidence also establishes that Ford Canada knew and budgeted on the expectation that there was a higher percentage of lower-priced vehicles and a lower percentage of the higher-priced vehicles sold in Canada. From about 1978 onwards Ford Canada could not recover increased foreign exchange costs through pricing in the Canadian market. Ford Canada did not expect significant strengthening of the Canadian dollar. The budget for each year anticipated a loss on the Canadian operations even though the budget would generally forecast profits overall through assembly and manufacturing profits from sales into the more favourable American market more than offsetting losses from the Canadian market. Ford Canada also anticipated increased warranty costs with the extended warranty introduced in the fall of 1991.

**337** Dr. Horst used a profit split method to result in a calculated $3.035 billion shortfall to Ford Canada for 1985 to 1995 (Exhibit #71). He split the overall reported profit or loss to Ford Canada and Ford U.S. according to the relative share of net fixed assets for each division, determining it to be 14% for sales and 86% for manufacturing and assembly. Dr. Horst determined that the transfer pricing adjustment for 1985 to 1995 was 2.2% of Ford Canada's net sales.

**338** Dr. Ballentine concluded that an arm's length transfer pricing system would have resulted in an additional $2.6 billion to $3.3 billion in earnings for Ford Canada between 1985 and 1995. He determined that the understatement of income was about $2.8 billion.

**339** Each of the OMERS' experts used a different method to determine the profit shortfall and independently concluded that for 1985 to 1995 it was in the range of approximately $2.6 to $3 billion.

**340** The issue is not whether a "profit split" (Horst), "comparables" (Clark) or "return on investment" (Ballentine) method should be used to set prices. Rather, the issue is whether the results effected under the Ford transfer pricing system were truly results which would be obtainable at arm's length by unrelated parties.

**341**   Dr. John P. Brown, testifying for Ford, viewed CVD as having two sources of profits and losses, the routine distribution business and that relating to the entrepreneurial ownership of intangibles. Ford submits that the OMERS experts' analyses ignore the allocation to Ford Canada of intangibles under the transfer pricing system. I disagree. The premise underlying Ford's view is that one must accept the structure of the existing transfer pricing system as both logical and fair.

**342**   The allocation of intangibles, or TELO, and the price paid therefore, is one aspect of the overall transfer pricing system. However, the results of the transfer pricing system must be arm's length regardless of the allocation in respect of intangibles. The ownership of intangibles and the allocation of risk need not be coincidental. Ford U.S. has rights to the intangibles that are superior to those of Ford Canada yet allocates the risk of the Canadian market to CVD. Ford attempts to rationalise the allocation of residual risk to CVD on the basis that CVD owns intangibles, assigned to it by Ford.

**343**   Dr. Horst supported his profit split approach to calculate arm's length profit because it was consistent with the basic principles seen in the Ford-Mazda agreements and it differentiates between the Canadian and U.S. markets.

**344**   Dr. Clark stated that a "market adjustment factor" to reflect market conditions is appropriate, being akin to a type of comparability adjustment recognised in transfer pricing policy.

**345**   Mr. Campbell incorporated a transfer pricing system adjustment (about $411 per share under Dr. Horst's analysis and $341.30 per share under the analysis of Dr. Clark) for 1985 - 1995 to his valuation.

**346**   Mr. Campbell employed a notional after-tax 12.5% rate of return to the calculated lost earnings to determine Ford Canada's overall loss. The lost earnings are seen as a foregone return to equity because the lost earnings represent incremental cash receipts. Mr. Campbell employed this rate because the record establishes that Ford earned an after-tax unlevered rate of return on equity in excess of that percentage.

**347**   Ford criticizes the assumed after-tax 12.5% rate of return on the basis that there was no evidence of forgone investment opportunities by Ford Canada and that quite possibly there would have been dividend pay-outs. Considering all the variables and possible factors, I accept Mr. Campbell's opinion that it is reasonable to employ the after-tax 12.5% rate of return.

**348**   Mr. Campbell's fair value calculations are arguably conservative because no provision could be made for growth capital expenditures, no provision was made for pre-1985 transfer pricing adjustments, income tax loss carry forwards were taken later (1995) than the earlier years in which they would have been actually utilized, and a 50% discount factor was used for the lower end of the labour savings advantage in his calculations.

**349**   In my view, Ford U.S. treated Ford Canada as if it were a wholly-owned subsidiary, with the acquiescence of the management and directing mind of Ford Canada, and maintained a transfer pricing system that was unfairly prejudicial to the interests of the minority shareholders. Ford U.S. was the beneficiary of a transfer pricing system which yielded non-arm's length results. Such conduct was detrimental to Ford Canada but more significantly, was prejudicial to the interests of only the minority shareholders. The majority shareholder, Ford U.S. gained 100% of the benefits at a corresponding cost to it of only 94% of the unfair losses to Ford Canada.

**350**    President Bennett's letter of February 6, 1995 to Ford Canada's directors is instructive. He attributed implicitly the long-standing problem of low earnings in the Canadian corporation to corporate structure and inter-company pricing arrangements. He stated:

> I urge you to review the situation with Ford US in the hope that changes can be made whereby Ford of Canada has an opportunity of participating in the profitability of the North American automotive operations and making a reasonable return on the assets employed. ... If the Canadian operations are not granted such an opportunity, then Ford US should at least buy out the minority shareholder interests.

**351**    This was an opportune time for a buy-out of the minority because of the recent changes on the balance sheet of Ford Canada with the consequential depressed value to its shares. Ford Canada had significant operating losses for 1991 to 1995 whereas Ford U.S. had significant operating profits for the period 1993 to 1995. Shareholders' equity in Ford Canada had decreased substantially from $1.4 billion in 1989 to $491 million in 1994. Ford Canada had a cumulative reported loss of $1.36 billion for 1991-1995 and the working capital had declined to negative $1.5 billion since 1989. As well, there was the promise of increased earnings as $3.1 billion had been invested in Canada in capital assets over 1991 to 1995 and a further $2.8 billion in capital expenditures was planned for 1996 to 2000.

**352**    The chairperson of the Special Committee acknowledged that there was little analysis of transfer pricing principles or how TELO costs are calculated. The evidence indicates that the board of directors had a limited knowledge of the inter-company pricing arrangements. There is nothing in the record to suggest that either the board of directors or the Audit Committee ever addressed the fundamental question of fairness to the minority shareholders because of the complex inter-company pricing arrangements. The record suggests the contrary, that is, that the reality was that the inter-corporate pricing system was determined solely by Ford U.S. and accepted uncritically through the years by Ford Canada's management. Mr. Bennett's letter of February, 1995 is the first and only critical comment in the evidentiary record. It was followed by the decision of Ford U.S. within two months to buy out the minority shareholders.

**353**    Legal counsel to the Special Committee had advised that the fairness of the transfer pricing system was relevant to a determination of fair value on the buy out. As well, Mr. Bennett had advised the Special Committee at a meeting June 22, 1995 that Ford Canada did not have a reasonable prospect of making reasonable returns on its own, given the inter-corporate structure and pricing system.

**354**    The Special Committee knew of Dr. Wright's transfer pricing report but did not ask for it nor did the Committee speak to her. CIBC Wood Gundy had a single conversation with Dr. Wright which related only to whether she foresaw any changes in the transfer pricing system going forward such that the forecast of CIBC Wood Gundy would be affected. In all events, the report of Dr. Wright, prepared for a different purpose (sanctifying the transfer price system in the event of any future challenge by the IRS), did not recognize or address the inherently flawed transfer pricing system from the standpoint of being unfairly prejudicial to the minority shareholders of Ford Canada.

**355**    It is noted incidentally that Gordon Capital gave an opinion to the Ontario Securities Commission which criticized the CIBC Wood Gundy valuation and fairness opinion, noting that CIBC

Wood Gundy relied largely upon the opinions of management of Ford U.S. and Ford Canada, with an apparent conflict of interest.

**356**    Ford Canada's minority shareholders had the reasonable expectation that management would act in the best interests of the corporation (meaning all of the shareholders) and take all reasonable steps to enhance profitability by changes to the inter-corporate pricing system.

**357**    In fact, Mr. Bennett acknowledged that there were no negotiations between Ford Canada and Ford U.S. with respect to prices paid by Ford Canada. Rather, all such prices and mark-ups were determined by Ford U.S. without input from Ford Canada. The annual reports of Ford Canada iterated that prices are negotiated on an arm's length basis but did not give any details of the transfer pricing system.

The Nature of the Ford U.S./Ford Canada Relationship

**358**    Ford U.S. is an affiliate of Ford Canada: ss. 2(2)(a), 2(5)(a) CBCA. The counterclaim asserts (para. 18), and the evidence establishes, that Ford U.S., with the assent of Ford Canada, sets the terms of the transfer pricing system, including the Canada/U.S. cost allocations for services such as TELO and headquarters administration, and sets the pricing by the Manufacturing divisions for components and the pricing by the Assembly divisions for assembly.

**359**    The inter-corporate Northbound/Southbound agreements or transfer pricing agreements negotiated between Ford Canada and Ford U.S. following upon the introduction of the Auto Pact in 1965 set up the terms of the relationship between the two entities. Each of these agreements incorporated the same basic terms, now seen in the March 28, 1979 agreement, which remained in force as of September 12, 1995.

**360**    Ford Canada held the exclusive right to the sale of Ford vehicles in Canada. Ford Canada maintained the ownership rights to the intellectual property (trademarks and other intangibles) associated with the sale of Ford products in the Canadian market. In exchange, Ford Canada paid TELO based upon the unit volume of sales (and based upon vehicle models sold as of 1995) in the Canadian market. CVD agreed to pay for assembled vehicles at the same interdivisional transfer price paid to the Ford U.S. Assembly division by USVD for the corresponding vehicle, identically equipped.

**361**    Under the inter-corporate agreements, Ford U.S. was responsible for the design and engineering functions for vehicles sold into the North American market and Ford Canada would pay its proportionate share of those costs based upon the number of units sold in Canada. One sees the advantages of a single, integrated, large market in this approach. Free trade does not lead to a zero sum' gain, but rather leads to a win-win' situation with gains in both countries.

**362**    This arrangement of specialisation in design and engineering at a focused, single corporate location is efficient in minimising the costs of the task and facilitates economies of scale in production. There are significant advantages to Ford Canada and Canadian consumers through the integrated market in terms of both costs and choice of product. However, it is to be noted also that by adding the Canadian market there is an advantage to Ford U.S. through increasing its profits and furthering its recovery of fixed costs.

**363**    If Ford Canada had been a wholly-owned subsidiary of Ford U.S., the shareholders of Ford U.S. would be indifferent to the inter-corporate pricing structure as the overall profit or loss to shareholders of the single enterprise on a consolidated basis would not be affected. (This leaves

aside the consideration of any tax advantages/disadvantages to the transfer pricing structure given two jurisdictions with different tax rates).

**364**    Similarly, as USVD is simply a division of Ford U.S. it does not matter in respect of inter-corporate transactions within the U.S. where the profits and losses are as between USVD and the Ford U.S. Manufacturing and Assembly divisions. If the profit of one division increases with a corresponding decrease to another division the net overall effect is the same for the single entity and hence, the shareholders.

**365**    The fact that Ford Canada has an overall loss through the transfer pricing structure is less of a disadvantage to Ford U.S. than if Ford Canada were a wholly-owned subsidiary with the same loss. With Ford U.S. having only 94% of Ford Canada's shares, Ford U.S. indirectly bears the losses (or shortfalls in profits) of Ford Canada to the extent of 94%. As well, to the extent that Ford Canada losses are matched by corresponding Ford U.S. gains, Ford U.S. comes out ahead. Thus, for example, if the TELO charge to Ford Canada were to be increased by $100.00, Ford U.S. would come out ahead by $6.00. (Stated otherwise, Ford Canada would pay Ford U.S. the $100.00, increasing the loss of Ford Canada by $100.00, which impacts adversely upon the equity of Ford U.S. in Ford Canada by only $94.00, leaving Ford U.S. with a net overall gain of $6.00.)

**366**    The potential unfairness of this phenomenon is compounded with the parent corporation, Ford U.S., being in the United States and the subsidiary, Ford Canada, being in Canada. This is because of a number of factors, already discussed. Two major factors are seen. First, there is the exchange rate. With the price parity principle, and all prices in U.S. dollars, as the Canadian dollar falls in relation to the U.S. dollar, the decline in profits, or increase in losses, will be magnified. (Ford Canada, in a 1992 message to shareholders, estimated a one-cent fall in the Canadian dollar as adversely affecting Ford Canada by about $25 million.)

**367**    Second, there is the difference in market conditions. If Canadians have a declining disposable income per capita relative to Americans, they will be less able to purchase vehicles, demand will decrease and the price for vehicles will tend to fall in Canada. As well, Canadians have a greater preference for smaller, cheaper cars, probably for a number of reasons, including lesser disposable incomes, higher gasoline prices and the need for better fuel economy. Smaller cars have lesser profit margins than large vehicles, in part because there is greater competition because of the presence of Asian manufactures. The overall impact is that different market factors make it much more difficult for CVD to break even than its counterpart, USVD.

**368**    These factors were observed by Ford Canada and its management and directors as reflected in the materials put forward in the annual Board Reviews. Expectations as to the value of the Canadian currency recognised a Canadian dollar below that of the American dollar from 1977 onward. Those expectations that were stated between 1985 and 1995 ranged from a low of 72 cents (1987) and a high of 84.8 cents (1992) and tended to mirror the movement of the actual fluctuating exchange rates. The point is, the forecasts for the annual Board Reviews from 1977 onwards sensibly recognised the weak Canadian dollar and anticipated a continuation of the weakness.

**369**    Mr. Bennett, a director of Ford Canada from 1965 to 1995, testified that the transfer pricing regime was agreed upon by Ford Canada in 1965 and was fair from the perspective of Ford management. For example, he points out that the payments by Ford Canada for TELO gave Ford Canada access to Ford U.S.'s full line of vehicles. If Ford Canada had been obliged to bear by itself the

full costs of product design and engineering the amount of TELO payments would have been insufficient to have permitted Ford Canada to design even a single vehicle on its own.

**370**    This observation is correct as far as it goes. But a further point is to be made. By expanding the market for Ford cars through the Auto Pact, the win-win' aspect of free trade for producers and consumers in both jurisdictions is seen. The expanded market allows for longer production runs with greater economies of scale, greater specialization in the production of manufactured components and assembly and greater choice of cars at lower prices by consumers (especially for Canadians, who entered the Auto Pact with the much smaller market).

**371**    But the win-win' aspect inherent to a trading relationship implies that both parties will profit. In my view, the evidence establishes that the structure of the transfer pricing system has been unfair to Ford Canada, and in particular, has disregarded unfairly the interests of its minority shareholders. In my view, and I so find, the inaction of Ford Canada through its management and board of directors after 1984 in failing to address and rectify the problems inherent to the structuring of the transfer pricing system constituted oppression within the meaning of s. 241(2) of the CBCA by Ford Canada against its minority shareholders.

**372**    Between 1985 and 1989 there were 12 directors of Ford Canada, four of whom were officers of Ford U.S., two of whom were officers of Ford Canada, with six outside directors, one of whom was a former officer of Ford Canada (being Mr. Bennett). In 1990 an additional officer of Ford Canada was added but in 1991 the board was again 12 directors with four officers of Ford U.S., three officers of Ford Canada and five outside directors, including Mr. Bennett. In 1992 the board was reduced to 10 directors, with three officers of Ford U.S., two officers of Ford Canada and five outside officers, including Mr. Bennett. For the period 1993 to 1995 the board consisted of nine directors, with two officers of Ford U.S., two officers of Ford Canada, and five outside directors, one of whom was Mr. Bennett. It is noted that it was not until 1993 that a majority of the directors were outside directors.

**373**    In my view, given the evidentiary record, as already discussed, there is no basis for a sustainable claim of oppression in law within the ambit of s. 241(2) against Ford U.S. One can certainly infer that Ford U.S. treated Ford Canada as a wholly-owned subsidiary. One can infer that Ford U.S. was quite satisfied with the continuation of the March 28, 1979 inter-corporate agreement. One can guess that Ford U.S. may well have resisted any attempted change by Ford Canada through renegotiation of the terms of the March 28, 1979 agreement; however, that is speculative given the paucity of the evidentiary record.

**374**    In my view, in the absence of any initiative on the part of Ford Canada to renegotiate the terms of the 1979 agreement so as to make adjustments to the transfer pricing system, Ford U.S. cannot be said to be in violation of s. 241(2) of the CBCA. The evidentiary record does not indicate any initiative by the management and directing mind of Ford Canada to analyse the problems and suggest alternatives for redress until Mr. Bennett's entreaty in 1995.

**375**    If CVD were to have truly operated at arm's length to the Assembly divisions, it would have negotiated a price that provided it with a reasonable profit in selling to its dealers. If Ford Canada were to have truly operated at arm's length to Ford U.S. it would have negotiated this structural change in pricing and/or a change to the TELO allocation.

**376**    There are at least four ways in which the dilemma for Ford Canada could have been addressed. All approaches would require re-negotiation of the March 28, 1979 trans-border transfer

price agreement and inter-corporate arrangements. Quite possibly, a combination of approaches would be necessary.

**377** First, Ford U.S. could reduce the mark-up on manufactured components; hence the Assembly divisions would pay less. As more components are manufactured in the United States than in Canada, the overall impact would have ameliorated the situation for Ford Canada by reducing the costs of assembling Ford vehicles, wherever assembled, sold in Canada (and the U.S.).

**378** Second, more Manufacturing facilities could be located in Canada. This would mean more manufacturing dollars to Ford Canada to better offset CVD losses.

**379** Third, the price parity principle could be modified through various approaches. For example, Ford U.S. Assembly could still profit by selling vehicles to CVD at less than fully-allocated costs if it recovered its incremental costs and some contribution to its fixed costs. The price by U.S. Assembly could reflect Canadian market realities, so as to assure CVD with a reasonable profit. The agreement by Ford Canada could be renegotiated so that Ford Canada would pay less to Ford U.S. for TELO.

**380** Fourth, and perhaps most simply, coupled with the change eventually recommended by Dr. Wright in respect of TELO, a discount to dealer price for Northbound vehicles would have resulted in an adjustment that would have achieved fairness for Ford Canada and its minority shareholders. Both General Motors and Chrysler provide prices for vehicles to their subsidiaries at a discount to the cost to the dealers (Exhibit #1, tab 628, vol. 34, JBD)

Ford U.S. Benefited from the Relationship

**381** Mr. Evershed acknowledged in his testimony that without a transfer pricing adjustment there was negative value in the Canadian operations and that CVD had "a material negative value" in the CIBC valuation.

**382** The reported overall loss of Ford Canada for 1985-1995 from North American operations was about $709 million. As Ford U.S. owned about 94% of the shares of Ford Canada, its implicit share of the reported loss was about $666 million. Ford U.S.'s profit on manufacturing and assembly on vehicles sold into Canada for the period was about $3.195 billion. Ford U.S. also received $3.586 billion for TELO from Ford Canada for that period.

**383** Hence, Ford U.S. had a net benefit from Ford Canada through the Canadian market for 1985 - 1995 of approximately $6.115 billion. This calculation ignores the additional benefit to Ford U.S. from a recovery of its fixed costs for manufacturing and assembly from the approximately $33.3 billion received by Ford U.S. in respect of finished vehicles sold to Ford Canada over 1985-1995 for the Canadian market. The amount of this cost recovery is unknown but is undoubtedly many billions of dollars.

**384** However, ignoring Ford Canada sales into the U.S., for 1985-1995, there was an overall loss from the Canadian market (reported profits of Ford U.S. and Ford Canada from Manufacturing and Assembly from sales into the Canadian market minus the cost of sales to CVD) of about $2.16 billion. In contrast, the overall profit from the U.S. market for 1985-1995 was about $30.609 billion, being $44.793 billion for total manufacturing and assembly ($4.647 billion by Ford Canada and $40.146 billion by Ford U.S.) less the total loss by USVD of $14.184 billion. (Exhibit # 71)

**385** In 1994, CVD had an average loss of US$1,600.00 for each vehicle sold to Ford Canada's dealers. In contrast, Ford U.S. had an average profit per vehicle of US $1,221.00. Therefore, the dif-

ference in the two markets was about US $2,821.00. The largest aspect of this difference arose from the "revenue gap", being an average of US $2,150.00 per vehicle. The weighted average revenue per vehicle sold in Canada was US $15,552.00; for Ford U.S. it was US $17,702.00.

**386**    The revenue gap between the U.S. and Canadian markets in 1994 was about 12.1%. The revenue gap in the main reflects the impact of two phenomena; first, the exchange rate; and second, the relative weaker purchasing power of automotive consumers in Canada.

**387**    In 1994, the average vehicle transaction price was 146% of per capita disposable income in Canada whereas in the U.S. it was only 109%. Put simply, Canadians cannot afford cars as easily as Americans. Given a lesser demand, coupled with intense competition from an array of supplier manufacturers, the retail price is adversely affected in Canada relative to the U.S.

**388**    Other factors came into play in 1994. Canada was still in the economic recession that had begun in the early 1990's. As a consequence, variable marketing costs for Ford Canada were US $123.00 higher per vehicle in Canada. As well, warranty costs per vehicle were US $370.00 higher in Canada. Finally, small and medium sized cars bring less profit than large vehicles. Some 73.3% of the cars sold in Canada in 1994 were small or medium cars, as compared to only 57.1% in the U.S. being in this category.

The Horst Frisch Inc. Transfer Pricing Report

**389**    Dr. Thomas Horst of Horst Frisch Inc. testified for OMERS as an expert in transfer pricing. In his opinion, the transfer prices that were charged between Ford Canada and Ford U.S. did not reflect the prices that would have been charged had the two corporations been dealing at arm's length. The Horst Frisch Inc. "Transfer Pricing Report" dated March 16, 2001 and revised December 14, 2001 (some 50 pages plus detailed Tables and Appendixes) was filed in evidence (Exhibit #67).

**390**    The Horst Frisch Inc. opinion observed first, that there were excessively high cumulative operating profits for the manufacturing divisions, coupled with large cumulative operating losses for the sales divisions, in both countries over 1985 to September 30, 1995. These "highly skewed results" (p. 3) are seen as prima facie evidence that the transfer prices were not at arm's length rates. (The Horst Frisch Inc. report, together with its later "Reply Report", together with the testimony of Dr. Horst at trial, is collectively referred to as "Host Frisch" or "Dr. Horst")

**391**    Horst Frisch reviewed the various methods used to determine arm's length transfer prices, including comparable uncontrolled price ("CUPS") methods, resale price methods, cost plus methods, comparable profits methods and profit split methods.

**392**    Next, Horst Frisch looked to Ford's two-way dealings in vehicles with Mazda, the supply agreements incorporating the basic pricing principles that "the prices should allow both the manufacturer and the marketer to earn acceptable profits on their businesses relating to that vehicle" (p. 3, Horst Frisch Inc. Report). The marketer was not treated as the sole risk-taking entrepreneur. In contrast, Ford's transfer pricing system simply took no account of whether CVD and USVD earned a profit or loss on the sale of vehicles to dealers.

**393**    Horst Frisch pointed out that Charles River Associates concluded in the report by Dr. Wright that the losses incurred by CVD were attributable in the main to the depreciation of the Canadian dollar and so did not impugn Ford's transfer pricing system. However, no arm's length party would

continue to operate on the basis of not adjusting prices to take into account the continuing devaluation of the Canadian dollar.

**394** Horst Frisch makes two key conclusions relating to the Ford transfer price system. First, Horst Frisch found that the operating margins and the rates of returns on net fixed assets of the total Ford manufacturing and assembly divisions exceeded the highest comparable profit rate of any of the 13 core business comparables used by Charles River Associates. (See Exhibit #72) Second, Horst Frisch considered the fact that CVD had substantial operating losses in every year to be indicative of a skewed transfer pricing system that did not achieve an arm's length result.

**395** Horst Frisch states (at p. 7, Horst Frisch Inc. Report) that

> the fundamental tenet of all transfer pricing regulations and guidelines is that the most compelling evidence of an arm's length price or profit margin in a transaction between related parties is the price or profit margin that one of those parties actually paid or received in a contemporaneous, directly comparable transaction with an unrelated party.

**396** Horst Frisch points to the Mazda agreements as the normative indicator of arm's length results. The manufacturers of the Mazda-designed vehicles (the Ford Festiva and Ford Aspire and assembled by Kia; and the Ford Probe) were not guaranteed recovery of costs plus a profitable mark-up (in contrast to Ford) and the marketer (whether Ford Canada or Ford U.S.) was not treated as the sole risk-taking entrepreneur (in contrast to CVD and USVD).

**397** Horst Frisch concludes (at p. 7, Horst Frisch Inc. Report):

> The terms of Ford's dealings with Mazda belie the two fundamental premises of the transfer pricing system between Ford U.S. and Ford Canada: (1) that when the vehicle's marketers share its development costs, the vehicle's marketers should bear all risk of loss, and (2) that the transfer prices for vehicles sold in Canada should be the same as for vehicles sold in the United States.

**398** The features of the Horst Frisch "profit split method" include splitting the combined loss or profits from Canadian and U.S. sales, respectively, between Ford's sales divisions and its manufacturing and assembly divisions based on the sales divisions' share of Ford's investments in net fixed assets over 1985 to September, 1995. As a result, 13.88% of the combined profit or loss on vehicles and parts sold to Canadian customers was allocated to Ford Canada's sales division, with the remainder apportioned among Ford U.S. and Canadian manufacturing and assembly plants that supplied vehicles, and components, to Ford Canada. (Exhibits #67 and #71)

**399** The same fixed percentage (13.88%) of the combined profit or loss on vehicles and parts sold to U.S. customers was allocated to Ford U.S.'s sales division, and the remainder of the combined profit or loss from those sales was apportioned among Ford U.S. and Canadian manufacturing and assembly plants that supplied vehicles, and components, to Ford U.S.

**400** Horst Frisch tested the reasonableness of its proposed transfer pricing adjustments by calculating the return on net fixed assets that Ford's Manufacturing, Assembly and sales divisions would achieve after effecting the adjustments. Dr. Horst opined that the Horst Frisch adjusted results were far more reasonable than Ford's reported results.

**401**    The Horst Frisch analysis led to the opinion that "the most reliable method for determining an arm's length transfer price for Ford Canada's purchase of vehicles from, and sales of vehicles to, Ford U.S. is the profit split method." (p. 4, Horst Frisch Inc. Report) See generally "Transfer-Pricing-Reg, Intl-Trans-Pricing US, Profit Split Method", CCH Incorporated, online: CCH Internet Tax Research Network <http://www.tax.cchgroup.com> (Exhibit #78). The ultimate conclusion of the Horst Frisch calculations is that Ford Canada's combined profits were understated by some $3.036 billion over 1985 to September 1995 and Ford U.S.' combined profits were overstated by the same amount. (Exhibit #71; charts #13 and #16)

**402**    My observation is that the profit split method is appropriate not only from the standpoint of better achieving arm's length results but also accords with the substantive reality of the Ford enterprise. Ford was operating in an integrated market by reason of the Auto Pact. With the assent of the directing mind of Ford Canada the Ford enterprise was seen simply as being a single entity, that is, the enterprise was indifferent to the internal divisional impact of the profit/loss allocation due to the realities of the unavoidable market differences in pricing in the two jurisdictions. Ford Canada was operating de facto as a wholly-owned subsidiary where such realities would not matter (leaving aside tax considerations, given different tax rates in the two jurisdictions) in the internal transfer pricing. As a wholly-owned subsidiary there would be only one consolidated loss or profit for the enterprise which would not change whatever the internal pricing structure might be.

**403**    The Charles River Associates' transfer pricing study of 1994 looked at the inter-corporate transfer pricing system simply from the standpoint of establishing whether the regime could be seen as being within the range of rationalized arm's length prices which would meet approval with the tax authorities. It did not address the large cumulative, and long-recurring annual losses (over 19 consecutive years) in Ford Canada's CVD. It did not address the question seen in the litigation at hand - if Ford Canada and Ford U.S. are to be considered as having to act as independent, arm's length entities functioning in the real world in their respective self-interests in the best interests of all their respective shareholders - is the transfer system in place realistic and fair?

**404**    Rather, the Charles River Associates 1994 report looked simply at, and accepted without critical comment, the artificially-constructed allocation of the risks between Ford Canada and Ford U.S., and the allocation of all risks to the sales divisions, notwithstanding that the empirical evidence of the marketplace establishes that the actual allocation of risks is very different when an independent manufacturer (such as Mazda or Kia) sells vehicles to an independent distributor (e.g. Ford) under comparable circumstances.

**405**    It is simply not credible that an independent distributor would have incurred such large losses as CVD had for such a long period of time, and anticipating each year that the next year would have the same negative result as the present and previous years. An independent company in such a position would simply choose to go out of business if it could not renegotiate its pricing of supplies.

**406**    In the Horst Frisch opinion, which I accept, the existing transfer price system is not realistic. In my view, it would not be seen with two parties who are truly at arm's length. The reasonable conclusion is made that Ford Canada allowed Ford U.S. to charge CVD higher prices for U.S. assembled cars and trucks (together with charges for TELO) than Ford U.S. would and could have charged an independent Canadian distributor. Ford Canada also allowed Ford U.S. to charge Ford Canada Assembly prices for manufactured components which resulted in higher Ford Canada Assembly prices which could not be passed on and recovered by CVD in its sales of vehicles to inde-

pendent Canadian dealers. As a result, Ford Canada's reported profit was smaller (or its reported loss was larger) than it would have been had Ford Canada been independent of Ford U.S.

**407**    The Horst Frisch analysis and opinion, following the so-called profit split approach, provides adjusted results that are more reasonable than the reported results of Ford Canada and Ford U.S. The true fair value of a share in Ford Canada as of September 11, 1995 should reflect the increased earning power and value implied by these adjustments. I accept the opinions of Horst Frisch seen in the Horst Frisch Report (Exhibit #67), in its "Reply Report" dated May 31, 2001 (Exhibit #68) and the opinion evidence of Dr. Horst expressed in his testimony. As mentioned above, Dr. Horst's transfer pricing adjustments would notionally add $3.036 billion to the profits of Ford Canada for 1985-1995 as an understatement of income while deducting the same amount from the profits of Ford U.S. as an overstatement of income. (Exhibit #71; charts #13 and #16).

The Deloitte & Touche Transfer Pricing Analysis

**408**    Deloitte & Touche LLP prepared a "Transfer Pricing Analysis" report of some 58 pages and 15 Appendixes (Exhibit #87) dated December 17, 2001 at the request of OMERS. (A "Draft Ford Motor Company of Canada Ltd. Transfer Pricing Analysis Fiscal Years 1985-1995" dated May 7, 1998 prepared by Deloitte & Touche LLP was filed as Exhibit #93; a report of the same title dated March, 2001 was filed as Exhibit #94). Dr. Richard Clark, Principal and National Co-Director of Transfer Pricing Economics for Deloitte & Touche LLP in Washington, D.C., directed the project and testified. (The Deloitte & Touche report, together with Dr. Clark's testimony at trial, are collectively referred to as "Deloitte & Touche".)

**409**    Deloitte & Touche concluded on the basis of its analysis that Ford Canada's profits were lower than they would have been had it been an independent company with its transactions with Ford U.S. being at arm's length. Deloitte & Touche opine that an independent company would not agree to an arrangement in which it purchases parts and vehicles at prices that effectively guaranteed a profit for Ford U.S. and in which its sales operation, CVD, consistently loses money. Rather, an independent company would negotiate transfer prices on sales to and purchases from Ford U.S. that over a business cycle would have resulted in levels of profit commensurate with a reasonable level of risk and appropriate to the manufacturing, assembly and sales and distribution functions that it performed. CVD had significant losses over a 19 year period, 1977-1995, being a time frame comprising almost two full business cycles in the automobile industry. That 19 year time period is certainly long enough to conclude that Ford's transfer pricing system did not produce arm's length results for Ford Canada.

**410**    Deloitte & Touche separately evaluated Ford Canada's three major business operations or functional divisions: CVD, component Manufacturing and vehicle Assembly. A number of objective sources were employed to determine notional arm's length figures for Ford Canada. An arm's length operating margin of 1.4% was attributed to Ford Canada's third party domestic sales of replacement parts and vehicles to determine a normative level of operating profit to Ford Canada from these sales through CVD. An arm's length cost plus mark-up of 7.3% was applied to Ford Canada's total manufacturing costs, including costs of goods sold and selling, general and administrative expenses, to determine a normative amount of manufacturing profits. An arm's length return of 26.7% on fixed assets to Ford Canada's Assembly plant fixed assets was utilized to determine a normative level of operating profits for Ford Canada's assembly function. The median cost mark-up of some 16 comparable manufacturers was used in determining the margin of 26.7%.

**411**    An alternative approach was also used to test the results by the application of the same return on fixed assets of 26.7% (in lieu of the 7.3% cost plus margin) to Ford Canada's Manufacturing operations with a resulting estimate of Ford Canada's annual average profit shortfall of $252 million per year, compared to the average of $239 million using the cost plus margin.

**412**    The application by Deloitte & Touche of these mark-ups to Ford Canada's actual sales, manufacturing costs and assembly fixed assets during the period 1985-1995 resulted in an initial estimate of an expected level of normative operating profits for Ford Canada over the period. Deloitte & Touche then refined this initial estimate by multiplying it by a "market adjustment factor."

**413**    The market adjustment factor was utilized to take into account differences in market conditions between Ford Canada and the comparables used in the Deloitte & Touche transfer pricing analysis. The actual results of the consolidated Ford U.S. and Ford Canada operations as a whole were used as a comparable for the purpose of determining the notional arm's length results of Ford Canada alone.

**414**    Given the integrated North American market, it was considered reasonable to assume that Ford Canada's consolidated Canadian operating results would have been highly correlated with Ford's consolidated U.S./Canada results, with both Ford U.S. and Ford Canada achieving similar results relative to third party norms.

**415**    The market adjustment factor reduces the profit margins derived from independent comparables to reflect the abnormally low profit of Ford's North America operations. (Exhibit #98) As well, the Deloitte & Touche analysis accounts for market differences between the U.S. and Canada. The estimate of arm's length profit attributable to Ford Canada's sales operations (CVD) was determined by multiplying an arm's length operating margin times Ford Canada's sales revenue from finished vehicles in Canada.

**416**    To the extent market prices for identical vehicles sold in the U.S. and Canada were lower in Canada (or that Canadian buyers on average bought lower-end vehicles), Ford Canada's sales revenues would have suffered. Under the Deloitte & Touche method of estimating profit shortfall, lower sales revenues translate directly into lower profits.

**417**    The market adjustment factor was computed by employing the same 1.4% operating margin to U.S./Canada consolidated sales, the same 7.3% mark-up on consolidated manufacturing costs, and the same 26.7% return on consolidated fixed assembly assets. The total of these profit components provided the estimate of the expected normative level of operating profit for consolidated Ford U.S. and Ford Canada operations for the examined 11 year period, 1985-1995. The "market adjustment factor" was then determined by dividing this notional number by Ford's actual consolidated U.S./Canada operating profit. The resulting market adjustment factor was 74.6%, reflecting the reality that Ford's consolidated U.S./Canada operations as a whole failed to achieve the expected normative profit levels during the period.

**418**    Deloitte & Touche concluded that Ford Canada's total operating profit over the period 1985-1995 would have been some $2.573 billion greater (and Ford U.S.'s operating profits less by the same amount) had the inter-corporate transactions been priced in accordance with the arm's length transfer pricing standards established through the Deloitte & Touche transfer pricing analysis. The actual operating margin earned by Ford Canada over 1985-1995 was negative 1.1%, compared to a

positive 4.3% operating margin for Ford U.S. With the argued-for reallocation of $2.573 billion in operating profits, Ford Canada would have achieved a 4.1% operating margin.

**419** Deloitte & Touche considers this estimate of the profits shortfall to Ford Canada through the existing transfer pricing system to be conservative. The analysis does not attempt to allocate to Ford Canada the full benefit of the labour cost savings realized by Ford Canada. As well, the analysis does not allocate to Ford Canada any return on the use by its credit arm of trademark rights owned by Ford Canada.

The Reply Evidence to the Transfer Pricing Analyses prepared by Horst Frisch and Deloitte & Touche

**420** Dr. John P. Brown, a retired principal in the Economic Consulting Services Group of KPMG LLP, prepared a report "A reply to the transfer pricing analyses prepared by Dr. Richard Clark and by Dr. Thomas Horst" (Exhibit # 65). He testified as to the Horst/Clark opinions that Ford Canada experienced a profit shortfall over 1985-1995 of some $2.6 billion to $3.0 billion due to a transfer pricing system that did not produce non-arm's length results. In my view, the attempted refutation by Dr. Brown of the Horst/Clark analyses is flawed and fails.

**421** Deloitte & Touche provided a reply (Exhibit #91) dated March 1, 2002 to the critiques of the Horst/Deloitte & Touche transfer pricing analyses made by Drs. Brown and Wright. Dr. Horst provided a "Second Reply To Ford Canada's Experts On Transfer Pricing Issues" dated February 22, 2002 (Exhibit #70).

**422** Dr. Brown emphasizes that the product and marketing intellectual property required to make and sell Ford vehicles in Canada is owned by Ford Canada and similarly, all of the product and marketing intellectual property required to make and sell Ford vehicles in the U.S. is owned by Ford U.S. He argues that the entrepreneurial risks associated with selling vehicles in each of the two markets should be retained by the entity for that market. Accordingly, he argues, the profit split methods of Horst/Clark effectively, but improperly, reallocate the ownership of intellectual property between Ford Canada and Ford U.S. I disagree.

**423** In my view, it is too simplistic to look at the nominal ownership of intellectual property as logically governing the allocation of entrepreneurial risk in the case at hand, as Dr. Brown does. No rational, independent entrepreneur in Ford Canada's position would agree to continue operations destined only to generate foreseeable, inevitable losses year-in, year-out, due to foreseeable continuing adverse economic conditions coupled with a known, static transfer pricing system. The simple ownership of intellectual property does not mean that such owner will irrationally buy and re-sell goods at an inevitable loss.

**424** Ford Canada's management was well aware of the adverse impact of the transfer pricing system upon Ford Canada. For example, the 1979 Annual Report of Ford Canada states:

> The Company purchases a large amount of its total material from U.S. sources, including finished vehicles and components from Ford U.S. and these purchases are settled in U.S. dollars. The Company also sells a substantial quantity of finished vehicles and components to Ford U.S. and these revenues are also settled in U.S. dollars. However, consistent with the total Canadian automotive industry, Ford incurs a sizeable net U.S. dollar transaction deficit. As a result of the net exposure in U.S. dollars, the devaluation of the Canadian dollar over the past

several years has resulted in large exchange costs penalty which have not been recovered in pricing. (Exhibit #1, tab 15, vol. #1, JBD)

425    For example, in 1992, James O'Connor, President of Ford Canada, wrote in his message to shareholders:

> [E]ach one-cent drop in the value of the Canadian dollar decreases Ford of Canada's profits by about $25 million. While declines in the Canadian dollar negatively impact Ford of Canada's profits, it also makes our exports more competitive. ... The bottom line for 1992 was a consolidated loss for [Ford Canada] of $364 million, or $43.87 a share, compared with a loss of $221 million, or $26.67 a share in 1991. (Exhibit #1, tab 28, vol. 2, JBD)

426    This statement recognizes implicitly that Ford Canada inevitably loses money through a falling dollar because of the transfer pricing system in place. In 1991 the actual average exchange rate was U.S. $0.873/Ca $1.00 (which was the most favourable rate seen for the Canadian dollar in any year between 1979 and 1995). Moreover, Ford Canada's annually forecasted expectations for budgetary purposes between 1978 and 1995 saw no end to the unfavourable exchange rate.

427    A rational entrepreneur (in the position of Ford Canada) would demand changes to the inter-corporate arrangements with Ford U.S. in its own self-interest in the face of significant annual losses to CVD and losses of share value while Ford U.S. is making a profit from the Canadian market. Indeed, the inter-corporate agreements allowed for termination of the existing transfer pricing contractual regime on short notice. There was no legal impediment to change. It would also be in the self-interest of the rational entrepreneur other party (Ford U.S.) to the ongoing relationship to agree to a new arrangement in its own self-interest.

428    Ford U.S. would not want to stop selling Ford cars into Canada in all events and, in particular, when it is doing so at a profit, even though some part of that profit has been artificially high due to the existing transfer pricing regime. Further, because Ford U.S. incurs significant fixed costs regardless of whether vehicles are sold in Canada, Ford would still earn a profit on vehicles sold in Canada because the revenue exceeds the variable, incremental costs incurred for such sales.

429    The dynamics of self-interest in such circumstances dictate that the parties should negotiate arm's length price results such that both will make a reasonable profit. The historically assigned ownership of intangibles is meaningless and of no real value to an entrepreneur who has no realistic foreseeable prospect of making a profit from the ownership of those intangibles because of a static transfer pricing system. The existing transfer pricing system assures one party to the transactions (Ford U.S.) of a profit at the expense of the other party (Ford Canada) under the reasonably foreseeable, continuing economic conditions.

430    Ford attempts to rationalize its position by pointing out that Ford Canada was profitable under the transfer pricing system as an entity in every year other than the years of economic recession, being 1979 to 1982 inclusive, and 1990 to 1995. This simplistic approach overlooks the fact that CVD had significant losses in every single year since 1977 which increased the overall losses of Ford Canada as an entity or significantly reduced the profit that it otherwise would have earned. The issues in this case are not answered by observing that Ford Canada sometimes earns an overall profit. Rather, the issue is whether there is oppression and unfairness in the transfer pricing system which results in an understatement of the profits (or conversely an overstatement of the losses) that

Ford Canada would earn if it were truly acting at arm's length from Ford U.S. in respect of transfer pricing.

**431**    Ford Canada seeks refuge in the disclosure to shareholders in its annual reports that the overall impact of a drop in the Canadian dollar was negative upon the profits of Ford Canada and that the ability of Ford Canada to be profitable in the Canadian market was largely dependent upon the performance of the Canadian dollar. This ignores the fact that Ford U.S. was gaining profits (through component manufacturing, U.S. assembly sales to CVD and TELO payments by CVD) at the expense of Ford Canada by the decline in the Canadian dollar and that a truly independent entity acting rationally in its self-interest at arm's length to Ford U.S. would have renegotiated the pricing of vehicles into the Canadian market (and/or TELO) to capture some of these foregone profits.

**432**    The record indicates that the Ford Canada management and Board of Directors did not give any consideration at any time to the reasonableness of the TELO paid, nor did the management and Board of Directors conduct any studies or give any consideration to the fairness to Ford Canada and in particular, to its minority shareholders, of the transfer pricing system in place.

**433**    In my view, Dr. Brown incorrectly characterizes the Horst/Clark analysis and profit split approach as, in effect, a forced expropriation of intellectual property without compensation. The flaw in the inter-corporate relationship between Ford Canada and Ford U.S. is the unfairness of the transfer pricing system.

**434**    Dr. Brown asserts that the appropriate transfer pricing method when intellectual property is wholly owned is the comparable profits method, not the profit split method. In my view, his argument illogically suggests that it would be a normal arm's length business relationship for Ford Canada as an entrepreneur to continue to buy vehicles from a supplier, Ford U.S, and always sell those vehicles to its independent dealers at a market loss, simply because of the ownership of intangibles for the Canadian market being with Ford Canada.

**435**    As well, on a fully-allocated basis there would have been a profit on vehicles sold in Canada from 1985-1995, simply by reallocating TELO costs. Why would a rational entrepreneur continue to pay for intellectual property through very significant TELO charges when such outlays, without any other change to the transfer pricing system, would only result with reasonable certainty in losses?

**436**    Finally, Dr. Brown refers to the comparisons made by Horst/Clark of Ford Canada's transactions with Ford U.S. to those carried out by various Ford entities with Mazda, Nissan, KIA and others. Dr. Brown asserts that such comparisons are inappropriate because of the differences in the way the transactions are structured, and it is inappropriate to require that all transactions have the same form. He emphasizes that the relevant tax authorities are indifferent to the form of transactions and that there is no such thing as an arm's length form; there are only arm's length prices that are important. But this begs the question - whether the Ford transfer price system resulted in arm's length prices? In my view, the transfer pricing system did not.

**437**    The point of the OMERS experts is not the particular form of the Mazda, KIA, Nissan and KIA inter-corporate transactions that is important but rather, the fact that any entrepreneur seller of vehicles will choose some form that is reasonably promising of yielding profits from sales.

**438**    It is noted as well that Deloitte & Touche tested its overall estimate of profit shortfall for Ford Canada by comparing Ford Canada's rate of profitability against the rate of profitability of

other Canadian automobile manufacturers. General Motors and Chrysler, even with wholly-owned subsidiaries, apparently choose a form for inter-corporate transactions that is comparatively realistic in terms of profit expectations for the Canadian subsidiary, by having a transfer pricing system that involves pricing to the subsidiary at a discount to the prices to dealers. The Canadian operations for both General Motors and Chrysler have been profitable in contrast to Ford Canada.

**439**    The other party entrepreneur manufacturer/assembler of the vehicles to such transactions will also seek a profit. The two parties, acting in their respective self-interests, will arrive at some form for inter-corporate transactions that reasonably meets their respective reasonable expectations of each making a profit. Thus, arm's length prices will be achieved. The problem with the (apparently unique) form of Ford Canada and Ford U.S. inter-corporate transactional transfer pricing is that Ford Canada had no reasonable anticipation of being able to profit on sales into the Canadian market during the period 1985-1995. The only reasonable anticipation of Ford Canada was to have losses, reflected in corresponding profits to Ford U.S. This form of transactional structure cannot and does not generate arm's length prices. The transfer pricing system for Ford Canada is seriously flawed from a business standpoint for that corporation.

**440**    Dr. Wright claims that the overall results of Ford Canada justify the Ford transfer pricing system. I disagree. I agree with the opinion of the OMERS transfer pricing experts that the overall approach is contrary to transfer pricing practice and is inconsistent with the approach taken by Dr. Wright herself in her 1994 transfer pricing documentation for Ford U.S. Moreover, I accept the Deloitte & Touche response to Dr. Wright that even on an overall basis, Ford Canada's results for 1985-1995 were abnormally low in comparison to Ford's worldwide operations, the benchmark adopted by Dr. Wright.

**441**    Ford's experts claim that in estimating Ford Canada's profit shortfall, Horst Frisch and Deloitte & Touche have in effect "restructured" the inter-corporate transactions between Ford Canada and Ford U.S. In my view, this criticism is unjustified. OMERS experts applied an acceptable transfer pricing method, employing the profit margins earned by comparable corporations, to test the reasonableness of the results achieved under Ford's transfer pricing system and to estimate a reasonable arm's length result. This same approach was taken by Dr. Wright in the 1994 Charles River Associates report for Ford U.S. She employed the profit margins of comparable companies as a method to test the reasonableness of the profit margins earned by Ford's Assembly and Manufacturing operations. This is the same approach as the "comparable profits method" advocated by Dr. Brown in his report.

**442**    The OMERS transfer pricing experts disagreed with the conclusions Dr. Wright reached through her use of the comparable profits method and some of the critical details of her application of the method. However, both Dr. Wright's approach and the approach of the OMERS experts tested the reasonableness of that system by using a transfer price methodology different from the system actually used by Ford. In my view, the Deloitte & Touche and Horst Frisch approaches constitute a proper transfer pricing analysis and do not constitute a "restructuring" of Ford's inter-corporate transactions.

**443**    I agree with and accept the opinion of Deloitte & Touche (p. 3, Exhibit #91):

> Based on our analysis of Ford's transfer pricing system, we concluded that the intercompany payments arising from the existing structure failed to meet any reasonable application of an arm's length test. The 21 years of continuous losses by

Ford Canada's Sales Operations [i.e. CVD] make this fact abundantly clear. Ford's experts suggest that these losses are somehow justified by Ford's structure-that notwithstanding year after year losses, Ford Canada, as an independent company, would willingly continue to make huge payments for TELO and purchase vehicles at prices that provide an insufficient profit margin to cover costs, let alone make a reasonable profit. Such a conclusion defies common sense.

**444**    An independent Ford Canada, or a Ford Canada acting independently and fairly through taking into account the interests of its minority shareholders, in the face of continuing losses in its business with Ford U.S., would have taken action to stem the losses and earn reasonable profits. The options to Ford Canada included: negotiating with Ford U.S. to enter into a relationship of simple distributorship for U.S. manufactured vehicles in the Canadian market; and renegotiating the prices Ford Canada pays to Ford U.S. for parts and finished vehicles and/or for TELO. The latter option is not based upon any assumed restructuring; rather, it contemplates only changes in the transfer prices.

**445**    A simple discount to dealer approach for northbound vehicles would have sufficed to ameliorate the obvious problem of low prices in the Canadian market. (If this was seen as violating the symmetry of the existing overall transfer pricing structure, or it was seen as necessary to also ameliorate for pricing to USVD into the American market, a discount to dealer pricing regime could have been established generally for Ford vehicles which took into account the different pricing in the two markets.)

**446**    The point is not what option for redress Ford Canada should or might choose. Rather, the point is that Ford Canada, acting independently, in particular, because of the necessity of acting in the best interests of all of its shareholders, and thereby treating its minority shareholders fairly, would have taken some action to achieve profitability for sales into the Canadian market.

**447**    Ford argues that Ford Canada gained from the existing relationship because of the benefit that might accrue from a possible appreciation of the Canadian dollar and from the potential improvement in pricing in the Canadian consumer auto market and that a long term perspective must be maintained. In my view, the evidence establishes that these would not be seen as reasonable possibilities for the Canadian market within a reasonable time span by the management of an independent entity in the position of Ford Canada looking forward over 1985-1995. In my view, an independent entrepreneur would take steps to adjust to the problematic aspects of the Canadian market through entering into different arrangements with its supplier, Ford U.S.

**448**    The reasonable expectations of the minority shareholders were that the management of Ford Canada would at all times act in the best interests of all the shareholders to make best efforts to earn a reasonable profit from Ford Canada's business operations. This was not possible over 1985-1995 given the structure of the transfer pricing system and its impact upon Ford Canada. A truly independent entity in the position of Ford Canada would have renegotiated and, moreover, would have been successful in doing so because it would be in Ford U.S.'s self-interest to accede to a changed arrangement. It is not necessary for OMERS to establish bad faith on the part of Ford Canada's directors or management. It is enough to establish, as has been done, that the foreseeable results of the omission of Ford Canada's directors and management to renegotiate the structure of the transfer pricing system would be oppressive and unfairly prejudicial to, and unfairly disregard the interests of, the minority shareholders.

**449** I find that the omission of Ford Canada to negotiate adjustments to the inter-corporate transfer price arrangements for 1985 to September 11, 1995, so as to achieve realistic arm's length results that would be seen in the marketplace between truly independent entities, as discussed above, effected a result (and in this omission the business of Ford Canada was exercised in such a manner) that was oppressive, unfairly prejudicial to, and unfairly disregarded the interests of the minority shareholders.

Disposition: The Fair Value of a Ford Canada Share

**450** As discussed, in determining a fair value for Ford Canada's shares there are two components considered by the dissenting shareholders' experts: the historical "oppression component" and the "go-forward component". The historical oppression component, as viewed by the OMERS experts, looks backward to the period 1985 - September 11, 1995 and contemplates a notional capital sum adjustment to Ford Canada's balance sheet, derived from incremental cash resulting from transfer price adjustments, leading to the fair value of Ford Canada as of September 11, 1995.

**451** This capital sum includes a calculation for the additional cash flows due to the transfer pricing adjustments, together with a notional annual return, or interest factor, through the reinvestment of those additional cash flows (a 12.5% compounded after-tax rate of return), that arguably would have been received by Ford Canada if the alleged defects of the transfer price system had not been present over that historical period.

**452** The go-forward component is forward-looking in the sense that it contemplates a capital sum representing the present value of future cash flows after September 11, 1995 that would reasonably be expected to accrue to the shareholders (plus the value of any redundant assets as of that date).

**453** Campbell Valuation Partners Limited ("CVPL") prepared a comprehensive 95 page "Valuation Report" (Exhibit #46) dated December 17, 2001, (the "Campbell Report") (in the place of an earlier report dated March 16, 2001), with detailed charts and appendices explaining the opinion rendered. Mr. Ian R. Campbell, the principal for CVPL, testified at length. In reaching its opinion, the Campbell Report relied upon the critiques of the transfer pricing system made by Deloitte & Touche and Horst Frisch respectively. Based on that reliance, Mr. Campbell adjusted the balance sheet of Ford Canada's Canadian operations as at September 11, 1995 to take into account both the asserted historical oppression component and the go-forward component, arriving at a present value fair market value per share as of the valuation date, September 11, 1995.

**454** In my view, the opinions of Deloitte & Touche and Horst Frisch portray a proper commercial result reflective of transfer pricing adjustments to achieve arm's length results as between Ford Canada's Canadian operations and Ford U.S., and it follows that a balance sheet adjustment is appropriate.

**455** On January 31, 2002 CIBC Wood Gundy provided "Comments on Revised Campbell Report" (Exhibit #45). CIBC Wood Gundy is of the view that the Campbell Report overstates the fair value of Ford Canada shares. CIBC Wood Gundy does not offer any comment upon the transfer pricing issues but takes the position that its calculation of the go-forward component is to be preferred and that the Campbell go-forward component is overstated because of an inappropriate selection of WACCs and terminal value multiples that are too high.

**456** In brief, Mr. Campbell adopted a "discounted discretionary after-tax cash flow methodology" in determining the en-bloc present value fair market value of Ford Canada's common shares as of

September 11, 1995. The values developed for each of Ford Canada's divisions were aggregated; the present value of existing income tax credits was added; and the present value of the after-tax benefit to Ford Canada in being able to claim undepreciated capital cost allowance on capital assets was added. Also added was an amount for the incremental cash or investment in business assets that arguably would have accrued to Ford Canada's operations had an appropriate transfer pricing system been in place 1985-1995.

**457** The capitalized value of certain management contingencies was deducted; also deducted was an after-tax amount for the under-funded portion of Ford Canada's pension plan. A deduction was also made for the negative working capital existing on the balance sheet.

**458** A nominal unlevered after-tax adjusted rate of return of 11% to 14% was employed when ascribing value to Ford Canada's operations. The risk-adjusted rates of return were determined by a review of relevant economic conditions and perceived rates of return required by corporate acquirers. ("A Survey of Corporate Acquirers" report by CVPL, filed as Exhibit #118, provided some empirical data as a basis for the calculations in this determination.)

**459** Having determined the after-tax rate of return, a "weighted average cost of capital" (being nominal rates, i.e. including forecasted inflation, in the range of 9.8% to 13.4%) was then applied to the acquirer's debt free forecasted after-tax discretionary cash flow, and the principal amount of the acquirer's existing interest bearing debt was deducted from the result.

**460** Analyses were also done in respect of Ford Australia and Ford New Zealand, the subsidiaries of Ford Canada.

**461** The Deloitte & Touche Report calculated that the annual EBIT generated by Ford Canada's operations was understated by about $239 million due to improper transfer pricing for 1985-1995. Ford Canada's resulting unconsolidated equity for Canadian operations as of September 11, 1995 would be about $2.83 billion. Rates of return under a perceived appropriate transfer pricing system were integrated into the value calculations for the functional divisions of Ford Canada.

**462** The Horst Frisch Inc. Report suggests that over 1985-1995 the annual EBIT generated by Ford Canada's operation was understated as a result of improper transfer pricing with an adjusted unconsolidated equity as of September 11, 1995 for Canadian operations being about $3.45 billion. Rates of return under a perceived fair transfer pricing system were integrated into the value calculations for the functional divisions.

**463** The Campbell Report noted that it did not take into account some factors which conceivably may have added further to the fair value determination of Ford Canada, such as the possible value to Ford Canada of its credit arm.

**464** Mr. Campbell's opinion is that the fair value of each common share of a dissenting shareholder of Ford Canada as of September 11, 1995, was in the range of about $500.00 to $610.00 based upon the opinion of Deloitte &Touche as to a fair transfer pricing system being in place for 1985 - September 11, 1995 and the forecast period 1995 Q4 to 2000 and thereafter. The breakdown by Mr. Campbell for the historical oppression component for 1985 to September 11, 1995 is a cumulative value per share of $341.24 (Exhibit #109) at the mid-point and $214.00 per share at the mid-point for the go-forward component. Thus, the overall valuation per share on the basis of the Deloitte & Touche foundation is about $555.00 per share at the mid-point.

**465**    Based upon the opinion of Horst Frisch with respect to transfer pricing, Mr. Campbell was of the opinion (in the revised schedules in Exhibit #103 to the Campbell Report, Exhibit #46- the revised schedules recalculating the present value of income tax loss carry forwards) that a range of value of about $555.00 to $670.00 (the Campbell Report fixed a mid-point of $610.00) per share was in order. The breakdown by Mr. Campbell for the historical oppression component for 1985 to September 11, 1995 is a cumulative value per share of $410.75 (Exhibit #109) at the mid-point and $199 per share at the mid-point for the go-forward component. Thus, the overall valuation per share on the basis of the Horst Frisch foundation is about $610.00 per share at the mid-point.

**466**    The Valuation Schedules in Appendix "A" of the Campbell Report, in determining a fair value per share as of September 11, 1995 proceed through various steps. The Schedules calculate present values for the various Ford Canada components, add the incremental cash resulting from the transfer price adjustment for the period 1985 to September 11, 1995 (being the period of alleged historical oppression for which the counterclaim is advanced) and add present values for after-tax free cash flows discounted by looking forward to the "forecast period", with calculations for Q4 of 1995 and for 1996 to 2000 and thereafter, being the go-forward component.

**467**    For the reasons given, I have found that there is not a sustainable oppression action in law for the recovery of compensation for the oppression in the time period prior to a complainant becoming a shareholder. As well, I have found that the Limitations Act applies, such that there cannot be recovery for the period prior to January 11, 1994.

The Historical Oppression Component of Compensation

**468**    In my view, a counterclaiming dissenting minority shareholder (i.e. OMERS and the Schedule "B" shareholders) has a successful claim for historical oppression for such part of the period from January 11, 1994 to September 11, 1995 that the particular shareholder may have owned his/her/its shares in Ford Canada.

**469**    Mr. Campbell breaks down the value-per-share impact of incremental cash through appropriate transfer pricing for 1994 at $44.25 and for 1995 to September 11 at $29.01 ($240.5 million incremental cash flow to Ford Canada), based upon Dr. Horst's analysis. (Exhibit #109; see also Exhibit #46, Schedule HF-11). Adjusting 1994 to remove the first 10 days, the value of January 11, 1994 to December 31, 1994 is about 355/365 times $44.25 = $43.04.

**470**    Mr. Campbell's breakdown of the value-per-share impact following Dr. Clark's analysis is $20.26 for 1994 and $12.97 for 1995 to September 11, 1995 ($107.5 million incremental cash flow to Ford Canada). (Exhibit #109) Adjusting the incremental cash for 1994 to remove the first 10 days, the value of January 11, 1994 to December 31, 1994 is about 355/365 times $20.26 = $19.70.

**471**    Taking the average of these two sets of values results in a value per share impact of ($43.04 + $29.01 +$19.70 + $12.97 =) $104.72 divided by 2 = $52.36.

**472**    Thus, for a complainant shareholder who owned the shares as of January 11, 1994, the compensation for the historical oppression component would be $52.36.

**473**    However, for a shareholder who owned the shares for only part of the January 11, 1994 to September 11, 1995 period, a calculation is necessary. The compensation in respect of the historical oppression component would be pro-rated by a calculation whereby a numerator, being the total days of ownership (not to exceed 609), is divided by the denominator of 609 and the resulting fraction multiplied by $52.36.

**474**    The determination of the entitlement of individual shareholders to compensation, and quanti-fication thereof, for the historical oppression component can be done by way of a reference to a Master of this Court under rr. 54.02(1)(b), 54.03(1) and 54.04(1) of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194.

The "go-forward" component in Fair Value

**475**    In my view, and I so find for the reasons given, the transfer pricing structure was unfair and oppressive to the minority shareholders for the historical period, 1985-1995. Accordingly, in my view, it would be unfair to all of the dissenting minority shareholders, being OMERS and the Schedule "A" and "B" dissenting shareholders, not to include the necessary notional changes to the transfer pricing structure in determining the "go-forward" component of value in respect of their shares. In my view, Ford Canada is required to notionally revise its transfer pricing structure with its parent to calculate the fair value of shares as of September 11, 1995.

**476**    Such adjustments result in recognized enhanced value to the dissenting minority sharehold-ers. The reference here is to "minority shareholders" because the majority shareholder, Ford U.S., was capturing this lost value indirectly in Ford U.S. through the operation of the existing transfer pricing system. Given a wholly-owned subsidiary following September 11, 1995, Ford U.S. is indif-ferent to the transfer pricing structure, apart from any tax impact considerations and meeting the requirements of the tax regulatory authorities for the two jurisdictions.

**477**    It is noted that in its meeting with the Special Committee of Ford Canada May 9, 1995, OMERS asked, inter alia, that issues of transfer pricing be considered and that there was a need to look at the value of the Canadian operations as a portion of the overall value of Ford. The value of Ford Canada should not be viewed simply on a stand alone basis. Rather, the Canadian operations should be considered as an integral part of Ford in its entirety. Put otherwise, the transfer pricing system created profits for Ford U.S. while generating corresponding losses to Ford Canada. (Exhibit #1, tabs 422, 424, vol. 24, JBD.) Ford Canada had a discrete value to Ford U.S. beyond that set forth in Ford Canada's financial statements.

**478**    Accordingly, an appropriate adjustment is to be taken into account for the "go-forward" component in determining the fair value of all the dissenting minority shares (i.e. the defendants in the action - OMERS and the Schedules "A" and "B" shareholders) as of September 11, 1995. The defendant minority shareholders' shares should have an amount included in calculating the value of the go-forward component to recognize the true earning power of Ford Canada for the future (based upon a fair transfer pricing system being in place).

**479**    This is done by making an adjustment for the present value of Canadian operations as of Sep-tember 11, 1995 for the purpose of determining the projected cash flows for Q4 1995 and the fore-cast period 1996-2000 and thereafter. Such adjustment contemplates that appropriate transfer pric-ing adjustments are in place for that go-forward period after September 11, 1995. As I have empha-sized, in my view, a truly independent entity purchasing the business of Ford Canada in an arm's length relationship to Ford U.S. would have negotiated appropriate transfer pricing system adjust-ments.

**480**    I place a present value as of September 11, 1995 for the go-forward component of the fair value of a Ford Canada share at $207.00. I have fixed this figure on the basis of the average of the two mid-points for the CVPL valuations of the go-forward component determinations based upon the Deloitte & Touche and Horst Frisch computations respectively.

**481** Ford submits that Mr. Campbell double-counted in arriving at his go-forward component of fair value by including a separate amount for "other revenue" when it had already been included in the calculations of Dr. Clark. However, the effect of Dr. Clark including "other revenue" in his calculation to obtain his market adjustment factor was miniscule and of no import. Ford also submits that there was double counting by Mr. Campbell in including in his valuation of the go-forward component an increment for the Canadian labour savings advantage in looking to the calculation of Assembly profit; however, Dr. Clark recommended this inclusion (Exhibit #22) and testified to this effect. In my view, Dr. Clark's opinion in this regard is supported by the evidence. Ford further submits that a correction was required in respect of Mr.Campbell's calculations of depreciation and for the tax loss carry-forward in arriving at his go-forward component. However, I accept Mr. Campbell's explanations in this regard. There was a good deal of judgment called for in the opinions as to valuation, based upon a great deal of complex and diverse data and extrapolations of value based upon probabilities and best effort opinions in looking at that data. I accept Mr. Campbell's opinion as to valuation as being supported by the evidence. I do not accept the criticisms of Ford Canada and its experts in respect of Mr. Campbell's determination of the go-forward component. In my view, if anything, Mr. Campbell's determination of the go-forward component is conservative. As discussed below, CIBC Wood Gundy's valuation was very close to that seen by Mr. Campbell even though CIBC Wood Gundy's valuation accepted the existing transfer price structure without reservation notwithstanding its shortcomings impacted severely upon the determination of the go-forward component.

**482** I choose the average of the midpoints for the following reasons. In my view, there is merit to both the Deloitte & Touche and Horst Frisch approaches. Both involve subjective elements in choices made by the experts in dealing with the extremely complex historical situation and financial data. Both the Deloitte & Touche and the Horst Frisch opinions have merit. The opinions necessarily involve best efforts with complex data. In my view, it is appropriate to take into account both theories in achieving a calculation of present fair market value per share, by averaging the experts' calculated figures at the mid-points.

**483** The essential point is that, for the reasons given above, adjustments to the transfer pricing regime are called for in calculating the fair value of the minority shares as of September 11, 1995. CIBC Wood Gundy did not consider the issue of adjustments to the transfer pricing system in giving its opinion as to valuation. The underlying major premise to Ford Canada's position as to valuation, and to CIBC Wood Gundy's valuation, is that there is no issue at all in respect of transfer pricing. (See review of CIBC Wood Gundy Valuation Report dated March 2001 by Campbell Valuation Partners Limited, Exhibit #56). Absent any adjustment required in respect of the transfer pricing system, the CIBC Wood Gundy valuation, and the Ford Canada offer of $185.00 per share, is not unreasonable.

**484** Mr. Campbell prepared an analysis of CIBC Wood Gundy's value calculation of adjusted after-tax free cash flow for 1995 to 2000 (Exhibit #105), did a breakdown of CIBC Wood Gundy's valuation (Exhibits #106 and #107) and did a comparison of the valuations based on the opinions of Deloitte & Touche and Horst Frisch as contrasted with that of CIBC Wood Gundy (Exhibit #108). Various scenarios were analyzed with Mr. Campbell taking into consideration CIBC Wood Gundy's discounted cash flow factor (Exhibits #121 to #124).

**485** CVPL, in its "Reply Report" (Exhibit #101), dated February 28, 2002, to the CIBC Wood Gundy critique of the Campbell Report (Exhibit #45), replicates the CIBC Wood Gundy valuation

model in Appendix "B", determining that CIBC Wood Gundy inherently has valued Ford Canada's CVD at a negative amount of $247.6 per share. This valuation is based upon the adverse impact of the transfer pricing system in place and assumes the status quo in respect of that system. I agree with Mr. Campbell's analysis, and his opinion that such a value determination is not plausible given Ford Canada's true market position.

**486** CVPL points out in Appendices "C" and "D" of the Reply Report that had CIBC Wood Gundy adopted the transfer pricing conclusions of Deloitte & Touche and Horst Frisch, that CIBC Wood Gundy's overall valuation, as recalculated, would have been about $660.00 per share (based on Deloitte & Touche) and $540.00 per share (based on Horst Frisch) at the mid-points.

**487** As discussed above, the CIBC Wood Gundy valuation does not take into account at all any historical oppression component in determining fair value. Nor does CIBC Wood Gundy contemplate any transfer pricing system adjustments as being appropriate in calculating the go-forward component. The CIBC Wood Gundy valuation places the fair value at $200.00 at the high end. This is close to the average ($207.00) of the mid-points for the valuation of the go-forward component by Mr. Campbell based upon the Deloitte & Touché and Horst Frisch findings and opinions.

**488** Mr. Campbell makes a notional adjustment to Ford Canada's balance sheet, taking into account the notional transfer pricing adjustments he favours, in calculating his "go-forward" component for fair value. Ford argues that Mr. Campbell's "go-forward" component calculation is inherently dependent upon a finding of oppression. While I find that there is historical oppression, and I accept the opinions of Mr. Campbell based upon the analyses of Drs. Clark and Horst, and buttressed by the opinion of Dr. Ballentine, a finding of "oppression" is not essential to supporting the "go-forward" component value computation by Mr. Campbell.

**489** Any rational, unrelated purchaser of Ford Canada's shares would make this notional adjustment to the balance sheet in calculating "fair value" to be paid for Ford Canada's shares for the reason that the transfer price adjustments would be achieved through renegotiation (this would probably be done before the share purchase, or the purchase would be conditional on this event). No rational purchaser would buy the business of Ford Canada without being assured of a reasonable return upon the purchaser's investment subject to the normative risks of the marketplace. No rational purchaser of Ford Canada would in effect guarantee Ford U.S. a profit from the Canadian operations while Ford Canada incurs continuing losses. (Ford U.S., as a purchaser of the minority shares in Ford Canada knows full well that Ford Canada generates profits over and above those seen in its financial statements, due to the inherent nature of the transfer price system which places those forgone profits with Ford U.S.)

**490** My determination places a fair value of $207.00 for the go-forward component of a Ford Canada share as of September 11, 1995. In my view, for the reasons given, the historical oppression component, 1985 - January 10, 1994, is not recoverable at law. However, as I have said, I would allow a recovery for historical oppression for the number of days within the period January 11, 1994 to September 11, 1995 that a shareholder owned her/his/its shares.

**491** Thus, I would fix the fair value per share of Ford Canada at ($207.00 plus $52.36 =) $259.36 per share for a shareholder who is a plaintiff by counterclaim and who was a shareholder throughout the entire January 11, 1994 - September 11, 1995 period. The defendant shareholders in Schedule "A" of the Statement of Claim have not joined in the oppression claim by counterclaim.

**492**    The Schedule "A" defendant shareholders are entitled to a fair value determination of $207.00 per share in recognition of the go-forward component. Given that $117.91 per share was paid by Ford Canada to the dissenting shareholders on January 10, 1997, all dissenting shareholders (i.e. OMERS and Schedules "A" and "B") are entitled to a further principal sum of $89.09 per share for the "go-forward" component.

Prejudgment Interest

**493**    Section 128(1), (3) of the Courts of Justice Act, R.S.O. 1990, c. C.43 provides for prejudgment interest from the date the cause of action arose calculated on the total past pecuniary loss at the end of each six-month period and at the date of the judgment. The amended statement of claim is dated October 31, 1995.

**494**    Section 128(4)(b) excludes an award of interest under s. 128(1) on interest accruing under this section. However, s. 128(4)(g) states that interest is not to be awarded under s. 128(1) where interest is payable by a right other than under this section. This exclusion has been interpreted as allowing interest to be payable where it is payable at common law or equity. As well, s. 130 confers a broad discretion upon the court to depart from s. 128, including the discretion to allow interest at a different rate or for a period other than as provided and the court may take any relevant consideration into account.

**495**    Dissenting shareholders have certain rights under the CBCA. Section 190(23) of the CBCA provides that a court may allow interest to a dissenting shareholder from "the date the action approved by the resolution is effective until the date of payment." The action approved by the resolution was amalgamation. The amalgamation became effective on October 1, 1995.

**496**    The dissenting shareholders have received $117.91 per share on January 10, 1997. I have found that all dissenting shareholders (i.e. OMERS and Schedules "A" and "B" shareholders) are entitled to a further principal sum of $89.09 per share. In addition, the counterclaiming OMERS and Schedule "B" shareholders are entitled to a further amount per share for the historical oppression component to a maximum of $52.36 (pro rated by the number of days of ownership for any given shareholder over the 609 day period January 11, 1994 to September 11, 1995.) I exercise my discretion to award prejudgment interest upon the unpaid sums at five per cent (5%) per annum, compounded semi-annually, from October 1, 1995 to the date of judgment, such interest amounts to be fixed in the reference to be made to the Master.

Costs

**497**    I may be spoken to as to the matter of costs.

CUMMING J.

*  *  *  *  *

Corrigendum
Released: February 13, 2004

Page 1 - Jason Squire name was spelt incorrectly

Page 113 (para 491) $259.36 has been substituted for $262.36

Page 114 (para 492) wording and calculations were changed.

Page 114 (para 496) wording and calculations were changed.

Page 115 is replaced because of line changes.
cp/e/nc/qw/qlrme/qlkjg/qlmjb
drs/e/qleet/qlsdd/qljal

# TAB 7



2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

▷
2001 CarswellMan 444

M. (M.) v. Roman Catholic Church of Canada

M.M. (Plaintiff/Respondent) and Les Oblats de Marie Immaculée du Manitoba and
Oblate Sisters de Saint Boniface (Defendants/Appellants) and The Roman Catholic
Church of Canada, The Attorney General of Canada, Archdiocese of St. Boniface,
Father Beaulieu, Father Ruest, Father John Doe and Sister Jane Doe (Defendants)
D.R.C. (Plaintiff/Respondent) and Les Oblats de Marie Immaculée du Manitoba
and Oblate Sisters de Saint Boniface (Defendants/Appellants) and The Roman
Catholic Church of Canada, The Attorney General of Canada, Archdiocese of St.
Boniface, Father Plumondeau, Father John Doe, and Sister Jane Doe (Defendants)

Manitoba Court of Appeal

Philp, Helper, Kroft, Monnin, Steel JJ.A.

Heard: June 8, 2001

Judgment: September 26, 2001

Docket: AI 00-30-04783, AI 00-30-04790

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Proceedings: reversing (1999), 180 D.L.R. (4th) 737 (Man. Q.B.)

Counsel: *D.K. Paterson, P. Halamandaris*, for Appellants

*V.S. Savino, P.M. Jerch*, for Respondents

*A. Frechette*, for Attorney General of Canada

*D.R. Davis*, for Attorney General of Manitoba

*R. Pollack, Q.C.*, for Archdiocese of St. Boniface

Subject: Civil Practice and Procedure; Torts

Limitation of actions --- Actions in tort -- Statutory limitation periods -- When statute commences to run -- Victims of sexual assault or domestic violence

Plaintiffs were Indians as defined by Indian Act -- As minors, Indians lived in residential school operated by church, and contended they were abused by school staff -- Indians brought action against church and Crown for damages for breach of fiduciary duty approximately 30 years after leaving school -- Churches' motion for striking out statement of claim was dismissed -- Crown appealed -- Appeal allowed -- Action was barred by Limitation of Actions Act as it read in 1931 -- Sections 40(1) and (2) of Limitation Act as it read in 1931 placed 30-year absolute limit for parties under disability to bring action -- Principle of discoverability was not applicable to absolute bar -- Indians' claim was barred as they had left residential school over 30 years prior to bringing action -- Current Limitation Act also created 30-year bar which was explicitly not subject to discoverability -- Limitation period was vested legal right that church may rely on to prevent litigation after expiry -- Earlier cases suggesting s. 75 of current Limitation Act is

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

inapplicable when minor reaches age of majority were incorrect -- Limitation of Actions Act, R.S.M. 1987, c. L150;
C.C.S.M., ss. 40(1), 40(2), 75 -- Indian Act, R.S.C. 1985, c. I-5.

Limitation of actions --- Actions in tort -- Statutory limitation periods -- When statute commences to run -- Actions
involving infant

Plaintiffs were Indians as defined by Indian Act -- As minors, Indians lived in residential school operated by church,
and contended they were abused by school staff -- Indians brought action against church and Crown for damages for
breach of fiduciary duty approximately 30 years after leaving school -- Churches' motion for striking out statement
of claim was dismissed -- Crown appealed -- Appeal allowed -- Action was barred by Limitation of Actions Act as it
read in 1931 -- Sections 40(1) and (2) of Limitation Act as it read in 1931 placed 30-year absolute limit for parties
under disability to bring action -- Principle of discoverability was not applicable to absolute bar -- Indians' claim was
barred as they had left residential school over 30 years previous to bringing action -- Current Limitation Act also
created 30-year bar which was explicitly not subject to discoverability -- Limitation period was vested legal right
that church may rely on to prevent litigation after expiry -- Earlier cases suggesting s. 75 of current Limitation Act is
inapplicable when minor reaches age of majority were incorrect -- Limitation of Actions Act, R.S.M. 1987, c. L150;
C.C.S.M., ss. 40(1), 40(2), 75 -- Indian Act, R.S.C. 1985, c. I-5.

**Cases considered:**

*Alberta (Director, Parentage & Maintenance Act) v. H. (R.)* (1993), 10 Alta. L.R. (3d) 225, (sub nom. *S.
(D.D.) v. H. (R.))* 46 W.A.C. 44, 47 R.F.L. (3d) 229, (sub nom. *S. (D.D.) v. H. (R.))* 141 A.R. 44, (sub nom.
*S. (D.D.) v. H. (R.))* 104 D.L.R. (4th) 73 (Alta. C.A.) -- referred to

*B. (T.L.) v. C. (R.E.)*, 2000 MBCA 83, [2000] 11 W.W.R. 436, 150 Man. R. (2d) 34, 230 W.A.C. 34 (Man.
C.A.) -- referred to

*Bera v. Marr*, 1 B.C.L.R. (2d) 1, 27 D.L.R. (4th) 161, [1986] 3 W.W.R. 442, 37 C.C.L.T. 21 (B.C. C.A.) --
considered

*Central & Eastern Trust Co. v. Rafuse*, 37 C.C.L.T. 117, (sub nom. *Central Trust Co. v. Rafuse)* [1986] 2
S.C.R. 147, (sub nom. *Central Trust Co. v. Rafuse)* 31 D.L.R. (4th) 481, (sub nom. *Central Trust Co. v.
Rafuse)* 69 N.R. 321, (sub nom. *Central Trust Co. v. Rafuse)* 75 N.S.R. (2d) 109, (sub nom. *Central Trust
Co. v. Rafuse)* 186 A.P.R. 109, 42 R.P.R. 161, 34 B.L.R. 187, (sub nom. *Central Trust Co. c. Cordon)*
[1986] R.R.A. 527 (headnote only) (S.C.C.) -- referred to

*Consumers Glass Co. v. Foundation Co. of Canada/Cie fondation du Canada* (1985), 51 O.R. (2d) 385, 20
D.L.R. (4th) 126, 9 O.A.C. 193, 30 B.L.R. 87, 33 C.C.L.T. 104, 13 C.L.R. 149, 1 C.P.C. (2d) 208 (Ont.
C.A.) -- referred to

*Cooke v. Gill* (1873), L.R. 8 C.P. 107 (Eng. C.P.) -- considered

*Crown Zellerbach Canada Ltd. v. R.* (1979), 13 B.C.L.R. 276, 11 C.P.C. 187, 101 D.L.R. (3d) 240 (B.C.
C.A.) -- considered

*Domco Industries Ltd. v. Mannington Mills Inc.* (1990), 29 C.P.R. (3d) 481, 107 N.R. 198, 35 F.T.R. 240
(note) (Fed. C.A.) -- referred to

*F. (C.M.) v. Manitoba*, 2001 MBQB 75, 155 Man. R. (2d) 4, [2001] 7 W.W.R. 501 (Man. Q.B.) -- not
followed

*Fehr v. Jacob*, 14 C.C.L.T. (2d) 200, 14 C.P.C. (3d) 364, [1993] 5 W.W.R. 1, 85 Man. R. (2d) 63, 41
W.A.C. 63 (Man. C.A.) -- considered

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

*Foley (Guardian ad litem of) v. Greene* (1990), 4 C.C.L.T. (2d) 309, *(sub nom. Foley v. Greene)* 74 D.L.R. (4th) 280, 85 Nfld. & P.E.I.R. 156, 266 A.P.R. 156, 48 C.P.C. (2d) 303 (Nfld. T.D.) -- referred to

*Grover v. Grover* (1980), [1981] 1 W.W.R. 203, 22 B.C.L.R. 256, 17 C.P.C. 298 (B.C. C.A.) -- referred to

*July v. Neal*, 57 O.R. (2d) 129, 32 D.L.R. (4th) 463, 17 O.A.C. 390, 19 C.C.L.I. 230, 12 C.P.C. (2d) 303, [1986] I.L.R. 1-2126, 44 M.V.R. 1 (Ont. C.A.) -- referred to

*Letang v. Cooper* (1964), [1965] 1 Q.B. 232, [1964] 2 All E.R. 929, [1964] Lloyd's Rep. 339 (Eng. C.A.) -- considered

*M. (K.) v. M. (H.)*, 142 N.R. 321, *(sub nom. M. c. M.)* [1992] 3 S.C.R. 6, 96 D.L.R. (4th) 289, 57 O.A.C. 321, 14 C.C.L.T. (2d) 1 (S.C.C.) -- considered

*MacKay v. Manitoba*, [1989] 6 W.W.R. 351, [1989] 2 S.C.R. 357, 61 D.L.R. (4th) 385, 99 N.R. 116, 61 Man. R. (2d) 270, 43 C.R.R. 1 (S.C.C.) -- followed

*Manitoba Hydro Electric Board v. John Inglis Co.* (1999), [2000] 1 W.W.R. 516, *(sub nom. Manitoba Hydro Electric v. John Inglis Co.)* 181 D.L.R. (4th) 470, 142 Man. R. (2d) 1, 212 W.A.C. 1 (Man. C.A.) -- considered

*Nielsen v. Kamloops (City)*, [1984] 5 W.W.R. 1, [1984] 2 S.C.R. 2, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1, 29 C.C.L.T. 97, 8 C.L.R. 1, 26 M.P.L.R. 81, 66 B.C.L.R. 273 (S.C.C.) -- considered

*Peixeiro v. Haberman*, 151 D.L.R. (4th) 429, 103 O.A.C. 161, 30 M.V.R. (3d) 41, [1997] 3 S.C.R. 549, 12 C.P.C. (4th) 255, 46 C.C.L.I. (2d) 147 (S.C.C.) -- referred to

*Perrie v. Martin*, 64 N.R. 195, [1986] 1 S.C.R. 41, 24 D.L.R. (4th) 1, 12 O.A.C. 269, 36 C.C.L.T. 36, 53 O.R. (2d) 672 (note) (S.C.C.) -- followed

*Photinopoulos v. Photinopoulos* (1988), 63 Alta. L.R. (2d) 193, [1989] 2 W.W.R. 56, 54 D.L.R. (4th) 372, 92 A.R. 122, 31 C.P.C. (2d) 267 (Alta. C.A.) -- referred to

*Pirelli General Cable Works Ltd. v. Oscar Faber & Partners* (1982), [1983] 2 A.C. 1, [1983] 1 All E.R. 65 (U.K. H.L.) -- referred to

*R. v. Gladue*, 133 C.C.C. (3d) 385, 171 D.L.R. (4th) 385, [1999] 2 C.N.L.R. 252, 23 C.R. (5th) 197, 238 N.R. 1, [1999] 1 S.C.R. 688, 121 B.C.A.C. 161, 198 W.A.C. 161 (S.C.C.) -- referred to

*R. v. J. (C.)* (1997), 115 Man. R. (2d) 72, 139 W.A.C. 72 (Man. C.A.) -- considered

*R. v. McCraw*, 7 C.R. (4th) 314, 128 N.R. 299, 66 C.C.C. (3d) 517, [1991] 3 S.C.R. 72, 49 O.A.C. 47 (S.C.C.) -- referred to

*Rarie v. Maxwell* (1998), 168 D.L.R. (4th) 579, 131 Man. R. (2d) 184, 187 W.A.C. 184, [1999] 6 W.W.R. 142, 29 C.P.C. (4th) 281 (Man. C.A.) -- considered

*Raymond v. Eli Lilly & Co.* (1977), 371 A.2d 170 (U.S. N.H.) -- referred to

*T. (S.J.) v. D. (S.)* (1996), 16 B.C.L.R. (3d) 1, 46 C.P.C. (3d) 139, 20 R.F.L. (4th) 240, *(sub nom. D. (S.) v. T. (S.J.))* 70 B.C.A.C. 274, *(sub nom. D. (S.) v. T. (S.J.))* 115 W.A.C. 274 (B.C. C.A.) -- referred to

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

*Tolofson v. Jensen* (1994), [1995] 1 W.W.R. 609, 22 C.C.L.T. (2d) 173, 100 B.C.L.R. (2d) 1, 32 C.P.C.
(3d) 141, 7 M.V.R. (3d) 202, 26 C.C.L.I. (2d) 1, 175 N.R. 161, 120 D.L.R. (4th) 289, (sub nom. *Lucas*
*(Litigation Guardian of) v. Gagnon)* [1994] 3 S.C.R. 1022, 77 O.A.C. 81, 51 B.C.A.C. 241, 84 W.A.C. 241
(S.C.C.) -- referred to

*W. (A.) v. M. (L.)* (1998), 125 Man. R. (2d) 228, [1999] 1 W.W.R. 161, 22 C.P.C. (4th) 329 (Man. Q.B.) --
not followed

*602533 Ontario Inc. v. Shell Canada Ltd.* (1998), 155 D.L.R. (4th) 562, 106 O.A.C. 183, 37 O.R. (3d) 504
(Ont. C.A.) -- referred to

**Statutes considered:**

*Canadian Charter of Rights and Freedoms,* Part I of the Constitution Act, 1982, being Schedule B to the Canada
Act 1982 (U.K.), 1982, c. 11

Generally -- referred to

s. 15 -- referred to

*Indian Act,* R.S.C. 1985, c. I-5

s. 2(1) "Indian" -- referred to

*Interpretation Act,* S.M. 2000, c. 26

s. 46(1) -- considered

s. 46(1)(c) -- considered

*Limitation Act,* R.S.B.C. 1979, c. 236

Generally -- referred to

s. 6(3) -- referred to

s. 8 -- referred to

*Limitation Act,* R.S.B.C. 1996, c. 266

s. 3(4)(k) -- referred to

s. 3(4)(l) -- referred to

*Limitation of Actions Act,* S.M. 1931, c. 30

Generally -- referred to

s. 3 -- considered

s. 3(1)(i) -- considered

Copr. © West 2007 No Claim to Orig. Govt. Works