2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253, 160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

s. 6 -- considered

s. 40A(1) [en. 1932, c. 24, s. 10] -- considered

s. 40A(2) [en. 1932, c. 24, s. 10] -- considered

*Limitation of Actions Act*, R.S.M. 1940, c. 121

s. 41(1) -- considered

s. 41(2) -- considered

*Limitation of Actions Act*, R.S.M. 1987, c. L150

Generally -- referred to

Pt. II -- referred to

s. 7 -- considered

s. 7(1) -- considered

s. 7(5) -- considered

s. 58 -- referred to

*Limitation of Actions Act*, R.S.S. 1978, c. L-15

s. 3(3.1) [en. 1992, c. 37, s. 15] -- referred to

*Limitation of Actions Act*, R.S.Y. 1986, c. 104

s. 2(3) -- referred to

*Limitations Act*, S.A. 1996, c. L-15.1

s. 13 -- referred to

*Medical Act*, R.S.B.C. 1960, c. 239

Generally -- referred to

*Medical Act*, R.S.M. 1987, c. M90

s. 61 -- referred to

*Miscellaneous Statutes Amendment Act, 1977*, S.B.C. 1977, c. 76

Generally -- referred to

**Rules considered:**

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

*Queen's Bench Rules*, Man. Reg. 553/88

   R. 21.01 -- pursuant to

**Words and phrases considered**

**cause of action**

A cause of action . . . is comprised of those elements necessary to establish the success of a claim.

**right to do so**

The phrase "the right to do so first accrued to him" in the longstop provision of the 1931 [*Limitation of Actions*] *Act* means exactly the same thing as "the occurrence of the act or omission that gave rise to the cause of action" in s. 7(5) of the current *Act*.

APPEAL by Crown from judgment reported at (1999), 39 C.P.C. (4th) 352, [2000] 2 W.W.R. 258, 180 D.L.R. (4th) 737, 141 Man. R. (2d) 209, 1999 CarswellMan 516 (Man. Q.B.), dismissing churches' motion for striking out statement of claim.

*Per curiam*:

1  The respondent in each of these actions is an "Indian" within the meaning of the *Indian Act*. Each has alleged harm of a physical, emotional, and cultural nature caused by the treatment received when each was a student at an Indian Residential School. Each was in residence during periods that ended more than three decades before the statements of claim were filed.

2  The appellants moved in the Court of Queen's Bench for the determination of a question of law; that being whether the cause of action brought by each of the respondents was statute-barred and should be dismissed or struck out. The motions were filed pursuant to Queen's Bench Rule 21.01 after the respondents filed their respective statements of claim.

3  The motions judge dismissed both motions without prejudice to the appellants' rights to plead that the claims were statute-barred because they were not brought within six years from the discovery of the cause of action. The appellants appeal from both orders.

**The Facts**

4  The statement of claim by M.M. (the M. claim) was filed on April 30, 1998.

5  In the M. claim, the respondent alleges that she attended the Pine Creek Indian Residential School (the school) for approximately 12 years; from the ages of 3 to 15. In particular, she says that she attended the school from in or around August 1930 to in or around June 1942.

6  The statement of claim by D.C. (the C. claim) was filed on June 11, 1998.

7  In the C. claim, the respondent alleges that he attended the school for approximately six years; from the ages of 10 to 16. In particular, he says that he attended the school from on or about September 1, 1944, to in or around 1950.

8  In both claims, the respondents initially alleged, *inter alia*, that while they were students at the school, various of the defendants committed certain torts against them (assault, sexual assault, and false imprisonment) and breached fiduciary duties owed to each of them with respect to the preservation of their culture and heritage. They

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

each claim general and special damages, loss of income, interest, and costs. At the hearing of this appeal, counsel for
the respondents advised that his clients had abandoned their claims in tort and were proceeding simply on the basis
of breach of fiduciary duty.

### The Constitutional Question -- A Preliminary Issue

9    Counsel for the respondents served the Attorney General of Manitoba with notice of a constitutional question
and addressed that question in the written material filed in response to these appeals. The respondents sought to
argue that *The Limitation of Actions Act* violates s. 15 of the *Canadian Charter of Rights and Freedoms* (the
*Charter*). The issue was not argued before or adjudicated by the motions judge, although it may have been referred
to before him in passing.

10    It was the position of the Attorney General of Manitoba that the issue was not properly before this court. The
Attorney General moved to strike those parts of the respondents' factum which refer to and rely upon the argument
raised under s. 15 of the *Charter* and further asked this court to decline to entertain any constitutional question at
this time.

11    The pronouncement of the Supreme Court in *MacKay v. Manitoba,* [1989] 2 S.C.R. 357 (S.C.C.), is applicable
to this case. *Charter* issues ought not to be argued in a factual vacuum. The factual underpinnings of a constitutional
issue have not been established in this case, where the only materials on the record are the respective statements of
claim and a single supporting affidavit. Scott C.J.M. stated in *R. v. J. (C.)* (1997), 115 Man. R. (2d) 72 (Man. C.A.),
that absent exceptional circumstances, this court will reject any invitation to entertain constitutional arguments
raised for the first time on appeal, especially where a factual context is absent. It was on this basis that the court
granted the Attorney General's motion and did not allow the respondents to proceed with the constitutional issue
raised by them.

### The Appellants' Argument

12    The appellants submit that both claims in their entirety must be dismissed, either by virtue of the provisions of
*The Limitation of Actions Act* that were in force at the time the causes of action pleaded in the statements of claim
arose (*The Limitation of Actions Act, 1931*, S.M. 1931, c. 30, as amended by S.M. 1932, c. 24, and thereafter) (the
1931 *Act*) or, alternately, by virtue of the provisions of *The Limitation of Actions Act* in force at the current time
(*The Limitation of Actions Act*, R.S.M. 1987, c. L150) (the current *Act*).

13    The appellants say that the claims filed against them are governed by the provisions of the 1931 *Act* that were
in force when the facts on which the claims are based are alleged to have occurred. They argue that both claims
became absolutely statute-barred under the provisions of the 1931 *Act*. They go on to argue that their right of
immunity from suit after the respondents' claims became statute-barred is a vested right which cannot be
retroactively affected by the enactment of the current *Act*. They say they acquired an "accrued right to plead a time
bar." See *Perrie v. Martin,* [1986] 1 S.C.R. 41 (S.C.C.), a case which we will address in greater detail later in these
reasons. In the alternative, they argue they are protected from suit by the provisions of the current *Act*.

### Which is the Applicable *Act*?

14    The current *Act* does not contain any detailed transitional provisions. Section 58 states:

> **Application of Act**
>
> **58** This Act applies to all causes of action whether they arose before or after the coming into force of this
> Act.

15    This section, which says that it is the statute in force today which governs regardless of when the cause of
action arose, must be read together with s. 46(1) of *The Interpretation Act*, S.M. 2000, c. 26 -- Cap. 180. There the

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

principle is clearly prescribed that the legislature does not intend new statute law to interfere with vested rights.

> **Effect of repeal**
>
> **46(1)** The repeal of an Act or regulation, whether or not it is also replaced, does not
>
> . . . . .
>
>> (c) affect a right, privilege, obligation or liability acquired, accruing or incurred under the repealed Act or regulation;
>
> . . . . .

16    In light of the Supreme Court decision in _Perrie v. Martin_, s. 46(1) means that the current *Act* governs in all cases by virtue of s. 58 unless a limitation defence has already vested under the repealed statute. We will begin therefore by addressing the appellants' submission that they acquired a vested right under the 1931 *Act*.

**(A) The longstop provision of the 1931 *Act***

17    The following are the provisions of the 1931 *Act* upon which the appellants rely:

> **3.** (1) The following actions shall be commenced within and not after the times respectively hereinafter mentioned:
>
> . . . . .
>
> *(i)* actions grounded on accident, mistake or other equitable ground of relief not hereinbefore specifically dealt with, within six years from the discovery of the cause of action;
>
> . . . . .
>
> **6.** If a person entitled to bring any action mentioned in paragraphs *(c)* to *(i)* inclusive of subsection (1) of section 3 is under disability at the time the cause of action arises, he may bring the action within the time hereinbefore limited with respect to such action or at any time within two years after he first ceased to be under disability.

18    Section 10 of S.M. 1932, c. 24, added the following to the 1931 *Act*:

> **40A.** (1) If, at the time at which the right to take any proceedings referred to in Parts II, III or IV *first accrued to any person*, he was under disability, then such person or a person claiming through him may (notwithstanding anything in this Act) take proceedings at any time within six years next after the person to whom the right first accrued first ceased to be under disability or died, whichever event first happened, provided that if he dies without ceasing to be under disability, no further time to take proceedings shall be allowed by reason of the disability of any other person.
>
> (2) Notwithstanding anything in this section, no proceedings shall be taken by a person under disability at the time *the right to do so first accrued to him*, or by any person claiming through him, *but within thirty years next after that time*.
>
> [emphasis added]

This section was renumbered s. 41(1) and (2) in the 1940 Revised Statutes. For ease of reference, we will refer to s. 41(1) and (2) as the longstop provision of the 1931 *Act*.

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

### (B) Is the longstop provision subject to discoverability?

19    The appellants agree that s. 3(1)(i) of the 1931 *Act* has its own built-in discoverability provision. They submit,
however, that it is not s. 3(1)(i) that is the governing provision of the *Act*, but rather, the longstop provision applies
in this case. They say that the longstop provision is not knowledge-based, is not subject to discoverability, and that
discoverability has no place in the construction and interpretation of that provision.

20    The appellants argue that in enacting the longstop provision, the legislature intended to bar all claims that had
not been initiated within 30 years from the time the cause of action arose; that the meaning of the longstop provision
is clear from its language and, to the extent that it is relevant, that the description of s. 41(2) in the marginal note as
the "ultimate limit" is consistent with their submission. Therefore, the M. claim became statute-barred no later than
1972, 30 years after she left the school. The C. claim became statute-barred no later than 1980, 30 years after he left
the school.

21    On the other hand, the respondents argue that there is no basis in law to construe the longstop provision in a
manner that restricts rights otherwise recognized by the legislature. Section 3(1)(i) provided to a person wronged by
the breach of a fiduciary duty the right to commence an action within six years after the discovery of the cause of
action. In introducing the longstop provision, the legislature did not restrict a plaintiff's time for discoverability
under s. 3(1)(i) and did not make that section in the 1931 *Act* subject to the longstop provision. Indeed, the use of the
phrase "the right to do so first accrued to him" in the longstop provision, they argue, is far from clear. The
respondents argue that clear legislative intent to restrict a plaintiff's right to commence an action pursuant to s.
3(1)(i) would be required to support the interpretation advanced by the appellants.

22    The respondents contend that the longstop provision in the 1931 *Act* is knowledge-based and point to the very
different wording of the comparable longstop provision in the current *Act* to support that contention. They say the
right to bring an action first accrued to them under the longstop provision when they discovered their cause of
action.

23    The longstop provision in the current *Act* reads as follows:

> **Persons under disability**
>
> **7(1)** For the purposes of this section and section 8, a person is under a disability
>
> > (a) while he is a minor; or
> >
> > (b) while he is in fact incapable of the management of his affairs because of disease or impairment of
> > his physical or mental condition.
>
> . . . . .
>
> **Ultimate time**
>
> **7(5)** Notwithstanding anything in this section, no action to which this section applies shall be brought by a
> person who is or has been under a disability or for or on his behalf by another after the expiration of 30
> years after the occurrence of the act or omission that gave rise to the cause of action.
>
> . . . . .

24    Under the longstop provision in the 1931 *Act*, the limitation period runs from the time when the right to take
proceedings first accrued to the person. The current *Act* states that time begins to run from the completion of the

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

occurrence of the acts or omissions giving rise to the cause of action.

**(C) The meaning of the phrase "the right to do so first accrued to him"**

25    To address this issue, we pose the following question: Does the phrase "the right to do so first accrued to him" used in the 1931 *Act* mean the same thing as "when a cause of action first accrued for the purposes of a limitation period"? Put another way, the question is: Does that phrase in the statute mean the same thing as "the occurrence of the act or omission that gave rise to the cause of action," the wording of s. 7(5) of the current *Act*? If the answer to the question is in the affirmative, then we conclude that the changes in the wording of the longstop provision in the 1931 *Act* were effected for the purposes of clarification and not to change the meaning and application of that provision. On the other hand, if the answer to the question is in the negative, the respondents' submission is strengthened.

26    To answer the question, it will be helpful to consider a working definition of a "cause of action."

27    One of the leading definitions comes from *Cooke v. Gill* (1873), L.R. 8 C.P. 107 (Eng. C.P.). Three concurring judgments were written. Brett J., in the course of his judgment, defined the cause of action as follows (at p. 116):

    "Cause of action" has been held from the earliest time to mean every fact which is material to be proved to entitle the plaintiff to succeed, — every fact which the defendant would have a right to traverse.

Brett J. concluded his reasons by noting (at p. 117):

    . . . [T]he jurisdiction to issue an attachment does not exist unless every fact material to establish a cause of action accrued within the city.

28    In *Letang v. Cooper*, [1964] 2 All E.R. 929 (Eng. C.A.), Lord Diplock defined a "cause of action" as follows (at p. 934):

    A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person.

29    Craig J.A., in *Crown Zellerbach Canada Ltd. v. R.* (1979), 11 C.P.C. 187 (B.C. C.A.), at 193, said that the phrase "cause of action" "includes, or comprises, every fact which the plaintiff must prove, if opposed, in order to obtain a judgment."

30    Lord Diplock's definition from *Letang v. Cooper* and Brett J.'s definition from *Cooke v. Gill* are the classic definitions and the ones most often quoted and adopted in Canadian cases. See, for example, *Domco Industries Ltd. v. Mannington Mills Inc.* (1990), 29 C.P.R. (3d) 481 (Fed. C.A.), at 496, *Photinopoulos v. Photinopoulos* (1988), 31 C.P.C. (2d) 267 (Alta. C.A.), at 275, *Grover v. Grover* (1980), 17 C.P.C. 298 (B.C. C.A.), at 301-2, *Foley (Guardian ad litem of) v. Greene* (1990), 4 C.C.L.T. (2d) 309 (Nfld. T.D.) at para. 36, *July v. Neal* (1986), 19 C.C.L.I. 230 (Ont. C.A.), at 239, and *Consumers Glass Co. v. Foundation Co. of Canada/Cie fondation du Canada* (1985), 1 C.P.C. (2d) 208 (Ont. C.A.), at 215.

31    A cause of action therefore is comprised of those elements necessary to establish the success of a claim.

32    Given the foregoing definition, it is not surprising that, traditionally, the rule was that the cause of action accrues and the limitation period begins to run from the point that the elements of the action are complete, regardless of whether or not the injury is reasonably discoverable. In Canada, accrual of a cause of action for limitation purposes has, however, been complicated by the issue of latent undiscovered injury, whether to person or property.

33    The Law Reform Commission of British Columbia in its *Report on the Ultimate Limitation Period: Limitation*

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

*Act, Section 8* (LRC 112, March 1990) describes the conventional rule as follows (at p. 21):

> The traditional rule concerning the point at which a limitation period commences is that time starts to run when the cause of action arises. In other words, time is considered to run from the point at which the plaintiff first had the right to sue. Determining the point when the right to sue first arises depends on the nature of the claim presented. In actions based on breach of contract, for example, the breach itself gives the right to sue. In actions based on the tort of negligence, however, the cause of action is not complete until the plaintiff has suffered actual damage. Under the traditional rule, the limitation period commences when damage occurs, whether the plaintiff has the means of knowing the fact or not.
>
> [case citations omitted]

34    This is the position that held in England until changed by statutory amendment: *Pirelli General Cable Works Ltd. v. Oscar Faber & Partners* (1982), [1983] 1 All E.R. 65 (U.K. H.L.).

35    The Supreme Court of Canada took a different view of that rule in *Nielsen v. Kamloops (City)*, [1984] 2 S.C.R. 2 (S.C.C.). They confirmed that view in *Central & Eastern Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 (S.C.C.). In these cases, the court held that a cause of action based in tort accrues for the purposes of a limitation period when the injured party knew or, in all of the circumstances, ought to have known that a cause of action was available.

36    In *M. (K.) v. M. (H.)*, [1992] 3 S.C.R. 6 (S.C.C.), at 34, La Forest J. referred with approval to the Supreme Court of New Hampshire's comments in *Raymond v. Eli Lilly & Co.*, (1977), 371 A.2d 170 (U.S. N.H.) at 172:

> There are at least four points at which a tort cause of action may accrue: (1) When the defendant breaches his duty; (2) when the plaintiff suffers harm; (3) when the plaintiff becomes aware of his injury; and (4) when the plaintiff discovers the causal relationship between his harm and the defendant's misconduct.

He concluded (at p. 35):

> In my view the only sensible application of the discoverability rule in a case such as this is one that establishes a prerequisite that the plaintiff have a substantial awareness of the harm and its likely cause before the limitations period begins to toll.

37    What must be remembered is that these cases were decided in the context of interpreting legislation from other jurisdictions which does not contain provisions akin to those found in Part II of the Manitoba legislation. (Part II of the Manitoba legislation provides protection for those plaintiffs who discover they have a cause of action against a wrongdoer, but make that discovery close to the end of the limitation period or after the limitation period has lapsed. More will be said about Part II of the current *Act* later in these reasons.) What also must be remembered is that in these cases, the court was not required to interpret a statutory longstop provision or to address the relationship between the limitation periods set out in provisions comparable to s. 3 and a longstop provision.

38    In *Fehr v. Jacob* (1993), 85 Man. R. (2d) 63 (Man. C.A.), Twaddle J.A. stated that the judge-made discoverability rule invoked by the Supreme Court in *Nielsen v. Kamloops (City)* and *Central & Eastern Trust Co. v. Rafuse* is a rule of construction, not a principle of general application detached from the statutory language. He concluded that the discoverability rule had no application to s. 61 of *The Medical Act*, R.S.M. 1987, c. M90, because time there was specifically stated to run from the date professional services terminated rather than from the date the cause of action accrued. He stated (at para. 13):

> In both those cases, the Supreme Court ruled that a cause of action did not accrue for limitation purposes until all the material facts were discovered by the prospective plaintiff.

He continued (at para. 22):

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

> In my opinion, the judge-made discoverability rule is nothing more than a rule of construction. Whenever a statute requires an action to be commenced within a specified time from the happening of a specific event, the statutory language must be construed. When time runs from "the accrual of the cause of action" or from some other event which can be construed as occurring only when the injured party has knowledge of the injury sustained, the judge-made discoverability rule applies. But, when time runs from an event which clearly occurs without regard to the injured party's knowledge, the judge-made discoverability rule may not extend the period the legislature has prescribed.

39      Twaddle J.A.'s comments were adopted by the Supreme Court of Canada in *Peixeiro v. Haberman,* [1997] 3 S.C.R. 549 (S.C.C.) at para. 37. (See also *Rarie v. Maxwell* (1998), 131 Man. R. (2d) 184 (Man. C.A.) at paras. 61 *et seq., per* Twaddle J.A.).

40      In *Rarie v. Maxwell,* this court held that Part II of the current *Act* was a comprehensive statutory regime to deal with the potential unfairness of limitation periods taking away a cause of action before reasonable discoverability was possible. Philp J.A. commented on an ultimate limitation period. He stated (at para. 36):

> The provision of an ultimate limitation, Lord Fraser's "final longstop date," is an express policy enactment of the Legislature that has no counterpart in the judge-made discoverability rule.

He went on to state (at para. 53):

> Part II of the *Act* relieves against the injustice of statutory limitation periods that preclude an action before the material facts are known. It is unnecessary to resort to a rule of construction in order to postpone the accrual of a cause of action to the date of discovery of the material facts. The general rule of discoverability laid down in *Kamloops* has no place in Manitoba.

41      The purpose of a longstop provision is to give a sense of absolute finality in certain cases. As with all limitation periods, it represents the legislative attempt to create a proper balance. Injured parties should not be deprived of a claim because of circumstances beyond their control, such as minority or incapacity or discoverability. Putative defendants, on the other hand, should not be compelled to have the sword of Damocles hanging over their heads forever. The first objective can be met if the period is truly long; 30 years in Manitoba. The second objective can be met, however, only if that very long period applies no matter what, even in the face of ongoing and continuing disability or the absence of knowledge despite reasonable efforts.

42      A legislated longstop provision prescribes a date by which courts and parties alike are obliged to recognize that there has been closure. If societal standards of the past are later regarded as unacceptable or unjust in the eyes of a new generation, and if remedies or compensation are deemed to be necessary to rectify the situation, then that initiative must come from government policy and legislative action. To achieve a result by interpreting *The Limitation of Actions Act* in the way urged by the respondents would be an invitation for the court to exceed its proper judicial role.

43      In Graeme Mew, *The Law of Limitations* (Toronto and Vancouver: Butterworths, 1991), four broad categories of reasons for limitation periods are identified (at pp. 7-8):

### 3.1. *"Peace and Repose"*

> It is said that statutes of limitation are acts of "peace" or "repose". The theory is that, at some point after the occurrence of conduct that might be actionable, a defendant is entitled to peace of mind. Courts should not be called upon to adjudicate stale disputes.

> When a period of limitation has expired, a potential defendant should be able to assume that he is no longer at risk from a stale claim. He should be able to part with his papers if they exist and discard any

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

> proofs of witnesses which have been taken; discharge his solicitor if he has been retained; and order
> his affairs on the basis that his potential liability has gone. That is the whole purpose of the limitation
> defence.

> [*Yew Bon Tew v. Kenderaan Bas Mara*, [1983] 1 A.C. 553 at 563 (P.C.), *per* Lord Brightman]

### 3.2. *Evidentiary Concerns*

With the passage of time between the occurrence of events giving rise to a claim and the adjudication of the
claim, the quality and availability of the evidence will diminish. Memories will fade, witnesses will die or
move away, and documents and other records will be destroyed. If a point in time is reached when evidence
becomes too unreliable to form a sound basis for adjudication, a limitation period should prevent the claim
from being adjudicated at all.

### 3.3. *Economic Considerations*

People who provide goods and services may be adversely affected by the uncertainty of potential litigation.
Economic consequences will directly flow. A potential defendant faced with possible liability of a
magnitude unknown may be unable or unwilling to enter into other business transactions. Others may be
unaware of a specific claim until many years after an event upon which the claim is based. The cost of
maintaining records for many years and obtaining adequate liability insurance is ultimately passed on to the
consumer. The Alberta Report concluded:

> . . . the result of peace denied can become excessive cost incurred, for the cost burden on the entire
> society is too high relative to any benefits which might be conferred on a tiny group of claimants by
> keeping defendants exposed to claims.

### 3.4. *Judgmental Reasons*

If a claim is not adjudicated until many years after the events that give rise to it, different values and
standards from those prevailing at the time the events occurred may be used in determining fault. Because
of changes in cultural values, scientific knowledge, and societal interests injustice may result. Can it be said
that the conduct of the "reasonable person" as perceived by a court today would accord with the view taken
by a judge of an earlier generation?

44    The Law Reform Commission of British Columbia in its Report, *supra*, stated unequivocally as follows (at p.
6):

> Once again, a postponement under section 6 [postponement for concealed causes of action] resulting from
> the plaintiff's ignorance of the material facts will not affect the running of time under the ultimate limitation
> periods in section 8, which operate independently of the plaintiff's state of knowledge.

And at p. 7 of the Report:

> . . . If the disability occurs after the cause of action has arisen, when the basic limitation period is already
> running, the running of time is suspended from the onset of the disability until it ceases.

> The ultimate limitation periods provided by section 8, however, are not affected by the plaintiff's disability.

45    In *Bera v. Marr* (1986), 1 B.C.L.R. (2d) 1 (B.C. C.A.), the plaintiff commenced an action against a medical
doctor claiming damages for alleged negligence in carrying out a surgical procedure on September 26, 1974, when
the plaintiff was 12 years of age. In his statement of defence, the defendant pleaded the provisions of the *Limitation*

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

*Act*, R.S.B.C. 1979, c. 236, and the *Medical Act*, R.S.B.C. 1960, c. 239, contending the action was statute-barred. It was agreed that the plaintiff first sought medical advice with regard to his alleged injury on November 18, 1981, seven years after the procedure was undertaken. The writ of summons was issued on April 23, 1982.

46     The question before the court was whether the limitation period which governed the action was the 10-year period specified in the 1975 legislation or the six-year period specified in the *Miscellaneous Statutes (Amendment) Act*, S.B.C. 1977, c. 76, now s. 8 of the *Limitation Act*. If the limitation period governing the action was held to be the period of "six years from the date on which the right to do so arose," as set out in s. 8 of the 1979 legislation, did the right to bring an action arise on the date on which the damage occurred or on the date upon which the plaintiff obtained the knowledge specified in s. 6(3) of the 1979 *Limitation Act*?

47     In the context of the case, the court concluded that the phrase "the right to do so arose" must mean the date of the alleged negligent conduct, not the date on which the plaintiff became aware of the negligent conduct or could reasonably have become aware of it.

48     Esson J.A. stated (at p. 27):

> There are strong policy reasons for not construing the date as of which the right to bring action arose in a manner different from that which has heretofore been given to them in the Limitation Act. To do so would be destructive of a balanced legislative scheme. Sections 6 and 8 are obviously designed to work together with s. 3(1) to provide relief against the injustice which can be created by hidden facts and, on the other hand, to provide reasonable protection against stale claims. All of that is premised upon the "right to do so" meaning the date of accrual of the cause of action without reference to knowledge. If that premise is disturbed, s. 6 will be made more difficult of application and s. 8 will cease to provide any real protection against stale claims.

49     Esson J.A. acknowledged that an infant's cause of action might lapse before reaching majority. He stated (*ibid.*):

> A significant part of the "balance" created by ss. 6, 7 and 8 [the statutory discoverability provisions and the longstop provision] is that the 30-year ultimate limitation is long enough so that no action by an infant can be barred before he comes of age and other actions falling within ss. 6 and 7 cannot be ultimately barred for more than a generation. The special ultimate limitation conferred upon physicians and hospitals is inconsistent with that balance. It is only in such cases that the infant's action can be barred before his majority and that other actions can be barred before the passage of a period of time beyond what could reasonably be regarded as adequate to prevent injustice to any claimant. In the case of physicians and hospitals, the legislature has seen fit to place greater weight on avoiding the injustice which can be caused to defendants by stale claims. It is for the legislature to decide what balance should be struck between those competing interests. The fact that it has accorded special treatment to two classes of potential defendants does not justify the court in disturbing one of the basic premises of the Act.

50     In Manitoba, where the 30-year period set out in the longstop provision (generally viewed as the span of one generation) exceeds by more than a decade any possible period of disability owing to legal infancy, the argument that such limitation period should not apply loses considerable force.

51     In our view, the reasoning employed by Esson J.A. in the British Columbia context logically applies to the construction of the longstop provision of the 1931 *Act*. It is evident and logical that the longstop provision applies despite continuing disability and was never intended by the legislature to be knowledge-based. The subsection begins, "Notwithstanding anything in this section"; that is, notwithstanding the suspension of time because of disability. It is clear that disability includes legal infancy.

52     It is also clear that the legislature made a policy decision in enacting the longstop provision to impose an

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

ultimate 30-year limitation period in all cases where the victim of a breach of duty is an infant or a person suffering from a disability. Accordingly, the judge-made discoverability rule of statutory construction has no place in the interpretation of the longstop provision in the 1931 *Act*. The right to take proceedings "first accrued" once there had been a breach of a duty and the plaintiff had suffered harm. The injured party then had 30 years from that point of time onward to file the claim, regardless of continuing incapacity and regardless of his or her state of knowledge.

53    Limitation legislation enacted in other jurisdictions supports our opinion that the longstop provision is not subject to the judge-made discoverability rule. The legislatures in British Columbia, Saskatchewan, and the Yukon have specifically addressed the problem of limitation periods where there is an allegation of sexual misconduct resulting in damages. In these three jurisdictions, there is no limitation period for sexual misconduct with a minor or sexual assault with anyone (*Limitation Act*, R.S.B.C. 1996, c. 266, s. 3(4)(k) and (l); *The Limitation of Actions Act*, R.S.S. 1978, c. L-15, s. 3(3.1); and *Limitation of Actions Act*, R.S.Y. 1986, c. 104, s. 2(3)). Alberta already separates aboriginal claims to some extent since claims by aboriginal people based on fiduciary breach are governed by the former statute rather than the present one, which contains a longstop of ten years (*Limitations Act*, S.A. 1996, c. L-15.1, s. 13).

54    We would answer the question posed earlier in these reasons as follows: The phrase "the right to do so first accrued to him" in the longstop provision of the 1931 *Act* means exactly the same thing as "the occurrence of the act or omission that gave rise to the cause of action" in s. 7(5) of the current *Act*.

55    Disability and knowledge are therefore irrelevant when determining the accrual of the cause of action for the purposes of the ultimate limitation period. The only difference then between the longstop provision of the 1931 *Act* and the current *Act* relates to the issue of loss or damage.

56    Under the longstop provision of the 1931 *Act*, time does not begin to run until the injured party has actually suffered loss or damage because it is only then that the right to bring proceedings crystallizes. Under s. 7(5) of the current *Act*, however, the calculation of time begins from the completion of the events giving rise to the cause of action detached from the issue of loss or damage: *Fehr v. Jacob*.

57    This difference is significant because the factual foundation necessary in order to determine when the time begins to run is different under the two sections. Under the longstop provision of the 1931 *Act*, the court needs to know when the events took place *and* when the injured party *first* suffered damage or loss. Under s. 7(5), the court needs to know only when the events or omissions giving rise to the action were complete.

58    In this case, the limitation time period has expired because both respondents ceased attending the residential schools in question more than 30 years ago. The respondents are not arguing that loss arose only after leaving the school. Their argument is that loss was suffered throughout the years at the school and continued throughout their lives. Accordingly, even if one is generous (from the respondents' perspective) and considers the last day of school attendance as the starting point for calculating the 30-year period, the respondents are well past the 30 years stipulated under the longstop provision.

59    We wish to comment upon an apparent lacuna in the 1931 *Act*.

60    The action of a plaintiff for injuries resulting from a breach of fiduciary duty that occurred when she was 17 years of age in circumstances where discovery of her cause of action is delayed will be barred by the longstop provision 30 years after the breach of duty occurred. Such is not the case for a victim in similar circumstances who was 18 years of age at the time the breach of fiduciary duty occurred. She would be able to take advantage of s. 3(1)(i) of the 1931 *Act* and would be entitled to commence an action six years after she discovered her cause of action, even if the discovery occurred more than 30 years after the cause of action arose. It is the respondents' contention that such an inequity was never the legislative intent and thus this court should not accept the interpretation advanced by the appellants.

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

61    However, the same inequity would apply to the circumstances of a 17- year-old victim and an 18-year-old victim under the current *Act*. The current *Act* is clearly not knowledge-based. Thus, the same gap in the legislation exists. The respondents' argument therefore lacks merit.

62    The appellants say that the different treatment accorded the two hypothetical plaintiffs described in the above scenario ought not to influence this court's interpretation of the statutes. The resulting impact of the legislation may be viewed as an oversight by the legislature and may result in a harsh effect. However, it is up to the legislature to remedy that oversight. The court's function is to apply the governing principles of statutory interpretation to the facts and to the legislation before it.

63    It is our view that the court should be very slow indeed to depart from the application of a limitation period which ensures that claims are judged within the general legal and social context of the time in which the allegedly tortious or inequitable conduct is supposed to have taken place.

64    Under the longstop provision of the 1931 *Act*, the appellants acquired a vested right to be immune from claims 30 years after the respondents left the school.

65    Therefore, pursuant to s. 46(1)(c) of *The Interpretation Act*, the current *Act* is not applicable to this case.

**Is the Decision in *Perrie v. Martin* Applicable?**

66    The Supreme Court of Canada considered the issue of the retrospective operation of legislation in *Perrie v. Martin* and concluded that the passage of a limitation period created an accrued legal right.

67    The facts were that, in Ontario, the limitation period for bringing medical malpractice suits was amended in 1974 from a period within one year of termination of medical services to a period of within one year of the date when the plaintiff learned of or ought to have known the facts giving rise to the action. The defendant surgeon operated on the plaintiff in 1969. In 1979, the plaintiff suffered pain in the area of the surgery and underwent another operation to remove a non-absorbable suture which had been left at the time of the 1969 surgery. Although such a malpractice suit would have been statute-barred by the pre-1974 legislation, both the Ontario Supreme Court and the Court of Appeal allowed the action to be brought in that it had been commenced within a year of the facts becoming known.

68    On appeal to the Supreme Court of Canada, the doctor's appeal was allowed.

69    The court discussed the retrospective operation of legislation. Chouinard J., for a unanimous court, stated (at pp. 46-47):

> On retrospectivity, Dickson J., as he then was, wrote in *Gustavson Drilling (1964) Ltd. v. Minister of National Revenue*, [1977] 1 S.C.R. 271, at p. 279:
>
>> First, retrospectivity. The general rule is that statutes are not to be construed as having retrospective operation unless such a construction is expressly or by necessary implication required by the language of the Act. An amending enactment may provide that it shall be deemed to have come into force on a date prior to its enactment or it may provide that it is to be operative with respect to transactions occurring prior to its enactment. In those instances the statute operates retrospectively.
>
> At page 282, in the same judgment, he wrote with respect to vested rights:
>
>> Second, interference with vested rights. The rule is that a statute should not be given a construction that would impair existing rights as regards person or property unless the language in which it is couched requires such a construction: *Spooner Oils Ltd. v. Turner Valley Gas Conservation Board*, [1933] S.C.R. 629, at p. 638. The presumption that vested rights are not affected unless the intention of

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

the legislature is clear applies whether the legislation is retrospective or prospective in operation. A prospective enactment may be bad if it affects vested rights and does not do so in unambiguous terms. This presumption, however, only applies where the legislation is in some way ambiguous and reasonably susceptible of two constructions.

70    The court focussed its decision on vested rights. It held that the expiry of a limitation period was a vested legal right and that the doctor therefore had the right to assume that he was no longer at risk from a stale claim.

71    For the most part, the decision in *Perrie v. Martin* has been applied without hesitation. See *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), and *602533 Ontario Inc. v. Shell Canada Ltd.* (1998), 37 O.R. (3d) 504 (Ont. C.A.).

72    We would be remiss if we did not point out however that the application of *Perrie v. Martin* has caused some courts discomfort in the area of family law.[FN1]

73    We find no difficulty in applying the principles set out in *Perrie v. Martin* to the cases at bar. The relationship between the appellants and the respondents, even accepting the respondents' submission that there was a fiduciary component in that relationship, was not and is not comparable to a continuing parent/child relationship.

74    Given the wording of s. 58 of the current *Act*, together with s. 46(1)(c) of *The Interpretation Act*, we conclude that the appellants had acquired a vested right pursuant to the longstop provision of the 1931 *Act*, that that right was not disturbed by the introduction of the current *Act*.

**The Current *Act***

75    The appellants' alternate argument is that even if the 1931 *Act* did not apply to these cases, the limitation period had lapsed under the current *Act* prior to the respondents bringing their claims. The plain and ordinary meaning of the words of s. 7(5) of the current *Act* demonstrates the legislative intent that the 30-year ultimate limitation period is to govern all causes of action that arose when the plaintiffs were minors. It is the inclusion of the words "or has been under a disability" in s. 7(5) that reinforces the interpretation advanced by the appellants. The latest that the respondent M. could have commenced an action would have been in or around June 1972, 30 years after she ceased to be a student at the school. And for C., the outside limit would have been in or around 1980, 30 years after he ceased to be a student at the school. In the result, both respondents' claims fall outside the 30-year ultimate limitation period described in s. 7(5). It is the appellants' position that the motions judge erred in his interpretation of s. 7(5) of the current *Act* by failing to give effect to the words "or has been under a disability."

76    As well as the motions judge's reasons in the cases at bar, the respondents rely upon two other Manitoba cases to support their position that s. 7(5) does not operate when a minor has reached the age of majority: *W. (A.) v. M. (L.)* (1998), 125 Man. R. (2d) 228 (Man. Q.B.); and *F. (C.M.) v. Manitoba* (2001), 155 Man. R. (2d) 4, 2001 MBQB 75 (Man. Q.B.).

***W. (A.) v. M. (L.)* and *F. (C.M.) v. Manitoba***

77    In *W. (A.) v. M. (L.)*, the presiding motions judge commented on the meaning and application of s. 7 of the current *Act*. He stated (at para. 12):

I reject as incorrect defendant's argument that s. 7 of the *Act* must apply. I interpret s. 7 as codifying the common law to provide that where by reason of disability a prospective plaintiff, or someone on his/her behalf, has not commenced action within the prescribed limitation period, the period of disability shall not be included in calculating the time within which action is required to be brought, provided however, that regardless of the disability, no action shall be brought after the expiration of 30 years after the occurrence of the act or omission giving rise to the cause of action. This is an attempt to balance the rights of a plaintiff which may not be understood or acted upon by the plaintiff because of disability and the rights of a

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

> defendant in terms of bringing to an end ultimately his/her exposure to a lawsuit. Once the period of
> disability has ended as it did in this case long ago, the limitation period then begins to run. The plaintiff is
> like any other and the fact that she was an infant at the time of the alleged conduct giving rise to the claim,
> does not mean that she is forever subject to the provisions of s. 7 (including s. 7(5)), when in fact her
> disability, particularly where as here being one of age, has long since expired in the normal course of
> events.

78    These words were adopted by the learned motions judge in the instant cases, who said (at para. 8):

> I find that the 30-year cap provided in s. 7(5) has no application to a claim brought by a person whose
> disability at the time the claim arose was that she was a minor. For such a person as the plaintiff, there is
> closure to the claim when she turns 18 and the applicable limitation period elapses. The 30-year cap is
> intended to cover the case of a plaintiff who, from the time the cause of action arose, has been suffering
> from a single disability or several disabilities, such as a mental incapacity. For such a case, closure is
> provided after the passage of 30 years. Such conclusion is supported by the judgment of MacInnes, J., in _W._
> _(A.) v. M. (L.)_ . . . where he held that s. 7(5) does not apply to a minor who has come of age.

79    In our view, both judges erred by failing to give meaning and effect to all of the words used in s. 7(5) of the
current _Act_. The words "or has been under a disability" cannot be ignored.

80    In _W. (A.) v. M. (L.)_ and the cases at bar, the judges drew a distinction between incapacity caused by mental or
physical impairment and incapacity which is deemed by virtue of minority. The clear and express language of s. 7(5)
and the established rules of statutory construction do not support such a distinction being made.

81    Moreover, there is no principled basis for such a distinction. Why should a person who is "incapable of the
management of his affairs because of disease or impairment of his physical or mental condition" be subject to an
ultimate limitation period and a capable person not be? One must assume that the legislature established a 30-year
outside limit in recognition of the need for a defendant to have closure and not be forever subject to the possibility of
an action against him or her. There is no policy reason why a minor, who ceases to be under a deemed disability at
age 18, should not be subject to the same outside limit as a person disabled by reason of mental incapacity. A person
who is under a continuing disability due to mental incapacity is more vulnerable and in need of greater protection
from the legislature than a person who merely was deemed to be disabled because he or she was a minor.

82    Schulman J., who was also the presiding judge in _F. (C.M.) v. Manitoba_, stated at para. 28 of his reasons in
that case:

> Until 1980, there were in Manitoba no longstop provisions in the _Act_. Claims by minors were governed by
> the provisions of s. 9, which read:

>> Where a person entitled to bring any action mentioned in clauses (c) to (j) inclusive of subsection (1)
>> of section 3 is under disability at the time the cause of action arises, he may bring the action within the
>> time hereinbefore limited with respect to such an action or at any time within two years after he first
>> ceased to be under disability.

> That provision merely reproduced the common law on the subject. Issues which arose in litigation relating
> to the claim in _Mumford v. Health Sciences Centre et al._ (1991), 77 Man. R. (2d) 1 (Q.B.), aff'd. (1993), 85
> Man. R. (2d) 271 . . . (C.A.), led to the preparation of a report on _Limitation of Actions: Time Extensions_
> _for Children, Disabled Persons and Others_ (1979) Law Reform Commission of Manitoba and the
> enactment of subsections 3 to 6 of s. 7 and s. 8. As part of this package of amendments, the longstop
> provisions which are under consideration here were enacted.

83    He misstated the law. There clearly was a longstop provision in Manitoba in the 1931 _Act_. Additionally, s. 6 of

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

the 1931 *Act* suspended the commencement of the running of time for limitation purposes during a period of disability.

84    The proposition stated by the motions judge in *W. (A.) v. M. (L.)* and adopted by the learned motions judge in the cases at bar and in *F. (C.M.) v. Manitoba* to the effect that the impugned provisions of the current *Act* were merely enacted to codify the common law is simply untenable.

85    Limitation periods are a creature of statute law. The enactment of the original ultimate limitation period in 1932 was not part of a codification of common law principles dealing with the interaction of disabilities and limitation periods. Moreover, as we noted above, s. 6 of the 1931 *Act* served to postpone the commencement of a limitation period in respect of a cause of action by persons under disability. The 1932 amendments introduced a stand-alone ultimate limitation provision. The clear language of the longstop provision is that a minor who ceases to be under a disability would still be subject to a 30-year ultimate limitation period. It cannot be said that the enactment of an ultimate limitation period codified the common law when the common law knew no such ultimate limitation.

86    And finally, at para. 32 of the *F. (C.M.) v. Manitoba* case, the motions judge stated:

> The situation is different in claims under s. 2(1)(k). In those cases, time does not start running until discovery of the cause of action. In circumstances of a minority, s. 7(2) only comes into play if discovery takes place while the injured party is under the age of 18. While the party is under 18, time does not run because of s. 7(2). However, if discovery takes place after the age of 18 even if the injury was sustained before the age of 18, s. 7 has no application because time does not start running until discovery. If discovery takes place after 18, s. 7 is not triggered. On this basis, if the plaintiffs in *M.* can establish that discovery took place after they turned 18, s. 7 has no application, and claims will not be tolled by the ultimate limitation period of s. 7(5). Similarly, in this case, if it is found that discovery took place following receipt of the report of Dr. Shane in 1999, the applicant's claim would not be tolled by s. 7(5) because there is no reliance on the benefits of s. 7(2), even though the wrongs, if committed, were committed while he was under the age of 18. In my view, if the Legislature intended that all claims arising while a plaintiff was an infant should be tolled by s. 7(5), clearer wording would have been required. Such clear wording is plainly set out in s. 14(4), but s. 14(4) has no application in this or the *M.* case. Based on this interpretation, I find that s. 7(5), in itself, does not bar any of the claims of the applicant based on a cause of action subject to a built-in discovering limitation period.

87    As we explained earlier in these reasons, the motions judge's interpretation of s. 7 must be rejected.

88    What is clear is that from 1932 onward, the legislature intended the longstop provision to have the effect urged by the appellants, and nothing contained in any subsequent amendments to *The Limitation of Actions Act* reflects a change in that intention.

89    Section 7 applies to any proceedings in which the cause of action arose when the person is or was under a disability. It defines the outer limitation period for the bringing of an action in those circumstances. There is no distinction to be drawn between incapacity caused by mental illness and incapacity deemed by virtue of infancy, nor is there any principled basis for drawing such a distinction.

90    We wish to make one final comment on the reasons given in *F. (C.M.) v. Manitoba*. At para. 34, the motions judge justified his conclusion by referring to certain principles of statutory construction. He stated:

> The conclusion I have reached is bolstered by a consideration of several principles of construction. Firstly, we are dealing with remedial legislation and, as such, we are required to give such fair, large and liberal construction in interpretation as best ensures the attainment of its objects (s. 12 of the *Interpretation Act*, R.S.M. 1987, c. I80). Secondly, in *Beaudoin* [(2000), 150 Man.R. (2d) 34, 2000 MBCA 83], Philp, J.A.,

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

> stated:

>> ¶58 The application of the presumptions of interpretation (discussed by Professor Ruth Sullivan in
>> *Driedger on the Construction of Statutes*, 3d Ed. (Toronto: Butterworths, 1994) in Chapter 15 supports
>> the conclusion I have reached. "It is presumed that the legislature does not intend to change existing
>> law or to depart from established principles, policies or practices." That is what Professor Sullivan
>> writes at p. 369. She explains (at p. 369) "The stability of law is enhanced by rejecting vague or
>> inadvertent change ..."

> He stated further:

>> ¶60 Another presumption is that "the legislature does not intend to abolish, limit or otherwise interfere
>> with the rights of subjects. Legislation that curtails rights is strictly construed" (Professor Sullivan at p.
>> 370). Again, nothing expressed in the 1967 amendments, or arising out of them by necessary
>> implication, evidences an intention by the Legislature to alter so drastically the limitation provisions
>> that had been in place for decades.

>> ¶61 Finally, Professor Sullivan notes (at p. 371), citing the comment of Estey, J., in *Berardinelli v.
>> Ontario Housing Corp. et al.*, [1979] 1 S.C.R. 275 at p. 280, that legislation interfering with the rights
>> to bring an action "attracts a strict interpretation and any ambiguity found upon the application of the
>> proper principles of statutory interpretation should be resolved in favour of the person whose right of
>> action is being truncated" . . .

> On an application of each of these principles of construction, s. 7(5) would not in itself bar a claim that is
> covered by s. 2(1)(k) of the *Act* where discovery takes place after the age of 18.

91    The appellants submit that the above-quoted principles of statutory interpretation apply only when ambiguity
necessitates resort to extrinsic aids. As noted by this court in its 1999 decision in *Manitoba Hydro Electric Board v.
John Inglis Co.* (1999), 142 Man. R. (2d) 1 (Man. C.A.) at para. 47, the Supreme Court of Canada has confirmed the
proper approach to statutory interpretation as follows:

> . . . [T]he proper construction of a statutory provision flows from reading the words of the provision in
> their grammatical and ordinary sense and in their entire context, harmoniously with the scheme of the
> statute as a whole, the purpose of the statute, and the intention of Parliament.

> [*R. v. Gladue*, [1999] 1 S.C.R. 688 (S.C.C.) at para. 25]

92    *R. v. Gladue*, [1999] 1 S.C.R. 688 (S.C.C.); The Supreme Court of Canada said in an earlier decision that
"words contained in a statute are to be given their ordinary meaning. Other principles of statutory interpretation only
come into play where the words sought to be defined are ambiguous." See *R. v. McCraw*, [1991] 3 S.C.R. 72
(S.C.C.), at 80.

93    We find no ambiguity whatever in s. 7 of the current *Act*. All of the words used convey the clear legislative
intent. The gap in the legislation to which we made earlier reference does not alter our conclusion. It is not up to the
courts in construing legislation to strain the clear legislative intent, despite what may be in a given factual situation a
harsh result.

### Reconsideration of the Decision in *B. (T.L.) v. C. (R.E.)*

94    Despite a very capable argument by counsel for the appellants, we decline the appellants' invitation to revisit
this court's decision in *B. (T.L.) v. C. (R.E.)* (2000), 150 Man. R. (2d) 34, 2000 MBCA 83 (Man. C.A.). In light of
our conclusion that the 1931 *Act* applies to these cases, we find it unnecessary to address the appellants' submission
on this issue.

Copr. © West 2007 No Claim to Orig. Govt. Works

2001 MBCA 148, 9 C.P.C. (5th) 69, [2001] 10 W.W.R. 607, 205 D.L.R. (4th) 253,
160 Man. R. (2d) 265, 262 W.A.C. 265, 10 W.W.R. 607, [2001] M.J. No. 401

**The Decision**

95     In the result, the appeal is allowed with costs. The respondents' claims are dismissed as being statute-barred
due to the passage of time.

*Appeal allowed.*

FN1. See *Alberta (Director, Parentage & Maintenance Act) v. H. (R.)* (1993), 104 D.L.R. (4th) 73 (Alta. C.A.), and
*T. (S.J.) v. D. (S.)* (1996), 16 B.C.L.R. (3d) 1 (B.C. C.A.).

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

# TAB 8

*Case Name:*
## Meek (Trustee of) v. San Juan Resources Inc.

**Between**
**James H. Meek, Jr. Trust, by its Interested Trustee,**
**Gary D. Fender, the Estate of Marian Meek Fender,**
**by its Executor, Gary D. Fender, and Bessie M.**
**Carrington, respondents (applicants), and**
**San Juan Resources Inc., appellant (respondents), and**
**Imperial Oil Resources Limited, respondents**
**(applicants), and**
**ConocoPhillips Canada Energy Partnership, and**
**Hampstead Trust Corporation, Not Parties to**
**the Appeal**

[2005] A.J. No. 1754

2005 ABCA 448

Docket: 0501-0110-AC

Alberta Court of Appeal
Calgary, Alberta

**Hunt, Berger and Ritter JJ.A.**

Heard: September 14, 2005.
Judgment: December 20, 2005.

(62 paras.)

*Limitation of actions -- Statutory limitation periods -- When time begins to run -- Appeal by defendant from judgment, reported at [2005] A.J. No. 13, allowed in part -- Plaintiffs ought not to have known of claim prior to actual notification -- Judge erred in assessment of ultimate limitation period -- Limitations Act, ss. 2(2), 3(1)(a), 3(1)(b), 3(3)(a), 3(3)(b), 3(5).*

*Civil procedure -- Interest -- Calculation of -- Rate of -- Cross-appeal by plaintiffs from interest award, reported at [2005] A.J. No. 13, allowed in part -- Plaintiffs entitled to simple interest calculated pursuant to Judgment Interest Act, s. 4(2).*

Appeal by the defendant oil company, San Juan Resources, from a decision in favour of the applicant beneficiaries, the Fender Estate and others, which found that their action for unpaid royalties was not barred by the Limitations Act. The oil company was successor in interest to lands that were subject to royalty payments under a trust agreement. The company was unaware of its royalty obligations and the beneficiaries of the trust were unaware that royalties were not being paid. When the beneficiaries became aware of this fact, they started an action. The judge held that the action was not statute-barred because the beneficiaries did not have actual knowledge of their claim until 2002. He further held that non-payment of royalties was a continuing course of conduct and thus the claim was not subject to the 10-year ultimate limitation period. The judge ruled that simple interest was owed on the payments rather than compound interest. The company challenged the judge's interpretation of the Limitations Act. The beneficiaries cross-appealed the interest award.

HELD: Appeal and cross-appeal allowed in part. Although the judge applied the wrong legal test, he was not wrong to conclude that the beneficiaries ought not to have known of their claim prior to actual notification. However, the judge erred in his assessment of the 10-year ultimate limitation period. To characterize non-payment of royalties as a continuous course of conduct would have resulted in no effective limitation period ever being imposed. The cause of action arose when the first breach of the royalty contract occurred, and each breach thereafter gave rise to a separate claim. Therefore, any failure to remit royalty payments ten years before the beneficiaries became aware of their claim was statute-barred. The judge was correct to award simple interest, but erred in awarding the 2005 interest rate for the entire amount owed. The beneficiaries were entitled to the relevant annual rate of interest as specified by the regulations to the Judgment Interest Act.

### Statutes, Regulations and Rules Cited:

Limitations Act, R.S.A. 2000 c. L-13, ss. 2(2), 3, 3(1), 3(1)(a), 3(1)(a)(i), 3(1)(b), 3(3), 3(3)(a), 3(3)(b), 3(5), 3(5)(a), 3(5)(b)

Judgment Interest Act, R.S.A. 2000 c. J-1, ss. 2(1), 2(3), 2(3)(b), 4(2)

Judgment Interest Regulation, Alta. Reg. 364/1984, ss. 9, 21

### Appeal From:

Appeal from the Judgment of The Honourable Mr. Justice LoVecchio. Dated the 7th day of January, 2005. (2005 ABQB 9, Docket: #0201-20724)

### Counsel:

J. Gruber and A. Ovens Solicitors for the Respondents (Applicants)

M.W. Mudie Solicitor for the Appellant (Respondent)

J. Whitaker Solicitor for Imperial Oil Resources Limited (Respondent)(Applicant)

REASONS FOR JUDGMENT

Reasons for judgment were delivered by Hunt J.A. Concurred in by Berger J.A.. Concurred in by Ritter J.A.

**1** HUNT J.A.:-- An oil company was successor in interest to lands that were subject to royalty payments under a trust agreement. The company was unaware of its royalty obligations and the beneficiaries of the trust were unaware that royalties were not being paid. When the beneficiaries became aware of this fact, they started an action. At issue is what part, if any, of their claim is barred by limitations law and what rate and type of interest is payable on the royalties.

## I.  FACTS

**2** The facts are fully set out in the trial judgment: James H. Meek Trust v. San Juan Resources Inc., 2005 ABQB 9, (2005), 364 A.R. 309. The Meek Royalty was established in 1952 by an agreement between James H. Meek Jr. and Canadian Delhi Oil Ltd. Clause V of the agreement provided:

> (2)  With respect to the overriding royalty to be or become payable by Delhi to Meek under the terms hereof, it is expressly agreed that:-
>
> (a)  Such overriding royalty shall be satisfied by payment by Delhi to Meek in Canadian funds at par at such place in the City of Calgary, in the Province of Alberta, as Meek may designate of Meek's proportionate share of the proceeds of sale of production of oil, gas and related hydrocarbons saved, recovered and marketed from the lands in respect of which such royalty is payable during the preceding month, less only production and severance tax applicable thereto, if any,

**3** In 1981, through a series of corporate transactions, Delhi became Sulpetro Limited. In 1987, Sulpetro entered into a farmout agreement with the appellant, San Juan Resources Inc. (San Juan). Later that year, Sulpetro went into receivership and Imperial Oil Resources Limited (Imperial) purchased Sulpetro's interest in the lands subject to the Meek Royalty. The Meek Royalty forms part of the Meek Trust, of which the respondents are the trustee and beneficiaries (collectively, the Meeks).

**4** Extensive lands involving many producing wells are subject to the Meek Royalty. Two wells located on the royalty lands entered into commercial production in 1988, but no royalties were paid. Soon after Imperial notified the Meeks about the non-payment in May 2002, they brought a claim for unpaid royalties against San Juan and Imperial.

**5** The issues were separated into two hearings. At the first, it was held that the royalty was not an interest in land and Imperial was obliged to pay it using a particular method of calculation: James H. Meek Trust v. San Juan Resources Inc., [2003] A.J. No. 1599, 2003 ABQB 1053. The second hearing, which gives rise to this appeal, was to determine whether (1) the action for royalty arrears was barred by limitation law; (2) interest payable on arrears was to be calculated on a simple or compound basis; and (3) Imperial was to be indemnified by San Juan.

**6** The appeal concerns only the first two issues. In addition, San Juan claims there were procedural irregularities in the second hearing.

## II.  LEGISLATION

Limitations Act, R.S.A. 2000 c. L-13 ( LA')

2(2)   Subject to sections 11 and 13, if, before March 1, 1999, the claimant knew, or in the circumstances ought to have known, of a claim and the claimant has not sought a remedial order before the earlier of

    (a)    the time provided by the Limitation of Actions Act, R.S.A. 1980 c. L-15, that would have been applicable but for this Act, or

    (b)    two years after the Limitations Act, S.A. 1996 c. L-15.1, came into force,

the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim.
....

3(1) Subject to section 11, if a claimant does not seek a remedial order within

(a) 2 years after the date on which the claimant first knew, or in the circumstances ought to have known,
(i) that the injury for which the claimant seeks a remedial order had occurred,
(ii) that the injury was attributable to conduct of the defendant, and
(iii) that the injury, assuming liability on the part of the defendant, warrants bringing a proceeding,

or

(b) 10 years after the claim arose,

whichever period expires first, the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim.

.... (3) For the purposes of subsection (1)(b),

    (a)    a claim or any number of claims based on any number of breaches of duty, resulting from a continuing course of conduct or a series of related acts or omissions, arises when the conduct terminates or the last act or omission occurs;

(b) a claim based on a breach of duty arises when the conduct, act or omission occurs; ....

(5) Under this section,

    (a)    the claimant has the burden of proving that a remedial order was sought within the limitation period provided by subsection (1)(a), and

    (b)    the defendant has the burden of proving that a remedial order was not sought within the limitation period provided by subsection (1)(b).

Judgment Interest Act, R.S.A. 2000 c. J-1 ( JIA')

2(1) Where a person obtains a judgment for the payment of money or a judgment that money is owing, the court shall award interest in accordance with this Part from the date the cause of action arose to the date of the judgment.

   (3) If it considers it just to do so having regard to changes in market interest rates, the circumstances of the case or the conduct of the action, the court may

(b) award interest under this Part at a rate higher or lower than the rate set out in this Part, ....

4(2) Interest awarded under this Part on pecuniary damages and in debt or other actions shall be calculated, for each year or part of a year included in the period in respect of which the interest is payable, at the prescribed rate applicable to that year.

## III. TRIAL DECISION

**7**    The trial judge held that the Meeks did not have actual knowledge until May 2002 when Imperial notified them about the unpaid royalties. In considering the phrase, "in the circumstance ought to have known, of a claim," in s. 2(2) and 3(1)(a) of the LA, he applied the test from Mahan v. Hindes, 2001 ABQB 831, (2001) 308 A.R. 1 at para. 30. He held that if something had occurred which would place them on inquiry and they did not follow through, the Meeks "ought to have known". He found that the Meeks were not put on inquiry until May 2002. As a result, the claim did not fall under s. 2(2) and was not barred by s. 3(1)(a).

**8**    The trial judge also considered whether the claim was barred by the 10-year "ultimate" limitation period in s. 3(1)(b). He concluded that the non-payment of royalties was a continuing course of action pursuant to s. 3(3)(a) and that the need to assert the claim had not yet arisen. Therefore, no portion of the claim was barred by the LA.

**9**    On the interest issue, the trial judge considered Bank of America Canada v. Mutual Trust, [2002] 2 S.C.R. 601, 2002 SCC 43. He recognized that while compound interest may be available, there was neither evidence showing whether the Meeks would have invested the money nor what San Juan had done with the money over the years. He held that simple interest was owing from the date the payment should have been made, at the rate in effect on the date of his decision.

## IV.   ISSUES ON APPEAL/CROSS-APPEAL

**10**   On the main appeal, San Juan raises procedural complaints and questions about the interpretation and application of the LA. The cross-appellants assert that the trial judge selected the wrong interest rate under the JIA and ought to have awarded compound rather than simple interest.

## V.   STANDARD OF REVIEW

**11**   The standard of review on questions of law is correctness: Housen v. Nikolaisen, [2002] 2 S.C.R. 235, 2002 SCC 33, para. 8. On questions of fact, it is whether the trial judge made a palpable and overriding error: Housen, at para. 10.

## VI.   ANALYSIS

Procedural Issues

**12**   The Meeks began their action by originating notice of motion. The appeal and cross-appeal issues were determined in a hearing ordered by the trial judge.

**13**   Prior to the hearing, the respondent Fender, trustee of the Meek Trust, had provided the other parties with a draft affidavit of records. Fender was examined for discovery. The parties declined the opportunity to discover Carrington, a beneficiary under the trust.

**14**   During Carrington's testimony, it became apparent that she had made investigations concerning the royalty payments beyond those conducted by Fender and, as a result, had undisclosed documents relevant to the litigation. San Juan sought an adjournment so Carrington could be examined for discovery.

**15**   The trial judge declined the adjournment because Carrington was from the United States, and, depending on what the missing documents revealed, there might not be a need to re-examine her. He ordered her to produce the documents, adding that San Juan could examine both her and Fender further if it so wished. The documents were produced but San Juan did not pursue further questioning. The trial judge refused to require Fender or Carrington to swear affidavits of records.

**16**   The trial judge's refusal to adjourn or order sworn affidavits of records is a matter of discretion reviewable on a standard of reasonableness: Decock v. Alberta (2000), 255 A.R. 234, 2000 ABCA 122, at para. 13.

**17**   His refusal of the adjournment was reasonable in the circumstances and worked no prejudice on San Juan (since it declined further examination). There was no need to require that Carrington file an affidavit of records because San Juan could have asked her under oath whether or not she had any other relevant documents.

**18**   As for the trial judge's refusal to require an affidavit of records from Fender, San Juan could have requested this before the hearing but chose to proceed on the basis of the draft affidavit. The argument made on appeal-that San Juan was uncertain whether Fender had produced all his documents, given that Carrington produced new documents-is not compelling. Since San Juan declined the opportunity to further examine Fender, it clearly suffered no prejudice.

Limitation Issues

**19**   San Juan did not challenge the finding that the Meeks did not have actual knowledge of the unpaid royalties until their notification by Imperial in May 2002. As a result, four main questions arise:

(i)     Did the trial judge apply the correct test in deciding whether the
        Meeks ought to have known of their claim?

(ii)    Ought the Meeks to have known of their claim before March 1,
        1999? If so, their claim is governed by s. 2(2) of the LA.

(iii)   If not, when ought they to have known of their claim? Under s. 3(1),
        a defendant is entitled to immunity after two years from this date or
        10 years from the date when the claim arose, whichever period ex-
        pires first.

(iv)    If the 10-year period expires first, how does it apply in this case?

The second and third questions are dealt with together.

**20**   The interpretation of the LA and the test for "ought to have known" are issues of law review-
able on the correctness standard. Absent legal error, the trial judge's determination of when the
Meeks ought to have discovered their claim is a question of mixed fact and law reviewable on a
standard of reasonableness or overriding and palpable error: Peterson v. Highwood Distillers Ltd.,
[2005] A.J. No. 882, 2005 ABCA 248, at para. 17; Seidel v. Kerr, (2003), 330 A.R. 284, 2003
ABCA 267, at para. 20.

(a)     The test for "ought to have known"

**21**   In determining whether the Meeks "ought to have known", the trial judge mistakenly applied
the common law test for discoverability from Mahan v. Hindes. At para. 43 he stated: "something
ought to be discovered (or known) only if something had occurred which would place the Appli-
cants on inquiry and they did not follow through with an inquiry.". The common law discovery
principles have been ousted by statute and it is the factors in s. 3(1)(a) which apply to a s. 2(2)
analysis: N. (J.) v. Kozens (2004), 361 A.R. 177, 2004 ABCA 394, at para. 30. The test for "ought
to have known" is that of "reasonable diligence" analyzed in the light of the three s. 3(1)(a) factors:
De Shazo v. Nations Energy Co., (2005), 256 D.L.R. (4th) 502 (Alta. C.A.), 2005 ABCA 241, at
para. 28. Accordingly, the facts that the trial judge found must be reviewed in the light of the correct
test (i.e. the s. 3(1)(a) factors) to determine when the Meeks ought to have known of their claim.

**22**   In this case, the only relevant s. 3(1)(a) factor is 3(1)(a)(i). Specifically, with the exercise of
reasonable diligence when ought the Meeks to have become aware of the injury, i.e. the unpaid roy-
alties?

(b)     When ought the Meeks to have known of their claim?

**23**   The trial judge analyzed in detail the information available to the Meeks prior to March 1,
1999. A key fact was that Carrington obtained microfiche from the Alberta Energy and Utilities
Board (AEUB) in February 1997, showing that the two wells were producing oil under the opera-
torship of San Juan. At that time, the monthly statement from Imperial did not provide particulars of
the wells on which the royalty was being paid. Thus, it was impossible to tell that royalties from the
two wells were not included in the payment. Therefore, the trial judge concluded at para. 80 that the
Meeks neither "knew, or in the circumstances ought to have known" of their claim prior to March 1,
1999 and that s. 2(2) of the LA did not apply.

**24**    In August 2000, Imperial changed its monthly reporting to include production volumes and royalty calculations on a well-by-well basis. The first of these reports was provided to the Meeks on September 27, 2000; however, Carrington did not obtain any updated information from the AEUB after 1997. The trial judge held at para. 84 that the changed reporting was not enough that the Meeks "ought to have known" of their claim prior to actual notice in May 2002.

**25**    San Juan attacks the trial judge's findings on two bases. First, it claims that the Meeks bear the burden of proof under s. 2(2) to prove that a remedial order was sought within the limitation period, a burden they did not meet. Second, San Juan asserts that the Meeks had a duty to ensure that the contract was being properly performed.

**26**    The first argument is based on the interpretation of s. 2(2). San Juan contends that because Kozens imported the three conditions in s. 3(1) to the s. 2(2) analysis, the burdens outlined in s. 3(5) are also imported into a s. 2(2) analysis.

**27**    But the LA does not say this. Section 3(5) specifically states that its allocation of burdens applies to s. 3. Section 2(2) itself is silent on the issue of burden of proof. Nor was that point discussed by the Alberta Law Reform Institute (ALRI) in its background work leading up to the LA. In recommending the enactment of s. 3(5)(a), the ALRI suggested that it was a departure from the existing law about burdens but explained that there were several reasons why a plaintiff ought to bear the burden in relation to discoverability: Limitations (Report No. 55) (Edmonton: Alberta Law Reform Institute, 1989) ( Limitations Report'), at page 74. It also said that the allocation of the burden on defendants in s. 3(5)(b) was consistent with the existing law, but had been stated expressly to avoid any ambiguity arising from s. 3(5)(a).

**28**    Under the previous limitations statute, in the context of discoverability, it has been held that when the defendant raises a limitation period, the onus rests on the plaintiff to disprove knowledge: Luscar Ltd. v. Pembina Resources Ltd., (1994), 162 A.R. 35, at para. 150.

**29**    The trial judge did not examine the issue of the burden of proof under s. 2(2). A review of legal argument filed before him suggests that it was not raised. Indeed, San Juan did not mention this point in its factum but only during oral argument.

**30**    Nothing turns in this case on who bears the burden of proof under s. 2(2). The facts found by the trial judge make it plain that prior to March 1, 1999, the Meeks could not have known, in the imported words of s. 3(1)(a)(i), "that the injury [the non-payment of royalty] had occurred". Thus, even if they bore the burden of proof under s. 2(2), they discharged it.

**31**    The second argument concerns the Meeks' responsibility to ensure that the contract was being performed correctly. San Juan relies on the following statement from Luscar at para. 131:

> ... it is the responsibility of a party to monitor its own contract, and put into force such mechanisms as may be required to aid it in identification of breaches, if it feels such mechanisms are necessary. If not, then it is the risk of the party whose mechanisms are not sufficient.

**32**    In Luscar, the respondents were sophisticated oil companies with all the necessary information and documentation in their possession. They attempted to argue, in part, that there was no discoverability because their land department was disorganized. The above passage adverted to their obligation to employ the information they actually had.

**33**    This case is totally different. The Meeks are well-educated and have some business experience but are not directly part of the oil industry. They lived in the United States, without easy access to material information. Carrington was well-organized and used the information available to her. Royalty interest holders often do not have ready access to the documentation that would enable them to determine if there is production from a particular well and whether they have been paid the royalty owing on that production. A royalty interest holder is entitled to expect the royalty payor to honour its obligations. Absent clear information to show improper payment, royalty interest holders are not obliged to take positive steps aimed at ensuring that they are being correctly paid. Although Imperial's new reporting procedures in 2000 made it easy to know what wells were the subject of royalty payments, Carrington did not have up-to-date information from the AEUB that would indicate what wells were in production. In other words, she did not simultaneously have the information that would enable her to put together the two critical pieces of the royalty puzzle. Nor was she obliged to procure the AEUB reports.

**34**    In summary, although the trial judge applied the wrong test, he was not wrong to conclude that the Meeks ought not to have known of their claim prior to actual notification by Imperial in May 2002.

>        (c)    How does the 10-year period apply in this case?

**35**    Is the claim by the Meeks partially barred by the ultimate limitation period in s. 3(1)(b)? The answer to this question requires consideration of the purpose behind s. 3(1)(b) and how its operation is affected by s. 3(3).

**36**    Discoverability principles do not apply to the ultimate limitation period: Bowes v. Edmonton (City), [2005] A.J. No. 941, 2005 ABQB 502, at para. 155.

**37**    When the LA came into force in 1999, the inclusion of the ultimate 10 year limitation period in s. 3(1)(b) was a significant change intended to address underlying policy concerns about limitations law. These policy concerns have been discussed by the Supreme Court: Peixeiro v. Haberman, [1997] 3 S.C.R. 549, at para. 34. There must be a balance of fairness between plaintiffs (who are unaware of their claims) and defendants. From the standpoint of certainty, there comes a time when defendants should be secure in the expectation that they will not be held to account for ancient obligations. From an evidentiary standpoint, claims based on stale evidence should be foreclosed. Finally, plaintiffs are expected to act diligently and not sleep on their rights.

**38**    The ultimate limitation provision in s. 3(1)(b) attempts to strike this balance: Limitations Report, supra, at p. 1. Although the Legislature reduced the ALRI's recommended 15 year period to 10 years, the ALRI's discussion remains instructive and underscores that the ultimate limitation period was intended to benefit defendants:

>        The second basic principle is repose. It incorporates the certainty of the fixed periods used in the limitations strategy at law, and <u>serves the interests of defendants by providing an absolute cut off date of 15 years within which the claimant must seek a remedial order</u>. ... . The defendant is entitled to a limitations defence when either the discovery limitation period or the ultimate limitation period expires, whichever occurs first ... . Together, in

> the context of the scheme proposed, these dual principles -
> knowledge and repose - provide a fair balance between the
> interests of claimants and defendants, both individually
> and collectively, and satisfy the interests of society at
> large.
> [emphasis added]

**39**    Section 3(3) specifies when a claim "arises" for the purpose of the ultimate limitation period in five circumstances. Only two (s. 3(3)(a) and (b)) have potential application to this case. Which provision applies requires an assessment of the purposes behind the LA. In my view, the applicable provision is s. 3(3)(b ) rather than s. 3(3)(a) (as found by the trial judge). The result in this case is that the early failures to remit royalty payments are barred but those within 10 years of December 2002 are not.

**40**    My conclusion is based on three main reasons.

**41**    First, it is clear from the ALRI's discussion at p. 65 and 69 that under general law, most claims arise (or accrue) at the time of the defendant's conduct:

> 14.    Commencement of the ultimate limitation period. <u>For most claims, the ul-
> timate period begins with the accrual of the claim. Most claims will accrue
> at the time of the defendant's conduct,</u> that is, when the defendant did, or
> failed to do, something. ... [emphasis added]
>
> 37.    ... <u>Most claims will accrue, as a matter of law, at the time of the defen-
> dant's conduct:</u> when he did, or failed to do, something. However, some
> claims will accrue at a different time ... [emphasis added]

**42**    This pre-existing general law is reflected in the language of s. 3(3)(b). The ALRI pointed out at p. 70 that s. 3(3)(b) will apply "to any claim which includes damage ... [I]t is immaterial whether the duty was based on tort, contract, statutory duty or otherwise."

**43**    Notably, the Limitations Report makes it clear that for the purpose of negligence law, the effect of s. 3(3)(b) will often be to shorten the limitation period, since it will cause the 10 year period to run even though damage has not yet been discovered. This underscores the point that the overall purpose of the LA is to balance the rights of plaintiffs and defendants by providing repose through the ultimate limitation period.

**44**    This observation leads to my second reason. The Meeks' contention, accepted by the trial judge, is that s. 3(3)(a) governs because each missed payment stems from the same contract and therefore constitutes a "continuing course of conduct". The trial judge held, at para. 95, that the conduct (non-payment) had not yet terminated so the limitation period had not yet commenced to run and the need to assert the claim had not yet arisen.

**45**    This result would fly in the face of the purpose of the ultimate limitation period. It would mean that their claim had not yet arisen, despite their actual knowledge of the cause of action in May 2002 and their lawsuit commenced a few months later. It would also mean that there would be no effective limitation period in a case where the breach of duty consists of a series of failures to make periodic payments. Defendants would have no protection from ancient obligations. I cannot accept that such an outcome serves the purpose of the ultimate limitation period.

**46**    Third, the Limitations Report makes it apparent that a failure to make a series of periodic payments was not the problem intended to be solved by s. 3(3)(a). The ALRI observed at p. 69 that s. 3(3) was meant to address five "particularly troublesome" situations. It gave two examples to illustrate s. 3(3)(a). The first is the release of toxic emissions over a nearby farm. The second is the repeated exposure of an employee to nuclear radiation. Each situation creates difficulty in determining when the cause of action arose, dependant on the nature of the claim (nuisance, trespass, breach of statute) and when the damage became apparent. The damage does not result from a single act but from the effect of many (related) acts occurring over time.

**47**    In a similar vein, in dicta in a case arising under the previous limitations statute, this Court suggested that oppression arises from a course of conduct: Seidel at para. 47-8. Like nuisance and trespass, the damage created by oppression often flows from a series of acts.

**48**    In contrast, when the breach of contract is a series of failures to make periodic payments, it generally is easy to ascertain when the breach occurred and what damage has been suffered. A cause of action for breach of contract arises when the breach occurs: Costigan v. Ruzicka (1984), 54 A.R. 385, (1984) 33 Alta. L.R. (2d) 21 (Alta. C.A.) at para. 17-19; Fidelity Trust Co. v. 98956 Investments Ltd. (Receiver of) (1988), 89 A.R. 151, 61 Alta. L.R. (2d) 193 (Alta. C.A.) at para. 18. Although neither case concerned a contract obliging a defendant to make periodic payments, when there are a series of breaches of a single covenant, "the claimant will succeed in respect of so much of the series of breaches ... as occurred within the [limitation period] before [the] action [was] brought.": Chitty on Contracts, 29th Ed, London: Sweet & Maxwell, 2004; Bowyer v. Woodman (1867) L.R. 3 Eq. 313; Archbold v. Scully (1861) 9 H.L.C. 360 at 377. These authorities suggest that an action arises with each breach.

**49**    To summarize, the Meeks' claim arose for the purposes of s. 3(1)(b) when the first royalty payments were missed in 1988. Each non-payment thereafter gave rise to a separate claim. Their claim is barred for any payments due 10 years prior to the commencement of their action.

**50**    I leave for another day the possible argument that s. 3(3) does not create a closed category. There may be cases that do not fall under s. 3(3)(a)-(e) and where the pre-LA general law must determine when the claim arose. Because in this case s. 3(3)(b) coincides with the pre-LA general law (namely, the Meeks' claim arose with each failure to make a royalty payment), it is unnecessary to decide whether s. 3(3) is intended to be comprehensive of all claims governed by the ultimate limitation period.

Interest Rate Under the JIA

**51**    The interpretation of the JIA is an issue of law attracting review on a standard of correctness. The trial judge dealt briefly with the question of what rate should be paid under the JIA. At para. 103, he said, "The interest rate to be employed for each of these calculations is to be the legal rate of interest in effect on the date of this decision."

**52**    Section 2(1) of the JIA requires that interest be paid in accordance with Part 1 of the Act. Section 4(2) requires that interest be calculated "for each year or part of a year included in the period in respect of which the interest is payable, at the prescribed rate applicable to that year." The interest rates are set annually pursuant to s. 4(2), varying according to general economic circumstances. The annual rate at the time of judgment (January 2005) was the historical low of 3.40%: Judgment Interest Regulation, Alta. Reg. 364/1984, s. 21. By contrast, the rate for 1992 was 7.5%: Judgment Interest Regulation, s. 9.

**53**    A trial judge has discretion under s. 2(3)(b) to award a higher or lower interest rate than that set out in the JIA, "having regard to changes in market interest rates, the circumstances of the case or the conduct of the action." The trial reasons do not suggest that the judge was exercising his discretion under s. 2(3)(b) in awarding the 2005 rate for the entire amount owing, rather than the applicable annual rates. Nor is there any apparent reason for the exercise of that discretion in this case.

**54**    The Meeks are entitled to the relevant annual rate of interest from the JIA on the amounts owing to them.

Compound or Simple Interest

**55**    The Meeks submit that the trial judge ought to have awarded compound, rather than simple, interest. They claim that the principle of time value of money', combined with the fact that they were unaware of the unpaid royalties, supports this claim. They suggest that the trial judge applied the wrong test as there is no requirement for evidence to show that the royalties would have been invested or that they would have earned compound interest.

**56**    Determination of the correct test for allowing compound interest is an issue of law, with a standard of correctness. Whether the correct test was met on the facts is subject to a standard of palpable or overriding error.

**57**    In Bank of America Canada v. Mutual Trust, the Supreme Court emphasized that judgment interest is used to compensate rather than punish. This principle applies to awards of both compound and simple interest. The compensatory principle is designed to put the plaintiff in the position it would have been had the contract been performed as agreed.

**58**    At para. 50, the Supreme Court stated that contract principles may require interest to be compounded in order to award the plaintiff the benefit of the bargain:

> Where the parties have earlier agreed on a compound rate of interest, or there are circumstances warranting it, it seems fair that a court have the power to award compound post-judgment interest as damages to enable the plaintiff to be fully compensated when the award is finally paid.

At para. 55, the Supreme Court outlined when compound interest should be ordered:

> An award of compound pre- and post-judgment interest will generally be limited to breach of contract cases where there is evidence that the parties agreed, knew, or should have known, that the money which is the subject of the dispute would bear compound interest as damages. It may be awarded as consequential damages in other cases but there would be the usual requirement of proving that damage component.

[emphasis added]

**59** The trial judge did not err in awarding simple interest. Since the Royalty Agreement was silent on interest, it cannot be said that the parties agreed or knew that the money would bear compound interest.

**60** Was there evidence that the parties should have known compound interest would be payable on the unpaid royalties? The Meeks assert that royalty income is notoriously known as an investment, given that it generally involves regular payments over long periods of time. While this may be so, there was no evidence before the trial judge to support this assertion. Since the test in Bank America was not met, the trial judge appropriately awarded only simple interest.

## VII. SUMMARY

**61** In the result, both the appeal and the cross-appeal are allowed in part. The Meeks are entitled to their royalties for the period of 10 years before they began this action on December 10, 2002. Simple interest on that amount is payable in accordance with s. 4(2) of the JIA.

**62** Given the mixed success, no costs are payable to either party.

HUNT J.A.
BERGER J.A.:-- I concur.
RITTER J.A.:-- I concur.

cp/e/qw/qlmmm/qljxl/qlsxs

e/drs/qljzb/qljal

# TAB 9

LEXSEE 2003 NL. C LEXIS 319

Between Jean Pardy, Bruce McCullough and John Ryan, plaintiffs, and Bayer Inc.,
defendant

**INDEXED AS:** Pardy v. Bayer Inc.

Docket: 2002 01T No. 4246 CP

Newfoundland and Labrador Supreme Court - Trial Division

**JUDGES:** Mercer J.

[2003] N.J. No. 182; 2003 NL.C. LEXIS 319; 2003 NFSCTD 109

**DATE INFORMATION:** Heard: June 16, 2003. Judgment: filed July 23, 2003.

**JUDGMENT DATE:** July 23, 2003

**OTHER-REFS:**
 [*1]  Cases cited:

Vitapharm Canada Ltd. v. F. Hoffman La-Roche Ltd., (2000), 4 C.P.C. (5th) 169.
Danyluk v. Ainsworth Technologies Inc. [2001] 2 S.C.R. 460.
McIntosh v. Parent [1924] 4 D.L.R. 420 (Ont. C.A.).
Angle v. Minister of National Revenue [1975] 2 S.C.R. 248.
Wilson v. Servier Canada Inc. (2000) 50 O.R. (3d) 219.
Nantais v. Electronics Propriety (Canada) Ltd. (1995), 25 O.R. (3d) 331 (Div. Ct.).
Wilson v. Servier Canada Inc. (2001) 16 C.P.C. (5th) 343.
Joanisse v. Barker (2003) 29 C.P.C. (5th) 296.

Statutes cited:

Judicature Act.
Class Actions Act.

Rules cited:

Rules 7A and 39 of the Rules of the Supreme Court of Newfoundland and Labrador, 1986, as amended.
Rule 50 of the Manitoba Court of Queen's Bench Rules.

**COUNSEL:**
Chesley Crosbie, Darlene Russell and Douglas Lennox, for the plaintiffs.
J. David Eaton, Q.C. and Genevieve Dawson, for the defendant.

**JUDGMENT:**

   [1] MERCER J.:-- The Defendant brought an application in this proposed class action seeking to dismiss or
permanently stay the action.  The application was engendered by a statement made by Plaintiffs' Counsel during a
recent conference conducted by the case management judge in a similar class action in Manitoba.  Plaintiffs' Counsel

[2003] N.J. No. 182; 2003 NL.C. LEXIS 319, *2

[*2]  indicated that if national certification were granted in Manitoba he would likely seek instructions to discontinue class actions in other provinces, including Newfoundland and Labrador.

ISSUE

[2] The issue is whether a discontinuance or stay is warranted having regard to possible multiplicity of proceedings, and unfairness to the Defendant.

FACTS

[3] This action is brought under the Class Actions Act, SNL, 2001 c.C-18-1.  It is a product liability class action concerning Baycol, a cholesterol lowering drug, distributed in Canada by the Defendant.  The Statement of Claim alleges that Baycol caused damage to muscle tissue, resulting in serious side effects, the most severe of which can lead to kidney failure and death.

[4] The Plaintiffs filed their certification application on March 26th, 2003.  The Reply of the Defendant has not yet been filed.

[5] The certification application proposes a class definition as follows:

(i)      Persons resident in Newfoundland and Labrador who were prescribed and ingested Baycol and who claim personal injury as a result ("Provincial Class");

(ii)     Persons who have a derivative claim on account of a family relationship with a person in (i) ("Provincial [*3]  Family Class");

(iii)    Persons resident in Nova Scotia, New Brunswick, and Prince Edward Island who were prescribed and ingested Baycol, who claim personal injury as a result, and opt-in to this proceeding ("Atlantic Class");

(iv)    Persons who have a derivative claim on account of a family relationship with a person in (iii) who opt-in to this proceeding ("Atlantic Family Class").

A number of class actions respecting Baycol have been filed across Canada and certain are potentially multi-provincial in scope.  In the Manitoba action, commenced subsequent to this action, certification was sought initially of a class of all persons resident in Canada, other than those in British Columbia and Quebec, who were prescribed and ingested Baycol and who claim personal injury as a result and on behalf of all persons who have a derivative claim on account of a family relationship.

[6] The law firm of Klein Lyons is counsel of record, acting through a local agent, in the Manitoba action.  Klein Lyons is also co-counsel in this action.

[7] On May 26th, 2003, there was a conference conducted by Mr. Justice McInness of the Court of Queen's Bench in Manitoba in its Baycol class action.  Present [*4]  at the conference for the named plaintiffs was David Klein of Klein Lyons together with local counsel.  Counsel for the Defendant, Bayer Inc., included William Olson, Q.C.  The Defendant, on this application, filed an affidavit from William Olson, Q.C., respecting comments made during the course of the conference in Manitoba.  Specifically paragraph 7 of the Olson affidavit states:

"Mr. Klein stated that, if a national class were certified in Manitoba, he would likely seek instructions to apply to stay the Newfoundland action ..."

[8] The certification hearing in Manitoba is scheduled for January 14 - 16, 2004.

## APPLICATION

[9] The Defendant cited the above-noted facts and submitted "that the continuation of multiple proceedings against the defendant, by the same counsel, seeking to certify overlapping classes in different jurisdictions is an abuse of process." The Defendant requests an order dismissing this action as an abuse of process or alternately an order permanently staying the action, or such other relief as this Court may deem just.

## ANALYSIS

[10] The Judicature Act, SNL 1990, c. J-4, as amended, authorizes the Court to direct a stay of proceedings pending before [*5] it - Section 97(1). Where a party applies for a stay of proceedings "either generally or where necessary for the purpose of justice" the Court shall make the order that may be just - Section 97(2). The Judicature Act further provides that the Court shall grant the remedies to which the parties are entitled in respect of the matters in dispute so that, where possible, multiplicity of proceedings concerning those matters may be avoided - Section 99.

[11] The Defendant submitted that, should the Manitoba Court certify the class initially requested, Plaintiffs' Counsel intended to select the jurisdiction in which they would prefer to proceed on behalf of the proposed class in this action. The Defendant argued that a continuation of this action would therefore result in "additional, unnecessary and potentially unrecoverable costs to the Defendant, a risk of inconsistent judgments because of unnecessary multiplicity of proceedings, and the duplicative expenditure of judicial and administrative resources."

[12] Regarding the avoidance of a multiplicity of proceedings the Defendant cited Vitapharm Canada Ltd. v. F. Hoffman La-Roche Ltd., (2000), 4 C.P.C. (5th) 169. In that case several [*6] class actions had been commenced by different representative plaintiffs, asserting to represent the same class and the same causes of actions against the defendants. Cumming J. stated that "there cannot be two class actions which proceed in respect of the same putative class ... asserting the same cause(s) of action." - paragraph 14. He held that the main criterion for determining which action would proceed was "what resolution is in the best interests of all putative class members while at the same time fair to the defendants." - paragraph 48.

[13] In Vitapharm Cumming J. was addressing the situation of competing class actions within a single province and his statement in paragraph 14 of Vitapharm, quoted above, must be understood in that context.

[14] The Defendant further based this application on the general principle that a party is not entitled to bring more than one claim for the same cause of action. It argued that "the named plaintiffs in [this] action and the putative class that they seek to represent, having chosen through their counsel to seek relief as part of a broader class before the Manitoba Court, are not entitled to obtain a remedy for identical claims in this [*7] Court." Reference was made to Danyluk v. Ainsworth Technologies Inc. [2001] 2 S.C.R. 460 in which Binnie J. stated:

> The law rightly seeks finality to litigation. To advance
> that objective, it requires litigants to put their best
> foot forward to establish the truth of their allegations
> when first called upon to do so. A litigant, to use the
> vernacular, is only entitled to one bite at the cherry.
> ... A person should only be vexed once in the same
> cause. Duplicative litigation, potential inconsistent
> results, undue costs, and inconclusive proceedings are to
> be avoided.
> Paragraph 18

[15] Danyluk discussed the doctrine of issue estoppel in an administrative law context, and did not address application of the doctrine, or specifically the timing of its application, to the resolution of issues arising from multiple class actions in two or more provincial jurisdictions. The following comments are pertinent as to whether issue estoppel