applies in this case at this stage. The doctrine applies where there has been a prior judgment on an issue between the same parties. McIntosh v. Parent [1924] 4 D.L.R. 420 (Ont. C.A.) at page [*8] 422; Angle v. Minister of National Revenue [1975] 2 S.C.R. 248 at page 254. On this application the Defendant asserts that the Plaintiffs in this action have chosen through their Counsel to seek relief as part of a national class before the Manitoba Court. There is no evidence however that the Plaintiffs have chosen to seek relief before the Manitoba Court. Klein Lyons are counsel to the plaintiffs in the Manitoba action and in this action. As Plaintiffs' Counsel observed "these are all different clients who may have different priorities and who may provide different instructions." If national certification were granted in Manitoba on the class definition initially sought the Plaintiffs in this action would be included unless they opted out of the Manitoba action. There was no evidence on this application respecting the position of the Plaintiffs on this point. There was no evidence that Klein Lyons has sought instructions from the Plaintiffs in this action respecting their possible participation in a national class action to be litigated in Manitoba. Indeed paragraph 7 of the Olson affidavit indicated that Klein Lyons would seek instructions on [*9] that point in the future. Prior to its certification as a class proceeding, an action should not be considered to have been commenced by a member of the putative class who is not a representative plaintiff, in the absence of class evidence of that member's participation in the action, Joanisse v. Barker (2003) 29 C.P.C. (5th) 296. In summary, the Plaintiffs in this action cannot be stated to be parties to the Manitoba action at this time.

[16] Furthermore the doctrine of issue estoppel applies where there has been a decision in a prior proceeding. The Manitoba action was commenced after this action and, to date, has not resulted in a judgment of that Court on the issue of class certification.

[17] Accordingly it follows that consideration of the doctrine of issue estoppel does not resolve this application in favour of the Defendant. There remains, however, the general proposition that multiplicity of proceedings should be avoided.

[18] The Defendant submitted that a stay of this action would not prejudice or have an unfair effect upon the Plaintiffs or putative class members inasmuch as they would have full access to the court system in a jurisdiction (Manitoba) chosen by their [*10] counsel. With respect to the Plaintiffs' right of access to the court system in Manitoba the Defendant's submission is at best premature. Prior to class certification in Manitoba the Plaintiffs herein cannot be said to have access to its courts, Joanisse v. Barker. The Plaintiffs herein have no control over the Manitoba plaintiffs and no right to be consulted respecting the conduct of the Manitoba action. Since the class action in Manitoba has not been certified no representative plaintiffs have been appointed and the Manitoba plaintiffs at this stage cannot be said to owe a legal duty to the Plaintiffs herein. As observed by Plaintiffs' Counsel "there is no guarantee that the Manitoba plaintiffs will not ultimately decide to abandon their claims, or settle them individually, or settle them as a class limited to that province."

[19] Currently the Plaintiffs herein have only this Court available to consider their application for certification of a class action. A dismissal of the Plaintiffs' action, the most drastic remedy sought by the Defendant, would risk leaving the Plaintiffs without that legal recourse as they would have no assurance that they could participate in another [*11] province's as yet uncertified class action. There would further be the risk of the expiry of limitation periods respecting putative class members in Newfoundland who currently have the protection of Section 39 of the Class Actions Act which suspends the running of limitation periods while a class action is proceeding.

[20] The possibility of potentially overlapping class actions is recognized in Rule 7A of the Rules of the Supreme Court of Newfoundland and Labrador, 1986, as amended. That was adopted to deal with class action proceedings. Rule 7A.04(6) provides:

> 7A.04(6) Where it appears that a class or representative proceeding covering all or a part of the matters to be dealt with in a class proceeding in this province has been certified in another jurisdiction in Canada, the court in considering whether and to what extent to grant the certification application

(a) may consider whether it would be appropriate to define the class as excluding the class certified in the other jurisdiction or as excluding persons who do not opt out of the other proceeding;

(b) may consider whether the other jurisdiction is a more convenient forum for the matter, and where the interests of [*12] the class resident in this province can be adequately represented in the other proceeding by the resident class members opting into that proceeding, stay the application;

(c) may grant the application without reference to the other proceeding; or

(d) make such other disposition as may be desirable. (emphasis added)

[21] Rule 7A.04(6)(b) clearly contemplates that a stay of a class action proceeding in Newfoundland may be warranted where a similar proceeding has been certified in another province. It does not compel that outcome, however, as Rule 7A.04(6)(c) provides that certification may be granted without reference to the other proceeding. The rule is consistent with recent Canadian cases which recognize that potentially overlapping class actions can arise in different provinces and that appropriate adjustments in the definition of a class may be required. In Wilson v. Servier Canada Inc. (2000) 50 O.R. (3d) 219 Cumming J. stated:

There are other actions concerning Servier Canada: in Quebec, Hotte v. Servier Canada, [1999] J.Q. No. 4371 (QL); and in British Columbia, Mathews v. Servier Canada, [2000] B.C.J. No. 846 [*13] ("Mathews"). Counsel for the plaintiff have been in communication with Quebec and British Columbia counsel. These two actions have not yet been certified. The proposed class in the Quebec action is limited to the residents of Quebec. The decision has been made in the class proceeding at hand to exclude Quebec residents from the proposed national class.

In British Columbia, the BCCPA provides a different procedure for non-residents. It contemplates the creation of a subclass of persons who are not resident in British Columbia and who wish to opt into the class. Counsel for the representative plaintiff in Mathews, supra, has advised that, if the action at hand is certified in Ontario, then the British Columbia representative plaintiff will not opt out, but rather seek to have the class members in British Columbia constituted as a subclass in the instant action.

The CPA contemplates the decertification of a class in
whole or in part, as circumstances in a given case may
change. If, ultimately, the Mathews case in British
Columbia becomes certified, then the class members for
that province can be deleted from the national class in
the case at hand.
Paragraphs [*14] 96-98

[22] That approach is similar to that enunciated in Nantais v. Electronics Propriety (Canada) Ltd. (1995), 25 O.R. (3d) 331 (Div. Ct.):

It is also argued that other class proceedings may be certified in other provinces relating to the matter which is the subject of this class proceeding. In my respectful view any of these practical difficulties which may develop as the matter proceeds can be met by amending the order in question to adjust the size of the class. If it is shown that the law of another province is so substantially different as to make the trial with respect to class members from that province very difficult, the class can be redefined. Additionally, if a class is certified in another province that group can be deleted from the Ontario class.

[23] It should further be noted that Rule 7A.04(6) contemplates reference to certification in another province at the stage when the Court is determining whether to grant the certification application.

[24] Having regard to the foregoing it is my conclusion that, as the Plaintiffs herein are not currently parties to the Manitoba action, the Defendant is not facing a multiplicity of proceedings [*15] respecting such Plaintiffs. If class certification were granted in Manitoba prior to this Court's decision on certification the effect of the Manitoba certification can be addressed as contemplated in Rule 7A.04(6).

[25] Comment should also be made on the contention that there would be prejudice or unfairness to the Defendant if it is required to contest applications in Manitoba and in Newfoundland and Labrador covering the same putative class. The Defendant alleged that it could face "additional, unnecessary and potentially unrecoverable costs." On this contention it is relevant that the Defendant, as is its right, resolutely opposes class certification in either province. It has clearly stated to this Court that all claims from persons who ingested Baycol and allege injury therefrom should be litigated in individual actions. The Defendant's contention respecting legal costs in contesting two class certification actions appears inconsistent with that desire to litigate numerous individual actions. See Wilson v. Servier Canada Inc. (2001) 16 C.P.C. (5th) 343.

[26] The Defendant, as an alternative to dismissal of this action, requested a stay pending the Manitoba decision on [*16] class certification and submitted that the Plaintiffs herein would not be prejudiced thereby. There was no evidence respecting the presence or absence of prejudice to the Plaintiffs. On its face however such a stay could operate to the detriment of the Plaintiffs herein by its obvious potential for delay. It would force the Plaintiffs to await the outcome of a proceeding to which they are not parties.

[27] Accordingly I find that the Defendant has failed to establish that the continuation of this action would be an abuse of process and the application is therefore denied.

[28] Subsequent to the hearing and during the course of preparation of this decision the Court was provided with further information respecting the Manitoba action. On June 30th, 2003, the Manitoba plaintiffs delivered their certification motion materials in accordance with the schedule in that proceeding. The class definition proposed by the Manitoba plaintiffs was revised and now excludes the residents of other provinces which have certified Baycol class actions. The proposed class action definition in Manitoba now reads:

"(a) All persons resident in Manitoba and elsewhere in Canada who were prescribed [*17] and ingested Baycol which was marketed in Canada by the defendant between February 18, 1998 and August 8, 2001, and who claim personal injury as a result ("Injury Class"); and

(b) All persons who have a derivative claim on account of a family relationship with a person described in paragraph (a) ("Family Class"); and

(c) Such other persons as the Court recognizes and directs.

Excluded from the class are persons resident in Quebec or British Columbia. Also excluded are persons resident in a province other than Manitoba who are members of an already certified class action in that other province."

[29] It was in recognition of this information that this decision has referred in respect to the Manitoba action to "the class initially requested"- see paras. 11 and 15. My decision on this application was not dependent upon or materially affected by this information. Counsel for the Plaintiffs and the Defendant agreed that the exclusion made explicit in the revised class definition requested in Manitoba was already implicit, given the class action priority rule recognized in Wilson v. Servier Canada Inc. - See par. 21 hereof.

[30] This decision has addressed the merits of the Defendant's [*18] application which, as noted, arose from comments made in a conference conducted by the case management judge in the Manitoba action. The Plaintiffs objected to admission of affidavit evidence respecting comments made in that conference, asserting that it was a pre-trial conference held pursuant to Rule 50 of the Manitoba Court of Queen's Bench Rules which provides:

[2003] N.J. No. 182; 2003 NL.C. LEXIS 319, *18

50.01(9)  Discussions at a pre-trial conference are
without prejudice and shall not be referred to in
subsequent motions or at the trial of the action except
as disclosed in the memorandum or order under subrule
(8).
(emphasis added)

[31] This rule is substantially similar to Rule 39.02(6) of the Rules of the Supreme Court of Newfoundland and Labrador, 1986, as amended.  The reference in the Manitoba Rule 50.01(9) to the memorandum or order under subrule (8) refers to a memorandum or order issued by the judge conducting the pre-trial conference.

[32] The Defendant contended that the conference conducted by the case management judge in Manitoba on May 26th, 2003, was a case management conference, not a pre-trial conference and that Rule 50.01(9) was therefore inapplicable. The Plaintiffs filed with the Court the [*19] memorandum issued by the case management judge respecting that conference.  It is headed Case Management Memorandum No. 1 and contains the following paragraph:

Copies of this case conference memorandum have been forwarded to counsel. Rule 50.01(8.2)
requires counsel to notify the court and other parties within 14 days following receipt of the
memorandum of any objection.

[33] It is clear therefore that the case management judge in Manitoba considered that the provisions of the Manitoba Court of Queen's Bench Rules respecting pre-trial conferences were applicable and it follows that the Defendant is bound by Rule 50.01(9) thereof.

[34] There are two aspects to Manitoba Rule 50.01(9) and our Rule 39.02(6).  First, the discussions at a pre-trial conference are "without prejudice" and second, the discussions are not to be referred to in subsequent motions (or, in this province, applications) or at the trial.  The second aspect enjoins reference to the discussions in the action in respect of which the pre-trial conference was held.  The filing of the Olson affidavit in this action does not therefore contravene that second aspect.

[35] To revert to the first aspect, the Plaintiffs [*20] contended that divulgence of without prejudice discussions from a pre-trial conference should not be countenanced.  They argued that the purpose of such conferences would be thwarted if free and open discussions are discouraged by the risk of subsequent disclosure, even in another action.  That argument has apparent merit.  However, it may be contended that disclosure could be warranted in exceptional circumstances, including where an abuse of process is indicated.  A resolution of this point should discuss whether the protection afforded by the Rules is for the benefit of the parties or also their counsel.  The impugned comments under discussion on this application were made by counsel for the Manitoba Plaintiffs.  To what extent, if any, can the Plaintiffs herein be affected by comments made by its counsel when representing litigants in another jurisdiction? Neither the Defendant nor the Plaintiffs cited any authorities respecting the protection afforded without prejudice comments at pre-trial conferences. I therefore considered the Olson affidavit and disposed of the application as indicated, leaving to another day the resolution of the interesting issue just noted.

[36] Application [*21] denied.

MERCER J.

# TAB 10



11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

▷
1995 CarswellBC 589

Privest Properties Ltd. v. Foundation Co. of Canada
PRIVEST PROPERTIES LTD., LORD REALTY HOLDINGS LTD., POLARIS REALTY (CANADA)
LIMITED, LORDINA LIMITED and POLARIS REALTY (WESTERN) LIMITED (Plaintiffs) v.
FOUNDATION COMPANY OF CANADA LIMITED, DONALCO SERVICES LTD., W.R. GRACE & CO.
OF CANADA LTD., ENG & WRIGHT PARTNERS, ARCHITECTS, and W.R. GRACE & CO. --
CONN. (Defendants); LORDINA LIMITED (Defendant by Counterclaim)
FOUNDATION COMPANY OF CANADA LIMITED, DOUBLE A/D DISTRIBUTORS LTD., DONALCO
SERVICES LTD., MACKENZIE, SNOWBALL, SKALBANIA & ASSOCIATES LTD., WEBB, ZERAFA,
MENKES, HOUSDEN, ENG & WRIGHT PARTNERS, ARCHITECTS, NELSON SKALBANIA, DONALD
THOMAS, CHARLES WRIGHT, GERHARD K. SCHADOW, DOUGLAS FAULKNER, MARTIN BRUCKNER,
WORKERS' COMPENSATION BOARD, GILBERT ENG and W.R. GRACE & CO. OF CANADA LTD.
(Third Parties)
British Columbia Supreme Court
Drost J.
Heard: 182 days between January 20, 1992 and January 10, 1994
Judgment: September 26, 1995
Docket: Doc. Vancouver C884875

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Counsel: D.W. Roberts, Q.C., L.J. Muir, L.P. Williamson, S.A. Griffin, M.M. Munro and M.A. Sandor, for plaintiffs and defendant by counterclaim.

R.W. Hunter and D.A. Garner, for defendant and third party Eng & Wright Partners, Architects, and third parties Charles Wright, Gilbert Eng, Gerhard K. Schadow, Douglas Faulkner, Martin Bruckner and Donald Thomas.

J.M. Giles, Q.C., R.J. McDonell and K. Shirley-Paterson, for defendant and third party Foundation Company of Canada.

D.F. Robinson, R.L. Hayley, T.S. Woods, K.A. Bridge, C.G. Proudfoot, D.E. Venour and J.J. Ovsenek, for defendant and third party W.R. Grace & Co. of Canada Ltd. and third party W.R. Grace & Co. -- Conn.

J.R. Singleton, J. Ingman-Baker and J.A. Hand, for defendant Donalco Services Ltd. and third party Double A/D Distributors Ltd.

B. McGarva, T. Hill and T. Whitby, for third party Webb, Zerafa, Menkes, Housden.

M.J.G. Walsh, T. Cherniak, B.A. Meckling and V. Bjorndahl, for third party Workers' Compensation Board.

Subject: Corporate and Commercial; Contracts; Public; Civil Practice and Procedure; Evidence; Torts; Estates and Trusts

Choses in Action --- Construction of assignments.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

Construction Law --- Breach of terms of contract -- Breach by contractor.

Construction Law --- Breach of terms of contract -- Breach of warranty -- Implied contractual warranty -- By contractor.

Construction Law --- Architects -- Damages against architect for breach of contract.

Construction Law --- Architects -- Professional negligence.

Contracts --- Construction and interpretation -- Implied terms, conditions and warranties -- Warranty -- Fitness.

Damages --- Remoteness and foreseeability -- Torts -- Economic loss.

Evidence --- Legal proof -- Inferences.

Evidence --- Opinion evidence -- Expert evidence -- Admissibility.

Evidence --- Opinion evidence -- Expert evidence -- Procedural issues -- Use of texts.

Fraud and Misrepresentation ---- Negligent misrepresentation (Hedley Byrne principle) -- Nature and extent of duty of care.

Fraud and Misrepresentation ---- Negligent misrepresentation (Hedley Byrne principle) -- Detrimental reliance.

Evidence --- Opinion evidence -- Expert evidence -- Purpose.

Evidence --- Opinion evidence -- Expert evidence -- Expert reports.

Judges and Courts --- Stare decisis -- Decisions of American courts.

Limitation of Actions --- Actions in contract or debt -- Statutory limitation periods -- Which limitation period applies.

Limitation of Actions --- Actions in contract or debt -- Statutory limitation periods -- When statute commences to run.

Limitation of Actions --- Actions in contract or debt -- Statutory limitation periods -- Suspension and interruption of statute.

Limitation of Actions --- Actions in tort -- Specific actions -- Miscellaneous actions in negligence.

Limitation of Actions --- Actions in tort -- Statutory limitation periods -- When statute commences to run.

Limitation of Actions --- Actions in tort -- Statutory limitation periods -- Extension of time to bring action -- Effect of legislation extending period.

Negligence --- Duty and standard of care -- Duty of care.

Negligence --- Duty and standard of care -- Standard of care.

Negligence --- Causation.

Negligence --- Strict liability (Rule in Rylands v. Fletcher) -- Product liability.

Negligence --- Strict liability (rule in Rylands v. Fletcher) -- Product liability.

Actions --- Extinction of right of action -- Release and satisfaction.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

Limitation of actions -- Postponement or extension of limitation period -- Ignorance of facts -- Plaintiffs suing for damages arising out of installation of asbestos-containing fireproofing material in their commercial building 20 years earlier -- Court finding that plaintiffs either knew or should have known that fireproofing material contained asbestos -- Provisions of Limitation Act, s. 6, accordingly not applying to postpone running of limitation period -- Postponement provisions also not applicable by reason that plaintiffs' claim one for pure economic loss -- Action dismissed as statute barred.

Limitation of actions -- Accrual of cause of action -- Discoverability of cause of action -- Cause of action accruing when all constituent elements in existence, whether or not plaintiff then aware of them.

Limitation of actions -- Limitations legislation -- Interpretation -- Limitation periods -- Plaintiffs suing for damages arising out of installation of asbestos-containing fireproofing material in its commercial building 20 years earlier -- Plaintiffs' claim one for pure economic loss falling within ambit of Limitation Act, s. 3(4) -- Applicable limitation period being six years.

Damages -- Bars to damage claims -- Release -- Building owner and general contractor entering agreement to settle disputes arising out of construction project -- Agreement including mutual release "of and from all, and all manner of action" -- Release being broad enough to preclude owner from claiming damages against contractor arising out of installation of asbestos-containing fireproofing material in building -- Wording of release assignment also barring claims against installation subcontractor and manufacturer of fireproofing material.

Construction law -- Architects and engineers -- Duties and liability -- Specification by architects of "Monokote" simpliciter for fireproofing material in construction project in early 1970s being within standard expected of reasonable architect at that time -- Architects' failure to specify asbestos-free fireproofing material in renovation of commercial building not amounting to negligence.

Torts -- Products liability -- Elements of cause of action -- Manufacturer of building materials being liable in tort where negligently manufactured product so defective as to pose real and substantial danger of causing injury to persons or property -- Products liability requiring some degree of fault -- Strict liability approach adopted in United States not applicable in Canada.

Torts -- Products liability -- Liability in particular cases -- Plaintiffs suing for damages arising out of installation of asbestos-containing fireproofing material in their commercial building -- Court finding that exposure to asbestos in public buildings far too low to increase health risks -- Asbestos in fireproofing material not contaminating plaintiffs' building or posing health hazard to occupants -- Plaintiffs' claim against manufacturer of fireproofing material dismissed.

Construction law -- Contractors -- Duties and liability -- Plaintiffs suing for damages arising out of installation of asbestos-containing fireproofing material in their commercial building -- Court finding that fireproofing material not inherently dangerous despite asbestos content -- Asbestos in fireproofing material not contaminating plaintiffs' building nor posing health hazard to occupants -- Plaintiffs' claims against general contractor and subcontractor for breach of duty to warn of presence of asbestos dismissed.

Evidence (civil) -- Opinion evidence -- Expert witnesses -- Writings put to expert in cross-examination admissible to test credibility of expert's opinion provided expert recognizing writing or author as authoritative -- Such writings admissible as substantive evidence only if expert adopting them as own -- Exceptional circumstances required to abrogate conventional rules not existing in asbestos-related litigation. .

The plaintiffs owned a commercial building which was extensively renovated between 1972 and 1975. The renovations included the construction of an adjoining office tower. The defendant architects were retained to prepare the plans and specifications for the project. Their contract specifications called for cementitious sprayed fireproofing. The specifications stated that in the tower "Mono-Kote, Type 4, asbestos free" spray fireproofing was to be used, and for the existing building the spray fireproofing was to be "Monocote ... or approved alternative." The defendant general contractor carried out the renovations. It engaged the defendant subcontractor to apply the fireproofing. The subcontractor sprayed with Monokote

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

MK-3 until August 1975 when the defendant manufacturer removed it from the Canadian market. The manufacturer and its parent company, also a defendant, had removed Monokote MK-3 from the United States market two years earlier after U.S. authorities banned the spraying of asbestos-containing fireproofing materials. Monokote MK-3 contained 12 to 13 per cent chrysotile asbestos fibres. The subcontractor finished the job with Monokote MK-5, an asbestos-free product the manufacturer had developed in 1972. The occupational health regulations in force at the time permitted the spray application of MK-3 in the building. The plaintiffs' project manager claimed that although he was aware at the time of the project that asbestos was a hazardous material, and that some spray fireproofing materials contained asbestos, he had no idea that MK-3 contained asbestos. Rather, he "assumed" that the specification of "Monokote" simpliciter called for an asbestos-free product, as he "assumed that there was absolutely no asbestos in the project, certainly in the fireproofing." Although one of the project manager's employees had considerable experience with fireproofing materials and the various products available, he claimed never to have discussed the matter with him. The installation of the fireproofing was completed in September 1975. As the renovation project neared completion one year later, a number of disputes arose between the general contractor and the plaintiffs relating to the final calculation of costs, retail sales taxes and delays. The plaintiffs sued for damages, but the parties settled the disputes. Their settlement agreement included a mutual release "of and from all, and all manner of action and actions, cause and causes of action ..." with the exception of four specified matters. Under the agreement, the plaintiffs also assigned to the general contractor all "rights, claims and demands whatsoever, in law and equity that it may have against the Contractor's sub-contractors."

In 1986 the plaintiffs began negotiating with a prospective tenant to occupy two floors in the building. The plaintiffs' offer to lease, which was accepted, contained a warranty that the building was free of friable asbestos. During subsequent renovations to the tenant's premises, a Workers' Compensation Board representative took samples of spray fireproofing that had been dislodged. Testing of the samples revealed that they contained chrysotile asbestos. The W.C.B. ordered the renovation work to stop. On the same day, the plaintiffs retained a consultant to assess the extent of asbestos-containing material in the building and recommend control options. Two days later, the plaintiffs assured the new tenant that they would remove the spray fireproofing from the tenant's premises immediately, and from the rest of the building over time. Within one week, a call for bids to complete the work had closed. One month later, the consultant produced a report confirming that the fireproofing in certain areas in the building contained friable asbestos. The report recommended removal of the fireproofing material, but included enclosure and an ongoing management program as options.

The plaintiffs sued. They alleged that the general contractor breached a contractual duty to use only the most appropriate building materials available, and had breached its duty of care by failing to warn the plaintiffs of the presence of asbestos and by installing an inherently dangerous material. The plaintiffs alleged that the architect had been negligent and in breach of contract by failing to take sufficient care in drafting the renovation specifications. The plaintiffs claimed that the subcontractor had breached a duty to warn them of the presence of asbestos, and had negligently misrepresented that Monokote MK-3 was suitable for use in the building. The plaintiffs alleged that the manufacturer and its parent company had been negligent in that they ought to have known that MK-3 was a dangerous product, that they had breached their duty to warn the plaintiffs of the dangers inherent in it and had negligently misrepresented the product as being of superior quality. The plaintiffs claimed $7.5 million for the cost of replacing the fireproofing material and loss of rental revenue, and $3 million in punitive damages.

Held:

Action dismissed.

A person whose responsibility it is to oversee a major construction project will be presumed to know publicly available facts which would be notorious to a reasonably competent person in the same position. The project manager's assertion that he had no idea that MK-3 contained asbestos, and that he "assumed" that an asbestos-free material would be installed in the building, was entirely unreasonable, if not untrue. The project manager was a qualified engineer. He knew of the concerns then being voiced about the use of asbestos-containing building materials. He knew that there were some asbestos-containing spray fireproofing products then on the market. He reviewed the specifications for the project and knew that one part called for an asbestos-free fireproofing material and the other did not. If, in fact, he expected that an asbestos-free fireproofing material would be installed throughout, he had sufficient personal knowledge to be put on his inquiry, and a readily available source

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

of information in the form of an employee. On all of the evidence, the plaintiffs' project manager knew, or must be deemed to have known, that the spray fireproofing product that had been specified, and which he approved for installation in the building, contained asbestos.

A cause of action accrues when all of the constituent elements exist, whether or not the plaintiff is then aware of them. It was clear that all of the elements necessary to the plaintiffs' causes of action came into existence during the period from 1973 to 1975 when the MK-3 was installed. Accordingly, the limitation period began to run in or about the month of September 1975 when the installation was completed. The applicable limitation period was six years. As the cause of the damage alleged by the plaintiffs was not "an identifiable external event," their claim was not for injury to property within the meaning of s. 3(1)(a) of the Limitation Act. Rather, it was a claim for pure economic loss within the ambit of s. 3(4) of the Act.

The crux of the matter was whether the postponement provisions of s. 6 of the Act applied. They did not. The plaintiffs' claims were for pure economic loss rather than "damage to property" within the scope of s. 6(3)(b) and none of their claims were for "professional negligence" within s. 6(3)(c). Moreover, the postponement provisions had no application to the facts of the case. The plaintiffs' argument under s. 6 was premised on the assertion that they simply had not known that the fireproofing contained asbestos and that the running of time should be postponed until their "discovery." But the plaintiffs had been aware of the controversies surrounding asbestos and throughout the project knew or ought to have known that MK-3 contained asbestos. Accordingly, the limitation period began to run as of the date the fireproofing installation was completed, without postponement. It followed that the plaintiffs' claims were statute barred.

The release included in the settlement agreement between the general contractor and the plaintiffs was broad enough to preclude recovery against the contractor in any event. The language of the release disclosed an intention on the part of the parties to discharge one another not just from specific claims, but from any unknown actions or claims. Similarly, the assignment clause in the settlement agreement barred any claim against the subcontractor. As for the manufacturer, although it was not a materialman or a subcontractor as defined in the general contract, it supplied materials to the renovation project and could become involved in litigation with the plaintiffs and in third party proceedings against the general contractor. In the circumstances, it made good sense to treat the manufacturer as a subcontractor covered by the assignment. Accordingly, the claims against the manufacturer were barred by the release.

The plaintiffs failed to establish that the fireproofing specification prepared by the architects did not measure up to the standard expected of the reasonably competent architect at that time. The architects were not aware whether MK-3 contained asbestos when they drafted the specifications. Although they should have known the composition of Monokote, or should have made enquiries to ascertain it, before specifying it for installation in the building, there had been nothing to convey to them the realization that the plaintiffs required an asbestos-free material. Moreover, the specification of Monokote simpliciter, rather than an asbestos-free fireproofing, was within the standard expected of a reasonable and prudent architect during the years 1972 to 1975.

On the authorities, it is now clear that under Canadian law a builder may be held liable in tort when it has constructed a building in a negligent manner and, subsequently, a dangerous defect in the building is discovered and repaired before any injury occurs to persons or property. The same principle must apply to one who negligently manufactures a product, knowing that it will be incorporated into a building, if that product is later found to be so defective that it poses a real and substantial danger of causing injury to persons or property. Thus, notwithstanding that their claim was for pure economic loss, the plaintiffs could have recovered that loss if they were able to establish, on a balance of probabilities, that the presence of MK-3 in the building released asbestos into the atmosphere of the building, that the asbestos in the MK-3 posed a "real and substantial" danger to workers and occupants, that the danger was caused by negligence and that the removal and replacement of the product was necessary to alleviate the danger. The plaintiffs, however, failed on all counts.

It is well settled that product liability requires some degree of fault. The plaintiffs' invitation to adopt the strict liability approach taken in the United States was not accepted.

Writings put to an expert witness in cross-examination are admissible to test the credibility of the expert's opinions provided that the expert recognizes the writing or the author as authoritative. Such writings are admissible as substantive evidence only if the expert adopts them as his or her own. The need for cross-examination is greater in the case of expert opinion evidence

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

than in factual situations because the trier of fact is likely to be in a poor position to assess the credibility of a scientific opinion without the aid of cross-examination. Those rules should not, except in unique circumstances, be abrogated. Complex as this trial was, learned as the authors of treatises on asbestos might be, the circumstances here were not so exceptional that the conventional rules did not apply.

Compliance with occupational health regulations or the municipal building code was not, per se, a defence to the plaintiffs' claims. But, by the same token, non-compliance with the United States standards was not, in itself, proof of negligence or breach of contract. The W.C.B.'s failure, after careful consideration of the available information, to enact an outright ban on the spray application of asbestos-containing fireproofing material was important evidence that the material was not inherently dangerous. MK-3 was an effective fireproofing product that was considered a breakthrough when first introduced. The description of it as a cementitious product was a valid one. The results of tests supported the manufacturer's belief that MK-3 was safe. Most critically, the expert evidence clearly established that the type of exposure to asbestos encountered in public buildings was far too low to increase the risk of a building worker or occupant contracting any asbestos-related disease.

The asbestos contained in the MK-3 did not contaminate the building, nor did it pose a health hazard to its occupants necessitating removal of the fireproofing material. The plaintiffs' claim to have acted quickly in removing the material out of concern for the health of occupants of the building was not borne out by the evidence. Rather, the plaintiffs had acted for economic, not health-related, reasons. Their decision to remove the fireproofing material from the two floors occupied by the new tenant was taken solely for the purpose of retaining the tenant. The plaintiffs' failure to tender evidence of air sampling tests taken in the building under their direction justified an inference that the asbestos levels were not inconsistent with those one would expect to find in the ambient air.

From these conclusions, it followed that there had been no negligence, no breach of a duty of care or a duty to warn and no misrepresentation. The plaintiffs' claims were dismissed.

Cases considered:

Abermin Corp. v. Granges Exploration Ltd. (August 10, 1990), Doc. Vancouver C884398, McColl J. (S.C.), [1990] B.C.W.L.D. 2040 -- referred to

Alberni District Credit Union v. Cambridge Properties Ltd. (1985), 65 B.C.L.R. 297 (C.A.) -- applied

Anns v. Merton London Borough Council (1977), [1978] A.C. 728, (sub nom. Anns v. London Borough Council of Merton) [1977] 2 All E.R. 492 (H.L.) -- applied

BG Checo International Ltd. v. British Columbia Hydro & Power Authority , [1993] 1 S.C.R. 12, 75 B.C.L.R. (2d) 145, [1993] 2 W.W.R. 321, 5 C.L.R. (2d) 173, 147 N.R. 81, 20 B.C.A.C. 241, 99 D.L.R. (4th) 577, 14 C.C.L.T. (2d) 233 [application for rehearing refused (1993), 5 C.L.R. (2d) 173n, 14 C.C.L.T. (2d) 233n] -- considered

Bera v. Marr, 1 B.C.L.R. (2d) 1, [1986] 3 W.W.R. 442, 37 C.C.L.T. 21, 27 D.L.R. (4th) 161 (C.A.)considered

British Columbia (Workers' Compensation Board) v. Thompson Berwick Pratt & Partners (1986), (sub nom. Workers' Compensation Board (British Columbia) v. Genstar Corp.) 24 B.C.L.R. (2d) 157, [1988] 4 W.W.R. 184 (C.A.) -- applied

British Russian Gazette & Trade Outlook Ltd. v. Associated Newspapers Ltd.; Talbot v. Associated Newspapers Ltd., [1933] 2 K.B. 616 (C.A.) -- referred to

Brownell v. Black (1890), 31 N.B.R. 594 (C.A.) -- referred to

Brownton Ltd. v. Edward Moore Incubon Ltd., [1985] 3 All E.R. 499 (C.A.) -- applied

Brunsdon v. Shaw (1992), 73 B.C.L.R. (2d) 313, 17 B.C.A.C. 225 -- applied

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

Buchan v. Ortho Pharmaceutical (Canada) Ltd. (1986), 35 C.C.L.T. 1, 54 O.R. (2d) 92, 12 O.A.C. 361, 25 D.L.R. (4th) 658, 32 B.L.R. 285 (C.A.) -- considered

Canadian Indemnity Co. v. Canadian Johns-Manville Co. (1988), 18 Q.A.C. 99, [1989] I.L.R. 1-2414, 54 D.L.R. (4th) 468, [1988] R.J.Q. 2651, affirmed [1990] 2 S.C.R. 549, [1990] I.L.R. 1-2650, 72 D.L.R. (4th) 478, 115 N.R. 161, 50 B.L.R. 1, 33 Q.A.C. 161, 50 C.C.L.I. 95 -- applied

Canadian National Railway v. Norsk Pacific Steamship Co., [1992] 1 S.C.R. 1021, 11 C.C.L.T. (2d) 1, 137 N.R. 241, 91 D.L.R. (4th) 289 [application for rehearing refused (July 23, 1992), Doc. 21838] -- considered

Central & Eastern Trust Co. v. Rafuse, (sub nom. Central Trust Co. v. Rafuse) [1986] 2 S.C.R. 147, 37 C.C.L.T. 117, 42 R.P.R. 161, 34 B.L.R. 187, 31 D.L.R. (4th) 481, 75 N.S.R. (2d) 109, 186 A.P.R. 109, 69 N.R. 321 [varied [1988] 1 S.C.R. 1206, 44 C.C.L.T. xxxiv] -- considered

D & F Estates Ltd. v. Church Commissioners for England, [1988] 2 All E.R. 992 (H.L.) -- considered

Delgamuukw v. British Columbia, [1991] 3 W.W.R. 97, 79 D.L.R. (4th) 185 (B.C.S.C.) [varied [1993] 5 W.W.R. 97, 104 D.L.R. (4th) 470, 30 B.C.A.C. 1] -- distinguished

Franklin v. Gramophone Co., [1948] 1 K.B. 542, [1948] 1 All E.R. 353 (C.A.) -- considered

Fredrickson v. Insurance Corp. of British Columbia, 3 B.C.L.R. (2d) 145, [1986] 4 W.W.R. 504, 17 C.C.L.I. 194, 28 D.L.R. (4th) 414, [1986] I.L.R. 1- 2100, affirmed [1988] 1 S.C.R. 1089, [1988] 6 W.W.R. 633, 38 C.C.L.I. 161, 49 D.L.R. (4th) 160, [1988] I.L.R. 1-2371, 86 N.R. 48 -- referred to

Gideon v. Johns-Manville Sales Corp., 761 F. 2d 1129 (5th Circ., 1985) -- considered

Gies v. Gunwall (1982), 143 D.L.R. (3d) 126 (B.C.S.C.) -- referred to

Graham v. British Canadian Loan & Investment Co. (1898), 12 Man. R. 244 (C.A.) -- referred to

Greveling v. Greveling, [1950] 1 W.W.R. 574, [1950] 2 D.L.R. 308 (B.C.C.A.) -- referred to

Holt v. P.P.G. Industries Canada Ltd. (1983), 25 C.C.L.T. 253 (Alta. Q.B.) -- considered

Karsanjii Estate v. Roque, 43 B.C.L.R. (2d) 234, [1990] 3 W.W.R. 612, 39 C.P.C. (2d) 168 (C.A.) -- referred to

Lambert v. Lastoplex Chemicals Co., [1972] S.C.R. 569, 25 D.L.R. (3d) 121 -- considered

Levitt v. Carr, 66 B.C.L.R. (2d) 58, [1992] 4 W.W.R. 160, 8 C.P.C. (3d) 101, 12 C.C.L.T. (2d) 195, 12 B.C.A.C. 27 [leave to appeal to S.C.C. refused 70 B.C.L.R. (2d) xxxiii, [1992] 6 W.W.R. lviii, 142 N.R. 160, 16 B.C.A.C. 82 ] -- considered

London & South Western Railway Co. (Directors, etc.) v. Blackmore (1870), L.R. 4 H.L. 610, 39 L.J. Ch. 713 (H.L.) -- considered

Lui v. West Granville Manor Ltd. (1985), 61 B.C.L.R. 315, 2 C.P.C. (2d) 184, 18 D.L.R. (4th) 391 (C.A.) -- considered

M'Alister (Donoghue) v. Stevenson, [1932] A.C. 562 (H.L.) -- considered

Meisel v. Tolko Industries Ltd. (January 18, 1991), Doc. Vancouver C876168, Campbell A.C.J.S.C. (S.C.), [1991]

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

B.C.W.L.D. 479 -- applied

Murphy v. Brentwood District Council (1990), [1991] 1 A.C. 398, [1990] 2 All E.R. 908 -- not followed

Nicholson v. John Deere Ltd. (1986), 58 O.R. (2d) 53, 34 D.L.R. (4th) 542, affirmed (1989), 68 O.R. (2d) 191, 57 D.L.R. (4th) 639 (C.A.) -- considered

Nielsen v. Kamloops (City), [1984] 2 S.C.R. 2, 66 B.C.L.R. 273, [1984] 5 W.W.R. 1, 29 C.C.L.T. 97, 26 M.P.L.R. 81, 8 C.L.R. 1, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1 -- considered

Ontario (Attorney General) v. Fatehi, [1984] 2 S.C.R. 536, 31 M.V.R. 301, 31 C.C.L.T. 1, 56 N.R. 62, 6 O.A.C. 270, 15 D.L.R. (4th) 132 -- referred to

Phillips v. Ford Motor Co., [1971] 2 O.R. 637, 18 D.L.R. (3d) 641 (C.A.) -- applied

Purdom v. Northern Life Assurance Co. of Canada, 63 O.L.R. 12, [1928] 4 D.L.R. 679, affirmed [1930] S.C.R. 119, [1930] 1 D.L.R. 1003 -- referred to

R. v. Anderson (1914), 5 W.W.R. 1052, 7 Alta. L.R. 102, 22 C.C.C. 455, 16 D.L.R. 203 (C.A.) -- applied

R. v. B. (K.G.), [1993] 1 S.C.R. 740, 19 C.R. (4th) 1, 79 C.C.C. (3d) 257, 148 N.R. 241, 61 O.A.C. 1 -- considered

R. v. Khan, [1990] 2 S.C.R. 531, 113 N.R. 53, 79 C.R. (3d) 1, 59 C.C.C. (3d) 92, 41 O.A.C. 353 -- considered

R. v. Smith, [1992] 2 S.C.R. 915, 15 C.R. (4th) 133, 139 N.R. 323, 75 C.C.C. (3d) 257, 94 D.L.R. (4th) 590, 55 O.A.C. 321 -- considered

Rentway Can. Ltd./Ltée v. Laidlaw Transport Ltd. (1989), 49 C.C.L.T. 150, 16 M.V.R. (2d) 86 (Ont. H.C.) -- referred to

Ridley Terminals Inc. v. Mitsubishi Canada Ltd. (1993), 16 C.L.R. (2d) 86 (B.C.S.C.) -- applied

Rivtow Marine Ltd. v. Washington Iron Works (1973), [1974] S.C.R. 1189, [1973] 6 W.W.R. 692, 40 D.L.R. (3d) 530 -- not followed

Rolland v. Hart (1871), 6 Ch. App. 678 -- referred to

Saskatchewan Wheat Pool v. Canada, [1983] 1 S.C.R. 205, [1983] 3 W.W.R. 97, 23 C.C.L.T. 121, 143 D.L.R. (3d) 9, 45 N.R. 425 -- considered

Stiles v. Beckett (1993), 22 C.P.C. (3d) 145 (B.C.S.C.) -- applied

Trendtex Trading Corp. v. Credit Suisse (1981), [1982] A.C. 679, [1981] 3 All E.R. 520 (H.L.) -- referred to

ViSP Construction v. Scepter Manufacturing Co. (1991), 45 C.L.R. 170 (Ont. Gen. Div.) -- considered

White v. Central Trust Co. (1984), 54 N.B.R. (2d) 293, 140 A.P.R. 293, 7 D.L.R. (4th) 236, 17 E.T.R. 78 (C.A.) -- applied

Winnipeg Condominium Corp. No. 36 v. Bird Construction Co., [1995] 1 S.C.R. 85, [1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176 N.R. 321, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241 , reversing [1993] 5 W.W.R. 673, 15 C.C.L.T. (2d) 1, 6 C.L.R. (2d) 1, 101 D.L.R. (4th) 699, 85 Man. R. (2d) 81, reversing

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

> (1992), 84 Man. R. (2d) 23 -- applied

> Wittman v. Emmott, 53 B.C.L.R. (2d) 228, [1991] 4 W.W.R. 175, 45 C.P.C. (2d) 245, 77 D.L.R. (4th) 77, leave to appeal to S.C.C. refused 58 B.C.L.R. (2d) xxxiv, [1991] 6 W.W.R. lxvii, 1 C.P.C. (3d) 233, 6 B.C.A.C. 80, 136 N.R. 319 -- applied

> Zurbrugg v. Bowie, 68 B.C.L.R. (2d) 322, [1992] 5 W.W.R. 314, 8 C.P.C. (3d) 71, 91 D.L.R. (4th) 599, 14 B.C.A.C. 125 -- applied

Statutes considered:

Asbestos Hazard Emergency Response Act, 15 U.S.C.A. § 2641 -- referred to

Companies Act, S.B.C. 1973, c. 18 -- referred to

Limitation Act, R.S.B.C. 1979, c. 236

> s. 3(1)(a)referred to

> s. 3(1)(a) [re-en. 1992, c. 44, s. 1(a)]considered

> s. 3(4)considered

> s. 6(3)considered

> s. 6(4)considered

> s. 6(5)considered

Statute of Limitations, R.S.N.S. 1967, c. 168 -- considered

Workmen's Compensation Act, S.B.C. 1916, c. 77 -- referred to

Workmen's Compensation Act, S.B.C. 1968, c. 59 -- referred to

Rules considered:

American Rules of Evidence -- referred to

Regulations considered:

Workers Compensation Act, R.S.B.C. 1979, c. 437 --

> Industrial Health and Safety Regulation, B.C. Reg. 585/77

> s. 35.03

> s. 35.07

> App. A

Workmen's Compensation Act, R.S.B.C. 1924, c. 278 --

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

> Accident-Prevention Regulations, B.C. Reg. 1/35
>
> s. 6
>
> s. 16

Workmen's Compensation Act, R.S.B.C. 1960, c. 413 --

> Accident Prevention Regulations, B.C. Reg. 43/66

Workmen's Compensation Act, S.B.C. 1968, c. 59 --

> Accident Prevention Regulations, B.C. Reg. 64/72

Action for damages for breach of contract, negligence and negligent misrepresentation. For related proceedings, see [1990] B.C.W.L.D. 1716 (S.C.); [1990] B.C.W.L.D. 1781 (Master); (1990), 44 C.P.C. (2d) 262 (B.C.S.C.); [1991] B.C.W.L.D. 927 (S.C.); [1991] B.C.W.L.D. 1463 (S.C.); 57 B.C.L.R. (2d) 88, [1991] I.L.R. 1-2737, 6 C.C.L.I. (2d) 23 (S.C.); [1991] I.L.R. 1-2780, 6 C.C.L.I. (2d) 87 (B.C.S.C.); (1991), 64 B.C.L.R. (2d) 41 (S.C.); (1991), 61 B.C.L.R. (2d) 200 , leave to appeal to C.A. refused (1991), 9 B.C.A.C. 275, [1992] B.C.W.L.D. 214 (S.C.); (1992), 4 C.P.C. (3d) 313, 6 C.C.L.I. (2d) 15 (B.C.S.C.); Privest Properties Ltd. v. W.R. Grace & Co. -- Conn. (1992), 67 B.C.L.R. (2d) 345, 14 B.C.A.C. 174; (1992), 13 C.P.C. (3d) 200, 21 B.C.A.C. 1, reversed (1992), 74 B.C.L.R. (2d) 353, 13 C.P.C. (3d) 205, 21 B.C.A.C. 5.

*Drost J.* :

**I. Introduction**

1    The plaintiffs, Privest Properties Ltd. and Lord Realty Holdings Ltd., are the owners of a building in which an asbestos-containing spray fireproofing material was installed, allegedly without their knowledge or consent. In this action, they and their co-plaintiffs, Polaris Realty (Canada) Limited, Lordina Limited and Polaris Realty (Western) Limited, seek compensation for the costs incurred and revenue lost while having that material removed from the building and replacing it with another, asbestos-free, fireproofing material. They also seek punitive damages.

2    The building in question was constructed in the 1930s and today forms part of the Harbour Centre complex, a major retail/commercial complex built during the 1970s in Vancouver, British Columbia. During the trial, the building was usually referred to by its original name, "the Spencer Building". I will also use that name, or simply call it "the Building".

3    The plaintiffs allege that the asbestos-containing fireproofing material was installed in the Building in the course of a major renovation project carried out between 1972 and 1975 as part of the development and construction of Harbour Centre. They say that the material installed was inherently dangerous and that, by continuously releasing asbestos fibres into the air, it caused physical damage to their property and endangered the health of Building workers and occupants. They say that due to the presence of asbestos in the material, they were unable to maintain, repair or renovate the Building without causing further releases of asbestos fibres, and for that reason they were obliged to undertake a programme of removal and replacement (the "abatement programme").

4    Throughout the relevant time period, the Harbour Centre complex was owned by one or more of the plaintiffs, Privest Properties Ltd. ("Privest"), Lord Realty Ltd. ("Lord Realty") and Lordina Limited ("Lordina"). The other plaintiffs, Polaris Realty (Canada) Limited ("Polaris Canada") and Polaris Realty (Western) Limited ("Polaris Western"), acted, at different times, as development and/or building managers.

5    The defendants, in the order in which their names appear in the style of cause, are:

6    The Foundation Company of Canada ("Foundation") -- the General Contractor who carried out the development and

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385,** 23 C.L.R. (2d) I, 128 D.L.R. (4th)
577

construction of the Harbour Centre complex and the renovation of the Building in the 1970s;

7    Donalco Services Ltd. ("Donalco") -- the sub-contractor engaged by Foundation at that time to install spray fireproofing in the Building;

8    W.R. Grace & Co. of Canada Ltd. ("Grace Canada"), formerly W.R. Grace Construction Materials Ltd. -- the manufacturer of the spray fireproofing material supplied for installation in the Building;

9    Eng & Wright Partners, Architects ("Eng & Wright") -- the firm of architects engaged by the plaintiffs to prepare the plans and specifications for the development of the complex, including the renovation of the Building; and

10    W.R. Grace & Co. -- Conn. ("Grace-Conn.") -- a U.S. corporation which is the sole shareholder of Grace Canada.

11    I will frequently refer to the two Grace companies, collectively, as "the Grace defendants".

12    Each of the defendants cross-claimed against its co-defendants. In addition, they collectively joined as third parties:

13    Double A/D Distributors Ltd., a company affiliated with Donalco Services Ltd.;

14    MacKenzie, Snowball, Skalbania & Associates Ltd., the mechanical engineers on the Project;

15    Nelson Skalbania, one of the original developers;

16    Donald Thomas, a specification writer engaged by Eng & Wright to prepare the specifications for the project;

17    Charles Wright, Gerhard K. Schadow, Douglas Faulkner, Martin Bruckner and Gilbert Eng, each of whom was at relevant times a partner or associate in Eng & Wright;

18    Webb, Zerafa, Menkes, Housden ("Webb Zerafa"), a firm of architects engaged by the plaintiffs to provide design consulting services; and

19    The Workers' Compensation Board of British Columbia ("the WCB").

20    Foundation counterclaimed against Privest, Lord Realty, Polaris Canada and Lordina for the costs incurred in defending this action. Foundation alleges that those parties were contractually obliged to maintain general liability and property damage insurance coverage, which, if effected, would in whole or in part cover the plaintiffs' claims herein, thus precluding their right to succeed in this action.

21    In the spring of 1987, parts of the interior of the Building were extensively renovated to meet the requirements of a new tenant. In the course of those renovations, some of the existing spray fireproofing material was exposed and disturbed. That led to the discovery of chrysotile asbestos in the existing fireproofing material, and to the Workers' Compensation Board of British Columbia issuing an order closing the area to unprotected workers.

22    Within a few days of that happening, the plaintiffs embarked upon an abatement programme which will eventually see the removal of all of the existing fireproofing material from the Building and its replacement by an asbestos-free material.

23    The plaintiffs allege that the chrysotile asbestos was contained in the spray-fireproofing material, known as Monokote MK-3, which was installed during the renovation of the Building between 1973 and 1975. They say that at that time there was widespread public knowledge of asbestos-related health hazards and, that, in the architectural profession and the construction industry at least, there was particular concern about the use of asbestos-containing spray fireproofing materials.

24    The plaintiffs maintain that they did not know that the material contained asbestos. Had they known, they say, they

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

would have taken steps to prevent its installation.

25    The plaintiffs say that they relied on the knowledge, skill and judgment of the defendants to specify and install appropriate materials to be used in the Building and that, by specifying and installing asbestos-containing MK-3, the defendants failed to exercise the degree of skill, care and diligence required of them.

26    The plaintiffs assert claims against Foundation in contract and in tort. They say that Foundation had a contractual responsibility to ensure that only the most appropriate products were used in the Building, a responsibility that it breached by permitting the installation of a hazardous product. And they say that, before entering into a formal contract with Polaris Western in 1975, Foundation assumed a duty of care to the owners of the Building which it breached by failing to warn them of the presence of asbestos in the specified spray fireproofing material and by installing an inherently dangerous material. They also allege that Foundation breached an implied warranty of fitness.

27    The plaintiffs also assert claims against the architect, Eng & Wright, in both contract and tort. They say that they relied on Eng & Wright's knowledge, skill and judgment as professional architects, and that Eng & Wright knew or ought to have known of that reliance. They allege that Eng & Wright acted negligently and in breach of contract by failing to take sufficient care in drafting the specifications for the renovation of the Building, failing to exercise the degree of skill required of a reasonable architect, and by failing to warn of the presence of a hazardous product. They also allege that Eng & Wright breached an implied warranty of fitness.

28    Their claim against the applicator, Donalco, lies in tort. They say that, despite the absence of a contractual relationship, Donalco owed them a duty of care. Donalco, they say, was experienced in the business of supplying and installing spray fireproofing material in buildings, and knew or ought to have known that they were relying on its knowledge, skill and judgment. They allege that Donalco knew of the dangers of asbestos and knew that MK-3 contained asbestos. They say that, notwithstanding that knowledge, Donalco failed to warn them of the presence of asbestos and the dangers associated with the use of an asbestos-containing product.

29    The plaintiffs also say that by approving a specification which called for the use of "Monocote" (sic) simpliciter, Donalco represented to them that Monokote MK-3 was suitable for use in the Building. They say that Donalco's representation was negligent, that they relied upon it, and that the representation resulted in the installation of MK-3 in the Building to the plaintiffs' detriment.

30    The impugned product, Monokote MK-3, was manufactured and supplied by Grace Canada, but the plaintiffs allege that its business operations, including the decision to continue marketing MK-3 in Canada after April 1973 (when its application by spraying was banned by the United States Environmental Protection Agency) were directed and controlled by its U.S. parent corporation, Grace-Conn.

31    The plaintiffs allege that the Grace defendants were negligent in that they knew or ought to have known that Monokote MK-3 was a dangerous product, capable of causing harm to others either in the course of its application or by its continued use or existence in the Building.

32    The plaintiffs also allege that the Grace defendants breached a common law duty to warn them of the dangers "inherent" in that product, and that they negligently misrepresented the product as being a superior one, without disclosing that it contained asbestos, and that other, asbestos-free, products then available could achieve the same purpose. Moreover, they say, by using the term "cementitious" to describe their product, the Grace defendants actively sought to convey the impression that there was no concern about the asbestos in their product.

33    Finally, the plaintiffs submit that their claims against the Grace defendants warrant application of the concept of strict liability.

34    It is the cost of the abatement programme (which has not yet been completed), and the loss of rental revenue allegedly resulting therefrom, that form the basis of the plaintiffs' claim for compensatory damages in the amount of $7,555,841.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

35    The plaintiffs also seek punitive damages. They allege that when the product was installed in the Building, all of the defendants knew or ought to have known that asbestos is a carcinogen and that MK-3 contained asbestos. They allege that the defendants knew or ought to have known that MK-3 was friable (i.e., that, on contact, it crumbled easily), and that it was being installed in places where there was a risk of it being disturbed and thus releasing respirable asbestos fibres.

36    The plaintiffs describe their claims against the Grace defendants as "unequalled in their importance in this case". They say that because the Grace defendants knew that asbestos is a carcinogen, it is reasonable to assume that the Grace defendants were well aware of the potential harm that could result from the installation of their asbestos-containing product in the Building. In his opening statement, plaintiffs' counsel described the activities of the Grace defendants as:

> ... a case of arrogant and reckless conduct of a multi-billion dollar corporation bent on wringing every last cent out of a product they knew was hazardous and which for that reason had been banned in the United States where [Grace-Conn.] had its corporate headquarters.

37    He then compared the Grace defendants with "those who commit acts of environmental terrorism against third world countries".

38    It is in the light of those inflammatory words that the plaintiffs claim the additional sum of $3 million by way of punitive damages.

39    In recent years, courts in the United States have been inundated by asbestos litigation. First came the wave of personal injury actions. Then came the second, and perhaps even larger wave, of property damage claims. I understand that the full extent of potential property damage awards and insurance claims runs into billions of dollars.

40    This is the first asbestos property damage claim to reach trial in a Canadian court. It may also be the first such action in which a contractor has been joined as a defendant with the manufacturer of an asbestos-containing product, the applicator who installed the product and the architect who allegedly specified its use.

41    The many claims, cross-claims and third party claims that were advanced gave rise to a multitude of complex issues. A total of 160 days were taken up by the presentation of evidence. During that time many hundreds of documents were entered as exhibits. Counsel then provided me with more than six thousand pages of written argument, followed by twenty-two days of oral argument.

42    For reasons which will soon become apparent, I did not find it necessary to address all of those issues. Many have not been dealt with, perhaps to be resolved another day.

43    Furthermore, I have found it impractical, if not impossible, to recount with any degree of completeness all of the testimonial and documentary evidence that was presented with respect to the issues that I will discuss. Similarly, I found it impractical to refer to every argument that was put forward on a given subject. Accordingly, when discussing an issue, I will mention only what I consider to be the most relevant aspects of the evidence and argument.

44    Having said that, I want to assure the parties that, with the benefit of counsel's able assistance, I have endeavoured to give full consideration to all of the evidence and submissions that were presented.

## II. Background Facts

45    In this section I intend to provide an overview of the evidence relating to the design and construction of the Harbour Centre complex, with particular emphasis on the installation of the spray fireproofing material in the Building and the events which led to the plaintiffs' decision to remove and replace it. Later, I will undertake a more detailed analysis of the evidence relating to the issues that fall to be decided.

46    The development of the Harbour Centre complex (the "Complex"), including the renovation of the Building, was

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

carried out under two separate groups of owners. Except when it is necessary to distinguish between the two phases, I will refer to the renovation and development project as "the Project". It began around 1970, when a group of developers (including the third party, Nelson Skalbania) acquired a major site in downtown Vancouver, B.C., which included an old bank building and the Spencer Building, then the location of Eaton's main Vancouver store. They retained Eng & Wright to design a commercial/retail development for the site.

47    In early 1971, Eng & Wright brought forward a design proposal that would have resulted in both of the old buildings being retained and a new office tower being erected. However, that scheme was rejected by the developers who decided, instead, to seek approval for the construction of a radically different kind of tower. They had in mind an office tower, on the top of which would be a revolving restaurant, similar to the Space Needle in Seattle, Washington.

48    The developers retained another firm of architects, Charles Paine & Associates, to design the new tower and restaurant ("the Tower"), while Eng & Wright carried on with the design of the retail and parkade portions of the Project, which included the renovation of the Building. Concordia Management Ltd. was hired to act as the Project Manager.

49    In December 1971, an application for a building permit was filed, but the "space needle" concept was rejected and the Project had to be re-designed once again.

50    In October 1972, Eng & Wright retained Donald Thomas, an independent specification writer, to prepare the necessary specifications for their portion of the Project. He did that and, on November 8, 1971, Concordia combined the Eng & Wright specifications for the retail and parkade portions of the Project with those of Paine and Associates relating to the Tower into what was called the "Vancouver Square Outline Specification".

51    Initially, the Fireproofing Section of that Outline Specification read as follows:

**13.2 Fireproofing**

A. Tower -- Spray fireproofing -- Cafco Asbestos free. Monocote [sic] etc. ...

B. Existing Eight (8) Storey Building -- upgrading not necessary.

52    A short time later, however, Mr. Charles Wright, the senior Eng & Wright partner working on the Project, learned that additional fireproofing had to be added to the existing structure in order to bring it up to current building code requirements. Accordingly, he amended the fireproofing specification by striking out the word "not" and adding, by hand, the word "Yes", so that it then read:

**13.2 Fireproofing**

A. Tower -- Spray fireproofing -- Cafco Asbestos free. Monocote [sic] etc. ...

B. Existing Eight (8) Storey Building -- upgrading not necessary. *YES*

53    In December 1972, a revised Development Permit Application was approved by the Vancouver Building Department.

54    Mr. Adrian Geraghty, who was the Structural Engineer Plan Checker for the Vancouver City Building Department during the years 1972 to 1975, testified that at that time officials in the Building Department regularly referred to test reports published in handbooks issued by Underwriters Laboratories Inc. ("ULI"), an American firm, and by Underwriters Laboratories Canada ("ULC"), for information concerning various building products, including spray fireproofing materials. Both of those laboratories tested assemblies of fireproofing materials in order to determine their fire resistance capabilities.

55    Speaking of the Vancouver City Building Department's practice at that time, Mr. Geraghty testified that:

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

> ... when an architect decides to use a particular assembly in a building to achieve fire resistance ratings, we will then ask him what is the number of the test that he proposes to use. We will then compare what he shows on his building permit application drawings with what is shown under that test number in the handbook, and if they're not similar, then we will normally reject that application.

56    In February 1973, the Vancouver Building Inspector approved the use of Underwriters Laboratory Inc. design J701 for the fireproofing to be applied to the floors of the Building intended for use as office space, and a modification of that design for the remaining floors intended for mercantile use.

57    By May 1973, General Contract Specifications had been prepared for the purpose of obtaining construction bids. Part I of those Specifications, which related to the retail and parkade sections, had been prepared by Eng & Wright. In it the following specification appears under the heading "Products":

> Sprayed fireproofing to be cementitiously applied Monocote [sic], as distributed by Grace Materials, or approved alternative, to equivalent thicknesses as required to provide fire ratings as specified.

58    Part II, which related to the Tower and had been prepared by Paine & Associates, specified that:

> Materials shall be Mono-Kote [sic], Type 4, asbestos free, well mixed cementitious sprayed fireproofing as manufactured by Grace Construction Materials or approved equal.

59    During the spring or early summer of 1973, Concordia engaged Foundation to act as the General Contractor for the Project.

60    In August 1973, Vancouver Square Holdings Ltd. sold the development site to the plaintiff Lord Realty, together with all the plans, specifications and permits that had been prepared and obtained up to that time. Lord Realty appointed Polaris Western to act as its agent and development manager in place of Concordia Management, and work continued on the Project on a "fast-track" basis.

61    Charles Paine & Associates were also let go and Polaris Western retained the third party, Webb Zerafa, to prepare a "conceptual redesign" of the entire project. At about the same time, Eng & Wright's engagement was enlarged to include the preparation of working drawings and specifications for the entire Project.

62    The final architectural drawings called for the first four floors of the new Tower to be built contiguous to the first four floors of the Building so that, on those floors, one could walk from one side to the other, from the Building into the new structure, without being conscious of the difference. Above the fourth floor level, the Tower stands separate from the Building, and it is topped by a revolving restaurant.

63    So that Eaton's Data Centre might remain on the seventh floor of the Building while the renovation and construction work proceeded, spray fireproofing was applied to the underside of the eighth floor in October 1973. The material used was Monokote MK-3 and it was applied by Donalco under a work order from Foundation. The application was supervised and inspected by Eng & Wright.

64    In February 1974, Eng & Wright prepared a "Brief Basic Architectural Specification", on the basis of which Foundation submitted a guaranteed upset price bid for the Project. Its fireproofing section simply contained a reference back to the specification prepared by Eng & Wright in 1973.

65    On March 1, 1974, Polaris Western entered into a written contract with Eng & Wright wherein the latter agreed, amongst other things, to prepare working drawings and specifications for the renovation of the Building, an extension to the Building, the new Tower (including a revolving restaurant and public observation gallery), and additions and alterations to the existing parking and loading facilities.

66    During the month of March 1974, Donalco submitted a quotation to Foundation for the application of spray fireproofing

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

to the "Structural Slab of Former Spencer Building (Retail Area) and Miscellaneous Structural Steel". The quotation was based on the use of Monokote materials as specified, manufactured by Grace Construction Materials Ltd., Vancouver, B.C. After some negotiating, Foundation accepted Donalco's final quotation on August 8, 1974, and in the fall of that year, Donalco spray fireproofed the underside of the seventh floor of the Building. Once again, the work was performed pursuant to a work order from Foundation and the material used was Monokote MK-3.

67    In August 1974, Foundation and Polaris Western settled upon the terms of a construction contract. On December 4, 1974, they executed a letter agreement confirming those terms and adding others. However, in the meantime, registered ownership of the Project and development site had changed again. On November 22, 1974, Lord Realty had transferred a 50% interest to its wholly owned subsidiary, Lordina, and the remaining 50% interest to Privest. Accordingly, when Polaris Western entered into the December 4, 1974 contract, it did so on behalf of Lordina and Privest.

68    In January 1975, representatives of Foundation, Lordina and Privest executed a formal construction contract, dated the 1st day of August, 1974.

69    The final specifications for the Project were completed by Eng & Wright in the spring of 1975. Between March and October of that year Donalco spray fireproofed the remaining parts of the Building. Apart from certain painted surfaces which were sprayed with another material, Monokote MK-3 was used until mid-August, when Grace Canada decided to remove it from the Canadian market. Donalco then switched to Monokote MK-5 to finish the job.

70    MK-3 contained approximately 12-13% asbestos fibres, whereas MK-5, which Grace-Conn. had developed in response to the publicly raised health concerns about the use of asbestos-containing spray fireproofing materials, was asbestos-free. Cafco Blaze Shield, the material used on painted surfaces in the Building, was also an asbestos-free spray fireproofing material.

71    The entire Project was completed in 1976, and Harbour Centre then began operating as a multi-purpose complex, consisting of a shopping centre, a department store, an office tower and a restaurant. The major tenant in the Building was a Sears Canada department store, occupying floors one through five. The sixth and seventh floors became office space accommodating several tenants.

72    Mr. Jonathan Hall became the General Manager of Harbour Centre in February 1985, a position he holds today as well as that of Vice-President of Polaris Canada. He is in charge of all operating aspects of Harbour Centre, including building management, leasing and any renovations that are required.

73    Not long after Mr. Hall became the General Manager, Sears Canada indicated to him that they would like to leave the complex or, alternatively, substantially reduce the amount of space they were occupying. According to Mr. Hall, Sears was so anxious to leave that, were it not for the fact that their lease was a "very strong" one, binding them for a further 20 years of an initial 30-year term, they would have abandoned their entire space and left the Building.

74    Polaris Canada, which by then had replaced Polaris Western as the manager of the Harbour Centre complex, learned that the federal Department of Public Works ("the DPW") was looking for office space in downtown Vancouver for use by the Department of Fisheries and Oceans ("the DFO"). After deciding to pursue the DFO as a tenant for part of the space occupied by Sears, Polaris Canada entered into an agreement with Sears that, should the DFO become a tenant, Sears would vacate the third and fourth floors of the Building and "contribute" a sum of money to secure a partial release of its obligations.

75    Polaris then entered into negotiations with the DPW and, in the spring of 1986, submitted an Offer to Lease the third and fourth floors of the Building. In accordance with a DPW requirement that the entire Building be free of formaldehyde, PCBs and friable asbestos, the Offer contained the following warranty:

The lessor warrants that the building, premises and the lands are free of friable asbestos, hazardous formaldehyde and polychlorinated biphenyls (PCB) and the lessor covenants to keep the building, premises and the lands free of

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

      such materials throughout the term of this lease and any renewals thereof.

76    In response to an earlier request initiated by Mr. Hall for confirmation that the Building was asbestos-free, Eng &
Wright had advised by letter that:

      ... this is to confirm that the sprayed fireproofing and thermal insulation specified for the above project was
      Monocote [sic] distributed by Grace Construction Materials.

77    That letter satisfied Mr. Hall and it was included in the tender documents submitted to the DPW.

78    Polaris's offer was accepted and the DFO leased the entire third and fourth floors of the Building (including the
contiguous floors in the tower) together with a small area of the ground floor, giving them their own lobby and elevator
access from the street level.

79    The tender proposal called for substantial alterations to the third and fourth floors of the Building. The ceilings had to
be replaced and new lighting, heating and ventilation systems had to be installed. As well, the proposal called for the
installation of three new elevators running from the new separate entrance. The owners did not intend, while making those
alterations, to replace the existing fireproofing, only to patch and repair it where damage occurred.

80    Sometime in 1986, a patron of the revolving restaurant at the top of the Tower questioned whether the readily visible
fire-proofing material on the underside of its roof structure contained asbestos. An enquiry was made and Mr. Hall
subsequently received from Eng & Wright a copy of a letter from Donalco, dated May 16, 1986, advising that:

      ... I have concluded that from the weekly reports and a letter from Doug McKay (formerly with Donalco) to Jeff
      Holland of Foundation Co. that Monokote Type 5 as manufactured by W.R. Grace was used on this project.

81    Then, in late 1986, after the third and fourth floor ceilings had been removed and the existing fireproofing material was
disclosed, the general contractor hired to do the renovation work (not Foundation) expressed concern as to whether the spray
fireproofing in the Building was, in fact, asbestos-free. At Mr. Hall's suggestion, he had a sample taken and tested. It was
found to contain asbestos. Polaris Canada then communicated with Grace Canada who sent a representative to examine the
site. He recommended that further samples be taken and sent to a different lab for testing. That was done, and Polaris
subsequently received a letter from the lab advising that all six of the samples taken showed less than 1% asbestos content, a
finding which was considered the equivalent of asbestos-free. To double check, Polaris sent four more samples for testing
and the same result was obtained.

82    Following his inspection of the site, the Grace representative wrote to Polaris advising that:

      The information I have gathered dating back to the approximate time that fire protection was sprayed in the area
      concerned at the Harbour Centre indicates Monokote MK-5 to be the involved product. Our records show the
      complex was referred to as the Sears Centre, Spencer Building and Vancouver Square. The product shipped at that
      time was Monokote MK-5.

83    But he also suggested to Mr. Hall that further samples be taken and a particular type of test be performed, a test that
would determine conclusively whether or not asbestos was present. That advice was not followed. On the evidence that he
then had, Mr. Hall concluded that the tests performed for the contractor were faulty, and that the Building was asbestos-free.
The renovation work continued.

84    During a regular inspection of the work being performed on the third and fourth floors of the Building, a representative
of the B.C. Workers' Compensation Board took some bulk samples of the spray fireproofing material that had been dislodged
and was lying about on the floors. Those samples were tested and found to contain in excess of 1% chrysotile asbestos. As a
result, on March 30, 1987, the Board issued the order which brought the renovation work to a halt. It stated that:

    LAB ANALYSIS OF BULK INSULATION SAMPLE CONFIRMS THE PRESENCE OF CHRYSOTILE

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

ASBESTOS.

ASBESTOS CONTAINING MATERIAL IS IN A DAMAGED CONDITION, SOME MATERIAL HAS ACCUMULATED ON THE FLOOR. WORKERS IN THIS AREA WERE NOT WEARING RESPIRATORY PROTECTION.

THIS ENDANGERS THE HEALTH & SAFETY OF WORKERS AND IS CONTRARY TO INDUSTRIAL HEALTH & SAFETY REG. 804 & 204.

EFFECTIVE IMMEDIATELY, NO UNPROTECTED WORKERS SHALL BE ALLOWED IN THIS AREA. PROPERLY TRAINED & EQUIPPED WORKERS SHALL CLEAN UP FALLEN INSULATION MATERIAL.

A HAZARD ASSESSMENT DETAILING PROPOSED CORRECTIVE ACTION SHALL BE SUBMITTED TO WCB PRIOR TO THE START OF ASBESTOS CONTROL.

85    On the same day that the WCB order was issued, Polaris Canada retained Pinchin-Harris & Associates Ltd. ("Pinchin-Harris") to survey and establish the extent of asbestos-containing material ("ACM") within the third and fourth floors of the Building (those leased to the DFO) and throughout the balance of the Building. They asked Pinchin-Harris to make recommendations with regard to "control options" for that material.

86    Polaris Canada also informed Sears and the DFO of the situation, and immediately embarked on a "damage control" programme with respect to the serious problem they had on their hands. In short, they decided to take all necessary steps to retain their new tenant.

87    In argument, the plaintiffs put it this way; they said:

Before receiving the Pinchin Harris report, but after taking advice from Pinchin Harris, the Owners decided that the asbestos-containing material should be immediately removed from the third and fourth floors. This decision was made as "damage control": they could not afford to lose the DPW tenancy, it meant millions to the project in terms of rent and would provide a needed boost to the retail area because of the 500 new employees.

88    Pinchin-Harris completed their report on May 2, 1987. In it they advised that between March 30 and April 27, 1987, they had conducted a "cursory" survey of the Building and its associated structures, and that bulk samples of "suspect material" had been taken and analyzed. They reported that four types of friable asbestos-containing materials ("ACMs") were found "or assumed to be present" and they provided an assessment, on an area-by-area basis, of the condition and the potential for disturbance or erosion of the ACMs that had been found in the Building.

89    However, long before that Report was issued, Mr. Hall and other representatives of the Building owners had agreed with the DPW that, not only would the existing spray fireproofing material be removed from the third and fourth floors immediately, but that it would be removed from the rest of the Building as well, over time and coincidental with planned renovations or scheduled lease terminations.

90    In the spring of 1987, Simon Fraser University expressed an interest in leasing the mezzanine, first and second floors of the Building, space still occupied by Sears, for its Downtown Campus. SFU also required the removal of all asbestos from the proposed premises before they would lease the space. The owners agreed to do that, and a lease agreement was signed in the fall of 1987. Sears terminated its tenancy of those areas in December of that year.

91    Of course, under the terms of the agreement with the DPW, the owners would, in any event, have had to remove the existing asbestos-containing fireproofing material from the space to be renovated for occupancy by SFU, and then from any other areas subsequently renovated. However, in the case of SFU and other new tenants, the plaintiffs say that the removal of the asbestos-containing material delayed the new tenants' occupation of the renovated premises and resulted in a further loss of rental income.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

### III. The Plaintiffs' Knowledge

#### *Introduction*

92     The extent of the plaintiffs' actual or imputed knowledge concerning the asbestos content of the spray fireproofing material that was specified for installation in the Building is one of the most important issues in this case. Indeed, it is so important that the Grace defendants devote more than 500 pages of their main argument to the subject, and another 33 pages in surreply.

93     The issue is relevant to the plaintiffs' allegation that the defendants were under a duty to warn them of the presence of asbestos in the spray fireproofing material to be installed in the Building, and to the defendants' assertion that the plaintiffs' claims are time-barred.

94     The Grace defendants plead that at the time the material was installed in the Building, the plaintiffs knew that:

95     (a) asbestos was an ingredient of many construction products and building components, including sprayed fireproofing; and

96     (b) during the construction of the Harbour Centre complex there were publicly voiced "concerns about the hazards of asbestos in certain circumstances and that in certain circumstances asbestos could be hazardous to human health or workers' safety".

97     They have also pleaded that Eng & Wright, Webb Zerafa and McKenzie Snowball (the "design professionals") were retained by the plaintiffs because of their knowledge and expertise. They say that those parties were the plaintiffs' "agents to know" for all purposes in connection with the materials to be used in the Building, and that their knowledge, whether actual or constructive, must be imputed to the plaintiffs.

98     The Grace defendants have also pleaded that the plaintiffs and their agents were aware at all relevant times that the presence of asbestos in sprayed fireproofing materials was the subject of controversy, that both asbestos-containing and asbestos-free formulations of sprayed fireproofing products (including Monokote) were available, and that the Grace defendants could have provided an asbestos-free product if that requirement was specified.

99     And all of the defendants have pleaded that the plaintiffs' claims are time-barred because the facts within their means of knowledge were such that the provisions of s. 6(3)(*i*) and (*j*) of the *Limitation Act* are applicable.

#### *Discussion*

100     The extent of public and industry awareness in Canada regarding the concerns that were being expressed at the time the MK-3 was installed in the Building about asbestos-related health hazards was commented upon judicially by the Quebec Court of Appeal in *Canadian Indemnity Co. v. Canadian Johns-Manville Co.* (1988), 54 D.L.R. (4th) 468. The question arose in that case because Canadian Indemnity rejected a claim on the ground that the insurance policy it had issued was invalid because the insured, Johns-Manville Co., had not fully informed it about the nature of the risks. In answer, the insured placed before the court numerous medical, scientific, newspaper and magazine articles, as well as conference proceedings in order to demonstrate that the health hazards of asbestos were of "public character and notoriety" in the late sixties and early seventies.

101     Writing for the court, Mr. Justice Rothman stated at p. 476-77 that:

> Quite apart from the many studies and reports on asbestos-related health hazards published in various medical and scientific journals prior to the issuance of the policy, there were numerous articles published in newspapers across Canada and in the United States dealing with asbestos-related health hazards, including those mentioned in the Selikoff reports. Many of these were published prior to the issuance of the policy in 1970 and its renewal in 1973. By the time the present proceedings in nullity were taken by the insurer in 1979, there were hundreds of articles

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

dealing with asbestos-related health hazards published in Canada.

Nor, with respect for the opinion of the trial judge, do I believe we can ignore the articles published in American newspapers and magazines when assessing the public character and notoriety of the facts in question. There may well be a question of weight or appreciation of the likely impact of those publications on an insurer in Canada, but the evidence would certainly be relevant and admissible.

In this case, some of the articles in question were published not in obscure publications. These were prominent articles in the New York Times, the Wall Street Journal, The New Yorker Magazine, The Washington Post and others.

On October 12, 1968, for example, The New Yorker carried a lengthy article by Paul Brodeur describing in some detail the work of Dr. Selikoff and his associates and the very high frequency of asbestosis among asbestos insulation workers. A news story appeared in the New York Times on the cancer risk as early as October 7, 1964, again quoting Dr. Selikoff. Canadians, and Canadian insurers in particular, are not isolated from the mainstream of news and knowledge in North America and, in my respectful opinion, these American articles were relevant to the issue of the public character of asbestos fibre hazards, at the very least as a complement to the Canadian material that was put in evidence.

102   Mr. Justice Rothman concluded at p. 480 that:

If the media accounts left him in any doubt as to the precise extent of the risk or as to the details contained in the Selikoff reports, any inquiry within the industry or even the most superficial research outside of it would have brought forward this information.

103   The case went to the Supreme Court of Canada: (1990), 72 D.L.R. (4th) 478. There, Gonthier J., writing for the court, upheld the reasoning of Rothman J.A. and specifically adopted the statements quoted above.

104   The Supreme Court held that when considering the obligation to be informed, the standard to be applied is that of the reasonable insurance underwriter. Consequently, while the average member of the public might not be aware of certain facts, those same facts would be notorious in the underwriting industry because of its position. As Gonthier J. put it at p. 508:

The insurer will be presumed to know only those facts which are publicly available and which would be notorious to the reasonably competent underwriter insuring similar risks in that industry.

105   Gonthier J. continues at p. 509:

Once it can be said that the reasonably competent underwriter would have been aware that the handling of asbestos and asbestos products involves a serious danger, then it is up to the Insurer to consult, if it wishes, the publicly available information in order to find the exact statistics on the actual severity of the risk.

106   In my opinion, the same standard should apply to a person whose duty and responsibility it is to oversee and direct a major real estate development project.

107   I will now explore, in some detail, the knowledge and means of knowledge of Mr. Geoffrey Kendrick, who was employed by Polaris Western as the Harbour Centre Project Manager during a critical stage of the construction of the complex and the renovation of the Building. I will then note a relevant piece of evidence given by Mr. Karsten von Wersebe who was an officer of Lord Realty and Polaris Western during the development phase. Finally, I will discuss some of the evidence relating to Mr. Vincent Strother who was employed by Polaris Western in May 1975 as Clerk of the Works on the Project, after having been employed for several years by Donalco.

108   In light of my conclusions regarding the knowledge and means of knowledge of the plaintiffs through those three persons, I do not find it necessary to consider the extent to which the knowledge or constructive knowledge of the design

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

professionals affects the plaintiffs.

109    Mr. Kendrick joined Polaris Western in 1974 as Project Coordinator for the entire Harbour Centre development. Later, he became the Project Manager, a position he occupied until the development project was completed.

110    Mr. Kendrick was well qualified for the job. He held a certificate in mechanical engineering. In 1964, he became a member of the Institute of Heating and Ventilating Engineers in the United Kingdom. During 1966, he spent three months studying industrial ventilation and air pollution at Michigan State University. In 1972, he became a member of the National Society of Professional Engineers in the United States.

111    Between 1965 and 1967, Mr. Kendrick was employed by a division of the Foundation Company of Canada as a section design engineer, working on air conditioning and machine ventilation. Between 1970 and 1974, when he joined Polaris Western, Mr. Kendrick was employed by H.A. Simons International in Vancouver as Assistant Manager, Project Planning. While holding that position, he was involved in the construction of a pulp and paper mill in New Zealand, and in the construction of a new building for Imperial Oil Limited at its Ioco refinery.

112    As project coordinator for Polaris Western, it was Mr. Kendrick's responsibility to co-ordinate the activities of the architects, the engineers, the contractor and all of the other persons involved in the project. In fact, he spent the major part of his time at the construction site.

113    Mr. Kendrick testified that, after assuming the position of project coordinator, he read the specifications identified as Pt. I, Retail Parkade, and Pt. II, The Tower, but did not notice the difference between the specifications for spray fireproofing materials to be used in those two areas. He said that he was not then familiar with the different kinds of spray fireproofing materials, and that he had no previous experience with Monokote products. In fact, he said, he had never before been involved in a project where an asbestos-containing spray fireproofing material had been used.

114    One of the documents produced by the plaintiffs is a Hazard Alert Bulletin, issued in 1975 by what was then the British Columbia Workmen's Compensation Board, entitled "Asbestos Exposure in the Construction Industry". It speaks of the diseases possibly associated with the inhalation of asbestos fibres and provides a series of recommended steps to be taken to "prevent adverse health effects". Mr. Kendrick acknowledged that this type of bulletin would, in the normal course, have come to his attention.

115    On examination for discovery, Mr. Kendrick testified that he could not be specific as to when he first became aware that asbestos was or could be a hazardous material, but that it was likely to have been in the mid-1970s. When that statement was put to him in cross-examination, he acknowledged that it was "probably" wrong, and said that:

> The point I was trying to make in answering these questions is that I couldn't -- I couldn't put an absolute fix on when I became -- had the knowledge that asbestos was a hazardous material. Certainly, I fully believe -- in fact, I know that when we were building Harbour Centre that I had knowledge of the problems of asbestos ...

> I'm saying that I cannot put a fix on the date when I became fixed with the knowledge of an asbestos problem. What I certainly can confirm is that the -- at this time that we were building the Harbour Centre, that to the extent that there was any asbestos in the fireproofing or any other material, then I would have been aware -- if I was aware of it, that I would have brought it to everybody's attention, and I wouldn't have allowed it to go through, not at all.

116    On May 8, 1975, Foundation forwarded to Mr. Kendrick copies of two brochures they had received from Donalco. One of them related to a spray fireproofing product known as Cafco Blaze Shield, and the other to the Monokote products then available. The phrase, "*No Asbestos*", appears in bold letters on the cover page of the Cafco brochure. When asked in direct examination whether seeing that statement alerted him to make further inquiries into the matter of the spray fireproofing material to be used, Mr. Kendrick said it did not because:

> ... I always believed there was no asbestos in the building anyhow. I wouldn't have even considered there would be

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

asbestos in the building, so.

Q. And why is that? Explain why that you assumed there was no asbestos in the building?

A. Well, very simply I have knowledge or had knowledge at the time that asbestos was a hazardous material, and I think I have given previous indications of that of -- in the various discoveries that I have had, and had I known at the time that we -- that there was asbestos or any -- any -- any thought of putting asbestos in -- in the building, particularly in this kind of material when -- when it's spread all over the place, I am sure I would have brought it to somebody's attention. First of all, I don't think I would have allowed it, but certainly I think we would have a general discussion with the engineers and the architects and the contractors about it to the point we would have I am sure found another -- either a different way of -- of doing the work or at least come to some understanding of what -- what was -- what was happening, and this issue never came up on the project, never at all. The fact that there is asbestos in the -- in this building was a surprise to me as I am sure it is to -- to everybody else.

117    A Specification Note in the Monokote brochure which Foundation sent to Mr. Kendrick stated that:

If non-asbestos materials are required, substitute Monokote Type 4 asbestos-free.

118    Mr. Kendrick testified that he could not recall whether he saw that specification note at the time, but said that if he had, and had then related it back to the project specifications, it would "possibly" have raised a question in his mind as to whether or not the specified material contained asbestos.

119    Under cross-examination by Mr. McDonell, Mr. Kendrick again asserted that, despite his wide experience in the construction industry and his awareness that, in some cases, spray fireproofing did contain asbestos, and notwithstanding his review of the Cafco and Monokote brochures, he "assumed" that the specification of "Monokote" simpliciter called for an asbestos-free product.

120    As the following excerpts show, Mr. McDonell effectively explored that astounding assertion:

Q. And despite all of your concerns you never put any of your concerns about asbestos into writing, did you?

A. No, because, as I indicated previously, we all assumed or I assumed there was absolutely no asbestos in the project, certainly in the fireproofing. Now, since that time I -- you've -- as you've pointed out, there may have been asbestos in the packing and may have been asbestos in the V.A. tile. But the job per se was asbestos free.

Q. And that's an assumption you had?

A. That's an assumption I had, and that's an assumption I held right up until the commencement of this litigation.

Q. And that assumption is based on absolutely no communication with any other individual, isn't it?

A. No, we assumed that it was not -- there was no fireproofing in.

Q. Who is "we"?

A. The architect -- I think you'll find the architect. I think you'll find when you question the contractors. I think when you find that you question everybody else that everybody else was under the assumption that there was no asbestos in the fireproofing, and to the extent there was, well, then somebody hoodwinked us. Somebody deliberately did something which was against our best interest.

Q. You never asked anyone?

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

A. No, I don't ask whether the sun is going to come up tomorrow. I expect it will, and I expect it will go down tonight. But it's very important to me, and I suggest it's very important to you.

Q. Well, you knew that there were concerns about the spray fireproofing on the job, didn't you?

A. There were concerns, but there were not concerns raised with respect to asbestos. There were concerns raised with respect to over-spray. There were concerns raised with respect to having a conformity of application. There were concerns with respect to it -- it sticking to the -- the surfaces it was supposed to stick. Half the stuff came down. And there was a lot of concerns raised, and if anybody thought for a moment it had asbestos in it I can assure you it would have been raised, discussed infinitum until there was a solution for it or until we'd found some way -- other way of dealing with it.

Q. I am going to ask that the witness have a copy -- I've taken -- it's an extract from the Statement of Claim filed October 4, 1991, paragraph 47 ...

Q. Paragraph 47, the last paragraph, I am going to read this to you, Mr. Kendrick:

In or about April 1975, the spray fireproofing work was interrupted because plumbing and sheet metal sub-trades were not prepared to work adjacent to where the spray fireproofing was being applied as they believed the spray fireproofing was harmful to their health.

Did you follow me?

A. Yes.

Q. You recall that incident, don't you?

A. No, I do not.

Q. Turn, please, to tab 3 of the discovery volume from Mr. Hunter's discovery.

A. Where are we now ...

Q. Thirty-nine. Yes. Question 150:

In the Statement of Claim in its newest form -- but it's been something that's been in the Statement of Claim for some time -- it says at paragraph 47 in part:

In or about April 1975 the spray fireproofing work was interrupted because plumbing and sheet metal sub-trades were not prepared to work adjacent to where the spray fireproofing was being applied as they believed the spray fireproofing was harmful to their health.

Now, first of all, do you recall, sir, any interruption in the work of the spray fireproofing in April 1975 as alleged here in paragraph 47?

A. I don't have a specific recollection in regards to the dates, no.

Q. Any general recollection of any interruption to the sprayed fireproofing work as alleged in paragraph 47 of the Statement of Claim?

A. Yes, I do.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

Q. Were you asked those questions?

A. Yes, I did.

Q. Did you give those answers?

A. Yes, I did.

Q. Are these answers true?

A. Yes, they are.

Q. You recall discussing around this time different kinds of sprayed fireproofing with Eng & Wright's representative also, don't you, Mr. Kendrick?

A. I'm sorry?

Q. In or around this time, April 1975, you had discussions with Mr. Schadow, Eng and Wright's representative, in regard to the different kinds of fireproofing being used?

A. I don't believe so, no.

Q. Could you turn, go back to tab 1 of your volume and turn to page 81 ...

MR. MCDONELL: Thank you. 453 question:

Now you recall some conversation with Mr. Schadow with respect to the different kinds of fireproofing that was being used; is that correct, in around April of '75?

A. Yes.

Were you asked that question?

A. Yes, I believe I was.

Q. Did you give that answer?

A. Yes.

Q. Is that answer true?

A. Yes.

Q. You were present on site when the spray fireproofing was being applied, weren't you?

A. Yes.

Q. And after the time you discussed different kinds of spray fireproofing with Mr. Schadow and after the time you recall a work stoppage in regard to spray fireproofing that's when you received the brochures that Mr. Hunter showed you, that is in May of 1975; is that right?

A. Yes.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

121    When it came his turn to cross-examine, Mr. Hayley took up the chase as follows:

Q. ... Now, I understand from your evidence that you have given the last couple of days that at the time of the Harbour Centre project both you and your superior, Mr. David Yolles, had been involved in construction for a number of years?

A. Yes.

Q. And you yourself had been involved at various times with the design aspects of construction, you were familiar with plans and specifications?

A. Yes.

Q. You have given that evidence. And, Mr. Kendrick, it was your evidence yesterday under quite close questioning that you were aware during the course of construction at Harbour Centre that asbestos in certain circumstances could pose a danger to health?

A. Yes.

Q. You also told Mr. McDonell under cross-examination that you knew that some fireproofing and insulation materials contained asbestos?

A. Yes.

Q. You knew that at the time of Harbour Centre?

A. Yes.

Q. You have given evidence that when you started your work at Harbour Centre you read the original specifications for the project, both the Paine specification for the tower and the Eng & Wright specification for the retail section which included the Spencer Building?

A. Yes.

Q. And you have given evidence that your reading would have included the fireproofing specifications in those documents?

A. Yes.

Q. So that when you read the Paine spec for the tower you would have seen that Mr. Paine had specified Monokote Type 4 asbestos-free fireproofing for the tower?

A. Yes.

Q. And you also knew as a result of your reading that Eng & Wright had not included such an asbestos-free requirement in their specification for the low-rise section of the project, that is, they merely required "cementitiously applied Monokote"?

A. Yes.

Q. Now, after you started in the project -- approximately what, February 1974?

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

A. That's correct.

Q. Mr. Paine had some involvement for a fairly brief period of time?

A. Very brief, maybe a month, maybe a month and a half. I only met with him once or twice.

Q. But then his retainer was terminated?

A. That's correct.

Q. By Polaris?

A. Yes.

Q. But Eng & Wright, as you have given evidence, continued as the site architects and responsible for the production of working drawings, site supervision and the final specification?

A. Yes.

Q. And you have given evidence, I believe, Mr. Kendrick, that Eng & Wright prepared the basic brief architectural specification that document in February of 1974 that adopted by reference the fireproofing spec that Eng & Wright had previously given for the Spencer Building in the original specs, that is, they referred back to those previous specifications and they referred back to the retail portion only?

A. Yes.

Q. Basically the brief architectural specification was intended, though, to apply to the entire project?

A. There was an outline specification jointly prepared by Webb Zerafa and Eng & Wright.

Q. But it was intended to apply to the entire project, high-rise or tower, low-rise section?

A. That's correct.

Q. So that turned back to the original Eng & Wright specification that said cementitiously applied Monokote?

A. Yes.

Q. And you have given evidence that you read the outline specification dated February 26, 1974 prepared by Eng & Wright and Webb Zerafa that again had no asbestos-free requirement, but simply specified Monokote?

A. That's correct.

Q. And I believe you have given evidence that you read, reviewed the final specifications for this project prepared by Eng & Wright in which the fireproofing specification called for cementitiously applied Monokote and once again had no asbestos-free requirement?

A. That is correct.

Q. Now, in the spring of 1975 you were advised that there was another fireproofing product, Cafco, that was being sprayed on this project, correct?

A. I believe so, yes.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th) 577

Q. You were provided with a brochure --

A. Yes.

Q. -- at this time, a Cafco brochure as well as a Monokote brochure?

A. Yes.

Q. And you have given some evidence that you would have reviewed these in the normal course, if not in excruciating detail, that you would have at least been aware of these and you would have perused them, correct?

A. Yes. I believe my evidence was that I most probably would have normally thumbed through them, yes.

Q. Thumbing through would have indicated to you that the Cafco product was asbestos-free because those big words leap off the page?

A. Yes, but, as I think I have already previously said, I probably would not have distinguished the difference between the two.

Q. But you would have seen Cafco?

A. I would have seen Cafco and I would have seen asbestos-free, yes.

Q. Now, a reading of the Monokote brochure, would it indicate to you that there were both asbestos-free and asbestos-containing formulations and that if you wanted an asbestos-free product you had to specify Monokote Type 4 asbestos-free; you have seen that in that brochure?

A. I have seen it subsequently to my -- obviously the original document that had flown across my desk, yes.

Q. Now, that's exactly what Mr. Paine specified for the tower, isn't it, precise phrase, Monokote Type 4 asbestos-free?

A. That was in the original specification, yes.

Q. Right. And that's not what was specified by Eng & Wright in any of these other specifications, correct?

A. That's correct.

Q. And that's also not what was specified by Eng & Wright and Webb Zerafa or either of them in the outline specification, February 26, 1974, which was incorporated by reference in the construction contract?

A. That's correct.

Q. The job proceeded on the basis not of Mr. Paine's spec, but on the basis of the outline spec of February 26, 1974 and subsequently the final specs that were drafted by Eng & Wright?

A. That's correct. The two different -- two different buildings, Mr. Paine's, Charles Paine's building was a totally different design compared with that of Webb Zerafa, he not only did the drawings change but also the specifications changed.

Q. I appreciate that, but there is none of Mr. Paine's wording in the specifications that were actually used on this job?

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

A. That's correct.

122    During that cross-examination, Mr. Hayley also established that Mr. Kendrick kept a close eye on the work going on in the Building and was familiar with most, if not all, of the materials and products being used, including several other asbestos-containing materials.

123    On the strength of those effective cross-examinations, I reject as patently false Mr. Kendrick's assertion that "I always believed there was no asbestos in the building" and "I wouldn't have even considered there would be asbestos in the building".

124    I find his assertion that he "assumed" that the spray fireproofing product used would be asbestos-free to be entirely unreasonable, if not untrue. If, in fact, Mr. Kendrick did not know that the spray fireproofing product that had been specified for installation was not asbestos-free, given the extent of his knowledge and experience, he clearly ought to have known.

125    Another significant piece of evidence was given by Mr. Karsten von Wersebe, whose testimony on discovery was read in by the Grace defendants.

126    Mr. von Wersebe became a Vice-President of Lord Realty in 1972. In 1973, he became President of the newly-formed Polaris Western and continued in both positions until the middle of 1976. As such, he was closely involved in the development of the Harbour Centre complex and the renovation of the Building.

127    Mr. von Wersebe acknowledged that at the time of his involvement he was aware of health concerns about asbestos and he said, "... in Vancouver there was quite a bit of talk about it". He testified that:

> Well, the -- obviously, I mean we in the building industry, from an ownership point of view, were made aware that fireproofing with asbestos is becoming, you know, hazardous for health reasons and that other materials ought to be used.

128    An important (albeit somewhat shadowy) person in connection with this matter is Mr. Vincent Strother. In May 1975, he was hired by Mr. Kendrick as Polaris's Clerk of the Works at Harbour Centre. Mr. Strother came to Polaris with an extensive background in the asbestos and fireproofing industries. He had worked in England with the well-known asbestos company, Turner & Newall (now T & N), in 1947 "doing experimental work on construction equipment and asbestos machinery". After emigrating to Canada, he was employed by a number of companies dealing with fireproofing and other asbestos products. From 1973 through to May 1975, Mr. Strother was employed by Donalco where he was involved with numerous large fireproofing projects both in the Toronto and Vancouver areas, including the Harbour Centre project. He was Donalco's Vancouver office manager and, as such, had full responsibility for all of the fireproofing work sub-contracted to Donalco at Harbour Centre.

129    Under construction at the same time as the Harbour Centre project was the Vancouver Centre development. The fireproofing specification for that project expressly called for an asbestos-free formulation of Monokote. On the evidence, I find that Mr. Strother was familiar with both fireproofing specifications and the different products called for by them. I also find that he was familiar with the various Monokote products then available, including the asbestos-containing MK-3 and asbestos-free MK-5, as well as which product was required for each project.

130    In direct examination, Mr. Kendrick acknowledged that when he hired Mr. Strother he knew that his most recent employment had been with Donalco, and that Mr. Strother had a "deep knowledge of fireproofing". But he went on to testify as follows:

> Q. Did you ever have discussions with Mr. Strother which provided you with information that spray fireproofing contained asbestos?

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

> A. No, not at all.
>
> Q. Did the subject of asbestos ever come up in your discussions with Mr. Strother?
>
> A. No, it certainly didn't.
>
> Q. Did you know from discussions with him that there was more than one kind of Mono-Kote [sic] product?
>
> A. No, we -- we never had a discussion about the -- fireproofing in general or fireproofing on the job.

131    Mr. Strother did not testify. It seems that prior to the trial he was engaged in assisting, not only the plaintiffs, but Foundation and the Grace defendants as well. No one wanted to call him as a witness, so it was agreed by all parties that no one would suffer from an adverse inference being drawn from the fact that he was not called as a witness.

132    As a general rule, the knowledge of an "agent to know" that is relevant to his engagement is imputed to his principal, whether or not the information was, in fact, conveyed to the principal: *Rolland v. Hart* (1871), 6 Ch. App. 678; *Purdom v. Northern Life Assurance Co. of Canada*, [1928] 4 D.L.R. 679 (Ont. C.A.), affirmed by the Supreme Court of Canada: [1930] S.C.R. 119; and *Greveling v. Greveling*, [1950] 2 D.L.R. 308 [[1950] 1 W.W.R. 574] (B.C.C.A.).

133    However, the plaintiffs maintain that Mr. Strother was not their "agent to know". They say that he was hired simply as Clerk of the Works; not for his knowledge or expertise in spray fireproofing. As Clerk of the Works, they insist, his only responsibilities were to measure the quantities of all construction and materials supplied for the purposes of calculating progress payments to be made to the sub-contractors, and not to advise about the spray fireproofing. Therefore, they say, Mr. Strother's knowledge did not become their knowledge, either actually or at law, and whatever he knew about the presence of asbestos in MK-3 does not affect them.

134    While I have grave doubts about Mr. Kendrick's insistence that he never discussed the subject of fireproofing with Mr. Strother, thaas I did not hear from Mr. Strother himself, I am not prepared to rule upon that matter. Nor do I find it necessary to decide whether or not he was an "agent to know". But Mr. Strother was there, on the site, working closely with Mr. Kendrick, and he knew that the MK-3 contained chrysotile asbestos.

135    On the evidence, I have no hesitation in finding that if, in fact, Mr. Kendrick expected that an asbestos-free fireproofing material would be installed, he had sufficient personal knowledge to be put on his inquiry and a readily available source of information.

136    Mr. Kendrick was a qualified engineer, with experience and training in the fields of heating, air conditioning and ventilation. He knew that plenums -- the spaces between the dropped ceilings and the underside of the floors above -- were used for air circulation and ventilation purposes. He knew of the concerns then being voiced about the use of asbestos-containing building materials, particularly asbestos-containing spray fireproofing materials. He knew that there were both asbestos-containing and asbestos-free varieties of spray fireproofing products currently on the market. He reviewed the specifications for both parts of the development and knew that one called for an asbestos-free fireproofing material and the other did not. He received and, at the very least, "thumbed through" the Cafco and Monokote brochures. He knew, or ought to have known that, so far as the Monokote products were concerned, if an asbestos-free material was required, that had to be stipulated in the specification. He had discussions with a representative of Eng & Wright following a work stoppage that was the result of concerns about the safety of the fireproofing material being sprayed onto the Building. And finally, he knew that he had in his employ the very man, Vincent Strother, who could provide him with all of the necessary information on the subject.

137    Yet, the plaintiffs ask this court to accept that, despite all that, Mr. Kendrick had no idea that MK-3 contained asbestos, and that he remained silent because he felt secure in the "assumption" that an asbestos-free material would be installed.

138    I do not accept that proposition. It flies in the face of reason.

Copr. © West 2007 No Claim to Orig. Govt. Works

11 B.C.L.R. (3d) 1, [1995] **10 W.W.R. 385**, 23 C.L.R. (2d) 1, 128 D.L.R. (4th)
577

139    In my view, Mr. Kendrick had more than enough knowledge to arouse his attention. If his expectation was what he says it was, he should have been on his guard and made some inquiry. Whatever is sufficient to excite attention and call for inquiry is also notice of everything which (it is afterwards found) such inquiry might have disclosed, even though it remained unknown for want of investigation: *Graham v. British Canadian Loan & Investment Co.* (1898), 12 Man. R. 244 (C.A.).

140    I find that Mr. Kendrick knew, or must be deemed to have known, that the fireproofing product that had been specified by Eng & Wright, and which he approved for installation in the Building, contained asbestos.

**IV. The Fireproofing Specifications**

141    The plaintiffs argue that, notwithstanding the extent of their own knowledge, Eng & Wright (in particular, Messrs. Wright and Thomas) had a duty to know that Monokote MK-3 contained asbestos and was a hazardous product. They say that the fireproofing specification prepared by Eng & Wright, which called for the installation of "cementitiously applied Monocote [sic]" rather than an asbestos-free material, did not measure up to the standard expected of a reasonably competent architect at that time.

142    The plaintiffs say that Pt. II of the fireproofing section of the Outline Specification assembled in November 1972, in which Paine & Associates specified "Spray fireproofing -- Cafco Asbestos free. Monocote [sic] etc." for installation in the Tower, ought to have alerted Mr. Wright to the fact that an asbestos-free material was also required for the Building.

143    Mr. Wright admitted that he did not read the Pt. II fireproofing specification. Clearly, he should have done so. However, it does not necessarily follow that, even if had, he would, or should, have realized that an asbestos-free material must also be specified for installation in the Building.

144    That hypothesis requires one to interpret the Paine specification of "Cafco Asbestos free. Monocote [sic] etc." as requiring the "Monocote [sic] etc." (presumably acceptable substitutes) to also be asbestos-free. That, in my view, would be a tortured interpretation of those words. Surely, if that was his intention, the writer would have specified the use of "Cafco Asbestos free. Asbestos free Monocote [sic] etc.", or words to that effect.

145    No one was called from Paine & Associates, and one is therefore left to speculate as to the intention of the specification writer. That is an inadequate basis on which to reach the conclusion suggested by the plaintiffs.

146    In December 1972, Eng & Wright received, and both Mr. Wright and Mr. Thomas read, a letter from F. Drexel Co. Ltd., the distributor of another type of sprayed fireproofing. That letter read, in part, as follows:

> *Attention: Mr. Don Thomas*
>
> Subject: Vancouver Square Development
>
> *Vancouver, B.C.*
>
> Dear Sir:
>
> Reference the spray fireproofing requirements for Eng & Wright's portion of this project, it was suggested by Mr. Wright that I forward technical literature pertaining to our product line directly to your attention.
>
> Specifically Don, I am forwarding data relative to Ceramospray IV, a *Non-asbestos* sprayed on fiber insulation. I understand that a material of this type (i.e. containing no asbestos fiber) would be desirable in this instance.
>
> Ceramospray is U.L. rated and I am sure we can provide you the rating required. (emphasis in original)

147    The plaintiffs argue that the Drexel letter ought to have alerted both Mr. Wright and Mr. Thomas to the fact that