Privest Properties Ltd.v. Foundation Co. of Canada Ltd., 1997 CanLII 2886 (BC C.A.)        Page 4 of 19

**Reasons for Judgment of the Court:**

## NATURE OF APPEAL

[1]  This is an appeal from the decision of Mr. Justice Drost pronounced 16 September 1995 dismissing the plaintiffs' claims against the defendants, dismissing the third party claims, and allowing the counterclaim of The Foundation Company of Canada Limited ("Foundation") for its expenses in defending the action.    The action arose out of the installation, and ultimate removal, of asbestos-containing spray fireproofing, Monokote ("MK-3") from a building owned and\or managed during the relevant period by the plaintiffs.   The trial involved 182 days of evidence over a period of two years and resulted in a 309-page judgment.

[2]  The trial decision is reported at 1995 CanLII 3385 (BC S.C.), (1995), 11 B.C.L.R. (3d) 1; [1995] 10 W.W.R. 385; 128 D.L.R. (4th) 577; 23 C.L.R. (2d) 1.

## ISSUES ON APPEAL

[3]  The plaintiffs submit that Mr. Justice Drost erred in:
1.    finding that MK-3 was not an inherently dangerous product;

2.    finding that Geoffrey Kendrick (the project manager), and therefore the plaintiffs, "knew, or must be deemed to have known, that the fireproofing product specified by Eng & Wright ... for installation in the building contained asbestos";

3.    holding that the plaintiffs' claims were barred by the *Limitation Act*, R.S.B.C. 1979, c. 236;

4.    finding that a 1977 Settlement Agreement with Foundation applied to bar the plaintiffs' claims against Foundation, the Grace defendants, and Donalco Services Ltd.

## CONCLUSION

[4]  For the reasons which follow, we have concluded that Mr. Justice Drost did not err in finding, on the evidence before him, that MK-3 was not an inherently dangerous product.  Since our conclusion in that regard is determinative of the appeal, it is unnecessary for us to deal with the other issues raised.  We

would, therefore, dismiss the appeal.

**BACKGROUND**
[5]  Because the trial decision has been reported, we will limit
our comments to a brief description of the background giving
rise to this litigation.

[6]  The plaintiffs are the owners/managers of the Spencer
building (the "Building") which forms part of a large
retail/commercial complex in downtown Vancouver.  In 1973-1975,
the Building underwent construction, including the addition of a
tower.  During the course of construction, MK-3, a fire-proofing
agent, was installed in the Building.  Eng & Wright were the
architects on the project, Foundation was the contractor, and
Donalco Services Ltd. ("Donalco") was the installer.  Mr.
Geoffrey Kendrick, who played a significant role in the ensuing
litigation, was the project manager hired by the plaintiffs.
The MK-3 was manufactured and supplied by Grace Canada, which is
wholly owned by W.R. Grace & Co. - Conn. (the "Grace
defendants").

[7]  In 1987, the 3rd and 4th floors of the Building were
extensively renovated to meet the requirements of a new tenant.
During the course of that renovation some of the existing
fireproofing material was disturbed, and the presence of
asbestos-containing MK-3 in the Building came to the attention
of the Workers' Compensation Board (the "WCB").  The WCB issued
an order closing the area to unprotected workers.  Shortly
thereafter, the plaintiffs embarked upon an abatement program
which eventually led to the removal of most of the MK-3 fire-
proofing from the Building and its replacement with an asbestos-
free fireproofing product.

[8]  The plaintiffs commenced action in 1988 for damages
totalling $7,555,841. which they say they suffered as a result
of having to remove the MK-3 from the Building and replace it
with another fireproofing agent.  They maintained that they
removed the MK-3 because it was an inherently dangerous product
which caused physical damage to their property and which, when
disturbed, endangered the health and safety of Building workers
and occupants.  They claimed that they had no knowledge that MK-
3 contained asbestos until the time of the WCB stop-work order
and that, had they known, they never would have agreed to its
installation.

[9]  The plaintiffs framed their action against Foundation and
Eng & Wright in contract and in tort, and against Donalco and

Grace in tort.

[10] The trial judge found that:

    (1)  MK-3 was not an inherently dangerous product;

    (2)  The plaintiffs' claims were barred by the ***Limitation Act***;

    (3)  The plaintiffs knew or ought to have known that there was asbestos in the MK-3 fireproofing when it was installed;

    (4)  The Settlement Agreement signed in 1977 operated to bar the plaintiffs' claims against Foundation, Donalco and Grace.

[11] As earlier noted, all of these findings are challenged by the plaintiffs.

## ANALYSIS
### DANGEROUS PRODUCT

[12] The pivotal question in this case is whether the MK-3 in the Building was a dangerous product.  If the plaintiffs did not prove that it was dangerous, then all the other issues become academic.

[13] The trial judge found that MK-3 was not dangerous.  The plaintiffs argue on appeal that his finding related only to the allegation that the ambient air in the Building was contaminated.  They say that he did not decide the real issue in the action, which was the risk of harm to workers when their activities disturbed the fireproofing during maintenance, repairs, and renovations.  They submit that the evidence at trial established a serious hazard to worker health and safety.

[14] We do not think the plaintiffs can succeed on either contention.  Although the trial judge gave greater emphasis to the ambient air question his reasons show that he also decided the issue of workers' health.  As to the nature of proof, the plaintiffs advanced their case by an indirect approach when air sampling during disturbance activities would have shown conclusively whether the exposure to workers was dangerous.  The plaintiffs relied on the actions taken by regulators such as the Environmental Protection Agency in the United States ("EPA") and the WCB regarding the use and handling of asbestos-containing

fireproofing for the inference that MK-3 is dangerous to
workers.  The plaintiffs also presented the expert opinion of an
industrial hygienist who sampled dust and debris from the
fireproofing in the Building to determine the potential for
disturbance.  From those results the expert derived a conclusion
that the fireproofing had to be removed.

[15] Experts called by the Grace defendants challenged this
evidence.  The experts said that there is no scientific proof
that working with or around MK-3 in place would create a
measurable risk of harm.  They referred to tests that indicate
the contrary.  They further testified that regulators have erred
on the side of worker safety in banning MK-3 and in requiring
elaborate precautions.  The trial judge said that he preferred
the experts called by Grace.  He was not prepared to infer
dangerousness from the indirect evidence offered by the
plaintiffs.

[16] What does "dangerous" mean in a hazardous building products
suit?  In *Winnipeg Condominium Corporation No. 36 v. Bird
Construction Co.*, 1995 CanLII 146 (S.C.C.), [1995] 1 S.C.R. 85, the
court required the showing of "a real and substantial danger",
and held that the plaintiff must prove a "serious risk to
safety" (at 125) and that "the danger was substantial and
foreseeable" (at 130).  The parties appear to agree on this
definition.

[17] The specific danger alleged by the plaintiffs is the
inhalation of airborne fibres released from the fireproofing
which may cause serious illness in the form of asbestosis, lung
cancer or mesothelioma.  The plaintiffs' case was presented to
the trial judge on the basis that one asbestos fibre in the
atmosphere of the Building was too many.  They alleged that
fibres would enter the breathing areas of the Building as a
result of the natural breakdown of the surface of the product
over time and when the fireproofing was disturbed by mainten-
ance, repairs, and renovations.  According to the plaintiffs,
all occupants and users of the Building were placed in serious
danger by MK-3.

[18] The trial judge rejected the plaintiffs' theory, mostly
based on the evidence of their medical expert, Dr. Arthur Frank,
that there is no safe level of airborne asbestos fibres.  The
court preferred the defence experts' opinions on the risk of
harm.  They said, and the trial judge accepted, that the hazard
must be assessed according to the intensity of the exposure,
i.e., the concentration of the fibres in the breathing area, and

the duration of the exposure.  He expressed his preference in
this way at 173 (11 B.C.L.R. (3d)):

> Where there is a conflict between the evidence of
> Dr. Frank and the medical experts called by the Grace
> defendants, I prefer the evidence of the latter.  In
> my opinion, the plaintiff was not successful during
> cross-examination in refuting their very convincing
> opinions on this point.  A good deal of those cross-
> examinations consisted of putting to the witness other
> studies that suggested a contrary opinion.  Those
> studies were not, for the reasons I gave earlier,
> allowed into evidence for the truth of their contents,
> but only to test the veracity of the witness's
> opinion.

[19] We cannot interfere with the weight attached to expert
evidence by the trial judge.  In *Toneguzzo-Norvell v. Burnaby
Hospital*, 1994 CanLII 106 (S.C.C.), [1994] 1 S.C.R. 114, McLachlin
J. said at 121-2:

> It is by now well established that a Court of
> Appeal must not interfere with a trial judge's con-
> clusions on matters of fact unless there is palpable
> or overriding error. In principle, a Court of Appeal
> will only intervene if the judge has made a manifest
> error, has ignored conclusive or relevant evidence,
> has misunderstood the evidence, or has drawn erroneous
> conclusions from it: see *P. (D.) v. S. (C.)*,
> 1993 CanLII 35 (S.C.C.), [1993] 4 S.C.R. 141, at pp. 188-
> 89 (*per* L'Heureux-Dubé J.), and all cases cited
> therein, as well as *Geffen v. Goodman Estate*,
> 1991 CanLII 69 (S.C.C.), [1991] 2 S.C.R. 353, at pp. 388-
> 89 (*per* Wilson J.), and *Stein v. The Ship "Kathy K"*,
> [1976] 2 S.C.R. 802, at pp. 806-8 (*per* Ritchie J.). A
> Court of Appeal is clearly not entitled to interfere
> merely because it takes a different view of the
> evidence. The finding of facts and the drawing of
> evidentiary conclusions from facts is the province of
> the trial judge, not the Court of Appeal.
>
> The Court of Appeal justified its intervention on
> the ground that it was in as good a position to draw
> inferences from the evidence as was the trial judge
> (at pp. 121-22):
>
> > There is no issue with respect to the veracity of
> > these expert witnesses. As the trier of fact the

> trial judge was free to reject or adopt in whole or in
> part the evidence of experts he found qualified
> but in the absence of findings of credibility
> this court is in as good a position as the trial
> judge to review the expert evidence and to draw
> inferences of fact therefrom: *New Brunswick*
> *(Workmen's Compensation Board) v. Greer* (1973),
> [1975] 1 S.C.R. 347, 7 N.B.R. (2d) 171, 42 D.L.R.
> (3d) 595, 1 N.R. 99. It should undertake this
> task if the trial judge has failed to take into
> account some obvious feature of the evidence or
> has misapprehended its significance: *Croke (A*
> *Minor) v. Wiseman*, [1982] 1 W.L.R. 71, [1981] 3
> All E.R. 852 (C.A.), per Griffiths L.J. at p.859
> (All E.R.).
>
> I agree that the principle of non-intervention of
> a Court of Appeal in a trial judge's findings of facts
> does not apply with the same force to inferences drawn
> from conflicting testimony of expert witnesses where
> the credibility of these witnesses is not in issue.
> This does not however change the fact that the weight
> to be assigned to the various pieces of evidence is
> under our trial system essentially the province of the
> trier of fact, in this case the trial judge.
>                                      [Emphasis added]

[20] The WCB regulates occupational health and safety.  It sets
threshold limit values ("TLVs") for exposure to potentially
harmful substances by workers in their employment.  In the 1972
*Accident Prevention Regulations*, B.C. Reg. 64/72, passed by the
WCB (in force when the MK-3 was applied to the Building) the
concept of threshold limit values is explained:

### THRESHOLD LIMIT VALUES FOR 1972

> Threshold Limit Values (TLV) refer to concentra-
> tions of airborne contaminants to which workmen may be
> repeatedly exposed without adverse effects. Because of
> individual susceptibility, a small percentage of
> workmen may experience some discomfort at
> concentrations at or below the stated concentrations.
> A smaller percentage of workmen may be more severely
> affected due to aggravation of pre-existing medical
> conditions.

Threshold Limit Values refer to time-weighted
average concentrations for a 7-8 hour workday and 40
hour work week. These values are based on the best
available information from industrial experience and
human and animal experimental work. Because TLV's are
time-weighted averages, excursions above the limit may
be permitted provided they are compensated by an
equivalent excursion below the limit. The extent of
the excursion above the limit are very dependant on
the toxicity of the contaminant, the frequency of
these excursions, their cumulative effects and the
duration of the high concentration periods.

[21] The TLV set for asbestos in 1972 was 30 fibres per cubic
centimetre of air.  In 1978 it was reduced to 2 fibres/cc, where
it remains.

[22] The experts at trial discussed exposure hazard in relation
to the 2 fibre/cc standard.  The question of dangerousness
turned on whether any building occupant or worker would likely
encounter asbestos dust concentrations in excess of the thresh-
old limit.

[23] The plaintiffs allege that hazardous exposure would result
from passive release of MK-3 in place (as a result of deterio-
ration) and from disturbance in the course of maintenance,
repair, and renovations.  In his reasons Drost J. addressed
himself primarily to the assertion that MK-3 contaminated the
breathing air in the Building, the general ambient air, and
therefore had to be removed.  He found that MK-3 in place
presented no hazard.

[24] The plaintiffs do not attack that finding on appeal.  They
say the trial judge failed to grasp the real issue, the hazard
to workers when they disturbed the fireproofing.

[25] We do not accept that criticism of the trial judgment.
While Drost J. devoted more space in his reasons to the alleged
contamination of the ambient air, he expressly concluded that
MK-3 did not present a danger to workers.  He said at 174:
As I have stated, all of the medical experts,
except Dr. Frank, opined that the levels of exposure
to asbestos fibres encountered in buildings is far too
low to increase the risk of a building worker or
occupant contracting any of the asbestos-related
diseases, including mesothelioma.  I accept those
opinions.

* * *

So far as the Spencer Building itself is con-
cerned, far from establishing a "real and substantial"
danger to persons, the evidence satisfies me that the
MK-3 that was installed between 1972 and 1975 was not
and is not an inherently dangerous product. I have no
hesitation in concluding that the asbestos fibres
contained in that MK-3 did not "contaminate" the
Building, nor did they expose its occupants and
workers to an increased risk of contracting any of the
asbestos-related diseases. Nor did any asbestos
fibres that were released into the atmosphere of the
Building by that product cause damage to property.
[Emphasis added]

[26] Earlier in his judgment, the trial judge discussed the
experts' evidence about the risk of harm when workers disturbed
asbestos-containing fireproofing. It is important to know as
background that MK-3 was mixed with water, vermiculite and
gypsum on site and then sprayed on the surface to be fire-
proofed. This gave the product a cementitious quality, like
plaster, which was designed to hold the material in place. This
gave greater stability than that in dry sprayed products which
are not bound in a matrix and tend to throw off fibres without
deliberate disturbance.

[27] In their evidence at trial several expert witnesses
referred to a study by Dr. William Nicholson of Mount Sinai
Hospital on asbestos exposure. Dr. Gordon Bragg was called by
the Grace defendants to give expert evidence concerning the
measurement and behaviour of airborne asbestos fibres in
buildings. The trial judge made these observations at 137 of
the reasons:

Dr. Nicholson's study shows that counts of
asbestos fibres in the air in buildings in which
cementitious asbestos-containing material was used
were lower or equivalent to the counts found in the
outside air. It also showed that some of the build-
ings in which dry sprayed fireproofing or insulation
materials had been applied had slightly raised fibre
counts.

* * *

As to the current state of knowledge, in my

> opinion, the evidence given by all of the medical
> experts, with the exception of Dr. Frank, clearly
> establishes that the type of exposure encountered in
> buildings is far too low to increase the risk of
> contracting any of the asbestos-related diseases.

And further, at 138:
> Dr. Bragg is familiar with a great many studies
> that compare the indoor asbestos levels of buildings
> containing ACMs [asbestos-containing materials] with
> the outdoor level around the same buildings.  He said
> that, in the great majority of those studies, it was
> concluded that there was no significant difference
> between indoor and outdoor levels.

> Dr. Bragg noted that these findings applied
> whether or not the ACM was in good condition, and that
> they took into account the possibility of repairs
> being performed in the building.

Finally, on the risk of inhaling the ambient air the trial judge
said at 142:
> In short, Dr. Bragg's evidence confirms the
> opinions expressed by the medical experts called by
> the Grace defendants that there is no increased risk
> to workers or occupants from the low level of exposure
> to asbestos that one may expect to encounter in public
> buildings generally.


[28] As we have said, the trial judge's reasons concentrate
mainly on general air quality in the Building.  Drost J. did not
expressly deal with the arguments about the hazard to workers in
the personal breathing zone of the disturbance they create.  But
the issue was squarely before him and he concluded that the
Building was not unsafe for users or workers because of the
asbestos in MK-3.  This was a very long trial with complex
evidence.  We cannot conclude from the reasons that the trial
judge overlooked a major feature of the case.  In our view, his
general conclusions about dangerousness must be taken to embrace
the alleged hazards from MK-3 in place and when disturbed.  He
showed that he was alive to the issue of the dangerousness of
MK-3 to workers, if it was disturbed, in the concluding part of
his judgment at 171:
> Fundamental to the success of the plaintiffs'
> claims is proof, on a balance of probabilities, that:

1.  the MK-3 fireproofing material contaminated the
    Building by continually releasing asbestos fibres
    into its atmosphere, thus causing physical damage
    to property of the plaintiffs and exposing
    tenants and others properly using the premises to
    such fibres;

2.  the asbestos fibres contained in the product MK-3
    posed a hazard to the health of workers and
    occupants of the Building;

3.  as a consequence, Building workers and occupants
    have been exposed and continue to be exposed to
    an increased risk of contracting an asbestos
    related disease;

and that

4.  as a consequence of the inherently dangerous
    nature of the product, and the inability of the
    plaintiffs to repair, modify, perform ordinary
    maintenance work, or renovate the Building with-
    out causing the further release of asbestos
    fibres thereby endangering the health of Building
    occupants and workers, the plaintiffs undertook
    the removal and replacement of all of the
    asbestos-containing fireproofing in the Building.

                              [Emphasis added]

[29] Did the plaintiffs prove that MK-3 is a dangerous product
when disturbed?  Put another way, did the plaintiffs show that
the exposure of workers to airborne asbestos fibres would exceed
the TLV of 2 fibres/cc?  We cannot say that they did.  Air
sampling during renovations would have produced the evidence one
way or the other, but the plaintiffs did not perform those
tests.  Instead they relied on the opinion of an expert, William
Ewing, whose methodology involved sampling the dust and debris
accumulated on the surfaces beneath the fireproofing.  From that
he determined the potential for disturbance which he found to be
so high that he recommended removal as the best method of
abatement of the risk.

[30] Mr. Ewing's approach did not go to the heart of the
dangerousness question: will workers inhale dangerous amounts of
asbestos fibres?  Exposure risk was the field of the experts
called by Grace, Dr. Peter Elmes and Dr. Gordon Bragg, who said

that disturbance potential determined by settled dust sampling
will not reveal the concentration of airborne fibres.  The trial
judge accepted their criticisms of Mr. Ewing's methodology.  We
will set out his reasons (at 161-3) in full on this point
because of their importance:

> Some of the experts called by the Grace defend-
> ants were asked for their opinion of Mr. Ewing's
> Report.
>
> Over the objections of Mr. Roberts, I found Dr.
> Elmes qualified to comment on the Report, on the basis
> that he had an expertise in the interpretation of air
> samples taken by others.
>
> Dr. Elmes was asked whether the air sampling
> results from the Ewing Report suggest a risk to the
> Building occupants. Dr Elmes stated:
>
> > There are no air sampling, in the accepted sense of
> > the word, results in this report. The samples
> > were taken by picking up dust off various sur-
> > faces. They weren't taken from the air. So they
> > consisted of particles, many of which were too
> > large to be respirable. They were then subjected
> > to ultrasonic treatment to break up these par-
> > ticles and, therefore, they may have created an
> > artificial situation which may or may not repre-
> > sent what might have occurred at some time in the
> > air of the building . . .
> >
> > This investigation, this examination of this dust that
> > was taken from the surfaces within the building
> > can be used to give us some idea of what the
> > fibres are in the material which might be
> > released if the material was damaged or dis-
> > turbed. *It doesn't give us an idea of how much
> > release was occurring or whether the people in
> > the building were at any risk from the presence
> > of this material in the building* . . .
> >                     (emphasis in text)
>
> Dr. Elmes went on to suggest that these type of
> sampling techniques could be used to find out what
> "*might* be released" if the building was demolished or
> the material being stripped out.
>
> Dr. Bragg expressed similar concerns. He sug-

gested that the surface sampling techniques used by
Mr. Ewing were procedures that existed in draft form
only, in the sense that the procedure had not been
codified by any of the codifying bodies. Indeed, he
suggested that he was not aware of any regulatory body
that suggests the use of this procedure, nor was he
aware of its acceptance or use by any scientific
organization.

According to Dr. Bragg, the problem with surface
sampling is that it provides no insight into the key
question, namely, whether there are measurable air-
borne levels of asbestos.  In this regard, he stated:

There has been an enormous amount of research over the
        years, particularly in the nuclear industry,
        attempting to relate material on surfaces to
        material in the air and I think it's generally
        accepted now that there is no relationship and
        that the fundamental reason for that is that the
        relationship is between disturbance and airborne
        material and not between material on the surface.

In other words, simply because asbestos can be
detected on the surface does not mean that fibres from
it will become airborne and in turn pose a health
risk.

When asked in cross-examination if an examination
to determine whether the particle had moved was a
reasonable thing to do, Dr. Bragg responded:

It depends on what our objective is. If our objective
        is to inquire whether it has moved, yes, it is.
        If our objective is to determine whether or not
        it's going to result in inhalable fibres in the
        air, then I would suggest that it is not an
        appropriate procedure.

Such a study, he acknowledged, may indicate
whether there had been some form of disturbance, but
he said that:

. . . it's important to discriminate between a
        disturbance which produces visible debris where
        the lay understanding that vibration and air
        flows may produce a disturbance is indeed true.

> Vibration and that type of air flow will, indeed, be
> capable, with certain types of materials,
> particularly with the dry sprayed material, of
> producing a disturbance which causes a change in
> location. What's important to do is to
> discriminate, though, between that - and we are
> now able to do so on the basis of the type of
> study that Mr. Ewing has done, for example -
> between that and the airborne material that is
> small enough to be of health significance.
>
> I accept the criticisms expressed by Drs.
> MacDonald [sic - Dr. Elmes] and Bragg about the
> methodology employed by Mr. Ewing. I am, accordingly,
> unable to accept that the results support a finding
> that the Building is in fact contaminated to a point
> where it posed a health hazard to its occupants,
> necessitating removal.

[31] Dr. Bragg said that it was unlikely that disturbance would
produce concentrations at the 2 fibre/cc level.  He made
reference to several studies: pounding a large dowel into the
fireproofing; pulling wire cable over settled dust and debris;
and sandblasting fixtures coated with fireproofing.  In none of
these tests did the air samples even approach the hazard level
set by the WCB.

[32] The plaintiffs argue that the danger can be inferred from
the extent of the precautions required by the WCB in the safe
handling of asbestos-containing materials.  They point to the
WCB's Manual of Standard Practices on the subject which divides
risk of exposure into three categories: low, moderate, and
high.  The categories are defined by activities, not according
to fibre counts in air sampling.  At all levels some form of
respirator must be worn and steps taken to prevent the escape of
any dust from the work area.  Protective clothing is required at
the moderate level along with elaborate clean-up procedures.  At
the high risk level the work area must be sealed and air drawn
to the outside by negative pressure.  Workers must have a multi-
chambered decontamination facility allowing them to remove their
protective clothing, to shower, and to dress without the risk of
carrying fibres from one activity to the other.

[33] The plaintiffs also submit that Grace's theory at trial,
obviously accepted by the trial judge, that MK-3 is safe if
handled properly, implies dangerousness in that proper handling
during disturbance involves extensive precautions.  They say

that this is confirmed by the trial judge's remarks (at 133) about demolition, which is just another form of disturbance:

> It is clear that when an asbestos-containing building is demolished, stringent safety precautions of the nature described during this trial, and mandated by the regulatory authorities, must be taken.

[34] Do these precautions prove a hazard to health? This was not the view taken by either Dr. Bragg or Dr. Elmes, both of whom felt that the increased risk of workers developing an asbestos related disease was negligible. Dr. Bragg said in his testimony:

> Q So your evidence is that these regulatory agencies such as the EPA and the Provincial Government of British Columbia are publishing these documents for the public and they are promulgating information that is contrary to scientific facts; is that what you are saying?
>
> A At the current time I am suggesting that it has caused the regulatory agencies to err extremely on the side of safety.
>
> Q A prudent course?
>
> A Not if it results in a redirection of resources to places where there is no significant risk.
>
> Q I take it, Dr. Bragg, you wouldn't want them to err on the other side?
>
> A I think that in the practice in this province there is a modest error on the side of safety and I think this is appropriate.

[35] There is evidence on both sides of the issue. Drost J. found that the plaintiffs had not proven their case. In our opinion, the plaintiffs are asking us to re-weigh the evidence and make a different choice as to expert opinion. This we cannot do. As we have said, the plaintiffs had the opportunity to sample the air and demonstrate conclusively that when disturbed MK-3 is a dangerous product. In the end, the trial judge was not persuaded by the methods of proof adopted by the plaintiffs on this crucial issue of fact. We are unable to find that he committed any palpable or overriding error in his

conclusion on dangerousness.

**DISPOSITION**
[36] The appeal is dismissed.


"THE HONOURABLE MADAM JUSTICE PROWSE"


"THE HONOURABLE MR. JUSTICE DONALD"


"THE HONOURABLE MADAM JUSTICE NEWBURY"

by _LexUM_ _____ for the Federation of Law Societies of Canada

# TAB 11



111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

▷
1998 CarswellOnt 2906

Soper v. Southcott

Sharyn Elaine Soper, Tammy Lynn Brandow, Gary Alan Soper, Dwayne Michael Soper
and Amanda Mae Brandow, Tessa Mary Lynn Brandow, by their Litigation Guardian,
Sharyn Elaine Soper, Plaintiffs (Appellants) and Dr. F. Robert Southcott and
St. Thomas-Elgin General Hospital, Defendants (Respondents)

Ontario Court of Appeal

McKinlay, Austin JJ.A. and Dunnet J. (ad hoc)

Heard: February 27, 1998
Judgment: July 6, 1998
Docket: CA C28616

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Proceedings: affirming (1997), 30 O.R. (3d) 704 (Gen. Div.)

Counsel: *Brian J.E. Brock, Q.C.,* for the appellants.

*David I. Hamer* and *Andrea H. Plumb,* for the respondents.

Subject: Civil Practice and Procedure; Public

Limitation of actions --- Actions in tort -- Statutory limitation periods -- When statute commences to run -- General

Patient brought action against doctor for damages arising from negligence -- Doctor brought motion for summary
judgment dismissing patient's action on ground that it was statute-barred -- Motion granted -- Limitation period for
action based on medical malpractice is one year from date plaintiff knew or ought to have known facts establishing
malpractice -- Lack of information on extent or type of damage does not delay time under limitation period -- Patient
received medical records more than one year before commencing action, and had sufficient time to obtain expert
opinion on whether doctor had breached standard of care -- Patient's appeal dismissed -- There was no genuine issue
for trial on question of applicability of s. 17 of Health Disciplines Act -- Section 17 requires plaintiffs to act with
reasonable diligence in discovering material facts upon which to found actions in negligence or malpractice --
Patient was in possession of material facts upon which to found her claim once her solicitor was in receipt of
hospital records -- It was possible in circumstances for patient to know material facts without medical opinion --
Health Disciplines Act, R.S.O. 1990, c. H.4, s. 17.

Cases considered by *Dunnet J.:*

> *Aguonie v. Galion Solid Waste Material Inc.* (1998), 156 D.L.R. (4th) 222, 107 O.A.C. 114, 38 O.R. (3d)
> 161, 17 C.P.C. (4th) 219 (Ont. C.A.) -- applied
>
> *Clemens v. Brown,* [1958] O.W.N. 200, 13 D.L.R. (2d) 488 (Ont. C.A.) -- applied
>
> *Findlay v. Holmes* (July 3, 1998), Doc. CA C21681 (Ont. C.A.) -- applied

Copr. © West 2007 No Claim to Orig. Govt. Works

111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

> *Gaudet v. Levy* (1984), 47 O.R. (2d) 577, 46 C.P.C. 62, 11 D.L.R. (4th) 721 (Ont. H.C.) -- applied
>
> *Law v. Kingston General Hospital* (1983), 42 O.R. (2d) 476 (Ont. H.C.) -- applied
>
> *Peixeiro v. Haberman*, 151 D.L.R. (4th) 429, 103 O.A.C. 161, 30 M.V.R. (3d) 41, [1997] 3 S.C.R. 549, 12 C.P.C. (4th) 255, 46 C.C.L.I. (2d) 147 (S.C.C.) -- applied

**Statutes considered:**

*Family Law Act*, R.S.O. 1990, c. F.3

> Generally -- referred to
>
> s. 2(8) -- referred to
>
> s. 61(4) -- referred to

*Health Disciplines Act*, R.S.O. 1990, c. H.4

> s. 17 -- considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

> R. 20 -- referred to

APPEAL by patient from judgment reported at (1997), 36 O.R. (3d) 704 (Ont. Gen. Div.), granting doctor's motion to dismiss patient's claim for damages arising from negligence.

**The judgment of the court was delivered by *Dunnet J.* (ad hoc):**

1    This appeal is brought from the dismissal of the appellants' action pursuant to rule 20 of the *Rules of Civil Procedure*. The motions judge held that the respondent orthopaedic surgeon, Dr.F. Robert Southcott, had established that there was no genuine issue for trial based on his finding that the appellants' claim for medical malpractice was statute-barred under section 17 of the *Health Disciplines Act*, R.S.O. 1990, c. H.4 (the "Act").

**Overview**

2    In 1974, the appellant, Sharyn Elaine Soper, suffered a right knee injury in a motorcycle accident. In July 1991, the respondent performed an arthroscopic examination of her knee which revealed that there was a tear of the medical meniscus, osteoarthritis and a torn posterior cruciate ligament. Consequently on November 6, 1991, the respondent performed a posterior cruciate ligament reconstruction of the appellant's knee at the St.Thomas-Elgin Hospital (the "hospital").

*a) appellant's knowledge*

3    In November 1991, the appellant began to keep a diary with details concerning the condition of her knee, as well as doctors' appointments, hospital admissions and surgical procedures. Her daughter, a nurse, expressed concerns regarding her care and treatment.

4    On January 3, 1992, the appellant reported to the respondent that she had fallen on her right knee three days

Copr. © West 2007 No Claim to Orig. Govt. Works

111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

earlier and there was an effusion present. On January 17, 1992, the appellant was re-admitted to hospital by the respondent to manipulate her knee in order to improve its range of motion. The knee was also debrided. She was discharged on January 29, 1992. Two days later, the appellant was admitted to hospital again, suffering from septic arthritis of her knee. She was discharged on February 20, 1992.

5    On June 1, 1992, the appellant was admitted to hospital for a further debridement performed by the respondent. On July 27, 1992, in the respondent's absence, she was seen by another orthopaedic surgeon, who admitted her to hospital for acute synovitis of her knee. While in hospital, the appellant attempted to solicit a second medical opinion without success because of her concerns about the condition of her knee. She remained under the care of the respondent until October 1992.

6    The appellant was eventually referred to another orthopaedic surgeon in January 1993, and from March 8 until March 22, 1993, she was admitted to hospital because of infection in her knee. She underwent arthroscopic debridement, sub-total synovectomy and irrigation of the knee. She was discharged home on a course of six weeks of intravenous antibiotics, following which her right knee infection was eradicated.

*b) retention of legal counsel*

7    On April 26, 1993, the appellant consulted a solicitor to investigate and determine whether there was any basis for proceeding with a medical negligence claim. In July 1993, the solicitor sought and received approval to have the investigation funded by the Ontario Legal Aid Plan (the "Plan"). In August 1993, the solicitor requested the hospital records. He did not request the clinical notes and records from the respondent.

8    In November 1993, the appellant was advised by her treating orthopaedic surgeon that she had two options: a high tibial osteotomy or total knee replacement.

9    On December 20, 1993, the solicitor received the hospital records and the following day, he sent them to a consultant he had retained in order to assist him in assembling the relevant documentation for submission to a medical expert for an opinion as to whether the respondent had been negligent.

10    In January 1994, the solicitor received a report from the appellant's treating orthopaedic surgeon commenting on the current condition of her knee and suggesting that replacement surgery may be required. In June 1994, he sought approval from the Plan to obtain an opinion on the issue of medical negligence. As a result of correspondence he received from the Plan, the solicitor obtained instructions from the appellant in the late fall of 1994 to discontinue investigation of the claim pursuant to the terms of a Legal Aid Certificate and to retain an expert. On December 19, 1994, the appellant underwent a total knee replacement.

11    The statement of claim was issued on March 30, 1995. The medical expert opinion was sought in May of 1995 and received in July of that year. The expert was of the opinion that had more aggressive therapy occurred initially, the joint infection might have been avoided.

**Findings of the Motions Judge**

12    The motions judge held that on December 20, 1993, when the appellant's solicitor received the medical reports from the hospital, which included the clinical notes and records of the respondent, the appellant had in her possession all the necessary facts from which it could be determined whether the respondent breached the applicable standard of care. He stated:

Before she retained counsel, she knew that she had had an infection in her knee joint, which had persisted for some time. She knew that the infection had flowed from the surgery performed by Dr. Southcott. She had several subsequent operations. As early as November 1991, her daughter, who was a nurse, expressed concerns to her about the care and treatment she was receiving from Dr.Southcott and stated she could not understand why the plaintiff was not hospitalized and treated with intravenous antibiotics. On July 27,

111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

> 1992, the plaintiff expressed concerns to her family physician about the care and treatment she was receiving from Dr. Southcott.

> . . . . .

> The allegations of negligence against Dr. Southcott, which are contained in the statement of claim, parallel those in the expert's opinion; namely, that the infection was the cause of the plaintiff's difficulties and that Dr. Southcott had failed to monitor the infection satisfactorily and had failed to order a sufficiently aggressive course of antibiotic treatment to prevent or counteract it. If the statement of claim could be issued on March 30, 1995, before the expert's report was obtained, I do not see why it could not have been issued within one year from the date upon which the hospital records were received. The fact that the statement of claim was issued before the expert report was received and contained allegations of negligence that echoed the expert opinion demonstrates that the plaintiff was already in possession of sufficient facts with which to allege negligence.

The motions judge found that the appellant had more than sufficient time within the year after receiving the medical records on December 20, 1993 to fulfil her duty to act reasonably and diligently to complete whatever investigation was necessary and to acquire whatever opinion was needed to satisfy herself that the respondent had failed to meet the applicable standard of care.

**Analysis**

13    Section 17 of the Act provides:

> **17.** No duly registered member of a College is liable to any action arising out of negligence and malpractice in respect of professional services requested or rendered unless such action is commenced within one year from the date when the person commencing the action knew or ought to have known the fact or facts upon which the person alleges negligence or malpractice.

In *Findlay v. Holmes* (July 3, 1998), Doc. CA C21681 (Ont. C.A.) this court applied the decision of the Supreme Court of Canada in *Peixeiro v. Haberman* (1997), 151 D.L.R. (4th) 429 (S.C.C.) in holding that the discoverability principle postpones the running of the statutory limitation period until the plaintiff knows, or by reasonable diligence could have known, the material facts upon which to bring an action. Further, this court also held, in adopting the reasoning of White J. in *Gaudet v. Levy* (1984), 47 O.R. (2d) 577 (Ont. H.C.), that s. 17 of the Act requires the plaintiff to act with reasonable diligence in discovering the material fact or facts upon which to found an action in negligence or malpractice. In *Findlay*, we stated that:

> It is a question of fact depending on the circumstances of the case as a whole, as to when knowledge of the material fact or facts was acquired by the plaintiff. While in many cases, as suggested by White J., the facts will only become known upon receipt of a medical opinion with respect to the applicable standard of care, there will also be cases where the plaintiff will have actual or deemed knowledge of the material facts: immediately after the surgery or treatment, some time later if the results are unexpected but the plaintiff is advised to wait until the problem resolves, or upon receipt of the clinical history.

14    In *Aguonie v. Galion Solid Waste Material Inc.* (1998), 156 D.L.R. (4th) 222 (Ont. C.A.), this court dealt with the proper role of a judge when hearing a motion for summary judgment and the applicability of the discovery rule in relation to the *Family Law Act*, R.S.O. 1990, c. F.3, ss. 2(8) and 61(4). Speaking for the court, Borins J.(ad hoc) states at p.229:

> ... the application of the discoverability rule to the facts of a particular case necessarily requires a finding of fact about when the plaintiff discovered the facts in respect to the remedy sought, or through reasonable diligence, ought to have discovered the facts.

In any motion for summary judgment, the judge is to decide whether the moving party has established that there is

Copr. © West 2007 No Claim to Orig. Govt. Works

111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

no genuine issue for trial. The evidence on the motion must satisfy the court that there is no issue of material fact which requires a trial for its resolution. Borins J. points out that the court's function is not to resolve the issue of fact, but rather to determine whether a genuine issue of fact exists. He goes on to say in *Aguonie* at pp.235-6:

> ... it must be clear to the motions judge, where the motion is brought by the defendant, as in this appeal, that it is proper to deprive the plaintiffs of their right to a trial. Summary judgment, valuable as it is for striking through sham claims and defences which stand in the way to a direct approach to the truth of a case, was not intended to, nor can it, deprive a litigant of his or her right to a trial unless there is a clear demonstration that no genuine issue exists, material to the claim or defence, which is within the traditional province of a trial judge to resolve.

> *Ontario New Home Warranty Program v. 567292 Ontario Ltd.* (1990), 71 O.R. (2d) 535 (Ont. H.C.) is a case which illustrates that, generally speaking, it is not appropriate for a motions judge, hearing a motion for summary judgment where the application of the discoverability rule is central to its resolution, to resolve this issue.

Where a defendant pleads a statutory limitation period, the plaintiff has the burden of proving that the cause of action arose within the limitation period (*Clemens v. Brown* (1958), 13 D.L.R. (2d) 488 (Ont. C.A.) at p. 491). Where a defendant brings a motion for summary judgment based on a statutory limitation period and the plaintiff adduces evidence giving rise to material facts requiring a trial in order to evaluate credibility, weigh evidence and draw factual inferences, if the defendant satisfies the court that there is no issue of fact requiring a trial for its resolution, the defendant will have satisfied the requirements of rule 20. The limitation defence then will have been made out.

15    The appellant submits that her claim against the respondent raises genuine issues for trial. She states that while the respondent was treating her, she was unhappy with the result, but she had no reason to believe that the infection or its recurrence was caused by inadequate or inappropriate treatment, and this is a question of credibility which requires a trial for its resolution.

16    Further, she submits that there is no evidence that the hospital records contain evidence that the respondent failed to adhere to the appropriate standard of care. Moreover, the motions judge was unable to say that the medical records contained facts upon which the appellant could allege negligence because he did not have the records before him on the motion to make such a finding. The limitation period, therefore, could not commence until the appellant received a professional medical opinion as to the appropriate standard of care.

17    The appellant also submits that the issue of whether the actions of the appellant fell below that which a reasonable person conducting a diligent investigation of the facts would have done is a question of fact which should be determined by a tribunal of fact, capable of hearing the witnesses, assessing credibility, hearing expert evidence and looking at a complete history of the matter.

18    The respondent submits that the appellant had actual knowledge of the facts upon which she alleges negligence more than one year before the action was commenced. Prior to retaining counsel in April 1993, she knew that she had an infection in her knee which had persisted and she knew that the infection had flowed from the surgery in November 1991. The same month, her daughter had concerns about her treatment and in July 1992, the appellant herself expressed concerns to her family doctor about her treatment by the respondent. In the alternative, she, through her solicitor, had actual knowledge of the requisite facts by December 1993 when she received the medical records from the hospital pertaining to her treatment.

19    The respondent states that *Aguonie, supra,* is distinguishable because the *Family Law Act* expressly empowers the court to extend the limitation period, whereas there is no similar provision available in the Act. In addition, there is nothing unusual about facts surrounding limitation defences that make them any less ascertainable on summary judgment motions than other facts that are adjudicated upon such motions.

Copr. © West 2007 No Claim to Orig. Govt. Works

111 O.A.C. 339, 39 O.R. (3d) 737, 43 C.C.L.T. (2d) 90, [1998] O.J. No. 2799

20    The motions judge held that upon receipt of the hospital records, the appellant had in her possession sufficient facts upon which she could allege negligence. There was no evidence that the records were missing a material fact which the appellant required before she could recognize a cause of action. There was no issue before him as to the sufficiency of the records. He examined the statement of claim and knew that the hospital records were in hand. Consequently, he was driven to the inescapable conclusion that the material facts were known to the appellant in December 1993. Moreover, between December 1993 and March 1995, no significant steps were undertaken in the prosecution of the investigation.

21    In *Law v. Kingston General Hospital* (1983), 42 O.R. (2d) 476 (Ont. H.C.) Griffiths J. held at p. 479:

> In many cases, I suspect that the necessary facts will not be acquired by the plaintiff alleging medical malpractice until his solicitor has had a reasonable opportunity to review all pertinent hospital and medical records. Section 17 prescribes that the time will run when the plaintiff knows or ought to have known of facts upon which he asserts allegations of negligence. That time will frequently run from the moment the solicitor for the plaintiff *carrying out diligent investigation* is first apprised of all the facts. [Emphasis added.]

And, to the same effect, White J. in *Gaudet*, *supra*, at p. 582:

> It is a question of fact as to when the information developed by his solicitor or by himself has reached the stage that a reasonably prudent person, *with appropriate access to medical knowledge* (appropriate in the sense of that which could be discovered by a reasonably prudent solicitor, or plaintiff following a reasonably diligent investigation) would have determined that he had *prima facie* grounds for inferring that his doctor had been negligent or had engaged in malpractice upon him. [Emphasis in Original.]

Limitation periods are not enacted to be ignored. The plaintiff is required to act with due diligence in acquiring facts in order to be fully apprized of the material facts upon which a negligence or malpractice claim can be based. This includes acting with diligence in requesting and receiving a medical opinion, if required, so as not to delay the commencement of the limitation period. In some cases, a medical opinion will be necessary to know whether to institute an action. In other cases, it will be possible to know material facts without a medical opinion, and the medical opinion itself will simply be required as evidence in the litigation. In the latter instances, the time of receipt of the medical opinion is immaterial to the commencement of the running of the limitation period.

**Disposition**

22    I agree with the motions judge that the appellant had in her possession, material facts upon which to found her claim once her solicitor was in receipt of the hospital records, which included the clinical notes and records of the respondent. She is deemed, therefore, to have been in possession of the material facts on December 20, 1993. Contrary to the submissions of the appellant, the allegations against the respondent in the statement of claim are not mere speculation. Such allegations could only have been gleaned from the hospital records. As the motions judge found, they parallel those in the expert's opinion. Accordingly, applying the principles enunciated in *Aguonie*, *supra*, there is no genuine issue for trial on the question of the applicability of s. 17 of the Act.

23    I would dismiss the appeal, but in the circumstances, without costs.

*Appeal dismissed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

# TAB 12

# In the Provincial Court of Alberta

**Citation: Stachniak v. County of Thorhild No. 7, 2006 ABPC 182**

**Date:** 20060725
**Docket:** P0390303528
**Registry:** Edmonton

Between:

### Philip Stachniak

Plaintiff

- and -

### County of Thorhild No. 7

Defendant

**Reasons for Decision of the Honourable Judge D.G. Ingram**

[1]     The Plaintiff says that in the course of doing work on Namepi Creek between 1977 and 1986 upstream from the Plaintiff's land, the Defendant caused the Plaintiff's farm to become infested with a noxious weed, Common Tansy, and that, subsequent to the upstream work, the Defendant failed to control the Common Tansy causing the Plaintiff damages in the sum of $24,852.58 being the amount the Plaintiff says is the value of work the Plaintiff did during the years 2001 to 2004 inclusive as a result of that infestation. The action raises issues as to causation, the common law defence of statutory authority, and under the *Municipal Government Act*, the *Weed Control Act* and the *Limitations Act*.

[2]     The Plaintiff's land is the southwest quarter of section 34, township 58, range 20, west of the fourth meridian, in the Province of Alberta, situate approximately 2 miles east of Radway. Namepi Creek flows from west to east meandering through a shallow valley of about 50 acres of the Plaintiff's land.. As a result of problems with flooding upstream, the Defendant County, operating under licences under the *Water Resources Act*, undertook work to channelize the portion of the creek lying upstream from the Plaintiff's land by straightening, widening and deepening the channel. The work was done from 1977 to 1986.

[3]     In or about 1985, yellow flowers of the weed Common Tansy appeared on the banks of the creek on the Plaintiff's land. No such weeds had been there before. In 1997, the creek flooded causing damage to the Plaintiff's land including structures which had been erected on

2006 ABPC 182 (CanLII)

Page: 2

the low land area near the creek. Following the flood, the yellow flowers of the Tansy weed appeared on both banks of the creek to the flood high water mark.

[4]    In 1999, the Plaintiff brought an action in this Court against the Defendant for damages arising from the flood as a result of the channelization project. The Plaintiff was awarded a Judgment against the Defendant on March 30th, 2001, by Judge J. L. Skitsko (see *Stachniak* v. *Thorhild (County No.7)*, 2001 ABPC 65). In June 2001, the Plaintiff wrote a complaint in connection with his tax assessment, specifically referring to the risk of future flood and erosion damage, with respect to the County failing to control the spread of Tansy, and untreated sewage in the creek (Tab 37, Exhibit 1).

[5]    In June, 2002, the Plaintiff issued an invoice to the Defendant for eradication and suppression of Tansy on his land for 245.5 hours of work at a nominal charge of $10.00 per hour for a total of $2,455.00, but was advised that the Council of the Defendant did not pay for weed control on private land. The Plaintiff then issued a series of invoices in respect of his Tansy control costs, billed at commercial rates for 2001 - $13,628.00, 2002 - $4,334.00, 2003 - $2,779.45 and 2004. The Plaintiff commenced this action on May 21st, 2003, claiming damages of $18,062.00 for work done to control Common Tansy on his lands for the years 2001 and 2002. The Claim was then amended on September 12th, 2005, to add the additional damages claimed for the years 2003 and 2004. The Plaintiff says he will continue to suffer damages to control the Tansy.

[6]    It appears that the Plaintiff's claim is in two parts: (1) the infestation by Tansy which appeared in or about 1986 which the Plaintiff says was caused by the channelization project, and (2) the continuation of the infestation on an ongoing basis which the Plaintiff says was caused by the Defendant's failure to eliminate or control the Tansy on the Plaintiff's land. Each of these parts of the Plaintiff's claim give rise to a number of issues.

Causation

[7]    The Plaintiff has an onus to satisfy the Court on the balance of probabilities that the acts or defaults of the Defendant in fact caused the damages alleged. The evidence showed that Common Tansy is a very prolific and invasive weed producing literally thousands of seeds that may be transmitted by many means. The Tansy first appeared on the Plaintiff's land along the banks of the creek during the later years of the channelization project. The Tansy later appeared to the high water limit of the creek following the 1997 flood. The evidence shows a sequence of events - the channelization followed by the infestation of weeds - but successive events are not necessarily cause and effect. The evidence also showed that Tansy tends to appear along watercourses in a fashion that indicates the seeds are carried by water downstream and deposited along the banks of the lower reaches of streams, etc. There was also evidence that Tansy was prevalent in the area upstream from the Plaintiff's land.

[8]    Causation is established whenever it is shown that the alleged result would not have occurred "but for" the alleged cause. I am not satisfied, on the balance of probabilities, that the

2006 ABPC 182 (CanLII)

Page: 3

evidence shows that the infestation of the Plaintiff's land would not have occurred but for the channelization project. Causation may also be established by showing that the conduct of the Defendant materially increased the risk of the harm and that the damage in question occurred within the scope of the risk created by the Defendant's conduct. I am satisfied that the evidence shows that the disturbance of upstream banks where Tansy grew created the risk that the Tansy would be spread to lands downstream. It therefore appears more probable than not that the upstream work carried out by the Defendant materially increased the risk of weeds being carried down stream and that weeds were carried downstream.

[9]     The test for causation is set out in *Athey* v. *Leonati* [1996] 3 S.C.R.458 as follows:

> "¶ 13     Causation is established where the plaintiff proves to the civil standard on a balance of probabilities that the defendant caused or contributed to the injury:  Snell v. Farrell, [1990] 2 S.C.R. 311; McGhee v. National Coal Board, [1972] 3 All E.R. 1008 (H.L.).
>
> ¶ 14     The general, but not conclusive, test for causation is the "but for" test, which requires the plaintiff to show that the injury would not have occurred but for the negligence of the defendant: Horsley v. MacLaren, [1972] S.C.R. 441.
>
> ¶ 15     The "but for" test is unworkable in some circumstances, so the courts have recognized that causation is established where the defendant's negligence "materially contributed" to the occurrence of the injury: Myers v. Peel County Board of Education; [1981] 2 S.C.R. 21, Bonnington Castings, Ltd. v. Wardlaw, [1956] 1 All E.R. 615 (H.L.); McGhee v. National Coal Board, supra.  A contributing factor is material if it falls outside the de minimis range: Bonnington Castings, Ltd. v. Wardlaw, supra; see also R. v. Pinske (1988), 30 B.C.L.R. (2d) 114 (B.C.C.A.), aff'd [1989] 2 S.C.R. 979.
>
> ¶ 16     In Snell v. Farrell, supra, this Court recently confirmed that the plaintiff must prove that the defendant's tortious conduct caused or contributed to the plaintiff's injury. The causation test is not to be applied too rigidly. Causation need not be determined by scientific precision; as Lord Salmon stated in Alphacell Ltd. v. Woodward, [1972] 2 All E.R. 475, at p. 490, and as was quoted by Sopinka J. at p. 328, it is "essentially a practical question of fact which can best be answered by ordinary common sense". Although the burden of proof remains with the plaintiff, in some circumstances an inference of causation may be drawn from the evidence without positive scientific proof."

2006 ABPC 182 (CanLII)

Page: 4

[10]    In dealing, fatally, with the maxim of *res ipsa loquitur*, the Court stated, in *Fontaine* v.
*British Columbia (Official Administrator)* [1998] 1 S.C.R. 424, as follows:

> "¶ 27    It would appear that the law would be better served if the
> maxim was treated as expired and no longer used as a separate
> component in negligence actions. After all, it was nothing more
> than an attempt to deal with circumstantial evidence. That
> evidence is more sensibly dealt with by the trier of fact, who
> should weigh the circumstantial evidence with the direct evidence,
> if any, to determine whether the plaintiff has established on a
> balance of probabilities a prima facie case of negligence against
> the defendant. Once the plaintiff has done so, the defendant must
> present evidence negating that of the plaintiff or necessarily the
> plaintiff will succeed."

[11]    On the basis of this test I am satisfied that it is more probable than not that the
channelization project in fact caused the spread of the Tansy seed to the Plaintiff's land and the
initial infestation. An infestation by a noxious weed is clearly a nuisance in both the popular
sense and the legal sense as it constitutes a substantial and unreasonable interference with the
Plaintiff's use and enjoyment of the land which he occupies. In nuisance, a Plaintiff must prove
that the Defendant caused the interference and damage to the land but is not required to prove
negligence; the Defendant has the onus to exculpate itself from liability.

The common law defence of Statutory Authority

[12]    Under the common law defence of Statutory Authority, a Defendant is not liable for a
nuisance created under statutory authority where the legislation authorizing the work intends that
the harm caused by the work will not result in liability to innocent parties. At common law,
where a nuisance was caused by a body acting under statutory authority, there is an onus on the
person exercising the statutory authority to show that the nuisance was the inevitable
consequence of carrying out that authority; that is, that it was "practically impossible" to avoid
the nuisance created by the work. Negativing negligence is not sufficient. See *Ryan* v. *Victoria
(City)* [1999] 1 S.C.R. 201

[13]    The Defendant is a statutory authority to which the foregoing common law principles
may apply. There is no evidence from which I could reasonably conclude that the infestation of
Common Tansy on the Plaintiff's land resulting from the construction of the channelization
project was an inevitable consequence of that construction. It therefore appears that under
common law the Defendant would be liable for the nuisance, namely, the infestation of Tansy
which it created in the course of the channelization project.

2006 ABPC 182 (CanLII)

Page: 5

## The *Municipal Government Act*

[14]    However, the Defendant is a municipality under the *Municipal Government Act*, RSA 2000 M-26, which at present contains the following provisions:

> Acting in accordance with statutory authority
>       527.2   Subject to this and any other enactment, a municipality is not liable for damage caused by any thing done or not done by the municipality in accordance with the authority of this or any other enactment unless the cause of action is negligence or any other tort.
>
> Non-negligence actions
>       528   A municipality is not liable in an action based on nuisance, or on any other tort that does not require a finding of intention or negligence, if the damage arises, directly or indirectly, from roads or from the operation or non operation of
>             (a)      a public utility, or
>             (b)      a dike, ditch or dam.
>
> Exercise of discretion
>       529   A municipality that has the discretion to do something is not liable for deciding not to do that thing in good faith or for not doing that thing.
>
> Inspections and maintenance
>       530(1)   A municipality is not liable for damage caused by
>             (a)      a system of inspection, or the manner in which inspections are to be performed, or the frequency, infrequency or absence of inspections, and
>             (b)      a system of maintenance, or the manner in which maintenance is to be performed, or the frequency, infrequency or absence of maintenance.
>
> The Act defines "public utility" very broadly, certainly broad enough to include the channelization project

[15]    This case was argued on the basis that these provisions are applicable.  Under section 528, there is no liability for nuisance arising directly or indirectly from the operation of a public utility.  Section 1(1)(y) defines "public utility" as including a "system or works used to provide...drainage".  "Negligence" means the tort of negligence, not merely "carelessness".  The Defendant is liable only for negligence; nuisance, which puts the onus on the Defendant to

2006 ABPC 182 (CanLII)

Page: 6

exculpate itself not merely by showing there was no negligence on its part but by showing that
the nuisance was the inevitable result of the work, is not enough.

[16]    Negligence consists of a duty of care and a failure to use reasonable care. The decision
to carry out a channelization project is clearly a policy decision in respect of which the
Defendant owed no duty to the Plaintiff. The implementation of the project is a operational
matter for which the Defendant may be liable if reasonable care was not exercised in its
performance and if the actions of the Defendant thereby caused the Plaintiff's damages. There
was no evidence as to the manner in which the channelization work was done. I can and did
conclude that the work caused the infestation as a matter of fact because the combination of
direct and circumstantial evidence indicated this to have probably been the case. However, there
is no direct nor circumstantial evidence which tends to show, on a balance of probabilities, that
the Defendant did the work in a negligent manner. The question then arises as to whether there is
an onus on a Plaintiff to prove negligence on the part of the municipality or whether there is an
onus on the municipality to show that there was no negligence. Under the *Municipal
Government Act*, there is no liability in the absence of negligence and, in my view, the onus is on
the Plaintiff to prove negligence. The Act does not provide a defence only where damage is the
inevitable consequence of the work, the Act requires that there be a cause of action in negligence
which, in my view, requires proof of negligence. In *Stachniak* v. *Thorhild*, Skitsko, P.C.J., found
that negligence was established; in this case, I find that it is not.

[17]    Alternatively, the Plaintiff says that the Defendant is liable under the terms of the
licences issued to the Defendant under the *Water Resources Act*. The only licences before me
are at Tab 21 and 22 of Exhibit 1. Each was for a term of one year  The former, dated August
17th, 1977, specifically provides: "the licencee is responsible for the time and manner in which
water is released and for any damages which may result there from"; the second, dated May 28,
1982, specifically provides: "the licencee is responsible for the construction, operation and
maintenance of the works and for any damage that may result therefrom". While the initial
infestation was caused by the channelization project, the continuation of the infestation has not
been shown to be related in any way to the operation or maintenance of the works constructed
under the licence and, in any event, it appears that the Municipal Government Act would require
proof of negligence.

[18]    The infestation of Tansy resulting from the construction of the channelization project was
caused by the same acts as caused the flooding referred to in the earlier judgment of this Court.
The Defendant did not defend on the basis that the claim for infestation merged in the Court's
earlier Judgment and I will not pursue this aspect further.

The *Limitations Act*

[19]    In addition, as to the initial infestation, the Defendant raises the *Limitations Act* and says
that under section 3(1)(b), the Defendant is entitled to immunity as the claim for the initial
infestation arose more than 10 years before the commencement of this action.

2006 ABPC 182 (CanLII)

Page: 7

[20]    The relevant sections of the *Limitations Act* are as follows:

> Section 3
> (1) subject to section 11, if a Claimant does not seek a remedial
> order within
> (b) 10 years after the claim arose...the Defendant, on pleading this
> Act as a defence, is entitled to immunity from liability in respect of
> the Claim.
> (3) for the purposes of subsection (1)(b),
> (a) a claim or any number of claims based on any number of
> breaches of duty, resulting from a continuing course of conduct or
> a series of related acts or omissions, arises when the conduct
> terminates or the last act or omission occurs;
> (b) a claim based on a breach of duty arises when the conduct, act
> or omission occurs;"

[21]    In my view, the claim for the initial infestation falls within (3)(3)(b) rather than (a). The initial infestation was caused by the work in the construction of the channelization project, a breach of duty which occurred by 1986. I find that the Defendant is not liable to the Plaintiff in respect of the infestation of the Plaintiff's land by Common Tansy as the act or conduct which caused that infestation to occur, happened more than 10 years before the commencement of this action. The 10 year limitation period is an ultimate limitation period; it is not dependent upon when discovery of the claim occurs nor on when the damages arise. It is dependent only upon when the act or conduct which was the breach of duty occurred. *Bowes* v. *Edmonton (City) 2005 ABQB 502* and *James H. Meek Trust* v. *San Juan Resources Inc. 2005 ABCA 448*

Duties under *Municipal Government Act* and *Weed Control Act*

[22]    The Plaintiff also claims that the Defendant had a duty under the *Municipal Government Act* and under the *Weed Control Act* to destroy, control, or at least prevent the spread of the Common Tansy and the failure of the Defendant to do so was a continuing course of conduct or a series of related acts or omissions, the last act or omission having not yet occurred and therefore the time has not yet started to run under section 3(3)(a) of the *Limitations Act*. The ongoing failure or refusal of the Defendant to destroy the Tansy on the Plaintiff's land is, of course, not subject to the 10 year limitation defence as the damage alleged occurred in the years 2001 to 2004.

[23]    From the year 2001 until the present, the Plaintiff has repeatedly made it clear to the Defendant that the Plaintiff considers it to be the obligation of the Defendant to either destroy or at least control the Common Tansy weeds on his land or compensate the Plaintiff for the cost of doing so. It was argued there was a common law duty as well as duties arising under the *Municipal Government Act* and the *Weed Control Act* and continuing breaches of those duties resulting in new or additional damages on an ongoing basis. I find that there is no duty to the

2006 ABPC 182 (CanLII)

Page: 8

Plaintiff or to any individual land owner to destroy or prevent the proliferation of noxious weeds on private land.

[24]     Under the *Weed Control Act,* a local authority (which includes the Defendant) is required to appoint a sufficient number of inspectors to carry out the *Act* within the municipality (section 5) and may make bylaws designating plants as restricted, noxious or nuisance weeds (section 7(1)). In the case of the Common Tansy, the bylaw would be required to designate it as a noxious weed as it is so designated in the regulations made under section 40(a) of the *Act*. An inspector may require an occupier or owner of land to destroy or control weeds in accordance with a notice given by the inspector. Under this section, an inspector appointed by the Defendant could require the Plaintiff to destroy or control the Tansy on his property, but the Plaintiff does not have the power to order the Defendant to destroy or control weeds. Under section 31, an occupant of land shall as often as is necessary, destroy all restricted weeds, control all noxious weeds and prevent the spread or scattering of nuisance weeds. As previously noted, Common Tansy is a noxious weed for the purpose of this categorization.

[25]     The Plaintiff is required to control the Common Tansy on his property and the Defendant is required to control the Common Tansy located on its property, including all of the highway lands located within the municipality. However, nothing under the Act requires the Defendant to destroy, control or prevent the spread of weeds on the Plaintiff's land nor the Plaintiff on the Defendant's land.

[26]     The Defendant presented considerable evidence showing that it was pro-active in seeking to control noxious weeds in the County and that it has severe limitations, primarily budgetary, which limit the amount which can be done. Further, all of the Defendant's operations for weed control were limited by the requirements of the Provincial Government for environmental reasons. If the Defendant had the obligation to control or destroy the weeds on the Plaintiff's land, it would have the same obligation to destroy weeds on all of the other privately owned land in the County. The Council of the County decides how it will spend the County's money and the decision which the Council of this County has made in connection with its policy of weed control is not a matter for which it is liable to any individual landowner, including the Plaintiff.

[27]     I find that the Defendant is not liable to the Plaintiff for the Defendant's refusal or failure to take steps to destroy or control the Tansy weed on the Plaintiff's land. I am satisfied that the steps taken by the Defendant in connection with weed control are entirely the result of policy decisions made by the Council within its authority and for which the Defendant is not answerable to the Plaintiff.

[28]     The Plaintiff's action is therefore dismissed. Costs may be spoken to by way of a telephone conference call arranged through the Clerk's office within 25 days of the date of these reasons, failing which an Order may be made.

[29]     A final word beyond the operative scope of this judgment. In my view, in the event the Defendant were liable for failing to destroy or control the Tansy on the Plaintiff's land, the

2006 ABPC 182 (CanLII)

Page: 9

Plaintiff's damages would have to be assessed on a one time basis. If it is possible to destroy the Tansy on the Plaintiff's land, the Plaintiff's damages would be the cost of doing so unless it could be shown that the cost would have been less if done earlier, in which case the Plaintiff's failure to mitigate would become a controlling factor. If it is not possible or practical to destroy the Tansy on the Plaintiff's land, the damages would be the reduced value of the Plaintiff's land due to the ongoing presence of Tansy. In my view, the Plaintiff cannot be in a position where he is entitled to damages on an ongoing annual basis, which is, in effect, the manner in which the claim is framed. Further, I am satisfied that the Plaintiff's claim is at least exaggerated. The initial claim for work done in 2001 was $2,455.00 (tab 12). This became $8,225.00, part of which was for "flood clean-up" (tab 17), and then $13,628.00 (tab 16). It appears that the damages claimed were probably caused by the original infestation, a nuisance for which the Defendant is not liable because of lack of proof that it was negligent, and which occurred at a time now so remote that the Defendant is entitled to immunity from the Plaintiff's claim in any event.

Heard on the 14th day of June, 2006.

Dated at the City of Edmonton, Alberta this 25th day of July, 2006.

_____
D.G. Ingram
A Judge of the Provincial Court of Alberta

**Appearances:**

Renn M. Moodley, Prowse Chowne LLP
    for the Plaintiff

Derek J. King, Brownlee LLP
    for the Defendant

2006 ABPC 182 (CanLII)

# TAB 13



[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

▷
1995 CarswellMan 19

Winnipeg Condominium Corp. No. 36 v. Bird Construction Co.
WINNIPEG CONDOMINIUM CORPORATION NO. 36 v. BIRD CONSTRUCTION CO. LTD. and SMITH
CARTER PARTNERS
Supreme Court of Canada
La Forest, L'Heureux-Dubé, Sopinka, Cory, McLachlin, Iacobucci and Major JJ.
Heard: October 12, 1994
Judgment: January 26, 1995
Docket: Doc. 23624

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Counsel: Kevin T. Williams and Paul Forsyth, for appellant.

Sidney Green, Q.C., and Murdoch MacKay, Q.C., for respondent.

David I. Marr and Roger B. King, Q.C., for intervener Smith Carter Partners.

Subject: Contracts; Torts; Property; Civil Practice and Procedure

Damages --- Remoteness and foreseeability -- Torts -- Economic loss.

Damages -- Tort -- Measure of damages -- Economic loss -- Subsequent purchaser suing original contractor for cost
of repairing defective building -- Court rejecting "complex structure" theory -- Court not allowing purchaser to
localize defect in one part of building and claim that damage to rest of building being "caused" by defect -- Such
loss being characterized as pure economic loss, not damage to property.

Damages -- Tort -- Measure of damages -- Real property -- Subsequent purchaser suing original contractor for cost
of repairing defective building -- Court rejecting "complex structure" theory -- Court not allowing purchaser to
localize defect in one part of building and claim that damage to rest of building being "caused" by defect -- Such
loss being characterized as pure economic loss, not damage to property.

Negligence -- Duty and standard of care -- Duty of care -- Contractor and others planning or constructing building
owing duty in tort to subsequent purchasers of buildings for their economic loss in repairing dangerous defects --
Court discussing scope of duty and policy considerations.

Negligence -- Liability in particular cases -- Construction -- Contractor and others planning or constructing building
owing duty in tort to subsequent purchasers of buildings for their economic loss in repairing dangerous defects --
Court discussing scope of duty and policy considerations.

Construction law -- Contractors -- Duties and liability -- Contractor and others planning or constructing building
owing duty in tort to subsequent purchasers of buildings for their economic loss in repairing dangerous defects --
Court discussing scope of duty and policy considerations.

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

Construction law -- Remedies -- Damages -- Contractor and others planning or constructing building owing duty in
tort to subsequent purchasers of buildings for their economic loss in repairing dangerous defects -- Court discussing
scope of duty and policy considerations.

Civil procedure -- Summary judgment -- Availability -- Court considering motion for summary judgment under
Manitoba Queen's Bench R. 20 must take hard look at action's merits and determine whether there is real chance
action will be successful -- Genuine issues for trial not to be decided summarily.

An apartment building's original owner and developer sold it to a subsequent purchaser who was not in contractual
privity with the general contractor who built the building. Later, after a large slab fell from the building, the
purchaser had to replace its entire exterior cladding. The purchaser sued the contractor for negligence, claiming its
economic loss. The motions judge dismissed the contractor's application to strike out the claim as disclosing no
cause of action, or alternatively for summary judgment. The Manitoba Court of Appeal struck the claim on the
former ground, ruling that damages for economic loss were not recoverable in the circumstances. The purchaser
appealed.

Held:

Appeal allowed.

The "complex structure" theory in cases involving contractors' liability for the cost of repairing defective buildings
should be rejected. The purchaser thus could not localize the defect in one part of the building and claim that the
damage to the rest of the building was somehow "caused" by that defect. The purchaser's loss could not be
characterized as damage to property as opposed to pure economic loss.

A contractor's duty to take reasonable care arises independently of any contractual duty between the contractor and
the original property owner. The duty in contract respecting materials and workmanship flows from the contractual
terms between contractor and owner. By contrast, the duty in tort respecting material and workmanship flows from
the contractor's duty to ensure that the building meets a reasonable construction standard. The original contract does
not define that duty's bounds. Thus, a contract with a building's original owner does not insulate a contractor from a
separate duty to a subsequent purchaser. That duty arises from the danger created by the work and not from the
contract's specifications.

It is reasonably foreseeable to contractors that if they construct a building negligently, causing it to contain latent
defects, subsequent purchasers may suffer damage when those defects manifest themselves. A lack of contractual
privity between a contractor and later inhabitants does not make potential injury any less foreseeable. A building is a
permanent structure commonly inhabited by many different persons over its useful life. By constructing a building
negligently, contractors create a foreseeable danger that will threaten every inhabitant during that life. The
foreseeable danger will also ground a contractor's duty in tort to a building's subsequent purchasers for the cost of
repairing the defect, if that defect is discovered prior to any injury and if it poses a real and substantial danger to the
building's inhabitants. Allowing recovery for the cost of repairing dangerous defects encourages subsequent
purchasers to mitigate potential losses before they become actual. "Discarding" a building is not a realistic option.
The contractor here should not escape liability simply because the purchaser acted quickly to alleviate the danger
that the contractor may well have helped to create. This case is distinguishable on a policy level from cases where
the workmanship was merely shoddy but not dangerously defective. If the contractor should be found negligent at
trial, the purchaser should recover the reasonable cost of putting the building into a non-dangerous state, but not the
cost of any repairs that would merely improve the building's quality.

There are two concerns raised by recognizing a contractor's duty in tort to subsequent purchasers of buildings for the
cost of repairing dangerous defects. The first is that warranties respecting quality of construction are mostly
contractual in nature and cannot be easily limited in tort. However, the tort duty to construct a building safely is

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176 N.R. 321, [1995] 1 **S.C.R. 85,** 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91 W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

circumscribed, and not parasitic upon any contractual duties between the contractor and the original owner. There is no serious risk of indeterminate liability respecting this duty. There is no risk of liability to an indeterminate class because the potential class of claimants is limited to those for whom the building is constructed: its inhabitants. There is no risk of liability in an indeterminate amount because the amount will always be limited by the reasonable cost of repairing the dangerous defect. Finally, there is little risk of liability for an indeterminate time because the contractor will only be liable for the cost of repairing the dangerous defect during the building's useful life. Moreover, as time passes it will become increasingly difficult for the building's owner to prove that the contractor's initial negligence caused the building's deterioration.

The second concern is that the doctrine of caveat emptor dictates that in the absence of an express warranty, there is no implied warranty of fitness for human habitation when buying an already completed house. The doctrine's underlying assumption is that a building's purchaser is better placed than the seller or builder to inspect the building and to bear the risk of latent defects. However, contractors and builders, because of their expertise, are best placed to ensure the reasonable structural integrity of buildings and their freedom from latent defects. The imposition of liability on builders provides an incentive for care in constructing buildings. For the court to apply caveat emptor to negate a contractor's duty in tort would be to apply a rule which has here become divorced from its underlying rationale. Thus no policy considerations negate a contractor's duty in tort to subsequent purchasers of a build ing to take reasonable care in its construction, and to ensure that the building does not contain defects that pose foreseeable and substantial danger to its occupants' safety. Here, the contractor could, in principle, be held liable in tort to the subsequent purchaser for the reasonable cost of returning the building to a non-dangerous state. The case should proceed to trial.

A court considering a motion for summary judgment under R. 20 of the Manitoba Queen's Bench Rules must take a hard look at the action's merits and determine whether there is a real chance that the action will be successful. Here, issues such as whether the work on the building was negligently performed were genuine issues to be considered at trial.

Cases considered:

Anns v. Merton London Borough Council, [1978] A.C. 728, (sub nom. Anns v. London Borough of Merton) [1977] 2 All E.R. 492 (H.L.) -- applied

Aronsohn v. Mandara, 484 A. 2d 675, 98 N.J. 92 (Sup. Ct., 1984) -- applied

Banque nationale du Canada c. Houle, [1990] 3 S.C.R. 122, 5 C.B.R. (3d) 1, (sub nom. Houle v. Canadian National Bank) 74 D.L.R. (4th) 577, 114 N.R. 161, 35 Q.A.C. 161 -- referred to

Bowen v. Paramount Builders (Hamilton) Ltd., [1977] 1 N.Z.L.R. 394 (C.A.) -- considered

Bryan v. Moloney (October 6, 1993), Doc. A77/1993 (Tasmania S.C.) -- considered

Canadian National Railway v. Norsk Pacific Steamship Co., [1992] 1 S.C.R. 1021, 11 C.C.L.T. (2d) 1, 137 N.R. 241, 91 D.L.R. (4th) 289 [application for rehearing refused (July 23, 1992), Doc. 21838 (S.C.C.)] -- considered

Central & Eastern Trust Co. v. Rafuse, (sub nom. Central Trust Co. v. Rafuse) [1986] 2 S.C.R. 147, 37 C.C.L.T. 117, 42 R.P.R. 161, 34 B.L.R. 187, 31 D.L.R. (4th) 481, 75 N.S.R. (2d) 109, 186 A.P.R. 109, 69 N.R. 321 [varied [1988] 1 S.C.R. 1206, 44 C.C.L.T. xxxiv] -- applied

D. & F. Estates v. Church Commissioners for England, [1988] 2 All E.R. 992 (H.L.) -- not followed

Drexel Properties Inc. v. Bay Colony Club Condominium Inc., 406 So. 2d 515 (Fla. 4th Dist. Ct. App.,

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

      1981) -- considered

      Dutton v. Bognor Regis Urban District Council, [1972] 1 Q.B. 373, (sub nom. Dutton v. Bognor Regis
United Building Co.) [1972] 1 All E.R. 462 (C.A.) -- considered

      Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd., [1993] 3 S.C.R. 206, [1993] 8 W.W.R. 129,
83 B.C.L.R. (2d) 145, 17 C.C.L.T. (2d) 101, 12 C.L.R. (2d) 161, 107 D.L.R. (4th) 169, 11 B.L.R. (2d) 101,
157 N.R. 241, 32 B.C.A.C. 221 -- considered

      Fraser-Reid v. Droumtsekas (1979), [1980] 1 S.C.R. 720, 9 R.P.R. 121, 103 D.L.R. (3d) 385, 29 N.R. 424 -
- considered

      Hedley Byrne & Co. v. Heller & Partners Ltd. (1963), [1964] A.C. 465, [1963] 2 All E.R. 575 (H.L.) --
considered

      Lempke v. Dagenais, 547 A. 2d 290, 130 N.H. 782 (Sup. Ct., 1984) -- considered

      M'Alister (Donoghue) v. Stevenson, [1932] A.C. 562 (H.L.) -- referred to

      Manolakos v. Gohmann, (sub nom. Rothfield v. Manolakos) [1989] 2 S.C.R. 1259, [1990] 1 W.W.R. 408,
41 B.C.L.R. (2d) 374, 46 M.P.L.R. 217, 1 C.C.L.T. (2d) 233, (sub nom. Manolakos v. Vernon (City)) 102
N.R. 249 [application for rehearing refused [1990] 1 W.W.R. lxxii, 46 M.P.L.R. 217n, 1 C.C.L.T. (2d)
233n] -- considered

      Murphy v. Brentwood District Council, [1991] 1 A.C. 398, [1990] 2 All E.R. 908 (H.L.) -- not followed

      Nielsen v. Kamloops (City), [1984] 2 S.C.R. 2, [1984] 5 W.W.R. 1, 66 B.C.L.R. 273, 29 C.C.L.T. 97, 26
M.P.L.R. 81, 8 C.L.R. 1, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1 -- applied

      Ontario (Attorney General) v. Fatehi, [1984] 2 S.C.R. 536, 31 M.V.R. 301, 31 C.C.L.T. 1, 56 N.R. 62, 6
O.A.C. 270, 15 D.L.R. (4th) 132 -- considered

      Podkriznik v. Schwede, [1990] 4 W.W.R. 220, 64 Man. R. (2d) 199 (C.A.) -- applied

      Richards v. Powercraft Homes Inc., 678 P. 2d 427, 139 Ariz. 242 (Sup. Ct., 1984) -- considered

      Rivtow Marine Ltd. v. Washington Iron Works, [1974] S.C.R. 1189, [1973] 6 W.W.R. 692, 40 D.L.R. (3d)
530 -- considered

      Terlinde v. Neely, 271 S.E. 2d 768, 275 S.C. 395 (Sup. Ct., 1980) -- considered

      Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (Sup. Ct., 1931) -- considered

      Vaughan v. Warner Communications Inc. (1986), 56 O.R. (2d) 242, 10 C.P.C. (2d) 205, 10 C.P.R. (3d) 492
(H.C.) -- considered

Statutes considered:

Civil Code of Quebec

      art. 1442considered

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

  art. 2118considered

  art. 2119considered

  art. 2120considered

Rules considered:

Manitoba, Queen's Bench Rules (1988)

  r. 20.01considered

  r. 25.11pursuant to

Appeal from judgment of Manitoba Court of Appeal, [1993] 5 W.W.R. 673, 15 C.C.L.T. (2d) 1, 6 C.L.R. (2d) 1,
101 D.L.R. (4th) 699, 85 Man. R. (2d) 81, allowing appeal from order of Galanchuk J. (1992), 84 Man. R. (2d) 23,
dismissing defendant's application to strike claim.

**The judgment of the court was delivered by *La Forest J.*:**

1  May a general contractor responsible for the construction of a building be held tortiously liable for negligence to
a subsequent purchaser of the building, who is not in contractual privity with the contractor, for the cost of repairing
defects in the building arising out of negligence in its construction? That is the issue that was posed by a motion for
summary judgment and a motion to strike out a claim as disclosing no reasonable cause of action argued before
Galanchuk J. of the Manitoba Court of Queen's Bench pursuant to r. 20.01 and 25.11 of the Manitoba *Court of
Queen's Bench Rules*, Man. Reg. 553/88, as amended. Galanchuk J. dismissed the motions, but the Court of Appeal
of Manitoba allowed an appeal from this decision and struck out the claim against the contractor on the grounds that
the damages sought were for economic loss, which were not recoverable in the circumstances, and hence that the
claim did not disclose a reasonable cause of action.

2  For reasons that will appear, I do not, with respect, share the views of the Court of Appeal; I agree with
Galanchuk J. that the action should proceed to trial. The facts as set out before Galanchuk J. are contained in the
appellant's amended statement of claim, the respondent's statement of defence and notice of motion. These facts are
as follows.

**Facts**

3  On April 19, 1972, a Winnipeg land developer, Tuxedo Properties Co. Ltd. ("Tuxedo"), entered into a contract
("the General Contract") with a general contractor, Bird Construction Co. Limited ("Bird"), for the construction of a
15-storey, 94-unit apartment building. In the General Contract, Bird undertook to construct the building in
accordance with plans and specifications prepared by the architectural firm of Smith Carter Partners ("Smith
Carter"), with whom Tuxedo also had a contract. On June 5, 1972, Bird entered into a subcontract with a masonry
subcontractor, Kornovski & Keller Masonry Ltd. ("Kornovski & Keller"), under which the latter undertook to
perform the masonry portion of the work specified under the General Contract. The work called for by the General
Contract commenced in April, 1972 and the building was substantially completed by December, 1974.

4  The building was initially built and used as an apartment block, but was converted into a condominium in
October, 1978, when Winnipeg Condominium Corporation No. 36 ("the Condominium Corporation") became the
registered owner of the land and building. The facts surrounding the conversion were a subject of dispute between
the parties, but during oral argument the appellant conceded for the purposes of this appeal that the Condominium
Corporation was a subsequent owner of the building and was not the alter ego of the original owner. I shall
accordingly deal with the appeal on the assumption that this was indeed the case.

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

5    In 1982, the Board of Directors of the Condominium Corporation became concerned about the state of the
exterior cladding of the building (consisting of 4-inch thick slabs of stone), which had been installed by the
subcontractor, Kornovski & Keller. The directors observed that some of the mortar had broken away and that cracks
were developing in the stone work. As a result of these concerns, the Condominium Corporation retained a firm of
structural engineers and the original architects, Smith Carter, to inspect the building. The engineers and Smith Carter
recommended some minor remedial work but offered the opinion that the stonework on the building was structurally
sound. The remedial work, costing $8,100, was undertaken at the Condominium Corporation's expense in 1982.

6    On May 8, 1989, a storey-high section of the cladding, approximately twenty feet in length, fell from the ninth
storey level of the building to the ground below. The Condominium Corporation retained engineering consultants
who conducted further inspections. Following these inspections, the Condominium Corporation had the entire
cladding removed and replaced at a cost in excess of $1.5 million.

7    An action was commenced in negligence by the Condominium Corporation against Bird, Smith Carter and
Kornovski & Keller. The Condominium Corporation, in its statement of claim, detailed alleged inadequacies in
design and workmanship, without assigning specific blame to one defendant or another. Bird responded by filing a
notice of motion for summary judgment and a motion to strike the Condominium Corporation's claim as disclosing
no reasonable cause of action with the Manitoba Court of Queen's Bench. Galanchuk J. heard the motions, along
with a similar one by the subcontractor. Smith Carter did not bring a motion of its own, but appeared and was
allowed to support the motions of its co-defendants. Both motions were dismissed. Bird appealed to the Court of
Appeal but the subcontractor did not. The appeal was dismissed with respect to the motion for summary judgment
but allowed with respect to the motion to strike and the statement of claim was struck out as against Bird.

**Judgments Below**

### *Court of Queen's Bench for Manitoba (1992), 84 Man. R. (2d) 23 (Galanchuk J.)*

8    Galanchuk J. dismissed Bird's motion for summary judgment and its motion to strike the Condominium
Corporation's claim as disclosing no reasonable cause of action on the grounds that the Condominium Corporation's
claim disclosed a reasonable cause of action and that the issues raised before him were genuine. He observed that
the parties had raised real issues of credibility and had introduced conflicting evidence of sufficient complexity to
warrant a trial. With respect to Bird's argument that the Condominium Corporation's loss was pure economic loss
and therefore not recoverable against Bird, he held that that issue had to be dealt with by a trial judge and that the
following question (at p. 28) would have to be answered at trial:

  Is there a sufficient degree of foreseeability of harm and proximity of the parties to impose liability in all of
  the circumstances of this case to warrant the plaintiff's claim for recovery?

### *Court of Appeal (1993), 85 Man. R. (2d) 1 [[1993] 5 W.W.R. 673] (Huband J.A., Scott C.J.M. and Philp J.A. Concurring)*

9    The Court of Appeal, we saw, allowed the appeal and struck out the Condominium Corporation's claim as
against Bird. Huband J.A., writing for a unanimous court, decided that the expenses incurred by the Condominium
Corporation in repairing the building were pure economic loss and not recoverable against Bird in tort. In reaching
this decision, he found the decision by the House of Lords in *D. & F. Estates Ltd. v. Church Commissioners for
England,* [1988] 2 All E.R. 992 (H.L.), to be directly on point. In that case, the House of Lords ruled that, in the
absence of a contractual relationship, the cost of repairing a defective structure, where the defect is discovered
before it causes personal injury or physical damage to other property, is not recoverable in negligence by a remote
buyer of real property against the original contractor or builder. Applying this reasoning, Huband J.A. observed that,
even if Bird's employees, rather than the subcontractor Kornovski & Keller, had affixed the exterior cladding, the
Condominium Corporation would not have had a claim in negligence because the damages claimed for the cost of

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

repairing the cladding would still have been purely economic in nature. In support of this conclusion, he quoted with approval the following passage from the reasons of Lord Bridge in *D. & F. Estates*, at p. 1006:

> ... liability can only arise if the defect remains hidden until the defective structure causes personal injury or damage to property other than the structure itself. If the defect is discovered before any damage is done, the loss sustained by the owner of the structure, who has to repair or demolish it to avoid a potential source of danger to third parties, would seem to be purely economic. Thus, if I acquire a property with a dangerously defective garden wall which is attributable to the bad workmanship of the original builder, it is difficult to see any basis in principle on which I can sustain an action in tort against the builder for the cost of either repairing or demolishing the wall. No physical damage has been caused. All that has happened is that the defect in the wall has been discovered in time to prevent damage occurring.

10     Huband J.A. found that the law as stated in *D. & F. Estates* was consistent with Canadian law. He expressed some concern about the fact that Lord Bridge and Lord Oliver in *D. & F. Estates* had expressly criticized the earlier decision of the House of Lords in *Anns v. Merton London Borough Council* , [1977] 2 All E.R. 492, in which Lord Wilberforce had set down a two-stage negligence test and had suggested, in an obiter passage, that liability might fall upon a contractor in similar circumstances to the case at bar. Huband J.A. observed that the application of the reasoning in *D. & F. Estates* by Canadian courts may be problematic because *D. & F. Estates* paved the way for the full repudiation of *Anns* by the Law Lords in *Murphy v. Brentwood District Council* , [1990] 2 All E.R. 908 (H.L.). By contrast, he noted, this Court explicitly declined, in *Canadian National Railway v. Norsk Pacific Steamship Co.* , [1992] 1 S.C.R. 1021, to abandon *Anns*.

11     However, Huband J.A. resolved the problem by deciding that the result in this case would be the same under either the *Anns* or the *Murphy* approach. First, Huband J.A., at p. 90, found that the concept of caveat emptor negated any relationship of proximity as defined under the first stage of Lord Wilberforce's two-stage *Anns* approach:

> The maxim, caveat emptor, operates as between purchaser and vendor. But the very existence of the principle instructs the potential purchaser to rely upon his own investigations, inspections and inquiries, and not to rely upon the fact that the vendor had retained Smith Carter Partners as architects, Bird as general contractor, and that Kornovski & Keller was one of the subcontractors, and since they are reputable firms, the integrity of the building can be safely assumed. The concept of "buyer beware" tells the potential purchaser that if it seeks greater protection than its own investigations, inspections and inquiries provide, it should seek appropriate warranties from the vendor or, if that cannot be bargained, to seek out an insurer to cover anticipated future risks.

Second, Huband J.A., at p. 86, found that the House of Lords in *D. & F. Estates* had set forth sufficiently compelling policy concerns to justify precluding recovery under the second branch of the *Anns* test:

> The great debate as to whether the *Anns* case was correctly decided and should be followed, or whether the reasoning in *Murphy* should be preferred will rage on. But in certain cases, I do not think that the difference in approach will yield a difference in result. In the *D. & F. Estates* case, the House of Lords did in fact consider whether there were factors which should negative, reduce or limit the scope of a duty of care owed by a building contractor to the subsequent lessee of the building, or a limitation on the damages to which a breach of that duty may give rise. The court found that considerations did exist which should limit the remedy. Lord Bridge observed that with respect to defective chattels, economic loss is recoverable in contract by a buyer or hirer of the chattel entitled to the benefit of a relevant warranty of quality, but economic loss is "not recoverable in tort by a remote buyer or hirer of the chattel". Lord Bridge concluded that the same law should apply in the field of real property and this need for consistency should indeed limit the breadth of a remedy for a breach of a duty of care.

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176 N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91 W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

## Analysis

12    This case gives this Court the opportunity once again to address the question of recoverability in tort for economic loss. In *Norsk*, supra, at p. 1049, I made reference to an article by Professor Feldthusen in which he outlined five different categories of cases where the question of recoverability in tort for economic loss has arisen ("Economic Loss in the Supreme Court of Canada: Yesterday and Tomorrow" (1990-91), 17 Can. Bus. L.J. 356, at pp. 357-58), namely:

      1. The Independent Liability of Statutory Public Authorities;

      2. Negligent Misrepresentation;

      3. Negligent Performance of a Service;

      4. Negligent Supply of Shoddy Goods or Structures;

      5. Relational Economic Loss.

I stressed in *Norsk* that the question of recoverability for economic loss must be approached with reference to the unique and distinct policy issues raised in each of these categories. That is because ultimately the issues concerning recovery for economic loss are concerned with determining the proper ambit of the law of tort, an exercise that must take account of the various situations where that question may arise. This case raises issues different from that in *Norsk*, which fell within the fifth category. The present case, which involves the alleged negligent construction of a building, falls partially within the fourth category, although subject to an important caveat. The negligently supplied structure in this case was not merely shoddy; it was dangerous. In my view, this is important because the degree of danger to persons and other property created by the negligent construction of a building is a cornerstone of the policy analysis that must take place in determining whether the cost of repair of the building is recoverable in tort. As I will attempt to show, a distinction can be drawn on a policy level between "dangerous" defects in buildings and merely "shoddy" construction in buildings and that, at least with respect to dangerous defects, compelling policy reasons exist for the imposition upon contractors of tortious liability for the cost of repair of these defects.

13    Traditionally, the courts have characterized the costs incurred by a plaintiff in repairing a defective chattel or building as "economic loss" on the grounds that costs of those repairs do not arise from injury to persons or damage to property apart from the defective chattel or building itself; see *Rivtow Marine Ltd. v. Washington Iron Works*, [1974] S.C.R. 1189 at 1207 [[1973] 6 W.W.R. 692]. For my part, I would find it more congenial to deal directly with the policy considerations underlying that classification as was done in an analogous situation in *Dutton v. Bognor Regis Urban District Council* , [1972] 1 Q.B. 373 (C.A.), per Denning M.R. (pp. 396-98), and Sachs L.J. (pp. 403-404). However, I am content to deal with the issues in the terms in which the arguments were formulated. Adopting this traditional characterization as a convenient starting point for my analysis, I observe that the losses claimed by the Condominium Corporation in the present case fall quite clearly under the category of economic loss. In their statement of claim, the Condominium Corporation claim damages in excess of $1.5 million from the respondent Bird, the subcontractor Kornovski & Keller and the architects Smith Carter, representing the cost of repairing the building subsequent to the collapse of the exterior cladding on May 8, 1989. The Condominium Corporation is not claiming that anyone was injured by the collapsing exterior cladding or that the collapsing cladding damaged any of its other property. Rather, its claim is simply for the cost of repairing the allegedly defective masonry and putting the exterior of the building back into safe working condition.

14    Although most of the Condominium Corporation's submissions before this Court were directed toward establishing that the costs of repair were recoverable economic loss, counsel for the Condominium Corporation made a subsidiary claim that the losses in question could, in fact, be characterized as damage to property as opposed to pure economic loss. In *D. & F. Estates*, supra, at pp. 1006-1007, Lord Bridge observed, in obiter, that:

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> ... it may well be arguable that in the case of complex structures ... one element of the structure should be regarded for the purpose of the application of the principles under discussion as distinct from another element, so that damage to one part of the structure caused by a hidden defect in another part may qualify to be treated as damage to "other property".

Counsel for the Condominium Corporation argued that the collapse of the cladding may have been attributable to the negligent installation of certain metal ties. Following the logic suggested by Lord Bridge, counsel argued that the loss suffered was not, in fact, economic loss but, rather, damage to "other property" and thus recoverable under the principles es tablished in *M'Alister (Donoghue) v. Stevenson*, [1932] A.C. 562 (H.L.). In other words, he sought to localize the defect in one part of the structure and to claim that the damage to the rest of the structure was "caused" in some manner by the defect.

15    I note at the outset that I do not find the Condominium Corporation's argument on this subsidiary point persuasive. In *Murphy*, supra, at pp. 926- 28, Lord Bridge reconsidered and rejected the "complex structure" theory he had suggested in *D. & F. Estates*, criticizing the theory on the following basis (at p. 928):

> The reality is that the structural elements in any building form a single indivisible unit of which the different parts are essentially interdependent. To the extent that there is any defect in one part of the structure it must to a greater or lesser degree necessarily affect all other parts of the structure. Therefore any defect in the structure is a defect in the quality of the whole and it is quite artificial, in order to impose a legal liability which the law would not otherwise impose, to treat a defect in an integral structure, so far as it weakens the structure, as a dangerous defect liable to cause damage to "other property".

> A critical distinction must be drawn here between some part of a complex structure which is said to be a "danger" only because it does not perform its proper function in sustaining the other parts and some distinct item incorporated in the structure which positively malfunctions so as to inflict positive damage on the structure in which it is incorporated. Thus, if a defective central heating boiler explodes and damages a house or a defective electrical installation malfunctions and sets the house on fire, I see no reason to doubt that the owner of the house, if he can prove that the damage was due to the negligence of the boiler manufacturer in the one case or the electrical contractor in the other, can recover damages in tort on *Donoghue v Stevenson* principles.

I am in full agreement with Lord Bridge's criticisms of the "complex structure" theory. In cases involving the recoverability of economic loss in tort, it is preferable for the courts to weigh the relevant policy issues openly. Since the use of this theory serves mainly to circumvent and obscure the underlying policy questions, I reject the use of the "complex structure" theory in cases involving the liability of contractors for the cost of repairing defective buildings.

16    Proceeding on the assumption, then, that the losses claimed in this case are purely economic, the sole issue before this Court is whether the losses claimed by the Condominium Corporation are the type of economic losses that should be recoverable in tort. In coming to its conclusion that the losses claimed by the Condominium Corporation are not recoverable in tort, the Manitoba Court of Appeal, we saw, followed the reasoning of the House of Lords in *D. & F. Estates*. In that case, the House of Lords found that the cost of repairing a defect in a building is not recoverable in negligence by a successor in title against the original contractor in the absence of a contractual relationship or a special relationship of reliance. I should say that the Court of Appeal might well have come to the same conclusion on the basis of the majority opinion in *Rivtow*, supra, an issue I will take up later. Here I shall dispose of the arguments relating to *D. & F. Estates*.

17    The facts in *D. & F. Estates* were as follows. The defendants were the main contractors hired by the owner of a piece of land to construct a block of flats between 1963 and 1965. The contractors hired a sub-contractor to carry out plastering work on the building which, it was later discovered, was performed negligently. In 1965, after the block was completed, the plaintiffs took a 98-year lease on a flat from the owner of the block. In 1980, the plaintiffs

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

discovered that the plaster on the ceilings and on one wall was loose and that some of the plaster had fallen down. The plaintiffs had the remaining plaster hacked off and the areas affected were replastered and redecorated at the plaintiff's expense. The plaintiff sued the original contractor in tort for the cost of the repairs and the estimated cost of future remedial work. At trial, the judge awarded damages against the contractors in respect of cost of the remedial work on the grounds that the contractors had been negligent in supervising the plastering work. The Court of Appeal reversed the trial judge's decision, and the plaintiff appealed to the House of Lords.

18    The House of Lords dismissed the appeal on two principal grounds. First, they decided that any duty owed by a contractor to a home owner with respect to the quality of construction in a building must arise in contract, and not in tort. They based this conclusion upon a concern that allowing recoverability for the cost of repairing defects in buildings would have the effect of creating a non-contractual warranty of fitness; see *D. & F. Estates*, at p. 1007.

19    Second, they decided that a contractor can only be held liable in tort to subsequent purchasers of a building when the contractor's negligence causes physical injury to the purchasers, damage to their other property, or where a special relationship of reliance has developed between the contractor and the purchasers along the lines suggested in *Hedley Byrne & Co. v. Heller & Partners Ltd., [1964] A.C. 465* (H.L.). See *D. & F. Estates*, at p. 1014.

20    There was no contract between the plaintiff and the defendants in *D. & F. Estates*, and the Law Lords found no special relationship of reliance on the facts of the case. Accordingly, they reasoned that the cost of repairing defective plaster fell under the category of "pure economic loss". Since the negligence in that case did not result in damage to persons or property, they concluded that the plaintiff could not claim that expense against the contractor. Lord Bridge expressed the conclusion as follows, at p. 1006:

> ... liability can only arise if the defect remains hidden until the defective structure causes personal injury or damage to property other than the structure itself. If the defect is discovered before any damage is done, the loss sustained by the owner of the structure, who has to repair or demolish it to avoid a potential source of danger to third parties, would seem to be purely economic.

Lord Oliver came to a similar conclusion, at p. 1014:

> ... such loss is not in principle recoverable in tort unless the case can be brought within the principle of reliance established by *Hedley Byrne*. In the instant case the defective plaster caused no damage to the remainder of the building and in so far as it presented a risk of damage to other property or to the person of any occupant that was remediable simply by the process of removal.

21    Huband J.A. found the reasoning in *D. & F. Estates* to be compelling and of strong persuasive authority and, on that basis, came to the conclusion that the costs of repair of the defects in the building were not recoverable in tort by the Condominium Corporation against Bird. With respect, I come to a different conclusion. In my view, where a contractor (or any other person) is negligent in planning or constructing a building, and where that building is found to contain defects resulting from that negligence which pose a real and substantial danger to the occupants of the building, the reasonable costs of repairing the defects and putting the building back into a non-dangerous state are recoverable in tort by the occupants. The underlying rationale for this conclusion is that a person who participates in the construction of a large and permanent structure which, if negligently constructed, has the capacity to cause serious damage to other persons and property in the community, should be held to a reasonable standard of care. Sir Robin Cooke expressed the rationale for this conclusion as follows ("An Impossible Distinction" (1991), 107 L.Q. Rev. 46, at p. 70):

> The point is simply that, prima facie, he who puts into the community an apparently sound and durable structure, intended for use in all probability by a succession of persons, should be expected to take reasonable care that it is reasonably fit for that use and does not mislead. He is not merely exercising his freedom as a citizen to pursue his own ends. He is constructing, exploiting or sanctioning something for the

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> use of others. Unless compelling grounds to the contrary can be made out, and subject to reasonable
> limitations as to time or otherwise, the natural consequences of failure to take due care should be accepted.

22    My conclusion that the type of economic loss claimed by the Condominium Corporation is recoverable in tort
is therefore based in large part upon what seem to me to be compelling policy considerations. I shall elaborate in
more detail upon these later in my reasons. However, before doing so, I think it important to clarify why the *D. & F.
Estates* case should not, in my view, be seen as having strong persuasive authority in Canadian tort law as that law is
currently developing. My reasons for coming to this conclusion are twofold: first, to the extent that the decision of
the House of Lords in *D. & F. Estates* rests upon the assumption that liability in tort for the cost of repair of
defective houses represents an unjustifiable intrusion of tort into the contractual sphere, it is inconsistent with recent
Canadian decisions recognizing the possibility of concurrent contractual and tortious duties; second, to the extent
that the *D. & F. Estates* decision formed part of a line of English cases leading ultimately to the rejection of *Anns*, it
is inconsistent with this Court's continued application of the principles established in *Anns*.

23    Turning to the first of these reasons, I observe that it is now well established in Canada that a duty of care in
tort may arise coextensively with a contractual duty. In *Central & Eastern Trust Co. v. Rafuse* (sub nom. *Central
Trust Co. v. Rafuse*), [1986] 2 S.C.R. 147, Le Dain J. explained the relationship between tort and contractual duties
as follows, at pp. 204-205:

> 1. The common law duty of care that is created by a relationship of sufficient proximity, in accordance with
> the general principle affirmed by Lord Wilberforce in *Anns v. Merton London Borough Council*, is not
> confined to relationships that arise apart from contract. Although the relationships in *Donoghue v.
> Stevenson*, *Hedley Byrne* and *Anns* were all of a non-contractual nature and there was necessarily reference
> in the judgments to a duty of care that exists apart from or independently of contract, I find nothing in the
> statements of general principle in those cases to suggest that the principle was intended to be confined to
> relationships that arise apart from contract ... the question is whether there is a relationship of sufficient
> proximity, not how it arose. The principle of tortious liability is for reasons of public policy a general one.

This is not say, of course, that a duty in tort arises out of a duty in contract. In *Rafuse*, Le Dain J. made it clear that,
although duties in tort and contract may arise concurrently, the duty in tort must arise independently of the
contractual duty. He stated, at p. 205:

> 2. What is undertaken by the contract will indicate the nature of the relationship that gives rise to the
> common law duty of care, but the nature and scope of the duty of care that is asserted as the foundation of
> the tortious liability must not depend on specific obligations or duties created by the express terms of the
> contract. It is in that sense that the common law duty of care must be independent of the contract.

For the similar situation under Quebec law, see *Banque nationale du Canada c. Houle, (sub nom. Houle v.
Canadian National Bank)* [1990] 3 S.C.R. 122, per L'Heureux-Dubé J., at pp. 165-67.

24    I emphasize the fact that contractual and tortious duties can arise concurrently in Canadian law because, in my
view, the decision in *D. & F. Estates* was based at least in part upon the assumption that a duty on the part of
contractors to take reasonable care in the construction of buildings can only arise in contract. In deciding that the
contractor in that case could not be held liable in tort for the cost of repairing the defective plaster, Lord Bridge
expressed a concern that the imposition of a tort duty upon a contractor to third parties would be to impose, in effect,
a contractual duty in tort. He stated, at p. 1007:

> To make [the contractor] so liable would be to impose on him for the benefit of those with whom he had no
> contractual relationship the obligation of one who warranted the quality of the plaster as regards materials,
> workmanship and fitness for purpose. I am glad to reach the conclusion that this is not the law ...

25    However, in light of this Court's decision in *Rafuse*, I do not believe that Lord Bridge's concern should

   Case 01-01139-AMC    Doc 16757-20    Filed 09/05/07    Page 46 of 56

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

preclude conceptualizing Bird's duty in tortious terms. In my view, a contractor's duty to take reasonable care arises independently of any duty in contract between the contractor and the original property owner. The duty in contract with respect to materials and workmanship flows from the terms of the contract between the contractor and home owner. By contrast, the duty in tort with respect to materials and workmanship flows from the contractor's duty to ensure that the building meets a reasonable and safe standard of construction. For my part, I have little difficulty in accepting a distinction between these duties. The duty in tort extends only to reasonable standards of safe construction and the bounds of that duty are not defined by reference to the original contract. Certainly, for example, a contractor who enters into a contract with the original home owner for the use of high-grade materials or special ornamental features in the construction of the building will not be held liable to subsequent purchasers if the building does not meet these special contractual standards. However, such a contract cannot absolve the contractor from the duty in tort to subsequent owners to construct the building according to reasonable standards. This is important because, in my view, the unfortunate result of the reasoning in *D. & F. Estates* is that it leaves subsequent purchasers with no remedy against a contractor who constructs a building with substandard materials or substandard workmanship, and thereby puts subsequent purchasers at considerable risk.

26    Thus, the fact that Bird negotiated a contract with Tuxedo, the original owner of the building, does not insulate Bird from a separate duty to the current owners of the building. This duty arises out of the danger created by the work and not the specifications contained in the contract. An analogy can be drawn, in this respect, with this Court's decision in *Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.,* [1993] 3 S.C.R. 206 [[1993] 8 W.W.R. 129]. In that case, an engineering firm had contracted with the province of British Columbia for the drawing up of specifications for a road-building project. There were errors in the specifications and a construction company, which had entered into a contract with the province for the building of the road, sued the engineering firm in tort, alleging negligent misrepresentation. This Court decided that the engineering firm could be held liable to the construction company in the absence of a contract. In so ruling, McLachlin J., at pp. 217-18, had the following to say about the effect of a duty in contract upon any duty owed to third persons in tort:

> Another way of putting the argument that the contract terminates the duty of care between the contractor and the engineers, is to say that once the contractor enters into a contract with the province which deals with the matter of design, the contract ousts all tort duties. Where the parties to the contract have themselves defined their obligations by contract, it may be argued that the contract must prevail over a different duty which tort law might impose, on the principle that people are free to determine their own civil rights and responsibilities. Subject to this limitation, however, the presence of a contract does not bar the right to sue in tort: *BG Checo International Ltd. v. British Columbia Hydro and Power Authority,* [1993] 1 S.C.R. 12. In this case, the contract is not between the plaintiff and the defendant. Moreover, for the reasons given above, it does not purport to limit the tort duty which is owed by the defendant engineering firm to the contractor. Accordingly, the argument that the parties have defined their obligations by the contract, thereby ousting tort obligations, cannot succeed.

27    The second reason that the *D. & F. Estates* decision should not be regarded as strong persuasive authority in the Canadian context is that the approaches taken by English and Canadian courts with respect to the recoverability of economic loss have, in recent years, diverged significantly. The decision by the House of Lords in *D. & F. Estates* was the penultimate step in a path of reasoning followed by the Law Lords culminating in *Murphy*, where they overruled their earlier decision in *Anns* and re-established a broad bar against recovery for pure economic loss in tort. This is a path this Court has chosen not to follow.

28    The divergence in approach between this Court and the House of Lords relates in large part to the question whether courts should impose what, in *Norsk*, I called a "broad exclusionary rule" against recovery for economic loss in tort. In *Norsk*, I discussed the development of the rule against recovery for economic loss in tort at common law and observed that, in its broad formulation, that rule was said to exclude all claims in negligence for pure economic loss in the absence of property loss or personal injury loss (at pp. 1054-61). I then made the following observation, at pp. 1060-61:

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85,** 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> A new stage in the development of the law on economic loss opened with the great case of *Hedley Byrne v.
> Heller, supra.* The speeches of the Law Lords were principally concerned with the problem of liability for
> negligent words, rather than with the issue of economic loss itself ...
>
> Only two of the Lords in *Hedley Byrne,* Lord Hodson and Lord Devlin, dealt specifically with the issue of
> economic loss. Both rejected the broad exclusionary rule. It was clear that henceforth economic loss was
> recoverable at least in some circumstances. With *Hedley Byrne* to guide the way, the broad rule came
> increasingly under attack in a variety of situations during this third phase.

The divergent attacks upon the broad rule after *Hedley Byrne* were synthesized in Lord Wilberforce's well-known
and influential decision in *Anns,* supra, where the House of Lords found a local council liable in negligence to a
successor in title for a failure to inspect the negligently constructed foundations of a building to ensure that it
complied with local by-laws. In his reasons, at p. 498, Lord Wilberforce rejected the traditional broad exclusionary
rule and instead proposed the following general approach to cases involving economic loss in tort:

> ... the position has now been reached that in order to establish that a duty of care arises in a particular
> situation, it is not necessary to bring the facts of that situation within those of previous situations in which a
> duty of care has been held to exist. Rather the question has to be approached in two stages. First one has to
> ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a
> sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the
> former, carelessness on his part may be likely to cause damage to the latter, in which case a prima facie
> duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider
> whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or
> the class of person to whom it is owed or the damages to which a breach of it may give rise ...

29    Applying this test, Lord Wilberforce came to the conclusion in *Anns,* supra, at p. 505, that the cost of repairing
a dangerous defect in a building and putting the building back into a non-dangerous state could, in principle, be
characterized as recoverable economic loss in tort. In coming to this conclusion, Lord Wilberforce was influenced
by the dissenting opinion of Laskin J. (as he then was) in *Rivtow,* supra. In *Rivtow,* a barge charterer who had
purchased several defective barge cranes through a distributor brought a claim in negligence against the
manufacturer for the cost of repair of two defective cranes installed on one of its barges. The charterer had decided
to repair the cranes after one of the cranes on another barge collapsed owing to a failure in the rear legs, killing the
crane operator. As a result, the barge had to be taken out of service for repairs in the busiest part of the logging
season. The majority in *Rivtow* found that the plaintiff had a valid claim because the manufacturer, having
knowledge of the defects in the cranes, had failed to warn the plaintiff about the defects prior to the accident.
Accordingly, the majority found the manufacturer liable in tort for the loss of extra profit caused by the
manufacturer's failure to warn promptly in a slack period, but explicitly rejected the plaintiff's claim for the cost of
repairing the damage to the defective cranes themselves. However, Laskin J., in dissent, took a different approach.
While agreeing with the majority that there had been a breach of a duty to warn, Laskin J. observed that he would
also have found the manufacturer liable for the cost of repairing the defective article. He noted that, if the defective
crane had caused personal injury or damage to property, then, under the traditional *Donoghue* analysis, the
manufacturer would have been liable. He then made the following argument, at p. 1217:

> Should it then be any less liable for the direct economic loss to the appellant resulting from the faulty crane
> merely because the likelihood of physical harm, either by way of personal injury to a third person or
> property damage to the appellant, was averted by the withdrawal of the crane from service so that it could
> be repaired?

Lord Wilberforce in *Anns* found Laskin J.'s reasoning persuasive in coming to his own conclusions that the cost of
repair for a dangerous defect in a building could be recoverable in tort. He stated, at p. 505:

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 **S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> If classification is required, the relevant damage is in my opinion material, physical damage, and what is recoverable is the amount of expenditure necessary to restore the dwelling to a condition in which it is no longer a danger to the health or safety of persons occupying and possibly (depending on the circumstances) expenses arising from necessary displacement. On the question of damages generally I have derived much assistance from the judgment (dissenting on this point, but of strong persuasive force) of Laskin CJ in the Canadian Supreme Court case of *Rivtow Marine Ltd v Washington Iron Works* ...

30    It appears, however, that the decision in *Anns* was the high water mark for recovery of economic loss in tort in England. Subsequently, the Law Lords have retreated from the broad approach to recoverability in tort for economic loss suggested by Lord Wilberforce. It is clear that the *D. & F. Estates* decision played an important part in this retreat. In *D. & F. Estates*, Lord Oliver, at pp. 1011-12, made the following criticism of the approach adopted by Lord Wilberforce in *Anns*:

> ... it is, I think now entirely clear that the vendor of a defective building who is also the builder enjoys no immunity from the ordinary consequences of his negligence in the course of constructing the building, but beyond this and so far as the case was concerned with the extent of or limitations on his liability for common law negligence divorced from statutory duty, Lord Wilberforce's observations were, I think, strictly obiter. My Lords, so far as they concern such liability in respect of damage which has actually been caused by the defective structure other than by direct physical damage to persons or other property, I am bound to say that, with the greatest respect to their source, I find them difficult to reconcile with any conventional analysis of the underlying basis of liability in tort for negligence. A cause of action in negligence at common law which arises only when the sole damage is the mere existence of the defect giving rise to the possibility of damage in the future, which crystallises only when that damage is imminent, and the damages for which are measured, not by the full amount of the loss attributable to the defect but by the cost of remedying it only to the extent necessary to avert a risk of physical injury, is a novel concept. Regarded as a cause of action arising not from common law negligence but from breach of a statutory duty, there is a logic in so limiting it as to conform with the purpose for which the statutory duty was imposed, that is to say the protection of the public from injury to health or safety. But there is, on that footing, no logic in extending liability for a breach of statutory duty to cases where the risk of injury is a risk of injury to property only, nor, as it seems to me, is there any logic in importing into a pure common law claim in negligence against a builder the limitations which are directly related only to breach of a particular statutory duty. For my part, therefore, I think the correct analysis, in principle, to be simply that, in a case where no question of breach of statutory duty arises, the builder of a house or other structure is liable at common law for negligence only where actual damage, either to person or to property, results from carelessness on his part in the course of construction.

In *D. & F. Estates*, Lord Bridge also expressed doubts about the *Anns* decision and explicitly rejected Laskin J.'s dissenting reasoning in *Rivtow* in favour of the majority reasoning (at p. 1006).

31    The reasons given by Lord Oliver and Lord Bridge in *D. & F. Estates* were a signal that the days of the *Anns* test in England were numbered. This became apparent in *Murphy*, supra, where the Law Lords explicitly rejected the two-part test suggested by Lord Wilberforce in *Anns* and restored the traditional broad exclusionary rule against recovery, in the absence of a special relationship of reliance, for pure economic loss in tort. In their reasons in *Murphy*, Lord Keith and Lord Bridge both made it clear that the reasoning in the 1988 *D. & F. Estates* decision played an influential role in their Lordships' decision to overrule *Anns*. In *Murphy*, Lord Bridge noted, at p. 925, that "the reasoning of the speeches in *D & F Estates* ... has gone far to question the principles on which the [*Anns*] doctrine rests". Similarly, Lord Keith stated, at p. 923:

> In my opinion there can be no doubt that *Anns* has for long been widely regarded as an unsatisfactory decision. In relation to the scope of duty owed by a local authority it proceeded on what must, with due respect to its source, be regarded as a somewhat superficial examination of principle and there has been extreme difficulty, highlighted most recently by the speeches in the *D & F Estates* case, in ascertaining on

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

exactly what basis of principle it did proceed.

32      By contrast, in respect of both the appropriate test with regard to the recoverability of economic loss and the
recoverability of the cost for repairing dangerous defects, this Court has chosen not to take the path followed by the
House of Lords in *D. & F. Estates* and *Murphy*. In the first place, this Court has not followed the House of Lords in
repudiating the two-part test established by Lord Wilberforce in *Anns*. The approach proposed by Lord Wilberforce
in *Anns* was adopted by this Court in *Nielsen v. Kamloops (City)*, [1984] 2 S.C.R. 2, where Wilson J., at pp. 10-11,
suggested the following slightly modified version of the *Anns* test:

> (1) is there a sufficiently close relationship between the parties ... so that, in the reasonable contemplation
> of [one person], carelessness on its part might cause damage to [the other person]? If so,
>
> (2) are there any considerations which ought to negative or limit (a) the scope of the duty and (b) the class
> of persons to whom it is owed or (c) the damages to which a breach of it may give rise?

Subsequently, the *Anns* approach was employed by this Court in *Manolakos v. Gohmann*, *(*sub nom. *Rothfield v.*
*Manolakos)* [1989] 2 S.C.R. 1259 at 1266, 1285 and, most recently, in *Norsk*, supra, where this Court chose not to
follow the Law Lords in retreating from the approach adopted in *Anns* and *Kamloops*. I made this clear in *Norsk*, at
p. 1054:

> ... I fully support this Court's rejection of the broad bar on recovery of pure economic loss in *Rivtow* and
> *Kamloops*. I would stress again the need to take into account the specific characteristics of each case.

Similarly, McLachlin J., at p. 1155, stated the following in *Norsk*:

> I conclude that, from a doctrinal point of view, this Court should continue on the course charted in
> *Kamloops* rather than reverting to the narrow exclusionary rule as the House of Lords did in *Murphy*.

33      Secondly, in recent years, members of this Court have, in dicta, expressed considerable sympathy for Laskin
J.'s reasoning in *Rivtow*. In *Kamloops*, Wilson J. observed that the reasoning in *Anns* was more compatible with the
reasoning in Laskin J.'s dissent in *Rivtow* than with the majority reasoning. At p. 33, she stated:

> In any event, the majority judgment of this Court in *Rivtow* stands until such time as it may be reconsidered
> by a full panel of the Court.

Shortly thereafter, in *Ontario (Attorney General) v. Fatehi*, [1984] 2 S.C.R. 536 at 544-45, the Court observed that
the law as stated in *Rivtow* was "uncertain" and that "*Rivtow* has been variously applied or rejected by the courts of
this country." Finally, in *Norsk*, I had occasion to comment upon Laskin J.'s dissent and stated, at pp. 1067-68, that
"Laskin J.'s concern with safety and the prevention of further damage is justified", and, at p. 1065, that:

> In Laskin J.'s view, the courts must be careful to avoid giving redress in tort for "safe but shoddy" products.
> Where the products are unsafe, however, tort may have a role: prevention of threatened harm resulting
> directly in economic loss should not be treated differently from post-injury treatment.

McLachlin J. made a similar observation, at p. 1161:

> One might fasten on the fact that damaging the bridge raised the danger of physical injury to CN's property.
> CN's property -- its trains -- were frequently on the bridge and stood to be damaged by an accident
> involving the bridge. Whether they were in fact damaged is immaterial to the question of proximity. What
> is important is that this danger indicates a measure of closeness which has traditionally been held to
> establish the proximity necessary to found liability in tort for pure economic loss. However, to found the
> decision on this criterion would be to affirm the minority position of Laskin and Hall JJ. in *Rivtow* that

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] **1 S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> danger of physical loss is sufficient to found liability. I note that the majority's restriction of recovery of
> economic loss to the duty to warn has been doubted. Wilson J. in *Kamloops* noted that the problem of
> concurrent liability in contract and tort may have played a major role in the majority decision in *Rivtow*,
> and (at p. 34) that "as in the case of *Hedley Byrne*, we will have to await the outcome of a developing
> jurisprudence around the question also". MacGuigan J.A. below stated at p. 166: "In my observation, courts
> will always find sufficient proximity where there is physical danger to the plaintiff's property". However it
> is not necessary to address that issue in this case since other factors clearly indicate the necessary
> proximity.

34    I conclude, therefore, that the *D. & F. Estates* decision is not of strong persuasive authority in the Canadian
context. Accordingly, the question arising in this appeal must be resolved with reference to the test developed in
*Anns* and *Kamloops*. I will now proceed, applying this test, to discuss whether the costs of repair claimed by the
Condominium Corporation are the type of economic loss that should be recoverable in tort.

### Was There a Sufficiently Close Relationship Between the Parties so that, in the Reasonable Contemplation of Bird, Carelessness on its Part Might Cause Damage to a Subsequent Purchaser of the Building such as the Condominium Corporation?

35    In my view, it is reasonably foreseeable to contractors that, if they design or construct a building negligently
and if that building contains latent defects as a result of that negligence, subsequent purchasers of the building may
suffer personal injury or damage to other property when those defects manifest themselves. A lack of contractual
privity between the contractor and the inhabitants at the time the defect becomes manifest does not make the
potential for injury any less foreseeable. Buildings are permanent structures that are commonly inhabited by many
different persons over their useful life. By constructing the building negligently, contractors (or any other person
responsible for the design and construction of a building) create a foreseeable danger that will threaten not only the
original owner, but every inhabitant during the useful life of the building. As noted by the Supreme Court of South
Carolina, in *Terlinde v. Neely*, 271 S.E. 2d 768 (1980), at p. 770:

> The key inquiry is foreseeability, not privity. In our mobile society, it is clearly foreseeable that more than
> the original purchaser will seek to enjoy the fruits of the builder's efforts. The plaintiffs, being a member of
> the class for which the home was constructed, are entitled to a duty of care in construction commensurate
> with industry standards. In light of the fact that the home was constructed as speculative, the home builder
> cannot reasonably argue he envisioned anything but a class of purchasers. By placing this product into the
> stream of commerce, the builder owes a duty of care to those who will use his product, so as to render him
> accountable for negligent workmanship.

36    In my view, the reasonable likelihood that a defect in a building will cause injury to its inhabitants is also
sufficient to ground a contractor's duty in tort to subsequent purchasers of the building for the cost of repairing the
defect if that defect is discovered prior to any injury and if it poses a real and substantial danger to the inhabitants of
the building. In coming to this conclusion, I adopt the reasoning of Laskin J. in *Rivtow*, which I find highly
persuasive. If a contractor can be held liable in tort where he or she constructs a building negligently and, as a result
of that negligence, the building causes damage to persons or property, it follows that the contractor should also be
held liable in cases where the dangerous defect is discovered and the owner of the building wishes to mitigate the
danger by fixing the defect and putting the building back into a non-dangerous state. In both cases, the duty in tort
serves to protect the bodily integrity and property interests of the inhabitants of the building. See *Dutton*, supra, at p.
396, per Lord Denning M.R.

37    Apart from the logical force of holding contractors liable for the cost of repair of dangerous defects, there is
also a strong underlying policy justification for imposing liability in these cases. Under the law as developed in *D. &*
*F. Estates* and *Murphy*, the plaintiff who moves quickly and responsibly to fix a defect before it causes injury to
persons or damage to property must do so at his or her own expense. By contrast, the plaintiff who, either
intentionally or through neglect, allows a defect to develop into an accident may benefit at law from the costly and

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

potentially tragic consequences. In my view, this legal doctrine is difficult to justify because it serves to encourage, rather than discourage, reckless and hazardous behaviour. Maintaining a bar against recoverability for the cost of repair of dangerous defects provides no incentive for plaintiffs to mitigate potential losses and tends to encourage economically inefficient behaviour. The Fourth District Court of Appeal for Florida in *Drexel Properties Inc. v. Bay Colony Club Condominium Inc., 406 So. 2d 515* (1981), at p. 519, explained the problem in the following manner:

> Why should a buyer have to wait for a personal tragedy to occur in order to recover damages to remedy or repair defects? In the final analysis, the cost to the developer for a resulting tragedy could be far greater than the cost of remedying the condition.

Woodhouse J. in *Bowen v. Paramount Builders (Hamilton) Ltd.*, [1977] 1 N.Z.L.R. 394 at 417 (C.A.), described the problem in similar terms:

> It would seem only common sense to take steps to avoid a serious loss by repairing a defect before it will cause physical damage; and rather extraordinary if the greater loss when the building fall down could be recovered from the careless builder but the cost of timely repairs could not.

Allowing recovery against contractors in tort for the cost of repair of dangerous defects thus serves an important preventative function by encouraging socially responsible behaviour.

38    This conclusion is borne out by the facts of the present case, which fall squarely within the category of what I would define as a "real and substantial danger". It is clear from the available facts that the masonry work on the Condominium Corporation's building was in a sufficiently poor state to constitute a real and substantial danger to inhabitants of the building and to passersby. The piece of cladding that fell from the building was a storey high, was made of 4' thick Tyndal stone, and dropped nine storeys. Had this cladding landed on a person or on other property, it would unquestionably have caused serious injury or damage. Indeed, it was only by chance that the cladding fell in the middle of the night and caused no harm. In this light, I believe that the Condominium Corporation behaved responsibly, and as a reasonable home owner should, in having the building inspected and repaired immediately. Bird should not be insulated from liability simply because the current owners of the building acted quickly to alleviate the danger that Bird itself may well have helped to create.

39    Counsel for Bird submitted that, although the Condominium Corporation behaved reasonably in fixing the defects in the masonry, Bird should not be held liable for the cost of repairs the Corporation incurred in fixing the defective masonry. In support of this submission, counsel for Bird relied upon Lord Keith's argument in *Murphy*, supra, that the decision to repair a dangerous defect in a building is analogous to a decision to discard a defective article. In either case, Lord Keith noted, at p. 918, the cost of repair cannot be characterized as a recoverable loss because the owner of the defective article may simply discard it and thereby remove the danger:

> It is difficult to draw a distinction in principle between an article which is useless or valueless and one which suffers from a defect which would render it dangerous in use but which is discovered by the purchaser in time to avert any possibility of injury. The purchaser may incur expense in putting right the defect or, more probably, discard the article. In either case the loss is purely economic.

40    While Lord Keith's argument has some appeal on the basis of abstract logic, I do not believe it is sufficient to preclude imposing liability on contractors for the cost of repairing dangerous defects. The weakness of the argument is that it is based upon an unrealistic view of the choice faced by home owners in deciding whether to repair a dangerous defect in their home. In fact, a choice to "discard" a home instead of repairing the dangerous defect is no choice at all: most home owners buy a home as a long-term investment and few home owners, upon discovering a dangerous defect in the home, will choose to abandon or sell the building rather than to repair the defect. Indeed, in most cases, the cost of fixing a defect in a house or building, within the reasonable life of that house or building, will be far outweighed by the cost of replacing the house or buying a new one. This was certainly demonstrated in this

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

case by the fact that the Condominium Corporation incurred costs of over $1.5 million in repairing the building
rather than choosing to abandon or sell the building. I conclude therefore that contractors ought reasonably to
foresee that subsequent purchasers of the building will incur expenses to repair dangerous defects created by their
negligence during the useful life of the building.

41      Given the clear presence of a real and substantial danger in this case, I do not find it necessary to consider
whether contractors should also in principle be held to owe a duty to subsequent purchasers for the cost of repairing
non-dangerous defects in buildings. It was not raised by the parties. I note that appellate courts in New Zealand (in
*Bowen*, supra), Australia (*Bryan v. Moloney*, S.C. Tasmania, No. A77/1993, Oct. 6, 1993), and in numerous
American states (e.g., *Lempke v. Dagenais*, 547 A. 2d 290 (N.H. Sup. Ct., 1988); *Richards v. Powercraft Homes
Inc.*, 678 P. 2d 427 (Ariz. Sup. Ct., 1984) (en banc); *Terlinde*, supra) have all recognized some form of general duty
of builders and contractors to subsequent purchasers with regard to the reasonable fitness and habitability of a
building. In Quebec, it is also now well-established that contractors, subcontractors, engineers and architects owe a
duty to successors in title in immovable property for economic loss suffered as a result of faulty construction, design
and workmanship (see arts. 1442, 2118-2120 of the *Civil Code of Quebec*; Pierre-Gabriel Jobin, *La vente dans le
Code civil du Québec* (1993), at pp. 79 and 142). However, it is right to note that from the tone of Dickson J.'s
reasons in *Fraser-Reid v. Droumtsekas* (1979), [1980] 1 S.C.R. 720 at 729-31, he would appear to be cool to the
idea, though he found it unnecessary to canvass the point. For my part, I would require argument more squarely
focussed on the issue before entertaining this possibility.

42      Without entering into this question, I note that the present case is distinguishable on a policy level from cases
where the workmanship is merely shoddy or substandard but not dangerously defective. In the latter class of cases,
tort law serves to encourage the repair of dangerous defects and thereby to protect the bodily integrity of inhabitants
of buildings. By contrast, the former class of cases bring into play the questions of quality of workmanship and
fitness for purpose. These questions do not arise here. Accordingly, it is sufficient for present purposes to say that, if
Bird is found negligent at trial, the Condominium Corporation would be entitled on this reasoning to recover the
reasonable cost of putting the building into a non-dangerous state, but not the cost of any repairs that would serve
merely to improve the quality, and not the safety, of the building.

43      I conclude that the law in Canada has now progressed to the point where it can be said that contractors (as well
as subcontractors, architects and engineers) who take part in the design and construction of a building will owe a
duty in tort to subsequent purchasers of the building if it can be shown that it was foreseeable that a failure to take
reasonable care in constructing the building would create defects that pose a substantial danger to the health and
safety of the occupants. Where negligence is established and such defects manifest themselves before any damage to
persons or property occurs, they should, in my view, be liable for the reasonable cost of repairing the defects and
putting the building back into a non-dangerous state.

***Are There Any Considerations that Ought to Negate (a) the Scope of the Duty and (b) the Class of Persons to
Whom it is Owed or (c) the Damages to which a Breach of it May Give Rise?***

44      There are two primary and interrelated concerns raised by the recognition of a contractor's duty in tort to
subsequent purchasers of buildings for the cost of repairing dangerous defects. The first is that warranties respecting
quality of construction are primarily contractual in nature and cannot be easily defined or limited in tort. Sidney
Barrett, in "Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis" (1989), 40 S.C.L.
Rev. 891, at p. 941, makes this argument in the following terms:

> Perhaps more than any other industry, the construction industry is "vitally enmeshed in our economy and
> dependent on settled expectations". The parties involved in a construction project rely on intricate, highly
> sophisticated contracts to define the relative rights and responsibilities of the many persons whose efforts
> are required -- owner, architect, engineer, general contractor, subcontractor, materials supplier -- and to
> allocate among them the risk of problems, delays, extra costs, unforeseen site conditions, and defects.
> Imposition of tort duties that cut across those contractual lines disrupts and frustrates the parties' contractual

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 **S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> allocation of risk and permits the circumvention of a carefully negotiated contractual balance among owner, builder, and design professional.

45    The second concern is that the recognition of such a duty interferes with the doctrine of caveat emptor which, as this Court affirmed in *Fraser-Reid v. Droumtsekas*, supra, at p. 723, "has lost little of its pristine force in the sale of land". The doctrine of caveat emptor dictates that, in the absence of an express warranty, there is no implied warranty of fitness for human habitation upon the purchase of a house already completed at the time of sale. Huband J.A. of the Manitoba Court of Appeal relied on this doctrine in concluding that no duty in tort could be owed to subsequent purchasers of a building. He presented the argument, at p. 90, as follows:

> The maxim, caveat emptor, operates as between purchaser and vendor. But the very existence of the principle instructs the potential purchaser to rely upon his own investigations, inspections and inquiries ... The concept of "buyer beware" tells the potential purchaser that if it seeks greater protection than its own investigations, inspections and inquiries provide, it should seek appropriate warranties from the vendor or, if that cannot be bargained, to seek out an insurer to cover anticipated future risks.

46    In my view, these concerns are both merely versions of the more general and traditional concern that allowing recovery for economic loss in tort will subject a defendant to what Cardozo C.J. in *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y.S.C., 1931), at p. 444, called "liability in an indeterminate amount for an indeterminate time to an indeterminate class." In light of the fact that most buildings have a relatively long useful life, the concern is that a contractor will be subject potentially to an indeterminate amount of liability to an indeterminate number of successive owners over an indeterminate time period. The doctrines of privity of contract and caveat emptor provide courts with a useful mechanism for limiting liability in tort. But the problem, as I will now attempt to demonstrate, is that it is difficult to justify the employment of these doctrines in the tort context in any principled manner apart from their utility as mechanisms for limiting liability.

### *The Concern with Overlap Between Tort and Contract Duties*

47    Turning to the first concern, a duty on the part of contractors to take reasonable care in the construction of buildings can, in my view, be conceptualized in the absence of contract and will not result in indeterminate liability to the contractor. As I mentioned earlier, this Court has recognized that a tort duty can arise concurrently with a contractual duty, so long as that tort duty arises independently of the contractual duty; see *Rafuse*, supra; *Edgeworth*, supra. As I see it, the duty to construct a building according to reasonable standards and without dangerous defects arises independently of the contractual stipulations between the original owner and the contractor because it arises from a duty to create the building safely and not merely according to contractual standards of quality. It must be remembered that we are speaking here of a duty to construct the building according to reasonable standards of safety in such a manner that it does not contain *dangerous* defects. As this duty arises independently of any contract, there is no logical reason for allowing the contractor to rely upon a contract made with the original owner to shield him or her from liability to subsequent purchasers arising from a dangerously con structed building. This point was forcefully made by Richmond P. in *Bowen*, supra, at p. 407:

> It is clear that a builder or architect cannot defend a claim in negligence made against him by a third person by saying that he was working under a contract for the owner of the land. He cannot say that the only duty which he owed was his contractual duty to the owner. Likewise he cannot say that the nature of his contractual duties to the owner sets a limit to the duty of care which he owes to third parties. As regards this latter point it is, for example, obvious that a builder who agreed to build a house in a manner which he knows or ought to know will prove a source of danger to third parties cannot say, in answer to a claim by third parties, that he did all that the owner of the land required him to do.

In the same case, Woodhouse J., at p. 419, made a similar point in the following terms:

> ... I do not consider the courts need be astute to protect those prepared to undertake jerry-building or

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 **S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

> shoddy work against the reasonable claims of innocent third parties merely because their bad work was
> done to a deliberate pattern or by arrangement. The recognition of a duty situation does not depend upon
> overcoming some initial bias in favour of excluding it. Instead, the principle applied by Lord Atkin "...
> ought to apply unless there is some justification or valid explanation for its exclusion": *Dorset Yacht Co
> Ltd v Home Office* [1970] AC 1004, 1027 ... I do not regard a private contractual arrangement for an
> inefficient design or for an unworkmanlike or inadequate type of construction as any sort of "justification
> or valid explanation" for releasing the builder from his duty to those who otherwise could look to him for
> relief.

48    The tort duty to construct a building safely is thus a circumscribed duty that is not parasitic upon any
contractual duties between the contractor and the original owner. Seen in this way, no serious risk of indeterminate
liability arises with respect to this tort duty. In the first place, there is no risk of liability to an indeterminate class
because the potential class of claimants is limited to the very persons for whom the building is constructed: the
inhabitants of the building. The fact that the class of claimants may include successors in title who have no
contractual relationship with the contractors does not, in my view, render the class of potential claimants
indeterminate. As noted by the New Jersey Supreme Court in *Aronsohn v. Mandara*, 484 A. 2d 675 (1984), at p.
680, "[t]he contractor should not be relieved of liability for unworkmanlike construction simply because of the
fortuity that the property on which he did the construction has changed hands".

49    Secondly, there is no risk of liability in an indeterminate amount because the amount of liability will always be
limited by the reasonable cost of repairing the dangerous defect in the building and restoring that building to a non-
dangerous state. Counsel for Bird advanced the argument that the cost of repairs claimed for averting a danger
caused by a defect in construction could, in some cases, be disproportionate to the actual damage to persons or
property that might be caused if that defect were not repaired. For example, he expressed concern that a given
plaintiff could claim thousands of dollars in damage for a defect which, if left unrepaired, would cause only a few
dollars damage to that plaintiff's other property. However, in my view, any danger of indeterminacy in damages is
averted by the requirement that the defect for which the costs of repair are claimed must constitute a real and
substantial danger to the inhabitants of the building, and the fact that the inhabitants of the building can only claim
the reasonable cost of repairing the defect and mitigating the danger. The burden of proof will always fall on the
plaintiff to demonstrate that there is a serious risk to safety, that the risk was caused by the contractor's negligence,
and that the repairs are required to alleviate the risk.

50    Finally, there is little risk of liability for an indeterminate time because the contractor will only be liable for the
cost of repair of dangerous defects during the useful life of the building. Practically speaking, I believe that the
period in which the contractor may be exposed to liability for negligence will be much shorter than the full useful
life of the building. With the passage of time, it will become increasingly difficult for owners of a building to prove
at trial that any deterioration in the building is attributable to the initial negligence of the contractor and not simply
to the inevitable wear and tear suffered by every building; for a similar view, see Sachs L.J. in *Dutton*, supra, at p.
405.

### The Caveat Emptor Concern

51    Turning to the second concern, caveat emptor cannot, in my view, serve as a complete shield to tort liability
for the contractors of a building. In *Fraser-Reid*, supra, this Court relied on the doctrine of caveat emptor in
rejecting a claim by a buyer of a house for the recognition of an implied warranty of fitness for human habitation.
However, the Court explicitly declined to address the question of whether caveat emptor serves to negate a duty in
tort (pp. 726-27). Accordingly, the question remains at large in Canadian law and must be resolved on the level of
principle.

52    In *Fraser-Reid*, Dickson J. (as he then was) observed that the doctrine of caveat emptor stems from the laissez-
faire attitudes of the eighteenth and nineteenth centuries and the notion that purchasers must fend for themselves in
seeking protection by express warranty or by independent examination of the premises (at p. 723). The assumption

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 **S.C.R. 85**, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

under lying the doctrine is that the purchaser of a building is better placed than the seller or builder to inspect the
building and to bear the risk that latent defects will emerge necessitating repair costs. However, in my view, this is
an assumption which (if ever valid) is simply not responsive to the realities of the modern housing market. In
*Lempke*, supra, at p. 295, the Supreme Court of New Hampshire made reference to a number of policy factors that
strongly militate against the rigid application of the doctrine of caveat emptor with regard to tort claims for
construction defects:

> First, "[c]ommon experience teaches that latent defects in a house will not manifest themselves for a
> considerable period of time ... after the original purchaser has sold the property to a subsequent
> unsuspecting buyer." ...

> Second, our society is rapidly changing.

>> We are an increasingly mobile people; a builder-vendor should know that a house he builds might be
>> resold within a relatively short period of time and should not expect that the warranty will be limited
>> by the number of days that the original owner holds onto the property. ...

> Furthermore, "the character of society has changed such that the ordinary buyer is not in a position to
> discover hidden defects. ..." ...

> Third, like an initial buyer, the subsequent purchaser has little opportunity to inspect and little experience
> and knowledge about construction. "Consumer protection demands that those who buy homes are entitled
> to rely on the skill of a builder and that the house is constructed so as to be reasonably fit for its intended
> use." ...

> Fourth, the builder/contractor will not be unduly taken unaware by the extension of the warranty to a
> subsequent purchaser. "The builder already owes a duty to construct the home in a workmanlike manner.
> ..." ... And extension to a subsequent purchaser, within a reasonable time, will not change this basic
> obligation.

> Fifth, arbitrarily interposing a first purchaser as a bar to recovery "might encourage sham first sales to
> insulate builders from liability."

Philip H. Osborne makes the further point in "A Review of Tort Decisions in Manitoba 1990-1993", [1993] Man.
L.J. 191, at p. 196, that contractors and builders, because of their knowledge, skill and expertise, are in the best
position to ensure the reasonable structural integrity of buildings and their freedom from latent defect. In this
respect, the imposition of liability on builders provides an important incentive for care in the construction of
buildings and a deterrent against poor workmanship.

53    My conclusion that a subsequent purchaser is not the best placed to bear the risk of the emergence of latent
defects is borne out by the facts of this case. It is significant that, when cracking first appeared in the mortar of the
building in 1982, the Condominium Corporation actually hired Smith Carter, the original architect of the building,
along with a firm of structural engineers, to assess the condition of the mortar work and exterior cladding. These
experts failed to detect the latent defects that appear to have caused the cladding to fall in 1989. Thus, although it is
clear that the Condominium Corporation acted with diligence in seeking to detect hidden defects in the building,
they were nonetheless unable to detect the defects or to foresee the collapse of the cladding in 1989. This, in my
view, illustrates the unreality of the assumption that the purchaser is better placed to detect and bear the risk of
hidden defects. For this Court to apply the doctrine of caveat emptor to negate Bird's duty in tort would be to apply a
rule that has become completely divorced, in this context at least, from its underlying rationale.

**Conclusion**

Copr. © West 2007 No Claim to Orig. Govt. Works

[1995] 3 W.W.R. 85, 18 C.L.R. (2d) 1, 23 C.C.L.T. (2d) 1, 43 R.P.R. (2d) 1, 176
N.R. 321, [1995] 1 S.C.R. 85, 121 D.L.R. (4th) 193, 100 Man. R. (2d) 241, 91
W.A.C. 241, 11 Const. L.J. 306, 74 B.L.R. 1

54    I conclude, then, that no adequate policy considerations exist to negate a contractor's duty in tort to subsequent purchasers of a building to take reasonable care in constructing the building, and to ensure that the building does not contain defects that pose foreseeable and substantial danger to the health and safety of the occupants. In my view, the Manitoba Court of Appeal erred in deciding that Bird could not, in principle, be held liable in tort to the Condominium Corporation for the reasonable cost of repairing the defects and putting the building back into a non-dangerous state. These costs are recoverable economic loss under the law of tort in Canada.

55    The Manitoba Court of Appeal affirmed the trial judge's dismissal of the motion for summary judgment but allowed the appeal from the trial judge's decision with respect to the motion to strike on the grounds that Bird's claim did not disclose a reasonable cause of action. As I have decided that Bird's claim discloses a reasonable cause of action, I would accordingly order the case to proceed to trial. I am also in agreement with both the trial judge and the Court of Appeal that this matter should not be resolved on a motion for summary judgment. In *Podkriznik v. Schwede*, [1990] 4 W.W.R. 220 (Man. C.A.), Twaddle J.A. made it clear, at p. 224, that a court considering a motion for summary judgment under R. 20 of the Manitoba *Queen's Bench Rules* must take a "hard look at the merits of an action" (quoting from *Vaughan v. Warner Communications Inc.* (1986), 56 O.R. (2d) 242 (H.C.), at p. 247) and determine whether there is a "real chance" that the action will be successful. In my view, Galanchuk J. was correct in concluding that there are genuine issues for trial in this case. In particular, there are conflicting allegations regarding Bird's participation in the construction and planning of the building, which disposes of the principal argument made on behalf of the respond ent at the hearing. Issues such as whether the work on the building was negligently performed, or whether Bird was negligent in the hiring of suitable subcontractors, or whether the danger was substantial and foreseeable can be considered at trial. This Court is not in a position to resolve these questions at this stage in the proceedings. Nor, despite the respondent's argument, is it necessary to reconsider the well-established principles regarding the vicarious liability of contractors for the work of sub-contractors. The appellant at no time raised this issue in this Court. The issue it raised was whether the Court of Appeal erred in its conclusion that the appellant's action in tort failed because the damages sought were not recoverable economic loss.

56    I would allow the appeal, reverse the decision of the Court of Appeal and make the following orders: that the losses alleged in the statement of claim, to the extent that they may be found to constitute pure economic loss flowing from the negligence of the respondent, be recoverable from the respondent, and that the order of the learned motions judge, that the within action proceed to trial against the respondent Bird Construction Co. Ltd. with respect to the remaining issues raised in the statement of claim, be reinstated. The appellant is entitled to its costs throughout.

*Appeal allowed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works