THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | **Objection Deadline: October 5, 2007 at 4 p.m.** |
| | ) | **Hearing Date: October 25, 2007 at 2 p.m.** |

## DEBTORS' MOTION FOR AN ORDER
## AUTHORIZING THE OPTIMIZATION PLAN

The above-captioned debtors and debtors in possession (collectively, the

"Debtors" or "Grace") in the above-captioned chapter 11 cases, by their undersigned counsel,

respectfully move this Court (the "Motion") for entry of an order authorizing the Debtors to

undertake before December 31, 2007, or as soon as practicable thereafter, certain transactions

more fully described herein (the "Optimization Plan") that: (i) establishes a more tax-efficient

global capital structure, that serves as the foundation for chapter 11 emergence financing,

(ii) reduces foreign cash taxes, and (iii) preserves the Debtors' anticipated U.S. federal

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

consolidated net operating losses ("NOLs").  In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105 and 363 of the Bankruptcy Code and Rule 6004 the Federal Rules of Bankruptcy Procedure.

## Background

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  These Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

4.      As of December 31, 2006, the Debtors had NOLs of approximately $200 million recorded for book purposes, which must be carried forward.  The Debtors estimate that by December 31, 2007, they will have up to $250 million in NOLs, and that after emergence the NOLs could potentially increase beyond $1 billion due to the payment of deductible bankruptcy claims and other expenses.

2

5.    The Debtors' foreign subsidiaries currently generate at least 60% of total revenues and substantially all free cash flows of Grace's worldwide operations. The foreign subsidiaries also currently pay foreign cash taxes in excess of $50 million annually.

6.    Because substantial earnings and free cash flow are generated in the Debtors' foreign subsidiaries, the Debtors will likely be required to utilize future foreign cash flows to support any emergence financing scenario. This is likely to involve substantial cash dividend distributions by the foreign subsidiaries to the Debtors.

7.    Further, from a tax standpoint, it would be optimal to fully leverage the foreign subsidiaries to support emergence financing because the foreign subsidiaries will be able to claim interest deductions, which reduce cash taxes. By contrast, the Debtors cannot obtain an immediate cash tax reduction from interest deductions because they have substantial NOLs, and deductions in the U.S. would simply add to the NOLs.

8.    In order to preserve the maximum amount of the NOLs expected to be created as a result of the payment of bankruptcy claims upon emergence, the Debtors must receive dividend distributions in a taxable year prior to the year of emergence. The Debtors will be subject to U.S. tax on their receipt of dividends from their foreign subsidiaries. In offsetting such taxes, current law requires the Debtors to apply their NOLs first, before applying their available foreign tax credits ("FTCs"). Because the Debtors' NOLs are expected to increase significantly after emergence, there is substantial risk that the NOLs will completely offset the U.S. tax on post-emergence dividend distributions, with related FTCs expiring unutilized. Such

3

use of NOLs to offset U.S. tax that would otherwise be offset by FTCs effectively renders those

FTCs worthless and reduces the amount of NOLs available to offset future taxable income.2

9.      Based on the foregoing, the Debtors have concluded that in order both to

preserve substantial anticipated NOLs and to establish a tax efficient global structure to support

emergence financing, it is important to maximize foreign dividend distributions to the Debtors,

and otherwise maximize U.S. taxable income, in a taxable year prior to the year of emergence.

### The Optimization Plan

10.     The Optimization Plan is designed to (a) provide a proper level of leverage

through the distribution as a dividend of up to €450 million in promissory notes (approximately

$600 million at current exchange rates) to the Debtors, (b) preserve the value of substantial

future NOLs and (c) serve as a foundation for tax efficient emergence financing.

11.     The Debtors intend to implement the Optimization Plan by December 31,

2007, or as soon as practicable thereafter, as follows:

(a)     Maximize dividend distributions from the Debtors' foreign subsidiaries to
        the Debtors through the repatriation of excess cash and/or distribution of
        promissory notes (on market terms and subordinated to third party debt)
        by Grace's foreign subsidiaries as follows:

        (i)     *Germany* – The Debtors would sell the stock of the parent
                company of the Debtors' chief German subsidiary group to another
                wholly-owned German subsidiary in exchange for a promissory
                note with a principal amount not to exceed the appraised fair
                market value of the German subsidiary group (estimated to be in
                excess of €400 million). This will be treated as a dividend
                distribution from Germany for U.S. tax purposes.

---

2 The following example illustrates the negative impact of post-emergence dividends on NOLs. Assuming that the foreign subsidiaries dividend $600 million this year, then the first $250 million of U.S. tax would be offset by the existing NOLs, with the remaining $350 million offset by FTCs. Assuming the same dividend distribution post emergence, when NOLs are estimated to increase to the $1 billion range, then the entire $600 million of U.S. tax would be offset by $600 million of NOLs, thereby reducing NOLs to $400 million, with FTCs likely expiring unused. This represents a loss of approximately $350 million in NOLs available to offset future taxable income.

4

(ii) *Belgium* – A Belgian subsidiary of the Debtors would acquire the stock of the Debtors' principal Italian subsidiary from the Debtors for a purchase price/promissory note with a principal amount not to exceed the Italian subsidiary's appraised fair market value (estimated at approximately €55 million). This will be treated as a dividend distribution from Belgium and Italy for U.S. tax purposes; and

(b) Accelerate U.S. taxable income to efficiently utilize current NOLs by terminating, for cash value, certain U.S. corporate owned life insurance ("COLI") policies.

(i) On terminating the COLI policies, the Debtors will receive approximately $85 million in cash, generating approximately $40 million in U.S. taxable income.

(ii) The Debtors propose to terminate the COLI policies because their investment return on policy assets is expected to be lower than Grace's post-emergence borrowing rates.

12.     The promissory notes issued in the Optimization Plan will be denominated in Euros, with foreign exchange gains and losses marked to market in Grace's financial statement consolidated income.   As appropriate, the Debtors will acquire currency hedge contracts from third party banks to manage the exchange risk.

13.     The Debtors believe that the Optimization Plan will produce the following results:

(a) The intercompany debt structure will support emergence financing requirements in a highly tax efficient manner;

(b) The promissory notes will create a tax-efficient debt structure in the European subsidiaries, permitting them to claim interest deductions that will reduce cash taxes in future years; and

(c) The Debtors will preserve a substantial amount of their NOLs through the dividend from the foreign subsidiaries and the COLI policy termination, in a taxable year prior to emergence.

5

## Relief Requested

14.     By this Motion, the Debtors seek an order authorizing the Debtors to implement the Optimization Plan and to perform any other acts that are necessary or useful for the Optimization Plan.

## Basis For Relief

15.     The Debtors bring this Motion under sections 105(a) and 363(b)(1) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. §363(b)(1).

16.     This court has the statutory authority to authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith.  In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Circ. 1986); In re Lionel Corp., 772 F.2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

6

17.     Under Section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest relief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The business judgment role has significance in Chapter 11 cases as it shields a debtor's management from judicial second-guessing. See Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D. N.Y. 1986) ("[T]he Code favors the continued operations of a business by a debtor and a presumption of reasonableness attaches to debtor's management decisions.") A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

18.     Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abotts Dairies, 788 F.2d at 145-47 (implicitly adopting the articulated business justification test of the Lionel standard and adding the "good faith" requirement); Delaware & Hudson, 124 B.R. at 176 (adopting Lionel in this district).

7

19.    The formulation of the Optimization Plan is the result of extensive analysis by the Debtors, which have determined, in good faith, that the transaction is in the best interests of the Debtors.  The Optimization Plan will create a debt structure in the European subsidiaries that will reduce foreign cash taxes and better position the Debtors to fund emergence payments in a tax-efficient manner.  In addition, the Optimization Plan will involve the repatriation of a substantial amount of cash from foreign subsidiaries to the Debtors to finance U.S. cash requirements.  Finally, the Optimization Plan will maximize the tax efficiency of the Debtors' NOLs and FTCs.

## Notice

Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the debtor in possession lenders, (iii) counsel to each official committee appointed by the United States Trustee, (iv) counsel to the Future Claimants' Representative, and (v) those parties that requested papers under Fed. R. Bankr. P. 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to implement the Optimization Plan, (ii) authorizing the Debtors to perform any other acts that are necessary or useful for the Optimization Plan and (iii) granting such other and further relief as the Court deems just and proper.

Dated:  September 17, 2007

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lori Sinanyan
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(302) 652-4100
Co-Counsel for the Debtors and Debtors in Possession

9