# EXPERT REPORT ON BEHALF OF W.R. GRACE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

**Prepared by**
**Daniel P. Myer and Mark T. Eveland**
**September 24, 2007**

## *TABLE OF CONTENTS*

1.    INTRODUCTION ................................................................................................ 3

2.    EXPERIENCE ..................................................................................................... 3

3.    MATERIALS REVIEWED AND METHODOLOGY ........................................... 5

4.    RESULTS OF REVIEW AND DISCUSSION ....................................................... 6

EXHIBIT A............................................................................................................... 12

EXHIBIT B............................................................................................................... 14

EXHIBIT C............................................................................................................... 17

EXHIBIT D............................................................................................................... 32

## EXPERT REPORT ON BEHALF OF W.R. GRACE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

### 1.    INTRODUCTION

Verus Claims Services, LLC ("Verus") has been retained by the W.R. Grace Official
Committee of Asbestos Personal Injury Claimants to review responses to the W.R. Grace
Asbestos Personal Injury Questionnaire ("PIQ") and accompanying attachments for 2,463
claimants identified as mesothelioma cases by Rust Consulting.  The purpose of this
review was to determine whether the information included in claimants' responses to the
PIQ and attachments included information that was sufficient to preclude a valid personal
injury claim against W.R. Grace & Co. ("Grace"), including (i) medical documentation
supporting the diagnosis of Mesothelioma, and (ii) allegations of exposure to asbestos
and/or asbestos-containing products manufactured, marketed, or supplied by Grace
and/or its subsidiaries.   In connection with this review, we have also been asked to
review and comment on the June 18, 2007 report of B. Thomas Florence, Ph.D. entitled
"Estimation of the Number and Value of Pending and Future Asbestos-Related Personal
Injury Claims: W.R. Grace".

Our opinion is limited to the evaluation of the estimation provided by Grace's experts; we
have not provided an independent estimation of the extent of Grace's total liability.
Verus Claims Services, LLC is being compensated at $400 per hour for our testimony
and between $50 and $200 per hour for other work contributing to this report.  We
reserve the right to modify this report as new information is made available between now
and the time of trial.

### 2.    EXPERIENCE

As a supplement to the Curriculum Vitae of Mark Eveland, which is attached as Exhibit
A, a brief summary of his experience relative to asbestos personal injury claims is
provided:

Over the past 14 years, Mark has been active in the administration of claims processing for approximately 20 different asbestos defendants, beginning with his involvement with the Center for Claims Resolution in 1993. He has been either directly or indirectly involved in the development, implementation and management of processes for tracking lawsuits, gathering of discovery documentation, evaluation and processing of settlements for over 500,000 asbestos personal injury claims filed in the tort system in nearly every jurisdiction within the United States.

As a supplement to the Curriculum Vitae of Dan Myer, which is attached as Exhibit B, a brief summary of his experience relative to asbestos personal injury claims is provided. Since 1982, Dan has been active in the overall management of asbestos personal injury claims in various supervisory and management positions for approximately 40 different defendants. Dan has evaluated, negotiated, and settled asbestos personal injury cases with virtually every major asbestos plaintiff's firm in the country. Dan has served as an expert witness in the area of asbestos claims management, spoken at national seminars on the topic of asbestos claims handling, and served as an escrow agent and court appointed trustee for asbestos personal injury settlements. Dan has negotiated various types of settlements of asbestos personal injury claims, including single cases, group settlements, global settlements, and inventory settlements dealing with thousands of claims. Over the past 25 years, Dan has been active in the area of asbestos claims management involving asbestos personal injury claims in virtually every state throughout the country.

Since 2001, we have provided claims management services for a number of active tort defendants, including Certainteed Corporation, Foseco, National Service Industries, and Union Carbide Corporation. In such capacity we are actively involved in developing settlement strategies, evaluating cases and negotiating settlements of trial listed cases in nearly every jurisdiction with an active trial docket.

In addition to providing claims management services for a number of tort defendants, our firm also serves as claims administrator for the Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust, Plibrico Asbestos Trust, ARTRA Asbestos

Trust, Porter Hayden Asbestos Bodily Injury Trust, and A&I Corporation Asbestos Bodily Injury Trust.   In this capacity, we have been directly involved in the management of over 110,000 claims.


### 3.    MATERIALS REVIEWED AND METHODOLOGY

Verus reviewed the PIQs and accompanying attachments for all records identified as mesothelioma claims in the data provided to Official Committee of Asbestos Personal Injury Claimants and its experts by Rust Consulting. A total of 2,463 records classified by Rust Consulting as mesothelioma claims were provided to Verus with the electronic images of the PIQs, attachments, and supplemental responses in PDF format.

Verus developed Claim Review Protocols (attached as Exhibit C) to review the PIQs and attachments and compile a database of (i) medical reports supporting a diagnosis of mesothelioma, (ii) allegations of exposure to Grace products, and (iii) general exposure history for each claim.

In developing the Claim Review Protocols, Verus reviewed the following documents in order to compile a list of Grace products for reference purposes while conducting the claims review:

  a.  W.R Grace & Co.'s Answers and Objections to Official Committee of Asbestos Personal Injury Claimants' First Set of Interrogatories Directed to the Debtors (dated 11/14/2005)
  b.  W.R. Grace & Co.'s Answers and Objections to Official Committee of Asbestos Personal Injury Claimants' First Set of Request for Production of Documents (dated 11/14/2005)
  c.  Debtor's Supplemental Response to Interrogatory 11 of the Official Committee of Asbestos Personal Injury Claimants' First Set of Interrogatories Directed to the Debtors (dated 10/17/2006)

The resulting list of Grace products is included as Appendix A to the Claim Review Protocols.

The electronic images were imported into a custom designed data processing application, and reviewers with experience in analyzing medical and legal records captured the information specified in the Claim Review Protocols directly from the images. Data was stored in an SQL Server database; the data was periodically reviewed throughout the project to ensure accuracy of the information being entered. A random sample of images processed each day was reviewed to determine if the protocols were being followed. The data resulting from this process is attached as Exhibit D.

## 4.    RESULTS OF REVIEW AND DISCUSSION

Medical documentation was provided as attachments to the PIQs for 2,221 of 2,463 claims within the review population.  Of the PIQs with medical attachments, 2,205 had documentation supporting a diagnosis of mesothelioma.  The remaining 16 claims included 2 claims that had medical records diagnosing lung cancer, and 14 had documentation of a non-malignant asbestos-related condition.  While mesothelioma diagnoses are not usually preceded by a diagnosis of a non-malignant condition, it is possible that some of these 14 claims have subsequent diagnoses of mesothelioma but the medical documentation for such has not yet been provided.

Table 4.1 below shows the number of claims with a diagnosis supported by the medical documentation provided to Verus.

**Table 4.1**
**PIQs with Medical Reports Provided – by Diagnosis**

| Diagnosis | Count | % of Total |
|---|---|---|
| Mesothelioma | 2,205 | 99.3% |
| Lung Cancer | 2 | 0.1% |
| Non-malignant | 14 | 0.6% |
| Total: | 2,221 | 100.00% |

Assuming the same proportion of mesothelioma diagnoses in the sub-population of 242 PIQs for which no medical attachments were provided, we extrapolate that there are approximately 2,445 mesothelioma cases in the reviewed population.  Table 4.2 below

shows the presumed counts by diagnosis when the PIQs without medical attachments are allocated to disease categories proportionally to the PIQs with medical attachments.

**Table 4.2**
**All PIQs Reviewed - by Diagnosis**

| Diagnosis | Count | % of Total |
|---|---|---|
| Mesothelioma | 2,445 | 99.3% |
| Lung Cancer | 2 | 0.1% |
| Non-malignant | 16 | 0.6% |
| Total: | 2,463 | 100.00% |

Verus also reviewed the PIQ responses and attachments for evidence of exposure to Grace asbestos-containing products and the occupation(s) in which the claimants' alleged exposure to asbestos-containing products occurred.  A total of 810 claims had documented allegations of exposure to one or more Grace asbestos-containing products, either in the answers provided in Part III of the PIQ or within the attachments.

We then classified the remainder of claims which did not have specific documented Grace Product exposure into (i) claims with Possible Grace Exposure based on the claimant's occupation(s) and (ii) claims with Unlikely Grace Exposure based on the claimant's occupation[1].  Based on the Grace statements that its products were not used in the friction and shipyard industries, Verus was asked to assume that the footnoted occupations were considered as unlikely Grace exposures.  Table 4.3 shows the number and percentage of claims in each category.

**Table 4.3**
**Claims by Type of Exposure Evidence / Occupation Categories**

| | Count | % of Total |
|---|---|---|
| Documented Grace Product Exposure | 810 | 32.9% |
| Possible Exposure based on Occupation | 1,613 | 65.5% |

---

[1] "Unlikely Grace Exposure" occupations are defined as the following Occupation codes provided in the Instructions to the Personal Injury Questionnaire:

    07 Auto mechanic/bodywork/brake repairman
    12 Brake manufacturer/installer
    34 Longshoreman
    46 Railroad worker/carman/brakeman/machinist/conductor
    49 Rigger/stevedore
    53 Shipfitter/shipwright

| | | |
|---|---|---|
| Unlikely Exposure based on Occupation | 40 | 1.6% |
| Total: | 2,463 | 100.0% |

Dr Florence's estimate excludes any claim without specific allegations of Grace asbestos-containing product exposure in the PIQ responses, assuming that the information provided by a plaintiff responding to the PIQ is all the evidence he or she would be ever able to amass to support their underlying legal claim. This assumption contradicts our experience in handling claims for both tort defendants and asbestos trusts. It is our opinion that the information provided can not be used to support the conclusion that the claims we have classified as "Possible Exposure" and "Unlikely Exposure" should be excluded from estimations of Grace's liability. Our opinion is based upon our experience in managing asbestos personal injury tort claims and knowledge of the extent and timing of discovery in asbestos litigation. Defendant specific product identification evidence is usually scant during the pendency of a case. Given the high volume of claims pending at any given time and the finite resources of plaintiff firms, discovery efforts are focused mainly on trial listed claims. Detailed product identification evidence against a specific defendant is usually developed as discovery progresses and co-defendants settle or are dismissed, narrowing the focus of plaintiff's discovery efforts on the remaining defendants.

The automatic stay entered upon the filing of Grace's bankruptcy petition had the effect of freezing all discovery as to Grace for claims pending at the time. As a result, the information provided in the PIQs and attachments must be viewed as incomplete and preliminary. Were plaintiffs permitted to proceed with defendant specific discovery, a significant number of the claims classified as Possible Exposure would likely have been able to establish proof of exposure to Grace asbestos containing products, and a limited number of the Unlikely Exposure claims may have been able to establish such proof as well.

Dr. Florence's estimate of the number of future claims is based in part on the number of historical closed claims in his sample which met the assumed criteria[2]. In their analysis

---

[2] Report of B. Thomas Florence dated June 18, 2007, p. 16.

of the closed claim files, ARPC assumes that the documents provided by Grace would have included all evidence plaintiffs had or would have regarding evidence of Grace exposure or medical issues.  Based upon our experience managing claims for tort asbestos personal injury defendants and asbestos trusts, this assumption is not supported by standard practice of plaintiffs and defendants for documenting settlements.  Plaintiffs do not typically provide defendants with all the supporting materials they have about the exposure or medical case at the time of settlement - which may include large quantities of documents and deposition testimony about exposure sites and specific product identification.  Rather, they only provide a subset of the available documentation as required by the specific terms and conditions of a given settlement in order to deem the claim eligible for compensation.  In the case of settlements involving trial listed cases, the documentation of product identification resides in the files of local defense counsel and/or plaintiff counsel, and is usually not provided to a central administrator post-settlement.  In such cases plaintiff counsel usually provides the settlement administrator with little more than supporting medical documents and a release.  In larger inventory settlements, a list of stipulated exposure sites is often negotiated for the group, and claimants with exposure at these sites are usually not required to provide the settlement administrator with product identification documentation.  As a result, there may often not be any documentation in the files for these individual claimants which supports exposure to the defendant's products.  Rather, these claim files must be considered in conjunction with other evidence that may be maintained in the files of national or local defense counsel, or an insurance carrier, or plaintiff counsel, or another party involved in the negotiation.  As a result of these practices, the closed claim files reviewed by ARPC likely do not represent the sum total of all available evidence for each individual case, and Dr. Florence's estimate therefore excludes historical closed claims for which sufficient support to meet the assumed criteria resides elsewhere.

The Nature of Exposure as defined in Part III of the PIQ was coded when available, but was not considered in the classification of exposure evidence shown above.   Not only was this information scarce (only 16% of the PIQs reviewed included a response to this question), but experience in the tort system and in administering Trusts shows that the

information sought in this regard is irrelevant in determining whether a claimant has sufficient exposure to establish a valid claim against a defendant or Trust.

Dr. Florence's estimate assumes that only those claimants with exposure arising from personally mixing or installing Grace asbestos-containing products could have a valid claim[3]. In our opinion, this is an invalid assumption because it is usually sufficient – in both the tort system and asbestos personal injury Trusts - for a claimant to establish that he or she worked in general proximity to an area where asbestos-containing materials were fabricated, repaired, installed, damaged, or otherwise disturbed in order to establish the defendant's liability. While the nature of the claimant's exposure may have an effect on the *relative* valuation of a claim in the tort system or under the Individualized Review programs established by most current Trusts – with higher settlement values going to claimants with heavier, direct exposure – it does not serve to bar claimants with indirect, bystander, or secondary exposure.

When Mr. Myer goes into settlement negotiations on behalf of his clients (who are asbestos defendants or groups of asbestos defendants), he uses his own working knowledge of the current "total gross value of a mesothelioma case", or, the amount of money a plaintiff would typically collect from all defendants as an aid in settlement negotiation to help him negotiate the best settlement he can for his particular clients. Our historical experience is that the total gross value has increased on a nationwide average basis over the past several years. The total gross value of a mesothelioma case in the time period of 1999- 2000 was approximately $2,500,000 to $3,500,000. The current total gross value of a mesothelioma case, on a nationwide average basis, is higher, approximately $5,000,000 to $8,000,000. We base this observation and working knowledge of the total gross value on hundreds of conversations over many years with various plaintiffs counsel, defense counsel, magistrates, judges, and mediators. The following factors (among others) have all contributed to the increase in the total gross value of mesothelioma cases from 1999-2007:

- The addition of non-traditional defendants in the litigation

---

[3] Report of B. Thomas Florence dated June 18, 2007, pp. 8-9.

- a lack of institutional knowledge from current asbestos claims management individuals for many defendants responsible for negotiating asbestos claim settlements
- a general trend toward setting the more serious cases, such as mesothelioma cases, for trial in many jurisdictions
- inflation in both litigation and medical costs
- many plaintiff firms having less involvement in non-malignant cases
- plaintiff experts becoming more sophisticated

Submitted this 25ᵗʰ day of September, 2007

**Daniel P. Myer**                    **Mark T. Eveland**

**EXHIBIT A**

## Mark T. Eveland

### Work Experience

| | |
|---|---|
| 1993 – 1997 | Peterson Consulting, LLC |
| 1997 – 2001 | Center for Claims Resolution (CCR) |
| 2002 – 2003 | Independent management consultant |
| 2003 – Present | Verus Claims Services, LLC |

### Specific Experience

- From 1993 through 1997, Mark was employed by Peterson Consulting, LLC as a management consultant in their Insurance and Environmental consulting practice. Mark's primary assignment was with the Center for Claims Resolution, where he was responsible for data integrity, system design and testing for the billing of indemnity and expense costs to member companies. Other significant engagements included development of an application for processing workers compensation claims for T&N, plc, and development and testing of software for a United States workers compensation rate-making service.

- From 1997 through 2001, Mark was employed by the Center for Claims Resolution. His initial responsibilities included internal audits of the claims evaluation and processing functions, and supervision of the allocation of all indemnity and defense costs to member companies' insurers. In 1999, Mark was promoted to Operation Manager, in which role he was responsible for all processing of filings against member companies, and processing, billing and payment of settlements. He served as principle liaison between the Legal and Claims Departments and the processing staff. In 2000 he was responsible for design of a new claims management processing and reporting system to facilitate the reorganization of the CCR pursuant to a major shift in settlement strategy.

- From 2002 through 2003, Mark worked as an independent management consultant and developed the initial business plan for a processing facility and system designs for a claims management system for the implementation of asbestos personal injury Trust Distribution Procedures. He assisted a nationally prominent law firm with the startup of an ancillary company for the administration of class action settlements, and administered several securities fraud, consumer and wage & hour class action settlements.

- In February 2003, Mark joined with five other partners to found Verus Claims Services, LLC to provide claims administration and consulting services for asbestos-related bankruptcy Trusts, class action settlements and tort defendants. Mark designed the proprietary claims management and reporting systems to support the company's bankruptcy trust practice and also provides custom data capture solutions for numerous clients. Verus Claims Services, LLC is located in Hopewell, NJ.

## Claims Administration Clients/Projects

**Michael Nance, et.al. v. Versata, Inc.,** No. 01-CV-1439 (U.S.D.C., N.D. California)

**In re Terayon Communications Systems, Inc. Securities Litigation,** No. C-00-1967 (U.S.D.C., N.D. California)

**In re Commtouch Software Ltd. Securities Litigation,** No. C-01-0719 (U.S.D.C., N.D. California)

**Bonnie J. Terry, et.al. v. Cigarettes Cheaper, et.al.,** No. 835526-3 (Sup. Ct., Alameda Co., CA)

**C.E. Thurston Virginia Qualified Settlement Trust**

**Reynolds v. A&I Corporation.,** No. 01-C-538 (Cir. Ct., Kanawha Co., WV)

**A&I Corporation Asbestos Bodily Injury Trust**

**Artra 524(g) Asbestos Trust**

**Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust**

**Plibrico Asbestos Trust**

**Porter Hayden Company Asbestos Trust**

## Education

Pennsylvania State University
B.A. in Political Science                1991
*(Recipient of National Merit Scholarship)*

Pennsylvania State University
Doctoral Program in Philosophy        August 1991 through December 1992

**EXHIBIT B**

**Daniel P. Myer**

**Work Experience**

| | |
|---|---|
| 1981-1986 | Continental Insurance Company (CIC) |
| 1986-1988 | Asbestos Claims Facility (ACF) |
| 1988-2001 | Center for Claims Resolution (CCR) |
| 2001–2007 | CMC Claims Management Services, LLC (CMC) |
| 2007–Present | Verus Claims Services, LLC (Verus) |

**Experience**

- From 1981 to 1986, Dan was employed at Continental Insurance Company, and served in their home office Environmental Claim Department as a Senior Analyst, Supervisor, and **Claim Manager**.  Dan's direct responsibility was to provide professional guidance to the Environmental Claim staff.  The Environmental Claim Department was responsible for the uniform application of Continental Insurance Company's coverage philosophy on environmental claim related issues.

- From 1986-1988, Dan was involved in the creation of the Asbestos Claims Facility, specifically with respect to the development of a strategic plan to handle asbestos bodily injury claims in the southern region of the country.  **As one of two Claim Supervisors**, Dan was responsible for acting as a liaison between the ACF's membership and the newly created Claim Department to ensure that the ACF claim operation became functional and properly trained in the area of asbestos claim handling.

- From 1988 until July 31, 2001, **Dan was the Director of the Claims Department** at the Center for Claims Resolution, with responsibility for the administration of the claim handling policies and procedures, preparation and implementation of the appropriate jurisdictional strategy plans, and the development of the annual operating budgets and indemnity cost projections for approximately thirty-eight states across the country.

- From August 1, 2001, until January 1, 2007 **Dan had been one of the five Principals** at CMC Claims Management Services, LLC providing asbestos claims handling and claims management services to a number of clients, including various asbestos defendants.

- In February, 2003 CMC started up a sister company, Verus Claims Services, LLC, to provide claim administration and support services to various law firms and bankruptcy trust.  As of January 1, 2007 the two companies combined into

Verus Claims Services, LLC located in Hopewell, New Jersey. **Dan is currently a principal in Verus Claims Services, LLC.**

**Testimony Experience**

- **National Services Industries** vs. Maryland Casualty, et al., Superior Court, Fulton County, Georgia, Civil Action E-22907 (1999)

- Safety National Insurance Co. vs. **Shook & Fletcher Insulation Co**. vs. Continental Casualty, et al., Circuit Court, Jefferson County, Alabama, Civil Action E-93-01574JCD (1999)

- **CSX Transportation, Inc.** vs. Certain Underwriters at Lloyds, London and London Market Insurance Companies, AAA, No. 22Y195001899 (2000) (Expert Testimony)

- **C.E. Thurston & Sons** vs. American Centennial Insurance, et al., United States District Court for the Eastern District of Virginia, Norfolk, Civil Action 2:97CV1034 (1999) (Expert Testimony)

- **Armstrong World Industries, Inc.** vs. Aetna Casualty and Surety Company, et al., Center for Public Resources, Institute for Dispute Resolution, Wellington Agreement ADP Proceeding (1998-2000)

- GAF Corporation vs. **Center for Claims Resolution, et al.,** Alternative Dispute Resolution Pursuant to CCR Producer Agreement (1997)

- Certain Underwriters at Lloyds, London, et al. vs. **Amchem Products, Inc.,** Alternative Dispute Resolution Pursuant to CCR Producer Agreement (2002)

- **Hercules, Inc.** vs. One Beach America Insurance Company, et al., Superior Court, New Castle, Delaware, Civil Action 02C-11-237-SCD (2004) (Expert Testimony)

- **ASARCO, Inc.** vs. Allstate, et al., District Court, Nueces County, Texas 105th Judicial District, Cause No. 01-2680D (2003) (Expert Testimony)

- **Armstrong World Industries, Inc. et al.** Debtor, Chapter 11 preceding U.S. Bankruptcy Court for the District of Delaware; Case no. 00-4471 (RJN) (2006)

- United States Mineral Products Company vs. **Anderson, Kill & Olick P.C.,** Superior Court, Essex County, New Jersey; Civil Action No. 01-4936 (WJM) (2006) (Expert Testimony)

- **Foster Wheeler, LLC** vs. Affiliated FM Insurance Company, et al., Supreme Court, New York, Index No. 600777/01 (Expert Testimony) (2007)

**Special Projects**

- Dan has served as a **Speaker** at various national asbestos-released seminars.

- Dan has served as a **Consultant** on asbestos claims management issues to insurance carriers, law firms, third party administrators, and various asbestos defendants.

- Dan has been appointed as a **Trustee** of the Virginia Asbestos Qualified Settlement Trust in Virginia Commonwealth Circuit Court, Portsmith, Virginia, and the Simmons Firm Asbestos Client Qualified Settlement Trust in Illinois Circuit Court, Madison County, Illinois

- Dan has been appointed as an **Escrow Agent** for settlement funds involving multiple defendants and multiple plaintiff law firms in various states.

**Education**

- B.S. in Public Administration
  William Patterson University, N.J.
  May 1978

  New Jersey State Scholarship recipient,
  1977

**EXHIBIT C**

**Claim Review Protocols**

**WR Grace Mesothelioma Review Project**

# 1        Logging on to the Dashboard

To access the Dashboard and all claim submission/review features:

1)   Go to https://192.168.2.218/fwcs.  You will be directed to the login page as shown below.

**Sign In**



Forgot ID or Password? Click here

2)   Enter your username in the **Login ID** field.

3)   Enter your Password.

   a)   On your first login, the system will direct you to a page to change the temporary password provided to you by the system administrator to a "strong password" of your creation.  Your new password must follow these requirements:

      i)    It must be between 6-12 characters in length

      ii)   It must contain at least one capital letter and one lower case letter

      iii)  It must contain at least 1 number

      iv)   It must contain at least one of the following special characters: @, #, $, %, &, *, ^, !, or =

4)   Select "wrg" from the **Client** dropdown

5)   Upon successfully logging in, you will be directed to the home page of the Dashboard.

### 2.1    Review of Supporting Documents Accompanying PIQs

PIQ documents have been automatically linked to the PIQ data coded by Rust Consulting and provided by LAS.   To access the PIQs and accompanying supporting documents, select Expedited => New Submissions from the New Filings menu.   The next PIQ that has not been reviewed will be loaded into the image viewer and the associated claim record will be displayed in the data entry form.   Note that the **Review Type** and **Exigency Type** fields are defaulted to "Not Applicable" for all claims.



The first step for processing each document in queue is to confirm that the image is linked to the correct claim record.

1.  Confirm that the WR GRACE PIQ number (the first series of digits of the electronic Bates stamp in the lower right corner) matches the number in the **Firm's Matter Number for This Claim** field.

    a.  If the image is not linked to the correct claim, select "Need Assistance" from the Review Outcome dropdown in the form header and click the 🔳 button.  A supervisor will unlink the image and re-link it to the correct claim.

2.  Confirm that the following fields in the Injured Party Information section match the information provided in Part I.a of the PIQ.  Update any of the following identification fields that do not agree with the information on the PIQ:

    a.  Last Name

    b.  First Name

    c.  Middle Name

    d.   Last four digits of SSN  (only the last four digits are provided on the PIQ; the SSN in the database has been padded to begin with a sequential number for the first five digits which were not provided on the PIQ)

    e.   Date of Birth

3.  If any changes were made, click the **Save** button before proceeding to the next section of the data entry form.

4.  Go to the Lawfirm tab and confirm that the information in the form agrees with the information in Section I.b of the PIQ.  If the law firm is not correct, select the appropriate firm from the **Law Firm Name** dropdown and click the **Save** button.



**2.2      Entering Occupational Exposure Information relevant to WR Grace Product
          Identification**

All mentions of exposure to WR Grace products are to be captured in the Exp page of the
application. Specifically, all information provided on Part III of the PIQ ("Direct Exposure to Grace
Asbestos Containing Products") must be captured, and each supporting document provided with
the PIQ must be reviewed to determine if mention is made to WR Grace asbestos containing
products. Each Reviewer must be familiar with the catalog of asbestos containing products
manufactured and/or marketed by WR Grace; refer to the attached Appendix A for a list of all
known WR Grace products.

If Part II of the PIQ or a document attached to the PIQ contains allegations of the claimant's
exposure to a WR Grace product (either by a specific trade name, or to a general product
category), the Reviewer must capture the following information in the **Exp** page (shown below) for
each such allegation:



1) Enter the date the exposure began in the **Start Date** field.

2) Enter the date the exposure ended in the **End Date** field.

3) Select the injured party's **Occupation** from the dropdown if it is available in the list.   *If the
   Occupation Code is provided, select the entry that begins with the numeric code provided on
   the PIQ or attachment.*

   a) If the injured party's occupation is not available in the **Occupation** list, select "Other"
      from the dropdown, and then enter the specific occupation in the **"If Other, please
      specify"** field.

4) Skip over the **Approved Site** fields.

5) Enter a portion of the site's name in the **Search for Site of Exposure** field and click the
   adjoining **Search** button. All sites where a portion of the name matches the search criteria
   provided will be displayed in the **Site of Exposure** dropdown, and you may then select the
   appropriate site from the dropdown

a) If the specific site is not listed in the dropdown, you may add a new site of exposure to the database by clicking the **Add New Jobsite** button.  A new section of the form will be displayed, as pictured:



i) Enter the name of the site in the **New Site of Exposure** field.

ii) Enter the City where the site is located.

iii) Enter the State where the site is located.

iv) Enter the Country where the site is located.  The new site will be saved when you save the completed exposure record.

6) Select the **Document Type** in which the product identification is made.

a) Select "PIQ Part III" if the data being entered is from Part III of the PIQ.

b) If the document is of a type not already listed in the dropdown, select "Other" and then enter the specific description in the **"If Other, please specify"** field immediately to the right.

7) Enter the codes fro Appendix A for each product identified in the **All WR Grace products to which claimant was exposed**.  If a specific product or product category is mentioned which is not mentioned on Appendix A, please contact a supervisor to add an entry to the list.

8) In the **Describe the circumstance of asbestos exposure** field, enter all of the alphabetical codes from the following list that are either provided by the claimant, or which most closely match any description provided by the claimant.  *If no code or specific description is provided, enter "NA".  When reviewing Part III of the PIQ, be sure to note any codes circled by the claimant in the list above the form, as well as those listed in the "Nature of Exposure" form field.*

a) A worker who personally mixed Grace asbestos-containing products

b) A worker who personally removed or cut Grace asbestos-containing products

c) A worker who personally installed Grace asbestos-containing products

d) A worker at a site where Grace asbestos-containing products were being installed, mixed, removed or cut by others

e) A worker in a space where Grace asbestos-containing products were being installed, mixed, removed, or cut by others

f) Other

9) Skip the **Evidence of WR Grace Exposure** grouping of radio buttons.

10) Skip the **Include in SOE** checkbox.

11) Enter the PIQ page number (the last four digits of the electronic Bates stamp in the lower right corner) or range of pages where the exposure information is located in the **Page Number(s)** field.

   *a)* Page ranges are entered as the first and last page of the range, separated by a dash. ***Example: 25 - 30***

12) If provided, enter the claimant's **Employer** exactly as noted on the document.

13) For Part III of the PIQ, enter the information provided in the "Basis for Identification of Each Grace Product" verbatim in the **Basis for ID** field.

14) For Part III of the PIQ, enter any dates provided in the "Dates and Frequency of Exposure" field into the Start Date and End Date as appropriate. Enter any other information regarding the frequency of the claimant's exposure (i.e. comments such as "Daily", "regularly", etc.) into the **Frequency of Exposure** field.

15) For Part III of the PIQ, select the code provided in the Industry Code column from the **Industry** dropdown.

16) For Part III of the PIQ, if the claimant provided an answer in the column labeled "Was Exposure due to working in or around areas…", select "yes" or "no" as appropriate from the **Exposure due to working around asbestos** dropdown, and enter any specific text provided into the **Regular Proximity** field verbatim.

17) Click the **Save** button to enter your changes. The exposure information will appear in the data grid beneath the data entry form.

18) If there are two or more exposure occurrences for the injured party, enter other exposure site information by repeating steps 1 through 9 above. Each exposure entered will appear in the data grid.

**2.3    Entering a Record for General Exposure to Asbestos**

For each claim, enter one record in the **Exp** page to capture a broad description of the claimant's general exposure history as to all asbestos containing products.

1) Enter the earliest date of exposure mentioned in the documents in the **Start Date** field.

2) Enter the latest date of exposure mentioned in the documents in the **End Date** field.

3) Select the most frequently mentioned **Occupation** from the dropdown if it is available in the list.    *If the Occupation Code is provided, select the entry that begins with the numeric code provided on the PIQ or attachment.*

   a) If the injured party's occupation is not available in the **Occupation** list, select "Other" from the dropdown, and then enter the specific occupation in the **"If other, please specify"** field.

4) Enter "General Exposure" the **Search for Site of Exposure** field and click the adjoining **Search** button.  Select the result returned from the **Site of Exposure** dropdown.

5) If provided anywhere in the documents, enter any information regarding the frequency of the claimant's exposure (i.e. comments such as "Daily", "regularly", etc.) into the **Frequency of Exposure** field.

6) Click the **Save** button to save the record.

## 2.4    Entering Secondary Exposure Information

If the injured party alleges exposure through another occupationally exposed person (i.e. Secondary Exposure) anywhere in the supporting documents attached to the PIQ, select Secondary Exposure as the Review Type in Section 1 of the Online Claim Form, and then complete the **Sec. Exp.** tab shown below:



1) Enter the **Date Exposure to Other Person Began**.

2) Enter the **Date Exposure to Other Person Ended**.

3) Select the injured party's **Relationship to Occupationally Exposed Person** from the dropdown.

4) If provided, enter the **SSN of Occupationally Exposed Person**.

5) If provided, enter a brief **Description of how claimant was exposed to WR Grace Products** in the space provided.

6) Click on the **Save** button.

### 2.5 Review of Supporting Medical Documents

Findings of a diagnosis of mesothelioma noted in any of the supporting documentation must be entered on the **Path** tab.   In addition to pathology reports typically expected with mesothelioma diagnoses, Reviewers must also examine all supporting documents such as interrogatory answer and deposition transcripts and also enter the details of any diagnosis of mesothelioma in such.



1) Enter the date of the report diagnosis in the **Report Date** field.

2) Select the name of the reporting physician (i.e. the physician who signed the report, either via electronic or physical signature) from the **Physician** dropdown.

   a) If the physician's name is not available in the dropdown, click on the button to add a new physician to the database.  See Section 4 for instructions on entering a new physician.

   b) If the physician's name is not provided, select "Unknown Physician" from the dropdown.

3) From the **Report Type** dropdown, select the description that best fits the type of report provided.

4) Skip the **Facility or Screening Company** dropdown.

5) From the **Findings/Interpretation** dropdown, select the injury/disease diagnosed by the examining physician in his/her conclusions.

6) Enter the PIQ page number (the last four digits of the electronic Bates stamp in the lower right corner) or range of pages where the report is located in the **Page Number(s)** field.

   *a)* Page ranges are entered as the first and last page of the range, separated by a dash. *Example: 25 - 30*

7) Click the **Save** button.  The details of the medical report will be saved and appear in the data grid below the data entry form.


After reviewing all supporting documents attached to the PIQ, select "Complete" from the **Review Outcome** dropdown in the form header and click the blue button to the right of the dropdown. This will mark the image as having been reviewed, and the next image in the processing queue will be served to the reviewer.

3.    **Adding a New Physician**

When entering medical exam information provided by a physician whose name does not appear in the **Physician** dropdown, the user will have to add the physician's name to the database before completing the data entry.  Each new physician added to the database will *not* be approved as a Qualified Physician per the TDP until his/her board certifications have been confirmed through a separate procedure performed on a daily basis for all new physician's entered into the database.

*In order to enable accurate matching of new physician's names to databases of board certifications, it is very important to enter as much information as is available for each physician – including the name of the hospital or clinic, and any address information provided in the report.*

To add a new physician to the database, follow these steps:

1) Click the **Add Physician** link on the data entry page (this link appears in each of the four pages for entering medical data).  The **Add Physician** popup will open, as shown below.

**Popup: Add Physician**



2) Enter the physician's **Last Name** as presented on the medical report.

3) Enter the physician's **First Name** as presented on the medical report.

4) Enter the physician's **Middle Name** as presented on the medical report, if applicable.

5) Enter the **Suffix** for the physician's name, if applicable.

6) Enter the name of the **Hospital / Clinic/ Practice** if noted in the medical report.

7) Enter the **Street Address** where the physician practices, if provided.

8) Enter the **City** where the physician practices, if provided in the report.

9) Enter the **State** where the physician practices, if provided in the report.

10) Enter the **ZIP Code** where the physician practices, if provided in the report.

11) Click the **Save** button to save the data and close the popup.

**Appendix A:  W.R. Grace Asbestos Containing Products**

| # | GraceProductName |
|---|---|
| 1 | Acoustical Plaster |
| 2 | Ari-Zonolite |
| 3 | Ari-Zonolite Board Texture |
| 4 | Ari-Zonolite Natura |
| 5 | Ari-Zonolite Natural |
| 6 | Ari-Zonolite Nu-White |
| 7 | Ari-Zonolite Oyster White |
| 8 | Bermuda Roof Aggregate |
| 9 | Block Insulation |
| 10 | Cement |
| 11 | Concrete Leveler |
| 12 | Decorators White |
| 13 | Decorators White Extra Hard |
| 14 | Econo-White |
| 15 | Econo-White 65 |
| 16 | Econo-White 70 |
| 17 | Econo-White Acoustical Texture |
| 18 | Econo-White Super White |
| 19 | Epoxy Coating |
| 20 | EX-Tex |
| 21 | EZ-Tex |
| 22 | Fireproofing |
| 23 | Gaskets |
| 24 | Gun Coat Spray Surfacer |
| 25 | Hi Temp Insulating Cement |
| 26 | Hi-Sorb |
| 27 | Hi-Sorb Acoustical Plaster |
| 28 | Insulation |
| 29 | MK 2 |
| 30 | MK-1 |
| 31 | Mono-Kote |
| 32 | Mono-Kote (MK-1) |
| 33 | Mono-Kote (MK-2) |
| 34 | Mono-Kote (MK-3) |
| 35 | Mono-Kote Fireproofing |
| 36 | Mono-Kote III |
| 37 | Monokote MK-4 |
| 38 | Monokote Spray Insulation |
| 39 | Monolite Zonolite |
| 40 | Oyster White |
| 41 | Oyster White Hi Sorb |
| 42 | Perl-Coustic |
| 43 | Perlite |
| 44 | Perltex |
| 45 | Perltex Fog |
| 46 | Perltex Perlite |
| 47 | Perltex Poly |

| # | GraceProductName |
|---|---|
| 48 | Perltex Polycourse |
| 49 | Perltex SAV |
| 50 | Perltex Spray |
| 51 | Perltex Spray Surfacer |
| 52 | Perltex Spray Surfaces |
| 53 | Perltex Super 40 |
| 54 | Perltex Super-40 Fog |
| 55 | Perltex Super-40 Perlite |
| 56 | Perltex Super-40 Perltex |
| 57 | Perltex Super-40 Poly |
| 58 | Perltex Super-40 Polycoarse |
| 59 | Perltex Super-40 SAV |
| 60 | Perltex Super-40 Spray Surfacer |
| 61 | Plaster Insulation |
| 62 | PlasterTex |
| 63 | Prep-Coat |
| 64 | Prep-Coat #3 |
| 65 | Prep-Coat #4 |
| 66 | Prep-Coat #5 |
| 67 | Remnants of material |
| 68 | Remnants of material |
| 69 | Satin White |
| 70 | See Attached |
| 71 | Slip resistant coating |
| 72 | Spra-Insulation |
| 73 | Spra-Wyt |
| 74 | Spra-Wyt Acoustical |
| 75 | Spra-Wyt Acoustical Finish |
| 76 | Spra-Wyt Finish |
| 77 | Spray products |
| 78 | Spray-Wyt |
| 79 | Super 40 Perlite |
| 80 | Super-40 |
| 81 | Super-40 SAV |
| 82 | UK3 spray |
| 83 | Vermiculite |
| 84 | Vermiculite Acoustical Plaster |
| 85 | Vermiculite Acoustical Plastic |
| 86 | Vermiculite based insulating cement (MacArthur) |
| 87 | Versakote |
| 88 | Woven Pipeline Wrapper |
| 89 | Woven Pipeline Wrapper |
| 90 | XX White Hi-Sorb |
| 91 | Z-Crete Insulation products |
| 92 | Zonocoustic |
| 93 | Zono-Coustic |
| 94 | Zono-Coustic (MK-2) |
| 95 | Zono-Coustic 1 |
| 96 | Zono-Coustic 2 |

| # | GraceProductName |
|---|---|
| 97 | Zono-Coustic 3 |
| 98 | Zono-Coustic Type Z |
| 99 | Zonolite |
| 100 | Zonolite A |
| 101 | Zonolite Acoustic |
| 102 | Zonolite Acoustical  Tile |
| 103 | Zonolite Acoustical Finish |
| 104 | Zonolite Acoustical Plaster/Plastic |
| 105 | Zonolite Acoustical Tile |
| 106 | Zonolite Acoustical Tile |
| 107 | Zonolite Board of Education Hard Texture |
| 108 | Zonolite Board of Education Texture |
| 109 | Zonolite cement |
| 110 | Zonolite cement |
| 111 | Zonolite Finish Coat |
| 112 | Zonolite Finish Coat Decorators White |
| 113 | Zonolite Finish Coat Decorators White Extra Hard |
| 114 | Zonolite Finishing Cement |
| 115 | Zonolite fireproofing |
| 116 | Zonolite Heat and Sound Insulation |
| 117 | Zonolite Heat and Sound Insulation |
| 118 | Zonolite Heat and Sound Insulation |
| 119 | Zonolite heat and sound shield |
| 120 | Zonolite High Temperature cement |
| 121 | Zonolite High Temperature Insulating Cement |
| 122 | Zonolite Hi-temperature Cement |
| 123 | Zonolite Insulating Cement |
| 124 | Zonolite Insulation |
| 125 | Zonolite Light Temp Cement |
| 126 | Zonolite Masonry |
| 127 | Zonolite Mono-Kote |
| 128 | Zonolite Mono-Kote (MK-1) |
| 129 | Zonolite Mono-Kote (MK-2) |
| 130 | Zonolite Mono-Kote (MK-3) |
| 131 | Zonolite Monokote 5 |
| 132 | Zonolite Monokote Fireproofing |
| 133 | Zonolite monokote super 40 perltex |
| 134 | Zonolite plaster |
| 135 | Zonolite Plaster |
| 136 | Zonolite Spra-Insulation |
| 137 | Zonolite Spra-Tex |
| 138 | Zonolite Spra-Tex Extra Hard |
| 139 | Zonolite Spra-Tex Regular |
| 140 | Zonolite Spray |
| 141 | Zonolite spray-on fireproofing |
| 142 | Zonolite Spray-Tex EH |
| 143 | Zonolite Super 40 |
| 144 | Z-Tex |
| 145 | Z-Tex 2 |

| # | GraceProductName |
|---|---|
| 146 | Z-Tex 2 Super White |
| 147 | Asbestos-impregnated papers and tapes |
| 148 | Automobile gaskets |
| 149 | Basco-bestos |
| 150 | Daraseal |
| 151 | Dearborn 11B |
| 152 | Dearborn 52A Mastic |
| 153 | Dearborn NO-Oxidized Wrapper No 3 |
| 154 | Dearborn NO-Oxidized Wrapper No 7 |
| 155 | Dearborn Z-type Blankets & Tape |
| 156 | Epoxy adhesives (medical) |
| 157 | Flosal |
| 158 | FP Coating |
| 159 | High velocity drying ovens |
| 160 | Medical Filters |
| 161 | Polyester resin (thixotropic agent) |
| 162 | Profiled sealants |
| 163 | Super Visbestos |
| 164 | Sylodex |
| 165 | Terolan Adhesive |
| 166 | Terolan Seam sealers |
| 167 | Terolex adhesive |
| 168 | Terotex underbody coating |
| 169 | Vellumoid gaskets |

**EXHIBIT D**