```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


IN RE:                      .      Case No. 01-01139 JKF
                            .
W. R. GRACE & CO.,          .
et al.,                     .      USX Tower - 54th Floor
                            .      600 Grant Street
                            .      Pittsburgh, PA 15219
          Debtors.          .
                            .      September 10, 2007
. . . . . . . . . . . . ..         9:14 a.m.
```

```
                TRANSCRIPT OF MOTION HEARING
           BEFORE HONORABLE JUDITH K. FITZGERALD
            UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

```
For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE L. FREEDMAN, ESQ.
                        Citigroup Center
                        153 East 53rd Street
                        New York, NY  10022
                        (Telephonic Appearance)


For the Debtors:        Kirkland & Ellis, LLP
                        By:  MICHAEL T. DIERKES, ESQ.
                        Aon Center
                        200 East Randolph Drive
                        Chicago, IL  60601
                        (Telephonic Appearance)


Audio Operator:         Janet Heller
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtors:            Kirkland & Ellis, LLP
                           By:  AMANDA C. BASTA, ESQ.
                           655 15th Street, N.W.
                           Suite 1500
                           Washington, DC  20005
                           (Telephonic Appearance)

For the Debtors:            Reed Smith, LLP
                           By:  LAWRENCE E. FLATLEY, ESQ.
                                DOUGLAS E. CAMERON, ESQ.
                                JAMES RESTIVO, ESQ.
                                TRACI S. REA, ESQ.
                           435 Sixth Avenue
                           Pittsburgh, PA 15219

For the Canadian           Speights & Runyan
Claimants:                 By:  DANIEL A. SPEIGHTS, ESQ.
                                MARION C. FAIREY, JR., ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924

For W. R. Grace:           W. R. Grace & Co.
                           By:  RICHARD FINKE

For Equity Committee:      Kramer Levin Naftalis & Frankel, LLP
                           By:  JESSICA J. GLASS, ESQ.
                                GARY M. BECKER, ESQ.
                           1177 Avenue of the Americas
                           New York, NY 10036
                           (Telephonic Appearances)

For Future Claimants       Orrick, Herrington, & Sutcliffe LLP
Representative:            By:  DEBRA FELDER, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, DC 20007
                           (Telephonic Appearance)

For the Asbestos           Campbell & Levine, LLC
Claimants Committee:       By:  MARK T. HURFORD, ESQ.
                           1700 Grant Building
                           Pittsburgh, PA 15219
                           (Telephonic Appearance)

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Fireman's Fund<br>Insurance Company: | Stevens & Lee, P.C.<br>By:  DAVID R. BEANE, ESQ.<br>111 North Sixth Street<br>Reading, PA 19603<br>(Telephonic Appearance) |
| For London Market<br>Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829<br>(Telephonic Appearance) |
| For the Asbestos<br>Claimants Committee: | Caplin & Drysdale<br>By:  WALTER B. SLOCOMBE, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005<br>(Telephonic Appearance) |
| For Ford Marrin Esposito<br>Witmeyer & Gleser: | Ford Marrin Esposito Witmeyer & Gleser<br>By:  SHAYNE W. SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005<br>(Telephonic Appearance) |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Bilzin, Sumberg, Baena, Price &<br> Axelrod<br>By:  SCOTT L. BAENA, ESQ.<br>       JAY M. SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131<br>(Telephonic Appearance by Mr. Baena) |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>44 Montgomery Street<br>Suite 1050<br>San Francisco, CA  94104<br>(Telephonic Appearance) |
| For Official Committee<br>Damage Claimants: | LECG<br>By:  SEAN WALSH<br>(Telephonic Appearance) |

4

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Official Committee<br>Asbestos Property<br>Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630<br>(Telephonic Appearance) |
| For the Official<br>Committee of Unsecured<br>Creditors: | Stroock & Stroock & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038-4982<br>(Telephonic Appearance) |
| For the Official<br>Committee of Unsecured<br>Creditors: | Duane Morris LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market Street<br>Suite 1200<br>Wilmington, DE  19801<br>(Telephonic Appearance) |
| For Murray Capital<br>Management, Inc.: | Murray Capital Management, Inc.<br>By:  MARTI MURRAY, ESQ.<br>New York, NY<br>(Telephonic Appearance) |
| For the Official<br>Committee of Asbestos<br>Claimants: | Anderson, Kill & Olick, P.C.<br>By:  ROBERT HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1182<br>(Telephonic Appearance) |
| For David Austern: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19801<br>(Telephonic Appearance) |
| For Official Committee<br>Asbestos Property<br>Damage Claimants: | Ferry, Joseph & Pearce, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market Street, Suite 904<br>Wilmington, DE  19899<br>(Telephonic Appearance) |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Royal Indemnity:          Wilson Elser Moskowitz Edelman
                                & Dicker LLP
                              By:  CATHERINE CHEN, ESQ.
                              150 East 42nd Street
                              New York, NY  10017
                              (Telephonic Appearance)

For Montana Department        Womble Carlyle Sandridge
of Environmental               & Rice
Quality:                      By:  FRANK A. MONACO, JR., ESQ.
                              One Atlantic Center
                              1201 West Peachtree Street
                              Suite 3500
                              Atlanta, GA  30309

1            UNIDENTIFIED ATTORNEY:  Good morning, Your Honor.

2            THE COURT:  Please be seated.  This is the matter of

3  W. R. Grace, Bankruptcy Number 01-1139.  This is the continued

4  motion for summary judgment concerning certain Canadian

5  limitations claims.  Participants by phone are Theodore

6  Freedman, Debra Felder, John Phillips, Martin Dies, Jessica

7  Glass, Mark Hurford, Theodore Tacconelli, Michael Lastowski,

8  David Bean, Arlene Krieger, Andrew Craig, Marion Fairey, Shayne

9  Spencer, Michael Dierkes, Marti Murray, Sean Walsh, Robert M.

10  Horkovich, Gary Becker, Francis Monaco, Walter Slocombe,

11  Catherine Chen, Alex Mueller, Scott Baena and Terence Edwards.

12  I'll take entries in court, please.  Good morning.

13            MR. CAMERON:  Your Honor, on behalf of the debtors,

14  Doug Cameron, Traci Rea and Jim Restivo.

15            MR. SPEIGHTS:  May it please the Court, on behalf of

16  the Canadian claimants Dan Speights and Marion Fairey, who is

17  here and not on the phone as indicated.

18            THE COURT:  Yes, thank you.

19            MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo on

20  behalf of the property damage committee.

21            THE COURT:  Okay.  Mr. Cameron?

22            MR. SPEIGHTS:  May it please the Court, I do have one

23  housekeeping matter before Mr. Cameron starts his argument, if

24  I could.

25            THE COURT:  All right.  Mr. Speights?

1          MR. SPEIGHTS:  I will not get into argument, I assure
2    you.
3          THE COURT:  Yes, sir.
4          MR. SPEIGHTS:  Your Honor, on -- last week, I can't
5    remember if it was Wednesday or Thursday, we got a copy of Mr.
6    Cameron's brief, his supplemental brief to the Court, along
7    with his submissions.  I was not aware that we could file a
8    supplemental brief.  I sent an e-mail asking that -- what
9    authority there was.  I had not received a response to my
10   e-mail, but I did have an informal chat with Mr. Cameron
11   outside.
12         I don't want to start off this morning, on a Monday
13   morning, in any way in an unpleasant manner, but I was not
14   aware we could file a supplemental memorandum, nor in the court
15   hearing a week or so ago when Mr. Restivo spoke about this
16   proceeding, nor in the e-mails telling me what we would do in
17   advance of the hearing, was a brief ever mentioned.  It is what
18   it is.
19         We are here today, but unless Your Honor is inclined
20   to say, well, let's go home and let Mr. Speights file a brief,
21   which I don't think Your Honor is, I certainly would ask Your
22   Honor for the Canadian claimants to have the right to respond
23   to this brief and file a supplemental submission as well.  I
24   can see where it would be very helpful to the Court to have a
25   brief explaining all the exhibits and all the stuff we put on

1 your desk last week, but I simply did not see any authority for

2 it, and I did not know we could do that.

3        THE COURT:  Okay.  Well, I think -- could we get

4 through the hearing?  The debtors' response brief essentially

5 took the amended expert report that you submitted and made some

6 comments about the amended expert report.  At least that's how

7 I took that brief.  And it kind of tracked the expert's

8 deposition with respect to the amended report, I thought.  Now,

9 when this is over, I may need briefs from both of you.  I'm not

10 sure.  Could we address that issue and see -- I didn't really

11 find anything in the debtors' supplemental memo that was too

12 startling, frankly, Mr. Speights.  I don't really see the need

13 for any response to that particular document.  If I'm missing

14 something, maybe you can highlight it for me at the lunch

15 break, and then I'll address that specific issue.  Otherwise, I

16 may need some pleadings or briefing from both of you, and could

17 we just wait -- get through this and see where it stands at

18 that point?

19        MR. SPEIGHTS:  Absolutely, Your Honor.  One sentence.

20 I do think that our supplemental would have highlighted what we

21 wanted to highlight, not just to respond to what they

22 highlighted, because a lot has happened on both sides since

23 this thing was originally scheduled, and I'm happy to postpone

24 it till the end of the day.  You did say lunch break.  I did

25 check with your scheduling clerk, and she indicated that we had

1 two hours set aside.  I understand we're not bound by exactly

2 two hours, but I would hope we finish before lunch.

3           THE COURT:  Oh, all right.  Well, that's fine, too.

4 Let's get finished --

5           MR. SPEIGHTS:  Thank you, Your Honor.

6           THE COURT:  -- and see where we go then.  All right,

7 Mr. Cameron.

8           MR. CAMERON:  Thank you, Your Honor.  Good morning,

9 Your Honor.  Doug Cameron on behalf of W. R. Grace, addressing

10 the debtors' motion for summary judgment with respect to the

11 time barred Canadian asbestos property damage claims.  And,

12 Your Honor, this motion involves all but one of the remaining

13 Canadian claims.

14           As Your Honor may recall, debtors filed the original

15 summary judgment motion back in February of this year, and at

16 that time the motion sought an order expunging 88 of the then

17 remaining 89 Canadian claims.  However, since that motion was

18 filed almost seven months ago, 33 of those 88 claims have been

19 either withdrawn or otherwise expunged by the Court, so we are

20 down to a total of 50 -- of 55.  I'm sorry, we're down to a

21 total of 56 Canadian claims, and this motion covers 55 of those

22 claims.

23           I would like briefly to provide Your Honor a little

24 procedural history to bring us from February of this year when

25 the motion was filed up to today, because, as Mr. Speights

1    recognized, a lot has happened since that time.  We filed our

2    motion for summary judgment back on February 17, and in support

3    of that motion we provided Your Honor with our motion, our

4    memorandum, and the December 21, 2006, expert report of Graeme

5    Mew, the foremost authority on limitations law in Canada.  We

6    also submitted, Your Honor, admissions from the claims files

7    relating to the dates of installation, where it was in the

8    claims files, for the buildings at issue, and we also submitted

9    an affidavit relating to the undisputed issue of when Grace

10   stopped selling product in Canada.

11          On March 19, Speights & Runyan submitted an

12   opposition to our motion.  At that time, they did not submit an

13   expert report, but they did at that time raise an argument that

14   the Anderson Memorial case tolled the Canadian limitation

15   periods.  The debtors then were permitted to file a reply to

16   that brief, and in that we included the affidavit of Mr. Mew

17   that addressed various issues raised by the Speights & Runyan

18   opposition, including this new class action tolling issue.

19          We then appeared before Your Honor on April 9 to

20   argue the motion, along with five -- four, five or six other

21   summary judgment motions that are filed.  At that time, Mr.

22   Speights argued to Your Honor that he needed to depose our

23   expert again, a second time, primarily on his affidavit, and

24   Your Honor ruled that he could depose Mr. Mew again, and that

25   deposition did take place on May 11.

**J&J COURT TRANSCRIBERS, INC.**

1          At the oral argument in response to some of the

2   arguments that Mr. Speights was raising, Your Honor raised an

3   issue as to whether or not the expert report of Mr. Mew would

4   be hearsay, whether you needed testimony, and so we advised

5   Your Honor at that time that what we would do is when his

6   deposition was rescheduled we would take the direct examination

7   of Mr. Mew, and we did that on May 11.

8          Over the next couple of months, as Your Honor is

9   aware, this -- the date for this argument was scheduled and

10  rescheduled, and there were various arguments on whether the

11  debtor could or had to amend certain objections.  When Your

12  Honor ruled on May 30 that the debtors' ultimate limitations

13  objections were part of the fifteenth omnibus objection, Mr.

14  Speights advised the Court that he would have to retain an

15  expert not only on class action tolling, which he had advised

16  the Court earlier, I believe at the April 9 hearing, but also

17  on the ultimate limitations period in Canada, and Your Honor

18  said that he could do that.

19         Mr. Speights did retain Professor John Irvine, and we

20  eventually received his report at the end of July.  Although

21  Mr. Speights told the Court that he needed to hire an expert

22  for class action tolling issues and ultimate limitation issues,

23  I think if you look at Professor Irvine's report it's largely

24  focused on the normal limitations period in Canada.

25  Significantly, Your Honor, Professor Irvine has candidly

1  admitted he's not an expert on class action tolling issues, on

2  American law or on conflicts law, and indeed his expertise on

3  limitations law is somewhat limited.

4        In any event, I deposed Professor Irvine on August

5  22nd in Chicago, and at that deposition Professor Irvine showed

6  up with a new -- a draft of a new report, advised me at that

7  deposition that he would be finished with that new report

8  shortly, and counsel agreed that we could take Mr. Irvine's

9  deposition on that new report.

10       As Your Honor will recall, we attempted to take that

11  deposition on August 29 in Winnipeg, where Mr. -- where

12  Professor Irvine resides.  That deposition did not go forward.

13  It was eventually rescheduled, and everybody went to Atlanta to

14  take the deposition of Professor Irvine on Friday, August 31.

15       Because we would have new depositions, new expert

16  reports, Your Honor ruled that we would be permitted to file --

17  or the parties would file supplemental submissions and provide

18  them to Your Honor by September 6th, and that's what we

19  provided to Your Honor.  Your Honor, we provided last week five

20  binders.  The first two binders contained our materials.  The

21  last three binders contained the materials from the Canadian

22  claimants.  And in the first binder, Your Honor, is the

23  supplemental submission which we provided to give an overall

24  review of all of the materials that have been submitted to Your

25  Honor.  We also included an appendix that had primarily new

1  material, but with respect to some of the issue -- legal issues

2  that are being addressed, we did include some materials that

3  were previously provided to Your Honor, primarily the Mew

4  expert report and the Mew affidavit that were previously

5  provided so that all the materials would be in one place.  We

6  also included the May 11 direct examination of Mr. Mew,

7  Professor Irvine's original report, his original July report

8  that we received and took his deposition on the first time and

9  then experts from Professor Irvine's depositions and then some

10  of the Canadian legal authority.  Even though it was addressed

11  before, we found these things are difficult to find, so we

12  thought it would be helpful to the Court to include copies of

13  that in the materials.

14       THE COURT:  Yes, thank you.  That is helpful,

15  actually.

16       MR. CAMERON:  We also provided, as I said, in the

17  last three binders, Your Honor, the materials that Mr. Speights

18  provided, and I'd like to come back to those materials at the

19  end of my argument, if I could.

20       Despite the mountain of material that you have before

21  you -- you have five new binders; you had, I think, two or

22  three binders from the original motion -- debtors' motion is

23  very simple.  It's based entirely on discreet, undisputed facts

24  and the well-established law in Canada.  There is no dispute

25  that Canadian law applies here.

1         With respect to that law, I would like to start with

2    the Canadian ultimate limitation periods, which bar 35 of the

3    remaining 55 Canadian claims.  And, Your Honor, as Graeme Mew

4    has explained, and Tab C is the Mew deposition, and Tab B --

5    Tab A of the new appendix is his report, Canadian ultimate

6    limitation periods are ultimate cutoff points within which time

7    a claim must be brought regardless of when the claims were or

8    ought to have been discoverable.  In other words, the Canadian

9    ultimate limitation periods run from a date certain, regardless

10   of the claimant's knowledge or discoverability of their claims.

11   There is no dispute on this point, and, in fact, the Canadian

12   claimants' expert, Professor Irvine, is in complete agreement

13   with this -- on this issue, and that's at Tab E, Irvine

14   deposition, at Page 204 - 220.

15        There are three Canadian provinces -- I think there

16   are claims in five remaining Canadian provinces, but only

17   three of those Canadian provinces have ultimate limitation

18   periods, and that's Alberta, British Columbia and Manitoba.

19   Alberta's ultimate limitation period is ten years.  British

20   Columbia and Manitoba's ultimate limitation periods are 30

21   years, and, again, there is no dispute on that.

22        As Mr. Mew has made clear in his report and his

23   testimony, under the Canadian authority, by their very nature,

24   ultimate limitation periods begin to run upon the installation

25   of an allegedly defective product.  Those cases are cited at

1 Pages 4 and 5 of our supplemental submission and discussed in

2 subsequent pages.

3 The claimants here do not dispute when the products

4 were installed, and our position, Your Honor, is that based on

5 when the products were undisputably installed, the claims are

6 barred by the applicable ultimate limitations period.  And I

7 think to understand why ultimate limitation periods run from

8 the installation on these -- the installation of the products

9 it's important to understand how the asbestos in building

10 claims are characterized in Canada.

11 Under Canadian law, the asbestos in building claims

12 are only recognized as claims for pure economic loss, and the

13 controlling case in Canada is the 1995 Supreme Court of Canada

14 decision in Winnipeg Condominium Corp. Number 36 v. Bird

15 Construction Company.  In Winnipeg Condo the Court, Your Honor,

16 held that a claim for the cost of repairing and replacing an

17 allegedly defective product -- in that case it was defective

18 masonry cladding on a building -- was a claim for pure economic

19 loss because such costs do not arise from injury from persons

20 or to property.  Instead, the injury for the claim is the cost

21 of replacing the defective product.  So you don't have to show

22 any physical injury to maintain the claim.

23 Prior to Winnipeg Condo such claims were not even

24 actionable in Canada.  However, Winnipeg Condo created an

25 exception that permitted such a claim for pure economic loss.

1  And I think, Your Honor, it's undisputed that the asbestos

2  property damage claims at issue here are <u>Winnipeg Condo</u>-type

3  claims and only cognizable under Canadian law as negligence

4  claims for pure economic loss.  Graeme Mew says that.

5  Professor Irvine says that and the only asbestos building case

6  in Canada says that.  Due to the special nature of these

7  claims, the only limitation trigger that makes any sense is

8  that the period begins to run from installation, and this is

9  borne out by the cases, the statutes and the legislative

10  history, which I'll get into, Your Honor.

11         I would like to address first the ultimate limitation

12  period in British Columbia, and as I indicated the British

13  Columbia ultimate limitation period is 30 years and it provides

14  that no action may be brought, and I'm quoting, "after the

15  expiration of 30 years from the date on which the right to do

16  so arose."  And this precise language, "the date on which the

17  right to do so arose," was interpreted by the British Columbia

18  Court in the only asbestos building case in Canada that's

19  addressed this issue.  That case, Your Honor, and you've heard

20  it cited numerous times, is the <u>Privest Properties, Limited v.</u>

21  <u>Foundation Company of Canada, Limited</u>, and it's cited in our

22  supplemental submission at Pages 4 to 6, and for your

23  reference, Your Honor, it's a very voluminous decision.  It's

24  under Tab G, Number 10 in Volume 1 of the binders of the

25  supplemental materials we provided.


**J&J COURT TRANSCRIBERS, INC.**

1          Now, _Privest_, like the Canadian claims at issue here,

2    involved a claim against W. R. Grace, as well as other

3    defendants, seeking to recover the cost of removing the

4    allegedly defective fireproofing product that Grace had

5    manufactured and sold, namely MK-3, the same product at issue

6    in many of these buildings.  And while the _Privest_ case was

7    fully litigated and resulted in a finding that Grace's product

8    was not inherently dangerous, that's not the issue for today.

9    I want to focus the Court's -- to the Court's application of

10   the controlling Canadian law that concluded that the

11   plaintiff's claims in _Privest_ were _Winnipeg Condo_ claim -- type

12   claims for pure economic loss and barred under the applicable

13   limitations period.

14         Now, with respect to the limitation issue in _Privest_,

15   the Court assumed for purposes of discussion that an actual

16   wrong was committed by one of the defendants, in other words

17   the limitation defense was dealt with as an alternative to the

18   defense on the merits, and the Canadian courts recognize that

19   there's no inconsistency in Grace asserting that its products

20   were safe and that in any event the claimants' products are

21   time barred.

22         So, the Court, and Judge Drost was the trial Judge,

23   then commenced his analysis of the limitation issue by asking

24   when did the cause of action arise, and he concluded that in

25   British Columbia, as in other Canadian provinces, a cause of

1  action accrues when all constituent elements exist.  And then

2  he held as a matter of law in support -- this was a legal

3  determination -- that it's clear that all the elements

4  necessary to plaintiff's cause of action came into existence

5  during the period 1973 to 1975 when the MK-3 was installed in

6  the building, and significantly the Court applied Winnipeg

7  Condo to the plaintiff's claims as a matter of law and held

8  that the cause of actions were for pure economic loss and fell

9  within the Winnipeg Condo exception.

10          The Court held that by the time the fireproofing was

11 installed all the constituent elements of the tort of pure

12 economic loss were in place and because installation occurred

13 more than six years before the plaintiff filed suit, the claim

14 was barred.  Now, in Privest they were dealing with a normal

15 limitations period because the ultimate limitation periods of

16 30 years had not run so they were dealing with the normal

17 limitations period.  And although Privest involved the

18 application of the normal limitation period and not the

19 ultimate limitation period, for purposes of determining the

20 trigger for the running of the limitation period for this type

21 of a pure economic loss claim it doesn't matter.  The statute

22 language is identical.  The only difference is, and we'll get

23 to it later in normal limitations, is there a discoverability

24 component with normal limitations that is not present in

25 ultimate limitation.

1        So, there's no dispute that _Privest_ is the only

2   Canadian opinion that's addressed the appropriate trigger for

3   limitation periods for an asbestos property damage claim.

4   There is also no dispute, and I think as claimant's own expert

5   has agreed, the Court in _Privest_ adopted the date of

6   installation as the trigger for the running of that limitation

7   period.  The Court's adoption of the installation trigger was

8   an issue of law, and the Court's adoption of the installation

9   trigger has never been challenged on this issue in the more

10  than ten years since it was issued.  Thus, under _Privest_ there

11  is no question that British Columbia's ultimate limitation

12  period would begin to run from the date of installation of

13  Grace's products.

14        Now, _Privest_, in its reasoning, has been consistently

15  followed by the British Columbia courts in subsequent _Winnipeg_

16  _Condo_ and pure economic loss type cases, and those cases, Your

17  Honor, are cited and discussed at Pages 4 through 7 of the

18  supplemental submission.  One is _Imz (phonetic) v. Prince_

19  _George City_, in which the Court relied on _Privest_ in holding

20  that claims of negligent inspection and negligent construction

21  were time barred because more than six years had passed since

22  the building's construction.  Another case, _B.C. Limited v._

23  _Dayhu, D-a-y-h-u, Investments, Limited_, is where the B.C. Court

24  of Appeal applied a date of construction trigger for the

25  British Columbia ultimate limitations period in a cause of

1 action that had arisen out of an alleged defective construction

2 and inspection of an apartment building.  Leave to appeal to

3 the Supreme Court of Canada was denied in that case.  And

4 finally, <u>Armstrong v. West Vancouver</u> was a British Columbia

5 Court of Appeal case that also applied a date of construction

6 trigger to an economic loss claim.

7         Now interesting, Your Honor, and I believe most

8 telling, is that this is precisely, precisely, what Professor

9 Irvine concluded in his original July report when he said, and

10 I'm quoting from that report, "Hence, on authority one must

11 conclude that in British Columbia the cause of action in this

12 class of case arises not when damage becomes discoverable, but

13 as soon as it is inflicted, and in economic loss cases founded

14 ultimately on <u>Winnipeg Condo</u>, it will be deemed to have been

15 inflicted as soon as the defective element is incorporated in

16 the building, whether or not it threatens danger."  That's what

17 Professor Irvine said in his original report.  The law hasn't

18 changed since his original report.  The law is clear that in

19 British Columbia the ultimate limitations period begins to run

20 on these claims from the date of installation of the allegedly

21 defective product.  There is no Canadian authority to the

22 contrary.  Claimant's attempt to have Your Honor rewrite

23 Canadian law should be rejected.

24         Now, while there are five remaining British Columbia

25 cases, only one has provided documentation in its claim files

1 concerning the date of installation of the Grace product.  In

2 that claim, Number 11632, the product was alleged to be

3 installed in the 1960s, and claimants don't dispute this.

4 Thus, British Columbia's 30 year ultimate limitation period ran

5 on this claim prior to the debtors' filing of its Chapter 11

6 petition on April 2, 2001.  More than 30 years had passed since

7 the 1960s when it was installed.  That claim is barred as a

8 matter of law.

9        The other four British Columbia claims, Your Honor,

10 are not part of this motion on the ultimate limitations period.

11 They are part of the motion on the normal limitations period,

12 and if the -- if those cases ever would have to be tried, we

13 would probably raise ultimate limitations when we get more

14 evidence on the date of installation.  We just don't have those

15 dates undisputed in the summary judgment record.

16        I'd like to turn, Your Honor, to Alberta, where all

17 33 -- there are 33 remaining Alberta claims, and all 33 of

18 those claims are barred by Alberta's ten year ultimate

19 limitation period.  Alberta has a ten year ultimate limitation

20 period that begins to run, like the British Columbia statute,

21 "after the claim arose."  And, Your Honor, the Alberta

22 Limitations Act is in Tab H, Number 1, in Volume 2 of the

23 supplemental submissions.

24        The Alberta Ultimate Limitation Statute also provides

25 that in a breach of duty case such as we have here, the phrase,

1  "after the claim arose," means that the claim arises when the

2  conduct, act or omission occurs, and that's in Section 3(b) of

3  the statute.  Based on this plain language, Alberta's ultimate

4  limitation period began to run when debtors' conduct occurred,

5  which is no later than when Grace's products were installed.

6  That's precisely what Mr. Mew concluded.

7          The issue of when damages occur for purposes of these

8  claims is irrelevant to the determination of when the ultimate

9  limitation period starts to run, immaterial in Alberta.  This

10 is clear.  This was made clear in the legislative history of

11 Alberta's Limitation Statute.  The drafters of Alberta's

12 ultimate limitation period made it clear that for good policy

13 reasons, the ultimate limitation period should commence with

14 the alleged negligent conduct and not with the result or

15 consequences of that conduct.

16         First, in its 1986 report on limitations, and this is

17 quoted at length, Your Honor, at Page 8 of our supplemental

18 submission, which is Tab 1 in the first binder, ALRI stated

19 that, "The ultimate period must begin at the time of a

20 defendant's negligent conduct even though that conduct will not

21 be legally wrongful unless it produces damages -- damage at

22 some point, perhaps many years later."  They recognize -- they

23 went on to recognize that in a breach of duty case, the

24 ultimate limitation periods may expire before the claim is even

25 accrued because the damage may not have occurred by that time,

1  but concluded there was no feasible alternative that would be

2  consistent with the policies of the ultimate limitation period.

3  They therefore recommended that in a claim based on negligence,

4  the ultimate limitation period should begin at the time of the

5  breach of duty, which the committee equated with the time of

6  the negligent conduct.  And, Your Honor, the Alberta Institute

7  of Law Research and Reform document is in Appendix Tab I, and I

8  was quoting from Pages 159 to 160.

9        Then in its 1989 Report, the ALRI set out its Model

10  Limitations Act, which included the present language that I

11  quoted in Section 3(b), that a claim based on a breach of duty

12  arises when the conduct, act or omission occurred, and it

13  commented that "The ultimate period for a claim based on the

14  breach of a duty begins when the conduct, act or omission

15  occurred and that the ultimate limitation period may expire

16  before the claim is even accrued, for the damage may not have

17  occurred by that time," and they again noted that this problem

18  of legal principle is inescapable because there is no feasible

19  alternative consistent with limitation policy.  And that, Your

20  Honor, that Report Number 55, while I was quoting from Page 70,

21  is at Appendix Tab J.

22        The case law in Alberta, Your Honor, is consistent

23  with the legislative history of the Limitations Act, and it's

24  cited at Page 9 of our supplemental submission, lead case,

25  Trustee of Meek v. San Juan Resources, Inc. an Alberta Court of

1 Appeal decision that recognizes the ultimate limitation period

2 begins to run even if damage has not yet been discovered,

3 citing the 1989 ALRI report that I had just referenced to the

4 Court.   Similar cases of <u>Boze v. Edmonton</u> and <u>Stachniak v.</u>

5 <u>Thorhild</u> (phonetic) are also cited in our supplemental

6 submission.

7          Even Professor Irvine agreed at his deposition that

8 the intent of the statute is that the acts and omissions

9 commence the ultimate limitations period and damage is

10 irrelevant.   That's at Appendix Tab F, Irvine Deposition Number

11 2, at Pages 36 to 38.

12          Obviously, this conclusion in Alberta is consistent

13 with the holding in <u>Privest</u> that applied the Canadian

14 limitation law to an asbestos property damage claim.   Although

15 the Alberta statute and the legislative history is even clearer

16 on this point than the statute that was examined in <u>Privest</u>,

17 that the period begins to run from the date of installation.

18          And moreover, Your Honor, the date of installation

19 trigger is the only trigger that's fateful -- faithful to the

20 intent and purpose of the Canadian ultimate limitation periods.

21 Those laws were adopted to settle stale claims definitively

22 after a time certain, regardless of anybody's state of

23 knowledge about the claim.   So therefore, Your Honor, the ten

24 year ultimate limitations period in Alberta would bar any claim

25 involving an installation of an alleged Grace product prior to

1 April 2, 1991, ten years prior to the filing of the debtors'

2 Chapter 11 petition.

3        And again, Your Honor, the summary judgment record

4 here demonstrates, and I don't think the claimants have

5 disputed any of this, that all 33 Alberta claims would involve

6 alleged installations before April 2, 1991.  Eight of those

7 Alberta claimants have admitted in their claims, claims form,

8 that the Grace products were installed in their building not

9 only prior to April 2, 1991, but at times prior to 1976, which

10 is more than 25 years before the filing of debtors' Chapter 11

11 petition, and, Your Honor, you can see that in Exhibit C in the

12 supporting appendix to the original motion for the -- for Claim

13 Numbers 12388, 12421, 12422, 12423, 12454, 12489, 12496 and

14 12576.

15        Now, the claimants for the other 25 Alberta claims

16 failed to provide any installation dates or failed to submit

17 any documentation in the claims files from which you could

18 determine the date of installation, so there's obviously no

19 evidence of any post-1991 installation, and there's good reason

20 for that.  As the affidavit of James Simtani (phonetic) that

21 Grace submitted with its original motion, that's Exhibit D as

22 in dog to the original motion, makes clear, Grace stopped

23 selling asbestos-containing products in Canada before 1976,

24 more than 15 years before April 1991 and 25 years before the

25 petition, Chapter 11 petition, was filed.  And, again, I don't

1  believe the claimants have disputed these facts and, thus,

2  there is no question that Alberta's ultimate limitation period

3  barred all of the Alberta claims by at least 1986 and, in any

4  event, clearly by April 2, 1991.

5          Now, in addition to the 33 Alberta claims and the one

6  British Columbia claim, there's also one Manitoba claim that's

7  barred by applicable ultimate limitation periods.  It's 30

8  years in Manitoba.  It begins to run, like the Alberta statute,

9  from the act or omissions that give rise to the cause of

10 action.  The record demonstrates, Your Honor -- the claims file

11 documentation for this one Manitoba claim, there's only one

12 remaining Manitoba claim in the bankruptcy, that's Claim Number

13 11620, alleges installation in 1956, well before April 2, 1971,

14 which would be 30 years prior to the filing of the Chapter 11

15 petition.  Again, I don't believe this fact has been disputed.

16 In fact, even claimant's expert, Professor Irvine, conceded

17 that under these circumstances, given a 1956 installation, it's

18 very, very likely that the ultimate limitations period would

19 cut short this action.  That's Appendix Tab E, Irvine

20 Deposition Number 1, at 234-235, and as a result, Your Honor,

21 that claim is time barred as a matter of law.

22          Now, as I indicated, Your Honor, the claimants do not

23 dispute the facts concerning the installation dates for these

24 35 claims, rather they misapply or ignore applicable Canadian

25 law in an attempt to argue that first the date of installation

1 does not trigger the running of the ultimate limitation period,

2 and they also argue that for purposes of the limitation period

3 calculation, their claims were commenced before April 2001.

4 I'd like to address those arguments.  However, Your Honor, they

5 have not cited and cannot cite the Court to any Canadian

6 authority to support this point.  The issue is clearly governed

7 by <u>Winnipeg Condo</u>, it's application to an asbestos in buildings

8 claim in <u>Privest</u> and the numerous authorities dealing with

9 ultimate limitation periods, both their purpose as well as

10 their application to these claims in relevant provinces.

11        Claimants' attempts to avoid the clear application of

12 ultimate limitation period to their claims are red herrings.

13 The first, Your Honor, red herring is the claimants' assertion

14 that Grace didn't even raise ultimate limitations in their

15 fifteenth omnibus objection.  That's simply incorrect.  I

16 mention this only because Mr. Speights has reserved his rights

17 to reargue this point on several occasions.  I'm not going to

18 go into the details of the argument, though, because the

19 Court's already correctly held that the debtor -- those

20 objections were included in the fifteenth omnibus objection and

21 the parties have proceeded accordingly since that ruling.

22        The second red herring or diversion is claimants'

23 attempt to invoke the tolling effect supposedly created by the

24 Anderson Memorial putative class action filed in South Carolina

25 State Court in 1992.  And what they've done is they've raised

1  Anderson Memorial in an attempt to toll the limitations and, in

2  fact, to change the date their claims in this bankruptcy were

3  commenced for limitation purposes.  And there's a reason why

4  Speights & Runyan is desperate to raise Anderson Memorial.

5  Without tolling, these Canadian claims are time barred as a

6  matter of law, and they know it.

7         Their own expert, Professor Irvine, recognized that

8  the fate of all the Canadian claims depends in large measure as

9  to whether Anderson Memorial tolls their claims and they can

10 avoid April 2, 2001, as the commencement date.  Professor

11 Irvine, however, conceded he's no expert in Canadian class

12 actions, and he's not rendering an opinion in that regard.  He

13 just indicates that it's an issue in his mind.  And there's

14 good reason.  Anderson Memorial has no effect on the running of

15 the Canadian limitation periods.

16        As an initial matter, and I know Your Honor has heard

17 arguments and read briefs on this for months, South Carolina's

18 Door Closing Statute precludes nonresidents whose claims did

19 not arise in South Carolina from suing there.  The Canadian

20 claimants are not, and never could have been, members of the

21 Anderson Memorial class.  There accordingly can be no tolling

22 of the Canadian claims through Anderson Memorial as a matter of

23 South Carolina law.

24        Second, Your Honor, as a matter of Canadian law, as

25 explained by Mr. Mew in his affidavit and as set forth in our

1 supplemental submission, the Anderson Memorial case did not

2 toll any Canadian limitation periods because the Canadian Class

3 Proceeding Acts that they rely upon were not even in effect

4 when Anderson Memorial was filed, and they do not apply

5 retroactively.  The Class Proceeding Acts enacted in several

6 Canadian provinces by their clear terms do not apply to actions

7 begun prior to their effective dates.  There is no dispute that

8 every one of these became effective after the Anderson Memorial

9 claim -- after the Anderson Memorial complaint was filed in

10 December of 1992.

11        Third, Your Honor, as Mr. Mew explains, there is

12 simply no Canadian authority, and Your Honor hasn't been cited

13 any by the claimants, for the proposition that a foreign class

14 action could toll a Canadian limitation period.  The tolling

15 provisions of the respective Canadian Class Proceeding Acts by

16 their terms only apply to actions commenced within their

17 particular Canadian province and do not apply to actions begun

18 outside of Canada.  And, Your Honor, that's -- Mr. Mew made

19 that clear in his appendix, or in his affidavit which is at

20 Appendix Tab B, and, Your Honor, in our supplemental submission

21 we gave an example of how the British Columbia Class Proceeding

22 Act only applies to actions actually filed under that Act in

23 British Columbia, and it goes on to say that the Act does not

24 apply to a proceeding that may be brought in a representative

25 capacity under another Act.

1          Thus, Your Honor, even if the Canadian Class

2   Proceeding Acts could be applied retroactively, which they

3   cannot by their clear terms, they would still not recognize any

4   tolling effect of a foreign action of Anderson Memorial.  It's

5   entirely irrelevant to the application of Canadian limitation

6   periods, and I would note that Mr. Mew has also indicated in

7   his affidavit at Paragraph 8, Appendix Tab B, that any tolling

8   through Anderson Memorial would in no event operate to toll

9   ultimate limitation period given the nature and purpose of

10  those statutes.

11          Now, Your Honor, even if the limitation period

12  arguably could be postponed as to December 23, 1992, and for

13  all the foregoing reasons it cannot, the Alberta and Manitoba

14  claims would still be time barred by the ultimate limitation

15  period.  Claimants do not dispute that Grace stopped selling

16  these products before 1976, more than 15 years before this

17  alleged tolling.  As a result, all 33 Alberta claims would be

18  barred, and the one Manitoba claim has a 1956 installment --

19  installation date, well more than 30 years before this alleged

20  tolling.  Even Professor Irvine recognized this.  Therefore,

21  Your Honor, the 33 Alberta claims and the one Manitoba claim

22  would be barred, irregardless of the Anderson Memorial action,

23  and I think it bears repeating, Your Honor, that the Canadian

24  Provincial Class Proceeding Acts do not provide tolling for

25  foreign actions.  Thus, Anderson Memorial is entirely

1    irrelevant to this issue.  Anderson Memorial cannot be used to

2    resurrect these 55 time barred Canadian claims subject to our

3    motion.

4              Address a couple of points that the claimants had

5    raised back in March in their reply.  They argued, Your Honor,

6    that because damages is an essential element of a cause of

7    action in negligence and because Grace denies that there's any

8    damages in their building, that until Grace concedes there's

9    damages, the statute couldn't run.  As discussed earlier, that

10   simply is not the law in Canada.  There is nothing in Canadian

11   law that requires a defendant to admit liability or damage

12   before it can prevail on its limitation defense.  Rather, as

13   was done in Privest, the Court would assume a wrong has been

14   committed and then would perform a limitation analysis.  And as

15   discussed previously, in a Winnipeg Condo case like this

16   limitation periods run from the breach of duty, not any

17   resulting damages, and the Alberta Law Reform Institute makes

18   that perfectly clear when it says, "To achieve its objective of

19   securing repose for the society of potential defendants, the

20   ultimate period must begin at the time of the defendant's

21   negligent conduct, even though that conduct will not be legally

22   wrongful unless it produces damages at some point -- some time,

23   perhaps many years later."  No Canadian court has ever held to

24   the contrary.  Claimants are attempting to have Your Honor

25   rewrite Canadian law.

1          They also raise an argument, Your Honor, that there

2    may be other asbestos property damage causes of action that

3    would alter the ultimate limitation analysis.  Under Canadian

4    law, as explained in Mr. Mew's affidavit and, in fact, as

5    conceded by Professor Irvine in his report, regardless of how

6    one tries to dress up the claim, an asbestos in buildings tort

7    claim falls under the rubric of a Winnipeg Condominium type

8    claim, cognizable under Canadian law as a negligence claim for

9    economic loss.  Such claims accrued when Grace products at

10   issue were allegedly installed.  That's precisely what the

11   Court in Privest concluded when faced with multiple causes of

12   action in that case.

13          Your Honor, I would like to turn briefly to the

14   applicable Canadian normal limitation periods.

15                         (Pause)

16          THE COURT:  I'm sorry, Mr. Cameron.

17          MR. CAMERON:  It's okay.  Your Honor, I'd like to

18   turn to the applicable Canadian normal limitations periods that

19   bar 55 of the remaining Canadian claims.  While we've just

20   addressed the 35 Canadian claims barred by the ultimate

21   limitations period, those 35 claims as well as an additional 20

22   in provinces that don't have ultimate limitations provisions,

23   are barred by the normal limitation periods.  Under Winnipeg

24   Condo and Privest, like the ultimate limitation period, the

25   normal limitation period begins to run on these pure economic

1  loss claims on the date of installation.  That's precisely what

2  _Privest_ concluded when analyzing the British Columbia normal

3  limitation period.  However, unlike the ultimate limitation

4  period, normal limitation periods are subject to

5  discoverability principles.  In other words, the Court needs to

6  determine whether a reasonable person would have been able to

7  discover the facts that could reasonably lead to a commencement

8  of an action.

9       And the important point here, Your Honor, is that

10  under Canadian law, and I think this is undisputed, it's the

11  claimants' burden to show that not only did they not know of

12  the facts that formed the basis of their claims, but they could

13  not have known of the facts before the normal limitation

14  periods run.  It's not a did not know.  It's they could not

15  have discovered that.  And according to Mr. Mew the Canadian

16  courts apply this burden shifting approach.  If the defendant

17  first shows that the claim was brought after the expiration of

18  the period, which for the pure economic loss claims would start

19  to run at installation, and if they weren't brought within two

20  to six years after that, then they are presumptively barred.

21  At that point in time, just like in _Privest_, the burden then

22  shifts to the plaintiff to prove that the commencement of the

23  running of the limitation period should be postponed until some

24  date after the alleged wrong.

25       Applying these Canadian legal standards, Your Honor,

1  to the remaining claims results in 55 of the claims being time

2  barred.  There is no dispute the normal limitation period is

3  either two years in Alberta or six years in all the other

4  provinces.  Similarly undisputed that Grace stopped selling

5  asbestos-containing products in Canada by 1976.  Accordingly,

6  as a matter of law, there can be no dispute that the normal

7  limitation periods presumptively ran on these claims by no

8  later than 1982.  Under Canadian law that burden is shifted.

9  The claimants have not come forward with any credible

10  admissible evidence that demonstrates not that they did not

11  discover, but they could not have discovered the basis for

12  their claims before April 2, 1995, in most of the provinces, or

13  April 2, 1999, in Alberta.  Thus, Your Honor, these claims are

14  time barred as a matter of law.

15        As I indicated, their attempt to avoid this normal

16  limitations period misses the mark because what they -- what

17  the claimants have done is they point to statements in their

18  proof of claim forms which say they did not know that the

19  asbestos-containing product in their building was a -- was

20  manufactured by Grace.  They didn't know that until 2003.  And

21  again, Your Honor, the legal standard and their burden is not

22  showing what they knew or didn't know, it's what they could or

23  could not have known.

24        They haven't submitted any evidence on this point,

25  nor could they do so.  Their own expert on product

1 identification, Donald Pinshen, testified that he was able to

2 identify Grace asbestos-containing fireproofing products in

3 buildings in the early 1980s.  He was also conducting seminars

4 and presentations for building owners throughout Canada,

5 including claimants in this bankruptcy, in which the

6 identification and detection of asbestos in buildings,

7 including Grace's MK-3, were discussed.

8            I think that the claimants, Your Honor, have failed

9 to submit any evidence and, as a result, their claims are

10 barred, and I think there is good reason why they can't submit

11 this evidence.  And while it's not the debtors' burden to come

12 forward to show what they could have or should have known, the

13 evidence is overwhelming, and importantly the Canadian case law

14 has addressed this issue.

15           The Privest case, in applying its normal limitation

16 period analysis, relied on the decisions of both they Quebec

17 Court of Appeal and the Supreme Court of Canada in the Canadian

18 Indemnity v. Canadian Johns Manville case and concluded as a

19 matter of law that the controversy relating to the health

20 effects of asbestos was widely known in Canada by the late

21 1960s and early 1970s.  The Trial Court went on to find that

22 either because of their actual or imputed knowledge, the

23 plaintiff's discoverability argument to the limitation defense

24 failed.

25           Even Professor Irvine agreed that in Privest Judge

1  Drost applied the Supreme Court of Canada's holding on

2  constructive knowledge in Johns Manville to building owners as

3  a matter of law and that he had no basis to disagree with the

4  holding.  That application to the building owners as a matter

5  of law has never been disapproved or rejected by any Canadian

6  Court, and I think, Your Honor, as we have in our original

7  submission, there's -- it's not surprising.

8           As Mr. Mew explains, well before the mid-1990s,

9  legislation throughout Canada made it a statute duty for

10  building owners to know whether asbestos-containing products

11  were in their buildings.  There were hundreds of Canadian

12  articles in journals and throughout Canada discussing asbestos

13  in buildings.  In 1980, 1980, the Royal Commission on Matters

14  of Health and Safety Arising from the Use of Asbestos in

15  Ontario was established and in 1984 issued its comprehensive

16  report that dealt in part specifically with asbestos in

17  buildings.

18           Moreover, as I indicated earlier, Your Honor, it's

19  during this time period in the early to mid-80s that Mr.

20  Pinshen was advising building owners through Canada, throughout

21  Canada.  Thus, having failed to submit any evidence to

22  demonstrate their claims could not be discovered with the

23  exercise of reasonable diligence, they cannot now seek to rebut

24  the overwhelming evidence of the notoriety of asbestos issues

25  in Canada.

**J&J COURT TRANSCRIBERS, INC.**

1              In sum, Your Honor, the asbestos in buildings claims

2  would be time barred and DOA in Canada.  The claimants know

3  that.  They cannot be magically revived by bringing them to a

4  U.S. Bankruptcy Court.  There is no dispute the products were

5  installed before 1976.  Canadian law is clear that for this

6  type of claim the time periods for limitation purposes begin to

7  run from installation.  There is no dispute that the applicable

8  time periods ran many years before.  Grace filed its Chapter 11

9  petition in April 2001.  And no evidence has been submitted by

10 the claimants to show that they could not have discovered their

11 claims within the statutory limitations period.  For these

12 reasons, Your Honor, debtors request that you enter the order

13 disallowing and expunging 55 of the remaining 56 Canadian

14 claims, and we submitted, Your Honor, with out supplemental

15 submission a proposed order that addresses those 55 claims.

16             As I indicated at the start, I'd like to come back to

17 the supplemental materials that were provided by Mr. Speights.

18 Mr. Speights sent the supplemental materials to us, and we

19 provided them to Your Honor in the binders, and I'd like to

20 specifically refer to the about 145 exhibits that he submitted.

21 These exhibits have been submitted, Your Honor, without any

22 basis, without any indication of how they are admissible or how

23 they relate to any of the issues before Your Honor on this

24 summary judgment record.  This is not an evidentiary hearing.

25 I don't know what they relate to.  We don't think they have

1  anything to do with the motion, certainly do not reflect the

2  presence of a genuine issue of fact that's material to any of

3  the Canadian legal issues that's been presented by this motion,

4  and, in fact, it's a very odd assortment of documents.  As best

5  I can tell, they relate to the merits of the case, not to the

6  Canadian limitation period issues.  There are no documents that

7  purport to go directly to any of the Canadian claimants.  In

8  fact, as best I can tell, it only looks like there's about a

9  handful, five, six, seven documents maybe, that even relate to

10 Canada or go to Canada.  Many of the documents, in fact, relate

11 to specific jobs or job sites in the U.S.

12         I will reserve further comment, Your Honor, until Mr.

13 Speights articulates how these documents can first even be part

14 of the summary judgment record and, if so, what they're

15 supposed to show.  Thank you.

16         THE COURT:  Mr. Speights?

17         MR. SPEIGHTS:  Your Honor, I have a terrible cough.

18 Could I go refill my water bottle before I start?

19         THE COURT:  Sure.

20         MR. SPEIGHTS:  Thank you, Your Honor.

21         THE COURT:  Would you like a brief recess?  We'll

22 take a ten minute recess.  Okay.

23                         (Recess)

24         THE COURT:  Please be seated.  Mr. Speights?

25         MR. SPEIGHTS:  May it please the Court, Your Honor,

1  we are either dealing with an extraordinarily simple matter or

2  an extraordinarily complex matter.  It may be an

3  extraordinarily simple matter in that the fundamental issue is

4  whether certain statutes are triggered at installation, and, if

5  the answer is no, then I think I go home happy.  Or we might be

6  dealing with six provinces and the laws of six provinces

7  dealing with a multitude of issues that Mr. Cameron has touched

8  on and I will touch on some more, but present, maybe not novel

9  questions to the Court, but each one in and of itself requiring

10  some detailed analysis.  We have a sprint or a steeplechase in

11  hand, and I'm going to address it as both.

12       Let me say from the outset what is obvious, that

13  while I appreciate Mr. Cameron's very professional and very

14  thorough argument, I don't agree with everything he says,

15  obviously, on the law, but I certainly don't agree -- his

16  characterization of what our position is or his

17  characterization of what our expert witness's position is.  I

18  noted that you found it quite helpful to have their

19  supplemental brief, which pegs in certain documents and, again,

20  we'll address it at the end of the hearing.  I think it would

21  be helpful likewise if Your Honor had our position pegged into

22  certain documents and certain deposition references.

23       I'm going to make some preliminary comments and deal

24  with a couple of procedural issues.  I am going to deal with

25  the argument that Mr. Cameron predicted I would deal with, that

1  is whether the ultimate statute of limitations were raised in

2  the fifteenth objection, et al.  I'm going to deal with the

3  statute of limitations issue, and Mr. Fairey will argue the

4  merits or lack of merits of the ultimate limitations issues,

5  what I call the repose issues, and I think that fairly divided

6  will be a more efficient way to present our position to the

7  Court.

8        On the preliminary issues, I have a couple of

9  comments.  First of all, when the motion arrived some period

10 ago with Mr. Mew's affidavit attached, I immediately turned to

11 Mr. Fairey and said, they can't do this.  You can't have an

12 expert on the law, and Mr. Fairey, like he does all too often,

13 corrected me on my seat-of-the-pants view of the law, and said,

14 well, this is foreign law so probably each side can present an

15 expert on what the foreign law is.  But I think it's important

16 to note -- and this is unusual I would think for the Court;

17 it's certainly unusual for me; it's the first time I've ever

18 dealt with an expert on the law -- that ultimately it's the

19 Court's decision on the law, the Court's view on the law, and

20 in reality my view is, and certainly my expert's view is, that

21 he's there to assist the Court in pointing out the issues and

22 the arguments, et cetera.  Where something is absolutely this

23 way, he will state it, and when it's not absolutely this way,

24 he will state, well, these are the two sides.  I've deposed Mr.

25 Mew twice.  I have nothing but great respect for Mr. Mew.  If I

1  got sued in Canada on a statute of limitations case, I would go

2  to Mr. Mew.  He knows the statute of limitations well.  I'm not

3  saying this in a pejorative sense.  I'm not saying he's an

4  advocate, but he has his views, and the Court certainly should

5  listen to his views, but because Mr. Mew says something or

6  because Professor Irvine says something doesn't mean Your Honor

7  has to follow that.  (Indiscernible) Your Honor to follow the

8  law.  Indeed, I hate to tell Grace this.  They might think of

9  another argument to make.  I don't think Grace is bound by Mr.

10 Mew if they have another argument they want to make, nor am I

11 bound by Professor Irvine.  This is not like calling an expert

12 on why the axle broke in order to get to the jury.  We could

13 proceed without an expert in this case.  We could just proceed

14 and argue Canada law, and we can still do that and argue any

15 points we want to, but I hope and believe that Professor

16 Irvine's full testimony, not taken out of context, is very

17 useful for the Court to consider these issues.

18          The second preliminary point I want to make is, and

19 it's a point I feel very strongly about and a point I probably

20 will keep returning to, I don't think this matter before you

21 today is appropriate for summary judgment treatment.  I

22 understand there are times when legal issues such as statute of

23 limitations are presented to the Court on a motion for summary

24 judgment, but I think there are several reasons why Your Honor

25 should say I'm going to have my trial on this -- because it's

1  bench trial; it's not going to be a long trial -- and have a

2  full record developed before Your Honor rules, and I thought

3  that before I got their supplemental brief the other day.  But

4  after reading their supplemental brief, I'm more convinced than

5  ever because Grace has made a professional attack on my expert

6  witness.  Okay, we have a battle of the experts going on.  In

7  his report, which is before Your Honor, Professor Irvine says,

8  "I cannot and do not accept his," talking about Mr. Mew's,

9  "blanket assertion that supposedly everywhere in Canada causes

10 of action always arise on the date of the installation of the

11 allegedly defective product and his statement that everywhere

12 and always unless postponed by the discoverability principle

13 that is the date on which ultimate limitation periods begin to

14 run.  Indeed, I must confess that on nearly every issue other

15 than those listed above, I find myself in potential

16 disagreement with the argument or thesis advanced by Mr. Mew."

17         Now, Your Honor, who's read the report -- by the way

18 that appears at Page 15-16 -- knows that my professor gives

19 great deference to Mr. Mew and everybody else involved in this,

20 a complete gentleman, but he disagrees.  They disagree with my

21 expert.  And Your Honor has made a ruling in this case that's

22 very important to the point.  Your Honor has ruled in these

23 objections proceedings that experts must testify live.

24         Now, it's true we have expert reports, which, you

25 know, Grace has complied with that.  I objected because it

1 wasn't under oath.  They did it in sort of an affidavit.  They

2 did it in the form of a deposition.  That's fine.  They

3 acknowledge right in the Mew deposition that if they're not

4 entitled to summary judgment they must call Mr. Mew at trial.

5 They cannot use a deposition for -- in lieu of live testimony,

6 and if we are going to rely on Professor Irvine, which I expect

7 we will, we will call him live at trial.

8        Well, Your Honor's rule was absolutely the correct

9 one.  You've got a battle of Canadian experts that you've never

10 met.  Issues may arise in Your Honor's mind about well, what if

11 this happens and what if that happens, and Your Honor has a

12 right to look at these experts and ask questions and make

13 judgments on their credibility before you render a decision.

14 So, I say to Your Honor, number one, that when you have a

15 battle of the experts, that's not appropriate for summary

16 judgment.

17        I also say to you, Your Honor, that if we were in

18 Canada, these issues would not be decided on a summary judgment

19 basis.  If we look at Mr. Mew's report, Page 14, there is a

20 quote here from Chief Justice Scott which says, "In my opinion,

21 this is not an appropriate case for summary judgment based on

22 affidavit evidence alone.  This is because there is a lack of

23 evidence to establish the essential factual background to

24 enable the Court to decide the complex and unresolved point of

25 law that this case raises."  And our expert, while giving great

1  deference, in fact, from this old litigator's viewpoint from

2  South Carolina, sometimes too much deference to every other

3  argument that can be made by other professionals, is absolute

4  that in Canada a matter presenting this myriad of issues,

5  including, you know, when does a statute accrue involving

6  injury in asbestos cases and other cases, et cetera, he is

7  absolute that you would need to develop a full factual record

8  in Canada.  So, leaving apart the battle of experts, I would

9  suggest to Your Honor a full record would enable all of us to

10  deal with these issues as Canada would deal with them.

11          I also say to Your Honor that Mr. Cameron today did

12  -- I think folded into my argument as well.  I didn't write

13  every comment down where he started quoting factual assertions.

14  Sometimes I disagree with him when he asserts these things, but

15  -- the Royal Commission study, Pinshen could have done this,

16  you know, et cetera, et cetera.  He is again throwing in facts

17  in the middle of a legal argument.  Could Pinshen have

18  identified?  Well, the Pinshen deposition I don't believe is a

19  part of this record, the Royal Commission study and what it

20  said.  Well, I can talk about the Royal Commission study if

21  it's before the Court.  I certainly would if we have a trial,

22  but I don't view us as doing that today.  So, I think Mr.

23  Cameron has also introduced facts, not only in attacking our

24  expert, but in his various arguments.

25          THE COURT:  Well, the issue isn't whether I have to

1 | decide facts.  The issue is whether there are any material
2 | facts in dispute, and I'm not sure that what the Royal
3 | Commission study said is a material fact in dispute.  There's a
4 | report.  I mean, it says what it says.
5 |         MR. SPEIGHTS:  Well, I'm not sure that the Royal
6 | Commission study is before Your Honor.  I frankly don't recall
7 | whether they put the study into evidence or not, but if it is
8 | in evidence then we will have to argue about what the Royal
9 | Commission study says, because it does not say, I don't
10 | believe, what Grace believes it says.  I believe what it says
11 | is that you shouldn't engage in precipitous removal.  You
12 | should wait until demolition or renovation activities which
13 | disturb the product and at that point cause a hazard which may
14 | or may not trigger a statute of limitations at that period.
15 | But it's just another thing floating around in the record.
16 | Again, the battle of the experts is the big thing.
17 |         And then another example of why I believe it's more
18 | appropriate, and I suppose this is something to consider at the
19 | end of all of the arguments today, you know, where are we on
20 | this, but in the deposition of Mr. Mew taken on May 11, 2007,
21 | and this I think folds into Professor Irvine's quote from one
22 | Court about why these things should not be decided at a summary
23 | judgment stage.  I am questioning Mr. Mew at Page 49 of the
24 | deposition.  This is the deposition they submitted.
25 | "Q   Well, under the Winnipeg case, does the Court provide

1  authority for bringing a case in economic loss where the

2  product is shown to be harmful?

3  "A   Yes.

4  "Q   And in that situation, in your opinion, are you telling me

5  that the statute of limitations still runs from installation?

6  "A   It depends on what the product is.  It depends on what the

7  circumstances are.

8  "Q   Are you telling me that in all the situations where you

9  have a case of economic loss where the product is harmful that

10  the statute commences to run upon installation?

11  "A   No."

12        Well, that's a perfect example of what Professor

13  Irvine was saying why we need to develop the fact.  It depends

14  on what the product is.  It depends on what the circumstances

15  are, according to Mr. Mew.  I'm sure Mr. Mew has firm views on

16  this, but the fact is he realizes that it depends on the facts

17  and circumstances.

18        In any event, Your Honor, I make that point at the

19  outset not to defer my argument on the merits, but I shall

20  return to it throughout the argument to say should we be

21  deciding this on this record.  The last thing we need in this

22  case that's gone on for quite some time is to have some

23  piecemeal resolution of matters.  It seems to me if I might be

24  right, and I think I'm right, but even if I might be right,

25  let's wrap it up in one hearing on the merits and be done with

1  it, and if you rule with me I'll proceed to deal with other

2  issues in the case, and if you rule against me it'll go up in

3  one package on appeal.

4        The next issue before I get to statute of limitations

5  is one that Mr. Cameron suggested I would argue, and he's

6  absolutely right.  Your Honor, I try not to make categorical

7  statements because in law there are two sides to every issue,

8  and I fully recognize that.  That's what we are about as a

9  profession.  But I truly believe that W. R. Grace absolutely

10 did not object on the ultimate statute of limitations in its

11 fifteenth objection, and I want to try to show you why I

12 believe that today and what has happened since I was before you

13 the last time when this almost came up in a tangential way on

14 the issue.

15        If Your Honor will recall, back in May we were before

16 you because Grace had filed a motion to amend its objections to

17 add some product ID objections and the ultimate limitation

18 objections to the Canada claims.  That's where we were.  You

19 would not allow them to do either, frankly.  You would not

20 allow them to amend the product ID.  They were stuck with it,

21 although you told me correctly that if I had evidence -- if Dr.

22 Pinshen wouldn't support it, I should withdraw it, which I did.

23 You also did not grant their motion to amend the fifteenth

24 objection to add ultimate limitations, but you said that you

25 thought it was already covered by the statute of limitations

1  objections.  And I did not have the full record before me then,

2  and that -- it sort of came up -- I appreciate what Your Honor

3  did, but I begged Your Honor and you agreed with me and you

4  entered a written order that said that I could raise that today

5  at this hearing because I had raised, well, Mr. Fairey had

6  raised that in the brief, in response to the motion for summary

7  judgment.  And now I have gone back and looked at the record,

8  not in terms of whether they should be allowed to amend, but,

9  again, as to whether it was properly -- already properly before

10  Your Honor on ultimate limitations.  Now, in addition to that,

11  I believe that what I have learned since then, including at

12  least one very important fact I learned from Mr. Mew's

13  deposition, affects my position on this and shows -- I think

14  fortifies my conclusion that they didn't raise it.

15      Let me go back.  The _Privest_ case was tried in 1995

16  in Canada.  It was tried by a lawyer named Mr. Hayley.  He was

17  the one that was sent to cover the deposition the other day.

18  We won't re-plow that ground today.  He's a lawyer from British

19  Columbia.  And _Privest_ to Mr. Hayley is like _Greenville City_

20  _Hall_ is to me.  He won the first Grace case on behalf of Grace

21  in Canada, and he wrote an article, frankly, saying this is the

22  end of all asbestos building cases in Canada, which is attached

23  to the Mew deposition.

24      _Privest_ did not, however, as Mr. Cameron said today,

25  involve an ultimate limitations.  That was not an issue.  That

1  was not an issue that Mr. Hayley litigated at trial for that

2  six month trial.  It was not an issue which Mr. Hayley

3  litigated on appeal to the Court of Appeals in a decision which

4  I'll refer to in a little while.

5         Now, fast forward to 2005, ten years.  Grace filed

6  its fifteenth objection.  When we were before you before,

7  somebody, I don't know if I did or Mr. Restivo did, put the

8  chart up with the C-1D and all that stuff.  What I didn't have

9  before you then -- may I pass this up, Your Honor?

10         THE COURT:  Thanks.

11         MR. SPEIGHTS:  What I did not have before you that

12  day because, frankly, I didn't know that issue about whether it

13  was already covered would be coming up, was the objection

14  itself, and what I've handed you is the fifteenth omnibus

15  objection, Pages 52 to 57, which deals with the Canadian

16  claims.  Your Honor, I tell you that if you review that section

17  of the argument dealing with Canadian claims, nowhere in there

18  from Pages 52 to 57 is the ultimate statute of limitations

19  mentioned.  Nowhere is it discussed.  Nowhere does Grace say

20  the ultimate statute of limitations is ten years or 30 years.

21  It simply is not a part of the objection.  I defy anybody, even

22  Grace with its very good lawyering, to come along and explain

23  why if this ultimate statute of limitations was so important to

24  its case that somewhere in here it did not argue the ultimate

25  statute of limitations.  This is -- Canadian claims is based

1  upon essentially the _Privest_ case, and I now know why that's

2  the case.  It was based on _Privest_ saying, according to Grace,

3  Mono-Kote is not hazardous and the statute of limitations, the

4  normal statute of limitations, has run.  That's what happened.

5  If we look at the motion itself, not some chart that Grace has

6  come up with, that's what happened.  Of course, Mr. Restivo and

7  Mr. Cameron and Ms. Rea were not involved at that time when the

8  fifteenth omnibus objection was filed.  They can't tell us why

9  it didn't discuss the ultimate limitations.  They don't know

10  whether a conscious decision was made or whether somebody just

11  forgot about it.  Other lawyers, other firms, were involved in

12  that.  What I -- would you like for me to pause, Your Honor, or

13  --

14          THE COURT:  No.

15          MR. SPEIGHTS:  What I did find out, though, which was

16  interesting, at least when the light went off in my head was,

17  when I took Mr. Mew's deposition and he said he was first

18  contacted by Mr. Hayley in March 2006, which told me -- and I'm

19  dealing with a solid record.  I'll go in a minute and say I

20  think Grace has to put something in evidence to explain this.

21  But Mr. Hayley apparently, and he was a professional approved

22  by this Court, was working on the statute of limitations issues

23  for Canada.  Mr. Hayley had tried _Privest_ where the ultimate

24  limitations was not at issue.  And if you read this brief, it's

25  like something Mr. Hayley would write having handled _Privest_,

1  perhaps with Kirkland & Ellis and others.  And what happened, I

2  believe, is that in March of 2006 when Mr. Hayley goes to meet

3  with Mr. Mew, Mr. Mew says, well, wait a minute, how about the

4  ultimate statute of limitations, and the light went off on

5  Grace's side.  And what did they do?  In June of 2006, after

6  Mr. Hayley met in March of 2006, they filed a motion, the

7  debtors filed a motion, to send the Canadian claims back to

8  Canada, and I believe there is a reasonable interpretation that

9  having looked at this, having been educated by Professor Mew,

10  they said, whoa, we need to do something.  They could have

11  moved when they met with Mr. Mew in March of 2006.  They could

12  have moved to amend the objections.  I would have argued

13  against them.  Your Honor would have ruled one way or the

14  other.  But I believe they chose instead to try to get them to

15  Canada and then try to sweep them under the general limitations

16  view.  Ultimately, Mr. Restivo, being the good lawyer that he

17  is, when I raised that in the response to the motion for

18  summary judgment, made a motion to amend the objections to

19  allow him to argue ultimate limitations.

20          Your Honor, I think with that factual record, number

21  one, they are not before the Court.  I ask you, when you take

22  this under advisement, I assume you're taking it under

23  advisement, to really study that 52 to 57, because it just

24  ain't there.  It really isn't.  And if Grace wants to claim

25  it's there, I think they need to show you something more than

1  just a lawyer argument, because it appears to me that somebody

2  most likely discovered it wasn't there at some later period.

3  So, Your Honor, I suggest to you again, I think with a little

4  more fortification now that we've had the record, that the

5  ultimate statute of limitations is not before today.  It was

6  not raised in the fifteenth objection.

7          Now, I'm going to turn to the statute of limitations.

8  Mr. Fairey will still address the ultimate statute in a few

9  minutes, even though I don't think it's properly before the

10  Court.

11          One thing that Grace and Speights & Runyan agree on

12  is that Canadian law is not that different from American law.

13  In the motion itself, the motion for summary judgment before

14  you, Grace says Canadian normal limitations periods comparable

15  to statutes of limitations in the United States.  They also say

16  ultimate limitations periods comparable to statutes of repose

17  in the United States.  And while we talk a lot about cases with

18  strange names out of Canada and -- the fact is that while

19  there's not a fully developed body of cases dealing with

20  asbestos in buildings in Canada as there is in the United

21  States, the general principles are essentially the same as we

22  have down here.  We know what a statute of limitations is.  We

23  know what accrual is.  We know what a discovery rule is.  We

24  know what negligence is, et cetera, et cetera.  And Mr. Fairey

25  will point out we know what a statute of repose is.

1          So, dealing with the statute of limitations with our

2    general knowledge of statute of limitations, where are we?

3    According to Grace, the statute of limitations is two or six

4    years from accrual unless postponed.  We both agree it's from

5    accrual.  There's very little I will cite the <u>Privest</u> lower

6    court decision for, which I think means virtually nothing in

7    light of the Court of Appeals decision in <u>Privest</u>, but even in

8    the <u>Privest</u> case, Justice Drost said a cause of action accrues

9    when all of the constituent elements exist.

10          Accrual is injury.  Injury in this state and this

11    country in an asbestos building case has never been

12    installation.  It's never been mere presence.  In fact, when

13    asbestos building plaintiffs in this country have proceeded to

14    court without proving injury, they have been thrown out of

15    court.  There is a lesson here in this country that I think is

16    perfectly applicable to the Canadian situation.  We have two

17    federal courts of appeal who have dealt with the issue of when

18    you can bring an asbestos building case in this country.  We

19    have the Tenth Circuit Court of Appeals in the <u>Adams-Arapahoe</u>

20    case which throws the case out because the plaintiff in that

21    case did not prove injury in terms we use down here,

22    contamination, but I'm not getting bogged down in what is

23    contamination, et cetera, et cetera -- injury.  And we have the

24    Eighth Circuit Court of Appeals in a case called <u>Tioga</u> saying

25    we agree with <u>Adams-Arapahoe</u>, but in this case the building

1  owner proved injury.  One Colorado school, one North Dakota

2  school.  The cases came out a different way because in the

3  North Dakota school, the Eighth Circuit found that it had

4  proved injury.  So, in this country, not -- installation does

5  not allow you to bring a case.  You'd be thrown out.  Mere

6  presence, you couldn't bring a case.  You'd be thrown out.  You

7  have to show injury.

8         And, of course, the next case that comes along in

9  this country, a case that I've cited to you starting with Owens

10  Corning and going through I don't know how many hearings, is

11  the MDU case, which was also the Eighth Circuit case which is

12  the same court as the Tioga case, and it was a case involving

13  W. R. Grace, and it was a case directly on the statute of

14  limitations.  I apologize for having to admit this, but I lost

15  the case on the statute of limitations in North Dakota, and MDU

16  goes up.  And MDU presented facts that the building owner knew

17  asbestos was bad, had known about it years ago, that it knew it

18  was going to have to do something about, et cetera, et cetera.

19  And the Eighth Circuit in a unanimous opinion written by Chief

20  Judge Arnold said, well all that being said and done, the

21  statute does not commence to run until there has been injury.

22  Until there is injury there's no accrual.  That's the law of

23  the land in this country.

24         We'll get to other things about is it postponed for

25  reasons, but I am just focusing on when does the statute start,

1  and certainly in this country it does not start upon

2  installation or knowledge or anything other than injury.  And I

3  believe, Your Honor, that the evidence is clear that that is

4  the rule in Canada.

5         Now, in order to get there I first have to deal with

6  Privest.  Privest was a case in which the plaintiff's lawyer

7  did not try the case as I would have.  He tried the case

8  contending that there was something wrong with the Grace

9  product from the moment of installation.  The Privest lawyers

10 did not attempt to show injury, and injury, according to

11 Winnipeg, not a statute of limitations case, but a case of when

12 can you recover for a dangerous product, the Court in Privest,

13 excuse me, the Court in Winnipeg recognizes that accrual for

14 bringing a case starts when there is injury, and for a

15 dangerous product that's when you prove substantial injury, a

16 dangerous product in a building.  If you cannot prove

17 substantial injury, you have no lawsuit, the same as the Courts

18 in America said in Adams-Arapahoe, you didn't prove injury;

19 you've got no lawsuit.  In Tioga, you do have injury; you bring

20 a lawsuit.

21        But we have Privest sitting over there where the

22 plaintiff did not try to show injury.  It did not try to show

23 the product was dangerous.  And the lower court kept telling

24 the plaintiff apparently in that case and certainly reminded it

25 a lot in its very lengthy decision, you had an opportunity to

1  test the product, to run air samples, to disturb the product

2  and show you had a dangerous product, and you chose not to do

3  so.  And when the case went up to the Court of Appeals of

4  Canada, which is really the only authority in Canada -- it's

5  the Court of Appeals decision --

6                    (Pause)

7         MR. SPEIGHTS:  -- what I need to do to turn this on?

8         THE CLERK:  (Indiscernible)

9         THE COURT:  Well --

10        MR. SPEIGHTS:  Actually because of your previous

11 request, had it working earlier today, but -- it was turned on

12 during Mr. Cameron's presentation.

13                   (Pause)

14        MR. SPEIGHTS:  Do you know where the zoom button is

15 --

16                   (Pause)

17        MR. SPEIGHTS:  This is the last page from the Court

18 of Appeals decision, Your Honor, which affirmed the Privest

19 decision.  "There is evidence on both sides of the issue.

20 Drost found that the plaintiffs had not proven their case.  In

21 our opinion, the plaintiffs are asking us to re-weigh the

22 evidence and make a different choice as to expert opinion.

23 This we cannot do.  As we have said, the plaintiffs had the

24 opportunity to sample the air and demonstrate conclusively that

25 when disturbed MK-3 is a dangerous product.  In the end, the

1  trial judge was not persuaded by the methods of proof adopted

2  by the plaintiffs on this crucial issue of fact.  We are unable

3  to find that he committed any palpable or overriding error in

4  his conclusion on dangerousness."  And that's all that <u>Privest</u>

5  stands for.  Despite the very lengthy decision down below, on

6  the Court of Appeals the Court said, listen, there's no need to

7  re-weigh all of the evidence on all of the issues.  The fact is

8  plaintiff did prove its case.  They did not prove MK-3 was

9  harmful or dangerous.  They did not prove hazard, the next

10  stage of our litigation before Your Honor.

11          And our expert, and I believe the cases support this

12  wholeheartedly, say that in light of <u>Winnipeg</u>, if you prove the

13  product is dangerous, if that is a theory of your case, that is

14  when the statute of limitations accrues.  It accrues when you

15  have a right to bring a case, and you don't have a right to

16  bring a case until you prove hazard or danger or substantial

17  danger under <u>Winnipeg</u>.  So the Court there has gotten, at that

18  point in time, where the United States courts got, you know,

19  maybe in '87 with <u>Greenville City Hall</u> or maybe a little later,

20  to the proposition that you just cannot bring a case where

21  there's no danger, but when you bring a case where you prove

22  danger, that's when the statute of limitations begins.

23          And therefore, Your Honor, I say to you and supported

24  by a lot in this record, which, again, I would peg to you if we

25  have an opportunity to do so, that when we deal with the

1  statute of limitations in Canada, it's just like the United

2  States.  You cannot bring a case until you can prove the

3  product is dangerous, and when it's dangerous the statute

4  accrues.  It's as simple as that.

5          This is a -- they want to talk about the postponement

6  issues of discovery and all of that, which I'm happy to do.

7  I'm happy to talk about Anderson and talk about discovery and

8  talk about fraudulent concealment and nuisance and everything

9  else that plaintiffs' lawyers use when they have a problem with

10 the statute.  But in this case the burden is on them.  The

11 burden is on Grace to show when the statute accrued.

12         They say the burden is on me to show, you know,

13 discovery.  That may or may not be the case.  But the law is

14 clear.  Your Honor has said before that the burden of proof is

15 on the defendant to prove the statute of limitations.  The law

16 is clear that that's the way the rules run in this court.  The

17 law -- they have the burden of proving when this statute

18 accrued.

19         They have attempted to say it accrues upon

20 installation.  I don't believe that's the law of Canada, and I

21 know it's not the law of the United States.  And they have a

22 real problem, Your Honor, in proving when the statute commenced

23 in Canada.  And their real problem is that they have answered

24 requests for admissions in this proceeding denying that today,

25 2007 -- perhaps they answered them in 2006 -- denying that

1  their product today is hazardous.  So, they are caught in a

2  real dilemma of how to prove the -- if it's not installation,

3  which I think clearly it's not, how do they prove the statute

4  has commenced, and only when they prove that or only when the

5  Court finds that date, whatever it is, and marks off the two or

6  the six years from that date do we ever get to the point -- if

7  that date expired on people, only then do we get to the date,

8  the question of, well, if you missed the statute from the

9  accrual, is there somewhere else you can deal with the

10 situation, and I think that is the fundamental issue before the

11 Court.

12         THE COURT:  But they don't have the burden to prove

13 their product is dangerous.  It's the plaintiff who would be

14 bringing an action who'd have to prove danger.  It wouldn't be

15 expected that the defendant in an action would be proving the

16 dangerousness of its own product.  It would be defending

17 against that danger.

18         MR. SPEIGHTS:  Well, that's a -- I understand your

19 observation, Your Honor.  It's something we argue around with

20 defense lawyers around and around when we are outside of the

21 courtroom, and it's certainly true that to bring the case we

22 have to show it's dangerous.  Okay.  No question about it.  And

23 we have a dilemma because, frankly, we don't want it to be

24 dangerous too soon because the statute might start to accrue.

25 So, we wouldn't make the mistake that the lawyer made in

1   Privest that the bad, the harm, the whatever occurred back upon

2   installation.  We would make the argument that the danger

3   occurred at some later point, and it could be from client to

4   client.  It could be upon demolition of the building.  It could

5   be upon substantial renovation.  It could be some other

6   circumstance, but that's our dilemma, not making danger too

7   soon.  They don't have the duty -- they don't have the burden

8   of proving the product's dangerous in the sense of can you

9   recover, but they've got the burden to prove when the statute

10  of limitations accrues, and that goes to the dangerousness.

11  Now, I know how they will try to do that.

12          THE COURT:  Sure, through the discoverability rule.

13          MR. SPEIGHTS:  Well, but -- no, I disagree

14  respectfully, Your Honor.  Discovery is something else.

15          THE COURT:  Well, is it?  I mean, here -- well, let

16  me hear your point and then you can answer mine, but why is it

17  something else?  I mean, in this case, you've got literature

18  that dates -- you've got a court opinion that says I think in

19  the Mansville, whatever the plaintiff's name was in the

20  Canadian Mansville case, that says that back in the 60s and 70s

21  building owners in Canada were advised of the dangers of having

22  asbestos products in their building.  So, surely, at that point

23  in time, there is some requirement on building owners to at

24  least explore whether there is asbestos in the building and, if

25  so, whether or not there is a danger caused by that product.

1 So, that's my question, but I'll hear your --

2        MR. SPEIGHTS:  Well, I'd rather respond to yours

3 first, and I'll get to mine, Your Honor.  My response, and not

4 in a flippant way, is almost so what.  Okay?  Let's assume that

5 every building owner in Canada knew everything about asbestos.

6 It was terrible stuff, and it was terrible stuff in buildings.

7 I don't agree with that, but let's just assume -- terrible

8 stuff.  Okay.  And let's suppose that we go forward that you

9 say, well, is it dangerous now in my building?  Until it's

10 dangerous in your building, the statute does not accrue.

11 That's <u>MDU</u>.  <u>MDU</u>, by the way is a New York Stock Exchange

12 company.  They've got sites all of the -- all over the country,

13 or at least throughout the Midwest, with boilers in all these

14 plants and other buildings they own and all this asbestos, and

15 they had knowledge of asbestos, as reflected in the record of

16 that case, ten years before the case, or 11 years.  They had a

17 report about the fireproofing, Mono-Kote-3, in their building,

18 that this was going to be a problem in the future, and you

19 would have to remove it in the future.  But that -- all I'm at

20 now, I'm not on -- it's always a problem to try to get these

21 two separated in one's mind.  It's hard for me to do it.  The

22 whole issue of knowledge and discovery rule and everything else

23 only comes into play when there is an accrual.

24        Now, you used the word -- now I want to respond to my

25 point, discovery, and there may be an argument that they're

1  entitled to discover what we knew and when we knew it to show

2  that we knew that the building was dangerous at a certain

3  period of time.  That's different from the discovery rule,

4  which is the postponement of the statute of limitations.  I

5  think that's where we had a little misconnect -- disconnect,

6  but I say to Your Honor that that is another reason why it's

7  not appropriate to resolve this on a motion for summary

8  judgment, because at this point in time where they have the

9  burden to show accrual, there is no evidence in the record to

10  show danger in these buildings at any particular time that

11  would have barred them from recovery by reason of the statute

12  of limitations.  And that requires, I believe, a trial and

13  maybe they're entitled to discovery on that, and I do think

14  they have the problem of trying to show danger when they say

15  there's no danger, but that's neither here nor there today.

16          My point today is they have the burden of showing

17  when the statute accrued and they can come and try to get

18  around their dilemma as I always try to get around my dilemma.

19  They can try to show you when the statute accrued.  Right now,

20  there are, you know -- they are adamant that it accrued at

21  installation, and if Your Honor rejects that, as I think Your

22  Honor should reject that, because I don't believe there's a

23  holding anywhere in the country that says it -- where the

24  product is dangerous it starts at installation, okay, then --

25  I'll take that back.  I actually think there's a case in

1  Georgia, and that's distinguishable.  But in any event, the

2  rule is universal that the statute accrues when there's a

3  dangerous product, and I think that's consistent with Canadian

4  law.

5        And I also say to Your Honor that it's also

6  consistent with what I read from my cross examination of Mr.

7  Mew.  It's not in his report.  It's in the deposition they have

8  published, and in that cross examination of Mr. Mew he says it

9  depends on the circumstances, it depends on the product.  So,

10  Mr. Mew himself has recognized that there is a factual issue

11  concerning that.

12        So, Your Honor, at some point I would hope that you

13  would reject the idea that the statute of limitations is

14  triggered by, you know, installation, and then we would deal

15  with how, probably at a pretrial, how we deal with this whole

16  hazard/dangerous issue.  We've got a bifurcated hazard trial.

17  Do we do it separately, et cetera, et cetera.  But I do think

18  it needs to be a trial on that.

19        But, Your Honor, what if -- what if I'm wrong on

20  accrual, which I don't think I am, or, more importantly, what

21  if we find accrual started more than six years before this

22  bankruptcy was filed?  What do we do then?  As I said, the law

23  is, Your Honor, the statute of limitations is two to six years

24  from accrual unless postponed, and over the years in this

25  country and in Canada there have been many recognized ways that

1 statute of limitations are postponed, especially in cases such

2 as product liability cases, which apply to asbestos building

3 cases.

4          The first is the discovery rule.  Mr. Mew has agreed

5 that there is a discovery rule in Canada.  We can talk about

6 when it applies or doesn't apply and which province verses

7 another province, but the discovery rule is when you knew or

8 should have known something.  It's really when you knew or

9 should have known you've been injured, when the statute

10 accrued.  When should you have known that this product was

11 dangerous?  And that clearly involves a factual issue, but the

12 discovery rule also involves something else.  The discovery

13 rule, according to Mr. Mew, would say it also means that you

14 knew not only that a product was dangerous, but who made the

15 product, that it was a Grace product, and the state of the

16 record at this point is -- the claim forms which Your Honor

17 required me to go back to the clients so that they could assert

18 when they knew they had a Grace product, and the state of the

19 record now is 2003.

20          So, I do not believe the factual record as it exists

21 today would allow the Court to find that my clients, from

22 whatever province, knew or should have known that the product

23 that Grace says is not dangerous was dangerous on a certain

24 year, triggering the statute of limitations a new statute based

25 upon the discovery rule.

65

1          The second way, Your Honor, the statute of

2    limitations, or another way, is a class action tolling

3    argument.  How many times have I argued <u>Anderson</u> before Your

4    Honor?  It looks like I could just file something that would

5    say see document Number 282, but obviously we have a record

6    here and I have to -- I have to at least quickly go through it,

7    because I know Your Honor is very familiar with the <u>Anderson</u>

8    arguments.

9          <u>Anderson</u> was filed in December 1992.  It not only was

10   a so called worldwide class, we have marked documents which are

11   before Your Honor in which Grace calls it an attempted

12   worldwide class.  So, Grace was on notice at that point that it

13   would have included the Canadian buildings back in 1992 and

14   admitted that it would have included the Canadian buildings.

15         There was a decision on the Door Closing Statute

16   which was not appealable, and the Court said one thing right

17   and one thing wrong, as it ultimately turned out to be.  The

18   Court said it had no jurisdiction to -- over out-of-state

19   claims.  In other words, if that order had been right, the

20   Court would have had no jurisdiction over Canadian claimants.

21   In fact, we now know because of the cotton seed case, <u>Abell v.</u>

22   <u>Monsanto</u> case, that the Court was wrong in that because it's

23   not jurisdiction.  It's not a jurisdictional bar, the Door

24   Closing Statute.  So that there was nothing about the <u>Anderson</u>

25   case before this case was filed in Wilmington that deprived the

1  Court below of jurisdiction over these claims, and had we

2  appealed that decision we would have gotten a decision down the

3  road once we could have, which would have held it was not a

4  jurisdictional argument because we all assume the Supreme Court

5  of South Carolina would have done the same thing in Anderson

6  that it did in the cotton seed case.

7         What we now know is, based upon cotton seed is, that

8  the Court would not have permitted a worldwide class action if

9  the defendant had affirmatively raised it because it's a

10 capacity to sue argument, and if Grace in South Carolina had

11 affirmatively in its answer or responsive pleading raised the

12 issue of the Door Closing Statute on a capacity to sue, it

13 could have kept us from proceeding.  But we did not know that

14 when this bankruptcy case was filed.  The status was, according

15 to Judge Hazart's order, there was a case, we preserve our

16 rights, and it was a worldwide class action, at least a

17 putative class, which would have included the Canadian

18 buildings.

19        So, the question is, does that toll the buildings

20 within the definition of the putative class.  Well, I think

21 that argument is probably presented to you in cases beside

22 Canada.  I think it's been briefed on issues pending before you

23 now, and, if not, it will be later.  And we don't need to

24 repeat ourselves other than to say that in this country,

25 tolling is recognized by the U.S. Supreme Court in American

1  <u>Pipe</u>, recognized by most Court of Appeals, and that until that

2  case is finally over that tolling continues to apply, so that

3  in this country we have tolling for these non-South Carolina

4  buildings which would not have ended until the Supreme Court

5  ruled, had it ruled, in the <u>Anderson</u> case.

6       The question is Canada.  Would Canada do the same

7  thing that, you know, some state in the U.S.A. would have done?

8  Well, there are two reasons why I think Canada would do so, and

9  clearly it's an issue.  Again, I think there should be a record

10 developed on it.

11       We can look at it two ways.  What would a Canadian

12 Court do if there had never been this bankruptcy?  What would

13 we have done if there had never been this bankruptcy?  What

14 would a Canadian Court do if faced with this situation in

15 Canada in sometime 2007?  Well, in 2007 a Canadian Court would

16 have to decide with a case before it there on behalf of a

17 Canadian building owner, would it toll the statute of

18 limitations because of this class action filed in South

19 Carolina?  Interestingly, the statutes, which I'm going to get

20 to in a minute, the statutes themselves on tolling say that

21 it's until the appeal is over.  So that wouldn't be a problem

22 just as a general principle of Canadian law, the fact that the

23 appeal wasn't over.

24       And I believe that there are two reasons why the

25 Canada Court would recognize tolling.  Number one is, according

1 to our professor, the Canadian Court would look to South

2 Carolina and see what the effect of the case was there.  What's

3 the rule of tolling down in South Carolina?  And if we go down

4 to South Carolina on tolling, while there's no direct case on

5 point, you would assume that the general tolling rules of the

6 United States apply, that the case would be tolled.  That's

7 American jurisprudence.

8         In addition, the Canadian Courts have cited on one or

9 more occasions the U.S. Supreme Court case, the <u>American Pipe</u>

10 case, which is the leading tolling case in the country.  But,

11 in any event, this is one of those issues that Professor Irvine

12 talked about that a Canadian Court would not decide without a

13 (indiscernible) record.  It would look to South Carolina -- it

14 could look to South Carolina and decide that's the way it works

15 down there where this case was brought, and we're going to

16 allow these Canadian plaintiffs the same rights of tolling that

17 would be allowed in Montana or whatever else down in the United

18 States.

19         Secondly, Your Honor, we have the tolling statutes,

20 that if applicable, Grace says they're not applicable, would

21 clearly allow tolling in this circumstance.  Grace says they

22 would not be applicable because of the date they were enacted,

23 which was sometime after 1992 I believe.  Mr. Fairey will

24 correct me if I'm wrong on that point.  Well, the point is that

25 the case in Canada -- wherein this -- let's pretend there's a

1 case in Canada -- would have been brought after the statutes.

2 So the date of the case from which you want tolling may be

3 pre-Canadian enactment.  The date of the case brought for which

4 you seek tolling is after the statute was enacted.  So therein

5 lies the question of would the Canadian Court apply the

6 Canadian class action statutes which would clearly allow

7 tolling under these circumstances, and that is an issue that we

8 have briefed and I want to cite again if we get a supplemental

9 brief to Your Honor, why in that situation it would.

10       But there's a third reason.  It's not just a question

11 of Canada looking to South Carolina or Canada looking to its

12 statutes.  There is a reason that we're not in Canada.  We're

13 in Pittsburgh.  We're in the Third Circuit Court of Appeals.

14 And when Your Honor is now considering this, perhaps it's

15 appropriate to consider that the case is not filed in Canada,

16 albeit Canada law might apply to it.  The case is filed in a

17 United States Federal Court, dealing with federal procedural

18 rules here, and dealing with the federal law of tolling, so

19 maybe it is at the end of the day that the Court would want to

20 consider whether or not it would look at its own rules to

21 accept whether tolling should apply.

22       That's a whole lot said about the _Anderson_ matter.

23 It's confusing, and I apologize.  But the fact is there was a

24 putative class.  Our expert thinks that we have shown a case

25 for tolling.  We think we need a full factual record to show

1 that, and at the end of the day if they get by the accrual

2 where they have the burden of proof, we think that tolling

3 would allow these claimants.  I also note to Your Honor that

4 each one of these claimants in their claim form filed in 2003

5 claimed that they are a member of the <u>Anderson</u> class.

6         So, we have postponement by discovery.  We have

7 postponement by class action tolling.  And then we get to a

8 third postponement issue, and of all the postponement issues, I

9 think it's -- it may be the strongest one for a factual record,

10 and that is the whole idea of fraudulent concealment.  Mr.

11 Cameron ended up his argument by pointing to all of those

12 documents we unloaded on the Court dealing with Grace's actions

13 and what we believe is a clear case of how Grace concealed the

14 dangers of asbestos, and those documents were marked as

15 exhibits for the statute of limitations trial.

16         I agree with Mr. Cameron that this is not an

17 evidentiary hearing.  I also agree that's why we need a trial

18 where you put these exhibits in.  It's obviously an issue of

19 fact about whether Grace fraudulently concealed, and this is

20 the important point, concealed that its product was hazardous,

21 fraudulently concealed the injury.

22         What we have done as a matter of, I guess, extreme

23 caution, I don't know that we needed to put them all in the

24 record at this time, but we need to be very careful here, is to

25 say that certainly there is strong evidence creating an issue

1  of fact that Grace concealed the dangers of asbestos for many

2  years.  And I realize I've been up here quite some time now,

3  and I would be happy to address -- it's what I've done for a

4  living for a long time -- I'd be glad to address all of the

5  Grace knowledge and how they covered it up and how they

6  concealed it, et cetera, et cetera, and they did that starting

7  with the information they published to building owners.  They

8  did that in their response to building owners' inquiries.  They

9  did that in their Sweets Catalogue and advertisements where

10 they didn't even say it had asbestos in the product, unlike,

11 for example, U.S. Mineral or U.S. Gypsum sprayed-on product.

12      They didn't even say to building owners, or more

13 properly to architects and specifiers, that it had asbestos in

14 it, going all the way up to the Safe Building Alliance, and

15 many of those documents are marked, where Grace spent millions

16 of dollars supporting the Safe Building Alliance.  The Third

17 Circuit Court of Appeals has said the Safe Building Alliance is

18 Grace's alter ego, and it did so to dissuade building owners

19 from removing -- arguing that the product was not hazardous

20 and, in my view, doing so because they wanted to present

21 statute of limitations problems, and publishing that material

22 all over the country and in Canada, information given to

23 organizations in the media, major newspapers, radio, et cetera,

24 that asbestos in buildings is overblown, it's not bad, it's not

25 dangerous, even that it's more dangerous to remove the product

1 | rather than leaving it in place.

2 |     So, here we have the basis of a fraudulent

3 | concealment.  If they prove the statute accrued at a certain

4 | period and the two or six years has run from that before this

5 | -- whatever date, before <u>Anderson</u> was filed or before the

6 | bankruptcy was filed, we still have a substantial issue on

7 | fraudulent concealment, and, again, that would require, I

8 | believe, a factual record.

9 |     Your Honor, I believe those are essential arguments

10 | made before you, but I want to return to one more argument that

11 | is not as flushed out as it could be, and that is that there is

12 | also a continuing duty to warn in Canada.  Mr. Mew acknowledges

13 | that in his deposition testimony in my examination of him at

14 | the first deposition, not the one that's published.  And here

15 | we have a situation where if Grace had a continuing duty to

16 | warn, there is in effect a new statute of limitations running

17 | every time it fails to warn so that if they didn't know enough

18 | in 1970, and I think they did to warn, and they found out

19 | something in '72 or '74 or '80, or they wanted to go out and

20 | tell people that, hey, we've got -- warning, you have

21 | Mono-Kote, do not disturb it unless you do X, Y and Z, it could

22 | be dangerous, and while there is a continuing duty to warn the

23 | statute of limitations continues to re-trigger itself.

24 |     It's very similar to nuisance which, by the way, is

25 | another cause of action.  Both the experts want to talk about

1  negligence, and that's what was involved in this country for

2  many years.  Nuisance came up, finally recognized in this

3  country in asbestos building cases, only a couple of years

4  before this bankruptcy was filed.  But in nuisance, there's a

5  continuing duty to clean up a nuisance, and that statute of

6  limitations continues to be re-triggered while the nuisance is

7  in place.  So, continuing duty to warn or nuisance, and perhaps

8  other causes of action, are also there, which require, in my

9  view, a record, an evidentiary, factual record which will all

10  wrap this up in one transcript.  We'll file perhaps proposed

11  findings of fact and conclusions of law, and Your Honor will

12  rule on each of these provinces.  I do not think it's

13  appropriate to get there today.  And I've taken a long time,

14  and Mr. Fairey wants to discuss the ultimate statute of

15  limitations, which I think are not part of this case as it now

16  stands.

17          THE COURT:  All right.

18          MR. FAIREY:  May it please the Court, Your Honor, I

19  will try to be very brief.  I know we've been going a long

20  time, and I think now we only have three ultimate statutes of

21  limitations that we need to deal with, but I want to say to

22  start with, and I think this is unequivocal, the opinion of

23  Professor Irvine, and he said it in his report and he said it

24  repeatedly throughout his deposition, that the date on the

25  cause of action in a _Winnipeg Condo_-type case is the date when

1 the building presents a situation of actual or impending

2 danger, a danger sufficiently to warrant as a matter of

3 reasonable prudence the undertaking of prompt remedial,

4 preventive intervention, and he cites that at Page 22 of his

5 report and in Page 1 of Appendix B, and he also says that what

6 that means in a Winnipeg Condo-type case is the product must be

7 positively dangerous.  And we've talked about Winnipeg Condo a

8 lot today, but I'm going to -- with the Court's indulgence,

9 talk about it just a little bit more because I think it's very

10 important to understand exactly what happened in 1995 when the

11 Supreme Court of Canada issued the Winnipeg Condo case.

12          And, briefly, the facts in that case are, there was a

13 building.  It was built in 1972 in Winnipeg, Manitoba.

14 Somewhere in 1989, the concrete cladding fell from the front of

15 the building on the ninth floor, and this action was brought in

16 1990 to recover the cost of fixing that problem to prevent it

17 from happening again.

18          Up until 1995 when the Supreme Court of Canada

19 finally took this issue up, there was no cause of action for a

20 building with a -- I mean reasonable and substantial danger.

21 There were economic loss cases in Canada.  They were

22 recognized.  They were not of this nature.  They were not

23 building construction cases.  The cases that had been

24 recognized up to this point, which are a different kind, dealt

25 with professional negligence, giving poor advice, lawyer

1  malpractice cases, things of that nature.  And they are very

2  clearly set forth and explained in great detail, and I would

3  urge Your Honor to read carefully the Winnipeg Condo case and

4  divide it up into five categories that Professor Feldeson

5  (phonetic), who is well known in Canada as a great scholar on

6  economic loss, but they're divided up into five categories that

7  separate out -- and the policy reasons behind each one, and the

8  one we're talking about here very specifically is a defective

9  or shoddy building.  That is what Judge Drost found in the

10  Privest case, that it was -- you had to show a -- you had to

11  show a substantial and real danger to your building, and that's

12  different than these other cases, the faulty inspection cases

13  that have been discussed.

14        But the Winnipeg Condo case then, after this

15  pronouncement from the Canadian Supreme Court, went back into

16  Manitoba, a province that has no discovery rule.  It has a

17  procedure where a plaintiff can bring a case after the cause of

18  action has already -- I mean, after the statute of limitations

19  has already passed, but it had no discovery rule, and so

20  litigation at that point then focused on, well, this building

21  was built in 1972.  The action was brought in 1990.  Clearly

22  the statute has run.

23        That is not what happened in the Trial Court.  The

24  Trial Court recognized this clear problem, that a cause of

25  action cannot accrue until you have all the elements necessary

1  to bring it, that is a duty, a breach of that duty, and a

2  damage or injury that results from that.  The Trial Court

3  struggled with it and I think issued an opinion saying that it

4  wasn't, in its view, the installation of the product in this

5  particular type of case, and then the case settled.  And since

6  then, in Manitoba, in the Trial Courts and going up to the

7  Appellate Courts, this issue has been litigated with some

8  fervor.

9          In a true <u>Winnipeg Condo</u> case, not in a negligent

10  inspection case, but in a true <u>Winnipeg Condo</u> case where the

11  allegation is the building presents a real and substantial

12  danger, when does the cause of action accrue?  And if there has

13  been anything clear from the appellate decisions on this issue,

14  it is that it doesn't accrue at installation.  That's always

15  the position that's pronounced by the defendants.  The Court of

16  Appeals has always said we're not going to decide this as a

17  matter of law, go back and develop the facts, get the facts

18  straight and let's see what kind of danger it is, and then

19  we'll determine when it occurred.  And so I think to Professor

20  Irvine's great frustration and apparently most of the Canadian

21  bar, what the Court of Appeals has said is go back down, have a

22  trial on the facts so we can develop everything, it's a very

23  complicated issue, and then when we have a full record we'll

24  make that determination.

25          And I say all that to show that this is not -- and

1  this is the primary opinion Professor Irvine offers -- this is

2  not an appropriate case for summary judgment.  It can't -- it

3  should not be decided on affidavit evidence alone because the

4  lack of evidence to establish essential background and enable

5  the Court to decide complex and unresolved points of law has to

6  be fully developed.

7        Now, I'd like to move first to the Alberta ultimate

8  limitations and what does all this mean, at least with respect

9  to Alberta.  Mr. Speights talked about tolling.  I'm not going

10  to repeat any of that except to say that obviously we feel that

11  the <u>Anderson</u> case, which was instituted in 1992, would make the

12  Alberta ultimate statute of limitations inoperable because it

13  wasn't enacted until March of 1999.

14        However, if you read -- if you say, well, that's not

15  right, let's move on and look at the statute, what does the

16  ultimate statute of limitations ultimately say?  First of all,

17  Section 5.1 of the Alberat statute provides that the operation

18  of the limitation period provided by the repose statute is

19  suspended during any period of time the defendant fraudulently

20  concealed the fact that the injury for which the remedial order

21  is sought had occurred.

22        Obviously, a case for fraudulent concealment in

23  Alberta is not bound by an ultimate limitations period.  The --

24  Your Honor has binders of documents before you which, you know,

25  certainly I'm sure the Court would benefit from testimony and

1 further evidence about that, but I do want to point out this is

2 not something new.  We didn't dump these documents for the

3 first time on the Court.  These documents and the information

4 they contain were cited and included in all of the Canadian

5 claimants' original response to the fifteen omnibus objection.

6 We have an extensive factual showing that all related to the

7 efforts of Grace to fraudulently conceal the injury.  And

8 remember, in Canada the injury is does this product create a

9 real and substantial danger in the building, and we think that

10 Grace's efforts to say their product is perfectly safe

11 throughout -- you know, throughout the years would go by that.

12       We've talked some -- Mr. Cameron has pointed out some

13 comments from the Alberta Law Reform Commission in support of

14 his view about ultimate limitations, but the Commission also

15 had some comments about this section and which -- which

16 suspends the statute, the ultimate statute, in cases of

17 fraudulent concealment, and this is what they say is the intent

18 of this section.  "It suspends the operation of the ultimate

19 limitation period indefinitely on the grounds that the

20 fraudulent concealment by defendant of the fact that an injury

21 had occurred should not be rewarded by a limitations defense.

22 The effect of Section 5-1 is to suspend the operation of the

23 limitation period until the time of discovery.  No exception

24 from the operation of the discovery limitation period is

25 required, because the discovery period will not begin to

1 operate until the claimant has the requisite knowledge.

2 Because there is no ultimate limitation period, a defendant

3 will always be subject to an allegation of fraudulent

4 concealment and can never be certain that he will be entitled

5 to a limitations defense to the claim.  Defendants in some

6 vulnerable categories would, therefore, be advised to retain

7 defensive files for an indefinite period."  And I think that

8 shows a clear intent of the drafters of this very Act to

9 exclude all --- I mean, for policy reasons, the same policy

10 reasons they say a defendant has to have a date certain when

11 liability is over, they say, ah, but we're not going to have a

12 date certain in cases of concealment, and we realize that may

13 work a hardship on the defendants, but that's in fairness the

14 appropriate thing to do.

15        Secondly, apart from fraudulent concealment, I don't

16 believe, and Professor Irvine, while not stating this is the

17 state of the law, says this is clearly an argument that has not

18 been addressed by the Alberta Courts, that the ultimate

19 limitations causes for economic loss, the accrual is not when

20 the last act or omission of the defendant occurred, and this is

21 based on the statutory construction of the ultimate limitations

22 period.

23        The Alberta statute divides injury into five

24 different categories:  personal injury, property damage,

25 economic loss, nonperformance of obligations and then has a

1    catchall at the end, in the absence of any of the above, for a

2    breach of duty, and I think there was a case cited, the <u>Meeks</u>

3    case, to the Court that talked about -- that they cite as a --

4    in support of their contention that the ultimate limitation

5    applies from the date of the last act or omission.

6         Now, the <u>Meeks</u> case is interesting in two respects,

7    but, first of all, the <u>Meeks</u> case was not a tort case.  It was

8    a -- I think it was breach of fiduciary duty case or perhaps a

9    breach of contract case.  But in any event, it's the type of

10   case that would be specifically covered in Section 3.1 -- I'm

11   sorry 3.3(b), and let me go through and explain how this works.

12        In the Alberta statute, Section 3.1(b) provides the

13   ten-year statute of repose.  It says that it begins to run ten

14   years after the claim arose.  Now, just stopping there and

15   reading that, when the claim arose for a <u>Winnipeg Condo</u> real

16   and substantial danger case would be when there is a real and

17   substantial danger from the product.

18        Then the cite -- the section that Grace relies on,

19   Section 3.3 I think (a) and (b), but that section says that a

20   claim or any number of claims based on any number of breaches

21   of duty resulting from a continuing course of conduct or a

22   series of related acts or omissions arises when the conduct

23   terminated or the last act or omission occurred.  And it says a

24   claim based on a breach of a duty arises when the conduct, act

25   or omission occurred.  So that is in terms of claims for breach

1  of duty.

2          The <u>Meeks</u> case, which they cited, was a claim for

3  breach of duty.  The economic loss case, which is separated in

4  a different category of injury, isn't covered under Section

5  3(b), so you have to look at Section 3.1(b) to determine the

6  operative language, and that doesn't say when the last act or

7  omission occurs.  It says, just as a general rule, what's

8  stated in the statute after the claim arose.  So, you have to

9  look at that in the context of what the actual statute says,

10  and it says, when a cause of action arises, not when the last

11  act or omission occurred.

12          But even if you follow through with the <u>Meeks</u> case,

13  the <u>Meeks</u> case goes on to recognize that in that situation all

14  it did was limit the damages.  It operated to provide immunity

15  to the defendant for damages more than ten years before the

16  case was filed.  If there were damages that were -- that

17  manifested themselves and became apparent in that ten years,

18  they were still recoverable.  It was not an absolute bar to the

19  action.  It just limited the amount of damages that could be

20  recovered.

21          Of course, in this case I think, apart from -- you

22  know, apart from whether -- even if this statute were to apply,

23  the Canadian claimants should have the opportunity to show, you

24  know, well, this is a damage-related issue, there are

25  liabilities that came after -- or close to ten -- or within ten

1    years of whatever the applicable date is, and that would be

2    duties that arise from the post-sale duties to warn, duties

3    that would arise from fraudulent conduct on behalf of the

4    defendants or duties that -- or damages that were incurred

5    because a real and substantial danger presented itself within

6    ten years of the statute.

7         Also, and Professor Irvine also notes this, any other

8    interpretation of the section would have Section 3.3 completely

9    swallow up 3.1.  In other words, you say one thing in 3.1, and

10   then in Section 3.3 say, but -- here are five exceptions, but

11   we really mean that everything -- everything goes from the date

12   of the last act or omission.

13        The last thing I would point out, and I do

14   acknowledge that the Alberta Law Commission generally, as most

15   commentators do when they discuss the policy behind ultimate

16   statutes of limitations, talk about there has to be some date

17   when the defendant is beyond -- beyond the pall of litigation,

18   and it does talk about that.  But it also in the same

19   commentary, if Your Honor would look at it, offers two examples

20   that create pretty significant problems, and both of those are

21   latent injury type cases.

22        Well, as it turns out, in 1989 when they were

23   discussing these problems, of course there wasn't even a

24   thought that a defective product building -- Winnipeg Condo's

25   reasonable and substantial danger.  That case hadn't even been

1  invented yet in Canada, but the two examples they do cite,

2  well, we have problems here because of latent injuries.

3  Clearly, the Winnipeg Condo's reasonably (sic) and substantial

4  danger, as well as asbestos property damage cases in general

5  involve latent injury, involve the installation of a product.

6  You can't look at the product and say it's dangerous.  You

7  can't inspect it.  At best, you would have to have -- you would

8  have to test it and have very, you know, qualified and highly

9  trained expert advice about it.  The product, when it's

10 installed, works like it's supposed to work.  It -- it's not --

11 the building is not fireproofed.  It's that over time, at some

12 point in time in a reasonably foreseeable circumstance, the

13 product's going to get disturbed and then it creates a

14 reasonable and substantial danger.  So, even at the time you

15 can see the Law Commission sort of grappling with this problem

16 of latent injury, and they, you know, try to explain that

17 distinction in the way they've drafted the statute, but they

18 could not have conceived of in 1989 the problems that would be

19 presented by an ultimate statute of limitations in a true

20 Winnipeg Condo real and substantial danger case.

21          THE COURT:  Well, has the statute been amended?

22          MR. FAIREY:  The statute --

23          THE COURT:  You're saying you couldn't conceive of a

24 true kind of -- the problems that would have come up, but they

25 could certainly conceive of them since the true Winnipeg --

1              MR. FAIREY:  The statute has not been amended.

2              THE COURT:  -- case, so --

3              MR. FAIREY:  But I -- the statute hasn't been

4  amended, but I believe it has -- it doesn't need to be amended

5  because what they're discussing there are for the generalized

6  breaches of duty, and the separate definition of economic loss

7  I think puts it into the category of when the cause of action

8  arose as opposed to when the -- when the last act or omission

9  occurred.  But, in any event, the -- I mean these discussions

10 were taking place in 1989.  Actually, the statute wasn't

11 enacted, and as I understand the process in Canadian law,

12 sometimes it takes years and years and years to get through the

13 legislative process.  The statute actually was enacted after

14 Winnipeg Condo came out, but all of the commentary about it was

15 before Winnipeg Condo.

16             But thirdly, even if this section were to apply and

17 it is Grace's acts or omissions that we're looking at, what are

18 those acts or omissions?  As Mr. Speights said, and I won't

19 (sic) repeat it, Canada expressly recognizes post-sale duties

20 to warn and certainly if they had knowledge that they should

21 have warned about even after the sale of this product, that,

22 you know, I think under the proper circumstances would be an

23 act or omission would be involved in this ultimate statute of

24 limitations.

25             I'd like to now turn to British Columbia briefly, and

1    in the Limitations Act of British Columbia, I believe it's

2    Section 8.1 that provides the ultimate limitations to commence,

3    and it says, "From the date on which the right to do so arose."

4    And again, this was briefly addressed by Mr. Cameron, what this

5    might mean and, of course, _Privest_ was cited, et cetera.  But

6    what we don't have, what hasn't been provided and I think is

7    very significant, is the law reform commission comments from

8    British Columbia about what this ultimate statute of

9    limitations means.

10            And we have -- I didn't have it Thursday, but I have

11   it now, and I would certainly submit it, request that it be

12   submitted and taken under advisement by the Court, but the Law

13   Commission report there, at Pages 24 and 25, recognizes that

14   under the British Columbia ultimate statute of limitations,

15   which says from the right to do so arose, that the commencement

16   of the ultimate limitations and ordinary limitations have the

17   same wording.  And so they say, "As the accrual of a cause of

18   action takes place only when all of its elements are present,

19   the ultimate limitation period may start to run at a point

20   considerably removed from the act or omission which gave rise

21   to the damage that is the subject of the action.  The problem

22   of latent damage resulting from the commission of an error in

23   the past is graphically illustrated by the example of defective

24   buildings.  An error in the original design or in the

25   construction of a building may remain undetected for decades

1  before any physical damage arises from it.  A further

2  refinement of the problem may be that physical damage may occur

3  to the -- " I'm sorry -- "may occur to the structure at some

4  point distant in time from the error which caused it, but the

5  damage itself may be hidden from view and undetectable until

6  even later.  The cause of action for negligence, however, would

7  accrue when the damage occurred, whether it was discoverable or

8  not.

9         "While Section 6.3 of Limitations Act would postpone

10  basic limitations periods in either case until the damage was

11  discoverable, the working of Section 8.1 presents a difficulty.

12  As it links the start of the ultimate limitation period to the

13  time at which the right to sue arose, it forces the Court to

14  make a finding as to the point in time when the actual damage

15  occurred.  Where damage has gone undetected for some time, this

16  may be a daunting task.  Uncertainty is created, which can only

17  be resolved after a full trial of the issue."

18         Now, that's the British Columbia Law Commission

19  report about this very same ultimate statute of limitations,

20  recognizing that damage has to be there, and because they

21  recognize that, they actually go on in this and recommend that

22  the statute be changed, and this was in 1990, and they

23  recommend that the statute be changed so that it refers back to

24  the acts or omissions of the defendant, as opposed to when the

25  right to sue arose, and that statute hasn't been changed.  That

1  was the effective statute then and now.  So, I think that sheds

2  a lot of light on the British Columbia ultimate statute of

3  limitations and the issue that they talk about.

4       I want to talk for a minute about _Privest_.  First of

5  all, it's just wrong to say _Privest_ has anything to do with the

6  ultimate statute of limitations, and as long as that decision

7  is, it just didn't address the ultimate statute of limitations.

8       The other aspects about _Privest_ that I think would be

9  of note to the Court are that it is -- _Privest_, I think

10 everyone who's been asked about it agrees that the Trial Court

11 decision in _Privest_, which is the one cited so heavily, is not

12 binding on anybody.  It represents the result of a case based

13 on the facts tried before that case, just as any District Court

14 trial would be in the United States.  You could look at it.  I

15 may give you some information.  It may give you reasonable

16 analysis, but at the end of the day all it is is essentially a

17 memorandum of law that is open to consideration.

18      I will point out, and this -- Professor Irvine

19 testified about this extensively in his deposition.  There are

20 several points on limitations that he certainly believes are

21 wrong as a matter of law, including the fact that he noted Mr.

22 -- Justice Drost in the _Privest_ case found that the discovery

23 rule in British Columbia would not apply to an economic loss

24 case, and that clearly is not true.  The Appellate Court has

25 come back since then and changed that and ruled that it is --

1  it does apply.

2      I would also note that unlike in British Columbia,

3  Privest went up on appeal.  The decision of the Appellate Court

4  was very limited to we're not going to weigh the evidence again

5  and we're not going to let the plaintiffs reargue the weight of

6  the evidence.  That's been it in British Columbia.  The cases

7  that are cited by Grace and that have been discussed by Grace

8  don't deal with a reasonable and substantial danger Winnipeg

9  Condo -- true Winnipeg Condo case.  They deal with other

10  aspects of economic loss.  They deal with the aspects of faulty

11  -- failure to properly inspect the building before issuing an

12  occupancy certificate or failure to properly design and -- at

13  the time the building was built.

14      The cases that have dealt with this true real and

15  substantial danger have all arisen out of Manitoba, and that is

16  where the Winnipeg Condo case was tried, and in a true Winnipeg

17  Condo real and substantial danger case, as I've said, they have

18  clearly -- clearly said we're going to wait until we get a full

19  record so we can make a determination as to what is appropriate

20  for the particular kind of case it is before us.

21      And with that, I want to move quickly to Manitoba and

22  then wrap up.  In Manitoba, there is an ultimate statute of

23  limitations, and it is -- it does say 30 years, but the

24  Manitoba statute on limitations is vastly different than

25  anything I've ever seen in any other province in Canada, I

think probably than the Court has ever seen, although I'm sure that you know a lot more about that than I would.  But a cause of action in Manitoba for limitations purposes arises only when the building becomes substantially dangerous.  Again, this is not just Professor Irvine, but, you know, there are other judges in Canada who agree with this, including in a concurring opinion in a post-Winnipeg Condo case Justice Steel of the Manitoba Court of Appeals who says, "If this action is categorized as one of economic loss due to defective structure, the damage is not inflicted until the building is found to contain defects which pose a real and substantial danger to the occupants of the building or other property.  It is only when the defect poses a real and substantial danger or there is imminent possibility of such danger that the cause of action is complete."  That's important for this reason, because if the cause of action is not complete until the appropriate time period before you file the lawsuit, you don't have to follow the Manitoba crazy scheme of discovery rule.

In Manitoba, there is no discovery rule by statute. There is a procedure.  If you're a plaintiff and you find out that you've been injured and that the cause of the injury and the injury occurred sometime way before the statute has run on you, you can go and make an ex parte application to the Court, and this is strictly a Manitoba procedure.  Then the Court will look at it and say yes or no, or whether or not you can

1  proceed, and the ultimate limitations period comes up in that

2  context.  Only when a plaintiff finds himself injured and he's

3  discovered his injury and the discovery of that injury occurred

4  years after the actual injury occurred does he have to go into

5  the Court to make this application.  And the ultimate

6  limitations comes into play when a Court looks at the

7  application and says do I grant this application or not?  Well,

8  the Manitoba statute says you cannot grant that application

9  unless -- or if the injury resulted from an act or omission

10  that occurred more than 30 years ago.  So, it's a very limited

11  context that that would apply.  It doesn't bar the Winnipeg

12  Condo-type suit that's brought in time.  That is it's brought

13  when the injury manifests itself, because -- or the real and

14  substantial danger, because you're in time.  You don't have to

15  go through this extraordinary procedure and these statutes just

16  don't come into play.

17          So, the -- just to sum up where we are, the point of

18  this litigation is is Mono-Kote or Grace asbestos-containing

19  surfacing treatment hazardous, and, if so, when if -- or when

20  does it present a real and substantial danger to the building

21  owners?  Grace says it's at installation, and it cites all kind

22  of policy reasons why it would be installation.  It, of course,

23  cites Privest, that it's installation.  But this is, as

24  Professor Irvine says, just not self-evidently right.  In order

25  for that to make any sense at all, it has to be that from the

1  moment the Mono-Kote is put in the building, it has to be a

2  real and substantial danger.  Grace certainly wouldn't agree

3  that it is.  I don't think these claimants are claiming that it

4  is, certainly not the Canadian claimants.  People live with

5  Mono-Kote in their buildings and operate their buildings safely

6  for many, many, many, many years.  It doesn't become a real and

7  substantial danger until late in the game.

8           Your Honor asked a question about the Canadian Johns

9  Manville case, and I did want to address that just briefly.

10  And I think Your Honor said that the Canadian Johns Manville

11  case stood for, and it was obviously cited in Privest, but it

12  stood for the proposition that there was a lot of knowledge

13  available to building owners about the hazards of asbestos, and

14  I -- that -- I want to point this out because that's not right.

15  That's a very -- it's a very lengthy decision, but the issue in

16  Johns Manville dealt with whether or not an underwriter at an

17  insurance company writing commercial insurance for an asbestos

18  manufacturer knew or should have known that asbestos in all the

19  ways that that manufacturer used it -- mining it, manufacturing

20  it, and all the ways that it was used -- would create a

21  liability.  The issue in the case was whether or not this

22  indemnity company could avoid paying its -- on the policies it

23  had written to Johns Manville because it claimed Manville

24  concealed the hazards of asbestos to it.  So, it's -- and the

25  actual holding in the case is very careful to say this finding

1  is based upon what a prudent underwriter should know.  It

2  doesn't say anything about what a prudent building owner or a

3  member of the general population should know.

4         And then what does it actually say?  What does _Johns_

5  _Manville_ say?  It doesn't say asbestos in Mono-Kote in a

6  building is bad.  It doesn't say asbestos in building products

7  in the building is bad.  It says there's a general problem with

8  asbestos, all kinds of asbestos, and, you know, before you

9  write an insurance policy on it, you have a -- an underwriter

10  has a duty to go and find out what those are.

11         To sum up the issues of the ultimate limitations, I

12  would point Your Honor to all of the subsequent true _Winnipeg_

13  _Condo_ litigation that has gone on and a determination there of

14  what the injury is and when does it accrue.  All of these Trial

15  Court and appellate decisions clearly separate the real and

16  substantial danger category from the other categories of

17  economic loss, but, more importantly, they separate the accrual

18  and when the injury occurs from installation.  If installation

19  was the trigger date, _Winnipeg Condo_ itself would never have --

20  I mean, that case would have been dead on arrival because that

21  building was -- the injury was found to have occurred or -- 17

22  years after the building was built.

23         So, in Canada, there must exist a hazard for there to

24  be a right to bring an action, and these are clearly questions

25  of fact on whether there is a hazard, and, if so, when does it

1  come into existence.  In the case of Mono-Kote ACM there is no

2  hazard until the fibers are released, and I think that's plain

3  under American law, which has fully litigated this issue, and

4  the Canadian Courts, which have not addressed this issue

5  directly except in _Privest_.  I think the trend is heading that

6  way.  Thank you, Your Honor.

7         THE COURT:  Mr. Cameron?

8         MR. CAMERON:  Try to be very brief here, Your Honor.

9  I was sitting there and I was almost surprised I was

10  responsible for the Canadian motion for summary judgment, and I

11  thought we were in a different argument there for a while

12  because I think we argued U.S. law much more than Canadian law.

13  We are in Canada, and I think by a slight-of-hand there's an

14  argument that installation is just not the law in the U.S.  It

15  doesn't matter.  I don't necessarily -- we won't agree with

16  that, but that's not the law in Canada.  To refer to _Privest_ as

17  only dealing with the hazard issue totally ignores the Judge's

18  opinion, which is the only case on point that clearly held that

19  installation was the trigger for a limitations period, albeit

20  in that case the normal limitations period, applying the same

21  law as ultimate.

22         I would note one thing at -- Mr. Fairey said at the

23  end was that _Winnipeg Condo_ would have been dead on arrival

24  because the case was filed 17 -- or the damage was discovered

25  17 years after the installation, or, I'm sorry, the case was

1 filed 17 years after installation.  It certainly would not have

2 been dead on arrival on the ultimate limitation, because the

3 ultimate limitation period in Manitoba is 30 years, not seven,

4 ten or 15.  So, I don't think that is accurate.

5          I think if you look closely at these cases, they are

6 not limitation period cases.  The cases we cited in our brief

7 are limitation period issues dealing with Winnipeg Condo-type

8 cases.  They have not cited to a single case where it would not

9 be date of installation.

10          I think -- I think the main point that they have,

11 Your Honor, is that we need a trial.  There's -- you know,

12 there's a bunch of factual issues.  There's a bunch of

13 documents.  I think it's simple.  The factual issue is not in

14 dispute, and that is the installation date.  The legal issue is

15 very much in dispute and something that Your Honor can

16 determine on summary judgment, and that is, is the date of

17 installation the appropriate trigger?  And the only case that

18 is clearly on point is the Privest case.  A number of cases

19 after the Privest case apply the same trigger for not just

20 faulty inspection cases.  Those are faulty construction cases,

21 as well in British Columbia.

22          I think what they're trying to do here, Your Honor,

23 is trying to equate the ultimate limitations period with the

24 normal limitations period, which I think they on one hand admit

25 discoverability doesn't apply in ultimate limitations, but then

1  on the other hand are really arguing for the same trigger, and

2  I believe that their own expert said that that would be

3  nonsensical to have the ultimate limitations and normal

4  limitation periods have the same trigger, with the ultimate

5  limitation period being as late as a normal limitation period

6  trigger that takes into account discoverability, when

7  discoverability is not part of the ultimate limitations.

8          I think, Your Honor, with respect to the argument

9  that the ultimate limitations is not in the fifteenth omnibus

10  objection, we've argued that.  I think if you look at the

11  omnibus objection, those statutes include -- it's one statutory

12  scheme.  They are all "statutes of limitation."  They're not

13  called statutes of repose.  I believe Your Honor has ruled on

14  that and the parties have --

15          THE COURT:  Well, Paragraph 166 under the Canadian

16  claims on Page 52 has a paragraph called "Third," which states,

17  "Third, all of the Canadian PD claims are precluded by

18  applicable statutes of limitation," and it's plural, statutes

19  of limitation.  Then when you get to the explanation of Third,

20  which starts on Page 56 at Paragraph 183, from there on it does

21  not appear that there is a further explanation of the ultimate

22  limitations period from there on.  I've read this pretty

23  quickly during your arguments, so maybe I've missed it.  I do

24  not see the word "ultimate limitations" listed.  It appears

25  that the argument that -- and I will call it argument; that's

1    pretty much what it is -- in Paragraphs 183 through 185 do talk

2    about the normal limitations period and the health hazard and

3    the Privest opinion.  Nonetheless, Paragraph 166 in that one

4    sentence, Third, does talk about applicable statutes of

5    limitations, and I think that's broad enough to cover it.  So,

6    I'm going to stick with the ruling that I said before.

7    Everybody is here.  We're prepared to deal with it.  I think

8    it's broad enough.  The discovery has gone on.  And I do think

9    it's broad enough to cover it.

10          MR. CAMERON:  Thank you, Your Honor.  A couple of

11   other points, Your Honor.  I believe that they've argued that

12   because this is a battle of the experts, therefore we need a

13   trial, but on the other hand they admit that it's a legal

14   issue.  I don't think the fact that the legal experts have a

15   battle on what the legal standard is would render this unable

16   to be determined on summary judgment by -- by Your Honor.  As I

17   said, the facts are not in dispute in terms of the date of

18   installation.

19          Another issue that was raised was fraudulent

20   concealment.  I would note in the first instance that, you

21   know, the documents that were provided to the Court, I mean,

22   they're not in context.  I'm not even sure how they're in the

23   summary judgment record.  I thought we have a summary judgment

24   record.  There's no affidavit.  There's no testimony.  It's

25   just a bunch of documents, and we still don't know what they

1    say.  It's here's a bunch of documents, Your Honor; I think we

2    need a trial.  I don't think that's appropriate in this

3    situation.  I don't think that's the appropriate procedure.  I

4    think we have the summary judgment record, and I believe this

5    is appropriate for your summary determination.

6         But the issue that was raised with respect to those

7    documents is fraudulent concealment.  That issue wasn't raised

8    in any of the prior briefing that was done on this issue.  In

9    any event, it's not applicable in Canada.  Mr. Mew addressed

10   this in his report.  It's not applicable in Canada unless you

11   have a special relationship.  I believe that some of the

12   statements that -- I can't remember if it was Mr. Fairey or Mr.

13   Speights were referring to in terms of people in certain

14   circumstances should maintain defensive files.  That is when

15   you have a special relationship.  There is no special

16   relationship here between Grace and the ultimate -- and the

17   ultimate building owner, and I believe that Mr. Mew covered

18   this in his expert report, and it's simply not an issue here in

19   Canada.

20        Another issue that they raise was a continuing duty

21   to warn.  I think that even if a continuing duty to warn is

22   alleged, it would make no sense to have a new limitation period

23   begin every day the defective product's in the building.  Mr.

24   Mew addressed this in his affidavit.  I don't see any legal

25   authority, any scholarly authority, any expert authority, on

anything to the contrary.  I think such a theory would completely undercut the policy behind the ultimate limitations period.  The law is clear that the knowledge is irrelevant to the running of the ultimate limitation period.

I could see there being an argument in the normal limitations period, Your Honor, where discoverability matters, but that would be trumped, I believe, by constructive notice as a matter of law, which is precisely what <u>Privest</u> did in applying the Canadian <u>Johns Manville</u> case as a matter of law, applying that constructive notice to the building owner.  Again, Mr. Mew addressed this in his affidavit, and I think everybody agrees, including Professor Irvine, that all of these claims, no matter how they're advanced, are cognizable only as negligence claims for pure economic loss under <u>Winnipeg</u> -- under <u>Winnipeg Condo</u>.

In terms of <u>Anderson Memorial</u> tolling, I'm not going to repeat the arguments we made, but I certainly don't agree with the statement of U.S. law, but, in any event, I think that's irrelevant.  The issue here is would the Canadian statutes toll -- you know, affect tolling as a result of <u>Anderson Memorial</u>?  It's interesting that I heard their expert has indicated that it would.  When I deposed Professor Irvine, he says I'm not an expert in class action tolling, I'm not an expert on conflict of laws, I'm not rendering any opinion, all I said is they told me about this <u>Anderson Memorial</u> case, and I

1 thought it could be an issue.  I think that's far from a

2 statement that the expert witness is supporting their tolling

3 argument.

4         I think finally, Your Honor, the <u>Winnipeg Condo</u>

5 discussion, it's interesting and theoretical, but I don't think

6 you need to grapple with that issue.  I think that <u>Privest</u>

7 decided.  I think <u>Privest</u> looked at that.  They looked at the

8 type -- that this is a type of <u>Winnipeg Condo</u> case involving

9 asbestos in buildings.  Its installation is when the cause of

10 action accrued under the statute, decided as a matter of law.

11 The only Canadian law on point, and I would also note that I

12 believe that the Alberta statute, the legislative history for

13 the Alberta statute, is eminently clear that it does not run --

14 that it does not run after the discoverability of damages.  I

15 think that is crystal clear.  Those statements were made before

16 the statute was enacted.  The statute was enacted actually

17 using the same language after <u>Winnipeg Condo</u> came down and

18 became effective in 1999.  Thank you, Your Honor.  Thank you,

19 Your Honor.

20         MR. SPEIGHTS:  I'll only respond to what Mr. Cameron

21 just said.  <u>Privest</u>, this is what <u>Privest</u> said, Drost,

22 D-r-o-s-t, "A cause of action accrues when all the constituent

23 elements exist, whether or not the plaintiff isn't aware of

24 them.  It was clear that all the elements necessary to

25 plaintiff's cause of action came into existence during the

1 period from 1973 to 1975, when the MK-3 was installed.

2 Accordingly, the limitation period began to run in or about the

3 month of September 1975, when the installation was completed."

4 That's what the Trial Judge found, never addressed on appeal,

5 there based upon what the plaintiff presented there, that all

6 the elements necessary to the plaintiff's cause of action came

7 into existence at installation.

8         That's not our case.  That's the reason I talked

9 about Tioga v. Adams-Arapahoe.  That's Adams-Arapahoe.  Our

10 case is an allegation that the product was dangerous.  If we

11 did not -- if we did not prove the product was dangerous, we

12 would be out of court under the Winnipeg case.  Under Winnipeg,

13 we can show that the product was dangerous, and if the product

14 was dangerous at installation, that's one thing.  That's not

15 what we claim.

16         THE COURT:  But in Privest the Court assumed that

17 there was proof of a dangerous product.  The plaintiff didn't

18 offer any proof of danger.

19         MR. SPEIGHTS:  Right.  The plaintiff blew it.

20         THE COURT:  Well, the plaintiff may have blown it,

21 but I think what the Court's saying is whether or not you prove

22 that there is a dangerous product, we're going to look at the

23 date at which you could have proven that product, so -- could

24 have proven that element.  You had the facts to know that a

25 product was dangerous as of the date of installation, and you

1 didn't choose to do anything to pursue that element.  So, we'll

2 just decide that -- I guess on the basis of the record -- that

3 at this point the issue is what did you know on the date of

4 installation?  On the date of installation you had all the

5 facts at your disposal.  You had the product.  You could have

6 tested it.  So, what's any different in <u>Privest</u> than in any

7 other building?  On the date of installation, all the building

8 owners have the product and could have tested it.

9        MR. SPEIGHTS:  Your Honor, that would be true in

10 America, too.

11        THE COURT:  Absolutely.

12        MR. SPEIGHTS:  But that's not --

13        THE COURT:  But we're not in America.

14        MR. SPEIGHTS:  I understand that, but I think

15 <u>Winnipeg</u> is the same as America, because we had no injury.

16 Grace says we were not injured upon installation.  We had no

17 injury at installation.  The fact that down the road it might

18 be a problem, we had no lawsuit we could bring.

19        THE COURT:  But it doesn't matter.  If the -- if --

20 for one of two reasons.  For the ultimate limitations period,

21 the knowledge is irrelevant.  It's simply a time period from

22 the date of installation, because as of that date you could

23 have known, even though you chose not to.  You can't turn a

24 blind eye.  It's like a -- your analogy that it's like a

25 statute of repose in the United States.  Whether or not --

1  given a statute of repose concept in the United States, whether

2  or not you know as of the date that the repose period ends that

3  you were subject to an injury that manifests itself later, it's

4  too bad.  You're out of court when that repose period's over.

5  That's the purpose of the ultimate limitations period.  So, for

6  ultimate limitations period, you have all the facts at your

7  disposal as of the date of installation.  Just like on a

8  statute of repose in the United States, you know as of the date

9  a building is completed that there -- that all of the elements

10  necessary to prove an injury have occurred.

11           Let's say the -- you know, the roof's been put on out

12  of skew, just to pick something, an architectural defect.

13  You're aware of the fact that there is an -- you have all the

14  facts to know that there was an architectural defect, even

15  though you don't do anything to prove that that architectural

16  defect exists.  So, your statute of repose, for my

17  hypothetical, is 15 years.  Fifteen years go by and suddenly

18  you've got roof problems because of this defect, it's too bad.

19  You can't sue.  The entity is protected by the statute of

20  repose because you didn't do what you should have done within

21  that 15 years to produce the proof of your cause of action.

22           It's the same thing with the limitations period in

23  Canada.  You had all the facts at your disposal.  You didn't

24  undertake to do what you needed to do to prove.  The period

25  runs.  You're out of luck.

1          With respect to the discovery period, to the extent

2   that they apply, I suppose what _Privest_ is saying is in the

3   period of time in which the installation is complete, you've

4   got access to the product.  You could do whatever testing you

5   choose to do on the product.  If you don't do it, then it's

6   your burden to show that there is a hazard or a danger.  If you

7   don't gather the facts when you've got the opportunity to do

8   them, that doesn't prevent the statute from beginning to run.

9   That's what it -- that's what the case seems to be saying.  The

10  fact that the parties didn't take it up apparently seems to

11  mean that in Canada they agree that that's what the state of

12  the law is, because otherwise you'd think that would have been

13  an element on appeal.

14          MR. SPEIGHTS:  Well --

15          THE COURT:  That's a pretty significant issue.

16          MR. SPEIGHTS:  Well, they would have -- the element

17  they took up on appeal -- the matter the Court of Appeals

18  addressed was, well, did they prove their case that it was

19  hazardous, and if they didn't prove it was hazardous, they were

20  out.  I don't know what other issues they tried to present on

21  appeal, but the Court of Appeals said you didn't prove the

22  product was hazardous; you're out of court; we don't have to

23  get to any of these other things.  And I do say -- before I

24  address directly your point, Your Honor, I do say that _Privest_

25  is just a Trial Court opinion that's not entitled to precedent,

**J&J COURT TRANSCRIBERS, INC.**

1  but leaving that aside, Your Honor, it's not the knowledge --

2  and I keep trying to make this point, and it's a difficult

3  concept -- but it's not what a claimant knows on the first

4  instance.  It's whether there is injury.  Was there a hazard?

5  Because under <u>Winnipeg</u> there, under cases here, you cannot

6  bring a lawsuit until there is injury, and the statute of

7  limitations does not start until there's injury.  And whatever

8  you knew, whatever my clients knew, when the building was

9  installed, does not mean there is no evidence in the record

10  that my clients thought there was injury.  There's no -- but,

11  more importantly, there's no evidence in the record that there

12  was injury.  Grace says there was no injury upon installation.

13          THE COURT:  Well, I mean, if that's the case, are

14  your clients -- I mean, are your -- can your clients prove

15  injury today?

16          MR. SPEIGHTS:  Well, that's what we want an

17  opportunity to show during the -- we've got a bifurcated

18  procedure to show hazard.

19          THE COURT:  Well, but -- I mean, I don't know.  It

20  seems to me that we're creating this construct that doesn't

21  work from a whole lot of different perspectives.  I mean, if --

22  if the product is dangerous, then it was dangerous from the

23  date of installation.  It hasn't changed.  I mean --

24          MR. SPEIGHTS:  That's not what the law is, Your

25  Honor.  And I understand this is not an American case, but we

have the benefit of struggling with this issue in this country

for 15 years, and what the Courts universally say is, you

cannot bring a product until it is dangerous, and it's not

dangerous by the mere presence.  The EPA says that.  Canada

regulatory authorities say that.  It's not dangerous while

sitting there.

THE COURT:  Well, okay.  Then -- but if that's -- if

that's the premise that you want me to accept, then I want to

leap ahead.  Let's say we get to trial.

MR. SPEIGHTS:  Right.

THE COURT:  Just hypothetically, we go to trial.

What evidence do I have, am I going to get, that it's dangerous

now, that it's not just sitting there?

MR. SPEIGHTS:  I'll do -- if we try this case, I'll

do what <u>Privest</u> should have done.  I will show you that this

product is dangerous when you start to demolish the building.

THE COURT:  But you haven't started to demolish the

building.

MR. SPEIGHTS:  Oh, in some instances we have.

THE COURT:  So, in the buildings that haven't been

started to be demolished, the product's still sitting there and

there is still no danger.

MR. SPEIGHTS:  Well, then we get to the -- if that's

the case there, we get to that issue of is there such a thing

as a future PD claim, which I'll argue with you with Mr.

1  Bernick.  But, you know, that's why you need to develop a

2  record.  I will show you that on these buildings where you

3  demolish the product, where you demolish the building, conduct

4  substantial activities disturbing the material, you produce --

5  and I'll show air measurements, air measurements, which <u>Privest</u>

6  didn't do, showing that in that instance, not when you're

7  sitting at a desk back in a -- 1975 or '82, but when you

8  disturb and demolish the material, that's when you get the

9  fiber levels that show there's a danger, and there's no

10 evidence in this record now that there was a danger back during

11 the old days that would cause me statute of limitations

12 problems.  There's simply nothing here yet.  That's why you

13 need a trial.

14         But what's interesting on this, I can feel Mr. Fink

15 smiling in the back of the room, although he's not showing it,

16 is that I'm making his arguments for years that through the SBA

17 (sic) and through the briefs that he's filed, that Mono-Kote in

18 place is safe.  I mean, that's -- that's our position.  It's no

19 danger to building occupants, et cetera, et cetera.  So, I'm

20 saying, okay, Grace, the harm occurs, the danger occurs, when

21 you disturb the material later on.  The best example is at

22 building demolition, and that's when you have a cause of

23 action, when you can show it's hazardous.  That -- I mean, I

24 can argue it 50 different ways, but that's the way it is.

25         And let me just jump a minute to the whole -- I'm not

1 here to argue ultimate limitations, but I'm responding to your

2 thing about statutes of repose, as to the way they work.  They

3 have said in their brief that ultimate statutes are like

4 American statutes of repose.  "Comparable" I think is their

5 word.  Okay.  Forty-nine out of 50 states in this country have

6 not found repose to be a problem.  I'm not saying all 49 have

7 dealt with it.  Grace has litigated this issue all over the

8 country, including the Seventh Circuit where the repose issue

9 was decided, the Eighth Circuit where the repose issue was

10 decided, et cetera, et cetera.  Only to my knowledge has a

11 repose been a bar to this type of case in the State of

12 Virginia, and even then I think there's an exception for

13 fraudulent concealment.

14          So, the same logic would apply to Canada.  Well,

15 there's a repose.  It's an idea we're going to ultimately cut

16 everything off, and yet maybe it's because they're good

17 plaintiffs' lawyers, maybe it's because of the intent of the

18 legislature.  It doesn't mean because there's a repose in

19 Canada, you're out of school any more than in America because

20 we litigated this for years.

21          THE COURT:  No, I was not trying to make an analogy

22 to the outcome of litigation.  I was only trying to illustrate

23 a point with respect to the operation of the statute.  That's

24 all.  I am not in any way convinced that because the United

25 States would make a ruling one way based on our statutes that

1  the Canadian Courts would make a similar ruling based on their

2  statutes.  I don't think that that analogy fits.  I don't think

3  that's my responsibility or my duty in this particular case.  I

4  need to look at the Canadian law and apply Canadian law, not

5  United States law, to the facts of -- that are before me now on

6  the Canadian claims.

7      MR. SPEIGHTS:  I believe you should apply Canadian

8  law, and my only point was where there is no authority there, I

9  think Canada would look to the United States, as it's done in

10  many of its cases in which it's dealt (indiscernible) what the

11  United States does, but obviously Canadian law trumps American

12  law when deciding an Canadian issue.

13      Last point, I want to return -- I'm sort of hard

14  headed about this, Your Honor, but I need to point this out.  I

15  believe you said you looked at Paragraph 183, and, of course,

16  you've been reading it while -- you know, during the middle of

17  a hearing, and I would urge Your Honor to continue to study

18  that issue for this reason.  Their -- while each Canadian

19  province has its own rules governing the statute of

20  limitations, plural, which you noted, and it is plural because

21  each province has a statute of limitations, with respect to

22  claims of asbestos property damage the time for filing a claim

23  has passed in each of these provinces at issue, and the claims

24  identified on Exhibit F-5.  Well, they drop a footnote.  The

25  debtors drop a footnote at the time before Mr. Restivo's firm

1  was involved, and what do they say in the footnote?  They refer

2  to six years.

3          THE COURT:  Right.  It's all about the -- it's all

4  about the normal statutes.  That's correct.

5          MR. SPEIGHTS:  And Privet is not an ultimate statute,

6  but six years, two years, three years.  Next page, Privest.

7  So, I really don't think that paragraph, any more than any

8  other part of this, deals with the ultimate statute of

9  limitations.  And let me say, I'm sympathetic to, you know,

10 calling time on even Grace.  I'm especially sympathetic to

11 calling time on me, and I'm more sympathetic on calling time on

12 my clients.  But this is a strange circumstance here.  Grace

13 says my clients' claims should be kicked out of court because

14 they did not timely do something, and yet they -- I believe the

15 clear reading of this -- they didn't timely object, and we've

16 got the whole history of how they got the objections processed.

17 And if they want to come forward with a motion to amend it and

18 set forth actually what happened, that's a different story, but

19 I don't think -- I think it's imminently fair for me to say to

20 Your Honor that my clients, who are facing their argument that

21 somehow we missed a deadline, should turn to Grace and say you

22 missed a deadline, not you, but somebody in Chicago or more

23 probably in British Columbia missed a deadline because you did

24 not assert ultimate statute of limitations there.

25          But let's assume that I'm -- that I lose for third

1  time on this issue, and I almost want to get down on my knees

2  and beg you to read this when you go back to chambers, Your

3  Honor.  But what does it mean if you say that, well, it's all a

4  limitations?  In one sense, I would say -- was saying that you

5  allege negligence, Mr. Plaintiff, well, therefore I say, well,

6  I've got nuisance, too.  And you say, no.  And I say, well

7  they're both torts.  Well, the fact that they're both torts

8  doesn't mean I allege negligence -- nuisance when I allege

9  negligence.  Same thing is the fact that I mentioned the word

10 limitations did not mean that I objected on every limitations

11 ground.

12              THE COURT:  Well, Mr. Speights --

13              MR. SPEIGHTS:  But --

14              THE COURT:   -- I mean, I would be sympathetic to that

15 if it hadn't been, you know, almost a year since all this has

16 been going on, and there has been so much discovery, at this

17 point I just don't see any prejudice to having gone forward at

18 this length of time with this argument in this capacity.  It's

19 not that -- you know, Mr. Mew has been subject to depositions.

20 You've retained an expert.  The parties are all aware of the

21 issue.  I just, frankly, can't see that anybody's been

22 prejudiced by going forward, number one.  And the debtor -- if

23 the debtor were to be found to have missed a deadline in this

24 case, I don't even remember when the fifteenth omnibus, at this

25 point, was filed and how long ago that was.  I know it was

1  awhile.

2           MR. SPEIGHTS:  September 1, 2005.

3           THE COURT:  Five, okay.  I know it was awhile.  But

4  even so, even with that missing a deadline, to the extent that

5  the ultimate limitations period in some of these provinces is

6  30 years, 30 years is a lot different period of time than two

7  years or four years, even so.  So, this isn't an issue I think

8  where we're talking about somebody missing a filing deadline

9  for a proof of claim in the case.  This -- we're talking about

10 not pursuing an action in one case in a building where the

11 product was apparently installed since 1956.  I mean --

12          MR. SPEIGHTS:  Your Honor --

13          THE COURT:  -- it's just not the same thing, Mr.

14 Speights.

15          MR. SPEIGHTS:  Well, respectfully, you know, it's the

16 same thing if both of us say we want the cases decided on the

17 merits of whether the product's bad and caused damage, but it

18 did come up when they got -- they filed their motion, the

19 fifteenth objection.  They got a special order of the Court to

20 get around a local rule --

21          THE COURT:  They did.

22          MR. SPEIGHTS:  -- which required them to do that, and

23 I raised this for the first time, and it came up to you on May

24 30, I think, when your order is, and the only additional work

25 -- I never deposed -- I don't think I've deposed Mr. Mew on

1  ultimate statute of limitations, and we had to do all of this

2  discovery anyway.  I understand, but I do want to make one more

3  point.  I really want to argue that another 20 minutes, but I'm

4  not.

5          But the point -- the last point I'll make is this.

6  If we consider it as a limitations, just kind of under that

7  catchall, like all things are tort, they use the word

8  "limitations" as something -- they can't have it both ways,

9  because if you consider it just like another limitations, it

10 seems to me that you can't now turn around and argue but this

11 limitations is quite different because there's a statute of

12 repose, et cetera, et cetera, et cetera.  Either it's a

13 limitations or it's a repose, and if it's a repose and if it's

14 something quite different, it was incumbent upon them to at

15 least have one sentence --  If you ask Grace -- if I ask Grace

16 out in the hall -- if I ask Mr. Restivo out in the hall -- I'll

17 wake him up over there -- and I say, what's your strongest

18 argument, I'll bet you a dollar that he would say ultimate.

19 And yet if that's their strongest argument, how in the world

20 did they not mention the word ultimate in this or in any of

21 their attachments to their case management orders.  They just

22 flat didn't do it, Judge.  Thank you very much.

23          THE COURT:  Okay.  Well, as I said, Mr. Speights, I

24 think this has just gone on long enough that at this point

25 there is not any prejudice because the issue has been fleshed

1  out adequately, and the fact that I have the binders that I

2  have with all the material in it that I have and the responses

3  and the expert opinions, I think are clear that I do have

4  substantial work product from all sides, both sides, that have

5  addressed this issue.

6           Now, you mentioned that you wanted an opportunity to

7  get something else, I'm not sure, a supplemental brief?

8           MR. SPEIGHTS:  Yes, Your Honor, we would like to do

9  essentially what Grace did and file a supplemental --

10          THE COURT:  All right --

11          MR. SPEIGHTS:  -- and peg it to the documents in the

12  evidence with an appendix right there so Your Honor can go

13  straight there and look.

14          THE COURT:  All right, how much time do you want?

15          MR. SPEIGHTS:  Let me ask the brief writer.

16                         (Pause)

17          MR. SPEIGHTS:  He begs for 30 days.

18          THE COURT:  It really doesn't matter.  I'm in the

19  process of trying to get two really big confirmation orders

20  out, and, frankly, by the time -- I mean, I just -- I don't

21  know --

22          MR. SPEIGHTS:  Thirty days.

23          THE COURT:  -- when I'm going to get -- and I'm

24  trying to get the other property damage matters out, so however

25  much time you need is okay.

1                MR. SPEIGHTS:  Thirty days, Your Honor.

2                MR. CAMERON:  Your Honor, two points.  One, first of

3    all, as I understand it, this is a supplemental brief.  It's

4    not a supplemental -- it's not a submission of supplemental

5    materials to try to supplement --

6                THE COURT:  No.

7                MR. CAMERON:  -- the summary judgment record.  This

8    is a brief.

9                THE COURT:  No, it's a brief.

10                MR. CAMERON:  Okay.

11                THE COURT:  Yes, but I --

12                MR. CAMERON:  And we would ask for a short time

13    period to reply.

14                THE COURT:  All right, supplemental brief due --

15    today is the 10th -- by October 12th, Mr. Speights?

16                MR. SPEIGHTS:  That's fine, Your Honor.

17                THE COURT:  And the debtors' reply by --

18                MR. CAMERON:  Ten days -- is the 22nd a week -- is

19    the 22nd a weekday?

20                THE COURT:  It is, but it might be Thanksgiving.  I'm

21    not -- I think that's Thanksgiving.  How bout --

22                MR. CAMERON:  You're on -- you're in October.

23    October.

24                THE COURT:  Oh, oh, October.  Yes, the -- how about

25    the 20 -- how about the 26th?  That's the following Friday.

1           MR. CAMERON:  That would be fine, Your Honor.  Thank

2   you.

3           THE COURT:  Okay.  The debtors' reply, please, only

4   address the new things in -- I mean, you've given me so much

5   paper.  I have read the submissions that have been given to me

6   so far.  All right, and then I'll have this matter under

7   advisement.  Okay.  Anything further today?

8           MR. CAMERON:  Nothing from the debtor, Your Honor.

9   Thank you.

10          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

11          THE COURT:  We're adjourned.  Oh, Mr. Sakalo, I

12  should have asked.  I take it the property damage committee

13  isn't taking a position on this?

14          MR. SAKALO:  Correct.

15          THE COURT:  Okay, thank you.

16          THE CLERK:  Close the record?

17          THE COURT:  Yes, thank you.

18                        * * * * *

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.


/s/ Denise M. O'Donnell

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.        Date:  September 20, 2007