# Rebuttal to the Testimony of

# W. R. Grace's Experts

## Mark A. Peterson

## Legal Analysis Systems

## September 25, 2007

# Table of Contents

EXECUTIVE SUMMARY ........................................................................ ES-1

1. Summary of Dr. Florence's Estimation for W.R. Grace ............................... 1
  1.1. What Dr. Florence Did ................................................................ 1
    1.1.1. Dr. Florence Accepted Highly Unusual Instructions from Grace ............... 1
    1.1.2. To Comply with Grace's Instructions Dr. Florence Abandoned
    Standard Estimation Methods ..................................................... 2
  1.2. Problems with Dr. Florence's Simulation Exercise ............................... 3
    1.2.1. Dr. Florence Does Not Provide an Expert Opinion about Grace's
    Asbestos Liabilities ............................................................ 3
    1.2.2. Dr. Florence Evaluates an Unrealistic Liability System ................... 4
    1.2.3. Dr. Florence Does Not Have the Data to Evaluate Grace's New
    Liability System ................................................................ 5
    1.2.4. Dr. Florence's Key Simulation Variables Are Flawed ..................... 9
  1.3. Summary Implications for Dr. Florence's Analysis and Report ................... 10

2. Grace Changed the Rules ................................................................ 13
  2.1. Grace's Rules Disallow 92 Percent of the Claims that Grace Paid in the
  Past ..................................................................................... 15
  2.2. Grace's New Rules Have Never Been Used by Grace or by Anyone ............... 17
    2.2.1. Dr. Florence Rejected the Dennis Emrick Claim, Settled by Grace
    for $1 Million ................................................................... 20
    2.2.2. Dr. Florence Rejected the William McCauley Claim, Settled by
    Grace for $425,000 .............................................................. 22
  2.3. Grace's Exposure Rules Ignore Basic Asbestos Litigation Principles ............ 23
  2.4. Grace's Lung Cancer Rules Would Improperly Require a Diagnosis of
  Asbestosis ............................................................................... 29
    2.4.1. Dr. Florence Rejected the Jack Kenworthy Claim that Grace Settled
    for $382,500 .................................................................... 30
    2.4.2. Dr. Florence Rejected the Marvin Pearson Claim that Grace Settled
    for $200,000 .................................................................... 33

3. Dr. Florence Has No Meaningful Data About Claimants' Ability to Meet Grace's
  New Rules ............................................................................... 35
  3.1. Information for Pending Claims Was Limited by Grace's Bankruptcy Stay ....... 36
  3.2. Dr. Florence Had Inadequate, Fragmentary Data for Closed Claims ............... 40
  3.3. Grace Withheld Many Documents from Dr. Florence, Jeopardizing the
  Integrity of His Analysis .............................................................. 41
  3.4. Dr. Florence Does Not Adequately Address His Missing Data Problems ........ 42

4. Values of All Pending and Future Claims Are Based on Only 28 Previous
  Settlements ............................................................................. 43

5. Dr. Dunbar's Report Is Misleading and Uninformative ............................... 45

6. Rule 26 Disclosures and Signature ...................................................... 48

# Tables

Table 1: Number of Sampled Claims Accepted and Number Settled for Value  ............  16

Table 2: Percent of Claims Accepted Compared to Percent Settled for Value  ..............  17

Table 3: Most Pending Claims Were Filed Recently  ....................................................  38

# Executive Summary

None of W. R. Grace's experts in this case provides an estimate of Grace's liability for asbestos bodily injury claims.  Dr. Florence does not.  His client, Grace, instructed him to ignore Grace's actual liabilities to asbestos claimants under the laws and processes of U. S. courts that determine those values.  Grace told Dr. Florence to substitute instead its contrived new rules devised for its bankruptcy proceedings.  Dr. Florence agreed to Grace's instructions and his report describes the analyses that he attempted to make.

Dr. Florence never states that the estimates in his report represent his opinion about Grace's liabilities for asbestos bodily injury claims, only that "ARPC (his company) estimated the Grace ... liability under the specified assumptions"  (Florence Report, p.  3).  Dr. Florence contrasts the estimates of his report ("ARPC has now been asked to estimate the Grace ... liability under a specific set of assumptions", Ibid, p. 2) with his four prior forecasts for Grace (and his forecasts for all other clients) that were "based solely on Grace's tort system experience" (Ibid).

Dr. Florence was well-advised in refusing endorsement of the liability assumptions that Grace required him to use ("that only claimants who claims met the following criteria [Grace's hypothetical new liability rules] would be able to sustain their burden of proof that their claims against Grace are valid", Ibid).  Grace's hypothetical new rules are wholly inconsistent with how Grace and other asbestos defendants resolve claims within the U. S. system of civil justice (Sections 2.1-2.4, below) and with the laws that determine those results (Section 2.3), and would radically change the respective legal rights of Grace and claimants (Section 2.2).

In reviewing claims information for 2,765 claims that Grace had previously resolved, Dr. Florence found that Grace would now use its new rules to reject 2,341 claims that it had settled with payment.  Radically, Grace would reverse its own decisions in 92 percent of these claims that it closed with payment.  The artificiality of Grace's new rules is demonstrated further by looking at the details for four of these claims that Grace now says are valueless but which it actually settled for over $2 million (Sections 2.2 and 2.4).  Each of these and many more asbestos claims that Grace now calls valueless under its new rules are strong, well-founded, clearly valuable claims that Grace could have rejected only at the risk of suffering catastrophic verdicts in each case.

In short, Grace's re-evaluations, which Dr. Florence was required to accept, are unrealistic.  Grace could not have afforded to disregard these claims in the past, as it now asserts the Court should do, and Grace could not afford to face trial now in these cases.

Dr. Anderson, Grace's expert epidemiologist, justifies Grace's new rules based on an assumption that Grace should not have to pay any claim unless the claimant can show that he or she would have suffered his/her injuries solely from exposure to Grace's asbestos containing products.  This is neither the law nor how Grace or any other asbestos defendant actually reaches decisions about settling or trying asbestos claims (Section 2.3).  Dr. Anderson's analyses and Grace's new rules are wholly inconsistent with how U. S. courts have for over 30 years addressed the joint facts that (1) asbestos claimants are almost invariably exposed to many different asbestos products by many different companies and that (2) each of these exposures contributes to a claimant's cumulative exposures that caused his dose-responsive asbestos-related diseases (Ibid).  Through these new

rules, Dr. Anderson and Grace would overturn the "cause in fact" rules that the Fifth Circuit devised to deal with the complexities of asbestos exposures and causation in the 1973 *Borel v. Fibreboard* decision and that became and remains the universally accepted basis for addressing asbestos claims.

Grace's rules and Dr. Anderson's and Dr. Florence's analyses suffer other fundamental problems that I discuss in Section 2.3. Both Grace's rules and its "nature of exposure" categories are so poorly articulated that they cannot be applied consistently or accurately by Grace's coders, or subjected to meaningful scientific discussion, or used as the bases for decisions that would affirm or deny the rights of hundreds of thousands of asbestos victims.

These problems with Grace's rules, but even more the novelty of those rules, have profound implications for the estimates that Dr. Florence provides of Grace's liability under the "specified assumptions" that Grace required of Dr. Florence. The core of the problem is simple: neither Grace nor any other defendant has ever required asbestos claimants to satisfy the new rules that Grace has just announced. So asbestos claimants have had no reason to and have not in fact provided Grace with information about whether or not they might satisfy those rules. Indeed, no Grace claimant was even aware of these then-unheard-of rules when they were actively litigating, negotiating, or resolving their claims with Grace before its petition date. As a result, few if any claimants had prepared evidence responsive to these unknowable rules, and no claimant with a pending or closed claim has prepared such information since Grace's petition date because that petition triggered an automatic stay of all proceedings, including discovery, in the pending cases. This leaves Dr. Florence with *no* empirical data for his forecasts and the inability to use standard methods to forecast Grace's liability under its artificial new rules.

Grace and Dr. Florence and Grace's other expert witnesses tried to meet their lack of data by creating new data (Sections 1.1, 1.2 and 3). From these, Dr. Florence and Grace improperly concluded that the large majority both of pending claimants and of the claims Grace paid before its bankruptcy would not have claims valid under Grace's new rules because they have not yet provided (or, for closed claims, Grace's files do not contain) evidence to satisfy those rules. This is shockingly unfair. It is illogical and inaccurate. Even though Grace and Dr. Florence undertook ambitious and expensive efforts to obtain and then review detailed information for pending and closed claims, they can have no reasonable expectation that these claims materials would address Grace's unknown, hypothetical rules. Worse, Dr. Florence cannot infer from whatever limitations he and other experts may find in information now available for past and pending claims that claimants would fail to qualify under Grace's new rules, simply because they have not yet provided Grace with information to satisfy these newly announced rules--rules that are still not required. If the rules were somehow required by courts, claimants could then supply additional evidence necessary to satisfy the rules (and they would be able to challenge Grace's interpretation of that evidence). Some claimants would and some would not meet Grace's standards, but this observation is not the basis for a quantitative forecast by Dr. Florence.

Yet, Dr. Florence and Grace ignore these obvious facts. In effect, Grace and Dr. Florence have decided that the vast majority of asbestos claimants do not have valid claims against Grace because they have not yet complied (or did not comply in the past) with rules that were never required of them, rules that they never heard about when they were able to prepare their evidence prior to the bankruptcy stay.

Grace made Dr. Florence's problems worse and its own position still more questionable by withholding from Dr. Florence information that it had and that he needed for his analysis of previously resolved claims. Having reached his conclusions that under Grace's rules only a small percentage of claims against Grace would pass muster, Dr. Florence still had to estimate how much Grace would pay to settle the few claims that it would acknowledge as valid under its new

rules.  Dr. Florence made the implausible assumption that he could derive those values from past settlements that Grace had reached with claimants who by happenstance satisfied the requirements of which they were totally unaware.  For this analysis, he looked to the information in Grace's files concerning a sample of 2,765 closed claims.  This process is fundamentally flawed.  For the same reasons that Dr. Florence could not reasonably determine the number of pending claimants who would qualify under Grace's rules by considering only the evidence that they had assembled to meet wholly different standards of liability, Dr. Florence could not do so for these closed claims that were prepared, negotiated, and resolved under the actual rules of the U. S. tort system, not Grace's self-invented criteria.  Moreover, for the same reason again, the amounts that Grace had been able to pay to settle claims under actual tort law standards in no way represents the cost that Grace would incur to settle claims meeting the far more demanding criteria that Grace has instructed Dr. Florence to apply.

But Grace sabotaged even Dr. Florence's flawed methodology first by providing him with only part of the information that it could have obtained for each sampled closed claim and then by claiming privileges and withholding from its own expert information that he needed for his review of closed claims.  By screening and editing claims information that it gave to Dr. Florence, Grace turned his independent, if misguided, research effort into one in which Grace was able to determine the conclusions that Dr. Florence and his coders made about claims.  There may or may not be validity to the privilege assertions that Grace made here, assertions made not to protect documents in discovery but rather to keep information from its own expert who was conducting an empirical study that Grace instructed him to make.  But whether or not legitimate, Grace's exercises of privilege fatally undermined Dr. Florence's analysis by withholding from him evidence that might have shown claims to be valid under its rules and then expecting him to decide that claims were invalid because they did not have evidence required by its rules.

In the end Grace was left with virtually no information to use in estimating the values of pending and future claims that might be compensable under Grace's rules (Section 4).  Dr. Florence determined the value of every pending and future mesothelioma claim based on only 21 out of the 3,000 plus settlements that Grace made with mesothelioma claimants.  It is even worse for claimants with other diseases.  Values for every pending and future lung cancer, other cancer, impaired asbestosis, severe asbestosis, and other nonmalignant claim were based on Grace's settlements among only 7 lung cancer claims.

This does not satisfy the requirements of credible research.  Dr. Florence had ample settlement data.  Grace had settled 157,084 asbestos injury claims.  Yet, because of his approach and Grace's sabotage of that approach, Dr. Florence used only 28 past settlements to value all pending and future claims for which Grace would be liable.  He cannot make a stable or reliable forecast on such a trivial foundation of settlement values.  This is demonstrated by adding to his 28 settlements just 4 more past settlements of claims which had clear evidence of substantial exposure to Grace asbestos--the two mesothelioma and two lung cancer claims that I examine in Sections 2.2 and 2.4 of this report.  The addition of just 4 more settlements almost doubles Dr. Florence's forecast, from $700 million to almost $1.4 billion.

# 1. Summary of Dr. Florence's "Estimation" for W.R. Grace

This Rebuttal Report responds to reports submitted by the Debtors' experts regarding estimation of the Debtors' liability for asbestos bodily injury claims, primarily the report by Dr. B. Thomas Florence (the "Florence Report" or the "ARPC Report"),[1] but also to a series of reports submitted by Dr. Elizabeth L. Anderson,[2] and the report submitted by Dr. Frederick C. Dunbar (the "Dunbar Report" or the "NERA Report"),[3] and to other submitted reports as well.  While these reports discuss some issues related to Grace's current liability for asbestos claims, none provides an estimate of that liability.

## 1.1. What Dr. Florence Did

### 1.1.1. Dr. Florence Accepted Highly Unusual Instructions from Grace

Dr. Florence is an expert with substantial experience in forecasting asbestos liabilities.  Many times he has provided courts with his opinions about the asbestos liability of various defendant-debtors, always basing his opinions on past resolutions, settlements, and verdicts of the defendant as they were reached under the legal rules and processes of actual tort litigation.  In other engagements within the past several years in which both Dr. Florence and I have testified to a court about a company's asbestos liabilities (e.g.  Armstrong, Babcock and Wilcox) his estimates were based on the same general methodology that I follow in this case--the liability estimate is based on the particular debtor company's past claims filing and settlement resolution history in the tort system.

In four engagements between 1995 and 2000, Dr. Florence and his company (ARPC) provided Grace with expert opinions about the magnitude of its asbestos liability, each time based on Grace's past resolutions, settlements and verdicts of the defendant: "As with all of ARPC's pre-petition estimates on behalf of Grace, this [December 2000] estimate was based solely on Grace's tort system experience" (Florence Report, p. 2).

But in this case Dr. Florence does not provide such an estimate of the aggregate values of asbestos claims against Grace based on its liability within the tort system.  That is because Dr. Florence's client, Grace, instructed him not to estimate how much Grace would have to pay to resolve asbestos law suits and claims under the tort laws and procedures that actually obtain in this country.  Rather, Grace instructed Dr.  Florence to estimate what Grace would have to pay to pending and future asbestos claimants if allowance of their claims were determined in a very different liability system using an entire set of rules newly invented by Grace that are not actual rules of the tort system that Grace, like all similar companies, would have had to face had it remained out of bankruptcy.  Grace's new liability system would impose onerous "exposure criteria," medical "causation criteria," and evidentiary restrictions that correspond neither to the prevailing rules in most American courts, nor to what Grace or any other defendant has ever required in settling asbestos claims (Sections 2.3 and 2.4), that are beyond requirements of what plaintiffs need to show in asbestos litigation (Section 2.3), and that are intended to greatly reduce Grace's asbestos liability costs (Section 2.1).

---

1.    "Estimation of the Number and Value of Pending and Future Asbestos-Related Personal Injury Claims:  W.R. Grace," by B. Thomas Florence, Ph.D., ARPC, June 18, 2007.

2.    Report by: Elizabeth L. Anderson, October 3, 2006 (the "Anderson Report"); Supplemental Report Elizabeth L. Anderson, June 11, 2007 (the "Anderson Supplement"), 2nd Supplemental Report and Rebuttal, Elizabeth L. Anderson, July 31, 2007 (the "Anderson 2nd Supplement")

3.    Report of Frederick C. Dunbar, June 18, 2007.

To his credit, Dr. Florence acknowledges the novelty of Grace's instructions:  After stating that all of his previous estimates for Grace were ''based solely on Grace's tort system experience'' Dr. Florence notes that he ''has now been asked to estimate the Grace ... liability under a specific set of assumptions,'' i.e. that asbestos claimants must meet all of Grace's new rules ''to sustain their burden of proof that their claims against Grace are valid'' (Ibid).

Dr. Florence accepted his client's unusual instructions and limitations.  His acceptance, in turn, forced him to change how he forecasts asbestos liability, to use in this case a methodology he has never before used, that has no validity for estimating what Grace's liability would be had it remained in tort litigation instead of filing for Chapter 11 protection, and that does not provide a plausible estimate of what Grace's liability would be if its rules were to determine the validity of claims.

### 1.1.2. To Comply with Grace's Instructions Dr. Florence Abandoned Standard Estimation Methods

No one has ever used Grace's newly invented rules, not in court, not in settlement, not in asbestos trusts set up following bankruptcy.  Grace has never imposed the rules nor have other asbestos defendants.  Plaintiffs have therefore never had any reason to develop or submit evidence to comply with these inapplicable rules.  Plaintiffs and Grace have never negotiated the values of settlements in cases where a plaintiff was required to and did satisfy Grace's exacting new rules (settlements that would have been far higher than Grace's past settlements in tort, because the plaintiffs would have met the much more demanding requirements that Grace has promulgated).  This means that quite apart from the unrealism of the Grace-invented criteria that he was require to assume, Dr. Florence has *no empirical data, no information about how asbestos claims would be submitted, evaluated, or paid in a hypothetical system* where Grace's rules were required.

To comply with Grace's instructions that he use its new rules, Dr. Florence had to abandon his (and all other recognized experts') standard forecasting methods in which he would analyze and extrapolate from a defendant's historic data of claim filings and resolutions.  Dr. Florence can get no such historical data for what litigation and settlement would be under Grace's hypothetical new liability system.  There never has been any.[4]

Because standard forecasting methods were unavailable to Dr. Florence, he and Grace's counsel instead designed a device to simulate how Grace's newly invented liability system might operate.  This exercise has several steps:

- First, they tried to fashion a way to gather data about what evidence pending claimants might have presented to satisfy Grace's rules, if those rules had been required.  Grace's PIQ form was used to get such data.

- Second, since neither Grace nor any other defendant had ever resolved claims on the bases of Grace's new rules, Dr. Florence had to simulate what these resolutions might be.  Dr. Florence and Grace hired coders to go through the PIQs for pending claims one at a time ''determining which claims would meet these criteria,'' deciding which claims would be accepted by Grace in its new liability system and which it would not accept (Ibid)  This process, in addition to other defects, assumed that claimants would never have an opportunity to challenge the coders' conclusions or gather or submit additional evidence.

--------------------

4.    Dr. Florence acknowledged that he lacked data needed to forecast liabilities within Grace's new liability system: ''In a typical asbestos bankruptcy estimation, the information necessary for determining which claims would meet these (i.e., Grace's) criteria would not be available'' (Florence Report, p. 2).

- Third, Dr. Florence still had no information about how much accepted claims might be worth. Neither Grace nor plaintiffs had never placed values on claims that had been required to and had in fact met Grace's exacting new rules. So, to simulate values in Grace's new liability system, Dr. Florence repeated the coder review process that he used for pending claims this time for a sample of 2,765 closed claims. Grace provided Dr. Florence with partial materials from files for each of these claims that had been resolved on the basis of laws that plaintiffs and Grace faced in the actual tort system, not on the basis of Grace's new, defendant-favorable rules that it invented for this proceeding. The same coders who reviewed pending claims for "determining which claims would meet these (new Grace) criteria," now reviewed whatever information Grace gave them for the closed claims, deciding in each review which of those claims would have been acceptable, had they been resolved under Grace's new rules.

The revisionist decisions that coders made about the acceptability of closed claims, had they been governed by Grace's new bankruptcy-proposed rules, had no actual impact on the closed claims, which had been settled and (mostly) paid before Grace sought Chapter 11 protection. But they did serve as the basis for Dr. Florence's calculations here. Dr. Florence used the amounts of Grace's past settlements in closed claims that his coders had found acceptable as his simulated values for Grace's new liability system. Dr. Florence assumed that Grace could pay pending (and future) claimants qualifying under its new rules the same settlement amounts that Grace had paid in the past to claimants who happened to have claims information satisfying Grace's subsequent rules, even though these past claims had not been evaluated and settled on the basis of satisfying Grace's new rules.

- Fourth, Dr. Florence based his forecast of the number of future claims on his coders' decisions about the acceptability of pending claims. He winnows down the number of claims that are actually pending or have been closed by Grace to only those his coders say would be approved by Grace under its rules for its new liability system. He then simulates that future claims would be approved or disapproved at the same rates as his coders found for pending claims.

## 1.2. Problems with Dr. Florence's Simulation Exercise

Dr. Florence's simulation contains a series of fatal flaws. Each flaw is so significant that it renders Dr. Florence's estimate meaningless as a forecast of Grace's asbestos liability. Taken together these flaws are devastating. Dr. Florence simply could not make a valid estimate of Grace's asbestos liability given that he acquiesced to Grace's instruction that he forecast its liability within Grace's new liability system. But even if Grace's new rules were appropriate bases for estimating asbestos personal injury liability, and even if Dr. Florence's simulation were accepted as an estimation in this case of the *number* of claims Grace would settle in the years after its Chapter 11 petition, Dr. Florence still has no data about the values of claims in Grace's unprecedented system that would permit meaningful estimates of Grace's liabilities.

### 1.2.1. Dr. Florence Does Not Provide an Expert Opinion about Grace's Asbestos Liabilities

Dr. Florence's simulation exercise and report comply with Grace's instructions to limit what he does. His only opinions, summarized in the brief "Opinion" section (2.0) of his report, are his estimates of Grace's asbestos liability based on simulation of Grace's proposed new liability system, estimates of the values of "pending claims that met [Grace's new] evidentiary criteria" and "future claims that would meet the evidentiary criteria" (Ibid, p 3). Dr. Florence does not provide an opinion of Grace's liability based on his standard approach to estimation, based on its likely experience in the actual tort system, or on any other realistic basis.

But Dr. Florence never states that his simulation results represent *his expert opinion* about what

Grace's liability would actually be for asbestos claims, as opposed to calculations that his client, Grace, told him to run to estimate its liabilities under the hypothetical liability system that Grace told him to assume would govern claim validity. Dr. Florence never states that in his expert opinion Grace's rules are in fact the correct basis for determining whether individual claims would have been paid had Grace stayed out of bankruptcy nor what such claims would be valued were this court to somehow manage the impossible task of conducting individual allowance proceedings for the claims as would be required under the Bankruptcy Code. He never states that Grace's rules, which would allow very few claims (only 6 percent of pending claims, only 8 percent of the closed claims that Grace had actually paid before bankruptcy), provide better estimates of Grace's liability than Grace's own past resolutions.

Indeed, in his report, Dr. Florence never states that he accepts the premises of the calculations he was instructed to perform for Grace: that asbestos claims would be allowed only if a claimant complies with Grace's new rules. Rather, he carefully characterizes Grace's new rules as premises for the expert opinions that he reports, premises that are separate from and not a part of his expert opinion. Because Dr. Florence never accepts as an expert that Grace's rules provide the basis for valuing his claims, his calculations based on those rules do not represent his expert opinion about the value of asbestos claims against Grace. As Dr. Florence has carefully distinguished, his report for Grace does not provide an estimate of Grace's liability based on "Grace's tort system experience" (Ibid, p. 2), which courts have always recognized as the basis for valuing asbestos personal injury claims made against a debtor defendant.

### 1.2.2. Dr. Florence Evaluates an Unrealistic Liability System

The utility of Dr. Florence's simulation exercise depends in several ways upon Grace's new rules:

- Are Grace's new rules appropriate bases for determining compensability and values of asbestos claims in the real world?

- Is the wording of Grace's new rules definite and clear so that claimants, lawyers, Dr. Florence's coders, and the Court will all have the same understanding of what the rules mean?

- Have Dr. Florence's coders applied the rules properly in deciding to accept or reject claims?

- Are Dr. Florence's values that he uses for the claims he found compensable under Grace's rules realistic values?

The answer to each of these questions is **No**.

The new Grace rules that Dr. Florence was required to use in his forecasts are greatly different from how Grace and other asbestos defendants resolve and value asbestos claims within the actual tort litigation system that determines the values of asbestos bodily injury claims (Section 2.1).

Moreover, Grace's new rules are so critically indefinite and uncertain that neither Dr. Florence nor the Court can know what the rules of Grace's new liability system are (Section 2.3.). Dr. Florence's coders do not seem to know either (Sections 2.2 and 2.4). Particularly in their coding of Grace's "minimum exposure criteria," where only 14 percent of the claims qualify, Dr. Florence's coders take an extremely narrow reading of the rule's requirement that workers have "personally installed" a Grace asbestos-containing product.[5] In this context "installed" is a poorly chosen, indefinite term that does not describe the varied ways in which claimants worked with the hundreds of different Grace asbestos-containing products. "Installed" is not a term used ordinarily to describe workers' usage of many of those products.[6]

---

5.    Grace's "minimum exposure criteria" would require that a claimant must have been exposed to one of its asbestos-containing products as a worker who either "personally mixed" or "personally installed" such products, (Florence Report, p. 2).

Common usage is that someone installs block insulation or installs a floor, but common usage is not that someone installs paint or installs cement or installs plaster or installs mastic or installs spray-on fireproofing--all types of Grace asbestos-containing products. Grace chose a word that has a misleadingly narrow usage, that does not describe all of the uses of its products, and then never explained that it intended the word to have a wider meaning that should apply to any of its products. Perhaps for this reason, Dr. Florence's coders found, for example, that plasterers who placed Grace asbestos-containing cementatious products on surfaces by hand or through spraying had *not installed* such products (Section 2.2.2).

In looking at Dr. Florence's simulation exercise, each of these problems--wrong rules, bad wording, bad coding--fade into each other. A decision to reject the claim of a plasterer who had a lifetime of spraying and troweling Grace asbestos-containing products for having failed Grace's ''minimum exposure criteria'' is a wrong decision that can be attributed to each of (1) coders' misapplication of Grace's rule and to (2) Grace's misleading choice of the word ''installed'' and to (3) Grace's failure to explain to its coders (and to claimants, lawyers and the Court) what it meant by the word ''installed'' and to (4) a wrong rule that does not represent how Grace and other defendants and courts had made decisions about exposures in resolving asbestos claims (Section 2.2.2). It does not make any difference where we place the blame. What is important is that decisions by Dr. Florence's coders to accept or reject claims based on Grace's new rules are radically different from Grace's actual decisions in settling the very same claims (Section 2.1) and with how claims are resolved within the actual system of tort litigation in this country (Section 2.3).

### 1.2.3. Dr. Florence Does Not Have the Data to Evaluate Grace's New Liability System

Dr. Florence did not have data that he needed to simulate Grace's new liability system. His simulation of the claims that would be paid in that system depended on his coders' decisions about information that they had for claims pending and closed as of Grace's April 2, 2001 petition date. Dr. Florence's information for all of claims is incomplete for several reasons.

### 1.2.3.1. Neither Plaintiffs Nor Grace Ever Developed Information to Address Grace's New Rules

Because Grace's new rules have never been required or used in its asbestos litigation, both pending and already closed claims will inevitably lack the very claims information that Dr. Florence needed to examine realistically whether or not those claims might satisfy Grace's rules. Even accepting the grossly unrealistic notion that Grace's rules would have governed its liability had it not filed for Chapter 11 protection, Dr. Florence's attempt to determine sufficiency of claimants' evidence under those rules cannot surmount the unavoidable problem that Grace and plaintiffs had never used Grace's newly invented rules to resolve asbestos claims. Plaintiffs had never needed to provide, and Grace had never sought, the information that Dr. Florence had to have to see whether or not plaintiffs would have met requirements of Grace's new rules. These

---

6.    The word ''install'' is an uncommon term to describe a claimant's direct use of many of Grace's products. It implies a mechanical use: the most closely relevant definition in my Merriam Webster's Collegiate Dictionary is ''to set up for use or service <had an exhaust fan installed in the kitchen>.'' It is not an expected or natural term for describing use of asbestos-containing sprays, plasters, mastics, cements, coatings or many of the other products to which claimants might have been exposed. The point of questionnaire construction is to use terms in a conventional manner so that respondents can understand what the questionnaire intends and provide the most accurate information in their answers. Here Grace did not use an expected and broadly applicable term, ''personally used,'' which would have led to more informed and accurate answers to Grace's PIQ, to more appropriate decisions by Dr. Florence's coders, and likely to decisions that far more claims would be compensable under Grace's rules.

novel rules did not even exist and were not known when plaintiffs and Grace were still preparing and resolving claims before April 2, 2001. And then after that day, Grace and plaintiffs no longer prepared or resolved the claims.

Some information pertaining to Grace's new rules may be available for some claims by happenstance, but there is no reason to expect that plaintiffs would have needlessly provided all evidence that they could provide pertaining to rules that had never been required and never known. Since claimants were never required to provide information which Grace only now asserts should be necessary to sustain a claim, there is simply no way of knowing how many could have met these standards had they ever been imposed, much less how many would have gathered information to meet those standards had the automatic bankruptcy stay not eliminated both discovery as well as any economic reason to continue development of the claims.

*Properly*, Dr. Florence's analysis of pending claims is a one-way test for claims, at best a measure of the absolute minimum number of claims that would be compensable under Grace's new rules. If Dr. Florence's coders find that the information available for a claim is sufficient under Grace's rules, Dr. Florence's analysis would have to give that claim value. But if information available now for the claim does not satisfy Grace's new rules, Dr. Florence *cannot properly* say that the claim would not be compensated under those rules. Dr. Florence cannot rule out that claimant might later provide information that meets Grace's rules were he ever required to meet those rules. But so far no claimant has ever needed to develop the special information related to Grace's new rules that Dr. Florence was looking for, and many claimants would not yet have obtained information relevant to those rules. And, of course, the automatic stay has prevented discovery against Grace to produce the exposure evidence its new rules would require.

This means that Dr. Florence cannot reasonably infer that *any* pending claim should be treated as invalid on the basis of information in the PIQ responses for the simple reason that Dr. Florence cannot know whether or not the claimant would provide special information required for Graces' rules should these rules ever be required. Of course, since Grace's rules do not reflect the actual requirements for sustaining claims, even now claimants have no requirement or reason to gather and provide information that Grace says is needed for a claim to be valid.

Because he can only say "Yes, a claim qualifies" and cannot say "No, a claim does not qualify," Dr. Florence cannot make use of any of the information that Grace has received from pending claimants in order to simulate the number of pending (or closed claims for that matter) that would qualify for compensation under Grace's rules. There is simply no way to know whether claims that do not now meet Grace's rules might do so. How many of these would come to meet the rules, if those rules were ever really required? Even if Grace's rules were to be the basis for approving claims in this bankruptcy, Dr. Florence cannot and has not estimated Grace's liability under those rules, because he cannot determine that *any* pending (or closed) claim is valueless under Grace's rules, even those with no current evidence that would satisfy those rules.

But this is precisely what Dr. Florence offers as the basis for his "estimate" of Grace's liability in its hypothetical new liability system. For purposes of his estimation, Dr. Florence *improperly treats as invalid* all of the claims that his coders found as not satisfying Grace's newly invented rules. Dr. Florence ignores the three facts that kill his analysis: (1) that claims have never been required to satisfy Grace's new rules, (2) that some claims would satisfy those rules if required, and (3) that he cannot know how many claimants would so supplement the evidentiary basis for their claims.

Similarly, Dr. Florence made a bootless effort to determine whether or not Grace's closed claims would have been compensable under Grace's new rules. Clearly Grace and asbestos plaintiffs have never negotiated the values of any claim based on the plaintiff having satisfied Grace's exacting new rules, rules which had not even been articulated when the claims were settled.

Because Grace and plaintiffs had never even considered Grace's then-nonexistent rules, their past resolutions have nothing to say about Grace's new rules. Information in some closed claims files might satisfy Grace's new rules, but plaintiffs and Grace did not negotiate their settlements on the basis of the plaintiff having satisfied rules that did not exist and were unknown, and they had no reason to present evidence satisfying the rules.

Centrally important to understanding flaws in Dr. Florence's analysis, the settlement amounts for any of these ''approved'' closed cases, resolved without reference to Grace's new rules, provide absolutely no information about the greater amounts that Grace would have had to pay, had it announced, required, and then actually resolved a claim that met the onerous rules that Grace only now proposes. This leaves Dr. Florence with no basis for valuing the individual pending and future claims that his coders decided to treat as valid.

### 1.2.3.2. Grace's Bankruptcy Stay Left Pending Claims Information Incomplete

Dr. Florence's information about pending claims is incomplete for a second reason. Entry of the litigation stay in this bankruptcy left claims files in plaintiffs' counsel offices incomplete. Litigation was stayed. Discovery stopped. Progress toward trial was frozen. And plaintiffs and their lawyers lost all economic incentives to continue even that limited part of the preparation of their cases against Grace that was not blocked by the automatic stay. Because their preparations were halted before many claimants had developed information that they would eventually submit to Grace in the course of ordinary litigation, many claimants will not yet have information that would normally have supported those claims against Grace in asbestos litigation under any standard, much less Grace's (Section 3).

But Dr. Florence's simulation needed even more information than claimants would have had even if they were fully prepared for trial--the special information that Grace's new rules would require, over and above the claims information that had been the basis of Grace's settlements in the past. Claimants have never been subject to Grace's rules, but even if they had been, because of the stay, claimants and their lawyers were prevented from gathering much of the information that Dr. Florence's simulation needed, and they had no incentive to gather the rest. So, again, Dr. Florence cannot properly reject pending claims as valueless, because they lack information that they cannot develop and have no incentive to develop now while the stay is in place. Claimants and their lawyers would return to developing additional support for their claims only after the stay is lifted and once they have some economic reason to incur the time and expense for such development.

If claimants were then required to respond to Grace's new rules after the stay is lifted, an unknowable number of pending claimants would develop the information required by those rules. No doubt some would not be able (or even try) to develop the evidentiary case necessary to induce a settlement under Grace's rules, but many would. What is crucial for understanding the impossibility of Grace's mandate to Dr. Florence is that it is impossible for him to know how many would claims fall on which side of the ledger. He can know only that some unknowable

---

7.    Dr. Florence never addresses this missing data problem adequately. He asked his coders to identify claims that had data sufficient for reviewing their consistency with Grace's new rules, but coders would not know if they had all pertinent information, and their codes were haphazard. Dr. Florence uses these codes to calculate rates of complying with Grace's new rules across all claims and only across those that ''had data.'' But these analyses are not meaningful because coders could not tell him how adequate the information was for any claim: did coders have all evidence that might support the claim under Grace's rules? Ultimately Dr. Florence reduces his forecasts of Grace's liability significantly because claimants' files did not include information pertaining to Grace's rules that they were never required to provide and did not know they would need to provide.

number would succeed and some would fail.[7]

### 1.2.3.3. Grace Failed to Provide Information on Closed Claims

Even if one were to accept the two wholly invalid ideas that Grace's criteria should determine what pending claims were valid and that Dr. Florence could then count the number of claims that would be valid under those rules, Dr. Florence still had to determine how much Grace would have to pay in settlements or verdicts to settle claims that it validated.  His chosen method for determining these values and his entire simulation effort depended upon yet one more impossibility: his ability to determine which closed claims in his 2,765 sample would have been compensable under Grace's new rules.  These determinations for closed claims were integral to Dr. Florence's plan for establishing the values of claims in his simulation.  Without those values, he could not simulate Grace's liability in its new litigation system.

To even begin this next step of simulating claims' validity, Dr. Florence needed complete claims information for his sample of closed Grace which his coders could then review to reach decisions about whether or not Grace's previously resolved claims would be payable under Grace's rules.  Dr. Florence's ability to satisfy Grace's instructions to base his forecast on Grace's new liability system depended on getting this complete information for his sample of closed claims (just as it depended on getting complete information for pending claims, which he could not get).

Ironically Grace made this impossible by denying Dr. Florence the complete information that he needed, thereby preventing Dr. Florence from being able to make the very forecast that it instructed him to make.  Grace gave Dr. Florence only limited and partial information for the closed claims in his sample (Section 3.3).[8] Closed claim files that Grace gave to Dr. Florence sometimes had few if any documents about the facts of the claim: for example materials provided by Grace for the Donald Halpain case--a $2 million mesothelioma claim, the largest value among sampled claims--contained only a pathology report, 102 other pages of pleadings, motions or other legal documents that did not address the facts of the cases, and 9 pages listing documents withheld under claims of privilege (including a deposition transcript).[9] Files provided by Grace were missing documents that had been identified and referenced in other materials that Grace had provided, including missing documents that would have been critical to coders' allowance decisions (Section 3.3).  Grace asserted privileges and withheld from its own expert, Dr. Florence, documents about these resolved claims that his coders needed for their allowance decisions, documents that Dr. Florence had to have in order to provide the forecast that Grace instructed him to make (Section 3.3).

By keeping from Dr. Florence documents that were necessary for his allowance decisions, Grace left Dr. Florence with only partial and therefore useless information to decide which closed claims would have met requirements of Grace's new rules.  Grace prevented Dr. Florence from implementing the method that he chose for deriving values in Grace's new liability system, an essential step in Dr. Florence's forecast.  Dr. Florence has no basis for estimating values of pending and future claims that he had found acceptable under Grace's rules.  Grace sabotaged Dr. Florence entire "estimation" exercise.

Grace could not have eliminated this problem of incomplete information even if it had not withheld documents under assertions of privilege and if it had retrieved claims documents from law firms that defended and resolved the closed claims.  All of the other sources of

---

8.     Dr. Florence concluded that Grace's historic database could not help his coders decide whether or not closed claims would satisfy Grace's rules (Ibid, p. 2).

9.     This information is derived from file 408478.pdf, included in the closed-claim sample images of ARPC's back-up cdrom.

extraordinarily defendant-favoring requirements.  After succeeding to meet these strict rules, plaintiffs would not have settled for as little as the amounts they had actually received in settlement when basing their claims on the tort rules that truly applied to Grace's claims.  But had these plaintiffs needed to and then met the stringent and biased rules that Grace now proposes, plaintiffs would then have demanded and settled their claims at much greater values, reflecting the greater risks that their claims demonstrated to Grace, greater risks that Grace would have overtly acknowledged.

According to Dr. Florence's own analyses, Grace's new rules would have been far more demanding than the bases Grace actually used in resolving the claims in the closed claims sample. Dr. Florence concluded that few closed claims in his sample would have met Grace's new rules (Section 2.1).  Dr. Florence recognized that claimants who would meet Grace's stringent rules would settle for higher settlement values (Florence Report, pp. 15-16).  Dr. Florence cannot know how much more plaintiffs would have demanded and received in settlement if they had been explicitly required and then met Grace's onerous rules.  But there is no plausibility to his assumption that these allowed claimants, those who meet Grace's new rules, would have settled for as little as they had received without having to qualify under Grace's demanding new rules.

Dr. Florence's assumptions about claim values are conceptually inadequate; settlement values among claims closed before Grace's new rules would not represent how claims would settle if Grace had been able to impose its new rules.

## 1.2.4.2. Just 28 Claims Are the Basis of Dr. Florence's Settlement Values

All of the values that Dr. Florence assigns to pending and future claims are based on disappearingly small numbers of past Grace settlements.  Dr. Florence bases his entire estimate of Grace's asbestos liability on the values from just 28 prior Grace settlements, basing most settlement values on only 7 past lung cancer settlements.  Dr. Florence has a woefully inadequate empirical basis for his derived values.

Dr. Florence selects only 21 Grace settlements as his basis for the values of all mesothelioma claims that he forecasts, 21 settlements out of the 3,296 mesothelioma claims that Grace had actually settled.  Dr. Florence uses *only 7* past lung cancer settlements to calculate the values that he *applies to every other pending and future claim* in his forecast, i.e. those who allege a disease other than mesothelioma.  Ironically, because he found ''insufficient'' closed claim data for other cancer claims and for nonmalignant claims, Dr. Florence used his 7 lung cancer claims to derive values for those diseases, as well as for lung cancer claims (Ibid p. 15).  Values for 78,878 pending and future asbestos claims are based on 7 of Grace's past settlements out of the 153,788 claims that Grace had actually settled.

Given the large number of past Grace settlements, these 28 claims are a clearly inadequate basis for forecasting the values of pending and future Grace claims that Dr. Florence has accepted. Values based on so few prior settlements are incredibly unstable.  Dr. Florence's median liability estimate would have nearly doubled to $1.37 billion if he had simply added four more closed claims, two mesothelioma and two lung cancers, which his coders should have accepted (Section 4).  Even ignoring the other problems fatal to his forecast, Dr. Florence cannot base a credible forecast on 28 out of 157,084 past settled claims.

## 1.3. Summary Implications for Dr. Florence's Analysis and Report

Dr. Florence was forced to undertake a meaningless simulation exercise when he agreed to base his estimates of Grace's asbestos liability on its newly invented rules.  As Dr. Florence's own analyses show, Grace's new rules create a liability system radically divergent from how Grace and other asbestos defendants actually address and resolve asbestos claims.  Dr. Florence's coders decided that only 6 percent of the claims in his closed claims sample had provided evidence that

would satisfy Grace's new rules, in sharp contrast to Grace's actual settlements and payments to 85 percent of these same closed claims.  Dr. Florence based his estimate of Grace's asbestos liability on unheard-of rules and coders' use of these rules that would *change the results for 92 percent of claims that Grace had settled with payment in the past*.  Grace's rules are far more restrictive than what Grace and other defendants have used in settling claims in the actual asbestos liability system.  Grace's rules are also so indefinite that it is not clear which claims would be accepted  under those rules.  Faced with this indefiniteness, Dr. Florence's coders applied these rules to limit further claims that would be accepted under the rules.  The effect of these rules and Dr. Florence's application of these rules is to create a hypothetical liability system radically different from how plaintiffs, Grace, other defendants, and courts address asbestos claims.

Grace's new liability system is so different from its actual litigation history that the details of claims as they were actually prepared and resolved cannot be used to determine how those claims would be treated in Grace's new liability system.  Information about claims and how they are actually treated within asbestos litigation is useless to Dr. Florence in forecasting Grace's liability within its hypothetical new system, applying its artificial new rules.  Neither Grace nor plaintiffs ever prepared, evaluated, or settled claims within the novel rules of Grace's new system.  As a result, Grace's instruction to forecast its liability within its new liability system forced Dr. Florence into a series of inappropriate research measures to try to estimate what Grace's liability would be in the counter-factual world of Grace's rules:

- (1) Dr. Florence *did not have data that he needed about pending claimants who might provide evidence required by Grace's rules*, since (a) they never faced those requirements and (b) their claims were incomplete and (c) because Grace's own bankruptcy petition stopped claimants' development of their claims;

- (2) Dr. Florence *did not have data that he needed about Grace's settlement values for claimants who could provide evidence required by its rules*, since neither Grace nor any defendant had ever imposed those requirements;

- (3) Dr. Florence *did not have data that he needed about closed claimants who would have provided evidence required by Grace's rules*, since they had never faced those requirements;

- (4) Dr. Florence had *only incomplete information about closed claims*, because Grace denied Dr. Florence information that was actually in its files that he needed for his estimation; and as a result

- (5) Dr. Florence *based his entire estimate on the values of only 28 past Grace settlements* and *used only 7 past Grace settlements to value 93 percent of pending and future claims*.

Each of these five problems is so significant that, by itself, it prevents Dr. Florence from making a meaningful estimation of Grace's liability under its rules.  Dr. Florence simply could not make a credible forecast based on Grace's instructions that he not use standard forecasting methods, but instead use Grace's newly invented rules as the basis for his forecast.  Grace's instructions forced Dr. Florence into a cascading series of fundamental flaws, each of which is by itself fatal to his forecasting method.  Because Grace's rules have never been the basis for how courts address asbestos injury law suits or how Grace has resolved its asbestos claims or how claimants prepare and submit their claims, Dr. Florence had no empirical data that would allow him to answer questions that were basic to asbestos liability forecasting:

- How many pending claims would be accepted under Grace's new rules?

- How many resolved and settled claims would have been accepted under Grace's rules?

- How many future claims would be accepted under Grace's new rules?'

- What are the value of claims that satisfy Grace's rules?

All of the extraordinary data that claimants were required to provide to Grace in this case, all of the elaborate data collection and coding processes that Grace undertook, are inadequate for determining whether or not pending claimants or resolved claimants would be able to comply with Grace's newly invented rules, simply because no claimant has ever been required to provide the evidence required by those rules and the automatic stay prevented them from assembling it. Through its instructions, Grace forced Dr. Florence (and all others in this case) into an impossible forecasting exercise which it then compounded by withholding from Dr. Florence data about closed claims.  In the end, by its instructions and by withholding its closed claim data, Grace left Dr. Florence to use only 28 of Grace's past settlements to value all pending and future claims.

In the following sections, I document these problems one at a time.

## 2. Grace Changed the Rules

Both before its bankruptcy and now in bankruptcy Grace has complained about legal rules and processes that govern its asbestos litigation, claiming that the civil litigation system forced it to settle claims that it should not have had to pay. Grace says that it entered bankruptcy in an attempt to substitute its own rules for the laws and procedures of asbestos litigation that actually determined the rights and obligations of asbestos plaintiffs and Grace in their asbestos litigation. Now as part of this estimation proceeding, Grace's expert, Dr. Florence, has based his liability forecast on those rules.

The new rules that Grace instructed Dr. Florence to use are much different from the rules that Grace used to resolve claims before its bankruptcy and from the rules applied courts to measure liability in asbestos personal injury cases. Dr. Florence recognized this.[12] The stark differences between the decision about compensability of closed claims made by Grace's coders and Grace's actual decisions in settling or rejecting those claims also demonstrate how different Grace's new rules are. These differences are the whole point of Grace's proposal for basing its liability on the new rules that it preferred.

By comparing Grace's actual past resolutions of the 2,765 closed claims in Dr. Florence's sample to the decisions made by Dr. Florence's coders when they applied Grace's new rules to those same claims, we see in Section 2.1 how radically different Grace's new rules are. Grace had actually *paid settlements to 2,341* of these 2,765 closed claims (85 percent), but Dr. Florence's coders decided that *only 178* of these 2,765 closed claims would be accepted under Grace's new rules (6.4 percent). Grace required that expert, Dr. Florence, to estimate the total value of asbestos claims based on Grace's newly invented rules that would compensate only 7.6 percent of claims that Grace had actually paid before bankruptcy (178 / 2,341 = 7.6%).

In Section 2.2, I examine two of the many claims that Grace would now treat as having no value either through settlement or in a possible trial, mesothelioma claims in Dr. Florence's sample that had received very large settlements from Grace, but that Dr. Florence's coders now found to be unacceptable under Grace's new rules. Dr. Florence gave neither of these example mesothelioma claims value, because Grace's coders found that the claims information for each claim did not satisfy requirements of Grace's new "minimum exposure criteria" rule (Florence Report, p. 2).[13] Specifically, Dr. Florence's coders did not find evidence that any of the claimants had "mixed" or "installed" Grace asbestos-containing products, as Grace's new exposure rule requires. In fact both of these mesothelioma claimants offered proof of significant occupational exposure to asbestos and to Grace's asbestos-containing products.

The examples illustrate how deviant Grace's new exposure rules are. Each of these claims had obvious strengths that explain why Grace settled each for hundreds of thousands or millions of

---

12.   Dr. Florence pointed out that his forecast for Grace differed from his standard forecasts that are "based solely on Grace's tort system experience" (Florence pp. 1-2). He also noted that, for this reason, the values of pending claims that his coders decided to allow would be based on values for closed claims that would also be accepted under Grace's rules.

13.   Dr. Florence's determinations of value among these closed claims significantly affected his estimates of average values that he then applies to qualifying pending and future claims, but the determinations did not affect these closed claimants, who had already settled. Review of these closed claims is important because it demonstrates how different Grace's new rules are from how Grace actually addressed asbestos claims in the U.S. court system that is the standard basis for estimation of such claims in bankruptcy. Also, since Dr. Florence's coders and coding processes are the same both for pending and closed claims, the review of closed claims lets us know how coders were also addressing pending claims. Coders were inappropriately denying value to pending claims in the same ways that they were among closed claims.

dollars.  In contrast, Grace's novel exposure rule treats as worthless these very mesothelioma claims that had among the highest values in Dr. Florence's sample of closed mesothelioma claims.  Grace's instructions required Dr. Florence to ignore these settlements in calculating the values that he would apply in his forecasts, disregarding the high values that Grace actually placed on the claims and that reflected the high probability of big judgments if Grace did not settle, but took the claims to trial.  Dr. Florence's "estimation" is the product of this radical disregard of the actual values of these asbestos claims.

These examples illustrate also the inherent unworkability of Dr. Florence's estimation approach.  Files provided by Grace for each of these closed claims are woefully incomplete, missing critical documents that had been identified in materials that Grace had provided and missing other key documents that Grace withheld under claims of privilege.  More fundamentally, the files for some, perhaps many, claims will be missing information that could speak to Grace's new rules but that claimants had no reason to provide because Grace's rules were never an issue in litigating or settling the claims.  Dr. Florence can never determine how big this missing data problem is and he lacks any way to address the problem (Section 3.3, below).

In Section 2.3, I discuss why Grace's exposure rule deviates so grossly from the actual legal standards that apply.  Contrary to how Grace and other defendants actually settle asbestos claims, Grace's new exposure rules demand that an asbestos claimant show that *by itself* the claimant's exposure to Grace asbestos could have caused the claimant's asbestos disease, even though (1) almost all claimants were exposed to asbestos from many defendants' products, and (2) their asbestos diseases are *dose-responsive*, associated with their total exposure to asbestos from all sources, Grace's and otherwise.  Since the Fifth Circuit's 1973 *Borel* decision rejected arguments like Grace's sole-source exposure rule, defendants, like Grace, who contributed to a claimant's total asbestos exposure have in turn contributed settlements to the total compensation paid to the claimant (*Borel v. Fibreboard*, (493 F.2d 1076).[14] Grace's sole source rule is inapplicable to the facts in almost every case: claimants have been exposed to asbestos in products of many companies, not just those of Grace.  These exposures to other defendants' asbestos does not negate Grace bearing its share of the overall obligation to compensate an injured plaintiff.  Grace's rule is contrary to defendants' and courts' recognition that dose-responsive asbestos related diseases are related to the total dose of all asbestos to which claimants have been exposed and that causation cannot be attributed entirely to one or another source: instead each defendant who contributed substantially to the overall dose of asbestos is liable (*Borel v. Fibreboard*, Ibid.).

In Section 2.4, I turn to another new Grace "causation" rule that requires lung cancer claimants to provide medical evidence of a second asbestos disease (asbestosis) that has not been required in litigation or in settlements reached by Grace or other asbestos defendants.  I explain how Grace's lung cancer rule exceeds the requirements even in the new "medical criteria" statutes that have been recently adopted in several states.  Again, I provide examples showing how Grace's new lung cancer rules deviate from its past settlements, discussing two lung cancer claims that Grace had settled for high values, but that Dr. Florence's coders now reject for failing to meet

---

14.    As I also discuss in Section 2.3, defendants who caused only *de minimus* asbestos exposure to a claimant might avoid paying a settlement to the claimant.  Whether or not a given exposure is sufficiently substantial is usually a question of fact for the jury to determine and by no means requires a showing that a plaintiff's repeated exposure to a defendant's product was the primary or majority cause of his injuries.  Juries have found liability and appellate courts have affirmed judgments even where a defendant was found to have only a small portion of the overall responsibility for the plaintiff's injuries.  See, e.g. *Barnes v. Owens Corning*, 201 F.3d 815, 817 (6th Cir. 2000) (affirming liability allocations against Owens Corning of 5 percent in one case and 2 percent in another).  Certainly the sufficiency of exposure in a particular case is not a decision that a defendant gets to make unilaterally.

Grace's newly invented rules.

In this and the following sections, I discuss two separate reasons that Grace's deviant new rules render Dr. Florence's forecasts invalid.

– First, Dr. Florence's simulation exercise has nothing to do with how Grace itself valued the legal claims that asbestos bodily injury creditors have (or future claims will have) as evidenced by Grace's settlements of 153,788 such claims under state laws. At best, Dr. Florence's forecast would be a meaningless estimate based on a set of rules that are not the law, that have been recognized by no one, and that have never been used by Grace or anyone to determine the value of asbestos claims. I discuss this issue in this section.

– Second, even if one thought that somehow Grace could now persuade courts to apply its newly invented rules as the law that would apply to asbestos claims against it, Grace's reliance on such novel, untested rules still leaves Dr. Florence with no empirical data about how those rules would affect the number of asbestos claims or the values of claims that meet those objectives--both basic parameters of a liability forecast. Grace has never used the rules, never required that claimants meet the rules. Claimants have never tried to meet the rules, never needed to provide Grace with evidence that they could meet these previously unknown rules. Neither Grace nor claimants have ever determined the values of any claim based on their satisfaction of these rules. Because the rules have never been used and there is no record about how litigation under those rules would unfold, Dr. Florence's attempt to estimate numbers and values of claims that would satisfy those rules is imaginative speculation. This issue underlies my discussions in Sections 2.1 and 2.2 about Dr. Florence's analysis of pending claims and closed claims and in Section 3 about how Dr. Florence cannot get data adequate for his intended analysis.

## 2.1. Grace's Rules Disallow 92 Percent of the Claims that Grace Paid in the Past

The radical changes that Grace attempts with its new rules showed clearly when Dr. Florence applied Grace's rules to his sample of Grace's closed claims. Dr. Florence used closed claims to give him estimates of settlement values for pending and future claims that are accepted under Grace's rules. To calculate his settlement value parameters Dr. Florence needed to determine which of his sampled closed Grace claims would be allowable under Grace's new rules.

Dr. Florence followed his same simulation process for both closed and pending claims. Dr. Florence had his coders review whatever information Grace had assembled for individual claims in order to decide whether or not each claim would be accepted under Grace's new rules. Because the coders, rules, and review process were the same for both closed and pending claims, Dr. Florence's results for accepting closed claims informs us about his decisions for accepting pending claims as well.

Grace provided claims information for 2,765 closed claims in Dr. Florence's sample. Table 1 shows for each disease (1) the number of sampled claims within each disease, (2) the number of these sampled claims that Grace closed by reaching a settlement for value and (3) the number of sampled claims that Dr. Florence's coders decided would be paid based on Grace's new rules. Dr. Florence's results show that compensability under Grace's new rules deviates sharply from Grace's actual decisions about settling these claims. Grace had actually reached settlements with 2,341 of the 2,765 claimants in the sample (Table 1), 85 percent of the sampled closed claims (Table 2). In sharp contrast, Dr. Florence's coders accepted only 178 of the 2,765 claims based on Grace's newly invented rules (Table 1), only 6 percent of sampled closed claims (Table 2). Grace's new rules resulted in overwhelming rejections among the 2,341 of these claims that Grace had settled for value: among the 2,341 claims that Grace had resolved by agreeing to pay a

settlement, Grace's coders would accept only 175 under its new rules (3 of the claims that coders did accept had been rejected by Grace, closed without settlement).  Applying Grace's new rules, the coders decided to accept only 7.5 percent of the claims that Grace had actually settled for value (175 / 2,341 = 7.5%).  Stated the other way, when Grace resolved these same claims under the state laws that determine the values of the claims, Grace paid more than 13 times as many claims as its coders determined to be payable allow under its newly invented rules (2,341 / 175 = 13.4).[15]

As Tables 1 and 2 show, these deviations do not apply solely or even primarily to ''unimpaired'' or relatively less serious claims.  Grace would most radically change the rules and compensation for the most seriously injured, cancer claimants, not ''unimpaired'' claimants.  Grace's coders decided that 11 percent of nonmalignant claims previously settled by Grace would be payable under Grace's new rules.  In contrast, among cancer claims that Grace had previously settled, the coders found only 3.8 percent would be payable under Grace's new rules.   But for both types of claims, these hugely increased rejection rates highlight that Grace's rules do not resemble the actual standards by which its liability was measured in the past and would be measured in the future.  These high rejection rates are the product of Grace's wrong rules, bad articulation of those rules, the inadequacy of information that Grace provided for the closed claims and coders errors in assessing these claims.

**Table 1:** Number of Sampled Claims Accepted and Number Settled for Value

| Resolution Status | Meso | Lung | OthCan | Nonmal | Other | Total |
|---|---|---|---|---|---|---|
| Number in Sample | 352 | 395 | 206 | 1,550 | 262 | 2,765 |
| Settled by Grace | 325 | 376 | 192 | 1,350 | 98 | 2,341 |
| Accepted by Coders | 27 | 7 | 0 | 147 | 0 | 178 |

Source: Derived from ARPC supplemental data.

---

15.   As part of their review, Dr. Florence's coders assigned a variable indicating whether or not the claim had data that could be used to examine compliance with Grace's rules.  It is not clear what this variable indicates, since Dr. Florence provided no protocol or explanation for the variable, no indication about how coders were supposed to make this judgment. Moreover, codes for this variable seem haphazardly related to the information actually available in files.  Whatever this variable means, coders found that mesothelioma and lung cancers usually did not have data, only 33 percent among closed mesothelioma claims and 22 percent among closed lung cancer claims. Again, it is not clear what to make of this:  Did claimants not have such information available?  Did Grace fail to provide documents that might have include such data?  In either event, claims would not be accepted if they had no evidence that pertained to Grace's new rules.  But even among claims that coders found as having data, few were accepted: coders accepted only 27 of 116 mesothelioma claims with data (23 percent) and they accepted only 7 of 85 lung cancer claims with data (8 percent).

**Table 2:** Percent of Claims Accepted Compared to Percent Settled for Value

| Resolution Status | Meso | Lung | OthCan | Nonmal | Other | Total |
|---|---|---|---|---|---|---|
| Number in Sample | 352 | 395 | 206 | 1,550 | 262 | 2,765 |
| % Settled by Grace | 92% | 95% | 93% | 87% | 37% | 85% |
| % Accepted by Coders | 8% | 2% | 0% | 9% | 0% | 6% |

Source: Derived from ARPC supplemental data.

## 2.2. Grace's New Rules Have Never Been Used by Grace or by Anyone

Dr. Florence's analysis of closed claims showed that compensation under Grace's new rules deviates sharply from Grace's actual decisions to settle the same claims when it faced the prospect of litigation subject to state laws.  In the next three sections I examine the deviance of Grace's rules.  I start in this section with examples, presenting details of two closed mesothelioma claims (a) that Grace recognized as unusually strong claims by settling for large amounts, (b) that asserted frequent, regular, and proximate occupational exposure to asbestos and (c) offered evidence of substantial exposure to Grace asbestos products, but that Dr. Florence's coders nevertheless rejected as failing to meet Grace's new exposure rules.[16]

To derive the historic values that he used for valuing pending claims that his coders accepted, Dr. Florence had the Delaware Claims Facility look at claims files provided by Grace for a sample of 2,765 claims that Grace had settled before its bankruptcy (identified by Dr. Florence as the "Closed Claims sample" (Ibid. p. 15).[17] Based on the information that Grace provided for each claim, coders decided which of these claims would have met Grace's new rules (Ibid).  Dr. Florence used the same coders and procedures for both pending and future claims to decide which claims should be deemed compensable under Grace's new rules.  So in reviewing coders decisions and the data provided by for closed claims, we can understand how Grace's new rules operate for both pending and closed claims.  The review of closed claims shows that compensability of claims according to Grace's new rules deviates greatly from the decisions Grace itself made to compensate these very claims (Section 2.1).  Grace's new rules would give no value to 2,163 claims that Grace had actually settled for a total of $36.6 million.  Coders used Grace's new rules to reject 92 percent of sampled closed claims in the sample that Grace had actually paid when it resolved the claims in the tort system.  Dr. Florence's decisions about the compensation of pending claims under Grace's rules would likely deviate in the same way from the real results that would have obtained in the actual tort system Grace continued in litigation with those claims.

High value claims are particularly useful for understanding how Grace's new rules diverged from the realities of actual asbestos litigation.  First, Grace's file for these claims would be more likely to include information that shows how plaintiffs documented and Grace reviewed claims for medical and exposure issues within the tort system.  When Grace paid hundreds of thousands or millions of dollars for a single claim, presumably it did so on the basis of sufficient knowledge

---

16.    Grace's "minimum exposure criteria," but none of Grace's medical rules, would apply to mesothelioma claims.

17.    As I discuss below, this attempt at creating values is flawed both in its conception and execution (Section 4).  Dr. Florence apparently recognized the flaws in his coders' review of closed claims.  His future forecast is based in part on the number of closed claims that would be accepted for payment under Grace's new rules.  But rather than relying on his coders actual decisions about qualifications under Grace's rules among closed claims, Dr. Florence instead used entirely different rates from his coders' reviews of pending claims (Ibid pp. 16-17).  Dr. Florence gave no reason for this substitution, but it suggests he lacked confidence in his data or analyses for closed claims.

fireproofing.  I believe they call it Monokote today."  (Ibid., p. 75).

– Mr. Emrick testified that he worked directly with other asbestos-containing products such as cutting and using asbestos blankets and asbestos cloth and wrap for pipes, both types of its asbestos containing products that Grace manufactured (Ibid, p. 114).  He testified that there was no disposal of scraps cut from these asbestos materials, they just fell to the ground (Ibid).

– Among other construction work sites Mr. Emrick worked at Good Samaritan Hospital in Portland, Oregon installing duct work for a new wing and installing coils for heating and cooling in the mechanical room.  We worked around boilermakers, brickmasons, pipefitters, drywallers, insulators (417597.pdf, p. 259, 274, 347).  A coworker, Mr.  Hyrstal Tompkins, identified Grace asbestos products at this site to which Mr. Emrick was exposed (ibid., p. 190).

– Mr. Emrick was exposed to asbestos at a Crown Zellerach paper mill in Wauna, Oregon.  Coworkers identified Grace asbestos-containing products at that site at which Mr. Emrick was exposed (Ibid., pp. 168 & 276).

– Mr. Emrick's "Preliminary PID" (product identification report) describes his work at the Wauna paper mill: "plaintiff recalls working around pipes, paper machinery, dryer hoods and (asbestos) dryer felts in dusty conditions.  "(P)laintiff recalls the felts were heavy and thick and threaded through the machinery.  Plaintiff recalls there were various different size rollers and rolls of felt.  Plaintiff recalls working around boilers." ("Preliminary PID," Ibid p. 276)

– Mr. Emrick added to this description of his work at the Wauna paper mill in his later "90 Day PID": "plaintiff recalls working a shutdown at this site...  visiting this site on several occasions ... crews used cranes to dismantle dryer hoods and bring in new ones ... handling parts of machines that involved supply or return air... removing and replacing (asbestos) gaskets throughout the mill for pipes and ductwork ... the gasket material came on a role and he would cut it with a razor knife ... using a paint scraper to scrape off old gasket material ... frequently cutting and using chunks of scrap dryer felt for protection ... always working around the (asbestos) dryer felt either standing above it or below it ... working in close proximity to mill hands using compressed air to remove dust and debris from their work areas causing airborne dust ... " ("90 Day PID," Ibid, p. 329).

– Mr. Emrick testified about his work and working conditions at paper mills: "Frequently, very large scale shutdown situations, where they would take a paper machine and almost entirely dismantle it.  It involved all the other crafts that you can imagine.  Our job was to handle the parts of the machine that had anything to do with the supply or return air." (Dennis Emrick, Perpetuation Deposition, March 120, 2000, p. 125).

– He testified that he was present in the area when the paper machines were disassembled: "Once the top of the machine was removed, we were working on the sides and underneath the machine ....  They basically disassembled the entire thing."  (Ibid, p. 130).  "... compressed air was frequently used around where we were working, because the mill hands would be there trying to take advantage of the downtime and clean the various flat surfaces that (had) all this residue from years of papermaking.  They would be bla--be shooting--blasting that around."  "It would get it airborne and be dusty." (Ibid, pp. 132-133).

– Mr. Emrick testified about paper mills "aside from the foundries, they're one of the more dirtier places on earth" (Ibid, p. 130).

– Throughout the file materials provided by Grace, Mr. Emrick's testimony or documents from his counsel identified the names and even depositions of supervisors and coworkers at these work sites who would be available to testify further about the details of Mr. Emrick's work

and workplace environment and to identify asbestos products to which he was exposed.  A
document titled "Product ID Report:  Dennis Emrick" lists W. R.  Grace documents as
among the sources for identifying the presence of Grace asbestos products at one work site.

– Mr. Emrick provided medical evidence of his mesothelioma including medical opinions that
his asbestos exposures caused the mesothelioma.

Claims materials provided to Dr. Florence by Grace clearly demonstrate Mr. Emrick's evidence of
(1) an asbestos-related mesothelioma, (2) his occupational exposures to asbestos, (3) his
occupational exposures to Grace asbestos-containing products, (4) his removal of asbestos-
containing products including Grace products and (5) that his own activities and those of
immediately coworkers caused his exposure to asbestos.  Grace knew that its asbestos-containing
Zonolite high temperature insulating cements were used at paper mills, the primary sites at which
Mr. Emrick claimed exposure to Grace asbestos products and knew from its own records and
litigation experience the paper mills where its products were present.[20] Grace settled Mr.
Emrick's claim for $1 million.

But Dr. Florence's coders decided the Emrick claim could not be accepted under Grace's new
rules.  In applying Grace's new rules as they were instructed by Grace, Dr. Florence coders
decided that this evidence could not "sustain (Mr.Emrick's) burden of proof that (his) claim
against Grace (was) valid," despite Mr. Emrick's extensive testimony about his heavy exposure to
asbestos, including asbestos that he and others identified as coming from Grace's asbestos
products.  Grace's new rules lead Dr. Florence to a far different conclusion about this claim than
the decision that Grace itself reached in deciding the claim under the laws and practices of
asbestos litigation in Oregon courts.

### 2.2.2. Dr. Florence Rejected the William McCauley Claim, Settled by Grace for $425,000

Dr. Florence's coders decided that the mesothelioma claim by William McCauley, filed in Illinois
courts, should not be accepted under Grace's new rules, a far different conclusion than Grace's
settlement of the claim for $425,000.

– William McCauley claimed that his mesothelioma was caused in part by his exposure to
Grace asbestos-containing products that he personally used as a commercial plasterer.

– Mr. McCauley's attorney stated that "he personally identified, both in his discovery and
evidentiary depositions, Grace asbestos-containing products.  He used these throughout his
career, particularly during the '50s and '60s" (371068.pdf, p. 3).

– Mr. McCauley stated that he sprayed Grace's Zonolite and Monokote asbestos spray products
and also mixed those products.

– In their deposition testimony, both Mr. McCauley and his coworker Tom Ladd state that Mr.
McCauley "used," "worked extensively with these products (Grace asbestos-containing
products)" for many years and "all during this time, Mr. McCauley worked around Zonolite
products and around Monokote" (Ibid, pp. 3-4).

– In a brief extract of a deposition provided to Dr. Florence by Grace, Mr. McCauley testified
that he worked with Grace's Zonolite, "we used it sometimes for insulation.  You know,
we--we mixed it with your Gypsolite (a gypsum plaster) sometimes.  Give it a little
slicker--little slicker finish where it applied a little bit easier."  (Ibid, p. 13).  Mr. McCauley

---

20.  The file materials provided by Grace for the Emrick claim do not include any documents from Grace about
whether or not this was a known Grace site, so while Grace would have known this key fact, Dr. Florence's
coders did not.

testified that the Zonolite came in sacks and that he mixed Zonolite into the plaster: ''Sometimes we'd throw it in to make the gyp work a little smoother, a little slicker. Sometimes that stuff didn't mix real good. It would be tough mixing and we would add it to give it, oh, just workability. We used to mix--even with cement we'd throw--it in the cement a lot of times to give it a little--because cement sometimes is stiff when you're trying to apply it by hand. I mean it don't--it don't go on the wall real smooth. It's--I don't know what to--what words to use. But it--it was common'' (Ibid, pp. 18-19). Mr. McCauley sprayed these mixtures, mixed them by hand, and cleaned up the asbestos-containing residue by scraping and brooming over-sprayed materials on the floor (Ibid, p 17).

File materials provided by Grace for this claim are grossly incomplete, including neither of the depositions of Mr. McCauley or his coworker, Mr. Ladd. Grace also withheld 15 documents as privileged, including pages from ''evidence deposition,'' materials on the ''discover deposition of McCauley,'' ''review of McCauley case'' and a ''discussion of McCauley claim.'' These withheld documents would likely have provided additional details about Mr. McCauley's claim that Dr. Florence's coders could have used in deciding whether or not to allow the claim, as well as discussion of Grace's conclusions about and reasons for settling the claim.

But even without these missing documents, Grace's coders should have found that Mr. McCauley's claim satisfied Grace's new ''minimum exposure criteria.'' Even in the brief deposition transcript, the coders should have seen that Mr. McCauley testified (and his coworker apparently confirmed) that he sprayed and applied Grace asbestos products over a period of years even though neither Mr. McCauley nor his attorney described Mr. McCauley's frequent applications of the Grace product by the magic word ''installing.'' The coders should also have found that Mr. McCauley mixed Grace asbestos-containing products, a verb that he actually used verbatim.

Mr. McCauley's claim is an example of the series of flaws in Dr. Florence's attempt to apply Grace's rules to the information in Grace claim files. (1) The coders erred. (2) The indefiniteness of Grace's rules had not clearly identifying the spraying and application of Grace cements as ''installation'' that satisfies its ''minimum exposure criteria.'' (3) Grace gave no instruction to its coders or to claimants and law firms who completed PIQ forms about what was included as ''installed'' or ''mixed.'' (4) But most fundamentally, these details of Grace's wording or its coders' application of its rules are beside the point: Grace's rules would reject real and valuable claims. Exposures like those that Mr. McCauley and Mr. Emrick described would certainly support a claim that would allow each and similar plaintiffs to reach a jury with the claim and present Grace with a significant risk of a large plaintiff's verdict. Grace recognized this in its actual litigation, when it faced actual threats from these claims and settled the two claims for a total of $1.425 million ($1.65 in today's 2007 dollars).

## 2.3. Grace's Exposure Rules Ignore Basic Asbestos Litigation Principles

Its new rules deviate so radically from how Grace has resolved asbestos claims in the past because they represent the analysis of Grace's retained epidemiological expert, Dr. Elizabeth T. Anderson, who did not consider how courts and parties actually deal with issues of causation in asbestos claims.

Modern asbestos litigation started with the Fifth Circuit's 1973 opinion in *Borel v. Fibreboard* (493 F.2d 1076, *1082) where the court addressed the dose responsiveness of asbestos disease and the factual complications that the asbestos disease suffered by Mr. Borel and most asbestos plaintiffs were caused by the cumulative effects of asbestos exposures to products of many different defendants (Hensler and Peterson, Understanding Mass Personal Injury Litigation. Brooklyn Law Review, Vol. 59: 961. 1993).

the legal rules of causation for asbestos claims.

Much is wrong with Dr. Anderson's conclusions, but most important she is not addressing the crucial question that Grace or other defendants or courts ask in evaluating and establishing the values of asbestos claims. If a claimant has evidence that asbestos exposure caused his disease, and evidence of more than *de minimus* exposure to a defendant's asbestos products, the claim likely will have merit against the defendant, even if exposure to the defendant's asbestos products would not have been sufficient *by itself* to cause the claimant's injury. Faced with such a claim Grace would have to assume that the claim had potential merit in court and, therefore, settlement value (except in the relatively rare instances where Grace had a legal defense such as statutes of limitation, prior releases, etc.). In the tort system, it would be pointless for defendants, including Grace, to try to establish that exposure to its products was insufficient *by itself* to cause a plaintiff's asbestos-related disease. The Borel court took this argument away from them and set the basic rules about exposure that parties have used since then to settle asbestos claims.

To be sure a defendant does argue sometimes successfully that a plaintiff who had only insubstantial exposures to its products should have no right to compensation from it. Courts in some cases have evaluated asbestos exposures by applying *de minimus* or "substantial contribution" rules, and parties have been settling asbestos claims in light of these rules where they apply. Over 20 years ago the Fourth Circuit adopted a "frequency, regularity, and proximity" test as its "*de minimus* rule (to) prove more than a casual or minimum contact" for exposures in asbestos cases (Lohrman v. Pittsburgh Corning Corp. 782 F.2d 1156, 1162 (4th Cir. 1986). Ten years ago the California Supreme Court discussed a substantial contribution rule: "that exposure to defendant's asbestos-containing product was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." (Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203, 1218 (Cal. 1997) quoted in Borg-Warner v. Flores, Mealey's Litigation Reporter: Asbestos, June 20, 2007, A-1, A-5 (Tex. 2007)).

Grace's "minimum exposure criteria" do not address these issues. These *de minimus* and "substantial contribution" rules have been part of the tort law of asbestos claims rules for years before Grace's bankruptcy petition. Almost all of Grace's pre-petition settlements were reached in light of these rules. Rather, Grace's new "minimum exposure rule" is its attempt to undercut the dominant rule of causation in asbestos litigation since Borel, replacing it with a harsh and unjustified rule that claimants can only recover from Grace if their exposures to Grace's products could *by itself* have caused their asbestos diseases. This is far from the *de minimus* or "substantial contribution" rules that are already part of the tort laws within which Grace resolved its asbestos claims.

In the courts, it is the rule that meeting the substantial contribution discussion did not require an asbestos plaintiff to "demonstrate that fibers from the defendant's particular product were the ones ... that *actually* produced the malignant growth," but that is what Dr. Anderson's rules would require; i.e., that exposure to Grace's asbestos products could have caused disease even if the claimant had no other asbestos exposures.

Court rulings since Grace's petition had not changed these standards. The recent Texas Supreme Court decision in *Borg-Warner v. Florres* reiterates that proofs like Dr. Anderson's are not required of asbestos claimant: "substantial-factor causation ... need not be reduced to mathematical precision. Defendant-specific evidence related to the approximate doses to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-disease, will suffice" (Ibid). The Borg-Warner decision may now require additional

defendant-specific evidence by Texas plaintiffs, probably coming from industrial hygienists or epidemiologists.  The Texas Supreme Court recognized that this evidence will be "inexact" ("We recognize the proof difficulties accompanying asbestos claims.  The long latency period for asbestos-related diseases, coupled with the inability to trace precisely which fibers caused disease and from whose products they emanated, make this process inexact" (Ibid, p.  A-4)).  There is a world of difference between what the Texas court would now require--"inexact" testimony based on the specific facts of that case about an approximate dose of Grace asbestos to which a plaintiff was exposed coupled with an expert opinion that this exposure was a "substantial factor"--and Dr. Anderson's arbitrary and misleadingly precise rules--her "benchmarks" that Grace exposures by themselves could cause the plaintiff's injury-- which were not derived from the specific facts of any case or the law of any state.

Dr. Anderson's analysis has other fundamental defects.  For her "exposure assessment" (the amount of Grace asbestos fibers to which a claimant was exposed), Dr. Anderson relied upon "weighted average asbestos levels that have been determined by Dr. Lees to be *typical of people exposed in situations similar to those of the claimants*" (Anderson Supplemental Report, pp. 6-7).  As their "typical" exposure situations, Dr. Lees reports and Dr. Anderson uses her five "nature of exposure" categories (A through E in Grace's PIQ form).  There are at least three problems with assuming Grace could apply a blanket rule for rejecting Grace claimants based on Dr. Anderson's mere speculation that claimants could not have suffered more than what she deems to be the average exposures in these five "typical" exposure situations.

- First, there is simply no content, no empirical referent for her five "nature of exposure" categories that are in Grace's PIQ form.  No one, not Grace, not Dr. Anderson, not Dr. Florence, has ever explicitly defined what exposure situations are included in any of the Grace/Anderson five nature of exposure groups.[22] Precisely what persons doing what activities are involved in "installing" a Grace asbestos product?  What is the difference between persons who are at "a site" where others are working with Grace asbestos products and those who are "in a space" where similar activities occur?  Who are the people at "sites" and at "spaces"?  What are they doing at the "sites" or "spaces"?  How long are they at the "site" or "space"?  Grace's "nature of exposure" categories are not categories used by epidemiological studies, which typically examine workers in particular trades or particular exposure sites.

Although Dr. Anderson represents her work as science, her "nature of exposure" categories are not scientifically defined concepts.  They have no operational definitions (statement of operations or steps that one can undertake to identify members of a category), the requisite to precise treatment of these exposure categories.  Indeed they have no definitions at all.  They are whatever a reader interprets them to be.

Neither Dr. Anderson, nor anyone can claim to have made legitimate, precise scientific analyses of categories like hers that have no definition, no precision, no clear meaning.  Dr. Anderson tries to finesse this problem by saying that she and her colleagues looked at research on groups of exposed persons who were "typical" of each of her categories.  But this does not help, it is merely further obfuscation.  How do they determine "typical"?  What are these "typical" groups?  Typical of what?  Neither Grace nor Dr. Anderson has told use precisely which exposed persons are in each of her categories, so how can she assess that subjects of particular research are "typical" of groups that she cannot define?  It is the same

---

22.   This is a problem for claimants in filling out the PIQ and for coders in interpreting the form.

problem all over again--no definition of the category and no definition of what is "typical."

– Second, whatever the meanings of these "nature of exposure" groups they will be extremely (even absurdly) diverse populations of exposed persons, such as all persons who ever cut or removed asbestos, all persons who were in a space where others worked with asbestos. The amounts of exposure for people in any category will range enormously. Indeed, Dr. Anderson notes that actual exposures among the individuals in a category will vary widely: "Workers ... in a space where Grace asbestos-containing products were being installed, mixed, removed or cut by others" (Dr. Anderson's Category E) "include passers-by ... or in the same building" and also workers like Dennis Emrick, who regularly worked in, on, and under paper machines and other industrial machines laden with asbestos dust (Ibid, p. 4). As Dr. Irving Selikoff described, some workers "in a site" or "in a space" in which significant work with asbestos products was being done will have had significant asbestos exposures: "Asbestos exposure in industry will not be limited to the particular craft that utilizes the material. **The floating fibers do not respect job classifications.** Thus, for example, insulation workers undoubtedly share their exposure with their workmates in other trades; intimate contact with asbestos is possible for electricians, boilermakers and foremen; perhaps even the supervising architect should be included" (Asbestos Exposure and Neoplasia. JAMA, 1964, p. 22).

Dr. Anderson obtained her averages for these heterogeneous groups from Dr. Lees. But Dr. Lees' average exposures are simply that, averages that do not adequately describe any individuals who may have had more or less exposure. Workers like Mr. Emrick were not exposed to an "average amount of asbestos," but Dr. Anderson's rules would disallow his claim because other, lightly exposed workers produce a far lower "typical" average than Mr. Emrick's actual exposure.[23] What we learn about Mr. Emrick's asbestos exposure will be based on the facts of his particular case, not based on an average for an ill-defined and hopelessly heterogeneous group of persons, an average that in no way represents his actual exposure. As Dr. William Nicholson observed in his seminal epidemiological forecast of asbestos related deaths, we cannot base compensation for individual victims based on averages for populations (Nicholson, Perkel and Selikoff, pp. 305-306).

– Third, because of the variability of exposure in each of Dr. Anderson's "nature of exposure" categories, there is no sense to her blanket distinctions that all claims in one category have merit, while no claims in another group have merit. The actual levels of exposures among workers in Dr. Anderson's categories will vary so widely that the more highly exposed workers in categories that she says have no merit will be greater than among many workers in categories of exposure that says have merit. Mr. Emrick's exposure was in terribly dusty work environments when he tore Monokote and other asbestos insulation out of buildings as part of his renovation work. Mr. Emrick observed that the asbestos dust created in tearing and pulling off pieces of insulation (exposures from "removal" which Dr. Anderson says have no merit) produced dirtier work environments than what he and insulators faced in new construction when they installed asbestos insulation (exposures which have merit according to Dr. Anderson). Dr. Anderson's blanket distinctions among these poorly defined and heterogeneous groups simply cannot support the falsely precise rules that she and Grace

---

23. Dr. Anderson uses the variability in exposures among these diverse groups perversely to lower the average exposures for all persons in that group. In effect she says that because some workers were infrequently exposed to Grace asbestos, she will then calculate an even lower average exposure that she will assume for frequently exposed workers like Mr. Emrick. She simply exacerbates the error of applying a low population average to the most highly exposed workers in the population.

propose that would let some asbestos sue while arbitrarily denying others the right to sue.

– Fourth, Dr. Lees makes his estimates of average exposures among persons who were *exposed* to asbestos, not persons who get sick and file claims. Asbestos claimants are not a random sample of all persons who were exposed to Grace asbestos; they are among the unlucky group who got sick as a result of their exposures, indeed a non-random subset of unlucky people who chose to file a law suit. Drs. Florence and Anderson and Lees all simply ignore that among all of the persons who were exposed--the population that Dr. Lees addresses--only an unrepresentative fraction will get sick with an asbestos-related disease. Because of the dose-response relationship this subset of persons who become sick will be different from the entire population in the Lees/Anderson ''typical'' exposure categories, among the more heavily exposed. In turn, the subset of sick persons who file law suits will be different from the entire population of exposed persons who become sick.

Dr. Anderson is applying average statistics for one population, exposed persons, to a different population of persons who are select and distinct in two ways: they got sick and having gotten sick they made a claim against Grace. One cannot assume that statistics for the larger population is applicable to this doubly unique sub-population (assuming for this argument that there is any meaning to ''population'' for any of Dr. Anderson's ''nature of exposure'' categories). Even if it were the case that *on average workers* in a type of job would not have been exposed to asbestos above some level, there is no basis to conclude that *no individual* worker doing a similar job could have been exposed to a higher level (much less to conclude that he could not possibly have been sufficiently exposed to Grace asbestos for that exposure to be a significant contribution to the cumulative exposure that caused his disease). An epidemiologist should have known better.

– Fifth, the Lees/Anderson ''typical exposure'' categories are not mutually exclusive. Again, as Mr. Emrick's claims exemplifies, most asbestos claimants will appear in several of their five categories, experiencing exposures in each.

## 2.4. Grace's Lung Cancer Rules Would Improperly Require a Diagnosis of Asbestosis

Grace's new rules for lung cancers deviate from its past settlements and applicable legal standards in two ways: First, as with mesothelioma and all other claims, Grace's exposure rules would require lung cancer claimants to show that *by itself* the claimant's exposure to Grace could have caused the claimant's lung cancer, ignoring that the actual issue is whether Grace's exposures contributed substantially to the dose-response causation from all exposures to asbestos, Grace's or others. As I discussed above, neither Grace nor other defendants have ever succeeded in demanded such a showing before settling lung cancer claims. Second, to have a lung cancer claim accepted under Grace's new rules a claimant must also have a second disease, asbestosis, documented by *more demanding* requirements than Grace's new rules even required as its ''Minimum impairment criteria for **Asbestosis** claims'' (Florence Report, p. 2). Again, before its bankruptcy Grace had never required any of these newly invented requirements in settling lung cancer claims and has no basis in tort litigation for demanding the requirements now.

Nevertheless, for purposes of this estimation proceeding, Grace instructed Dr. Florence, and requests the Court, to base the estimate of the value of lung cancer claims against Grace on rules that it never required and that courts do not now require in asbestos litigation.

Grace labels its new rules for lung cancers as ''Minimum causation criteria'' (Ibid), but these requirements go well beyond evidence required even by new ''tort reform'' statutes that have been adopted since 2004 in six states.[24] None require that in order to have a cause of action an asbestos lung cancer plaintiff must also demonstrate asbestosis.[25] Florida has the strictest requirement: that

lung cancer plaintiffs who smoked must provide radiological or pathological evidence of either asbestosis or pleural thickening (Fla. Stat. Ann. Sect. 774.204 (3); Patrick M. Hanlon and Anne Smetak, Asbestos Changes, NYU Annual Survey of American Law, Vol. 62:525, 568 (2007)).  If Grace had adopted even this strictest of actual operating standard, albeit applicable only to smokers in one state, Grace's coders would have found many more lung cancer claims compensable than they did in using Grace's proposed rules.  Lung cancer claimants could then have demonstrated their substantial exposure to asbestos by showing pleural thickening as well as by showing asbestosis.[26] Also under Florida's or other rules, coders would have based findings of asbestosis or pleural thickening on a wider array of medical evidence, including pathology, radiology and CT scans in addition to B-reads of X-rays, which was the only evidence acceptable under Grace's rules.

In the guise of its "causation criteria," Grace would impose barriers to compensation that prevent claimants from offering proof of causation, barriers that are not required in asbestos litigation and that were not required by Grace and could not be required by other defendants.  In instructing Dr. Florence to use its excessive new rules for lung cancer claims, Grace forced Dr. Florence to reject compensation of claims that Grace and other defendants settle for value and that would qualify for payment in tort litigation, even under the strictest new state medical criteria statutes in the few states that have enacted such statutes.  By accepting Grace's unusual instructions and then using Grace's rules to reject many claims of the types that Grace had in fact settled, often for large amounts (Sections 2.4.1 and 2.4.2), Dr. Florence produced distorted, grossly understated estimates of the aggregate value of lung cancer claims.  Moreover he is again left with an insuperable methodological problem:  because Grace has never used its rules as requirements or in settling lung cancer claims, its instructions to Dr. Florence leave him with no empirical information about how many lung cancer claims would actually meet Grace's new rules or about the values of claims that met those rules.

These and other problems with Grace's rules and Dr. Florence's forecasting under those rules can be seen in examples of lung cancer claims that their coders rejected.

### 2.4.1. Dr. Florence Rejected the Jack Kenworthy Claim that Grace Settled for $382,500

Mr. Jack Kenworthy worked 16 years for Grace at its Zonolite mining and manufacturing operations in Libby, Montana.

---------------------

24.  Ohio in 2004; Texas, Georgia and Florida in 2005; South Carolina and Kansas in 2006.

25.  Asbestosis, which Grace's rule requires, does not itself cause or contribute to the risk of lung cancer.  Rather, the presence of either pleural thickening or asbestosis are "markers" of asbestos exposure that show a claimant had a substantial exposure to asbestos, which does cause or contribute to causing lung cancer.  The presence of such markers in a lung cancer claimant are meaningful when there is an argument about causation, for example among plaintiffs who smoked or among those for whom the extent of asbestos exposure is challenged.  The markers show that the claimant had enough asbestos exposure to scar his pleura (pleural thickening) or his lung tissue (asbestosis) and therefore enough to cause lung cancer.  Because pleural thickening is regarded as at least as good an indication of substantial asbestos exposure as asbestosis, both are useful in showing a past exposure to asbestos.  Asbestosis and pleural disease can be shown by X-ray, CT scans, high resolution CT scans or pathology.

26.  Florida's rule is more consistent with "causation criteria," as Grace calls its own rule.  Both pleural thickening and asbestosis, which Florida accepts, are indicative of substantial asbestos exposure.  Although pleural thickening supports causation in demonstrating substantial exposure, Grace will accept only asbestosis, a diagnoses that it can more easily challenge.

– He started as a construction laborer at the mine and subsequently worked as a service mechanic, welder layout man, warehouse man, and then worked in heavy equipment repair (W. R. Grace PIQ 39231-0018, p. 10). Mr. Kenworthy claimed that he was exposed to and inhaled asbestos dust throughout his 16 years at Zonolite. Grace's employment records agree. Its "Employee Exposure Summary" for Mr. Kenworthy dated 3/21/84 calculated that he had 16.2 fiber-years of asbestos exposure (Ibid., p. 146).

– After working at the Zonolite facilities for fifteen years, Grace told Mr. Kenworthy in 1983 that his exposure to Grace's asbestos placed his health at risk and that this risk was greater because he smoked. In a February 2, 1983 letter to Mr. Kenworthy, Grace's General Manager Libby Operations , William McCaig, wrote Mr. Kenworthy about results of recent company medical monitoring:

> "I was very happy to notice that the results showed normal chest X rays and normal lung functions in your case. You may not be aware just how lucky you are to have a normal chest X ray and normal lung function. We all tend to think that normal is the 'norm' or what is to be expected. The fact of the matter is that smokers who have been exposed to the hazards of asbestos show abnormalities in their chest X rays and/or impairment in their lung functions much more frequently than not." (407677.pdf, p. 145).

– Other materials supplied by Grace for the Kenworthy claim further demonstrate Grace's recognition that workers like Mr. Kenworthy were put at particular risks of lung cancer because their asbestos exposures multiplied the risks they already faced from smoking. By 1980 Grace was trying to reduce smoking among its employees because the asbestos exposures of workers who smoked greatly increased their risks of lung cancer. A January 1980 statement by an arbitrator of a union grievance against Grace about Grace's prohibition of employee smoking on company property summarized discussions between Grace and union representatives about this synergistic risk:

> "There is no real dispute about the proposition that persons working and smoking in an atmosphere laden with asbestos fibers are subjected to a dramatically multiplied risk of disease, especially respiratory cancer'' (Ibid., p. 179).

– Mr. Kenworthy left his job in 1984 one year after Grace told him of his heighten health risks from his workplace exposure to Grace's asbestos.

– He died from lung cancer 16 years after leaving his job with Grace.

Medical documents that Grace gave to Dr. Florence were incomplete. Grace omitted the most important diagnoses in the April 2000 report by Dr. Alan C. Whitehouse, supported by a contemporaneous review by Dr. Teel of a CT scan of Mr. Kenworthy's lungs. The reports were central to Mr. Kenworthy's claim and include the doctors' conclusions that Mr. Kenworthy had asbestosis, had extensive asbestos related pleural thickening, and that his lung cancer resulted from his asbestos exposure (Rust case number 03013809.pdf, pp.163-166). While neither report is in the pdf for materials provided to coders by Grace, both were attached to the PIQ form submitted by Mr. Kenworthy's counsel in support of his liquidated claim in this case along with an October 20, 1999 radiologist's finding of Mr. Kenworthy's pleural thickening (Ibid. p. 50). None of these documents or conclusions material to Dr. Florence's coding efforts appear among the documents for this claim provided by Grace to Dr. Florence and his coders.

These documents had almost certainly been given to Grace or its attorneys during negotiations of Mr. Kenworthy's claim. The Dr. Whitehouse letter and attachments provide all of the evidence needed to show an asbestos related lung cancer; the opinions were by the most prominent doctor dealing with the Libby claims; and the Whitehouse and Teel reports were generated at about the time the claim settled. But none of these critical documents were provided by Grace to its coders,

apparently because of a privilege claim by Grace. Dr. Florence's materials for the Kenworthy case include a privilege log showing that Grace withheld a medical report and an accompanying letter and "note" dated May 15, 2000 all under a claim of privilege (Ibid, p. 6) (Grace also withheld other documents under claims of privilege).[27] The only medical report that was near in time to the May 15, 2000 date of the documents now claimed to be privileged were the April 28, 2000 medical report from Alan C. Whitehouse, M.D. and the April 11, 2000 CT scan interpretation by Gordon Teel, M.D. to which Dr. Whitehouse refers.

Because Grace withheld or omitted the Whitehouse and Teel reports, Grace's coders could not properly apply Graces "minimal causation for lung cancer claims" to Mr. Kenworthy's claim. They had no basis of knowing that a doctor had found Mr. Kenworthy's lung cancer resulted from his asbestos exposure, and that he had asbestosis. Mr. Kenworthy also had extensive pleural thickening and his pleural thickening and asbestosis were confirmed by CT scans. These medical records along with his substantial asbestos exposure strongly evidence Mr. Kenworthy's asbestos-related lung cancer and represented a significant litigation risk for Grace, which Grace recognized in settling the claim for $382,500.

But its new lung cancer rules that Grace now urges on the Court and required Dr. Florence to use are not consistent with the laws that apply to actual asbestos litigation and that Grace had to consider in settling claims before its bankruptcy. Grace's new, uniquely harsh causation rules would rigidly reject Mr. Kenworthy's claims, because his asbestosis was diagnosed from a CT scan and not a B-read with an ILO reading of at least 1/0, as it rules require. Grace's rules disregard both the CT scan findings and his pleural thickening each of which would be enough to meet the most strict state law causation requirements.

And Grace's rules again rigidly disregard his 16 year history of asbestos exposures at its own Zonolite mine and mill, the 16.2 fiber-years of asbestos exposure according to Grace's own calculation, and its own foresight in the 1980s that Mr. Kenworthy's asbestos exposures as an employee would subject him to risks of the very lung cancer, asbestosis and pleural disease that he came to suffer and die from. Grace's rules ignore all this, because its coders found that Mr. Kenworthy's asbestos exposures came from his work "at a site where Grace asbestos-containing products were being installed, mixed, removed or cut by others," not from having "mixed" or "installed" Grace asbestos products. In fact, Grace's "minimal exposure criteria" would perversely protect it from almost all liability to workers at its Libby mine and mill. Employees there, like Mr. Kenworthy, were fatally exposed by mining and milling Grace's asbestos-containing vermiculite, not by installing or mixing any of its products. Grace's rules simply do not apply to their exposures, so based on those rules they would not be entitled to compensation and their claims would not add to the estimate of Grace's liability in these proceedings.

Grace settled the Kenworthy claim for $382,500, the largest settlement among the lung cancer claims in Dr. Florence's closed claim sample. The reasons for this large settlement are apparent. Mr. Kenworthy had substantial exposure to Grace's asbestos during the 16 years he worked for the company. Grace itself measured this exposure. Records in Mr. Kenworthy's file demonstrate that Grace knew the he faced a "dramatically multiplied risk" of lung cancer, especially because his asbestos exposure multiplied the risks he already faced as a smoker. Grace actually warned Mr. Kenworthy of risks from his workplace exposure to asbestos and he quit work soon after. He subsequently suffered and died from lung cancer. Dr. Whitehead diagnosed Mr. Kenworthy's "extensive asbestosis" and pleural thickening.[28] Dr. Teel's review of Mr. Kenworthy's 10/20/99 CT scans found: "Extensive sheet like pleural thickening ... (and) coarse linear densities in the

---

27.   Grace's "privilege" assertion prevents us from knowing with certainty which medical report Grace withheld under a privilege claim.

lung bases above the hemidiaphragms." leading to his "(f)indings compatible with extensive asbestos-related pleural disease ... (and) with asbestos-related parenchymal disease (i.e. asbestosis) of mild to moderate severity" (Rust case number 03013809.pdf, pp.163-164, parentheticals added).[29] Grace settled this claim for $382,500 because the full record for the claim, including the Whitehouse and Teel medical reports, presented it with a significant risk of a far larger trial judgment.

Clearly Mr. Kenworthy had more than "minimal exposure" to Grace asbestos. His medical documents clearly demonstrate that this asbestos exposure was a cause of his lung cancer. His diagnoses of asbestosis and pleural disease satisfy the medical criteria of any asbestos defendant and even the most exacting new state laws addressing asbestos litigation. In all states his diagnosis of "extensive pleural thickening" would satisfy causation criteria for lung cancer. All except Grace's new rules, whose criteria would find that Mr. Kenworthy did not have "minimal exposure" to Grace asbestos and whose "minimal causation criteria for Lung Cancer" do not accept what courts, legislatures, and other defendants accept.

## 2.4.2. Dr. Florence Rejected the Marvin Pearson Claim that Grace Settled for $200,000

Grace settled the lung cancer claim of Marvin Pearson for $200,000, but Dr. Florence's coders rejected the claim. This rejection illustrates several general flaws that affect Dr. Florence's evaluations of claims on the bases of Grace's new rules: coders' mis-coding of "nature of exposure" as used in Grace's "minimal exposure" rule; the uncertainty and indefiniteness of Grace's rules; the inappropriate narrowness and rigidity of Grace's rules; and the inconsistency between the rules and how claims are actually evaluated by Grace and other defendants.

Most strikingly, Mr. Pearson's case exemplifies how important it is that claims materials be absolutely complete in applying Grace's rules. Claims materials available from Grace showed that Mr. Pearson had a strong claim that should have been approved even under Grace's exacting new lung cancer rules for exposure and causation.

The materials show his exposure to Grace asbestos products. Mr. Pearson and six co-workers identified his exposure to Grace asbestos-containing products over two decades as a carpenter and construction worker, mostly at the Iowa State University campus. The materials also include his claim that he personally *applied* asbestos products, a verb that should be regarded as synonymous with *installed* as used in Grace's rules.[30] A June 28, 2000 Mt. Sinai medical report cites his "exposure narrative" in summarizing that he "was frequently exposed to asbestos through his own labor" with "daily exposures," including his *"application"* of asbestos products (Ibid, p. 63).

The materials also show that Mr. Pearson had an unusually strong lung cancer causation case. He did not smoke. He had serious asbestosis, a B-read with a 1/1 ILO score and pleural thickening;

---

28. He reported "apparent from the CT scans that there is extensive asbestosis"; "extensive asbestos changes with pleural thickening, diaphragmatic calcification as well as mediastinal adenopathy"; "It is clear from the X-rays and the CT scan that Mr. Kenworthy has asbestosis.... The CT scan much more clearly demonstrates his asbestosis." (Ibid. pp. 165-166).

29. Because Dr. Teel was reviewing x-rays and CT scans without having examined or taken a history from Mr. Kenworthy, it would have been inappropriate for him to make diagnoses.

30. The definition of *apply* includes: "to put to use," "to lay or spread on (e.g., varnish)." The definition of *install* includes: "to set up for use" Merriam Webster's Collegiate Dictionary, Tenth Edition, 1993).

The X-ray "film of 4/24/97 is quality one and showed 1/1 parenchymal opacities with a right diaphramatic plaque and right A1 and left A2 thickening" (Howard Kipen, M.D. medical report 7/31/99; Ibid., p. 57; see also 6/28, 2000 Mt. Sinai Hospital medical report, Ibid, pp. 63-63 and 4/24/97 B-reader report, ibid., p. 64).

Pathology findings made by Mt. Sinai Hospital, the center of research on asbestos related disease in the U.S., confirmed both his asbestosis and that his lungs were burdened with asbestos fibers of the type included in Grace's products.[31]

It is clear that Mr. Pearson had a strong law suit against Grace that forced Grace's settlement of the claim for such high value because it would have faced significant risk were the law suit to be tried. It is not a valueless claims, as Dr. Florence's coders decided in applying Grace's new rules. Grace's rules simply do not capture the value of the claim as it appeared in the claims materials supplied by Grace.

Mr. Pearson demonstrated significant occupational exposure to asbestos and he established that he *applied* Grace's products. The B-read of Mr. Pearson's X-ray, his pathology results and his extensive asbestos exposure together support his diagnosis of asbestosis made by Dr. Kipen (Ibid, p. 58). Even if he did not have a diagnosis of asbestosis based on a B-read with a 1/0 or greater ILO score, the only basis that Graces' rules accept for its causation requirement, Mr. Pearson had strong causation evidence that gave high value to his lung cancer. The pathological findings of asbestos fibers in his lung and demonstration of pleural thickening by X-ray and by pathology are all demonstrations of causation that are accepted by asbestos defendants, courts, and even the strictest causation requirements in recent "tort reform" legislation. Grace's new rules are inappropriate for estimation in this case solely because they fail to include pleural thickening and pathological evidence as evidence sufficient to show causation for lung and other cancers.

But Grace forced Dr. Florence's coders to deny this claim by supplying coders with only incomplete information for the claim. Grace asserts 28 instances of privilege in withholding documents that included copies of medical reports, correspondence with plaintiffs' counsel, evaluations of the claim and other matters that are material for determining whether or not Mr. Pearson's claim would be allowable under Grace's new rules. Grace failed to provide a transcript of Mr. Pearson's deposition (referenced in a privilege log that was the last page of the pdf for these materials, Ibid, p. 240). Because the only conceivable inadequacy of Mr. Pearson's claim under Grace's rules involved which defendant's asbestos products he *applied*, this deposition would have been essential to coding of the claim under Grace's rules.

---

31.   The Mt. Sinai report summarizes Marvin Pearson's asbestos exposure:

"Dr. Kipen 7/31/99: construction worker and plumber, carpenter 1954-1956, exposed to high temperature pipe covering and boilers' other exposures 1960-1963, 1964-1998. 5/9/97 McFarland Clinic: history of significant asbestos exposure 1960-1963; "plowed out" asbestos doors, worked as a carpenter; Exposure narrative: worked as a carpenter 1954-1998, construction, various residential and industrial sites, frequently exposed to asbestos through his own labor and from co-workers; daily exposures; cut many pieces of insulation and drywall with a knife, *application*, removal which created heavy dust; worked with insulators, pipe-fitters and welders; high temperature steam pipes under repair, insulators worked on pipes, furnaces and boilers; wore work clothes home." (394831.pdf, p. 63).

"--the lung tissue confirmed carcinoma of the lung. The findings of an increased lung parenchymal burden of asbestos bodies, amosite asbestos and chrysotile asbestos in fibral bodies confirms a substantial occupational type asbestos exposure." (394831.pdf, p. 64).

## 3. Dr. Florence Has No Meaningful Data About Claimants' Ability to Meet Grace's New Rules

The previous section demonstrated how radical are the changes that Grace attempts to make in litigation of its asbestos claims through its new rules. The change is seen most clearly where Dr. Florence's coders decided about the compensability under Grace's rules of the sampled closed claims. Coders accepted only 8 percent of claims that Grace had already settled for value in this sample. As shown in the details of the example claims that I discussed, Dr. Florence's coders rejected claims that had clear and significant value in tort litigation. In addition to applying wrong legal standards, as Grace instructed, Dr. Florence's coders made narrow and wrong coding decisions based on the deeply flawed data that Grace had provided.

These examples and statistics explain the primary methodological reason why Dr. Florence cannot base his Grace-rules estimate on the information assembled for pending and closed claims. Dr. Florence looked to evidence pertaining to Grace's rules where there was none and where there no reason to expect such evidence, even aside from the effects of the automatic stay. Claimants had no reason to provide evidence pertaining to rules that have never been required either for settlement or to meet any legal standards and, so, did not provide that evidence. Real claimants do not have to provide evidence to satisfy fictitious rules.

Claimants, through their attorneys, produce in court and in settlement the evidence that is required for them to be successful and that is sufficient to make a defendant (or its counsel) realize that the defendant faces a real risk of a substantial adverse judgment should the claim go to trial. Claimants have no reason to produce evidence beyond that necessary to secure a settlement.

Grace's rules are not the rules by which Grace or any other defendant has ever determined the values of asbestos claims or determined whether or not they have value at all. Plaintiffs, Grace, and other defendants look to the laws and practices of real world litigation in assembling and assessing evidence for their law suits, not to Grace's fictitious (and then nonexistent) new rules that never determined the merits or values of those claims.

The novelty of Grace's rules creates a basic and un-fixable flaw in Dr. Florence's estimation. Claimants and Grace do not routinely have information in their files pertaining to Grace's novel new rules. They have had no reason to. The rules did not exist. They had not even been proposed. Had the rules of actual litigation been different, the evidence would then have been different as well. If Grace had demanded and been able to enforce demands that claimants satisfy its new rules (which, of course, did not even exist when these claim files were generated), then claimants would have had reason to provide the evidence pertaining to the rules that Dr. Florence now needs for his analysis. Many would have provided the evidence. But Dr. Florence has no way to determine how many claims would have satisfied Grace's rules if they had then actually existed. And Dr. Florence *cannot reasonably conclude* that any, let alone all, claimants would be unable to satisfy Grace's novel rules simply because they have not yet provided evidence needed to satisfy these rules that have never existed.

Yet that is just what Dr. Florence has done. His entire forecast, all of his simulations for pending and closed claims, are based on looking at these claims and saying that "No, these claims do not count for estimation, because right now they do not have the information they need to meet Grace's rules." It does not matter that they have never had to meet the rules, that claimants did not even know about the rules, or that they might be able to meet these rules in the future should they ever be required. Right now they have not, from which Dr. Anderson says they "do not have merit and should not be considered further." This is not only astoundingly wrong as research, it is grossly unfair. Grace and Dr. Florence would deny the value of asbestos claims for failing to

mesothelioma claims that would be accepted under Grace's new rules, and Dr. Florence would have derived a much higher estimate of Grace's liability within its own new liability system.

Even when it provided documents, Grace was carelessly incomplete in what it provided. For example, the claim file for Dennis Emrick (417597.pdf) contained only every-other page of the manuscript for his perpetuation deposition, the most important document for this $1 million claim.[34]

### 3.3. Grace Withheld Many Documents from Dr. Florence, Jeopardizing the Integrity of His Analysis

Whatever reason that Grace failed to provide these documents that Dr. Florence required for his analysis, Grace intentionally withheld other important documents from Dr. Florence and parties to this case under claims of privilege. Before giving Dr. Florence the claims files for his sample of closed claims, Grace's counsel screened those files and then withheld many documents. Almost every claim that I reviewed listed large numbers of such withheld documents. Frequently the documents withheld by Grace appeared necessary for Dr. Florence's review and his coders' decisions about whether or not a claim would be compensable under Grace's new rules. Many of these documents would have helped to explain Grace's settlements decisions for particular claims, an issue that is central to the Court's present estimation proceedings. Among the documents that Grace withheld are:

- deposition transcripts, settlement and case summaries, disposition reports, status reports, letters and documents obtained from plaintiff's attorney (Claim of Donald Wayne Halpain, 408478.pdf)

- documents about plaintiffs' demands, reviews of claim, settlement, copies of deposition pages (Claim of William McCauley, 371068.pdf).

- discussion of exposure history, discussion of medical reports, summary of case (Claim of Swen Olin, 412880.pdf)

- discussions of case, settlement discussions, status of case, plaintiff's employment history, medical reports, pathology reports, plaintiff's demand (Claim of Marvin Pearson, 394831.pdf)

- medical reports (Claim of Jack Kenworthy, 407677.pdf).

In many of these files, the withheld documents are the only documents that might address matters for which Dr. Florence undertook his data collection.

While this exercise of privilege may be standard when Grace provides documents to third parties, it is inappropriate to withhold information from an empirical analysis of closed claims that Grace itself is proffering as showing lack of evidence in its files. Grace's claim of privilege *against itself* is devastating to the integrity of Dr. Florence's analysis. Counsels' edits imposed a partisan litigation process in the middle of what was supposed to be an objective empirical study of Grace's historic settlement values. Dr. Florence did not get all of the information available for his sampled claims, but only those claims that had been screened and approved by Grace's counsel. Counsel could have and in some cases seems to have determined Dr. Florence's conclusions by choosing to give or withhold particular documents. This censorship of information by Grace's counsel is simply unacceptable for the analysis of Grace's potential liability to be fair and objective.

Whether or not Grace's claims of privilege would be legitimate in response to an adversary's

---

34.   This carelessness seems to have been compounded by the Delaware Facility who reviewed and coded these data. We saw no indication that the Facility noted or asked for correction of the omissions.

discovery demands, its frequent claim of privilege in withholding documents from its own experts and data coders undercuts its own novel claims valuation analysis that it offers as the basis for estimation in this case. Grace is attempting to rely on an absence of information that is, in substantial part, the product of its own failure to provide its experts with information that is in its own files! In this case, Grace has been aggressive in pressing plaintiffs' law firms and others to provide an unprecedented set of information for its novel approach. But when Grace had to provide information about closed claims, which only it could provide, Grace withheld and failed to provide its own experts with the information that would identify which closed claims satisfied its new rules. Grace sabotaged its own estimation theory and analysis.

### 3.4. Dr. Florence Does Not Adequately Address His Missing Data Problems

Dr. Florence never addresses this missing data problem adequately. He asked his coders to indicate if a claim file had *some* information pertaining to Grace's new rules, but coders responded to this haphazardly and their responses cannot support analyses that Dr. Florence makes from coders' responses. My reviews of closed claims that coders reviewed show that they would say "No, there was no information" when there clearly was, and they would say "Yes, there is information" when the file clearly lacked information adequate to see if the claim satisfied Grace's rule. Coders' confusion is understandable. Dr. Florence did not provide instructions as to how coders were to code this decision. But then, neither the coders nor Dr. Florence could know if a file contained *all pertinent* information, the only case for which their coding decisions could be made. As a result, coders' responses seemed at best to address whether or not the file contained *any* information pertaining to Grace's rules without telling us if that information was substantial, let alone adequate for decisions about satisfaction of Grace's rules. For the reasons I have discussed it is unlikely that more than a few pending or closed claims would have had all information that coders needed. Even then, coders could not have identified these claims.

## 4. Values of All Pending and Future Claims Are Based on Only 28 Previous Settlements

In the end, Dr. Florence is left with so little information about claims values that his entire forecast rests on a trivial number of past settlements. The value for almost every pending and future claim in Dr. Florence's forecasts is based on Grace's settlements of only 7 claims.

To value pending and future lung cancers, Dr. Florence used the average values for the only 7 lung cancer claims in his closed claim sample that his coders found meeting Grace's new rules. But he then used these 7 claims further, as the basis for valuing all nonmalignant and other cancer claims as well.[35] Astoundingly, Dr. Florence explains that he used only 7 lung cancer claims to value other cancers "because there were insufficient other cancer closed claims'' (Florence, p. 15). And he used 7 lung cancer claims to value Grace's several categories of nonmalignant claims because Grace did not have adequate data about nonmalignant claims (Ibid).

The empirical basis for Dr. Florence's mesothelioma values is just as slim--21 sampled closed claims that he said met Grace's new rules (Ibid). Grace settled 1,725 mesothelioma claims for a total of $129 million during 1998-2001, Dr. Florence used settlements of just 21 claims during the two year period just prior to the bankruptcy date, totaling $3.1 million to value mesothelioma claims that were pending or would be filed in the future.

So, Dr. Florence's entire forecast of Grace's liability is based on settlements of just 28 claims. This is a wholly inadequate basis for a forecast. Neither 7 nor 21 nor 28 settlements can provide a stable and reliable basis for forecasting values of many thousands of other claims. This is shown by a simple example. If Dr. Florence had added settlements for the examples of closed claims that I discussed in this report, the Emrick and McCauley mesothelioma claims and the Kenworthy and Pearson lung cancer claims--all clearly compensable claims whose values Dr. Florence should have included--his overall liability forecast for Grace would have almost *doubled*, from his $712 median present value to $1.37 billion. For all the reasons that I discussed in this report, this would still be a meaningless number based on Grace's fictitious rules and the complete lack of any useful data. And the resulting forecast would still be unacceptably unreliable, based on only 32 past settlements, mostly on 9 lung cancer settlements. But the example illustrates just now unreliable and, therefore, meaningless Dr. Florence's forecasts actually are. No forecast can be taken seriously where the addition of only four more historic settlements can cause the forecast to double. No matter what its other features, no credence can be given Dr. Florence's forecasts resting on such a trivial and unreliable empirical basis.

Beyond the striking paucity of settlements relied upon by Dr. Florence for his claim values, the past settlement averages for closed claims that Dr. Florence uses provide no insight about how much Grace would have to pay now to settle pending claims that would meet its new rules. Averages among claims settling six to eight years ago and that happened to have evidence meeting the then-unknown rules that Grace has now invented do not measure how much Grace

---

35.    He first obtained a set of ratio multipliers as "the average settlement values for other cancer, severe asbestosis, asbestosis, and unimpaired asbestosis claims as a ratio to lung cancer based on the average ratios of values found in four recent asbestos trusts (Armstrong, Babcock & Wilcox, USG, and Pittsburgh Corning)'' (Florence, p. 15). He then calculated Grace's average settlement values by applying these ratio multipliers to the average of the 7 lung cancer settlements meeting Grace's new rules.

Because the claims criteria in each of these TDPs are different from Grace's extreme new rules, the ratios of values in those trusts have nothing to do with relative values of claims under Grace's rules. But while these criteria differences make Dr. Florence's ratios wholly inappropriate for forecasting Grace's liability under its new rules, this problem fades in comparison to relying on just the 7 past settlements to forecast Grace's liability for all pending and future asbestos claims.

would have to pay now to settle claims that would be required to and did meet Grace's new rules. Grace's newly invented rules were not the bases for establishing settlement amounts during 1999 to 2001.

Today Grace's new rules would identify exceptionally valuable claims that meet Grace's onerous standards.  Indeed, Grace would certify these as exceptional and valuable claims.  In effect these would be claims against which Grace had no substantive defense, leaving aside the rare instances in which it might have had legal defenses like prior release, statute of limitations and the like. Were Grace's rules somehow to be accepted today as the governing standards, they would identify a small number claimants with exceptionally valuable claims who had striking exposures to Grace asbestos products (enough exposure so that Grace asbestos by itself could have caused their asbestos disease) and that even the aggressively litigating Grace has validated as valuable.

Although neither Grace nor Dr. Florence has asserted that past claims were ever required to satisfy Grace's novel new rules in order to receive settlements, Dr. Florence now treats past settlement values among the few claims meeting Grace's rules as having been made in consideration of a claimant's satisfaction of Grace's then-unheard of rules.  They were not.

## 5. Dr. Dunbar's Report Is Misleading and Uninformative

Before closing, I have a few comments about Dr. Dunbar's report for this estimation proceeding. Dr. Dunbar's report does not figure into Dr. Florence's estimation and the point of his report here is not apparent. Should he testify in the estimation proceedings, I may have further comments.

Most of Dr. Dunbar's report is his view of the history of asbestos litigation. This is less an objective description of the litigation than a partisan regurgitation of Grace's view of the litigation. Dr. Dunbar frequently bases his "history" on representations made by Grace or other defendants in pleadings or statements by Grace's asbestos lawyers about their interests in and views of the litigation (see, e.g. Dunbar Report, pp. 22, 26-28).

Dr. Dunbar substitutes his client's diatribe against plaintiff lawyers for balanced consideration of both the problems and the positive contributions that they have brought to the litigation. Dr. Dunbar totally disregards, for example, the plaintiffs' bar's development of the new TDPs that trusts now use to allow and value claims channeled to the trusts. And he fails to recognize how these changes will help reshape litigation of asbestos claims in courts, by discouraging claims that cannot meet the trust's newly strengthened requirements and by increasing the quality of claims that will continue to come forward for compensation by trusts and in litigation. These TDPs represent the most important reforms that strengthen requirements of claimants to show meaningful exposures and demonstrations that those exposures contributed to their asbestos-related injuries. To obtain more than token payments from a trust, claimants must present evidence of their significant occupational exposures to asbestos, their exposures by the particular defendant, and a serious injury (cancer or an impairing nonmalignant disease). Plaintiffs' lawyers and their professionals in bankruptcy cases developed and implemented these new rules. Dr. Dunbar neither credits nor recognizes these reforms.

Certainly the tort system is far from perfect. But Dr. Dunbar describes only what he claim as defects in the tort system that are adverse to defendants. Arguably the biggest "defect," which courts and objective commentators have repeatedly recognized, is the fact that there are simply not enough courts and court trial days available to allow plaintiffs to get their cases to trial in anything resembling an expeditious schedule. Mass tort claims in general, and asbestos claims in particular, often sit for years before there is any prospect of a trial, a factor which defendants like Grace consistently used to their advantage in settlement decisions.

Dr. Dunbar frequently mis-describes the history of the Manville trust, particularly the events that led to its insolvency in 1990, and the development of the two TDPs which it has operated under since 1995, both of which I participated in as the Special Expert for Judges Weinstein and Lifland. Dr. Dunbar mis-characterizes the Manville Trust's medical audit and the results and conclusions of that audit, matters of which I am acutely aware from my own participation. I am personally responsible for this audit, having inserted the Trust's obligation to conduct audits in the TDP that settled the Trust's limited fund class action litigation and then having talked the Trust's staff into actually carrying out the audit. The primary conclusion about the audit, as stated by the Trust's consultants at Pennsylvania State University and the University of Pennsylvania, is that B-readers' conclusions about X-rays are so variable that the Trust could not legitimately substitute conclusions of the Trust's B-readers for those of any claimant's B-readers. It is understandable that Dr. Dunbar did not want to emphasize this conclusion, since it undercuts his client's new rules that lung cancer claimants can qualify only if Grace's experts agree with B-reads provided by claimants (Florence Report, pp. 2 and 10).

Grace's new B-reader rule is clearly inconsistent with principles of litigation in this country. It would allow Grace itself, as a party in litigation, to become the fact finder in the litigation as well, simply because it could generate partisan evidence contrary to a claimant's evidence. But, as Dr. Dunbar does not note, this rule is also inconsistent with well established, independent research

about the great variability in B-readers' interpretations of X-rays. This variability that was so apparent in the Manville Trust's audits that its experts told the Trust it could not legitimately do what Grace and Dr. Florence have done here, replacing claimants' own evidence with the conclusions by Grace's experts.

Dr. Dunbar's recitation of asbestos litigation's more recent history is no better balanced. Contrary to the evidence that I present in my expert report and the observations by lawyers who actually participate in asbestos litigation, Dr. Dunbar argues that "settlement averages have declined" recently (Dunbar Report, p. 73). To support his argument, he plays misleading word games and presents (also misleading) data for only one, atypical defendant, Bendix.

Bendix manufactured brakes and other automotive friction products. Like all friction product defendants, Bendix faces real litigation threats from mesothelioma victims who can show exposures to its products, but less significant risks than non-friction defendants for other disease claims. Most claims against friction defendants, like Bendix, are from persons with occasional exposures as "shade tree mechanics" who changed their own brakes or from claimants' brief exposures while working in repair garages. Unless a claimant has mesothelioma, these fleeting exposures present relatively little risk to friction product defendants and have little settlement value.

Dr. Dunbar jumbles up all this in making his argument for declining "settlement values." First, he never presents any data about "settlement values" as he claims that he does. Rather, his table (Figure 36) and discussion for Bendix involves *resolution values* which are calculated across all of the claims that a defendant resolved, both those paid settlements and those closed without payment (Ibid, p. 74). Dr. Dunbar acknowledges that resolution values "reflect both settlements and dismissals" (Ibid). The resolution average trends that he describes can be, and almost certainly are, the result of increases in the percent of claims that Bendix and others have closed without payment rather than decreases in the actual settlement amounts when they do pay claimants. As I discussed in my expert report, recent and expected trends are of increasing rates of claims rejections by asbestos defendants, but increasing values for those claims that are paid. By presenting trends in *resolution values*, Dr. Dunbar collapses rejection rate trends together with what would likely be increasing trends in Bendix's settlement values among mesothelioma claims. He never presents any evidence about the actual trends in settlement values paid by Bendix or by any other defendant, but rather tries to mislead the Court by presenting these *resolution trends* after saying that he will discuss settlement trends. Further, he never presents trends for any specific type of cancer, but only for all "malignant claims." This exacerbates his misleading substitution of resolution values for settlement values. First, trends in settlement values differ among cancers: mesothelioma claims have increased much more dramatically than settlements among other cancers. His Bendix data provide no information about the types of claims, mesothelioma, that present the greatest and most sharply increasing threats to Grace and other asbestos defendants, as I again describe in my expert report. Second, as a friction product defendant, a significant percentage of Bendix's resolutions of lung and other cancers will be dismissals rather than settlements, as I discussed above. This further obscures the trend in Bendix's mesothelioma settlement values, trends that have been increasing among other defendants. So by incorporating all of these different trends--dismissals and settlements for lung cancers, for other cancers, and for mesothelioma--Dr. Dunbar's Bendix data carries no information about actual trends in its settlement values for any type of disease or across all diseases.

Dr. Dunbar refers to "10-Ks of other defendants" to support his claim that "settlement averages have declined." Since these provide even less information--these are trends in *resolutions* calculated across every type of disease--they do not support his claim of decreasing settlement values.

In fact, the broadest available information from property/casualty insurance companies is consistent with the trends of increasing settlement values (particularly for mesothelioma) that we have seen among many specific defendants. Insurers' current and projected costs of asbestos claims have increased sharply since 2001 according to a June 27, 2007 update of the Table of "U.S. Property/Casualty Asbestos Loss and Expense Net of Reinsurance" presented by TheStreet.com. This table was first presented by the American Academy of Actuaries in 2006 and updated with data from the "National Association of Insurance Commissioners" (Declaration of Robert M. Horkovich Authenticating Chart, September 21, 2007). Insurers' annual payments for asbestos claims almost doubled during 2003-2006 from the averages during 2000 and 2001. Annual payments were greatest in 2004 but remained much higher in 2005 and 2006 than they had been before: 2006 payments were 167 percent of payments during 2000 and 2001. Insurers' total costs to resolve asbestos claims have been increasing at a time when there have been sharp decreases in claim filings and in the number of settled claims. This means that the *average settlement* paid by insurers have been increasing at rates that are likely faster than rates of increase in their total payments. Moreover, insurers anticipate that this will increase. Insurers' estimates of their entire future and incurred costs increased in every year--by 2006 the $59.24 billion estimate was 81 percent greater than the estimate from 2000.

Dr. Dunbar also ignores the extensive evidence cited and discussed in my June 2007 expert report in this case, which clearly demonstrates that mesothelioma settlement values have increased substantially from 1999-2000 to the present time (Peterson Report, pp. 23-30).

## 6. Rule 26 Disclosures and Signature

DATA CONSIDERED:  In reaching the opinions and conclusions set forth in this Report, I have considered, in addition to the data considered in my original June 2007 Expert Report, the following information: my background, training, experience and knowledge of the asbestos litigation developed over the past 25 years, the items of data explicitly identified in the report, publicly available sources of information concerning inflation rates, and publicly available documents about Grace including its 10-Ks and 10-Qs.

QUALIFICATIONS:  My qualifications to perform this analysis and provide expert testimony are set forth in my C.V., a copy of which was attached to my June report as Exhibit 1.

PUBLICATIONS:  Any publications I have authored within the past ten years are set forth in my C.V., a copy of which was attached to my June report.

COMPENSATION:  My compensation for services rendered in this case is set forth in the fee applications Legal Analysis Systems files on a regular basis with the Bankruptcy Court.  At present, my hourly rate is $700.

PRIOR TESTIMONY:  A listing of all cases in which I have testified as an expert at either trial or deposition within the past four years was attached to my June report as Exhibit 2.

I reserve the right to modify this report as new information becomes available between now and the time of trial.  I anticipate that I will review the expert witness reports of opposing expert(s) and offer my opinions about their analyses and conclusions in rebuttal testimony.

```
                                /s/ Mark A. Peterson
        _____
                                Mark A. Peterson, J.D., Ph.D.
                                LEGAL ANALYSIS SYSTEMS
```