# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. Grace & Co., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Re: Docket No. 14597** |
| | ) | |
| | ) | **Claim Nos.: See Exhibit 1** |
| | ) | **Reply Deadline: October 26, 2007 @ 4:00 p.m.** |

## ANDERSON MEMORIAL HOSPITAL'S SUPPLEMENTAL POST-HEARING MEMORANDUM RE: CANADIAN STATUTE OF LIMITATIONS

By and through Anderson Memorial Hospital and on their own behalf, Canadian Claimants listed on Exhibit 1 respectfully submit this Supplemental Post-Hearing Memorandum Re: the Canadian Statutes of Limitations.

### I.    Summary of Material Facts in Dispute

On February 19, 2007, the Debtors moved for summary judgment on 88 out of 89 then pending Canadian claims.[1] To prevail on its motion, Grace must establish that there are no genuine issues of material fact that every single one of these claims is barred by the applicable limitation acts of the various Canadian provinces in which the buildings stand.

The Canadian claimants contend that the ordinary statute of limitations is not a bar to these claims because the record demonstrates that almost all of the fifty-six (56) remaining

---

[1] Due to product identification withdrawals, only fifty-seven (57) of the eighty-nine (89) Canadian claims remain. Of the fifty-seven (57) remaining Canadian claims, only fifty-six (56) are before the Court on summary judgment. Grace did not seek summary dismissal of Claim No. 12533 which is a building in Montreal, Quebec. Of the fifty-six that are subject to Grace's summary judgment motion, thirty-three (33) are buildings (mostly school buildings) in Alberta, five (5) are buildings in British Columbia, one (1) is in Manitoba, three (3) are Newfoundland, one (1) is in Nova Scotia and thirteen (13) are in Ontario. (See, Ex. 1).

claimants did not learn that the Grace product in its building contained asbestos until 2003.[2]

Moreover, since a cause of action in Canada cannot arise or accrue until damage occurs, Grace's failure to admit that its asbestos-containing products have caused damage or are even capable of causing damage to any claimant's building precludes the Debtors from establishing their statute of limitations defense.    Indeed, the crucial factual dispute in this case is whether Grace's asbestos-containing products contaminate buildings by releasing asbestos fibers and creating an unreasonable risk of harm or a "real and substantial" danger to persons or property. As stated by the Debtors' designated expert on Canadian Tort Law, Professor Lewis Klar, the issue in a Canadian asbestos building case is not whether Grace's MK-3 fireproofing "contains" fibers, but whether the fireproofing "releases" fibers into the environment.    (04/04/2007 Deposition of Professor Lewis Klar, p. 126).    It is not until the asbestos fibers are released in concentrations sufficient to create an unreasonable danger to persons or property that a cause of action arises.

## II.    Accrual of Cause of Action

The critical legal principle in dispute in this case is when, under Canadian Law, does a cause of action for economic loss due to a "shoddy" or "defective" building (a true *Winnipeg Condo* case) accrue or arise sufficient to trigger the statute of limitations.    Based upon the *Winnipeg Condo* case itself, along with the developing Canadian case law, such a cause of action accrues on

---

[2] In its Supplemental Memorandum, the Debtors suggest that the claimants must come forth with "other evidence" and cannot rely upon the allegations in their proof of claim forms. (Dk. No. 16755). Given the long history of this case, the litigation leading up to the specialized claim forms required by the Court and the repeated representations of the Debtors to this Court regarding the import of the proof of claim forms, this suggestion is absurd. Apart from the requirement that the proof of claim forms be signed by the party "under penalty of perjury" (the same as an affidavit), the Debtors successfully moved this Court for an Order requiring Speights & Runyan to obtain claim forms signed by the claimants (as opposed to the attorneys) specifically answering the question of when the claimant learned that its building contained an asbestos-containing material manufactured by Grace. (Dk. No. 12919, p. 96). Grace has also repeatedly represented to the Court that it could streamline the trial of objections because of the evidentiary content of the claim forms. Finally, to preserve the evidentiary force of the claim forms, Grace successfully urged this Court to enter an Order prohibiting claimants from amending claim forms without Court approval. (Dk. No. 16470). Grace cannot seriously be heard to suggest that it can on the one had require, through Court Order, that these Canadian claimants personally answer, under penalty of perjury, the question of when they first learned that their building contained asbestos-containing products manufactured by Grace, and then on the other hand, argue that the Claimants cannot rely upon these very same averments to create a genuine issue of material fact.

> The date when a plaintiff becomes aware, or ought with reasonable
> diligence to have become aware, that is building presents a
> situation of actual or impending danger, a danger sufficiently
> substantial to warrant, as a matter of reasonable prudence, the
> undertaking of prompt remedial preventive intervention.

(Dk. No. 16754, p.22 and Appendix B p. 1). In order for the damage to be actionable, there must

be a condition in the building that is "positively dangerous." (Id, Appendix B, p. 5). Therefore,

in order to prevail on its statute of limitations defense, the Debtors must show that there is no

dispute of material fact that its asbestos-containing products created a "real and substantial"

danger to each claimants' building which was discovered by the claimants more than the

prescribed number of years prior to filing suit.[3]

*Winnipeg Condo* lends instruction. The facts reported were that the building was

constructed, with defective components in place, in 1972. Seventeen years later, after the

building had changed owners, the cladding on the front of the building separated and fell nine

stories down to the ground. Seventeen years after the defective components were installed in the

building, the owners of the condominium brought suit against the original builders of the

condominium seeking to recover millions of dollars to repair the cladding and prevent further

accidents. The case was dismissed in the lower courts and the Plaintiffs appealed. The Supreme

Court of Canada reviewed the case in 1995 and reversed the precedent upon which the dismissal

was originally based, finding that Canadian courts would now recognize causes of action for

economic losses for "shoddy" or "defective" buildings where the plaintiff could show that the

"shoddy" or "defective" building posed a "real and substantial" danger to persons or property.

---

[3] The effect of class action tolling from the *Anderson Memorial* case and the issue of whether the applicable filing date for limitations purposes was April 2, 2001 or December 22, 1992 has previously been argued and is the subject of discussion in the Report of Professor John Irvine. The Claimants will not repeat those arguments here again, but simply incorporate its prior submissions on this point and note that class action tolling is a matter of both American law and Canadian law. *See, American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554, 94 S. Ct. 756, 776, 38 L.Ed.2d 713 (1974); *Crown Cork & Seal v. Parker*, 462 U.S. 345, 103 S. Ct. 2392, 76 L.Ed.2d 628 (1983); *McDonald v. United Airlines*, 432 U.S. 385, 97 S. Ct. 2464, 53 L.Ed.2d 423 (1977). (Dk. No. 14898, pp. 5-8); (Dk. No. 16754, pp. 15-17).

Though not specifically addressed by the Canadian Supreme Court, this analysis implicitly recognized that a cause of action under the new *Winnipeg Condo* cause of action would not arise until the "shoddy" or "defective" construction created a "real and substantial" danger to persons or property. This is especially evident from the fact that the case had come through the Manitoba courts and was subject to Manitoba limitations law which does not give claimants an automatic right to invoke the discovery rule. (Dk. No. 16754, p. 32, Appendix A and Appendix B, pp. 10-14).

Post-*Winnipeg Condo* case law has offered further guidance supportive of this accrual standard, but without producing a definitive holding. Nevertheless, the concept is perhaps best explained in a concurring opinion from the Manitoba Court of Appeals, in *Sentinal Self-Storage v. Dyregov*, (2003) 180 Man. R. (2d) 85 (¶70) (Exhibit 2), where Madame Justice Steele explained the accrual standard for a *Winnipeg Condo* type case as follows:

> if this action is categorized as one of economic loss due to defective structure, the damage is not inflicted until the building is found to contain defects which pose a real and substantial danger to the occupants of the building or other property. It is only when a defect poses a real and substantial danger or there is imminent possibility of such danger that the cause of action is complete.

This is also consistent with the testimony of Grace's Canadian Tort Law expert, Professor Lewis Klar. Professor Klar candidly admitted that if there is no "real and substantial" danger, then there is no claim. (04/04/2007 Deposition of Professor Lewis Klar, pp. 134-137). Professor Klar further testified that in a *Winnipeg Condo* type case, the question of when the defective building components began to pose a "real and substantial" danger is a question of fact. Specifically Professor Klar testified as follows:

Q.    Is it a fair statement of Canadian law that, in order to establish a claim based upon negligent design and construction, the plaintiff's cause of action requires the existence of damages considerably beyond minimal or nominal in order for a suit for pure economic loss to succeed?

A.    I would say that in order for a plaintiff to succeed in a claim for pure economic loss to repair or restore a building to a non-dangerous state or a product the building must pose a real and substantial danger to persons or property. In order for such a claim to succeed that must be established.

Q.    And when that occurs is a matter of fact based on particular circumstances of each building? . . . Would you agree with that?

A.    Yes, I would agree it would be a question of fact. When a product or a building poses a real and substantial danger that would be a question of fact.

(Id, at p. 141).

Nevertheless, Grace supports its motion with the testimony and affidavit if its Canadian statute of limitations expert, Mr. Graeme Mew, who, at the base of his opinions regarding when statues begin to run and what building owners "should have known" rests upon a single premise – that a Canadian cause of action for asbestos property damage arises in every single Province at the moment the asbestos-containing material is installed in the building. (Dk. No. 14136, p. 10; 3/15/07); (03/15/2007 Deposition of Graeme Mew, pp. 81-82). This conclusion is made without reference to any factual basis. Indeed, the factual predicate for this opinion – that Grace asbestos products create any risk of danger to persons or property in Canadian buildings from the moment they are installed, has been denied under oath by Grace. Accordingly, there is clearly a question of fact as to when the *Winnipeg Condo* cause of action accrues.

Mr. Mew's legal support for this expansive opinion is founded on two decisions emanating from the Province of British Columbia; *Privest Properties Ltd v. Foundation Co. of Canada*, (1995) 11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385 (B.C.S.C.), and *Armstrong v. West*

*Vancouver*, (2003) 10 B.C.L.R. (4th) 305, neither of which represent any binding precedent on this court or on these Canadian claimants.[4]

*Privest Properties Ltd v. Foundation Co. of Canada*, (1995) 11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385 (B.C.S.C.), *aff'd in part*, [1997] 31 B.C.L.R. (3d) 114, (1997) 31 B.C.L.R. (3d) 114, *supplemental reasons* [1997] 36 B.C.R. (3d) 155 (B.C.C.A.); *leave to appeal refused* [1997] 224 N.R. 152, is the only asbestos property case in Canada to ever reach the trial stage.[5] (Dk. No. 16754, p. 12). As explained by Professor Irvine, the decision is "lengthy, careful and elaborate in the sense that it deals with a multiplicity of discrete issues, difficult questions of law." (Id). However, in the final analysis, the critical issue of the case – the "set of issues which [would have] enabled Drost, J., had he so chosen, to dismiss the case without more" came down to the finding, based solely on the evidence presented in that particular case, that "MK-3 was not an inherently dangerous product." (Id). As the Court of Appeals concluded,

> For the reasons which follow, we have concluded that Mr. Justice Drost did not err in finding, **on the evidence before him,** that MK-3 was **not** an inherently dangerous product. Since our conclusion in that regard is determinative of the appeal, it is unnecessary for us to deal with the other issues raised. We would, therefore, dismiss the appeal.

(Dk. No. 16754, p. 13) (emphasis in original) (citations omitted).

Importantly, because this primary factual finding by the trial court was conclusive of the case, other findings in the case such as Drost, J.'s contradictory finding that the statute of

---

[4] Indeed, Mr. Mew candidly admitted in is March 15, 2007 deposition that neither the legal nor factual findings stated in *Privest Properties Ltd v. Foundation Co. of Canada*, (1995) 11 B.C.L.R. (3d) 1, [1995] 10 W.W.R. 385 (B.C.S.C.), would be binding upon any other subsequent litigant bringing the same type of claim against the Debtors in British Columbia, let alone the other Provinces in Canada. (3/15/2007 Deposition of Graeme Mew, pp. 102-105). This is because in affirming the trial decision in *Privest*, the British Columbia Court of Appeals expressly declined to consider any of the legal or factual findings made by the trial court on the statute of limitations issue. *Privest v. W. R. Grace & Co.*, [1997] 5 W.W.R. 265, ¶4 ("For the reasons which follow, we have concluded that Mr. Justice Drost did not err in finding, on the evidence before him, that MK-3 was not an inherently dangerous product. Since our conclusion in that regard is determinative of the appeal, it is unnecessary for us to deal with the other issues raised.") *See also*, (Dk. No. 16754, p. 26).

[5] Immediately after the trial of *Privest*, Grace settled a number of other cases pending in Canada. (Dk. No. 15069).

limitations begins to run upon the installation of the product, lack the importance and utility of the primary finding.[6]  (Id).

Indeed, when viewed analytically, a finding that a product with a an allegedly latent defect is not dangerous and has not caused any damage is patently inconsistent with a finding that the statute of limitations begins to run the minute that product is installed.  Indeed, a product like MK-3, which is installed well before the completion of the building or its occupancy can hardly be said to present a "real and substantial" danger to persons or property before anyone has had a chance to be exposed to it.  This is precisely why Professor Irvine has opined that the limitations portion of *Privest* is wrong.[7]

Professor Irvine further opines that Mr. Mew's reliance on *Armstrong v. West Vancouver*, (2003) 10 B.C.L.R. (4th) 305 is similarly misplaced in a number of different ways.  (Dk. No. 16754, pp. 18-19 and Appendix B, pp. 1 - 10).  Primarily, the accrual standard in *Armstrong* is for a different category of economic loss claim (negligent inspection) with different policy considerations behind it.  But more importantly, the problem created by Mr. Mew's opinion is that he takes an inapposite holding from one Province and boldly asserts that it sets the accrual standard across all relevant Provinces of Canada.  As stated by Professor Irvine, "to pretend that all these limitations periods, so differently expressed in their respective statutes, all begin to run at the same conceptual point; and to add that that point in every instance the "date of installation

---

[6] Professor Irvine has repeatedly opined that the statute of limitations accrual finding was, at best, *obiter dicta*, and at worst, an alternative or secondary finding.  (08/22/2007 Deposition of Professor John Irvine, p. 26), noting that the statute of limitations finding was made without reference to any Canadian legal authority, and that the running of the statute prior to the occurrence of any damage caused by the MK-3 violates the basic premise of Canadian limitations law – that a cause of action cannot accrue until all elements necessary to perfect the claim have transpired. (Dk. No. 16754, n. 51) ("it is axiomatic that a cause of action in negligence is complete only when damage resulting from the defendant's acts or omission is shown.")

[7] That the trial judge in *Privest* was wrong in his legal analysis of the law of limitations in a *Winnipeg Condo* type case has become manifest on one respect:  the limitations finding that there was no discovery rule for a cause of action for negligent economic loss has been subsequently rejected by the British Columbia Court of Appeals. (Id, pp. 61-65).

of the allegedly defective product" as Mr. Mew states at page 15 of his opinion, is not self-evidently right." (Dk. No. 16754, p. 18).

In contrast to the Debtors' expert, Professor Irvine has concluded that Canadian courts have not and would not summarily dismiss claims such as these without the full factual presentation of a trial. (Id, p. 27 and Appendix B, p. 13-14). Indeed, even *Privest* where the installation of the product clearly preceded the filing date by more than a decade, there was a full trial to determine the facts. In his report and testimony, Professor Irvine states that the legal issue of when a statute of limitations for a "shoddy or defective" building case "arises" is far from settled in any Canadian province, noting that Canadian Appellate courts have consistently dodged this very issue, citing the need for a complete factual record to be presented. (08/22/2007 Deposition of Professor John Irvine, pp. 33-34).

> [In] *Winnipeg Condo. No. 36 v. Bird Construction (No. 2)*, (1999) 131 Man. R. (2d) 283, *overruling* 130 Man. R. (2d) 203; *Sentinel Self-Storage Corp. V. Dyregov*, (2003) 180 Man. R. (2d) 85 and *Valley Agricultural Society v. Behlen Industries*, 184 Man. R. (2d) 263, *reversing* (2003) 172 Man. R. (2d) 248, . . . the Court of Appeal declines to elaborate on whether a "real and substantial danger" is present in the absence of a complete picture of the evidence adduced at trial. As Chief Justice Scott put it on behalf of the Court, in relation this very issue in the *Valley Agricultural Society case* [at p. 267, para. 12]:
>
>> In my opinion, this is not an appropriate case for summary judgment based on affidavit evidence alone. This is because there is a lack of evidence to establish the essential factual background to enable the court to decide the complex and unresolved point of law that this case raises.

(Dk. No. 16574, Irvine Report, Appendix B, p. 14).[8]

---

[8] Professor Irvine affirmed the opinions set forth in his report under oath at the conclusion of his deposition. (08/31/2007 Deposition of Professor John Irvine, p. 126).

Moreover, Professor Irvine's opinion that any decision as to when a cause of action "arises" should only be decided upon a full evidentiary record at trial is further supported by the British Columbia Law Commission "Report on the Ultimate Limitation Period: Limitation Act, Section 8." In that report, the Commission specifically recognizes that the British Columbia "ultimate limitations" period begins to run, by statute, only after the damage has occurred. (Exhibit 3, *British Columbia Law Commission*, "Report on the Ultimate Limitation Period: Limitation Act, Section 8", p. 25). It is incumbent upon the court, then, to determine when the damage occurred before it can determine when the "ultimate limitations" period began to run. "Where damage has gone undetected for some time, this may be a daunting task. Uncertainty is created which **can only be resolved after a full trial of the issue**." [Id] (emphasis supplied).

The Debtors have likewise glossed over specific provisions in the Limitations Act of Alberta and British Columbia which require the claimant to have actual or imputed knowledge of the identity of the defendant to trigger the statute of limitations. In the Alberta *Limitations Act*, S.A. 1996, c. L-15.1 the statute is triggered only when

> The claimant first knew, or in the circumstances ought to have known, (i) that the injury for which the claimant seeks a remedial order had occurred; (ii) **that the injury was attributable to conduct of the defendant**, and (iii) that the injury, assuming liability on the part of the defendant, warrants bringing a proceeding.

(Emphasis supplied). Likewise, the British Columbia Act provides that

> Time does not begin to run against a plaintiff with respect to an action referred to in subsection (3) [including damage to property] until **the identity of the defendant** is known to the plaintiff

*Limitations Act (British Columbia)*, R.S.B.C. c 266 §6(4). Indeed, the Debtors' limitations expert, Mr. Mew, offered testimony regarding this requirement as follows:

Q.    So, in the *Privest*, and I actually think this is somewhere in *Privest*, but among other things, time does not begin to run until the identity of the defendant is known to the plaintiff.  Is that correct?

A.    This section is what is called the postponement provision of the *British Columbia Act*, and it is British Columbia's statutory rendition of the discoverability rule.  So, with that sort of qualification, I agree.

Q.    And is that true in other provinces besides British Columbia, that is, the identity of the defendant is known?

A.    Yes.  In one of the...time starts to have a cause of action. You have to have a defendant, a party whose identity is known, or at least capable of being ascertained.  And that is...it is in statutory form of British Columbia and in some other provinces, and even in those which...it is not in statutory form.  The discoverability rule operates in that fashion.

(03/15/2007 Deposition of Graeme Mew, pp. 112-13.[9]

With only a few exceptions, each of the Canadian claimants presented evidence in its verified claim form that it did not learn that Grace was the manufacturer of asbestos- containing materials in its building until 2003.  (Dk. No. 14898, Exhibit 10).  Accordingly, there is a material issue of fact as to when the limitations periods for which actual knowledge of the identity of the defendant is triggered for those claims.

### III.    Ultimate Limitations Period

#### A.    "Ultimate Limitations" are not Properly Before this Court

On September 1, 2005, after over four years in bankruptcy and almost two and a half years after the bar date for traditional asbestos property damage proofs of claim, the Debtors filed their Fifteenth Omnibus Objection against, *inter alia*, the 57 Canadian property damage

---

[9] Mr. Mew likewise testified that knowledge of the manufacturer is an essential element of proof in a Canadian asbestos property damage case.  (03/15/2007 Deposition of Graeme Mew, pp. 61-2).

claims now subject to the Debtors' motion for summary judgment.[10]   The Fifteenth Omnibus Objection was supposed to be a comprehensive objection by the Debtors which identified every possible ground for objection to traditional property damage claims that the Debtors wished to raise.  It is not overstatement to say that the procedures and content of the Fifteenth Omnibus were painstakingly reviewed, litigated, negotiated and ultimately ruled upon by this Court.  As this Court clearly recognized when it later refused the Debtors attempts to amend their objections – if the Debtors intended to raise an objection, it was their obligation to do so in the Fifteenth Omnibus Objection.

In that objection, the Debtors devoted five pages to the Canadian Statutes of Limitation, citing the specific Canadian statutes and specific limitations periods which it claimed applied to this action citing the specific "ordinary" limitations periods for various Canadian provinces. (Dk. No. 9315, pp. 52-57, n. 17).   Nowhere are the so-called "ultimate" limitations periods referred to or cited.  Indeed, even though Grace's Limitations expert, Mr. Mew, was first hired by Grace in March of 2006 (3/15/2007 Mew Depo., pp. 11-12), it was not until the December 21, 2006 when Debtors filed his expert report that the issue of the "ultimate" limitations was ever raised by Grace.

### B.  No "Ultimate Limitation" for Fraudulent Concealment of the Injury

In Alberta, the "ultimate limitations" period is "suspended during any period that the defendant fraudulently concealed **the fact that the injury for which the remedial order is sought had occurred.**"  *RSA 5(1)*.  This exception to the "ultimate" limitations period in Alberta is significantly tied, not to the concealment of the Defendants acts or omissions, but rather to the fact that any injury has occurred at all.  In an asbestos building case, this means that if there is

---

[10] Of the fifty-seven (57) remaining Canadian claims, only fifty-six (56) are before the Court on summary judgment.  Grace did not seek summary dismissal of Claim No. 12533 which is a building in Montreal, Quebec.  Of the fifty-six that are subject to Grace's summary judgment motion, thirty-three (33) are buildings in Alberta, five (5) are buildings in British Columbia, one (1) is in Manitoba, three (3) are Newfoundland, one (1) is in Nova Scotia and thirteen (13) are in Ontario. (See, Ex. 1)

evidence that Grace concealed the fact that its asbestos-containing products could pose a "real and substantial" danger under foreseeable circumstances, then there is no "ultimate limitations" period in Alberta.[11]

When Grace began marketing its asbestos-containing Monokote throughout the country in the early 1960's, it never disclosed the fact that Monokote contained asbestos. The evidence from Grace's own files and corporate testimony confirms that Grace's own salesmen did not know that asbestos was in Monokote. Even when Grace's competitors began placing warnings on bags of asbestos-containing fireproofing as early as 1962, Grace did not disclose the asbestos content of Monokote to the salesmen who sold, the architects who specified it or the workmen who mixed it and sprayed it.

In fact, as more information became public about hazards of asbestos, Grace made a conscious decision not to inform architects that Monokote contained asbestos. When one of its competitors announced its new asbestos-free fireproofing product had achieved approval from Underwriter's Laboratory in 1970, Mr. Thomas Egan, head of Grace's fireproofing division, sent a memo advising Grace's salesmen not to spread this information, but to "let the architect or other find out for himself . . ."

The ban on the sale of asbestos-containing surfacing materials did not end Grace's efforts to conceal the hazards associated with asbestos in its products. Within one month of the first asbestos property damage verdict in the country, the three largest former manufacturers of asbestos containing fireproofing (Grace, United States Gypsum Co. and National Gypsum Co.) met in secret in Washington, D.C. and formed the Safe Buildings Alliance ("SBA"). The SBA has spent millions of dollars (contributed by its member companies) to reduce the members'

---

[11] Evidence of Grace's concealment is demonstrated in Exhibits 1 – 145 submitted in the Court's binder prior to the September 10, 2007 hearing.

liability by encouraging building owners to forego the removal of asbestos based upon often incorrect and misleading scientific and technical information prepared with the assistance of counsel for its member companies. *In re School Litigation*, 842 F.2d 671 (3d Cir.1987) (holding that the SBA was the alter-ego of its member companies).

SBA's internal minutes confirm the Third Circuit's finding. The minutes reflect, inter alia, that as early as June 1984, SBA intended (1) to lobby and influence Congress, State Legislatures, and Federal and State Regulatory Agencies; (2) to influence public thinking and building owner's decisions through a massive public relations campaign using national and local media, as well as the scientific, technical and trade press and (3) to

> coordinate and, as necessary, directly interact with these [scientific, medical and building sciences] communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication . . . The information developed in this effort may have utility, and therefore cost savings, in providing assistance in the underlying litigation."

SBA, which eventually consisted of only Grace and U. S. Gypsum, spent millions of dollars in these efforts. SBA has lobbied the White House, Congressmen and federal agencies. When the Environmental Protection Agency promulgated the 1990 amendments to the NESHAP regulation, the SBA filed suit against EPA, and spent vast sums challenging the regulation. Rather than waste its own limited time and resources on this issue, EPA agreed to settle the SBA suit and issue the EPA NESHAP Clarification of Intent, 58 Fed.Reg. 51,784-01 (Oct. 5, 1993). Although the clarification did not change the actual regulation, it did make sweeping policy statements in accordance with SBA propaganda. Subsequently, the SBA filed suit against OSHA, challenging its regulations on asbestos.

Despite the fact that it had no interest in this subject outside of litigation (its member companies long ago stopped selling asbestos products), SBA and its members occupied three

seats on the EPA Committee which developed the regulations advising school districts what they should do about asbestos-containing materials. SBA's officers, as well as its member's litigation experts sit on peer review panels for EPA guidance documents and testimonial publications. Despite having no scientific qualifications, SBA's former president and head lobbyist, John Welch, was a voting member of the ASTM asbestos sub-committee of the indoor air quality committee that decided what standards and test procedures would be endorsed by ASTM as scientifically reliable. In the 1980's and 1990's, the SBA blitzed the country with a massive media campaign and generated proposed state and local statutes and regulations to minimize litigation expenses of its members.

SBA's lobbying efforts also included contact directly with many individual state representatives. SBA directly contacted national and local newspapers in an attempt to influence public opinion. Furthermore, newspaper pieces that were written by the SBA highlighted the misleading pamphlet "What You Should Know About Asbestos in Buildings" and were published in newspapers throughout the country.[11] SBA also put their message on the radio waves in a program called "A Question of Safety" which it aired across the country.    As an example of the lengths to which the SBA went to manufacture science, in 1988, the SBA sponsored "the Harvard Symposium," a closed conference in which defense litigation experts were invited to present and publish their work. The information presented at the "symposium" was quickly disseminated by the SBA, which publicized the proceedings in newspapers and radio spots all over the country as a "landmark report." SBA failed to tell that it had contacted Harvard and suggested the symposium and located the co-sponsors. Among those who made presentations at this closed forum were many of Grace's litigation experts.

---

11 *See, In re: Asbestos Schools Litigation*, 115 F.R.D. 22 (E.D.Pa.1986) for discussion of the content and misleading nature of this publication.

As this evidence demonstrates, there are clearly factual issues in dispute regarding Grace's concealment that its product caused damage.

### C.    Accrual under the "Ultimate Limitation"

Even if Grace did not fraudulently conceal the injury caused by its asbestos-containing products, in construing the "ultimate limitations" provisions of British Columbia and Alberta, it is necessary to consider what is meant by the phrase "when the claim arose" for the "injury" of economic loss (in the case of Alberta) and when "the right to do so [bring a cause of action] arose" (in the case of British Columbia).[12]   Like the United States, Canadian courts consider damage to be an essential element that must be alleged and proven in a negligence action.  As explained by the Manitoba Court of Appeals in *Long v. Western Propeller Co. Ltd.*, [1968] 67 D.L.R. (2d) 345, 63 W.W.R. 146 (Man. C.A.) "[i]n negligence actions . . . there is no 'cause to sue' until the third requirement of the A, B, C rule – i.e., the damage, has occurred."  (Dk. No. 14898, Exhibit 7).  That court went on to find that damage was required to complete the cause of action in negligence and that the limitation period did not begin to run until the damage had occurred.  This is wholly consistent with Professor Irvine's opinion that under the Alberta and British Columbia statutes, the right to bring an asbestos building case under *Winnipeg Condo* does not arise until

> The date when a plaintiff becomes aware, or ought with reasonable diligence to have become aware, that is building presents a situation of actual or impending danger, a danger sufficiently substantial to warrant, as a matter of reasonable prudence, the undertaking of prompt remedial preventive intervention.

---

12 The so-called "ultimate limitation" period of Manitoba simply does not apply to this bankruptcy court.  In Manitoba, the so-called "ultimate limitations' period is only applicable to special proceedings brought in Manitoba by a Plaintiff whose cause of action has expired, but who is trying to obtain an *ex parte* writ to re-open their case under the discovery rule.  *See, Manitoba Limitations Act*, 14(1) - (4).  Accordingly, the thirty (30) year so-called "ultimate limitation" only serves to prevent a Plaintiff from filing an *ex parte* proceeding to obtain permission to bring an action under the discovery rule.  This limitation has no application to the *Winnipeg Condo* type case where the claim is brought within six (6) years of the time that the  "real and substantial" damage manifests itself.

(Dk. No. 16754, p. 22); *see also,* (04/04/2007 Deposition of Professor Lewis Klar, pp. 134-7, 141).

Despite the plain language of these statutes, the Debtors contend that the "ultimate limitations" periods for Alberta and British Columbia are triggered by the last act or omission of the defendant rather than by the occurrence of damage by way of a "real and substantial danger." In the case of Alberta, the Debtors rely upon *RSA* 3(3)(a), which provides that for the "ultimate limitations" period, a claim (or claims) based upon breach of duty (or series of related acts or omissions) begins to run when the "last act of omission" occurred.

First, even if Alberta courts were to construe the limitations period to run from the time the acts or omissions giving rise to the injury occurred, the Debtors could not prevail on summary judgment. As noted by the Canadian Supreme Court in *Hollis v. Dow Corning Corp.*, [1995] 4 S.C.R. 634:

> It is well established in Canadian law that a manufacturer of a product has a duty to warn consumers in the use of its product of which it has knowledge or ought to have knowledge. . . . The duty to warn is a continuing duty, requiring manufacturers to warn not only of dangers known at the time of sale, but also of dangers discovered after the product has been sold and delivered. All warnings must be reasonably communicated, and must clearly describe any specific dangers that arise from the ordinary use of the product.

(Dk. No. 14898, Exhibit 9); *see also,* (08/22/07 Deposition of Professor John Irvine, p. 53). Indeed, Mr. Mew acknowledged in his deposition that in Canada, a manufacturer has a continuing duty to warn. (03/15/2007 Deposition of Graeme Mew, pp. 58-59). Accordingly, even if the limitations period began to run upon the occurrence of the acts or omissions of the Debtors giving rise to liability, a new cause would accrue for every breach of the continuing duty to warn. Under Canadian law, these duties would continually arise, especially where Grace's

original sales and promotional literature failed to disclose that its products even contained asbestos.  More importantly, these duties would arise as Grace learned that when its asbestos-containing products were disturbed upon renovation or demolition, that they released significant amounts of asbestos fibers thus creating a "real and substantial" danger where none previously existed.  Grace's failure to warn building owners of these and other foreseeable dangers associated with its products amounts to a continuing course of conduct clouds the issue of when the "last act or omission occurred."

Second, the *RSA* 3(3)(a)-(c) does not apply to economic loss cases; only to cases involving a generalized "breach of duty."  RSA 1(e) makes this distinction clear when it defines "injury" into five (5) different categories, and specifically differentiates "personal injury", "property damage", "economic loss", "non-performance", and then further provides that injury also means "in the absence of any one of the above [including economic loss], for breach of duty."  Because the special limitation of RSA 3(3) only applies to actions for "breaches of duty" and not "economic loss" then the "ultimate limitations" period for an economic loss case would only begin to run when the cause of action "arises" under its ordinary meaning rather than the special rule for a generic "breach of duty."

As with the Alberta statute, the "ultimate limitations" period in British Columbia is triggered only when the right to bring an action arises.  (Dk. No. 16754, pp. 18-21).  In a *Winnipeg Condo* type case, this means that the accrual of the "ultimate limitations" period occurs only when the requisite damage has occurred, i.e., when the product has created a "real and substantial danger."  Both the Debtors and Mr. Mew cite the case of *Armstrong v. West*

*Vancouver* to suggest that accrual means the date the product was installed. However, Armstrong is inapposite. (Id., Appendix B 1-10).[13]

More importantly, the British Columbia Law Commission (the body responsible for drafting and interpreting British Columbia statues) has expressly recognized that the British Columbia "ultimate limitations" period can only begin to run "when all its elements are present." (Exhibit 3, p. 24-25). Specifically, the Law Commission reported

> as the accrual of a cause of action takes place only when all its elements are present, the ultimate limitation period may start to run at a point considerably removed from the act or omission which gave rise to the damage that is the subject of the action.
>
> The problem of latent damage resulting from the commission of an error in the past is graphically illustrated by the example of defective buildings. An error in the original design or in the construction of a building may remain undetected for decades before any physical damage arises from it. A further refinement of the problem may be that physical damage may occur to the structure at some point distant in time from the error which caused it but the damage itself may be hidden from view and undetectable until even later. The case of action for negligence, however, would accrue when the damage occurred, whether it was discoverable or not.
>
> While section 6(3) of the limitations act would postpone the basic limitations period in either case until the damage was discoverable, the working of section 8(1) presents a difficulty. As it links the start of the ultimate limitation period to the time at which the right to sue arose, it forces the court to make a finding as to the point in time when actual damage occurred. Where damage has gone undetected for some time, this may be a daunting task. Uncertainty is created which can only be resolved after a full trial of the issue.
>
> The fact that the commencement of the ultimate limitations period is tied to the occurrence of actual damage in actions based on negligence means that providers of goods and services cannot know for certain when the dangers of litigation have finally passed

---

13 While Grace has suggested that the trial court decision in *Privest* is also instructive on the "accrual" of the "ultimate limitations" period in British Columbia, its expert has readily admitted that *Privest* did not address the "ultimate limitations" period. (03/15/2007 Deposition of Graeme Mew, p. 70).

> in relation to particular transactions. Greater certainty would be
> provided if the ultimate limitation period ran from the act,
> omission or breach of some legal duty giving rise to the damage
> rather than from the accrual of the cause of action. In most cases,
> this would provide a relatively precise reference point

(*Id*). The commission suggested that to alleviate this result, the legislature needed to amend the

"ultimate limitations" statute to be triggered by the "last act or omission." Since the legislature

has failed to change this statute, it must be presumed to mean exactly what the Law Commission

reported.

###    IV.    Constructive Knowledge and *Canadian Johns-Manville*

The Debtors have also failed to present this Court with any Canadian authority finding

that "constructive notice" is available to trigger the appropriate limitations period.

The Canadian Supreme Court's decision in *Canadian Indemnity Co. v. Johns-Manville Co., Ltd.*

[1990] 2 S.C.R. 549, cited by Grace as an example of the "public character and notoriety" of the

"alleged health hazards of asbestos" in Canada is completely inapposite and the Debtors' citation

of this case is misleading for a number of reasons.

The limited issue before the Canadian Supreme Court in the *Canadian Indemnity* case

was whether or not a company whose primary business was mining and selling raw asbestos had

a duty under a specific Insurance Act Quebec to disclose medical studies in its possession

showing its workers were suffering from a high incidence of lung disease when it applied for a

general liability insurance policy. Under the Act, an insured was obligated to "fully and fairly"

disclose to an insurer those facts which show the nature and extent of the risk to be insured. *Id* at

p. 24. The statutory exception to this requirement notes that the "insured is not obligated to

represent facts known to the insurer or which from their public character and notoriety he is

presumed to know." *Id* at p. 29. In interpreting these statutes, the court determined that the

reference to "public character" simply meant that the information was accessible by the insurer. *Id.* With respect to the "notoriety" requirement, the court specifically rejected the argument that the information must be "notorious" to the general public.

> I have little difficulty concluding that the "notoriety" of art. 2486 C.C. must be interpreted with reference to the insurer. Article 2484 C.C. does not refer to notorious facts which the general public is presumed to know, nor does it refer to notorious facts which those in the industry in which the risk is being insured are presumed to know; it expressly states that the notoriety in question is that which he, the insurer, is presumed to know." . . .
>
> It is still possible to argue that that which is notorious to the insurer is identical to that which is notorious to the general public or, alternatively, to those in a particular industry. In my opinion, however, such arguments lack credibility. Instead, according to my view of this matter, the court is required to focus on the insurer and to determine what it can or should be presumed to know.

*Id* at p. 29-30. Accordingly, it is clear that the Canadian Supreme Court specifically rejected the implication made by the Debtors and their expert -- that the *Canadian Indemnity* case found that the hazards of asbestos were widely known to the general public in Canada in the late 1960's and early 1970's.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## III. Conclusion

The Debtors have failed to establish that there are no genuine issues of material fact and they are entitled to summary judgment based upon the limitations periods of Canada. More importantly, because of the complex factual findings necessary to determine if and when Grace's asbestos-containing products pose a "real and substantial danger" to persons or property under Canadian law, coupled with the novelty of the legal issues and the conflicting opinions of the parties' Canadian legal experts, this Court should conduct a trial on the merits of the case and take the opportunity to observe the testimony and evidence on a full record, as well as the opportunity to observe and pose questions to the Canadian legal experts. Accordingly, the Debtors' motion should be denied.

DATED: October 12, 2007

Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:    (302) 654-0248
Facsimile:    (302) 654-0728
E-mail:        loizides@loizides.com

- and –

Daniel A. Speights (SC Fed. ID No. 4252)
Marion C. Fairey, Jr. (SC Fed. ID No. 6101)
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
Post Office Box 685
Hampton, SC  29924
Telephone:    (803) 943-4444
Facsimile:    (803) 943-4599

*Counsel for Anderson Memorial Hospital*