# EXHIBIT 2



# Sentinel Self-Storage Corp. v. Dyregrov, 2003 MBCA 136 (CanLII)

PDF Format
Date:              2003-11-04
Docket:            AI02-30-05159
Parallel citations: (2003), 233 D.L.R. (4th) 18 • (2003), [2004] 11 W.W.R. 454 • (2003), 180 Man. R. (2d) 85

Reflex Record

## IN THE COURT OF APPEAL OF MANITOBA

Coram:  Monnin, Steel and Freedman JJ.A.

*BETWEEN:*

| | |
|---|---|
| *SENTINEL SELF-STORAGE CORPORATION* ) | **M. G. Finlayson** |
| ) | *for the Appellant* |
| *(Plaintiff) Appellant* ) | |
| ) | **D. I. Marr** *and* |
| ) | **G. L. Juliano** |
| - and - ) | *for the Respondents Dyregrov et al.* |
| ) | |
| ) | **R. S. Literovich** |
| *ALVIN DYREGROV, DYREGROV &* ) | *for the Respondent A. F.* |
| *BURGESS, DYREGROV CONSULTANTS,* ) | *Eshmade & Associates Ltd.* |
| *A. F. ESHMADE & ASSOCIATES LTD.* ) | |
| *and SUBTERRANEAN (MANITOBA) LTD.* ) | *Appeal heard:* |
| ) | ***April 10, 2003*** |
| *(Defendants) Respondents* ) | |
| ) | *Judgment delivered:* |
| ) | ***November 4, 2003*** |

## MONNIN J.A.

1        This matter comes before us by way of an appeal from the dismissal of an application to extend the time for the filing of a notice of appeal. The real issue, however, is whether the plaintiff's claim is statute-barred pursuant to *The Limitation of Actions Act*, R.S.M. 1987, c. L150.

2          The plaintiff alleged in a statement of claim filed May 31, 1996, that in June of
1987 it retained the defendant Dyregrov (Dyregrov) as a professional soils
consultant to provide advice and make recommendations in relation to the proposed
construction of a self-storage facility. The plaintiff further alleged that it was a term
of the agreement between it and Dyregrov that Dyregrov would use skill and care in
all services provided in relation to the construction project, and particularly the
foundation system, and that Dyregrov knew, or ought to have known, that the
plaintiff would rely upon his skill and expertise in the field of geotechnical
engineering and soil analysis and would rely upon his professional opinion, advice
and recommendations. Finally, the plaintiff alleged that Dyregrov owed it a duty of
care in providing it with opinion advice and recommendations that it relied upon
relative to the design of the piles and foundation system for the building it was
erecting.

3          The plaintiff also alleged in that same statement of claim that it retained the
defendant Eshmade (Eshmade) as a civil and structural engineer consultant to
provide advice and make recommendations with respect to the same construction
project. The plaintiff further alleged that it was a term of the agreement with
Eshmade that Eshmade would use skill and care in all services provided in relation
to the construction project and that Eshmade knew, or ought to have known, that the
plaintiff would rely upon his skill and expertise in the field of consulting civil and
structural engineering and would rely upon his professional opinion, advice and
recommendations. Finally, the plaintiff alleged that the defendant Eshmade owed it
a duty of care in providing it with opinion advice and recommendations that it relied
upon relative to the foundation system for the building and to perform intermittent
inspections of the work in progress to ensure conformity of the construction with
the design and specifications.

4          The plaintiff had also sued the foundation contractor, Subterranean (Manitoba)
Ltd. (Subterranean) but discontinued against it. The plaintiff had alleged that
Subterranean would ensure that its portion of the construction was performed in a
good, careful and workmanlike manner in accordance with the approved plans and
specifications and accepted standards of construction.

5          The piles for the foundation were installed by approximately November 2, 1987
and the pile caps were attached by September 29, 1988. The project was
substantially completed by December 15, 1988, the date upon which the City of
Winnipeg issued an interim Occupancy Permit for the building. It was entirely
complete upon issue of a final Occupancy Permit sometime prior to June 1, 1989.

6          Even prior to the completion of the work, the plaintiff became aware of some
movement problems with the building but performed only sporadic investigations of
the problem pending the filing of its suit.

7          In May of 2000, the two defendants brought a motion for summary judgment dismissing the plaintiff's claim on the basis that the statement of claim had been filed past the applicable limitation date. The master granted the motion on December 8, 2000. Counsel for the plaintiff (who was not counsel on this appeal) then inadvertently failed to file a notice of appeal from the master's decision within the time period provided by the Queen's Bench Rules. The plaintiff then sought an extension of time to file its appeal.

8      The test to be met on an application to extend time for filing an appeal is threefold (see *Hunter v. Hunter* 2000 MBCA 134 (CanLII), (2000), 150 Man.R. (2d) 291, 2000 MBCA 134, at para. 6); an applicant must demonstrate:

     1)     that there is an arguable ground of appeal;

     2)      that there was a continuous intention to appeal during the period when the appeal should have been commenced; and

     3)      that it is right and just in all of the circumstances that time for commencing the appeal be extended.

9          The motions judge was satisfied the plaintiff met grounds two and three. He, however, found that the plaintiff did not demonstrate that it had an arguable ground of appeal because the claim was statute-barred. He stated (at paras. 7-12):

The plaintiff's action against Dyregrov and Eshmade was originally founded in contract and tort. However, by the time of the motion before me, it had been reduced to a claim in tort only. The claim is one of negligence and/or negligent misrepresentation, in respect of design. That is, the plaintiff's complaint is not one of faulty construction, but rather that Dyregrov's and Eshmade's work was deficient in respect of the design of the concrete piles and foundation which resulted in pile and foundation movement with consequent damage.

For plaintiff to succeed against either Dyregrov or Eshmade, it must therefore prove the existence of a duty of care, a breach of that duty, and the causation of damage as a result of the breach. And, if a cause of action exists, *The Limitation of Actions Act* ... (the "*Act*") requires that the plaintiff must commence its action within six years from the date the cause of action accrued. In this case, the plaintiff commenced action by Statement of Claim issued May 31, 1996. Its cause of action must therefore have accrued some time after, not before, May 31, 1990.

For purposes of this motion, I am prepared to assume that a cause of action accrued. The question, however, is when did it accrue, that is, when did the damage resulting from the breach of duty occur, for it was from that moment on the facts of this case that the plaintiff had six years in which to sue.

The plaintiff argues that the cause of action accrued after May 31, 1990, or at least that the determination of that issue is sufficiently unclear as to be left to the trial judge for determination. Dyregrov and Eshmade argue (as they did successfully before Master Ring) that the plaintiff's cause of action accrued before May 31, 1990, that the action is

statute barred, and that therefore there is no arguable ground for appeal.

As this claim against Dyregrov and Eshmade is one for negligent advice or design, it seems to me that the damage resulting from the negligent advice or design which would complete the plaintiff's cause of action, would arise at the very latest when the plaintiff or its agent relied to its detriment upon the negligent advice or design, namely, when the construction work itself was executed.   The physical damage may not have been discovered until some time subsequently, but the damage insofar as the instant claim is concerned would occur when the negligent advice or design was relied upon to its detriment by the plaintiff or its agent.

The evidence on the motion before me makes clear that the piles for the foundation were installed by approximately November 2, 1987, and the pile caps were attached by September 29, 1988.  The project was substantially complete by December 15, 1988, the date upon which the City of Winnipeg issued an interim Occupancy Permit.  By letter dated December 15, 1988, the City of Winnipeg enclosed the interim Occupancy Permit, advising that the permit would expire on June 1, 1989.  The letter also advised:

> The issuance of a further or permanent Occupancy Permit is contingent upon the following:
>
> 1.  Completion of landscaping must be confirmed.

It is therefore clear that by the date of the interim Occupancy Permit, namely December 15, 1988, and indeed one can safely infer, by some date prior thereto the advice, opinion and recommendations respecting the design of the piles and foundation had been relied upon inasmuch as the piles and foundation had obviously by then been installed and constructed.  If the design was faulty or the advice negligent, as I have assumed, then when construction followed, relying upon the negligent design or advice the damage occurred, albeit that external manifestation of damage had not yet occurred, and the cause of action accrued.

10    The plaintiff argues that the motions judge was in error when he found that it did not have an arguable case.  It argues that the motions judge adopted legal principles that are without precedent in Manitoba in an area of law that is uncertain or evolving.  The subtext to the plaintiff's argument is that, contrary to what was found by the motions judge, damage - the third leg of what is required to launch a tort action - did not occur at the time the building was completed but only when it was discovered.  It attempts to place itself in the same light as the plaintiff in *Winnipeg Condominium Corp. No. 266 v. 3333 Silver Developments Ltd. et al.* 2000 MBQB 233 (CanLII), (2000), 155 Man.R. (2d) 164, 2000 MBQB 233.

11    This court dealt with a not dissimilar issue in a recently released decision. *Burke v. Heaton* 2003 MBCA 104 (CanLII), (2003), 228 D.L.R. (4th) 257, 2003 MBCA 104, is a case in which a solicitor was sued for allegedly providing negligent advice.  The defendant solicitor moved to have the claim struck out on the basis that it was statute-barred.  The issue became when did the cause of action arise; when the

advice was given or when it was discovered that negligent advice had been given. In order to decide that the cause of action arose at the time of the giving of the advice, it was necessary to extensively review and analyze many of the authorities that are now being referred to us in this case.

12      In *Burke*, we pointed out that in reviewing this issue one must be aware of the differences that exist in the law of this province as opposed to other Canadian jurisdictions (at para. 26):

> What one must be mindful of in attempting to sort out the issue that this case presents is that there are few cases on which one can rely because of the fact that the discoverability rules that apply in Manitoba are different than most Canadian jurisdictions but similar to those applicable in England. The discoverability rule is not applicable in Manitoba because the *Act* permits a plaintiff to apply for an extension of the limitation period where the relevant damage is discovered only after the limitation date has passed: *Rarie v. Maxwell* [reported 124 Man.R. (2d) 241]. In Manitoba, the cause of action accrues in the traditional way (upon damage occurring), but if the relevant damage is discovered only after the limitation date has passed, then the plaintiff can apply for an extension of the limitation date. Therefore, the reason for disregarding *Forster* [[1982] 2 All E.R. 753] or *Costigan* [ reflex, (1984), 13 D.L.R. (4th) 368; leave to appeal to SCC refused 13 D.L.R. (4th) 368n] in other Canadian jurisdictions does not apply in this province.

13      In addition, it was necessary in *Burke* to analyze the evolution and treatment of economic loss cases by the Supreme Court of Canada, including identifying the nature of the economic loss as that loss might be treated differently depending on how it is to be categorized. The following is found at paras. 20-21:

> In *Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.* [reported 1995 CanLII 146 (S.C.C.), (1995), 121 D.L.R. (4th) 193], the Supreme Court not only accepted the concept of recovery in tort for economic loss but went on to accept Professor Feldthusen's five categories of cases in which such recovery can occur. LaForest J. went on to state however that not all categories would be treated in the same manner. He wrote in that decision (at para. 12):
>
> > This case gives this court the opportunity once again to address the question of recoverability in tort for economic loss. In *Norsk* [*Canadian National Railway Co. v. Norsk Pacific Steamship Co.*, 1992 CanLII 105 (S.C.C.), [1992] 1 S.C.R. 1021], at p. [1049], I made reference to an article by Professor Bruce Feldthusen in which he outlined five different categories of cases where the question of recoverability in tort for economic loss has arisen ("Economic Loss in the Supreme Court of Canada: Yesterday and Tomorrow" (1991), 17 C.B.L.J. 356, at pp. 357-8), namely:
> >
> > > "1. The Independent Liability of Statutory Public Authorities;
> > >
> > > "2. Negligent Misrepresentation;
> > >
> > > "3. Negligent Performance of a Service;

"4.  Negligent Supply of Shoddy Goods or Structures;

"5.  Relational Economic Loss."

I stressed in *Norsk* that the question of recoverability for economic loss must be approached with reference to the unique and distinct policy issues raised in each of these categories.  That is because ultimately the issues concerning recovery for economic loss are concerned with determining the proper ambit of the law of tort, an exercise that must take account of the various situations where that question may arise.

This whole issue of economic loss is more clearly dealt with in … Professor John Irvine's "The Liability of Design Professionals" presented at the Canadian Bar Association's 2002 National Construction Law Conference.  He wrote (at pp. 21-23):

The catalyst for change was the scholarly work of an academic, Professor Bruce Feldthusen of the University of Western Ontario, who in various publications, but most particularly in his masterly "Economic Negligence" [4th ed. (Carswell, 2000)], put forward and carefully analyzed a whole new approach to the topic.  In short, it asserted that the main mistake had been to treat economic loss as a unitary problem with a "one-size-fits-all" solution.    The proper approach was to acknowledge the diversity of the topic, isolate the various categories of economic loss claim into five more or less self-contained cubicles, and develop a set of principles for each, using the duty of care concept, in each of them, as the instrument whereby claims might be controlled.  By the mid-nineties, the Supreme Court of Canada had adopted the 'Feldthusen approach' and endorsed the categories he identifies; and has done so consistently ever since.  Since these categories are now well-entrenched in Canadian Law, and since I cannot hope to improve on Bruce Feldthusen's descriptions of them, I shall just quote here the synopsis from the 4th edition, noting that at each stage, an example is provided to convey the flavour or "pith and substance" of each category:

"(1)  Negligent Misrepresentation:  An investor relies on negligently prepared financial accounts to invest in a company which subsequently goes bankrupt.    Had the accounts been properly prepared the bankruptcy would have been predictable and the investor would not have lost money.  The investor sues the accountant.

"(2)  Negligent Performance of a Service:  A lawyer negligently draws a will in violation of the *Wills Act*, and in consequence the intended beneficiary is deprived of his inheritance.  The frustrated beneficiary sues to recover the lost gift, even though he had not been aware of the intended gift, and had not otherwise relied on it.

"(3)  Defective Products or Building Structures:  The defendant negligently manufactures a tractor which will not start in damp weather.  The tractor defect neither causes nor poses a risk of causing physical harm.  The owner by-passes the immediate seller and sues the manufacturer directly for damages such as those which would be awarded in an action based on the breach of the implied warranty of merchantability.    A builder

> constructs a home with faulty foundations such that the home poses a risk of collapsing. The non-privity owner sues the builder for the cost of remedying the defect.
>
> "(4)  Relational Economic Loss (consequent on physical damage to a third party): A negligent motorist strikes an electricity pole causing a power outage which shuts down an entire industrial park. Firms in the park, and their employees who were sent home without pay, sue to recover their financial losses.
>
> "(5)  Public Authority's Failure to Confer an Economic Benefit:  A statutory public authority is given discretion to inspect building construction. It either fails altogether to inspect, or inspects in a manner which the court finds unreasonable. As a result, a latent defect goes undiscovered. When the defect is discovered, the owner sues the authority to recover the cost of remedying the defect."

14       Based on the above, the first step that must be accomplished in attempting to decide when damage occurs is to identify in which of Feldthusen's categories the plaintiff's claim fits. The motions judge, as previously stated, found in para. 7 of his reasons that "[t]he claim is one of negligence and/or negligent misrepresentation, in respect of design. That is, the plaintiff's complaint is not one of faulty construction, but rather that Dyregrov's and Eshmade's work was deficient in respect of the design of the concrete piles and foundation which resulted in pile and foundation movement with consequent damage." In para. 11, he said: "… this claim against Dyregrov and Eshmade is one for negligent advice or design … ." Without having specifically stated so, it does appear that the motions judge accepted the fact that the claim fits into the second category, being a negligent performance of a service. The manner in which the claim is framed and the fact that the defendants were not the builders lend weight to his conclusion.

15       The manner in which this claim was framed was commented on in another recent Manitoba decision dealing with the issue of limitation dates and faulty construction. *Valley Agricultural Society v. Behlen Industries Inc., et al* 2003 MBQB 51 (CanLII), (2003), 172 Man.R. (2d) 248, 2003 MBQB 51, was a case in which the builder and the consulting engineer were sued when the roof of a building they had respectively built and designed failed. Schulman J., in arriving at the same conclusion as the motions judge in the present case, made a point of distinguishing the nature of the two cases. He wrote in his reasons (at para. 20):

While I have reached the same conclusion as MacInnes, J., in the **Sentinel Self-Storage** case, this case appears to be different in at least one respect. The claim in **Sentinel Self-Storage** was for "negligent advice or design" or a hybrid of them. To the extent that the claim was for negligent advice, it would fall to be determined under a different category of negligence than the instant case.

16    The plaintiff has attempted to argue the limitation issue as if the cause of action was one of a negligent or defective product or building structure but that is not the manner in which its action has been framed.

17    In Bullen and Leake and Jacob's *Precedents of Pleadings*, 12th ed. (London: Sweet & Maxwell, 1975) at 8, the authors refer to an article by Jacob entitled "The Present Importance of Pleadings" (1960) *Current Legal Problems*, pp. 171, 174. The article deals not only with the purpose of pleadings but also with the duty or function of a court with respect to the manner in which a case is pled.  The extract from the article reads:

> As the parties are adversaries, it is left to each of them to formulate his case in his own way, subject to the basic rules of pleadings.... For the sake of certainty and finality, each party is bound by his own pleading and cannot be allowed to raise a different or fresh case without [due amendment properly made]. Each party thus knows the case he has to meet and cannot be taken by surprise at the trial.  <u>The court itself is as much bound by the pleadings of the parties as they are themselves.  It is no part of the duty or function of the court to enter upon any inquiry into the case before it other than to adjudicate upon the specific matters in dispute which the parties themselves have raised by their pleadings.  Indeed, the court would be acting contrary to its own character and nature if it were to pronounce upon any claim or defence not made by the parties.  To do so would be to enter the realms of speculation....</u>  Moreover, in such event, the parties themselves, or at any rate one of them, might well feel aggrieved; for a decision given on a claim or defence not made, or raised, by or against a party is equivalent to not hearing him at all and may thus be a denial of justice. The court does not provide its own terms of reference or conduct its own inquiry into the merits of the case but accepts and acts upon the terms of reference which the parties have chosen and specified in their pleadings.  In the adversary system of litigation, therefore, it is the parties themselves who set the agenda for the trial by their pleadings and neither party can complain if the agenda is strictly adhered to.  In such an agenda, there is no room for an item called "Any other business" in the sense that points other than those specified may be raised without notice. [my emphasis]

18    I am not prepared to consider that the cause of action is anything other than how the plaintiff itself framed it and that is clearly an allegation of negligent advice or service.

19    I am satisfied that the conclusion arrived at by the motions judge in finding that the action was statute-barred accords with the conclusion arrived at in *Burke* (at paras. 22-23):

> I am satisfied that the principles that apply to establish when damage occurs in a case such as *Winnipeg Condominium Corp. No. 266* are different than in cases of a negligent performance of a service which is what we are dealing with here.  This very issue was canvassed in *New Islington and Hackney Housing Assn. Ltd. v. Pollard Thomas and Edwards Ltd.*, [2000] E.W.J. No. 7012 (QL) (H.C.J.Q.B.D.). Dyson J. wrote (at paras. 34-35):
>
> > The problem of latent damage caused by negligent advice in contexts other than

that of buildings and chattels was treated differently.  We have seen that Lord Fraser said that he did not think that the analogy between cases concerning the negligent design of buildings and negligent advice by solicitors was a good one. In *D. W. Moore & Co. v. Ferrier*, [1988] 1 All E.R. 400, Bingham L.J. said at page 411H that cases such as *Pirelli* [[1983] 2 A.C. 1] and *Dove* [[1983 1 W.L.R. 1436] "turn on special principles related to their own subject matter."

There are many examples of these cases of negligent advice by professional persons, where it has been held that the claimant suffers damage when he or she acts in reliance on the advice, even if unaware of the defect until later. Examples are *Forster v. Outred, Moore v. Ferrier*, [[1998] 1 A.E.R. 400] *Knapp v. Ecclesiastical Insurance Group plc*, [1998] L.L.R. (Insurance and Reinsurance) 390, and many others. Thus, in *Forster*, the defendant solicitors were instructed to advise the plaintiff about executing a mortgage which charged her freehold property as security for a loan made to her son.  Her case was that the solicitors had been negligent in that she should have been advised not to execute the mortgage.  A question arose as to whether her cause of action in tort accrued when she executed the mortgage, or only later when her son became bankrupt and she had to pay off the loan.  The Court of Appeal held that it accrued at the earlier date.  This was because she suffered a loss from the moment her property was reduced in value by the encumbrance, although it was not to be known at that time whether her son would default.  As Hobhouse L.J. said in *Knapp* (at page 28):

> "From these authorities it can be seen that the cause of action can accrue and the plaintiff have suffered damage once he has acted upon the relevant advice 'to his detriment' and failed to get that to which he was entitled.  He is less well off than he would have been if the defendant had not been negligent."

What Dyson J. wrote in this case applies to the case before us.  I have not been persuaded that the dictum set out in *Forster* has been changed in any way over the years or that it is not applicable here.

20        Because of the fact that the claim was initiated past the limitation period, the motions judge was correct in concluding that the plaintiff did not have an arguable case and that its motion to extend time to appeal should be dismissed.

21     I would therefore dismiss the plaintiff's appeal with costs.


_____  J.A.


I agree:  _____  J.A.

**STEEL J.A.** (concurring)

22      I have read the reasons of Justice Monnin, and with respect, while I agree with the conclusion, I arrive there by a slightly different path.

23      The plaintiff in this case must show that it has an arguable ground of appeal on the question of law as to whether its claim is barred by *The Limitation of Actions Act*, R.S.M. 1987, c. L150.  It does not have to show that its action will probably succeed, but merely that it has a reasonable chance of success.

24      Justice Monnin has carefully detailed the facts in his reasons for decision, and I will not repeat them, except as is necessary.

25      This is a claim in tort only alleging that the defendants' work was deficient in respect of the design of concrete piles and foundation, which resulted in pile and foundation movement with consequent damages.

26      Dyregrov is a geotechnical engineer who was retained by the plaintiff to provide engineering services for the construction of a new self-storage warehouse facility. His responsibility was to supply the structural engineer with the parameters that permitted him to design the structure of the piles.  The piles were, in fact, built in accordance with his recommendations.  Eshmade is a structural engineer who was responsible for doing a design check.  He signed and sealed the foundation drawings, prepared a piling specification, submitted the documents for a building permit and provided inspection services during construction, culminating in his letter of certification to the City with respect to the foundation.  It is these piles and their alleged "jacking" which are the source of this litigation.

27      The Master granted the defendants summary judgment in this case dismissing the action on the basis that it was commenced outside the limitation period.  In doing so, he must have decided that there was no genuine issue for trial.

28      However, the matter came on before us as an appeal from the motions court judge's dismissal of the plaintiff's request for an extension of time for filing a notice of appeal from the Master's decision.  In doing so, the motions court judge held that the plaintiff had no arguable ground of appeal.

29      On appeal in front of us, the argument was made that showing an arguable ground of appeal requires a very low threshold.  It is submitted that it is a lower test and a different one than proving a genuine issue for trial in the case of summary judgment.

30      We are all familiar with the test for summary judgment.  The court must determine whether there is a genuine issue for trial by taking a hard look at the merits of the

action and determining whether it has a real chance of success. There must be an "air of reality" to the action. In doing so, a court should be careful to avoid cutting off access to the trial process prematurely. See *Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.*, 1995 CanLII 146 (S.C.C.), [1995] 1 S.C.R. 85 at para. 55, referring to Justice Twaddle's comments in *Podkriznik v. Schwede* 1990 CanLII 2617 (MB C.A.), (1990), 64 Man.R. (2d) 199 (C.A.), and, more recently, *Blanco et al. v. Canada Trust Co. et al.* 2003 MBCA 64 (CanLII), (2003), 173 Man.R. (2d) 247, 2003 MBCA 64, at para. 24.

31      It is also clear that the existence of an arguable ground of appeal is one of the required criteria on a motion to extend the time for filing an appeal. See *Bohemier et al. v. CIBC Mortgages Inc.* 2001 MBCA 161 (CanLII), (2001), 160 Man.R. (2d) 39, 2001 MBCA 161.

32      Once again, the jurisprudence urges courts to look carefully at the merits of the ground of appeal in order to determine whether there is a "reasonable chance of success" or a "reasonably arguable ground" so that the ground of appeal withstands a "close scrutiny of the facts." See *Branum v. Branum* reflex, (1998), 129 Man.R. (2d) 142 at paras. 9-11 (C.A.), *Moss, Re* reflex, (1999), 13 C.B.R. (4th) 231 at para. 3 (Man. C.A.), and *Hunter v. Hunter* 2000 MBCA 134 (CanLII), (2000), 150 Man.R. (2d) 291, 2000 MBCA 134, at para. 9.

33      In both situations, the court must determine whether the chance of success is "real" or "reasonable." This means that in the present case, this court will have to determine whether the plaintiff has a reasonable chance of success at arguing there is a genuine issue for trial.

34      Having established the applicable test, I now venture onto the murky ground of recovery in tort for economic loss and interaction with statutes of limitation.

35      This action was originally based on both contract and tort. *The Limitation of Actions Act*, in s. 2(1)(i), specifies that an action for breach of contract must be brought within six years of the cause of action arising. In contract, this point occurs when the breach of contractual duty occurs regardless of when damage results from the breach. Therefore, there is no question that more than six years had passed from the breach of contractual duty when the statement of claim was filed on May 31, 1996. As pointed out by the motions court judge, when this matter appeared before him, the claim was based only on the tort of negligence. The contract claim had been abandoned.

36      In negligence, on the other hand, the cause of action arises only when damage results from the defendant's breach of duty. Because of the nature of the Manitoba statute, as well as that of British Columbia[1], Alberta and Newfoundland[2], the judge-made rule of discoverability does not apply. So, the cause of action arises and damage results at the time when damage is inflicted and not at that perhaps

much later date when the plaintiff gains knowledge or discovers the damage.

37        Moreover, this is a negligence action for the recovery of economic loss. Not all economic loss occasioned by negligence is recoverable. In the case of *Burke v. Heaton* 2003 MBCA 104 (CanLII), (2003), 228 D.L.R. (4th) 257, 2003 MBCA 104, this court reviewed the treatment of economic loss cases by the Supreme Court of Canada. At para. 20 of the *Burke* case, Justice Monnin pointed out:

> In *Winnipeg Condominium Corp. No. 36 v. Bird Construction Co.* ... the Supreme Court not only accepted the concept of recovery in tort for economic loss, but went on to accept Professor Feldthusen's five categories of cases in which such recovery can occur. La Forest J. went on to state however that not all categories would be treated in the same manner.

38        Thus, whether the law recognizes that a tort exists or that a duty of care can arise depends upon the particular categorization of the claim. It is only if the law recognizes that a duty of care exists in a particular situation can one go further and determine when the cause of action accrues or the damage can be said to have been inflicted:

> The governing approach to economic loss claims nowadays ... is first to allot one's claim to the most appropriate sub-category in the "Feldthusen catalogue", and proceed with analysis based on the jurisprudence developed within that discrete cubicle.

> [Professor John Irvine, "The Liability of Design Professionals" (Canadian Bar Association's 2002 National Construction Law Conference) at p. 11]

39        Justice Monnin reviews all five of the Feldthusen categories in his judgment. Obviously, the most plausible category to which one might assign this claim is either "negligent performance of a service" or "negligent supply of shoddy goods or structures." But which one is it to be? The categorization has significant impact on recovery and therefore on the limitation period.

40        The motions court judge categorized the claim against Dyregrov and Eshmade as one for negligent advice or design. In such an action, the damage resulting from the negligent advice which would complete the plaintiff's cause of action would arise at the very latest when the plaintiff relied, to its detriment, upon the negligent advice; namely, when the construction work itself was executed. The damage is inflicted when the negligent design is relied upon to its detriment by the plaintiff.

41        If this action is characterized as negligent performance of services or negligent misrepresentation, then identifying when the cause of action becomes statute-barred is relatively simple. Applying *Burke*, the cause of action arose at the time service

was provided or, as the motions judge held, at the time the advice was relied on. Section 2(1)(n) of *The Limitation of Actions Act* states that the period for commencing an action where no specific statutory provision is made, which is the case here, is six years after the cause of action arose. In this case, the piles and pile caps and the building were completed in 1988, while the statement of claim was not filed until 1996, far beyond the six years.

42      However, if it is categorized as a defective structure causing economic loss, the determination of when the damage was inflicted, and thus when the limitation period begins to run, becomes much more difficult. As we have seen, according to *Winnipeg Condominium Corporation No. 36*:

> … [D]amage of a legally-recognized kind does not exist, and the cause of action does not "arise", until there exists in the structure a level of infirmity such as to pose a real and substantial danger to the inhabitants of the structure or to their property. Only then does the cause of action "arise", and only then, (apart from any statutory extension) does the limitation period start to run.

> [Irvine, at pp. 57-58[3]]

43      So, in which category are these actions to be placed?

44      The facts in the *Burke* case involved the actions of a lawyer in drafting a security document. Such actions have been and continue to be categorized as the negligent performance of a service.

45      My brother Justice Monnin has applied *Burke* and has categorized this case as a situation of a negligent performance of a service similar to the lawyer in *Burke*. The motions court judge seems to have categorized this as negligent misrepresentation since he refers to detrimental reliance in his decision, a requirement of negligent misrepresentation, but not negligent performance of a service. I believe, on the other hand, that this case falls within the category of defective structures as outlined by the Supreme Court in the *Winnipeg Condominium Corporation No. 36* case.

46      As well, I do not think that the manner in which the statement of claim is drafted should be determinative of the legal consequences of the facts pleaded. It is true that the statement of claim pleads a failure to exercise due care and skill in making recommendations for the design and construction of the foundation pile system and in reviewing the plans and specifications for the pile foundation system. However, whether the damage caused by those actions is recoverable in law is a question of categorization to be determined by the courts.

47      In attempting to categorize the actions of these defendants, I have found great assistance in the article by Professor John Irvine presented at the Canadian Bar Association's 2002 National Construction Law Conference entitled "The Liability

of Design Professionals." In that article, he discussed, as the title indicates, not only the liability for faulty construction, but liability for faulty design, as well as such other functions as "advising, supervising and certifying." He specifically addresses the issue which arises in our case, which is (at p. 9):

> ... [W]hen, if a negligence action was available against these defendants, had it "arisen"? That is, when had the final ingredient of "damage" resulting from the defendant's breach of duty, occurred? Was it when the negligent design was first incorporated, all unwittingly, into the tower? Or when the first cracks appeared? Or when serious structural problems first became apparent to the defendants, (or should have become apparent, perhaps, to the eye of ordinary vigilance)?

48    In the unanimous decision of the Supreme Court of Canada delivered by La Forest J. in *Winnipeg Condominium Corporation No. 36*, the court decided that design errors which engender economic loss should be placed in the category dealing with the supply of a defective product or structure (at para. 43):

> I conclude that the law in Canada has now progressed to the point where it can be said that contractors (as well as subcontractors, architects and engineers) who take part in the design and construction of a building will owe a duty in tort to subsequent purchasers of the building if it can be shown that it was foreseeable that a failure to take reasonable care in constructing the building would create defects that pose a substantial danger to the health and safety of the occupants. Where negligence is established and such defects manifest themselves before any damage to persons or property occurs, they should, in my view, be liable for the reasonable cost of repairing the defects and putting the building back into a non-dangerous state.

49    In the above quote, the court makes clear that it is including design professionals in this new principle, not just builders.

50    This case is not easy to categorize. I can understand why the motions court judge equated it with a situation of negligent misrepresentation. All the required elements are present. The plaintiff and Dyregrov were in a special relationship, the plaintiff could be said to have reasonably relied upon Dyregrov's representations that the pile design it recommended would be adequate and the representations may well prove to have been negligently made and inaccurate. The plaintiff also suffered a detriment – an economic loss from having to repair the allegedly badly designed foundation.

51    However, for the most part, negligent misrepresentation cases simply involve situations in which the plaintiff reasonably relies upon negligently inaccurate advice or information to make a decision which results in an economic detriment. These cases do not involve situations in which a tangible, dangerous building is produced

in reliance on negligent advice. Furthermore, these cases have never involved situations in which the plaintiff is suing for the cost of repairing the defective building.

52          The case of *Hercules Managements Ltd. v. Ernst & Young*, 1997 CanLII 345 (S.C.C.), [1997] 2 S.C.R. 165, is an example of the typical factual situation of a negligent misrepresentation action. In that case, an audit report was prepared for a company as required by statute. Shareholders relied on the report and invested more money in the company. When the shareholders ended up losing money, they sued the auditors for negligent misrepresentation. The Supreme Court ultimately determined that no duty of care was owed to the shareholders, but approached the case as one of negligent misrepresentation.

53     In *Winnipeg Condominium Corporation No. 36*, the case of *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.*, [1964] A.C. 465 (H.L.), played only a peripheral role in the judgment, and the case was clearly not decided as a case of negligent misrepresentation.

54     As well, in the recent case of *Brett-Young Seeds Ltd. et al. v. Assié Industries Ltd. et al.* 2002 MBCA 74 (CanLII), (2002), 166 Man.R. (2d) 33, 2002 MBCA 74, this court did not treat the case as one of negligent misrepresentation. The plaintiffs had contracted with Assié to design and manufacture grain hopper cones. Assié engaged an engineering firm to design the cones and then manufacture them to the design specifications. When the cones did not work properly, the plaintiffs sued Assié and the engineering firm. Although the motions court judge considered the case as one of negligent misrepresentation, this court clearly did not (at paras. 10-11):

On its appeal, Brett-Young does not argue that its cause of action against Wolfrom is based on negligent misrepresentation. The basis of its claim, set out in para. 7 of its re-re-amended statement of claim (quoted above in para. 3), is "pure and simple negligence". The essence of the argument is:

"It is submitted that if Mr. Wolfrom's advice to the defendant Assié was negligent, and the plaintiffs suffered damages as a result of that negligence, the plaintiffs have a claim against Mr. Wolfrom in negligence."

In support of that proposition, Brett-Young relies on **Winnipeg Condominium Corp. No. 36 v. Bird Construction Co. et al.**

Tortious liability for shoddy or negligently manufactured products has grown inexorably in the 70 years since Lord Atkin blew away the privity rule in **Donoghue v. Stevenson** [[1932] A.C. 562 (H.L.)]. For our purposes, it is enough to observe that the right to recover for pure economic loss in product liability cases in Canada has matured from a dissenting opinion, to a "doubtful" departure from the common law exception, to the considered view of the Supreme Court. ....

55      Nor do I agree with Justice Monnin that this is a case of negligent performance of a service, similar to the *Burke* case. It is true, once again, that all the elements of negligent provision of a service are present. Dyregrov undertook to design a portion of the foundation for a specific purpose for the plaintiff's benefit, the plaintiff relied on that undertaking and it may well be that the negligent performance of the service injured the plaintiff. However, cases dealing with the negligent provision of a service involve situations in which the defendant simply provides an intangible "service," not cases in which the service or design results in a tangible product or structure which turns out to be dangerous and in need of repair. For example, in *Blacklaws v. 470433 Alberta Ltd.* 2000 ABCA 175 (CanLII), (2000), 187 D.L.R. (4th) 614, 2000 ABCA 175, the Alberta Court of Appeal held that the claim before it (relating to the negligent mismanagement of a vacation timeshare property) was <u>not</u> a case of economic loss caused by defective products or building since "[t]here was no tangible product here" (at para. 62). Furthermore, these cases do not involve situations in which the plaintiff is essentially suing for the cost of repairing the dangerous structure. The facts of this case fit more appropriately within the category of economic loss for defective structure.

## PRIVITY

56      The defendants argue that the facts in this case are significantly different from the *Winnipeg Condominium Corporation No. 36* case (and the cases that followed it, such as *Winnipeg Condominium Corp. No. 266 v. 3333 Silver Developments Ltd. et al.* 2000 MBQB 233 (CanLII), (2000), 155 Man.R. (2d) 164, 2000 MBQB 233, and *Valley Agricultural Society v. Behlen Industries Inc. et al.* 2003 MBQB 51 (CanLII), (2003), 172 Man.R. (2d) 248, 2003 MBQB 51). The difference is that the plaintiff is still the original owner of the property in question and had a direct and contractual relationship with these defendants. The presence of the contractual relationship, argue the defendants, would be a type of relationship which would be considered a "special relationship" under *Hedley Byrne*, and therefore, this is a situation of negligent misrepresentation. In support, they cite the English case of *Murphy v. Brentwood District Council*, [1990] 2 All E.R. 908, in which the House of Lords repudiated its decision in *Anns v. Merton London Borough Council*, [1978] A.C. 728, something that has not occurred in Canada.

57      So, for example, in *Murphy*, Lord Mackay stated (at p. 912):

In these circumstances I have reached the clear conclusion that the proper exercise of the judicial function requires this House now to depart from *Anns* in so far as it affirmed a private law duty of care to avoid damage to property which causes present or imminent danger to the health and safety of owners, or occupiers, ….

58    *Murphy* was not followed in the *Winnipeg Condominium Corporation No. 36* case. Justice La Forest stated (at para. 22):

> ... [T]o the extent that the *D & F Estates* [[1988] 2 All E.R. 992 (H.L.)] decision formed part of a line of English cases leading ultimately to the rejection of *Anns*, it is inconsistent with this Court's continued application of the principles established in *Anns*.

59    Moreover, I do not believe that the existence of a contractual relationship between the parties should make a difference in the application of tort law and its relationship to limitation periods. There is concurrent liability here in both contract and tort. After the case of *Central Trust Co. v. Rafuse*, 1986 CanLII 29 (S.C.C.), [1986] 2 S.C.R. 147, it was clear that a duty of care, sounding in a tort action for negligence, might arise whenever a relationship of sufficient proximity was discernible regardless of whether that relationship also constituted a contract. Therefore, in this case, subject to the limitation period, the owner might sue in contract for design defects. Such a suit would not be available in tort with its longer limitation period unless the defect posed a threat of danger. Such a difference seems reasonable from a policy perspective given the voluntary nature of contracts and the objective in tort of deterring harm arising from dangerous structures.

60    What does not seem reasonable is to allow a potentially much longer limitation period simply because the building changed owners. There is no reason to differentiate between privity and non-privity owners, except, of course, to acknowledge that one cannot make an end run around express limitation clauses in the contract by recourse to one's tort remedy. "To that extent, contract 'trumps' tort" (Irvine, at p. 8). And see *J. Nunes Diamonds Ltd. v. Dominion Electric Protection Co.*, [1972] S.C.R. 769.

61    The jurisprudence supports this interpretation. For example, in his text on *Economic Negligence*, 4th ed. (Toronto: Carswell, 2000), Professor Bruce Feldthusen, when commenting on this category, states (at p. 159):

> Typically, these are buyers' claims against non-privity sellers, or against *immediate sellers when there exists some advantage in suing in tort over suing under contract* or statutory sales law. Usually, the suit seeks to recover damages for the inadequate value of a defective product or the cost of repairing or replacing it, along with associated commercial loss.

[emphasis added]

62    In the *Winnipeg Condominium Corporation No. 36* case, there was no contractual

privity between the defendant builders and the plaintiff. Although Justice La Forest's conclusion is couched in terms of subsequent purchasers, his comments throughout the rest of the judgment make it clear that the thrust of the decision will be equally applicable with respect to original owners of building structures who have suffered economic loss by effecting repairs (subject, of course, to any specific contractual terms which limit the defendant's liability in this area). His comments indicate that he accepts the concept of concurrent liability, and his main focus is foreseeability, not privity (at para. 25):

> In my view, a contractor's duty to take reasonable care arises independently of any duty in contract between the contractor and the original property owner. The duty in contract with respect to materials and workmanship flows from the terms of the contract between the contractor and home owner. By contrast, the duty in tort with respect to materials and workmanship flows from the contractor's duty to ensure that the building meets a reasonable and safe standard of construction. For my part, I have little difficulty in accepting a distinction between these duties. The duty in tort extends only to reasonable standards of safe construction and the bounds of that duty are not defined by reference to the original contract.

63    It must be remembered that this case focussed on the question of a relationship of sufficient proximity to give rise to a duty of care. Such a relationship would seem self-evident between the builder and original owner.

64    La Forest J. went on to consider whether there was a sufficiently close relationship between the plaintiff and the contractor, considering they were not in contractual privity. In discussing this, Justice La Forest makes further comments which suggest that the contractor's duty is owed not only to subsequent owners, but also to the original owner of defective buildings. He stated (at paras. 35-36):

> In my view, it is reasonably foreseeable to contractors that, if they design or construct a building negligently and if that building contains latent defects as a result of that negligence, subsequent purchasers of the building may suffer personal injury or damage to other property when those defects manifest themselves. A lack of contractual privity between the contractor and the inhabitants at the time the defect becomes manifest does not make the potential for injury any less foreseeable. Buildings are permanent structures that are commonly inhabited by many different persons over their useful life. By constructing the building negligently, contractors (or any other person responsible for the design and construction of a building) create a foreseeable danger that will threaten *not only the original owner*, but every inhabitant during the useful life of the building. As noted by the Supreme Court of South Carolina, in *Terlinde v. Neely*, 271 S.E.2d 768 (1980), at p. 770:
>
> > *The key inquiry is foreseeability, not privity.* In our mobile society, it is clearly foreseeable that more than *the original purchaser* will seek to enjoy the fruits of

the builder's efforts. The plaintiffs, being a member of the class for which the home was constructed, are entitled to a duty of care in construction commensurate with industry standards. In the light of the fact that the home was constructed as speculative, the home builder cannot reasonably argue he envisioned anything but a class of purchasers. *By placing this product into the stream of commerce, the builder owes a duty of care to those who will use his product*, so as to render him accountable for negligent workmanship.

In my view, the reasonable likelihood that a defect in a building will cause injury to its inhabitants is also sufficient to ground a contractor's duty in tort to subsequent purchasers of the building for the cost of repairing the defect if that defect is discovered prior to any injury and if it poses a real and substantial danger to the inhabitants of the building. In coming to this conclusion, I adopt the reasoning of Laskin J. in *Rivtow* [[1974] S.C.R. 1189], which I find highly persuasive. If a contractor can be held liable in tort where he or she constructs a building negligently and, as a result of that negligence, the building causes damage to persons or property, it follows that the contractor should also be held liable in cases where the dangerous defect is discovered and *the owner of the building* wishes to mitigate the danger by fixing the defect and putting the building back into a non-dangerous state. In both cases, the duty in tort serves to protect the bodily integrity and property interests of the inhabitants of the building. See *Dutton*, [[1972] 1 Q.B. 373 (C.A.)], at p. 396, *per* Lord Denning M.R.

[emphasis added]

65      Since the contractor's duty in tort is independent from his duty in contract, it therefore stands to reason that the contractor's duty is owed equally to the original owner of the building as to subsequent owners. The presence or lack of contractual privity should not matter, as the duty of care arises in tort, not in contract. The duty of care in tort arises upon the creation of the building, the duty being to create a safe building. The focus is on the degree of danger to persons and other property created by the negligent construction of a building. It is the degree of danger which justifies imposing tortious liability for the cost of repairing these defects as opposed to contractual liability, which focusses on what was promised.

66      This is also consistent with the *Anns/Kamloops* approach[4] which was applied in *Winnipeg Condominium Corporation No. 36*. Pursuant to this approach, in order to determine whether the defendant owes a plaintiff a duty of care, the first task of the court is to determine whether a sufficiently close relationship exists between the parties such that in the reasonable contemplation of the defendant, carelessness on its part might cause damage to the other person. If so, then a *prima facie* duty of care arises. The next step is to determine whether there are any considerations which ought to negative or limit the scope of the duty, or the class of persons to whom it is owed, or the damages to which a breach of it may give rise.

67        Applying the *Anns/Kamloops* approach to the case of a builder and the original
owner of the building, where the two are in contractual privity, it is clear that a
sufficiently close relationship exists between the parties such that in the reasonable
contemplation of the builder/designer, carelessness on its part might cause injury or
damage to the original owner of the building.  As for policy considerations which
could negate this duty, the only consideration which could arise in this scenario is
that the recognition of a tortious duty on the part of a builder towards the original
contracting owner would create a non-contractual warranty of fitness and
unnecessarily intrude into the contractual sphere.  However, this argument was
rejected in *Rafuse*, where it was determined that a duty of care in tort may arise
co-extensively with a contractual duty.  Thus, there is no reason to deny the
imposition of a duty of care on the builder towards the original contracting owner of
a building structure.  In this case, as in the case of subsequent owners, the builder
has a duty in tort to build a non-dangerous building.

68        Professor Irvine also seems to take this viewpoint.  In his paper, he reviews the use
of the *Anns/Kamloops* approach in *Winnipeg Condominium Corporation No. 36* and
states (at p. 27):

> The first stage of this <u>Anns</u> test presented no difficulty in the <u>Winnipeg Condo</u>
> case, since it was manifestly foreseeable that latent defects contained in the
> building due to the carelessness of the defendants would be highly likely to cause
> physical harm or crippling expense *not just to the original owners of the building,
> but to successors in title too,* such as the present plaintiffs.

[emphasis added]

69        Thus, I would place the defendants' actions in this case into the category of
economic loss for defective structure, except for one crucial factor that is absent.

## REAL AND SUBSTANTIAL DANGER

70        If this action is categorized as one of economic loss due to defective structure, the
damage is not inflicted until the building is found to contain defects which pose a
real and substantial danger to the occupants of the building or other property.  It is
only when a defect poses a real and substantial danger or there is an imminent
possibility of such danger that the cause of action is complete.

71        When confronted with the question of when the cause of action arose or when the
damage was inflicted, Justice Huband, in *Winnipeg Condominium Corp. No. 36 v.
Bird Construction Co. et al.* ⅜ reflex, (1999), 131 Man.R. (2d) 283 (C.A.), referred
the matter to trial for the hearing of evidence.  Since the Supreme Court had held
that this type of loss was recoverable only when the defect resulted in real and

substantial danger or a threat of danger, then damage is inflicted when that type of defect occurs. This is a matter that can normally be determined only after the hearing of evidence. Justice Huband stated (at para. 15):

The case of **Pirelli General Cable Works Ltd. v. Oscar Faber & Partners (a firm)**, [1983] 1 All E.R. 65 (H.L.), illustrates the difficulty in determining precisely when a cause of action arises in situations akin to the present case. The issue in the **Pirelli** decision was when a cause of action arose with respect to a large industrial chimney that had been negligently designed, but where the damage was not immediately evident. Lord Fraser of Tullybelton makes this observation at p. 70:

"Unless the defect is very gross, it may never lead to any damage to all to the building. It would be analogous to a predisposition or natural weakness in the human body which may never develop into disease or injury. The plaintiff's cause of action will not accrue until damage occurs, which will commonly consist of cracks coming into existence as a result of the defect even though the cracks or the defect may be undiscovered and undiscoverable. There may perhaps be cases where the defect is so gross that the building is doomed from the start, and where the owner's cause of action will accrue as soon as it is built, but it seems unlikely that such a defect would not be discovered within the limitation period. Such cases, if they exist, would be exceptional."

72     Yet, in this case, significant affidavit evidence was filed regarding the nature of the defect, the pile "jacking" and its impact on the structure. What is significant is the failure of the plaintiff to allege that the defects have resulted, or there is an imminent possibility that they will result, in a real and substantial danger to the occupants. There is no doubt that remedial work is necessary. However, nowhere in any of the evidence filed by any of the parties has there been an allegation that the defects have rendered the building dangerous. As has been mentioned, Canadian law does not allow redress in tort for non-dangerous deficiencies. In order to recover, the potential loss must be of a kind recognized by law. In this case, the loss must be one that is potentially dangerous.

73     The affidavits filed for summary judgment detail complaints of dust getting into the storage units, water on the floor and difficulty with doors closing. The undue foundation and pile movement caused cracks in the blacktop. Yet, Mr. Backhouse, who had prepared the plans and specifications for the foundations of the project, sent a letter of structural assurance to the City in July 1990. The independent consultant's report from Hardy BBT Limited, after a detailed review of the problem, concluded:

The magnitude and nature of the corner breaks do not suggest a risk to the structural integrity of any of the individual panels but do detract from the aesthetic appearance of the walls. The repairs to date should be adequate to restore the panels' appearance.

74      The most serious comment came from a report by Mr. Backhouse dated September 27, 1994, where he opined that "[t]hese movements, if left uncontrolled, will gradually render sections of the buildings unusable." On the other hand, in the case of *Winnipeg Condominium Corp. No. 266*, a case of defective structure, the plaintiff alleged (at para. 4):

> 1)      that the defendants failed in a duty of care to ensure the units would not contain defects which would pose a substantial danger to the health and safety of the occupants and/or owners; ….

## CONCLUSION

75      The defendants took part in the design of the foundation system of this building. Consequently, they came within the parameters set out by the Supreme Court of Canada in the decision of *Winnipeg Condominium Corporation No. 36*. Thus, for a cause of action to exist, there must be a degree of damage that poses a substantial danger or threat of danger to the health and safety of the occupants or other property.

76      Nowhere in the material filed for the summary judgment motion is there any evidence, or even allegation, that the defects in design and subsequent pile "jacking" may give rise to that element of danger that is fundamental to recovery under the principles delineated by the Supreme Court in the *Winnipeg Condominium Corporation No. 36* case.

77      Therefore, I conclude that the plaintiff does not have a reasonable chance of success at arguing there is a genuine issue for trial. I would dismiss the appeal with costs.

_____ J.A.

---

[1] See *Bera v. Marr* reflex, (1986), 1 B.C.L.R. (2d) 1 (C.A.), and *Wittman (Litigation Guardian of) v. Emmott* (1991), 45 C.P.C. (2d) 245 (B.C.C.A.)

[2] *Limitations Act*, S.A. 1996, c. L-15.1, s. 3(1)(a); *Limitations Act*, S.N. 1995, c. L-16.1, s. 14

[3] Canadian law does not allow redress in tort for purely qualitative, non-dangerous deficiencies. So, if the plaintiff is unable to prove the design defect resulted in a "real and substantial danger," the limitation period is irrelevant since there would be no cause of action at all.

[4] Referring to the English case of *Anns* and the case of *Kamloops (City of) v. Nielsen et al.*, 1984 CanLII 21 (S.C.C.), [1984] 2 S.C.R. 2