# EXHIBIT 3

# LAW REFORM COMMISSION OF BRITISH COLUMBIA

## REPORT ON
## THE ULTIMATE LIMITATION PERIOD:
## LIMITATION ACT, SECTION 8

### LRC 112

### MARCH 1990

The Law Reform Commission of British Columbia was established by the *Law Reform Commission Act* in 1969 and began functioning in 1970.

The Commissioners are:

ARTHUR L. CLOSE, *Chairman*
HON. RONALD I. CHEFFINS, Q.C., *Vice-Chairman*
MARY V. NEWBURY
LYMAN R. ROBINSON, Q.C.
PETER T. BURNS, Q.C.

Thomas G. Anderson is Counsel to the Commission

Gregory G. Blue is Legal Research Officer to the Commission.

Sharon St. Michael is Secretary to the Commission

Linda Grant provides text processing and technical copy preparation.

The Commission offices are located at Suite 601, Chancery Place, 865 Hornby St., Vancouver, BC V6Z 2G3.

**Canadian Cataloguing in Publication Data**
Law Reform Commission of British Columbia
        Report on the ultimate limitation period,
        Limitation Act, section 8

        (LRC, ISSN 0843-6053; 112)

        Includes bibliographical references.
        ISBN 0-7718-8936-4

        1.    Limitation of actions - British Columbia
        2.    British Columbia.  Limitation Act.
        I.    Title.
        II.   Title: The ultimate limitation period, Limitation Act, section 8.
        III.  Series: Law Reform Commission of British Columbia.  LRC; 112.

KEB184,L55L38 1990              347.711'052            C90-092114-5

# Table of Contents

I.      INTRODUCTION                                                                        1
        A.      General                                                                    1
        B.      Reference to the Commission Leading to This Report                          1
        C.      Section 8 and its Operation                                                2
                1.      Section 8                                                          2
                2.      Basic Limitation Periods                                           3
                3.      Section 5 - Confirmation of the Cause of Action                    3
                4.      Section 6 - Postponement of the Cause of Action                    4
                        (a)     Subsection 6(1) - Claim by a Trust Beneficiary             4
                        (b)     Subsection 6(3) - Other Cases of Concealed
                                Causes of Action                                          4
                        (c)     Section 6 and the Ultimate Limitation Periods             5
                5.      Section 7 - Disability                                            5
                6.      Section 11(2) - Stay of Execution on a Judgment                   5
                7.      Summary                                                            6
        D.      Conclusion                                                                6

II.     BACKGROUND TO THE ENACTMENT OF SECTION 8                                           7
        A.      The 1974 Report on Limitations                                            7
                1.      The Problem of Concealed Causes of Action                          7
                        (a)     An Example:  Industrial Disease                            7
                        (b)     The *Limitations Act 1963*                                 8
                        (c)     A Simpler Solution:  Postponement                          8
                        (d)     A Limit on Postponement                                    9
        B.      Why 30 Years?                                                            10
        C.      The 1975 *Limitations Act*                                               11
        D.      Summary                                                                  11

III.    IS THERE A CONTINUED NEED FOR AN ULTIMATE LIMITATION
        PERIOD?                                                                          12
        A.      Introduction                                                             12
        B.      What Ends Do Limitation Periods Serve?                                   12
                1.      Finality                                                          12
                2.      Quality of Evidence                                              12
                3.      Fairness in the Litigation Process                               13
                4.      Economic Reasons                                                 13
        C.      The Traditional One-Sidedness of the Limitation of Actions              13
        D.      The Non-Statutory "Discoverability" Rule                                 14
        E.      The Effect of the Non-Statutory Discoverability Rule on the
                British Columbia *Limitation Act*                                        15
        F.      Is There Still a Need for an Absolute Time Bar?                          16
        G.      Should the Ultimate Limitation Period Apply to Personal
                Injury Claims?                                                           17
        H.      Summary                                                                  18

IV.     SHOULD SECTION 8 REMAIN IN ITS PRESENT FORM?                                     19

| | | | |
|---|---|---|---|
| A. | Introduction | | 19 |
| B. | The Experience with Section 8 | | 19 |
| C. | Length of the Ultimate Limitation Periods | | 20 |
| | 1. | General | 20 |
| | | (a) Objections to the 30-Year Period | 21 |
| | | (b) Records | 21 |
| | | (c) The Changing Liability Insurance Scene | 21 |
| | | (d) Trends in Reform Elsewhere | 22 |
| | | (e) A Reduction in Length is Warranted | 22 |
| | 2. | Fraud, Fraudulent Breach of Trust and Wilful Concealment | 23 |
| | | (a) The Equitable Rule | 23 |
| | | (b) Fraud and a Shortened Ultimate Limitation Period | 23 |
| | | (c) (c) An Argument Against Special Treatment for Fraud: Spurious Claims | 23 |
| | | (d) Retention of the 30-Year Ultimate Limitation Period in Cases of Fraud | 24 |
| D. | Commencement of the Ultimate Limitation Period | | 24 |
| E. | Treatment of Disability Under a Reduced Ultimate Limitation Period | | 26 |
| | 1. | Minors | 26 |
| | | (a) Generally | 26 |
| | | (b) Running of Time After the Age of Majority | 27 |
| | | (c) Cumulative Effect of Sections 6 and 7 | 27 |
| | | (d) The Alberta Solution | 27 |
| | | (e) Another Solution to the Cumulative Postponement Problem | 28 |
| | 2. | Other Disability | 29 |
| | 3. | Notices to Proceed | 30 |
| F. | Confirmations and the Ultimate Limitation Period | | 30 |
| G. | Summary | | 31 |
| V. | SPECIAL LIMITATION PERIODS PROTECTING PARTICULAR CLASSES | | 32 |
| A. | The Background | | 32 |
| B. | Origins of Special Limitations in Canada | | 33 |
| C. | The Merits of Special Limitation Periods | | 34 |
| | 1. | The Need for Simplicity | 34 |
| | 2. | Fairness | 35 |
| | 3. | Trends in Law Reform Elsewhere | 35 |
| | 4. | Conclusion | 36 |
| D. | The Six-Year Ultimate Limitation Period in Section 8(1) | | 36 |
| | 1. | Record Management | 36 |
| | | (a) Health-Care Institutions | 37 |
| | | (i) The Submission | 37 |
| | | (ii) Discussion | 38 |
| | | (b) Physicians | 38 |
| | | (i) The Submission | 38 |
| | | (ii) Discussion | 38 |
| | | (c) Transitional Considerations | 39 |
| | | (d) Conclusion | 39 |
| | 2. | The Rate of Medical Advance | 39 |
| | | (a) The Submission | 39 |

|  |  | (b) | Discussion | 39 |
|  | 3. | Access to the Courts |  | 40 |
|  |  | (a) | The Submission | 40 |
|  |  | (b) | Discussion | 40 |
|  | 4. | Defensive Medicine |  | 42 |
|  |  | (a) | The Submission | 42 |
|  |  | (b) | Discussion | 42 |
|  | 5. | Public Funding of Health Care |  | 42 |
|  |  | (a) | The Submission | 42 |
|  |  | (b) | Discussion | 43 |
|  | 6. | Charitable Nature of Health Care |  | 43 |
|  |  | (a) | The Submission | 43 |
|  |  | (b) | Discussion | 43 |
| E. | Summary and Recommendations |  |  | 43 |

| VI. | TRANSITIONAL CONSIDERATIONS | 45 |
|  | A. | General | 45 |
|  | B. | Transitional Situations | 45 |
|  | C. | Situation No. 1 | 46 |
|  | D. | Situation No. 2 | 46 |
|  | E. | Fraud, Wilful Concealment and Fraudulent Breach of Trust | 47 |
|  | F. | Claims Already Barred at Effective Date of Amendments | 47 |
|  | G. | Summary | 48 |

| VII. | CONCLUSION | 49 |
|  | A. | General | 49 |
|  | B. | Recommendations Contained in this Report | 50 |
|  | C. | Draft Amendments to the *Limitation Act* | 51 |
|  | D. | Acknowledgments | 51 |

| APPENDICES | 53 |

| A. | *LIMITATION ACT*, R.S.B.C. 1979, c. 236 | 53 |

| B. | DRAFT AMENDMENTS TO THE *LIMITATION ACT* | 62 |

| C. | LIST OF ORGANIZATIONS WHOSE REPRESENTATIONS WERE CONSIDERED BY THE COMMISSION | 68 |

TO THE HONOURABLE BUD SMITH, Q.C.
ATTORNEY GENERAL OF THE PROVINCE OF BRITISH COLUMBIA:

The Law Reform Commission of British Columbia has the honour to present the following:

REPORT ON
THE ULTIMATE LIMITATION PERIOD:
LIMITATION ACT, SECTION 8

This Report concerns the ultimate limitation period created by section 8 of the *Limitation Act*. An aspect of that provision was, as recommended by the Justice Reform Committee, referred by you to the Law Reform Commission for study and report.

Section 8 raises a number of difficult issues including whether particular classes of persons or occupational groups should be given the benefit of a shorter limitation period than that which governs proceedings against citizens who are not members of the class or group. We recommend that they should not. Other recommendations address concerns in relation to the length of the ultimate limitation period, the time from which it should run and the need to protect the rights of minors.

# CHAPTER I                                                       INTRODUCTION

## A.    General

Any statute of limitations represents a compromise between the interests of those who have claims to make and the interests of those against whom the claims are made.  Both are entitled to a fair and timely decision.  There is a general perception that claimants should not be allowed to "sit on their rights" for an inordinate length of time before bringing a lawsuit, and that defendants should not be subjected to the threat of possible legal action indefinitely.  This perception forms the basis for laws establishing limitation periods, which are a feature of every developed legal system.

These laws set periods of fixed length within which a person having a claim must sue, or else lose the right to do so.  While a limitation statute should try to achieve fairness towards both plaintiff and defendant, a certain degree of arbitrariness is unavoidable in fixing the length of a limitation period.

Historically, time was considered to run under a limitation period from the point at which the plaintiff's right to sue, or "cause of action" arose, whether or not the plaintiff was aware or could reasonably be expected to be aware of the facts which gave rise to it.[1]  There were normally exceptions for cases of fraud or legal disabilities on the part of the plaintiff, such as minority or mental incompetence.  In these cases the limitation period would begin to run when the plaintiff ceased to be disabled or when the fraud was discovered and the plaintiff became aware of the relevant facts.

Where a legally competent plaintiff was merely unaware of the facts surrounding a possible claim and there was no deliberate attempt to conceal them on the part of a defendant, relief against the limitation period was not generally provided.  This occasionally gave rise to very harsh results.  The law of limitations in British Columbia prior to 1975 followed this pattern.[2]

The present *Limitation Act*[3] of British Columbia dates from 1975, and was the product of a major law reform effort in which an attempt was made to resolve problems resulting from concealed causes of action, among many other issues.  The *Limitation Act* includes provisions for the postponement of the running of time under the basic limitation period in certain cases until the material facts surrounding a cause of action become discoverable.[4]  It also contains an ultimate limitation period, not subject to postponement, to prevent open-ended possibilities for litigation.[5]

## B.    Reference to the Commission Leading to This Report

In its final report submitted in 1988, the Justice Reform Committee headed by the Deputy Attorney

---

1.    The historical position was altered in the 1980's by developments in Canadian case law which are discussed in Chapter III.

2.    *See* the *Statute of Limitations*, R.S.B.C. 1960, c. 370.

3.    R.S.B.C. 1979, c. 236, originally enacted as the *Limitations Act*, S.B.C. 1975, c. 37.

4.    Ss. 6(1), (3).

5.    S. 8.

1

General, the Honourable E.N. Hughes, Q.C., suggested that the *Limitation Act* be reviewed with regard to special limitation periods:[6]

> Any reform process should review the special limitation periods applied to particular classes of people, such as medical doctors. Any special limitation periods should be fully justified and all similar classes should be treated in the same manner.

Subsequently, in July 1989, the Attorney General requested the Commission to consider the *Limitation Act* with a view towards:

> ... an assessment of the merits of special limitation periods as applied to particular classes of people, such as different professional or occupational groups.

At present, the only special limitation period in the *Limitation Act* protecting a particular class of persons is the six-year ultimate limitation period in s. 8 in respect of claims against medical practitioners, hospitals, and hospital employees. In this Report, we have accordingly considered the merits of special limitation periods relating to particular classes, but as there have recently been significant developments in the general law of limitations and considerable law reform activity in this area in a number of other Canadian and Commonwealth jurisdictions, the Commission has also taken the opportunity provided by this reference to re-examine section 8 of the *Limitation Act* in a more general fashion.

## C.    Section 8 and its Operation

While section 8 is a key provision of the *Limitation Act*, its significance can only be understood in terms of its relationship to other sections. The remainder of this Chapter is devoted to an explanation of the scheme of the Act and how section 8 interacts with its other provisions.

## 1.    SECTION 8

Section 8 of the *Limitation Act* is in these terms:

> 8.    (1)   Subject to section 3(3), but notwithstanding a confirmation made under section 5 or a postponement of the running of time under section 6, 7 or 11(2), no action to which this Act applies shall be brought after the expiration of 30 years from the date on which the right to do so arose, or in the case of an action against a hospital, as defined in section 1 or 25 of the *Hospital Act*, or a hospital employee acting in the course of employment as a hospital employee, based on negligence, or against a medical practitioner based on professional negligence or malpractice, after the expiration of 6 years from the date on which the right to do so arose.
>
> (2)   Subject to subsection (1), the effect of sections 6 and 7 is cumulative.

There are actually two ultimate limitation periods created by section 8: the general 30-year one and the special six-year ultimate limitation period for negligence or malpractice actions against a medical practitioner, hospital or hospital employee. The general 30-year ultimate limitation period applies to all actions other than the kinds of actions subject to the six-year ultimate limitation under section 8, and those which are not subject to any limitation period. The latter are set out in section 3(3) of the Act, and chiefly relate to personal status and recovery of possession of land.

---

6.       Justice Reform Committee, *Access to Justice: Report of the Justice Reform Committee* (1988) 226.

The essential feature of the two ultimate limitation periods created by section 8 of the *Limitation Act* is that they only operate to bar an action if time has not already expired under some other limitation period prescribed by the Act. An ultimate limitation period is sometimes referred to as a "long stop."

2.    BASIC LIMITATION PERIODS

The *Limitation Act* creates limitation periods of two, six and ten years for various categories of claims, which normally run from the time to commence action first arises.[7] For instance, a claim for personal injury is governed by a two-year limitation period running, in most cases, from the time the injury is suffered.[8] An action to recover a simple debt must be commenced within six years from the time when the debt became payable.[9] A beneficiary of a trust must sue a trustee who has made wrongful use of trust assets within ten years from the time of the trustee's wrongful act.[10] In most cases, if a potential plaintiff does not commence his action within the normal limitation period, his right of action will be statute-barred long before the ultimate limitation period under section 8 expires.

The running of time under the basic limitation period may be affected by the operation of sections 5, 6, 7 or 11(2), however. In these instances, the ultimate limitation periods prescribed by section 8 may become relevant.

3.    SECTION 5 - CONFIRMATION OF THE CAUSE OF ACTION

The doctrines of acknowledgment and part payment have a lengthy history. For several centuries it has been the law that if a debtor acknowledged his liability to pay a debt or made a partial payment towards the satisfaction of a debt, the limitation period is considered to begin afresh at the time of the acknowledgment or part payment.[11] Section 5 of the present *Limitation Act* retains these doctrines under the term "confirmation" of the cause of action, although it modifies the older law in some respects.[12] If a cause of action is confirmed by acknowledgment[13] in writing or by a payment prior to the expiration of the limitation period, the time during which the limitation has run prior to the confirmation does not count in the reckoning of time against the plaintiff.[14] Essentially, the basic limitation period starts over again.

---

7.    Ss. 3(1), (2), (4), (5), 10.

8.    S. 3(1)(a).

9.    S. 3(4).

10.   S. 3(2)(c).

11.   *See* Williams, *Limitation of Actions in Canada* (2nd ed., 1980) 219. For a description of the historical development of the doctrines of acknowledgment and part payment, see Law Reform Commission of British Columbia Report 15, *Limitation of Actions: Part II - General* (1974) (referred to elsewhere in this Report as "LRC 15") 86-89.

12.   In particular, s. 5(2)(b) provides that an acknowledgment of a judgment or debt has effect whether or not a promise to pay can be implied from it. Under the prior law, an acknowledgment had to contain an express or implicit promise to pay in order to start the limitation period running anew: *Tanner* v. *Smart*, (1827) 6 B.&C. 603, 108 E.R. 573 (K.B.).

13.   An acknowledgment must contain some admission of liability: *Podovinikoff* v. *Montgomery*, (1984) 58 B.C.L.R. 204 (C.A.); *Farrell* v. *Tisdale*, (1987) 16 B.C.L.R. (2d) 230 C.A.).

14.   S. 5(1). At common law, an acknowledgment or part payment was only effective to restart the limitation period if the claim to which it related was in debt or for a liquidated sum. S. 5(10) of the *Limitation Act* states that, except as specifically provided, s. 5 does not operate to make any cause of action capable of confirmation which was not capable of confirmation before July 1, 1975 (the effective date of the Act). British Columbia courts have nevertheless held that claims for unliquidated damages are capable of being confirmed by acknowledgment or part payment. *See Pederson* v. *Lehn*, (1981) 28 B.C.L.R. 309 (C.A.); *Johal* v. *Harstad*, (1988) 24 B.C.L.R. (2d) 61 (C.A.).

3

While a confirmation operates to renew the basic limitation period, section 8 provides a second, outside limitation beyond which a plaintiff cannot sue, despite successive confirmations of the claim by the defendant. For example, a debtor might confirm a creditor's cause of action shortly before the basic six-year limitation under section 3(4) of the Act expired, and do so again on successive occasions prior to the expiry of the renewed six-year basic limitation periods. In that case, the basic limitation period would restart each time, but the creditor could not sue the debtor after thirty years had passed since the debt first became payable.

4.    SECTION 6 - POSTPONEMENT OF THE CAUSE OF ACTION

Section 6 of the *Limitation Act* provides for the postponement of the start of the basic limitation period in some circumstances. Its operation is somewhat different from that of section 5. A confirmation under section 5 causes a limitation period which has already commenced to recommence from the date of the confirmation. Section 6, on the other hand, simply prevents the basic limitation period from running at all until the plaintiff has knowledge of the material facts surrounding the claim, or ought reasonably to be aware of them. Section 6 is intended to guard against time running out before a plaintiff could realize that a claim existed.

Section 6 contains two provisions concerning postponement.

*(a)    Subsection 6(1) - Claim by a Trust Beneficiary*

In a claim by a trust beneficiary against a trustee for fraud or fraudulent breach of trust by the trustee, or to recover trust property from a trustee, the limitation period does not run against the beneficiary until the beneficiary is fully aware of the act of the trustee on which the claim is based.

*(b)    Subsection 6(3) - Other Cases of Concealed Causes of Action*

In claims for personal injury, property damage, professional negligence, fraud or deceit, relief from the consequences of a mistake, breach of trust other than those falling within subsection 6(1), actions under the *Family Compensation Act*,[15] and those in which material facts have been concealed, time does not commence to run against a plaintiff until the plaintiff is aware of the defendant's identity and the facts within the plaintiff's means of knowledge would lead a reasonable person, appropriately advised, to conclude that an action would have a reasonable prospect of success and, further, that he should bring an action in his own interests, taking his circumstances into account.[16] "Facts," in this context, include the existence of a legal duty owed to the plaintiff by the defendant and a breach of that duty, resulting in injury, damage or loss to the plaintiff.[17]

---

15.    R.S.B.C. 1979, c. 120. Section 2 of this Act creates a cause of action for "wrongful death," allowing the personal representative of the deceased to sue on behalf of the deceased's dependants.

16.    The "circumstances" of the plaintiff thus form an element of the test for the running of time. In *Evans* v. *Vancouver Port Corporation*, [1989] B.C.J. No. 2364 (C.A.), the court appeared to give a fairly wide interpretation to "circumstances" in s. 6(3)(j) of the *Limitation Act*. In *Evans* the plaintiff was an injured worker who had to elect under s. 10(2) of the *Workers Compensation Act*, R.S.B.C. 1979, c. 437 to either bring an action or receive compensation. He elected to receive workers' compensation benefits because he could not afford to wait for a judgment against the employer. Subsequently, the Workers' Compensation Board decided not to pursue a subrogated claim against the employer, but left the plaintiff free to bring an action. The Court of Appeal held that time did not run against the plaintiff in the interim, as it would not have been in his interests to bring the action until the Board signified its intentions.

17.    *Limitations Act*, R.S.B.C. 1979, c. 236, s. 6(4).

4

*(c)      Section 6 and the Ultimate Limitation Periods*

Once again, a postponement under section 6 resulting from the plaintiff's ignorance of the material facts will not affect the running of time under the ultimate limitation periods in section 8, which operate independently of the plaintiff's state of knowledge.[18]

5.      SECTION 7 - DISABILITY

The *Limitation Act* of British Columbia, like other general limitation statutes in force in Canada,[19] gives relief against limitation periods to persons under legal disability. These are persons whom the law does not consider to be capable of handling their own legal affairs. It has always been thought unfair to allow time to run against them until they can be considered capable of making decisions with legal consequences. The British Columbia *Limitation Act* recognizes two forms of disability as affecting the basic limitation period: minority and the state of being actually incapable of or substantially impeded in the management of one's own affairs.[20]

If a plaintiff is under such a disability when the cause of action is acquired, time does not run under the basic limitation period while disability persists.[21] If the disability occurs after the cause of action has arisen, when the basic limitation period is already running, the running of time is suspended from the onset of the disability until it ceases.[22]

The ultimate limitation periods provided by section 8, however, are not affected by the plaintiff's disability.

6.      SECTION 11(2) - STAY OF EXECUTION ON A JUDGMENT

A judgment is considered to create a new obligation on which it is possible to sue.[23] The *Limitation Act* provides that an action on a judgment for the payment of money or the return of personal property may not be brought after 10 years.[24] Section 11(2), however, provides that if an order staying execution of a judgment is made, the limitation period for an action on the judgment is suspended while the stay is in effect.

The suspension of the basic 10-year limitation period produced by the stay of execution, however, does not apply to the ultimate limitation period under section 8.

---

18.      *See Bera v. Marr*, (1986) 1 B.C.L.R. (2d) 1 (C.A.); *Wittman* v. *Emmott*, [1989] B.C.D. Civ. 2481-09 (S.C.).

19.      *Limitations of Actions Act*, R.S.A. 1980, c. L-15, ss. 8, 46; *The Limitation of Actions Act*, R.S.M. 1987, c. L150, s. 7; *Limitation of Actions (Personal) and Guarantees Act*, R.S.N. 1970, c. 206, s. 4, as amended; *Limitations of Actions (Realty) Act*, R.S.N. 1970, c. 207, s. 15; *Limitation of Actions Act*, R.S.N.B. 1973, c. L-8, s. 18; *Limitations of Actions Act*, R.S.N.S. 1967, c. 168, s. 3; *Limitations Act*, R.S.O. 1980, c. 240, ss. 36, 37, 39, 47; *Statute of Limitations* R.S.P.E.I. 1974, c. S-7, s. 5; *Limitation of Actions Act*, R.S.S. 1978, c. L-15, s. 6, as amended.

20.      S. 7(5).

21.      S. 7(1). It is possible for a potential defendant to cause the limitation period to commence to run against a potential plaintiff under disability by serving a notice to proceed under s. 7(6) on the guardian and the Public Trustee. The notice does not constitute an admission and is not a confirmation of the cause of action: s. 7(10).

22.      S. 7(3).

23.      *Jacobs . Beaver*, (1908) 17 O.L.R. 496, 502.

24.      S. 3(2)(f).

7.    SUMMARY

Under the *Limitation Act* there are four provisions which operate to alter the running of time under the basic limitation periods.  These are:

| | | |
|---|---|---|
| Section 5 | - | A confirmation of a cause of action causes time to run anew. |
| Section 6 | - | The running of time is postponed where the plaintiff is not aware of the factual basis of the claim. |
| Section 7 | - | The running of time is postponed where the plaintiff is under a legal disability. |
| Section 11(2) | - | The running of time is postponed for an action on a judgment where there has been a stay of execution. |

None of these provisions affect the running of the ultimate limitation period under section 8 and in each case the plaintiff's claim will be statute-barred either 6 years or 30 years after the claim arose, depending on which period applies, having regard to the characteristics of the defendant.


D.    **Conclusion**

In this Chapter we have attempted to explain the principal features of the current *Limitation Act*. Particular emphasis has been placed on the relationship between the basic limitation period, which is capable of postponement, and the ultimate "long stop" found in section 8, as this relationship is fundamental to the issues dealt with in this Report.

The next Chapter describes the origin of the current *Limitation Act* and the rationale behind some of its most distinctive provisions.

**CHAPTER II**                                    **BACKGROUND TO THE ENACTMENT**
                                                      **OF SECTION 8**


**A.      The 1974 Report on Limitations**

1.      THE PROBLEM OF CONCEALED CAUSES OF ACTION

In 1974 this Commission published a Report[1] which examined the law of limitation of actions in British Columbia in depth and concluded that the *Statute of Limitations*[2] then in force, together with a large number of limitation provisions in other provincial statutes, should be replaced by a comprehensive statute written in modern language.[3] The *Statute of Limitations* was largely a re-enactment of individual provisions of several English statutes enacted between 1623 and 1861.[4] Much of its language was obscure, containing references to obsolete legal concepts. Reforms of archaic limitations law on a similar scale had also been proposed by the Ontario Law Reform Commission in an extensive study published in 1969.[5]

One of the problems addressed in the 1974 Report concerned the situation of the plaintiff who was unaware of the facts surrounding a cause of action through no fault of his own. The law was clear that time ran under a limitation period from the point at which the cause of action arose, namely when all the essential facts entitling a person to sue were present. A plaintiff ignorant of those material facts would be unaware that time was running against him. It was possible that a cause of action could become statute-barred before the plaintiff was aware he had the claim. While the law gave some relief in the case of fraud or fraudulent concealment by deeming the cause of action to arise when the material facts were discovered,[6] this stopped far short of exhausting the possibilities for concealed causes of action.

   *(a)     An Example:  Industrial Disease*

The harshness with which the law treated the excusably unaware plaintiff is illustrated by the English

---

1.    Law Reform Commission of British Columbia, Report No. 15, *Limitations: Part II - General* (1974), referred to in this Report as "LRC 15."

2.    R.S.B.C. 1960, c. 370.

3.    *Supra*, n. 1 at 6, 13.

4.    *See* LRC 15 at 9-10.

5.    Ontario Law Reform Commission, *Report on Limitation of Actions* (1969).

6.    Section 38 of the *Statute of Limitations*, R.S.B.C. 1960, c. 370 provided:
       38.   In every case of a concealed fraud, the right of any person to bring a suit in equity for the recovery of any land or rent of which he, or
             any person through whom he claims, may have been deprived by such fraud shall or with reasonable diligence might have been first
             known or discovered; provided that nothing in this clause contained shall enable any owner of lands or rents to have a suit in equity for
             the recovery of such lands or rents, or for setting aside any conveyance of such lands or rents on account of fraud, against any bona fide
             purchaser for valuable consideration who has not assisted in the commission of such fraud, and who at the time that he made the purchase
             did not know and had no reason to believe that any such fraud had been committed. In cases other than suits for recovery of land or rent,
             a plaintiff could invoke an equitable doctrine which prevented a fraudulent defendant from taking advantage of the limitation period:
             *Gibbs* v. *Guild*, (1882) 9 Q.B.D. 59 (c.a.); *Bulli Coal Mining Co.* v. *Osborne*, [1899] A.C. 351 (P.C.) *See also Guerin* v. *The Queen*,
             [1984] 2 S.C.R. 355, 390 (S.C.C.).

case *Cartledge* v. *E. Jopling & Sons, Ltd.*[7]  The plaintiffs had contracted pneumoconiosis, a lung disease, as a result of improper ventilation in a factory in which they had worked for many years.  The working conditions violated existing standards for factory ventilation.  By 1950 the working conditions had been rectified, but the plaintiffs already had the disease.  As the disease produced no symptoms in its early stages, however, they were unaware of it.  Actions were commenced against the factory owners in 1956 following the discovery of the disease.  At all court levels the action was held to be statute-barred by the six-year limitation period under the *Limitation Act 1939*.[8]  The cause of action had accrued as soon as damage had been suffered by the plaintiffs, and this could not have been later than 1950.

   (b)   The Limitations Act 1963

By the time the case had reached the House of Lords, it had already prompted the appointment of a committee to inquire into the problems of limitation periods and concealed causes of personal injury.  Its recommendations resulted in the enactment of the *Limitations Act 1963*.[9]  This Act enabled the court to allow an extension of the limitation period in personal injury cases where the plaintiff had been ignorant of the material facts.  The plaintiff was required to prove that he had been unaware of material facts "of a decisive character" until after the expiration of the limitation period or a point in time not more than 12 months prior to its expiration and not more than 12 months prior to his application for relief under the Act.[10]  The *Limitations Act 1963* was heavily criticized for its complexity and obscurity.[11]  Provisions modelled on it were nevertheless adopted in Manitoba in 1967.[12]

   (c)   A Simpler Solution:  Postponement

In delivering judgment in *Cartledge*[13], Lord Reid suggested a simpler legislative solution to the problem presented by the concealed cause of action, namely postponement of the running of time until the cause of action could be discovered with the exercise of reasonable diligence on the part of the plaintiff.[14]

The notion that relief should be provided against a limitation period where the cause of action was concealed from the plaintiff otherwise than through fraud was accepted by law reform bodies in Canada and

---

7.   [1963] A.C. 758 (H.L.).  *See also Von Cramm* v. *Riverside Hosptial of Ottawa*, (1986) 32 D.L.R. (4th) 314 (Ont. C.A.).  The *Von Cramm* case was decided ten days before the Supreme Court of Canada released its decision in *Central Trust Company* v. *Rafuse*, [1986] 2 S.C.R. 147, in which the "discoverability" rule for the commencement of time under a limitation period was expressed to be a rule of general application.  *See, ibid.*, 224.  It is interesting to contrast the decision of the Ontario Court of Appeal in *Von Cramm* with its decision in *July et al.* v. *Neal*, (1986) 32 D.L.R. (4th) 463, rendered only a short time later, after *Central Trust Company* v. *Rafuse* had been decided.  In *July* v. *Neal, supra*, the Supreme Court's decision was applied to find that a triable issue existed as to whether or not a limitation period had been postponed.

8.   2 & 3 Geo. 6, c. 21, s. 2(1).

9.   1963, c. 47.

10.  *Supra*, n. 9, ss. 1 (1), (3).

11.  *Pickles* v. *National Coal Board*, [1968] 2 All E.R. 598, 599 *per* Lord Denning, M.R. (C.A.): "... this very complicated and obscure Act ..."; *Drinkwater* v. *Joseph Lucas (Electrical) Ltd.*, [1970] 3 All E.R. 769, at 774 (C.A.); *Central Asbestos Co. Ltd.* v. *Dodd*, [1972] 2 All E.R. 1135, 1138 *per* Lord Reid (H.L.).

12.  *An Act to amend The Limitation of Actions Act and to amend Certain Provisions of other Acts relating to Limitation of Actions*, S.M. 1966-67, c. 32, s. 4.  The provisions are now contained in the *Limitation of Actions Act*, R.S.M. 1987, c. L150, ss. 14-20.

13.  *Supra*, n. 7.

14.  *Ibid.*, at 733.  Lord Reid actually suggested that s. 26 of the *Limitation Act 1939*, 2 & 3 Geo. 6, c. 21, be extended to encompass the situation presented by *Cartledge*.  Section 26 provided that time did not run in cases of fraud, fraudulent concealment of the right of action, or mistake until the fraud or mistake was discovered by the plaintiff, or could have been discovered with reasonable diligence.

other Commonwealth countries in the years following the enactment of the *Limitations Act 1963* in England. At the 1968 Conference of Commissioners on Uniformity of Legislation in Canada the Alberta Commissioners recommended that relief should be available in actions based on property damage and professional negligence as well as personal injury, considering these to be the areas in which an issue as to concealed damage was most likely to arise.[15]  They stated that postponement of the limitation period was to be preferred as a solution rather than judicial extension.[16]

The Ontario Law Reform Commission agreed with the Alberta Commissioners as to widening the category of actions in which relief against limitation defences should be available, but favoured judicial extension rather than postponement.[17]  Proposals were made in New South Wales and South Australia for legislation modelled on the *Limitations Act 1963*.[18]  The Law Reform Commission of South Australia recommended that the scheme of the 1963 English Act be extended to all causes of action.

In its 1974 Report, this Commission adopted the solution Lord Reid had suggested, recommending that the new limitation statute for British Columbia contain a provision postponing the running of time in certain kinds of actions until the plaintiff was aware of the defendant's identity and of sufficient other facts such that a reasonable person who had received appropriate professional advice would consider an action warranted.[19]  The provision would apply only to the actions that are now listed in section 6(3) of the *Limitation Act*.  The person seeking the benefit of the postponement would have the burden of proving that the provision applied to the case.

The Commission's recommendations concerning the postponement provision were made in the context of others for reductions in the length of many existing limitations.  Provisions of the *Statute of Limitations* dating from 1623 prescribed a six-year limitation for many common actions.[20] In light of modern conditions this was considered to be far too long for actions based on physical damage.  As physical damage would come to the plaintiff's attention readily in most cases, the Commission proposed that actions for personal injury, property damage and resulting economic loss be subject to a two-year limitation period.[21] The provision for postponement of the running of time was partly intended to be a safeguard for plaintiffs in exceptional situations where concealed damage might not become apparent during the reduced limitation period.[22]

### (d)    A Limit on Postponement

The postponement provision raised one serious concern.  Its operation might result in a limitation

---

15.    *Proceedings of the Fiftieth Annual Meeting of the Conference of Commissioners on Uniformity of Legislation in Canada*(1968) 71.

16.    *Ibid.,* at 72.

17.    *Supra,* n. 5 at 108-109.

18.    New South Wales Reform Commission, *First Report on the Limitation of Actions* (1967) 133-135; Law Reform Commission of South Australia, *Twelfth Report:  Law Relating to Limitation of Time for Bringing Actions* (1970) 3-4.

19.    LRC 15 at 81-82.

20.    R.S.B.C. 1960, c. 370, s.3.

21.    LRC 15 at 26-27.

22.    *Ibid.*

period being postponed indefinitely. The Commission thought that a fair balance between the competing interests of plaintiffs and defendants required an end to the possibility of litigation at some point. Accordingly, it was proposed that the new limitation statute contain an ultimate time bar. The ultimate bar would take effect without regard for any postponement, suspension or confirmation affecting the basic limitation period. The length proposed for the ultimate limitation period was 30 years.[23]

## B.    Why 30 Years?

A number of factors influenced the Commission, in 1974, to recommend a relatively lengthy ultimate limitation period of 30 years. First, it was thought that period had to be sufficiently long to allow for latent damage to manifest itself in a variety of situations. Industrial diseases were a prominent consideration.

A 30-year period was also seen as preventing any disadvantage which might be caused by reason of the plaintiff's minority at the time the concealed cause of action arose. If the ultimate limitation period was not longer than the period of minority, a minor's cause of action could become completely barred before the minor came of age and could sue in his own right.

The Commission also accepted the argument that a creditor should be able to take full advantage, to an extent consistent with the purposes of a limitation statute, of a series of confirmations made by a debtor over an extended period of time. This would have a beneficial effect on commercial matters, because the extension in time of the creditor's ability to recover from the debtor improved opportunities for long-term financing. As the basic limitation period for actions in debt was left at six years, an ultimate limitation period which was substantially shorter than 30 years would restrict the benefit that successive confirmations would provide to the creditor.

The concept of a longer, absolute limitation overriding the postponement of a shorter one was not entirely new in 1974. There were precedents for an ultimate limitation period of the length proposed. The English *Real Property Limitation Act, 1833*[24] imposed a 40-year limitation period on actions to recover land or rent which applied regardless of the fact that another, much shorter, limitation period might be postponed by reason of the plaintiff's disability.[25] This had been re-enacted as section 30 of the British Columbia *Statute of Limitations*[26]. The English *Limitation Act 1939*[27] contained a similar provision creating a 30-year ultimate limitation.[28]

More recent precedents were provided by the 30-year limitation period in section 15(1) of the *Nuclear Installations Act 1965*[29] of the United Kingdom, a provision obviously intended to take account of injury or damage appearing long after the event causing exposure to radiation. In 1967 the New South Wales Law

---

23.    LRC 15 at 101.

24.    3 & 4 Will. 4, c. 27.

25.    *Ibid.*, s. 17.

26.    *Supra*, n. 2.

27.    2 & 3 Geo. 6, c. 21.

28.    *Ibid.*, s. 22 (c).

29.    1965, c. 57, s. 15(1).

Reform Commission recommended a 30-year ultimate limitation period as a counterweight to its recommendation for discretionary extension of basic limitation periods.[30] This recommendation had been adopted into law in New South Wales in 1969.[31]

### C.    The 1975 *Limitations Act*

For the most part, the recommendations made by this Commission in the 1974 Report were carried into effect in the *Limitations Act*[32] enacted the following year. Section 8 of the new Act, however, contained a feature which had not been among the Commission's recommendations. As enacted, it provided as well as the 30-year ultimate limitation period a further special 10-year ultimate limitation period for negligence or malpractice actions against medical practitioners and hospitals. An amendment made in 1977 reduced this special limitation to six years, and expanded the protected category to include hospital employees acting in the course of their employment.[33] Section 8 remains in this form today.

### D.    Summary

The *Limitation Act* came into being as a result of a comprehensive review of limitations in British Columbia. The provision in section 6(3) of the Act for the undiscovered cause of action was a reform for which there was a widely-recognized need.

The ultimate limitation period under section 8 arose because it was believed that the relief given to a plaintiff under the postponement provisions of the *Limitation Act* should be balanced with some protection against stale claims.

Remaining Chapters of this Report will examine whether this concern remains valid in light of developments in the general law of limitation of actions since 1975, and, if so, whether section 8 requires amendment to attain a more just balance between plaintiffs and defendants.

---

30.    New South Wales Law Reform Commission, *Report on the Limitation of Actions* (1967) 127.

31.    *Limitation Act 1969*, S.N..S.W. 1969, Act No. 31, s. 51.

32.    S.B.C. 1975, c. 37.

33.    *Miscellaneous Statutes Amendment Act, 1977*, S.B.C. 1977, c. 76, s. 19.

CHAPTER III                      IS THERE A CONTINUED NEED FOR
                                 AN ULTIMATE LIMITATION PERIOD?


A.    **Introduction**

In keeping with the scope of this Report as a general reconsideration of the ultimate limitation period, this Chapter addresses the basic question whether the long stop remains a useful component in the scheme of the *Limitation Act*. As an initial step towards answering this question, it is worthwhile to summarize the rationale for limitation periods in general. This exercise will help to put the concept of the ultimate limitation period in the proper perspective.


B.    **What Ends Do Limitation Periods Serve?**

1.    FINALITY

The most obvious and most easily attainable goal of a system of limitations is finality in litigation. Limitation statutes are sometimes referred to as "statutes of repose,"[1] as they provide a good defence to a claim based on the lapse of time, regardless of how well-founded the claim might otherwise be. In so doing, they provide certainty as to the legal position of the parties. This allows individuals to order their affairs on the basis of settled expectations.[2] The psychological and economic benefits of certainty in legal relations are considerable.

Limitation statutes also serve a social purpose in quieting past disputes and ensuring, as far as is practicable, that the resources of the judicial system are employed to resolve disputes of current significance. On this point the Alberta Institute of Law Research and Reform stated:[3]

> We believe that a society must secure as much peace as it reasonably can, and that it can quite properly focus its primary attention on resolving present conflicts ... Broadly speaking, there must be a time when, insofar as human transgressions are concerned, the slate is wiped clean. A reasonable limitations system can secure this objective.

2.    QUALITY OF EVIDENCE

Evidence has a tendency to deteriorate with time. Witnesses' memories may fade and the witnesses themselves may become unavailable. Documents can become lost or damaged. When the quality of evidence is poor, the court's task becomes difficult at best and, at worst, may lead to an incorrect result. The existence of a limitation period encourages the plaintiff to bring the action while evidence is still reasonably fresh and accessible.

3.    FAIRNESS IN THE LITIGATION PROCESS

---

1.    *Doe d. Duroure v. Jones*, (1791) 4 T.R. 300, 308; 100 E.R. 1031, 1035.

2.    *See Deaville v. Boegeman*, (1984) 14 D.L.R. (4th) 81, 86 (Ont. C.A.).

3.    Alberta Institute of Law Research and Reform, *Report for Discussion No. 4: Limitations* (1986) 31.

12

To a great extent, this ground for the existence of a system of limitation of actions is linked with evidentiary concerns. While deteriorating evidence may cause difficulty for both plaintiffs and defendants in conducting litigation, defendants are more likely than plaintiffs to be prejudiced by the passage of time before an action is commenced because they may not be aware that a claim exists, and so would not have reason to collect and preserve evidence in order to meet it. This is particularly true where the act or event which gives rise to the claim is one of a large number of similar acts or events which normally attract no adverse consequences.

The manufacture or distribution of a single defective item out of a large inventory of the same product or an unrealized error in rendering a professional service on a single occasion are examples of potential liabilities which could exist for a long time before the manufacturer or the party rendering the service became aware that an injured plaintiff was claiming compensation. Requiring plaintiffs to litigate claims within an appropriate length of time helps to ensure that both sides have a fair opportunity to marshal evidence in support of a case.

Evolving legal and social standards give rise to a another connection between procedural fairness and timeliness. If there are limitation periods, conduct which attracts legal consequences is more likely to be judged in light of the standards existing at the time of the conduct than if there are no restrictions on the plaintiff's ability to litigate.[4] This rationale for the limitation of actions is of increasing importance, given the rate at which attitudes and norms currently change. New areas of liability arise continually in response to evolving sensitivities. Concern over the environment is a prominent example of the pressures to which the legal system has begun to respond, in part through the imposition of civil liability.

4.      ECONOMIC REASONS

A person who faces the possibility of litigation as a defendant has a contingent liability. While the possibility lasts, the economic future of the potential defendant is more uncertain than it would otherwise be. Dealings with creditors and lenders are likely to be affected. Once the limitation period has passed without an action having been commenced, the contingent liability ceases and the individual's financial affairs become more predictable. This benefits not only the individual, but all who may be at risk should he become insolvent as the result of a judgment. Thus a statute of limitations indirectly benefits a much wider circle.

Being ready to defend a civil action may require that adequate records be maintained for long periods. This generates a cost which is passed on by providers of goods and services to consumers. The cost of liability insurance is likewise passed on. The greater the degree of uncertainty as to the potential for litigation, the greater these costs are likely to be. The increased costs would be reflected ultimately throughout the economy. A system of limitation of actions places a cap on uncertainty and helps to control the cost of doing business.

C.      **The Traditional One-Sidedness of the Limitation of Actions**

In a sense, the limitation of actions benefits society at large and defendants as a class at the expense of plaintiffs as a class. As outlined in the previous Chapter, the idea that relief should be given against the injustice occasionally produced by the rigidity of limitation periods arose initially in relation to personal injury claims in the 1960's. This led to legislated reforms in various jurisdictions, including British Columbia.

---

4.      *Ibid.*, at 33-34.

In the years following, a significant change also occurred in the way in which limitation statutes were interpreted by the courts. Concern for injecting a greater degree of fairness into the historical one-sidedness of limitations, favouring defendants, led courts to find that the running of time was implicitly postponed in order to assist the unaware plaintiff.


## D.    The Non-Statutory "Discoverability" Rule

The traditional rule concerning the point at which a limitation period commences is that time starts to run when the cause of action arises. In other words, time is considered to run from the point at which the plaintiff first had the right to sue. Determining the point when the right to sue first arises depends on the nature of the claim presented. In actions based on breach of contract, for example, the breach itself gives the right to sue.[5] In actions based on the tort of negligence, however, the cause of action is not complete until the plaintiff has suffered actual damage.[6] Under the traditional rule, the limitation period commences when damage occurs, whether the plaintiff has the means of knowing the fact or not.

In a 1984 case dealing with concealed damage to a building, *City of Kamloops* v. *Nielsen*,[7] the Supreme Court of Canada adopted the view, accepted in a line of recent English and Canadian cases,[8] that in situations where negligently caused damage was outside the plaintiff's means of knowledge, the limitation period should run from the time the damage became discoverable with the exercise of reasonable diligence.[9]

*Kamloops* v. *Nielsen*, like most of the English cases, dealt with concealed defects in a building. The Supreme Court, however, reaffirmed the "discoverability" principle as a general rule for interpreting limitation statutes three years later in *Central Trust Company* v. *Rafuse*,[10] a case dealing with professional negligence on the part of a lawyer.

Thus there is a non-statutory, judge-made rule in Canada now that the running of time under a limitation period is postponed until the plaintiff discovers the material facts or ought to have discovered them

---

5.    *Mott* v. *Trott*, [1943] S.C.R. 256, [1943] 2 D.L.R. 609; *Terrace School District No. 53* v. *Berwick et al.*, (1963) 38 D.L.R. (2d) 498, 42 W.W.R. 25 (B.C.S.C.).

6.    *Long* v. *Western Propeller Co. Ltd.*, (1968) 65 D.L.R. (2d) 147 (Man. Q.B.).

7.    [1984] 2 S.C.R. 2, 10 D.L.R. (4Th) 641.

8.    See *Sparham-Souter* v. *Town & Country Developments (Essex) Ltd.*, [1976] 2 All E.R. 65 (C.A.); *Dennis et al.* v. *Charnwood Borough Council*, [1982] 3 All E.R. 486 (C.A.); *Ordog* v. *District of Mission*, (1980), 110 D.L.R. (3d) 718 (B.C.S.C.); *Robert Simpson Co. Ltd. et al.* v. *Foundation Co. of Canada Ltd. et al.* (1982), 36 O.R. (2d) 97 (C.A.); *New Brunswick Telephone Co., Ltd.* v. *John Maryon International Limited et al.*, (1982), 113 A.P.R. 469 (N.B.C.A.); leave to appeal refused *(sub nom. John Maryon International Ltd. et al.* v. *New Brunswick Telephone Co., Ltd.)*, *ibid.*, at 468. (S.C.C.).

9.    The majority in the Supreme Court rejected the decision of the house of Lords in *Pirelli General Cable Works Ltd.* v. *Oscar Faber & Partners Ltd.*, [1983] 2 A.C. 1 (H.L.) which had overruled *Sparham-Souter*, *supra*, n. 8, and reaffirmed *Cartledge* v. *E. Jopling & Sons Ltd.*, [1963] A.C. 758 (H.L.) as a correct statement of the law in England concerning the commencement of a limitation period.

10.    [1986] 2 S.C.R. 147. Le Dain, J. speaking for the court, stated at 224:
     ... the judgment of the majority in *Kamloops* laid down a general rule that a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence, and that rule should be followed and applied to the appellant's cause of action in tort against the respondents under the Nova Scotia *Statute of Limitations*, R.S.N.S. 1967, c. 168. There is no principled reason, in my opinion, for distinguishing in this regard between an action for injury to property and an action for the recovery of purely financial loss caused by professional negligence as was suggested in *Forster* v. *Outred*, at pp. 765-766.

14

with reasonable diligence.[11]

## E.    The Effect of the Non-Statutory Discoverability Rule
##        on the British Columbia *Limitation Act*

The adoption of the discoverability rule by the Supreme Court of Canada created some initial uncertainty around the interpretation of the *Limitation Act*. Since 1975, of course, section 6(3) of the *Limitation Act* had provided expressly for postponement of the limitation period in certain kinds of actions if the plaintiff was not aware of the material facts. Section 8 of the Act also provided upper limits on the extent of the postponement. The judge-made discoverability rule had no upper limit, and therefore had the potential to expose defendants to liability for an indefinite period.

If the judge-made rule applied to section 6(3), the provision would become meaningless, since the basic limitation periods under the Act would be postponed in any event until the material facts became discoverable. If it applied to section 8, the concept of an ultimate limitation period would also be rendered meaningless, since the outside limitation periods created by section 8 would then be postponed as well until the plaintiff could discover the material facts.

In *Bera* v. *Marr*,[12] which was decided after *Kamloops* v. *Nielsen*[13] and before *Central Trust Company* v. *Rafuse*,[14] the British Columbia Court of Appeal held that the *Limitation Act* contained a "balanced legislative scheme"[15] which would be overturned if the judge-made discoverability rule applied. Sections 3(1), 6(3) and 8 were based on the common law rules concerning the time at which a cause of action arises, without reference to the state of the plaintiff's knowledge.

In two subsequent cases, *Wittman* v. *Emmott*,[16] and *Levitt* v. *Carr*[17] it was held that the Supreme Court's decision in *Central Trust Company* v. *Rafuse* did not alter the law as the Court of Appeal had expressed it in *Bera* v. *Marr*. Thus the situation appears to be that the judge-made discoverability rule does not apply to a limitation statute like the British Columbia *Limitation Act*, which contains its own discoverability rule.

## F.    Is There Still a Need For an Absolute Time Bar?

The adoption of the discoverability rule by the Supreme Court shows that the general law surrounding

---

11.    While, strictly speaking, *Central Trust Company* v. *Rafuse* dealt only with tort, as a claim for breach of contract was not pursued, the discoverability rule for determining the beginning of a limitation period has been applied by the Ontario Court of Appeal to a claim in contract as well. *See Consumers Glass Co. Ltd.* v. *Foundation Co. of Canada Ltd.*, (1985) 51 o.r. (2d) 385 (C.A.). The Alberta Court of Appeal, however, refused to extend the discoverability rule to a claim for breach of contract in *Fidelity Trust Co.* v. *Weiler*, [1988] 6 W.W.R. 427 (Alta. C.A.).

12.    (1986), 1 B.C.L.R. (2d) 1 (C.A.).

13.    *Supra*, n. 7.

14.    *Supra*, n. 10.

15.    *Supra*, n. 12 at 27.

16.    [1989] B.C.D. Civ. 2481-09 (S.C.).  (Under appeal at time of writing.)

17.    [1989] B.C.D. Civ. 2481-08, 2632-10, and 3386-01 (S.C.).  (Under appeal at time of writing.)

limitation of actions has moved in the same direction as legislative reform did in British Columbia in the mid-seventies. The pervading theme has been aptly summarized by the New South Wales Law Reform Commission:[18]

> It is no longer accepted that certainty and finality should be pursued independently of the other goals of limitations statutes.

The judge-made discoverability rule addresses the basic injustice produced by the barring of a valid claim before it is possible for the plaintiff to become aware he has it, and still discourages plaintiffs from "sitting on their rights" once they ought to be conscious of them. It nevertheless has the potential to postpone the beginning of the limitation period indefinitely. This aspect of the new rule has not escaped unfavourable comment.[19] Applied in isolation, a discoverability rule does not serve the purpose of freeing defendants, after an appropriate length of time, from the economic and psychological burdens of potential litigation and the practical difficulties of defending stale claims. It does not take into account broader social interests in seeking finality to litigation, such as the economic impact of increased liability insurance costs passed on to consumers of goods and services.

Once it is accepted that the goals of certainty and finality should yield to the unknowing plaintiff's right to present a claim when the facts come to light, it does not necessarily follow that they should be abandoned entirely. Replacing the traditional one-sidedness of limitations law favouring defendants with an equally one-sided regime favouring plaintiffs fails to achieve the necessary balance.

Some protection is needed against the injustice which may result where a plaintiff succeeds simply because the defendant is not able to present any evidence due to the lapse of time and lack of notice that a claim exists. While increasing computerization and the widespread tendency among professionals and those in the commercial world to maintain better records for longer periods (itself a product of increased litigation) may diminish this concern somewhat, judicial procedures still rely heavily on oral evidence based on human memory. Obviously, this is vulnerable to time. Records must still be verified through oral evidence, and in many cases the factual background of the events surrounding even the most meticulous records has to be supplied through resort to the memories of witnesses.

Litigation over stale claims, where the quality of evidence is likely to be poor, is a wasteful exercise. An ultimate time bar reduces the opportunity for inefficient use of the resources of the court system.

Continued availability of liability insurance coverage and the cost of it are also important factors to consider. The uncertainty as to the duration of liability which is produced by an open-ended discoverability rule has a serious effect on the predictability of future claims experience. It affects both the insurer's decision to assume a risk and the amount of the premium. Only a relatively small number of plaintiffs are likely to benefit from the discoverability rule in any event. If liability insurance became unobtainable or if premiums became unmanageably large as a result of the lack of an ultimate bar, plaintiffs as a class would be prejudiced.[20] Paradoxically, an upper limit on the postponement of a limitation period may therefore be in

---

18.  New South Wales Law Reform Commission, *Limitation of Actions for Personal Injury Claims*, (1986) at 13.

19.  *See* Blom, "Concurrent Liability in Tort and Contract:  Start of Limitation Period:  *Central Trust Co.* v. *Rafus*" (1987), 21 U.B.C.L.R. 429, at 447.

20.  The Ontario Task Force on Insurance referred to the "extreme uncertainty associated with 'long-tail' risks" as being one of the causes of the large increases in premiums and withdrawals by insurers from the liability insurance market in the mid-1980's.  *See* Ontario Task Force on Insurance, *Final Report* (1986) 29.

the interests of plaintiffs as a group.

In other recent studies by law reform bodies in Canada and other Commonwealth countries in the area of limitations, it has generally been accepted that if a discoverability rule is adopted, some upper limit should be imposed on the possible length of the postponement.[21] The draft *Uniform Limitations Act* adopted by the Uniform Law Conference of Canada contains an ultimate limitation period as well as a discoverability rule.[22] A few recent studies have concluded no upper limit should be imposed on certain types of claims.[23]

A limitations scheme should strive to attain a rational balance between the interests of plaintiffs, defendants and society at large.  On balance, there are good reasons, grounded in the basic objectives of limitation of actions, for retaining an ultimate limitation period operating independently of the plaintiff's knowledge or ignorance of material facts.  We are inclined to agree with the Alberta Law Reform Institute, which concluded that those basic objectives could not be achieved without an ultimate bar.[24]  Accordingly, it is our conclusion that an ultimate limitation period should be retained in the *Limitation Act*.

## G.    Should the Ultimate Limitation Period Apply to Personal Injury Claims?

Some law reform bodies have concluded that personal injury claims should not be subject to an ultimate limitation period.[25]  Current English and Scottish legislation allows the basic limitation period for personal injury claims to be extended in cases of concealed damage without imposing an outside limit, except where the damage stems from a defective product.[26]

The argument for excluding personal injury claims from the scope of the ultimate limitation period generally concentrates on the example of latent industrial or environmental diseases which develop over long

---

21.    *See* Alberta Law Reform Institute *Report No. 55:  Limitations* (1989) 35; Law Reform Committee (Scarman Committee), *Twenty-fourth Report (Latent Damage)* (1984) paras. 4.2, 4.4, 4.10, 5.3(c); Newfoundland Law Reform Commission, *Report on Limitation of Actions* (1986) 7, 10; Law Reform Branch (N.B.), *Limitations Act - Discussion Paper* (1988) 8 (s. 9); Law Commission of New Zealand, *Limitation Defences in Civil Proceedings* (1988) 103; Law Reform Commission of Saskatchewan, *Proposals for a New Limitation of Actions Act* (1989) 47; Scottish Law Commission, *Report on Prescription and Limitation of Actions (Latent Damage and Other Related Issues)* (1989) para. 3.16; Law Reform Committee of South Australia, *Eighty-seventh Report Relating to Claims for Injuries from Toxic Substances and Radiation Effects* (1985) 27.  The English Law Reform Committee and Scottish studies cited in this note were restricted to claims arising from damage to property.

22.    Uniform Law Conference of Canada, *Proceedings of the Sixty-fourth Annual Meeting* (1982) 33, 341 (ss. 13(2), (3)).

23.    Australian and Victoria Law Reform Commissions (Joint Report), *product Liability* (1989) 118; New South Wales Law Reform Commission, *Limitation of Actions for Personal Injury Claims* (1986) 57; Law Reform Commission of Western Australia, *Report on Limitation and Notice of Actions: Latent Disease and Injury* (1982) 68.

24.    Alberta Law Reform Institute, *Report No. 55:  Limitations* (1989) 35.

25.    *See supra*, n. 23.

26.    In England, the *Limitation Act 1980*, c. 58, s. 33 gives an unfettered discretion to order that the three-year limitation period in s. 11 (the commencement of which is subject to a discoverability rule) for actions based on personal injury shall not apply in a given case if it appears equitable to do so. This effectively leaves an action in which such an order is made outside any limitation period.  Actions for personal injury based on defective products are subject to a separate limitations regime because of an EEC directive, however.  The *Consumer protection Act 1987*, Schedule 1, amending the *Limitation Act 1980* and enacted to implement the EEC directive, provides for a three-year basic limitation period for personal injury or property damage claims emanating from defective products, running from the later of the accrual of the cause of action or the discoverability date.  There is also a ten-year ultimate limitation period, running from the time the defective product was supplied, whether or not the ten-year period even if it has not yet accrued.  The cause of action is extinguished at the end of the ten-year period even if it has not yet accrued.  The discretion to order that the limitation period shall not apply in a personal injury case under s. 33 of the *Limitation Act 1980* cannot be exercised in relation to the ten-year ultimate limitation period. The *Prescription and Limitation (Scotland) Act 1984* c. 45, s. 2 enacted the recommendation made by the Scottish Law Commission that there should be no long negative prescription applicalbe to personal injury actions. *See* Scottish Law Commission, *Prescription and the Limitation of Actions:  Report on Personal Injuries Actions and private International Law Questions* (1983), para, 2.1.

periods and may not produce any perceptible symptoms for several decades.[27]  To set up an arbitrary outside limit running from a point in time before obvious symptoms occur may produce injustice of the *Cartledge*[28] variety.

At a fundamental level, however, the distinction being made between personal injury and other kinds of claims derives from sympathy towards the victim.  Deteriorating evidence and the lack of opportunity given to defendants to gather and preserve evidence can be as much a problem in personal injury cases as in others.  While it is unquestionable that personal injury litigation holds a greater potential for hard cases than litigation over other kinds of loss, the natural sympathy for the victim which is felt in a latent injury case does not, in our view, dictate a departure from the present structure of the *Limitation Act*, which treats personal injury and property damage similarly for the purposes of both the basic and ultimate limitation periods.[29]

## H.    Summary

In order to achieve a proper balance between the interests of plaintiffs and defendants, an ultimate limitation period should be retained in the *Limitation Act*.  If the *Limitation Act* did not contain this feature, we doubt that the statute would achieve its purpose.

We do not find a need to treat personal injury claims on a different basis than claims for other kinds of damage.  These, too, should be subject to a long stop.

Having reached the conclusion that the ultimate limitation period should be retained, we intend to consider next whether the statutory provision creating it requires modification.

---

27.    Some diseases associated with exposure to asbestos or silica dust, for example, have a latency period in excess of twenty-five years.  See law Reform Commission of Western Australia, *Report on Limitation and Notice of Actions:  Latent Disease and Injury, supra*, n. 23.

28.    *Supra*, n. 9.

29.    R.S.B.C. 1979, c. 236, ss. 3(1)(a), 8.

**CHAPTER IV**                                  **SHOULD SECTION 8 REMAIN IN ITS PRESENT FORM?**

### A.    Introduction

Is 30 years still an appropriate length of time for the ultimate limitation period?  Should the long stop affect all plaintiffs, including those under disability?  From what point in time should it run?  In this Chapter we address these questions.  The first step in considering the merits of the present section 8, however, is to examine how the provision has functioned in practice.

### B.    The Experience with Section 8

Reported cases decided under section 8 are not plentiful.  The 30-year ultimate limitation has been found to bar claims arising from land dealings in a few instances,[1] but these claims would likely have been statute-barred in any event prior to the enactment of the *Limitation Act*, or would have been barred also under its transitional provisions in section 14.

The special ultimate limitation period for claims against medical practitioners, hospitals and hospital employees has been invoked somewhat more often.  This might have been expected, given its shorter length.

*Bera* v. *Marr*[2] involved the special medical limitation in a situation complicated by the 1977 amendment[3] which reduced the period from 10 years to six.  The allegedly negligent surgery on which the action was based took place in 1974, when the plaintiff was twelve years old.  He attained majority in 1981 and two months later first became aware of the facts which led to the commencement of the action.  The basic two-year limitation period would have been postponed under section 6(3) until he became aware of the material facts, but a defence based on section 8 was raised.  If the six-year limitation applied, the action would have been barred in 1980.  The British Columbia Court of Appeal found, however, that the amendment did not affect rights arising before its enactment, so that the 10-year ultimate limitation applied.  Even though the time ran under the ultimate limitation from the date of the surgery, the action was not statute-barred and could proceed.[4]

The infant plaintiff in *Wittman* v. *Emmott*[5] was not so fortunate.  He was born in August, 1978. During birth he allegedly suffered intracranial bleeding, which led to cerebral palsy and severe motor impairment.  In March 1979 he and his mother were diagnosed as suffering from a bleeding disorder called von Willebrand's disease.  Several years later the mother gave birth to a second child.  During her second pregnancy, she learned that a blood coagulant is normally administered to pregnant women having the disease

---

1.       *Kruger* v. *The Queen*, [1986] 1 R.C. 3, 30 (C.A.); *Apsassin* v. *The Queen*, [1988] 3 F.C. 20 (T.D.); *Sterrit* v. *Canada* (F.C.T.D., 17 February 1989).

2.       (1986), 1 B.C.L.R. (2d) 1 (C.A.).

3.       *Miscellaneous Statutes Amendment Act*, S.B.C. 1977, c. 76, s. 19.

4.       The ten-year ultimate limitation period contained in the original form of s. 8 was also held to be applicable in *Levitt* v. *Carr*, [1989] B.C.D. Civ. 3386-01, 2632-10 and 2410-12 (S.C.).

5.       [1989] B.C.D. Civ. 2481-09 (S.C.).

19

and deliveries are normally performed by caesarean section. The mother also learned that no coagulation test which might have led to the detection of von Willebrand's disease had been performed during her first pregnancy. The action was commenced in February, 1985. The defendant made a preliminary motion to have the action dismissed as being out of time. On the authority of *Bera* v. *Marr*,[6] it was held that the six-year ultimate limitation period ran from the time of the damage, and the action was accordingly statute-barred.[7]

*Wittman* v. *Emmott* illustrates a feature of the special six-year ultimate limitation period in section 8 which distinguishes it from the other limitation periods created by the *Limitation Act*. It is the only limitation period which can result in the barring of a minor's claim before the minor reaches majority. In all other cases, this would be impossible due either to section 7(1) or to the fact that the general ultimate limitation period is significantly longer than the length of time needed to reach majority in British Columbia.[8]

## C.    Length of the Ultimate Limitation Periods

### 1.    GENERAL

In 1974 there were few precedents to guide the Commission in recommending an appropriate length of time for the ultimate limitation period. The period had to be sufficiently long to allow the discoverability rule to serve its purpose in preventing injustice where material facts were beyond the plaintiff's means of knowledge. Another objective was to protect minors and persons under disability as far as possible without depriving defendants of reasonable protection against stale claims.

The Commission had little doubt that a large section of the general public would consider the barring of a valid claim before the plaintiff could be aware of the material facts to be an unacceptable result. The press attention given to the decision in *Wittman* v. *Emmott*[9] indicates that this is likely still true.[10]

The 30-year ultimate limitation period recommended in the 1974 Report[11] was in line with reforms being made to limitation legislation in some other jurisdictions at the time to resolve problems associated with latent injury and damage. In 1985 the Law Reform Commission of South Australia still referred to 30 years as being "the usual limit of latency" in light of present knowledge.[12]

The number of cases which have emerged since the enactment of the *Limitation Act* in which the lapse of time between the material events and the commencement of action is anywhere near 30 years seems

---

6.      *Supra*, n. 2.

7.      An appeal in *Wittman* v. *Emmott*, *supra*, n. 5, is currently pending in the British Columbia Court of Appeal.

8.      The *Age of Majority Act*, R.S.B.C. 1979, c. 5, s. 1 provides that a person attains the age of majority at 19 years.

9.      *Supra*, n. 5.

10.     *See The Province*, June 26, 1989 at 5.

11.     LRC 15 at 101.

12.     Law Reform Commission of South Australia, *Eighty-seventh Report: Relating to Claims for Injuries from Toxic Substances and Radiation Effects* (1985) 27.

to be very small, however. The few cases of this kind mainly involve allegations of fraud or breach of trust.[13]

### (a)    Objections to the 30-Year Period

Various professional organizations have frequently expressed dissatisfaction with the 30-year ultimate limitation period on the ground that it imposes unreasonable burdens on their members because of the expense of maintaining records, the need in many cases to maintain liability insurance after retirement, and increases in the cost of liability insurance which are said to be attributable to the unpredictability of claims experience over a period as long as 30 years. In some cases, liability insurance after retirement may not be available.

### (b)    Records

The length of time during which records are preserved is, of course, something that is usually within the control of the defendant. It is a natural assumption that the likelihood of a claim arising from a particular transaction diminishes with time, and after a point the continued retention of records may no longer be cost-effective. Computerization would provide at least a partial answer to the problem in many cases. The Commission is prepared to accept, however, that the 30-year ultimate limitation period may create economic hardship in connection with the retention of records, particularly for individual practitioners of professions and small businesses.

### (c)    The Changing Liability Insurance Scene

There is evidence that the assumption[14] made in the 1974 Report that insurance could be expected to be in place for most risks which would be affected by claims governed by a postponable limitation period is one that can no longer be made without a good deal of qualification. In the 1980s liability insurance, particularly for professional negligence, has become much more costly and coverage limits have been lowered.[15] Many insurers have withdrawn from the market for professional liability coverage.[16]

It is doubtful whether limitation periods have had a large influence on the insurance crisis in comparison to other factors. A major cause of the recent convulsions in the liability insurance market is the practice of reinsurers of treating Canada on the same basis as the United States in assessing risks, and the withdrawal of many reinsurers from the North American market altogether on the basis of American claims experience.[17] Other significant factors were fluctuations in the investment income of insurance companies in the 1980's and the impact on reinsurers of mass claims resulting from the Bhopal toxic gas emission and other disasters.[18]

---

13.    *Kruger* v. *The Queen; Sterrit* v. *Canada; Apsassin* v. *The Queen, supra,* n. 1.

14.    LRC 15, at 73-74.

15.    Burns et al. "General Trends in the law of Negligence and in professional Liability" in *Professional Negligence in Canada,* ed. B.M. Knoppers (1988) 19, 56-66.

16.    *Ibid.*

17.    Lilly, "Professional Liability Insurance," Appendix 10 to *Final Report of the Ontario Task Force on Insurance* (1986) 286; *cf.* Huber, "Injury Litigation and Liability Insurance Dynamics," (1987) 238 *Science* 31, 32.

18.    Ontario Task Force on Insurance, *Final Report* (1986) 30-31.

While the insurance market may now be returning to stability after completing the adjustment required in the mid-1980's to deal with unexpectedly large losses,[19] the adoption of the open-ended discoverability rule in *Kamloops* v. *Nielsen*[20] *and Central Trust Company* v. *Rafuse*[21] nevertheless makes it more difficult for insurers to predict future claims experience and maintain adequate reserves. This uncertainty has detrimental consequences for the availability, scope, and cost of coverage.

In this regard, the *Limitation Act* places British Columbia defendants in a better situation than that of their counterparts in other provinces. The general limitation legislation of other provinces is now subject to the discoverability rule without an overriding cap like that provided by section 8 of the British Columbia statute. Yet there may be little or no practical difference between the difficulty of predicting the possibilities of litigation over an indefinite period and over one as long as 30 years.

### (d)    Trends in Reform Elsewhere

Law reform bodies in other jurisdictions which have studied this area recently have tended to recommend either ten or fifteen years as an appropriate length for the long stop.[22]  A slight preference for fifteen years has emerged.

### (e)    A Reduction in Length is Warranted

So far as one can glean from the reported cases, relatively few claims emerge so long after the material events that section 8 of the *Limitation Act* becomes relevant. This seems to bear out the statement made by the Alberta Institute of Law Research and Reform in its 1986 discussion paper that:[23]

> Within ten years after the occurrence of the events on which the overwhelming majority of claims are based, these claims will have been either abandoned, settled, litigated or become subject to a limitations defence under the discovery rule.

While reduction of the long stop to 10 years from 30 may prevent a few more meritorious claims from succeeding than the present 30-year provision, the number would not likely be large. Our view is that, for most categories of claims now within the scope of the discoverability rule in section 6(3), a 10-year ultimate limitation period should apply.

---

19.    Rea, "Economic Perspectives on the Liability Insurance Crisis" in Law Society of Upper Canada, *Special Lectures: Insurance Law* (1987) 3.

20.    [1984] 2 S.C.R. 2.

21.    [1986] 2 S.C.R. 147.

22.    The Scarman Committee in England concluded that fifteen years was appropriate for the long stop in property damage cases and this recommendation was incorporated into the *Latent Damage Act 1986: see* Law Reform Committee, *Twenty-fourth Report (Latent Damage)* 21, para. 4.13. The Scottish Law Commission, after making a tentative recommendation for retention of a twenty-year period of long negative prescription for all claims for reparation other than personal injury, has recently concluded in its final report that the long stop should be reduced to fifteen years: *see* Scottish Law Commission, *Report on Prescription and Limitation of Actions (Latent Damage and Other Related Issues)* (1989) 25-27. Fifteen years has been recommended in New Zealand: *see* New Zealand Law Commission, *Limitation Defences in Civil Proceedings*(1988) 100. Both the New Zealand and Scottish Commissions appear to have been persuaded chiefly by the arguments of the building industry in those countries that a longer ultimate period for bringing actions would make adequate insurance cover unavailable.
The Alberta Law Reform Institute, after having tentatively concluded that a 10-year ultimate limitation period was warranted, has now recommended 15 years as the appropriate length: *see Report No. 55: Limitations* (1989) 35. Ten years is the maximum period of postponement which would be permitted under the discoverability rule in the Uniform *Limitation Act* adopted by the Uniform Law Conference of Canada in 1982: *see* Uniform Law Conference, *Proceedings of the Sixty-fourth Annual Meeting* (1982) 341-357, s. 13(3).

23.    Alberta Institute of Law Research and Reform, *Discussion Paper No. 4: Limitations* (1986) 156.

The Commission recommends that:

1.   *Section 8 of the* Limitation Act *be amended to reduce the ultimate limitation period of general application from 30 years to 10 years.*

2.      FRAUD, FRAUDULENT BREACH OF TRUST AND WILFUL CONCEALMENT

(a)    *The Equitable Rule*

A limitations scheme is intended to benefit defendants who are likely to be prejudiced by a plaintiff's delay in bringing action. It is not intended to benefit fraudulent defendants by allowing them to escape the consequences of their own deceptive conduct. In the past, certain rules were devised by courts of equity to prevent defendants who defrauded the plaintiff or deliberately concealed facts material to the plaintiff's claim from acquiring a limitation defence due to the plaintiff's ignorance of the true situation.[24] The equitable rule that the running of time is postponed until discovery of the facts in cases of fraud or fraudulent concealment predates the general rule of discoverability which has recently been adopted by Canadian courts.

(b)    *Fraud and a Shortened Ultimate Limitation Period*

The *Limitation Act* also provides for the postponement of the basic limitation period in cases of fraud and wilful concealment of material facts.[25] The 30-year long stop still applies, however, and would result in a fraudulent defendant obtaining a good defence if the circumstances resulted in the postponement of the basic limitation period for long enough to attract the provision.

If the ultimate limitation period is shortened to ten years, a question arises as to whether it should continue to apply to cases of fraud or wilful concealment of material facts. A case could be made for excluding these situations from the scope of any ultimate limitation period on the ground that the limitation statute should not become an instrument of fraud by allowing a defendant to hide behind his own deception.[26] One can have little sympathy with those who commit fraud, and a defrauded plaintiff should have every opportunity to obtain justice, subject to the overall objectives of a limitation of actions scheme. After the present upper limit of thirty years, however, it is doubtful that the quality of evidence would permit a proper determination of the issues in any event.

(c)    *An Argument Against Special Treatment for Fraud: Spurious Claims*

One argument which might be raised against distinguishing between situations of fraud and wilful concealment on one hand, and other kinds of claims on the other for the purposes of the long stop, is that it would lead to fraud or concealment being pleaded whenever a plaintiff sought to evade a limitation defence. The fear is that spurious claims would proliferate.

---

24.    *See Guerin* v. *The Queen*, [1984] 2 S.C.R. 355; *Gibbs* v. *Guild*, (1882) 9 Q.B.D. 59 (C.A.); *Bulli Coal Mining Co.* v. *Osborne*, [1899] A.C. 351 (P.C.). *See also* David, "Postponement of Limitation Periods: The Innocent Defendant," (1986) 6 *Advocates' Quarterly* 385.

25.    Ss. 6(3)(d), (e). The express terms of s. 6(3) of the *Limitation Act* supplant the equitable rule that the limitation period is postponed in the case of fraud: *Abernethy* v. *Ross*, (1986) 70 B.C.L.R. 27 (S.C.).

26.    This has been the position taken by the New Zealand Law Commission in its recommendations for a new limitations law: New Zealand Law Commission, *Limitation Defences in Civil Proceedings* (1988) 102. The Alberta Law Reform Institute also reached the conclusion that fraudulent concealment should be outside the scope of the ultimate limitation period: *Report No. 55: Limitations* (1989) 40.

23

The potential for statute-barred plaintiffs to raise spurious allegations of this kind in an attempt to gain the benefit of a postponement of the limitation period under section 6(3) is already present, however, and has always been present ever since the equitable rule allowing postponement for fraud was first developed. It does not appear to be a problem that is incapable of being controlled by normal judicial procedures. In reality, pleading in this fashion is no different from pleading alternative causes of action subject to different limitation periods in the hope of succeeding on some basis if one of the claims made in the action should turn out to be statute-barred. There are many instances in which it is not possible to determine if a claim is time-barred until after a full trial. The usual sanctions of costs are available to discourage wildly erratic pleading, and often are applied with particular severity in cases of unsubstantiated pleas of fraud.

### (d)  Retention of the 30-Year Ultimate Limitation Period in Cases of Fraud

Two concerns must be balanced: the need to prevent misuse of the *Limitation Act* and the policy of ensuring finality in litigation. We think that balance can be attained by allowing the present 30-year ultimate limitation period to continue to apply to claims based on fraud or deceit, fraudulent breach of trust, or wilful concealment of material facts relating to the cause of action.

There does not seem to be any reason to distinguish between situations in which the claim itself is based on fraud or deceit, and those in which the cause of action is not fraud, but where material facts have been deliberately concealed from the plaintiff. In equity, both situations would have resulted in the postponement of the limitation period until the veil of deception was lifted.[27]

The Commission recommends that:

2.   *Notwithstanding Recommendation 1, an ultimate limitation period of 30 years should be retained for cases of fraud, fraudulent breach of trust or wilful concealment of material facts relating to the claim.*

## D.   Commencement of the Ultimate Limitation Period

At the present time, section 8(1) prevents the commencement of an action after a stated number of years "from the date on which the right to do so arose." This wording, similar to that in section 3 creating the basic limitation periods, ties the running of time to the point at which a cause of action accrues according to common law principles.[28]

As the accrual of a cause of action takes place only when all its elements are present,[29] the ultimate limitation period may start to run at a point considerably removed from the act or omission which gave rise to the damage that is the subject of the action. This is often apparent in professional negligence cases where there has been reliance on faulty advice. Actual damage may not be suffered until the plaintiff has acted on the basis of advice received.

---

27.     *Bulli Coal Mining Co.* v. *Osborne*, [1899] A.C. 351 (P.C.); *Twyford* v. *Bishopric*, (1914), 20 D.L.R. 871 (Alta. S.C.).

28.     *Bera* v. *Marr, supra*, n. 2 at 26.

29.     *Ibid.*, at 14. *See also Cook* v. *Gill*, (1873) L.R. 8 C.P. 107, 116.

24

The problem of latent damage resulting from the commission of an error in the past is graphically illustrated by the example of defective buildings. An error in the original design or in the construction of a building may remain undetected for decades before any physical damage arises from it. A further refinement of the problem may be that physical damage may occur to the structure at some point distant in time from the error which caused it but the damage itself may be hidden from view and undetectable until even later.[30] The cause of action for negligence, however, would accrue when the damage occurred, whether it was discoverable then or not.[31]

While section 6(3) of the *Limitation Act* would postpone the basic limitation period in either case until the damage was discoverable, the wording of section 8(1) as it now stands presents a difficulty. As it links the start of the ultimate limitation period to the time at which the right to sue arose, it forces the court to make a finding as to the point in time when actual damage occurred.[32] Where damage has gone undetected for some time, this may be a daunting task. Uncertainty is created which can only be resolved after a full trial of the issue.

The fact that the commencement of the ultimate limitation period is tied to the occurrence of actual damage in actions based on negligence means that providers of goods and services cannot know for certain when the dangers of litigation have finally passed in relation to particular transactions. Greater certainty would be provided if the ultimate limitation period ran from the act, omission or breach of some legal duty giving rise to the damage, rather than from the accrual of the cause of action. In most cases, this would provide a relatively precise reference point. This solution was adopted in the English *Latent Damage Act 1986.*[33]

In the case of a continuing cause of action or one based on a series of related acts or omissions, time should run from the end of the defendant's course of conduct or the last in the series of acts or omissions in order to prevent the possibility of the ultimate limitation period expiring while the wrongful conduct may still be persisting.

In a few exceptional cases, allowing time to run from the act or omission of the defendant could result in the denial of recovery before damage ever occurred. As objectionable as it may seem from the viewpoint of legal theory to bar a cause of action before it comes into being, the advantages of certainty as to the commencement of the ultimate limitation period outweigh the disadvantage of barring a small number of inchoate claims.

The Commission recommends that:

3.    *(1)  Where an action is based on an act, omission or breach of a legal duty, the ultimate limitation period should run from the date of the act, omission, or breach.*

     *(2)  Where an action is based on a series of related acts, omissions or breaches of duty or a*

---

30.   *See Dennis* v. *Charnwood Borough Council*, [1982] 3 All E.R. 486 (C.A.).

31.   *Pirelli General Cable Works Ltd.* v. *Oscar Faber & Partners*, [1983] 2 A.C. 1 (H.L.).

32.   An illustration of the difficulty of ascertaining the point at which the cause of action arose in latent damage cases is found in *Pirelli General Cable Works Ltd.* v. *Oscar Faber & Partners Ltd.*, *supra*, n. 31 and *Dennis* v. *Charnwood Borough Council, supra*, n. 30. *See also Glover . Trousdale*, (1985) 13 C.L.R. 1074 (B.C. Co. Ct.).

33.   1986, c. 37, s. 1 (ading s. 14B to the *Limitation Act 1980*, c. 58).

*course of conduct, the ultimate limitation period should run from the last of the acts, omissions or breaches of duty or the end of the course of conduct.*

## E.    Treatment of Disability Under a Reduced Ultimate Limitation Period

1.    MINORS

   *(a)    Generally*

At the present time, it is unnecessary to treat minors and other persons under legal disability differently from other plaintiffs since the current ultimate limitation period of 30 years is considerably greater than the age of majority in British Columbia.[34]  It imposes no special disadvantage on a minor plaintiff.  If the general ultimate limitation period is reduced as recommended, it is necessary to decide how it should affect minors, or if it should affect them at all.  A long stop of 10 years could operate to extinguish a minor's right of action before the minor attained majority and was able to sue without the assistance of a guardian *ad litem*.[35]

It is sometimes argued that limitation periods should run against minors because parents, guardians or the Public Trustee are able to protect the minor's position.   Adherents of this argument maintain that postponement of the limitation period until majority imposes an unreasonable hardship on defendants.

But parents or guardians are not always attuned to a minor's legal rights.  They may not be willing to become involved in litigation on the minor's behalf and, in many cases, they simply do not have the resources to do so.  The Public Trustee is required to take proceedings on a minor's behalf if a notice to proceed has been served under section 7(6) of the *Limitation Act* and it is apparent to the Public Trustee that the guardian to whom it was directed is failing to attend to the infant's interests.[36]  In practice, however, notices to proceed are rarely served and the circumstances would not likely come to the notice of the Public Trustee.

The fact that a notice to proceed under section 7(6) of the Act is available to a defendant to start time running against a minor is, however, an answer to the contention that protecting minors' rights of action causes hardship to defendants.   While serving a notice to proceed may alert a plaintiff to the existence of a claim and thus bring about an action which might not have been commenced otherwise, limitation periods are intended only to ensure that defendants have a fair opportunity to contest claims.  They are not intended simply to enable them to avoid liability.  Defendants can either avail themselves of the right to cause time to run against a minor or take their chances and let sleeping dogs lie, in the hope that no action will be brought.

---

34.    The *Age of Majority Act*, R.S.B.C. 1979 c. 5, s. 1 provides that a person attains the age of majority at 19 years.

35.    Rule 6(2) of the *Supreme Court Rules* requires persons under disability to commence or defend actions through a guardian *ad litem*..

36.    S. 8 of the *Infants Act*, R.S.B.C. 1979, c. 196 states:
   8.    Where a notice to proceed has been delivered to the Public Trustee under section 7 of the *Limitation Act* and it appears to the Public Trustee that the guardian to whom that notice was delivered is failing to take reasonable steps to protect the interests of the disabled plaintiff or is otherwise acting to the prejudice of the disabled plaintiff, the Public Trustee shall
   (a)    investigate the circumstances stated in the notice and out of which the claim may arise or be claimed to arise; and
   (b)    commence and maintain a proceeding for the benefit of the disabled plaintiff if he believes that the proceeding would have a reasonable prospect of succeeding and would result in a judgment that would justify commencing it.

26

In our view, to allow a minor's right of action to become statute-barred before it could be exercised would be a perverse result.  Minors' rights should not be endangered by the apathy, ignorance or impecuniosity of their guardians.  We are not convinced that the traditional protection of minors against limitation periods should be abandoned.

The Commission recommends that:

*4.    The ultimate limitation period should not run against a minor.*

*(b)    Running of Time After the Age of Majority*

When a minor having a claim reaches majority, he or she has the longer of two possible periods in which to commence action.  This results from section 7(2) of the *Limitation Act*:

> (2)  Where the running of time against a person with respect to a cause of action has been postponed by subsection (1) and that person ceases to be under a disability, the limitation period governing that cause of action is the longer of either
>
> (a)    the period which that person would have had to bring the action had that person not been under a disability, running from the time that the cause of action arose; or
>
> (b)    such period running from the time that the disability ceased, but in no case shall that period extend more than 6 years beyond the cessation of disability.

The two periods are:  firstly, the time within which the plaintiff could have brought the action if he or she had not been a minor at the time the claim arose, running from the point when the claim arose and, secondly, the same amount of time running from the date on which the plaintiff reached majority, but not extending for more than six years from the date of majority.  Section 7(2) ensures that when disability ceases, the plaintiff will have at least as long to commence an action as if there had been no disability at the time the claim arose.

*(c)    Cumulative Effect of Sections 6 and 7*

A difficulty arises from the fact that the effect of sections 6 and 7 is cumulative.[37]  A minor who was unaware of material facts surrounding a possible claim would have the benefit of postponement under section 6(3) as well as section 7(1).  If ignorance persisted after majority, the basic limitation period would not commence to run until the criteria in section 6(3) for its commencement were met.

At the present time, the extent of the postponement is capped by the ultimate limitation periods under section 8, but if the new 10-year ultimate limitation period is not to be applicable due to the fact the plaintiff was a minor at the time the claim arose, the running of time could theoretically be postponed indefinitely.

While such cases would be extremely rare, this is a result which we do not think the *Limitation Act* should allow.  At some point the concern for fairness to minors and unaware plaintiffs should be balanced with the need for certainty in the legal position of defendants.

*(d)    The Alberta Solution*

_____

37.    S. 8(2).

A solution was suggested in the 1986 discussion paper[38] published by the Alberta Institute of Law Research and Reform  for the problem of the disability provisions and the discovery rule combining to create indefinite possibilities for litigation. This was to allow the ultimate limitation period to be suspended during the disability for a maximum of 10 years.[39]  This would ensure that the ultimate limitation period could not expire before the basic two-year limitation period had run after the attainment of the age of majority in Alberta at 18.[40]  It could, however, allow for the proposed ultimate limitation period not to expire until ten years after the attainment of majority, if a hidden cause of action accrued to a minor after the age of eight.

### (e)    Another Solution to the Cumulative Postponement Problem

We prefer another solution which is based on the present section 7(2) and is linked with Recommendation 3. Under that recommendation, the ultimate limitation period under section 8 would run from the time of the conduct of the defendant on which the claim is founded, rather than from the accrual of the cause of action under common law rules.

Under section 7(2) as it now stands, a person who was under disability at the time a cause of action accrued is not to have less time to bring an action after ceasing to be under disability than he would have had if he had not been under disability.  Under Recommendation 1, a person not under disability who acquired a claim without knowledge of the material facts would, in theory, have up to 10 years to commence an action before the claim was extinguished.  Under Recommendation 3, the 10 years would run from the time of the defendant's act or omission which resulted in the claim.  Thus a full 10 years running from the time of the defendant's conduct giving rise to the claim should be available to a minor to whom a concealed cause of action accrues.

If, however, that 10-year period expired before majority, the minor would still have the benefit of the postponement of the basic limitation period under section 6(3) both before and after majority, assuming the material facts remained unknown to him.  Neither the basic nor the ultimate limitation periods would have run, since the former would have been postponed and the latter would not run against minors.  In this circumstance, however, section 7(2) would prevent an action being brought after six years from the date on which majority was attained.  In this manner an upper limit would be placed on the open-endedness created by the combined effect of the two sources of postponement, undiscoverability of the cause of action and minority.

---

**EXAMPLE NO. 1**

A is exposed to radiation through the defendant's negligence at age 17 and develops undetected cancer at 18. This remains undiagnosed when A attains majority the following year. A's cancer, its cause and the defendant's identity are discovered when he is twenty. The two-year basic limitation period begins to run at this point, as A now has knowledge of the material facts.

---

38.    *Supra*, n. 23.

39.    *Ibid.*, at 290-292.  In its final Report, however, the Alberta Institute concluded that there should be no upper limit on the extent of postponement of either the basic or the ultimate limitation periods by reason of disability.  *See* Alberta Law Reform Institute, *Report No. 55: Limitations* (1990) 41.

40.    *Age of Majority Act*, R.S.A. 1980, C. a-4, S. 1.

28

---

### EXAMPLE NO. 2

The same facts as in Example No. 1, except that A's cancer is still undetected when he is 27.

A is to be allowed at least the same amount of time he would have had if he had not been a minor at the time the claim arose, i.e., when the undetected cancer occurred. This would be 10 years running from the time of the negligent conduct, a length of time corresponding to the length of the proposed ultimate limitation period. The time has elapsed with the injury still undiscovered and A cannot bring an action.

---

### EXAMPLE NO. 3

B is exposed to radiation at age seven through the defendant's negligence and develops an undetected form of cancer at 16 as a result. Neither the basic nor the ultimate limitation periods have started to run. When B reaches majority at 19, the cancer is still undetected. The cancer, its cause, and the defendant's identity are detected when B is 22. The basic limitation period now starts to run and B must bring an action within two years.

---

### EXAMPLE NO. 4

The same facts as in Example No. 3, except that B's cancer is still not detected after six years from the time B attained majority. B can no longer sue.

---

In summary, the *Limitation Act* already contains rules concerning the running of time against persons who reach the age of majority with respect to claims which arose during minority. Those rules provide an appropriate solution in those cases where the defendant would otherwise look to the ultimate limitation period to prevent liability persisting for an indefinite period. No additional provisions are required.

2.    OTHER DISABILITY

The other form of disability which is recognized by the *Limitation Act* as a postponing factor is actual incapacity to manage one's affairs or the state of being substantially impeded in doing so.[41] This differs from minority in that its duration is uncertain. In light of this, the treatment of adult persons under disability requires a greater emphasis on the need for eventual certainty in the legal position of defendants.

The legal affairs of most incapacitated adults will likely be in the hands of the Public Trustee or representatives appointed under the *Patients Property Act* for the specific purpose of managing their affairs.[42] Such a representative is more likely to be alert to rights of action which the incapacitated person may possess than the parent of a child who has suffered a civil wrong. In addition, the Public Trustee or a committee appointed under the *Patients Property Act* is accountable to the person whose affairs are being administered. There is much less chance that rights will be lost through neglect or inadvertence than in the case of minors.

---

41.    S. 7(5)(a)(ii).

42.    R.S.B.C. 1979, c. 313.

The proposed 10-year ultimate limitation period and postponement of the basic limitation period under sections 7(1) and 7(3) should provide adequate protection to incapacitated adults. It is therefore our conclusion that the ultimate limitation period should run against disabled adults in the normal manner.

3.    NOTICES TO PROCEED

While the mechanism through which a potential defendant can cause time to begin running against a potential plaintiff under disability by serving a notice to proceed on a guardian and the Public Trustee under section 7(6) of the *Limitation Act* will not often be employed, it balances the interests of legally incompetent plaintiffs with those of defendants who are concerned they may be prejudiced in any future action by the lapse of time.

Protection is given against limitation periods to minors and other persons under legal disability partly because it is assumed they may not be capable of appreciating their legal position. Notice to the guardian and the Public Trustee, in the detail required,[43] serves to make those responsible for the legal interests of a person under legal disability aware of circumstances which may affect the legal position of the disabled person. It therefore serves the same purpose as the traditional protection against the running of time.

Since the same interest is secured either through postponement of the limitation period or through notice to the guardian and the Public Trustee, we do not see a reason to increase the already considerable protection given to legally incapacitated persons by restricting the availability of the notice to proceed mechanism. We do not propose any change in the substance of sections 7(6) to 7(11) of the Act.[44]

F.    **Confirmations and the Ultimate Limitation Period**

The underlying rationale for allowing confirmations to renew the limitation period is that the running of time is a defence which gradually accrues. Defendants may avail themselves of the defence or not, as they wish. If a defendant chooses to acknowledge the validity of a plaintiff's claim either through a payment or by admission, he can legitimately be taken to have waived the benefit of the defence to the extent that it has accrued to that time. The plaintiff should have the benefit of that waiver.

One of the original reasons for setting the ultimate limitation period at 30 years was to give a creditor the full benefit of successive confirmations by a debtor. Many commercial arrangements are intended to unfold over a time span longer than 10 years, and limitation periods should not interfere with the enforcement of legal rights and liabilities except to the extent necessary to protect against the dangers of litigating over truly stale claims. If the ultimate limitation period is reduced to 10 years from 30, as we have recommended, there is less reason to exclude it from the effect of confirmations.

---

43.    S. 7(7) states:
    (7)    A notice to proceed delivered under this section must
        (a)    be in writing;
        (b)    be addressed to the guardian and to the Public Trustee;
        (c)    specify the name of the person under a disability;
        (d)    specify the circumstances out of which the cause of action may arise or may be claimed to arise with such particularity as is necessary to enable the guardian to investigate whether the person under a disability has the cause of action;
        (e)    give warning that a cause of action arising out of the circumstances stated in the notice is liable to be barred by this Act;
        (f)    specify the name of the person on whose behalf the notice is delivered; and
        (g)    be signed by the person delivering the notice, or his solicitor.

44.    In the draft amendments to the *Limitation Act* found in Appendix B to this Report, however, the present ss. 7(6) to 7(11) would be relocated.

We do not see any objection in principle to allowing confirmations to restart the running of time under a reduced long stop as well as under the basic limitation period. While both the short and the long limitation periods are designed to quiet legal disputes after an appropriate length of time, they are not intended simply as an obstacle to the enforcement of legal rights. A confirmation is a voluntary act by the defendant which amounts to an admission of the validity, in whole or in part, of the plaintiff's claim. The plaintiff should have a renewed opportunity to obtain a just remedy.

The Commission recommends:

5.    *A confirmation within the meaning of section 5 of the* Limitation Act *should operate to renew the ultimate limitation period as well as the basic one.*

## G.    Summary

The present 30-year ultimate limitation period appears to be unnecessarily long. Very few claims arise after so long a time that the ultimate limitation period is brought into question. While limitation periods have not been a significant factor in the liability insurance crisis, a shorter ultimate limitation period would reduce some of the uncertainty associated with long-term risks and thus help to maintain the availability of coverage at a reasonable cost. In other jurisdictions where the concept of an ultimate limitation period has been studied recently, a length of time considerably shorter than 30 years has been favoured. Most recommendations elsewhere have been for a 10 or 15-year long stop. We have concluded that a 10-year ultimate limitation period would be appropriate.

Different considerations apply to cases of fraud or wilful concealment of material facts relating to a claim. In these cases, a 30-year long stop should continue to apply.

Under the present law, time begins to run under the ultimate limitation period when the cause of action arises. This depends on common law rules which can sometimes be difficult to apply, especially in cases of latent damage or injury. More certainty would be obtained if the ultimate limitation period commenced to run at the time of the act, omission, or breach of some legal duty by the defendant on which the claim is founded.

As a 10-year ultimate limitation period could be very prejudicial to minors, it should not run against them. Instead, the rules in the *Limitation Act* which presently govern the running of time against persons under a legal disability should apply.

At present, a confirmation of a claim by a defendant causes time to begin running again under the basic limitation period, but has no effect on the long stop. If the ultimate limitation period is to be reduced to 10 years from 30, however, a confirmation should cause it to recommence also.