**CHAPTER V**                              **SPECIAL LIMITATION PERIODS**
                                          **PROTECTING PARTICULAR CLASSES**


**A.     The Background**

    The only provision in the *Limitation Act* which is related to the characteristics of a particular class of persons rather than the legal nature of the claim is found in section 8(1).  It is the special six-year ultimate limitation period for negligence or malpractice actions against medical practitioners, hospitals, and hospital employees.

    Prior to the enactment of the present *Limitation Act* in 1975, there were more than a hundred limitation provisions scattered throughout the statutes prescribing special, usually short, limitation periods for actions against various defendants.  Some of these were contained in legislation creating public and private bodies.[1]  Others applied to actions against various professional and occupational groups.[2]

    The same proliferation of short special limitation periods in a large number of different Acts also existed in the legislation of other provinces and, to a great extent, still does.

    In the 1974 Report on limitations, the Commission recommended the repeal of most special limitation periods in British Columbia legislation in favour of consolidating limitation provisions into a single principal statute.[3]  Included in the recommendation for repeal were short limitation periods for actions against physicians,[4] dentists,[5] pharmacists,[6] nurses,[7] veterinarians,[8] podiatrists,[9] and chiropractors[10] arising out of the rendering of professional services, and a provision in the *Statute of Limitations* protecting public officials and justices of the peace.[11]  These provisions typically imposed limitation periods of one year or less.

    The grounds for this recommendation were chiefly that limitation legislation should be accessible,

---

1.    *See* LRC 15, 104-108.  For example, the Chilliwack Dyking District enjoyed a six-month limitation period in relation to all actiions of any kind against its board: *Chilliwak Dyking District Act*, S.B.C. 1949, c. 9, S. 16.

2.    *See* LRC 15 at 105.

3.    LRC 15 at 105.

4.    *Medical Act*, R.S.B.C. 1960, c. 239, s. 82(1).

5.    *Dentistry Act*, R.S.B.C. 1960, c. 99, s. 65.

6.    *Pharmacy Act*, R.S.B.C. 1960, c. 282, s. 57.

7.    *Registered Nurses Act*, R.S.B.C. 1960, c. 335, s. 33.

8.    *Veterinary Medical Act*, R.S.B.C. 1960, c. 55, s. 33(3), as am. By S.B.C. 1970, c. 49, s. 1.

9.    *Chiropody Act*, R.S.B.C. 1960, c. 53, s. 20.

10.   *Chiropractic Act*, R.S.B.C. 1960, c. 54, s. 14(2), as am. By S.B.C. 1967, c. 8, s. 6.

11.   R.S.B.C. 1960, c. 370, s. 11.

readily understood, and widely known.[12]  Reduction in the length of many of the general limitation periods in the then existing *Statute of Limitations*[13] was seen as an adequate substitute for the special protections which had arisen. The protection of some occupational groups was also seen as unfair by others not enjoying a similar advantage.[14]  This Commission agreed with the Ontario Law Reform Commission which had urged the repeal of many special limitation periods in Ontario legislation on the same grounds.

When introduced as a first reading Bill, the *Limitation Act* made no distinction between the professions *vis-a-vis* either the basic or the ultimate limitation period. House amendments, however, created a special ultimate limitation period of ten years for negligence or malpractice actions against medical practitioners and hospitals. In 1977 the ten-year period was reduced to six years, and hospital employees became part of the protected class.[15]

## B.    Origins of Special Limitations in Canada

The progenitor of special limitation provisions relating to professions and occupations in Canada was apparently a section in an 1887 Ontario statute creating a limitation period of one year for actions against physicians for negligence or malpractice "by reason of professional services requested or rendered."[16]  The time ran from the termination of professional services in the matter complained of. As it was located in a special Act governing the medical profession, the provisions of the general limitation statute stating time did not run against infants could not be applied.

In the first case in which it was considered, one involving an infant, the section drew a negative judicial reaction, as it resulted in the infant's claim being barred before the injury had become apparent:[17]

> The liability arises when professional services were rendered; the Ontario Statute bars an action a year after these services terminate: that is, end as a matter of fact. The result may be that, if no disastrous consequences are manifest till a year after the close of the professional employment, the right of action is gone or rather never arose as an available remedy, but that only shews what an admirable safeguard has been thrown around the College of Physicians and Surgeons of Ontario. This legislation appears to be unique, not copied from the statute-book of any other country, and may need considerable amendment before it can commend itself as being fair all round.

Despite this initial hostility, similar provisions became common in Canadian legislation by the first decades of the twentieth century.

---

12.    LRC, 105-105.

13.    R.S.B.C. 1960, c. 370.

14.    LRC, 15, 105.

15.    *Miscellaneous Statutes Amendment Act, 1977*, S.B.C. 1977, c. 76, s. 19.

16.    *An Act to Amend the Medical Act*, S.O. 1887, c. 24, s. 2.  *See* McLaren, "Of Doctors, Hospitals and Limitations - 'The Patient's Dilemma'," (1973) 11 Osgoode Hall L.J. 85.

17.    *Miller* v. *Ryerson*, (1893) 22 O.R. 369, 372 *per* Boyd, C. (C.A.). The characterization of the provision by another of the judges, Meredith J. at 373 is interesting:
> It is not an Act respecting limitations of actions, but one passed mainly for the benefit of the medical profession; nor is the provision in question an amendment of the provisions of any such statute, but simply a provision for the special protection of the registered members of that profession.
*See also Tremeer* v. *Black*, [1924] 2 D.L.R. 520, 528 (Sask. C.A.).

Legislation protecting public officials by means of a short limitation period was widely adopted as well. It was based on English models.[18] Legislation of this kind is still common in Canada.

## C.    The Merits of Special Limitation Periods

1.    THE NEED FOR SIMPLICITY

The law of limitation of actions should be as simple as its underlying policy allows. This is important because limitations have enormous impact on the legal position of a person who may be unaware that time is running out under a limitation period. While there are good reason for limiting the time for commencing most actions, there should be as few distinct limitation periods as possible and the legislative provisions creating them should be as accessible as possible. Those applying to the common types of actions should be contained in a single statute. The only exceptions should be provisions which relate to a unitary legislative scheme which creates rights of action peculiar to itself. Actions under the *Builders Lien Act*[19] would be an example. To remove limitation provisions of this kind from the statute creating the causes of action to which they relate would actually make them less accessible and more likely to create a trap for the unwary.

Limitation periods should not be conceived as devices to protect special interests. The historical justification for the limitation of actions, which remains valid today, is to prevent injustice resulting from the prosecution of a civil action at a time so remote from the material events that evidence which might afford a defence is likely to have deteriorated to a point where the court's ability to do justice is impaired. Other reasons for imposing a limitation period stem from the lack of social utility of litigation over old disputes and the drain it creates on the resources of the court system. The mere insulation of particular classes of defendants from litigation *per se* is not a valid reason for the existence of limitation statutes, yet we believe that they have been seen by proponents of special protections as a means simply of preventing claims, meritorious or not, from coming forward and thus a means of restricting the volume of litigation.

In fact, special limitation periods, which are normally very short, often have the opposite effect, as they force the commencement of actions in order to preserve rights before the merits can be adequately investigated.

The growth of special limitations was due in part to the long limitation periods under the 1623 statute[20] which formed the basis for much of the original limitation legislation of the common law provinces.[21] The provision governing most actions against professionals prior to the special enactments was the six-year limitation period applicable to personal injury.[22] This archaic legislation dated from a time when the pace of life was far slower, communications were primitive, much of the population was illiterate and legal advice was difficult to obtain. The long periods prescribed were, for the most part, inflexible and did not allow for hidden causes of action. The present *Limitation Act* has replaced these with shorter basic limitation periods

---

18.    *See Public Authorities Protection Act, 1893*, 56 & 57 Vict., c. 61 and enactments repealed by it. The 1893 English Act was repealed in turn by the *Law Reform (Limitation of Actions) Act 1954*, 2 & 3 Eliz. 2, c. 36, s. 1.

19.    R.S.B.C. 1979, C. 40.

20.    *Statute of Limitations*, 21 Jac. 1, c. 16.

21.    McLaren, *supra*, n. 16 at 102.

22.    *Statute of Limitations*, 21 Jac. 1, c. 16, s.3.

more in line with present-day conditions. The provision for postponement until the cause of action becomes discoverable is to take account of exceptional cases in which an inflexible period would give rise to a clear injustice. It is balanced with an upper time limit which is not subject to postponement. In this Report we recommend that the upper limit be reduced. To the extent that there may have been a valid basis for the proliferation of special protections in British Columbia prior to 1975, it has disappeared.

2.    FAIRNESS

Other reasons for the proliferation of special protections, we suspect, were the political influence of groups seeking protection and the lack of critical review by legislators of proposals for the enactment of such legislation. This would appear to be borne out by the bewildering capriciousness reflected in the choice of groups and entities selected for protection and the disparate length of the limitation periods in the large collection of special limitation protections in British Columbia statutes before 1975.[23]

Limitation periods which are related to the occupation of the defendant are invidious. They are naturally seen to be unfair by occupational groups which do not enjoy similar protection, yet perceive themselves to be similarly situated. The result is perpetual agitation for amendments to give equal protection from litigation. If the legislature accords special treatment to one professional or occupational group, how can it in fairness deny it to another?

While it is now likely that limitation periods favouring particular occupational groups would survive constitutional challenge under section 15(1) of the *Canadian Charter of Rights and Freedoms*,[24] which prohibits discrimination,[25] it is undesirable to create unequal degrees of protection among defendants on the basis of occupation or economic activity. The solution is to establish a general scheme of limitation of actions which treats defendants equally, and yet provides adequate protection from stale claims.

3.    TRENDS IN LAW REFORM ELSEWHERE

The Law Reform Commissions of Newfoundland and Saskatchewan have recently recommended the repeal of most of the special limitations protecting occupational categories in their respective provinces.[26] The draft limitation statute proposed by the Alberta Law Reform Institute would merge the occupationally-

---

23.    *See* LRC 15, 206-213.

24.    *Constitution Act, 1982.*

25.    In *Andrews* v. *Law Society of British Columbia*, [1989] 1 S.C.R. 143, the Supreme Court of Canada adopted an "enumerated and analogous grounds" test for discrimination offending s. 15(1) of the Charter. Under this approach, a finding of discrimination is dependent on the complaining party belong to a class capable of being described by reference to the grounds enumerated in the subsection (i.e., race, national or ethnic origin, colour, religion, sex, age or mental or physical disability) or grounds analogous to them. The distinction complained of must also be made on an enumerated or analogous ground in order to constitute discrimination. In *Mirhadizadeh* v. *The Queen in right of Ontario*, (1989) 69 O.R. (2d) 422 (C.A.), a six-month limitation period protecting public authorities was challenged on the basis of s. 15(1) of the Charter and was upheld. The Ontario Court of Appeal applied *Andrews, supra,* to find that injured plaintiffs were not a class within the protection of s. 15(1), and that the discrimination alleged was not made on an enumerated or analogous ground. In *Wittman* v. *Emmott*, [1989] B.C.D. Civ. 2481-09 (S.C.) The court stated the view that the special six-year ultimate limitation period for medical negligence claims did not violate s. 15(1) of the Charter, although this did not need to be decided. The challenges to special limitation periods in *Mirhadizadeh* and *Wittman* were made by plaintiffs., said in *Mirhadizadeh, supra,* at 426 to be "... a disparate and heterogeneous group linked together only by the fact that they are victims of alleged wrongs ..." Possibly an argument could be made that a group of potential defendants linked by a common occupation and enjoying no special limitation protection, *e.g.,* veterinarians, is a discrete class disadvantaged by a special short limitation period for actions against members of another health profession, *e.g.,* physicians, but it is difficult to imagine that a distinction based on occupation or economic activity alone would meet the enumerated and analogous grounds" test.

26.    *See* Newfoundland Law Reform Commission, *Report on Limitation of Actions* (1986) 8-9; Saskatchewan Law Reform Commission, *Proposals for a New Limitation of Actions Act: Report to the Minister of Justice* (1989) 54. The draft limitation statute proposed by the Alberta Law Reform Institute would merge the present special occupationally-defined limitation periods of one year to ss. 55 and 56 of the *Limitation of Actions Act*, R.S.A. 1980, c. L-15, as amended, into a general two-year limitation period. *See* Alberta Law Reform Institute, Limitations (1990) 6-7.

related limitation periods of one year now contained in the Alberta *Limitation of Actions Act*[27] into a general two-year limitation period.[28]  This reinforces our views on this question.

4.      CONCLUSION

We agree with our predecessors, who recommended in the 1974 Report on limitations that the number of special limitation periods in British Columbia legislation be reduced.[29]  The regrowth of special limitation provisions related to the occupation or activity of the defendant would be retrograde.


**D.      The Six-Year Ultimate Limitation Period in Section 8(1)**

The terms of the reference to review the *Limitation Act* in connection with the merits of special limitation periods applicable to particular classes leads unavoidably to the special ultimate limitation period for negligence and malpractice[30] claims against medical practitioners, hospitals, and hospital employees. The issue for consideration is whether it should be retained or whether the general ultimate limitation period should apply, modified as recommended in this Report.  The latter course would result in the ultimate limitation period applicable to this group of defendants being increased from 6 to 10 years.

We have consulted with the College of Physicians and Surgeons of British Columbia, the British Columbia Medical Association, and the British Columbia Health Association and have received written submissions from the latter two organizations.  Submissions received from the Public Trustee and the Office of the Ombudsman have touched on the issue of the special six-year ultimate limitation period as well.

Several arguments for retaining this provision were presented by the medical and health care organizations.  The chief arguments for retention are discussed below.

1.      RECORD MANAGEMENT

Both the BCHA and the medical organizations cited increased costs associated with record-keeping as an area of concern.  Any increase in the ultimate limitation period, it was maintained, would exacerbate the problems which health care institutions and medical practitioners are now experiencing in managing the volume of patient care records.

*(a)      Health-Care Institutions*

Record-keeping by hospitals is governed by regulations made under the *Hospital Act*.[31]  Patient care

---

27.     R.S.A. 1980, c. L-15, ss. 55, 56 as amended.

28.     *See* Alberta Law Reform Institute, *Limitations* (1990) at 6-7.

29.     *Ibid.,* at 104-117.

30.     The words "negligence or malpractice," although ostensibly referring to tort, likely cover any actionable wrong emerging from the patient-care giver relationship, whether sounding in negligence, contract, or battery. *See Strachan v. Simpson,* (1979) 10 C.C.L.T. 145 (B.C.S.C.); *Boase v. Paul,* [1931] 4 D.L.R. 435 (Ont. C.A.); *Letiec v. Rowe,* (1981) 130 D.L.R. (3d) 379 (Nfld. C.A.); *Vincent v. Hall,* (1985) 49 O.R. (2d) 701 (H.C.).

31.     R.S.B.C. 1979, c. 176.

records are divided into three classes: primary, secondary and transitory.[32] A primary record is one which contains the "pertinent medical data" of a patient's medical record, including case histories, discharge summaries, consultation reports, all other documents prepared or signed by attending medical practitioners, and "significant findings" transferred from other documents to the primary record.[33] A secondary record is a document "which contains information that may be of vital medical importance at a particular time and which may have lasting legal significance but which is not deemed to be necessary for the future care and treatment of the patient."[34] A transitory record is one which has no further apparent value following the patient's discharge.[35]

Every item of information which is "deemed to be significant by the attending medical practitioner" and is contained in secondary or transitory documents must be recorded or designated for recording on the appropriate primary document.[36]

The regulations require that primary documents be retained for ten years following the patient's most recent discharge from the hospital and secondary documents for six years following discharge after receipt of the care to which the document relates.[37] Transitory documents need not be retained after the final completion of the patient's medical record by the attending practitioners.[38] These minimum legal requirements in effect today were in effect well before the passage of the present *Limitation Act*.[39]

The regulations leave a good deal of flexibility for individual institutions in the application of the classification scheme to particular kinds of information. Retention and destruction schedules beyond the minimum requirements can be determined by the hospital's board and its administrator.[40]

    *(i)*   *The Submission*

The cost and logistical difficulties of maintaining hospital records for up to 30 years were the principal considerations which led to the introduction of a special, shorter ultimate limitation period for actions against hospitals. Those difficulties have not disappeared since 1975. They undoubtedly contribute to the overall cost of the public health care system.

Current record-making practices are much more sophisticated than those of even a few years ago, resulting in greater volume. Fetal monitoring in particular generates voluminous records. At the present time

---

32.    B.C. Reg. 289/73, s. 13(1), as am. By B.C. Reg. 89/85.

33.    *Ibid.*, s. 13(1)(a).

34.    *Ibid.*, s. 13(1)(b).

35.    *Ibid.*, s. 13(1)(c).

36.    *Ibid.*, s. 13(2).

37.    *Ibid.*, s. 14(1)(a), (b).

38.    *Ibid.*, s. 14(1)(c).

39.    B.C. Reg. 289/73, s. 14 came into effect on September 13, 1973.

40.    S. 14(2) of B.C. Reg. 14(2) provides that the board of a hospital may authorize its administrator by resolution to destroy medical records on the expiry of the minimum retention period stated in s. 14(1). S. 14(2) allows the administrator to determine that certain records have continuing value for research, historical or other purposes and direct their retention for a further period, after which he may authorize their destruction, notwithstanding a direction from board under s. 14(1).

there is no practical way of storing these electronically.

Increasing computerization of hospital records provides a partial answer, but the day when all or most of the information that is required for medical, administrative and legal purposes can be stored in this manner in British Columbia health care institutions is somewhat remote. The portion of a hospital budget which can be devoted to the acquisition and development of information systems is greatly restricted.

*(ii)    Discussion*

Our consultations with the British Columbia Health Association indicated that management of patient care records continues to be a problem for health-care institutions, but also that the long periods of retention (up to twenty-five years in the case of larger hospitals) which characterize the practice of British Columbia hospitals at the present time are attributable mainly to the perceived needs of medical care and research. The existing limitation periods do not appear to be a major factor.

We have also been told that information thought to be of possible legal significance is normally incorporated into the primary medical record. While retention and destruction schedules vary as between hospitals, it is understood that many hospitals retain records far longer than ten years.

On the basis of the information available, we do not think that a ten-year ultimate limitation period would impose a significant increase in the burdens now placed on most hospitals in connection with hospital record management. While some institutions whose retention and destruction schedules are now shorter than the norm among British Columbia hospitals may find it advisable to revise their record management practices, we believe that the limitation period should reflect an attainable average and not the lowest common denominator.

*(b)    Physicians*

*(i)    The Submission*

The expense and inconvenience of maintaining records for substantial periods is also a matter of concern to individual practitioners, for whom the need to maintain patient care records is a greater economic burden than for institutions, in relative terms.

*(ii)    Discussion*

The Commission is informed, however, that the Medical Protective Association, the main provider of professional liability insurance for nearly all physicians in Canada, stipulates that records should be maintained for ten years in any event.[41] Thus a change to a general ten-year long stop would not appear to increase the retention period which most prudent physicians would currently observe in regard to record maintenance.

*(c)    Transitional Considerations*

A concern raised by the BCMA was the potential for a gap in some practitioners' records which could result from a change from a six-year ultimate limitation period to a longer one. Practitioners who had

---

41.    Letter from the British Columbia Medical Association, December 1, 1989.

destroyed records more than six years old might find themselves in difficulty in defending a claim based on events more than six years in the past. If the change to a 10-year ultimate limitation period is made, however, transitional provisions could minimize this possibility.

### (d)    Conclusion

It is recognized that the availability of records and the costs associated with maintaining them are significant considerations in any proposed change to the limitations scheme. Existing cost burdens and logistical difficulties of record management, however, are not attributable to legal factors alone and we are not persuaded that the changes to limitation periods recommended in this Report would significantly disrupt current practices.

## 2.    THE RATE OF MEDICAL ADVANCE

### (a)    The Submission

This argument holds that as the rate of change in medical knowledge, technology and technique is so great, a time lag of more than a very few years between the events that are the subject of an action and the time the action comes to trial will make it difficult to determine the standard of care at the time of the events in question. Thus, there will be a danger that conduct in the past will be judged in light of standards prevailing at a later date.

### (b)    Discussion

The fact that medicine is evolving rapidly is indisputable, but this is true of many other fields as well. The argument based on change in the standard of care is one that is made by many other professional groups.

Our review of medical jurisprudence also shows that courts are quite conscious of the rapid evolution of standards and are careful not to judge physicians' past actions in light of more recent knowledge. In *Koerber* v. *Kitchener-Waterloo Hospital*[42] the trial took place nine years after the events, but the court was careful to note the conditions prevailing in a community hospital in 1978 and to rule on the defendants' conduct in light of them. The action was dismissed. More remarkable is *Tiesmaki* v. *Wilson*,[43] where the trial took place thirteen years after the events, but the court applied the former standard of care, exonerating a general practitioner, a nurse, and a community hospital because the standard had been met by all three.[44]

The law is very clear that the standard of care is to be assessed in light of conditions at the time of treatment.[45] The court's determination of the appropriate standard of care unquestionably grows more difficult the more remote the material events become, but memory is not so deficient that the knowledge and practices of less than a decade in the past cannot be proved. If the higher standard of a later time is wrongly applied in a medical or hospital negligence case within this time frame, it is more likely attributable to faulty presentation of evidence than to remoteness of the events in question.

---

42.    (1987) 62 O.R. (2d) 613 (H.C.).

43      [1974] 4 W.W.R. 19 (Alta. S.C.), aff'd. [1975] 6 W.W.R. 639 (Alta. S.C.. App. Div.).

44.    *See also McLean* v. *Weir and Goff*, [1980] 4 W.W.R. 330 (B.C.C.A.); *Kehler* v. *Myles and Foothills General Hospital*, (1986) 48 Alta, L.R. (2d) 258 (Q.B.).

45.    *See Roe* v. *Minister of Health*, [1954] 2 Q.B. 66 (C.A.) and cases cited in notes 43-44.

The argument surrounding the rate of change has considerable force as an objection to limitation periods that are overly long, but we do not believe that a general ultimate limitation period of 10 years, running from the date of the act or omission of the defendant, presents difficulty in this regard.

## 3.    ACCESS TO THE COURTS

### (a)    The Submission

Concerns were expressed to the Commission about the increased opportunity for litigation that an increase in the ultimate limitation period from six years to ten would provide. The medical organizations reject the suggestion that uniformity in limitations law is in itself a justification for the change.

The risk of involvement in a lawsuit was said to be a significant factor in declining morale and higher levels of stress in the medical profession. The Commission was told that any change except a reduction in the length of limitation periods would be perceived as an indication that the government was apathetic towards the needs of physicians. The "tort reform" efforts in the United States, characterized by limits on damage awards, abolition of joint and several liability and, in some cases, imposition of short limitation periods for medical negligence actions were urged as examples which British Columbia should follow.

It was emphasized that the prevalence of malpractice litigation was leading to reduced entry into specialties seen to be at risk, such as obstetrics, perinatology, and orthopaedic surgery, and causing practitioners in these fields to restrict their practice or withdraw from the fields altogether. There is good evidence this is occurring in the United States, and to a lesser extent in Canada.[46] The contention is made that the prevalence of medical negligence litigation is having an adverse effect on availability of certain sectors of health care.

Rising insurance costs were noted as a concern by the BCMA. These were described as an inducement to bargain for greater compensation in negotiations with government, and thus increasing the total costs of the health care scheme.

### (b)    Discussion

Neither the BCHA nor the medical organizations were in a position to predict the degree to which an enlargement of the long stop would increase the volume of medical litigation. Available figures do not suggest that the number of claims presented in which postponement of the basic limitation period is relied upon by the plaintiff is a large proportion of the total of medical negligence actions in British Columbia,[47] although the proportion tends to fluctuate between given years.

It is only exceptional cases which are not governed by the two-year basic limitation period, and the number of actions against physicians which actually succeed is not large.[48]

There is no doubt that medical insurance costs have risen markedly, but this is also true of

---

46.    Rosenblatt and Hurst, "An Analysis of Closed Obstetric Malpractice Claims," (1989) 74 Obstetrics & Gynecology 710; Woodward and Rosser, "Effect of medicolegal liability on patterns of general and family practice in Canada," (1989) 141 Canadian Medical Association Journal 291.

47.    BCMA submission to the Commission, November 1989, at 3.

48.    The 1988 Annual Report of the Canadian Medical Protective Association states that in that year, 10 judgments were awarded against its members, 17 in 1987 and 19 in 1986. These are national figures. Canadian Medical Protective Association, *Eighty-eighth Annual Report* (1989) 19.

professional liability insurance generally. The need for the continued availability of insurance, at manageable cost, is one of the considerations which have led us to recommend a reduction in the general ultimate limitation period. We are not convinced, however, that subjecting medical and hospital negligence claims to the same ultimate limitation period as other professional negligence actions would have a significant influence on the volume of litigation or on the pattern of outcomes.

The rise in the cost of professional liability insurance is due to many factors. Undoubtedly the frequency of litigation has increased, as well as the size of claims. This is chiefly traceable, however, to causes other than the length of the ultimate limitation period. Unrealistically high expectations placed on physicians and the cost of care component in damage awards are far more significant in producing a greater volume of litigation and higher insurance premiums, respectively, than is the availability of an extended limitation period to take account of disability or undiscovered causes of action. British Columbia physicians currently enjoy more protection than their colleagues in a number of other provinces, as the *Limitation Act* places a cap on the operation of the open-ended discoverability rule that now exists in Canadian law.[49]

The reduction in the number of physicians practising in the obstetrical field, which is seen as a sector that is particularly at risk, is due at least as much to a desire for lifestyle changes as to fear of litigation, according to a recent Canadian study.[50]

It is worthy of note that some American courts, in occasionally striking down special limitation provisions for medical cases on grounds related to the U.S. constitution, have refused to accept the evidence offered for the contention that litigation is having an adverse impact on the availability and cost of health care, where this argument has been made in support of this kind of legislation.[51]

We do not dispute that there are problems associated with continued reliance on litigation as a means of resolving matters pertaining to professional liability. If these problems are to be addressed, however, it must be in the context of a much wider study than the present reference allows. Whether or not there is a desirable alternative to traditional modes of litigation is not the question with which we now have to deal. We must decide whether the retention of a special protection is warranted, or whether the general ultimate limitation period, modified as proposed in this Report, would provide adequate protection to all professional groups.

We do not agree that problems of morale within the medical profession can or should be addressed by restricting the ability of genuine victims of negligence to recover compensation by means of a special limitation period shorter than that applicable to other classes of defendants. Unrealistic expectations of the capabilities of medicine should be dispelled through greater public education and full explanations of the risks associated with treatment. Limitation periods are not the correct focus.

---

49.    The discoverability rule enunciated in *Central Trust Company* v. *Rafuse*, [1986] 2 S.C.R. 147 has been applied not only to the traditional kind of limitation statute, under which time runs from the accrual of the cause of action, but also to provisions which expressly state the point from which time runs by reference to an event which is ascertainable solely as a question of fact. *See Desormeau* v. *Holy Family Hospital*, [1989] 5 W.W.R. 186 (Sask. C.A.) For an example of the application of the discoverability rule to a special limitation period (s. 15 of *The Hospital Standards Act*, R.S.S. 1978, c. H-10) which expressly stated that time ran from the occurrence of damage. The medical legislation of some provinces contains an express discoverability rule which has no upper limit and could allow for indefinite postponement of the running of time. *See Health Disciplines Act*, R.S.O. 1980, c. 196, s. 17; *Medical Act*, S.N.B. 1981, c. 87, s. 67.

50.    Woodward and Rosser, *supra*, n. 46.

51.    *Kenyon* v. *Hammer*, (1984) 688 P. 2d 961. *See also* Trombetta, "The Unconstitutionality of Medical Malpractice Statutes of Repose: Judicial Conscience Versus Legislative Will," (1989) 34 Villanove L.R. 397, 402, 405-406.

4.      DEFENSIVE MEDICINE

    *(a)*     *The Submission*

A significant portion of the overall cost of health care can be attributed to "defensive medicine" being practised as a result of the threat of litigation. This involves extra laboratory tests, X-rays and other investigations being done out of excessive caution because physicians fear that any omission will be seized on to found a negligence suit, whether or not good medical judgment would dictate that a particular investigation or procedure was required.

    *(b)*     *Discussion*

We do not doubt that defensive medicine is being practised. This may not be an entirely negative phenomenon. Defensive practices reduce the risk of error and thus, presumably, the incidence of negligence claims, though some practices, such as over-use of radiological procedures, may actually increase the risk to patients.

A special ultimate limitation protection for physicians is not, however, a solution for the negative results of defensive medicine. As only a few claims arise outside the basic limitation period in any event, it will not reduce the frequency of claims to an appreciable degree, nor does it have any effect on the size of claims. A sense of security on the part of medical practitioners need not be acquired at the cost of depriving genuine victims of negligence of compensation beyond the extent inherent in a rational scheme for limitation of actions.

5.      PUBLIC FUNDING OF HEALTH CARE

    *(a)*     *The Submission*

As the health care system is publicly financed through taxation, the imposition of extra costs must be controlled. Litigation produces a drain on the entire system, diverting funds which are intended for providing care.

    *(b)*     *Discussion*

For some time, the nearly universal trend has been to reduce special immunities and protections for governmental and other public bodies, placing them on a more equal footing with other litigants. Due to the availability of financial support, the very fact that health care institutions are publicly funded places them at an advantage in defending claims by private claimants. To give special protection to them in the form of a shorter limitation period merely adds to the advantage these institutions already enjoy and compounds the disadvantage suffered by injured parties.

While physicians' remuneration is also drawn from public sources, and insurance costs may have some impact on fee increases, it does not follow that physicians should be insulated from liability to a greater extent than other professionals at the expense of injured persons. The entire burden of loss should not be placed on the most blameless party, namely the injured victim, in order to benefit the public purse. In any event, the benefit to the public purse is illusory, since the injured victim will continue to be treated under the health care scheme.

6.      CHARITABLE NATURE OF HEALTH CARE

(a)     *The Submission*

Health care is an activity with charitable and altruistic origins. It should not be discouraged through exposure of its institutions and practitioners to civil liability and thus should be protected from litigation to a greater degree than other activities in society.

Hospitals are non-profit institutions that must serve all sectors of the population, as must the professionals who make up the health-care team. They cannot choose to assume some risks and not others. The number of consumers of health care is much greater than consumers of other services, and thus there is greater potential for litigation. Accordingly, the opportunity for litigation should be restricted to a greater degree than in other sectors.

(b)     *Discussion*

The argument founded on the charitable and altruistic origins of health care is partly a philosophical one. For that reason is difficult to address except in terms of a social policy choice. If, contrary to the recommendations of the Commission, it is accepted that health care is fundamentally different from other activities giving rise to legal consequences, all its sectors should nevertheless be treated alike. At the present time only hospitals and two categories of care-givers, physicians and hospital employees, enjoy the benefit of the six-year ultimate limitation period. Other health professions and categories of care-giving institutions should be treated in the same manner. Extension of the special six-year long stop to claims against other providers of health care and other categories of health-care institutions, subject to the qualification that time did not run against minors, would be a more rational response than the status quo.

## E.     Summary and Recommendation

While there may once have been some justification for the growth of special limitation periods protecting particular classes of persons, it ceased with the reform of archaic limitations law that culminated in the enactment of the current *Limitation Act*. A regrowth of special limitation periods relating to particular classes such as occupational groups would run counter to the need for simplicity in the law of limitation of actions and would be perceived as unfair by unprotected groups, leading to continued agitation for similar protection. Limitation periods should have general application.

At the present time, the *Limitation Act* contains only one special limitation period protecting a particular class of defendants. This is the six-year ultimate limitation period in section 8(1) for negligence or malpractice claims against medical practitioners, hospitals, and hospital employees. After fully considering the submissions of interested groups, we are not satisfied that its retention is warranted, and believe that adequate protection would be obtained under the general ultimate limitation period, if the latter were reduced to 10 years as proposed in this Report.

The Commission recommends that:

6.     *The special six-year ultimate limitation period for negligence and malpractice claims against medical practitioners, hospitals and hospital employees, running from the time at which the right to bring action arises, should be deleted from section 8(1) of the* Limitation Act *in favour of a general ultimate limitation period of 10 years, running from the time of the act, omission or breach of duty leading to the claim.*

43

CHAPTER VI                          TRANSITIONAL CONSIDERATIONS

### A.      General

The recommendations made so far in this Report would have the effect of reducing the length of the ultimate limitation period from 30 years to 10 years in most cases. In certain others the ultimate limitation period would be increased from six years to 10. In addition, the commencement of the ultimate limitation period would be the time of the act or omission of the defendant leading to the claim, instead of being dependent on legal rules for determining when a cause of action arises.

The transitional problems these changes might generate could be handled in one of two ways. First, the legislation might be left silent on the matter of transition and allow courts applying the *Limitation Act* to find solutions based on the *Interpretation Act*[1] and common law interpretive doctrines. Alternatively, the legislation might spell out expressly the manner in which it would apply to claims which had not yet been the subject of legal proceedings when the changes became effective.

The following discussion sets out the views of the Commission with regard to the form that express transitional provisions should take.

### B.      Transitional Situations

The changes proposed to the ultimate limitation periods would create two situations calling for special treatment:

*Situation No. 1*

When the amendments to section 8 become effective, time is already running under the present ultimate limitation period.

This means that damage, if required in order to give the right to sue, has already occurred.

*Situation No. 2*

When the amendments to section 8 become effective, an act or omission by the defendant which will subsequently cause damage to the plaintiff has occurred, but the damage has not yet occurred.

This means that time is not yet running under the present ultimate limitation period, as the right to bring an action has not yet arisen.

### C.      Situation No. 1

---

1.      R.S.B.C. 1979, c. 206.

44

One way to resolve the first situation would be to allow the action to continue to be governed by the present ultimate limitation period. In other words, the amendments would only affect claims arising after the time at which they come into force. This would prevent uneven effects which would result if the new ultimate limitation period suddenly applied with full vigour to existing claims, expanding the time currently available to some plaintiffs, reducing it for others, and in some cases immediately extinguishing the possibility of action.

If the amendments did not apply to existing claims, the duration of liability would be extended for some defendants much longer than we think should be the case, however. If a claim arose just before the amendments came into force, it might persist for nearly 30 years after the changes were made.

The solution we prefer to adopt is one which would allow the existing ultimate limitation period to continue to apply, provided that it would not extend the potential for litigation for more than 10 years, running from the effective date of the amendments. Thus, a plaintiff whose action would be barred by the present ultimate limitation period sooner than the earliest date on which the new ultimate limitation period could have expired is essentially unaffected by the amendment. One who would have less time under the new ultimate limitation period than under the present one would have up to ten years to bring an action, always assuming, of course, that the basic limitation period does not expire in the interim.

The Commission recommends that:

7.    *(1) If a claim arises before the effective date of the amendments to section 8 of the* Limitation Act *and is not statute-barred on that date, the plaintiff should be able to bring an action on the claim before the earlier of:*

(a)    *the expiration of the time remaining, on the effective date of the amendments, under the ultimate limitation period which governed the claim before the amendments became effective; or*

(b)    *ten years from the effective date of the amendments;*

*subject to the earlier expiration of a basic limitation period.*

## D.    Situation No. 2

Since the new ultimate limitation period would run from the date of the defendant's act or omission, applying it might bar the claim before damage occurred and the right to bring an action arose. While in other situations we would consider this acceptable in order to provide certainty as to the start of the limitation period, it would be unfair to apply this new feature as of a point in time at which the parties would not have had the expectation that the plaintiff's recourse against the defendant might be barred before any harm was actually suffered.

Again, the expectations of the parties at the time of the relevant conduct of the defendant could be preserved by allowing the present ultimate limitation period to continue to govern the cause of action, but in the case of the general 30-year long stop, this would not serve the policy of reducing the length of time the defendant remains at risk.

The solution we propose is to allow an action to be brought within the shorter of the amount of time that would be available under the present ultimate limitation periods and a period of ten years running from the effective date of the amendments, again subject to the earlier expiration of a basic limitation period.

The Commission recommends that:

7.    (2) If a claim arises after the effective date of amendments to section 8 of the Limitation Act and is based on an act, omission or breach of duty occurring before the effective date, the plaintiff should be able to bring an action on the claim before the earlier of:

(a)    the expiration of the ultimate limitation period which governed the claim before the effective date of the amendments; and

(b)    ten years from the effective date of the amendments;

subject to the earlier expiration of a basic limitation period.


E.    **Fraud, Wilful Concealment and Fraudulent Breach of Trust**

There should be no ten-year "cap" imposed in the cases of fraud, fraudulent breach of trust and wilful concealment of the material facts surrounding a cause of action. The existing ultimate limitation period should continue to apply where the claim arose before the amendment of section 8. If the claim arose after the effective date of the amendments, but derived from conduct occurring prior to that date, a thirty-year ultimate limitation period should be imposed, running from the effective date of the amendments.

The Commission recommends that:

7.    (3) If a claim for fraud or fraudulent breach of trust, or a claim in which material facts relating to the claim have been wilfully concealed, arises before the effective date of the amendments to section 8 of the Limitation Act and is not statute-barred on that date, the claim should be governed by the ultimate limitation period which applied immediately before the effective date of the amendments.

7.    (4) If a claim for fraud or fraudulent breach of trust, or a claim in which material facts relating to the claim have been wilfully concealed, arises after the effective date of amendments to section 8 of the Limitation Act and is based on an act, omission or breach of a legal duty occurring before that date, the claim should be governed by an ultimate limitation period of 30 years, running from the effective date of the amendments.


F.    **Claims Already Barred At Effective Date of Amendments**

As is usually the case when limitation periods are altered, the changes proposed in this Report would have no effect on causes of action that are already statute-barred at the time the amendments come into force.

G.    **Summary**

While the transitional application of the changes to section 8 of the *Limitation Act* proposed in this

Report could be left to interpretation, it would be preferable to include express transitional sections in the amendments which implement the changes. Two situations must be considered: that in which a claim may have arisen before the effective date of the amendments, but where no action has been brought and that in which a claim arises after the effective date of the amendments, but the claim is based on an act, omission, or breach of legal duty occurring before the effective date.

The solution we propose is that the present ultimate limitation period should continue to govern if it would expire less than 10 years from the date on which the amendments come into force. If not, the claim will be absolutely barred 10 years after that date, at the latest.

In cases of fraud, fraudulent breach of trust, or wilful concealment of material facts, the 10-year cap would not apply and instead the claim would be barred, at the latest, 30 years after the effective date of the amendments, unless time expired under the ultimate limitation period which governed the claim before the changes came into force.

Cl aims already statute-barred at the date of the amendments would be unaffected.

# CHAPTER VII                                        CONCLUSION

## A.    General

While the reasons for the presence of the ultimate limitation period in the *Limitation Act* are still sound, the general ultimate limitation period is unnecessarily long. Experience indicates that not enough claims emerge at a time so distant from the material events as to justify the inconvenience that a 30-year long stop imposes on potential defendants. A long stop of 10 years would be sufficient in all but a few cases to allow claims to come forward where the basic limitation period has been postponed.

Cases of fraud, fraudulent breach of trust, and those in which material facts have been deliberately concealed, however, require more consideration to be given to the plaintiff's position. Defendants should not receive the benefit of a limitation defence if their own conduct has prevented a plaintiff from knowing of the existence of a claim. At some point, litigation nevertheless becomes a fruitless exercise due to the deterioration of evidence, and it would be appropriate to allow the long stop to remain at 30 years for these cases.

A greater degree of certainty in legal relations could be obtained if time began to run under the ultimate limitation period from the time of the act, omission or breach of a legal duty on the part of the defendant giving rise to a claim, rather than from the time at which damage or loss results. Often these will coincide, but occasionally they are separated by a very lengthy interval. In addition, the actual timing of damage or loss is sometimes difficult or impossible to determine. While linking the commencement of the ultimate limitation period to the defendant's act, omission or breach could have the unfortunate result of barring a claim before it arose if the time ran out before the plaintiff suffered actual damage, these cases would be rare. The need for both plaintiffs and defendants to know when the opportunity for litigation is closed outweighs the disadvantage to a small class of plaintiffs.

Some incidental changes to the scheme of the *Limitation Act* flow from the reduction of the ultimate limitation period. In particular, the position of minors has to be reconsidered. We conclude that time should not run against minors under a 10-year long stop.

An other matter arising from the reduction of the ultimate limitation period is the effect of a confirmation within the meaning of section 5 of the *Limitation Act*. At present a confirmation affects only the basic limitation period, but in order to give a plaintiff the full benefit of confirmations, especially in commercial matters, the 10-year ultimate limitation period should start afresh as well.

A topic referred for our consideration by the Attorney-General, namely the merits of special limitation periods protecting particular classes of persons, was addressed in this Report because the only provision of the *Limitation Act* of this nature is the special six-year ultimate limitation period in section 8(1) for negligence or malpractice claims against medical practitioners, hospitals, and hospital employees. Limitation periods for actions against particular categories of defendants, such as professional groups, were largely eliminated from British Columbia legislation when the *Limitation Act* was introduced in 1975. As special limitation periods interfere with the achievement of simplicity and accessibility in limitation legislation, and are unfair to unprotected but similarly situated groups, we do not favour their regrowth. After consulting with groups currently affected by the special six-year ultimate limitation period and fully considering their submissions, we conclude that their interests can be adequately protected by a general ultimate limitation period reduced to 10 years in length.

**B.    Recommendations Contained in This Report**

A restatement of the recommendations made in this Report is set out below:

1.    *Section 8 of the* Limitation Act *should be amended to reduce the ultimate limitation period of general application from 30 years to 10 years.*

2.    *Notwithstanding Recommendation 1, an ultimate limitation period of 30 years should be retained for cases of fraud, fraudulent breach of trust or wilful concealment of material facts relating to the claim.*

3.    *(1)   Where an action is based on an act, omission or breach of a legal duty, the ultimate limitation period should run from the date of the act, omission, or breach.*

       *(2)   Where an action is based on a series of related acts, omissions or breaches of duty or a course of conduct, the ultimate limitation period should run from the last of the acts, omissions or breaches of duty or the end of the course of conduct.*

4.    *The ultimate limitation period should not run against a minor.*

5.    *A confirmation within the meaning of section 5 of the* Limitation Act *should operate to renew the ultimate limitation period as well as the basic one.*

6.    *The special six-year ultimate limitation period for negligence and malpractice claims against medical practitioners, hospitals and hospital employees, running from the time at which the right to bring action arises, should be deleted from section 8(1) of the* Limitation Act *in favour of a general ultimate limitation period of 10 years, running from the time of the act, omission or breach of duty leading to the claim.*

7.    *(1)   If a claim arises before the effective date of the amendments to section 8 of the* Limitation Act *and is not statute-barred on that date, the plaintiff should be able to bring an action on the claim before the earlier of:*

       *(a)   the expiration of the time remaining, on the effective date of the amendments, under the ultimate limitation period which governed the claim before the amendments became effective; or*

       *(b)   ten years from the effective date of the amendments;*

       *subject to the earlier expiration of a basic limitation period.*

7.    *(2)   If a claim arises after the effective date of amendments to section 8 of the* Limitation Act *and is based on an act, omission or breach of duty occurring before the effective date, the plaintiff should be able to bring an action on the claim before the earlier of:*

       *(a)   the expiration of the ultimate limitation period which governed the claim before the effective date of the amendments; and*

49

(b)    *ten years from the effective date of the amendments;*

*subject to the earlier expiration of a basic limitation period.*

7.    (3)    *If a claim for fraud or fraudulent breach of trust, or a claim in which material facts relating to the claim have been wilfully concealed, arises before the effective date of the amendments to section 8 of the* Limitation Act *and is not statute-barred on that date, the claim should be governed by the ultimate limitation period which applied immediately before the effective date of the amendments.*

7.    (4)    *If a claim for fraud or fraudulent breach of trust, or a claim in which material facts relating to the claim have been wilfully concealed, arises after the effective date of amendments to section 8 of the* Limitation Act *and is based on an act, omission or breach of a legal duty occurring before that date, the claim should be governed by an ultimate limitation period of 30 years, running from the effective date of the amendments.*

## C.    Draft Amendments to the *Limitation Act*

As the recommendations made in this Report would, if adopted, require amendments to the *Limitation Act*, a draft of amendments embodying the recommendations has been included in Appendix B. The draft legislation is included only as an illustration of the manner in which the recommendations could be implemented. It does not form part of the formal recommendations.

## D.    Acknowledgments

The Commission wishes to acknowledge the contributions of the persons and organizations consulted in the course of the preparation of this Report. The comments and submissions of the College of Physicians and Surgeons, the British Columbia Medical Association, the British Columbia Health Association, the Public Trustee, and the Office of the Ombudsman were of great assistance.

A submission on the ultimate limitation period, prepared by the Law Society of British Columbia on behalf of itself and a number of other professional organizations, was also provided to us and was most helpful to the Commission and its staff in preparing this Report.

We express our appreciation for the work of our predecessors, who conducted the comprehensive study of the law of limitation of actions in British Columbia represented by Report 15, *Report on Limitations - Part 2: General*, which led to the enactment of the present *Limitation Act*.

We also wish to acknowledge the contribution of Gregory G. Blue, Legal Research Officer, who undertook research and, subject to the direction of the Commission, drafted this Report.

ARTHUR L. CLOSE, Q.C.

HON. RONALD I. CHEFFINS, Q.C.

MARY V. NEWBURY

LYMAN R. ROBINSON, Q.C.

PETER T. BURNS, Q.C.

# APPENDIX A

## *LIMITATION ACT*, R.S.B.C. 1979, c. 236

**Definitions**

1.    In this Act

"action" includes any proceeding in a court and any exercise of a self help remedy;

"collateral" means land, goods, documents of title, instruments, securities or other property that is subject to a security interest;

"judgment" means a judgment, order or award of

    (a)    the Supreme Court of Canada relating to an appeal from a British Columbia court;
    (b)    the British Columbia Court of Appeal;
    (c)    the Supreme Court of British Columbia;
    (d)    a County Court of British Columbia;
    (e)    the Provincial Court of British Columbia; and
    (f)    an arbitration under the *Commercial Arbitration Act,* and includes an arbitral award to which the *Foreign Arbitral Awards Act* or the International *Commercial Arbitration Act* applies;

"secured party' means a person who has a security interest;

"security agreement" means an agreement that creates or provides for a security interest;

"security interest" means an interest in collateral that secures payment or performance of an obligation;

"trust" includes express, implied and constructive trusts, whether or not the trustee has a beneficial interest in the trust property, and whether or not the trust arises only by reason of a transaction impeached, and includes the duties incident to the office of personal representative, but does not include the duties incident to the estate or interest of a secured party in collateral.

**Application of Act**

2.    Nothing in this Act interferes with

    (a)    a rule of equity that refuses relief, on the grounds of acquiescence, to a person whose right to bring an action is not barred by this Act;
    (b)    a rule of equity that refuses relief, on the ground of ]aches, to a person claiming equitable relief in aid of a legal right, whose right to bring the action is not barred by this Act; or
    (c)    any rule or law that establishes a limitation period, or otherwise refuses relief, with respect to proceedings by way of judicial review of the exercise of statutory powers.

**Limitation periods**

3.    (1) After the expiration of 2 years after the date on which the right to do so arose a person shall not bring an action

    (a)    for damages in respect of injury to person or property, including economic loss arising from the injury, whether based on contract, tort or statutory duty;
    (b)    for trespass to property not included in paragraph (a);
    (c)    for defamation;
    (d)    for false imprisonment;
    (e)    for malicious prosecution;
    (f)    for tort under the *Privacy Act*;
    (g)    under the *Family Compensation Act;*
    (h)    for seduction;
    (i)    under section 23.1 of the *Engineers Act.*

(2) After the expiration of 10 years after the date on which the right to do so arose a person shall not bring an action

(a)    against the personal representatives of a deceased person for a share of the estate;

(b)    against a trustee in respect of any fraud or fraudulent breach of trust to which the trustee was party or privy;

(c)    against a trustee for the conversion of trust property to the trustee's own use;

(d)    to recover trust property or property into which trust property can be traced against a trustee or any other person;

(e)    to recover money on account of a wrongful distribution of trust property against the person to whom the property is distributed, or a successor;

(f)    on a judgment for the payment of money or the return of personal property.

(3)  A person is not governed by a limitation period and may at any time bring an action

(a)    for possession of land where the person entitled to possession has been dispossessed in circumstances amounting to trespass;

(b)    for possession of land by a life tenant or remainderman;

(c)    on a judgment for the possession of land;

(d)    by a debtor in possession of collateral to redeem that collateral;

(e)    by a secured party in possession of collateral to realize on that collateral;

(f)    by a landlord to recover possession of land from a tenant who is in default or over holding;

(g)    relating to the enforcement of an injunction or a restraining order;

(h)    to enforce an easement, restrictive covenant or profit a prendre;

(i)    for a declaration as to personal status;

(j)    for a declaration as to the title to property by any person in possession of that property.

(4)  Any other action not specifically provided for in this Act or any other Act shall not be brought after the expiration of 6 years after the date on which the right to do so arose.

(5)  Without limiting the generality of subsection (4) and notwithstanding subsections (1) and (3), after the expiration of 6 years after the date on which right to do so arose an action shall not be brought

(a)    by a secured party not in possession of collateral to realize on that collateral;

(b)    by a debtor not in possession of collateral to redeem that collateral;

(c)    for damages for conversion or detention of goods;

(d)    for the recovery of goods wrongfully taken or detained;

(e)    by a tenant against a landlord for the possession of land, whether or not the tenant was dispossessed in circumstances amounting to trespass;

(f)    for the possession of land by a person who has a right to enter for breach of a condition subsequent, or a right to possession arising under possibility of reverter of a determinable estate.

(6)  No beneficiary, as against whom there would be a good defence by virtue of this section, shall derive any greater or other benefit from a judgment or order obtained by another beneficiary than he could have obtained if he had brought the action or other proceeding and this section had been pleaded.

(7)  In subsections (3) and (5) "debtor" means a person who owes payment or other performance of an obligation secured, whether or not he owns or has rights in the collateral.

**Counterclaim, etc.**

4.    (1)  Where an action to which this or any other Act applies has been commenced, the lapse of time limited for bringing an action is no bar to

(a)    proceedings by counterclaim, including the adding of a new party as a defendant by counterclaim;

(b)    third party proceedings;

(c)    claims by way of set off, or

(d)    adding or substituting of a new party as plaintiff or defendant, under any applicable law, with respect to any claims relating to or connected with the subject matter of the original action.

(2)  Subsection (1) does not operate so as to enable one person to make a claim against another person where a

claim by that other person

(a)  against the first mentioned person; and

(b)  relating to or connected with the subject matter of the action, is or will be defeated by pleading a provision of this Act as a defence by the first mentioned person.

(3)  Subsection (1) does not operate so as to interfere with any judicial discretion to refuse relief on grounds unrelated to the lapse of time limited for bringing an action.

(4)  In any action the court may allow the amendment of a pleading, on terms as to costs or otherwise that the court considers just, notwithstanding that between the issue of the writ and the application for amendment a fresh cause of action disclosed by the amendment would have become barred by the lapse of time.

**Confirmation of cause of action**

5.    (1)  Where, after time has commenced to run with respect to a limitation period fixed by this Act, but before the expiration of the limitation period, a person against whom an action lies confirms the cause of action, the time during which the limitation period runs before the date of the confirmation does not count in the reckoning of the limitation period for the action by a person having the benefit of the confirmation against a person bound by the confirmation.

(2)  For the purposes of this section,

(a)  a person confirms a cause of action only if he

(i)   acknowledges a cause of action, right or title of another; or

(ii)  makes a payment in respect of a cause of action, right or title of another;

(b)  an acknowledgment of a judgment or debt has effect

(i)   whether or not a promise to pay can be implied from it; and

(ii)  whether or not it is accompanied by a refusal to pay;

(c)  a confirmation of a cause of action to recover interest on principal money operates also as a confirmation of a cause of action to recover the principal money; and

(d)  a confirmation of a cause of action to recover income falling due at any time operates also as a confirmation of a cause of action to recover income failing due at a later time on the same amount.

(3)  Where a secured party has a cause of action to realize on collateral,

(a)  a payment to him of principal or interest secured by the collateral; or

(b)  any other payment to him in respect of his right to realize on the collateral, or any other performance by the other person of the obligation secured,

is a confirmation by the payer or performer of the cause of action.

(4)  Where a secured party is in possession of collateral,

(a)  his acceptance of a payment to him of principal or interest secured by the collateral; or

(b)  his acceptance of

(i)   payment to him in respect of his right to realize on the collateral; or

(ii)  any other performance by the other person of the obligation secured,

is a confirmation by him to the payer or performer of the payer's or performer's cause of action to redeem the collateral.

(5)  For the purposes of this section, an acknowledgment must be in writing and   signed by the maker.

54

(6) For the purposes of this section, a person has the benefit of a confirmation only if the confirmation is made to him or to a person through whom he claims, or if made in the course of proceedings or a transaction purporting to be under the *Bankruptcy Act* (Canada).

(7) For the purposes of this section, a person is bound by a confirmation only if

(a)    he is a maker of the confirmation;
(b)    after the making of the confirmation, he becomes, in relation to the cause of action, a successor of the maker;
(c)    the maker is, at the time when he makes the confirmation, a trustee, and the first mentioned person is at the date of the confirmation or afterwards becomes a trustee of the trust of which the maker is a trustee; or
(d)    he is bound under subsection (8).

(8) Where a person who confirms a cause of action to

(a)    recover property;
(b)    enforce an equitable estate or interest in property;
(c)    realize on collateral;
(d)    redeem collateral;
(e)    recover principal money or interest secured by a security agreement, by way of the appointment of a receiver of collateral or of the income or profits of collateral or by way of sale, lease or other disposition of collateral or by way of other remedy affecting collateral; or
(f)    recover trust property or property into which trust property can be traced,

is on the date of the confirmation in possession of the property or collateral, the confirmation binds any person in possession during the ensuing period of limitation, not being, or claiming through, a person other than the maker who is, on the date of the confirmation, in possession of the property or collateral.

(9) For the purposes of this section, a confirmation made by or to an agent has the same effect as if made by or to the principal.

(10) Except as specifically provided, this section does not operate to make any right, title or cause of action capable of being confirmed which was not capable of being confirmed before July 1, 1975.

**Running of time postponed**

6.    (1) The running of time with respect to the limitation period fixed by this Act for an action

(a)    based on fraud or fraudulent breach of trust to which a trustee was a party or privy; or
(b)    to recover from a trustee trust property, or the proceeds from it, in the possession of the trustee, or previously received by the trustee and converted to his own use,

is postponed and does not commence to run against a beneficiary until that beneficiary becomes fully aware of the fraud, fraudulent breach of trust, conversion or other act of the trustee on which the action is based.

(2) For the purposes of subsection (1), the burden of proving that time has commenced to run so as to bar an action rests on the trustee.

(3) The running of time with respect to the limitation periods fixed by this Act for an action

(a)    for personal injury;
(b)    for damage to property;
(c)    for professional negligence;
(d)    based on fraud or deceit;
(e)    in which material facts relating to the cause of action have been wilfully concealed;
(f)    for relief from the consequences of a mistake;
(g)    brought under the *Family Compensation Act;* or

55

    (h)    for breach of trust not within subsection (1)

is postponed and time does not commence to run against a plaintiff until the identity of the defendant is known to him and those facts within his means of knowledge are such that a reasonable man, knowing those facts and having taken the appropriate advice a reasonable man would seek on those facts, would regard those facts as showing that

    (i)    an action on the cause of action would, apart from the effect of the expiration of a limitation period, have a reasonable prospect of success; and

    (j)    the person whose means of knowledge is in question ought, in his own interests and taking his circumstances into account, to be able to bring an action.

(4)  For the purpose of subsection (3),

    (a)    "appropriate advice", in relation to facts, means the advice of competent persons, qualified in their respective fields, to advise on the medical, legal and other aspects of the facts, as the case may require;

    (b)    "facts" include

        (i)    the existence of a duty owed to the plaintiff by the defendant; and

        (ii)    that a breach of a duty caused injury, damage or loss to the plaintiff,

    (c)    where a person claims through a predecessor in right, title or interest, the knowledge or means of knowledge of the predecessor before the right, title or interest passed is that of the first mentioned person;

    (d)    where a question arises as to the knowledge or means of knowledge of a deceased person, the court may have regard to the conduct and statements of the deceased person.

(5)  The burden of proving that the running of time has been postponed under subsection (3) is on the person claiming the benefit of the postponement.

(6)  Subsection (3) does not operate to the detriment of a bona fide purchaser for value.

(7)  The limitation period fixed by this Act with respect to an action relating to a future interest in trust property does not commence to run against a beneficiary until the interest becomes a present interest.

**Persons under disability**

7.    (1)  Where, at the time the right to bring an action arises, a person is under a disability, the running of time with respect to a limitation period fixed by this Act is postponed so long as that person is under a disability.

(2)  Where the running of time against a person with respect to a cause of action has been postponed by subsection (1) and that person ceases to be under a disability, the limitation period governing that cause of action is the longer of either

    (a)    the period which that person would have had to bring the action had that person not been under a disability, running from the time that the cause of action arose; or

    (b)    such period running from the time that the disability ceased, but in no case shall that period extend more than 6 years beyond the cessation of disability.

(3)  Where, after time has commenced to run with respect to a limitation period fixed by this Act, but before the expiration of the limitation period, a person having a cause of action comes under a disability, the running of time against that person is suspended so long as that person is under a disability.

(4)  Where the running of time against a person with respect to a cause of action has been suspended by subsection (3) and that person ceases to be under a disability, the limitation period governing that cause of action is the longer of either

    (a)    the length of time remaining to bring an action at the time the person came tinder the disability; or

    (b)    one year from the time that the disability ceased.

(5) For the purposes of this section,

    (a)    a person is under a disability while he is

        (i)    a minor; or

        (ii)    in fact incapable of or substantially impeded in the management of his affairs; and

    (b)    "guardian" means a parent or guardian having actual care and control of a minor or a committee appointed under the *Patients Property Ace*.

(6) Notwithstanding subsections (1) and (3), where a person under a disability has a guardian and anyone against whom that person may have a cause of action causes a notice to proceed to be delivered to the guardian and to the Public Trustee in accordance with this section, time commences to run against that person as if he had ceased to be under a disability on the date the notice is delivered.

(7) A notice to proceed delivered under this section must

    (a)    be in writing;

    (b)    be addressed to the guardian and to the Public Trustee;

    (c)    specify the name of the person under a disability;

    (d)    specify the circumstances out of which the cause of action may arise or may be claimed to arise with such particularity as is necessary to enable the guardian to investigate whether the person under a disability has the cause of action;

    (e)    give warning that a cause of action arising out of the circumstances stated in the notice is liable to be barred by this Act;

specify the name of the person on whose behalf the notice is delivered; and

    (g)    be signed by the person delivering the notice, or his solicitor.

(8) Subsection (6) operates to benefit only those persons on whose behalf the notice is delivered and only with respect to a cause of action arising out of the circumstances specified in the notice.

(9) The onus of proving that the running of time has been postponed or suspended under this section is on the person claiming the benefit of the postponement or suspension.

(10) A notice to proceed delivered under this section is not a confirmation for the purposes of this Act and is not an admission for any purpose.

(11) The Attorney General may make regulations prescribing the form, content and mode of delivery of a notice to proceed.

**Ultimate limitation**

8.    (1) Subject to section 3 (3), but notwithstanding a confirmation made under section 5 or a postponement or suspension of the running of time under section 6, 7 or 11 (2), no action to which this Act applies shall be brought after the expiration of 30 years from the date on which the right to do so arose, or in the case of an action against a hospital, as defined in section I or 25 of the *Hospital Act*, or hospital employee acting in the course of employment as a hospital employee, based on negligence, or against a medical practitioner based on professional negligence or malpractice, after the expiration of 6 years from the date on which the right to do so arose.

    (2) Subject to subsection (1), the effect of sections 6 and 7 is cumulative.

**Cause of action extinguished**

9.    (1) On the expiration of a limitation period fixed by this Act for a cause of action to recover any debt, damages or other money, or for an accounting in respect of any matter, the right and title of the person formerly having the cause of action and of a person claiming through him in respect of that matter is, as against the person against whom

the cause of action formerly lay and as against his successors, extinguished.

(2) On the expiration of a limitation period fixed by this Act for a cause of action specified in column 1 of the following table, the title of a person formerly having the cause of action to the property specified opposite the cause of action in column 2 of the table and of a person claiming through him in respect of that property is, as against the person against whom the cause of action formerly lay and as against his successors, extinguished.

| Column 1 | Column 2 |
| --- | --- |
| *Class of action* | *Property* |
| For conversion or detention of goods. | The goods. |
| To enforce an equitable estate or interest in land. | The equitable estate or interest. |
| To redeem collateral, in the possession of the secured party. | The collateral. |
| To realize on collateral in the possession of the debtor. | The collateral. |
| To recover trust property or property into which trust property can be traced. | The trust property or the property into which the trust property can be traced, as the case may be. |
| For the possession of land by a person having a right to enter for a condition subsequent broken or a possibility of reverter of a determinable estate. | The land. |

(3) A cause of action, whenever arising, to recover costs on a judgment or to recover arrears of interest on principal money is extinguished by the expiration of the limitation period fixed by this Act for an action between the same parties on the judgment or to recover the principal money.

**Conversion or detention of goods**

10.   Where a cause of action for the conversion or detention of goods accrues to a person and afterwards, possession of the goods not having been recovered by him or by a person claiming through him,

    (a)   a further cause of action for the conversion or detention of the goods;
    (b)   a new cause of action for damage to the goods; or
    (c)   a new cause of action to recover the proceeds of a sale of the goods, accrues to him or a person claiming through him, no action shall be brought on the further or new cause of action after the expiration of 6 years from the date on which the first cause of action accrued to the plaintiff or to a person through whom he claims.

**Completion of enforcement process**

11.   (1) Notwithstanding section 3 or 9, where, on the expiration of the limitation period fixed by this Act with respect to actions on judgment, there is an enforcement process outstanding, the judgment creditor or his successors may

    (a)   continue proceedings on an unexpired writ of execution, but no renewal of the writ shall be permitted;
    (b)   commence or continue proceedings against land on a judgment registered under the *Court Order Enforcement Act,* Part 3, but no renewal of the registration shall be permitted unless those proceedings have been commenced; or
    (c)   continue proceedings in which a charging order is claimed.

(2)   Where a court makes an order staying execution on a judgment, the running of time with respect to the limitation period fixed by this Act for actions on that judgment is postponed or suspended for so long as that order is in force.

**Adverse possession**

12.    Except as specifically provided by this or any other Act, no right or title in or to land may be acquired by adverse possession.

**Foreign limitation law**

13.    Where it is determined in an action that the law of a jurisdiction other than British Columbia is applicable and the limitation law of that jurisdiction is, for the purposes of private international law, classified as procedural, the court may apply British Columbia limitation law or may apply the limitation law of the other jurisdiction if a more just result is produced.

**Transitional provisions**

14.    (1)  Nothing in this Act revives any cause of action that is statute barred on July 1, 1975.

(2)  Subject to subsections (1) and (3), this Act applies to actions that arose before July 1, 1975.

(3)  If, with respect to a cause of action that arose before this Act comes into force, the limitation period provided by this Act is shorter than that which formerly governed the cause of action, and will expire on or before July 1, 1977, the limitation period governing that cause of action shall be the shorter of

(a)    2 years from July 1, 1975; or
(b)    the limitation period that formerly governed the cause of action.

(4)  Subject to subsection (1), a confirmation effective under section 5 is effective, whether given before, on or after July 1, 1975.

(5)  Nothing in this Act interferes with any right or title to land acquired by adverse possession before July 1, 1975.

**Repeal of special limitations**

15.    (1)  Where an Act that incorporates or constitutes a private or public body contains a provision that would have the effect of limiting the time in which an action

(a)    within section 3(1), (2) and (3); or
(b)    to enforce any right or obligation not specifically created by that Act,

may be brought against that body, that provision is repealed to the extent that it is inconsistent with this Act.

(2)  Subsection (1) does not apply to a limitation provision that specifically provides that it operates notwithstanding this Act.

**Urea formaldehyde foam insulation**

16.    No action for damages caused by urea formaldehyde foam used as insulation that is brought on or before December 22, 1986 shall be barred on the ground that the bringing of the action is otherwise barred by this Act.

# APPENDIX B

## DRAFT AMENDMENTS TO THE *LIMITATION ACT*

Section 7 is repealed and the following is substituted:

Section 7 of the *Limitation Act* currently does not distinguish between minors and persons under other legal disability in connection with postponement of the limitation period produced by the disability. As minority will be treated somewhat differently than other legal disability, a revision of the section is necessary. In this draft the present s. 7 has been divided into three new sections numbered 7, 7.1 and 7.2 The first of the new sections deals with minors.

7. (1) Where, at the time the right to bring an action arises, a person is a minor, the running of time with respect to a limitation period fixed by this Act is postponed until that person ceases to be a minor.

This provision accomplishes the repeal of the existing s. 7 and the substitution of the three new sections.

The draft subsection 7(1) ensures that a limitation period fixed by the Act does not run against a minor until attainment of majority.

(2) Where the running of time against a person having a cause of action has been postponed by subsection (1) and that person ceases to be a minor, that person may bring an action within the longer of

This subsection ensures that minors, on attaining majority, will not have any less time to bring an action than they would have had if they had not been minors when the cause of action arose, taking into account all the facts of the case, including those which would allow for the postponement of the limitation period for reasons other than minority.

    (a) the period, running from the time the right to bring the action arose, within which that person could have brought the action if he had not been a minor at the time the right to do so arose, determined as if section 8(1) applied; or

    (b) a period running from the date on which that person ceased to be a minor,

        (i) equal in length to the period within which that person could have brought the action if he had not been a minor at the time the right to do so arose; and

        (ii) determined as if section 8(1) did not apply;

On attaining majority, a person who was a minor when a cause of action arose would be able to commence an action within the same amount of time he would have had if he had not been a minor when it accrued, running from the time the cause of action accrued and taking the ultimate limitation period into account or, if longer, the amount of time allowed under the basic limitation period running from the attainment of majority. As this latter period could theoretically be subject to indefinite postponement, however, it would be capped at six years.

but in no case shall that period extend more than six years after the date on which that person ceased to be a minor.

60

7.1 (1) Where, at the time the right to bring an action arises, a person is under a disability, the running of time with respect to a limitation period fixed by this Act is postponed so long as that person is under a disability.

Section 7.1 deals with persons under legal disability, i.e. those who are incapable of or substantially impeded in the management of their affairs. The basic limitation period is postponed by s. 7.1(1) while the disability persists in the case of a disability existing at the time a cause of action accrues, but the ultimate limitation period still runs by virtue of the wording of the draft s. 8(1), *infra*.

(2) Where the running of time against a person with respect to a cause of action has been postponed by subsection (1) and that person ceases to be under a disability, that person may bring an action within the longer of

This provision is similar to the present s. 7(2), and ensures that on cessation of a disability existing at the time a cause of action arises, the person formerly under disability can sue within the time which would have been available had he or she not been under disability.

(a) the period within which that person could have brought an action had he not been under a disability when the right to do so arose, running from the time that the cause of action arose; or

(b) the period within which that person could have brought an action had he not been under a disability when the right to do so arose, running from the time that the disability ceased, but in no case shall that period extend more than 6 years after the cessation of disability.

(3) Where, after time has commenced to run with respect to a limitation period fixed by this Act, but before the expiration of the limitation period, a person having a cause of action comes under a disability, the running of time against that person is suspended so long as that person is under a disability.

These subsections are similar to the present ss. 7(3) and 7(4). They deal with the case of disability occurring after time has commenced to run against a potential plaintiff. In such a case, the running of time under the basic limitation period is suspended while the disability persists.

(4) Where the running of time against a person with respect to a cause of action has been suspended by subsection (3) and that person ceases to be under a disability, the limitation period governing that cause of action is the longer of either

After the disability ceases, the person has the longer of the amount of time which remained to him to sue when the disability arose, or one year from the cessation of disability, in which to bring an action. This would be subject to the ultimate limitation period prescribed by the draft s. 8(1), *infra*.

(a) the length of time within which the person could have brought an action at the time he came under disability; or

(b) one year from the time that the disability ceased.

61

(5) For the purposes of this section, a person is under disability while he is in fact incapable of or substantially impeded in the management of his affairs, otherwise than by reason solely of minority.

(6) The onus of proving that the running of time has been postponed or suspended under this section is on the person claiming the benefit of the postponement or suspension.

7.2 (1) Notwithstanding sections 7, 7.1 and 8(2), where a minor or a person under disability has a guardian and anyone against whom the minor or the person under disability may have a cause of action causes a notice to proceed to be delivered to the guardian and to the Public Trustee in accordance with this section, time commences to run against that person as if he had attained majority or ceased to be under a disability, as the case may be, on the date the notice is delivered.

(2) A notice to proceed delivered under this section must

    (a) be in writing;

    (b) be addressed to the guardian and to the Public Trustee;

    (c) specify the name of the minor or the person under disability;

    (d) specify the circumstances out of which the cause of action may arise or may be claimed to arise with such particularity as is necessary to enable the guardian to investigate whether the person under a disability has the cause of action;

    (e) give warning that a cause of action arising out of the circumstances stated in the notice is liable to be barred by this Act;

    (f) specify the name of the person on whose behalf the notice is delivered;

    (g) be signed by the person on whose behalf the notice is delivered, or his solicitor

The new subsection 7.1(5) adopts the present definition of "disability," with the difference that minority is no longer included.

A plaintiff claiming the benefit of a postponement or suspension of the basic limitation period under s. 7.1 has the onus of proving that the provision has operated in his or her favour.

These provisions are similar to ones in the present s. 7 and enable a potential defendant to start time running against a minor or a person under disability by serving a notice to proceed on the guardian of the minor or incompetent person and the Public Trustee.

(3)  Subsection (1) operates to benefit only those persons on whose behalf the notice is delivered and only with respect to a cause of action arising out of the circumstances specified in the notice.

These provisions are similar to present ones and are largely self-explanatory.

(4)  A notice to proceed delivered under this section is not a confirmation for the purposes of this Act and is not an admission for any purpose.

Subsection 7.2(4) provides that a notice to proceed cannot be considered a confirmation under s. 5 of the *Limitation Act* so as to start the limitation period afresh, nor is it an admission which can be used in evidence against the person serving the notice to proceed.

(5) For the purposes of this section, "guardian" means a parent or guardian having actual care and control of a minor or a committee appointed under the *Patients Property Act*.

(6)    The Attorney General may make regulations prescribing the form, content and mode of delivery of a notice to proceed.

Section 8 is repealed and the following is substituted:

8.  (1)  Subject to section 3(3), section 5 and subsections (2), (3) and (4), but notwithstanding a postponement or suspension of the running of time under sections 6, 7.1 or 11(2), no action to which this Act applies shall be brought after the expiration of

The changes recommended in the Report require a new version of s. 8 of the *Limitation Act*. This provision accomplishes the repeal of the present s. 8 and the substitution of the new version. The new s. 8(1) establishes the 10-year ultimate limitation period for most actions now subject to limitation periods fixed by the *Limitation Act*, and leaves those based on fraud, deceit or fraudulent breach of trust, or cases where there has been wilful concealment of the cause of action, subject to a 30-year ultimate limitation period.

(a)  30  years, where the limitation period has been postponed pursuant to sections 6(1), 6(3)(d) or 6(3)(e); or

(b)  10  years, in any other case;

The ultimate limitation period will now run from the date of the act, omission or breach of duty on which the action is based, rather than from the time the right to bring the action rose.

from

(c)  the date on which the act, omission or breach of duty occurred, if the action is based upon an act, omission, or breach of duty; or

(d)  if the action is based upon a series of related acts, omissions or breaches of duty or a course of conduct, the last act, omission or breach of duty in the series or the end of the course of conduct; and

(e)  in  any other case, the date on which the right to do so arose.

As the new subsection 8(1) is subject to section 5 of the Act, a confirmation of the cause of action by acknowledgment or part payment will cause the ultimate limitation period to begin afresh.

63

(2) This section does not apply to an action if, at the time either

    (a) the cause of action arose, or;

    (b) the act, omission or breach of duty, if any, on which the action is based, occurred,

the plaintiff was a minor.

(3)  Subject to section 3(3), section 5 and subsection (4), where

    (a) the right to bring an action arose before this section comes into force and the action is not statute barred on that date; or

    (b) a right to bring an action arises after this section comes into force and the cause of action is based on an act, omission or breach of duty occurring before that date;

the action, notwithstanding a postponement or suspension of the running of time under sections 6, 7.1 or 11(2), shall not be brought after

    (c) the expiration of the ultimate limitation period that would have governed the cause of action before this section came into force; or

    (d) 10 years after the date on which this section comes into force;

whichever is earlier.

(4) Subsection (3) does not apply to an action where the limitation period fixed by section 3 has been postponed pursuant to sections 6(1), 6(3)(d) or 6(3)(e) and

    (a) the right to bring the action arose before this section comes into force; or

    (b) the action is based upon an act, omission or breach of duty occurring before this section comes into force, but the right to bring the action has not arisen at that time

Subsection 8(2) makes it clear that the ultimate limitation period does not run against a minor. Instead, the provisions of s. 7 will govern minor's claims.

Subsection 8(3) is a transitional provision to take account of situations in which time is running under the present ultimate limitation periods at the time these amendments come into force, or where a wrongful act or omission has taken place but has not yet resulted in damage. In either case, an action could be brought within the earlier of the presently applicable limitation period or 10 years from the effective date of the amendments.

By virtue of subsection 8(2), subsection 8(3) does not apply to minors' claims. Instead, s. 7 will apply to ensure that a minor's claim cannot be barred before majority is reached.

Where the basic limitation period under s. 3 has been postponed until the cause of action ought to have been discoverable because a concealed fraud (s. 6(3)(d)), a fraudulent breach of trust (s. 6(1)), or wilful concealment of material facts (s. 6(3)(e)) is involved, the ultimate limitation period will remain at 30 years.

This subsection indicates that the transitional section 8(3) will not apply to such a cause of action.

and in such a case the action, notwithstanding the postponement of the limitation period fixed by section 3, shall not be brought after

    (c) the expiration of the ultimate limitation period which governed the cause of action before this section came into force, in a case to which paragraph (a) applies; or

    (d) 30 years from the date on which this section comes into force, in a case to which paragraph (b) applies.

8.1  Subject to sections 7(2) and 8, the effect of sections 6, 7 and 7.1 is cumulative.

Instead, the existing ultimate limitation period will continue to apply if the cause of action has arisen at the effective date of the amendments. If the right to bring the action has not arisen at the effective date, but it subsequently does and the claim is based on conduct of the defendant occurring before the effective date, the ultimate limitation period is thirty years from the effective date of the amendments.

This subsection is similar to the present s. 8(2). It provides that a plaintiff may claim the benefit of all the provisions of the *Limitation Act* which postpone the commencement of the basic limitation period for reasons of excusable lack of knowledge, infancy, or disability to the extent to which they are applicable in a particular case.

The cumulative effect of the postponement provisions is restricted, however, by the ultimate limitation periods under s. 8 and by the provisions of s. 7(2) concerning minors' claims and the time limits for bringing action after reaching majority.

# APPENDIX C

## LIST OF ORGANIZATIONS WHOSE REPRESENTATIONS
## WERE CONSIDERED BY THE COMMISSION

**Persons and Organizations Consulted by the Commission**

British Columbia Health Association

British Columbia Medical Association

College of Physicians and Surgeons of British Columbia

Office of the Ombudsman

Public Trustee

**Organizations Presenting Written Submissions to the Commission**

British Columbia Health Association

British Columbia Medical Association

Office of the Ombudsman

Public Trustee

**Organizations Represented in Law Society of British Columbia Submission to Attorney General**

Architectural Institute of British Columbia

Association of Physiotherapists & Massage Practitioners of British Columbia

Association of Professional Engineers

Association of Professional Foresters

British Columbia Pharmacists' Society

Canadian Bar Association, British Columbia Branch

College of Dental Surgeons

Corporation of Land Surveyors

Institute of Chartered Accountants

Law Society of British Columbia

Physiotherapy Association of British Columbia

Registered Nurses Association

Society of Management Accountants