# EXHIBIT A

# EXHIBIT A

## Rebuttal Report of Dr. John Parker

### I.    Introduction

I was asked to review various expert reports submitted in this bankruptcy case and

provide a rebuttal report. I reviewed the expert reports of Dr. Laura Welch, Dr. Mark Peterson,

and Dr. Alan C. Whitehouse. This report is provided to respond to the reports of these experts. I

have also reviewed the expert reports of Drs. Daniel Henry, David Weill, Paul Epstein, Steven

Haber, Richard Sellman, Brent Pistorese, and Tim Obermiller. Throughout the course of this

report, I have on occasion relied upon literature referenced and opinions expressed in these

reports in forming my opinions. This report is offered in the true spirit of encouraging ethical

and professional behavior by scientists involved in asbestos litigation.

### II.    Background

I am currently a Professor and Chief of Pulmonary and Critical Care Medicine at West

Virginia University Health Sciences Center. From 1985 through 1998, I worked in a number of

capacities for the National Institute for Occupational Safety and Health ("NIOSH"). I was the

Chief of the Examination Processing Branch at the Division of Respiratory Disease Studies for

NIOSH from July 1991 through August 1998. In this position, I provided oversight for the

NIOSH Coal Workers' Respiratory Health Program as well as the NIOSH B-reader program and

served as faculty for the American College of Radiology View-box Seminar on Pneumoconiosis.

Additionally, I was the co-author of NIOSH Hazard Alerts regarding toxicity of silica in sand

blasters, rock drillers, and construction workers. I also developed a cooperative agreement with

the Finnish Institute for Occupational Health for studying the health effects of asbestos on

Russian chrysotile miners and millers. Concurrently to serving as Chief of the Examination

Processing Branch, I was also the Acting Chief of the Clinical Investigations Branch and the

Acting Chief of the Epidemiological Investigations Branch at the Division of Respiratory

types of "litigation screening diagnostic labels" have the potential to corrupt national data on the prevalence of asbestos-related disease.

## VI. Estimating present and future claims based on past claims

In reviewing the expert report of Dr. Mark Peterson, it is evident that his estimation of present and future claims is influenced by the number of claims filed against Grace prior to its filing for bankruptcy. As discussed above and in Dr. Haber's report, these litigation/compensation-driven claims have frequently been based on unreliable diagnostic methodology and do not accurately reflect the true prevalence of asbestos-related disease. Thus, the influence of litigation/compensation-driven screening activities inflates the apparent prevalence of disease. A future estimation, which relies upon historical litigation/compensation screening-generated claims would be expected to substantially overestimate future claims.

## VII. Is there a unique "Libby Disease?"

As the third and "tie-breaking" reader for the Libby ATSDR chest radiographic study, I have seen several thousand radiographs of Libby residents and employees of the mine and mill. The radiographic abnormalities, primarily pleural abnormalities, are typical of non-chrysotile asbestos exposures. It has been suggested that there is a unique or distinct pattern of lung injury from exposure to the tremolite contaminants within the Libby vermiculite. I do not share this opinion or concern. The diagnostic methodology and medical standards detailed in Section II of this report are appropriate for evaluating people exposed to tremolite from Libby.

I have had the opportunity to review expert reports authored by Drs. David Weill, Richard Sellman, Brent Pistorese, and Tim Obermiller regarding the Libby population and agree

with their findings.[3]  Specifically, as discussed above, a misdiagnosis or mislabeling, or an

overemphasis of an asbestos-related disease can have important untoward consequences for

individuals.  This includes not only dire psychological consequences for the misdiagnosed

individuals but also may minimize treatable or correctable conditions by attributing an

individual's health problems exclusively to an asbestos related disease.

## VIII.  Medical Ethics and Professionalism

Improper diagnostic labeling may have serious consequences for individuals and society.

In recognition of the ethical concerns raised in the *In re Silica* proceeding and concerns that

similar improper professional behavior was occurring in asbestos-related litigation, NIOSH has

developed a statement about ethical considerations for B-readers and a B-reader Code of Ethics,

which is available on the NIOSH website.  The B-reader Code of Ethics references both the ACR

Code of Ethics (http://www.ama-assn.org/ama/pub/category/13337.html) and the ACOEM Code

of Ethics (http://www.acoem.org/codeofconduct.aspx).  The B-reader Code of Ethics is an

important step forward, and I believe that adhering to this code of ethics could successfully

address many of the concerns raised in this report.

> The B Reader Code of Ethics is intended to assist B Readers in recognizing and
> maintaining a high level of ethical conduct. The outcome of chest radiograph
> classification can have important medical, legal, and social implications. It is
> critical that B Readers perform chest radiograph classifications properly and with
> integrity. This code, modeled after those of the American Medical Association
> and the American College of Radiology, is a framework to help B Readers
> achieve this goal.

---

[3] The reports of Drs. Sellman, Pistorese, and Obermiller were submitted in *U.S. v. W.R. Grace*, No. CR-05-07-M-DWM (D. Mont.) and are attached to this report.