# **<u>EXHIBIT 5</u>**

# W. R. Grace Bankruptcy
## Report of Stephen M. Snyder

### Summary:

I understand that I will likely be called as a witness at the hearing on asbestos estimation. I intend to offer testimony about various aspects of the claims Grace faced and the defenses it and other defendants asserted in asbestos litigation, including the following:

(1)  How and when plaintiffs proved exposure and asbestos product identification in the litigation process and the exposure evidence typically required by Grace and other defendants in evaluation and settling of claims;

(2)  The nature of the evidence plaintiffs would introduce at trial on liability issues;

(3)  The chrysotile defense and why it is generally not a successful defense, even for companies who allegedly have "pure" chrysotile products;

(4)  The difficulties defendants face in defending mesothelioma cases, the limited nature of the defenses (including causation defenses) available in cancer claim cases and the results of same;

(5)  The defenses raised in non-malignant claim cases and the results of same, including lack of impairment, lack of disease, suspect or weak medical evidence, and the results of trials of asbestosis or so-called pleural plaque cases;

(6)  The medical evidence asbestos defendants would require before settling a non-malignant claim;

(7)  The risks Grace or any asbestos defendant faced in trying cases;

(8)  That W.R. Grace's ("Grace") experience in the asbestos litigation over the period (from before 1982 through 2000) it received and defended asbestos personal injury and death ("BI") claims  was consistent with that of many defendants whose asbestos containing products, like Grace's, were widely distributed and used in commercial and industrial applications;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snyder
Miller
& Orton
LLP

(9)    That, taken as a whole, the asbestos BI liabilities Grace resolved in settlement or otherwise short of trial—and those that it saw threatened in the future as new claims arose—reflected actual liabilities for disease caused by exposure to Grace products that would have accrued had the BI claims embodying those liabilities proceeded to trial;

(10)   That in the absence of its Chapter 11 filing in April 2001 Grace would have continued to face and accrue liabilities typical of a defendant of its general defense profile and that there are factors unique to Grace that would support the conclusion that Grace's liability exposure actually would have increased as compared to other such defendants;

(11)   That Grace benefitted substantially from the settlement programs its counsel put in place for it, particularly after 1995. Had Grace (like others, such as Owens Corning, before it had) adopted an aggressive trial strategy by refusing to settle cases unless there was undisputable evidence of product identification or exposure to the asbestos in Grace products and undisputable evidence of the presence of an asbestos-related disease (although in mesothelioma cases the fact of disease was less often disputed) the likely result would have been a tremendous increase in the number and size of jury verdicts against Grace, and ultimately in its case settlement averages and overall asbestos liability; and

(12)   That a view that has become popular in some circles that the volume of asbestos BI cases so stressed the tort system starting in the 1990's and thereafter that the system, taken as a whole, grossly overvalued the liabilities represented by claims in the tort system assumes, without support in my opinion, that a fully robust tort system with expanded capacity able to accommodate all the cases filed would have lessened the overall liability threat to and expense burden on Grace and other defendants like it.

**Background and Qualifications:**

I am an attorney at law and, since 1972, I have been licensed to practice in all California state and federal courts. I am a partner in the law firm of Snyder Miller & Orton LLP, which has its offices at 111 Sutter Street, San Francisco, CA, 94104.

Exhibit A to this declaration outlines my basic biographical, educational, employment and professional background and history, including the approximately 30 years I practiced law in San Francisco with the law firm of Brobeck, Phleger & Harrison, LLP ("Brobeck"). In addition to my partnership in Snyder Miller & Orton LLP, I currently remain associated with Brobeck, Phleger & Harrison as the chair of its Liquidation Committee. My present hourly fee for representing clients or for consulting or testifying as an expert is $600.

Throughout my entire career at Brobeck, starting in 1972, my practice always included to some degree defense of injury or death claims brought against Brobeck clients. Initially this was limited to maritime litigation including injury or death claims of seamen or longshoremen under the Jones Act or general maritime law. Before the end of the 1970s my practice broadened to include, among other things, defense of asbestos claims on behalf of a traditional asbestos defendant, Fibreboard Corporation (a Bay Area building products corporation which manufactured and distributed—in the West and Southwest—a line of high temperature industrial insulation products that, in the period between the late 1930s and early 1970s, contained some asbestos).

By the early 1980s, my practice became composed mainly of asbestos litigation defense work. In the years since then I have represented the following defendants in asbestos related litigation:

ACandS, Inc., Armstrong World Industries, Carey Canada Inc., Celotex Corporation, CertainTeed Corporation, Dana Corporation, Eagle-Picher Industries, Inc., Fibreboard Corporation, Flexitallic Gasket Company, Inc., Flintkote Company, GAF, Hopeman Brothers, Keene Corporation, Maremont Corporation, National Gypsum Company, Nation Service Industries, Inc., Nosroc Corporation, Nuclear & Environmental Protection, Inc., Nuturn Corporation, Owens Corning Fiberglas Corporation, Owens-Illinois, Pfizer, Inc., Pittsburgh

Snyder Miller & Orton LLP

Corning Corporation, H. K. Porter Company, Inc., Quigley Inc., Rock Wool Manufacturing, Shook & Fletcher Insulation Company, Thorpe Insulation Company, C. E. Thurston & Sons, Turner & Newall, Unijax, Inc., Union Carbide Corporation, Union Carbide Agricultural Products Co., Inc., United States Gypsum Company, Westinghouse Corporation, Mac Arthur Co., Western Mac Arthur Co., Western Asbestos Corporation.

None of the information or opinions in this report is based on confidential communications with, or confidential information of, any of the above-listed asbestos defendants or any other of my clients.

In the period before 1986, my work for Fibreboard in the asbestos litigation involved serving as one of its national counsel in litigation directly managed by Fireman's Fund Insurance Company as lead carrier for various Fibreboard casualty insurance carriers. These carriers were defending Fibreboard claims under reservations of rights to deny coverage. Most of these carriers, including Fireman's Fund, also were in litigation with Fibreboard over this coverage in complex litigation pending in California state courts which the California Supreme Court had consolidated for all purposes (with a large number of other, similar cases) before San Francisco Superior Court Judge Ira Brown. (*Asbestos Insurance Coverage Case,* Judicial Council Coordinated Proceeding No. 1072 (California Superior Court, County of San Francisco.)).  My responsibilities for Fibreboard during this period included working with other Fibreboard lawyers to monitor these insurer settlement practices as well as (a) to defend Fibreboard directly in connection with claims for punitive damages, (b) to defend Fibreboard in so-called plantworker cases (i.e., claims brought directly against Fibreboard by its former employees, each of which necessarily also included a claim to avoid the bar imposed by state workers compensation statutes), and (c) to represent Fibreboard in connection with negotiations leading to the formation, in June of 1985, of the Asbestos Claims Facility ("ACF").

The ACF was created out of the settlement between 37 asbestos "producer-defendants" and some of their insurers who had been antagonists in the asbestos insurance coverage litigation consolidated before Judge Brown in California.  In the ACF, defendants

4

Snyder
Miller
& Orton
LLP

shared liability costs and defense resources according to predetermined formulas. The insurers, many of whom had unlimited defense obligations, benefited from the efficiency and economy this produced. For example, after the ACF began operating, the number of law firms representing these 37 defendants in asbestos cases across the country was reduced 95% from over 1200 to 60. Also, the ACF provided unparalleled opportunities to settle, in groups, large numbers of cases on behalf of multiple defendants (creating what came to be called a "one-stop shopping" discount). In the period roughly 1986-1989, within which the ACF operated, I acted as the ACF liaison counsel in Northern California, coordinating the work of three law firms defending the 37 ACF producer defendants in over 5,000 cases. I also served on the Asbestos Defense Steering Committee of the San Francisco Superior Court which, at that time, was creating general orders to manage the increasing volume of asbestos cases. The ACF defendants in Northern California tried over 100 asbestos cases to Northern California juries and were successful in obtaining court rulings and general orders that substantially diminished the proportions, compared to other U.S. jurisdictions, of marginal asbestos disease cases compared to serious (e.g., cancer) cases. Since then, of major asbestos jurisdictions, California has continued to have a case mix in which malignancy and more serious non-malignancy cases are more predominant. One result of this is that in recent years a large number of asbestos malignancies have been tried to jury verdicts in Northern California courts.

ACF defendants represented a range of asbestos defendant types, from "traditional" defendants whose products were used to insulate high-temperature, pipe-and-boiler industrial, power or marine equipment to defendants who, like Grace, mined asbestos, relied in some instances on the so-called "chrysotile defense," or whose products (including spray-on insulation products) were used mainly in commercial and construction applications.

Brobeck represented Fibreboard on the ACF board of directors. I continued to represent Fibreboard in its punitive damages defense, served on several ACF committees, and, finally, represented Fibreboard in connection with the dissolution of the ACF and the establishment of several multi-defendant nationwide counsel sharing regimes after the ACF.

Snyder
Miller
& Orton
LLP

5