UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                          . Case No. 01-1139(JKF)
                                .
                                .
W.R. GRACE & CO.,               . 5414 USX Tower Building
                                . Pittsburgh, PA  15222
                                .
                Debtor.   .
                                . October 25, 2007
. . . . . . . . . . . . . . . . . 2:07 p.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

<u>APPEARANCES</u>:

For the Debtor:             Kirkland & Ellis, LLP
                            By:  JANET BAER, ESQ.
                                 LISA ESAYIAN, ESQ.
                                  (telephonic appearance)
                                 DAVID M. BERNICK, P.C., ESQ.
                                 AMANDA BASTA, ESQ.
                                 BARBARA HARDING, ESQ.
                                  (telephonic appearance)
                                 ELLEN AHERN, ESQ.
                                  (telephonic appearance)
                            Aon Center
                            200 East Randolph Drive
                            Chicago, IL  60601


For the Debtor:             Reed Smith, LLP
                            By:  JAMES J. RESTIVO, JR., ESQ.
                            435 Sixth Avenue
                            Pittsburgh, PA  15219

Audio Operator:             Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  <u>jjcourt@optonline.net</u>**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Debtor: | Pachulski, Stang, Ziehl, Young,<br> Jones & Weintraub, P.C.<br>By:  JAMES E. O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899 |
| For Dies & Hile PD Claimants: | Pryor Cashman Sherman & Flynn LLP<br>By:  RICHARD LEVY, JR., ESQ.<br>410 Park Avenue<br>New York, NY  10022 |
| For Prudential: | Riker, Danzig, Scherer, Hyland &<br> Perretti, LLP<br>By:  CURTIS M. PLAZA, ESQ.<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ  07962 |
| For the Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan, LLP<br>By:  KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY  10048-4982 |
| For Maryland Casualty: | Connolly Bove Lodge & Hutz LLP<br>By:  JEFFREY C. WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 |
| For Equity Committee: | Peninsula<br>By:  TED WESCHLER, ESQ. |
| For Pittsburgh Corning: | Reed Smith, LLP<br>By:  JAMES J. RESTIVO, JR., ESQ.<br>435 Sixth Avenue<br>Pittsburgh, PA  15219 |
| For David T. Austern,<br>Future Claimants Rep: | Orrick Harrington & Sutcliffe<br>By:  DEBRA FELDER, ESQ.<br>      (telephonic appearance)<br>      ROGER FRANKEL, ESQ.<br>      (telephonic appearance)<br>3050 K Street, NW<br>Washington, DC  20007 |

```
APPEARANCES (Cont'd.):

For Asbestos Creditors'          Caplin & Drysdale, Chartered
                                 By:  NATHAN D. FINCH, ESQ.
                                      PETER LOCKWOOD, ESQ.
                                      (telephonic appearance)
                                 One Thomas Circle, NW
                                 Washington, DC  20005

                                 Campbell & Levine, LLC
                                 By:  MARK T. HURFORD, ESQ.
                                 800 N. King Street
                                 Suite 300
                                 Wilmington, DE  19801

For Official Committee of        Bilzin Sumberg Baena Price
Property Damage Claimants:        & Axelrod LLP
                                 By:  SCOTT L. BAENA, ESQ.
                                      (telephonic appearance)
                                      JAY M. SAKALO, ESQ.
                                      (telephonic appearance)
                                 Wachovia Financial Center
                                 200 South Biscayne Boulevard
                                 Suite 2500
                                 Miami, FL  33131

For Reaud, Morgan & Quinn        Stutzman, Bromberg, Esserman,
and ELG:                          & Plifka, PC
                                 By:  SANDER L. ESSERMAN, ESQ.
                                      (telephonic appearance)
                                      VAN J. HOOKER, ESQ.
                                      (telephonic appearance)
                                 2323 Bryan Street, Suite 2200
                                 Dallas, TX  75201

For Ad Hoc Committee             Weil, Gotshal & Manges, LLP
of Equity Security-Holders:      By:  M. JARRAD WRIGHT, ESQ.
                                      (telephonic appearance)
                                 1300 Eye Street, NW, Suite 900
                                 Washington, DC 20005

For the FAI Claimants:           The Scott Law Group
                                 By:  DARRELL SCOTT, ESQ.
                                      (telephonic appearance)
                                 2712 Middleburg Dr.
                                 P. O. Box 2665
                                 Columbia, SC 29206
```

4

APPEARANCES (Cont'd.):

For National Union Fire            Zeichner Ellman & Krause LLP
Company:                           By:  MICHAEL S. DAVIS, ESQ.
                                        (telephonic appearance)
                                        ROBERT GUTTMAN, ESQ.
                                        (telephonic appearance)
                                   575 Lexington Avenue
                                   New York, NY  10022


For Official Committee of          Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage           By:  THEODORE J. TACCONELLI, ESQ.
                                        (telephonic appearance)
Claimants:                         824 Market Street
                                   Suite 904
                                   P.O. Box 1351
                                   Wilmington, DE  19899


For David T. Austern,              Phillips, Goldman & Spence, P.A.
Future Claimants Rep:              By:  RICHARD Y. WYRON, JR., ESQ.
                                        (telephonic appearance)
                                   1200 North Broom Street
                                   Wilmington, DE  19806


For Future Claimants Rep:          Orrick, Herrington & Sutcliffe
                                   By:  RAYMOND G. MULLADY, JR. ESQ.
                                   3050 K Street, NW
                                   Washington, DC  20007


For Latigo Partners:               Latigo Partners
                                   By:  STEPHEN BLAUNER, ESQ.
                                        (telephonic appearance)


For Property Damage                Speights & Runyan
Claimants:                         By:  DANIEL A. SPEIGHTS, ESQ.
                                        (telephonic appearance)
                                   200 Jackson Avenue East
                                   Hampton, SC  29924


Roman Catholic Church              Dies, Henderson & Carona
Archdiocese of New Orleans:        By:  MARTIN DIES, ESQ.
                                        (telephonic appearance)
                                   1009 Green Avenue
                                   Orange, TX  77630

```
APPEARANCES (Cont'd.):

For Future Claimants:          Phillips, Goldman & Spence, P.A.
                               By:  JOHN C. PHILLIPS, JR., ESQ.
                                    (telephonic appearance)
                               1200 North Broom Street
                               Wilmington, DE  19806

For the State of Montana:      Womble Carlyle Sandridge & Rice
                               By:  FRANCIS A. MONACO, JR., ESQ.
                                    (telephonic appearance)
                               222 Delaware Avenue
                               Wilmington, DE  19801

For Grace Certain Cancer       Montgomery, McCracken, Walker
Claimants:                       & Rhoads, LLP
                               By:  NOEL C. BURNHAM, ESQ.
                                    (telephonic appearance)
                               300 Delaware Avenue, Suite 750
                               Wilmington, DE  19801-1607

                               Montgomery, McCracken, Walker
                                 & Rhoads, LLP
                               By:  LEONARD BUSBY, ESQ.
                                    (telephonic appearance)
                                    NATALIE D. RAMSEY, ESQ.
                                    (telephonic appearance)
                               123 South Broad Street
                               Philadelphia, PA  19109

For ACE Insurance Co.:         White & Williams, LLP
                               By:  MARC S. CASARINO, ESQ.
                                    (telephonic appearance)
                               824 N. Market Street, Suite 902
                               P.O. Box 709
                               Wilmington, DE  19899-0709

U.S. Trustee:                  U.S. Trustee Department
                               By:  DAVID KLAUDER

For PD Claimants:              Richardson Patrick Westbrook
                                 & Brickman, LLC
                               By:  EDWARD WESTBROOK, ESQ.
                                    (telephonic appearance)
                               1037 Chuck Dawley Blvd., Bldg. A
                               Mount Pleasant, SC  29464
```

APPEARANCES (Cont'd.):

| | |
|---|---|
| Official Committee of<br>Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>     (telephonic appearance)<br>1100 North Market St., Suite 1200<br>Wilmington, DE  19801-1246 |
| For London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>     (telephonic appearance)<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Asbestos Property Damage | The Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>     (telephonic appearance)<br>44 Montgomery Street, Ste. 1050<br>San Francisco, CA  94104 |
| For Asbestos Property Damage<br>Claimants: | Bilzin Sumberg Baena Price<br>  & Axelrod LLP<br>By:  MATTHEW I. KRAMER, ESQ.<br>     (telephonic appearance)<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Bank of America<br>Securities: | Bank of America Securities<br>By:  ROBERT RYAN<br>     (telephonic appearance) |
| For Brayton Purcell: | Lowenstein Sandler, PC<br>By:  JEFF KRAMER, ESQ.<br>     (telephonic appearance)<br>     SHARON LEVINE, ESQ.<br>     (telephonic appearance)<br>65 Livingston Avenue<br>Roseland, NJ 07068 |
| For W.R. Grace & Co.: | W.R. Grace & Co.<br>By:  DAVID SIEGEL<br>     (telephonic appearance)<br>     MARK SHELNITZ<br>     (telephonic appearance) |

APPEARANCES (Cont'd.):

For Silverpoint Capital:        Silverpoint Capital
                                By:  JOHN KU
                                       (telephonic appearance)

For Ford Marrin Esposito        Ford Marrin Esposito Witmeyer
Witmeyer & Gleser, LLP:          & Gleser, LLP
                                By:  SHAYNE SPENCER, ESQ.
                                       (telephonic appearance)
                                Ford Marrin Esposito Witmeyer
                                Wall Street Plaza
                                New York, NY  10005

For Barren & Budd et al:        Law Offices of Daniel K. Hogan
                                By:  DANIEL K. HOGAN, ESQ.
                                       (telephonic appearance)
                                1701 Shallcross Avenue
                                Suite C
                                Wilmington, DE  19806

For Goldentree Asset Mgt.:      Goldentree Asset Mgt.
                                By:  NOAH CHARNEY
                                       (telephonic appearance)

For Caxton Associates, LLC:     Caxton Associates, LLC
                                By:  JAMES RIEGER, ESQ.
                                       (telephonic appearance)

For Christopher M. Candon:      Cohn Whitesell & Goldberg, LLP
                                By:  CHRISTOPHER M. CANDON, ESQ.
                                       (telephonic appearance)
                                101 Arch Street
                                Boston, MA  02110

For David T. Austern, The       Piper Jaffray & Co.
Future Claimants Rep.:          By:  JASON SALGANICK
                                       (telephonic appearance)
                                     JONATHAN BROWNSTEIN
                                       (telephonic appearance)

For Official Committee of       Anderson Kill & Olick, P.C.
Asbestos Property Damage         By:  ROBERT M. HORKOVICH, ESQ.
Claimants:                             (telephonic appearance)
                                1251 Avenue of the Americas
                                New York, NY  10020

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Travelers Indemnity<br>Insurance Co.: | Simpson, Thacher & Bartlett, LLP<br>By:  SUNG CHOI, ESQ.<br>     (telephonic appearance)<br>25 Lexington Avenue<br>New York, NY  10017 |
| For Share Holder for W.R.<br>Grace & Co.: | Tocqueville Asset Management<br>By:  PETER SHAWN<br>     (telephonic appearance) |
| For Official Committee of<br>Equity Security Holders: | Kramer, Levin, Naftalis &<br> Frankel, LLP<br>By:  JESSICA GLASS, ESQ.<br>     (telephonic appearance)<br>919 Third Avenue<br>New York, NY  10022 |
| For the Debtor: | Kirkland & Ellis, LLP<br>By:  LORI SINANYAN, ESQ.<br>     (telephonic appearance)<br>777 South Figueroa Street<br>Los Angeles, CA  90017 |
| For Official Committee of<br>Asbestos Personal Injury | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>     (telephonic appearance)<br>One Thomas Circle, N.W.<br>Washington, DC  20005 |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  BEAU HARBOUR<br>     (telephonic appearance) |
| For Daniel Chandra: | Brencourt Advisors<br>By:  DANIEL CHANDRA<br>     (telephonic appearance) |
| For Scotts Company:<br> LLP | Vorys, Sater, Seymour and Pease<br><br>By:  TIFFANY STRELOW COBB, ESQ.<br>     (telephonic appearance)<br>52 East Gay Street<br>P.O. Box 1008<br>Columbus, OH  43216 |

APPEARANCES (Cont'd.):

For Credit Suisse First          Credit Suisse First Boston
Boston:                          By:   TIM McARDLE
                                       (telephonic appearance)

For State of Montana:            Christensen, Moore, Cockrell,
                                  Cummings & Axelberg, PC
                                 By:   DALE R. COCKRELL, ESQ.
                                       (telephonic appearance)
                                 Two Medicine Bldg.
                                 160 Heritage Way, Suite 104
                                 P.O. Box 7370
                                 Kalispell, MT  59904-0370

For Avenue Capital Group:        Avenue Capital Group
                                 By:   CHELSEA CLINTON
                                       (telephonic appearance)

For the Debtor:                  Kirkland & Ellis, LLP
                                 By:   THEODORE L. FREEDMAN, ESQ.
                                       (telephonic appearance)
                                 Citigroup Center
                                 153 East 53rd Street
                                 New York, NY  10022

For Andrew Hain:                 Bank of New York
                                 By:   ANDREW HAIN
                                       (telephonic appearance)

For Dune Capital Management:     Dune Capital Management
                                 By:   GUY BARON
                                       (telephonic appearance)

For BNSF Railway Company:        Pepper Hamilton, LLP
                                 By:   ANNE MARIE AARONSON, ESQ.
                                       (telephonic appearance)
                                 3000 Two Logan Square
                                 18th & Arch Streets
                                 Philadelphia, PA  19103

For Lehman Brothers:             Lehman Brothers
                                 By:   ANDREW CHAN
                                       (telephonic appearance)

APPEARANCES (Cont'd.):

For One Beacon America          Drinker Biddle & Reath LLP
Insurance Company:              By:  DAVID P. PRIMACK, ESQ.
                                     (telephonic appearance)
                                1100 N. Market Street
                                Suite 1000
                                Wilmington, DE 19801


For Fireman's Fund              Stevens & Lee
Insurance Company:              By:  DAVID R. BEANE, ESQ.
                                     (telephonic appearance)
                                111 North Sixth Street
                                P.O. Box 679
                                Reading, PA  19603


For Millennium Partners:        Millennium Partners
                                By:  IGOR VOLSHTEYN
                                     (telephonic appearance)


For Various Claimant Firms:     Stutzman, Bromberg, Esserman,
                                 & Plifka, PC
                                By:  DAVID J. PARSONS, ESQ.
                                     (telephonic appearance)
                                2323 Bryan Street
                                Suite 2200
                                Dallas, TX  75201


For Royal Insurance:            Wilson Elser Moskowitz Edelman
                                 & Dicker LLP
                                By:  CARL J. PERNICONE, ESQ.
                                     (telephonic appearance)
                                150 East 42nd Street
                                New York, NY  10017


For Federal Insurance Co.:      Cozen O'Connor
                                By:  JEFFREY R. WAXMAN, ESQ.
                                     (telephonic appearance)
                                Chase Manhattan Centre
                                1201 North Market Street
                                Suite 1400
                                Wilmington, DE  19801


For State of California:        Hahn & Hessen LLP
                                By:  CHRISTINA J. KANG, ESQ.
                                     (telephonic appearance)
                                488 Madison Avenue
                                14th and 15th Floor
                                New York, NY  10022

APPEARANCES (Cont'd.):

For Official Committee of          LECG, LLC
of Asbestos Property               By:   ELIZABETH DEVINE
Claimants:                               (telephonic appearance)

For Motley Rice, LLC:              Motley Rice, LLC
                                  By:   JOHN HERRICK, ESQ.
                                        (telephonic appearance)
                                  28 Bridgeside Blvd.
                                  Mt. Pleasant, SC  29464

For Murray Capital                Murray Capital Management
Management:                       By:   MARTI MURRAY
                                        (telephonic appearance)

For CNA:                          Goodwin & Procter, LLP
                                  By:   BRIAN MUKHERJEE, ESQ.
                                        (telephonic appearance)
                                  Exchange Place
                                  Boston, MA  02109

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-1139.  Participants are Robert Ryan, Jeff

3    Kramer, Gary Becker, David Siegel, Scott Baena, John Ku, Shayne

4    Spencer, Daniel Hogan, Debra Felder, Noah Charney, Richard

5    Wyron, James Rieger, Christopher Candon, Roger Frankel, Mark

6    Shelnitz, Jason Salganick, Robert Horkovich, Jay Sakalo, John

7    Phillips, Robert Guttmann, Sung Choi, Jonathan Brownstein,

8    Jessica Glass, Peter Shawn, Alex Mueller, Andrew Craig, Jarrad

9    Wright, Janet Baer, Lori Sinanyan, Walter Slocombe, Beau

10   Harbour, Daniel Chandra, Tiffany Cobb, Ellen Ahern, Tim

11   McArdle, David Ziegler, Van Hooker, Barbara Harding, Theodore

12   Tacconelli, Sander Esserman, David Bernick, Marc Casarino, Mark

13   Hurford, Ken Pasquale, Dale Cockrell, Chelsea Clinton, Theodore

14   Freedman, Sharon Levine, Andrew Hain, Peter Lockwood, Guy

15   Baron, Anne Marie Aaronson, Francis Monaco, Michael Lastowski,

16   Andrew Chan, David Primack, David Beane, Igor Volshteyn, David

17   Parsons, Lisa Esayian, Michael Davis, Carl Pernicone, Jeff

18   Waxman, Martie Dies, Daniel Speights, Matthew Kramer, Edward

19   Westbrook, Darrell Scott, Christina Kang, Anne Kearse, Terence

20   Edwards, Stephen Blauner, Elizabeth Devine, John Herrick, Marti

21   Murray, Brian Mukherjee, Natalie Ramsey, and Noel Burnham.

22          I'll take entries -- first of all, is anyone in the

23   District of Delaware in court in Delaware?

24                    (No verbal response)

25          THE COURT:  Okay.  I'll take entries in court,

**J&J COURT TRANSCRIBERS, INC.**

1 please.

2          MR. BERNICK:  Good afternoon, Your Honor.  David

3 Bernick for Grace.

4          MS. BASTA:  Amanda Basta for Grace.

5          MS. BAER:  Janet Baer for Grace.

6          MR. RESTIVO:  Jim Restivo for Grace.

7          MR. O'NEILL:  Good afternoon, Your Honor.  James

8 O'Neill for Grace.

9          MR. PASQUALE:  Ken Pasquale for the Unsecured

10 Creditors Committee.  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. FINCH:  Good afternoon, Your Honor.  Nathan Finch

13 for the Asbestos Claimants Committee.

14          MR. MULLADY:  Good afternoon, Your Honor.  Raymond

15 Mullady for the Future Claimants Representative.

16          THE CLERK:  I'm sorry, sir.  I didn't get your name.

17          THE COURT:  Mr. Mullady.

18          MR. MULLADY:  Raymond Mullady.

19          THE CLERK:  Oh, okay.

20          MR. MULLADY:  Thank you.

21          MR. HURFORD:  Good afternoon.  Mark Hurford, Campbell

22 & Levine, for the ACC.

23          MR. KLAUDER:  Good afternoon, Your Honor.  David

24 Klauder for the United States Trustee.

25          MR. LEVY:  Richard Levy of Prior Cashman on behalf of

1  the Dies and Hile PD Claimants.

2         MR. PLAZA:  Good afternoon, Curtis Plaza from Riker

3  Danzig on behalf of Prudential Insurance Company of America.

4         THE COURT:  Ms. Baer.

5         MS. BAER:  Good afternoon, Your Honor.  Although the

6  agenda has 34 items on it, it's actually a pretty short agenda

7  once we get through all the things that can be grouped.  Your

8  Honor, matters 1 through 3 are claims-related matters that are

9  all being continued.  I have orders, and I will hand them up at

10  the end for Your Honor to sign.

11         THE COURT:  All right.

12         MS. BAER:  Your Honor, matter Number 4 is Grace's

13  motion to approve its optimization plan.  A certificate of no

14  objections was filed on that.  That is a plan for us to do some

15  offshore dividending to the parent here in the United States in

16  order to take advantage of some tax-related matters.

17         THE COURT:  I saw that the CNO was filed.  I simply

18  haven't had an opportunity yet to get those orders enters.  Oh,

19  pardon me one second.

20                     (Pause)

21         THE COURT:  I will have the order entered approving

22  Item 4.

23         MS. BAER:  Thank you, Your Honor.  Would you like me

24  to submit another or just leave it with you?

25         THE COURT:  No, I'll just -- if you don't mind, I'm

**J&J COURT TRANSCRIBERS, INC.**

1  going to have them taken care of on the docket.  If they're not

2  entered by Monday, Ms. Baer, then please notify my staff, and

3  I'll take care of it.  I don't have staff in Delaware either

4  today or tomorrow, so it probably will be until Monday and

5  until they're entered.  So maybe you should make it Tuesday.

6  If they're not on the docket by Tuesday, then please notify my

7  staff here in Pittsburgh.

8            MS. BAER:  I will do so.  Thank you.

9            THE COURT:  Okay.  Thank you.

10            MS. BAER:  Item Number 5, Your Honor, is the United

11  States Trustee's motion to appoint an examiner with respect to

12  the Tersigni matter.  I understand from my colleagues that some

13  progress was made this morning in court, and I assume the

14  United States Trustee will address that.

15            THE COURT:  All right.  Mr. Klauder.

16            MR. KLAUDER:  Thank you, Your Honor.  And I take it

17  we can just go over the things we talked about this morning

18  with regard to the procedures.

19            THE COURT:  Yes.  I'm not sure what new parties are

20  here, but I do see Mr. Ziegler in court, so for his benefit

21  perhaps it would be a good idea --

22            MR. KLAUDER:  Right.

23            THE COURT:  -- to let him know what I'm trying to get

24  him into perhaps.

25            MR. KLAUDER:  And I did speak to Mr. Ziegler before

**J&J COURT TRANSCRIBERS, INC.**

1    court.  The proposal and what was agreed to in the three cases

2    this morning was kind of doing this in a two-step process

3    today.  The Court would order that the U.S. Trustee can appoint

4    an examiner.  We would go ahead and get that done as soon as

5    possible, work with the parties on both the appointment of the

6    examiner, a work plan, and something -- some prorated sharing

7    of costs.  There would be a second hearing on November 13th at

8    1:00, which would be a global hearing that would encompass both

9    the Delaware cases and the Pittsburgh cases, which are all in

10   front of Your Honor, and we can discuss some of the subsequent

11   issues that may come up related to the examiner proceeding

12   forward with the investigation.

13          THE COURT:  Okay.  That is essentially what I had

14   approved this morning in the other cases in which the United

15   States Trustee's Office had approved or had moved for the

16   appointment of an examiner, and I did agree that an examiner

17   was appropriate under those circumstances.  Does anyone want to

18   be heard on the two-step process?  Mr. Ziegler.

19          MR. ZIEGLER:  Your Honor, just so I understand, is it

20   then the examiner will be appointed, but at this point in time

21   the scope of the examiner's work and what they're going to do

22   hasn't been decided?  That will be decided at the next

23   hearing?

24          THE COURT:  Correct.

25          MR. ZIEGLER:  That is primarily, you know, our -- our

1  date for even filing a response to the motion isn't until

2  tomorrow --

3          THE COURT:  Right.

4          MR. ZIEGLER:  -- so we hadn't done that yet.  Our

5  primary concern is the expense and the scope, and our view was

6  that perhaps the examiner should be initially given a limited

7  charge to give us some preliminary report to give us an idea of

8  what assets are out there that could possibly be recovered in

9  the scope of the overcharging.  But we can address that I guess

10 at the next hearing.

11         THE COURT:  That actually was raised in the last case

12 by Mr. Lantry as well.  I think that is something that the

13 parties should talk to the U.S. Trustee's Office about in the

14 course of talking about the scope.  But I think what the

15 estates need to figure out first is whether they have a cause

16 of action and what that cause of action -- what those causes of

17 action, plural, if any, may be.  I don't know whether the

18 recoveries, if any, would be limited to the Tersigni firm or

19 against Mr. Tersigni's estate.  I don't know at this point.

20 I'm not sure.  I certainly don't want to see so much expense

21 spent that it subsumes what was already paid out.  That doesn't

22 make any sense.  And I think the U.S. Trustee's Office is

23 sympathetic to that deal as well, so --

24         MR. ZIEGLER:  That is our primary concern, Your

25 Honor.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Yes, and I think that all of the estates

2  share that.  Mr. Lockwood in one of the hearings this morning

3  had also pointed out that there may be a number of ways to

4  allocate the costs, and I think that is something that the

5  parties need to talk about, too, which is why I think this two-

6  step phase makes some sense.  First, let's get an examiner on

7  board, so that the parties can talk about who would be

8  appropriate in that capacity and in that role.  Hopefully, it

9  can one entity.  Maybe one will not be possible.  There are so

10  many cases involved.  I don't know.  If one, that would be

11  great.  If not, then as few as possible.  And, secondly, let's

12  take a look at the scope and what other -- a process and what

13  other issues may need to be addressed.

14        MR. ZIEGLER:  That's fine, Your Honor.  We would like

15  to be obviously included in all those discussions even though

16  the matter has not come up for hearing in our cases yet.  We'll

17  only have one step in our cases, but we'll be -- we're happy to

18  participate and cooperate with the U.S. Trustee.

19        THE COURT:  Okay.  Yes, and I think that's one reason

20  why I was trying to use the Pittsburgh Corning hearing date

21  actually, so that we could get the Pittsburgh cases into the

22  space to process.  I thought we could simply a Court Call

23  hearing, so that anyone who wants to be involved can simply

24  call in.  I've already notified Court Call to take anybody who

25  wants to call in for that hearing at that time.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ZIEGLER:  Your Honor, I think I'll work with your

2    staff, and we'll prepare some sort of notice, and perhaps give

3    that to the debtors' counsel for the Delaware cases.  We can

4    actually add it to the agenda.  It will already be on the

5    agenda for our cases, and we'll provide it to the -- a notice

6    to the other counsel, the Delaware counsel, and they serve it

7    to people in their cases.

8          THE COURT:  That would be great.

9          MR. ZIEGLER:  Okay.

10          THE COURT:  Okay.

11          MR. ZIEGLER:  Will do.

12          THE COURT:  Thank you, Mr. Ziegler.

13          MR. ZIEGLER:  Thank you.

14          THE COURT:  I appreciate it.  Okay.  Well then an

15    order will be entered when it's -- oh, I'm sorry -- will be

16    entered when it's submitted by the U.S. Trustee's Office to

17    appoint an examiner, and then the matter will be continued

18    until November 13th at 1:00.  And for all Delaware matters,

19    that will be a Court Call proceeding.

20          MR. KLAUDER:  Your Honor, I did indicate at the last

21    hearing this morning -- it was probably a bit presumptuous that

22    I hoped to have handed those orders up today, but it was just

23    -- it was too much of a task to get it out to everybody and get

24    it into Your Honor, so we will do that as soon as possible.

25          THE COURT:  That's fine.

1              MR. KLAUDER:  Thank you.

2              THE COURT:  I'll get it signed when I get it.  Thank

3  you.  Ms. Baer.

4              MS. BAER:  Your Honor, that takes us to agenda Item

5  Number 6, which is a lift stay motion that was filed.  Your

6  Honor, this lift stay motion was filed based on a mistaken

7  assumption of the way in which the insurance worked.  We have

8  provided the insurance information to plaintiff's counsel, and

9  it clearly provides that we have a very large deductible, so

10 this would be come a Grace obligation.  Under those

11 circumstances I received an e-mail this morning from

12 plaintiff's counsel indicating he would withdraw his motion to

13 lift stay.  So we will submit an order doing so, Your Honor.

14             THE COURT:  All right.

15             MS. BAER:  Your Honor, that takes us to agenda Item

16 Number 7, which is a status on the Scotts matter.  As you may

17 recall, Your Honor, the Scotts matter is a declaratory judgment

18 adversary proceeding that was filed by the Scotts Company

19 against the Grace insurers or some of the insurers asking for a

20 declaration from this Court as to whether or not Scotts is

21 entitled to shared insurance because of some litigation that

22 they had been involved in, and that also involved apparently

23 Grace vermiculite.

24             Your Honor, this matter has been continued for about,

25 I don't know, the last 6, 12, 18 months, something like that.

1  It continues to be Grace's position that this really is

2  premature.  It would be a diversion that the Court clearly does

3  not need to take right now.  We would have serious challenges

4  about whether or not they'd be entitled to shared insurance but

5  really believe it's premature.  Until we know what's going to

6  happen in the Grace estate, what's going to happen to the

7  insurance, who would be the parties in interest, it simply

8  makes no sense from the debtor's perspective to have the

9  Court's time taken up with what could be complicated insurance

10 litigation.  So we would ask, Your Honor, that this simply be

11 delayed or set over for another status as we move on along

12 through the estimation hearing and see where we go with respect

13 to the plan and what happens with insurance.

14        THE COURT:  All right.  Anyone else wish to be heard

15 on this matter?

16        MR. KORTANEK:  Your Honor?

17        THE COURT:  Yes?

18        MR. PRIMACK:  This is David Primack at Drinker,

19 Biddle & Reath for One Beacon America Insurance.  In the past

20 we asked the Court to consider this matter and move it forward.

21 I'm sure it is yet another case where the Court's going to

22 probably agree with the debtors, but I just want to put it on

23 the record that we would want this matter to go forward.

24        THE COURT:  Well, unfortunately, I do still agree

25 with the debtor.  Until this case gets further along than it

**J&J COURT TRANSCRIBERS, INC.**

1 is, I'm just not sure that it makes much sense to get into this

2 kind of complex litigation, so it seems to me that it should be

3 continued.  Frankly, I think at this point it ought to go into

4 maybe the May or June agenda, because by then, hopefully, we're

5 going to get through this estimation proceeding, and,

6 hopefully, that's going to be a trigger to get something moving

7 in this case.  So how about June?

8          MS. BAER:  I think that makes sense, Your Honor.

9          THE COURT:  All right.

10          MS. COBB:  Your Honor?

11          THE COURT:  Yes?

12          MS. COBB:  This is Tiffany Cobb of the law firm

13 Vorys, Sater, Seymour & Pease on behalf of the Scotts Company.

14 We have no objection to continuing this matter to May or June.

15 And just for some brief context, you may recall, Your Honor,

16 that this was a -- not placed on the agenda by Scotts as a

17 result of Scotts request but rather Your Honor's efforts to

18 continue this matter into the future, and so here we are.  I do

19 think to the extent that the debtor can update Scotts and the

20 Court as to whether the status quo has changed, specifically,

21 whether there's anything being done with the insurance proceeds

22 prior to confirmation, that would be of interest.  But subject

23 to that, we have no objection to continuing the matter.

24          THE COURT:  Well, that's fair, Ms. Cobb.  I think if

25 there is some change with respect to insurance, then the debtor

1    should definitely put this on to an earlier agenda and should

2    update both the insurance companies that are involved, the

3    committees, and Scotts, otherwise, if there is no change, let's

4    put it off until June.  Okay.  Thank you.

5              MS. COBB:  Okay.  Thank you.

6              MS. BAER:  Thank you, Your Honor.  We will do so.

7              THE COURT:  Okay.  Thank you.

8              MS. BAER:  Your Honor, agenda Item Number 9 relates

9    to a PI status, and we'd like to move that to the end and get

10   everything out of the way first, so the PI matters can all be

11   taken together.

12             THE COURT:  What happened -- oh -- to 8.  You're

13   going to do that later, too.

14             MS. BAER:  Yes, we'll do that later.

15             THE COURT:  Okay.  All right.

16             MS. BAER:  Your Honor, agenda Item Number 9 is our

17   motion for approval of the Prudential property damage claim

18   settlement, and agenda Items Number 10 through 30 are our

19   motions to approve the various property damage claim

20   settlements with the Dies claimants.  The Prudential motion

21   addresses eight claims.  The Dies settlements address 258

22   claims.  There were objections filed by the FCR and the ACC

23   with respect to one provision in the settlement agreements

24   having to do with what the settlement agreements can be used

25   for and not used for.  We have resolved that matter with some

**J&J COURT TRANSCRIBERS, INC.**

1 language that essentially says they can be used as appropriate

2 under law or an appropriate rule.  The parties preserve their

3 rights with respect to all objections in that regard, and we

4 submitted certifications of counsel with revised orders that

5 provides that revised language.  And if Your Honor has no

6 questions, we would ask that all of those settlements be

7 approved.

8          THE COURT:  What does that mean?

9          MS. BAER:  What it means, Your Honor, is the

10 settlement agreements and the paragraph in the settlement

11 agreements that provided that the settlement could not be used

12 for any purposes whatsoever by any party is modified so that

13 the various committees are permitted to refer to the settlement

14 agreements as appropriate under existing law and rules.  If the

15 laws do not permit them to be referred to or don't permit them

16 to refer to in a certain way, the law will control.  And all

17 parties have the right to object if the settlement agreements

18 are going to be referred to or used for a purpose we all

19 believe would be inappropriate.

20          THE COURT:  Okay, so essentially all this is doing is

21 putting off until the estimation hearing the issue that I need

22 to decide either today or then, which is can they be used for

23 purposes of the estimation hearing.

24          MR. FINCH:  Your Honor -- no, Your Honor, that's not

25 it exactly, Your Honor.

1            THE COURT:  Okay.  I mean whether you're going to use

2    them in the insurance settlements, that's a different issue.

3    You know, I -- I have a dog in that fight.

4            MR. FINCH:  Would you like for me to explain how --

5            THE COURT:  Sure.

6            MR. FINCH:  -- how this could come up?  As I

7    understand these settlements, the property damage claims are

8    going to be allowed in a particular amount and paid 100 cents

9    on the dollar.  The ACC and the FCR are going to be filing a

10   plan of reorganization fairly soon, and in any kind of plan of

11   reorganization if a claim is allowed, the amount at which it is

12   allowed can be used in the plan of reorganization for purposes

13   of cram down or anything else, and that would be one of the

14   purposes to which the settlement agreement originally drafted

15   would purport to preclude us from referring to a reference or

16   using, and we don't think that's appropriate.  And so the

17   language has been fixed with respect to these settlement

18   agreements, so they can be used however as appropriate under

19   applicable law.  They have nothing to do --

20           THE COURT:  Well, how can they be --

21           MR. FINCH:  -- with the asbestos PI estimation

22   hearing.

23           THE COURT:  Well, how can they be being allowed when

24   there's no admission of liability in the settlements?  They

25   can't possibly be allowed as claims when there's no admission

**J&J COURT TRANSCRIBERS, INC.**

1  of liability.

2         MR. FINCH:  No, when there's a 9019 settlement,

3  there's no admission of liability, and the claim is allowed as

4  settled at the allowed amount of the claim.  I mean that's the

5  way this -- any settlement works with the debtor.

6         THE COURT:  But these say specifically that there's

7  no admission.  When I said no admission of liability, there's

8  no admission that the debtor's product is being used in the

9  buildings.  So what's the basis for the settlement and the

10  allowance of the claim?

11         MR. FINCH:  The debtor has agreed to pay X amount of

12  dollars to claimant if the claimant --

13         THE COURT:  So you're converting them into a contract

14  claim as opposed to a tort claim --

15         MR. FINCH:  Correct.  That's --

16         THE COURT:  -- for purposes of a plan?

17         MR. FINCH:  That's what any settlement does.  That's

18  an unliquidated claim that's converted to a contract claim.

19         THE COURT:  That's fine.

20         MR. FINCH:  Once it becomes a contract claim, it is

21  whatever the dollar amount is, and contract claims get added up

22  and totaled up in plans of reorganization all the time.

23         THE COURT:  That's fine.  I just wanted to understand

24  what -- when you're talking about the allowance of a claim, I

25  just wanted to be sure that I understood what you were talking

1  about.

2         MR. FINCH:  No, this is for plan purposes.  It's all

3  property damage claims.  It has nothing to do with personal

4  injury estimation anyway.

5         THE COURT:  Okay.  That's fine.  All right, so you'd

6  have a different order, or are you going to submit one?

7         MS. BAER:  Your Honor, we have submitted

8  certifications of counsels and attached to those all of the

9  revised orders.  I can also hand them up to you if you'd like

10  them.

11         THE COURT:  I'm not -- I have not seen that language.

12  When were they submitted?

13         MS. BAER:  They were submitted, I believe, on Friday.

14         MR. FINCH:  Monday.

15         MS. BAER:  On Monday.

16         MR. FINCH:  Monday.

17         MS. BAER:  And I can hand them up now if you'd like

18  to look at one.

19         THE COURT:  No, just tell me the new docket numbers,

20  and I'll take a look at them.

21         MS. BAER:  The certification of counsel for the

22  Prudential order is 17113.

23         THE COURT:  All right.

24         MS. BAER:  The certification for the Dies orders --

25  and there are I believe 10 or 11 of them -- is 17112.  It's one

1 certification of counsel and attached to it are all of the

2 orders, 21.

3          THE COURT:  Okay.  I'll take a look at them.  If I

4 have some difficulty figuring it out, I'll have someone contact

5 you, Ms. Baer, but --

6          MS. BAER:  Thank you, Your Honor.

7          THE COURT:  -- okay.  Thank you.  Let me make a note

8 though, so I know what I'm looking for here.  So that's Items 9

9 through 30?

10          MS. BAER:  Correct.

11                    (Pause)

12          THE COURT:  Okay.  Thank you.

13          MS. BAER:  Your Honor, Items 31 and 32 are property

14 damage and ZAI status, and Mr. Restivo is here to address

15 those.

16          THE COURT:  All right.  Thank you.

17          MR. RESTIVO:  Good afternoon, Your Honor.

18          THE COURT:  Afternoon.

19          MR. RESTIVO:  There is not a lot to report since the

20 last omnibus.  One claim has been dismissed voluntarily by Mr.

21 Speights, Number 12430, and we filed a certification of

22 counsel.  I am attempting to convince Mr. Speights that he

23 needs to dismiss eight or nine more.  So far I've been largely

24 unpersuasive.

25          What that means, Your Honor, is the Court as of today

1  has 172 remaining property damage claims to deal with, 159 of

2  those, Your Honor, are sub judice out of California, Canada,

3  two in Arkansas, four in New York.  That leaves straggling

4  approximately 13 other claims.  We're looking at those claims

5  now.  A few of them are in the eight or nine I'm trying to

6  convince Mr. Speights on, but we're trying to what, if

7  anything, can be done with what's left, and that's basically

8  where we stand on traditional property damage claims.

9            With respect to Item Number 32, Your Honor, ZAI, we

10  would once again ask to defer discussion of that until the

11  November omnibus.

12            THE COURT:  All right.  Thank you.

13            MR. RESTIVO:  Thank you, Your Honor.

14            MS. BAER:  Your Honor, agenda Item Number 33 is a

15  status on the New Jersey Department of Environmental Protection

16  matter.  Your Honor asked that this matter be put on the

17  agenda.

18            As you may recall, Your Honor, this is a circumstance

19  where the debtor moved for an expansion of the preliminary

20  injunction to include the action that was filed against the

21  debtors by the State of New Jersey or to clarify that, in fact,

22  Section 362 stayed this action.  New Jersey claimed it was a

23  police power action.  It is clearly an action to collect a fine

24  and nothing but fine.  There is no environmental protection

25  that's being sought here.  The property is being cleaned up.

1          The matter was actually argued twice, Your Honor.

2    Once it was argued about two years ago.  Your Honor took it

3    under advisement but directed the parties to see if they could

4    settle.  We finally received some settlement information from

5    the State.  We met.  We were unable to resolve it.  We came

6    back in April of this year, reargued it.  Again Your Honor

7    indicated you believe that this was actually stayed by Section

8    362.  You took it under advisement and have not ruled on our

9    actual request.

10         In the meantime, New Jersey then filed a request for

11   a proof of claim to be permitted to be filed late.  You denied

12   that request.  That matter is up on appeal, and their appellate

13   brief is due in early November.

14         That's essentially the status, Your Honor.  We await

15   an order from the Court ruling on our request to declare that

16   this, in fact, is stayed by Section 362, or, alternatively,

17   that you will enter an injunction under Section 105 enjoining

18   this matter from proceeding under the circumstances, given they

19   have no proof of claim on file.  This is nothing but the

20   collection of a fine.

21         THE COURT:  Okay.  I think what I was a little

22   confused about, because there was never an order either on the

23   injunction or the relief from stay and then the appeal was

24   filed -- I wasn't really sure whether at this point I had

25   jurisdiction to do anything, because these matters seem to be

1 somewhat intertwined, although I think the denial of the right

2 to file the late proof of claim may be somewhat independent of

3 the others.  But I'm a little I guess leery as to what my

4 jurisdiction is in -- on the circumstances.

5      MS. BAER:  Yes, I think it is still independent, Your

6 Honor, although they do not have an existing claim against the

7 debtor.  This adversary proceeding is both against the debtor

8 and against the debtor's employees and officers.  Grace has an

9 indemnity obligation under the law to its employees and

10 officers as well as under its bylaws, and under those

11 circumstances, Your Honor, if New Jersey would proceed against

12 the officers, it would be the same as proceeding against Grace.

13 Therefore, even absent a claim against Grace, it would

14 detrimentally affect the estate, and, therefore, I believe we

15 do, in fact, need the entry of an injunction by Your Honor, and

16 I believe you still have jurisdiction over that.  It's somewhat

17 independent of the proof of claim itself.

18      THE COURT:  All right.  Is anyone present with --

19 representing New Jersey?

20           (No verbal response)

21      THE COURT:  Okay.  There is no one responding.  All

22 right.  That's what I -- I just needed some clarification, Ms.

23 Baer, because I kind of lost track of this one, and I was a

24 little unclear as to what my jurisdiction may be because of the

25 appeal.  So I think what I need to do is just get this pulled

1  and get an order out.  So I will have somebody take a look at

2  it.  Okay.  Thank you.

3          MS. BAER:  Thank you, Your Honor.  Agenda Item Number

4  34 --

5          THE COURT:  May I make a note, please --

6          MS. BAER:  Sure.

7          THE COURT:  -- before you go on here?

8          MS. BAER:  Sorry.

9                          (Pause)

10         THE COURT:  Okay.  Thank you.

11         MS. BAER:  Your Honor, agenda Item Number 34 is the

12 debtor's expedited motion for relief from the October 31st

13 discovery cutoff for deposing certain lawyers named as

14 witnesses in the estimation.  Mr. Bernick is here to address

15 that as well as PI status in general.

16         THE COURT:  Mr. Bernick.

17         MR. FINCH:  Your Honor, is there some kind of time

18 limit on this argument as you've had in the past?

19         THE COURT:  Fifteen minutes per side.

20         MR. FINCH:  Thank you, Your Honor.

21         UNIDENTIFIED ATTORNEY:  Your Honor, may those of us

22 who are here on PD matters be excused?

23         THE COURT:  I'm sorry.  I can't hear you, sir.

24         UNIDENTIFIED ATTORNEY:  May those of us who are here

25 on PD matters be excused?

1           THE COURT:  Anybody is excused for any purpose, but I

2     cannot guarantee that I'm not going to get back into some other

3     matters, and whatever I get into is fair game.

4           UNIDENTIFIED ATTORNEY:  Understood, Your Honor.

5           THE COURT:  So you leave at your own peril.

6           UNIDENTIFIED ATTORNEY:  Thank you.

7           THE COURT:  Okay.

8           MR. BERNICK:  Your Honor, there are really two

9     different parts of this motion.  One relates to three lawyers

10    we want to call our lawyers for different claimants, and the

11    other relates to two experts, one of whom apparently they're

12    not sure they're going to call.  That's Mr. Horkovich.  He's a

13    fact witness.  They're not sure if they're going to call him.

14    And the other person is an expert.  That's Ed Snyder, and so

15    I'll address them separately.

16          With respect to the three lawyers, this kind of goes

17    back over some basic information, but the issues that were --

18    that we have here with our request for discovery is pretty

19    basic.  Is it the claimants case not our case that settlements

20    -- Grace's past settlements are a very critical part of the

21    estimation.  Indeed they are the whole backbone of their

22    estimation.  So they, not Grace, seek to place the settlements

23    at issue.  We will seek to exclude, as Your Honor well knows,

24    all of that evidence on the grounds that it violates Rule 408,

25    and it's prejudicial.

1        But this is their case for whatever its value might

2   be.  The position they take specifically is those settlements

3   constitute an admission of liability, exactly what Rule 408 is

4   designed to foreclose.  Because they place this at issue,

5   inevitably they place the relationship -- they place lawyers on

6   both sides at issue, because it's lawyers who actually agree to

7   these settlements.  So their evidence involves lawyer conduct.

8        Now, what lawyer conduct are they seeking to develop?

9   Well, we've got a settlement.  A settlement is a meeting of the

10  minds that results from discussions and is reflected in an

11  agreement.  So they're saying that that meeting of the minds

12  constituted an admission of liability.  They are anticipating

13  that we will call lawyers, a lawyer in particular, but maybe

14  more than one, at least Mr. Hughes, who is in-house counsel for

15  Grace, to respond to this contention and say when we settle,

16  sure, liability evidence is out there.  But what was driving

17  Grace to settle in many, many cases was not that liability

18  could be proven up based upon the rules that are applicable in

19  this court and state substantive law but based upon the

20  exigencies of something surviving the asbestos docket where

21  nobody had been successful in being able to litigate on a case-

22  by-case basis that didn't swamp everybody.

23       So our lawyer, Mr. Hughes, they anticipated would be

24  called, and probably the reason they anticipated that is that

25  we had open discussions in court about how the estimation would

1  proceed, and then there was open discussions -- when they

2  talked about settlement, my position was, well, settlement (a)

3  is not a basis for an estimation.  It doesn't establish

4  liability, and (b) in particular, in this case, given the

5  circumstances under which there was settlement.  So they said,

6  well, let's take discovery of Grace.  So they placed at issue

7  -- they placed at issue the settlements and made them -- by

8  doing so they not only put at issue the discussions and the

9  agreements, but they put at issue intent.  They said it was

10  Grace's intent in doing the settlement process to admit

11  liability.  That is Grace was settling, because they were

12  afraid of the legal liability, and that is confirmed by the

13  discovery that they sought.  They sought discovery of Grace,

14  not simply about public discussions or about the agreements.

15  They sought discovery about Grace relating the whole side of

16  the equation including Grace's intent.

17          We, as you remember, resisted that discovery and said

18  it violates Rule 408, and it also seeks privileged material.

19  But in effort to at least focus the matter we said, okay, we'll

20  agree to produce three witnesses.  We're not waiving this

21  position at all, but that is their view of the estimation

22  process.  Your Honor has said consistently that the two sides

23  have different views, and for purposes of discovery,

24  everybody's got to be able to develop their case.  So we saw

25  that coming, and we said let's just get through it, so we can

**J&J COURT TRANSCRIBERS, INC.**

1  produce three witnesses.  We can produce documents pursuant to

2  a certain scope, and that was all reflected in the order where

3  we specifically did not waive any privileges or objections to

4  the admissibility of the evidence.  So we provided all of that.

5  So that discovery has gone under way.

6          In the meantime we have a process obviously of

7  getting ready for the estimation, and we were content to simply

8  produce our people, because they asked for it.  They did

9  identify two of the three lawyers as being potential fact

10  witnesses a couple years ago when we were first exchanging

11  lists.  God knows the process was very early, but they now

12  apparently want to be able to respond presumably -- they say in

13  rebuttal, but really it's their case.  Their going to put on

14  the settlement case.  We're not going to put on any lawyers to

15  put in evidence about settlements, unless it's responsive to

16  their case.  So they're now saying, well, gee, their case is

17  also going to involve testimony of lawyers.

18          So they come and say they now want to call lawyers.

19  They say it in rebuttal to us, but in effect it is their case.

20  It's not our case, and, we, therefore, want to take discovery.

21  We all know there is an agreement that any undeposed witness

22  who was on the filed list of witnesses that just got turned

23  over would be able to be deposed.  So there's no question about

24  our ability to take the depositions of these claimants'

25  lawyers.  The only question is whether we'd get in preparation

1  for to be able to use in those depositions exactly what they

2  got from us.  Now their answer is, oh, well, our people aren't

3  going to really talk about intent.  They're not going to talk

4  about privilege materials.  They're simply going to talk about

5  what got discussed, albeit that will be a proffer for purposes

6  of establishing precisely what are intent is.

7           Now, the way the rules work is if you produce a

8  witness who's going to testify about a matter, you can't define

9  the scope of cross examination, and you certainly can't do so

10 on the context of discovery.  We believe that by going down

11 this road with the proposition that settlements are an

12 admission of liability and our intent was basically to settle

13 our liability, that they have placed not only our intent at

14 issue but their intent at issue.  And to the extent that they

15 want to confine themselves to discussions that occurred,

16 obviously, what it is that lawyers say was on their minds

17 during the course of those discussions is also probative of

18 what the discussions were.  So you can't have it both ways.

19          They can't say we get all this discovery of Grace's

20 lawyers and service of the proposition that the settlements

21 were settlements of liability, then call their own lawyers and

22 say, oh, we get to define the rules of discovery that take

23 place with respect to our own lawyers.  It's got to be a two-

24 way street.

25          Now, when this issue came up, I suggested in a meet

**J&J COURT TRANSCRIBERS, INC.**

1 and confer that there ought to be a way to at least narrow the

2 scope of what it is that we're arguing about.  I said if your

3 people are going to come and say, whoa, I dealt with Grace for

4 20 years, and Grace was always doing deals that basically were

5 an admission of liability, that's a pretty broad ambit for

6 testimony that's going to implicate literally all of their

7 claim files, all their work product, all their thoughts.  They

8 said, oh, no, we're not going to really do all of that.  We may

9 argue that what they're saying stands for that proposition, but

10 we're only going to proffer limited evidence.

11        I said, well, tell me what the limited evidence is.

12 Tell me what the limited proffer is.  Maybe there's a way of at

13 least focusing the  discovery dispute such that we're not

14 talking about turning over all of their files but only certain

15 of their files that are actually implicated by the testimony.

16 The response to that has been we're not required to do that,

17 and we don't really -- we're not prepared to do that.  So our

18 request to have the proffer limited and focused so we can have

19 discovery take place on a reasonable timetable has not produced

20 resolution, and that's why it is we're here today.

21        Our position -- our proposal is there's no question

22 that we're entitled to depose these people.  There's no

23 question that the rules of discovery permit that inquiry to be

24 a broad inquiry.  There's no question that they can't control

25 the scope of our cross examination by simply saying, oh, we're

1 only going to talk about this.  The cross examination goes to

2 the whole scope of evidence that is either relevant or may lead

3 to the discovery of relevant evidence.  And they can't then

4 invoke their privilege, because they are themselves -- by

5 proffering their witnesses to be deposed pursuant to those

6 rules, they are placing at issue evidence that may well be

7 privileged but is certainly reasonably calculated to lead to

8 discovery of evidence.

9          In the proposition in favor of which they seek to

10 propound that evidence is a proposition that goes to intent.

11 That is the intent of one party.  It certainly will go to the

12 intent of another.  If they're entitled to show our intent as

13 an admission, we're entitled to show their intent as a contrary

14 admission.  That they were settling not based upon liability.

15 That they were settling, because they knew that it could force

16 us to settle bunches of cases where we have no liability

17 because of the threat of overwhelming us in the trial docket.

18 That's our position.  They place it at issue.  They place it at

19 issue here, throughout the matter, and they can't constrain our

20 discovery.

21          Now, with respect to Mr. Snyder, Mr. Snyder is a

22 related proposition in that Mr. Snyder also is a lawyer.  He

23 was a defense lawyer during the course of the asbestos

24 litigation.  Mr. Snyder has been proffered as an expert witness

25 to give his overview on the history of asbestos litigation.  To

1  be able to say, oh, well, what Grace is trying to do here in

2  this courtroom, we tried to do in the State Court system -- he

3  represented Owens-Corning -- and it didn't work.  So he's going

4  to be providing an historical overview of his trials and

5  tribulations not involving Grace but involving Owens-Corning.

6          Now, we think that that's a pretty dubious

7  proposition or proffer of expert testimony.  Any lawyer -- all

8  of us could come in here and basically make all of those

9  arguments on the basis of a record or a better record to be

10  made of Owens-Corning.  Why is it that he has an expert comes

11  in and is given status as an expert to basically give his

12  ruminations as a lawyer in the same fashion that all of us

13  could do here?  I don't how Your Honor is going to rule on

14  that.  But we don't how Your Honor's going to rule, so we get

15  to take his deposition.

16          Now, because he's an expert witness, the stipulation

17  prevents us from getting discovery -- that special stipulation

18  -- getting discovery with respect to anything that he doesn't

19  rely upon.  So his reliance materials are there, and you can't

20  go beyond them.

21          They've done more.  They've asked to have him testify

22  as a fact witness.  They're not simply content to offer his

23  opinions.  They want to put into evidence the factual history

24  that he was a part of.  To the extent that they want to put

25  into evidence that factual history, the stipulation does not

**J&J COURT TRANSCRIBERS, INC.**

1 enable them -- is not a reason why our rights of cross

2 examination of him as a fact witness are cut off.  So if he

3 wants to offer himself up or be called as a fact witness with

4 respect to Owens-Corning's litigation history with asbestos and

5 what they tried to do, at that point he's talking about

6 impressions that he formed and things that he did as a lawyer

7 that places directly at issue his work product, his attorney-

8 client communications, because he was a lawyer, and he was

9 involved in this whole process.  I can't be foreclosed from

10 questioning and cross examining him on the documents and files

11 and events that were the basis for his testimony because he's a

12 lawyer.  He's testifying as a witness.  He's placing them at

13 issue.

14 　　　　　Now, again, I suggested that the answer to the

15 situation, rather than requiring production of all the

16 throwback firms' old files -- I don't know if we have them

17 anymore -- tell us what specifically he's going to testify to

18 on the facts.  If it's a limited set of facts, then our

19 discovery with respect to those facts also is limited, and

20 maybe we won't have a big problem.  I haven't gotten any

21 response to that.  The response that I've gotten is you've got

22 his expert report, so you know what he's going to say.  So I do

23 have his expert report, but I don't know what part of the

24 expert report he's going to testify to as a fact.  It's not

25 specified anywhere.  And the specification that he is going to

1 testify to something is a fact, it's got to be limited,

2 otherwise, we're going down the road of all these different

3 files.

4      In both cases I think that the answer here, Your

5 Honor, is that we get to take the depositions, that we get

6 discovery of these matters that are being placed at issue by

7 them, and the way to constrain how much of a problem this is

8 going to be is for them to specify much more precisely a

9 particular set of facts and evidence, so that we can have a

10 focused discussion about the extent of discovery into those

11 facts.  We're prepared to have that discussion.  They say

12 they're not ready.  They don't know what their proffer is.

13      We're prepared to have that discussion at some point,

14 you know, in three weeks, in a month, in December.  If they

15 want more time to figure out what particular settlements

16 they're going to talk about or what particular events Mr.

17 Snyder's going to talk about, we're happy to wait until they're

18 done with that and then take the depositions after the relevant

19 documents are produced.  But we're not prepared to have the

20 deadline for discovery go forward and have them argue, oh,

21 well, we gave up our rights with respect to these people and be

22 forced to take a deposition where they're holding all the

23 cards, and we haven't had the discovery that we need.  The

24 discovery cutoff I think is the end of October for fact

25 discovery.  Expert discovery I think is mid-November.

1          So our specific request is that this process unfold

2     on a timetable that permits them to give a very focused,

3     factually focused proffer, so that this issue of how much of

4     these privileged materials are implicated, can be reasonably

5     litigated.  If they don't want to do that, if they don't want

6     to have a limited proffer, then we have no choice but to ask

7     for very broad discovery of the lawyers' files.  I haven't

8     gotten into all of what we face in taking discovery of their

9     files and problems that we have because of all the privileges

10    that they asserted and indeed successfully.  Indeed when they

11    were overruled, they did have to be produced.  They were never

12    produced.  And I think that Your Honor has heard so much about

13    that.  We can talk about that on another day.

14          But the fact of the matter is you can't have it both

15    ways.  This is not -- settlements are not a one-way street, and

16    the evidence that relates to the parties' intent and settlement

17    is not a one-way street.  Did they press forward and want to

18    call these people without our opportunity to take that

19    discovery?  I think it would be -- it's plainly wrong under the

20    rules, and we should be able to have the discovery proceed.

21    Thank you.

22          THE COURT:  Mr. Finch.

23          MR. FINCH:  Your Honor, the ACC and the FCR have

24    never said that Mr. Bernick could not take the discovery of the

25    fact witnesses that we identified to him, two of the three of

1  them -- actually, three of the five of them, almost two years

2  ago.

3          Secondly, neither the FCR or the ACC or the plaintiff

4  lawyers have never put at issue the reasons why they settled

5  cases.  They have -- we believe that the best estimate -- the

6  best evidence of what the financial costs would be to Grace to

7  resolve its asbestos liabilities is to look at the past history

8  and use the settlement values and the resolution values going

9  forward.  Even Grace's expert, Tom Florence, in this case -- in

10 this case, in the estimation case, values the cases by

11 reference to settlement values.  They -- ultimately, his whole

12 analysis hinges on the settlement values in six cases.  So Rule

13 408 doesn't say just no evidence of what the settlement

14 criteria are, but then I can put on evidence of the values.

15 And the Rule 408 talks about the settlement of the claim.

16 That's the claim as between if I wanted to put in settlement

17 communications with Mr. Bernick about what the whole Grace

18 liability aggregate liability is.

19         Experts rely on the past settlements all the time,

20 and nothing that the ACC or the FCR or the claimants' counsel

21 have done has put at issue the reasons why they settled cases

22 or the internal thought processes.  Grace came in here.  They

23 wanted a bankruptcy and said, you know, we settle cases,

24 because we have no other choice, and we settle without --

25 completely without regard to liability.  That put at issue

1    their -- in our view, their internal communications on that

2    subject matter.  We said give us that discovery.

3         And if you recall, I served that discovery back in

4    2005, and we had a big motion to compel.  It was argued in this

5    courtroom on December the 5th, 2006, and I got the documents,

6    and I went out and took the depositions of Mr. Hughes and Mr.

7    Beeber (phonetic) and Mr. Siegel.  I didn't get a narrative

8    description of what Mr. Bernick might elicit from them.  I

9    didn't get the list of documents he might use with them at

10   trial.  I did what any trial lawyer does.  I take the

11   depositions of the witnesses who have knowledge that the other

12   side might call in its case.

13        By contrast, the asbestos claimants and the FCR, we

14   never said, oh, we settled cases because of X, or, oh, we

15   settled cases because of Y, or, oh, the tort system was great,

16   or, oh, the tort is broken.  Our experts rely on the past

17   resolution history of the company, because that's the generally

18   accepted methodology to estimate the liability that's been

19   approved by the Owens-Corning, Federal Mogul, and Armstrong

20   courts.  And in the Owens-Corning court case there was a

21   dispute about methodology explicitly in that opinion.

22        There are many things a lawyer can testify to that

23   don't involve privileged communications or internal analyses or

24   work product.  If I put on evidence in a case, if I put a

25   document into evidence, that's not privileged.  If somebody

**J&J COURT TRANSCRIBERS, INC.**

1  takes some -- takes my deposition and says, Mr. Finch, what

2  evidence did you put on in this case, that's not privileged.

3  If I have a settlement communication about a case, it may be

4  confidential, but it's not privileged.  If I have a -- you

5  know, if I produce something in discovery, Mr. Finch, what did

6  you produce in discovery?  That's not privileged.  All that is

7  fair game for Mr. Bernick to ask the lawyers about.  But the --

8  you know, the point that we have somehow thwarted his discovery

9  or prevented him from taking this discovery is just completely

10 false.

11          Secondly, Your Honor, what this really boils down to

12 is a timing matter.  He's -- what he's -- the specific motion

13 he's asking for, he's saying I want two things from counsel for

14 the ACC.  I want relief from the deadline -- the October 31st

15 fact discovery deadline, and I want you to tell me in advance

16 what these guys are going to say on the stand in explicit

17 detail.

18          We'll take the first item first, the timing.  You've

19 set pretrial deadlines in this case.  You've get a trial

20 deadline in this case.  The very first order you entered

21 setting a schedule for estimation of the asbestos liabilities

22 had a provision in it that says, "By December the 22nd, 2005

23 all parties shall exchange preliminary designations of the non-

24 expert witnesses each intends to call at the asbestos PI

25 estimation hearing."  That wasn't an identify all people with

**J&J COURT TRANSCRIBERS, INC.**

1 knowledge or a general description.  I -- this was a negotiated

2 order, and I wanted that provision in there, because I wanted

3 to try to focus the parties in on who was really going to

4 testify.  And so when I filed that list -- the ACC's list on

5 February the 3rd, 2006, I didn't give a blunderbuss list.

6 There were about 18 people, 13 of which were employees of Grace

7 or people Grace had control over or consultants of Grace.

8 There were 5 people who weren't in that category, David

9 Austern, the Futures Rep, Ted Goldberg, Mark Meyer, another

10 plaintiff's lawyer, Peter Krause, and Steven Snyder.

11          Well, it turns out that Snyder is also an expert.  In

12 terms of a narrative testimony, I mean he's got his expert

13 report.  I assume that Your Honor is going to treat the experts

14 in this case the way you've treated experts in every other case

15 I've tried before you, which is basically the experts testify

16 as to what's in their report and don't go wandering off into t

17 he universe.  I mean Mr. Snyder knows what he knows, because he

18 was a percipient fact witness.  That's the basis for his

19 expertise.  He lived asbestos litigation, still lives asbestos

20 litigation for 20-some years.  That's why I listed him as a

21 fact witness.  He knows this stuff not because he went to

22 school or got a degree.  He did it.  But the point is he's got

23 the narrative description of Mr. Snyder's testimony.

24          With respect to Mr. Goldberg and Mr. Cooney and Mr.

25 Krause, I gave him the best narrative description I can give

1  right now.  I don't know exactly how I'm going to -- what

2  exactly I'm going to ask these people.  I know generally I'm

3  going to ask them to talk about their public dealings with

4  Grace in terms of what evidence they put on in cases, what

5  discovery they proffered to Grace, and what settlements they

6  had with Grace.  Grace has all the documents relevant to that.

7  They would have all the exhibits that got entered into evidence

8  in trials with them.  They would have the settlement agreements

9  between the clients of those firms and them.  They have the

10 questionnaires that those people submitted.

11      If I ask a question at a trial that they say is --

12 that the -- they say, oh, they were prevented from asking --

13 Grace was prevented from asking that question, because the

14 lawyer objected on privilege grounds, then you're to going to

15 let him answer it at trial either.  That's the way you solve

16 this.  But there's no reason to push off the deadlines here.  I

17 mean they've had two years to do this discovery.  They could've

18 subpoenaed Mr. Krause and Mr. Goldberg back in 2006 or in the

19 first part of 2007.  That's what this is about, Your Honor.

20      And as far as, you know, the idea that he's somehow

21 entitled to get now a detailed description of what these people

22 would testify to, sometimes I don't decide what people are

23 going to testify to until the middle of trial.  I mean, you

24 know, I don't know if you're -- you've seen me try cases, Your

25 Honor.  I usually come up here with a one-page sheet of paper,

**J&J COURT TRANSCRIBERS, INC.**

1  and I just go with it.  So I mean the idea that I have to put

2  down everything I might ask these people is just -- there's

3  nothing the Federal Rules of Civil Procedure that would provide

4  that, and I can't do it.  I just don't know yet.  And, you

5  know, yes, it is our case, but Grace filed a motion to estimate

6  its liabilities.  Grace is going to put its case on first.

7  We're going to respond to that case.  And until I sort of see

8  their case come in, I don't really know exactly what these

9  people will testify to.  I do know that the documents that I

10 might use with them -- I haven't narrowed down the universe,

11 but Mr. Mullady and I are going to sit in a room -- and the

12 documents would be documents that came from Grace's files that

13 are publicly available.  And so I -- it's not going to be some

14 secret evidence or secret documents.  It's the stuff he has.

15 He complains about the fact that there are millions of

16 documents to look through.  It's because Grace has millions of

17 pages of stuff that it produced, and it made people submit

18 questionnaires where they produced millions of more pages to

19 Grace.

20       So, you know, yes, it's a big document case, but

21 that's not my fault, and that's never been an excuse in any

22 other big document cases I have tried that courts have ordered

23 the party to provide some kind of narrative description in

24 advance.  And there's certainly no cause to push any of the

25 deadlines in this case.  He's had plenty of time to get his

1  discovery done, and you've got to put an end to it, so we can

2  try the case in January.  I mean the Court has allotted 18 days

3  to do this trial.  There's very little flexibility for me and

4  my partner, Mr. Inselbuch, on the back end of it, and we would

5  very much oppose any kind of extension of the deadlines here,

6  and we have to get the case done, over, tried.  And I'll turn

7  the podium over to Mr. Mullady for the test of our rebuttal.

8           MR. MULLADY:  Good afternoon, Your Honor.

9           THE COURT:  Good afternoon.

10          MR. MULLADY:  Just very, very briefly.  I just want

11  to make two points.  On the Rule 408 point, Rule 408 just

12  doesn't apply in this instance.  This is not -- this proceeding

13  is not to prove the liability of the claim.  Certainly in the

14  case of my clients, the Future Claimants, their claims are

15  inchoate.  Their claims are not before this Court.  We're

16  certainly not looking to introduce the evidence that we would

17  obtain from Grace's in-house counsel for that purpose.

18          The settlement agreements are being used by the ACC

19  and the FCR to demonstrate how Grace monetized its liability in

20  the aggregate, which is a demonstrated way for experts to

21  predict on an actuarial basis what that liability would be,

22  accounting for changed circumstances, and accounting for

23  changes in the legal environment since the date of the

24  petition.  So that's the first point.  I think the Rule 408

25  issue is really just a side show here.

1          What this is really about, it's about sequencing, and

2  it's about where we are in this process.  Right now -- and I

3  think Mr. Bernick has some illustrative time lines on this that

4  he will undoubtedly like to reveal in a few minutes.  We're at

5  the very end of fact discovery.  This request to produce a

6  proffer of these lawyer witnesses came about a week ago.  There

7  really isn't time for Grace to issue subpoenas for the

8  documents that they think they need and then to take

9  depositions based on a review of that material by October 31st.

10  And so they're here asking really for an enlargement of the

11  period in which they should've done what they were -- can do,

12  so -- to do what they should have done a long time ago, which

13  was to anticipate what we were doing with these lawyers, which

14  is no secret.  I think Mr. Bernick knows what these lawyers are

15  going to say, and he had the wherewithal to issue the

16  discovery.

17          And I think when you look at everything else that's

18  going on, I think they've been distracted by a lot of discovery

19  that is somewhat off point.  I mean over the last couple of

20  weeks what have we been doing?  We've been sitting at

21  depositions where we've been hearing for hours and hours about

22  the Manville trust, the changes in the TDPs to the Manville

23  bankruptcy, the medical audit.  Mr. Austern was deposed.  He

24  was asked no questions about this case.  He was asked about the

25  Manville case.  It's been a wonderful trip down memory lane to

1  hear about Manville, to hear about Mr. Bernick's tobacco case,

2  to have people from trusts deposed for hours on end about the

3  criteria in their TDPs and whether it would be a breach of

4  their fiduciary duties if they paid claims when the criteria

5  weren't met.  Fascinating.  Absolutely nothing to do with this

6  case.  That's what they've been focusing on.

7          Now they're turning back to this issue of the

8  lawyers, and they've realized we've only got a couple of weeks.

9  We didn't do what we needed to do.  It's too late, Your Honor.

10  They have the data they need to put their case on.  It's in

11  their expert reports.  The theories have been made and

12  presented.  They've been rebutted.  We're ready to do, and this

13  is just, in my view -- and I think what you'll hear next -- is

14  Part 2.  The other shoe that's going to drop here is all these

15  deadlines need to move, and the trial date needs to be

16  continued.

17          THE COURT:  The trial date is not being continued.

18          MR. MULLADY:  Thank you, Your Honor.  That's all I

19  have.

20          MR. BUSBY:  Your Honor, this is Leonard Busby

21  speaking with Natalie Ramsey, and we represent Peter Krause,

22  who is one of the subpoenaed deponents.  May I be heard for a

23  moment on these issues?

24          THE COURT:  Yes, sir.

25          MR. BUSBY:  Thank you so much, Your Honor.  I want to

**J&J COURT TRANSCRIBERS, INC.**

1    -- the Court to understand first that Mr. Krause has agreed to

2    be deposed at a mutually convenient time and place.  Mr. Krause

3    is also willing to agree or willing to be deposed at a mutually

4    convenient time and place after October 31st.  Mr. Krause has

5    sought to be reasonable and cooperative.  It is Grace that has

6    created the present problem by demanding documents that are

7    facially and obviously privileged.

8         Your Honor, I apologize for not being there in

9    person, but the document requests that are appended to the

10   subpoena directed to Mr. Krause include all -- any and all

11   documents relating to the process by which potential asbestos

12   personal injury claims against Grace were evaluated by his

13   firm.  And I could go on.  They ask for basically every

14   internal document, work product and attorney-client

15   communications that go to how these cases were settled

16   internally, their evaluation, their strategy.  These are

17   documents that are facially and obviously privileged.

18        Now, whatever statements or arguments were made by

19   Mr. Finch on behalf of the ACC, and whatever decision was made

20   by Grace to provide arguably privileged documents to the ACC,

21   are entirely irrelevant to the privilege status of Mr. Krause's

22   documents.  The privilege at issue here belongs not to Mr.

23   Krause but to his clients.  Mr. Krause does not have the

24   discretion or the authority to waive any privilege.  It is his

25   ethical and legal duty to preserve the privilege.  Mr. Krause

1  is a proposed non-party witness who has himself not put

2  anything at issue.

3          As I understand Mr. Bernick's argument, the ACC has

4  put Grace's intent at issue, but, as Mr. Finch correctly points

5  out, putting that intent at issue does nothing to put at issue

6  the countervailing intent of any of the asbestos claimants.

7  That is not at issue within the meaning of the doctrine of

8  putting a concept or a principle at issue so as to waive a

9  privilege.  In any event, Mr. Krause hasn't put anything at

10  issue himself.  He's a non-party witness.

11          Now, the last thing I would add is that as regards

12  the proper procedure for addressing this dispute, Grace

13  properly issued a subpoena to Mr. Krause pursuant to Rule 45,

14  and that subpoena is captioned correctly and appropriately

15  under a caption of the United States District Court for Texas.

16  Mr. Krause has timely served his objections to the subpoena

17  pursuant to Rule 45.  For the moment, Mr. Krause has decided to

18  rely on his right under Rule 45 to be protected in his own home

19  court from undue burden, including the undue burden sought to

20  be imposed on him by Grace to create a privilege log of what

21  could be many thousands of pages of privileged documents.

22          Your Honor, it's amazing that at the end of Grace's

23  motion they ask Your Honor to enter an order against Mr.

24  Krause, that he provide a privilege log.  With all due respect,

25  at the moment Mr. Krause is not subject to this Court's

1 jurisdiction under Rule 45.  The only court that can hear and

2 rule on that ultimate issue at the moment is a court in Texas.

3        Now, the fact of the matter is that this problem

4 could be solved -- this whole concern debate could be solved if

5 Grace would withdraw its request for facially and obviously

6 privileged documents.  Grace is before the Court, and Grace

7 could certainly agree to, or perhaps with Your Honor's help, be

8 encouraged to withdraw a request for privileged documents.

9        So this is not a problem that has been created by Mr.

10 Krause.  It is not, respectfully, a matter that Your Honor can

11 force on Mr. Krause by ruling that he has to provide a

12 privilege log.  And Mr. Krause is not trying to create problems

13 here.  He's trying to cooperate.  He's willing to show up for

14 deposition, and he's not in a position, nor could he be put in

15 a position, of providing privileged documents with his own firm

16 or his own clients because of conduct of the ACC.  And, as Mr.

17 Finch pointed out, the ACC has not put the intent of any

18 plaintiffs' lawyers at issue in any event.  Thank you, Your

19 Honor.

20        THE COURT:  All right.  Anyone else on the phone wish

21 to speak?

22                    (No verbal response)

23        THE COURT:  Mr. Bernick.

24        MR. BERNICK:  Thank you, Your Honor.  I think that

25 there are basically four specific issues that have been

**J&J COURT TRANSCRIBERS, INC.**

1  identified that relate to this, and I'll try to use that to

2  organize a very brief response to what's been said.  I think

3  the first issue is is the discovery that we're seeking

4  relevant, and the arguments that you've heard is that Grace's

5  intent has been placed at issue by the claimants, but their own

6  intent has not been place at issue.

7            THE COURT:  But the claimants aren't the parties.

8            MR. BERNICK:  Well, the claimants are not the

9  parties, but their lawyers who acted on their behalf are being

10  called by the committees to testify.

11            THE COURT:  Yes, maybe.

12            MR. BERNICK:  And if the committees seek to put at

13  issue Grace's intent -- settlements at issue and, therefore,

14  the intent of the parties at issue, then there's no --

15            THE COURT:  I don't think --

16            MR. BERNICK:  There's --

17            THE COURT:  Pardon me.  I don't think that the ACC

18  intends to put Grace's intent at issue.  I think what the ACC

19  is saying is that Grace has intended to put Grace's intent at

20  issue.

21            MR. BERNICK:  That is totally and completely false.

22            THE COURT:  Well, then if the debtor is not going to

23  introduce any evidence with respect to its settlement history,

24  nothing --

25            MR. BERNICK:  Well, no, that's not really -- that's a

**J&J COURT TRANSCRIBERS, INC.**

1  different issue.

2         THE COURT:  Well --

3         MR. BERNICK:  Your Honor, this is totally

4  unprofessional.

5         THE COURT:  Well, I'm just trying to get to an

6  understanding of how this context is going to come up.

7         MR. BERNICK:  That's fine.  I just -- I thought I

8  just did it, which is the plaintiffs have a case --

9         THE COURT:  No, this is the debtor's objection.  The

10 debtor is going forward first on the objection.

11        MR. BERNICK:  Yes, and I just said I -- but Grace's

12 case --

13        THE COURT:  Right, and in Grace's case what is Grace

14 at this point intending to do with respect to its settlement

15 history?

16        MR. BERNICK:  Grace, as part of its case, will do

17 nothing with the settlements.

18        THE COURT:  Okay.  I thought that's what I said, and

19 you said no, that wasn't correct.

20        MR. BERNICK:  No.  No.  What you said was that Grace

21 has placed the settlement history at issue, and I said no.  I

22 said Grace will not put the settlement history at issue.  If

23 Grace has to go first, which is an interesting question,

24 because, after all, their burden is to establish what Grace's

25 liabilities are.  But whatever it is -- whoever goes first,

**J&J COURT TRANSCRIBERS, INC.**

1  Grace's affirmative case is based upon the -- what these claims

2  actually are worth.  Are they (a) meritorious, and (b) what are

3  they worth?  And meritorious is the threshold, it's the filter,

4  it's the beginning point of this process.

5       Grace will establish, based upon the data that has

6  been submitted in connection with the questionnaires and on the

7  basis of the medical analysis of that data, the industrial

8  hygiene analysis of that data, and based upon epidemiology,

9  Grace will establish how many claims currently pending have

10  evidence that reasonably supports the merits.  It is Grace's

11  position -- and this will all be laid out.  I think we talked

12  about it before.  It will be laid out in Grace that the filter

13  of the rules is the end of the day there has to be liability.

14       You've got claims allowance if you focus on

15  liability.  You have claims estimation.  The very first

16  question of estimation is is the claim a valid claim.  That the

17  claim has no validity.  It's value is zero.  Whatever would've

18  been paid for at settlement previously.  That's what the rules

19  require.  We don't have a non-liability estimate.  We don't

20  have a claim estimated to have value where there is no

21  liability.  So Grace's first part of this presentation in this

22  case will be we got to analyze a snapshot of all the current

23  claims in order to determine which ones of those claims are on

24  the merits supported by evidence, and it's a very -- we've done

25  the best that we can with the data that's been submitted.  This

1 part of the questionnaire is very critical, Your Honor.  That

2 there was massive non-compliance with your orders on the

3 questionnaires, so the data that we have is not as robust as we

4 would like, but it actually is quite robust.  It is

5 extraordinarily revealing.  How little information they got

6 relating to any of these claims.  They'll say, oh, we don't

7 have this yet.

8          We've also analyzed the past settled claims not for

9 purposes of determining what the settlements were but for

10 purposes of determining what did anybody ever get to support

11 these claims.  We find that -- again, in the past claims they

12 had very, very little evidence of liability.  We have numbers

13 that go down to way under 25 percent of claims that even can

14 identify a Grace product to even say that there was exposure.

15          So our case will be that if you take a look at this

16 population of claims as they exist today, they do not have even

17 the beginning of a liability case.  On the basis of determining

18 how many of them do have a basis for a liability case, that is

19 somebody who is actually saying -- and even arguably as a

20 result of real exposures, we will include them.  And then the

21 question is how many of them are there going to be in the

22 future, and that is a function basically of epidemiology.  If

23 you a group of people as to whom you can establish that they're

24 sick from a specific kind of exposure, those are the predicates

25 on the basis of which science tells you how many claims there

1  will be in the future.

2         So when it comes to Grace's case, Grace's case -- if

3  the folks here have read our reports that we're reporting to

4  the Court and what our reports say as opposed to their

5  characterization of their view of their case, Grace's case does

6  not turn on settlement at all.  There's only feature of Grace's

7  case that even mentions settlements, which is that after claims

8  pass a filter of establishing liability, yes, we do want to

9  take a look at what comparable cases would've been settled for

10 in terms of their monetary value.  That is the settlements used

11 for purposes of establishing a damage figure.  It is not for

12 purposes of establishing liability.

13         There's no aspect of this contention that is in any

14 way, shape, or form that is the settlements were an admission

15 of liability that is part of our case.  We expect they will

16 then come back as part of their case or, if they go first, that

17 this will be their case.  That they'll call their experts.

18 Their experts are Dr. Mark Peterson and the like.  Their whole

19 analysis is driven by past settlements.  We will seek to

20 exclude that testimony, because (a) it violates Rule 408, which

21 is completely and utterly applicable in this proceeding, and

22 (b) it violates <u>Daubert</u> standards, because there are people --

23 if they talk about the <u>Manville</u> case, I don't know where

24 they're coming from.

25         I just took the deposition of one of their lawyers
                    **J&J COURT TRANSCRIBERS, INC.**

1  yesterday, and Mr. Staler (phonetic) relies totally on his

2  analysis of claims in the Manville case.  It's the whole basis

3  for his opinion.  It's the whole basis for his work.  It also

4  the basis for the future projection from Mr. Biggs (phonetic).

5  Both of Mr. Mullady's experts rely upon the Manville case.  It

6  can't be terribly surprising to him that we're focused on the

7  history of the Manville case and whether it's going to be

8  useable for anything at all.

9          But the fact of the matter is that they focus on

10 settlements.  They focus on settlements, and they presumably

11 will then call these lawyers to say Grace settled for liability

12 reasons.  We think it's completely and utterly inadmissible.

13 We think it's totally improper.  I don't care how many

14 different folks have done it before.  It doesn't make it the

15 correct approach, and these tortured abuses of Rule 408 almost

16 are a laugh.  If 408 was so full of holes, nobody would ever

17 engage in settlement discussions for fear of a situation where

18 it can be used pursuant to one of these holes that are to

19 establish liability against them down the road.  You don't have

20 discovery into settlement.  We permitted discovery into

21 settlement to avoid the situation where basically they weren't

22 able to develop their part of their case, and we did so

23 specifically reserving our right to exclude this evidence.  But

24 if they want to put that evidence in, fine, they can call these

25 people, and then we will call and response people like Mr.

1 Hughes who say let me tell you what the real story was.  I

2 disagree with these people.  I disagree with the plaintiff's

3 lawyers when they X and Y and Z.

4 So we are not placing in any way, shape, or form the

5 settlement history as evidence of liability for this Court at

6 all.  We will seek to exclude it.  It is they who are calling

7 these people, and they most certainly are putting our intent at

8 issue.  The idea that they can say, oh, I'm just going to talk

9 about the discussions and the agreement, I'm not going to talk

10 about what I thought, but then they will use that to infer what

11 Grace thought, and that they will also have direct evidence of

12 what Grace thought, because they sought it notwithstanding the

13 fact that it was privileged.  That's a joke.  They are

14 specifically, no matter how narrow their proffer is, that I'm

15 only going to talk about the discussions, they are placing at

16 issue the settlement.

17 To the extent that they place the settlement at

18 issue, the settlement is the meeting of the minds, and they

19 will argue that the meeting of the minds was a meeting of the

20 minds about avoiding liability.  They've said it just now.

21 Now, if they're going to be able to conduct discovery of Grace

22 and put evidence in of Grace's mind that met, how in the world

23 can they argue that their intent is irrelevant.  If they want

24 to argue with that, and they want to have a record of this case

25 where we are foreclosed from conducting exactly the kind of

1  discovery that they conducted, that's fine.  We'll proceed, and

2  it'll be a terrific issue on appeal, because it is a total one-

3  way street.

4          The second argument that they make is that we don't

5  need this information.  That we can get along without it.  Ohm

6  don't worry.  It wont be too painful.  Mr. Bernick knows what

7  these people are going to say.  It's just not that big a deal.

8  I'm sorry.  They took discovery of our people, and before they

9  took even one deposition, they got massive discovery of all of

10 our documents.  And when they took the deposition of Mr.

11 Hughes, Mr. Beeber, and Mr Siegel, they were completely armed

12 with exactly the kind of documents that we now seem to get when

13 they want to take -- when we want to take discovery of the

14 people that they're going to testify -- have testify.

15         THE COURT:  But if they -- if you've known about at

16 least two of these five witnesses for two years, why haven't

17 you issued the subpoenas?

18         MR. BERNICK:  Because we (a) -- well, that is a

19 situation -- well, first of all, the argument that's being made

20 there is an argument that we have somehow waited too late,

21 given up our rights, so we don't get to cross examine, which

22 would be a very, very Draconian sanction for something that

23 didn't happen.  Here's why.  Those lists were always

24 preliminary lists -- always preliminary lists.  There's no

25 question about it, and there's no question about the fact that

1  when we put in place this most recent pretrial order, we

2  specifically recognized -- and I've told the Court, because it

3  was an agreement with counsel -- both counsel who are sitting

4  here.  I told the Court that we needed time to depose anybody

5  on their list who we hadn't had the opportunity to depose, and

6  there was agreement on that.  So the parties specifically

7  contemplated that the first lists were preliminary.  It was the

8  final list.  We would have the opportunity, in fact, to take

9  depositions.  So there's no question about our ability to take

10  these depositions.

11            The real issue is what is the scope of the testimony,

12  and, therefore, what is the scope of the discovery that we

13  need, and can it be done without disrupting preparation for

14  trial.  And I'm sorry, Your Honor.  You've established a firm

15  trial date.  I am not going to ask to have that firm trial date

16  moved.  I'm not even -- I haven't even thought about doing it,

17  because Your Honor has been very adamant about that.  But that

18  cannot be -- and that is -- that cannot be an excuse for

19  improperly curtailing our rights, which is what they're asking

20  you for -- our rights to conduct discovery of their witnesses.

21  You can't say, oh, well, now that the trial date's there, and

22  even though we've agreed that deposed people who are on the

23  fact witness can't be deposed, because we're going to have them

24  -- they're going to have them testify so broadly, or they're

25  not going to tell us what their testimony is going to be that

1  we can't get the discovery, because there's just not enough

2  time.

3          In other words, I didn't create this problem.  The

4  problem was created, because we had preliminary witness lists

5  that were not final, that everybody knew that there was going

6  to be discovery of the people who were not deposed, and that

7  particularly why this argument is just so outrageous is the

8  time that we spent here before Your Honor trying to prize from

9  the grasp of these very firms even the minimal information

10 about what it is they had to support the claims that are at

11 issue with the case.  And the argument that we heard repeatedly

12 and on and on and on, even when Your Honor overruled the

13 argument and limited their privileges, they still didn't obey,

14 was that all this stuff is privileged.  We couldn't even --

15 from their point of view, we couldn't ask question one of any

16 of these lawyers, because it was all privileged, including Mr.

17 Krause's firm, including Mr. Cooney's firm, all of these

18 different firms.

19         So throughout this whole process we've been trying to

20 conduct discovery of the firms on a very narrow topic, and they

21 asserted the broadest privileges known to man to resist all

22 that discovery.  And in the end of that process, Your Honor,

23 the last stroke -- and we're still not done with -- they

24 haven't done even what they promised last time to do.  I

25 remember being on the telephone conversation and somebody asked

**J&J COURT TRANSCRIBERS, INC.**

1  -- I think it was maybe Ms. Ramsey says, well, can you really

2  tell us that this is it?  If you -- we do this, there won't be

3  anymore discovery from the law firms, no depositions, and I

4  said -- I said I really can't buy a pig in a poke like that,

5  but personally -- I said I'll go on the line personally.  I

6  will tell you that I don't intend to seek anymore discovery of

7  the law firms, and the matter was closed off.  And now all of a

8  sudden two weeks later, ah, we're going to call these same

9  people as witnesses to testified on the stand, and yet we can't

10  get any of the information?  And they now say, oh, well, you

11  knew about it all along.  Come on.  That's not a two-way

12  street.  That is grossly unfair and abusive.

13          And the only excuse that I've heard today for why it

14  is that we still have this problem is again of their making.

15  I'm prepared to sit down -- and I said this over the telephone

16  as part of the meet and confer.  I'm prepared to sit down and

17  say tell me specifically what kinds of -- what settlements

18  you're talking about, so that we can go get the files, take a

19  look, and that we can then make a very focused request for the

20  information that we need, so that we can come to terms on this.

21  And I said that repeatedly at a meet and confer, because I know

22  Your Honor (a) wants us to meet and confer and (b) to solve

23  these problems.  And that would solve the problem, because then

24  we would have a very limited focus and limited work to be done.

25          And what I hear now is an outrageous statement from

1  counsel where he says, well, you know, I guess I try a lot of

2  cases, and I'm kind of loose and kind of take it as it go.

3  Well, that's fine, and it's very amusing, and all this is very

4  laughable to these people, but it has nothing to do with the

5  Rules of Evidence and nothing to do with the Rules of

6  Procedure.  The Rules of Procedure require that you do be

7  prepared for trial, that you have a focused case, that you know

8  what it is that you're going to do.  The trial lawyer stuff is

9  all great, and I've tried a few cases, too, and what -- most of

10  were -- when I tried cases, most courts make you determine what

11  it is that you're going to do at trial, and I think that's what

12  this case is about, too.

13        So the problem that we have is there's only one

14  problem.  The problem is not our entitlement to take the

15  discovery.  It's not the relevance of the documents.  It's not

16  the privileges.  The problem is that they just don't want to

17  specify a limited scope that's commensurate with what these

18  people are actually going to say.  And if they don't do that,

19  which is I suppose their prerogative, they can say I don't

20  know.  Well, then that doesn't affect my rights to be able to

21  conduct broad discovery.

22        So what they're saying is, oh, well, I've got to keep

23  my options open, which then means that Grace can't make a

24  focused request, which then means that they say, well, gee,

25  there's no enough time for anything else.  Your Honor, this is

1  obviously up to you.  It's a matter of case management to a

2  certain extent, but it goes way beyond that.  We're talking

3  about people -- lawyers taking the stand who have been

4  intimately involved in this case, who have actively resisted

5  discovery, who have violated Your Honor's orders, and who are

6  now going to appear on behalf of the ACC while at the same time

7  they go down to Texas to protect themselves, and I can't cross

8  examine them.  I have -- it's as plain as day that that is a

9  violation of our rights.  And if they want to justify it on the

10 grounds that it's somehow too late, and the case has gone on

11 for five years, they are the ones who have created the timing

12 problem, and all they want to do today is to laugh

13 unprofessionally at a problem of their own creation.

14         MR. FINCH:  Very briefly, Your Honor.  With respect

15 to the Rule 408 argument, the exact same argument was

16 considered and rejected in a case called <u>Babcock & Wilcox</u>.  I

17 don't have the cite off the top of my head.  The decision was

18 issued on February the 7th or February the 8th, 2002.

19         Secondly, I grew up trying cases in the Eastern

20 District of Virginia, and there were deadlines for when you

21 have to get your discovery done.  Whether it's a multi-billion

22 dollar patent case or a bus accident case, you get your

23 discovery done by the deadline.  I had a scheduling conference

24 with the debtor in August of this year, and I said, look, we've

25 identified some plaintiff lawyers on our fact discovery list a

1  year and a half ago.  You haven't deposed those people.  Are

2  you going to want to depose those people?  We're trying to work

3  out dates to schedule expert depositions over a three-month

4  period of time.  And they said, oh, we don't know yet.  We'll

5  read the expert -- the final rebuttal reports, and we'll let

6  you know.  They could have put these subpoenas out long ago.

7       They could have deposed these lawyers long ago.  The

8  ACC and the FCR never did anything to preclude that discovery.

9  And, you know, I do know generally speaking what these lawyers

10 will testify to, but I can't put into a specific proffer until

11 I'm in the trial.  I mean I just don't know.  Grace filed a

12 motion to estimate its liability.  It's my view the movant

13 files a motion, the respondent responds to the motion.  They --

14       THE COURT:  Yes, this is not a proof of claim

15 process.

16       MR. FINCH:  This is not a proof of claim process, and

17 the fact is from day one in this case when Grace filed its

18 informal brief and said the tort system is broken, and we

19 settled cases for reasons having nothing to do with liability,

20 they put at issue the reasons.  Now, they voluntarily produced

21 documents in the face of our motion to compel, but I never said

22 -- put at issue the reasons why people settle cases.  It's

23 just --

24       THE COURT:  I'm not sure they put -- I mean they've

25 said that in this case, but people have said a lot of things in

**J&J COURT TRANSCRIBERS, INC.**

1 this five-year-old case.  Whether that is an issue that is

2 going to be advocated in the course of the trial is another

3 matter.

4          MR. FINCH:  That's fine, Your Honor, but the point is

5 this is the -- the deadlines here have to be real.  The fact

6 that a lawyer is put on the stand and testifies about what the

7 settlement criteria were or what the allegations were in a case

8 or what evidence is put on in the case, by no means have they

9 opened up the door to privilege or work product.  You've seen

10 -- in the --

11          THE COURT:  If the debtor --

12          MR. FINCH:  -- <u>Pittsburgh Corning</u> case you saw David

13 Ellis testify.  In <u>Federal Mogul</u> you saw Ms. Schumacher

14 testify.

15          THE COURT:  They weren't issues in that case.  Here's

16 the issue here.  If the debtor puts on -- if the debtor in its

17 case puts on no evidence concerning its settlement strategy --

18 and I'll just use that as a broad-based word right now -- then

19 I'm not sure what relevance the debtor's settlement intent is

20 going to have.  If you want to introduce evidence of the

21 settlements, why are the documents -- the settlement documents

22 not going to be the best evidence.  I don't -- what difference

23 is the intent going to make?

24          MR. FINCH:  I wasn't putting on the evidence of the

25 intent, but --

1              THE COURT:  Well --

2              MR. FINCH:  -- the evidence of the -- what the settle

3    -- what Grace told them and the criteria they had to meet isn't

4    always in the documents, and also the evidence that the -- that

5    the -- I mean my suggestion, Your Honor, is this is an issue

6    that you can resolve on a witness-by-witness or question-by-

7    question basis at trial.  I am not stopping him from going out

8    and taking the depositions of these lawyers.  My suggestion is

9    he's had a long time to do it, and he sat on his hands.  But if

10   he wants to take their depositions, he can take their

11   depositions, and he can fight with them about the documents.

12   But my position is that (a) there has to be an end to discovery

13   sufficiently in advance of trial so people can prepare for

14   trial, (b) there is -- there has been no opening the door by

15   the ACC or the FCR or the claimants' counsel in the way that

16   Grace has, and (c) this is a -- the idea that he -- that the

17   debtor would come in and ask for relief from the schedule when

18   it has known the identity of these people for over a year and a

19   half and could've taken their depositions at any point in that

20   time is a little bit hard to swallow.  Thank you, Your Honor.

21             MR. BUSBY:  Your Honor, Leonard Busby again, if I may

22   for just a moment?

23             THE COURT:  Yes, sir.

24             MR. BUSBY:  Thank you so much, Your Honor.  I just

25   wanted to comment that there's no intent on the part of Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Krause to interfere with Mr. Bernick's right of cross

2  examination.  He has every right of cross examination

3  recognized in the law.  He does not, however, have the right to

4  cross examine on privilege documents, nor does he have the

5  right to obtain those documents in the first place.  So Mr.

6  Bernick is presuming an entitlement to documents in order to

7  cross examine as to which there is no legal foundation.

8          THE COURT:  Well, I think the problem is that the

9  Court's faced with a chicken and an egg situation, and,

10  unfortunately, I don't really know which side has the chicken

11  and which side has the egg, and I'm not going to know that

12  until trial starts.  The debtor is telling me that it doesn't

13  have any intention in its case of putting its settlement intent

14  into evidence.  If it doesn't, then I'm not exactly sure at ths

15  point in time what relevance the debtor's intent to settle

16  cases is going to be -- is going to have.

17          If what the claimants -- it's not the claimants --

18  the ACC and the FCR and the other committees intend to do is

19  introduce facts as to what the debtor demanded by way of

20  evidence to settle a case -- you know, what the work history

21  was, what the medical criteria was -- and that's what the

22  purpose of using certain lawyers who were involved in the

23  settlement history of the debtor's was, frankly, I don't see

24  how you're hurt by telling that to the debtor.  It seems to me

25  you could limit the inquiry substantially by saying this is the

**J&J COURT TRANSCRIBERS, INC.**

1  general scope of what we're going to use these lawyers for.

2           MR. FINCH:  I thought I did do that, Your Honor.  In

3  our papers that we filed at Pages 9 and 10 this is what I

4  write.  This is what we wrote.  "They're being called by the

5  ACC and the FCR to testify about their public dealings with

6  Grace and settlement discussions, discovery, and trial."  What

7  I meant by that is they're going to testify about the facts as

8  to what evidence Grace demanded of them, when in the process

9  that evidence is typically available, what often times would

10 happen with the evidence that -- you know, it wouldn't be sent

11 necessarily to Grace.  It would be in the -- in a warehouse

12 somewhere that everybody had access to.  These -- the -- what

13 the criteria were that were spelled out in the documents as

14 well as the criteria they were told, and when they started

15 trials with Grace or tried cases with Grace, what evidence,

16 documents, exhibits, etcetera, experts, they would put on in

17 those trials.   That's as about as detailed as I can get at

18 this point in time.  And all those documents I assert to Your

19 Honor are not privileged, not work product, not secret, and

20 Grace has them.

21          THE COURT:  Mr. Mullady.

22          MR. MULLADY:  Thank you, Your Honor.  I want to

23 respond to the relevancy point, because I think a lot's been

24 said, but it needs to maybe be given a little sharper focus, so

25 the Court understands exactly how this trial is likely to play

1  out and why all of this is going to be relevant.

2       Before I do that I just have to -- I feel constrained

3  to respond to Mr. Bernick's remark or implication that the FCR

4  and the ACC do not have a focused case or don't take this

5  process seriously.  We take this process very seriously.  We

6  have done nothing to warrant that aspersion, and I would submit

7  that it is the aspersion that is unprofessional.

8       Now, on the relevancy point, Your Honor, our case is

9  predicated on existing case law that says -- asbestos

10 estimation case law that says that to estimate the debtor's

11 liability, the Court should assume -- make the no bankruptcy

12 assumption.  The Court should assume that we are one day before

13 the petition is filed, and we are trying to establish what

14 Grace's pending and future liabilities relating to asbestos

15 personal injury claims would be estimated at as if they had

16 become fixed immediately before the filing of the bankruptcy

17 petition and in a manner that would not be influenced by the

18 fact that the bankruptcy petition was filed either on that date

19 or any date in the future.

20       And, further, Your Honor, that the estimation should

21 be conducted without consideration of the protections afforded

22 to Grace through bankruptcy and without regard for the

23 resources that Grace might have to offset its liabilities.

24 That's what courts have said is the method -- the best method

25 to estimate the liability.  So we're going to go back and now

1  have an exercise in looking ahead in this hypothetical world

2  where Grace is not in bankruptcy, and it's January the 14th,

3  2008, and Grace has been in the tort system since April 2nd

4  2001.  It never left the tort system, and we're trying to have

5  actuaries establish what the total tab is going to be from that

6  point forward from April 2, 2001 until the very last person --

7  victim of asbestos illness dies.

8           Now, that's what we're doing, so how does this issue

9  of what Grace was doing to settle claims pre-petition play into

10  this?  Well, it's very simple.  We have to make a prediction --

11  the experts have to have a basis to testify as to what Grace

12  would likely have done post-petition.  So what's the best

13  window into that?  What they were doing pre-petition.  What was

14  Grace doing pre-petition?  We know what it was doing.  It was

15  settling the vast majority of its asbestos personal injury

16  claims.

17           Why was Grace settling claims?  Well, that's very

18  interesting, and here's where the lawyers for the plaintiffs

19  come into play, but fast forward for a second.  We now know

20  that Grace's blue ribbon panel of expert industrial hygienists,

21  medical doctors, and so forth have established these liability

22  criteria, many of which we submit are not in the tort system,

23  never been in the tort system, and never likely to be in the

24  tort system, but that's a side issue.  They've set up these

25  criteria, and on the basis of winnowing the claims through

1  these criteria filters, which they make in their own judgment

2  without any adjudication of whether they're correct or not,

3  they get down to a certain number, and then they go from there.

4          Well, Mr. Krause, for example -- and I don't mean to

5  speak for Mr. Krause and those attorneys on the phone.  Any one

6  of these plaintiffs' lawyers will be able to testify about

7  whether those criteria were required by Grace pre-petition.

8  Did Grace -- Mr. Krause, did Grace require that you submit an

9  affidavit that your client personally mixed, cut, or handled a

10 Grace asbestos product?  Answer, no, they did not.  Did they

11 require this medical proof?  Well, no, they didn't.  Actually,

12 they required different medical proof, and it was not nearly as

13 stringent as that and so forth and so on.  None of that is

14 about a specific case.  None of that implicates privilege.  All

15 of that can be asked of these witnesses in a deposition right

16 now without really any documents.

17         The documents that Grace would want to use in that

18 respect, I would submit, are their own documents.  They have

19 the settlement agreements with the lawyers who are on this

20 phone, with the lawyers who were involved in this process.

21 They know what they required.  They required an affidavit of a

22 lawyer that established some very rudimentary, very threshold

23 level of criteria to get paid.  That's what they required.  So

24 they know that, and they can ask the lawyers about that.  And

25 that's all we're going to do with these witnesses.

1          Now, with the caveat that we still have not finished

2    taking discovery -- we haven't finished deposing the experts.

3    We don't know what they're going to say in full, but, as the

4    ACC said in its papers at Page 10, they will elicit "the

5    statements Grace made to plaintiffs' lawyers in the course of

6    settling or trying cases and the criteria Grace required the

7    cases to meet, and this implicates no privilege testimony."

8          So I think this is a little bit of a tempest and a

9    teapot.  The way we're going to use this testimony they can

10   discover right now.  This trying to get at the intent and this

11   whole Rule 408 issue, I just don't think it really is something

12   the Court needs to be concerned about right now.  Let them take

13   the depositions of Mr. Krause, whose said he's made -- he would

14   make himself available, and the other lawyers, and we'll see

15   where we come out.

16          THE COURT:  All right.

17          MR. BERNICK:  Your Honor, I would just like to

18   respond on the question of relevance, because, obviously, we

19   kind of getting into it, and every time we do we end up talking

20   about the same thing.  It comes out unfortunately in the

21   context of discovery, but I think that Mr. Mullady did a good

22   job in explaining where they're going in a way that may be

23   helpful here, and I would just like to build on it momentarily,

24   because I think it highlights exactly the issue that Your Honor

25   has.

1          He says, gee, it's established law, i.e., it has been

2    done in some of the estimations that have taken place in these

3    more recent cases, which obviously are, you know, light years

4    different in terms of the focus on the issues and focus on the

5    data in this case.  And Your Honor will have the opportunity to

6    consider those cases in -- and find -- and make Your Honor's

7    own determination about whether they're right or they're wrong,

8    because there is, in fact -- there are very important threshold

9    legal issues that carry through these strongly competing

10   estimation approaches.  It's half the facts in science, and

11   it's half the law, and, in fact, I think you'll see when the

12   <u>Daubert</u> briefs are filed, and we're going to make an effort in

13   our <u>Daubert</u> brief to lay out very systematically why we think

14   the law operates in a certain way, because it bears upon the

15   fifth requirement of <u>Daubert</u>, which is essentially the <u>Daubert</u>

16   requirement.

17          So he says, well, we think that the law is clear.  If

18   you take -- what was Grace's liability the day before the

19   bankruptcy?  Right here.  He says all of the things that Grace

20   is doing now, which are in the bankruptcy process, should be

21   ignored, because the real question is what would have been

22   Grace's tort liability if the bankruptcy had never occurred?

23   Now, we think that is dead wrong, because estimation is

24   estimation of liability.  Liability is the liability, if it is

25   not agreed, would actually have -- if you didn't have

1  estimation, it would have to be established in the bankruptcy

2  case itself.

3       If we weren't talking about 100,000 claims, we just

4  had one claim, we'd go try the claim.  It would be tried in

5  Bankruptcy Court under the Federal Rules of Evidence and

6  Procedure using state substantive law.  So the tort system is a

7  sloppy way of talking not about the law, substantive law, in

8  the procedural and evidence rules, it's a way of talking about

9  in a sense the marketplace for claims resolution.  And the

10  estimation rules say nothing about the marketplace for claims

11  resolution replacing substantive law, procedural rule, and

12  evidence.  So we have a big, big issue with this point that

13  Your Honor's going to have to resolve.  But that's what their

14  position is.

15       He then says, well, if we're going to take the

16  liability the day before and ignore the bankruptcy process, the

17  question is what -- how would that liability have been

18  resolved.  Now it's very interesting coming from the Futures

19  Representative, because the day before the bankruptcy and

20  indeed today there are no future claims.  So the claims -- the

21  liability that existed the day before the bankruptcy excludes

22  future demands.  Future demands are not liabilities.  Future

23  demands are not even claims.  So if you wanted to take the

24  liability the day before, we'd be talking about occurrence, and

25  we wouldn't even have to have this estimation, because there's

1  no question that we have plenty of money to pay the

2  occurrences.

3         But be that as it may, let's assume they got their

4  perspective.  They say they're now going to take the tort

5  system, not tort law, not evidence, not procedure, the tort

6  system, and what they're going to talk about?  They're going to

7  talk about cost of resolution.  They're going to say if you

8  want to know what the claims should be estimated at, just talk

9  about their cost of resolution.  From our point of view that's

10  very different from liability.  Legal liability is not the same

11  thing as cost of resolution.  And that is 408, but it's also a

12  fact.

13         So they say, well, look, we're not arguing about the

14  legal liability.  The suggestion is they're not going to talk

15  about legal liability at all.  They're just here to talk about

16  the cost.  I suppose if you wanted to take and say how much --

17  if there were no bankruptcy, how much would it have cost Grace

18  to resolve the current claim and the Future resolve claims, you

19  could erect a model that simply takes the past settlement

20  history and extrapolates to the future purely on a financial

21  basis, and that's exactly what the models do.  And Dr. Peterson

22  will testify from the stand and Ms. Biggs will testify from the

23  stand, the two principal modelers, that that's all that they

24  have done.

25         Dr. Peterson, I've already cross examined him in the

1 same <u>Babock & Wilcox</u>, and he admitted under oath, and he'll

2 admit again, that he doesn't know if there's legal liability.

3 He doesn't know if there's causation.  He doesn't know if

4 there's anything.  All he's here to talk about is cost.  Now,

5 that's fine.  If they want to call Dr. Peterson and simply talk

6 about cost, if they want to call all the witnesses that they

7 want simply to talk about cost, we'll argue that it's massively

8 irrelevant as far as by <u>Daubert</u>, because it doesn't fit.  It's

9 not called for -- it's not allowed under state substantive law,

10 federal substantive law, civil procedure, anything.  It's

11 totally irrelevant, because the question here is legal

12 liability.

13         But we don't need to have testimony from lawyers.  We

14 don't need that testimony from lawyers on either side of the

15 case.  If their case is all about cost, they don't need -- they

16 don't need Krause.  They don't need Cooney.  They don't need

17 any of these people, because it's just purely a financial case.

18 That's not what they're about.  They want to go further.  They

19 want to say that this really was legal liability under the tort

20 system.  That's what they want to say, because they've got to

21 get to an asbestos liability, and the cost is not a liability.

22         And they will not only say that, because they have to

23 under the law, they've already said it in their briefs.  You

24 take a look at the briefs they wrote for today.  You take a

25 look at all the expert reports.  Take a look at what these

1 lawyers are going to say.  They're going to say more than cost.

2 They're going to say, well, we settled these cases with Grace,

3 and Grace had settlement criteria, and the criteria -- we've

4 got criteria down here.  The criteria don't equal Grace's

5 criteria here.

6        Well, why are the criteria for settlement of any

7 consequence whatsoever?  They don't use those criteria in their

8 models.  They simply take the cost of resolution.  They say

9 let's project it going forward.  The reason that they want to

10 talk about criteria is they want to be able to say that Grace's

11 criteria, which are criteria of legal liability, are not the

12 same thing as the criteria for liability in the, quote, tort

13 system.

14        So what are they trying to do?  They're trying to say

15 let's get discovery of Grace on its settlement criteria to be

16 able to argue that there was legal liability according to

17 Grace.  Grace was admitting that it had to pay where the

18 criteria were X and Y and Z, and that should be taken into

19 consideration as making incredible Grace's contention that the

20 criteria should be different today.  So if it's just cost,

21 what's the relevance of the criteria?

22        But it goes further than that, because they don't

23 want to just have Peter Krause talk about the Grace settlement

24 criteria.  Our people will admit what the settlement criteria

25 are.  They already have.  It's right in our documents, right in

1  our files.  They don't need the plaintiffs' lawyers to come and

2  explain to you what the criteria are.  They want to go further

3  and say Grace had an intent and a strategy which was to avoid

4  greater liability at trial.  Their papers in the court today

5  say that.  That's why they took the testimony of our people.

6  It's to try to establish what their intent was.

7      Now, we differ on what the intent was, but they most

8  certainly -- most certainly -- the whole reason they get into

9  all this stuff with Grace, and that's why they took the

10 discover of our lawyers, they took the discovery of privileged

11 materials, was precisely to get into intent.  Now, they'll say,

12 well, Peter Krause is not going to utter the word intent, but

13 they're going to proffer Peter Krause's testimony about the

14 criteria together with our evidence of intent in order to argue

15 that, in fact, we believe that we had liability where these

16 criteria -- these historical criteria were used.

17     Now, I could go on at length about why these criteria

18 were used, indeed why the same criteria were used by the

19 Manville trust and by all kinds of other people, because they

20 were a short form way of getting companies to pay far more than

21 their legal liability, because they had to, because they had no

22 choice, because they were overwhelmed with the lawsuits that

23 they couldn't defend.  But that's for another day.

24     When they argue, Your Honor, that this is simple, it

25 doesn't require intent, nobody's intent, the models work with

**J&J COURT TRANSCRIBERS, INC.**

1  cost, if that's all they want to do in their case, the

2  discussion we're getting today is completely academic.  We

3  won't have to have any discovery of Grace's intent, the

4  lawyers' intent.  We won't face any of these privileged things.

5  If all they do is put on Mark Peterson and Ms. Biggs from an

6  actuarial point of view to talk about what the -- this drug

7  will cost say -- the future cost would've been, we'll say it's

8  wrong.  We'll say it's inadmissible.  Who cares?  We don't need

9  discovery of the lawyers.

10          So it's all in their hands.  Do they want to open the

11  door that they opened when they took the discovery of Eber, of

12  Hughes, and of Siegel and into the questions of why things were

13  done historically, whether that really is admission of

14  liability, or do they not?  And I'm prepared to sit down --

15  they make all these statements.  Well, it's not going to be

16  that bad.  It's just going to be this.  You already know this,

17  etcetera, etcetera.  I offered a week ago to have that

18  conversation, and the answer that I got back was, well, you

19  know, I'll kind of make up my mind later on, because that's how

20  I try cases.  I can't live with that.  I've got to know.  I've

21  got -- this is my opportunity to take discovery not when

22  they're in the middle of trial.

23          So I'm happy, and what I -- I would suggest the Court

24  might suggest to us is to refine exactly what it is that these

25  folks are going to say.  If all they're going to talk about is

1 the settlements and of their costs for different kinds of

2 claims, I won't to be back here asking for any of discovery,

3 because I already know what that is.  And if they want to have

4 witnesses testify, yes, they can.  I already know what that is.

5          But if they're going to say more -- if they're going

6 to talk about criteria and if the proffer is going to be that

7 the criteria are important, because they're different from the

8 standards of liability that Grace now argues, then I need

9 discovery, because the other question is why were those

10 criteria used.  And that very much implicates them, because who

11 developed the criteria.  They developed the criteria just like

12 the plaintiffs' lawyers developed the criteria in the Manville

13 trust.  Do you think the defense lawyers developed the criteria

14 in the Manville trust?  The plaintiffs' lawyers, because they

15 ran the trust, and they developed criteria that they thought

16 they can comfortably meet, so that they didn't have to prove

17 liability and so that they could get all these massive

18 settlements.  Those criteria implicate not just Grace's intent

19 in meeting them, they implicate Mr. Krause's intent and the

20 intent of all the plaintiffs' lawyers for having insisted upon

21 them, and that's why it's so fundamentally unfair.

22          THE COURT:  Well, folks, look, I think the issue is

23 this.  Are you going to call these witnesses to get into the

24 issue of Grace's I guess intent in getting into the criteria?

25 If you tell me no, you're not going to ask questions of intent,

**J&J COURT TRANSCRIBERS, INC.**

1  I'm not going to permit discovery on the issue of intent, but

2  you're not going to ask one single question about Grace's

3   intent.

4          MR. FINCH:  Your Honor, I'm certainly going to ask

5  them what were Grace's criteria.  I'm certainly going to ask

6  them -- criteria is not intent.  Criteria is what evidence

7  Grace required them to submit.  I'm going to ask them what --

8  when evidence was available in the litigation process, when

9  they gave it to Grace.  I might ask them questions about the

10  questionnaires they submitted in this case, but I'm certainly

11  not going to ask them questions about the intent that Grace --

12  that what -- you know, what was Grace's intent.  They don't

13  know what Grace's intent --

14          THE COURT:  Well, you -- they couldn't ask -- answer

15  that question.

16          MR. FINCH:  Right.

17          THE COURT:  But the point --

18          MR. FINCH:  Or what was -- what their intent was.

19  But I mean I'm not going to ask them what was their intent in

20  settling cases.  They probably wouldn't tell me.  I mean they'd

21  say that it's privileged or work product, or what was their

22  internal evaluation of cases.  But what a lawyer does vis-a-vis

23  another lawyer and says to that lawyer or puts on in evidence

24  -- you know, some of these guys started trial with Grace 50 or

25  60 times.  The fact is that, you know, I may ask them -- I will

**J&J COURT TRANSCRIBERS, INC.**

1  ask them about that, but I'm not -- I mean I don't know what

2  Your Honor means by intent.  I'm certainly going to call the

3  lawyers.  I'm going to ask the lawyers questions that do not

4  invade their clients' privileges.  I'm going to ask them about

5  their dealings with Grace and the evidence they produce to

6  Grace in discovery and what their historical dealings with

7  Grace are.  And beyond that, I can't really, you know -- I

8  can't sit down and put the 50-page proffer at this juncture in

9  the case.  I'm just not ready or prepared to do that, and

10  nothing in the Rules of Federal Civil Procedure require that.

11  And I -- if he wants to take their depositions, he can take

12  their depositions.  He has 50 fact witnesses.  I haven't gotten

13  a narrative description of the testimony that Mr. Centani

14  (phonetic) and Egan, who are historical witnesses who have some

15  knowledge of some of the products that Grace made.  I haven't

16  gotten a narrative description of Mr. Siegel's testimony or Mr.

17  Beeber's testimony or Mr. Hughes' testimony.  That's not how

18  this  discovery works.

19          THE COURT:  All right.  Well, I --

20          MR. BERNICK:  Your Honor, they got all the documents

21  before those people testified.  And again, you know, he says

22  I'm not going to ask intent.  It's the criteria.  It's how the

23  process took place, because it is proper to establish the

24  proposition that our criteria today are different.  There's a

25  bright line between --

1          THE COURT:  But I don't think the debtor denies that

2  the criteria today are different.

3          MR. BERNICK:  We don't.  We actually don't.

4          THE COURT:  Okay.

5          MR. BERNICK:  But the question is the purpose for

6  which that testimony is offered.  If it's offered for the

7  purpose of saying -- of course, the criteria were whatever they

8  were.

9          THE COURT:  Exactly.

10          MR. BERNICK:  There's no question about it.  They

11 don't need to call these witnesses to have them testify about

12 what the criteria were.  Everybody knows what the criteria

13 were.  The question is whether it stands in the service of the

14 proposition that the criteria in a sense replaced the liability

15 standard, and they go to say that our liability standard that

16 we're arguing for today was -- is the wrong liability standard.

17 If that point -- this is all a game about Grace admitting in

18 the course of the prior settlements that these criteria were

19 adequate legally, and that is -- not only is this wrong from

20 Grace's point of view, that's what that implicates their role

21 in the creation of the criteria.

22          THE COURT:  But the problem that I still have --

23          MR. BERNICK:  Yes?

24          THE COURT:  -- don't the settlement agreements say

25 that there is no admission of liability?

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  Absolutely.

2              THE COURT:  Well, then how is anybody going to argue

3    that there is, in fact, an admission of liability?

4              MR. BERNICK:  I don't know.

5              THE COURT:  Okay.

6              MR. BERNICK:  But if they're going --

7              THE COURT:  Well, neither do I.

8              MR. BERNICK:  I -- well, you know, that is an

9    argument that Your Honor may be able to dispose of --

10             THE COURT:  I think I just did.

11             MR. BERNICK:  -- and dispose of this whole --

12             THE COURT:  I just did dispose of it.  If the

13   settlement agreements say that no one is admitting any

14   liability, nobody's going to tell me that the settlement

15   process is an admission of liability.  That's it.  I'm not

16   going to hear about it if that's the case.

17             Now, with respect to the discovery, I think you've

18   gotten as much from the ACC and the FCR in terms of the fact --

19   the facts that they intend to use the lawyers for as you can

20   possibly get.  This whole discussion for the past hour and a

21   half has been about that.  I think you've got their general

22   parameters about what they intend to call these witnesses for.

23   It is to show what the settlement negotiation process was all

24   about, and that -- whether it's relevant or not, I don't know

25   at this point.  I can't make a determination of relevance now.

1          But to the extent that they're going to say what were

2     Grace's criteria -- you know, at what point was evidence

3     introduced, and it's a factual narrative, the lawyers are

4     competent witnesses to discuss that.  You've got that

5     information.  It doesn't appear to be relevant to a specific

6     case, but if it is, the debtor was a party to it.  You've got

7     the settlement documents.

8          MR. BERNICK:  Well, but I need to know -- sure, I've

9     got tens of thousands of files.  I need to know -- and I should

10    have by virtue of the same fact that they're testifying, I

11    should be able to get access to the documents that they have

12    that bear upon that factual testimony, and that's what we've

13    asked for.

14         THE COURT:  So -- and the way to get it is to ask the

15    witnesses that question.  And I --

16         MR. BERNICK:  I subpoenaed --

17         THE COURT:  Well, then you've got the subpoenas

18    outstanding.

19         MR. BERNICK:  That's what I -- that's exactly why

20    we're here is I got the subpoenas outstanding, and rather than

21    having four different motions to compel, I teed the issue up in

22    exactly this fashion to try to get the Court's involvement on

23    the question of, well, what is the scope of this going to be.

24    And I did try to work it out with the other side.  If the scope

25    of their testimony is simply going to be, this is the -- this

**J&J COURT TRANSCRIBERS, INC.**

1  is how settlements -- in a sense the settlement agreement, I

2  can't quarrel with that.  If they're going to say these were

3  the criteria for the settlement agreement, need to know what

4  that's proffered for, because it's not relevant to anything but

5  liability.  There is no relevance that it has to anything but

6  liability, and then we're back in the same situation.

7          So, Your Honor -- and then they say, well -- well,

8  he's going to say why you didn't answer the questionnaires in a

9  certain way.  How long did I spend asking for testimony on

10  exactly that subject, and it was totally foreclosed, and

11  they're now opening the door to have the same discussion all

12  over again?

13          THE COURT:  I didn't hear anything about --

14          MR. BERNICK:  He said the --

15          THE COURT:  I heard that here.  I am not sure how

16  we're going to get into anything about these questionnaires

17  from anybody.  I have made every ruling on the questionnaires

18  that I'm going to make as far as I know.  And to the extent

19  that somebody wants to supplement answers to questionnaires,

20  they're not going to be doing it in that evidentiary hearing.

21  If they didn't have -- if they couldn't put it in writing on

22  the questionnaires, they certainly are not going to be giving

23  me additional information that they can somehow or other create

24  or -- I don't mean create in the term --

25          MR. BERNICK:  Well, I think what they're suggesting

**J&J COURT TRANSCRIBERS, INC.**

1  is he's going to explain why he couldn't answer the

2  questionnaire in a certain way.

3       THE COURT:  I'm afraid he's not.  He's not going to

4  be explaining.  It's either in writing in those questionnaires,

5  or it's not there.  I think I made those rulings clear early

6  on.  What's in is available for the fact and expert witnesses,

7  and, otherwise, for purposes of this estimation hearing, it

8  doesn't exist.  And that's the end of it.  We are not getting

9  into those questionnaires again, period.  End of story.

10      MR. BERNICK:  Okay, so we'll pursue the subpoenas,

11  and I -- yes.  You know, maybe we'll be back on a motion to --

12  I would really -- I urge the other side to sit down and see if

13  we could become more specific, because I really believe that if

14  they're going to avoid the inference that there was liability

15  from those criteria, then we're talking about very limited

16  testimony.  And if it's very limited testimony, there's a very

17  limited amount of discovery that I'm going to need, and then I

18  will know what these people are going to say, because it's in

19  our files.

20      THE COURT:  Well, there is not going to be an

21  inference of liability, unless there is something in the

22  settlement agreement in which case somebody's going to have to

23  show me the settlement agreement that indicates that, in fact,

24  there is an admission of liability.  Because, otherwise, people

25  generally settle, so that you don't admit liability.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Right.

2          THE COURT:  So unless there is an admission of

3    liability, you are not going to be arguing to me that the

4    settlements are an admission of liability.  I am not going to

5    accept it for that purpose.  Number one, I don't think I can

6    under the Rules of Evidence, but number two, unless you can

7    show me that the document itself is different from that, the

8    document itself will preclude that use.  So --

9          MR. BERNICK:  Thank you.

10         THE COURT:  That's that.  Now, in terms of going

11   beyond October 31st, today is the 25th.  I don't know if your

12   witnesses can all be available between now and October 31st. I

13   understand that you have a schedule that went beyond that date

14   by consent.  Can you live with that schedule by consent beyond

15   the October 31st date?

16         MR. FINCH:  Your Honor, I'm perfectly happy to --

17   subject to the witnesses' availability, to have them deposed

18   in, you know, November or December, if that's when they're

19   available.  I don't know about anybody's availability other

20   than the dates that they've got.  I tried to get dates from Mr.

21   Cooney, Mr. Krause, and Mr. Goldberg when they were available

22   within the confines of the November 15th discovery cutoff.

23         MR. BERNICK:  I think we can --

24         MR. FINCH:  The 9th for Mr. Cooney and the 15th for

25   Mr. Krause.  I don't know if that will work or not.  I don't

1  know if they got anymore dates available between now and, you

2  know --

3          MR. BERNICK:  I think we can work -- I really think

4  we can work this out.

5          MR. FINCH:  I think could probably work the dates

6  out.

7          THE COURT:  All right.  Well, this is -- then this is

8  my ruling.  I will deny the motion without prejudice, but that

9  is assuming that the witnesses will make themselves available.

10 If the witnesses will not make themselves available after

11 October 31st, then on the debtor's affidavit that indicates a

12 witness will not, I will reconsider it, and I will extend it

13 for purposes of any witness who will not make himself or

14 herself voluntarily available after October 31st.

15         MR. FINCH:  Oh, no, I'm sure they'll make themselves

16 available after October 31st, because two of them were after

17 October 31st in any event.  It's just, you know, whether

18 they've got dates after -- other than the two -- couple of

19 dates that I gave them that they were available in November.

20 I've got to talk to them and talk to their lawyers.

21         MR. BERNICK:  Well, if it's got to --

22         MR. FINCH:  I think we'll be able to work it out and

23 get these depositions done in December.

24         MR. BERNICK:  What's got to happen is we've got to

25 have the discussion about -- a further discussion about what

1  the testimony and what the documents are going to be, and I'm

2  happy to have that discussion not immediately but when you're

3  closer.  It doesn't make that much difference to me.  But that

4  really is the key thing, because that will drive the question

5  of whether we have further issues with respect to the

6  subpoenas.  I want to make sure, Your Honor, we haven't

7  forgotten Mr. Snyder.  He was the expert witness who's now

8  going to talk about as a fact witness his experience as a

9  lawyer, and they're saying I can't get discovery of his

10  documents.

11      MR. FINCH:  Your Honor, Mr. Snyder produced all the

12  documents on which he relied for purposes of his testimony in t

13  his case.

14      MR. BERNICK:  And that's sufficient for his testimony

15  as an expert, and then only his opinions come in.  But if he's

16  going to testify as a fact witness, that's not my -- the

17  stipulation doesn't limit my ability --

18      THE COURT:  No, they -- if he's going to testify as a

19  fact witness, and he's going to be talking about other

20  documents, you're clearly entitled to the discovery of other

21  documents that he's going to produce as a fact witness.  His

22  role as a fact witness is different from his role as an expert

23  witness.  I'm not sure why you want to have him as both, but

24  nonetheless, if you do, you've got to satisfy both criteria.

25  So --

1          MR. FINCH:  Your Honor, Mr. Snyder -- his background

2    is counsel for Owens-Corning and what he did in trials

3    involving Owens-Corning and when in the discovery process and

4    how plaintiffs prove product identification is not in any sort

5    of documents that he has possession of.  Those documents

6    belong, if they exist anywhere, maybe at Owens-Corning.  But he

7    doesn't have them.  I mean he's got --

8          MR. BERNICK:  Well --

9          MR. FINCH:  He's got the knowledge that he gained

10   from 20 years of experience.  He produced everything on which

11   he relies for the testimony I'm going to elicit in this case.

12   Whether you call it fact or expert, I mean he's not going to

13   talk about any documents other than what he produced to Grace

14   as part of his reliance material.

15         THE COURT:  What's the relevance of what anybody did

16   in the <u>Owens-Corning</u> case as a fact witness going to be with

17   this case?

18         MR. FINCH:  Because they're -- the relevance is that

19   they're saying that these criteria that they want to put in

20   place through their experts are somehow reflective of the tort

21   system or reflective of criteria that if you try to apply them,

22   what would happen.  Owens-Corning tried to apply criteria like

23   that.  They tried a thousand asbestos personal injury cases.

24   They ran up $500 million of liability in judgments in about two

25   years, and they realized that that's -- that the plaintiffs win

**J&J COURT TRANSCRIBERS, INC.**

1  more cases than they lose, and when they lose, they -- when the

2  defendants lose, they lose big.  That is a very relevant fact

3  when you -- in our view of the case if what you're attempting

4  to estimate is what the liability the debtor faced had it not

5  gone into bankruptcy --

6            MR. BERNICK:  Yes, well, Your Honor, that --

7            MR. FINCH:  -- and that is very relevant.

8            MR. BERNICK:  They can -- again, they can argue that.

9  They can argue that that's the way the tort system was.  I

10 think that actually is totally irrelevant, because that's the

11 tort system.  It is not evidence of liability, and liability is

12 all that we're about here today.  But whatever it is -- and Mr.

13 Snyder -- I know Mr. Snyder from other litigation.  Mr. Snyder

14 is a very experienced and capable defense lawyer, and I read

15 his report, and, frankly, you know, I felt for Owens-Corning.

16 They had a big problem.

17           That then opens the door to why the tort system was

18 broken, which again they're now saying they're not going to

19 open, but they, in fact, are through Mr. Snyder.  But whatever

20 the story is, whatever the relevance argument they want to make

21 and whether it's right, wrong, or indifferent, they can't come

22 in with Mr. Snyder as a fact witness and say he's going to talk

23 about his 20 years of experience.  And because he's not going

24 to make reference to a document or the documents don't exist or

25 he doesn't have them, that you can't conduct discovery of a

**J&J COURT TRANSCRIBERS, INC.**

1 fact witness.  That's just crazy.

2          THE COURT:  No, you may conduct discovery.  To the

3 extent that he does have documents, you can certainly get them.

4 To the extent that he doesn't have documents, and the documents

5 are relevant, and he can't testify to them, I'm not sure how

6 he's going to testify.  The rules are going to apply, Mr.

7 Bernick.

8          MR. BERNICK:  Yes.

9          THE COURT:  So the rules will apply.  To the extent

10 that he's an expert, however, I think the point is that the

11 documents have already been produced.

12          MR. BERNICK:  Yes, that -- this is not triggered by

13 his expert report or the statement that he's going to testify

14 as an expert.  I recognize the impact of the stipulation.  We

15 have invoked that stipulation.  This is solely by virtue of

16 their decision to designate him as a fact witness.

17          THE COURT:  Okay.  My -- what I would like from the

18 debtor is an order that denies the request to extend the

19 discovery deadlines but without prejudice for any witness who

20 will not make himself or herself, as among these lawyer groups,

21 voluntarily available for a deposition beyond the October 31st

22 deadline.  And as to Mr. Snyder, this order does require that

23 he -- to the extent he's being called as a fact witness, that

24 the rules regarding fact witness depositions apply equally as

25 well to the fact witness portion of his deposition.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  Thank you, Your Honor.

2              THE COURT:  All right.  What's next?

3              MR. BERNICK:  I think that the only thing that was

4    next is the PI status report.  I think that Mr. Finch

5    anticipated that we would raise the timing -- the deadlines

6    here.  I guess my information -- I note there's been a

7    dialogue, and Mr. Finch has been good enough to send us a

8    letter with some proposals that he has.  I've looked at it.

9    I've got some reactions to it, and I think rather than our

10   trying to hash that out now, it makes sense -- and we're not

11   asking to move the trial date.  It makes sense to -- for Mr.

12   Finch and Mr. Mullady and I to have a further conversation to

13   see if we can't work out more of the details.  The pretrial

14   order that's in place I think asks for too much in some areas

15   given where we are in the case, asks for too little in some

16   areas, and it's no fault of the Court.  It's just it was a

17   standard thing.  In fact, I think we agreed to the pretrial

18   schedule, so it's certainly no fault of the Court, but I'd like

19   to hash out, you know, orders of witnesses, when graphics are

20   going to be produced, a bunch of different things that aren't

21   spoken to in that order.  And so I'd like to have the

22   opportunity to sit down with the other side and go through

23   that.  If we've got problems, then we'll certainly report to

24   the Court.

25              MR. FINCH:  I can do that today if you're available

**J&J COURT TRANSCRIBERS, INC.**

1  today.

2         MR. BERNICK:  Yes, surely, I'd be happy.  One thing I

3  would ask for the Court's guidance on, on the trial briefs,

4  we're going to have these Daubert motions, and I kind of think

5  that the Daubert motions -- you can't address the issue of fit

6  without dealing with relevance.  And so I think that the

7  Daubert motions are likely to be from both sides pretty much --

8  at least from our side, pretty much a roadmap of how we looked

9  at the case.  And I guess the question really is does Your

10  Honor have a fixed view, should we say, on the need or scope of

11  the trial briefs, because I think in this case it may be that

12  you'll read the Daubert motions, and they'll kind of serve

13  pretty well to educate Your Honor about where this case is

14  going.

15         THE COURT:  I'm not actually sure at this point until

16  we get to some final pretrial conference where you're all

17  headed.  You know, you folks know a whole lot more.  I think I

18  have a better understanding of what the ACC and the FCR intend

19  to do.  I think theirs is a much more traditional case.

20         MR. BERNICK:  Right.

21         THE COURT:  I've been reading the debtor's expert

22  reports, so I have a little bit of an understanding I think of

23  what the debtor's intent is but --

24         MR. BERNICK:  But they're very hard -- there's so

25  many of them and how they fit together is difficult, because

**J&J COURT TRANSCRIBERS, INC.**

1  they're -- in the sense they're not -- they don't cut along

2  legal joints.  They cut along factual joints, and we're very

3  mindful of that, and that's why, you know, the discussion we

4  had today I had hoped that we were going to have after we

5  submitted our Daubert briefs, so that you would see (a) how we

6  look at the law, and (b) how the experts fit together, both

7  their experts and our experts.  And I know that ours is more

8  difficult, because the Court is less familiar with it.  But

9  we're very sensitive to that, happy to do it.  I think it's

10 going to be in the Daubert briefs, and the reason I'm raising

11 it is that Your Honor has a -- we're going to lay out the

12 roadmap for our case significantly before trial, and we'll do

13 it in the -- the question is whether we need to do it again in

14 the trial briefs is kind of what I'm asking.

15         THE COURT:  No, I don't want -- I don't need things

16 filed twice.

17         MR. BERNICK:  Right.

18         THE COURT:  We've --

19         MR. FINCH:  Well --

20         THE COURT:  -- killed enough trees.

21         MR. FINCH:  I mean I've always thought a trial brief

22 is sort of -- yes, I don't have any problem with referring by

23 reference back to the Daubert motions.  I think the Daubert

24 motions in some way will frame the issue, but the trial brief

25 is sort of a -- I've always viewed a trial brief, particularly

**J&J COURT TRANSCRIBERS, INC.**

1   in a jury case, as sort of just a roadmap.  These are the

2   witnesses.  This one's going to talk -- and make a paragraph by

3   paragraph -- this guys' going to say this.  This guy's going to

4   say this.  This guys' going to say this.  It was some overview

5   about what it is we're trying.  I'm not sure that that is --

6   that all of that would be in a <u>Daubert</u> brief or necessarily

7   that it would all be covered.  So I would want the right to

8   file a trial brief.  I don't have a problem with referencing

9   back to the <u>Daubert</u> motions in the trial brief.

10          MR. BERNICK:  Okay.  Well, I -- we know -- I now know

11  Mr. Finch's view, but I take from the Court that it's not

12  necessary to have two briefs that say the same thing.

13          THE COURT:  No.

14          MR. BERNICK:  So I don't think that Mr. Finch is

15  really suggesting that.  So to the extent that the <u>Daubert</u>

16  brief doesn't cover something that you think should be in the

17  trial brief, I'm happy to take up the question of what further

18  paper we need to file.  I know you'll go easy on me.  Right?

19          THE COURT:  Well, I would expect that I'm going to

20  get some sort of pretrial statement.  Now maybe you call it a

21  brief, and I just call it a pretrial statement.  That would lay

22  out the witnesses and a short summary of what the witnesses are

23  going to testify to.

24          MR. BERNICK:  Sure.

25          THE COURT:  That will have all of your documents pre-

1  marked for identification.

2          MR. FINCH:  Yes.

3          THE COURT:  That will be in -- you know, in exhibit

4  number order.

5          MR. BERNICK:  Yes.

6          THE COURT:  And that, if necessary, we'll have, you

7  know, some explanation.  That's probably not going to be

8  necessary, but if, for example, you've got an objection to

9  something like authenticity, I'd like to know that.  I'd want

10 to know why I have witness who's just kind of out there being

11 called.  And, usually, it's something odd like that, an

12 objection to authenticity.  I'm assuming that you're going to

13 be working out --

14         MR. BERNICK:  Yes.

15         THE COURT:  -- those kinds of issues.

16         MR. BERNICK:  Yes, I don't know -- I'm sorry.  My

17 only concern -- and this is something I was going to take up.

18 I don't know how many exhibits we're really going to have here

19 and how voluminous they're going to be.  I would like to avoid

20 the situation where people are working day and night to do long

21 lists of objections to preserve all options, because nobody

22 really knows whether the document's going to be used at all.

23 If we have a limited number of documents, I think that we'll be

24 able to probably get together and figure out what the -- but

25 that's another one of these situations.  The exhibits are due

**J&J COURT TRANSCRIBERS, INC.**

1  at a certain point.  I'm not sure that it makes a lot of sense

2  to require right then that the objections and the responses to

3  the objections be all notes, because we're only going to get

4  through probably a couple witnesses maybe before we're then

5  going to hiatus to March.  I'm not suggesting that we don't

6  submit the exhibits.  We do.  We should have the exhibits.  We

7  should have the witnesses.  We should have short summaries of

8  their testimony.  I'm just trying to avoid a lot of paperwork

9  where people aren't going to make a bunch of objections.

10         MR. FINCH:  Surprisingly, I agree with Mr. Bernick

11 on this.  What I think what we had sort of suggested is right

12 before Christmas we would file the last piece of the <u>Daubert</u>

13 briefing, whatever trial brief, if there is one, there is, and

14 a pretrial statement that says, you know, these are the

15 witnesses each side will call, and this is the exhibits, and

16 then we would exchange objections to exhibits and file those,

17 you know, like a week or two later.  That's what I want to work

18 out with Mr. Bernick in advance of the trial, but so --

19         MR. BERNICK:  Yes.

20         MR. FINCH:  -- that we don't have to --

21         MR. BERNICK:  That's fine.

22         MR. FINCH:  So I think --

23         MR. BERNICK:   I think we're going to -- I think

24 we're going to reach a lot of agreement, and everyone's going

25 to want to assure that Your Honor is educated as much as

**J&J COURT TRANSCRIBERS, INC.**

1 possible before the trial starts about where the whole thing is

2 headed.  And I think that's important here, because there are

3 very, very critical threshold legal issues that have been --

4 that have not been resolved, and I think that that's going to

5 emerge very, very quickly in this process.  And I think that's

6 important for the Court to know up front.

7        THE COURT:  My only concern about the objections is

8 that if they are going to need some separate argument, that I

9 have time to get that done before trial starts.  If, in fact,

10 there are going to be things like relevance that I can't rule

11 on until I have a witness on the stand to know what the

12 relevance is anyway, it doesn't really matter.

13        MR. BERNICK:  Yes, I don't --

14        MR. FINCH:  I think most of the objections would be

15 things you can't -- I think there -- frankly, there will be

16 very few authenticity objections.  There may be hearsay

17 objections and/or relevance objections and/or 408-type

18 objections, which I don't think Your Honor can really rule on

19 until they're -- somebody tries -- you know, because a document

20 you can put in for one purpose, and it's admissible.  But if

21 you try to put it in for the truth, it's not.  I mean -- and

22 you don't really know until you put it in.  And so what I had

23 anticipated, and I think Mr. Bernick had anticipated, is we

24 would exchange objections that we could foresee in advance, you

25 know, a week or two after we exchange the exhibits and file the

1 exhibits with the Court, and it will be sufficiently in advance

2 of the trial.  And then if it's -- something comes -- I mean I

3 don't sort of really anticipate a exhibit-by-exhibit motion in

4 limine-type practice they way you would have in a normal civil

5 litigation.  It's more as a witness comes up, you put the

6 evidence in, there's objection, and you argue it right there on

7 the spot.  That's --

8           THE COURT:  Right.

9           MR. FINCH:  That's the sort of the way I --

10          THE COURT:  What I'm more trying to get to is what

11 exhibits you can admit by stipulation, so that you don't need

12 to put a witness on the stand just to identify --

13          MR. BERNICK:  Well, oh, I think that none of us are

14 going to want to have to call --

15          MR. FINCH:  Records custodians and the like.

16          MR. BERNICK:   -- witnesses to authen -- or to get

17 documents in.  I don't think anybody wants to do that.

18          THE COURT:  Right.  So that's -- I mean that's my

19 major point.

20          MR. BERNICK:  Yes, that's right.  I don't --

21          THE COURT:  To the extent that you have a lot of

22 exhibits, the more that you can agree are admissible, you know,

23 for whatever purposes you choose to argue, but that can at

24 least come into evidence for that purpose, I think the better

25 off we are.  Have you agreed that the trial testimony can

1  proceed by way of deposition or declaration or however you're

2  going to do it on the direct case and then submit witnesses for

3  cross examination?

4          MR. FINCH:  We have not --

5          MR. BERNICK:  We have not.  We've not --

6          MR. FINCH:  We have not agreed on that.

7          MR. BERNICK:  I kind of think, Your Honor -- I had a

8  long -- my trial in Washington in the U.S. Tobacco litigation

9  lasted nine months.  Everything was done with written directs,

10 and you save the live stuff for cross.  It just ends up being

11 -- in a complicated case with expert testimony, I think it's

12 probably better that at least with respect to the expert

13 witnesses that we have some time for direct, so that Your Honor

14 can kind of get into what -- you know, how they fit into the

15 process and what their testimony -- it just doesn't come across

16 the same way on paper.  So maybe --

17         MR. FINCH:  The suggestion --

18         MR. BERNICK:  Well, I don't know, Your Honor.  It's

19 up to you, but that would be our preference.  But that's

20 certainly something that we can talk about with the other side.

21 If Your Honor has a strong preference to do the directs in

22 writing and then just do cross, is that what Your Honor's

23 indicating?

24         MR. FINCH:  Your Honor, one thing that we did in the

25 Armstrong case, which I think is -- might be a -- sort of a

**J&J COURT TRANSCRIBERS, INC.**

1   half way point, which is that if an expert is allowed to

2   testify at all, the report would come into evidence, even

3   though normally an expert witness report is hearsay.  But

4   because this is a bench trial, the report would come in, and

5   then you could ask -- you could put the expert on, and they

6   could sort of summarize their testimony on direct.  So there

7   would be live direct from the expert witnesses to whatever

8   extent either side thinks they need to do it within the

9   confines of how much time we've got to do this, and then

10  there's normal cross examination.

11          I think, frankly, for fact witnesses the -- let me

12  just say my experience in the Federal Mogul cases seemed that

13  there was a lot more time spent on haggling about the content

14  of declarations and the admissibility of declarations.  That if

15  some of the people had just put those people on the stand and

16  asked them a direct, it would be a lot faster.

17          THE COURT:  But the problem with that was it wasn't

18  -- they weren't haggling about the direct.  It's that I made a

19  mistake and said that they could put the cross examination or a

20  rebuttal in by way of the written submissions.  I'm not going

21  to do that again.

22          MR. FINCH:  I wholeheartedly agree with that, but I

23  just think that it might be --

24          MR. BERNICK:  May I --

25          MR. FINCH:  We're in the process of coming up with a

**J&J COURT TRANSCRIBERS, INC.**

1  proposal --

2          MR. BERNICK:  I think we have to talk about that,

3  because --

4          MR. FINCH:  -- and we will talk about that.

5          MR. BERNICK:  Yes, because the problem with the

6  expert reports is the expert reports massively incorporate

7  reliance materials --

8          THE COURT:  They do that.

9          MR. BERNICK:  Yes, and so you're going to end up with

10  an exhibit list that goes on for, you know, 9,000 exhibits.

11          MR. FINCH:  You don't have to put the attachments in

12  exhibits to the --

13          MR. BERNICK:  Well, that's the -- that's what I'm

14  saying, is that there's a lot of stuff in those reports that,

15  frankly, we don't need to clutter the record up with.

16  That's --

17          THE COURT:  Well, here's my concern about the exhibit

18  reports.  I mean I'm already working on my second Xerox box

19  full of the reports, and they're not all filed yet.  So --

20          MR. FINCH:  Yes, I -- no, they are.  They all should

21  be filed.

22          THE COURT:  Oh, I thought you had additional --

23          MR. FINCH:  No.  No, they're all done.

24          THE COURT:  No, they're all in?

25          MR. FINCH:  I mean they should all be --

1          THE COURT:  Okay.  Well, I'm in the --

2          MR. FINCH:  -- sub judice.  Not sub judice but --

3          MR. BERNICK:  I admire Your Honor.  But I frankly

4   having gone through a lot of the rebuttal reports, particularly

5   the technical ones on the models, but I don't know how -- I

6   know a lot about modeling.  I know that they do, too, but I

7   don't how much -- I don't know how you can get through a lot of

8   that material.  It's --

9          THE COURT:  Snoring works pretty well.

10          MR. BERNICK:  It is just -- it's mind numbing and

11   opaque.  And so again I admire Your Honor.  I really think that

12   when you get these Daubert briefs, they're going to help.  I

13   hope they help enormously in providing some perspective, and

14   maybe with the benefit of that you can go back to some of the

15   expert reports and see how they fit in.  But I really do think

16   that there's just -- the rebuttal reports ended up having an

17   awful lot of new material in them, so we have a new

18   calculation, a new modeling effort by -- and I'm not taking

19   issue with this propriety -- Mr. Staler.  Mr. Snyder's report

20   -- his rebuttal report is much longer than his first report.

21   So there's just a lot of stuff there, and I kind of wonder

22   whether the briefs might be a better path to understanding

23   where this is going.

24          THE COURT:  Well, they may.  I mean what I'm really

25   just trying to do at the moment is get some basic understanding

**J&J COURT TRANSCRIBERS, INC.**

1 of what I'm going to be facing.  I'm not really trying -- at

2 this point I'm not trying to read them for full comprehension.

3 I'm just trying to get an idea of what the overall substance

4 is.  So I should explain.  I'm not, you know, word smithing the

5 briefs or the reports at this point.

6        My inclination -- normally, I do like to try to do

7 the cases by putting a direct on by some form of declaration,

8 at least as the -- to the fact witnesses.  Please, with respect

9 to the curriculum vitae, have your experts just submit that in

10 writing.  There is really no reason why we need to spend two

11 hours on somebody telling me where they went to school and what

12 degrees they have.  I think I can read that much more quickly

13 than I can listen to it.  And if you -- and I don't see any

14 reason why that can't be submitted on paper.  If you want to

15 hand it up in court, that's fine.  I promise I will take a look

16 at it.  In the course of 30 seconds I can read it.  It'll take

17 you an hour to get it onto the record.  So, please, have those

18 for each of your expert witnesses in writing if no one

19 disagrees with that.  I would much prefer just to have a one-

20 or two-page sheet of paper that summarizes the educational and

21 work history background.  Many of your reports already have all

22 of that with all the publications and things attached anyway.

23 But rather than get into that, that will save some time.

24        MR. BERNICK:  Okay.  Well, work on this and be able

25 -- I think we'll probably be able to work it all out.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  But in this case I think at least by way

2    of the experts it may be advisable just to put them on the

3    stand and, you know, let you ask questions, but I will have

4    read the reports in advance.  So we'll see how that goes.  When

5    do we have -- I'm sure we had at some point a final pretrial

6    conference I think?

7           MR. FINCH:  No, actually, we don't have a date.

8           MR. BERNICK:  No.

9           THE COURT:  Well, we should.  And with respect to the

10   <u>Daubert</u> motions, are you expecting an argument on those motions

11   in advance of the first day of trial?

12          MR. BERNICK:  That's in the order.  The order calls

13   for that, Your Honor.

14          THE COURT:  All right.

15          MR. FINCH:  The order calls for that.

16          THE COURT:  Okay.  My expectation is that in all

17   probability you're not going to get a ruling on those motions

18   until after trial.  That's my expectation.

19          MR. BERNICK:  I think that we all pretty much

20   anticipated that.

21          THE COURT:  So all right.  Ms. Baer, perhaps you

22   could contact my staff in the next day or and see if we can set

23   up a final pretrial.  Maybe some of these issues -- it may be

24   worthwhile just spending a few minutes.

25          MR. FINCH:  When were you thinking about in terms of

**J&J COURT TRANSCRIBERS, INC.**

1   general time frame?  I mean we --

2         MR. BERNICK:  During your holiday, Nathan.

3         MR. FINCH:  No, I don't care about -- I mean I do

4   care about Christmas Day.  That sort of matters to me, but in

5   terms of -- you know, the next three weeks are incredibly --

6   I'll be flying all around the country for various depositions

7   and stuff.  I mean --

8         THE COURT:  Well, I was hoping some time perhaps

9   between Thanksgiving and Christmas before your final documents

10  are filed, so that in the event that something surprising does

11  come up, there's time to make some adjustments.

12        MR. FINCH:  Okay, so some time in December basically.

13        THE COURT:  Or late November/early December, and I'll

14  call it a final pretrial.  It may not end up being final, but,

15  you know, so that some of these issues that we're talking about

16  now we can address.  When's the next omnibus hearing?  Maybe we

17  can do then.

18        MS. BAER:  It's late November.

19        MR. FINCH:  The 26th.

20        MS. BAER:  November 26th.

21        THE COURT:  Maybe we can just spend a few minutes

22  then.

23        MR. FINCH:  I don't know if Mr Inselbuch is available

24  that day.  I'll just have to check, Your Honor.  But if we

25  could get some alternative dates from the Court in that time

                 **J&J COURT TRANSCRIBERS, INC.**

1  frame, that would be, you know, preferable.

2          MR. BERNICK:  Well, why don't we --

3          MR. FINCH:  I think the best way is to have Ms. Baer

4  contact chambers and get dates the way you've done it before

5  and circulate around, you know --

6          THE COURT:  I think that would be helpful, because I

7  think that would be better than now --

8          MR. FINCH:  Right, and all of us --

9          THE COURT:  -- plus I would prefer to have you folks

10  go do some talking and resolve some of these other issues that

11  you can resolve before you have to take off, if you have time.

12          MR. FINCH:  Okay.

13          THE COURT:  All right.  We're adjourned.

14          MR. BERNICK:  Good.  Thank you, Your Honor.

15          MR. FINCH:  Thank you, Your Honor.

16          MS. BAER:  Your Honor, there's one other scheduling

17  matter --

18          THE COURT:  Oh.

19          MS. BAER:  -- somewhat related.  You may recall in

20  the final -- in the current CMO we had some extra dates, and

21  the one last extra date we had was November 1st.  Right now,

22  Your Honor, November 1st at 9:00 a.m. we have an argument on

23  the prejudgment interest issue for RMQ.  We have nothing else

24  on the agenda, nor can we.  The Peterson deposition is that

25  day, so the parties wouldn't be available to do anything else

1  here.

2          So, Your Honor, what I would ask is, number one, if

3  we could move the RMQ hearing to early afternoon, so that we

4  can do it, fly in and out in one day.  And then, number two, we

5  need no other time from the Court other than the RMQ hearing,

6  which will take probably 30 minutes.

7          THE COURT:  Why don't we just do it by phone?

8          MS. BAER:  That's absolutely fine with me.  I don't

9  know if Mr. Davis or Mr. Hooker or Esserman are on the phone

10  anymore.

11          MR. HOOKER:  This is Van Hooker.  I'm on the phone,

12  and doing it by phone would be fine.

13          THE COURT:  Can you -- are you speaking for Mr.

14  Esserman, Mr. Van Hooker?

15          MR. HOOKER:  Yes, well, I'll probably be handling the

16  argument, Your Honor.

17          THE COURT:  Okay, then is -- do you want to move the

18  time anyway, or is -- I'm not sure.  We had it scheduled at

19  nine.

20          MS. BAER:  Then it doesn't matter.  Nine is fine if

21  you want to get the rest of your day cleared off.  It was just

22  a matter of I couldn't -- we couldn't fly in and be here by

23  nine in the morning.

24          THE COURT:  What time is that for both of you?

25          MR. HOOKER:  It would be 8:00 for our -- us, Your

1  Honor, so --

2          MS. BAER:  Same with me.

3          THE COURT:  Do you want to move it until a little

4  later?

5          MR. HOOKER:  It may be -- whatever is convenient for

6  the Court.  Later in the morning would be great.

7          THE COURT:  Pick a time.  I have the day reserved for

8  you, so do you want to make it -- are you in the office by 9,

9  your time, both of you?

10          MR. HOOKER:  I could make it by nine if -- well, no,

11  I would be.  Would 11:00 be okay for the Court and 10:00 for

12  the people in the central time zone?

13          THE COURT:  Sure.  Eleven o'clock eastern time?

14          MR. HOOKER:  Yes.

15          THE COURT:  All right.  We'll make it 11:00 eastern

16  time on November 1st.

17          MS. BAER:  Your Honor, should we do that through

18  Court Call, or should I just arrange a separate number for that

19  hearing?

20          THE COURT:  Whatever you prefer, Ms. Baer.

21          MS. BAER:  Okay.  I'll work it out.

22          THE COURT:  But let my staff know, please.

23          MS. BAER:  I will do so.

24          THE COURT:  Okay.

25          MS. BAER:  And we'll inform Mr. Davis from National

1  Union.

2          THE COURT:  All right, so the time is changed to

3  11:00 a.m.  The rest of you, if you're not interested in this,

4  please, you're free to go.  And, Ms. Baer, I think you wanted

5  to hand up a couple of orders.

6          MS. BAER:  I do.  I have them right here.  Thank you.

7          THE COURT:  All right.  Thank you.

8          ALL:  Thank you, Your Honor.

9          THE COURT:  We're adjourned.

10                          * * * * *

11                       **<ins>CERTIFICATION</ins>**

12          I, PATRICIA C. REPKO, court approved transcriber,

13  certify that the foregoing is a correct transcript from the

14  official electronic sound recording of the proceedings in the

15  above-entitled matter to the best of my ability.

16

17  <ins>/s/ Patricia C. Repko</ins>          Date:  November 2, 2007

18  PATRICIA C. REPKO

19  J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**