UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO.,               .    Case No. 01-01139(JKF)
*et al.,*                       .    (Jointly Administered)
                                .
          Debtors.              .    Nov. 26, 2007 (2:07 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Good afternoon, please be seated.  This

2     is the matter of W.R. Grace, 01-1139.  The participants by

3     phone are: Ari Berman, Brian Mukherjee, Shayne Spencer,

4     Douglas Cameron, Daniel Speights, Jarrad Wright, James

5     Restivo, Walter Slocombe, Alex Mueller, Debra Felder, Richard

6     Wyron, Jay Hughes, Jason Solganick, Jeff Waxman, Igor

7     Volshteyn, Gentry Klein, Lewis Kruger, Janet Baer, Sung Choi,

8     Darrell Scott, Robert Horkovich, Christina Kang, David

9     Siegel, Peter Lockwood, Jacob Cohn, Terence Edwards, Richard

10    Levy, Marti Murray, Roger Frankel, Martin Dies, Peter Shawn,

11    Edward Westbrook, Andrew Craig, Lori Sinanyan, Theodore

12    Freedman, David Bernick, Arlene Krieger, Natalie Ramsey,

13    Andrew Chan, Scott Baena, Paul Norris, Ellen Ahern, Daniel

14    Cohn, Mark Shelnitz, Jonathan Brownstein, John Demmy, Robert

15    Phillips, Carl Pernicone, Andrew Hain, Michael Davis, Robert

16    Guttmann, Tiffany Cobb, Daniel Glosband, Barbara Harding,

17    David Parsons, Sander Esserman, and Van Hooker.  I'll take

18    entries in court.  Good afternoon.

19          MR. BERNICK: Good afternoon, Your Honor.  David

20    Bernick for Grace.

21          MS. BAER: Good afternoon, Your Honor, Janet Baer

22    for Grace.

23          MR. PASQUALE: Good afternoon, Your Honor.  Ken

24    Pasquale from Stroock for the Unsecured Creditors Committee.

25          MR. HOROWITZ: Good afternoon, Your Honor.  Greg

1    Horowitz from Kramer, Levin for the Equity Committee.

2              MR. O'NEILL: Good afternoon, Your Honor.  James

3    O'Neill from Pachulski for the debtor.

4              MR. FINCH: Good afternoon, Your Honor.  Nathan

5    Finch from Caplin & Drysdale for the Grace ACC.

6              MR. MULLEDY: Good afternoon, Your Honor.  Raymond

7    Mulledy for the Future Claimants Representative.

8              MR. SAKALO: Good afternoon, Your Honor.  Jay Sakalo

9    and Matthew Kramer on behalf of the Property Damage

10   Committee.

11             MR. FRANKEL: Good afternoon, Your Honor.  Roger

12   Frankel representing the Future Claims Representative.

13             MR. INSELBUCH: Elihu Inselbuch from Caplin &

14   Drysdale for the Asbestos Creditors Committee.

15             MR. HERFORD: Mark Herford, Campbell & Levine, for

16   the ACC.

17             MR. ANSBRO: John Ansbro, Orrick, Harrington, also

18   for the FCR.

19             MR. McDANIEL: Garvin McDaniel, Bifferato,

20   Gentilloti, for Royal Indemnity.

21             MS. HEILMAN: Leslie Heilman, Ballard, Spahr,

22   Andrews & Ingersoll, the State of California Department of

23   General Services.

24             THE COURT: Anyone else?  Ms. Baer?

25             MS. BAER: Good afternoon, Your Honor.

1          MS. KEARSE (TELEPHONIC): This is Anne Kearse on the

2   telephone with the Motley Rice claimants.

3          THE COURT: All right, thank you.  Once second.

4   Okay, thanks.  Ms. Baer?

5          MS. BAER: Your Honor, agenda item number 1 is the

6   debtors' fifth omnibus objections to claims.  There's one

7   claim left with the Weatherford entities environmental-

8   related claim.  We are working on and have an agreement on a

9   settlement.  We will probably submit the order before or at

10  the next omnibus hearing.  I have an order continuing it

11  until then.  Would you like me to hand up the orders now or

12  at the end?

13         THE COURT: Just do them at the end.

14         MS. BAER: Okay.

15         THE COURT: Give me a minute though, please.  Okay,

16  thank you.

17         MS. BAER: Your Honor, agenda item number 2 is the

18  debtors' eighteenth omnibus objections to claims.  There are

19  two matters left.  One is being resolved today with an order.

20  The second one is in the process of being resolved.  We're

21  very close, and we will have an order continuing that matter

22  to the next omnibus in the hopes that by then we'll have an

23  agreement to resolve it completely.

24         THE COURT: All right.

25         MS. BAER: Agenda item number 3, Your Honor, is also

1   a claims objection with respect to Massachusetts.  That

2   matter is being continued to the next omnibus hearing, and I

3   have an order that I'll hand up on that one.  Agenda item

4   number 4, Your Honor, the debtors' twenty-fourth omnibus

5   objection.  That's a new one up for the first time today.

6   There was one response.  That response has been resolved.  It

7   was a situation where they filed against the wrong debtor.

8   We've agreed that their claim will be considered to be a

9   claim against W.R. Grace & Co.  All of the other matters,

10  there were no responses and we will be handing up an order

11  resolving all of those objections.

12          THE COURT: All right, just a second.  Okay, thank

13  you.

14          MS. BAER: Your Honor, agenda item number 5 is the

15  debtors' application to employ Deloitte Financial Advisory

16  Services to do some due diligence work for the company with

17  respect to a transaction.  A certificate of no objections was

18  filed, Your Honor.  I have the order if you do not have it

19  and can hand that up at the end also.

20          THE COURT: I've already told my office to stamp

21  items 2, 5, 6, 7, and 8.  I just told them 7 and 8 when we

22  were on the way into court.  I hadn't seen those for some

23  reason or other, there was just a glitch.  So, 2, 5, 6, 7,

24  and 8 should already be entered by the end of the day.

25          MS. BAER: Thank you, Your Honor, we will look for

1    that.  Your Honor, with that, I can then skip over items 6,

2    7, and 8, as you've indicated those orders are being entered.

3    Agenda item number 9, Your Honor, is the PI estimation

4    pretrial, and we're going to skip that for now and just

5    finish the rest of the agenda and then come back to that as

6    that will take more than a couple of minutes.

7         THE COURT: Okay, one second.  So, with respect to

8    item 2, are you handing up a different order or is this the

9    same as the one that I am instructing my staff to enter

10   already?

11        MS. BAER: We're handing up one additional order,

12   Your Honor, that resolves one of the claims that was on

13   there, and then the second order is the order continuing the

14   matter.

15        THE COURT: Okay, so there will be three orders

16   altogether, the one that was already filed that I'm telling

17   my staff to enter and two more?

18        MS. BAER: I'm not sure about the already filed one.

19        MR. O'NEILL: Your Honor, James O'Neill, for the

20   record.  The one already filed is the one claim resolution,

21   and the one which Ms. Baer will hand up is the continuation.

22        THE COURT: All right, so it will be one more order.

23        MR. O'NEILL: Correct.

24        THE COURT: Okay, thank you.

25        MS. BAER: We'll sort that out before we hand it up,

1    Your Honor.

2            THE COURT: All right, let me just make sure I have

3    my notes correct.  Okay, I think it is, thank you.

4            MS. BAER: Your Honor, that takes us to agenda item

5    number 10, which was a motion from California to permit the

6    filing of an expert report.  The debtor had no objections to

7    the filing of the report and a certificate of no objections

8    was filed on that matter also.  I do have an order if Your

9    Honor does not have that.

10            THE COURT: I instructed my staff to enter orders on

11    numbers 10 and 11 through 18 as well.  So I think that should

12    have been entered or will be entered today.

13            MS. BAER: That makes it easy, Your Honor.  That

14    takes us up to agenda item number 19.

15            THE COURT: All right, one second, while I get

16    caught up again.  Okay.

17            MS. BAER: Agenda item number 19 is a general status

18    on property damage claims.  I believe that Mr. Restivo is on

19    the line.

20            THE COURT: Mr. Restivo?

21            MR. RESTIVO (TELEPHONIC): Good afternoon, Your

22    Honor.  With respect to item 19, there is nothing new to

23    report on the PD claims.  The Court knows what is *sub judice*

24    before the Court, and nothing new has happened since the last

25    omnibus hearing.

1              THE COURT: Okay, that was easy.

2              MR. RESTIVO (TELEPHONIC): With respect to item 20,

3    a status conference on ZAI issues, Mr. Westbrook and I once

4    again would like to continue that until the next omnibus

5    hearing.

6              THE COURT: One second.  All right, they're

7    continued, thank you.

8              MR. RESTIVO (TELEPHONIC): Thank you, Your Honor.

9              MS. BAER: Your Honor, that takes us to agenda item

10   number 21, which is a status conference that the Court asked

11   us to put on the agenda with respect to Mr. Speight's motion

12   to alter and amend the Court's order disallowing certain

13   claims, and I believe Mr. Bernick is going to address that.

14             THE COURT: Mr. Bernick?

15             MR. BERNICK: Your Honor, I'm prepared to go first

16   if that's appropriate, but this is actually Mr. Speights'

17   motion if he wants to address it in the first instance, and I

18   don't know if he's on the phone to do so.

19             THE COURT: Mr. Speights?

20             MR. BARRY (TELEPHONIC): Your Honor, this is Bud

21   Barry from Dan Speights' office.  Mr. Speights just called

22   me.  He should be there shortly.  His plane was delayed

23   coming in today.

24             THE COURT: All right, we'll wait for him for a few

25   minutes, then, Mr. Barry, thank you.

1          MR. BARRY (TELEPHONIC): Thank you, Your Honor.

2          MR. BERNICK: I think that the next item on the

3     agenda to take up is item number 9 which deals with the

4     pretrial order in connection with the upcoming estimation

5     trial, and it may be more appropriate actually to have

6     counsel for the ACC at least take the beginning here because

7     I believe that Mr. Finch has drafted up a fairly detailed

8     proposal for the pretrial schedule.  There are some

9     outstanding issues, but maybe in order to at least begin with

10    where we agree, it would be appropriate to have him go first.

11          THE COURT: Mr. Finch?

12          MR. FINCH: Thank you, Your Honor.  Nathan Finch for

13    the ACC.  Let me hand the copies of the proposed - this is a

14    draft order, it's not ready for any court signature.  It

15    doesn't have numbers and paragraphs and stuff but, it's

16    something I slid to Mr. Bernick, and I think there's

17    agreement in large part.  I'd like to pass a copy of it up to

18    Your Honor if that's appropriate.

19          THE COURT: Sure.

20          MR. FINCH: And to counsel for the commercial

21    creditors and the Equity Committee, who I don't know if they

22    - I don't believe - I didn't send it them.  I don't believe

23    they've seen this.

24          THE COURT: All right.  Thank you.

25          MR. FINCH: Does Your Honor have the draft in front

1    of you?

2            THE COURT: I do.

3            MR. FINCH: It goes through a series of topics.  The

4    first of which is the Daubert motions.  Under the Court's

5    current schedule, the Daubert motions will be due November

6    30th, and the responses would be due - so it's just so the

7    briefing is ended on December the 21st.  What we and the

8    debtor have agreed to is that the Daubert motions, the

9    initial Daubert deadline will be due - the briefs will be due

10   January - excuse me, December the 7th with the oppositions to

11   the Daubert motions due on December 21st, and then the replies

12   due January the 7th, and we would ask for some guidance from

13   the Court as to page limitations on that.  What we had

14   suggested would be - what we had sort of internally thought

15   about was 75 pages for the - per party for the initial

16   Daubert briefs, and then 75 pages for the responsive Daubert

17   briefs, and then replies limited to no more than 30 pages.

18   That's sort of thinking through it and working out the number

19   of pages.

20           THE COURT: When you're talking about 75 pages, are

21   you talking about collectively, for all experts or per

22   expert?

23           MR. FENCH: No, no, collectively for all experts.

24   Basically, the ACC would have a brief of 75 pages.  The

25   debtor would have a brief of 75 pages.  The Commercial

1    Creditors could put in a brief of 75 pages.  Equity, 75

2    pages, if they need it.   I mean, I'm not suggesting that

3    everybody needs that.  The FCR -

4              THE COURT: And you expect that I'm going to read

5    all these things, including the replies of 30 pages each the

6    week before trial starts.

7              MR. FINCH:  Well, I suspect we will be shorter than

8    that, but that is the idea, Your Honor.

9              THE COURT: You will not be shorter.  If I give you

10   75 pages, it will come in at 90, it's guaranteed.

11             MR. FINCH: Your Honor, usually when I put pen to

12   paper, I try to be short and brief and to the point.

13             THE COURT: Then you're a miracle, Mr. Finch.

14             MR. FINCH: But that's the deadline so at least it

15   would be a somewhat of a shift from your current schedule.

16   We'd like to get the deadlines in place, and if your Court

17   has some guidance as to the page limitations.

18             THE COURT: Well, I'm a little concerned about

19   getting replies the week before trial, the week before these

20   arguments are going to be scheduled if there are going to be

21   - I'm not sure how many people are going to be on the initial

22   filing side.  So I don't know how many replies I'm going to

23   have, nor do I know why I need replies on Daubert motions

24   that would seem to me that the issues are pretty clear.  So -

25             MR. FINCH: Well, I am willing to forego replies,

1    and I'm pretty sure counsel for the debtor is not, and so, I

2    think that the parties who will be filing Daubert briefs

3    would be the ACC and the FCR will be filing Daubert briefs

4    that Daubertize some of Grace's experts.  I am sure the

5    debtor will be filing Daubert briefs to Daubertize some or

6    all of the ACC and FCR experts.  I rather suspect the Equity

7    Committee would be filing a Daubert brief.  I'm not sure

8    about the commercial creditors.  So it basically would be,

9    you know, two briefs from my side of the table over here, two

10   maybe three briefs from that side of the room over there, and

11   then there would be responses to each, and then a reply.  So

12   –

13            THE COURT: You've just killed 13 trees collectively

14   in the process.

15            MR. FINCH: I understand, Your Honor, but, I mean,

16   this is a major substantive issue in the case that all

17   parties have very strong views of.  I think it is, frankly,

18   in some ways more complex and more page consuming to write

19   these Daubert briefs than some of the briefs that Your Honor

20   saw this past summer in the Federal-Mogul case from all these

21   various insurance issues.  I do believe that, you know,

22   sitting down with my team of brief writers, 75 pages is

23   something they've assure me they could get under, and, you

24   know, if the Court says 60, we would certainly live with

25   that.

1          THE COURT: Well, I have a problem with -

2          MR. FINCH: I haven't discussed the page limitations

3   with Mr. Bernick or counsel for the other committees, this is

4   sort of off the top of my head.

5          THE COURT: Well, I appreciate that, but I think the

6   issue is this: I'm not exactly sure what difference in you or

7   maybe I should start with a different question.  Are you

8   picking different experts to file Daubert motions against so

9   that if the Committee picks three of the debtors' experts,

10  and the FCR picks two - So, am I getting 75 pages on the same

11  theme applied to different witnesses?

12         MR. FINCH: No, no, no.  They would be - We would

13  certainly write the briefs in ways not to duplicate, but we

14  may be focusing on the same witness, but we would be taking

15  different aspects.  We would divide up the work with the FCR

16  so that if we had - Let's say we picked on, so to speak,

17  experts A, B, C, D, and E.   We might talk about A, B, C, D,

18  and E about issues 1, 2, and 3, and the FCR would talk about

19  maybe A, B, and C, but only issues 4 and 5 or issues 0 and 1,

20  or something like that.  We would never - to not have any

21  kind of overlap, and I'm sure the debtor and the commercial

22  creditors and the equity would endeavor to do the same thing.

23         THE COURT: All right, so then, why don't we just

24  set a maximum number of pages that can be filed, and you can

25  divide up the pages however you'd like.  In fact, I would

1   think that one joint brief by everybody who wants to file a

2   Daubert brief with respect to the side that they're on would

3   make the most sense; wouldn't it?  Are you taking different -

4   That's what I'm trying to get to, are you taking different

5   positions?  Is the Futures Rep going to have a different

6   position on the Daubert issue than the -

7          MR. FINCH: I'm not sure they would have a different

8   position, but they may have a different tact and a different

9   approach given that they represent the future claimants and

10  we represent the current claimants and there are certain

11  differences in the drafting process that we've already

12  identified.

13         THE COURT: Oh, all right.

14         MR. FINCH: So, maybe the easiest way to do it is to

15  give, you know, our side - Mr. Mulledy and I since the Libby

16  claimants are out of it.  It would just be Mr. Mulledy and I,

17  you know, 150 pages and their side - What do you think you

18  need?

19         MR. BERNICK: I think that that's too much.  Indeed,

20  I don't think that we would seek to have 150 pages

21  collectively for our side at all.  I mean, I think, Your

22  Honor, that the touchstone for our position on this is

23  figuring out what it would take for Grace to write a brief on

24  all the issues that have to be addressed and just a couple of

25  comments on that.  We look at these briefs as being because

1    the fit requirement in Daubert ultimately addresses the

2    fundamental question of relevance, together with other

3    prominent Daubert which is reliability.  But this is really

4    the appropriate time in which to set out what we think are

5    the legal and factual contours of the estimation because we

6    know that's been discussed on a more informal basis on many,

7    many different occasions, but we're now in a position where

8    the record is complete.  Our thoughts are probably a little

9    bit more matured, and all of the issues of relevance go,

10   again, very centrally to Daubert.  So, as we suggested last

11   time, we think that our trial brief will not be very long.

12   Indeed, I'm not sure we'll have a trial brief, but that the

13   Daubert motions will basically enable us to convey to the

14   Court our sense of what the architecture of the case is and

15   then also address particular experts.  We think we need 75

16   pages for that.  Secondly, it is our further reflection that

17   actually the time that's probably spent writing and for Your

18   Honor reading these briefs this may even be - I hope will be

19   the best time that Your Honor can spend before the trial

20   begins.  We know that the process of making your way through

21   the expert reports has been difficult, and I think we

22   committed last time -

23          THE COURT: If that's your idea of a good time, Mr.

24   Bernick -

25          MR. BERNICK: No, I didn't -

1          THE COURT:  - after this case is done, we need to

2     talk.

3          MR. BERNICK: Yeah.  It's pretty precisely in

4     contrast to that that I'm suggesting that these briefs will

5     be good use of the Court's time because I think it's up to us

6     to take those expert reports and kind of using the language

7     of the law and the like, also a certain amount of clarity can

8     be added to the process.  So, bottom line is, that we intend

9     to use our Daubert briefs really as our roadmap for what is

10    problematic both in terms of relevance and in terms of

11    reliability in this case.  I know that we can undertake to

12    coordinate with the other folks who are at this table to

13    assure that there is no duplication, and my informal

14    conversations just now indicate they do not have an intent to

15    file any kind of major brief.  So, I think if we get 75 pages

16    for the debtor, and we then have the ACC, if the ACC wants

17    getting 75 pages for the ACC, and then other people can file

18    non-duplicative shorter briefs, I suspect that we will end up

19    with something that is considerably less than 150 pages in

20    the aggregate.  I know that that's true on our side of the

21    table, and yet we won't have imposed what I think would be an

22    unnecessary constraint at the outset on the total number of

23    pages that either principal side of the controversy has to

24    devote to the major brief.  I really think it would be

25    counterproductive to get into further allocations between the

1    different people who are sitting at the table.  I suspect

2    that so far as Mr. Finch and Mr. Mulledy are concerned they

3    probably haven't gotten down to that level of detail either.

4    If we have one principal brief on either side that's 75

5    pages, together with non-duplicative additional briefs,

6    preferably not to exceed the total of say 40 pages, that we

7    could get the job done, and I suspect that they could as

8    well.

9        MR. FINCH: That would work, I think, Your Honor.  I

10   mean, I'm sure that would work.  We'll make that work.

11       MR. BERNICK: And on the replies, we also devoted

12   some considerable discussion to the replies because both

13   sides, I think, wanted to push back for purely logistical

14   reasons, wanted to push back the initial due date of briefs,

15   and then that got us to the question of replies.  Again, we

16   specifically recognize that that would have the effect of

17   putting yet additional paper before Your Honor shortly before

18   the trial.  My own sense at the time though was that it was

19   inevitable that there would be in particular questions that

20   people - or points that people would want to make on both

21   sides regarding how the record was being characterized in the

22   initial briefs.  It's not so much that there would be a whole

23   new issue that came up that hadn't been anticipated.  It

24   would be more that because we're dealing with a pretty fast

25   record, people want to have the opportunity to point out

1    limitations or potential misconstructions made in the

2    opposing side's briefs by way of reply.  If you didn't get

3    that reply, that would essentially mean that whatever people

4    said in the opening briefs, unless they happen to meet issue

5    precisely, would be all that Your Honor had before the trial

6    started, and recognizing that it does put pressure on Your

7    Honor, again, at least our sense was that that would be time

8    very well spent.  It is the debtors' belief in this case that

9    by the time we're done with these briefs and we have the

10    Daubert/opening statement argument at the beginning of the

11    trial, Your Honor's going to have a pretty good view of where

12    the joints are in this estimation, that is the key issues

13    that will have to be resolved.  There's a tremendous amount

14    of legal complexity and factual complexity but much of it is

15    derivative of a series, you know, pick a number 10 major

16    issues that, I think, Your Honor's going to see in these

17    briefs, and the better informed we think that Your Honor is,

18    the more Your Honor, I think, will be able to tell us fairly

19    early on, you know, okay, I get this, what about that,

20    and/or, you know, I've already established this, what about

21    that?  The more we to do kind of front-end load this trial

22    process so that Your Honor is really, really well-informed

23    before we start will save us a lot of time at the back-end.

24    So that's the overall philosophy that we have.  We don't

25    regard this just as a matter of submitting obligatory papers.

1    We're really trying to make it into a process that's

2    meaningful for the Court.

3           MR. FINCH: So, that's still not a number of pages,

4    but my suggestion, Your Honor, is that the response briefs

5    would be the same number of pages as the initial briefs, and

6    then the reply briefs, I think what I said was, 30 pages per

7    party, but maybe Mr. Mulledy and I could do 30 pages per side

8    and Mr. Bernick and the people over there could do 30 pages

9    per side so you would get a total, you know, 30 pages from

10   each side a week before the trial.  So that takes care of the

11   first -

12          MR. BERNICK: Is that all right with Your Honor?

13          MR. FINCH: Yes, would that be all right with Your

14   Honor?

15          THE COURT: So I'm going to get two 75-page briefs,

16   and not more than two 40-page briefs from each side as your

17   opening and response briefs.

18          MR. FINCH: Yes, Your Honor.

19          THE COURT: And then two reply briefs of not more

20   than 30 pages each.

21          MR. FINCH: Yes, Your Honor.

22          THE COURT: Yes, I can - Yes, I can deal with that.

23   What I would like, however, and I hope - Don't make me live

24   to regret this, please, don't make me live to regret this,

25   but I think what would make most sense is that attached as an

1    appendix to these briefs, if you've got a citation to a

2    specific example or illustration or something, that you

3    attach the piece right to the brief.  Don't make me go search

4    for it through the docket because frankly with the amendments

5    that have come in to these expert reports at this point,

6    that's going to be a very difficult thing to do.

7         MR. FINCH: No, no, we would envision that as long

8    as it didn't count against our page limitations, you might

9    have - you might get a 75-page brief, but you might have lots

10   and lots of attachments to it that are snippets of deposition

11   testimony or portions of an expert report or, you know,

12   whatever it is you're citing to so that you don't have to go

13   back through the docket to get it.  I mean that would -

14        THE COURT: That's fine.  Do it in a binder format

15   so that everything is tabbed so that it's easy to find.

16        MR. FINCH: Okay.

17        MR. BERNICK: Would Your Honor prefer - I don't know

18   whether you've done this in other cases, would you have any

19   desire to have an electronic linkage so that you can double

20   click?

21        THE COURT: Sure.  I would like to have an

22   electronic link.  I think that would be fine, but I'd also

23   like to have a paper copy because, frankly -

24        MR. BERNICK: It's pretty fast, I think.

25        THE COURT: It is.  Sometimes it's just easier to

1    put your fingers in the pages than it is - So, my staff is a

2    lot better at using the electronic dockets for briefs than I

3    am.  I still - I'm still somewhat married to paper.  I try

4    not to be, but I am.  So, I think it would be helpful to have

5    the electronic version with the clicks and that does make it

6    easier sometimes, but I would still like to have a binder

7    format too.

8            MR. FINCH: Okay, thank you, Your Honor.

9            THE COURT: All right, wait, wait.  Let me make a

10    note, please.  You say January 7th if fine.

11            MR. FINCH: Your Honor, Mr. Mulledy had a question

12    for the Court.

13            THE COURT: Oh, sorry.

14            MR. MULLEDY: Your Honor, I'm just a little bit

15    confused about the 40-page non-duplicative briefs and who

16    gets to file those.  As I understood what Your Honor was

17    saying, we have a 75-page principal brief for each of these

18    tables here, meaning the debtors' constituencies and the

19    personal injury creditors constituencies, and that other

20    briefs could be filed by entities other than those two

21    principal constituencies in a non-duplicative way up to 40

22    pages.  Is that correct?

23            MR. FINCH: No, that's not how I understood.

24            MR. MULLEDY: No, okay.  Not at all then - That's

25    why I raised the question.

1          MR. FINCH: I thought what the proposal was and I

2     thought what Your Honor's order was that the ACC and the

3     debtor would have 75-page briefs and then there could be 40-

4     page briefs, for example, from the Equity Committee or a

5     combination of the Equity Committee and the Commercial

6     Creditors and from the FCR.

7          THE COURT: Well, I guess that's a question.  Do you

8     need more than 40 pages, Mr. Mulledy?

9          MR. MULLEDY: I don't think so.  Just give me a

10    moment.  I think we can work within those constraints, Your

11    Honor.  I mean for us it's a matter of a different emphasis.

12    I mean, the real problem I have is with the non-duplicative

13    element of this.  We will be seeing - We will have to say and

14    make some of the same arguments that the ACC is making about

15    the methodology that the debtors are employing here.  That's

16    inevitable because it is that methodology that affects the

17    future claims analysis.  Now, the emphasis will be decidedly

18    different, but I don't want to have an objection that we

19    filed a duplicative brief.  To me it seems to make more sense

20    to take a - to have a combined brief with a combined page

21    limitation that would cover the ACC and the FCR and to have

22    the same thing on that side instead of, you know, having

23    arguments later about whether somebody's brief was

24    duplicative of the principal brief.

25          MR. BERNICK: Your Honor, I guess, we don't need

1    that number of pages in one brief, and frankly, it would be -

2    the coordination difficulties would be significant.  It seems

3    to me that if the FCR's concern is that they would be argued

4    toy waived some argument that they don't make in 40 pages,

5    then I don't have any problem with their joining in all the

6    arguments that are made by the ACC for purposes of preserving

7    their record.  If the issue is does it take 40 pages to have

8    a different emphasis, I guess that's where the question is.

9    If you need more than 40 pages to add a different emphasis.

10          MR. MULLEDY: I'm fine with the page limitation.  I

11   think that is enough pages to make the different emphasis.

12   What I'm concerned about is in the course of presenting that

13   emphasis I'm going to hear an objection that what I filed is

14   a duplicative brief because I'm taking the position that the

15   debtors' methodology is unreliable and shouldn't be

16   considered and that I know that would be part of the ACC's

17   brief.

18          THE COURT: Okay, I -

19          MR. BERNICK: I have no desire to make such an

20   objection because it's fruitless.  I mean, Your Honor has set

21   a 40-page limit.  There's always been duplication from the

22   FCR and for obvious reasons.

23          THE COURT: Well, I think to a certain extent, to

24   put your argument in context, you may have to make some of

25   the same arguments, you know, I think the Equity Committee

1    may end up having to make some of the same analysis just to

2    put it in context without necessarily going into the same

3    level of detail.  I will do this.  From the Equity Committee

4    and from the Future Claims Rep I will take a 40-page brief,

5    maximum 40-page brief.  You may argue whatever you want in

6    that 40-page brief.  If anybody else is filing a brief, it

7    has to be limited to 40 pages, and it may not be duplicative

8    of what the other parties are arguing.  If you've got the

9    same argument to raise in that context - I don't know who

10   else would be involved in the trials, but if somebody is,

11   then incorporate by reference whatever the argument is from -

12   that way I should have the whole panoply of arguments that

13   everybody chooses to raise that I think will be actively

14   involved in the litigation so that I'm not missing somebody.

15   Is there another entity that expects to be actively

16   participating in the trial?

17           MR. BERNICK: That would be pretty meaningful for us

18   because we have operated, I think, under the expressed

19   guidance of the Court that the estimation doesn't involve any

20   particular claim.  It involves the committees.

21           THE COURT: Well, I don't think it does, but let me

22   find out.

23           MR. FINCH: Your Honor, the Asbestos Claimants

24   Committee and the Future Claimants Representatives and their

25   counsel are the only entities on my side of the table that I

1    anticipate appearing and putting on the evidence or making

2    arguments against estimation arguments.  So they're not going

3    to see individual claimants or their counsel appearing in a

4    role as counsel on behalf of individual claimants.  You might

5    have one of them or maybe two of them testify as a fact

6    witness but you're certainly not going to have them appearing

7    and representing their clients in the estimation.  This is an

8    estimation of Grace's aggregate asbestos liability.  Every

9    other one of these cases that I've ever handled, the

10   plaintiff lawyers never even bothered to come to the room to

11   watch much less put on their client's case.  So this is not

12   going to be -

13            THE COURT: I understand.  If I may, please.  I am

14   asking everybody other than the debtor, the Equity Committee,

15   the Future Claims Rep, and the Asbestos Creditors Committee,

16   is there anybody else who's represented who is appearing

17   either on the phone or here in court today who intends to

18   present any evidence or participate in the briefing on these

19   issues?

20            MR. PASQUALE: Here I am, Your Honor.  You didn't

21   name the Unsecured Creditors Committee.

22            THE COURT: I did not.

23            MR. PASQUALE: We have been and we will be

24   continuing to participate in the estimation process.

25            THE COURT: Okay, are you going to file a brief?

1          MR. PASQUALE: I will be filing a trial brief.  As I

2     stand here today, I don't believe we will be participating in

3     the Daubert motions, but I would like some . . . (microphone

4     not recording) to submit a very short trial brief . . .

5          THE COURT: Okay, we're not to the trial brief.

6          MR. FINCH: We're not to the trial brief yet.

7          MR. PASQUALE: I understand.  I just wanted to make

8     clear the debtors was talking about using the Daubert and the

9     trial briefs.  So that's what I . . . (microphone not

10    recording).

11         THE COURT: All right, thank you.  Anybody else?

12    All right, then it's not an issue.  We've set the page

13    limits, you can argue whatever you want within your 75 and 40

14    page limit.

15         MR. FINCH: Okay, and we're not going to see a bunch

16    of insurance companies coming into this - I mean, there are

17    thousands of insurance companies in the room here, so I just

18    wanted to -

19         MR. BERNICK: And they always appear in groups;

20    right?

21         MR. FINCH: They tend to.

22         THE COURT: All right.

23         MR. FINCH: Mr. Mulledy, I think, had one followup

24    question.

25         MR. MULLEDY: If the Court would indulge me on one

1    more question.  On the reply briefs, Your Honor, the 30-page

2    limitation, how is that applied?

3              THE COURT: That's per side.  So -

4              MR. MULLEDY: Side meaning?

5              THE COURT: The Futures Claims Rep and the Asbestos

6    Committee is one side.  The Equity Committee and the debtor

7    is the other side, and since the Unsecured Creditors

8    Committee is not filing a Daubert brief, they won't be filing

9    a reply brief.

10             MR. MULLEDY: Can we divide that up 15 pages apiece

11   in separate briefs, or do a collective brief of 30?  Does

12   Your Honor have a care?

13             THE COURT: I would prefer to get a collective brief

14   of however you want to do it.  If you want to submit, you

15   know, 30 pages and say this is the ACC's view and this is the

16   FCR's view and it takes 20 for one and 10 for the other, I

17   don't care how you divide it up.

18             MR. MULLEDY: Understood.  Thank you, Your Honor.

19             MR. FINCH: Okay.  We'll divide that however we

20   divide that.

21             THE COURT: You don't need to file one if you don't

22   think there's anything -

23             MR. FINCH: That's true too, Your Honor.  The second

24   topic on the pretrial runoff schedule in the draft order I

25   placed before you is a list of trial exhibits, trial witness

1  lists, and pretrial briefs, and here on December 21st, 2007,

2  there would be the deadline for the submission of the trial

3  brief, a list of all witnesses that a party intends to call

4  as a witness at the hearing, along with a brief description,

5  i.e., very brief description of what they intend to testify

6  about or what the party intends to ask about them, and a list

7  of all the trial exhibits that each side intends to offer in

8  its case in chief pre-marked for identification.  The parties

9  shall exchange the copies of the trial exhibits on that date.

10  At the same time the exhibits and the exhibit list will be

11  sent to the Court, and then on January 4th, 2007, the parties

12  would exchange authenticity objections to the exhibits as

13  well as any stipulations regarding the admissibility of the

14  exhibits.  I rather suspect that there will be a large

15  category of exhibits as to which there is no real dispute

16  about the admissibility, but there will be categories of

17  things as to which there are various - maybe not authenticity

18  but certain objections to, but this is a deadline for

19  identifying any authenticity objections we may have.  Is that

20  schedule acceptable to the -

21        MR. BERNICK: We're agreeable to everything.

22        MR. FINCH: No, no, this is a question is it

23  acceptable to Your Honor, and then could there be some

24  guidance on the page limits for the trial brief, and given

25  that we have, you know, long involved Daubert briefs, I tend

1    to agree with Mr. Bernick, the trial briefs will not be as

2    extensive as they otherwise might, but we do intend to file a

3    trial brief to sort of lay out more like a trial brief you

4    would - as opposed to a legal argument/Daubert brief.

5         MR. BERNICK: Your Honor had a concern last time,

6    that you did want something, because we raised that same

7    issue.  Your Honor wanted something that would talk about the

8    witnesses and what they would say.   So, we included language

9    in this draft that would provide that there would be a

10   listing of the witnesses who would be called, and a

11   description, obviously in somewhat general terms of what they

12   would say to satisfy that request by the Court.  Beyond that,

13   we - There may be something that we would want to address in

14   a trial brief, but right now I can't think of it beyond what

15   we're going to address in the Daubert briefs.

16        THE COURT: What is it that you expect would be

17   addressed in the trial brief, Mr. Finch, that's not going to

18   come up in the Daubert brief?

19        MR. FINCH: Well, Daubert goes to the relevance and

20   fit, and admissibility of expert testimony, but there is sort

21   of - might even be in the trial brief, that you tell the

22   Court the sort of overall story that the witnesses will

23   testify to if they're allowed to testify, more than just, you

24   know - If you're trying a bus accident case, you might list

25   the four eyewitnesses where they see the bus accident, but

1    then in your trial brief you would say, This is what happened

2    on such and such a day, and the bus ran over my client in the

3    crosswalk, et cetera, et cetera.  It's more of a -

4             THE COURT: An opening statement.

5             MR. FINCH: Yes, in some sense, and I think that,

6    you know, given that we do have a Daubert brief that will

7    identify for the Court all the various experts, or the ones

8    at least that are the focus of this case and the -

9             (CLERK REPORTS AN EQUIPMENT FAILURE TO THE COURT)

10            THE COURT: Is it too far away?  Is that better?  Is

11   that recording?  Is it picking up, recording?  Okay.  All

12   right.  Wait.

13            MR. FINCH: Sure.

14            THE COURT: Please be seated.  Okay, Mr. Finch, I'm

15   sorry.  I lost you where you were going to lay out what the

16   trial's going to be all about, go ahead.

17            MR. FINCH: Yes, what the trial's going to be all

18   about, that's the purpose of the trial brief, and during the

19   break, Mr. Mulledy and Mr. Bernick and Mr. Pasquale and I had

20   a discussion which sort of modifies what's on the piece of

21   paper here and what the suggestion for Your Honor is that the

22   ACC and FCR would file a trial brief on December 21st, not to

23   exceed 50 pages combined, and then the debtor and anybody

24   else would file a trial brief on January the 4th, not to

25   exceed 50 pages combined.

1          MR. BERNICK: From the debtors' point of view, we

2    think that the trial brief is even more paper for Your Honor

3    to get through.  We question its real value given the

4    extensive Daubert briefing that will take place.  We suggest

5    that we not have trial briefs, and I think that there is

6    still a strong desire on the other side to have trial briefs,

7    so we then proposed a situation where they would go first and

8    we would respond and that is fine with us.  We think that

9    that's a little bit better.  We fundamentally don't think

10   it's worth having Your Honor get a hundred pages of paper

11   more.  So, we think that it probably would be more

12   appropriate to have something that's a little bit more

13   summary in form, perhaps 25 pages or even 20 pages a side,

14   just to give kind of an overview of how the case is going to

15   go in.  So, that would be our position is that we really try

16   to truncate that process in light of the reality of all that

17   Your Honor's going to have to take up here in this period.

18          THE COURT: Well, I mean, if what you're going to be

19   doing is telling me your opening statement, I don't really

20   need to read that.  I'm going to hear it, and I think you're

21   going to want to tell it to me anyway, so I don't really need

22   to hear it and read it.  If you have something that you need

23   to say in the pretrial narrative, there is a place in the

24   pretrial narrative for legal issues.  That I'm willing to

25   hear.  If you think they're unique legal issues, I'm not sure

1    what they're going to be after you get the Daubert motions

2    done though.  I mean, it's just an estimation hearing except

3    for that; isn't it?

4         MR. BERNICK: In light of Your Honor's statement

5    just there be prepared to live with probably even less on the

6    theory that we'd be in a position to probably represent to

7    Your Honor that we would save our response to their trial

8    brief until the opening arguments so that Your Honor is

9    alerted to that fact, and then I'm not even sure we would

10   need to respond to their brief.

11        MR. FINCH: Your Honor, there is a fair amount of

12   evidence that's not expert in nature, and for that reason

13   alone I think there needs to be a trial brief.  I am - I

14   believe we can get it done in less than 50 pages.  I think 25

15   is too tight.  I don't have a problem with 35 or 40 pages per

16   side.

17        THE COURT: Okay.  I mean a brief is supposed to be

18   a matter of law; isn't it?  I mean what's the issue that

19   you're -

20        MR. FINCH: Not necessarily a trial brief, Your

21   Honor.  I mean, I have historically used trial briefs as a

22   way to sort of tell my story of the case, sort of what's

23   coming down the pike.  It's not a legal brief.  Maybe it's a

24   trial memorandum is a better way to describe it, that lays

25   out, this is what we will prove for Your Honor to consider.

1          THE COURT: That's an opening statement.  Right, you

2    want to do the opening statements in writing instead of

3    orally?

4          MR. FINCH: No, I'd like to do them orally, but I

5    think there are aspects of the trial brief - it will assist

6    Your Honor at the opening statement to have the trial brief -

7          THE COURT: Sure, I will have read it once, and then

8    you're going to repeat it to me by telling it to me the same

9    time.

10         MR. FINCH: I'm not sure I would repeat the trial

11   brief.  I don't intend to be able to repeat anything twice,

12   but the point is, Your Honor, I do, and my clients do believe

13   that we need a trial brief and so does Mr. Mulledy.

14         MR. MULLEDY: Your Honor, I would just add, if I

15   might, the simple point that I see this as a bench memorandum

16   in a non-jury case where we want the Court to know, as the

17   evidence comes in, what the legal background is for receiving

18   the evidence.  What is the law of estimation?  I think that's

19   a pretty important issue here.  I'm not sure that gets

20   covered with - in the way that we'd want that to be covered

21   just in the Daubert context.  So there's a Daubert piece that

22   we see.  We also see an overriding issue of what is the law

23   of estimation?  What law should the Court apply?  I think

24   we're going to hear from the debtors that - I don't think

25   we're going to see eye-to-eye on that.  I think that issue

1    needs to be crystalized in a legal brief, and I also think

2    it's helpful for Your Honor to have a scorecard of what

3    witnesses are going to testify and basically what they'll

4    say.  That's what I see this trial brief doing.

5          THE COURT: Oh, I definitely want pretrial

6    statements that will lay out who the witnesses are and a

7    summary of what they're going to say and all the exhibits

8    pre-marked for identification.  I did think I had asked for

9    that earlier on.

10          MR. MULLEDY: You did.

11          MR. BERNICK: We're going to address the issue of

12    what law's applicable in the context of the Daubert motions

13    because you can't decide relevance or fit without knowing

14    what law it is that we're working with, so, again, really I

15    think that this is - Well, I've said what I need to say.

16          THE COURT: Okay.  I think briefs limited to 40

17    pages should be sufficient after all of these other briefs on

18    the Daubert issue, so, the brief part itself, however long it

19    takes you to lay out who the witnesses are, I really don't

20    want to know point by point what the witnesses are going to

21    testify about.  I simply want to know, are they fact

22    witnesses and if so, on what point.

23          MR. FINCH: No, my concept of that would be expert

24    witness on asbestos-related medical issues.  Expert witness

25    on a asbestos-related industrial hygiene issues.  Fact

1    witness on, you know, trial settlement process or something

2    like that.

3              THE COURT: Yeah, that's what I'm looking for.

4              MR. FINCH: That level of detail.

5              THE COURT: Okay, but I do want the exhibits.

6              MR. FINCH: Yes, and the exhibits, just so the

7    record is clear, the exhibits would be the exhibits that each

8    side would intend to offer in its direct case.  It wouldn't

9    include things you might use for cross-examination or

10   impeachment, as to which you really don't know until you see

11   the direct case of the other side.

12             THE COURT: Of course.

13             MR. BERNICK: Are we talking 40 pages a side, not 40

14   pages a party?

15             MR. FINCH: Yes, 40 pages a side.

16             MR. MULLEDY: That's what I understood the Court to

17   say.

18             MR. FINCH: Forty pages a side.

19             THE COURT: Yes.

20             MR. FINCH: Then, the next item on the proposed

21   order -

22             THE COURT: Oh, wait, I'm sorry.  Pardon me Mr.

23   Finch, I'm sorry for interrupting, but the schedule then

24   you're going to do them at the same time or -

25             MR. FINCH: No, no, the schedule will be the list of

1    witnesses and the list of exhibits would be filed

2    simultaneously on December the 21st.  And then the ACC, FCR

3    trial brief of 40 pages will be filed on th 21st.  The

4    debtors' quote, "trial brief", will be filed on January the

5    4th.  But everybody would get Your Honor their list of

6    witnesses and brief description of what the witnesses will

7    testify to as well as the exhibits on December the 21st before

8    Christmas.

9            THE COURT: All right.

10           MR. FINCH: The next item is basically a

11   housekeeping item, relates to issues relating to the order of

12   witnesses -

13           THE COURT: Okay.

14           MR. FINCH:  - and, this is because the trial is

15   sort of in various traunches, and many of the witnesses are

16   expert witnesses whose schedules get booked up.  We've

17   negotiated and agreed a proposal that basically says, For the

18   January portion of the hearing, and I'm sure the debtors'

19   case will take the entire January portion of the hearing, the

20   debtor will by January 4th, 2007 (sic), tell us not only, you

21   know, the list of witnesses that it intends to call in that

22   hearing, but as best as it can determine, the order of those

23   witnesses, and then the list will be updated on a weekly

24   basis, and then for the later portions of the hearing,

25   whichever party is putting on its case, will give the other

1    side ten days prior to the resumption of the hearing a list

2    of the witnesses that are going to called in that section of

3    the case in the order that they will be called in and then at

4    the end of each hearing day during the case itself, whoever's

5    putting on witnesses, whichever party is putting on witnesses

6    the next day, will tell the other side the names of the

7    witnesses and the order in which they will appear, in case

8    there's, you know, last minute logistical problems.  So this

9    is a way to make sure that the right lawyers and the right

10   boxes of stuff are in the courtroom for each day.  So that's

11   spelled out in here.  The next issue is another agreed issue

12   which is issues relating to the designation of deposition or

13   prior testimony.  Given that a lot of the prior testimony

14   won't be offered until later in the proceeding, rather than -

15   and some of it may become unnecessary as the case comes in,

16   what the parties have agreed to do is 14 days prior to the

17   date that they intend to submit to Your Honor a deposition or

18   prior testimony, they would give the other side a list of the

19   deposition designations as well as a marked up copy of the

20   transcript.  Then the other side would have 10 days to

21   provide counter designations and/or objections to that, and

22   then the party proffering the deposition or prior testimony

23   would have three days to provide any counter or counter-

24   designations or objections to the counter-designated

25   testimony, and then the party proffering the prior testimony

1    would submit to Your Honor the entire deposition or prior

2    transcript with the parties' designations, debtors' side

3    counter designations and the objections and counter-counter

4    designations all tied up in one big bundle with one side

5    using one color to mark what the designations are and the

6    other side using another color, and, you know, I had

7    proffered blue for the asbestos creditors and grey for Grace,

8    but if they want to use a different color, that's okay with

9    me, but the party proffering the testimony would have the

10   obligation to submit all this to the Court in the color-coded

11   copies of the transcript.

12        THE COURT: Okay, again, for this purpose, I'd like

13   the information submitted in binders so that it's, you know,

14   already punched and submitted and have the binders marked,

15   it's much easier to handle that way.

16        MR. FINCH: The way I envision this and the way I've

17   done it in other cases is, I think, frankly, in cases

18   involving Your Honor, is to have a binder with the witness's

19   name and the past testimony of John Smith.  The first several

20   pages are basically pleadings that have page/line, page/line

21   designations from each side, and then a copy of the entire

22   transcript from page 1 to the very end, but color marked up

23   with the pages so designated.

24        THE COURT: That's fine.  Okay, that's fine.

25        MR. FINCH: The next item on the proposed order is

1   something that is not agreed to which I'll pass for the

2   moment, which is motions in limine other than Daubert

3   motions.  The final agreed item on the order relates to

4   miscellaneous, and there are two items on that.  One is that

5   demonstrative exhibits must be produced to the opposing

6   parties 24 hours prior to use.  The other is that Rule 1006

7   summaries of voluminous exhibits must be produced to opposing

8   parties at least 72 hours prior to being offered, and I

9   believe that's all agreed to.

10          MR. BERNICK: Yeah, the only little bit of texture

11   on the demonstratives is that I think we all anticipate that

12   there will probably be some revisions to demonstratives even

13   within the 24-hour period.  So it's not designed to be a

14   gotcha kind of thing, but it's designed to give fair notice

15   of what the demonstratives are going to be in advance.  I

16   hope that there's agreement on that.

17          MR. FINCH: There's no disagreement here, Your

18   Honor, although the revisions in there are revisions.  If

19   there's a, you know, two-page demonstrative exhibit 24 hours

20   in advance, and then a 40-page demonstrative exhibit offered

21   during the hearing, I may have objections to that.  So, you

22   know, fair notice is one thing, but completely adding to or

23   revising something is something else entirely.

24          THE COURT: That sounds like there's no agreement,

25   folks, because -

1          MR. BERNICK: It's just not practical.  I frankly

2     think that there's - there happens to be a little bit of

3     ground that's somewhere between 4 pages turning into 40

4     pages.  I mean inevitably in working with witnesses, you

5     refine details, and if there's abuse I think it will become

6     fairly obviously, and it will be raised before the Court, but

7     we think it is unrealistic to expect that demonstratives will

8     be final, final, final, no changes 24 hours in advance.

9          MR. FINCH: I agree with that, Your Honor, but maybe

10    -

11         THE COURT: Mr. Finch, who is it that has whatever

12    the wireless device is that's on?  Okay, Mr. Finch, go ahead.

13         MR. FINCH: Maybe what we can do is demonstratives

14    exchanged 24 hours - initially, I mean, good faith efforts of

15    draft demonstratives 24 hours prior to use and then on the

16    morning of use, the final demonstratives.

17         MR. BERNICK: That's fine.

18         MR. FINCH: Okay.  Then the two open items on this

19    order.  One relates to the schedule for motions in limine

20    other than Daubert motions, and the second relates to what I

21    call the time trial proceedings, and I guess I'll take up the

22    time trial proceedings first as to which there's no agreement

23    on this, but basically, Your Honor has provided dates through

24    now, May the 7th or May the 8th, in which to try this case, and

25    it's our understanding from the Clerk's Office those are the

1    - that's the end.  There's no more dates available after

2    that.  In the ordinary course of a trial, Mr. Bernick would

3    start his case and he would go until whenever he's done with

4    his case, and then Mulledy and I would put on a response

5    case, and we would go until whenever we're done with that,

6    and then Mr. Bernick would have a rebuttal presumably and if

7    there's any sur-rebuttal, people just to get the trial done,

8    and it goes however long it goes.  Here, Your Honor has put,

9    as I understand it, a limit on the amount of time the Court

10   has available to give the parties to try the case, which is

11   perfectly within the discretion of the Court, and I think

12   it's a sensible thing to do.  My -

13            THE COURT: That's in the eye of the beholder.  In

14   my view I haven't put any limits whatsoever on this process.

15   I've committed two or three days a week from January through

16   May, virtually.  That is an impossibly long time.  It

17   shouldn't take anywhere near that length of time to get this

18   proceeding finished.

19            MR. FINCH: I agree with that in principle, Your

20   Honor, but the - given that there is a finite amount of time,

21   it seems to me there has to be a mechanism in place to make

22   sure that the time we do have it allocated fairly between the

23   parties.

24            THE COURT: Okay.

25            MR. FINCH: And, you know, through no fault of

1    anybody, what if we get to 14 days into it and the debtor's

2    still putting on its case, and then it's unfair to my client

3    and to Mr. Mulledy's client to say you only have 4 days to

4    finish your case, Mr. Finch.  So, my proposal is if we have

5    some kind of an agreed mechanism - or not agreed, court

6    ordered mechanism up front to put some discipline on the

7    proceedings and make sure that it's done by the time that the

8    Court thinks it should be done, and just by - in way of

9    passing, my first experience in a time trial was in the

10   Armstrong proceeding.  The Federal District Court there

11   citing some Third Circuit case law imposed time limits on the

12   parties of 7 hours per side for expert testimony and 2 hours

13   per side for fact witness testimony.  Now, admittedly there

14   were far fewer witnesses in that case than this one here, but

15   the basic concept was that if I was standing up moving my

16   mouth, my side would be charged with that time.   Mr. Bernick

17   is standing up moving his mouth or Mr. Pasquale or Mr.

18   Horowitz or whoever else for the Equity Committee, their side

19   would be charged with the time.  That a courtroom deputy or

20   some other officer of the Court would keep track of this

21   using a chess clock or some other device.  At the end of the

22   day there would be a reconciliation with the parties as to

23   how long each side has taken, and that the proposal would be

24   just to divide 20 trial days times, you know, estimated 7

25   hours trial time per day in half, and so we each have 20

1    times 7 is 140 divided by 2 is 70 hours per side.  I think

2    there has to be some kind of mechanism up front to make sure

3    that we get done with this by the end of the cutoff.  You

4    know, I frankly, Your Honor, I did not like the time trial

5    proposal in the Armstrong case until I actually did it, and

6    then looking back on it, I think it made a lot of sense, and

7    it was a - sort of a very easy way for the Court to impose

8    some rigor on the parties and make them get things done in

9    what is a reasonable amount of time, and I strongly commend

10   to Your Honor to put into place something like that here.

11   It's a very simple, mechanically to do, it's fair to both

12   sides.  There's, you know, you can use your time however you

13   want.  If you want to quote from the King James version of

14   the Bible you can do it, all subject to relevance and

15   admissibility, but there's no limitations substantively or

16   how you divide the time up between Mr. Mulledy's case and my

17   case or whatever, but it does put a limit on the overall

18   trial and puts a framework around it.  So that's my proposal

19   for the time trial, and then as to the second non-agreed

20   item, which is for motions in limine other than Daubert

21   motions, we just need to know Your Honor's preference.  One

22   suggestion had been that we just file motions in limine sort

23   of on a rolling basis.  I don't tend to like that approach.

24   I would prefer to have a deadline for filing motions in

25   limine.  Maybe you could have deadlines on each traunch of

1    the trial, but just to have no limits on motions in limine

2    strikes me as, you know, leading to lots and lots of paper

3    being filed for no real purpose.  I mean normally motions in

4    limine would be due sometime - on evidentiary issues would be

5    sometime before the start of the trial.  And so, my proposal

6    would be that motions in limine would be filed at the same

7    time that the initial trial brief is filed.  If the debtor

8    has motions in limine against our case, he files it December

9    21st.  If we have motions in limine against their case, we

10   filed it December 21st.  But that's just, you know, there's no

11   agreement, no negotiation really about that, that's just -

12   I'm asking the Court to pick a deadline for motions in

13   limine.  And with that, unless Mr. Mulledy has any comments,

14   anyone else on our side has any comments, we'll cede the

15   podium to my adversary.

16        THE COURT: To help me with the last issue, at the

17   moment, what types of motions in limine other than the

18   Daubert motions are you contemplating?

19        MR. FINCH: Well, there is a motion in limine about

20   whether or not the debtors' past settlement history is

21   relevant and admissible for purposes of estimating its

22   liability.  That's the way it's been done in other cases.

23   When a party enters into a settlement, it doesn't admit to a

24   tort liability, but the settlement agreement itself creates a

25   contract liability.  Just like when a debtor runs over

1  somebody with its truck and then that person files a proof of

2  claim form with the Bankruptcy, sometime in the bankruptcy

3  case they do a settlement agreement.  They have a 9019

4  motion.  They settle that case for $5 million or whatever

5  they settle it for.  That becomes a liability that's a

6  schedule on the debtors' books.  It's a settlement.  It's a

7  contract.  It's not a tort liability, but it's a contract

8  liability, and when the debtor was in the tort system in a

9  solvent company, just like every other solvent company, it

10 estimates its liability based on its expected future cost of

11 paying claims.  In most cases, 98 percent of cases get

12 resolved by settlement, not by trial, and so the real world

13 best evidence way to estimate liability is to use a company's

14 settlement history.  That's a motion in limine.  Mr. Bernick

15 has pretty much assured us he's going to file that motion.

16 Whether he wraps it up with a Daubert motion, I don't even

17 know if it's a Daubert issue, but I've got the flip side of

18 that motion.  You know, I would tend to file a motion in

19 limine saying, That methodology is admissible or that

20 evidence, the evidence of the debtors' settlement is not

21 barred by 408 or anything else for purposes of estimating the

22 liability.  That's a motion in limine that I can foresee

23 physically tied to the Daubert brief necessarily, or it

24 doesn't have to be.  I don't think it is, and so, you know,

25 there may be motions in limine relating to foundational

1  testimony from certain fact witnesses whether they know what

2  they say they're testifying to.  There may be motions in

3  limine that come up on, you know, hearsay issues within a

4  document or a series of documents.  Motions in limine

5  relating to the - some of the materials that has been

6  gathered in the case.  I don't know whether I'm going to need

7  them or not until I see the debtors' final exhibit list and

8  list of witnesses.  So that's the kind of motion in limine,

9  sort of evidentiary issues that aren't Daubert related to

10  experts.  They come up.  They inevitably come up.  Usually by

11  the time you get the other side's - and maybe my proposal

12  having these due on December 21st is a little premature.

13  Maybe the thing to do is have them due in January after we've

14  seen their list of exhibits, they've seen our list of

15  exhibits, and then the Court wouldn't necessarily rule on the

16  motions until the party proffers the piece of evidence.  I

17  just think there needs to be somewhere in the schedule a

18  date, whether it's January 4th, January 7th, January 10th,

19  whatever, for filing motions in limine.  Mr. Mulledy wants to

20  comment.

21        MR. MULLEDY: My only added comment to that, Your

22  Honor, is it should be before the trial begins because any

23  procedure that contemplates a rolling handing across the

24  counsel table each morning a new motion in limine is going to

25  be a major distraction, to say the least.  We have limited

1   resources, all of us do, to try this case, and we're going to

2   be, I'm sure, performing legal research for our own

3   presentations to divert them away from that and now start

4   writing an opposition brief on a limine motion that was

5   handed to you the morning of trial for an issue that is

6   likely to come up that day or the next day is just a

7   disruption that none of us need, and I think it's

8   unnecessary.  If we know that there are going to be issues

9   about evidentiary matters in this trial, we all know what

10  those issues are right now.  We can brief them and get them

11  out of the way, and the rest of it can just be handled on an

12  exhibit-by-exhibit basis noting objections for the record.

13          MR. FINCH: With that, Your Honor, I'll sit down.

14  Thank you.

15          THE COURT: Mr. Bernick?

16          MR. BERNICK: Yeah, I think that both of these

17  issues are good issues, but what they're being put to Your

18  Honor as if there's kind of a black and white situation and

19  there's nothing between and that that solution, the white

20  solution and the black solution or however you take it, is to

21  have something decided in advance by way of a regiment or

22  routine that makes all of this very predictable, and I think

23  that in neither situation is that either workable or is that

24  appropriate.  With regard to the time, this is obviously

25  different from other cases.  If you take a look at the sheer

1    volume of the expert materials that are involved in this

2    case, to say nothing of the factual materials to be submitted

3    to the Court, I think actually the concern that most of all

4    animates Mr. Finch's remarks and the remarks of the other

5    side is that the trial dates simply will not be enough.  So

6    that it's not a question of having a surplusage of time, it's

7    running out of time.  I believe that if all issues and all

8    evidence that have been the subject of discovery or put

9    before Your Honor you literally couldn't recite them all in

10   the period of time to be involved, in the period of time

11   that's set aside for this trial.  So, obviously, something

12   has to change in order to get this thing done in a reasonably

13   prompt fashion.  What they propose is basically deferring how

14   that process takes place and basically saying instead, we'll

15   just run it by the clock, which basically means that no

16   decisions are really made as the case proceeds about what the

17   Court is most interested in and what issues are raised in

18   importance to the Court and instead everybody kind of makes

19   their own decisions based upon how much the clock is running

20   out.  The problem with that is, the clock doesn't reflect the

21   reality of what happens during a trial, which is that certain

22   issues become important.  Other issues become less important.

23   The issues that are important warrant more time and

24   attention.  The ones that are less important obviously less

25   time, and in that fashion, basically, people make up their

1    minds about what's worth pursuing, and I believe that Your

2    Honor is going to - I think it would be terrific and even

3    dispensable to getting this trial done on time for Your Honor

4    to kind of react and give us notions about what it is, what

5    evidence, what issues are you most focused on, and that's in

6    a sense of having all this briefing in advance.  The concern

7    I have with doing it by the clock is very simple, which is

8    that there are conceivably, you know, 50, 60, 80 different

9    little issues.  There are hundreds if not thousands of

10   different pieces of evidence.  It's very easy to put a matter

11   at issue to make a contention.  It's very difficult in some

12   cases to as efficiently to address that contention or that

13   issue, and I don't want to be in a position where my client

14   all of a sudden faces issues.  There are significant issues -

15   and a whole slew of them, and now the clock is going, and

16   what actually drives our ability to respond is how many

17   issues have been put on the table, all of a sudden, not

18   knowing where, in the sense Your Honor's going or what's

19   going to be important in this case and the clicking of the

20   clock, and I've been in the situation before.  It's not an

21   uncommon situation where you have trial by the clock.  In

22   this case it should not be a function of getting cutoff that

23   an issue gets decided, that is the issue has been raised.

24   Some evidence has been submitted, but the other side has not

25   had the opportunity to respond.  So I think as a practical

1    matter, what's going to be very important here is for - is

2    for the trial to start and for the parties to make judgments

3    about where they want to focus their case, but to have, in a

4    sense, a more interactive process with the Court to focus

5    what it is that we're really talking about, what it is that's

6    going to make a difference to the Court's decisions so that

7    we're not operating by a clock that artificially constrains

8    the due process right of a party to respond to any number of

9    scores and scores of issues that are coming up.  If we tried

10   all of the issues again that are in these expert reports and

11   all the evidence that relates to them, it is plain that the

12   trial days cannot begin to be enough.  This case will be not

13   different from many, many other very lengthy and very

14   complicated bench trials.  So to get to the point whereas

15   Your Honor obviously hopes and expects will be able to take

16   fewer trial days, that's not going to be because a clock is

17   ticking.  A clock is indifferent to the substance of what's

18   going on.  It's because the parties do a good job of putting

19   the issues before Your Honor, and we get some feedback or

20   some indication from Your Honor about what you've already

21   heard enough of and what it is that you want to hear going

22   forward, and on that basis the parties can decide on their

23   own what it is that they really need to pursue.  Now, it may

24   become important at some time for Your Honor to constrain the

25   amount of time that one party takes on a certain subject or

1    that one party takes in the aggregate.  That is something

2    that Your Honor is totally and completely capable of doing on

3    an informed basis using true judicial discretion.  A clock is

4    not judicial discretion.  A clock is an artificial

5    constraint, and we'd be very much against the idea of putting

6    this case on the clock.  We think it creates way, way too

7    many opportunities for unfairness, and we don't think it's

8    necessary and appropriate given the length of time that's

9    been dedicated to the preparation of this case.  With respect

10   to, and I don't know - I'm happy to go on and talk about the

11   motions in limine.  My remarks are similar, but if Your Honor

12   had questions with respect to time or reactions on the time,

13   I can address those.

14           THE COURT: No, go ahead.

15           MR. BERNICK: Okay.  With respect to the motions in

16   limine, in a sense, it's very much the same kind of thing.

17   We think that the principal issues that relate to the

18   admissibility of expert testimony will be raised by way of

19   the Daubert briefs.  There may be additional in limine issues

20   in the sense of issues of general importance to the

21   admissibility of evidence in the case.  Mr. Finch has

22   identified one, although Your Honor already has actually

23   given us some guidance at the last hearing on that issue

24   precisely.  There may be some others.  Ordinarily, you would

25   not have motions in limine that dealt with those big issues

1    in a bench trial - I should say, normally in a jury trial, if

2    you have motions in limine that dealt with big issues of

3    admissibility, you don't even want to have them come before

4    the jury so they're handled all in advance and that creates,

5    obviously, a major burden, but it's necessary because the

6    jury needs to - there needs to be guidance before opening

7    statements take place.  Here we have a bench trial.  So

8    there's not an issue of somehow keeping matters from coming

9    up in court, and that gives both sides a lot of flexibility.

10   In the same fashion, Your Honor doesn't have to decide

11   Daubert motions.  You can hear the Daubert motions and you've

12   already told us you're not going to decide them, in the same

13   fashion we can have issues, other issues of admissibility, it

14   would come up during the course of trial, and they could be

15   briefed at an appropriate in time if they're going to be

16   briefed and decided at an appropriate point in time.  To

17   force all matters that might be taken up in limine, again

18   into this period of time before the trial starts, is just

19   completely unrealistic.  As Mr. Finch has acknowledged in the

20   last caveat that he made towards the end of his remarks,

21   we're going to be very busy doing all kinds of different

22   things.  The last thing that I think we need is to have a

23   deadline that says artificially, you've got to give me all

24   the motions before the trial starts.  I suspect that what

25   will happen is that beyond the Daubert motions there will

1    probably be a handful of major issues going to admissibility

2    that warrant having some significant briefing, and I think

3    it's then up to the parties that intend to raise those

4    matters to raise them in a timely fashion, and that does not

5    mean, again, black/white.  That they all of a sudden all get

6    raised in the morning that the issue is going to come up by

7    exchanging a brief across the courtroom.  That would

8    obviously not be timely, and we're certainly not

9    contemplating anything of that nature.  So, I think that the

10   real choice is do you force the prosecution of any written

11   motions in limine to take place before the trial even starts

12   or do you impose the burden on the moving party to timely

13   make a motion by way of brief for those matters that will in

14   fact be briefed.  With respect to all other matters, there

15   are all kinds of issues of admissibility that will in fact

16   get resolved, not just during the morning, but during the

17   course of the trial itself, and that's not something that I

18   take to be within the scope of the issue we're discussing

19   now.  We're discussing now our significant briefs on issues

20   of general application, and it seems to me that the more

21   prudent way to deal with that, given the fact that this is a

22   bench trial, is to have them made on motion at an appropriate

23   time reasonably in advance of when they'd have to be decided,

24   so that the other side, in fact, does have the opportunity to

25   submit a timely responsive brief.  There are going to be all

1    kinds of gaps in the schedule so that there shouldn't be any

2    reason why we've got significant briefs that are filed

3    without notice on the morning when Your Honor's going to be

4    presented with the issue to decide.  So that would be our

5    proposal about how to resolve the motion in limine issue.

6            THE COURT: Anybody else?

7            MR. FINCH: May I respond?

8            THE COURT: Mr. Finch.

9            MR. FINCH: On the motion in limine issue first,

10    reasonable notice is a fine concept but my experience is, in

11    the middle of a trial, it's better to have fixed and hard and

12    fast rules, and whether you want to say motions in limine

13    relating to the first traunch will be due January 10th, we

14    have to have a schedule in place so that we don't just have,

15    you know, reasonableness being in the eye of the beholder.

16    That's why I asked Your Honor to set a firm date for motions

17    in limine.  If you want to do it in traunches, that's fine

18    too, but I just - It makes me very uncomfortable to have no

19    schedule at all.

20            THE COURT: Well, let's go back to the list of

21    witnesses who are expected to be called and when these

22    witnesses are going to be identified to the other side and

23    then to the Court, because I'm not - I mean it just went by

24    me pretty fast, so -

25            MR. FINCH: That would be December 21st under the

1  schedule, Your Honor.

2          THE COURT: All right.  So, I would assume that by

3  December 21st if you've got motions in limine with respect to

4  witnesses or documents that are going to be on the January

5  list, you ought to be able to file motions with respect to

6  any of those significant issues by the date or within so many

7  days after that list is divulged.  And then, the same with

8  the March and April trial traunches.

9          MR. BERNICK: Well, Your Honor, I think that the

10 list that we have is on the 21st is trial briefs, all

11 witnesses -

12         MR. FINCH: All the witnesses.

13         MR. BERNICK: It's not the ordering, and then with

14 respect to the ordering of the witnesses, this is January 4th

15 for January.  So on the 4th we would indicate those people

16 expected to be called simply during the January portion of

17 the hearing.

18         THE COURT: Right, and you're not going to have

19 witnesses probably what, the first three days?  Or first two

20 days at least of trial?

21         MR. BERNICK: Well, I think actually we probably

22 will have witnesses at least during the second and third -

23         MR. FINCH: Second day of trial.

24         MR. BERNICK: Second, third, and fourth days of the

25 trial in January.

1          THE COURT: Well, tell me what those dates are.

2          MR. BERNICK: That's the - they are the 16th, the

3    23rd, and the 24th, if memory serves.

4          THE COURT: Okay.  So, if you disclosed - if you

5    filed your motions in limine with respect to witnesses that

6    were going to be called the 16th through the end of January,

7    whatever those dates were -

8          MR. BERNICK: Right.

9          THE COURT:  - by, well, the January date would have

10   to be shortened if you're not going to call the witnesses -

11   I'm sorry, to disclose the witnesses until January 4th, that

12   would have to be a pretty shortened date to make that

13   meaningful.

14         MR. BERNICK: That's part of the reason.  I mean

15   that - the burden is, in that instance because they're my

16   witnesses, likely on the ACC and the FCR to go ahead and do

17   that, and they won't know exactly - Well, they could probably

18   do a pretty good job in determining what the exhibits would

19   be, they wouldn't necessarily know that by that time because

20   remember, the exhibits are -

21         MR. FINCH: The exhibits - all the exhibits we'd

22   have by December the 21st.

23         MR. BERNICK: But you wouldn't know which one

24   belonged with which witness.  You'd probably suspect if you

25   could do that.  I also don't know what necessarily might be

1    used by them on cross-examination.  Again, I don't think

2    we're really talking about the issues of admissibility with

3    respect to particular documents or for that matter even maybe

4    particular aspects of the testimony.  What we're talking

5    about is an issue that's of such broad application that it

6    warrants a brief.

7         THE COURT: Right.  Yeah, I don't expect that, for

8    example, your hearsay objections unless it's going to take a

9    brief, you're going to be making them by a motion in limine -

10        MR. FINCH: No, probably -

11        THE COURT:  - or relevance to particular witnesses.

12   That's going to come up by way of trial objection not by way

13   of a motion in limine.

14        MR. FINCH: Right, right.

15        THE COURT: So, I think Mr. Bernick's correct about

16   that.  You're going to reserve motions in limine for the

17   really overarching issues.

18        MR. FINCH: I agree with that, Your Honor, but I do

19   think that there needs to be a date in January for the

20   January portion.  A date in late February for the March

21   portion, and a date in late March for the April portion.

22        MR. BERNICK: I think that counsel is making an

23   argument that's really going to have much more bite on them.

24   I really think, and maybe this is an area where it would

25   probably stand some more discussion.  We could probably agree

```
1    to something that says that in any matter that is raised by -
2    any matter of admissibility that is raised by briefing shall
3    not be heard by the Court until the other side responds and
4    that response should be - 7 days should be allotted for that
5    response to be made so that no one's getting briefs the
6    morning that a matter has to be decided, and basically we
7    would have a fairly shortened period for motions in limine
8    that would basically give anybody who is responding to a
9    motion in limine a week to put together a response.  And if
10   you want to be busily working on the 408 issue, I suppose
11   that can be done although I suspect that that's going to be
12   your motion not ours because I think Your Honor's already
13   given us sufficient guidance on that.
14        MR. FINCH: Your Honor, I think maybe the best way
15   to handle it for today's purposes for purposes of getting an
16   order to you to sign tomorrow or the next day is for motions
17   in limine just to leave that, you know, to be determined by
18   the Court after further discussion between the parties.  I
19   think there are - the real concern was that we have
20   sufficient time to respond to motions in limine and to tee up
21   motions in limine, and if what the - I think I understand Mr.
22   Bernick's proposal, and I think that might make sense, but
23   I'd like to talk about it with the people in my firm and Mr.
24   Mulledy's firm who are actually going to be writing more of
25   the briefs than I may.
```

1          THE COURT: Okay, well, I have a concern in this

2     too.

3          MR. FINCH: I understand, Your Honor.

4          THE COURT: That is, Mr. Bernick's saying that the

5     other side ought to have 7 days to respond, that's fine, but

6     I need some time to read it.  I don't want to be handed it

7     the day of the hearing neither.  So, the 7 days to respond in

8     my view means that it's going to have to be filed a couple of

9     days in advance, and the problem is that in some instances,

10    you've got 3 days of trial testimony in a row, and I'm not

11    sure exactly what time we're going to break up in those days,

12    and I can tell you, some days I may get three briefs at

13    night, some days, if you beat me up the way you do in some

14    hearing dates, I'm probably not going to be able to read

15    briefs at night because I won't understand the word that I'm

16    reading at that point in time.  So -

17         MR. FINCH: Well, Your Honor, one of the, I guess

18    luxuries that we do have is that this is a bench trial, and

19    the practice that I think Your Honor has followed under cases

20    is that you can hear testimony sometimes subject to a motion

21    to strike it later.  So even though it's styled a motion in

22    limine, maybe it's a motion in limine and then the - if the

23    motion is filed, let's say on just a hypothetical, pick a

24    day, March the 4th, then the response is 7 days, due later on

25    March the 11th, and the guy actually testifies on March the

1    6th, then you have the argument about the motion in

2    limine/motion to strike on March the 12th, and the testimony

3    is stricken if the Court agrees with the party proffering the

4    motion in limine.

5         MR. BERNICK: I would strongly object to that.  I

6    mean, that defeats the whole purpose for the exercise.  It

7    means that we're wasting testimony time.  This should be done

8    so that the matter is decided and then it helps us figure out

9    what we're going to be doing next.

10        THE COURT: Well, okay, for my purposes, I would

11   like whatever briefs - motions in limine and briefs are going

12   to be filed, to be filed the Friday before whatever the next

13   week's hearings are going to be.   So that I have the weekend

14   to read whatever's coming up the following week.  That

15   should, I think, give you all sufficient time to get the

16   documents filed and get me an opportunity, hopefully, to read

17   them, but when I say Friday, I mean Friday morning.

18        MR. FINCH: That means the response has to be to

19   Your Honor by that time.

20        THE COURT: That means everything has to be to me.

21        MR. FINCH: So there would be an initial brief the

22   Friday before the Friday and then the response that Friday.

23        THE COURT: Correct.

24        MR. BERNICK: That would be fine with us.

25        THE COURT: And there will be no replies.

1          MR. FINCH: That's fine with -

2          THE COURT: I'm not having replies, don't ask.

3          MR. FINCH: That's fine with us.

4          THE COURT: The answer is no.

5          MR. FINCH: That's fine.  For example, the first

6    week of trial, if I have any motions in limine, the first

7    week of trial starts on January the 14th, the prior date - the

8    Friday before that is the 11th -

9          THE COURT: Right.

10          MR. FINCH: So, I'd have to have it on the 4th.

11          THE COURT: And that's the day the designations are

12   due, so that's not going to work in that instance, so I think

13   for that one, your designations are going to have to be done

14   - pardon me, your motions in limine with respect to those

15   designations, you'll have to do on the 7th, which is the

16   following Monday.

17          MR. FINCH: Following Monday.  I may not have a

18   motion in limine for the first set of the debtors' witnesses

19   other than our Daubert briefs, but until I - I'll get his

20   exhibits on the 21st.  I'll see all of his witnesses on the

21   21st and I'll see the exact order that he's going to call them

22   in, in January.  I think that's workable.

23          THE COURT: Right.  You won't see the order though

24   until January 4th, which is the day that normally your motion

25   in limine for that - the first week of trial would be due.

1    So what I'm suggesting is, just for the first one, your

2    motions would be due the following Monday, which would be

3    January 7.  The responses would still be due January 11.

4    That shortens both of your time, not mine.

5             MR. BERNICK: Okay.  That's fine.

6             MR. FINCH: That's fine.

7             THE COURT: Okay.

8             MR. FINCH: And then finally on the time trial

9    proposal, the response Mr. Bernick made was saying that this

10   potentially raises due process issues and that the guidance

11   from the Court would be helpful to the lawyers in putting on

12   their case.  I - first of all, I don't think it's a due

13   process issue.  I think everybody's going to have the process

14   that is due to them in the 20 days that the Court has given

15   us, but secondly, deciding what's important in your case and

16   how the judges are reacting to the evidence you're putting on

17   is something a lawyer has to do in every case, and in every

18   trial I've been involved in, whether it's a time trial or

19   not, the Judge puts constraints on what people are allowed to

20   do and can't do, and so, what I'm saying is, this is a way

21   that is fair *ab initio* in advance to divide up the time.  I

22   don't know if there's any other way to divide up the time at

23   the front.  If Mr. Bernick thinks he, you know, wants more

24   time at the end of the 20 days, he can make a motion to Your

25   Honor to get more time.  If on the other hand, he thinks, you

1  know, I've put five issues on the table, he's only got ten

2  hours left, part of a lawyer's job is to figure out what's

3  important and what's less important and structure your case

4  accordingly.  So I do think there has to be some kind of

5  governor at the front, and I think the time trial is the best

6  way to do it in this instance, you know, that's obviously a -

7  it's not something that happens in every case, but I do think

8  it's within the inherent power of the Court to order that.

9        THE COURT: Well, I think it's within the discretion

10  of the Court to do it, Mr. Finch.  The trouble I'm having in

11  this case is, and I haven't finished reading all the expert

12  reports, but it does seem as though you're trying two

13  entirely different cases, and that's why I'm having some

14  difficulty with figuring out the concept of this time trial

15  here.  It almost seems as though - just from looking at the

16  expert reports, obviously, I don't know exactly how the

17  evidence is going to come in, but from looking at the expert

18  reports, it looks as though the debtor has its view of the

19  world and your cross-examination of the debtors' witnesses is

20  going to go down a track because that's the debtors' view of

21  the world and you're going to attack it however you think it

22  ought to be attacked, and then your side has its view of the

23  world, and you're going to put on your view, and then the

24  debtors' going to attack it however it thinks it has to be

25  attacked, but the two views of the world are really not the

1    same.

2           MR. FINCH: I agree with that, Your Honor.  My only

3    caveat or observation is, I believe their view of the world

4    is irrelevant to the issues the Court has to decide.

5           THE COURT: Well -

6           MR. FINCH: But, you know, I agree that there are

7    definitely two ships crossing in the night.  Maybe they'll

8    crash somewhere.  I assume that they'll be shooting each

9    other as they go by each other, but I guess my plea for Your

10   Honor is that I would like some kind of governor on the time

11   up front so we don't have a situation where we're 16 days

12   into this and Mr. Bernick is calling his last witness and

13   then you turn to Mr. Mulledy and me and say, you know, you've

14   got five days, guys.

15          THE COURT: Gee, guys, sorry.

16          MR. FINCH: Yes.

17          MR. BERNICK: But that's not an issue.  In fact,

18   we're actually concerned about exactly the same thing, which

19   is if they then raise the - Sorry.

20          MR. FINCH: Sure.

21          MR. BERNICK: If they decide of the 35, 40, 50, 60,

22   80 different issues that they're all of a sudden going to

23   make a big deal towards the end of their case about 3 of

24   those issues that we thought to be of absolutely no

25   consequence, but Your Honor's fascinated with them, we don't

1    want to have the clock cut off our response to those very

2    important issues.  And I would say that Your Honor's

3    observation is not only correct, but that's only the

4    beginning of it in a way because while there are two very

5    different visions of how estimation and what this estimation

6    in particular should involve, the issues that drive who's

7    right is not just one issue and it's not even just one

8    factual or legal issue.  It is a series of legal issues.  It

9    is a series, perhaps less so a series of factual issues.  And

10   Your Honor may take those first 5 or 6 legal issues and

11   decide them in a way that cuts against both sides, and then

12   we'll have to figure out what to do with that.  So this is

13   very, very much a moving picture where Your Honor in a sense

14   can't even decide, well, I adopt their view of the world or I

15   adopt the other side's view of the world.  Your Honor's going

16   to have to decide a series of discrete legal issues that are

17   very interrelated and will have a variety of different

18   potential effects on both visions, and then, there's another

19   part which is that you have two different visions and then

20   both sides will probably respond - I know that we have, I

21   suspect that they will also - both sides will also respond to

22   the other side's world is that we're at least in part

23   accepted and say, They still did it wrong.  So that if you

24   use the Peterson model, well, okay use Peterson's model,

25   they're wrong about the answer.  Or they'll say the same

1    thing about Florence.  So there are many, many different ways

2    in which Your Honor can go down the path of resolving

3    different issues.  We think, obviously, on balance, that

4    they've got to win almost all their issues before their

5    vision is viable.  They probably say the same thing about us.

6    What is very certain though is that again, as Your Honor has

7    seen, if all that happens is that we go down the road of

8    putting everything in, including making our, quote,

9    "judgments" - but this case isn't like most cases.  It's a

10   very complicated case.  You can always make judgments about

11   this issue is important or that issue's important, but the

12   real thing is what's important to the Court so that the Court

13   feels comfortable with how this case is being played out, and

14   that's not something that should be determined by how the

15   clock is ticking.  It ought to be determined by a little bit

16   more, you know, focus process of focusing on what issues Your

17   Honor is concerned about, what issues the parties select as

18   being important and having adequate time to respond to that.

19   All that said, I agree with Mr. Finch's concern, which is

20   that nobody should be in a position where in a sense they're

21   not getting the time that they fairly and appropriately need

22   to deal with the evidence and the issues that are put before

23   them.  And as a consequence, it would not be something that

24   we would believe would ever take place, that we would use up

25   most of the trial days and then say, Well, okay, you know,

1    they've just got 4 trial days left.  That's obviously not

2    acceptable either.  So, I think what's probably going to

3    happen is that we'll both develop an initial approach for

4    what witnesses we're going to call as part of our case.

5    We'll probably do it on the theory that we're only going to

6    get half of the trial time, including cross-examination, and

7    we'll start to make draws on who's going to testify and in

8    what order in order to get it done within this period of

9    time.  That's certainly what we're going to try to do, and as

10   it goes along, I think, particularly in the beginning part of

11   the case in a sense it's going to be where there's the

12   greatest inefficiency because we'll know less about how

13   things have turned out and the kinds of questions that Your

14   Honor may have early on in the case.  So in a sense, we're

15   the ones who are going to be bearing the burden of proceeding

16   when the case is the least focused.  That's something that

17   we're extremely mindful of, and at a certain point, we're

18   going to say to Your Honor, Okay, we think that this is where

19   it's going.  Here's how much time we think we're at.  Maybe

20   at the end of each week we can update the Court - both sides

21   can update the Court on how much time it's taking so that we

22   don't wait until being 16 days into 20 days before the

23   problem is raised.  It ought to be a continuous process of

24   examining where the case is going, obviously mindful of Your

25   Honor's statement today that it's got to get done fast.  We

1   all, I think, are totally sympathetic with that.  We want to

2   get it done promptly, but you can't assure that being done in

3   a fair way by setting the clock.  So our proposal would be

4   that at the end of each trial week we have a short discussion

5   with the Court on what's happening next in our case.  How

6   long our case is going to take, and you can see it as it

7   comes along.  I think to expect to do anything more on this

8   in advance is again imposing an artificial constraint that

9   doesn't do justice to the issues that we have to deal with.

10          MR. INSELBUCH: Your Honor, Elihu Inselbuch for the

11  Asbestos Committee.  I think Mr. Bernick is probably right.

12  The disadvantage of doing it this way though is it removes a

13  certain amount of discipline that the parties would have to

14  impose on themselves.  So long as the Court is committed to

15  providing how many additional days as might be necessary to

16  give everybody a fair crack here, then we can't argue with

17  you that there is a need to set a time trial.

18          THE COURT: I'm going to retire in not more than

19  seven years, Mr. Inselbuch.

20          MR. INSELBUCH: I may not hang on that long, Your

21  Honor, but I'm holding on by my fingernails.  Your Honor, I

22  think Mr. Bernick's idea of reviewing after each section of

23  where we are and how much more we're going to need, is a very

24  good one, and I would just say this to the Court also that,

25  planning additional days for this trial is not something

1    that's easily done.  Either the calendar commitments of all

2    the lawyers, the experts, the Court, it's complicated, so, if

3    somewhere along the way in March it's beginning to look like

4    you might need some more days, we should start finding them.

5         THE COURT: Well, I think if it's going to look like

6    there are additional days needed, for my purposes, you're

7    going to have to find them now because this is not the only

8    case I have that's asking for 20 trial days, and that's the

9    problem because, you know, bankruptcy judges typically are

10   not in for long trial dates.  That's what you do on the other

11   side of the street not on this side of the street.

12        MR. INSELBUCH: That's what motivated us to propose

13   the time trial because there's no way - We really believe

14   that we should be able to complete this trial in the time

15   already committed.  I think Mr. Bernick believes that as

16   well, but neither side is prepared to say, Well, if you let

17   my adversary use as much time as he might want, I won't be

18   left with enough time.

19        THE COURT: Well, I guess - This is why I am having

20   some difficulty.  The debtors' theory, from what I can

21   ascertain so far, is somewhat novel.  I, at least -

22        MR. INSELBUCH: Somewhat?

23        THE COURT: Yes.  So I haven't - I'm not exactly

24   sure how long the presentation of this type of case is going

25   to take because at least I personally haven't been through

1   this type of an estimation hearing exactly the way the debtor

2   is proposing it as it seems to be coming out in the expert

3   reports so far.

4          MR. INSELBUCH: No one has.

5          THE COURT: Well -

6          MR. BERNICK: Your Honor, I am happy to go through

7   all this -

8          THE COURT: No, wait.  No, it's not a Daubert issue.

9   I'm not raising it for that purpose.  I'm attempting to get

10  the issue of the time needed to put the evidence in, and so,

11  it may take me a bit more time to understand what the debtor

12  is doing simply because it doesn't follow the normal track

13  that this Court's familiar with in the exact sense that the

14  Court has seen it before, that's all.  That's all I'm saying.

15  I'm not making any judgments, good, bad, or indifferent.

16  It's simply that from my own experience, I'm more familiar

17  with what the other side is attempting to do.  It doesn't

18  look to me, from the other side's expert reports that your

19  case ought to be taking - direct case, ought to be taking a

20  huge number of days.  Your expert reports seem to be

21  following the more traditional mold in which the expert

22  testimony for estimation hearings hasn't taken all that long.

23  So, that's why I am somewhat at a loss.  If -

24          MR. INSELBUCH: Well, we are in the same position

25  you are, Your Honor.  We have to cross-examine the debtors'

1   case.

2           THE COURT: Yes, you do.

3           MR. INSELBUCH: We have to oppose the debtors' case.

4   We have to rebut the debtors' case, and we have the same

5   uncertainty about how long that might take.

6           THE COURT: Okay.  So, if we start with the

7   proposition that the debtor needs X days for its case in

8   chief, notwithstanding cross-examination, just to put on its

9   evidence in its case, and your side needs X days to put on

10  its case in chief, forget about cross-examination, just to

11  put the witnesses on, I would think that as experienced trial

12  lawyers, you probably have a pretty good concept of how long

13  it's going to take you to examine your witnesses.  Why don't

14  you tell each other that fact, and maybe that gets us a start

15  at how long the cross-examination is going to take because

16  traditionally, limiting the cross-examination, focuses the

17  cross-examination a whole lot better than not limiting the

18  cross-examination.  So, maybe that's a way that we can begin

19  this process of winnowing down what an appropriate time for

20  trial ought to be.

21          MR. INSELBUCH: Are you directing us to do this,

22  Judge?

23          THE COURT: Yes.

24          MR. INSELBUCH: Very well.

25          THE COURT: Okay, but I mean to be realistic about

1    it, not to, you know, put fluff in.  I expect it to be an

2    honest fee petition type of process.

3           MR. INSELBUCH: Well, then let's work that through,

4    that's going to take us a little time to do -

5           THE COURT: Yes, it will.

6           MR. INSELBUCH:  - and to sit down with each other

7    and present that, and at some point then, you'll want us to

8    come back to the Court.

9           THE COURT: Yes.

10          MR. INSELBUCH: And tell you what we've learned from

11   all of that.

12          THE COURT: Yes.

13          MR. INSELBUCH: And what that then suggests needs to

14   be the next step in that process.

15          THE COURT: Yes, because I think that will at least

16   find out whether this 20 days reserved is adequate, you know,

17   more than enough, wholly insufficient, whatever.  My general

18   sense is, this ought to be enough.  If it's under by two

19   days, fine.  Let's find that out now and figure out two more

20   days.

21          MR. INSELBUCH: Well, maybe the time to do that is -

22   what is it, the 21st?  All the witnesses will be identified

23   and all the exhibits will be identified.  At that point we

24   should be able to sit down with those lists and say how long

25   will the direct examination take with each of these

1   witnesses.

2          THE COURT: So, perhaps this is an issue in terms of

3   dividing up the time that can be addressed on the first of

4   the trial days.

5          MR. INSELBUCH: Very well.  That's fine with us,

6   Your Honor.

7          THE COURT: Or at the next omnibus, but I think that

8   may be before your witness list -

9          MR. BERNICK: Yeah, I think that that's fine, but I

10  think also during this period of time, particularly because

11  you will have received the briefs again - You know, my one

12  regret here is that we could - we might have been able to

13  precipitate some of the these broader structural issues at

14  some point in the past, but we were very involved in

15  discovery.  I think that the - not to argue the merits of it,

16  but the debtors' approach is going to be very apparent in the

17  briefs that we file in December, and I think that during the

18  same period of time that the parties are working to figure

19  out how long it will take to put in their direct cases, Your

20  Honor will have the opportunity also to read the briefs and

21  kind of get a better sense of the trial, and I think that the

22  discussion that would be very worthwhile is a discussion at

23  the outset of the trial about really, in a sense, okay, maybe

24  right after the opening statements, how is the debtors' case

25  going to proceed, and then how will the ACC, FCR's case

1   proceed, because at that point you will have at least gotten

2   the briefs a major way partly - probably through I suspect a

3   chunk of them, and we then will have more data on who it is

4   that we're going to call.  That's something I've got to sit

5   down and do, and I know that the other side has to as well.

6   Again, the basic problem is that the direct examination, in

7   the same fashion that the expert reports say, Oh, well,

8   here's going to be, you know.  The direct examination is,

9   Here it is.  And the real problem is, well, when the issues

10  get joined, how do the issues get joined, and then what is

11  required to deal with them, and I would also urge that while

12  our approach has not been used in the asbestos - contested

13  asbestos estimations, which have taken place recently, it has

14  been used in non-asbestos cases.  Indeed, there is case law

15  on our approach.  So that's another place that people can go

16  to think about how long this trial is going to last.  Dalkon

17  Shield's involved many of the same kinds of issues.  The Dow

18  Corning case involved many of the same kinds of issues.  So

19  there is learning out there, but I think that in a sense this

20  trial is going to become long not in the direct examinations.

21  It's going to become long when issues are joined on cross-

22  examination and then there's rebuttal, and that is,

23  unfortunately, the most difficult part of the trial to time

24  estimate.  It's really a question of then lawyers making

25  judgments about how much time they want to spend pursuing

1    stuff on cross.  I suspect the answer there too is also

2    apparent because we've now cross-examined all of the experts.

3    I know I've had the opportunity to do so, and I know that the

4    other lawyers have as well.  So I think more than anything

5    else, it really is a question of becoming more concrete about

6    the sequence of witnesses and most particularly, you know,

7    Your Honor's sense of what it is that needs to be understood

8    by the Court so that understanding both approaches you can

9    then reach a decision, and I think that will have the

10    greatest influence on how much time we want to spend covering

11    things that Your Honor doesn't want to hear about.

12        THE COURT: All right, well, I think if you spend

13    some time talking to each other about how long the direct

14    case is going to take, that probably will - and, actually,

15    how long the cross-examination of the particular witnesses

16    will take because I think you probably already know which at

17    least of the experts you're going to spend the most time

18    focusing on, and how long you expect you're going to need for

19    that purpose.  Now, I don't know about the rebuttal.  That's

20    a little bit harder to predict, I suppose, until you see what

21    direction the cross-exam goes, although if you've done the

22    depositions and also affidavits with declarations, you

23    probably have some of that in mind too, but I would think

24    that in terms of your direct case and most of the cross-

25    examination, you have some idea as to what an appropriate

1   schedule will be, and that you can, indeed, estimate how much

2   time you think you're going to need, and then it will be my

3   responsibility either to keep you to that schedule or to cut

4   off the time if it's necessary or whatever.  So, I think if

5   you try to give each other some good faith estimates and we

6   talk about it on January 14th, maybe we can come up with a

7   schedule then.  Bring your calendars.  If we need to add

8   dates, I'll take a look, but honestly dates are really going

9   to be very difficult, and I know you're going to be into

10  either June or July.  I can't recall which, but I know May

11  was done, tied up from my point.

12       MR. BERNICK: That's fine, Your Honor.  I want to

13  make just one more small comment.  I had two other issues

14  just to report on briefly to the Court.  The small comment is

15  that one of the other things that I think may be making this

16  complicated although, as I sit here, I don't know what the

17  solution to it is, is this: Your Honor focused a lot of time

18  and attention last time in discussing whether the debtor was

19  going to put the prior settlements at issue, and we went back

20  and forth on that and zeroed in on it, and I said, No, we're

21  not going to put it at issue.  The ACC and the FCR will be

22  covering the prior settlements, and so, really the sequence

23  of the case will be pretty much the debtor is going to put on

24  what it believes to be the appropriate model but is not going

25  to address by way of anticipating a response.  It's not going

1    to anticipate and make a response to their model.  So, they

2    will have their model that comes out in their case, and as a

3    consequence, in a sense, their case is both a response to

4    ours in a proposal of their case, which then means that our

5    real response is by way of rebuttal.  And that tends to, in a

6    sense, space it out a little bit more.  Maybe it shortens up

7    our presentation a little bit at the outset, but this is not

8    a plaintiffs/defendants and then rebuttal.  It's

9    plaintiffs/defendants/plaintiffs or however you want -

10   whoever's hat you want to put on because there are two

11   different theories of the case, and that, I think again,

12   makes it a little bit more difficult, although I don't have a

13   solution to that because I don't think that we can be put in

14   a position of trying to put on a response to their model as

15   part of our case.  I don't think that that would make any

16   sense.  In any event, we will certainly meet and confer and

17   try to come up with a concrete schedule and proposals for the

18   Court on the schedule that you've indicated.  There are two

19   issues that I wanted to raise that relate to personal injury,

20   and I think then the only other matter on the agenda, unless

21   other people need to raise something else is, Mr. Speights is

22   now present here, and so we can take up item 21 on the

23   agenda, but there are two matters that I would like to raise

24   concerning the estimation process.  The first is that we did

25   have a fairly long discussion last time about the proposed or

1    the possibility of lawyer testimony and then the discovery

2    that would be associated with that, and Your Honor gave us, I

3    think, a good deal of guidance that relates to that.  We

4    haven't really resolved that issue.  There was first some

5    discussion about whether the lawyers would sit for more than

6    one deposition.  So that we'd take their deposition to find

7    out what they're going to say, and then we come back and have

8    arguments about discovery and then there's the possibility of

9    a second deposition.  We've not heard from all three lawyers'

10   counsels, but at least with respect to one, they said that

11   they're not agreeable to that.  It's got to be one deposition

12   and frankly we think that that's the best approach.  So, we

13   come back to, I think, where Your Honor left it last time,

14   which is that we would proceed with the subpoenas that have

15   been issued and move to compel on those subpoenas and that

16   that would then be the vehicle from which Your Honor can

17   address where discovery is going to be compelled.  I think

18   that in thinking about it, probably what makes sense is to

19   have that be a motion that is to compel the production of

20   discovery but also then the flip side of it is to foreclose

21   testimony regarding discovery that is not offered, that is to

22   say, what we're really talking about are subject matter areas

23   and the purpose for which that evidence is proffered.

24   Really, we're talking about whether they're going to get to

25   the issue of the debtors' intent and settlement.  What we'll

1   do is we'll file a motion that lists the different subject

2   matters that we think are potentially implicated by the

3   testimony and the purpose for which that testimony is being

4   offered, and then what we're moving to compel discovery of.

5   We would then like the other side to respond so that these

6   matters can be raised at the next omnibus, and Your Honor can

7   go through and say, Okay, this discovery is allowed.  This

8   discovery is not allowed, but at the same time, if there's

9   not going to be discovery, there's not going to be testimony.

10  So that we have before the deposition takes place a roadmap

11  of the area in which the testimony is going to be permitted,

12  and we then know, also, the discovery that can be had with

13  respect to that area.  So there's no ambiguity about it.  We

14  don't have to come back with motion practice on people

15  refusing to answer questions at depositions or refusing to

16  offer discovery.  So that would be our plan in order to get,

17  if we can, to the end point so that we can determine whether

18  these depositions are what they're really going to be about

19  and what discovery is going to be offered in advance of the

20  depositions so that we can take a meaningful dep.  So, what

21  we'd like is for Your Honor to accept a motion along those

22  lines from us.  We would file that motion probably within, I

23  guess, a week.  Let's see, we have from now until the 16th,

24  17th?  So, that's basically three weeks.  So we would take a

25  week to file our motion, and then they can have - at Your

1    Honor's discretion obviously, time for a response, and we

2    would need a reply.

3        MR. FINCH: Your Honor, I don't represent the

4    lawyers.  I don't know if their counsel is present either on

5    the phone or in the courtroom.  The ACC and the FCR would not

6    be respondents to that motion as I understand it because it's

7    a motion to compel the production of documents.  So, it's in

8    the possession of these law firms and their firm.  So I'm not

9    sure that my agreement or lack of agreement binds the debtor

10   from filing whatever motion it wants to file, but in terms of

11   working out a schedule I can't speak for the lawyer

12   witnesses.  So, I don't know if Ms. Ramsey's on the telephone

13   or Mr. Rhodes for the Goldberg Persky firm.

14       THE COURT: Anybody on the phone representing any of

15   the law firms?

16       MS. RAMSEY (TELEPHONIC): Yes, Your Honor.  Natalie

17   Ramsey representing Peter Krauss (phonetical) and

18   representing John Clooney (phonetical).

19       THE COURT: Yes, ma'am.  Your response?

20       MS. RAMSEY (TELEPHONIC): I'm having some

21   difficulty, Your Honor, following the entire discussion.

22   There's sort of a wind tunnel effect on the telephone.  So I

23   apologize, but I couldn't hear everything that was said, but

24   from what I understood Mr. Bernick to say, I know that Mr.

25   Krauss has filed objections to the document requests that

1    accompanied his subpoena in the Northern District of Texas.

2    Mr. Cooney has served objections to the document requests

3    that accompanied his subpoena which was issued out of the

4    Northern District of Illinois in the Northern District of

5    Illinois.  Those objections were filed within the appropriate

6    time frame.  Since that time there has been no direct

7    discussion with me concerning either the document requests or

8    how we might proceed other than I learned by notices that

9    were filed on the docket that the depositions did not go

10   forward on the dates that they were proposed initially.

11   There also was a carbon copy on an email correspondence from

12   Mr. Finch to Mr. Bernick where I learned that there was

13   apparently some discussion about the possibility of

14   proceeding with two separate dates.  My response to Mr. Finch

15   was, you know, I needed to understand why that was necessary

16   and what discussions there had been between the ACC and the

17   debtor with respect to resolving the issues about the scope

18   of the testimony and, therefore, whether there was guidance

19   with respect to what documents the debtor might appropriately

20   need.  Since that time I have literally not heard anything

21   from the debtors.  So, I understand that the debtor can file

22   whatever motion it wants.  We, obviously, will respond.  Part

23   of our response, I anticipate, will be that the motion with

24   respect to subpoenas issued out of district courts in other

25   parts of the country where the witnesses reside, needs to be

1    determined in those courts, and I think we put that position

2    on the record at the last omnibus hearing.

3            MR. BERNICK: Your Honor, this illustrates exactly

4    the problem we have which is that these lawyers have appeared

5    before this Court.  They represent parties that are here

6    before this Court.  They submitted 2019 statements.  If they

7    want to insist that we litigate these matters in the

8    jurisdiction in which they reside, I suppose they can, but it

9    does seem to me that Your Honor certainly has the power to

10   control the flow of evidence before the Court and

11   particularly in light of the fact that this testimony is

12   being proffered not by these lawyers or by their clients

13   being proffered by the ACC and the FCR, which then brings me

14   to the second part of our motion, and why it is that Mr.

15   Finch's observation is not appropriate.  And as he says,

16   Well, this is just a matter that relates to the other

17   lawyers, of course, Ms. Ramsey then says, Well, yeah, but the

18   other lawyers are in some other jurisdiction and they got –

19   We're not going to submit to the jurisdiction of the

20   Bankruptcy Court, but the buck stops here in the Court with

21   what evidence comes before the Court and whether there's been

22   appropriate discovery with respect to that evidence.  And

23   that matter, I would think, vitally involves the interests of

24   the ACC and the FCR.  If Ms. Ramsey and her client don't want

25   to show up and participate, that's fine with us, but then the

1   testimony ought to be foreclosed.  So the motion that we're

2   saying should be brought on is a motion that has two parts to

3   it.  One is to compel the testimony, and the other - to

4   compel the discovery, and the second is if the discovery is

5   not offered up for any reason that there then be no testimony

6   that is permitted by that witness with respect to that

7   subject matter because our discovery rights have not been

8   acquitted, and whoever shows up can show up, take whatever

9   position they want, but at the end of the day, Your Honor

10  needs, I believe, to determine whether there should be

11  discovery and if there's not discovery whether testimony is

12  permissible, and if counsel for these lawyers and if the

13  lawyers themselves want to say, We're not going to show up

14  and we're not going to be bound, and we're going to litigate

15  this elsewhere, I don't think it's the debtors' obligation to

16  go to the four corners of the earth to compel the testimony

17  when it's being - discovery, when the testimony is being

18  proffered here by the ACC and the FCR.  It is their

19  responsibility to define that testimony, and it's their

20  responsibility to assure that Your Honor's orders with

21  respect to appropriate discovery are complied with, and if

22  they can't comply with it, the testimony should not be

23  proffered by them.  It is this Court that has the ability to

24  control the flow of evidence and the associated discovery.

25  All we're asking for is that that be done in a timely

1    fashion.  Whoever wants to show up can show up.

2            MR. FINCH: Your Honor -

3            MS. RAMSEY (TELEPHONIC): Your Honor, this is Ms.

4    Ramsey again.  Just to clarify.  I want to make sure that I

5    was clear before that both Mr. Clooney and Mr. Krauss had

6    agreed to dates to be deposed, and those were anticipating

7    appearing on those dates until they learned by notice filed

8    with the Court that they were not going to be required.  So,

9    we have never indicated that we are not prepared to be

10   deposed.  What we have - what both Mr. Clooney and Mr. Krauss

11   have taken issue with is the scope of the document request

12   attached to the subpoenas which are very, very broad and ask

13   for a tremendous amount of discovery against their respective

14   law firms.

15           MR. FINCH: Your Honor, Nathan Finch for the ACC.

16   To reiterate what Ms. Ramsey said, first of all this is a

17   matter which strikes me as something that is - can be brought

18   on by motion in limine not by a motion to compel and then

19   some kind of - by asking the Court for what is in effect an

20   advisory opinion as to how some discovery fight may play out

21   in Texas or Illinois.  We listed these lawyers as fact

22   witnesses two years ago, two of the three of them, and the

23   third one in September.  They made themselves available for

24   depositions in October and November.  Grace unilaterally

25   canceled those deposition.  Grace put document subpoenas on

1    those lawyers that basically called for every piece of paper

2    in their file that has the word "asbestos" on it.  They quite

3    properly objected to the scope of the document subpoenas.

4    They said, We'll show up for the depositions if you - we're

5    willing to work with you on a narrowed scope of the document

6    requests.  They've gotten radio silence from the debtor.  For

7    Mr. Bernick to come in and now say, Your Honor, we've got to

8    do a motion to compel and have the ACC and the FCR be

9    respondents to that motion to compel, which we're not the

10   targets of the discovery, has got it upside down.  We listed

11   these people as witnesses.  They are third party witnesses.

12   They are not the parties in the case.  The debtor had the

13   ability to do discovery from them.  It chose not to.  It

14   chose instead to serve blunderbuss document subpoenas and now

15   it has to go and litigate those document subpoenas with the

16   counsel.  They still said they would sit for a deposition.

17   It strikes me that asking a Court for an advisory opinion on

18   a motion to compel as to which the Court doesn't have the

19   documents in front of it, the documents are in Texas and

20   Illinois, is not the proper fashion to proceed here.  If, as,

21   and when we seek to put these witnesses on the stand at

22   trail, Mr. Bernick can file a motion in limine, and if he can

23   demonstrate that there is some area of testimony that we

24   elicit that has been foreclosed either by the ACC or by the

25   witnesses refusing to answer a question in a deposition, then

1    Your Honor can deal with it on a motion in limine basis, but

2    to do a motion to compel where the ACC and the FCR don't have

3    possession of the documents and with in mind the entire

4    process that led us to this point.  They could have gotten

5    these documents years ago, Your Honor.  We've identified Mr.

6    Krauss and Mr. Goldberg at least as fact witnesses in

7    February of 2006.  The debtor identified Mr. Beaver and Mr.

8    Hughes and Mr. Siegel as potential fact witnesses in that

9    same fact witness list.  I spent a year either filing motions

10   to compel or wading through lots of documents to enable me to

11   take those people's depositions, and I went out and did so.

12   Mr. Bernick and counsel for Grace could have done the same

13   thing.  So, I think it's a little disingenuous for them to

14   say, Oh, the ACC and these lawyers have put up a stonewall

15   here, which is not the case.  These witnesses have offered

16   themselves up for deposition.  They have objected to

17   blunderbuss document subpoenas.  They have said we are

18   willing to produce a reasonable category of documents.  We're

19   willing to meet and confer with you.  They haven't heard

20   anything from the debtor about what a more reasonable way to

21   limit this.  So I think the entire proposal is out of hand,

22   frankly, Your Honor, and that the best way to deal with this

23   and Mr. Bernick thinks these people shouldn't be allowed to

24   testify, he files a motion in limine at the appropriate time

25   under the schedule I think we agreed to an hour ago, it would

1    be seven days in advance of the Friday before these people

2    would be called, which would probably be in March and April.

3    That's my suggestion for how the Court should handle this,

4    and by then, either the motions to compel will have been

5    granted in Illinois and Texas or they would have worked it

6    out.  They will have certainly sat for their depositions and

7    that's the proper way to proceed.  Thank you, Your Honor.

8           THE COURT: All right.  Someone else wanted to

9    speak.

10          MR. BERNICK: That was, I think, somebody from Gray

11   & Purcell (phonetical) raised - or representing Gray &

12   Purcell asking whether we were going to raise that, and we

13   said no.

14          THE COURT: Oh, asking whether you were going to

15   raise -

16          MR. BERNICK: We were going to raise Gray & Purcell

17   and the answer is no.  We went through all of these things

18   last time, and at the end of the discussion last time, Your

19   Honor had provided us with guidance on how you were coming

20   out on certain issues that were imbedded in the discovery

21   matters that were before the Court.  I believe Your Honor's

22   last instruction was that we probably would have no choice

23   but to proceed with the motions to compel on the subpoenas.

24   So we're now down to the practicality of how to deal with

25   that problem, and I'm not going to go revisit the two years

1   of trying to pry documents out of the same law firms that are

2   now saying, Oh, they want to go ahead and testify because we

3   went through that last time.  It's down to practicalities.

4   And the practical issue really comes down to two things that

5   are fundamentally incompatible.  We can't have these people

6   proffered as witnesses to testify in this proceeding by the

7   ACC and the FCR and then be faced with trying to litigate

8   discovery issues against them in jurisdictions other than

9   this jurisdiction because there will be a fundamental

10  disconnect.  Any court that takes up the question of

11  compliance with subpoenas in the other jurisdictions will

12  have not a clue on whether - to what extent the testimony

13  that's being - what testimony will in fact be offered from

14  these people and whether the proffering of that testimony

15  puts the underlying work product or attorney/client privilege

16  matters at issue.  We'll go before a judge in Chicago.  We'll

17  go before a judge in California or in Texas and they'll say,

18  Well, as far as I know these privileges apply and until they

19  waive it, I have no reason to decide that there is going to

20  be any kind of discovery of them at all because those judges

21  won't know exactly what matters are in fact to be put before

22  this Court and what arguments of waiver will then have to be

23  taken up by this Court.  Only this Court can decide that, and

24  this Court can easily decide that without having to give an

25  advisory opinion and without having to somehow wait for a

1    waste of time and waste of money process to play out in these

2    other courts.  The way the Court does that simply is to say,

3    If the testimony is going to be offered in this courtroom, in

4    this courtroom, it has to be offered under the rules that

5    apply here including the discovery rules.  The discovery that

6    the debtor seeks is appropriate discovery or it's not

7    appropriate discovery given the proffer of testimony that's

8    going to take place and it will either be offered or not - it

9    won't be offered, but however that comes out, there won't be

10   testimony that goes into areas as to which there's not the

11   opportunity for discovery.  Again, Your Honor has complete

12   control and power over the evidence.  If these lawyers are

13   coming before this Court to give testimony, these lawyers

14   have to come before this Court to deal with discovery that is

15   ancillary to that testimony or to delegate that to the ACC

16   and the FCR.  They can't take the position that they will

17   both be here for trial purposes, but not be here for

18   discovery purposes, and that Your Honor has no ability to

19   control discovery and can't give any guidance because somehow

20   that's an advisory opinion.  That would make truly the law

21   into a total ass, and that is just not the way the law works.

22   Discovery goes along with trial testimony.  That's the whole

23   purpose for trial testimony.  So all that we're seeking to do

24   and if they want to make all these arguments again by way of

25   responding to the motion, let them make the arguments.  They

1    can go file their briefs, but we want to submit a brief that

2    seeks to compel the discovery pursuant to Your Honor's

3    guidance last time, and then says, in the alternative where

4    the discovery is not offered for any reason it cannot be -

5    those matters, those subject matters cannot be the subject of

6    testimony at trial.  Maybe that's a determination in limine,

7    I don't really think so.  I think that that's basically part

8    and parcel of discovery and preclusion orders that take place

9    all the time, and they can come back and respond, and

10   whatever the response is, we will then know when Your Honor

11   rules what the testimony - what discovery is going to be

12   permitted and if the discovery is not permitted, what

13   testimony will then not be offer-able at trial.  We'll do it

14   all at one time because Your Honor is, at the end of the day,

15   in complete control of the flow of discovery and evidence in

16   this case.

17          THE COURT: Well, I know I'm in control of the

18   evidence that's going to be produced at trial.  Whether I

19   have jurisdiction over this issue or not, I don't know, but

20   I'm sure you'll tell me in your brief, and so, you know,

21   you're going to file what you're going to file.  If what

22   you're asking me is to allow this to happen on shortened

23   notice so that it can be heard in December since trial's

24   going to start in January, I guess I can do that, but I do

25   want everything submitted to me - Well, today's what?  The

1    26th - I guess the debtor has to file its motion if it's going

2    to and brief by the 3rd, and the response and brief have to be

3    filed by the 10th.  If the debtor is going to do a reply, it

4    truly has to be limited in this instance to five pages.  I'm

5    not going to have time to get through all this by the 13th.

6              MR. BERNICK: So it would be the 3rd for our motion.

7    Their response is then due -

8              THE COURT: The 10th.

9              MR. BERNICK: - on the 10th, which is a Monday, and

10   then any reply is five pages or less and is due when?

11             THE COURT: The 13th.

12             MR. BERNICK: The 13th.  We can certainly make that

13   happen.  Indeed, what I - well, what I would even propose in

14   order to give everybody a little bit more time is that we

15   would waive the reply and maybe if we could have until the 4th

16   to file our motion.  They then get until the Tuesday, the

17   11th, and then Your Honor has the briefs fully by that time.

18   If we have to take up matters in reply, we can just take them

19   up in the context of argument.  I don't think it's going to

20   be remarkably new.

21             MR. FINCH: Your Honor, this is going to be

22   happening at least as with respect to the ACC and the FCR.

23   At the same time we're filing Daubert motions, responses for

24   Daubert motions, and pretrial briefs.  This is really a

25   motion in limine for witnesses at trial not a discovery

1    issue, and it is fundamentally unfair to my client when these

2    are individual people we're seeking to put on the stand.  The

3    document requests are directed at law firms based in Texas

4    and Illinois, and to basically ask the Court to issue an

5    advisory opinion on what can be testified to at trial in this

6    type of schedule, when we're doing so much other stuff, is

7    unfair.  I think that it's a subject that should be subject

8    to a motion in limine when, as, and if we identified them as

9    people we will call in such a block of time and not dealt

10   with on a hurry up and rush basis on a discovery issue in the

11   same time we're briefing five other things, and so I think it

12   is a problem the debtor has created for itself.  It doesn't

13   have to be resolved in the next 10 days.  It's something they

14   could have resolved long ago and to then cram it into the

15   same time period that Mr. Mulledy and I are going to be

16   writing briefs on Daubert, trial briefs, response to their

17   Daubert briefs is just simply unfair.

18          MR. BERNICK: Your Honor, we went through all of

19   these timing issues before.  The pretrial schedule for this

20   case was specifically -

21          THE COURT: You need to use the microphone.

22          MR. BERNICK:  - specifically created the

23   opportunity to take the depositions of further people who

24   need to be deposed who hadn't been deposed and who were on

25   fact witness lists.  So this is nothing that was new.  We

1   always anticipated this was going to happen.  The same

2   argument that said, Oh, well, gee, we waited till the last

3   minute, we responded to completely last time, and the outcome

4   of the discussion last time after the better part of an hour

5   and a half of discussion was that we would proceed by way of

6   motion practice.  All that we have done is to now make a

7   concrete proposal for getting that motion practice done.  The

8   issue is not overwhelmingly complicated.  We have to get this

9   thing resolved, otherwise the net result is that they will be

10  putting on people as to whom we have not had the opportunity

11  of discovery, and that was completely contrary to exactly the

12  deal that was made in connection with the pretrial schedule

13  that provided that we would have that opportunity.  Your

14  Honor also gave us relief from the October 31 deadline for

15  purposes of taking this discovery, and this was last time.

16  So, the whole idea that all of a sudden we're now rearguing

17  whether we should have the opportunity to conduct this

18  process at all, Your Honor resolved this last time.  All

19  we're doing is being concrete about it.

20          THE COURT: I am not entirely clear at this point

21  whether this is coming up as a discovery sanction or as a

22  motion in limine.  I think in some senses it's the flip side

23  of the same point.

24          MR. BERNICK: It is.

25          THE COURT: It's a little difficult to see without a

1    motion.  You know, I think the debtor has the opportunity to

2    raise this.  You've got the opportunity to rebut it and to

3    suggest that it should come up in another fashion.  It seems

4    to me that if you're going to produce a witness then in fact

5    if the requested discovery is relevant, the debtor needs an

6    opportunity to do discovery.  I understand that the witnesses

7    were identified a long time ago, and that may be to the

8    debtors' peril.  I don't know.  I need to see it in the

9    context of the appropriate motions and briefs.  I've already

10   indicated, I don't know - With respect to the production of

11   document issue, I don't think that issue is before me at all.

12   That's before another court where the motions are pending not

13   before me.

14        MR. BERNICK: Well, the request is for - the request

15   for relief that's pending before you, Your Honor, is what

16   kind of discovery is appropriate if they are going to be

17   permitted to testify in certain areas, and if the discovery

18   then is not offered, that the testimony is not offered, and

19   that cannot be put before any judge at any remote

20   jurisdiction because they don't know anything about this case

21   and what this case is focused on.  They can't determine

22   whether privileged matters have been put at issue or not

23   because they have no connection to this case, and that is not

24   a situation of Grace's creation.  That is a situation of the

25   creation of the claimants and their counsel.  This is just a

1   very - at the end of the day, it's pretty simple.  Are these

2   people going to be permitted to testify about something as to

3   which we don't get discovery?  That is the matter that we're

4   going to be putting before Your Honor, and if they want to

5   argue that somehow we should - in a sense, we should be the

6   ones who now at this point in time don't get discovery

7   because they fought tooth and nail against all discovery of

8   lawyers for two years and lead us down the path for my making

9   a representation on the telephone at their suggestion that I

10  would not seek any further discovery of the law firms, only

11  then to turn around, and then identify these lawyers as

12  people that they were actually going to call at trial and

13  testify about exactly the same matters as to which they had

14  resisted discovery for two years, let them make that

15  argument.  Let them make the argument again because at the

16  end of the day, this is all a question about whether they get

17  to call people live to the stand in this courtroom and

18  simultaneously to say, Well, we've got to go litigate

19  privilege in the four corners of the earth.  Your Honor can't

20  even consider that but they still get to testify.  It's they

21  still get to testify that I want to raise before the Court.

22  If they want to take a position that for whatever reason

23  they're going to insist upon privilege and they're not going

24  to produce documents, they can tell the Court that, and then

25  Your Honor can decide whether there's going to be testimony

1    or not.

2           THE COURT: My major concern at the moment, Mr.

3    Bernick is the allegation that there has been some effort by

4    the law firms to try to get in touch with the debtor to

5    resolve the discovery issue and there's been no response to

6    that.

7           MR. BERNICK: That is - That's not right.  What

8    happened was, at the end of the last hearing, the burden was

9    put back on the debtor and the ACC and FCR to figure out,

10   well what are these people going to say to see if we could

11   resolve this.  So obviously rather than having - it's

12   pointless for me to talk with Natalie Ramsey or anybody else

13   to try to resolve the scope of their testimony because they

14   don't control the scope of the testimony of these people.

15   All they're doing is protecting the privileges that they

16   believe apply to the law firm files.  So, the cart here, the

17   cart is - or the horse here is what are these people actually

18   going to say at trial and what discovery is necessary in

19   order that that trial testimony be offered up?  The cart is,

20   Well, what happens to the privilege?  Now, we can't resolve

21   the privilege issues in Texas, Illinois.  We can't resolve

22   them with Ms. Ramsey or with counsel for Goldberg, Persky

23   until we figure out what is it that these people are actually

24   going to say when they come here to testify.  That is an

25   issue for the ACC and the FCR.  So we reached out to them to

1   try to see - I did have conversations with Mr. Finch and Mr.

2   Mulledy.  In fact we had lunch, a very product lunch, talked

3   about the pretrial order and I raised precisely this issue

4   saying, We've got to sit down and see if we can't resolve it.

5   It didn't get anywhere.  It didn't get anywhere.  So there's

6   no point in calling up counsel for these individual

7   witnesses.  I've got nothing to say because I don't yet have

8   a solution to the horse, which is, What's the testimony going

9   to be?  So, my proposal for doing this motion is, again, to

10  put out, you know, the list of, here are the subject matters.

11  We then move.  They can respond.  I don't even know that we

12  need counsel for the individuals here because maybe we don't

13  even need to resolve privilege issues.  What we need to

14  resolve is, if they're going to testify about these given

15  subject matters, are we entitled to discovery or not, and if

16  we're not going to get the discovery, are we going to hear

17  them testify about those subject matter areas?  That's a

18  matter squarely within Your Honor's control in deciding, Are

19  we going to have testimony in areas where there is not going

20  to be discovery?  That I believe is the issue that we'll tee

21  up before Your Honor because that's the one that we're

22  focused on.  We have - Oh, we have another lawyer for the

23  agency.  Go ahead.

24          MR. INSELBUCH: Thank you.  First of all, there's no

25  emergency here.  He's making an emergency.  These witnesses

1    can't possibly be reached for testimony until sometime in

2    March if not later.  So there's no need to resolve these

3    issues today.  Second of all, we have followed the Federal

4    Rules of Civil Procedure in this case, just as we do in every

5    other case.  When you have a witness that's not subject to

6    the jurisdiction of the Court, you get a subpoena served on

7    them where they can be subject to the jurisdiction of the

8    Court.  That's what Mr. Bernick did.  Those witnesses have

9    said they would testify at deposition.  He served a document

10   notice.  They've objected to it.  He hasn't done anything

11   more about it.  There are procedures that deal with what you

12   do when a witness objects to document production.  He's

13   chosen not to do that.  He could still choose to do that.  He

14   could proceed and see what documents he gets.  He's going to

15   get a list of the witnesses who are being called on to

16   testify and a small synopsis of what their evidence is going

17   to be in accordance with Your Honor's order.  He's going to

18   have some idea at that point.  For sure, he cannot be

19   required to sit there while a witness testifies on subjects

20   where he was precluded from discovery.  Nobody is arguing

21   with that view, but that doesn't change the rules and the

22   jurisdictions of the various courts to apply the rules, the

23   Federal Rules of Civil Procedure here.  They have not been

24   repealed.  I would suggest to Mr. Bernick that when he

25   figures out what he wants to do, if he wants to proceed to

1    get his documents, he can go and see what the judges say

2    about that.  If the judges say he can't have those documents,

3    and if those witnesses proceed in your Court to offer

4    evidence from those very same documents that he was precluded

5    from seeing in the discovery phase, for sure Your Honor won't

6    permit that to happen.  But he is not entitled to have you

7    address this in some kind of vacuum where you have no

8    jurisdiction over the deposition documents themselves, and

9    worse yet to do it now on an emergency basis when everybody

10   else is doing something else.  I would submit to Your Honor

11   that he should go ahead, finish his business on discovery,

12   get whatever documents he thinks he wants, take his

13   deposition, see whether his questions are objected to at the

14   deposition, and then he'll be ready at trial to deal with

15   whatever evidence is presented before Your Honor, and that

16   won't be until March if not April or May.

17        MR. BERNICK: That's an invitation, Your Honor, to

18   have this whole matter continued to play out during the

19   course of trial.  The procedures that we have had, indeed at

20   the insistence of the ACC and the FCR, was not to have that

21   take place.  There was active opposition to that having taken

22   place, and there is now an opportunity to get this matter

23   resolved.  The only reason that it's taking time is the same

24   people who are voluntarily going to come into this courtroom

25   and testify are saying that they're not going to volunteer to

1   have matters about discovery that are directly tied to their

2   testimony resolved in this Court.  You cannot do it both

3   ways.  You can't show up, testify live at trial, then say,

4   Oh, by the way, you don't have jurisdiction over me.  That is

5   novel.  That's not only novel, it's not what the rules

6   contemplate.  The witness is here.  Your Honor would have the

7   power if we had a witness testifying right now to say, Go get

8   me the documents.

9          THE COURT: Yes, I would, and maybe I'll do that.

10         MR. BERNICK: But there's no reason - the only

11  reason that they want to have this postponed is then to argue

12  later on, Well, he's had the opportunity to take the

13  discovery.  It's not a big deal.  Let's let the evidence come

14  in however it will.  We don't want to go down that road, and

15  we certainly don't believe it's appropriate for us to have to

16  go litigate issues of privilege in the four corners of the

17  world outside of this Bankruptcy Court before judges that

18  will not have the ability to resolve those issues because

19  they don't know what it is these people are going to say at

20  trial.

21         THE COURT: But I mean that happens in any court in

22  which a subpoena is issued if there's a document request

23  that's objected to and the subpoena is contested in the court

24  in which the subpoena was issued.  That always happens.

25         MR. BERNICK: That is true.  Typically if you have a

1    witness that's outside the jurisdiction of the Court and

2    there's then discovery, they have the privilege of appearing

3    before a local court to contest that discovery.  There's no

4    question about that.  This case is different for two reasons.

5    It's different, first of all, because those people have been

6    here and they've participated.  They've entered appearances,

7    and they have filed 2019 statements.  I believe that we can

8    get - In fact, we've gotten discover repeatedly over

9    precisely this objection of matters that we didn't go out to

10   the law firms and subpoena the law firms, but we had all

11   kinds of discovery and the connection with those matters they

12   were content to have Your Honor resolve privilege issues,

13   including the consultancy privilege which they had Your Honor

14   resolve, and after all that process was all over, they tell

15   us, Oh, well, gee, we'd like to have those matters resolved

16   in the four corners of the earth.  It's different from that

17   reason, and it's then different for an even more important

18   and more fundamental reason.  These are not third party

19   witnesses who are outside the jurisdiction of the Court.

20   They're going to be showing up here, and that is completely

21   different.  If you get -

22            THE COURT: No, I think we're talking apples and

23   oranges.  I think the difference is this: In the instance

24   where the lawyers filed the 2019 statements, they were filing

25   them as counsel of record for the claimants in the case, and

1   the documents that were subpoenaed were the claimants'

2   records in the custody of the lawyers.  So, yes, they were

3   before the jurisdiction of the Court because they were

4   officers of the Court representing the clients who were

5   subject to the jurisdiction of this Court, but that's a

6   different issue from what happens now.  Now, you were looking

7   at those lawyers as witnesses here, not in their capacity as

8   attorneys who are officers of this Court but as actual fact

9   witnesses in their own behalf, which is why the subpoenas had

10  to be issued in another court, not this one.  So I'm not at

11  all convinced that this Court has the jurisdiction to

12  adjudicate the document objections that are attached to a

13  subpoena issued by another court.  I don't think I do, Mr.

14  Bernick.

15          MR. BERNICK: Well, Your Honor, I would say two

16  things: One, I don't think that the - I don't think that that

17  line is quite so clear.  Yes, the claimants with respect to

18  whom they were counsel of record were claimants who still

19  have pending claims.  They're not settled claims.  Whereas, I

20  believe that the testimony that they'll offer relates to

21  claims that were settled, and there is that distinction

22  there.  The closed claims clients have not come before the

23  Court.  I believe, however, that the testimony that they're

24  going to offer is testimony that says, because correspondence

25  indicates this, that the reason that their current claims

1    didn't have the information that they should have had in

2    connection with the questionnaires was that that information

3    had never been required with respect to prior claims, and

4    therefore, was not turned over with respect to the current

5    claims.  So that they're going to blur that line.  They're

6    going to offer up the past settlement practice by way of now

7    finally explaining with respect to clients that they do

8    represent in this Court why it is they haven't submitted the

9    information.  So, they are testifying as fact witnesses on

10   behalf of essentially the evidence that's being offered from

11   current claimants.  So when they show up here, they're

12   showing up here not only with the hat of being counsel for

13   prior claimants, they're showing up here with the hat of

14   being counsel for current claimants and trying to exculpate

15   or offer some responses to why the information has not been

16   provided.  That's point one.  Point two, we can't get beyond

17   the notion that their showing up in this Court to offer

18   testimony.  If they were going to have offered testimony

19   through deposition before as third parties outside the

20   jurisdiction of this Court, we would have come back to Your

21   Honor, basically with the same issue during the course of the

22   discovery process, and you would have had to reach the same

23   issue which is, Do I now allow in the deposition testimony of

24   this person who's outside the jurisdiction of the Court given

25   the fact that they've objected on privilege grounds on X, Y,

1    Z.  This is no different from that, but it's stronger because

2    they are now actually showing up.  They're going to - They're

3    not going to -

4              THE COURT: But you can take the deposition and the

5    deposition testimony would be just as good.  I mean the rules

6    provide for the allowance of -

7              MR. BERNICK: That is true, but they're not doing

8    that.  They're going to be here.  They are -

9              THE COURT: Maybe they're going to be here.

10             MR. BERNICK: Well, they are - Well, that's

11   certainly the representation that's been made.

12             THE COURT: Well, we'll see.

13             MR. BERNICK: And the discovery has been cut off

14   with respect to all other testimony.  So they're going to be

15   here as live witnesses.  So the issue of law before Your

16   Honor is, Do you have jurisdiction to define the conditions

17   under which their live testimony will be offered, or do you

18   have to defer to how those matters get resolved by a judge

19   who is a stranger to this proceeding, will not preside over

20   the taking of that evidence in some far-flung court, and the

21   answer to that, I think, is just totally plain.  They are

22   volunteers here.  They are not simply people who are

23   appearing under compulsion.  They are volunteers.  There is

24   no subpoena that's going to put them on the stand.

25             THE COURT: All right.

1           MR. BERNICK: So if they are volunteers and they are

2    appearing voluntarily on the stand, that clearly the rules

3    that would apply to them is - if they were not before the

4    Court, are different.  If they're not before the Court, we'd

5    have to proceed by way of subpoena that issues out of a local

6    court.  They're before the Court.  Your Honor has complete

7    power to make determinations about what you will and will not

8    accept by way of testimony depending upon where there's been

9    discovery.   All we want to do is that we want to front-end

10   load this so that Your Honor makes clear what it is that's

11   going to be acceptable or not.  Mr. Inselbuch says, Well,

12   clearly, if somebody gets on the stand and there hasn't been

13   discovery, Well, gee, that shouldn't be allowed.  Well, if

14   that principle is not controversial, it shouldn't be very

15   difficult to work through the list of the different subject

16   matters as to which we believe that they are potentially

17   going to testify and determine, Well, which ones of them are

18   properly amenable to discovery if they're going to testify

19   live, and then it's up to them to decide whether they want to

20   oppose it in whatever jurisdiction they're in.

21           THE COURT: Well, I think it may be easier in this

22   case to keep discovery on that issue open and to require that

23   in the witness list designation if these lawyers are called

24   or to be called as witnesses, that the specific areas of

25   their testimony be identified.  And that way, rather than

1    just general they're a fact witness on the concept of

2    settlements, that it has to be articulated in a better

3    fashion.  In fact, I think by way of declaration.  And then

4    you'll know what the proposed areas are, and then you can

5    determine whether or not there will need to be some discovery

6    if you choose to object to the testimony or what, and I think

7    in that context a motion in limine may work, but in all

8    instances, you'll know whether you want to take discover or

9    not, and I will simply keep discovery open for that purpose.

10         MR. BERNICK: Okay, that's fine with us, Your Honor.

11    That way we will have that on the 21st, but I still then will

12    want to get the matter teed up fairly promptly with the Court

13    so we then can proceed, and we would then, I think probably

14    take that up.  Do we have a pretrial conference at any time

15    before - This is it.

16         THE COURT: I think what we'll do, I believe, is put

17    this issue on - When's the January omnibus hearing?  Let's

18    put this on the January omnibus, not on the trial date, but

19    just on the January omnibus because by then we will have -

20    the trial will have started.  You will have had the witness

21    designations.  You'll know whether the witnesses are

22    potentially going to be called.  You'll have the specific

23    areas in fact declarations.  I want them by declaration for

24    these witnesses.

25         MR. BERNICK: Okay, that's fine, and then we can put

1   it on for the January omnibus.  The one - the other one

2   witness, and I do have - I can hardly - There's a lot -

3          MR. INSELBUCH: I don't understand, Your Honor,

4   about a declaration.

5          MR. BERNICK: Well, why don't -

6          THE COURT: What I am suggesting at this point -

7          MR. BERNICK: Go ahead, go ahead.

8          THE COURT: What I'm saying is, for these particular

9   witnesses, the lawyers that the ACC or FCR may choose to call

10  who have been subject of the subpoenas and who have not yet

11  been deposed and who have not yet responded to the document

12  production requests attached to the subpoenas, that to the

13  extent that they're going to be identified as witnesses,

14  rather than just a general subject matter line that says

15  they're going to be called to articulate issues about the

16  settlements, that their statement as to what they are going

17  to be called to do should be by way of declaration from the

18  witness.

19         MR. INSELBUCH: They can't do that, Your Honor.

20         THE COURT: Why not?

21         MR. INSELBUCH: Because we control them as

22  witnesses.

23         THE COURT: Yes.

24         MR. INSELBUCH: They are not - They are third-party

25  witnesses.

1          THE COURT: Yes.

2          MR. INSELBUCH: And first of all, he could take his

3  discovery.  He keeps saying the discovery's been blocked.

4  It's never been blocked.  He never chose to take his

5  depositions.

6          THE COURT: Well, he could take the depositions,

7  that's true.

8          MR. INSELBUCH: He can take any deposition he

9  wanted.

10          THE COURT: That's true.

11          MR. INSELBUCH: He could have taken them for months.

12  He had them - He had agreed dates on two occasions to take

13  the depositions.

14          THE COURT: That's true.

15          MR. INSELBUCH: He didn't do it.

16          THE COURT: That is true.

17          MR. BERNICK: Your Honor, that is -

18          MR. INSELBUCH: That is absolutely true.

19          THE COURT: Pardon me, gentlemen -

20          MR. INSELBUCH: I'm sorry, Your Honor.

21          THE COURT: You will not - neither of you will do

22  this any longer, please.

23          MR. INSELBUCH: I beg your pardon, Your Honor.

24          THE COURT: You could take the depositions, Mr.

25  Bernick, why haven't you taken the depositions?

1          MR. BERNICK: Excuse me.  For all the reasons that

2     we went over the last time when Mr. Inselbuch wasn't here,

3     which is that there's no point in taking a deposition where

4     the witness has not produced any documents -

5          THE COURT: Well, sure there is.  You can ask what

6     the documents are and whether they exist and if the witness

7     says, Yes, I have them but I'm not going to produce them

8     because of whatever, attorney/client privilege, you'll know

9     that there are in fact documents.

10          MR. BERNICK: Sure, we could always do that and then

11     have a discovery process for documents afterwards and then a

12     new deposition.

13          THE COURT: Right.

14          MR. BERNICK: We made the decision that there was no

15     point in doing that, that the first thing that had to be

16     resolved was what were they going to say and what documents

17     would be implicated so that we could get it resolved, and

18     history has shown how well taken that was because now their

19     answer is, they don't even want to have Your Honor resolve

20     them, they want to have judges all over the country resolve

21     them.

22          THE COURT: Well, they're entitled to that.  That's

23     where the subpoena came from.

24          MR. BERNICK: That may well be, that may well be,

25     but the reason that they were not deposed during the period

1    of time when at least two of them were listed was very

2    simple, which is that while they had been listed before,

3    every day, every week we were here arguing again and again

4    and again about whether we would get any discovery into how

5    the lawyers actually ran the litigation.  How they settled

6    cases, the information that was gathered, and we were shut

7    down every step of the way.

8              THE COURT: Okay, but we're beyond that, and I'm

9    trying simply at this point to figure out what it is that the

10   debtor is going to need, and I'm going - I am simply trying

11   to work out a process.  And you're correct, Mr. Inselbuch,

12   the debtor could take the deposition.  I'm also correct that

13   you could attach by way of some information as to what the

14   witnesses are going to be called to testify a declaration as

15   to what they will be called to testify.  If you want to do

16   the declaration saying if called this witness will be called

17   to testify about the following, that's fine.

18             MR. INSELBUCH: We are prepared to give Mr. Bernick

19   and the Court a fair summary of what the testimony will be,

20   what we will ask the witnesses to testify.

21             THE COURT: That's fine.

22             MR. BERNICK: But it has to be a - Mr. Inselbuch has

23   said, and it's true, that they control - those were his

24   words.  They control these witnesses -

25             THE COURT: Of course -

1          MR. BERNICK: Excuse me, they control these

2    witnesses.  They are getting the witnesses to show up for

3    whatever reason they're showing up but it's at their request

4    without compulsion and that number two, they will then define

5    what it is they're going to have to say.

6          THE COURT: Of course.

7          MR. BERNICK: So it's fine with me if we get the

8    declaration about what the witness is going to say, and Mr.

9    Inselbuch has a hand in it, but it has to come from the

10   witness about what the witness is going to say -

11         THE COURT: No, it does not.  You can take the

12   deposition after Mr. Inselbuch provides the summary if you

13   choose to do that.  I think that's correct.  It's a witness

14   summary.  It can be a summary of what the witness is, but Mr.

15   Inselbuch, I don't want it to be, you know, three words.

16   It's about the settlement.

17         MR. BERNICK: Well, I -

18         MR. INSELBUCH: Excuse me, excuse me.

19         MR. BERNICK: Your Honor, this is - I've never had

20   someone physically push me away from the podium.

21         THE COURT: Mr. Inselbuch, you will not do that.

22   Gentlemen, move.  Both of you move.

23         MR. INSELBUCH: Because he won't move.

24         THE COURT: Both of you move.

25         MR. INSELBUCH: I can speak from here, Your Honor.

1          THE COURT: Gentlemen.  I really do not appreciate

2     this type of behavior.

3          MR. INSELBUCH: I don't blame you, Your Honor.

4          THE COURT: It's like - Well, then, please don't do

5     it any longer.

6          MR. INSELBUCH: Yes, Your Honor, I was just -

7          THE COURT: Apologize to Mr. Bernick.

8          MR. INSELBUCH: Mr. Bernick, I'm very sorry.

9          THE COURT: All right, now, Mr. Inselbuch.

10          MR. INSELBUCH: Thank you.  You can be assured that

11     I will take the Court's instructions to heart.  I understand

12     the sense of what you're telling me.  I understand the words

13     as well.

14          THE COURT: All right.

15          MR. INSELBUCH: And you can be assured that I will

16     honor them.

17          THE COURT: All right, thank you.  Okay, so that the

18     record is clear, I am keeping discovery open as to these

19     three witnesses.  It is not closing.  We will put this issue

20     back on the January omnibus so that you have the witness

21     designations with a particularized understanding of what the

22     witnesses will be called to testify about if they're called

23     at all, which I don't know at this point that they will be

24     listed, but if they are, it will be itemized in some fashion

25     or other that will be meaningful.  Then, Mr. Bernick, if you

1    think you need discovery we'll address further issues at that

2    time.  With respect to the documents though, I think Mr.

3    Inselbuch's correct.  If you're going to have a document

4    fight, I think you're going to have to do that in the court

5    in which the documents subpoena was issued.

6         MR. BERNICK: I think really that may be true.

7    Again, I think when they show up on the stand, it's all over,

8    they're here before the Court, but frankly, once we have Your

9    Honor's determination about what's going to happen with

10   respect to their ability to testify about matters where

11   there's no discovery, the burden is then, it seems to me, on

12   the lawyers and their clients to decide, Well, do they want

13   to offer up that discovery or not?  I'm not inclined at that

14   point to go around and then present that piece of paper to a

15   bunch of judges all over the country who really aren't going

16   to know anything about the case and have it resolved by them

17   in the abstract.  The burden is then on them to offer up the

18   discovery that's ancillary to their witnesses' voluntary

19   testimony.

20        THE COURT: Well, we'll address that in January and

21   see what happens.  In all probability, if they're going to

22   try to testify about documents and you want the documents,

23   you're probably going to get them or else they're not going

24   to testify about documents.  Whether they're going to be

25   testifying about documents or not is something at this point

1    I just don't know.

2          MR. BERNICK: Well, I think they're going to testify

3    about facts and the facts are going to be very general and

4    they're going to go - you know, it's all the stuff we talked

5    about last time, and the real issue is whether we get full

6    and complete discovery with respect to those, and I think

7    when we get down to the details of how broad their testimony

8    is going to be, I think we're going to be back to where we

9    were at the last hearing, which is a fundamental decision

10   that's got to be made about whether they really want to place

11   at issue what is it that they thought was the meeting of the

12   minds about settlement because that is, at the end of the

13   day, what they're doing.  Is here were the criteria that were

14   used.  Everybody was happy that that represented a liability.

15   Grace was happy, that was Grace's intent.  That was our

16   intent, and they want to be able to say that without being

17   cross-examined on any particular file, on any particular

18   matter, on any particular document.  It's the same

19   discussion, exactly the same discussion that we had the last

20   time.

21         THE COURT: Well, they're going to have some

22   difficulty testifying as to what was in Grace's mind; aren't

23   they?  Just like Grace is going to have difficulty testifying

24   about what is in somebody else's mind.

25         MR. BERNICK: I agree, but that's the only real

1   purpose for which it could be proffered, but these are all

2   things that we can take up in due course.  The last issue

3   that relates to this and then there was one more unrelated

4   issue, is the deposition of Mr. Snyder.  Mr. Snyder is an

5   expert witness.  His deposition was not taken because - for

6   two reasons really.  One, is that there was not agreement

7   with respect to discovery of his underlying files, and number

8   two, his wife unexpectedly passed away.  So we deferred the

9   deposition.  The issue with respect to Mr. Snyder is, can he

10  testify as a fact witness as well as an expert witness

11  without being amenable to discovery of the materials that he

12  was dealing with as a fact witness?  He represented Owens

13  Corning for many years.  He wants to tell the story as an

14  expert of why Owens Corning ultimately didn't have any choice

15  but to settle because their liability would have been even

16  greater if they had decided to litigate.  That testimony as

17  an expert we've got a lot of problems with for a variety of

18  reasons, but it's not a question of whether we get discovery

19  of his files for that purpose.  It's when he's proffered as

20  fact witness that once again we've got a problem.  He talks

21  about the history of his representation of Owens Corning,

22  down so some fairly specific details.  As a fact witness, he

23  wants to offer them into evidence.  We think that they have

24  only tangential relevance because none of the other side's

25  experts, either the ACC's experts or the FCR's experts,

1    actually relies upon the history of Owens Corning settlements

2    for most of the period of time that Mr. Snyder was

3    representing them.  So I'm not sure why it ties into their

4    models, but they want to offer it up.  If they're offering

5    him as a fact witness, we should get discovery of him as a

6    fact witness.  I believe that the right answer, probably is,

7    they don't need him as a fact witness.  They can have him

8    testify as an expert in which case the underlying facts don't

9    themselves come into evidence, but they may support whatever

10   opinion he has.  We tried again to press the issue during the

11   interim period of time since the last hearing.  We were not

12   able to reach resolution so he is yet another situation.

13   Now, he is an expert witness.  So, we have to take his

14   deposition under any set of circumstances, and we would like

15   to.  We can schedule that, but if we are then going to be

16   faced with his testifying as a fact witness as well, I think

17   what I would probably propose today is that we handle him in

18   the same way as we just did for the other lawyers when it

19   comes to his capacity as a fact witness.  Is if they want to

20   schedule him, list him as being a fact witness as well as an

21   expert, they should supply us with the same witness statement

22   at the same time -

23           MR. INSELBUCH: Okay.

24           MR. BERNICK: Good.  But then we've got to have -

25   we're going to have two depositions of Mr. Snyder.

1            MR. INSELBUCH: No.

2            MR. BERNICK: Well, then, I guess Mr. Inselbuch

3    says, No.  We're entitled to take his deposition as an expert

4    without waiting for this process to unfold of taking his

5    deposition as a fact witness.

6            MR. INSELBUCH: Okay.

7            MR. BERNICK: What?

8            MR. INSELBUCH: Okay.

9            MR. BERNICK: Good.  Last issue of the day, I think

10   we've resolved -

11           THE COURT: Just a minute.

12           MR. BERNICK: Okay.

13           THE COURT: All right, so discovery is not closed

14   then as to Mr. Snyder with respect to his being called as a

15   fact witness, and this also will be addressed at the January

16   omnibus with respect to his testimony as a fact witness.  I

17   assume you're going to work out the deposition with respect

18   to his expert testimony.

19           MR. BERNICK: Yes, because that's just been really a

20   question of his personal situation.  The last -

21           THE COURT: Right.

22           MR. BERNICK:  - issue that I have before we get to

23   Mr. Speights relates to the plan of reorganization, the

24   proposed plan of reorganization that was just filed by the

25   ACC and the FCR.  I know that Your Honor is probably aware of

1    that and aware of the basic dimensions of that, although I

2    don't know if you've had the opportunity to study it.

3         THE COURT: No, I haven't.

4         MR. BERNICK: And all that I would say is I don't

5    know - I don't know and I don't want to anticipate today how

6    it is that that plan will be used, if at all, in connection

7    with the estimation process, but enough said that Your Honor

8    should also know about something else which is that you

9    terminated exclusivity - obviously, they asked for that

10   termination in order to file that plan, which they did, that

11   is not a surprise, but I think you probably also hoped and

12   expected that there would be some settlement-related activity

13   as well.  All that I can report is that the debtor after

14   termination of exclusivity sought to initiate a new run of

15   talks, made a specific proposal to the other side, and that

16   perhaps coincident with their development of their plan, the

17   only response to our proposal was a major step in the

18   opposite direction, that is, they've pulled back on their

19   position in a fairly dramatic way and the parties are now

20   further apart then they were before the termination of

21   exclusivity.  We're still hopeful that that situation will

22   change, but at this point in time, all that we have of their

23   settlement position essentially is what it is that's

24   reflected in the new plan that they have proposed.

25        THE COURT: All right.  Mr. Finch?

1           MR. FINCH: Yes, this is a housekeeping matter.

2    Your Honor, we will submit a revised and amended case

3    management order containing all the dates and briefing

4    schedules and stuff probably on Wednesday.

5           THE COURT: All right.

6           MR. BERNICK: I think that that's all that we had on

7    personal injury, and I don't know if there's anything else

8    that you all wanted to raise.  Are you okay?  Okay, and then

9    I think the last matter was Mr. Speights' matter that relates

10   to three claims that has been the subject to a lot of

11   briefing, but rather than getting into it myself, Mr.

12   Speights wants to take that matter up.

13          MR. FINCH: Your Honor, may I be excused?

14          THE COURT: Anybody who wants to leave may, but you

15   act at your peril, as I've said before.

16          MR. FINCH: Thank you, Your Honor.

17          THE COURT: This is item 21, I think - have I lost -

18   Good afternoon, Mr. Speights.

19          MR. SPEIGHTS: Good afternoon, Your Honor.  Dan

20   Speights representing certain PD claimants with respect to

21   item 21.  Your Honor, after listening the last three hours of

22   the PI debate I must confess I want to quote George Gobel, I

23   feel like a pair of brown shoes with a black tuxedo in

24   getting up here and arguing about whether three pieces of

25   paper were signed on March 31, 2003.  Your Honor, this is a

1    status conference.  We're not here to argue the merits, we've

2    argued the merits several times and Your Honor issued an

3    order and then an amended order, and we're at a status

4    conference to decide where we go from here.  And, as I see

5    the situation, there is one issue.   I believe Mr. Bernick

6    believes there are two issues.  I believe he would agree with

7    me that one issue is whether these three claimants signed an

8    authorization before March 31, 2003.  It's as simple as that.

9    It's a simple factual issue.  I'm not sure whether the

10   debtors challenge that or not as to one, two, or three, but

11   it seems to me in this complex case that if there's anything

12   that could be decided in a few minutes, it should be that

13   issue.  The question is, how do you decide it if the debtors

14   won't finally concede it now.  The first way to decide it at

15   least would be to have a meet and confer.  Last Monday

16   morning, at 10:35 a.m., I sent an email to Mr. Bernick and

17   Ms. Baer and another lawyer in their firm and suggested that

18   we have a meet and confer, and I told them when I was

19   available last week, and I did not hear a response.  I know

20   it was Thanksgiving week, and I know everybody's busy, and I

21   don't want to start any unpleasantness, but I'm still

22   available to have a meet and confer.  I might say while I was

23   on the late plane coming into Philadelphia this morning, I

24   got a message from someone at Kirkland & Ellis suggesting Mr.

25   Bernick was available for a telephone call at noon, and I was

1    in the air at noon, but perhaps we should just sit down in a

2    room together and say what is it about these pieces of paper

3    that make you suspicious?  Do you think Dan Speights has some

4    printing press in Hampton, South Carolina kicking out false

5    authorizations?  I have shared the pieces of paper with the

6    Court and Mr. Bernick that show, I think, conclusively that

7    we had authority before March 31.  So I'm happy to do it by

8    meet and confer, but if they're never going to concede, I'm

9    happy to do it before a neutral.  I'm happy to do it at

10   trial.  Set it down for a trial, an evidentiary hearing, or

11   whatever the Court decides.  I'm even, and I know, and I

12   understand Mr. Bernick's very busy, and this is a rather

13   insignificant matter under the greater context of all the

14   hundred thousand personal injury claims.  I'm happy to sit

15   down with his client, Mr. Fink, the corporate counsel is

16   familiar with this and see if he and I can't agree on that

17   issue.  I'm happy to sit down with Mr. Restivo.  We've had

18   great luck in sitting down and saying, Do you or do you not

19   agree that these authorizations were executed prior to March

20   31?  And that to me is the only issue.  Now, Mr. Bernick has

21   a second issue which he raises, and I think it's in the

22   amended order, and that is, even if the authorities were

23   executed before March 31 were they timely disclosed to the

24   debtor?  Fine, set it down for a hearing, and we will argue

25   that issue.  We briefed it.  I'm pretty confident about what

1   happened.  Your Honor's addressed it in an order, and I'm

2   happy to come to Pittsburgh - I'm willing to come to

3   Pittsburgh, I'll say, in December or in January or whatever

4   and we'll argue that second issue, but we don't even need to

5   get to the second issue until at least we resolve the first

6   issue.  Were these authorities executed before March 31,

7   2003?  So, I guess at a status conference all I'm looking at

8   is a process to finally resolve this matter and again, any of

9   those alternatives are suitable to me.  Thank you, Your

10  Honor.

11          THE COURT: Mr. Bernick.

12          MR. BERNICK: Your Honor, we did think about,

13  indeed, thought a lot about if there's a way to get this

14  matter resolved without being litigated.  I did reach out to

15  Mr. Speights perhaps a little too late because of the travel

16  schedules and the like, but my message was not going to be

17  any different from what it is that I'll tell Your Honor which

18  is that we just don't see how to do it.  There's a very

19  specific issue that drives whether the claims are going to go

20  forward at all.   The matter has been briefed extensively.

21  We did make a proposal earlier on to Mr. Speights about how

22  to resolve the three, but he raised a very good concern with

23  it that I won't go into in detail, but we agreed with him

24  that we really couldn't discuss our approach on a basis that

25  would be appropriate from the point of view of how he's

1    representing his clients.  Basically, you have one client

2    being treated one way and another client being treated

3    another way, which is what we thought was the right way to

4    go, but he said he can't do that, and we agreed with him, he

5    couldn't do that.  So, we really come down to this issue.

6    This issue is the driving issue and the context of which it

7    takes place is not simply well, we're at the beginning.

8    Remember that we've now been through this issue ad nauseam in

9    terms of gratification and the like, and Your Honor decided

10   that to reopen or to open up the question as to whether a

11   prior order issued by the Court should have included these

12   three claims or not.  So, it is not as if this is being

13   approached with a clean slate.  The real question is as Mr.

14   Speights demonstrated that there is a reason why these claims

15   should be treated differently from the other 68 claims that

16   were expunged as being late claims, and the threshold issue

17   there is not whether there is in fact evidence that there was

18   authority before the bar date.  The issue, first issue is

19   whether your prior order was complied with and if it wasn't

20   complied with whether the prior order in a sense was revoked

21   or altered in some fashion during this hearing that took

22   place in January.  To be more concrete, we know that there

23   was a September 23, 2005 order that said, if you've got

24   authorizations, written authorizations, give us a list of the

25   client claims with respect to which you have the written

1    authorizations, the documentation, and that order applied,

2    and they submitted certain information by that order, and the

3    information they submitted in time for that order didn't in

4    fact establish that they had authority prior to the bar date,

5    which is the key issue.  So, at the last hearing Your Honor

6    issued as part of your order the requirement that the

7    briefing that would be filed before the Court would not only

8    provide any documentation that Mr. Speights thought

9    appropriate, but would specifically address the question of

10   whether relief was granted from that September 23 order and

11   the subsequent hearing that took place in January where Mr.

12   Speights proposed to argue ratification first.  And the fact

13   of the matter is, the record as it stand now, shows that he

14   did choose to argue ratification first at that hearing.  Your

15   Honor allowed him to do that, but there's nothing that

16   happened at that hearing or at any other time that modified,

17   suspended, or otherwise affected the terms of the September

18   23 order, that would require that he had to submit that

19   information and that list by September 23.  There's nothing

20   that happened subsequently that gave any relief from that

21   order.  So, that order would apply by its terms and that is

22   the end of the story because the authorization information

23   that was provided by the time of that order did not establish

24   that the authorization was pre-bar date.  So their latest

25   brief now creates or purports to create a whole new issue,

1    which is, Well, did that September 23 order require that we

2    submit authorizations that predated the bar date?  That is,

3    he now says, Well, we weren't really required to submit any

4    particular authorizations but just an authorization or some

5    authorization.  So we didn't really care to submit

6    information about pre-bar date authorizations, and moreover,

7    it's unfair - it's unfair to require that that order be read

8    otherwise because we didn't really know at that time whether

9    it made a difference whether the authorizations were pre- or

10   post-bar date.  And he says, Gee, the whole question of

11   timing arose subsequently.  So this is now a whole attack not

12   on the question of whether they were given relief from the

13   September 23 order, but whether the September 23 order by its

14   terms required that they submit the authorization that they

15   had pre-bar date.  So it's now a whole new argument, and

16   obviously he now wants yet another hearing because we have

17   lots and lots of hearings when it comes to these PD claims

18   that Mr. Speights has.  The observation that I would make is

19   that there is a relatively simple answer to the question of

20   whether the September 23 order - We now know it was never

21   revoked, never suspended, there was never relief given from

22   it.  We're now done with that theory.  We're now on a theory

23   that says, Should it be interpreted to require that Mr.

24   Speights offer up evidence of authorization pre-bar date?  Or

25   is it really true, as he says, that nobody really was raising

1    the issue of when the authorization was provided?  And we

2    would just draw Your Honor's attention to Exhibit S to the

3    brief that we filed because it turns out that what was going

4    on at the time that all this was taking place is that we had

5    raised the issue of authorization generally, and we couldn't

6    even figure out what the record was for authorization.  So,

7    we were saying, We object.  They don't have authorizations,

8    their obligations is to supply them, and we couldn't even get

9    the record fixed on what the authorizations were.  That's why

10   the September 23 order was issued, was to say - and it was

11   issued on the same date with a deadline on the same date as

12   the order was issued.  That is, it's closing today.  That was

13   the essence of that order.  Well, is it really true that

14   there wasn't any question that had been raised about

15   timeliness of authorization?  That's just not - there's not -

16   that's not accurate.  Mr. Speights filed a statement of facts

17   relating to its authorization to file certain claims in this

18   Chapter 11, and he did that on July the 13th of 2005.  So he

19   did it months before the September date, and this document's

20   particularly important, and we refer to it in our thirteenth

21   objection - our thirteenth objection which is docket 9311

22   that was filed, that's the omnibus objection on authority,

23   and it was filed on September 1.  So it's a month before the

24   September 23 order.  This specifically says in paragraph (30)

25   on page 14: Speights has also signed a statement of facts

1   confirming Speights had no oral or written authority from

2   these clients before filing claims in March 2003.  See

3   Exhibit S.  So it's Exhibit S to docket 9311, and this

4   Exhibit S dated months before July 13, systematically goes

5   through a whole series of claims and specifically

6   differentiates whether there was authority before the bar

7   date or after the bar date.  So, with respect to the first

8   one, Northwest Community Hospital, Speights & Runyon received

9   no oral or written authority from these two claimants either

10  before filing these claims in Chapter 11 or since.  Paragraph

11  (D) is Fort Wayne Chamber of Commerce, separately stated,

12  Speights & Runyon had oral authority from this claimant

13  before filing this claim in the Chapter 11.  And then (4)

14  says, Speights & Runyon states it now has obtained - It has

15  now obtained written authority from its claimant and will

16  provide this evidence.  Paragraph ©) deals with yet another

17  claim.  Buyers Machine Company separately states that no

18  communication with this client before filing the claim and

19  paragraph (6) says, Believed it had authority to file this

20  claim based upon Anderson Memorial.  So the whole question of

21  timing, when was the authority given, was it given before the

22  claim was filed, after the claim was filed, was in his own

23  document because this is exactly the issue that we were

24  raising with him at the time.  So he knew in July that when

25  the authorization was given was important.  He made the

1    differentiation himself.  We pointed this out in the

2    thirteenth omnibus objection filed in September.  The record

3    was closed on September the 23rd, that record had to reflect

4    whether there was authority before or after the bar date, and

5    with respect to these three claims, again, we now know that

6    the material that was provided in a timely fashion, given

7    that deadline, did not reflect whether or not the

8    authorizations had been given before or after the bar date.

9    You simply can't determine it.  So, the threshold issue is,

10   has been common in these case is, are people going to comply

11   with Your Honor's order?  Here we had a plain order.  The

12   purpose was to fix the record.  The record is fixed, and the

13   motions that Mr. Speights has made which really give rise to

14   all of this to now amend the record or supplement it, those

15   motions are not well-taken, and the order expunging these

16   three claims as part of the group of 71 should stand.  We

17   don't really think that it's necessary to have another

18   hearing on this.  The matter's been fully submitted to Your

19   Honor.  We supplied for the record here a particularly

20   important citation given the last brief that he submitted.

21   If Your Honor wants us to file another brief that lays that

22   out, we can, but we think that we now have a complete record,

23   and that the September 23 order still stands and requires

24   that these claims be expunged.

25              THE COURT: Mr. Speights?

1          MR. SPEIGHTS: Let me be very succinct, Your Honor.

2     Number one, I disagree with everything that Mr. Bernick said

3     except the fact that it was too late to call me at noon today

4     to have a meet and confer.  Number two, we're here on a

5     status conference.  I didn't come to argue the merits.  I

6     didn't bring the file with me.   We're here to have a status

7     conference.  Mr. Bernick says you're submitted after he

8     argues the merits for ten or fifteen minutes.  Set it down

9     for hearing.  He doesn't want to concede anything.  Set it

10    down.  It's been fully briefed.  We'll argue.  You'll finally

11    decide it and we'll move on, and I want to contest not only

12    what's in his briefs but his new arguments today.  But again,

13    this is a status conference.  We shouldn't be taking up the

14    Court's time arguing the merits of this thing once again.

15    So, if Your Honor wants to address the merits, I'll do the

16    best I can, but I came here, they prepared the agenda, I came

17    here for a status conference to see if there was some way out

18    of this thicket short of arguing the merits.  It's obvious

19    now that Mr. Bernick's not going to concede anything about

20    this, and I'm prepared to address each issue he has brought

21    up and argue it, and if you want to set it specially, if you

22    want to set in December, whatever, I'm prepared to argue.

23          THE COURT: Mr. Speights, these three particular

24    claims, what's the nature of the claims?  What's the debtor

25    facing in terms of liability on these claims?

1          MR. SPEIGHTS: There are three USA claims.  One of

2     them is far larger than the other two.  I didn't bring the

3     file and the claims with me today because this is a status

4     report.  I can't tell you the amount involved.  I certainly

5     can look that up and tell them.  I'm sure Mr. Fink knows, and

6     I'm sure he's told Mr. Bernick, but I simply don't know, and

7     if I can log into my computer, I can tell you everything

8     about them.

9          THE COURT: Well, does anybody from the debtors'

10    side know the answer to that?

11         MR. BERNICK: Sitting here at this table, we don't

12    know the details of these three particular claims.

13         THE COURT: You know, part of the reason I wanted

14    the status conference is I simply don't know at this point

15    what prejudice there's going to be to the debtor, and

16    frankly, I need to have an argument if in fact it's not going

17    to be resolved.  If there is not going to be substantial

18    prejudice to the debtor I think you ought to get it resolved.

19    If there is, if it's a very large claim or if they are very

20    large claims, and there is going to be some substantial

21    prejudice, maybe there's nothing you can do but get it

22    argued.

23         MR. BERNICK: Well, I'd be happy to take that up

24    with my client and also with Mr. Speights.  The difficulty

25    really is that the - it's not just prejudice to the debtor.

1    I mean all this really emanates from the question of whether

2    in fact if you need authority by the time you file a claim

3    before a bar date, because to allow to not require authority

4    or to get the authority afterwards basically means that the

5    bar date -

6            THE COURT: Oh, no, I -

7            MR. BERNICK:  - is, so -

8            MR. SPEIGHTS: You've ruled on that.

9            THE COURT: I've decided that issue.

10           MR. BERNICK: Yes, well, but this -

11           THE COURT: You have to have the authority in

12   advance of the bar date.

13           MR. BERNICK: But see, the question of prejudice

14   really comes down in a way, you know, is Grace prejudiced?  I

15   don't know, but that really was not the predicate for our

16   position on expungement to begin with.

17           THE COURT: I know that.  I understand that.

18           MR. BERNICK: Yeah, yeah.

19           THE COURT: But, nonetheless, I think we're spinning

20   a lot of wheels because there's a factual issue on which you

21   two cannot agree, and that really was not litigated in the

22   context of the ratification hearing.  Now, whether I can get

23   there I think is wrapped up in the argument that you're

24   making today and that Mr. Speights wants an opportunity to

25   rebut.  I'll give Mr. Speights that opportunity to rebut but

1    there is, I think, this factual contention that as to these

2    three claims there really was authority before the bar date,

3    therefore, they weren't subject to the ratification order

4    because from Mr. Speights' point of view, there was no need

5    for ratification because he had the authority before the bar

6    date.  So you don't look at ratification when the authority

7    existed.  I think that's - I hope - I don't want to speak for

8    you, Mr. Speights.  In a nutshell, that's kind of how I

9    understand your argument.

10          MR. SPEIGHTS: Yes.

11          MR. BERNICK: I agree that it really turns on the

12    other order here, which is the September 23 order that says,

13    If you have the evidence -

14          THE COURT: Give it to the debtor, right.  I

15    understand.

16          MR. BERNICK: And, yeah - so, but I don't know what

17    the story on the three claims - I'd be happy to go back to my

18    client and take that matter up, but I did that before I came

19    here, and we didn't see anything else to do.  We did have

20    proposals for how to kind of wrap this up, but they would

21    have treated different clients differently in part because

22    the paper's a little bit different for different kinds of

23    clients.

24          THE COURT: Well, and I understand, Mr. Speights,

25    obviously, I don't know the terms of your settlement and

1    again, I'm only making some suppositions.  I understand from

2    a lawyer's point of view in representing a myriad of clients

3    that it's difficult to explain to one if there is some

4    information submitted to one that a particular client's

5    treated in some fashion differently from another, but the

6    reality is that not all claims are alike, and to a certain

7    extent sometimes they're, you know, there simply are reasons

8    why some claims are treated differently.  I don't know the

9    justification in these particular cases.  To the extent that

10   there can be some settlement proposal, quite frankly, I

11   really think these three, if it's at all possible, ought to

12   be settled.  I think you've got a legal issue - not a legal,

13   a factual issue that may end up requiring me to go back and

14   do - if I get past the debtors' argument with respect to the

15   September 23rd order, some at least limited evidentiary

16   hearing because I think it's going to be - If the debtor is

17   contesting the authority date, and I understand the debtor to

18   be contesting the authority date because even when the

19   information was submitted, as I understand the debtor's

20   position, the pre-March 31, 2005 deadline or date does not

21   appear clearly on the facts or whatever it was that was the

22   transmittal.  So the debtor doesn't agree with the underlying

23   factual premise to start with.  So if I get past the legal

24   argument, then I'm into a factual dispute in any event.  Now,

25   can it be a short trial - Yes.  I suppose probably as trials

1   go in this case, it's probably going to be a short trial,

2   nonetheless, it's then another proceeding that everybody has

3   to get prepared for, and I'm not sure in the grand scope of

4   things, that it is going to justify the effort that it will

5   take.  So, I would think that starting with what the limits

6   of the claims are, what the likely prejudice to the debtor

7   and the debtor's estate would be, might perhaps get you off

8   of dead center, and I think perhaps, as to these three

9   claims, some settlement effort really might be advisable.

10          MR. SPEIGHTS: I'm happy to proceed in that way,

11  Your Honor.  The one thing I can't do and I won't address in

12  the discussions we had is I cannot agree to give up one of

13  the claims, because I represent each one of the claimants.  I

14  understand claims - claimants are treated differently, but

15  I'm not going to concede on any of the three, because just

16  succinctly this and again I don't want to get into the

17  merits, the position on the all three is, we had authority

18  before March 31.  We complied with the order and gave

19  authority.  Later on in the ratification fight the issue came

20  up about the dates, and we believe we had several authorities

21  because we had several bankruptcies, and we wanted to cure

22  that and Your Honor addressed that.  It's not a complicated

23  factual situation.  I guess what I would like to know, if we

24  are not able to resolve it, are we going to start with a

25  legal issue and then go to the factual issue or vice-versa or

1    at the same time -

2            THE COURT: No, I think -

3            MR. BERNICK:  - and I don't care when you want to

4    do it.

5            THE COURT: I think, Mr. Speights, the easiest thing

6    to do would be to give you a chance to respond to what I

7    consider an argument that the debtor just made concerning the

8    September 23rd order and the July 13th filing that you made

9    because I haven't looked at that July 13th filing either.  I

10   think you need an opportunity to do it.  That may be the

11   means-all and ends-all, and there's no point getting into the

12   facts if in facts if in fact that's going to adjudicate the

13   issue, and if I can't get around that position then, that's

14   just going to end it.  So, I don't see any point to try and

15   set a trial if in fact I can't get past that argument.  So, I

16   think the issue would be joined by having you file a brief on

17   that issue letting me set - it can be by phone.  I don't

18   think it's going to be a very long argument on that point

19   only, and then I will give you a ruling on that point.  If I

20   think that I can get past that argument and I need an

21   evidentiary hearing, we'll set one.  If I can't get past that

22   point then that will end it, and, you know, things will -

23   you'll do what you need to do from there on.

24           MR. SPEIGHTS: Thank you, Your Honor.

25           MR. BERNICK: We also - I'm not sure just to be

1    complete on this.  Your Honor has motions before you on

2    summary judgment.  I don't know how these claims, these three

3    particular claims overlap with that, and I'd have to go back

4    and check.  I don't know if Mr. Restivo -

5              MR. SPEIGHTS: They don't overlap at all.

6              THE COURT: I don't think they're in -

7              MR. SPEIGHTS: We have two buckets.  We have a

8    bucket that's active before Your Honor on summary motions and

9    we have a bucket on the way to the District Court and the

10   question is, which bucket do these three go in.

11             THE COURT: Right now we're do they go?  They don't

12   go anywhere at the moment.

13             MR. SPEIGHTS: But they don't.  They are out here

14   and if you rule in favor of Mr. Bernick, I join them with the

15   ones on the way to the District Court, and if you rule with

16   me, they go back into Mr. Resitvo's bucket to decide what he

17   wants to do with them, and I'm not sure what objections he

18   wants to pursue on these three.

19             THE COURT: All right, why don't we do this.  Why

20   don't I give you time to attempt to settle these matters, to

21   try to file some motion to approve a settlement in time for

22   the January omnibus.  It's too close for the December, at

23   this point in time now.  And if you can't, if your not able

24   to do that, then how much time after that do you want to file

25   your brief, Mr. Speights?

 1             MR. SPEIGHTS: If settlement fails?

 2             THE COURT: Yes.

 3             MR. SPEIGHTS: Twenty days?

 4             THE COURT: So, let me just pick a date.  How about

 5   February the 15th?

 6             MR. SPEIGHTS: That's fine, Your Honor.

 7             THE COURT: Will you want to do a brief - I'll call

 8   it a reply, Mr. Bernick?

 9             MR. BERNICK: Why don't you give us the opportunity,

10   and we'll see if it's really necessary.

11             THE COURT: All right by when?

12             MR. BERNICK: Ten days later.

13             THE COURT: All right, February 26th.  When's the

14   February omnibus?  Oh, can you possibly file this in time

15   that I can put this on the February omnibus for argument, Mr.

16   Bernick?

17             MR. BERNICK: Sure.  I mean - whatever it takes to

18   get this matter back before Your Honor I'm sure we'll - we

19   won't have problems submitting a brief at that point.  It

20   ought to be pretty short.

21             THE COURT: February 22nd?  The omnibus is the 25th?

22   Yes, can you submit your brief by the 22nd?

23             MR. BERNICK: Sure, absolutely.

24             THE COURT: Argument on February 25 at the omnibus.

25   I don't think the argument will take that much time that it

1   can't be done then, and it can be by phone, Mr. Speights.

2   You don't need to be here for this argument specifically.  If

3   you choose to do it by phone, that's fine.

4          MR. SPEIGHTS: Thank you, Your Honor.

5          THE COURT: Okay.  What else?

6          MR. BERNICK: That's it.  We appreciate your

7   spending the time late this afternoon.

8          THE COURT: Okay, I'm not sure folks whether you are

9   aware that my clerk here in Delaware, Jennifer - Jennifer

10  Patone Cook is going to be leaving.  She has taken a job with

11  a law firm here in Delaware.  So Friday will be her last day.

12  So effective on Monday, if you would please start emailing

13  once again to Julie Johnston who was my prior clerk before

14  Jennifer took over until I get a new permanent clerk here,

15  that would be helpful.  We posted the notice on the website.

16  We will be sending a notice out to everyone that that will be

17  a temporary change.  Also keep mailing to the JKF box.  I'm

18  going to try to make arrangements to have Julie have access

19  to Jennifer's emails to try to - Oh, that's been done?  So,

20  that should facilitate things in case anything falls through

21  the cracks in the meantime, but nonetheless, I'm going back

22  to Julie Johnston temporarily, and, yes, I'll take your

23  orders.

24          MS. BAER: And, Your Honor, there's one other order

25  and that is we filed a certification of counsel on the

1  omnibus hearing order, hearing agenda for next year, which

2  has the -

3           THE COURT: Okay.

4           MS. BAER: Could we get that signed today too?

5           THE COURT: Yes, uh-huh.

6           MS. BAER: Great.

7           THE COURT: All right, thank you.

8           ALL: Thank you very much.

9           MR. EVER: I think there was some discussion about

10  changing the hearing time?

11           THE COURT: Oh, yes, folks.  Mr. Bernick, pardon me.

12  Folks, may we have your attention for a minute.  I'm thinking

13  of pushing these hearing times back to maybe at least one

14  o'clock starting in January?  Would that adversely affect

15  anyone?

16           MR. BERNICK: That would be great just because it

17  means that . . . (microphone not recording).  I'll say

18  there's less pressure at the end of the day, but . . .

19  whatever time . . . Obviously it would improve our chances of

20  -

21           THE COURT: Getting home.

22           MR. BERNICK: Getting home.

23           THE COURT: Okay.  Even earlier if - Once I get

24  Federal-Mogul out of the system, but that's going to take a

25  couple of months, then I can probably move it back even

1   earlier but I'm a little hesitant to do that until I get a

2   couple of the Federal-Mogul leftover issues resolves.  So why

3   don't we say one o'clock starting in January.

4            UNIDENTIFIED SPEAKER: One o'clock is preferable.

5   Before one, some of us would have to come in the night before

6   in any event, so either way we'd lose a night.  One o'clock

7   we likely could get in and out on the same day.

8            THE COURT: All right, fine.  Let's move it to one

9   o'clock then.

10           MS. BAER: Your Honor, I can do this by hand or we

11  can submit it -

12           THE COURT: Do it by hand, that's fine.

13           MS. BAER: I'll do it right now.

14           THE COURT: Sure.

15           MS. BAER: Right.

16           THE COURT: Okay, folks, thank you.

17           (Whereupon at 5:35 p.m., the hearing in this matter

18  was concluded for this date.)


         I, Elaine M. Ryan, approved transcriber for the
United States Courts, certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


/s/ Elaine M. Ryan                         December 3, 2007
Elaine M. Ryan
2801 Faulkland Road
Wilmington, DE 19808
(302) 683-0221