IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re:                                      :    Chapter 11
                                            :    Case No. 01-01139(JKF)
                                            :
W. R. GRACE & CO., et al.,                  :    (Jointly Administered)
                                            :
                        Debtors.            :
---------------------------------------------------------- X

**OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS' MEMORANDUM IN SUPPORT OF DEBTORS'
MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS RELATING TO
CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY**

The Official Committee of Equity Security Holders (the "Equity Committee") of

W.R. Grace & Co. ("Grace") submits this memorandum in support of Grace's Motion to

Exclude Expert Opinions in Connection with the Estimation of its Current and Future

Asbestos Personal Injury Liability (the "Grace Motion").

### Preliminary Statement

> "***Daubert* explains that the language of Rule 702 requiring
> the expert to testify to *scientific knowledge* means that the
> expert's opinion must be based on the 'methods and
> procedures of science' rather than 'subjective belief or
> unsupported speculation.'"**[1]

The Equity Committee applauds and joins the Grace Motion in its entirety.

Through the Grace Motion, Grace has for the first time brought logic and clear thinking

to the historically muddled issue of estimating asbestos personal injury liabilities for

purposes of bankruptcy reorganization.   In particular, new light has been cast upon two

pivotal questions: (1) *what* should the Court be estimating?; and (2) *what methods* should

---

[1]  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993) (emphasis in original)).

the Court accept as competent evidence in making that estimation?   Grace's memorandum is comprehensive, and the Equity Committee does not wish to subject the Court to undo repetition.   We therefore write separately only to make some brief observations pertinent to these two points.[2]

The Equity Committee represents the innumerable holders of more than 70 million shares of common stock of Grace.   Grace stock is publicly traded and highly liquid, with average daily volume of more than 900,000 shares.   At the current market price of about $26 (the price has ranged between $24 and $30 over the past three months), the market capitalization of Grace's equity is more than $1.8 billion.   If there is any truth to market efficiency and the "wisdom of the crowd" – and there assuredly is – there can be no question about Grace's solvency.   *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (absent evidence of market distortion, market value of equity is the best evidence of solvency).   Every day, hundreds of people make investments expressing their confidence that Grace's assets massively exceed its liabilities, including Grace's aggregate exposure for present and future asbestos personal injury liabilities.

Each dollar included in the Court's estimation of Grace's asbestos personal injury liabilities comes out of the equity holders' pockets.   To the extent that the liabilities are real, legitimate obligations of the company, this is as it should be.   Evidence presented to the Court in the forthcoming estimation trial will demonstrate that, as a matter of logic and epidemiological science, the number of individuals who could realistically have developed true asbestos-related disease from Grace products is diminishingly small.

---

[2]   The Revised and Amended Case Management Order of the Estimation of Asbestos Personal Injury Liabilities allows the Equity Committee's memorandum to be 40 pages long; however, this memorandum is only 13 pages long.   The Equity Committee has agreed to allow the Debtors to make use of the remaining 27 pages for the Grace Motion.

While the equity holders fully understand the requirement that they bear the economic burden resulting from legitimate asbestos-related liability, the estimated liability should be consistent with this reality.

However, value should not, and must not, be taken away from Grace shareholders on the basis of the sort of arbitrary, wholly unscientific and result-oriented extrapolations by the claimants' purported experts, based on historical settlements that were entered into under the duress of the unmanageable pressures of a litigation system out of control. These settlements invariably stated on their terms that no liability was being admitted and include a vast number settlements of claims that were, it is now clear, legally meritless.

Thus, the Equity Committee respectfully submits that the answers to each of the two questions posed above are clear. *First*, the Court should estimate Grace's *real* liability on *legitimate* claims of asbestos-related injury *caused by Grace product*. To do otherwise, to blink reality by engaging in the claimants' chimerical enterprise of guessing what would have happened in a fictitious world "but for the bankruptcy," would merely perpetuate the unprincipled shakedown from which Grace entered bankruptcy to seek protection.

*Second*, in making its estimation the Court should rely only upon *legitimate and scientifically defensible* methods, a standard that claimants' estimation experts – in particular, Dr. Peterson and Ms. Biggs -- utterly fail to satisfy. To illuminate the numerous scientific shortcomings of these purported experts, the Equity Committee has obtained the expert report of Dr. James Heckman, a Nobel laureate economist who has devoted his career to studying and improving scientific methods for modelling human behavior. (The "Heckman Report," a copy of which is attached as Exhibit 1.)

Having analyzed Dr. Peterson's and Ms. Biggs' estimation reports in detail, Dr. Heckman concludes that neither has "use[d] a reliable methodology." Rather, both "employ simple extrapolation of trends and *ad hoc* adjustments," which do "not meet the criteria of the scientific method." (Heckman Report ¶8). That Dr. Peterson and Ms. Biggs disagree between themselves by $2 billion (a variance of more than 50%) alone speaks volumes. Their estimates are meaningless numbers supported by "subjective belief [and] unsupported speculation." *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). Such estimates should not be the basis for taking billions of dollars away from Grace's stockholders.

I.

### The Court Should Estimate the Value of Legally Meritorious Claims, Not What Grace Would Supposedly Have Paid to Settle Claims – Meritorious and Otherwise -- in a Fictitious "But For the Bankruptcy" World

Grace filed for Chapter 11 bankruptcy protection on April 2, 2001. That historical fact can never be altered. Yet both of the claimants' estimations are predicated entirely upon the counterfactual assumption that the Grace bankruptcy petition *never occurred*. This "but for the bankruptcy" assumption is not the result of any expert opinion; rather it is an integral aspect of the sole question that claimants' counsel chose to put to its experts. *See, e.g.,* Peterson Dep. at 267 ("It's a legal argument."). As explained in the Grace Motion, this question is wrong as a matter of law. The claimants' experts therefore fail the "fit" prong of the *Daubert* test. We further note that, by design, the claimants' experts' specific application of the "but for the bankruptcy" assumption leads to palpably absurd results.

The sole and express reason for the bankruptcy filing was Grace's inability to achieve fair resolution of the flood of asbestos claims being asserted against it in state

KL3 2629416.4

courts. "We believe that the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims." April 2, 2001, Press Release (quoting Grace Chairman Paul J. Norris). Subsequent events have entirely vindicated both aspects of this assertion. The state court system has been shown to be in fact broken, as legislatures and courts have recognized in a continuing series of tort reform measures. Moreover, a vast portion of the claims against Grace (and other defendants) were unmeritorious, the product of disreputable mass screenings and usually supported entirely by diagnoses from a small group of doctors who have now been utterly discredited, most notoriously by Judge Janice Jack in the Silica Multidistrict litigation. There is no need to recount of these facts at length, most of which are well known to the Court and will be explored at trial. It will suffice to observe that even Dr. Peterson and Ms. Biggs acknowledge that, through these events, the asbestos litigation environment has been fundamentally changed since the date of Grace's bankruptcy petition. *See, e.g.,* Mark A. Peterson, W.R. Grace Projected Liabilities for Asbestos Personal Injury Claims as of April 2001 (the "Peterson Report") at 12; Jennifer L. Biggs, Expert Estimation of Asbestos Personal Injury Liabilities of W.R. Grace as of April 2, 2001, Supplemental Report ("the Biggs Supp. Report"), at 17, 61.

Grace was thus completely justified in seeking bankruptcy protection from the massive losses it was suffering from the unrelenting flood of *claims* being asserted against it in a broken legal system, and seeking a fair resolution of its legitimate asbestos-related *liabilities* in an orderly process through the Court. The claimants "but for the bankruptcy" assumption would directly deprive Grace of this very benefit, by guessing what would have happened if Grace had continued in the broken system. This approach

-5-

would render the bankruptcy process meaningless, with startlingly inequitable implications.

For example, Ms. Biggs' estimation assigns value to a host of claims that by her own analysis lack merit. Imagine that a company files for bankruptcy the day before trial is to commence on a seemingly powerful multimillion dollar lawsuit against it. A year later, evidence is uncovered demonstrating that the claim was fraudulent, and based upon forged documents. But the plaintiff persists, arguing that because Bankruptcy Code § 502(b) requires that its claim be valued "as of the date of the filing of the petition date," the exculpatory evidence not available until after the petition date must be ignored. The contention would obviously be absurd.

The "but for the bankruptcy" assumption leads Ms. Biggs to take precisely the same palpably absurd position. Ms. Biggs admits that "scrutiny of claims originating from mass screening activities has shown that many of the B-readings are suspect," and concludes that the exposure of these practices will lead to a "significantly higher dismissal rate" for non-malignant claims against Grace going forward. Biggs Supp. Report at 61. But she nonetheless applies Grace's historical dismissal rate to the claims she believes *would have* been settled through 2003, reasoning that, if Grace had not filed for bankruptcy, it would have continued to pay on bogus claims until "increased scrutiny of mass screening activities" in 2004. *Id.* at 61.[3] Ms. Biggs' estimate thus attributes value to thousands of meritless claims that she thinks Grace would have been forced to settle, "but for the bankruptcy," before the true nature of these claims came to light.

---

[3]    Specifically, Ms. Biggs assumes that Grace would have paid to settle more than 80% of the nonmalignant claims resolved before 2004, but barely one-third of such claims resolved thereafter. Biggs Supp. Report at 62, Table 17.

Dr. Peterson, by contrast, applies a decreased "payment rate" (i.e., an increased dismissal rate) to all claims resolved after the Petition Date. Peterson Report at 21.   But his application of the "but for" assumption has other, equally unjustifiable implications. Among other things, Dr. Peterson is oddly selective about which bankruptcy he assumes out of existence:   his "but for" world entirely excludes the Grace bankruptcy, but expressly includes – and places great weight upon -- the bankruptcy of other asbestos defendants.   In Dr. Peterson's view, the prospect of bankruptcy filings by other major asbestos defendants causes an increase in both the number of claims filed against Grace and the value of claims. *See, e.g.,* Peterson Report at 25-26; Peterson Dep. at 268-69.   On this basis Dr. Peterson increases his liability estimate for Grace. In similar fashion, Dr. Peterson has used the fact of Grace's bankruptcy to increase his asbestos liability estimates in other bankruptcies, such as Owens Corning.   Peterson Dep. at 271.   Thus, through Dr. Peterson's selective interpretation of the "but for" assumption, every defendant's liability is increased by the bankruptcy (or potential bankruptcy) of every other defendant.    The aggregate liability of all asbestos manufacturers is thereby magically increased through the bankruptcy process, a result that makes no logical sense -- but has obvious benefits for the asbestos committees that repeatedly hire Dr. Peterson.

## II.

### Dr. Peterson's and Ms. Biggs's Estimations Are the Product of Arbitrary Judgments, "Speculative Belief" and "Unsupported Speculation", Not Defensible "Methods and Procedures of Science" as Required by *Daubert*

The estimation exercises of Dr. Peterson and Ms. Biggs are the result of two distinct elements: (1) predictions about medical processes that will lead to future occurrences of asbestos-related diseases, and (2) predictions about human behavior, including decisions to bring claims against Grace (legitimate or otherwise), whether to

settle such claims, and for how much.  The former task is a matter of epidemiology, which is not within either of these individuals' areas of expertise but is not a major area of controversy in this case.  The latter, far more important human volitional element is a matter of economics.  *See* Heckman Report at 7 ("Methods for predictions of outcomes that are based on decision-making at individual and organizational levels and interactions among these participants are at the heart of economic science.").

It would be difficult to imagine anyone more qualified to speak to this topic than James Heckman.  Dr. Heckman is one of the world's foremost experts on the methods for modelling and predicting human behavior.  In the words of the Nobel Prize Committee, Dr. Heckman (and his co-award winner Daniel McFadden) has developed methods that "are now standard tools, not only among economists but also among other social scientists."  *See* http://nobelprize.org/nobel_prizes/economics/laureates/2000/ press.html, attached as Exhibit 2.  Dr. Heckman's detailed critique of the work of Dr. Peterson and Ms. Biggs is set forth in his attached expert report, and need not be repeated here in their entirety.  We touch only upon a few salient points.

Science is the enterprise of *understanding* what is going on in the world, and *applying* that understanding for practical purposes.  At the heart of the scientific endeavor is "the formulation of hypotheses as to causes and effects and the testing of these hypotheses against empirical evidence."  Heckman Report ¶ 11.  To merely describe what has happened, or to assume that what has happened in the past will continue into the future, is not science.  Nor is it science to adjust extrapolations from history on the basis of off-hand and unsupported "judgments" – even "informed judgments" – that are not the product of any articulated and tested method.  *Daubert*, 509 U.S. at 590.  For all of their

KL3 2629416.4

charts and tables, Dr. Peterson and Ms. Biggs offer nothing to the Court beyond "simple extrapolation of trends and *ad hoc* adjustments." *Id.* at 5.

Dr. Heckman charitably observes that there are situations where decisions may reliably be made on the basis of the simplistic assumption that the future will continue to be like the past. This is so where the environment is so stable that it is not necessary to understand the underlying dynamics of cause and effect, because they do not change. For example, if one lives in the tropics where the weather never changes, there is no need to understand the complex meteorological factors at play to reliably predict what the weather will tomorrow: same as today. This is not science, though, and offers no help in making predictions in a dynamic environment where important factors are changing. *See, e.g.,* Heckman Report ¶¶ 20, 34.

Beyond question, the asbestos litigation environment is highly dynamic. Developments of recent years have effected fundamental shifts, with more undoubtedly to come. Dr. Peterson and Ms. Biggs acknowledge as much, purporting to address the impact of these fundamental changes through sizeable adjustments that, though undoubtedly correct as to direction (tending to reduce their estimates), lack any methodological justification. *See generally* Heckman Report ¶¶ 65-74, 83-86. "[T]o be reliable, expert testimony must be based on sufficient facts or data and it must be the product of reliable principles and methods properly applied." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003). The size of Dr. Peterson's and Ms. Biggs' *ad hoc* adjustments, and how they were applied (*e.g.*, Will tort reform result in decreased filing rates, or increased dismissal rates, or both? How will settlement values be affected? When will these impacts occur?), are not the result of any systematic analysis or

-9-

calculation; they are pure speculation. Even Dr. Peterson concedes that "some of these adjustments, while informed by the research that I've done, are not, themselves, scientific decisions." Peterson Dep. at 248.

Furthermore, before applying their arbitrary adjustments Dr. Peterson and Ms. Biggs do *not* simply assume that the future will simply be like the past. Instead, both of their estimates are dramatically increased by projecting that future settlement values will rise, on the basis of purported historical "trends" they assume will continue. *See, e.g.,* Peterson Report at 34; Biggs Supp. Report at 63-67. These extrapolated trends are not the basis of any empirically established relationship of cause and effect, and hence lack any scientific justification.

In technical terms, a "trend" is a monotonic relationship between time and an observed variable. A historical trend is merely an observation that in the past the variable – here, average settlement values – has tended to move in a certain direction and calculating the average rate of that movement. *See* Peterson Dep. at 246, 248-49. This is not science, it is measurement. Absent plausible and empirically tested hypotheses as to *why* time would cause the variable to increase, there is no basis to expect the historical trend to continue. For example, someone observing a baseball leaving a bat at a 45% upward angle will observe that the height increases -- for a while. This observation establishes a historical trend, but the trend tells absolutely nothing about cause and effect. Time does not cause the ball to rise, the force initially imparted does, and there are other factors (friction, gravity) at work. Without an analytical model of cause and effect, the historical trend is useless in predicting the ball's future position – indeed, worse than useless, it is positively misleading. Similarly, one might observe the amount of coal

-10-

being removed from a mine increasing over time, but this historical trend would be the result of numerous underlying forces. Without understanding and quantifying those forces, the trend is no basis for reliably predicting the future output of the mine. The only thing one can say for certain is that a simple forward projection of the trend will be wrong: the mine will be exhausted.

The fact that settlement values generally (although by no means exclusively) increased in the years prior to the Grace bankruptcy filing that gives no insight into cause and effect – it tells one nothing about *why* those values increased – and therefore provides no basis whatsoever to predict what will happen in the future. Neither Dr. Peterson nor Ms. Biggs has even attempted to build an analytical model of the causes underlying their observed historical data, and to test that model on the data.

When asked whether he had any hypothesis as to why time would result in an increase in settlement values, Dr. Peterson appeared to be considering the question for the first time. He began to spin theories about increasing "public knowledge about asbestos," "more trial lawyers around than there were before," and "the increase in skill" of the plaintiffs' bar – and then admitted that there are similar factors that would tend to decrease settlement amounts, such as tort reform and increasing publicity about suspect claims practices. Peterson Dep. at 250-53. By identifying this non-exhaustive panoply of factors, Dr. Peterson tacitly admits that the notion of a unitary "trend" is simplistic and useless. There is no single force moving settlement values upward over time. Instead, there are many factors tending in different directions, the strength of which will vary over time. It is difficult to imagine, for example, that the already substantial public knowledge about the dangers of asbestos could continue to increase; on the other hand, information

about the extent of suspect claims practices and plaintiff abuses of the tort system is only beginning to come to light.

In his report, Dr. Heckman explains that a scientifically valid forecast of future asbestos liabilities in the tort system requires the creation of a model identifying at least the major factors at play and making hypotheses about the cause and effect relationships. "The next step is then to empirically specify and test the model with data to validate and quantify the hypothesized relationships." Heckman Report ¶ 11. Once these empirically tested relationships are established, informative predictions can be made about the future – and, importantly, the range of error of the forecast can be quantified. *Id.* ¶ 71; *see Daubert*, 509 U.S. at 594 (noting that "the court should ordinarily consider the known or potential rate of error" in considering admissibility of expert testimony).

In his deposition testimony described above unpacking what he believed might underlie the historical "trend" in settlement values, Dr. Peterson demonstrated that he would have no trouble identifying the factors that should be incorporated into a true model of asbestos claiming behavior. Peterson Dep. at 250-53. A review of such factors is merely the starting point for a scientifically valid estimation. As Dr. Heckman explains,

> The[] complexities and underlying interrelationships among the outcomes that determine Grace's future asbestos claims and claim values make the development of reliable forecasts a challenging but not insuperable task. Armed with modern econometric tools and powerful computing capabilities, economists have formulated and estimated models of comparable complexity. These models are regularly applied to policy decision-making that affects tax policy and the like.

Heckman Report ¶ 36; *see also id.* Appendix B (describing examples of such models). Neither Dr. Peterson nor Ms. Biggs, nor any other expert put forward by claimants, has

even attempted to create such a scientifically defensible model for predicting Grace's future asbestos personal injury liability.

### Conclusion

For the reasons set forth above, as well as the reasons set forth in Grace's memorandum, Grace's *Daubert* motion should be granted.

Dated: December 7, 2007

Respectfully submitted,

BUCHANAN INGERSOLL &
   ROONEYPC

By: _____
Teresa K. D. Currier (ID No. 3080)
The Brandywine Building
 1000 West Street, Suite 1410
Wilmington, Delaware  19801
Telephone:  (302) 552-4200
Facsimile:  (302) 552-4295

- and -

KRAMER LEVIN NAFTALIS &
   FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
919 Third Avenue
New York, New York  10022
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

Attorneys for the Official Committee of
Equity Security Holders

-13-