# Exhibit 1

**Rebuttal Report of**

**James J. Heckman**

**to the Reports of Mark A. Peterson**

**and Jennifer L. Biggs**

September 25, 2007

## I.      INTRODUCTION

### A.     Qualifications

1.  I am the Henry Schultz Distinguished Service Professor of Economics in the Department of Economics at the University of Chicago. I also have part-time appointments at University College Dublin and Peking University, China. I have served on the faculties of the Department of Economics at Columbia University and Yale University, where I was the A. Whitney Griswold Professor of Economics. I received my B.A. (summa cum laude) in mathematics from Colorado College in 1965 and my M.A. and Ph.D. in economics from Princeton University in 1968 and 1971, respectively.

2.  I specialize in the fields of Labor Economics, Applied Microeconomics and Econometrics, which is the application of statistical techniques to economic problems. In 1983, I received the John Bates Clark Medal awarded biannually by the American Economics Association to the most distinguished economist under the age of 40. In 2000, I was awarded the Nobel Prize in Economics.  I am a Member of the National Academy of Sciences, a Fellow of the American Academy of Arts and Sciences, a Fellow of the Econometric Society, a Fellow of the American Statistical Association, a Fellow of the Society of Labor Economics, and a Senior Research Fellow of the American Bar Foundation. I also am a Research Associate of the National Bureau of Economic Research and I direct the Economics Research Center at the Department of Economics at the University of Chicago. I also direct the Center for Social Program Evaluation at the Harris School at the University of Chicago.

2

3.   I have published over two hundred articles in scholarly journals and compendia and have written or edited five books. I currently serve as an Associate Editor of the Journal of Labor Economics, Econometric Reviews, and the Journal of Population Economics. I have previously served as Co-Editor of the Journal of Political Economy and as an Associate Editor of Evaluation Review, the Journal of Econometrics, the Review of Economic Studies and the Journal of Economic Perspectives. In addition to my academic experience, I have served as an advisor to the World Bank, the Inter American Development Bank, the United States Department of Labor, and the Ministry of Fiscal Equity of Argentina, and government agencies in Brazil, Taiwan, South Korea, Germany, Scotland and Ireland. I also have presented testimony before committees of the United States Congress. In the past four years, I have offered expert testimony in *Blue Cross and Blue Shield of New Jersey, et al. v. Philip Morris, Inc.*, *Falise, et al. v. American Tobacco Co., et al.* and *United States v. Philip Morris, et al.* A copy of my curriculum vitae is attached as Exhibit A to this report. A list of materials considered is included as Exhibit B. I am being compensated at the rate of $1800 per hour.

4.   The central issue addressed by Dr. Peterson and Ms. Biggs in this matter is the estimation of future asbestos-related claims and claim values faced by Grace. At the heart of this issue is human choice – choices by individuals and plaintiffs law firms to file and settle claims and choices by defendant firms in response to these behaviors. Economists have long studied and modeled the factors driving human choices – at various levels of human organization – e.g., individual and firm levels, and have developed accepted methods for the statistical analysis of economic data. This field is generally referred to as econometrics. In fact, a focal point of my work has been the development of scientific bases for policy evaluation, applying sound economics and econometric methodology to the study of human choice. I have studied outcomes

produced by human behavior in a number of different areas, and have analyzed the implication of changes in factors driving choice (e.g. incentives, costs) for predictions of future outcomes.[1] My work has placed special emphasis on models of individuals (or disaggregated groups, such as organizations or firms), and the problems and possibilities created by heterogeneity, diversity, and unobserved counterfactual states.

5.  This vast and growing econometric literature has focused on developing tools, grounded in scientific methods, to identify relationships that can be used to make reliable forecasts in changing environments.  This literature emerged in response to recognized shortcomings in forecasting techniques, specifically those techniques that naively extrapolate from simple historical relationships among variables.  These simple extrapolation techniques have led to many recognized failures in reliable predictions and subsequent policies based on those predictions.  These failures have been observed in stock market predictions, regulation of monetary supply, predictions of the effects of educational policies, and a host of other programs designed to promote equality and economic prosperity.  The evaluation and development of predictive approaches and their application to policy analysis have been the central focus of my research.

**B.     Summary of Tasks and Conclusions**

6.  I have been asked by counsel for W.R. Grace's Equity Committee to evaluate the reliability of the methodology and estimates presented by Dr. Mark A. Peterson in his Report of June 2007 ("Peterson Report") and Ms. Jennifer Biggs in her report of June 2007 ("Biggs Report").  In their reports, Dr. Peterson and Ms. Biggs attempt to estimate W.R. Grace's ("Grace's") future asbestos-related liabilities, assuming a counter-factual, "but-for" world in which Grace had not entered bankruptcy.  I understand that liability is

---

[1]   For example, see Heckman and Ashenfelter "Measuring the Effect of an Anti-Discrimination Program" (1974); Heckman "Shadow Prices, Market Wages and Labor Supply" (1974); and Heckman, Lochner and Taber "Tax Policy and Human-Capital Formation" (1998).

a legal finding, based on various elements including causation and incidence of harm, which neither Dr. Peterson nor Ms. Biggs incorporate into their estimation. Instead, Dr. Peterson and Ms. Biggs both claim to estimate Grace's future asbestos liabilities by forecasting potential claims and settlement values under the assumption that these claims would be resolved under the tort system.[2]

7.   I have been asked to assess whether Dr. Peterson's and Ms. Biggs' forecasting approaches are reliable and apply valid scientific methods for analyzing past and projecting future claiming behavior.

8.   Based on my analyses and review of materials related to this case, I have drawn the following central conclusions:

    i.   Dr. Peterson and Ms. Biggs do not use a reliable methodology to estimate future claim levels and future claim values that would have been filed and resolved in the tort system but for the Grace bankruptcy.

    ii.   Reliable forecasts of future asbestos claims and settlement values in a changing environment require modeling of the economic incentives driving individual choices (e.g. decision to bring a claim) and firm behavior (e.g., litigation strategy). There is a well-established econometric framework, based on the scientific method, for performing this type of analysis.

    iii.   Instead, Dr. Peterson and Ms. Biggs employ simple extrapolation of trends and *ad hoc* adjustments.

- Simple extrapolation does not meet the criteria of the scientific method, although it can provide informative estimates of outcomes in instances where processes follow well-established trends that are likely to persist into the future.

- Dr. Peterson's and Ms. Biggs' estimation techniques do not meet the criteria of the scientific method, and whether their estimates provide any information hinges on the stability of the processes that determine these different outcomes over time.

---

[2]   See Peterson Report, p. 9 and Biggs Report, p. 5.

- There have been well-documented changes in the asbestos-related litigation environment. Therefore, Dr. Peterson's and Ms. Biggs' simple extrapolations provide no reliable basis for principled analysis of future claims.

iv. Further, even if Dr. Peterson's and Ms. Biggs' approaches could reliably estimate future claims and settlement values in a tort system but for the bankruptcy, which I do not think they do, their methods do not translate into reliable estimates of the number and value of claims resolved under a bankruptcy regime, which I understand may apply to these estimates.

- I have been told by counsel to assume that the legal standards that will be applied to resolve asbestos claims in the context of bankruptcy are significantly different than the legal standards in the tort system but for the bankruptcy.

- Observed past settlements that were resolved under the tort system, were a function of participants' strategic behavior under the substantive and procedural rules of the many different courts in which claims were and could be brought.

- Therefore, even if Dr. Peterson's and Ms. Biggs' forecasting methodologies could provide informative estimates of Grace's likely future claims and settlement values but for the bankruptcy, these estimates would not be likely outcomes under the bankruptcy regime.

9. In sum, Dr. Peterson's and Ms. Biggs' approaches do not follow scientific or any reliable methodology for forecasting outcomes in changing environments. Therefore, Dr. Peterson's and Ms. Biggs' estimation approaches do not provide a basis from which to draw informative measures of Grace's future asbestos-related liabilities or future claims and settlement values.

6

II.     **PREDICTION OF OUTCOMES THAT DEPEND ON HUMAN CHOICES UNDER CHANGING INCENTIVES IS A CENTRAL AREA IN APPLIED ECONOMICS**

10. Dr. Peterson and Ms. Biggs attempt to predict the level of Grace's future asbestos-related claims and claim values. The ultimate levels of these outcomes depend on a host of factors, including the choices that are made by claimants and defendants under specific legal regimes. Prediction of these future outcomes using scientific methods involves identifying the causal relationships between these different factors (such as particular legal requirements) that affect economic incentives and future choices.

11. Methods for predictions of outcomes that are based on decision-making at individual and organizational levels and interactions among these participants are at the heart of economic science. The empirical scientific method calls for the formulation of hypotheses as to causes and effects and the testing of these hypotheses against empirical evidence. Thus, to develop a valid empirical economic model, the first step would be to consider potential relationships among the main economic variables of interest. The next step is then to empirically specify and test the model with data to validate and quantify the hypothesized relationships.

12. By failing to specify or estimate such an economic model, or even provide any indication of a model of decision making that underlies their empirical approach, neither Dr. Peterson nor Ms. Biggs meet the basic standard of empirical science as applied to economic problems. The fundamental methodological requirements for valid economic forecasting were articulated by Haavelmo more than sixty years ago and have been

7

refined by many researchers since.[3] Instead of applying this body of knowledge, Dr.

Peterson and Ms. Biggs simply extrapolate from a set of historical patterns onto future

outcomes in an *ad hoc* fashion with no articulated economic rationale.

13.   The econometric approach to forecasting develops explicit models of outcomes

where the causes of effects are investigated and the mechanisms governing choices are

analyzed.  The variables that economists generally seek to predict are known as the

"choice" or "endogenous" variables in an economic model.  They are sometimes called

"internal" variables because they are determined by the social system. In particular, the

discipline of applied econometrics focuses on explaining and predicting outcomes that

are determined by economic participants' choices.  In the model of Grace's future claims

and claim values, the main endogenous outcomes (i.e., the ones determined by participant

choices) are decisions whether to bring or settle claims, settlement values, and case

dismissals.

14.   Econometric work over the last several decades has focused on organizing and

analyzing large datasets that provide an empirical basis to link these multiple interrelated

causal factors to the choice-based outcomes.  While the basic statistical theory to

implement these types of tests has existed for many decades, the advent of computer

technology has led to the collection of large datasets and the use of more sophisticated

empirical techniques.  These developments have dramatically advanced the ability to

model outcomes that are driven by multiple causal factors, such as asbestos-related

claiming behavior.

---

[3]    See Haavelmo "The Probability Approach in Econometrics" (1944). For a discussion of recent
literature on this topic, see Heckman and Vytlacil "Structural Equations, Treatment, Effects and
Econometric Policy Evaluation" (2005).

8

15.   Reliable predictions of outcomes are generated by using carefully estimated models and accounting for any anticipated changes in the relevant factors. The model and resulting estimates also should be scientifically tested for reliability by determining the sensitivity of the estimates when explicit assumptions of the model are varied. The predicted outcomes of this econometric model, developed and tested using scientific methodology, can then be considered to be reliable, as its predictions would be robust and reliable.

16.   Estimates of asbestos-related claims and claim values rest on individual decisions, most importantly the decisions whether to bring a claim against a defendant at all, whether to settle the claim, and at what value -- as well as defendants' corresponding decisions. These choices will be controlled by numerous factors influencing the incentives and costs of each course of action. Accordingly, a reliable econometric model used to predict the number and value of Grace's future asbestos-related claims must consider and account for the numerous factors controlling economic incentives to file and settle claims, such as the value of expected settlement payouts, company solvency, and medical documentation standards.

17.   Additionally, each of these individual factors in turn will depend on a number of underlying inputs. For example, expected tort settlement payouts can depend on inputs such as the claimant's disease, evidence of exposure and product identification, venue where the claim was filed, conduct of the defendant, the laws governing the claim as well as the defendant's and plaintiff's expectations regarding the cost and success of litigation. Similarly, an individual's decision whether or not to file a claim can depend on the onset

9

of disease, the full cost of bringing a claim and the expected outcomes of settlement and litigation (which in turn depend on the tort settlement values described above).

18. A scientific approach to building a reliable forecast on the endogenous variables driving Grace's future claims and settlement values under the tort system would indicate both how these endogenous variables affect one another and how each is affected by "exogenous" / "externally-specified" factors (i.e. variables which determine the endogenous outcomes but are themselves determined outside the model). For example, the incidence of disease would be an exogenous variable because it is a function of biological processes, not choice.

### III.    DR. PETERSON DOES NOT EMPLOY A RELIABLE EMPIRICAL OR THEORETICAL METHODOLOGY TO ESTIMATE THE NUMBER AND VALUE OF GRACE'S FUTURE ASBESTOS-RELATED CLAIMS

19. Dr. Peterson's estimates of Grace's future claims and claim values are derived from methods that impose specific assumptions on patterns of the future values that he is attempting to estimate. These assumptions on patterns are based only on simple extrapolation of recent trends in settlement outcomes, calibrations based on unjustified benchmarks, and imposed relationships between epidemiological outcomes and human behavior.

20. Dr. Peterson's simplistic estimation approach ignores the significant possibility that current outcomes and recent trends in these Grace data may not accurately reflect future behavior. Under a changing environment, reliably forecasting outcomes involves understanding the factors that drive (and how they drive) these outcomes, since these factors will differ in the future. For asbestos-related settlements, many environmental

10

factors that influence claimants' and defendants' strategic behavior, and hence the number and value of Grace's future claims, are known to be changing.

21. Further, Dr. Peterson employs benchmarks to predict Grace's future average settlement values using current value metrics derived from other companies and trusts, without establishing either the current or future validity of these comparisons with respect to Grace. Understanding relationships between factors and outcomes is a fundamental aspect of careful econometric forecasting, as it provides a basis from which to select appropriate benchmarks.

22. In sum, Dr. Peterson's naive extrapolation method is unreliable because he fails to account for how changing environmental factors or characteristics unique to Grace may influence future asbestos-related litigation outcomes. Consequently, Dr. Peterson's empirical approach not only fails to meet scientific criteria for developing forecasts but also ignores well-established methods for predicting outcomes that are driven by human choices. I expand on these observations below.

## A.    Overview of Dr. Peterson's Estimation Approach

23. Dr. Peterson predicts the number of claims in future years and the average value of these claims (by disease type). The time-series of these predicted values are used to predict the number and value of claims for particular years (by simply multiplying these two numbers for that year after adjusting for a theoretical percentage of claims that would be dismissed). The approaches he uses for estimating the number and value of claims are as follows:

11

### 1.    Peterson's Method for Estimating Future Number of Claims

24.  Dr. Peterson starts with Nicholson's epidemiological model projecting the incidence of asbestos-related cancers.  To determine the subset of those who will bring cancer-related claims against Grace, Dr. Peterson calculates a base "propensity to sue" as the ratio of historical claims filed against Grace from 1999 to the first quarter of 2001 to cancer incidence rates for the same period.[4]  Dr. Peterson then assumes that this base propensity to sue will grow at the same rate of increase as that actually experienced by the Manville Trust from 2000 to 2006.[5]  He calculates a propensity to sue for each of the diseases separately.  For years beyond 2006, Dr. Peterson assumes that the propensity to sue will stay constant at the 2006 level.  Finally, he calculates the future number of claims that will be filed against Grace by multiplying these projected propensities by the corresponding disease incidence for each of the future years.

25.  For nonmalignant claims levels, Dr. Peterson employs a different method.  As there is no epidemiological model detailing nonmalignant incidence rates, Dr. Peterson simply assumes the percentage change in nonmalignant claims is the same rate as the percentage change in cancer incidence.[6]  I understand that this is a change in the methodology Dr. Peterson has used in previous cases, where he benchmarked non-

---

[4]  He also calculates an average propensity to sue during 2000-2001 (Peterson Report, pp. 70-71).

[5]  Dr. Peterson does not calculate the difference between Manville propensity to sue in 2000 and 2006, but calculates the difference between the propensity to sue in 2000 and an average propensity to sue between 2003-2006. Specifically, Dr. Peterson calculates the "rate of increase in Manville's propensities to sue for each cancer between 2000 and 2003-2006" and spreads "Manville's actual rates of increase in propensities over the 2002-2006 period for our forecast of Grace propensities to sue during 2002-2006" (Peterson Report, p. 73).

[6]  Dr. Peterson states that "we start with the level of nonmalignant claims that it received in 1999 and 2000 and then forecast that future claims will decrease at a rate parallel to the Nicholson forecast of the incidence of future asbestos-related cancers" (Peterson Report, p. 82).

malignant claims to cancer claims, as opposed to cancer incidence. As I discuss later, this approach does not appear to be based on any logical and empirically tested relationship, but rather benchmarks an outcome that depends on human choice (bringing a non-malignant claim) to an epidemiological event for a different disease (cancer).

### 2.    Peterson's Method for Estimating the Future Claim Values

26.    Dr. Peterson uses five scenarios to project Grace's average future claim values. Two of these scenarios are based on extrapolations of Grace's own historical data: 1) Short-Term Grace Ratio and 2) Long-Term Grace Regression. The other three scenarios are based on settlement values paid by "comparable" asbestos defendants – U.S. Gypsum ("USG"), Quigley and Turner & Newall ("T&N").

#### a)    Short-Term Grace Ratio

27.    Dr. Peterson calculates the 2001 base settlement value by averaging the settlement values paid by Grace during 2000 and 2001. He then assumes that this base settlement value will increase between 2001 and 2006 at an annualized rate equivalent to the historical rate of increase in average settlement values paid by Grace during the 1997-1999 period to the average paid during the 2000-2001 period.[7] For years after 2006, his simplistic extrapolation method assumes that average settlement values will increase only at the rate of inflation.

---

[7]    Dr. Peterson states "For each disease we calculated the rates in increase in Grace's settlements from the 1997 to 2001 using the following formula:

*2000-2001 average settlement / 1997-1999 average settlement*

We then projected this increase forward, forecasting that by 2006 Grace would be paying in settlements the amounts that it had paid in 2000-2001 multiplied by the rate of increase that we calculated using the formula above." (Peterson Report, p. 33).

b)  Long-Term Grace Regression

28.  Dr. Peterson's regression is another method of simple extrapolation from Grace's own historical data.  The regression equation does not attempt to model the processes that are driving the outcomes at issue. Technically speaking, he estimates a regression of log settlement values as a function of a linear time trend and state dummy variables using 1991-2001 data for each of the diseases separately, and uses the estimated trend coefficients from this regression to simply extrapolate future settlement values for 2001 through 2006.[8]  Furthermore, when extrapolating the future settlement values for 2001 through 2006, Dr. Peterson implicitly assumes that the distribution of claims across states that was observed during 1999 to 2001 will continue to hold for every future predicted year.

c)  Increases Based on Other Comparable Firms

29.  In this approach, Dr. Peterson calculates the average settlement value for each of the four disease categories paid by Grace during 2000 and 2001 as the 2001 base settlement value.  He then uses the settlement values paid by firms he claims are "comparable" asbestos defendants – USG, Quigley and T&N – as of 2001 as a purportedly reliable basis for extrapolating Grace's settlement values from 2001 through 2006.[9]  He simply assumes that Grace's base settlement values will increase at an annualized rate such that Grace will pay, in 2006, settlement values that these "comparable" companies paid in 2001.

---

[8]  Peterson Report, Appendix B, page B-1.
[9]  Peterson Report, p.31.

14

**B.    Dr. Peterson's Failure to Model the Relationship Among Exogenous Factors and Endogenous Outcomes Leads to Unreliable Predictions**

30.    By failing to estimate, or even consider, any of the large number of relationships between the endogenous and exogenous variables that determine future claims and settlement values, Dr. Peterson's approach does not meet basic standards for making reliable predictions.  In particular, Dr. Peterson acknowledges the significance of tort reform, changes in disease incidence, and changes in firms' financial conditions, yet his methods do not model or estimate the impact of these changes on future values of the outcomes he is trying to estimate.[10]

31.    Dr. Peterson also fails to account for the interrelationships between his three main endogenous variables, each of which is likely affected by changes in the other two, another basic standard of economic science.  For example, I have been advised that tort reforms may lead to caps on damages; increase injury thresholds for stating a claim; apply more rigorous standards for admission of proof of injury, causation, or product identification; or eliminate tactical devices, such as forum shopping or case consolidation. Each of these developments could affect total settlement payments in a number of ways, both directly and indirectly through feedback effects.  By lowering the value of settlements that plaintiffs receive and increasing dismissal rates, tort reforms could discourage future filings and hence reduce the number of filed complaints, and limit the resources that plaintiffs' legal counsel dedicate towards litigation-related efforts, such as claims recruitment and case prosecution.  Tort reforms could increase defendants'

---

10. He does attempt to adjust for the impact of tort reform on case dismissal rates, but provides no empirical evidence to support the adjustment he makes, and he makes no attempt to adjust for the effect of tort reform on propensity to sue or settlement values.

likelihood of prevailing through litigation (both actual and perceived) and decrease

expected damage awards, thus increasing the likelihood that defendants would eschew

quick settlement strategies to pursue litigated outcomes (as the downside risks would be

mitigated). This in turn could increase potential claimants' perceived costs of pursuing

claims, which could further reduce the likelihood of filing a claim.

32. These interrelationships imply that a change in an exogenous factor, such as tort

reform, will not only have a direct effect on each of the endogenous variables, but will

also have indirect effects through their feedback on one another. For example, if tort

reform directly increases dismissal rates, this may reduce the likelihood to file a claim,

which may in turn affect settlement values and further change dismissal rates.

33. A reliable estimation method requires an economic model to predict the

"equilibrium" outcome of all these interrelated effects. Dr. Peterson's extrapolation

methods, however, are based on the conglomeration of *ad hoc* sets of trends from

different time periods, benchmarks from different firms, and current state variation in

settlement values that may not represent future variations. Thus, Dr. Peterson provides

no evidence supporting the conclusion that these methods are valid historically and no

basis from which to conclude that they have any predictive power for the future.

34. Such extrapolation methods are well known to provide misleading predictions

in dynamic environments. The well-known "Lucas Critique" speaks directly to the

difficulty in projecting future outcomes using historical relationships among endogenous

variables, or between endogenous and exogenous variables. The Royal Swedish

Academy cited this critique as a basis for Dr. Robert Lucas' Nobel Prize in their October

1995 announcement, "The Scientific Contributions of Robert E. Lucas, Jr."[11]  In

particular, Dr. Lucas contends that relationships measured under one "policy regime" can

not be used to make predictions following important policy changes, unless the full

impact of those policy changes is accounted for.   This critique illustrates exactly why Dr.

Peterson's methodology renders his predictions unreliable.   While Dr. Peterson

acknowledges that there have been and continue to be major tort reforms in state courts,

he fails to consider, aside from some *ad hoc* adjustments to claim dismissal rates, how

these policy changes could affect any of the other trends or patterns he is measuring.

   35.   Dr. Peterson's failure to account for how changes in factors underlying

asbestos- related outcomes under the tort system ignores economic methods developed

over 50 years ago.  Since at least the early 1940's, econometricians have understood that

accurate prediction of future variables requires identification and estimation of stable

economic relationships.[12]  Reliable predictions cannot be based on patterns and trends

that hold only at one point in time under one set of policies and exogenous factors.

Rather, as mentioned above, sound predictions are based on identifying the underlying

stable economic relationships, such as how individuals' decisions to sue are determined

by expected settlement values, dismissal rates, and exogenous factors and how courts'

decisions to dismiss are determined by the number of lawsuits and other factors.   Using

---

[11]   As the Royal Swedish Academy notes, "The 'Lucas critique'…has received enormous attention and been completely incorporated in current thought."  The central idea of the Lucas critique traces back to Haavelmo "The Probability Approach in Econometrics" (1944) and Marschak "Economic Measurements for Policy and Prediction" (1953).

[12]   See Trygve Haavelmo "The Probability Approach in Econometric," (1944), Jacob Marschak "Economic Measurements for Policy and Prediction," (1953). For a discussion of this issue, see Arthur Goldberger, *A Course in Econometrics*, 1991, p.343-346, James Heckman "Econometric Causality" ( 2007) and James Heckman "Haavelmo's Legacy," ( 2007).

these accepted econometric methods, a model would be estimated on available data. Predictions for these endogenous variables then would be based on these estimated parameters along with projected values of the key exogenous variables. Dr. Peterson takes no steps toward implementing this accepted approach.

36.   These complexities and underlying interrelationships among the outcomes that determine Grace's future asbestos claims and claim values make the development of reliable forecasts a challenging but not insuperable task.   Armed with modern econometric tools and powerful computing capabilities, economists have formulated and estimated models of comparable complexity.   These models are regularly applied to policy decision-making that affects tax policy, education policy and the like.   For some representative examples of these types of models, see Appendix B.

37.   Simple extrapolation from short-run trends ignores the impact that even small changes in underlying factors can have on outcomes.   Therefore, Dr. Peterson's extrapolation methods are insufficient and fail to meet basic economic criteria for sound estimation.   As a result, Dr. Peterson's forecasts of Grace's future asbestos claims and claim values are unreliable and uninformative.

IV.       **DR. PETERSON'S ARBITRARY ASSUMPTIONS HIGHLIGHT THE SHORTCOMINGS OF HIS FLAWED METHODOLOGY**

38.   In his report, Dr. Peterson acknowledges that a simple extrapolation is insufficient for forecasting values in a world that is changing.   Instead of identifying and modeling the factors that drive these changes, however, Dr. Peterson employs arbitrary assumptions and adjustments that have neither a theoretical nor an empirical basis.   In

18

this section, I review a number of these assumptions.  These assumptions are integral to

Dr. Peterson's estimates – different assumptions generate different forecasts.  As a result,

Dr. Peterson's empirical results are sensitive - in some cases, highly sensitive- to each of

the arbitrary assumptions that he makes.

A.    **Dr. Peterson Uses an Unusual and Arbitrary Time Period for His Extrapolation**

39.  The period Dr. Peterson has arbitrarily chosen as the basis for his extrapolation

method appears atypical.  The observed values of claims filed and average settlements

paid during the time period preceding Grace's bankruptcy do not appear to follow any

overall trend.  This indicates that the underlying determinants driving these outcomes

could be changing during this time.  Dr. Peterson ignores the implications of these

changes on his estimates and instead arbitrarily chooses specific time periods from which

to extrapolate.  His results are highly sensitive to these arbitrary choices.  Additionally,

Dr. Peterson's chosen period immediately preceded Grace's bankruptcy, and

bankruptcies are, by definition, unusual events.  (See Figure 1).



Figure 1
Total Number of Claims Filed Against Grace
1977 - 2001Q1

Source: Grace Claims Data.

### 1.  Dr. Peterson Chooses Arbitrary Time Spans For Forecasting His Estimates

40.  Dr. Peterson uses an extrapolation method to forecast claims and settlement values and yet completely ignores substantial variations in the level of these outcomes over the 10 years in his sample.  Further, he provides no evidence as to why the periods he chooses to use in his calculations are the most appropriate.  Indeed, as I show below, Dr. Peterson's estimates are highly sensitive to his choice of these time periods.

41.  The level of claims filed against Grace varied during the 1990's.  For example, the number of cancer-related claims filed against Grace increased by 89 percent between 1998 and 2000 and the number of nonmalignant claims filed against Grace increased by 119 percent in the same period (see Table 1).  In contrast, the number of cancer-related

claims filed against Grace fell by 37 percent between 1996 and 1998 and the number of nonmalignant claims declined by 47 percent in the same period.

42.   Similarly, there have been wide variations in past settlement values paid by Grace.  For example, the settlement values for lung cancer increased by 115 percent between 1995 and 2000 (see Table 2), but declined by 67 percent between 1990 and 1995.  Nonmalignant settlement values rose by 52 percent between 1995 and 2000, and fell by 52 percent during 1990-1995.

43.   These observed swings in settlement values and the number of claims filed against Grace suggest profound changes in the underlying processes generating these outcomes within this short time period.  For example, changes in the levels of claim filing could be related to endogenous changes in claimants' and Grace's incentive to litigate a claim.  Dr. Peterson fails to explain or model these changes and, as a result, cannot support why his chosen time period is appropriate for his extrapolation method.

44.   Given these sizeable variations in settlement values across years, Dr. Peterson's calculation of the rate of increase in settlement values for his "Short-Term Grace Ratios" scenario is highly sensitive to his choice of time periods.  For example, using the rate of increase in average settlement values between 1997-1999 and 2000-2001 Dr. Peterson projects that mesothelioma settlement values will increase from $93,640 to $190,785 between 2001 and 2006  (Peterson report, Table 14).  If, instead, Dr. Peterson used the rate of increase in settlement values between 1997-1998 and 1999-2001, his projected settlement values for mesothelioma would range from $78,762 in 2001 (a decrease of roughly16% in his estimate) to $140,209 in 2006 (a decrease of roughly 27% in his

21

estimate). (See Figure 2). Therefore, not only does Dr. Peterson fail to explain why his chosen period is the appropriate benchmark, but his estimates appear highly sensitive to his arbitrary assumptions.



**Figure 2**
**Comparison of Predicted Settlement Values Based on**
**Peterson's and Alternative Base Periods for Trend Calculation**

Note: Peterson uses the rate of increase in settlement values between 1997-1999 and 2000-2001 to forecast settlement values in 2001 and 2006.  An Alternative method uses rate of increase between 1997-1998 and 1999-2001 to forecast settlement values.
Source: Peterson's report, Table 9.

### 2.   Dr. Peterson's Analysis Does Not Take into Account Structural Breaks

45.   Forecasts based on simple extrapolation methods will be misleading during times of structural change in the underlying relationships.  Of particular significance here, recent changes in the litigation environment likely alter the structural relationships that determine settlement values.

46.   As Dr. Peterson himself acknowledges, many courts and defendants now scrutinize the medical evidence more closely than they did in the past and many important state jurisdictions have changed their tort laws to discourage mass filings,

impose limits on non-economic damages, and make their courts less hospitable to non-resident plaintiffs. This momentous change in asbestos litigation environment will likely change the incentive to litigate a claim going forward. Yet Dr. Peterson chooses to estimate the number of future claims and claim values based on forecasting methods that do not allow for such structural changes.

47. Dr. Peterson's "Long-Term Grace Regression" scenario estimates settlement values as a function of a linear time trend and dummy variables for states (i.e. individual state-specific effects), and uses the estimated trend coefficients from his regression to simply extrapolate future settlement values. This linear-trend model may accurately predict future values in the short run under special circumstances, but without understanding the underlying relationships driving outcomes these would not be sound predictions for long-run claim values. Extrapolation would only accurately predict Grace's short-run claim values if: (1) Grace's settlement values displayed well-established trends in the past; and (2) the structure of those well-established trends is not expected to change going forward. Neither of these appears to be appropriate assumptions in this context. First, as illustrated above, there are wide fluctuations in past settlement values indicating the absence of a well-established trend. Second, the recent changes in the asbestos litigation environment suggest a fundamental structural change in the relationship between settlement values and time-trend – as even Dr. Peterson appears to recognize. (Peterson Report, p. 12)

48. Furthermore, when extrapolating the future settlement values for 2001 through 2006, Dr. Peterson implicitly assumes that the distribution of claims across states that

23

was observed during 1999 to 2001 will continue to hold for every future predicted year. Given that a number of states have adopted state tort reform in the early 2000's, it is likely that the distribution of claims across states will look very different from those observed during 1999-2001.[13]

49. For example, a simple test of structural change based on Dr. Peterson's own regression confirms the existence of at least one structural break in settlement values.[14] Furthermore, because several states have adopted tort reforms in the early 2000's, one would expect additional structural changes going forward. The fact that Dr. Peterson's regression does not take into account structural changes in settlement values renders his estimates based on "Long-Term Grace Regression" scenario unreliable.

### 3.    Dr. Peterson Forecasts from a Period Immediately Preceding Grace's Bankruptcy with Unusual Settlement and Claim Values

50. Dr. Peterson's stated goal is to forecast particular outcomes (Grace's future claims and settlements values) had Grace *not* filed for bankruptcy.[15] Dr. Peterson asserts that he seeks to "avoid and attempt to adjust for artificial events . . . which affect litigation in ways that do not occur and would not recur in the ordinary tort litigation of the defendant's asbestos law suits" (Peterson Report, p. 9). Yet Dr. Peterson provides no evidence that forecasting from a period *immediately preceding Grace's bankruptcy* generates reasonable predictions of what would have happened in the absence of Grace's

---

[13]    See, e.g., American Tort Reform Association, www.atra.org and CBO (2004).
[14]    Specifically, a Chow test for structural breaks finds a statistically significant finding in 1999 at the one percent level. See Gregory C. Chow (1960) and Johnston and Dinardo (1996).
[15]    Dr. Peterson states that his "estimation looks at how a debtor would continue to receive and resolve claims within the U.S. court system instead of within the protections of Chapter 11." (Peterson Report, p. 9)

bankruptcy, or that Grace's bankruptcy did not "affect litigation in ways that do not occur
and would not recur" in ordinary circumstances.

51.   Evidence suggests that claimants anticipated Grace's 2001 bankruptcy and
resulted in an acceleration in claims filed immediately preceding the bankruptcy.[16]
Indeed, Dr. Peterson himself notes that "During the three months in 2001 to the time of
its April 2, 2001 bankruptcy petition, Grace received 33,653 claims, 37 % more claims in
three months than in all twelve months of 1999.  Its annualized rate of 2001 filings was
up almost 50 percent over 2000 [under conservative assumptions]" (Peterson Report,
p.5).  Dr. Peterson never investigates why filings were so high, or what this might
indicate about the influence of Grace's impending bankruptcy, or – most importantly –
whether extrapolating from such a period is likely to produce reliable forecasts.  Again,
Dr. Peterson fails to address this issue or provide evidence of whether he has chosen the
appropriate period from which to base his forecasts.

**B.   Dr. Peterson Uses Unsound Benchmarks From Which He Projects Future
Claim Levels And Their Settlement Values**

52.   Dr. Peterson uses unsound and arbitrary benchmarks to project Grace's claims
and settlement values.  First, when projecting future claiming behavior against Grace, Dr.
Peterson assumes that the propensity to sue Grace between 2000 and 2006 will increase
at exactly the same rate as experienced by the Manville Trust during the same period.
Second, when projecting Grace's future settlement values, Dr. Peterson uses settlement
values paid by other asbestos defendants.  As I discuss below, both these assumptions,

---

[16]   See, e.g., Biggs Report, p. 41 and "WR Grace CEO: Mulling Chapter 11 as Asbestos Suits Mount"
*The Wall Street Journal*, Jan. 29, 2001.

using data from the Manville Trust and other asbestos defendants, constitute poor

benchmarks from which to project Grace's future claims and values of these claims.

### 1. Dr. Peterson Arbitrarily Uses Claiming Behavior against the Manville Trust As a Benchmark for Future Claims Against Grace

53. Dr. Peterson assumes that the propensity to sue Grace would have increased

between 2000 and 2006 at the same rate actually experienced by the Manville Trust over

that period.[17] The Manville Trust administers funds to litigants *post-bankruptcy*, while

Dr. Peterson's forecasts are intended to predict the number and value of asbestos-related

claims against Grace brought about by litigation in the *absence of bankruptcy*. Dr.

Peterson provides no evidence to support his implicit assumption that claiming behavior

is unaffected by the prospect of bankruptcy; indeed, he does not even address the issue.

54. Similarly, Dr. Peterson does not address any potential increase in claims against

the Manville Trust over the 2000-2006 period due to the bankruptcy filings of large

asbestos manufacturers in 2000, an increase he claims Grace would have experienced.[18]

If Manville is an appropriate benchmark and he is estimating a but-for world without a

Grace bankruptcy, he must estimate the effect from Grace's bankruptcy on Manville

claims and adjust the rate of increase in Manville claims from 2000 to 2006 accordingly.

Instead, if Dr. Peterson believes that Manville did not experience this spill-over effect

from other bankruptcies, as he claims Grace would have, then claiming behavior against

the Manville Trust would not be representative of Grace's future experience (according to

---

[17] Dr. Peterson states that "we use asbestos claims data from the Manville Trust to understand trends in asbestos claims filings since Grace's April 2, 2001 petition date and to forecast claims that would have been filed against Grace since that date." (Peterson Report, p. 42)

[18] Dr. Peterson argues that because of eight so called top-tier asbestos defendants' declaration of bankruptcies in 2000 and 2001, "both claims against Grace and the amount that it would have had to pay to resolve asbestos claims would have increased greatly." (Peterson Report, pp. 25-26)

his own logic). Either way, the rate of increase in claims against the Manville Trust does not provide a reliable basis from which to infer the rate of increase in claims against Grace.

> **2.    Dr. Peterson Uses Three Asbestos Manufacturers as Benchmarks for Forecasting Future Settlement Values with No Empirical or Theoretical Basis.**

55. Dr. Peterson assumes that the settlement values paid in 2001 by firms he claims are "comparable" asbestos companies – USG, Quigley, and T&N – provide a reliable basis for forecasting the settlement values Grace would have paid in 2006, but provides no reliable evidence to support these comparisons.[19] Dr. Peterson fails to show that the size, mix of products sold, mix of customers, mix of plaintiff types and illnesses, or even the simple trends in litigation experienced by any of these companies, are sufficiently similar to Grace's to justify using the settlement values of these companies to forecast for Grace.[20] Instead, Dr. Peterson arbitrarily argues that "until its bankruptcy, Grace's increasing settlement costs closely tracked the trends for other defendants" (Peterson report, p. 27).

56. Contrary to Dr. Peterson's assertion, there is much variation in the levels and trends in settlement values paid by Grace and these "comparable" companies (see Table 3). For example, Grace paid an average of $63,774 for a mesothelioma claim in 1998, whereas USG, Quigley, and T&N paid on average $36,072, $20,927, and $50,812,

---

[19]    Dr. Peterson states "To estimate the amounts by which Grace's settlement payments would have increased since its petition date, we use settlement data for three comparable co-defendants: USG, Quigley, and Turner & Newall." (Peterson Report, p.42)

[20]    The extent of Dr. Peterson's analysis of the comparability of these firms to Grace in his report is the following statement: "While there are differences between Grace and each of these defendants, T&N and USG in particular are good comparisons for Grace. All three companies manufactured and sold asbestos-containing construction products. Both T&N and Grace were dominant manufacturers of widely-used spray insulation and each sold a wide range of other asbestos-containing products." (Peterson Report, p. 30)

respectively. In 2001, Grace paid an average of $97,839 for a mesothelioma claim, whereas USG, Quigley, and T&N paid averages of $221,745, $188,031, and $194,051, respectively. Thus, depending upon the year, these companies' mesothelioma settlement values are either much higher or much smaller than those paid by Grace. Specifically, in 1998, Quigley's mesothelioma settlement value is roughly 67 percent smaller than Grace's mesothelioma settlement value, whereas, in 2001, USG's average mesothelioma settlement value is roughly 127 percent higher than that of Grace.

57. Furthermore, the trends have also varied across companies. For instance, between 1996 and 2001, Grace's settlement value for mesothelioma increased by roughly 256 percent. However, during the same time period, settlement values increased by roughly 917 percent for USG, 838 percent for Quigley and 478 percent for T&N.

58. Dr. Peterson provides no support as to why these three companies are appropriate benchmarks. First, the variations in levels and trends in settlement values paid by Grace as compared to these other firms indicates that historically these firms were not comparable to Grace. Second, Dr. Peterson provides no evidence as to why, going forward, these companies are reliable benchmarks. Therefore, his projected settlement values from these analyses are unreliable. Additionally, even if other firms' claim values were comparable to those of Grace, there is no scientific basis for Dr. Peterson's assumption that in 2006 Grace would pay claim values paid by other defendants as of 2001.

## C.    Dr. Peterson Employs Additional Unsound Assumptions and Adjustments with No Empirical Basis

59. Dr. Peterson's applies additional unsound assumptions and adjustments in his estimation of Grace's future claims and claim values. First, Dr. Peterson assumes the rate of change in nonmalignant claims will exactly mirror the rate of change in cancer

incidence. Second, he makes arbitrary adjustments when taking into account the effect of tort reforms.

### 1. Dr. Peterson Assumes the Rate of Change in Nonmalignant Claims Filed Against Grace Will Mirror the Rate of Change in Cancer Incidence

60.    Dr. Peterson assumes that the rate of change in nonmalignant claims filed against Grace will exactly mirror the rate of change in cancer incidence even though he admits that the "disease processes for asbestos-related cancers and asbestos-related nonmalignant diseases differ" (Peterson Report, p. 79). Dr. Peterson argues that claims against Grace and other defendants across past years reveal a stable relationship between the number of cancer claim filings and nonmalignant claim filings. However, he admits that the "recent changes in the litigation environment have disturbed this historical stability between cancer and nonmalignant filings." (Peterson report, p. 81).

61.    As a response to this break in the historical trend, Dr. Peterson assumes that the rate of change in Nicholson's incidence of cancers is an appropriate predictor of the change in the number of nonmalignant claims. Again, Dr. Peterson provides no support as to why the underlying processes generating nonmalignant claims and the epidemiology of cancer incidence are related.

62.    In using the change in cancer incidence to predict nonmalignant filings, Dr. Peterson is implicitly employing a purely epidemiological process as a benchmark for that driven by both epidemiology and human behavior. To the extent some of the nonmalignant claims are fraudulent (or have lacked a sound medical basis), Dr. Peterson's method essentially forecasts this behavior using cancer rates without providing any support as to why an epidemiological process provides a reliable basis from which to draw conclusions regarding the decision to commit fraud.[21]

---

[21]  For a discussion on baseless claims, see expert report of Dr. Dunbar, pp. 13-46, June 2007.

63. The act of bringing a claim when there is no actual medical condition arising from the alleged harmful agent is entirely a function of human behavior, controlled by the sorts of incentives and costs as discussed previously. Epidemiology, which models biological processes such as disease, does not capture human strategic behavior, and it makes no sense to use an epidemiological model (and here, of a different disease than that being examined) to project fraudulent and medically-baseless claims. Yet this is exactly what Dr. Peterson does without logical explanation or justification. In fact, the historical rate of change in cancer incidence was a poor predictor of the rate of change in non-malignant claims. (See Figure 3).



Figure 3
Comparison of Percentage Changes in
Non-Malignant Claims Versus Nicholson's Cancer Incidence
1985 - 2000

Source: Peterson Report, Table 29 and Table C1.

64. Moreover, while Dr. Peterson's revised method for projecting future non-malignant claims based on cancer incidence (as opposed to cancer claim filings) was supposed to account for his assertion that the historical ratio of nonmalignant claim filings to cancer claim filings has recently been disturbed, it does not. A simple ratio of Dr. Peterson's projected non-malignant claims and projected cancer claims in this matter exhibits exactly the stable relationship that he claims has been disrupted. (See Table 4). Graphically, this can be seen by plotting Dr. Peterson's predicted number of cancer claims and non-malignant claims. (See Figure 4).



**Figure 4**
**Peterson's Predicted Number of Cancer and Non-Malignant Claims**
**2002-2039**

Source: Peterson Report, Table C3.

31

### 2.    Dr. Peterson Employs Arbitrary Adjustments To Account For The Effect of Tort Reform.

65.    Although Dr. Peterson recognizes the importance of tort reform to his forecasts (see, e.g., Peterson, p. 12), he incorporates tort reform into his analysis in arbitrary, and potentially unreasonable, ways.  Dr. Peterson acknowledges that tort reform will likely reduce the overall amount of asbestos litigation, and thus the number of asbestos claims that Grace would face.[22]  Rather than modeling this process to determine the magnitude of this reduction, Dr. Peterson simply makes *ad hoc* assumptions such as "Grace's nonmalignant claim filings would have been 30 percent below its pre-petition (2000-2001) levels" (Peterson, p. ES-2).  However, Dr. Peterson provides no evidence to support the validity of these assumptions.

66.    Second, Dr. Peterson makes no adjustment to Grace's claim values despite existing empirical evidence demonstrating that tort reform reduces claim values.  For example, as discussed in Browne and Puelz (1999), Appendix B, the authors find that caps on non-economic damages reduce litigated values by 13 to 19 percent.  Dr. Peterson ignores such findings, and instead assumes that claim values will be completely unaffected by tort reform. To defend this assumption, Dr. Peterson argues that tort reforms, by culling out the weakest claims, could actually be expected to increase the average value of remaining claims that survive dismissal.  This argument conflates two ideas that have not been proven to be directly related: the value of the claim and the standard of medical proof. Most importantly, this issue illustrates what Dr. Peterson

---

[22]    Dr. Peterson states "we must adjust our analyses to reflect changes that have occurred in the litigation environment during the six years since Grace's petition date" (Peterson Report, p. 12).

should have, but did not, do. Having formulated an hypothesis, Dr. Peterson failed to create a model and test it on the data.[23]

67. Therefore, Dr. Peterson applies *ad hoc* and arbitrary adjustments to his estimates of Grace's future claims as a means of accounting for the effect of tort reform without providing any evidence of their validity. As a result, his forecasts are unreliable, and likely (given his assumption that tort reform will not affect claim values) overstate Grace's asbestos future asbestos-related claim payments.

**D.    Dr. Peterson Fails to Perform True (Or Useful) Sensitivity Analyses.**

68. Dr. Peterson titles Section 7 of his report, "Sensitivity Analyses." The purpose of a sensitivity analysis is to determine whether forecast results hold when crucial assumptions are altered; for example, assumptions about which factors are important, how basic relationships between factors should be estimated, and so forth. If one finds that changes in crucial assumptions produce only small changes in the forecasts – i.e., the forecasts are not "sensitive" to any particular assumption – one can be more confident in the reliability of the forecasts.

69. Dr. Peterson's "sensitivity analyses" are not sensitivity tests at all, as his tests involve altering only a small set of assumptions (the "adjustments" he had made in an *ad hoc* fashion). Therefore, Dr. Peterson fails to employ any methodology to justify his estimation approach or empirically verify his assumptions. As a result, he does not rigorously test his methodology. As stated previously, Dr. Peterson is extrapolating over a potentially unrepresentative period and ignoring endogenous relationships. Dr.

---

[23]    In fact, when Browne and Puelz investigated the impact of various types of tort reforms on average claim values, they found that the final settlement values either increased or decreased depending on the nature of the reform.

Peterson fails to address the question of how his forecast changes if he uses an earlier or longer time period, or how his results would change if endogeneity were properly accounted for.

70.   Once again, Dr. Peterson's basic problem is that he fails to develop an underlying model.  Without an underlying model of the process by which asbestos claims and claim values are generated, he cannot conduct a true sensitivity analysis – he has no basis from which to proceed.  Because he has not specified which factors matter and how they matter, he cannot analyze the effect of treating them differently; for example, allowing them to change at different rates, or altering the nature of the assumed relationships among (or between) factors and his outcomes of interest (litigation rates, propensity to sue, settlement values).

71.   Sensitivity analysis requires an understanding of the basic mechanism determining the outcomes – when one has that understanding, one can construct appropriate tests.  For example, one can establish a true confidence interval, which reflects the statistical uncertainty of a given forecast.  Dr. Peterson can not calculate any confidence intervals, but instead provides a simple range of possible forecasts resulting from the arbitrary alteration of arbitrary assumptions.  However, he is unable to choose among them, as none are derived from an underlying causal structure that would provide the basis for a rigorously justified, or "scientific" model.

**E.    Dr. Peterson Arbitrarily Claims His Forecasts Are Both Conservative And Robust**

72.   Throughout his report, Dr. Peterson claims his estimates are conservative.  For example, in his executive summary, Dr. Peterson writes, "Our forecasts are based on

34

conservative assumptions and analyses that are more likely to underestimate, rather than overestimate, Grace's liabilities" (Peterson Report, p. ES-2).    Similarly, Dr. Peterson writes, "we forecast such steep drops [from 2001 levels in claims paid by Grace] out of conservatism, to assure we do not overestimate the number of claims that Grace will now pay" (Peterson Report, p. 85).    However, Dr. Peterson appears to use the word "conservative" merely to signify "less than 2001 levels."    There is nothing inherently conservative about forecasting "steep drops" from 2001 levels, given that 2001 saw the highest number of claims and settlement values in Grace's history.

73.    Dr. Peterson asserts that he is being conservative merely because he assumes that certain historic trends will not continue into the future (e.g., Peterson report, p. 21 and p.70).    But since Dr. Peterson fails to account for the processes that generated the historic trends, it is impossible to judge whether his ostensibly conservative assumptions are truly conservative.

74.    Dr. Peterson further asserts that his estimates are robust.    In his report, Dr. Peterson presents his forecasted settlement amounts and writes of "the close correspondence among these forecasts that are based on three different methods – multiple regression, extrapolation from Grace's recent history, and comparisons to payments made by three different co-defendants—and data from four different defendants.    This close correspondence provides assurance about the robustness of each of the forecasts" (Peterson Report, p. 37).    In fact, the "close correspondence" among the forecasts tells us nothing about how robust the forecasts are to changes in important assumptions, which is what robustness tests typically are intended to demonstrate.    The

mere fact that alternative scenarios based on arbitrary assumptions yield close results does not mean the results are robust or reliable.

**F.    Dr. Peterson's Faulty Methods Render His Forecasts Unreliable and Uninformative.**

75.  Dr. Peterson does not provide a well-specified model explaining the underlying factors and processes that generate the outcomes (claim levels and settlement values) that he is trying to predict.  Had Dr. Peterson identified the determinants driving these outcomes, he could appropriately model any observed changes in the environment in which he is forecasting and accurately adjust for their effects (e.g. the effect of tort reform).  Instead, Dr. Peterson employs a simple extrapolation method and, as a result, applies arbitrary assumptions and adjustments to his estimates to account for these observed changing factors.  Finally, despite his claims, Dr. Peterson does not provide sufficient evidence that his estimates are either conservative or robust.  These unsupported adjustments and assumptions highlight the inherent flaws in his methodology and provide additional reasons why his forecasts for Grace's future asbestos claims and claim values are unreliable and uninformative.

76.  Lastly, the nature of Dr. Peterson's calculations – which build on each other in a cumulative fashion – means any bias imparted by one assumption is magnified by biases in others when the biases work in the same direction.  As a result, an even larger bias is transmitted in the final forecasts than the biases that these individual assumptions would imply.

36

V.       **MS. BIGGS' ANALYSES ALSO FAILS TO PROVIDE RELIABLE ESTIMATES OF GRACE'S FUTURE CLAIMS OR CLAIM VALUES**

77.   In her report, Ms. Biggs attempts to estimate the number and value of Grace's future asbestos-related claims under the assumption they would be filed and settled in state tort courts. Ms. Biggs' report is not well documented and thus unclear on certain fundamental points underlying her estimation procedure. This itself runs counter to the application of scientific method, which requires explicit documentation such that analysts can understand and replicate the analysis. As a result, it is difficult to provide a comprehensive opinion of such a poorly documented analysis.

78.   The analysis that is explicitly set out appears to suffer from many of the same flaws as found in Dr. Peterson's report. Of crucial significance, the starting point of Ms. Biggs' estimation is a projection of the total number of asbestos claims in the United States (against all defendants), that was based in part on projections by other parties and which Ms. Biggs extrapolated forward in an unprincipled fashion. Like Dr. Peterson, Ms. Biggs appears not to model this system and instead uses a forecasting methodology based on unjustified "judgments" and simple extrapolation of past outcomes.

79.   Since the environment for which she is projecting is changing, something a basic extrapolation method cannot accommodate, Ms. Biggs must take account for the effect of these changes. As a result, like Dr. Peterson, Ms. Biggs employs arbitrary assumptions and ad hoc adjustments in her estimation. Therefore, although her calculations differ at points from Dr. Peterson, Ms. Biggs' estimation methods suffer from the same fundamental flaws.

37

## A.    Ms. Biggs Employs a Simple Extrapolation Using Arbitrary Base Values

80.    As discussed in this report, claim levels and settlement values are outcomes determined by human behavior as well as certain external variables. Ms. Biggs does not model the underlying processes and factors driving these outcomes, but instead employs a simple extrapolation method using recent Grace data. For example, to project Grace's future asbestos claims filings, Ms. Biggs uses the average "propensity to sue" Grace ("Grace's share") from 1997 to 2001, calculated as the number of Grace's historical claim levels during this period as a fraction of her estimated total claims filed in asbestos litigation, by state (Biggs Report, p. 49). Ms. Biggs provides no evidence, or underlying theoretical support, that this specific average is an accurate measure of the propensity to sue Grace in the future. Furthermore, she provides no justification as to why this metric will remain constant in the changing future environment.

81.    Similarly, to project future average settlement values, Ms. Biggs considers several alternative average settlement values based on various historical group of years. She arbitrarily chooses a base value calculated as the 1998-2001 trended average settlement value paid by Grace even though she recognizes "that the averages [based on 1998-2001] are highest for this group of years" (Biggs Report, p. 60). She argues that the "1998 – 2001 trended averages are a reasonable base for future average payments, given that I have made no explicit adjustments for several factors that can reasonably be expected to have placed additional upward pressure on Grace's future settlement amounts" (Biggs Report, pp. 60-61). However, she provides no empirical evidence to

38

support her contention that using this highest average will be offset by not adjusting for

factors that would have otherwise increased the settlement rate.

**B.    Ms. Biggs Employs Arbitrary Assumptions and Adjustments**

82.    Ms. Biggs attempts to incorporate the effect of changes in the environment into

which she is projecting in order to estimate future claim levels and settlement values.

However, because Ms. Biggs does not model these changes she cannot reliably account

for their effect, but rather she employs arbitrary adjustments with no evidence to support

their validity.

**1.    Ms. Biggs Makes Arbitrary and Unsound Adjustments for Tort
      Reform**

83.    Ms. Biggs acknowledges in her report that "…the asbestos litigation

environment has undergone significant changes over the last several years."[24]  To

incorporate these changes into her forecasts, Ms. Biggs projects an increase in the

dismissal rates for nonmalignant claims from Grace's historical level for claims.

However, Ms. Biggs provides no evidence regarding the reliability of the magnitude of

these decreases.  Further, Ms. Biggs assumes these tort reforms will have no effect on the

dismissal rate of malignant claims, an assertion for which she provides no justification.

84.    Unlike Dr. Peterson, Ms. Biggs acknowledges that tort reform will likely affect

future settlement values.  Despite this acknowledgement, however, Ms. Biggs still applies

an arbitrary assumption as to the effect.  She assumes a 10% reduction in average

settlement values from 2003 to 2005 due to tort reform.[25]  Ms. Biggs provides no

---

[24]    Biggs Report, p15.
[25]    Ms. Biggs states that she imposes "a decline in the average claim values from 2003 to 2005 of 10%
per year to reflect changes in the tort system" (Biggs Report, p. 61).

39

theoretical or empirical basis for either this 10% reduction or the limitation of this effect to the three years.

85.   Finally, like Dr. Peterson, Ms. Biggs makes the assumption that tort reform will have no effect on individuals' claiming behavior.  Ms. Biggs admits that certain jurisdictions have adopted "laws relating to case consolidation and forum, tightening restrictions regarding the connection between a plaintiff and the venue of the case" (Ms. Biggs, p. 15).  Given that several states have recently adopted venue reform, it is likely that the incentives to file claims in these states will decrease going forward.

86.   In sum, when accounting for these changes in the asbestos litigation environment, Ms. Biggs applies *ad hoc* adjustments to her estimates of Grace's future claim levels and settlement values without modeling the effect of changes in litigation environment on incentives to litigate.

### 2.   Ms. Biggs Employs Arbitrary Assumptions Regarding the Growth of Future Settlement Values

87.   Ms. Biggs assumes a growth pattern for average settlement values, from an adjusted 2001 base value, but provides no evidence to justify the validity of her assumptions.  As she states in her report "I applied the historical trends for each disease type selected above (e.g. 40% for mesothelioma) through the 2002 Settled Year.  I then impose a decline in the average claim values from 2003 to 2005 of 10% to reflect changes in the tort system, relating to venue restrictions and joint and several liability.  I then assume a 1% increase per year for five years beginning in 2006, relating to expected increases in plaintiff demands.  I assume a 3% annual increase each year to reflect inflation and I also assume there will be a 1% annual reduction in claim values beginning

in 2006 for 15 years to reflect lower expected awards as claimants age."[26]  Like her other

adjustments, Ms Biggs never provides evidence to support why these different growth

rates are valid.  For example, she provides no evidence as to why plaintiffs did not

already seek maximum awards in the historical data from which she is projecting or why

these changes warrant a 1% increase for five years.  Finally, Ms. Biggs provides no

justification either for why the decline from aging claimants should equal 1% and why

this aging population does not affect settlement values until 2006.

C.    **Ms. Biggs' Faulty Methods Render Her Forecasts Unreliable and
       Uninformative.**

88.   Ms. Biggs uses a simple extrapolation method with arbitrary adjustments to

project Grace's future asbestos-related claim levels and settlement values.  For precisely

the same reasons outlined above regarding Dr. Peterson's estimation methodology, Ms.

Biggs' extrapolation methods are insufficient and fail to meet basic econometric criteria

for sound estimation.  Ms. Biggs' approach does not follow scientific or any reliable

methodology for forecasting these outcomes, given both the changing legal environment

and changing economic incentives affecting the choices of the participating agents.  As a

result, Ms. Biggs' forecasts of Grace's future asbestos claims and claim values are

unreliable and uninformative.

---

[26]    Biggs Report, p. 61.