# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.*, | ) | Case No. 01-1138 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## GRACE'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION OF ITS CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY

David M. Bernick, P.C.
Janet S. Baer
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI, STANG, ZIEHL &  JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

*Co-Counsel for the Debtors and Debtors in Possession*

December 7, 2007

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................v

INTRODUCTION ........................................................................................................1

PART I:  THE ESTIMATION LAW APPLICABLE TO THIS CASE........................................9

I.      SECTION 502(b) OF THE BANKRUPTCY CODE MANDATES THAT A
        DEBTOR MUST BE FOUND LIABLE FOR A CLAIM IN ORDER FOR THE
        CLAIM TO BE ALLOWED IN A BANKRUPTCY CASE. ..............................................9

II.     STATE SUBSTANTIVE LAW GOVERNS THE ALLOWANCE OF CLAIMS. ..........10

III.    THE ALLOWANCE OF CLAIMS IS A FEDERAL PROCEDURE THAT IS
        GOVERNED BY THE FEDERAL RULES OF EVIDENCE AND THE
        FEDERAL RULES OF CIVIL PROCEDURE. ..............................................................10

IV.     SECTION 524(G) OF THE BANKRUPTCY CODE DOES NOT ABROGATE
        THE REQUIREMENTS OF SECTION 502(B) OF THE BANKRUPTCY CODE.........11

V.      ESTIMATION DOES NOT CHANGE THE RULES FOR ALLOWANCE. .................12

        A.      No Value Should Be Ascribed to Meritless Claims................................12

        B.      Future Demands Should Receive No Higher Value Than Current Claims
                for Determining Feasibility, and Should Not Be Ascribed Any Value in a
                Solvency Determination...........................................................................13

VI.     THE MASS-TORT CASELAW ALSO MANDATES AN ESTIMATION OF
        GRACE'S LEGAL LIABILITY.....................................................................................13

        A.      Courts that Substituted Settlement Practices for Actual Liability Did So in
                Violation of § 502(b) of the Bankruptcy Code. ....................................16

        B.      The Cases Never Articulated a Sound Rationale for Abandoning Liability
                Standards..................................................................................................17

        C.      Liability Was Not Contested by the Debtor in the Cases Cited.............18

VII.    THE TWO BASIC VISIONS OF ESTIMATION AND THE CORE ISSUES TO
        BE DECIDED. ...............................................................................................................19

        A.      Claimants' Vision of Estimation Ignores the Bankruptcy Filing and
                Improperly Relies on Hypothetical Settlement Costs.............................19

        B.      Grace's Vision of Estimation Is Based on Actual Legal Liability and
                Established Science...................................................................................20

C.    The Legal Issues to Be Resolved. ...........................................................21

1.    Can claimants use cost in place of adjudicated legal liability?.................21

2.    Can claimants use the privatized state-court "tort system" experience in place of bankruptcy law?......................................................21

3.    Can claimants use prior settlements to establish liability? ......................21

4.    Do claimants measure liability using scientific methods?........................21

PART II:  CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE ........................................................................................................21

I.    CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE BECAUSE THEY MEASURE THE WRONG THING. ....................22

A.    What Claimants' Affirmative Estimation Experts Measure. ..................................22

1.    How claimants' affirmative estimation experts use Grace's prior settlements...............................................................................................22

B.    What Claimants' Estimation Experts Fail to Measure...........................................23

1.    Claimants' experts ignore record evidence generated from the POC and PIQ process as to the merit of the claims at issue. .............................23

2.    Claimants' experts fail to present any data or analysis on the essential elements of product identification and exposure. ......................24

3.    Claimants' experts fail to present any data or analysis on the essential element of causation....................................................................24

4.    Claimants' experts fail to present any data or analysis on the essential element of diagnosis...................................................................28

C.    Claimants' Estimation Experts' Opinions Are Therefore Inadmissible Under the "Fit" Requirement of Rule 702. ...........................................................28

1.    Relevance under Rule 702 and *Daubert*. ...................................................28

2.    Claimants' affirmative estimation experts' opinions do not "fit."............29

D.    Claimants' Estimation Experts' Opinions Violate the Terms of Grace's Prior Settlements................................................................................................29

E.    Claimants' Estimation Experts' Opinions Are Inadmissible Under Rule 408.......................................................................................................................30

1. Federal Rule of Evidence 408. ............................................... 30

2. The use of prior settlements to estimate Grace's liability violates Rule 408. ................................................................ 31

II. CLAIMANTS' EXPERTS' OPINIONS ARE NOT THE PRODUCT OF A SCIENTIFICALLY RELIABLE METHODOLOGY. ....................................... 32

 A. Reliability under Rule 702 and *Daubert*. ................................. 32

 B. Claimants' Affirmative Estimation Experts' Opinions Are Not Reliable. ........... 33

  1. Claimants' experts admit they their models should be tested against accepted scientific methods. ............................... 33

  2. Claimants' experts assess claiming and settlement behavior. ............ 34

  3. But many, many factors unrelated to the merits drive claiming and settlement behavior. .................................... 35

  4. Claimants' experts have applied no scientific method to analyze the factors that drive claiming and settlement behavior or predicting future claims against Grace. ........................... 36

  5. Claimants' experts' projections of claims depends upon untested judgments and assumptions. ................................... 37

   (A) Peterson's estimation approach. .................................. 37

   (B) Biggs's estimation approach. ..................................... 43

  6. Claimants' experts' judgments and assumptions repeatedly have proven wrong. .......................................... 45

   (A) Claimants' estimation experts failed to predict prior increases and decreases in filings. ............................. 46

   (B) Claimants' experts' estimation models generate results inconsistent with objective trends in asbestos claims in recent years. ........................................ 46

  7. Claimants' experts do not reliably predict claiming and settlement values for an extended number of years. .............. 48

  8. Claimants experts fail to account for information that indicates the very claiming behavior they attempt to model has produced large numbers of meritless claims ..................................... 48

  9. Additional indicia of unreliability. ................................... 52

PART III: OTHER *DAUBERT* CHALLENGES ............................................................................52

I.      CLAIMANTS' REBUTTAL ESTIMATION EXPERTS' OPINIONS ARE
INADMISSIBLE. .....................................................................................................53

      A.     Stephen M. Snyder.................................................................................54

      B.     Marshall S. Shapo. ...............................................................................57

      C.     Daniel P. Myer and Mark T. Eveland. ..................................................58

      D.     Jacob Jacoby. ........................................................................................60

II.     GRACE'S NON-ESTIMATION *DAUBERT* iSSUES. ..............................................62

      A.     Issues Related to Exposure Evidence. ..................................................62

            1.     Settled-dust analysis....................................................................62

            2.     Indirect preparation.....................................................................63

      B.     Issues Related to Causation Evidence....................................................64

            1.     Anecdotal evidence......................................................................65

            2.     Relative risks of less than 2.0 and confidence intervals that include
1.0....................................................................................................66

            3.     The no-threshold theory...............................................................68

      C.     Issues Related to Diagnostic Evidence. .................................................70

CONCLUSION..................................................................................................................74

# TABLE OF AUTHORITIES

**Cases**

*A.H. Robins Co. v. Piccinin,*
    788 F.2d 994 (4th Cir. 1986) ................................................................... 13, 14

*Belton v. Fibreboard Corp.,*
    724 F.2d 500 (5th Cir. 1984) ........................................................................ 31

*Bittner v. Borne,*
    691 F.2d 134 (3d Cir. 1982).......................................................................... 12

*Borg-Warner Corp. v. Flores,*
    232 S.W.3d 765 (Tex. 2007).......................................................................... 25

*Brock v. Merrell Dow Pharms., Inc.,*
    874 F.2d 307 (5th Cir. 1989) ........................................................................ 67

*Butner v. United States,*
    440 U.S. 48 (1979)......................................................................................... 10

*Chism v. W.R. Grace & Co.,*
    158 F.3d 988 (8th Cir. 1998) ........................................................................ 24

*Crowley v. Chait,*
    322 F. Supp. 2d 530 (D.N.J. 2004) ............................................................... 62

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)..................................................................... 28, 29, 32, 33

*Daubert v. Merrell Dow Pharm., Inc.,*
    43 F.3d 1311 (9th Cir. 1995) ................................................................... passim

*DeLuca v. Merrell Dow Pharm., Inc.,*
    911 F.2d 941 (3d Cir. 1990)........................................................................... 66

*Feit v. Great-West Life & Annuity Ins. Co.,*
    460 F. Supp. 2d 632 (D.N.J. 2006) ............................................................... 26

*Fiberglass Insulators, Inc. v. Dupuy,*
    856 F.2d 652 (4th Cir. 1988) ........................................................................ 31

*Fid. & Deposit Co. of Maryland v. Hudson United Bank,*
    493 F. Supp. 434 (D.N.J. 1980) .................................................................... 31

*Fisher v. Ciba Specialty Chem. Corp.,*
    238 F.R.D. 273 (S.D. Ala. 2006) .................................................................. 54

v

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................................. 26

*Georgia-Pacific Corp. v. Stephens*,
    ___ S.W.3d ___, 2007 WL 2343882 (Tex. Ct. App. Aug. 13, 2007) ........................... 70

*Glastetter v. Novartis Pharms. Corp.*,
    107 F. Supp. 2d 1015 (E.D. Mo. 2000) .................................................................. 65

*Haberen v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Trust Agreement*,
    812 F. Supp. 1376 (E.D. Pa. 1992) ........................................................................ 53

*Hall v. Baxter Healthcare Corp.*,
    947 F. Supp. 1387 (D. Or. 1996) ........................................................................... 67

*Harris v. Owens-Corning Fiberglas Corp.*,
    102 F.3d 1429 (7th Cir. 1996) ............................................................................... 24

*Heiser v. Woodruff*,
    327 U.S. 726 (1946) .............................................................................................. 10

*Heller v. Shaw Indus., Inc.*,
    167 F.3d 146 (3d Cir. 1999) ............................................................................ 26, 27

*Hollander v. Sandos Pharms. Corp.*,
    95 F. Supp. 2d 1230 (W.D. Okla.. 2000) .............................................................. 65

*In re A.H. Robins Co.*,
    880 F.2d 694 (4th Cir. 1989) ................................................................................ 14

*In re Armstrong World Indus., Inc.*,
    285 B.R. 864 (Bankr. D. Del. 2002) ................................................................ 63, 64

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ........................................................................ 16, 17, 32

*In re Baldwin-United*,
    55 B.R. 885 (Bankr. S.D. Or. 1985) ..................................................................... 13

*In re Breast Implant Litig.*,
    11 F. Supp. 2d 1217 (D. Colo. 1998) .................................................................... 67

*In re Buchholz*,
    224 B.R. 13 (Bankr. D.N.J. 1998) .......................................................................... 9

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ................................................................................. 13

*In re Corey,*
  892 F.2d 829 (9th Cir. 1989) ...................................................................... 12

*In re Dow Corning Corp.,*
  211 B.R. 545 (Bankr. E.D. Mich. 1997) ...................................................... 15

*In re Dow Corning Corp.,*
  215 B.R. 346 (Bankr. E.D. Mich. 1997) .......................................... 13, 15, 16

*In re Eagle-Picher,*
  189 B.R. 681 (Bankr. S.D. Ohio 1995) ................................................... 16, 18

*In re Federal-Mogul Global, Inc.,*
  330 B.R. 133 (D. Del. 2005) .................................................................. 16, 17

*In re G.I. Indus., Inc.,*
  204 F.3d 1276 (9th Cir. 2000) ...................................................................... 9

*In re Johns-Manville Corp.,*
  36 B.R. 743 (Bankr. S.D.N.Y. 1984) ........................................................... 10

*In re MacDonald,*
  128 B.R. 161 (Bankr. W.D. Tex. 1991) ........................................................ 12

*In re Nuisance Corp.,*
  17 B.R. 80 (Bankr. D.N.J. 1981) ................................................................... 9

*In re Paoli R.R. Yard PCB Litig.,*
  35 F.3d 717 (3d Cir. 1994) ................................................... 25, 27, 29, 33

*In re Sanford,*
  979 F.2d 1511 (11th Cir. 1992) .................................................................... 9

*In re Silica Prods. Liab. Litig.,* MDL 1553,
  398 F. Supp. 2d 563 (S.D. Tex. 2005) .................................................... 72, 74

*In re TMI Litig. Cases Consol. II,*
  910 F. Supp. 200  (M.D. Pa. 1996) ................................................... 29, 65, 69

*In re USG Corp.,*
  290 B.R. 223 (Bankr. D. Del. 2003) ..................................................... 13, 14, 15

*In re W.R. Grace & Co.,*
  355 B.R. 462 (D. Del. 2006) ................................................................... passim

*Kaplan v. First Options of Chicago, Inc.,*
  143 F.3d 807 (3d Cir. 1998) ....................................................................... 11

*Kelley v. Am. Heyer-Schulte Corp.*,
    957 F. Supp. 873 (W.D. Tex. 1997)...................................................................... 67

*Kool, Mann, Coffee & Co. v. Coffey*,
    300 F.3d 340 (3d Cir. 2002)............................................................................... 12

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................................................ 29

*McMahon v. Bunn-O-Matic Corp.,*
    150 F.3d 651 (7th Cir. 1998) .............................................................................. 55

*McShain, Inc. v. Cessna Aircraft*,
    563 F.2d 632 (3rd Cir. 1977) .............................................................................. 31

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank*,
    877 F.2d 1333 (7th Cir.1989) ............................................................................. 55

*Montgomery County v. Microvote Corp.*,
    320 F.3d 440 (3rd Cir. 2003) .............................................................................. 62

*Owens Corning v. Credit Suisse First Boston*,
    322 B.R. 719 (D. Del. 2005).......................................................................... 16, 17

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
    745 F.2d 248 (3d Cir.1984)................................................................................. 62

*Player v. Motiva Enters., LLC*,
    2006 WL 166452 (D.N.J. Jan. 20, 2006) ........................................................... 61

*Raleigh v. Ill. Dep't of Rev.*,
    530 U.S. 15 (2000).............................................................................................. 10

*Roberts v. Owens-Corning Fiberglass Corp.*,
    726 F. Supp. 172 (W.D. Mich. 1989) ................................................................. 24

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
    950 F. Supp. 981 (C.D. Cal. 1996) ..................................................................... 67

*Shaw by Strain v. Strackhouse*,
    920 F.2d 1135 (3d Cir. 1990).............................................................................. 62

*Siharath v. Sandoz Pharms. Corp.,*
    131 F. Supp. 2d 1347 (N.D. Ga. 2001) ............................................................... 65

*Smith v. Ames Dep't Stores, Inc.*,
    988 F. Supp. 827 (D.N.J. 1997) .......................................................................... 61

*Soldo v. Sandoz Pharm. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003)......................................................... 25, 65

*Stark v. Armstrong World Indus., Inc.*,
    21 Fed. Appx. 371 (6th Cir. 2001)................................................................ 24

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
    127 S. Ct. 1199 (2007)................................................................................. 10

*United States v. Articles of Banned Hazardous Substances*,
    34 F.3d 91 (2d Cir. 1994) ............................................................................ 53

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
    744 F. Supp. 1259 (S.D.N.Y. 1990)............................................................. 61

**Statutes**

11 U.S.C. § 101(12) ............................................................................................ 13

11 U.S.C. § 101(32) ............................................................................................ 13

11 U.S.C. § 101(5) .............................................................................................. 10

11 U.S.C. § 502(b) ............................................................................ 9, 11, 15, 17

11 U.S.C. § 502(c) ................................................................................. 12, 13, 16

11 U.S.C. § 524(g) ................................................................................. 11, 13, 18

11 U.S.C. § 726.................................................................................................... 9

**Treatises**

Berman DW, Crump, KS, *Final Draft: Technical Support Document For a Protocol to
    Assess Asbestos-Related Risk*, EPA at A4 (2003)............................................ 69

*Diagnosis and Initial Management of Non-Malignant Disease Related to Asbestos*, ATS
    Statement Paper 2004, Am. J. Resp. CCM v.170 691, 695 ("ATS Guidelines")............. 71

EPA, *Comparison of Airborne Asbestos Levels Determined by Transmission Electron
    Microscopy ("TEM") Using Direct and Indirect Transfer Techniques* (Mar. 1990)
    at 33.................................................................................................................. 64

EPA, *Guidelines for Carcinogen Risk Assessment*, 51 Fed. Reg. 33992 (1986)......................... 69

EPA, *Summary Report For Data Collected Under The Supplemental Remedial
    Investigation Quality Assurance Project Plan (SQAPP) for Libby, Montana at ES-
    2* (Oct. 23, 2007) ........................................................................................... 63

Federal Judicial Center, Reference Manual on Scientific Evidence (2nd ed. 2000) .................... 69

Hodgson JT, Darnton A., *The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure*, Ann. Occup. Hyg. 44:565-601 at 575-76 (2000) .......... 69

Miller, M.R., Crapo, R., *et al.*, *Series ATS/ERS Task Force: Standardization of Lung Function Testing – General  considerations for lung function testing*, Eur. Resp. J. 26 at 157 (2005) ............................................................................................................. 71

National Academy of Sciences, Committee on Asbestos, *Asbestos: Selected Cancers* at 1 (2006)........................................................................................................................... 26

*Restatement (Third) of Torts: Liab. Physical Harm* § 28, cmt. c(1) (2005)................................ 25

## <u>INTRODUCTION</u>

After years of intense litigation by the parties (and work by the Court), the record is finally in place to answer the question that has driven this case from its inception:  What is Grace's ***legal liability*** for personal-injury claims?  Notwithstanding the often mind-numbing detail behind their work, the parties' experts' opinions starkly reflect the centrally relevant issues the Court must resolve.

Those issues are more legal than scientific; more methodological than fact-specific.  They cluster around two questions:  (1) What is being ***measured*** in the estimation? (2) Is it being measured in a ***reliable*** fashion?  The answer to the first question turns upon the law, the second upon the scientific reliability of the experts' methods.  In *Daubert* terms, the first is an issue of "fit," and the second is a question of reliability.  Not surprisingly, the answers to the two questions are tightly tethered.  The parties' competing views of what the law deems relevant drives the approach their experts have taken to modeling, and vice-versa.  The good news is that this relationship holds some promise for the efficiency of the estimation hearing, inasmuch as decisions on a small number of issues may have a dramatic effect on outcome, sparing the parties and the Court from much eyeball-rolling detail.

Perhaps more unexpectedly, most of the key issues do not involve materially disputed facts.  While the Court is fully empowered to weigh the evidence and determine the facts, much of the case can be decided from the admissions of the experts:  Thus, on the first question, *i.e.*, what is being measured in the estimation, the claimants' experts now have admitted that the entirety of their work is trapped in the twisted notion – a notion that could only have been born and bred in a legal environment run amok – that past settlements substitute for the adjudication of disputed legal liability:

- The experts measure the cost of claims, not the evidence of legal liability.

  o "This is an estimation of the value of the asbestos claims. The value of the claims, presumably ***the cost*** they would have to pay."

    -- (Peterson Dep. at 181)

  o "By the term 'anticipate liabilities,' I refer to the dollar amount that Grace would be expected to pay ***to monetize and resolve*** the pending and future asbestos personal injury claims against it."

    -- (Biggs Supp. Rpt. at 7)

- The cost they measure is the cost of settlement.

  o "The value of the claims, presumably the cost they would have to pay, and that cost is a ***settlement*** cost . . . ."

    -- (Peterson Dep. at 181)

  o "I was to determine what they would have to pay, and I used what they historically ***settled for*** as part of the basis for that."

    -- (Biggs Dep. at 340)

- The settlements they use to measure cost took place long before trials, and had very little to do with actual or potential trial outcomes.

  o The notion that plaintiffs get paid in settlement according to what their case might yield at trial "is a naïve and inaccurate description of the settlement process [in] mass asbestos litigation."

    -- (Peterson Dep. at 173)

  o "[M]ost cases are ***not*** resolved for [verdict] considerations,"

    -- (Peterson Dep. at 173-74)

  o "The settlement process in mass asbestos litigation is ***not*** necessarily driven by individual verdict value."

    -- (Peterson Dep. at 173-74)

- The settlements they use to measure cost were made in the privatized, high-volume business known as the "tort system".

  o "[W]hat I'm assuming is that these claims have a value that's based upon their value in the ***tort system*** which establishes the value – the legal value of any claim in bankruptcy."

> -- (Peterson Dep. at 182)

> o I estimated "how much it would have cost Grace to resolve cases as they came up in the ***tort system***."

> -- (Biggs Dep. at 338)

- Their estimates assume that Grace never filed its bankruptcy case, and therefore that the protections of the Bankruptcy Code and the Federal Rules of Civil Procedure and Evidence made applicable via the Code do not exist.

> o "Q:  You are estimating what Grace's aggregate asbestos exposure would have been ***but for the bankruptcy***; is that fair?  A: I think that comes close to the concept, yes."

> -- (Peterson Dep. at 264-65)

> o "I was instructed to assume that Grace's bankruptcy ***did not occur*** and that claims would have been handled through the tort system."

> -- (Biggs Supp. Rpt. at 7)

The Court thus will not have to resolve whether this is in fact what the claimants' experts have done.  Rather, the Court will have to consider whether their approach can be reconciled with the bedrock rule of law, as set forth in the plain language of the Bankruptcy Code and the Federal Rules of Evidence, including Rules 408 and 702.  The answer is that it cannot be reconciled.

On the second question, *i.e.*, is it being measured reliably, again the claimants' experts' admissions go to the core of the matter:  Can *ipse dixit* prognostications of how tort lawyers have behaved in the past and may behave in the future pass for "reliable science"?

- The claimants' experts recognize that their work should be tested against accepted scientific methods.

> o Peterson believes his work is "science" and that its "appropriate to judge [his] work according to scientific standards."

> -- (Peterson Dep. at 32-33)

3

- o  Biggs claims to be "applying scientific principles to evaluating past experience and making a reasoned assumption going forward. That's a scientific method."

     --    (Biggs Dep. at 226)

- o  Stallard too says that his work "should be judged upon whether its is scientifically valid, reliable, and reproducible."

     --    (Stallard Dep. at 17)

- The experts' models do not focus on assessments of disease but on claiming and settlement behavior.

  - o  Peterson did no quantification of "how much disease was caused or contributed to by Grace."  Rather, "what [his] model does is predict ***behavior***."

     --    (Peterson Dep. at 29, 37-38)

  - o  Biggs focused on the ***behaviors*** of filing and settling claims.

     --    (Biggs Dep. at 117)

  - o  Stallard admitted he did not predict whether claimants were getting sick, but whether they were ***filing claims***.

     --    (Stallard Dep. at 101)

- But many, many factors drive claiming and settling behavior.

  - o  "Most of the variation that occurs in asbestos claiming [and] settlements is because of ***behavioral*** effects, ***not biological*** effects."  "[P]ersonal factors" – things like actual exposure data and actual medical condition and actual causation had little to do with settlements.

     --    (Peterson Dep. at 76, 171-72)

  - o  With regard to filing and settling claims. there are "***many, many*** different factors that relate to those behaviors."

     --    (Biggs Dep. at 117)

  - o  Trends in Stallard's data were "due to developments in ***legal*** processes as opposed to ***biological*** processes."

     --    (Stallard Dep. at 95)

4

- Critically, they have not studied these factors scientifically, nor do they have any method for doing so.

  - o Peterson is unaware of any model that can predict these factors *more than five or six years*.

    - -- (Peterson Dep. at 77-78)

  - o Peterson's assumption that there might be a causal association for a certain behaviors is a *"quasi-experiment."*

    - -- (Peterson Dep. 130)

  - o Stallard admitted that he *could not even think of* a scientific methodology capable of predicting such changes, let alone claim to have used such a method himself.

    - -- (Stallard Dep. at 103-04)

  - o Biggs is not aware of "any . . . *formal method of scientific analysis* that enables [her] to identify causal factors" affecting claims experience.

    - -- (Biggs Dep. at 255-56)

  - o Biggs is not aware "of any scientific methodology that is available for predicting how the legal externalities are going to evolve with respect to asbestos claims."

    - -- (Biggs Dep. at 224)

  - o Biggs admits she does not "have the expertise to build a model regarding specific claiming behavior and how that would change in the future."

    - -- (Biggs Dep. at 229)

- Thus, inevitably, their projections of claim volumes and claim values both depend upon a series of judgments and assumptions that none of them have tested.

  - o Biggs repeatedly refers to the sole basis for her assumptions as her *"judgment"* about what she thinks is appropriate.

    - -- (Biggs Dep. at 166-67, 259-60, 313-17)

5

- o She "did not test" her assumption that the ratio of claims against Grace versus the rest of the industry during her calibration period would stay the same.

  -- (Biggs Dep. at 146, 160)

- o Biggs conducts no analysis of the future propensity to sue Grace; all that she does is assume that it will remain constant.

  -- (Biggs Dep. at 130, 163-64, 216-17, 236-37)

- o Biggs assumes – without analysis – that the industry benchmark she uses for 2006 will stay the same for 2007, 2008, and 2009.

  -- (Biggs Dep. at 323)

- o Biggs does not assume settlement demands will stay the same; she simply assumes that they will increase. This "was more judgmental in nature," because "there is not any experience to actually observe in making that judgment."

  -- (Biggs Dep. at 342-44)

- o Biggs admits that she did not "do any tests to determine which years from '93 to 2001 . . . were most representative" to use as a calibration period. She simply asserted in her own defense: "That's a judgment."

  -- (Biggs Dep. at 317)

- Those judgments have repeatedly proven wrong – by being both too high and too low.

  - o Peterson incorrectly predicted a drop-off in claims in the early 90s, and failed to predict the spike in claims prior to 2001.

    -- (Peterson Dep. at 51-52; 66)

  - o No expert predicted the rise in claims in the late 90s, or the drop off in claims after 2003.

    -- (Stallard Dep. at 65-66)

  - o Biggs agrees that "people who have done estimates of asbestos liability have, with a fair degree of consistency, failed to predict" "changes in the litigation environment."

    -- (Biggs Dep. at 140)

6

      ○   Grace and other asbestos defendants "were affected by increases in the propensity to sue for meso that weren't foreseen."

      --   (Biggs Dep. at 244-45)

- No projection has been shown to be valid over more than seven years, nor should any be considered valid for a longer period of time.

      ○   Peterson could not think of a scientific model that would reliably predict changes in these factors for ***more than a period of six or seven years***.

      --   (Peterson Dep. at 46-47)

      ○   Peterson's forecast models were ***unable*** to predict behavioral changes in 2003 until there was data showing the change was ***actually*** occurring; to predict the change earlier would have been ***"speculative."***

      --   (Peterson Dep. at 58)

Again, the Court will have to decide whether these admissions can be squared with the judicial gatekeeping principles that were articulated by the Supreme Court years ago to keep junk science out of our courts, principles which provide that expert opinions must be the product of reliable scientific methods, rather than subjective judgment or *ipse dixit*.

In these respects the estimation case is simple. A well-defined series of big-picture issues dominate the case, and everyone, including the experts, knows what they are. It is Grace's hope and belief that the Court can address these issues early in the case to great effect, and Grace has therefore sought to present them for decision in the context of its *Daubert* motions.

Of course, the claimants' constant refrain is that the Court should simply blink away all of this – the science, the law, *Daubert* – because their method is consistent with a hallowed "tradition" of estimating liability in asbestos bankruptcies and that, as skeptically intoned in *Fiddler on the Roof*, this tradition must be kept alive without further scrutiny because it cannot withstand that scrutiny. This effort at "judge nullification" flies in the face of the systematic and

rule-driven approach that the Court has taken throughout this bankruptcy. The law should govern, not merely selected recent cases that must, like all cases, be scrutinized for their real value as precedent. It is fair to say that there is far less to these cases than meets the eye. Standing in contrast to prior non-asbestos mass-tort bankruptcies and the plain terms of the Bankruptcy Code, none of the three decisions relied upon by claimants (*Armstrong*, *Owens Corning*, and *Federal-Mogul*) either developed an appropriate record as Grace has done, or framed all the relevant issues as Grace has done, or involved liability disputed by the debtor as it is by Grace. Grace well knows that the Court will give careful consideration to these cases, as it will to the others that are brought to its attention, and the sooner that the totality of the relevant law is addressed and appropriate weight given to the statutes, rules, and cases at issue, the faster this case will be resolved.

Part I of this memorandum sets forth the legal architecture governing the estimation of Grace's asbestos personal-injury liability. This framework provides the necessary predicates for assessing the admissibility of the claimants' experts' opinions.

Part II explains how and why the claimants' experts' opinions are inadmissible. The first section shows how their opinions are precluded under the "fit" prong of Rule 702 and Rule 408 because they ***measure the wrong thing***: Grace's hypothetical cost to resolve cases in the state-court tort system rather than Grace's legal liability. The second section shows how these same opinions are barred under the reliability prong of Rule 702, as claimants' experts cannot show their measurements are performed using ***scientifically reliable*** methods.

Part III of the memorandum presents additional *Daubert* challenges to claimants' rebuttal estimation experts' opinions and various "non-estimation" expert opinions.

<u>**PART I:  THE ESTIMATION LAW APPLICABLE TO THIS CASE**</u>

I.      **SECTION 502(B) OF THE BANKRUPTCY CODE MANDATES THAT A DEBTOR MUST BE FOUND LIABLE FOR A CLAIM IN ORDER FOR THE CLAIM TO BE ALLOWED IN A BANKRUPTCY CASE.**

When the Court completes its review of the evidence, it will be apparent that Grace's Chapter 11 plan, which pays all asbestos personal-injury claims and future demands in full, is feasible and confirmable.  The claimants contend that the estimation will show Grace to be insolvent.  In either case, the benchmark is Grace's liability as a debtor; namely, what claims are allowable under § 502 of the Bankruptcy Code.  *See* 11 U.S.C. § 726 (only allowed claims may participate in distributions from a bankruptcy estate).

Section 502 of the Bankruptcy Code requires that there be legal liability on a claim in order for it to be allowed in a bankruptcy.  Specifically, § 502(b)(1) of the Bankruptcy Code expressly disallows claims that are "unenforceable against the debtor and property of the debtor under any agreement ***or applicable law***." 11 U.S.C. § 502(b)(l) (emphasis added); *see also In re G.I. Indus., Inc.,* 204 F.3d 1276, 1281 (9th Cir. 2000) ("A claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law.") (citation omitted); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("a claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy"); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law"); *In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("To the extent that applicable law, including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim.").

## II.    STATE SUBSTANTIVE LAW GOVERNS THE ALLOWANCE OF CLAIMS.

State law governs the substance and validity of claims.  Recently, in *Travelers Casulty & Surety Co. of America v. Pacific Gas & Electric Co.*,127 S. Ct. 1199 (2007), the Supreme Court reiterated the "settled principle that 'creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'"  127 S. Ct. at 1204-05 (quoting *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20 (2000)).  Reflecting on its prior rulings, the Supreme Court noted that "the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law,'" *Travelers Cas.*, 127 S. Ct. at 1205 (quoting *Butner v. United States*, 440 U.S. 48, 57 (1979) (citation omitted)), and that "when the Bankruptcy Code uses the word 'claim' – which the Code itself defines as a 'right to payment,' 11 U.S.C. § 101(5)(A) – it is usually referring to a right to payment recognized under state law." *Id.*

## III.    THE ALLOWANCE OF CLAIMS IS A FEDERAL PROCEDURE THAT IS GOVERNED BY THE FEDERAL RULES OF EVIDENCE AND THE FEDERAL RULES OF CIVIL PROCEDURE.

While state substantive law provides the basis for assessing the substance and validity of claims, the process for allowing claims against Grace in its bankruptcy case is a federal judicial proceeding, which means that ***the Federal Rules of Evidence (as incorporated by Bankruptcy Rule 9017) and the Federal Rules of Civil Procedure (as incorporated by Bankruptcy Rule 9014) apply*** – even as state substantive law determines the validity of the claim.  Without question, "bankruptcy courts are federal courts with original and exclusive jurisdiction over bankruptcy cases under Article I of the United States Constitution and thus are not inalienably bound to enforce state law." *In re Johns-Manville Corp.*, 36 B.R. 743, 750 n.4 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985); *see also Heiser v. Woodruff*, 327 U.S. 726 (1946)

(federal courts *always* apply *federal* procedural law); *Kaplan v. First Options of Chicago, Inc.,* 143 F.3d 807, 814-15 (3d Cir. 1998) (same).

Most importantly, two key evidentiary rules apply to the ultimate resolution of asbestos claims against Grace and any estimation of Grace's aggregate asbestos personal-injury liability: (1) Federal Rule of Evidence 408 prohibits the use of prior settlements to establish liability; and (2) Federal Rule of Evidence 702 bars unqualified, irrelevant, or scientifically unreliable expert opinion testimony.

## IV.    SECTION 524(G) OF THE BANKRUPTCY CODE DOES NOT ABROGATE THE REQUIREMENTS OF SECTION 502(B) OF THE BANKRUPTCY CODE.

The fact that § 524(g) effectively allows for a deferred claims-allowance process does not mean that Grace's liability for plan confirmation purposes should be assessed according to any rules other than those that would apply to a definitive ruling on the claims at issue, either via district-court litigation or the bankruptcy-court allowance process.  Because the source of Grace's liability for asbestos-related personal injury claims arises under state tort law, this Court must consider the underlying merits of these claims for plan confirmation purposes under relevant state law.

As discussed in greater detail below, state tort laws generally require the claimants to prove certain elements of causation, including proof of actual exposure sufficient to cause of a reliably diagnosed disease.  Importantly, Grace has the ability to contest the validity of any asserted claims under § 502(b)(1) by raising any defenses otherwise available under state law, including whether all the essential elements required to maintain a cause of action have been met.  The claimants' approach to estimation, which uses pre-bankruptcy settlements as dispositive evidence of liability, would strip Grace, and the other constituencies in this case including unsecured creditors and equity, of that fundamental right.

11

## V.      ESTIMATION DOES NOT CHANGE THE RULES FOR ALLOWANCE.

The same substantive law principles and evidentiary rules that apply to the adjudication of a single claim for purposes of allowance in a federal bankruptcy proceeding apply to the estimation of thousands of claims in an estimation proceeding: ***non-bankruptcy substantive law and applicable evidentiary rules apply*** (as do many of the rules of federal procedure), and a merits-based approach to estimation must control just as if an individual claims-allowance proceeding were being conducted.  Section 502(c) of the Bankruptcy Code allows the Court to "estimate[ ] for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).   Estimation thus is centrally an alternative, more streamlined path for quantifying disputed claims when individual claims allowance would unduly impede the progress of a case.  *See Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 (3d Cir. 2002) ("The object of [an estimation] proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan.").

### A.      No Value Should Be Ascribed to Meritless Claims.

A non-meritorious claim can and should be estimated at a value of zero, and claims with low probabilities of success should be discounted accordingly.  *Bittner v. Borne*, 691 F.2d 134, 136-37 (3d Cir. 1982) (no abuse of discretion in temporarily allowing claims at $0 in view of, among other things, "the ultimate merits of their state court action"); *In re Corey*, 892 F.2d 829, 834 (9th Cir. 1989) (lower court estimate of certain property claim at $0 affirmed "[g]iven the highly speculative nature" of those claims); *In re MacDonald*, 128 B.R. 161, 167 (Bankr. W.D. Tex. 1991) (post-petition administrative claim for fraud valued at $0 for voting purposes where the claimant offered at estimation hearing "no competent 'summary trial' evidence"); *In re*

*Baldwin-United*, 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985) (court estimated certain claims at $0 for purposes of allowance under §502(c)).

      **B.**      **Future Demands Should Receive No Higher Value Than Current Claims for Determining Feasibility, and Should Not Be Ascribed Any Value in a Solvency Determination.**

Future demands are inherently uncertain as compared to existing claims. However, the same merits standards that govern legal liability for current claims apply to estimating the value of the future demands because § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code requires parity in valuing and paying those demands on the same basis as current claims. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004). Thus, future demands should receive no more deference for purposes of estimation than that given existing claims. Both should be evaluated on their merits.

In addition, future demands only become relevant for purposes of a § 524(g) analysis. The are not relevant to a solvency determination. The Bankruptcy Code defines insolvency as a "financial condition such that the sum of such entity's ***debts*** is greater than all of such entity's property . . . ." 11 U.S.C. § 101(32) (emphasis added). The term "debt" is defined under the Bankruptcy Code as "liability on a ***claim***." 11 U.S.C. § 101(12) (emphasis added). Hence, a solvency determination includes only claims, not future demands.

**VI.**      **THE MASS-TORT CASELAW ALSO MANDATES AN ESTIMATION OF GRACE'S LEGAL LIABILITY.**

Grace's focus on the legal merits of claims is consistent with the claims-allowance measures undertaken in other mass-tort bankruptcies such as *A.H. Robins* (Dalkon Shield claims), *USG* (asbestos claims), and *Dow Corning* (breast-implant claims). In all of these cases, as in this case, ***liability*** on account of the debtor's mass tort claims ***was disputed by the debtor***, and a merits-driven approach – consistent with the Federal Rules of Civil Procedure and the

Federal Rules of Evidence – was undertaken to value the claims, either through estimation or an alternative mechanism. In particular, even though the courts in some of these cases faced thousands of claims and individual claim-adjudication was impossible, the courts employed the same legally required process that applies to individual claims. Nothing changed because of the volume of claims or the nature of the claims being valued.

**Robins.** In *Robins*, the court held that an estimation of Dalkon Shield personal injury claims was necessary. *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1013 (4th Cir. 1986), *cert. denied,* 479 U.S. 876 (1986). To assist in that process, a two-page questionnaire and claim form was completed by approximately 195,000 claimants. Next and importantly, a ***fifty-page*** questionnaire was sent to (and ***medical records*** were requested from) a random sample of 7,500 claimants. Roughly 6,000 responses were received. *In re A.H. Robins Co.*, 880 F.2d 694, 699 (4th Cir. 1989). The data-collection process lasted nearly a year and a half. *Id.* The data allowed experts to weed out, for example, claims where there was no medical proof of the use of the Dalkon Shield. An aggregate estimate derived from a merits-based methodology was accepted by the district court, and affirmed by the Fourth Circuit, in connection with confirmation of the debtor's plan. *Id.* at 700. This estimate later proved to be conservative, and excess funds were used for an additional distribution.

**USG.** In *USG*, the debtors sought a merits-based estimation of their asbestos liability because they believed they possessed certain substantive defenses to many of the asbestos claims. The claimants in that case opposed a merits-based approach, and advocated an estimation based solely on settlement and litigation history, without regard to the application of federal procedural rules to the claims at issue. *In re USG Corp.*, 290 B.R. 223, 224 (Bankr. D. Del. 2003). In deciding to apply a merits-based estimation on account of certain of the asbestos

claims,[1] the court observed that while certain matters are discretionary for a court in a bankruptcy case, the court has *no* discretion to take anything but a merits-based approach to claims allowance. *Id.* at 225. Judge Wolin plainly articulated the Court's role in a merits-based estimation as follows:

> The Court exists to assist the parties in resolving their differences. It does so by providing a framework within which the parties can litigate those differences to a Court-imposed result or compromise them based upon the parties' expectation of a predictable outcome. In bankruptcy . . . if the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist . . . . In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation. The Court will protect those who have been truly harmed.

*In re USG Corp.*, 290 B.R. at 225.

**Dow Corning.** In *Dow Corning*, the court noted that the process of claims allowance under § 502(b) of the Bankruptcy Code "includes the determination of whether the debtor is liable on the claim – that is, whether the claim is valid." *In re Dow Corning Corp.,* 215 B.R. 346, 354 (Bankr. E.D. Mich. 1997). Because liability was disputed and estimation had to focus on the merits, the Court analyzed whether estimation would really save time. The court concluded that, rather than engage in estimation, the parties should proceed directly to the adjudication of the claims either through a class action pursuant to Rule 23, common-issue trials pursuant to Rule 42, or some other aggregative device. *In re Dow Corning Corp.*, 211 B.R. 580, 80-85, 94 (Bankr. E.D. Mich. 1997). Moreover, in implementing this ruling, the *Dow Corning* court ruled that this approach contemplated the bankruptcy court entertaining summary judgment motions to determine if the claimants could survive the *Daubert* standard and produce

---

[1] In *USG*, the court decided an estimation of "cancer-only" claims was necessary in the first instance because there was evidence that the debtor in that case may have been insolvent even if only counting the claims of the very sick or deceased victims of asbestos exposure. *Id.* at 224.

scientifically reliable evidence that the debtor's silicone caused their injuries.  *In re Dow Corning Corp.*, 215 B.R. at 352.

As this Court is well aware, there are courts that have estimated a debtor's aggregate liability for personal-injury asbestos claims without deciding liability.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 124 (D. Del. 2006); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 134-135 (D. Del. 2005); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721-722 (D. Del. 2005), *In re Eagle-Picher*, 189 B.R. 681 (Bankr. S.D. Ohio 1995).  The claimants assert that this Court should follow these cases.  Claimants are wrong.

### A.    Courts that Substituted Settlement Practices for Actual Liability Did So in Violation of § 502(b) of the Bankruptcy Code.

In all of these cases, the estimations were being done for the same purpose as it is being done in this proceeding – to determine the debtor's liability for asbestos personal injury claims so as to allocate the debtor's value among its constituents.  The courts in these cases referenced the estimation process contemplated by § 502(c), and in some cases, expressly asserted that they were engaging in that process (*e.g.*, estimation of contingent and unliquidated claims for purposes of allowance).  *See*, *e.g.*, *Owens Corning*, 322 B.R. at 721-722; *see also Federal-Mogul*, 330 B.R. at 136.  They even acknowledged that claims must be valued in accordance with state substantive law.  *Armstrong,* 348 B.R. at 123; *Owens Corning*, 322 B.R. at 722; *Federal-Mogul*, 330 B.R. at 155.

However, the methodology these courts actually adopted did not decide the debtor's actual legal liability under a merits-based analysis applying state law, but rather assumed the validity of current and future claims based upon historical settlement practices, sometimes with some adjustment.  *Armstrong*, 348 B.R. at 124 (both sides proposed methodology based on the debtor's historical settlements with some variations); *Owens Corning,* 322 B.R. at 722-23 (court

16

relied on historical settlements taking into consideration certain adjustments for probable changes in the tort system); *Federal-Mogul*, 330 B.R. at 157-158 (experts for competing sides both relying on historical settlement values).   This purported "estimation" methodology substituted the debtor's historical settlement decisions for estimation of legal liability on the merits.  This is simply not correct under the Bankruptcy Code.  Even where, in some cases, the courts make an "adjustment" for changes in the litigation environment that could decrease the historical settlement values, *see*, *e.g.*, *Armstrong,* 348 B.R. at 124, such an adjustment merely tweaks the results of a calculation still based on settlement history.  It does not represent an assessment of merit or liability.

     **B.**    **The Cases Never Articulated a Sound Rationale for Abandoning Liability Standards.**

In the same cases, the courts concluded that an estimation must be based on how the claims would fare in the state court "system" ***as if there were no bankruptcy case.***  *See*, *e.g*, *Armstrong*, 348 B.R. at 123 ("A court must therefore look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy); *Owens Corning,* 322 B.R. at 722 ("claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy"); *Federal-Mogul*, 330 B.R. at 157 (determining what settlement figures would be "had they been resolved pre-petition").

These statements are contrary to the law governing the allowance and estimation of disputed claims and appear to be the result of over-reading two basic (and true) propositions: (1) state law governs the substance of claims in bankruptcy, and (2) claims are to be valued as of the petition date.  *See*, *e.g.*, *Owens Corning*, 322 B.R. at 722 ("This [the fact that claims are valued as of the petition date and governed by state substantive law] necessarily means that

claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.") (citations omitted).

The unsupportable (and unsupported) leap from these propositions to the "traditional" estimation approach is obvious.  First, the fact that state *substantive* law governs the claims does not negate the applicability of federal *procedural* and *evidentiary* rules in determining claims allowance, or disallowance, or estimation any more than it does in a case removed to federal court on diversity grounds.  Second, the idea that claims should be "valued as of the petition date" simply requires that the total current and future liability (measured by appropriate standards) should be present valued to the petition date.  This basic "time value of money" concept makes perfect sense in the context of estimating liability for purposes of funding a § 524(g) trust because a debtor needs to provide for funding a trust today with amounts sufficient to cover claims that will be allowed at some future point in time.  *Neither* proposition addresses – much less supports – the derogation of the rules of legal liability in favor of admission-by-settlement.

**C.    Liability Was Not Contested by the Debtor in the Cases Cited.**

These cases also stand in stark contrast to this estimation proceeding because the merits of the debtor's underlying liability was not at issue.  In *Eagle-Picher,* for example, the court did estimate the amount of the debtor's liability for purposes of formulating a plan based largely on Eagle-Picher's settlement-payment history, but Eagle-Picher's underlying *liability* to asbestos claimants was not at issue.  Indeed, the only attention the *Eagle-Picher* court gave to any issue related to liability was a passing reference to certain expert testimony dealing with the weight that ought to be given to certain claims based on issues of merit.  189 B.R. at 685.

## VII.    THE TWO BASIC VISIONS OF ESTIMATION AND THE CORE ISSUES TO BE DECIDED.

The parties' competing approaches to estimation not only arrive at different estimates as to the number and aggregate value of existing claims and future demands; they set out to *measure two very different things* and make fundamentally different assumptions as to the *appropriate measure* of the value of the claims they identify.

### A.    Claimants' Vision of Estimation Ignores the Bankruptcy Filing and Improperly Relies on Hypothetical Settlement Costs.

The principal affirmative estimation experts for the PI Committee (Peterson) and the FCR (Biggs) both purport to estimate Grace's liability by attempting to predict what it would have *cost* Grace to resolve all existing and future asbestos claims via litigation in the tort system *had Grace never filed for bankruptcy.*

To claimants, estimates of this hypothetical cost are the sole and exclusive measure of Grace's liability.  (Peterson Rpt. at 9 (determining how Grace "would continue to receive and resolve claims within the U.S. Court system"); Biggs Supp. Rpt. at 6-7 (assuming "Grace's bankruptcy did not occur and that claims would have been handled through the tort system" and determining "the dollar amounts that Grace would be expected to pay to . . . resolve the pending and future asbestos personal injury claims against it" in the tort system))

Indeed, claimants' counsel made it clear at a recent hearing that their approach is to estimate tort system cost, not actual legal liability in a federal bankruptcy proceeding – or, put another way, they simply assume that "liability" does not mean anything other than cost, or, more precisely, price.  (*See*, *e.g*., Oct. 25, 2007 Hr'g Tr. at 51 (Dkt. # 17280) ("[T]his proceeding is not to prove the liability [for] a claim . . . [but] to demonstrate how Grace monetized its liability in the aggregate, which is a demonstrated way for experts to predict on an actuarial basis what that liability would be . . . "); *id.* at 76 ("[E]stimation should be conducted without

19

consideration of the protections afforded to Grace through bankruptcy . . . . So we're going to go back now and have an exercise in looking ahead in this hypothetical world where Grace is not in bankruptcy . . . It never left the tort system, and we're going to have actuaries establish what the total tab is going to be from . . . April 2, 2001 until the very last person – victim of asbestos illness dies."))

With cost as the sole focus, past settlements are simply extrapolated through a series of grammar-school-level, arithmetic judgments to call for decades more of settlements in an assured-to-continue privatized business of claims bartering in the state courts.  The fact that Grace filed for bankruptcy is expressly assumed not to have occurred, and, thus, neither the bankruptcy nor any implications that flow from the application of bankruptcy law or procedures has any impact or effect on their estimates.

**B.      Grace's Vision of Estimation Is Based on Actual Legal Liability and Established Science.**

Grace's approach to estimating its liability is fundamentally different.  It is not a measure of cost to resolve claims based on historical settlement amounts.  Relying on the evidence of record in this bankruptcy, Grace's experts deploy the ***established, objective methods*** of industrial hygiene and epidemiology to find the current claimants that have a reasonable prospect of proving that they developed an ***asbestos-related disease caused by exposure to Grace products.*** They then measure the value of those valid claims by determining the dollar amounts for which ***factually similar claims*** have been resolved in the past.  Finally, they carry these measures forward to account for future demands by using ***established epidemiological models*** to determine the incidence of future disease cause by Grace.

**C.      The Legal Issues to Be Resolved.**

The approaches to estimation proffered by the parties force the issues previewed above to the fore.  Resolution of these issues is key to assessing the admissibility of the expert opinions.

> **1.      Can claimants use cost in place of adjudicated legal liability?**
>
> **2.      Can claimants use the privatized state-court "tort system" experience in place of bankruptcy law?**
>
> **3.      Can claimants use prior settlements to establish liability?**
>
> **4.      Do claimants measure liability using scientific methods?**

## PART II:  CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE

This section is organized around the two basic questions identified at the outset.

First, do the experts measure the right thing?  As outlined above, claimants' experts measure cost, specifically the cost of settlement in the state-court tort system.  What they should have measured – and what they instead ignore – is the available evidence relevant to the merits, and thus the allowability, and thus Grace's likely liability for, the claims and future demands at issue.  As a result claimants' experts' opinions:

- Are inadmissible because they do not satisfy the "fit" requirement of *Daubert* and Rule 702;

- Are inadmissible because they violate Grace's prior settlements as a matter of contract law; and

- Are inadmissible because they violate Rule 408 which prohibits the use of settlements to determine liability.

Second, do they employ a reliable, scientific methodology to estimate what they purport to estimate (the cost to resolve claims in the tort system)?  No such method is used, and this renders their opinions inadmissible under the "reliability" prong of Rule 702.

# I.    CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE BECAUSE THEY MEASURE THE WRONG THING.

## A.    What Claimants' Affirmative Estimation Experts Measure.

### 1.    How claimants' affirmative estimation experts use Grace's prior settlements.

What is critical is how claimants' experts make use of Grace's prior settlements.  Though they profess to be measuring only the cost of resolving cases, they are in fact using settlements, and settlement amounts, to decide for which (*i.e.*, for how many) existing and future claims Grace should be held liable.

PI Committee expert Peterson examines the number of claims made against Grace, the fraction of those claims that get paid – what he calls the "payment rate" – and the value of paid claims.  (Peterson Rpt. at ES-1)  Peterson expressly assumes that Grace's decision to settle a case, and the amount it paid, demonstrates its liability:

> Grace closed many claims without payment, ***presumably because it believed*** that the claimants had inadequate evidence of an asbestos-related disease, could not establish a Grace asbestos exposure, or that Grace had a legal defense that would keep a case from ever reaching a jury. . . .  Importantly, Grace paid more or less in settlement ***depending upon its perception of the strength of liability claims***, just as it paid more or less depending upon the strength of injury and damage claims.

(*Id*. at 10-11) (emphasis added)  The information claimants themselves have submitted to the Court via the POCs and PIQs was not used.  (*Id.* at 53 ("[W]e base our forecast on Grace's historic asbestos claims database, rather than on the . . . data generated by the PIQ and POC processes in this case."))

FCR expert Biggs estimates Grace's liability by "multiplying the known pending and projected future claims filings (both reduced for expected dismissals) by the expected average payment amounts that Grace would pay to claimants in each of the years in the projection."

(Biggs Supp. Rpt. at 5)[2]   Biggs's "dismissal estimates are based on a review (separately by disease type and jurisdiction) of Grace's historical claims that it closed without payment (or dismissed), relative to its total closed [*i.e.*, settled] claims."   (Biggs Supp. Rpt. at 24)   Both experts thus base their estimates on the assumption that Grace's historical settlements are the same as legal liability on those claims, and assume that Grace is liable for a similar percentage of claims going forward.

### B.    What Claimants' Estimation Experts Fail to Measure.

By choosing to base their estimation opinions on the measure of Grace's hypothetical future cost to resolve cases in the state-court tort system, claimants' experts not only end up with opinions that are irrelevant and inadmissible for the reasons set forth above, they also forego any of the required analysis of information concerning the merit of the claims and future demands to be estimated.

### 1.    Claimants' experts ignore record evidence generated from the POC and PIQ process as to the merit of the claims at issue.

Both Peterson and Biggs deliberately turn a blind eye to what is the only relevant evidence available regarding liability for the claims at issue:   The submissions of actual claimants to the Court in this case via POCs and the PIQs.   Both experts acknowledge the existence of this information.   But when it comes to assessing the merits of these claims they ignore it.

---

[2]  Biggs filed an original and supplemental report.  She applied the same methodology in both reports, incorporating most of her original report into her supplemental report.  The supplemental report only updates her assumptions about the projected number of claims to be filed against Grace.  (Biggs Supp. Rpt. at 4-5)

### 2.     Claimants' experts fail to present any data or analysis on the essential elements of product identification and exposure.

Under the law, in order to establish that they have allowable claims, claimants must first provide evidence that they were actually exposed to Grace products.  *See Harris v. Owens-Corning Fiberglas Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996) (plaintiff does not meet burden of showing cause "simply by establishing that he inhaled asbestos dust; rather, he must produce evidence tending to show that he inhaled asbestos produced by the *defendant's* product").  Importantly, "the mere 'showing that the asbestos manufacturer's product was present somewhere at his place of work' is insufficient."  *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx. 371, 376 (6th Cir. 2001) (quoting *Roberts v. Owens-Corning Fiberglass Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989)).

They must also prove that these products actually contained and released respirable asbestos.  *See Chism v. W.R. Grace & Co.*, 158 F.3d 988, 992 (8th Cir. 1998) (plaintiffs failed to prove Grace products could have released inhalable fibers and thus there was no evidence Grace contributed to plaintiffs' injury).

Although Peterson and Biggs essentially opine that thousands of individuals have valid claims against Grace, they make no attempt to identify actual, specific exposures to identified Grace products.  In fact, none of the experts for the claimants have made an attempt to determine whether individual claimants were in fact exposed to Grace asbestos-containing products.  (*See* Welch Dep. at 23-26; Lemen  Dep. at 69-70; Hammar Dep. 30; Brody Dep. at 10-11; Castleman Dep. at 21; Roggli Dep. at 16-17)

### 3.     Claimants' experts fail to present any data or analysis on the essential element of causation.

Causation is a key requirement for liability under state law.  "Proof of causation is a necessary element in a products liability action.  Absent a causal relationship between the

defendant's product and the plaintiff's injury, the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation."  *See Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003).  In asbestos and other toxic tort cases, proving "but for" causation generally requires a claimant to prove, by a preponderance of the evidence, both that the alleged exposure is "capable of causing the disease ('general causation')" and that it did "cause[] the plaintiff's disease ('specific causation')."  *Restatement (Third) of Torts: Liab. Physical Harm* § 28, cmt. c(1) (2005).  Finally, the plaintiff must show that he or she actually has an asbestos-related disease.

To be reliable, and thus admissible under *Daubert*, an expert opinion attributing a claimant's disease to exposure to a Grace product requires a reliable opinion based on reliable medical evidence that Grace's product was not only capable of causing the disease but that the product did in fact cause the claimant's disease.  This requires:

- *Proof of dose.*  *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex. 2007) ("Given asbestos's prevalence, therefore, some exposure 'threshold' must be demonstrated before a claimant can prove his asbestosis was caused by a particular product.");

- *Quantification of risk.*  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995) ("*Daubert II*") ("[P]laintiffs must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it."); and

- *Consideration of alternative causes.*  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758-59 (3d Cir. 1994) ("*Paoli II*") ("[I]t is incumbent on the claimant's expert to consider . . . plausible alternative causes.)

*See generally*, *In re W.R. Grace & Co.*, 355 B.R. 462 (D. Del. 2006)  Claimants' experts, however, simply assume causation wherever a claim was settled, even under conditions where there is no showing asbestos can cause the disease or whether asbestos did in fact cause the disease.

Peterson also includes in his estimation liability for thousands of cancers that he calls "other cancers." He forecasts that there will be nearly 9,000 "other cancers" in the post-petition period. (Peterson Rpt. at 78, Tbl. 34) Biggs similarly uses an "other cancers" category. Neither explains whether any of these "other cancers" can be attributed to asbestos exposure. Rather, by attributing liability to Grace for these cancers, they implicitly assume that these "other cancers" may be caused by asbestos.[3] However, because most "other cancers" are not causally related to asbestos exposure, and because they make no attempt to include only those cancers that have been shown to be caused by asbestos exposure, claimants' experts' estimation of liability for these cancers is flawed and must be excluded. Without scientific evidence that there can be a causal connection between "other cancers" and asbestos exposure "a logical connection between the facts and the expert's opinion is lacking." *Feit v. Great-West Life & Annuity Ins. Co.*, 460 F. Supp. 2d 632, 637 (D.N.J. 2006) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Rather, claimants ask this Court to accept the attribution of liability for "other cancers" to Grace based on only the "*ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Any opinion that liability for other cancers is attributable to Grace's asbestos-containing products does not "reliably flow" from the fact that these other cancers have not been shown to be related to asbestos exposure, and must be excluded. *Heller*, 167 F.3d at 152.

---

[3] The National Academy of Sciences, Institute of Medicine, was "charged with evaluating the evidence relevant to the causation of cancers of the pharynx, larynx, esophagus, stomach, colon, and rectum by asbestos and with judging whether the evidence is sufficient to infer a causal association." National Academy of Sciences, Committee on Asbestos, *Asbestos: Selected Cancers* at 1 (2006). The Institute found that there was "not sufficient" evidence "to infer a causal relationship between asbestos exposure" and pharyngeal, stomach, and colorectal cancer. (*Id.* at 6, 9, 10) The Institute further found that "the evidence is inadequate to infer the presence or absence of a causal relationship between asbestos exposure and esophageal cancer." (*Id.* at 8) Only for laryngeal cancer did the Institute find that the evidence was "sufficient to infer a causal relationship" between it and asbestos exposure. (*Id.* at 7)

The claimants' experts similarly fail to perform the requisite causation analysis regarding conditions known to be caused by asbestos, such as lung cancer.[4]  They make no attempt to reliably distinguish between lung cancers that are more likely than not caused by asbestos exposure and those that are more likely than not caused by other agents.  Their conclusions are further flawed because they ignore plausible alternative causes of that disease.  *Heller*, 167 F.3d at 156; *Paoli II*, 35 F.3d at 758-59.  When a claimant asserts liability based on exposure caused by a defendant and when the "defendant points to a plausible alternative cause," it is incumbent on the claimant's expert to consider these plausible alternative causes.  *Id.*  If the expert cannot explain why the defendant's plausible alternative cause is not the sole cause, the expert's methodology is unreliable and must be excluded under *Daubert*.  *Paoli II*, 35 F.3d at 766.

The condition that accounts for the majority of the calculated claims – mesothelioma – fares no better.  There is not one word in either Peterson's or Biggs's report that provides any reliable, scientific basis for the conclusion that they draw:  that all claimants who make mesothelioma claims – and even some that don't – have a valid claim that their condition was caused by exposure to Grace asbestos-containing products, aside from a token percentage derived from the percentage of cases Grace did not settle while it was operating in the tort system.

---

[4]  It is well-established that lung cancer may be caused by a number of things other than exposure to asbestos, most notably smoking.  As this Court has already acknowledged, "[s]moking studies have shown that smokers are ten times more likely (RR 10.0) than nonsmokers to have lung cancer."  *In re W.R. Grace & Co.*, 355 B.R. 462, 483 (D. Del. 2006).  In addition, claimants' expert Dr. Lemen testified that "There are multiple chemicals in the environment that can cause lung cancer. . . .  [T]here are probably a dozen at least and maybe more that have been identified that can cause lung cancer in humans."  (Lemen Dep. at 121)  Thus, all lung cancers cannot be attributed to asbestos exposure.  Because smoking, in addition to any exposure to one of a dozen chemicals, is a "plausible alternative cause" for lung cancer, the claimants' experts bear the burden to establish why smoking is not the sole cause for lung cancers they include in their estimates.  *Heller*, 167 F.3d at 156.

4.      **Claimants' experts fail to present any data or analysis on the essential element of diagnosis.**

The same problems apply to the claimants' experts' failure to consider whether claimants actually have the conditions they assert.   Again, the claimants' estimation experts give no accounting for whether existing and future claimants will actually have the conditions they have claimed or will claim.   Peterson, for example, disavows any investigation at all into issues of disease.   (Peterson Dep. at 29 (admitting he did no quantification of "how much disease was caused or contributed by Grace").   This is particularly troubling in light of what the available data show with regard to past and existing claims.

C.      **Claimants' Estimation Experts' Opinions Are Therefore Inadmissible Under the "Fit" Requirement of Rule 702.**

Claimants' experts' use of Grace's prior settlements renders their estimation opinions inadmissible under Federal Rule of Evidence 702.

1.      **Relevance under Rule 702 and *Daubert.***

In its watershed *Daubert* opinion, the Supreme Court directed courts to exercise a "gate keeper" function in deciding whether or not to admit expert testimony.   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).   The threshold standards enunciated in *Daubert* and developed in subsequent opinions provide the fundamental predicates for determining whether the proponent has met its burden to establish the admissibility of its expert testimony by a "preponderance of proof."   *See id.* at 592 n.10 (citation omitted).   *Daubert* sets forth a two-pronged standard, which has been incorporated into Federal Rule of Evidence 702.   In particular, Rule 702 and *Daubert* prescribe that only expert testimony that is both (i) relevant and (ii) reliable is admissible.   *See Daubert II*, 43 F.3d at 1316.   These are two distinct considerations, both of which must be met for expert testimony to be admissible.

The first consideration is relevance or "fit."  To satisfy the relevance prong, the expert testimony must "assist the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702. "Fit" requires that the expert's opinion be "sufficiently tied to the facts of the case [such] that it will aid the [trier of fact] in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (citations omitted); *see also id.* at 591-92; *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203  (M.D. Pa. 1996) ("[T]o be helpful, the proffered testimony must have a logical connection to a fact in issue – it must 'fit.'").

The proponent of expert testimony must establish the admissibility of the expert's evidence "by a preponderance of the evidence."  *See Paoli II*, 35 F.3d at 744.   Finally, although born in the context of "scientific" opinions, the Supreme Court has emphasized that rigorous standards of admissibility laid down by *Daubert* apply "to all expert testimony."  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

### 2.    Claimants' affirmative estimation experts' opinions do not "fit."

By their own admission claimants' experts do not purport to estimate Grace's **liability** for existing claims and future demands.  Instead, they estimate the hypothetical **cost** to Grace of resolving these claims and future demands as if they were lawsuits in the tort system based on Grace's historical cost of resolving personal-injury asbestos cases in the tort system.  This effort does not measure Grace's liability on the merit of the claims and future demands at issue in federal-court bankruptcy litigation, and it therefore fails the "fit" requirement of Rule 702.

### D.    Claimants' Estimation Experts' Opinions Violate the Terms of Grace's Prior Settlements.

As the Court has already found, the threshold issue regarding the use of past settlements as admissions of liability is whether such admissions were made in fact.  They were not.  The settlement agreements that Grace entered into with tort plaintiffs prior to the bankruptcy

expressly stated that Grace was **not** admitting liability by entering into the settlement.   (*See* Peterson Dep. at 263 ("[V]irtually without exception they have a proviso that says there's no admission of liability by the defendant."))   As the Court has previously found, these settlements therefore cannot be read as admissions of liability.   (*In re W.R. Grace & Co.*, *et al.*, Oct. 25, 2007 Hr'g Tr. at 90) ("If the settlement agreements say that no one is admitting any liability, nobody's going to tell me that the settlement process is an admission of liability.   That's it.   I'm not going to hear about it if that's the case.")

### E.   Claimants' Estimation Experts' Opinions Are Inadmissible Under Rule 408.

There is no question that, if this were a trial on the merits of one or more asbestos claims, no expert could proffer an opinion that Grace should be held liable for damages because Grace had previously settled a similar claim.   It is no different here.   There is no room for refuge in the notion that the claimants' experts avoid this problem because all they are doing is predicting the cost of resolving claims.   Such an approach works only if one ignores whether the claims have merit, an issue the law plainly does not allow the claimants to sidestep.

### 1.   Federal Rule of Evidence 408.

Rule 408 prohibits evidence concerning the settlement of claims "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."   Fed. R. Evid. 408.   In addition to barring evidence of offers and negotiations, it also bars evidence that a settlement has taken place.   "While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto."   Fed. R. Evid. 408 (Advisory Committee Notes).   The prohibition extends beyond settlement activity in a particular case, as it also prohibits evidence that a litigant settled a related case.   *Fiberglass Insulators, Inc. v. Dupuy*, 856

F.2d 652, 655 (4th Cir. 1988) (settlement of a different cause of action excluded when it related

to the same litigation); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (improper

to allow settlements with other asbestos defendants as proof of amount of claim against non-

settling defendants).

The primary goal of Rule 408 is to encourage settlement.  This goal is accomplished by

allowing parties to negotiate freely and enter into settlements without their conduct being used

against them at a later date.   "[F]ederal policy encourages negotiation of settlements 'by

preventing the parties to the compromise from being tied elsewhere to the concession they made

inter sese.'"  *Fid. & Deposit Co. of Maryland v. Hudson United Bank*, 493 F. Supp. 434, 445

(D.N.J. 1980) (quoting *McShain, Inc. v. Cessna Aircraft*, 563 F.2d 632, 635 n.5 (3rd Cir. 1977)),

*rev'd on other grounds*, 653 F.2d 766 (3rd Cir. 1981).  Rule 408 is also based on the fact that

parties settle cases for a whole host of reasons, many of which may have nothing to do with

liability or actual amount of damages.   "[T]he offer may be motivated by a desire for peace

rather than from any concession of weakness of position."   Fed. R. Evid. 408 (Advisory

Committee Notes).  *See also Fid. & Deposit Co*, 493 F. Supp. at 445 ("[I]t is often more

advantageous, economical, and desirable for a party to buy his peace than to go through litigation

even when his chances of prevailing are great.") (quotation omitted).   Rule 408 thus embodies a

judgment that evidence of prior settlements is generally both irrelevant and prejudicial, and

clearly establishes that prior settlements cannot be used to establish liability on a claim.

### 2.    The use of prior settlements to estimate Grace's liability violates Rule 408.

The claimants' experts' approach violates all of the relevant policies behind Rule 408.

There can be no assurance that Grace would have entered into any settlements, or would have

settled any particular case on the terms it did, if it would have been forced to assume that such

settlements could be used to establish its liability for related claims.  Moreover, there is likewise no assurance that any particular settlement, or aggregation of settlements, was driven by the merits of the claims settled.  Peterson himself admitted in deposition that (contrary to the assertion in his report that settlements reflect the strength of claims) Grace's prior settlements were influenced by a number of factors plainly unrelated to the merits of any claim.  In fact, he admitted that "personal factors" – things like actual exposure data and actual medical condition and actual causation had little to do with settlements.  (Peterson Dep. at 171-72)

It is true that, in the recent asbestos estimations discussed above, other courts have allowed the use of prior settlements to estimate a debtor's asbestos liability.  *See*, *e.g.*, *Federal-Mogul*, 330 B.R. at 157; *Armstrong*, 348 B.R. at 124.  ***None*** of these cases, however, considered an objection to this evidence under Rule 408, and none therefore considered whether the rules permit evidence of claimant behavior in the tort system as probative of the debtor's actual liability.

## II.    CLAIMANTS' EXPERTS' OPINIONS ARE NOT THE PRODUCT OF A SCIENTIFICALLY RELIABLE METHODOLOGY.

Claimants' experts' opinions are all inadmissible under Rule 702 because they are not the product of a reliable scientific methodology.

### A.    Reliability under Rule 702 and *Daubert*.

The second consideration under Rule 702 and *Daubert* is reliability.  To satisfy the reliability prong, the expert's testimony must be based upon "sufficient facts or data" and must be "the product of reliable principles and methods" that are "reliably" applied "to the facts of the case."  Fed. R. Evid. 702; & Advisory Committee Note (2000).  In other words, the expert's opinions must be "derived by the scientific method" and "supported by appropriate validation."  *Daubert*, 509 U.S. at 590.  An expert's "bald assurance of validity is not enough."  *Daubert II*,

43 F.3d at 1316.  The court must determine if the expert's opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"  *Paoli II*, 35 F.3d at 742 (quoting *Daubert* 509 U.S. at 590).  "[A]ny step that renders the [expert's] analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Paoli II*, 35 F.3d at 745 (emphasis omitted); *see also Daubert II*, 43 F.3d at 1319 ("[E]xperts must explain precisely how they went about reaching their conclusions and point to some objective source . . . to show that they have followed the scientific method . . . .").

**B.     Claimants' Affirmative Estimation Experts' Opinions Are Not Reliable.**

That claimants' experts' opinions are not reliable is established by outright admissions under oath:

- They admit their models should be judged by scientific standards.

- But they admit that they are not determining any epidemiological process but, instead, claim-filing and settlement behaviors.

- And they acknowledge that there are a number of factors that drive the behaviors they attempt to model.

- Ultimately, claimants' experts are forced to admit that they have not and cannot analyze these factors scientifically.  They cannot even identify anyone who has ever done so.

- Predictably in light of these key admissions, the actual building blocks of their estimates turn out to be uniformly subjective judgments incapable of verification or confirmation.  In fact, their predictions turn out to be demonstrably unreliable for the simple reason that they have already been proven wrong in several different ways.

**1.     Claimants' experts admit they their models should be tested against accepted scientific methods.**

The claimants' experts all agree that their work should be judged according to scientific standards.

**Peterson.**  Peterson thinks that his work is "science" and that "it's appropriate to judge [his] work according to scientific standards."  (Peterson Dep. at 33)

**Stallard.**   Stallard, upon whose work several critical aspects of Biggs's estimation opinion rest, agrees that his work, as well as the work of Biggs, "should be judged upon whether it is scientifically valid, reliable, and reproducible."  (Stallard Dep. at 17)

**Biggs.**   Biggs also claims she is "applying scientific principles to evaluating past experience and making a reasoned assumption going forward.  That's a scientific method." (Biggs Dep. at 226)

### 2.    Claimants' experts assess claiming and settlement behavior.

Claimants' experts' models use historical litigation behaviors to predict hypothetical litigation results.

**Peterson.**  Peterson arrives at his estimate of the number of existing claims Grace should pay based on the percentage of cases Grace settled pre-bankruptcy.  (*See*, *e.g.*, Peterson Rpt. at 54-55)  He estimates the number of future claims against Grace by looking at the historical ratio of people who decided to sue Grace (vs. national disease incidence data) and simply applies that number forward for all relevant times as if claiming behavior is frozen as it was shortly before Grace filed this case.  He values both the existing and future claims by looking to the amounts Grace decided to pay to settle past cases.  (*Id.* at 55-56, 87-89)

**Biggs.**   Though the details differ, Biggs presents a similar behavioral model.   She determined a number for future claims based on the arithmetic ratio of asbestos filings against Grace (vs. industry filings) and projects that ratio going forward.  (Biggs. Supp. Rpt. at 21-23) She values all the claims she comes up with based on historical settlement values.  (*Id.* at 63-67)

### 3. But many, many factors unrelated to the merits drive claiming and settlement behavior.

The inputs to the claimants' experts' models reflect the results of a myriad of decisions by litigants, lawyers, judges, legislatures, doctors, insurers, and the public's perception of the issues relevant to asbestos litigation – all of which are driven by any number of complex social and legal factors. (*See* Biggs Dep. at 117 (there are "many, many different factors that relate to those behaviors"); *see also id.* at 119-20, 125-26) Their outputs purport to be a prediction about how these same people and entities would have behaved had they continued to litigate asbestos cases against Grace in the tort system. What cases were filed, and would have been filed but for the bankruptcy? What cases were settled, and for how much? What cases would have been settled, and for how much, but for the bankruptcy?

**Peterson.** Peterson has admitted: "Most of the variation that occurs in asbestos claiming [and] settlements is because of behavioral effects, not biological effects." (Peterson Dep. at 76) Peterson also admitted that what he called "personal factors" – things like actual exposure data and actual medical condition and actual causation had little to do with settlements. (*Id.* at 171-72)

**Biggs.** Biggs acknowledged that "apart from the biological process, there is a legal environment process that affects claiming behavior." (Biggs Dep. at 195)

**Stallard.** Stallard, who provides much of the foundation for Biggs's conclusions, agreed that most of the claims volatility experienced by the Manville Trust was "due to developments in legal processes as opposed to biological processes." (Stallard Dep. at 95)

**4.    Claimants' experts have applied no scientific method to analyze the factors that drive claiming and settlement behavior or predicting future claims against Grace.**

The reliability of the claimants' experts' estimations turns upon the reliability of the assumptions the experts make about the causes of the historical behaviors that serve as inputs to their models and the assumptions they make about whether, how, and why those causes change over time.  Anyone can do the arithmetic that takes historical numbers and applies them to a different set or data or projects them into the future.  The critical *expert* endeavor is deciding whether there is a *scientific basis* for any of this.  Yet, this is precisely what claimants' experts have failed to do.

**Stallard.**  Stallard admitted that he *could not even think of* a scientific methodology capable of predicting such changes, let alone claim to have used such a method himself. (Stallard Dep. at 103-04)

**Biggs.**  Biggs agreed that the changes in Grace's experience with claims were not foreseen and that she was not aware of "any . . . formal method of scientific analysis that enables [her] to identify causal factors" affecting claims experience.  (Biggs Dep. at 255-56)

**Peterson.**  Peterson engages in "quasi-experimentation" to see if there might be causal associations between the behaviors he cannot more rigorously model.  (Peterson Dep. at 130) And while he is unwilling to say he had no reliable methods – was still forced to undermine seriously the viability of his work by admitting that he could not identify any model that reliably predicted claiming behavior more than six or seven years hence.  (*Id.* at 46-47)

***These admissions go to the heart of the claimants' case and lay bare the fact that their estimates are not the result of a scientifically reliable methodology and cannot be admitted into evidence consistent with Daubert and Federal Rule of Evidence 702.***

**5.**  **Claimants' experts' projections of claims depends upon untested judgments and assumptions.**

An examination of some of the particular steps taken by each expert to formulate their estimates reveals that, at each juncture, the experts rely upon subjective "judgments" and arbitrary assumptions rather than any established, replicable, or reliable methodology to generate their massive estimates of the amounts of Graces's asbestos personal-injury liability.

**(A)**  **Peterson's estimation approach.**

Peterson's estimate of future claims (for both Peterson and Biggs the lion's share of their liability estimates come from the number of future claims they predict) involves four steps:



GRS111907-10B

**①**        **First, Peterson determines the arithmetic ratio of Grace claims compared to the incidence of disease across the country.**  This is called the "propensity to sue."  This analysis necessarily assumes a ***real and reliable*** relationship between the total national incidence of disease and the claims filed against a specific defendant, here, Grace.  Yet Peterson offers no demonstration that such a real and reliable relationship exists.  There is, of course, a mathematical ratio, but that does not mean that the two numbers are linked in a systemic, measurable way.  In order for Peterson's step here to be a scientific one, there must be some showing that the relationship between the two values has a factual basis that will justify imposing it across a different time.

**②**        **Second, Peterson selects a time period, called a "calibration" period, to derive a "propensity to sue" ratio that will be applied in all future years.**  Peterson's judgment here was to select the time period 1999 until April 2001.  Peterson offers no science to support the selection of this time period.  He did, however, manage to pick "that period [that] represents the highest propensity ever in Grace's filing experience."  (Peterson Dep. at 187)

**The claims spike.**  Peterson's selected time period included the dramatic spike in claims against Grace that occurred in 2000 and 2001.

But the spike in claims that drives billions of dollars worth of these experts' aggregate estimates was demonstrably not the result of any sudden up-tick in the development of non-malignant disease**.**  (*See* Kazan Dep. at 38-39 (describing spike in claims asserted on behalf of people who had no lung function deficit and were not sick); *see also* Austern Dep. at 76-80, 162-63 (unexpected increase in non-disabling asbestosis claims) & 190-91 (spike in non-malignant claims relative to malignants not attributed to any difference in underlying incidence of disease))

It was caused by lawyer-driven decisions to name as many defendants as possible in asbestos filings, likely to protect against the prospect of bankruptcy filings by one or a more limited number of defendants.  (*See* Kazan Dep. 38-39, 52-53 (flood of non-malignant, unimpaired claims brought by people who were not sick driven principally by increases in unreliable and illegitimate litigation screening); *see also* Austern Dep. 76-80 ("amazing elasticity" of plaintiffs' lawyers to find and bring minimal asbestosis claims))

Moreover, as to malignant claims, what looks like an explosion of claims against Grace is actually an explosion of allegations being made by the same number of plaintiffs with the same claimed conditions against ***multiple potentially responsible parties.***

The same was true for mesothelioma.  (*See*, *e.g.*, Peterson Dep. at 145 ("Increase in claims was greater than increase in mesothelioma."; *id.* at 148-49 (admitting increases due in part to people "suing more defendants"))  This is reflected in both Peterson's and Biggs's propensity curves:



(*See* Peterson Rpt. at 70)



(*See* Biggs Rpt. at 19)

These proliferating asbestos claims cannot represent an increase in claimed liability – though that is precisely the purpose to which claimants' experts put them – as by definition they cannot represent a greater aggregate amount of potential damages against the asbestos industry. More plaintiffs named Grace in lawsuits during this period; more claimants filed claims against the Manville Trust during the same months; more defendants, debtors, and trusts may have been brought to the table by one or more means, but each responsible party's individual share of the total liability underwent no great change or increase.

The same problem arises when one looks to the escalation in settlement values seen during the same time period.



*(See* Peterson Rpt. at 28)

As the number of claims increased, the pressure on litigants, courts, and other constituencies to resolve cases likewise rose. As more defendants were on the hook for potential judgments, and as major industry players sought protection from claims in bankruptcy, even more pressure was put on the remaining defendants to pay up.

One way to illustrate the pernicious effect of the claimants' experts' analysis is to think through what the result would be if they were to apply their analysis in multiple estimation proceedings simultaneously. Assume that over a one-year period, 100 plaintiffs filed asbestos cases against defendant A and another 100 plaintiffs filed asbestos cases against defendant B. Further assume that in the following year, 200 plaintiffs filed cases, but these plaintiffs all filed cases against **both** A and B. Looking at each defendant in isolation, the claimants' experts would see a doubling in the number of cases (which in this case would lead them to predict a further doubling in year three). In reality, however, the aggregate liability should have stayed the same.

41

**Joint liability.**    And the problem was exacerbated by the threat of joint liability. Claimants' experts fail to account for the risk of joint liability and its effect on the settlement decisions and settlement values during their "calibration" periods.  Peterson, for example, admits that in some jurisdictions, Grace faced the risk that it would have to pay judgments not based only on its share of any established liability, but that it also bore the risk of paying for damages attributable to other unavailable or insolvent defendants under doctrines of joint liability. (Peterson Dep. at 168-70)  He did no work, however, to determine whether and to what extent Grace's past settlements were influenced by this risk as opposed to simply being reflective (as he claims) of Grace's several share of the potential liability.  (*Id.* at 169-70)  Claimants agree that for purposes of estimating Grace's liability in bankruptcy, the issue is Grace's appropriate share of any liability, and that it would be inappropriate to include in an estimate of Grace's liability the risk that Grace may have to pay the share of some other, insolvent defendant as a result of a state-court judgment.  Indeed, claimants argued precisely this when they opposed Grace's efforts to discover to what extent claimants had recovered on claims against other defendants on the basis that these other payments were irrelevant to an estimation of Grace's liability.  (Nov. 28, 2006 Claimants' Opp'n to Mot. to Compel Discovery (Dkt. # 13812) at 10-14)

**3**    **Third, Peterson uses his propensity-to-sue-Grace ratios and increases them by what he claims was an increase in the propensity to sue Manville from 2001 to 2006.** With no explanation as to the relevance or application of the Manville claims experience to Grace, Peterson then applies the increased propensity-to-sue-Grace ratios to his estimate of the future incidence of disease.  Peterson admits that, despite his claim to be modeling tort-system behavior, this data from the Manville Trust is not "tort system" data, and is in fact the result of a negotiated process that set parameters for claims.  (Peterson Dep. at 196-99)  The product of this

calculation is his estimate of the future number of claims he predicts would have been filed against Grace "but for" the bankruptcy.

**4**    **Fourth, Peterson assumes that his increased, 1999-2001 propensity-to-sue ratio will continue for the rest of time.**    Peterson's decision to hold the propensity-to-sue ratio constant over time is, again, based solely on his unchecked assumption.  He calculates future filing rates on the wholly arbitrary assumption that the sharp increase in claims against Grace from 1999 to 2001 would have continued.  (Peterson Rpt. at 66-87; Peterson Dep. at 183-84) This is probably the most pernicious element of the analysis in light of Peterson's stark admission that "the maximum period of time" over which there have *ever* been "models of claiming and claim resolution that have reliably predicted subsequent changes" is "seven years." (Peterson Dep. at 46-47; *see also* Biggs Dep. at 190-91 (claiming five, but not ten years' accuracy))

**(B)    Biggs's estimation approach.**

Biggs's forecast and future claims also contains four components, each of which is also based solely on her own, subjective judgment:

43



GRS111907-15B

**First, Biggs calculates a relationship between nationwide asbestos filings and filings against Grace.**  Biggs asserts a relationship between the number of claims filed against Grace as out of all claims filed against all asbestos defendants.  She provides no basis on which to assert that there should be any such systematic relationship.

**Second, Biggs identifies a "calibration" period for which she compares the nationwide fling rate to calculate a percentage of nationwide claims that will be filed against Grace.**  Biggs selected the time period of 1997 and 2001.  She offers no methodology to

44

support her selection, though she also managed to capture the spike in claim filings.  (Biggs Supp. Rpt. at 63-67; *see also* Biggs Dep., at 317)  Both Peterson and Biggs thus end up with analyses that heavily weight and emphasize data from the months preceding Grace's Chapter 11 filing, which saw sharp increases in both the number of filings against Grace and the dollar amounts paid to settle claims.  These selections, however, are arbitrary and artificial, without any analysis as to whether the time periods at issue can reliably serve as proxies for the future.

**③**        **Third, Biggs uses this percentage and applies it to her estimate of the future nationwide claims filings.**  The product is her estimate of the future number of claims to be filed against Grace.  In doing so, Biggs makes a number of increases in the historical percentages she sees based on her "judgment" that the upswing in claims prior to Grace's bankruptcy filing is more predictive than using a longer time period during which the number of claims against Grace actually decreased relative to the industry as a whole.  (Biggs Supp. Rpt. at 46-53; Biggs Dep. at 259-60, 265, 273 (admitting she had no basis for this assumption other than that certain law firms agreed not to file claims against Grace at certain times, which effect she did not quantify); *id.* at 313-17)  Biggs provides no basis other than her "judgment" for picking numbers that continue the pre-bankruptcy up-tick in claims against Grace for all her future forecast years. (Biggs Supp. Rpt. at 52-53; Biggs Dep. at 313-17)  She claims her assumptions are "reasonable" (Biggs Dep. at 160), but admits they cannot be tested (*id.*) and that she does not have the expertise to build a model that can predict claiming behavior into the future (*id.* at 118-19, 229).

> **6.    Claimants' experts' judgments and assumptions repeatedly have proven wrong.**

Perhaps the simplest demonstration of the unreliability of plaintiffs' estimation methods is that, as far as we can tell, they simply do not work.

### (A)    Claimants' estimation experts failed to predict prior increases and decreases in filings.

Despite all the "experience" courts and experts supposedly have with the "traditional" method of estimation, no one has been able to successfully predict future trends in filings and settlements.

**Peterson.**  By his own admission, Peterson incorrectly predicted a drop-off in claims in 1990 (Peterson Dep. at 51-52), and failed to predict the spike in claims against Grace prior to 2001.  (*Id.* at 66)  Yet he now asks the Court to take on faith his prediction that claims will not drop off against Grace in the future.

**Biggs.**  Biggs likewise failed to predict the spike in claims in 1999 and 2000 (Biggs Dep. at 137) and now offers no basis to support her assertion that things will not change in the future, which, conveniently for the FCR, means continued increases in both the number of claims and settlement values.

### (B)    Claimants' experts' estimation models generate results inconsistent with objective trends in asbestos claims in recent years.

Claimants' models fail to explain observed trends in claims against other asbestos defendants subsequent to Grace's bankruptcy petition.  Because both claimants' experts divide the universe into pre-petition and post-petition claims (treating post-petition bankruptcy claims and future demands as if they were the same), many of the drivers of their assumptions play out in terms of the numbers of claims and values they assume for the years 2001 to the present.  We know, however, what has happened to other asbestos defendants during this period.  What that evidence shows is inconsistent with the forecasting presented by Peterson and Biggs, which essentially looks to Grace's recent pre-bankruptcy experience as the baseline, normal period for analysis.  As is turns out, that period was strikingly anomalous.  Claims against the Manville

Trust from 2003 to the present have declined precipitously, as have the number of claims paid and the amounts to resolve claims reported by companies in public filings, and the criteria for determining valid claims has tightened considerably.  (*See* Austern Dep. at 187)



47



**7.    Claimants' experts do not reliably predict claiming and settlement values for an extended number of years.**

Again, claimants' experts admit their methods do not produce reliable results.  Though their models purport to forecast behaviors, costs, and ultimately liability for decades into the future – "until the very last person . . . dies," as their counsel put it (Oct. 25, 2007 Hr'g Tr. at 76 (Dkt #17280)), the experts themselves were more humble.  Peterson (the most sanguine of the group) when asked if he had a reliable scientific model that could predict claims and claims-resolution behavior, admitted that he was unaware of any scientific model capable of predicting changes in the legal environment over more than seven years – quite a bit less than the life-time spanning estimates produced by Peterson and Biggs.  (Peterson Dep. at 46-47)

**8.    Claimants experts fail to account for information that indicates the very claiming behavior they attempt to model has produced large numbers of meritless claims.**

It is bad enough that claimants' experts simply assume that the vast majority of claimants have allowable claims against Grace.  It is downright absurd when they employ "behavioral"

models that fail to recognize some of the most telling behavioral evidence to be found: that a significant portion of asbestos claims were driven by considerations other than merit. Grace's experts offer the following conclusions, none of which has been materially rebutted by claimants:

- Dr. Daniel Henry's x-ray study of a proportional sample of 800 lung and other cancer claimants demonstrates that fewer than 8% of the claimants have radiographic evidence (a profusion score of 1/0 or greater) sufficient to attribute the claimants' malignancies to asbestos exposure. This finding was in stark contrast to the findings of the claimants' x-ray readers, who found a 1/0 or greater in 82% of the claimants in the sample.

- Dr. David Weill's review of pulmonary function tests for 150 of the non-malignant claimants revealed that none of the tests complied with all American Thoracic Society requirements for lung function testing.

- Dr. Anderson's review of the PIQ responses and attachments shows that over 80% of the claimants did not mix or apply Grace's products, but rather were merely bystanders to Grace products or were unable or unwilling to provide any or sufficient information on the nature of their exposure to Grace products. As established in Drs. Anderson and Lees analysis, bystander exposure to Grace products is capable only of causing extremely low, if any, exposure to asbestos. And, as established in Drs. Moolgavkar's and Anderson's reports, exposure at these very low levels has not been demonstrated with any scientific certainty to cause asbestos-related disease.

- Dr. Parker and Dr. Haber's review of the practices of 24 doctors and at least 6 screening companies underlying non-malignant claims and finds these doctors' and screeners' diagnostic practices to be unreliable. This impacts at least 63% of the non-malignant claims at issue.

Discovery of doctors, both in this case and others, has further impugned the integrity of already questionable medical diagnoses underlying many pre-petition asbestos claims. Grace focused much of its discovery effort on the doctors and screening companies that helped to generate the "evidence" that supports the pending claims against Grace. While this effort has been impaired in part by objections (including unfounded privilege assertions) and the invocation of the Fifth Amendment privilege against self incrimination, some basic facts about the behaviors of asbestos claimants and their representatives have come to light:

- Lawyers and claimants are selectively omitting or concealing evidence that does not support their claims or that would raise questions about the reliability of the underlying medical diagnoses.

- Doctors who have participated in medical-legal screening processes do not follow accepted medical practices in rendering diagnoses. Doctors with litigation-based screening practices often do not perform differential diagnoses to rule out other, non-asbestos causes of disease, do not take their own occupational and exposure histories from claimants, and do not conduct physical examinations before diagnosing disease.

- Screening doctors and litigation-based B-readers frequently rely on clerical staff to translate their notes, generate their reports, and stamp their names to the reports, and just as frequently fail to review their reports themselves.

- Screening companies and law firms gave doctors instructions and/or criteria for their diagnoses and reports that the doctors duly followed.

- Claimants or their attorneys have shopped negative x-rays, searching for doctors who will provide positive findings in order to support claims.

Similarly, the contentious battles over law firm discovery have yielded further evidence that estimation methods predicated on the cost of resolving pre-bankruptcy claims are not based on "good grounds." In particular, two overarching themes have been revealed through this discovery: First, claimants' law firms overwhelmingly conflated "work history" with "exposure history" – often admitting that they did not even determine whether individual claimants were "actually" exposed to Grace's asbestos containing products – let alone the duration, proximity and/or frequency of such exposures. Second, deliberate and tailored interrogatories propounded by Grace have revealed that critical diagnosis evidence (including evidence tending to contradict the diagnoses advanced by claimants) continues to be secreted from Grace under the guise of the "consulting expert" privilege. This continuing failure to produce (or the inexcusably late production of) such key medical records reflects patent violations of this Court's Consulting Expert Order and further undermines the reliability of claimants' experts' opinions.

It is common knowledge among those who have an interest in asbestos litigation that any data collected concerning claims and settlements over the past several years will be littered with bogus claims and payments that have no relation to the merits of anyone's claim.   The fundamental cause of the asbestos litigation crisis in late 1990s and early 2000s was a flood of unimpaired claims.  (Kazan Dep. at 38)  These claims, on behalf of plaintiffs who were not "sick" by any ordinary definition of the word, were the result of screenings arranged by the asbestos plaintiffs' bar.  (*Id.* at 24, 34-39)  There was no increase in the incidence of disease, but an increase in the market for asbestos claims driven by lawyers' solicitations and entrepreneurial zeal.  (*Id.* at 42-48, 66-67)   To assume that claim-filing data and settlement rates and payments from this period can be used without even an ***inquiry*** into the underlying validity of the evidence behind these claims is beyond defense.

The point here is not to ask the Court to declare all of these criticisms valid, or to establish that they affirmatively preclude any possible assessment of liability (though they are valid and generally do preclude such findings).  The point is that claimants' experts simply ignore this information and do not account for even the possibility that one or more of the claims at issue may not, in fact, be worth what the claimants' experts assume them to be worth.  Of course, this is just another example of the pernicious nature of using the "what it would cost Grace to resolve claims in the tort system had it not filed for bankruptcy" approach to estimation. All consideration of the merits is conveniently avoided on the theory that such concerns are ultimately irrelevant.  This fatally undermines any confidence that the Court might otherwise have that the claimants' estimation experts' approach meets the minimum standards of relevance (and reliability) mandated for expert opinions under Rule 702.  There is no argument that can

justify the admission of opinion evidence that does not even attempt to account for data that

undermines the assumptions and conclusions proffered by the these experts.

### 9.    Additional indicia of unreliability.

In addition to the deficiencies identified above, claimants' affirmative estimation experts'

opinions also suffer from the following flaws:

- There is no way to test or replicate the assumptions used by Peterson and Biggs or the viability of their conclusions other than to wait and see if they prove to be correct.

- None of the methods used by these experts have been the subject of peer review.  (Peterson Dep. at 44-46; Biggs Dep. at 64-65, 74)

- There is no real way to measure the error rate of their models.  (*See* Biggs Dep. at 136-140)

- Finally, there are no standards governing the work these experts have done, and there is no "general acceptance" of the methodology they employ – which is distinct from the simple fact that similar work has been done before

These shortcoming underscore the fundamental problem with unreliable expert opinions in

general and claimants' affirmative estimation experts' work in particular:  With no ability to

check their assumptions and judgments against standards or replicate or verify their analysis, the

only way to test viability of their conclusions is to wait and see if they prove to be correct.  This

case deserves better.

## PART III: OTHER *DAUBERT* CHALLENGES

This Part outlines Grace's *Daubert* challenges to claimants' other experts.  These expert

opinions are likely to be relevant only to the extent that claimants rely upon their opinions to

challenge Grace's affirmative estimation case.  Grace therefore expects to address the issues

identified here more fully in response to claimants' *Daubert* motions.  Grace also intends to file

motions *in limine* that may raise some of these same issues and seek ruling regarding evidence to

be offered by some of the same experts discussed below.  This section is simply intended to identify Grace's principal *Daubert* issues that may lend themselves to consideration prior to the hearing.

## I.    CLAIMANTS' REBUTTAL ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE.

Claimants have proffered the testimony of lawyers Stephen Snyder, Marshall Shapo, and Daniel Myer and Mark Eveland to offer opinions on the manner, purpose, and processes through which Grace and other defendants resolved asbestos claims in the tort system.  Claimants also offer the testimony of Jacob Jacoby, a self-described "consumer psychologist," to opine on the reliability of the PIQs submitted by claimants or their counsel.   These "expert" opinions all suffer from fatal flaws.

First, Snyder, Shapo, and Myer and Eveland use prior settlements as a substitute for liability on the part of Grace, which is prohibited by Rule 408.  Second, their views on historical tort-system settlement values do not "fit" the issue of estimating existing and future claims, which turns, first and foremost, on an assessment of the merit of those claims.  Third, none of their opinions are based on any reliable methodology; they are only speculative "say so" opinions of lawyers and claims agents regarding the validity and value of disputed claims.  *See In re Federal-Mogul Global, Inc.*, Case No. 01-10578, June 20, 2007 Hr'g Tr. at 106-07, 116-17 (Bankr. D. Del.).  Fourth, much of their testimony encompasses legal opinions and conclusions that are not proper subjects of expert testimony under *Daubert* and Rule 702.  *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994)   ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Haberen v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Trust Agreement*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992) ("An expert may not opine legal

53

conclusions drawn by applying the law to the facts."). Courts have specifically concluded that Rule 702 cannot be used as a tool for circumventing the adversarial process by packaging lawyer advocacy under the guise of "expert opinion." *Fisher v. Ciba Specialty Chem. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006).

### A.    Stephen M. Snyder.

Snyder is a lawyer whose expert report is essentially a 68-page brief that argues: (1) the use of merits-based criteria by Grace's estimation experts underestimates the cost of resolving those cases in the tort system; (2) that, contrary to one of the criticisms of using historical settlement values to value claims, Grace got a "good deal" in past settlements because it was a "peripheral" defendant and its lawyers did a good job of settling cases; (3) tort reform has not reduced the value of asbestos claims; and (4) claimants should not be faulted for not having evidence to support their claims. Again, the focus – at least for purposes of Grace's estimation motions – is that the tort system has established values for claims and that any estimation must respect that valuation, regardless of what the evidence shows about the merits of claims. He relies on no specific data, information, or reproducible scientific models. Instead, he bases his opinions on "general knowledge" gained through his work as a defense lawyer. (Snyder Rebuttal Rpt. at 3) As a result, Snyder's report is grounded on little more than rank speculation and personal legal conclusions rather than any reliable and reproducible methodology.

**Grace's valuation assumptions.** Snyder first opines that "[a]pplication of the claims valuation assumptions provided to Grace's evaluation expert would understate Grace's liabilities as determined by reference to actual and, I believe, reliable results achieved in the tort system." (*Id.* at 4) Snyder makes this bald assertion without reference to any sort of evidence. Snyder's opinion consists of nothing more than the conclusions of a lawyer-advocate, with no supporting evidence or analysis. By way of example, Snyder notes that the system for settling asbestos

cases is governed by an enormous common store of data.  (*Id.* at 9)  This purported "data" includes "[t]housands of verdicts" and "thousands of computer simulations."  (*Id.* at 6)  Snyder does not disclose the "thousands of verdicts" he repeatedly refers to, reveal which settlements or computer simulations he relies upon, nor disclose any other data or analysis supporting his conclusions that asbestos settlements were the product of an "efficient market" that benefited defendants by resolving claims for less than their value would have been at trial.  Snyder makes no attempt to tie these general assertions about "asbestos cases" to Grace's prior trial results or its actual liability to any claimants.  Without any specific evidence or defined methodology, Snyder's analysis cannot be replicated or verified.  In effect, he asks the Court to accept his conclusions based on his experience and purported expertise as a defense lawyer.  His baseless conclusions are neither helpful nor reliable, and should be excluded.  *See, e.g., McMahon v. Bunn-O-Matic Corp.,* 150 F.3d 651, 658 (7th Cir. 1998) ("We have said before, and reiterate, that '[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'") (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989)).

**Grace's settlement "leverage."**  Snyder also claims that "Grace leveraged its peripheral defendant status to achieve reasonable settlements."  (Snyder Rebuttal Rpt. at 28)  Snyder's assertion that Grace was a "peripheral defendant" as opposed to a "front line defendant" is without content or analysis.  The only support for his assertion is that Grace had "target defendant potential" (*id.* at 29) – *i.e.*, that it should have had to pay as much as "front line defendants" to settle cases – is his unsupported, speculative, subjective opinion that discovery and verdicts in property damage cases, as well as "bad press," would potentially increase Grace's liability.  (*Id.* at 30-31)  It is apparent from Snyder's report that the conclusions he draws from

his account of the history of asbestos litigation are based on little more than his personal opinions, and are unsupported by any reliable or verifiable methodology or analysis.   For example, Snyder asserts that Owens Corning's "trial losses specifically informed defendants like Grace that they were not going to prevail on their non-impairment theories. . . ."  (*Id.* at 35-36) Nowhere does Snyder cite any evidence to support this assertion, nor does he make any effort to show that Grace's cases and trial results were in any way comparable to Owens Corning's. Furthermore, to the extent Snyder's opinions are premised on his review of in-house counsel's memoranda and testimony regarding Grace's settlement practices, his conclusions are nothing more than another lawyer's subjective and unsubstantiated view of the significance and meaning of that material.  Snyder applies no methodology to his review of this information, and he stands in no better position than the Court with respect to determining the meaning or significance of these facts.

**The post-2003 decline in asbestos claims.**  Snyder opines that the decline in the filing of new asbestos claims since 2003 is solely attributable to congressional consideration of the Fairness in Asbestos Injury Resolution Act, and is not the result of tort reform at the state level. (*Id.* at 60-63)  Snyder bases this opinion on his view that state courts are incapable of correcting the "core flaws in the tort system."  (*Id.* at 63)   After reciting problems that have plagued asbestos litigation over the years, Snyder concludes that "All of these issues were challenging and viable issues in 1986 and 1996.  In my opinion the case has not yet been made that they will not remain viable and just as challenging in the tort system in the future."  (*Id.*)  Other than stating his subjective conclusion, Snyder provides no supporting methodology, reasoning, or analysis for his attribution of the decline in new asbestos claims.  As with his other opinions, he

simply says, "Take my word for it."   This opinion cannot assist the Court and should be excluded.

**Claimants' inability to prove their claims.**   In the final section of his report, Snyder argues that asbestos litigation "would grind to a halt" if plaintiffs were required to assemble evidence of actual exposure to defendants' products and of actual asbestos-related injury.  (*Id.* at 63-66)  Amazingly, he asserts that such evidence is unnecessary, because "[a]ll the counsel in the litigation generally can anticipate how this will play out in a given case."  (*Id.* at 65-66)  In other words, according to Snyder, the actual facts do not matter in the "tort system."   Snyder's characterization – indeed, his touting – of the most objectively flawed aspects of mass-tort litigation is of no help to the Court in determining the value of the existing and future claims at issue, other than to lend support to the notion that any values derived from tort-system settlement values do not reflect the merit of the cases resolved.

### B.    Marshall S. Shapo.

Marshall Shapo is a law professor, who, like Snyder, offers an opinion that Grace's experts have erred in their characterization of and assumptions as to how claims have been and would be valued in the tort system.  Also, like Snyder, his opinion is essentially an extended legal argument, and concludes its 96 pages by stating that "the case is not proven for the proposition that judicial case law and legislation since April 2001 would significantly have minimized the most substantial claims that Grace paid before it entered bankruptcy; nor has it been shown that post-April 2001 changes in the law would permanently minimize Grace's future liabilities for such claims had it remained in the tort system."  (Shapo Rpt. at 96)

Though he describes his report as a "survey" of selected asbestos and non-asbestos caselaw (Shapo Rpt. at 70), he has never been directly involved in asbestos litigation (Shapo Dep. at 14-15); instead, his opinion purportedly "stems from his long-term study of the law of

products liability" and "summarize[s]" his understanding of the progression of case law.  (Shapo

Rpt. at 94-95)   Shapo opines that post-petition changes in the asbestos-litigation landscape

"would not significantly have minimized the most substantial claims that Grace paid before it

entered bankruptcy and surely cannot be shown to have done so permanently."  (*Id.* at 3)

Shapo's historical overview and interpretation of selected caselaw fails both the helpfulness and

reliability prongs of *Daubert*.  Shapo's conclusions are based on little more than his reading of

caselaw.  (*Id.* at 80)  The Court can read opinions as well as Shapo.  His opinion usurps the role

exclusively reserved for the Court (or at least precluded for witnesses), and is plainly

inadmissible on this basis alone.  Moreover, by Shapo's own admission, his opinion is not based

upon any reliable or reproducible methodology.  (*Id.* at 79; Shapo Dep. at 15)  Instead, his report

is based upon his understanding of cases that he "selected . . . from a large body of case law,"

because he believes them to be "symbolic of the point that threads its way through all of these

areas of substantive products law."  (Shapo Rpt. at 56)  The law under *Daubert* and its progeny is

clear – an expert's opinion must be based upon a reliable, reproducible methodology.  A law

professor's ruminations and theories after reading a stack of decisions does not meet this

requirement.

### C.    Daniel P. Myer and Mark T. Eveland.

Daniel P. Myer and Mark T. Eveland submitted a joint rebuttal report that is "limited to

the evaluation of the estimation provided by Grace's experts."  (Myer & Eveland Rpt. at 3)

Their task was to evaluate the work done by Florence estimating the number of valid claims

based on the PIQ data.  In fact, the report is little more than an apology for claimants not having

provided information in the PIQ process that would clearly be necessary for a claimant to

establish liability on the part of Grace in any merit-driven litigation.  Thus, the real point of the

report is to opine that in "our experience" asbestos plaintiffs do not bother to develop evidence of

exposure (*id.* at 8), the automatic stay prevented further discovery (*id.*), settlements were concluded based on incomplete and unsubstantiated information (*id.* at 8-9), and that most asbestos claims to date have been resolved with regard to the nature of the plaintiff's actual asbestos exposure (*id.* at 9-10).  In the end, the report is more a catalogue of the flaws plaguing asbestos litigation and failed trust resolution procedures, rather than argument for rejecting a merits-based analysis for estimating the value of bankruptcy claims.

Myer and Eveland's joint report should be excluded because it fails all three prongs of the *Daubert* analysis: expertise, relevance, and reliability.  Myer and Eveland lack any qualifications for opining on the substantive validity of mesothelioma claims.  Their only putative expertise comes from experience with claims management services, where they "develop[] settlement strategies, evaluat[e] cases and negotiat[e] settlements of trial listed cases . . . ."  (*Id.* at 4)  Claims settlement, which is driven by market forces and other factors extraneous to substantive law, is a separate and distinct practice from the law that would govern those claims at trial.  Myer and Eveland might be qualified to opine on how they might choose to settle a case, but that does not translate into the ability to speak to how a case should be resolved on the merits.  Even if they were somehow qualified to render such an opinion, it would be an inadmissible legal conclusion that would usurp the role of the Court.[5]

---

[5]  In addition, Myer and Eveland's report is wrought with the same sort of deficiencies that plague Snyder's and Shapo's reports.  Myer and Eveland provide speculative and conclusory statements without identifying any methodology – reliable or otherwise – for their opinions.  Their report is replete with self-serving, conclusory statements that reference neither data nor analysis.  For example, Myer could not identify any data or other specific analysis to back his critique of the work of Florence.  The only basis he could identify was purported experience: "There's no hard data to base that on, no.  It's based on our experience."  (Myer Dep. at 196-97)  Similarly, Eveland and Myer did not employ any analysis in reaching their conclusion regarding the current average value of mesothelioma claims.  At deposition, Myer testified that the basis for this opinion was "conversations with plaintiff lawyers, in discussions with co-defendants, in discussions with in some instances judges" (*id.* at 142), but he refused to identify any specific discussions.  (*Id.* at 155-56)  Other than these alleged discussions, Myer has no "hard data," statistics, or other empirical analysis to support the conclusion.  (*Id.* at 122-23)

### D.    Jacob Jacoby.

Jacob Jacoby, a business school professor with a doctorate in psychology, opines on the use of the PIQs to screen claims and, like Myer & Eveland on behalf of the ACC, concludes that the PIQ process did not produce a reliable data set from which to draw conclusions about Grace's liability.  The thrust of his criticisms is that the PIQ "surveys" were not appropriately designed to elicit whether claimants will be able to prove certain facts in support of their case. The details of his report notwithstanding, it is critical to note that Jacoby's premise and his opinions deal with the PIQs as a "survey," not as legal discovery documents submitted on behalf of claimants in anticipation of a judicial proceeding to estimate the value of their claim.  Perhaps the most convenient way to think of Jacoby's opinion is to treat it as a psychologist's explanation of why a plaintiff should not be bound by his or her answers to interrogatories on grounds such as the questions were poorly drafted, confusing, or were not read objectively by the propounding party.  Like claimants' other rebuttal estimation experts, Jacoby's opinions do not satisfy the criteria of expertise, relevance, or reliability.

Jacoby has no experience that would qualify him to testify as to the reliability of a court-ordered discovery device.  He is not a lawyer, but a "consumer psychologist" who does "research on consumer behavior [and] consumer psychology." (Jacoby Dep. at 7)  He has no experience in mass tort cases or asbestos cases.  He has never testified regarding court-ordered proof of claim forms or about their mailing, nor has he written on any of these subjects.  (*Id.* at 8-10)  He has never surveyed lawyers or litigants active in litigation.  (*Id*. at 24-26)  He acknowledges that "in the vast majority of instances … the surveys [which he conducts] are not court approved." (*Id*. at 27)  Jacoby may have experience, even expertise, on the general topic of how people answer survey questions, but this does not qualify him to opine on the effectiveness or import of questions posed in discovery in ongoing litigation.  *See*, *e.g., Player v. Motiva Enters., LLC*,

2006 WL 166452, at *5 (D.N.J. Jan. 20, 2006) ("[W]here a proposed expert's area of experience is adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.").

Jacoby's opinions lack any "fit" to the facts of this case. He argues that because the PIQ was not developed or administered in accordance with accepted survey methodology, its results are unreliable. (*See* Jacoby Rpt. at 5-7) His position ignores the critical fact that the PIQ is not, and was never intended to be, a survey. The PIQ was a discovery device – like an interrogatory or a deposition upon written questions. (Jan. 21, 2005 Hr'g Tr. (Dkt. # 7680) at 132-33 (Court likening PIQ to a "series of interrogatories"); June 27, 2005 Hr'g Tr. (Dkt. # 8961) at 80 ("Rather than taking depositions of 400,000 personal injury plaintiffs, we're going to do it through claim forms. So it will be approved.")) Jacoby offers no explanation of how or why survey principles should apply to discovery devices, and cites no precedent for that proposition.

Jacoby's opinions are baseless. He considered no objective evidence of the reliability of the PIQs; he merely relied upon factual assumptions supplied by claimants' counsel, many of which are plainly contradicted by the record. Where Jacoby did examine actual evidence, he reviewed only select data – cherry-picked by counsel for the FCR – and did not review contradictory evidence that would undermine his opinions. (Jacoby Dep. at 113, 119-22, 176-78) Other courts have excluded Jacoby's expert opinions for failing to examine actual data and instead relying on personal beliefs as well as for ignoring data that contradicted his preconceived notions. *See Smith v. Ames Dep't Stores, Inc.*, 988 F. Supp. 827, 834 (D.N.J. 1997) (excluding Jacoby's report because his "failure to consider data gleaned from actual consumers limits its value"); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1273-74 (S.D.N.Y. 1990) (harshly criticizing Jacoby's methodology because he constructed his study to prove his

conclusion regardless of the actual facts).  Here Jacoby's only consideration of the facts was to accept a number of unverified assumptions supplied to by counsel.  (*See*, *e.g.*, Jacoby Rpt. at 9-13)  When an expert's opinion is based on factual assumptions, "those assumptions 'must find some support in the record.'"  *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (quoting *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 262 (3d Cir.1984)).  Jacoby candidly admits that he does not "have any expertise to know if the assumptions [provided to him by counsel] are true or not."  (Jacoby Dep. at 48)  He did not "do any independent research to determine if any of [the] assumptions were correct."  (*Id*. at 49)  Rather, Jacoby simply "accepted" that all of the assumptions supplied by counsel were correct "in good faith."  (*Id*.)  This renders his opinions unreliable and inadmissible.  *See*, *e.g.*, *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3rd Cir. 2003) (barring expert's testimony because it was based on selective sampling of materials from counsel); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004) (opinion based on materials "spoonfed" by counsel inadmissible).

## II.   GRACE'S NON-ESTIMATION *DAUBERT* ISSUES.

Finally, Grace has identified three *Daubert* issues that cut across multiple experts whose testimony may be at issue in the estimation hearing.

### A.   Issues Related to Exposure Evidence.

Grace has moved to preclude any expert opinion to the extent it relies upon "settled-dust analysis" or the "indirect prep method" to draw conclusions as to whether a claimant can establish the requisite exposure to Grace's asbestos-containing products.

#### 1.   Settled-dust analysis.

Claimants may seek to introduce expert testimony that purports to establish inhalation exposure via measurements of asbestos fibers in settled surface dust.  This Court has already

determined that settled-dust analysis is not reliable to prove exposure.  *W.R. Grace*, 355 B.R. at 487 n.103 ("air sampling provides a better indication of airborne exposure. . . .  [D]ust sampling is not an accepted measurement of individuals' exposure levels."); *In re Armstrong World Indus., Inc.*, 285 B.R. 864, 871 (Bankr. D. Del. 2002) ("*Armstrong II*") (settled dust analysis fails both the reliability and fit prongs under *Daubert*, because it does not establish whether respirable asbestos fibers are or could become airborne – as they must to pose a threat to human health). Settled-dust analysis provides no information regarding what is in the air, nor does it indicate what is likely to become airborne.  The standard method used to analyze settled dust, known as ASTM D5575, recognizes as much, and expressly states that "no relationship has been established between asbestos-containing dust as measured by this test method and potential human exposure to airborne asbestos."  ASTM D5575 § 5.1.2.  Claimants' own experts, William Longo and Steven Hays, agree that the settled dust method cannot be used to determine airborne asbestos levels.  (Longo Dep. at 200 ("nobody should try to make a determination of what the air level is based on an asbestos-containing dust"); Hays Dep. at 298 ("I agree that I can't take a settled dust number, prepared direct or indirect, for that matter, and convert that into an airborne exposure that would be used to compare to PCM data."))  Recent government research confirms that dust measurements are not a reliable measure of what asbestos fibers are or can be in the air. (EPA, *Summary Report For Data Collected Under The Supplemental Remedial Investigation Quality Assurance Project Plan (SQAPP) for Libby, Montana at ES-2* (Oct. 23, 2007)).  Any expert testimony relying on settled-dust analysis as a means of determining or measuring asbestos exposure should be excluded under *Daubert* and Rule 702.

### 2. Indirect preparation.

Claimants may also seek to introduce evidence of airborne asbestos levels based on air samples subjected to "indirect preparation."  Indirect preparation involves putting the sample in

an acidic solution, shaking it, bombarding it with ultrasound, diluting it, and then distributing it on a new filter for reading under a microscope. By contrast, "direct preparation" examines an air sample as it was collected on the initial filter, without any other procedures that may alter the physical form of any asbestos present. The indirect preparation method is unreliable in determining exposure levels because it changes the material collected by disaggregating single non-respirable bundles of asbestos into thousands or millions of fibers. *See* EPA, *Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy ("TEM") Using Direct and Indirect Transfer Techniques* (Mar. 1990) at 33; ASTM D5575 § 1.4.1 (stating that the ASTM D5755 "may alter the physical form of the mineral fibers"). In fact, the EPA and OSHA require the use of the ***direct*** preparation method to establish compliance with airborne concentration standards. Claimants' expert Longo admits that: (1) peer-reviewed studies have found that indirect preparation alters fiber size and fiber counts; (2) his contrary opinion has not been published in any peer-reviewed literature; and (3) he is unaware of any articles by his peers in the microscopy community supporting his opinion. (Longo Dep. at 177-78, 197) This same evidence was excluded in *Armstrong II*, where the court found that "the indirect method is not a scientifically valid method of *quantifying* the level of asbestos contamination in a room or building." 285 B.R. at 870-71. The same result should obtain here.

> **B.**    **Issues Related to Causation Evidence.**

Grace has moved to exclude the introduction of any expert opinion to the extent it purports to establish causation on the basis of: (a) anecdotal evidence as opposed to epidemiology; (b) epidemiology that shows a relative risk not greater than 2.0 or has a confidence interval that includes a relative risk of 1.0; or (c) the proposition that there is no threshold below which causation cannot be proven, and calculations that rely upon that proposition.

1.      **Anecdotal evidence.**

Epidemiology is the "primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease." *In re W.R. Grace & Co.*, 355 B.R. at 482 (citing *Siharath v. Sandoz Pharms. Corp.,* 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001)). "Epidemiological studies identify and quantify associations between agents and diseases." *Id*. at 482. Courts routinely exclude expert testimony on general causation – particularly for well-known and long-studied conditions such as those at issue here – if it is not based upon valid epidemiological studies. *See In re TMI Litig.*, 193 F.3d 613, 707-08 (3d Cir. 1999) (excluding expert who relied on unreliable epidemiological studies).

"The fundamental scientific limitations of anecdotal evidence have led federal courts to consistently reject individual case reports as a reliable basis for medical causation opinions." *In re W.R. Grace & Co.*, 355 B.R. at 481. *See, e.g.*, *Soldo*, 244 F. Supp. 2d at 462-63 ("Standing alone, a case report does not establish causation. . . . Case reports cannot be used to determine relative risk."); *Siharath*, 131 F. Supp. 2d at 1363 ("[G]iven the limits of case reports in establishing general causation, as recognized by Plaintiffs' experts, the Court must conclude that Plaintiffs' reliance upon case reports as a substitute for epidemiology cannot withstand the scrutiny that *Daubert* requires"); *Hollander v. Sandos Pharms. Corp.*, 95 F. Supp. 2d 1230, 1237 (W.D. Okla.. 2000) ("[C]ase reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation"); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1028 (E.D. Mo. 2000) ("[P]laintiffs' experts' reliance on case reports is not sufficient to make their causation opinions reliable under *Daubert*.").

Many of the causation opinions offered by claimants' experts are based on case studies or personal experiences and are thus unreliable for the purpose of proving causation. Dr. Roggli, for example, opines that his "studies have found that approximately 70% of mesotheliomas in

women are asbestos-related."  (Roggli Rpt. at 2)  Upon examination, however, Dr. Roggli's

"study" turns out to be 40 cases he reviewed over the past 25 years that were referred to him for

consultation in anticipation of litigation.  (Roggli Dep. at 138, 140, 142)  This hardly qualifies as

a study; the sample size and selection bias alone render it useless for purposes of drawing any

conclusions as to the risk of developing mesothelioma.  Similarly, Dr. Welch, who testifies on

behalf of plaintiffs in brake worker asbestos personal injury cases, authored an amicus brief to

the Michigan Supreme Court requesting that it ignore the robust body of epidemiological

literature that finds no causal link between brake work and mesothelioma.  (Welch Rebuttal Rpt.

at App. I)  Although epidemiological studies have specifically investigated the risk of disease

associated with brake work, Dr. Welch does not accept these findings.  She relies on case studies

to support her view instead.  (Welch Dep. at 192-93)  These sorts of opinions demonstrate, at

best, a lack of understanding as to the role of anecdotal evidence and epidemiology in identifying

and showing causation.  The Court should make clear that there is no room for such confusion in

this case by excluding expert testimony that purports to show causation in the absence of, or

contrary to, epidemiological evidence.

### 2.    Relative risks of less than 2.0 and confidence intervals that include 1.0.

In the absence of extenuating factors, "[c]laimants must establish causation by a 2.0

relative risk rate" to meet their burden of proof.  *W.R. Grace*, 355 B.R. at 483.  A relative risk of

2.0 indicates a 50% likelihood that an agent caused a disease, and courts therefore equate a

relative risk greater than 2.0 with the plaintiff's burden of proving that the agent was more likely

than not a cause of their disease.  *See DeLuca v. Merrell Dow Pharm., Inc.,* 911 F.2d 941, 958-

59 (3d Cir. 1990) (requiring Bendectin plaintiffs to establish relative risk of limb reduction

defects arising from epidemiological data of at least 2.0, which equates to more than a doubling

of the risk).  *See also Daubert II*, 43 F.3d at 1320 ("[P]laintiffs must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it.").  Accordingly, courts routinely hold that an expert opinion finding causation where the relative risk is less than 2.0 is not helpful to the trier of fact and must be excluded from evidence.  *See, e.g.*, *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981 (C.D. Cal. 1996); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217 (D. Colo. 1998).

Epidemiology showing a relative risk of 2.0 is a necessary, but not sufficient, basis on which to find causation.  In order for an epidemiological study to support a finding of causation, it must not only show the possibility that exposure more than doubled the risk of disease, it must also show that the finding was unlikely to be the result of chance.  In epidemiological terms, this means that the confidence interval for the relative risk cannot include (*i.e.*, the lower bound of the interval must be higher than) 1.0.  "A risk of 1.0 means that the risk of disease to individuals exposed to an agent is the same as that to unexposed individuals."  *In re W.R. Grace & Co.*, 355 B.R. at 482-83.  As a result, a confidence interval that includes 1.0 will be said to show no statistically significant association between the factor and the disease.  *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311-12 (5th Cir. 1989) (epidemiological studies with lower-end confidence intervals less than 1.0 are not reasonably relied upon by experts to form opinions regarding causation).  *See also Kelley v. Am. Heyer-Schulte Corp.*, 957 F. Supp. 873, 878 (W.D. Tex. 1997) (holding "unreasonable as a matter of law" a causation opinion based on a study with a confidence interval including 1.0).

Dr. Welch, for example, claims that there is evidence of a causal association between asbestos exposure and lung cancer at exposures as low as 4 f/yr.  (Welch Rebuttal Rpt. at 2)  Her

basis for this is a paper by Sullivan that does show a relative risk confidence interval that exceeds 2.0, but the interval does not exclude 1.0.  (Welch Dep. at 243-44)  Dr. Welch conceded that these results are therefore not statistically significant (*id.* at 243), which leaves her with no basis for opining that such exposures double the risk of lung cancer.  These opinions – and any others of the same stripe – are unreliable and should be excluded from evidence under Rule 702.

### 3.    The no-threshold theory.

Claimants' experts advocate a theory that states there is no threshold exposure below which one can say asbestos was not a cause of disease.  (*See*, *e.g.*, Lemen Rpt. at 30 ("A safe exposure concentration has never been identified for exposure to asbestos for which cancer will be prevented."); Welch Rpt. at 16 ("There is no threshold below which we can say there is no risk for lung cancer from asbestos exposure."); Brody Rpt. at 3 ("Even though mesothelioma is a dose-responsive disease, this tumor has been shown to develop in susceptible individuals with relatively brief exposures, and no safe or threshold level of exposure to asbestos has been determined for mesothelioma."))  Under this theory, experts take associations observed at higher levels of exposure and speculate that the relationship persists "downward" to support causation at levels where there is no epidemiologically observed significant increase in the incidence of disease.[6]

The no-threshold theory, and the calculations that flow from it, are not reliable methods for showing causation.  As is clear from the very publications that derive the models, they were

_____

[6]  Even so, some of claimants' own experts have admitted that there are levels at which asbestos exposure does not cause disease.  (*See* Roggli Dep. at 108, 110-12 ("I think there are levels that I would consider to be trivial levels of exposure."), 113 ("I don't ascribe to the one-fiber theory."); Hammer Dep. at 74-75 (admitting to threshold for asbestosis and lung cancer), 77-78 (no proof that very low exposures "would put anyone at a measurable increased risk of developing mesothelioma"))

not intended to be used to support causation at levels below the observed epidemiological data showing increased risk.

> Without actual evidence of low dose responses, the linear non-threshold model cannot be validated below the range of observed response. EPA acknowledges that the low dose response is uncertain and stated this clearly in its 1986 Cancer Risk Assessment Guidelines (EPA 1986b): "It should be emphasized that the linearized multistage procedure [the most common no-threshold model] leads to a plausible upper limit to the risk that is consistent with some proposed mechanisms of carcinogenesis. Such an estimate, however, does not necessarily give a realistic prediction of the risk. The true value of the risk is unknown, and may be as low as zero."

(Anderson Rpt. at 7-8 (quoting EPA, *Guidelines for Carcinogen Risk Assessment*, 51 Fed. Reg. 33992, 33997-98 (1986)). *See also* EPA, *Guidelines for Carcinogen Risk Assessment*, 51 Fed. Reg. at 33,993-94 (1986) (noting subjective nature of risk assessments based on uncertainty inherent in very low exposures); Hodgson JT, Darnton A., *The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure*, Ann. Occup. Hyg. 44:565-601 at 575-76 (2000) ("The standard assumption is that, other things being equal, the risk will be proportional to dose; but this is more a cautious default assumption than anything more soundly based."); Berman DW, Crump, KS, *Final Draft: Technical Support Document For a Protocol to Assess Asbestos-Related Risk*, EPA at A4 (2003). (*See also* Moolgavkar October Rpt. at 7; Lemen Dep. at 121)

Courts require experts to properly quantify the dose that is sufficient, based upon reliable epidemiology, to cause disease. *See e.g.*, *In re TMI Litig.*, 193 F.3d at 674 (opinion that agent caused disease not "helpful to the trier of fact" where expert could not testify to the dose received). This Court also rejected the "no threshold" model in its *ZAI* opinion: "The use of the no safe level or linear 'no threshold' model for showing unreasonable risk 'flies in the face of the toxicological law of dose-response . . . .'" *In re W.R. Grace & Co.*, 355 B.R. at 476 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence at 475 (2nd ed. 2000)). Other

courts have also excluded the same experts tendered by claimants here where they have offered testimony predicated on the "no threshold model" of causation. *See, e.g., Georgia-Pacific Corp. v. Stephens*, No. 01-05-00132-CV, ___ S.W.3d ___, 2007 WL 2343882 at *15 (Tex. Ct. App. Aug. 13, 2007). In *Georgia-Pacific*, the Texas Court of Appeals held testimony was unreliable and inadmissible where the expert failed to show that the theory that "***any*** exposure to a product that contains asbestos results in a statistically significant increase in the risk of developing mesothelioma" was generally accepted in the scientific community. *Id.* (emphasis added). All no-threshold causation opinions, and any calculations that derive or rely upon them to show causation, should be excluded under Rule 702.

### C.    Issues Related to Diagnostic Evidence.

Grace has moved to exclude any expert opinions to the extent they are based upon unreliable diagnoses of disease. Claimants' estimation experts base much of their opinions on historical data as to the number of individuals filing claims alleging they developed disease as a result of exposure to Grace's asbestos-containing products. They pointedly ignore, however, any inquiry into whether the historical claims on which they base their estimates were made by people who actually had the disease alleged – despite the fact that several doctors whose diagnoses are at issue have disavowed their diagnoses or even claimed that they never made diagnoses of asbestos-related disease. (*See* Haber Rpt. at 3; *see also*, *e.g.*, Jan. 11, 2007 Levine Resp. to Grace Dep. by Written Question No. 162 at 187)  Yet there is no denying that to the extent the diagnoses on which those claimants relied turn out to be unreliable, any estimates that assume such claims have value is likewise rendered unreliable and inadmissible under Rule 702.

There are accepted medical and scientific standards for diagnosing nonmalignant asbestos-related disease.  To make such a diagnosis, a physician must find:

- An exposure history with an appropriate latency period;[7]

- Chest radiograph evidence of small irregular opacities with an appropriate profusion;[8]

- A pulmonary function test ("PFT") revealing a restrictive impairment and below-normal diffusion capacity;[9]

- Physical signs and symptoms as indicated by physical examination;[10] and

- A differential diagnosis of asbestosis ruling out alternative causes of disease.[11]

(*See generally* Weill Rpt. at 25-36)  The vast majority of the diagnoses performed to date on Grace claimants has failed to meet these standards.  (*See generally* Haber Rpt. (6/11/07))  These diagnoses, and any expert opinions that depend on their accuracy, must be rejected.

**Inadequate Exposure History.**  The testimony of doctors and screeners as well as documents produced by doctors demonstrate that they routinely diagnosed patients without

---

[7] An appropriate exposure history is critical to the diagnosis of occupational lung diseases. There are several "essential" elements of an exposure history:  type of work performed described in sufficient detail; duration of each job performed; type of asbestos-containing products used; and qualitative description of intensity of exposure. (Weill Rpt. at 27)  *See Diagnosis and Initial Management of Non-Malignant Disease Related to Asbestos*, ATS Statement Paper 2004, Am. J. Resp. CCM v.170 691, 695 ("ATS Guidelines").

[8] In the context of occupational lung disease, x-ray interpretation is governed by the ILO classification system. (*See* Weill Rpt. at 30 (describing abnormalities); Henry Rpt. at 10; Haber Rpt. at 24-25)

[9] (*See* Weill Rpt. at 25; Haber Rpt. at 19-20)  *See also* Miller, M.R., Crapo, R., *et al.*, *Series ATS/ERS Task Force: Standardization of Lung Function Testing – General  considerations for lung function testing*, Eur. Resp. J. 26 at 157 (2005).

[10] A physical examination is essential for diagnosing an asbestos-related disease.  (Weill Rpt. at 28)  Although physical examination findings are rarely specific for any particular occupational lung disease, there are a number of findings (*e.g.*, peripheral cyanosis, finger clubbing, or chest examination abnormalities) that may indicate that lung disease is present. (*Id.*)

[11] Given that asbestosis resembles numerous other diseases on x-ray, a diagnosing doctor must exclude other possible etiologies of chest x-ray abnormality.  (*See* ATS Guidelines at 702)  The main factor that a doctor should use in excluding other causes of the abnormality is a careful exposure history taken in the manner described above. (*See* Weill Rpt. at 36)

obtaining adequate exposure histories.  The exposure histories they used were taken by lawyers, paralegals, or untrained screening company personnel, and in most instances the doctors simply indicated the person's occupational title.  Often, they would only be told that the person "had exposure to asbestos consistent with asbestosis."  (*See*, *e.g.*, Feb. 18, 2005 Ballard Testimony at 55, 58, *In re Silica Prods. Liab. Litig.*, MDL 1553, 398 F. Supp. 2d 563 (S.D. Tex. 2005); Conner Dep. at 41, 90, 103, 125, 138; Gaziano Dep. at 190-194)  Critically, the exposure histories used by the doctors in the screening process are devoid of the details the ATS Guidelines deem sufficient to form the basis of a diagnosis of an asbestos-related illness – duration, intensity, time of onset and setting of exposure experienced by the patient.  (*See* ATS Guidelines at 695 (commenting that "the occupational title is not enough, as the names of many occupations and trades are uninformative"); *see also* Haber Rpt. at 55-56 (discussing the level of detail in Dr. Segarra's occupational histories); *id.* at 61-62 (discussing Dr. Schonfeld); *id.* at 67 (discussing Drs. Mezey & Krainson); *id.* at 14-15 (discussing RTS method for obtaining employment histories); *id.* at 16 (discussing Healthscreen))

**No Physical Examination.**  Evidence also demonstrates that the doctors who rendered diagnoses in the screening context often did not perform a physical examination and did not believe one was necessary in order to diagnose an asbestos-related disease.  (*See* Gaziano Dep. at 271-72; Oaks Dep. at 191; *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 600, 604-06, 630, 638 (discussing Dr. Ray Harron))  Even when the doctors did perform a physical exam, the exams were often too cursory to be sufficient for purposes of diagnosing a claimant with an asbestos-related disease.  (*See* Haber Rpt. at 43-46 (discussing Dr. Nayden))

**Appearance of Disease on a X-Ray/Radiograph.**  Diagnoses also failed to meet the ILO standards.  A number of doctors asserted their Fifth Amendment privilege against self-

incrimination when asked whether they adhered to the ILO standards.  (*See generally* R. Harron Dep. at 78-79; A. Harron Dep. at 15-16, 44; Ballard Dep. at 66)  Other doctors testified that they accepted differential payment depending on the results of their diagnoses, which NIOSH has deemed to be unethical.  (*See*, *e.g.*, Lucas Dep. at 70-71; Haber Rpt. at 25 (discussing Dr. Ballard); *id.* at 49 (discussing Dr. Altmeyer))  Moreover, the doctors often knew the disease for which they were screening.  (*See* Haber Rpt. at 25 (discussing Dr. Ballard's practices); *id.* at 47-48 (discussing Dr. Oaks); *id.* at 59 (discussing Dr. Gaziano); *id.* at 15 (discussing RTS practices))  An x-ray study conducted by Grace's expert Dr. Daniel Henry suggests that these practices have lead to the gross "over-reading" of x-rays.  A panel of three independent B-readers found that the claimants' B-readers analyzed in the study over-read x-rays in 60% to 100% of the cases.  (*See generally* Henry X-ray Rpt.; Henry Supp. X-ray Rpt. at 1-2)  Further, for certain law firms, the law firms' B-readers over-read x-rays between 35% and 94% of the time.  (*Id.*)  These dramatic results underscore the impact of using unreliable practices.

**Pulmonary Function Tests.**  The evidence also demonstrates that in many cases the doctors and screening companies who generated asbestos diagnoses did not comply with the ATS standards for taking and interpreting PFTs.  Grace expert Dr. Weill analyzed 150 PFTs selected as a random sample from the non-malignant claimants.  None satisfied all of the ATS requirements.  (*See* Weill Rebuttal Rpt. at 38-40; *see also* Haber Rpt. at 40 (discussing Dr. Mitchell); *id.* at 68 (discussing Drs. Mezey & Krainson); *id.* at 17 (discussing Healthscreen); *id.* at 19 (discussing PTS's practices, including charging only for PFTs that found impairment); *id.* at 21 (discussing PFL))

**No Differential Diagnosis.**  Finally, the evidence demonstrates that in most cases the doctors did not perform a differential diagnosis prior to diagnosing an asbestos-related disease.

(*See* Gaziano Dep. at 48; Oaks Dep. at 107; *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 600, 604-06, 630, 638 (discussing Dr. Ray Harron); Haber Rpt. at 45 (discussing Dr. Nayden); *id.* at 63 (discussing Dr. Schonfeld); *id.* at 64 (discussing Dr. Castiglioni))  These repeated, and compounded deficiencies in the record of the very claims at issue in this proceeding have far-reaching implications – not only for those claims that have no reliable evidence of an asbestos-related disease, but for the estimation opinions that depend upon large numbers of deficient claims to opine as to the current and expected number of claims for which Grace should pay.

## **CONCLUSION**

For the reasons set forth above, this Court should exclude the testimony of claimants' experts opinions as requested in Grace's *Daubert* motion.

December 7, 2007                              Respectfully submitted,

KIRKLAND & ELLIS LLP

/s/ David M. Bernick, P.C.
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, IL  60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

-and-

PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

*Co-Counsel for the Debtors and Debtors in Possession*