# EXHIBIT 8

# EXPERT REPORT OF JACOB JACOBY, PH.D.

September 25, 2007

## *In re W.R. Grace & Co., et al., Chapter 11*

Pending before

## Hon. Judith K. Fitzgerald

Bankruptcy, District of Delaware

Trademark Association, International Bar Association, American Intellectual Property Law Association, Practicing Law Institute, Federal Trade Commission, National Association of Attorneys General, and at New York University and Fordham University, among others.

A complete description of my qualification is in my Curriculum Vitae, which along with a list of publications I have authored in the past ten years, is attached as Appendix A. A list of cases in which I have testified as an expert within the past four years is attached as Appendix B. I am being compensated at my standard rate of $750 per hour for my work on this report and in preparation for any testimony. For my time spent testifying, I will charge my standard rate of $850 per hour. A list of materials I relied upon is attached as Appendix D.

### III. REQUIRED ELEMENTS AND FOUNDATION OF A RELIABLE, ADMISSIBLE SURVEY

The threshold requirement that must be met in order for survey results to meet basic standards of reliability and trustworthiness is that the survey must "fit the issues to be decided in [the] case." Merisant Co. v. McNeil Nutritionals LLC, 242 F.R.D. 315 (E.D.Pa. 2007).[5] Simply stated, the survey must ask relevant questions. See Federal Judicial Center ("FJC") *Reference Manual on Scientific Research*, Second, "Reference Guide on Survey Research", Section II.A, at 236-237 (2000). It must be designed to achieve the survey proponent's stated objectives by addressing the specific questions raised in the case.

Assuming that the survey is designed to meet its objectives by asking relevant questions, the FJC's *Manual for Complex Litigation*, Fourth, Section 11.493, at 118 (2007) and the FJC's *Reference Manual on Scientific Evidence*, Second, "Reference Guide on Survey Research,"

---

[5] In this declaration I refer to legal treatises and pertinent case law. Although I am a social scientist, not a lawyer, for nearly 30 years I have been designing and conducting surveys that are admitted as evidence in litigated matters. My work has therefore required me to study and gain an understanding of what federal and state courts, and other authoritative legal sources have said constitute proper (and improper) survey methodologies.

5

Section II, at 236-39 (2000) provide the following framework that survey researchers and triers of fact must consider when surveys are proffered as evidence in litigated matters.

    A.    The survey was conducted by qualified survey experts following proper survey procedures;

    B.    The population was properly chosen and defined;

    C.    The sample chosen was representative of that population;

    D.    The questions asked were clear and not leading;

    E.    The data gathered were accurately reported;

    F.    The data were analyzed in accordance with accepted statistical principles;

    G.    The process was conducted so as to ensure objectivity.

In order to establish trustworthiness, the proponent of the survey has the burden of establishing that the survey has been conducted according to these generally accepted survey principles.[6] As indicated above, in my opinion the Grace PIQ survey fails to meet many of these basic requirements.

In addition, surveys that relate to litigated matters are typically accompanied by a survey report, submitted by the survey expert who oversaw the survey design and administration. As the FJC's *Reference Manual on Scientific Evidence* states: "The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey." A survey report should include the following:[7]

    1.    the purpose of the survey;

---

[6] See Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494 (3d Cir. 1998), quoting Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978). ("A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. The proponent of the evidence has the burden of establishing these elements of admissibility.").

[7] See FJC *Reference Manual on Scientific Research*, Second, "Reference Guide on Survey Research", Section IV.B, at 270-71 (2000).

2.   a definition of the target population and a description of the population that was actually sampled;

3.   a description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria, and other pertinent information;

4.   a description of the results of sample implementation, including (a) the number of potential respondents contacted, (b) the number not reached, (c) the number of refusals, (d) the number of incomplete interviews or terminations, (e) the number of noneligibles, and (f) the number of completed interviews;

5.   the exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits;

6.   a description of any special scoring (e.g., grouping of verbatim responses into broader categories);

7.   estimates of sampling error, where appropriate (i.e., in probability samples);

8.   statistical tables clearly labeled and identified as to source of data, including the number of raw cases forming the base for each table, row, or column; and

9.   copies of interviewer instructions, validation results, and code books.

I am unaware that Grace has submitted any survey report in support of the survey data relied upon by its various experts.

## IV.   <u>OPINIONS</u>

By way of brief background, in an effort to learn whether the claimants who have claims currently pending against Grace meet Grace's selected liability criteria, Grace developed and utilized the PIQ. I understand that the pool of intended PIQ respondents consisted of all claimants who, according to Grace's historical Case Management System ("CMS") records, had sued Grace on or before its bankruptcy petition date (April 2, 2001) for personal injury or

7

From what Grace has outlined above, I see that its objective for the PIQ survey was to learn whether claimants "will be able" to prove their cases against Grace at some future time. With that overarching question in mind, counsel for the FCR asked me to assume that the time when an asbestos claimant is typically required to prove his or her case, i.e., the time when a claimant "will be able to ... prove" the case, is at the time of summary adjudication or trial.

Further, in assessing whether Grace's PIQ asked the relevant questions in order for Grace's experts to determine "whether the [claimants' PIQ] evidence provided ... will be able to scientifically prove" their cases against Grace, I assumed as true additional testimony from Grace expert, Dr. Bragg, regarding his procedures and the information he relies upon in performing claimant asbestos exposure analyses. Finally, I was asked by counsel to assume certain additional facts as true relating to the status of the Grace claimants' files at the time they responded to the PIQ and about how (and when) claimants' attorneys typically undertake to prepare their clients' cases for summary adjudication or trial. I note that Dr. Bragg's testimony is consistent with, and corroborates a number of the assumptions supplied by counsel. These additional assumptions are set forth below.

### 1.    **Factual Assumptions**

In assessing whether the Grace PIQ was properly designed to meet Grace's stated survey objectives, I assumed following facts as true.

#### a.    **Assumptions About the Types of Information Necessary for Industrial Hygienists to Form Opinions About Claimant Asbestos Exposure**

I have assumed that the following testimony from Grace expert witness, Dr. Gordon Bragg, correctly summarizes the types of information relied upon by industrial hygiene experts when forming their professional opinions about claimant asbestos exposure.

> Q: Have you performed an exposure analysis for an individual claimant before?
>
> A: Many times.
>
> Q: Can you describe to me what goes into such an analysis?
>
> A: A data-gathering process which, in most of the reports and depositions that I do, would include inquiring, obtaining <u>answers to interrogatories from both sides</u>, and particularly concentrating upon the <u>deposition of the claimant or upon the coworkers who may form the technical basis claimant</u>, a review of the <u>fundamental exposure data that most closely relates to this individual's exposure</u>, bringing that together to analyze the fundamental factors in an exposure analysis which would be, the mantra is proximity, duration and frequency, but that that, I would add source, <u>what is the source, the intensity; that is, the intensity of the original disturbance or source, if there is one</u>; variability, <u>is this source a variable source</u> or do the -- does the exposure data tend to be more closely grouped, and converting that into an exposure analysis which typically results in a measurement of comparing daily exposures to current or existing PELs at the time, as the case may be, and also relating it to regulatory exposures and relating it to background exposures. (emphasis supplied)[10]

I have also assumed as true the following testimony from Dr. Bragg as to whether the PIQ provides the information that he typically relies upon when forming his opinions about a claimants' asbestos exposure.

> Q: It is possible, however, that an individual filling out this PIQ could fill out the information requested and you would still not have a full appreciation of the three mechanisms as they applied to the claimed ACM?
>
> [Objection]
>
> A: In performing an exposure analysis, I would certainly feel <u>this is a bare minimum</u>.
>
> Q: Meaning that you would ideally, in performing an exposure analysis, acquire additional and more particular information as to the exposure and the mechanism applied to the ACM?
>
> [Objection]

---

[10]    Bragg Trans., at 136-37.

> A: <u>When I do these exposure analyses, I almost always have more information than a modestly filled out PIQ would provide.</u>
> (emphasis supplied)[11]

### b. Assumptions Regarding Claimants' Information Available to Answer the Grace PIQ

As to the general background, status and nature of the information contained in the Grace claimants' files as of the petition date and the time they responded to the PIQs, counsel asked that I assume the following.

* Summons and complaints filed on behalf of asbestos claimants are based upon the information known at the time the complaint is filed. This information typically is preliminary, and far from complete.

* Many asbestos personal injury plaintiffs do not have personal or comprehensive knowledge of all the specific asbestos containing products to which they were exposed.

* It is typical for an asbestos personal injury claimant to sue ten or more defendants, and the majority of the cases of Grace claimants who received PIQs had not yet been prepared for trial or the defense of summary judgment motion practice as of the date of Grace's bankruptcy on April 2, 2001.

* Grace claimants have taken little, if any, discovery from Grace since April 2, 2001 due to (i) the automatic stay on discovery and trial imposed on all claimants' cases as of April 2, 1001, and/or (ii) Grace's successful resistance of plaintiff efforts to lift the discovery stay. Since April 2001, the claimants' attorneys have had little tactical or economic incentive to continue to develop their clients' cases against Grace, and few, if any, have done so.

* The information provided in 2006 and 2007 by the claimants' attorneys in response to the Grace PIQ was drawn from the claimants' files, and generally these had not been further developed or updated after April 2001, and in many instances had not been updated for some time before April 2001 because the cases had not yet moved into discovery.

---

[11] Bragg Trans., at 143-44.

### c. Assumptions Regarding Steps Taken by Plaintiff Attorneys to Prepare Asbestos Personal Injury Case for <u>Summary Judgment or Trial</u>

I was also asked to assume that most plaintiffs' counsel prove their client's <u>exposure</u> to a particular defendant's asbestos-containing products through any or all of the following evidence, and, in most cases, that the identification, discovery and preparation of this evidence does not occur until the case is being prepared for summary judgment motion practice, or for trial. In particular, I have assumed that if a claimant was permitted to take Grace to trial, counsel would undertake full work up of the case to include the following, but in the vast majority of cases, this case development has not been undertaken.

* Testimony from co-workers concerning asbestos products, working conditions, and frequency of exposure at a particular place at a particular time where the plaintiff was present and/or worked.

* Document and deposition discovery of Grace's records and former employees relating to a particular job site or job sites where the plaintiff was known to have been present.

* Discovery from third party sources such as product distributors, purchasing agents, and state asbestos abatement records about Grace's asbestos products at particular locations.

* Testimony from prior trials or depositions concerning Grace's asbestos products at a place and time where the plaintiff was known to have been present.

* Expert testimony from industrial hygienists or similar experts about likely asbestos exposures given the plaintiff's working situation and exposure to Grace products.

* Expert testimony from medical doctors concerning whether the plaintiffs' lungs or pleura show evidence of asbestos exposure.

In addition to assuming that plaintiffs' counsel would prepare the case to prove exposure to a given defendant's or group of defendants' asbestos fibers, I have also been asked to assume that plaintiffs' counsel would endeavor to obtain expert testimony from medical experts to prove causation and injury, and that such expert evidence would be used to supplement the medical

12

information available when the case was initially filed. In preparing the case, the plaintiff's medical records typically would be reviewed by a doctor or doctors with expertise in the relevant medical subspecialty. If the plaintiff were still living, the plaintiff would possibly undergo further medical tests. Finally, I have assumed that by the time of summary judgment or trial, the plaintiff would obtain and present medical expert testimony summarized as follows.

* In mesothelioma cases, testimony from a doctor that to a reasonable degree of medical certainty, the plaintiff's mesothelioma was caused by asbestos exposure and that given the facts of exposure to a particular defendant's product as described by witnesses or otherwise demonstrated by the exposure evidence presented at trial (or on summary judgment) that the exposure to the defendant's asbestos fiber caused, was a significant factor in causing, or contributed to the cause of the mesothelioma.

* In lung cancer cases, testimony from a doctor that to a reasonable degree of medical certainty, asbestos exposure caused or contributed to the cause of the plaintiff's lung cancer. Such experts would also usually testify that given the facts of exposure to a particular defendant's product as described by witnesses or otherwise proven at trial (or on summary judgment) that the exposure to the defendant's asbestos fiber caused, was a significant factor in causing, or contributed to the cause of the lung cancer.

* For non-malignant cases, the plaintiff would typically have a more recent chest x-ray taken, pulmonary tests performed, an HRCT (high resolution chest x-ray) taken in appropriate cases. The plaintiff would obtain and present expert testimony from a doctor that to a reasonable degree of medical certainty, the plaintiff has a non-malignant disease that was caused by exposure to asbestos. The medical expert would also typically opine that given the facts of exposure to a particular defendant's product as demonstrated by the evidence at trial (or on summary judgment) that the exposure to the defendant's asbestos fiber caused, was a significant factor in causing, or contributed to the cause of the non-malignant disease. The expert would likely also opine on the prognosis and adverse health impacts as a result of having an asbestos-related non-malignant disease.

Finally, I was asked to assume that in the majority of claimant cases against Grace, the above expert evidence and opinions had not been obtained at the time the claimants responded to the Grace PIQ.