# EXHIBIT 11

# EXPERT REPORT ON BEHALF OF W.R. GRACE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

Prepared by
Daniel P. Myer and Mark T. Eveland
September 24, 2007

# EXPERT REPORT ON BEHALF OF W.R. GRACE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS

## 1. INTRODUCTION

Verus Claims Services, LLC ("Verus") has been retained by the W.R. Grace Official Committee of Asbestos Personal Injury Claimants to review responses to the W.R. Grace Asbestos Personal Injury Questionnaire ("PIQ") and accompanying attachments for 2,463 claimants identified as mesothelioma cases by Rust Consulting. The purpose of this review was to determine whether the information included in claimants' responses to the PIQ and attachments included information that was sufficient to preclude a valid personal injury claim against W.R. Grace & Co. ("Grace"), including (i) medical documentation supporting the diagnosis of Mesothelioma, and (ii) allegations of exposure to asbestos and/or asbestos-containing products manufactured, marketed, or supplied by Grace and/or its subsidiaries. In connection with this review, we have also been asked to review and comment on the June 18, 2007 report of B. Thomas Florence, Ph.D. entitled "Estimation of the Number and Value of Pending and Future Asbestos-Related Personal Injury Claims: W.R. Grace".

Our opinion is limited to the evaluation of the estimation provided by Grace's experts; we have not provided an independent estimation of the extent of Grace's total liability. Verus Claims Services, LLC is being compensated at $400 per hour for our testimony and between $50 and $200 per hour for other work contributing to this report. We reserve the right to modify this report as new information is made available between now and the time of trial.

## 2. EXPERIENCE

As a supplement to the Curriculum Vitae of Mark Eveland, which is attached as Exhibit A, a brief summary of his experience relative to asbestos personal injury claims is provided:

3

Over the past 14 years, Mark has been active in the administration of claims processing for approximately 20 different asbestos defendants, beginning with his involvement with the Center for Claims Resolution in 1993. He has been either directly or indirectly involved in the development, implementation and management of processes for tracking lawsuits, gathering of discovery documentation, evaluation and processing of settlements for over 500,000 asbestos personal injury claims filed in the tort system in nearly every jurisdiction within the United States.

As a supplement to the Curriculum Vitae of Dan Myer, which is attached as Exhibit B, a brief summary of his experience relative to asbestos personal injury claims is provided. Since 1982, Dan has been active in the overall management of asbestos personal injury claims in various supervisory and management positions for approximately 40 different defendants. Dan has evaluated, negotiated, and settled asbestos personal injury cases with virtually every major asbestos plaintiff's firm in the country. Dan has served as an expert witness in the area of asbestos claims management, spoken at national seminars on the topic of asbestos claims handling, and served as an escrow agent and court appointed trustee for asbestos personal injury settlements. Dan has negotiated various types of settlements of asbestos personal injury claims, including single cases, group settlements, global settlements, and inventory settlements dealing with thousands of claims. Over the past 25 years, Dan has been active in the area of asbestos claims management involving asbestos personal injury claims in virtually every state throughout the country.

Since 2001, we have provided claims management services for a number of active tort defendants, including Certainteed Corporation, Foseco, National Service Industries, and Union Carbide Corporation. In such capacity we are actively involved in developing settlement strategies, evaluating cases and negotiating settlements of trial listed cases in nearly every jurisdiction with an active trial docket.

In addition to providing claims management services for a number of tort defendants, our firm also serves as claims administrator for the Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust, Plibrico Asbestos Trust, ARTRA Asbestos

| | | |
|---|---:|---:|
| Unlikely Exposure based on Occupation | 40 | 1.6% |
| Total: | 2,463 | 100.0% |

Dr Florence's estimate excludes any claim without specific allegations of Grace asbestos-containing product exposure in the PIQ responses, assuming that the information provided by a plaintiff responding to the PIQ is all the evidence he or she would be ever able to amass to support their underlying legal claim. This assumption contradicts our experience in handling claims for both tort defendants and asbestos trusts. It is our opinion that the information provided can not be used to support the conclusion that the claims we have classified as "Possible Exposure" and "Unlikely Exposure" should be excluded from estimations of Grace's liability. Our opinion is based upon our experience in managing asbestos personal injury tort claims and knowledge of the extent and timing of discovery in asbestos litigation. Defendant specific product identification evidence is usually scant during the pendency of a case. Given the high volume of claims pending at any given time and the finite resources of plaintiff firms, discovery efforts are focused mainly on trial listed claims. Detailed product identification evidence against a specific defendant is usually developed as discovery progresses and co-defendants settle or are dismissed, narrowing the focus of plaintiff's discovery efforts on the remaining defendants.

The automatic stay entered upon the filing of Grace's bankruptcy petition had the effect of freezing all discovery as to Grace for claims pending at the time. As a result, the information provided in the PIQs and attachments must be viewed as incomplete and preliminary. Were plaintiffs permitted to proceed with defendant specific discovery, a significant number of the claims classified as Possible Exposure would likely have been able to establish proof of exposure to Grace asbestos containing products, and a limited number of the Unlikely Exposure claims may have been able to establish such proof as well.

Dr. Florence's estimate of the number of future claims is based in part on the number of historical closed claims in his sample which met the assumed criteria[2]. In their analysis

---

[2] Report of B. Thomas Florence dated June 18, 2007, p. 16.

of the closed claim files, ARPC assumes that the documents provided by Grace would have included all evidence plaintiffs had or would have regarding evidence of Grace exposure or medical issues. Based upon our experience managing claims for tort asbestos personal injury defendants and asbestos trusts, this assumption is not supported by standard practice of plaintiffs and defendants for documenting settlements. Plaintiffs do not typically provide defendants with all the supporting materials they have about the exposure or medical case at the time of settlement - which may include large quantities of documents and deposition testimony about exposure sites and specific product identification. Rather, they only provide a subset of the available documentation as required by the specific terms and conditions of a given settlement in order to deem the claim eligible for compensation. In the case of settlements involving trial listed cases, the documentation of product identification resides in the files of local defense counsel and/or plaintiff counsel, and is usually not provided to a central administrator post-settlement. In such cases plaintiff counsel usually provides the settlement administrator with little more than supporting medical documents and a release. In larger inventory settlements, a list of stipulated exposure sites is often negotiated for the group, and claimants with exposure at these sites are usually not required to provide the settlement administrator with product identification documentation. As a result, there may often not be any documentation in the files for these individual claimants which supports exposure to the defendant's products. Rather, these claim files must be considered in conjunction with other evidence that may be maintained in the files of national or local defense counsel, or an insurance carrier, or plaintiff counsel, or another party involved in the negotiation. As a result of these practices, the closed claim files reviewed by ARPC likely do not represent the sum total of all available evidence for each individual case, and Dr. Florence's estimate therefore excludes historical closed claims for which sufficient support to meet the assumed criteria resides elsewhere.

The Nature of Exposure as defined in Part III of the PIQ was coded when available, but was not considered in the classification of exposure evidence shown above. Not only was this information scarce (only 16% of the PIQs reviewed included a response to this question), but experience in the tort system and in administering Trusts shows that the

information sought in this regard is irrelevant in determining whether a claimant has sufficient exposure to establish a valid claim against a defendant or Trust.

Dr. Florence's estimate assumes that only those claimants with exposure arising from personally mixing or installing Grace asbestos-containing products could have a valid claim[3]. In our opinion, this is an invalid assumption because it is usually sufficient – in both the tort system and asbestos personal injury Trusts - for a claimant to establish that he or she worked in general proximity to an area where asbestos-containing materials were fabricated, repaired, installed, damaged, or otherwise disturbed in order to establish the defendant's liability. While the nature of the claimant's exposure may have an effect on the *relative* valuation of a claim in the tort system or under the Individualized Review programs established by most current Trusts – with higher settlement values going to claimants with heavier, direct exposure – it does not serve to bar claimants with indirect, bystander, or secondary exposure.

When Mr. Myer goes into settlement negotiations on behalf of his clients (who are asbestos defendants or groups of asbestos defendants), he uses his own working knowledge of the current "total gross value of a mesothelioma case", or, the amount of money a plaintiff would typically collect from all defendants as an aid in settlement negotiation to help him negotiate the best settlement he can for his particular clients. Our historical experience is that the total gross value has increased on a nationwide average basis over the past several years. The total gross value of a mesothelioma case in the time period of 1999- 2000 was approximately $2,500,000 to $3,500,000. The current total gross value of a mesothelioma case, on a nationwide average basis, is higher, approximately $5,000,000 to $8,000,000. We base this observation and working knowledge of the total gross value on hundreds of conversations over many years with various plaintiffs counsel, defense counsel, magistrates, judges, and mediators. The following factors (among others) have all contributed to the increase in the total gross value of mesothelioma cases from 1999-2007:
- The addition of non-traditional defendants in the litigation

---

[3] Report of B. Thomas Florence dated June 18, 2007, pp. 8-9.

10