# EXHIBIT 12

# W. R. Grace

# Projected Liabilities for Asbestos Personal Injury Claims

## As of April 2001

## Mark A. Peterson

## Legal Analysis Systems

## June 2007

# Executive Summary

## Purpose and Approach

This report summarizes results of analyses to estimate the liability of W. R. Grace ("Grace") for asbestos personal injury claims that had been filed and were unresolved ("pending claims") and claims that would be filed in the future ("future claims") as of the date of Grace's bankruptcy petition, April 2, 2001.

## Source of Grace's Liability

Grace is an unusual asbestos defendant. Grace was both a miner and manufacturer with a broad array of over 200 asbestos-containing products that were sold directly to the public and used in many different industries. From 1923 the Zonolite Company, which Grace acquired in 1963, mined, processed and sold vermiculite, an ore that was contaminated with tremolite, a particularly dangerous amphibole form of asbestos. Vermiculite dust is primarily responsible for the widely publicized health problems in Libby Montana. Grace also used chrysotile, another form of asbestos, in products that it manufactured and sold. Grace continued to mine vermiculite until the 1990s, selling asbestos containing fibers and commercial and consumer products for years after other major companies stopped such sales. Despite its large numbers of asbestos products and its sales of asbestos containing fibers and products in eight decades, Grace arrived late as a primary asbestos defendant before quickly becoming one of the greatest current targets of litigation by the time of its bankruptcy petition.

## Data Sources

In analyzing and forecasting Grace's asbestos liabilities we use a 2002 Grace claims database. We also consider and draw upon the experiences of other asbestos defendants who have continued to receive and settle asbestos claims during the six years since Grace entered bankruptcy. We can better understand what would have been Grace's asbestos liability at and after its petition date by examining what has happened with other defendants in these last six years. Our forecasts also consider effects of recent and foreseeable continuing changes in the asbestos litigation environment.

## Accepted Method for Estimating Asbestos Liability

We use standard forecasting methods that have been regularly accepted by courts, asbestos trusts and businesses for establishing asbestos liabilities. Asbestos liability is estimated as the product of three factors: (1) the number of claims, (2) the fraction of claims that get paid and (3) the paid values of those claims.

Concerning (1), the *number of pending claims* is generally known or can be derived from available data. To forecast the *number of future claims*, we use standard forecasting methods that rely upon proven epidemiology, Grace's own trends in claim filings, its levels of past claim filings, and information on trends and levels of filings against other asbestos defendants before and during the six years that Grace has been in bankruptcy.

Concerning (2), the *fraction of claims* paid by Grace, we first analyzed at, but did not adopt,

developments that have occurred since the date for which forecasts are made.

- The forecasts reflect the epidemiology of asbestos-related diseases, both past trends as well as expected future trends in the incidence of asbestos-related disease, past trends and expected future trends in filings of claims for those diseases, and both past and expected future trends in the amounts paid to indemnify those claimants.

- The forecasts value asbestos claims as they have been valued in reality by defendants, plaintiffs and courts as shown by trial judgments, if any, and settlements that reflect the business judgment of all parties as to the likelihood that a plaintiffs could obtain a judgment, anticipated indemnity payments and litigation costs, the parties' risk preferences and assessments of the time value of money. These forecasts avoid and attempt to adjust for artificial effects of matters such as deadlines, bar-dates, stays or moratoria on claims filings and resolutions each of which affect litigation in ways that do not occur and would not recur in the ordinary tort litigation of the defendant's asbestos law suits.

- The forecasts attempt to predict the future behavior of litigants: filing behavior among victims of asbestos disease and their lawyers; how defendants, plaintiffs and courts will value and resolve claims in the future. Because these are forecasts of objective future events, they cannot be based on the experts' or their clients' subjective, personal views about which claims should or should not be paid or how much a plaintiff deserves to be paid. Rather the forecasts are based on actual past behavior of plaintiffs and law firms in filing claims and on how defendants, plaintiffs and courts have actually valued and resolved the asbestos claims.

Courts, litigants, businesses, trusts and others rely upon estimations of asbestos liabilities. Better forecasts, those that use the sources listed above applying methods that have been tested and found to be reliable, have become important bases for decisions involving tens of billions of dollars.

Forecasts in this report have all of these features of previous forecasts that have been accepted and found credible by trusts, courts and other entities with incentives to determine and rely upon the best possible estimates of asbestos liability.

## 4.2. Standard Methods for Forecasting Asbestos Liability

To establish an aggregate value of pending and future asbestos bodily injury creditors, bankruptcy estimation looks at how a debtor would continue to receive and resolve claims within the U. S. court systems instead of within the protection of Chapter 11. Standard methods for estimating this aggregate liability start by examining and extrapolating from a debtor company's prior history in asbestos litigation. Some experts characterizes this as estimation based on the proposition that "past is prologue" for future liabilities.

By the time of its bankruptcy petition, Grace had already received 328,658 and evaluated and resolved 193,468 asbestos injury claims within the legal processes that provide the context for now estimating its aggregate current and future asbestos liability. Grace's historic data is particularly important in showing how the company had itself valued asbestos claims in the past and how its values have been changing and could be expected to continue to change further over time. Where, as here, Grace has placed values on 157,084 settled claims (i.e., those claims that were resolved by payment of money to the claimant), we have enormous data on how it valued asbestos claims up to the time of its bankruptcy petition.

In that process, Grace had every interest in evaluating claims with the most accurate and realistic basis it could adopt. Grace and all asbestos defendants (indeed businesses who are defendants in any litigation) address and resolve the asbestos suits brought against them as business judgments, just as plaintiffs and their lawyers do on the other side.[5] In deciding to settle, defendants look to

the risks and likely amounts that they would have to pay later to resolve claims.  They settle to avoid greater future costs—including the costs of paying judgments based on adverse verdicts they might suffer.  Like most defendants, Grace sometimes found it advantageous to resolve claims in groups, rather than individually, and normally found it advantageous to resolve claims through settlements, rather than trials, because both decisions lowered its resolution costs (as shown clearly in our analysis of Grace's data at Section 4.3.2.1 below).[6]

The result is that most asbestos claims against Grace were resolved without making a final determination of liability in those claims after a full trial and a jury verdict.  Specifically, according to its database and the Snyder expert report (Attachment 2), Grace resolved 193,468 asbestos bodily injury claims prior to its bankruptcy, but only 78 claims were tried to verdict and perhaps another 1,543 were resolved by summary judgment entered for one side or the other.[7] Accordingly, almost all claims were resolved by negotiated agreements between Grace and plaintiffs.

In this process, Grace was not helpless.  Grace refused to enter into large-scale, inventory settlements that were not in its interest.[8] Grace closed many claims without payment, presumably

---

5.    In his February 22, 2007 deposition in this case, Jay Hughes, Grace's lawyer who oversaw its asbestos litigation, described Grace's approach to defending that litigation:

    A: First of all, you have to understand it's all market driven.  I mean
      we're going to get out of the case based on the amount on money that we can.
    ..... So it was an economically-driven decision."
    (February 22, 2007 Deposition of Jay Hughes, p. 96).
    A: We were trying to get the cases at the cheapest possible amount? ["?" in transcript]

    Q: That was true in all of your dealing with W. R. Grace, you were trying
      to resolve the cases for the cheapest amount that you could,
      correct?

    A: Yes.

    Q: And you were successful in doing that in your own view, correct?

    A: Generally. (Ibid, p. 254).

6.    Mr. Hughes described Grace's asbestos litigation strategy: "the management of the asbestos litigation involves the balancing of large-scale settlements with the advantages and disadvantages of a trial settlement/litigation strategy." Ibid.

    Mr. Hughes "believed it to be in Grace's interest" to enter into inventory settlement (Ibid, pp. 85-85).

    Mr. Hughes lists some ways in which inventory settlements benefited Grace in his February 2, 1999 memorandum to his superior, Bob Beber:
    "Such a comparison shows modest savings when inventory settlements are
    employed to resolve these claims.
    "Inventory settlements, however, also reduce outside defense costs and
    significantly reduce the risk of adverse verdicts.
    "Adverse verdicts not only result in an immediate cash requirement far
    in excess of any reserved amount or anticipated settlement, but tend
    to adversely affect future settlement values in that jurisdiction."
    Ibid, pp. 127-133, Exhibit 113.

7.    Some of these cases with verdicts may have been on appeal or might not yet have reached final judgments at the time of Grace's petition.

8.    When it could not reach settlements at terms that it found acceptable Grace was prepared to and did go to trial (Ibid, p. 254).

because it believed that the claimants had inadequate evidence of an asbestos-related disease, could not establish a Grace asbestos exposure, or that Grace had a legal defense that would keep a case from ever reaching a jury (Section 4.3.2). In addition, Grace let thousands of claims languish for years without any resolution until they were apparently abandoned (Section 6.1.3). When it did choose to settle, Grace worked to do so under favorable terms. Grace frequently chose the timing of settlements, settling "tens of thousands of cases" early before they had trial dates, because "asbestos claims have little settlement value until a trial date is scheduled."[9] Grace also reached an unusual arrangement to settle cases directly with a lawyer who "originated" many of Grace's mesothelioma claims, settling at lower values than those cases would have received after referral to lawyers who would actually prepare and, if necessary, try those cases.[10] Importantly, Grace paid more or less in settlement depending upon its perception of the strength of liability claims, just as it paid more or less depending upon the strength of injury and damage claims. Mr. Hughes testified that (1) the likelihood that a claimant would show liability, (2) the potential size of a verdict and (3) the impact of large verdicts on its ability to settle later cases were all among a number of issues that determined the amount that Grace would pay in settlement and, indeed, whether it would pay at all (Ibid, p. 97, p. 272, p. 133), along with such other matters as the strength of the medical evidence, the availability of legal defenses, a case's "jury appeal," and other factors.

As is true of virtually all tort settlements, in its settlements Grace would have rarely if ever acknowledged liability in a settlement or even necessarily concluded that in its perfect world as designed by asbestos defendants it should have to pay at all. It is also true that plaintiffs would seldom have accepted a settlement with Grace as representing the full measure of their view of Grace's "true" and "just" liability for the plaintiff's damages. The tort system for asbestos cases has advantages and disadvantages for both sides. But both sides accepted settlements as a compromise that eliminated their risks and their continuing litigation costs within the actual tort system, not an idealized system that would have been preferred by one side or the other. Grace settled claims because it recognized the risks of those claims: some probability that it would be found liable for an amount greater--usually far greater--than what it had to pay in settlement.[11] The record is clear that Grace was able to settle claims, including the most serious, for fractions of verdicts in similar cases (Section 4.3.2.1). Plaintiffs, for their part, accepted less to get faster payment and to eliminate their own risks, which included the risk of receiving nothing.

To determine the amounts that it would pay for settlements, Grace looked to the amounts it had paid in the past, its historic settlements and judgments.[12] Standard asbestos liability estimation methods use an asbestos defendant's actual past payments in precisely the same way--here estimating how Grace would have fared in further tort litigation had it not entered bankruptcy by

---

9.  Ibid, pp. 104-105; Hughes Deposition Exhibit 152, Jay Hughes memorandum to Paul Norris, president and CEO of Grace, Bates 109-0152.

10. Q: So you established a course of dealing with him in settling
        mesothelioma claims?
    A: Yeah, I established a relationship with Roger, and we settled
        some cases directly."
        Ibid, p. 255

11. This recognition was key to Grace's attempts to achieve inventory settlements with law firms, which Grace pursued in part to avoid the risks that some of the clients of the law firm who were subject to the inventory settlements might instead take their cases to trial and obtain verdicts adverse to Grace. Ibid, pp. 130-131

12. Grace's past settlements "gave us insight into what plaintiffs would be willing to accept" (Ibid pp. 97-98). But as plaintiffs' lawyers increased their settlement demands, as they did for mesothelioma in 2000 and 2001, Grace had to increase the amounts of its settlements. (Ibid, pp. 269-270).

**Table 3:** Numbers of Pending Claims, By Disease and Liquidation Status

| Description | Number of Pending Claims | | | | | |
|---|---|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal | Unspec | Total |
| Number Liquidated | 139 | 466 | 215 | 17,700 | 0 | 18,520 |
| Number Not Liquidated | 1,406 | 1,931 | 477 | 31,222 | 81,634 | 116,670 |
| Total Pending | 1,545 | 2,397 | 692 | 48,922 | 81,634 | 135,190 |

Note: Nonmalignant claims include claims classified as "asbestos-related" by Grace.

The various discovery and proof of claim processes in this case show how modestly estimation is affected by the question: how many pending claims have been settled but not paid pre-petition? Although Grace's historic database reports that among the 135,190 unresolved asbestos claims, 18,520 have been settled but not fully paid (Table 3), more than twice as many claimants (38,953) filed POCs for the October bar date asserting that they have settled but unpaid claims. There is relatively little difference in Grace's aggregate liability to the 38,953 reportedly-settled claims depending up whether all or half are treated as pre-petition liquidated claims, so the question has little significance for estimation of Grace's overall liability for asbestos bodily injury claims. This issue is examined further in Appendix A.

Our primary forecast of liability for pending claims, presented in Section 6, assumes 18,520 pending liquidated claims, as reported in Grace's historic database.

Finally, some claims identified as pending in Grace's pre-petition database are likely to have been abandoned by claimants, without being entered as dismissed in Grace's claims database. These must be excluded in estimating Grace's liability for pending claims. In Section 6.1.4, I discuss adjustments to our analyses to reflect a reduction for abandoned claims.

### 4.3.2. Payment Rates--The Percentage of Grace Claims That Would Be Compensated

As I discuss above and in later sections of this report, we reduce the count of pending Grace claims by eliminating claims that have no apparent disease (Section 6.1.3), that have already been settled though unpaid (Section 6.1.3) or that have been abandoned (Section 6.1.4). Among the remaining pending claims, not all will receive payment. This section discusses this second key estimation parameter, the forecast payment rates.

We know Grace's historic payment rates from its claims data (among resolved claims for each disease, the percent that was closed with payment), but we expect that after April 2, 2001 Grace would pay fewer claims than this historic rate, both because of broad changes in asbestos litigation and also because Grace now represents that it might have changed its litigation strategies.

Prior to its bankruptcy, Grace made payments in a very high percent of asbestos claims that it resolved. Among the 14,127 claims that Grace resolved in 2001, fewer than one in twenty was resolved without payment (Table 4). The percent of claims closed by payment was modestly lower during the five prior years.

come to reject a greater number of nonmalignant claims, particularly among claims pending on the petition date, an effect that we forecast by estimating a lower payment percent for nonmalignant claims.

We expect that instead of making payments in over 90 percent of resolved claims (Grace's historic payment rates), Grace would likely pay lower percentages of pending and future claims. Because these events occurred after Grace's bankruptcy petition, we cannot simply calculate how much payment rates might fall. We use three alternative sets of estimates of payment rates--*historic*, *reduced*, and *lowest* payment rate assumptions--that bound the likely range in which Grace's actual payment rates might fall.

The *historic* rates are simply Grace's payment rates during 2000 and 2001. These set an upper bound of Grace's likely liability costs for asbestos claims, but we expect that now Grace will likely reject more claims than it had historically. We discuss forecasts using Grace's *historic* payment rates in our sensitivity analyses, Section 7 of the report.

As our estimate for *lowest* payment rates, we assume that after April 2, 2001, Grace would eliminate from payment 40 percent of nonmalignant claims that it would have paid in the past and 30 percent of cancer claims that it would have paid. To derive these alternative low rates we first start with Grace's payment rates during 2000-01 (i.e., payment rates used in the high rate alternative) and then eliminate another 30 percent of cancer claims and 40 percent of nonmalignant claims that would have been paid using Grace's historic payment rates. By using these two steps of eliminating claims, we assume that Grace would make payments in only 64 to 68 percent of cancer claims and 58 percent of nonmalignant claims.

The *lowest* payment rate assumptions are conservative and likely overestimate the number of claims that Grace could resolve without payment, particularly among cancer claims (Table 8). I used these 30 and 40 percent assumptions for my recent forecasts of asbestos liabilities for Armstrong and USG. But payment rates for Armstrong and USG would fall for reasons that do not apply to Grace. Both these defendants were members of the defendant consortium the Center for Claims Resolution (CCR), whose strategy of settling claims on behalf of all CCR members had somewhat inflated payment rates among its members,[15] suggesting that payment rates for Armstrong and USG would fall sharply after they left CCR. Grace was not a CCR member, would not have had a post-CCR adjustment to its payment rates, and, therefore, would not likely have seen as sharp drops in payment rates as we expect for these former CCR members.

To reflect these differences between the expected experience of Grace and CCR members USG and Armstrong, we use a third, more likely assumption, a *reduced* payment rate assumption, that assumes future payment rates for Grace half-way between the high and low payment rate assumptions.

Table 8 shows the estimated Grace forecast payment rates for the *historic*, *reduced* and *lowest* rate

---

15.   By their mutual agreement, each CCR member would make payments for settled claims if it had been named in the claimant's law suit so long as the claimant could show exposure to products of at least one CCR member and had evidence of an asbestos-related disease. Because of this agreement, the CCR did not insist on evidence of exposure by each member named in a law suit, but rather paid a claim if CCR determined that any one of its members had liability. Even though under this CCR arrangement each member likely contributed settlements for some claims that it would have avoided paying as a stand alone defendant, CCR members recognized that their asbestos liabilities were far lower under the CCR arrangement than if they had been standing alone. This arrangement dissolved with the CCR's dissolution in January 2001. Now standing alone after the CCR's dissolution, each former member had to assess whether or not there was some likelihood that claims could show exposure to its own products, assessments that would likely reduce the percent of claims that each former CCR member now closed with payment. But these changes do not apply to Grace, who was not a CCR member.

We made a second use of this transition matrix. We assume, first, that diseases in Grace's database for pending claims primarily represent plaintiffs' allegations rather than Grace's own confirmation of disease and, second, that after further review Grace would reclassify some claims with alleged disease. We use the transition matrix in Table 20 to estimate how these alleged diseases among all pending claims will likely change to the distributions of diseases that would eventually be determined by Grace, the bases for their resolutions of those claims. Because Table 20 primarily compared plaintiffs' disease allegations (the rows are categories in Grace's database) to the diseases confirmed by the Manville Trust (the columns), the table is an example about how plaintiffs allegations differ from defendants' conclusions about disease. By using the transformation matrix in Table 20 we can estimate how defendants such as Grace would categorize diseases among pending Grace claims after review of the claims. These provide more appropriate bases for forecasting Grace's liabilities than use of disease categories that are derived primarily from plaintiffs' allegations.

**Table 21:** Disease Distributions After Imputation for Pending Claims and Elimination of Stale Claims

| Description | Distribution of Claims | | | | | Total |
| | Meso | Lung | OthCan | Nonmal | None | |
|---|---|---|---|---|---|---|
| **Number** | | | | | | |
| Resolved | 4,104 | 7,444 | 2,754 | 166,767 | 12,399 | 193,468 |
| Liquidated | 139 | 466 | 215 | 17,700 | 0 | 18,520 |
| Unresolved | 2,885 | 5,346 | 1,325 | 93,365 | 6,329 | 109,250 |
| Total | 7,128 | 13,256 | 4,294 | 277,832 | 18,728 | 321,238 |
| **Percent** | | | | | | |
| Resolved | 2.1% | 3.8% | 1.4% | 86.2% | 6.4% | 100.0% |
| Liquidated | .8 | 2.5 | 1.2 | 95.6 | .0 | 100.0 |
| Unresolved | 2.6 | 4.9 | 1.2 | 85.5 | 5.8 | 100.0 |
| Total | 2.2 | 4.1 | 1.3 | 86.5 | 5.8 | 100.0 |

Table 21 shows our estimate of the number of active, pending (and unliquidated) claims in each disease category after imputation of unspecified disease claims and use of the Manville matrix to transform allegations to confirmed disease categories. We estimate that Grace will never determine the specific diseases for 6,329 pending claims and will resolve those claims without payment. We show these claims under the "None" column to reflect that they would be rejected without determinations of disease.

### 6.1.5. Calculation of Indemnity for Pending Claims

In the next sections I describe our forecast for the 102,921 pending asbestos claims against Grace that have not been liquidated (there are 18,520 liquidated claims according to Grace's database), that are not claims that we assume to be inactive stale claims (7,420 claims) and that are not claims that we assume will lack an asbestos-related disease (6,329 claims). Table 22 shows these three steps for winnowing down the number of pending claims that we forecast Grace would have to consider for payment. In response to a bar date in this case approximately 38,953 claimants say they have liquidated, unpaid claims. If this is correct, we would forecast that Grace would face approximately 82,488 pending, unliquidated claims. However, following standard forecasting practices we base our forecast on Grace's historic asbestos claims database, rather than on the problematic data generated by the PIQ and POC processes in this case.

Table 22: Estimated Number of Pending, Unliquidated, Active, Asbestos-Disease Claims

| Pending Claim Category | Historical Database | Expected Responses |
|---|---|---|
| Total Pending Claims | 135,190 | 135,190 |
| Liquidated Claims | -18,520 | -38,953 |
| Inactive, Stale Claims | -7,420 | -7,420 |
| No-disease Claims | -6,329 | -6,329 |
| Total | 102,921 | 82,488 |

Accepting values for the 18,520 liquidated claims in the Grace database, Grace has a liability of $62.5 million for these claims (2001 dollars).

### 6.1.5.1. Forecasts of Grace's Payment Rates

As I discussed in Section 4.3.2 and Section 4.3.3, we use two payment parameters to forecast how much Grace would have to pay to resolve these claims: (1) *payment rate*--the percents of claims in each disease category that Grace will resolve with payment and (2) *average settlement*--amounts that Grace would pay to claims in each disease category when it makes a payment (i.e., the average excluding claims closed without payment).

As with all asbestos defendants, Grace resolved some asbestos claims without payment, from 4 to 8 percent (varying among disease types) during 2000 and 2001. We use these past rates for one of our three alternative payment rate assumptions, *historic* payment rates. We use this alternative primarily to show what Grace's liability would be if we were to assume that its past experience would continue. However, for the reasons described in Section 4.3.2, we assume that Grace's *payment rates* would have dropped sharply and abruptly after April 2, 2001 had Grace not filed for bankruptcy protection and that much greater percentages of claims would be resolved without payment. We use two alternative estimates of how much payment rates might fall. Our *lowest* payment rate assumption follows assumptions of our liability analyses for the two former CCR members Armstrong and USG. The low payment assumption is that instead of making payments in over 90 percent of resolved claims (Grace's historic payment rates), Grace would make payments to only 64 to 68 percent of cancer claims and 58 percent of nonmalignant claims (Table 23). These forecast assumptions are taken from our earlier liability forecasts for former members of the CCR and reflect our expectations about changes in how former CCR members would review and settle claims after leaving CCR: that because of a CCR policy that members contribute to settlements in every case where named in a law suit, we would see particularly sharp drops in their payment rates after leaving CCR (Section 4.3.2). Because Grace had not been a CCR member so that its past claim filings and payment rates had not been inflated by CCR policies, we expect that it would not be able to achieve as sharp drops in its payment rates among cancer claims as we forecast for CCR members. Like our *historic* payment rate assumption, our *lowest* payment rate assumption is a lower bound estimate (particularly among future claims where we forecasts reduced filings with a drop off in poorer quality claims) rather than a forecast that we view as likely. To reflect the likely differing changes in payment rates between Grace and the former CCR members, we derived our third *reduced* payment rate assumption. This model uses rates that are midway between Grace's *historic* rates and those of our *lowest* payment rate" forecast. As shown in Table 23, this assumption is that Grace would pay 78 to 82 percent of cancer claims and 58 percent of nonmalignant claims. We regard forecasts based on the *reduced* payment rates as more likely. We do not expect that Grace's liabilities would be great as those forecast using its *historic* payment rates or as low as liabilities forecast using the sharply reduced

*lowest* payment rates among cancer claims, but would be near liabilities forecast using our reduced payment rates. In resolving pending nonmalignant claims, we assume that Grace could achieve far more success in closing those claims without payment. Therefore, we assume for both our *reduced* and *lowest* forecast models that Grace could close 42 percent of nonmalignant claims without payment, compared to its historic experience of rejecting only 4 percent.

**Table 23:** Payment Percentages for Grace

| Payment Rate Definition | Payment Percentages | | | |
|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal |
| Historic | 92.1% | 95.3% | 96.7% | 96.3% |
| Reduced | 78.3 | 81.0 | 82.2 | 57.8 |
| Lowest | 64.5 | 66.7 | 67.7 | 57.8 |

### 6.1.5.2. Forecasts of Grace Settlement Amounts

For all of the reasons discussed in Section 4.3 and Section 4.4 above, we forecast that Grace's *average settlement* values would have continued to increase after April 2001 as they had been increasing in the past, either at the same rates that Grace's settlement values had increased since 1997 (short-term trend) or since 1990 (regressions results for Long-Term Trend) or else at one of three slowly increasing rates that would leave Grace's settlement values in 2006 equal to amounts paid in 2001 among the three other comparable asbestos defendants: USG, Quigley, and T&N.

Each of these alternatives forecast that *average settlement* values would increase gradually over five years from 2002 through 2006. Because we forecast that Grace would have settled all pending claims between 2001 and 2003, we do not use the increased 2006 values as estimates of what Grace would pay pending claims.[25] Instead we use Grace's 2002 *average settlement* values for each of our five alternative value models shown in Table 13 through Table 15, values that in each alternative model are only modestly greater than Grace's settlement averages for 2000 and 2001 (Table 24).

---

25.    We assume that one-third of pending claims would be settled and paid in each year 2001, 2002 and 2003, essentially equivalent to assuming that all pending claims would settle at the *average settlement* value for 2002.

**Table 24:** 2002 Settlement Values Forecast

| Average Settlement | Settlement Values | | | |
|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal |
| 2000-2001 Average | $93,640 | $17,912 | $9,891 | $3,372 |
| Long Term Grace | $108,918 | $18,688 | $11,088 | $3,018 |
| Short Term Grace | 107,964 | 19,952 | 10,784 | 3,548 |
| Quigley | 107,651 | 20,041 | 10,146 | 3,681 |
| T&N | 108,331 | 19,836 | 10,261 | 3,680 |
| USG | 111,260 | 20,553 | 10,372 | 3,678 |

Note: Payment amounts are expressed in 2001 dollars.

We forecast that pending mesothelioma claimants who receive settlements would be paid 15 to 19 percent more in settlement than the 2000-2001 pre-petition settlements for such claims, but that pending nonmalignant claims who receive settlements would be paid at most 9 percent more and possibly 10 percent less than nonmalignant claims that settled in 2000-2001.[26]

In contrast to our forecast of five-year gradual increases in *average settlement* values, we forecast that Grace's *payment rates* would drop immediately and sharply in 2002 (Table 23) when it would reject without payment 3 to 6 times as many cancer claims and 11 times as many nonmalignant claims as it had before its bankruptcy.

Table 25 shows our forecasts of both settlement parameters for pending claims, *average settlements* and *payment rates* by disease, for ten combinations of two alternative payment rate assumptions and five alternative settlement average assumptions. The table also shows Grace's *historic* payment rates and settlement averages for each disease.

**Table 25:** Payment Parameters for Pending Claims

| Payment Rates | Average Settlement | Payment Rates | | | | 2002 Payment Amount | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Meso | Lung | OthCan | Nonmal |
| Historic | Historic | 92.1% | 95.3% | 96.7% | 96.3% | $93,640 | $17,912 | $9,891 | $3,372 |
| Reduced | Long Term Grace | 78.3% | 81.0% | 82.2% | 57.8% | $108,918 | $18,688 | $11,088 | $3,018 |
| Reduced | Short Term Grace | 78.3 | 81.0 | 82.2 | 57.8 | 107,964 | 19,952 | 10,784 | 3,548 |
| Reduced | Quigley | 78.3 | 81.0 | 82.2 | 57.8 | 107,651 | 20,041 | 10,146 | 3,681 |
| Reduced | T&N | 78.3 | 81.0 | 82.2 | 57.8 | 108,331 | 19,836 | 10,261 | 3,680 |
| Reduced | USG | 78.3 | 81.0 | 82.2 | 57.8 | 111,260 | 20,553 | 10,372 | 3,678 |
| Lowest | Long Term Grace | 64.5% | 66.7% | 67.7% | 57.8% | $108,918 | $18,688 | $11,088 | $3,018 |
| Lowest | Short Term Grace | 64.5 | 66.7 | 67.7 | 57.8 | 107,964 | 19,952 | 10,784 | 3,548 |
| Lowest | Quigley | 64.5 | 66.7 | 67.7 | 57.8 | 107,651 | 20,041 | 10,146 | 3,681 |
| Lowest | T&N | 64.5 | 66.7 | 67.7 | 57.8 | 108,331 | 19,836 | 10,261 | 3,680 |
| Lowest | USG | 64.5 | 66.7 | 67.7 | 57.8 | 111,260 | 20,553 | 10,372 | 3,678 |

Note: Payment amounts are expressed in 2001 dollars. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

Taken together these assumptions--sharply lower payment rates and modest increase in settlement values--mean that we forecast that Grace would pay less to resolve pending claims than it had paid to resolve claims before its bankruptcy petition. Table 26 shows the size of these predicted

Figure 17: Claim Filings for Major Asbestos Defendants, 1990-2001



Note: Grace's 2001 entry based on annualizing filings. The USG and OC entries are
annualized for bankruptcy year.

In this section I consider how Grace's increasing claim filing trends would have continued into
the future, presenting our forecasts of future claims that would be filed after Grace's bankruptcy
petition date. We forecast Grace's future claims using the standard "Nicholson" forecasting
method. In making these forecasts, we look to the effects of recent changes in the litigation
environment which cause us to adjust and reduce our forecast of the number of future
nonmalignancy claims that would be filed against Grace (Section 6.2.4).

The number, timing and types of future claims against Grace will depend both upon the number
of people in each future year who develop diseases that are asbestos-related (the incidence of
diseases) and also the fraction of those people who will pursue claims against Grace (its
"propensities to sue").

This section describes how the historic propensities to sue Grace for cancer are calculated and
used to forecast future cancer claims. Inputs to these calculations are (1) epidemiological models
of the incidence of asbestos-related cancer deaths, and (2) historic data on the number of cancer
claims filed against Grace and (3) data on cancer claims filings against other defendants both
before and since Grace's petition date.

### 6.2.1. The Incidence of Asbestos-Related Cancers

Medical research by epidemiologists provides projections of the incidence of asbestos-related
cancers. Projections differ somewhat among epidemiologists, but most agree on the relative

changes in cancer deaths over time--increasing until late in the twentieth century followed by a slow decrease in the following years.  Because of this general agreement on changes over time, projections of future claims will be generally similar even when based on differing projections of incidence.

Figure 18 shows epidemiological projections of the annual number of asbestos-caused deaths between 1967 and 2027 from each of three asbestos-related cancers--mesothelioma, lung cancer and other (primarily gastro- intestinal) cancers--among workers exposed before 1980 in major asbestos-using industries.[27] The figure represents the results of work by Nicholson, Perkel and Selikoff (1982) which is generally recognized as the most comprehensive and reliable forecast of asbestos-related cancer deaths (Appendix Table C1). The peak year of forecast deaths differs among the three types of cancers because the latency periods, i.e., the time from first asbestos exposure to the occurrences of cancer, differ among the three diseases.  Because the latency period is longest for mesothelioma, the risk of that disease increases for a longer period and the incidence of mesothelioma peaks later than for other asbestos-related cancers.  The patterns of asbestos diseases among exposed workers and, therefore, the patterns of legal claims, have been changing over time with these changes in the relative incidences of each type of cancer.  In past years lung cancer has been the most frequent cancer among occupationally exposed workers and the most frequently claimed cancer.  However, now and in each future year approximately the same number of workers will suffer mesothelioma and lung cancer.

---

27.   Forecasts for lung and other cancers are excess deaths, i.e., the number of additional deaths that will occur because of asbestos exposures that are in addition to cancer deaths that would otherwise have occurred without asbestos exposure.  Asbestos exposure is the only know cause of mesothelioma.

**Figure 18:** Nicholson Cancer Projections



### 6.2.2. Accuracy of Epidemiological Projections

Epidemiologists' projections, like those of Nicholson, et. al., have their own uncertainties, but can be tested by comparing projections for past years with data on mesothelioma deaths in those same years collected by the National Cancer Institute's SEER (Surveillance, Epidemiology and End Results) cancer registry. The SEER program collects comprehensive data on the incidence, treatment and end results (including deaths) for all types of cancers at seventeen different sites in the United States. SEER generates cancer rates from these sites that can then be used to estimate the incidence of each type of cancer for the United States as a whole. The SEER program is highly sophisticated and recognized as the state of the art for such programs throughout the world and its results are widely used in medical research and planning.

Because SEER collects data continually, its counts provide estimates of the annual national incidence of each type of cancer over many years. SEER's annual estimates of the national incidence of mesothelioma provide the means to test epidemiological forecasts of mesothelioma deaths. Asbestos is the only known cause of mesothelioma and so epidemiologists' forecasts of asbestos-related mesothelioma deaths should tend to correspond to the annual SEER national incidence counts for all mesothelioma deaths. While the SEER national incidence measures are themselves estimates based on the sample of SEER sites that have their own uncertainties, over many years an accurate epidemiological forecast of mesothelioma deaths should track trends in the SEER estimates of actual mesothelioma deaths.

SEER collects its data from a limited number of major sites around the country (e.g. two sites are Los Angeles-Long Beach and the entire state of Iowa). It is impossible to make a random selection of such sites, but SEER has attempted to select a cross section of sites that will closely

mimic key demographic characteristics of the U.S. as a whole. In recent years the SEER program has expanded its number of sites both to provide more data and better matches to the country as a whole. SEER's counts of sites went from 9 before 1992, to 13 between 1992 and 1999, and now 17 sites since 2000.

Estimates of the national incidence of cancers are enhanced because SEER provides rates of cancer broken down by key demographic variables so that national estimates can take into account differences in rates by age and other characteristics. These age rates are particularly important for estimating national incidences of mesothelioma and other diseases whose incidence is strongly related to age.

SEER's counts of 2000 to 2003 national mesothelioma deaths based on its most comprehensive 17 sites are remarkable close to Nicholson's forecasts of mesothelioma incidence (Table 28). Nicholson forecast 12,173 mesothelioma deaths for this four year period, within 233 of the SEER national counts of 12,406 mesothelioma for those years. This is less than a 2 percent difference. This correspondence supports the conclusion that Nicholson's forecasts, made almost 25 years ago, remain remarkably accurate even today.

**Table 28:** Comparison of Nicholson Projections with
SEER-17 Site Estimates of Mesothelioma Incidence

| Death Year | Nicholson Projections | SEER-17 Estimates |
|---|---|---|
| 2000 | 3,024 | 3,172 |
| 2001 | 3,042 | 3,124 |
| 2002 | 3,060 | 3,125 |
| 2003 | 3,048 | 2,985 |
| Total | 12,173 | 12,406 |

**Figure 19:** Epidemiological Projections Confirmed by SEER's Mesothelioma Counts



While SEER's 9-sites provide a somewhat less comprehensive view of national cancer rates than its 17-sites, the availability of 31 years of data from these 9 sites provides an opportunity to compare the long-term correspondence between Nicholson's forecasts and the SEER data. Nicholson and his colleagues published their forecasts in 1982. Since then and through the most recent years of data, the Nicholson forecasts closely track the 9-site SEER estimates of annual mesothelioma deaths. SEER's 31-year trends are shown in Figure 19 and, as Figure 19 shows, the Nicholson et. al. forecasts correspond remarkably well to SEER's 9-site estimates of actual mesothelioma deaths up through 2000, where Nicholson is higher by only 1.4%.

Subsequently, the 9-site numbers dip considerably, but data from SEER's 17-sites show that there continues to be close correspondence between Nicholson and SEER after 2000 despite divergence between Nicholson's forecast and the 9-site SEER estimates. The difference between the 17-site and 9-site SEER estimates suggest that differences in the two SEER curves may be due to uncertainties in estimating national incidence data from SEER.

Because lung cancer and the other asbestos-related cancers have causes other than asbestos exposure, the SEER estimates of those cancer deaths will exceed and cannot be used to test the epidemiological forecasts for those other cancers. But because Nicholson's forecasts for all types of cancers are based on the same methods and the same estimates of the number of exposed workers and the extent of their asbestos exposures, the strong confirmation of Nicholson's forecast for mesothelioma provides confidence for Nicholson's epidemiological forecasts for each type of cancer.

Figure 19 also shows a second forecast of asbestos-related mesothelioma deaths made by analysts at KPMG-Peat Marwick in 1992 as part of their work as experts in the bankruptcy proceedings of

National Gypsum. Dr. Tom Vasquez and his colleagues at KPMG-Peat Marwick attempted to update the 1982 forecasts made by Nicholson, et. al., using more recent U.S. Labor Department statistics on the populations of workers in asbestos exposed industries, more recently formulated medical models of the risk of mesothelioma and lung cancer from asbestos exposure and several alternative assumptions (KPMG's annual forecasts are reproduced in Appendix Table C2). As Figure 19 illustrates, the shape of KPMG forecasts (i.e., their trends) are very similar to those made by Nicholson et. al. a decade previously and, as a result, claims forecasts that are based on the two alternative epidemiological forecasts are only slightly different.

The close correspondence between KPMG and SEER before the 1990s is not a validation of the KPMG forecast. KPMG derived its revised forecasts in part by fitting the forecasts to the SEER data through the 1980s. The curves correspond not because KPMG was forecasting mesothelioma incidence before the 1990s but because the KPMG estimates were made to fit to SEER's estimates by the KPMG researchers. Figure 19 shows that over the subsequent eight-year time period 1993 to 2000 the original Nicholson projections more closely fit the SEER data on actual mesothelioma deaths than do the KPMG forecasts. Since 2000, estimates of national mesothelioma incidence derived from the 9-site SEER fall between the Nicholson and KPMG forecasts, but national estimates derived from the SEER-17 sites more closely validate the Nicholson than the KPMG forecasts.

### 6.2.3. Propensities to Sue Grace

Data and forecasts of the incidence of asbestos-related diseases describe the potential for liability against Grace. As long as asbestos-related cancers occur, it is likely that some claims will be filed. We compare Grace's data on past claim filings to Nicholson's incidence forecasts for past years to see how much of this potential for asbestos cancer claims was directed against the company in the past: Among all the potential asbestos-related cancer claims in the U.S. what fraction resulted in Grace claims? We formalize these comparisons through our propensity to sue calculations shown in the next paragraph. Grace's claims data also show trends in claiming against the company, whether the propensities to sue had increased, decreased or stabilized in recent years. The historic levels and trends in propensities to sue document the past behavior by claimants and plaintiffs' lawyers in pursuing possible claims for asbestos-related cancers.

We look to this past history of claiming against Grace--past propensities to sue and trends in the propensities to sue--as well as information about claiming against other asbestos defendants to forecast future claiming against Grace. We forecast the number of claims for each type of cancer in each future year by multiplying the number of deaths projected by Nicholson for that year times our forecast of the propensity to sue for that cancer in that year. The calculations that are used first to derive propensities to sue and second to forecast future claims based on these propensities to sue are stated below.

*Calculation of Propensity to Sue:*

   *Number of Claims ÷ Incidence = Propensity to Sue*

*Forecasting Future Claims from Propensity to Sue:*

   *Propensity to Sue × Incidence in Future Year = Projected Claims in Future Year*

We base our forecast of future propensities to sue Grace primarily on the number of cancer claims filed in the past against Grace and its trends in past annual filings. Table 29 shows the annual

number of asbestos bodily injury claims filed against Grace for each type of asbestos-related disease after the imputation of unspecified disease claims, as described in Section 6.1.4. Claim filings against Grace continued at high levels until Grace filed for bankruptcy protection in April 2001. It received over 33,000 claims in the first quarter of 2001. The 2001 filings during one quarter cannot be compared meaningfully to the annual filings for prior years. To permit meaningful comparisons, Table 29 also shows annualized filings for 2001, using Grace's claim filings during 1999 through March 2001 to fill in the last three quarters of 2001 filings. Overall, Grace saw a sharp increase in annual claim filings over the decade of the 1990s. This trend too was shared with other major asbestos defendants.

**Table 29:** Number of Filings Against Grace, By Filing Year and Disease (After Reallocation)

| Filing Year | Number of Filings | | | | | |
|---|---|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal | None | Total |
| 1980- | 2 | 0 | 1 | 3 | 0 | 6 |
| 1981 | 1 | 0 | 1 | 10 | 0 | 12 |
| 1982 | 5 | 0 | 3 | 23 | 2 | 33 |
| 1983 | 9 | 6 | 4 | 164 | 88 | 271 |
| 1984 | 12 | 12 | 7 | 311 | 43 | 385 |
| 1985 | 34 | 33 | 13 | 531 | 3 | 614 |
| 1986 | 68 | 69 | 40 | 1,516 | 32 | 1,725 |
| 1987 | 99 | 181 | 53 | 2,327 | 392 | 3,052 |
| 1988 | 131 | 168 | 95 | 5,377 | 489 | 6,260 |
| 1989 | 86 | 173 | 57 | 4,201 | 370 | 4,887 |
| 1990 | 152 | 315 | 126 | 5,047 | 350 | 5,990 |
| 1991 | 322 | 499 | 133 | 13,085 | 1,293 | 15,331 |
| 1992 | 437 | 923 | 296 | 15,574 | 1,128 | 18,358 |
| 1993 | 346 | 884 | 327 | 15,340 | 1,457 | 18,355 |
| 1994 | 571 | 1,041 | 339 | 18,030 | 984 | 20,966 |
| 1995 | 594 | 1,367 | 527 | 29,219 | 678 | 32,386 |
| 1996 | 652 | 1,574 | 550 | 34,454 | 2,176 | 39,407 |
| 1997 | 634 | 1,238 | 361 | 23,651 | 914 | 26,797 |
| 1998 | 574 | 887 | 292 | 18,302 | 1,258 | 21,313 |
| 1999 | 675 | 1,114 | 313 | 20,295 | 2,180 | 24,576 |
| 2000 | 1,159 | 1,690 | 463 | 40,079 | 3,471 | 46,861 |
| 2001 (1/4) | 566 | 1,082 | 293 | 30,292 | 1,420 | 33,653 |
| 2001 (Ann) | 1,366 | 2,377 | 649 | 60,514 | 3,777 | 68,683 |
| Total | 7,129 | 13,256 | 4,294 | 277,831 | 18,728 | 321,238 |

Notes: Entries for 2001 (in red) are filings only through the first quarter before Grace's April 1, 2001 petition. Entries for 2000(Ann) (in green) are annualized filings using filing rates over the 27 month period January 1999-April 1, 2001, for the last three quarters of 2001

Figure 20 provides graphic representations of these increasing trends in Grace filings for each of the three types cancers. To provide the most meaningful information about Grace's filings that closely preceded its petition, we average filings over the period January 1999 to April 2001 to obtain annualized rates for 2001. Note that the instability in claim filings between 1996 and 1998, the sharp increases in 1996 and declines in 1997-1998 are results of the moratoria agreement that Grace negotiated with major plaintiff's law firms.

Figure 20: Number of Cancer Filings Against Grace



Note: Grace's 2001 filings are annualized across the period from January 1999 to April 1, 2001.

Figure 21 compares Nicholson's forecast of mesothelioma deaths between 1990 and 2001 with the number of mesothelioma claims filed against Grace in those years. As Figure 21 shows, during the three years before its bankruptcy, mesothelioma claims against Grace had increased sharply, growing closer to the incidence of mesothelioma deaths that Nicholson forecast. But even with these increases, the number of mesothelioma claims against Grace remained well below the number of mesothelioma incidences occurring in the country each year and below the number of mesothelioma claims filed against the Manville Trust.

**Figure 21:** Nicholson Meso Forecasts vs Grace Actuals



Note: Grace's 2001 filings are annualized across the period from January 1999 to April 1, 2001.

We used the standard Nicholson Method for forecasting future claim filings for each cancer, a method based on Grace's historic propensities to sue. To illustrate with mesothelioma filings: forecasts of future mesothelioma claim filings are based on a calculation of the relationship between past claims to the past incidence of the disease. This calculation, the "propensity to sue," is derived by dividing the number of claims for mesothelioma in a year (the lower, blue line in Figure 21) by the number of mesothelioma deaths projected for that same year (the higher red line in Figure 21). This establishes the historic claiming rate for mesothelioma against Grace, what percent of persons getting mesothelioma in each past year have filed a claim against Grace. Propensities to sue Grace for lung cancer and for other cancers are calculated similarly, by dividing the number of claims for each type of cancer in a year by the Nicholson forecast of the number of asbestos-related deaths from that cancer in the same year.

Table 30 below shows the annual propensities to sue Grace calculated for each of the three types of asbestos-related cancers for each year since 1990. From the early 1990s the number of cancer claims filings have increased steadily for most asbestos defendants, but this pattern differed somewhat for Grace. Propensities to sue Grace were relatively low and flat during the early 1990s and before, but these increased in the mid-1990s as Grace became more prominent in the litigation and jumped even more in 2000 and 2001 as other target asbestos defendants entered bankruptcy and with Grace's extensive bad publicity. Grace's filings in the late 1990s were affected by major law firms' agreement to a moratoria in those years as a term in their inventory settlements with Grace. These plaintiffs' law firms agreed to file no claims (but for a few

exceptions) for several years. The filing moratoria reduced filings during the last years of the 1990s, pushing some filings forward into the earlier years in which the agreements were signed and pushing other filings later. If Grace had not been able to implement these moratoria, its filing trends preceding its bankruptcy would have shown a smoother and steadier increase. Furthermore, Grace itself concluded that even after they ended the moratoria continued to suppress its claim filings through the time of Grace's bankruptcy petition (Hughes Deposition, February 22, 2007, pp. 81-82), artificially reducing both the filings in the two years preceding the petition and also liability forecasts that are based on filings during those years.

**Table 30:** Propensities to Sue Grace, by Disease: 1990-2001

| Filing Year | Type of Cancer | | |
|---|---|---|---|
| | Meso | Lung | OthCan |
| 1991 | 12.0% | 9.1% | 8.9% |
| 1992 | 15.9 | 16.8 | 19.8 |
| 1993 | 12.4 | 16.2 | 22.1 |
| 1994 | 20.1 | 19.3 | 23.1 |
| 1995 | 20.6 | 25.5 | 36.3 |
| 1996 | 22.3 | 29.7 | 38.2 |
| 1997 | 21.4 | 23.5 | 25.3 |
| 1998 | 19.2 | 17.2 | 21.0 |
| 1999 | 22.5 | 22.1 | 22.9 |
| 2000 | 38.3 | 34.3 | 34.7 |
| 2001 | 74.4 | 90.1 | 89.8 |
| 00-01 | 45.6 | 45.3 | 45.5 |
| 99-01 | 35.4 | 34.8 | 35.3 |

Note: 2001 propensities to sue are annualized based on filings and incidence for one quarter. 00-01 annualized rates are over 15 month period from January 2000 to April 1, 2001. 99-01 annualized rates are over 27 month period from January 1999 to April 1, 2001.

Forecasts of future Grace claims must take two matters into account: (1) the most recent level of claiming shown by the propensities to sue during years preceding Grace's bankruptcy filing and (2) the fact that cancer filings and propensities to sue had increased sharply as of April 2001. Together these matters not only establish a starting point for forecasting future Grace cancer claims based on the most recent propensity to sue, but also suggest that propensities to sue Grace would continue to increase and exceed the levels of the base period. Although Grace did not discuss claim filing trends in terms of propensities to sue, it too acknowledged that its future claims filings would increase in its 2000 Annual Report (Section 3.2 above). Moreover, asbestos cancer claim filings have increased since Grace filed for bankruptcy in 2001. Because it is now six years since Grace's petition, we have the opportunity to examine subsequent claims filings against other asbestos defendants over the past six years and to use these as guides to what would have happened to Grace's claim filings had it continued in asbestos litigation after April 2001, as I discuss below.

Despite the evidence that claim filings would have continued to increase after its petition date, and Grace's and our expectations of such increase, our forecasts here are more conservative. We forecast, first, that the number of future nonmalignant claims filed against Grace would not have increased at all, but would have begun by falling sharply in 2002 after Grace's petition date and

would decline for thereafter year-after-year in the future. Second, we forecast that the number of cancer claim filings also would not have increased, but rather would have remained essentially stable over the five years following Grace's bankruptcy. We forecast that Grace's cancer filings in 2002 would fall sharply from filing rates at its petition date and would then have increased slowly for five years. Only by 2006, would cancer filings finally approach Grace's pre-petition levels in 2000 and 2001. Overall, cancer filings over this five year period (2002-2006) would be lower than cancer filings at the time of Grace's bankruptcy. We forecast that then, beginning in 2007 and in all future years, Grace's cancer filings would drop slowly but steadily year-after-year in parallel with the gradually declining disease incidence.

In addition to annual rates, Table 30 shows propensities to sue Grace for two periods: 2000-2001, the fifteen months immediately preceding Grace's bankruptcy petition, that shows the level of claiming against Grace at its petition date. Because claims filings against Grace and other defendants were trending upward at the time of its bankruptcy petition, these most recent propensities represent the best assumption about the starting point for forecasting the continuing trends in claim filings against Grace. The second period shown in Table 30, 1999-2001, is longer, including the earlier year 1999 when claims filings against Grace were markedly lower than the fifteen months preceding its bankruptcy. Use of this longer propensity to sue period (1999-2001 rather than 2000-2001) results in a forecast that is lower than Grace's claim filing trends at the time of its bankruptcy. Rather than forecasting a continuing increase in claims filings, the 1999-2001 propensities to sue produces forecasts that Grace claim filings would have dropped sharply after April 2001 to filing rates averaged over the 1999-2001 that are lower than Grace's actual filing rates in 2000-2001, the time of its petition. Although propensities to sue based on this longer 1999-2001 period are less consistent with Grace's filing experience before bankruptcy, we use the 1999-2001 base period in this report in order to produce conservative forecasts that will be most likely to underestimate, rather than overestimate Grace's asbestos liabilities. Our sensitivity analyses, presented in Section 7, show forecasts based on the alternative and likely 2000-2001 base period.

The rates of change that we forecast in propensities to sue Grace between 2001 and 2006 are rates of increase that actually occurred for the Manville Trust over the very period for which we forecast "future" Grace claims, i.e., from 2001 through 2006. We base our forecasts on the Manville Trust's actual propensities to sue for three reasons. First, we have Manville data about claim trends that are exactly contemporaneous for the "future" period that we need to forecast for Grace. Second, because Manville data are universally regarded as the most comprehensive data on asbestos claims filing and have been used repeatedly by analysts in forecasting liabilities for other defendants, they are appropriate for forecasting Grace's liabilities. Third, the Manville data are remarkably "clean," current, and free of problems such as the need to impute diseases among claims that do not have specific disease (see discussion of this issue in Section 6.1.4 above).

Manville's mesothelioma claim filings continued to increase after Grace's bankruptcy filing in early 2001. Figure 22 and Figure 23 show respectively the number of mesothelioma and lung cancer claims filed annually against Grace and against Manville. On each figure we continue Manville filings after Grace's bankruptcy filing and through 2006. The figures show Manville's filings for 2003 through 2006 averaged over those years, because claim filings over those years were distorted by 2003 changes to Manville's claims procedures. When the Manville Trust announced it 2002 that it would adopt new, stricter claims procedures in 2003 many claimants "accelerated" their filings; claims that would otherwise have been filed in these later years were filed instead in 2003. Consequently, Manville's claim filing trends for the four years from 2003 through 2006 are best represented by averaging its claims across those years as shown in Figure 22 and Figure 23, below.[28]

**Figure 22:** Trends In Grace and Manville Mesothelioma Claims (2003-2006 Smoothed)



Note: Grace filings in 2001 are annualized over the 27 month period from January 2000 to April 1, 2001. Manville 2003-2006 filings are averaged over that four year period.

28. David Austern, CEO of the Manville Trust, reported to Judges' Jack B. Weinstein and Burton R. Lifland: "As you may recall, the deadline to file claims pursuant to the original (1995) TDP was in late 2003 and law firms accelerated the filing of many claims to meet that deadline that, in the ordinary course, would not have been filed until 2004 or later" (Letter of February 28, 2006). Because of these temporal disturbances, we know that some of Manville's 2003 claims would have been filed later had the Trust not made and announced its changes, but we cannot know how many filings were accelerated. As a result, we can attach no significance to the different levels of filings across these four years.

**Figure 23:** Trends In Grace and Manville Lung Cancer Claims (2003-2006 Smoothed)



Note: Grace filings in 2001 are annualized over the 27 month period from January 2000 to April 1, 2001. Manville 2003-2006 filings are averaged over that four year period.

Table 31 shows our calculation of the rates of increase in Manville's propensities to sue for each cancer between 2000 and 2003-2006. Because Nicholson's forecasts of asbestos-related lung cancer deaths falls during the period 2000 through 2006, propensities to sue Manville's for lung cancer remained stable from 2000 to 2006 even though claim filings were falling during these years.

**Table 31:** Rates of Increase in the Propensity to Sue

| Disease | Current Manville |
|---------|------------------|
| Meso    | 1.305            |
| Lung    | 1.006            |
| OthCan  | 1.291            |

Table 32 shows our forecast of the rates of annual increases in cancer propensities to sue (which are trivial for lung cancer): how we spread Manville's actual rates of increase in propensities over the 2002-2006 period for our forecast of Grace propensities to sue during 2002-2006, the first five years of "future" claims. The "rate of increase" for 2002 is 1.00, i.e., no change from

propensities to sue obtaining during the 1999-2001 base period that we use for forecasting propensities to sue, but lower than Grace's actual propensities to sue during 2000 and 2001. We then forecast that beginning in 2003 Grace's propensities to sue would increase at rates parallel to Manville's from as shown in Table 32 so that by 2006 Grace's propensities to sue would have increased by amounts equal to the Manville increases shown in Table 31. As Table 32 shows, we forecast that the Grace propensities will increase gradually at the same rate of increase in each year from 2003 through 2006. After 2006 we forecast that propensities to sue Grace will remain unchanged at their 2006 levels. Because incidences of asbestos-related cancers are forecast to decline for each cancer after 2006, this means that we forecast decreasing numbers of cancer claims in each year after 2006.

**Table 32:** Rates of Increase in the Propensity to Sue

| | Rates of Increase | | | | | |
|---|---|---|---|---|---|---|
| Disease | 2002 | 2003 | 2004 | 2005 | 2006 | 2007+ |
| Meso | 1.000 | 1.076 | 1.153 | 1.229 | 1.305 | 1.305 |
| Lung | 1.000 | 1.002 | 1.003 | 1.004 | 1.006 | 1.006 |
| OthCan | 1.000 | 1.073 | 1.146 | 1.218 | 1.291 | 1.291 |

Table 33 shows the results of applying the Manville increases to forecast Grace propensities between 2002 and 2006. We start in 2002 with Grace's propensities to sue during the 1999-April 2001 base period. The propensities to sue for each year after 2002 is calculated by multiplying the 1999-2001 base period propensities (shown as the 2002 propensities) times the rate of increase for that year shown in Table 32. As Table 33 shows, the resulting propensities increase gradually over the first five "future" years for Grace, but these do not represent an increase over Grace's propensities to sue before its bankruptcy. Rather, by 2006 when our forecast propensities peak, they are equivalent to Grace's actual propensities at the time of its bankruptcy petition, the period 2000-2001 (shown in red in Table 33). Among asbestos defendants, the Grace forecasts after 2001 would not represent high propensities to sue. Even in 2006, we forecast that less than half of mesothelioma victims will file claims against Grace, well under Manville's recent 80 percent propensities for mesothelioma and well under Grace's own experience in the first quarter of 2001. Only one third of asbestos-related lung cancers and less than half other cancers caused by asbestos result in claims against Grace, rates that are again lower than recent rates for Manville and Grace itself in 2001. Finally, we forecast that after 2006, Grace's propensities to sue will remain fixed at the 2006 rates shown in Table 33.

**Table 33:** Actual and Forecast Propensities to Sue for Cancers

| Disease | Actual | | | Forecast | | | | | |
|---------|--------|------|------|------|------|------|------|------|-------|
|         | 1999   | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007+ |
| Meso    | 22.5%  | 38.3% | 74.4% | 35.4% | 38.0% | 40.8% | 43.4% | 46.1% | 46.1% |
| Lung    | 22.1   | 34.3 | 90.1 | 34.8 | 34.9 | 34.9 | 35.0 | 35.0 | 35.0  |
| OthCan  | 22.9   | 34.6 | 89.8 | 35.3 | 37.9 | 40.5 | 43.0 | 45.6 | 45.6  |

Notes: Propensities to sue in 2001, shown in red, are based on one quarter year. Forecast 2002 propensities are Grace's propensities averaged over the period 1999-2001.

Our forecasts of future filings against Grace are strongly conservative. Even though the environment of asbestos litigation in the early 2000s caused most observers, including Grace and us, to expect increases in future claim filings, our liability forecasts assume no such increase in Grace claim filings. Figure 24 shows graphically our forecast of mesothelioma claim filings for each year after Grace's bankruptcy petition. The vertical bar at year 2001 represents the time of Grace's bankruptcy filing. To the left, the upper curve shows the annual Nicholson forecast of mesothelioma incidence (in green) and the lower curve the number of mesothelioma claims filed against Grace (in red), the two parameters that are used to calculate the Grace propensity to sue. Forecast claims are to the right of vertical bar, with the Nicholson incidence forecast again the upper curve and our forecast of future mesothelioma filings the lower curve (in blue). In each future year the forecast number of mesothelioma claim filings is calculated by multiplying the Nicholson incidence for that year (the upper curve) times the propensity to sue for that year. As I discussed, forecast mesothelioma filings start in 2002 well below actually Grace filings in 2000 and 2001, remain below through 2005 and then approach the 2000-01 level only in 2006. Thereafter, mesothelioma filings fall slowly as deaths from mesothelioma slowly decline.

**Figure 24:** Nicholson Meso Forecasts vs Grace Actuals



Figure 25 shows the context of our forecast of Grace's future mesothelioma claims comparing both past and forecast future claims for Grace from 1990 through 2006 with the number of mesothelioma claims received by Manville over the same period (again averaging Manville's 2003-2006 filings because of the 2003 accelerated filings). Note that mesothelioma filings against each defendant were roughly parallel prior to Grace's petition date. Our conservative forecast does not assume continuing parallelism after April 2001. Rather, we forecast a much greater gap between the filings against each: that Grace's claims fall in 2002 while Manville's increased and a gap that is never reduced in later years.

**Figure 25:** Trends In Grace and Manville Mesothelioma Claims (2003-2006 Smoothed)



**Figure 26:** Trends In Grace and Manville Lung Cancer Claims (2003-2006 Smoothed)



We carry out similar calculations for lung cancers and other cancers. For each cancer, we forecast fewer annual claim filings than Grace received before its petition date. Figure 26 compares Grace and Manville filings and trends for lung cancer claims. Again for lung cancer as for mesothelioma, we forecast that the parallelism in filings against each defendant that had obtained before Grace's bankruptcy would change after April 2001. Our forecast of a sharp decrease in Grace lung cancer filings for 2002 introduces a much wider gap than we saw in comparing filings for the two defendants in prior years. Because we forecast that Grace lung cancer filings continue to decrease after 2002, this sharply widened gap is never reduced in future years.

Table 34 shows the total number of future claim filings that we forecast for each type of cancer through year 2039, the end of our forecast period.

**Table 34:** Number of Forecast Cancer Claims Filed After April 2001

| Model | Forecast Cancer Claims | | | |
|---|---|---|---|---|
| | Meso | Lung | OthCan | Total |
| Nicholson | 29,268 | 26,086 | 8,765 | 64,119 |

### 6.2.4. Projection of Future Nonmalignancy Claims

To forecast the number of asbestosis and pleural claims that will be filed against Grace in future

years we do not use the same method that we use to forecast Grace's future cancer claims. First, there are no published, peer-reviewed epidemiological projections for the incidence of nonmalignant asbestos-related diseases that are like the Nicholson cancer forecasts and no epidemiological forecast of nonmalignant asbestos-related disease has been tested and confirmed by actual experience as have the Nicholson cancer forecasts. Second, the disease processes for asbestos-related cancers and asbestos-related nonmalignant diseases differ. Unlike the asbestos-related cancers, which become known to victims abruptly through the rapid onset of symptoms and diagnoses, nonmalignant diseases are insidious. Asbestosis and pleural diseases are progressive diseases that develop gradually over time with the accumulation of scarring of the lungs or pleura. Because dyspnea (shortness of breath) and other effects of these disease increase over time, victims of these diseases may be unaware of the earliest onset of symptoms or may attribute breathing problems to their increasing age or other possible causes. So unlike the asbestos-related cancers, which become known to victims by a signal event--the diagnosis of a grave disease--that will be most likely to trigger claim filing, victims of nonmalignant asbestos diseases may become aware of their diseases gradually or they may be made aware by a medical diagnosis of asbestosis or pleural disease that could be made earlier or later in the progression of the disease. Consequently, filings of claims for asbestosis and pleural disease cannot be predicted from epidemiological evidence in the same manner as can filings of asbestos-related cancers.

Based on our analyses of claims data for Grace and many other defendants we have seen that across all past years there has been an historically stable relationship between the number of cancer and nonmalignant filings against Grace. This is shown in Figure 28: the past trend in annual filings of nonmalignant claims against Grace is similar to its trends for cancer claims (filings are placed on different scales to demonstrate this parallelism). Like cancer filings, the Georgine class action suppressed filings of nonmalignant claims during the mid-1990s, but filings rebounded greatly after the U.S. Supreme Court rejected the Georgine class action in mid-1997 and, as with cancer filings, nonmalignancy filings remained at these new, higher levels until the time of Grace's bankruptcy. Figure 27, below, shows Grace's annual nonmalignant claim filings.

**Figure 27:** Annual Nonmalignant Claims Against Grace



Note: Grace's 2001 entry based on annualizing filings over the 15 months from January 2000 through March 2001.



**Figure 28:** Comparison of Nonmalignant and Cancer Claim Counts



Claims filing trends for nonmalignant and malignant asbestos-related diseases corresponded closely because those filings are generated by similar sets of social, institutional and behavioral determinants. As Figure 28 demonstrates, in the past, filings of asbestos nonmalignant claims in a year could be predicted well from filings of cancer claims. The stable relationship between filings of cancer and nonmalignant claims has been one of the most common patterns in asbestos litigation, not only for Grace, but for other asbestos defendants as well.

Now, however, recent changes in the litigation environment have disturbed this historic stability between cancer and nonmalignancy filings. While cancer filings have increased or continued at high rates in the last few years, filings of nonmalignant claims have fallen. Some of the decrease in nonmalignant filings results from the U.S. Senate's extended consideration of asbestos legislation that would create a national compensation fund and eliminate asbestos litigation ("We attribute the comparatively low rate of claim filings in 2004 to three factors ... 3) the uncertainty surrounding the national asbestos litigation," February 28, 2005 letter from David Austern to Judges Jack B. Weinstein and Burton R. Lifland). The possibility of such legislation has broadly affected asbestos litigation, resulting in fewer settlements of asbestos law suits and reduced filings of new law suits. Given uncertainties about whether or not newly filed law suits would ever result in payment, plaintiffs' lawyers have become unwilling to spend the work and money required to prepare new cases, particularly nonmalignant claims. The possibility of national legislation particularly suppressed nonmalignant claim filings which are more likely than cancer claims to be generated by law firms' entrepreneurial activities and whose filings are more easily deferred because they are less subject to statutes of limitations. This suppression of claim filings resulting from the Senate's legislative considerations will likely be transitory, with a likely rebound in filings should the prospect of legislation disappear.

However, other developments suggest that filings of nonmalignant claims may never rebound to their great numbers of several years ago. First, several states that have been centers of much asbestos litigation have adopted new statutes that will limit the number of new law suits for nonmalignant claims in those states, primarily by establishing medical criteria that plaintiffs must establish in order to bring suit. Second, as I discussed above, courts and defendants have documented the troubling practices of some medical providers who have examined and prepared documents to support many plaintiffs' claims for nonmalignant injuries. While fewer recent claims have depended upon documentation by doctors subject to these criticisms, in the past a significant fraction of law suits for nonmalignant diseases have presented medical documents from doctors or medical facilities who have been criticized. This criticism and attention will likely reduce the number of future law suits for nonmalignant claims. Third, some plaintiffs' law firms have redirected their efforts in recruiting and filing asbestos injury claims, concentrating increasingly on more valuable and less controversial cancer claims. If this redirection by law firms continues, it could reshape asbestos litigation.

For all these reasons we expect that the historically stable pattern between the number of cancer and nonmalignant claims will change and that nonmalignant claim filings will decrease in future years, both relative to cancer filings and in absolute numbers. Although nonmalignant claim filings increased after 2000 among defendants who continued to receive asbestos claims, we forecast instead that after April 2001 future nonmalignant claims against Grace would decrease steadily from their levels before Grace's bankruptcy. To forecast Grace's future nonmalignant claim filings, we start with the level of nonmalignant claims that it received in 1999 and 2000 and then forecast that future claims will decrease at a rate parallel to the Nicholson forecast of the incidence of future asbestos-related cancers, i.e., at a constant relationship to the projected number of asbestos-related cancers. Medical researchers have suggested that trends in the incidence of cancers, like those forecast by Nicholson, represent the best means for estimating asbestos disease generally among exposed workers.

Figure 29 shows our long term forecast of future Grace claims. The figure shows the number of claims filed against Grace annually prior to the bankruptcy, showing separately our forecasts for cancer and nonmalignant claims: cancer claims appear at the bottom and nonmalignant claims appear above. In contrast to our forecast that Grace's cancer filings would be stable from 2002 through 2006, we forecast that Grace's future nonmalignant filings would drop immediately and greatly in 2002, nonmalignant filings in all of 2002 would be no more than the number it received in the *first three months of 2001*. Grace's nonmalignant filings in 2002 would be barely half of its annualized filings in 2000 and 2001. We forecast that nonmalignant filings would then decrease further in each year after 2002.

Figure 29: Actual And Projected Filings



The following two figures (Figure 30 and Figure 31) show past and forecast future claims separately for cancers and nonmalignancies in order to better demonstrate the differing forecast trends in filing for each type of disease claim. For cancers we forecast five years of reduced but generally stable filings, an immediate drop in 2002 followed by short-term increases through 2006 that reflect the experiences of other defendants between 2001 and 2006 and that would restore Grace filing levels about to their pre-bankruptcy level by 2006. But nonmalignant filings simply drop, according to our forecast, sharply at first and continuously forever. For both types of diseases, we forecast lower claims filings against Grace in the future than in its past, despite many strands of evidence and opinion (including Grace's) that claims filings would have increased after April 2001. Our forecasts are conservative in order to assure that we do not overestimate Grace's future filings.

**Figure 30:** Actual And Projected Cancer Filings



**Figure 31:** Actual And Projected Nonmalignant Filings



Case 01-01139-AMC    Doc 17587-11    Filed 12/08/07    Page 37 of 41

W. R. Grace

85

In order to understand the significance of these trends, how highly conservative all of our forecast assumptions are, it is important to recall that we also forecast sharp increases in the percent of claims that Grace will reject without payment. For each type of cancer and for nonmalignancies, we forecast that Grace will pay a far smaller fraction of filed claims than it did prior to 2001. In contrast to the fewer than *10 percent* of claims that Grace rejected pre-petition, we forecast that Grace would now reject *42 percent* of nonmalignant claims and would reject as many as *35 percent* but at least *20 percent* of the reduced number of cancer claims that we forecast for the future

When we combine these two sets of conservative assumptions--that in the future Grace will receive far fewer claim filings and then reject a greater percent of them--we forecast that Grace would pay far fewer claims after April 2001 than it has in the past. Despite all of the reasons to expect otherwise, in effect we assume that Grace would be far more successful in its asbestos litigation in the future than it had been before its bankruptcy.

The following figures show the dramatic turn-around that we forecast for Grace. We forecast that Grace will now pay a lower percentage of cancers (area in red in Figure 32), than it had in the past (area in gold in Figure 32). and a much lower percentage of nonmalignant claims (area in red in Figure 33) than it had in the past (area in gold in Figure 33). Our forecast of the total number of nonmalignant claims that Grace would compensate starts in 2002 at 41.3 percent of the number it paid in the year (January 2000-April 2001, annualized) before the bankruptcy and drops thereafter. We expect some amount of drop in compensated nonmalignant claims both because of Grace's possible turn to a more individualized process for reviewing and resolving claims and also because of the important recent changes in asbestos litigation--criticisms and increased scrutiny of medical documentation of nonmalignant claims, statutory and judicial changes in the legal treatment of nonmalignant disease claims, changes in the practices among plaintiffs' law firms. But we forecast such steep drops out of conservatism, to assure that we do not overestimate the number of claims that Grace will now pay.

Figure 32: Past and Projected Cancer Filings



Figure 33: Past and Projected Nonmalignant Filings



### 6.2.5. Forecast Number of Future Claims

Table 35 shows the results of the forecast. Appendix Table C3 shows the forecast filings for each disease for each year from 2001 to 2039.

Table 35: Number of Forecast Claims Filed After April 2001

| Model | Forecast Claims | | | | |
|---|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal | Total |
| Nicholson | 29,268 | 26,086 | 8,765 | 694,382 | 758,501 |

### 6.2.6. Estimating Liability for Forecast Future Claims

To value future claims we used the same values that I discussed in presenting our forecasts for pending claims, the average settlement values and payment rates shown in Table 25 above. Our forecast average resolution values are obtained by multiplying settlement values and payment rates for each disease.

In forecasting the values of future claims, we assumed that payments would be adjusted for future inflation at a rate of 2.5 percent per year. This rate was being used by the Congressional Budget Office at the time of Grace's bankruptcy and is close to the rate of inflation since then. Table 36 shows the value of future claims adjusting future inflation.

Table 36: Forecast Indemnity for Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $7,491 | $817 | $170 | $2,109 | $10,587 |
| Reduced | Short Term Grace | 6,356 | 881 | 152 | 2,453 | 9,841 |
| Reduced | Quigley | 6,266 | 900 | 113 | 2,931 | 10,210 |
| Reduced | T&N | 6,463 | 857 | 119 | 2,925 | 10,363 |
| Reduced | USG | 7,366 | 1,016 | 126 | 2,918 | 11,426 |
| Lowest | Long Term Grace | $6,169 | $673 | $140 | $2,109 | $9,091 |
| Lowest | Short Term Grace | 5,234 | 725 | 125 | 2,453 | 8,538 |
| Lowest | Quigley | 5,160 | 741 | 93 | 2,931 | 8,926 |
| Lowest | T&N | 5,322 | 706 | 98 | 2,925 | 9,051 |
| Lowest | USG | 6,066 | 837 | 103 | 2,918 | 9,925 |

Notes: Millions of dollars of the year when paid. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

The results in Table 36 estimate the value that we forecast for future claims in terms of the dollars of the year when claims will be paid. However, these do not represent the present value of Grace's liabilities. Since these liabilities will mostly arise in future years, they must be reduced to present value to account for the time value of money. Table 37 shows the estimated present value of these liabilities, based on a discount rate of 5.11%.

Table 37: Present Value (PV) of Future Claims as of April 2001

| Payment Rates | Average Settlement | Forecast Indemnity PV | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $3,520 | $434 | $89 | $1,081 | $5,124 |
| Reduced | Short Term Grace | 2,996 | 467 | 79 | 1,258 | 4,801 |
| Reduced | Quigley | 2,954 | 477 | 59 | 1,497 | 4,988 |
| Reduced | T&N | 3,045 | 455 | 63 | 1,494 | 5,057 |
| Reduced | USG | 3,464 | 538 | 66 | 1,490 | 5,558 |
| Lowest | Long Term Grace | $2,899 | $357 | $73 | $1,081 | $4,411 |
| Lowest | Short Term Grace | 2,467 | 385 | 65 | 1,258 | 4,175 |
| Lowest | Quigley | 2,433 | 393 | 49 | 1,497 | 4,372 |
| Lowest | T&N | 2,508 | 375 | 52 | 1,494 | 4,428 |
| Lowest | USG | 2,853 | 443 | 54 | 1,490 | 4,840 |

Notes: Millions of 2001 dollars. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 5.11%. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

### 6.2.7. Estimating Liability for Pending and Forecast Future Claims

Finally, we add our forecast liabilities for pending and future claims. Table 38 shows forecast

indemnity as dollars of the year in which they will be paid. Table 39 shows the present value of those liabilities.

Table 38: Forecast Indemnity for Pending and Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $7,753 | $907 | $183 | $2,320 | $11,165 |
| Reduced | Short Term Grace | 6,616 | 977 | 165 | 2,693 | 10,451 |
| Reduced | Quigley | 6,525 | 996 | 125 | 3,179 | 10,826 |
| Reduced | T&N | 6,724 | 952 | 131 | 3,173 | 10,980 |
| Reduced | USG | 7,634 | 1,114 | 139 | 3,165 | 12,053 |
| Lowest | Long Term Grace | $6,387 | $748 | $151 | $2,320 | $9,607 |
| Lowest | Short Term Grace | 5,450 | 805 | 136 | 2,693 | 9,086 |
| Lowest | Quigley | 5,375 | 821 | 103 | 3,179 | 9,480 |
| Lowest | T&N | 5,539 | 786 | 108 | 3,173 | 9,606 |
| Lowest | USG | 6,288 | 919 | 114 | 3,165 | 10,488 |

Notes: Millions of dollars of the year when paid. Future claims are assumed to settle 2 years after filing, present claims in 2002. Indemnity is inflation adjusted at 2.5% per year. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

Table 39: Present Value (PV) of Pending and Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity PV | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $3,769 | $520 | $102 | $1,282 | $5,672 |
| Reduced | Short Term Grace | 3,243 | 558 | 91 | 1,487 | 5,380 |
| Reduced | Quigley | 3,200 | 569 | 71 | 1,733 | 5,573 |
| Reduced | T&N | 3,293 | 546 | 75 | 1,730 | 5,643 |
| Reduced | USG | 3,718 | 632 | 78 | 1,726 | 6,153 |
| Lowest | Long Term Grace | $3,106 | $429 | $84 | $1,282 | $4,901 |
| Lowest | Short Term Grace | 2,672 | 461 | 75 | 1,487 | 4,695 |
| Lowest | Quigley | 2,637 | 470 | 59 | 1,733 | 4,899 |
| Lowest | T&N | 2,714 | 451 | 62 | 1,730 | 4,955 |
| Lowest | USG | 3,064 | 522 | 64 | 1,726 | 5,375 |

Notes: Millions of 2001 dollars. Future claims are assumed to settle 2 years after filing, present claims in 2002. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 5.11%. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.