# EXHIBIT 14

**EXPERT WITNESS REPORT OF MARSHALL S. SHAPO**

In Response to Report of Frederick C. Dunbar

In Re W. R. Grace & Co., et al.

September 25, 2007

## I. SCOPE OF ASSIGNMENT AND SUMMARY OF OPINION

I have been asked by counsel for David Austern, the Official Representative of Asbestos Personal Injury Claimants ("FCR"), whether changes in the legal environment since W.R. Grace & Company ("Grace") filed for bankruptcy protection in April 2001 would have significantly affected the amount Grace would have paid in settlements and judgments for asbestos personal injury claims had Grace remained in the tort system. This report analyzes that question and provides a rebuttal to the opinion of Frederick C. Dunbar, Grace's expert economist. This report, together with any testimony that I may give in this bankruptcy proceeding, is for use solely in connection with the estimation hearing in this proceeding on the asbestos personal injury liability of Grace. This report and any testimony that I may give is not intended, and should not be used, for any other purpose.

I conclude that legislation and changes in judicial case law since April 2001 would not significantly have minimized the most substantial claims that Grace paid before it entered bankruptcy and surely cannot be shown to have done so permanently. I thus reject Dr. Dunbar's apparent premise that a "dramatically changed . . . asbestos litigation environment" would have achieved that reduction in Grace's overall exposure to liability.[1] It seems that it is beside the point for Dr. Dunbar to suggest that estimates of Grace's liability based on "simple extrapolation of its experience in the tort system necessarily overestimate its actual liability."[2] It also would appear that it is something of a straw man for Dr. Dunbar to assert that such an approach would entail a prediction that the trust would have to pay a significant number of illegitimate claims.[3] I note in this connection that the estimation experts for the FCR and the Official Committee of

---

[1] *See* Report of Frederick C. Dunbar at 1 (June 18, 2007) (hereinafter, "Dunbar Report")
[2] *Id.*
[3] *See id.*

3

employees to wear masks.[233] Given evidence that the plaintiff "had only an eighth grade education, had difficulty reading, and thus did not pay attention to warning labels," the court said the manufacturer's proffered evidence was enough "to rebut any presumption that [the plaintiff] would have heeded a warning" and that the lack of a warning "was not only *a* cause, but the sole cause of [the plaintiff's] injuries."[234] What makes this decision particularly relevant is the year of the decision, 1993. That predates the Texas venue-limiting statute, now repealed, of which Dr. Dunbar contends Grace "would have been the beneficiary."[235] This would appear to be one instance where common law decision-making has already constricted the running room for plaintiffs, and where whatever effect a liability-limiting statute would have would be marginal.

I have selected these decisions involving asbestos, and in one case silica, from a large body of case law. They are simply symbolic of the point that threads its way through all of these areas of substantive products law: the battle is over the substantive rules and their rationales, and the procedure-oriented statutes are not likely to shift the battle lines, or the tide of battle, in any significant way.

I.   **Scope of duty issues**

One other set of issues provides an important ground of analysis with respect to the substantive law. This is the area of scope of duty, sometimes labeled proximate cause, where the defendant denies that the obligation created by its culpable conduct reaches to the particular plaintiff or to the type of injury sued upon. Again, there are disagreements about the application of the law to cases involving asbestos or other toxic products.

A suit for cleanup costs involving PCBs used in electrical components led to a decision with two edges. One edge, defendant oriented, appears in a finding that "as a matter of law . . .

---

[233] *See Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750 (Tex. 1993).
[234] *Id.* at 754.
[235] *See* Dunbar Report, *supra* note 1, at 61.

citizens.[303] The Indiana Supreme Court, though, restrictively interpreted a statute of repose that benefited plaintiffs suing "persons who mined and sold commercial asbestos," holding that the statute did not cover defendants that did not mine asbestos.[304] Moreover, in a case in which Grace successfully defended the constitutionality of a statute of repose, the Seventh Circuit said that it was "not the courts' business to instruct the Indiana legislature when it is better for consumers than producers to bear that risk."[305]

This brief review of statutes and case law demonstrates that where basic limitations legislation sets the ground rules, the shape of the future depends on judicial interpretation. Particular jurisdictions have construed statutes of limitations in different ways, but there is no indication that there are changes nationwide that would significantly affect future liabilities of Grace. Indeed, it would appear that if any developments in the law would tend one way or another, it might well be to increase those liabilities to some degree. This is because the most recent *statutory* changes on limitations periods have loosened up the law in favor of plaintiffs, and asbestos plaintiffs in particular. In this area of the law, it seems improbable that Grace's overall exposure will be lessened in the future.

***

**Conclusion**

The substantive law of products liability ranges as widely as its varied subject matter would suggest. This survey, which focuses largely, though not exclusively, on asbestos cases, spans products doctrines from representational and non-representational theories of liability to theories of defect and concepts of duty. It also summarizes relevant aspects of the law involving

---

[303] *See Tyson v. Johns-Manville Sales Corp.*, 399 So.2d 263 (Ala. 1981).
[304] *AlliedSignal, Inc. v. Ott*, 785 N.E.2d 1068 (Ind. 2003).
[305] *Pitts v. Unarco Indus., Inc.*, 712 F.2d 276, 280 (7th Cir. 1983).

sprayed "all the way up to the 40th floor of one of the towers and the 64th in the other."[338] The next year, a U.S. attorney in Montana announced the indictment of both Grace and the seven company officials for knowing endangerment of Libby residents and concealment from the government of the health hazards of its mining operations. The indictment included allegations of continued misleading and obstruction of the government "by not disclosing . . . the true nature and extent of the asbestos contamination" of the community.[339]

I cannot scientifically calculate the probable effects of such publicity on Grace's future legal exposure. However, it seems probable that the media spotlighting of Grace, combined with the culpability manifest in its prior behavior, would push against any changes in the tort environment, including the effects of liability-limiting tort statutes as well as the residual effects of stricter judicial proof requirements.

A powerful judicial indication of the elements of Grace's conduct that would be likely to counter any changes in the law aimed at reducing tort liabilities appears in the decision of the bankruptcy court in the *Sealed Air* decision.[340] That 2002 case arose from an allegedly fraudulent conveyance, the transfer of the packaging division of Grace to the Sealed Air Corporation in 1998. The technical question was whether post-1998 asbestos claims against Grace that had not been formally filed at the time of the transfer should be counted in determining Grace's solvency in 1998. The court's view that the claims should be chalked up that way drew on the reality that asbestos-caused diseases often have "long latency periods," something that the court tartly commented had "been common knowledge for twenty to perhaps

---

[338] Andrew Schneider & David McCumber, *An Air That Kills: How the Asbestos Poisoning of Libby, Montana, Uncovered a National Scandal*, Chapter 23 (Berkley Books 2005) (quotation at 333).
[339] Press Release, U.S. Dept. of Justice, *W.R. Grace and Executives Charged with Fraud, Obstruction of Justice, and Endangering Libby, Montana Community* (Feb. 7, 2005), http://www.usdoj.gov/opa/pr/2005/February/05_enrd_048.htm.
[340] *In re W.R. Grace & Co.*, 281 B.R. 852 (D. Del. 2002).

thirty years."[341] The court found it "reasonable to conclude that of the tens of thousands of persons making claims for asbestos personal injury against W.R. Grace after the 1998 transfer date, substantial numbers of them had viable claims against the company prior to that time."[342]

In this opinion the court was speaking generally and not in specific dollar terms. Indeed, it pointed out that for purposes of this decision, it "need not determine the exact value of the post-1998 claims"; all it had to decide was "whether [those claims] exceeded the debtor's assets."[343] That limitation established, the court effectively accepted the view that the key determinants of liability were exposure and disease, noting that *"[e]x hypothesi,* these [post-1998] claimants were already exposed to and injured by W.R. Grace's products."[344] In the court's characterization, the defendants argued that "the post-1998 claims were contingent and thus subject to discounting by the reasonable probability that the contingency would not arise."[345] The court effectively reduced this argument to an absurdity, saying that "[t]o hold that the making of a formal claim was the contingency upon which W.R. Grace's insolvency was balanced is to hold, in effect, that unknown claims are always contingent."[346] As I read the thrust of the opinion, it suggests that on the key liability issues involving culpability—which in practice may well have some impact on the calculation of damages—Grace's conduct will weigh strongly against the tendency of any changes in the law to minimize overall exposure.

The very tone of the *Sealed Air* decision cuts strongly against a view that minimizes Grace's potential exposure. Moreover, it lends emphasis to the uncertainty about the size of the "long tail" of asbestos liabilities over the next decades. This is especially apparent in the court's

---

[341] *Id.* at 862.
[342] *Id.*
[343] *Id.* at 866.
[344] *Id.* at 863.
[345] *Id.* at 862.
[346] *Id.* at 863.

- A geographically diverse example of new manifestations of future illness that also cropped up in 2007 was a discovery of "35 additional cases of mesothelioma among northeastern Minnesota iron ore workers."[413] This triggered a new study by the Minnesota Department of Health, which had concluded in a 2003 survey that a variety of occupational exposures of 17 mesothelioma victims who had worked in the iron mining industry could account for their illness. These jobs included "plumbing, carpentry, boiler operators, or maintenance work."[414]

- The new report of Minnesota cases, if not Grace-related, was simply symbolic of the broad and continuing problem of smoldering disease that faced Grace. Indicative of a legal universe of claims that was expanding even as some types of claims were contracting was a Tennessee appellate decision in April 2007. The court in this case reversed a dismissal of a claim for the mesothelioma death of a woman who allegedly was exposed as a child to asbestos from her father's work clothing. The court declared that the father's employer "could have understood that the risk of injury to someone like [the decedent] was a reasonably foreseeable probability."[415]

### C.    The verdict: not proven

I conclude with an observation that stems from my long-term study of the law of products liability. A particular reference point is my continuing work on a treatise on which I began research approximately forty years ago, and for which the first of four editions was published twenty years ago. In the writing of that work, I have analyzed and often briefed about 12,000 products liability cases; I have also read thousands of other cases in more general tort

---

[413] *See Minnesota: Asbestos-Related Cancers Among Miners Prompt Study by State Health Department*, 37 O.S.H. Rep. (BNA) 328 (April 12, 2007).
[414] *Id.*
[415] *Satterfield v. Breeding Insulation Co.*, 2007 WL 1159416, at *6 (Tenn. Ct. App. April 19, 2007).

law, a subject I have taught since 1965. When I make judgments about how I may most usefully present a case in my treatise, I find it notable how particularized those cases are—an observation that I know will not be news to practicing lawyers or judges. It would now appear that there are not likely to be substantial changes in state rules beyond those that have been enacted, and that there will be no passage of a comprehensive compensation system for asbestos-related illness. Thus, the body of law I have summarized in Section VII, which has held relatively steady over the years bridging the Grace bankruptcy, will continue to be applied to the facts of specific cases as it has been applied up to now.

One could agree, *arguendo*, with Dr. Dunbar's suggestion that a facile projection of Grace's pre-bankruptcy "experience in the tort system" would lead to an overestimation of its "actual liability."[416] This Report, indeed, has tried to avoid a "wooden application" (to borrow a phrase of Dr. Dunbar) of legal analysis. Rather, I have indicated that the substantive law applicable to claims against Grace has not significantly changed since 2001. And, though acknowledging my lack of expertise in the fields commanded by the FCR and ACC experts Jennifer Biggs and Mark Peterson, I have indicated that it is at least open to question that various procedure-oriented changes in the law since that time would significantly reduce Grace's overall liability. I note also that Biggs' report specifies various changes in the "asbestos litigation environment" that her estimates take into account,[417] and that Peterson has provided no fewer than "ten alternative estimates of Grace's liability for future claims."[418] These carefully qualified statements make clear the irrelevance of Dr. Dunbar's concern about hypothetical simplistic approaches that might lead to inflated estimates of the payment of "unfounded claims."[419]

---

[416] Dunbar Report, *supra* note 1, at 1.
[417] See, e.g., Biggs, *supra* note 81, at 7, 55.
[418] See Peterson, *supra* note 81, at ES-4.
[419] Dunbar Report, *supra* note 1, at 1.

To sum up my own principal conclusions: the case is not proven for the proposition that judicial case law and legislation since April 2001 would significantly have minimized the most substantial claims that Grace paid before it entered bankruptcy; nor has it been shown that post-April 2001 changes in the law would permanently minimize Grace's future liabilities for such claims had it remained in the tort system.