# EXHIBIT 15

# Rebuttal Expert Witness Report

of

## Stephen M. Snyder

Submitted On Behalf Of

Asbestos Creditors Committee

In Re: W. R. Grace

September 24, 2007

bar has demonstrated over the decades, explains why filings in all categories will reemerge notwithstanding tort reform in some states.

9. A review of a sample of individual asbestos claims or settlement files will not provide a complete picture of the quality or merit of those claims. Neither plaintiffs nor defendants prepare or maintain comprehensive or complete information in such files while claims are *in process* short of trial. They collect enough information to assign each claim to its category and leave it to the occasional trial to prepare an individual claim comprehensively to test the validity of classes of claims and to adjust settlement values over time. Asbestos claims, sometimes large groups of them, are evaluated by reference mainly to commonly and centrally held stores of information about liability, exposure or medical facts and trial and settlement experience. This is possible because the asbestos litigation is a "mature" tort where all sides have access to wealth of information about cases and their values that has enabled them to evaluate and settle claims in large groups based on standardized, average case profiles well in advance of trial. Litigation of this scale could not resolve claims without the ability to treat cases in groups and without avoiding the crushing cost burden of the need to prepare each case in detail.

### C. Approach: Grounded In The Tort System As It Operated

My perspective is mainly a practical one and is based on widely available information I acquired through having been a participant in the litigation in a variety of capacities – defense lawyer for many asbestos defendants, national counsel for significant defendants (Fibreboard and, after 1996, Owens Corning), co-architect of one of the early global class action settlement attempts,[2] counsel to asbestos defendants who have sought and obtained resolution of their asbestos liabilities through bankruptcy, insurance coverage counsel for a number of asbestos defendants, and trustee of two trusts established under section 524(g) of the bankruptcy code.

Thus, for example, while Grace experts prescribe criteria by which Grace asserts a court or asbestos trust should evaluate claims against Grace, this report seeks to explain how the system has in fact valued them.

The Grace expert reports conclude that the tort system improperly ignored criteria Grace would prescribe and, as a result, improperly assigned value to a wide spectrum of claims, especially so-called non-impaired, non-malignant claims that should not have been assigned any value. This report describes how these categories of claims have been valued, sometimes richly, in the tort system and will continue to retain value in any system applying traditional tort rules and procedures.

---

[2] *Ortiz v. Fibreboard Corporation*, 527 U.S. 815, 119 S. Ct. 2295 (1999).

The Grace expert reports do not discuss individual jury trial results in any detail. This report describes:

i) How asbestos negotiators, adversaries with access to a wealth of information from an enormous number and variety of individualized trials and decades of discovery and investigation, used these trial results and other available data to assign values to cases that reflected actual tort system risks of liability;

ii) How Grace's managers used Grace's peripheral defendant status to negotiate settlements that kept its costs low, preserved low settlement averages for use in a later global settlement or other valuation process, and effectively protected Grace from the much greater asbestos litigation challenges then confronting the front line asbestos defendants;

iii) Why I conclude that this strategy was not forced on Grace but was the correct choice for Grace, one fortunately available to it because other "target" defendants in this period were spending fortunes conducting defenses that absorbed the attentions of the plaintiffs' bar in the course of *unsuccessful* defense efforts to remake the litigation into what the Grace expert reports now say it has become.

II. **APPLICATION OF THE CLAIMS VALUATION ASSUMPTIONS PROVIDED TO GRACE'S EVALUATION EXPERT WOULD UNDERSTATE GRACE'S LIABILITIES AS DETERMINED BY REFERENCE TO ACTUAL AND, I BELIEVE, RELIABLE RESULTS ACHIEVED IN THE TORT SYSTEM**

The criteria employed by Grace and given to Dr. Florence of ARPC for estimation purposes represent a traditional defense view of medical-legal issues which are still contested on a regular basis in asbestos courts across the country. In the main, they have been rejected by courts as categorical legal criteria and sent to juries as opinion evidence to be weighed and accepted or rejected in deciding individual cases. Juries sometimes have accepted these criteria for decision making in particular cases, but also quite often have rejected and have accepted contrary plaintiff presentations such as those laid out in the reports of the ACC's medical and legal expert.

Adoption of the Grace criteria therefore would supplant tort system outcomes with categorical defense criteria on issues the tort system has dealt with regularly over the years and consistently leaves to jury resolution. Any estimation built on these criteria would fail to credit claims routinely deemed valid by the courts and juries. Peremptory implementation of these criteria to adjudicate classes of claims would ignore individual claims characteristics that even the mass trial structures Grace criticized remained sensitive to.

4

enforce settlement values that departed from these norms because they reflected a company's unique and inward looking view of what settlement values should be.

The claims estimators who testify in asbestos bankruptcy cases can run thousands of computer simulations of the variables in their estimation models to determine variability and frequency of different results. The asbestos litigation, as huge as it is, provides its claims managers its own version of this iterative process in the form of jury verdict results from repeated trials of the very same issues. Those issues are not decided just once – they are tried over and over again – and as results have multiplied they have clarified the range and frequency of likely outcomes.

Asbestos trials constantly and repeatedly address issues such as:

> Liability – was the defendant negligent, were its products defective, did it fail to warn adequately? Generally, there has been no single answer to the liability question. It normally is determined on case specific facts on a case by case basis.

> Injury – are symptoms and health effects experienced by the plaintiff caused by asbestos? Were pleural changes caused by asbestos or something else? Was the plaintiff's cancer caused by asbestos? Was a mesothelioma caused by exposure to asbestos or was it "spontaneous" or "idiopathic"? The tort system requires a plaintiff to prove he/she was "injured." Juries in individual cases have found that "injury" has occurred even though the proof does not demonstrate the disease fits conventional definitions such as "asbestosis."

> Legal causation – was a breach of duty (negligence, failure to warn, a product defect) a legal cause of injury? Did the plaintiff experience "enough" exposure to a defendant's products under governing law?

> Damages – Were medical expenses caused by asbestos injury or something else? Was time lost from work due to asbestos injury or by non-asbestos health effects? What amount should be awarded on account of fear, anxiety, worry, emotional suffering and the like caused by the defendant's negligence or other breach of duty?

Thousands of verdicts have been returned in cases presenting the different circumstances defendants see time and time again: in pro-defendant jurisdictions, in pro-plaintiff jurisdictions; against defendants with favorable liability facts, against those with poor, even aggravated, liability facts; on negligence theories, based on failure to warn doctrines, under strict liability instructions – the list goes on. All types of disease processes have been represented: impaired, non-impaired, mere pleural changes, "pleural asbestosis", cured lung cancer, terminal mesothelioma, etc. Plaintiffs are young, old, middle aged. Defendants can be seen as "front line" or "peripheral." Asbestos exposures tried to juries have been light or heavy, brief or repetitive and

6

settlement processes have created a very efficient market for valuing claims – precisely because anyone with an understanding of the substantive law and willing to study the trial results and the archives of evidence can evaluate potential outcomes at trial and make well informed settlement decisions. Those settlements, in turn, become data which parties factor into the next round of talks on comparable cases, and on the round after that, and so on.

Although this system has resolved hundreds of thousands of multi-party claims it nevertheless been heavily criticized by every participant constituency – plaintiffs, defendants, lawyers, and courts. But, it bears emphasis, *it is what it is* and it has equipped claims managers, lawyers and settlement judges with an enormous store of information – more than in any other litigation in history – with which to evaluate their cases.

### B. The Common Store Of Information Available In The Asbestos Litigation Allows Experienced Negotiators To Settle Claims Effectively Based On Limited Plaintiff Specific Information In Individual Files

Asbestos trial preparation – with the host of technical issues left open for decision in each case – is very expensive. Settlements avoid the costs of trial preparation but require the parties to reach agreement in the absence of full case specific information – including especially the presentation from the other side – that a trial would provide. Early settlements of large groups of cases that multiply those savings are possible in the asbestos litigation because the available historical trial, discovery, and settlement information enables the defense claims managers to handicap and settle claims based on limited individual file information.

Grace's approach to ascertaining whether its products had been identified at a particular location[4] is typical of how the litigants use centrally held commonly

---

[4] The question whether defendants' asbestos products were among those plaintiff was exposed to – so-called "product identification" testimony – has always been a core issue in the asbestos litigation. Companies often rely on sales records, product distribution testimony or testimony about proper or customary use and application of certain products to argue that their products were not present or were present only in amounts that they argued should be considered insignificant. "Co-workers" (not just tradesmen but also teamsters, warehousemen, supply clerks, etc.) have been particularly important plaintiff product identification witnesses. They testify to the products actually used, installed or removed at certain locations at certain times. They explain how contractors regularly borrowed products from other jobs or how distributors or contractors exchanged or took products from other distributors or contractors. Sales or distribution records typically contain gaps (i.e., where sales were to resellers or to inventory and therefore could not be traced to actual jobs) and often did not follow products to their final destinations. Thus, juries typically are left to weigh the eye witness testimony provided by plaintiffs and co-workers against inferences from incomplete sales records or job books provided by defendants.

9

## III. GRACE LEVERAGED ITS PERIPHERAL DEFENDANT STATUS TO ACHIEVE REASONABLE SETTLEMENTS

Not all defendants are equal in the asbestos litigation. Some are viewed as more significant – plaintiffs see them as "better" targets. Some are viewed as less attractive just because they are "new" to the litigation or because of relatively strong defenses, product characteristics, relative rarity in the workplace, etc. These latter defendants can employ several strategies to secure settlements at significant discounts from values that would be assigned by juries. However, perceptions change. "Peripheral" defendants can be and are pushed into the front line of defendants where they become the focus of intense efforts to develop and fine tune the evidentiary case to be presented against them at trial. Joint and several liability rules have been especially significant in moving "peripheral" asbestos defendants into positions of prominence. Increased attention directed at a defendant translates into increased efforts to "identify" that defendant's products, or to develop a stronger liability case against it.

Grace was a peripheral defendant[33] in the asbestos litigation throughout the 1980's and 1990's. Grace's group settlement practices were consistent with a well informed strategy by a defendant whose main objectives were to limit costs, stay out of the main trial fray, keep overall settlement averages low to retain its "peripheral defendant" identity as long as possible, and keep the front line defendants in the maw of the litigation to pay the lion's share of liability.

While Grace was trying an average of under ten cases a year in the 1990s, major defendants were spending hundreds of millions of dollars trying hundreds of cases in an effort to drive down their settlement shares and beat back claims they believed had no value. They gambled that the iterative trial process would reduce their liabilities if they tried – and won – more claims. Unfortunately for them, they did not win their trials and the opposite turned out to be the case. Constant trial activity actually increased values and filings across the board in the tort system during this period.

---

order finding that the District Court had overstepped its bounds by "usurping the role of the jury". Id. at 1139. Juries have compensated so-called "other" cancers as asbestos related on the strength of expert opinion testimony such as that supplied here by Dr. Hammar. As a result, defendants have treated "other cancer" cases as compensable in settlement.

[33] Grace has termed itself a "second tier" defendant. (Hughes Deposition, February 22, 2007 ("Hughes Estimation Deposition") at pp. 139:8-40:18.) I use the term "peripheral" to distinguish Grace from more significant defendants like Fibreboard, for example. In my view, Fibreboard long was a second tier defendant because its products were distributed regionally, not nationally. Eventually, and particularly after dissolution of the ACF in 1988, Fibreboard became a first tier defendant.

28

In this environment, Grace did not have to try many of its own cases to set settlement values. It did not need to risk disastrous verdicts such as those that plagued front line defendants. *Grace had available information from trial results from the verdicts being returned against others.* As long as Grace's managers were satisfied that Grace was obtaining sufficient discounts under the circumstances, it made no sense for it to increase its costs and draw attention to itself by demanding to go to trial or more detailed information from plaintiffs in settlement negotiations. While such information might have allowed Grace to set highly individualized values dependent on the detailed facts of cases, it would have, in turn, forced plaintiffs to work on the cases to develop the information, which would have increased costs, settlement demands and the likelihood that Grace would become a more frequent trial target. Trial-like information comes only with trial-like prices, including defense costs and indemnity payments.

### A. Grace Was A Peripheral Defendant With Target Defendant Potential

Because asbestos was ubiquitous, widely used in countless products in a broad variety of settings in the 20th Century, thousands of defendants could have been sued in asbestos cases as early as the 1970's. But developing winnable cases against new defendants is costly and time consuming. Asbestos plaintiffs lawyers have a well grounded and practical understanding of when it becomes necessary or desirable to begin the process of bringing new defendants into the equation. With original, deep pocket defendants on line, plaintiffs chose not to prosecute claims against the vast majority of potential defendants in the 1970s and 1980s.

The original asbestos defendants were asbestos miners and "pipe and boiler" insulation makers such as Johns-Manville, Raybestos Manhattan, Owens Corning, Fibreboard Corporation, Pittsburgh Corning Corporation, Eagle Picher, Celotex/Carey, and Keene Corporation. Those companies' products were heavily used starting with wartime production, e.g., in shipyards, in the early 1940's. They were in the first wave of defendants sued in the late 1960s and especially after the *Borel v. Fibreboard* decision by the Fifth Circuit in 1973. Having spent the time and effort early to develop good cases against those early defendants, the plaintiffs' trial bar continued to focus on them for more than 30 years – despite a number of changes over time in the "mix" of cases -- until mounting bankruptcies and changes in claimant work histories led them to recalibrate against new or historically less prominent defendants.

Grace was not among these original front line defendants. Among other things, asbestos-containing products that became the subject of later litigation against Grace were not widely used in shipyards and did not come to market until after WWII and the Korean conflict. But Grace had the potential to become more prominent in the personal injury litigation. The same lawyers who filed personal injury claims against the original asbestos defendants also prosecuted property damage claims against companies, such as Grace, who made and marketed spray-on and other asbestos-containing products applied in construction and reconstruction of large commercial,

29

institutional, industrial, and government building projects. Eventually, after years of work, having collected information regarding types of asbestos-containing products, their capacity to cause injury, locations where they were installed, replaced, or ripped out, and facts relating to Grace corporate history and conduct for use in property damage claims plaintiffs easily could add Grace as a defendant in individual personal injury claims. As Mr. Hughes said in his arbitration deposition ("The plaintiff[s]... developed a package of information about Grace historically so they were able to transfer the work...developed in...in the property damage cases to the bodily injuries claims."(Hughes Arb. Deposition at p. 107:8-12).

Grace was prominent among property damage defendants since its products were widely distributed and because early property damage claims Grace took to trial drew adverse punitive damages verdicts on facts that risked exposing Grace to the same treatment in the personal injury litigation.[34] Grace understood that it was a logical defendant to be brought to the fore of the asbestos litigation as "target" defendants failed through bankruptcies.[35]

Grace's liability in asbestos personal injury and death cases was premised almost entirely on its status as a defendant which made and distributed "spray on" and

---

[34] *City of Greenville v. W. R. Grace & Co.*, 640 F. Supp. 559 (D. S. Car. 1986), affirmed a January 24, 1986 jury verdict of $6.4 million in actual and $2 million in punitive damages against Grace in a property damage case. The trial court found the evidence supporting the verdict to be "compelling" (Id. at 563 and at 564-565) and that there was "ample evidence not only of negligence, but of recklessness and willfulness." (Id. at 566) The Fourth Circuit Court of Appeals affirmed in August 1987, 827 F.2d 975. Punitive damages were returned against Grace in another early property damage case involving Mercer University, later reversed on limitations grounds. See *Corporation of Mercer University v. National Gypsum Co.*, 877 F.2d 35 (11th Cir. 1989). Grace continued to face punitive damages in property damage cases into the 1990's. *State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co.*, 834 F. Supp. 1046 (C.D. Ill. 1992) ($2 million in punitive damages) and *T.H.S. Northstar Associates v. W.R. Grace & Company - Conn.*, 860 F. Supp. 640 (D. Minn. 1994) ($13.5 million verdict overturned as punitive damages not available under applicable law). But see *Clayton Center Associates v. W. R. Grace & Co.*, 861 S.W.2d (1993), which reverses punitive damages award on the basis of Missouri law as there was no evidence presented at trial that Grace had actual knowledge "the product was dangerous after it was installed in a building." Id. at 694. Significantly, the appellate court observed that Grace's Mono-Kote was friable, easily crumbled and generated dust and debris full of asbestos threatening a risk of harm to building occupants such that "a jury could reasonably conclude that Mono-Kote was unreasonably dangerous." Id at 689. The Court also found the evidence sufficient to support a finding of failure to warn of the dangers of asbestos in the product. Id at 692.

[35] Hughes Arb. Deposition at p. 106:21-107:7; Hughes Ex. 168 (BOCAS 1396-1417; Dec. 6, 1994) (Grace liability increase would be "extremely serious" if OCF were to enter bankruptcy); Deposition of Robert Beber, Feb. 21, 2007 ("Beber Deposition") at p. 115:12-23 (Grace could end up being the "last standing defendant."). As the litigation grew beyond exposures to insulators in wartime shipyards to, e.g., construction and industrial sites, it increasingly would implicate construction and industrial work sites where Grace's products were "broadly used." Those sites "ran the gamut." (Hughes Arb. Deposition at p.109:12-16.)

related asbestos-containing products. However, its history as a miner of asbestos-contaminated vermiculite, the publicity about its ownership and operation of its facilities in Libby, Montana, and its distribution to ordinary consumers of vermiculite and vermiculite products carrying trace amounts of asbestos amphibole fibers had the potential to increase at least Grace's visibility, if not its liability, in the litigation.

### B. The Front Line Defendants Confronted The Major Core Issues In The Litigation Through The 1990s, Allowing Others Like Grace To Collect And Use Valuable Settlement Related Intelligence Generated By Their Efforts

Dr. Dunbar's history concludes that the "...ACF [Asbestos Claims Facility] provided a relatively easy route to settlement and thus gave incentives for plaintiffs lawyers to find more claimants."[36] (Dunbar Report at p. 7.) It makes only passing reference to the role the ACF and its major share members played as front line defendants and emphasizes the impact of the Manville Trust and of the generally lower tier defendants who formed the Center for Claims Resolution ("CCR") after the ACF dissolved in 1988. But it was the front line defendants, including the ACF and, later, the ACF's major share members, who first grappled with issues like screenings, non-impaired claims and mass trials starting in the 1980's and whose actions, successes, and failures were most significant among defendants in shaping events in the decade and a half that followed.

The ACF succeeded Manville as the lead defense advocate in the asbestos litigation.[37] It was, by a very wide margin, the most powerful force in the litigation on the defense side between its formation in 1985 and its dissolution in 1988. Its members paid most of the settlement money that was then being poured into the system. It also tried a substantial number of cases. The ACF took on a campaign in the mid-1980's against mass screenings. Raymark, an early major front line defendant (which did not join the ACF), sued screening doctors and clinics on RICO theories in 1988. See *Raymark Industries, Inc. v. Stemple*, 1991 WL 100820 (D. Kan. 1991). Because it represented the majority of defendants in almost every case the

---

[36] Dr. Dunbar also reports that the ACF achieved its goal of keeping cases out of the tort system. (Dunbar Report at p. 7.) But the ACF was very much "in" the tort system and actually never realized its goal of providing an alternative to tort system resolution.

[37] Manville Corporation left the litigation when it filed bankruptcy in August, 1982. The Manville Trust, which first began accepting claims -- outside of the litigation -- in early 1988 and continued only until its supervising court took it back under court protection in 1990, has never been significant in the asbestos litigation. See the Trust's own version of its history at http://www.mantrust.org/history.htm. Academicians and trend watchers study the Trust's filing history because it is generally accepted that any claim filed anywhere against any defendant in the litigation also eventually will be filed against the Manville Trust. However, it is difficult to assess the significance to the litigation of administrative claims filings against a trust which is paying ten, now only five, cents on the settlement dollar.

31

In the first years after leaving the ACF, OC spent tens of millions of dollars to try to shift liability in the tort system from itself to companies like Grace and the members of the CCR. During this period the threat to peripheral defendants was not that plaintiffs' lawyers would "coach" product identification witnesses.[46] It was that OC would employ its infamous "picture book" to identify those defendants in discovery and implement its program of trials and settlements to enforce its insistence that plaintiffs get more of their settlement money from companies like Grace. This OC "outreach" program did not work, at least from OC's perspective. Peripheral defendants resisted it. Plaintiffs continued to sue OC, largely because they were comfortable with their case against OC, because OC had established a generous payment history, because of a run-on-the bank mentality that OC and other major defendants like it would not survive long[47], and – most ironically – because joining OC in a case insured that OC would apply its resources to build the product identification case against other defendants. OC's outreach efforts supplemented the plaintiffs' store of information identifying claims against others but also touched off increased trial activity that generated <u>increased</u> values generally and, perversely, hardened plaintiffs resolve against OC.

As it became apparent that its outreach program would not produce the desired result, OC found itself confronting plaintiffs more directly on the very issues being debated in this case: screening practices, no impairment cases, low dose exposures, cancer causation. It tried hundreds of cases – individually and in small groups – as part of a program to enforce its view of appropriate tort system valuation criteria similar to those that that emerged in the CCR global settlement for "future claims" and that are now seen in the Grace expert reports. This program included trials of substantial numbers of non-malignant cases and produced very negative results for OC. Settlement values escalated. OC was inundated with large verdicts that included repeated awards of punitive damages, reducing OC to arguing to courts and to juries that no further punitive damages should be awarded in light of the enormous punishments being meted out. <u>See</u> G. Peterson Affidavit. These trial losses specifically informed defendants like Grace that they were not going to prevail on their

---

[46] Mr. Hughes expressed his concerns about "coached" product testimony in his deposition taken on July 19 and August 21, 2002 *In re W. R. Grace & Co. v. Sealed Air Corporation and Cryovac, Inc.* ("Hughes *Sealed Air* Testimony") and in deposition in this estimation proceeding. A newspaper story about "coaching" is cited as evidence of impropriety. <u>See</u> generally, Dunbar Report at pp. 26-29.

[47] Many of the original front-line asbestos companies declared bankruptcy between 1987 and the end of 2000: Nicolet, Inc. (July 17, 1987); Raymark Industries (March 18, 1988, with later filings for related entities); Celotex and Carey Canada (October 12, 1990); Eagle-Picher (January 7, 1991); H.K. Porter (February 15, 1991); Keene Corporation (December 3, 1993); and, Owens Corning and Fibreboard Corporation (Fall 2000).

35

non-impairment theories and that they certainly could not depend on the major defendants to eliminate those types of cases altogether. The cascade of adverse verdicts against OC drew more and more claims into the system as plaintiffs sought to share in OC's willingness to put its corporate net worth on the line to prove its point in the litigation.

In 1997, OC acquired Fibreboard, another major former ACF defendant. In December 1988, OC announced its National Settlement program which is discussed briefly in Dr. Dunbar's report at pp. 10-11. The NSP, like the CCR global settlements, attempted to purchase – with money paid in settlement on current claims – a commitment[48] to stricter settlement disease and exposure criteria covering future claims. In the end, the NSP price was too high. OC could not afford it. Dr. Dunbar observes that the year 2000 claims surge Grace experienced was just one more development that "could not occur if claims were purely driven by epidemiology" (p. 47), implying that the surge had an illicit source. The actual source is not difficult to describe. The year 2000 surge undoubtedly related in large part to the enormous infusion of cash promised by OC's NSP and the extended discussions between OC and plaintiffs' lawyers as rumors multiplied that OC was nearing the end of its financial resources.

OC's experience was a high profile example of what major defendants went through during this period and illustrates a number of additional disagreements I have with conclusions advanced in the Grace expert reports.

<u>No one in the litigation seriously advocates that all claims should be brought as soon as they are medically manifested.</u>

Major defendants like OC have been the first to feel the impact of periodic claims "surges" that so fascinate students of this litigation. Dr. Dunbar's report emphasizes repeatedly that the fact that claims "surged" from time to time shows that claims were not being filed as might be expected from normal disease manifestation. He suggests that this, in turn, is probative of illicit manipulation by the trial bar.[49] I disagree. All sides – defendants, responsible plaintiffs' lawyers, and courts alike – have cooperated over the years in different attempts to shield the litigation from serious consequences if claims arose in the litigation as soon as they medically manifested. It was defendants, not plaintiffs, who took the first steps on this path. Dr. Dunbar describes adoption of suspense dockets (e.g., in New York) as a part of the

---

[48] "Agreement" would be too strong a term to use here since plaintiffs' lawyers never were in a position to make binding promises of this sort on behalf of clients who had not yet retained them.

[49] Descriptions of surges appear throughout the Dunbar Report at pages 21 and 22 for example, he observes that filing surges are "inconsistent with a system in which medical factors drive claims" and that they are "inconsistent with the medical development of asbestos-related disease."

## IV. TORT REFORM IN SOME STATES HAS NOT TURNED THE TIDE IN THE NATIONAL ASBESTOS LITIGATION

I disagree with Dr. Dunbar's conclusion that recent tort reform in some states has caused the litigation to reverse course, especially with regard to low value claims.

Dr. Dunbar is persuaded that the across-the-board reduction in asbestos filings against all defendants starting in 2003, a year before Judge Jack's opinion in the silica litigation, and continuing through 2006 "bears out" the "expected impact" of the tort reform in various states described elsewhere in his report.[98] Dr. Dunbar relies on selected public company filings to conclude that there was "a general decline in claims for all companies since 2003." (Dunbar Report at p. 69.) Among other things, his report relies on a July 2006 press report from Madison County, Illinois – termed a "hell hole" jurisdiction by some authorities cited in the report – that asbestos filings had continued to fall even there after reaching a peak in 2003.[99]

Across the board filing reductions *of all kinds of claims* in the litigation cannot be explained by tort reform measures in some states aimed to inhibit filings of *certain kinds (i.e., low value) claims.* There is a much better explanation for the across the board 2004-2006 claims reductions, one consistent with the view that claims will reemerge notwithstanding occasional tort reform in some states. In August 2003, the Republican Chair of the Senate Judiciary Committee, Arlen Specter, stated his support for the Fairness in Asbestos Injury Act (FAIR[100]), national legislation that would have eliminated – top to bottom – the asbestos tort system and replaced it with a national administrative claims process.[101] Asbestos defendants had been unsuccessfully seeking federal tort reform legislation since before Johns Manville's bankruptcy when Congresswoman Millicent Fenwick of New Jersey – then Manville's headquarters state – had first sought Congressional action. But the situation in 2003

---

[98] Dunbar Report at pp. 68-69: "Following Reforms, Aggregate Filings Have Slowed"; an "expected impact of the recent reforms" perhaps reflecting attorney decisions "...to pass on the low-benefit cases..."; all as "borne out" by "a general decline in claims for all companies since 2003." Dr. Dunbar, for example, points to tort reform in Mississippi as one example how claim values there have been significantly reduced. Dunbar Report at pp. 55-61. But, the Mississippi venue rule changes have done nothing to eliminate dangerous, small group consolidated trials of the type that resulted in the *Cosey* verdict.

[99] *Asbestos cases continue to drop in Madison County*, The Madison St. Clair Record, July 7, 2006.

[100] S. 1125, 108th Cong. (2003)

[101] *See*, Hanlon and Smetak, *Asbestos Changes, NYU Survey of American Law*, 62 NYU L.Rev. 525, 580 *et. seq.* (2007). The authors were counsel to FAIR Act proponents and their firm is successor to the firm that formerly represented the CCR.

was different. There was bipartisan Senate Judiciary Committee support for this FAIR Act legislation in a Congress still controlled by Republican majorities. And prospects for passage were boosted further by announced Presidential support for national asbestos tort reform. All this caused the asbestos trial bar seriously to consider – for the first time ever – sweeping national asbestos tort reform that seemed imminent and likely.

And the legislation *was* sweeping. It not only eliminated all cases of any kind in the tort system and imposed more defense friendly disease criteria (effectively cutting off all marginal claims and even lung cancer claims of smokers when not accompanied by a diagnosis of asbestosis), the claimant benefit schedule limited payouts on claims at all levels and cut deeply into lawyer contingency fees. The legislation also would have eliminated all § 524 trusts, a potential source of "seed" funds for plaintiffs to use in prosecuting their third party claims in the tort system, and would have confiscated all assets of those trusts in order to help fund the $140 billion said to be needed for the national trust. Legislative maneuvering over FAIR Act passage had attorneys for plaintiffs and defendants biting their nails for almost two years, well into 2006 when the results of November, mid-term, Congressional elections settled to everyone's satisfaction that national tort reform legislation once again would not pass.[102]

The effect of FAIR's potential imminent passage on the asbestos trial bar was comprehensive. Plaintiffs firms cut back their asbestos practices – especially their investments in and investigations of new cases – significantly and new filings dried up. Now that it is known that FAIR will not pass the question in my view is not whether tort system claims at all levels will reemerge but when the process of plaintiff lawyer reinvestment and investigation will refill the new claim pipeline so that filings will recommence. The question already has been answered in Madison County, where the local press has reported a resurgence of claims there.[103]

The experience of the 1990's has had its effects on the litigation, however. Plaintiffs firms have become much more aggressive and sophisticated in finding and in not hoarding new cases but in referring them to lawyers who can demand the best values in jurisdictions that will accept the claims and return the best results. Availability of the internet has supercharged both of these processes significantly. The competition among plaintiffs lawyers for mesothelioma claims has become very intense, nearly guaranteeing that all mesothelioma cases will find their way into

---

[102] Hanlon and Smetak, *supra*, at 583.

[103] "After a three year decline in the number of asbestos lawsuits filed in Madison County, new complaints are on the rise in 2007... As of June 30, 227 asbestos cases have been filed here, and a vast majority of them are complaints from out-of-state plaintiffs." *Judges not worried about Madison County asbestos upsurge*, The Madison St. Clair Record, July 26, 2007.

61

competent hands and that these plaintiffs will suffer less than before from the averaging effects of blanket group settlements. Mass trials may be a thing of the past as are mass movements of claims. However, most courts now are more comfortable with modest sized trial consolidations and, as already stated, the common issue partial mass trial genie is not entirely back in its bottle. And work already is underway identifying the new asbestos lead jurisdictions of the future. A heavily populated state like California, one of the jurisdictions attracting increased attention, conceivably could accommodate thousands of claims because of the multiplicity of California's asbestos jurisdictional "contacts."[104]

Although the case has not been made that non-impairment claims have been eliminated altogether, when and how many of these claims will reemerge is more difficult to predict. Investment returns on those cases are lower for plaintiffs than for, e.g., cancer cases. Also delays are greater in filing and in reaching settlements in these cases because of the continuing conventions that permit and even encourage deferring filing of these cases. Relevant also is the fact that many of the new defendants being brought into the system are not as vulnerable to these kinds of cases. Plaintiffs with automotive brake, clutch plate or gasket "very low dose" asbestos exposures are much less likely to bring suit in these cases. But this good news for these very low dose defendants likely would be bad news for Grace had it stayed in the litigation. Grace *did* make and distribute products that will support recoveries in cases like this. In a future tort system it would have fewer tort system codefendants with which share those liabilities. Thus, had Grace remained a defendant in the evolving asbestos tort system, plaintiffs would have been able to finance initial work up of their marginal cases out of settlement trust recoveries and then target Grace as one of a lessening number of defendants who could be sued in cases of this sort.

The number of non-impairment claims that reemerge and when that will take place will depend on a rebuilding sequence that echoes the past, albeit with the following modern overtones: 1) the extent to which internet claims acquisition and referrals reach these types of claims; 2) when any of the several alternative jurisdictions now being actively explored by plaintiffs lawyers will prove to be hospitable to non-malignant filings; and 3) which firms, building on capital accumulated in prosecuting higher value claims, will invest its resources in prosecuting these types of claims as part of a practice, for example, of submitting such claims for compensation by various bankruptcy-created trusts.

---

[104] Hanlon and Smetak, supra, was published shortly before the date of Dr. Dunbar's report. It parallels much of Dr. Dunbar's historical account and his views regarding tort system abuse. Nonetheless, they concluded that it is impossible to declare "victory" noting that "it is highly doubtful that the current balance will last indefinitely" because "the asbestos litigation system is currently in the process of sorting out values." Id. at p. 600. They note, correctly, I believe, that the underlying economics and the "structure of the American court system tends to keep the cycle going." Id. The authors point to Los Angeles as one attractive new forum. Footnote 292.

OC and the other major defendants spent hundreds of millions in defense and indemnity dollars trying to accomplish the same objectives the Grace expert reports now say have been accomplished through no more than a sudden realization of core flaws in the tort system that dawned after Grace's bankruptcy filing. But nothing that has been revealed since Grace filed bankruptcy would be news to the managers of the ACF and the large defendants like OC, who were aware well before 2000 of issues like inter-B-reader variability, movement of claims across jurisdictional boundaries, recoveries in non-impairment claims, consolidated trials, and excesses of certain screeners and doctors. All of these issues were challenging and viable issues in 1986 and 1996. In my opinion the case has not yet been made that they will not remain viable and just as challenging in the tort system in the future.

## V. INDIVIDUAL CLAIMS FILES DO NOT SUMMARIZE ALL AVAILABLE EVIDENCE; HIGH COSTS AND INFORMATION OVERLOAD HAVE CAUSED THE PARTIES TO LIMIT THE INFORMATION RETAINED IN INDIVIDUAL CLAIM FILES

Stakeholders in this litigation long ago realized that the litigation would grind to a halt if all courts and all parties collected or maintained individual case files that contained all information relevant to each case. Court rules, party conventions, such as claims processing procedures in large group settlements, and computer and imaging technologies all come to bear in reducing the day-to-day aspects of this litigation to manageable proportions. "Asbestos personal injury cases are mature mass torts because so many have been tried before so many different juries that the trials are quite routinized and the outcomes are generally predictable. For these cases the trial process is more of a case flow mechanism that a procedure for determining liability, causation, and damages."[105]

Courts with loaded asbestos dockets have issued rulings against burdening court staff or files with, e.g., discovery demands or responses. Parties retain these until needed in trial or motion practice. With 30 to 40 defendants sued in each case, plaintiffs typically have obtained orders requiring them to respond only to limited

---

[105] Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, 39 ARIZ. L. REV. 595, 607 (1997). And see, Francis E. McGovern, Resolving Mature Mass Tort Litigation, 69 B.U. L. REV. 659, 689-94 (1989). In its formative stages, a mass tort often involves individualized litigation as plaintiffs and defendants work through the issues of liability, general causation, and the like. This stage of the litigation involves very high costs for both sides. Plaintiffs' lawyers must build the case against the defendants through extensive discovery and expert testimony. Defendants must conceive and test defenses in trial. There comes a point, however, when this intensive litigation generates a metric for evaluating cases. After this point, trials become relatively rare, and virtually all cases are settled on the basis of essentially administrative procedures. Professor McGovern calls this stage "mature." Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, 39 ARIZ. L. REV. 595, 607 (1997)

standardized discovery, to produce employment or medical records to a single defense representative at designated times in the evolution of the case, and to produce injured clients only for a single "defense" medical examination or deposition. Individual defendants not wishing to duplicate 30 to 40 times the same collection of medical information often share these costs, sometimes through joint defense representatives appointed by the court. The defense "medical" committees thereby created come to grips with how to share costs and the timing and extent of medical evaluation work to be done. Not surprisingly, small share defendants like Grace with plans to settle early are likely to be most vociferous in limiting and delaying early medical "work up" costs. Plaintiffs' lawyers sometimes limit themselves to medical data supplied by their diagnosing physician and wait until defendants collected other "treating doctor" records to "free ride" on copying costs.

The repetitive nature of the litigation also has provided opportunities to economize. The cost control strategies employed by both sides include deferral of full development of individual case facts, especially expert testimony, until the last possible minute – normally when it becomes clear a case actually will go to trial.

In pursuit of the same control and efficiency objectives, asbestos counsel on both sides have amassed substantial product identification libraries composed not only of company records but also of thousands of volumes of deposition testimony from key job site or product identification witnesses. See, e.g., Hughes Arb. Deposition at pp. 107:8-108:22; Hughes Ex. 152; Beber Deposition at p.19:4-20:4; Hughes Estimation Deposition at pp. 47:2-50:3 and 57:24-59:1. The depositions of these key witnesses were taken often in the early years, frequently in large groups of cases.

Co-defendants, particularly the "front line" co-defendants, were often as active as plaintiffs in seeking to implicate products of co-defendants (the joint and several liability version, in asbestos cases, of misery loving company). Owens Corning's post ACF use of its "Picture Book" in its Outreach program took this intra-defense product identification struggle to a new level. The enormous work product effort that went into production of the OC picture book became a staple in the product identification libraries of all parties.[106]

Evidence rules generally provide that testimony given when a defendant's interests are represented may be used against that defendant in other cases. In asbestos, this rule meant that a deposition could be used against the defendants who

---

[106] The complete Owens Corning picture book is submitted with the reliance materials. Attached as Exhibit D is a copy of the index of the book as well as photographs of the Grace product labels. Although most of the photographs are in color, the photographs of the Grace labels are not.

64

had appeared (or whose interests in challenging the testimony were substantially the same as those who were present) in all later cases. Thus, depositions of witnesses who testified to the presence of products have had very long shelf lives and there has been no need to repeat these depositions in subsequent cases. As a result, based on information held centrally *but not in individual claims files* most defendants and plaintiffs alike know what types of products and exposures will be featured – and through what types of evidence – for a plaintiff whose work history shows employment at a particular place at a particular time. Hughes Arb. Deposition at pp. 108:13-109:22.

Similar conventions developed regarding collection and use of medical evidence certainly as early as the 1980's. Plaintiff lawyer individual claims files might only include a conclusory medical diagnosis with a narrative job site/work history summary. Beyond that, the file might collect the basic medical information that would be needed to submit claims under various group or "office" settlement programs that had been negotiated and as requested under court rules. This could include the basic information, most of which was available to the defense in discovery, received from referring counsel or the treating or screening physicians and/or copies of medical records supplied by examining and evaluating physicians and hospital facilities or clinics obtained by counsel through waivers and permissions signed by the plaintiffs.

In claim after claim in a particular geographic area the parties see similar evaluations – x-ray readings, spirometry tests, physical evaluations and medical histories, smoking and asbestos exposure histories – from a limited number of regional medical sources: doctors, technicians, clinics, hospitals. The defense – particularly leading defendants or joint defense medical counsel – examines these sources through depositions and other discovery exhaustively, to the point in fact that eventually all can anticipate with fair accuracy how witnesses on both sides will eventually testify in trial on ultimate questions of injury and causation in any given case just by looking at the bare medical reports and records initially produced in discovery.

They also can anticipate how medical evidence would evolve as time for trial approached in those very few cases that ever would see a trial department. Radiology findings provide an example. If a plaintiff lawyer's office file in a non-malignancy case headed for trial contained radiology findings – chest x-ray B reader ILO scores, for example – of a kind that the defense successfully had attacked in other trials, the lawyer likely might obtain additional x-rays and further lung function readings (to demonstrate disease progression, if any). The lawyer also might resort to alternative experts or testing regimes using different technology, e.g., high resolution CT scans, contrast dye (e.g., gallium) uptake scans. All the counsel in the litigation generally can anticipate how this will play out in a given case based simply on knowledge of the basic medical data in the original files, an understanding how the plaintiffs lawyer will develop and extend that information if and when a trial occurs, and knowledge how the trial court will rule on questions of admissibility of evidence adduced from these

other medical sources. The result: cases can and will be settled on the bare bones medical case file records, unadorned by the results of the much more comprehensive trial preparation measures that otherwise would be needed to take the case to a jury. The trial win-loss record, a measure of the forensic margin of error in these claims files, establishes – as occasionally readjusted through further individual trial activity – the settlement price to be paid for non-malignancy claims that remain active, i.e., that are not otherwise in repose on suspense dockets, yet to be filed in a plaintiff lawyer's back room long term inventory queue, or in green card[107] cold storage.

The evidentiary equation established in the 1980's on medical issues was different than on other, e.g., product identification, issues mainly because of the high expense – especially when applied to thousands of cases – to all sides of any incremental development of case specific medical information. This was particularly acute for peripheral defendants watching their costs which anticipated paying only a small share in settlement – and rarely anticipated trying cases – and therefore had strong incentives to "free ride" on and make do with the medical work-up of larger, front line defendants.[108] Overall, though, the result for medical claims file information has been the same as with product identification and exposure claims file information. *The individual in process plaintiff's case file, without more, does not reflect how the claim will be presented at trial.* Those case files only are developed to a limited point, a convention that is the result of an economizing-driven and often judicially regulated medical information détente between plaintiffs and defendants in cases, such as these, where medical issues were repetitive and the outcomes are predictable.

Thus, material found in individual claims files *in process*, when married with the data available in central repositories, can inform managers about the value of claims for settlement purposes. But it is not adequate for trial and will not stand up to trial – like scrutiny without considerable updating and more intense work, including resort to centrally held data. The Grace-prescribed criteria require trial-like exposure and medical evidence. A more meaningful review of Grace's historical results at this level of detail would be a review of trial evidentiary records accompanied by an evaluation of the verdicts which resulted in the litigation before bankruptcy.

---

[107] Green cards are described at pp. 36-37 of this report.

[108] Indeed, before Manville's bankruptcy in August 1982 virtually all other defendants free rode everywhere off Johns Manville medical work-ups. Similar regimes existed while the ACF, which paid well over most settlement dollars in most jurisdictions, was active in the litigation.