# EXHIBIT 23

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

    Debtors.

Case No. 01-1139 (JFK)

----------------------------------------

DEPOSITION OF:

Jennifer L. Biggs

Monday, November 5, 2007

Washington, D.C.

Lead:  David Bernick, Esquire

Firm:  Kirkland & Ellis, LLP

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 64

1    intellectual capital, some of the specific

2    assumptions and how we developed those

3    assumptions, that is proprietary, yes.

4        Q    And in terms of the

5    peer-reviewed paper, the only peer-reviewed

6    paper that you have identified so far

7    that -- unless you are going to tell me

8    about -- the only peer-reviewed paper you

9    have identified so far that relates to

10   those models is the Cross paper published

11   in '97, correct?

12       A    That's the only paper that

13   deals specifically with the model.  But

14   there are other -- there is other

15   peer-reviewed information that feeds into

16   the model.

17           For example, we rely on

18   assumptions relating to run-off patterns

19   that were developed by Professor Stallard,

20   and his work was peer-reviewed as part of

21   the Manville proceedings back in 1993 and

22   1994.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 65

1           So different assumptions that

2    we rely on could be peer-reviewed or

3    published in other places.

4        **Q    Is there any other -- is there**

5    **any assumption that's in the model beyond**

6    **Mr. Stallard -- Dr. Stallard's run-off**

7    **assumption that has been peer-reviewed?**

8        A    Not that is occurring to me

9    right now.

10       **Q    You said that there is a**

11   **difference between the underlying -- there**

12   **is a difference between the estimation of**

13   **the insureds' asbestos liability as it's**

14   **treated in the two models -- that is, the**

15   **defense model versus and the insurance**

16   **model -- because of information**

17   **constraints.**

18       **What did you mean by**

19   **information constraints?**

20       A    When we do work for an

21   insurance company or a reinsurance company,

22   we are typically looking at the experience

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 74

1      made available publicly, that is,

2      published, an estimate for liability of a

3      specific defendant company?

4          A     I am not sure what was

5      published with regard to the liabilities of

6      the early bankruptcies that I mentioned

7      earlier such as Pay Corp.

8              In terms of liability estimates

9      for other individual defendants, I'm not

10     aware of any.

11         Q     Okay.  I take it that the

12     answer would -- this is pretty

13     self-evident, but there has not been a

14     defendant-specific asbestos liability

15     estimate by Tillinghast that has been

16     published in a peer-reviewed journal,

17     correct?

18         A     A specific estimate in a

19     peer-reviewed journal, no.

20         Q     Okay.  The expert report that

21     you did for Delta American Re, that expert

22     report and your testimony, did that reveal

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 117

1     estimating -- is, you are estimating the

2     presentation of claims that are -- their

3     frequency, their value, their payment?

4          A    That's right.

5          Q    Okay.  And so those are

6     behaviors; are they not?

7          A    And I evaluate them in

8     aggregate, and I think I was perhaps

9     misinterpreting your question in terms of

10    individual behaviors.

11         Q    But those are the behaviors --

12    those are behaviors; are they not?

13         A    That claims are filed.

14         Q    And settled.

15         A    They represent the behavior or

16    actions of the parties involved.

17         Q    Right.  And there are many,

18    many different factors that relate to those

19    behaviors; are there not?

20         A    Yes.

21         Q    There are the behaviors of

22    lawyers in different parts of the country.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 118

1    There are the behaviors of the courts in

2    administering the claims and setting

3    standards for the claims.  There are

4    behaviors of the companies that are

5    litigating or settling the claims.

6        Correct?

7    A    Those would be included, yes.

8        Q    And there are causes of all of

9    those behaviors; are there not?

10   A    Yes.

11       Q    And all I'm saying is:

12       Have you done an expert

13   analysis at any point in time that

14   specifically and quantitatively identifies

15   the causes of any of those behaviors?

16   A    No.

17       Q    Whose job is it in estimation

18   to do that?

19   A    It's not necessary for

20   estimation.

21       Q    Well, fair enough.  That's

22   something that estimation doesn't purport

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 119

1      to do?

2          A    It's not necessary.  What I am

3      trying to estimate is the resulting

4      effects, not the cause of it.

5          Q    But we all know that, if

6      something happens in the future, the

7      changes in the environment, that can have

8      effect on claims-filing and settlement,

9      right?

10             MR. MULLADY:  Objection.

11         Vague.

12         Q    Well, your counsel has said

13     that's vague.  Let's go back.

14             If we take a look at the

15     history of asbestos claims filing and

16     resolution, that is a history where there

17     have been huge changes that affected

18     dramatically the trends of claim filing and

19     resolution, correct?

20             MR. MULLADY:  Objection to the

21         form.

22         A    There have been many changes

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 120

1    over the years, yes.

2        **Q    And those reflect the fact that**

3    **different factors have come into the legal**

4    **environment that cause changes in behavior,**

5    **correct?**

6        A    One of many reasons.

7        **Q    Okay.  So one of many reasons,**

8    **yes?  If you just say "one of many**

9    **reasons" --**

10       A    One of many reasons, yes.

11       **Q    So, now, obviously, if you are**

12   **predicting what is going to happen in the**

13   **future, the future is going to be subject**

14   **to similar changes, right?**

15       A    Not necessarily of the same

16   cause or magnitude.

17       **Q    I understand that.  That's the**

18   **whole issue, isn't it, that, in the future,**

19   **we know that there is going to be some**

20   **change, correct?**

21       A    In something.  I don't know

22   change in what.

US District Court - Delaware                  FINAL - November 5, 2007
Chapter 11 - W.R. Grace                               Jennifer L. Biggs

Page 125

1    radically because a meso claim is not going

2    to be worth a lot less today than it used

3    to be worth.  It's still worth a lot of

4    money.

5            So I am an expert in looking at

6    claiming behaviors in the aggregate and

7    making reasonable assumptions to feed into

8    my model.

9            So I don't want to say I am not

10   an expert because I am an expert in making

11   those estimations, and they incorporate

12   some of what I believe you are describing.

13           And when you use the label an

14   "expert" in this, my expertise is very

15   broad.  So your questions are confusing to

16   me.

17       **Q    Well, I understand that, but**

18   **your expertise has a limitation.  And all**

19   **I'm doing is exploring the limitations of**

20   **your expertise.**

21           **You can do calculations using**

22   **models, but you have to have assumptions**

US District Court - Delaware      FINAL - November 5, 2007
Chapter 11 - W.R. Grace      Jennifer L. Biggs

Page 126

1    that drive those models, correct?

2        A    The assumptions are a very

3    important part of it.

4        Q    And the assumptions that you

5    were just talking about, the assumptions

6    that are important to estimating a future

7    rate of claim filings, are assumptions that

8    go to how people will act under various

9    circumstances, correct?

10       A    In the aggregate.

11       Q    In the aggregate?

12       A    Correct.

13       Q    And in the aggregate their

14   actions under those circumstances would be

15   a function of a variety of factors,

16   correct?

17       A    Yes.

18       Q    Okay.  And when it comes to how

19   those -- what those factors are and how

20   they will affect claiming behavior, there

21   are people who are expert in analyzing

22   marketplace behavior from the point of view

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 136

1    differs, yes.

2        Q    Okay.  And when it comes to

3    that litigation environment, you -- it

4    would be fair to say -- I think you just

5    said it -- that it's very difficult to

6    predict how the litigation environment is

7    actually going to change from year to year.

8        Would that be fair?

9        A    You might have ideas of certain

10   reforms that are about to pass or things

11   like that, but it's difficult to predict

12   years in advance how the litigation

13   environment might change, yes.

14       Q    In fact, if you take a look at

15   Manville, nobody predicted that, when the

16   Manville Trust opened its doors in the

17   first instance, that it would be

18   overwhelmed with claims, correct?

19           MR. FINCH:  Objection.

20   Foundation.

21       Q    If you know.  If you don't

22   know, just say you don't know.

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                   Jennifer L. Biggs

Page 137

1       A    I don't know.

2           Q    No one predicted in the early

3   '90s that claims would continue to rise

4   during the mid '90s, correct, against the

5   industry in general?

6       A    I think some of the work that

7   Professor Stallard did included different

8   ranges of estimates against Manville

9   specifically.  I don't know what specific

10  industry-wide projections regarding

11  increased claims were in the early '90s.

12          Q    In the late '90s, there was a

13  very dramatic up-swing in claims

14  industry-wide, correct?

15      A    Yes.

16          Q    Nobody predicted that; did

17  they?

18      A    They may have been part of

19  ranges of estimates.

20          Q    You don't know -- do you know

21  that they were?

22      A    I believe in the 1993 and 1994

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 138

1    work there were many, many scenarios of

2    possible future claim filings in the

3    context of the Manville Trust.

4        Q    So it's your testimony that

5    Mr. Stallard got it right?  He predicted

6    the up-swing in the late 1990s?

7            MR. MULLADY:  Objection.

8        That's not what she said.

9        Q    Well, there was an up-swing --

10       A    I believe he provided a range

11   of projections.  I don't think that that

12   was what he called his preferred estimate,

13   but I believe that he explored the

14   uncertainty and provided a range of

15   possible outcomes.

16       Q    Right.  And then he did a

17   retrospective view after 2000, and he had

18   to adjust his model because it turns out

19   that the world had changed, correct?

20       A    He -- in his 2001 paper, he

21   described a way to update his projections

22   to reflect changes in the propensity to

Page 139

1    sue.  That's right.

2         Q    And he had not foreseen these

3    changes at the time he did his original

4    estimate, correct?

5         A    I don't know what he foresaw.

6    But his original preferred estimate of the

7    number of claims, the actual subsequent

8    events, differed from that.

9         Q    Okay.  And then there was a

10   very significant change in filing behavior

11   against Manville and against other

12   companies after 2003, correct?

13        A    There were changes against

14   filings against Manville as well as other

15   companies, not necessarily related.

16        Q    But there were significant

17   changes, correct?

18        A    There were dramatic decreases

19   in the number of non-malignant claim

20   filings.

21        Q    And nobody predicted those,

22   correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 140

1           MR. FINCH:  Objection to the

2       form.  Foundation.

3           **Q      In 2003, nobody predicted the**

4       **drop-off that was going to occur in 2004,**

5       **correct?**

6           A     I am not aware of it.

7           **Q      Now, in your estimate, take**

8       **the -- so we what we have is a series of**

9       **changes that have taken place in the**

10      **litigation environment over the years,**

11      **fair?**

12          A     Yes.

13          **Q      And is it also fair to say that**

14      **people who have done estimates of asbestos**

15      **liability have, with a fair degree of**

16      **consistency, failed to predict those**

17      **changes, true or not?**

18          A     There have been changes in the

19      litigation environment that have not been

20      predicted ahead of time, true.

21          **Q      Now, Mr. -- Dr. Peterson was**

22      **able to testify that the longest that he**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 160

1      and the ratio that comes out of that, the

2      assumption that it would then remain

3      constant over a long period of years, with

4      the exception of the date of first exposure

5      adjustment, that assumption is an

6      assumption that you did not test, correct?

7           MR. FINCH:  Objection to the

8      form.

9      A    I haven't tested it in a

10     statistical sense because there are not any

11     statistics to test.  I have tested it from

12     a reasonableness perspective in terms of

13     what might be likely to happen to Grace

14     relative to other defendants.

15     Q    Okay.  Now, from that

16     perspective, that is the perspective that

17     says, "Is Grace's environment vis-a-vis

18     other defendants going to change or not in

19     the future," that's an assessment that you

20     did to see about reasonableness, right?

21          MR. MULLADY:  Objection.

22     Foundation.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 190

1      A    And to make adjustments if you
2    need to.
3      Q    If you have the ability to
4    determine what the subsequent experience
5    is, with respect to a given estimate, is it
6    required or important, either one, under
7    actuarial standards to test that estimate
8    and see whether it was accurate or not?
9      A    I think it would be a best
10   practice.
11     Q    Okay.  Now, have you actually
12   tested any of your -- any company-specific
13   estimate that Tillinghast has done to see
14   whether over time it was accurate or not?
15     A    I have compared some estimates,
16   how they have changed over time.
17     Q    Is any -- are any of those
18   comparisons publicly available?
19     A    Not that I'm aware of.
20     Q    Have you tested whether -- have
21   you found any estimate that turned out to
22   be still accurate five years later, going

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 191

1    out that far?

2        A    By "still accurate" can you

3    define what that would mean, because I

4    typically provide a range of estimates.

5        Q    Yes, within the range of

6    estimates.

7        A    So within the range five years

8    later?

9        Q    Yes.

10       A    Certainly, some of them have

11   been, yes.

12       Q    Ten years?

13       A    I am not aware of comparisons

14   where we have looked at the same book of

15   business ten years apart to make the

16   comparison.

17       Q    Now, in the case of -- in the

18   case of -- strike that.

19           In the case of the asbestos

20   liability estimates, I think that's where I

21   have -- I started out.  Strike that.

22           I want to go -- you are talking

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 195

1  when it comes to claiming behavior.  And he

2  refers to those as socio-legal or legal

3  environment.

4        Are you familiar with that?

5        MR. MULLADY:  Objection to

6     foundation.

7     A    It sounds familiar.  I read his

8  deposition quickly, so I will -- should

9  I -- you are telling me that's what he

10  said, right.

11     Q    That's what he said.  I am just

12  asking whether you are familiar with that.

13     A    I thought you were asking me if

14  that's what he said.

15     Q    No.  Are you familiar with his

16  other -- the fact that he differentiates

17  and says, apart from the biological

18  process, there is a legal environment

19  process that affects claiming behavior?

20        Are you familiar with his

21  statements and writings to that effect?

22     A    I would agree with the premise.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 219

1          I mean, it brought some cases

2    to trial, but it settled most of its cases.

3          **Q    That's true of most companies,**

4    **isn't it, they settle most of their cases,**

5    **right?**

6          A    I believe that's true.

7          **Q    But Grace also litigates the**

8    **cases, too, right?**

9          A    Some of them.

10          **Q    Union Carbide litigates cases,**

11    **has for the last two or three years,**

12    **correct?**

13          A    I believe so.  I don't follow

14    that closely.

15          **Q    Ask him.  He knows about that?**

16          A    I don't talk to Ray about that.

17          **Q    Union Carbide is solvent,**

18    **right?**

19          A    Yes.

20          **Q    How many other major solvent**

21    **defendants are there out there in the tort**

22    **system to litigate cases other than**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 226

1      method that I think you are looking for,

2      but it is a scientific way to do it.

3          **Q     So your answer to that would be**

4      **yes?**

5          A     I can think of something.  Yes.

6          **Q     Okay.  But it's supposed to be**

7      **scientific methodology.  Is that a**

8      **scientific methodology?**

9          A     I am applying scientific

10     principles to evaluating past experience

11     and making a reasoned assumption going

12     forward.  That's a scientific method.

13     Maybe we define that differently.

14         **Q     Okay.  Is that within the scope**

15     **of your expertise, the method that you just**

16     **described for predicting changes in the**

17     **legal environment?**

18         A     I evaluated the likelihood of

19     significant changes in the legal

20     environment relating to meso claims.  I

21     have to -- I have to make an assumption

22     regarding how that might or might not

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 229

1      of a way or a model to use to do that.  As

2      a necessity of making my estimate, I need

3      to come up with an assumption regarding the

4      future propensity to sue.  And the basis I

5      used to make that judgment is scientific in

6      nature.

7              So in a very technical sense, I

8      have used the scientific process to make an

9      assumption.  I haven't built a model, and I

10     don't think I have the expertise to build a

11     model regarding specific claiming behavior

12     and how that would change in the future.

13             But that is different to me

14     than whether I have the expertise to use

15     scientific principles to make an informed

16     judgment and make a necessary judgment

17     regarding the estimate of future

18     liabilities.

19     **Q      That's a question of selective**

20     **judgment, I think your term is?**

21             MR. FINCH:  Objection to the

22         form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 255

1   cause-and-effect factors at a more

2   individual claimant basis.  I just fail to

3   see how that is very possible, given the

4   types of data that are available regarding

5   individual claimants for mesothelioma.

6       Q    Well --

7       A    It sounds like a great theory,

8   but I don't think it's very practical.

9       Q    I see.  Are you aware of any

10  other formal method of scientific analysis

11  that enables you to identify causal

12  factors?

13      A    I haven't studied that.  That's

14  not how I do my analysis.

15      Q    Now, when it comes to Grace

16  specifically, apart from the moratoria,

17  were there any other factors that you

18  identified affecting Grace such that they

19  might change the Grace propensity in

20  relationship to the industry propensity

21  during the late -- during the calibration

22  period?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 256

1              Did I screw that up?

2        A    No.  I'm thinking.

3              Not specifically.

4        Q    How much of the increase -- or

5    there was an increase in the propensity

6    versus the industry during your calibration

7    period, correct?

8        A    Yes.

9        Q    Okay.  So, in fact, if we took

10   your propensity number, about 58 percent --

11       A    For meso.

12       Q    -- for meso, that number

13   reflects in part the impact of an increase

14   in propensity to sue Grace during your

15   calibration period, correct?

16       A    Ratios of Grace's claims

17   relative to the industry claims are higher

18   in 2000 and 2001.

19       Q    Right.

20       A    And some of that increase is

21   attributable to certain moratorium

22   agreements expiring.  And other reasons for

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 259

1         A     That it increased in 2000,

2    2001.

3         Q     Yes.  To that extent, you had

4    to look -- you wanted to look for factors

5    that would account for that increase, that

6    is, Grace-specific factors, right?

7         A     I wanted to understand

8    information that would tell me which years

9    would be most representative of Grace for

10   the future.

11        Q     Right.  And in order to do

12   that, again, you have to go look back to

13   what is causing the events to take place.

14   You want to know if there are going to be

15   events that are non-recurring or if there

16   are going to be events that are recurring,

17   correct?

18        A     I agree.

19        Q     Now, as I understand it, the

20   only event that you have actually analyzed

21   that is unique to Grace during that period

22   of time is the -- are the moratoria,

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                         Jennifer L. Biggs

Page 260

1      correct?

2          A    The moratorium, and the other

3      specific item that I needed to consider for

4      the calibration period was what the partial

5      year of filings represents in terms of the

6      relationship to the industry.  I need to

7      set them on equal time or volume

8      considerations in order for the ratio to

9      make sense.

10         Q    But in terms of changes

11     affecting the propensity against Grace, the

12     only --

13         A    I didn't identify anything

14     else.   Correct.

15         Q    Okay.  Now, with respect to the

16     moratorium, did you measure -- from what

17     you have said -- well, let me just ask you.

18         Did the moratorium have the net

19     effect of increasing the overall average

20     propensity to sue Grace in the calibration

21     period?  In other words, did the moratoria

22     affect propensity within the calibration

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 265

1        **Q     Okay.**
2        A     Because of the effect of the
3    moratorium.
4        **Q     No, the effect of the**
5    **moratorium would only affect 1996.  Well, I**
6    **will rephrase it.  What it says, you work**
7    **with 1996 back to 1991 before really any of**
8    **the moratorium had any kind of effect on**
9    **the propensity?**
10       A     I haven't looked at that
11   specific range of years, but one test that
12   I did do was I looked at the whole period
13   from '92 to 2001.  And I get essentially
14   the same percentage that I selected by
15   reaching back that far.
16       **Q     You still are then including**
17   **the later period of time.  What I am trying**
18   **to tease out is --**
19       A     I think the propensity to sue
20   Grace increased.  I think it's important to
21   use a span of years that are as current and
22   responsive to the future as possible.  But

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 273

1    moratoria.  That's fine.

2          But I then asked the question,

3    what about the two years that have the

4    greatest impact on the calibration period,

5    which are 2000, 2001.

6          Do they affect -- do they

7    reflect the impact of another factor that

8    is unique to Grace other than the

9    moratorium?

10          That's what I am getting at.

11    So the question is:

12          Did you look to see whether a

13    portion of the increase in propensity in

14    2000, 2001, was due to factors other than

15    the moratorium, that is, factors unique to

16    Grace?

17          Did you do that?

18      A     I didn't specifically break it

19    apart in terms of how much is the

20    moratorium and how much might be other

21    factors.

22      Q     Fine.  Let me ask you a couple

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 313

1      understanding of the data.

2              I directly relied on a

3      selection of '97 to 2001 as being

4      responsive.

5          Q      Now, if we take a look at the

6      trend line from '93 through '98, that's a

7      total of six years.  And is it fair to say

8      that the propensity trend line from '93 to

9      '98 is consistently down?

10         A      The ratios in each successive

11     year of Grace relative to the industry are

12     lower.

13         Q      Then there are two years in

14     which there is the beginning of a rise, and

15     then one year in which there is sharp jag

16     up, correct?

17         A      1999 increases, and 2000

18     increases at a greater rate.

19         Q      And are there statistical tests

20     to use to determine whether the group of

21     years from '97 -- from '93 to '98 is

22     statistically different from the group of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 314

1    years, '98 -- I mean -- 1999, 2000, and

2    2001?

3        A    You could use tests to

4    determine if you felt that the average

5    during the two time periods was different,

6    but that wouldn't prove anything.

7        Q    Well, it may not prove

8    anything, but there are tests that are

9    available -- are there not -- for testing

10   as a statistical matter whether those two

11   groups of numbers are significantly

12   different, correct?

13       A    You could test whether the

14   averages are different, but the purpose

15   here is not to show whether they are

16   different.  The purpose is to make an

17   assumption regarding what is most

18   representative for the future.

19       Q    Well --

20       A    And it doesn't matter if the

21   two groups are different --

22       Q    So --

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 315

1      A    -- to do that.

2      Q    **Well, first of all, you didn't**

3  **do the test, right?**

4      A    I didn't see a need to do that.

5      Q    **But you didn't do the test?**

6      A    I didn't do the test because I

7  did not think it was necessary.

8      Q    **Fair enough.**

9          **So if it turns out that there**

10  **is a steep downward trend from '93 to '98,**

11  **there is then a change in direction from**

12  **1999 and 2000. You then get to the key**

13  **question which is:**

14          **If those trends are there and**

15  **they are statistically significant, down**

16  **and then reversal up, you then have to ask**

17  **yourself the question, do you not, about**

18  **which trend is most probative of the**

19  **future, right?**

20      A    I didn't try to answer the

21  question, which trend is representative of

22  the future. I tried to ask myself:  Which

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 316

1    overall rate is most representative of the

2    future?

3           And if I were to follow one

4    theory that says I should be as responsive

5    as possible to recent period experience, I

6    would have only used the data in 2000 and

7    2001 with the very high level.

8           But I didn't do that because I

9    didn't think it was appropriate.

10          I looked into the underlying

11   nature of the reasons that the '97, '98,

12   and 1999 -- '96, '97, '98, and '99 years

13   are depressed and selected the overall

14   calibration period as representative going

15   forward.

16          And as long as I understand the

17   reasons why one group of years is going

18   down, I don't need to test whether they're

19   statistically different. I just need to

20   make an informed judgment as to what I

21   think is the best rate on a going-forward

22   basis.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 317

1          Q      Did you do any tests to

2     determine -- did you do any tests to

3     determine which years from '93 to 2001,

4     which years were most representative?

5          A     That's a judgment.

6          Q      I understand that.  But did you

7     do a test or statistical or other

8     quantitative test to kick the tires on your

9     judgment?

10              MR. MULLADY:  Objection to the

11        form.

12          A     I used principles of actuarial

13     science relating to the credibility of

14     data, stability of data, responsiveness of

15     the time period.  I used those fundamental

16     principles to make a reasonable assumption.

17          Q     Okay.  I have got two more

18     topics to cover, and then I will be done.

19              I want to now turn from -- the

20     ratio that we have talked about is

21     propensity.  It's a ratio -- it's a ratio

22     between claims against Grace and claims

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 338

1    **claimants that it settled with?**

2        A    I am not aware of that evidence

3    in this case.  No.

4        **Q    I take it you were not asked,**

5    **as part of your work, to calculate Grace's**

6    **several liability at any point in time,**

7    **correct?**

8        A    I was asked to estimate future

9    liability, an estimate of what it would

10   take to monetize its liabilities if it had

11   continued in the tort system.

12       **Q    How much it would have cost**

13   **Grace to resolve cases as they came up in**

14   **the tort system, right?**

15       A    Right.

16       **Q    I am just asking you -- I take**

17   **it then the answer to my question is no,**

18   **nobody specifically asked you to determine**

19   **what Grace's several liability was,**

20   **correct?**

21       A    But it's -- even at several

22   liability could change over time.  I'm not

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 340

1      Q    Were you asked to determine

2   that?

3      A    I was asked to determine what

4   they would have continued to pay, and I

5   used what they historically settled for as

6   part of the basis for that.

7      Q    What they historically paid,

8   settled for, they paid in order to avoid

9   not only their share of the liability, but

10   also joint liability, correct?

11      MR. MULLADY:  Objection.

12   Foundation.

13      Q    If you know.  If you don't

14   know, just say you don't know.

15      A    I don't know all of the reasons

16   that they entered into the settlements that

17   they did.

18      Q    If you want to know what their

19   share was -- we all know how much they

20   paid -- but if you want to know what their

21   share was of the total liability, you have

22   to know how much it paid in the aggregate