# EXHIBIT 27

```
 1           IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE DISTRICT OF DELAWARE
 2

 3
     In re:
 4
                              Chapter 11
 5
     W.R. GRACE & CO., et al.,
 6
                              Case No. 01-113 (JKF)
 7                            (Jointly Administered)
              Debtors         Related Docket No. 11958
 8

 9

10

11       The deposition of DOMINIC GAZIANO, taken upon
     oral examination, pursuant to notice and pursuant
12   to the Federal Rules of Civil Procedure, before
     Johnny J. Jackson, Registered Diplomate Reporter
13   and Notary Public in and for the State of West
     Virginia, Wednesday, October 18, 2006, at the
14   Offices of Ciccarello, Del Giudice & LaFon, 1219
     Virginia Street, East, Charleston, West Virginia.
15

16

17

18

19

20

21

22         JOHNNY JACKSON & ASSOCIATES, INC.
              606 Virginia Street, East
23               Charleston, WV  25301
                    (304) 346-8340
24
```

```
 1  communication came to happen?
 2      A.  Mostly it was through phone calls.
 3      Q.  Do you know if there was any written
 4  correspondence between your office and Motley Rice?
 5      A.  There may have been schedules of exams,
 6  et cetera, from the firm, yes, ma'am.
 7      Q.  Would those schedules and the like be
 8  retained in your files?
 9      A.  I doubt it.  I doubt that we keep that.
10  They were just to state that, you know, we are
11  referring so many, these cases for you to evaluate,
12  et cetera, and set up an appointment.
13      Q.  Do you know whether in your files you
14  maintain records based on law firms or attorneys
15  who were individual contacts or sources of work for
16  you, or is it all by claimant?
17      A.  A lot of it is by the attorney.
18      Q.  Would those files be files that would be
19  maintained by Ms. Loudermilk?
20      A.  I don't believe so.
21      Q.  Where would they have been maintained?
22      A.  I don't know that they were maintained.
23      Q.  In this electronic day and age, do you
24  know whether Ms. Loudermilk communicates with law
```

1  claimants, how often and what percentage would you
2  roughly say you actually examined the patients as
3  opposed to simply reviewing medical records and
4  films without examination of patients?
5      A.  I don't know.  Oftentimes I examine, did
6  the x-ray and obtained the history and then I went
7  to do the physical examination at the site or have
8  them referred in to me for the complete
9  examination.
10         So oftentimes it was one that led to the
11 other, and that was quite often that I did the
12 exams.
13     Q.  When you did examinations of patients, say
14 you went to an out-of-state screening and you were
15 doing physical examination of patients at the
16 behest of a law firm, would you be provided with at
17 least some occupational or exposure history prior
18 to you conducting the physical exam?
19     A.  It may be provided, yes, ma'am.
20     Q.  In those cases, in those instances, would
21 you know whether the occupational history or the
22 exposure history were taken by people who were
23 properly trained to do so?
24     A.  I'm not sure.

1    Q.    You wouldn't know?

2    A.    I wouldn't know.

3    Q.    When you were provided with medical

4  records, including occupational or exposure

5  histories, for your review, without a physical

6  examination of a patient, would you know whether

7  the histories had been taken by people who were

8  properly trained to take them?

9    A.    I wouldn't know what their training was.

10   Q.    Do you believe it's important that an

11 exposure history or occupational history be taken

12 by someone with any kind of medical training?

13   A.    Not necessarily.  I think a technician

14 could be taught to take an occupational history.

15   Q.    Would it depend on whether the technician

16 was properly trained to take an exposure history?

17   A.    I think it's important that they know what

18 they doing, yes, ma'am.

19   Q.    Do you know what kind of training might be

20 provided to the individuals who took exposure

21 histories in the materials that you would tend to

22 review for a law firm?

23   A.    No, ma'am.

24   Q.    Do you have any way of knowing what the

1   person's background was who took the history?
2        A.   No.
3        Q.   Dr. Gaziano, did you ever physically
4   recommend to any law firm or anyone for whom you
5   did litigation-related consulting work that any
6   specific guidelines be followed in taking an
7   exposure history?
8        A.   No.
9        Q.   Similarly, you wouldn't know whether any
10  particular questions were asked by the person
11  taking the exposure history in terms of probing the
12  person's exposure or occupational past?
13       A.   That's correct.
14       Q.   You're aware, aren't you, Doctor, that in
15  some cases lawyers themselves are the persons who
16  take the exposure histories in the materials
17  submitted to you?
18       A.   I believe that may be the case.
19       Q.   Did you ever offer to train any of the
20  lawyers with whom you worked about the proper way
21  to take an exposure history?
22       A.   No.
23       Q.   Do you know one way or another whether any
24  of the lawyers who did take exposure histories were

1  ever trained in taking exposure histories by anyone
2  with a medical background?
3      A.   I don't know.
4      Q.   Do you know what criteria the lawyers used
5  in the circumstances where you did litigation-
6  related consulting -- let me try that again.
7           MR. DEL GUIDICE:  He has already testify
8  that he doesn't know how these lawyers took the
9  history.  And these questions are all he doesn't
10 knows.  I would be quite surprised if you get a
11 lawyer to do that.  It's probably a paralegal doing
12 it.
13          MS. AHERN:  We will move here a little
14 more quickly.
15 BY MS. AHERN:
16     Q.   Doctor, in terms of how the occupational
17 or exposure histories were taken and the materials
18 that were submitted to you, do you know what
19 criteria went into the histories that were taken?
20     A.   No, ma'am.
21     Q.   Dr. Gaziano, for people whom you have
22 diagnosed as having asbestosis, do you have any
23 idea what particular asbestos-containing products
24 they may have been exposed to?

1    A.    I don't try to determine that.

2    Q.    And for the people who you diagnosed as

3 having asbestosis, do you know how they were

4 exposed to asbestos-containing products beyond

5 industry or job position?

6    A.    Well, it depends on what kind of

7 information I could get. I imagine occasionally I

8 may get a nonoccupationally-related exposure

9 history.

10         Certainly -- many of these were

11 preliminary assessments. But I did examine, go and

12 examine a large number of them and found that their

13 history was reasonable, a reasonable history in

14 terms of their occupation. There wasn't any wide

15 disparity in presenting the, wide area presenting

16 the history.

17    Q.    Dr. Gaziano, for the materials that are

18 submitted to you by lawyers for your review in

19 connection with litigation-related consulting, do

20 you have any way of knowing whether the exposure

21 histories that you are given are reliable?

22    A.    I make certain assumptions that they are

23 reliable, and I have had numerous opportunities to

24 follow through on my own in examining these and

1    A.   Yes, ma'am.

2    MS. GRAHAM: I pass the witness.

3    MS. AHERN: I think I have one or two

4 follow-up questions.

5    VIDEOGRAPHER: We are off the record. The

6 time is 5:12 p.m.

7    (Pause.)

8    VIDEOGRAPHER: We are back on the record.

9 The time is 5:13 p.m.

10    EXAMINATION

11 BY MS. AHERN:

12    Q.   Dr. Gaziano, you have previously testified

13 in the course of another case that an x-ray in and

14 of itself cannot constitute a diagnosis with regard

15 to asbestos lung disease without an occupational

16 history and a physical examination.

17    Do you stand by that testimony?

18    A.   I don't stand by that testimony. I don't

19 know that I have ever said that.

20    Q.   Do you recall giving an affidavit in a

21 Tennessee case?

22    MR. DEL GUIDICE: Could the doctor see the

23 affidavit?

24    MS. AHERN: I don't have the affidavit.

```
1   BY MS. AHERN:
2       Q.   The case of Herbert Wyatt.
3       A.   I don't recall.  And I wouldn't have said
4   that because I don't believe that.  I haven't
5   believed that.
6       Q.   Fair enough.
7            Doctor, is it your position that you have
8   never expressed the opinion that an x-ray in and of
9   itself cannot constitute a diagnosis with regard to
10  asbestos lung disease without an occupational
11  history and physical exam?
12      A.   I don't think the physical examination is
13  required.  I think the occupational history, as I
14  stated here, the occupational history, a period of
15  time, which is latency, and a chest x-ray is what
16  is required.  And physical exam is not required by
17  these standards.
18      Q.   Is it your opinion that a physical
19  examination is unnecessary to diagnose asbestosis?
20      A.   Yes, ma'am, that's my opinion.
21      Q.   Has that always been your opinion?
22      A.   Yes, ma'am.
23           MS. AHERN:  I have nothing further.
24           VIDEOGRAPHER:  We are off the record.  The
```