# EXHIBIT 32

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------

CHAPTER 11
IN RE:
W.R. GRACE & CO., et al.,
    Debtors

Case No. 01-1139 (JFK)
Jointly Administered

-----------------------------------------

DEPOSITION OF
Jacob Jacoby, Ph.D.
November 1, 2007
New York, New York
Lead: Elli Leibenstein, Esquire
Firm: Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING    1-800-825-3341

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 7

1   A.   Yes.
2   Q.   So you understand how a deposition
3   works?
4   A.   Yes.
5   Q.   In what area is your degree?
6   A.   My doctorate is in psychology.
7   Q.   Undergraduate?
8   A.   My undergraduate master's are also in
9   psychology, the doctorate in psychology with
10  minors in statistics and sociology.
11  Q.   What are your areas of expertise for
12  purposes of this case?
13  A.   I am a consumer psychologist. I do
14  research on consumer behavior, consumer
15  psychology, and in the process of doing research
16  I have to use research methods, and so I teach
17  both consumer behavior and research methods at
18  the university.
19  Q.   Which university?
20  A.   These days, New York University.
21  Q.   Are you teaching courses now?
22  A.   This semester, yes.
23  Q.   Were you teaching courses last
24  semester?
25  A.   Yes.

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 8

1    Q.  What courses did you teach?
2    A.  This semester I'm teaching
3  introductory marketing, last semester I was
4  teaching advertising management.
5    Q.  The semester before that?
6    A.  I think it was also introductory
7  marketing.
8    Q.  You are not a lawyer, is that correct?
9    A.  That's correct.
10   Q.  You do not have any experience with
11 asbestos personal injury claims, is that
12 correct?
13   A.  That is correct.
14   Q.  You have no experience with mass
15 torts, is that correct?
16   A.  I guess so. I'm not even sure what
17 torts mean. But I think I don't have any
18 experience in mass torts. I may have been
19 involved in a case that was mass tort, but I'm
20 not thinking in those terms so I'm not aware if
21 I was or not.
22   Q.  I am not referring to the pastry.
23   A.  I think that would be a tart.
24   Q.  You have no experience with personal
25 injury claims, is that correct?

A. Years ago I did do some testifying in regard to personal injury matters, I'm talking 10, 15 years ago in regard to, among other things, paint thinner for DuPont, also in regard to button batteries as being ingested by children, and a number of other matters that because they are 15, 20 years old, I just don't remember.

But not recently. I guess the answer to your question is not recently have I been involved in any personal injury matters.

**Q. For purposes of your report in this case, you have relied on a lot of assumptions by the lawyers, is that correct?**

MR. ANSBRO: Objection to the form of the question, specifically the term "a lot."

You may answer.

A. I have been given a number of assumptions by the attorneys to rely on, yes.

**Q. Do you know how many assumptions?**

A. I would say if we looked at the report we could count, but offhand maybe ten, something that order.

**Q. You have never testified in an asbestos case, is that correct?**

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 10

1   A.  That is correct.
2   Q.  Have you ever testified about
3   court-ordered proof of claim forms?
4   A.  No, not to my knowledge.
5   Q.  Have you ever testified about the
6   mailing of court-ordered forms?
7   A.  No, not to my knowledge.
8   Q.  Have you ever written any articles
9   about asbestos claims?
10  A.  No.
11  Q.  Have you ever written any articles
12  about court-ordered proof of claim forms?
13  A.  No.
14  Q.  Have you ever written any articles
15  about the mailing of court-ordered forms?
16  A.  No.
17  Q.  When were you retained in this case?
18  A.  Sometime in the middle of 2006 to the
19  best of my recollection.
20  Q.  By whom?
21  A.  By the firm Orrick Herrington.
22  Q.  When you say the middle of 2006, can
23  you be a little bit more precise?
24  A.  Yes, I can. I recall chatting with
25  the attorneys in August of 2006 because I was --

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 24

1   Q. Besides the case you just described
2   regarding casting material to distributors, are
3   there any other cases in which you have surveyed
4   the entire population?
5       MR. ANSBRO: Just object to the form
6   of the question again. Go ahead.
7   A. I have been involved in hundreds of
8   cases and -- over about thirty years, and I
9   cannot at this point remember, obviously, all
10  the cases. From time to time I do get involved
11  in surveying entire populations, but that is
12  infrequent.
13  Q. And you have identified this situation
14  involving a casting material to distributors.
15  Are there any other situations that you can
16  identify now at this point?
17  A. If I could I would tell you.
18  Q. In your surveys, are the people being
19  surveyed litigants in the case?
20  A. Generally not, although I have done
21  work in class actions. But generally not.
22  Q. Well, your understanding is in a class
23  action, other than the named plaintiff, are the
24  other people actually litigants in the case?
25  A. I see what you are saying. No, they

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 25

1   are not, and in that regard, no, I have not done
2   one where I have surveyed named litigants.
3       **Q. So as you sit here today, you are not**
4   **aware of any time that you have ever surveyed**
5   **litigants in a case, is that correct?**
6       A. I'm not aware of knowingly having
7   surveyed litigants. I mean, they may have by
8   luck of the draw been involved in the survey
9   without my knowledge.
10      **Q. There was never the purpose of a**
11  **survey to survey the litigants in a case, is**
12  **that correct?**
13      A. There was never the purpose to survey
14  the litigants. There have been times when the
15  purpose was to survey members of the class, but
16  not litigants. Okay?
17      **Q. In the situations where you have**
18  **performed surveys, are you aware of any time in**
19  **which the people that you have surveyed were**
20  **represented by counsel for the case in which you**
21  **were doing the survey?**
22      MR. ANSBRO: Objection to form of the
23  question and to the foundation.
24      A. I would have no way of knowing.
25      **Q. Is a survey a court-ordered**

JANE ROSE REPORTING  
1-800-825-3341   janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 26

1    discovery?
2       (Question read)
3       MR. ANSBRO: You are asking about the
4    PIQ in this case or in --
5       MR. LEIBENSTEIN: In general.
6       MR. ANSBRO: In any case?
7    BY MR. LEIBENSTEIN:
8       Q.   In your cases?
9       A.   I'm aware that it can be a
10   court-ordered discovery. Generally it is not.
11      Q.   Have you ever surveyed lawyers?
12      A.   Have I ever surveyed lawyers? As a
13   group, just lawyers?
14      Q.   Yes.
15      A.   I don't recall doing so.
16      Q.   In any of the surveys that you
17   performed, was the form of the survey ever court
18   approved before you performed the survey?
19      A.   I have the feeling that years ago I
20   was involved in one or two matters where both
21   plaintiff and defendant -- and I don't even know
22   which side I was working for -- had what they
23   intended to do reviewed by the court, which has
24   been suggested as you probably know, but I can't
25   recall any specifics on that.

JANE ROSE REPORTING  
1-800-825-3341   janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 27

1  Q. So you agree with me, then, the vast
2  majority of cases the survey is not court
3  approved prior to the survey being performed?
4  A. That is correct. Excuse me, let me
5  qualify that. In the vast majority of instances
6  of which I am aware the surveys are not court
7  approved. There may be other arenas where they
8  are court approved, but in my knowledge in the
9  areas where I am generally involved, I'm not
10  aware.
11  Q. In the surveys that you performed
12  outside of this case, do the people that are
13  being surveyed know anything about the case for
14  which you are performing the survey?
15  MR. ANSBRO: Objection to form and
16  foundation. Go ahead.
17  A. Sometimes they may, and in fact, I
18  have questions sometime in that regard. For
19  example, in one matter it was Pebble Beach and a
20  bunch of other golf courses as plaintiffs versus
21  Tour 18, T-O-U-R 18, a case down in the U.S.
22  District Court in Texas, and at the end of the
23  main questionnaire I asked questions as to
24  whether or not people were -- had heard anything
25  about a dispute between so and so and if so what

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Jacob Jacoby, Ph.D.

Page 48

1    Q. So if I wanted to know what
2 assumptions were you asked to make by Orrick
3 Herrington, I should look to pages 9 to 13 of
4 your report, is that right?
5    A. Yes.
6    Q. You personally don't have any
7 expertise to know if the assumptions are true or
8 not, is that correct?
9    A. That's correct.
10    Q. You were asked to assume -- strike
11 that.
12    Did you ever try and make your own
13 independent judgment to see if the assumptions
14 were correct or incorrect?
15    A. Well, based upon informal knowledge,
16 some that I -- some of the assumptions I know to
17 be correct, for example, the assumption that
18 attorneys generally will not prepare a case
19 fully until it gets close to trial. That I know
20 from my own experience, so --
21    Q. But your own experience doesn't
22 include asbestos personal injury claims, is that
23 correct?
24    A. That's correct, as I said, I have not
25 been involved in any prior matter involving

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 49

1   asbestos claims.
2      Q.  Did you do any independent research to
3   determine if any of these assumptions were
4   correct?
5      A.  I assumed that the assumptions were
6   correct, and if they weren't, you know, it would
7   be easy to demonstrate that they weren't correct
8   and the court would understand they weren't
9   correct.
10     I accepted this in good faith saying
11  there is no way, shape or form counsel would
12  want to give me incorrect assumptions because
13  they recognized the value of everything I say
14  could be tossed out. So my assumption regarding
15  the assumptions is is that they are all
16  accurate.
17     Q.  My question was did you do any
18  independent research to determine if any of
19  these assumptions were correct?
20     A.  Sorry. I meant to tack on a sentence
21  in response. And so given that assumption of
22  mine, I didn't need to do nor did I do any
23  independent research to confirm or disconfirm
24  the assumptions I was given.
25     Q.  Now, on page 9 you talk about in the

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 113

1  Have you ever heard the term motion to
2  compel?
3  A.  Yes.
4  Q.  Do you know that Kirkland & Ellis
5  moved to compel the claimants to answer the
6  questions on the PIQs themselves instead of
7  submitting attachments?
8  MR. ANSBRO:  Object to the form of the
9  question, foundation.  Go ahead.
10  A.  I don't know what K&E needed.
11  Q.  Did Orrick Herrington tell you that
12  Grace moved to compel the claimants to answer
13  the questions on the PIQ themselves instead of
14  submitting attachments?
15  MR. ANSBRO:  Same objections, form and
16  foundation.  Go ahead.
17  A.  I don't know.
18  Q.  My question was did Orrick Herrington
19  tell you?
20  A.  I don't recall -- I said I don't know
21  because I don't recall them telling me, but I
22  don't know if they did.
23  Q.  Did you ask anybody: Hey, you know,
24  did Grace ever move to compel the claimants to
25  answer these questions?

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - November 1, 2007  
Jacob Jacoby, Ph.D.

Page 119

1 cover letter that went out with the second wave
2 of PIQs that made mention of a number of factors
3 that -- but I don't know if that's what you are
4 referring to.
5     Q.  I am not. I am referring to a
6 document that your counsel didn't provide to
7 you.
8         (Jacoby Exhibit 3, Letter dated
9 February 6, 2006, on Kirkland & Ellis
10 letterhead, Re: W.R. Grace Bankruptcy, marked
11 for identification)
12 BY MR. LEIBENSTEIN:
13     Q.  Have you ever seen this February 6,
14 2006 letter before?
15     A.  I don't recall ever having seen this
16 letter before.
17     Q.  Do you see that in the first -- now,
18 February 6, 2006, that was before the new
19 deadline for completing or returning the
20 questionnaires, is that correct?
21     A.  If I recall, the deadline was moved
22 twice each time by sixty days, so I don't
23 remember where this came in.
24     Q.  Do you see in the first bullet point
25 where it says: All persons who complete the

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 120

1   questionnaire must answer all questions asked as
2   complete and accurately as possible?
3       A.   I do.
4       Q.   Do you see that?
5       A.   Yes.
6       Q.   Is that a fair thing to ask the
7   claimants to do?
8       A.   Sure it is.
9       Q.   Then specifically questions must not
10  be answered by means of attaching documents, do
11  you see that?
12      A.   Yes, I do.
13      Q.   Is that a fair thing to ask the
14  claimants themselves?
15      A.   I don't know whether it is fair or
16  not. I know this is something that was told to
17  them based on now looking at this letter.
18      Q.   Doesn't the letter make clear that
19  Grace was -- wanted to have the answers to the
20  questions themselves instead of submitting
21  attachments?
22          MR. ANSBRO:  Objection to the form of
23  that question. The letter speaks for itself.
24          Go ahead.
25      A.   Yes, I think the letter does speak for

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware　　　　　　　　FINAL - November 1, 2007
Chapter 11 - W.R. Grace　　　　　　　　　　　　　Jacob Jacoby, Ph.D.

Page 121

1　　itself. Also this is coming from Kirkland &
2　　Ellis, it is -- I don't know -- they are
3　　representing what the court's previous rulings
4　　and instructions are. Maybe it should come from
5　　the court -- I don't know.
6　　　　Q. **You never saw it before so you just**
7　　**don't know?**
8　　　　A. That's exactly right.
9　　　　Q. **Would you have liked to have seen this**
10　**before you filed your report?**
11　　　A. No, it doesn't make a difference to my
12　opinions. I mean, it would have been more --
13　yet more information.
14　　　Q. **Do you agree with me more information**
15　**is better than less information?**
16　　　A. No. No. Because there is a concept
17　called information overload which I have studied
18　extensively and which formed the basis for the
19　Federal Trade Commission's rotated warnings on
20　cigarette packaging.
21　　　Q. **Do you think having this extra level**
22　**would have been information overload for you?**
23　　　A. Well, you keep referring to other
24　things I should have looked at. At a certain
25　point -- how many documents are there in this

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 122

1  case? You don't have to -- that's a rhetorical
2  question and I'm the one that's supposed to
3  answer them so you don't have to answer my
4  question, but I know there is just more than a
5  container boat load, and clearly I couldn't be
6  expected to look at each and every document that
7  might possibly be relevant.
8      Q.  **How many documents have I asked you to**
9  **look at so far?**
10     A.  Well, you have asked me did counsel
11 give me this document, did counsel give me that
12 document, and there are a number of times when I
13 said to you: I don't recall if I got that.
14     Wouldn't it have been important for
15 you to look at?
16     Would it changed my opinions based on
17 what I have seen? Thus far nothing would.
18     Q.  **Are you aware that this letter went to**
19 **all counsel and all claimants who were served**
20 **with PIQs?**
21     MR. ANSBRO: Object to the foundation.
22     A.  I doubt if that were true because you
23 guys can't even tell me that the PIQ reached all
24 claimants. So, you know, sure it went to a lot
25 of people who received the PIQs. All? Might be

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 176

1  potentially verifiable.
2      Q.  You talked about that the instructions
3  failed to indicate that the answers to the
4  questionnaires would be the sole basis upon
5  which Grace would decide the validity of claims
6  for purposes of its liability estimate, do you
7  remember that criticism?
8      A.  Yes.
9      Q.  Would you agree with me that this
10  language could have solved that problem, failure
11  to fill out the PIQ may have significant
12  consequences including your being forever barred
13  from receiving payment on account of your claim?
14      A.  Maybe, maybe not.  It is too vague and
15  it really doesn't get at what you need to do.
16      Q.  Were you aware that that language was
17  proposed by Grace?
18      A.  No, I don't recall hearing that.
19      Q.  You would agree at least that that
20  language is stronger than the language that's
21  actually in the PIQ, the language I just read?
22      A.  I believe so, yes.
23      Q.  Do you know who opposed that language?
24      A.  I never heard that language, I don't
25  know if anyone opposed it.

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 177

1  Q. So I guess you don't know whether the
2  FCR itself that opposed that language, right?
3  MR. ANSBRO: Just note my objection to
4  the foundation of this line, the examination.
5  Go ahead.
6  A. I have no idea if that language was
7  proposed by anyone and, if so, by whom.
8  Q. And no one provided you the transcript
9  from which you could find out who was the one
10  who opposed that language, is that correct?
11  MR. ANSBRO: Same objection, form and
12  foundation.
13  A. If any such exists I am not aware of
14  it.
15  Q. Do you know Mr. Frankel?
16  A. I know several Mr. Frankels, I don't
17  know which one --
18  Q. Do you know Mr. Frankel from Orrick
19  Herrington?
20  A. I don't believe so.
21  Q. Do you know if the reason why the
22  court did not use the stronger language I read
23  to you was because of Mr. Frankel who represents
24  the FCRs? I'll read it again.
25  A. Excuse me, just one word. Did you say

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware  FINAL - November 1, 2007
Chapter 11 - W.R. Grace  Jacob Jacoby, Ph.D.

Page 178

1   Franco or Frankel?
2   Q. Frankel.
3   A. E-L?
4   Q. Yes.
5   A. Okay. Now that we have clarified
6   that, I'm sorry, go ahead.
7   Q. Do you know if the reason why the
8   court did not use the stronger language I read
9   to you earlier was because Mr. Frankel who
10  represents the FCR opposed that language?
11  MR. ANSBRO: Objection to form and to
12  foundation.
13  A. I have no idea.
14  Q. Do you know how asbestos can get into
15  someone's lungs?
16  A. By breathing in asbestos, the fibers,
17  the filaments.
18  Q. Would you agree with me that the
19  fibers need to be in the air for the person to
20  breath it in?
21  A. Generally under normal circumstances,
22  yes.
23  Q. I mean, if you have a tile with
24  asbestos in it, just walking on it is not going
25  to make a person get asbestos-related disease,