# EXHIBIT 33

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Steven Kazan

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE COUNTY OF DELAWARE

---

CHAPTER 11
IN RE: W.R. GRACE & CO., et al.,
    Debtors.

Case No. 01-1139 (JFK)
Jointly Administered

---

VIDEO DEPOSITION OF
Steven Kazan
October 29, 2007
San Francisco, California
Lead: John Donley, Esquire
Firm: Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - October 29, 2007  
Steven Kazan

Page 24

1  Q. And if you skip down to the fourth
2 paragraph, which begins, "My third group."
3  A. Yes.
4  Q. Do you see that? You're explaining a
5 group of claimants there who may or may not have
6 som evidence of change in their lungs, but have no
7 functional or physiological impairment whatsoever.
8 Do you see that?
9  A. Yes.
10  Q. And that's describing what we've been
11 talking about a few minutes ago as unimpaired
12 claimants.
13  A. Yes.
14  Q. And in the next sentence what did you
15 state in your testimony? Could you read that
16 outloud.
17  A. "They are not, by any ordinary definition
18 of the word sick, what we would call sick."
19  Q. All right. And I guess this is an obvious
20 question, but that testimony was truthful when you
21 gave it, correct?
22  MR. LOCKWOOD: Objection.
23  Are you asking him whether his opinion
24 testimony is what he believed in or whether -- are
25 you trying to make this into a question of fact?

JANE ROSE REPORTING  
1-800-825-3341  janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - October 29, 2007  
Steven Kazan

Page 34

1  A. Okay.
2  Q. -- and I'm referring to the second full
3  paragraph, do you recall testifying in your
4  experience there are over 150 medical causes that
5  produce changes in the lungs that are consistent --
6  "consistent with asbestos disease"?
7  MR. LOCKWOOD:  Objection.  Lack of
8  foundation.
9  THE WITNESS:  I wouldn't say that's based
10  on my experience.  It's certainly based on what
11  I've read and been told.  Again, it's an area on
12  which I don't have a qualified opinion, but that is
13  my understanding.
14  MR. DONLEY:  Q.  All right.  In the
15  mid-1980s, Mr. Kazan, moving to a new topic, did
16  you observe a trend in asbestos case filings?
17  A. Yes.
18  Q. And was it something you regarded at the
19  time as a disturbing new trend?
20  A. Well, I -- you know, I know I've talked
21  about it and written about it, and, frankly, I
22  don't remember what the details of it were, but
23  there were developments in the litigation.
24  Is it in the mid-eighties we're talking
25  about?

JANE ROSE REPORTING  
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - October 29, 2007
Steven Kazan

Page 35

1   Q. Starting with the mid-eighties for now and
2   I'll cover some later time periods later.
3       Did you observe that some members of the
4   asbestos plaintiff's bar at that time began
5   arranging x-ray screenings to generate clients?
6   That's really what I was getting at.
7       A. Yes, there were screening programs by
8   then. In fact, I think there were some earlier
9   than that, but --
10      Q. Okay. And if I could refer you to
11  Exhibit 2, at page 197 of your prepared
12  congressional testimony.
13      A. Okay.
14      Q. Under the heading there Asbestos
15  Litigation, Warning Signals, do you see that?
16      A. Yeah, I do.
17      Q. Did you characterize the trend there as a
18  disturbing new trend?
19      A. Yes, I did.
20      Q. And the screenings that you saw trending
21  in the mid-eighties, did they lead you to sharp
22  increases in filings by unimpaired plaintiffs in
23  particular?
24      A. Yes.
25      Q. Did you observe that there were thousands

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Steven Kazan

Page 36

1  of claims being filed on behalf of people who were
2  not sick?
3      MR. LOCKWOOD: Objection. Lack of
4  foundation.
5      THE WITNESS: I don't know that I observed
6  it firsthand. I think I saw the data that was
7  coming through and learned of it from that. If
8  there's something specific that you want to refer
9  me to in this prepared statement, I'm glad to look
10 at it, but --
11     Q. On the live statement, Exhibit 3 I guess
12 that is, if you could turn back to page 25 --
13     A. Yes. Exhibit 3 is the other session. I'm
14 sorry, page 25?
15     Q. Yeah. Just to clarify, Exhibit 2 was the
16 prepared statement from September, '02.
17     A. Right.
18     Q. And Exhibit 3 was the transcript of the
19 live testimony before the panel.
20     MR. LOCKWOOD: In '02.
21     THE WITNESS: In '02?
22     MR. DONLEY: Q. In '02, correct.
23     A. Okay.
24     Q. And we may look at an '03 session chaired
25 by Senator Hatch a little bit later. This is

US District Court - Delaware                FINAL - October 29, 2007
Chapter 11 - W.R. Grace                                Steven Kazan

Page 37

1    before Senator Leahy in '02, or did I get that
2    backwards?
3        A. No, you got it right. In '03 Senator
4    Hatch became the chair of the committee.
5        Q. Okay. So back in '02, Exhibit 3, page 25,
6    do you have that in front of you?
7        A. Yes.
8        Q. A little below the middle of the page, the
9    paragraph beginning "Asbestos victims began filing
10   suit," do you see that?
11       A. I'm sorry, page 25?
12       Q. Page 25.
13       A. Okay.
14       Q. Little more than halfway down, paragraph
15   beginning "Asbestos victims began filing suit."
16       A. Yes, I see that.
17       Q. And the sentence you reported there, you
18   said "By the mid-eighties, mid 1980's, a disturbing
19   new trend began to emerge. Some of my colleagues
20   began filing thousands of claims for people who
21   just were not sick."
22           Do you see that?
23       A. I see that.
24       Q. Based on the data and trends that you had
25   available to you, you believed that to be accurate,

US District Court - Delaware	FINAL - October 29, 2007
Chapter 11 - W.R. Grace	Steven Kazan

Page 38

1   correct?
2   A. Yes.
3   Q. And in the late nineties, did you observe
4   that trend accelerating?
5   A. Yes.
6   Q. And I see you noted three years ago, and
7   this was something you said as of 2002, this trend
8   accelerated rapidly, correct?
9   A. Yes.
10  Q. Would you agree that the fundamental
11  cause, in your view, of the asbestos litigation
12  crisis at that time, the late nineties and heading
13  into the early -- what do we call themselves, 00's,
14  was a -- what you viewed as a flood of unimpaired
15  claims?
16  A. Yes.
17  Q. And did you observe courts being inundated
18  with claims of people who had exposed to asbestos
19  but had no lung deficit and were not sick?
20  MR. LOCKWOOD: Objection to form.
21  Foundation.
22  THE WITNESS: Well, that was certainly my
23  understanding of the situation. It's not like I
24  went from courthouse to courthouse and saw boxes of
25  files flooding in the door. I mean I --

US District Court - Delaware             FINAL - October 29, 2007
Chapter 11 - W.R. Grace                              Steven Kazan

Page 39

1      MR. DONLEY: Q. Sure.
2      A. I think this is what was going on. I
3  think I understood that that was going on, and I
4  think that's the truth about what was going on.
5      Q. You studied it, and you had an
6  understanding of it and you saw large numbers of
7  new unimpaired claims coming in that were higher
8  than the trend previously, as of late nineties,
9  early 00's, fair?
10     A. Yes.
11     Q. And, based on what you observed
12 personally, based on trends that you observed, did
13 you conclude that the problem with the nonmalignant
14 claims at that time was being driven principally by
15 increases in litigation screening?
16     A. Yes.
17     Q. And did that -- was that a function of an
18 increase in high volume mobile screenings arranged
19 by a certain group of entrepreneurial lawyers?
20     MR. LOCKWOOD: Objection to form. Lack
21 of foundation.
22     THE WITNESS: I'm sorry. Finished?
23     MR. LOCKWOOD: Yeah.
24     THE WITNESS: Certainly, the -- probably
25 great majority of the screening cases were based on

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Steven Kazan

Page 42

1   when you testified in the first of the two or three
2   transcripts we put before you, taking a snapshot as
3   of that time and what you observed in the years
4   preceding 2002, going back to the late nineties, at
5   that snapshot in time -- and I'm referring you here
6   to page 206 --
7       A.  Of --
8       Q.  -- of your Exhibit 2.
9           On page 206, immediately below the heading
10  was -- at that snapshot in time, had you formed the
11  view that what was wrong with asbestos litigation
12  was due almost entirely to the huge numbers of
13  claims filed each year by lawyers who have found
14  people who are not sick?
15          MR. LOCKWOOD:  Objection to form.
16          THE WITNESS:  That's what it says here and
17  that's what I said, but that -- in the context of
18  the changes in the litigation environment.
19          MR. DONLEY:  Q.  You were referring to --
20  principally to the screenings that had been taking
21  place at an accelerated rate before then, is that
22  fair?
23      A.  Yes.  But this is in the context of
24  changes in the asbestos litigation environment.  I
25  was not saying that it was these cases that were

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Steven Kazan

Page 43

1   the cause of the asbestos problem, if I can use
2   that term.
3       **Q. Okay. Were those cases, in your view at**
4   **that time, the unimpaired cases coming out of**
5   **screenings at an accelerated rate, contributing to**
6   **a problem of limiting compensation to cancer**
7   **victims in light of finite resources from**
8   **defendants being available?**
9       MR. LOCKWOOD: Objection to form. Lack of
10  foundation.
11      THE WITNESS: That was my view and the
12  position we were taking at the time. The change
13  was largely driven by what I described as
14  entrepreneurial screenings as the explanation for
15  how things had had changed from the early nineties
16  and mid-nineties to the situation that presented
17  itself to all of us in -- from 2000 on.
18      MR. DONLEY: Q. All right. I'd like to
19  explore that in a little more detail and start by
20  seeing if we can agree on the -- some terminology.
21      You have used the terms "a medical model"
22  and also the term "entrepreneurial model" to
23  describe certain aspects of asbestos litigation,
24  correct?
25      A. Correct.

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Steven Kazan

Page 44

1   Q. And by the term "medical model," is that
2   the model of how things, in your experience,
3   traditionally worked in toxic tort cases, where a
4   patient goes to see a doctor, may get diagnosed
5   with symptoms, and may then be referred to a
6   lawyer?
7   A. Well, I -- I don't know that I really want
8   to speak about the whole breadth of toxic tort
9   litigation. Certainly in asbestos litigation, the
10  medical model refers to somebody being diagnosed by
11  a doctor, either because they went with symptoms or
12  because they were being provided with appropriate
13  medical monitoring through their employer or union
14  in kind of the ordinary course of events, receiving
15  a diagnosis of some kind, and then undertaking to
16  explore the -- what legal rights they had and
17  being -- and either finding a lawyer or being
18  referred by the doctor to a lawyer, or being
19  advised by the doctor that they should find a
20  lawyer and so on. That's the medical model, where
21  the diagnosis precedes the legal representation.
22   Q. Okay. And if I direct you to Exhibit 4,
23  which is your March 5th, 2003 testimony --
24   A. Yes.
25   Q. And if I could ask you to turn to page

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Steven Kazan

Page 45

1    two, please, Mr. Kazan.
2    A. Okay.
3    Q. Nine lines from the bottom, if -- if you'd
4    be so good as to count up there with me -- the
5    sentence beginning "In the real world."
6    A. Yes.
7    Q. I think you're describing the medical
8    model that you just talked about there. Could you
9    read what you said at the time.
10    A. Yeah. "In the real world, a person who
11    wants to receive medical advice about a symptom, or
12    even about risks of future illness from some
13    exposure, would go to a doctor, explain his
14    occupational and medical history, undergo tests
15    that comply with generally accepted technical
16    standards and receive a considered diagnosis. That
17    is the medical model, and that's precisely what
18    does not happen in asbestos litigation."
19    Q. Okay. And what you meant by that last
20    sentence was, I take it, with the increase in
21    unimpaired claims coming out of screenings in the
22    late nineties, early 00's, that was the
23    entrepreneurial model?
24    A. Yeah. That was an introduction to sort of
25    the next paragraph referring to the change. I,

Page 46

1  obviously, was not suggesting that it never
2  happened in asbestos litigation, but that what was
3  the troubling aspect is the way that that had
4  changed in large areas of the world of litigation.
5     **Q. Okay. So had you seen in the years**
6  **preceding 2003 a shift to what you describe in the**
7  **next paragraph?**
8     A. Oh, yeah.
9        MR. LOCKWOOD: Object to the form.
10       THE WITNESS: I and the people I was
11  speaking for had been seeing this extensively. I
12  had personal knowledge and experience, to a limited
13  degree at least, with how the screening companies
14  said they operated.
15       MR. DONLEY: Q. Okay. And could you read
16  what you wrote in the next paragraph about that
17  topic.
18       A. "In asbestos litigation, screening firms
19  recruit asbestos-exposed individuals as clients.
20  Technicians employed by firms administer tests that
21  rarely comply with applicable technical standards.
22  The test results are provided to doctors who are
23  often not licensed in the relevant state who did
24  not consider themselves to be in a doctor-patient
25  relationship with the potential claimant, and who

Page 47

1   often have a financial interest in identifying as
2   many potential plaintiffs as possible. The doctor
3   usually does not render a diagnosis, but merely
4   affirms that the x-rays presented to him are
5   "consistent with" asbestosis. If this were
6   medicine, it would be malpractice. But it's not
7   medicine, it's the medical side of legal
8   entrepreneurship."
9        Q. **And by legal entrepreneurship, did you**
10   **mean a situation where clients were recruited by**
11   **lawyers, screened, and suits filed even in some**
12   **case where there was no real illness?**
13        A. I'm sorry, by legal entrepreneurship, I
14   was referring to the whole screening industry, and
15   particularly the mobile x-ray vans screening
16   industry run by a relatively small handful of
17   companies and the kinds of things we're all been
18   talking about over the years. And the question of
19   whether it was the screening companies or the
20   lawyers who were starting this is an interesting
21   question with a multifactorial answer and -- but
22   I'm not sure how important it is to explore --
23        Q. **Okay.**
24        A. -- those details.
25        Q. **Let me ask -- and I do apologize for**

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Steven Kazan

Page 48

1     jumping around from documents. If you could turn
2     back to Exhibit 3 on page 25 of your September '02
3     testimony.
4        A. Okay.
5        Q. And go to the second paragraph from the
6     bottom of that page, please.
7        A. Yes.
8        Q. Could you read for us what you testified
9     about this entrepreneurial screening process.
10       A. Yeah. "We've gone from a medical model in
11    which a doctor diagnoses an illness and the patient
12    then hires a lawyer to an entrepreneurial model in
13    which clients are recruited by lawyers who then
14    file suit, even when there is no real illness.
15    These are not patients, they're plaintiffs
16    recruited for profit."
17       Q. And one more there in the paragraph right
18    above that, could you read that for us, please.
19       A. "Today these claimants are often treated
20    like commodities, recruited and bundled by hired
21    gun operators of mobile x-ray equipment, or through
22    websites that proclaim to people you may have
23    million dollar lungs."
24           Vivid advocacy, wouldn't you say?
25       Q. Well, the million dollar lungs, you saw

US District Court - Delaware                    FINAL - October 29, 2007
Chapter 11 - W.R. Grace                                    Steven Kazan

Page 52

1       A. I don't know, is that back or forward?
2       Q. I think you're right. Moving to page
3  210 --
4       A. Okay.
5       Q. I'll just use the number.
6       A. Okay.
7       Q. And focusing on the end of the second full
8  paragraph there. Based on all you learned about
9  the screenings and the trends in the late nineties
10 and early 00's, had you formed the view by 2002
11 that there was no legitimate scientific doubt that
12 litigation screenings are not calculated to provide
13 real health benefits?
14      MR. LOCKWOOD:  Objection. Lack of
15 foundation.
16      THE WITNESS: That was certainly our
17 position, and my personal view and understanding of
18 the science.
19      MR. DONLEY: Q. Was it also your view at
20 that time that there was no legitimate scientific
21 doubt that the results of these accelerated mobile
22 screenings were unreliable?
23      MR. LOCKWOOD:  Objection to the form.
24 Lack of foundation.
25      THE WITNESS: Yes. That's what I said at

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - October 29, 2007  
Steven Kazan

Page 53

1   the top of page 210, and, again, that was my
2   understanding based on a whole host of things,
3   but....
4       MR. DONLEY:  Q.  Directing you back to
5   Exhibit 3, which is the live transcript from
6   September, 2002, before Senator Hatch and Senator
7   Leahy and the others --
8       A.  Okay.  Is there a page?
9       **Q.  Page 30, please.**
10      A.  Okay.
11      **Q.  And about two-thirds of the way down,**
12  **Senator Hatch posed a question to you, asking how**
13  **it's possible you could be seeing some 90,000 new**
14  **cases in the previous year.  Do you see that?**
15      A.  Yes.
16      **Q.  And could you read your answer for us,**
17  **sir.**
18      A.  "It is a function, Senator, of the vigor
19  and strength of the free market system.  There is
20  an economic opportunity for my colleagues in the
21  plaintiff's bar and they are maximizing that
22  opportunity."
23      **Q.  And is that referring to this -- screening**
24  **trends that we've been talking about for the last**
25  **30 minutes or so here, in general?**

JANE ROSE REPORTING  
1-800-825-3341   janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Steven Kazan

Page 66

1   observed about people who tried to predict the
2   unimpaired nonmalignants, that one of the factors
3   driving the trends for those claims was
4   entrepreneurial zeal?
5       MR. LOCKWOOD:  Object to the form.  Lack
6   of foundation.
7       THE WITNESS:  Well, yeah, as I told
8   Senator Hatch, and as I repeatedly told senators,
9   particularlt conservative Republican senators, that
10  they really be proud, as would Adam Smith, that the
11  free market system was working superbly well and
12  that there was much for conservative Republicans to
13  glory in in this situation, and I think that was
14  true.
15      I mean that was the whole point of this,
16  that if you don't like the results of the way the
17  rules are, the sensible thing to do is change the
18  rules.  And, you know, if there are too many home
19  runs, move the fences out.
20      Q.  Fair enough.  But if there's a type of
21  claim or a group of claims that's being driven by
22  entrepreneurial zeal and economic incentives of
23  claim solicitation, those things can't be measured
24  or predicted by reference to medical science.
25  You've agreed and testified to that, correct?

JANE ROSE REPORTING  
1-800-825-3341   janerosereporting.com

US District Court - Delaware                              FINAL - October 29, 2007
Chapter 11 - W.R. Grace                                              Steven Kazan

Page 67

1       A. Yes. Yes, to some extent that's true with
2   respect to the nonmalignants.
3       Now, I have to say that in recent years
4   there's been a growing recognition that the
5   economic potential embedded in mesothelioma
6   diagnoses was quite substantial, and so we're
7   seeing an increase in the propensity to bring those
8   claims, you know, largely as a manifestation of not
9   only increased awareness by doctors and citizens
10  and the publicity created by legislative intents
11  and all the rest, but also by advertising and the
12  internet and all the rest.
13      That isn't to say that anybody can go out
14  and manufacture a mesothelioma case, but the
15  percentage of them that come to at least the
16  potential for litigation has increased over the
17  last number of years to the point where I think
18  relatively few are kind of falling through the
19  cracks, and if you go back 10 or 20 years ago, you
20  know, half of them probably were. So --
21      **Q. If I focus my question on just unimpaired**
22  **nonmalignants, have you seen any improvement in**
23  **claim forecasting methodology for those claims**
24  **since 2002?**
25      MR. LOCKWOOD: Object to the form. Lack