# EXHIBIT 39

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------

CHAPTER 11

IN RE:
W.R. GRACE & CO., ET AL.,

    DEBTORS.

CASE NO. 01-1139 (JFK)
JOINTLY ADMINISTERED

-------------------------------------------------

VIDEOTAPED DEPOSITION
Dr. Mark Peterson
November 1, 2007
Westlake Village, California
Lead: David M. Bernick, Esquire
Firm: Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 29

1    A.  In this case, yes.

2        Q.  Is it true that in doing your projections, you

3    consider disease trends but you are not predicting

4    disease trends?

5        A.  You're speaking of the incidence and prevalence

6    of disease?

7        Q.  That's correct.

8        A.  That's correct.

9        Q.  Okay.  Is it true that in your work on this

10   case, according to your standard method, that you do not

11   determine how much disease was caused or contributed to

12   by W.R. Grace?

13       MR. FINCH:  Object to form.

14       THE WITNESS:  I don't quantify that, no.

15   BY MR. BERNICK:

16       Q.  That is not the output of your work, your

17   estimation work, correct?

18       A.  That's correct.

19       Q.  Okay.  Now, Mr. Stallard, Research Professor

20   Stallard --

21       A.  Actually I think he's a doctor.

22       Q.  Well, that's what we thought, but he's not.

23       MR. FINCH:  Apparently not.

24   BY MR. BERNICK:

25       Q.  And I don't mean to demean him.  The guy's done

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                         Dr. Mark Peterson

Page 32

1    also an important scientific test to apply to his
2    scientific work?
3        A.  I believe he so testified, yes.
4        Q.  Now, would you agree that reproducibility is an
5    important test to apply to your work?
6        A.  I think it's an element of any scientific work,
7    yes.
8        Q.  Thank you.
9            Do you agree that consistency is an important
10   test to apply to your work?
11       A.  I don't understand what you mean by
12   "consistency," particularly vis-a-vis "reproducibility."
13       Q.  Consistency, that is the data, as an example,
14   has been gathered in a way that lends -- strike that.
15           That the data has been gathered in a consistent
16   way, analyzed in a consistent way, from study to study.
17       A.  Well, that's not predictive good science, no.
18       Q.  Do you agree that predictive value, that is the
19   value of your model in being predictive, do you believe
20   that's an important test for your work?
21       A.  Yes.
22       Q.  Okay.  Do you believe that your work that --
23   Professor Stallard says he performed scientific work as
24   an actuary; do you believe that your own work is
25   science?

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 33

1        A.  Yes.
2            Q.  Do you believe it's appropriate to judge your
3        work according to scientific standards?
4            A.  Yes.
5            Q.  Okay.  Now, one area that we talked about,
6        actually began talking about as concerns science, was
7        asbestos disease, and I'm just going to ask you, as
8        well:  Would you agree with me that there's a lot of
9        science that has been done and published over the years
10       about the disease trends, that is asbestos disease
11       trends, and I'll be more specific, the incidence and
12       prevalence of asbestos-related illness?
13           A.  There are a number of scientific documents that
14       address trends in asbestos-related disease, yes.
15           Q.  Would you agree with me that the studies that
16       have been done about the incidence and prevalence of
17       asbestos-related illness have been done, many of the
18       most important ones, have been done by epidemiologists?
19           A.  Epidemiologists have participated in many of
20       them, yes.
21           Q.  Okay.  Many of those studies are epidemiological
22       studies, correct?
23           A.  That's -- yes.
24           Q.  Epidemiological studies of asbestos-related
25       illness have been done for particular occupational

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 37

1    annual incidence of mesothelioma.  Correct?

2        A.   As the data have come in, they have been applied

3    to test the accuracy of the predictions of the model,

4    yes.

5        Q.   And what you're saying is essentially Nicholson

6    has done -- the Nicholson model has held up over time,

7    that is, as judged in light of its predictive value,

8    it's been found to have high predictive value?

9        A.   Yes.

10       Q.   Would you agree with me that using

11   epidemiological models, that when it comes to

12   asbestos-related illness, disease, it has been and is

13   today possible to predict the future to a reasonable

14   degree of certainty?

15       A.   Yes.

16       Q.   Okay.  Now, let's talk a little bit about

17   predicting not disease, but behavior.  I believe you've

18   testified on more than one occasion, but in B & W and

19   subsequently, that what your model does is to predict

20   behavior; is that fair?

21       A.   Well, yes, that's -- the filings of claims and

22   the settlements of claims are both behaviors, yes.

23       Q.   Okay.  And that's what I was going to get to,

24   the particular behaviors that your model seeks to

25   predict are behaviors relating to the filing and

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 38

1    settlement of claims.  That's what you're trying to
2    predict, correct?
3        A.  Yes.
4        Q.  Okay.  Now, Professor Stallard also has had that
5    enterprise as his enterprise, correct?
6        A.  It's my understanding, yes.
7        Q.  Well, you said you've read his materials.
8        A.  I've read some of his materials.
9        Q.  You've read the deposition, you've read the
10   articles in the Annals of Science in 1992.
11           Did you ever read his book?
12           MR. FINCH:  You mean 1992 or 2001?
13           MR. BERNICK:  Oh, did I say 1992?  I did.
14   That's fair enough, thank you very much.
15       Q.  You read the article in the Annals of Science.
16   Did you ever read his book that was published in 2005?
17       A.  I think I've looked at it, but I've not read it.
18   I mean, I've looked at parts of it, scanned.
19       Q.  Okay.  Now, according to Professor Stallard, in
20   predicting future claims, do you recall that he says
21   that there are two basic drivers for claims:  One is the
22   underlying disease rate, and the other are what he calls
23   legal and economic factors?
24           Do you recall that?
25       A.  No.

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                        Dr. Mark Peterson

Page 44

1      A.  At that point in time, that's my understanding,
2  yes.
3      Q.  And therefore, let me now ask you the broader
4  question:  The only work that has been published of
5  Dr. Stallard, Mr. Stallard, that has been published for
6  review by the public is work relating to an estimation
7  of asbestos liabilities for Johns Manville Trust.
8  Correct?
9      A.  I don't think this is sufficiently important
10  argument for you and I to get angry about it, but it
11  became available to the public for review as a result of
12  the Sealed Air litigation, so in that sense, it was
13  published.  It was not -- in that sense it was
14  published, but not in another sense.  That's how I
15  understand the term.  So I guess I would say no, it
16  became available.
17      Q.  And you think that the answer you just gave is a
18  representative answer for being clear in answering a
19  question?
20      A.  That's why I answered it.
21      Q.  Okay.
22          MR. BERNICK:  I want to mark that one as well.
23      Q.  Now, Dr. Peterson, the published work that
24  Professor Stallard did regarding Johns Manville focused
25  on the -- on changes that had taken place in the filing

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 45

1    of claims against the Manville Trust.  Correct?
2        A.  I'm sorry, speaking about the 2001 annals paper?
3        Q.  Anything.
4        A.  The original work that they did really didn't
5    deal with the volatility of the stuff that they did for
6    the 706 panel.  In 2001, he went back and looked at
7    deviations of his forecast from the claims experience
8    and found that they were different.  "Volatility" is
9    probably not a word I would apply to it.
10       Q.  That's a word that he used, correct?
11       A.  I don't recall.
12       Q.  You didn't read that in the deposition?
13       A.  I don't recall that word.
14       Q.  Okay.  Do you recall "changes, changes in the
15   filing rates"; do you recall his talking about that,
16   either in the deposition or in the book or in the
17   article?
18       A.  I recall that the -- the filing rates differed
19   from their forecast, and I don't recall how he
20   characterized it.  At the time he published it, I
21   thought they were too low.
22       Q.  Again, move to strike as nonresponsive.  Didn't
23   ask you that question, Dr. Peterson.
24       A.  I don't know if he characterized it as changes
25   or not.  I think he probably did, but I'm not certain.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 46

1    Q.  Do you recall his testimony that changes in
2  non- -- strike that.
3        Do you recall his testimony that non-biological
4  factors were the most important contributor to changes
5  in the filing rate against Johns Manville Trust?
6    A.  I believe that's what he testified to, yes.
7    Q.  Do you recall that he testified that nobody has
8  developed a reliable scientific model that can predict
9  changes in the legal environment?
10   A.  No, I don't recall that specific statement.
11   Q.  Can you identify any scientific model,
12 Dr. Peterson, that has been shown reliably to predict
13 changes in the legal environment?
14   A.  What do you mean by "the legal environment"?
15   Q.  Lawsuits being filed and litigated; claims being
16 filed, litigated; claims being presented, settled.  Do
17 you know of any scientific model that has been
18 demonstrated to reliably predict changes in the legal
19 environment?
20       MR. FINCH:  Object to form, compound.
21       THE WITNESS:  Over modest periods of time, there
22 have been models of claiming and claim resolutions that
23 have reliably predicted subsequent changes, yes.
24 BY MR. BERNICK:
25   Q.  Okay.  What's the maximum period of time?

FINAL - November 1, 2007
Dr. Mark Peterson

Page 47

1    A.  Six years, seven years.
2        **Q.  Okay.  Now, let's talk a little bit about**
3    **2000 --**
4    A.  I'm sorry --
5        **Q.  Which model --**
6    A.  I'm sorry, your question was reliably -- never
7    mind, I withdraw my --
8        **Q.  Okay.  Let's talk about 2003 in particular.**
9    **It's true, is it not, that after 2003, or on and after**
10   **2003, there were changes in the legal environment for**
11   **the litigation and settlement of asbestos claims?**
12       A.  Beginning in that period of time, there were
13   some important developments and changes in the legal
14   environment involving asbestos claims, that's correct.
15       **Q.  Okay.  And it also true that those changes have**
16   **had a significant impact on claiming and settlement**
17   **behavior?**
18       MR. MULLADY:  Objection; form, vague.
19       THE WITNESS:  There have been multiple changes,
20   some of which have had significant impacts on some
21   claims.  Both regarding filings and settlements.
22   BY MR. BERNICK:
23       **Q.  Okay.  Is it true that even as of -- when did**
24   **those changes actually -- those legal changes in the**
25   **environment, or changes in the legal environment, when**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 51

1          (Whereupon a discussion was held off
2          the record.)
3
4     BY MR. BERNICK:
5          Q.  Dr. Peterson, at what point in time did proposed
6     legislation, state or federal, begin to have a
7     significant impact on claims filings and claims
8     resolutions?
9          MR. MULLADY:  Objection; vague.
10          MR. FINCH:  Join.
11          THE WITNESS:  I think any of them, I mean,
12     across the board, was probably beginning in the period
13     2003 or so.
14     BY MR. BERNICK:
15          Q.  When in 2003?
16          A.  I can't give you precise date.
17          Q.  Isn't it true that you didn't do -- that none of
18     your modeling work -- strike that.
19          Isn't it true that in the modeling work and
20     estimation work that you were doing, prior to 2002, none
21     of those estimates predicted an impact from state,
22     proposed state or federal legislation.  Correct?
23          A.  I don't recall.
24          Q.  Well, let me just ask:  When was the first time
25     that you did an estimate, using your standard method,

US District Court - Delaware        FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 52

1    that predicted or even, even recognized an impact on
2    claiming behavior from proposed state or federal
3    legislation?
4        A.   I think it was -- it was when we began to
5    observe the effects of the -- of the Senate's
6    consideration of the Fair Act, and that would have been
7    sometime, I believe, in the period of 2004 or so.
8        Q.   So --
9        A.   But I'd have to go back and look.
10       Q.   Up through the time that the effects actually
11   were observed, you didn't do any estimates that
12   predicted that there would be effects.  Correct?
13       A.   I didn't anticipate or predict that the Senate
14   was going to consider a national asbestos fund, the Fair
15   Act, and that it would have the impacts that it had in
16   basically in suppressing claims.  No, I didn't foresee
17   that.
18           I think it would have been speculative.  I mean,
19   one of the limits of the expert work that I or other
20   people do is we can't speculate about the future.  There
21   are events that happen and will happen in the future we
22   don't know about.  We have no -- I mean, they can
23   happen, it might happen, but there is really not much
24   concrete evidence that it would happen, and if you try
25   and say they are, it's speculative.  Indeed -- I'll

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                Dr. Mark Peterson

Page 58

1  **litigation environment, not simply in '04, but also in**
2  **'03?**
3          MR. MULLADY:  Objection; foundation.
4          THE WITNESS:  Could you read the question?
5  BY MR. BERNICK:
6      **Q.  I'll state it again.**
7          **Isn't it true that the effects of changes in the**
8  **legal environment on claiming and settlement behavior**
9  **became observable in 2003?**
10     A.  Yes.
11     **Q.   Okay.  When in 2003?**
12     A.  I can't give you a date.
13     **Q.   Isn't it true that throughout 2003, you -- your**
14 **estimates continued to give no effect to changes in the**
15 **litigation environment?**
16     A.   I think because there wasn't sufficient data to
17 be able to see whether changes that were occurring at
18 that time were temporary or permanent, and indeed, that
19 continues to be a problem today, that I didn't make -- I
20 didn't know, I didn't have an opinion about whether -- I
21 didn't have a scientific opinion about whether or not
22 those changes would last and should be such that they
23 should be reflected in the forecast, but I also can't
24 recall the forecast I made in 2003,
25     **Q.   Well, in particular, you made the forecast in**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 66

1    you can see increases from particular companies.  The
2    real issue is, what does it mean, what does it signify?
3    And the point of the research that I try to do is to
4    understand the significance of the quantitative effects
5    that I see, and so I was observing some changes in the
6    early nineties, but I didn't think there was a basis for
7    making an inference that this meant something until
8    several years later.
9        Q.  And you reached the point -- strike that.
10           When did you first factor -- strike that.
11           When did you first change the estimates that you
12   were doing to reflect the observe -- strike that.
13           When did you first change the estimates that you
14   were doing to predict a continuing increase in malignant
15   claim filings in the 1990's?  When was the first time
16   you actually did that in an estimate?
17       A.  I can't give you a precise date.  It would be
18   somewhere in the range of 1996 to 1998.
19       Q.  Okay.  Would it be fair to say that you did not
20   predict in your estimates in advance that change, that
21   is the increased rate of filing of malignant claims in
22   the 1990's?
23       A.  Prior to having made that change, by definition,
24   I didn't predict it, that's correct.
25       Q.  Non-malignant claims, it turns out the

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                      Dr. Mark Peterson

Page 76

1    **significant period of years, say more than five years?**
2        A.   Most of the variation that occurs in asbestos
3    claiming settlements is because of behavioral effects,
4    not biological effects.  Since it accounts for most of
5    the change, it's -- it's going to also have more error
6    in its prediction.
7        **Q.   And that error in prediction becomes more**
8    **pronounced the greater the number of years you go out in**
9    **your prediction, correct?**
10       A.   Clearly for -- the confidence in any forecast,
11   including these forecasts, is greater for years that are
12   more contemporaneous than those that are in the future,
13   and it's greater for years that have already occurred,
14   where we actually can sit and look at the -- what's
15   happened with other companies, what the litigation
16   environment is.
17       **Q.   So are you --**
18       A.   In this case, we have the ability to forecast
19   for the future, in quotes, for Grace, that began in 2001
20   and extend to today.  We have more confidence in that
21   than we do for the forecast for the next five years, and
22   more than we do for the following five years, and so on.
23       **Q.   Okay.  Is there any quantitative or statistical**
24   **analysis that you've done to put -- to specify your**
25   **level of confidence in forecasting Grace claiming**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 77

1  behavior over a five-year period versus a ten-year
2  period or any other period of time?  Is there any
3  quantitative or statistical analysis that you've done
4  that captures the range of uncertainty going off into
5  the future?
6      A.   I haven't looked specifically at that issue.  It
7  can be done, and given your question, I can assure you
8  it will be done, but I have not done it.  It can be
9  done.
10     Q.   I'm not asking you to do it and I think it's too
11  late for you to do it, but my question in any event,
12  Dr. Peterson:  Are you aware of any estimate of asbestos
13  liability for a given company that has actually proven
14  to be accurate over a period greater than five years?
15     A.   Five, six, I wouldn't go beyond seven, but in
16  that range, with regard to my own work, I think
17  Dr. Florence has testified that he's made forecasts
18  that -- that have proven to be accurate for that time
19  period and maybe somewhat beyond, using standard
20  estimation methods, not the methods he uses here, which
21  really aren't estimation methods.
22     Q.   Well, Dr. Peterson, what estimate of years has
23  proven to be accurate over a period greater than five
24  years?
25     A.   I'm -- I'd have to go back and look at the

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 78

1    precise number of years.  The Fuller-Austin forecast.

2         **Q.   Okay.  Any others?**

3         A.   Maybe National Gypsum.  That's hard to tell,

4    because there are probations in the filings there.

5         **Q.   Anything else?  Got Fuller-Austin, National Gyp.**

6         A.   It's possible that it's for H.K. Porter.  I'd

7    have to go back and look, I haven't looked recently, but

8    the one, Fuller-Austin is a period that I'm familiar

9    with.

10        **Q.   Any others that are possible other than**

11   **Fuller-Austin, National Gyp, and H.K. Porter?**

12        A.   I don't know that there are any that can be

13   tested for that, for that --

14        **Q.   I didn't ask you that.  I just asked whether any**

15   **of your estimates have been shown to be accurate over a**

16   **period of more than five years.**

17        A.   Those are the ones that come to mind.

18        **Q.   Okay.  Fuller-Austin, was that a period of time**

19   **when it was out of bankruptcy, that is before**

20   **bankruptcy?**

21        A.   It was a pre-pac, it was in bankruptcy for a

22   very brief period of time, but I think it was the

23   post-bankruptcy period.  The forecast would have been

24   made in '97 , '98, and the forecast proved to be

25   accurate for a number of years, and I don't know whether

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 130

1      **Q.  I'm asking --**
2      A.  Yes, the quantitative --
3      **Q.  What's the quantitative calculation?**
4      A.  Yes, the quantitative calculation is the
5      observation that you get one event and then you get a
6      different event.
7      **Q.   And that's enough for you to say in this**
8      **particular case that it's causative?**
9      A.   It's known as a quasi-experiment.  If you see
10     that pattern in other circumstances, you -- you make
11     inferences and that's the inference.
12     **Q.  So there's a technique that you're deploying, in**
13     **this particular instance called "quasi-experimentation";**
14     **those are the words you just used.  Correct?**
15     A.   It's a recognized research method in social
16     science.
17     **Q.  So in this particular case, you're using**
18     **quasi-experimentation to say that the observed**
19     **concurrence of publicity surrounding Libbey, with the**
20     **increase in claim filings against Grace, is sufficient**
21     **for you to say that the, one, that is publicity, was**
22     **causative in the sense of being contributory, to the**
23     **other, which is the filing rates.  Is that your**
24     **testimony?**
25     A.  No, I didn't say that.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 145

1      **filings, true?**
2          A.   The -- broadly across defendants, cancer claims
3      including mesothelioma increased in the late 1990's.
4          **Q.   And into 2000 and 2001?**
5          A.   They increased more rapidly in those years.
6          **Q.   Okay.  And Grace was a part of that, Manville's**
7      **a part of that, Fred Mogul's a part of that, U.S.G. was**
8      **a part of that, all those different companies were a**
9      **part of that, right?**
10          MR. FINCH:  Objection; vague.
11     BY MR. BERNICK:
12          **Q.   They all saw those kinds --**
13          A.   Many companies that were in asbestos
14     litigations, or that were trusts, so the increase I just
15     described, that's the same question you asked me before,
16     and those increases were even greater in 2000, 2001.
17     Although a number of companies have bankruptcies in that
18     year, so we don't know what went on with standard
19     bankruptcy.
20          **Q.   Now, we also know, as you've told us, that the**
21     **principal cause of that is claiming behavior as opposed**
22     **to some parallel increase in the incidence of disease.**
23     **Correct?**
24          A.   Increase in claims was greater than the
25     increased incidence of mesothelioma.

Page 148

1    coming into the system, and what portion of it was due

2    to more people suing more defendants?  Do you know what

3    was what?

4        A.   I don't think you can desegregate that other

5    than saying that the increase in total number of claims

6    seems much more significant.

7        Q.   Well, but did you actually analyze that

8    quantitatively in the case of Grace?

9        A.   You can't --

10       Q.   I didn't ask whether you can or can't.  I just

11   asked you whether you did.

12       A.   Well, I don't do things I can't do.

13       Q.   Well then, it's very simple.  Just say:  "I

14   didn't do it."  Make things go much faster,

15   Dr. Peterson.

16       A.   But the patterns, particularly the Manville

17   patterns, suggest that it's a general -- as I said,

18   there were other things going on, but no, there was no

19   way within the Grace data to examine an issue, and I

20   didn't do it.

21       Q.   Okay.

22           MR. MULLADY:  Can we take a five-minute break?

23           MR. BERNICK:  Yeah, I think we can but just let

24   me see.

25           VIDEO OPERATOR:  We're off the record at 11:51.

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                Dr. Mark Peterson

Page 149

1          (Whereupon a brief recess was taken.)
2                          ***
3          VIDEO OPERATOR:  We're back on the record at
4     12:32.  This is the start of Disk Number 3.
5     BY MR. BERNICK:
6          Q.  I have a couple other questions on different
7     approaches to litigation and their impact, and then I
8     want to get to some of the parameters that you used in
9     your estimate for Grace, and it probably will take 15 or
10    20 minutes so we'll be all set, right?
11         First of all, there's a lot of discussion in
12    your report, Dr. Peterson, to the effect of what the
13    impact is if you have -- if you pursue settlements as a
14    defendant manufacturer, if you pursue settlements on a
15    group basis versus an individual basis.
16         Do you recall that your report focuses on that?
17         A.  Yes.
18         Q.  And my question to you is:  I know it's always
19    possible with respect to a given company's track record
20    to see how much they paid per a certain kind of claim,
21    if they settled claims individually or in groups, but
22    I'm -- I'm trying to ascertain whether a company is
23    actually better off adopting an approach that says, on
24    the one hand, we're going to settle everything globally,
25    that is in groups, and on the other, we're going to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 168

1      A.   I had no need to and I didn't do it, and I
2   couldn't do it.
3      Q.   Now, when a company, in the torts system prior
4   to April of 2001, is facing the prospect of going to
5   trial, that's the prospect that in many states will
6   involve joint and several liability.  Correct?
7      A.   In some states, yes.
8      Q.   And in those states that have joint and several
9   liability prior to 2001, isn't it true that a company
10   that goes to trial faces the risk of being assessed not
11   only its several share, but its joint share?
12      A.   In a verdict, it may have to pay a joint and
13   several liability verdict, of course.
14      Q.   And the fact that the company faces that risk
15   provides negotiation leverage to the claimants in that
16   case, correct?
17      A.   At trial, near trial, yes, that's an advantage
18   the plaintiffs have in that circumstance.
19      Q.   And isn't it true, then, that to the extent that
20   you are in a state that had joint and several liability
21   prior to April of 2001, that a company that was facing
22   the prospect of trials in that state, would be -- would
23   have an incentive and would be called upon to pay
24   something for the risk that they faced of joint and
25   several liability?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 169

1          A.  Could you read that question.

2          **Q.  Yes.  In the case of the states that had joint**

3    **and several liability prior to Grace going into**

4    **bankruptcy, Grace would have the need and would be**

5    **required to pay something to avoid the risk of joint and**

6    **several liability?**

7          MR. FINCH:  Object to form.

8          THE WITNESS:  If it was approaching trial, that

9    may be a consideration they would take into account,

10   with a lot of other things, but yes.

11   BY MR. BERNICK:

12         **Q.  The marketplace, in the states that had joint**

13   **and several liability, would require that any defendant**

14   **pay something to avoid the risk of joint and several**

15   **liability.  Correct?**

16         A.   That may be one of a number of conversations

17   that would be taken into account.

18         **Q.  Okay.  Have you ever calculated the portion of**

19   **the settlements that Grace reached that was attributable**

20   **to the avoidance of the risk of joint and several**

21   **liability?**

22         A.   Well, I think there are too many parameters that

23   would likely affect it and the data aren't available to

24   do it.  I have not calculated.  I don't think it's

25   possible to calculate that in the way that you asked

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 170

1    about it.
2       **Q.  Have you done that calculation for any company?**
3       A.  No different for any company.
4       **Q.  Okay.  Now, in talking about, again, the amount**
5    **of money that would be paid in settlement in the tort**
6    **system prior to April of 2001, we know that there are a**
7    **variety of factors, and you've said this repeatedly,**
8    **that affect the value of the case in the tort system.**
9    **Correct?**
10      A.  I'm sorry, I was thinking about your last
11   question -- no, no, but I have to add something to my
12   answer in the last question.  And indeed I'm not sure
13   that my prior answer was correct.
14      The best empirical evidence I have is that the
15   exposure that a company face under several liability as
16   opposed to joint and several liability, there's not been
17   a demonstration that it adds value.  I said that it
18   would -- it may very well not add liability -- add value
19   to a claim.
20      **Q.  Whatever you want, Dr. Peterson.**
21      **So now I want to ask you about the things that**
22   **do contribute to the value in the tort system of an**
23   **individual claim.  And I think you said there are many**
24   **things that contribute to it, we all know that, correct?**
25      A.  Yes.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 171

1      **Q.  One of the things would be the jurisdiction,**
2      **right?**
3          A.  Yes, it can have an important effect.
4      **Q.  The lawyer?**
5          A.  Yes.
6      **Q.  The merits of the case?**
7          A.  Can't quantify that.  In negotiations, of
8      course, the parties look at that, but merits is not a
9      variable that can be subject to economic analysis or the
10     kind of analysis I do.
11     **Q.  Okay.  Now, one of the things that also affects**
12     **the value of the case are the personal -- is the**
13     **personal side of the case: Is the plaintiff young or**
14     **old?  Family, not family?  What their background is?  A**
15     **hundred different things that bear upon whether the jury**
16     **would find their case to be a compelling case.**
17         **Would you agree with that?**
18         A.  No, I wouldn't agree with the examples you've
19     given.  In most cases, the matter of the age and the
20     family consideration doesn't affect the settlement value
21     of the case.  It would --
22     **Q.  Go ahead.**
23         A.  It would affect the case if, perhaps some of
24     them would, depending upon the disease and other
25     matters, if you're going to trial.  But if it's a case

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                     Dr. Mark Peterson

Page 172

1    that settles as most cases are settled, well before
2    trial, those, I don't think those matters are very
3    important.
4        Q.   You know the kind of personal factors that I'm
5    talking about?
6        A.   I know what you mentioned and I disagree that
7    they're important.
8        Q.   Okay, fine.
9            Do you actually -- have you actually done --
10   gathered any data to determine the effect of those
11   personal factors on settlement values?
12       A.   Yes.
13       Q.   Okay.  What data do you have?
14       A.   We've looked at that again and again:  Age.
15   Family matter, I haven't.  Age.  And age is not an
16   important -- despite the kind of folk wisdom about it,
17   age is generally not an important predictor of a
18   settlement value.  It appears to be important in -- for
19   mesothelioma claims, or claims that are going to trial,
20   because it adds trial value, but for -- and that's kind
21   of -- that adds to the average, it adds to the higher
22   verdict.  I believe, for the bulk of cases, the means
23   for every disease, age has little effect upon the value
24   of a claim.
25       Q.   Okay.  Let's talk about an individual case that,

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                  Dr. Mark Peterson

Page 173

1    where the person is not part of some big group
2    settlement, but is represented by, you know, one of the
3    so-called Meso firms that don't have a huge number of
4    cases, and those firms tend to prepare their cases at
5    some point to go to trial.  Correct?
6        A.  In some cases, not all.
7        Q.  Okay.  And are you saying that in the cases
8    where, with respect to law firms that represent very
9    sick people, that whether their client is young or old
10   at the time they became sick is not material to the
11   value of the case?
12       MR. FINCH:  Objection.
13       THE WITNESS:  I didn't say that.
14   BY MR. BERNICK:
15       Q.  Well, in general, if the settlement marketplace
16   works well, individuals get paid according to what their
17   claim might yield if it went to trial, discounted by the
18   uncertainties that are associated with the trial.
19   Correct?
20       A.  I think that's a naive and inaccurate
21   description of the settlement process and asbestos, mass
22   asbestos litigation.
23       Q.  So you would agree that the settlement process
24   in mass asbestos litigation is not necessarily driven by
25   individual verdict value?

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                      Dr. Mark Peterson

Page 174

1      A.   It can be.  There's the -- there is the -- there
2   is the opportunity for it to be so, if either the
3   defendant or the plaintiff chooses to do that, but most
4   cases are not resolved for those considerations, no.
5      **Q.   That's what I'm saying.  I made -- I didn't**
6   **know, I'm honestly looking at your report.  So you would**
7   **say that when it comes to the vast bulk of settlements,**
8   **the vast number of settlements in the tort system, that**
9   **verdict value, while it's out there unknown, doesn't**
10  **necessarily drive the value of the cases that are being**
11  **settled, because they're being settled in a more routine**
12  **basis in groups.  Is that what you're saying?**
13     A.   I wouldn't agree to it the way you've phrased
14  the question.
15     **Q.   What would be your phrasing?**
16     A.   Clearly, verdicts affect the general value of
17  claims.  As verdict goes up or in jurisdictions where
18  verdicts are high, claims have higher values, so it
19  affects the marketplace.  Again, to use your term,
20  affects the marketplace value of asbestos claims.
21  They're responsive to that as a group.
22        With regard to whether you and I would get a
23  different settlement in a Meso claim, we would get -- if
24  it were on the verge of trial, people would look at the
25  personal considerations.  If it were case settled, as

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 181

1    Grace would have to pay as these claims came to it, came
2    up in the tort system.  In the ordinary course of the
3    tort system, so if a claim arose ten years in the
4    future, it will have somewhat different value than a
5    claim did on the day of the bankruptcy, simply because
6    of inflation.
7    BY MR. BERNICK:
8        Q.  What do you think?
9        A.   And so I think that it's -- the attempt is to
10   say what would be the value of the claim when it came up
11   to be liquidated and resolved by Grace, and those are
12   not all going to be liquidated on the date of the
13   bankruptcy.
14       Q.  Would it be fair to say that instead of
15   estimating Grace's liability, what you are estimating is
16   its current and expected cost of resolution?  Would that
17   be a fair way of putting it?
18       A.   Well, I think more specifically it's the value
19   of the claim.  This is an estimation of the value of the
20   asbestos claims.  The value of the claims, presumably
21   the cost they would have to pay, and that cost is a
22   settlement cost based upon considerations of liability,
23   but it's the cost that I would expect that would be
24   paid, borne by Grace to settle that claim.
25       Q.  Is a parameter for your analysis, the cost that

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                Dr. Mark Peterson

Page 182

1    **Grace would have to pay but for the bankruptcy?**
2            MR. FINCH:  Objection.
3            MR. BERNICK:  I thought that was going to be an
4    easy one.
5        **Q.  That's what your report says.**
6        A.   The bankruptcy is not a consideration.  It's
7    the -- if the -- if the liability continues on, what
8    would they be paying to resolve these claims.
9        **Q.  Yeah, what you assume for purposes of your**
10   **analysis was that Grace was not in bankruptcy, was still**
11   **in the tort system, correct?**
12       A.   What specifically what I'm assuming is that
13   these claims have a value that's based upon their value
14   in the tort system which establishes the value -- the
15   legal value of any claim in bankruptcy.
16       **Q.  All this stuff, Dr. Peterson, it's just so**
17   **simple, why does it have to be this big deal?**
18       A.   Because no question from you is simple,
19   Mr. Bernick.
20       **Q.  That's not true.  This question is simple.  The**
21   **question is whether you were estimating the current and**
22   **expected cost of resolving the claims, assuming that**
23   **those claims were brought and resolved outside of**
24   **bankruptcy in the tort system.  True or not?**
25       A.   Yes.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 183

1    **Q. Okay. And is it further your assumption that,**
2    **when Grace would turn to dealing with those claims, that**
3    **it would -- its preference would be to litigate rather**
4    **than to settle in groups; was that a further assumption**
5    **that you made for purposes of your analysis?**
6    A. Well, I have alternative analyses. One is that
7    they would continue the practices that they did before,
8    which is the set of forecasts based upon their historic
9    payment rates. The other forecasts assume that while
10   they wouldn't litigate every claim, they would attempt
11   to be more aggressive.
12       You asked where do you draw the line. We went
13   through a whole set of questions, where do you draw the
14   line between settling a case or trying it? This
15   suggested they would draw the line more towards
16   litigating, not that they would litigate every claim.
17   **Q. Okay. So that's fair enough.**
18   **So to put it precisely, your assumption is that**
19   **going forward, Grace would be more focused on, more**
20   **oriented towards litigation than they had been**
21   **historically?**
22   A. And more skeptical towards the claims, their
23   related notions, yes.
24   **Q. Okay. Now, in actually going through and doing**
25   **your analysis, you look at Grace's -- the propensity to**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 184

1    sue Grace in the tort system and the expected propensity
2    to sue Grace in the future.  That's one analysis that
3    you do, is propensity, correct?
4      A.  Yes.
5      Q.  Another analysis that you do, I think you called
6    the rate of payment, which is of all the claims that are
7    filed, what percentage of them are actually paid?
8      A.  That's not quite right.  Of all the claims that
9    are resolved, what percent get paid.
10                      ***
11        (Whereupon a discussion was held off
12        the record.)
13                      ***
14    BY MR. BERNICK:
15      Q.  The rate of payment which was designed to
16    capture how many of the claims that were filed would be
17    paid, that's another thing that you looked at, right?
18      A.  I just corrected that.  How many of -- those
19    that are resolved, how many get paid.
20      Q.  Okay, fine.
21        And the third was how much would be paid for
22    those that got resolved.
23      A.  Payment.  Among those that got --
24      Q.  Paid --
25      A.  -- paid, how much on average do they get paid.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 187

1    are over a 27-month period from January 19th to
2    April 2nd, 2001."
3         So it's calculating what would be the annual
4    rate based upon that 27-month period.  That describes it
5    with that.
6         **Q.  A simple way to put it, that the start point for**
7    **your model when it came to filing propensity, was to**
8    **work with a propensity number derived from Grace's**
9    **experience from 1999 through the time that it filed for**
10   **Chapter 11.**
11        A.  I think that's correct.
12        **Q.  Okay.  Is it true that that period represents**
13   **the highest propensity ever in Grace's filing**
14   **experience.**
15        A.   There were -- no, there were years of higher
16   propensity to sue for lung cancer and other cancer --
17        **Q.  All I'm talking about is Meso.**
18        A.  For Meso.
19        **Q.   Yes, all my questions are going to be Meso**
20   **throughout these questions.**
21        A.  Yes, it's true for Meso.
22        **Q.   And because your propensity analysis begins**
23   **with, for Meso, begins with a propensity number derived**
24   **from this high propensity period of time, that has the**
25   **effect of having whatever trend you then have thereafter**

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 196

1          Q.  I'll use a different word.  That was a period of
2     significant change up and down in the Johns Manville
3     Trust experience, correct?
4          A.  The claims filings changed in that period of
5     time, yes.
6          Q.  Significantly, correct?
7          A.  They went up significantly in 2003 to levels
8     that they had never been before.
9          Q.  Right.
10         A.  And then following that, in the next several
11    years, they were lower.
12         Q.  Right.
13         A.  Significantly lower.
14         Q.  I understand that.
15             Now, let me ask you a couple questions about
16    that.  That's the actual tort system data that you in
17    fact used in your Grace forecast, and by that I mean,
18    data that postdates April of 2001.  Correct?
19         A.  Well, we used it in the forecast that didn't
20    involve -- that had a change in propensity to sue.  We
21    also provided forecasts that kept Grace's actual
22    propensities to sue through the period of May -- March
23    2001.
24         Q.  Right.  Now, it's true, is it not, that Johns
25    Manville is not in the tort system?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 197

1      A.   No, it's correct that they're not -- they're a

2   trust.

3      Q.   Okay.  Johns Manville is not making decisions

4   about whether to litigate or settle at all, correct?

5      A.   That's not true.

6      Q.   Well, they don't -- there aren't any litigation

7   of cases against the Manville Trust, true?

8      A.   There can be.

9      Q.   But there aren't any, there have never been

10  since the trust opened its doors again in 1995, correct?

11     A.   There have been threats, but there have been no

12  actual trials.

13     Q.   And the decisions that Johns Manville makes on a

14  routine basis over tens of thousands of claims, is

15  simply whether to accept claims for settlement or

16  whether to reject them, right?

17     A.   I think that's too narrow.

18     Q.   Do they have any other option that actually is

19  explored other than settlement or rejection?

20     A.   Their option is to offer the scheduled value or

21  to negotiate an individual value of the claim.  Both of

22  those produce settlements, or if they can't reach

23  agreement with the claimant, to arbitrate it or mediate

24  it or try it, and there are cases that go to arbitration

25  and mediation.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 198

1    Q.  And there are no cases that go to trial.
2    A.  Not yet.
3    Q.  Not yet.
4    A.  Doesn't mean there won't be.
5    Q.  You recognized earlier in the day that the
6  experience of a bankruptcy, post-bankruptcy trust, is
7  different from the experience of a company still in the
8  tort system.  Correct?
9    A.  The experience, how it settles claims are
10 different.  I don't think I opined that the claims
11 filing is necessarily different.
12   Q.  Okay.  And how it settles claims --
13   A.  Particularly for a company like Manville, that
14 would -- that accepts and essentially represents the
15 closest thing to a universe of all claims of asbestos --
16   Q.  So Manville, in particular, is a unique trust
17 because it pretty much accepts the claims of anybody
18 who's sick and has an asbestos exposure.  Correct?
19   A.  It's not unique.
20   Q.  Well, it certainly has that approach, correct?
21   A.  It has that approach.  Others do, too.
22   Q.  And certainly the approach that the trust uses
23 in resolving claims affects the propensity of people to
24 make claims against it, correct?
25   A.  Probably.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 199

1       Q.  And is it also correct that the criteria that
2  are used in accepting claims were -- came out of not a
3  litigated outcome, but a negotiated outcome with the
4  plaintiffs' bar?
5       A.  It came out of a -- the current?
6       Q.  Yes.
7       A.  Actually both of them in this period.  The trust
8  distribution procedures involved negotiations within the
9  plaintiffs' bar, and then between the plaintiffs' bar
10  and the Manville Trust, and the future representatives
11  participated in those discussions.
12      Q.  Right, but it was a negotiated resolution,
13  correct?
14      A.  Yes.
15      Q.  Okay.  Let's talk about the rate of payment.  To
16  determine the, for your forecast, the rate of payment
17  for W.R. Grace, you looked to the experience of two
18  companies in the tort system prior to April of 2001.
19  Correct?
20      A.  Yes.
21         MR. FINCH:  Object to form.
22  BY MR. BERNICK:
23      Q.  And those two companies were Armstrong and
24  U.S.G., right?
25      A.  That was one of the sources.  There was other

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 263

1    that obligation.  But I mean liability has the meaning
2    that it has in litigation, but also the whole
3    assumption, the whole analysis is -- relies upon
4    settlement data, and effectively assumes that in the
5    future, asbestos claims will either be dismissed or
6    rejected by Grace, or would be settled, and that
7    settlement becomes a liability.  It's a contractual
8    liability, but it's a liability.  It's the contractual
9    liability, it's a conversion of a contingent tort claim
10   into a certain -- a contingent unliquidated tort claim
11   into a fixed certain contract liability, and that's how
12   this stuff -- the processing of these claims proceeds.
13       Q.  Okay, that's interesting.  Let me be somewhat
14   concrete.  You've reviewed many, many settlement
15   agreements in your life, I'm sure, right?
16       A.  Yes.
17       Q.  And virtually without exception, they have a
18   proviso that says there's no admission of liability by
19   the defendant in agreement to make the payment, right?
20       A.  That's right, and I've acknowledged and
21   discussed that in my report.
22       Q.  Okay.  And so when you say that a claim -- and I
23   think you've been careful in some of these answers in
24   saying you're estimating the value of the claims.  When
25   you say that a claim has a value because it's likely to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 264

1    be settled at that amount, you're not suggesting that
2    that means that the defendant actually had legal
3    liability as a result of some wrongdoing, right?
4        A.   They have the risk of liability, but they don't
5    have established liability.  That's beyond what I'm
6    trying to do.
7        Q.  Okay.
8        A.   And can do.
9        Q.  Just going back to the more, to my view more
10   careful explanation you gave of estimate -- of
11   estimating the value of all present and future asbestos
12   claims, when you were asked to do that, were you given
13   any instructions about what you should assume in
14   estimating that value?
15       A.   I can't think of any.  I've been doing this work
16   for 25 years.
17       Q.  Let me be very specific, then.
18       A.   Fifteen years.
19       Q.  And maybe you'll agree with this.  You had a
20   discussion with Mr. Bernick about what I would call your
21   assumption that Grace remain in the tort system, I would
22   call it a "but for the bankruptcy" assumption.  Is that
23   a term you would understand?
24       A.   I understand that.
25       Q.  Okay.  So in doing your estimation, you are

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 265

1    estimating what Grace's aggregate asbestos exposure

2    would have been but for the bankruptcy; is that fair?

3        A.  I think that comes close to the concept, yes.

4        Q.  Were you instructed to do your estimation on a

5    "but for the bankruptcy" basis?

6        A.  No.

7        Q.  You decided on your own that the appropriate

8    assumption to make would be a "but for the bankruptcy"

9    assumption, correct?

10       A.  No.

11       Q.  Well -- Grace actually did file for bankruptcy,

12   right?

13       A.  Yes.

14       Q.  So your estimation is an estimation of what

15   would have happened in a hypothetical world that did not

16   come to pass, right?

17       A.  The analysis is -- it's hypothetical in that

18   there are claims that would have arisen over this period

19   of time which couldn't have arisen because the

20   bankruptcy stay, although I assume they're accumulating,

21   becoming accrued.  The values that are used are based on

22   real values and the opportunity to kind of see what's

23   been happening to similar kind of values in similar

24   cases outside.  The analysis is driven by the fact --

25   and I started to say this and Mr. Bernick got antsy.