# EXHIBIT 42

US District Court - Delaware  FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace  P.J. Eric Stallard

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------------

CHAPTER 11
IN RE:
W.R. GRACE & CO., et al.,

    Debtors

Case No. 01-1139 (JFK)
Jointly Administered
-----------------------------------------

DEPOSITION OF
P.J. Eric Stallard
October 24, 2007
Durham, North Carolina
Lead: David Bernick, Esquire
Firm: Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING   1-800-825-3341

US District Court - Delaware  FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace  P.J. Eric Stallard

Page 17

1  reliability, reproducibility, and validity. Correct?
2  You never make that disclaimer?
3    A.  That's correct.
4    Q.  So, again, we should be judging your work
5  in this case as to whether it is scientifically valid,
6  scientifically reliable, and scientifically
7  reproducible; correct?
8    A.  Those qualities are part of an evaluation
9  of my work; they are not a complete evaluation. But
10 certainly, they would be components of a review of my
11 work.
12   Q.  Okay. At the least, your work in this
13 case should be judged based upon whether it is
14 scientifically valid, reliable, and reproducible;
15 correct?
16   A.  Correct.
17   Q.  Would the same apply to the work of
18 Ms. Biggs?
19   A.  Yes.
20   Q.  Would the same apply to the work of
21 Dr. Peterson?
22   A.  Dr. Peterson is not an actuary, so he is not
23 bound by the Code of Professional Conduct of actuaries.
24 My understanding is, he is a lawyer in good standing.
25 I don't think I am in a position to -- to comment on

US District Court - Delaware  FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace  P.J. Eric Stallard

Page 65

1   It's certainly -- it's certainly something that could
2   be done, and I simply haven't done that.
3       Q.   It is true, is it not, that in the late
4   1990s, there was a fairly significant, indeed, a
5   dramatic upswing in asbestos claims against a wide
6   variety of companies?
7       A.   It is true.
8       Q.   Are you aware of anybody who predicted that?
9       A.   No.
10      Q.   It is also true that that kind of claiming
11  behavior continued to rise up through approximately
12  2003; correct?
13      A.   When you say, that type of claim --
14      Q.   The dramatic increase in the rate of
15  asbestos tort claim filings continued up through
16  approximately 2003; correct?
17      A.   I believe that -- I believe that's correct.
18      Q.   It then fell dramatically after 2003;
19  correct?
20      A.   The totality of filings not stratified by
21  diseases dropped dramatically after 2003; I believe
22  that's correct.
23      Q.   Are you aware of anybody who predicted that
24  occurrence?
25      A.   I don't have a specific recollection. I

Page 66

1   know there was significant tort reform going on in
2   multiple states, and it would not be surprising at
3   all to me that persons who had studied the potential
4   impact of that tort reform would have expected that
5   nonmalignant claims would decline. But I can't attach
6   a specific name.
7       **Q.   Are you aware of any actuary or any**
8   **estimator of asbestos liabilities who predicted the**
9   **drop-off in nonmalignant claims after 2003?**
10      A.   I'm having -- I'm having a little trouble
11  answering your question. And I will tell you why I
12  have trouble. When I work with companies, one of the
13  things I ask their defense counsel is what their
14  expectations are with respect to the upcoming year or
15  two years, relatively short-term. And my recollection
16  is, in at least one case, sometime after 2003, I was
17  told that the expectation was that the claims would --
18  that there would be an impact of favorable tort reform,
19  and that the impact was down.
20      You are asking me if I am familiar with
21  anyone who said this. And the answer is, I have had
22  conversations that have indicated to me there was an
23  expectation of improvement without specific
24  quantification.
25      **Q.   I have been a party to many of those**

US District Court - Delaware             FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace                       P.J. Eric Stallard

Page 95

1  from 1995 to 1999 was more a product of legal process
2  than it was a product of a biological process; correct?
3      A.   Correct.
4      Q.   Isn't it true that if we take a look at all
5  of the significant volatility in the Manville Trust,
6  from the time it opened its doors, most of that
7  significant volatility is due to developments in
8  legal process as opposed to biological process?
9          MR. KRAMER:  I object to the form.
10     A.   I would agree, in a general way, with that.
11     Q.   In general, I think also that it is your
12 observation that when we take a look at biological
13 process as opposed to legal process, that biological
14 process is a process that, from an actuarial point of
15 view, can be captured in stable relationships and
16 relatively stable trends.  Fair?
17     A.   The --
18     Q.   I think I am using your words.
19     A.   Right.  The characterization is fair, but
20 the degree of stability depends on the specific
21 disease process that you have been looking at.
22     Q.   Fair enough.  But, by and large, with the
23 disease process, and in particular, mesothelioma -- we
24 will focus on mesothelioma -- that's a process where,
25 from an actuarial point of view, the process and its

US District Court - Delaware  FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace  P.J. Eric Stallard

Page 101

1     Q. All of Ms. Biggs' trends deal with the
2 filing of claims; correct?
3     A. Correct.
4     Q. So what you are predicting is not whether
5 somebody is sick from Manville asbestos; what you are
6 predicting is whether they make a claim of being sick
7 from Manville asbestos. Correct?
8     A. That's correct.
9     Q. And those are two related but different
10 things; correct?
11     A. Correct.
12     Q. Whether somebody is sick from Manville
13 asbestos is a function of biological process; correct?
14     A. Correct.
15     Q. Whether a person makes a claim for being
16 sick from Manville asbestos is a function of a much
17 more complex process that involves many behavioral
18 factors; correct?
19     A. I would -- I would agree -- I would agree
20 that it is a different process. I don't -- I don't
21 necessarily agree that it's a much more complex
22 process.
23     Q. Sure it is, because if somebody makes a
24 claim against the Manville Trust, just makes a claim,
25 that is not predictable solely by reason of exposure

US District Court - Delaware                FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace                             P.J. Eric Stallard

Page 103

1   Q.  And the legal environment is a very, indeed,
2   extraordinarily complex environment; correct?
3   A.  There, I will comment that my expertise does
4   not -- does not extend into expertise in characterizing
5   the legal environment with regard to its complexity or
6   lack thereof.
7   Q.  Do you regard yourself able, as an actuary,
8   to predict changes in the legal environment?
9   A.  I -- I don't -- I don't predict changes in
10  the legal environment.
11  Q.  In all of your work, are you aware of
12  any scientist who has applied scientific method to
13  predicting changes in the legal environment for
14  asbestos claims?
15  A.  I am not -- I am not aware of such an
16  analysis.
17  Q.  Is there any scientific methodology that you
18  can even think of that would be capable of predicting
19  changes in the legal environment for asbestos?
20  A.  The scope of that question goes beyond my
21  expertise.  In a general, nonexpert way, I would -- I
22  would have trouble imagining how to structure a model
23  that would be able to successfully predict such
24  changes.  I could imagine a model that might tell you
25  changes for a short term.  But if you asked, would this

US District Court - Delaware  FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace  P.J. Eric Stallard

Page 104

1  model extend 5, 10, 15, 20 years in the future, I would
2  have trouble conceptualizing this.
3      Q.  I will give you a really concrete one.
4      Was there any way scientifically to predict
5  that the Manville Trust, when it first opened its
6  doors, was going to be overwhelmed with claims?
7      A.  Without having done a detailed review of the
8  projection models at that time, but with my knowledge
9  of the projections that had been done in the early
10 1980s, I believe it could have been possible -- which
11 is a hypothetical that you asked me to consider -- it
12 could have been possible to develop projections that
13 had much higher values than the ones that were
14 ultimately adopted in the litigation process.
15     Q.  That's an interesting statement. Are you
16 telling me that there was a scientific method for
17 predicting that when the trust opened its doors to
18 begin with, the trust would be overwhelmed with
19 claims, to the point that it couldn't handle them?
20     A.  The question as to -- the question as to
21 whether it was possible is different from asking
22 whether there was a specific, accepted method in place.
23 I don't know --
24     Q.  Yes, it is, and I'm asking the latter.
25     A.  Right. So I put that question or interpret