**Figure 20:** Number of Cancer Filings Against Grace



Note: Grace's 2001 filings are annualized across the period from January 1999 to April 1, 2001.

Figure 21 compares Nicholson's forecast of mesothelioma deaths between 1990 and 2001 with the number of mesothelioma claims filed against Grace in those years. As Figure 21 shows, during the three years before its bankruptcy, mesothelioma claims against Grace had increased sharply, growing closer to the incidence of mesothelioma deaths that Nicholson forecast. But even with these increases, the number of mesothelioma claims against Grace remained well below the number of mesothelioma incidences occurring in the country each year and below the number of mesothelioma claims filed against the Manville Trust.

**Figure 21:** Nicholson Meso Forecasts vs Grace Actuals



Note: Grace's 2001 filings are annualized across the period from January 1999 to April 1, 2001.

We used the standard Nicholson Method for forecasting future claim filings for each cancer, a method based on Grace's historic propensities to sue. To illustrate with mesothelioma filings: forecasts of future mesothelioma claim filings are based on a calculation of the relationship between past claims to the past incidence of the disease. This calculation, the "propensity to sue," is derived by dividing the number of claims for mesothelioma in a year (the lower, blue line in Figure 21) by the number of mesothelioma deaths projected for that same year (the higher red line in Figure 21). This establishes the historic claiming rate for mesothelioma against Grace, what percent of persons getting mesothelioma in each past year have filed a claim against Grace. Propensities to sue Grace for lung cancer and for other cancers are calculated similarly, by dividing the number of claims for each type of cancer in a year by the Nicholson forecast of the number of asbestos-related deaths from that cancer in the same year.

Table 30 below shows the annual propensities to sue Grace calculated for each of the three types of asbestos-related cancers for each year since 1990. From the early 1990s the number of cancer claims filings have increased steadily for most asbestos defendants, but this pattern differed somewhat for Grace. Propensities to sue Grace were relatively low and flat during the early 1990s and before, but these increased in the mid-1990s as Grace became more prominent in the litigation and jumped even more in 2000 and 2001 as other target asbestos defendants entered bankruptcy and with Grace's extensive bad publicity. Grace's filings in the late 1990s were affected by major law firms' agreement to a moratoria in those years as a term in their inventory settlements with Grace. These plaintiffs' law firms agreed to file no claims (but for a few

exceptions) for several years. The filing moratoria reduced filings during the last years of the 1990s, pushing some filings forward into the earlier years in which the agreements were signed and pushing other filings later. If Grace had not been able to implement these moratoria, its filing trends preceding its bankruptcy would have shown a smoother and steadier increase. Furthermore, Grace itself concluded that even after they ended the moratoria continued to suppress its claim filings through the time of Grace's bankruptcy petition (Hughes Deposition, February 22, 2007, pp. 81-82), artificially reducing both the filings in the two years preceding the petition and also liability forecasts that are based on filings during those years.

**Table 30:** Propensities to Sue Grace, by Disease: 1990-2001

| Filing Year | Type of Cancer | | |
|---|---|---|---|
| | Meso | Lung | OthCan |
| 1991 | 12.0% | 9.1% | 8.9% |
| 1992 | 15.9 | 16.8 | 19.8 |
| 1993 | 12.4 | 16.2 | 22.1 |
| 1994 | 20.1 | 19.3 | 23.1 |
| 1995 | 20.6 | 25.5 | 36.3 |
| 1996 | 22.3 | 29.7 | 38.2 |
| 1997 | 21.4 | 23.5 | 25.3 |
| 1998 | 19.2 | 17.2 | 21.0 |
| 1999 | 22.5 | 22.1 | 22.9 |
| 2000 | 38.3 | 34.3 | 34.7 |
| 2001 | 74.4 | 90.1 | 89.8 |
| 00-01 | 45.6 | 45.3 | 45.5 |
| 99-01 | 35.4 | 34.8 | 35.3 |

Note: 2001 propensities to sue are annualized based on filings and incidence for one quarter. 00-01 annualized rates are over 15 month period from January 2000 to April 1, 2001. 99-01 annualized rates are over 27 month period from January 1999 to April 1, 2001.

Forecasts of future Grace claims must take two matters into account: (1) the most recent level of claiming shown by the propensities to sue during years preceding Grace's bankruptcy filing and (2) the fact that cancer filings and propensities to sue had increased sharply as of April 2001. Together these matters not only establish a starting point for forecasting future Grace cancer claims based on the most recent propensity to sue, but also suggest that propensities to sue Grace would continue to increase and exceed the levels of the base period. Although Grace did not discuss claim filing trends in terms of propensities to sue, it too acknowledged that its future claims filings would increase in its 2000 Annual Report (Section 3.2 above). Moreover, asbestos cancer claim filings have increased since Grace filed for bankruptcy in 2001. Because it is now six years since Grace's petition, we have the opportunity to examine subsequent claims filings against other asbestos defendants over the past six years and to use these as guides to what would have happened to Grace's claim filings had it continued in asbestos litigation after April 2001, as I discuss below.

Despite the evidence that claim filings would have continued to increase after its petition date, and Grace's and our expectations of such increase, our forecasts here are more conservative. We forecast, first, that the number of future nonmalignant claims filed against Grace would not have increased at all, but would have begun by falling sharply in 2002 after Grace's petition date and

would decline for thereafter year-after-year in the future. Second, we forecast that the number of cancer claim filings also would not have increased, but rather would have remained essentially stable over the five years following Grace's bankruptcy. We forecast that Grace's cancer filings in 2002 would fall sharply from filing rates at its petition date and would then have increased slowly for five years. Only by 2006, would cancer filings finally approach Grace's pre-petition levels in 2000 and 2001. Overall, cancer filings over this five year period (2002-2006) would be lower than cancer filings at the time of Grace's bankruptcy. We forecast that then, beginning in 2007 and in all future years, Grace's cancer filings would drop slowly but steadily year-after-year in parallel with the gradually declining disease incidence.

In addition to annual rates, Table 30 shows propensities to sue Grace for two periods: 2000-2001, the fifteen months immediately preceding Grace's bankruptcy petition, that shows the level of claiming against Grace at its petition date. Because claims filings against Grace and other defendants were trending upward at the time of its bankruptcy petition, these most recent propensities represent the best assumption about the starting point for forecasting the continuing trends in claim filings against Grace. The second period shown in Table 30, 1999-2001, is longer, including the earlier year 1999 when claims filings against Grace were markedly lower than the fifteen months preceding its bankruptcy. Use of this longer propensity to sue period (1999-2001 rather than 2000-2001) results in a forecast that is lower than Grace's claim filing trends at the time of its bankruptcy. Rather than forecasting a continuing increase in claims filings, the 1999-2001 propensities to sue produces forecasts that Grace claim filings would have dropped sharply after April 2001 to filing rates averaged over the 1999-2001 that are lower than Grace's actual filing rates in 2000-2001, the time of its petition. Although propensities to sue based on this longer 1999-2001 period are less consistent with Grace's filing experience before bankruptcy, we use the 1999-2001 base period in this report in order to produce conservative forecasts that will be most likely to underestimate, rather than overestimate Grace's asbestos liabilities. Our sensitivity analyses, presented in Section 7, show forecasts based on the alternative and likely 2000-2001 base period.

The rates of change that we forecast in propensities to sue Grace between 2001 and 2006 are rates of increase that actually occurred for the Manville Trust over the very period for which we forecast "future" Grace claims, i.e., from 2001 through 2006. We base our forecasts on the Manville Trust's actual propensities to sue for three reasons. First, we have Manville data about claim trends that are exactly contemporaneous for the "future" period that we need to forecast for Grace. Second, because Manville data are universally regarded as the most comprehensive data on asbestos claims filing and have been used repeatedly by analysts in forecasting liabilities for other defendants, they are appropriate for forecasting Grace's liabilities. Third, the Manville data are remarkably "clean," current, and free of problems such as the need to impute diseases among claims that do not have specific disease (see discussion of this issue in Section 6.1.4 above).

Manville's mesothelioma claim filings continued to increase after Grace's bankruptcy filing in early 2001. Figure 22 and Figure 23 show respectively the number of mesothelioma and lung cancer claims filed annually against Grace and against Manville. On each figure we continue Manville filings after Grace's bankruptcy filing and through 2006. The figures show Manville's filings for 2003 through 2006 averaged over those years, because claim filings over those years were distorted by 2003 changes to Manville's claims procedures. When the Manville Trust announced it 2002 that it would adopt new, stricter claims procedures in 2003 many claimants "accelerated" their filings; claims that would otherwise have been filed in these later years were filed instead in 2003. Consequently, Manville's claim filing trends for the four years from 2003 through 2006 are best represented by averaging its claims across those years as shown in Figure 22 and Figure 23, below.[28]

**Figure 22:** Trends In Grace and Manville Mesothelioma Claims (2003-2006 Smoothed)



Note: Grace filings in 2001 are annualized over the 27 month period from January 2000 to April 1, 2001. Manville 2003-2006 filings are averaged over that four year period.

28.   David Austern, CEO of the Manville Trust, reported to Judges' Jack B. Weinstein and Burton R. Lifland: "As you may recall, the deadline to file claims pursuant to the original (1995) TDP was in late 2003 and law firms accelerated the filing of many claims to meet that deadline that, in the ordinary course, would not have been filed until 2004 or later" (Letter of February 28, 2006). Because of these temporal disturbances, we know that some of Manville's 2003 claims would have been filed later had the Trust not made and announced its changes, but we cannot know how many filings were accelerated. As a result, we can attach no significance to the different levels of filings across these four years.

**Figure 23:** Trends In Grace and Manville Lung Cancer Claims (2003-2006 Smoothed)



Note: Grace filings in 2001 are annualized over the 27 month period from January 2000 to April 1, 2001. Manville 2003-2006 filings are averaged over that four year period.

Table 31 shows our calculation of the rates of increase in Manville's propensities to sue for each cancer between 2000 and 2003-2006. Because Nicholson's forecasts of asbestos-related lung cancer deaths falls during the period 2000 through 2006, propensities to sue Manville's for lung cancer remained stable from 2000 to 2006 even though claim filings were falling during these years.

**Table 31:** Rates of Increase in the Propensity to Sue

| Disease | Current Manville |
|---------|------------------|
| Meso    | 1.305            |
| Lung    | 1.006            |
| OthCan  | 1.291            |

Table 32 shows our forecast of the rates of annual increases in cancer propensities to sue (which are trivial for lung cancer): how we spread Manville's actual rates of increase in propensities over the 2002-2006 period for our forecast of Grace propensities to sue during 2002-2006, the first five years of "future" claims. The "rate of increase" for 2002 is 1.00, i.e., no change from

propensities to sue obtaining during the 1999-2001 base period that we use for forecasting propensities to sue, but lower than Grace's actual propensities to sue during 2000 and 2001. We then forecast that beginning in 2003 Grace's propensities to sue would increase at rates parallel to Manville's from as shown in Table 32 so that by 2006 Grace's propensities to sue would have increased by amounts equal to the Manville increases shown in Table 31. As Table 32 shows, we forecast that the Grace propensities will increase gradually at the same rate of increase in each year from 2003 through 2006. After 2006 we forecast that propensities to sue Grace will remain unchanged at their 2006 levels. Because incidences of asbestos-related cancers are forecast to decline for each cancer after 2006, this means that we forecast decreasing numbers of cancer claims in each year after 2006.

**Table 32:** Rates of Increase in the Propensity to Sue

| Disease | Rates of Increase | | | | | |
|---------|------|------|------|------|------|-------|
|         | 2002 | 2003 | 2004 | 2005 | 2006 | 2007+ |
| Meso    | 1.000 | 1.076 | 1.153 | 1.229 | 1.305 | 1.305 |
| Lung    | 1.000 | 1.002 | 1.003 | 1.004 | 1.006 | 1.006 |
| OthCan  | 1.000 | 1.073 | 1.146 | 1.218 | 1.291 | 1.291 |

Table 33 shows the results of applying the Manville increases to forecast Grace propensities between 2002 and 2006. We start in 2002 with Grace's propensities to sue during the 1999-April 2001 base period. The propensities to sue for each year after 2002 is calculated by multiplying the 1999-2001 base period propensities (shown as the 2002 propensities) times the rate of increase for that year shown in Table 32. As Table 33 shows, the resulting propensities increase gradually over the first five "future" years for Grace, but these do not represent an increase over Grace's propensities to sue before its bankruptcy. Rather, by 2006 when our forecast propensities peak, they are equivalent to Grace's actual propensities at the time of its bankruptcy petition, the period 2000-2001 (shown in red in Table 33). Among asbestos defendants, the Grace forecasts after 2001 would not represent high propensities to sue. Even in 2006, we forecast that less than half of mesothelioma victims will file claims against Grace, well under Manville's recent 80 percent propensities for mesothelioma and well under Grace's own experience in the first quarter of 2001. Only one third of asbestos-related lung cancers and less than half other cancers caused by asbestos result in claims against Grace, rates that are again lower than recent rates for Manville and Grace itself in 2001. Finally, we forecast that after 2006, Grace's propensities to sue will remain fixed at the 2006 rates shown in Table 33.

**Table 33:** Actual and Forecast Propensities to Sue for Cancers

| Disease | Actual | | | Forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007+ |
| Meso | 22.5% | 38.3% | 74.4% | 35.4% | 38.0% | 40.8% | 43.4% | 46.1% | 46.1% |
| Lung | 22.1 | 34.3 | 90.1 | 34.8 | 34.9 | 34.9 | 35.0 | 35.0 | 35.0 |
| OthCan | 22.9 | 34.6 | 89.8 | 35.3 | 37.9 | 40.5 | 43.0 | 45.6 | 45.6 |

Notes: Propensities to sue in 2001, shown in red, are based on one quarter year. Forecast 2002 propensities are Grace's propensities averaged over the period 1999-2001.

Our forecasts of future filings against Grace are strongly conservative. Even though the environment of asbestos litigation in the early 2000s caused most observers, including Grace and us, to expect increases in future claim filings, our liability forecasts assume no such increase in Grace claim filings. Figure 24 shows graphically our forecast of mesothelioma claim filings for each year after Grace's bankruptcy petition. The vertical bar at year 2001 represents the time of Grace's bankruptcy filing. To the left, the upper curve shows the annual Nicholson forecast of mesothelioma incidence (in green) and the lower curve the number of mesothelioma claims filed against Grace (in red), the two parameters that are used to calculate the Grace propensity to sue. Forecast claims are to the right of vertical bar, with the Nicholson incidence forecast again the upper curve and our forecast of future mesothelioma filings the lower curve (in blue). In each future year the forecast number of mesothelioma claim filings is calculated by multiplying the Nicholson incidence for that year (the upper curve) times the propensity to sue for that year. As I discussed, forecast mesothelioma filings start in 2002 well below actually Grace filings in 2000 and 2001, remain below through 2005 and then approach the 2000-01 level only in 2006. Thereafter, mesothelioma filings fall slowly as deaths from mesothelioma slowly decline.

**Figure 24:** Nicholson Meso Forecasts vs Grace Actuals



Figure 25 shows the context of our forecast of Grace's future mesothelioma claims comparing both past and forecast future claims for Grace from 1990 through 2006 with the number of mesothelioma claims received by Manville over the same period (again averaging Manville's 2003-2006 filings because of the 2003 accelerated filings). Note that mesothelioma filings against each defendant were roughly parallel prior to Grace's petition date. Our conservative forecast does not assume continuing parallelism after April 2001. Rather, we forecast a much greater gap between the filings against each: that Grace's claims fall in 2002 while Manville's increased and a gap that is never reduced in later years.

**Figure 25:** Trends In Grace and Manville Mesothelioma Claims (2003-2006 Smoothed)



**Figure 26:** Trends In Grace and Manville Lung Cancer Claims (2003-2006 Smoothed)



We carry out similar calculations for lung cancers and other cancers.  For each cancer, we forecast fewer annual claim filings than Grace received before its petition date.  Figure 26 compares Grace and Manville filings and trends for lung cancer claims.  Again for lung cancer as for mesothelioma, we forecast that the parallelism in filings against each defendant that had obtained before Grace's bankruptcy would change after April 2001.  Our forecast of a sharp decrease in Grace lung cancer filings for 2002 introduces a much wider gap than we saw in comparing filings for the two defendants in prior years.  Because we forecast that Grace lung cancer filings continue to decrease after 2002, this sharply widened gap is never reduced in future years.

Table 34 shows the total number of future claim filings that we forecast for each type of cancer through year 2039, the end of our forecast period.

**Table 34:** Number of Forecast Cancer Claims Filed After April 2001

| Model | Forecast Cancer Claims | | | |
|---|---|---|---|---|
| | Meso | Lung | OthCan | Total |
| Nicholson | 29,268 | 26,086 | 8,765 | 64,119 |

### 6.2.4. Projection of Future Nonmalignancy Claims

To forecast the number of asbestosis and pleural claims that will be filed against Grace in future

years we do not use the same method that we use to forecast Grace's future cancer claims. First, there are no published, peer-reviewed epidemiological projections for the incidence of nonmalignant asbestos-related diseases that are like the Nicholson cancer forecasts and no epidemiological forecast of nonmalignant asbestos-related disease has been tested and confirmed by actual experience as have the Nicholson cancer forecasts. Second, the disease processes for asbestos-related cancers and asbestos-related nonmalignant diseases differ. Unlike the asbestos-related cancers, which become known to victims abruptly through the rapid onset of symptoms and diagnoses, nonmalignant diseases are insidious. Asbestosis and pleural diseases are progressive diseases that develop gradually over time with the accumulation of scarring of the lungs or pleura. Because dyspnea (shortness of breath) and other effects of these disease increase over time, victims of these diseases may be unaware of the earliest onset of symptoms or may attribute breathing problems to their increasing age or other possible causes. So unlike the asbestos-related cancers, which become known to victims by a signal event--the diagnosis of a grave disease--that will be most likely to trigger claim filing, victims of nonmalignant asbestos diseases may become aware of their diseases gradually or they may be made aware by a medical diagnosis of asbestosis or pleural disease that could be made earlier or later in the progression of the disease. Consequently, filings of claims for asbestosis and pleural disease cannot be predicted from epidemiological evidence in the same manner as can filings of asbestos-related cancers.

Based on our analyses of claims data for Grace and many other defendants we have seen that across all past years there has been an historically stable relationship between the number of cancer and nonmalignant filings against Grace. This is shown in Figure 28: the past trend in annual filings of nonmalignant claims against Grace is similar to its trends for cancer claims (filings are placed on different scales to demonstrate this parallelism). Like cancer filings, the Georgine class action suppressed filings of nonmalignant claims during the mid-1990s, but filings rebounded greatly after the U.S. Supreme Court rejected the Georgine class action in mid-1997 and, as with cancer filings, nonmalignancy filings remained at these new, higher levels until the time of Grace's bankruptcy. Figure 27, below, shows Grace's annual nonmalignant claim filings.

**Figure 27:** Annual Nonmalignant Claims Against Grace



Note: Grace's 2001 entry based on annualizing filings over the 15 months from January 2000 through March 2001.



**Figure 28:** Comparison of Nonmalignant and Cancer Claim Counts



Claims filing trends for nonmalignant and malignant asbestos-related diseases corresponded closely because those filings are generated by similar sets of social, institutional and behavioral determinants. As Figure 28 demonstrates, in the past, filings of asbestos nonmalignant claims in a year could be predicted well from filings of cancer claims. The stable relationship between filings of cancer and nonmalignant claims has been one of the most common patterns in asbestos litigation, not only for Grace, but for other asbestos defendants as well.

Now, however, recent changes in the litigation environment have disturbed this historic stability between cancer and nonmalignancy filings. While cancer filings have increased or continued at high rates in the last few years, filings of nonmalignant claims have fallen. Some of the decrease in nonmalignant filings results from the U.S. Senate's extended consideration of asbestos legislation that would create a national compensation fund and eliminate asbestos litigation ("We attribute the comparatively low rate of claim filings in 2004 to three factors ... 3) the uncertainty surrounding the national asbestos litigation," February 28, 2005 letter from David Austern to Judges Jack B. Weinstein and Burton R. Lifland). The possibility of such legislation has broadly affected asbestos litigation, resulting in fewer settlements of asbestos law suits and reduced filings of new law suits. Given uncertainties about whether or not newly filed law suits would ever result in payment, plaintiffs' lawyers have become unwilling to spend the work and money required to prepare new cases, particularly nonmalignant claims. The possibility of national legislation particularly suppressed nonmalignant claim filings which are more likely than cancer claims to be generated by law firms' entrepreneurial activities and whose filings are more easily deferred because they are less subject to statutes of limitations. This suppression of claim filings resulting from the Senate's legislative considerations will likely be transitory, with a likely rebound in filings should the prospect of legislation disappear.

However, other developments suggest that filings of nonmalignant claims may never rebound to their great numbers of several years ago. First, several states that have been centers of much asbestos litigation have adopted new statutes that will limit the number of new law suits for nonmalignant claims in those states, primarily by establishing medical criteria that plaintiffs must establish in order to bring suit. Second, as I discussed above, courts and defendants have documented the troubling practices of some medical providers who have examined and prepared documents to support many plaintiffs' claims for nonmalignant injuries. While fewer recent claims have depended upon documentation by doctors subject to these criticisms, in the past a significant fraction of law suits for nonmalignant diseases have presented medical documents from doctors or medical facilities who have been criticized. This criticism and attention will likely reduce the number of future law suits for nonmalignant claims. Third, some plaintiffs' law firms have redirected their efforts in recruiting and filing asbestos injury claims, concentrating increasingly on more valuable and less controversial cancer claims. If this redirection by law firms continues, it could reshape asbestos litigation.

For all these reasons we expect that the historically stable pattern between the number of cancer and nonmalignant claims will change and that nonmalignant claim filings will decrease in future years, both relative to cancer filings and in absolute numbers. Although nonmalignant claim filings increased after 2000 among defendants who continued to receive asbestos claims, we forecast instead that after April 2001 future nonmalignant claims against Grace would decrease steadily from their levels before Grace's bankruptcy. To forecast Grace's future nonmalignant claim filings, we start with the level of nonmalignant claims that it received in 1999 and 2000 and then forecast that future claims will decrease at a rate parallel to the Nicholson forecast of the incidence of future asbestos-related cancers, i.e., at a constant relationship to the projected number of asbestos-related cancers. Medical researchers have suggested that trends in the incidence of cancers, like those forecast by Nicholson, represent the best means for estimating asbestos disease generally among exposed workers.

Figure 29 shows our long term forecast of future Grace claims. The figure shows the number of claims filed against Grace annually prior to the bankruptcy, showing separately our forecasts for cancer and nonmalignant claims: cancer claims appear at the bottom and nonmalignant claims appear above. In contrast to our forecast that Grace's cancer filings would be stable from 2002 through 2006, we forecast that Grace's future nonmalignant filings would drop immediately and greatly in 2002, nonmalignant filings in all of 2002 would be no more than the number it received in the *first three months of 2001*. Grace's nonmalignant filings in 2002 would be barely half of its annualized filings in 2000 and 2001. We forecast that nonmalignant filings would then decrease further in each year after 2002.

Figure 29: Actual And Projected Filings



The following two figures (Figure 30 and Figure 31) show past and forecast future claims separately for cancers and nonmalignancies in order to better demonstrate the differing forecast trends in filing for each type of disease claim. For cancers we forecast five years of reduced but generally stable filings, an immediate drop in 2002 followed by short-term increases through 2006 that reflect the experiences of other defendants between 2001 and 2006 and that would restore Grace filing levels about to their pre-bankruptcy level by 2006. But nonmalignant filings simply drop, according to our forecast, sharply at first and continuously forever. For both types of diseases, we forecast lower claims filings against Grace in the future than in its past, despite many strands of evidence and opinion (including Grace's) that claims filings would have increased after April 2001. Our forecasts are conservative in order to assure that we do not overestimate Grace's future filings.



Figure 30: Actual And Projected Cancer Filings



Figure 31: Actual And Projected Nonmalignant Filings

In order to understand the significance of these trends, how highly conservative all of our forecast assumptions are, it is important to recall that we also forecast sharp increases in the percent of claims that Grace will reject without payment. For each type of cancer and for nonmalignancies, we forecast that Grace will pay a far smaller fraction of filed claims than it did prior to 2001. In contrast to the fewer than *10 percent* of claims that Grace rejected pre-petition, we forecast that Grace would now reject *42 percent* of nonmalignant claims and would reject as many as *35 percent* but at least *20 percent* of the reduced number of cancer claims that we forecast for the future

When we combine these two sets of conservative assumptions--that in the future Grace will receive far fewer claim filings and then reject a greater percent of them--we forecast that Grace would pay far fewer claims after April 2001 than it has in the past. Despite all of the reasons to expect otherwise, in effect we assume that Grace would be far more successful in its asbestos litigation in the future than it had been before its bankruptcy.

The following figures show the dramatic turn-around that we forecast for Grace. We forecast that Grace will now pay a lower percentage of cancers (area in red in Figure 32), than it had in the past (area in gold in Figure 32). and a much lower percentage of nonmalignant claims (area in red in Figure 33) than it had in the past (area in gold in Figure 33). Our forecast of the total number of nonmalignant claims that Grace would compensate starts in 2002 at 41.3 percent of the number it paid in the year (January 2000-April 2001, annualized) before the bankruptcy and drops thereafter. We expect some amount of drop in compensated nonmalignant claims both because of Grace's possible turn to a more individualized process for reviewing and resolving claims and also because of the important recent changes in asbestos litigation--criticisms and increased scrutiny of medical documentation of nonmalignant claims, statutory and judicial changes in the legal treatment of nonmalignant disease claims, changes in the practices among plaintiffs' law firms. But we forecast such steep drops out of conservatism, to assure that we do not overestimate the number of claims that Grace will now pay.



Figure 32: Past and Projected Cancer Filings

**Figure 33:** Past and Projected Nonmalignant Filings



## 6.2.5. Forecast Number of Future Claims

Table 35 shows the results of the forecast. Appendix Table C3 shows the forecast filings for each disease for each year from 2001 to 2039.

**Table 35:** Number of Forecast Claims Filed After April 2001

| Model | Forecast Claims | | | | |
|---|---|---|---|---|---|
| | Meso | Lung | OthCan | Nonmal | Total |
| Nicholson | 29,268 | 26,086 | 8,765 | 694,382 | 758,501 |

## 6.2.6. Estimating Liability for Forecast Future Claims

To value future claims we used the same values that I discussed in presenting our forecasts for pending claims, the average settlement values and payment rates shown in Table 25 above. Our forecast average resolution values are obtained by multiplying settlement values and payment rates for each disease.

In forecasting the values of future claims, we assumed that payments would be adjusted for future inflation at a rate of 2.5 percent per year. This rate was being used by the Congressional Budget Office at the time of Grace's bankruptcy and is close to the rate of inflation since then. Table 36 shows the value of future claims adjusting future inflation.

Table 36: Forecast Indemnity for Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $7,491 | $817 | $170 | $2,109 | $10,587 |
| Reduced | Short Term Grace | 6,356 | 881 | 152 | 2,453 | 9,841 |
| Reduced | Quigley | 6,266 | 900 | 113 | 2,931 | 10,210 |
| Reduced | T&N | 6,463 | 857 | 119 | 2,925 | 10,363 |
| Reduced | USG | 7,366 | 1,016 | 126 | 2,918 | 11,426 |
| Lowest | Long Term Grace | $6,169 | $673 | $140 | $2,109 | $9,091 |
| Lowest | Short Term Grace | 5,234 | 725 | 125 | 2,453 | 8,538 |
| Lowest | Quigley | 5,160 | 741 | 93 | 2,931 | 8,926 |
| Lowest | T&N | 5,322 | 706 | 98 | 2,925 | 9,051 |
| Lowest | USG | 6,066 | 837 | 103 | 2,918 | 9,925 |

Notes: Millions of dollars of the year when paid. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

The results in Table 36 estimate the value that we forecast for future claims in terms of the dollars of the year when claims will be paid. However, these do not represent the present value of Grace's liabilities. Since these liabilities will mostly arise in future years, they must be reduced to present value to account for the time value of money. Table 37 shows the estimated present value of these liabilities, based on a discount rate of 5.11%.

Table 37: Present Value (PV) of Future Claims as of April 2001

| Payment Rates | Average Settlement | Forecast Indemnity PV | | | | |
|---|---|---|---|---|---|---|
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $3,520 | $434 | $89 | $1,081 | $5,124 |
| Reduced | Short Term Grace | 2,996 | 467 | 79 | 1,258 | 4,801 |
| Reduced | Quigley | 2,954 | 477 | 59 | 1,497 | 4,988 |
| Reduced | T&N | 3,045 | 455 | 63 | 1,494 | 5,057 |
| Reduced | USG | 3,464 | 538 | 66 | 1,490 | 5,558 |
| Lowest | Long Term Grace | $2,899 | $357 | $73 | $1,081 | $4,411 |
| Lowest | Short Term Grace | 2,467 | 385 | 65 | 1,258 | 4,175 |
| Lowest | Quigley | 2,433 | 393 | 49 | 1,497 | 4,372 |
| Lowest | T&N | 2,508 | 375 | 52 | 1,494 | 4,428 |
| Lowest | USG | 2,853 | 443 | 54 | 1,490 | 4,840 |

Notes: Millions of 2001 dollars. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 5.11%. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

### 6.2.7. Estimating Liability for Pending and Forecast Future Claims

Finally, we add our forecast liabilities for pending and future claims. Table 38 shows forecast

indemnity as dollars of the year in which they will be paid. Table 39 shows the present value of those liabilities.

Table 38: Forecast Indemnity for Pending and Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $7,753 | $907 | $183 | $2,320 | $11,165 |
| Reduced | Short Term Grace | 6,616 | 977 | 165 | 2,693 | 10,451 |
| Reduced | Quigley | 6,525 | 996 | 125 | 3,179 | 10,826 |
| Reduced | T&N | 6,724 | 952 | 131 | 3,173 | 10,980 |
| Reduced | USG | 7,634 | 1,114 | 139 | 3,165 | 12,053 |
| Lowest | Long Term Grace | $6,387 | $748 | $151 | $2,320 | $9,607 |
| Lowest | Short Term Grace | 5,450 | 805 | 136 | 2,693 | 9,086 |
| Lowest | Quigley | 5,375 | 821 | 103 | 3,179 | 9,480 |
| Lowest | T&N | 5,539 | 786 | 108 | 3,173 | 9,606 |
| Lowest | USG | 6,288 | 919 | 114 | 3,165 | 10,488 |

Notes: Millions of dollars of the year when paid. Future claims are assumed to settle 2 years after filing, present claims in 2002. Indemnity is inflation adjusted at 2.5% per year. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.

Table 39: Present Value (PV) of Pending and Future Claims after April 2001

| Payment Rates | Average Settlement | Forecast Indemnity PV | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Meso | Lung | OthCan | Nonmal | Total |
| Reduced | Long Term Grace | $3,769 | $520 | $102 | $1,282 | $5,672 |
| Reduced | Short Term Grace | 3,243 | 558 | 91 | 1,487 | 5,380 |
| Reduced | Quigley | 3,200 | 569 | 71 | 1,733 | 5,573 |
| Reduced | T&N | 3,293 | 546 | 75 | 1,730 | 5,643 |
| Reduced | USG | 3,718 | 632 | 78 | 1,726 | 6,153 |
| Lowest | Long Term Grace | $3,106 | $429 | $84 | $1,282 | $4,901 |
| Lowest | Short Term Grace | 2,672 | 461 | 75 | 1,487 | 4,695 |
| Lowest | Quigley | 2,637 | 470 | 59 | 1,733 | 4,899 |
| Lowest | T&N | 2,714 | 451 | 62 | 1,730 | 4,955 |
| Lowest | USG | 3,064 | 522 | 64 | 1,726 | 5,375 |

Notes: Millions of 2001 dollars. Future claims are assumed to settle 2 years after filing, present claims in 2002. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 5.11%. T&N values for other cancer and nonmalignants were estimated by averaging values for Quigley and USG.