# EXHIBIT 23

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

    Debtors.

Case No. 01-1139 (JFK)

----------------------------------------

DEPOSITION OF:

Jennifer L. Biggs

Monday, November 5, 2007

Washington, D.C.

Lead:  David Bernick, Esquire

Firm:  Kirkland & Ellis, LLP

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                     Jennifer L. Biggs

Page 58

1      two models that it uses.  One is an

2      insurance model.  The other is a

3      defendant -- the defendant insured's model,

4      fair?

5          A    Correct.

6          Q    Okay.  All I am saying is, if

7      we wanted to go look for those models and

8      find them described, is there any

9      publication or piece of paper that is made

10     available publicly that describes exactly

11     how those models work?

12         A    The paper that we have been

13     referring to provides quite a bit of detail

14     regarding the insurance model.  There is

15     not a separate article that talks

16     specifically to our defendant model; but

17     some of the process and method that is used

18     to estimate the liabilities of an

19     individual defendant are described within

20     the paper that we have been talking about.

21         Q    Okay.  I think I understand the

22     answer to that question.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 64

1    intellectual capital, some of the specific

2    assumptions and how we developed those

3    assumptions, that is proprietary, yes.

4         **Q     And in terms of the**

5    **peer-reviewed paper, the only peer-reviewed**

6    **paper that you have identified so far**

7    **that -- unless you are going to tell me**

8    **about -- the only peer-reviewed paper you**

9    **have identified so far that relates to**

10   **those models is the Cross paper published**

11   **in '97, correct?**

12        A     That's the only paper that

13   deals specifically with the model.  But

14   there are other -- there is other

15   peer-reviewed information that feeds into

16   the model.

17        For example, we rely on

18   assumptions relating to run-off patterns

19   that were developed by Professor Stallard,

20   and his work was peer-reviewed as part of

21   the Manville proceedings back in 1993 and

22   1994.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 65

1           So different assumptions that

2      we rely on could be peer-reviewed or

3      published in other places.

4           Q    Is there any other -- is there

5      any assumption that's in the model beyond

6      Mr. Stallard -- Dr. Stallard's run-off

7      assumption that has been peer-reviewed?

8           A    Not that is occurring to me

9      right now.

10          Q    You said that there is a

11     difference between the underlying -- there

12     is a difference between the estimation of

13     the insureds' asbestos liability as it's

14     treated in the two models -- that is, the

15     defense model versus and the insurance

16     model -- because of information

17     constraints.

18          What did you mean by

19     information constraints?

20          A    When we do work for an

21     insurance company or a reinsurance company,

22     we are typically looking at the experience

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 74

1    made available publicly, that is,

2    published, an estimate for liability of a

3    specific defendant company?

4        A    I am not sure what was

5    published with regard to the liabilities of

6    the early bankruptcies that I mentioned

7    earlier such as Pay Corp.

8            In terms of liability estimates

9    for other individual defendants, I'm not

10   aware of any.

11       Q    Okay.  I take it that the

12   answer would -- this is pretty

13   self-evident, but there has not been a

14   defendant-specific asbestos liability

15   estimate by Tillinghast that has been

16   published in a peer-reviewed journal,

17   correct?

18       A    A specific estimate in a

19   peer-reviewed journal, no.

20       Q    Okay.  The expert report that

21   you did for Delta American Re, that expert

22   report and your testimony, did that reveal

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 117

1    estimating -- is, you are estimating the

2    presentation of claims that are -- their

3    frequency, their value, their payment?

4        A    That's right.

5        Q    Okay.  And so those are

6    behaviors; are they not?

7        A    And I evaluate them in

8    aggregate, and I think I was perhaps

9    misinterpreting your question in terms of

10   individual behaviors.

11       Q    But those are the behaviors --

12   those are behaviors; are they not?

13       A    That claims are filed.

14       Q    And settled.

15       A    They represent the behavior or

16   actions of the parties involved.

17       Q    Right.  And there are many,

18   many different factors that relate to those

19   behaviors; are there not?

20       A    Yes.

21       Q    There are the behaviors of

22   lawyers in different parts of the country.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 118

1    There are the behaviors of the courts in

2    administering the claims and setting

3    standards for the claims.  There are

4    behaviors of the companies that are

5    litigating or settling the claims.

6        Correct?

7    A    Those would be included, yes.

8        Q    And there are causes of all of

9    those behaviors; are there not?

10   A    Yes.

11       Q    And all I'm saying is:

12       Have you done an expert

13   analysis at any point in time that

14   specifically and quantitatively identifies

15   the causes of any of those behaviors?

16   A    No.

17       Q    Whose job is it in estimation

18   to do that?

19   A    It's not necessary for

20   estimation.

21       Q    Well, fair enough.  That's

22   something that estimation doesn't purport

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 119

1    to do?

2        A    It's not necessary.  What I am

3    trying to estimate is the resulting

4    effects, not the cause of it.

5        Q    But we all know that, if

6    something happens in the future, the

7    changes in the environment, that can have

8    effect on claims-filing and settlement,

9    right?

10           MR. MULLADY:  Objection.

11       Vague.

12       Q    Well, your counsel has said

13   that's vague.  Let's go back.

14           If we take a look at the

15   history of asbestos claims filing and

16   resolution, that is a history where there

17   have been huge changes that affected

18   dramatically the trends of claim filing and

19   resolution, correct?

20           MR. MULLADY:  Objection to the

21       form.

22       A    There have been many changes

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                                  Jennifer L. Biggs

Page 120

1    over the years, yes.

2        **Q    And those reflect the fact that**

3    **different factors have come into the legal**

4    **environment that cause changes in behavior,**

5    **correct?**

6        A    One of many reasons.

7        **Q    Okay.  So one of many reasons,**

8    **yes?  If you just say "one of many**

9    **reasons" --**

10        A    One of many reasons, yes.

11        **Q    So, now, obviously, if you are**

12    **predicting what is going to happen in the**

13    **future, the future is going to be subject**

14    **to similar changes, right?**

15        A    Not necessarily of the same

16    cause or magnitude.

17        **Q    I understand that.  That's the**

18    **whole issue, isn't it, that, in the future,**

19    **we know that there is going to be some**

20    **change, correct?**

21        A    In something.  I don't know

22    change in what.

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                       Jennifer L. Biggs

Page 125

1      radically because a meso claim is not going

2      to be worth a lot less today than it used

3      to be worth.  It's still worth a lot of

4      money.

5              So I am an expert in looking at

6      claiming behaviors in the aggregate and

7      making reasonable assumptions to feed into

8      my model.

9              So I don't want to say I am not

10     an expert because I am an expert in making

11     those estimations, and they incorporate

12     some of what I believe you are describing.

13             And when you use the label an

14     "expert" in this, my expertise is very

15     broad.  So your questions are confusing to

16     me.

17         **Q    Well, I understand that, but**

18     **your expertise has a limitation.  And all**

19     **I'm doing is exploring the limitations of**

20     **your expertise.**

21             **You can do calculations using**

22     **models, but you have to have assumptions**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 126

1    that drive those models, correct?

2        A    The assumptions are a very

3    important part of it.

4        Q    And the assumptions that you

5    were just talking about, the assumptions

6    that are important to estimating a future

7    rate of claim filings, are assumptions that

8    go to how people will act under various

9    circumstances, correct?

10       A    In the aggregate.

11       Q    In the aggregate?

12       A    Correct.

13       Q    And in the aggregate their

14   actions under those circumstances would be

15   a function of a variety of factors,

16   correct?

17       A    Yes.

18       Q    Okay.  And when it comes to how

19   those -- what those factors are and how

20   they will affect claiming behavior, there

21   are people who are expert in analyzing

22   marketplace behavior from the point of view

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                           Jennifer L. Biggs

Page 130

1      A    Correct.

2      Q    Now, when it comes to, for

3    example, whether propensity to sue is going

4    to go up or down against a given company,

5    that is also an area that in your analysis

6    is an area about which you make

7    assumptions?

8      A    In this case, I make

9    assumptions regarding the propensity to sue

10   Grace.

11     Q    Right.  Now, those assumptions

12   about the propensity to sue Grace, whether

13   they are going to go up or down, are

14   assumptions that don't come to you as a

15   result of any scientist saying, "Here is

16   what is going to happen," correct?

17     A    I don't -- I don't get them

18   from an outside expert.  Those are my

19   assumptions.

20     Q    Right.  And when you say your

21   assumptions, you don't have a quantitative

22   or published methodology on the basis of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 136

1    differs, yes.

2         Q    Okay.  And when it comes to

3    that litigation environment, you -- it

4    would be fair to say -- I think you just

5    said it -- that it's very difficult to

6    predict how the litigation environment is

7    actually going to change from year to year.

8         Would that be fair?

9         A    You might have ideas of certain

10   reforms that are about to pass or things

11   like that, but it's difficult to predict

12   years in advance how the litigation

13   environment might change, yes.

14        Q    In fact, if you take a look at

15   Manville, nobody predicted that, when the

16   Manville Trust opened its doors in the

17   first instance, that it would be

18   overwhelmed with claims, correct?

19        MR. FINCH:  Objection.

20   Foundation.

21        Q    If you know.  If you don't

22   know, just say you don't know.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 137

1          A    I don't know.

2          Q    No one predicted in the early

3    '90s that claims would continue to rise

4    during the mid '90s, correct, against the

5    industry in general?

6          A    I think some of the work that

7    Professor Stallard did included different

8    ranges of estimates against Manville

9    specifically.  I don't know what specific

10   industry-wide projections regarding

11   increased claims were in the early '90s.

12         Q    In the late '90s, there was a

13   very dramatic up-swing in claims

14   industry-wide, correct?

15         A    Yes.

16         Q    Nobody predicted that; did

17   they?

18         A    They may have been part of

19   ranges of estimates.

20         Q    You don't know -- do you know

21   that they were?

22         A    I believe in the 1993 and 1994

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 138

1     work there were many, many scenarios of

2     possible future claim filings in the

3     context of the Manville Trust.

4          **Q     So it's your testimony that**

5     **Mr. Stallard got it right?  He predicted**

6     **the up-swing in the late 1990s?**

7               MR. MULLADY:  Objection.

8          That's not what she said.

9          **Q     Well, there was an up-swing --**

10         A     I believe he provided a range

11    of projections.  I don't think that that

12    was what he called his preferred estimate,

13    but I believe that he explored the

14    uncertainty and provided a range of

15    possible outcomes.

16         **Q     Right.  And then he did a**

17    **retrospective view after 2000, and he had**

18    **to adjust his model because it turns out**

19    **that the world had changed, correct?**

20         A     He -- in his 2001 paper, he

21    described a way to update his projections

22    to reflect changes in the propensity to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 139

1      sue.  That's right.

2          **Q      And he had not foreseen these**

3      **changes at the time he did his original**

4      **estimate, correct?**

5          A      I don't know what he foresaw.

6      But his original preferred estimate of the

7      number of claims, the actual subsequent

8      events, differed from that.

9          **Q      Okay.  And then there was a**

10     **very significant change in filing behavior**

11     **against Manville and against other**

12     **companies after 2003, correct?**

13         A      There were changes against

14     filings against Manville as well as other

15     companies, not necessarily related.

16         **Q      But there were significant**

17     **changes, correct?**

18         A      There were dramatic decreases

19     in the number of non-malignant claim

20     filings.

21         **Q      And nobody predicted those,**

22     **correct?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 140

1           MR. FINCH:  Objection to the

2       form.  Foundation.

3           **Q     In 2003, nobody predicted the**

4       **drop-off that was going to occur in 2004,**

5       **correct?**

6           A    I am not aware of it.

7           **Q     Now, in your estimate, take**

8       **the -- so we what we have is a series of**

9       **changes that have taken place in the**

10      **litigation environment over the years,**

11      **fair?**

12          A    Yes.

13          **Q     And is it also fair to say that**

14      **people who have done estimates of asbestos**

15      **liability have, with a fair degree of**

16      **consistency, failed to predict those**

17      **changes, true or not?**

18          A    There have been changes in the

19      litigation environment that have not been

20      predicted ahead of time, true.

21          **Q     Now, Mr. -- Dr. Peterson was**

22      **able to testify that the longest that he**

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                    Jennifer L. Biggs

Page 146

1      Q    -- '97 to 2001, and you adjust

2      it to reflect the Grace in your view has

3      later dates of first exposure?

4      A    Based on their own claim data.

5      Q    Based on their own claim data.

6           And subject to that one

7      adjustment, you assume that the litigation

8      environment of Grace versus the rest of the

9      industry otherwise remains constant for the

10     rest of the projection, correct?

11     A    I think -- yes, let me try to

12     answer it with more words.  I do --

13     Q    If you feel it necessary?

14     A    I do.

15          I continue to reflect changes

16     in the industry level of claim filing

17     beyond Grace's bankruptcy date; but, other

18     than the adjustments for the differences in

19     first exposure dates, I assume that Grace's

20     experience will follow the same general

21     pattern as what I have assumed for the

22     industry in total.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 160

1    and the ratio that comes out of that, the

2    assumption that it would then remain

3    constant over a long period of years, with

4    the exception of the date of first exposure

5    adjustment, that assumption is an

6    assumption that you did not test, correct?

7         MR. FINCH:  Objection to the

8    form.

9         A    I haven't tested it in a

10   statistical sense because there are not any

11   statistics to test.  I have tested it from

12   a reasonableness perspective in terms of

13   what might be likely to happen to Grace

14   relative to other defendants.

15        Q    Okay.  Now, from that

16   perspective, that is the perspective that

17   says, "Is Grace's environment vis-a-vis

18   other defendants going to change or not in

19   the future," that's an assessment that you

20   did to see about reasonableness, right?

21        MR. MULLADY:  Objection.

22   Foundation.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 163

1          A    Correct.

2          Q    You didn't do any quantitative

3    test, correct, of your assumption?

4          A    Of the future -- let me just

5    make sure I understand what you are saying.

6               Of the ratio of future Grace

7    claims that don't exist --

8          Q    That's your statement.

9          A    -- relative -- well, I don't

10   understand your question then.

11         Q    Very simple.

12              You took a ratio that was

13   derived from an historical period of time.

14   You assumed it was going to remain the

15   same.  That assumption you did not test

16   statistically.

17              You have just testified to

18   that, right?

19         A    The basis for the assumption is

20   tested statistically based on historical

21   information.

22         Q    The assumption that the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 164

1       propensity would remain the same in the
2       future from 2001 going forward would remain
3       the same, that is an assumption, correct or
4       not?
5           A    That's an assumption.
6           Q    Okay.  And it wasn't tested by
7       you, correct or not?
8           A    To the extent I've looked at
9       the stability of the historical ratio, that
10      is a test of the validity of that
11      assumption in the future.
12              In terms of other tests that
13      you seem to be implying that I should have
14      done, I don't even know what you are
15      suggesting; but based on all of the data
16      that is available, I performed reasonable
17      tests to support the assumption.
18          Q    Okay.  Okay.  The only thing
19      that you have now referred to is tests to
20      the history, right?
21              You said that you looked at
22      tests going back?

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                    Jennifer L. Biggs

Page 166

1     the '97, '98 time frame, '99 time frame.

2          Grace had entered into a

3     moratorium agreement, so their level of

4     filings during those years was suppressed.

5     If I look at their ratio relative to the

6     industry, I see that it looks low in the

7     years that there are moratoriums.

8          So I am able to interpret that

9     data. I am able to understand what caused

10    their relationship relative to the industry

11    to change during different time frames.

12          And the purpose of this whole

13    calibration period is to look at the years

14    and the time frame that will be most

15    relevant for selecting Grace's ratio

16    relative to the industry on a going-forward

17    basis. And I think I have done adequate

18    tests to make that assumption.

19    **Q     What you have now said is that**

20    **you looked at historically to the**

21    **propensity to given periods. Then you made**

22    **a judgment about which one would be**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 167

1    reasonable to be used on a going-forward

2    basis; is that right?

3          MR. MULLADY:  Objection.

4       Misstates the testimony.

5       Q    Is that right or not,

6    Ms. Biggs?

7       A    I have made a well-grounded

8    assumption.

9          MR. MULLADY:  Can we take a

10      short break.

11         MR. BERNICK:  No, I want to ask

12      a few more questions.  Then I will be

13      five or ten minutes.  I actually just

14      want to finish this up.

15         MR. MULLADY:  We are going to

16      stop soon.

17         MR. BERNICK:  You can stop

18      anytime you want, Ray.

19         MR. MULLADY:  Well, I just

20      asked you if we could stop and you

21      said you wanted to ask five more

22      minutes of questions.

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 190

1          A     And to make adjustments if you

2     need to.

3          Q     **If you have the ability to**

4     **determine what the subsequent experience**

5     **is, with respect to a given estimate, is it**

6     **required or important, either one, under**

7     **actuarial standards to test that estimate**

8     **and see whether it was accurate or not?**

9          A     I think it would be a best

10    practice.

11         Q     **Okay.  Now, have you actually**

12    **tested any of your -- any company-specific**

13    **estimate that Tillinghast has done to see**

14    **whether over time it was accurate or not?**

15         A     I have compared some estimates,

16    how they have changed over time.

17         Q     **Is any -- are any of those**

18    **comparisons publicly available?**

19         A     Not that I'm aware of.

20         Q     **Have you tested whether -- have**

21    **you found any estimate that turned out to**

22    **be still accurate five years later, going**

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                        Jennifer L. Biggs

Page 191

1     out that far?

2          A     By "still accurate" can you

3     define what that would mean, because I

4     typically provide a range of estimates.

5          Q     Yes, within the range of

6     estimates.

7          A     So within the range five years

8     later?

9          Q     Yes.

10          A     Certainly, some of them have

11     been, yes.

12          Q     Ten years?

13          A     I am not aware of comparisons

14     where we have looked at the same book of

15     business ten years apart to make the

16     comparison.

17          Q     Now, in the case of -- in the

18     case of -- strike that.

19               In the case of the asbestos

20     liability estimates, I think that's where I

21     have -- I started out.  Strike that.

22               I want to go -- you are talking

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                        Jennifer L. Biggs

Page 195

1      when it comes to claiming behavior.  And he

2      refers to those as socio-legal or legal

3      environment.

4              Are you familiar with that?

5              MR. MULLADY:  Objection to

6         foundation.

7         A    It sounds familiar.  I read his

8      deposition quickly, so I will -- should

9      I -- you are telling me that's what he

10     said, right.

11        Q    That's what he said.  I am just

12     asking whether you are familiar with that.

13        A    I thought you were asking me if

14     that's what he said.

15        Q    No.  Are you familiar with his

16     other -- the fact that he differentiates

17     and says, apart from the biological

18     process, there is a legal environment

19     process that affects claiming behavior?

20             Are you familiar with his

21     statements and writings to that effect?

22        A    I would agree with the premise.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 216

1    think are going to take place in the legal

2    environment in the future with regard to

3    the propensity to sue for mesothelioma?

4        A    I have basically predicted that

5    the environment will be consistent with

6    what we see today, so I haven't tried to

7    predict future changes in that environment.

8        Q    With respect to Grace, you have

9    assumed that the environment will be the

10   same as the way it was from '97 to 2001,

11   correct?

12       MR. FINCH:  Objection to the

13   form.

14       A    No.

15       Q    In terms of the propensity to

16   sue, Grace versus the industry?

17       A    Maybe -- that's not what you

18   asked me.

19       Q    Well, I'm sorry.

20           With respect to Grace, the

21   propensity to sue Grace versus the

22   industry, you are assuming will be the same

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 217

1     going forward, the estimate, as it was from

2     '97 to 2001, correct?

3          A     Other than the changes in the

4     date of first exposure, I am assuming that

5     that -- that Grace's relationship relative

6     to the industry would remain constant.

7          Q     And in doing so, you did not

8     perform any scientific analysis of the

9     factors that would affect the propensity to

10    sue Grace for mesothelioma, correct?

11         MR. MULLADY:  Objection and

12         foundation.

13         A     I reviewed the resulting

14    claims.  Inherent within them are all of

15    those behaviors.  I have not studied the

16    specific behaviors.

17         Q     Okay.  But we know that

18    propensities have changed in the sense that

19    the result -- the result in terms of an

20    aggregate propensity -- we know that those

21    have shifted over time, right?

22         A     They have consistently

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 219

1          I mean, it brought some cases

2    to trial, but it settled most of its cases.

3          **Q    That's true of most companies,**

4    **isn't it, they settle most of their cases,**

5    **right?**

6          A    I believe that's true.

7          **Q    But Grace also litigates the**

8    **cases, too, right?**

9          A    Some of them.

10          **Q    Union Carbide litigates cases,**

11    **has for the last two or three years,**

12    **correct?**

13          A    I believe so.  I don't follow

14    that closely.

15          **Q    Ask him.  He knows about that?**

16          A    I don't talk to Ray about that.

17          **Q    Union Carbide is solvent,**

18    **right?**

19          A    Yes.

20          **Q    How many other major solvent**

21    **defendants are there out there in the tort**

22    **system to litigate cases other than**

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                          Jennifer L. Biggs

Page 224

1    having trouble focusing.

2        Q    Sure.  That's fine.

3            "Are you aware of any

4    scientific methodology that is available

5    for predicting how the legal externalities

6    are going to evolve with respect to

7    asbestos claims?"

8        His answer was:  "No."

9        Would your answer be different?

10       A    I would also answer no.

11       Q    Last question:

12           "Is there any scientific

13   methodology that you can think of that

14   would be capable of predicting changes in

15   the legal environment for asbestos?"

16       That's the question that I

17   asked him?

18       MR. MULLADY:  Page?

19       MR. BERNICK:  This is page 103.

20       Q    "Is there any scientific

21   methodology that you can even think of that

22   would be capable of predicting changes in

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 226

1    method that I think you are looking for,

2    but it is a scientific way to do it.

3        Q    So your answer to that would be

4    yes?

5        A    I can think of something.  Yes.

6        Q    Okay.  But it's supposed to be

7    scientific methodology.  Is that a

8    scientific methodology?

9        A    I am applying scientific

10    principles to evaluating past experience

11    and making a reasoned assumption going

12    forward.  That's a scientific method.

13    Maybe we define that differently.

14        Q    Okay.  Is that within the scope

15    of your expertise, the method that you just

16    described for predicting changes in the

17    legal environment?

18        A    I evaluated the likelihood of

19    significant changes in the legal

20    environment relating to meso claims.  I

21    have to -- I have to make an assumption

22    regarding how that might or might not

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                            Jennifer L. Biggs

Page 229

1      of a way or a model to use to do that.  As

2      a necessity of making my estimate, I need

3      to come up with an assumption regarding the

4      future propensity to sue.  And the basis I

5      used to make that judgment is scientific in

6      nature.

7              So in a very technical sense, I

8      have used the scientific process to make an

9      assumption.  I haven't built a model, and I

10     don't think I have the expertise to build a

11     model regarding specific claiming behavior

12     and how that would change in the future.

13             But that is different to me

14     than whether I have the expertise to use

15     scientific principles to make an informed

16     judgment and make a necessary judgment

17     regarding the estimate of future

18     liabilities.

19         Q    That's a question of selective

20     judgment, I think your term is?

21             MR. FINCH:  Objection to the

22     form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 236

1    filed.  I just know that they were filed.
2         And I also know that the rate
3    has been steadily increasing for many, many
4    years, and that, based on my understanding
5    of the environment, there is not a reason
6    to expect a decrease.
7         So my model is not a rigorous
8    regression analysis of specific variables
9    to affect propensity to sue.  I am not
10   aware of that type of model, and that's not
11   what I have employed.
12       Q    And then, therefore, when it
13   comes to the future, you don't have a model
14   for future propensity.  You have a model
15   for --
16       A    I have an assumption for future
17   propensity to sue, based on the model of
18   the past.
19       Q    Okay.  But you don't have a
20   model for future propensity to sue.  It is
21   an assumption, correct?
22       A    It is -- I have a model of the

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 237

1      future propensity to sue in the industry,

2      and I have made an assumption regarding

3      Grace's share of that.  So I do have a

4      model of the future propensity to sue.

5          **Q     But you don't have a model of**

6      **the future propensity to sue at the company**

7      **level, correct?**

8          A    I make an assumption that it

9      will remain at a constant level.

10         **Q     That constant level is the**

11     **level as which it was -- existed from '97**

12     **to 2001, correct?**

13         A    Relative to the industry,

14     correct.

15         **Q     And if you change that**

16     **calibration period by even a year, it would**

17     **very significantly affect the entire future**

18     **projection, correct?**

19         A    It could.  You could look at

20     lots of different blocks of years, and you

21     need to use informed judgment to decide

22     what is most appropriate.  You can't just

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 244

1    future were unforeseeable.  Others, I
2    think, could be predicted, so I don't want
3    to just say the totality of it couldn't be
4    foreseeable.  So --
5        **Q    But the totality certainly**
6    **couldn't have been foreseen, correct, in**
7    **any given year, the totality --**
8        A    But material factors that are
9    part of that could be, so I don't want to
10   just put it all in a bucket and say we
11   couldn't tell you about anything.  There
12   are significant parts of it that we could
13   tell you about it.
14       **Q    Would you agree with me that,**
15   **in any given year of Grace's history, the**
16   **propensity to sue Grace year-by-year or**
17   **over a period of many years was in its**
18   **totality materially affected by factors**
19   **that could not be foreseen?**
20       A    I think Grace, as well as other
21   defendants, were affected by increases in
22   the propensity to sue for meso that weren't

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 245

1    foreseen.

2        Q    Now, I want to focus

3    specifically on your calibration period for

4    Grace -- that is from '97 to 2001.

5    Correct?

6        A    For the number of filings,

7    correct.

8        Q    Just still talking propensity,

9    when it comes to the propensity

10   determination that you made, you used a

11   calibration period of '97 to 2001.  Fair?

12       A    True.

13       Q    Okay.  Now, if we went back

14   over that period of time, that calibration

15   of time, in fact, there turned out to be

16   during that calibration period dramatic

17   volatility in Grace's propensity, correct,

18   with respect to mesothelioma?

19       A    There were fluctuations in the

20   ratios that I show of Grace relative to the

21   industry.  And when I see that type of

22   thing, it's important to me to try to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 255

1    cause-and-effect factors at a more

2    individual claimant basis. I just fail to

3    see how that is very possible, given the

4    types of data that are available regarding

5    individual claimants for mesothelioma.

6        **Q    Well --**

7        A    It sounds like a great theory,

8    but I don't think it's very practical.

9        **Q    I see. Are you aware of any**

10   **other formal method of scientific analysis**

11   **that enables you to identify causal**

12   **factors?**

13       A    I haven't studied that. That's

14   not how I do my analysis.

15       **Q    Now, when it comes to Grace**

16   **specifically, apart from the moratoria,**

17   **were there any other factors that you**

18   **identified affecting Grace such that they**

19   **might change the Grace propensity in**

20   **relationship to the industry propensity**

21   **during the late -- during the calibration**

22   **period?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 256

1           Did I screw that up?

2      A    No.  I'm thinking.

3           Not specifically.

4      Q    How much of the increase -- or

5   there was an increase in the propensity

6   versus the industry during your calibration

7   period, correct?

8      A    Yes.

9      Q    Okay.  So, in fact, if we took

10   your propensity number, about 58 percent --

11      A    For meso.

12      Q    -- for meso, that number

13   reflects in part the impact of an increase

14   in propensity to sue Grace during your

15   calibration period, correct?

16      A    Ratios of Grace's claims

17   relative to the industry claims are higher

18   in 2000 and 2001.

19      Q    Right.

20      A    And some of that increase is

21   attributable to certain moratorium

22   agreements expiring.  And other reasons for

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 259

1    A    That it increased in 2000,

2    2001.

3        Q    Yes.  To that extent, you had

4    to look -- you wanted to look for factors

5    that would account for that increase, that

6    is, Grace-specific factors, right?

7        A    I wanted to understand

8    information that would tell me which years

9    would be most representative of Grace for

10   the future.

11       Q    Right.  And in order to do

12   that, again, you have to go look back to

13   what is causing the events to take place.

14   You want to know if there are going to be

15   events that are non-recurring or if there

16   are going to be events that are recurring,

17   correct?

18       A    I agree.

19       Q    Now, as I understand it, the

20   only event that you have actually analyzed

21   that is unique to Grace during that period

22   of time is the -- are the moratoria,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 260

1    correct?

2        A    The moratorium, and the other

3    specific item that I needed to consider for

4    the calibration period was what the partial

5    year of filings represents in terms of the

6    relationship to the industry.  I need to

7    set them on equal time or volume

8    considerations in order for the ratio to

9    make sense.

10       Q    But in terms of changes

11   affecting the propensity against Grace, the

12   only --

13       A    I didn't identify anything

14   else.   Correct.

15       Q    Okay.  Now, with respect to the

16   moratorium, did you measure -- from what

17   you have said -- well, let me just ask you.

18       Did the moratorium have the net

19   effect of increasing the overall average

20   propensity to sue Grace in the calibration

21   period?  In other words, did the moratoria

22   affect propensity within the calibration

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                    Jennifer L. Biggs

Page 265

1          **Q    Okay.**

2          A    Because of the effect of the

3    moratorium.

4          **Q    No, the effect of the**

5    **moratorium would only affect 1996.  Well, I**

6    **will rephrase it.  What it says, you work**

7    **with 1996 back to 1991 before really any of**

8    **the moratorium had any kind of effect on**

9    **the propensity?**

10         A    I haven't looked at that

11   specific range of years, but one test that

12   I did do was I looked at the whole period

13   from '92 to 2001.  And I get essentially

14   the same percentage that I selected by

15   reaching back that far.

16         **Q    You still are then including**

17   **the later period of time.  What I am trying**

18   **to tease out is --**

19         A    I think the propensity to sue

20   Grace increased.  I think it's important to

21   use a span of years that are as current and

22   responsive to the future as possible.  But

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                                    Jennifer L. Biggs

Page 273

1      moratoria.  That's fine.

2              But I then asked the question,

3      what about the two years that have the

4      greatest impact on the calibration period,

5      which are 2000, 2001.

6              Do they affect -- do they

7      reflect the impact of another factor that

8      is unique to Grace other than the

9      moratorium?

10             That's what I am getting at.

11     So the question is:

12             Did you look to see whether a

13     portion of the increase in propensity in

14     2000, 2001, was due to factors other than

15     the moratorium, that is, factors unique to

16     Grace?

17             Did you do that?

18        A    I didn't specifically break it

19     apart in terms of how much is the

20     moratorium and how much might be other

21     factors.

22        Q    Fine.  Let me ask you a couple

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 313

1    understanding of the data.

2        I directly relied on a

3    selection of '97 to 2001 as being

4    responsive.

5        **Q    Now, if we take a look at the**

6    **trend line from '93 through '98, that's a**

7    **total of six years.  And is it fair to say**

8    **that the propensity trend line from '93 to**

9    **'98 is consistently down?**

10       A    The ratios in each successive

11   year of Grace relative to the industry are

12   lower.

13       **Q    Then there are two years in**

14   **which there is the beginning of a rise, and**

15   **then one year in which there is sharp jag**

16   **up, correct?**

17       A    1999 increases, and 2000

18   increases at a greater rate.

19       **Q    And are there statistical tests**

20   **to use to determine whether the group of**

21   **years from '97 -- from '93 to '98 is**

22   **statistically different from the group of**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 314

1    years, '98 -- I mean -- 1999, 2000, and
2    2001?
3        A    You could use tests to
4    determine if you felt that the average
5    during the two time periods was different,
6    but that wouldn't prove anything.
7        Q    Well, it may not prove
8    anything, but there are tests that are
9    available -- are there not -- for testing
10   as a statistical matter whether those two
11   groups of numbers are significantly
12   different, correct?
13       A    You could test whether the
14   averages are different, but the purpose
15   here is not to show whether they are
16   different.  The purpose is to make an
17   assumption regarding what is most
18   representative for the future.
19       Q    Well --
20       A    And it doesn't matter if the
21   two groups are different --
22       Q    So --

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 315

1      A    -- to do that.

2          Q    Well, first of all, you didn't

3      do the test, right?

4      A    I didn't see a need to do that.

5          Q    But you didn't do the test?

6      A    I didn't do the test because I

7      did not think it was necessary.

8          Q    Fair enough.

9              So if it turns out that there

10     is a steep downward trend from '93 to '98,

11     there is then a change in direction from

12     1999 and 2000.  You then get to the key

13     question which is:

14              If those trends are there and

15     they are statistically significant, down

16     and then reversal up, you then have to ask

17     yourself the question, do you not, about

18     which trend is most probative of the

19     future, right?

20     A    I didn't try to answer the

21     question, which trend is representative of

22     the future.  I tried to ask myself:  Which

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 316

1    overall rate is most representative of the

2    future?

3            And if I were to follow one

4    theory that says I should be as responsive

5    as possible to recent period experience, I

6    would have only used the data in 2000 and

7    2001 with the very high level.

8            But I didn't do that because I

9    didn't think it was appropriate.

10            I looked into the underlying

11    nature of the reasons that the '97, '98,

12    and 1999 -- '96, '97, '98, and '99 years

13    are depressed and selected the overall

14    calibration period as representative going

15    forward.

16            And as long as I understand the

17    reasons why one group of years is going

18    down, I don't need to test whether they're

19    statistically different.  I just need to

20    make an informed judgment as to what I

21    think is the best rate on a going-forward

22    basis.

Page 317

1      Q     Did you do any tests to

2    determine -- did you do any tests to

3    determine which years from '93 to 2001,

4    which years were most representative?

5      A    That's a judgment.

6      Q     I understand that.  But did you

7    do a test or statistical or other

8    quantitative test to kick the tires on your

9    judgment?

10            MR. MULLADY:  Objection to the

11      form.

12      A    I used principles of actuarial

13    science relating to the credibility of

14    data, stability of data, responsiveness of

15    the time period.  I used those fundamental

16    principles to make a reasonable assumption.

17      Q     Okay.  I have got two more

18    topics to cover, and then I will be done.

19            I want to now turn from -- the

20    ratio that we have talked about is

21    propensity.  It's a ratio -- it's a ratio

22    between claims against Grace and claims

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 323

1    And I need to look at things in these

2    five-year buckets in order to then apply

3    the run-off from that point forward.

4         So I needed -- I had an actual

5    data point for 2006.

6    Q    Yes.

7    A    And I used that to develop to

8    '09.

9    Q    Would it be fair to say that

10   for 2007, 2008, 2009 you made the judgment

11   or assumption that the rate would be the

12   same as 2006?

13   A    Yes.

14   Q    And is that a judgment for an

15   assumption that is the output of a

16   quantitative analysis, or is that simply a

17   judgment that you made, you considered to

18   be reasonable and of service in answering?

19   A    It took into consideration the

20   expected run-off between the 2005 to 2009

21   group versus the 2000 to 2004 group from

22   Professor Stallard's work, both his older

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 338

1      **claimants that it settled with?**

2          A    I am not aware of that evidence

3      in this case.  No.

4          **Q    I take it you were not asked,**

5      **as part of your work, to calculate Grace's**

6      **several liability at any point in time,**

7      **correct?**

8          A    I was asked to estimate future

9      liability, an estimate of what it would

10     take to monetize its liabilities if it had

11     continued in the tort system.

12         **Q    How much it would have cost**

13     **Grace to resolve cases as they came up in**

14     **the tort system, right?**

15         A    Right.

16         **Q    I am just asking you -- I take**

17     **it then the answer to my question is no,**

18     **nobody specifically asked you to determine**

19     **what Grace's several liability was,**

20     **correct?**

21         A    But it's -- even at several

22     liability could change over time.  I'm not

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 340

1    **Q    Were you asked to determine**
2    **that?**
3         A    I was asked to determine what
4    they would have continued to pay, and I
5    used what they historically settled for as
6    part of the basis for that.
7         **Q    What they historically paid,**
8    **settled for, they paid in order to avoid**
9    **not only their share of the liability, but**
10   **also joint liability, correct?**
11        MR. MULLADY:  Objection.
12   Foundation.
13        **Q    If you know.  If you don't**
14   **know, just say you don't know.**
15        A    I don't know all of the reasons
16   that they entered into the settlements that
17   they did.
18        **Q    If you want to know what their**
19   **share was -- we all know how much they**
20   **paid -- but if you want to know what their**
21   **share was of the total liability, you have**
22   **to know how much it paid in the aggregate**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 342

1      A    It employs assumptions, yes.

2      Q    And the assumptions that it

3  employs -- I am fiddling because it's

4  around here someplace -- is essentially

5  that there would be a CPI adjustment of

6  about 3 percent, correct?

7      A    That's one component of what I

8  call the trend, which is the annual change

9  in the average costs.

10     Q    Another component was an

11  assumed reduction of 10 percent for three

12  years, correct?

13     A    Correct, from 2002 to 2005.

14     Q    And another assumption was that

15  there would be a 1 percent increase per

16  year in the settlement demands, just

17  because settlement demands always go up,

18  right?

19     A    That there would be a 1 percent

20  increase in settlement demands following

21  the three years of 10 percent decreases

22  because, in general, there is some erosion

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 343

1    of the reforms that led to these decreases.

2        **Q    Finally, there is then an**

3    **assumption that settlement demands will**

4    **decline to some extent as a result of aging**

5    **of the population, correct?**

6        A    Correct.

7        **Q    Now, is there any model that**

8    **led to each one of those assumptions -- are**

9    **those basically assumptions that you used**

10    **in making your model?**

11        A    Those are assumptions that are

12    used within the model.  There was some

13    analysis that led to the selection of each

14    of those assumptions.

15        **Q    At the end of the day, though,**

16    **when you selected, for example, 10 percent**

17    **decline for three years, would that be the**

18    **outcome of some statistical analysis, or is**

19    **that a judgment on your part?**

20        A    It was the outcome of reviewing

21    experience for large defendants that

22    remained solvent during the relevant time

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 344

1    period.

2        Q    Okay.  You then have the

3    assumption that settlement demands will

4    increase 1 percent forever.  Is there a

5    model?

6        A    Excuse me.

7        Q    You then said -- I thought you

8    then said --

9        A    For five years.

10       Q    For five years.

11           Is there a model that told you

12   that answer, or was that again an

13   assumption that you made?

14       A    That was a judgment based on --

15   that was more judgmental in nature than the

16   10 percent decline, partly because we are

17   talking about the time period into the

18   future of 2006 to 2010.  So there is not

19   any experience to actually observe in

20   making that judgment.

21           But it's consistent with

22   expectations of what would typically happen