# EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-1139 (JKF) |
| Debtors. | Jointly Administered |
| | **Objection Deadline:  December 21, 2007** |
| | **Hearing Date:  January 14, 2008 at 9:00 am in Pittsburgh, PA** |

**MOTION OF FUTURE CLAIMANTS' REPRESENTATIVE TO PRECLUDE TESTIMONY OF DEBTORS' EXPERTS DR. B. THOMAS FLORENCE, DR. ELIZABETH L. ANDERSON, DR. SURESH MOOLGAVKAR, DR. PETER S.J. LEES, AND DR. RICHARD J. LEE PURSUANT TO RULES 702, 703 AND 403 OF THE FEDERAL RULES OF EVIDENCE**

The generally accepted sample size in statistics for the generation of reliable estimates would be 1,082 claims. *See* Supplemental/Rebuttal Expert Report of P.J. Eric Stallard, at 10 (Sept. 25, 2007) (Attached hereto at Exhibit I and cited herein as "Stallard Report (Ex. I).") Although samples smaller than 1,082 can be used because of data limitations, the smaller the sample size, the higher the error rate. *Id.* at 10. However, Dr. Florence does not calculate the potentially substantial error rates associated with his small sample size. Dr. Florence's six mesothelioma closed-claim settlement values range from $9,981 to $446,516, and the average settlement value is $155,240. *See* Declaration of P.J. Eric Stallard dated December 7, 2007, at ¶24. (Attached at Exhibit J and cited herein as "Stallard Decl. (Ex. J).") Thus, the true payment for mesothelioma claimants who could have met Grace's criteria, at the 95% confidence interval, range from $25,173 to $285,306. Stallard Decl. (Ex. J) at ¶24.

Similarly, Dr. Florence does not provide an adequate explanation for his decision not to use trial verdicts. *See* Florence Dep. (Ex. A) at 309:12-17. This is hardly surprising since the average trial verdict of $1.3 million for mesothelioma claims is almost nine times higher than Dr. Florence's average settlement value of $155,240.[21] Had Dr. Florence relied upon Grace's trial verdict history when assigning values to pending and future "valid" claims, his liability estimates would have been dramatically impacted.

Because Dr. Florence provides no analysis of why his use of a six-claim sample is reliable, or why he excluded trial verdicts, "the Court cannot evaluate this element" and "[a]s a result, this weighs against the admission of the proffered testimony." *Allen*, 1997 WL 34501372

---

[21] Florence Dep. (Ex. A) at 310:9-18 (Counsel citing to Report of Jennifer Biggs at 48: "Historically, Grace had nine mesothelioma verdicts averaging 1.3 million.").

lawsuits received after the petition date were not included in CMS.  *See* Hughes Dep. (Ex. H) at

348:14-25, 352:14-18.

Dr. Florence's exclusion of claimants with a post-petition diagnosis also was improper

and renders his estimate unreliable.  It is incorrect to exclude claims that were filed prior to the

petition date, regardless of the recorded diagnosis date.  Stallard Report (Ex. I) at 19.  It is not

uncommon for a claimant to have multiple diagnosis dates, some of which are after a claim is

filed.  Biggs Report (Ex. J) at 23.

### 2.    Exclusion of 28,923 Claims From CMS Database

Dr. Florence excluded 28,923 of the 112,690 claims from the CMS database, after

excluding the 5,063 claims discussed above, because he could not obtain a match between their

CMS record and the POC records.  *See* Florence Supp. Report (Ex. B) at 8; Stallard Report

(Ex. I) at 19.[23]  Dr. Florence essentially assumed that these 28,923 claimants do not exist:

> Q.  Okay.  And what did you do with the 28,923 people who filed
> a proof of claim form for an asbestos personal injury claim in
> your subsequent steps in your analysis?
>
> A.  The are—they are not considered—I mean, considered in the
> sense—directly considered in the sense of calculation of rate.
>
> Q.  So for purposes of your analysis, you assumed that they did not
> exist, correct?
>
> A.  If they did not file a POC and be a pending case, they were not
> in the base that we calculated from, correct.

---

[23] The Stallard Report is a rebuttal to Dr. Florence's initial report served on June 18, 2007, not his supplemental
report served on September 25, 2007.  In his June report, Dr. Florence represented that the total number of historical
claims was 113, 648, and the number of claims that could not be matched to a POC was 29,172.  Those values
changed to 112,690 and 28,923, respectively, in Dr. Florence's September report (referred to herein as "Florence
Supp. Report").

2007).[24]  (Attached hereto at Exhibit M, and cited herein as "Anderson Report (Ex. M).")  Dr. Anderson eliminates (i) all workers who personally removed or cut Grace asbestos-containing products (category B of the PIQ), (ii) all workers at a site where Grace asbestos-containing products were being installed, mixed, removed, or cut by others (category D of the PIQ), and (iii) all workers in a space where Grace asbestos-containing products were being installed, mixed, removed, or cut by others (category E).  *Id.* at 15-17.  Dr. Anderson made four fundamental mistakes that render her conclusions unreliable and inadmissible.

First, Dr. Anderson assumed that the *average* asbestos exposures of everyone in each of the PIQ categories is representative of *all* the workers in that category.  Thus, Dr. Anderson assumes that if the average worker in a job category had a low cumulative exposure, then all workers in that category had a low exposure.  However, it is scientifically improper to use an average (or mean) value, without providing the range of distributions.  *See* Stallard Decl. (Ex. J) ¶9-10.[25]  That is because some individuals in the group may have much higher exposures than others — which in fact is the case with respect to each of the PIQ categories that Dr. Anderson eliminated.  *Id.* at ¶12.  Indeed, by using the mean rather than the range of distributions, Dr. Anderson incorrectly excluded *as much as 44.2% of the diseased population* under her own exposure thresholds (which as discussed below are too high).  *Id.* ¶19.  The underlying data

---

[24]  For her assessment of the average asbestos exposure levels (fiber concentrations) associated with each PIQ exposure category, Dr. Anderson relies on the calculations of Dr. Lees.  Dr. Lees purports to develop asbestos fiber exposure estimates for persons who historically worked with or around certain Grace products.
[25]  Remarkably, although Dr. Anderson relied on Dr. Peter Lees for the calculation of the averages, she never asked him to calculate the range of distributions or the error rate, and Dr. Lees did not makes such calculations.  *See* Anderson Dep. at 172-175 (Nov. 2, 2007).  (Excerpt attached hereto at Exhibit N.)  Dr. Peter Lees' (i) failure to calculate and report error rates  and variances from his means (ii) his inadequate sample of exposure levels (limited to only ten Grace sites) (iii) his high margin of error and (iv) his misplaced reliance on Dr. Richard Lee's erroneous PCME conversion factor render his report unreliable and inadmissable.  *See* P. Lees Dep. at 133-34 (Oct. 29, 2007).  (Excerpt attached hereto at Exhibit O.)  Accordingly, the FCR joins the ACC in moving to disqualify Dr. Peter Lees.  Similarly, the FCR joins the ACC in moving to disqualify Dr. Richard Lee, on whom Dr. Peter Lees relies, because

reveals that the spread of the distributions – *i.e.*, the different exposures within the group – is very large, with some members of the group substantially exceeding the exposure benchmarks that Anderson used. *Id.* at ¶12. Grace's own documents show that Mr. Kenworthy, who was a Grace worker in one of the excluded categories, had an asbestos-exposure level above Dr. Anderson's benchmarks. *See* Mark A. Peterson, Rebuttal to the Testimony of W.R. Grace's Experts, at (Sept. 25, 2007) at 31-33. (Excerpted copy attached at Exhibit P.) By ignoring the range of distributions and focusing just on the mean, Anderson improperly excluded people with legitimate claims, such as Mr. Kenworthy, from recovery.[26]

Second, Dr. Anderson looked at the *wrong group* in assessing whether people working in each of the PIQ categories had sufficient exposure to Grace asbestos diseases to get an asbestos-related disease. Her analysis thus fails the "fit" requirement and fails to comply with *Daubert*. Before excluding everyone in PIQ categories B, D, and E, Dr. Anderson should have looked at the subgroup of workers in each of those PIQ categories who actually developed an asbestos-related disease (*i.e.*, the claimants in each group) and measured the distribution of asbestos exposure to that group. Dr. Anderson did not do this. Instead, she examined the mean exposure of all the people who worked in the group, not just those who got sick. In essence, by analogy, Dr. Anderson used the mean speed of all drivers — not the range of speeds of those drivers who get into accidents — to estimate the number of future accidents caused by speeding. Just as it can be statistically demonstrated there is a direct relationship between speed and accidents, here, there is an established relationship between asbestos exposure and asbestos disease. Future

---

he used an improper PCME conversion method that had the effect of significantly discounting the actual exposures to asbestos.

[26] Dr. Anderson asserted that disparate exposures would converge to the mean over time. Dep. 243-247. However, there is no scientific basis for this assumption. *See* Stallard Decl. (Ex. J) at ¶16.

asbestos claimants will have a higher exposure level than the average worker — a fact Dr. Anderson ignored in precluding everyone in PIQ categories B, D, and E from any recovery.

Thus, Dr. Anderson's exclusion of PIQ categories B, D, and E had no valid scientific basis. As Professor Stallard explains, it is not scientifically valid to use an estimate of a single parameter such as the *mean* of a distribution of asbestos exposure levels for a given cohort of workers to characterize the entire set of workers. Stallard Decl. (Ex. J) at ¶9. Instead, the *full distribution* of the asbestos exposure levels should be estimated from relevant data and the results used to estimate the fraction of exposure levels in that cohort exceeding each specified threshold value. *Id.* This principle is fundamental to the accurate characterization of the distribution of risk-related measurements in a heterogeneous population, *i.e.*, a cohort of workers with individual members who differ in their levels of exposure to asbestos, as is the case here.[27] *Id.*

Third, Dr. Anderson wrongly assumed that low-dose exposure will not cause asbestos-related diseases because the epidemiological studies cannot accurately measure low-dose exposure.[28] "Epidemiological evidence is not the only legally sufficient proof for establishing a

---

[27] Prof. Lees, upon whom Anderson relies affirmed that the worker cohorts are heterogeneous. *See* Stallard Decl. (Ex. J) at ¶9 n.1.

[28] It is well recognized that "employing the results of group-based studies of risk to make a causal determination for an individual plaintiff is beyond the limits of epidemiology." Reference Manual on Scientific Evidence (Ex. E) at 337. Moreover, in analogous litigation arising out of tort claims based on ionizing radiation exposure, the Third Circuit rejected the argument that disease causation can only be proven in the range of doses where the dose-response rate is directly observable:

> [T]he fact that risks of cancer from exposure at low doses are based on extrapolations from higher doses [above 10 rem] does not mean that the scientific community believes that there is no causal connection between a low-level exposure and cancer induction. We do not believe that the scientific community views that connection to be speculative. Rather, as noted above, at very low doses it is possible that ionizing radiation may deposit sufficient energy into a cell to adversely modify it. Indeed, scientists assume that there is no threshold for the induction of cancer. . . . . . . Accordingly, we conclude that it was error for the District Court to hold that all the plaintiffs had to demonstrate an exposure of at least 10 rem to satisfy their burden of establishing causation. By doing so, the District Court was, in effect, deciding, contrary to the opinions of the scientific

## CONCLUSION

In sum, Grace's experts do not provide an appropriate estimate of its liability for pending and future asbestos-related personal injury claims. Instead, Grace has strung together a series of compartmentalized expert reports — each of which is flawed — and proffered an estimate for which none of its experts assumes full responsibility. Such an approach does not meet the *Daubert* standard of relevance or reliability. *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999). Accordingly, the FCR respectfully requests that the Court preclude the expert testimony of Drs. Florence, Anderson, Moolgavkar, Lees and Lee pursuant to Rules 702, 703 and 403 of the Federal Rules of Evidence.

Dated:  December 8, 2007

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
*/s/ Raymond G. Mullady, Jr.*
Roger Frankel
Richard Wyron
Raymond G. Mullady, Jr.
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

John Ansbro
666 Fifth Avenue
New York, NY 10103
(212) 506-5000

- and -

PHILLIPS, GOLDMAN & SPENCE, P.A.
John C. Phillips, Jr. (#110)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200

*Co-Counsel to David T. Austern,*
*Future Claimants' Representative*