**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., et al., | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Objection Deadline: 11/11/08 at 4:00 p.m.** |
| | ) | **Hearing Date: 1/28/08 at 1:00 pm** |

**MOTION OF THE CITY OF CHARLESTON, SOUTH CAROLINA**
**FOR RELIEF FROM THE AUTOMATIC STAY**

The City of Charleston, South Carolina (the "City"), by and through its undersigned counsel, hereby moves for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) and, in support of this Motion, the City respectfully states as follows:

**BACKGROUND**

1.      The above-captioned debtors and debtors-in-possession ("Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on April 2, 2001  ("Petition Date"), and are in possession of all assets of the estate.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. § 362.  This is a core proceeding.

3.      The City is a governmental unit, as that term is defined by 11 U.S.C. § 101(27).

4.      The City is not a creditor of the Debtors.[1]

5.      The Debtors own certain real property located within the limits of the City, which property is more fully described as:

---

[1] As a governmental unit, the City does levy taxes, for which the Debtors, as the owners of assets located within the City, are responsible for.  However, as of the date of this Motion, the Debtors are current with all of their obligations to the City.

All that certain piece, parcel or tract of land, together with any improvements thereon, situate, lying and being in the City of Charleston, County of Charleston, State of South Carolina, containing approximately 16.464 Acres, more or less and shown on a plat entitled: "PLAT SHOWING THE BOUNDARY SURVEY OF A 16.464 ACRE PARCEL, OWNED BY W.R. GRACE AND COMPANY, LOCATED IN THE CITY OF CHARLESTON, CHARLESTON COUNTY, SOUTH CAROLINA," prepared by Engineering, Surveying, & Planning, Inc., dated February 5, 1991, revised February 13, 1992, and recorded in Plat Book CG, Page 177, RMC Office for Charleston County.

Being a portion of the property conveyed to W. R. Grace & Co., by deed of NACO Fertilizer Company, dated September 24, 1954, and recorded September 30, 1954, in Book Z-58, Page 393, RMC Office for Charleston County.

TMS#464-02-00-051 ("Grace Property").

6.    With respect to the Grace Property, the City is informed and believes that:

- For over fifty years, the Debtors operated a fertilizer manufacturing and pesticide formulation facility on the Grace Property.  As a result of the Debtors' operations, the property became contaminated and, on or about May, 2005, the U.S. Army Corps of Engineers and the South Carolina Department of Health and Environmental Control issued a joint public notice regarding the required remediation of the contamination;

- The Debtors have almost completed remediation on the property;

- Virtually all improvements have been removed from the property and only monitoring wells and cement capping remain;

- As of December 1, 2005, the Grace Property appraised for $1,185,000.00.  *See* Appraisal of 1820 Harmon Street of Charleston Appraisal Service, Inc., dated December 9, 2005, [2] a copy of which is attached hereto as Exhibit A;[3] and

- No liens encumber the Grace Property.

---

[2] The City has ordered an updated appraisal, which it will provide to the Court if it is completed in advance of the January 28, 2008 hearing date.

[3] Both because of the size and number of the exhibits and the service list, the exhibits referenced herein are not being served on all parties.  However, electronic copies will be provided to anyone requesting them from the undersigned counsel.

7.     As a governmental unit, the City is tasked with certain responsibilities and obligations to its citizens to ensure their health, safety, and welfare.   Among these responsibilities and obligations are the obligations to maintain the City's properties, its parks, buildings, public thoroughfares and streets, and to provide fire, police, sanitation, and other services.

8.     To this end, the City owns certain real property located on Milford Street, Charleston, South Carolina, upon which is located the City's public works and fire training facility ("Milford Street Facility").  The Milford Street Facility:

- Is over 40 years old;

- Is utilized by numerous City departments, including, but not limited to, the City's Public Services, Fire, Police, Traffic and Transportation, Parks, Fleet Management, Environmental Services (including Trash Collection, Garbage Collection, and Street Sweeping);

- Is the location of the Fire Department Training Facility, the Police Department radio maintenance shop, fleet services, and driver training;

- Is the location of the Traffic and Transportation Sign Shop;

- Is used by the Parks Department Electrical, Facilities Maintenance & Construction Division as a lay down area;

- Services a fleet of approximately 400 vehicles, almost half of which cycle in and out of the facility at any one time.  Estimates are that each night, approximately 127 vehicles of various types are stored on the property, as are various related pieces of heavy equipment;

- Has environmental issues as a result of the age and use of the facility, which are being addressed in a developing remediation plan; and

- Has a fueling station that provides "critical fluids" and fuel on a daily basis to Environmental Services Vehicles.

*See* Milford Street Operations Center Study performed by Heery International, P.C. dated November, 2004, updated May, 2005 ("Heery Report") at 3 - 7, attached hereto as <u>Exhibit B</u>.

9.      In addition to the foregoing, the City is tasked with developing and fostering the economic development of the community, which inures to the benefit and well being of not only all the residents of the City and County of Charleston, but also the State of South Carolina as a whole.   Consistent with this obligation, in 2000, the Charleston City Council, after years of study, adopted an Economic Development Plan of the Enterprise Community and, in 2003 adopted the Charleston Neck Plan[4] (collectively "Economic Development Plans").

10.      In the Economic Development Plans, the City identified the needs and strategies for improving the economic development and quality of life for the citizens located in the "Neck Area,"—a historically economically depressed area.   The plans set forth three basic goals, or "principles" which govern redevelopment in the "Enterprise Community":

- creating economic opportunities;

- promoting neighborhood revitalization; and

- improving the delivery of heath and human services.

*See* Exhibit C at 6.

11.      One important strategy identified in the Economic Development Plans as one that would help the City improve the Neck Area and achieve the goals of the Economic Development Plans is the relocation and upgrading of the Milford Street Facility from its present location to an industrial zone. *Id.* at 45.

12.      To facilitate this relocation, on December 21, 2004, the Charleston City Council approved a Tax Increment Financing Plan for the Redevelopment of the Charleston Neck Redevelopment Project Area ("TIF Plan").    *See* Ordinance No. 2004-151, at 11, excerpts of which are attached hereto as Exhibit D.  In addition to establishing a "TIF District" the TIF Plan

---

[4] A true and correct copy of the Charleston Neck Plan is attached hereto as Exhibit C.

provides for the relocation of the Milford Street Facility to an industrial zone. *Id.*

13.    Also in 2004, the City retained the assistance of consultants and experts who conducted a study of the Milford Street Facility, and analyzed the then current use of the facility and the problems with the site. The purpose of this initial study was to determine the City's needs moving forward.

14.    In addition, in 2005, as part of the City's due diligence, the City commissioned an updated independent study by Heery International, P.C. ("Heery"). *See* Exhibit B. In preparing its report, Heery reviewed the existing physical condition of the Milford Street Facility and found numerous problems with the facility, including, but not limited to, physical and environmental issues. *See id.* at 11 – 15. Heery also determined that it would cost the City at least $13,451,296.00[5] to correct the problems with the Milford Street Facility to make it comply with federal and state laws and to make it better meet the needs of the City. Still, simply updating the Milford Street Facility rather than moving it to an industrial zone would directly conflict and negatively impact the TIF Plan.

15.    Accordingly, the City has conducted an extensive investigation, spanning several years, to find a suitable site for the relocated Milford Street Facility. As a result of this investigation, the City has determined that the Grace Property fulfills all of the requirements, and is the optimal site for relocation of the Milford Street Facility.[6]

16.    To this end, on November 27, 2007, the City passed a resolution that authorized the City's legal counsel to attempt to acquire the Grace Property either by negotiated purchase or by eminent domain. A true and correct copy of the resolution is attached hereto as <u>Exhibit E</u>.

---

[5] Estimate of 2006 Construction Costs. *See* Exhibit B at Appendix D.

[6] The Heery Report contains an analysis of an alternate site considered by the City for relocation of Milford Street, and provides an example of the in-depth review and analysis undertaken by the City in its search for a new location. *See* Exhibit B.

17.     The City has previously approached the Debtors and has attempted to engage them in discussions regarding a sale of the Grace Property.  However, these discussions have not progressed.[7]  Accordingly, in the absence of a negotiated agreement with the Debtors to purchase the Grace Property, the City wishes to exercise its powers of eminent domain against such property and to acquire the same for public use, for just and fair compensation to be paid to the Debtors according to the laws of the State of South Carolina.

18.     The City's power of eminent domain is comparable to that of other municipalities. Under South Carolina law, the City may use the power of eminent domain to acquire land for public or corporate purposes.  The City has broad powers to "provide the myriad varieties of authorized public works . . . and to acquire any property essential to a plan of slum clearance and redevelopment of areas that are primarily blighted." 18 SOUTH CAROLINA JURISPRUDENCE, *Eminent Domain* §16.  The landowner is entitled to just compensation for the value of the property taken.  *Id.* § 19.

19.     In South Carolina, the South Carolina Eminent Domain Procedures Act (the "Act") governs all condemnations in the state.  S.C. Code Ann. § 28-2-10 *et seq.*  The eminent domain procedure beings with the filing of a condemnation notice, the contents of which are established by statute, and includes the amount the condemnor has determined to be just compensation, the identity of the condemnor and its purpose and authority, a description of the property taken, along with other notices and information.  *Id.* § 28-2-70(a).  Upon receipt of the notice, the landowner has 30 days within which to accept the condemnor's tender; otherwise, it is deemed rejected, the issue of just compensation is joined, and all other issues are waived.  *Id.* § 28-2-470.  In the absence of a stay of proceedings challenging the right to condemn, the

---

[7] Notwithstanding the foregoing, the City intends to continue its efforts to engage the Debtors in negotiation discussions as part of the City's exercise of its eminent domain rights.

condemnation notice becomes the law of the case, and only the amount of compensation remains in dispute. 18 SOUTH CAROLINA JURISPRUDENCE, *Eminent Domain* § 39, 40.  If a dispute arises as to the amount of just compensation, then a trial is held, and the court's ruling is subject to normal appeal procedures.  S.C. Code Ann. § 28-2-310 through 320; *see also* 18 SOUTH CAROLINA JURISPRUDENCE, *Eminent Domain* § 40.

20.    The City notes that the recommendations made in the Heery Report are now over three (3) years old.   The cost estimates to either repair the Milford Street Facility, or to construct a new facility on the Grace Property (or any other property), increase daily.  This, coupled with the fact that the delay in moving the Milford Street Facility has both slowed the implementation of the Economic Development Plans, and increased the stress on the limited resources of the Milford Street Facility, required the City to seek relief now, rather than waiting until negotiations with the Debtors fail, or stall again.

## **RELIEF REQUESTED AND BASIS THEREFOR**

21.    The filing of a bankruptcy petition operates as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).[8]  Accordingly, the City

---

[8] The City recognizes that the filing of the Debtors' petition would not operate as a stay of an action by the City to enforce its police and regulatory power.  11 U.S.C. § 362(b)(4).  The City also notes that courts addressing the scope of the "police and regulatory power" exception to the automatic stay have found that Congress intended §362(b)(4) to be construed broadly.  *See, e.g., Penn Terra, Ltd. v. Dep't of Environmental Resources*, 733 F.2d 267, 273 (3d Cir. 1984).  However, it is not readily clear that the City's exercise of its power of eminent domain falls within the exception created by section 362(b)(4).  *See, e.g., Maryland v. Amoruso* (*In re Quality Supplier General P'ship*), 176 B.R. 135 (Bankr. D. Md. 1994); *PVI Assocs. v. Redevelopment Auth.* (*In re PVI Assocs.*), 181 B.R. 210 (Bankr. E.D. Pa. 1995) (inverse condemnation action); *In re Chicago, M., S. P. & P. R. Co.*, 738 F.2d 209, 211-212 (7th Cir. 1984) ("Because of the exclusive jurisdiction of the reorganization court [over assets of a debtor] it is necessary for a state or municipality contemplating  an eminent domain proceeding to obtain leave of the reorganization court.").  Accordingly, while the City is not waiving its position that the stay is inapplicable, the City has nonetheless elected to seek stay relief before proceeding forward.

seeks relief from the stay pursuant to 11 U.S.C. § 362(d)(1), for cause, to permit it to commence and pursue to conclusion a condemnation action against the Grace Property pursuant to its powers of eminent domain.

22.     Courts addressing the issue of a governmental entity's request for stay relief to pursue eminent domain routinely grant the relief requested by the governmental entity, in part, in recognition of the proposition that a state's exercise "of its power of eminent domain should not readily be found to conflict with the purposes of federal law." *In re F.A. Potts and Co., Inc.*, 49 B.R. 517, 519 (Bankr. E.D. Pa. 1985).

23.     When determining whether to grant stay relief in these circumstances, courts engage in a balancing of the interests to determine whether relief from stay should be granted. *See Maryland v. Amoruso (In re Quality Supplier General P'ship)*, 176 B.R. 135, 141 (Bankr. D. Md. 1994); *In re F.A. Potts and Co., Inc.*, 49 B.R. at 519. The federal interest in protecting a debtor's right to reorganize should take priority if that interest can be accomplished without "doing substantial harm to the state's interests in pursuing condemnation. . . ." *Amoruso*, 176 B.R. at 141. This requires a debtor to show that the property in question is needed for "'an effective reorganization [of the debtor] *that is in prospect*' [and] 'that there [is] a reasonable possibility of a successful reorganization within a reasonable time.' " *Id.* (quoting *United Savings v. Timbers of Inwood Forest*, 484 U.S. 365, 376 (1988) (emphasis in original)).

24.     If a conflict appears between the debtor's reorganization and the public interests, and this conflict cannot be reconciled, then the public interest that would be served by the governmental entity's exercise of its eminent domain powers must prevail, and deference given

to the governmental unit's sovereign power of eminent domain. *Id.; see also Massachusetts v. Bartlett*, 384 F.2d 819, 822 (1st Cir. 1967), *cert. denied*, 390 U.S. 1003 (1968) ("even to the extent that there is a public interest in the preservation of the going business, this economic interest is inferior to the public interest which is the basis of the state's prescriptive rights.")

25.      The City asserts that the balance is in favor of stay relief because, among other reasons, the Debtors cannot meet the requisite burden of establishing that the Grace Property is needed for an effective reorganization and that there is a reasonable possibility that they will reorganize within a reasonable time frame.

26.      The Debtors cannot rationally argue that the Grace Property is essential to their ability to reorganization effectively.   The Debtors are no longer operating a business on the Grace Property.   Accordingly, the Debtors will not suffer any loss in its operations if the Motion is granted and the Grace Property is acquired by the City via its rights of eminent domain. Additionally, the Grace Property is but one small piece of the Debtors' entire bankruptcy estate, and is one of numerous parcels of property owned by the Debtors that is being remediated. Moreover, upon information and belief, the Debtors may already anticipate selling the Grace Property at some point in the future.   The Grace Property simply does not appear to be a key or even substantial factor in the Debtors' reorganization process.

27.      Similarly, the Debtors cannot demonstrate that there is a reasonable possibility of a successful reorganization within a reasonable time.   The Debtors' chapter 11 cases have been pending since 2001.   While a disclosure statement and plan were filed by the Debtors on November 13, 2004, the disclosure statement and plan appear to have been vigorously objected to by various parties in interest, and no order approving the disclosure statement or confirming the plan have ever been entered.   Additionally, neither the plan or disclosure statement

specifically identified the Grace Property by name, leaving the City to believe that the Grace Property comprised some of the "Excess Real Property" identified by the Debtors as property that it intended to sell. *See* Disclosure Statement for Debtors' Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code filed November 13, 2004 (Docket No. 6894) at §2.7.1.[9]  While the City is certainly aware of the reasons for the delay in the confirmation of a plan, the uncontroverted facts are that the delay has been extensive, and the Debtors are not likely to confirm a plan within the reasonable future.

28.    In sum, the City's exercise of its powers of eminent domain over the Grace Property will have no negative impact on the Debtors' reorganization.  To the contrary, the process may actually benefit the Debtors' estate because it will result in the liquidation of a non-productive asset of the Debtors' estate, which will yield in an infusion of cash to benefit the Debtors, their estates and creditors, and bring the Debtors one step closer to reorganization.

29.    In contrast, as evidenced by the exhibits attached to this Motion, the City is in immediate need of the Grace Property.  The Milford Street Facility was outdated and over utilized in 2004, when the initial Heery Report was completed, and the passage of time has not improved its condition.  In addition, the acquisition of the Grace Property will enable the City to come closer to fulfilling the goals set forth in its Economic Development Plans.

30.    The relocation of the Milford Street Facility to the Grace Property will directly benefit the public interest in countless ways, including enabling the City to better serve members of the public and allowing remediation of the old facility to begin.  The relocation will also

---

[9] The City is also aware that a plan of reorganization was recently filed by The Official Committee of the Asbestos  Personal Injury Claimants and The Future Claimants' Representative on or about November 6, 2007 ("Asbestos Claimants Plan"). The City has reviewed the Asbestos Claimants' Plan, and no reference is made to the Grace Property, further supporting the City's contention that the City's exercise of its powers of eminent domain as to the Grace Property will not negatively impact efforts to reorganize the Debtors.

indirectly benefit the public by enabling the City to proceed with its TIF Plan and by increasing the financial well being of the surrounding area and the state as a whole.  As expressed by the Seventh Circuit, "[t]he state's right to take property for public use is an attribute of sovereignty, of great importance."  *In re Chicago, Milwaukee, St. Paul, and Pacific R.R. Co.*, 739 F.2d 1169, 1174 (7th Cir. 1984).

WHEREFORE, the City prays that the Court grant the relief requested, and grant the City relief from the automatic stay, for cause, to permit the City to proceed with its exercise of its sovereign right of eminent domain as to the Grace Property.

DATED:  December 21, 2007          CONNOLLY BOVE LODGE & HUTZ LLP

**/s/ Christina M. Thompson**
Karen C. Bifferato (No. 3279)
Christina M. Thompson (No. 3976)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone: (302) 658-9141
Telecopy: (302) 658-0380

-and-

Tara E. Nauful, Esquire
Haynsworth Sinkler & Boyd, PA
1201 Main Street, 22nd Floor
P.O. Box 11889
Columbia, South Carolina 29211
Telephone: (803) 779-3080
Telecopy: (803) 765-1243
*Attorneys for the City of Charleston, South Carolina*