# EXHIBIT A

# CHARLESTON APPRAISAL SERVICE, INC.
### *REAL ESTATE APPRAISERS AND CONSULTANTS*

**304 Meeting Street, Ste. 201**
**Charleston, SC 29401**
**Phone: 843-723-6258**
**Fax:  843-723-4676**
**Fed. I.D. : 57-0769203**

**Michael C. Robinson, MAI,SRA**
**President**
**Joseph G. McInerney, III**
**Harold E. Marshall**

December 9, 2005

Colleen Carducci
Director, RE Management
City of Charleston
P.O. Box 304
Charleston, SC 29402

Re:  Complete Appraisal-Summary Report
     1820 Harmon Street (464-02-00-051)
     Charleston, SC

Dear Ms. Carducci:

In accordance with your request for professional evaluation services, I have prepared a Complete Appraisal-Summary Report of the above referenced tract. This report is intended to comply with the requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice (USPAP) for Summary Appraisal Reports effective January 1, 2005. It is a Summary Report due to the level of presentation and explanation provided.

In conjunction with this appraisal, I have made a physical inspection of the subject tract and comparable sales tracts included in this report.  As a result of my investigation and analysis, it is my opinion that the fee simple market value of the subject tract as of December 1, 2005 is:

**ONE MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS . . $1,185,000**

This value estimate was made after a thorough study of available sales and data felt to be pertinent to this appraisal. An analysis of all data is included in the following pages along with reasoning used in forming my opinion of value.

It is necessary to mention that according to a joint public notice from the U.S. Army Corps of Engineers and the S.C. Department of Health and Environmental Control, the subject tract contains contamination from a former fertilizer manufacturing and pesticide formulation plant located on the subject tract. You have indicated to me that remediation  of this contamination is underway, and for purposes of this report, I have been instructed to assume that a "no further action" letter has been issued.

. For this reason, I assume the tract has no hazardous waste or groundwater contamination. I also assume the tract has no substantial freshwater wetlands. I also assume that drainage and storm water retention requirements can be met for proper development of the tract. Should any of the above assumptions be proven incorrect by subsequent studies, my value estimate could be affected.

## EXHIBIT A

I certify that to the best of my knowledge and belief, the statements and opinions contained in this report are full, true and correct. I certify that I have no interest in the subject tract, and that neither the employment to make this appraisal nor the compensation is contingent upon the value estimate.

I further certify that this appraisal was made in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation effective January 1, 2005 and in compliance with the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

This appraisal is intended to meet the requirements of Title XI of the Financial Institution Reform, Recovery and Enforcement Act (FIRREA) of 1989, Public Law. This appraisal assignment was not made nor was the appraisal rendered on the basis of a requested minimum valuation, specific valuation or an amount which would result in approval of a loan.

This appraisal was prepared for the exclusive use of the client. The information and opinions contained in this appraisal set forth the appraiser's best judgment in light of the information available at the time of the preparation of this report. Any use of this appraisal by any other person or entity, or any reliance or decisions based on this appraisal are the sole responsibility and at the sole risk of the third party. Charleston Appraisal Service, Inc. accepts no responsibility for damages suffered by any third party as a result of reliance on or decisions made or actions taken based on this report.

Respectfully submitted,

**CHARLESTON APPRAISAL SERVICE, INC.**

Michael C. Robinson, MAI, SRA
President
State Certified General Real
Estate Appraiser SC# CG 76

MCR/tew
05-180

## PROPERTY LOCATION

The subject tract is located on the north side of Herbert Street and the east side of Harmon Street just west of Meeting Street Road in the City of Charleston, Charleston County, South Carolina. Its street address is 1820 Harmon Street. The tract is identified on the Charleston County Tax Assessors's map 464-00-00 as parcel 051. A reduced copy of this tax map with the subject tract identified appears in this section of the report.

## LEGAL DESCRIPTION

The legal description for the subject tract is contained in the most recent deed on the tract located in the Charleston County RMC Office.

## PROPERTY RIGHTS APPRAISED

The property rights appraised are those of fee simple ownership. Fee simple is the greatest possible estate in real property, but subject to the limitations of eminent domain, escheat, police power and taxation. The tract has no known easements or encroachments affecting value, and I assume it is available for sale or lease at economic figures.

## SUMMARY OF IMPORTANT DATA & CONCLUSIONS

| | | |
|---|---|---|
| TRACT LOCATION | : | 1920 Harmon Street, Charleston, SC |
| TAX MAP NUMBER | : | 464-02-00-051 |
| OWNER | : | W.R. Grace and Company |
| IMPROVEMENTS | : | None |
| TRACT SIZE | : | 16.46 Acres |
| HIGHEST & BEST USE | : | Industrial |
| ZONING | : | Heavy Industrial (HI) |
| TAXES | : | $ |
| FLOOD ZONE | : | Zone B, Zone C |
| ESTIMATE OF FEE SIMPLE MARKET VALUE | : | **$1,185,000** |
| DATE OF INSPECTION | : | November 14, 2005 |
| DATE OF ESTIMATE | : | December 1, 2005 |

## PURPOSE OF THE APPRAISAL AND USE RESTRICTIONS

The purpose of this appraisal is to estimate the fee simple market value of the subject tract. Market value is defined as follows:

> *"the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus".* [1]

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(a)   buyer and Seller are typically motivated;

(b)   both parties are well informed or well advised, and each acting in what he considers his own best interest;

©)   a reasonable time is allowed for exposure in the open market;

(d)   payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(e)   the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

It is understood that this appraisal will be utilized by the client for potential purchase purposes.

---

[1]   "The Appraisal of Real Estate"
12th Edition, Page 22

### DATE OF THE APPRAISAL

December 1, 2005

### DATE OF THE INSPECTION

November 14, 2005

### STATEMENT OF OWNERSHIP

According to the information in the Charleston County RMC Office, the subject tract is owned by W.R. Grace and Company. The last transaction on the tract took place on September 30, 1954. This transaction is recorded in Deed Book Z58, page 393.



## *Regional Map*





**Area Map**







# CHARLESTON APPRAISAL SERVICE, INC.
## LIMITING CONDITIONS

The appraisal is subject to the following conditions and to such other specific and limiting conditions as are set forth in the appraisal report.

1.  The legal description furnished is assumed to be correct.

2.  No responsibility is assumed for matters of a legal nature affecting the property appraised or the title thereto, nor is any opinion rendered as to the title which is assumed to be good and marketable. All existing liens and encumbrances have been disregarded unless otherwise stated, and the property is appraised as though free and clear. Management and ownership are assumed to be in competent hands. It is assumed that all national, state, county and city laws, ordinances and restrictions have been complied with.

3.  The sketch in this report indicates approximate dimensions and is included to assist the reader in visualizing the property. We have made no survey, engineering studies or soil and analysis of the property and assume no responsibility in connection with such matters or for engineering which might be required to discover such factors.

4.  Unless otherwise noted herein, it is assumed that there are no encroachments, zoning or restriction violations existing in the subject property.

5.  Information, estimates and opinions contained in this report are obtained from sources considered reliable and believed to be true and correct; however, no liability for them can be assumed by the appraiser.

6.  The appraiser is not required to give testimony or attendance in court by reason of this appraisal, with reference to the property in question, unless arrangements have been previously made.

7.  The division of the land and improvements as valued herein is applicable only under the program of utilization shown. These separate valuations are invalidated by any other application. On all appraisals, subject to satisfactory completion, repairs or alterations, the appraisal report and value conclusion are contingent upon completion of the improvements in a workmanlike manner.

8.  Disclosure of the contents of this appraisal report is governed by the By-Laws and Regulations of the Appraisal Institute. Except as hereinafter provided, the party for whom this appraisal report was prepared may distribute copies of this report, in its entirety, to such third parties as may be selected by the party for whom this appraisal report was prepared; however, selected portions of this appraisal report shall not be given to third parties without prior written consent of the signatories of this appraisal report. Further, neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations media, sales media or other media for public communication without the prior written consent of the signatories of this appraisal report.

## CHARLESTON APPRAISAL SERVICE, INC.
### CERTIFICATE OF APPRAISAL

I certify that, to the best of my knowledge and belief, .....

☞ the statements of fact contained in this report are true and correct.

☞ the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions.

☞ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

☞ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

☞ my engagement in this assignment was not contingent upon developing or reporting predetermined results.

☞ my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result or the occurrence of a subsequent event directly related to the intended use of this appraisal.

☞ my analyses, opinions and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.

☞ as of the date of this report, I, Michael C. Robinson, MAI, SRA, have completed the requirements under the continuing education program of the Appraisal Institute and also the continuing education program of the South Carolina Real Estate Appraiser's Board.

☞ I have made a personal inspection of the property that is the subject of this report.

☞ no one provided significant professional assistance to the person signing this report.

☞ based on my investigation, analyses and conclusions and subject to the General Assumptions and Limiting Conditions incorporated by reference into this certificate, it is my opinion that the fee simple market value of 1820 Harmon Street, Charleston, South Carolina as of December 1, 2005 is:

**ONE MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND ($1,185,000) DOLLARS**

Michael C. Robinson, MAI, SRA
State Certified General Real
Estate Appraiser SC #CG 76

## REGIONAL AND CITY DATA

The subject property is located in the City of Charleston, Charleston County, South Carolina. Charleston is located approximately 100 miles north of Savannah, Georgia, 110 miles east of Columbia, South Carolina and 120 miles south of Wilmington, North Carolina.

Charleston is the financial and spiritual hub of what is known as the Trident Area (Charleston, Berkeley, and Dorchester Counties). The 1990 census indicated a population of 506,875 for the region, and the 2000 census indicated a population for the region of 549,033. This number reflects a 8.32% increase since the 1990 census figures were estimated. The following indicators prepared by the Charleston Council of Governments provide a more detailed account of population growth.

| Year | Charleston County | Growth No. | % | Trident Area | Growth No. | % |
|------|------------------|------------|-----|--------------|------------|-----|
| 1960 | 216,382 | – | – | 278,961 | – | – |
| 1970 | 247,650 | 31,268 | 14.4 | 336,125 | 57,164 | 20.5 |
| 1980 | 276,712 | 28,062 | 11.7 | 430,462 | 84,337 | 28.0 |
| 1990 | 295,039 | 18,327 | 6.6 | 506,875 | 76,413 | 17.8 |
| 2000 | 309,969 | 14,930 | 5.1 | 549,033 | 42,158 | 8.3 |

The Metropolitan Statistical Area (Trident Area) contains 2,621 square miles and more than one-half million people. Charleston County contains 933 square miles and 91 miles are along the coastline of the Atlantic Ocean.

Charleston possesses a full complement of rail, highway, and airline services. The Seaboard Coastline and Southern Railroad both provide freight service, and Amtrak offers regularly scheduled passenger service heading both north and south.

Interstate 26 connects Charleston with the center and west side of the state. This interstate also intersects Interstate 95 approximately 50 miles west of Charleston. Interstate 95 is the major north-south, limited access highway between New England and Florida. Interstate 526, also known as the

Mark Clark Expressway, now provides beltway access to all parts of the Metropolitan Charleston area.

The Charleston International Airport in North Charleston with fully modern facilities opened in April 1985. Its carriers include Continental-Continental Express, Delta-Comair, ASA, AC-Jet, Northwest-Mesaba Air, U.S. Airways-PSA, Chatauqua Airlines, Masa-Jet, United Express, Air Canada, Midway Airlines and Trans-World Express. In addition, the Trident Area is also served by numerous motor carriers and overnight mail and package carriers.

The Port of Charleston ranks in the top 6th nationally in foreign commerce and first in containerized cargo volume on the East and Gulf coasts. Only the combined ports of New York and New Jersey handle more containerized cargo. The port had a record year of activity in 2000 handling 13.0 million tons for the year, a 10% increase over 1999. More than 1,900 vessels and barges arrived at the South Carolina State Ports Authority's five Charleston area terminals in 2000, an increase of 10% over the previous year's totals. In 1995, the expansion of the Wando Terminal was completed. Since 1997, the Port Authority has invested over $100 million in improving the existing facilities at the five public terminals in the Charleston Harbor.

Charleston's economic status is stable and has been experiencing steady growth. The labor force increased 17% from 236,960 in 1990 to 277,285 in 2000. In 2002, the civilian labor force numbered 282,029. Local unemployment has consistently been lower than the national figures.

A recent issue of WORLD TRADE magazine which reaches 60,000 international business executives ranked Charleston among the nation's "hot spots" for economic development. The WALL STREET JOURNAL also published a story about Charleston's local economy under the headline: "Shipyard? What Shipyard? Charleston Area Takes Off".

The government labor force remains a dominant force in the local economy accounting for 23.7% of the total employed. The Charleston Air Force Base employs 3,800 active duty personnel and 1,200 civilian employees. The Navy

employs 12,543 personnel including contract employees. The Air Force Base is home to 53 C-17 aircrafts, the nations newest and most versatile transport planes.

Since 1995, the Coast Guard has doubled its number of personnel stationed in Charleston. As part of a reorganization campaign, nearly 400 people moved from New York's Governor's Island to the Charleston Naval Base.

Although the final closure of the Charleston Naval Base and Naval Shipyard occurred on April 1, 1996, other naval related businesses continue to thrive and grow in the area. The Naval Weapons Station in Goose Creek, just above North Charleston, is the largest Naval facility in the Tri-County area not slated to close. The high technology Naval Electronics & Engineering Center, NISE-East (Naval Command & Ocean Surveillance Center, In-Service East Coast Division, formerly NAVALEX) is expanding to absorb employees from three other national electronics centers which have been closed. A $26 million engineering and administration center which will become NISE-East's new headquarters at the Naval Weapons Station. By 1999, NISE-East had nearly 1,500 military employees and could have as many as 7,500 private hire civilian contractors with a total payroll of $50 million annually and a direct economic impact in excess of $1.2 billion.

Also, Combat Equipment Base Afloat/Asia (formerly Army Preposition Forces) located at the Naval Station Annex was established in December 1993. This new military support system consists of 18 ships which are essentially floating warehouses. Each ship contains all the supplies needed for an Army beachhead landing and is designed to last for three years. Phase I, which began in 1993, consisted of the initial loading of provisions and equipment on the 18 vessels. Phase II was initiated in late 1996 when the first vessel returned to port for reloading. The vessels will return to Charleston for inventory and restocking on a continuous basis.

In 1998, the Navy transferred its Naval Nuclear Training Facility from Orlando, Florida to the Naval Weapons Station in Goose Creek. The new facility resulted in 500 additional jobs and an estimated 2,500 military trainees visiting annually.

The U.S. Border Patrol opened a school for new agents at the Charleston Naval Base in April 1996. Students attend classes and live in barracks there, and approximately $5 million was spent for construction of driving and firing ranges at the Naval Weapons Station in Goose Creek. As many as 1,500 agents were trained during the school's first full year of operation. In the summer of 2003, the U.S. Navy transferred 152 acres of the old Naval Base property to the U.S. Border Patrol.

Additional plans are underway to develop alternate uses of the Naval Base facilities to strengthen the area economy. A number of Federal agencies have been relocating onto the base including the National Oceanographic and Atmospheric Administration (NOAA), National Civilian Conservation Corps (NCCC), Department of Defense Finance and Accounting Center and a State Department Administration Center. Also, the U.S. Postal Service opened a regional processing and distribution center on the Naval Base in October 1995.

The Noisette Company purchased 178 acres at the north end of the old Charleston Naval Base property on July 1, 2003. There are still 388 acres to be transferred. The Naval Base land will form the beginning of redevelopment in that section of North Charleston. The Noisette Project has been touted as one of the largest redevelopment projects of its type ever attempted in the United States. Property on roughly 3,000 acres in North Charleston which includes portions of the former Charleston Naval Base will be transformed over a 15 year period. The project will be based on a master plan which will call for up to 10,000 new or rehabilitated housing units, eight million square feet of commercial space, upgrading of schools in the district, restoration of Noisette Creek which bisects the subject tract and establishment of a city park and boardwalk along the Cooper River.

In the Trident Metro area (Charleston/Dorchester/Berkeley), Berkeley County has been most successful in attracting new businesses. In 1995, Berkeley county secured approximately $1.04 billion in capital investments which created about 3,000 jobs. Overall, Charleston County ranked 14th in the state with $121 million in investments, and Dorchester County was next with $114 million.

An influential factor in attracting new businesses to the area is the state's Enterprise Zone Act. This legislation which was enacted in April 1995 permits the state to offer incentives to companies that plan to build or expand in rural counties or areas considered to be "economically depressed". The Charleston area gained enterprise zone status due to the shutdown of the Naval base and shipyard.

In addition to the base redevelopments, several other major companies are experiencing growth, planning to expand or locating in the Charleston area.

Berkeley County was selected by the Nucor Corporation as the site for a $500 million state-of-the-art steel mill. By 1997, the plant created 500 manufacturing jobs which pay an average of $55,000 a year. In addition, at least six mill-related companies have built facilities on the Nucor site increasing total employment to more than 1,500 jobs. In the spring of 1997, a $150,000,000 expansion of the mill was announced. Operations at the new mill began in 1998.

Amoco Chemical Company chose to update its Berkeley County Cainhoy plant instead of a facility in Alabama with a $200-$300 million expansion. The project created an additional 90 new jobs, retained existing jobs and doubled the plant's output of purified terephthalic acid.

Mikasa built a large wholesale distribution center within Charleston's city limits in 1996-1997. The facility is located near Cainhoy and employs approximately 200 workers.

Bayer Corporation opened its $170 million Dorlastan spandex facility. This represents the largest single investment made in the United States by the subsidiary of the big German drug maker, Bayer AG. It employs 170 workers whose annual salaries average $32,500.

The Scientific Research Corporation opened an office in North Charleston that is expected to employ 250 people with average salaries of $48,000. The Medaphis Corporation relocated to North Charleston and created several hundred jobs processing medical bills for doctors.

National Car Rental Systems, Inc. opened a centralized booking facility employing up to 500 workers. National invested $8 million in equipment and renovations.

BMW exports production of its Z-3 Roadster from its Greer, South Carolina manufacturing plant through Charleston's port facilities. Charleston's port facilities are also the port of entry for German built automobiles imported to the United States.

The types of companies which relocate and expand in the Charleston area are of particular importance to local business people. Companies which routinely bring in out-of-town trainers, consultants, etc. (such as Nucor, NISE-East and its contractors, and the proposed Navy Nuclear Training School at the Naval Weapons Station) can replace the revenues once generated by the Naval base and shipyard business.

Industrial development is becoming more and more important in the local economy with the location of national companies and business expansions in the Trident Area. Westvaco, Alumax, Ling Industrial Fabrics, Inc., Braswell Services Group, South Carolina Electric and Gas Company (SCE&G), South Carolina Public Service Authority, Miles, Inc., E.I. DuPont and Robert Bosch are all large facilities in the area with more than 350 employees each.

Daniel Island, a 4,500 acre tract of land centrally located in the Tri-County area, has been set aside for a development which will be comprised of four million square feet of commercial space and 7,000 homes. Healthsource, the state's largest health maintenance organization, relocated its headquarters to a new $6 million building on the island in 1996 and plans to develop another office building on the island to handle future growth. Blackbaud, a computer software company, has also moved into new corporate headquarters on the island. Adjacent to this is a soccer field that is home to the Charleston Battery, a professional soccer team. Bishop England High School, a private Catholic school, sold its downtown Charleston campus and built a new facility on Daniel Island. The school opened for the 1998-1999 academic year. The new forty acre campus serves up to 1,000 students. Sun-Com, a wireless phone service provider, relocated its regional

headquarters to the island. Its move brought approximately 575 existing and new employees into a 100,000 square foot office complex built on a 10 acre site near Interstate 526. The company leased the $13.5 million facility for 15 years and occupancy started February 2002.

Tourism is a large income generating industry which is responsible for the influx of approximately five million visitors annually. To accommodate these visitors, Charleston has more than 10,000 hotel and motel rooms in the metropolitan area and also a wide assortment of restaurants offering the finest in seafood and lowcountry cuisine.

The Trident area attracts many visitors because of its history, architecture, plantations, beaches and natural beauty. Many also come for special events such as the Southeastern Wildlife Exposition, Christmas in Charleston, the Cooper River Bridge Run, the Worldfest Charleston International Film Festival and historic home tours.

According to a recent study compiled by the Center for Business Research and the Citadel's Center for International and Regional Development, the economic impact of the tourist industry is $2.3 billion annually. With an estimated three to five million visitors each year, the tourism industry generates an estimated 35,000 jobs in the local economy.

Since its origin, Charleston has always shown an appreciation for the arts, and many of its tourists are attracted to the art related institutions and activities that Charleston is reputed to offer. On an eleven acre site within the city limits stands the Municipal Auditorium which seats 2,702 people in its main facility. Adjacent exhibit space of 11,200 square feet is also available, and it can accommodate 1,300 people for banquets. The Gibbes Art Gallery displays numerous exhibitions including those of international artists. Also active in Charleston are a ballet company, a symphony orchestra, an opera company and a stage company.

In May 1976, Charleston was chosen as the location for the United States edition of the Spoleto Arts Festival which has been flourishing in Spoleto, Italy since 1956. It is a forum for new and young talent in the performing

arts and has become a permanent event in Charleston for two weeks every spring.

In 1993, the North Charleston Coliseum opened. This 192,000 square foot facility seats approximately 14,000 people. It is located between Interstate 26 and the International airport. Athletic and entertainment events of national caliber are regularly scheduled. Also, North Charleston has erected a multi-million dollar convention center/exhibition hall on 50 acres of land it owns in the Centre Pointe development.

Education is also a strong focus of the area. The Trident Area has three colleges, a fully accredited medical university, a technical college, a culinary arts college, an adequate public school system and 25 private and parochial schools. In the school year 1997-98, the number of public schools in the Tri-County area totaled 135 with an enrollment of over 90,000 and an overall pupil-teacher ratio of 25:1.

Charleston offers ample health care and medical training. It has eight major medical centers including the oldest medical university in the south, the Medical University of South Carolina (MUSC). MUSC possesses an international reputation, attracts researchers and patients worldwide and employs 7,528 people. The center of the health care industry is located in an eight block area in downtown Charleston. Four hospitals (Roper, Charleston Memorial and the Ralph H. Johnson VA Medical Center along with MUSC) form this medical center. Four additional hospitals serve the medical needs of the region. They include Bon Secours-St. Francis Xavier Hospital, Trident Medical Center, a Columbia/HCA managed facility, Summerville Medical Center (also a Columbia/HCA managed facility) and East Cooper Regional Medical Center. Bon-Secours-St. Francis Xavier Hospital opened its new facility in the West Ashley section of Charleston in September 1996. Its downtown facilities were sold to MUSC. There are a total of approximately 2,597 beds in local hospitals. The combined facilities employ approximately 15,909 employees. Charleston Memorial Hospital is owned by Charleston County and is currently being managed by MUSC; however, its fate is uncertain at this time.

Several banks and mortgage banking firms are available in the area and are

open to offering mortgage financing on properties such as the subject. A total of 32 banks, savings and loans and credit unions help to serve the needs of the community. There are 149 bank branches in the Greater Charleston area.

In Charleston County's diversified economic base, agriculture still plays an important role in the county's economy just as it did in 1800. This is particularly true of the sea islands which form the barrier between the mainland and the Atlantic Ocean. Their chief crops include soybeans, corn and tomatoes.

With its deep social roots, apparent economic soundness and historically principled politics, Charleston is destined to retain its leadership role in the lowcountry and state. Over the past years, awareness of the quality of life that exists in Charleston has been increasing as evidenced by the massive influx of tourists as well as permanent residents. The population of the Trident Area has increased roughly 17.8% over the past ten years, and the U.S. Census Bureau estimated the population at 506,875 in 1990 and 549,033 in 2000.

Original forecasts for the region's economy predicted a lackluster performance in 1994 and 1995 as the area struggled to absorb the loss of the Naval complex and shipyard closings; however, the area exceeded expectations in many sectors. The labor force and total employment remains stable and unemployment continues to stay below the national average. Retail sales have increased, and a number of national retailers have opened new stores in the region. Several major employers relocated to the area, and sectors of the economy, which are unrelated to the military, seem to be filling in the gaps made by the Naval complex closure. From 1996 through 1999, there was a strengthening in nearly all areas of the economy of the Charleston-North Charleston Metropolitan Statistical Area (MSA), and this growth has continued into the next decade.

## NEIGHBORHOOD DATA

A neighborhood is a portion of a larger community in which there is a homogenous group of populations, buildings or land uses. Natural or manmade boundaries many times will define a neighborhood. The primary purpose of a neighborhood analysis is to identify and consider relative existing and potential influences that may have an impact on the value of the subject tract.

The subject neighborhood includes those properties south of Cosgrove Avenue in North Charleston and north of Mt. Pleasant street on the peninsula of Charleston. This is an industrial neighborhood located between the Ashley River and the Cooper River. It is known as the "neck" area. Interstate 26 is several blocks to the west of the subject tract, and access is good to downtown Charleston, Mt. Pleasant, North Charleston and West Ashley via Interstate 26 and other adjoining roads. This area has been historically utilized by light and heavy industrial developments made possible by the availability of rail, river and road transportation. Located nearby are several oil companies, industrial plants, Massey Coal Terminal, facilities of the South Carolina State Ports authority and the tract formerly occupied by the Charleston Naval Shipyard and U.S. Naval Base now being privately developed.

The shipyard tract is located on 1,285 acres situated on the west bank of the Cooper River. The subject tract is located south of that tract. The shipyard tract was assigned to the Redevelopment Authority to convert it to private use, and numerous leases have been signed to individual companies. Part of the base tract will be developed on the south by the S.C. State Ports Authority. The north end of the tract has been sold to the Noisette Company for development that will also include a total of some 3,500 acres of private land to the west.

S.C. Electric and Gas Company has a generating plat located west of the subject tract on the Ashley River. It is known as Plant Hagood. Also located nearby are large plants belonging to Airco Alloys, Braswell Shipyards, Southern Dredging Company, Exxon Oil, Charleston Supply and plants operated

by Charleston Commissioners of Public Works and the North Charleston Public Sewer District.

Morrison Drive, located south of the subject tract, was at one time considered a prime location by owners of car dealerships. Decreasing traffic flow along Morrison Drive prompted many of these businesses to move to U.S. Highway 17 South. In the past year or two, Morrison Drive has had a rebirth of popularity among service related businesses. Several tracts have been sold, and new construction has taken place. Meeting Street Road, which is actually the extension of Meeting Street, has traditionally been the home for industrial buildings and automotive repair shops. There are no quality residential subdivisions nearby to support retail or service businesses. The subject tract is located east of Meeting Street Road.

No substantial new development has taken place in the Meeting Street Road area in recent years; however, a private development team has been recently purchasing large pieces of property in the "Neck" area for redevelopment. This project is known as Magnolia. The plan promises to bring a totally new face to a substantial portion of the land north of Mt. Pleasant Street and south of Cosgrove Avenue.

## SITE DATA

I was not provided with a plat on the subject tract. According to the Charleston County Tax Assessor's map, the tract contains a total of 16.46 acres. It has 885 feet of frontage on Herbert Street and a total of 473 feet of frontage on Harmon Street. A railroad right-of-way runs along the border of the tract's east property line for a distance of 1,082 feet. Its north property line is slightly irregular measuring a total of 625 feet. If a subsequent survey proves this data to be incorrect, my value estimate could be affected.

The subject tract is located just over 700 feet east of Meeting Street Road. It wraps around a 2.1 acre tract that is located in the corner of Herbert and Harmon streets. For fifty years or more, the tract was occupied by a fertilizer manufacturing and pesticide formulation facility owned by W.R. Grace and Company. During that period of time, it was determined by the U.S. Army Corps of Engineers and the South Carolina Department of Health and Environmental Control that the tract became contaminated. A copy of the joint public notice issued by these two agencies to that effect is included in the addenda of this report. At the direction of the client, I have been asked to estimate the value of the subject tract assuming that all contamination will be removed, and that a "no further action" letter will be issued.

For purposes of this report, I assume that the tract is clean, contains no hazardous materials or chemical agents, and that no groundwater contamination has occurred. Since the presence of hazardous materials or groundwater contamination could affect my value estimate, the client is advised to obtain proper certification on this issue.

The tract is served with municipal water and sewer service. Garbage collection and police protection is provided by the City of Charleston. According to the Federal Emergency Management Agency Flood Maps, the subject tract is in zone B and Zone C. Since flood maps are subject to interpretation, I recommend a surveyor be retained to determine this statement to be accurate.



## HIGHEST AND BEST USE/ZONING

The highest and best use of the land is defined as:

> "the reasonably probable and legal use of vacant land or an improved property that is physically possible, legally possible, appropriately supported, financially feasible, and that results in the highest value."[2]

Analysis of Vacant Land:

> "among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination – the use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements." [3]

Analysis of Improved Property:

> "the use that should be made of a property as it exists – an existing property should be renovated or retained as is so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one." [4]

The highest and best use analyses for vacant land and improved properties should consider four criteria. They are listed below:

1) Physically Possible
2) Legally Permissible
3) Financially Feasible
4) Maximally Productive

---

[2]  The Appraisal of Real Estate
Appraisal Institute, 12th Edition, page 305

[3]  The Appraisal of Real Estate
Appraisal Institute, 12th Edition, page 60

[4]  The Appraisal of Real estate
Appraisal Institute, 12th Edition, page 60

## ZONING

According to the City of Charleston Planning and Zoning Department, the subject tract is zoned Heavy Industrial (HI).This is compatible with other uses in the neighborhood.

**HIGHEST AND BEST USE AS VACANT** - An analysis of highest and best use as vacant considers a tract's existing use and all potential uses. It assumes that the tract is vacant or can be made vacant by demolishing the existing improvements. If vacant, the buyer must determine which improvements, of all that are available, would represent the "ideal" improvement and optimize the use of the tract.

In the appraisal of real estate, several techniques require separating the land and improvement value. For instance, a separate land value is a basic component of the Cost Approach. Also, identifying comparable sales that have a similar highest and best use to the subject tract is essential since land use influences value.

One of the first criteria to consider in making a best use analysis is to ascertain the legal constraints on the land. Typical areas to investigate include: lease obligations, private restrictions, governmental zoning, building codes and environmental regulations.

Applicable building codes and environmental regulations presently in effect are reasonable and do not impose burdensome restrictions that would prevent the land from being developed to its highest and best use.

The City of Charleston has zoned the subject tract Heavy Industrial. This classification permits the land to be utilized in a multitude of commercial fashions including retail, repair facilities, warehouses, manufacturing, distribution, storage yards and storage garage facilities. The zoning requirements on lot sizes and setbacks are the two components in addition to zoning that dictate the use of the tract.

As described in *The Appraisal of Real Estate,* the size, shape, area, terrain, and accessibility of a parcel of land affect the uses to which it can be

developed. The subject tract is fairly regular in shape and is substantially level. It has access to all public utilities and has no known adverse encroachments or wetlands or unusual soil conditions. It is of sufficient size to support many development types.

Financially feasible uses are those uses that bring a positive return to a landowner's investment. This return is based upon the value of the tract and/or cost necessary to develop. Financially feasible uses must also be legally permissible and physically possible. Based on the zoning, size and location of the subject tract, it is my opinion that the financially feasible uses for the tract are similar to those that currently exist in the neighborhood. These uses are warehouses, distribution facilities, service businesses, auto/truck repair facilities and hauling companies. Other uses permitted in the HI zones could also be financially feasible.

The maximally productive use for a subject tract is that use which returns the greatest financial benefit to the landowner. This analysis could require a substantial amount of analysis and depend upon architectural and development input. In the case of the subject tract, however, it is my opinion that its maximally productive use could very well be many of those uses that are considered to be financially feasible.