## ASSESSMENT/PROPERTY TAXES

Real Estate in Charleston County is appraised at 100% of its market value. Property other than owner occupied, single family residences are assessed at 6%. In 2005, the Assessor's Office released new tax appraisals to all property owners in Charleston County. These appraisals were effective for the tax year 2005. The subject tract is currently appraised by the Charleston County Tax Assessor for $922,000.

The subject tract is in Tax District 7-2 of the City of Charleston. The 2005 combined tax millage for this district is 237.1. The calculation for 2005 taxes on the subject tract if vacant is presented below.

| | |
|---|---|
| Appraised Value | $922,000.00 |
| Assessment Ratio | x .06 |
| 2005 Millage | .2371 |
| TOTAL | $ 13,116.37 |

In November 1990, Charleston County voted in favor of a 1% local option sales tax. By law, most of the proceeds from the tax must be used to reduce real and personal property taxes in the County. The tax was implemented in 1991, and adjustments due to the Local Option Sales Tax are as follows.

| | | | |
|---|---|---|---|
| 2005 Taxes | | = | $13,116.37 |
| City/County Credit | $922,000 x .00090 | = | − 1,659.60 |
| TOTAL 2005 TAXES | | | $11,456.77 |

Since the cost for providing municipal services continues to rise, without the benefit of the local option sales tax, taxes would be higher in succeeding years.

## MARKETING TIME

Estimating a marketing period is a very subjective exercise due to the forces operating in the market. The rise and fall in interest rates, general state of the economy, size of a property, changes in land uses and marketing expertise all impact a marketing period. All the above plus several additional factors would play a role in the time it would take to sell the subject property. Since many of these forces are unpredictable, I feel it is necessary to qualify any marketing estimate.

Since the subject tract's highest and best would be for light industrial or warehouse use, its purchaser would most likely be an investor(s) interested and experienced in such development.

What the marketing period for the tract might be is a matter of speculation. In the Valuation section of this report, I have included a number of sales of tracts that are pertinent to the value of the subject tract prior to the easement. I believe that if properly priced for current conditions and professionally marketed, the subject tract could sell within one year.

## THE APPRAISAL PROCESS

In the foregoing sections of this report, I have examined and discussed the subject property. To arrive at an estimate of market value, it is necessary to collect and analyze all data in the market which might tend to indicate the value of the subject property. The subject property must be compared to comparable properties which can be constructed, purchased or from which a similar monetary return may be received.

Each of the three approaches to value requires data collection from the market, and each is governed equally by the principle of substitution. This principal holds that "when two or more commodities or services with substantially the same utility are available, the one with the lowest price receives the greatest demand and widest distribution".

In the Cost Approach; "no man is justified in paying more for a property than that amount by which he can obtain, by purchase of a site and construction of a building, without undue delay, a property of equal desirability and utility".

In the Income Capitalization Approach; "value tends to be set by the investment necessary to acquire, again without undue delay, a comparable substitute income property offering an equally desirable net income return".

As applied to the Sales Comparison Approach, the principle may be stated: "when a property is replaceable in the market, its value tends to be set at the cost of acquiring an equally desirable substitute property, assuming that no costly delay is encountered in making the substitution".

## SCOPE OF THE APPRAISAL

All three approaches (Cost, Income Capitalization, Sales Comparison) were considered for use in this report. In an improved commercial property, these are the traditional approaches to value that are made independently and reconciled into a final estimate of value. In conducting these approaches, it is necessary to collect general, specific and economic data about the region, neighborhood and site. It is also necessary to collect sales, cost, rental and expense data of a comparable nature. This data is typically obtained from office files, commercial MLS, local realtors, other property owners and courthouse records.

The subject tract is vacant, and as such, it was not possible to perform the Income Capitalization Approach to value. Vacant tracts are not typically bought and sold for their income producing characteristics. It was not possible to perform the Cost Approach to value for the same reason.

The site valuation was performed using techniques of the Sales Comparison Approach. In this approach, it was necessary to collect sales and other pertinent data on similar vacant tracts in the general market area. This data was obtained from the sources listed above. Adjustments between the sales and the subject tract were made for reasons to be discussed later in this appraisal. The value indications from each of the comparable sales were then reconciled into a final estimate of fee simple market value for the subject tract.

## SITE VALUATION

I have searched the neighborhood for sales of industrial tracts of similar size and character to the subject tract. I have also attempted to locate any tracts that are under contract of sale or option as well as those currently listed for sale. Details on those chosen for comparison to the subject are contained on individual sheets following this discussion. The units of comparison most commonly used when appraising vacant land are price per front foot, price per square foot and price per acre. The only one felt to be of significance in comparing the sales to the subject tract is price per acre. Factors considered in the site valuation are time of sale, conditions of sale, location of the property, size of the property, topography and amenities. By including a large number of comparable sales, it is possible then to bracket the value of the subject tract.

The market generally indicates that smaller tracts sell for a greater price per acre when all other factors are constant. Obviously, amenities, location, desirability, views and development potential all impact this indication. I have considered all these features when comparing the comparable sales to the subject tract.

On the following pages is a comparable sales map and sheets summarizing each sale used for comparison to the subject tract. Following these is a discussion of the comparison process.



## LAND SALE NO. 1

| | | |
|---|---|---|
| LOCATION | : | 1766 Meeting Street Road, N. Charleston, SC |
| SALE PRICE | : | $250,000 |
| DATE OF SALE | : | January 13, 2005 |
| GRANTOR | : | Marathon Oil Company |
| GRANTEE | : | Jeffrey Allen Romfo |
| SIZE | : | 2.44 Acres |
| DEED BOOK AND PAGE | : | W522 – 356 |
| TAX MAP NUMBER | : | 464-02-00-041,092 |
| UNIT OF COMPARISON AND AMOUNT | : | $112,705/Acre |

Corner of Milford Street – zoned Commercial – also has frontage on Harmon Street on rear – irregular shape – had prior contamination, but "no further action" letter received – 2 buildings on site demolished at cost of $25,000.



## LAND SALE NO. 2

| | | |
|---|---|---|
| LOCATION | : | Meeting Street Road, North Charleston, SC |
| SALE PRICE | : | $1,081,627 |
| DATE OF SALE | : | May 24, 2004 |
| GRANTOR | : | Allied Terminals, Inc. |
| GRANTEE | : | Ashley II of Charleston, LLC |
| SIZE | : | 11.75 Acres |
| DEED BOOK AND PAGE | : | E494 - 219 |
| TAX MAP NUMBER | : | 464-00-00-033 |
| UNIT OF COMPARISON AND AMOUNT | : | $92,053/Acre |

Vacant site at corner of Algonquin Street - has access to Greenleaf Street also - 558 feet of frontage on Meeting Street - zoned Commercial.



### LAND SALE NO. 3

| | | |
|---|---|---|
| LOCATION | : | 2000 Pittsburg Avenue, North Charleston, SC |
| SALE PRICE | : | $475,000 |
| DATE OF SALE | : | August 8, 2004 |
| GRANTOR | : | Joan B. Coates |
| GRANTEE | : | Ashley II of Charleston, LLC |
| SIZE | : | 6.01 Acres |
| DEED BOOK AND PAGE | : | Y506 – 310 |
| TAX MAP NUMBER | : | 466-00-00-009 |
| UNIT OF COMPARISON AND AMOUNT | : | $79,035/Acre |

Rectangular site with 549 feet of road frontage – old building of no value on site (demolished since sale) – zoned Commercial.



## DISCUSSION

Prior to adjustments, comparable sales 1-3 indicate a price per acre range of $79,053 to $112,705. A recap of the sales is shown below.

| LAND SALES SUMMARY | | | | |
|---|---|---|---|---|
| Sale | Date | Sale Price | Acreage Size | Unadjusted Price/Acre |
| 1 | 01/05 | $ 250,000* | 2.44 | $112,705 |
| 2 | 05/04 | $ 1,081,627 | 11.75 | $ 92,053 |
| 3 | 08/04 | $ 475,000 | 6.01 | $ 79,035 |
| | | | | |

\* Adjusted for Demolition Cost by $25,000

Prior to making comparisons between the comparable sales and the subject tract, it is necessary to recognize changes in prices due to market conditions. I have not been able to locate any sales and resales of similar tracts that have occurred in a reasonable study period from which to extract a change in market conditions. In urban and suburban commercial markets, increases have been documented at 8%-12% or higher per annum. In resort areas, price increases have been documented at 20% or higher per annum. Based upon recent activity in the neighborhood, it is my opinion that it is appropriate to adjust all sales included in this report by 8% per annum to recognize increases in market conditions. These adjustments are indicated in the chart below.

| Sale | Adjusted Price Per Acre |
|---|---|
| 1 | $120,594 |
| 2 | $103,099 |
| 3 | $ 86,939 |

Sale 1 is a 2.44 acre tract located on the corner of Meeting Street Road and Milford Street on the Charleston "Neck". It is located one block from the subject tract. This sale has 215 feet of frontage on Meeting Street Road as

well as frontage on Milford Street and Harmon Street to the rear. This sale required negative adjustments due to its substantially smaller size and superior location on Meeting Street Road, a four lane major artery servicing this area and also due to its corner exposure. A positive adjustment to this sale is required due to the somewhat unusual hour glass shape of the sale tract. Two buildings that were on the site at the time of sale were demolished at a cost of $25,000 to the purchaser. After consideration of these features, an overall negative adjustment of 40% was required indicating a price per acre for the subject tract of $72,356.

Sale 2 is an 11.75 acre tract located several blocks south of the subject tract. It has 558 feet of frontage on Meeting Street Road, 226 feet of frontage on Greenleaf Street and approximately 750 feet of frontage on Algonquin Street. The sale tract is relatively rectangular in shape except for the appendage extending north to Greenleaf Street. This sale required negative adjustments due to its sightly smaller size, superior location on Meeting Street Road, a more commercially oriented thoroughfare, and also due to its corner exposure. After consideration of these features, an overall negative adjustment of 30% was required indicating a price per acre for the subject tract of $72,169.

Sale 3 is a 6.01 acre tract located on Pittsburg Avenue several blocks north of the subject tract. There were no buildings of value on the this tract at the time of the sale. They have subsequently been demolished at very little expense. This sale is rectangular in shape. It is bordered on its west side by a railroad right-of-way. This sale required a negative adjustment due to its somewhat smaller size. It is similar in location being on a side street and also has no corner exposure which is similar to the subject tract. After consideration of these features, an overall negative adjustment of 20% was required indicating a price per acre for the subject tract of $69,551.

## ADJUSTMENT CHART

| SALE | TIME ADJUSTED PRICE/ACRE | TOTAL ADJUSTMENT | ADJUSTED PRICE/ACRE |
|------|--------------------------|------------------|---------------------|
| 1 | $120,594 | -40% | $72,356 |
| 2 | $103,099 | -30% | $72,169 |
| 3 | $ 86,939 | -20% | $69,551 |

After adjustments, the price per acre range indicated by the comparable sales is $69,551 to $72,356. Sale 3 required the fewest number of individual adjustments, and it indicated a price per acre at the bottom of the range. Sales 1 and 2 required the largest overall adjustments, and they indicated prices per acre in the $72,000 range. Sale 2 is most similar in size, and it indicated a price per acre in the middle of the range. With equal consideration given to all sales, it is my opinion the price per acre indicated for the subject tract is $72,000. Consequently;

16.46 Acres  x  $72,000  =  $1,185,120

**INDICATED SITE VALUE AS OF DECEMBER 1, 2005:**

**ONE MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS . . $1,185,000**

# QUALIFICATIONS OF APPRAISER
## MICHAEL C. ROBINSON, MAI, SRA

### BIOGRAPHICAL

Born in Charleston, South Carolina - Currently reside at 32 Hasell Street, Charleston, SC
Graduated from local grammar and high schools
Graduated from The Citadel in 1965 with degree in English

### PROFESSIONAL DESIGNATIONS

MAI - Member, Appraisal Institute
SRA - Senior Residential Appraiser, Appraisal Institute

### BUSINESS AND PROFESSIONAL AFFILIATIONS

Appraisal Institute - South Carolina Chapter - President 2000
Board of Zoning Appeals - City of Charleston
Charleston Trident Board of Realtors
Charleston Chamber of Commerce
Institute of Financial Education, President 1979-1980
Licensed Broker - State of South Carolina
Lowcountry Savings Bank - Chairman of the Board - 1988-1997
Metropolitan Charleston Exchange Club - Treasurer 1981-1982
State Certified General Real Estate Appraiser - State of S.C. - Cert. # CG 76
Seminar Panels on Conservation Easements: Clemson University, Lowcountry Open Land Trust, Appraisal Institute

### EDUCATION

| | | | |
|---|---|---|---|
| Business Practices and Ethics | - | 2005 - | Columbia, SC |
| Analyzing Operating Expenses | - | 2005 - | Columbia, SC |
| Single Family Fraud | - | 2005 - | Columbia, SC |
| Home Mortgage Fraud | - | 2004 - | Columbia, SC |
| National USPAP Update | - | 2004 - | Columbia, SC |
| Business Practices & Ethics | - | 2004 - | Columbia, SC |
| Improving Appraisals | - | 2003 - | Columbia, SC |
| Worth of Appraisal to Client | - | 2003 - | Columbia, SC |
| Partial Interest Valuation | - | 2002 - | Columbia, SC |
| Proposed Subdivisions and Condominiums | - | 2002 - | Columbia, SC |
| Analyzing Distressed Real Estate | - | 2002 - | Columbia, SC |
| Real Estate Fraud | - | 2002 - | Columbia, SC |
| Appraiser's Professional Development | - | 2001 - | Columbia, SC |
| Detrimental Influences | - | 2000 - | Columbia, SC |
| Loss Prevention | - | 1999 - | Columbia, SC |
| Litigation Skills for Appraisers: An Overview | - | 1999 - | Columbia, SC |
| USPAP in Cross-Examination | - | 1999 - | Columbia, SC |
| Supporting Sales Comparison Grid | - | 1999 - | Columbia, SC |
| Appraising Historic & High Value Homes | - | 1998 - | Columbia, SC |
| Understanding New Trends in Quality Appraisal Production | - | 1998 - | Royal Caribbean |
| Standards of Professional Practice, Parts A & B | - | 1998 - | Columbia, SC |
| Fair Lending and the Appraiser | - | 1996 - | Columbia, SC |
| The Appraiser as an Expert Witness | - | 1996 - | Columbia, SC |
| Easement Valuation | - | 1996 - | Savannah, GA |
| The Internet and Appraising | - | 1996 - | Savannah, GA |

# ADDENDA

Qualifications of Appraiser
Michael C. Robinson, MAI, SRA
Page 2

### EDUCATION CON'T

| | | | |
|---|---|---|---|
| Environmental Risk & the Real Estate Appraiser | - | 1995 | - Columbia, SC |
| Appraisal Regulations of the Federal Bank Agencies | - | 1994 | - Columbia, SC |
| Discounted Cash Flow Analysis | - | 1993 | - Columbia, SC |
| Litigation Valuation | - | 1993 | - Columbia, SC |
| Feasibility & Analysis & Highest&Best Use | - | 1992 | - Columbia, SC |
| Americans With Disability Act | - | 1992 | - Columbia, SC |
| Standards of Professional Practice, Parts A & B | - | 1992 | - Columbia, SC |
| Real Estate Risk Analysis | - | 1991 | - Columbia, SC |

### EMPLOYMENT HISTORY

After graduation from The Citadel, I spent two years with the U.S. Army and resigned as a Captain in 1968. From 1969 to 1973, I was employed by the Charleston County Assessor's Office. I was promoted to Senior Staff Appraiser during this time. From 1973 to 1984, I was Chief Appraiser of Home Federal Savings & Loan Association of Charleston. In this capacity, I was responsible for all residential, commercial, industrial and development appraisals requested by the Loan Committee. From 1984 to present, I offer appraisal services through Charleston Appraisal Service, Inc.

### PARTIAL LIST OF MAJOR CLIENTS

Asset Management and Consulting Services (AMCS)
Atlantic Coast Life Insurance Company
Baker Motors of Charleston
Bank of America
Beaufort Realty Company
Beaufort County Open Land Trust, Inc.
Bell South
Berkeley-Charleston-Dorchester Council of Governments
Bon Secours-St. Francis Xavier Hospital
Carolina First Bank
Charleston Naval Complex Redevelopment Authority
Charleston Commissioners of Public Works
Cities of Charleston, North Charleston, Folly Beach and Goose Creek
Clemson University
Collins Investment Management Inc.
Counties of Charleston and Berkeley
Community First Bank
CSX Railroad
Department of the Navy
Ducks Unlimited Foundation
Exxon Corporation, USA
First Citizens Bank
First Federal of Charleston
Lowcountry Open Land Trust, Inc.
McNair Law Firm
MeadWestvaco
Medical University Of South Carolina
National Park Service
Rick Hendrick's Automobile Dealerships
Rivers Enterprises Real Estate

S.C. Department of Transportation
S.C. Department of Natural Resources
S.C. Electric and Gas Company/SCANA
S.C. Real Estate Development
S.C. State Ports Authority
South Coast Community Bank
SouthTrust Bank
St. Andrews Public Service District
Sun Bank & Trust Corporation of Florida
The Bank of South Carolina
The Beach Company
The Citadel Military College of S.C.
The Conservation Fund
The Nature Conservancy
The Trust for Public Land
Town of Hollywood
U.S. Army Corps of Engineers
Wachovia
Wetlands America Trust

Various other Banks, Mortgage Companies
and Attorneys



**D H E C**

PROMOTE PROTECT PROSPER

C. Earl Hunter, Commissioner
*Promoting and protecting the health of the public and the environment.*

### Notification of Public Notice

Enclosed are public notices issued by the SCDHEC Office of Ocean and Coastal Resource Management and the U.S. Army Corps of Engineers. All interested parties are allowed 30 days for major developments and 15 days for minor developments after receipt of the public notices to file written comments to the OCRM pertaining to the applications. Only those comments received within this period must be reviewed by the OCRM in processing the permit application. Any person wishing notification of the initial OCRM decision on any specific public notice must make written request within the designated review period for that public notice.

| APPLICANT | PUBLIC NOTICE NUMBER | SUSPENSE DATE |
|---|---|---|
| J. M Pendarvis | 2005-1E-112-P | June 4, 2005 |
| Adam Bernholz | 2005-1R-123-P | June 4, 2005 |
| W. R. Grace & Co.- Conn. | 2005-1R-130-P/C | June 4, 2005 |

May 5, 2005



C. Earl Hunter, Commissioner
*Promoting and protecting the health of the public and the environment.*

## PUBLIC NOTICE

The attached public notice, **2005-1R-130-P/C, W.R. Grace and Co.-Conn.**, has activities requiring direct critical area authorization.  The direct critical area permitting is required for impacts to the Tidal Wetlands D and E.  In addition, Freshwater impacts to Wetlands A, B, and C will require certification/authorization under the South Carolina Coastal Zone Management Act.

Comments on the impacts to the **Tidal Wetlands D and E** will be received until **June 4, 2005**. For further information, please contact the project manager, **Denise Sanger,** at 843-747-4323 ext. 114.

May 5, 2005

J O I N T
P U B L I C  N O T I C E

**CHARLESTON DISTRICT, CORPS OF ENGINEERS**
69A Hagood Avenue
Charleston, South Carolina 29403-5107
and the
**S.C. DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL**
OFFICE OF OCEAN AND COASTAL RESOURCE MANAGEMENT
1362 McMillan Avenue, Suite 400
Charleston, South Carolina 29405

*MAJOR ACTIVITY*

REGULATORY DIVISION                                                              April 29, 2005
Refer to: P/N # 2005-1R-130-P

Pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403), Sections 401 and 404 of the Clean Water Act (33 U.S.C. 1344), and the South Carolina Coastal Zone Management Act (48-39-10 et.seq.) an application has been submitted to the Department of the Army and the S.C. Department of Health and Environmental Control by

**W.R. GRACE & CO. – CONN.**
**RMT, INC.**
**30 PATEWOOD DRIVE, SUITE 100**
**GREENVILLE, SOUTH CAROLINA 29615**

for a permit to perform excavation and place fill in

**FRESHWATER WETLANDS AND AN UNNAMED TRIBUTARY OF SHIPYARD CREEK**

at 1820 Harmon Street, Charleston, Charleston County, South Carolina. (Latitude: 32.83°, Longitude: 79.95°).

In order to give all interested parties an opportunity to express their views

N O T I C E

is hereby given that written statements regarding the proposed work will be received by both of the above mentioned offices until

**12 O'CLOCK NOON, MONDAY, 30 MAY 2005**

from those interested in the activity and whose interests may be affected by the proposed work.

The proposed work consists of performing remediation of a former fertilizer manufacturing and pesticide formulation facility. The work is being performed under an Administrative Consent Agreement (No. 89-34-SW, S) with the South Carolina Department of Health and Environmental Control. The Administrative Order requires the following:

  a. Wetland A: Approximately 650 cubic yards of sediment will be excavated from this ditch system to a depth of 2 feet, affecting 0.12 acres of on-site wetlands. Following excavation, the ditch will be filled with 2,250 cubic yards of clean fill.
  b. Wetland B: Approximately 2,500 cubic yards of soil and sediments will be excavated to a maximum depth of 6 feet, affecting 0.39 acres of on-site wetlands. This area will be filled with 2,500 cubic yards of clean fill.

REGULATORY DIVISION                                            29 April 2005
Refer to: P/N# 2005-1R-130-P

    c.  Wetland C: No excavation activities will occur at this on-site 0.03 acre wetland. A 30-inch diameter reinforced concrete pipe will be installed in this ditch and the area will be filled with approximately 250 cubic yards of clean fill to bring it up to the elevation of the adjoining uplands. .

    d.  Wetland D: Off-site sediments on property adjacent to W.R. Grace property will be excavated to a depth of 2 feet or hardpan, whichever is encountered first. The maximum volume of materials to be excavated is 1,375 cubic yards affecting 0.42 acres of non-tidal, freshwater wetlands. These wetlands will be restored to pre-excavation elevations with approximately 18 inches of an organic fill and 6 inches of sandy soil. The area will be re-planted to restore pre-excavation wetlands.

    e.  Wetland E: Off-site sediments within the channel of an unnamed tributary to Shipyard Cree will be excavated to a depth of 2 feet or hardpan, whichever is encountered first. This excavation is limited to the bottom of the channel and will not include adjoining vegetated areas. Approximately 650 cubic yards will be removed from the streambed affecting approximately 1,130 linear feet (0.199 acres). Approximately 360 linear feet of this is tidally influenced. The streambed will be backfilled with 12 inches (+/-3 inches) of coarse sand.

The applicant proposes to purchase credits from an approved mitigation bank in the Charleston area to compensate for the loss of 0.54 acres of on-site wetlands. The project purpose as stated by the applicant is to implement the selected remedy for this site through excavation and removal of residual contaminants from a former fertilizer manufacturing and pesticide formulating facility to achieve the remedial goals identified in the Record of Decision and ameliorate potential human health and environmental risks.

NOTE: Plans depicting the work described in this notice are available and will be provided, upon receipt of a written request, to anyone that is interested in obtaining a copy of the plans for the specific project. The request must identify the project of interest by public notice number and a self-addressed stamped envelope must also be provided for mailing the drawings to you. Your request for drawings should be addressed to the .

U.S. Army Corps of Engineers
ATTN: REGULATORY DIVISION
69A Hagood Avenue
Charleston, South Carolina 29403-5107

       The District Engineer has concluded that the discharges associated with this project, both direct and indirect, should be reviewed by the South Carolina Department of Health and Environmental Control in accordance with provisions of Section 401 of the Clean Water Act. As such, this notice constitutes a request, on behalf of the applicant, for certification that this project will comply with applicable effluent limitations and water quality standards. The work shown on this application must also be certified as consistent with applicable provisions the Coastal Zone Management Program (15 CFR 930). The District Engineer will not process this application to a conclusion until such certifications are received. The applicant is hereby advised that supplemental information may be required by the State to facilitate the review.

       Pursuant to Section 7(c) of the Endangered Species Act of 1973 (as amended), the District Engineer has consulted the most recently available information and has determined that the project is not likely to adversely affect any Federally endangered, threatened, or proposed species or result in the destruction or adverse modification of designated or proposed critical habitat. This public notice serves as a request for written concurrence from the U.S. Fish and Wildlife Service and/or the National Marine Fisheries Service on this determination.

REGULATORY DIVISION                                          29 April 2005
Refer to: P/N#2005-1R-130-P

This initiates the Essential Fish Habitat (EFH) consultation requirements of the Magnuson-Stevens Fishery Conservation and Management Act. Implementation of the proposed project would impact 1.16 acres of freshwater and estuarine substrates and emergent wetlands utilized by various life stages of species comprising the red drum, shrimp, and snapper-grouper management complexes. Our initial determination is that the proposed action would not have a substantial individual or cumulative adverse impact on EFH or fisheries managed by the South Atlantic Fishery Management Council and the National Marine Fisheries Service (NMFS). Our final determination relative to project impacts and the need for mitigation measures is subject to review by and coordination with the NMFS.

The District Engineer has consulted the latest published version of the National Register of Historic Places for the presence or absence of registered properties, or properties listed as being eligible for inclusion therein, and this worksite is not included as a registered property or property listed as being eligible for inclusion in the Register. Consultation of the National Register constitutes the extent of cultural resource investigations by the District Engineer, and he is otherwise unaware of the presence of such resources. Presently unknown archaeological, scientific, prehistorical, or historical data may be lost or destroyed by the work to be accomplished under the requested permit.

Any person may request, in writing, within the comment period specified in this notice, that a public hearing be held to consider this application. Requests for a public hearing shall state, with particularity, the reasons for holding a public hearing.

The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the project must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the project will be considered including the cumulative effects thereof; among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, flood plain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production and, in general, the needs and welfare of the people. A permit will be granted unless the District Engineer determines that it would be contrary to the public interest. In cases of conflicting property rights, the Corps of Engineers cannot undertake to adjudicate rival claims.

The Corps of Engineers is soliciting comments from the public; Federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this activity. Any comments received will be considered by the Corps of Engineers to determine whether to issue, modify, condition or deny a permit for this project. To make this decision, comments are used to assess impacts on endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are used in the preparation of an Environmental Assessment and/or an Environmental Impact Statement pursuant to the National Environmental Policy Act. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the activity.

REGULATORY DIVISION                                    29 April 2005
Refer to: P/N# 2005-1R-130-P

  If there are any questions concerning this public notice, please contact me at 843-329-8167 or toll free at 1-866-329-8187.

TMS#: 464-02-00-051

Robin Coller-Socha
Project Manager
Regulatory Division
U.S. Army Corps of Engineers

Denise Sanger
Project Manager
SC DHEC-OCRM



SOURCE: USGS TOPOGRAPHIC MAPS: CHARLESTON
CHARLESTON COUNTY, SOUTH CAROLINA

| **RMT**, INC. | **W.R. GRACE & CO. - CONN.**<br>**CHARLESTON, S.C.**<br><br>**SITE LOCATION MAP** | DRAWN BY: | DMC |
|---|---|---|---|
| | | APPROVED BY: | AWH |
| | | PROJECT NO. | 70856.33 |
| | | FILE NO. | j/pmt/00-10456/33/<br>dig and rail/pmt/figure/d |
| | | DATE: | MARCH 2005 |

2005-IR-130-P

FIGURE   1 OF 10



LEGEND

EXISTING CONCRETE SLAB/FOUNDATION
EXISTING CONTOUR
EXISTING CHAIN LINK FENCE
EXISTING WETLAND DELINEATION
EXISTING RAILROAD
EXISTING PROPERTY LINE
EXISTING WETLAND AREA

SCALE: 1"=200'

W.R. GRACE & CO.- CONN.
CHARLESTON, S.C.

ONSITE
EXISTING CONDITIONS

| DRAWN BY: | DMC |
| APPROVED BY: | RWH |
| PROJECT NO. | 70934.83 |
| FILE NO. | |
| DATE: | MARCH 2005 |

2005-IR-130-P

FIGURE  2  OF 10



FIGURE  3 OF 10



WETLAND AREA "B"
16,876 SQ. FT.
0.39 ACRES

SEABOARD COASTLINE RAILROAD

N 364500

WETLAND AREA "C"
1,450 SQ. FT.
0.03 ACRES

DRAINAGE
EASEMENT

E 2321000

**LEGEND**

| | |
|---|---|
| EXISTING CONCRETE SLAB/FOUNDATION | |
| EXISTING CONTOUR | — — -10 — — |
| PROPOSED ON SITE UPLAND EXCAVATION | |
| PROPOSED ON SITE WETLAND EXCAVATION. AND PERMANENT FILL | |
| EXISTING CHAIN LINK FENCE | —X— — · —X— |
| EXISTING WETLAND DELINEATION | —X— · — · —X— |
| EXISTING RAILROAD | |
| EXISTING PROPERTY LINE | |

0    100    200

SCALE: 1"=100'

**RMT** INC.

W.R. GRACE & CO.- CONN.
CHARLESTON, S.C.

ONSITE EXCAVATION PLAN
AND WETLAND AREAS "B" AND "C"

| | |
|---|---|
| DRAWN BY: | DMC |
| APPROVED BY: | RWH |
| PROJECT NO. | 70859.33 |
| FILE NO. | b/on4/86-70858/33/ dlg and bad/road Plan.dwf zt-7- |
| DATE: | MARCH 2005 |

2005-1R-130-P

FIGURE  4  OF 10



EXISTING
WETLAND
DELINEATION

UNNAMED TRIBUTARY
TO SHIPYARD CREEK

EXISTING
WETLAND
DELINEATION

WETLAND AREA
203,661 SQ. FT.
4.68 ACRES

## LEGEND

| | |
|---|---|
| EXISTING CONTOUR | ----772---- |
| EXISTING CHAIN LINK FENCE | —x———x— |
| EXISTING WETLAND DELINEATION | —·—·—·— |
| EXISTING RAILROAD | ⊥⊥⊥⊥⊥⊥⊥⊥⊥⊥⊥ |
| EXISTING PROPERTY LINE | —··—··— |
| EXISTING WETLAND AREA | [shaded] |

0    200    400

SCALE: 1"=200'

**RMT** INC.

**W.R. GRACE & CO.- CONN.**
**CHARLESTON, S.C.**

**OFFSITE**
**EXISTING CONDITIONS**

| | | |
|---|---|---|
| DRAWN BY: | | CMC |
| APPROVED BY: | | RMH |
| PROJECT NO. | | 70856.15 |
| FILE NO. | | |
| DATE: | | MARCH 2005 |

2005-IR-130-P

FIGURE 5 OF 10



LEGEND

| | |
|---|---|
| EXISTING CONTOUR | — — — 10 — — — |
| PROPOSED WETLAND EXCAVATION AND ENHANCED BACKFILL | |
| EXISTING CHAIN LINK FENCE | —x———————x— |
| EXISTING WETLAND DELINEATION | |
| EXISTING RAILROAD | |
| EXISTING PROPERTY LINE | |

SCALE: 1"=60'

0    60    120

**RMT** INC.

W.R. GRACE & CO.- CONN.
CHARLESTON, S.C.

OFFSITE EXCAVATION PLAN
AND WETLAND AREA "D"

| | |
|---|---|
| DRAWN BY: | DMC |
| APPROVED BY: | RWH |
| PROJECT NO. | 70880.33 |
| FILE NO. | 3v000/00-70880/33/ dig and bmd/occ/figures |
| DATE: | MARCH 2005 |

2005-1R-130-P

FIGURE 6 OF 10



WETLAND AREA "E"
8,675 SQ. FT.
0.20 ACRES

PROGRESSION
OF BACKFILL

MEAN HIGH WATER

EXISTING
WETLAND
DELINEATION

MEAN HIGH WATER

N 365000

PROPOSED 10' WIDE x 20'
LONG ROCK CHECK DAM

EXISTING
WETLAND
DELINEATION

UNNAMED TRIBUTARY
TO SHIPYARD CREEK

FLOATING
SILT CURTAIN
AS REQUIRED
(TYPICAL)

WETLAND AREA "E"
8,675 SQ. FT.
0.20 ACRES

N 364500

PROGRESSION
OF EXCAVATION

SITE ACCESS

**LEGEND**

| | |
|---|---|
| EXISTING CONTOUR | —— —772 —— —— |
| EXISTING CHAIN LINK FENCE | —x—————x— |
| EXISTING WETLAND DELINEATION | — — — —— — |
| EXISTING RAILROAD | ⊡⊡⊡⊡⊡⊡⊡ |
| EXISTING PROPERTY LINE | |
| PROPOSED 2' DEEP SEDIMENT EXCAVATION AND 1' CLEAN SAND BACKFILL | ▨▨▨ |
| PROPOSED FLOATING SILT CURTAIN | ⊶——⊶ |

0        150        300

SCALE: 1"=150'

**RMT** INC.

W.R. GRACE & CO.- CONN.
CHARLESTON, S.C.

OFFSITE EXCAVATION PLAN
AND WETLAND AREA "E"

| | |
|---|---|
| DRAWN BY: | DWG |
| APPROVED BY: | RWH |
| PROJECT NO. | 7945V.35 |
| FILE NO. | b/area/cd-tombs/zlf clg and bck/area/f5xdr.d |
| DATE: | MARCH 2005 |

2005-1R-130-P

FIGURE 7 OF 10



2005-IR-130-P



2005-12-130-P



2005-1R-130-P