# EXHIBIT B

# Deloitte.

May 23, 2007

Ms. Susette Smith
Director - Enterprise Risk Management
W. R. Grace & Co.
62 Whittemore Avenue
Cambridge, Massachusetts 02140

Dear Ms. Smith:

As requested, Deloitte & Touche LLP ("Deloitte & Touche") is pleased to provide this engagement letter to assist W. R. Grace & Co. (Grace) with its Enterprise Risk Management (ERM) implementation initiative. The purpose of this letter is to confirm the terms of our engagement as described below.

**SCOPE OF SERVICES**

Deloitte & Touche understands that Grace would like our assistance in supporting management's ERM initiative with the primary objective of implementing an ERM process that better coordinates existing risk management efforts across Grace.

Deloitte & Touche will assist Grace with its ERM initiative by providing services in three initial phases of work as described below.

**PHASE 1: START-UP, ERM OPERATIONAL FRAMEWORK & RISK MANAGEMENT CAPABILITY ASSESSMENT**

**PHASE 2: ASSESS BUSINESS RISKS AND DEFINE GRACE'S RISK APPETITE**

**PHASE 3: PRIORITIZE AND RESPOND TO RISKS**

Upon the completion of Phases 1, 2 and 3, Deloitte & Touche will discuss potential follow-on work for consideration by Grace. Deloitte & Touche will also discuss any immediate requests to facilitate a more in-depth assessment of improvement opportunities identified in these three phases of work. Deloitte & Touche will provide, for Grace's approval, a description of the approach, deliverables, schedule and estimated costs for any consulting services required beyond those outlined in this engagement letter.

## PHASE 1 OVERVIEW: START-UP, ERM OPERATIONAL FRAMEWORK & RISK MANAGEMENT CAPABILITY ASSESSMENT

In Phase 1, Deloitte & Touche will assist Grace's ERM Steering Committee in launching its ERM initiative by planning logistics, communication, developing the ERM Operational Framework including the risk assessment approach, creating detailed project plans and schedules, defining deliverable requirements, and estimated project resource requirements. This phase of work will also include orienting the ERM Steering Committee and selected members of Grace's management team on basic ERM concepts and techniques. This phase is expected to include the following steps:

1. Clarify with Grace the objectives and initial vision for its ERM initiative and clarify Grace's expectations regarding the specific roles and areas of focus for Deloitte & Touche and Grace resources.

2. Obtain and review relevant company information as identified by Grace and provided to Deloitte & Touche to form the basis for developing a recommended timeline and project and resource plan for review and acceptance by the Grace ERM Steering Committee. Activities are expected to include:
   - Defining recommended project roles, responsibilities, meeting and interview schedules, deliverable development and review milestones, and a preliminary project timeline.
   - Identifying and developing an understanding of Grace's existing risk management processes/functions, supporting tools and systems, risk related reports, and existing risk policies, and other related applicable sources as identified by Grace.

3. Design and customize the ERM Operational Framework using Deloitte & Touche's proprietary tools, templates, and other intellectual capital. During this stage, we will work with Grace to develop the draft ERM Operational Framework. This will include the risk taxonomy (common risk language), major risk types, and criteria to assess, measure, and prioritize risk. Grace's Director – ERM and ERM Steering Committee will review and approve the ERM Operational Framework prior to its application in Phase 2.

4. Deloitte & Touche will assist Grace's Director - ERM in performing a self-assessment of Grace's overall ERM capabilities. This capability self-assessment will be conducted by survey and will be primarily targeted at the individuals that make up the ERM Steering Committee or other designated Grace management as determined by Grace's Director - ERM. Deloitte & Touche will make available a Deloitte & Touche proprietary tool to collect the survey information being gathered.

5. Deloitte & Touche will aggregate Grace's capability as reflected in the self-assessment survey responses and distribute a draft report of the current capabilities, as identified by the survey participants, to the ERM Steering Committee or other designated group in advance of a series of follow-up interviews of selected survey participants.

6. Deloitte & Touche and members of the Grace ERM project team will conduct follow-up interviews with up to 10 survey participants as selected by Grace. The interviews are expected to take 60 minutes each to discuss current risk management practices and capabilities, as well as the desired state.

7. Deloitte & Touche will prepare a draft report highlighting Grace's overall ERM capability for consideration by the ERM Steering Committee. The draft report will summarize the results of the survey and interviews and where they exist, identify potential gaps between current and desired capabilities.

8. Conduct an orientation session with Grace's ERM Steering Committee to familiarize them with Deloitte & Touche's ERM methodology including its approach to assessing and prioritizing risks and defining management's risk appetite.

9. Conduct a kick-off session with Grace's ERM Steering Committee or other designated individuals for Grace to review, revise and ratify the project and resource plan and the recommended ERM operational framework. Grace will be responsible for all direct communications with Grace personnel and for the timely review, revision and approval of all Deloitte & Touche work products.

**PHASE 1 DELIVERABLES**

Deloitte & Touche will work with Grace's Director - ERM to provide the following deliverables for review, approval and acceptance by Grace management:

- Recommended Project Work Plan
- Project Orientation Session and Communication Materials
- A Grace management approved initial draft ERM Operational Framework and proposed methodology that includes:

    - Risk Domains (e.g., entities, processes, systems etc. to be assessed)
    - Roles & Permissions (e.g., who will be involved in the risk assessment)
    - Risk Library (e.g., a library of risk categories, sub-categories and specific risks that have been configured to the needs of Grace)
    - Risk Assessment Parameters & Scales (e.g., the criteria to be used to assess risk)
    - Required Management Assertions (e.g., reasonable, qualified or no assurance regarding the current effectiveness and efficiency of Grace's risk mitigation and control techniques)
    - Primary Risk Responses (e.g., the spectrum of risk mitigation and control responses)
    - Authoritative Requirements (e.g., internal and external requirements for the risks to be included in the Phase 2 assessment including where internal Grace requirements such as policies and procedures may be absent)
    - Templates for management surveys, reports and assertions (e.g., the survey template to be used and the reports to be generated)
    - ERM Capability Assessment framework (e.g., the criteria to be used to initially assess Grace's current level of risk management capability)
    - Workflow (e.g., a plan outlining the Grace approved methodology and key milestones and Deloitte & Touche and Grace responsibilities for each phase with target turnaround times for Grace's review and approval of draft Deloitte & Touche work products)

- ERM Capability Assessment Overview and potential gap analysis between Grace's current and desired capabilities
- ERM Project Kick-off Session
- ERM Concepts and Techniques Training Session

## PHASE 2 OVERVIEW: ASSESS BUSINESS RISKS AND DEFINE GRACE'S RISK APPETITE

Grace will, at all times, be responsible for the self-assessment of its risks and defining its risk appetite. In Phase 2, Deloitte & Touche will assist Grace with the following:

A. Performing an Enterprise Risk Assessment (ERA) using the initial ERM Operational Framework approved by Grace in Phase 1. The ERM Operational Framework will be used as the guide for Grace in completing a self-assessment of its key risks and developing an overall risk profile for the organization. Deloitte & Touche will assist Grace in completing the ERA by facilitating and supporting a risk assessment survey, follow-up management interviews and risk prioritization workshops. Deloitte & Touche will assist Grace in applying the ERM Operational Framework to the identification and assessment of specific risks that Grace desires to be included in the Framework.

The following key steps will be followed:

1. Deloitte & Touche and Grace's Director - ERM will communicate with the ERM Steering Committee regarding the purpose, process, product, expected time commitment and intended use of work products for this phase. Grace's Director - ERM will provide a list of the Grace individuals to participate in the risk self-assessment survey process.
2. Deloitte & Touche will send the survey template with instructions for completing the survey to the participants as selected by Grace's Director - ERM. Deloitte & Touche will monitor participation and response rates. Deloitte & Touche expects to use DeloitteDex, a proprietary Deloitte & Touche tool, as the survey tool for conducting this survey.
3. Selected survey participants will complete the self-assessment of risks for their areas of responsibility for each category of risk.
4. Deloitte & Touche will compile the results of the survey and produce a draft report for Grace's Director – ERM and the ERM Steering Committee.
5. Deloitte & Touche and where desired Grace's Director – ERM will jointly conduct up to 25 one-hour interviews / group meetings with senior executives, division management teams and selected individuals as mutually identified by Grace and Deloitte & Touche based on responses to the survey to further understand, interpret and validate survey results and potential capability gaps.
6. Deloitte & Touche will prepare a draft summary report of risks in descending order of inherent and residual exposure as identified by the survey participants (or as may be modified by Grace's management).
7. Deloitte & Touche will brief Grace's Director – ERM and the ERM Steering Committee

B. Assisting Grace in identifying and establishing key elements of the company's risk appetite model. The following are guiding principles for the approach that Deloitte & Touche will use to assist Grace in developing its risk appetite model:

- Grace's risk appetite should be defined by its senior management and approved by the Board of Directors for the various types of risks e.g. mergers and acquisition, credit/market, reputation.
- Grace's risk appetite for the various types of risk should be aligned with its business objectives and value drivers and should be linked to key performance indicators.
- Responsibility for applying risk appetite should be distributed across Grace's organization to all levels of management in order to align the organization, people, processes and infrastructure to a common understanding of risk appetite and acceptable levels of risk.
- Risk appetite concepts should be embedded into Grace's policy development, business and strategic planning, resource allocation and various risk processes such as compliance, insurance, safety, physical and cyber security, internal audit, finance, quality, business continuity and disaster recovery, and legal, among others, and should ultimately be embedded into key business decisions (e.g., sales, purchasing, contracts, etc.).

Consistent with the above objectives, the following project steps will be followed:

1. Deloitte & Touche, Grace's Director – ERM and the ERM Steering Committee will work collaboratively to agree on the specific objectives of a risk appetite/tolerance framework and supporting process for Grace.
2. Deloitte & Touche will obtain, review, and analyze relevant Grace documents, which may include, among others, the following:
    a. Board-level Governance and Audit/Risk Committee charters
    b. Results of previous risk assessments
    c. Updated strategic planning documents
    d. Division and corporate performance metrics
    e. Available loss event or incident data and management's response
    f. Delegation of authority matrices and policies
    g. Position descriptions and accountabilities for key Grace management
3. Deloitte & Touche and the Director - ERM will jointly interview key executives and other stakeholders to obtain their input concerning the desired risk appetite levels for Grace specific types of risk with focus on the following:
    a. Validate objectives of the risk appetite process
    b. Understand Grace management's tolerance levels for key types of risk
    c. Validate the Grace value drivers and key performance metrics

      d. Discuss management's response to historical losses, missed opportunities, strategy execution failures, and adverse events

      e. Discuss areas where management can and should take more intelligent risk

      f. Discuss tolerance levels for both financial and non-financial risk impacts for the various types of risk

4. Deloitte & Touche will assist Grace's Director - ERM in evaluating potential risk appetite metrics such as Earnings-at-Risk, Cash Flow-at-Risk or other similar metrics common for the chemical process industry. Deloitte & Touche will provide recommendations regarding these metrics and the Director – ERM will select risk appetite metrics to be recommended to the ERM Steering Committee for review and acceptance.

5. Deloitte & Touche will assist Grace in formalizing a recommended risk appetite model which will entail the following activities:

      a. Defining recommended risk appetite thresholds and authority limits for the various types of risk

      b. Defining recommended processes/protocols for escalating risks that exceed authority limits or defined appetite levels

      c. Drafting procedures for applying the risk appetite model

      d. Developing templates and definitions that translate risk appetite levels into guidelines that can be used by the Divisions and others to support risk assessment and response, risk escalation, and ongoing decision-making

      e. Developing draft risk appetite policy recommendations

      f. Reviewing, revising and finalizing the risk appetite model with the ERM Steering Committee

6. Deloitte & Touche will support Grace's Director – ERM in presenting the recommended risk appetite model to the executive management team and Board for final approval.

**PHASE 2 DELIVERABLES**

Deloitte & Touche will work with Grace's Director - ERM to provide the following deliverables for review, approval and acceptance by Grace management and the Board as required:

- Targeted risk assessment surveys for selected survey participants

- Preliminary and Final Risk Assessment Reports – Deloitte & Touche will produce detailed and summary risk assessment reports incorporating the results of the survey and the interviews for Grace's review, revision and acceptance

- Recommended Grace Risk Appetite Metrics for the various types of risks

- Recommended Grace Risk Appetite Model and supporting process descriptions, procedures and guidelines, and policies

- Draft Risk Appetite Presentation and Communication Materials

## PHASE 3 OVERVIEW: PRIORITIZE RISKS

Deloitte & Touche will work with Grace's Director - ERM to assist in management's prioritization of its risks and identification of key improvement opportunities. Deloitte & Touche will support Grace by providing drafts for management review and approval.

Deloitte & Touche will demonstrate the framework and process that Grace can utilize in its development of improved risk response plans and then coach, support, and assist Grace's management team in preparing detailed response plans for each of its top ten risks, as identified by Grace. This is expected to promote knowledge transfer and help build sustainable risk management capabilities within Grace.

This phase is expected to include the following steps:

1. Assist Grace management with creating and grouping the initial list of ranked risks and determining the top ten priority risks from those risks identified and assessed in Phase 2, based on:
    - Identified inherent risk to value and the organization's risk appetite thresholds for these exposures;
    - Residual exposure risk (vulnerability or net risk) for each risk considering the adequacy of existing risk mitigation and control techniques; and
    - The relationship between each risk, other risks and Grace's mission critical business objectives.
2. Provide coaching and support to Grace's Director – ERM to validate identified risks including meeting with key stakeholders to help develop consensus.
3. Assist Grace management in reviewing and prioritizing its identified risks.

## PHASE 3 DELIVERABLES

Deloitte & Touche will assist Grace in developing the following for executive management review and approval:
- Prioritized Top Ten Risks for Grace including management's conclusions regarding the effectiveness of existing risk mitigation efforts and its overall conclusion regarding the need for increased mitigation and assurance.

## DELOITTE & TOUCHE ENGAGEMENT TEAM

Deloitte & Touche has selected a service team that brings commitment and significant ERM and industry knowledge to Grace. E.J. Landry, Partner and leader of Deloitte & Touche's Enterprise Risk Services ("ERS") practice for the Boston office will serve as the engagement partner and will have overall responsibility for the project.

Don Dixon, a Director and leader of Deloitte & Touche's Governance & Risk Oversight practice in the Southeast United States, will serve as project leader and will oversee project planning, assessment activities, deliverable development, and participate in

key executive interviews and briefings. Don will also provide advice to the Director – ERM and the ERM Steering Committee regarding project direction and results.

Derrick Sturisky, a Senior Manager in our Governance & Risk Oversight practice, will provide day-to-day support of project activities and Lane Kimbrough, a Manager in the Governance & Risk Oversight practice will serve as risk assessment and risk appetite subject matter specialist. Dilek Cilingir, a Senior Manager in the Boston ERS practice will provide support for risk assessment activities and project deliverables development. Alex Zmoira, a Senior Manager in the Governance & Risk Oversight practice and also located in our Boston office, will provide additional subject matter advice at various stages of the project. In addition, managers and senior consultants from the Boston and Baltimore ERS practice will support the day-to-day delivery of the project as required. The team will be supplemented, as needed, by other specialists with specific industry, risk management, technology or business process experience to deliver the highest quality of service.

## GRACE PROJECT TEAM AND TIME COMMITMENT

Grace's Director - ERM will be responsible for the overall management of this project and will be the primary interface between Grace and Deloitte & Touche. Additional Grace staff will be needed to coordinate project logistics and facilitate access to information and personnel needed to complete various project activities. To the extent that Grace is unable to provide resources to support these and additional activities outlined below, Deloitte & Touche will meet with Grace's Director - ERM to discuss and agree on any changes needed to project schedule, estimate hours, fees and expenses.

In order to complete the activities identified above, Grace agrees to the following:
1. The ERM Steering Committee will attend an orientation session (estimated to take three hours) to review and approve the project approach, schedule, and deliverables.
2. A representative from Grace will attend all interviews and management meetings and to assist with project introductions, information gathering, validation and clarification, as needed.
3. Grace interviewees and meeting attendees will be asked to review preliminary information prior to scheduled interviews and meetings. Interviews will be expected to last for no more than one hour and meetings will be typically be less than two-hours. Grace will provide staff resources to assist in scheduling interviews, meetings, and teleconferences.
4. Survey participants will be asked to devote an estimated 45 minutes to complete the on-line survey. Grace will be asked to provide staff resources to assist in the administration and follow-up on survey responses.
5. Using templates provided by Deloitte & Touche and approved by Grace, Grace will collect information about existing ERM practices and provide the data to Deloitte & Touche for analysis.
6. Grace will be responsible for assigning specific responsibilities for follow-up regarding information requests.

This level of involvement is also expected to provide an opportunity for ERM knowledge transfer to Grace.

Deloitte & Touche will provide the Director - ERM with verbal status briefings once a week and written progress reports every two weeks for the duration of the project.

## MANAGEMENT'S RESPONSIBILITIES

Substantial and meaningful involvement of senior management of Grace is critical to the success of this engagement. Grace shall be responsible for ensuring that their senior management actively participates in both the planning and execution of this engagement. Grace is solely responsible for evaluating for its use the appropriateness and applicability of any results of this project or any recommendations made by Deloitte & Touche and for the implementation of any decisions and actions Grace determines it should implement based on the results of this project.

Grace agrees that any reports issued by Deloitte & Touche will not be used by or circulated, quoted, disclosed, or distributed to, nor will reference to such reports be made to, anyone other than an Grace management level individual or Grace employee who would reasonably require access to such reports in the course of performing his or her job responsibilities or a member of the Board of Directors of Grace. Throughout the course of the engagement, Grace management will be responsible for the final review, acceptance and approval of all project deliverables. Grace shall not be prohibited from creating its own materials based on the contents of such Services and Deliverables and disclosing such Grace-created materials to other third parties, provided that Grace does not, expressly or by implication, identify Deloitte & Touche, in any manner whatsoever, as the source of the content reflected in such Grace-created materials. Deliverables that Grace redacts so that they do not, expressly or by implication, identify Deloitte & Touche, in any manner whatsoever, as the source of the content reflected therein, shall be deemed "Grace-created materials" for the purposes of this paragraph.

## PROFESSIONAL STANDARDS

The services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants ("AICPA"). Deloitte & Touche will provide its observations, advice, and recommendations. However, Deloitte & Touche's services will not constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the AICPA, and, therefore, Deloitte & Touche will not express an opinion or any other form of assurance with respect to Grace's system of internal control over financial reporting or its compliance with laws, regulations, or other matters.

Deloitte & Touche will not perform any management functions, make management decisions, or perform in a capacity equivalent to that of an employee of Grace. In addition, Deloitte & Touche will not be providing any legal advice or conducting a legal review of any of Grace's documents, records, or policies.

It is understood and agreed that Deloitte & Touche's services will include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Grace.

Grace acknowledges and agrees that Deloitte & Touche will not be responsible for the accuracy or completeness of any data made available to Deloitte & Touche through any third-party tool, database, or software application. Grace further acknowledges and agrees that Deloitte & Touche will have no responsibility for evaluating the functionality of such third-party tool, database, or software application, or for any results obtained by Deloitte & Touche through the use of such third-party tool, database, or software application.

**ESTIMATED FEES AND SCHEDULE**

We estimate that the total hours for this engagement will be 750 for all phases of work which will equate to an estimated total professional services fee of $222,500. The table below outlines our estimated hours, fees and timeframe for each phase of work based on our understanding of your requirements. We will work with Grace's Director – ERM to review and revise these estimates as required as based on the agreed upon project work plan.

| Project Phase | Estimated Hours | Estimated Fees | Estimated Project Weeks |
|---|---|---|---|
| Phase 1: Start-Up & ERM Operational Framework | 160 | $47,500 | 3 – 4 |
| Phase 1a: Assess Existing Risk Management Capability | 70 | 21,000 | 1 – 2 |
| Phase 2: Assess Business Risks & Define Grace's Risk Appetite | 420 | $124,500 | 6 – 8 |
| Phase 3: Prioritize Risks | 100 | $29,500 | 2 – 4 |
| Totals | 750 | $222,500 | 12 – 18 |

| Deloitte & Touche Professional Level | Hourly Rates |
|---|---|
| Partner/Principal | $415 |
| Director | $374 |
| Senior Manager | $330 |
| Manager | $300 |
| Staff | $195 |

We will bill Grace for actual hours worked by each Deloitte & Touche professional level based on the hourly rates provided above. Expenses are estimated to be approximately fifteen percent (15 %) of the engagement fees. Expenses include, but are not limited to, our reasonable travel, meal, lodging, and mileage expenses in accordance with our standard policies and will be billed separately at actual costs.

Provided that the scope of services does not change in any material aspect from that described in this letter, Deloitte & Touche's billing for fees shall not exceed $222,500. Any material changes in the scope of services must be in writing and signed by Deloitte & Touche and Grace's Director – ERM; such writing shall detail the changes in the scope of services and the estimated fees.

During the term of this engagement, Grace may request that Deloitte & Touche perform additional services that are not encompassed by this engagement letter. Deloitte & Touche may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are acceptable to Grace and Deloitte & Touche.

The estimated hours and fees assume that there will be active management involvement and timely completion of tasks as outlined in the "Grace Project Team and Time Commitment" and "Management's Responsibilities" sections of this letter. The hours and fees estimate also assumes that the actual number of surveys sent, interviews and meetings to be held and timing of meetings are as outlined in this letter. Variations from these expectations or other changes to the scope will cause a change in our estimated fees. We will notify you as soon as we become aware of such situations.

This engagement letter, together with the General Business Terms attached hereto, constitutes the entire agreement between Grace and Deloitte & Touche with respect to this engagement, supersedes all other oral and written representations, understandings or agreements relating to this engagement, and may not be amended except by the mutual written agreement of Grace and Deloitte & Touche. This engagement letter is also contingent upon Deloitte & Touche successfully completing its normal client acceptance process.

We are prepared to commit to these estimated rates and resources as long as the engagement letter is signed and work commences within 30 days of the date of this letter.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this engagement letter to us. A duplicate of this engagement letter is provided for your records.

We value our relationship and sincerely appreciate the opportunity to serve you on this important project. Please feel free to call E.J. Landry at (617) 437-2157 should you have any questions.

Yours truly,

DELOITTE & TOUCHE LLP

By: _[signature]_

Date:_____

E.J. Landry, Partner

Accepted and agreed to for W. R. Grace & Co. on behalf of itself and its subsidiaries:

By: _[signature] Robert M. Tarola_   Title: _SVP & CFO_

Date: _31 May 2007_

**GENERAL BUSINESS TERMS**

1. **Services.** It is understood and agreed that the services provided by Deloitte & Touche (as defined in paragraph 12) (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by W. R. Grace & Co., the Client. For purposes of these terms and the Engagement Letter, the "Client" shall mean W. R. Grace & Co. and its subsidiaries. W. R. Grace & Co. represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, itself and its subsidiaries.

2. **Payment of Invoices.** Deloitte & Touche's invoices are due upon presentation. Invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (a) 1½% per month or (b) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Without limiting its rights or remedies, Deloitte & Touche shall have the right to halt or terminate the Services entirely if payment is not received within thirty (30) days of the invoice date. The Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Deloitte & Touche's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Deloitte & Touche's property.

3. **Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of the Services. This engagement may be terminated by either party at any time, with or without cause, by giving written notice to the other party not less than thirty (30) days before the effective date of termination, provided that, in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. Deloitte & Touche may terminate this engagement upon written notice to the Client if it determines that (a) a governmental, regulatory, or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board, or the Securities and Exchange Commission), or an entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation, or decision, the result of which would render Deloitte & Touche's performance of any part of the engagement illegal or otherwise unlawful or in conflict with independence or professional rules, or (b) circumstances change (including, without limitation, changes in ownership of the Client or any of its affiliates) such that Deloitte & Touche's performance of any part of the engagement would be illegal or otherwise unlawful or in conflict with independence or professional rules. Upon termination of the engagement, the Client will compensate Deloitte & Touche under the terms of the Engagement Letter for the Services performed and expenses incurred through the effective date of termination.

4. **Deliverables.**

a) Deloitte & Touche has created, acquired, or otherwise has rights in, and may, in connection with the performance of the Services, employ, provide, modify, create, acquire, or otherwise obtain rights in, works of authorship, materials, information, and other intellectual property (collectively, the "Deloitte & Touche Technology").

b) Except as provided below, upon full and final payment to Deloitte & Touche hereunder, the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of the Client. To the extent that any Deloitte & Touche Technology is contained in any of the Deliverables, Deloitte & Touche hereby grants the Client, upon full and final payment to Deloitte & Touche hereunder, a royalty-free, fully paid-up, worldwide, nonexclusive license to use such Deloitte & Touche Technology in connection with the Deliverables.

c) To the extent that Deloitte & Touche utilizes any of its property (including, without limitation, the Deloitte & Touche Technology or any hardware or software of Deloitte & Touche) in connection with the performance of the Services, such property shall remain the property of Deloitte & Touche and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (1) Deloitte & Touche shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent, and other intellectual property laws, in and to the Deloitte & Touche Technology and (2) Deloitte & Touche may employ, modify, disclose, and otherwise exploit the Deloitte & Touche Technology (including, without limitation, providing services or creating programming or materials for other clients). Deloitte & Touche does not agree to any terms that may be construed as precluding or limiting in any way its right to (1) provide consulting or other services of any kind or nature whatsoever to any person or entity as Deloitte & Touche in its sole discretion deems appropriate or (2) develop for itself, or for others, materials that are competitive with or similar to those produced as a result of the Services, irrespective of their similarity to the Deliverables.

d) To the extent any Deloitte & Touche Technology provided to the Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such Deloitte & Touche Technology is licensed to the Client by Deloitte & Touche as agent for Deloitte & Touche Products Company LLC on the terms and conditions herein. The assignment and license grant in this paragraph 4(d) do not apply to any Deloitte & Touche Technology (including any modifications or enhancements thereto or derivative works based thereon) that is subject to a separate license agreement between the Client and a third party, including without limitation, Deloitte & Touche Products Company LLC.

5. **Limitation on Warranties.** THIS IS A SERVICES ENGAGEMENT. DELOITTE & TOUCHE WARRANTS THAT IT SHALL PERFORM THE SERVICES IN GOOD FAITH AND WITH DUE PROFESSIONAL CARE. DELOITTE & TOUCHE DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR DELOITTE & TOUCHE, UPON RECEIPT OF WRITTEN NOTICE, TO USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO DELOITTE & TOUCHE HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

6. **Limitation on Damages and Indemnification.**

   a) The Client agrees that Deloitte & Touche, its subcontractors, and their respective personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Client to Deloitte & Touche pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the recklessness, bad faith or intentional misconduct of Deloitte & Touche or its subcontractors. In no event shall Deloitte & Touche, its subcontractors, or their respective personnel be liable for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

   b) The Client shall indemnify and hold harmless Deloitte & Touche, its subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables to any third party.

   c) In circumstances where all or any portion of the provisions of this paragraph are finally judicially determined to be unavailable, the aggregate liability of Deloitte & Touche, its subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that Deloitte & Touche's conduct bears to all other conduct giving rise to such Claim.

7. **Client Responsibilities.** The Client shall cooperate with Deloitte & Touche in the performance by Deloitte & Touche of the Services, including, without limitation, providing Deloitte & Touche with reasonable facilities and timely access to data, information, and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Deloitte & Touche for purposes of the performance by Deloitte & Touche of the Services. The Client acknowledges and agrees that Deloitte & Touche's performance is dependent upon the timely and effective satisfaction of the Client's responsibilities hereunder and timely decisions and approvals of the Client in connection with the Services. Deloitte & Touche shall be entitled to rely on all decisions and approvals of the Client. The Client shall be solely responsible for, among other things (a) making all management decisions and performing all management functions; (b) designating a competent management member to oversee the Services; (c) evaluating the adequacy and results of the Services; (d) accepting responsibility for the results of the Services; and (e) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

8. **Force Majeure.** Except for the payment of money, neither party shall be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9. **Limitation on Actions.** No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the date of the last payment due to the party bringing such action.

10. **Independent Contractor.** It is understood and agreed that each party hereto is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner, or representative. Neither party shall act or represent itself, directly or by implication, in any such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

11. **Confidentiality and Internal Use.**

    a) The Client agrees that all Services and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be, and should not be, used by any person or entity other than the Client. Except as otherwise specifically provided in the Engagement Letter, the Client further agrees that such Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such Services or Deliverables be made to, any person or entity other than the Client and other contractors of the Client to whom the Client may disclose the Deliverables solely for the purpose of such contractors providing services to the Client relating to the subject matter of this engagement, provided that the Client shall ensure that such contractors do not further circulate, quote, disclose, or distribute such Deliverables, or make reference to such Deliverables, to any person or entity other than the Client. Notwithstanding the foregoing, the Client shall not be prohibited from creating its own materials based on the content of such Services and Deliverables and using and disclosing such Client-created materials for external purposes, provided that the Client does not, expressly or by implication in any manner whatsoever, attribute such materials to Deloitte & Touche or otherwise refer to or identify Deloitte & Touche in connection with such materials.

    b) To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing such information (1) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this paragraph 11(b); (2) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (3) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure in breach hereof, (ii) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party that the receiving party believes is not prohibited from disclosing such information to the receiving party by obligation to the disclosing party, (iii) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (iv) is developed by the receiving party independently of any disclosures made by the

disclosing party to the receiving party of such information. In satisfying its obligations under this paragraph 11(b), each party shall maintain the other's trade secrets and proprietary or confidential information in confidence using at least the same degree of care as it employs in maintaining in confidence its own trade secrets and proprietary or confidential information, but in no event less than a reasonable degree of care. Nothing in this paragraph 11(b) shall alter the Client's obligations under paragraph 11(a). Notwithstanding anything to the contrary herein, the Client acknowledges that Deloitte & Touche, in connection with performing the Services, may develop or acquire experience, skills, knowledge, and ideas that are retained in the unaided memory of its personnel. The Client acknowledges and agrees that Deloitte & Touche may use and disclose such experience, skills, knowledge, and ideas.

12. **Survival and Interpretation.** All paragraphs herein relating to payment of invoices, deliverables, limitation on warranties, limitation on damages and indemnification, limitation on actions, confidentiality and internal use, survival and interpretation, assignment, nonexclusivity, waiver of jury trial, nonsolicitation, and governing law shall survive the expiration or termination of this engagement. For purposes of these terms, "Deloitte & Touche" shall mean Deloitte & Touche LLP and, for purposes of paragraph 6, shall also mean Deloitte & Touche Products Company LLC, one of its subsidiaries. The Client acknowledges and agrees that no affiliated or related entity of Deloitte & Touche, whether or not acting as a subcontractor, or such entity's personnel shall have any liability hereunder to the Client or any other person and the Client will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement. Without limiting the foregoing, affiliated and related entities of Deloitte & Touche are intended third-party beneficiaries of these terms, including, without limitation, the limitation on liability and indemnification provisions of paragraph 6, and the agreements and undertakings of the Client contained in the Engagement Letter. Any affiliated or related entity of Deloitte & Touche may in its own right enforce such terms, agreements, and undertakings. **The provisions of paragraphs 6, 9, 12, 14, and 17 hereof shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

13. **Assignment and Subcontracting.** Except as provided below, neither party may assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or Claims) without the prior written consent of the other party. The Client hereby consents to Deloitte & Touche assigning or subcontracting any of Deloitte & Touche's rights or obligations hereunder to (a) any affiliate or related entity, whether located within or outside of the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Deloitte & Touche, provided that no changes in the Engagement Team will be made without Client's approval. Services performed hereunder by Deloitte & Touche's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Deloitte & Touche's personnel, unless otherwise agreed.

14. **Waiver of Jury Trial.** **THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

15. **Nonsolicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of this engagement with personnel of the other party shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

16. **Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including exhibits, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the Engagement Letter, these terms shall govern and control. All notices hereunder shall be (a) in writing, (b) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (c) effective upon receipt.

17. **Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including exhibits, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). Any action based on or arising out of this engagement or the Services provided or to be provided hereunder shall be brought and maintained exclusively in any court of the State of New York or any federal court of the United States, in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.