# EXHIBIT C

# Deloitte.

**Deloitte & Touche LLP**
2 World Financial Cntr
New York, NY 10281-1414
USA

Tel: (212) 436-2000
Fax: (212) 655-8132
www.deloitte.com

June 28, 2007

Jeffrey A. Forgang
Vice President
Global Environment, Health, Safety and Security
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044 USA

Dear Mr. Forgang:

On behalf of Deloitte & Touche L.L.P. (Deloitte & Touche), thank you for giving us the opportunity to provide Crisis Management Planning Services to W. R. Grace & Co. (Grace). We look forward to being a part of your team.

We are excited about the possibility of serving you. We will listen to your concerns and those of management to understand your expectations to exceed them. Our approach to providing services is simple:

- Assign a talented and experienced team
- Back them with deep regional, national and global resources
- Provide high-quality service

**A Talented Team to Serve You**

The resumes we have provided within the proposal will demonstrate that a highly experienced and knowledgeable team has been assigned to you. The team we have assembled to serve you is designed to maximize the talent and knowledge of our specialists on your behalf. Our client service team will strive to serve Grace every day with the highest level of responsiveness, subject matter specialization, integrity and professionalism. We remain firmly committed to Grace's success and are eager to demonstrate our capabilities on this important project.

A member of
Deloitte Touche Tohmatsu

# Our Approach to Assisting W. R. Grace & Co.

## Overview

We believe our top-down approach to this opportunity is unique. We examine Crisis Management Planning from a business perspective to contain the impact of a crisis on Grace's business in the event of an occurrence. Specifically, our approach will provide the required input and direction to complete a holistic Crisis Management Plan. We will take into consideration, Grace's desire to leverage current efforts yet thoroughly prepare the organization for crisis management.

Our experience has shown that in order to build an operationally sound plan, many aspects of Grace's environment must be considered to contain a crisis. It is through this approach that we can satisfy Grace's primary requirements for a Crisis Management Plan that can eventually be deployed to protect operations in nearly 40 countries. Given this perspective, we propose a three-phased approach.



## PHASE I – PROJECT INITIATION AND PLANNING

The objective of this phase is to perform the necessary steps in order to properly plan the project. We will identify and validate the key organizational components integral to the development of the Crisis Management Plan.

*Phase I activities include:*

- Identify key stakeholders
- Identify Corporate Crisis Management Team members
- Identify functional groups for project participation
- Develop steering project plan

During this phase we will work with the Grace CMP Project Manager and staff to identify the key resources to initiate and complete the Crisis Management Plan. Once the resources have been identified, Deloitte & Touche will co-develop a high level project plan for steering the project with the Grace CMP Project Manager. Project participants representing areas critical to this project within Grace will be identified and integrated with the Deloitte & Touche project team. We will also develop a status report template and schedule for project status communications.

*Phase I Deliverables:*

1. Summary/listing of key resources
2. Steering Project Plan
3. Project status reporting template

## Phase II – Current State Assessment

The objective of this phase is to identify and retain formal and informal crisis management processes already in place. We will obtain for review current documentation that will assist us in obtaining an understanding of emergency response programs in place and in process. During this phase we will identify the requirements to accomplish the development of the Crisis Response Model leading to the CMP. If necessary, we will conduct interviews as required, to validate and clarify our understanding of the current state associated with the core continuity and emergency preparedness.

*Phase II activities include:*

- Understand current state of preparedness
- Review:
  - Current draft crisis management plan
  - Current emergency response planning processes and plans
- Develop Crisis Response Model

*Phase II Deliverables:*

1. Current State of Preparedness Summary Report
2. Crisis Response Model
3. Phase I & II status report

The elapsed time to complete Phase I and Phase II is estimated to be approximately two to three weeks.

## Phase III – CMP Development

The objective of this phase is to define the key components required for crisis management, validate the findings and construct the Corporate Crisis Management Plan to address Grace's corporate locations in an integrated, comprehensive fashion. Our approach will identify the logical component definitions and working with key staff,

validate those findings prior to inclusion in the Corporate Crisis Management Plan. We will also develop materials for awareness, training and testing of the CMP. We will not present the training nor execute any testing within the scope of this project.

### Phase III activities include:

- Define Corporate Crisis Management Plan including components:
    - Crisis Response Team Roles / Responsibilities
    - Command Center equipment & space requirements
    - CMP activation triggers
    - CMP logical geographical requirements
    - CMP activation and deactivation processes
    - Define CMP continuous improvement process
    - Develop Crisis Management training and awareness package
- Present CMP to Grace management
- Revise CMP as needed
- Receive final sign-off of Grace's CMP

### Phase III Deliverables:

1. Corporate Crisis Management Plan
2. Crisis Management training and awareness package
3. Management Presentation of Corporate CMP
4. Phase III status reports

The elapsed time to complete Phase III is estimated to be approximately four to five weeks.

# Project Assumptions

The following key assumptions have been used in defining our overall project approach and estimated professional fees.

- A Grace CMP project coordinator will be appointed to coordinate all activities and manage all internal schedules and questions regarding engagement activities.
- Grace will make all relevant documentation to performing the Current State of Preparedness available to Deloitte & Touche prior to the start of Phase II
- We will work with Grace CMP Project Manager to assist us in identification of the most appropriate individuals for any necessary interviews and schedule them within a reasonable timeframe based on travel requirements. Delays in scheduling or limited availability of management and key staff would impact the engagement delivery timeframes and final project costs.
- Deloitte & Touche will be working closely with a select number of Grace's teams, vendors and other personnel to obtain data requirements to complete the project deliverables.
- We will meet with the project sponsor/designee on an agreed upon reporting schedule to review project status and issues.
- Our services will be performed in accordance with the Standards for consulting Services of the American Institute of Certified Public Accountants (the AICPA) and will not constitute an engagement to provide

audit or attestation services as described in the professional standards issued by the AICPA. In addition, we will not provide any legal advice regarding our services; all legal issues with respect to these matters will be the responsibility of Grace.

- Deloitte & Touche staff will be provided with the following onsite requirements; workspace with voice communications, data/internet connectivity and printing capabilities to meet their needs to complete tasks associated to the deliverables and that provides access to Deloitte & Touche resources.
- Deloitte & Touche staff will bring to the project, methodologies, tools (personal computers), templates etc. required to complete the deliverables outlined in the proposal.
- The consultants are expected to be onsite at the Grace locations based on the project activity requirements. Where possible, and when in agreement with the Grace CMP project manager, they may work from their Deloitte & Touche office in the geographical location they are assigned to. They will arrive on-site Monday's before noon and leave late Thursday evenings or after noon on Friday.
- Deloitte & Touche will not perform any management functions, make management decisions, or perform in a capacity equivalent to that of an employee of Grace.

## Project Timeline

We are firmly committed to presenting quality deliverables that provide value to you. Our projects are structured to provide defined deliverables, as well as, knowledge transfer to your internal staff on the methods and tools used in building crisis management plans. Our project management framework allows both our project manager and your project manager to closely monitor work progress.

We are prepared to start this effort on a mutually agreed upon time after receipt of a signed engagement letter, including our General Business Terms.

Based on the current proposed tasks, the estimated timeline and work effort to accomplish project deliverables will be approximately 6 to 8 weeks elapsed time. Upon completion of the Current Assessment of the state of preparedness and the determination and acceptance of the Crisis Management Response Model, we recommend a review with the Grace CMP project manager. Once an agreement on the response model is reached, we reserve the right to re-assess the timeline and associated professional fees and make any necessary changes based on the scope of work effort anticipated.

The table that follows describes the projected schedule for the phases of activity that will take place during this engagement.

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Phase I: Project Initiation and Planning | ■ | | | | | | | |
| Phase II: Current State Assessment | | | | | | | | |
| Phase III: CMP Development | | | | ■ | ■ | ■ | ■ | ■ |

# Deloitte & Touche's Project Team

The project team will consist of highly skilled resources from Deloitte & Touche LLP's US based Enterprise Risk Services ("ERS") group. The team reflects our understanding of the complex global environment in which Grace currently operates, which requires professionals with emergency response and crisis management planning skills. This core project leadership team combines our strongest individuals to provide the scope of services discussed in our approach. Additional information has been provided in the following section, on each of our team members, with our core team having their roles clearly defined. Assuming that Grace engages Deloitte & Touche to assist in the efforts to address their crisis management initiative, Deloitte & Touche will make every effort to make the individuals listed below available to support the engagement.

As required, we will utilize staff from our global offices to support the core team for knowledge of specific regulatory requirements that could influence the planning process and to review project deliverables for consistency of documentation for use in other geographical locations where Grace is located.

## Core Team Members

### Steven Ross
Director

Steve is the Global Director of our Business Continuity Management practice and oversees the identification of risk exposures, development of recovery strategies and the development of Business Continuity Plans. With over 30 years experience in information protection, Steve is a frequent contributor to professional journals and industry conferences, including the CSI annual Conference, RSA, Continuity Insights and others. He is a Certified Business Continuity Professional (CBCP) and authored "Business Continuity Planning for e-Commerce", and was interviewed by CNN and Bloomberg TV on the topic of Pandemic Planning for Businesses." He has assessed and implemented Business Continuity Plans for banks, government agencies, and industrial corporations, and has performed numerous related assessments of security and control. In consulting engagements, he specializes in planning, implementation, and standardization for BCM programs and in overall data security and control. Steve has performed a wide range of consulting engagements for clients in the public and private sector.

### Project Role

Steve will serve as your Engagement Leader for this critical initiative. Steve will provide oversight to the project. He will be responsible for review of both deliverables, as well as the process activities of the engagement. Steve will utilize his experience in BCM and Crisis Management to provide direction during research activities, information gathering, and documentation review and may participate in project status meetings. He will oversee the engagement and will have ultimate responsibility for your satisfaction with both deliverables as well as the process.

### Sandra Allison
Manager

Sandy, Deloitte & Touche LLP Enterprise Risk Services Manager, is responsible for managing and delivering projects to implement effective business continuity management programs which include emergency response and crisis management plans for Deloitte & Touche clients. Her experience includes consulting for a broad range of companies and industries. She is a Certified Business Continuity Professional (CBCP) and has over 22 years experience. Her experience includes development and exercising Emergency Operations Center plans, development of policies and planning materials, as well as, documenting response and continuity plans and determining recovery solutions with industry vendors for financial, insurance and manufacturing clients. Sandra managed the Corporate Business Continuity Management program for Michigan's largest bank holding company where she spent 7+ years in Information Technology Risk Management. She has previously held HAZMAT certification with experience in the manufacturing environment where regulatory requirements included emergency response planning.

### Project Role

Sandy will serve as the Project Manager and will be on-site on a regular basis. Sandy will be actively involved in the planning effort. She will provide real-time guidance as required to the engagement team in the field. Sandy will be involved in research activities, information gathering sessions, documentation review and will participate in project status meetings as well as key interviews. Sandy will be responsible for the development of all deliverables.

### Tad Dickie
Senior Consultant

Tad is a Senior Consultant in our Enterprise Risk Services. He has more than 10 years of experience in information technology in the financial services, technology and manufacturing industries. Tad has developed data center site security designs including hot site vendor SLA requirements and negotiation. Tad has led recovery planning design initiatives while serving as lead Network Engineer. He has also led selection, implementation and testing of off-site back-up / recovery systems. Further he has extensive experience in conducting requirements gathering initiatives, cross platform delivery, ITIL adherence and enterprise governance compliance. Tad has deep infrastructure management skills with an emphasis on structured delivery of secure solutions within project delivery timelines. He is CISSP and MCSE certified.

### Project Role

Tad will serve as on-site staff for the project. He will be actively involved in assisting with the planning effort and executing the day to day tasks required by the project. Tad will be involved in research activities, information gathering sessions, documentation preparation and will participate in project status meetings and direct interfacing with Grace' stakeholders.

# Professional Fees

Deloitte & Touche has business continuity professionals with varying years of experience who specialize in assessing business needs, analyzing solutions, developing business continuity, emergency response and crisis management plans, implementing and testing programs, and ongoing quality assurance and process improvement. We have provided bios for a sample of our professionals in the *"Project Team"* section of the proposal. Deloitte & Touche professionals used for the specific tasks to be performed will be approved in advance by W. R. Grace.

We are prepared to staff and begin this project within two weeks of receiving Grace's approval of this proposal and are projecting the overall effort to take approximately 6 to 8 weeks to complete.

Our professional fees for the scope of this project are estimated to be $100,000. These fees are based upon our current understanding of the project requirements, our proposed approach, our estimate of the level of effort required, our roles and responsibilities, and active participation of Grace's management and other personnel, as required and defined in the proposal. Based on our experience, issues sometimes arise that require efforts beyond what was initially anticipated. If this should occur, we will discuss it with you prior to performing any additional work.

Provided that the scope of services does not change in any material aspect from that described in this letter, Deloitte & Touche's billing for fees shall not exceed $100,000. Any material changes in the scope of services must be in writing and signed by Deloitte & Touche and Grace's Vice President Global Environment, Health, Safety and Security; such writing shall detail the changes in the scope of services and the estimated fees.

In addition to professional fees, our invoices will include direct out-of-pocket expenses such as charges for travel, software licensing fees, messengers, etc. Based on our experience with similar engagements, we estimate that our expenses for this project would be approximately 15% of the professional fees. This estimate is based on our understanding of the project scope, the deliverables that will be provided to you, the number and level of

personnel assigned to the project, and the total time required to complete this project successfully. We will bill biweekly for actual hours and expenses incurred.

These fees will change only if circumstances beyond our control arise which would extend the duration or change the scope of the project, our fees will vary accordingly. We understand that W. R. Grace reserves the right to change the scope of the project at any time. Deloitte & Touche is willing to increase or decrease the scope of our involvement to be sensitive to Grace's budgetary and people constraints. We are eager to work with you to achieve the appropriate balance of scope and professional fees.

## Other Matters

- The services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants ("AICPA"). We will provide our observations, advice, and recommendations. However, our services will not constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the AICPA, and, therefore, we will not express an opinion or any other form of assurance with respect to Grace's system of internal control over financial reporting or its compliance with laws, regulations, or other matters.

- Deloitte & Touche will not perform any management functions, make management decisions, or perform in a capacity equivalent to that of an employee of Grace.

- The services provided under this engagement letter should not be used as the basis for management's assertion in connection with Sarbanes-Oxley. Deloitte & Touche will make no representations or warranties nor provide any assurances that (1) Grace's disclosure controls and procedures and the internal control and procedures for financial reporting are compliant with the certification requirement and internal control reporting requirement of Sarbanes-Oxley, or (2) Grace's plans are sufficient to address and correct any shortcomings that would prohibit Grace from making the required certification or from reporting under Sarbanes-Oxley. In addition, Deloitte & Touche will not be providing any legal advice or conducting a legal review of any of Grace's documents, records, or policies.

- While we believe our proposed procedures will assist Grace with your Business Continuity risk mitigation efforts, we cannot warrant the work performed by Grace or third-party vendors or contractors, or that all errors or defects can or will be eliminated from the systems, or that operation of the systems will be error-free. As a provider of consulting services only, without control or responsibility for the activities within Grace's risk reduction plan, we cannot be responsible for these situations. Deloitte & Touche will rely, without verification, on representations of the business processes and product capabilities made by Grace's personnel or those of your software and hardware vendors and any other third parties.

- Deloitte & Touche may utilize software that is currently owned by or licensed to Deloitte & Touche in connection with the performance of its services. If Grace would like Deloitte & Touche to use other software, such software is to be acquired by and licensed to Grace, with Deloitte & Touche as a sublicensee for use in connection with the performance of its services to Grace. With respect to software that is owned or licensed to Deloitte & Touche, if Company personnel will access or use such software, Grace agrees to become a licensee in accordance with terms established by Deloitte & Touche; provided, however, that Deloitte & Touche agrees that Grace will not be required to pay to Deloitte & Touche for Deloitte & Touche's account any licensing fees with respect to its use of such software.

## Access to Working Papers

The working papers prepared by Deloitte & Touche in connection with this engagement are the property of Deloitte & Touche. Upon request, copies of any or all working papers that Deloitte & Touche considers to be

nonproprietary, including any reports issued to Grace pursuant to this engagement, will be provided to management of Grace and the Affiliates of Grace; provided, however, that in such case, Grace shall ensure that its Affiliates do not further circulate, quote, disclose or distribute such working papers or reports or make reference to such working papers or reports. For purposes of this engagement, "Affiliates" of any entity shall mean those entities which control, are controlled by or are under common control with such entity. The Company may provide access to such copies to regulators in the exercise of their statutory oversight of Grace. However, other third parties may not be provided access to such copies without prior written consent from Deloitte & Touche.

Other third parties will not be granted access to or photocopies of nonproprietary working papers retained by Deloitte & Touche until Grace provides Deloitte & Touche with a written consent and the third party provides Deloitte & Touche with a written agreement satisfactory to Deloitte & Touche in its reasonable discretion relating to such access. A representative from Deloitte & Touche will also be present during the period that the third party, including regulators, is provided access to nonproprietary working papers retained by Deloitte & Touche.

Third parties, including regulators, will not be provided with a photocopy of any nonproprietary working papers without the prior written consent of both Deloitte & Touche and Grace, except as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards, or in connection with litigation pertaining hereto.

* * * * *

This engagement letter, together with the General Business Terms attached hereto, constitutes the entire agreement between Grace and Deloitte & Touche with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by the mutual written agreement of Grace and Deloitte & Touche. In the event of any inconsistency between this engagement letter and the General Business Terms, the following order of priority shall apply: (1) General Business Terms and (2) engagement letter.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this engagement letter to us. A duplicate of this engagement letter is provided for your records.

Thank you again for this opportunity to be of service to Grace. If there are any questions or if we may be of further assistance to you, please feel free to call Steve Ross at (212) 436-2226 or (917) 837-2484.

Yours truly,

Deloitte + Touche, LLP

By: Steven J. Ross
Firm Director

Approved and Accepted for W. R. Grace & Co.

By: _____  Date: 7/11/07

~~Jeffrey A. Forgang~~  William M. Corcoran

Title: _____
Vice President

Page 9

## GENERAL BUSINESS TERMS

1. **Services.** It is understood and agreed that the services provided by Deloitte & Touche (as defined in paragraph 12) (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, W. R. Grace & Co., (the "Client"). For purposes of these terms and the Engagement Letter, the "Client" shall mean W. R. Grace & Co. and its subsidiaries. W. R. Grace & Co. represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, itself and its subsidiaries.

2. **Payment of Invoices.** Deloitte & Touche's invoices are due upon presentation. Invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (a) 1½% per month or (b) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Without limiting its rights or remedies, Deloitte & Touche shall have the right to halt or terminate the Services entirely if payment is not received within thirty (30) days of the invoice date. The Client shall be responsible for all taxes imposed on the Services or on the transaction, other than Deloitte & Touche's income taxes imposed on a net basis or by employment withholding, and other than taxes imposed on Deloitte & Touche's property.

3. **Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of the Services. This engagement may be terminated by either party at any time, with or without cause, by giving written notice to the other party not less than thirty (30) days before the effective date of termination, provided that, in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. Deloitte & Touche may terminate this engagement upon written notice to the Client if it determines that (a) a governmental, regulatory, or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board, or the Securities and Exchange Commission), or an entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation, or decision, the result of which would render Deloitte & Touche's performance of any part of the engagement illegal or otherwise unlawful or in conflict with independence or professional rules, or (b) circumstances change (including, without limitation, changes in ownership of the Client or any of its affiliates) such that Deloitte & Touche's performance of any part of the engagement would be illegal or otherwise unlawful or in conflict with independence or professional rules. Upon termination of the engagement, the Client will compensate Deloitte & Touche under the terms of the Engagement Letter for the Services performed and expenses incurred through the effective date of termination.

4. **Deliverables.**
a) Deloitte & Touche has created, acquired, or otherwise has rights in, and may, in connection with the performance of the Services, employ, provide, modify, create, acquire, or otherwise obtain rights in, works of authorship, materials, information, and other intellectual property (collectively, the "Deloitte & Touche Technology").

b) Except as provided below, upon full and final payment to Deloitte & Touche hereunder, the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of the Client. To the extent that any Deloitte & Touche Technology is contained in any of the Deliverables, Deloitte & Touche hereby grants the Client, upon full and final payment to Deloitte & Touche hereunder, a royalty-free, fully paid-up, worldwide, nonexclusive license to use such Deloitte & Touche Technology in connection with the Deliverables.

c) To the extent that Deloitte & Touche utilizes any of its property (including, without limitation, the Deloitte & Touche Technology or any hardware or software of Deloitte & Touche) in connection with the performance of the Services, such property shall remain the property of Deloitte & Touche and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (1) Deloitte & Touche shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent, and other intellectual property laws, in and to the Deloitte & Touche Technology and (2) Deloitte & Touche may employ, modify, disclose, and otherwise exploit the Deloitte & Touche Technology (including, without limitation, providing services or creating programming or materials for other clients). Deloitte & Touche does

not agree to any terms that may be construed as precluding or limiting in any way its right to (1) provide consulting or other services of any kind or nature whatsoever to any person or entity as Deloitte & Touche in its sole discretion deems appropriate or (2) develop for itself, or for others, materials that are competitive with or similar to those produced as a result of the Services, irrespective of their similarity to the Deliverables.

d) To the extent any Deloitte & Touche Technology provided to the Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such Deloitte & Touche Technology is licensed to the Client by Deloitte & Touche as agent for Deloitte & Touche Products Company LLC on the terms and conditions herein. The assignment and license grant in this paragraph 4(d) do not apply to any Deloitte & Touche Technology (including any modifications or enhancements thereto or derivative works based thereon) that is subject to a separate license agreement between the Client and a third party, including without limitation, Deloitte & Touche Products Company LLC.

5. **Limitation on Warranties.** THIS IS A SERVICES ENGAGEMENT. DELOITTE & TOUCHE WARRANTS THAT IT SHALL PERFORM THE SERVICES IN GOOD FAITH AND WITH DUE PROFESSIONAL CARE. DELOITTE & TOUCHE DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR DELOITTE & TOUCHE, UPON RECEIPT OF WRITTEN NOTICE, TO USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO DELOITTE & TOUCHE HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.

6. **Limitation on Damages and Indemnification.**
a) The Client agrees that Deloitte & Touche, its subcontractors, and their respective personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Client to Deloitte & Touche pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the recklessness, bad faith, or intentional misconduct, of Deloitte & Touche or its subcontractors. In no event shall Deloitte & Touche, its subcontractors, or their respective personnel be liable for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

b) The Client shall indemnify and hold harmless Deloitte & Touche, its subcontractors, and their respective personnel from all Claims arising from the Client's disclosure of the Services or Deliverables to any third party.

c) In circumstances where all or any portion of the provisions of this paragraph are finally judicially determined to be unavailable, the aggregate liability of Deloitte & Touche, its subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that Deloitte & Touche's conduct bears to all other conduct giving rise to such Claim.

7. **Client Responsibilities.** The Client shall cooperate with Deloitte & Touche in the performance by Deloitte & Touche of the Services, including, without limitation, providing Deloitte & Touche with reasonable facilities and timely access to data, information, and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Deloitte & Touche for purposes of the performance by Deloitte & Touche of the Services. The Client acknowledges and agrees that Deloitte & Touche's performance is dependent upon the timely and effective satisfaction of the Client's responsibilities hereunder and timely decisions and approvals of the Client in connection with the Services. Deloitte & Touche shall be entitled to rely on all decisions and approvals of the Client. The Client shall be solely responsible for, among other things: (a) making all management decisions and performing all management functions; (b) designating a competent management member to oversee the Services; (c) evaluating the adequacy and results of the Services; (d) accepting responsibility for the results of the Services; and (e) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

**8. Force Majeure.** Except for the payment of money, neither party shall be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

**9. Limitation on Actions.** No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the date of the last payment due to the party bringing such action.

**10. Independent Contractor.** It is understood and agreed that each party hereto is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner, or representative. Neither party shall act or represent itself, directly or by implication, in any such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

**11. Confidentiality and Internal Use.**
a) The Client agrees that all Services and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be, and should not be, used by any person or entity other than the Client. Except as otherwise specifically provided in the Engagement Letter, the Client further agrees that such Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such Services or Deliverables be made to, any person or entity other than the Client and other contractors of the Client to whom the Client may disclose the Deliverables solely for the purpose of such contractors providing services to the Client relating to the subject matter of this engagement, provided that the Client shall ensure that such contractors do not further circulate, quote, disclose, or distribute such Deliverables, or make reference to such Deliverables, to any person or entity other than the Client. Notwithstanding the foregoing, the Client shall not be prohibited from creating its own materials based on the content of such Services and Deliverables and using and disclosing such Client-created materials for external purposes, provided that the Client does not, expressly or by implication, in any manner whatsoever, attribute such materials to Deloitte & Touche or otherwise refer to or identify Deloitte & Touche in connection with such materials.

b) To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing such information (1) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this paragraph 11(b); (2) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (3) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure in breach hereof, (ii) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party that the receiving party believes is not prohibited from disclosing such information to the receiving party by obligation to the disclosing party, (iii) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (iv) is developed by the receiving party independently of any disclosures made by the disclosing party to the receiving party of such information. In satisfying its obligations under this paragraph 11(b), each party shall maintain the other's trade secrets and proprietary or confidential information in confidence using at least the same degree of care as it employs in maintaining in confidence its own trade secrets and proprietary or confidential information, but in no event less than a reasonable degree of care. Nothing in this paragraph 11(b) shall alter the Client's obligations under paragraph 11(a). Notwithstanding anything to the contrary herein, the Client acknowledges that Deloitte & Touche, in connection with performing the Services, may develop or acquire experience, skills, knowledge, and ideas that are retained in the unaided memory of its

personnel. The Client acknowledges and agrees that Deloitte & Touche may use and disclose such experience, skills, knowledge, and ideas.

**12. Survival and Interpretation.** All paragraphs herein relating to payment of invoices, deliverables, limitation on warranties, limitation on damages and indemnification, limitation on actions, confidentiality and internal use, survival and interpretation, assignment, nonexclusivity, waiver of jury trial, nonsolicitation, and governing law shall survive the expiration or termination of this engagement. For purposes of these terms, "Deloitte & Touche" shall mean Deloitte & Touche LLP and, for purposes of paragraph 6 shall also mean Deloitte & Touche Products Company LLC, one of its subsidiaries. The Client acknowledges and agrees that no affiliated or related entity of Deloitte & Touche, whether or not acting as a subcontractor, or such entity's personnel shall have any liability hereunder to the Client or any other person and the Client will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement. Without limiting the foregoing, affiliated and related entities of Deloitte & Touche are intended third-party beneficiaries of these terms, including, without limitation, the limitation on liability and indemnification provisions of paragraph 6, and the agreements and undertakings of the Client contained in the Engagement Letter. Any affiliated or related entity of Deloitte & Touche may in its own right enforce such terms, agreements, and undertakings. **The provisions of paragraphs 6, 9, 12, 14, and 17 hereof shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

**13. Assignment and Subcontracting.** Except as provided below, neither party may assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or Claims) without the prior written consent of the other party. The Client hereby consents to Deloitte & Touche assigning or subcontracting any of Deloitte & Touche's rights or obligations hereunder to (a) any affiliate or related entity, whether located within or outside of the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Deloitte & Touche, provided that no changes in the Engagement Team will be made without Client's approval. Services performed hereunder by Deloitte & Touche's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Deloitte & Touche's personnel, unless otherwise agreed.

**14. Waiver of Jury Trial.** THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.

**15. Nonsolicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of this engagement with personnel of the other party shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

**16. Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including exhibits, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the Engagement Letter, these terms shall govern and control. All notices hereunder shall be (a) in writing, (b) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (c) effective upon receipt.

**17. Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including exhibits, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles

thereof). Any action based on or arising out of this engagement or the Services provided or to be provided hereunder) shall be brought and maintained exclusively in any court of the State of New York or any federal court of the United States, in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.