# EXHIBIT 5

# REBUTTAL REPORT
# OF FREDERICK C. DUNBAR
# TO REPORT OF JENNIFER L. BIGGS

September 25, 2007

## IV. IS A TORT SYSTEM FORECAST RELEVANT?

As stated in her report, Ms. Biggs was "instructed to assume that Grace's bankruptcy did not occur and that claims would have been handled through the tort system."[9] She notes further than her "estimates therefore focus on the debtor's anticipated liabilities, but for the bankruptcy."[10]

If the Court in this matter concludes that the appropriate approach to estimation is to evaluate liability in the bankruptcy setting and not in the tort system, Ms. Biggs' approach will not be relevant. For example, lax guidelines for evidence on injury and exposure, which have been a feature in the tort system, may not be a feature of post-bankruptcy adjudication. If so, the best estimate of the number of future claims found to be valid by post-bankruptcy procedures would be substantially smaller than an estimate based on claims that had positive tort values pre-bankruptcy.

History demonstrates that claims in the federal system are handled differently than those in state court. For example, federal multi-district litigation (MDL) courts have had the effect of consolidating proceedings. Federal courts also have imposed strict medical criteria, allowing for the prioritization of cases. Since 1992, for example, all federal court asbestos cases have been subject to an order dismissing the claims of those who cannot produce evidence of impairment caused by asbestos.[11] Recent federal rulings have reinforced this stance. For instance, in January 2003, Judge Weiner of the MDL 875 docket operating in the Eastern District of Pennsylvania ordered that all non-malignant, asbestos-related personal injury cases assigned to the MDL docket and initiated through a mass X-ray screening would be subject to administrative dismissal without prejudice, with the tolling of all applicable statutes of limitations.[12] In the MDL 875 docket, plaintiffs must now provide evidence of impairment before claims are reinstated. In his order, Judge Weiner explained that, "the filing of mass screening cases is

---

[9] Biggs Report, p. 5

[10] Ibid.

[11] Behrens, Mark A., "Asbestos and Silica Litigation Reform: Helping the Sick, Curbing Fraud, and Providing Liability Fairness," *The State Facto (American Legislative Exchange Council)*, February 2007.

[12] "MDL Judge Issues Order to Administratively Dismiss X-Ray Screening Cases," *Mealey's Litigation Reporter: Asbestos*, Vol. 17, Issue 1, February 1, 2002. Mass screenings were typically an arrangement between a plaintiff's attorney and a union where mobile vans with x-ray and pulmonary function testing would screen workers at a plant and sign the worker up with the attorney should there appear to be a viable claim.

10

tantamount to a race in the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs."[13] Judge Weiner transferred 5,500 actions to MDL 875's inactive docket on March 31, 1997 and another 976 cases on April 29, 1999.[14]

Many claims in the MDL remain pending: the Eastern District of Pennsylvania in Philadelphia was assigned the asbestos MDL, and "35,033 of its pending 47,293 cases are asbestos cases."[15] In Grace's data, throughout the 1990s, Federal claims were less likely to resolve than state claims. (See Figure 1 and Exhibit 3.)

**Figure 1**



Comparison of W. R. Grace's Resolution Rates in Federal vs. State Court, by File Year
For All Diseases

Note: See Exhibit 3 for details.

---

[13] *Ibid.*

[14] "Judge Weiner Lists 5,500 MARDOC Actions for Administrative Dismissal," *Mealey's Litigation Reporter: Asbestos,* Vol. 12, Issue 6, April 18, 1997. See also *Mealey's Litigation Reporter: Asbestos,* Vol. 14, Issue 7, May 7, 1999.

[15] *Ibid.*

11

Therefore, even though state substantive law applies in federal court, this pattern demonstrates that cases in federal court are handled differently from cases in state court.

## V. ANALYSIS OF MS. BIGGS' ASSUMPTIONS ABOUT CLAIMING BEHAVIOR

### A. Filing Rate Assumptions

Ms. Biggs makes several unsupported and/or flawed assumptions that affect her filing rates.[16] Moreover, Ms. Biggs did not model the causal factors affecting filing rates either in the period leading up to Grace's bankruptcy or since its filing occurred.

#### 1. Inclusion of Partial Year 2001 in Filing Rate Calculation

Ms. Biggs uses a calibration period from 1997 through 2001 to estimate filing rates against Grace. Filings in 2001 extend only through the first three months, however, so that Ms. Biggs is required to make assumptions about the remainder of 2001 based on this data.

As she acknowledges, filings in the first three months of 2001 were artificially increased due to the impending Grace bankruptcy. She states that:

> I found that...a data entry backlog did not appear to be the most significant reason for the post-petition Party Entry Dates. Rather, I found that more than half of the 18,000 claims related to matters served in 2000 and before, suggesting that the Grace bankruptcy (or the threat of subsequent asbestos defendant bankruptcies in 2001) might have prompted the

---

[16] In addition, in preparing the Grace Historical Claim Data to use as an input to her forecast, Ms. Biggs fails to remove duplicates from non-cancer claims. Specifically, she asserts that "elimination of the duplicate records from CMS is an extremely time-consuming process, and I conducted it only for malignant claims." This failure is in contrast to Dr. Peterson, the ACC's expert. If we remove non-malignant and unknown duplicate claims using methodology consistent with Dr. Peterson, we find that Ms. Biggs' failure to remove duplicates causes her to overstate pending filings by over 3,100 claims. In turn, this failure leads to an overestimation of her filing rate and an overestimate of future claims.

While Ms. Biggs in fact acknowledges this failure will cause her to overstate the number of non-malignant claims, she asserts that "For the nonmalignant claims, I expect the higher projected filing rates from including duplicate records are offset by the higher dismissal rates." However, she provides no empirical analysis supporting this assertion and there is no theoretical basis to assume that duplicate claims in the database would offset her higher dismissal rates to account for tort reform.

Compounding this problem, Ms. Biggs then reallocates a substantial percentage of the unknown claims to malignant disease categories. As Ms. Biggs attempts only to remove duplicates from her malignant claim counts, these unknown claims also necessarily include duplicates. Post-reallocation, then, the overstatement caused by Ms. Biggs failure to remove duplicates from the unknown claims thereby also causes her to overstate pending cancer filings. In turn, this causes her to overstate the historical filing rate against Grace, and so to overstate future cancer filings.

12