# EXHIBIT 6

# REBUTTAL REPORT
# OF FREDERICK C. DUNBAR
# TO REPORT OF MARK PETERSON

September 25, 2007

    e. Dr. Peterson's regression analysis of Grace average settlement values over time does not attempt to model the behavioral factors affecting settlements in the past or the changes that occurred after Grace's bankruptcy that affected settlements from 2001 through 2006. In fact, the recent experience of solvent defendants (using both public and proprietary data) reveals that settlement values have returned to pre-2002 levels, moving in the opposite direction from Dr. Peterson's predicted upward trend. A statistical analysis of verdicts also reveals a similar trend.

4. Dr. Peterson's preferred assumptions are nearly always biased upward. However, his report contains alternative assumptions used in sensitivity tests of his forecast that are more consistent with recent data. Substituting these assumptions in Dr. Peterson's model leads to the following findings:

    a. Combining the sensitivity test assumptions considered by Dr. Peterson that are more consistent with recent data results in a total present value liability estimate of $2.313 billion.

    b. It is acknowledged by other experts that filings for the first quarter of 2001 claims data were tainted by Grace's imminent bankruptcy. If, in addition to making the sensitivity test assumptions, we exclude the first quarter of 2001 from the sample of data from which Dr. Peterson's estimates future claims filing rates, then the estimated present value of liability falls to $2.025 billion.

## II. MATERIALS CONSIDERED

In addition to the materials included in my initial report, I considered the following materials in preparation of this report.

1. Report of Dr. Peterson and backup;

2. Report of Jennifer L. Biggs and backup;

3. Report of Joseph J. Radecki, Jr. and backup;

4. W. R. Grace Historical Claims Database;

5. Manville Trust Database, Manville Trust e-Extract Version 3.0 as of December 31, 2006;

6. Academic articles, judicial decisions and other relevant document on asbestos litigation and tort reforms, including:

    a. Behrens, Mark A., "Asbestos and Silica Litigation Reform: Helping the Sick, Curbing Fraud, and Providing Liability Fairness," *The State Factor (American Legislative Exchange Council)*, February 2007;

2

    b. "MDL Judge Issues Order to Administratively Dismiss X-Ray Screening Cases," *Mealey's Litigation Reporter: Asbestos,* Vol. 17, Issue 1, February 1, 2002;

    c. "Judge Weiner Lists 5,500 MARDOC Actions for Administrative Dismissal," *Mealey's Litigation Reporter: Asbestos,* Vol. 12, Issue 6, April 18, 1997;

    d. *Mealey's Litigation Reporter: Asbestos*, Vol. 14, Issue 7, May 7, 1999;

    e. Angelina, Michael E., "The 'Energizer Bunny' of Toxic Torts," *Casualty Insurance,* 2001;

    f. Table 4 in Memo dated April 24, 1998 from Mark E. Lederer, CFO of Manville Trust to Elihu Inselbuch (Bates #CRMC 0168905);

    g. Carroll, Stephen J., *et al.*, "Asbestos Litigation Costs and Compensation, An Interim Report," *RAND Documented Briefing,* 2002, pages 47-48;

    h. "Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trials," NBER Working Paper 9362, Michelle White, December 2002;

    i. *In Re: Silica Products Liability Litigation,* Order No. 29: "Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions," (hereafter, "Order No. 29");

7. Letter from Robert A. Falise to Honorable Jack. B. Weinstein and Honorable Burton R. Lifland, dated February 28, 2007, available at http://mantrust.org/FILINGS/4thqtr06.pdf. Mealey's Litigation Report Asbestos, 1 (2002), Volume 17, Issue #7, Kilough, v. Brown & Root Inc., et al., No. 98-27940;

8. Treasury Yield Methodology at http://www.ustreas.gov/offices/domestic-finance/debt-management/interest-rate/yield.shtml and http://www.treas.gov/offices/domestic-finance/debt-management/interest-rate/yieldmethod.html;

9. Frank J. Fabozzi, "The Handbook of Fixed Income Securities," McGraw Hill, 2005, p. 207;

10. NERA proprietary data for asbestos defendants; and

11. SEC Filings from 2001-2006 for asbestos defendants.

    My CV is attached as Exhibit 1 and an appended list of materials considered is included as Exhibit 2.

## III. IS A TORT SYSTEM FORECAST RELEVANT?

As stated in his report, Dr. Peterson's intent is to estimate Grace's liability as if Grace were still going to be resolving its asbestos litigation in the tort system. If the Court in this matter concludes that the appropriate approach to estimation is to evaluate liability in the bankruptcy setting and not in the tort system, Dr. Peterson's approach will not be relevant. For example, lax guidelines for evidence on injury and exposure, which have been a feature in the tort system, may not be a feature of post-bankruptcy adjudication. If so, the best estimate of the number of future claims found to be valid by post-bankruptcy procedures would be substantially smaller than an estimate based on claims that had positive tort values pre-bankruptcy.

History demonstrates that claims in the federal system are handled differently than those in state court. For example, federal multi-district litigation (MDL) courts have had the effect of consolidating proceedings. Federal courts also have imposed strict medical criteria, allowing for the prioritization of cases. Since 1992, for example, all federal court asbestos cases have been subject to an order dismissing the claims of those who cannot produce evidence of impairment caused by asbestos.[1] Recent federal rulings have reinforced this stance. For instance, in January 2003, Judge Weiner of the MDL 875 docket operating in the Eastern District of Pennsylvania ordered that all non-malignant, asbestos-related personal injury cases assigned to the MDL docket and initiated through a mass X-ray screening would be subject to administrative dismissal without prejudice, with the tolling of all applicable statutes of limitations.[2] In the MDL 875 docket, plaintiffs must now provide evidence of impairment before claims are reinstated. In his order, Judge Weiner explained that, "the filing of mass screening cases is tantamount to a race in the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs."[3] Judge Weiner

---

[1] Behrens, Mark A., "Asbestos and Silica Litigation Reform: Helping the Sick, Curbing Fraud, and Providing Liability Fairness", *The State Factor (American Legislative Exchange Council)*, February 2007.

[2] "MDL Judge Issues Order to Administratively Dismiss X-Ray Screening Cases," *Mealey's Litigation Reporter: Asbestos,* Vol. 17, Issue 1, February 1, 2002. Mass screenings were typically an arrangement between a plaintiff's attorney and a union where mobile vans with x-ray and pulmonary function testing would screen workers at a plant and sign the worker up with the attorney for the purpose of making claims on asbestos defendants.

[3] *Ibid.*