# EXHIBIT 9

# TEXAS OCCUPATIONAL MEDICINE INSTITUTE

Diagnostic Practices in a Litigation Context:

## Screening Companies

And

## The Doctors They Employed

By

**Steven E. Haber, M.D., F.C.C.P.**

**June 11, 2007**

### Introduction

In connection with the W.R. Grace bankruptcy, I have evaluated the reports and diagnostic practices of various doctors who have submitted medical records or reports in support of Grace claimants. I have also evaluated the methodologies of these physicians and the screening companies who employed them. I also reviewed deposition transcripts, court documents and other materials.

The doctors I have evaluated were: Dr. James Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Glyn Hilbun, Dr. Richard Kuebler, Dr. Larry Mitchell, Dr. Barry Levy, Dr. George Martindale, Dr. Gregory Nayden, Dr. Walter Allen Oaks, Dr. Robert Altmeyer, Dr. Jeffrey Bass, Dr. Richard Levine, Dr. Jay Segarra, Dr. Dominic Gaziano, Dr. Alvin Schonfeld, Dr. Leo Castiglioni, Dr. Phillip Lucas, Dr. Robert Mezey, Dr. James Krainson, Dr. Paul Venizelos and Dr. Robert Von McGee. These are all medical doctors, holding either a Doctor of Medicine ("M.D.") or a Doctor of Osteopathic Medicine ("D.O.") degree. Some are specialists, such as a pulmonologist or a radiologist, and some hold Board certification. These doctors purport to diagnose asbestos-related disease, or issue reports which function as diagnosing reports, in a litigation context.

There are accepted medical and scientific methodologies and standards that apply to all physicians. These include rules on physician behavior and ethical matters. For instance, the American Medical Association ("AMA") has published its Code of Medical Ethics (Code of Medical Ethics of the American Medical Association: Current Opinions with Annotations, 2006-2007, council on Ethical and Judicial Affairs). State Medical Boards also have specific conduct rules for their physicians. Many medical specialty groups, such as the American College of Chest Physicians ("ACCP"), the American Thoracic Society ("ATS"), the American College of Radiology ("ACR"), the American Board of Medical Specialties ("ABMS"), and others, publish practice and ethics guidelines/standards. There are also standards for clinical and diagnostic situations. For example, the ATS has published Standards for the performance and interpretation of Pulmonary Function Testing ("PFTs"). The International Labour Office ("ILO") has Guidelines for the classification of radiographs for pneumoconioses. The National Institute for Occupational Safety and Health

("NIOSH"), the governing body for the "B" reader program in the United States recently published ethical guidelines for "B" readers (see below). These standards, rules and guidelines govern the physician's practice and provide a paradigm to evaluate a doctor's methodology and behavior.

A number of asbestos Trusts have concluded that many of these doctors are unreliable or unqualified and have ceased accepting their medical reports or conclusions in support of claims. These doctors include: Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. A. Harron, Dr. R. Harron, Dr. Hilbun, Dr. Kuebler, Dr. Mitchell, Dr. Levy, Dr. Martindale, Dr. Nayden and Dr. Oaks. These Trusts have suspended acceptance of a number of these doctors, and many of the screening companies the doctors had affiliations with, from submitting any materials in support of claims. Some of these screening companies include N&M, Inc., Respiratory Testing Services, Occupational Diagnostics, Pulmonary Testing Services, Pulmonary Advisory Services, Healthscreen, American Medical Testing and others. (*See* CRMC 9/12/05 Suspension Letter; Celotex 10/18/05 Suspension Letter; Eagle Pitcher 10/19/05 Suspension Letter; Keene 4/3/06 Suspension Letter; Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com; Stipulation of Settlement and Order, *In Re: Manville Personal Injury Settlement Trust Medical Audit Procedures Litigation* at ¶ 1 (f)(i), Master File No. 98 Civ. 5693, May 20, 1999 (E.D. and S.D. York); David Austern 9/24/02 Memorandum, CRMC, Suspension of Acceptance of Medical Records Prepared by Dr. Gregory Nayden and American Medical Testing Facility.)

Many of these doctors have begun to distance themselves from their diagnoses and opinions, including Dr. Altmeyer, Dr. Bass, Dr. Levine, and Dr. Segarra. Many have disavowed their diagnoses or claimed they never made diagnoses of asbestos-related disease. Therefore, in my opinion, one should not interpret as diagnostic the reports authored by these doctors purporting to render diagnoses.

Many of these doctors used improper or scientifically unsound methods and practices, and this, in part, contributed to trusts no longer accepting their medical reports or conclusions in support of claims. Such practices are inherently unreliable and do not adhere to accepted medical and scientific standards and guidelines. Some doctors used the same or similar

practices as the doctors suspended by trusts, including Dr. Gaziano, Dr. Schonfeld, Dr. Lucas and others. Others based their reports upon similarly unreliable information. Some doctors relied on the medical reports or conclusions of those suspended doctors or screening companies in preparing their reports.

There are doctors who have worked extensively with companies who performed mass screenings for occupational lung disease injuries in a litigation context. Examples of such doctors include Dr. Castiglioni, Dr. Mezey, Dr. Krainson, Dr. Venizelos, and Dr. Von McGee. These companies utilized unreliable practices. Many of the doctors affiliated with these companies generated impossibly large numbers of diagnosing reports.

Below is a discussion of these doctors, their affiliations with screening companies and their practices and methodologies. In addition, please refer to the reliance materials for additional background and support for my analyses of these doctors and screening companies.

## Background – Diagnostic Medical Tests

X-ray radiation is a form of ionizing radiation that is potentially dangerous. State, federal and local governments regulate the use of medical x-ray equipment. Accidental x-ray exposure or inadvertent over-exposure can lead to damage of skin, bones, eyes and other organs. When instruments have a radiation leak, the path of radiation can occur in unexpected directions. X-ray beams can bounce off surfaces and bend around corners. Authorized users of x-ray equipment should be knowledgeable about radiation safety. Furthermore, they should have appropriate training and licensure. Mobile vans equipped with x-ray equipment should have proper structural shielding.

The decision to have an x-ray is a medical one, based on the likelihood of benefit from the exam and the potential risk from radiation. With proper medical supervision, the patient should have exposure to the minimum amount of radiation necessary to obtain the needed test. X-ray technicians should follow accepted protocols, including for equipment calibration, maintenance and patient exposure.

When performing x-rays for pneumoconiosis evaluation, it is important that the radiographer produce good quality x-rays for the reader. The technique and equipment used for chest x-ray imaging for pneumoconioses can influence the ILO classification (*Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses* - Revised Edition 2000 at 15). According to the ILO Guidelines, the radiographer must be "well trained and supervised" (*id.*) The ILO notes that the radiographer and physician/reader should establish and maintain good communication (*id.*). To ensure improvement in any suboptimal images, the physician should provide feedback to the radiographer and advise him or her on quality control issues (*id.*). The ILO also notes, "Physicians and radiographers should take cognizance of local regulations" (*id.*).

Performing PFTs includes a battery of tests aimed at evaluating the functioning of the lung. Test subjects are required to exhale forcibly, strain, pant, hold their breath, and other maneuvers. PFT testing can be physically demanding. In the setting of recent myocardial infarction, severe hypertension, recent eye surgery, hypoxemia, or current cardiac chest pains, there is potential danger to the patient when performing this testing. In addition, there are conditions where testing is unlikely to provide optimal or reliable results, such as confusional state, recent stroke, abdominal pain and oral or facial pain. Certain medications, such as bronchodilators, can interfere or affect testing. The technician should be aware of testing contraindications and conditions that might adversely affect the results.

Testing subjects should preferably avoid certain activities before testing. These include smoking, consuming alcohol, eating a large meal, performing vigorous activity, and wearing constrictive clothing (Miller M.R., Crapo R., et al, "Series ATS/ERS Task Force: Standardization of Lung Function Testing – General considerations for lung function testing," Eur. Resp. J. 26 at 153-161 (2005)). The patient should receive appropriate instructions regarding these activities in advance of testing.

PFT technicians should have sufficient education and training to assure that he or she understands the fundamentals of the tests, the common signs of pulmonary diseases and the management of the acquired PFT data (*id.* at 157). Technicians need to be familiar with the theory and practical aspects of all commonly applied techniques, measurements, calibrations, hygiene, quality control and other aspects of testing, as well as having basic

background knowledge in lung physiology and pathology (*id.*). There should be a quality control program in place, including routine monitoring of technician performance, daily instrument calibration, infection-control, and technician continuing education (*id.* at 158).

When performing PFT testing, there is potential for transmission of upper respiratory diseases, enteric infections and blood-borne infections through direct contact (*id.*). There is also potential for transmission of disease through indirect contact, such as tuberculosis, various viruses, and pneumonia (*id.*). The technician should utilize appropriate infection control techniques, to protection against spread of disease to the technician and subsequent test subjects.

As with x-rays, pulmonary testing requires medical order and supervision. Although testing is typically safe, there are risks involved, particularly if testing commences in a patient not recognized as a medical danger. It is important that the physician Medical Director oversee the preparation for, and testing of, the patient.

### Background – "B" Reading

According to the International Labor Office, the ILO classification provides a means for describing and recording systematically the radiographic abnormalities in the chest provoked by the inhalation of dusts. The classification system includes Guidelines and sets of standardized films. In 1974, the NIOSH began the "B" reader program. The intent of the "B" reader program was to insure that physicians using this system are as accurate and precise as possible. The "B" reader certification examination has been in place since 1978. A physician must pass the certification examination to be a "B" reader.

Inter-reader variability occurs when readers disagree amongst themselves on a classification. Intra-reader variability occurs when a reader classifies a radiograph differently on different occasions. Reader variability is one of the factors that prompted the ILO to develop the classification system and was a catalyst for NIOSH's development of the "B" reader program.

NIOSH notes that when excessive, reader variability can reduce the utility of the data. Systematic variation between readers, in which one reader consistently reports more or less abnormality than another, is related to bias, according to NIOSH. Bias can occur when readers have information concerning the radiographs they are classifying, by consciously or unconsciously influencing their classifications. NIOSH cites knowledge of worker exposure as an example of such information. Knowing that x-rays are from a plaintiff's lawyer could also introduce bias.

NIOSH has established a "B" reader code of ethics (www.cdc.gov/niosh/topics/chestradiography/breader-ethics.html). They state that it is "critical" that "B" readers perform classifications "properly and with integrity." "B" readers should be "honest and objective." NIOSH states that "B" readers should report "individuals or enterprises that they know to be deficient in character or competence, or engaging in fraud or deception." If providing testimony, a "B" reader should be "unbiased, medically and scientifically correct, and clinically accurate." NIOSH states that "B" readers should not accept compensation that is contingent upon the findings of their chest x-ray classification.

Joseph Gitlin, et al published the results of a study comparing the radiographic interpretations by "B" readers retained by lawyers in asbestos litigation ("initial readers") compared to those from an independent blinded panel of B-readers. (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for asbestos related changes," Acad. Radiol. 11 at 843-856 (2004).) The stated purpose of the study was to determine if a group of independent consultant "B" readers would confirm the chest radiograph interpretation by physicians retained by attorneys representing persons alleging asbestos disease. The authors reported, "A small number of B readers has made a reputation with attorneys by consistently interpreting chest radiographs of asbestos claimants as positive in 90-100% of cases" (*id*). Gitlin, et al found that of 551 chest x-rays, initial readers read 95.9% as positive (1/0 profusion or higher), whereas the panel interpreted the same x-rays as positive in only 4.5% (*id.*). This is an exceptionally high rate of disagreement with the panel readers and suggests inaccuracies and bias by the initial readers. The authors concluded that the magnitude of the difference was "too great" for expected inter-reader variability and that there was "no support in the literature" for the high level of positive readings by the initial readers (*id.*).

4e3a3aef15a8f43b

Gitlin, et al stated that "initial' readers had over 2000 times greater odds of reporting a chest radiograph as positive (1/0 or greater) than a consultant reader (*id.*). The authors concluded, "This suggests there is essentially no agreement between consultants and initial readers in small opacities profusion rating" (*id.*). The "initial" readers referenced in the Gitlin report include Dr. Ballard, Dr. Ray Harron, Dr. Levine, Dr. Segarra, Dr. Gaziano and Dr. Lucas (Gitlin Affidavit *In Re Owens Corning, November 10, 2004* at 10).


### Background – Screenings

The principal purpose of medical screening of an individual is to detect as early as possible evidence of disease in at-risk individuals. Proper medical screening should be objective, comprehensive and meaningful. Testing should be without preconceived notion of outcome. Only experienced and qualified physicians, using standardized tools, should perform and interpret medical screening. The physician screener should be thorough and complete. To be meaningful, participants in screenings should receive clear communication from the doctor, including information on preventative action and follow-up (for all discovered abnormalities). There should be timely disclosure of results to the patient by the physician and appropriate patient education.

So-called "drive-by" screenings, conducted by, or on behalf of, attorneys for litigation, have given medical screening a bad name. Such screenings use non-standardized or flawed methods, do not clearly communicate results to individuals, and provide no preventative care or patient education. It is even worse when there is misinterpretation or misuse of data to support a particular diagnosis.

The Association of Occupational and Environmental Clinics ("AOEC") have published on the principles and guidelines of asbestos screening (www.aoec.org/priciples.htm). They noted a general concern that "medically inadequate screening tests are being conducted to identify cases of asbestos-related disease for legal action." They further stated, "These tests do not conform to the necessary standards for screening programs conducted for patient care and protection." The AOEC voiced concerns over the use of brief and/or non-standardized questionnaires, reliance on x-

rays and pulmonary function tests of variable quality, lack of objective interpretation, and diagnoses based on insufficient data. Other concerns for the AOEC included the failure to clearly communicate findings to patients, failure to properly follow-up regarding asbestos- and non-asbestos -related diseases, and the lack of attention to patient education and disease prevention.

Other issues regarding these screening companies include lack of medical oversight, performance of medical testing without physician order or proper licensure, use of untrained personnel, lack of safety controls, incomplete testing, and financial incentives toward bias. Many of these screening companies perform high volume testing, with the goal of signing up clients for attorneys. Numerous trusts have ceased accepting any reports generated from a number of these screening companies.

### N&M, Inc.

N&M is, in effect, a spin-off of Pulmonary Testing Services ("PTS") (see below). Heath Mason and Molly Netherland are the founders of N&M. Both had worked for Jerry Pitts at PTS before the Owens Corning fraud and RICO lawsuit in 1996 caused that entity to shut down. (*See* Complaint, *Owens Corning v. Pitts, et al*, No. 96-2095 (E.D. La June 19, 1996).) Heath Mason is Jerry Pitts' step-grandson. N&M started up in July 1996, one month after PTS ceased doing business. (Mason 7/8/03 Dep. at 22, 29-32.) N&M incorporated in Mississippi, and conducted screenings in numerous states and U.S. territories. (*See* N&M QuickBooks Report, Sales by Item Summary, produced in *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553.) N&M screened over 40,000 individuals and grossed over $25 million. (*See* N&M QuickBooks Report, Sales by Firm Summary; N&M Profit and Loss Statement produced in *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553.) Neither Heath Mason nor Molly Netherland had qualifications or training for medical work. (Netherland 4/22/96 Dep. at 69; Mason Testimony, *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings, at 268-69 (S.D. Tex. Feb. 17, 2005).) Before forming N&M, Mason had worked for two years at PTS and Netherland had provided x-ray services for Jerry Pitts.

N&M often performed more than 100 screenings daily. (*The Silica Story: Mass Tort Screening and the Public Health*, Hearings before Subcommittee on Oversight and Investigation of the Committee of Energy and Commerce, House of Representatives, 109th Congress at 132 (March 8, 2006).) Its pulmonary function technicians had no formal training, certification or licensure to perform lung volumes or diffusion testing. The technicians performed the entire testing in 15 minutes. (Mason 7/8/03 Dep. at 311-13, 42-43.) N&M technicians did not conform to time requirements of the ATS to avoid interference between testing. They also never tested with bronchodilators for airflow obstruction, as required by the ATS. (*See* Mason testimony, *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings, at 268-69 (S.D. Tex. Feb. 17, 2005).) Some technicians performed between 50 and 100 tests in a single day. (Mason testimony, *The Silicosis Story: Mass Tort Screening and the Public Health*, Hearings before the Subcommittee on Oversight and investigations of the Committee on Energy and Commerce of the House of Representatives, 109th Congress, 2d Session (March 8, 2006).) They used unacceptable sampling for diffusion testing, resulting in falsely lower results. (*See* generally N&M Claimant PFT examples in reliance materials.) There was no physician oversight of pulmonary function testing. (Mason 7/8/03 Dep. at 160-61.) There was no physician prescription for pulmonary function testing. (*Id.* at 216-17.)

After arriving at a screening, a representative from the law firm signed up the individual and he or she then had a chest x-ray. (*In re Silica Prods.Liab.Litig.*, 398 F. Supp. 2d 563, 601 (S.D. Tex. 2005).) There was no physician oversight and no physician order for the x-rays. (*See* Mason testimony, *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings, at 271 (S.D. Tex. Feb. 17, 2005).) The x-ray technician, Pamela May, was not aware of the ILO guidelines for taking x-rays and did not correct for quality errors, such as mottle (May 3/27/07 W. R. Grace Dep. at 52).

Numerous doctors have worked with N&M, including Dr. Ray Harron, Dr. Andrew Harron, Dr. Castiglioni, Dr. Martindale, Dr. Venizelos, Dr. Levine, Dr. Oaks, Dr. Mezey, Dr. Krainson, Dr. Gaziano, Dr. Altmeyer, Dr. Hilbun, Dr. Cooper, Dr. Lucas, and Dr. Segarra. (*See, e.g.,* QuickBooks reports, N&M Payments to Altmeyer, A. Harron, R. Harron, and Gaziano, produced in *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553.) Many of these physicians have disavowed their diagnoses, had their reports

deemed unacceptable by trusts or courts, and/or taken the Fifth Amendment
when now asked about their practices with N&M. (*See* individual
discussion of doctors below.) Numerous trusts have disallowed medical
records and reports generated through N & M. These include CRMC,
Celotex, Eagle-Picher, Babcock and Wilcox, Plibrico and Keene. (CRMC
9/12/05 Suspension Letter; Celotex 10/18/05 Suspension Letter; Eagle
Picher 10/19/05 Suspension Letter; Keene 4/3/06 Suspension Letter; *see also*
Plibrico Trust on Physician and Screening Complaints at www.verusllc.com;
Babcock and Wilcox Trust's distribution procedures at
www.bwasbestostrust.com.)  Courts have also deemed N&M generated
materials unacceptable. (*See* Order 29, *In Re: Silica Prods.Liab.Litig.*, 398
F. Supp. 2d at 596-604 (S.D. Tex. Feb. 17, 2005).) Some judges have
referred to work by N&M as fraudulent. (*See* 1/20/06 Hearing Transcript,
*Clancy Comans v. American Optical Corp., et al.*, Case No. 05-002855 (Cir
Ct. Broward County, Fla.) Certain individuals associated with N&M,
including Heath Mason, Rhonda Mason and Dr. Ray Harron, pleaded the
Fifth Amendment when questioned about their practices in connection with
N&M. (*See, e.g.* H. Mason 2/27/07 W.R. Grace Deposition; R. Harron
12/15/05 W.R. Grace Deposition; *see also* R. Mason 12/15/06 W.R. Grace
Deposition; A. Harron 1/12/06 W.R. Grace Deposition.)

After performing screenings, N&M did not notify any governmental
agencies as might be required by law when diagnosing asbestosis. (*See In
Re: Silica Prods.Liab.Litig.*, 398 F. Supp. 2d at 635 (S.D. Tex. Feb. 17,
2005).) The diagnosing doctors did not consider those screened as patients
and did not perform patient education or disease prevention, or arrange
appropriate follow-up for medical conditions. (*See, e.g.*, Mason 7/8/03 Dep.
at 87; Mezey 10/18/04 Dep. at 12; Altmeyer 3/30/06 Dep. at 16-17; *see also*
Harron 9/28/04 Dep at 104; Martindale 10/29/04 Dep at 66; see *also* N&M
Physician-Patient Waivers, produced in MDL 1553-N&M -63025, 521099,
49631.)

In summary, N&M began as a virtual spin-off from another entity
associated with unreliable or questionable screening practices. Its principals
had no medical education, training or qualifications to operate a service
administering medical testing. N&M produced poor quality pulmonary
function testing and chest x-rays. It used untrained personnel and did not
follow accepted medical standards. The N&M technician performed x-rays
without a physician order. Medical testing was without appropriate

physician order or supervision.  There was lack of attention to patient education and disease prevention.  There was poor communication of findings to patients and no appropriate medical follow-up.  Diagnoses were based upon insufficient data and many of the physicians subsequently disavowed their diagnoses.  Many of those associated with N&M, including the physicians and owners, have pleaded the Fifth Amendment regarding their work practices for this company.  Numerous trusts and courts ceased accepting reports from N&M work.  In my opinion, the work performed by N&M, Inc. and all reports generated on behalf of N&M or based upon N&M data, are unreliable because of its failure to comply with accepted medical and scientific methodologies.  N&M does not meet acceptable standards for medical screening, in my opinion.

### Respiratory Testing Services ("RTS")

RTS was based out of Mobile, Alabama.  It performed screenings in approximately 35 states, and for at least 75 different plaintiffs' law firms. (*See* Certain Defendants' Combined Motion and Brief to Exclude Diagnostic Materials Created by Respiratory Testing Services, Inc., and to Dismiss Claims of Plaintiffs Relying on Same, *In Re: Asbestos Prods.Liab.Litig* (No. VI), 8, Case No. MDL 875 (E.D. Pa., April 3, 2007).)  It performed screenings in states without licensure or Health Department authorization, including Mississippi, Texas, and Ohio.  (*See* Testimony of Texas and Mississippi radiological control officers, Robert W. Goff (Director, Division of Radiological Health, Mississippi Department of Health) and Richard A. Ratliff, P.E., L.M.P., (Radiation Control Officer, Division of Regulatory Services, Texas Department of State Health Services), *The Silicosis Story: Mass Tort Screening and the Public Health*, Hearings before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, 109th Congress, 2d session at 236 (June 6, 2006).)  In total, it screened over 40,000 individuals.

The owner of RTS was Mr. Charles Foster.  Mr. Foster had no medical background or training.  (Foster 8/6/02 Dep. at 214-15.)  Before starting RTS, he worked for PTS, a screening enterprise owned by Mr. Jerry Pitts (see above).  (Complaint, *Owens Corning v. Pitts, et al.*, No. 96-2095 (E.D. La June 19, 1996).)  Mr. Foster began RTS in 1994.  (Foster 8/6/02 Dep. at 127, 222.)  Mr. Foster had union ties from his previous work as a

pipefitter. Mr. Foster or other RTS representatives attended union meetings and solicited union officials on behalf of Michael Fitzgerald, a plaintiff's attorney in asbestos litigation. (Foster 8/6/02 Dep. at 149-52; *see also* Certain Defendants First Amended Supplemental Brief in Response to Plaintiffs' Challenge to the Constitutionality of the ASCFA, Ponder v. Amer. Optical Corp., filed October 25, 2006, Case No. 03-09423-AI (Cir. Ct., 15th Judicial Cir., Palm Beach Cty., Fla.).) Mr. Fitzgerald prepared a "request form" for the union official to sign, whereby avoiding ethical complications by having it appear that the screening was union-sponsored. (*See id.; see also* Fitzgerald 3/4/99 letter to Foster.)

Mr. Foster's apparent business plan for RTS was to find twenty positives among a screening of fifty people. (Foster testimony, *In re Silica Prods.Liab.Litig.*, Docket No. MDL 1553, *Daubert* Hearing, at 169-70 (S.D. Tex. Feb. 18, 2005); Foster 3/10/04 Dep. at 112-13.) Analysis of records suggests that RTS obtained a 40-50% positive screening rate. (*See* Certain Defendants' Combined Motion and Brief to Exclude Diagnostic Materials Created by Respiratory Testing Services, Inc., and to Dismiss Claims of Plaintiffs Relying on Same, *In Re: Asbestos Prods.Liab.Litig.* (No. VI), 8, Case No. MDL 875 (E.D. Pa., April 3, 2007); Foster Testimony, *In Re: Silica Prods.Liab.Litig.*, Docket No. MDL 1553, *Daubert* Hearing, at 169-70 (S.D. Tex. Feb. 18, 2005).)

Mr. Foster hired Dr. Jay Segarra as Medical Director. (Foster testimony, *In re Silica Prods.Liab.Litig.*, Docket No. MDL 1553, *Daubert* Hearing, at 174 (S.D. Tex. Feb. 18, 2005).) Dr. Segarra worked for RTS from 1994 until 2000 and then occasionally from 2003 until 2005. (Segarra W.R. Grace 11/20/06 Dep. at 20-21; *see also* Segarra 10/14/02 Dep. at 278.) Dr. Segarra denied having been the RTS Medical Director, but did admit to overseeing x-ray performance and supervising pulmonary function testing at times. (*Id.* at 18, 91.) Over a six-year period, Dr. Segarra received approximately $1.5 million for his work for RTS. (*See* Segarra 11/20/06 W.R. Grace Dep. at 126-29.) Other physicians who worked for RTS include Dr. Altmeyer, Dr. Gaziano, Dr. Ballard, Dr. Mezey, Dr. Krainson, Dr. Nayden, Dr. Oaks, and Dr. Schonfeld. (*See* Nayden 3/28/02 Dep at 77-78; Altmeyer, 3/30/06 Dep. at 48, 50-51; Foster 9/27/04 Dep. at 165 (regarding Altmeyer, Oaks, Gaziano), 140-41 (regarding Mezey), 158 (regarding Ballard); *see also* Krainson 2/1/05 Dep. at 15.)

During the screening, the attendee would first see the RTS Testing Manager. This person would determine whether he or she met the sponsoring attorney's screening criteria. (Foster 9/27/04 Dep. at 143-44.) Next, the sign-in person obtained a brief work history and went over requests for x-rays and PFTs. (*Id.* at 148-50.) The sign-in person had no medical training or background. (*Id.* at 116.) No doctor ordered the medical testing. The person had medical testing performed before even seeing a physician. (*Id.*) According to Mr. Foster, the patient was who requested the x-ray. (*Id.* at 150.) At times, however, RTS sometimes used a blank x-ray order form from Dr. Segarra (*see* Blanket Order signed by Dr. Jay Segarra; *see also* Testimony of Texas and Mississippi radiological control officers, Robert W. Goff (Director, Division of Radiological Health, Mississippi Department of Health) and Richard A. Ratliff, P.E., L.M.P., (Radiation Control Officer, Division of Regulatory Services, Texas Department of State Health Services), *The Silicosis Story:  Mass Tort Screening and the Public Health*, Hearings before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, 109th Congress, 2d session, at 238 (June 6, 2006).)

The majority of the PFT technicians working for RTS were unlicensed and uncertified. (Foster 9/27/04 Dep. at 22-23; Gaziano 12/14/05 Dep. at 94-95.) They did not perform testing with bronchodilators in the presence of airflow obstruction, as would be required by the American Thoracic Society. (Gaziano 12/14/05 Dep. at 122-24.)

After the chest x-ray (typically done in a mobile van (*see* photographs of RTS x-ray van identified in reliance materials) and the pulmonary function testing were completed, the individual went for a physical examination. (Foster 9/27/04 Dep. at 155-56.) The physical examinations were usually cursory and took only a few minutes. (*See In Re: Silica Prods.Liab.Litig.*, 398 F. Supp. 2d at 587, 632 (S.D. Tex. 2005).) After the examination, the person either went home or met with the attorney, who was present at the screening to sign up prospective clients. (Gaziano 12/14/05 Dep. at 122-24.)

Numerous trusts suspended acceptance of work generated through RTS. These include Keene, CRMC, Celotex, Eagle-Picher, Plibrico, and Babcock and Wilcox. (*See* CRMC 9/12/05 Suspension Letter; Celotex 10/18/05 Suspension Letter; Eagle Picher 10/19/05 Suspension Letter;

Keene 4/3/06 Suspension Letter; Plibrico Trust on Physician and Screening
Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution
procedures at www.bwasbestostrust.com.) In addition, Mr. Charles Foster,
the RTS owner, now asserts the Fifth Amendment when questioned about
his practices. (Foster 10/27/06 W.R. Grace Deposition; Foster testimony,
*The Silicosis Story: Mass Tort Screening and the Public Health,* Hearings
Before the Subcommittee on Oversight and Investigations of the Committee
on Energy and Commerce, House of Representatives, 109th Congress, 2d
Session, at 264 (June 6, 2006).) Physicians such as Dr. Ballard have taken
the Fifth Amendment regarding the practices of RTS and their work with
RTS. (*See* Ballard 2/22/07 W.R. Grace Dep. at 46.) Many of the doctors
affiliated with RTS have disavowed or distanced themselves from their
asbestos-related diagnoses. (Oaks 3/9/06 W.R. Grace Dep. at 93, 149-50;
Nayden 3/28/02 Dep. at 164-65.)

The RTS methodology was to perform the entire screening on one
day. There was a financial incentive for the physician reading the x-ray to
read it as positive because he would then get more money for doing the
physical examination as well. Dr. Schonfeld reportedly told Mr. Foster that
this was unethical and was the reason that Dr. Schonfeld purportedly
stopped working for RTS. (Schonfeld 6/21/04 Dep. at 83.) Such a process
introduces bias at the "B" reading stage if there is an incentive for the reader
to find positives.

In summary, reports and materials generated through RTS are
untrustworthy. After working for Jerry Pitts, Mr. Foster started RTS. He
had no medical education or background. RTS used untrained and
uncertified, non-medical personnel for medical testing. RTS performed
without the order of a physician, violating certain state laws. It performed
screenings without state permission. Many of the doctors RTS used were
unlicensed in the states where the screenings occurred. Its methodology
introduced potential bias into the "B" reading. The diagnosing physicians
relied on poor quality medical testing, histories obtained by non-medical
personnel, and cursory physical examinations. There was a lack of attention
to patient education and disease prevention. There was a general failure to
communicate findings to patients and to arrange appropriate follow-up for
medical conditions. RTS or its physicians did not report positive asbestosis
diagnoses to the appropriate governmental agencies, as required by law in
those states. Generally, the physician based the asbestos disease diagnosis

on insufficient data and many of the physicians subsequently disavowed
their diagnoses. Many of those associated with RTS, including Mr. Foster
and some physicians, have pleaded the Fifth Amendment regarding their
work practices for this company. Numerous trusts suspended acceptance of
work performed by RTS and various courts (including courts in Washington
and Florida) have disallowed RTS records. The methods of RTS are under
federal grand jury and congressional investigation. In short, in my opinion,
the work performed by RTS and all reports generated on behalf of RTS or
based upon RTS data, are unreliable.


### Healthscreen, Inc.

Healthscreen, Inc. was a screening company run out of Jackson,
Mississippi from 1998 until 2004. (Jamison 9/27/05 Dep at 28.) In total,
they screened approximately 21,000 people in thirty states. (*See* Pulmonary
Function Test Customer Listing, produced by Healthscreen in *In Re: Silica
Prods.Liab.Litig.*, MDL Docket No. 1553, (S.D. Tex.); Jamison 9/27/04
Dep. at 246.) According to Jack Jamison, the diagnoses that Healthscreen
provided were prepared for litigation purposes only (Jamison 9/27/05 Dep.
at 93; Bass 5/10/03 Dep. at 32, 56-57). Dr. Bass was the Medical Director
of Healthscreen until Dr. McGee replaced him in 2000 (Bass 5/10/03 Dep. at
42; *see also* discussion of Drs. Bass and McGee below).

Healthscreen conducted its evaluations, including pulmonary function
testing and physical examinations in hotel and motel rooms. These were
sometimes administered in the same room that the physician or technician
slept in (Bass 5/10/93 Dep. at 87-88; Jamison 9/27/05 Dep. at 115; Craft
Dep. 01/29/03 at 52). The law firms provided the lists of clients to screen
(Craft 1/29/03 Dep. at 56) and attorneys would sometimes be present at the
screening (Bass 5/10/03 Dep. at 88; Jamison 9/27/05 Dep. at 117-20).

The exposure histories came from law firms (Jamison 9/27/95 Dep. at
120) or Healthscreen "greeters" (Bass 5/10/93 Dep. at 70). According to Dr.
Bass, the exposure histories were devoid of details (Bass 5/10/93 Dep. at Ex.
10).

Healthscreen performed x-rays of individuals before a physician
examined them (Craft 1/29/03 Dep. at 54). A Healthscreen technician

administered the x-rays in a mobile unit (Jamison 9/27/05 Dep. at 113).
According to Mr. Jamison, the law firms requested the x-rays (*Id.* at 148-
149). A physician did not order the x-ray. (*Id.*)

Healthscreen performed pulmonary function testing on individuals
without physician order (*Id.* at 150). The pulmonary function technicians
were not licensed (Craft 1/29/03 Dep. at 9; Pickering 1/29/03 Dep. at 57;
Moran 1/29/03 Dep. at 20-21). As with the x-rays, it was the law firm
requesting the pulmonary function test (Bass 1/30/03 Dep. at 25; Jamison
9/27/05 Dep. at 149-152). The pulmonary function technician often had no
experience with pulmonary function testing (Moran 1/29/03 Dep. at 11-12;
Shelton 1/29/03 Dep. at 12-13).

The CRMC stopped accepting reports prepared by Healthscreen, Inc.
in September 2005 (CRMC 9/12/05 Suspension Letter). David Austern, the
President of CRMC, noted issues of unreliability and alleged fraud. (*Id.*)
Dr. Bass, the Healthscreen Medical Director affirmed in his affidavit that he
never diagnosed any individual with asbestosis (*see* Bass 1/25/05 Affidavit;
see *also* discussion of Dr. Bass below).

In summary, Healthscreen performed testing of thousands of
individuals for the sole purpose of litigation. It used untrained and
unqualified technicians and performed medical testing and examinations in
hotel and motel rooms. Healthscreen tested individuals without physician
orders or oversight. Healthscreen's exposure histories were devoid of detail,
according to its own former Medical Director. The CRMC has suspended
allowing Healthscreen work and its former Medical Director has disavowed
his diagnostic reports. There is no evidence that this company provided
proper attention to patient education and disease prevention. There is also
no evidence of proper medical follow-up. Diagnoses were based on
insufficient data and physicians did not perform the proper differential
diagnosis. Healthscreen does not meet accepted medical standards for
medical screening, and in my opinion, work affiliated with Healthscreen is
unreliable.

### American Medical Testing ("AMT")

AMT was created solely for litigation purposes. Its only source of income was plaintiff law firms. Guy Foster started AMT in 2000. (Guy Foster 12/12/01 Dep. at 62.) He obtained his experience with screening companies while working for RTS and his uncle, Charles Foster. (*Id.* at 59.) Between March 2000 and December 2001, AMT evaluated somewhere between 12,000 and 14,000 individuals. (*Id.* at 111.) Guy Foster had previously worked at a grocery store and had no medical training or education. (*Id.* at 55-57) AMT hired Dr. Gregory Nayden as their Medical Director (Nayden 9/28/05 Dep. at 26; *see also* discussion of Dr. Nayden below).

AMT often conducted its services at motels (Guy Foster 12/12/01 Dep. at 48). Law firms often provided AMT with "B" readings and exposure histories. (*Id.* at 72, 215.) These "B" readers included Dr. Ballard, Dr. Schonfeld, and Dr. Lucas (*see* further discussion of these doctors below).

On average, AMT screened 50 to 65 individuals daily (Nayden 3/28/02 Dep. at 88). AMT screened individuals based upon chest x-rays performed without a physician's order. (*See, e.g.*, 1/8/01 Order, South Carolina Department of Health and Environment.) Although Dr. Nayden diagnosed every patient he saw with asbestosis (Nayden 3/28/02 Dep. at 165-66), he later indicated that he had actually never made any diagnosis on any of the 14,000 individuals he evaluated. (Nayden 9/28/05 Dep. at 28-29.)

In September 2002, the CRMC suspended acceptance of medical records prepared by Dr. Nayden and AMT (David Austern 9/24/02 Memorandum, CRMC Suspension of Acceptance of Medical Reports Prepared by Dr. Gregory Nayden and the American Medical Testing Facility). The CRMC concluded that the records from AMT and Dr. Nayden were "bereft of credibility." (*Id.*) They noted that AMT "intake" workers took incomplete and unreliable work and exposure histories, which Dr. Nayden then reviewed. (*Id.*) They also noted inconsistent testimony given by AMT personnel. (*Id.*)

In summary, Guy Foster started AMT in 2000, after working for his uncle Charles Foster at RTS (*see* discussion above on RTS). In less than two years, they screened approximately 14,000 individuals. The CRMC

determined that the reports from AMT and Dr. Nayden had no credibility whatsoever. Dr. Nayden himself has disavowed making any diagnoses of asbestosis. Dr. Nayden had relied on inadequate histories, provided by either attorney firms or unqualified AMT workers. AMT used "B" readers whose work numerous trusts suspended accepting (see below). AMT performed medical testing, such as pulmonary function and x-rays without a physician order. It screened large numbers of individuals on a daily basis. There is no evidence that AMT provided proper attention to patient education and disease prevention or reported asbestosis diagnoses to the proper governmental agency, as required by law in some states. There is no evidence that it performed appropriate medical follow-up or communicated medical findings to those individuals screened. In my opinion, the work done by AMT does not meet acceptable standards for medical screening and work affiliated with AMT is unreliable.

### Pulmonary Testing Services, Inc. ("PTS")

Pulmonary Testing Services, Inc. was based out of Mississippi. Jerry Pitts and his cousin Glenn Pitts ran Pulmonary Advisory Services, Inc. ("PAS") and Pulmonary Advisory Services of Louisiana, Inc. ("PASL"). In August of 1992, Glenn Pitts sold his interests in PASL to Jerry Pitts, who then reincorporated to form PTS. Neither Jerry Pitts nor Glenn Pitts had medical training. PTS operated out of the same location as PASL, used former PASL employees, and former PASL-associated physicians, including Dr. Larry Mitchell and Dr. Richard Kuebler. Dr. Ray Harron also worked for PTS.

PTS provided pulmonary function testing, "B" readings, physical examinations, and diagnostic reports for law firms in an asbestos litigation context. In its four years of existence, PTS screened over 40,000 individuals (and perhaps as many as 100,000). PTS apparently grossed over $25 million during this time. Initially, PTS charged more for a "positive" PFT than for a "negative" PFT. Eventually, PTS did not charge at all for negatives. (*See* Foster 06/04/96 Dep. at 116-17.) This provides a financial bias towards "finding" impairment. PTS tested 50-100 individuals daily. (*Id.* at 111-13.) It only tested individuals who met certain criteria set by lawyers. (*Id.* at 124-39, 187-88.)

In 1996, Owens Corning sued PTS for fraud and violations of RICO. Owens Corning alleged that PTS systematically and deliberately departed from accepted standards in pulmonary function testing with the intent to defraud. They contended that such manipulation overstated pulmonary impairment, regardless of whether any such impairment in fact existed. Owens Corning noted that PTS failed to meet accepted standards for PFTs in over 95% of cases analyzed. Such deviations from standards included markedly shortened expiratory times, lack of acceptability criteria, and lack of reproducibility criteria. (*See Owens Corning v. Pitts, et al,* Civil Action No. 96-2095 (E.D. L.A. June 19, 1996).)

Manville Personal Injury Settlement Trust Medical Audit found that no evidence from either Dr. Richard Kuebler or Dr. Larry Mitchell would be accepted. (Stipulation of Settlement and Order, *In Re: Manville Personal Injury Settlement Trust Medical Audit Procedures Litigation* at ¶ 1 (f)(i), Master File No. 98 Civ. 5693, May 20, 1999 (E.D. and S.D. York).) The CRMC later suspended accepting work from Dr. Ray Harron. (CRMC 9/12/05 Suspension Letter.) Numerous other trusts have also stopped accepting Dr. Harron's work (as noted below).

In summary, PTS performed large numbers of screenings between 1992 and 1996. Owens Corning sued PTS for fraud and violations of RICO. Based upon the allegations in the Owens Corning lawsuit, PTS manipulated the PFT results in such a way to overestimate the presence of a "positive" PFT. PTS had a financial incentive for "positive" screenings. Various trusts have ceased allowing claim submissions to be supported by work from physicians affiliated with PTS. PTS used unacceptable PFT methodology, resulting in a false impression of impairment. In my opinion, the work by PTS, including the physicians affiliated with this company, is unreliable.

### Pulmonary Function Laboratory, Inc. ("PFL")

PFL began doing screenings in 1978. (McNeese 4/22/96 Dep. at 23-27.) By 1988, it only worked for attorneys. (McNeese 3/26/93 Dep. at 20-22.) PFL screened over 14,000 individuals in a period of ten years. (McNeese 4/22/96 Dep. at 172-74.) It had clinics in Alabama, Mississippi, and Ohio. (McNeese 3/26/93 at 37-38.) PFL screened as many as two hundred individuals in a day. (Id. at 13-15.) Doctors who worked with PFL

include Dr. Michael Conner, Dr. Edward Holmes, Dr. Phillip Lucas, Dr. Alvin Schonfeld, and Dr. Jay Segarra. (McNeese 4/22/96 Dep at 109-110, 143; Holmes 4/12/96 Dep. at 42-43; Schonfeld 12/18/06 W.R. Grace Dep. at 219-21; McNeese 3/26/93 Dep. at 33.)

The records indicate that PFL may have received payment on a contingency basis, based upon lawsuit recovery. (*See* Complaint, *Pulmonary Function Laboratory, Inc. v. William Wilson, et al.*, Civ. Act. No. 92-73383 (Cir. Ct. Hinls. Co. MS, Oct. 29, 1992).) Therefore, PFL would receive more money, based upon a larger recovery by the claimant. This would provide a financial incentive for the screening company to "find" more impairment or abnormality.

In 1997, PFL was also involved in Owens Corning's RICO lawsuit, asserting fraud against various doctors and screeners. (*See* Complaint, *Owens-Corning v. William McNeese and Pulmonary Function Laboratory, Inc.*, Civ. Act. No. 3:97 CV 29ws (S.D. MS. Jan. 22, 1997).) Owens Corning alleged that beginning in 1988, PFL generated false medical test results and falsely indicated pulmonary impairment. (*Id.* at ¶ 5.) The allegations involved significant breeches in ATS requirements, including insufficient exhalation times, lack of reproducible testing, acceptance of unacceptable data and submaximal efforts, among others. (*Id.*)

In summary, PFL screened large numbers of individuals in numerous states for litigation purposes. Owens Corning sued them under RICO for alleged fraudulent activities. Trusts have suspended acceptance of medical reports and conclusions of some of the physicians associated with PFL. Some of these same doctors employ improper practices. PFL may have received payment on a contingency basis, leading to bias in finding impairment. Its PFT results do not meet ATS criteria. Based upon the materials I have reviewed pertaining to PFL, the pulmonary function testing it performed was unreliable and did not meet accepted medical standards.

### MOST Health Services, Inc. ("MOST")

MOST was founded in February 1989. (Werner 10/2/00 Dep. at 18-22.) From 1990 until 2000, MOST performed over 400,000 screening x-rays, in almost every state of the Union. (*Id.* at 84-87, 93.) Typically, it

used a mobile trailer set up in the parking lots of hotels or union halls.
(Werner 10/3/00 Dep. at 200-04, 249.) There were many states in which
MOST performed testing without permits or meeting regulatory statutes.
(Werner 10/2/00 Dep. at 96-97.) In 2007, the Department of Environmental
Protection fined MOST for conducting unauthorized x-ray health screenings
in Pennsylvania. (*See* Commonwealth of Pennsylvania Department of
Environmental Protection Release, "DEP Fines Mobile Health Service
Company \$80, 500" (February 7, 2007).)

        Doctors affiliated with MOST included Dr. Richard Levine, Dr. Alvin
Schonfeld, Dr. Robert Steiner (Werner 10/3/00 Dep. at 184-192 (discusses
Levine and Schonfeld performing B-reads); Steiner 7/30/01 Affidavit at 4)
and perhaps Dr. Ray Harron, Dr. Dominic Gaziano, and Dr. Robert Mezey.
(*See generally* MDL 875 MOST production, including reports from Drs.
Harron, Gaziano and Mezey.) Dr. Steiner indicated that he read x-rays for
MOST in the early 1990s. (Steiner 7/30/01 Affidavit at 4.) He stated that in
his experience the film quality was often suboptimal and sometimes
unreadable (*id*). In fact, of a small audit that he performed, over half had
serious technical flaws and one-third was unreadable (*id*). Dr. Steiner also
noted the potential for risk of ionizing radiation to patients and technicians
from MOST's x-ray screenings (*id.* at 5).

        Law firms funded MOST's screenings. Typically, before undergoing
x-ray testing, screened persons would meet with law firm representatives to
sign up in advance with the law firm. (Werner 10/3/00 Dep. at 200-04, 209.)
A MOST technician or helper signed the workers in but did not require
independent verification of identification. (Kemeny 10/12/05 Dep. at 60.)
Requests for testing came from lawyers, not doctors. MOST then sent the x-
rays to a doctor for interpretation. After receiving the test results, MOST
sent a copy to the sponsoring law firm, and would destroy their copy in three
months. (Werner 10/3/00 Dep. at 215.)

        In summary, MOST performed a huge volume of x-ray screenings
from 1990 until 2002. It primarily performed these screenings in mobile
units located at union halls and motel parking lots. MOST performed this
testing without proper permission or quality control. According to Dr.
Steiner, a large number of its x-rays were unreadable. MOST worked with a
number of "B" readers whose reports are no longer accepted by trusts or
deemed unreliable (see discussion below of various doctors). MOST's

Case 01-01139-AMC   Doc 17696-8   Filed 12/21/07   Page 24 of 72

*Diagnostic Practices In A Litigation Context:*
*Screening Companies And The Doctors They Employed* _____ *Page 23 of 71*

screening lacked attention to patient education and disease prevention. There is no evidence that MOST personnel performed appropriate follow-up of medical conditions or communicated findings to the patient. MOST produced poor quality x-rays, potentially endangering people with ionizing radiation. Depending upon the quality defects of the x-rays, this could result in over-reading of abnormality. Based upon my review, I would not rely upon x-rays produced by this company or the reports of physicians reading them because MOST did not conform to accepted medical and scientific methodology and procedures.

### Dr. James Ballard

Dr. Ballard is a radiologist and is currently a NIOSH-certified "B" reader. Dr. Ballard neither holds himself out as a pulmonary expert nor makes clinical diagnoses of occupational lung diseases or lung diseases in general (Ballard 10/22/03 Dep. at 10-11).

I have reviewed a letter from David Austern, the President of Claims Resolution Management Corporation ("CRMC"), and dated September 12, 2005 (9/12/05 CRMC Suspension Letter at 1-2.) He reported that certain doctors and screening facilities were under congressional investigation for alleged fraud and their reliability was the subject of Federal Grand Jury inquiry. Based on the evidence presented in the silica Multidistrict Litigation (MDL), the CRMC found it credible to challenge the reliability of their reports. As a result, the CRMC (Johns Manville trust) would reject any reports prepared by these doctors and facilities. (*Id.*) Furthermore, the CRMC had not received any information or evidence to support continued acceptance of their reports. There were nine doctors listed as not acceptable for the CRMC, including Dr. Ballard, Dr. Oaks, Dr. Ray Harron, Dr. Martindale, and Dr. Levy. CRMC deemed the screening companies N&M, Inc., RTS, Inc., and Healthscreen, Inc. as unacceptable.

I have also reviewed a letter from John Mekus, the Executive Director of the Celotex Asbestos Settlement Trust, dated October 18, 2005 (Celotex 10/18/05 Notice of Trust Policy Regarding Acceptance of Medical Reports at 1-2). The Trust no longer accepted reports from a list of doctors, including Dr. Ballard, Dr. Martindale, and Dr. Oaks (*id.*). This letter further casts doubt on Dr. Ballard's reliability, in that the Trust would not accept

any claim that relied on a medical report from a listed doctor. The Trust does not trust Dr. Ballard's reports.

William Nurre, the Executive Director of the Eagle-Picher Personal Injury Settlement Trust, issued a report on October 19, 2005 (Eagle-Picher 10/19/05 Personal Injury Settlement Trust Letter at 1-2). Mr. Nurre stated that they could no longer presume that certain physicians, including Dr. Ballard, Dr. Oaks, Dr. Martindale, and others, meet the standard for a "qualified physician" (*id.*). They also considered N&M, Inc. and RTS, Inc. no longer "qualified" (*id.*). Again, the Trust would not accept reports from the listed doctor, or medical reports that relied on their x-ray interpretation or "B" reading (*id.*). They appear to consider Dr. Ballard's reports and x-ray readings unreliable.

I have also reviewed a 2006 letter from the Trustees of Keene Creditors Trust (Keene Creditors Trust 4/13/06 Letter, at 1-8). This letter gives background on this asbestos trust and how to make a claim. Under the section entitled "Suspended Doctors and Screening Companies" (*id.* at 8), the Trustees report that certain doctors and screening companies might not meet "reliability standards" and would not be accepted under Section 5.4(a)(ii) regarding the Trusts' reasonable confidence in the Claim as "credible and consistent with recognized medical standards." Included on this list are Dr. Ballard, Dr. Martindale, Dr. Oaks, Dr. Harron, and others. The screening companies were RTS, Inc., N&M, Inc. and Occupational Diagnostics. As with the other trusts, Keene would not accept claims that relied on medical information from Dr. Ballard. (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.)

In summary, multiple asbestos Trusts have deemed Dr. Ballard's reports unqualified, unreliable and unacceptable.

Dr. Ballard's "B" readings are improperly biased by attorneys. When performing "B" readings, it is best that the reader only consider the radiograph and not specific information of the patient. The reader should not be focused on finding a specific disease (such as asbestosis) at the expense of an honest and thorough reading. The ILO *Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses* (Revised Editions 1980 and 2000) note, "When classifying radiographs for

epidemiological purposes, it is essential that the reader does not consider any other information about the individuals being studied." They add, "Awareness of supplementary details specific to individuals can introduce bias into results" (*id.* at 19 and 12, respectively).

Dr. Ballard admits that he makes his "B" readings according to the information provided to him by lawyers or testing service (Ballard Testimony, *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings at 55, 58 (S.D. Tex. Feb.18, 2005). Such communication from the lawyer might be that the work exposure history was "consistent with asbestosis" or that they wanted him to "look for asbestosis" (*id.* at 55). Not only does this introduce bias, but also the information does not come from a medical professional. I have reviewed numerous examples of letters from lawyers to Dr. Ballard instructing him to look for particular diseases when reading x-rays.

Another form of bias toward reading might occur if a "B" reader charges more money for "positive" readings than "negative" ones. I reviewed a letter to Dr. Ballard dated August 13, 1999 from Nix, Patterson & Roach regarding 100 x-rays for his interpretation (Nix, Patterson & Roach 8/13/99 Letter). They requested a "report and an ILO for the positive films." Dr. Ballard billed out for 99 interpretations (Nix, Patterson & Roach 8/13/99 Letter; 439480 Statement). This suggests he did not bill for negatives and he read 99% of the films as positive. If correct, he is billing differently for positives and negatives and there is a financial incentive to find an x-ray positive. For another set of x-rays from the same law firm, Dr. Ballard invoiced only for positive reads and had a 97% positive rate involving 1000 films (8/27/99 Nix, Patterson & Roach Letter with Statements 439486, 439491, 439495, 439496, 439488).

Dr. Ballard uses improper B-reading methodology. Attorney-provided information sways his readings, perhaps even to the level of profusion or degree of pleural disease. His readings appear biased. He apparently charges more for positive B-readings and has an extremely high rate of positive readings. In my opinion, Dr. Ballard's B-readings are unreliable.

Dr. Ballard also has a high volume of litigation-related diagnoses and x-ray readings. In the years leading up to his 2005 *In Re: Silica* testimony,

Dr. Ballard performed "probably several thousand" B-readings each year
(Ballard Testimony, *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553,
*Daubert* Hearings, at 29 (S.D. Tex. Feb 18, 2005). According to the CRMC,
Dr. Ballard was number two in the top 25 individuals who authored B-
readings in support of claims submitted to the Manville Trust (CRMC 1/3/06
Resp. to Dep. by Written Questions at No. 12). Dr. Ballard was number four
of the top 25 doctors who authored reports in support of claims submitted to
the Manville Trust (*id.* at No.14 (a), 14(c)). The CRMC also identified the
top ten dates (and the corresponding totals) on which diagnoses were made
or diagnosing reports were authored by the top 25 doctors authoring reports
(*id.* at No. 14(b)). Dr. Ballard had from 157 to 297 reports on individual
days. (*Id.*)

According to data presented in other litigation, 80% of Dr. Ballard's
1,444 positive B-readings were at the lowest category (1/0) and only 1%
were greater than 1/1. (*In Re Silica Prods.Liab.Litig.*, 398 F. Supp. 2d at
610.) Dr. John Parker, the former administrator of NIOSH's B-reader
program, stated that the "lack of variability" was "stunning" and
"suggests...readers are not being intellectually and scientifically honest in
their classifications" (*id.*). He noted, "...the consistency with which these
films are read as 1/0 defies all statistical logic and all medical and scientific
evidence of what happens to the lung when it's exposed to workplace dust"
(*id.*).

Based on my review of the materials, it is evident that Dr. Ballard has
performed huge numbers of B-readings for litigation purposes. He was the
second most prolific B-reader in the Johns Manville Trust. He has invoiced
for millions of dollars for B-readings. An expert from NIOSH stated that
Dr. Ballard's B-readings defied statistical logic and were scientifically
unreliable.

Dr. Ballard's entire diagnostic method is problematic and unreliable.
According to his testimony, Dr. Ballard read films sent to him from mobile
testing groups (Ballard 4/28/04 Dep. at 39). One such group was
Respiratory Testing Services. He did work for them in Alabama, but he also
traveled with this group to read x-rays. He went to Mississippi and
Louisiana for RTS, according to his testimony in April 2004 (*id.* at 39-40).
According to his testimony in October 2003, he did work for RTS in
Mississippi, Louisiana, Kentucky, and Arkansas (Ballard 10/22/03 Dep. at

75-76). He did not possess a license to practice medicine in these four states. Many states' Medical Boards (such as Mississippi) consider writing a medical opinion (such as an x-ray interpretation or medical report) that potentially affects the subsequent diagnosis or treatment as constituting the practice of medicine.

The ATS has published Official Statements on the diagnosis of non-malignant asbestos-related diseases. The first was in 1986 ("The Diagnosis of Nonmalignant Diseases Related to Asbestos," Am. Rev. Resp. Dis. 134; at 363-368 (1986); *see also* Gaziano 10/18/06 Dep. at Ex. 17) and the most recent in 2004 ("Diagnostic and Initial Management of Nonmalignant Disease Related to Asbestos," Am. J. Respir. Crit. Care Med. 170 at 691-715 (2004)). Both note the role of obtaining thorough exposure histories. In 1986, the ATS notes, "A careful sequential history of all exposures to all potentially harmful substances is obviously important." In their latest Statement, the ATS writes, "It is essential to take a comprehensive occupational and environmental history when asbestos-related disease is suspected...obtained whenever possible directly from the patient." Such a history should define the "duration, intensity, time of onset and setting" of exposure. The ATS adds, "The occupational title is not enough." (*Id.* at 695.)

In its discussion on occupational lung injury, the AMA's "Guides to the Evaluation of Permanent Impairment, 5th Edition" states: "It is important to obtain a complete occupational history from the individual to evaluate the possible effect of these exposures. A chief component of the history contains a chronological description of work activities, beginning with the first year of employment and includes names of employers, the specific types of work performed, the materials used by the person, and the potentially toxic materials present in the workplace." The AMA goes on to state "To assess its significance, ask the individual to estimate the frequency and intensity of exposure to each substance, as well as information about the use of respiratory protective devices." (*See* American Medical Association, "Guides to the Evaluation of Permanent Impairment," 5th ed., at 90, (November 2000).)

In addition to obtaining a reliable occupational exposure history, the ATS requires the physician exclude ("rule out") alternative diagnoses ("Diagnostic and Initial Management of Nonmalignant Disease Related to

Asbestos," Am. J. Respir. Crit. Care Med. 170 at 692 (2004)). There are about 150 causes of interstitial lung disease. The ILO notes there is nothing "pathognomonic" on chest x-ray for pneumoconiosis (such as asbestosis). To properly rule out other more probable cause requires a detailed complete medical history and thorough physical examination, by trained medical personnel and may require additional medical testing.

Law firms or testing services provided Dr. Ballard with work histories (*In Re: Silica Prods.Liab.Litig.,* 398 F. Supp. 2d at 610). Such work history amounted to a simple statement from the law firm or testing service indicating, "There is exposure history that's consistent with asbestosis" (*id.* at 609-610). This is insufficient for diagnosing asbestosis or other asbestos-related disease. Dr. Ballard issued diagnoses without taking a medical or exposure history or performing physical examinations on any of the claimants (*id.* at 609). Such methodology does not meet accepted standards. Interestingly, in 2004, Dr. Ballard testified that he was not familiar with the ATS diagnostic criteria for asbestosis (Ballard 4/28/04 Dep. at 125).

I reviewed additional testimony from Dr. Ballard referring to his diagnostic practices. When asked, "What is the method that you would follow in order to diagnose a person with asbestosis," he responded, "Fifth Amendment" (Ballard 2/22/07 W.R. Grace Dep. at 62-63). Regarding whether he excluded other causes when he diagnosed people for litigation, he again invoked the Fifth Amendment (*id.* at 107). He invoked the Fifth Amendment when asked about the reliability of the exposure histories in patients he diagnosed with asbestos-related disease (*id.* at 140). When asked if it was appropriate to use the ATS guidelines for diagnosing non-malignant asbestos-related disease, Dr. Ballard answered, "Fifth Amendment" (*id.* at 65). Even when asked if he was familiar with the ILO guidelines for the classification of radiographs for pneumoconioses (as every "B" reader must be), he answered, "Fifth Amendment" (*id.* at 66). That even discussing how he practices medicine could incriminate him is rather curious and casts further doubt on the reliability of his medical work. Dr. Ballard invoked his Fifth Amendment rights when testifying before Congress (*The Silica Story: Mass Tort Screening and the Public Health,* Hearings Before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, 109th Congress, 2d Session, at 122-23 (March 8, 2006).) Dr. Ballard again took the Fifth Amendment during a deposition in March 2007 (Ballard 3/8/07 Dep. at 8).

The clinical diagnosis of asbestosis requires obtaining a detailed occupational and exposure history, appropriate imaging findings and exclusion of other more probable cause. Dr. Ballard did not obtain an exposure and work history as required for properly diagnosing asbestosis. He often did not take any medical history or perform a thorough physical examination and therefore he could not properly exclude alternative diagnoses. He is not familiar with accepted diagnostic criteria for asbestosis. As stated previously, his B-readings are not reliable. These factors demonstrate that his work does not meet accepted medical standards.

I have reviewed instances where Dr. Ballard's B-readings depended upon the disease for which he was asked to read. For example, on February 14, 2000, Dr. Ballard did a B-reading of Claimant A.B.'s chest x-ray dated October 15, 1999. (*See* A.B. 10/15/99 ILO at MDL 1553- Washington-007504.) He reported profusion 1/0 s/t (irregular) opacities in the mid and lower lung zones and extent 3 (the greatest extent) non-calcified chest wall pleural plaques. In a letter dated February 14, 2000, he concluded the findings were consistent with asbestosis. On June 7, 2004, Dr. Ballard again read the October 15, 1999 chest x-ray, but this time "for the presence and classification of pneumoconiosis (silicosis)." This time, he reported profusion 1/0 p/q (rounded) opacities in all lung zones and the pleural disease had disappeared. In a narrative report dated June 7, 2004, addressed to Law Offices of Alwyn Luckey, he indicated he had reviewed an occupational history and concluded that the x-ray findings "are due to silicosis." On the same x-ray, irregular opacities and extent 3 pleural plaques from asbestosis apparently disappeared, and were replaced with rounded opacities from silicosis. That he could read the same x-ray so completely differently goes far beyond expected or reasonable intra-reader variability. Such differences, from a certified B-reader, would almost have to be intentional and cannot be discounted as simple intra-reader variability.

In October 2003, when queried about inter-reader variability during a deposition, Dr. Ballard expected there would be "general agreement" within his positive B-reads and those from a panel of B-readers (Ballard 10/22/03 Dep. at 144). He went on to testify that if such a panel found only 5 percent agreement, that would be beyond expected inter-reader variability and would probably be statistically significant (*id.* at 144-45). As noted above, Gitlin, et al published the results of a study comparing the radiographic

interpretations by "B" readers retained by lawyers in asbestos litigation compared to those from an independent blinded panel of B-readers. (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for asbestos related changes," Acad. Radiol. 11 at 843-856 (2004).) Based upon a subsequent affidavit from Dr. Gitlin (*In Re Owens Corning, November 10, 2004*), Dr. Ballard was one of the seven initial "B" readers. Gitlin, et al found that the "B" reader panel only agreed with the "initial" reader (Dr. Ballard and others) in 4.5% of cases. This provides further evidence of Dr. Ballard's unreliability.

In my opinion, Dr. Ballard does not use accepted and scientifically valid methodology. His exposure and work histories are inadequate and he does not exclude alternative diagnoses, as required by accepted standards. Thus, his reports are unreliable and flawed. In an epidemiological study, a B-reader panel disagreed with his positive readings in an overwhelming percentage. His B-readings appear biased. The dramatic changes in reading the same x-ray go beyond the pale of acceptable intra-reader variability. Numerous asbestos Trusts have ceased to accept his reports and conclusions as not reliable. In my opinion, Dr. Ballard's reports and B-readings are unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Ballard.

### Dr. Kevin Cooper

According to his Curriculum vitae, Dr. Cooper received his Medical Degree in 1988. He did Residency training in Obstetrics and Gynecology from 1988 to 1990. He initially practiced in Georgia. In 1992, he started his practice in Mississippi. From 1996-1999, he did an Occupational Medicine Residency in Wisconsin. As of January 2006, he continued to work at Cooper Family Medicine Clinic in Pascagoula, Mississippi. Dr. Cooper's CV does not list any Board Certification, and he is not Board Certified according to the ABMS (www.abms.org). He has never been a NIOSH-certified "B" reader.

In his January 4, 2005 deposition, Dr. Cooper testified that in April 2002, Allen Netherland (Molly Netherland's husband -- one of N&M, Inc.'s

founders) approached him about doing "small physical examinations" for N&M, Inc. N&M, Inc. is a mass screening company that came under fire in the *In re Silica* litigation (see discussion above). Allen Netherland was a patient and a good friend of Dr. Cooper's (Cooper 1/4/05 Dep. at 21-22).

Dr. Cooper indicated that N&M inserted the diagnostic language into his reports and that he should not have signed them (*id.* at 19-20, 52-53, 64-69). Dr. Cooper disavows diagnosing anyone with asbestosis or silicosis (*id.* at 114-18). He states in his affidavit from January 20, 2006 that he has never diagnosed any individual with asbestosis or silicosis (Cooper 1/20/06 Affidavit).

Numerous trusts have suspended accepting reports in support of claims authored by Dr. Cooper. These include CRMC (CRMC 9/12/05 Suspension Letter), Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.) Thus, like Dr. Ballard, these asbestos claims trusts have deemed Dr. Cooper's reports and conclusions as unreliable and unacceptable.

In summary, Dr. Cooper has worked with N&M, Inc., a mass screening company utilizing a number of practices that are not medically or scientifically sound or accepted. He has stated that N&M, Inc. inserted the diagnostic language used in his reports. Dr. Cooper has disavowed his own reports, claiming that he has never diagnosed anyone with asbestosis or silicosis. Several asbestos Trusts consider Dr. Cooper unacceptable or unreliable and they have stopped accepting his work. In my opinion, the reports pertaining to asbestos- or silica-related disease from Dr. Cooper are unreliable. As he has claimed that he never diagnosed any individual with asbestosis, one cannot rely on his reports in support of asbestosis claims.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Cooper.

### Dr. Todd Coulter

Dr. Coulter is a general internist.  He has no specialized training in Radiology, Pulmonary Diseases, or Occupational Medicine.  Dr. Coulter became involved in mass screenings after the owner/operator of Occupational Diagnostics recruited him (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp.2d 563, 616 (S.D. Tex. 2005).).  Occupational Diagnostics is a mass screener for occupational lung disease in a litigation context.

Although in his own clinical practice, he had only diagnosed six individuals with silicosis in ten years (Coulter Testimony, *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings at 69 (S.D. Tex. Feb 17, 2005)), he diagnosed 237 individuals with silicosis in just eleven days during a screening for Occupational Diagnostics.  (*Id.* at 73.) He testified that he saw between fifty and sixty patients daily, spending up to fifteen minutes with each person.  This would indicate that he would work 15-hour days with no breaks (*See In Re: Silica Prods.Liab.Litig.*, 398 F. Supp.2d at 616).

Dr. Coulter is not a "B" reader but he read his own chest x-rays.  Each of the 237 individuals he diagnosed with silicosis had predominantly lower lobe interstitial abnormality according to his reports.  Dr. Coulter conceded to the court that these findings were characteristics of asbestosis rather than silicosis, suggesting his unfamiliarity with these pneumoconioses (*In Re: Silica Prods.Liab.Litig., 398* F. Supp.2d at 618.).

Occupational Diagnostics ran their operation out of a Century 21 real estate office (Coulter Testimony, *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings at 69, 81 (S.D. Tex. Feb 17, 2005).). They performed screenings at a Western Sizzler and at hotel parking lots (*id.* at 70).  When questioned before Congress, Dr. Coulter invoked the Fifth Amendment (*The Silica Story: Mass Tort Screening and the Public Health,* Hearings before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, 109th Congress, 2d Session, at 436-437 (July 26, 2006).

Numerous trusts have suspended accepting reports from Dr. Coulter. These include CRMC (CRMC 9/12/05 Suspension Letter), Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher

Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.) As with the numerous other doctors rejected by asbestos claims trusts, Dr. Coulter's reports have been deemed unreliable and unacceptable when offered in support of claims.

Dr. Coulter did screening work with Occupational Diagnostics. They did screenings at restaurants and hotel parking lots. Dr. Coulter participated in screenings of large numbers of individuals. Dr. Coulter is not a "B" reader or radiologist and diagnosed hundreds of patients with silicosis despite having radiographic findings, according to Dr. Coulter, more consistent with asbestosis. Numerous asbestos trusts have ceased acceptance of Dr. Coulter's work. He has taken the Fifth Amendment before Congress. In my opinion, based upon testimony records, he does not utilize reliable diagnostic methodology. His reports and past work do not demonstrate competence in reading chest x-rays for pneumoconioses. In my opinion, his diagnostic reports for silica- and asbestos-related diseases are unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Coulter.

### Dr. Andrew Harron

Dr. Harron, an osteopath, is a radiologist from Wisconsin and former "B" reader. He is the son of Dr. Ray Harron (discussed below). He has worked with N&M, Inc.

The CRMC suspended acceptance of work by Dr. Harron and deemed his work unreliable to support claims (CRMC 9/12/05 Suspension Letter). Other Trusts also stopped accepting him, including Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at

www.bwasbestostrust.com.)  These trusts have also ceased acceptance of
reports and materials generated by N&M, the company for whom he
worked.  (*Id.*)

The CRMC found it credible to challenge the reliability of Dr.
Andrew Harron's reports (CRMC 9/12/05 Suspension Letter).  Celotex
Asbestos Settlement Trust would not accept any claim that relied on a report
by him (Celotex 10/18/05 Suspension Letter).  The Executive Director of
Eagle-Picher Personal Injury Settlement Trust stated they could no longer
presume that certain physicians, including Dr. Harron, meet the standard for
a "qualified physician" (Eagle Picher 10/19/05 Suspension Letter).  This
Trust considered Dr. Harron's reports and x-ray readings unreliable (*id.*).
The Trustees from Keene Creditors Trust found that his reports might not
meet "reliability standards" (Keene 4/3/06 Suspension Letter).  They
concluded that claims based upon his reports might not be "credible and
consistent with recognized medical standards" (*id.*).

Dr. Harron indicated that he filled out a "B" read and then his father's
(Dr. Ray Harron) office staff would transcribe it into a diagnostic report.  Dr.
Andrew Harron did not read the medical reports and the secretaries used a
stamped signature (A. Harron Testimony, *In Re: Silica Prods.Liab.Litig.*,
MDL Docket No. 1553, *Daubert* Hearings at 154-155(S.D. Tex Feb. 18,
2005)).  These practices echoed those of his father, Dr. Ray Harron (see
below).

Dr. Harron has invoked the Fifth Amendment before Congress and
there have been official calls to the Attorney General for launching an
investigation of him.  (*The Silicosis Story: Mass Tort Screening and the
Public Health,* Hearing before the Subcommittee on Oversight and
Investigation of the Committee on Energy and Commerce, House of
Representatives, 109th Congress, 2d Session, at 121 (March 8, 2006).)  As
of January 2006, Dr. Harron invoked the Fifth Amendment to every question
asked of him, including his diagnostic methodology.  (*See generally* A.
Harron 1/12/06 W.R. Grace Deposition.)  That he now pleads the Fifth
Amendment when queried about his diagnostic practices, suggests to me that
his work is unreliable.

Numerous trusts have stopped accepting reports by Dr. Andrew
Harron.  He has invoked the Fifth Amendment when questioned about his

diagnostic practices and methodologies. Trusts have also ceased accepting work performed through screening companies with whom Dr. Harron was associated. Dr. Harron's methodology does not meet accepted medical and scientific standards. Based upon my review of this information, I would not rely upon Dr. Harron's "B" readings or reports.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Andrew Harron.

### Dr. Ray Harron

Dr. Harron no longer actively practices radiology. As of 1995, Dr. Harron "worked exclusively for plaintiffs' lawyers, reading x-rays and diagnosing asbestosis and silicosis for use in litigation. (Feb. 16, 2005 Trans. at 258-60.)" (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp 2d 563 at 603-04.) He holds board certification by the American Board of Radiology. He is a former NIOSH "B" reader. As of March 2007, Dr. Harron had agreed to not practice medicine in Texas and not to seek to renew or reinstate his Texas license. In the Texas Board of Medicine order, the Board notes that Dr. Harron did not usually review or edit the reports prepared by his clerical staff (Agreed Order in the Matter of the License of Raymond Anthony Harron, MD 4/13/07 at ¶17).

Numerous trusts suspended acceptance of work from Dr. Harron, including the Claims Resolution Management Corporation (CRMC 9/12/05 Suspension Letter), Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.)

In summary, Dr. Ray Harron has been deemed unqualified, unreliable and unacceptable to multiple asbestos Trusts.

Dr. Ray Harron is the top individual authoring "B" reads in support of claims submitted to the Manville Trust, at over 15,000 total (CRMC 3/2/06 Response to Amended Notice of Deposition Upon Written Question at No.

12).  He is also top physician for submitting primary diagnosing reports for claims submitted to the Manville Trust at over 51,000 (*id.* at No. 13).  He is also top physician for authoring reports submitted in support of claims to the Manville Trust at over 88,000 (*id.* at No. 14 (a)-(c)).  Dr. Harron has had numerous individual days with over 250 diagnosing reports on a single day.  On June 20, 2002, for example, he submitted 424 diagnosing reports, and on November 21, 1994, he submitted 515 individual reports to Manville (*id.* at No. 14 (b)).

Dr. Ray Harron has invoked the Fifth Amendment numerous times, including before Congress.  (*The Silicosis Story: Mass Tort Screening and the Public Health,* Hearings before the Subcommittee on Oversight and Investigation of the Committee on Energy and Commerce, House of Representatives, 109th Congress, 2d Session, at 122 (March 8, 2002) and in his deposition in this case (*see generally* R. Harron 12/15/05 W.R. Grace Deposition).)  In April 2006, the U.S. Chamber of Commerce petitioned the U.S. Attorney to open an investigation into Dr. Ray Harron.

Dr. Ray Harron has testified that for him to find an adequate exposure history he just needs a simple statement that someone was exposed and that it was in the past (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp 2d 563 at 604 and Harron Testimony, *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings at 301 (S.D. Tex. Feb. 16, 2005)).  Dr. Harron did not take exposure histories directly from the people he diagnosed.  Rather, he relied on information from non-medical personnel, including a plaintiff's lawyer or employees of the screening company.

Dr. Harron had two assistants, Kathy Christopher and Vonda Oats, pass his reports along to the attorneys without going over them first.  He entrusted his signature stamp to N&M and anyone could have stamped his reports (*id.* at 285-286).  "At some point, Dr. Harron's relationship with N&M grew so close that N&M had a stack of blank ILO forms that had been signed by Dr. Harron.  (Feb. 17, 2005 Trans. at 370-71.)"  (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp 2d 563 at 600.)  There is no explanation as to why Dr. Harron pre-signed ILO forms if he himself later completed them.  Dr. Harron testified that he did not dictate his reports, but instead trusted the secretaries/typists to know how to "translate [the ILO from] into English."  (Feb 16, 2005 Trans. at 289-90.)  (*Id.* at 605.)  In essence, Dr. Harron did not

personally take the exposure history, and "failed to write, read, or personally sign the actual report" (Feb. 16, 2005 Trans. at 285-90, 300, 317.) (Id.)

Based upon a subsequent affidavit from Dr. Gitlin (*In Re Owens Corning, November 10, 2004*), Dr. Harron was one of the seven initial "B" readers in the Gitlin study (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for asbestos related changes," Acad. Radiol. 11 at 843-856 (2004). That the "B" reader panel only agreed with the "initial" reader (Dr. Harron and others) in 4.5% of cases provides further evidence of Dr. Harron's unreliability.

Dr. Harron has demonstrated inconsistencies in his "B" readings. Of 1,587 *Silica* MDL plaintiffs, Dr. Harron read 99.37% of them as irregular opacities ("asbestos reads") before December 31, 2000 and then 99.68% as rounded opacities ("silica reads") after December 31, 2000. As an example, Mr. C. K. had a chest x-ray read by Dr. Harron from 1994, reporting profusion 1/1 s/t (irregular) opacities in all lung zones. (*See* C.K. 10/17/94 ILO at MDL 1553 - CRMC - 0057005.) The same individual had a chest x-ray read by Dr. Harron in 2002, with 1/1 p/p (rounded) opacities in all lung zones. (*See* C.K. 10/17/94 ILO at MDL 1553 -McGee - 001697.) In this case, the irregular opacities disappeared according to Dr. Harron, with the appearance of rounded opacities in the same location. As another example, Ms. C. R. had a chest x-ray read by Dr. Harron in 1995 with 1/0 s/t opacities, which became 1/0 p/p opacities in 2002. (*See* C.R. 9/12/95 ILO at MDL 1553 -CRMC-0054143; C.R. 2/7/02 ILO at MDL 1553 -Robinson-000903.) It is medically and scientifically unsound that irregular small parenchymal opacities from asbestosis would disappear, only to be replaced by small rounded opacities of the same profusion and location.

Dr. Harron's work is unreliable. Expert "B" reading panels have found remarkable disagreement to his readings and Dr. Harron himself has recycled hundreds, if not thousands, of "B" readings first read as asbestosis and later as silicosis. This defies any medical probability. Furthermore, numerous trusts have stopped accepting his work. He has pleaded the Fifth Amendment, including before Congress. That he now pleads the Fifth Amendment when queried about his diagnostic practices, suggests to me that his work is unreliable. Dr. Harron's methodology did not follow accepted

medical and scientific standards and procedures. I would not rely on any report by Dr. Harron regarding asbestos- or silica-related lung injury.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Ray Harron.

### Dr. Glyn Hilbun

Dr. Hilbun is a general surgeon from Mississippi. He retired from medical practice in January 2005. Molly Netherland, one of the principals of N&M, Inc., recruited him for screening evaluations in April 2002. Dr. Hilbun indicated that N&M hired him to perform physical examinations and that he did not express any diagnostic opinion in his report. In an affidavit from December 29, 2005, Dr. Hilbun swore that he had never performed any testing for asbestosis during his medical career and had never made a diagnosis of asbestosis. (Hilbun 12/29/05 Affidavit.)

Dr. Hilbun handwrote his notes, which were then typed by N&M personnel and had additional language added. Dr. Hilbun would not vouch for any typewritten report without comparing it to his handwritten original. (Hilbun 12/20/04 Dep. at 100.) In his written testimony to the Oversight and Investigations Subcommittee, Dr. Hilbun stated that he never gave an opinion or rendered a diagnosis on any of the patients he saw for N&M. (Hilbun 6/6/06 Written Testimony, *The Silicosis Story: Mass Tort Screening and the Public Health,* Hearings before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, 109th Congress, 2d Session at 259 (June 6, 2006).) He stated that N&M inserted the diagnostic language without his knowledge or approval.

Numerous trusts have stopped accepting reports from Dr. Hilbun, including CRMC (CRMC 9/12/05 Suspension Letter), Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene Suspension Letter 4/3/06). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.) This suspension by various asbestos claims trusts casts doubt on Dr. Hilbun's reliability, in that these trusts do not

accept any claim that relied on a medical report from a listed doctor, such as
Dr. Hilbun.

Dr. Hilbun has indicated the he has never diagnosed an individual
with asbestosis or silicosis. He further indicated that N&M added diagnostic
terminology in his reports without his knowledge or authorization.
Numerous trusts refuse to accept Dr. Hilbun's reports in support of claims.
In my opinion, Dr. Hilbun's reports regarding diagnosis of asbestos- or
silica-related diseases are unreliable because they do not conform to
accepted diagnostic standards. More importantly, Dr. Hilbun himself
disavows any such diagnosis.

In addition, see generally reliance materials for additional background
and support for my analysis of Dr. Hilbun.


### Dr. Richard Kuebler and Dr. Larry Mitchell

Dr. Kuebler is a radiologist. He was a NIOSH-certified "B" reader
from 1992 until 1996 (Kuebler 1/6/94 Dep. at 11-12). Dr. Mitchell is an
internist. He never passed the "B" reading examination. Drs. Kuebler and
Mitchell worked with Pulmonary Advisory Services ("PAS") and
Pulmonary Testing Services ("PTS"). Dr. Mitchell was the Medical
Director of PTS and their primary diagnosing physician.

Dr. Kuebler is in the list of top twenty-five individuals authoring "B"
reads in support of claims submitted to the Manville Trust (CRMC 3/2/06
Resp. to Amended Notice of Dep. Upon Written Questions at No. 12). Dr.
Mitchell is in the top twenty-five individuals considered the primary
diagnosing doctor on reports submitted in support of claims to the Manville
Trust with 11,762 (*id.* at No. 13). Almost all these reports are before 1995.
Dr. Kuebler is also in the top twenty-five individuals considered primary
diagnosing doctor (*id.*). Both Drs. Kuebler and Mitchell are in the top
twenty-five for physicians authoring reports submitted in support of claims
to the Manville Trust. Dr. Kuebler is the eighth and Dr. Mitchell is the
seventh. (*Id.* at No. 14 (a)-(c).) Drs. Kuebler and Mitchell are listed number
one as the most frequent pairing of physicians for claims to the Manville
Trust (*id.* at No. 14 (d)).

Owens Corning sued Dr. Mitchell, along with PTS, for fraud and deceptive practices. The allegations pertain to fraudulently generated pulmonary function data, including false level of impairment (*Owens Corning v. Pitts, et. al.,* Civil Action No. 96-2095 (E.D. L.A. June 19, 1996).) According to the Manville Personal Injury Settlement Trust Medical Audit, Drs. Kuebler and Mitchell did not meet an acceptable level of reliability (Stipulation of Settlement and Order, *In Re: Manville Personal Injury Settlement Trust Medical Audit Procedures Litigation* at ¶ 1 (f)(i), Master File No. 98 Civ. 5693, May 20, 1999 (E.D. and S.D. York).).

Based upon my review, Dr. Kuebler and Dr. Mitchell rendered huge numbers of reports for asbestos litigation claims. In conjunction with the screening companies they worked with, these doctors were sued for allegedly fraudulent activities by Owens Corning in relation to their work in asbestos screenings. Manville Trust ceased acceptance of reports or conclusions from both of them because they had not followed accepted medical standards. In my opinion, neither Dr. Kuebler's nor Dr. Mitchell's diagnostic reports for asbestos litigation are reliable.

In addition, see generally reliance materials for additional background and support for my analysis of Drs. Kuebler and Mitchell.


### Dr. Barry Levy

Dr. Levy is Board-certified in Internal Medicine and Occupational Medicine. He has no specialized training in Pulmonary Diseases or Radiology. He is not a "B" reader. He testified that he is not qualified to read x-rays (Levy 05/03/04 Dep. at 68 - 69).

From evidence at the *In Re: Silica* MDL hearing, Dr. Levy apparently diagnosed some 1389 patients with silicosis, including approximately 1200 in just 72 hours (*In Re: Silica Prods.Liab.Litig.,* 398 F. Supp. 2d 563, 612 (S.D. Tex. 2005).) The court noted that on average Dr. Levy devoted less than four minutes to each of his diagnostic evaluations in this litigation. Of that time, he spent one minute reviewing the report for accuracy. In contrast to these large numbers, Dr. Levy testified that he diagnosed approximately forty patients with silica-related disease in his entire career (Levy 05/03/04 Dep. at 47-48).

The CRMC suspended acceptance of work from Dr. Levy and deemed his work unreliable (CRMC 9/12/05 Suspension Letter). Other Trusts also stopped accepting his work, including Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.)

The CRMC found it credible to challenge the reliability of Dr. Levy's reports (CRMC 9/12/05 Suspension Letter). Celotex Asbestos Settlement Trust would not accept any claim that relied on a report by Dr. Levy (Celotex 10/18/05 Suspension Letter). The Executive Director of Eagle-Picher Personal Injury Settlement Trust stated they could no longer presume that certain physicians, including Dr. Levy, meet the standard for a "qualified physician" (Eagle Picher 10/19/05 Suspension Letter). This Trust considered Dr. Levy's reports and x-ray readings unreliable (*id.*). The Trustees from Keene Creditors Trust found that Dr. Levy's reports might not meet "reliability standards" (Keene 4/3/06 Suspension Letter). They concluded that claims based upon his reports might not be "credible and consistent with recognized medical standards (*id.*).

Dr. Levy has no specialized training in Pulmonary Diseases or Radiology. He relied upon incomplete and unreliable work histories, prepared by non-medically trained personnel. Dr. Levy is not a "B" reader and never personally reviewed the person's x-rays. He relied upon a number of B-readers, many of whom Trusts have rejected. Dr. Levy did not use accepted diagnostic methodology, including methodology that he himself published. His methods were improper and scientifically unsound. Dr. Levy based his reports upon unreliable information. In my opinion, Dr. Levy's reports do not meet accepted medical and scientific standards and they are unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Levy.

### Dr. George Martindale

Dr. Martindale is a radiologist and former "B" reader. He worked in Alabama with Drs. Ballard and Oaks. Dr. Martindale did work for N&M, Inc. He provided second opinion reads on Dr. Harron's "B" readings, and indicated that Dr. Harron's writings on the film jacket influenced his readings. (Martindale 10/29/04 Dep. at 16.) Dr. Martindale was identified as the diagnosing physician in approximately 3700 silicosis claims in *In Re: Silica* MDL 1553 and for thousands more asbestos-related claims. (*In Re: Silica Prods.Liab.Litig.*, 398 F.Supp.2d at 581.) Subsequently, Dr. Martindale testified that he was merely providing an opinion regarding a chest x-ray and was not diagnosing asbestosis or silicosis (Martindale 10/29/04 Dep. at 66). He also stated that not withstanding how he phrased his reports, he was not making a diagnosis of asbestosis or silicosis (*id.* at 120). In his testimony before Congress, he stated that he was only involved as a "B" reader and never as a diagnosing physician. As a result, he had withdrawn approximately one-third of the 10,000 claims in the Silica MDL (*The Silica Story: Mass Tort Screening and the Public Health,* Hearings before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, 109th Congress, 2d Session, at124-125 (March 8, 2006).

The CRMC suspended accepting all reports from Dr. Martindale and deemed his work unreliable (CRMC 9/12/05 Suspension Letter). Other Trusts also stopped accepting reports from Dr. Martindale, including Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.)

The CRMC found it credible to challenge the reliability of Dr. Martindale's reports (CRMC 9/12/05 Suspension Letter). Celotex Asbestos Settlement Trust would not accept any claim that relied on a report by Dr. Martindale (Celotex 10/18/05 Suspension Letter). The Executive Director of Eagle-Picher Personal Injury Settlement Trust stated they could no longer presume that certain physicians, including Dr. Martindale, meet the standard for a "qualified physician" (Eagle Picher 10/19/05 Suspension Letter). This

Trust considered Dr. Martindale's reports and x-ray readings unreliable (id.).
The Trustees from Keene Creditors Trust found that Dr. Martindale's reports
might not meet "reliability standards" (Keene 4/3/06 Suspension Letter).
They concluded that claims based upon his reports might not be "credible
and consistent with recognized medical standards (id.).

        In summary, multiple asbestos Trusts consider Dr. Martindale's
reports and conclusions as unreliable and unacceptable. He has testified that
it was never his intention to diagnose any individual with an asbestos-related
disease. In fact, he has distanced himself from his prior diagnoses and now
disavows them by his own admission. In my opinion, Dr. Martindale's
reports are not reliable.

        In addition, see generally reliance materials for additional background
and support for my analysis of Dr. Martindale.


    **Dr. Gregory Nayden**

        Dr. Nayden received a chiropractic degree in 1972 (Nayden 9/28/05
Dep. at 15). He did not work as a chiropractor, however. From 1979 until
1983, he went to osteopathic school. After receiving his D.O., he did a
residency in Internal Medicine. He did not receive any sub-specialty
training in Pulmonary Diseases or Occupational Medicine. In 1987, he
worked for approximately for two years at the VA hospital in Indiana and
then worked two years in emergency room medicine. Next, he worked
approximately five years at public health clinics. From 1996 until 2000, he
did part-time emergency room work at several hospitals in Alabama.

        In around 2000, he started doing work for RTS performing asbestos
screening for possible compensation for occupational lung disease. As of
September 2005, he was doing land development in Gulf Shores and no
longer in medical practice (Nayden 9/28/05 Dep. at 5).

        In addition to working for RTS, Dr. Nayden performed work for AMT
-- another occupational lung disease mass-screener. AMT was a company
owned by Mr. Guy Foster, the nephew of Charles Foster, who owned RTS.
Guy Foster was a former grocery store manager with no medical background

or training. Dr. Nayden was the medical director for AMT (Nayden 9/28/05 Dep. at 26; Foster 12/12/01 Dep. at 150).

Dr. Nayden had a medical license to practice in Alabama, but he also did work for AMT in Georgia, Louisiana, Arkansas, and Florida (Foster 12/12/01 Dep. at 151) and other screening company work in Mississippi (Nayden 3/28/02 Dep. at 55). These were states wherein he did not hold a license to practice.

Dr. Nayden did not consider himself an expert in diagnosing or treating asbestos related disease (Nayden 9/28/05 Dep. at 26-27). Before starting work for RTS or AMT, he had never evaluated, treated, or even seen a case of asbestosis (*id.* at 25; Nayden 3/28/02 Dep. at 73).

According to Mr. Guy Foster, AMT tested at least 12,000 to 14,000 people between March 2000 and December 2001 (Foster 12/12/01 Dep. at 111). Dr. Nayden estimated he had evaluated approximately 14,000 individuals for AMT (Nayden 9/28/05 Dep. at 28-29). Nayden estimated that he evaluated an average of 20 to 60 people daily (*id.* at 40).

Dr. Nayden received a work history and "intake" form from non-medical personnel at AMT (Foster 12/12/01 Dep. at 211). Mr. Guy Foster designed the intake form. Dr. Nayden testified that he did not know who was taking the work histories (Nayden 9/28/05 Dep. at 42). According to Mr. Foster, the work histories did not distinguish between asbestos and non-asbestos insulation exposure (Foster 12/12/01 Dep. at 212). Dr. Nayden stated that he assumed that the exposures were daily and of duration listed on the forms (Nayden 3/28/02 Dep. at 107). These exposure histories were incomplete and inadequate according to ATS and AMA standards.

Dr. Nayden received a report or B-reading from AMT. The B-readers included Dr. Ballard, Dr. Lucas, and Dr. Levine. He then relied on such B read reports in his own report. Dr. Nayden testified that he does not understand the B-reading terminology and never personally reviewed any chest x-ray. He indicated that his report always agreed with the B-readers' findings (Nayden, 3/28/02 Dep. at 210). Dr. Nayden never communicated with the B-reader (Nayden 9/28/05 Dep. at 41).

After briefly reviewing the intake form, he performed a "cursory" physical examination (*id.* at 38-39). (The dictionary definition of "cursory" is "hasty and therefore not thorough or detailed.") Dr. Nayden testified that his examination consisted of checking the breathing, listening to the heart, and checking the hands for clubbing and the ankles for edema (Nayden 3/28/02 Dep. at 54-55). This is indeed a cursory physical examination, and not meeting standards for diagnosing occupational lung disease. He then reviewed pulmonary function testing of the person, done by someone at AMT (*id.*). The PFTs did not include post bronchodilator testing (*id.* at 145). Dr. Nayden did not know the qualifications of the PFT technician or important aspects of the equipment (*id.* at 172-74, 189).

Dr. Nayden's diagnostic criteria for asbestosis were a positive chest x-ray and work history (Nayden 3/28/02 Dep. at 132). As noted above, the work histories were inadequate to support a diagnosis of asbestosis. His diagnostic criteria did not include exclusion other more probable cause, as required by the ATS. He only performed a cursory examination of the claimant. He was not familiar with important dose-response data for asbestosis. According to Dr. Nayden, all approximate 14,000 people that he saw had asbestosis. Incredibly, Dr. Nayden indicated that he considered all 14,000 positive for asbestosis before he even evaluated them (*id.* at 165).

In his deposition from September 2005, Dr. Nayden indicated that he had actually never made any diagnosis, on any of the 14,000 individuals he evaluated, including a diagnosis of asbestosis (Nayden 9/28/05 Dep. at 28-29). He said he did not even consider them his patients.

In September 2002, the CRMC suspended acceptance of medical records prepared by Dr. Nayden and AMT (David Austern 9/24/02 Memorandum, CRMC, Suspension of Acceptance of Medical Records Prepared by Dr. Gregory Nayden and American Medical Testing Facility). CRMC concluded that Dr. Nayden's records were "bereft of credibility." (*Id.*) CRMC noted incomplete and unreliable work and exposure histories, inconsistent testimony from AMT personnel, improper diagnostic criteria and Dr. Nayden's unfamiliarity with PFT and B-reading processes and terminology.

Dr. Nayden admits that he is not an expert regarding asbestos related disease and had virtually no prior medical experience pertaining to

asbestosis. He has no sub-specialty training in medical fields pertaining to occupational lung disease. He testified as to his unfamiliarity with important aspects of asbestos-related disease. He relied upon incomplete and unreliable work histories, prepared by non-medically trained personnel. He made assumptions about exposures, including frequency and duration. He had no information regarding the nature of exposure in many cases. Dr. Nayden relied upon a number of B-readers, who themselves have been rejected by Trusts. Dr. Nayden never personally reviewed the person's x-rays or communicated with the B-reader.

Dr. Nayden did not use accepted diagnostic methodology, such as those promulgated by the ATS. His methods were improper and scientifically unsound. He has subsequently claimed that he never made any diagnoses of asbestosis. Dr. Nayden based his reports upon unreliable information. Several asbestos Trusts do not consider him acceptable or reliable and he relied on B-readings of others not accepted by Trusts. In my opinion, Dr. Nayden's reports do not meet accepted medical and scientific standards and they are unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Nayden.

### Dr. Walter Allen Oaks

Dr. Oaks is a radiologist and NIOSH-certified "B" reader. He began doing work for asbestos litigation in the fall of 2000, at the suggestion of Dr. James Ballard (Oaks 3/9/06 W.R. Grace Dep. at 15,19). He participated in screening activities with RTS, Inner Visions, and N&M, Inc. (*Id.* at 23, 49-50 and 142.) He held a medical license in Alabama but performed screening evaluations in a number of states. In addition to occupational mass-screening companies, Dr. Oaks also worked directly with law firms and law groups including Environmental Litigation Group, Asbestos Litigation Alliance, and others (*id.* at 32, 81).

Numerous trusts have suspended acceptance of Dr. Oaks, including CRMC (CRMC 9/12/05 Suspension Letter), Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter), Eagle Picher Personal Injury Settlement Trust (Eagle Picher 10/19/05 Suspension Letter), and Keene

Creditors Trust (Keene 4/3/06 Suspension Letter). (*See also* Plibrico Trust on Physician and Screening Complaints at www.verusllc.com; Babcock and Wilcox Trust's distribution procedures at www.bwasbestostrust.com.) Thus, like Dr. Ballard and others, these asbestos claims trusts have deemed Dr. Oaks as unqualified, unreliable and unacceptable.

Dr. Oaks is listed in the top twenty-five individuals authoring "B" reads in support of claims submitted to the Manville Trust, with 2372. These were primarily from 2001 and 2002 (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question at No. 12).

In his positive reports, Dr. Oaks concluded there were radiographic changes "consistent with asbestosis." He has testified that such terminology does not constitute a diagnosis. He has also testified that if the exposure information was not compiled by a medical professional that he would not feel comfortable offering a medical opinion (Oaks 3/9/06 W.R. Grace Dep. at 149-150, 159). Although he was told that Dr. Harron was a pulmonologist and had been obtaining the medical history, based upon the deposition of Pam May and the testimony of Heath Mason, it was N&M employees filling out the intake sheets, not a physician. (May 3/27/07 W.R. Grace Dep. at 117; *see also* Heath Mason testimony, *In Re: Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearing at 328 (S.D. Tex. Feb. 17, 2005).)

Dr. Oaks relied on "B" readings from Dr. Ray Harron. Dr. Ray Harron has been deemed unreliable by numerous trusts, and he has taken the Fifth Amendment regarding his work practices (R. Harron 12/5/05 W.R. Grace Dep. at 17).

Dr. Oak's "B" readings had potential for reader bias. When performing "B" readings, it is best that the reader only consider the radiograph and not specific information of the patient. The reader should not focus on finding a specific disease (such as asbestosis) at the expense of an honest and thorough reading. The ILO *Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses* (Revised Editions 1980 and 2000) note, "When classifying radiographs for epidemiological purposes, it is essential that the reader does not consider any other information about the individuals being studied." They add,

"Awareness of supplementary details specific to individuals can introduce bias into results" (*id.* at 19 and 12, respectively).

Dr. Oaks admitted that he provided "B" reading reports according to the requests provided to him by testing services, and ultimately lawyers. In her June 2006 opinion, Judge Jack noted, "When reading x-rays, Dr. Oaks testified if the screening company told him to read for silicosis, that is the only disease he would mention in the report, even if he felt the x-ray was also consistent with asbestosis. (Feb. 17, 2005 Trans. at 235, 246.) Likewise, if the screening company told him to look for asbestosis, that is all he would report. (Feb. 17, 2005 Trans. at 235, 246)." (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp.2d 618-19.) In addition, the judge noted, "The screening company would tailor this process to the wishes of the law firm. In the words of Mr. Mason, "basically, [the screening company is] a service; whatever [the law firm] asked us to do is what we did. (Feb. 17, 2005 Trans. at 281.)" (*In Re: Silica Prods.Liab.Litig.*, 398 F. Supp. 2d at 598.)

Not only does this demonstrate bias in Dr. Oak's reports, there is potential that his "B" readings were also biased, as he based them upon information screening companies or lawyers provided to him.

Based upon my review of these data, I do not find Dr. Oaks' work reliable. In addition, he has relied upon other physicians and companies who are unreliable and suspended from various trusts. Furthermore, Dr. Oaks testified that his report of a finding "consistent with" asbestosis does not constitute a diagnosis of asbestosis. In this regard, I agree with Dr. Oaks. Although findings might be consistent with asbestosis, there are a large number of other medical conditions to which the x-rays also could be consistent. Dr. Oaks did not meet accepted diagnostic criteria for asbestosis. He relied upon inadequate exposure data and insufficient medical information to exclude alternative causes. Dr. Oaks' reports are not diagnoses, and should not be used as such.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Oaks.

### Dr. Robert Altmeyer

Dr. Altmeyer is a medical doctor, board certified in Internal Medicine and Pulmonary Diseases. He is a former NIOSH-certified "B" reader. He holds medical licenses in Ohio and West Virginia. Dr. Altmeyer has worked for N&M, Inc and RTS. A number of trusts have stopped accepting work from these companies. He has worked directly with a number of law firms. Based upon his affidavit, he has performed screenings in numerous states where he does not hold a medical license, including Alabama, Florida, Missouri, Illinois, Kentucky, Mississippi, and Texas. (Altmeyer 7/20/06 Affidavit at ¶3.)

Dr. Altmeyer ranks twelfth in the top twenty-five physicians authoring "B" readings in support of claims submitted to the Manville Trust (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question at No. 12). He is also in the top twenty-five of physicians considered the primary diagnosing doctor on reports submitted in support of claims submitted to the Manville Trust (*Id.* at No. 13). He is also in the top twenty-five of physicians authoring reports submitted in support of claims to the Manville Trust (*Id.* at No. 14 (a)-(c)). On certain days, he has authored over 150 diagnosing reports for individuals in the Manville Trust (Altmeyer 6/7/02 Invoice to N&M). For example, on April 24, 2003, he authored 154 reports. The next day, he authored 150 reports (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question at 14 (b)). Dr. Altmeyer testified that it takes him 15 to 20 minutes to do a complete workup and that he could have seen seventy a day (Altmeyer 03/30/06 Dep. at 150-51). It was common for him to see thirty-eight individuals daily in his work for N&M and RTS (*id.* at 153).

Dr. Altmeyer indicated he had a potential for bias because RTS or N&M told him what he was looking for. In addition, his fee structure was such that if he read an x-ray as positive, he would be paid more because he would follow it up with an examination. (Altmeyer 3/30/06 Dep. at 94-95.) For his medical history, Dr. Altmeyer relied on information generated by non-medical personnel through screening companies. (*Id.* at 89.) Such medical histories were incomplete and inadequate, and therefore, the entire basis for his opinions is unreliable.

Dr. Altmeyer issued an affidavit on July 20, 2006 pertaining to his involvement in the screenings for asbestos litigants in numerous states. He affirmed that a "B" reading read as "consistent with asbestosis" is not in-and-of-itself a diagnosis nor does it imply a diagnosis of an asbestos-related disease. He further affirmed that a diagnosis of an asbestos-related disease could not be made based on a chest x-ray alone, but rather required exposure with proper latency, a physical examination, and exclusion of other potential causes. He stated that any "B" reading of his used as the sole basis for a diagnosis of an asbestos-related disease was without his knowledge or consent and was improper (Altmeyer 7/20/06 Affidavit at ¶5-7).

Dr. Altmeyer has worked with numerous law firms as well as with N&M, Inc. and RTS. Based upon Manville Trust data, he is in the top twenty-five for "B" readings, diagnosing physician, and authoring reports. He relies on medical information from non-trained individuals. Based upon the Manville data, on some days he has rendered over 150 diagnoses in a single day. Such a volume is staggering. Based upon his affidavit, he attended screenings in numerous states without proper licensure. Dr. Altmeyer states that it was improper to use his "B" reading as a sole basis for a diagnosis of an asbestos-related disease.

In my opinion, Dr. Altmeyer's work regarding asbestos screenings is unreliable. He himself has disavowed any diagnoses based solely upon his "B" readings. He did not base his diagnosing reports upon a detailed occupational and medical history obtained directly for the patient. Rather, he relied on brief reports generated by screening company non-medical personnel. This is not an acceptable practice for diagnosing an asbestos-related disease or excluding other more probable cause.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Altmeyer.

### Dr. Jeffrey Bass

Dr. Bass is a board certified internist and emergency room physician. He has no training in Pulmonary Diseases or Occupational Medicine. He worked as the Medical Director for Healthscreen, Inc. -- a screening company that provided mass evaluation of individuals for the purposes of

seeking compensation for occupational lung disease. According to his affidavit, out of the thousands of individuals for whom he issued reports, he only examined twenty or thirty of them (Bass 1/25/06 Affidavit). Dr. Bass goes on to state that he did not review any actual chest x-rays and has never diagnosed any individual with asbestosis or silicosis (*id.* at 1).

In reviewing Dr. Bass' deposition testimony from May 10, 2003, I find some conflicting information regarding his affidavit noted above. Specifically, he is asked regarding his work with Healthscreen, "And then are you, in your mind, making a diagnosis or not, doctor?" To which he answers, "Yes." (Bass 5/10/03 Dep. at 32.) Similarly, when asked, "With respect to your work that you do for Healthscreen, do you in fact consider it a diagnosis of an asbestos-related condition?" He responds, "Yes." (*Id.* at 112.) In his more recent testimony, Dr. Bass contradicts these statements and he now disavows any diagnosis of asbestosis.

On September 12, 2005, the CRMC determined that medical reports prepared by Healthscreen, Inc. were not reliable and would no longer be accepted. The CRMC also noted that Healthscreen was the subject of Federal Grand Jury and Congressional investigations into alleged fraud and that evidence presented at the Silica MDL supported the challenge to Healthscreen's reliability. The CRMC determined that they would no longer accept any reports from Healthscreen, Inc. (CRMC 9/12/05 Suspension Letter).

In his affidavit, Dr. Bass attested that he had never diagnosed any individual with asbestosis. Therefore, any report of his used for such purpose is unreliable. Furthermore, Dr. Bass did not utilize accepted methodology for diagnosing asbestosis.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Bass.

### Dr. Richard Levine

Dr. Levine is a board certified radiologist. He is also a NIOSH-certified "B" reader. He does not hold himself out as a pulmonologist or occupational medicine specialist. He received his medical degree at Albert

Einstein College of Medicine in 1969. He completed his radiology
residency in 1973. He did not receive any subspecialty training in
Pulmonary Diseases or Occupational Medicine. He holds an active medical
license in the State of Pennsylvania. His licensures from New York and
New Jersey are inactive.

Dr. Levine has performed thousands of "B" readings. He has worked
for over ninety different law firms. According to the CRMC data, Dr.
Levine ranked sixth in the top twenty-five physicians authoring "B" reads in
support of claims submitted to the Manville Trust. (CRMC 3/2/2006 Resp.
to Amended Notice of Dep. upon Written Question, No. 12) He ranked
number four in the top twenty-five of primary diagnosing doctors for claims
submitted to the Manville Trust in 13,551 cases. (*Id.* at Question No. 13.)

Based upon a subsequent affidavit from Dr. Gitlin (*In Re Owens
Corning, November 10, 2004*), Dr. Levine was one of the seven initial "B"
readers in the Gitlin study (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer
E., "Comparison of "B" readers' interpretations of chest radiographs for
asbestos related changes," Acad. Radiol. 11 at 843-856 (2004)). Hence, a
panel of "B" readers only agreed with the readings of Dr. Levine and others
in less than 5% of cases. This provides further evidence of Dr. Levine's
unreliability.

According to his Responses to Deposition by Written Questions, Dr.
Levine has no understanding as to the diagnostic criteria for asbestosis
(Levine 1/9/07 Resp. to Grace Dep. By Written Question, Question 87 at
111 (I have "no understanding as to the criteria for making a clinical
diagnosis of asbestosis." I am not qualified to make such a clinical
diagnosis, nor have I ever made such a clinical diagnosis.").) He further
stated that he was unqualified to make such a clinical diagnosis and had
never made such a clinical diagnosis. (*Id.* ("I am not qualified to make such
a clinical diagnosis, nor have I ever made such a clinical diagnosis.").) In
response to Question 161, he indicated that he was not qualified to render a
clinical diagnosis of asbestos-related disease and had never done so. (*Id.* at
186.) In response to Question 162, he indicated that no court or tribunal
should rely on any of his reports to establish a clinical diagnosis of asbestos-
related disease. (*Id.* at 187 ("Although I am reluctant to tell a court what it
should or should not rely upon, I can represent that in my view as a board
certified radiologist who is also a NIOSH certified B-reader, it is a mistake

to rely upon a B-reading for any purpose other than that for which it was originally designed and intended. More specifically, no B-reading can or does conclusively or clinically establish the presence (or absence) of any occupational dust disease. Thus, none of my reports, and, I believe, no report from any other B-reader can or should be relied upon or considered as a clinical diagnosis of an asbestos-related disease, or any occupational dust disease.").)

In his general statement, Dr. Levine noted, "A positive "B" read simply does not equate to a clinical diagnosis of an occupational dust disease." (*Id.* at 1 (General Statement).) He noted that radiographic densities or shadows might be "caused by any number of disease processes" and that reading x-ray shadows is "subjective and non-conclusive." (*Id.*) He stated that if any persons used his "B" reads as a clinical diagnosis of occupational dust disease, misused his "B" reads for purposes for which they were never intended, and practiced "bad science." (*Id.* at 2.)

When queried about his report terminology using terms such as "diagnostic," "diagnostic of asbestosis," "indicating asbestosis," and "indicate asbestosis," he indicates that he referred to a radiological diagnosis and that the findings were "consistent with" asbestosis but not a clinical diagnosis. (*Id.* at 107-09 (Question Nos. 83-85).)

I concur with Dr. Levine in that no x-ray alone is clinically diagnostic of pneumoconiosis. This holds true for asbestos-related disease, including asbestosis. The ILO also notes there is nothing pathognomonic of pneumoconiosis on a chest radiograph. Dr. Levine states that he has never made a clinical diagnosis of an asbestos-related disease and that his reports should never have been used for such purpose. I concur with Dr. Levine that no court or tribunal should rely on his reports to establish a clinical diagnosis of an asbestos-related disease. Simply put, Dr. Levine's "B" readings are merely his impressions of a radiographic pattern, and alone do not meet accepted diagnostic criteria for asbestosis or other pneumoconiosis.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Levine.

### Dr. Jay Segarra

Dr. Segarra is a pulmonologist, board certified in Internal Medicine, Pulmonary Diseases, and Critical Care. He is a NIOSH-certified "B" reader. He practices primarily in Mississippi, but holds several other state medical licenses. He has done medical screenings in 23 states, some in places where he did not hold medical licensure (Dr. Jay Segarra, CV). He has done most of his screening work through RTS. Over a six-year period, he received approximately $1.5 million for his work for RTS. (*See* Segarra 11/20/06 W.R. Grace Dep. at 126-29.) He has also worked with N&M, Inc. and other screening companies. (*Id.* at 109.)

Dr. Segarra has read an estimated 100,000 screening x-rays. (*Id.* at 120.) He is fourth of the top twenty-five individuals authoring "B" reads in support of claims submitted to the Manville Trust (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question at No. 12). He is third of the top twenty-five individuals considered the primary diagnosing doctor on reports submitted to claims to the Manville Trust, with 23,200 (*id.* at No. 13). He is third in the top twenty-five individuals authoring reports submitted in support of claims to the Manville Trust, with 38,447 (*id.* at No. 14 (a)-(c)). According to the CRMC data, Dr. Segarra has had a number of days in which he has had over 150 diagnosing reports on a single day. As an example, he submitted 194 on July 29, 2003, 192 on October 15, 1994, and 178 on March 15, 1994 (*id.*). Such numbers would not fit with his testified estimate of taking one to one and a half hours per patient.

Dr. Segarra had testified that he rarely or never diagnosed an individual when relying on an x-ray reading by another doctor (and not reading it himself). He referred to this as "splitting the diagnosis" (Segarra 11/20/06 W.R. Grace Dep. at 159). Nevertheless, there were 1255 cases of splitting or "piggybacking" the diagnosis (*Id.* at Ex. 11). The "other" x-ray reader upon whom Dr. Segarra "piggybacked" included Dr. Ballard and Dr. Ray Harron, doctors whose reports are no longer accepted by numerous trusts.

Based upon a subsequent affidavit from Dr. Gitlin (*In Re Owens Corning, November 10, 2004*), Dr. Segarra was one of the seven initial "B" readers in the Gitlin study (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for

asbestos related changes," Acad. Radiol. 11 at 843-856 (2004)). That the "B" reader panel only agreed with the "initial" reader (Dr. Segarra and others) in 4.5% of cases provides further evidence of Dr. Segarra's unreliability.

Before 2001, Dr. Segarra primarily diagnosed asbestos-related disease with relatively few diagnoses of silicosis or mixed-dust pneumoconiosis. After this time, there was a marked increase in the number of cases he diagnosed with silicosis and mixed-dust pneumoconiosis (Segarra 11/20/06 W.R. Grace Dep. at 357-58). This correlates with the upsurge in silica-related diagnoses, as reported in the Silica MDL hearings.

I have reviewed reports and "B" readings by Dr. Segarra in which he has "flopped" from an asbestos-related diagnosis to a silica-related diagnosis, or visa versa. An example of such case pertains to Mr. R.L. (*See* Segarra 11/20/06 W.R. Grace Dep. at Ex. 43) On March 24, 2003, Dr. Segarra read a chest x-ray of Mr. R.L. from February 11, 2003. He graded this as a quality 1 x-ray with profusion 1/0 s/t opacities in the lower lung zones. He saw no rounded opacity, no upper lung zone opacity, and no large opacity. In an attached narrative, he stated that the interstitial changes were "consistent with mild pulmonary asbestosis" and that there was "no radiographic evidence for silicosis." On July 11, 2003, Dr. Segarra read Mr. R.L.'s x-ray from the same day. Again, he graded this as a good quality x-ray. This time, however, he observed profusion 1/0 p/q opacities in the upper lung zones only. He saw no irregular opacity and no lower lobe opacity. He reported the presence of benign granulomata, in the perihilar regions, which he had not commented on previously. Interestingly, he stated that he compared this to the x-ray from February 11, 2003, noting no interval change, despite the dramatic change based on his descriptions. In this case, Dr. Segarra diagnosed Mr. R.L. with chronic simple silicosis based upon the chest x-ray appearance and did not diagnose him with asbestosis.

Another example is Mr. J.N. Dr. Segarra read a chest x-ray of Mr. J.N. from November 9, 2004 as having profusion 1/0 p/q opacities in all six lung zones. Approximately six months later, Mr. J.N. had a chest x-ray from May 12, 2005 in which Dr. Segarra read profusion 1/0 t/s opacities in the lower lung zones. All the rounded opacities had disappeared. (*See* Segarra 11/20/06 W.R. Grace Dep. at 297-98; *see also* National Public Radio Report: *Silicosis Ruling Could Revamp Legal Landscape*, March 6, 2006,

www.npr.org, Story Id. 5244935 (Interview of Jay Segarra discussing J.N. report).) Such intra-reader variability goes beyond expected degree and such "flops" are not consistent with accepted medical knowledge of these diseases. Furthermore, there is no reason to believe this practice is any different for Grace claimants. These inconsistent readings support the opinion that Dr. Segarra's B-readings are not reliable.

On September 10, 2003, Dr. Segarra evaluated Claimant A.G. (*See* Segarra 11/20/06 W.R. Grace Dep. at Ex. 45.) Dr. Segarra described Claimant A.G. as having exposure to rock dust and limestone dust while doing road construction from 1955 until 1970. From 1970 until 1986, he worked as an outdoor maintenance laborer at an oil refinery, primarily cutting grass and doing outside maintenance. Dr. Segarra noted that he did not work in high heat areas, asbestos-intensive areas, or near sandblasting. Since 1999, he had worked for Texas City doing lawn maintenance with a tractor. Dr. Segarra wrote that Claimant A.G. believed he was exposed to asbestos, "but is not sure how." Dr. Segarra read A.G.'s x-ray dated August 10, 2002 as having profusion 1/1, p/q opacities in all six lung zones. He saw no pleural plaques or pleural calcifications. He did note elevation of the right hemidiaphragm. Dr. Segarra's diagnosis of Claimant A.G. was chronic simple silicosis.

Dr. Segarra evaluated Claimant A.G. again, just a few months later (on January 7, 2004). Dr. Segarra noted that A.G. stated he had been exposed to asbestos while working at the oil refinery, but provided no details, such as the intensity, duration, nature, or frequency of exposure. He did not state, as he had in his prior report, that Claimant A.G. did not know how he had been exposed to asbestos. This time, Dr. Segarra read A.G.'s x-ray as having profusion 0/1 t/t opacities in the mid and lower lung zones. Claimant A.G.'s silicosis and rounded opacities had disappeared. Dr. Segarra did describe the presence of bilateral diaphragmatic calcified pleural plaques, which he had not described on the prior x-rays. Dr. Segarra diagnosed Claimant A.G. with asbestos-related pleural disease but found there was no radiographic evidence for silicosis.

Dr. Segarra has extensive done work with RTS and some screening work with N&M, Inc. Numerous trusts have rejected work from both these screening companies, including CRMC (CRMC 9/12/05 Suspension Letter), Eagle-Picher Personal Injury Settlement Trust (Eagle-Picher 10/19/05

Suspension Letter), Keene Creditors Trust (Keene 4/3/06 Suspension Letter), and Celotex Asbestos Settlement Trust (Celotex 10/18/05 Suspension Letter). That means reports generated through work for the screening companies, including Dr. Segarra's reports, have been rejected and determined to be unacceptable and unreliable by these asbestos claims trusts.

During his screening work in Washington State, Dr. Segarra performed examinations, rendered diagnoses and recommended treatment, without being licensed in that State, a criminal offense (10/15/02 Order, *In re: Certain Asbestos Cases*, (ACR XXIV Cases) (Sup. Ct. King County, Wash.).)

Of significant concern is Dr. Segarra's testimony regarding his terminology and phraseology in his reports. He seems to make a distinction when his report uses the word "impression" versus "diagnosis/impression." (See Segarra 11/20/06 W.R. Grace Dep. at 104.) However, in a letter to Mr. Alwyn Lucky, an attorney in Mississippi, he attempted to clarify his report language for this attorney. Dr. Segarra wrote that on individuals for whom he used the phrase "interstitial changes consistent with mild pulmonary asbestosis in a subject with an appropriate environmental exposure history and an adequate latent period," meant that he had reviewed the exposure history and found it to be sufficient to cause the radiographic abnormalities that he described. He goes on to state, "As with the *diagnosis* of most illnesses, there are certain criteria that I use in each *diagnosis* that I do not always recite in my reports. Please be advised that I do indeed look at the patient's exposure history to asbestos (when provided) and latency period, and base my *diagnosis* with a reasonable degree of medical probability, that the individual does indeed have pulmonary asbestosis" (A. Luckey 8/5/03 Letter)(emphasis added). To a layperson, I can see how Dr. Segarra's distinctions are hard to follow. As a physician, we often use the word "impression" or "assessment" in rendering a diagnosis for our patients. If a doctor writes, for example, "Impression: Mr. Jones has hypertension," this is his diagnosis, regardless of whether he actually used the word "diagnosis" in his report. It seems that only Dr. Segarra can determine which of his reports constitutes a diagnosis and which does not. (*See* Segarra 11/20/06 W.R. Grace Dep. at 172-73.) Without his individual "okay" for each case as a "diagnosis," none should be considered diagnosing reports, in my opinion.

This subjectivity alone renders the use of his reports in support of asbestos claim litigation as suspect.

Based upon my review of this information regarding Dr. Segarra, I do not find his reports or "B" readings reliable. I have seen examples of "flops," wherein irreversible diseases have disappeared and new ones have appeared. A panel of "B" reading experts found dramatic disagreement with his readings. I have seen examples of inadequate occupational exposure histories taken by Dr. Segarra. I have seen an implausible number of silica and mixed-dust claims supported by Dr. Segarra beginning in 2001. Dr. Segarra has relied upon other "B" readers, whose work trusts have stopped accepting. Dr. Segarra has worked with companies such as N&M and particularly RTS, from whom numerous trusts have stopped accepting reports or conclusions in support of claims. Dr. Segarra has provided huge numbers of diagnosing reports, including almost 200 patients in a single day. He is the third most prolific diagnosing doctor submitting claims to the Manville Trust. Finally, Dr. Segarra uses certain phrases and terminologies that are not typical for normal medical practice and are clearly confusing to laypeople, and in my opinion, even physicians. Without consulting Dr. Segarra on each individual case, one cannot rely on his report as rendering a diagnosis. Based upon this information, I do not find Dr. Segarra's "B" readings reliable and I cannot tell objectively whether to rely on his reports as a diagnosis.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Segarra.

### Dr. Dominic Gaziano

Dr. Gaziano received his medical degree from the Medical College of Virginia in 1962. He completed an Internal Medicine Residency and then a Pulmonary Medicine Fellowship. He holds board certification in Internal Medicine and Pulmonary Disease. He is a NIOSH-certified "B" reader. He has been licensed to practice medicine in New Hampshire, Virginia, West Virginia, Alabama, and Texas. He stopped seeing patients in private practice in 1997.

Dr. Gaziano has read over 150,000 chest x-rays, mostly for law firms and some screening companies. He has done screenings in fourteen different states, many in which he was not licensed. He is one of the highest diagnosing doctors in claims against Grace. He is the fifth most prolific author of "B" reads in support of claims submitted to the Manville Trust. (CRMC 1/3/06 Resp. to Dep. By Written Questions at Nos. 12, 13 and 14(a).) He is fifth in the top twenty-five of doctors considered primary diagnosing doctor on reports submitted in support of claims to the Manville Trust (12,983 reports). (*Id.*) He is fifth in number of physicians authoring reports submitted in support of claims to the Manville Trust with 22,855. (*Id.*) On October 24, 2005, he stated that he spends 15-20 minutes with the people he screens (Gaziano 2/24/05 Dep. at 150) but there are days when he screened sixty individuals. This occurred on at least eight occasions. (CRMC 1/3/06 Resp. to Dep. by Written Questions at No. 14(b).)

Based upon a subsequent affidavit from Dr. Gitlin (*In Re Owens Corning, November 10, 2004*), Dr. Gaziano was one of the seven initial "B" readers in the Gitlin study (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for asbestos related changes," Acad. Radiol. 11 at 843-856 (2004)). That the "B" reader panel only agreed with the "initial" reader (Dr. Gaziano and others) in less than 5% of cases provides further evidence of Dr. Gaziano's unreliability.

Dr. Gaziano conducted his screening evaluations at hotel rooms and motel conference rooms. (Gaziano 10/18/06 W.R. Grace Dep. at 89.) He relied on the occupational history on a form taken by individuals that he did not know their qualifications for taking a medical or employment history. Dr. Gaziano indicated that he did not believe a physical examination was required for diagnosis (Gaziano 10/18/06 W.R. Grace Dep. at 171-72, 189-95). During the same deposition, he stated that a differential diagnosis was not required and he stated that it was just "not important." (*Id.* at 148.)

Dr. Gaziano admitted in his deposition from February 25, 2005 that knowing what he is screening for affected his "B" readings. (Gaziano 2/25/05 Dep. at 85.) During the same deposition, he admitted that he does not always use the standard ILO films. (Gaziano 2/24/05 Dep. at 162.) This is contrary to ILO guidelines. Dr. Gaziano indicated that, in many instances, he does not read and sign or review his reports and does not keep records.

(Gaziano 10/18/06 W.R. Grace Dep. at 223.)  Dr. Gaziano typically does not take an occupational history from the individual himself and when he does talk about exposures, he does not inquire as to the duration of exposure or the use of respiratory protective equipment (Gaziano 2/25/05 Dep. at 39-40).

Dr. Gaziano relied upon incomplete and unreliable work histories, prepared by non-medically trained personnel. He admitted that he does not believe that a physical examination is required to make a diagnosis of an asbestos-related disease and does not believe that a differential diagnosis is important or that you need to exclude other more probable cause.

Dr. Gaziano has done "B" readings without using the ILO standard films as required by the ILO. As he keeps no records, it may be impossible to determine which "B" readings for which he used the standard films and for which ones he did not. Therefore, all of his "B" readings are suspect.

Dr. Gaziano stated that he takes 15-20 minutes to do a screening but at that rate, it would take close to 20 straight hours to screen sixty patients, as he has done on more than one occasion. To screen sixty patients or more in one day suggests that he is spending far less time than to which he has testified.

In summary, Dr. Gaziano did not use accepted diagnostic methodology, and in my opinion, neither his screening reports nor "B" readings are reliable. By taking an incomplete work and exposure history, along with inadequate past medical history, his diagnoses do not meet accepted standards. He not only does not have sufficient information to exclude alternative diagnoses, but he testified that doing such was unimportant. This, too, is contrary to accepted standards.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Gaziano.

### Dr. Alvin Schonfeld

Dr. Schonfeld received his D.O. degree in 1972. He is board certified in Internal Medicine and Pulmonary Diseases (Schonfeld 6/23/05 Dep. at 9-10). He has been a NIOSH-certified "B" reader since 1990 (Schonfeld

7/10/06 Dep. at 12). He holds a license to practice medicine in fourteen states but has done work in at least thirty-two states (Schonfeld 12/18/06 WR Grace Dep. at 86). Two states' courts (Oregon and Utah) have excluded him for practicing medicine without a license. (*Id.* at 91; see *also* Order granting Defendants' Motion for Summary Judgment, *Raught v. Asbestos Corporation Limited, et al.*, in Superior Court of Washington, No. 02-2-10083-O (SEA).

Dr. Schonfeld has worked for numerous screening companies and directly through plaintiffs' law firms. Dr. Schonfeld has connections to PFL, a screening company deemed unacceptable by trusts. (Schonfeld 12/18/06 W.R. Grace Dep. at 219-21; McNeese 3/26/93 Dep. at 33.) Dr. Schonfeld worked for RTS. Dr. Schonfeld testified that Mr. Charlie Foster (of RTS) told him that he was not reading enough x-rays as positive. Dr. Schonfeld believed that the structure of the screenings at RTS created a financial pressure to read x-rays as positive (Schonfeld 7/10/06 Dep. at 52-53; Schonfeld 6/21/04 Dep. at 83; Schonfeld 6/23/04 Dep. at 16).

In terms of volume, Dr. Schonfeld is one of the most prolific physicians supporting claims against W.R. Grace. He is the number two physician in the top twenty-five considered primary diagnosing doctor on reports submitted for claims against the Manville Trust, with 31,211 such reports (CRMC 3/2/06 Response to Amended Notice of Dep. Upon Written Question at No. 13). He is also number two on the top twenty-five individuals authoring reports submitted in support of claims to the Manville Trust with 41,573 such reports (*id.* at No. 14 (a)-(c)). He is ninth in the top twenty-five individuals submitting "B" reads in support of claims to the Manville Trust (*id.* at No. 12). He testified that he recalls physically examining eighty individuals on a given day. (Schonfeld 12/18/07 W.R. Grace Dep. at 321.) According to Exhibit E from the Manville Trust, there are numerous days where he has authored over 200 diagnosing reports on a single day. For example, on August 31, 2001, he authored 494 reports, and on October 7, 1994, he authored 407 reports. Despite these large numbers of x-rays that he read as positive, he claimed that 75 to 90% of the films he read were normal (Schonfeld 7/10/06 Dep. at 20).

Dr. Schonfeld did not obtain adequate exposure histories to support a diagnosis of asbestosis. The accepted medical standard includes information regarding the date of first exposure, duration, intensity, nature, and

frequency of exposures. The standard also requires information regarding exposures to other potentially harmful substances and the use of respiratory protective equipment.

Patient D.C. (from November 22, 1999) is an example of Dr. Schonfeld's inadequate work histories (Schonfeld 12/18/06 WR Grace Dep. at Ex. 25). In this instance, the occupational history merely states, "He indicated exposure to aerosolized asbestos during his career." Dr. Schonfeld does not state what work Mr. D.C. did, when he worked, when he had exposures to asbestos or how, or any other information other than as quoted above. Dr. Schonfeld notes that this patient had a history of cardiac arrhythmia, staphylococcal infection, congestive heart failure, and a pacemaker, but provides no other information. Even worse, on physical examination, he notes that this gentleman had a prior median sternotomy surgery and had evidence on auscultation that he had had an aortic valve replacement, yet he did not discuss this in his past medical history. Regarding the same gentleman, Dr. Schonfeld reviewed pulmonary function testing, which he stated met ATS standards. There is severe airflow obstruction yet they did not perform bronchodilator testing as recommended by the ATS. In addition, the trial efforts do not correlate with the reported values. This is just one example. In my review of other reports, I find additional problems with the PFTs that do not meet ATS criteria despite his statement that they did.

As another example is Mr. G.L. (*id.* at Ex. 27). Dr. Schonfeld noted that this gentleman worked as a laborer, but did not specify any exposure to asbestos. He stated that the pulmonary function testing met ATS standards, yet the flow volume loop reveals a severe cough defect within the first second, clearly not meeting ATS criteria. In addition, they did not perform bronchodilator testing as recommended by the ATS.

As another example is Mr. J.L., in which Dr. Schonfeld merely states that this gentleman "worked at various places where he was exposed to aerosolized asbestos" (*id.* at Ex. 33). Such an occupational and exposure history does not meet accepted standards for diagnosing asbestos-related disease.

Dr. Schonfeld has read huge volumes of x-rays and submitted large numbers of diagnosing reports for asbestos-related litigation purposes. In

reviewing some of his diagnostic reports, he neither obtains an adequate occupational and exposure history, nor does he exclude other more probable cause. Although he claims that the pulmonary function testing meets ATS criteria, this is frequently untrue. Furthermore, many of these individuals smoked and had significant airflow obstruction but did not have post-bronchodilator testing as recommended by the ATS. Dr. Schonfeld does not attribute the importance of their smoking to the obstructive disease. Dr. Schonfeld has done work for various screening companies whose reports and related work are no longer accepted by various trusts. In my opinion, Dr. Schonfeld's diagnosing reports for asbestos-related disease are not reliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Schonfeld.

### Dr. Leo Castiglioni

Dr. Castiglioni was an internist. He was not a "B" reader and had no specialty training in Pulmonary Diseases or Occupational Medicine. He was board certified in Internal Medicine. He performed work for Pulmonary Advisory Services, Pulmonary Testing Services, Inc., and N&M, Inc. His role for these screening companies was providing a linking letter based on Dr. Ray Harron's "B" reading and report in support of asbestos-related disease diagnoses. Dr. Castiglioni did not examine any individual, maintained no patient-physician relationship, and merely performed a paper review (R. Harron 5/15/97 Dep. at 223 - 224).

Dr. Castiglioni relied on Dr. Ray Harron's "B" readings and did not personally review any x-rays (R. Harron 5/15/97 Dep. at 224). He also relied on Dr. Harron's occupational, exposure, and past medical histories. These records from Dr. Harron were inadequate to support a diagnosis of asbestosis or to exclude other more probable causes. The acceptance of Dr. Ray Harron's work has been suspended by numerous trusts and Dr. Harron has taken the Fifth Amendment before Congress and in his deposition in this litigation.

According to Dr. Harron's testimony, N&M, Inc. and Dr. Harron split a $25 fee for Dr. Castiglioni's diagnostic reports. (R. Harron 5/15/97 Dep.

at 221-225) Dr. Castiglioni also provided his services for PTS as with N&M, Inc. for Dr. Harron (*The Silicosis Story: Mass Tort Screening and the Public Health,* Hearings Before the Subcomm. on Oversight and Investigation of the Committee on Energy and Commerce, 109th Congress, 2d Session at 122 (March 8, 2006).

In my opinion, the reports by Dr. Castiglioni are not reliable. He based his reports solely on paper review from information by Dr. Ray Harron and the screening companies. These companies and Dr. Harron have been deemed unacceptable and unreliable by numerous trusts. In reviewing Dr. Castiglioni's diagnosing reports, he merely states that he thinks the particular individual has asbestosis based upon the "stated occupational history and the "B" reading." Given that the history of exposures by Dr. Harron are inadequate to support a diagnosis of asbestosis and that Dr. Castiglioni made no attempt to exclude other more probable cause/differential diagnosis, his methodology does not meet accepted diagnostic standards. Furthermore, Dr. Castiglioni relies upon screeners and individuals whose work is unreliable and unacceptable to numerous trusts due to the failure to follow accepted medical standards. In this regard, no reports by Dr. Castiglioni regarding the diagnosis of an asbestos-related disease are reliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Castiglioni.

### Dr. Phillip Lucas

Dr. Lucas is board certified in Internal Medicine. He was apparently board eligible for Radiology in 1983 but he never obtained Board certification. (Lucas 5/5/07 W.R. Grace Dep at 20-21.) He is a former NIOSH "B" reader but has allowed his "B" reader certification to lapse. (*Id.* at 22.) Dr. Lucas did asbestos screenings for RTS (Lucas 6/15/02 Dep. at 45-47) and has been paid by other screening companies (*see* Lucas 5/5/07 W.R. Grace Dep. at 31 (N&M, Inc.), 134-35 (Pulmonary Function Laboratories)).

Dr. Lucas has read tens of thousands of x-rays (*id.* at 157). From 1997 to 1998, he read over 14,000 films (Lucas Invoice Summary 1997-

1998). He has authored over 2000 "B" readings for submission to the Manville Trust and ranks ninth in the top twenty-five physicians authoring reports submitted to the Manville Trust, with 13,337 submissions (CRMC 3/2/06 Resp. to Amended Notice of Dep. by Written Question at No. 14 (a)-(c)). He is the sixteenth top primary diagnosing doctor for Manville (*id.* at No. 13). He has authored over 250 diagnosing reports in a single day (example, January 29, 1996 and March 17, 1996). (*Id.* at 14 (b).)

Dr. Lucas has estimated that 60% of his "B" readings were negative, 30% positive, and no more than 10% unreadable (Lucas 3/31/99 Dep. at 60-61). In 2002, he claimed only 10-20% of his x-ray readings were positive (Lucas 6/15/02 Dep. at 88). In 2004, he stated that his readings from 2003 and 2004 were 60-70% negative (Lucas 5/22/04 Dep. at 87). These numbers are troubling considering the sheer volume of positive "B" reads submitted.

Dr. Lucas states that a "B" reading alone is insufficient as a diagnosis and that his "B" reading reports do not constitute diagnoses. (*Id.* at 25; *see also* Lucas 5/5/07 W.R. Grace Dep. at 43, 71-72.) He has also indicated it would be improper to use his "B" readings and reports as diagnoses. (Lucas 5/22/04 Dep. at 65-66; Lucas 5/5/07 W.R. Grace Dep. at 43-44.) He states that the phrase "causally related to asbestosis" does not constitute a diagnosis. ((Lucas 5/22/04 Dep. at 65-66 at 37; *see also* Lucas 5/5/07 W.R. Grace Dep. at 73-74("Q: ...[W]hen you put in your report that your reading is consistent with asbestosis or any asbestos-related disease, you're not making a diagnosis regarding any asbestos-related diseases, are you? A. I'm not diagnosing asbestosis or any of it's secondary manifestations."), 172-74 ("It was never intended to be a diagnosis . . . I'm not making a diagnosis." 176 ("Q. [Referring to W.R. Grace Claimants] And also just to clarify, when you performed your physical examinations, you weren't making a diagnosis of an asbestos-related disease? A. Correct.").) Dr. Lucas testified that he never diagnosed any individual with an asbestos-related disease in his clinical practice (Lucas 5/5/07 W.R. Grace Dep. at 106, 109).

Dr. Lucas is one of the "initial" B readers of the Gitlin report. As noted above, a panel of B readers disagreed with his and others' readings in approximately 95% of the time. (Gitlin JN, Cook LL, Linton OW, Garrett-Mayer E., "Comparison of "B" readers' interpretations of chest radiographs for asbestos related changes," Acad. Radiol. 11 at 843-856 (2004); *see also*

Lucas 5/5/07 W.R. Grace Dep at 169 (Lucas has no opinion regarding appropriateness of panel readers disagreeing with him 90% of the time).) Such variance goes well beyond acceptable limits for inter-reader variability.

Dr. Lucas testified that when reading chest x-rays for attorneys, he only completes the NIOSH ILO form if the film is "positive" (Lucas 5/5/07 W.R. Grace Dep. at 157-58). He also testified that, depending upon the arrangement with the attorney, he charged $35 for a "negative" B-reading and $70 for a "positive" reading (Lucas 5/5/07 W.R. Grace Dep. at 70-71). This is unethical according to NIOSH and is a source of reader bias.

Dr. Lucas has indicated that his reports do not constitute diagnoses and should not have been used in such a manner (Lucas 5/5/07 W.R. Grace Dep. at 43, 73-74, 172-74, 176). I concur. In addition, on the basis of the Gitlin report, and supported by the sheer volume of x-rays read by Dr. Lucas, I do not find his x-ray readings credible and I would not rely upon them. Furthermore, he has worked with screening companies who have been rejected as unreliable by numerous trusts and whose practices and methodologies have been called into question. These factors indicate that Dr. Lucas' reports do not comply with medically recognized practices and requirements and are therefore unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Lucas.

### Dr. Robert Mezey and Dr. James Krainson

Dr. Mezey is a Board certified pulmonologist and a NIOSH-certified "B" reader. He holds medical licenses in New York, Alabama, and Florida (Dr. Joseph Mezey, C.V.). Dr. Krainson is also a Board certified pulmonologist and NIOSH-certified "B" reader. He has a medical license in Florida (Dr. James Krainson C.V.). Both physicians have worked with a number of screening companies, including RTS and N&M. As noted above, numerous trusts have suspended acceptance of RTS and N&M (and all medical reports generated through both of these screening companies), including Eagle-Picher Personal Injury Settlement (Eagle-Picher 10/19/05 Suspension Letter) and Celotex Asbestos Settlement Trust (Celotex 10/18/05

Suspension Letter). Drs. Mezey and Krainson worked together and were in the top twenty of physician pairings according to CRMC data.

Both Dr. Mezey and Krainson are in the top twenty-five individuals authoring "B" reads in support of claims submitted to the Manville Trust, totaling 4848 together (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question at No. 12). Dr. Krainson ranks 18th in the top twenty-five physicians authoring "B" readings in support of claims submitted to the Manville Trust (*id.* at No. 12). Dr. Mezey is in the top twenty-five of individuals considered primary diagnosing doctor on reports submitted in claims to the Manville Trust, with 4736 (*id.* at No. 13). He is number sixteen in the top twenty-five physicians authoring reports submitted in support of claims to the Manville trust with 8839 (*id.* at No. 14 (a)-(c)). Dr. Mezey has submitted as many as 76 reports in one day (December 3, 2002) (*id.* at No. 14(b)).

The work and exposure histories provided by these physicians are inadequate to support a diagnosis of an asbestos-related disease and do not meet accepted medical standards. For example, Dr. Krainson reported on September 23, 1997 regarding Claimant I.B., the following exposure history: "The patient describes occupational exposure to asbestos materials with a latency period of greater than fifteen years from time of exposure to the time of development of signs and symptoms." (P.I. Questionnaire of I.B., Rust ID 000708678 at 44654-00234 through 44654-0041.) He does not indicate any occupation, exposure to other materials, the nature, intensity, or frequency of asbestos exposures, the use of respiratory protective equipment, or the time of onset of exposure to asbestos.

As another example, this time from Dr. Mezey, is a report dated October 31, 2000 regarding Claimant P.P. (P.I. Questionnaire of P.P., Rust ID 001611991 at 44813-0023 through 44813-0032.) Dr. Mezey's exposure history states, "Mr. P.P. states that he was occupationally exposed to asbestos materials on a regular basis for many years, beginning in approximately 1965." Dr. Mezey does not state what occupation or occupations claimant P.P. had, the nature, intensity, or specific duration of exposure. He does not mention exposures to other materials or the use of respiratory protective equipment.

Dr. Mezey and Dr. Krainson use NIOSH "B" reading forms that have been altered. Under the comment section are two typed entries, one stating, "Interstitial lung disease consistent with asbestos exposure/asbestos-related disease" and the other, "Pleural thickening/pleural plaques consistent with asbestos exposure/asbestos-related disease." Consideration should be given as to whether such entries might lead to reader bias. There are no similar entries for "No pneumoconiosis" or "Other pneumoconiosis." (P.I. Questionnaire of J.H., Rust ID 001274117 at 007506-060.)

Numerous pulmonary function testing show results that do not meet ATS criteria for acceptability. An example is Mr. P.M. in a report from January 5, 2001. There is severe regularity of flow, no plateau, and no exhalation beyond six seconds. There are other examples as well. *(See, e.g.,* P.I. Questionnaire of P.M., Rust ID 000149372 at 44723-0028 through 44723-0035.) I have reviewed numerous examples and noted repeated patterns of unacceptable PFTs, yet upon which Drs. Mezey and Krainson relied.

In my opinion, the occupational exposure histories as detailed by Drs. Mezey and Krainson are inadequate to warrant a diagnosis of asbestos-related disease or other pneumoconiosis. They do not follow ATS or AMA guidelines. The alteration of their NIOSH forms suggests possible bias and the pulmonary function testing do not meet ATS criteria. In my opinion, the diagnostic reports by Drs. Mezey and Krainson are unreliable.

In addition, see generally reliance materials for additional background and support for my analysis of Drs. Mezey and Krainson.

### Dr. Paul Venizelos

Dr. Venizelos is a pulmonary physician. He has been a NIOSH "B" reader since 1992. He worked with numerous law firms and for N&M, Inc. According to the Ohio License Center, Dr. Venizelos had his initial license in Ohio in 1975. According to their records, in 1988, Dr. Venizelos had a felony conviction resulting in board-ordered suspension of his license and probation (Ohio License Center 12/15/05 Letter). In his deposition from April 13, 2005, he testified he had never been convicted of a felony (Venizelos 4/13/05 Dep. at 37).

According to the CRMC data, Dr. Venizelos is in the top twenty-five for physicians considered primary diagnosing doctor on reports submitted for claims to the Manville Trust. Together, with his associate, Dr. Rao, he submitted 12,820 reports (CRMC 3/2/06 Resp. to Amended Notice of Dep. Upon Written Question, at No. 13). Dr. Venizelos is also in the top twenty-five of those authoring reports submitted to claims to the Manville Trust. Indeed together with his associate Dr. Rao, they totaled 17,080 reports (*id.* at No. 14 (a)). Dr. Venizelos has numerous dates where he has rendered diagnosing reports for over 80 individuals in a single day (CRMC 3/2/06 Response to Amended Notice of Dep. Upon Written Question at No. 14(b)). According to N&M, as of April 2005, their pulmonary group (Drs. Venizelos and Rao together) expensed over $600,000 to N&M (N&M QuickBooks Report, Expenses by Vendor Summary).

Dr. Venizelos performed "B" readings for N&M and second readings of Dr. Harron's positives. "B" readings of Dr. Harron's x-ray reads were discussed at the *In re Silica* MDL proceedings. *In re Silica Prods.Liab.Litig.*, MDL Docket No. 1553, *Daubert* Hearings, at 18-19 (S.D. Tex. Feb. 17, 2005). Dr. Venizelos testified that he does not render a diagnosis when reading the x-ray alone (Venizelos 4/13/05 Dep. at 27). He went on to state, however, that when actually evaluating the patient in order to arrive at a diagnosis, that they "usually" included "some medical history." (*Id.*). This does not meet accepted standards for diagnosing asbestos-related diseases, such as those published by the American Thoracic Society.

In my opinion, it is improper to use a chest x-ray "B" reading alone to diagnose an asbestos-related disease or other pneumoconiosis. Dr. Venizelos testified that his "B" reading alone was not a diagnosis. In my opinion, his involvement and work with N&M causes me concern regarding his methodology and reliability. Before I would rely on any of Dr. Venizelos' reports, I would need to see all underlying documents supporting their allegations. Without these, I would not rely on his reports.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. Venizelos.

### Dr. Robert Von McGee

Dr. McGee is an internist who worked as the Medical Director for Healthscreen, Inc. -- a screening company that provided mass evaluation of individuals for the purposes of seeking compensation for occupational lung disease. Healthscreen's previous director, Dr. Jeffrey Bass, issued an affidavit on January 25, 2006, indicating that he had never reviewed any x-rays for Healthscreen, had not ordered any x-rays or pulmonary function tests, and had never diagnosed any individual with asbestosis or silicosis (Bass 1/25/06 Affidavit). According to the deposition testimony of Jack Jamison (Healthscreen's corporate representative), both Dr. Bass and Dr. McGee primarily did "paper review of materials" provided to them by Healthscreen. (Jamison 9/27/05 Dep. at 202-205.) Typically, Drs. McGee and Bass did not perform a physical examination.

I have reviewed examples of Dr. McGee's reports for Healthscreen. On May 13, 2000, he dictated his report on Mr. Allen Easton. He does not state from whom he obtained the occupational, exposure and past medical histories. Dr. Margaret Thoma performed the physical examination, but did not include the neurological exam (despite the patient's history of neuropathy) or an abdominal exam. An incomplete examination does not meet accepted standards. Dr. McGee did not review Mr. Easton's x-ray. Dr. McGee's assessment briefly discusses the exposure to asbestos, the reported chest x-ray changes but he makes no diagnosis whatsoever.

Similarly, he dictated a report regarding Mr. Leonard Mager (May 27, 2000) without indicating the source of the history, noting an incomplete physical examination by Dr. Thoma and x-ray findings by Dr. Mark Klepper. In this case, Dr. Klepper reported profusion 0/1 small opacities, which he opined (incorrectly) were consistent with asbestosis. Again, Dr. McGee noted the exposure history and chest reading, but rendered no diagnosis.

According to David Austern from the CRMC, the CRMC independently determined that medical reports prepared by Healthscreen were unreliable and would no longer be accepted (CRMC 9/12/05 Suspension of Acceptance of Medical Reports Letter). The CRMC also cited evidence from the *In re: Silica* MDL that Healthscreen reports are unreliable. (*Id.*) The CRMC also noted that Healthscreen was the subject of

a Federal Grand Jury and Congressional investigations into alleged fraud.
(*Id.*)

In my opinion, as Healthscreen's Medical Director, Dr. McGee's reports and diagnoses are not reliable. Based on my review of a number of his reports, he relied on insufficient historical data and incomplete physical examinations and did not render any diagnosis. Furthermore, he relied on "B" readings from other physicians deemed unacceptable by the CRMC (example, Dr. James Ballard). In their audit, the CRMC determined that all medical records prepared by or through Healthscreen were unreliable. In my opinion, none of Dr. McGee's work done through or for Healthscreen is reliable.

In addition, see generally reliance materials for additional background and support for my analysis of Dr. McGee.

Steven E. Haber, M.D., F.C.C.P.
June 11, 2007