# EXHIBIT 19

## Rebuttal Report of Dr. John Parker

### I.    Introduction

I was asked to review various expert reports submitted in this bankruptcy case and

provide a rebuttal report. I reviewed the expert reports of Dr. Laura Welch, Dr. Mark Peterson,

and Dr. Alan C. Whitehouse. This report is provided to respond to the reports of these experts. I

have also reviewed the expert reports of Drs. Daniel Henry, David Weill, Paul Epstein, Steven

Haber, Richard Sellman, Brent Pistorese, and Tim Obermiller. Throughout the course of this

report, I have on occasion relied upon literature referenced and opinions expressed in these

reports in forming my opinions. This report is offered in the true spirit of encouraging ethical

and professional behavior by scientists involved in asbestos litigation.

### II.    Background

I am currently a Professor and Chief of Pulmonary and Critical Care Medicine at West

Virginia University Health Sciences Center. From 1985 through 1998, I worked in a number of

capacities for the National Institute for Occupational Safety and Health ("NIOSH"). I was the

Chief of the Examination Processing Branch at the Division of Respiratory Disease Studies for

NIOSH from July 1991 through August 1998. In this position, I provided oversight for the

NIOSH Coal Workers' Respiratory Health Program as well as the NIOSH B-reader program and

served as faculty for the American College of Radiology View-box Seminar on Pneumoconiosis.

Additionally, I was the co-author of NIOSH Hazard Alerts regarding toxicity of silica in sand

blasters, rock drillers, and construction workers. I also developed a cooperative agreement with

the Finnish Institute for Occupational Health for studying the health effects of asbestos on

Russian chrysotile miners and millers. Concurrently to serving as Chief of the Examination

Processing Branch, I was also the Acting Chief of the Clinical Investigations Branch and the

Acting Chief of the Epidemiological Investigations Branch at the Division of Respiratory

different exposure histories and attorney requests resulted in markedly different radiographic readings, often on the very same film. When the reported exposure history was to asbestos, the radiographic report was typical of asbestos lung injury, and when the reported exposure history was to silica, the radiographic report was typical of silica lung injury pattern. Again, these disparate radiographic reports were generated from observations of chest radiographs on the same individuals, often taken from a review of the exact same chest x-ray. In fact, it is noteworthy that the characteristic patterns of these two occupational lung diseases, asbestosis and silicosis, are quite different and do not resemble each other. This "dual diagnosis" observation in the *In re Silica* proceedings could not occur if physicians were practicing with intellectual and scientific honesty. Indeed, many authorities, including NIOSH, recommend classifying films without knowledge of workplace exposures and only later in the diagnostic process to integrate the radiographic findings with the occupational history, specifically to reduce bias in radiographic interpretations.

I have reviewed the October 3, 2006 expert report of Dr. David Weill and the October 3, 2006 expert report of Dr. Paul Epstein, both of which concur with my opinion as to the rarity of the dual incidence of asbestosis and silicosis.

## IV.   Medical Evidence Generated For Litigation

As discussed above, diagnostic testing used in asbestos-related disease and associated impairment evaluation include chest radiography and lung function testing, both of which are widely available. Performance and interpretation standards for these diagnostic tests are well accepted in the medical community. In many scientific and quantitative settings, it is widely acknowledged that garbage in equals garbage out, suggesting of course that only reliable diagnostic testing will generate a reliable diagnosis. Thus, if the accepted methods for

10

conducting these tests are not followed, the results will not be reliable  I have reviewed the

expert reports of Dr. Daniel Henry and Dr. David Weill, which evaluate medical evidence

submitted by claimants in this case to determine whether the evidence meets the appropriate

medical guidelines and concur with their conclusions.

A.    **Henry Chest X-ray Study**

Dr. Daniel Henry designed, conducted, and reported a chest radiographic study that

evaluated films submitted by claimants with a non-mesothelioma malignancy who claimed that

they had radiographic evidence to attribute their malignancy to asbestos exposure ("Henry X-ray

Study"). Applying both the ILO Guidelines and NIOSH recommendations, Dr. Henry developed

a protocol to have the films read by three independent and blinded readers, and also inserted

"control films" among the study films to assess reader tendencies. I was one of the three readers.

At the time I read and classified the films, I was not aware of who retained me, the source of the

films, or any other information about the medical history of the cohort.  Several months after my

readings, I was provided a copy of Dr. Henry's report and at that time learned the details about

the study population as well as the results of the three independent readings.

The Henry Chest X-ray Study found that 7% of the claimant population had a profusion

score of 1/0 or greater based on a majority read by two or more of the independent B-readers.

This is contrasted with the claimants' B-readers who read over 80% of the films as having a

profusion score of 1/0 or greater.  This dramatic level of disagreement is difficult if not

impossible to explain by chance or inter-reader variability.  This strongly suggests reader bias

among the claimants' readers.  Bias of this type can be reduced by blinding readers as to source

of films and exposure histories, and by carefully adhering to the ILO and NIOSH Guidelines as

well as professional ethics and code of conduct.  The Henry X-ray Study incorporated these

11

principles and utilized control films, which support the reliability of the classifications by the independent readers.

### B.    Lung Function Tests

Lung function testing is critical in establishing severity and potential impairment from asbestos-related disease. Lung volumes, spirometry, and carbon monoxide diffusing capacity are the most commonly utilized lung function tests for asbestos-related disease. Quality medically credible data for lung function testing is best collected and interpreted utilizing guidelines established by the American Thoracic Society, along with impairment assessment as outlined by ATS and the AMA. Andersson, G., Cocchiarella, L., *AMA Guides to the Evaluation of Permanent Impairment*, § 5.4d (5th ed. 2001). A review by Dr. David Weill of a sample of lung function tests submitted by the claimants in this case, demonstrated poor compliance with the nationally and internationally accepted guidelines. Specifically, 100% of the tests failed to comply with all ATS Guidelines.

In both clinical and litigation applications, it is imperative to ensure that the lung function testing adheres to ATS Guidelines. Spirometry is effort-dependant and can only provide reliable information about an individual's lung function if he or she makes a conscientious effort to properly perform the test and is properly "coached" by the spirometry technician. Only an individual who is making a full effort to perform the test will be able to meet the reproducibility requirements of the ATS Guidelines. In a litigation context, it is especially important to ensure that ATS Guidelines are met. Full compliance with the ATS guidelines assures accurate and reproducible measurements. In my clinical practice, I do not rely on litigation-generated PFTs that do not meet ATS Guidelines to establish a diagnosis of respiratory disease, to determine impairment, or to prescribe therapy.

12

V.    Medical Screenings In a Litigation Context

In her June 2007 report, Dr. Laura Welch defends the use of medical screening, pointing out that it is frequently performed in occupational settings and at times is required by law. Welch Report at 5-6. I do not in any way disagree with the importance of medical screening. In fact, medical screening and medical surveillance occupied a large portion of my medical professional life. I feel passionately about protecting workers from unsafe occupational conditions. However, the misapplication of medical screening, specifically litigation screening, may inaccurately label workers and former workers with disease that may not be present. This may create undue concern, worry, psychological stress, and even financial burden, or unnecessary medical testing for workers and retired workers.

Moreover, it is important to distinguish between an OSHA screening that is supervised by medical professionals who provide appropriate follow up for more definitive diagnostic consideration and medical therapies; and a litigation/compensation-driven screening directed by non-medical professionals whose primary concern is generating as many potential claimants as possible. As discussed in Dr. Haber's report, litigation/compensation-driven screenings do not generate medically reliable findings to establish occupational lung disease diagnoses.

These litigation/compensation-driven screenings may also have the effect of corrupting the medical records of screened individuals. Specifically, individuals who are given a screening diagnostic label of "asbestosis" frequently report this to their treating physician. I am aware of instances in which this "litigation screening diagnostic label" has been incorporated into the medical records of individuals. Ironically, I have seen this diagnostic label persist and appear on death certificates, when the individual clearly did not die of or with an asbestos disease. These