# EXHIBIT 22

**Rebuttal to the Testimony of**

**W. R. Grace's Experts**

**Mark A. Peterson**

**Legal Analysis Systems**

**September 25, 2007**

### 2.2.1. Dr. Florence Rejected the Dennis Emrick Claim, Settled by Grace for $1 Million

I discuss the first claim at greater length because it is a dramatic, but typical instance of flaws in Dr. Florence's analysis. Grace provided more information for this claim than others, a mesothelioma claim by Dennis Emrick filed in Oregon (a 355 page pdf). This shows the richness and texture of exposure information as claims are developed in litigation even with efficiencies that parties have developed for the litigation: how testimony from the asbestos victim is combined with testimony (by reference) of coworkers, documents, and other evidence to detail the conditions in which the victim worked and how he was exposed to asbestos fibers through his own work, the work of others, and the presence of asbestos in his workplaces. This example is a vivid contrast to what Dr. Florence used for his decisions about allowance of pending claims in his estimation--answers to cryptic and poorly defined questions in Grace's PIQ questionnaire and limited information about claims whose preparations were suspended six years ago.

Mr. Emrick was a sheet metal worker who worked in and around boilers, foundries, paper mills, and other industrial sites in Oregon and Washington and on new construction and demolition/remodeling construction of commercial facilities in those states and in Detroit, Michigan. Grace recognizes that its asbestos-containing Zonolite high temperature insulating cements were used at paper mills, the primary sites at which Mr. Emrick claimed exposure to Grace asbestos products, and about which he testified in his depositions.[18] Mr. Emrick identified his exposure to Grace's asbestos Monokote insulation and offered coworkers' and documentary evidence that also showed such exposures in paper mills and during construction. Grace settled the Emrick mesothelioma claim for $1 million. Dr. Florence's coders rejected Mr. Emrick's claim, because they decided that Mr. Emrick had not asserted that he had either "mixed" Grace asbestos-containing products or "installed" such products, the only two ways that claimants can establish exposure to Grace asbestos under its new rules.[19]

Mr. Emrick testified about his heavy exposure to asbestos in two depositions that were included in his claim file:

- Mr. Emrick worked as a sheet metal worker on new construction and remodels of industrial buildings, "almost always" working nearby other, active trades (Dennis Emrick, Perpetuation Deposition, March 12, 2000, p. 75-77). These working conditions were "crowded and dusty," "frequently generat(ing) a lot of dust," "the trades around us would generate a lot of dust" that would be in the air, cover the ground and cover his cloths (Ibid).

- As part of remodels he worked on demolitions of existing industrial sites, removing removed asbestos coverings on old pipes, cutting insulated ductwork with saws and reciprocating Sazalls that vibrated, "spread stuff all over" and caused insulation and other debris to drop (Ibid. p. 83, 106-107)

- Mr. Emrick testified that in demolition work at the River Rouge Ford plant in Detroit he removed and replaced Grace's asbestos-containing Monokote spray: "We oftentimes had to tear out the old and put in new. That applies not only to the exterior siding we did, but very often on the interior walls that we would be working on, as well...Generically, it would be

---

18. Mr. Jay Hughes, Grace's attorney in charge its asbestos litigation, listed paper mills as one of two examples of "industrial locations" where the product was used.

19. None of Grace's new rules would have rejected the mesothelioma claim for medical reasons--mesothelioma required only satisfaction of the exposure rule.

fireproofing. I believe they call it Monokote today." (Ibid., p. 75).

- Mr. Emrick testified that he worked directly with other asbestos-containing products such as cutting and using asbestos blankets and asbestos cloth and wrap for pipes, both types of its asbestos containing products that Grace manufactured (Ibid, p. 114). He testified that there was no disposal of scraps cut from these asbestos materials, they just fell to the ground (Ibid).

- Among other construction work sites Mr. Emrick worked at Good Samaritan Hospital in Portland, Oregon installing duct work for a new wing and installing coils for heating and cooling in the mechanical room. We worked around boilermakers, brickmasons, pipefitters, drywallers, insulators (417597.pdf, p. 259, 274, 347). A coworker, Mr. Hyrstal Tompkins, identified Grace asbestos products at this site to which Mr. Emrick was exposed (ibid., p. 190).

- Mr. Emrick was exposed to asbestos at a Crown Zellerach paper mill in Wauna, Oregon. Coworkers identified Grace asbestos-containing products at that site at which Mr. Emrick was exposed (Ibid., pp. 168 & 276).

- Mr. Emrick's "Preliminary PID" (product identification report) describes his work at the Wauna paper mill: "plaintiff recalls working around pipes, paper machinery, dryer hoods and (asbestos) dryer felts in dusty conditions. "(P)laintiff recalls the felts were heavy and thick and threaded through the machinery. Plaintiff recalls there were various different size rollers and rolls of felt. Plaintiff recalls working around boilers." ("Preliminary PID," Ibid p. 276)

- Mr. Emrick added to this description of his work at the Wauna paper mill in his later "90 Day PID": "plaintiff recalls working a shutdown at this site... visiting this site on several occasions ... crews used cranes to dismantle dryer hoods and bring in new ones ... handling parts of machines that involved supply or return air... removing and replacing (asbestos) gaskets throughout the mill for pipes and ductwork ... the gasket material came on a role and he would cut it with a razor knife ... using a paint scraper to scrape off old gasket material ... frequently cutting and using chunks of scrap dryer felt for protection ... always working around the (asbestos) dryer felt either standing above it or below it ... working in close proximity to mill hands using compressed air to remove dust and debris from their work areas causing airborne dust ... " ("90 Day PID," Ibid, p. 329).

- Mr. Emrick testified about his work and working conditions at paper mills: "Frequently, very large scale shutdown situations, where they would take a paper machine and almost entirely dismantle it. It involved all the other crafts that you can imagine. Our job was to handle the parts of the machine that had anything to do with the supply or return air." (Dennis Emrick, Perpetuation Deposition, March 120, 2000, p. 125).

- He testified that he was present in the area when the paper machines were disassembled: "Once the top of the machine was removed, we were working on the sides and underneath the machine .... They basically disassembled the entire thing." (Ibid, p. 130). "... compressed air was frequently used around where we were working, because the mill hands would be there trying to take advantage of the downtime and clean the various flat surfaces that (had) all this residue from years of papermaking. They would be bla--be shooting--blasting that around." "It would get it airborne and be dusty." (Ibid, pp. 132-133).

- Mr. Emrick testified about paper mills "aside from the foundries, they're one of the more dirtier places on earth" (Ibid, p. 130).

- Throughout the file materials provided by Grace, Mr. Emrick's testimony or documents from his counsel identified the names and even depositions of supervisors and coworkers at these work sites who would be available to testify further about the details of Mr. Emrick's work

and workplace environment and to identify asbestos products to which he was exposed. A document titled "Product ID Report: Dennis Emrick" lists W. R. Grace documents as among the sources for identifying the presence of Grace asbestos products at one work site.

− Mr. Emrick provided medical evidence of his mesothelioma including medical opinions that his asbestos exposures caused the mesothelioma.

Claims materials provided to Dr. Florence by Grace clearly demonstrate Mr. Emrick's evidence of (1) an asbestos-related mesothelioma, (2) his occupational exposures to asbestos, (3) his occupational exposures to Grace asbestos-containing products, (4) his removal of asbestos-containing products including Grace products and (5) that his own activities and those of immediately coworkers caused his exposure to asbestos. Grace knew that its asbestos-containing Zonolite high temperature insulating cements were used at paper mills, the primary sites at which Mr. Emrick claimed exposure to Grace asbestos products and knew from its own records and litigation experience the paper mills where its products were present.[20] Grace settled Mr. Emrick's claim for $1 million.

But Dr. Florence's coders decided the Emrick claim could not be accepted under Grace's new rules. In applying Grace's new rules as they were instructed by Grace, Dr. Florence coders decided that this evidence could not "sustain (Mr.Emrick's) burden of proof that (his) claim against Grace (was) valid," despite Mr. Emrick's extensive testimony about his heavy exposure to asbestos, including asbestos that he and others identified as coming from Grace's asbestos products. Grace's new rules lead Dr. Florence to a far different conclusion about this claim than the decision that Grace itself reached in deciding the claim under the laws and practices of asbestos litigation in Oregon courts.

### 2.2.2. Dr. Florence Rejected the William McCauley Claim, Settled by Grace for $425,000

Dr. Florence's coders decided that the mesothelioma claim by William McCauley, filed in Illinois courts, should not be accepted under Grace's new rules, a far different conclusion than Grace's settlement of the claim for $425,000.

− William McCauley claimed that his mesothelioma was caused in part by his exposure to Grace asbestos-containing products that he personally used as a commercial plasterer.

− Mr. McCauley's attorney stated that "he personally identified, both in his discovery and evidentiary depositions, Grace asbestos-containing products. He used these throughout his career, particularly during the '50s and '60s" (371068.pdf, p. 3).

− Mr. McCauley stated that he sprayed Grace's Zonolite and Monokote asbestos spray products and also mixed those products.

− In their deposition testimony, both Mr. McCauley and his coworker Tom Ladd state that Mr. McCauley "used," "worked extensively with these products (Grace asbestos-containing products)" for many years and "all during this time, Mr. McCauley worked around Zonolite products and around Monokote" (Ibid, pp. 3-4).

− In a brief extract of a deposition provided to Dr. Florence by Grace, Mr. McCauley testified that he worked with Grace's Zonolite, "we used it sometimes for insulation. You know, we--we mixed it with your Gypsolite (a gypsum plaster) sometimes. Give it a little slicker--little slicker finish where it applied a little bit easier." (Ibid, p. 13). Mr. McCauley

---

20. The file materials provided by Grace for the Emrick claim do not include any documents from Grace about whether or not this was a known Grace site, so while Grace would have known this key fact, Dr. Florence's coders did not.

testified that the Zonolite came in sacks and that he mixed Zonolite into the plaster:
"Sometimes we'd throw it in to make the gyp work a little smother, a little slicker.
Sometimes that stuff didn't mix real good. It would be tough mixing and we would add it to
give it, oh, just workability. We used to mix--even with cement we'd throw--it in the cement a
lot of times to give it a little--because cement sometimes is stiff when you're trying to apply it
by hand. I mean it don't--it don't go on the wall real smooth. It's--I don't know what
to--what words to use. But it--it was common" (Ibid, pp. 18-19). Mr. McCauley sprayed
these mixtures, mixed them by hand, and cleaned up the asbestos-containing residue by
scraping and brooming over-sprayed materials on the floor (Ibid, p 17).

File materials provided by Grace for this claim are grossly incomplete, including neither of the
depositions of Mr. McCauley or his coworker, Mr. Ladd. Grace also withheld 15 documents as
privileged, including pages from "evidence deposition," materials on the "discover deposition of
McCauley," "review of McCauley case" and a "discussion of McCauley claim." These withheld
documents would likely have provided additional details about Mr. McCauley's claim that Dr.
Florence's coders could have used in deciding whether or not to allow the claim, as well as
discussion of Grace's conclusions about and reasons for settling the claim.

But even without these missing documents, Grace's coders should have found that Mr.
McCauley's claim satisfied Grace's new "minimum exposure criteria." Even in the brief
deposition transcript, the coders should have seen that Mr. McCauley testified (and his coworker
apparently confirmed) that he sprayed and applied Grace asbestos products over a period of years
even though neither Mr. McCauley nor his attorney described Mr. McCauley's frequent
applications of the Grace product by the magic word "installing." The coders should also have
found that Mr. McCauley mixed Grace asbestos-containing products, a verb that he actually used
verbatim.

Mr. McCauley's claim is an example of the series of flaws in Dr. Florence's attempt to apply
Grace's rules to the information in Grace claim files. (1) The coders erred. (2) The indefiniteness
of Grace's rules had not clearly identifying the spraying and application of Grace cements as
"installation" that satisfies its "minimum exposure criteria." (3) Grace gave no instruction to its
coders or to claimants and law firms who completed PIQ forms about what was included as
"installed" or "mixed." (4) But most fundamentally, these details of Grace's wording or its
coders' application of its rules are beside the point: Grace's rules would reject real and valuable
claims. Exposures like those that Mr. McCauley and Mr. Emrick described would certainly
support a claim that would allow each and similar plaintiffs to reach a jury with the claim and
present Grace with a significant risk of a large plaintiff's verdict. Grace recognized this in its
actual litigation, when it faced actual threats from these claims and settled the two claims for a
total of $1.425 million ($1.65 in today's 2007 dollars).

## 2.3. Grace's Exposure Rules Ignore Basic Asbestos Litigation Principles

Its new rules deviate so radically from how Grace has resolved asbestos claims in the past
because they represent the analysis of Grace's retained epidemiological expert, Dr. Elizabeth T.
Anderson, who did not consider how courts and parties actually deal with issues of causation in
asbestos claims.

Modern asbestos litigation started with the Fifth Circuit's 1973 opinion in *Borel v. Fibreboard*
(493 F.2d 1076, *1082) where the court addressed the dose responsiveness of asbestos disease
and the factual complications that the asbestos disease suffered by Mr. Borel and most asbestos
plaintiffs were caused by the cumulative effects of asbestos exposures to products of many
different defendants (Hensler and Peterson, Understanding Mass Personal Injury Litigation.
Brooklyn Law Review, Vol. 59: 961. 1993).