# EXHIBIT 26

US District Court - Delaware  FINAL - November 2, 2007
Chapter 11 - W.R. Grace  Elizabeth Anderson, Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------

CHAPTER 11
IN RE:
W.R. GRACE & CO., et al.,

    Debtors.
Case No. 01-1139(JFK)
Jointly Administered

-------------------------------

DEPOSITION OF
Elizabeth L. Anderson, Ph.D.
November 2, 2007
Washington, D.C.
Lead: Walter B. Slocombe, Esquire
Firm: Caplin & Drysdale, Chartered

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - November 2, 2007  
Elizabeth Anderson, Ph.D.

Page 171

1       BY MR. SLOCOMBE:
2       Q. What is the basis for saying that an
3  individual's exposure in the category of being
4  in the space where a Grace asbestos product was
5  being mixed or installed will cluster toward the
6  average?
7       MS. HARDING: Object to form.
8       THE WITNESS: Because the -- well,
9  it's a -- it's a scientific fact that as you
10 take long-term averages and assume that
11 somebody is exposed for as long as the life of
12 the product or 45 years, it's not just a day's
13 exposure. And we have data to describe that
14 average exposure. Over a very long period of
15 time everybody is going to cluster toward that
16 average.
17      So it's scientifically supportable.
18 But when we assume not that the person was
19 exposed one day or two days but the full
20 lifetime of the product on the market or a
21 45-year occupational exposure that the average
22 exposure is going to well characterize what they
23 were exposed to.
24      BY MR. SLOCOMBE:
25      Q. Did you look at the data that Dr. Lees

JANE ROSE REPORTING  
1-800-825-3341  janerosereporting.com

US District Court - Delaware  
Chapter 11 - W.R. Grace  
FINAL - November 2, 2007  
Elizabeth Anderson, Ph.D.

Page 208

1   requirements associated with filling out the PIQ
2   and other matters for that matter.
3       MR. SLOCOMBE: Okay. I'll withdraw the
4   question.
5       BY MR. SLOCOMBE:
6   **Q. You've said that cases which were**
7   **classified as insufficient information would be**
8   **subject to further review.**
9       A. No, I didn't say that.
10  **Q. I'm sorry.**
11      **What did you say with respect to**
12  **further review about insufficient information**
13  **cases?**
14      A. The purpose of this classification was
15  not to try these cases and determine whether
16  these claims should be made or not. This was a
17  screening exercise.
18      It was to set up an approach by which
19  we could evaluate whether or not product groups
20  or individuals even if we gave them 45 years of
21  the highest possible exposure would have
22  credible claims, and so then we could speak to
23  the issue of screening claims that did not seem
24  to be credible. Then we could talk about
25  claims that might be credible and say those

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - November 2, 2007  
Elizabeth Anderson, Ph.D.

Page 209

1   would be subject to further case-by-case
2   evaluation.
3        This information was given to
4   Dr. Florence and his team to use in their mixed
5   analysis, and I don't know how they used it.
6        But the point of this exercise is not
7   to do a final trial but rather to provide an
8   approach that allows us to make reasonable
9   classifications of meritorious -- potentially
10  meritorious claims versus those that have no
11  scientific credibility.
12     **Q.  Do I correctly understand that in the**
13  **cases which were classified as insufficient**
14  **information you were not necessarily determining**
15  **that those cases had no scientific credibility,**
16  **simply that there was not enough information to**
17  **judge whether they did or not?**
18       MS. HARDING:  Object to form.  I think
19  that --
20       THE WITNESS:  It was as simple as
21  saying they didn't provide sufficient
22  information to be classified in one of these
23  nature of exposure categories.
24       BY MR. SLOCOMBE:
25     **Q.  You've said and it certainly seems to**

US District Court - Delaware  FINAL - November 2, 2007
Chapter 11 - W.R. Grace  Elizabeth Anderson, Ph.D.

Page 245

1  how do you deal with data sets that you know are
2  going to express the variability over long
3  periods of time.
4  　　　And so I see no unique characteristics
5  in this data set, and I'm not going to discuss
6  Dr. Lees' data set any further because these are
7  his data. He dealt with them. He knows the
8  background of these studies. And it's not
9  appropriate for me to deal with his data sets in
10  any more detail.
11  　　　BY MR. RASMUSSEN:
12  　　Q. **But one individual's exposure to**
13  **asbestos could remain higher than the average**
14  **exposure of the job category he was in for the**
15  **course of his entire life; isn't that right?**
16  　　A. I don't think so.
17  　　Q. **Why not?**
18  　　A. Not -- because I have chosen to use
19  these data sets over very, very long periods of
20  time.
21  　　　And I think over long periods of time,
22  in every guideline, in every application and all
23  of EPA's guidance documents, you use the
24  long-term averages. And that's exactly what
25  I've done and I've assumed very, very long

US District Court - Delaware  FINAL - November 2, 2007
Chapter 11 - W.R. Grace  Elizabeth Anderson, Ph.D.

Page 246

1  periods, durations of exposure, the 45 years
2  that the product that was on the market or the
3  life of the product.
4  　　And so I think that this is not a
5  fruitful discussion.
6  　　I mean, that's -- you have people
7  averaging -- their exposures are going to
8  average over these long durations, and so that's
9  just not a correct portrayal.
10  　　**Q. Is it your testimony that all workers'**
11  **exposure converged to the same identical mean**
12  **value over the course of years?**
13  　　MS. HARDING: Object to form, and it
14  mischaracterizes testimony.
15  　　THE WITNESS: I've said I think this is
16  a reasonable representation of the exposure over
17  long durations.
18  　　BY MR. RASMUSSEN:
19  　　**Q. For an individual?**
20  　　A. For anyone in these categories, because
21  the data converge. And this is the way data
22  sets are handled routinely across all of EPA's
23  guidance, for air, for Superfund sites, for
24  everything.
25  　　**Q. Is the convergence monotonic?**

US District Court - Delaware  FINAL - November 2, 2007
Chapter 11 - W.R. Grace  Elizabeth Anderson, Ph.D.

Page 249

1  the wind blows one way, another way. There are
2  different activities going on.
3  And so what you want to capture over a
4  long period of time for exposures that are very
5  important to lifetime exposure circumstances is
6  a fair characterization of all of this
7  difference that you observe in the data sets.
8  I've said, number two, that EPA has
9  guidelines and practices that are documented for
10  dealing with this. It's expected. This isn't
11  unusual. It's expected. What these guidelines
12  drive toward is a way of describing the best
13  characteristics of the data set for long-term
14  exposures.
15  Number three, what we've done is we've
16  applied those long-term -- these concentrations
17  to long-term durations that are the longest that
18  could possibly exist, either 45 years of
19  employment or the full lifetime of the product.
20  Therefore, I think these eight-hour averages are
21  very representative of exposure across the
22  universe of these individuals.
23  I don't think that any individual for
24  45 years is going to be exposed to one of the
25  highest data points in this data set, and I

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 2, 2007
Elizabeth Anderson, Ph.D.

Page 283

1  for different application situations and
2  different individuals therefore who would have
3  been in those particular environments, and he's
4  provided that.
5      And I've said that I think by selecting
6  the highest of his averaged values and by
7  selecting the longest possible durations and by
8  assuming that all the products that were used
9  were all Grace products and by assuming any
10 number of other very high-end assumptions,
11 including my table 5 which assumes that anybody
12 could have been exposed to all of the Grace
13 products at the very highest level for 45 years,
14 is a fair representation of the reasonable
15 high-end exposure that anybody could have
16 gotten.
17     So I don't think that you can separate
18 exposures for sick people from not sick people
19 as far as Grace products are concerned for a
20 variety of reasons. Some people get sick and
21 some don't when they're exposed to the same
22 thing.
23     In your population of sick people, they
24 could have been exposed to any number of other
25 things and not just Grace products and for any

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - November 2, 2007  
Elizabeth Anderson, Ph.D.

Page 284

1    number of other reasons. Your question is not a
2    question that has any other reasonable response
3    than what I have given I don't think. I'm
4    trying to be responsive, but I don't think I can
5    be more responsive.
6        BY MR. RASMUSSEN:
7        Q. If a claimant who has meso has a
8    cumulative exposure level of 8 fiber per
9    milliliter years from Grace products and an
10   exposure of 8 fibers --
11       A. How many fibers?
12       Q. -- 8 from Grace and an exposure of
13   8 fibers per millimeter year cumulative from
14   products of other manufacturers, do you count
15   that claim as a valid claim against Grace?
16       A. I would need to see all the
17   case-specific information and evaluate the
18   case.
19       Q. What if there was no other information
20   than the information I've given you?
21       MS. HARDING: I'm going to object to
22   form and incomplete hypothetical.
23       THE WITNESS: I doubt seriously that
24   that would be the only information that would be
25   available.

US District Court - Delaware  FINAL - November 2, 2007
Chapter 11 - W.R. Grace  Elizabeth Anderson, Ph.D.

Page 309

1   range of eight-hour TWAs that Dr. Lees
2   calculated rather than the mean of the average
3   eight-hour TWA that Mr. Lees calculated --
4           MS. HARDING: Object to form.
5           BY MR. RASMUSSEN:
6       Q.  -- isn't that true?
7       A.  I've already said that no credible
8   scientist engaged in risk assessment on any
9   circumstance for a 45-year lifespan eight hours
10  a day for every day they worked for 45 years
11  would pick the fact that that person is always
12  going to be exposed to some extraordinary
13  circumstance that differs from the mean over
14  that period of time.
15          And for each of these products I've
16  chosen the highest, not the lowest, not the
17  mean, I've chosen the highest value for the
18  product that had the highest value to make these
19  calculations.
20          So that's not a credible circumstance.
21      Q.  But you didn't --
22          MS. HARDING: You know, just before we
23  go on, I just -- I think we're approaching the
24  seven hours, so -- we only -- we took a
25  35-minute lunch. We've taken a few breaks. I

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com