# EXHIBIT 31

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Dr. Peter Lees

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

-----------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

Debtors.

Case No. 01-1139 (JFK)

-----------------------------------------

DEPOSITION OF:

Dr. Peter Lees

October 29, 2007

Washington, D.C.

Lead: Walter Slocombe, Esquire

Firm: Caplin & Drysdale

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Dr. Peter Lees

Page 42

1   my work, broadly speaking, relates to
2   exposure and reconstruction for many
3   substances.
4        With respect to asbestos, it
5   would begin in the '90s and is limited to
6   Grace-related materials.
7        Q   And what information -- what
8   data did you rely on in those historic
9   exposure reconstructions in the 1990s other
10  than the studies and reports which are
11  referenced in your reports in this case,
12  which we will come to in due course?
13       A   Okay. In exposure
14  reconstruction, you look at any and all of
15  the available data. I believe that the --
16  that what is presented in my reports --
17  well, actually, what was available in the
18  earliest days of the '90s was really
19  limited to the question of Monokote III
20  exposure.
21       I'm not sure I am giving a
22  clear answer to your question. But there

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 66

1    of disease and time, I mean, there are
2    different time periods. And I think,
3    clearly, it's relevant to the course of a
4    day; but it's also relevant to, you know, a
5    year or ten years or a decade or whatever.
6        Q   Yes. But is it your contention
7    that the only factor which is relevant to
8    the risk resulting from exposure to
9    airborne asbestos fibers is the cumulative
10   exposure over time and not the magnitude of
11   the peaks?
12       A   The cumulative exposure is the
13   input in -- if we are talking asbestos or
14   any other carcinogen, cumulative exposure
15   is the standard input into all
16   epidemiologic studies I know, and all
17   government and other risk assessments that
18   I know.
19       Q   The June and July reports that
20   you did present job exposure matrices for
21   exposure to Grace products?
22       A   Yes.

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 94

1  the early 1990s, in my work with Grace at
2  the time.
3  **Q  And I'm sorry.**
4  A  And you know, as a part of this
5  activity, I requested from Grace all of
6  their reports that talked anything about
7  exposure anywhere at any product.
8  **Q  So do I correctly understand**
9  **that you first became aware of at least**
10  **some of these reports when Grace provided**
11  **them to you in the early 1990s when you**
12  **started to work as a Grace consultant?**
13  A  Initially, yes.
14  **Q  Do you know where Grace got**
15  **them?**
16  A  Well, some of the reports were
17  from consultants that I presumed to have
18  been hired by Grace, and so I can
19  understand where they got those reports.
20  There were three reports from -- measuring
21  exposures related to the application of
22  Monokote III. There are three reports from

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

Page 110

1   Q   And rather than who paid for
2   it?
3   A   Yes.
4   Q   What did you do to evaluate the
5   methodology and the soundness of the seven
6   reports on which you rely?
7   A   Well, again, the criteria are
8   laid out in my June report, and they spoke
9   to things about, for instance, the use of a
10  standard methodology, identification of
11  product, description of what was going on,
12  so that, you know, there was a basis for
13  saying that they did it right.
14  Q   These reports vary a good deal,
15  don't they, in how much detail they will
16  tell you about how the study was done and
17  what the circumstances were?
18  A   There is a breadth of detail,
19  yes.
20  Q   But isn't the fact that -- and
21  I don't mean this necessarily critically"
22  isn't the fact that you used all of the

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - October 29, 2007  
Dr. Peter Lees

Page 111

1  data you were given, and this one
2  exception, the manufacturing process, you
3  didn't reject any of the data you were
4  given?
5        MR. McMILLIN: Objection. You
6  mean as of Monokote III?
7        MR. SLOCOMBE: As to
8  Monokote III.
9     A   Sure. Monokote III, all of the
10 studies met the bar. I can tell you, you
11 know, more broadly that there were
12 something like 300 individual studies or
13 reports that were evaluated as a part of
14 this exposure assessment, and around 50 of
15 them were rejected.
16    Q   But none of these had to do
17 with Monokote III?
18    A   That's correct.
19    Q   And appendix G is for products
20 containing both vermiculite and chrysotile
21 that were sprayed, correct?
22    A   That's what we were just

JANE ROSE REPORTING  
1-800-825-3341  janerosereporting.com

US District Court - Delaware          FINAL - October 29, 2007
Chapter 11 - W.R. Grace                        Dr. Peter Lees

Page 128

1   Q   Do you have an opinion about
2   whether these 21 readings is a
3   representative sample of the population of
4   all of the instances in which Monokote III
5   was sprayed on?
6   A   I do.
7   Q   And what is that?
8   A   The bottom line is that it -- I
9   hold it to be representative. And there
10  probably are two main reasons that I
11  believe that to be so.
12       First of all is the relative
13  tightness of the data in terms of their
14  they're in -- in terms of variability, it's
15  what I would normally expect to see within
16  a population.
17       And the second thing is, with
18  respect to possible bias in the data, I
19  averaged up the exposure concentrations
20  from the studies done by Grace. And I
21  averaged up the concentrations done by the
22  state health departments. And they are

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 129

1  virtually identical.
2  You know, I can also say that I
3  believe -- in terms of bias, I think the --
4  I think the lowest study with the lowest
5  concentration was actually done by a state
6  health department, and the one that shows
7  the highest was actually Grace.
8  So I don't have any reason to
9  believe there is any particular bias in the
10  sampling, and its relative tightness or
11  homogeneity, given the confidence that that
12  is a good and representative sampling.
13  Q  You speak of the relative
14  tightness of the readings. What, if any,
15  statistical analysis did you do to measure
16  the tightness of the readings?
17  A  I looked at the range.
18  Q  What do you mean you looked at
19  the range?
20  A  Well, I mean the highest and
21  the lowest. I did not calculate standard
22  deviation, if you will. My evaluation of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - October 29, 2007
Dr. Peter Lees

Page 130

1   the variability was limited to an
2   observation of the maximum and the minimum
3   values.
4       Q   **Is it the practice in the field**
5   **of industrial hygiene not to calculate a**
6   **standard deviation for a set of**
7   **measurements like this?**
8       A   It would really depend on its
9   use.
10      Q   **And in what respect would it**
11  **depend on its use?**
12      A   Well, with respect to my task
13  here, the number that would go forward into
14  subsequent analyses -- in other words, the
15  number that would be used, would be the
16  mean exposure.
17          And so in order to calculate
18  standard deviations or whatever, that's
19  just not a number that would be carried
20  forward into subsequent analyses, so I
21  didn't explicitly do it in this case.
22      Q   **If you were submitting an**

US District Court - Delaware　　　　　　　　FINAL - October 29, 2007
Chapter 11 - W.R. Grace　　　　　　　　　　　　　　Dr. Peter Lees

Page 131

1   analysis like this to a peer-reviewed
2   journal, would you calculate a standard
3   deviation of the results?
4   　　A　It's conceivable. Yeah.
5   　　Q　You said that if I -- and I
6   know your counsel will object that I am
7   mischaracterizing; but maybe I am
8   misunderstanding -- you said that you were
9   going to produce some mean, which is an
10  average, correct?
11  　　A　Correct.
12  　　Q　In the field of industrial
13  hygiene, if you were making an analysis
14  like this, would you limit the presentation
15  to the mean of the numbers?
16  　　A　Again, it would depend on why I
17  was presenting the data, for what purpose
18  the data were developed.
19  　　Q　What would be the conditions
20  under which -- in submitting your work for
21  publication to the profession, that you
22  would not calculate a standard deviation of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - October 29, 2007
Dr. Peter Lees

Page 132

1   the results? And by "results," I mean the
2   readings.
3       A   You know, it would not be
4   unusual, maybe even standard, to calculate
5   the standard deviation. My point and the
6   reason that I didn't do it in this case,
7   was that, in the subsequent risk analyses
8   done by others, those measures of
9   variability were not incorporated in there
10  and are not typically incorporated in their
11  estimates of risk.
12          So there was really -- in this
13  case there was no compelling reason to
14  calculate standard deviations.
15      Q   Who told you that -- well, the
16  standard deviation is a measure roughly, in
17  layman's terms, of the variance of -- the
18  degree to which the results will deviate
19  from the mean; is that correct?
20      A   That's correct.
21      Q   Who if anyone instructed you
22  that, in subsequent use of your data, the

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 133

1   degree to which the readings deviated from
2   the mean would not be taken into account?
3       A   In terms of instruction, I
4   don't believe anybody told me. It is in
5   the -- it is standard practice in
6   epidemiologic studies in order to calculate
7   the risk associated with a certain
8   exposure.
9           It is the standard practice to
10  use the average, and that's the -- and for
11  cumulative things like this, in any average
12  exposure that is carried forth into the
13  epidemiologic analyses, and it is not at
14  all typical to.
15      Q   In the field of epidemiology,
16  to the degree you are familiar with it, is
17  it not the practice to apply the technique
18  of calculating a standard deviation to the
19  readings which are obtained in the studies?
20      A   They calculate confidence
21  intervals on their risks, yes.
22      Q   That is the equivalent, isn't

Page 149

1  various sources of information used to
2  estimate exposure will provide a range of
3  exposure estimates."
4      Do your tables show a range of
5  exposures as the final result?
6      A   The summary tables do not show
7  the range, but the initial table,
8  typically, table one of the appendices,
9  shows a range. Yes.
10     Q   Why didn't you show ranges in
11 your summary report?
12     A   As I described before, the
13 product of my work that got carried forward
14 into the risk analyses was the average
15 exposure, which is the standard measure
16 that is used in epidemiologic or risk
17 analyses.
18     So I provided, if you will,
19 just the bottom line useful information to
20 the risk assessors.
21     Q   Is it your position that the
22 average readings obtained in the

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 152

1   Vague as to time frame. You can
2   answer.
3   **Q  The time frame would be when**
4   **Monokote III was being used.**
5   A  Okay. As I have said several
6   times in my report and in our discussions,
7   there is variability in exposure
8   measurements for a whole variety of reasons
9   that you have -- some of which you have
10  touched on -- is expected.
11      And taking the next step, that,
12  if you talk about an individual worker,
13  yes, on some days there they are going to
14  be high. But on other days they are going
15  to be low, above the average and below the
16  average.
17      And, over time, actually, as
18  you work more and more, if you will,
19  your -- the variability will decrease, and
20  your average for an individual would look
21  more and more like the average for the
22  population.

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

Page 198

1  sprayer working with Monokote had the exact
2  same exposure to asbestos fibers in the
3  course of his work?
4     MR. McMILLIN: Objection.
5  Vague as to length of time. You can
6  answer.
7     A   Well, there are different
8  components of exposure. The magnitude, the
9  frequency and the duration are the three
10  considerations here. So that the --
11     Q   All right. Magnitude?
12     A   Magnitude. The number that I
13  have assigned here is the average. I will
14  readily admit to you the possibility that
15  some individuals were exposed above that
16  average. Some were exposed below that
17  average.
18     But, again, you know, the more
19  experience a person has, sometimes you are
20  high sometimes, you are low. The more you
21  work, the more your average as an
22  individual looks like the average of the

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 200

1       So that I would -- if you had a
2  bunch of 15-minute exposure measures, I
3  expect very high variability; and it's
4  shown there as a factor of an order of
5  magnitude.
6       If you compared a longer
7  averaging time, eight-hour measures, the
8  variability would be less, and, similarly,
9  if you went to longer time periods, like a
10 year, the variability would be even less.
11     Q   And that's a matter of
12 speculation; isn't it?  You don't actually
13 have any data about what the exposures were
14 for Monokote spraying over a full day of
15 measurement, much less over a year?
16     MR. McMILLIN:  Objection.
17 Compound.
18     A   The comment is a generality, if
19 you will, of all of the exposure data
20 regardless of what the substance is.
21     Q   Could you read that back.
22     (Reporter read back last

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 213

1   offer any opinions on what kinds of
2   evidence courts, in fact, permit to be
3   considered by the jury or the trier of fact
4   when there is an issue of an individual
5   plaintiff's past exposure to asbestos from
6   a defendant's products?
7        A    Since I don't think I have any
8   knowledge about what courts do and do not
9   permit, I guess my answer is no. I won't.
10       Q    Is there any consensus in the
11  field of industrial hygiene that the only
12  evidence that should be considered in
13  evaluating the exposure of an individual is
14  the result of studies of average asbestos
15  fiber levels in broadly similar operations?
16            MR. McMILLIN:  Objection.
17       Vague.  You can answer.
18       A    There are two parts to that
19  question.  The first part is having to do
20  with average exposures.  And, certainly,
21  within the field of occupational health, as
22  I have said multiple times during this

US District Court - Delaware  FINAL - October 29, 2007
Chapter 11 - W.R. Grace  Dr. Peter Lees

Page 242

1     Q   And there is a statistical
2  analysis called "analysis at variances";
3  isn't there?
4     A   I have heard of it.
5     Q   Okay. Did you use that in
6  analyzing the PCM values that you analyzed?
7     A   It's been quite a while since I
8  took biostatistics, but I'm not sure how
9  analysis of variance -- I'm sorry -- would
10 be in this situation, in any -- either
11 of -- either of -- I didn't apply it.
12    Q   And why didn't you?
13    A   Again, what I have produced
14 here is the standard input to epidemiologic
15 risk assessment, the kind of data that OSHA
16 has used to do the risk assessment that
17 lies behind their standard; that is the
18 average exposure.
19    Q   Is the variability of
20 cumulative exposure faced by individuals an
21 important aspect of predicting the risk of
22 disease?