# EXHIBIT 63

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Objection Deadline: December 21, 2007 |
| | ) | Hearing Date: January 14, 2008 at 9:00 am in Pittsburgh, PA |
| | ) | |

**MOTION OF FUTURE CLAIMANTS' REPRESENTATIVE TO PRECLUDE TESTIMONY OF DEBTORS' EXPERTS DR. B. THOMAS FLORENCE, DR. ELIZABETH L. ANDERSON, DR. SURESH MOOLGAVKAR, DR. PETER S.J. LEES, AND DR. RICHARD J. LEE PURSUANT TO RULES 702, 703 AND 403 OF THE FEDERAL RULES OF EVIDENCE**

W.R. Grace & Co.'s Answers and Objections to the Future Claimants' Representative's Second Set of Requests to Debtors for the Production of Documents, at 4 (Oct. 9, 2007) (emphasis added) (Attached hereto at Exhibit D.) This admission by Grace renders transparent Grace's improper attempt to disallow claims in this estimation.[13]

### C. Dr. Florence's Methodology Does Not Fit the Substantive State Tort Law Requirements that Govern Grace's Asbestos-Related Personal Injury Claims

While Grace acknowledges that state law governs the "validity and value" of asbestos claims, not a single expert has opined on whether Grace's self-determined "evidentiary criteria" accord with past, present, or future state substantive law.[14] Accordingly, Dr. Florence's methodology (which employs Grace's assumed criteria) is irrelevant to this Court's estimation of Grace's liability even under a no-bankruptcy assumption. *See Paoli*, 35 F.3d at 744 (expert opinion must be helpful to the court).

No state requires a claimant to satisfy Grace's medical and exposure criteria and excludes claimants unless they personally mixed or installed asbestos-containing products. Dr. Florence excluded, among others, (i) all claimants who did not file a Proof of Claim, (ii) all claimants who filed Proofs of Claim but had dates of disease diagnosis after the petition date, (iii) all claimants who did not personally mix or install Grace asbestos-containing products, and (iv) all claimants who did not identify a Grace product in their PIQ responses. He excluded those claimants notwithstanding that, given the bankruptcy stay, the claimants have not fully developed their product identification cases against Grace by way, for example, of supporting witness testimony. *See, e.g.*, Florence Supp. Report (Ex. B) at 2. As stated above, no Grace expert has testified that

---

[13] The FCR notes that under Grace's pending plan, the estimated amount of liabilities is capped, and the asbestos personal injury claimants have no right to vote on the plan.

these criteria are required under any state tort regime. *See Paoli*, 35 F.3d at 742 (opinions based merely on "subjective belief or unsupported speculation" are properly excluded). Indeed, "although medical criteria legislation has been passed in some states, *there are no universal standards.*" *Armstrong*, 348 B.R. at 131 (emphasis added). Nor is there any evidence in the record that any state has pending or enacted legislation that incorporates Grace's criteria.

Grace, in effect, asks this Court to make new law in this estimation proceeding by changing the substantive state tort law requirements governing liability for asbestos claims. It is well settled, however, that "[t]his Court does not have the authority to change state law." *Owens Corning v. Credit Suisse First Boston*, No. 04-00905, 2005 U.S. Dist. LEXIS 10752, at *3 (D. Del. Apr. 13, 2005); *see also In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 413-14 (7th Cir. 2005) ("Bankruptcy Courts lack authority to alter rules of state law, or depart from those in the Code, to implement their own views of wise policy.") (citation omitted).[15]

### D. The Minimum Exposure Criteria Derived from Dr. Anderson Do Not Fit the Estimation Inquiry Because They Eliminate Claims Which Must Be Given Positive Values for Estimation Purposes

---

[14] For example, Dr. Florence disclaims all responsibility for the evidentiary criteria he used to exclude (and zero-value) tens of thousands of pending and future claims from his estimation. *See* Florence Dep. (Ex. A) at 13:10-14:8, 239:16-21, 242:13-22.

[15] Grace ignores recent precedent in arguing that it is proper to exclude claims under its "valid claim" criteria because those claims might "ultimately be disallowed" under bankruptcy trust procedures. A similar suggestion was rejected in *Armstrong, supra*:

> The Plan Opponents state that it 'makes good sense' to use the Manville Trust experience in 2004 and 2005 after the Trust imposed stricter medical criteria requirements because it: 'reflects both (i) the changing circumstances in the state tort system, and (ii) the practice of paying only legitimate claims . . . .' The Court disagrees. *The use of the Manville Trust experience to predict AWI's future liability is not realistic at this time.* Although the procedures implemented by the Manville Trust may indeed make good sense, *the Manville Trust is not operating in the tort system—in which any estimation of AWI's future liability must assume that it will operate.* . . . And although medical criteria legislation has been passed in some states, there are no universal standards. . . .

348 B.R. at 131 (rejecting Dr. Letitia Chambers' expert testimony). The *Armstrong* court's reasoning applies with even greater force here, because Grace's "valid claim" standards are more stringent than the Manville TDPs, and have not been adopted by any existing asbestos trust.

In estimating Grace's asbestos liability the Court cannot assume that Grace would have faced a "perfect world" in which it would incur liability (through settlement or judgments) for only those claimants who could satisfy their burden on each element of their claims. *See Owens Corning v. Credit Suisse First Boston*, No. 04-00905 (Bankr. No. 00-03837), 2005 U.S. Dist. LEXIS 10752, at *3 (D. Del. Apr. 13, 2005). Rather, the Court must recognize that "[a]ll cases which can survive summary disposition under state law have some potential value." *Id.* at *3.

In contrast, Dr. Florence's estimation assumes that entire categories of claims are not compensable and must therefore be valued at zero for estimation purposes. *See* Florence Supp. Report (Ex. B) at 9, n.7. In fact, Dr. Florence includes in his estimation only those claims that Dr. Anderson considers potentially compensable because they meet her purported "minimum exposure criteria," which require that the claimant either have personally mixed or installed Grace asbestos products. These categorical exclusions violate the "fit" requirement for admissibility because they flatly disregard the imperatives of estimation under Section 524(g) by discounting to zero substantial numbers of claims that would "survive summary disposition under state law." *Owens Corning*, 2005 U.S. Dist. LEXIS 10752, at *3. There is no evidence in the record, and no expert opinion, that a failure to satisfy Grace's "minimum exposure criteria" would result in summary disposition under any state's tort law.

Even if the Court were to admit Dr. Anderson's underlying "minimum exposure criteria," Dr. Florence's estimation testimony is still inadmissible, because those opinions at least raise disputed issues of material fact in individual cases.[16] *See Allen v. IBM*, No. 94-264, 1997 WL

---

[16] Indeed, the Third Circuit has cautioned against the grant of summary judgment based on epidemiologically derived threshold exposure values, noting that "common sense alone mitigates against establishing a bright line threshold" exposure for determining individual causation. *See In re TMI Litig*, 193 F.3d at 726-27 & n.179. That prohibition is consistent with the caveats contained in the Reference Manual on Scientific Evidence explaining that, as a scientific matter, epidemiology does not answer questions of individual causation which must account for

>potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*See Paoli*, 35 F.3d at 742 n.8 (citing *Daubert, supra*, and *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985)).[17] The Court may also consider any other relevant factors, such as whether the probative value of the expert testimony is substantially outweighed by confusion or unfair prejudice. Fed. R. Evid. 403. Dr. Florence's proffered opinions fail to meet many of the applicable hallmarks of reliability.

### A. Dr. Florence's Methodology Is Not Based on a Testable Hypothesis

Under Rule 702, "a key question" is whether the hypothesis underlying the methodology "can be (and has been) tested." *Daubert*, 509 U.S. at 593. This factor checks "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." *See* Fed. R. Evid. 702 Advisory Committee Notes (citing *Daubert, supra*); *see also United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004) ("Testability ensures the basic possibility of meaningful cross-examination."). Dr. Florence does not, and cannot, test his chief hypothesis.

The hypothesis underlying Dr. Florence's methodology consists of two inter-related propositions:

(1) only those claimants with claims that meet Grace's specified criteria "will be able to sustain their burden of proof" against Grace and should therefore be assigned positive values in the estimation process, and

---

[17] "[T]he district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgionos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

>   (2)  the value of all pending and future claims that meet Grace's specified criteria equals the average settlement payments for a sample of *closed* claims (adjusting for inflation) that meet Grace's criteria, which criteria *did not exist* at the time the claims were closed.[18]

First, one could not test whether *future* claimants "will be able to sustain their burden of proof" against Grace based on the incomplete PIQ responses of present claimants. Dr. Florence uses the information contained in the PIQ responses as a key determinant of the number of pending (and by extrapolation, future) claims that should be included in his liability estimation. *See* Florence Supp. Report (Ex. B) at 2-3. This assumes that PIQs completed with information gathered as of the petition date provide sufficient information to determine whether claimants "will be able" to prove their cases *in the future*. However, this proposition is not testable because there is no data regarding the nature and quality of evidence that individual claimants "will be able" to gather for trial or settlement. *See, e.g.*, Florence Dep. (Ex. A) at 97:2-8 (acknowledging that PIQs did not ask claimants to identify fact witnesses); *id.* at 164:11-19 (acknowledging that "occasionally co-worker depositions will be provided as proof of exposure"). Furthermore, Grace's PIQ survey data provides no basis for Dr. Florence to conclude whether claimants "will be able" to prove their cases at summary adjudication or trial (or to any asbestos trust) because it did not ask those questions. *See* Expert Report of Jacob Jacoby, at 14-17 (Sept. 25, 2007) (Excerpt attached hereto at Exhibit F.) Indeed, Grace's industrial hygiene expert, Dr. Gordon Bragg, testified that when forming his opinions about a claimants' asbestos exposure, "I almost always have more information than a modestly filled out PIQ would provide." *See* Bragg Dep. at 152:9-11 (Sept. 19, 2007) (Excerpt attached hereto at Exhibit G.)

---

[18] *See* Florence Supp. Report at 15, 17.

Second, Dr. Florence's use of settlement values on closed claims that matched Grace's new claims criteria unscientifically assumes that the amounts paid on the closed claims were based on the new Grace criteria. However, Dr. Florence states that "the differences in the [payment] averages for those [closed claims] that met the criteria and those that did not *are not statistically significant*." Florence Supp. Report (Ex. B) at 15 (emphasis added). In other words, Dr. Florence does not know whether Grace's new "valid claim" criteria have any relevance whatsoever to Grace's historic settlement amounts, and he concedes that his assumption cannot be tested:

> Q. Do you have any opinion whether – if the six mesothelioma claims in your forecast were settled under the specified assumption as criteria for settlement, whether the settlement amounts would have been different?
>
> A. I have no way of knowing. . . .

Florence Dep. (Ex. A) at 300:5-11. Of course, Grace historically settled thousands of claims that did *not* meet its newly specified criteria, *id.* at 56:10-20, 57:17-20, and Grace's chief in-house litigation counsel confirmed this fact. *See, e.g.*, Jay Hughes Dep. at 122:14-24 (Feb. 22, 2007) ("I'm sure there were some [lung cancer cases] where we didn't have a diagnosis of asbestosis.").[19] (Excerpt attached hereto at Exhibit H and cited herein as "Hughes Dep. (Ex. H).").

Given the impossibility of testing any relationship between Grace's new criteria and historical settlement amounts, Dr. Florence's assumption that historical payments on closed claims that happen to match Grace's criteria can be used to forecast payments on future claims fails to bridge "[the] analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*

---

[19] Grace's newly specified criteria require a diagnosis of asbestosis for all "valid" and compensable lung cancer claims, and Dr. Florence excluded claims that failed this criterion. *See* Florence Supp. Report (Ex. B) at 2.

*v. Joiner*, 522 US. 136, 146 (1997). In sum, Dr. Florence's estimate of Grace's pending and future liability based on such an unsupported extrapolation is unreliable and highly prejudicial, and thus properly excluded on such bases. *See* Fed. R. Evid. 702 and 403.

### B.   Dr. Florence Fails to Account for Potentially Huge Error Rates Inherent in His Claim Value Assumptions and Employs No Control Standards

Although Dr. Florence himself did not disclose error rates for his analysis, the error rates are so high as to render his analysis unreliable and inadmissible. Dr. Florence concedes that he has no understanding of where the Grace evidentiary criteria would apply or even what purpose his estimation model serves in this case. *See* Florence Dep. (Ex. A) at 247:6-8, 259:13-19. Thus, there is "no way to know whether [Dr. Florence's] methodology leads to erroneous results and there are no established standards controlling its application." *See In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 375 (Bankr. D. Del. 2006). There are substantial potential errors associated with Dr. Florence's claims valuation methodology that he fails to consider or disclose to the Court.

Specifically, Dr. Florence estimated the value for all pending and future claims against Grace through the year 2049, based on only six settled mesothelioma claims that, in Grace's view, satisfied Grace's "valid claim" criteria. *See* Florence Dep. (Ex. A) at 113:3-115:15. The average settlements for the six closed mesothelioma claims was $155,240. *Id.* Dr. Florence provides no indication of the potential rate of error associated with his selection of six settled claims, nor any scientific basis for concluding that six settled claims constitute a reliable foundation for estimating the average value of all claims that could satisfy Grace's criteria in the future. *See* Florence Dep. (Ex. A) at 139:6-14. *See, e.g., Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 362 (D. Del. Apr. 17, 2006) ("The expert must explain

how and why he or she has reached the conclusion being proffered and must have a basis more than a subjective belief or speculation.") (citing *Joiner*, 522 U.S. at 144).

As a preliminary matter, Dr. Florence provides no indication of the potential rate of error associated with his selection of six settled claims, nor any scientific basis for concluding that six settled claims constitute a reliable foundation for estimating the average value of all claims that could satisfy Grace's criteria in the future. *See* Florence Dep. (Ex. A) at 139:6-14. *See, e.g., Cryovac*, 430 F. Supp. 2d at 362 ("The expert must explain how and why he or she has reached the conclusion being proffered and must have a basis more than a subjective belief or speculation.") (citing *Joiner*, 522 U.S. at 144). It is telling that Dr. Florence was unable to articulate any controlling standard that he employed to determine the number and nature of historical closed claims he would use to produce a reliable forecast (*i.e.*, sample size).[20]

---

[20]
    Q. If, instead of there being six mesothelioma claims that met the criteria, there was only one claim, namely the claim bearing the settlement amount [of] $9,981, would it be your opinion that your forecast would be reliable?

    A. I probably, if there was one claim in this category of $9,981, I probably wouldn't use $9,981 as the average to estimate the value of the claims.

    Q. Why not?

    A. It seems unreasonable to penalize a claimant for meeting these criteria, so I would probably – I mean, probably assign the overall average to the claims – be more likely to say the claims would be settled for $96,000 on the average.

    Q. ... If there were only one claim, mesothelioma claim where the criteria were met and it was the claim that Grace settled for $446,516, how would you have carried our the rest of your analysis? ...

    A. I don't think – I would have to think about it. I'm not sure I could make the decision here. ... I mean, it's – again, the issue here was one of: What is a reasonable value to assign to these claims that meet this criteria? ... I would have to think about it. I'm not quite sure how I would cut that.

Florence Dep. (Ex. A) at 306:17-309:11.

The generally accepted sample size in statistics for the generation of reliable estimates would be 1,082 claims. *See* Supplemental/Rebuttal Expert Report of P.J. Eric Stallard, at 10 (Sept. 25, 2007) (Attached hereto at Exhibit I and cited herein as "Stallard Report (Ex. I).") Although samples smaller than 1,082 can be used because of data limitations, the smaller the sample size, the higher the error rate. *Id.* at 10. However, Dr. Florence does not calculate the potentially substantial error rates associated with his small sample size. Dr. Florence's six mesothelioma closed-claim settlement values range from $9,981 to $446,516, and the average settlement value is $155,240. *See* Declaration of P.J. Eric Stallard dated December 7, 2007, at ¶24. (Attached at Exhibit J and cited herein as "Stallard Decl. (Ex. J).") Thus, the true payment for mesothelioma claimants who could have met Grace's criteria, at the 95% confidence interval, range from $25,173 to $285,306. Stallard Decl. (Ex. J) at ¶24.

Similarly, Dr. Florence does not provide an adequate explanation for his decision not to use trial verdicts. *See* Florence Dep. (Ex. A) at 309:12-17. This is hardly surprising since the average trial verdict of $1.3 million for mesothelioma claims is almost nine times higher than Dr. Florence's average settlement value of $155,240.[21] Had Dr. Florence relied upon Grace's trial verdict history when assigning values to pending and future "valid" claims, his liability estimates would have been dramatically impacted.

Because Dr. Florence provides no analysis of why his use of a six-claim sample is reliable, or why he excluded trial verdicts, "the Court cannot evaluate this element" and "[a]s a result, this weighs against the admission of the proffered testimony." *Allen*, 1997 WL 34501372

---

[21] Florence Dep. (Ex. A) at 310:9-18 (Counsel citing to Report of Jennifer Biggs at 48: "Historically, Grace had nine mesothelioma verdicts averaging 1.3 million.").

at *18 (exclusion is proper where expert failed to provide method's known or potential rate of error).

### C. Dr. Florence's Methodology Is Not Generally Accepted and Is Inconsistent With His Prior Work In Other Litigation and Non-Litigation Contexts

Courts also consider (i) whether an expert's method is generally accepted, (ii) the method's relationship to other accepted methods, and (iii) the method's non-judicial uses. *See Paoli*, 35 F.3d at 742 n.8. Moreover, under Rule 703, the court must determine whether Dr. Florence relies "on a type of data reasonably relied upon by experts" in his field of estimation.

This Court has characterized Dr. Florence's estimation methodology as novel. *See* Transcript of Proceedings, Dkt. No. 17546, at 69 (Nov. 26, 2007). Indeed, it has components, such as the use of Grace's "assumed criteria," that have never been used by any Bankruptcy Court to estimate a debtor's liability for pending and future asbestos-related personal injury claims. *See, e.g., Armstrong*, 348 B.R. at 123 (estimating liability under no-bankruptcy assumption); *Owens Corning*, 322 B.R. at 722 (same); *Federal-Mogul*, 330 B.R. at 158, 162 (same). Instead, courts uniformly "utiliz[e] information known about these debtors and their history in the handling of claims which have been asserted against them in the past" and make adjustments to account for probable changes in the "litigation landscape." *Armstrong*, 348 B.R. at 124. "[A]n estimation by definition, is an approximation and necessarily involves comparing a known or established quantum of data to the thing being estimated." *Id.* (citing *Federal-Mogul*, 330 B.R. at 155). The fact that no court has ever approved Dr. Florence's approach in the asbestos-claims estimation context weighs heavily against admissibility. *See Nellson*, 356 B.R. at 375-76.

sand"); *see also Quinones-Pacheco v. Am. Airlines, Inc.*, 979 F.2d 1, 6 (1st Cir. 1992) (excluding analysis "predicated on an assumption not supported by the record").

As explained in Professor Stallard's September 25, 2007 report and the response and rebuttal report of Jennifer Biggs, Dr. Florence's estimate is built upon a number of deficient and inappropriately biased assumptions, and Dr. Florence's opinions fail under Rule 702 and *Daubert* for all of the reasons set forth in Professor Stallard's and Ms. Biggs' rebuttal reports. *See* Stallard Report (Ex. I) at 19, 20; *see also* Response and Rebuttal Report by Jennifer L. Biggs, at 22 (Sept. 25, 2007). (Attached hereto at Exhibit K as cited herein "Biggs Report (Ex. K).") Each assumption builds upon other assumptions, creating a cumulative degree of uncertainty that renders the estimate unreliable. Stallard Report (Ex. I) at 19. These assumptions bias Dr. Florence's projections downward, resulting in a baseless estimate that is "inadequate to handle all claims expected to arise over the next 40-50 years." *Id.* at 21; *see Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion offered."). Dr. Florence's report is thus replete with flawed assumptions, any one of which renders his estimation opinions inadmissible. Examples of such assumptions are summarized below.

### 1. Exclusion of 5,063 Claims With Post-Petition Diagnosis or Filing Dates

Dr. Florence excluded 5,063 claims from the CMS database because they had filing or diagnosis dates later than the bankruptcy petition date of April 2, 2001. Stallard Report (Ex. I) at 19. Jay Hughes, Grace's senior in-house attorney responsible for asbestos personal injury litigation, testified that post-petition filing dates in CMS were due to a lag in data entry, and that

lawsuits received after the petition date were not included in CMS. *See* Hughes Dep. (Ex. H) at 348:14-25, 352:14-18.

Dr. Florence's exclusion of claimants with a post-petition diagnosis also was improper and renders his estimate unreliable. It is incorrect to exclude claims that were filed prior to the petition date, regardless of the recorded diagnosis date. Stallard Report (Ex. I) at 19. It is not uncommon for a claimant to have multiple diagnosis dates, some of which are after a claim is filed. Biggs Report (Ex. J) at 23.

### 2. Exclusion of 28,923 Claims From CMS Database

Dr. Florence excluded 28,923 of the 112,690 claims from the CMS database, after excluding the 5,063 claims discussed above, because he could not obtain a match between their CMS record and the POC records. *See* Florence Supp. Report (Ex. B) at 8; Stallard Report (Ex. I) at 19.[23] Dr. Florence essentially assumed that these 28,923 claimants do not exist:

> Q. Okay. And what did you do with the 28,923 people who filed a proof of claim form for an asbestos personal injury claim in your subsequent steps in your analysis?
>
> A. The are—they are not considered—I mean, considered in the sense—directly considered in the sense of calculation of rate.
>
> Q. So for purposes of your analysis, you assumed that they did not exist, correct?
>
> A. If they did not file a POC and be a pending case, they were not in the base that we calculated from, correct.

---

[23] The Stallard Report is a rebuttal to Dr. Florence's initial report served on June 18, 2007, not his supplemental report served on September 25, 2007. In his June report, Dr. Florence represented that the total number of historical claims was 113, 648, and the number of claims that could not be matched to a POC was 29,172. Those values changed to 112,690 and 28,923, respectively, in Dr. Florence's September report (referred to herein as "Florence Supp. Report").

*See* Florence Dep. (Ex. A) at 73:9-74:1. Dr. Florence's analytic work file therefore was based on 83,767 claims. Had he matched the 28,923 claims, and had he retained all of the 5,063 claims in addition, his analytic work file would have been larger. *See* Stallard Report (Ex. I) at 19.

According to Professor Stallard, the exclusion of such large fractions of pending claims can substantially downwardly bias an estimate in two ways. *See* Stallard Report (Ex. I) at 19. First, the historical claim filing counts used in calibrating the projections will appear to be substantially smaller than they actually were. *Id.* Second, the total settlement value assigned to the pending claims will appear to be substantially smaller than it should be. *Id.* Dr. Florence's report provides insufficient justification for these exclusions and insufficient detail to assess the size of the impact on his estimates. *Id.* Dr. Florence's report does not provide enough information to state qualitatively that the impact could be large. *Id. See Allen*, 1997 WL 34501372 at *18 (failure to provide information on the method's potential error rates weighs in favor of excluding testimony).

> 3. **Assumption That 51% of Lung Cancer Claimants Have Invalid Claims, And Use of Overly Restrictive Lung Cancer Causation Criteria**

Dr. Florence correctly notes in his report that x-ray evidence not submitted in discovery by 2,421 of the 4,764 lung cancer claimants (51%) likewise will not be available for the estimation trial. *See* Florence Supp. Report (Ex. B) at 10. However, the unavailability of evidence at the time of the estimation proceeding is not the same thing as unavailability at the time of trial in the tort system. Dr. Florence's assumption therefore excluded more than 51% of otherwise potentially valid lung cancer claims. *See* Stallard Report (Ex. I) at 20.

The lung cancer causation criteria used by Dr. Florence are too strict because an asbestosis diagnosis is not a necessary precursor to asbestos-induced lung cancer. *See* Victor L.

Roggli, Supplemental/Rebuttal Expert Report, at 3 (July 31, 2007). (Attached hereto at Exhibit L.) Thus Dr. Florence's criteria eliminated still other potentially valid claims.

### 4. Assumption That Only Individuals Who Personally Mix or Install Asbestos Products Will Contract An Asbestos-Related Disease

As noted previously, among the claim validity criteria given to Dr. Florence by Grace counsel is that only individuals who personally mixed or installed asbestos products will contract an asbestos-related disease. However, as Dr. Roggli has observed, people who were exposed to asbestos but did not personally mix or install asbestos-containing products have developed asbestos-related diseases. Dr. Florence thus potentially excluded substantial numbers of valid claims. As Professor Stallard has noted, although the impact of this exclusion is exceedingly complex, it is reasonable to conclude that the impact is very large. *See* Stallard Report (Ex. I) at 20.

### 5. Failure to Adjust Valuations Drawn From Historical Sample of Claims Meeting Assumed Criteria

Although Dr. Florence uses valuations drawn from a historical sample of claims that meet the screening criteria he was given by Grace counsel, he failed to make any adjustment for the fact that Grace's share of the total liability would have been higher in such cases. *See* Stallard Report (Ex. I) at 20. Simple logic dictates that plaintiffs whose predominant occupation involved personally mixing or installing Grace asbestos-containing products would not be able to establish liability against some or all of Grace's co-defendants. Professor Stallard has calculated that the numerical impact of this effect is potentially very large. *See id.* at 7-8.

### 6. Exposure Criteria Used for Forecast of Incidence of Mesothelioma And Lung Cancer

-29-

Dr. Florence used two different methods to forecast the number of future claims that will be able to meet the assumed criteria against Grace for mesothelioma and lung cancer—the Nicholson/KPMG method and the Peto/ARPC method. Although the Nicholson/KPMG and Peto/ARPC claim run-offs that Dr. Florence used were based on different exposure criteria than Dr. Florence used, these differences were not taken into account in his estimation procedure. *See* Stallard Report (Ex. I) at 20. Nor did Dr. Florence provide any results that would allow one to quantify the impact of these differences. *Id.*

### 7. Assumptions Regarding "Calibration Periods" Used to Estimate The Number of Future Claims

In estimating the number of future claims, Dr. Florence calculated a median forecast based on 32 individual forecasts—the product of two methods for calculating the number of claims that would be able to meet the assumed criteria, two alternative mesothelioma and lung cancer forecast methods (Nicholson/KPMG and Peto/ARPC), four calibration periods (1996-2000, 1997-2000, 1998-2000 and 1999-2000), and two methods for estimating the other cancers and nonmalignancies (ratio and regression). *See* Florence Supp. Report (Ex. B) at 19. As Professor Stallard has observed, Dr. Florence's assumptions regarding the use of four calibration periods indicates that his estimates are subject to great uncertainty. *See* Stallard Report (Ex. I) at 21. Moreover, the fact that it is now known that both claim-filing counts and settlement values were increasing after the period 1999-2000 means that none of Dr. Florence's calibration periods represent "that historical period that is expected to be most reflective of future events," as he assumed in his expert report. *See* Florence Supp. Report (Ex. B) at 19. Thus the actual uncertainty of his estimates must be substantially larger than the amount he indicated in his report. *See* Stallard Report (Ex. I) at 21.

fissionable material "can hardly be relied upon as 'good science'" and was "completely lacking in scientific validity and reliability").

Dr. Moolgavkar improperly relies on an estimate of the rate of mesothelioma (regardless of cause) in women published in a 2004 article by Bertram Price and Adam Ware. *See* Dr. Suresh Moolgavkar, Supplemental Report on Asbestos and Disease Causation, at 23, App. 2 (June 11, 2007) (attached hereto at Exhibit S); Bertram Price & Adam Ware, *Mesothelioma Trends in the United States: An Update Based on Surveillance, Epidemiology and End Results Program Data for 1973 through 2003,* 159 Am. J. Epid. 107 (2004) (attached hereto at Exhibit T). Price and Ware assert that the rate of asbestos disease in women is constant. In fact, however, as Dr. Roggli testified, a closer examination of the data shows that the rate of mesothelioma in women echoes the pattern in men, which is precisely what one would expect if women became exposed to Grace asbestos products by being close to husbands who were exposed and whose clothes contained asbestos fibers. *See* Roggli Dep. (Ex. Q) at 134-135.

Even if one accepts Price and Ware's unscientific assessment that the incidence of mesothelioma in women were constant, the claim that this constancy somehow suggests the rate of disease independent of asbestos is not founded upon a scientifically valid epidemiological study. Such a study would have to be based on a comparison between two groups identical in all respects except for the studied exposure. *See DeLuca v. Merrell Dow*, 911 F.3d 941, 945 (3d Cir. 1990). *See also* Reference Manual on Scientific Evidence (Ex. E) at 363-73 (discussing generally the importance to control for confounding factors). Price and Ware's analysis does not comply with this most basic principle of epidemiological study design and therefore does not reliably isolate the rate of disease independent of asbestos exposure.