# EXHIBIT 64

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.*, | ) | Case No. 01-1138 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**GRACE'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE
EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION OF ITS
CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY**

|  |  |
|---|---|
|  | David M. Bernick, P.C.<br>Janet S. Baer<br>KIRKLAND & ELLIS LLP<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Telephone: (312) 861-2000<br>Facsimile: (312) 861-2200 |
|  | Laura Davis Jones (Bar No. 2436)<br>James E. O'Neill (Bar No. 4042)<br>Timothy P. Cairns (Bar No. 4228)<br>PACHULSKI, STANG, ZIEHL & JONES LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware 19899-8705<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400 |
| December 7, 2007 | *Co-Counsel for the Debtors and Debtors in Possession* |

Federal Rules of Evidence – was undertaken to value the claims, either through estimation or an alternative mechanism. In particular, even though the courts in some of these cases faced thousands of claims and individual claim-adjudication was impossible, the courts employed the same legally required process that applies to individual claims. Nothing changed because of the volume of claims or the nature of the claims being valued.

***Robins.*** In *Robins*, the court held that an estimation of Dalkon Shield personal injury claims was necessary. *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1013 (4th Cir. 1986), *cert. denied,* 479 U.S. 876 (1986). To assist in that process, a two-page questionnaire and claim form was completed by approximately 195,000 claimants. Next and importantly, a *fifty-page* questionnaire was sent to (and ***medical records*** were requested from) a random sample of 7,500 claimants. Roughly 6,000 responses were received. *In re A.H. Robins Co.,* 880 F.2d 694, 699 (4th Cir. 1989). The data-collection process lasted nearly a year and a half. *Id.* The data allowed experts to weed out, for example, claims where there was no medical proof of the use of the Dalkon Shield. An aggregate estimate derived from a merits-based methodology was accepted by the district court, and affirmed by the Fourth Circuit, in connection with confirmation of the debtor's plan. *Id.* at 700. This estimate later proved to be conservative, and excess funds were used for an additional distribution.

***USG.*** In *USG*, the debtors sought a merits-based estimation of their asbestos liability because they believed they possessed certain substantive defenses to many of the asbestos claims. The claimants in that case opposed a merits-based approach, and advocated an estimation based solely on settlement and litigation history, without regard to the application of federal procedural rules to the claims at issue. *In re USG Corp.,* 290 B.R. 223, 224 (Bankr. D. Del. 2003). In deciding to apply a merits-based estimation on account of certain of the asbestos

models that fail to recognize some of the most telling behavioral evidence to be found: that a significant portion of asbestos claims were driven by considerations other than merit. Grace's experts offer the following conclusions, none of which has been materially rebutted by claimants:

- Dr. Daniel Henry's x-ray study of a proportional sample of 800 lung and other cancer claimants demonstrates that fewer than 8% of the claimants have radiographic evidence (a profusion score of 1/0 or greater) sufficient to attribute the claimants' malignancies to asbestos exposure. This finding was in stark contrast to the findings of the claimants' x-ray readers, who found a 1/0 or greater in 82% of the claimants in the sample.

- Dr. David Weill's review of pulmonary function tests for 150 of the non-malignant claimants revealed that none of the tests complied with all American Thoracic Society requirements for lung function testing.

- Dr. Anderson's review of the PIQ responses and attachments shows that over 80% of the claimants did not mix or apply Grace's products, but rather were merely bystanders to Grace products or were unable or unwilling to provide any or sufficient information on the nature of their exposure to Grace products. As established in Drs. Anderson and Lees analysis, bystander exposure to Grace products is capable only of causing extremely low, if any, exposure to asbestos. And, as established in Drs. Moolgavkar's and Anderson's reports, exposure at these very low levels has not been demonstrated with any scientific certainty to cause asbestos-related disease.

- Dr. Parker and Dr. Haber's review of the practices of 24 doctors and at least 6 screening companies underlying non-malignant claims and finds these doctors' and screeners' diagnostic practices to be unreliable. This impacts at least 63% of the non-malignant claims at issue.

Discovery of doctors, both in this case and others, has further impugned the integrity of already questionable medical diagnoses underlying many pre-petition asbestos claims. Grace focused much of its discovery effort on the doctors and screening companies that helped to generate the "evidence" that supports the pending claims against Grace. While this effort has been impaired in part by objections (including unfounded privilege assertions) and the invocation of the Fifth Amendment privilege against self incrimination, some basic facts about the behaviors of asbestos claimants and their representatives have come to light:

49

incrimination when asked whether they adhered to the ILO standards. (*See generally* R. Harron Dep. at 78-79; A. Harron Dep. at 15-16, 44; Ballard Dep. at 66) Other doctors testified that they accepted differential payment depending on the results of their diagnoses, which NIOSH has deemed to be unethical. (*See, e.g.*, Lucas Dep. at 70-71; Haber Rpt. at 25 (discussing Dr. Ballard); *id.* at 49 (discussing Dr. Altmeyer)) Moreover, the doctors often knew the disease for which they were screening. (*See* Haber Rpt. at 25 (discussing Dr. Ballard's practices); *id.* at 47-48 (discussing Dr. Oaks); *id.* at 59 (discussing Dr. Gaziano); *id.* at 15 (discussing RTS practices)) An x-ray study conducted by Grace's expert Dr. Daniel Henry suggests that these practices have lead to the gross "over-reading" of x-rays. A panel of three independent B-readers found that the claimants' B-readers analyzed in the study over-read x-rays in 60% to 100% of the cases. (*See generally* Henry X-ray Rpt.; Henry Supp. X-ray Rpt. at 1-2) Further, for certain law firms, the law firms' B-readers over-read x-rays between 35% and 94% of the time. (*Id.*) These dramatic results underscore the impact of using unreliable practices.

**Pulmonary Function Tests.** The evidence also demonstrates that in many cases the doctors and screening companies who generated asbestos diagnoses did not comply with the ATS standards for taking and interpreting PFTs. Grace expert Dr. Weill analyzed 150 PFTs selected as a random sample from the non-malignant claimants. None satisfied all of the ATS requirements. (*See* Weill Rebuttal Rpt. at 38-40; *see also* Haber Rpt. at 40 (discussing Dr. Mitchell); *id.* at 68 (discussing Drs. Mezey & Krainson); *id.* at 17 (discussing Healthscreen); *id.* at 19 (discussing PTS's practices, including charging only for PFTs that found impairment); *id.* at 21 (discussing PFL))

**No Differential Diagnosis.** Finally, the evidence demonstrates that in most cases the doctors did not perform a differential diagnosis prior to diagnosing an asbestos-related disease.