# EXHIBIT 65

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| W.R. GRACE & CO. *et al.*, | ) | Case No. 01-1139 (JKF) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | **Objection Deadline: December 21, 2007** |
|  | ) | **Hearing Date: January 14, 2008 @ 9:00 a.m.** |
|  | ) | **in Pittsburgh, PA** |

### THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS' OMNIBUS MOTION TO EXCLUDE OR LIMIT TESTIMONY PURSUANT TO *DAUBERT* AND RULES 702 AND 703 OF THE FEDERAL RULES OF EVIDENCE

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
James P. Wehner
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005
(202) 862-5000

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10022-4614
(212) 319-7125

Marla R. Eskin (DE No. 2989)
Mark T. Hurford (DE No. 3299)
Campbell & Levine, LLC
800 North King Street,
Suite 300
Wilmington, DE 19801
(302) 426-1900

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*

unprecedented criteria that each personal injury claim must satisfy. The criteria include the following:

- For any asbestos personal injury claim, the claimant must have "mixed" or "installed" Grace asbestos-containing products,

- For lung cancer claims, the claimant must have a B-reader report from a "reliable" reader with a "reproducible" ILO score of 1/0 or greater,

- No cancer claims other than mesothelioma, lung cancer, or laryngeal cancer are allowed as valid claims, and

- Nonmalignant claims must produce B-reader reports and pulmonary function tests with specific minimum test results.

These criteria – essentially "filters" through which all claimants must pass – do not reflect the law of any state or the tort system generally.

- No state court or legislative body has held that unless a plaintiff proves that he or she "mixed" or "installed" a defendant's asbestos-containing products, the claim is invalid as a matter of law. Rather, whether the particular circumstances of a plaintiff's asbestos exposure caused a plaintiff's injury is a jury question. *E.g., Borel v. Fiberboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973).

- A lung cancer claim may be proven with pathology and work history and does not necessarily require a B-read demonstrating an additional asbestos disease, a point Dr. Florence concedes. *See* Thomas Florence, Deposition Transcript, Oct. 30, 2007, at 185 (attached as Exhibit 1).

- Whether asbestos caused a cancer other than mesothelioma, lung cancer or laryngeal cancer is a jury question that can be answered in the affirmative based on jury consideration of expert medical testimony. Juries have, for example, awarded recoveries to asbestos plaintiffs suing for colon cancer. *E.g., In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135-37 (2d Cir. 1995) (reinstating a jury verdict in favor of asbestos personal injury plaintiffs with colon cancer assigning causation to an asbestos defendant).

- There is no uniform set of test results required of non-malignant claimants by state law. *See, e.g., Armstrong,* 348 B.R. at 131 ("[A]lthough medical criteria legislation has been passed in some states, there are no universal standards.").

Nor did Grace ever apply these criteria in the years that it resolved asbestos claims in the tort system. Now, however, by insisting that Grace claimants satisfy these criteria, Grace is asking this court to substitute a new and unprecedented legal framework for existing state law. Under this new regime, Grace would have this Court rule that claims not meeting their criteria are invalid *as a matter of law*. Their value would be zeroed out and the affected claimants should recover nothing.

Dr. Florence subjects all pending claims to these criteria. To estimate the number of future claims, Dr. Florence takes the now-reduced number of pending claims –only those whose PIQ responses satisfied the criteria– and projects them into the future. Finally, to obtain monetary values for the few claims remaining after application of the criteria, Dr. Florence takes a sample of 285 of Grace's settled (or "closed") mesothelioma claim files and then applies the liability filters retroactively to determine if any of those settled claims had data in their files to meet Grace's new criteria, data which was not relevant or required when the case was settled so there was no reason at the time to document satisfaction of the criteria. Only *six* mesothelioma cases retroactively meet the criteria. From these six cases – out of tens of thousands Grace settled prior to bankruptcy – Dr. Florence derives values for all claims.

To be admissible under the Federal Rules of Evidence, an expert opinion must both "fit" the case, that is be relevant to, and helpful in resolving, the question before the Court, and be reliable in its methodology. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993); *In re TMI Litig.,* 193 F.3d 613, 662-66 (3d Cir. 1999). Dr. Florence's opinion fails a *Daubert* challenge because it simply does not address the issue before the Court, and so must be excluded for lack of fit. As described above, the sole

6

III.    **Dr. Florence Answers the Wrong Questions with Flawed Methods**

Dr. Florence, the President of ARPC, is the only Grace expert offering an independent estimate of any kind of Grace's overall asbestos liability. As shown below, his estimate, the product of an novel estimation method never endorsed by any court, satisfies neither the fit nor the reliability prongs of the *Daubert* test and must be excluded.

   a.    **Dr. Florence's opinion fails the fit test of *Daubert* because it does not help the court answer any question at issue in these proceedings**

        i.    **This Court must determine Grace's liability for asbestos personal injury had it remained in the tort system rather than filing for bankruptcy**

The sole question facing the Court in this estimation proceeding is what Grace's asbestos personal injury liability, measured by state tort law standards, would be had it continued in the tort system and not gone into bankruptcy. Courts have widely recognized this as the proper objective of estimation. *See, e.g., Owens Corning,* 322 B.R. at 722 (ruling that "claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy"); *Armstrong*, 348 B.R. at 123 (ruling that "[a] court must therefore look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy"); *Eagle-Picher*, 189 B.R. at 691-92 (future claims must be valued as of the filing date of the bankruptcy case); *Federal-Mogul*, 330 B.R. at 158 (object is to determine "what a claim would have been worth but for the bankruptcy").

Moreover, this approach is consistent with the fundamental principles of bankruptcy law. These principles include that bankruptcy claims are valued by applicable non-bankruptcy law standards, *see, e.g., Raleigh,* 530 U.S. at 20, and that the Court must value an unliquidated claim as it stood prepetition so that the bankruptcy

estate may be allocated fairly among the creditors. *In re Brints Cotton Mktg.*, 737 F.2d 1338, 1342 (5th Cir. 1984).

Courts have considered, and rejected, other approaches to estimation that attempt to value claims in various bankruptcy scenarios outside the tort system. For example, In *Owens Corning*, a creditor suggested that the proper measure of the asbestos personal injury liability was the amount that would be paid by a settlement trust that would be set up as a result of the bankruptcy process itself. The court declined to take that approach, stating, "[w]e are not, at this time, deciding how much each claimant will actually be entitled to receive, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." *Owens Corning*, 322 B.R. at 722. *See also Eagle-Picher*, 189 B.R. at 691 (rejecting valuation of claims at trust levels as having "nothing whatever to do with estimation of claims").

### ii.    Dr. Florence does not estimate Grace's asbestos personal injury liability had it remained in the tort system

Dr. Florence has in the course of his long career offered opinions on the current and future asbestos liability of numerous companies, including Grace, always until this case by measuring what those liabilities would be in the tort system. The opinion he puts before the Court here is entirely different. It does not estimate Grace's asbestos personal injury liability had it remained in the tort system. Instead, it estimates Grace's liability under a set of criteria delivered to Dr. Florence by Grace's counsel that purport to determine what cases are "valid"—not under the law as it actually exists, but as Grace might wish the law were. *See* Thomas Florence, Supplemental Report, Sept. 25, 2007, at 2 ("ARPC has now been asked to estimate the Grace pending and future asbestos liability

14

under a specific set of assumptions.") (attached as Exhibit 3). The assumed criteria

include the following:

- For any asbestos personal injury claim to be valid, the claimant must have "mixed" or "installed" Grace asbestos-containing products,

- For lung cancer claims to be valid, the claimant must have a B-reader report from a "reliable" reader with a "reproducible" ILO score of 1/0 or greater,

- No cancer claims other than mesothelioma, lung cancer, or laryngeal cancer are allowed as valid claims, and

- Nonmalignant claims must produce B-reader reports and pulmonary function tests with specific minimum test results in order to be valid claims.

These Grace-supplied criteria were designed to limit liability to claims that Grace, in its

unilateral judgment, considered to be compensable claims.[3]

Dr. Florence made it clear that had he would have done his estimate differently

had he been asked to generate an estimate of Grace's liability in the tort system. He

would not have used Grace's criteria.

Q.   On the record. Do you have a view, as you sit here today, that, if you're asked to estimate Grace's liability based on the assumption that it did not go into bankruptcy, whether or not the specified set of assumptions concerning what claims would be valid and compensable would be the criteria that you would use in estimating Grace's liability?

. . .

A.   No, probably not, if it was an assumption that they would not file for bankruptcy, they were not in bankruptcy but were in the tort system, I would probably do it similar to the way I have done it in other situations where that assumption was made.

---

[3]   The effect of this is that Dr. Florence "estimates" the value of the claims of entire categories of current claimants at zero, turning an estimation process conducted under Section 1129 of the Bankruptcy Code for plan confirmation purposes into a disallowance procedure. His method, of course, offers these unfortunate claimants none of the procedural protections of section 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007, or the due process clause.

Florence Dep. 208-09 (readback omitted). Dr. Florence's estimate is limited solely to liability under the assumed criteria. He offers no opinion on liability in the tort system whatsoever.[4]

### iii. The assumed criteria do not reflect the tort system, or Grace's pre-bankruptcy tort system experience

Florence could offer no basis for assuming the assumed criteria reflect the tort system Grace would encounter had it not entered bankruptcy. For example, he could cite no proposed or enacted legislation that incorporated the assumed criteria. Florence Dep. 251-52. Indeed, he made no attempt to see if the assumed criteria bore any relation to the current tort system.

> Q. You have not attempted to determine whether the specified assumptions are currently used in the tort system; have you?
>
> A. I have not. No.

Florence Dep. at 251.

Nor could Dr. Florence point to any tort system defendant (or even any asbestos bankruptcy trust) whose asbestos liability is governed by the assumed criteria. For example, when questioned about the assumed criterion that a claimant personally "mix"

---

[4] Grace's other estimation expert, Dr. Fredrick Dunbar, does not provide an opinion on liability in the tort system, either. *See* Frederick Dunbar, Deposition Transcript, Nov. 6, 2007, at 9 (Q. Is it correct that Dunbar Exhibit 3, a rebuttal report to Dr. Mark Peterson, does not contain your own independent estimate of Grace's liability for pending and future asbestos personal injury claims? A. Yes.") (attached as Exhibit 31). Nor does the UCC's expert, Dr. Letitia Chambers, or the Equity's expert, Dr. James Heckman. *See* Letitia Chambers, Deposition Transcript, Nov. 14, 2007, at 13 ("Q . . . [Y]ou haven't been asked nor have you provided your opinion about what your opinion is as to Grace's liability for pending and future asbestos claims; is that correct? A. I have not.") (attached as Exhibit 32); James Heckman, Deposition Transcript, Nov. 12, 2007, at 27 ("Q. Does this report actually estimate the liabilities of W.R. Grace for pending and future asbestos-related personal injury claims? A. No.") (attached as Exhibit 33).

or "install" asbestos-containing products, Dr. Florence acknowledged that he knew of no

precedent for any such requirement.

> Q. In fact, is there any TDP that you are aware of that has – for the
> mesothelioma criteria restricts payment only to people who
> personally mix or personally install asbestos-containing products?
>
> A. Not that I'm aware of, no.
>
> Q. Are you aware of any defendant in the tort system who restricts
> payment in mesothelioma cases only to people who personally
> mixed or personally installed their asbestos-containing product?
>
> A. I'm not sure I know what the exposure criteria are for any
> defendant in the tort system, and it's currently pending in the tort
> system.
>
> Q. So you can't point to a single example of a defendant or a trust that
> restricts payment for mesothelioma claims to people who
> personally mix or personally install asbestos-containing product.
>
> A. I know – none of the trusts that I work with, I know none of those
> trusts where, in the TDP, the mesothelioma claims are restricted to
> these two exposure criteria only.
>
> Q. What about for solvent defendants? Are you aware of any solvent
> defendant that restricts payment in mesothelioma cases solely to
> people who can demonstrate that they personally mixed or
> personally installed an asbestos-containing product?
>
> A. As I said, my knowledge of defendants is slim. So I – in this
> instance, I know of none.

Florence Dep. 127-29 (objections omitted). *See also id.* at 184-85 (conceding that the

assumed lung cancer X-ray diagnostic criteria are not followed in the tort system or under

asbestos settlement trust procedures).

In this, at least, Dr. Florence is correct. No state court or legislative body has held

that unless a plaintiff proves that he or she "mixed" or "installed" a defendant's asbestos-

containing products, that claim is invalid as a matter of law. Rather, whether the

particular circumstances of a plaintiff's asbestos exposure caused a plaintiff's injury is a

jury question. *E.g., Borel v. Fiberboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973). No state court or legislative body has ruled out asbestos claims for cancers other than mesothelioma, lung cancer or laryngeal cancer. Quite the opposite. *See, e.g., In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135-37 (2d Cir. 1995) (reinstating a jury verdict in favor of asbestos personal injury plaintiffs with colon cancer assigning causation to an asbestos defendant). Finally, no uniform set of test results required of non-malignant claimants has been adopted nationwide. *See, e.g., Armstrong,* 348 B.R. at 131 ("[a]lthough medical criteria legislation has been passed in some states, there are no universal standards").

Finally, Dr. Florence admits that the assumed criteria provided to him by Grace do not reflect the historical criteria Grace actually used to settle asbestos personal injury claims:

> Q.   Okay. You would agree with me that, historically, Grace paid mesothelioma claims that did not meet these criteria?
>
> A.   To my knowledge, they did.

Florence Dep. at 57. In deposition, Grace's in-house counsel conceded the same point. While in the tort system, Grace never applied these criteria when settling cases nor enjoyed the benefit of these criteria when trying them. *See, e.g.,* Hughes Dep. at 50, 61, 154. The criteria are quite simply fantasy.

### iv.   Dr. Florence's opinion thus fails the "fit" test under *Daubert*

For Dr. Florence's report to pass the "fit" requirement of *Daubert*, it must address the particular disputed factual issues in this case. *Paoli*, 35 F.3d at 743. An expert who does not address the disputed issues in the case is of no help to the Court and must be excluded.

For example, in *Rapp v. Singh*, 152 F. Supp. 2d 694, 695 (E.D. Pa. 2001), a plaintiff brought a products liability action for injuries sustained when a truck pushed the plaintiff's car into another vehicle. The plaintiff claimed that the rear bumper guard on the truck was defective for failing to have a certain vertical attachment. The plaintiff was required to prove that the vertical attachment was a safer alternative and that the defective design exacerbated the injuries. *See id.* at 698. The court acknowledged that the plaintiff's expert witness conducted "a rigorous analysis of the accident as it happened," but found that the expert failed to provide any sort of analysis regarding what would have happened had the vertical attachment been in place. *Id.* at 704-05. The court then concluded that the opinion offered by the expert witness "in no way illuminates the problem at the heart of [the plaintiff's] case" and excluded the expert's testimony on the basis of lack of fit. *Id.*

Similarly, Dr. Florence's expert report in the present case does not estimate Grace's asbestos personal injury liability had it remained in the tort system, the issue this Court is called upon to decide. Instead, it estimates Grace's liability under a set of assumed criteria delivered to Dr. Florence by Grace about what cases are "valid". Because, under *Daubert's* fit requirement such an opinion fails to assist the court in determining liability in the tort system, Dr. Florence's report must be excluded.

### b. Dr. Florence's method is unreliable

#### i. His method is unreliable because Dr. Florence did not examine the validity of his assumptions

*Daubert* and its progeny do not permit a litigant to daisy-chain expert evidence together to create a combined methodology that no single expert vouches for. *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999). In *TMI*, plaintiffs attempted to combine the

opinions of several experts to establish the radiation dose of Three Mile Island area residents. The plaintiffs engaged a risk management expert, Dr. Crawford-Brown, in a capacity the Third Circuit characterized as a "chairperson for their team of experts." *Id.* at 714. Crawford-Brown testified that had he been doing the risk assessment himself, he would have assessed of the strengths and weaknesses of the evidence presented by the underlying experts. *Id.* at 715. He admitted, however, that he never made any attempt to assess the validity of any of the assumptions the other experts used to formulate their opinions. The Third Circuit concluded that this uncritical combining of opinions without an expert who endorses the entire methodology does not satisfy *Daubert*.

> Crawford-Brown's failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* and it was not calculated to produce reliable results.

*Id.* at 716.

Here, as Crawford-Brown did in *TMI*, Dr. Florence acts as the "chairperson" of the collection of experts Grace has assembled. Like Crawford-Brown in *TMI*, Dr. Florence admitted in deposition he would not have used the assumptions embodied by the other experts had he made the estimate using his usual methods. *See* Florence Dep. at 208-09. Finally, as with the expert excluded in *TMI*, Florence made no independent assessment whatsoever of the validity of the assumptions he incorporated into his own opinion, he simply did as he was instructed, without any exercise of his own expert judgment.

> Q.    Who provided the assumptions regarding the evidence required to demonstrate the validity of the claims?
>
> A.    Our client.

20

Q.    Did you make any assessment of the validity of those assumptions?

A.    No. We operated under the assumptions we were given.

Florence Dep. at 13-14. Indeed, Dr. Florence took pains to disassociate himself from

these assumptions.

Q.    Do you have any opinion, one way or the other, as to whether these criteria are valid assumptions for a court to adopt in estimating Grace's asbestos liability?

A.    I don't.

Q.    Do you have any opinion, as you sit here today, as to whether these criteria could successfully have been applied by Grace if it had not gone into bankruptcy?

A.    I don't.

Q.    Do you have any opinion, as you sit here today, as to whether these criteria would be adopted by a trust set up to pay pending and future Grace asbestos personal injury claims?

. . .

A.    I guess the trust could adopt any criteria. The criteria for trusts has changed over the years.

Q.    You don't have an opinion whether these are appropriate criteria or not; do you? You don't have an opinion one way or the other or not?

A.    About the appropriateness?

Q.    Yes.

A.    No.

Q.    And you don't have any opinion about whether people who don't meet these criteria could successfully prosecute a claim in the tort system to judgment against an asbestos defendant following a trial; do you?

. . .

A.    I don't.

21

Florence Dep. at 151-54 (objections and readbacks omitted). Under *TMI*, therefore, Dr. Florence's opinion must be excluded as flawed under *Daubert* as the product of an unreliable methodology.

> ### ii.  His method is unreliable because it relies on incomplete and flawed information

An expert that relies upon incomplete and flawed information is not using a method that satisfies *Daubert's* reliability requirement. For example, in *Snodgrass v. Ford Motor Co.*, 2002 WL 485688 (D.N.J. Mar. 28, 2002), the court considered a *Daubert* challenge to the expert opinion of a statistician, a Dr. Moshman, who had developed a comparison of vehicle fire rates. The comparison was based on a database of vehicle fires compiled by the defendant with the assistance of Rust Consulting and another expert who reviewed entries. *See id.* at *9-12. The court observed that the database itself had significant flaws, suffering from both incomplete information and incorporating subjective judgments of interested experts.

> The fires were initially included in the database based on fire reports of tremendously variable reliability and are being reviewed after the fact and solely for purposes of this litigation to determine whether they indeed should be "included."

*Id.* at 10. The court ultimately excluded the opinion of the statistician relying on the database because the database was simply unsuitable for that purpose.

> Using a database the entries of which may or may not be fires attributable to ignition switch defects as the foundation for Dr. Moshman's opinions regarding the fire rates of such entries suggests that the "existence and maintenance of standards controlling the technique's operation," required by Rule 702 and *Kannankeril*, 128 F.3d at 807 n. 6, is inherently lacking. If the database is not an accurate portrayal of what it purports to be-namely, a compilation of actual incidents of fires caused by ignition switches-then Dr. Moshman's use of this database, which assumes the conclusions of ignition switch fires to be accurate, is methodologically unsound.

*Id.* at 10.

Here, Dr. Florence's analysis of which pending and historical claims satisfy the assumed criteria depends on the personal injury questionnaire database sample coded by Rust Consulting and Exponent and on the sample of closed claims provided by Grace from its in-house litigation files. Both sources have significant flaws, and like the expert who relied on the flawed database in *Snodgrass*, Dr. Florence's resulting opinion is methodologically unsound.

### 1. The PIQ responses Dr. Florence relies on are fundamentally incomplete

Dr. Florence's methodology relies upon a review of the PIQ responses conducted by Exponent to determine what percentage of the pending claims satisfy the "assumed criteria" provided by Grace. Specifically, he incorporates the coding of a sample of the questionnaires and attachments created by Exponent staffers who actually reviewed the documents. Florence Supp. Report at 6.

"If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *TMI*, 193 F.3d at 697. *See also Snodgrass*, 2002 WL 485688, at *9-12 (excluding expert because of reliance on inaccurate data base). Here, the PIQ questionnaires and attachments, on which Florence (and Anderson) relied as their source of data were profoundly incomplete as a source of information on what evidence claimants would be able to bring to bear to support their claims. Under bankruptcy law, the litigation stay imposed by this bankruptcy in 2001 immediately suspended personal injury litigation and insured that no case would come to trial until the bankruptcy proceeding was concluded, if then. Discovery stopped and has been frozen for the past six and a half years. This

23

means that individuals could not obtain from Grace any new information to make out

their cases and that as a practical matter they and their counsel had no incentive to

undertake detailed preparations for the trial of their claims.

As one law firm representing asbestos personal injury claimants explained in a

response to an interrogatory served by Grace:

> Motley Rice notes that had it been pursuing each Claimant's case against
> Debtor in the usual course of litigation, Motley Rice would have had
> substantial additional information available to it for each Claimant's case
> concerning both Debtor's liability and each Claimant's medical condition
> and asbestos exposure history. With respect to exposure history, the
> Claimant, if in life, would have been interviewed again, co-workers
> previously identified would have been interviewed or re-interviewed, and
> additional investigation for additional co-worker and exposure witnesses
> would have been conducted. Motley Rice would have relied on its own
> files and, when appropriate, those of respected co-counsel to locate and
> interview these individuals. The examples mentioned previously are
> intended to create an illustrative list of additional exposure resources that
> Motley Rice would pursue that is not currently available or feasible, as
> opposed to an exhaustive list.

> This exposure history would have been supplemented by discovery from
> Debtor concerning the locations to which it sold or distributed its asbestos-
> containing products by way of invoices or other written documentation.
> Also, product location information would have been available from
> suppliers, distributors, contractors, and premises that used, installed, or
> purchased Debtor's asbestos containing products. Of course, other
> discovery devices, such as interrogatories, requests for admissions and
> documents, together with depositions of individuals designated by Debtor
> pursuant to Federal Rule of Civil Procedure 30(b)(6) or a state equivalent
> would have been employed as well. These discovery methods have all
> been essentially unavailable to Motley Rice during the stay entered in
> Debtor's bankruptcy case.

Motley Rice LLC's Objections and Responses to Debtors Third Set of Interrogatories to

Certain Asbestos Personal Injury Pre-Petition Litigation Claimants' Law Firms, July 13,

2007, at 16-17 (attached as Exhibit 4). Thus, because their cases were halted before

claimants had developed information in the course of ordinary litigation, claimants

simply do not yet have the information that would normally have supported those claims against Grace in asbestos litigation.

The incompleteness of the PIQs as a definitive measure of the evidentiary support for claims is inherent in the PIQ process that Grace insisted on. Grace did not agree to waive the stay of discovery to facilitate development of evidence on the claims. Nothing in this Court's orders required claimants, in responding to the questionnaire, to gather information beyond what they had available when the responded to the PIQ. While some claimants no doubt pursued claims against defendants still subject to tort proceedings, that effort would not (except by pure coincidence), add to their information about their claims against Grace, particularly with regard to their Grace-specific exposure.

Dr. Florence has said he was unaware of gaps in claimant information resulting from the bankruptcy stay and could not explain his reliance on this incomplete information. In deposition, Dr. Florence admitted that he had never seen the interrogatory answer reproduced above or any of the approximately 20 sets of interrogatory answers from claimants' firms describing how they tried to answer the PIQ on behalf of their clients. Florence Dep. at 154-55. He disclaimed knowledge of how asbestos claims are actually litigated or proven in the tort system. *See, e.g.,* Florence Dep. at 164 ("Q. Any expertise at all in the methods by which plaintiffs prove exposure to an asbestos defendant's products? A. No."). Moreover, he stated that he was unfamiliar with how Exponent retrieved and coded the information that it did have. *See, e.g.,* Florence Dep. at 169 ("I don't know what Exponent did."). Thus, Dr. Florence's use of this incomplete data renders his opinion unreliable, both because the information base

on which he depended was fatally incomplete and because he failed to take any steps to inquire into the adequacy of the information he was given.

At several points in his Supplemental Report, Dr. Florence purports to deal with the problem of missing information in the PIQs by applying an alternative method. This method would account for the PIQs that do not provide information sufficient to put their claimants into a category by assuming that those claimants would fall into categories in the same proportions as those whom Exponent did assign to specific categories. *See, e.g.,* Florence Supp. Report at 10 and Table 4-5 ("The second method calculates the number of historical pending claims that met the assumed criteria and assumes that claimants who did not provide nature of exposure data either on the or with the PIQs met the criteria in the same proportion as those who provided the data"). Unfortunately, while this method may indeed result in assuming that a handful of additional claimants "met the criteria," it does not eliminate the problem of the fundamental incompleteness of the PIQ data. Whether a claimant included some exposure data in his PIQ response or no exposure data at all, every pending claimant operated under the burden of the bankruptcy stay and its effect on evidence gathering. Applying a percentage from those who could provide some information to those who had no information merely applies the results of a consistently flawed process to a larger group. Indeed, the only way Dr. Florence's "second method" could have worked was if there was a pool of PIQ respondents who had enjoyed the opportunity to fully develop their cases as if they were in the tort system and going to trial. But there was no such pool of fully discovered and trial-ready "test" cases, and Florence's "second methodology" is as flawed as his first.

26

## 2. His analysis of the closed claim files to determine the value of claims is unreliable

Having whittled down the pending claims by running them through the liability filters imposed by Grace, Dr. Florence needed some way to place a monetary value on the claims that remained. He now finally turned to Grace's settlement history.[5] But he imposed an unusual twist. He had Exponent run the paperwork Grace had on an arbitrarily selected sample of 285 settled claims (the "closed claim files") through the Grace-imposed liability filters to find those satisfying the criteria provided him by Grace. Florence Supp. Report at 15. Six mesothelioma claims passed. These six formed the basis of the value of every pending and future claim in Dr. Florence's forecast.

Unfortunately, Dr. Florence had little idea what documentation was available for a "closed claim" and whether it would be sufficient to determine if such a claim satisfied the assumed criteria. "All we asked for is all of the information Grace had available to it. I don't know nothing about how Grace collected that information." Florence Dep. at 120. Dr. Florence did not know what information Grace obtained or what plaintiffs submitted to Grace in order to settle or otherwise resolve a case, or whether Grace kept it. "I am not sure what these people did with regard to Grace. I don't know . . . what information was submitted to Grace, whether it was all of the information, part of the information." *Id.* at 121-22.

---

[5]  Grace asks this Court to depart from the governing case law of *Armstrong, Owens Corning,* and *Federal Mogul,* which mandate that an asbestos debtor's historical settlement history must form the basis of any estimate of liability, and instead assume that Grace should only pay claims that Grace's experts would agree meet its various "liability filters." It is ironic that, after all of its protestations that settlement history is irrelevant to measure its liability, Dr. Florence values the claims that survive Grace's liability filters by reference to historical settlement values.

Grace's centrally maintained records on the cases it had settled are an inherently incomplete and unreliable basis for drawing conclusions as to where settled claims should be classified in Grace's "nature of exposure" categories (even assuming that is a relevant inquiry here). Grace did require that before it settled a case claimants had to show evidence of work with Grace products, but it did not require that they show that they mixed or installed those products. *See* Jay Hughes, Deposition Transcript, Feb. 22, 2007, at 150-51 (attached as Exhibit 5). Since evidence of being a mixer or installer was not required to obtain a settlement, evidence to that effect would be in Grace's closed case files only by coincidence or happenstance, and no valid inference can be drawn from its absence.

In a submission Grace made to an insurance arbitration panel in 2003, Grace admitted that its claims files do not contain all of the information produced in the litigation of the claim and relevant to a particular claimant's exposure to asbestos from Grace's asbestos products. Instead, it relied on shorthand "exposure affidavits" that contain only a fraction of this material, setting out in summary form only the products and years of exposure.

> Grace began using exposure affidavits and submitting them to insurers, who accepted them, in the early 1990s. (Tr. 120-121). "[E]xposure affidavits became the industry standard or the standard operating procedure for the plaintiffs' firms and the corporate defendants as a way to, in a very concise manner, capture exposure dates to the particular defendants' products." (Tr. 117). . . . Exposure affidavits followed years of extensive discovery and investigation that had taken place over the years in the asbestos bodily injury litigation. (Tr. 107-109). As Mr. Hughes testified:
>
> In most cases, in many cases where exposure affidavits were obtained, there is a lot of other information concerning where the products were found . . . historical litigation, deposition testimony, etc., and discovery. But in the context of processing large groups of claims, we needed to come up with a document that would be sufficient for our purposes, for the

> purpose of plaintiffs' attorneys and our insurers as a way to communicate
> when these exposure years were . . . [I]t became commonplace. We
> developed a form of exposure affidavits where the individual claimants
> would swear to exposure for a particular period and products. That would
> be part of the material submitted under these settlement claims to the
> defendants. (Tr. 117).

Grace Post Hearing Memorandum, Feb. 17, 2003 (BOCA0518189-90) (attached as

Exhibit 6). As Grace described, plaintiffs settling cases did not routinely provide Grace

with all the information that they had relevant to exposure. Instead, settlements were

reached in the context of years of litigation of earlier claims with exposures from the

same sites. This litigation produced depositions, discovery, testimony and documents

concerning the presence of Grace's asbestos-containing products. Plaintiffs did not

reproduce this background material in documenting settlements because the professionals

handling the claims for Grace were already familiar with them. Rather, Grace, plaintiffs'

lawyers and insurers relied on summary exposure affidavits to provide evidence and a

record for the instant claim, while knowing that more complete evidence of exposures

often resided in documents from prior litigation and from each parties knowledge of the

contents of those documents. Dr. Florence's closed claim analysis completely ignores the

limitations and broader context of the closed claim files, and blindly limits itself to these

summary materials in Grace's files.

    Moreover, if Dr. Florence had asked about the basis of the Exponent review on

which he would have relied, he would have discovered its grave limitations. As Dr.

Anderson testified, the review was strictly limited to the selected material Grace handed

over. *See* Elizabeth Anderson, Deposition Transcript, Nov. 2, 2007, at 120-23 (attached

as Exhibit 2). Not only did Exponent make no attempt to get additional information from

the claimants with whom Grace had settled, it did not even contact the local counsel who

had defended Grace in the cases settled and who would almost certainly have had additional files on the claims. *See id.* at 123-24.

Finally, the Exponent reviewers did not even have access to the full Grace closed claim files. Grace asserted privilege over portions of the closed claim files and withheld key documents about resolved claims. In many cases, the documents might have answered the question of whether a claim met the criteria. Examples include:

| FOUR EXAMPLES OF CLAIM FILES WITH _WITHHELD_ ITEMS | | | |
|---|---|---|---|
| **Items Withheld** | **Grace Claimant** | **Bates Range Withheld** | **Pages Withheld** |
| Letters, Faxes, Deposition Transcripts, Medical Records, Case Summaries, Case Documents | Donald Wayne Halpain | 0050302-03 0050318-22 0050324-50 0050353-54 0050278-88 | 47 |
| Letters, Faxes, Expert Report Materials, Case Summaries | Swen Olin | 0053328-29 0053347-49 0053353-55 | 6 |
| Letters, Faxes, Medical Reports, Personnel Records, Case Documents | Jack Kenworthy | 0048991ff 0049013ff 0049014ff 0049091ff 0048985 | ≥5* |
| Letters, Faxes, Medical Reports, Environmental and Occupational Health Sciences Institute Report, Pathology Report, Personnel Records, Case Documents | Marvin Pearson | 0041138-53 0041156-66 0041181-85 0041238 0041244-45 0041250-54 0041270-73 0041280 0041374-79 0041382-83 0041387-88 0041394-423 0041428 | 76 |

*At least 5, as no Bates Ranges were provided on the Kenworthy withheld sheets

30

As such, there can be no expectation that the closed claim files upon which Dr. Florence relied had complete or adequate information to make any informed determinations.[6]

Given the spotty nature of the files, it is not surprising that the coding of these closed claim files has likewise proven to be completely arbitrary. This is shown most clearly by the differences between the coding of closed claims files in Dr. Florence's June 2007 report, which was conducted by the Delaware Claims Facility ("DCF"), and the coding of the closed claims files in his September 2007 report, which was conducted by Exponent. On reviewing the closed claims files, DCF had determined that only 21 closed mesothelioma claims satisfied the assumed criteria. Two months later, the second group of coders – Exponent – found that *none* of the 21 mesothelioma claims previously identified by DCF satisfied the assumed criteria, but found another, *entirely different* six claims did.

---

[6]  *See* Claim files of Donald Wayne Halpain, Swen Olin, Jack Kenworthy, and Marvin Pearson (excerpts attached as Exhibit 7).

| CLOSED MESOTHELIOMA CLAIMS THAT SATISFY THE "ASSUMED CRITERIA" | |
| --- | --- |
| **According to Delaware Claims Facility**<br>**(21)** | **According to Exponent**<br>**(6)** |
| Bess, Isaac<br>Cutrer, Roland<br>Denton, Russell<br>DiBona, Louis<br>Einsig, Diane<br>Harvey, Richard<br>Hogan, Regis<br>Hogue, Alton<br>Krammes, Paul<br>Leblanc, Lawrence<br>Lopan, Edward<br>Murchland, Leonard<br>Olin, Swen<br>Perkins, Robert<br>Robertson, Thelmer<br>Sprenger, Raymond<br>Steward, John<br>Szurick Sr, Nicholas<br>Tate, Marvin<br>Wright, Robert<br>Yaghoobi, Mark | Bane, Gary<br>Carroll, Henry<br>McCauley, William<br>McNealy, Thomas<br>Mullen, James<br>Sciubba, Edna |

There was *no overlap* between the two determinations.  The fact that the two different coders completely disagreed on who passed the assumed criteria screen demonstrates that the "data" from the closed claim file sampling is simply arbitrary and unreliable.

### iii.  His method is unreliable because it was created for the purposes of litigation

One of the key factors of reliability under *Daubert* is whether the method employed by the expert is one that was created for the purposes of the litigation, or whether it is one that is employed by the expert outside the litigation context.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent

32

i.    **Every daily exposure was at an "average" level**

Dr. Anderson based her analysis on the premise that every individual claimant was exposed at the same, average, levels – both for what she has been told by Dr. Lees were the average exposure levels he had calculated for the concentration of asbestos to a worker would have been exposed while working with or near Grace asbestos-containing products, and the Exponent-calculated average duration and frequency of such work. This grossly distorting and oversimplifying assumption is fundamentally unreliable and renders Dr. Anderson's work inadmissible under *Daubert*.[16]

It defies both science and common sense to claim, as she does, that everyone who worked with Grace asbestos-containing materials had exactly the same exposure.[17] Believing that all the workers at the thousands of sites at which various Grace asbestos-containing products were used got the same average exposure is the equivalent of saying that because the average American male is 5'10" tall, every American man could walk

---

considerable negative evidence.  Rather here we are showing only that, even on its own terms, the analysis is unreliable and unscientific.

[16] Dr. Lees' averages are themselves unreliable – and render all conclusions based on them unreliable – because they are based on a sample not shown to be representative and are artificially reduced by Dr. Richard Lee's unsubstantiated "conversion" factors. *See* Section VII, *infra*. The values as actually observed in the measurements on which Dr. Lees relied are heavily discounted – to as low as 0.7% of the original measurement – by the Lee conversion factors. *See* Anderson 2d Supp./Reb. Report at 9 ("I used PCME values . . . to compare the estimated exposures associated with Grace products to the OSHA PEL.").  Dr. Anderson conceded on deposition that she "could not recall" ever using Lee's conversion factor in any of her other work on asbestos issues. Anderson Dep. at 220.  Dr. Anderson's adoption, through Lees, of Lee's unreliable discounts is another basis for excluding her testimony on reliability grounds.

[17] Dr. Anderson's frequency/duration calculations share the same flaws – they are based on a set of highly arbitrary assumptions based on very limited data about how often workers in various occupational categories would have worked with Grace products and for how long. *See* Anderson 2d Supp. Report at 2-5.  Dr. Anderson ascribes these postulated frequencies and durations to everyone who worked in those job categories, with no attempt to indicate what variations would be from the averages she uses.

asbestos-containing products were actually installed.[19]   Moreover, it is contrary to the

evidence of industrial hygiene experts that different working procedures and different

working conditions – which may persist over time – would mean different exposure

levels for people doing broadly similar jobs.  *See, e.g.,* Peter Lees, Deposition Transcript,

Oct. 29, 2007, at 154-55 (attached as Exhibit 20); Steve Hays, Deposition Transcript,

Oct. 22, 2007, at 315-17 (attached as Exhibit 10).

> ii.    **The exposures of those who already have asbestos-related disease may have been different from the wider population**

Dr. Anderson's imposition of Dr. Lees' average exposures onto the population of

individual Grace claimants introduces a related methodological flaw.  Dr. Lees' averages

purport to represent the exposure of every person who used or encountered Grace

asbestos-containing materials whether they got sick or not.  Dr. Anderson, however,

employs these averages to assess whether individuals who have ***already been*** diagnosed

as having asbestos-related disease can possibly have a valid claim.  If one recognizes that

individual exposures can vary from the average, as Dr. Lees himself does, Lees Dep. at

154-55, and as his data clearly show, the possibility arises that those who became sick

may have had different exposures than those who did not.  Indeed, that this would be the

case is highly consistent with the increasing incidence of asbestos related disease with

increasing exposure.  But Dr. Anderson makes no showing that the averages calculated

for all exposed persons are representative of the exposures of those who were actually

injured.

---

[19]  For example, she has never seen the product being applied, and has no knowledge of whether everyone who worked with Monokote 3 used the same techniques.  *See* Anderson Dep. at 75, 201.

iii.    **The PIQ data and closed claim files are not a reliable indicator of the claimants' work history and contact with Grace asbestos-containing products**

Dr. Anderson (through the Exponent staff) reviewed a sample of PIQ forms and attachments to determine "nature of exposure" categories, *i.e.*, how claimants alleged they had been exposed to Grace asbestos-containing material, and what specific facts they advanced to support their allegations. The results of the samples were reported and incorporated into Dr. Florence's report. Review of the PIQs, however, could provide a reliable basis for conclusions about the evidentiary support for the claims only if the PIQ responses contain the full evidence that claimants would bring to bear as their cases moved toward settlement and trial. That is simply not the case. To pretend that the PIQs could provide a reasonable approximation of the evidence that claimants could present when their cases came up for trial or settlement is to ignore reality.

Under our legal system, plaintiffs are not required to – and do not – assemble their full evidentiary case when they file their complaints in court. All that is required for filing is a good faith belief that they have a basis for their claim; the detailed evidence is assembled only as the case proceeds toward trial. That the evidence can be assembled only after the case is filed is absolutely true insofar as the plaintiffs employ discovery procedures. As a practical matter, even the detailed fact gathering that can be done without resort to the discovery process is accomplished fully only as the case nears a trial date, as plaintiffs' attorneys do detailed interviews, check evidence gathered for similar cases in the past, review depositories of documents, and otherwise complete their trial preparation. Grace's bankruptcy filing halted all discovery by the claimants and also meant that no cases would come to trial while the Chapter 11 proceeding continued,

47

which eliminated any incentive for plaintiffs and the counsel to do further fact gathering on their own.

At best, the PIQ replies show what information the claimants had at the time they completed the forms; in fact, in almost all cases that will be only the information on hand when Grace's bankruptcy filing effectively halted their fact-gathering. (In many instances the PIQ responses are explicitly qualified by a statement that the information presented is limited because discovery has been stayed and trial preparation not complete.) Nothing in this Court's orders regarding the PIQs required (or enabled) claimants to gather additional information; the discovery stay remained in effect. Nothing that claimants may have done to gather evidence for the prosecution of claims against still-solvent defendants other than Grace would have added to their information about Grace exposure except by purest coincidence. Accordingly, no valid conclusions can be drawn from the PIQ responses about the claimants' cases. Yet that is precisely what Anderson has done.

Moreover, the PIQ review process overseen by Dr. Anderson was itself flawed. The Exponent reviewers made no effort to go beyond the questionnaires and their attachments. *See* Anderson Dep. at 133 ("Q. Do I correctly understand . . . that the Exponent team looked at the material that had come in with a particular PIQ but didn't go beyond what had come in with the particular PIQ? A: That's . . . my understanding."). They made no effort to contact the claimant to see what additional information they might have, or might plan to develop before trial. *Id.* at 131 ("I don't think we went any further to try to get them to tell us something they'd been asked to tell us and they . . . if they didn't tell us that, they didn't tell us."). They did not even seek additional

48

information that Grace held itself, concerning, for example, whether Grace products were used at a site at which a claimant worked. *Id.* at 130, 132 ("I don't think there was any further investigation of Grace files, but I don't know that for sure.")

        The Exponent review of Grace's closed claim files to attempt to determine which claims that Grace settled prior to bankruptcy "really" were valid was equally flawed because it was based on improperly limited data. Under Dr. Anderson's guidelines, Exponent's reviewers put a closed claim in a "valid" occupational category only if the Grace closed claim file – as supplied to them by Grace's counsel in this proceeding – showed clearly that a claimant who had been paid had worked as a mixer or installer of Grace product. Even accepting Dr. Anderson's invalid assumption that only mixers or installers should have been compensated, the fact – if it was a fact – that Grace's files did not contain evidence that they were in such a category is not a reliable basis for treating their claim as invalid.

        Prior to bankruptcy Grace did not follow the "validity" criteria it now maintains should govern. Prior to April 2001, Grace did require that claimants it settled with show evidence of work with Grace products, but it did not require that they show that they mixed or installed those products and did not ask claimants for information on the point. *See* Anderson Dep. at 119 ("It was not gathered at the time"). Since evidence of being a mixer or installer was not required to obtain a settlement, evidence to that effect would be in Grace's closed case files only by coincidence or happenstance, and no valid inference can be drawn from its absence.

        Moreover, the Exponent reviewers did not turn to any other source of information to see if past closed claims would have met the "nature of exposure" requirement. Not

49

only did they not seek information from the claimants, they did not even contact Grace's own defense counsel, whose files would likely be much more complete than Grace's central archives. Anderson Dep. at 122-23. They simply stuck to the files that Grace provided them. (In fact, Grace even withheld from its own experts some of the data that it did have on closed claims.) That a search of such limited data failed to turn up much is a measure only of the limits of data; it is utterly unreliable as a measure of the actual underlying facts.[20]

## V.    Dr. Moolgavkar Creates Hurdles for Asbestos Claimants that Do Not Exist in the Tort System and are Unsupported by Science

Dr. Moolgavkar is a non-practicing doctor and epidemiologist. His contribution to Grace's string of expert reports is his calculation of exposure thresholds that Dr. Anderson, in turn, employs in her determination of whether individual claimants have a "scientifically valid" claim. These thresholds purport to calculate the average exposure to asbestos-containing fibers to which a claimant would have to be subjected to in order to demonstrate that asbestos caused his or her disease. Suresh Moolgavkar, Supplemental Report, June 11, 2007, at 3, 14, Appendix 2 (attached as Exhibit 11). These thresholds are flawed in several ways. First, they incorporate assumptions about how individual claimants prove asbestos related disease that are inconsistent with the law, and as a result the thresholds fail a *Daubert* analysis for lack of fit. Second, the method of calculating the thresholds themselves lack the reliability required by *Daubert* because they are not peer-reviewed and at odds with the scientific literature, indeed contradicting the very literature upon which they claim to be based.

---

[20] *See also* discussion of the limitations of the closed claim file review, *supra,* at Section III.b.ii.

a. **Dr. Peter Lees' analysis does not employ proper scientific methodology**

Specifically, (1) Dr. Lees does not show that the handful of historical

measurements he relies on are representative of any population; (2) Dr. Lees presents

only averages as the result of his calculations, without calculating any measure of

distribution or variance; (3) the methodology he employs has not been, and the particular

study he presents here could not be, published in a peer-reviewed publication; and (4) he

relies on the PCME conversion factors of Dr. Richard Lee which themselves run contrary

to proper scientific methodology.  Consequently, Dr. Peter Lees' asbestos worker

exposure rate conclusions should be excluded by this Court.

i. **Dr. Lees does not show that the handful of historical measurements he relies on are representative of any defined population.**

Dr. Peter Lees report collects and combines information from a small number of

historical documents reporting measurements from a very limited number of jobsites and

products.  For example, Dr. Lees' results relied on measurements from only *ten* of the

many thousands of job sites that used Grace Monokote 3 sprayed-on fireproofing.[26]  Lees

Dep. at 93; *see also* James Cintani, Deposition Transcript, Sept. 18, 2007, at 240-45

---

because Unocal's compliance with the TLV in place at the time was not an absolute
defense to plaintiffs' premises liability claim); *Nolan v. Weil-McLain*, No. 01-L-117,
2005 WL 724041, at *8 (Ill. Cir. Ct. Mar. 21, 2005) (among other things, jury properly
considered defendants' compliance with TLV's mandated until the late 1960s, and
verdict in favor of plaintiff on its negligence action was not erroneous); *Anderson v.
Combustion Eng'g, Inc.*, 647 N.W.2d 460, 464 (Wisc. Ct. App. 2002) ("jury was free
to disregard" expert's opinion regarding compliance with TLVs in awarding damages
to widow of a mesothelioma victim); *Fulmore v. CSX Transp., Inc.*, 557 S.E. 2d 64, 73
(Ga. Ct. App. 2001) (rejecting defendants' argument that "plaintiffs are bound by TLV
standards for dangerous levels of asbestos established in 1946" and stating "[t]he TLV
standards presently in existence do not necessarily preclude tort liability, even
assuming CSX had complied with same").

[26] Dr. Lees uses the Monokote 3 measurements to estimate exposure for all "chrysotile
added" products.

(attached as Exhibit 21). The measurements from those ten sites were taken for different reasons at different times by different technicians, and there is no way to confirm that they used similar techniques or what control measures, if any, were implemented. Nonetheless, after grouping these measurements by product type, Dr. Lees averages across all these measurements to get his final exposure estimates.

*Daubert* principles require that sampling studies – such as Dr. Lees' – be based on an adequately representative sample.[27]  For example, in *United States v. Mikos*, 2003 WL 22922197, at *2-3 (N.D. Ill. Dec. 9, 2003), the court considered whether a sampling study of bullet composition based on a collection of 27,000 bullet samples maintained by the FBI satisfied *Daubert*. The court observed:

> Defendant points out the government fails to provide information about the source of these 27,000 samples, how they were selected, and, assuming they were gathered over the last thirty years, whether they were collected at the same rate during the last thirty years, or whether their collection concentrated in a certain time period or came from any particular geographic location . . . . The important point, however, is that the record before us does not reflect that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole.

*Id.* at *4. The Court, finding the study failed a *Daubert* analysis, explained that

> It is therefore not safe, no matter how tempting, to draw conclusions from such prior experiences unless scientific standards have been incorporated to assure that a representative sample has been obtained.

---

[27] *See Cuffari v. S-B Power Tool Co.*, 80 Fed. Appx. 749, 751 (3d Cir. 2003) (excluding a study because "it is merely a random survey of a sample that does not even purport to be representative of the population [sought to be measured]."); *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1182 (D. Kan. 2007) (excluding a study because, in part, "the survey participants are not representative of the universe of [the population to be measured]."); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (excluding a study because the author "did not make any attempt to select a sample to approximate the relevant characteristics of the target population.").

*Id. See also Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) ("to represent adequately the risk or other prediction at issue, the samples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured").

Dr. Lees' opinion is entirely devoid of any such analysis or assurances about the representativeness of the data he happens to have. During his deposition, Dr. Lees admitted that he did not know what standards or calculations are necessary to determine whether a sample is representative of the population. Lees Dep. at 126 ("I am not a biostatistician, so I really can't answer that question directly for you"). Furthermore, Dr. Lees did not make any such calculations. *See id.* at 129, 134. Thus, Dr. Lees' combining of the disparate data from the historical reports is without statistical validity and should be disregarded under *Daubert*.

Moreover, even assuming that the unrelated data sources (1) were representative of some defined population and (2) could be combined, Dr. Lees has not determined what sample size necessary to characterize the defined population. And it is unlikely, given the small number of data points at hand, that the number would be sufficient. For example, Dr. Lees' results relied on measurements from only *ten* of the many thousands of job sites that used Grace sprayed-on fireproofing. Lees Dep. at 93; *see also* Cintani Dep. at 240-45. Dr. Lees did not even know how large his population is – *i.e.*, how many total Monokote 3 jobsites existed. *See* Lees Dep. at 123-24. ("I don't know that number."). Courts have consistently rejected such disregard of sample size in scientific

analysis as being contrary to proper scientific methodology.[28]  And as one Court has

explained, "[t]he greater the number of samples used, the more representative the sample

population will be of the true population, and the less likely will the results be skewed

due to variation within and among tiles." *Dal-Tile Corp. v. United States,* 2004 WL

528328, at *20 (Ct. Int'l Trade Mar. 16, 2004).  Applying these established standards, Dr.

Lees' report should be excluded here.

### ii.    Dr. Lees presents only averages as the result of his calculations, without calculating any measure of distribution or variance

Dr. Lees presents, as his results, merely the simple averages of the measurements

by job category, with no indication of the distribution, variance, or "spread" of the data

that goes into the averages.  Including only the average makes the data useless for its

intended purpose in the Grace expert scheme, the determination of whether conditions at

job sites could have exceed given exposure thresholds.  Indeed, the presentation of

"average" exposure without any indication of the distribution of the underlying values

actually *conceals* information because it suppresses information about how much the

observations varied among themselves.

An average, or "arithmetic mean" in statistical parlance, is calculated by adding

up the values of the observations and dividing by the number of observations.  The values

---

[28]  *See, e.g., In re Silicone Gel Breast Implants Prods. Liab. Litig.,* 318 F. Supp. 2d 879, 898 (C.D. Cal. 2004) (rejecting the consideration of a study because "the sample size of subjects [in the study] was vanishingly small"); *Kelley v. Am. Heyer-Schulte Corp.,* 957 F. Supp. 873, 880 (W.D. Tex. 1997) (excluding a study ruling "[t]he small size of the study leads the Court to conclude that it is not reasonably relied upon by experts to form conclusions regarding an association between [the two relevant factors]"); *Valentine v. Pioneer Chlor Alkali Co.,* 921 F. Supp. 666, 676, 678 (D. Nev. 1996) (noting that "[i]n any epidemiological or toxicological study, the size of the sample populations studied is crucial," and rejecting the study because, in part, "he chose a tiny sample size").

in submitting his work for publication to the profession, Dr. Lees answered, "You know, it would not be unusual, maybe even standard, to calculate the standard deviation." Lees Dep. at 131-32.

In deposition, Dr. Lees at first attempted to justify his failure to provide any measures of distribution or variance by claiming that epidemiologists, whose results his own data would be combined with, did not require a measure of variance. Lees Dep. at 133. When pressed, however, he admitted that epidemiologists, too, measure variance. "They calculate confidence intervals on their risks, yes." Lees Dep. at 133.

Courts have consistently held that failing to account for the distribution or variance of data necessitates a study's exclusion from consideration by a court under *Daubert*. *See, e.g.*, *Biondo v. City of Chicago*, 2002 WL 1160948, at *5-6 (N.D. Ill. May 31, 2002) (in not calculating a standard deviation, expert testimony was not the product of reliable methods); *Hutchinson v. Hamlet*, 2006 WL 1439784, at *4 (N.D. Cal. 2006) (failure to calculate standard deviation of measurements of height in video stills rendered methodology of opinion unreliable under *Daubert*); *Perez v. City of Batavia*, 2004 WL 2967153, at *10 (N.D. Ill. 2004) ("[T]he fact that Kennedy did not bother to perform the standard deviation calculation and, hence, the fact-finder has *no* basis on which to evaluate the statistical significance of the results is one more reason for the Court to conclude that the statistics are unreliable."); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 49 (2d Cir. 2004) (affirming the exclusion of a study where "the court found that Dr. Bidanset did not state a known or potential error rate for the theory."); *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (affirming the exclusion of a study where the author failed to "determine[] any error rate associated with it."). Thus, Dr. Peter

Lees' failure to report *any* measure of distribution or variance – steps he acknowledges would be "standard" in data analysis in his field – make his results unreliable, and require exclusion of his study from consideration by this Court.

        **b.**    **His method is not peer reviewed, nor could it be published in a peer reviewed journal**

Dr. Lees admitted in deposition that the methodology he employed for estimating exposure among various job types to various products was not peer reviewed.

> Q.    Is there any published peer-reviewed literature on the exposure magnitude in the course of application of Monokote III?
>
> A.    Not that I'm aware of that simply calls it out.  No.
>
> Q.    Of any Grace product?
>
> A.    Not that I'm aware of.
>
> Q.    You said not – that you were not aware of any published peer-reviewed literature on exposure magnitude in the course of application of Monokote III that specifically calls it out.
>
> Are you aware of any that you know to have been a measure of exposure to Monokote III asbestos, but that doesn't specifically identify it in the published paper?
>
> A.    No, I don't.
>
> Q.    Is there any published model to be used for purpose of estimation of exposure magnitude of asbestos for Monokote III?
>
> A.    By "model," you mean?
>
> Q.    Well, I mean whatever you meant when you said "through modeling to allow a good estimation of exposure magnitude"?
>
> A.    By that, I meant some sort of a mathematical calculation. I am not aware of any, no.

Lees Dep. at 90-91.  Whether a method has been subject to peer review and publication is a relevant factor in determining admissibility under *Daubert*.  *See Van Wyk*, 83 F. Supp. 2d at 520.  Moreover, as noted above, Dr. Lees admitted that measurements of variability

(such as standard deviation) – which his analysis lacks – would be "standard" in the peer review and publication of studies in his field. *See* Lees Dep. at 131-32. Therefore, the methodology Dr. Lees employs here would not survive peer review in his field. This further shows that this method is unreliable under *Daubert*.

     **c.    Dr. Lees relies on Dr. Richard Lee's flawed conversion factors**

     Dr. Lees used Dr. Richard Lee's PCME conversion factors to lower his asbestos exposure estimates dramatically. As will be described in more detail *infra*, the conversion factors used by Dr. Richard Lee are not generally accepted in the scientific community and were created specially for this litigation report in a manner contrary to the standard practice within the field of asbestos measurement. In fact, in response to the question why did he "use [Dr. Richard Lee's] conversion factors as opposed to somebody else's," Dr. Peter Lees responded, "Well, I guess the simple fact is that I am not aware of any other conversion factors." Lees Dep. at 68-69. Dr. Peter Lees is not aware of any other conversion factors in these circumstances because none exist – no peer-reviewed publication has accepted (or would accept) such nonstandard calculations. In fact, regarding the peer-reviewability of these figures, Dr. Peter Lees even admits "I don't believe that they would have been published. No." Lees Dep. at 71. Consequently, because Dr. Richard Lee's conversion factors should be excluded by this Court, the conclusions reached by Dr. Peter Lees as well as other Grace experts which rely on those conversion factors should likewise be excluded.

**VII.   Dr. Richard Lee's Conversion Factors Are Not Generally Accepted**

     This Court has already taken a skeptical view of Dr. Richard Lee's conversion of fiber counts, finding that his method of converting fiber counts to a Phase Contrast

too small to be seen through an PCM/optical microscope, and (2) TEM can distinguish

asbestos fibers among the overall fiber count derived from PCM analysis.[30]

However, no generally accepted or approved conversion method or factor exists

to convert PCM values to equivalent TEM values (or vice-versa). This is because each

sample from individual asbestos-laden environment, when measured, has a different ratio

between PCM and TEM values. While scientists can measure asbestos concentrations

from the same sample using both PCM and TEM methods, the resulting ratio or

conversation factor would be valid *for that sample only*, not generally applicable to other

samples. *See* NIOSH Method 7402 at 7. For this reason, one cannot convert PCM values

measured in one setting or study into TEM equivalent values using a standard conversion

factor.[31]

For this reason, all three Federal Government agencies that address asbestos

hazards in the workplace – The Occupational Safety and Health Administration

---

[30] Dr. Lee emphasizes this comparison problem himself by first criticizing opponent experts for relying on TEM measurements, and then criticizing the use of PCM measurements. *Compare*, "he relies on TEM results which reported all fibers counted using an indirect sample preparation procedure, a method known to dramatically and artificially increase fiber counts," *with* "PCM counts include other non-asbestos fibers." Lee Supp./Reb. Report at 5 and 13.

[31] The EPA has stated:

The unit risk is based on fiber counts made by phase contrast microscopy (PCM) and should not be applied directly to measurements made by other analytical techniques. The unit risk uses PCM fibers because the measurements made in the occupational environment use this method. Many environmental monitoring measurements are reported in terms of fiber counts or mass as determined by transmission electron microscopy (TEM). PCM detects only fibers longer than 5 um and >0.4 um in diameter, while TEM can detect much smaller fibers. TEM mass units are derived from TEM fiber counts. The correlation between PCM fiber counts and TEM mass measurements is very poor.

EPA, Asbestos; CASRN 1332-21-4, Chronic Health Hazard Assessments for Noncarcinogenic Effects (attached as Exhibit 25).

("OSHA"), the Environmental Protection Agency ("EPA"), and the Agency for Toxic

Substances and Disease Registry ("ATSDR") – agree that *no generally acceptable*

*correlation exists* to compare or convert TEM to PCM, and vice versa. *See* Opinion

Letter from OSHA, to Sen. Conrad Burns, June 30, 2005 ("PCM and TEM results do not

correlate well, and no generally applicable conversion factor exists between the two

measurement techniques.") (attached as Exhibit 26); EPA, Asbestos; CASRN 1332-21-4,

Chronic Health Hazard Assessments for Noncarcinogenic Effects ("Likewise, the

correlation between PCM fiber counts and TEM fiber counts is very uncertain and no

generally applicable conversion factor exists for these two measurements."); ATSDR,

Health Consultation, Zonolite/W.R. Grace Site, March 14, 2005 ("The correlation

between PCM fiber counts and TEM fiber counts is also very uncertain, and no generally

applicable conversion factor exists for these two measurements.") (attached as Exhibit

27).

> **b.    Dr. Lee's microscopy measurement conversion factors are unreliable**

Dr. Lee, nevertheless, provides what he maintains are generally applicable

conversion rates from PCM values into a TEM equivalent measurement, called PCME.

Dr. Lee implies that this method is commonplace; however, he cites no governmental or

peer-reviewed study that has ever attempted to rely or draw conclusions on such

methodology in converting PCM measurements from unrelated data as does Dr. Lee here.

As support for his unsubstantiated conversion factors here, Dr. Lee implies that

because OSHA approved "NIOSH 7402 method which allows for a correction factor to

be applied to PCM data," OSHA approved a correlation between PCM and TEM.

Richard Lee, Rebuttal Report, June 11, 2007, at 7 (attached as Exhibit 28); *see also* Lee

Supp./Reb. Report at 13 (same text). This is simply not true. NIOSH 7402 merely

69

suggests using TEM and PCM measurements of the *same sample* to make an accurate

count – something Dr. Lee did not and could not do here. *See* NIOSH Method 7402 at 7

("Apply this fraction [as obtained by TEM] to fiber counts obtained by PCM on the same

filter or on other filters for which the TEM sample is representative."). Thus, making a

correlation from a TEM and a PCM measurement for use in the *same sample* is proper;

however, making a correlation from other samples and using that relationship to convert a

separate PCM or TEM value is not.[32] No wholesale general conversion factors have been

approved, accepted, or successfully peer-reviewed.

In fact, Dr. Lee eventually acknowledges that "no universal conversion factor has

been developed" between TEM and PCM. Lee Supp./Reb. Report at 13; *see also* Lee

Reb. Report at 7 ("[N]o general conversion has been developed."). He further admitted

in deposition, that his conversation methods have "not been published in a peer-reviewed

journal." Lee Dep. at 128 (attached as Exhibit 29). As this Court has previously noted

with respect to Dr. Lee's conversion factors, "Dr. Lee's alteration of NIOSH has not been

peer reviewed or published, and thus fails one of the tests of reliability noted in *Daubert*."

*In re W.R. Grace & Co.*, 355 B.R. 462, 488 (Bankr. D. Del. 2006).

The conclusions drawn by Dr. Lee about conversion factors and by any other

expert relying on these conversion factors are therefore unreliable. Consequently, all of

Dr. Lee's novel conversion factors between PCM and "TEM equivalent" to postulate

"PCME" values for Grace asbestos concentrations and all conclusions based on data

---

[32] In fact, Dr. Lee made this exact point in 2002 in his Expert Report in the matter of
*United States v. W.R. Grace, Co.*, stating, "to determine the fraction of particles in the
PCM analysis that were asbestos requires that the *same particles* be counted."
Richard Lee, Expert Report, *United States v. W.R. Grace*, at 8 (emphasis added)
(attached as Exhibit 30).