# EXHIBIT 88



C

Georgetown Law Journal
October, 1987

Essay

**\*137** THE DECLINE OF CAUSE [FNa]

Judith Jarvis Thomson [FNaa]

Copyright 1987 by the Georgetown Law Journal Association; Judith Jarvis Thomson

I

Once upon a time there was a simple why of characterizing tort law. It could in those days be said that the defendant will be declared liable for the plaintiff's loss if and only if the plaintiff proves the following three things: (1) that he suffered a loss, (2) that an act or failure to act on the part of the defendant was proximate cause of the plaintiff's suffering that loss, and (3) that the defendant was at fault in so acting or failing to act. Proximate cause was a messy business, of course, but one thing that was clear was that a person's act or omission was not proximate cause of another person's loss unless it caused the loss.

So much for once upon a time. Fault went first: it began to be possible in certain kinds of cases for a plaintiff to win his suit if he proved (1) that he suffered a loss, and (2) that an act or failure to act on the part of the defendant proximately caused his loss, even though he did not prove (3) that the defendant was at fault in so acting or failing to act. Now cause is going. In a number of cases in recent years the plaintiff has won his suit on proof (1) that he suffered a loss, and (3) that there was a faulty act or omission on the part of the defendant, but without proving (2) that the defendant's faulty act or omission caused the loss. No doubt the plaintiff has to prove *some* connection between his loss and the defendant's faulty act. If I prove I lost my legs this morning, and that you hit your little brother with a brick yesterday, *that* certainly will not suffice for me to win a suit against you for damages for the loss of my legs. The plaintiff has to connect the faulty act with the loss. But in the kind of case I have in mind, the connection he makes need not be causation.

*Which* kind of case? A good example is *Sindell v. Abbott Laboratories*, [FN1] which was decided by the California Supreme Court in 1980. The plaintiff alleged she could prove that she developed cancer as a result of the DES taken by her mother while pregnant; she alleged she could prove also that the defendants-eleven drug companies-knew or should have known that DES **\*138** would cause cancer in the daughters of mothers who took it. In other words, she alleged she could prove (1) that she was harmed, and (3) that the defendant drug companies were at fault. But she was unable to prove, after the passage of so many years, which drug company had marketed the very DES her mother took; so she was unable to prove about any of the drug companies (2) that *its* acts had caused the harm she suffered. All the same, she won the right to get to a jury on the facts she alleged she could prove, and the right to win if she could prove them.

An earlier California case-*Summers v. Tice*, [FN2] decided in 1948-presented the problem that confronted the plaintiff in *Sindell* much more starkly and cleanly. The plaintiff Summers had gone hunting with the two defendants, Tice and Simonson. A quail was flushed, and, as Summers alleged, the defendants fired negligently in Summers' direction; as he also alleged, one of the two wounded him. But he was unable to prove which, since

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the defendants had fired similar pellets from similar guns. Loss yes, fault yes, but causality could not be proved. However he too won his suit.

My own impression is that cases like *Summers* and *Sindell*-in which loss and fault are clear, but causality cannot be proved-were very rarely won until recently. Why are they being won now? It is an excellent question, with, I am sure, a great many answers. Chief among them is probably a mix of four things: first, the very fact that causality *is* hard to prove in them; together with, second, the felt need to regulate the increasing number of activities which impose risk as a byproduct of technological advance; third, an increasing public acceptance of egalitarianism; and fourth, the absence as yet of a mechanism other than the tort suit to regulate those activities and secure a measure of compensation for those who may be being victimized by them. [FN3]

II

A related phenomenon-at least I think it really must be related-is the increasing dismissiveness about causality that can be seen in legal theorizing. Here are Landes and Posner in an article published in 1983: 'causation in the law is an inarticulate groping for economically sound solutions . . ..' [FN4] In an article published in 1975, Calabresi defends the idea that certain concepts related to causality have a role to play in law, but his defense of that idea would have puzzled many lawyers fifty years ago. He says:

> *[I]n law* the term 'cause' is used in different guises but always to identify *139 those pressure points that are most amendable to the social goals we wish to accomplish . . .. [U]se of such [causal] concepts has great advantages over explicit identification and separation of the goals. Terms with an historical, common law gloss [like 'cause'] permit us to consider goals (like spreading) that we do not want to spell out or too obviously assign to judicial institutions. [FN5]

This dismissiveness about causality is not visible only in those whose legal theorizing is influenced by economics. [FN6]

III

I am not competent to speak to the question why the law and legal thory have been developing in these ways, or even to the question exactly what forms these developments have taken. What I want to do instead is to mull over one of the sources of the welcome with which these developments have been received by many of the moral philosophers who have taken note of them.

What I have in mind is that there has been a phenomenon equally entitled to be called 'The Decline of Cause' in moral theorizing.

The moral sophisticate nowadays is nowhere near as enamored of causality as the ignorant rest of us. Here is an example. Yesterday, Alfred backed his car out of his driveway without looking. Bad of him!-one ought not do that. Today, Bert backed his car out of his driveway without looking, but lo and behold there was a child at the end of the driveway, and Bert ran over the child and crushed its legs. Horreneous!-much worse. Or so many people think.

The moral sophisticate regards that as a vulgar error. 'Look,' he says, 'both Alfred and Bert behaved negligently, indeed equally negligently. Bert crushed a child's legs and Alfred did not, but that was just bad luck for Bert, and good luck for Alfred. After all, it wasn't Bert's fault that there was a child at the foot of his driveway; all Bert was at fault for is exactly what Alfred was at fault for, namely backing his car out of his driveway

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

without looking. So Bert acted no worse than Alfred did, and-other things being equal-Bert is no worse a person than Alfred is.'

The moral sophisticate may concede that the law does well to mark a difference between Alfred and Bert in the following two ways: (1) imposing a more severe punishment on Bert than on Alfred, and (2) making Bert, and *140 not Alfred, compensate the child's parents. But if so, he says it is for reasons extraneous to the *moral* valuation proper to them and their acts.

It is clear that the moral sophisticate is going to hold this same view in other pairs of cases too. Murder and attempted murder, of course. Yesterday Charles fired a gun at a man, to kill him; Charles' intended victim was wearing a bullet proof vest, so Charles did not kill him. Today David fired a gun at a man, to kill him; David's intended victim was not wearing a bullet proof anything, so David did kill him. David murdered a man, and Charles only attempted murder, but the moral sophisticate says that David acted no worse than Charles did-for after all, it was just bad luck for Charles that his intended victim was wearing that vest, and thus nothing that Charles can take any credit for.

It seems to me three principles lie behind this moral attitude. The first concerns itself with *acts*. What we do in the world depends on the world as well as on us. If you fire a gun at a man to kill him, then the question whether you do not merely fire a gun at him, but also kill him turns on whether the world cooperates-thus on whether the bullet actually reaches him, as it might not if some third party intervenes, and on whether it enters him when it reaches him, as it might not if he is wearing bullet proof clothes. The first principle I have in mind says that the moral value of what you do in the world turns on and only on that part of it which is *entirely* under your control. When you fire a gun at a man, what is under your control is at most such things as the kind of gun you fire, the time and place at which you fire it, the direction in which you fire it, and the intention with which you fire it-merely to scare your victim, or merely to wound him, or positively to kill him. The rest that happens is up to the world, and is not something that has any bearing on the moral value of your act.

I said 'at most.' Let us look again at the kind of gun you fire. Is it new? Is it clean? Is it sufficiently powerful to do the work you want it to do? Strictly speaking, that the gun you fire does or does not have these features is not entirely under your control. What is under your control is only that you have made an effort to be sure that you are firing a suitable gun and now think you are: After all, somebody might have secretly replaced your carefully chosen gun with a different one-whether a person did or did not do this is not under your control. Similarly for the time and place at which you fire the gun, and the direction in which you fire it: Somebody might have secretly altered your clocks and roadmaps, and substituted distorting glasses for the glasses you normally wear-whether a person did or did not do this is also not under your control.

Strictly speaking, all that is entirely under your control are your intentions in acting-what you are at any given time setting yourself to be doing. That is not to say that setting yourself to do this or that is all you actually *do*; it is *141 to say that the normal value of what you do *by* setting yourself to act in this or that way turns entirely on the moral value of those settings of yourself to act.

The second of the three principles concerns itself with *failures to act*, or omissions, for short. Consider two switchmen on different railways, Edward and Frank. Both were under a duty to throw a switch at ten this morning, and both failed to do so because they did not want to be bothered. Edward's omission caused a terrible train crash; Frank's omission caused nothing untoward at all, since the train Frank's switch-throwing was to turn had luckily-stalled before the fork in the track. If you think murder no worse than attempted murder, you will surely think Edward's omission no worse than Frank's. It was, after all, no credit to Frank, it was merely good luck for him, that his train had stalled. The second principle says that the moral value of an omission-as of an act-turns

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on and only on what is entirely under the agent's control. If you could have set yourself to do a thing, and ought to have done so, then your failure to do so is equally bad no matter what your omission does or does not cause.

The cases of Alfred and Bert with which I began are cases to which both principles apply. Alfred and Bert both acted, for they backed their cars down their driveways; and both failed to act, for they failed to look while doing so. Given the two principles, the fact that Bert's acting while failing to act caused a child's legs to be crushed has no bearing at all on the moral value of what he did.

The third of the three principles has to do with the moral value of *persons*. We do think of some people as morally better than others; on what does this judgment turn? Presumably in part on the moral value of what a person does and fails to do. Given the first two principles, however, that is a function only of the moral value of a person's settings of himself to do this or that, and his failures to set himself to do this or that.

But only in part, for there is something else that a friend of these ideas should think bears on a person's moral value. What I have in mind is that if you think that good and bad luck has no bearing on the moral value of an act or omission *or* person, then you should grant that the truth or falsehood of certain counterfactuals is relevant. For example, I do not drive, and a fortiori have never backed a car out of a driveway with *or* without looking. If I had driven, would I on occasion have backed my car out of my driveway without looking? Isn't that relevant to the question how good or bad a person I am?

I am sure that all of us have faced temptations to act badly, and that many of those temptations we have resisted, though some we have not. Most people, however, are lucky enough never to be tempted to do something truly dreadful. For example, I am sure that none of us has ever been in a position *142 of power over prisoners in a concentration camp. I am sure that none of us has been lost at sea in a lifeboat with no provisions other than a plump cabin boy. We have been lucky. How would we behave if we were in such situations? Surely that we would or would not behave in this or that way has a bearing on our moral value as people. One reason why Stanley Milgram's experiments [FN7] were found so shocking was that they uncovered the fact that a lot of perfectly ordinary people were quite ready to set themselves to cause others a great deal of pain simply on being told by an authority figure in a white coat to do so. Milgram's readers did not think for a moment that the actual absence of pain excused the subjects of the experiments; and they took it that what Milgram had shown was a deep moral failing which may be present in perfectly ordinary people, though without ever in fact showing itself.

How good a person are you? The third principle tells us that to the extent to which you do not know what you would set yourself to do in situations you have been so far lucky as not to have faced, you just do not know how good a person you are.

I described the person who holds these views as the 'moral sophisticate,' because I think we do think these views more sophisticated than those which tell us to look merely at what happens, more sophisticated even than those which tell us to look *both* at what happens *and* at what is internal to a person-what he sets himself to do, and what he would set himself to do if he were in situations he has never faced. But I might just as well have described the person who holds these views as a Kantian, because it is directly from Kant that they come down to us today. Kant said: 'The good will is not good because of what it effects or accomplishes or because of its adequacy to achieve some proposed end; it is good only because of its willing, i.e., it is good of itself . . .. Usefulness or fruitlessness can neither diminish nor augment [its] worth.' [FN8] And so similarly for the bad will: it is not bad because of what it causes, but only of itself. We might redescribe the decline of cause in moral philosophy as the triumph of Kant.

That Kant has triumphed seems clear enough. For example, I rather fancy that all of you have at least some

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inclination to agree with the three principles I drew attention to. I certainly do.

It is of interest to notice that these Kantian ideas are visible even in contemporary defenders of the most un-Kantian moral theory of all. I have Utilitarianism in mind, of course. Classical Utilitarians-such as John Stuart Mill and G. E. Moore-took the view that you have acted wrongly if and only if your act causes there to be les good in the world than you could have *143 caused by choosing some other alternative act which was open to you at the time. Whether you knew it or not. Mill did explicitly grant that a man's intentions in acting do have a bearing on the moral evaluation proper to *him*; but Mill insisted that the morality of a man's *act* turns on, and only on, a comparison between what it does in fact cause, and what his other available alternatives would have caused. But hardly anyone is a Classical Utilitarian nowadays. Those in favor of its spirit say that the morality of a man's act turns, not on what it in fact causes, but on what he expects it to cause. In short, the morality of action turns, not on actual, but on expected utilities.

Now I think that these Kantian ideas are one source of the welcome with which many moral philosophers have received those developments in law and legal theory that I mentioned at the outset. For example, they think that all of the defendants were at fault in *Sindell* and *Summers*-equally at fault, regardless of whoever in fact caused the harm. So they think that no one can object, on *moral* grounds, to the plaintiffs' winning, and to the defendants' therefore having to share in the plaintiffs' costs. [FN9]

IV

What should *we* think of all this? It is swimming upstream to try to fight it, but my own feeling is that it smells too much of the study and too little of the open air. Adam Smith said, very plausibly, I think,

> But how well soever we may seem to be persuaded of the truth of [these ideas], when we consider [them] after this manner, in abstract, yet when we come to particular cases, the actual consequences which happen to proceed from any action, have a very great effect upon our sentiments concerning its merit or demerit, and almost always either enhance or diminish our sense of both. [FN10]

Alfred backed his car out of his driveway without looking, and luckily for him, nothing untoward happened in consequence. Bad of him, we think. But not horrendous. People do that kind of thing often enough. They ought not, but they do, and it seems no great sin. Bert also backed his car out of his driveway without looking, but *he* ran a child down and crushed its legs. As Adam Smith said, we just *do* think that what Bert did was worse than what Alfred did. How can philosophy be right which tells us we are mistaken in thinking this?

On the other hand, I think that Adam Smith's remark would not have been at all plausible if he had not said 'almost always.' He said: 'the actual consequences which happen to proceed from any action, have a very great *144 effect upon our sentiments concerning its merit or demerit, and *almost always* either enhance or diminish our sense of both.' [FN11] There seem to me to be two kinds of case in which they do not.

To get at the first kind, let me draw your attention to the fact that in every example I have given, right from the outset, the agent whose act did cause a harm was at fault. In the two court cases I began with, all of the defendants were at fault, the drug companies in *Sindell*, the negligent hunters in *Summers*. Alfred and Bert were both careless. Charles and David, each of whom shot at a man to kill him, were both at least attempting murder. And so on. But what of an agent who causes someone to suffer a harm, but not by negligence or intention or by any wrong at all? A child runs out into the street and is run down by a truck driver who is entirely without fault-he has taken all due care to ensure that his truck, and in particular, his brakes, were in good order, and he was driving with all due care. The child simply ran too suddenly, too close, into the path of his truck. Does the very

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fact that he caused harm to the child diminish our sense of the merit of his actions? I think not. This example comes from Thomas Nagel, and he says about it: 'The driver, if he is entirely without fault, will feel terrible about his role in the event, but will not have to reproach himself.' [FN12] Nor will we reproach him. There is nothing to reproach him for. So here is a case of the first kind I had in mind: it is a case in which an agent was not at fault at all in acting, and that a bad consequence happens to flow from his action does not affect our sense of its merit or demerit. In particular, the bad consequence does not make us think worse of his driving than we would have thought had that bad consequence not flowed from it.

Symmetrically, we might imagine someone who does something of no particular merit, and something good just happens to flow from his doing it. For example, suppose a man is standing at a street corner, waiting for a bus. As he waits, he is idly tapping his foot. Through some freak of nature, his tapping his foot causes three lives to be saved. This good consequence does not affect our sense of the merit or demerit of his tapping his foot. In particular, it does not make us think better of his tapping his foot than we would have thought had that good consequence not flowed from it.

Let us go back to that truck driver, whom I will call Unlucky No Fault Driver. His not having been at fault must be the crucial fact about him which makes him an exception to Adam Smith's remarks. For let us now contrast him with two other truck drivers. Both of them were at fault. They were supposed to check their brakes before leaving the garage, but did not want to be bothered. So both went out with bad brakes. In the case of the *145 first, nothing untoward happened, and I will call him Lucky Fault Driver. I will call the second Unlucky Fault Driver. A child ran in front of Unlucky Fault Driver's truck and he ran it down. I want to have it be clear about Unlucky Fault Driver that he ran the child down not because the child ran too suddenly, too close into the path of his truck, but because his brakes were not in good working order. Had his brakes been in good working order, he would have been able to stop his truck in time; but they were not, so he was not. Lucky Fault Driver acted badly, of course; but I think we do feel that Unlucky Fault Driver acted worse. The fact that a bad consequence flowed from his action does seem to affect our sense of its demerit.

Why? I think the answer is quite simply that Unlucky Fault Driver is to blame for the death he caused. Unlucky No Fault Driver also caused a death; but he is not to blame for it, since he was in no way at fault for causing it. It seems right to say that that is why the bad consequence which flowed from Unlucky No Fault Driver's action does not make us think it worse than we would have thought it had that bad consequence not flowed from it. More generally, it seems right to say that a bad consequence of an action makes that action worse *only* where the agent is to blame for that bad consequence which his action causes.

I am sure that the Kantian moral sophisticate would say at this point, 'But surely it was mere bad luck for Unlucky Fault Driver that he caused a child's death. And surely one can't plausibly think a man to blame for something that he caused merely out of bad luck.' There is a mistake here, and I think it the main source of the trouble. For it was not *mere* bad luck for Unlucky Fault Driver that he caused a child's death. We need a clearer grip on how bad luck figures in these cases. Unlucky No Fault Driver was in two ways unlucky. It was a piece of bad luck for him that a child ran into his path; and second, it was a piece of bad luck for him that he was unable to stop his truck in time. Unlucky Fault Driver was unlucky in only the first of those two ways. It was a piece of bad luck for him that a child ran into his path; but it was not a piece of bad luck for him that he was unable to stop his truck in time. His being unable to stop his truck in time was due to his bad brakes, and thus to his own negligence. Lucky Fault Driver did not have that first piece of bad luck, so it remains a counterfactual truth about him that *if* he had had it, then he too would have been unable to stop his truck in time. His being unable to stop would not have been a mere piece of bad luck for him, but would, instead, have been due to his negligence.

And it is the very same thing-namely Unlucky Fault Driver's negligence-that makes it not *mere* bad luck for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

him that he caused the child's death, that also makes him to blame for the child's death. Unlucky No Fault Driver, by contrast, was not at fault; and that is why it was mere bad luck for **146** him that he caused a child's death, and therefore also why he is not to blame for the death of the child he killed.

The Kantian moral sophisticate could of course insist that a man cannot be thought to blame for something if bad luck entered *in any way at all* into the history of his bringing it about. But that seems to me even on its face implausible. Consider, for example, a man who is brought to trial for murder. 'Look,' his lawyer says to the court, 'I grant that the victim's death is not *mere* bad luck for my client, since my client fired a gun at him with the intention of killing him. But the victim's death is in part due to my client's bad luck. For unbeknownst to my client, the victim almost always wore a bullet proof vest, and it was just bad luck for my client that the victim's bullet proof vest happened to be at the cleaners' on the day my client shot at him. So my client cannot be thought to blame for his victim's death.' Whatever else will work in a court, *that* won't.

Let us go back now and look again at the first of the three principles that I said lie behind the moral attitude of the Kantian moral sophisticate. The first principle is: the moral value of what you do in the world turns on and only on that part of it which is entirely under your control. That seems to me to be false, and for the reason I have pointed to. Admittedly the two faulty drivers, Lucky Fault Driver and Unlucky Fault Driver, both acted equally negligently, and the difference between them has its source in the fact that one had good luck, the other bad luck. All the same, the difference which has that source is a moral difference, and of a very grave order. For the one is *by* his negligence to blame for a death, and the other is not.

A similar point surely holds of failures to act. Edward and Frank both failed to throw the switch; Edward's (but not Frank's) negligence caused a crash, for which he is therefore to blame. That, I think, is why we think that what he did was worse than what Frank did.

It seems to me, however, that we should be more sympathetic to the third of the three principles I mentioned, which yields that Unlucky Fault Driver is no worse a person that Lucky Fault Driver is, and that Edward is no worse a person than Frank. Counterfactual truths about what people would have done and been to blame for if they had been in circumstances which they were lucky enough to have avoided really are important to us in assessing how good a person is-as important, I think, as truths about what they in fact did and in fact are to blame for.

This difference between our judgments of acts on the one hand and the people who perform them on the other hand may perhaps be due to the fact that different kinds of consequences flow from our arriving at these two different kinds of judgments. When we learn that someone is a bad person-untrustworthy, unreliable, prone to acting without thought for others-what flows from this judgment? Well, our attitude toward him changes, and in **147** consequence we will behave differently toward him in many more or less delicate ways in the future. This reaction is appropriate whether the judgment is provoked by what he actually did *or* by what we have come to learn he would do if he were in circumstances he has not in fact been in. By contrast, some of the consequences of learning that a person has actually acted badly are backward looking. If we learn he is to blame for a dreadful outcome, we do not merely alter our behavior toward him in future, we may also lock him up for what he did, or exact compensation for it from him, or both. [FN13]

V

Candor, however, compels me to mention a difficulty for what I have been saying. Let us go back to Adam Smith. He said: 'the actual consequences which happen to proceed from any action, have a great effect upon our

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sentiments concerning its merit or demerit, and *almost always* either enhance or diminish our sense of both.' [FN14] I mentioned one class of exceptions. Unlucky No Fault Driver, for example, was merely unluckly. He caused a child's death, but because this was through no fault of his own, we do not think the worse of his actions. Where there is fault, however, I said that consequences do make a difference. We do think worse of Unlucky Fault Driver's actions than of Lucky Faulty Driver's actions, and that is because the one is, and the other is not, to blame for a bad outcome.

But there is yet another class of exceptions to Adam Smith's remarks, which makes trouble for any simple treatment of these issues. The simplest example comes from a case I mentioned at the outset, namely *Summers v. Tice.* [FN15] (That is a wonderful case. If it had not occurred, we would have had to invent it.) The two defendants, Tice and Simonson, both fired negligently in Summers' direction, and one of them shot Summers, but we cannot tell which. Who should pay Summers' bills? Most people feel it right that Tice and Simonson should split the costs. The actual outcome in court was joint and several liability, but arguably that comes to roughly the same thing given the possibility of a suit for contribution, and in any case there are reasons to **\*148** think that outcome fairer to Summers than a division of the costs. So far so good, nothing puzzling yet.

Now for the source of the puzzlement. Suppose that during the course of the trial evidence had come forward which made it as certain as empirical matters ever are that the pellet that caused Summers' injury came from Tice's gun, so that it is Tice who is to blame for Summers' injury. We do, I think, take it to be clear that Simonson should now be dismissed from the suit: no doubt he acted badly, but he is not to blame for the injury, and hence he is not appropriately held liable for its costs. [FN16] But our *moral* assessment of Tice and Simonson does not shift. We do not think the worse of Tice, or even of Tice's acts, because he, as it turns out, is to blame for the harm; and we do not think the better of Simonson, or of Simonson's acts, because *he*, as it turns out, is not to blame for the harm. Our moral attitude does not shift in any way by virtue of the discovery that it is Tice who actually caused the harm. So we really seem to have a second kind of exception to Adam Smith's remarks.

It could of course be said that it is just irrational on our part to fail to distinguish between Tice and Simonson in the way in which we do distinguish between Lucky and Unlucky Fault Drivers. But it does not *feel* irrational. And the moral views of the man and woman in the street are deserving of great respect: they ought not be dismissed as irrational unless it really does turn out that there is no rationale for them.

What bubbles up in us men-and-women-in-the-street is, I think, this: 'Simonson nearly caused the very same harm that Tice caused.' It is not true of Lucky Fault Driver that he nearly caused the very same harm that Unlucky Fault Driver caused. Or at least you were not thinking of him as having done so. One driver goes out in one part of town, the other in another; they both have bad brakes; a child runs in front of one, no child runs in front of the other. So far so good. One is to blame for a death and the other is not, and we feel very differently about what they did.

But now let the two drivers set out from the same part of town, down the same street. A child runs in front of both. Both come to a long screeching halt. The child is hit by one truck and not by the other. If the child had been running *ever* so slightly slower, it would have been hit by the other truck. Now the drivers seem to us like Tice and Simonson: we think no worse of what the one did than of what the other did.

This suggests that something else is at work in these cases, possibly two things, in fact.

**\*149** In the first place, Tice and Simonson did not merely act equally negligently; they each imposed roughly the same risk of harm on a person. Similarly for the two truck drivers who set out from the same part of town, and in front of both of whom one child runs. Not so for two truck drivers who set out from different parts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of town. If they both set out with bad brakes, they acted equally negligently; but if a child runs in front of one, and no child so much as gets near the other, they do not in fact impose even roughly the same risk of harm on anyone.

This does make a difference to us. Suppose you back your car out of your driveway without looking, but no child was anywhere near you. Perhaps you will feel bad later on thinking the matter over: after all, it is negligent to back out without looking. But you will not *dwell* on what you did; it would be irrational to lie awake at night shuddering at the thought of what you *might* have caused. But suppose you back your car out of your driveway without looking, and there was a child in the vicinity; indeed, you nearly hit it, and would have hit it but for the child's having noticed a penny up ahead and run faster to get to it. Here the shudder is not out of place. We all know what that terrible, nagging thought is like: it is not merely of what you might have caused, but of what you nearly did cause. You do not feel as bad as you would if you had actually hit the child; but you do feel considerably worse than you would if there had been no child in the vicinity at all.

Adam Smith said that the bad consequences of an act affect our sense of its merit or demerit, and I agreed that this is so if the act was faulty: for the bad things an act causes are things that its agent is to blame for, if his act was faulty. What seems to come out here is that it is not merely the actual bad consequences of an act that affect our sense of its demerit: the higher the risk of bad consequences that the act actually imposes on others, the greater the demerit of the act.

It is puzzling that this should be so, however. Your negligence in backing out of your driveway without looking is no greater or worse if there is a child in the vicinity than if there is not; and since you did not actually hit the child, we cannot explain our feeling that what you did was worse by appeal to the fact that you are to blame for a harm to the child. *Nobody* was harmed. So there is a gap here, and I hope you will find it as interesting a question as I do just how it is to be filled.

I said it is possible that there are two further things at work in these cases. The second of them is this: Tice and Simonson did not merely act equally negligently, and they did not merely each impose roughly the same risk of harm on *a* person; they each imposed roughly the same risk of harm on one and the same person, namely Summers. Similarly for the two truck drivers who set out from the same part of town, and in front of both of whom one child runs. Does *that* matter to us? I do not find it clear that it does. Dickenson*150 fired his shotgun negligently last Wednesday, and nearly hit someone. He feels awful about what he did, and we think it right that he feel awful about it. Do we think worse of what Simonson did, given he nearly hit someone on Thursday, *and* given also that the person Simonson nearly hit was in fact hit by Tice? Perhaps so. But it is even harder, I think, to see why that should be so-if it is.

## VI

Let me now try to pull this material together just briefly. I began by drawing attention to two phenomena in law-more precisely, one in law itself, the other in legal theory-which seem to warrant saying that as far as tort law is concerned at any rate, there has been a decline of cause. Many people think that if cause declines in law, law to that extent departs from morality. It therefore seemed to me worth drawing attention to the fact that there has been a decline of cause in moral theory too. That decline in part explains why moral theorists who interest themselves in law have welcomed those developments in law and legal theory. But it is of interest for its own sake. As Adam Smith said, when you think about these matters in the abstract, the philosophers seem to be right; but when you come out of the study, they seem to be wrong. Moral theorists must of course ask themselves why that is, and whether there is a rationale for it; that is the job of the moral theorist. But I hope that lawyers will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

find these questions of interest too. The law certainly is not, and need not be, an exact reflection of the morality of those governed by it; but responsible government tries to be sure it has a sound rationale whenever it departs from that morality, and therefore does well to try to become clear about what that morality is.

[FNa] This paper is a revised version of my Phillip A. Hart Memorial Lecture, given at the Georgetown Law Center on Apr. 2, 1987.

[FNaa] Professor of Philosophy, Massachusetts Institute of Technology.

[FN1]. 26 Cal. 3d 88, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912 (1980).

[FN2]. 33 Cal. 2d 80, 199 P.2d 1 (1948).

[FN3]. For an interesting discussion of these and related matters, which brings out their bearing on a particular case, see P. SHUCK, AGENT ORANGE ON TRIAL, MASS TOXIC DISASTERS IN THE COURTS (1986).

[FN4]. Landes & Posner, *Causation in Tort Law: An Economic Approach*, 12 J.L. STUD. 109, 131 (1983).

[FN5]. Calabresi, *Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr.*, 43 U. CHI. L. REV. 69, 106-07 (1975) (emphasis in original).

[FN6]. *See, e.g.*, Kelman, *The Necessary Myth of Objective Causation Judgments in Liberal Political Theory*, 63 CHI.-KENT L. REV. 579 (1987).

[FN7]. *See* S. MILGRAM, OBEDIENCE TO AUTHORITY (1974) (summarizing results of Milgram's experiments).

[FN8]. I. KANT, FOUNDATIONS OF THE METAPHYSICS OF MORALS 12-13 (Bobbs-Merill ed. 1969).

[FN9]. *See, e.g.*, Fischer & Ennis, *Causation and Liability*, 15 PHIL. & PUB. AFFAIRS 33 (1986); Kagan, *Causation, Liability, and Internalism*, 15 PHIL. & PUB. AFFAIRS 41 (1986)

[FN10]. A. SMITH, THE THEORY OF MORAL SENTIMENTS 134 (Arlington House ed. 1969).

[FN11]. The emphasis is mine.

[FN12]. T. NAGEL, MORTAL QUESTIONS 28-29 (1979).

[FN13]. As I wrote in part III, the moral sophisticate may say that while the law does well to mark a difference between Alfred and Bert (punishing Bert more severely than Alfred, exacting compensation for the injury from Bert), this is for reasons extraneous to the moral valuation proper to them and their acts. I think it is one thing to say the moral valuation proper to *them* does not warrant differential legal consequences: Bert is surely no worse a person than Alfred is. But it is another thing to say the moral valuation proper to *their* acts does not warrant differential legal consequences: Bert, after all, is to blame for a harm and Alfred is not, so there really is a moral difference between what Bert did and what Alfred did.

[FN14]. A. SMITH, *supra* note 10, at 134. The emphasis is mine.

[FN15]. 33 Cal. 2d 80, 199 P.2d 1 (1948).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN16]. Why this should be so is discussed in Thomson, *Remarks on Causation and Liability*, 13 PHIL. & PUB. AFFAIRS 101 (1984). Criticism of that discussion may be found in Fischer & Ennis, *supra* note 9, and in Kagan, *supra* note 9.
76 Geo. L.J. 137

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.