# EXHIBIT 102



c

Fordham Law Review
May, 2003

Notes

**\*2679 RETURNING TO THE ROOTS OF THE BRAMBLE BUSH: THE "BUT FOR" TEST REGAINS PRIMACY IN CAUSAL ANALYSIS IN THE AMERICAN LAW INSTITUTE'S PROPOSED RESTATEMENT (THIRD) OF TORTS**

John D. Rue [FNa1]

Copyright (c) 2003 Fordham Law Review; John D. Rue

> There was a man in our town, And he was wondrous wise, He jumped into a bramble bush, [FN1] And scratched out both his eyes;
> But when he saw his eyes were out, With all his might and main, He jumped into another bush, And scratched 'em in again. [FN2]

### Introduction

Under the common law, courts used the word "cause" interchangeably to characterize "what happened," or, alternatively, "what law ought to do about it." [FN3] An empirically ascertainable \*2680 connection between a defendant's tortious act and a plaintiff's injury ("factual cause") has long been considered a threshold question of liability. [FN4] Factual causation is an objective question of fact [FN5] and can stem either from an overt act or from a failure to act. [FN6] From the perspective of negligence law, the failure to act--for instance the failure to provide sufficient fire escape routes from a residential apartment, [FN7] to warn of inherent product dangers, [FN8] or to fence off a \*2681 railroad track [FN9]--can be just as much the cause of an injury as the proactive initiation of a sequence of events that brings about harm to another. [FN10] If such omissions are found to be the source of an injury, liability will generally result. [FN11]

Nonetheless, in order to prove factual causation, the plaintiff must show that the act or omission in question resulted in the harm to the plaintiff. [FN12] Classically, cause-in-fact was determined using the "but for" test. [FN13] Simply stated, "but for" analysis requires the finder of fact to determine that the asserted harm would not have come to pass "but for" the defendant's tortious act. [FN14] An action is not a "but for" cause of an injury if the injury would have come about regardless of the action. [FN15]

Since the 1920s, however, courts have also used what is now known as the "substantial factor" test to determine whether or not a tortious act caused the plaintiff's harm. [FN16] This doctrine was given a gigantic boost by its adoption in the original Restatement of Torts ("First Restatement") by the American Law Institute ("ALI" or "Institute"). [FN17] The First Restatement's treatment of factual causation codified the "substantial factor" test as the primary element of the causal inquiry. [FN18] Since that time, the use of the "substantial factor" test has mushroomed, and functions as a part of the causation analysis conducted by courts in "virtually every jurisdiction." [FN19]

In May 2003, the ALI proposes to revise its articulation of the test for factual causation. [FN20] The ALI's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

most recent statement of this test was adopted in 1979, and is contained in sections 430 through 433 of the Restatement (Second) of Torts ("Restatement (Second)"). [FN21] *2682 Under the new standard, articulated in proposed sections 26 to 28 ("Draft Revisions" or "Draft" ') of the Restatement (Third) of Torts, Basic Principles of Liability ("Restatement (Third)"), the ALI would declare the classic "but for" test to be the majority rule. [FN22] The "substantial factor" doctrine, first articulated in Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Railway, [FN23] incorporated into the First Restatement, [FN24] and retained largely unaltered in the Restatement (Second), [FN25] would be repudiated. [FN26] If the ALI's membership [FN27] adopts the proposed revisions, both the "substantial factor" doctrine and the language associated with it would be entirely excised from the Restatement (Third). [FN28]

The ALI asserts that this change is necessary because courts have employed the substantial factor test in ways, and in the pursuit of ends, utterly foreign to the original purpose of the rule. [FN29] In evaluating the ALI's claim, this Note reviews the historical context in which the substantial factor doctrine arose, and conducts an analysis of the functional purposes the doctrine has served over time. This Note argues that the ALI's proposed changes are warranted, although the basis for making those changes may be insufficiently documented in case law by the Reporters' Notes.

Adopting these revisions would elucidate an area of the law that has grown exponentially more opaque since the publication of the Restatement (Second). The resulting clarity would bolster legal certainty at a time when tort law itself is under fire in public discourse. [FN30] This opacity and public criticism combine to create ample justification for the ALI's new position.

*2683 The Reporters' Notes [FN31] accompanying the proposed revisions, however, are incomplete: they do not acknowledge the deep divisions between jurisdictions in this area of the law. If the Draft is to avoid the same sort of controversy that surrounded the adoption of the Restatement (Third) of Products Liability [FN32] and offer persuasive support for the jurisprudential shift to the "but for" test that it advocates, the ALI must be more forthcoming about the extent to which its proposals go beyond merely restating the law. The drafters should frankly admit that they are offering a prescriptive vision for the direction in which the law ought to evolve, if this in fact is their aim.

Part I of this Note discusses the origin, implementation, and limitations of the most commonly used tests of cause-in-fact, the "but for" and "substantial factor" tests. This part then examines the manifestations of these tests in the first two Restatements, discusses the subsequent caselaw relying on those formulations, examining the following categories of cases: (a) "two fires" cases similar to Anderson, [FN33] (b) toxic torts (including asbestos) cases, (c) environmental torts cases, (d) those cases decided under a "loss of chance" theory in medical malpractice, and (e) "butterfly effect" cases, which use the "substantial factor" doctrine to prevent the imposition of limitless liability on an admitted tortfeasor for the damages factually caused by the wrongdoing. Finally, Part I summarizes the pending revisions to the Restatement (Third). Part II *2684 surveys the scholarly criticism of both standards, presents an analysis of cases that have relied heavily on the "substantial factor" doctrine since its inception, with an emphasis on those decided since the publication of the Restatement (Second), and then examines of the likely outcome in cases of each of these categories under the new proposed standard. [FN34]

Part III argues that the changes proposed are well advised, if not long overdue, despite the fact that the ALI would be well served by an effort to flesh out the Reporters' Notes and to provide a more instructive delineation between its attempts to restate the law and its desire to reshape it. The proposed revisions indicate that the ALI is on its way to bolstering certainty in American tort law, which is good for both plaintiffs and defendants. [FN35] Therefore, whether the Reporters' Notes are revised or not, courts currently committed to the substantial factor test should carefully consider the approach advocated by the Institute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I. "But For" and the Rise of "Substantial Factor"

The "but for" test emerged unchallenged from the mists of time, entering the twentieth century as the only widely accepted judicial test of factual cause. [FN36] But like Athena, who sprang forth fully-grown and armored from Zeus' head, [FN37] the "substantial factor" test burst explosively on to the jurisprudential landscape at the beginning of the twentieth century. [FN38] At first, the "substantial factor" test functioned merely as a stopgap measure to shore up the distinguished and time-proven "but for" test. [FN39] But as the century wore on, "substantial factor" jurisprudence increased in both complexity and prevalence. [FN40] Today, the "substantial factor" test stands side-by-side with "but for" in most jurisdictions. [FN41] At times, these two standards function *2685 smoothly in tandem, but they are occasionally at complete odds--offering differing results and leaving courts with no clear guidance as to which test should control. [FN42]

This part traces the background of the "but for" test, and closely examines its workings in practice. It then describes the origin of the "substantial factor" test, and examines the process by which the standard's acceptance in the First Restatement led to its wide judicial acceptance. Finally, the Part closely scrutinizes the uses to which courts have put the growing "substantial factor" doctrine since its inception.

A. The "But For" Test: Advantages in Theory and Practice

The "but for" inquiry is a hypothetical, counterfactual process. [FN43] It asks the finder of fact to determine whether the harm would have come to the plaintiff, had the defendant not acted (or failed to act) in breach of her duty. [FN44] Nonetheless, the plaintiff need not prove beyond doubt that the defendant's conduct was a cause of the plaintiff's injury. [FN45] All that is required is evidence sufficient for a reasonable juror to conclude that it is more likely than not that the injury was caused by the defendant's tortious act. [FN46]

Professor David Robertson has suggested that this deceptively simple, seemingly intuitive examination can be best analyzed by breaking it down into the following five steps. [FN47] First, the jury must identify the plaintiff's injury. [FN48] Often this first step is straightforward, but sometimes the issues can be murky. [FN49] Next, the jury must identify *2686 the defendant's tortious act or omission. [FN50] The remaining three steps involve linking the two identified elements via counterfactual analysis--the finder of fact must (a) imagine that the defendant had not acted tortiously, (b) frame an inquiry as to whether the identified harm to the plaintiff would have occurred anyway, and (c) answer that hypothetical question. [FN51]

Many scholars agree with Professor Robertson's assertion that "[o]n the matter of factual causation, mainstream and traditional views are the right views." [FN52] Indeed, the "but for" test's greatest strength is that it is "both simple enough for everyday application in lawyers' offices and busy trial courts and at the same time comprehensive enough to solve the recurrent types of occasionally quite challenging causation difficulties." [FN53] Because factual cause is "a matter upon which any layman is quite as competent to sit in judgment as the most experienced court," it is crucial that the courts employ a test that is appropriate for use by citizens of all levels of sophistication. [FN54] Perhaps for this reason, many scholars argue that the "but for" test's greatest strength is its ease of use by juries. [FN55] Professor Robertson has observed that "when answering [the "but for" inquiry] we intuitively refer to our common experience of living on a populated planet subject to the forces of gravity and nature. It is for that reason that any layman is quite as competent to answer ordinary cause-in-fact questions as 'the most experienced court.'" [FN56] The "but for" test is uniquely suited to this task. [FN57]

"The 'but for' test seems to work well with garden-variety examples of causation." [FN58] In most cases, and in virtually all clear-cut cases, it will yield the "correct" answer on the question of cause-in-fact. [FN59] If a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff reads, for example, in the literature of a professional association of optometrists that its members are qualified to detect glaucoma, and four members of that association subsequently fail to detect that disorder, the "but for" test correctly sets the bar for the *2687 plaintiff to prove that the defendant association's tort was a "cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produce[d] the result complained of and without which the result would not have occurred." [FN60]

In the hard cases, however, where cause-in-fact is not intuitively clear, the "but for" test can be ineffective. The most glaring example of this shortcoming involves multiple tortfeasors and a relationship to the tortious act that has been variously referred to as "over-determined" causation, "duplicative" causation, and, in the nomenclature of the Draft Revisions, "multiple sufficient causation." [FN61] Here, courts will often turn to the "substantial factor" test. [FN62]

In addition to the straightforward, functional nature of the analysis inherent to the "but for" test, the standard has the weight of its historical "pedigree" on its side. [FN63] At least as far back as the mid-nineteenth century, courts have used the test to seek out the "actual" cause of harm as the basis for liability. [FN64] Even after courts severed factual from proximate causation, [FN65] "early cause-in-fact cases applied the 'but for' test as the exclusive test" for determining factual causation. [FN66] The test has survived the innovations of the intervening decades--virtually every jurisdiction still uses the "but for" test as an element of the causation inquiry. [FN67]

B. Supplementing "But For": The "Substantial Factor" Doctrine

### 1. The Beginning: The "Two Fires" Cases

The "substantial factor" test was given its first judicial articulation by the Supreme Court of Minnesota in Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Railway, [FN68] In that case, one of the Railway's engines caused a fire that had destroyed the plaintiff's property. [FN69] The *2688 defendant argued, however, that another fire, of unknown origin, had simultaneously been moving toward the plaintiff's property, propelled by the wind, and would have destroyed the plaintiff's premises in any event. [FN70] Since the harm would have occurred even without the Railway's tortious conduct, the plaintiff was unable to satisfy the requirements of "but for" causation. [FN71]

The Minnesota Supreme Court upheld the trial court's finding of liability. [FN72] With neither evaluative comment nor citation to authority, the court summarized approvingly the trial court's charge to the jury as including an instruction that liability would be created if the fire was a "substantial factor in causing plaintiff's damage." [FN73] Thus, with little fanfare, the Minnesota Supreme Court gently pushed the snowball down the hill.

### *2689 2. "Substantial Factor" Rises to Prominence: The ALI and the Restatement of Torts

The ALI was founded in 1923, just three years after Anderson was decided. [FN74] The purpose of the movement which resulted in the formation of the ALI is the subject of some scholarly dispute. [FN75] It is accepted history that the founders of the Institute included conservatives and formalists, as well as progressives and those critical of legal formalism. [FN76] The last of these included those widely known today as "Legal Realists" [FN77] as well as some who would better be described simply as legal pragmatists: those who evaluated the law within the structures of an evolving understanding of society through sociology, anthropology, and

the other "soft" sciences. [FN78]

The eclectic nature of the views of the Institute's founders was amply demonstrated in the extended jockeying for position between the different groups in the early formation efforts. [FN79] At one early meeting

> [t]he agenda . . . identified three goals for the restatement: clarification, simplification, and "adaptation [of the law] to the needs of life." The first two goals responded to the oft-repeated complaints of both progressive and formalist academics, and practitioners and judges. The third, explicitly reformist goal, represented the contribution of the progressive-pragmatist professors. [FN80] As this record indicates, in its early days the ALI was being pulled in contradictory directions. Formalists, realists, corporatists, law professors, practitioners, and judges each had an impact on the nascent organization. [FN81] Inevitably, the product of this diverse group contained ambiguities.

The ALI's Restatements are not primary authority, but they are widely considered to be extraordinarily persuasive. This influence *2690 derives from their nature as "restatement[s] of basic legal subjects that [can] tell judges and lawyers what the law [is]." [FN82] As such, these publications represent the product of one of the primary missions of the organization. [FN83] Separately, the Institute also engages in "intensive examination and analysis" which is designed to "culminate[] in a work product containing extensive recommendations or proposals for change in the law," such as the Model Penal Code. [FN84] These two aims are not one, however, and the Institute has recently been subject to criticism for blurring the line between the two. [FN85]

Nowhere is the philosophical disjunction between the founding members of the Institute more pronounced than in what subsequently came to be known as sections 430 through 434 of the First Restatement. The First Restatement adopted a broad approach to causation, incorporating a "substantial factor" analysis under its examination of "legal cause." [FN86] If the drafters had sought to clearly delineate the inquiry into (a) whether or not the defendant's act was a necessary antecedent ("factual cause") from (b) the policy-driven analysis of the appropriate scope of the defendant's liability for the tortious act ("proximate cause"), the mixed message sent by the two parts of section 432 suggests that these writers were unable to agree on a single perspective. [FN87] While subsection (1) endorses the "but for" test, subsection (2) suggests that the "substantial factor" test is available when the "but for" test seems to be failing to function properly (such as in Anderson). [FN88] But whether subsection (2) was ever intended to go beyond the narrow confines of the "two fires" model has been the subject of much debate.

It is not at all clear that the ALI intended the "substantial factor" doctrine to offer courts the option of a reduced standard of causation. In fact, in coining the phrase "substantial factor," the drafters of the original Restatement seem to have been primarily concerned with protecting defendants from unlimited liability from the "but for" results of their tortious acts. [FN89] The first preliminary draft of the Restatement certainly considers "but for" to be the threshold test for *2691 causation, stating on the very first page of the section on "Legal Cause":

> This part of the Restatement deals with the question of the causal relation necessary to make it just to hold a wrongdoer liable for an injury which would not have occurred had it not been for his wrongdoing only in so far as it is important in determining the existence and extent of liability for . . . negligent misconduct. [FN90] Accordingly, this preliminary draft asserted that merely satisfying the "but for" test, while necessary in almost all cases to establish liability, is not sufficient to do so. [FN91] In the same section, in Comment a, the draft continues:
> The actor's tortious conduct may be a necessary antecedent of another's injury and yet it may have so slight an effect in bringing it about that it is revolting to a reasonable sense of justice to regard the actor as responsible. It is impossible to define the precise extent to which the actor's conduct must contribute in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bringing about another's injury in order to make it proper to regard it as a substantial cause thereof and therefore to make it just to hold the actor responsible for the injury. [FN92]

At this early stage of doctrinal development, the separation between factual and proximate cause was not yet clear. [FN93] The First Restatement makes no secret of its concern for the potential of unlimited liability for defendants. But despite the fact that unlimited liability was a paramount concern in the development of the "substantial factor" doctrine, scholarly and judicial treatment of that concern has since been subsumed by the proximate cause inquiry. [FN94]

Early cases citing to the Restatement support this view. Citing to a tentative draft of the First Restatement, the Sixth Circuit held in 1933 that the "substantial factor" doctrine was controlling in Johnson v. Kosmos Portland Cement Co. [FN95] In that case, the defendant, a barge owner, negligently failed to maintain the hold of the barge in order to prevent production of volatile gases and additionally failed to vent the hold. The vessel was subsequently struck by lightning, and the gases *2692 ignited, killing the decedents. [FN96] The district court found for the defendant on proximate causation grounds, but the appellate court disagreed, citing the Restatement of Torts, and holding that the defendant's negligence was a "substantial factor" in causing the explosion. [FN97] In finding liability, the court articulated exceptions to the "substantial factor" doctrine, stating in dicta that the "substantial factor" doctrine does not apply if: (1) the tortious act "merely creates an incidental condition or situation in which the accident otherwise caused results in such injury," (2) the act is one "from the commission of which no generally injurious results can reasonably be foreseen," or (3) "where a secondary efficient cause intervenes to break the chain of causation and so becomes the sole proximate cause of the injury." [FN98]

Similarly, in 1942, the Minnesota Supreme Court followed Anderson in Lunde v. National Citizens Bank of Mankato. [FN99] Here, the plaintiff was standing within two feet of a negligently maintained glass door when a gust of wind blew the door open and the glass shattered, injuring the plaintiff. [FN100] Citing both Anderson and Dean Prosser, the court held that "the fact that some other cause [the wind] operated in connection with this negligence could not relieve defendants from liability. The original negligence concurred with another cause, and, operating at the same moment, produced the injury." [FN101]

### 3. The Restatement (Second) of Torts and Causation Jurisprudence

The ALI revised the Restatement in 1964, but the changes to sections 430 through 433 were minor. [FN102] The Restatement (Second) retained the "substantial factor" definition of causation, merely including the "but for" test as an element of the definition of "substantial factor." [FN103]

The most important uses of the "substantial factor" doctrine by courts since the adoption of the Restatement (Second) have occurred in cases where alternative theories of liability have been employed. First, there are the "two fires" cases--those with facts similar to Anderson. [FN104] Next are "indeterminate defendant" cases where there is more than one possible defendant. This area of causation law was *2693 originally addressed in the seminal case Summers v. Tice, [FN105] but has its most significant contemporary application in toxic and environmental torts cases, including asbestos cases and the "market share liability" cases surrounding the marketing of DES. [FN106] Additionally, one line of cases invoking the "loss of chance" doctrine has been heavily dependent on the rubric of "substantial factor." [FN107] Finally, there are cases originally intended by the drafters of the First Restatement to be dealt with by the "substantial factor" doctrine which manifest what could be termed the "butterfly effect"--where the original tort is greatly attenuated from the ultimate injury. [FN108]

### a. "Two Fires" Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The strongest argument for the "substantial factor" doctrine can be found in cases of multiple sufficient causes. [FN109] Anderson, discussed above, is much cited for this principle because it represents an early emergence of the doctrine's use (pre-dating and informing the First Restatement), and its facts offer a clear example of multiple sufficient causation--where two forces acting independently, either of which are sufficient to cause the harm in question, combine to injure the plaintiff. [FN110]

Nonetheless, modern cases abound where the "substantial factor" doctrine was used to address contemporary concerns. In Basko v. Sterling Drug, Inc., [FN111] the defendant drug manufacturers were shown to have manufactured two of the three drugs the plaintiff was prescribed for a skin disease. [FN112] The plaintiff filed a complaint against the defendants when she began to experience problems with her vision. [FN113] The jury found for the defendant, but the appellate court reversed citing the Restatement (Second). [FN114] The court held that the trial court had committed reversible error in failing to provide a "substantial factor" instruction to the jury, reasoning:

> Suppose, for example, that the jury found (1) that plaintiff's blindness was caused by a combination of Aralen and Triquin, and *2694 (2) that the risk of [disease] did not become known until 1959. Suppose also that the jury found (3) that there was no breach of the duty to warn with respect to Aralen, but (4) that defendant gave inadequate warnings with respect to Triquin. On these facts, plaintiff would be entitled to recover if the jury found that either Aralen or Triquin alone would have been sufficient to produce chloroquine retinopathy, and that Triquin was a "substantial factor" in producing her injury. [FN115] Thus, as is apparent in Basko, despite the fact that the "two fires" rule was originally devised for a simple case of overdetermination, courts have found it sufficiently flexible to address the more complex facts of many contemporary cases.

The "substantial factor" doctrine has also proven helpful to plaintiffs in tobacco litigation. In Burton v. R.J. Reynolds Tobacco Co., [FN116] the plaintiff sued the defendant tobacco company after having smoked approximately one full package of cigarettes a day for over forty years. [FN117] Despite evidence that the plaintiff had primarily smoked Camel cigarettes, and had only smoked Lucky Strikes (the defendant's product) when Camel cigarettes were not available, the court ruled that factual causation had been satisfied. [FN118] Citing to the Restatement (Second), but without mention of the "but for" test, the court held that "an act or product is the actual cause of the plaintiff's injury if the act or product is a substantial factor in bringing about the harm [to the plaintiff]." [FN119]

### b. The Indeterminate Defendant

In Summers v. Tice, [FN120] the plaintiff, Summers, and the two defendants went hunting together. [FN121] Summers proved that both defendants negligently fired in the plaintiff's direction. [FN122] The trial court found in the plaintiff's favor, despite his inability to prove which of his hunting companions had been the factual cause of his injury. The California Supreme Court affirmed, holding that the burden of proof in such cases shifts to the defendants. The court reasoned:

> They are both wrongdoers--both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can. The injured party has been placed by the defendants in the unfair position of pointing to which defendant *2695 caused the harm. If one can escape the other may also and plaintiff is remediless. [FN123] The Restatement (Second) adopted this approach, and the Draft Revisions retain it. [FN124] The Draft Revisions explain:
> > The rationale for shifting the burden of proof to defendants whose tortious conduct exposed the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff to a risk of harm is that, as between two culpable defendants and an innocent plaintiff, it is preferable to put the risk of error on culpable defendants rather than on the innocent plaintiff. [FN125]

The Draft Revisions state that "since the publication of the Second Restatement in 1965, courts have generally accepted the alternative liability principle of [section] 433B(3), while fleshing out its limits." [FN126] The limits specifically fleshed out here include that: (a) the plaintiff must sue all of the tortfeasors involved, [FN127] (b) the tortious act of the defendants must have increased the risk of harm to the plaintiff, [FN128] and (c) both the burden of production and the burden of persuasion on the matter of factual causation shift to the defendants. [FN129]

Despite the fact that Summers is not on its surface a causation case, [FN130] the line of cases that begins with Summers extends to some of the most contentious causation issues of today, most notably toxic and environmental torts. [FN131] Here too, courts have found use for the "substantial factor" doctrine. In fact, according to at least one view, "traditional tort law requires only that the defendant's actions be a 'substantial factor' in bringing about the consequences complained of. . . . [T]here has never been a rule that a defendant is not responsible if his actions contributed less than 50% of the causes of an injury." [FN132]

*2696 In Allen v. United States, [FN133] the court noted that "[i]n the pragmatic world of 'fact' the court passes judgment on the probable. Dispute resolution demands rational decision, not perfect knowledge." [FN134] Allen adopted a "substantial factor" test in a very thorough opinion. [FN135] In rejecting the "but for" test, the court held:

> [W]here a defendant who negligently creates a radiological hazard which puts an identifiable population group at increased risk, and a member of that group at risk develops a biological condition which is consistent with having been caused by the hazard to which he has been negligently subjected, such consistency having been demonstrated by substantial, appropriate, persuasive and connecting factors, a factfinder may reasonably conclude that the hazard caused the condition absent persuasive proof to the contrary offered by the defendant. [FN136] Interestingly, in addition to utilizing the "substantial factor" doctrine to untangle a complicated combination of conventional liability claims, the Allen court also seemed to analyze the "increased risk" in terms of the "substantial factor" test. [FN137]

In Queen City Terminals v. General American Transportation Corp., [FN138] the plaintiff-owner of a facility that handled chemical products sued three defendants who were related in a complex web of privity for direct and special damages relating to the spillage of toxic chemicals. [FN139] Considering the matters under a combination of contract and tort law, the court refrained from even mentioning the "but for" test, holding simply that the plaintiff had to prove that the defendant's act had been a "substantial factor" in causing the damages. [FN140] Further, the court declined to review the application of the "substantial factor" doctrine de novo, stating that "[t]he determination of whether an actor's conduct was a substantial factor in producing the plaintiff's injury is a question of fact to be determined by the trier of fact." [FN141]

Moreover, in individual cases where defendant identification has proven difficult or impossible, plaintiffs have argued (sometimes successfully) for scrapping the "but for" rule altogether, most notoriously in the DES cases of the 1980s and 1990s. [FN142] In these cases, *2697 multiple manufacturers of DES, a drug that when taken by pregnant women was found to have caused birth defects in children, were sued by the children themselves after a period of time when, in most cases, it had become impracticable to determine which defendant had manufactured the particular drugs in question. [FN143] With varying degrees of confidence, courts implemented a "market share liability" theory for the determination of damages. [FN144] Most, like the California Supreme Court in Sindell v. Abbot Laboratories, retained at least some level of commitment to the "but for" test. [FN145] But at least one court, the New York Court of Appeals, seemed to altogether jettison the demand for proof of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"but for" causation by either the plaintiff or the defendant. In Hymowitz v. Eli Lilly & Company, the court held that "because liability here is based on the over-all risk produced, and not causation in a single case, there should be no exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury." [FN146]

To be sure, the Hymowitz court emphasized that its logic was developed in response to special circumstances. [FN147] Furthermore, despite a number of subsequent invitations by plaintiffs to adopt the market share rule to other products, both the New York courts and the federal courts have thus far declined to extend the rule beyond the facts of Hymowitz. [FN148] In any event, such an overt rejection of the "but for" rule by New York's highest court is interesting to note.

### *2698 c. Asbestos

In Borel v. Fibreboard Paper Products Corp., the fifth Circuit cited the Restatement (Second), Dean Prosser, and Professors Malone and Green for its innovative use of the "substantial factor" doctrine in asbestos litigation. [FN149] In that case, the plaintiff worked with industrial insulation for over thirty years. Over that period, he was exposed to a great deal of asbestos manufactured by the defendants. [FN150] At the end of his average work day, Borel was covered with asbestos dust. He asserted that he "blowed [sic] this dust out of [his] nostrils by handfuls at the end of the day. . . . [I]t is impossible to get rid of all of it. Even your clothes just stay dusty continually unless you blow it off with an air hose." [FN151]

The plaintiff was unable to prove by a preponderance of the evidence which defendant manufactured the asbestos which gave him asbestosis and mesothelioma. [FN152] The court acknowledged that "it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust [and therefore the actions of which particular defendant] resulted in injury to" the plaintiff. [FN153] But without specifically citing Summers, the court noted:

> It is undisputed, however, that [the plaintiff] contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions.  It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury.  We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to [the plaintiff]. [FN154]

Thus, using a similar logic to that found in Summers, the Borel court used "substantial factor" language to find liability where "but for" was unable to serve. [FN155]

Borel was a "landmark" case, the first example of the application of the "substantial factor" doctrine to asbestos injury. [FN156] The first, *2699 perhaps, but far from the last --Borel has been cited with approval in every circuit. [FN157] Clearly, the "substantial factor" test is well ensconced in asbestos law. [FN158]

### d. "Loss of Chance"

Under certain conditions, the "loss of chance" doctrine allows recovery for "a heightened risk of death or injury" despite the plaintiff's inability to prove by a preponderance of the evidence that the defendant had caused the injury in question. [FN159] One line of the "loss of chance" cases relies heavily on the "substantial factor" doctrine. [FN160] Those courts that allow complete recovery to the plaintiff on a showing of an increase in the risk of harm generally rely on "substantial factor" causation doctrine to solidify their analysis. [FN161] Interestingly, these opinions also highlight difficulties which courts often have in separating the "substantial factor"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doctrine from "but for" causation and "loss of chance" theory. [FN162]

Consider a patient who undergoes a medical procedure with a less than fifty percent chance of success. The procedure is then complicated by medical malpractice, which further reduces the patient-plaintiff's chance of survival. In these circumstances, when courts believe they are limited to a choice between the "but for" test (which can be quite harsh from the perspective of the plaintiff on *2700 these facts [FN163]), or the "substantial factor" doctrine (which can be intolerably vague from the defendant's point of view [FN164]), the results rarely achieve a balance between legal and societal efficiency on the one hand and an intuitive sense of justice on the other. [FN165]

The following hypothetical may be illustrative: A is to undergo heart surgery, which has a forty-five percent chance of success--odds that A has accepted as his best chance of survival. Due to conceded malpractice, A's chance of survival is reduced dramatically to five percent. A dies. [FN166] Under the ordinary "but for" test, combined with *2701 ordinary "preponderance of the evidence" rules, A's survivors will invariably recover nothing. [FN167]

But assuming a thousand such cases, and accepting the foregoing statistics as true, 400 of the 950 deaths were actually caused by the malpractice. The problem, perhaps obviously, is the difficulty of identifying which 400 of the thousand in question were actually harmed by the defendant.

In 1981, Professor Joseph King published an article that has since been cited by virtually every major opinion invoking what has come to be known as the "loss of chance" doctrine. [FN168] Professor King argues:

> Loss of a [less than fifty percent] chance should be compensable even if the chance is not better than even, and it should be recognized and valued as such rather than as an all-or-nothing proposition. Any other rule fails to satisfy the goals of tort law. [FN169] King also asserts that treating causation as an all-or-nothing proposition is "arbitrary" and "irrational," and that it "subverts the deterrence objectives of tort law by denying recovery for the effects of conduct that causes statistically demonstrable losses." [FN170]

Professor King supports his argument with a hypothetical involving two jars of coins. [FN171] The finder of fact has estimated that the first jar contains forty pennies, with the likelihood that it contains more than forty pennies equal to the possibility that it contains fewer. [FN172] A plaintiff who lost a jar of unknown value could not be judicially compensated; such compensation would require too much speculation. [FN173] In this example, however, we know (by the assumptions of the hypothetical) that the possibility of the jar containing more than forty pennies precisely offsets the possibility that it contains fewer. [FN174] Thus, the contents of this jar is compensable in the event of loss--it is worth forty cents. [FN175]

The second jar contains sixty coins that are valueless, and forty that are worth one dollar each. [FN176] The chance to draw one coin from the *2702 jar--a forty percent chance of drawing a coin that is worth a dollar-- is also clearly worth forty cents:

> The possibility that the chance is worth more than forty cents is discounted by the identical chance that it is worth less than forty cents. The forty percent chance is a final estimate, already discounted, just like the estimate of value of the contents of the first jar. The decision to compensate the former estimate and not the latter makes no more sense than an arbitrary holding with respect to the first jar that its loss would not be compensated unless it was estimated to contain at least fifty-one coins. [FN177]

Under the "all or nothing" view of causation, this narrow analysis is precisely the state of the law. [FN178] A plaintiff who is estimated to have lost a fifty-one percent chance of survival is compensated for the full value of the loss, while another plaintiff who has lost a forty-nine percent chance gets nothing.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Professor King's article has been influential. [FN179] In Herskovits v. Group Health Cooperative of Puget Sound, the plaintiff offered evidence that defendant's late diagnosis of the decedent had reduced the decedent's chance of survival from thirty-nine to twenty-five percent. [FN180] Sitting en banc, the Supreme Court of Washington reversed the lower court's grant of summary judgment for the defendant, holding that the plaintiff need not show a fifty-one percent chance that the decedent would have survived absent the defendant's malpractice. [FN181] While the majority did not base its decision on the "loss of chance" doctrine, the concurrence signed by three of the five-justice majority did, expressly rejecting the majority's reasoning. [FN182] Quoting extensively from Professor King's article, the concurrence concluded that "the loss of a less than even chance [was] an actionable injury." [FN183] The concurrence then further cited King on the question of *2703 damages, concluding that justice would be best served by the imposition of proportional damages. [FN184]

In Falcon v. Memorial Hospital, the plaintiff offered expert testimony that the patient would have had a 37.5% opportunity of surviving the medical accident that had caused her death. [FN185] The trial court dismissed the complaint on causation grounds. [FN186] The Supreme Court of Michigan held that the plaintiff need only establish that the omitted procedure had the potential for improving the patient's recovery or preventing her death, and that the resulting injury was her lost chance of recovery. [FN187] The majority opinion explained that the holding applied only to a "limited class of cases" where a defendant had taken responsibility for protecting the plaintiff from "a particular harm" and then tortiously increased the risk of that harm. [FN188] The court reasoned:

> Patients engage the services of doctors, not only to prevent disease or death, but also to delay death and to defer or ameliorate the suffering associated with disease or death. If the trier of fact were to decide, on the basis of expert testimony, that the undertaking of the defendant physician included the implementation of tasks and procedures that, in the case of [the plaintiff], would have enabled the physician and other medically trained persons, who were present at the time of delivery, to provide her, in the event of the medical accident that occurred, an opportunity to survive the accident, a failure to do so was a breach of the understanding or undertaking. [FN189] Thus, Falcon and the jurisdictions which follow it use Professor King's theory to avoid the question of the standard of causation by redefining the injury and proportionally reducing recovery, while allowing compensation to plaintiffs who might otherwise be unable to prevail.

But some courts have cross-pollinated Professor King's original argument with the "substantial factor" doctrine. [FN190] Thus in Roberson v. Counselman, [FN191] on a showing that the defendant's malpractice had been a substantial factor in bringing about the plaintiff's injury, the court held that the plaintiff should be allowed complete recovery. [FN192]

*2704 Finally, in an approach many scholars find problematic, many courts have simultaneously utilized (a) the "loss of chance" concept, (b) the "substantial factor" doctrine, and (c) section 323 of the Restatement (Second), in order to allow full recovery. [FN193] As the Draft Revisions point out, section 323 of the Restatement (Second) is included in a discussion of duty, not causation. [FN194] The Reporters' Notes for the Draft Revisions express concern that the "increased risk" language in this section has been misused in these circumstances. [FN195]

e. The "Butterfly Effect"

As previously discussed, the initial impetus for adopting the "substantial factor" doctrine was to limit the liability of a tortfeasor for damages that were too remotely connected to the original wrong. [FN196] As one court has noted:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

It has been observed that all events on Earth are so interrelated that "a butterfly's wingbeat in the Amazon can spawn a hurricane in the Caribbean." However, between the hugely attenuated connection between the butterfly's liability and the direct connection of someone who directly impacts another as the final physical cause of harm, there exists a level of intermediate causation which our law recognizes as a legal cause, nonetheless. [FN197] Accordingly, a number of jurisdictions use the "substantial factor" doctrine as a "but for" -plus test. [FN198] At least one scholar believes that the ALI's proposal would "properly move" the treatment of these types of cases into a separate section on proximate cause. [FN199]

## II. Standing Between the Bramble Bushes: "But For" Versus "Substantial Factor"

As a result of the jurisprudential evolution described in Part I, modern courts are now presented with a clear choice between the "but for" and "substantial factor" tests--each legitimately claiming *2705 broad acceptance in case law, and offering deep and layered philosophical support. This part closely examines the strengths and weaknesses first of the "but for" test, [FN200] and then of the "substantial factor" test. [FN201] Finally, this part describes the changes to the Restatement (Second) suggested by the proponents of the Draft Revisions. [FN202]

## A. Criticism of the "But For" Test

Despite its widespread acceptance, the "but for" test has not lived its long life without criticism. [FN203] The vast majority of this criticism falls into two categories: (1) the "but for" test is under-inclusive, generally providing valid positive results but occasionally creating false negatives, and (2) the "but for" test's reliance on counterfactual analysis compromises its legitimacy as a credible means of resolving the causation inquiry. [FN204]

### 1. Underinclusivity

Courts and scholars alike widely acknowledge that the "but for" test creates anomalies in circumstances of multiple sufficient causation, [FN205] where (a) an injury has more than one cause, and (b) more than one of the causes, by itself, would have been sufficient to *2706 cause the plaintiff's harm. [FN206] Furthermore, in cases of medical malpractice, where the plaintiff has lost a less-than-fifty percent chance of a successful outcome, the "but for" test has often been found wanting. [FN207]

Clearly, the traditional test does not neatly resolve all causal questions. If two fires, either of which would have been sufficient to destroy the plaintiff's property, combine to destroy the property in question; [FN208] if a horse is startled by the noise of two motorcyclists, where the noise made by either of them separately would have startled the horse sufficiently to cause him to bolt; [FN209] or if two polluters each contribute sufficient pollution to poison the same lake. [FN210] Counterfactual analysis would lead the factfinder in these instances to exonerate both defendants, on the grounds that each could assert that the harm would have come to the plaintiff regardless of its own individual act, thereby leaving the plaintiff without a remedy. [FN211]

The retributive aims of tort law are deeply offended by such results. [FN212] Furthermore, the argument has been cogently made that this result can afford an unjustifiable windfall to defendants. [FN213] Clearly, two culpable defendants should not both escape liability, merely on the basis of a rote incantation of the "but for" rule in combination with an assertion of another defendant's tortious behavior. [FN214]

### *2707 2. What If? The Counterfactual Hypothetical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The "but for" inquiry relies on the imagination of the factfinder for an analysis of probabilities involving "facts" that never happened. Professor Mark Grady explains:

> [C]ause-in-fact analysis is a hypothetical reconstruction of how events would have turned out if something would have been different. . . . [T]he court asks "what if?" If there had been no negligence would the accident have happened anyway? . . . In short, cause-in-fact analysis is both hypothetical and counterfactual analysis. [FN215] Criticism of this approach challenges the advisability of the counterfactual hypothetical, as well as both its psychological and philosophical legitimacy.

### a. Advisability

According to Professor Leon Green, "[t]ests of this character have the same vice as any 'if,' or any analogy. They take the eye off the ball." [FN216] The "ball" in this instance is the tortious act, which should be the focus of the causal inquiry. [FN217] The "but for" test instead "takes the focus off the defendant's conduct and goes abroad for other causes." [FN218] Indeed, Professor Green goes further:

> In no case does [the "but for" test] present the issue to be determined. It sends the inquirer back to discover if the result could have happened without the defendant's participation. . . . Such an inquiry at this point is vicious . . . it presents an inquiry impossible of determination. [FN219]

According to Professor Green, the "but for" test is compromised by the fact that it is an analogy--the counterfactual hypothetical can never be reliably determined, and therefore encourages the factfinder to make a policy judgment under the guise of a causal inquiry. [FN220] Professor Wayne Thode agrees, denouncing the "drawbacks and . . . lack of rationality" of the "but for" test because "it focuses the jury's attention on speculation about what might have happened rather than on the cause in fact problem of 'what happened.'" [FN221] Professor Thode *2708 argues that courts use counterfactual analyses in conjunction with the "but for" test as a means to implement policies, rather than to determine factual causation. [FN222] Given the fact that contemporary jurisprudence has moved policy analysis to the question of proximate cause, if Professors Green and Thode are correct, then the "but for" test has little claim to legitimacy as even an element of the inquiry into factual causation. [FN223]

### b. Psychological Legitimacy

In addition to those scholars who argue that the law is merely misguided in its use of counterfactuals, there is an increasing body of work in the field of psychology which casts doubt on whether factfinders use a hypothetical approach to reach conclusions at all. [FN224] These scholars question the nature of the relationship between intuitive counterfactual analysis and intuitive causal determinations. [FN225]

Professor Barbara A. Spellman and Alexandra Kincannon conducted a survey of psychological studies examining the "mutability" of various elements of a story under counterfactual analysis. [FN226] The "mutable" element of a story is that which subjects are most likely to change when asked to complete an "if only" sentence that will change the outcome, i.e., "if only she hadn't had so much to drink before getting in the car," she'd be alive today. [FN227] By "mutability," the authors refer to the likelihood that a subject will choose to change a particular element of the story when asked to construct a counterfactual hypothetical with a differing result. [FN228] The researchers operated on the assumption that the event that the subject thought was the most "mutable" could be determined by seeing which proposed mutation the subject wrote down first. [FN229]

*2709 Based on their research, Spellman and Kincannon argue that jurors who are asked to engage in hypothetical analysis may tend to be influenced by whether the events being "mutated" by the proposed counterfactu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

al hypothetical are (1) unusual under the circumstances; (2) closely related to the focus of the story being created for the factfinder; (3) "controllable" events, rather than "uncontrollable" ones; or (4) "immoral" events, rather than "moral" ones. [FN230] Additionally, events that come later in the "story" have been shown to be more "mutable" than earlier ones, and "[i]f the events form a causal chain in which the earlier events cause the later ones, then the first will be more mutable; if the events form a temporal chain in which the events are independent, then the last will be more mutable." [FN231]

There were dramatically different results to these experiments when subjects were presented with circumstances of multiple sufficient causation versus when they were given circumstances best described as multiple necessary causes. [FN232] In gathering data, Professor Spellman and Ms. Kincannon used the following hypothetical:

> Reed hates Smith and wants to kill him. West also hates Smith (for an entirely different reason) and also wants to kill him. One day Reed shoots Smith in the head. At the exact same instant, West shoots Smith in the heart. Smith dies. The coroner says that either shot alone would have been enough to kill Smith. [FN233]

Subjects were divided into two groups: one group was given the above facts (multiple sufficient causes), while the story told to the other group changed the last sentence--the coroner states that neither shot alone would have killed Smith (changing the story into one of multiple necessary causes). [FN234] In the first situation, the "but for" test utterly fails to place blame on either party; in the second, it is clear that both Reed and West were "but for" causes of Smith's death. [FN235]

*2710 On the question of which character's behavior (Reed's, West's, or both) to "mutate" for the "if only" analysis, the results showed a predictable divide in the perceived need for change to achieve a different result. [FN236] In the sufficient causation group, sixty-eight percent saw the need to alter both Reed's and West's actions to save Smith's life; and in the necessary causation group, seventy-one percent hypothetically changed only one character's behavior. [FN237]

Despite the likely predictions of advocates of the "but for" test, when asked to assign jail time based on causation in the two scenarios, the results did not vary on the basis of whether or not the act was a "but for" cause of the harm. [FN238] In fact, results of the experiment showed subjects to consider Reed and West as significantly more causal under the sufficient circumstances, where an individual mutation would have no effect, than under the necessary scenario, where a single mutation could have avoided the result. [FN239]

In order to address concerns that the malevolent intent contained in the above hypothetical was an undue influence on the results, the authors conducted an otherwise similar experiment using a hypothetical involving a fire simultaneously "caused" by two sources, one natural and one negligent. [FN240] The results were virtually identical. [FN241] The authors concluded that "[s]ubjects are quite willing to attribute causality to events that, when mutated, do not change the outcome," and therefore that "subjects are not using 'but for' reasoning to attribute causality in these cases." [FN242]

Similarly, Professor Judith Jarvis Thomson argues that "the truth-values of counterfactuals are affected by matters having to do with what is customary and what is expected, for they influence what we are likely to hold fixed in considering a counterfactual," thus compromising the counterfactual analysis as a tool for ascertaining the factual cause, devoid of moral and or policy considerations. [FN243] Most compellingly, she argues that "but for" analysis of omissions raises *2711 troubling questions about counterfactuals in general. [FN244] Professor Thomson uses her own hypothetical: Jones, a signalman, fails to pull the lever to switch a train's tracks. [FN245] The train subsequently has a head-on collision. [FN246] Did Jones cause the accident? Professor

Thomson reasons:

> Jones failed to pull the lever. A fortiori, he did not pull the lever. Did his not pulling the lever cause
> the crash? None of us pulled the lever in fact; did your not pulling the lever cause the crash? The reply
> most commonly made here is that Jones was under a duty to pull the lever, and you were not. (Hence his
> not pulling it is a failure to pull it, whereas your not pulling it is not.) But how could the question whether
> Jones was under a duty to pull the lever matter to the question whether his not pulling it caused the
> crash? What has morality to do with the question whether one thing caused another? [FN247] Professor
> Thomson urges that she is not asserting that "these questions have no answers," but only that there do not
> seem to be any "in the offing." [FN248] In short, she believes that these questions have not been "taken as
> seriously as they should be." [FN249]

### c. Philosophical Legitimacy

In Causation in Tort Law, Professor Wright asserts that "efforts [including the "but for" test] to articulate a
comprehensive, factual test of actual causation have failed repeatedly." [FN250] He attributes this failure, at
least in part, to the counterfactual, hypothetical nature of the test. [FN251] As a result, he asserts, "the hypothet-
ical nature of the but for inquiry necessarily involves or at least invites introduction of policy considerations into
a supposedly factual inquiry." [FN252]

*2712 Professor Wright offers a proposal to modify the "but for" test, turning it around and focusing its in-
quiry on actual occurrences rather than on hypothetical counterfactuals. [FN253] Building on the work of H.L.
A. Hart and A.M. Honoré's Causation in the Law, Professor Wright proposes a test which he asserts "captures
the essential meaning of the concept of causation" [FN254] and is "applicable to the entire spectrum of causa-
tion cases." [FN255] The Necessary Element of a Sufficient Set ("NESS") test asks the factfinder to work back-
ward (from the perspective of the "but for" test), and inquire as to whether the candidate for factual cause was a
necessary element of the set of causes that actually led to the plaintiff's injury. [FN256] In this way, factual
cause can be determined without resort to hypotheticals and the attendant impact of inevitable policy considera-
tions by the factfinder. [FN257]

In their criticism of Professor Wright's NESS test, which replaces the counterfactual hypothetical of the "but
for" test with an analysis of each element for "causal sufficiency," Professors Richard Fumerton and Ken Kress
assert that the analysis underlying the NESS test is itself circular. [FN258] Moreover, rather than simply criticiz-
ing the NESS test, the authors go further--they maintain that the "but for" test for causation may be the best sup-
port that philosophy can supply to the law, arguing in part:

> Philosophers have long recognized that there is an intimate connection among the concepts of causal
> connection, lawful connection, and the relation expressed by contingent counterfactual (subjunctive) con-
> ditionals. . . . The trick has been to get a philosophically adequate account of one of these concepts that
> does not presuppose an understanding of either of the other two so that one could then employ it in saying
> something illuminating about the remaining two. It has not been an easy trick to accomplish. . . . In any
> event, if the law is waiting for philosophers to offer something better than a pre-philosophical grasp of
> what is involved in one thing causing another, the law had better be very patient indeed. [FN259] Thus, in
> rebutting Professor Wright's criticism of the "but for" test, Professors Fumerton and Kress not only argue
> that the standard is the best test available, but that it is likely to be the best possible. [FN260] Therefore,
> according to these authors, Professor Wright's theory is incapable of addressing some cases of "causal
> preemption," unless he can "come up with a way to distinguish lawful (or law-like) sufficiency *2713
> from causal sufficiency without relying on the concept of causation, a task that has eluded all philosoph-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ers to date." [FN261]

B. Criticism of the "Substantial Factor" Doctrine

As one scholar has noted: "[t]he problem with the substantial factor formula as a test of actual causation (apart from its complete lack of guidance on what constitutes a 'factor') is that the alleged cause must be a substantial factor," demanding a quantitative measure without providing any specific quantitative requirement. [FN262] Thus, the "substantial factor" test is an excellent judicial tool, except that courts nationwide are at complete odds with each other as to the meaning of "substantial," as well as to the meaning of "factor." [FN263]

In Rutherford v. Owens-Illinois, Inc., [FN264] for example, the California Supreme Court urged that the "substantial factor" doctrine was "formulated to aid plaintiffs as a broader rule of causality than the 'but for' test." [FN265] Accordingly, the court held that "[u]ndue emphasis should not be placed on the term 'substantial.'" [FN266] While the Rutherford court admitted that the "substantial factor" test "has been invoked by defendants whose conduct is clearly a 'but for' cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury," it found this reasoning to be a "[m]isuse[]" of the doctrine. [FN267] Thus, Rutherford exemplifies one point on the spectrum of opinion as to the meaning of "substantial" as used in the "substantial factor" doctrine--a cause may not be the only cause of the harm, and indeed may not even be a "but for" cause, and yet have contributed sufficiently to have created liability for the tortfeasor. [FN268]

On the other hand, many courts have held that the "substantial factor" standard is a heightened one compared to the "but for" test. For example, in Zuchowicz v. United States, [FN269] Judge Guido Calabresi outlined the "substantial factor" test for the Second Circuit as follows: "(a) that the defendant's negligent act or omission was a but for cause of the injury, (b) that the negligence was causally linked to the harm, and (c) that the defendant's negligent act or omission was proximate to the resulting injury." [FN270] And in Herkert v. Secretary of the Department of Health & Human Services, [FN271] the U.S. Court of Claims held that the "[p]etitioner must not only show that but for the vaccine *2714 [the plaintiff] would not have had the injury, but also that the vaccine was a substantial factor in bringing about his injury." [FN272] Clearly, in these jurisdictions, the "substantial factor" test requires an additional showing beyond "but for."

Furthermore, it is far from settled case law that the "substantial factor" doctrine is applicable only to factual, and not proximate cause. In Densberger v. United Technologies Corp., [FN273] the defendant asserted that the district court's bald statement that "'[p]roximate cause' simply means substantial factor" had been error. [FN274] While the Second Circuit noted that the instruction was "incomplete," it found the error harmless as the charge had "sufficiently covered the essential issues" of causation. [FN275] Nonetheless, harmless or not, the district court clearly did not fully examine the Zuchowicz factors. [FN276] The fact that Densberger can be nonetheless reasonably synthesized with Zuchowicz does not adequately counter the charge by the ALI that the standard is "confusing." [FN277]

Another group of cases simply define "substantial factor" to mean that the factfinder is convinced on causation. In DeBurkarte v. Louvar, [FN278] the Iowa Supreme Court upheld an instruction that "[s]ubstantial means that a party's conduct has such an effect in producing the harm as to lead a reasonable person to regard it as a cause." [FN279] The Missouri Supreme Court also used this circular definition in Ray v. Upjohn Co., [FN280] opining opaquely that the word "[s]ubstantial denotes that the defendant's conduct had such an effect that reasonable people would regard it as the cause of the harm." [FN281]

Indeed, there are even cases that call into question Dean Prosser's assurances about the ability of the non-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

legal mind to comprehend the phrase "substantial factor." [FN282] In Williams v. Department of Revenue, [FN283] the Supreme Court of Alaska's primary task was to untangle the meaning that had been attached to the phrase "substantial factor" by a key expert witness in a workers' compensation hearing. [FN284] The doctor stated that "work-related stress 'was a major factor in the employee's having to quit her job in 1990,' *2715 even though he also testified that 'a major factor is not a substantial factor.'" [FN285]

Scholarship has come to recognize the difficulty of pinning any universal meaning on the phrase "substantial factor." Even Dean Prosser was against the expansion of the use of the test, arguing that its use "tends to leave to the jury matters which should be decided by the court." [FN286] More recently, one scholar commented that "the traditional specific causation instruction couched in terms of 'substantial factor' is unnecessarily vague, in that it provides too little guidance to a serious factfinder." [FN287] Another scholar has observed that "the term 'substantial factor,' which has come to mean many things to the courts, may prove confusing to a jury, and its application has been inconsistent in case law." [FN288] The test's vagueness also leaves it open to charges that the "substantial factor" "is guided by policy much more than by the 'but for' test," undercutting the argument that application of the "substantial factor" standard is an efficacious remedy for the shortcomings of the "but for" test. [FN289]

## C. Proposed Revisions to the Restatement (Second)

If the drafters of the Draft Revisions are dissatisfied with the "substantial factor" test as a means by which to address perceived shortcomings in the "but for" test, its abandonment nonetheless would leave a void where many hard causation cases have been decided in the past. The Draft Revisions propose to fill that gap with section 27's concept of "Multiple Sufficient Causal Sets," [FN290] with section 28(b)'s enunciation of the traditional Summers v. Tice rule, [FN291] with the treatment of proximate cause under section 29 (which is still under discussion within the Institute), [FN292] and by placing the ALI condoned treatment of "loss of chance" doctrine out of causation analysis altogether. [FN293] Thus, the Draft Revisions suggest addressing the "two fires" cases in section 27; [FN294] "indeterminate defendant" cases, such as many toxic torts, environmental torts, and future market share liability applications in section 28(b); [FN295] "butterfly effect" cases in *2716 section 29; [FN296] and removing "loss of chance" cases from causation analysis altogether and move it into the analysis of injury. [FN297]

### 1. Section 26: Factual Cause

The Draft Revisions recommend that the ALI squarely align itself behind the "but for" test. [FN298] While the previous Restatements included the "but for" test as an element of "legal cause," it was de-emphasized-- appearing only as part of a limitation of the definition of "substantial factor." [FN299] The Draft Revisions are as articulate in silence as in enunciation--while they would allow the "but for" test to stand on its own for the first time, they would simultaneously excise any mention of the phrase "substantial factor" from the body of the text, arguing in the commentary:

> [Substantial factor's] primary function was to permit the factfinder to decide that factual cause existed when there were overdetermined causes--each of two separate causal chains sufficient to bring about the plaintiff's harm, thereby rendering neither a but for cause. The substantial factor test has not, however, withstood the test of time, proving confusing and being misused. [FN300]

Remarkably, the ALI defines withstanding the "test of time" by whether the rule creates "confus[ion]" and by the incidence of its use for its intended (by the drafters of the Restatement, presumably) purpose. [FN301]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The ALI makes no reference here to the level of the rule's judicial acceptance as a measure of its success.

No evaluation of the ALI's "misuse" standard as a litmus test for the success of the "substantial factor" doctrine is possible without looking to the original purpose of the rule as written by the ALI, as contrasted to the purposes for which it is used by courts today. The ALI's original purpose was to protect defendants from unlimited liability for the effects of their tortious acts, with a minor exception for overdetermination. [FN302] Alternatively, many courts today use the doctrine as a "broader" standard, intended to aid plaintiffs who would otherwise fail the "but for" test. [FN303]

The Draft Revisions also suggest that the Restatement treat factual causation by itself, in a separate chapter from the discussion of proximate cause, thus eliminating the need for the bifurcated discussion of "legal cause" contained in sections 430 through 33 of the *2717 Restatement (Second). [FN304] This rejection of the amalgamating nomenclature "legal cause" employed by the first two Restatements, [FN305] is intended to clarify the standards discussed. [FN306] Accordingly, the Draft entirely abandons the phrase "legal cause." [FN307]

### 2. Section 27: Multiple Sufficient Causal Sets

Another innovation proposed by the Draft Revisions is the conception of all necessary causes combining to create a "causal set." [FN308] The Draft first introduces "causal set" nomenclature in section 26, stating:

> An actor's tortious conduct need only be a factual cause of the other's harm. The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur. . . . Recognition of multiple causes does not require modifying or abandoning the "but for" standard in this section. Tortious conduct by an actor need be only one of the causes of another's harm. When there are multiple sufficient causes, each of which is sufficient to cause the plaintiff's harm, supplementation of the but for standard [with the standard articulated in Section 27] is appropriate. [FN309] *2718 Section 27 comes into play in cases involving two or more extant causal sets, each individually sufficient to bring about the harm. [FN310] In this case, and in this case only, a causal set that does not satisfy the counterfactual analysis of the "but for" test may nonetheless serve as the basis for liability. [FN311] Thus, where the Restatement (Second) invoked the "substantial factor" test, the Draft Revisions propose to strictly limit the use of this renamed analysis to these unusual circumstances.

The comments to the Draft Revisions expressly bring circumstances of "incremental" causation under the umbrella of section 27, including cases where "tortious conduct by one actor is insufficient, even with other background causes" [FN312] to cause the harm, but "when combined with conduct by other persons, the conduct overdetermines the harm." [FN313] Under section 27, all contributing causes would be considered to be factual causes. [FN314]

### 3. Section 28(b): Burden of Proof

Section 28(b) is not substantially different from the section it replaces in the Restatement (Second). [FN315] Where it differs, it merely clarifies those elements of the Summers rule which have evolved in the years since the adoption of the Restatement (Second). Specifically, it limits the Summers rule by requiring the joinder of all defendants, proof by the plaintiff that the actions of all defendants were tortious, and proof by the plaintiff that the tortious act of at least one of the defendants actually caused the plaintiff's injury. [FN316] In these cases, as under the old rule, the burden of persuasion is shifted to the defendant. [FN317] But the Draft Revisions go further, expressly stating that the burden of production shifts to the defendant as well. [FN318] In short, the revisions contained in section 28(b) are little more than *2719 overdue housekeeping, updating the Restatement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Second) with more recent jurisprudential analysis.

### 4. Reporters' Notes

While the ALI's Restatements are not primary authority, they reap a great deal of their extraordinary persuasiveness from their perceived reliability in presenting the current state of the law. [FN319] Accordingly, writing and rewriting the Restatements is one of the most significant undertakings in which the ALI engages. [FN320] Separately, the Institute also engages in the creation of extensive recommendations for how the law should evolve--most notably in the form of "model codes." [FN321] But the ALI has recently been subjected to extensive criticism, with many scholars charging the Institute with blurring the line between a "restatement" of the law and recommendation for the law's change. [FN322] Therefore, in addition to a clear appraisal of the substance of the proposed changes, a detached critical analysis also demands an assessment of the legitimacy of the support in case law for the revisions. For this purpose, an examination of the Reporters' Notes is necessary. [FN323]

The Reporters offer a wide range of support for the "but for" rule, asserting that courts and scholars alike "routinely acknowledge that the but-for test is central to determining factual cause." [FN324] The Draft Revisions invoke cases in support of this statement, interpreting law from fifteen different jurisdictions, [FN325] as well as a wide range of *2720 scholarship. [FN326] The pedigree of the "but for" test may be so venerable that it need not be proven yet again at this late date--but the Reporters nonetheless thoroughly ground the Institute's reasoning in caselaw and scholarship. [FN327]

In Comment j of the same section, the Reporters make the Institute's case for the excision of "substantial factor" language from the Restatement. [FN328] They begin with an admission that the "treatment of 'substantial factor' in both [preceding] Torts Restatements is confusing," [FN329] and argue that the test "has few supporters among commentators." [FN330] Comment j further declares that "[w]ith the sole exception of multiple sufficient causes, 'substantial factor' provides nothing of use in determining whether factual cause exists." [FN331] Startlingly, given the near universal infiltration of the "substantial factor" test into the judicial discourse, [FN332] the Reporters cite a single scholar and no courts for this remarkable proposition. [FN333]

The Reporters build a case against "substantial factor" based on logical analysis. [FN334] The Reporters assert that as a test for factual causation, the standard is "undesirably vague." [FN335] Extensively noting examples in the case law, the Comment states that this vagueness could "lure a factfinder into thinking that a substantial factor means *2721 something less than a but-for cause or, conversely, may suggest that the factfinder distinguish among factual causes, determining that some are and some are not 'substantial factors.'" [FN336] Thus, largely in the interest of clarity, rather than on grounds of caselaw, the Draft Revisions urge the superiority of the "but for" test.

### III. The Draft Revisions: Doing the Right Thing in the Wrong Way

Finding inconsistencies in the law, however, is not tantamount to resolving those differences. In purporting to clarify the law in this area, the ALI may well be crossing the line from restating the law to prescribing a solution.

The Draft notes that the "treatment of 'substantial factor' in both Restatements is confusing." [FN337] Given its willingness to accept at least partial blame for the current state of judicial uncertainty, the ALI should attempt to clear up the problem in the Restatement (Third). But if the new Restatement is to avoid exacerbating the prob-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lem, it is vital for the Reporters to be exacting in their evaluation of the authority upon which they rely. If the ALI is going to excise a concept as central to contemporary jurisprudence as the "substantial factor" test of causation, the Reporters' Notes must clearly indicate the extent to which this change is a reflection of the evolution of legal thought as manifested in case law, as opposed to a manifestation of the ALI's mission to create a work product containing "extensive recommendations or proposals for change in the law." [FN338] A critical examination of those cases and articles on which the Reporters' Notes rely is therefore indispensable to an evaluation of the revisions to the body of the Restatement.

This part argues that a return to the "but for" test is warranted. [FN339] But the Reporters' Notes offered by the drafters are incomplete and require additional work. [FN340] There are a number of cases and controlling precedents that the Reporters' Notes either ignore or give *2722 short shrift. [FN341] This part concludes that, if the ALI is to avoid reliving the embarrassments of the recent past, it must be more forthcoming about precisely where it draws the line between restating the law and articulating the direction in which the Institute believes the law should develop. [FN342]

A. The Right Thing: Fulfilling the Promise of The American Law Institute

In proposing these changes, which recognize the unhelpful contribution of the Restatement (Second) to the development of the common law in the area of factual causation, the ALI has shown an admirable willingness to return to its roots by adopting a Restatement that aspires to "restate" the law as it is, rather than articulating a prescription for what it ought to become.

Nonetheless, to make manifest that aspiration to "restate" the law with integrity, the Reporters should offer the legal community a closer examination of the sources on which the Draft relies. Cases cited for the proposition that "substantial factor" is either an easier or a more difficult standard to meet than "but for" need to be on point. The ALI should concede that many jurisdictions have adopted the "substantial factor" test and show no evidence of dissatisfaction with it. For purposes of intellectual honesty, it is vital for the Institute to acknowledge that its proposal for a recommitment to "but for" causation to the exclusion of the "substantial factor" test is a prescriptive vision of the law. If only in the interest of clarifying confusion caused by previous Restatements, the ALI should make this clear.

1. Section 26: "But For" Prevails over "Substantial Factor"

The "but for" test is the worst mechanism to determine factual cause imaginable, except for all the others that have been tried so far. [FN343] Problems with the test are numerous, but the advantages outweigh them by far. [FN344] The test's extensive pedigree has made it well-respected by a judicial system that places great emphasis on precedent, and great value on judicial certainty. [FN345] The logic of "but *2723 for" is conceptually clear enough to be grasped by finders of fact of any level of sophistication. [FN346] In the vast majority of cases, it produces results that are in alignment with the everyday person's intuitive sense of justice. [FN347]

That the ALI proposes to excise all use of the phrase of "substantial factor" in the Draft Revisions is laudable. While there is clearly a need for a "patch" to the "but for" test to address those circumstances where "but for" simply fails to produce an intuitively just result, the "substantial factor" doctrine has created much judicial mischief since its inception. [FN348]

There is nothing wrong with the "substantial factor" test, except for the fact that there is neither scholarly nor judicial agreement on the definition of "substantial," nor is there any consensus on the meaning of "factor."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN349] This linguistic ambiguity has created a "doctrine" which is little more than a jurisprudential Rorschach blot--in one circumstance justifying a relaxed standard of causation, in another supporting a heightened standard, and in yet another providing nothing more than a synonym for the "but for" test. [FN350] This vagueness has created substantial uncertainty, and threatens to undermine the confidence of plaintiffs and defendants alike in the ability of the courts to treat "like cases alike." [FN351]

Nonetheless, the ALI has an obligation to the legal community to clearly acknowledge the prevalence of this standard. There are, after all, many jurisdictions which have used the "substantial factor" test for much of the twentieth century, even if in tandem with or as part of the "but for" standard. Courts in those jurisdictions are unlikely to be persuaded by a Restatement that fails to take notice of this stark legal reality. For example, thorough discussion in the Reporters' Notes of Rutherford v. Owens-Illinois, Inc., [FN352] Keir v. United States, [FN353] or Reynolds v. Gonzalez, [FN354] and the Pattern Jury Instructions from *2724 California, [FN355] New Jersey, [FN356] and New York [FN357] would go a long way toward clarifying the confusion.

The commentary in section 26 directly addresses the evolution of the "loss of chance" doctrine for the first time in an ALI Restatement. [FN358] To some extent, this commentary clears the muddy waters created by the vigorous churn of change in this volatile area of the law. By urging courts to refrain from misusing the language of section 323 of the Restatement (Second) as justification for a relaxed standard of causation, the Draft Revisions restore some consistency and coherence to the doctrine--perhaps saving the "loss of chance" doctrine from its own most ardent supporters. By recommending the use of the proportional approach to "loss of chance" analysis, and the rejection of the reduced standard of causation approach, the ALI lends credibility to the new doctrine. [FN359]

At least one scholar and jurist evaluates this approach as "probably fair." [FN360] The Draft Revisions suggest a doctrinal placement for loss of chance doctrine (in the analysis of injury, rather than as part of the causation inquiry) where it may do the most good for plaintiffs who need it, but at the least risk to the certainty of tort law in general. [FN361]

### 2. Section 27--Two Fires, et al., Under the Draft Revisions

In practice, the substance of the "new" test articulated in section 27 would be little more than the "substantial factor" test without the phrase "substantial factor." But in addition, the ALI recommends that courts strictly circumscribe its use to cases involving multiple sufficient causation. [FN362] In this manner, the ALI's proposal retains the strength of the "substantial factor" test (its ability to pinch hit for "but for" in the rare instances of multiple sufficient causation, where "but *2725 for" fails), without the risk of judicial misunderstanding or deliberate stretching created by the use of the tremendously vague "substantial factor" language. [FN363] The new articulation retains the inclusiveness of "substantial factor," while happily scrapping its scattershot approach.

### B. The Wrong Way: The Reporters' Notes Build a Case for "But For" on a Foundation of Sand

#### 1. "Substantial Factor" is a More Stringent Standard than "But For" to Establish Factual Cause

The Draft Revisions cite only four cases in support of the proposition that some jurisdictions "use[] the 'substantial factor' requirement to impose a more onerous burden on the plaintiff with regard to factual cause than merely establishing but for causation": two directly and two as indirect support (using a "see also" signal).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN364] First, the Reporters cite Shyface v. Secretary of Health & Human Services [FN365] as an example of this view. The Shyface opinion does indeed state that "the standard of 'actual causation' is more stringent than the 'but for' standard." [FN366] Elsewhere, though, the court seems to be using "but for" as a synonym for factual cause, and "substantial factor" for proximate cause, stating that "an action is the 'legal cause' of harm if that action is a 'substantial factor' in bringing about the harm, and . . . the harm would not have occurred but for the action." [FN367]

In its discussion of the definition of "legal cause," the court cited sections 431 of the Restatement (Second) in its entirety, which asserts that: "legal cause [exists] if (a) [the defendant's] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the [defendant] from liability because of the manner in which his negligence has resulted in the harm." The commentary to the Restatement (Second) clarifies the meaning of subpart (b) with a cross reference to sections 435 through 61. [FN368] It is significant to note, however, that these sections fall under the category headings "Rules Which Determine the Responsibility of a Negligent Actor for Harm Which His Conduct is a Substantial Factor in Producing," [FN369] "Superseding Cause," [FN370] and "Causal Relation Affecting the Extent of *2726 Liability But Not Its Existence." [FN371] In short, section 431(b) contemplates not what the Draft Revisions are partitioning into factual cause, but what is currently referred to as proximate cause in common judicial parlance.

Thus, the Shyface court relies heavily on the Restatement (Second) to support its assumption that "legal cause" is the sum of factual cause and proximate cause, and for the conclusion that the "substantial factor" test may be used to invoke a higher standard for imposing liability. While an inquiry into whether causation is sufficient to justify the imposition of liability would certainly compel a higher standard than one merely regarding factual cause, this inquiry addresses the court's (and the Restatement's) complex definition of "legal cause" far more than it does the simpler formulation of factual cause posited by the Draft Revisions. [FN372] Thus, the Shyface court seems to be addressing a question quite different from the one for which the Reporters cite it.

Next, the Draft Revisions cite Challis Irrigation Co. v. Idaho, [FN373] where the plaintiff sought to recover for damages related to a break in its canal subsequent to a flood (which raised the level of the river), and which may have been exacerbated by an excess of debris which had gathered in the defendant's "trash rack," located above a flood-activated bypass. [FN374] In its discussion of causation, the court stated:

> [Factual cause] embraces two closely related elements. First, an event is the cause in fact of a succeeding event only if the succeeding event would not have occurred but for the prior event. . . . The second element is a requirement that the first event be a "substantial factor" in producing the succeeding event. [FN375]

Disturbingly, the Reporters fail to identify that these statements are dicta, and that they are actually diametrically opposed to the substance of the holding. [FN376] The jury instruction in question used neither the "but for" nor the "substantial factor" standard for causation; instead it defined proximate cause as "a cause which, in natural or probable sequence, produced the damage complained of." [FN377] The opinion notes that this "instruction [did] not completely explain the elements of cause in fact. . . . [Nor did the instruction] *2727 make [the standard of causation] entirely clear." [FN378] The court nonetheless accepted this definition for the purpose of review. [FN379]

Thus, despite holding that a reasonable jury could have found that the defendant's negligence had resulted only in approximately twenty percent of the increased volume of the canal, the court did not make a quantitative inquiry into whether this twenty percent satisfied the "substantial factor" test. [FN380] Instead, the court merely inquired "whether the jury, following the instructions given in this case, reasonably could have inferred that the canal failure more probably resulted from clogging at the trash rack, in combination with the increased flow

from the river, than from such increased flow alone." [FN381] Therefore, while the court invoked language that suggests its philosophical sympathy with the idea for which the Draft cites Challis, it nonetheless seems a strange citation for the proposition that "substantial factor" is a standard which "impose[s] a more onerous burden on the plaintiff" given that the court imposed no such burden in this case. [FN382]

The first case the Draft Revisions cite as indirect support for this proposition is Culver v. Bennett. [FN383] The Culver court suggests that the "substantial factor" rule is harder on plaintiffs, and that it is therefore most commonly "invoked in cases in which a defendant's conduct is clearly a 'but for' cause of plaintiff's harm, and defense counsel contends that defendant's conduct made such an insubstantial contribution to the outcome that liability should not be imposed." [FN384] Nonetheless, readers of the Draft Revisions might be forgiven for concluding that this analysis holds little weight in an opinion which clearly rejects any such application of the rule. [FN385] The court utterly disavows the "substantial factor" rule, stating that "our time-honored definition of proximate cause has been the but for rule. . . . Most simply stated, proximate cause is [defined in Delaware as] that direct cause without which the accident would not have occurred." [FN386] Thus the court ordered a new trial, despite the fact that the plaintiff had not raised the issue below, holding that the use of "substantial factor" language in the jury instructions was "plain error" [FN387] which "resulted *2728 in a defense verdict." [FN388] Accordingly, this case also seems to be inapposite.

Finally, the Draft Revisions cite Ten Hagen v. DeNooy. [FN389] However, this opinion repeatedly anchors its analysis of the use of the "substantial factor" test as a tool to be utilized in the proximate cause inquiry. [FN390] In fact, the opinion is entirely devoid of both the word "factual" and the word "actual." [FN391] Considering this, it may be that Ten Hagen is perhaps even more indirectly related to the Draft Revisions' proposition than suggested by the "see also" signal used by the Reporters. [FN392]

### 2. "Substantial Factor" is a Lower Standard than "But For"

Alternatively, the Draft cites a number of cases for the proposition that "substantial factor" is actually a lower standard than "but for," [FN393] suggesting that it is permissible to invoke "substantial factor" rhetoric in order to find liability where the case for "but for" causation is defective. These cases fall easily into two categories--those that the ALI puts forth as generally supporting the proposition, and those which impose liability for the "loss of a chance" of survival in medical malpractice. [FN394]

The Draft Revisions cite only three cases as support for the proposition that some jurisdictions construe "substantial factor" to be a lower standard than "but for" causation. [FN395] Interestingly, given the extensive treatment given by the Draft to "loss of chance" cases in Comment n, two of these cases in the general discussion of "substantial factor" are medical malpractice "loss of chance" cases as well, leaving only a single case citation to support the general principle as applied outside of the area of medical malpractice. [FN396]

Interestingly, that lone non-medical case, Hake v. Manchester Township, [FN397] also addressed circumstances involving a lost chance of survival. [FN398] In this case, the plaintiff's son had been arrested by a local *2729 police department for stealing his father's car. [FN399] While isolated in a room at the police station, [FN400] the decedent hanged himself with his belt. [FN401] When he was found, an officer trained in first aid requested permission from the Chief of Police to cut him down and try to resuscitate him. [FN402] The Chief denied permission, saying that he "wanted him left where he was." [FN403]

While the case does not address a medical question, the opinion is laden with references to the use of "loss of chance" doctrine in medical malpractice. [FN404] By analogy to "loss of chance," the court held that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff need only prove a "substantial possibility" of rescue, had the defendant not failed in his duty. [FN405] The court declared:

> [C]ausation for failure to act [is] generally expressed in terms of whether the conduct may be viewed as a substantial factor contributing to the loss. . . . [P]laintiffs here need establish only that defendants had a duty to try to save Robert's life and that there was a substantial possibility of the rescue of their son from death. [FN406]

Thus, the Hake court utilized the "loss of chance" doctrine in combination with a modified "substantial factor" test (inquiring into the existence of a "substantial possibility" of rescue) in an unconventional (non-medical) circumstance. [FN407] Furthermore, it did so in a case involving an alleged breach of duty by omission, rather than by commission. [FN408] Given (a) these unusual facts, (b) the unusual cross-pollination of "substantial factor" with "loss of chance" outside of the realm of medical malpractice, and (c) the unusual use of a modified "substantial factor" test seeking a "substantial possibility" of successful rescue, it is unfortunate that this is the only non-"loss of chance" case offered by the Draft to support this proposition. [FN409]

As discussed above, there are essentially two approaches to "loss of chance" recovery. [FN410] The first, which remains truest to Professor King's original proposal, is the reconceptualization of the injury in these cases. [FN411] The second approach combines "loss of chance," **2730** "substantial factor," and perhaps section 323 of the Restatement (Second) in order to allow full recovery on a reduced standard of causation. [FN412]

Comparing these two approaches, the Draft expressly urges the reconceptualized injury approach over the relaxed causation standard. The Reporters' Notes assert that "recognizing lost opportunity as harm is preferable to employing a diluted 'substantial factor' or other factual causation test, thereby leaving recovery to the unconstrained inclination of any given jury and providing those fortunate plaintiffs with a windfall in the form of full recovery for their physical harm." [FN413]

Nonetheless, the Draft stops short of endorsing any "loss of chance" approach at all, cautioning that because the doctrine addresses a matter, the definition of injury within the framework of medical malpractice specifically, which is outside the scope of the current revisions to the Restatement (Second), the ALI "takes no position" on it, leaving "loss of chance" to future Restatements to discuss more thoroughly. [FN414]

### 3. Jury Instructions

Although the Reporters' Notes to the Draft Revisions make more than a cursory examination of the relevant case law, there are a number of important issues left unanswered by the disparities between the Reporters' analysis and the text of the cases and their supporting jury instructions. If judges and scholars are to evaluate the legitimacy of the proposed revisions to the Restatement, they will need to be able to rely on the integrity of the Reporters' Notes. Unfortunately, some of these disparities may call into question the reliability of the Reporters' Notes as a whole.

For example, the Draft acknowledges that Mitchell v. Gonzales [FN415] is the leading case on the question of causation in tort under California law. [FN416] The Reporters minimize Mitchell's significance with the assertion that "the court objected not to the but-for component of the instruction, but to the use of 'proximate cause' to describe factual causation." [FN417] However, the court was unequivocal in a later case, stating that "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact **2731** determinations." [FN418] Moreover, one look at California's pattern jury instructions shows that jurisdiction to be firmly committed to the "substantial factor" doctrine, to the exclusion of the stricter (under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

California law) "but for" test. [FN419] Those instructions state, in full that "[t]he law defines cause in its own particular way. A cause of injury, damage, loss, or harm is something that is a substantial factor in bringing about an injury, damage, loss, or harm." [FN420] The discrepancy between these instructions and what is admitted by the Reporters' Notes is unsettling.

The Draft also cites Vincent v. Fairbanks Memorial Hospital [FN421] for the proposition that Alaska uses "the but-for test routinely for factual causation." [FN422] Vincent was a split decision, which held that the use of a "but for" instruction was error, even if harmless. [FN423] The Reporters' reliance on this case as proof of Alaska's commitment to the "but for" rule is both misplaced and disturbing. Indeed, the issue on which the court was split did not have to do with whether the "but for" instruction was error (on that point, the judges were unanimous), but on whether that error was harmless. [FN424] In fact, the Alaska pattern jury instruction uses an opaque combination of "substantial factor" and "but for" which seems to be taken largely from the Restatement (Second), which the Draft proposes to replace. [FN425]

Similarly, the Draft relies on Daugert v. Pappas [FN426] for the proposition that Washington "routinely" uses the "but for" test for *2732 factual causation. [FN427] While this is a fair approximation of the rule used in that case, it is a glaring omission that the Reporter fails to note the extensive discussion in Daugert of a sizable exception to the "but for" rule--Washington's commitment to "substantial factor" analysis in "loss of chance" cases, [FN428] as embodied in Herskovits. [FN429] As noted elsewhere in the Draft, Herskovits is a leading example of the reliance on section 323 of the Restatement (Second) for the invocation of the "substantial factor" doctrine in "loss of chance" cases. [FN430] Clearly, if the proposed revisions were adopted by both the ALI and the Washington courts, Herskovits would have to be reevaluated. [FN431] Given the Draft's assertion that reliance on section 323 in combination with the "substantial factor" doctrine is "misplaced," one might be forgiven for the conclusion that the Reporters' failure to synthesize Daugert with Herskovits is perhaps less than fully forthcoming. [FN432]

## 4. Prescription Versus Description

Judge Calabresi, for one, points out that "while [the Restatement's] point of view about 'substantial factor' might be a perfectly good one," he considers the notion that "a Restatement [should offer] a prescriptive vision [to be] very much in doubt." [FN433] He argues that although the Restatements have always attempted to identify trends in the law, it is quite a different thing to attempt to set a trend. [FN434] In retrofitting its articulation of factual causation, the ALI is "being descriptive in terms of results, but prescriptive in terms of theory." [FN435]

Judge Calabresi points out a troubling point about the ALI's quest for certainty--that it is possible to be too certain. [FN436] The "substantial factor" doctrine has proven to be an "open ended" judicial tool which has assisted courts in resolving thorny problems which have had nothing to do with its original purpose. [FN437] For example, he asks, would the market share liability exception have evolved under the strict "but for" test now advocated by the ALI? [FN438]

Some degree of certainty is necessary for the stability of tort law in general, and so the revisions to the Restatement may be necessary. *2733 The Draft goes to great lengths to address most if not all of the exceptions to the "but for" test which have evolved over the past century. [FN439] But the Draft can only incorporate "the exceptions that have already been thought of." [FN440]

Therefore, depending on how the new Restatement would be used by courts, adoption of the revisions runs the risk of counterproductively freezing the law. [FN441] As the ALI moves forward in the approval process, an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

important question is raised: Do these revisions attempt to lock out the possibility of new innovations? [FN442] To the extent that they do, their adoption by the ALI (and more significantly, by the courts) presents a delicate balancing of the interests of certainty against the need for flexibility in the common law. [FN443]

Conclusion

Notwithstanding that the Restatements do not have the force of law, they are tremendously persuasive. Since the adoption of the First Restatement, courts have looked to the ALI for an independent analysis of the state of the law. In their current form, sections 26 and 27 of the Draft Revisions are a significant and positive step forward in the articulation of common law tort principles which are true to the actual cases, while retaining credibility as internally coherent logical doctrine. The ALI should enthusiastically adopt these provisions. And the courts would do well to implement them as written. Nonetheless, the ALI has a responsibility to its constituency--judges, scholars, and attorneys--to clarify where it is "restating" the law, and where it is offering a prescriptive vision. The Reporters' Notes, as they stand, are a good start in this direction. But additional work is still required.

Arguably, the Institute stands in the position of the man in the rhyme, [FN444] at the crucial moment between bramble bushes. Having once jumped into the bush by declaring "substantial factor" to be the law when the doctrine was still in its infancy, the ALI has since (in its own estimation) seen the "substantial factor" doctrine spin out of control. It is now for the membership to consider a second jump into the same type of bush, articulating as a "restatement" of the law the ALI's prescriptive vision for the law's evolution (a full commitment to "but for" at the expense of "substantial factor"). It is up to the ALI to decide how confident it is, having scratched its eyes out once, that *2734 taking this proposed step will succeed in "scratch[ing] 'em back in again." [FN445]

[FNa1]. J.D. Candidate, 2004, Fordham University School of Law; M.F.A., 1993, Sarah Lawrence College; B.A., 1990, Nottingham Trent University. I gratefully acknowledge the substantial and invaluable guidance of Associate Dean Benjamin Zipursky; sine qua non. Thanks goes especially to Nina Rue for her ongoing encouragement, and also to Professor George Conk, Dr. Richard Sahn, Dr. Thomas J.E. Walker, Dr. Robert Smith, William Wilson, Esq., Danielle DePalma, Michele Kogon, and Hanna Shay. Finally, I wish to express sincere gratitude to the Honorable Judge Guido Calabresi for his generous assistance.

[FN1]. Cf. Richard W. Wright, Once More into the Bramble Bush: Duty, Causal Contribution, and the Extent of Legal Responsibility, 54 Vand. L. Rev. 1071 (2001) [hereinafter Wright, Once More into the Bramble Bush]; Richard W. Wright, Causation, Responsibility, Risk, Probability, Naked Statistics, and Proof: Pruning the Bramble Bush by Clarifying the Concepts, 73 Iowa L. Rev. 1001 (1988) [hereinafter Wright, Pruning the Bramble Bush]; Karl Llewellyn, The Bramble Bush (1930); The Man in Our Town, "Mother Goose" (circa 1760), reprinted in Llewellyn, supra; see infra text accompanying note 2.

[FN2]. "Mother Goose," supra note 1; see also infra text accompanying note 444.

[FN3]. Union Pump Co. v. Allbritton, 898 S.W.2d 773, 777 (Tex. 1995) (Cornyn, J., concurring); Wex S. Malone, Ruminations on Cause-In-Fact, 9 Stan. L. Rev. 60, 60 (1956) (internal quotations omitted); Interview with Hon. Guido Calabresi, Judge, United States Court of Appeals, Second Circuit, in New Haven, Conn. (Feb. 12, 2003) [hereinafter Calabresi Interview]; see also Arno C. Becht & Frank W. Miller, The Test of Factual Causation in Negligence and Strict Liability Cases 2-4 (1961); Morton J. Horwitz, The Transformation of Amer-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ican Law: 1870-1960: The Crisis Of Legal Orthodoxy 52 (1992) [hereinafter Crisis Of Legal Orthodoxy].

[FN4]. William L. Prosser, Torts § 41 (4th ed. 1971). Under traditional factual causation analysis, courts would delineate "proximate" causes from "remote" ones. See Danielle Conway-Jones, Factual Causation in Toxic Tort Litigation: A Philosophical View of Proof and Certainty in Uncertain Disciplines, 35 U. Rich. L. Rev. 875, 878 (2002) (asserting that "[t]he emphasis on direct traceability, or cause and effect, dominates the law of traditional torts"). "Proximate" is used here to mean immediate, or the opposite of attenuated. This concept of "proximate" cause should not be confused with the modern, policy-driven causal analysis usually referred to by the same name. This older use of the term had its source in Lord Bacon's Maxims of the Law, which articulated its first maxim thus: "In jure non remota causa, sed proxima spectatur" ("In law, look to proximate, not remote, causes."). Horwitz, supra note 3, at 52 (quoting F. Bacon, Maxims of the Law, in 7 Works 307, 327 (J. Spedding et al. eds., 1879)).

[FN5]. Prosser, supra note 4, § 41; Felix S. Cohen, Field Theory and Judicial Logic, 59 Yale L.J. 238, 252 (stating that "[a]ccording to the orthodox view, whether event A is the cause of event B is a question of object-ive fact to which all value judgments are irrelevant"). Factual cause is distinct from "proximate" or "legal cause," the determination of which is primarily policy-driven. See Daniel B. Dobbs, The Law of Torts 409 (2000) (noting that "moral and practical judgments" are important questions in causation analysis, but that "the law has separate places for them," and that they should not be "import[ed]" from proximate cause analysis. A detailed examination of proximate cause is beyond the scope of this Note, and for its purposes I assume the validity of this bifurcated view of causation into "proximate" cause and "factual" cause (although this Note will necessarily discuss the historical evolution of the dichotomy). For an overview of proximate cause, see generally Dobbs, supra at 443-92. For the classic jurisprudential articulation of the doctrine of proximate cause, as differentiated from cause-in-fact, see Palsgraf v. Long Island Railroad Co., 162 N.E. 99, 101-05 (N.Y. 1928) (Andrews, J., dissenting). See also Guido Calabresi, Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr., 43 U. Chi. L. Rev. 69, 85-90 (1975) (arguing that "but for" causation has little if any relevance to the policies pursued by tort law, and therefore advocating a greater reliance on a "causal link" analysis in pursuit of those policies). But see Malone, supra note 3, at 66-67 (arguing that policy considerations inevitably affect any attempt at objective causation analysis using the "but for" test, and that "[t]he essential weakness of the but for test is the fact that it ignores the irresistible urge of the trier to pass judgment at the same time that he observes").

[FN6]. Prosser, supra note 4, § 41. But see Mario J. Rizzo, Foreword: Fundamentals of Causation, 63 Chi.-Kent L. Rev. 397, 398 (1987) (arguing that "omissions are not causal processes. An omission simply permits a system to go on its way"); see infra notes 243-49.

[FN7]. Higgins Inv., Inc. v. Sturgill, 509 S.W.2d 266 (Ky. 1974) (holding defendant landlord liable for negligence in decedent's death by fire, for failing to provide two means of escape from decedent's apartment).

[FN8]. See, e.g., East Penn Mfg. v. Pineda, 578 A.2d 1113 (D.C. 1990).

[FN9]. Hayes v. Mich. Cent. R.R. Co., 111 U.S. 228, 241 (1884) (asserting that the plaintiff need only show "that there is reasonable probability that the accident resulted from the want of some precaution which the defendants might and ought to have resorted to" [sic]).

[FN10]. Prosser, supra note 4, § 41.

[FN11]. Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN12]. Id.

[FN13]. Id.; see also Calabresi Interview, supra note 3, at 85.

[FN14]. Prosser, supra note 4, § 41.

[FN15]. Id.

[FN16]. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry., 179 N.W. 45, 46-47 (Minn. 1920) (holding sufficient for a finding of liability a jury determination that the defendant's conduct had been a "substantial factor" in bringing about the injury to the plaintiff); Dobbs, supra note 5, at 415.

[FN17]. Restatement of Torts, § 432 (1934) [hereinafter First Restatement].

[FN18]. Id.

[FN19]. Ralph Nader, The Corporate Drive to Restrict Their Victims' Rights, 22 Gonz. L. Rev. 15, 16 n.8 (1986) (stating that in "virtually every jurisdiction, a defendant may be held liable in the first place only if the defendant's conduct is a substantial factor in bringing about the harm").

[FN20]. Restatement (Third) of Torts: Liability for Physical Harm: Basic Principles (Tentative Draft No. 2, Mar. 25, 2002), §§ 26-28 [hereinafter Draft Revisions].

[FN21]. Section 431 defines legal cause as one which is a "substantial factor" in bringing about the harm, barring a legal excuse. Section 432 then defines "substantial factor" as a "but for" cause, with a caveat. Restatement (Second) of Torts (1979) [hereinafter Restatement (Second)]; see infra Parts I.B, II.B.

[FN22]. Draft Revisions, supra note 20, § 26, at 29.

[FN23]. 179 N.W. 45, 46-47 (Minn. 1920). The court was likely influenced by a suggestion of the test in a three-part article published in the Harvard Law Review. Jeremiah Smith, Legal Cause in Actions of Tort, 25 Harv. L. Rev. 103, 223, 303 (1912).

[FN24]. First Restatement, supra note 17, §§ 430-33.

[FN25]. Restatement (Second), supra note 21, §§ 430-33.

[FN26]. Draft Revisions, supra note 20, § 26, at 39-40, 56-64.

[FN27]. The membership of the ALI is made up of "judges, practicing lawyers, and legal scholars from all areas of the United States as well as some foreign countries, selected on the basis of professional achievement and demonstrated interest in the improvement of the law." Press Release, Am. Law. Inst., Kathryn Oberly Elected to American Law Institute Council (Feb. 4, 2003), at http:// www.ali.org (last visited on Apr. 6, 2003).

[FN28]. Draft Revisions, supra note 20, § 26, at 39-40, 56-64.

[FN29]. Id., § 26 cmt. j, at 39 (asserting that the "substantial factor" test has "prove[n] confusing and [is] being misused").

[FN30]. See Kenneth S. Abraham & Lance Liebman, Private Insurance, Social Insurance, and Tort Reform: Toward a New Vision of Compensation for Illness and Injury, 93 Colum. L. Rev. 75, 88 (1993) (arguing that "tort

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 Fordham L. Rev. 2679

law is not a very sensible system" for meeting the policy goal of compensating victims); see also Paul A. Crotty, Tort Reform: Shutting Off the Money Faucet, 2 City L. 125 (1996) (advocating special protection from tort litigation for the city of New York).

[FN31]. The Restatements, according to the ALI:

[C]onsist[] of Introductory Notes, rules of law presented in blackletter type and numbered sections, and accompanying Comments and Reporters' Notes. The Introductory Notes, the rules of law in blackletter type, and the Comments express the views of the Institute.... The Reporters' Notes, on the other hand, reflect the views of the Reporters and describe the legal sources that they have considered relevant.
1 Restatement of Foreign Relations XI.

[FN32]. See e.g., Monroe H. Freedman, Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements, 26 Hofstra L. Rev. 641, 660 (1998) (arguing that "[c]onflicts of interest on the part of members of the ALI have called into question the integrity of ALI Restatements of the Law"); Frank J. Vandall, A Critique of the Restatement (Third), Apportionment as it Affects Joint and Several Liability, 49 Emory L.J. 565, 621 (2000) (accusing the Institute of "masking" its true intentions, and asserting that "[a] true Restatement would adopt the dominant position"); Frank J. Vandall, The American Law Institute Is Dead in the Water, 26 Hofstra L. Rev. 801, 802 (1998) (arguing that the rejection of the consumer expectations rule in the Restatement (Third) of Product Liability is not a fair reflection of the state of the law); Calabresi Interview, supra note 3 (asserting that the ALI "gets it wrong" when it declares the risk/utility rule to have supplanted the consumer expectations rule, and further arguing that New York, California, and other significant jurisdictions have rejected this analysis and remain committed to a two factor approach, allowing the plaintiff to prove defendant liability in either way).

[FN33]. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry., 179 N.W. 45 (Minn. 1920). This case, involving the assignment of liability to a defendant who at most shared responsibility for the plaintiff's injury with a fire of unknown origin, was the first of a type which are now referred to by the Draft Revisions as "multiple sufficient causation" cases. See infra Part I.B.1.

[FN34]. In fact, the last on this list, the "butterfly effect" cases, seemed to be the primary motivation for the inclusion of "substantial factor" language in the Restatement. Foreword to Restatement of Torts (Preliminary Draft No. 41A, 1931) (asserting that legal cause "deals with the principles and rules which determine whether and, if so, at what point, the defendant's responsibility is to be terminated short of answering for all those injuries which, but for his negligence, the other would not have sustained") [hereinafter Preliminary Draft].

[FN35]. Stacey Allen Carroll, Note, Federal Preemption of State Products Liability Claims: Adding Clarity and Respect for State Sovereignty to the Analysis of Federal Preemption Defenses, 36 Ga. L. Rev. 797, 802 (2002) (stating that "both plaintiffs and defendants alike" benefit from an increase in judicial certainty).

[FN36]. See infra Part I.A; see also supra text accompanying notes 12-15.

[FN37]. Mark P.O. Morford et al., Classical Mythology, at http:// www.brandeis.edu/departments/classics/class170/myth2a8a.htm (last visited Apr. 15, 2003); Leonard C. Muellner, Divine Children of Zeus, at http:// www.brandeis.edu/departments/classics/class170/myth2a8a.htm (last visited Apr. 15, 2003).

[FN38]. See infra Part I.B.1.

[FN39]. See infra Part I.B.1, I.B.2.

[FN40]. See infra Part I.B.3.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN41]. See supra note 19 and accompanying text.

[FN42]. See infra Part I.B.3.

[FN43]. David W. Robertson, The Common Sense of Cause in Fact, 75 Tex. L. Rev. 1765, 1770 (1997).

[FN44]. Id. at 1771.

[FN45]. Prosser, supra note 4, § 41.

[FN46]. Id; see Vern R. Walker, Preponderance, Probability and Warranted Factfinding, 62 Brook. L. Rev. 1075 (1996) (discussing the meaning of "preponderance of the evidence").

[FN47]. Robertson, supra note 43, at 1769.

[FN48]. Id. at 1769-71.

[FN49]. Many jurisdictions have recognized increased risk as a cognizable cause of action. See, e.g., Falcon v. Mem'l Hosp., 462 N.W.2d 44, 57 n.47 (Mich. 1990) (finding for the plaintiff on a "loss of chance" theory, but limiting recovery "to only that amount of reduced chance of recovery actually caused by the physician's negligent conduct" (internal quotations and citations omitted)); Herskovits v. Group Health Coop., 664 P.2d 474, 479 (Wash. 1983) (rejecting defense counsel's assertion that the evidence "must show that [the plaintiff] 'probably' would have had a 51 percent chance of survival if the hospital had not been negligent," and finding for the plaintiff on a "loss of chance" theory); see also Chaplin v. Hicks, 1911 K.B. 786 (Eng. C.A.) (allowing a beauty contestant proportional recovery (in contract) when defendant wrongfully deprived plaintiff of the opportunity to be chosen as the winner of a beauty contest); infra Part I.B.3.d. Other jurisdictions have taken this notion further, including the increased risk brought about by the aggravation of a pre-existing condition in medical malpractice. See, e.g., Reynolds v. Gonzalez, 798 A.2d 67, 78 (N.J. 2002) (stating that "'the application of a standard of causation that is more flexible than that used in conventional tort claims' [is] appropriate in medical malpractice cases involving preexistent conditions," (quoting Evers v. Dollinger, 471 A.2d 405, 413 (N.J. 1984)). To the extent that these cases allow recovery for an injury where factual cause cannot be established by a preponderance of the evidence, they raise troubling questions both about the "but for" test and the "substantial factor" analysis which has come to supplement "but for" analysis. See infra Part III.A.1.c.

[FN50]. Robertson, supra note 43, at 1770.

[FN51]. Id. at 1770-71.

[FN52]. Id. at 1766.

[FN53]. Id. at 1767.

[FN54]. Prosser, supra note 4, § 41.

[FN55]. Robertson, supra note 43, at 1769.

[FN56]. Id.

[FN57]. Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN58]. Richard Fumerton & Ken Kress, Causation and the Law: Preemption, Lawful Sufficiency, and Causal Sufficiency, 64 Law & Contemp. Probs. 83, 95 (2001).

[FN59]. Id.; Robertson, supra note 43, at 1776 (asserting that "[r]equiring the plaintiff to prove cause in fact by the but-for test is almost always the right approach").

[FN60]. Collins v. Am. Optometric Ass'n, 693 F.2d 636, 640 (7th Cir. 1982) (citations omitted).

[FN61]. See generally Draft Revisions, supra note 20, § 27 cmt. a, at 68-70; Richard W. Wright, Causation in Tort Law, 73 Cal. L. Rev. 1735 (1985).

[FN62]. See infra Part I.B.3.a.

[FN63]. Christopher M. Hohn, Note, Cause-In-Fact in Missouri: A Return to Normalcy, 59 Mo. L. Rev. 947, 953 (1994) (stating that the "but for" test of factual cause has "ancient roots"); cf. Burnham v. Superior Court, 495 U.S. 604, 616 (1990) (holding that mere physical presence is sufficient basis for exercise of in personam jurisdiction justified by the doctrine's "pedigree," as evidenced in a "formidable body of precedent").

[FN64]. See Horwitz, supra note 3, at 52; Calabresi Interview, supra note 3.

[FN65]. See Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 101-05 (N.Y. 1928) (Andrews, J., dissenting).

[FN66]. Union Pump Co. v. Allbritton, 898 S.W.2d 773, 780 (Tex. 1995) (Cornyn, J., concurring).

[FN67]. See Nader, supra note 19, at 16 n.8.

[FN68]. 179 N.W. 45 (Minn. 1920).

[FN69]. Id. at 46.

[FN70]. Id. In fact, it's not clear from the Anderson opinion whether there were a total of two fires or three. The opinion notes the defendant's assertion that "fires were burning west and northwest of and were swept by the wind towards plaintiff's premises." Id. Since the fire set by the defendant was also west of the plaintiff's property, the defendant might have been referring here to either the fire it had allegedly set and another of unknown origin, or to two additional fires, not including the one set by defendant's services. Id. For simplicity, and because this case and those like it are commonly referred to as "two fires" cases, this Note refers to the fire(s) of unknown origin in the singular.

[FN71]. Id. If the "but for" test were applied in this case, the test would fail because when any single fire is hypothetically removed from the fact pattern, the other fires cause the damage anyway--thus neither fire is a "but for" cause. See Charles Kester, The Language of Law, the Sociology of Science and the Troubles of Translation: Defining the Proper Role for Scientific Evidence of Causation, 74 Neb. L. Rev. 529, 535 (1995) (stating that in "a merging fires case, strict application of the but for test would preclude any recovery by [the plaintiff], since neither fire is the but for cause of the damage to [her] property").

[FN72]. Anderson, 179 N.W. at 45-46.

[FN73]. Id. at 46. This development, which seemed to loosen the standard of factual causation, dovetailed nicely with the legal trend toward a bifurcation of causal analysis. One implication of that divergence was the creation of additional room for a policy-driven examination of "proximate" cause. Horwitz, supra note 3, at 51-63. Inter-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

estingly, in Palsgraf, Judge Andrews dropped the phrase "substantial factor" into his discussion of proximate causation with a casualness that implied that the phrase might be interchangeable with "but for" causation:

> Except for the explosion, [Mrs. Palsgraf] would not have been injured. We are told by the appellant in his brief, "It cannot be denied that the explosion was the direct cause of the plaintiff's injuries." So it was a substantial factor in producing the result--there was here a natural and continuous sequence--direct connection. The only intervening cause was that instead of blowing her to the ground, the concussion smashed the weighing machine which in turn fell upon her. There was no remoteness in time, little in space. And surely, given such an explosion as here, it needed no great foresight to predict that the natural result would be to injure one on the platform at no greater distance from its scene than was the plaintiff.

Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 105 (N.Y. 1928) (Andrews, J., dissenting).

[FN74]. Anderson was decided in 1920, and the American Law Institute was founded in early 1923. Anderson, 179 N.W. at 45; N.E.H. Hull, Restatement and Reform: A New Perspective on the Origins of the American Law Institute, 8 Law & Hist. Rev. 55, 64 (1990). Of course, the Restatement of Torts was a substantial project, and was not officially adopted by the organization until 1934. See First Restatement, supra note 17, at vii.

[FN75]. The conventional view is that the ALI was founded by members of the Formalist tradition, aspiring to concretely codify the rules of the common law for posterity--perhaps even leading to the statutory enactment of the Restatements. But at least one scholar takes issue with this view, arguing that the true founders of the Institute were pursuing a reformist agenda. See generally Hull, supra note 74.

[FN76]. See Hull, supra note 74, at 64-65.

[FN77]. See id.

[FN78]. Id.

[FN79]. See id. at 74-81.

[FN80]. Id. at 81.

[FN81]. Id.

[FN82]. This is the goal of the Restatements, according to the ALI's website. Am. Law Inst., About the American Law Institute, at http:// www.ali.org/ali/thisali.htm (last visited Apr. 6, 2003). But see Calabresi interview, supra note 3 (stating that "I paid more attention to the Restatements as a law school professor than I do since I became a judge").

[FN83]. About the American Law Institute, supra note 82.

[FN84]. Id.; see, e.g., Model Penal Code (1962).

[FN85]. See supra note 32.

[FN86]. First Restatement, supra note 17, §§ 430-34.

[FN87]. Restatement (Second), supra note 21, § 432.

[FN88]. Dobbs, supra note 5, at 415 (asserting that "[s]o far as they rely upon any test of causation at all when causal issues are embarrassing, [courts] may invoke the 'substantial factor' test").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN89]. See generally Preliminary Draft, supra note 34.

[FN90]. Id. at 5 (emphasis added).

[FN91]. See id. at 6 (explaining that even in the face of "but for" causation, the court may limit liability if it believes that its imposition would be "unjust or inexpedient"); id. at 7 (defining "legal cause" as requiring that the "sequence of events... is such as to make it just and expedient to hold the actor responsible"). The "substantial factor" doctrine appears in an embryonic form in the assertion that legal cause must have "a substantial effect in bringing about the injury." Id. at 25 (emphasis added).

[FN92]. Id. at 25-26 (emphasis added).

[FN93]. See supra notes 3-19 and accompanying text.

[FN94]. This is especially interesting to note, given that the current revisions to the Restatement are being proposed as a check on the growth of the use of the "substantial factor" doctrine for the plaintiff. See infra Part I.B.3.

[FN95]. 64 F.2d 193, 194-95 (6th Cir. 1933).

[FN96]. Id. at 194.

[FN97]. Id. at 196-97.

[FN98]. Id. at 197.

[FN99]. 6 N.W.2d 809, 810-11 (Minn. 1942); see also supra notes 68-73 and accompanying text.

[FN100]. Lunde, 6 N.W. 2d at 810.

[FN101]. Id. (quoting Moore v. Townsend, 76 Minn. 64, 68 (1899)).

[FN102]. Restatement (Second), supra note 21; compare First Restatement, supra note 17, §§ 430-33, with Restatement (Second), supra note 21, §§ 430-33.

[FN103]. Restatement (Second), supra note 21, §§ 430-33.

[FN104]. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry., 179 N.W. 45 (Minn. 1920). This type of case is referred to in the Draft Revisions as involving "multiple sufficient causal sets." Draft Revisions, supra note 20, § 27, at 68.

[FN105]. 199 P.2d 1 (Cal. 1948).

[FN106]. See, e.g., Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076 (5th Cir. 1973); Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980); Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069 (N.Y. 1989).

[FN107]. See, e.g., Hamil v. Bashline, 392 A.2d 1280, 1286 (Pa. 1978) (asserting that it is "a question for the jury as to whether or not [the] increased risk was a substantial factor in producing the harm").

[FN108]. See infra text accompanying note 197.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN109]. Robertson, supra note 43, at 1777.

[FN110]. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry., 179 N.W. 45 (Minn. 1920); Prosser, supra note 4, § 42.

[FN111]. 416 F.2d 417 (2d Cir. 1969) (applying Connecticut law).

[FN112]. Id. at 419.

[FN113]. Id.

[FN114]. Id.; Restatement (Second), supra note 21, at § 432.

[FN115]. Basko, 416 F.2d at 429 (emphasis added).

[FN116]. 181 F. Supp. 2d 1256 (D. Kan. 2002).

[FN117]. Id. at 1259.

[FN118]. Id. at 1270-71.

[FN119]. Id. at 1270 (internal quotations omitted).

[FN120]. 199 P.2d 1 (Cal. 1948).

[FN121]. Id. at 1-2.

[FN122]. Id. at 3.

[FN123]. Id. at 4.

[FN124]. Draft Revisions, supra note 20, § 28(b), cmt. e, at 95, 118-34.

[FN125]. Id. § 28(b) cmt. f, at 119.

[FN126]. Id. § 28(b) cmt. e, at 118.

[FN127]. Id. § 28(b) cmt. g, at 118-19, 169-71 (observing that when courts in the 1980s were faced with an on-slaught of cases growing out of liability for manufacture of DES, the "near-universal" response was to rebuff these attempts to invoke alternate liability because the plaintiff had not joined all potential defendants); see, e.g., Sindell v. Abbott Labs., 607 P.2d 924, 931 (Cal. 1980); see also Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069, 1082 (N.Y. 1989).

[FN128]. Draft Revisions, supra note 20, § 28(b) cmt. g, at 118-19, 169-71; see, e.g., Burton v. Waller, 502 F.2d 1261, 1280 (5th Cir. 1974) (applying Mississippi law).

[FN129]. Draft Revisions, supra note 20, § 28(b), at 95; see, e.g., Bowman v. Redding & Co., 449 F.2d 956, 968 (D.C. Cir. 1971) (addressing procedural implications).

[FN130]. Note that the Summers opinion found neither that the defendant had been a "substantial factor" in bringing about the harm, nor that the defendant was necessarily liable--rather, the burden of proof was simply

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shifted to the defendant, creating a rebuttable presumption of liability. Summers v. Tice, 199 P.2d 1, 4-5 (Cal. 1948).

[FN131]. Calabresi Interview, supra note 3.

[FN132]. Edward J. Schwartzbauer & Sidney Shindell, Cancer and the Adjudicative Process: The Interface of Environmental Protection and Toxic Tort Law, 14 Am. J.L. & Med. 1, 31-32 (1988).

[FN133]. 588 F. Supp. 247 (D. Utah 1984), rev'd on other grounds, 816 F.2d 1417 (10th Cir. 1987).

[FN134]. Id. at 260.

[FN135]. Id. at 415.

[FN136]. Id. (first emphasis added).

[FN137]. Id.; see also infra Part I.B.3.d for the implications of increased risk on the use of the "substantial factor" doctrine in "loss of chance" cases in medical malpractice.

[FN138]. 653 N.E.2d 661 (Ohio 1995).

[FN139]. Id. at 667.

[FN140]. Id. at 667-68.

[FN141]. Id. at 669.

[FN142]. See, e.g., Sindell v. Abbot Labs., 607 P.2d 924 (Cal. 1980); Conley v. Boyle Drug Co., 570 So. 2d 275 (Fla. 1990); Smith v. Cutter Biological, Inc., 823 P.2d 717 (Haw. 1991); Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069 (N.Y. 1989); Martin v. Abbot Labs., 689 P.2d 368 (Wash. 1984); Collins v. Eli Lilly Co., 342 N.W.2d 37 (Wis. 1984) (finding liability proportional to the risk created, as measured by market share).

[FN143]. Sindell, 607 P.2d at 925; Conley, 570 So. 2d at 279.

[FN144]. See Naomi Sheiner, Comment, DES and a Proposed Theory of Enterprise Liability, 46 Fordham L. Rev. 963 (1978). For examples of DES cases, see Sindell, 607 P.2d at 937 (holding that, after joining the manufacturers of a substantial portion of DES, the burden of proof could be shifted to the defendants); Hymowitz, 539 N.E.2d at 1071-72 (holding that even those defendants who prove that they did not manufacture the DES in question were liable under a market share theory).

[FN145]. Sindell, 607 P.2d at 925-26.

[FN146]. Hymowitz, 539 N.E.2d at 1078 (emphasis added).

[FN147]. Id. at 1078-79 (stating that the court was faced with an "unprecedented identification problem," and that "exceptional circumstances are presented").

[FN148]. See, e.g., Hamilton v. Beretta U.S.A. Corp., 264 F.3d 21 (2d Cir. 2001) (gun manufacturers); Santiago v. Sherwin-Williams Co., 794 F. Supp. 29 (D. Mass. 1992) (lead paint pigmentation); N.Y. Tel. Co. v. AAER Sprayed Insulations, Inc., 250 A.D.2d 49 (N.Y. App. Div. 1998) (asbestos). For a discussion of the implications of extending market share liability theory beyond the confines of DES, compare Aaron Twerski & Anthony J.

Sebok, Liability Without Cause? Further Ruminations on Cause-in-Fact as Applied to Handgun Liability, 32 Conn. L. Rev. 1379 (2000), with John C.P. Goldberg & Benjamin C. Zipursky, Concern for Cause: A Comment on the Twerski-Sebok Plan for Administering Negligent Marketing Claims Against Gun Manufacturers, 32 Conn. L. Rev. 1411 (2000).

[FN149]. 493 F.2d 1076, 1094 (5th Cir. 1973).

[FN150]. Id. at 1081-82.

[FN151]. Id. at 1082.

[FN152]. Id. at 1083. "Mesothelioma is a rare form of cancer... which involves the mesothelial cells of an organ, usually the lungs, heart or abdominal organs." Mesothelioma and Asbestosis Information Resource, Common Questions, at http://www.asbestosismesothelioma.com/common.html (last visited Mar. 27, 2003). Asbestosis is a "serious lung inflammation caused by asbestos exposure that could lead to Mesothelioma." Common Questions, at http:// www.asbestosismesothelioma.com/ (last visited Mar. 27, 2003).

[FN153]. Borel, 493 F.2d at 1094.

[FN154]. Id.

[FN155]. See id.

[FN156]. Brian M. DiMasi, Comment, The Threshold Level of Proof of Asbestos Causation: The "Frequency, Regularity and Proximity Test" and a Modified Summers v. Tice Theory of Burden-Shifting, 24 Cap. U. L. Rev. 735, 741 (1995).

[FN157]. Borel has been followed by the Fourth, Fifth, Sixth, Ninth, Tenth, and D.C. Circuits. See, e.g., Foster v. Am. Home Prods. Corp., 29 F.3d 165, 170 (4th Cir. 1994); King v. Armstrong World Indus., 906 F.2d 1022, 1025 (5th Cir. 1990); Ins. Co. of N. Am. v. Forty-Eight Insulations, 633 F.2d 1212, 1225 (6th Cir. 1980); Van Cleef v. Aeroflex Corp., 657 F.2d 1094, 1099 (9th Cir. 1981); Menne v. Celotex Corp., 861 F.2d 1453, 1470-71 (10th Cir. 1988); Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1038 n.3 (D.C. Cir. 1981). It has also been cited with approval by the First, Seventh, and Eighth Circuits. See, e.g., Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1232 (1st Cir. 1990); Needham v. White Labs., Inc., 639 F.2d 394, 401 (7th Cir. 1981); Karjala v. Johns-Manville Prods. Corp., 523 F.2d 155, 158-59 (8th Cir. 1975). Even in the Second and Third Circuits, where the Courts of Appeals have not expressly condoned Borel, district courts have nonetheless cited to it as persuasive authority. See, e.g., Del Cid v. Beloit Corp., 901 F. Supp. 539, 550 (E.D.N.Y. 1995); Amader v. Pittsburgh Corning Corp., 546 F. Supp. 1033, 1038 (E.D. Pa. 1982).

[FN158]. See DiMasi, supra note 156, at 741.

[FN159]. See Paul Speaker, The Application of the Loss of Chance Doctrine in Class Actions, 21 Rev. Litig. 345, 345 (2001).

[FN160]. See, e.g., Hamil v. Bashline, 392 A.2d 1280 (Pa. 1978). The court stated:

> Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

Id. at 1286.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN161]. Id.

[FN162]. Jones v. Montefiore Hospital, 431 A.2d 920, 923-24 (Pa. 1981); Pipe v. Hamilton, 56 P.3d 823, 825-27 (Kan. 2002).

[FN163]. See, e.g., Cooper v. Sisters of Charity, Inc., 272 N.E.2d 97, 104 (Ohio 1971), overruled by Roberts v. Ohio Permanente Med. Group, Inc., 668 N.E.2d 480 (Ohio 1996). In Cooper, the plaintiff showed evidence supporting the claim that the patient had possessed "a chance... maybe some place around 50%" of survival with surgery, but that the defendant had negligently discharged him several hours prior to his death without taking his vital signs. Id. at 104 (emphasis in original). The trial court directed a verdict for the defendant on the issue of causation, and both the intermediate appellate court and the state Supreme Court affirmed, holding that "the issue of proximate cause can be submitted to a jury only if there is sufficient evidence showing that with proper diagnosis, treatment and surgery the patient probably would have survived." Id. at 104 (emphasis added).

[FN164]. See e.g., Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 399 (Tex. 1993). In a case of first impression for the Texas court, the plaintiff sued the defendant hospital for failure to diagnose cervical cancer, leading to a loss of a less-than-fifty percent chance of survival. Id. The Texas Supreme Court declined to adopt a "loss of chance" rule, explaining that while the law "always settles for some lower threshold of certainty" than absolute proof, "[b]elow reasonable probability, however, we do not believe that a sufficient number of alternative explanations and hypotheses for the cause of the harm are eliminated to permit a judicial determination of responsibility." Id. at 405. The court went on, stating:

> Imperfect as it may be, our legal system attempts to ascertain facts to arrive at the truth. To protect the integrity of that goal, there must be some degree of certainty regarding causation before a jury may determine as fact that a... defendant did cause the plaintiff's injury and should therefore compensate the plaintiff in damages. To dispense with this requirement is to abandon the truth-seeking function of the law.

Id. (quoting Falcon v. Mem'l Hosp., 462 N.W.2d 44, 66 (Mich. 1990)).

[FN165]. Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1368-69 n.53 (1981).

[FN166]. There is an argument to be made, of course, that there is no principled reason for drawing the line for recovery at plaintiffs who have actually suffered the harm sought to be avoided (in the case of this example, a plaintiff who has suffered some reduction in her chance of survival, but has nonetheless survived). But as part of his excellent overview of the "loss of chance" doctrine, Professor David A. Fischer offers a neat reply to this concern. The plaintiff who does not suffer the ultimate harm cannot recover because:

> [U]sing hindsight, we now know that the portion of the chance that defendant destroyed had no real value because plaintiff did not need it to obtain the benefit.... The chance lacked value because it was not a true chance at all. Chance is a concept that arises out of a lack of information. We think that careless shooting in the vicinity of another person creates a risk of harming that person. But if we had full information, including the precise location of the person and the precise direction of the bullet, we would know that the true chance of harm is either 100 percent or 0 percent. [The patient's survival] was like shooting a bullet that missed. We know in hindsight that our estimate of chance was wrong.

David A. Fischer, Tort Recovery for Loss of a Chance, 36 Wake Forest L. Rev. 605, 619 (2001).

[FN167]. Dobbs, supra note 5, at 434-35.

[FN168]. See generally King, supra note 165; see, e.g., Thompson v. Sun City Cmty. Hosp., 688 P.2d 605, 615 (Ariz. 1984); Aasheim v. Humberger, 695 P.2d 824, 828 (Mont. 1985); Perez v. Las Vegas Med. Ctr., 805 P.2d 589, 591 (Nev. 1991); Scafidi v. Seiler, 574 A.2d 398, 407 (N.J. 1990).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN169]. King, supra note 165, at 1376.

[FN170]. Id. at 1377.

[FN171]. Id. at 1376-77.

[FN172]. Id. at 1377.

[FN173]. Id.

[FN174]. Id.

[FN175]. Id.

[FN176]. Id.

[FN177]. Id.

[FN178]. Id.

[FN179]. A number of jurisdictions, however, have expressly rejected the "loss of chance" doctrine. See, e.g., Alfonso v. Lund, 783 F.2d 958, 964-65 (10th Cir. 1986) (applying New Mexico law); Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1020 (Fla. 1984); Manning v. Twin Falls Clinic & Hosp., Inc., 830 P.2d 1185, 1190 (Idaho 1992); Russell v. Subbiah, 500 N.E.2d 138, 141 (Ill. App. Ct. 1986); Watson v. Med. Emergency Servs. Corp., 532 N.E.2d 1191, 1196 (Ind. Ct. App. 1989); Fennell v. S. Md. Hosp. Ctr., Inc., 580 A.2d 206, 214 (Md. 1990); Ladner v. Campbell, 515 So. 2d 882, 888 (Miss. 1987); Pillsbury-Flood v. Portsmouth Hosp., 512 A.2d 1126, 1129-30 (N.H. 1986); Jones v. Owings, 456 S.E.2d 371, 374 (S.C. 1995); Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 407 (Tex. 1993).

[FN180]. 664 P.2d 474, 475 (Wash. 1983).

[FN181]. Id. at 479.

[FN182]. Rather than follow Professor King's logic to its conclusion, allowing for proportional recovery, the majority cited Hamil v. Bashline, 392 A.2d 1280 (Pa. 1978), as support for the position that section 323 of the Restatement (Second) serves "as authority to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury." Herskovits, 664 P.2d at 477 (emphasis added).

[FN183]. Id. at 487 (Pearson, J., concurring).

[FN184]. Id.

[FN185]. 462 N.W.2d 44, 45 (Mich. 1989). This case was subsequently superseded by statute. See Blair v. Hutzel Hosp., 552 N.W.2d 507 (Mich. 1996).

[FN186]. Id. at 45-46.

[FN187]. Id. at 52.

[FN188]. Id. at 51 (quoting Thompson v. Sun City Cmty. Hosp., 688 P.2d 605, 608 (Ariz. 1984)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN189]. Id.

[FN190]. See, e.g., Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978)

[FN191]. 686 P.2d 149 (Kan. 1984).

[FN192]. Id. at 160 (characterizing Cooper as "extreme" and remanding for consideration under the "loss of chance" doctrine).

[FN193]. See, e.g., Mitzelfelt v. Kamrin, 584 A.2d 888, 894 (Pa. 1990); Hamil, 392 A.2d at 1283.

[FN194]. Draft Revisions, supra note 20, § 26 cmt. n, at 67-68.

[FN195]. Id.; see infra Part III.A.1.c.

[FN196]. Preliminary Draft, supra note 34, Foreword.

[FN197]. Brim v. Wertz, 35 Pa. D. & C.4th 277, 285 n.5 (1996).

[FN198]. See, e.g., Colosi v. Sec'y of the Dep't of Health & Human Servs., No. 02-310V, 2002 U.S. Claims LEXIS 312, at *6 (Ct. Cl. Oct. 30, 2002) (holding that plaintiff must not only show "but for" causation, "but also that the [tortious act] was a substantial factor in bringing about her injury"); Bell v. Sec. of the Dep't Health & Human Servs., No. 99-128V, 2001 U.S. Claims LEXIS 23, at *28 (Ct. Cl. Feb. 6, 2001) (ruling that the plaintiff "must not only show that but for the [wrongful act], he or she would not have had the injury, but also that the [wrongful act] was a substantial factor in bringing about his or her injury").

[FN199]. Calabresi Interview, supra note 3.

[FN200]. See infra Part II.A.

[FN201]. See infra Part II.B.

[FN202]. See infra Part II.

[FN203]. See, e.g., Richard A. Epstein, A Theory of Strict Liability, 2 J. Legal Stud. 151, 160-61 (1973) (arguing that the "but for" test is flawed because it treats too many conditions as causes); Wright, Once More into the Bramble Bush, supra note 1 (arguing that the "but for" test is underinclusive, and offering a modified NESS test as a replacement). It may be that this perspective is more in keeping with the intention of the drafters of the original Restatement. See supra Part I.B.3.e.

[FN204]. It is also interesting to note that some courts have disregarded the "but for" test in cases where it would be overly inclusive. See, e.g., Connellan v. Coffey, 187 A. 901, 903. (Conn. 1936) (holding that "[i]f the chain of causation... includes an act or omission which... is or becomes of no consequence in the results or so trivial as to be a mere incident of the operating cause, it is not such a factor as will impose liability for those results"); Huey v. Milligan 175 N.E.2d 698, 701 (Ind. 1961) (holding that under contributory negligence doctrine, only negligence which "directly or proximately contributed to the injury" would function as a bar to plaintiff's recovery); Golden v. Lerch Bros., 281 N.W. 249, 252 (Minn. 1938) (finding that the "factual situation utterly fails to establish that [the defendant's] acts or failure to act was a material element or substantial factor in the happening of the harm to plaintiff" (emphasis added)). In general, though, these concerns are addressed in contemporary causation analysis under the rubric of proximate cause. See supra notes 3-19 and accompanying text.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN205]. See, e.g., Zuchowicz v. United States, 140 F.3d 381, 388 n.6 (2d Cir. 1998) (applying Connecticut law); Basko v. Sterling Drug, Inc., 416 F.2d 417, 430 (2d Cir. 1969) (applying Connecticut law); Vincent v. Fairbanks Mem'l Hosp., 862 P.2d 847, 854 (Alaska 1993); see also H.L.A. Hart & A.M. Honoré, Causation in the Law 124 (1959); Jane Stapleton, Legal Cause: Cause-in-Fact and the Scope of Liability for Consequences, 54 Vand. L. Rev. 941, 968 (2001).

[FN206]. See Draft Revisions, supra note 20, § 27.

[FN207]. See, e.g., Aasheim v. Humberger, 695 P.2d 824, 828 (Mont. 1985); Herskovitz v. Group Health Coop., 664 P.2d 474, 477-79 (Wash. 1983). For a discussion of the "loss of chance" doctrine, see supra Part I.B.3.d.

[FN208]. Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co., 179 N.W. 45, 45-46 (Minn. 1920); Kingston v. Chicago & N.W. Ry. Co., 211 N.W. 913, 914 (Wis. 1927).

[FN209]. Corey v. Havener, 65 N.E. 69, 69 (Mass. 1902).

[FN210]. Landers v. E. Tex. Salt Water Disposal Co., 248 S.W.2d 731, 731-32 (Tex. 1952).

[FN211]. Peter Cane, Atiyah's Accidents, Compensation and Tte Law 95-97 (6th ed. 1999) (asserting the "unfairness" of this result); Dobbs, supra note 5, at 415 (arguing that a strict application of the "but for" test in such cases "leads to a result that is almost always condemned as violating both an intuitive sense of causation, and good legal policy").

[FN212]. James E. Viator, Note, When Cause-In-Fact is More than a Fact: The Malone-Green Debate on The Role of Policy in Determining Factual Causation in Tort Law, 44 La. L. Rev. 1519, 1531 (1984) ("Clearly, to permit the multiple defendants to escape liability by endlessly passing the hot-potato of sufficient cause back and forth between them would offend the principle of retribution.").

[FN213]. For the argument that the "but for" test creates a windfall by relieving independent, causally adequate tortfeasors see Thomas A. Eaton, Causation in Constitutional Torts, 67 Iowa L. Rev. 443, 460-61 (1982).

[FN214]. Id.

[FN215]. Mark F. Grady, Proximate Cause and the Law of Negligence, 69 Iowa L. Rev. 363, 392 (1984) (citation omitted).

[FN216]. Leon Green, The Causal Relation Issue in Negligence Law, 60 Mich. L. Rev. 543, 556 (1962).

[FN217]. Id. at 557.

[FN218]. Id.

[FN219]. Leon Green, Are There Dependable Rules of Causation?, 77 U. Pa. L. Rev. 601, 605 (1929) (citation omitted).

[FN220]. Id.

[FN221]. E. Wayne Thode, The Indefensible Use of the Hypothetical Case to Determine Cause In Fact, 46 Tex. L. Rev. 423, 431 (1968).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN222]. Id. at 430-31.

[FN223]. See Dobbs, supra note 5, at 409 (asserting the need for a separation between the factual inquiry and policy analysis).

[FN224]. See, e.g., Barbara A. Spellman & Alexandra Kincannon, The Relation Between Counterfactual ("But For") and Causal Reasoning: Experimental Findings and Implications for Jurors' Decisions, 64 Law & Contemp. Probs. 241 (2001).

[FN225]. Id. at 250.

[FN226]. Id.

[FN227]. Id.

[FN228]. Id.

[FN229]. Id. at 243-44. For example:
    Early empirical support for the belief came from a study in which subjects read a story about a woman who was taken out to dinner by her boss. The boss orders dinner for both of them, but the dish contains an ingredient--wine--to which the woman is allergic. She eats the dish, gets sick, and dies. In both conditions of the experiment the boss had considered ordering something else: In one condition (one-wine), the other dish did not contain the fatal ingredient; in the other condition (two-wine), the other dish also contained wine. Subjects were asked to list four things that could have been different in the story to prevent the woman's death (mutation task) and to rate how much of a causal role the boss's decision to order that dish played in her death. Subjects in the one-wine condition--where the alternative choice did not contain wine--were more willing to mutate the selection of the dish and rated the boss's decision as more causal.
Id. at 249.

[FN230]. Id. at 244.

[FN231]. Id. at 245.

[FN232]. In the nomenclature of the Draft Revisions, multiple sufficient causes occur where there are two forces, operating independently, and each is sufficient to cause the harm. Draft Revisions, supra note 20, § 27, at 68. Alternatively, multiple necessary causes are members of a causal set which are in themselves necessary to cause the harm, even if they are insufficient to do so by themselves. Id. at 73. Under the logic of the Draft Revisions, the latter are factual causes by virtue of the "but for" test, while the former are covered under the exception outlined by § 27. Id. § 26 cmt. i, at 37-38, 56.

[FN233]. Spellman & Kincannon, supra note 224, at 251.

[FN234]. Id.

[FN235]. Id. at 251-52.

[FN236]. Id. at 252.

[FN237]. Id. at 253.

[FN238]. Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN239]. Id.

[FN240]. Id.

[FN241]. Id. at 254. When told a story of multiple sufficient causation (i.e., either fire alone would have caused the whole building to burn), most subjects "mutated" the involvement of both actors (forty-six percent to seventeen percent), and when told a story of multiple necessary causes (i.e., each fire alone would have only caused half the building to burn), most subjects "mutated" only one of the actors (fifty percent to twenty-eight percent). More significant, when asked to assign causation, subjects assigned more causality to the wind and the lightning in the "sufficient" scenario, where hypothetically changing it would have made no difference, than in the "necessary" hypothetical, where its absence would have changed the resultant harm. Id.

[FN242]. Id. at 254.

[FN243]. Judith Jarvis Thomson, Causality and Rights: Some Preliminaries, 63 Chi.-Kent L. Rev. 471, 483-84 (1987).

[FN244]. Id. at 495.

[FN245]. Id. at 494.

[FN246]. Id.

[FN247]. Id. at 495. This passage is an interesting, if unintended, foreshadowing of the ALI's renunciation of the use of § 323 of the Restatement (Second) to reduce the standard of causation in "loss of chance" cases. Draft Revisions, supra note 20, § 26 cmt. n, at 67-68. The Draft Revisions point out that the principle contained in § 323 of the Restatement (Second) is relevant only to the question of duty, not causation. Id. § 26, at 67. Given this argument, one might be forgiven for challenging the ALI drafters as to how a duty analysis (which, as Professor Thomson points out here, is inherent to the factual causation inquiry in cases involving tortious omissions) fits into their proposal to firmly commit the ALI to the "but for" test in all cases, both those involving torts of commission and those of omission. See infra text accompanying notes 358-61.

[FN248]. Thomson, supra note 243, at 495.

[FN249]. Id.

[FN250]. Wright, supra note 61, at 1774.

[FN251]. Id. at 1776.

[FN252]. Id.

[FN253]. Id.

[FN254]. Id. at 1789.

[FN255]. Id. at 1788.

[FN256]. Id. at 1776.

[FN257]. Id.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN258]. Fumerton & Kress, supra note 58 at 83, 102.

[FN259]. Id. at 104-05.

[FN260]. Id.

[FN261]. Id. at 102.

[FN262]. Wright, supra note 61, at 1782 (emphasis in original).

[FN263]. Id.

[FN264]. 941 P.2d 1203, 1214 (Cal. 1997).

[FN265]. Id.

[FN266]. Id.

[FN267]. Id.

[FN268]. See id. at 1213-25.

[FN269]. 140 F.3d 381 (2d Cir. 1998) (Calabresi, J.).

[FN270]. Id. at 388-89.

[FN271]. No. 97-518V, 2000 U.S. Claims LEXIS 12 (Ct. Cl. Jan. 19, 2000).

[FN272]. Id. at 25 (emphasis added).

[FN273]. 297 F.3d 66 (2d Cir. 2002).

[FN274]. Id. at 72 n.8 (internal quotations omitted).

[FN275]. Id. at 73 (internal quotations omitted).

[FN276]. See id.; Zuchowicz v. United States, 140 F.3d 381, 388-89 (2d Cir. 1998).

[FN277]. Draft Revisions, supra note 20, § 26 cmt. j, at 39.

[FN278]. 393 N.W.2d 131 (Iowa 1986).

[FN279]. Id. at 138 n.3 (internal quotations omitted).

[FN280]. 851 S.W.2d 646 (Mo. 1993) (internal quotations omitted).

[FN281]. Id. at 654.

[FN282]. See Prosser, supra note 4, § 41, at 248.

[FN283]. 938 P.2d 1065 (Alaska 1997).

[FN284]. Id. at 1074.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN285]. Id.

[FN286]. Prosser, supra note 4, § 42.

[FN287]. Vern R. Walker, Direct Inference in the Lost Chance Cases: Factfinding Constraints Under Minimal Fairness to Parties, 23 Hofstra L. Rev. 247, 301 (1994).

[FN288]. Amy J. Vyhlidal, Note, Concurrent Omission: How Should Liability be Allocated? Haag v. Bongers, 256 Neb. 170, 589 N.W.2d 318 (1999), 78 Neb. L. Rev. 925, 926 (1999).

[FN289]. Aaron Gershonowitz, What Must Cause Injury in Products Liability?, 62 Ind. L.J. 701, 707 (1987).

[FN290]. Draft Revisions, supra note 20, § 27, at 68.

[FN291]. Id. § 28(b); see Summers v. Tice, 199 P.2d 1, 4-5 (Cal. 1948).

[FN292]. Id. § 29.

[FN293]. Id. § 26 cmt. n, at 65.

[FN294]. Id. § 27 illus. 1, at 69.

[FN295]. Id. § 28(b).

[FN296]. Id. § 29.

[FN297]. Id. § 26 cmt. j.

[FN298]. See Draft Revisions, supra note 20, § 26 cmt. b, at 30, 46-48.

[FN299]. See Restatement (Second), supra note 21, at § 432.

[FN300]. Draft Revisions, supra note 20, § 26 cmt. j, at 39 (citation omitted).

[FN301]. Id.

[FN302]. See supra Part I.B.2.

[FN303]. See, e.g., Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203, 1214 (Cal. 1997).

[FN304]. Restatement (Second), supra note 21, §§ 430-33.

[FN305]. Draft Revisions, supra note 20, § 26 cmt. a, at 30 (admitting that "[d]espite the venerability of the 'legal cause' term in Restatement history, it has not been widely adopted in judicial and legal discourse nor is it helpful in explicating the ground that it covers").

[FN306]. Id. The Reporter offers no explaination for the discrepancy between the reference here to "judicial and legal discourse" as a standard for the success of the "legal cause" nomenclature, and the apparent opinion of the ALI that the virtual omnipressence of the "substantial factor" doctrine in causation jurisprudence is of little significance. Compare id. § 26 cmt. a, with id. § 26 cmt. j; see also supra note 21 and accompanying text.

[FN307]. Draft Revisions, supra note 20, § 26 cmt. a, at 29-30.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN308]. Draft Revisions, supra note 20, § 26 cmt. c, at 30.

[FN309]. Draft Revisions, supra note 20, § 26, at 30-31 (parenthetical omitted). The Draft Revisions' use of the language of "causal sets" seems on the surface to have been influenced by Professor Richard Wright. See Wright, Pruning the Bramble Bush, supra note 1, at 1018-42 (arguing for a replacement of counterfactual "but for" analysis with a proactive inquiry into whether the tortious act was a "Necessary Element of a Sufficient Set" (the "NESS" test), or whether the act was part of a causal set which was in itself sufficient to bring about the injury). Professor Wright was himself admittedly influenced by H.L.A. Hart and A.M. Honoré's seminal work, Causation in the Law. Id. at 1001-10. But Wright's influence on the ALI's Draft Revisions seems to be in form rather than substance. The key aspect of the NESS test--a shift from counterfactual analysis to a proactive inquiry into what actually happened--is notably missing from the Draft Revisions' firm commitment to the counterfactual nature of the "but for" analysis. See Draft Revisions, supra note 20, § 26 cmt. e, at 33 (asserting that a determination of factual cause "requires a counterfactual inquiry" (emphasis added)).

[FN310]. Draft Revisions, supra note 20, § 27, at 68-94.

[FN311]. Id.

[FN312]. Draft Revisions, supra note 20, § 27 cmt. f., at 73.

[FN313]. Id; see, e.g., Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203, 1206 (Cal. 1997) (holding that plaintiff need only prove that "the defendant's asbestos products was, in reasonable medical probability, a substantial factor in causing or contributing to his risk of developing cancer," and that the plaintiff "need not prove... that fibers from a particular defendant's asbestos-containing products were those, or among those, that actually began the cellular process of malignancy" (first two emphases added)).

[FN314]. Draft Revisions, supra note 20, § 27 cmt. f, at 73-75, 85-88.

[FN315]. Restatement (Second), supra note 21, § 433B.

[FN316]. Draft Revisions, supra note 20, § 28(b), at 95.

[FN317]. Id.; The Restatement (Second), supra note 21, § 433B(2), states:
Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

[FN318]. Draft Revisions, supra note 20, § 28(b), at 95.

[FN319]. This is the goal of the Restatements, according to the ALI's website at ht-tp://www.ali.org/ali/thisali.htm (last visited on Apr. 3, 2003).

[FN320]. Id.

[FN321]. Id.

[FN322]. See, e.g., Freeman v. Hoffman-LaRoche, Inc., 618 N.W.2d 827, 840 (Neb. 2000) (stating that § 6(c) of the Restatement (Third) "has no basis in the case law," and declining to adopt it, in favor of § 402(a) of the Re-statement (Second)); Frank J. Vandall, The American Law Institute Is Dead in the Water, 26 Hofstra L. Rev. 801 (1998) (arguing that the rejection of the consumer expectations rule in the ALI's treatment of product liability in

the Restatement (Third) is not a fair reflection of the state of the law); Calabresi Interview, supra note 3 (questioning the utility of ALI prescriptions for the law); see also Monroe H. Freedman, Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements, 26 Hofstra L. Rev. 641, 660 (1998) (arguing that "[c]onflicts of interest on the part of members of the ALI have called into question the integrity of ALI Restatements of the Law"). But see Victor E. Schwartz, The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance, 10 Kan. J.L. & Pub. Pol'y 41 (2000) (asserting that the Restatement (Third) "favors [neither] plaintiffs nor defendants [and] is based on case law written by America's judges").

[FN323]. See Draft Revisions, supra note 20, §§ 26-28, at 45-68, 80-94, 134-190. The Reporters' Notes are written by Michael D. Green and William Charles Powers, Jr., and represent their views. See supra note 31.

[FN324]. Draft Revisions, supra note 20, § 26 cmt. b, at 46.

[FN325]. Draft Revisions, supra note 20, § 26 cmt. b, at 46-47. These jurisdictions include New Jersey (Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 73-75 (3d Cir. 1996)), Pennsylvania (Robertson v. Allied Signal, Inc., 914 F.2d 360, 366-68 (3d Cir. 1990)), Indiana (Collins v. Am. Optometric Ass'n, 693 F.2d 636, 640-41 (7th Cir. 1982)), the Federal Circuit (Bunting v. Sec'y of Health & Human Servs., 931 F.2d 867, 871-73 (Fed. Cir. 1991)), Alaska (Vincent v. Fairbanks Mem'l Hosp., 862 P.2d 847, 851-52 (Alaska 1993)), Connecticut (Stewart v. Federated Dep't Stores, Inc., 662 A.2d 753, 757-59 (Conn. 1995), Delaware (Culver v. Bennett, 588 A.2d 1094, 1096-97 (Del. 1991)), Florida (Sardell v. Malanio, 202 So. 2d 746, 747 (Fla. 1967)), Iowa (Gerst v. Marshall, 549 N.W.2d 810, 816-17 (Iowa 1996)), Missouri (Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852 (Mo. 1993)), Montana (Young v. Flathead County, 757 P.2d 772, 777 (Mont. 1988)), Nebraska (Union Pac. R.R. Co. v. Kaiser Agric. Chem. Co., 425 N.W.2d 872, 881 (Neb. 1988)), New Hampshire (Bronson v. Hitchcock Clinic, 677 A.2d 665, 668 (N.H. 1996)), South Carolina (Olson v. Faculty House of Carolina, Inc., 544 S.E.2d 38 (S.C. 2001)), and Washington (Daugert v. Pappas, 704 P.2d 600, 605-06 (Wash. 1985)). Draft Revisions, supra note 20, § 26 cmt. b, at 46-47.

[FN326]. These citations include such divergent authors as Wex S. Malone, Patrick Atiyah, Arno C. Becht, Frank W. Miller, Guido Calabresi, David A. Fischer, Michael S. Moore, David W. Robertson, Jane Stapleton, Glanville Williams, and Richard W. Wright. Draft Revisions, supra note 20, § 26 cmt. b, at 47-48.

[FN327]. Draft Revisions, supra note 20, § 26 cmt. b, at 46-48.

[FN328]. Draft Revisions, supra note 20, § 26 cmt. j, at 56-63.

[FN329]. Id. at 56.

[FN330]. Id. at 61. In support of this assertion, the Reporters cite Arno C. Becht, Frank W. Miller, Dan B. Dobbs, Bert Black, David H. Hollander, Jr., William V. Dorsaneo III, Leon Green, Charles O. Gregory, David W. Robertson, Jane Stapleton, Robert Strassfeld, Richard Wright, and the seminal work of H.L.A. Hart and A.M. Honoré. Id. at 61-62.

[FN331]. Draft Revisions, supra note 20, § 26 cmt. j, at 57.

[FN332]. See supra note 19 and accompanying text.

[FN333]. Draft Revisions, supra note 20, § 26 cmt. j, at 57 (citing Robertson, supra note 43, at 1777-78).

[FN334]. Id. at 56-63.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN335]. Id. at 57.

[FN336]. Id. Jurisdictions cited as representing the notion that "substantial factor" is a higher standard than "but for" standing alone include the Federal Circuit (Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)), Idaho (Challis Irrigation Co. v. State, 689 P.2d 230, 235 (Idaho Ct. App. 1984)), Delaware (Culver v. Bennett, 588 A.2d 1094 (Del. 1991)), and Iowa (Ten Hagen v. DeNooy, 563 N.W.2d 4 (Iowa 1997)). Draft Revisions, supra note 20, § 26 cmt. j, at 63. Jurisdictions cited for a construction of the "substantial factor" doctrine as something less than "but for" include Indiana (Mayhue v. Sparkman, 653 N.E.2d 1384 (Ind. 1995)), Kansas (Roberson v. Counselman, 686 P.2d 149 (Kan. 1984)), and New Jersey (Hake v. Manchester Township, 486 A.2d 836 (N.J. 1985)). Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN337]. Draft Revisions, supra note 20, § 26 cmt. j, at 56.

[FN338]. Am. Law Inst., About the ALI, at http:// www.ali.org/ali/thisali.htm (last visited Apr. 3, 2003).

[FN339]. See infra Part III.A.

[FN340]. See infra Part III.B.

[FN341]. Id.

[FN342]. See infra Part III.B.4.

[FN343]. Cf. Winston Churchill, Remarks in the House of Commons (Nov. 11, 1947), reprinted in The Political Resource Page, available at http:// www.politicalresource.net/winston_churchill_quotations.html (last visited Apr. 3, 2003) ("Many forms of Government have been tried, and will be tried in this world of sin and woe. No one pretends that democracy is perfect or all-wise. Indeed, it has been said that democracy is the worst form of government except all those other forms that have been tried from time to time.").

[FN344]. See supra Part II.A.

[FN345]. See supra text accompanying note 63.

[FN346]. See supra text accompanying note 53-54.

[FN347]. See supra text accompanying notes 58-60.

[FN348]. See supra Part II.B.

[FN349]. Id.

[FN350]. Id.

[FN351]. See Vacco v. Quill, 521 U.S. 793, 799 (1997) (noting that the Equal Protection Clause of the Fourteenth Amendment "embodies a general rule that States must treat like cases alike").

[FN352]. 941 P.2d 1203, 1206-07 (Cal. 1997) (holding that "the plaintiff must, in accordance with traditional tort principles, demonstrate to a reasonable... probability that a product or products supplied by the defendant, to which he became exposed, were a substantial factor in causing his disease or risk of injuries" (emphasis added)). Interestingly, the Draft Revisions cite this case as support for § 27. Draft Revisions, § 27 cmt. g, at 85.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN353]. 853 F.2d 398, 417 (6th Cir. 1988) (holding that "[o]nce a prima facie case has been established, the trier of fact must determine whether the defendant's conduct was a substantial factor in bringing about the injury of which plaintiff complains" (emphasis added)).

[FN354]. 798 A.2d 67, 75 (N.J. 2002) (expressly declining to abolish the "substantial factor" test on the grounds of its vagueness and confusion, and stating that when there are two or more causes to an injury, each individual cause "need not... be capable of producing the injury; it is enough if [the cause in question is] a substantial factor in bringing [the injury] about" (emphasis added)).

[FN355]. Cal. Jury Inst. (Civil), BAJI 3.76 (2002) [hereinafter California Jury Instructions] (stating that a cause of an injury, damage, loss or harm is "something that is a substantial factor in bringing [it] about" (emphasis added)).

[FN356]. N.J. Model Jury Charges (Civil), Ch. 7.10 (1998/1999) (requiring for a showing of causation that the defendant's act was "a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about" (emphasis added)). It is perhaps significant to note that while this language may suggest a "but for" -plus test in theory, Reynolds suggests precisely the opposite in practice. 798 A.2d at 75 (stating that application of the "substantial factor" test is a "reduced burden of proof of causation").

[FN357]. N.Y. Pattern Jury Inst., PJI 2:70 ("An act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury." (emphasis added)).

[FN358]. Draft Revisions, supra note 20, § 26 cmt. n, at 42-44.

[FN359]. See supra Part I.B.3.d.

[FN360]. Calabresi Interview, supra note 3.

[FN361]. See supra Part I.B.3.d.

[FN362]. See supra Part II.C.2.

[FN363]. See id.

[FN364]. Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN365]. 165 F.3d 1344, 1352-53 (Fed. Cir. 1999).

[FN366]. Id. at 1348 (citations omitted in original).

[FN367]. Id. at 1352 (emphasis added).

[FN368]. Restatement (Second), supra note 21, § 431 cmt. d.

[FN369]. Id. §§ 435-39. This category includes sections on foreseeability, intended consequences, unintended consequences of intended invasions, and so on.

[FN370]. Id. Superceding Cause includes sections on superceding cause, intervening cause, acts done under impulsion of emotional disturbance, and harm increased or accelerated by extraordinary forces of nature. Restatement (Second), supra note 21, §§ 440-53.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN371]. 165 F.3d at 1352. This category includes sections on insanity, mitigation, and exacerbation of harm by unforeseeable circumstances. Restatement (Second), supra note 21, §§ 454-61.

[FN372]. See Draft Revisions, supra note 20, § 26, at 29.

[FN373]. 689 P.2d 230 (Idaho 1984); Draft Revisions, supra note 20, § 26, at 63.

[FN374]. Challis, 689 P.2d at 233-34.

[FN375]. Id. at 235 (internal quotations and citation omitted).

[FN376]. Id.

[FN377]. Id.

[FN378]. Id.

[FN379]. Id.

[FN380]. Id. at 236.

[FN381]. Id. (emphasis added).

[FN382]. Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN383]. 588 A.2d 1094 (Del. 1991).

[FN384]. Id. at 1099.

[FN385]. Id.

[FN386]. Id. at 1097 (internal quotations omitted, alterations in original).

[FN387]. Id. at 1096 (quoting Wainwright v. State, 504 A.2d 1096, 1100 (Del. 1986), as stating that "[u]nder the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." (citation omitted)).

[FN388]. Culver, 588 A.2d at 1099.

[FN389]. 563 N.W.2d 4 (Iowa Ct. App. 1997).

[FN390]. Id. at 8. The court held that:
[I]n order to be a proximate cause of plaintiff's injuries, it is not enough to assert that the harm to plaintiff would not have occurred had defendants not been negligent. Although a finding of negligence is necessary, it is not, standing alone, sufficient. The fault or negligence of a defendant must also be a substantial factor in bringing about plaintiff's harm.
Id.(emphasis added).
[FN391]. Id.

[FN392]. Draft Revisions, supra note 20, §26 cmt. j, at 63.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN393]. Id.

[FN394]. Id. § 26 cmt. n., at 65-68.

[FN395]. Id. at 63.

[FN396]. Id.

[FN397]. 486 A.2d 836 (N.J. 1985).

[FN398]. Id. at 838.

[FN399]. Id. at 839.

[FN400]. Id. Whether he had been taken into custody was disputed at trial. Id.

[FN401]. Id. at 840.

[FN402]. Id.

[FN403]. Id.

[FN404]. Id.

[FN405]. Id. at 841.

[FN406]. Id. (internal citations and quotation marks omitted).

[FN407]. Id.

[FN408]. See id. at 839-41. For a discussion of the problems created by this fusion of the duty inquiry and the investigation into factual cause, see supra notes 243-49 and accompanying text.

[FN409]. Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN410]. See infra Part I.B.3.d.

[FN411]. See generally King, supra note 165. Thus, in a "loss of chance" case, there is a recognition of the chance of survival as a thing of value in itself, and the injury for which the plaintiff seeks recovery is understood to encompass the loss of some portion of that chance. Id. at 1396-97.

[FN412]. See infra Part I.B.3.d. Jurisdictions cited by the Reporters as adhering to this approach include Arizona, Indiana, Iowa, Montana, Oklahoma, Pennsylvania, Washington, and West Virginia. Draft Revisions, supra note 20, § 26 cmt. n, at 67.

[FN413]. Draft Revisions, supra note 20, § 26 cmt. n, at 43.

[FN414]. Id. § 26 cmt. n, at 44.

[FN415]. 819 P.2d 872 (Cal. 1991).

[FN416]. Draft Revisions, supra note 20, § 26 cmt. j at 63; Id. § 26 cmt. n., 65-68.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN417]. Draft Revisions, supra note 20, § 26 cmt. j, at 62.

[FN418]. Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203, 1214 (Cal. 1997). Interestingly, the Rutherford court cited Mitchell for that very proposition. Id.

[FN419]. California Jury Instructions, supra note 355.

[FN420]. Id.

[FN421]. 862 P.2d 847 (Alaska 1993).

[FN422]. Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN423]. Vincent, 862 P.2d at 854.

[FN424]. Id. (Burke, J., dissenting) (stating that Justice Burke was "unable to agree that the error in the trial court's instructions to the jury was harmless").

[FN425]. Compare Alaska's Pattern Jury Instruction on the Subject of Legal Cause, Alaska Pat. Jur. Inst., Art. 3.06, available at http:// www.state.ak.us/courts/juryins.htm, with Restatement (Second), supra note 21, §§ 430-33.

       A legal cause of harm is an act or failure to act which is a substantial factor in bring[ing] about the harm. An act or failure to act is a substantial factor in bringing about harm if it is more likely true than not true that:

       1. the act or failure to act was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it; and

       2. the harm would not have occurred but for the act or failure to act.

       [There is, however, one exception to the requirement that the harm would not have occurred but for the act, or failure to act, of the defendant. If two forces operated to cause the harm, one because of the defendant and the other not, and each force by itself was sufficient to cause the harm, then the defendant's act or failure to act is a cause of the harm if it was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it.]

Alaska Pat. Jur. Inst., Art. 3.06, supra (bracketed text in original).

[FN426]. 704 P.2d 600 (Wash. 1985).

[FN427]. Draft Revisions, supra note 20, § 26 cmt. j, at 63.

[FN428]. Dougert, 704 P.2d at 604-06.

[FN429]. Herskovits v. Group Health Coop., 664 P.2d 474 (Wash. 1983).

[FN430]. Draft Revisions, supra note 20, § 26 cmt. n, at 67.

[FN431]. See id. (arguing that reliance on § 323 for "loss of chance" cases is "misplaced," and urging the use of the formula allowing only proportional recovery).

[FN432]. Id.

[FN433]. Calabresi Interview, supra note 3.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN434]. Id.

[FN435]. Id.

[FN436]. Id.

[FN437]. Id.

[FN438]. Id.

[FN439]. See supra Part III.A.

[FN440]. Calabresi Interview, supra note 3.

[FN441]. Id.

[FN442]. Id.

[FN443]. Id.

[FN444]. See supra text accompanying note 2.

[FN445]. Id.
71 Fordham L. Rev. 2679

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.