# EXHIBIT 107

Westlaw.

62 Wash. & Lee L. Rev. 873                                                                                Page 1

C

Washington and Lee Law Review
Summer, 2005

Article

*873 THE CHALLENGE TO THE INDIVIDUAL CAUSATION REQUIREMENT IN MASS PRODUCTS
TORTS

Donald G. Gifford [FNa1]

Copyright (c) 2005 Washington and Lee University School of Law; Donald G. Gifford

*874 I. Introduction

The transcendent issue in American tort law has always been whether a victim can recover from the injurer without a showing of fault on the part of the injurer. [FN1] More recently, however, the basic demarcation between those categories of tort law in which fault is required for liability and those in which it is not seems comparatively stable. [FN2] Meanwhile, a second, even more *875 fundamental aspect of traditional tort law is under assault, both within the realm of theory and in the litigation system itself. With or without a requirement that the plaintiff prove that the injurer acted with fault in order to recover, tort law traditionally accepted the notion that a particular plaintiff must prove that a particular defendant's acts caused the plaintiff's injuries. [FN3] Yet during the past quarter-century, this requirement has been challenged, particularly in mass products torts [FN4] and in environmental cases. [FN5] As early as 1987, legal philosopher Judith Jarvis Thomson observed, "Fault went first . . . [n]ow cause is going." [FN6]

Much has happened since then. The signature torts of our time are no longer motor vehicle accidents in which an individual plaintiff sues an individual defendant whose actions can be causally connected with a specific victim's harm. Claims against manufacturers of tobacco products, handguns, lead pigment, and many other mass products are generally brought on behalf of *876 collective plaintiffs-usually either class action representatives or states or municipalities seeking reimbursement of amounts paid to Medicaid recipients as a result of the harms caused. In these actions and other cases against manufacturers of mass products, the identity of the party that manufactured the product that caused any individual victim's harm frequently is unknown. Instead, plaintiffs seek to impose liability on defendant-manufacturers collectively, through various legal theories including civil conspiracy or concert of action, alternative liability, and market share liability.

Operating together, the collective plaintiff and the collective or indeterminate defendant fundamentally challenge the traditional requirement of individualized causation in tort law. No longer, at least in the important subset of tort liability known as mass products torts, is tort law focused on the costs of an accident, that is, seeking compensation for an individual victim from an identified wrongdoer for harm caused during a discrete event. Today, tort litigation is often explicitly intended as the chosen vehicle to address social problems such as handgun violence, tobacco-related diseases, and childhood lead poisoning. Control of the litigation in these high profile mass torts cases has shifted from an individual wronged party and her counsel to lawyers representing governmental or other collective entities suing in relation to harms suffered by thousands or even hundreds of thousands of victims. [FN7]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The challenge to the traditional requirement of individual causation also has been at the core of the revitalized debate among tort scholars during the past generation as to what constitutes the fundamental essence of tort law. Two very different conceptions of the theory of torts have emerged. [FN8] Law and *877 economics and other instrumental conceptions of tort law-most often identified with the views of Guido Calabresi [FN9] and Richard Posner [FN10]-posit that tort law pursues policy objectives derived from the needs of the society external to the legal system, such as wealth maximization, accident prevention, or the goal of distributing losses on a widespread basis. Instrumental theorists typically do not believe that it is necessary for a particular victim of harm to identify the particular injurer who caused her specific harm in order to recover. William Landes and Richard Posner, who share an instrumental conception of tort law, have virtually mocked any requirement of individual causation: "[C]ausation in the law is an inarticulate groping for economically sound solutions. . . ." [FN11] In short, those with an instrumental conception of tort law generally view any requirement of particularity in causation as "old fashioned" and likely to impede their goals.

The instrumental assault on traditional tort law causation principles, however, has provoked a strong response from those who view the tort system as pursuing corrective justice; that is, as a means of requiring the injuring party to repair the losses caused by his or her wrongful conduct. Ernest Weinrib and other corrective justice scholars argue that intrinsic to the entire notion of tort liability is the idea that a particular victim must prove that his harm was caused by a particular injurer. [FN12]

This Article begins, in Part II, with a brief summary of the debate between the proponents of the instrumental and the proponents of the corrective justice conception of tort. This debate addresses such overarching issues as the goals of tort law and the justification for tort liability. Perhaps more than on any other concrete issue, however, the proponents of the two approaches divide on the question whether a particular victim must prove that a particular injurer caused her injury as a prerequisite for recovery.

During the same decades that this debate over the grand theory of tort law has raged, courts have encountered mass products torts cases in which the existence of a continuing requirement of individual causation, if left intact, would prove decisive in denying liability for the victims' losses. The attack upon the particular victim/particular injurer paradigm of tort *878 liability first reached a critical threshold in the 1970s and the 1980s when victims of asbestos-related diseases joined in class actions [FN13] and consolidated cases [FN14] to sue asbestos products manufacturers and often were unable to identify the specific manufacturers whose products caused their illnesses. [FN15] Similarly, the individual causation requirement also posed an insurmountable barrier to lead- poisoned children [FN16] and Vietnam veterans suffering from diseases caused by the defoliant Agent Orange [FN17] and seeking compensation from product manufacturers.

Sindell v. Abbott Laboratories, [FN18] probably the classic causation case of that era, was the unusual exception in which plaintiffs recovered. The facts in Sindell illustrate the causation problem faced by victims of mass products torts. The plaintiff sued on behalf of herself and other similarly situated women suffering from cancerous and pre-cancerous growths that allegedly resulted from their mothers' consumption, at least ten or twelve years earlier, of diethylstilbestrol (DES), a synthetic compound of estrogen *879 intended to prevent miscarriages in pregnant women. [FN19] She lacked the means to identify which pharmaceutical company manufactured the DES consumed by her mother because the eleven drug companies named in the complaint and scores of additional drug companies used an identical chemical formula for the drug, which was approved by the federal Food and Drug Administration. The plaintiff admitted that she could not identify which company had manufactured the drug responsible for her injury, and accordingly, the trial court dismissed the complaint. [FN20] The California Supreme Court, however, reversed the case on appeal and introduced the concept of market share liability, a form of causation that dispensed with the individual causation requirement. [FN21]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Part III analyzes how victims of latent diseases caused by exposure to mass products and the victims' attorneys, during the 1980s, tried to combine procedural devices such as class actions and consolidations-that in effect created "collective plaintiffs"-with new "collective defendant" theories of causation. These theories, such as market share liability and alternative liability, would enable courts to hold multiple and indeterminate manufacturers of products liable without proof of individual causation. By the late 1980s, with rare exceptions, it was clear that these challenges to the principle of individual causation were unsuccessful. For the most part, the tort system had rejected this first wave of the instrumentalist challenge to the traditional requirement of individual causation.

The problems caused by the inability of victims of latent diseases and their attorneys to prove individual causation have not disappeared, however. A "second wave" of challenges to the individual causation requirement was launched during the mid-1990s when state governments sued tobacco manufacturers to "recoup" the financial losses they had experienced as a result of tobacco-related illnesses, consisting largely of medical assistance (Medicaid) payments to victims of such diseases. The new form of the "collective plaintiff" in the late 1990s and early years of the twenty-first century was the state, [FN22] *880 municipality, [FN23] health insurer, [FN24] union health and welfare fund, [FN25] or hospital [FN26] suing to recover the collective entity's financial losses resulting from harms experienced by individual victims, such as those resulting from tobacco-related illnesses, handgun violence, and childhood lead poisoning. When the states, municipalities, and other organizational litigants tried to overcome causation requirements using those substantive law approaches that generally had been rejected by the courts during the 1980s, such as market share liability, they were usually-as would be expected-unsuccessful. [FN27] The states and other new collective plaintiffs, however, arguably have experienced somewhat greater success in using substantive tort claims, such as fraud and public nuisance, in new and novel ways that enable them to recover their financial losses without proving an individual causation link between any particular manufacturer and any specific victim.

Today the fate of the individual causation requirement in mass products tort law hangs in the balance. It is difficult to predict whether the second wave challenges to the individual causation requirement that are inherent in the state and municipal recoupment actions will be any more successful in overturning the particular injurer/ particular victim causation paradigm than were the class actions and consolidated mass torts claims of the 1980s. [FN28] What is clear, however, is that these novel forms of tort litigation provide an unusual testing *881 ground for the most fundamental theories of the nature of tort liability, as well as having important "real world" consequences for the economic and social problems resulting from tobacco-related illnesses, handgun violence, and childhood lead poisoning.

II. The Instrumentalist Challenge to a Requirement of Individual Causation and the Corrective Justice Response

Judges and scholars alike regard as axiomatic the requirement that the plaintiff must prove that the defendant caused plaintiff's harm in order to establish liability. William Prosser described it as "the simplest and most obvious" aspect of determining tort liability. [FN29] In Payton v. Abbott Laboratories, [FN30] the Massachusetts Supreme Judicial Court noted that "identification of the party responsible for causing injury to another is a long-standing prerequisite" for liability. [FN31] The court reasoned that the requirement "separates wrongdoers from innocent actors, and also ensures that wrongdoers are held liable only for the harm that they have caused." [FN32]

Some of the most influential architects of tort theory during the past generation, however, have rejected the individual causation requirement in torts. In 1975, then Yale Professor-and current Second Circuit Court of Appeals Judge-Guido Calabresi argued that the requirement that a particular plaintiff prove that a particular defend-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ant caused its harm was "far from being the essential, almost categorical imperative it is sometimes described to be." [FN33] In the decades that followed Calabresi's provocative challenge, the requirement of individual causation became, and remains, a principal focus of disagreement between those scholars such as Calabresi and Judge Richard Posner, who espouse instrumental perspectives on torts, most notably law and economics, and other scholars, such as Ernest Weinrib, who conceptualize tort liability in terms of corrective justice. [FN34] Instrumentalists believe that the goal of tort law is **882** to pursue policy objectives that themselves are derived from the needs of the society external to the legal system, such as accident prevention, [FN35] wealth maximization, [FN36] and the widespread distribution of the economic losses resulting from accidents. [FN37] In contrast, corrective justice theorists believe that the essence of tort law is the objective that an injuring party should repair the losses caused by his or her wrongful conduct. [FN38] Though Izhak England, in his superb typology of contemporary tort theory, convincingly argues that any attempt to divide tort theorists into two camps is oversimplified, [FN39] the dichotomy works here for purposes of exploring the views of scholars on the specific issue of whether a particular victim must prove that a particular injurer caused her harm in order to hold the injurer liable. Those with an instrumental conception of tort typically believe that it is not necessary for a particular victim to identify the particular injurer who caused his harm. On the other hand, **883** corrective justice theorists begin with a notion that a tort is a harm caused by a particular injurer to a particular victim.

### A. The Instrumentalist Conception of Tort Liability and the Requirement of Individual Causation

Among those with an instrumental conception of torts, Calabresi most specifically has argued that a particular victim need not identify a particular injurer in order to recover. The origins of Calabresi's conception of tort law lie both in the field of welfare economics [FN40] and in the reformist zeal of the Great Society of the 1960s. [FN41] For Calabresi, the goal of tort law is to reduce "the costs of accidents," an economic and social problem like any other economic and social problem. To achieve this goal, Calabresi identifies several "subgoals" for the tort system. First, he argues that any accident compensation system should "discourage activities that are 'accident prone' and substitute safer activities as well as safer ways of engaging in the same activities." [FN42] Calabresi's second objective is to distribute the costs of accidents in a manner that inflicts "less pain" than if the accident costs were borne solely by the original victims. [FN43] The most important way of accomplishing this objective is to distribute the losses resulting from an accident broadly across many people. Calabresi also argues in favor of the "deep pocket" notion: that the costs of accidents will cause less pain and disutility if paid for by people who will suffer less "social and economic dislocation as a result of bearing them, usually thought to be the wealthy." [FN44]

Calabresi thus focuses on objectives related to the victim (loss distribution or compensation) and to the injurer (loss avoidance or deterrence) that are not necessarily intrinsically linked. The need to impose liability on the injurer in order to discourage her harm-producing activity does not require that the financial penalty extracted from the injurer be transferred to the particular **884** injurer's victim. Conversely, any particular victim can receive her compensation from any party capable of distributing her accident losses as broadly as possible; loss distribution does not require that her losses be paid by the injuring party. Calabresi clearly accepts the notion that liability can be assessed on injurers on a collective, as opposed to a particularized, basis:

> For centuries society has seemed to accept the notion that justice required a one-to-one relationship between the party that injures and the party that is injured . . . . There is, of course, no logical necessity for linking our treatment of victims, individually or as a group, to our treatment of injurers, individually or as a group. [FN45]

Viewed from the perspective of the loss avoidance goal, according to Calabresi, the traditional "but for" requirement of causation between a particular injurer's acts and a particular victim's harm,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> [F]ar from being the essential, almost categorical imperative it is sometimes described to be, is simply a useful way of toting up some of the costs the [potential injurer] should face in deciding whether avoidance is worthwhile. One could do away with the but for test and employ other methods to achieve the same end. For example, one could simply guess at the size of the injury costs that will be associated in the future with behavior causally linked to such injury costs. [FN46]

By recognizing the possibility of nontraditional mechanisms for loss minimization and for loss distribution, Calabresi severs the linkage between deterrence and compensation that has been regarded as inherent in traditional tort law. Further, he notes that the amount that should be paid by the injurer to discourage harm-producing activity need not be equivalent to the amount needed to compensate the injured party. [FN47]

Nor is Calabresi alone, among the instrumentalists, in rejecting the traditional requirement that a particular victim be required to prove that her harm was caused by a particular victim in order to recover. Posner, for example, who subscribes to a much different version of law and economics, [FN48] *885 agrees. He concludes that manufacturers that may have produced the product responsible for the harm of any particular victim, even when the particular manufacturer who produced the particular product causing the victim's harm cannot be identified, should be held jointly and severally liable without a right of contribution against other manufacturers because "joint liability under a negligence standard creates incentives for both potential injurers to take due care." [FN49]

### B. The Corrective Justice Response

#### 1. Weinrib and the Strong Version of the Individual Causation Requirement

In contrast to the instrumental conception, Ernest Weinrib's corrective justice perspective regards "the basic feature of private law" to be that "a particular plaintiff sues a particular defendant." [FN50] Liability "requires that the plaintiff have a right and that the defendant act in breach of a duty." [FN51] Tort law is not a matter of promoting welfare; it instead is a matter of protecting rights as conceived by Aristotle and Kant. [FN52] Torts cannot be understood in terms of instrumental objectives. [FN53] Both the original wrong and "the transfer of resources that undoes it," according to Weinrib, constitute "a single nexus of activity and passivity where actor and victim are defined in relation to each other." [FN54]

Weinrib finds that the idea that one party's injury at the hand of the other should be rectified by enforcing the victim's claim against the injurer was *886 recognized even before Aristotle. [FN55] Aristotle identified justice with equality, and injustice with transactions creating excesses or shortfalls. [FN56] To Aristotle, however, equality certainly did not mean an equal distribution of resources, nor did he define or describe the meaning of equality except in formal or mathematical terms. To provide substantive definition to Aristotle's formal notion of equality, Weinrib turns to Immanuel Kant. Weinrib reads Kant to conclude that individuals, as "self determining agents . . . are duty-bound to interact with each other on terms appropriate to their equal status." [FN57] Individuals must "treat the other's personal . . . embodiment[] in a manner that does not violate their formal equality as free wills." [FN58]

Weinrib derives his theory of corrective justice from his reading of Aristotle and of Kant. Once the injurer has caused unjust harm to the victim, the injurer must compensate the victim in order to restore him to the pre-existing state. [FN59] The injurer has realized a corresponding gain in normative, but usually not factual, terms; her gain is a gain in comparison to what she is due or entitled. [FN60] Under this view, "because the plaintiff has lost what the defendant has gained, a single liability links the particular person who gained to the particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

person who lost." [FN61] Unlike the instrumental conception of torts that makes it possible to separate the victim's need for compensation from the desire to discourage harm-producing activity by the defendant, these "mutually independent changes in the parties' holdings" cannot "be restored by two independent operations." [FN62] The correlative relationship between the victim and *887 the injurer, argues Weinrib, "locks the plaintiff and the defendant into a reciprocal normative embrace, in which factors such as deterrence and compensation, whose justificatory force applies solely to one of the parties, play no role." [FN63] The court's role can only be understood as that of applying liability in the case of a bipolar relationship. [FN64]

### 2. Corrective Justice Without a Requirement of Individual Causation

Not all theorists typically associated with corrective justice perspectives necessarily share Weinrib's view that the law should require that a particular victim must prove that his harm was caused by a particular injurer in order to recover. Jules Coleman, for example, expounds a corrective justice explanation for tort law that is distinct from that of Weinrib. [FN65] He argues that though tort law serves both moral and instrumental goals, its core "implements corrective justice." [FN66] Corrective justice requires wrongdoers, according to Coleman, "to repair the wrongful losses for which they are responsible." [FN67] He claims that his description of the wrongful losses for which the injurer should be held liable, unlike Weinrib's, is derived from existing social practice and not from abstract principles. [FN68] Wrongdoing, in Coleman's analysis, is defined not by reference to Aristotle or to Kant, but by the violation of an appropriate social norm or convention. [FN69] Tort liability, by strengthening and enforcing these legitimate expectations, enhances the liberal conception of society by providing the stability that individuals require in order to effectively promote their own welfare. At the same time, recovery in tort addresses the victim's need for compensation created by the wrongful loss.

Coleman's version of corrective justice, not surprisingly, leads him to the conclusion that "the goals of tort law are pursued only within a structure of case-by-case adjudication between individual victims and their respective *888 injurers." [FN70] The injurer is liable for the victim's harm because she "is responsible in a way which others are not." [FN71] In short, tort liability implementing corrective justice principles is created by the relationship of the victim and the injurer and that relationship sets the parameters for who should satisfy the obligation to repair the wrongful loss.

Coleman rejects other writers who argue that imposing collective liability on indeterminate defendants can be reconciled with corrective justice principles. These writers suggest that an injurer can be held liable anytime it imposes a risk on a victim, even if it cannot be determined which injurer's risk in fact resulted in the victim's harm. Richard Wright, for example, when faced with a case such as Sindell v. Abbott Laboratories, [FN72] argues:

> [I]f each defendant is held liable only for her share of the risk exposure, there is no conflict with the corrective-justice view. It still must be proven that each defendant caused the risk exposure that possibly led to the manifested injury, and liability is for such risk exposure, rather than the manifested injury. [FN73]

Coleman explicitly rejects the attempt of Wright and other scholars to reconcile corrective justice principles with market share liability and other impositions of liability when particularity of causation cannot be proved. [FN74] He claims that Wright is being inconsistent when he argues that the creation of unjustifiable risk is the relevant harm in Sindell and similar cases, but that elsewhere in tort law liability results only from the harm itself. [FN75] Coleman nevertheless sanctions liability without proof of individual causation, even when such liability is imposed within the tort system, as something separate and *889 apart from the basic corrective justice principles of tortious liability. Instead, Coleman supports it as a form of social insurance or an alternative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compensation system in which manufacturers who have imposed the risk are assessed for the damages. [FN76]

Coleman's endorsement of liability without proof of individual causation, though seemingly inconsistent with his core collective justice principles, is consistent with his recognition that the tort system pursues multiple goals:

> I am unwilling to treat departures from corrective justice in tort law as mistakes in need of reform. Instead, other parts of tort law may reflect alternative approaches to allocating losses . . . in ways that sever the relationship between agent and loss under corrective justice. [FN77]

Attempts of corrective justice proponents to justify the imposition of liability on manufacturers of fungible mass products even when a victim cannot prove which manufacturer caused her harm seem logically strained. Claire Finkelstein, for example, has catalogued a group of disparate cases, including those involving both market share liability and recovery for loss of chance in the medical malpractice context, that she claims establish the beginning of a trend within tort law recognizing liability for risk creation. [FN78] It clearly remains the case, however, that the tort system generally does not allow a victim to recover from a defendant merely because she was exposed to harm resulting from defendant's risk creation. [FN79] As yet, for example, the tort system is a long *890 way from allowing the victim of an unidentified, intoxicated hit-and-run driver, or even any driver on the highway late Saturday night that may not have been involved in a two-car collision but still would have been exposed to the risk created by intoxicated drivers, to recover from all Saturday-night drivers who are subsequently found guilty of driving while intoxicated.

Corrective justice principles appear to leave victims of diseases resulting from exposure to harmful products without a remedy within the tort system. Coleman recognizes that liability based upon mere risk creation is inconsistent with corrective justice principles. His own valiant effort to find a way around this conclusion in the cases involving latent diseases resulting from exposure to mass products torts, which clearly troubles him, requires Coleman to graft principles of social insurance or alternative compensation systems onto the tort system in seeming contravention of corrective justice principles.

### III. The First Wave of Attempts to Collectivize Causation in Tort Law

By the 1970s, the scientific, cultural, and legal predicates for challenging the traditional requirement of proof of individual causation in tort law were in place. Having conquered polio and other devastating infectious diseases, the focus of public health efforts increasingly shifted to diseases caused by exposure to toxic substances, either in the environment or contained in products. [FN80] For the first time, the public understood the devastating diseases caused by exposure to asbestos dust, [FN81] the strong causal link between lung cancer and smoking, [FN82] the effects of *891 low doses of lead on children in terms of loss of intelligence, [FN83] and other links between product exposure and detrimental health consequences.

At the same time, changes in the law-particularly the adoption of strict products liability-overcame many of the legal barriers faced by victims and their lawyers seeking compensation from manufacturers of harmful products. Yet in cases of latent illnesses and similar harms in which the specific manufacturer of the fungible or nearly fungible product that caused the specific victim's harm could not be identified, the traditional requirement of individual causation in torts remained an obstacle.

This Part describes and analyzes the procedural mechanisms and the substantive theories of causation, in cases involving multiple and indeterminate defendants, that victims' attorneys and the courts pioneered in the 1980s to overcome this obstacle. These novel approaches sought to transform the tort action from an "individual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against individual" contest concerning a specific, isolated tortious act and the resulting particular harm to a very different system for handling accidental harms. That system, as envisioned by Calabresi and other instrumental-ists, viewed the liability issue as a matter to be decided between the collective plaintiff and the collective defendant. I begin with a brief analysis of the forms that the "collective plaintiff" has assumed in recent mass product tort *892 actions, [FN84] before turning attention to the various strands of collective liability for multiple and indeterminate defendants.

There is an analytical risk in parsing the collective tort action in this regard, however. Often mass product tort actions combine the collective form of the plaintiff-a class action or a state recoupment action seeking damages resulting from the latent diseases experienced by hundreds, thousands, or even millions of victims-with an attempt to impose liability on multiple or indeterminate defendants-the collective defendant-through theories based upon concert of action, alternative liability, market share liability, or simply an expanded interpretation of the traditional doctrine of concurrent liability. The combination of the collective plaintiff and the collective defendant, I would argue, is greater than the sum of the parts. There is a risk that separately parsing examples of the collective plaintiff and of the collective defendant, as I have in this section and the next section, will obscure the extent to which contemporary mass product tort lawsuits are fundamentally a very different animal from their tort ancestors.

### A. The Collective Plaintiff

### 1. Class Actions

During the 1980s, class actions appeared to be the vehicle that courts would choose to "collectivize" claims of victims resulting from mass products *893 torts. [FN85] One of the most ambitious attempts to use the class action vehicle as a means of collectivizing the tort process and eliminating any requirement of individual causa-tion was the decision by federal district court Judge Robert M. Parker in Cimino v. Raymark Industries, Inc. [FN86] Judge Parker certified as a class action the claims of 3,031 victims of asbestos disease [FN87] in their litigation against various asbestos manufacturers and then permitted the use of statistical evidence to prove both the causal connection between the defendants' products and the plaintiffs' injuries and the amount of each claimant's damages. [FN88] Because of the novelty of Judge Parker's approach and the manner in which it anti-cipated the use of statistical and sampling evidence in later mass products torts litigation, I will describe the lit-igation in some detail.

Judge Parker's trial plan anticipated three phases. [FN89] During Phase I, the jury heard a complete trial of the individual cases of ten class representatives that was designed to reach resolution, for all members of the class, on the issues of product defectiveness, the adequacy of warnings, and the appropriateness of punitive dam-ages. [FN90] Judge Parker then divided the members of the plaintiff class into five disease categories based upon which illnesses the class members allegedly had sustained as a result of the exposure to the asbestos products. [FN91] As originally scheduled, the same jury, during Phase II, was to decide the percentage of class members in each category that had been exposed to each defendant's products and the percentage of claims in each disease category *894 barred by statutes of limitations or other specified defenses. [FN92] During this phase, the jury also would assess a lump sum determination of damages for all plaintiffs within each specified disease category. [FN93] The court, however, skipped Phase II and went directly to Phase III. Following the trial of Phase III, the parties stipulated as to what the findings of Phase II would have been, including the relative proportion of financial responsibility of each defendant. [FN94]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In Phase III, Judge Parker employed a statistical sampling approach-two juries heard a sampling of cases to determine whether each sample plaintiff suffered from an asbestos-related disease and if so, what damages that sample plaintiff had sustained. [FN95] The court conducted a hearing to confirm that the randomly drawn sample plaintiffs from each disease category were representative of the population of that group. [FN96] The court then proposed to award each nonsample member within any given disease category the average damage verdict of the sample plaintiffs within that group whose cases had been heard by the jury.

Though the plaintiffs consented to this approach, the defendants objected. [FN97] The defendants in Cimino argued that even as to the sample plaintiffs there had been no determination that any particular defendant's product had caused any particular disease sustained by a member of the plaintiff class. This lack of individual causation, according to the defendants, violated both the substantive law of causation and each defendant's right to a jury trial under the Seventh Amendment. [FN98] Judge Parker rejected this argument, reasoning that the liability of any particular defendant for damage awards, determined by the average of the awards of sample class members within a disease category viewed collectively, would be comparable to what would occur if all the damage awards had been determined individually. [FN99]

*895 Unfortunately for Judge Parker and the future of attempts to overcome the obstacles posed by the individual causation requirement, the Court of Appeals for the Fifth Circuit disagreed. [FN100] The court first found that the trial court had not established that a particular defendant's products caused the harm to a particular plaintiff, thereby failing the requirement that causation "be determined as to 'individuals, not groups.'" [FN101] Further, in the "extrapolation cases," the court held that the determination of damages, without either a trial or a jury, denied the defendants their due process rights. [FN102]

The Cimino litigation marked a key battle between proponents of the use of the class action as a collective mechanism to address mass products torts and those committed to the traditional model of particular claimant/ particular defendant. Since that time, class action litigation largely has fallen by the wayside as a means of determining collective liability for victims of mass products torts. Today, with rare exceptions [FN103] or in unusual circumstances, [FN104] courts almost always deny class certification in mass product torts. [FN105] A *896 plaintiff seeking class action certification in the federal courts must satisfy the four requirements of subsection (a) of Rule 23 of the Federal Rules of Civil Procedure [FN106] and one of three alternative requirements of subsection (b). [FN107] Courts usually find that litigants seeking class certification in the context of mass products torts fail to meet one or more of the requirements, generally on the grounds that the cases of victims of mass products torts turn on individualized proof of causation, reliance, comparative fault, and/or damages.

For example, in Estate of Mahoney v. R.J. Reynolds Tobacco Co., [FN108] the court found that the named plaintiff's claims were not necessarily "typical" of those of other members of the proposed class, victims of tobacco-related diseases who had been heavy smokers and who were residents of Iowa, because different members of the proposed class probably responded differently to the alleged misrepresentations of tobacco manufacturers. [FN109] Further, the representative class action plaintiff could not establish, as required by Rule 23 (b)(3), that common issues of law and fact predominated over individual issues. [FN110] The court noted that resolution of fact issues necessary to prove causation, such as whether any particular plaintiff's cancer resulted from smoking and whether she would have refrained from smoking or quit smoking if the defendants had not misrepresented the risks of their products, were individual issues of fact, not common ones, as were those issues related to affirmative defenses (such as contributory negligence and assumption of risk) and those involving the class members' damages or injuries. [FN111]

*897 Both the United States Supreme Court and Congress have limited the ability of class action lawsuits to serve as a vehicle for overcoming the individual causation requirement. The Supreme Court has placed import-

ant restrictions on the ability of counsel in class actions to reach a "global settlement" that resolves the claims of both those victims who already are experiencing injuries and those who may sustain injuries in the future. [FN112] Without the ability to reach such enforceable settlements, these settlements become substantially less attractive from the perspective of the defendant-manufacturers. More recently, Congress enacted, and President Bush signed into law, the Class Action Fairness Act [FN113] that will make it more difficult for victims of mass torts to file actions in state courts where the class certification requirements may be more favorable than in the federal courts.

Class actions may remain, however, a viable vehicle for handling mass products claims in at least one situation. When members of the putative class have been exposed to a dangerous product that may cause a latent disease, some courts have allowed class certification for purposes of "medical monitoring" claims under Federal Rule of Civil Procedure 23(b)(2), which provides for certification of an action seeking declaratory or injunctive relief when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." [FN114] In these claims, plaintiffs typically ask the court to establish a medical monitoring program intended to detect the onset of any injuries or diseases that might occur in the future as a result of exposure to defendants' products. [FN115]

*898 Notwithstanding this narrow exception, there is little doubt that class actions-at least those seeking compensation for injuries and diseases resulting from exposure to mass products-have disappointed some of the early proponents of class actions that saw them as a means of overcoming traditionally insurmountable obstacles in proving causation in mass products torts and similar cases. [FN116] Barring reform that is improbable in the current political climate, the class action mechanism does not appear to be part of the solution to overcoming the obstacles posed by the requirement of individual causation in mass products torts.

### 2. Consolidation

In a few instances, plaintiffs' attorneys and courts in mass products torts cases have sought to use the procedural device of consolidation as a vehicle for satisfying individual causation requirements that they otherwise could not satisfy. As used by most courts, consolidation is most accurately viewed as a procedural device for joining many individual actions for determination of one or more issues that otherwise would need to be tried repetitively in individual trials of particular plaintiffs, [FN117] but not as a means of truly imposing collective liability on a group of defendants to benefit multiple victims or to eliminate a requirement of individual causation. [FN118] Yet a few trial courts have employed *899 consolidation in conjunction with statistical evidence to establish true collective liability to benefit a group of undifferentiated plaintiffs and, in the process, eliminate the individual causation requirement. In the Brooklyn Navy Shipyard Litigation, [FN119] for example, Judge Jack Weinstein consolidated sixty-four actions brought by victims of asbestos-related disease for trial on all issues. [FN120] The defendants contended that the plaintiffs had failed to identify the particular manufacturer whose product injured each particular plaintiff, thus failing to satisfy the causation requirement. [FN121] The Second Circuit Court of Appeals, however, upheld Judge Weinstein's finding of causation, noting that the plaintiffs had established that they or their decedents had spent time at a common worksite, the Brooklyn Navy Shipyard, where they were exposed to asbestos; that the products of each defendant had been used at the shipyard and contributed to the asbestos fibers in the air; and that each plaintiff or plaintiff's decedent had developed diseases linked to the defendants' products. [FN122] The court of appeals concluded: "Because the events happened years ago, and many of those exposed to the asbestos are deceased, to require precision of proof would impose an insurmountable burden." [FN123] By loosening the standard of evidentiary sufficiency on the issue of whether any particular defendant's product contributed to any particular plaintiff's injury, Judge Weinstein and the Second Circuit Court of Appeals used consolidation to implicitly impose a form of collective liability with little

or no proof of individual causation linking a particular defendant and a particular plaintiff. [FN124]

More often in consolidated cases, however, collective liability is not anticipated, and the trial court judge goes to great lengths to stress to the jury the requirement of a causal link between each plaintiff and a specific *900 defendant. [FN125] For example, in another consolidated asbestos case, the court outlined the steps to be taken to assure that the jury separately considered the causal connection between each specific plaintiff and each specific defendant. [FN126] After noting that common issues of law and fact favored consolidation, the court noted that other issues, including those related to causation, required "effort to prevent confusion and preju- dice": [FN127]

[T]he particular measures that will work best here . . . include [] separate notebooks for the jurors, tabbed for each plaintiff and each defendant, careful attention to the presentation of evidence, and cau- tionary instructions reminding the jurors that, during their deliberations, they would have to consider each of the plaintiff's claims separately. . . . [FN128]

As illustrated by these examples of consolidated cases, in most instances consolidation imposes collective li- ability only in the sense that multiple plaintiffs are able to prove those aspects of liability related to a defendant's conduct in a single proceeding. In and of itself, consolidation does not eliminate the need to prove a causal link between the acts of a particular defendant and the harm sustained by a particular plaintiff. A very small number of trial court judges, however, including Judge Weinstein, appear to have used consolidation as a means of ac- complishing collective liability when proof of the causal connection between a particular victim and a particular plaintiff appears insufficient to meet the ordinary civil burden of proof.

### B. Liability of Multiple and Indeterminate Manufacturers

The victim of a latent disease caused by exposure to products that are fungible or nearly fungible often is not able to identify the particular tortfeasor that manufactured the product causing her harm, particularly when-as is often the case-a substantial period of time, often several decades, has passed between the time that the product was manufactured and the onset of the plaintiff's harm. The scenario in Sindell v. Abbott Laboratories, [FN129] previously *901 described, [FN130] is but one example of the impossible challenge that the plaintiff frequently encounters. The claimant's entitlement to recover for her injury generally has been denied because of her inabil- ity to prove which particular defendant manufactured the product in cases of exposure to Agent Orange, [FN131] asbestos insulation, [FN132] lead pigment, [FN133] and cigarettes. [FN134]

The denial of liability in cases in which the victim is unable to identify the particular injurer that caused her harm no doubt remained the general rule in American tort law during the first wave of collective mass tort ac- tions during the 1980s. Yet during that era, courts creatively applied traditional tort doctrines and invented new ones that enabled-and continue to enable-victims in some jurisdictions, often in isolated circumstances, to recov- er without proof that their harm was caused by a particular injurer. Many of these doctrines, upon initial examin- ation, appear to be only procedural devices that shift the burden of proof to the defendant to prove that he was not the injurer that caused plaintiff's harm. The realistic effect of such doctrines, however, generally has been to impose liability without proof of individual causation because, in actuality, neither the plaintiff nor the defend- ant can prove which injurer's acts caused a particular plaintiff's harm. Further, some courts have *902 held that a defendant can be found to be liable on a collective basis even if it can prove that it was not in fact the cause of the harm to the specific plaintiff. [FN135]

### 1. Market Share Liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Perhaps no other judicially created mechanism for holding defendant-manufacturers collectively liable has tantalized academic tort commentators as much as market share liability, [FN136] which originated in the California Supreme Court's decision in Sindell v. Abbott Laboratories. [FN137] The court held that "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injury." [FN138] This holding, claimed the California Supreme Court, results in each manufacturer's liability reflecting the injuries caused by its own products, even though the tortious acts of any particular defendant are never causally linked to the harm suffered by any particular victim. [FN139] The court justified its holding on the basis of instrumental goals including loss minimization (what Calabresi had referred to as primary cost avoidance): "The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects, thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety." [FN140] Further, the opinion reflects the instrumental goal of loss distribution: [FN141]

> From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. As was said by Justice Traynor in Escola, "[t]he cost of an injury and the loss *903 of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." [FN142]

The court also invoked an argument based on justice. It stated: "As between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." [FN143]

Because the defendant could be excused from liability if it proved that it was not responsible for a particular victim's harm, it is possible to interpret Sindell as an opinion that merely shifts the burden of proof on the issue of causation to the defendant. In Hymowitz v. Eli Lilly & Co., [FN144] however, the New York Court of Appeals imposed true collective liability for the creation of risk [FN145] when it held that a particular manufacturer of DES who could prove that its product could not have been the one that caused the harm to the particular victim nevertheless would be liable on a market share liability theory:

> [B]ecause liability here is based on the over-all [sic] risk produced, and not causation in a single case, there should be no exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury. It is merely a windfall for a producer to escape liability solely because it manufactured a more identifiable pill, or sold only to certain drugstores. These fortuities in no way diminish the culpability of a defendant for marketing the product, which is the basis of liability here. [FN146]

The court conceded "the lack of a logical link between liability and causation in a single case." [FN147]

Despite the considerable scholarly support for the idea of market share liability-except for cases against DES manufacturers-the concept met with virtually universal rejection by the courts during the quarter-century following the Sindell decision. [FN148] In July 2005, however, the Wisconsin Supreme Court *904 in Thomas v. Mallett [FN149] allowed a childhood lead poisoning victim's action against manufacturers of lead pigment to proceed to trial on a "risk contribution" (similar to market share liability) theory despite plaintiff's inability to identify the specific manufacturers of the product that caused his illness. [FN150] The court justified its opinion on grounds similar to those articulated in Sindell. [FN151] On fairness grounds, the cost of the harm should be imposed on the "arguably negligent" manufacturers, not on "an innocent plaintiff who is probably not at fault . . . ." [FN152] On instrumental grounds, the manufacturers are in a better position to distribute losses than is the individual victim. [FN153]

The court rejected the manufacturers' arguments that their product lacked the fungibility necessary for mar-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ket share liability, finding that the jury should be allowed to consider the testimony of plaintiff's expert that the differences in chemical composition between various lead pigments did not affect their bioavailability and hence the consequences of exposure to lead-based paint. [FN154] The defendant-manufacturers argued that it would not be feasible for the trial court to administer a risk-contribution regime and to accurately determine each defendant's market share because the lead pigment-containing paint present in the three houses where the child had lived could have been applied at any point **905 between 1900 and 1978. The Wisconsin Supreme Court, however, responded that the manufacturers "are essentially arguing that their negligent conduct should be excused because they got away with it for too long." [FN155] This reasoning ignores the fact, noted by one of the dissenting judges, that "many of the defendants produced white lead carbonate for only a small fraction of the seventy-eight-year period during which paint containing white lead carbonate could have been applied to the walls of [the plaintiff's] three residences." [FN156]

Thomas v. Mallett could turn out to be the most direct and important challenge to the individual causation requirement yet. In one of two strongly worded opinions, the dissenting judges argue:

> The end result of the majority opinion is that the defendants, lead pigment manufacturers, can be held liable for a product they may or may not have produced, which may or may not have caused the plaintiff's injuries, based on conduct that may have occurred over 100 years ago when some of the defendants were not even part of the relevant market . . . [N]one of these facts seem to matter to the majority. [FN157]

Justice Prosser, one of the dissenting judges, writes an opinion reminiscent of the Fifth Circuit Court of Appeal's reversal on due process grounds of Judge Parker's attempts in Cimino v. Raymark Industries [FN158] to calculate individual class members' damages awards through a collective process without individual adjudication. Prosser suggests that "the very real possibility that innocent defendants will be held liable for wrongs they did not commit" [FN159] raises serious procedural due process concerns because defendants are denied the opportunity to present the defense, well settled under tort law, that they did not cause the harm. [FN160]

At this time, it is impossible to predict whether the decision in Thomas v. Mallet is an isolated opinion driven by the Wisconsin Supreme Court's desire to identify a funding source to address the public health crisis posed by childhood lead poisoning [FN161] or whether it is a harbinger of things to **906 come. As a practical matter, the determination of the risk contribution of each defendant over a seventy-five year period appears to be an impossible task for a trial court and jury. In fact, when the Wisconsin Supreme Court became the first court to accept the risk contribution theory in a DES case in 1984, it recognized the substantial practical problems with market share liability [FN162] and distinguished risk contribution liability from it. The Court held that in assigning a percentage of liability to each manufacturer-defendant, the jury should consider not only its respective market share, but also the relative degree of the egregiousness of its conduct compared to that of other manufacturers. [FN163] In determining the manufacturers' relative market shares, one factor in the risk contribution calculation, the jury would be required to consider the following factors: the timing of the various producers' entry, exit, and sometimes re-entry into the relevant market; the great differences in the amount of lead-pigment contained in **907 various lead-based paints; [FN164] how much of the plaintiff's exposure occurred at each of three houses where he lived; and the possible effect of bioavailability on the effects of exposure (disputed between the parties). The jury's determination of market share here would be far more challenging than in the DES situation, where the chemical formula of manufacturers' products were identical and the products causing the harm were consumed by the victim's mother in a specific period lasting less than nine months. The jury then would be required to consider these factors along with its evaluation of the level of egregiousness of each of the manufacturer's conduct. It is difficult to see how combining "apples and oranges"-the percentage of market share and level of egregiousness of each defendant-in any way makes the jury's calculation more manageable.

On the other hand, the availability of either the market share or risk contribution liability theory in a collective action brought by a state or municipality against an industry [FN165] might provide an industry facing the prospect of huge liability exposure and possible bankruptcy with strong incentives to settle. As Judge Richard A. Posner has noted, the liability exposure in a collective tort action poses risks to industries that a series of individual tort actions do not, [FN166] and an industry finding itself "under intense pressure to settle" [FN167] "may not wish to roll these dice." [FN168] The Wisconsin Supreme Court's opinion in Thomas v. Mallett, still at the summary judgment stage, begins with an extended recitation of allegations against lead-pigment manufacturers, drawn from plaintiff's allegations and the testimony of his experts, but presented as objective truth. [FN169] The court's call for trial judges to *908 perform the impossible feat of determining the relative contributions of defendant-manufacturers to risk contribution, coupled with its gratuitous "piling on" of unproven facts, may be intended more to induce settlement than it is to meaningfully guide lower courts' administration of causation determinations in mass products torts.

### 2. Concurrent Causation Resulting in Indivisible Harm

Traditional common law holds that where the tortious acts of two or more defendants are each a cause-in-fact of an indivisible injury to the plaintiff, the defendants are jointly and severally liable. [FN170] Because each defendant's acts are a cause-in-fact of the plaintiff's injury, this is not an example of a victim recovering without proof that a particular defendant caused her harm. In recent decades, however, courts sometimes have applied concurrent causation in a manner that has enabled the plaintiff to recover without identifying the particular defendant whose products have harmed her. [FN171] In Rutherford v. Owens-Illinois, Inc., [FN172] for example, the California Supreme Court held in a consolidated action for asbestos-related personal injuries that plaintiffs "need not prove with medical exactitude that fibers from a particular defendant's asbestos-containing products were those, or among those, that actually began the cellular process of malignancy." [FN173] The court acknowledged that it was scientifically unclear whether each exposure to asbestos and the resulting "scarring of the lungs contributes cumulatively to the formation of a tumor" or whether, on the other hand, "only one fiber or group of fibers actually causes the formation of a tumor," in which case, "the others would not be legal causes *909 of the plaintiff's injuries." [FN174] The court argued: "Plaintiffs cannot be expected to prove the scientifically unknown details of carcinogenesis, or trace the unknowable path of a given asbestos fiber." [FN175] Instead, the court held that:

> [P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the risk of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that actually produced the malignant growth. [FN176]

Traditionally, tort law generally understood cause-in-fact as something more than an increase in the risk of an injury. [FN177] But in Rutherford v. Owens-Illinois, Inc., the effect of the novel application of concurrent causation is to impose liability without identification of the particular defendant that caused a particular plaintiff's injury. The victim was exposed to the asbestos products of many manufacturers. These products may have increased the victim's risk of suffering from cancer, and it was impossible for any of the defendants to show that its products were not an actual cause of the cancer, just as it is impossible for the victim to prove that any particular manufacturer's product, in fact, did contribute to his cancer. Under the court's holding, these manufacturers were held collectively liable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 3. Alternative Liability

A number of courts have held defendant-manufacturers liable under a theory of alternative liability for latent diseases suffered by a particular victim even when it cannot be shown which manufacturer's product harmed the plaintiff. [FN178] The origins of alternative liability lie in the classic case of Summers *910 v. Tice [FN179] in which a hunter was injured when shot in the eye by one of his two hunting companions. [FN180] The victim was able to prove that both defendants had fired negligently, but he could not establish which defendant's shot was in fact the cause of his substantial injuries. [FN181] The California Supreme Court held that because the two defendants had each acted negligently toward the plaintiff, although each acted independently, the burden shifted to each defendant to prove that his negligent act was not the cause of the plaintiff's injury. [FN182] Unless this burden was met, the defendants would be held jointly and severally liable. In short, under alternative liability, the plaintiff need not prove with *911 particularity the identity of the injuring party in order to recover. In the absence of rebuttal, the defendants are held liable collectively.

In the modern context, victims have sought to expand the applicability of the doctrine of alternative liability beyond a context involving "one plaintiff and two defendants" to the larger arena of mass products torts, involving, for example, "180 plaintiffs . . . and at least 16 defendants." [FN183] Courts, however, have found significant differences between the fact scenario in a case like Summer v. Tice and that in the mass products torts context. First, as the Michigan Supreme Court has noted:

> Perhaps the most fundamental, and arguably the most important, factual difference between Summers and this case is that in Summers, each defendant was negligent toward the sole plaintiff; each could have caused the injury to the plaintiff although only one in fact did so. Here, the plaintiffs do not even claim that each of the defendants was negligent toward each of the plaintiffs. Therefore, each of the defendants in this case could not have caused injury to each of the plaintiffs. Stated differently, in Summers, each defendant was negligent toward the plaintiff; here, each defendant was negligent toward a plaintiff, but each defendant was not negligent toward each plaintiff. Thus, all defendants were not negligent toward each plaintiff, and each defendant could not have caused each plaintiff's injury. [FN184]

On the other hand, looking at alternative liability in the context of mass products torts from the instrumental perspective suggests that this use of alternative liability is unobjectionable. As Judge Weinstein notes:

> In mass tort cases . . . dropping the requirement that a plaintiff identify a particular defendant as the cause in fact of his injuries does not undermine the principle that a defendant should only be held responsible for the damage it caused. As long as a plaintiff can prove general causation, i.e., that he was injured by the type of product or substance manufactured by defendants, and as long as there is a rational method for determining the percentage of the total harm caused to all those damaged by each of the possible defendants, the principle remains intact. [FN185]

The second issue that arises in mass tort cases, but not in Summers, is whether all possible manufacturers whose products might have harmed the victim or victims are named as defendants in the legal action. Courts frequently regard it as unfair to hold defendant-manufacturers jointly and severally liable *912 in a situation in which the plaintiff cannot prove that any of the defendants before the court in fact caused the harm because not all manufacturers have been joined as defendants. [FN186] Other courts, however, have been more understanding of the victim's situation and have not imposed upon plaintiffs the frequently impossible obligation of suing all manufacturers. Instead, these courts have required plaintiffs to "make a genuine attempt to locate and identify the tortfeasor responsible for the individual injury." [FN187]

Though some courts have allowed the use of alternative liability to prove causation in a mass products case in which the particular victim cannot identify the particular injurer that caused her harm, most courts reject the

application of alternative liability principles in these cases. This is because the large number of potential injurers would result in too many "false positives"-manufacturers would be held liable even though only one or a few among many manufacturers were in fact the injurer(s) responsible for the victim's injury-and because the plaintiff typically cannot identify and join all the potential injurers in her legal action. [FN188] In short, except in cases meeting specific criteria that typically do not occur in the mass products torts context, alternative liability is unlikely to prove effective in overcoming the obstacle of individual causation.

#### 4. Enterprise or Industry-wide Liability

The three approaches for finding product manufacturers collectively liable that have previously been discussed in this section-market share liability, concurrent causation resulting in indivisible harm, and alternative liability-are *913 all approaches applicable to situations in which each of the mass product manufacturers or potential injurers is acting independently or in parallel with each other. The remaining two theories of collective liability-industry-wide liability (enterprise liability) and concert of action or civil conspiracy-apply when the defendant-manufacturers have acted jointly or cooperated with each other.

In Hall v. E.I. Du Pont De Nemours & Co., [FN189] Judge Jack Weinstein held six manufacturers of blasting caps and their trade association potentially liable, jointly and severally, on a theory of "enterprise liability" (subsequent courts more often have referred to it as "industry wide liability" [FN190]) for damages to children resulting from eighteen separate accidents. Judge Weinstein justified his decision on the grounds that defendants had cooperated in a safety program through a trade association, and acting either jointly or in parallel, had adopted common safety features that were inadequate-they did not provide for warnings on dangerous products. [FN191] However, since Judge Weinstein's decision, courts almost universally have rejected liability based upon "enterprise" or industry-wide liability. [FN192] For example, in Ryan v. Eli Lilly & Co., [FN193] the court refused to apply enterprise liability and described it as "repugnant to the most basic tenets of tort law." [FN194]

#### 5. Civil Conspiracy and Concert of Action

Beginning in the early 1980s, courts also began using the concepts of concert of action and civil conspiracy to hold manufacturers of products collectively liable to one or more victims harmed by fungible products even when a causal connection could not be established between a particular manufacturer and a particular victim. [FN195] Under the well established doctrine of *914 concert of action, manufacturers of products may be held jointly and severally liable if they "acted in concert," that is, if they acted pursuant to a common plan or design. [FN196] Some courts equate "civil conspiracy" with "concert of action." [FN197] Other courts distinguish the two concepts on the grounds that civil conspiracy requires the joint tortfeasors to share intent to accomplish an unlawful objective, but tort liability for concert of action merely requires that the tortfeasors engage in tortious conduct while acting in concert. [FN198]

Courts have little difficulty in holding manufacturers liable on a concert of action basis where it can be proved that there was an explicit agreement among manufacturers to engage in tortious conduct. [FN199] The courts take different approaches, however, on the issue of whether "consciously parallel conduct" is sufficient to create concert of action liability by "implied or tacit agreement or understanding." [FN200] In Bichler v. Eli Lilly & Co., the New York Court of Appeals upheld the jury's finding of concert of action based upon the DES manufacturers' "consciously parallel behavior" in marketing DES without adequate testing. [FN201] Other courts have held that parallel activity by several product manufacturers is insufficient to establish concert of action. [FN202]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*915 As described in the next Part, concert of action has emerged as an important theory for holding manufacturers liable in many cases, including the tobacco litigation of the late 1990s and the twenty-first century. Concert of action, however, allows the victim to overcome the requirement of individual causation only in those instances in which she can prove an agreement to engage in tortious conduct.

Some of the approaches developed during the 1980s for circumventing the individual causation requirement when proof of such causation, as a practical matter, was impossible-including market share liability and industry-wide liability-have been limited, for the most part, to the factual contexts in which they originally were adopted. Some courts creatively and expansively applied traditional notions of concurrent causation resulting in indivisible harm to the mass products contexts, but most did not. And alternative liability and concert of action generally were limited to specific-and unusual-circumstances. Until the 1990s, the traditional tort requirement that the victim prove that her harm was caused by a particular injurer remained largely intact. Then came the tobacco litigation.

### IV. The Second Wave of Collective Mass Products Torts Actions

#### A. The Collective Plaintiff Redux

##### 1. Government Recoupment Actions

The most highly publicized litigation in recent decades has been the actions brought by state governments against manufacturers of tobacco products seeking reimbursement or "recoupment" of medical assistance payments and other expenditures necessitated by tobacco-related illnesses. [FN203] The success of the states in the settlement of the tobacco litigation has led to the filing of recoupment actions, by either *916 municipalities or states, against the manufacturers of other products, notably handguns [FN204] and lead pigment. [FN205]

The nature of the recoupment action does not require the government-plaintiff to prove that products manufactured by any particular defendant caused the tobacco-related disease of any particular victim/Medicaid recipient. The government acts as a collective plaintiff, suing in relation to the claims of those victims whose medical expenses have been paid for by state medical assistance programs. [FN206] The underlying damage claims in government recoupment actions generally focus, at least nominally, on the financial harm caused to the state itself by tobacco-related illness or gun violence. The substantive legal bases for the claims often are not traditional torts that require proof of specific causation of a physical injury sustained by a particular victim, but rather "less particular" torts claiming that the state has suffered a wrong in its own right when it has reimbursed the expenses caused by tobacco-related illnesses. These legal theories include misrepresentation, public nuisance, unjust enrichment and restitution, and indemnity or indemnification.

In the decades before the mid-1990s, plaintiffs who had sued tobacco companies for their tobacco-related illnesses had been uniformly unsuccessful. [FN207] Often, the particular plaintiff was unable to show that cigarettes manufactured by any particular defendant had caused her tobacco-related disease. Instead, the defendants in these actions argued successfully that a particular plaintiff's cancer had been caused by another manufacturer's *917 products, exposure to different carcinogens, or the plaintiff's own lifestyle factors. [FN208]

In 1994, the State of Mississippi filed the first of the state recoupment actions against the tobacco companies. [FN209] The complaint failed to include the claims based upon the traditional theories of recovery against product manufacturers-strict products liability, negligence, and implied warranty-and instead included only three

claims: ones based upon public nuisance, unjust enrichment, and indemnity. By using these torts in the novel context of products liability actions, the state attempted to avoid both the need to prove individual causation-that a particular manufacturer caused a specific smoker's illness-and the defendant's use of well established defenses based on a smoker's own conduct, such as contributory negligence and assumption of risk. Within three years after the filing of the Mississippi complaint, at least forty states had filed suits against the tobacco manufacturers. [FN210] Many of these states also included claims for public nuisance, [FN211] unjust enrichment or restitution, [FN212] *918 and indemnity (indemnification). [FN213] These states and others also filed claims based upon common law misrepresentation, [FN214] antitrust violations, [FN215] and federal Racketeer Influenced Corrupt Organizations (RICO) theories. [FN216] None of these substantive claims, though they would recover the medical expenses incurred by individual victims of tobacco-related disease, required the governmental plaintiff to prove that products manufactured by a particular defendant caused a particular victim's disease. In still other instances, states passed statutes that explicitly eliminated defenses based upon the state's inability to prove causation between the manufacture of a product by a specific manufacturer and the illness resulting to any particular victim of tobacco-related illness. [FN217] Courts never had a chance to determine the legal viability of these novel substantive claims in the tobacco litigation because the states' actions against the tobacco companies ultimately were settled. [FN218]

The success of the tobacco litigation has led states and municipalities to file recoupment actions against manufacturers of lead pigment, seeking reimbursement of medical expenses paid *919 to victims of childhood lead poisoning, [FN219] and against manufacturers of handguns for medical expenses paid to victims and other expenses incurred by the government as a result of handgun violence. [FN220] Regardless of whether the government entity's recoupment action is based upon a tort-such as public nuisance or unjust enrichment-that arguably does not require the plaintiff to prove a causal link between a particular defendant and a particular plaintiff, or a statute providing the same, the lawsuit typically seeks to recover the medical expenses accruing from the injuries experienced by a group of victims without proof that that any particular victim's injury was caused by products manufactured by a particular defendant.

### 2. Actions by Medical Insurers, Union Health Funds, and Hospitals

The states' success in achieving the tobacco settlement also spawned a number of actions brought by third-party entities alleging that their costs had been increased by the wrongful acts of tobacco companies, and therefore, they should be able to recover these costs under legal theories including misrepresentation and RICO. [FN221] Each of these actions, brought by health insurers, [FN222] trusts organized by unions to provide health care benefits to workers and their families, [FN223] and hospitals [FN224] alleged that the wrongful acts of tobacco manufacturers resulted in the plaintiff sustaining financial losses when it paid the medical costs of the victims of tobacco disease. Similarly, in Falise v. American Tobacco Co., [FN225] the trust established by the bankruptcy court to handle claims brought by millions of victims of asbestos-related disease against former asbestos products manufacturer Johns-Manville Corporation sued the manufacturers of tobacco products, alleging that because of the synergistic effect of asbestos and tobacco products in causing various diseases, the trust had paid claims filed against it that in fact had been caused, at least in part, by tobacco products. [FN226]

*920 Again, in each of these cases brought by health insurers, union trust funds, hospitals, and the Manville Trust, the collective plaintiff sought to recover damages for its own financial losses that resulted from tobacco-related diseases suffered by thousands of victims, without any proof that the product of a particular defendant caused harm to a particular victim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B. Overcoming the Individual Causation Requirement in Recoupment Actions

1. "Deceit and Fraud-A Continuing Conspiracy" [FN227]

States and other collective plaintiffs in recoupment actions against manufacturers most often rely on a combination of the concert of action or civil conspiracy theory for holding multiple defendants liable [FN228] and substantive claims based upon common law fraud [FN229] or fraud-based statutory claims. [FN230] For example, the State of Ohio's complaint in the litigation that led to the tobacco settlement alleged that the defendant manufacturers had manufactured, promoted, and sold tobacco products both "while knowing, but denying and concealing that their tobacco products caused injury and sickness" [FN231] and while enhancing the addictive properties of their products. The allegation that all this was done while the defendants were "engaged in a conspiracy" [FN232] enabled the *921 state to hold the manufacturers jointly and severally liable. Similarly, the State of New York alleged that the defendant manufacturers had conducted a "[c]ampaign of [s]uppression, [d]eceit and [m]isrepresentations." [FN233]

If an individual victim of tobacco-related disease or another disease resulting from product exposure sues a manufacturer for misrepresentation, in most cases she will need to prove that she exposed herself to the product in reliance upon specific statements made by a specific manufacturer or by defendants acting in concert with one another, and that her reliance resulted in her tobacco-related disease. [FN234] The requirement of reliance is obviously one aspect of causation in misrepresentation cases. For example, in Lewis v. Lead Industry Ass'n [FN235] the court denied the misrepresentation claims of the parents of a lead-poisoned child because they could not allege that "they exposed their children to lead-based paint in reliance upon any statement made by any of the defendants, nor [did] they allege that the defendants' failure to disclose any fact caused them to expose their children to lead-based paint." [FN236] In a handful of mass product tort opinions, courts have expressed support for the idea of "fraud-on-the-marketplace" that enables the plaintiff to recover for misrepresentation without proving that she heard and relied upon a specific false statement of the manufacturer, [FN237] but most courts reject the fraud-on-the-marketplace concept in mass products torts. [FN238]

An individual victim of product-related disease, as a realistic matter, may have an easier time proving reliance when the manufacturers' fraud consists of failing to disclose information regarding the harmful effects of its products *922 when it is legally obligated to do so, either as a result of the manufacturers' active suppression of information regarding the harmful effects of its products [FN239] or because the manufacturers' earlier partial statements were misleading. In Wright v. Brooke Group Ltd., [FN240] for example, the Iowa Supreme Court held that when manufacturers had made misleading statements to the consuming public, even if the plaintiffs could not prove that they heard or relied upon any particular statement, the manufacturers had a duty to disclose sufficient information to the public generally to keep their earlier statements from being misleading. [FN241] It is far easier, of course, for the individual plaintiff to assert that he would have avoided exposure to a product if he had been warned when that situation is merely a hypothetical one than it is to prove that he in fact heard an affirmative misrepresentation and relied upon it to the detriment of his health.

2. The Use of Statistical and Sampling Evidence

The state and other collective plaintiffs in recoupment actions do not submit individualized proof establishing the harms experienced by each particular resident with a product-related disease and the causal connection between the particular victim and one or more specific manufacturers. Instead, the collective plaintiff relies upon statistical and sampling evidence. For example, in a state's lawsuit against tobacco manufacturers seeking

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reimbursement of expenses caused by tobacco-related diseases, it must be recognized that smoking does not cause all cases of lung cancer. Further, if the collective plaintiff's underlying substantive claim is one based upon the manufacturers' alleged misrepresentations, not all smokers would have avoided smoking even if the manufacturers had not misrepresented, concealed, or failed to disclose the risks of smoking. Yet it is unrealistic to expect-and contemporary law does not always require-that the collective plaintiff must prove that the cancer of each victim for whose medical expenses recovery is sought was caused, in an objective, scientific sense, by tobacco products, or that the victim would not have started smoking or would have stopped smoking if the defendant- manufacturers had not misrepresented the risks of smoking.

*923 Statistical and sampling evidence enables the collective plaintiff in these cases to prove, at least in the aggregate, the number of victims of tobacco-related diseases whose diseases were caused by the misrepresentations of the tobacco-companies, by determining the following:

> a) the portion of the total number of cancer cases which were caused by exposure to tobacco products and
>
> b) the percentage of the victims of those tobacco-caused cancer cases that would not have started smoking or would have stopped smoking if the defendant-manufacturers had not misrepresented the dangers of smoking.

Laurens Walker and John Monahan provide the following account from the trial in the State of Minnesota's case against the tobacco companies of the use of statistical methodology to establish the portion of the total number of cancer cases caused by exposure to tobacco products:

> The plaintiffs next called an expert in biostatistics . . . [who] described a model used to estimate the loss to the plaintiffs resulting from the alleged misconduct of the defendants. . . . First, 280 million medical bills coded with one or more of the thirteen smoking-related diseases and presented for payment to the plaintiffs-the State of Minnesota or Blue Cross and Blue Shield of Minnesota-were summed. Then three reductions were made. The first was intended to eliminate bills for patients not exposed to the defendants' alleged misconduct because the patients were not smokers. Since information about the smoking habits of the patients was not included on the bills, a survey of a random sample of Minnesota residents was used to determine the reduction necessary to eliminate disease and expense not caused by smoking. The second reduction was intended to take into account the fact that some of the smokers would have acquired one of the thirteen diseases without smoking. The expert used epidemiological studies to determine the percentage of patients who were smokers but who likely would have contracted one of the thirteen diseases even if they had not smoked. [FN242]

This testimony enabled the fact finder to determine the amount of damages resulting from tobacco-related diseases. However, if the collective plaintiff's substantive claim were based upon common law misrepresentation or fraud-based statutory remedies, the amount still would be an over-inclusive figure because it would include damages sustained by victims of tobacco-related disease who would have started smoking and continued smoking even if the defendant-manufacturers had not misrepresented the dangers of smoking. In In *924 re Simon II Litigation, [FN243] Judge Weinstein allowed experts specializing in behavioral science and survey methodology to testify as to the rates of smokers who would have quit smoking if the tobacco companies had not misrepresented the risks. [FN244] The experts' testimony was premised on telephonic surveys, a comprehensive review of empirical literature already available on this issue, and a random sampling of the depositions of a health insurer's subscribers. [FN245]

The use of statistical and sampling evidence has allowed collective plaintiffs to prove the amount of financial damages they have sustained as a result of the increase in disease rates attributable to the use of the manu-

facturer's products and the manufacturer's tortious conduct. The harm proven is in the aggregate; it is not the result of summing the medical expenses attributable to each individual victim. Put another way, the use of statistical and sampling evidence is the method of proof that enables recoupment actions to proceed on a collective, as opposed to a particularistic, basis.

### 3. Torts Seeking Compensation for the Collective Harm: Public Nuisance, Restitution, and Indemnity

State and municipal recoupment actions, as well as those brought by health insurers, union health funds, and hospitals, also allege torts that claim that the tortious harm was experienced directly by the collective plaintiff and not by the individual victims who suffered from tobacco-related disease or other product-related disease. These substantive claims, historically not asserted in claims against product manufacturers, include public nuisance, unjust enrichment and restitution, *925 and indemnity (indemnification). By using these legal theories, the state or other collective plaintiff attempts to avoid the need to prove causation-that a particular manufacturer caused a specific smoker's illness-as well as to preclude the defendant's use of well established defenses based on a smoker's own conduct such as contributory negligence and assumption of risk. Many of the states' recoupment actions against tobacco manufacturers included claims for public nuisance, [FN246] unjust enrichment or restitution, [FN247] and indemnity. [FN248] Because these recoupment actions ultimately were settled, courts never had a chance to determine the legal viability of the claims. [FN249] Since the tobacco settlement, states and municipalities have continued to assert claims based on public nuisance, unjust enrichment, and indemnity against manufacturers of other products, most notably, manufacturers of handguns [FN250] and lead pigment. [FN251]

### a. Public Nuisance

Until the tobacco recoupment actions filed in the mid-1990s, public nuisance was typically regarded as "a species of catch-all low grade criminal offense" [FN252] or as "the great grab bag, the dust bin, of the law." [FN253] Public nuisances included environmental harms such as the discharge of untreated sewage, violations of public morals such as playing bingo for money or nude *926 exotic dancing, and even the playing of loud music and anti-abortion protests that blocked access to abortion clinics. [FN254]

The tort of public nuisance lacked-and continues to lack-meaningful definition and discernable boundaries. [FN255] In a recent recoupment action brought by the City of Chicago against handgun manufacturers, the Illinois Supreme Court noted that public nuisance extends "'to virtually any form of annoyance or inconvenience interfering with common public rights.'" [FN256] Similarly, in another recoupment action against gun manufacturers, the Ohio Supreme Court began with the Restatement (Second) of Torts's language that defines public nuisance as "'an unreasonable interference with a right common to the general public,'" [FN257] acknowledging that the definition "is couched in broad language." [FN258]

In recoupment actions, state attorneys general and private counsel retained by the states have taken advantage of the vagueness of the concept of public nuisance, and the absence of meaningful parameters bounding liability, to circumvent the requirements of more well-defined and mature bodies of law governing products liability actions. [FN259] In particular, state recoupment actions asserting public nuisance claims seek to eliminate any requirement that the state or municipality prove that any specific manufacturer produced the products that have caused any particular harm.

This elimination of the individual causation requirement in recoupment litigation asserting public nuisance claims can result either from the substantive definition of the public nuisance tort or from the handling of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

causation *927 requirement, and often these issues blur. First, courts in recoupment litigation sometimes have described a "public right," the interest protected by the public nuisance tort, more broadly-and less accurately-than in the manner it has been traditionally understood: as "an indivisible resource shared by the public at large, like air, water, or public rights of way." [FN260] Instead, some courts in recoupment cases have characterized a statewide or citywide accumulation of private harms as a violation of the entitlement protected by the public nuisance tort. [FN261] The Wisconsin Court of Appeals recently accepted this rather dramatic expansion of the public nuisance tort-in the process eliminating the individual causation requirement linking the manufacturers' conduct with the harms suffered by victims of childhood lead poisoning-when it allowed the City of Milwaukee to proceed with its public nuisance claims against the manufacturers of lead-based paint or lead pigment. That court ignored the alleged harms failure to fall within the traditionally recognized boundaries for a public right:

> The City has admitted that, because technology does not make it possible to do so, the City cannot identify the specific lead pigment or paint contained in the houses being abated. The City contends such identification is unnecessary where, as here, it is a community-wide health threat which is the alleged public nuisance, and the City can prove community-wide marketing and sales by defendants in the City of Milwaukee at times relevant to the creation of the nuisance . . . .
>   The City maintains that this position is consistent with the fact that public nuisance is focused primarily on harm to the community or the general public, as opposed to individuals who may have suffered specific personal injury or specific property damage. We agree. Were it otherwise, the concept of public nuisance would have no distinction from the theories underlying class action litigation, which serves to provide individual remedies for similar harms to large numbers of identifiable individuals. [FN262]

Focusing on the causation requirements for a public nuisance action, a Rhode Island trial court also recently interpreted the public nuisance tort very broadly so as to eliminate any requirement of individual causation in that state's recoupment action against manufacturers of lead pigment. [FN263] The court rejected the manufacturers' contention that the state was obligated to prove that the manufacturers "are the proximate cause of the particular injury(ies) complained *928 of." [FN264] The court acknowledged that individual causation was generally a requirement of actions based on negligence or products liability law but held that, in a public nuisance action, the defendants would be held jointly and severally liable if it could be shown that they had participated in the unreasonable interference with a right common to the general public. [FN265]

This same argument that government recoupment actions alleging public arguments do not require proof of individual causation recently was explicitly rejected by an Illinois appellate court in an action brought by the City of Chicago against manufacturers of lead-based paint or lead pigment. [FN266] The city argued that because its claims were based on public nuisance, it was not required to prove the identity of any manufacturer that caused any particular harm. [FN267] The court rejected the argument, finding that the theory "'would make the manufacturers insurers of their industry . . . and would result in an abandonment of the principle that, to be held liable, a causative link must be established between a specific defendant's tortious acts and the plaintiff's injuries.'" [FN268]

*929 The ultimate success or failure of the combination of the public nuisance tort and government recoupment actions in overcoming the traditional requirement of individual causation in mass products torts cases has yet to be decided. Within the next few years, the state supreme courts of Illinois, New Jersey, [FN269] Rhode Island, and Wisconsin will render decisions that will go a long way toward deciding this critical issue. Yet the reader of the recent opinions in these government recoupment/public nuisance cases [FN270] seldom escapes the conclusion that well-intentioned judges, seeking judicial remedies to tragic public health and public safety crises that the legislative and executive branches have been unable or unwilling to effectively address, have dra-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

matically expanded the traditional, and perhaps better grounded, understanding of public nuisance.

### b. Unjust Enrichment and Indemnity

Unjust enrichment and indemnity have emerged alongside public nuisance as poorly defined torts used by states and municipalities against product manufacturers. In State v. Lead Industries Ass'n, [FN271] a Rhode Island trial court *930 denied the defendants' motion to dismiss the state of Rhode Island's unjust enrichment claim against manufacturers of lead pigment seeking damages for the state's expenses in addressing childhood lead poisoning. [FN272] The court quoted from an earlier Rhode Island Supreme Court opinion that stated that the doctrine of unjust enrichment "permits the recovery in certain instances where a person has received from another a benefit, the retention of which, would be unjust under some legal principle, a situation which equity has established or recognized." [FN273] In order to recover, the state or other plaintiff must show that it conferred a benefit upon the defendant that the defendant both appreciated and accepted "in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." [FN274] The Rhode Island trial court found that the state's payment of the expenses caused by childhood lead poisoning at a time when defendants continued to profit from the sale of lead added to the defendants' benefit and therefore was sufficient to avoid a motion to dismiss. [FN275]

Most courts, however, have rejected unjust enrichment claims for injuries generally regarded as tort injuries sounding in the more traditional theories of strict products liability or negligence. [FN276] In Perry v. American Tobacco Co., [FN277] for example, the court rejected the plaintiffs' claims on the grounds that defendant-to-bacco companies had not been enriched "because Defendants [had] no legal duty to smokers to pay their medical costs." [FN278]

The trial court in the Rhode Island paint litigation also has denied the defendants' motion to dismiss a separate claim based upon indemnity. [FN279] The *931 court stated, "The concept of indemnity is 'based upon the theory that a party who has been exposed to liability solely as a result of the wrongdoing of another should be able to recover from the wrongdoer.'" [FN280] In order to recover on an indemnity theory, according to the court, the plaintiff must prove three elements: "First, the party seeking indemnity must be liable to a third party. Second, the prospective indemnitor must also be liable to the third party. Third, as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor." [FN281] The court upheld the state's allegations that "as between the State and the defendants . . . the defendants ought to bear the burden of the lead-related expenditures resulting from the damages due to the lead." [FN282]

Again, most other courts have rejected the use of the indemnity theory of recovery in what essentially is a tort claim brought by a state, municipality, health insurer, or similar party. [FN283] In rejecting such a claim, the court in Allegheny General Hospital v. Phillip Morris, Inc. [FN284] correctly noted that the right of indemnity exists only when one party without active fault on its part is legally obligated to pay damages caused by the actions of another party. [FN285] For example, an employer, faultless in its own right, generally is obligated to pay for the torts committed by its employees within the scope of their employment under the doctrine of vicarious liability. If the employer in fact pays the claim, it has legal grounds to pursue (but probably will not) an indemnity claim against the employee whose conduct was negligent or otherwise tortious. The liability of the party who in fact pays, stated the court in Allegheny General Hospital, must rest on fault that is imputed to the state or is constructively imputed because of either some legal relationship between the parties or some "positive rule" of statutory or common law. [FN286]

In the case of recoupment actions against product manufacturers, the state is not legally obligated to make

medical assistance payments to recipients as a *932 result of the manufacturers' tortious conduct being imputed to the state. In short, the indemnity claim adds nothing to a recoupment action unless the state can show both (1) another basis of the legal obligation of the manufacturer to reimburse the victims of product-related harms, and (2) a legal obligation that the state pay for the product-related harms because of some relationship between the state and the manufacturer.

### 4. Evaluating the Probable Success of Recoupment Actions in Overcoming the Individual Causation Requirement

Recoupment actions brought by states and municipalities, when coupled with substantive claims of either (1) fraud, committed by multiple defendants acting in concert or as part of a civil conspiracy, or (2) one of the torts seeking compensation for collective harm-public nuisance, unjust enrichment, or indemnity-are the latest attempt to override or circumvent the traditional requirement of individual causation in tort cases. Yet, even if government recoupment actions are successful, they do not enable individual victims of latent diseases and other injuries resulting from exposure to mass product torts to recover from the manufacturers directly. The victims of such torts, those suffering from tobacco-related disease, handgun violence, and childhood lead poisoning, recover nothing from the manufacturers of the products. [FN287] Only the state or the municipality recovers directly.

In a sense, however, the state's payment of Medicaid proceeds to many of the actual victims, when coupled with the recoupment action, acts much like an alternative compensation system for the individual victims that limits compensation to payment of specified medical expenses. Many victims of such product-caused harms, however, are not Medicaid recipients and will recover nothing. Further, neither the state nor any of its residents, whether Medicaid recipients or not, recover damages for the lost income or the noneconomic damages, such as pain and suffering, sustained by the actual victims of product-related harms. Viewed from an instrumental perspective, these limitations on recoverable damages reduce the manufacturers' incentives to minimize losses below the socially efficient level. [FN288]

*933 In order to circumvent the requirement of an individual causal link between a particular manufacturer and an individual recipient of Medicaid benefits suffering harm as the result of tobacco-related illness, handgun violence, or childhood lead poisoning, the government must either prove fraud committed by manufacturers acting in concert or through a civil conspiracy, or rely upon novel and questionable interpretations of ancient concepts such as public nuisance, unjust enrichment, or indemnity. No government yet has recovered a judgment based upon any of these three mass products torts. It is possible, perhaps likely, that government recoupment actions against manufacturers provide a viable mechanism for overcoming the obstacles posed by the traditional individual causation requirement only when it can be proved that the manufacturers, acting in concert or as part of a civil conspiracy, have committed fraud.

### V. Conclusion

Modern scientific understanding informs us that, in a probabilistic or actuarial sense, millions of people suffer from diseases resulting from exposure to mass products and other toxic substances. Yet nearly a full generation after courts first addressed the troubling causation problems inherent in cases involving latent diseases and other harms resulting from exposure to fungible or nearly fungible products manufactured by multiple defendants, the individual causation requirement in tort-requiring the victim to prove that her specific harm was caused by the products of a particular manufacturer-remains remarkably resilient, denying compensation to the victims of such harms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

One might have expected a different outcome. Mass products torts seem the perfect crucible in which to conduct a real world test of the plausibility of the contrasting notions of causation inherent in the instrumental and corrective justice theories of tort liability. Calabresi and others advocating an instrumental conception of tort law find no justification for a requirement that the victim prove that her harm was caused by a particular injurer. The instrumental theory has profoundly influenced the development of other aspects of products liability. [FN289] But on the issue of the required causal connection, at *934 least, it appears that the result championed by Weinrib and other corrective justice theorists is prevailing. The requirement of individual causation has had remarkable staying power within the tort system.

What is less clear, however, is the reasoning behind this continuing judicial insistence on individual causation. One possibility, of course, is that Weinrib is right and that courts accept his conclusion that the inherent philosophical justification for tort liability requires a link between an individual victim and an individual injurer.

There is, however, a second possibility. It may be that courts recoil from assessing liability to a particular manufacturer whose acts cannot be shown to have caused the plaintiff's harm because the whole notion seems both foreign to the judicial function and one not easily handled by the courts. Involuntarily taking funds from one group and transferring them to another group in the absence of proof of individual causation, regardless of how persuasive the victims' tragic illnesses may be, seems more like a taxation and welfare function to be handled by legislative and administrative bodies than it does a judicial function.

Further, if the plaintiff in a mass products case with indeterminate manufacturers is to recover without proof of individual causation, sooner or later the court must determine the respective share of the financial responsibility for each of the defendant-manufacturers, either through market share liability or during a subsequent contribution action among manufacturers. [FN290] Yet only in a few cases, such as those involving DES, is it possible to apportion realistically causal responsibility in a manner that satisfies typical notions of fairness and accuracy within the judicial process. Framed as an issue of institutional competence and appropriate institutional boundaries, disquietude about recovery in the absence of proof of individual causation is fully compatible with an instrumental theory of tort law.

In the absence of proof of an individual causal connection, compensation for harms caused by exposure to mass products torts is better left to alternative compensation systems than to courts. [FN291] In these venues, we can dispense with any requirement of individual causation: determinations of which claimants may recover, and which manufacturers must pay and in what amounts, would be left to the legislative branch and administrative agencies. Today's scholars, *935 judges, and mass products torts attorneys, intellectual heirs of the 1960s [FN292] whose conception of torts has been shaped by the instrumental theory, expect too much from the judicial system.

[FNa1]. Professor of Law, University of Maryland School of Law. I would like to thank Oscar Gray, Michael Rustad, Richard Boldt, Gordon Young, Dan Gilman, and Maxwell Chibundu for their helpful review and comments on an earlier version of this paper. I also am grateful to the participants at the Thomas F. Lambert Tort Law Conference at Suffolk University School of Law and at a faculty workshop at the University of Maryland School of Law for their comments and suggestions. Finally, I want to express my appreciation to Rachel Mehrbakhsh and Anjali Downs, both students at the University of Maryland School of Law, for their research and editorial assistance.

[FN1]. See Jeremiah Smith, Sequel to Workmen's Compensation Acts, 27 Harv. L. Rev. 235, 363 (1914)

(predicting "that the incongruities" between the no fault principles of the workers' compensation statutes and the predominantly fault requirements of the common law "will not be permitted to continue permanently without protest"). Compare, e.g., Oliver W. Holmes, The Common Law 76 (Mark DeWolfe Howe ed. 1963) (1881) (arguing that the injurer should pay for victim's loss only when at fault), and Richard A. Posner, A Theory of Negligence, 1 J. Legal Stud. 29, 32-34 (1972) (arguing for a fault requirement), with Guido Calabresi, The Costs of Accidents: A Legal and Economic Analysis (1970) [hereinafter The Costs of Accidents] (concluding that the fault system is a failure and should be replaced).

[FN2]. See, e.g., Gary T. Schwartz, The Beginning and the Possible End of the Rise of Modern American Tort Law, 26 Ga. L. Rev. 601, 603 (1992) (concluding that since the early 1980s, the expansion of absolute liability, so prominent in American tort law between 1960 and 1980, "has essentially ended").

[FN3]. See, e.g., Holmes, supra note 1, at 64 (noting that a defendant may be held liable "for harm which he has done"); see also Claytor v. Owens-Corning Fiberglass Corp., 662 A.2d 1374, 1382 (D.C. App. 1995) ("[A] defendant cannot be held liable unless the defendant has in fact caused the plaintiff's harm."); Ingersoll v. Liberty Bank of Buffalo, 14 N.E.2d 828, 829 (N.Y. 1938) ("Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible . . . plaintiff cannot have a recovery."); Richard L. Abel, A Critique of Torts, 37 UCLA L. Rev. 785, 811 (1990) ("[E]very tort system, whether based on fault or strict liability, must determine whether a particular defendant caused a particular plaintiff's injury."); Louis Kaplow & Steven Shavell, Fairness Versus Welfare, 114 Harv. L. Rev. 966, 1101 (2001) ("There is a reluctance on fairness grounds to impose liability when it cannot be proved that a particular injurer caused harm to a particular victim.").

[FN4]. See, e.g., Menne v. Celotex Corp., 861 F.2d 1453, 1468 (10th Cir. 1988) (shifting burden to defendant-manufacturers to prove absence of cause in fact); Sindell v. Abbott Labs., 607 P.2d 924, 931 (Cal. 1980) (allowing plaintiff to recover on a market share liability basis despite her inability to identify manufacturer of product that caused her harm); Thomas v. Mallett, 701 N.W.2d 523, 562 (Wis. 2005) (allowing victims of childhood lead poisoning to recover against lead pigment manufacturers on a "risk contribution" basis); Laurens Walker & John Monahan, Sampling Liability, 85 Va. L. Rev. 329, 337 (1999) (describing use of statistical and sampling evidence in Minnesota's cases against tobacco manufacturers that enabled the state to recover for medical expenses it had paid to residents with tobacco-related disease without proof that any particular manufacturer's product caused any specific resident's disease).

[FN5]. See, e.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1051-52 (2d Cir. 1985) (holding defendant site owners liable for public nuisance even though they did not contribute to the presence or cause of the release of hazardous substances on their property); Michie v. Great Lakes Steel Div., 495 F.2d 213, 215-16 (6th Cir. 1974) (holding defendants jointly and severally liable for harms caused by their pollutants despite inability of plaintiffs to identify specific polluter "where said pollutants mix in the air so that their separate effects in creating the individual injuries are impossible to analyze").

[FN6]. Judith Jarvis Thomson, The Decline of Cause, 76 Geo. L. J. 137, 137 (1987).

[FN7]. See Jack B. Weinstein, Ethical Dilemmas in Mass Tort Litigation, 88 Nw. U. L. Rev. 469, 494, 504-05 (1994) (describing how lawyers in mass products torts cases assume control of litigation because of the inability of clients to do so). Judge Weinstein notes that in mass tort cases:

      [T]he lawyer acts on behalf of a group that cannot effectively control the lawyer's conduct of the litigation. The lawyer often must form his or her own judgments about what course of action is in the best interests of many clients as a group and, perhaps more importantly, best reflects the needs and the unexpressed de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sires of that group.

Id. at 504. The result, Judge Weinstein concludes, is that in many cases, "[t]he client becomes no more than an unembodied cause of action." Id. at 494

[FN8]. For the purposes of analyzing the issue posed in this Article, whether a particular victim should be required to prove that a particular injurer caused her harm in order to recover, division of contemporary tort theories into two categories should suffice. In reality, any such attempt to categorize tort theories is multifaceted and far more complex. Izhak England provides a typology of tort theories that is both concise and more successful than most. Izhak England, The Philosophy of Tort Law 1-83 (1993); see also infra note 39 and accompanying text (describing England's typology).

[FN9]. E.g., The Costs of Accidents, supra note 1; Guido Calabresi & John T. Calabresi Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055 (1972).

[FN10]. E.g., Richard A. Posner, Economic Analysis of the Law (6th ed. 2003); Posner, A Theory of Negligence, supra note 1, at 32-34.

[FN11]. William M. Landes & Richard A. Posner, Causation in Tort Law: An Economic Approach, 12 J. Legal Stud. 109, 131 (1983).

[FN12]. See generally Ernest J. Weinrib, The Idea of Private Law (1995).

[FN13]. See, e.g., Cimino v. Raymark Indus., Inc., 751 F. Supp. 649, 650-51 (E.D. Tex. 1990) (laying forth the class action claim), rev'd in part, 151 F.3d 297 (5th Cir. 1998); see also infra notes 86-102 and accompanying text (discussing Judge Parker's approach in Cimino).

[FN14]. See, e.g., In re E. & S. Dist. Asbestos Litig., 772 F. Supp. 1380, 1387 (E.D. & S.D.N.Y. 1991), aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831 (2d Cir. 1994) (discussing the propriety of consolidation).

[FN15]. See, e.g., Bateman v. Johns-Manville Sales Corp., 781 F.2d 1132, 1133 (5th Cir. 1986) (barring recovery in asbestos case where plaintiffs were unable to identify either the specific products causing their diseases or any of the manufacturers of the products); Goldman v. Johns-Manville Sales Corp., 514 N.E.2d 691, 702 (Ohio 1987) (same).

[FN16]. See, e.g., Skipworth v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 175 (Pa. 1997) (affirming dismissal of claims where plaintiff suffering from childhood lead poisoning could not identify specific manufacturers of lead pigment contained in paint that had been applied at various times during a period lasting more than a century to interior walls of house where plaintiff lived). But see Thomas v. Mallett, 701 N.W.2d 523, 532-533 (Wis. 2005) (allowing victims of childhood lead poisoning to recover against lead pigment manufacturers on a "risk contribution" basis without proof of causal connection between a particular victim and a specific manufacturer). In 2001, I consulted briefly with Dickstein Shapiro Morin & Oshinsky of Washington, D.C., which represents E.I. du Pont de Nemours & Co., on several legal issues in the litigation brought by the state of Rhode Island against lead pigment manufacturers. As the former Chair of the Maryland Lead Paint Poisoning Commission, I also have served as a consultant and an advisor to the National Paint and Coatings Association on state legislative responses to reduce and eliminate childhood lead poisoning. Obviously, the views expressed in this Article are strictly my own.

[FN17]. See, e.g., In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1263 (E.D.N.Y. 1985) (finding that plaintiffs who opted-out of class action settlement were unable to prove that their diseases resulted from ex-

posure to Agent Orange or that "any particular defendant produced the Agent Orange to which he may have been exposed").

[FN18]. Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980).

[FN19]. See id. at 925-26 (setting forth the complaint).

[FN20]. See id. at 934 (stating that the trial court sustained the defendants' demurrers).

[FN21]. See id. at 937-38 (stating that "[u]nder this approach, each manufacturer's liability would approximate its responsibilities for the injuries caused by its own products").

[FN22]. See, e.g., State v. Lead Indus. Ass'n, Inc., No. 99-526, 2001 R.I. Super LEXIS 37, at *1 (R.I. Super. Ct. Apr. 2, 2001) (allowing state's claims against manufacturers of lead pigment for reimbursement of expenses resulting from childhood lead poisoning); Complaint, Moore ex rel. State v. Am. Tobacco Co., No. 94-1429 (Miss. Ch. Ct. Jackson County, filed May 23, 1994) (filing the first of state recoupment actions against the tobacco companies), available at Tobacco Litigation Documents, Website of the Galen Digital Library of University of California, San Francisco, www.library.ucsf.edu/tobacco/litigation [hereinafter Tobacco Litigation Documents] (last visited June 17, 2005).

[FN23]. See, e.g., City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1140 (Ohio 2002) (allowing claims of municipality against gun manufacturers for reimbursement for expenses such as increased police, emergency, health, and corrections costs).

[FN24]. See, e.g., Blue Cross & Blue Shield, Inc. v. Philip Morris, Inc., 113 F. Supp. 2d 345, 352 (E.D.N.Y. 2000) (claiming recovery from tobacco product manufacturers based on misrepresentation and RICO theories).

[FN25]. See, e.g., Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc., 23 F. Supp. 2d 771, 777 (N.D. Ohio 1998) (seeking recovery against tobacco manufacturers as a result of costs incurred by plaintiff health trusts for treatment of smoking-related illnesses and addiction).

[FN26]. See, e.g., Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 432 (3d Cir. 2000) (claiming recovery from tobacco companies for unreimbursed costs of health care provided to nonpaying patients suffering from tobacco-related disease).

[FN27]. See, e.g., Agency for Health Care Admin. v. Associated Indus., 678 So. 2d 1239, 1254 (Fla. 1996) (holding unconstitutional on state due process grounds a statute enabling the state to recover Medicaid costs resulting from tobacco-related illnesses from manufacturers on a market share liability basis).

[FN28]. Also, the Wisconsin Supreme Court recently resurrected a theory of collective causation known as "risk contribution," similar to market share liability, in a case brought by childhood lead poisoning victims against pigment manufacturers. See Thomas v. Mallett, 701 N.W.2d 523, 532-33 (Wis. 2005) (allowing victims of childhood lead poisoning to recover against lead pigment manufacturers on a "risk contribution" basis).

[FN29]. William Prosser, Handbook of the Law of Torts § 41, at 237 (4th ed. 1971); see also Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, The Law of Torts § 20.2 (1986) ("Through all the diverse theories of proximate cause runs a common thread; almost all agree that defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is liability.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN30]. Payton v. Abbott Labs., 437 N.E.2d 171 (Mass. 1982).

[FN31]. Id. at 188.

[FN32]. Id.

[FN33]. Guido Calabresi, Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr., 43 U. Chi. L. Rev. 69, 85 (1975).

[FN34]. See infra notes 49-77 and accompanying text (discussing the corrective justice approach). Corrective justice and law and economics have been described as "the two most powerful theories of tort in American legal thought today." Christopher H. Schroeder, Corrective Justice and Liability for Increasing Risks, 37 UCLA L. Rev. 439, 439 (1990). But see infra note 39 (describing view of Izhak Englard that any attempt to dichotomize tort theories is oversimplified).

[FN35]. See The Costs of Accidents, supra note 1, at 26-27 (stating that "the principal function of accident law is to reduce the sum of the costs of accidents and the costs of avoiding accidents").

[FN36]. See generally Posner, Economic Analysis of the Law, supra note 10; Posner, A Theory of Negligence, supra note 1.

[FN37]. See The Costs of Accidents, supra note 1, at 27-28 (describing the importance of spreading accident losses and shifting them to "deep pockets" as means of reducing "the real societal costs of accidents").

[FN38]. See generally Jules L. Coleman, Risks and Wrongs (1992); Weinrib, supra note 12.

[FN39]. See Englard, supra note 8, at 1-83. Englard concludes, for example, that moral responsibility and social utility are not "an antinomy" and that "only a very specific philosophy, especially one which grounds itself on Kantian notions, will create an irreducible opposition between these two concepts." Id. For example, according to Englard, Posner's "starting point is the comprehensive positive economic principle of wealth maximization" (certainly a utilitarian or instrumental approach), but Posner also regards the imposition of liability on the defendant as "a moral responsibility." Id. Englard further notes that some scholars, notably critical theorist Richard Abel, strongly emphasize "distributive justice," in contrast to "corrective justice" in the Aristotelian dichotomy. Id. at 66-67. Fundamentally, Englard concludes, "The rhetoric of actual tort law is pluralistic: law-givers and courts rely on a multitude of contrasting reasons in imposing liability." Id. at 64. He ultimately acknowledges, however, that "[t]he two extreme, opposite, univalent theories of tort liability are the utilitarian, economic theory of Posner and the non-instrumentalist, corrective justice theory of Weinrib." Id. at 31. According to Englard, Calabresi, while "postulat[ing] economic efficiency as the overriding rational principle of tortious liability, affords" a place "in principle, to considerations of justice." Id.; see also Guido Calabresi & A. Douglas Melamed, Property Rules, Liability Rules, and Inalienability: One View of the Cathedral, 85 Harv. L. Rev. 1089, 1102 (1972) (illustrating "other justice reasons").

[FN40]. See Keith N. Hylton, The Theory of Tort Doctrine and the Restatement (Third) of Torts, 54 Vand. L. Rev. 1413, 1416-17 (2001) (crediting Calabresi with the "most sophisticated applied treatment to the law" of the welfare economics of Pigou); see generally A.C. Pigou, The Economics of Welfare (1920).

[FN41]. See John C.P. Goldberg & Benjamin C. Zipursky, Accidents of the Great Society, 64 Md. L. Rev. 364, 370 (2005) (outlining Calabresi's argument).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN42]. The Costs of Accidents, supra note 1, at 68.

[FN43]. See id. at 27-28 (setting forth the second subgoal). The aim of Calabresi's third subgoal of "tertiary cost reduction" is to reduce the costs of achieving the other two goals, primary and secondary cost avoidance. See id. at 28 (briefly explaining the third subgoal).

[FN44]. Id. at 40.

[FN45]. Id. at 297.

[FN46]. Guido Calabresi, Concerning Cause and the Law of Torts: An Essay for Harry Kalven, Jr., supra note 33, at 85 (emphasis in original).

[FN47]. See The Costs of Accidents, supra note 1, at 302-03 (arguing that the amount of an injurer's payment should depend on its comparative level of fault compared with that of the other injurers).

[FN48]. See Richard A. Posner, Guido Calabresi's The Costs of Accidents: A Reassessment, 64 Md. L. Rev. 12, 12 (2005) ("[D]escribing deep differences . . . between us . . . concerning the proper way to apply economics to torts."); see also Englard, supra note 8, at 31-42 (comparing Calabresi's and Posner's views of tort liability); Keith N. Hylton, Calabresi and the Intellectual History of Law and Economics, 64 Md. L. Rev. 85, 90 (2005) (contrasting views of Calabresi and Posner).

[FN49]. Landes & Posner, supra note 11, at 124-25; see also William M. Landes & Richard A. Posner, Joint and Multiple Tortfeasors: An Economic Analysis, 9 J. Legal Stud. 517, 540-41 (1980) (defending joint liability in actions against manufacturers of fungible products "on the ground that it will induce better record keeping and thus reduce the future incidence of cases where the costs of information result in treating an individual tort as a joint tort").

[FN50]. Ernest J. Weinrib, Corrective Justice, 77 Iowa L. Rev. 403, 409 (1992) (emphasis added); see also Weinrib, supra note 12, at 1, 142-44 ("The most striking feature of private law is that it directly connects two particular parties through the phenomenon of liability.").

[FN51]. Weinrib, supra note 12, at 125.

[FN52]. See id. at 56, 57, 84, 131 (describing Aristotle's and Kant's views on corrective justice).

[FN53]. See Ernest J. Weinrib, Causation and Wrongdoing, 63 Chi.-Kent L. Rev. 407, 415 (1987) (presenting an implication of "causation construed as the particularization of the sufferer in relation to the actor").

[FN54]. Weinrib, supra note 12, at 56.

[FN55]. See id. (observing, however, that "Aristotle . . . was the first to point to the distinctive features of this process"). See Aristotle, Nicomachean Ethics 120-23 (Martin Ostwald trans., 1962) ("When one man has inflic-ted and another received a wound . . . the doing and suffering are unequally divided; by inflicting a loss on the offender, the judge tries to take away his gain and restore the equilibrium.").

[FN56]. See Weinrib, supra note 12, at 60-61 (describing Aristotle's idea of justice); see also Aristotle, supra note 55, at 118-20 ("Since an unjust man and an unjust act are unfair or unequal, it is obvious that there exists also a median term between the two extremes of inequality. This is the fair or equal . . . [n]ow the just in transac-tions is also something equal (and the unjust something unequal), but (it is something equal) which corresponds

not to a geometrical but to an arithmetical proportion.").

[FN57]. See Weinrib, supra note 12, at 61 (stating that "Aristotle is not committed . . . to any particular criterion of equality"); see also Immanuel Kant, The Metaphysics of Morals 42, 56, 214, 230 (Mary Gregor trans., 1991) (discussing the nature of the individual).

[FN58]. Weinrib, supra note 12, at 104.

[FN59]. See id. at 114-36, 142-44 (discussing correlativity).

[FN60]. See id. at 115-20 (proposing "a distinction between . . . the 'factual' and the 'normative' aspects of gains and losses").

[FN61]. Id. at 63.

[FN62]. See id. (explaining the bipolarity of corrective justice).

[FN63]. Id. at 142.

[FN64]. See id. at 144 (defining the court's task).

[FN65]. See generally Coleman, supra note 38, at 197-431.

[FN66]. See id. at 428 (cautioning, however, "that it is a mistake to hold that tort law as a whole is a matter of corrective justice"); see also id. at 303 (expressing the view "that accident law implements a variety of different principals and policies").

[FN67]. Id. at 324; see generally id. at 323-26.

[FN68]. See id. at 433 (stating that his "approach could not be more different" than the approach of Ernest Weinrib).

[FN69]. See id. at 358-60 (asserting that local norms are critical to the idea of wrongdoing in corrective justice theory).

[FN70]. Id. at 374.

[FN71]. Id. at 355.

[FN72]. Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980).

[FN73]. Richard W. Wright, Causation, Responsibility, Risk, Probability, Naked Statistics, and Proof: Pruning the Bramble Bush by Clarifying the Concepts, 73 Iowa L. Rev. 1001, 1073 (1988); see also Claire Finkelstein, Is Risk A Harm?, 151 U. Pa. L. Rev. 963, 967-90 (2003) (arguing that victim should be able to recover for being exposed to the risk of harm, even if she cannot prove that the acts of any particular wrongdoer resulted in her harm); Glen O. Robinson, Multiple Causation in Tort Law: Reflections on the DES Cases, 68 Va. L. Rev. 713, 739 (1982) (justifying market share liability on the basis that fairness requires only that the particular defendant held liable be one that created a risk of injury to the particular plaintiff, not the injury itself); Thomson, supra note 6, at 137-38 (sanctioning the use of probabilistic evidence to hold manufacturers of mass products liable without proof of individual causation). The "risk contribution" arguments of Wright, Finkelstein, and Robinson

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appeared to have prevailed in the Wisconsin Supreme Court's recent opinion in Thomas v. Mallett, 701 N.W.2d 523, 532-33 (Wis. 2005) (allowing recovery on a "risk contribution" basis).

[FN74]. See Coleman, supra note 38, at 399-400, 405-06 (faulting Wright's argument).

[FN75]. See id. (same).

[FN76]. See id. at 405 (discussing the DES cases). Coleman acknowledges that in the case of mass products cases involving indeterminate defendants, he believes that the tort system should focus on goals other than corrective justice:

My suggestion is that we read the DES cases not as an effort to implement corrective justice in an imperfect world but as an effort to implement localized or constrained at-fault pools to deal with injuries caused by certain kinds of defective products. . . . (The tort suit is used as a forum for implementing this plan simply because it uses the plaintiff class as private prosecutors and is presumably desirable on those grounds.) Id.

[FN77]. Id. at 434.

[FN78]. See Finkelstein, supra note 73, at 980-81 (presenting the "Risk Harm Thesis"); see also Judith Jarvis Thomson, Remarks on Causation and Liability, 13 Phil. & Pub. Affairs 101, 101 (1984) (noting that some recent cases have allowed recovery without causation). Thomson believes that potential injurers, such as manufacturers of mass products, can be held liable on legal grounds that do not require the particular victim to identify the particular injurer responsible for her harm when the potential injurers not only "act equally negligently" but also "impose[] roughly the same risk of harm on one and the same person." Id. at 149.

[FN79]. See, e.g., Metro-North Commuter R.R. v. Buckley, 521 U.S. 424, 428-44 (1997) (holding that a railroad worker negligently exposed to asbestos, but without any symptoms of any disease, cannot recover under the Federal Employer's Liability Act (FELA) for negligently inflicted emotional distress or for future medical costs until he manifests symptoms of a disease). But see Thomas v. Mallett, 701 N.W.2d 523, 532-33 (Wis. 2005) (allowing recovery on a risk-contribution basis without proof of individual causation).

[FN80]. The environmental movement had its roots in the nineteenth century recognition of the link between sanitation and the "germs" that caused infectious illness. See Christopher Warren, Brush With Death: A Social History of Lead Poisoning 39-41 (2000) (stating that the "reduction in the epidemiological background noise, together with the establishment of an interventionist pediatric industry" resulted in "an increased awareness of environmental poisons in general and of lead in particular"); Anjali Garg & Philip J. Landriagan, Social Policy and Social Movements: Children's Environmental Health: New Gains in Science and Policy, 584 Annals Am. Acad. Pol. & Soc. Sci. 135, 137 (2002) (discussing human health and the environment). As the incidence of infectious diseases began to decline, the focus on the environment also diminished. Then, in 1962, the publication of Rachel Carson's Silent Spring focused the public's attention on the deleterious health consequences of toxins present in the environment. See generally Rachel Carson, Silent Spring (1962); Garg & Landriagan, supra, at 136-38.

[FN81]. See Paul Brodeur, Outrageous Misconduct: The Asbestos Industry on Trial 10-14 (1985) (describing studies released in 1964 showing a dramatic increase in mortality and morbidity among those exposed to asbestos).

[FN82]. See David Kessler, A Question of Intent: A Great American Battle with a David Kessler, A Question of Intent: A Great American Battle with a Deadly Industry 198 (2001) (discussing the public awareness of the link

between Deadly Industry 198 (2001) (discussing the public awareness of the link between cigarette smoking and cancer). On December 8, 1953, a series of medical cigarette smoking and cancer). On December 8, 1953, a series of medical presentations linked smoking to cancer and thus the dangers of cigarettes first came presentations linked smoking to cancer and thus the dangers of cigarettes first came to widespread public attention. Id. "At the time, a link between smoking and cancer to widespread public attention. Id. "At the time, a link between smoking and cancer had not been acknowledged by the National Cancer Institute, the U.S. Public Health had not been acknowledged by the National Cancer Institute, the U.S. Public Health Service, or many distinguished members of the medical and scientific communities." Service, or many distinguished members of the medical and scientific communities." Id.; see also Robert L. Rabin, A Sociolegal History of the Tobacco Tort Litigation, Id.; see also 44 Stan. L. Rev. 853, 856 (1992) (describing the "great cancer scare" of the 44 Stan. L. Rev. 853, 856 (1992) (describing the "great cancer scare" of the 1950s). 1950s).

[FN83]. See Warren, supra note 80, at 14 (noting the lack of knowledge about lead poisoning). According to Warren, "At the beginning of the twentieth century, the relative lack of diagnostic tools meant that only acute, clinical plumbism was accurately diagnosed." Id. Public health researchers only "became aware of the true scale of childhood lead poisoning in the late 1960s." Id. at 28. Warren continues, "as late as the early 1950s, Baltimore's aggressive pediatric lead screening program defined cases in which the blood-lead level exceeded 70 g/dL only as 'possible lead poisoning.'" Id. Today, the Center for Disease Control states, "Many studies point to a link between BLLs [blood lead levels] >10 g/dL and harmful health effects, in particular learning disabilities and behavior problems." Ctrs. for Disease Control and Prevention, Nat'l Ctr. for Envtl. Health, Children's Blood Lead Levels in the United States, Preventing Lead Poisoning in Young Children, available at http://www.cdc.gov/nceh/lead/research/kidsBLL.htm#Defining%20the% 20problem (last visited June 18, 2004). Warren concludes, "The prerequisites for the discovery of childhood lead-poisoning's epidemic nature were met in the Untied States by the 1920s . . . . But until the 1970s, the medical and public health communities' responses remained sluggish, if not moribund." Warren, supra, at 43.

[FN84]. I do not consider here certain voluntary practices of plaintiffs' attorneys in aggregating similar cases for the purposes of preparation, discovery, and trial, including voluntary joinder. See Fed. R. Civ. P. 20 (setting forth the rule for voluntary joinder); Michael D. Green, The Inability of Offensive Collateral Estoppel to Fulfill Its Promise: An Examination of Estoppel in Asbestos Litigation, 70 Iowa L. Rev. 141, 183-84 (1984) (asserting that concerns about the effects that collateral estoppel have on joinder are not significant in asbestos cases); Enterprise Responsibility for Personal Injury, Volume II: Approaches to legal and Institutional Change 404-05 (American Law Institute Reporters' Study 1991) (discussing voluntary joinder). Nor does this Article address the creation of networks among plaintiffs' attorneys. See Paul Rheingold, The MER/29 Story-An Instance of Successful Mass Disaster Litigation, 56 Cal. L. Rev. 116, 122 (1968) (discussing the formation of the plaintiff's group); Enterprise Responsibility for Personal Injury, supra, at 405 (discussing networks). Finally, this Article does not discuss the combination of a test case with a pattern settlement. See Jack B. Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buff. L. Rev. 433, 447-48 (1960) (discussing stare decisis); Enterprise Responsibility for Personal Injury, supra, at 405-06 (discussing test case, pattern settlements). By themselves, these procedural and tactical devices do not result in the imposition of collective liability in a way that abrogates the traditional causal link between a particular plaintiff and a particular defendant. See generally Howard M. Erichson, Informal Aggregation: Procedural and Ethical Implications of Coordination Among Counsel in Related Lawsuits, 50 Duke L.J. 381 (2000) (examining ethical and procedural implications of informal aggregation).

[FN85]. In In re School Asbestos Litigation, 789 F.2d 996, 1011 (3d Cir. 1986) (certifying class action of school districts against asbestos manufacturers), the Court of Appeals described the frustrations of separately litigating

mass products torts claims:

> Inefficiency results primarily from relitigation of the same basic issues in case after case. Since a different jury is empanelled in each action, it must hear the same evidence that was presented in previous trials. A clearer example of reinventing the wheel thousands of times is hard to imagine. . . . In case after case, the health issues, the question of injury causation, and the knowledge of the defendants are explored, often by the same witnesses.

Id. at 1001, 1003.

[FN86]. See generally Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990), rev'd in part, 151 F.3d 297 (5th Cir. 1998).

[FN87]. See 751 F. Supp. at 652 (setting forth the court's plan). After the dismissal, severance, or settlement of 733 individual cases, a class consisting of 2,298 plaintiffs went to trial. Id. at 652-53.

[FN88]. See id. at 659-65 (describing Phase III of the plan); see also infra notes 242-45 (summarizing the use of statistical evidence in cigarette cases).

[FN89]. See Cimino, 751 F. Supp. at 653 (setting forth an overview of the plan).

[FN90]. See id. at 653 (describing Phase I). The trial took 133 days and yielded 25,348 pages of trial transcript. Id. During the trial, 272 expert witnesses and 292 fact witnesses testified. Id.

[FN91]. Id.

[FN92]. See Cimino v. Raymark Indus. Inc., 151 F.3d 297, 301 (5th Cir. 1998) (describing Phase II).

[FN93]. Id.

[FN94]. See id. (describing the stipulation). The stipulation explicitly provided, however, that defendants continued to object to Judge Parker's trial plan and that, if the appellate court rejected the provisions of the trial plan for determining causation, the stipulated percentages of damages were "void." See id. at 307 (stating that the "defendants were not thereby agreeing that the trial plan . . . was a permissible way to adjudicate their liability and damages").

[FN95]. See id. at 303 (describing phase III).

[FN96]. See Cimino v. Raymark Indus., Inc., 751 F. Supp. 649, 664 (E.D. Tex. 1990) (stating that "the court elected to defer that decision until after the damages trial").

[FN97]. See id. at 665 (explaining the defendant's objection on due process grounds).

[FN98]. See id. at 665-66 (explaining the defendant's constitutional challenges).

[FN99]. See id. at 666 (stating that "[i]f the existence of variables are the driving force behind defendants' due process argument, then due process has been served").

[FN100]. See Cimino v. Raymark Indus., Inc., 151 F.3d 297, 315-21 (5th Cir. 1998) (concluding that "the extrapolation case judgments, as well as the phase III judgments, are fatally flawed").

[FN101]. See id. at 319 (quoting In re Fibreboard Corp., 893 F.2d 706, 711 (5th Cir. 1990)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN102]. See id. (noting that the phase III holding "necessarily requires reversal of the judgments in the five extrapolation cases"). The Court of Appeals acknowledged the plight of trial court judges forced to address the onslaught of asbestos litigation but concluded that "real reform" required an asbestos-dispute resolution scheme established by Congress. See id. at 321 (observing that Congress has not acted).

[FN103]. See, e.g., In re Copley Pharm., Inc., 158 F.R.D. 485, 488-93 (D. Wyo. 1994) (certifying class in action against manufacturer of Albuterol, a drug allegedly contaminated by microorganisms); In re West Virginia Rezulin Litig. v. Hutchinson, 585 S.E.2d 52, 62-76 (W. Va. 2003) (certifying class in action brought by victims of liver disease allegedly caused by Rezulin, an oral insulin drug manufactured by defendants).

[FN104]. See, e.g., In re St. Jude Med., Inc., MDL No. 01-1316, 2004 U.S. Dist. LEXIS 149, at *39 (D. Minn. Jan. 5, 2004) (certifying class for purposes of medical monitoring claim but denying class certification for injury claims); see also In re Simon II Litigation, 211 F.R.D. 86, 108, 190 (E.D.N.Y. 2002) (certifying class for punitive damages only), rev'd, 407 F.3d 125, 137-38 (2d Cir. 2005) (vacating class certification order and rejecting class members' argument that certification was warranted because constitutional limits on punitive damages created a limited fund available to satisfy individual class members' claims).

[FN105]. See, e.g., Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1235 (9th Cir. 1996) (denying class certification in case against manufacturer of epilepsy drug); In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1304 (7th Cir. 1995) (denying class certification of hemophiliacs whose blood transfusions were contaminated with HIV); Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 276 (S.D. Fla. 2003) (denying class certification of plaintiffs making claims against manufacturer of dietary supplement containing ephedra and caffeine); In re Baycol Prods. Litig., 218 F.R.D. 197, 216 (D. Minn. 2003) (denying class certification of plaintiffs making claims against manufacturer of drug prescribed to lower lipid levels of individuals with high cholesterol); Benner v. Becton Dickinson & Co., 214 F.R.D. 157, 174 (S.D.N.Y. 2003) (denying class certification of plaintiffs making claims against manufacturer of contaminated secondary needlesticks).

[FN106]. See Fed. R. Civ. P. 23(a) (giving the requirements for class certification). The party seeking class certification must prove that the proposed class meets the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Id.

[FN107]. See infra notes 108-11 and accompanying text (illustrating how individualized issues can prevent certification); infra notes 114-15 and accompanying text (discussing certification for the purpose of medical monitoring).

[FN108]. Estate of Mahoney v. R.J. Reynolds Tobacco Co., 204 F.R.D. 150 (D. Iowa 2001).

[FN109]. See id. at 154 (discussing the typicality requirement).

[FN110]. See id. at 156 (applying the predominance test).

[FN111]. See id. at 156-60 (discussing the individual fact issues). Other courts, in denying class certification to proposed nationwide classes, have noted the difficulty of applying varying substantive principles of state law from different states. See, e.g., Perez v. Metabolife Int'l Inc., 218 F.R.D. 262, 266 (S.D. Fla. 2003) (denying certification of a class of members from four states due to the "difficulty of applying varying and unsettled legal principles in multiple states"). Chief Judge Richard Posner of the Seventh Circuit, for example, has described how the trial court, in such a case, might be required to give "a kind of Esperanto instruction, merging the negli-

gence standards of the 50 states and the District of Columbia." In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300 (7th Cir. 1995).

[FN112]. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 597 (1997) (overturning the certification of a so-called "opt-out" class under Rule 23(b)(4) of the Federal Rules of Civil Procedure because of a conflict of interest when plaintiffs' lawyers represented both those with current injuries and those who may sustain injuries in the future as a result of past exposure to product); Ortiz v. Fibreboard Corp., 527 U.S. 815, 820 (1999) (overturning the certification of a mandatory class under Rule 23(b)(1)(B) in part because of the failure to properly address conflicts of interest within the class).

[FN113]. Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, available at http://thomas.loc.gov/ (last visited June 18, 2005).

[FN114]. Fed. R. Civ. P. 23 (b)(2).

[FN115]. See, e.g., In re St. Jude Med., Inc., MDL No. 01-1396, 2004 U.S. Dist. LEXIS 149, at *14 (D. Minn. Jan. 5, 2004) (certifying the class for purposes of the medical monitoring claims); Lewis v. Lead Indus. Ass'n, Inc., 793 N.E.2d 869, 877 (Ill. App. Ct. 2003) (affirming dismissal of class action seeking funds for medical monitoring of children exposed to lead-based paint that contained lead pigments manufactured by defendants).

[FN116]. See, e.g., Ortiz v. Fibreboard Corp., 527 U.S. 815, 867-68 (1999) (Breyer, J., dissenting) (arguing that "the alternative to class-action settlement is not a fair opportunity for each potential plaintiff to have his or her own day in court").

[FN117]. See Fed. R. Civ. P. 42(a) ("When actions involving a common question of law or facts are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated . . . .").

[FN118]. The more typical use of consolidation as a procedural device to determine issues that are common to all plaintiffs is illustrated by a Maryland trial court's consolidation of 8,555 asbestos cases in ACandS, Inc. v. Godwin, 667 A.2d 116 (Md. 1995). The jury considered the issues of whether each defendant had been negligent or was liable under strict products liability, and whether it should be held liable for punitive damages, on a consolidated basis. See id. at 120-22 (presenting the background information). The jury also found, for each defendant, a ratio of the amount of punitive damages it should pay for each dollar of compensatory damages assessed against it. Id. The remaining issues-whether each specific defendant's products caused harm to any particular plaintiff and the amount of each plaintiff's damages-were determined individually, either during the trial of Phase II for the six "illustrative" plaintiffs, or during subsequent mini-trials for the remainder of the plaintiffs. Id. In short, from the perspective of the plaintiffs, the trial plan "collectivized" the handling of whether each defendant's acts were tortious but did not collectivize issues of establishing the causal connection between a particular defendant's conduct and a particular victim's injury or the determination of damages for a particular victim's injury. As such, the court's process, while collective in nature in terms of process and procedure, substantively is a closer relative to a case in which a plaintiff is allowed to employ offensive issue preclusion to prove defendant's conduct establishing liability.

[FN119]. In re E. & S. Dists. Asbestos Litig., 772 F. Supp. 1380 (E.D. & S.D.N.Y. 1991), aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831 (2d Cir. 1994).

[FN120]. See In re E. & S. Dist. Asbestos Litig., 772 F. Supp. at 1387-88 (discussing the propriety of consolation).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN121]. See In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 836 (2d Cir. 1994) (discussing causation).

[FN122]. See id. at 837 (rejecting defendant's argument).

[FN123]. Id.

[FN124]. Id. But see Leverance v. PFS Corp., 532 N.W.2d 735, 740-44 (Wis. 1995) (reversing trial court's judgment in consolidated cases on the grounds that the aggregative process adopted by the trial court, where all plaintiffs were awarded judgments calculated on the basis of the average jury awards in a few test cases, was inconsistent with the defendant's due process right to a jury trial on the issues of causation, contributory negligence, and damages).

[FN125]. See, e.g., Malcolm v. Gypsum Co., 995 F.2d 346, 353-54 (2d Cir. 1993) (finding that trial court's attempts in consolidated case to assure that the jury separately evaluated causation and damages in consolidated cases involving forty-eight plaintiffs and twenty-five defendants were inadequate).

[FN126]. See In re New York Asbestos Litig., 145 F.R.D. 644, 653-56 (S.D.N.Y. 1993) (discussing each factor individually), later proceedings at 149 F.R.D. 490 (S.D.N.Y. 1993) (granting consolidation).

[FN127]. See id. at 656 (finding it too early in the proceedings to determine the best plan).

[FN128]. Id.

[FN129]. Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980).

[FN130]. See supra notes 18-21 and accompanying text (describing the Sindell v. Abbott Laboratories case).

[FN131]. See, e.g., In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1263 (E.D.N.Y. 1985) (finding that plaintiffs who opted out of class action settlement were unable to prove that their diseases resulted from exposure to Agent Orange or that "any particular defendant produced the Agent Orange to which he may have been exposed").

[FN132]. See, e.g., Bateman v. Johns-Manville Sales Corp., 781 F.2d 1132, 1133 (5th Cir. 1986) (barring recovery in asbestos case where plaintiffs were unable to identify either the specific products causing their diseases or any of the manufacturers of the products).

[FN133]. See, e.g., Santiago v. Sherwin Williams Co., 3 F.3d 546, 549-51 (1st Cir. 1993) (rejecting market share liability against manufacturers of lead pigment because of both the impossibility of determining when multiple paint layers were applied during a fifty-three year period and the variance in which manufacturers contributed to the relevant market at various times during this period); City of Philadelphia v. Lead Indus. Ass'n, 994 F.2d 112, 126 (3d Cir. 1993) (rejecting market share liability, noting that it "compromises fairness to defendants who must incur sometimes staggering litigation costs as they are forced to defend all claims involving their product irrespective of their market shares"); Skipworth v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 172 (Pa. 1997) (finding "that application of market share liability to lead paint cases would grotesquely distort liability"). But see Thomas v. Mallett, 701 N.W.2d 523, 532-33 (Wis. 2005) (allowing victims of childhood lead poisoning to recover against lead pigment manufacturers on a "risk contribution" basis, similar to market share liability).

[FN134]. See, e.g., Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 515 (D.N.J. 2002) (dismissing claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against tobacco company because plaintiff "provided insufficient evidence that decedent was exposed to [manufacturer's] product").

[FN135]. See, e.g., Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069, 1078 (N.Y. 1989) (adopting a market share theory); see also infra notes 144-47 and accompanying text (discussing whether Sindell shifts the burden of proof to defendant).

[FN136]. See, e.g., Harper, James & Gray, supra note 29, at § 20.2 (describing "developments along the lines of [] Sindell" as "well warranted"); Finkelstein, supra note 73, at 980-81 (arguing for extension of liability, based upon Sindell principles, to creation of risk where harm has not yet occurred); Robinson, supra note 73, at 739-40 (concluding that the imposition of liability in DES cases on a market share liability basis is fair and serves deterrence).

[FN137]. See Sindell v. Abbott Labs., 607 P.2d 924, 937 (Cal. 1980) (setting forth a market share theory).

[FN138]. Id. at 937.

[FN139]. See id. (explaining its theory).

[FN140]. Id. at 936.

[FN141]. Loss distribution is a part of what Calabresi described as "secondary cost avoidance." See supra notes 41-44 and accompanying text (discussing secondary and tertiary cost avoidance).

[FN142]. Sindell, 607 P.2d at 936.

[FN143]. Id.

[FN144]. Hymowitz v. Eli Lilly & Co., 539 N.E.2d 1069 (N.Y. 1989).

[FN145]. See Coleman, supra note 38, at 399-400 (noting that the court assigned "the defendant liability reflecting his share of the national market"); see also Collins v. Eli Lilly Co., 342 N.W.2d 37, 50-51 (Wis. 1984) (allowing plaintiff to proceed against one or more manufacturers of DES on the theory that each defendant contributed to the "risk of injury"); Robinson, supra note 73, at 739 (justifying market share liability on the basis that fairness requires only that the particular defendant held liable be one that created a risk of injury to the particular plaintiff, not the injury itself).

[FN146]. Hymowitz, 539 N.E.2d at 1078.

[FN147]. Id. at 1078 n.3.

[FN148]. See, e.g., Goldman v. Johns-Manville Sales Corp., 514 N.E.2d 691, 702 (Ohio 1987) (rejecting market share theory for asbestos products generally); Shackil v. Lederle Labs., 561 A.2d 511, 529 (N.J. 1989) (rejecting market share liability except in the context of DPT vaccines). But see Wheeler v. Raybestos-Manhattan, 11 Cal. Rptr. 2d 109, 113 (Ct. App. 1992) (allowing market share liability in the context of asbestos brake pads).

[FN149]. Thomas v. Mallett, 701 N.W.2d 523 (Wis. 2005).

[FN150]. See id. at 532-33 (allowing the plaintiff's claim to proceed). The Court held that plaintiff is required to prove the following elements in order to recover on a strict products liability claim applying the risk contribu-

tion theory:

        (1) That the white lead carbonate was defective when it left the possession or control of the pigment manufacturers;

      (2) That it was unreasonably dangerous to the user or consumer;

      (3) That the defect was a cause of [Plaintiff]'s injuries or damages;

        (4) That the pigment manufacturer engaged in the business of producing or marketing white lead carbonate or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the pigment manufacturer; and

        (5) That the product was one which the company expected to reach the user or consumer without substantial change in the condition it was when sold.

Id. at 564.

[FN151]. See supra notes 137-43 and accompanying text (describing the court's opinion in Sindell).

[FN152]. Thomas, 701 N.W.2d at 557.

[FN153]. See id. at 558 (stating the instrumentalist proposition).

[FN154]. See id. at 559 (concluding that fungibility does not require chemical identity).

[FN155]. Id. at 562.

[FN156]. Id. at 594 (Prosser, J., dissenting).

[FN157]. Id. at 567-68 (Wilcox, J., dissenting).

[FN158]. Cimino v. Raymark Industries, 151 F.3d 297, 319 (5th Cir. 1998); see supra notes 86-102 and accompanying text (describing Judge Parker's efforts).

[FN159]. Thomas v. Mallett, 701 N.W.2d 523, 595 (Wis. 2005) (Prosser, J., dissenting).

[FN160]. See id. at 593 (Prosser, J., dissenting) (discussing the defendant's due process argument). He also raises substantive due process concerns because of the retroactive imposition of liability. See id. at 595-96 (stating that the majority's opinion "shocks the conscience").

[FN161]. Several aspects of the opinion suggest this possibility. See Thomas, 701 N.W.2d at 533-34 (describing health consequences of childhood lead poisoning and prevalence of lead-based paint in American residential units); id. at 552-54 (acknowledging liability of landlords for failure to maintain lead-based paint, but noting absence of effective remedy in litigation against landlords because of insurance policy exclusions and state legislation granting immunity).

[FN162]. The Wisconsin Supreme Court recognized the difficulty of determining market shares in Collins v. Eli Lilly Co. See Collins v. Eli Lilly Co., 342 N.W.2d 37, 53 (Wis. 1984) (adopting risk contribution theory in action against DES manufacturers). The court stated:

        The primary factor which prevents us from following Sindell is the practical difficulty of defining and proving market share . . . . There are several reasons for this: The DES market apparently was quite fluid, with companies entering and leaving the market over the years; some companies no longer exist and some that still exist may not have relevant records; and apparently there are no accurate nationwide records pertaining to the overall production and marketing of DES. We view defining the market and apportioning market share as a near impossible task if it is to be done fairly and accurately in order to approximate the probability that a de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fendant caused the plaintiff's injuries . . . . The defendants are faced with possible liability for DES which they may not have produced or marketed.
Id. at 48-49.

[FN163]. See id. at 53 (announcing the factors the jury should consider). The court stated:

> In assigning a percentage of liability to each defendant, the jury may consider factors which include, but are not limited to, the following: whether the drug company conducted tests on DES for safety and efficacy in use for pregnancies; to what degree the company took a role in gaining FDA approval of DES for use in pregnancies; whether the company had a small or large market share in the relevant area; whether the company took the lead or merely followed the lead of others in producing or marketing DES; whether the company issued warnings about the dangers of DES; whether the company produced or marketed DES after it knew or should have known of the possible hazards presented to the public; and whether the company took any affirmative steps to reduce the risk of injury to the public.

Id. at 53.

[FN164]. Obviously, this factor applies only in actions against manufacturers of lead-based paint, not actions against pigment manufacturers. The amount of lead by weight in paint ranged from one percent by weight to seventy percent or more by weight. Compare American Standards Ass'n, Standard No. Z661, at 5 (1955) (setting forth the voluntary industry standard adopted in 1955, limiting lead content in paint to no more than one percent of total weight) with U.S. Dept. of Commerce, Circular of the Bur. of Standards No. 89, United States Government Master Specification for Paint, White, and Tinted Paints Made on a White Base, Semipaste, and Ready Mixed, Fed. Spec. Board, Stand. Spec. No. 10B, at 2 (3d ed., Apr. 25, 1927) (requiring white base semi-paste paint to be purchased by the federal government to include a minimum of forty-five percent and a maximum of seventy percent white lead).

[FN165]. See supra notes 22-26 and accompanying text (providing examples of the "new form" of collective plaintiff).

[FN166]. See In re Rhone-Poulence Rorer Inc., 51 F.3d 1293, 1299 (7th Cir. 1995) (granting mandamus to decertify class action certified by trial judge).

[FN167]. Id. at 1298.

[FN168]. Id.

[FN169]. Thomas v. Mallett, 701 N.W.2d 523, 533-48 (Wis. 2005). Justice Wilcox, in his dissenting opinion, observes that the majority's "over 50 pages of so-called 'facts' . . . are simply irrelevant" to the issue at hand. Id. at 569.

[FN170]. See, e.g., Walt Disney World v. Wood, 515 So. 2d 198, 202 (Fla. 1987) (upholding joint and several liability where defendants acting independently caused indivisible injury); Corey v. Havener, 65 N.E. 69, 69 (Mass. 1902) (stating that "if two or more wrongdoers contribute to an injury, they may be sued either jointly or severally").

[FN171]. See, e.g., Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1094 (5th Cir. 1973) (addressing asbestos products), cert. den., 419 U.S. 869 (1974); Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203, 1223 (Cal. 1997) (holding that plaintiff must prove only that exposure to defendant's product contributed to the risk of developing cancer, not that such products actually played in a role in causing the disease); Purcell v. Asbestos Corp., 959 P.2d 89, 95 (Or. Ct. App. 1998) (holding that when exposure to the asbestos products of multiple manufacturers each increased the risk of mesothelioma, a jury could find causation for each manufacturer).

[FN172]. Rutherford v. Owens-Illinois, Inc., 941 P.2d 1203 (Cal. 1997).

[FN173]. Id. at 1206.

[FN174]. Id. at 1218.

[FN175]. Id. at 1219.

[FN176]. Id.

[FN177]. But see Reynolds v. Tex. & Pac. Ry. Co., 37 La. Ann. 694, 698 (1865) (holding that where defendant's negligence greatly multiplies the chance of an accident, negligence itself is evidence of causation); Martin v. Herzog, 126 N.E. 814, 815 (N.Y. 1920) (holding that evidence of violation of statute intended to prevent the kind of injury or accident that actually occurred is itself evidence of causation).

[FN178]. See, e.g., Menne v. Celotex Corp., 861 F.2d 1453, 1474 (10th Cir. 1988) (shifting burden to defendant manufacturers to prove absence of cause-in-fact); Poole v. Alpha Therapeutic Corp., 696 F. Supp. 351, 356 (N.D. Ill. 1988) (same); Abel v. Eli Lilly & Co., 343 N.W.2d 164, 176-77 (Mich. 1984) (same); Ferrigno v. Eli Lilly & Co., 420 A.2d 1305, 1316 (N.J. Super. Ct. Law Div. 1980) (same); see also In re "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 822-28 (E.D.N.Y. 1984) (finding a version of alternative liability to be a viable claim against manufacturers of Agent Orange in an opinion approving settlement of class action). In Menne, the plaintiff developed mesothelioma after working for forty years as a pipefitter and plumbing and heating contractor. Plaintiff proved that he had been exposed to asbestos products manufactured by each of the ten defendants but could not prove that exposure to any particular defendant's product was a substantial cause of his disease, a requirement under Nebraska law. In these circumstances, the court held that the burden shifted to each defendant to prove that "exposure was unlikely to have been frequent or long enough to be a substantial factor in causing Menne's mesothelioma." Menne, 861 F.2d at 1468. The court acknowledged that "[w]here a defendant lacks evidence as to the frequency or duration of exposure, the burden shift may well result in a finding that the defendant is a cause of the harm." Id. at 1469.

[FN179]. Summers v. Tice, 199 P.2d 1 (Cal. 1948).

[FN180]. See id. at 1-2 (stating the facts of the case).

[FN181]. See id. at 2-4 (defining the issue).

[FN182]. See id. at 10 (considering the relative positions of the party and the results of placing the burden on the plaintiff); see also Menne, 861 F.2d at 1468-69 (shifting the burden to the defendant); Restatement (Second) of Torts § 433B(3) (1965) (shifting the burden of proof to the defendant); Restatement (Third) of Torts § 28(b) (Proposed Final Draft No. 7, 2005) (shifting the burden of proof to the defendant). In Menne, the court stated:

          Under these conditions, where [the plaintiff] can demonstrate the likelihood of exposure to visible dust from a defendant's product(s), Nebraska law would then require that defendant to prove the exposure was unlikely to have been frequent or long enough to be a substantial factor in causing [the plaintiff's] mesothelioma. In other words, where the requirement of but-for causation would defeat a plaintiff's claim in a concurrent cause case, we believe that Nebraska would adopt the more lenient substantial factor test of causation.

Menne, 861 F.2d at 1468-69. The proposed final draft of the Restatement (Third) of Torts states:

When the plaintiff sues all of multiple actors and proves that each engaged in tortious conduct that exposed the plaintiff to a risk of physical harm and that the tortious conduct of one or more of them caused the plaintiff's harm but the plaintiff cannot reasonably be expected to prove which actor caused the harm, the burden of proof,

including both production and persuasion, on factual causation is shifted to the defendants.
Restatement (Third) of Torts § 28(b) (Proposed Final Draft No. 7, 2005).

[FN183]. See Abel v. Eli Lilly & Co., 343 N.W.2d 164, 172 (Mich. 1984) (distinguishing the case from Summers).

[FN184]. Id. at 172-73.

[FN185]. In re "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 823 (E.D.N.Y. 1984).

[FN186]. See, e.g., Smith v. Cutter Biological, Inc., 823 P.2d 717, 725 (Haw. 1991) (requiring joinder of "all responsible parties"); Goldman v. Johns-Manville Sales Corp., 514 N.E.2d 691, 697 (Ohio 1987) (stating that where there were over 165 asbestos manufacturers, "the only way to make sure that the guilty defendant was before the court would be to sue all asbestos companies").

[FN187]. Abel, 343 N.W.2d at 173. Similarly, in Menne v. Celotex Corp., 861 F.2d 1453, 1466 (10th Cir. 1988), the Court of Appeals held that "in cases of concurrent causation such as this, if all or substantially all of the available and identifiable, implicated manufacturers are before the court, and if some of these defendants can be shown to have each contributed some harm at a possibly substantial level, then all potential defendants need not be before the court." Id. at 1466.

[FN188]. See, e.g., In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 175 F. Supp. 2d 593, 621 n.42 (S.D.N.Y. 2001) (limiting alternative liability to cases involving a small number of tortfeasors, all of whom were before the court); Sindell v. Abbott Labs, 607 P.2d 924, 930-31 (Cal. 1980) (same); Hymowitz v. Eli Lilly & Co., 539 N.E. 2d. 1069, 1074 (N.Y. 1989) (rejecting application of alternative liability because it requires that defendants have better access to information regarding identity of injurer and that all possible injurers be joined in action).

[FN189]. Hall v. E.I. Du Pont Nemours & Co., 345 F. Supp. 353 (E.D.N.Y. 1972).

[FN190]. See, e.g., Sindell, 607 P.2d at 934 (finding "industry wide liability" to be the more accurate term).

[FN191]. See Hall, 345 F. Supp. at 370-80 (analyzing the plaintiffs' claims).

[FN192]. See, e.g., Schwartzbauer v. Lead Indus. Ass'n, Inc., 794 F. Supp. 142 (E.D. Pa. 1992) (holding that plaintiffs did not state a claim); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1017 (D.S.C. 1981) (rejecting the theory); Thomas v. Mallett, 701 N.W.2d 523, 567 (Wis. 2005) (rejecting enterprise liability, in part because "the record indicates that the 'paint industry was highly competitive, with each paint company jealously guarding the secrecy of their paint formulas'"); Zafft v. Eli Lilly & Co., 676 S.W.2d 241, 247 (Mo. 1984) (requiring causation).

[FN193]. Ryan v. Eli Lilly & Co., 514 F. Supp. 1004 (D.S.C. 1981).

[FN194]. See id. at 1017 (rejecting enterprise theory).

[FN195]. See, e.g., In re Related Asbestos Cases, 543 F. Supp. 1152, 1158 (N.D. Cal. 1982) (allowing plaintiffs to proceed on concert of action theory); Abel v. Eli Lilly & Co., 343 N.W. 2d 164, 176 (Mich. 1984) (finding that plaintiffs made sufficient allegations to support their concert of action claim despite their inability to identify the specific DES manufacturer); Bichler v. Eli Lilly & Co., 436 N.E.2d 182, 188 (N.Y. 1982) (holding the defendant liable on a concerted action theory for injuries caused by prenatal exposure to DES).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN196]. See Harper, James & Gray, supra note 29, at § 10.1 (explaining concert of action).

[FN197]. See, e.g., Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (3d Cir. 1994) (stating that common law of civil conspiracy encompasses liability for concerted action); In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 175 F. Supp. 2d 593, 622 (S.D.N.Y. 2001) (stating that concert of action and civil conspiracy are intertwined and require the same factual allegations); Boyle v. Anderson Fire Fighters Ass'n Local 1262, 497 N.E.2d 1073, 1079 (Ind. App. 1986) (stating that concert of action in commission of tort is sometimes referred to as "civil conspiracy").

[FN198]. See, e.g., Doe v. Baxter Healthcare Corp., 178 F. Supp. 2d 1003, 1020 (S.D. Iowa 2001) (stating that civil conspiracy requires that conspirators agree to commit an injurious result, which is not required for concert of action).

[FN199]. See, e.g., Bichler, 436 N.E. 2d at 188 (concluding that plaintiffs need not show an express agreement between DES manufacturers if an implied agreement can be inferred from "consciously parallel conduct"); see also Sindell v. Abbott Labs., 607 P.2d 924, 932 (Cal. 1980) (rejecting a concert of action theory where plaintiffs failed to show a tacit agreement among DES manufacturers to fail to conduct adequate tests or to give sufficient warnings); Abel v. Eli Lilly & Co., 343 N.W. 2d 164, 176 (Mich. 1984) (holding defendants liable in a concert of action claim where plaintiffs alleged that the defendants were jointly engaged in negligently manufacturing and promoting DES).

[FN200]. Bichler, 436 N.E. 2d at 187.

[FN201]. See id. at 188 (finding consciously parallel conduct by itself to be enough).

[FN202]. See, e.g., Sindell, 607 P.2d at 933 (rejecting a concert of action claim where the defendants' parallel or imitative conduct consisted of solely relying upon each others' testing and promotion of DES); Hymowitz v. Lilly & Co., 539 N.E.2d 1069, 1074-75 (finding that "parallel activity, without more, is insufficient to establish the agreement element necessary to maintain a concerted action claim"); Martin v. Abbott Labs., 689 P.2d 368, 379 (Wash. 1984) (rejecting the concerted action theory as a basis of liability in a DES case despite evidence of a substantial amount of parallel activity among the defendant manufacturers).

[FN203]. See, e.g., Complaint, Moore ex rel. State v. Am. Tobacco Co., No. 94-1429 (Miss. Ch. Ct. Jackson County, filed May 23, 1994), available at Tobacco Litigation Documents, supra note 22 (setting forth the complaint against the tobacco company).

[FN204]. See, e.g., City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1156 (Ohio 2002) (reversing dismissal of claims against gun manufacturers). But see, e.g., City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002) (affirming dismissal of claims against gun manufacturers).

[FN205]. See, e.g., City of Chicago v. Am. Cyanamid Co., No. 1-03-3276, 2005 Ill. App. LEXIS 14, at *8 (Ill. App. Ct. Jan. 14, 2005) (granting defendants' motion to dismiss); City of Milwaukee v. NL Indus., Inc., 2004 Wisc. App. LEXIS 885, at *18 (Wis. App. Ct. Nov. 9, 2004) (denying defendant's motion for summary judgment); State v. Lead Indus. Ass'n, Inc., No 99-5226, 2001 R.I. Super. LEXIS 37, at *56 (R.I. Super. Ct. Apr. 2, 2001) (denying, partially, defendants' motion to dismiss claims).

[FN206]. The government sues only for those amounts of medical expenses that have been paid to victims of the tobacco-related disease, not for other claims that the individual victims might have against tobacco manufacturers. See, e.g., Floyd v. Thompson, 227 F.3d 1029, 1037-38 (7th Cir. 2000) (holding that Medicaid recipients do

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not have an entitlement to a portion of the proceeds of the Master Settlement Agreement between forty-six states and the tobacco manufacturers).

[FN207]. See Donald G. Gifford, Public Nuisance As a Mass Products Liability Tort, 71 U. Cin. L. Rev. 741, 754-56 (2003) (discussing tobacco litigation before government recoupment actions); Robert L. Rabin, The Tobacco Litigation: A Tentative Assessment, 51 DePaul L. Rev. 331, 331 (2001) (stating that smokers began suing tobacco companies in the early 1950s).

[FN208]. See Robert L. Rabin, Essay: A Sociological History of the Tobacco Tort Litigation, 44 Stan. L. Rev. 853, 860 (1992) (explaining the failures of early tobacco litigation); see also Sackman v. Liggett Group, 173 F.R.D. 358, 363 (E.D.N.Y. 1997) (discussing projects funded by the tobacco industry defendants, some of which linked "environmental factors and other non-smoking factors, such as air pollution, geographic location, type of employment, and place of birth, with the incidences of disease commonly associated with smoking").

[FN209]. Complaint, Moore ex rel. State v. Am. Tobacco Co., No. 94-1429 (Miss. Ch. Ct. Jackson County, filed May 23, 1994), available at Tobacco Litigation Documents, supra note 22.

[FN210]. See Rabin, The Tobacco Litigation, supra note 207, at 337 (discussing the state health care reimbursement cases); Tobacco Litigation Documents, supra note 22 (setting forth the complaints).

[FN211]. See, e.g., Complaint, State ex rel. Woods v. American Tobacco Co., Inc., No. CV-96-14769 (Ariz. Sup. Ct. Maricopa County, filed Aug. 20, 1996) (alleging public nuisance claims in count 9), available at Tobacco Litigation Documents, supra note 22; Complaint, People v. Philip Morris, No. 96-L13146 (Ill. Cir. Ct. Cook County, filed Nov. 12, 1996) (alleging a public nuisance claim in count 9), available at Tobacco Litigation Documents, supra note 22; Complaint, State v. R.J. Reynolds Tobacco Co., No. CL71048 (Iowa Dist. Ct. Polk County, filed Nov. 27, 1996) (alleging a public nuisance claim in count VIII), available at Tobacco Litigation Documents, supra note 22; Complaint, Moore v. Am. Tobacco Co., No. 94-1429 (Miss. Ch. Ct. Jackson County, filed May 23, 1994) (alleging a public nuisance claim in Count Three at ¶¶ 89-91), available at Tobacco Litigation Documents, supra note 22 (setting forth the complaints); see also complaints filed by the states of Oklahoma, Texas and Utah, available at Tobacco Litigation Documents, supra note 22 (setting forth the complaints).

[FN212]. See, e.g., Conye ex rel. Ohio v. Am. Tobacco Co., 183 F.3d 488, 491 (6th Cir. 1999) (claiming tobacco manufacturers had been "unjustly enriched at the expense of the State of Ohio [and had] unlawfully shifted the financial responsibility for their conduct to the state"); Philip Morris, Inc. v Glendening, 709 A.2d 1230, 1234 & n.6 (Md. 1998) (alleging unjust enrichment of defendants and reciting state's payment of three billion dollars in medical assistance for tobacco-related healthcare costs).

[FN213]. See, e.g., Complaint, Moore v. Am. Tobacco Co., No. 94-1429 (Miss. Ch. Ct. Jackson County, filed May 23, 1994) (alleging an indemnity claim in Count Two at ¶¶ 84-88), available at Tobacco Litigation Documents, supra note 22.

[FN214]. See, e.g., Complaint, State v. Philip Morris, Inc., (N.Y. Sup. Ct. 1997), available at Tobacco Litigation Documents, supra note 22. Similar complaints were also filed by Arizona, Connecticut, Iowa, Kansas, Massachusetts, Michigan, New Jersey, Oklahoma, Texas, Utah, Washington, and West Virginia. Id.

[FN215]. E.g., Complaint, Kelly ex rel. State. v. Philip Morris, Inc., No. 96-84281-CZ (Mich. Cir. Ct. Ingham County, filed Aug. 21, 1996) (alleging violations of Michigan Antitrust Reform Act in Count Two, ¶¶ 201-08), available at Tobacco Litigation Documents, supra note 22. Similar complaints were also filed by Kansas,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Michigan, Minnesota, Texas, Washington, and West Virginia. Id.

[FN216]. See, e.g., Complaint, State v. Philip Morris, Inc., (N.Y. Sup. Ct. 1997) (alleging, in Thirteenth Cause of Action, fraud under the Racketeer Influenced Corrupt Organizations Act), available at Tobacco Litigation Documents, supra note 22. Similar complaints filed by New Jersey, Texas, and Utah are also available at id.

[FN217]. See, e.g., 33 Vt. Stat. Ann. § 1911 (2001) (stating that the state may proceed under a market share theory of liability).

[FN218]. The tobacco industry settled with four individual states initially and later with the remaining forty-six states in the "Master Settlement Agreement." The Master Settlement Agreement settled the state recoupment actions brought by the forty-six states for $206 billion but did not grant the tobacco companies immunity from individual or class action claims. See McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1254-55 (11th Cir. 2001) (describing terms of the Master Settlement Agreement). The agreement also obligated the tobacco companies to refrain from youth-oriented advertising. It did not, however, include any provisions acknowledging the FDA's regulatory powers over tobacco products.

[FN219]. See supra note 205 (providing examples of lawsuits against lead paint manufacturers).

[FN220]. See supra note 204 (providing examples of lawsuits against handgun manufacturers).

[FN221]. See, e.g., Blue Cross & Blue Shield, Inc. v. Philip Morris, Inc., 113 F. Supp. 2d 345, 388 (E.D.N.Y. 2000) (denying defendant's motion to dismiss claims of medical insurer based on misrepresentation and RICO).

[FN222]. See, e.g., id. at 354 (setting forth the plaintiff's claim).

[FN223]. See, e.g., Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc., 23 F. Supp. 2d 771, 777 (N.D. Ohio 1998) (denying defendants' motion to dismiss civil conspiracy and antitrust claims).

[FN224]. See, e.g., Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 433 (3d Cir. 2000) (upholding dismissal of claims as too remote).

[FN225]. Falise v. Am. Tobacco Co., 94 F. Supp. 2d 316 (E.D.N.Y. 2000).

[FN226]. See id. at 322 (denying defendant's motion to dismiss RICO and common law fraud claims).

[FN227]. Complaint, State v. Am. Tobacco Co., Civil Action No. 95-1466AO (Fla. Cir. Ct., filed Feb. 21, 1995), at ¶ 84-85, available at Tobacco Litigation Documents, supra note 22.

[FN228]. See supra notes 195-202 and accompanying text (explaining civil conspiracy and concert of action).

[FN229]. See supra note 214 (providing an example of a claim based on misrepresentation).

[FN230]. In the tobacco litigation, for example, many states included a claim based upon the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (2000), generally referred to as "RICO." See supra note 216 (providing an example of a RICO based claim). Enacted by Congress in 1970 as part of the Organized Crime Control Act, RICO prohibits "enterprise criminality" which is defined broadly to include not only violence and corruption by organized crime and violent gangs, but also "criminal fraud" by corporations. See generally Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985). But see United States v. Philip Morris USA, Inc., 396 F.3d 1190, 1198-1207 (D.C. Cir. 2005) (disallowing federal government claims against tobacco manufacturers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for disgorgement of profits).

The states' complaints in the tobacco litigation also included many claims based upon state consumer protection acts. See, e.g., Complaint, People v. Philip Morris, Inc. (Ill. Cir. Ct. 1996) (alleging, in Count 3, violations of Illinois Unfair and Deceptive Acts or Practices Act), available at Tobacco Litigation Documents, supra note 22.

[FN231]. Complaint, State ex rel. Coyne v. Am. Tobacco Co., No. 315 249, at ¶ 21A (Ohio Ct. C.P. 1997), available at Tobacco Litigation Documents, supra note 22.

[FN232]. Id.

[FN233]. Complaint, State v. Philip Morris, Inc., at ¶ 147A (N.Y. Sup. Ct. 1997), available at Tobacco Litigation Documents, supra note 22.

[FN234]. See, e.g., Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 517-24 (D.N.J. 2002) (denying claim because victim could not prove reliance); Lewis v. Lead Indus. Ass'n, Inc., 793 N.E.2d 869, 876 (Ill. App. Ct. 2003) (denying claim because victim's parents could prove reliance neither on statements of defendants nor on their failure to disclose harmful nature of product).

[FN235]. Lewis v. Lead Indus. Ass'n, 793 N.E.2d 869 (Ill. App. Ct. 2003).

[FN236]. Id. at 876.

[FN237]. See, e.g., Falise v. Am. Tobacco Co., 94 F. Supp. 2d 316, 335 (E.D.N.Y. 2000) (holding that asbestos trust not need show reliance by specific claimants on statements made by tobacco industry when "the vast unprecedented nature of the fraudulent scheme" resulted in "detrimental reliance on this distorted knowledge by an intended and foreseeable class of victims"); Williams v. Philip Morris, Inc., 48 P.3d 824, 831 (Or. Ct. App. 2002) (accepting plaintiff's "fraud on the market" theory).

[FN238]. See, e.g., Glassner v. R.J. Reynolds Tobacco Co., 223 F. 3d 343, 353 (6th Cir. 2000) (rejecting fraud on the market theory while relying on Ohio law); Brown v. Philip Morris, Inc., 228 F. Supp. 2d 506, 518 (D.N.J. 2002) (rejecting fraud on the market theory while relying on New Jersey law).

[FN239]. See, e.g., Nicolett v. Nutt, 525 A.2d 146, 150 (Del. 1987) (holding that when manufacturers had conspired to suppress medical and scientific information regarding harmful effects caused by exposure to their asbestos products, they had a duty to warn).

[FN240]. Wright v. Brooke Group Ltd., 652 N.W. 2d 159 (Iowa 2002).

[FN241]. See id. at 175-76 (determining a manufacturer's duty to disclose).

[FN242]. Laurens Walker & John Monahan, Sampling Liability, 85 Va. L. Rev. 329, 336-37 (1999).

[FN243]. In re Simon II Litig., 211 F.R.D. 86 (E.D.N.Y. 2002).

[FN244]. See id. at 127-29 (presenting the expert's testimony).

[FN245]. See id. (same).

[FN246]. See supra note 211 (providing examples).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN247]. See Complaint, Kelly ex rel. State. v. Philip Morris, Inc., No. 96-84281-CZ (Mich. Cir. Ct. Ingham County, filed Aug. 21, 1996) (demanding, in Count Three, restitution based upon unjust enrichment), available at Tobacco Litigation Documents, supra note 22; Complaint, State v. Philip Morris, Inc., (N.Y. Sup. Ct. 1997) (alleging, in Sixth Cause of Action, unjust enrichment), available at Tobacco Litigation Documents, supra note 22; Complaint, State ex rel. Coyne v. Am. Tobacco Co., No. 315-249 (Ohio Ct. C.P. 1997) (demanding restitution based upon unjust enrichment in Count Four), available at Tobacco Litigation Documents, supra note 22; see also supra note 212 (providing examples).

[FN248]. See supra note 213 (providing an example).

[FN249]. See McClendon v. Georgia Dep't of Cmty. Health, 261 F.3d 1252, 1254-55 (11th Cir. 2001) (describing terms of Master Settlement Agreement).

[FN250]. See, e.g., City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002) (upholding trial court's dismissal of public nuisance claim); NAACP v. AcuSport, Inc., 271 F. Supp. 2d 435, 446 (E.D.N.Y. 2003) (finding that "evidence presented at trial demonstrated that defendants are responsible for the creation of a public nuisance," but dismissing case because "[p]laintiff did not establish . . . that it suffered the special kind of harm required to establish its private cause of action"); Ganim v. Smith & Wesson Corp., 780 A.2d 98, 123 (Conn. 2001) (dismissing public nuisance and unjust enrichment claims on remoteness grounds). But see City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1151 (Ohio 2002) (reversing dismissal of public nuisance claims against gun manufacturers).

[FN251]. See, e.g., City of Chicago v. Am. Cyanamid Co., 823 N.E.2d 126, 130-31 (Ill. App. Ct. 2005) (affirming dismissal of public nuisance claims against manufacturers of lead pigment); City of New York v. Lead Indus. Ass'n, 700 N.Y.S.2d 361, 364 (N.Y. Sup. Ct. 1999) (dismissing indemnity and restitution claims). But see City of Milwaukee v. NL Indus., Inc., 691 N.W.2d 888, 894 (Wis. App. Ct. 2004) (allowing public nuisance claims to proceed against manufacturers of lead pigment or lead-based paint); State v. Lead Indus. Ass'n, Inc., C.A. No. 990-5226, 2001 R.I. Super. LEXIS 37, at *19-28 (R.I. Sup. Ct. Apr. 2, 2001) (denying, partially, defendants' motion to dismiss).

[FN252]. William L. Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997, 999 (1966).

[FN253]. Awad v. McColgan, 98 N.W.2d 571, 573 (Mich. 1959).

[FN254]. See Gifford, supra note 207, at 776 (asserting that a variety of fact patterns has resulted in public nuisance claims).

[FN255]. See id. at 774-86 (defining the tort of public nuisance).

[FN256]. City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099, 1111 (Ill. Sup. Ct. 2004) (quoting W. Keeton, Prosser & Keeton on Torts § 86, at 618 (5th ed. 1984)).

[FN257]. City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1142 (Ohio 2002) (quoting Restatement (Second) of Torts § 821(B)(1) (1965)).

[FN258]. Id.; see also Flo-Sun, Inc. v. Kirk, 783 So. 2d 1029, 1036 (Fla. 2001) (stating that "a public nuisance may be classified as something that causes any annoyance to the community or harm to public health"); Gifford, supra note 207, at 774-75 (stating that "no other tort is as vaguely described or poorly understood as public nuisance").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN259]. See Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp., 273 F.3d 536, 540 (3d Cir. 2001) (stating that use of public nuisance in recoupment actions is patently intended to circumvent "the boundary between the well-developed body of product liability law and public nuisance law"); Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co., 984 F.2d 915, 921 (8th Cir. 1993) (employing public nuisance law in products cases threatens to allow public nuisance to become "a monster that would devour in one gulp the entire law of tort"); see also Gifford, supra note 207, at 834, 837 (stating that "[c]ourts should not replace the substantial bodies of mature doctrinal and policy analysis"); see generally id. at 753-834.

[FN260]. City of Chicago v. Am. Cyanamid Co., No. 1-03-326, 2005 Ill. App. LEXIS 14, at *8 (Ill. App. Ct. Jan. 14, 2005) (rejecting city's claim).

[FN261]. See Gifford, supra note 207, at 814-19 (discussing interference with a public right).

[FN262]. City of Milwaukee v. NL Indus., Inc., 691 N.W.2d 888, 892 (Wis. App. Ct. 2004).

[FN263]. See State v. Lead Indus. Ass'n, C.A. No. 99-5226, 2004 R.I. Super LEXIS 191, at *7-8 (R.I. Super. Ct. Nov. 9, 2004) (denying defendants' motion to dismiss public nuisance claim).

[FN264]. See id. (noting that "the primary thrust of plaintiff's case here is its public nuisance cause of action").

[FN265]. See id. (rejecting defendant's argument).

[FN266]. See City of Chicago v. Am. Cyanamid Co., 823 N.E.2d 126, 133 (Ill. App. Ct. 2005) (agreeing with the lower court "that plaintiff's amended complaint failed to sufficiently allege proximate causation").

[FN267]. See id. at 135 (setting forth the government's argument).

[FN268]. See id. (quoting Lewis v. Lead Industries Ass'n, 793 N.E.2d 869, 875 (Ill. App. Ct. 2003)). In the city of Cincinnati's recoupment action against the manufacturers of handguns, the Ohio Supreme Court ignored any possible requirement of individual causation. City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1142 (Ohio 2002). The harms alleged by the city were broadly and vaguely defined:

> The city alleged that, as a result of the defendants' conduct in manufacturing or distributing handguns, the city had suffered a host of problems, ranging from the costs of responding to shootings to decreased property values and tax revenues, and to Cincinnatians' general fears resulting from criminal activity and injuries caused by firearms.

City of Cincinnati v. Beretta U.S.A. Corp., 2000 Ohio App. LEXIS 3601, CCH Prod. Liab. Rep. P15880 (Ohio Ct. App. Aug. 11, 2000) rev'd, 768 N.E.2d 1136 (Ohio 2002). The Ohio Supreme Court, however, reversed the lower courts' decisions to dismiss the claims, holding that the allegation in the complaint that merely alleged that the fifteen defendants had directly caused the harms was sufficient. See Beretta U.S.A. Corp., 768 N.E.2d at 1150-51 (noting that reversal does not mean plaintiff will necessarily win on remand). The court found that the damages were not too remote, finding persuasive factors such as the relative ease of proving the amount of the city's expenditures for police and property repairs. Still, the court did not enter into any discussion at all of the difficult "cause in fact" issues regarding whether a chain of causation existed that would link any individual defendant to any victim of gun violence to the city's expenditures as a result of such violence. See id. at 1149 (taking the allegations in the complaint as true).     More often in recoupment cases, courts have found the remoteness of the harms resulting from the handgun manufacturer's conduct in creating a public nuisance to be fatal to the government's claim. See Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp., 273 F.3d 536, 540-41 (3d Cir. 2001) (citing numerous examples); see also Ganim v. Smith & Wesson Corp., 780 A.2d 98, 130-31 (Conn. 2001) (holding that the governmental plaintiffs lacked standing to allege a claim of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

common-law public nuisance because the harms they claimed were too remote from the defendant's misconduct and too derivative of the injuries of others); City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099, 1138 (Ill. 2004) (holding that defendants' actions were not a proximate cause of any harms caused by "the aggregate of the criminal acts of many individuals over whom they have no control"). In Camden County Board of Chosen Freeholders, the court reasoned:

> The causal chain is simply too attenuated to attribute sufficient control to the manufacturers to make out a public nuisance claim. In the initial steps, the manufacturers produce lawful handguns and make lawful sales to federally licensed gun distributors, who in turn lawfully sell those handguns to federally licensed dealers. Further down the chain, independent third parties, over whom the manufacturers have no control, divert handguns to unauthorized owners and criminal use.

Camden County Bd. of Chosen Freeholders, 273 F.3d at 541.

[FN269]. See In re Lead Paint Litig., No. A-1946-02T3, at 34 (N.J. Super. Ct. App. Div., filed Aug. 17, 2005) (reversing trial court dismissal of public nuisance claims brought by twenty-six governmental entities against lead-paint manufacturers and distributors).

[FN270]. E.g., City of Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136 (Ohio 2002); City of Milwaukee v. NL Indus., Inc., 691 N.W.2d 888 (Wis. Ct. App. 2004); State v. Lead Indus. Ass'n, C.A. No. 99-5226, 2001 R.I. Super. LEXIS 37 (R.I. Sup. Ct. Apr. 2, 2001).

[FN271]. State v. Lead Indus. Ass'n, C.A. No. 99-5226, 2001 R.I. Super. LEXIS 37 (R.I. Sup. Ct. Apr. 2, 2001).

[FN272]. See id. at *50-51 (finding that the state's unjust enrichment claim survives a motion to dismiss); see also NL Indus., Inc., 691 N.W.2d at 896-97 (rejecting defendant's motion for summary judgment on restitution claim).

[FN273]. See Merchants Mut. Ins. Co. v. Newport Hosp., 272 A.2d 329, 332 (R.I. 1971) (asserting that unjust enrichment is not limited to circumstances in which there is a fraudulent act).

[FN274]. See Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, at *49 (quoting R & B Elec. Co. v. Armco Constr. Co., 471 A.2d 1351, 1355 (R.I. 1984)).

[FN275]. See id. at *50-51 (taking the allegations in the complaint as true).

[FN276]. See, e.g., Perry v. Am. Tobacco Co., 324 F.3d 845, 857 (6th Cir. 2003) (affirming dismissal of unjust enrichment claims); Or. Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris, Inc., 185 F.3d 957, 968 (8th Cir. 1999) (same); Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc., 171 F.3d 912, 937 (3d Cir. 1999) (same).

[FN277]. Perry, 324 F.3d at 845.

[FN278]. See id. at 851 (affirming the dismissal of the complaint).

[FN279]. See State v. Lead Indus. Ass'n, C.A. No. 99-5226, 2001 R.I. Super. LEXIS 37, at *53 (R.I. Sup. Ct. Apr. 2, 2001) (stating that "the state has articulated the requisite elements for an indemnity claim").

[FN280]. Id. at *51 (quoting McCrory v. Spigel, 740 A.2d 1274, 1276-77 (R.I. 1999)).

[FN281]. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, at *51 (quoting Muldowney v. Weatherking Prods., Inc., 509 A.2d 441, 442-43 (R.I. 1986)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN282]. Id. at *53.

[FN283]. E.g., Allegheny Gen. Hosp. v. Philip Morris, Inc., 116 F. Supp. 2d 610, 622 (W.D. Pa. 1999) (dismissing indemnity claim where plaintiffs were "neither vicariously nor secondarily liable for any torts committed upon their Medicaid, medically indigent or non-paying patients with tobacco-related diseases"); SEIU Health & Welfare Fund v. Philip Morris, Inc., 83 F. Supp. 2d 70, 93 (D.D.C. 1999) (dismissing claim because plaintiffs had not alleged that they were joint tortfeasors with defendants).

[FN284]. Allegheny Gen. Hosp. v. Philip Morris, Inc., 116 F. Supp. 2d 610 (W.D. Pa. 1999).

[FN285]. See id. at 621-22 (quoting Builders Supply Co. v. McCabe, 77 A.2d 368 (Pa. 1951).

[FN286]. See id. at 622 (same).

[FN287]. See, e.g., Floyd v. Thompson, 227 F.3d 1029, 1030-37 (7th Cir. 2000) (denying claims of Medicaid recipients that they were entitled to a portion of the proceeds resulting from the Master Settlement Agreement between the tobacco manufacturers and the states that had settled after filing recoupment actions).

[FN288]. See The Costs of Accidents, supra note 1, at 198-99, 222-23 (arguing that restricting victims' recovery to economic losses would undermine the goal of primary accident cost avoidance by alleviating the need for the injurer to consider the full consequences of its actions).

[FN289]. See, e.g., Greenman v. Yuba Power Prods., Inc., 377 P.2d 897, 901 (Cal. 1963) (justifying the adoption of strict products liability on the basis of loss minimization principles); Henningsen v. Bloomfield Motors, Inc., 161 A.2d 69, 83-84 (1960) (holding that implied warranties extend to those not in privity with the seller on the basis of instrumentalist principles).

[FN290]. See Donald G. Gifford, The Peculiar Challenges Posed By Latent Diseases Resulting From Mass Products, 64 Md. L. Rev. 613 (2005) (noting that any contribution system that provides for collective responsibility must address the division of financial responsibility).

[FN291]. See id. at 619-20 (stating that the current system fails to accomplish Calabresi's three goals of reducing accident costs); see generally Robert L. Rabin, Some Thoughts on the Efficacy of a Mass Toxics Administrative Compensation Scheme, 52 Md. L. Rev. 951 (1993).

[FN292]. See generally Goldberg & Zipursky, supra note 41.
62 Wash. & Lee L. Rev. 873

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.