**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**REPLY MEMORANDUM IN SUPPORT OF GRACE'S MOTION TO
EXCLUDE EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION
OF ITS CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY**

Teresa K.D. Currier (ID No. 3080)
BUCHANAN INGERSOLL &
  ROONEY PC
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

Philip Bently
Gregory Horowitz
Douglas Mannal
KRAMER LEVIN NAFTALIS &
  FRANKEL LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Attorneys for the Official Committee of
Equity Security Holders*

David M. Bernick, P.C.
Janet S. Baer
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI, STANG, ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

*Co-Counsel for the Debtors and Debtors in
Possession*

## **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.    FORCED TO ABANDON THEIR PLATITUDE THAT "THIS HAS ALL BEEN
      DECIDED BEFORE," CLAIMANTS ARE NOW OFFERING UP
      WHOLESALE CHANGES TO THE CODE. ................................................................2

      A.    That the Bankruptcy Code Makes Grace's Legal Liability The Test Of
            Grace's Ultimate Obligation To Pay Cannot Be Refuted.......................................2

            1.    Grace's Liability For Asbestos Personal Injury Claims Is
                  Structured By § 502(b) of the Bankruptcy Code. ........................................2

            2.    The estimation at hand must apply the test of legal liability, not
                  displace it. ...................................................................................................3

            3.    Grace's precedents confirm the need for a merits-based estimation. ..........5

            4.    Claimants just don't seem to get that their cases *simply did not
                  address* the issue presented here................................................................7

      B.    Claimants Now Seek to Rewrite the Code..............................................................8

            1.    Theory 1:  Estimation changes the standard for liability and claims
                  allowance. ...................................................................................................8

            2.    Theory 2:  Section 524(g) compels an estimation that ignores legal
                  liability in favor of the debtor's pre-Chapter 11 settlement costs...............8

            3.    Theory 3:  State procedural and evidentiary rules should govern
                  this estimation because the ultimate allowance of disputed claims
                  must be done in state courts..........................................................................9

            4.    Theory 4:  Settlement equals liability. ........................................................9

            5.    Theory 5:  Estimation must be linked to a particular plan, and if a
                  settlement-based plan is proffered by claimants, then a settlement
                  cost approach is mandated. ........................................................................10

            6.    Theory 6:  The "reality" is that the claims will never be litigated,
                  but rather, will be settled as in the past......................................................10

      C.    Claimants Are Caught Dead-to-Rights on Rule 408..............................................11

i

1.      By their own admission, the essence of claimants' position is that settlement equals liability. ........................................................................11

2.      There is nothing left for them to do but dance (and stumble) on the head of a pin...................................................................................................12

        a.      Claimants ignore entirely that the settlement agreements themselves prohibit their use to establish liability.........................12

        b.      The "unrelated case" exception has no application here in related litigation against the same defendant................................12

        c.      The "other purposes" exception is similarly inapplicable here.........................................................................................................13

        d.      Rule 703 does not blast a hole under the waterline of Rule 408...........................................................................................................14

        e.      Saying that Grace violates Rule 408 does not make it so. .............14

II.     CLAIMANTS' EXPERTS HAVE ADMITTED AWAY THE RELIABILITY OF THEIR BASIC ESTIMATION METHODS, WHICH LEAVES THEM ARGUING FOR SPECIAL RULES TO APPLY IN ASBESTOS CASES.....................15

        A.      Claimants' Experts Cannot Deny that Their Methods Are Not Scientific Methods.............................................................................................................15

                1.      Claimants' experts admitted they are looking, not at legal liability, but at claiming and settlement behavior. ....................................15

                2.      Claimants' estimation experts have no reliable scientific method for analyzing the claiming and settlement behavior that forms the basis for their opinions..................................................................16

                3.      All they are left with is *ipse dixit* "judgments.".........................16

        B.      Claimants' Experts Cannot Deny that Their Methods Have Proven Unreliable in the Past and Cannot Be Counted on to Predict Future Claims. ..........................................................................................................17

        C.      Claimants' Experts Cannot Demonstrate the Reliability and Objectivity of their Methods as Applied to Grace. ....................................................17

                1.      Peterson's calibration period is arbitrary and not the output of any objective method........................................................................18

3.     The apples and oranges problem:  Peterson uses a bankruptcy trust to project future claims against Grace assuming it is not in bankruptcy.............................................................................................19

4.     Even Peterson cannot stand foursquare behind the ability of his model to predict behavior more than a few years hence...........................21

   a.     Peterson assumes an exaggerated filing rate...................................21

   b.     Peterson assumes an exaggerated payment rate............................22

   c.     Peterson assumes an exaggerated settlement amount...................22

1.     Biggs's assertion of a relationship between Grace filings and nationwide filings has no basis outside her own head. ............................22

2.     Biggs's calibration period is unreliable. ....................................................23

3.     Biggs's extended forecast is unreliable......................................................24

D.     In the End, Claimants Seek to Make New Law for Asbestos Cases.....................24

1.     Because claimants' experts failed to follow any "scientific" method, they are left scrambling – and they now advance the self-fulfilling proposition that, precisely because their opinions are not technically "scientific," they are not required to follow a "scientific" method. ................................................................................24

2.     They argue that acceptance in the business world equals acceptance as good science......................................................................26

3.     They argue that a scientific estimation would just be too hard to do.............................................................................................................26

4.     They argue that *ipse dixit* judgments can replace the scientific method...........................................................................................27

III.     CLAIMANTS' OUT-OF-ORDER POT SHOTS AGAINST GRACE'S METHOD MISS THE MARK. ................................................................................28

A.     Claimants' Attacks on the PIQs...........................................................................28

B.     Claimants' Attack on "Grace's" Criteria. ............................................................28

C.     Claimants' Argument that Judgments Should Be Used to Value Claims.............29

IV.     OTHER ISSUES....................................................................................................30

CONCLUSION.......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpex Computer Corp. v. Nintendo Co., Ltd.*,
   1994 WL 139423 (S.D.N.Y. Mar. 18, 1994) .................................................. 14

*Barnes v. Owens-Corning Fiberglas Corp.*,
   201 F.3d 815 (6th Cir. 2000) ........................................................................ 29

*Booth v. Black & Decker*,
   166 F. Supp. 2d 215 (E.D.Pa. 2001) ............................................................ 25

*Borg-Warner Corp. v. Flores*,
   232 S.W.3d 765 (Tex. 2007)......................................................................... 29

*Broadcort Capital Corp. v. Summa Med. Corp.*,
   972 F.2d 1183 (10th Cir. 1992) .................................................................... 13

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002) ........................................................................ 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ........................................................................ 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)................................................................................. 25, 26

*Dodge v. Cotter Corp.*,
   328 F.3d 1212 (10th Cir. 2003) .................................................................... 26

*Gallegos v. Swift & Co.*,
   237 F.R.D. 633 (D. Colo. 2006) ................................................................... 27

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...................................................................................... 27

*In re A.H. Robins Co.*,
   880 F.2d 694 (4th Cir. 1989) ...................................................................... 6, 7

*In re Agent Orange Prod. Liab. Litig.*,
   611 F. Supp. 1223 (E.D.N.Y. 1985) ............................................................ 14

*In re Babcock & Wilcox Co.*,
   274 B.R. 230 (E.D. La. 2002)....................................................................... 13

iv

*In re Breast Implant Litigation,*
    11 F. Supp. 2d 1217 (D. Colo. 1998) ............................................................ 25

*In re Corey,*
    892 F.2d 829 (9th Cir. 1989) ........................................................................ 4

*In re Dow Corning Corp.,*
    211 B.R. 545 (Bankr. E.D. Mich. 1997) ...................................................... 4

*In re Dow Corning Corp.,*
    215 B.R. 526 (Bankr. E.D. Mich. 1997) ................................................... 5, 6

*In re G.I. Indus., Inc.,*
    204 F.3d 1276 (9th Cir. 2000) ...................................................................... 2

*In re MacDonald,*
    128 B.R. 161 (Bankr. W.D. Tex. 1991) ...................................................... 4

*In re Nuisance Corp.,*
    17 B.R. 80 (Bankr. D.N.J. 1981) ................................................................. 2

*In re Roman Catholic Archbishop of Portland in Oregon,*
    339 B.R. 215 (Bankr. D. Or. 2006) .............................................................. 5

*In re USG Corp.,*
    290 B.R. 223 (Bankr. D. Del. 2003) ............................................................ 7

*Kannankeril v. Terminix Int'l, Inc.,*
    128 F.3d 802 (3d Cir. 1997) ....................................................................... 29

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) .............................................................................. 25, 27

*Louderback v. Orkin Exterminating Co.,*
    26 F. Supp. 2d 1298 (D. Kan. 1998) .......................................................... 29

*Nachtsheim v. Beech Aircraft Corp.,*
    847 F.2d 1261 (7th Cir. 1988) .................................................................... 14

*Oddi v. Ford Motor Co.,*
    234 F.3d 136 (3rd Cir. 2000) ................................................................. 25, 27

*Orleans Parish Sch. Bd. v. Asbestos Corp.,*
    114 F.3d 66 (5th Cir. 1997) ........................................................................ 29

*Pappas v. Sony Elecs., Inc.,*
    136 F. Supp. 2d 413 (W.D. Pa. 2000) ........................................................ 27

*Rutherford v. Owens-Illinois, Inc.*,
    941 P.2d 1203 (Cal. 1997) ............................................................................... 29

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Electric Co.*,
    127 S.Ct. 1199 (2007) ...................................................................................... 2

*Valentine v. PPG Industries, Inc.*,
    821 N.E.2d 580 (Ohio Ct. App. 2004) ........................................................... 29

*Vermande v. Hyundai Motor Am., Inc.*,
    352 F. Supp. 2d 195 (D. Conn. 2004) ............................................................ 13

**Statutes**

11 U.S.C. § 101(12) ..................................................................................................... 3

11 U.S.C. § 101(32) ..................................................................................................... 2

11 U.S.C. § 502(b) ............................................................................................... passim

11 U.S.C. § 502(c) .............................................................................................. 4, 8, 11

11 U.S.C. § 524(g) ............................................................................................... 5, 8, 9

**Rules**

Fed. R. Bankr. P. 3007 .................................................................................................. 3

Fed. R. Bankr. P. 7001 .................................................................................................. 3

Fed. R. Bankr. P. 9014 .................................................................................................. 3

**Treatises**

Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 6273 (2007) .................... 14

## <u>INTRODUCTION</u>

So, all of the issues now are on the table, and the conventions (much hallowed by the claimants), of recent asbestos bankruptcies have been put under the lights for a real examination on the merits.

It is unsurprising that the claimants have no ***factual*** response to the ***fact*** that the methods they proffer are ridden with subjective judgments, have been unreliable in the past, and cannot be considered as reliable for the future – their experts have ***admitted*** those facts.  Predictably, claimants now advance a familiar argument in the new context of this case:  that their methods should not be held to the same standards that the law applies to all other experts who testify in federal court and that unreliability should be tolerated because it has been tolerated in the past. As set forth in Section II of this reply brief, no such exceptions can or should be created.

What is more surprising is that the claimants ***still*** fail to grasp the core legal problem that confronts them – that their theory of the case turns upon an outright rejection of the ancient common law principle of legal liability and, because neither the Code nor any other statement of our jurisprudence has announced the abandonment of liability-based civil responsibility, the rejection of the plain language of the Code.  Instead, claimants advance a variety of extreme and unsupportable arguments, all of which emanate from the implicit displacement of legal liability as the test for imposing an obligation to pay claims.  Nor have they been candid enough to acknowledge that their favorite trio (or quartet) of cases does not endorse such anarchy, because those courts were not even asked to decide the issue posed here.  In all of those cases, the litigants had agreed to a settlement-based analysis, and they differed only on the judgmental adjustments that should be made to the historical trends in light of what all agreed were changed legal circumstances.  Each of these attempts – to rewrite the rule of law set out in the Code and to misinterpret the case law – are addressed at the outset in Section I, below.

## ARGUMENT

I.    **FORCED TO ABANDON THEIR PLATITUDE THAT "THIS HAS ALL BEEN DECIDED BEFORE," CLAIMANTS ARE NOW OFFERING UP WHOLESALE CHANGES TO THE CODE.**

    A.    **That the Bankruptcy Code Makes Grace's Legal Liability The Test Of Grace's Ultimate Obligation To Pay Cannot Be Refuted.**

        1.    **Grace's Liability For Asbestos Personal Injury Claims Is Structured By § 502(b) of the Bankruptcy Code.**

Two related purposes for this estimation proceeding have been articulated in the past:

- to determine whether Grace is *insolvent*; *i.e.*, whether the sum of Grace's liabilities is greater than the value of Grace's property (11 U.S.C. § 101(32)); and

- to determine how much *any* plan will have to set aside if the plan is to pay asbestos personal injury claims and demands in full.

Both of these purposes turn on the same core question that must be answered by this Court: What should Grace be *obliged* to pay to personal-injury creditors as a chapter 11 debtor? The Code and Supreme Court case law are clear that any such obligation turns on *legal liability*.

What Grace can be compelled to pay is addressed in one place in the Bankruptcy Code: 11 U.S.C. § 502(b). Section 502(b) is the gateway to determining a debtor's liability when it is disputed. Section 502(b) provides that a claim may be allowed only if it is enforceable under "applicable law." 11 U.S.C. § 502(b)(1). The cases are clear that this reference to applicable law means applicable non-bankruptcy law, which, in this case, means state substantive law. In particular, all of a debtor's defenses under state law apply in bankruptcy. *See*, *e.g.*, *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Electric Co.*, 127 S.Ct. 1199, 1204 (2007) ("Section 502(b)(1) [provides that] any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy"); *In re G.I. Indus., Inc.,* 204 F.3d 1276, 1281 (9th Cir. 2000) (claim not allowable under § 502(b) if unenforceable under nonbankruptcy law); *In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981).

2

With respect to estimation for plan formulation, we must assume that there is no consensual plan because at this point none has been proposed.  The Bankruptcy Code and the Rules make clear that if there is no consensual plan, and the question is therefore what an objecting Debtor is *compelled* to pay, the answer turns on liability.  That is the teaching as we have seen from § 502(b).  Thus, the legal equation that governs this proceeding is simple:  If Grace has no legal liability for an asbestos claim under state law, Grace has no obligation to pay that claim.  The estimation of Grace's legal liability for either of the two purposes set forth above *must* be guided entirely by this principle.[1]

### 2.    The estimation at hand must apply the test of legal liability, not displace it.

There are two procedures contemplated by the Code for determining a debtor's legal liability on a claim or group of claims:  allowance proceedings and estimation proceedings.

Allowance proceedings, where liability is disputed, contemplate a full-blown contested matter or adversary proceeding to resolve the central issue of § 502(b); namely, a determination of legal liability based on whether the claims are enforceable under state law.  *See* Fed. R. Bankr. P. 3007, 7001, and 9014.  Allowance proceedings, where liability is disputed, also demand that the court apply state substantive law, as guided by its own procedural and evidentiary rules.  The *Dow Corning* case, which Grace has previously discussed at length (Grace Br. at 16-17; Grace Opp. at 4-5), provides the clearest articulation of how these principles work in order to determine *mass tort* liability.  There, the court acknowledged that in a case of *disputed* mass tort liability, the court would need to adjudicate the claims under state substantive law while applying federal

---

[1] Of course, the test of when the debtor can be compelled to pay is no different if the purpose of the estimation is to determine solvency.   "Debt," the touchstone for whether Grace is insolvent, means "liability on a claim."  11 U.S.C. § 101(12).

procedural devices such as common issue trials under FRCP 42 or through a class action under FRCP 23, and the court would also, therefore, apply federal evidentiary standards such as *Daubert*, notwithstanding any conflicting state evidentiary rules. *In re Dow Corning Corp.*, 211 B.R. 545, 580-85 (Bankr. E.D. Mich. 1997).

Estimation proceedings, whether done to determine on a streamlined basis the value of "contingent and unliquidated" claims under § 502(c), or for other purposes such as plan confirmation, also contemplate contested matters and also ask the same fundamental question: What is the debtor's liability on a claim or group of claims?  It is critical, therefore, that because the objective of estimation is to determine the allowable amount of a claim or group of claims, the principles that guide allowance must still apply.  In particular, it is indisputable that where a court in an estimation concludes that the claim has no merit under applicable state law, the court must estimate the value of the claim at zero.  *See, e.g, In re Corey,* 892 F.2d 829, 834 (9th Cir. 1989) (lower court estimate of certain property claim at $0 affirmed "[g]iven the highly speculative nature" of those claims); *In re MacDonald,* 128 B.R. 161, 167 (Bankr. W.D. Tex. 1991) (post-petition administrative claim for fraud valued at $0 for voting purposes where the claimant offered at estimation hearing "no competent 'summary trial' evidence").  In addition, because estimation proceedings are contested matters, the same procedural and evidentiary rules apply as in allowance proceedings; namely, the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

In the end (and to put it bluntly), by proffering an estimation methodology that deviates from the test of legal liability, claimants are proffering their own brand of ***federal substantive law*** to displace the very thing they allegedly advocate – the application of state substantive law to their claims.  In effect, claimants' proposed estimation would adopt a new test for determining

Grace's legal obligation to pay. That result is directly contrary to the bedrock principles embedded in § 502(b) of the Bankruptcy Code.[2]

### 3.    Grace's precedents confirm the need for a merits-based estimation.

The analysis set forth above is, alone, consistent with the approach taken by the bankruptcy court in *Dow Corning* when it recommended that the parties proceed to a full-blown allowance proceeding with respect to the debtor's putative mass tort liability. *Dow Corning*, 211 B.R. at 580-85. After the bankruptcy court had made such recommendation in the estimation decision, the debtor moved before the bankruptcy court for summary judgment on an omnibus disease claim objection, asserting that the claims could not survive *Daubert*. *In re Dow Corning Corp.,* 215 B.R. 526 (Bankr. E.D. Mich. 1997). Contrary to the claimants' assertion that the court "reversed itself" in previously recommending merits-based proceedings could be brought before the bankruptcy court (PI Opp. at 15), the bankruptcy court acknowledged that it was "empowered to grant summary judgment disallowing personal injury claims pending against a debtor." *Id.* at 527 (citing *In re Dow Corning Corp.*, 215 B.R. 346). The court recommended that the district court in that case withdraw the reference with respect to the debtor's omnibus objection and its motion for summary judgment, not because the bankruptcy court believed it did not have jurisdiction over the motion, but primarily because of a consolidated action involving a

---

[2]  Claimants' argument that potential limitations on the Court's jurisdiction to estimate the value of personal-injury claims for purposes of allowance requires something other than a merits-based approach is also misplaced. Claimants cite *In re Roman Catholic Archbishop of Portland in Oregon*, 339 B.R. 215 (Bankr. D. Or. 2006), for the proposition that a bankruptcy court "not have jurisdiction to estimate personal injury claims to establish a cap on the payment to a fund." (FCR Opp. at 10) However, the court in that case concluded that it **did** have jurisdiction to estimate the value of personal-injury claims for confirmation and voting purposes, but that the estimation of the claims for purposes of establishing a capped fund required a merits-based proceeding to be conducted by a district court. *Id.* at 221, 225. Since Grace's case will, under § 524(g), require that the confirmation order be "issued or affirmed by the District Court," *see* 11 U.S.C. § 524(g)(3)(A), the requirement that a district court make such a determination will be satisfied. More importantly, there is nothing in *Archbishop of Portland* that suggests that this Court, in undertaking to estimate for purposes of determining whether Grace is insolvent or how much it must pay to asbestos personal-injury claimants in the aggregate, can adopt anything **but** a merits-based approach.

5

non-debtor affiliate that was already being adjudicated at the district court so as not to lead to potentially inconsistent results, and secondarily because of the district court's ultimate appellate review of the bankruptcy court's rulings. *Id.* at 527-529. The district court accordingly withdrew the reference then entertained Dow Corning's motion for summary judgment. Ultimately, the parties reached an agreement in principle and proposed a consensual plan before the district court fully adjudicated the claims.

The history of *A.H. Robins*, too, is fully supportive of Grace's position and has been mischaracterized by claimants. The PI Committee's suggestions that the *Robins* decision tells "little about estimation methodology" and that the *Robins* Court did not endorse a merits-based approach to estimation (PI Opp. at 15-16), are simply false. As is clear from the *Robins* decision, Dr. Francine Rabinovitz (the estimation expert for one of the insurers) applied a merits-based approach to her estimation, which utilized the results from a representative sample of the questionnaires provided by the claimants. *In re A.H. Robins Co.*, 880 F.2d 694, 699 (4th Cir. 1989). Dr. Rabinovitz reviewed the debtor's database, which included the results of a two-page questionnaire and claim form from nearly 195,000 claimants, roughly 6,000 responses to a fifty-page questionnaire, and medical records from a random sample of 7,500 claimants. *Id.* Dr. Rabinovitz then "weeded out those, for example, with no medical proof of use of the Dalkon Shield . . . [and] classified the claims into those with and without complications and the nature of the injuries claims." *Id.* Thereafter, among other things, her estimate made downward adjustments for what she believed was necessary and appropriate – a "considerable reduction from disallowance of claims." *Id.* at 700. Thus, Dr. Rabinovitz testified that the personal-injury liability in that case was between $2.2 - 2.5 billion. *Id.* at 699. Considering alternate estimates ranging far above and below this estimate, the district court found the liability to be $2.475

billion.  *Id.* at 700.  The Fourth Circuit, on appeal, cited this record with approval, noting that it was "a good example of competent testimony . . . [and that] her conclusions more nearly match the conclusions of the district court than any other single witness offered."  *Id*. at 699.

In *USG*, an asbestos-related case where liability was disputed and where the debtor and the court contemplated a merits-based estimation because the debtor's liability was disputed, the court acknowledged, under such circumstances, the need for "reject[ing] unsubstantiated claims, bogus medical evidence and fanciful theories of causation."  *In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003).  Rather than acknowledge that the *USG* court got it "right" under the facts at the time of the proposed estimation, claimants simply conclude that such an approach should be disregarded since the case was ultimately settled before such process was undertaken (PI Opp. at 15).  In addition, claimants assert that the key point of *USG*, which they allege Grace ignored, is that the *USG* Court held that state substantive law applies.  (*Id.*)  Grace, of course, does not ignore this – it is central to Grace's position.

>    **4.    Claimants just don't seem to get that their cases *simply did not address* the issue presented here.**

Grace has already addressed extensively why the estimation cases relied on by claimants should not be followed in this proceeding.  (*See* Grace Br. at 17-22; Grace Opp. at 6-9)  The critical point is that claimants *still today* blink away what the courts in these cases addressed:  Far from proposing that estimation should assess the evidence of legal liability, the contending parties in *all* of the cases *agreed* instead to use settlement history and disagreed only on adjustments that should be made to the settlement history in light of changed legal circumstances.  Thus, the core issue of what test applies to determine the obligation to pay and the associated analysis of § 502(b) was simply not before those courts.

**B.      Claimants Now Seek to Rewrite the Code.**

Remarkably, claimants do not even attempt to explain how their proposed methodology for estimation is consistent with the principles of § 502(b) or the merits-based claims estimation process mandated by the Bankruptcy Code.  Rather, they breezily seek all of the value of estate without any regard for the merits of their claims.  (*See* PI Committee/FCR November 5, 2007 Plan at Articles 7.6.1(v); 7.6.2(c); and 7.7(j))  And they do so advancing theory after fanciful theory as to why the rules of the game do not apply to them.

> **1.      Theory 1:  Estimation changes the standard for liability and claims allowance.**

As discussed extensively in Grace's prior briefs and above, there is simply no such concept built into the Bankruptcy Code.  Estimation for allowance is a procedure that § 502(c) says can be used to address "contingent and unliquidated" claims without unnecessary delay.  Even when estimation is being conducted for a purpose other than the ultimate allowance of the claim, an estimation must *still* follow the rules of § 502(b).  All *disputed* claims, even in a streamlined estimation proceeding, are subject to their ultimate merits under applicable law.  Claimants cite no cases to the contrary, and Grace is not aware of any such case.

> **2.      Theory 2:  Section 524(g) compels an estimation that ignores legal liability in favor of the debtor's pre-Chapter 11 settlement costs.**

What claimants seem to be arguing next is that their proposed estimation methodology is required for purposes of confirming a plan that incorporates a channeling injunction under § 524(g).  Thus, the FCR asserts that this Court will not be in a position to make the finding that the "actual amounts, number and timing of future demands cannot be determined," 11 U.S.C. § 524(g)(2)(B)(ii)(II), if it uses the merits-based approach to estimation urged by Grace.  (FCR Opp. at 5)  In effect, the FCR argues that if the estimation takes into account that certain categories of asbestos personal-injury claims are not allowable, either because they fail to satisfy

state substantive law, or because they cannot be proven under the applicable federal rules, the resulting estimation would be too precise to satisfy § 524(g).  In essence, then, claimants are advocating their method because it would make the truth more obscure.  Enough said.

**3.      Theory 3:  State procedural and evidentiary rules should govern this estimation because the ultimate allowance of disputed claims must be done in state courts.**

The PI Committee argues that Grace cannot base its estimation model on the assumption that claims will be adjudicated under the Federal Rules of Evidence and Civil Procedure because there is a possibility that if the disputed claims are to be tried, a bankruptcy court would abstain and send the cases to state court for trial.  (PI Opp. at 19-20)  The prospect that the Court will scatter the personal-injury asbestos claims at issue here to the winds of 50 state courts is a chimera.  Abstention is simply not an available option where the asbestos personal-injury claims are at the core of the bankruptcy case.  Claimants cite ***no case*** in which a district court has abstained from adjudicating the key claims that form the ***central*** issue of the bankruptcy and have been filed in the bankruptcy case ***against a debtor***, holding that those cases should be adjudicated all over the country in various state courts, with different results, with the bankruptcy court twiddling its thumbs until the results come in to be incorporated into a plan.

**4.      Theory 4:  Settlement equals liability.**

The PI Committee attempts to justify the basic premise of their experts' approach – that Grace's aggregate liability for asbestos personal-injury claims can be extrapolated from historical settlements – by making the point that a settlement is a liability.  "Grace's legal liability on the personal injury claims against it is not something separate from the cost of resolution of those claims."  (PI Opp. at 26)  "[A] settlement is a liability."  (PI Opp. at 13) "[T]he settlement contract itself creates a contractual liability on the part of Grace."  (*Id.*)  This obvious point is irrelevant; it establishes nothing.  The fact that Grace may have bound itself to

contractual asbestos-claim-settlement obligations prior to entering bankruptcy has no bearing on the underlying merits of the cases in which those settlements were reached, much less the *current* or *future* claims against Grace.

      **5.**      <u>**Theory 5**</u>**:  Estimation must be linked to a particular plan, and if a settlement-based plan is proffered by claimants, then a settlement cost approach is mandated.**

Claimants suggest that this estimation must determine what would be necessary to fund their plan.  This puts the cart before the horse.  The benchmark is not what it costs to effectuate any particular plan – especially the claimants' plan, which is designed to wipe out Grace's equity.  The proper measure is what Grace can be compelled to pay.  That determination will drive the plan – not the other way around.

      **6.**      <u>**Theory 6**</u>**:  The "reality" is that the claims will never be litigated, but rather, will be settled as in the past.**

Claimants assert that "the vast majority of asbestos claims were settled by Grace in the past, and it is utter fiction to believe anything other than that the vast majority of cases would be settled in the future by whatever entity inherits Grace's liability for asbestos claims – either a trust, or the Reorganized Debtor."  (PI Opp. at 20-21)  Their argument is misplaced.  Neither the fact that Grace settled cases in the pre-bankruptcy environment or the possibility that a trust created pursuant to a confirmed plan in this case may ultimately settle claims in a post-bankruptcy environment has any bearing on the rules for estimation  Nor is it relevant that asbestos personal-injury claims have been settled, rather than litigated, by other post-bankruptcy trusts.  Again, claimants want to work backwards.  The particular method by which claims are ultimately resolved cannot dictate the value of the claim.  Estimation is governed by the applicable law and a determination of what Grace can be compelled to pay, not whether such payments will take place via settlements.

### C.       Claimants Are Caught Dead-to-Rights on Rule 408.

Claimants' scramble to rewrite the Bankruptcy Code finds its parallel in their attempt to escape their estimation case's plain and obvious violation of Federal Rule of Evidence 408.

The premise of claimants' case is that Grace's liability has been, can be, and should be, both established and measured *not* by any inquiry into the facts or law that would dictate the outcome in litigation or a Section 502(c) estimation, but by *looking at Grace's prior settlements*. There is no way to reconcile this approach with either the letter or spirit of Rule 408.

### 1.       By their own admission, the essence of claimants' position is that settlement equals liability.

Claimants do not contest that Rule 408 prohibits the use of prior settlements to establish liability.  Instead, they protest that they *are not using settlements to establish liability*.  They claim they are simply using settlements to "project" the "cost" of future settlements.  (PI Opp. at 12; FCR Opp. at 3)  On the one hand, claimants argue that the only acceptable measure of Grace's liability for purposes of this estimation is a settlement-based estimate.  (*See*, *e.g.*, PI Opp. at 26 (equating "legal liability" with "the cost of resolution"))  On the other hand, they say they are not using settlements to determine liability.  This is pure – and inartful – sophistry.

Moreover, claimants' argument wholly ignores the underpinning of Rule 408; *i.e.*, that there is every reason to suspect that settlements are *unreliable* indicators of liability and that parties should not have prior settlements held against them.  (*See* Grace Opp. at 30-31)  There is no reason to suspect, much less conclude, that state-court asbestos settlements are somehow an exception to the general rule that parties often buy peace *without regard to the merits* of a claim.

Claimants' misstep here reveals more than just poor rhetorical judgment and sloppy reasoning.  It is the logical result of starting with the false (and cynical) premise that there is no distinction between the merit of a suit and the amount of money a defendant will pay to get rid of

it.  Even if the Bankruptcy Code allowed them to proceed on such a basis – which, as explained

above, it does not – Rule 408 would still preclude their estimation case.

> **2.    There is nothing left for them to do but dance (and stumble) on the head of a pin.**

> > **a.    Claimants ignore entirely that the settlement agreements themselves prohibit their use to establish liability.**

Claimants offer no explicit response to the Court's statement that the settlement

agreements at issue here will ***not*** be used to establish liability.  (*See* Grace Br. at 29-30)  They

attempt instead to sidestep the Court's admonition by arguing that the settlement agreements

nevertheless represent contractual liabilities of Grace.  But, as explained above, this has nothing

to do with whether they are a valid basis on which to establish an estimate of Grace's ***tort***

liability.  The issue is not what Grace owed or owes on an agreement to settle a case; the issue is

what Grace owes on existing and future tort claims.  The latter cannot be established by the

former as a matter of logic, let alone without running afoul of Rule 408.

> > **b.    The "unrelated case" exception has no application here in related litigation against the same defendant.**

Claimants also attempt to confuse the issue by arguing that their use of prior settlements

does not violate Rule 408 because it is being offered in a "different" case.  (PI Opp. at 31)

Common sense dictates that if claimants' arguments were valid, prior settlements would be put

before the finder of fact in ***every*** mass-tort case on the theory that the claim being litigated or

estimated is a "different" claim than one that has been settled.  This simply does not happen, and

with good reason, as is obvious under any reading of Rule 408.

Claimants' primary support for their "unrelated case" argument is a one-paragraph

discussion in a case that involved an admission made in the course of settlement discussions on a

matter entirely unrelated to the claim being litigated.  *Broadcort Capital Corp. v. Summa Med.*

*Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992). It did ***not*** involve the use of one settlement to prove liability for that claim or for another claim based on exposure to the same toxic substance. In fact, the one toxic-tort case the plaintiffs ***do*** cite says that under Rule 408, a "plaintiff in a tort case against a particular defendant cannot establish liability in that case by using evidence of attempts to settle that case, or evidence of verdicts that other plaintiffs have won ***against the defendant in other cases***." *In re Babcock & Wilcox Co.*, 274 B.R. 230, 256 (E.D. La. 2002).

> **c.      The "other purposes" exception is similarly inapplicable here.**

Claimants go on to claim that they can use a settlement-based estimation because their efforts are not for the purpose of establishing liability on the part of Grace, but for "the purpose of this Court's better understanding of Grace's aggregate asbestos liability on a different set of claims, the unresolved pending and future claims." (PI Opp. at 31) How is advocating for "this Court's better understanding" of Grace's liability different from any other attempt to establish that liability, whether individually or in the aggregate, at a certain value?

Again, plaintiffs cite *Babcox & Wilcox* as support,[3] even though in that case:

- The court was conducting an estimation for purposes of a ***solvency*** determination, ***not*** an estimation for purposes of allowance or for plan formulation. *In re Babcock & Wilcox Co.*, 274 B.R. at 262-63.

- The court expressly limited its opinion to the solvency issue, and stated that for any other purpose, "***this opinion and judgment will not be binding.***"  *Id.* (emphasis added).

- Babcock's own historical estimate (which was at issue) was based upon settlement history.

- The only conclusion the court actually reached was that "plaintiffs have shown the existence of future asbestos liabilities." *Id.* at 257.

---

[3] Claimants' other authorities, *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002), and *Vermande v. Hyundai Motor Am., Inc.*, 352 F. Supp. 2d 195, 202 (D. Conn. 2004), are clearly distinguishable, as the issue in both cases was the amount-in-controversy requirement, not whether or to what extent the defendant was liable.

- The court actually ended up rejecting the plaintiffs' evidence as to the amount of those liabilities, thus largely mooting the Rule 408 arguments. *Id.* at 262-63.

There is no purpose **other than** to estimate the value of Grace's liability on disputed existing and future asbestos personal-injury claims.

> **d.** **Rule 703 does not blast a hole under the waterline of Rule 408.**

Claimants' next argument is that Rule 703 allows them to sanitize their use of settlements to establish liability by flushing them through expert reports.  (PI Opp. at 34-35)  They cite no authority for this, and in fact, the law provides otherwise:

- "Admitting expert opinion based on evidence inadmissible under these rules [including Rule 408] would undermine the policies of those rules. . . . [C]ourts have refused to permit experts to testify to the bases of an opinion when that testimony amounts to a backdoor attempt to avoid the prohibitions against admitting [among other things] offers of compromise . . . ."  Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Evid.* § 6273 (2007).

- "[M]aterials independently excluded by the court by reason of another rule of evidence will [not] automatically be admitted under Rule 703."  *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1270 (7th Cir. 1988) (collecting cases and affirming exclusion of evidence under Rule 403, notwithstanding Rule 703).

- *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985) (court obligated to assess reliability of information relied upon by expert, including failure to meet concerns raised under other rules of evidence).

- *Alpex Computer Corp. v. Nintendo Co.*, 1994 WL 139423 at *11 (S.D.N.Y. Mar. 18, 1994), *vacated in part on other grounds*, 1994 WL 381659 (S.D.N.Y. Jul. 21, 1994) ("[T]he court declines to eviscerate Rules 408 and 403 by admitting the evidence . . . through the back door of Rule 703.").

> **e.** **Saying that Grace violates Rule 408 does not make it so.**

Claimants' final attack is to argue that Grace uses settlements so they can too.  This schoolyard-style taunt ignores what the experts actually do.  Where claimants' experts **determine** liability for disputed and anticipated claims based on the fact of settlement, Grace's experts do no such thing.  Grace's expert Florence **first** determines the number of claims on which Grace **might be found liable**.  He then assumes that **if** Grace pays on those claims, it would pay

amounts commensurate with what it paid to resolve other *factually similar claims in the past*. Using settlement amounts to determine the value of claims *on which the expert assumes liability may be established* is fundamentally different from using settlement amounts to determine *on which claims Grace may be held liable.*

## II.    CLAIMANTS' EXPERTS HAVE ADMITTED AWAY THE RELIABILITY OF THEIR BASIC ESTIMATION METHODS, WHICH LEAVES THEM ARGUING FOR SPECIAL RULES TO APPLY IN ASBESTOS CASES.

Claimants ignore the testimony of their experts on the key bases (or lack thereof) for their opinions. Instead, they try to convince the Court that the law allows for expert testimony *not* based on the rigorous application of reliable, scientific methods to established facts.

### A.    Claimants' Experts Cannot Deny that Their Methods Are Not Scientific Methods.

Claimants' estimation *experts* have *admitted* that their work should be tested against scientific standards. (*See*, *e.g.*, Peterson Dep. at 32-33; Biggs Dep. at 226; Stallard Dep. at 17) Confronted with these admissions, claimants' *lawyers* now argue these standards do not apply. (PI Opp. at 51); (FCR Opp. at 13) Instead, they say that Peterson's and Biggs's methodologies are sufficiently reliable because these experts have done this several times before. (PI Opp. at 51); (FCR Opp. at 13) Claimants have no response to the *undisputed* admissions of their own experts that their estimation models (1) fail to address *liability*, (2) are *not* scientifically reliable; and (3) are thus little more than *ipse dixit* "judgments."

#### 1.    Claimants' experts admitted they are looking, not at legal liability, but at claiming and settlement behavior.

Neither Peterson nor Biggs makes any assessment of the incidence, cause, or risk of any *disease*. They rely solely on claiming and settlement *behavior* to drive their estimates. (*See* PI Opp. at 50 ("It is, after all, claims and their payment that is being estimated, *not* the incidence of disease as such.") (emphasis added)) This is completely uncontroverted.

15

2.      **Claimants' estimation experts have no reliable scientific method for analyzing the claiming and settlement behavior that forms the basis for their opinions.**

Having gone down the path of modeling claiming and settlement behavior, one must necessarily ask whether claimants have brought to bear a scientifically reliable method for accomplishing the task they chose to undertake.  Plaintiffs can identify no such method.  (*See* Peterson Dep. at 77-78, 130; Biggs Dep. at 224, 229, 255-56; Stallard Dep. at 103-04) Claimants' responsive briefs provide no help.  None of the arguments they present take on the issue of whether the models they use reliably forecast ***the specific behaviors being predicted*** – all they do is argue such an inquiry ***is not necessary***.  This is not, however, a question that one can simply skip over, and it too remains unrefuted.

3.      **All they are left with is *ipse dixit* "judgments."**

The inevitable result of the prior two propositions is that, despite that claimants' experts purport to be using "science" to reach their opinions, they are in fact using nothing more than *ipse dixit* "judgments" to predict the number of claims and how much they are worth. Claimants' experts admitted that at almost every turn, the critical input necessary to determine a given number, percentage, or time frame came ***not*** from the objective application of scientifically reliable standards or principles, but from their own subjective ***judgment***.  (*See*, *e.g.*, PI Opp. 53 (Peterson's choice of his calibration period "is obviously a matter of judgment"); Biggs Dep. at 166-67, 259-60, 313-17, 342-44)

Claimants' counsel argue that their experts are "scientists" and that therefore their work, absent high-school-level mathematical errors, represents "scientific judgments."  In fact, what they represent are opinions the results of which are driven by inherently unscientific guesses as to how many people have claims against Grace and how much those people should be paid for those claims; "quasi-experiments" to use Peterson's phrase (Peterson Dep. at 130), divorced

from any "formal method of scientific analysis" to quote Biggs (Biggs Dep. at 255-56) – none of which bear any relationship whatsoever to the issue at hand, which is what should Grace be required to pay under applicable law in light of the merits of the claims at issue.

**B.      Claimants' Experts Cannot Deny that Their Methods Have Proven Unreliable in the Past and Cannot Be Counted on to Predict Future Claims.**

In years past, claimants have been fond of saying that, yes, the models they want to use to predict Grace claims have been wrong, but that they have been *too low* in their predictions.  This has never been proof that their methods or conclusions are *reliable*.  In fact, today, it proves just the opposite.

The unreliability of the methods their experts use is now come home to roost, as their models *overpredict* Grace's liability.  As pointed out in Grace's Opening Brief, claimants' models failed to predict the drop-off in claims actually seen against the Manville Trust from 2003 to the present.  (Grace Br. at 46-47)  Billions of dollars have been put into trusts on the basis of like estimates that failed to accurately predict *all manner of changes* in the claiming behaviors that form the drivers for claimants' models.  (*See generally* Grace Br. at 45-52) Claimants offer no response to these arguments.  They have nothing to say other than it was good enough then; it's good enough now.  That is not science; it is not the law; and, more importantly, it is not even true.  It was never good, let alone good enough.  It still isn't.

**C.      Claimants' Experts Cannot Demonstrate the Reliability and Objectivity of their Methods as Applied to Grace.**

The foregoing admissions alone compel barring claimants' evidence.  In addition, however, claimants have failed to demonstrate that their experts execute their analyses of Grace in a scientifically reliable manner as required by Rule 702 and *Daubert*.

17

**Peterson (_see_ Exhibit 1, as indicated)**

**1**   **2**      1.      **Peterson's calibration period is arbitrary and not the output of any objective method.**

The PI Committee does not dispute that Peterson relies only on a single approximately two-year "calibration period" of Grace's claims filings from 1999-2001 to project into the future. The PI Committee also does not dispute that the two-year period chosen by Peterson is **_an aberration_** – that the high level of claims during the two-year period is the result of a spike in claims against Grace. It represents an abnormally high level of claims against Grace that has not been shown to be tied to any **_facts_** or **_analysis_** that would justify the assumption that it should be applied to the next four **_decades_** to determine future claims against Grace.

Indeed, the PI Committee admits – as it must – that Peterson's choice of only this anomalous two-year period that represents a spike in claims against Grace **_"is obviously a matter of judgment."_**  (PI Opp. at 53 (emphasis added))  The PI Committee offers no explanation for why it would be proper to choose this aberrant period as the calibration period to project far into the future, nor any basis for assuming it should apply for decades to come.  Peterson makes no effort to perform any statistical analysis showing whether or how it was appropriate to use this two-year period of the spike as a basis for his estimates of future claims.  This is no better than making stock-market predictions based on the Dow Jones Industrial Average for **_1999-2000_** and assuming the resulting curve will govern values for the next **_half-century_**.  Like the market for equities, the forces that shape the law, the behavior of asbestos claimants and their lawyers, and the value of asbestos claims, have been and will no doubt continue to be volatile.  There is certainly nothing in Peterson's report or testimony that supplies the necessary **_analysis_** to conclude that the application of Peterson's two-year period is anything but arbitrary (and self-serving).  The effect of this arbitrary "judgment" is shown on Exhibit 2.

18

Instead of defending Peterson's "judgment," the PI Committee points to Florence's prior work to somehow suggest that, in this matter, Peterson does the same thing that Florence has done in other matters.  The PI Committee claims that in the *Armstrong* case, Florence "also selected the two years (1999 and 2000) immediately preceding the debtor's petition as ***the*** calibration period."  (PI Opp. at 53 (emphasis added))  This claim is false.  In the *Armstrong* case – as in this case – Florence used ***four different*** calibration periods spanning ***five years***, including 1996-2000, 1997-2000, 1998-2000 and 1999-2000.   As Florence explained:  "The range of calibration periods -- were selected so as to include sufficient years such that the influence of any single anomalous year would be mitigated."  (Florence Armstrong Rpt. at 17)  Unlike Peterson, Florence did ***not*** choose to rely only on a ***single*** two year period with the highest level of claims just prior to the bankruptcy filing.[4]

> ### 3.     The apples and oranges problem:  Peterson uses a bankruptcy trust to project future claims against Grace assuming it is not in bankruptcy.

Despite the fact that the fundamental premise of Peterson's analysis is a projection of Grace claims as if Grace were still in the ***tort system***, he proceeds to estimate those claims on the basis of claims against a ***bankruptcy trust***.  Thus the PI Committee admits that "Peterson makes the judgment" to increase the mesothelioma claims filings against Grace in the future based on what he said is "the increased propensity to file claims against the Manville Trust."  (PI Opp. at 55)  They cannot (and do not) dispute that the Manville Trust is a ***settlement*** – not litigation – facility, but that Peterson assumed that Grace in the future would be ***litigating*** claims.  (Grace Opp. at 42 (citing Peterson Dep. at 196-199))  They provide no explanation for how Peterson can

---

[4]   Similarly, the PI Committee's claim that Florence used a similar calibration period in the Federal-Mogul bankruptcy is also inaccurate.  There Florence used ***three*** calibration periods, including 1999-2001, 2000-2001, and 1999-2000, which excluded the peak filing year in the year of the bankruptcy.  (Florence Vellumoid Rpt. at 4)

take the "apples" of claims against a ***bankruptcy trust*** and turn them into the "oranges" of claims against Grace in ***the tort system***. There is no scientific methodology that turns settlement claims into tort suits, yet Peterson simply pretends they are the same. Neither Peterson nor the claimants' lawyers have any analysis that explains how one might make such a transformation.

The PI Committee's efforts to explain away this problem are, to put it charitably, silly. Instead of proffering any method that explains how one might move from apples to oranges and therefore reliably apply the Manville data to Grace (assuming such a method exists), all the PI Committee says is that Peterson uses the Manville data because "the Manville Trust data show actual claiming in the post-petition period, they 'are universally regarded as the most comprehensive data on asbestos claims filing and have been used repeatedly by analysts in forecasting liabilities for other defendants,' and they are of high quality." (PI Opp. at 55-56) But the "comprehensiveness" or "quality" of the data for claims against the Manville Trust provides no logical support for Peterson "making a judgment" that there is a ***relationship*** between Manville settlement filings and future Grace tort filings. Similarly, the PI Committee's claim that "there has been a well-established pattern over the years prior to April 2001 for the propensity to sue Grace to track very closely with changes in the propensity to sue the Manville Trust" (PI Opp. at 56) is without support. Peterson makes no such assertion in his report (*see* Peterson Rpt. at 71), and the chart (Peterson Rpt. at Fig. 22) does not "track very closely."

For the same reason, the PI Committee's reliance on a statement by Dunbar (PI Opp. at 56) is misplaced. Dunbar never stated that there would be a relationship between Manville Trust filings and the filings against any individual defendant and has never used any supposed relationship between Manville Trust filings and an individual defendant's claims to make a forecast of claims. Certainly, Dunbar never advocated increasing the estimated filings against a

defendant based upon a perceived increase against Manville.  In any event, given that Peterson does not provide any support for his "judgment" that there would be a relationship between Grace and Manville filings after 2001, Peterson's model is unreliable.

**④        4.        Even Peterson cannot stand foursquare behind the ability of his model to predict behavior more than a few years hence.**

The PI Committee acknowledges that "existing models of future claiming behavior and claim resolution can be demonstrated to be reliable only for a limited period."  (PI Opp. at 56)  In fact, Peterson could not even ***think of*** a scientific model that would reliably predict changes in claiming behavior and settlement factors for ***more than a period of six or seven years***.  (Peterson Dep. at 46-47)  Nevertheless, the PI Committee does not dispute that Peterson extends his model for ***decades***.  Their response is only that "all the experts must extend their estimates well beyond the current decade."  (PI Opp. at 57)  That is true, but it does not mean that there is no way to make such a forecast that meets the *Daubert* standard.  It means that it is Peterson's opinion that his own estimates are unreliable for the task at hand.

Indeed, not only is Peterson's estimate not reliable for decades, it is not even reliable for the years 2001-2006.  Despite the admission that after 2001 there are "factors that likely will reduce the number of claims in which Grace would make payments" (PI Opp. at 58), the PI Committee does not dispute that Peterson performs no statistical analyses to adjust for these factors.  Instead, they admit that Peterson "assumes" a decline in filings and adjusts payments to "reflect his expectation[s]."  (*Id.*)  Similarly, Peterson's settlement values are simply based on assumptions.  Subjective "assumptions" and "expectations" do not replace science.

### a.        Peterson assumes an exaggerated filing rate.

The PI Committee's claim that Peterson's filing assumptions are "conservative" is belied by the facts.  Indeed, as the chart used by the PI Committee demonstrates (PI Opp. Ex. 5),

Peterson assumes a ***higher*** filing rate after 2005 that is ***double*** the rate that the SEC data demonstrate. Given that Peterson's model assumes that his filing rates will continue at this two-fold higher level for decades, Peterson's model assumes a higher filing rate that is twice the level indicated by the data for ***every year from 2005 through the end of his forecast decades later.***

**b.      Peterson assumes an exaggerated payment rate.**

Likewise, Peterson's payment rate "assumptions" – for which Peterson admits that "I don't think there's any data" (Peterson Dep. at 209) – are also inflated. As the PI Committee's charts demonstrate (PI Opp. Ex. 12), Peterson assumes a ***higher*** filing rate after 2005 that is ***double*** the rates that the SEC data demonstrate. Given that Peterson's model assumes that his payment rates will continue at this two-fold higher rate for decades, Peterson improperly assumes a double payment rate ***for every year from 2005 through the end of his forecast.***

**c.      Peterson assumes an exaggerated settlement amount.**

Finally, Peterson's settlement values are based on the settlement values of USG, T&N, and Quigley. (Peterson Dep. at 214-15) Peterson admits that all three companies were nearly bankrupt and that none adopted the litigation-oriented approach that Peterson "assumed that Grace would pursue." (Peterson Dep. at 214-17) Peterson has no basis for assuming these values are appropriate for Grace.

**Biggs (*see* Exhibit 3, as indicated)**

**① 1.      Biggs's assertion of a relationship between Grace filings and nationwide filings has no basis outside her own head.**

The FCR concedes that Biggs's model is based upon a supposed relationship between nationwide filings and Grace filings. (FCR Opp. at 24) Biggs's use of a model that compares Grace claims to a nationwide "industry benchmark" of claim filings is an innovation that no expert has ever presented to a court before and such a model has never "undergone external peer

review."  (Biggs Dep. at 63-64)  Indeed, her industry benchmarks "are based on judgments without scientific tests."  (Biggs Dep. at 322-23)

Biggs's "industry benchmark" is like a committee-generated sketch of a creature no one has ever seen.  Through 2001, Biggs uses a compilation of industry data.  But from 2001 to 2009, Biggs uses "smoothed" *Manville* data as the source for the "industry" benchmark.  (Biggs Dep. at 302)  Then Biggs *extends* the Manville curve for 2001-2006 to 2009.  (Biggs Dep. at 320)  Next, after 2009, the "industry benchmark" is based on *Stallard's work* for decay rates for Manville.  (Biggs Dep. at 105)  Thus, Biggs's "industry benchmark" has a head, eyes, and limbs, each designed ad hoc.  The combined result is the product of assertion – not scientific analysis.

To defend the Biggs model, the FCR states only that she used "reasonable tests to support the assumption" and "found that Grace experienced similar historical claims-filing trends as other defendants."  (FCR Opp. at 24)  However, one can only search the record in vain for any such "tests."  What Biggs "found" cannot possibly be replicated and, thus, is nothing more than subjective belief.  These "assumptions" based on what Biggs "found" cannot replace science and statistics.  As such, her model is unreliable and inadmissible.

**2.      Biggs's calibration period is unreliable.**

Like Peterson, Biggs's work stumbles on the basic problem that her results are driven by the application of a single, arbitrary "calibration period" that, by her own admission, is not the product of analysis or testing:  "That's a judgment."  (FCR Opp. at 26)  Like Peterson, it includes the huge spike in claims, and also as with Peterson, she uses that calibration period that includes the spike to project into the future for decades.  *Daubert* does not allow an expert to choose an arbitrary basis to predict the future – especially one that is skewed to impart bias.

**3.**   **3.**   **Biggs's extended forecast is unreliable.**

Like Peterson, Biggs also looks to claims against the Manville Trust as the basis for her "industry benchmark" to predict claims for the next several decades.  (Biggs Dep. 105, 302, 320)  Biggs does so notwithstanding her admissions that the Manville Trust was not in the tort system and, indeed, did not require claimants to demonstrate company-specific exposure.  (Biggs Dep. at 325-32)  By contrast, under Biggs's assumptions, Grace would be in the tort system and would require some evidence of exposure.  Thus, Biggs use of the Manville data to project Grace claims is neither logical nor reliable.

**D.**   **In the End, Claimants Seek to Make New Law for Asbestos Cases.**

Faced with glaring admissions, failed models, and error-strewn work, claimants are reduced to arguing that the Court should lower the bar for purposes of admitting their evidence. The result is a series of attempts to overturn 25 years federal expert evidence jurisprudence.

> **1.**   **Because claimants' experts failed to follow any "scientific" method, they are left scrambling – and they now advance the self-fulfilling proposition that, precisely because their opinions are not technically "scientific," they are not required to follow a "scientific" method.**

The failure of claimants' experts to utilize a reliable scientific method has forced claimants to change their story repeatedly.  First, claimants' experts conceded in their depositions that their work should be tested against scientific standards.  (Peterson Dep. at 32-33; Biggs Dep. at 226; Stallard Dep. at 17)  Unable to satisfy these "scientific" standards, claimants since changed their position to argue their experts' opinions are not "scientific," and should be judged according to some *different* standard.   (PI Opp. at 51)   In reality, claimants disingenuously ask this Court to abandon its gatekeeping responsibility altogether, in favor of claimants' self-serving assertions that their experts' opinions are sufficiently reliable under *Daubert* because (1) they use "standard" estimation methods that (2) they say are "scientific."

Claimants' position tells the court ***nothing*** as to whether the work of their experts is sufficiently reliable to pass muster under *Daubert* and Rule 702.  Simply asserting a method is a "standard method" that has been used before does not in any way demonstrate the reliability of the method.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999) ("[T]he presence of *Daubert's* general acceptance factor [does not] help show that an expert's testimony is reliable where the discipline itself lacks reliability"); *Booth v. Black & Decker, Inc.*, 166 F. Supp. 2d 215, 220 (E.D. Pa. 2001) (excluding causation expert testimony under *Daubert* where testimony was allegedly based on "a standard method applied by others in the field," but "no persuasive, objective evidence that this method was subject to peer review, had a known or potential rate of error, could be measured against existing standards, or was generally accepted").  Second, conclusory statements by the experts that their methods are sound carry no weight and cannot trump the court's gatekeeping function.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995) ("[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive."); *In re Breast Implant Litigation*, 11 F. Supp. 2d 1217, 1234-35 (D. Colo. 1998) (same).

Rule 702 and *Daubert* require an expert's opinion to be grounded in a reliable methodology.  *See Kumho Tire*, 526 U.S. at 151 (gatekeeping obligation extends to all expert testimony, whether or not "scientific" in nature); *see also* Fed. R. Evid. 702 (testimony must be "product of reliable principles and methods").  To be reliable, "an inference or assertion must be derived by the scientific method."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 159-60 (3rd Cir. 2000) (expert causation opinion excluded because expert never tested causation theory or performed tests to

support his *ipse dixit* judgments); *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221-23 (10th Cir. 2003) ("plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound").

> ## 2.    They argue that acceptance in the business world equals acceptance as good science.

Instead of showing that their methods are reliable, claimants argue that it is enough that these same methods have sufficed in the business world.  (PI Opp. at 45-49)  But the fact that companies have used methods similar to claimants' with respect to their liability ***does not*** make claimants' experts' analysis ***reliable*** as a matter of science, and consequently, as a matter of law. There is no sound basis for arguing acceptance by earnest stock brokers somehow trumps the judgment of scientists trained in the relevant disciplines.  Indeed, the notion that use of a method (which may have been driven by any number of practical considerations and expediencies) somehow confers veracity on the analysis is a complete non-sequiter.  Markets and investors are given information and they do with it what they will.   Who are claimants to say everyone ***believes it to be scientifically reliable***.  It is what it is; it does not become gospel simply because it gets included in a 10-K.

> ## 3.    They argue that a scientific estimation would just be too hard to do.

Claimants' argument rests on the premise that their models are the best we can do, and that therefore they are good enough for submission into evidence.  But uncertainty, complexity, and even a lack of data is not a license to abandon *Daubert*'s reliability standards.  Indeed, such conditions should raise suspicions, not ally them.  Grace did not choose to undertake the task of predicting claiming and settlement behaviors for the next 50 years.  Claimants' experts have constructed their own house of cards, and are now desperate to convince the Court it is sturdy – not because it can withstand a gust of wind, but because it could not have been made stronger.

4.    **They argue that *ipse dixit* judgments can replace the scientific method.**

Time and again, claimants' experts explain unsupported portions of their methodology by reference to their purported professional judgment.  The fact of the matter, however, is that their analyses teem with unjustifiable *ipse dixit* pronouncements without reliable scientific or logical support.  These judgments cannot replace the scientific method and do not survive *Daubert* scrutiny.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Oddi*, 234 F.3d at 158 (expert's "*ipse dixit* does not withstand *Daubert's* scrutiny.

An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation."); *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000) ("If *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert."); *Gallegos v. Swift & Co.*, 237 F.R.D. 633, 639-40 (D. Colo. 2006) (experts unsupported conclusions regarding plaintiffs' percentile comparison to the general population were "precisely the kind of *ipse dixit* . . . that does not meet the standards of Rule 702 or *Daubert*").  While it is true that *Kuhmo Tire* permits experts to testify based on their training and experience; it is not, as claimants argue, a wholesale abandonment of Rule 702 and this Court's gatekeeper role.  526 U.S. at 150.

Ultimately, claimants are arguing that *Daubert*, *Kuhmo Tire*, and the Federal Rules of Evidence have no bearing on their case.  They that seek to ignore the law in favor of an ill-defined *sui generis* approach to the estimation of liability that ignores the Bankruptcy Code thus also advance one-off standards for the admissibility of expert opinion testimony.

### III.    CLAIMANTS' OUT-OF-ORDER POT SHOTS AGAINST GRACE'S METHOD MISS THE MARK.

#### A.    Claimants' Attacks on the PIQs.

Claimants again attack Grace's use of the PIQs, but to no avail.  Even a sampling of their complaints demonstrates how misguided their arguments are:

- The PI Committee characterizes the PIQs as "material prepared for trial purposes by the other side."  (PI Opp. at 39)  But this is not Grace's information.  ***Claimants*** filled out the PIQs, not Grace.  Caimants do not even attempt to challenge the accuracy of the compilation of the PIQ data that forms the basis for Grace's expert analysis.

- They claim the PIQs are "wholly inadequate as a definitive measure of the claimants' trial evidence."  (PI Opp. at 40)  Again, if the responses are inadequate, that is not the fault of Grace, but of the claimants.

- They claim the PIQs are deficient because claimants cannot be required to provide their evidence prior to trial.  (PI Opp. at 41)  Staving off an inquiry into the merit of their bankruptcy claims is not an option.  Claimants were repeatedly ***ordered*** to provide their evidence.  (*See* Jan. 21, 2005 Hr'g Tr. at 140).

#### B.    Claimants' Attack on "Grace's" Criteria.

Claimants also attack the so-called "Grace" criteria for determining which claims are valid.  As should be clear by now, these criteria are not "Grace's"; they are the criteria imposed by the law on any plaintiff in a toxic tort case, where he has the burden to ***prove exposure, causation via an assessment of dose and increased risk, and disease.***

The issue is simply whether, as a rule, a plaintiff can have a potentially valid case without:  (a) proof of sufficient exposure to Grace asbestos to cause his disease; (b) sufficient increased risk to justify a finding of causation under established epidemiology; and (c) verifiable evidence of the claimed disease.  Claimants claim these requirements have no basis in the law, but ***they fail to cite a single case decided under* Daubert *that says a plaintiff can prove a claim absent a quantification of exposure, risk, and proof of actual disease.***  The cases claimants cite in response are wholly inapposite:

- *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815 (6th Cir. 2000), contains no *Daubert* analysis. Nothing in the case suggests that in order to establish fault plaintiffs did not have to show sufficient exposure to asbestos to cause their diseases.

- *Orleans Parish Sch. Bd. v. Asbestos Corp.*, 114 F.3d 66 (5th Cir. 1997), says nothing about the legal acceptance of the no-threshold theory of causation and likewise contains **no** *Daubert* analysis. The language claimants quote is not even the court's.

- *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997), simply held that an expert could opine on exposure levels given his knowledge and work with the available information. It did not give anyone *carte blanche* to proceed against a defendant without a reliable quantification of exposure.

- *Louderback v. Orkin Exterminating Co.*, 26 F. Supp. 2d 1298 (D. Kan. 1998), does discuss *Daubert*, but cites a host of cases excluding testimony for failure to account for established thresholds below which causation had not been established. *Id.* at 1305-06. Though the court ultimately allowed the plaintiff's exposure evidence, it did so only after satisfying itself that plaintiff's expert had a reliable basis for concluding the plaintiff was sufficiently exposed to justify a finding of causation. *Id.* at 1306-07.

None of these cases support claimants' argument.[5]

## C.    Claimants' Argument that Judgments Should Be Used to Value Claims.

Claimants also argue that Grace should apply judgments to calculate the value of their claims, not settlements, and that this would result in an estimated liability of some $12 billion. (PI Opp. at 7-8, 29-30) This is wrong.

As with settlements, claimants take a judgment for something that it is not. Even assuming a hypothetical, valid, affirmed-on-appeal, paid judgment that represents only Grace's

---

[5] Moreover, even state law (which claimants incorrectly say should be the sole measure of the validity of their claims) often requires this same proof, *see, e.g.*, *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 771-772 (Tex. 2007) (requiring evidence of exposure and dose to sustain an asbestos personal-injury claim); *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1223 (Cal. 1997) (requiring "some threshold exposure to the defendant's defective asbestos-containing products"); *Valentine v. PPG Industries, Inc.*, 821 N.E.2d 580, 588 & n.1 (Ohio Ct. App. 2004) (requiring proof of exposure and dose) – which puts the lie to the notion that somehow Grace is imposing unprecedented criteria to the claims at issue. To the extent there are states that might allow a plaintiff to take his case to a jury **without** meeting these basic requirements, this is a case of the exception proving the rule: the criteria imposed by *Daubert* and the Federal Rules – which in hundreds of pages of briefing no party has suggested do not apply – mandate the "criteria" claimants falsely attribute to "Grace."

liability (as opposed to a joint-and-several-based liability), such a judgment says nothing as to liability on a *different* claim absent some form of preclusion or estoppel – neither of which claimants advance.

Moreover, claimants' argument assumes that claimants would prevail in litigation on all the claims the Grace's experts do not value at zero.  This is *not* what Grace's experts say, nor does it make any sense.  Grace's experts accounted for potential liability on *every* claim that they estimate might muster enough evidence of exposure, causation, and disease to have a *chance* of success in litigation.  Grace's experts *did not* undertake to further evaluate whether claimants could actually win these cases; they simply assumed that the value of cases that met the bottom-tier criteria for proof would, on average, command values similar to those obtained by *factually similar* cases in the past.

## IV.    OTHER ISSUES.

Grace and the Equity Committee stand on their prior briefs on all other issues.

## CONCLUSION

This Court should exclude claimants' estimation case as set out in Grace's motion.

Dated:  January 7, 2008

Respectfully submitted,


BUCHANAN INGERSOLL &
  ROONEY PC

/s/ Teresa K.D. Currier _____
Teresa K.D. Currier (ID No. 3080)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295


- and –


KRAMER LEVIN NAFTALIS &
  FRANKEL LLP

/s/ Philip Bently_____
Philip Bently
Gregory Horowitz
Douglas Mannal
919 Third Avenue
New York, New York 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000


*Attorneys for the Official Committee of
Equity Security Holders*

KIRKLAND & ELLIS LLP

/s/  David M. Bernick, P.C. _____
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200


- and –


PACHULSKI, STANG, ZIEHL & JONES LLP

/s/ James E. O'Neill_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI, STANG, ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400


*Co-Counsel for the Debtors and Debtors in
Possession*

**INDEX OF EXHIBIS CITED IN GRACE'S
REPLY MEMORANDUM IN SUPPORT OF GRACE'S MOTION TO
EXCLUDE EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION
OF ITS CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY**

| Exhibit | Date | Description |
|---------|------|-------------|
| **Numbered Exhibits** | | |
| 1 | | Peterson's Estimation Approach |
| 2 | | Peterson: Propensities to Sue: Mesothelioma (1990-2001) |
| 3 | | Biggs Estimation Approach |
| **Expert Reports** | | |
| 4 | 3/29/2006 | Florence Expert Report, *In re Armstrong World Indus.*, No. 00-CV-4471 (D. Del. 2006) (excerpt) |
| 5 | 2007 | Florence Expert Report re Asbestos Liability Coverage Analysis for Claims Against Vellumoid, *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del. 2007) (excerpt) |
| 6 | 6/18/2007 | Peterson Expert Report (excerpt) |
| **Depositions** | | |
| 7 | 11/5/2007 | Biggs Deposition (excerpt) |
| 8 | 11/1/2007 | Peterson Deposition (excerpt) |
| 9 | 10/24/2007 | Stallard Deposition (excerpt) |
| **Hearings** | | |
| 10 | 10/25/2007 | Hearing Transcript (excerpt) |
| 11 | 1/21/2005 | Hearing Transcript (excerpt) |
| 12 | 11/22/2004 | Memorandum and Order, *In re Owens Corning*, Case No. 00-3837 (Bankr. D. Del.) |

| Exhibit | Date | Description |
|---------|------|-------------|
| | | **Court Documents** |
| 13 | 12/21/2007 | ACC's Opposition Brief with Charts 5 & 12 (excerpt) |
| 14 | 11/5/2007 | ACC/FCR Plan of Reorganization (excerpt) |
| 15 | 12/21/2007 | FCR Opposition Brief (excerpt) |
| 16 | 12/8/2007 | Grace's Daubert Brief (excerpt) |
| 17 | 12/21/2007 | Grace's Opposition Brief (excerpt) |
| | | **Other Documents** |
| 18 | | R. Aaron, Bankruptcy Law Fundamentals § 3.03 [2] (excerpt) |