# Exhibit 7

US District Court - Delaware

FINAL - November 5, 2007

Chapter 11 - W.R. Grace

Jennifer L. Biggs

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

    Debtors.

Case No. 01-1139 (JFK)

------------------------------------------

DEPOSITION OF:

Jennifer L. Biggs

Monday, November 5, 2007

Washington, D.C.

Lead:  David Bernick, Esquire

Firm:  Kirkland & Ellis, LLP

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 63

1    Mealey's, different conferences like that,

2    where I often will talk about how to

3    estimate liabilities.

4           So it's not like it's a big

5    secret.  We talk about the methods that we

6    use fairly publicly.

7           **Q    Well, let's try the bottom**

8    **line.**

9           **There is -- the models**

10   **themselves that Tillinghast uses are**

11   **secret, correct?**

12          MR. FINCH:  Objection to the

13   form.

14          MR. MULLADY:  Objection.

15   Foundation.

16          **Q    That's the whole way to**

17   **maintain your proprietary value, your**

18   **secrets?**

19          A    Yes.  Their existence is not a

20   secret.  The way they operate is not a

21   secret.

22          But some of the underlying

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 64

1    intellectual capital, some of the specific

2    assumptions and how we developed those

3    assumptions, that is proprietary, yes.

4        **Q    And in terms of the**

5    **peer-reviewed paper, the only peer-reviewed**

6    **paper that you have identified so far**

7    **that -- unless you are going to tell me**

8    **about -- the only peer-reviewed paper you**

9    **have identified so far that relates to**

10   **those models is the Cross paper published**

11   **in '97, correct?**

12       A    That's the only paper that

13   deals specifically with the model.  But

14   there are other -- there is other

15   peer-reviewed information that feeds into

16   the model.

17           For example, we rely on

18   assumptions relating to run-off patterns

19   that were developed by Professor Stallard,

20   and his work was peer-reviewed as part of

21   the Manville proceedings back in 1993 and

22   1994.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 105

1    A    I don't think you are

2  understanding the totality of what I did,

3  so let's break it down.

4    **Q    Okay.  But for the period of**

5  **time from 2010 going forward, you used a**

6  **decay rate that comes straight from**

7  **Mr. Stallard's work, correct?**

8    A    That's correct.

9    **Q    You did not provide that decay**

10  **rate, correct?**

11    A    Correct.  I relied on Professor

12  Stallard for the decay rate.

13    **Q    And the decay rate represents**

14  **the decay rate that is the shape of the**

15  **future estimate of Manville filings,**

16  **correct?**

17    A    It's the rate of run-off of the

18  claims.

19    **Q    Right.  And all you did was**

20  **take his decay rate and tack it on to the**

21  **last year of your trend, that is, 2009,**

22  **correct?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 130

1    A    Correct.

2    **Q    Now, when it comes to, for**

3    **example, whether propensity to sue is going**

4    **to go up or down against a given company,**

5    **that is also an area that in your analysis**

6    **is an area about which you make**

7    **assumptions?**

8    A    In this case, I make

9    assumptions regarding the propensity to sue

10    Grace.

11    **Q    Right.  Now, those assumptions**

12    **about the propensity to sue Grace, whether**

13    **they are going to go up or down, are**

14    **assumptions that don't come to you as a**

15    **result of any scientist saying, "Here is**

16    **what is going to happen," correct?**

17    A    I don't -- I don't get them

18    from an outside expert.  Those are my

19    assumptions.

20    **Q    Right.  And when you say your**

21    **assumptions, you don't have a quantitative**

22    **or published methodology on the basis of**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 140

1    MR. FINCH:  Objection to the

2    form.  Foundation.

3    **Q    In 2003, nobody predicted the**

4    **drop-off that was going to occur in 2004,**

5    **correct?**

6    A    I am not aware of it.

7    **Q    Now, in your estimate, take**

8    **the -- so we what we have is a series of**

9    **changes that have taken place in the**

10   **litigation environment over the years,**

11   **fair?**

12   A    Yes.

13   **Q    And is it also fair to say that**

14   **people who have done estimates of asbestos**

15   **liability have, with a fair degree of**

16   **consistency, failed to predict those**

17   **changes, true or not?**

18   A    There have been changes in the

19   litigation environment that have not been

20   predicted ahead of time, true.

21   **Q    Now, Mr. -- Dr. Peterson was**

22   **able to testify that the longest that he**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 146

1     **Q     -- '97 to 2001, and you adjust**

2     **it to reflect the Grace in your view has**

3     **later dates of first exposure?**

4          A    Based on their own claim data.

5     **Q     Based on their own claim data.**

6          **And subject to that one**

7     **adjustment, you assume that the litigation**

8     **environment of Grace versus the rest of the**

9     **industry otherwise remains constant for the**

10    **rest of the projection, correct?**

11         A     I think -- yes, let me try to

12    answer it with more words.  I do --

13    **Q     If you feel it necessary?**

14         A    I do.

15              I continue to reflect changes

16    in the industry level of claim filing

17    beyond Grace's bankruptcy date; but, other

18    than the adjustments for the differences in

19    first exposure dates, I assume that Grace's

20    experience will follow the same general

21    pattern as what I have assumed for the

22    industry in total.

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                    Jennifer L. Biggs

Page 160

1     **and the ratio that comes out of that, the**
2     **assumption that it would then remain**
3     **constant over a long period of years, with**
4     **the exception of the date of first exposure**
5     **adjustment, that assumption is an**
6     **assumption that you did not test, correct?**
7           MR. FINCH:  Objection to the
8       form.
9         A     I haven't tested it in a
10    statistical sense because there are not any
11    statistics to test.  I have tested it from
12    a reasonableness perspective in terms of
13    what might be likely to happen to Grace
14    relative to other defendants.
15        **Q     Okay.  Now, from that**
16    **perspective, that is the perspective that**
17    **says, "Is Grace's environment vis-a-vis**
18    **other defendants going to change or not in**
19    **the future," that's an assessment that you**
20    **did to see about reasonableness, right?**
21          MR. MULLADY:  Objection.
22      Foundation.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 163

1    A    Correct.

2        **Q    You didn't do any quantitative**

3    **test, correct, of your assumption?**

4        A    Of the future -- let me just

5    make sure I understand what you are saying.

6        Of the ratio of future Grace

7    claims that don't exist --

8        **Q    That's your statement.**

9        A    -- relative -- well, I don't

10    understand your question then.

11        **Q    Very simple.**

12        **You took a ratio that was**

13    **derived from an historical period of time.**

14    **You assumed it was going to remain the**

15    **same.  That assumption you did not test**

16    **statistically.**

17        **You have just testified to**

18    **that, right?**

19        A    The basis for the assumption is

20    tested statistically based on historical

21    information.

22        **Q    The assumption that the**

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 164

1    **propensity would remain the same in the**

2    **future from 2001 going forward would remain**

3    **the same, that is an assumption, correct or**

4    **not?**

5        A    That's an assumption.

6        **Q    Okay.  And it wasn't tested by**

7    **you, correct or not?**

8        A    To the extent I've looked at

9    the stability of the historical ratio, that

10    is a test of the validity of that

11    assumption in the future.

12            In terms of other tests that

13    you seem to be implying that I should have

14    done, I don't even know what you are

15    suggesting; but based on all of the data

16    that is available, I performed reasonable

17    tests to support the assumption.

18        **Q    Okay.  Okay.  The only thing**

19    **that you have now referred to is tests to**

20    **the history, right?**

21            **You said that you looked at**

22    **tests going back?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 166

1    the '97, '98 time frame, '99 time frame.

2         Grace had entered into a

3    moratorium agreement, so their level of

4    filings during those years was suppressed.

5    If I look at their ratio relative to the

6    industry, I see that it looks low in the

7    years that there are moratoriums.

8         So I am able to interpret that

9    data.  I am able to understand what caused

10   their relationship relative to the industry

11   to change during different time frames.

12        And the purpose of this whole

13   calibration period is to look at the years

14   and the time frame that will be most

15   relevant for selecting Grace's ratio

16   relative to the industry on a going-forward

17   basis.  And I think I have done adequate

18   tests to make that assumption.

19        **Q    What you have now said is that**

20   **you looked at historically to the**

21   **propensity to given periods.  Then you made**

22   **a judgment about which one would be**

US District Court - Delaware                   FINAL - November 5, 2007
Chapter 11 - W.R. Grace                               Jennifer L. Biggs

Page 167

1    **reasonable to be used on a going-forward**

2    **basis; is that right?**

3            MR. MULLADY:  Objection.

4    Misstates the testimony.

5        **Q    Is that right or not,**

6    **Ms. Biggs?**

7        A    I have made a well-grounded

8    assumption.

9            MR. MULLADY:  Can we take a

10   short break.

11           MR. BERNICK:  No, I want to ask

12   a few more questions.  Then I will be

13   five or ten minutes.  I actually just

14   want to finish this up.

15           MR. MULLADY:  We are going to

16   stop soon.

17           MR. BERNICK:  You can stop

18   anytime you want, Ray.

19           MR. MULLADY:  Well, I just

20   asked you if we could stop and you

21   said you wanted to ask five more

22   minutes of questions.

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                                Jennifer L. Biggs

Page 216

1    **think are going to take place in the legal**

2    **environment in the future with regard to**

3    **the propensity to sue for mesothelioma?**

4         A    I have basically predicted that

5    the environment will be consistent with

6    what we see today, so I haven't tried to

7    predict future changes in that environment.

8         **Q    With respect to Grace, you have**

9    **assumed that the environment will be the**

10   **same as the way it was from '97 to 2001,**

11   **correct?**

12        MR. FINCH:  Objection to the

13   form.

14        A    No.

15        **Q    In terms of the propensity to**

16   **sue, Grace versus the industry?**

17        A    Maybe -- that's not what you

18   asked me.

19        **Q    Well, I'm sorry.**

20        **With respect to Grace, the**

21   **propensity to sue Grace versus the**

22   **industry, you are assuming will be the same**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 217

1    **going forward, the estimate, as it was from**

2    **'97 to 2001, correct?**

3        A    Other than the changes in the

4    date of first exposure, I am assuming that

5    that -- that Grace's relationship relative

6    to the industry would remain constant.

7        **Q    And in doing so, you did not**

8    **perform any scientific analysis of the**

9    **factors that would affect the propensity to**

10   **sue Grace for mesothelioma, correct?**

11       MR. MULLADY:  Objection and

12   foundation.

13       A    I reviewed the resulting

14   claims.  Inherent within them are all of

15   those behaviors.  I have not studied the

16   specific behaviors.

17       **Q    Okay.  But we know that**

18   **propensities have changed in the sense that**

19   **the result -- the result in terms of an**

20   **aggregate propensity -- we know that those**

21   **have shifted over time, right?**

22       A    They have consistently

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                        Jennifer L. Biggs

Page 224

1    having trouble focusing.

2        **Q    Sure.  That's fine.**

3            **"Are you aware of any**

4    **scientific methodology that is available**

5    **for predicting how the legal externalities**

6    **are going to evolve with respect to**

7    **asbestos claims?"**

8            **His answer was:  "No."**

9            **Would your answer be different?**

10       A    I would also answer no.

11       **Q    Last question:**

12           **"Is there any scientific**

13   **methodology that you can think of that**

14   **would be capable of predicting changes in**

15   **the legal environment for asbestos?"**

16           **That's the question that I**

17   **asked him?**

18           MR. MULLADY:  Page?

19           MR. BERNICK:  This is page 103.

20       **Q    "Is there any scientific**

21   **methodology that you can even think of that**

22   **would be capable of predicting changes in**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 226

1    method that I think you are looking for,

2    but it is a scientific way to do it.

3         **Q    So your answer to that would be**

4    **yes?**

5         A    I can think of something.  Yes.

6         **Q    Okay.  But it's supposed to be**

7    **scientific methodology.  Is that a**

8    **scientific methodology?**

9         A    I am applying scientific

10   principles to evaluating past experience

11   and making a reasoned assumption going

12   forward.  That's a scientific method.

13   Maybe we define that differently.

14        **Q    Okay.  Is that within the scope**

15   **of your expertise, the method that you just**

16   **described for predicting changes in the**

17   **legal environment?**

18        A    I evaluated the likelihood of

19   significant changes in the legal

20   environment relating to meso claims.  I

21   have to -- I have to make an assumption

22   regarding how that might or might not

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                    Jennifer L. Biggs

Page 229

1    of a way or a model to use to do that.  As

2    a necessity of making my estimate, I need

3    to come up with an assumption regarding the

4    future propensity to sue.  And the basis I

5    used to make that judgment is scientific in

6    nature.

7          So in a very technical sense, I

8    have used the scientific process to make an

9    assumption.  I haven't built a model, and I

10   don't think I have the expertise to build a

11   model regarding specific claiming behavior

12   and how that would change in the future.

13         But that is different to me

14   than whether I have the expertise to use

15   scientific principles to make an informed

16   judgment and make a necessary judgment

17   regarding the estimate of future

18   liabilities.

19   **Q    That's a question of selective**

20   **judgment, I think your term is?**

21         MR. FINCH:  Objection to the

22         form.

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                        Jennifer L. Biggs

Page 236

1    filed.  I just know that they were filed.

2           And I also know that the rate

3    has been steadily increasing for many, many

4    years, and that, based on my understanding

5    of the environment, there is not a reason

6    to expect a decrease.

7           So my model is not a rigorous

8    regression analysis of specific variables

9    to affect propensity to sue.  I am not

10   aware of that type of model, and that's not

11   what I have employed.

12       **Q    And then, therefore, when it**

13   **comes to the future, you don't have a model**

14   **for future propensity.  You have a model**

15   **for --**

16       A    I have an assumption for future

17   propensity to sue, based on the model of

18   the past.

19       **Q    Okay.  But you don't have a**

20   **model for future propensity to sue.  It is**

21   **an assumption, correct?**

22       A    It is -- I have a model of the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 237

1    future propensity to sue in the industry,

2    and I have made an assumption regarding

3    Grace's share of that.  So I do have a

4    model of the future propensity to sue.

5        **Q     But you don't have a model of**

6    **the future propensity to sue at the company**

7    **level, correct?**

8        A    I make an assumption that it

9    will remain at a constant level.

10       **Q     That constant level is the**

11   **level as which it was -- existed from '97**

12   **to 2001, correct?**

13       A    Relative to the industry,

14   correct.

15       **Q     And if you change that**

16   **calibration period by even a year, it would**

17   **very significantly affect the entire future**

18   **projection, correct?**

19       A    It could.  You could look at

20   lots of different blocks of years, and you

21   need to use informed judgment to decide

22   what is most appropriate.  You can't just

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 244

1    future were unforeseeable.  Others, I

2    think, could be predicted, so I don't want

3    to just say the totality of it couldn't be

4    foreseeable.  So --

5        **Q    But the totality certainly**

6    **couldn't have been foreseen, correct, in**

7    **any given year, the totality --**

8        A    But material factors that are

9    part of that could be, so I don't want to

10   just put it all in a bucket and say we

11   couldn't tell you about anything.  There

12   are significant parts of it that we could

13   tell you about it.

14       **Q    Would you agree with me that,**

15   **in any given year of Grace's history, the**

16   **propensity to sue Grace year-by-year or**

17   **over a period of many years was in its**

18   **totality materially affected by factors**

19   **that could not be foreseen?**

20       A    I think Grace, as well as other

21   defendants, were affected by increases in

22   the propensity to sue for meso that weren't

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 245

1    foreseen.

2         **Q    Now, I want to focus**

3    **specifically on your calibration period for**

4    **Grace -- that is from '97 to 2001.**

5    **Correct?**

6         A    For the number of filings,

7    correct.

8         **Q    Just still talking propensity,**

9    **when it comes to the propensity**

10   **determination that you made, you used a**

11   **calibration period of '97 to 2001.  Fair?**

12        A    True.

13        **Q    Okay.  Now, if we went back**

14   **over that period of time, that calibration**

15   **of time, in fact, there turned out to be**

16   **during that calibration period dramatic**

17   **volatility in Grace's propensity, correct,**

18   **with respect to mesothelioma?**

19        A    There were fluctuations in the

20   ratios that I show of Grace relative to the

21   industry.  And when I see that type of

22   thing, it's important to me to try to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 255

1    cause-and-effect factors at a more

2    individual claimant basis.  I just fail to

3    see how that is very possible, given the

4    types of data that are available regarding

5    individual claimants for mesothelioma.

6        **Q    Well --**

7        A    It sounds like a great theory,

8    but I don't think it's very practical.

9        **Q    I see.  Are you aware of any**

10   **other formal method of scientific analysis**

11   **that enables you to identify causal**

12   **factors?**

13       A    I haven't studied that.  That's

14   not how I do my analysis.

15       **Q    Now, when it comes to Grace**

16   **specifically, apart from the moratoria,**

17   **were there any other factors that you**

18   **identified affecting Grace such that they**

19   **might change the Grace propensity in**

20   **relationship to the industry propensity**

21   **during the late -- during the calibration**

22   **period?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 256

1          Did I screw that up?

2     A    No.  I'm thinking.

3          Not specifically.

4     Q    How much of the increase -- or

5     there was an increase in the propensity

6     versus the industry during your calibration

7     period, correct?

8     A    Yes.

9     Q    Okay.  So, in fact, if we took

10    your propensity number, about 58 percent --

11    A    For meso.

12    Q    -- for meso, that number

13    reflects in part the impact of an increase

14    in propensity to sue Grace during your

15    calibration period, correct?

16    A    Ratios of Grace's claims

17    relative to the industry claims are higher

18    in 2000 and 2001.

19    Q    Right.

20    A    And some of that increase is

21    attributable to certain moratorium

22    agreements expiring.  And other reasons for

US District Court - Delaware            FINAL - November 5, 2007
Chapter 11 - W.R. Grace                         Jennifer L. Biggs

Page 259

1      A    That it increased in 2000,

2    2001.

3      **Q    Yes.  To that extent, you had**

4    **to look -- you wanted to look for factors**

5    **that would account for that increase, that**

6    **is, Grace-specific factors, right?**

7      A    I wanted to understand

8    information that would tell me which years

9    would be most representative of Grace for

10   the future.

11     **Q    Right.  And in order to do**

12   **that, again, you have to go look back to**

13   **what is causing the events to take place.**

14   **You want to know if there are going to be**

15   **events that are non-recurring or if there**

16   **are going to be events that are recurring,**

17   **correct?**

18     A    I agree.

19     **Q    Now, as I understand it, the**

20   **only event that you have actually analyzed**

21   **that is unique to Grace during that period**

22   **of time is the -- are the moratoria,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 260

1    **correct?**

2        A    The moratorium, and the other

3    specific item that I needed to consider for

4    the calibration period was what the partial

5    year of filings represents in terms of the

6    relationship to the industry.  I need to

7    set them on equal time or volume

8    considerations in order for the ratio to

9    make sense.

10       **Q    But in terms of changes**

11   **affecting the propensity against Grace, the**

12   **only --**

13       A    I didn't identify anything

14   else.   Correct.

15       **Q    Okay.  Now, with respect to the**

16   **moratorium, did you measure -- from what**

17   **you have said -- well, let me just ask you.**

18       **Did the moratorium have the net**

19   **effect of increasing the overall average**

20   **propensity to sue Grace in the calibration**

21   **period?  In other words, did the moratoria**

22   **affect propensity within the calibration**

US District Court - Delaware                 FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 302

1    exact number, but I want to say it was like

2    700,000 of the plaintiffs, and that they

3    used that information to slot the filing to

4    the earliest year of litigation against any

5    defendant.

6         So that portion of the

7    benchmark that we are talking about is

8    based on much more than just filing

9    information against Manville.

10   **Q    In 2006 going forward all -- in**

11   **order to get your industry benchmark -- I'm**

12   **sorry.**

13        **Prior to 2006 -- from 2001 to**

14   **2006, you did a calculation that was based**

15   **upon Johns Manville plus 5 percent,**

16   **correct?**

17        A    During the 2001 to 2006 period

18   for mesothelioma, my benchmark is based

19   predominantly on an analysis of Manville

20   data against the Trust; and it assumes that

21   Manville represents 95 percent of the

22   industry total.

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 313

1    understanding of the data.

2          I directly relied on a

3    selection of '97 to 2001 as being

4    responsive.

5      **Q    Now, if we take a look at the**

6    **trend line from '93 through '98, that's a**

7    **total of six years.  And is it fair to say**

8    **that the propensity trend line from '93 to**

9    **'98 is consistently down?**

10     A    The ratios in each successive

11   year of Grace relative to the industry are

12   lower.

13     **Q    Then there are two years in**

14   **which there is the beginning of a rise, and**

15   **then one year in which there is sharp jag**

16   **up, correct?**

17     A    1999 increases, and 2000

18   increases at a greater rate.

19     **Q    And are there statistical tests**

20   **to use to determine whether the group of**

21   **years from '97 -- from '93 to '98 is**

22   **statistically different from the group of**

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 314

1   **years, '98 -- I mean -- 1999, 2000, and**

2   **2001?**

3        A    You could use tests to

4   determine if you felt that the average

5   during the two time periods was different,

6   but that wouldn't prove anything.

7        **Q    Well, it may not prove**

8   **anything, but there are tests that are**

9   **available -- are there not -- for testing**

10  **as a statistical matter whether those two**

11  **groups of numbers are significantly**

12  **different, correct?**

13       A    You could test whether the

14  averages are different, but the purpose

15  here is not to show whether they are

16  different.  The purpose is to make an

17  assumption regarding what is most

18  representative for the future.

19       **Q    Well --**

20       A    And it doesn't matter if the

21  two groups are different --

22       **Q    So --**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 315

1    A    -- to do that.

2        **Q    Well, first of all, you didn't**

3    **do the test, right?**

4    A    I didn't see a need to do that.

5        **Q    But you didn't do the test?**

6    A    I didn't do the test because I

7    did not think it was necessary.

8        **Q    Fair enough.**

9        **So if it turns out that there**

10    **is a steep downward trend from '93 to '98,**

11    **there is then a change in direction from**

12    **1999 and 2000.  You then get to the key**

13    **question which is:**

14        **If those trends are there and**

15    **they are statistically significant, down**

16    **and then reversal up, you then have to ask**

17    **yourself the question, do you not, about**

18    **which trend is most probative of the**

19    **future, right?**

20    A    I didn't try to answer the

21    question, which trend is representative of

22    the future.  I tried to ask myself:  Which

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                          Jennifer L. Biggs

Page 316

1    overall rate is most representative of the

2    future?

3            And if I were to follow one

4    theory that says I should be as responsive

5    as possible to recent period experience, I

6    would have only used the data in 2000 and

7    2001 with the very high level.

8            But I didn't do that because I

9    didn't think it was appropriate.

10           I looked into the underlying

11   nature of the reasons that the '97, '98,

12   and 1999 -- '96, '97, '98, and '99 years

13   are depressed and selected the overall

14   calibration period as representative going

15   forward.

16           And as long as I understand the

17   reasons why one group of years is going

18   down, I don't need to test whether they're

19   statistically different.  I just need to

20   make an informed judgment as to what I

21   think is the best rate on a going-forward

22   basis.

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 317

1          **Q     Did you do any tests to**

2     **determine -- did you do any tests to**

3     **determine which years from '93 to 2001,**

4     **which years were most representative?**

5          A    That's a judgment.

6          **Q     I understand that.  But did you**

7     **do a test or statistical or other**

8     **quantitative test to kick the tires on your**

9     **judgment?**

10          MR. MULLADY:  Objection to the

11     form.

12          A    I used principles of actuarial

13     science relating to the credibility of

14     data, stability of data, responsiveness of

15     the time period.  I used those fundamental

16     principles to make a reasonable assumption.

17          **Q     Okay.  I have got two more**

18     **topics to cover, and then I will be done.**

19          **I want to now turn from -- the**

20     **ratio that we have talked about is**

21     **propensity.  It's a ratio -- it's a ratio**

22     **between claims against Grace and claims**

Page 320

1    benchmark, and that's the Tillinghast

2    industry benchmark?

3        A    Correct.

4        Q    And you don't do the date of

5    first exposure adjustment from -- from 2001

6    to 2006, you use the industry benchmark,

7    and you do the date of first exposure

8    adjustment?

9        A    Correct.

10        Q    And then 2006 to 2009, as I

11    understand it, that simply is extending the

12    benchmark that you have for 2006 through

13    '09?

14        A    I believe we have kept a

15    constant level.

16        Q    Then from '09 going forward,

17    you use the decay rate from the Stallard

18    estimate for the Manville claims, correct?

19        A    I apply the run-off patterns by

20    date of first exposure group to the

21    experience for the '05 to '09 period.

22        Q    '05 to '09?

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 322

1    '09, you simply use the same number

2    year-by-year.  Was that because you didn't

3    have an industry benchmark?

4        A    I had actual information that I

5    could look at when I was building the model

6    through 2006, and so I reflected that

7    actual information to the extent I could.

8    And then I assumed that '07 through '09

9    would remain the same as 2006.

10       Q    Why then didn't you -- is there

11   not an industry benchmark for those years?

12       A    The industry benchmark is what

13   is stated.

14       Q    But that's for -- why don't you

15   just simply use the data point that comes

16   off the industry benchmark for '07, '08,

17   '09?

18       A    I don't think I am even

19   understanding your question.  When I

20   developed the industry benchmark, I made an

21   assumption that '07, '08, and '09 would

22   continue on par with the 2006 data point.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 323

1    And I need to look at things in these

2    five-year buckets in order to then apply

3    the run-off from that point forward.

4        So I needed -- I had an actual

5    data point for 2006.

6        **Q    Yes.**

7        A    And I used that to develop to

8    '09.

9        **Q    Would it be fair to say that**

10   **for 2007, 2008, 2009 you made the judgment**

11   **or assumption that the rate would be the**

12   **same as 2006?**

13       A    Yes.

14       **Q    And is that a judgment for an**

15   **assumption that is the output of a**

16   **quantitative analysis, or is that simply a**

17   **judgment that you made, you considered to**

18   **be reasonable and of service in answering?**

19       A    It took into consideration the

20   expected run-off between the 2005 to 2009

21   group versus the 2000 to 2004 group from

22   Professor Stallard's work, both his older

US District Court - Delaware             FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 325

1    **fair to say that between those two things,**

2    **you're basically assuming that the -- that**

3    **people will bring claims to Grace in the**

4    **same way that -- in a way that mirrors how**

5    **they are bringing claims against the**

6    **Manville Trust, fair?**

7        A    No.

8        **Q    Well, the decay rate is for the**

9    **Manville Trust; is it not?**

10       A    Professor Stallard's run-off

11   patterns are calculated based on data from

12   the Manville Trust.  The Manville Trust is

13   representative of filings in the tort

14   system against other defendants as well.

15           If you look in the Manville

16   Trust data, there is another field called

17   "earliest litigation date," which shows

18   that -- and it's not a required field to be

19   filled it.  It shows that more than half

20   the respondents have already listed

21   litigation against other defendants in the

22   tort system at an earlier point in time.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 326

1        So I'm using industry

2    experience that is best compiled through

3    the Manville Trust.

4        **Q    Okay.  And -- but you -- at the**

5    **end, as a result of the analysis that you**

6    **have just mentioned, you are using the**

7    **experience of the Manville Trust to be**

8    **representative of claims in the tort system**

9    **against the industry, correct?**

10       A    I am using it as

11   representative, yes.  In terms of the

12   characteristics of the run-off patterns,

13   but I want to distinguish that the specific

14   year that a claim is filed against Manville

15   is likely to differ from the time period of

16   when it's filed against a solvent

17   defendant.

18       So certain characteristics of

19   that data, yes, are representative of the

20   industry.

21       **Q    But the overall propensity to**

22   **sue the industry you measure using**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 327

1    propensity to sue Manville, correct, and

2    going forward?

3        A    The overall propensity to sue

4    the industry?

5        Q    Yes, the propensity to sue the

6    industry you capture by looking at the

7    propensity to sue Manville?

8        A    Yes.

9        Q    Okay.  Now --

10       A    To eventually sue Manville, not

11   necessarily what has already happened.

12       Q    Now, in fact, Manville has a

13   very special status; does it not?

14           MR. MULLADY:  Objection to the

15       form.

16       Q    Let me be more specific.

17       A    Manville is a trust.  Is that

18   what you are referring to?

19       Q    Yes, a trust, that's number

20   one.  It's not a solvent company, correct?

21       A    Correct.

22       Q    Manville is never sued or sues,

US District Court - Delaware                    FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 328

1    **correct?**

2         A    No, claims are brought to the

3    Trust with a proof of claim form.

4         **Q    And so my statement is correct,**

5    **that they are not sued, and they don't sue,**

6    **correct?**

7              **You said --**

8         A    No, I don't think claimants sue

9    the Trust.  I think the Trust has initiated

10   suits relating to the claim audit process

11   or things like that over time.

12        **Q    There is not litigation in**

13   **terms of the Trust, correct?**

14        A    Not in order to recover a claim

15   against the Trust.

16        **Q    Is it also true that the Trust**

17   **pays out pursuant to criteria?**

18        A    The trust distribution process

19   criteria.

20        **Q    The answer is yes?**

21        A    Yes.

22        **Q    Is it true that those trust**

US District Court - Delaware          FINAL - November 5, 2007
Chapter 11 - W.R. Grace                      Jennifer L. Biggs

Page 329

1    **distribution process criteria are a product**

2    **of negotiation with representatives, in**

3    **part, of the claimants' lawyers?**

4        A    I believe that is true.

5        **Q    Okay.  Is it true, as**

6    **Dr. Peterson has told us, that anybody who**

7    **otherwise qualifies as having**

8    **asbestos-related illness can get paid from**

9    **the Manville Trust?**

10            MR. MULLADY:  Objection.  Lack

11        of foundation.

12        A    Is it true that anybody -- can

13    you just repeat it?

14        **Q    Yes.  Is it true that, no**

15    **matter whose asbestos they were exposed to,**

16    **somebody with asbestos-related illness can**

17    **recover against the Manville Trust?**

18        A    In practice, that is probably

19    largely true, but I believe -- I haven't

20    looked at the proof of claim form.  I

21    believe you have to allege exposure to a

22    Manville product.  You don't?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 330

1      **Q    That's not what we heard from**
2   **Dr. Peterson.  If you know otherwise, just**
3   **tell us.**
4      A    I said I haven't looked at the
5   proof of claim form.
6        MR. MULLADY:  Objection.  Let
7      me make an objection.  Lack of
8      foundation.
9      A    Sorry.
10     **Q    Do you know -- do you know**
11  **how. -- I mean, the fact of the matter is**
12  **that the Manville settlement criteria are**
13  **permissive that way, and it's precisely for**
14  **that reason that you look to Manville as**
15  **being representative of the industry,**
16  **correct?**
17      **Manville is sued no matter**
18  **whose asbestos we are talking about.**
19     A    Manville is sued because the
20  products it brought were so prevalent, and
21  there are some restrictions in terms of who
22  can sue relating to exposure after 1982.

US District Court - Delaware                FINAL - November 5, 2007
Chapter 11 - W.R. Grace                              Jennifer L. Biggs

Page 331

1      **Q      Well, you say so prevalent, but**

2      **you don't really know that the settlement**

3      **criteria even are specific to Manville**

4      **product?**

5           A      Well, I believe they are.

6      That's why there is an end date in 1982.  I

7      said I had not looked at this form.

8           **Q      Now, would you agree with**

9      **Dr. Peterson that Johns Manville is not in**

10     **the tort system?**

11          A      They are not -- claims are not

12     being brought against Manville in the tort

13     system.  They are being brought through the

14     bankruptcy trust process.

15          **Q      And that is different from**

16     **claims being brought in the state court**

17     **tort system; is it not?**

18          A      Yes, it's different.

19          **Q      Would you agree with**

20     **Dr. Peterson that claiming and settlement**

21     **behavior versus a trust is different from**

22     **settlement behavior in connection with a**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 332

1    company not in Chapter 11?

2        A    Yes, there are differences.

3        Q    And would you agree with me

4    that the purpose of your modeling was to

5    model what the claims would have been

6    against Grace, assuming that Grace stayed

7    in the tort system?

8        A    Yes.

9        Q    Are there other companies that

10   you looked to who are still in the tort

11   system to see whether they were comparable

12   to Grace?

13           In other words, take that back.

14           Dr. Peterson talks about the

15   history of Owens Corning before Chapter 11

16   as evidence of what would have happened to

17   Grace if Grace fought everything.  So he

18   uses Owens Corning as a comparator.

19       A    As a specific defendant to

20   compare to.

21       Q    Yes.

22           Have you looked to see, among

Page 342

1        A    It employs assumptions, yes.

2        **Q    And the assumptions that it**

3    **employs -- I am fiddling because it's**

4    **around here someplace -- is essentially**

5    **that there would be a CPI adjustment of**

6    **about 3 percent, correct?**

7        A    That's one component of what I

8    call the trend, which is the annual change

9    in the average costs.

10       **Q    Another component was an**

11   **assumed reduction of 10 percent for three**

12   **years, correct?**

13       A    Correct, from 2002 to 2005.

14       **Q    And another assumption was that**

15   **there would be a 1 percent increase per**

16   **year in the settlement demands, just**

17   **because settlement demands always go up,**

18   **right?**

19       A    That there would be a 1 percent

20   increase in settlement demands following

21   the three years of 10 percent decreases

22   because, in general, there is some erosion

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 343

1    of the reforms that led to these decreases.

2        **Q    Finally, there is then an**

3    **assumption that settlement demands will**

4    **decline to some extent as a result of aging**

5    **of the population, correct?**

6        A    Correct.

7        **Q    Now, is there any model that**

8    **led to each one of those assumptions -- are**

9    **those basically assumptions that you used**

10    **in making your model?**

11        A    Those are assumptions that are

12    used within the model.  There was some

13    analysis that led to the selection of each

14    of those assumptions.

15        **Q    At the end of the day, though,**

16    **when you selected, for example, 10 percent**

17    **decline for three years, would that be the**

18    **outcome of some statistical analysis, or is**

19    **that a judgment on your part?**

20        A    It was the outcome of reviewing

21    experience for large defendants that

22    remained solvent during the relevant time

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 5, 2007
Jennifer L. Biggs

Page 344

1    period.

2        Q    Okay.  You then have the

3    assumption that settlement demands will

4    increase 1 percent forever.  Is there a

5    model?

6        A    Excuse me.

7        Q    You then said -- I thought you

8    then said --

9        A    For five years.

10        Q    For five years.

11            Is there a model that told you

12    that answer, or was that again an

13    assumption that you made?

14        A    That was a judgment based on --

15    that was more judgmental in nature than the

16    10 percent decline, partly because we are

17    talking about the time period into the

18    future of 2006 to 2010.  So there is not

19    any experience to actually observe in

20    making that judgment.

21            But it's consistent with

22    expectations of what would typically happen