# Exhibit 8

US District Court - Delaware         FINAL - November 1, 2007
Chapter 11 - W.R. Grace              Dr. Mark Peterson

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., ET AL.,

      DEBTORS.

CASE NO. 01-1139 (JFK)

JOINTLY ADMINISTERED

-------------------------------------------------

VIDEOTAPED DEPOSITION

Dr. Mark Peterson

November 1, 2007

Westlake Village, California

Lead:  David M. Bernick, Esquire

Firm:  Kirkland & Ellis

FINAL COPY

JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 32

1    also an important scientific test to apply to his

2    scientific work?

3        A.  I believe he so testified, yes.

4        Q.  Now, would you agree that reproducibility is an

5    important test to apply to your work?

6        A.  I think it's an element of any scientific work,

7    yes.

8        Q.  Thank you.

9            Do you agree that consistency is an important

10    test to apply to your work?

11        A.  I don't understand what you mean by

12    "consistency," particularly vis-a-vis "reproducibility."

13        Q.  Consistency, that is the data, as an example,

14    has been gathered in a way that lends -- strike that.

15            That the data has been gathered in a consistent

16    way, analyzed in a consistent way, from study to study.

17        A.  Well, that's not predictive good science, no.

18        Q.  Do you agree that predictive value, that is the

19    value of your model in being predictive, do you believe

20    that's an important test for your work?

21        A.  Yes.

22        Q.  Okay.  Do you believe that your work that --

23    Professor Stallard says he performed scientific work as

24    an actuary; do you believe that your own work is

25    science?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 33

1      A.  Yes.

2          **Q.  Do you believe it's appropriate to judge your**

3     **work according to scientific standards?**

4      A.  Yes.

5          **Q.  Okay.  Now, one area that we talked about,**

6     **actually began talking about as concerns science, was**

7     **asbestos disease, and I'm just going to ask you, as**

8     **well:  Would you agree with me that there's a lot of**

9     **science that has been done and published over the years**

10    **about the disease trends, that is asbestos disease**

11    **trends, and I'll be more specific, the incidence and**

12    **prevalence of asbestos-related illness?**

13     A.  There are a number of scientific documents that

14    address trends in asbestos-related disease, yes.

15         **Q.  Would you agree with me that the studies that**

16    **have been done about the incidence and prevalence of**

17    **asbestos-related illness have been done, many of the**

18    **most important ones, have been done by epidemiologists?**

19     A.  Epidemiologists have participated in many of

20    them, yes.

21         **Q.  Okay.  Many of those studies are epidemiological**

22    **studies, correct?**

23     A.  That's -- yes.

24         **Q.  Epidemiological studies of asbestos-related**

25    **illness have been done for particular occupational**

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 46

1      **Q.   Do you recall his testimony that changes in**
2      **non- -- strike that.**
3            **Do you recall his testimony that non-biological**
4      **factors were the most important contributor to changes**
5      **in the filing rate against Johns Manville Trust?**
6         A.   I believe that's what he testified to, yes.
7      **Q.   Do you recall that he testified that nobody has**
8      **developed a reliable scientific model that can predict**
9      **changes in the legal environment?**
10        A.   No, I don't recall that specific statement.
11     **Q.   Can you identify any scientific model,**
12     **Dr. Peterson, that has been shown reliably to predict**
13     **changes in the legal environment?**
14        A.   What do you mean by "the legal environment"?
15     **Q.   Lawsuits being filed and litigated; claims being**
16     **filed, litigated; claims being presented, settled.  Do**
17     **you know of any scientific model that has been**
18     **demonstrated to reliably predict changes in the legal**
19     **environment?**
20        MR. FINCH:  Object to form, compound.
21        THE WITNESS:  Over modest periods of time, there
22     have been models of claiming and claim resolutions that
23     have reliably predicted subsequent changes, yes.
24     BY MR. BERNICK:
25     **Q.   Okay.  What's the maximum period of time?**

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                            Dr. Mark Peterson

Page 47

1          A.  Six years, seven years.

2          **Q.   Okay.  Now, let's talk a little bit about**

3    **2000 --**

4          A.  I'm sorry --

5          **Q.   Which model --**

6          A.  I'm sorry, your question was reliably -- never

7    mind, I withdraw my --

8          **Q.   Okay.  Let's talk about 2003 in particular.**

9    **It's true, is it not, that after 2003, or on and after**

10   **2003, there were changes in the legal environment for**

11   **the litigation and settlement of asbestos claims?**

12         A.  Beginning in that period of time, there were

13   some important developments and changes in the legal

14   environment involving asbestos claims, that's correct.

15         **Q.   Okay.  And it also true that those changes have**

16   **had a significant impact on claiming and settlement**

17   **behavior?**

18             MR. MULLADY:  Objection; form, vague.

19             THE WITNESS:  There have been multiple changes,

20   some of which have had significant impacts on some

21   claims.  Both regarding filings and settlements.

22   BY MR. BERNICK:

23         **Q.   Okay.  Is it true that even as of -- when did**

24   **those changes actually -- those legal changes in the**

25   **environment, or changes in the legal environment, when**

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 51

1          (Whereupon a discussion was held off
2          the record.)
3
4     BY MR. BERNICK:
5          **Q.   Dr. Peterson, at what point in time did proposed**
6     **legislation, state or federal, begin to have a**
7     **significant impact on claims filings and claims**
8     **resolutions?**
9          MR. MULLADY:  Objection; vague.
10         MR. FINCH:  Join.
11         THE WITNESS:  I think any of them, I mean,
12    across the board, was probably beginning in the period
13    2003 or so.
14    BY MR. BERNICK:
15         **Q.   When in 2003?**
16         A.   I can't give you precise date.
17         **Q.   Isn't it true that you didn't do -- that none of**
18    **your modeling work -- strike that.**
19         **Isn't it true that in the modeling work and**
20    **estimation work that you were doing, prior to 2002, none**
21    **of those estimates predicted an impact from state,**
22    **proposed state or federal legislation.  Correct?**
23         A.   I don't recall.
24         **Q.   Well, let me just ask:  When was the first time**
25    **that you did an estimate, using your standard method,**

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                        Dr. Mark Peterson

Page 52

1    **that predicted or even, even recognized an impact on**

2    **claiming behavior from proposed state or federal**

3    **legislation?**

4        A.   I think it was -- it was when we began to

5    observe the effects of the -- of the Senate's

6    consideration of the Fair Act, and that would have been

7    sometime, I believe, in the period of 2004 or so.

8        **Q.   So --**

9        A.   But I'd have to go back and look.

10       **Q.   Up through the time that the effects actually**

11   **were observed, you didn't do any estimates that**

12   **predicted that there would be effects.  Correct?**

13       A.   I didn't anticipate or predict that the Senate

14   was going to consider a national asbestos fund, the Fair

15   Act, and that it would have the impacts that it had in

16   basically in suppressing claims.  No, I didn't foresee

17   that.

18           I think it would have been speculative.  I mean,

19   one of the limits of the expert work that I or other

20   people do is we can't speculate about the future.  There

21   are events that happen and will happen in the future we

22   don't know about.  We have no -- I mean, they can

23   happen, it might happen, but there is really not much

24   concrete evidence that it would happen, and if you try

25   and say they are, it's speculative.  Indeed -- I'll

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                            Dr. Mark Peterson

Page 58

1    **litigation environment, not simply in '04, but also in**
2    **'03?**
3              MR. MULLADY:  Objection; foundation.
4              THE WITNESS:  Could you read the question?
5    BY MR. BERNICK:
6         **Q.  I'll state it again.**
7              **Isn't it true that the effects of changes in the**
8    **legal environment on claiming and settlement behavior**
9    **became observable in 2003?**
10        A.  Yes.
11        **Q.   Okay.  When in 2003?**
12        A.  I can't give you a date.
13        **Q.   Isn't it true that throughout 2003, you -- your**
14   **estimates continued to give no effect to changes in the**
15   **litigation environment?**
16        A.   I think because there wasn't sufficient data to
17   be able to see whether changes that were occurring at
18   that time were temporary or permanent, and indeed, that
19   continues to be a problem today, that I didn't make -- I
20   didn't know, I didn't have an opinion about whether -- I
21   didn't have a scientific opinion about whether or not
22   those changes would last and should be such that they
23   should be reflected in the forecast, but I also can't
24   recall the forecast I made in 2003,
25        **Q.   Well, in particular, you made the forecast in**

Page 66

1    you can see increases from particular companies.  The
2    real issue is, what does it mean, what does it signify?
3    And the point of the research that I try to do is to
4    understand the significance of the quantitative effects
5    that I see, and so I was observing some changes in the
6    early nineties, but I didn't think there was a basis for
7    making an inference that this meant something until
8    several years later.
9        **Q.  And you reached the point -- strike that.**
10           **When did you first factor -- strike that.**
11           **When did you first change the estimates that you**
12   **were doing to reflect the observe -- strike that.**
13           **When did you first change the estimates that you**
14   **were doing to predict a continuing increase in malignant**
15   **claim filings in the 1990's?  When was the first time**
16   **you actually did that in an estimate?**
17       A.  I can't give you a precise date.  It would be
18   somewhere in the range of 1996 to 1998.
19       **Q.  Okay.  Would it be fair to say that you did not**
20   **predict in your estimates in advance that change, that**
21   **is the increased rate of filing of malignant claims in**
22   **the 1990's?**
23       A.  Prior to having made that change, by definition,
24   I didn't predict it, that's correct.
25       **Q.  Non-malignant claims, it turns out the**

US District Court - Delaware           FINAL - November 1, 2007
Chapter 11 - W.R. Grace                           Dr. Mark Peterson

Page 77

1     **behavior over a five-year period versus a ten-year**
2     **period or any other period of time?  Is there any**
3     **quantitative or statistical analysis that you've done**
4     **that captures the range of uncertainty going off into**
5     **the future?**
6          A.   I haven't looked specifically at that issue.  It
7     can be done, and given your question, I can assure you
8     it will be done, but I have not done it.  It can be
9     done.
10         **Q.   I'm not asking you to do it and I think it's too**
11    **late for you to do it, but my question in any event,**
12    **Dr. Peterson:  Are you aware of any estimate of asbestos**
13    **liability for a given company that has actually proven**
14    **to be accurate over a period greater than five years?**
15         A.   Five, six, I wouldn't go beyond seven, but in
16    that range, with regard to my own work, I think
17    Dr. Florence has testified that he's made forecasts
18    that -- that have proven to be accurate for that time
19    period and maybe somewhat beyond, using standard
20    estimation methods, not the methods he uses here, which
21    really aren't estimation methods.
22         **Q.   Well, Dr. Peterson, what estimate of years has**
23    **proven to be accurate over a period greater than five**
24    **years?**
25         A.   I'm -- I'd have to go back and look at the

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                                Dr. Mark Peterson

---

Page 78

1    precise number of years.  The Fuller-Austin forecast.

2         **Q.   Okay.  Any others?**

3         A.   Maybe National Gypsum.  That's hard to tell,

4    because there are probations in the filings there.

5         **Q.   Anything else?  Got Fuller-Austin, National Gyp.**

6         A.   It's possible that it's for H.K. Porter.  I'd

7    have to go back and look, I haven't looked recently, but

8    the one, Fuller-Austin is a period that I'm familiar

9    with.

10        **Q.   Any others that are possible other than**

11   **Fuller-Austin, National Gyp, and H.K. Porter?**

12        A.   I don't know that there are any that can be

13   tested for that, for that --

14        **Q.   I didn't ask you that.  I just asked whether any**

15   **of your estimates have been shown to be accurate over a**

16   **period of more than five years.**

17        A.   Those are the ones that come to mind.

18        **Q.   Okay.  Fuller-Austin, was that a period of time**

19   **when it was out of bankruptcy, that is before**

20   **bankruptcy?**

21        A.   It was a pre-pac, it was in bankruptcy for a

22   very brief period of time, but I think it was the

23   post-bankruptcy period.  The forecast would have been

24   made in '97 , '98, and the forecast proved to be

25   accurate for a number of years, and I don't know whether

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 130

1      **Q.   I'm asking --**
2      A.   Yes, the quantitative --
3      **Q.   What's the quantitative calculation?**
4      A.   Yes, the quantitative calculation is the
5      observation that you get one event and then you get a
6      different event.
7      **Q.    And that's enough for you to say in this**
8      **particular case that it's causative?**
9      A.   It's known as a quasi-experiment.  If you see
10     that pattern in other circumstances, you -- you make
11     inferences and that's the inference.
12     **Q.   So there's a technique that you're deploying, in**
13     **this particular instance called "quasi-experimentation";**
14     **those are the words you just used.  Correct?**
15     A.   It's a recognized research method in social
16     science.
17     **Q.   So in this particular case, you're using**
18     **quasi-experimentation to say that the observed**
19     **concurrence of publicity surrounding Libbey, with the**
20     **increase in claim filings against Grace, is sufficient**
21     **for you to say that the, one, that is publicity, was**
22     **causative in the sense of being contributory, to the**
23     **other, which is the filing rates.  Is that your**
24     **testimony?**
25     A.   No, I didn't say that.

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                      Dr. Mark Peterson

Page 196

1        **Q.   I'll use a different word.  That was a period of**
2    **significant change up and down in the Johns Manville**
3    **Trust experience, correct?**
4        A.   The claims filings changed in that period of
5    time, yes.
6        **Q.  Significantly, correct?**
7        A.   They went up significantly in 2003 to levels
8    that they had never been before.
9        **Q.  Right.**
10        A.   And then following that, in the next several
11    years, they were lower.
12        **Q.  Right.**
13        A.   Significantly lower.
14        **Q.  I understand that.**
15           **Now, let me ask you a couple questions about**
16    **that.  That's the actual tort system data that you in**
17    **fact used in your Grace forecast, and by that I mean,**
18    **data that postdates April of 2001.  Correct?**
19        A.   Well, we used it in the forecast that didn't
20    involve -- that had a change in propensity to sue.  We
21    also provided forecasts that kept Grace's actual
22    propensities to sue through the period of May -- March
23    2001.
24        **Q.  Right.  Now, it's true, is it not, that Johns**
25    **Manville is not in the tort system?**

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                         Dr. Mark Peterson

Page 197

1      A.   No, it's correct that they're not -- they're a

2    trust.

3         **Q.   Okay.  Johns Manville is not making decisions**

4    **about whether to litigate or settle at all, correct?**

5      A.   That's not true.

6         **Q.   Well, they don't -- there aren't any litigation**

7    **of cases against the Manville Trust, true?**

8      A.   There can be.

9         **Q.   But there aren't any, there have never been**

10   **since the trust opened its doors again in 1995, correct?**

11     A.   There have been threats, but there have been no

12   actual trials.

13        **Q.   And the decisions that Johns Manville makes on a**

14   **routine basis over tens of thousands of claims, is**

15   **simply whether to accept claims for settlement or**

16   **whether to reject them, right?**

17     A.   I think that's too narrow.

18        **Q.   Do they have any other option that actually is**

19   **explored other than settlement or rejection?**

20     A.   Their option is to offer the scheduled value or

21   to negotiate an individual value of the claim.  Both of

22   those produce settlements, or if they can't reach

23   agreement with the claimant, to arbitrate it or mediate

24   it or try it, and there are cases that go to arbitration

25   and mediation.

US District Court - Delaware          FINAL - November 1, 2007
Chapter 11 - W.R. Grace                        Dr. Mark Peterson

Page 198

1      Q.  And there are no cases that go to trial.

2      A.  Not yet.

3      Q.  Not yet.

4      A.  Doesn't mean there won't be.

5      Q.  You recognized earlier in the day that the

6   experience of a bankruptcy, post-bankruptcy trust, is

7   different from the experience of a company still in the

8   tort system.  Correct?

9      A.  The experience, how it settles claims are

10   different.  I don't think I opined that the claims

11   filing is necessarily different.

12      Q.  Okay.  And how it settles claims --

13      A.  Particularly for a company like Manville, that

14   would -- that accepts and essentially represents the

15   closest thing to a universe of all claims of asbestos --

16      Q.  So Manville, in particular, is a unique trust

17   because it pretty much accepts the claims of anybody

18   who's sick and has an asbestos exposure.  Correct?

19      A.  It's not unique.

20      Q.  Well, it certainly has that approach, correct?

21      A.  It has that approach.  Others do, too.

22      Q.  And certainly the approach that the trust uses

23   in resolving claims affects the propensity of people to

24   make claims against it, correct?

25      A.  Probably.

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 199

1      **Q.   And is it also correct that the criteria that**
2    **are used in accepting claims were -- came out of not a**
3    **litigated outcome, but a negotiated outcome with the**
4    **plaintiffs' bar?**
5       A.   It came out of a -- the current?
6       **Q.   Yes.**
7       A.   Actually both of them in this period.  The trust
8    distribution procedures involved negotiations within the
9    plaintiffs' bar, and then between the plaintiffs' bar
10   and the Manville Trust, and the future representatives
11   participated in those discussions.
12      **Q.   Right, but it was a negotiated resolution,**
13   **correct?**
14      A.   Yes.
15      **Q.   Okay.  Let's talk about the rate of payment.  To**
16   **determine the, for your forecast, the rate of payment**
17   **for W.R. Grace, you looked to the experience of two**
18   **companies in the tort system prior to April of 2001.**
19   **Correct?**
20      A.   Yes.
21         MR. FINCH:  Object to form.
22   BY MR. BERNICK:
23      **Q.   And those two companies were Armstrong and**
24   **U.S.G., right?**
25      A.   That was one of the sources.  There was other

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 209

1    than they did before.

2        **Q.   Well, that data's not in your report.**

3        MR. FINCH:  That data was provided as part of

4    his backup material in this case.

5        MR. BERNICK:  I'm not asking for your testimony,

6    Nate.  I'm asking for his testimony.

7        **Q.   Do you have any data in your report that**

8    **actually shows that they were paying more claims in CCR,**

9    **a greater rate of payment of claims in CCR than they**

10    **would have if they had not been in CCR?**

11       A.   No, I don't think there's any data.  I'm not

12    really relying upon that issue for any of my forecasts.

13       **Q.   Well, but you're relying upon -- your statement**

14    **is that Grace would not have dropped as much because**

15    **those folks were in CCR, that's that CCR was material to**

16    **their rate of payment.  Right?**

17       A.   Yes.

18       **Q.   And all I'm saying is, where is your data that**

19    **says that their being in CCR was, in fact, material to**

20    **their rate of payment?  Where was the data?**

21       A.   I don't know that -- I haven't provided data.

22    My basis for saying that is, the understanding of what

23    the CCR arrangement was and the testimony by many people

24    who participated in CCR, I mean, it's a -- it's a

25    commonly known and recognized feature of the CCR

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 214

1          And what I'm asking you is, isn't it true that
2    neither one of those companies were comparable to the
3    litigation strategy that you assumed that Grace would
4    have going forward if it had stayed in the tort system;
5    isn't that true?
6        A.   I don't think anyone's comparable because no one
7    has done this or attempted to do it since --
8        Q.   I didn't ask you about anyone --
9        A.   Well, if no one's done it, these companies
10   haven't.
11       Q.   This is just another speech, Dr. Peterson.
12          I'll say it again, Armstrong or U.S.G., neither
13   one of those companies adopted the litigation-oriented
14   approach that you in your calculation assumed that Grace
15   would pursue; true or not?
16       A.   It's true, no other company has attempted
17   successfully to implement a strategy that I'm assuming
18   Grace would be able to do.
19       Q.   Let's talk about dollar amounts.  To
20   determine -- the company that you looked to for purposes
21   of determining what Grace would have paid in settlement
22   amounts in the tort system after April of 2001, are
23   Turner & Newell and Quigley, correct?
24          MR. FINCH:  Objection.
25          THE WITNESS:  And U.S.G.

US District Court - Delaware                    FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 215

1    BY MR. BERNICK:
2        **Q.  And U.S.G.?**
3        A.  Yes.
4        **Q.  Yes, U.S.G.**
5        A.  Well, and also Flintkote and --
6        **Q.  I'm not going to ask you about those because you**
7    **just give --**
8        A.  You asked what I looked at, and I looked at --
9        **Q.  I've already got that.**
10       A.  I've also looked at Flintkote and I've also
11   looked at Thorpe Insulations, but I can't use them in
12   these calculations by Thorpe.
13       **Q.  I can't use them either -- and my experts can't**
14   **use it because they didn't have it either, so I'm not**
15   **going to pursue any questions that relate to Thorpe and**
16   **Flintkote.  I'm going to talk about Quigley, Turner &**
17   **Newell, and U.S.G.**
18           **Isn't it a fact that Turner & Newell -- when did**
19   **Federal Mogul file for Chapter 11?**
20       A.  I think it was September or October, 2001.
21       **Q.  And U.S.G. in about the same period of time?**
22       A.  Around then, yes.
23       **Q.  So with respect to Turner & Newell and U.S.G.,**
24   **neither one of those companies had any experience in the**
25   **tort system from 2002 going forward, correct?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - November 1, 2007
Dr. Mark Peterson

Page 216

1    A.  That's right.

2    **Q.  And you've already established that the tort**

3    **system was significantly affected by the -- by a variety**

4    **of factors beginning in 2003, 2004.  Correct?**

5    A.  Well, I don't think that's correct.  I -- it was

6    affected by a variety of factors beginning in 2000.  The

7    most important factors affecting value happened in 2000.

8    **Q.  There were additional effects that were downward**

9    **effects, tended to reduce the viability of asbestos**

10    **claims beginning in 2003, 2004.  Correct?**

11    A.  I disagree with that.

12    **Q.  Okay.  With respect to Turner & Newell and**

13    **U.S.G., there was no 2002 going forward tort experience,**

14    **correct?**

15    A.  I'm sorry, to the -- to whom?

16    **Q.  Turner & Newell and U.S.G., right?**

17    A.  You already asked me that, that's correct.

18    **Q.  With regard to Quigley, it did have experience**

19    **in 2003 and 2004 and you talked about that, correct?**

20    A.  Yes.

21    **Q.  Isn't it true that that experience was also**

22    **experienced during a period of time when it was**

23    **specifically seeking to negotiate a prearranged**

24    **bankruptcy?**

25    A.  It didn't reach one.  I don't recall what the

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware                FINAL - November 1, 2007
Chapter 11 - W.R. Grace                              Dr. Mark Peterson

Page 217

1    discussions were in that period of time.

2        **Q.   Have you analyzed whether the Quigley experience**

3    **was affected by the prospect of its going into Chapter**

4    **11?  Have you looked at that?**

5        A.   Well, I've looked at that issue across many

6    companies.

7        **Q.   No, I'm talking about Quigley.**

8        A.   I didn't look at it specifically within quickly.

9        **Q.   You're not familiar with the fact that Quigley**

10   **announced they were seeking to resolve the asbestos**

11   **liabilities significantly before Quigley filed a Chapter**

12   **11?**

13       A.   I don't believe -- I'm not sure when they did

14   it.  I don't believe it was in 2001 or two.

15       **Q.   I didn't say 2002.  I'm talking about 2003,**

16   **2004.**

17       A.   I don't remember the date.

18       **Q.   So you didn't even look at that?**

19       A.   I'm familiar with it.  I just -- their data for

20   2001, which is what I used here, was not in that period.

21       **Q.   No, you used data beyond 2001 in your analysis.**

22       A.   I presented but the calculations are based on

23   the 2001 data.

24       **Q.   Oh, okay.  So with respect to Turner & Newell,**

25   **U.S.G., and Quigley, the only actual data that you used**