# Exhibit 9

US District Court - Delaware   FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace   P.J. Eric Stallard

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-----------------------------------------
CHAPTER 11
IN RE:
W.R. GRACE & CO., et al.,

      Debtors

Case No. 01-1139 (JFK)
Jointly Administered
-----------------------------------------

DEPOSITION OF
P.J. Eric Stallard
October 24, 2007
Durham, North Carolina
Lead:  David Bernick, Esquire
Firm:  Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING    1-800-825-3341

US District Court - Delaware        FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace                    P.J. Eric Stallard

Page 17

1   reliability, reproducibility, and validity. Correct?
2   You never make that disclaimer?
3        A.   That's correct.
4        Q.   So, again, we should be judging your work
5   in this case as to whether it is scientifically valid,
6   scientifically reliable, and scientifically
7   reproducible; correct?
8        A.   Those qualities are part of an evaluation
9   of my work; they are not a complete evaluation. But
10  certainly, they would be components of a review of my
11  work.
12       Q.   Okay. At the least, your work in this
13  case should be judged based upon whether it is
14  scientifically valid, reliable, and reproducible;
15  correct?
16       A.   Correct.
17       Q.   Would the same apply to the work of
18  Ms. Biggs?
19       A.   Yes.
20       Q.   Would the same apply to the work of
21  Dr. Peterson?
22       A.   Dr. Peterson is not an actuary, so he is not
23  bound by the Code of Professional Conduct of actuaries.
24  My understanding is, he is a lawyer in good standing.
25  I don't think I am in a position to -- to comment on

US District Court - Delaware  
Chapter 11 - W.R. Grace

FINAL - Oct. 24, 2007  
P.J. Eric Stallard

Page 65

1   It's certainly -- it's certainly something that could
2   be done, and I simply haven't done that.
3       Q.   It is true, is it not, that in the late
4   1990s, there was a fairly significant, indeed, a
5   dramatic upswing in asbestos claims against a wide
6   variety of companies?
7       A.   It is true.
8       Q.   Are you aware of anybody who predicted that?
9       A.   No.
10      Q.   It is also true that that kind of claiming
11  behavior continued to rise up through approximately
12  2003; correct?
13      A.   When you say, that type of claim --
14      Q.   The dramatic increase in the rate of
15  asbestos tort claim filings continued up through
16  approximately 2003; correct?
17      A.   I believe that -- I believe that's correct.
18      Q.   It then fell dramatically after 2003;
19  correct?
20      A.   The totality of filings not stratified by
21  diseases dropped dramatically after 2003; I believe
22  that's correct.
23      Q.   Are you aware of anybody who predicted that
24  occurrence?
25      A.   I don't have a specific recollection.  I

Page 66

1   know there was significant tort reform going on in
2   multiple states, and it would not be surprising at
3   all to me that persons who had studied the potential
4   impact of that tort reform would have expected that
5   nonmalignant claims would decline. But I can't attach
6   a specific name.
7       **Q. Are you aware of any actuary or any**
8   **estimator of asbestos liabilities who predicted the**
9   **drop-off in nonmalignant claims after 2003?**
10      A.   I'm having -- I'm having a little trouble
11  answering your question. And I will tell you why I
12  have trouble. When I work with companies, one of the
13  things I ask their defense counsel is what their
14  expectations are with respect to the upcoming year or
15  two years, relatively short-term. And my recollection
16  is, in at least one case, sometime after 2003, I was
17  told that the expectation was that the claims would --
18  that there would be an impact of favorable tort reform,
19  and that the impact was down.
20          You are asking me if I am familiar with
21  anyone who said this. And the answer is, I have had
22  conversations that have indicated to me there was an
23  expectation of improvement without specific
24  quantification.
25      **Q. I have been a party to many of those**

US District Court - Delaware                    FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace                              P.J. Eric Stallard

Page 103

1    **Q.   And the legal environment is a very, indeed,**
2    **extraordinarily complex environment; correct?**
3       A.   There, I will comment that my expertise does
4    not -- does not extend into expertise in characterizing
5    the legal environment with regard to its complexity or
6    lack thereof.
7    **Q.   Do you regard yourself able, as an actuary,**
8    **to predict changes in the legal environment?**
9       A.   I -- I don't -- I don't predict changes in
10   the legal environment.
11   **Q.   In all of your work, are you aware of**
12   **any scientist who has applied scientific method to**
13   **predicting changes in the legal environment for**
14   **asbestos claims?**
15      A.   I am not -- I am not aware of such an
16   analysis.
17   **Q.   Is there any scientific methodology that you**
18   **can even think of that would be capable of predicting**
19   **changes in the legal environment for asbestos?**
20      A.   The scope of that question goes beyond my
21   expertise.  In a general, nonexpert way, I would -- I
22   would have trouble imagining how to structure a model
23   that would be able to successfully predict such
24   changes.  I could imagine a model that might tell you
25   changes for a short term.  But if you asked, would this

US District Court - Delaware	FINAL - Oct. 24, 2007
Chapter 11 - W.R. Grace	P.J. Eric Stallard

Page 104

1   model extend 5, 10, 15, 20 years in the future, I would
2   have trouble conceptualizing this.
3       Q.   I will give you a really concrete one.
4            Was there any way scientifically to predict
5   that the Manville Trust, when it first opened its
6   doors, was going to be overwhelmed with claims?
7       A.   Without having done a detailed review of the
8   projection models at that time, but with my knowledge
9   of the projections that had been done in the early
10  1980s, I believe it could have been possible -- which
11  is a hypothetical that you asked me to consider -- it
12  could have been possible to develop projections that
13  had much higher values than the ones that were
14  ultimately adopted in the litigation process.
15      Q.   That's an interesting statement.  Are you
16  telling me that there was a scientific method for
17  predicting that when the trust opened its doors to
18  begin with, the trust would be overwhelmed with
19  claims, to the point that it couldn't handle them?
20      A.   The question as to -- the question as to
21  whether it was possible is different from asking
22  whether there was a specific, accepted method in place.
23  I don't know --
24      Q.   Yes, it is, and I'm asking the latter.
25      A.   Right.  So I put that question or interpret