# Exhibit 13

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Related Docket Nos.: 17577, 17585, 17586, 17587,** |
| | ) | **17588, 17589, and 17620** |
| | ) | **Hearing Date: January 14, 2008 @ 9:00 a.m. in** |
| | ) | **Pittsburgh, Pennsylvania** |

## THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS' RESPONSE TO GRACE AND THE EQUITY COMMITTEE'S MOTIONS TO EXCLUDE OR LIMIT EXPERT TESTIMONY

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
James P. Wehner
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005
(202) 862-5000

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10022-4614
(212) 319-7125

Marla R. Eskin (DE No. 2989)
Mark T. Hurford (DE No. 3299)
Campbell & Levine, LLC
800 North King Street,
Suite 300
Wilmington, DE 19801
(302) 426-1900

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*

future claimants whose cases had not made it to trial would still remain unliquidated and undetermined.

Recognizing that the sheer number of asbestos claims and the long latency period of the asbestos diseases precluded asbestos defendants from resolving all of their present and future asbestos claims during a bankruptcy, Congress, following the lead of the courts in the Manville bankruptcy, enacted section 524(g) of the Bankruptcy Code.  Grace has taken advantage of this provision by filing a Plan of Reorganization which contains a section 524(g) channeling injunction that provides all of its pending and future asbestos personal injury claims will be channeled to a trust and considered and resolved by the trust post-bankruptcy.  Under a section 524(g) plan *all* of Grace's asbestos personal injury claimants are channeled to a trust for post confirmation claims evaluation, settlement and, if necessary, trial, and *none* of Grace's asbestos personal injury claims will be "allowed" during the bankruptcy.  In a section 524(g) plan, claims review and resolution will occur only after plan confirmation, and will be conducted by the section 524(g) trust.  Indeed, section 524(g) of the Bankruptcy Code does not mention the "allowance" of claims at all.  Allowance of a claim is something that happens during the pendency of the bankruptcy case; in a section 524(g) plan, the pending claims and future demands are channeled to a trust which assumes the liabilities of the debtor and must use its assets "***to pay*** claims and 'demands'"[2] that would otherwise have been asserted against the reorganized debtor post bankruptcy.  11 U.S.C. § 524(g)(2)(B)(IV) (emphasis added).

In order for Grace's proposed 524(g) Plan to be confirmable, it must meet a variety of Bankruptcy Code requirements relevant here.  First, the Court must find that "the actual amount, numbers and timing of such future demands" cannot be determined, 11 U.S.C.

---

[2]    A demand is defined as a demand for payment that was not a claim within the bankruptcy proceedings and which "is to be paid" by a section 524(g) trust.

§ 524(g)(2)(B)(ii)(II), and that the benefits provided to the debtor and related parties by the

channeling injunction are "fair and equitable" to future demand holders in light of the benefits

provided to the section 524(g) trust by or on behalf of such debtors and related parties.  11

U.S.C. § 524(g)(4)(B)(ii).  Section 524(g) also requires a finding that "the trust will operate

through mechanisms that provide reasonable assurance that the trust will value, and be in a

financial position to pay, present claims and future demands that involve similar claims in

substantially the same manner."  11 U.S.C. § 524(g)(II)(B)(V).  Finally, the Code also requires

that a separate class or classes of the asbestos claimants "whose claims are to be addressed by a

trust . . . is established, and votes, by at least 75 percent of those voting, in favor of the plan."  11

U.S.C. § 526(g)(2)(B)(ii)(IV)(bb).

Because Grace proposes in its Plan to pay its non-asbestos creditors 100 percent of the

value of their claims (including post-petition interest), while channeling the asbestos personal

injury claims and demands to a section 524(g) trust, which is funded with assets that are only

sufficient to pay claims worth approximately $1.6 billion in net present value, the requirements

of section 1129(b)(1) of the Bankruptcy Code must be met as well.[3]  This necessarily requires

the Court to estimate the aggregate size of Grace's liability for pending and future asbestos

claims which may be used to later determine whether or not the Plan "unfairly discriminates"

against and is "fair and equitable" to the asbestos personal injury class.[4]  *See, e.g., In re*

---

[3]    Section 1129(b)(1) of the Bankruptcy Code provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements
> of subsection (a) of this section other than paragraph (8) are met with respect to a
> plan, the court, on request of the proponent of the plan, shall confirm the plan
> notwithstanding the requirements of such paragraph if the plan does not
> discriminate unfairly, and is fair and equitable, with respect to each class of
> claims or interests that is impaired under, and has not accepted, the plan.

[4]    Grace's Plan is patently unconfirmable for other reasons, including its inclusion of a section
524(g) injunction without giving asbestos personal injury claimants a vote on the Plan, and

*Armstrong World Indus., Inc.*, 348 B.R. 111, 114-15 (D. Del. 2006) (Robreno, J); *In re Owens Corning*, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995).

In conformity with these cases, the ACC and FCR estimation experts do not attempt to predict or offer opinions on whether individual claims are "valid" or "invalid" if litigated to a final judgment. Instead the ACC and FCR experts, recognizing that the vast majority of claims in the past were settled, and that the vast majority of claims in the future will be settled, project the financial cost of resolving claims in the real world in which they will be litigated. This approach, as the cases say it must, takes into account: (1) Grace's past claim filing and settlement history, including what types of claims were and were not paid money; (2) the projected nationwide incidence of asbestos related disease, and actuarial projections of the likely number of future claims; and (3) changes in the asbestos litigation environment since the bankruptcy petition date. As we describe below, the ACC/FCR estimation experts' methodology has been repeatedly accepted by courts charged with the task of estimating the value of asbestos claims, relied upon by solvent companies and insurers when estimating liability for financial statement purposes, and followed by Grace itself, both before and after filing its bankruptcy petition, for business planning, SEC reporting, and insurance collection purposes. For example, Grace specifically defined contingent obligations it owed to asbestos claimants as constituting a legal "liability" in financial statements it filed prior to its bankruptcy. In Grace's December 31, 2000 10-K, it reports that "[a]sbestos-related *liability* expected to be satisfied within one year." W. R. Grace & Co., SEC Form 10-K, December 31, 2000, at F-14, F-15 (emphasis added)

---

because it allows shareholders to retain their ownership interest in the reorganized Debtor even if all present and future asbestos creditors are not paid in full, which is a violation of the absolute priority rule unless such treatment is consented to by the asbestos claimants' class.

703 of The Federal Rules of Evidence, Dec. 8, 2007 [D.I. 17581] ("ACC Mem."), it is Grace's

method that is novel, untested, unreliable, and which should be rejected on *Daubert* grounds.

Ultimately, the utter irrationality of rejecting the well-established ACC/FCR estimation

methodology to follow Grace's unprecedented estimation approach is illustrated by one simple

fact: after all of its discussion that the claims must be evaluated based on its supposed "liability

criteria" (i.e., the only claims that are valid are those that Grace's experts would concede have an

asbestos related disease caused by exposure to asbestos from a Grace product), Grace

nonetheless goes on to value the "valid claims" by reference to ***settlement*** values established in

just six cases. Even if Grace is right about every other aspect of this estimation (which it is

clearly not), how can this Court possibly accept an estimate that rejects Grace's historical

settlement criteria for valuing claims yet values the claims using historical settlement amounts?

At the end of the day, Dr. Florence's forecast treats as "valid" only about 15% of Grace's

pending and future mesothelioma claims and 10% of Grace's pending and future non-malignant

claims – despite the fact that, historically Grace paid money to settle over 80% of its

mesothelioma claims, and 90% of its non-malignant claims. But these 15% of claims that

survived all of Grace's "validity criteria" would not be "average" asbestos claims that would

settle for historical settlement values; they would be gold standard cases where liability and

injury were not subject to dispute. The metric for valuing these claims cannot be the values

assigned to "average" settlements; why would a claimant with an indisputably valid

mesothelioma claim against Grace accept a settlement of $155,240 (the value used by Dr.

Florence in his forecast) when, if he took the case to judgment, on the average he would recover

almost $1,300,000? Instead, these "valid" claims would have to be valued by reference to the

Grace judgment history, which, as Dr. Peterson will testify (without challenge), averages

7

$1,261,570 for each mesothelioma claim and $319,265 for each non-malignant claim,[5] compared to Dr. Florence's values for "valid" claims of $155,240 for mesothelioma and $4,830 for "unimpaired asbestosis." *See* Florence Supp. Report at 16. Simple arithmetic shows that if Dr. Florence's median estimate is adopted in all respects other than his (mis)use of settlement values, Grace's total liability for pending and future asbestos claims is over ***$12 billion***.[6]

> **B.    Courts have already determined the proper methodology and approach to estimation for asbestos defendants invoking the protection of section 524(g).**

For the Court to find that the asbestos creditors have not been unfairly discriminated against and that the benefits provided to the debtor and related parties by the channeling injunction are "fair and equitable" to future demand holders, the value allocated to the section 524(g) trust under Grace's Plan must be sufficient to pay all pending and future asbestos personal injury claims the same value such claims would be worth if Grace had simply passed them through the bankruptcy. Thus, the Court must estimate what this aggregate liability will be.

---

[5]    *See* chart of Grace Judgments (attached as Exhibit 3). The Grace judgment averages do not include 5 plaintiff judgments for which Grace's share of the judgments totaled $43,038,931 (the Reaud, Morgan & Quinn cases), which were on appeal when Grace entered bankruptcy.

[6]    The arithmetic underlying this calculation is as follows: The Grace average judgment in mesothelioma cases is $1,261,571, which is 8.13 times the $155,240 settlement value for "valid" claims used by Dr. Florence in his estimate. Holding all other aspects of Dr. Florence's estimates constant, but using Grace's judgment averages in mesothelioma cases instead of the settlement average calculated by Dr. Florence, results in a liability for mesothelioma claims alone of $2.2 billion, which is 8.13 times bigger than Dr. Florence's median estimated mesothelioma liability of $268 million. ($268m * 8.13 = $2.178 billion). Similarly, the Grace average judgment in non-malignant cases is $319,265, which is 66.1 times the $4,830 settlement value for "valid" "unimpaired asbestosis" claims used by Dr. Florence in his estimate. Using Grace's judgment averages in non-malignant cases instead of the settlement average calculated by Dr. Florence, but holding everything else the same, results in a liability for non-malignant claims of $10.1 billion, which is 66 times bigger than Dr. Florence's median estimated liability for "unimpaired asbestosis" of $153 million. ($153m * 66.1 = $10.113 billion). The sum of the mesothelioma liability and the non-malignant claim liability is $12.3 billion.

opposed to the debtor is irrelevant to the analysis in those cases.  The fact is, many of the arguments made by Grace here were considered by the courts there and rejected.[8]

Grace also argues that the prior asbestos estimation cases should be disregarded because Evidence Rule 408 precludes the use of past settlements between asbestos claimants and Grace as a basis for estimating Grace's liability on unresolved pending and future claims and Grace did not admit liability in any of its prior settlement agreements.  This argument is simply unfounded.  As we show *infra* at section II.A.iii., Rule 408 does not bar evidence of past settlements as the basis from which to estimate Grace's liability; this argument was raised and squarely rejected in the *Babcock & Wilcox* case.  The ACC and FCR experts are not using the evidence of a past settlement in a case to demonstrate that Grace had tort liability ***in any particular case that settled*** or for ***any particular pending or future claim***.  Instead, the ACC and FCR experts using the past claims resolution history as the basis to project the number of future settlement agreements Grace would enter into, the number of judgments it would suffer, and the cost of such settlements and judgments.  But because settlements made up such an overwhelming percentage of the cases Grace resolved, and will make up an overwhelming percentage of the cases resolved in the future, Grace's prior settlements are the best real world evidence of what price it would cost Grace to resolve the pending and future asbestos claims that will be asserted against it.

---

[8]    To the extent that Grace is arguing that somehow these other asbestos defendants had conceded liability when they settled cases, it is simply incorrect.  Like Grace, neither Owens Corning nor Armstrong nor Federal-Mogul ever admitted liability when they resolved cases by settling them.  *See*, *e.g.*, Settlement Agreement between Ness Motley claimants, and Owens Corning (Sept. 19, 2000) at 16 (attached as Exhibit 4); Settlement Agreement between Goldberg Persky claimants, and Owens Corning and Fibreboard Corp. (Dec. 10, 1998) at 17 (attached as Exhibit 5).

More fundamentally, a settlement *is* a liability.[9]  Grace, like most asbestos defendants, chose to try some of the cases against it, but settled the vast majority of the claims by making a payment of money to the claimant in exchange for a release which released the plaintiff's claims against Grace (and Grace only) from its potential tort liability.  As is the case in most settlements, the settlement agreements between Grace and asbestos claimants contain no admission by Grace of any ***tort*** liability (and conversely, no admission by the plaintiff that Grace was not liable for his injury).  However, the settlement contract itself creates a ***contractual*** liability on the part of Grace.  Thus, while a settlement agreement is not a tort liability, it is a valid contractual obligation of the company, with just as much validity as a bond or a real estate lease.

Grace has consistently recognized that when it converted its unliquidated asbestos tort liabilities to fixed contractual liabilities by entering into settlement agreements, it created a "real legal liability."  For example, David Siegel, Grace's General Counsel from 1999 to 2005, agreed that when Grace entered into a binding settlement agreement resolving an asbestos personal injury claim, that binding settlement agreement became a legal liability:

> Q.    Would you agree with me that when an asbestos personal injury case was
>        settled by W.R. Grace, that that settlement became a financial obligation
>        of the company?
>
> A.    When you say when it was settled, you mean if we entered into a binding
>        settlement agreement?
>
> Q.    Correct.

---

[9]    As a matter of first principles, a settlement agreement that resolves a contingent tort claim is a valid and enforceable contract.  *See Marine Midland Realty Credit Corp. v. LLMD of Mich., Inc.*, 821 F. Supp. 370, 373 (E.D. Pa. 1993) ("Settlement agreements are contracts between the parties and contract principles are generally applicable to their construction."), which converts a contingent tort claim to a fixed monetary liability; *Santopadre v. Pelican Homestead & Sav. Ass'n*, 937 F.2d 268, 272 (5th Cir. 1991) (noting that obligations due under a settlement agreement are fixed, liquidated liabilities).

A.      At that point the binding settlement agreement was a contractual obligation of the company.

Q.      That was a legal liability of the company.

A.      At that point, if it was a binding settlement agreement signed by both parties and all the conditions, absolutely.

David B. Siegel, Deposition Transcript, May 23, 2007, at 38-39 (excerpt attached as Exhibit 6).

The *Owens Corning*, *Armstrong*, *Federal-Mogul*, and *Eagle-Picher* cases recognize this reality. These cases are well reasoned, directly on point, and make clear that (1) a debtor's past settlement history is the proper basis from which to estimate its aggregate liability for pending and future asbestos claims, and (2) the ACC/FCR estimation methodology both "fits" the requirements of the applicable bankruptcy law, and provides a reliable basis for estimating Grace's liability for pending and future asbestos claims. Knowing that the most pertinent authority renders its *Daubert* attacks on the ACC and FCR experts toothless, Grace points to the *USG*, *Dow Corning*, and *A.H. Robins Co.* bankruptcy cases to support its argument that the ACC/FCR estimation methodology does not "fit" the applicable law. *See* Grace Mem. at 13-16. None of these cases provide such support, however.

USG, the only asbestos bankruptcy case of the three, simply never reached the point of an estimation proceeding – it was settled before such a proceeding was necessary, and therefore the case has little to say about how one should be conducted. The little it does say is contrary to Grace's approach, rather than supportive of it. Grace selectively quotes the preliminary comments of Judge Wolin in *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003), in its Memorandum, without context. Grace notes that the court states:

In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation. The Court will protect those who have been truly harmed.

*Id.* at 225.  However, Grace omits the following significant qualification immediately following this sentence, one that undercuts its approach entirely:

> As stated, this Court can only do so within the context of the law binding upon it and upon the claims before it.  It is basic that federal bankruptcy jurisdiction does not oust state law governing claims on a debtor's estate. . . . The Bankruptcy Code only creates a forum for dividing inadequate assets among competing claims; it says nothing about the law under which those claims arise.  An unbroken line of authority holds that state law claims remain governed by state law, even after the debtor invokes federal bankruptcy protection.  This principle defines the extent of the Court's discretion.

*Id.* (citations omitted).

The Dow Corning bankruptcy, *In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997), involving breast implant product liability, is likewise inapposite.  While Grace claims that the bankruptcy court in *Dow Corning* "contemplated" entertaining summary judgment motions on key liability issues, no such procedure was ever employed in the proceeding.  Moreover, only weeks after issuing the opinion cited by Grace, the bankruptcy court reversed itself, deciding that the key summary judgment and evidentiary motions should "bypass the bankruptcy judge altogether."  *In re Dow Corning Corp.*, 215 B.R. 526, 529 (Bankr. E.D. Mich. 1997).  Indeed, that court expressed concern that it did not even have the power to issue a report or recommendation with respect to such motions.  *Id.*

Finally, *A.H. Robins*, a case that has suffered critical reviews from both courts and scholars, also tells this court little about estimation methodology.  A.H. Robins was the manufacturer of the Dalkon Shield, an intrauterine birth control device that had been used for a short period in the 1970s.  Personal injury judgments against A.H. Robins for injuries caused by these devices put the company into bankruptcy.  *See In re A.H. Robins Co.*, 788 F.2d 994, 996 (4th Cir. 1986).

Although in the proceeding to estimate the debtor's liability, the court (Judge Merhige) did permit the use of a questionnaire process, its estimation opinion reveals almost nothing about how he arrived at the estimated liability. *See In re A.H. Robins Co.*, 88 B.R. 742, 747 (E.D. Va. 1988). The court neither endorsed a "merits-based" approach nor ruled on the validity of classes of claims or defenses to liability. *Id.* Indeed, what little can be inferred about Judge Merhige's deliberations from the case's history undercuts Grace's implication that he estimated the value of certain cases at zero. At the estimation proceeding, Thomas Florence, the very same expert Grace employs here, presented an estimate which eliminated certain categories of claimants that he determined could not have a "valid" claim based on questionnaire responses.[10] Dr. Florence then presented an estimate of $1.215 billion.[11] Other experts took different approaches that did not make the same assumptions about whether categories of claims were valueless.[12] Although Judge Merhige's estimation opinion does not reveal how he arrived at his final estimate, it was more than twice Dr. Florence's figure and it was in line with other experts applying alternative assumptions about the "validity" of cases. *See A.H. Robins*, 88 B.R. at 747.

In any event, the context of A.H. Robins' tort liability was very different from Grace's. In asbestos cases, plaintiffs are exposed to many different companies' asbestos products, and disputes over the amount of exposure to a given defendant's asbestos is an issue in every case. By contrast, there was only one Dalkon Shield manufacturer, and the plaintiffs either used the device or they did not.

---

[10]    Richard B. Sobol, *Bending the Law* 183-84 (1991) (excerpts attached at Exhibit 7).

[11]    *Id.*

[12]    *Id.* at 187-90 (discussing Rabinovitz estimate); *see also* Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U.L. Rev. 659, 685 (1989) (excerpts attached at Exhibit 8).

Second, the state court tort system is where the claims arise, and is the forum where the claims would be litigated and resolved if the debtor had passed them through its bankruptcy. Moreover, in all likelihood the state court tort system, because of the abstention doctrine, is the forum where the claims would be litigated even if Grace could litigate them all during the pendency of its bankruptcy case.  As noted above, 28 U.S.C. § 157(b)(2)(B) precludes a bankruptcy court from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution.  Indeed, the claims liquidation process would likely not occur in a federal court at all.  Grace's assumption that, because it is in bankruptcy, its asbestos claims would ultimately be litigated in a federal court following federal procedures, is highly speculative at best, and irrelevant in any event.

Grace's assumption that any litigation of its asbestos claims during its bankruptcy would necessarily occur in federal court is speculative, because it ignores the abstention doctrine.  28 U.S.C. § 157(b)(5) specifies that personal injury cases are to be tried in the federal district court where the bankruptcy case is pending or where the claim arose.  However, 28 U.S.C. § 1334(c)(1) allows the District Court to abstain from hearing a particular proceeding arising under title 11 when it is "in the interest of justice, or in the interest of comity with State courts or respect for State law."  *Id.*  In considering the interplay of these two statutory provisions, courts have uniformly held that district courts must first undertake an abstention analysis pursuant to 28 U.S.C. § 1334(c)(1) *before* transferring a case pursuant to section 157(b)(5).  *See, e.g., Dow Corning Corp. v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Connecticut (In re Dow Corning Corp.)*, 86 F.3d 482, 497-98 (6th Cir. 1996); *Asbestosis Claimants v. Apex Oil Co. (In re Apex Oil),* 980 F.2d 1150, 1153 (8th Cir. 1992); *In re Pan American Corp.,* 950 F.2d 839, 844 (2d Cir. 1991) ("A motion under section 157(b)(5), therefore, requires an abstention

analysis."); *Citibank, N.A. v. White Motor Corp. (In re White Motor Credit),* 761 F.2d 270, 274 (6th Cir. 1985) ("[I]t makes good sense to give the district courts wide latitude in referring the cases through abstention to other courts.").  Given that the asbestos personal injury claims all involve interpretations of state substantive law, and most of them have been pending in state courts where they have progressed against solvent defendants for years, there is every reason to expect that the district court would not transfer these cases to the MDL or other federal courts, and further exacerbate an already clogged federal docket, but would instead remand those cases back to the state courts in which the claims are currently pending.

Grace's assertion that because it is in bankruptcy, its asbestos claims would ultimately be litigated in a federal court is also irrelevant, because:  1) the federal courts would have to apply state substantive law to the claims; 2) the claimants would be entitled to a jury trial on disputed factual issues; and 3) no federal court could decide that whole classes of claims (such as claims brought by people who did not "personally mix" or "personally install" asbestos products) had zero value on some kind of aggregate basis as Grace attempts to do through its experts here – such an attempt to resolve individual asbestos claims on an aggregate basis violates due process. *See Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 320-21 (5th Cir. 1998).

Finally, regardless of forum, Grace's asbestos personal injury claims will have to be resolved, and the Court must estimate the total cost Grace would have to pay to resolve them.   If you want to estimate the value of something, you must look to the most comparable item you can find where the value is known.  This commonsense rule holds just as true for valuing asbestos claims as it does in everyday life.  *See, e.g.*, *Eagle-Picher*, 189 B.R. at 686 ("In valuation, the only sound approach is, if possible, to begin with what is known.").  The vast majority of asbestos claims were settled by Grace in the past, and it is an utter fiction to believe anything

other than that the vast majority of cases would be settled in the future by whatever entity

inherits Grace's liability for asbestos claims – either a trust, or the reorganized debtor.  To ignore

this reality and assume something different, as Grace invites the Court to do here, is akin to

ignoring the price of houses in a real estate valuation case.

II.     **Grace's Approach to Estimation Is Contrary to the Bankruptcy Code, Inconsistent with a section 524(g) Plan, and Beyond the Power of This Court.**

   A.     **This proceeding is not, and cannot be, a section 502(c) estimation for purposes of allowance.**

Though Grace cites cases concerning the "allowance" of claims in bankruptcy (*e.g.*,

Grace Mem. at 9) in support of its *Daubert* attacks on the ACC and FCR estimation experts,

under the Grace Plan (or any 524(g) plan) **none** of the asbestos personal injury claims will be

"allowed" within the meaning of the Bankruptcy Code, either during the bankruptcy case or

afterwards, by a 524(g) trust.  Although Grace now asserts otherwise, throughout these

proceedings both Grace and the Court repeatedly made statements that the Estimation Hearing is

demonstrably **not**  an estimation for the allowance of claims.  Although section 502(c) addresses

the estimation of individual claims for purposes of allowance, the Debtor and this Court have

made it quite clear that no individual claimant's claim will be estimated for purposes of

allowance or distribution from the estate, and thus no individual plaintiffs will even appear at the

Estimation Hearing.  Indeed, this Court has repeatedly stated (and Grace has agreed) that the

Estimation Hearing is for the purpose of determining Grace's aggregate liability for pending and

future asbestos personal injury claims, and not for the purpose of evaluating or estimating the

claims for purposes of individual allowance or disallowance. *See, e.g.*, Hr'g Transcript, Sept. 25,

2006 at 166 ("This process is to help anybody's expert that the information that they need to try

to convince me of what the existing and future asbestos personal injury claims will be, and how

much it's going to cost to resolve them.  That's what this is for.  And nothing else."), 194 ("The

point was that this is for estimation purposes, not for allowance and disallowance purposes.")
(excerpt attached as Exhibit 9). Grace has even admitted that this estimation is not for purposes
of allowance. *See* Grace's Response to the ACC's First Set of Requests for Admission and
Supplemental Interrogatories Directed to the Debtors, Nov. 20, 2006, Request No. 2, at 1-2
(excerpt attached as Exhibit 10).

### B.    The estimation is for plan confirmation only.

In the present case, the Court is estimating asbestos personal injury and wrongful death
claims in the aggregate solely for the purpose of *plan confirmation*, and not allowance purposes.
As noted above, 28 U.S.C. §§ 157(b)(2)(B) and 157(b)(5) preclude a bankruptcy court from
liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims
against the estate for purposes of distribution. This statute draws a clear distinction between
estimation for purposes of confirming a plan (which a bankruptcy court can do, and which is the
subject of the Estimation Hearing) and estimation for purposes of final allowance or distribution,
which can only be done in the district court.

Under section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007, before an
objected-to claim can be determined for allowance, a claimant must be provided notice of the
objection and the opportunity for a hearing. Here, no objection to any unliquidated pending
asbestos personal injury claim has ever been filed, and no notice has been given to the individual
asbestos personal injury claimants that the allowance or disallowance of their individual claim
would be an issue to be determined in connection with this Estimation Hearing. Estimating these
claims for allowance purposes without providing the necessary notice and hearing to each
individual claimant would violate due process. *See, e.g., In re La Rouche Indus., Inc.*, 307 B.R.
774, 781 (D. Del. 2004); *In re Waterman Steamship Corp.*, 157 B.R. 220, 221 (S.D.N.Y. 1993).

### i.    Settlement payments are a major element in Grace's tort liability.

Contrary to Grace's contention, Grace's "legal liability" on the personal injury claims against it is not something separate from the cost of resolution of those claims.[14]  Indeed, its liability *is* the cost of such resolution.  The Code is explicit on this identity between liability and payment.  A "debt" is defined as a "liability on a claim."  11 U.S.C. § 101(12).  A "claim" is defined as a "right to payment."  11 U.S.C. § 101(5)(A).  Putting these two definitions together, a "debt" is a "liability," based on a "right to payment" on a "claim."  The claims here are pending and future assertions of a right to payment from Grace flowing from injuries arising from exposure to Grace's asbestos-containing products.[15]  The aggregate value of those claims is Grace's liability, and is necessarily estimated by, nothing more and nothing less than a forecast of the total amount of payments to which Grace would be obligated arising out of the claims, both pending and future.  This quantity is precisely what Dr. Peterson measures, and so what he measures exactly "fits" the question the Court must answer.

The courts have recognized this identity.  *See, e.g.*, *Ohio v. Kovacs*, 469 U.S. 274, 283 (1985) (environmental "cleanup order had been converted into an obligation to pay money," and

---

[14]    Grace misrepresents Peterson as having said at his deposition that he ignores considerations of liability.  For example, Grace quotes him as saying, "This is an estimation of the value of the asbestos claims.  The value of the claims, presumably the cost they would have to pay," omitting to quote the rest of the answer, which continues, "and that cost is *a settlement cost based upon considerations of liability*, but it's the costs that I would expect would be paid, borne by Grace to settle the claim."  Mark Peterson, Deposition Transcript, Nov. 1, 2007, at 181 (attached as Exhibit 12).

[15]    Grace states that "a solvency determination includes only claims, not future demands."  Grace Mem. at 13.  This statement is puzzling.  Grace acknowledges, and has its expert estimate, its liability for future claims as part of this Estimation Proceeding.  To the extent that Grace is suggesting that future demands do not constitute a portion of the liability which must be estimated for § 524(g) and § 1129(b) purposes, it is simply wrong and inconsistent with the purpose and structure of § 524(g), which requires funding of a trust sufficient to pay future demands.  Grace could only ignore future claims in a liability estimation if it were going to pass them through its bankruptcy to be asserted against the reorganized debtor, which it is clearly not doing here.

are greater than the cost of the settlement package."). As the claimants' evidence will show, Grace settled cases because it had a realistic fear of losing at trial, not because it could not mount a defense if it had chosen to. With experience (both their own and that of other defendants) Grace counsel (and the plaintiffs' bar) developed an understanding about the likely results of taking cases to trial – and so had a "merits-based" approach to settlements, i.e., one that reflected their weighing of the probabilities as to the jury's verdict and the costs and risks of going to trial.[17]

Had Grace not sought bankruptcy protection, it – like all other asbestos defendants – would have continued to resolve the majority of the claims against it prior to trial. Accordingly, a forecast of pending and future liability must include settlements, and such a forecast must take into account how Grace and plaintiffs settled in the past. Just as past jury verdicts are properly considered in estimation because they indicate the outcomes on claims that went to trial, so settlement decisions must likewise be considered because they reflect what the parties agreed on as acceptable (if not ideal) resolutions, taking account of expected jury actions, the costs (including large jury awards) that Grace anticipated and sought to avoid, and both parties' assessments of the strengths of plaintiffs' evidence and Grace's available defenses. In short, Grace's true asbestos liability can reliably be estimated only by taking into account its *entire* claims-resolution history.

If settlements were not included in the forecast, it would be necessary to assume that every claim went to trial, and estimate Grace's liability solely on the basis of judgments. As

---

[17]    "Through repeated practice, the experienced lawyer has developed an almost unconscious calculus [for valuing a case] that incorporates past valuations with an assessment of their accuracy, a knowledge of prior verdicts and settlements, and the relationship of past experience to the facts of the current case." P. Hoffman, *Valuation of Cases for Settlement: Theory and Practice*, 1991 J. Dispute Resol. 1, 6 (attached as Exhibit 50).

noted *supra* at 8, if one accepted Florence's very low estimate of "meritorious" cases but applied

Grace's judgment averages – Grace's liability would be over $12 billion.  Alternatively, as Dr.

Peterson shows, even assuming 90% of claims were disposed of – by summary judgment or

otherwise – prior to verdict, and even assuming Grace would win as large a percentage of trials

in the future as it had won in the past, and further assuming no increase in the amount of jury

verdicts, the result would be a liability of over $3 billion for the pending claims alone, and $30 to

$40 billion for the combination of pending and future claims.  Mark Peterson, W.R. Grace

Projected Liabilities for Asbestos Personal Injury Claims, June 2007, at 95-96 (attached as

Exhibit 13).  This is many times Dr. Peterson's estimate that (realistically) assumes most cases

would be settled.  Peterson Expert Report at 91-96.

### iii.    Rule 408 does not bar the admission of evidence concerning prior settlements as the basis for estimating liability here.

Grace argues that Federal Rule of Evidence 408 prohibits the ACC from utilizing Grace's

settlement history and protocol as a basis for estimating aggregate asbestos liability.  This

contention reflects a fundamental misstatement of the scope and purpose of Rule 408.  That rule

provides:

> (a) Prohibited uses.    Evidence of the following is not admissible … when offered to prove liability for, invalidity of, or amount *of a claim* that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
>> (1)   furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise *the claim*; and
>>
>> (2)   conduct or statements made in compromise negotiations regarding *the claim*, [inapplicable exception omitted].
>
> (b) Permitted uses. – This rule does not requires exclusion if the evidence is offered for purposes not prohibited by subdivision (a).

Federal Rule of Evidence 408 (examples omitted, emphasis added).  Just as the rule against

hearsay applies only when the out-of-court statement is offered to prove the truth of the matter

asserted, Rule 408 prohibits evidence of settlements only when offered to "prove the validity or

invalidity of the claim that is the subject of the compromise."  *In re Babcock & Wilcox Co.*, 274

B.R. 230, 256 (Bankr. D. La. 2002). The Rule permits the use settlements when offered for the

purpose of estimating liability on ***different*** claims.  *See id.* (also noting that when "settlement

negotiations and terms explain and are part of another dispute, however, they are often admitted

to allow the trier of fact to understand the case"); *see also* 2 Weinstein, Federal Evidence §

408.08[1] ("Rule 408 does not require exclusion if the evidence is offered for some purpose

other than proving liability for, the invalidity of, or the amount of a disputed claim."); *Broadcort*

*Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992) (finding evidence

from prior settlement discussions admissible because it related to an entirely different claim from

the claim that was the subject of the negotiations).[18]

Thus, nothing in Rule 408 prohibits the admission of evidence concerning Grace's

settlement history of past asbestos claims for the purpose of this Court's better understanding of

Grace's aggregate asbestos liability on a different set of claims, the unresolved pending and

future claims.  Indeed, such evidence has regularly been admitted for precisely that purpose in

virtually all previous asbestos bankruptcy cases.  *See In re Armstrong World Indus.*, 348 B.R.

---

[18]  Courts can also admit evidence regarding compromise negotiations even when the attempted settlement was made in the case at bar, if such evidence is offered for a purpose other than establishing liability or validity of the claim at issue.  *See, e.g., Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) ("Rule 408 is inapplicable because this evidence was not offered to establish the amount of Petsmart's liability, but merely to indicate Cohn's assessment of the value of the trademark."); *Vermande v. Hyundai Motor Am., Inc.*, 352 F. Supp. 2d 195, 202 (D. Conn. 2004) (Rule 408 prevents the use of previous settlement offers made in the case only when offered to prove liability for or invalidity of a claim, and does not prevent a court from considering a settlement demand previously made for the purposes of assessing the amount in controversy to determine jurisdiction).

111, 123-24 (D. Del. 2006); *In re Eagle-Picher Indus.*, 189 B.R. 681, 686 (Bankr. S.D. Ohio

1995), *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 157 (D. Del. 2005); *Owens Corning v.*

*Credit Suisse First Boston*, 322 B.R. 719, 721-25 (D. Del. 2005).

     In one such case, *Babcock & Wilcox*, the court flatly rejected the debtor's argument

(made by the same counsel that represents Grace here) that Rule 408 prohibited admission of

such evidence, and held that "the court, in determining whether B&W's future estimation of tort

liabilities was reasonable, can consider both settlements by B&W and other case histories against

other asbestos defendants as part of the grounds for its decision." *In re Babcock & Wilcox Co.*,

274 B.R. at 256-57.  Refusing to admit the debtor's settlement history, the court noted, would be

tantamount to closing "one's eyes to the realities that existed [prior to the bankruptcy filing]."

*Id.* at 256-57.  This Court, too, should not close its eyes to the realities of Grace's settlement

history, which is not only admissible but essential to a proper estimation of Grace's aggregate

liability.

     The authority Grace cites in support of its contention that Rule 408 precludes the

admission of evidence that it settled "related cases" is stretched far beyond its actual precedential

value.  Both cases involved attempts to introduce evidence regarding settlements that occurred

either in the actual case at issue or in a closely related proceeding involving the same parties, for

a purpose expressly prohibited by the rule.  Here of course, neither the ACC nor the FCR were

ever parties to any of the tens of thousands of individual settlement agreements entered into

between asbestos claimants and Grace.  If anything, the first case Grace cites, *Fiberglass*

*Insulators, Inc. v. Dupuy* stands for the unremarkable proposition that evidence of an incendiary

statement made by the counsel of a party presently before the court during the course of prior

settlement negotiations between the same parties, to resolve a matter directly connected to the

not fall within any exception to Rule 408." *Id.* The court of appeals explained that the trial court erred when it revealed the dollar amounts of the settlements to the jury, and instructed the jury to add any damages they wished the plaintiffs to receive from the defendant to that amount, violations of Rule 408 "because they directed the jury to consider the settlement as part of the proof of the amount of the claim." *Id.*

In addition, even if Rule 408 did render settlements inadmissible, under the Federal Rules of Evidence an expert may nevertheless rely on them to render an opinion. Rule 703 provides that expert testimony based upon facts or data which are not independently admissible may be introduced if the information relied upon is "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. This rule operates to allow expert witnesses to base their opinions on information that is inadmissible when that sort of information is generally accepted or relied upon in the expert's field. *See, e.g., S. Cent. Petroleum, Inc. v. Long Bros. Oil Co.,* 974 F.2d 1015, 1019 (8th Cir. 1992) (noting that the "Federal Rules of Evidence permit experts to rely on inadmissible information in forming their opinion as long as the underlying information" is regularly and reasonably relied upon in the relevant field, and finding no abuse of discretion when an expert in a mineral rights case was permitted to make revenue projections based on multiple hearsay about the oil well in question, because the underlying information was reasonably used by experts). It is indisputable that evidence concerning Grace's settlement criteria and settlement history is information of a type regularly and reasonably relied upon by experts in the field of estimation of aggregate asbestos liability – indeed, the testifying expert witnesses in every contested asbestos liability estimation case to date have heavily relied upon the debtor's past claims resolution and settlement history and the company's settlement criteria as a basis for their estimates. *See, e.g., Armstrong,* 348 B.R. at 123-24; *Federal-Mogul,* 330 B.R.

at 155; *Owens Corning*, 322 B.R. at 721-25; *Babcock & Wilcox*, 274 B.R. at 256-57; *Eagle-Picher*, 189 B.R. at 690-92.

In fact, Grace's own estimation expert witness, Dr. Florence, has consistently relied upon Grace's settlement history as a foundation for estimating the company's aggregate liability. In an estimate of the future asbestos claims against Grace that Dr. Florence prepared in May of 1997, he relied on Grace's settlement history as the basis for his projections. *See* KPMG, Estimate of the Number of Future Claims to be Filed with W.R. Grace & Co. for Compensation for Injuries Arising From Asbestos Exposure and Estimates of the Costs Associated With the Resolution of the Claims Prepared for W.R. Grace, May 27, 1997, at 4-5 ("KPMG 1997 Future Claims Estimate") (attached as Exhibit 14). Even Dr. Florence's estimate of Grace's aggregate asbestos liability in this proceeding utilizes pre-petition settlement values. *See* Florence Supp. Report at 15-17.

**B.    The estimation experts correctly considered the actual legal standards that determine the merit of a tort claim, and rightly did not apply Grace's liability filters because they do not reflect the law.**

Grace says that Dr. Peterson's opinion should not be heard because only "meritorious" claims should be considered in estimation of liability, and that only claims that meet Grace's criteria are meritorious, and because he did not rely on Grace's PIQ project. *See* Grace Mem. at 12, 23, 48-50. This interlocking argument has three fundamental flaws:

o   First, a claim is not "unmeritorious" simply because there might be uncertainty about how a claim that has been settled (or will be settled in the future) would have been (or will be) judged at trial – much less merely because Grace's counsel believe that in a more defendant-friendly world, such cases would not be compensated.

o   Second, Grace's substantive standards for what a plaintiff has to show to establish liability do not correspond to the law.

o   Third, Grace's insistence that the PIQs could serve as a reliable method of determining the merits of claims is also wrong.

### i.    The possibility that Grace might have defenses it could advance at trial does not mean that claims are without merit.

Grace did not settle all claims; it insisted on evidence of disease and exposure, and refused to pay on a significant percentage of the claims presented to it.  When it faced trial, it sought summary judgment or other pre-trial dismissal where its attorneys believed this might be granted.  It took cases to trial in some instances, but settled most claims before trial.  Grace's outside counsel, James Restivo, described Grace's litigation approach in a letter to its auditors as follows:

> The Company generally tries to settle those cases where there is evidence of (a) exposure to a product formerly manufactured by the Company; and (b) the presence of an asbestos-related injury.  In cases without such evidence, the Company seeks to be dismissed and, where necessary, on occasion proceeds to trial in such cases.

Letter from James Restivo, Grace outside defense counsel, to Price Waterhouse (Jan. 17, 1996) (attached as Exhibit 15).

Grace may well believe it had potential defenses in many of the cases it settled, and that it would have such defenses in the future.  In most cases, however, there will be material facts in dispute, so that the plaintiff's case can survive summary judgment (or other pre-trial dismissal) and go to trial.  In such a situation, of course, the outcome is decided not by either party acting unilaterally, but in court, usually by a jury.  Grace was not prevented from presenting defenses at trial – and it did so with some success, but also with highly expensive overall results – average judgments were $1,261,570 in mesothelioma cases, and $319,265 in non-malignancy cases.

Accordingly, for estimation purposes, it is irrelevant that Grace says it could contest many of the pending claims.  Disputed claims are expressly included in the Code's definition of

"claim,"[19] and their value must be included in the estimation here.  Grace had the right to contest such claims prior to its bankruptcy and sometimes did so, but it settled and paid in most cases because it recognized the high risk that it would be unlikely to keep the case from the jury and, that in the event of trial, juries would, on average, hold it liable for large enough amounts that it was in its economic interest to settle, even taking into account the probability of defendant verdicts.  Dr. Peterson's conclusion that Grace would continue to settle claims to which it believed it would have had some potential defense is not only reliable, it is clearly correct.

## ii.    Grace's "merits" standards do not correspond to the law.

Grace's Memorandum speaks often of the proposition that only "meritorious" claims create liability.[20]  The problem with Grace's demand for "merit" is that its definition of merit is not the law.  The merits of tort claims are measured by state tort law as applied by judges and juries, and not by the criteria Grace invented for the purposes of its case and which it sets forth in its Memorandum as the standard for asserting that "a significant portion of asbestos claims were driven by considerations other than merit."  Grace Mem. at 49.

The details of tort-law standards vary somewhat from state to state, but the basic pattern is consistent across the country, as to both substance and level of evidence needed.  Plaintiffs must show medical evidence on which a jury can find a condition caused by asbestos, and must show evidence of exposure to the particular defendant's asbestos-containing material sufficient for the jury to find that exposure to have been a substantial contributing factor in causing their disease.  Under tort law standards, establishing that an asbestos personal injury tort claim has merit does *not* require, as Grace claims:

---

[19]    *See* Alan N. Resnick et al., 2 Collier on Bankruptcy ¶ 101.05[6] (15th ed. rev. 2006) ("The fact that the tort claim may be unliquidated or disputed does not mean that it is not a claim.").

[20]    *E.g.*, "No value should be ascribed to meritless claims."  Grace Mem. at 12.  "Claimants [ignore that claiming] has produced large numbers of meritless claims."  Grace Mem. at 48.

*Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 808-09 (3d Cir. 1997); *Louderback v. Orkin Exterminating Co.,* 26 F. Supp. 2d 1298, 1306 (D. Kan. 1998).  No court requires every asbestos personal injury claimant to meet a specific, numerical exposure threshold to make out a claim, as Dr. Anderson would apply Dr. Moolgavkar's numerical thresholds.  *See* ACC Mem. at 51-53 and cases cited therein.  Likewise, no court has ever held, and no state statute, however "reformed," imposes any version of Dr. Anderson's "mix or install" rule, and no recognized industrial hygiene or epidemiological studies support it.[22]  Finally, as Judge Fullam noted, a single supportive reading from a certified reader is sufficient to permit – though not of course to require – a jury to find an asbestos-related injury.  *Owens Corning*, 322 B.R. at 724.

Even if it was the role of an estimation expert to "judge" individual claims according to a set of criteria (which it is not), these criteria are the wrong ones.  As Grace's merits criteria do not correspond to the tort law in any state, Dr. Peterson could not apply them in his expert opinion to arrive at an estimate of Grace's liability had it remained in the tort system.  Nor can Grace's own experts.

### iii.    The Grace PIQ exercise is not a valid, much less an indispensable, source of information on the merits of claims.

Grace claims Dr. Peterson and Ms. Biggs are unreliable because they do not rely on the PIQs as the authoritative source on whether plaintiffs can prove exposure.  Grace Mem. at 23.  As Grace stresses elsewhere, the PIQs are just Grace's "discovery device," they are not any sort of "agreed" database of information.  That an expert declines to draw his data from material prepared for trial purposes by the other side is no basis to exclude his testimony.  *See Heller v.*

---

[22]    As Dr. Welch will testify, sheet metal workers whose job duties do not require them to "personally mix" or "personally install" asbestos products suffer from mesothelioma at a rate that is well over 100 times the background rate for mesothelioma.

*Shaw Indus., Inc.*, 167 F.3d 146, 160 (3d Cir. 1999) (trial court cannot exclude expert testimony simply because witness used one test rather than another).

The PIQs are, in any event, wholly inadequate as a definitive measure of claimants' trial evidence, for the reasons set out in detail in the ACC's Memorandum at 23-26, and in Dr. Peterson's and other rebuttal reports. *See* Mark Peterson, Rebuttal Report, Sept. 25, 2007, at 4-5, 27, 38-40 (attached as Exhibit 16); Daniel P. Myer and Mark T. Eveland, Expert Report on Behalf of W.R. Grace Official Committee of Asbestos Personal Injury Claimants, Sept. 24, 2007, at 8-9 (attached as Exhibit 17).  Even if the PIQs were a perfect measure of claimants' personal knowledge of their Grace exposure at the time the claimants' filled out the form – which they are not – that knowledge is not the only means by which claimants can establish exposure.  To meet this part of their burden of proof, plaintiffs routinely use many different forms of evidence in addition to their own memories, including defendants' records, prior depositions, and co-worker testimony.

Under Grace's proposed Plan of Reorganization, or any 11 U.S.C. § 524(g) plan, no asbestos claimant can litigate his or her claim to judgment during the pendency of the bankruptcy case – all such claims are channeled to a trust for post-confirmation evaluation and resolution. Nor is it possible for Grace or the Court to make determinations of "Grace's liability" or claim validity based upon the data collected in this case.  Grace is particularly misleading when it attempts to equate a B-reader's report and interrogatory responses that a claimant produced in response to the Personal Injury Questionnaire discovery with the complete fact and expert testimony that the plaintiff would rely upon when the time came to prove his claim at trial.  The two are not the same.

In asbestos litigation, like any civil litigation, the only time the plaintiff was able or required to "prove" Grace's "real liability" and the amount of his damages for which Grace was responsible was when he presented his case for trial by a jury.  Such trials were conducted at the conclusion of a process normally governed by scheduling orders that set a trial date, provided for discovery, and required the plaintiff to identify his testifying experts for trial and produce their "expert witness reports" and otherwise identify the witnesses and exhibits he would use in trial to support his claim.  In many jurisdictions neither the plaintiff nor the defendant could proceed with any discovery after an asbestos personal injury case is filed until the case was moved onto the "trial docket."  This meant that, as a practical matter, usually only a small percentage of the claims pending against Grace or any other asbestos defendant were in the process of being actively discovered and prepared for trial at any one time, much less were in a fully trial-ready state, with all discovery completed and all evidence in hand.

The effect of Grace's bankruptcy was to halt all proceedings, including discovery, in the pending cases and to indefinitely defer any prospect of the cases coming to trial, thereby, as a practical matter, suspending the plaintiffs' evidence-gathering and trial preparation. Accordingly, the PIQ responses – in addition to all their other limitations – are no measure of what evidence claimants would be able to present at the point when the cases would have to be evaluated by a jury at trial.

### C.    Dr. Peterson has used an established, accepted methodology for estimating tort liability and Grace's effort to exclude his testimony is without merit.

#### i.    Outline of Dr. Peterson's methodology.

In order to estimate liability on an aggregate basis, the ACC's estimation expert, Dr. Mark Peterson, relies on well-validated epidemiology, the undisputed record from Grace's own files of how it handled similar claims prior to its bankruptcy, and his understanding, based on

The seminal case on estimation of asbestos claims, *Eagle-Picher,* squarely supports Peterson's methodology. The court in *Eagle-Picher* estimated the debtor's liability for purposes of formulating a plan, based in part on the debtor's claims-resolution history. *See* 189 B.R. at 684-86. That case established the key considerations that should enter into a court's estimation of present and future asbestos liabilities: (1) the history of the debtor company; (2) the total number of claims expected; (3) the category of disease and occupation; and (4) settlement values for claims close to the bankruptcy filing date. *See id.* at 690-91. The argument underlying Grace's arguments against Peterson's work – that its claims-resolution history cannot serve as the data set from which to estimate – was specifically rejected by the court in *Eagle-Picher,* which concluded that the debtor's pre-petition record was "a valuable experiential resource" for estimating the value of pending and future claims. *Id.* at 686.

This estimation methodology is the standard in non-litigation contexts as well. It has been used by corporations, settlement trusts, risk managers, and insurance companies, as well as by courts in contexts outside section 502(c). It is widely employed for financial reporting purposes by companies that face asbestos liabilities. For example, RPM International, Inc., a building products manufacturer, described in detail how its estimation consultant used the standard methodology to arrive at the aggregate asbestos liability figure reported in its 2006 10-K.

> The methodology used by C&W to project our liability for unasserted potential future asbestos-related claims included C&W doing an analysis of (a) widely accepted forecast of the population likely to have been exposed to asbestos; (b) epidemiological studies estimating the number of people likely to develop asbestos-related diseases; (c) historical rate at which mesothelioma incidences resulted in the payment of claims by us; (d) historical settlement averages to value the projected number of future compensable mesothelioma claims; (e) historical ratio of mesothelioma related indemnity payments to non-mesothelioma indemnity payments; and (f) historical defense costs and their relationship with total indemnity payments.

RPM Int'l, Inc. 2006 Form 10-K, at 59 (excerpt attached as Exhibit 21).  Likewise Dana

Corporation, an automotive parts manufacturer, reports that it uses the standard model to

estimate its aggregate liability.  *See* Dana Corp. 2005 Form 10-K, at 39-50 (excerpt attached as

Exhibit 22).  *See also* Union Carbide Corp. 2006 Form 10-K, at 6-7 (excerpt attached as Exhibit

23).

     In fact, Grace itself uses the standard method in contexts other than this proceeding.  Dr.

Florence's firm ARPC used the method to estimate Grace's aggregate asbestos liability on

several occasions prior to Grace's bankruptcy, most recently in August 1998.[25]  These estimates

formed the basis of the asbestos reserve reported in Grace's securities filings.

     Moreover, in seeking to recover insurance proceeds, Grace has offered its insurers

estimates incorporating the standard method.  For example, when seeking to recover proceeds

from one of its high-level excess insurers, Integrity Insurance, Grace sent the 1998 Florence

estimate cited above, along with an estimate prepared by Dr. Peterson in 2002.  Both used the

standard method.  *See* Letter from Frederick H. Zaremby, to Integrity Insurance (July 7, 2005)

(attached as Exhibit 25).  In ***December 2006***, Grace similarly presented the 2002 Peterson

estimate in its effort to recover insurance proceeds from C.A.M.A.T., another of Grace's excess

insurers.  In an email from Grace's in-house counsel in charge of insurance to the insurer, Grace

stated:

> Please see the attached spreadsheet reflecting an asbestos allocation for
> the C.A.M.A.T. policy at varying limits through exhaustion.  The creditors
> committee report by Mark A. Peterson filed in the bankruptcy court
> reflects a lower bodily injury liability of approximately $3.184 billion.
> This number does not include any property damage or Zonolite liabilities.

---

[25]  *See* ARPC, Estimate of the Number of Future Claims to Be Filed with W.R. Grace & Co. for
Compensation for Injuries Arising from Asbestos Exposure and Estimates of the Costs
Associated with the Resolution of Claims, August 14, 1998 ("ARPC 1998 Future Claims
Estimate") (attached as Exhibit 24).  *See also* KPMG 1997 Future Claims Estimate.

> I can copy the Peterson report (approximately 3 inches thick) or you can find the report and all other filings in the Grace bankruptcy on the Delaware Bankruptcy court's website.

*See* Email from Frederick H. Zaremby, to Mary Dumbleton (Dec. 7, 2006) (attached as Exhibit 26).[26]

Grace's estimation experts have also used the method extensively, if not exclusively, in their work for clients other than Grace. As noted in the ACC's Memorandum, Dr. Florence has employed a methodology essentially similar to Dr. Peterson's throughout his career. ACC Mem. at 4. Dr. Florence used the standard methodology in his recent work in the *Federal-Mogul* case. *See, e.g.,* Thomas Florence, Summary of Liability Estimates and Asset Coverage for the Pneumo Abex Subfund, *In re Federal-Mogul Global, Inc.*, No. 01-10578, at 4-6 (Bankr. D. Del. 2007) (attached as Exhibit 27). In his reports and deposition in that case, Dr. Florence described the "Nicholson" methodology for estimating asbestos liabilities as "generally accepted" in the field. *See* Thomas Florence, Deposition Transcript, *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del. 2007), May 15, 2007, at 122-24 ("Florence *Federal-Mogul* Dep.") (excerpt attached as Exhibit 28).

The estimation procedure that Dr. Peterson uses is also supported by Frederick Dunbar, Grace's rebuttal expert on estimating asbestos claims. Dr. Dunbar has specifically advocated the use of historical settlement information – including settlements and judgments obtained in the state courts – in performing an estimation. In his 1996 treatise on estimating mass tort claims, Dr. Dunbar states that, "[w]here data is available on the indemnity payments that historically have been made on similar claims, an average of these may serve to estimate the payment on

---

[26] It is inconsistent, to say the least, for Grace to disparage Dr. Peterson's methodology and estimates in this Court, yet offer Dr. Peterson's prior estimates to its insurers in an effort to potentially collect insurance proceeds (which, under its Plan, Grace in large part proposes to keep for itself).

pending or future claims." Dunbar, *Estimating Future Claims* at 81. Later in the book,

Dr. Dunbar describes how his firm and other experts used historical averages of settlement

values to predict and value pending and future asbestos claims in the *National Gypsum* case.[27]

*See id.* at 158-60.

      If the "Nicholson" approach used by Dr. Peterson for estimating future asbestos liabilities

was so unreliable as to be inadmissible on *Daubert* grounds, solvent asbestos defendants

companies, courts, insurers and asbestos trusts would not all rely upon it, or some variant

thereof, to estimate their liability and make financial decisions with billions of dollars at stake

based on the result. The reason they do, of course, is that the Nicholson/Peterson/Biggs

approach to estimation *is* reliable. It has been used frequently for the past twenty years (at least)

to forecast asbestos liabilities, because its three most salient underpinnings have remained

relatively constant over a long period. First, there have been reliable projections of the future

course of mesothelioma and asbestos related cancers since Dr. Nicholson's work was published

in 1982, which projections have been confirmed in the intervening 25 years by comparison to

National Cancer Institute SEER data on the annual incidence of mesothelioma. Second, our

legal system treats asbestos claims, and particularly mesothelioma claims, as having significant

monetary value, and claimants and their lawyers will continue to assert them as long as asbestos-

related injuries continue to arise. Third, the best evidence of what indemnity a company will pay

to resolve claims tomorrow is what it is paying today, after adjusting for foreseeable trends such

as rising jury verdicts or tort reform in particular jurisdictions.

      While there have been year-to-year fluctuations in claim filing rates against particular

defendants, and there have been some changes in the margins of tort law in some jurisdictions

---

[27]   *In re National Gypsum Co.*, No. 37214-SAF-11 (Bankr. N.D. Tex. 1993).

affecting non-malignant claims, the fundamental facts described above have remained valid for over twenty years.  In particular, any recent tort law changes have had little impact on mesothelioma claims, which historically and in the projections make up the bulk of any company's asbestos liability.  And, moreover, Dr. Peterson and Ms. Biggs have taken changes in filing behavior for non-malignant claims into account in their respective estimates.

Of course, no prediction of the future is perfectly accurate, and all such predictions are inherently subject to significant uncertainty, as other estimating courts have acknowledged.  *See, e.g., Armstrong*, 348 B.R. at 114 ("Of course, the Court's inquiry is complicated by the fact that AWI's liability for asbestos PI claims is an uncertain number."); *Owens Corning*, 322 B.R. at 721 ("[W]e are dealing with uncertainties, and are attempting to make predictions which are themselves based upon predictions and assumptions.").  But, in essence, estimating asbestos liabilities based on the Nicholson/Peterson/Biggs methodology is no different than estimating pension liabilities based on the pension laws as they currently exist and actuarial estimates of the life expectancy and expected retirement dates of the work force for the company whose pension is at issue.  Of course, there could, in the future, be some kind of sea change which renders all such forecasts obsolete.  For example, estimating pension funding requirements would be changed radically if Congress passed a statute allowing all companies with private defined benefit pension plans to roll their assets and obligations into some kind of "National Pension Program."[28]  But the fact that such an event is possible does not relieve companies (or the courts) of estimating the total liability based on the facts and events which are known today and reasonably foreseeable in the future.

---

[28]   The obvious analog for asbestos was the so-called FAIR Act, the passage of which was always unlikely, but if enacted would have eliminated Grace's future asbestos liability and replaced it with a (greatly reduced) tax liability to be paid to some kind of super asbestos fund.

iii.    **Grace's specific challenges to the admission of Dr. Peterson's expert testimony are groundless.**

1.    **Peterson uses epidemiological science in his work.**

Grace claims that Dr. Peterson's estimate is unreliable because it is not based on "science," but "claiming and settlement behavior." Grace Mem. at 33-34. The fact is that Dr. Peterson uses epidemiology as the foundation of his estimate, basing his projections of future claims on the widely-recognized forecasts by Nicholson. *See* Peterson Expert Report at 69. The Nicholson projections are generally regarded as the most accurate of the various models, *id.* at 61-66, and as Dr. Florence, among many others who work in the field, has acknowledged, use of the "Nicholson method" for estimating future asbestos liability is generally accepted in that field. *See* Florence *Federal-Mogul* Dep. at 121-24. *See also* Thomas Florence, Asbestos Liability Coverage Analysis for Claims Against Vellumoid, *In re Federal-Mogul Global, Inc.*, No. 01-10578, at 3-4 (Bankr. D. Del. 2007) (attached as Exhibit 29). But Peterson's methodology also does what is necessary in any accurate estimate of liability on tort claims – it takes into account that Grace's liability depends not only on how many people incur disease, but on whether they make claims and how those claims are handled. It is, after all, claims and their payment that is being estimated, not the incidence of disease as such.[29] The behavioral factors – e.g., an increased propensity to sue Grace, higher settlement values, greater scrutiny of medical evidence on non-malignant cases, and the like – that Peterson concludes would affect post-petition claims,

---

[29]    Peterson's projections have, as Grace notes, Grace Mem. at 46, proven in the past to understate the actual levels of filings and liabilities that the companies involved have had to face, a result which has been generally true of other experts' forecasts of asbestos liability. *See* Florence *Federal-Mogul* Dep. at 208-10 ("I know that I've given testimony that said my forecasts have tended to be low, and, in some instances, the meso and lung cancer forecasts have been low."). From this, Grace makes the bizarre argument that since his work has historically tended to underestimate, it is likely to overestimate now. The reason Dr. Peterson's past estimates have been low is not that his method is unreliable, but that it is deliberately conservative. *See infra* at 52-53.

and hence resolutions and liabilities, are the product of study and experience and not , as Grace

claims, unexplained "subjective judgments."  Grace Mem. at 33.  As *Kumho Tire v. Carmichael*

makes clear, Rule 408 permits testimony regardless of whether it is not formal, academic

science, when it is based on study, experience, reliable data, and methodology.  *See* 526 U.S.

137, 150 (1999).  Dr. Peterson fully meets that standard – he has studied all aspects of the issue

of compensation for asbestos-caused personal injuries, published extensively on the subject, and

both developed and applied his knowledge of the field in a variety of non-litigation contexts.

Even if his expert opinion was not "scientific," Rule 702 and *Daubert* principles would permit

the Court to consider his expert testimony.  Expert opinions permitted by Rule 702 are not

limited to "scientific" knowledge, but extend to all "scientific, ***technical, or other specialized***

***knowledge*** [that] will assist the trier of fact to understand the evidence or to determine a fact in

issue" (emphasis added).  As the Supreme Court has noted, "there are many different kinds of

experts, and many different kinds of expertise."  *Id.* at 150.[30]

>           2.      **Dr. Peterson's method properly relies on the historical record**
>                   **of Grace's settlements.**

Grace also repeats its general objection to the use of settlements as evidence of its

liability in a slightly different form, claiming that Dr. Peterson erred in taking into account the

increases in Grace's average settlement payments in 1999-2001.  Grace contends that, because

its settlements in that period arose out of a fear that, with some previous "target" defendants in

---

[30]  For example, courts routinely admit expert opinion regarding the valuation of real estate or
      companies.  *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077-79 (5th Cir. 1996)
      (land valuation); *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 486 F. Supp. 2d 741,
      749-50 (N.D. Ill. 2007) (real estate valuation); *R.A. Mackie & Co. v. Petrocorp Inc.*, 329 F.
      Supp. 2d 477, 514  (S.D.N.Y. 2004) (value of stock warrants).  Such valuations almost
      require experts to make many judgments that cannot be "scientifically tested," such as what
      are the comparable companies in a given industry (for company valuations), or what real
      estate is comparable to Blackacre in a real estate valuation case.

settlement amounts, that would be a real-world fact about the liabilities Grace would have faced

had it remained in the tort system.[31]

### 3.    Dr. Peterson's use of the last two years before Grace's petition as his calibration period is appropriate.

Dr. Peterson looks to the January 1999-April 2001 period to establish the level and trends

in the filing of claims against Grace from which he projects the post-petition patterns.  Grace

objects to this choice of calibration period as having "no science to support the selection."  Grace

Mem. at 38.  Since an estimation necessarily involves forecasting an unknown future by

reference, at least in part, to a foundation of known experience, it is necessary to pick some base

period to treat as the starting point.  While it is obviously a matter of judgment exactly which

years should be used as this base, Grace is ignoring the facts when it says that Dr. Peterson offers

no rationale for his choice.  The fact is, Dr. Peterson clearly explains his choice.  He chose to

take account of the clear upward trends in the period before bankruptcy for a sufficiently long

period in order for those trends to be well-established and more conservative than extrapolating

from the very rapid increase in the last year before filing.  *See* Peterson Expert Report at 70-71.

Interestingly, when Dr. Florence – in the *Armstrong* case – prepared an estimate using a

methodology very similar to Peterson's, he also selected the two years (1999 and 2000)

immediately preceding the debtor's petition as the calibration period.  *See* Thomas Florence,

Expert Report, *In re Armstrong World Indus.*, No. 00-CV-4471 (D. Del. 2006), March 29, 2006,

---

[31]  Grace's apparent argument is that claimants, in a rush to beat bankruptcy filings, were suing defendants for whom they would not, in the end, be able to establish exposure – a piece of speculation for which Grace offers no substantiation.  As such, it is highly relevant that Dr. Peterson, to be conservative, has assumed that a far higher share of claims – even for mesothelioma – would be resolved without payment than the percentage Grace actually paid in the years prior to bankruptcy.  Prior to its petition, Grace resolved without payments only 8% of mesothelioma claims; in his estimate Peterson assumed that percentage would rise to at least 22%, and, in his lowest estimate to 36%.  This is hardly the "token" rejection rate Grace claims.  Grace Mem. at 27.

at 2, 21 (excerpt attached as Exhibit 31).  And, as recently as this past summer, Dr. Florence, in

connection with asbestos liability estimates he prepared of the estimated asbestos liability for

several Federal-Mogul subsidiaries or related entities, used "calibration periods" of the most

recent two or three years prior to the Federal-Mogul bankruptcy, which were the years 1999-

2001.  *See* Thomas Florence, Asbestos Liability Coverage Analysis for Claims Against

Vellumoid, *In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del. 2007), at 4-5.

When asked why he used the most recent time period prior to the bankruptcy for his "calibration

period" Dr. Florence answered:

> It's based on a theory that the best prediction of what's going to happen
> tomorrow is what happens today as opposed to what happened three
> months from today or five years from today.  So when we pick calibration
> periods, we seldom pick beyond three years because we don't think
> they're relevant for estimating what's going to happen in the future.

Florence *Federal-Mogul* Dep. at 178.

> **4.      Grace's claim that the 1999-2001 period is not representative
> because it includes a "spike" in claims filed in anticipation of
> bankruptcies is pure speculation, and in any event provides no
> basis for excluding Dr. Peterson's testimony.**

Peterson's estimate reflects the undisputed fact that claims against Grace increased

sharply in 1999, 2000, and early 2001 before its Chapter 11 petition.  Grace received twice as

many claims in 2000 as in 1999, and in the three months before it filed April 1, 2001, it had

already received 75% as many claims as in the whole of 2000.  *See* Peterson Expert Report at

Table 29.  Grace, in an effort to explain away its escalating-claims problem, spins a theory that

this increase was really only a "spike," caused by "allegations being made by the same number

of plaintiffs with the same conditions against multiple potentially responsible parties."  Grace

Mem. at 38-42 (emphasis in original).  Grace does not point to any evidence to support this

theory,[32] and the available information suggests that it is wrong.[33]  In any event, Grace's

speculations about the reasons for the escalation of claims against it is, at best, a quarrel about

the weight to be given to the increasing inflow of claims, not a demonstration of a flaw in Dr.

Peterson's reasoning or a methodological error.

> ### 5.     Dr. Peterson properly considered the increased rate of claiming against the Manville Trust in projecting a rising propensity to sue Grace.

In his estimate, Dr. Peterson makes the judgment that the increased propensity to file

claims against the Manville Trust in the years after Grace's petition indicates that Grace would

also have seen a continuation of the trend in the late 1990's for a growing share of the total

number of people with asbestos-related conditions to sue Grace.  *See* Peterson Expert Report at

71-72.  Grace accuses Peterson of giving "no explanation" for this conclusion, asserting that

since the Manville Trust was not in the tort system, claims against it are irrelevant to forecasts of

lawsuits.  Grace Mem. at 42.  That accusation is blind to what Dr. Peterson's report actually

says:  "We base our forecasts on the Manville Trust's actual propensities to sue for three

reasons" – the Manville Trust data show actual claiming in the post-petition period, they "are

universally regarded as the most comprehensive data on asbestos claims filing and have been

---

[32]   The deposition testimony that Grace cites for this proposition weakly attributes the rise to more claims for non-malignant conditions being filed and the efforts of plaintiffs' lawyers. Whatever else may be said of these explanations they are not consistent with Grace's contention that the increase was simply due to more defendants being named.

[33]   A RAND Institute for Civil Justice study which attempted to count the total "number of unique individuals who had filed asbestos personal injury claims," taking account of filings against more than one of the defendants for whom it had data, shows an increase in all disease categories from 1999 through 2001, consistent with the overall conclusion that "the annual number of individuals filing asbestos injury claims has grown sharply over time, particularly in recent years."  S. Carroll et al., *Asbestos Litigation*, 69-72 (2005) (excerpt attached as Exhibit 32).

used repeatedly by analysts in forecasting liabilities for other defendants,"[34] and they are of high

quality.  Peterson Expert Report at 71.  Moreover, as Dr. Peterson's Figure 22 shows, there has

been a well-established pattern over the years prior to April 2001 for the propensity to sue Grace

to track very closely with changes in the propensity to sue the Manville Trust.  *See* Peterson

Expert Report at 72.

Indeed, in a November 2006 paper presented at a financial conference, Fred Dunbar,

Grace's rebuttal estimation expert, explicitly relied on Manville mesothelioma claims filing data

as a surrogate for trends in the mesothelioma filings against the asbestos industry generally,

writing

> [f]or most individual defendants, it can be difficult to discern a trend in
> future mesothelioma incidence just by observing recent annual filings. . . .
> One exception to this generalization is the Manville Trust claims data.  As
> noted above it provides a benchmark for claims experience in general.

Paul Hinton, Ron Miller, Faten Sabry, and Fred Dunbar, *Where are Mesothelioma Claims*

*Heading?* (November 2006) at 3-4 (attached as Exhibit 33).

### 6.    Extending the projection period until mid-century is both reasonable and necessary in making an estimation.

Grace calls Dr. Peterson's work "pernicious" because he includes in his total estimate the

liabilities that Grace will continue to incur for many years into the future.  Grace Mem. at 43.

Grace claims to find support for this challenge in the fact that Dr. Peterson candidly

acknowledges that existing models of future claiming behavior and claims resolution can be

demonstrated to be reliable only for a limited period.  Peterson Dep. at 46, 76-77.  But the reality

is that, as Dr. Peterson acknowledged, "the confidence in any forecast, including these forecasts,

---

[34]    In the *Armstrong* estimation, Judge Robreno observed that "the Manville Trust Claims
Database is widely accepted as a reliable source of asbestos claims data," and noted that Dr.
Peterson had looked to that trust's propensity to sue experience in estimating the debtor's
future claims numbers.  *Armstrong*, 348 B.R. at 127 n.21.

is greater for years that are more contemporaneous than those that are in the future." Peterson

Dep. at 76.  And this analysis neither makes the forecast inadmissible, nor provides an excuse to

fail to make long term projections in a situation such as this where the Plan must take into

account events far into the future.  *Cf. Owens Corning*, 322 B.R. at 721 ("[W]e are dealing with

uncertainties, and are attempting to make predictions what are themselves based upon

predictions and assumptions.").  The need to consider the more time-remote elements in Grace's

liability is clear – any plan that includes a section 524(g) trust will channel to the trust all future

asbestos personal injury claims against the reorganized Grace entity.  The experts on both sides

agree that, because of the long latency periods for asbestos-related conditions, compensable

injuries arising from pre-petition exposure to Grace asbestos will, as recognized epidemiological

studies suggest, continue to arise for many decades into the future.  Accordingly, all the experts

must extend their estimates well beyond the current decade.  If the Court is to make an

estimation on which the trust can be adequately funded, it must have evidence of the full

prospective liability.  Dr. Peterson's work is, in fact, conservative on the point, assuming that

after 2006, there will be an end to long-established secular trends of increases in both (1) after-

inflation settlement value dollars and (2) propensity to sue.

> **7.      Far from ignoring factors since 2001 that would limit Grace's
> liability, Dr. Peterson has made generous allowance for them.**

Grace contends that Dr. Peterson's estimates are unreliable because they "do not account

for even the possibility that one or more of the claims at issue may not, in fact, be worth what the

claimants' experts assume them to be worth."  Grace Mem. at 51.  Grace attempts to support this

argument by pointing not to established facts, but to its own experts' assertions – almost entirely

invalid or irrelevant – about B-reads, PFTs, minimum exposure benchmarks, and the like.  For

the most part, Grace is attempting to bootstrap its own efforts to deny the reality of re-writing the

law and juggling the medical and industrial hygiene facts through its "criteria," into an attack on

the ACC and FCR estimates on the grounds that the ACC/FCR estimates do not accept Grace's

manufactured criteria.  Grace asserts that "none" of its experts' assertions about B-reads, PFT,

occupational exposure levels, and screening operations, "has been materially rebutted by

claimants."  Grace Mem. at 49.  On the contrary, the claimants have presented detailed expert

testimony and other information showing that Grace's standards of "merit" including those listed

are bad science, bad medicine, bad industrial hygiene, and bad law.[35]

        In any event, Dr. Peterson's actual computations refute Grace's unsubstantiated claims

that he has "ignored" events since 2001 that seem likely to raise barriers to claimants, that he has

assumed that all future claims will be entitled to compensation, or even that he has assumed that

the same share of claims as were compensated in the past will be compensated in the future.  His

report details factors that likely will reduce the number of claims on which Grace would make

payments, including criticism of certain doctors and medical facilities, changes in tort law, and

increased scrutiny of medical evidence.  Peterson Expert Report at 19-20.  To take account of

these factors, he assumes a drastic decline in the number of non-malignant claims as compared to

historic levels.  Moreover, his estimate for both cancer and non-malignancy claims reflects his

expectation "that instead of making payments in over 90 percent of resolved claims . . . Grace

---

[35]    The claim that Grace's contentions in this regard are "unrefuted" is frivolous.  Grace's
        specific grounds for supposing that most of the claims against it lacked "merit" include its
        "benchmarks" for minimum exposure thresholds, refuted by Dr. Welch, Dr. Lemen, and Dr.
        Hammar; exposures from work other than as mixer or installer, refuted by Hays, Longo,
        Stallard, and Welch; the necessity of a "replicable B read," refuted by Dr. Welch and ILO
        standards; its contentions concerning PFTs, refuted by the fact that only a handful of states
        require them; and, finally, Grace's contentions concerning the effects concerning tort law
        reform, refuted by Dr. Peterson, Marshall Shapo, Steve Snyder, and the fact that total payouts
        in asbestos litigation by the U.S. insurance industry are still far higher today than they were
        in 2000 or 2001.  *See* Mark Peterson, Rebuttal Report, Sept. 25, 2007 (Declaration of Robert
        M. Horkovich Authenticating Chart) (attached as Exhibit 34).

**Exhibit 5**
**Data from Public Annual SEC Filings**
**Index of Yearly Asbestos Claims Filed [1]**
**2001-2006**



**Notes and Sources:**

Data obtained from SEC 10-K filings for each company. When available, data from the most recent 10-K filing is used. Includes only data reported at the individual claim level, not number of lawsuits. Includes only annual and not cumulative data. ("Cumulative" indicates that claim filings are from the time the company began receiving claims up to the given year.)

[1] Change in yearly asbestos claims calculated as the average of the logarithmic returns for each company. Includes companies that reported filings data in at least two consecutive years and have more than 50,000 total claims filed between 2001 and 2006.

**Exhibit 12**
**Date from Public Annual SEC Filings**
**Index of Payment Rates[1]**

**2001-2006**



**Notes and Sources:**

Data obtained from SEC 10-K filings for each company.  When available, data from the most recent 10-K filing is used.  Includes only data reported at the individual claim level, not number of lawsuits.  Includes only annual and not cumulative data.  ("Cumulative" indicates that the dismissals and/or resolutions reported are from the time the company began receiving claims up to the given year.)

[1] Change in yearly asbestos payment rates calculated as the average of the logarithmic returns for each company.  Includes only companies that reported both dismissed and resolved claims in at least two consecutive years.  Dismissed and resolved claim counts for any given year are obtained from the same 10-K filing.