# Exhibit 15

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W.R. GRACE & CO., *et al.*, | ) Case No. 01-1139 (JKF) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Related Docket Nos. 17577, 17585, 17586, 17587, 17588, 17589, 17620** |
| | ) **Reply Deadline: January 7, 2008** |
| | ) **Hearing Date: January 14, 2008 at 9:00 am in Pittsburgh, PA** |

**FUTURE CLAIMANTS' REPRESENTATIVE'S OPPOSITION TO MOTIONS OF W.R. GRACE AND OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS TO EXCLUDE EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION OF <u>GRACE'S CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY</u>**

contrary to Grace's assertion, the estimation process used by Ms. Biggs discounts for fraudulent and bogus claims through her dismissal rates, which are calculated, *inter alia*, in light of observed post-petition claims resolution data and changes in state tort laws.

Ms. Biggs' analysis also meets the *Daubert* threshold of reliability. Contrary to Grace's assertion, Ms. Biggs uses scientific actuarial analysis to estimate the number and range of values for future claims based on past claims. Indeed, Grace's own resolution of past claims is the best evidence of the value of future claims once adjustments are made for, *inter alia*, historic trends in Grace's settlement values and inflation. In preparing her estimate, Ms. Biggs also considered the pertinent available information. Contrary to Grace's assertion, she did not ignore the Personal Injury Questionnaires ("PIQs"). She used them to refine her analysis, rather than as the sole basis for her analysis, because to do the latter would have been unsound given the deficiencies in the PIQ process and data, including incompleteness. Similarly, the calibration period used by Ms. Biggs was determined in accordance with the principles of actuarial science.

Predicting the future does not allow for precise-to-the-dollar estimates far into the future, but actuarial analysis such as conducted by Ms. Biggs, can and does provide a reasonable scientific basis for estimating the *range* in which future claims will fall, and the value of that range is not limited to seven years as Grace suggests.

Finally, because Ms. Biggs uses the resolution of past claims to estimate the aggregate value of future claims, she does not run afoul of Federal Rule of Evidence 408 or the terms of Grace's prior settlements. Ms. Biggs is not using a particular past settlement to adjudicate liability for a particular future claim. Rather she is using aggregate data regarding past claims to estimate the range of future claims and the amount of money that will be necessary to resolve those claims in the tort system.

- Forces them to accept a matrix for resolving their claims based upon Grace's "liability filters," which are not the law of any state;
- Caps the Debtors' contribution to the trust at the amount estimated by the Court, so long as that amount is $1.6 billion or less; and
- Permits the equity holders to retain their equity interests and benefit from the success and profitability of reorganized Grace, without regard to whether future asbestos creditors ultimately are fairly paid.

These harms to present and future asbestos claimants flow from Grace's flawed notions that this Court should determine the amount of Grace's "liability" for both pending and future claims under the standards Grace's witnesses have concocted, and that, as long as Grace contributes that artificially-low amount to a trust, Grace is "done" with asbestos. Neither the Bankruptcy Code nor fundamental fairness supports that result here.

**B.    Section 524(g) Provides the Context for This Estimation Proceeding**

In considering whether to confirm Grace's plan, the Court must make a number of findings under Section 524(g) with respect to future demands, two of which are critical for this purpose.

First, the Court must determine that "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. § 524(g)(2)(B)(ii)(II). Despite Grace's insistence on a detailed, "merits-based" analysis, and its zealous application of evidentiary and liability filters, Grace must argue to the Court at confirmation that it cannot determine the amount, number or timing of future demands. So, by definition, future demands must be estimated — that is, the Court must consider all pertinent available data to determine its best estimate of future claims, which Grace must acknowledge cannot be determined with precision.[4]

---

[4] Estimation proceedings are, by their very nature, inexact. *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721 (Bankr. D. Del. 2005) ("we are dealing with uncertainties, and are attempting to make predications which are themselves based upon predictions and assumptions"); *In re Armstrong World Indus.*, 348 B.R. 111, 124 (Bankr. D. Del. 2006); *In re Federal-Mogul*, 330 B.R. at 155 (Bankr. D. Del. 2005) ("An estimation by definition, is an approximation and necessarily involves comparing a known or established quantum of data to the thing being

5

Second, Grace must also establish, and the Court must also find, with respect to the proposed Section 524(g) injunction intended to protect the Debtors:

> that identifying such debtor or debtors . . . in such injunction with respect to such demands . . . is *fair and equitable* with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors . . . .

11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added). The Bankruptcy Code does not define "fair and equitable" for Section 524(g) purposes with respect to future demands.[5] But common sense does: it is fair and equitable for Grace to contribute to a trust to pay asbestos claimants the amounts it would have had to pay to resolve such present and future claims outside of bankruptcy, and Grace must do so before equity interests may retain any value.

Grace is seeking extraordinary relief here. Section 524(g) is the only provision of the Bankruptcy Code which provides debtors with protection against future demands, which it effectively discharges. Grace could elect not to seek Section 524(g) relief, and proceed to confirm a traditional plan. If Grace were to confirm such a plan, however, future demands would be asserted against the reorganized Grace, post-confirmation, *in the tort system*, to be litigated, resolved and paid *under state law, as if the bankruptcy case had never been filed.* In that scenario, it would cost Grace, and future claimants would receive, whatever Grace was required to pay to resolve those claims *in the tort system, under state law, as if the bankruptcy*

---

estimated."). Thus, the Court cannot achieve "mathematical precision" in estimation proceedings. *Owens Corning*, 322 B.R. at 725; *Armstrong*, 348 B.R. at 124.

[5] Section 1129(b) uses the phrase "fair and equitable" only with respect to claims, and provides, among other things, that unsecured claimants must be paid the "allowed amount" of their claims before a junior class of interests may receive any distribution. 11 U.S.C. § 1129(b)(2)(B). But "allowed amount" has no meaning in this estimation context, where the Debtors forswear any effort to have the Court determine the "allowed amount" of any individual claim, and by definition, the amount (and number and timing) of demands cannot be determined. So, Section 1129(b) does not inform the Court about this estimation process.

6

Grace points to three cases where it suggests a form of merits-based determination was used in estimating a debtor's liability. Grace's Mem. Supp. Mot. Exclude Expert Opinions in Connection with the Estimation (Dec. 8, 2007) (hereinafter "Grace Mem.") at 13-15, (*citing In re USG Corp.*, 290 B.R. 223, 224 (Bankr. D. Del. 2003); *In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997); and *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986). Each of these cases is inapposite to the facts here. In *USG*, the only asbestos bankruptcy case of the three, the case was settled before the court reached the point of an estimation hearing, so "merits-based" methods were never applied by the court to estimate USG's liability.[8] In *Dow Corning*, the debtor sought to challenge the merits of certain breast implant claims in the context of an omnibus claims objection under Section 502(b) (where claimants have the full panoply of rights) and not, as here, part of an estimation proceeding. *See Dow Corning*, 215 B.R. at 348. And finally, in *A.H. Robins*, another non-asbestos case, though the court did permit the use of a questionnaire process, its estimation opinion reveals almost nothing about how the court arrived at the estimated liability. *A.H. Robins Co.*, 88 B.R. 742, 747 (Bankr. E.D. Va. 1998). In each of these cases, however, one thing is clear: such an approach has never been applied in any proceeding relating to asbestos personal injury claims where both present and future claims were being estimated and channeled to a trust.

Moreover, unlike the cases on which it relies, Grace is not applying state law. Rather Grace is using its experts to create more restrictive standards, not recognized under the law of any state. Again, the law is clear: a debtor is bound by the legal landscape it would have faced absent the bankruptcy. *Armstrong*, 348 B.R. at 123 (*citing Owens Corning*, 322 B.R. at 722); *Federal-Mogul*, 330 B.R. at 155 (Rodriguez, J.); *see also Eagle-Picher*, 189 B.R. at 683.

---

[8] The USG Trust was ultimately funded with approximately $4 billion of consideration by the debtors.

### D.   Grace's "Merits-Based" Approach Is Improper Under Section 524(g)

"The 'principal consideration' in an estimation proceeding, must be an accommodation to the underlying purposes of the Code." *Armstrong*, 348 B.R. at 123 (internal citations omitted). The Court should be guided in this process by Section 524(g). But Grace's methodology runs counter to both the purpose and structure of Section 524(g). First, Section 524(g) requires that present and future asbestos claims be resolved in a fair and efficient manner through a trust mechanism. *See* 11 U.S.C. § 524(g)(2)(B). Yet, Grace's methodology would impose an aggregate cap on the funding, thereby limiting the total amount that claimants could ever recover from the Section 524(g) trust, turning its proposed "merits-based" estimation into a *de facto* estimation *for distribution purposes*. *See In re Roman Catholic Archbishop of Portland*, 339 B.R. 215, 223, 224 (Bankr. D. Or. 2006) (bankruptcy courts do not have jurisdiction to estimate personal injury claims to establish a cap on the payment to a fund).

Second, Section 524(g) presumes that holders of asbestos personal injury claims are entitled to vote—yet, Grace's plan denies that vote. Section 524(g) provides that the court cannot issue a channeling injunction without the affirmative vote of at least 75% of those creditors whose claims are to be channeled and who vote. 11 U.S.C. § 524(g)(2)(B)(ii)(V). Moreover, the structure of Grace's plan demonstrates that these claimants are impaired because: (a) claimants are channeled to a trust; (b) their rights to proceed in the tort system and seek a jury trial are constrained; and (c) the trust is a limited fund which may not be sufficiently funded ultimately to pay claims in full. Even Grace cannot seriously argue that these claimants' legal, equitable and contractual rights are not altered. *See* 11 U.S.C. § 1124. Thus, under Grace's plan, asbestos claimants are impaired and have an absolute right to vote. *See* 11 U.S.C. § 1126.

Keeping in mind the policies of Section 524(g), Congress would never have allowed a court to estimate present and future asbestos personal injury claims in a way that would deprive

10

claimants of their right to vote and could result in claims not being fully paid while equity holders emerge scot-free with all of their interests intact. The net result of Grace's approach is to use the estimation process to fix a number (indeed, an absurdly low number) for asbestos claims and then effectively subordinate all claims in excess of that amount (particularly future claims) to the interests of current equity holders. This turns the Bankruptcy Code on its head.

### E.     What This Estimation Proceeding Is Not

The Court should also keep in mind what is not being, and what cannot be, accomplished here. First, all parties agree that this is not a proceeding to allow or disallow any individual asbestos personal injury claim. Second, this is not a proceeding to establish criteria for the allowance or disallowance of future demands, although Grace may wish it were. Third, this proceeding cannot determine whether asbestos personal injury claims may vote. The Debtors may try to use the results of this proceeding to argue, as they suggest in connection with their plan, that if Grace contributes the estimated amount to the Trust, these asbestos claims will be "paid in full" and thus are "unimpaired" and not entitled to vote. That argument by Grace is, of course, inconsistent with Sections 524(g), 1124 and 1126, as set out above.

Moreover, this proceeding cannot reverse the law already established in these cases mandating the inclusion of future demands as liabilities for purposes of determining solvency. While the Debtors mention in their brief that future demands are "not relevant to a solvency determination" and that such a determination "includes only claims, not future demands," (Grace Mem. at 13), they are dead wrong — the District Court has already ruled to the contrary in connection with the Sealed Air fraudulent transfer adversary proceeding. *In re W.R. Grace &*

11

account of tort reform; and she operates under the well-settled "no bankruptcy" assumption. *Armstrong*, 348 B.R. at 123; *Owens Corning*, 322 B.R. at 721-22; *Federal-Mogul*, 330 B.R. at 158, 162.

Second, as demonstrated above, this estimation does not involve a claim-by-claim adjudication on the merits. Rather, Grace's liability must be estimated based on its actual past experience in the tort system adjusted for tort-reform—precisely what Ms. Biggs has done. Thus, Grace's arguments that Ms. Biggs' methodology purportedly does not "fit" this case because it does not analyze each claimant's individual product exposures, legal proof of "causation," or medical diagnosis, are simply misplaced. Those are the elements of Grace's new, untested and created-for-litigation model. Nothing in *Daubert* requires that an expert's opinion must "fit" that of her adversary.

Third, Ms. Biggs' estimation more than meets the reliability standards as articulated in *Daubert* and extended to technical and specialty knowledge in *Kumho Tire*. Ms. Biggs used the same scientific methodology in this case that she uses in the commercial world in estimating the liability of insurers and solvent asbestos defendants. And, contrary to Grace's misleading statements, Ms. Biggs' estimation methodology (unlike Grace's) is based upon published, peer reviewed actuarial estimation models, in accordance with the Actuarial Standards of Practice. Finally, Ms. Biggs' methodology is closely related to the estimation approach used by virtually every expert, including Dr. Florence, in prior asbestos bankruptcy proceedings.

Fourth, presumably because Grace could find no grounds to criticize Ms. Biggs' application of actuarial science, Grace's and the Equity Committee's "reliability" arguments mischaracterize Ms. Biggs' work as a "behavioral model." The source of the phantom behavioral model is the Equity Committees' expert, Dr. Heckman, who opines in high-sounding

13

they identify." Grace Mem. at 19. Ms. Biggs follows precedent and properly uses Grace's settlement history, with adjustments for post-petition changes in the litigation environment. Grace rejects the precedent and proceeds "as if an individual claims-allowance proceeding were being conducted." *Id.* at 12. The two approaches could not be less alike.

Yet Grace nevertheless contends that Ms. Biggs' methodology does not "fit" this case because she did not identify the individual claimants' product exposures or legal proof of causation, and did not scrutinize each claimant's essential elements of medical causation. Nothing in Rule 702 or *Daubert* or state tort law called for Ms. Biggs to "fit" her actuarial model to Grace's approach. Ms. Biggs' actuarial model fits the issue before this Court in accordance with the precedent in this Circuit.

It is important to recognize, however, that Ms. Biggs does account for fraudulent and bogus claims against Grace, *in the aggregate*, through her dismissal rates, which run as high as 99%. In particular, her estimation builds upon a separate analyses for each of the key asbestos jurisdictions, broken down by disease type. For each jurisdiction, Ms. Biggs' takes into account, *inter alia*, (i) the state's medical criteria (ii) judicial and legislative changes to such criteria, and (iii) Grace's actual history of claims resolution in each jurisdiction. She also analyzes the relationship of these factors to claiming data from the Manville Trust and other asbestos defendants. Biggs Supp. Rpt. 48, 60-61, Sept. 25, 2001 (attached hereto as Exhibit 1); Biggs Dep. 347:11-352:15, Nov. 5, 2007 (attached hereto as Exhibit 2). Based on this information, Ms. Biggs calculated the anticipated dismissal rates by disease type for each jurisdiction. *See* Biggs Supp. Rpt. (Ex. 1) at 61; Biggs Dep. (Ex. 2) at 347:10-348:10. For example, for the state of Mississippi, Ms. Biggs' actuarial model assumes that 99% of non-malignant claims still pending at the end of 2004 would be dismissed.

16

The dismissal rates thus account for non-meritorious claims that might potentially lack sufficient evidentiary proofs on among other things, product identification, exposure, causation, and disease.  This approach is consistent with the authority in this District.  *See, e.g., Owens Corning*, 322 B.R. at 724 (non-meritorious claims are properly accounted for where the historical claiming statistics are "discounted to some extent").

Finally, Ms. Biggs reasonably relies upon Grace's settlement history for empirical confirmation of Grace's own assessments of claim merits.  For most of its pre-petition history, Grace considered that its settlement and claims resolution strategies achieved good value under the circumstances.  Robert Beber, Grace's former General Counsel, testified that he was "quite happy" with Jay Hughes' strategic handling of claims and "what he achieved for W.R. Grace." Beber Dep. 216, 221 (Feb. 21, 2007).  Ms. Biggs has reasonably relied upon Grace's settlement data as reflective of presumably rational economic decisions by Grace to settle those claims.

    **C.**    **Ms. Biggs' Methodology Is Scientific, Reliable and Admissible Under Rule 702, *Daubert* and *Kumho Tire***

The truth completely belies Grace's bald statements that Ms. Biggs' estimation is not "scientific," has not been "peer reviewed," has no "standards governing the work," and is not "generally accepted."  Her actuarial estimation bears the key hallmarks of a reliable methodology admissible in court because it is based upon published, peer-reviewed modeling concepts, was prepared in strict compliance with standards of actuarial science, is closely related to estimation methodologies that have been accepted by courts in prior estimation proceedings, and has long been relied upon in non-judicial settings by insurers, reinsurers and solvent asbestos defendants when establishing billions of dollars in asbestos reserves.  *See Paoli*, 35 F.3d at 742 n.8 (citing *Daubert, supra,* and *United States v. Downing,* 753 F.2d 1224, 1238 (3d Cir. 1985)); *Kumho Tire*

17

### 1.   Ms. Biggs' Analysis of the Relationship Between Nationwide Asbestos Filings and Filings Against Grace Is Reliable

Grace claims that Ms. Biggs provided "no basis" for asserting a "systematic relationship" between the number of claims filed against Grace and against all asbestos defendants. Grace Mem. at 44. This is false. Ms. Biggs derives her relationship by applying actuarial methods to empirical facts. Biggs Dep. (Ex. 2) at 164:8-17 ("To the extent I've looked at the stability of the historical ratio, that is a test of the validity of that assumption in the future . . . based on all of the data that is available, I performed reasonable tests to support the assumption.").

In particular, Ms. Biggs reviewed the ratios of Grace's historical claims relative to Tillinghast's industry benchmark of total historical claims by disease type and found that Grace experienced similar historical claims-filing trends as other defendants. Biggs Supp. Rpt. (Ex. 1) at 20. These Grace/benchmark ratios underlie Ms. Biggs' forecast of future claims. *Id.* at 48-52. This approach is consistent with Tillinghast's estimations in non-judicial settings. It is also consistent with the case law. In *Federal-Mogul*, for example, the court relied on the experts' "historical comparisons from other asbestos defendants" in its estimation of future claims. 330 B.R. at 157. *See also Eagle-Picher,* 189 B.R. at 690-91 (recognizing "desirability of considering trends general to the industry" and "particularly regarding the rate of filing of claims").

Grace also incorrectly states that Ms. Biggs did not use epidemiological studies to inform her estimation. Grace Mem. at 33. In fact, she used Professor Stallard's "epidemiology forecasts to project claims." Biggs Dep. (Ex. 2) at 193:7-8. Stallard's September 2007 update includes individuals exposed to asbestos through 1984. Ms. Biggs applies the shape of Stallard's updated claim run-off curves by date-of-first-exposure (DOFE) worker cohort to Grace's actual claims by DOFE period. Biggs Supp. Rpt. (Ex. 1) at 54-57. Stallard's update, and Biggs' use of the update, explain why Grace's continued production of asbestos products long after other

24

> Q: Fair enough. So if it turns out that there is a steep downward trend [in claims] from '93 to '98, there is then a change in direction from 1999 and 2000. You then get to the key question which is: If those trends are statistically significant, down and then reversal up, you have to ask yourself the question, do you not, about which trend is most probative of the future, right?
>
> A: I didn't try to answer the question, which trend is representative of the future. I tried to ask myself: Which overall rate is most representative of the future?
>
> And If I were to follow one theory that says I should be as responsive as possible to recent period experience, I would have only used the data in 2000 and 2001 with the very high level. But I didn't do that because I didn't think it was appropriate.
>
> I looked into the underlying nature of the reasons that the '97, '98 and 1999 -- '96, '97, '98, and '99 years are depressed and selected the overall calibration period as representative going forward. And, as long as I understand the reasons why one group of years is going down, I don't need to test whether they're statistically different. I just need to make an informed judgment as to what I think is the best rate on a going-forward basis.
>
> Q: Did you do any tests to determine — did you do any tests to determine which years from '93 to 2001, which years were most representative?
>
> A: That's a judgment.
>
> Q: I understand that. But did you do a test or statistical or other quantitative test to kick the tires on your judgment?
>
> A: ***I used principles of actuarial science relating to the credibility of data, stability of data, responsiveness of the time period. I used those fundamental principles to make a reasonable assumption***.

Biggs Dep. (Ex. 2) at 315:8 – 317:16 (emphasis added)

This record, and the exhaustive work that underlies Ms. Biggs' report, completely belies Grace's representation that Ms. Biggs' selection of the claims calibration period was "arbitrary and artificial" and "without any basis."[15]

---

[15] Grace's motion contains numerous other claims of alleged ad hoc guesstimates, each of which is belied by the facts. Unfortunately, space does not permit exposing these baseless Grace statements in this brief.

### 3. Ms. Biggs Calculates a Reliable Range of Grace's Estimated Liability

Grace's baseless suggestion that anything less than a precise number that is 100% predictable is not scientific or reliable simply ignores reality "since mathematical precision cannot be achieved in the predication being undertaken, it is important that we not pretend to have achieved mathematical accuracy." *Owens Corning,* 322 B.R. at 725. Likewise, an argument that "any subjective judgment must be excluded—is simply not called for by *Daubert.*" *Crowley,* 322 F. Supp. 2d at 549. No method is "so accurate as to eliminate some use of subjective judgment in the estimation of future claims." *Id.* ("That an expert injects personal judgment in the course of offering his testimony is hardly grounds for excluding that testimony."). Indeed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Comm. Notes (2000).

Thus, courts find reliable those estimates that "incorporate historical factors and account for changed circumstances in the asbestos litigation environment." *Armstrong,* 348 B.R. at 124. Ms. Biggs' actuarial principles call for the calculation of "reliable ranges" of estimates. *See* ASOP No. 36 at § 3.6.4. ("The actuary may determine a range of reasonable reserve estimates that reflects the uncertainties associated with analyzing the reserves."). This is precisely what Ms. Biggs does. Her best estimate of Grace's liabilities is $3.8 billion (discounted to present value), within a range of reasonableness with a low of $3.2 billion to a high range of $5.0 billion. *See* Biggs Supp. Rpt. (Ex. 1) at 72.

Finally, Grace's statement that the claimants-experts "admit their methods do not produce reliable results" is false. Grace Mem. at 48. Ms. Biggs testified that she "routinely provide[s] estimates of liability that include costs through 2050, and those are reliable estimates that are used to make financial decisions." Biggs Dep. (Ex. 2) at 141:9-12. Professor Stallard, whose claim run-offs Ms. Biggs relies upon, similarly testified that "over the past half dozen years, the

27

actual outcomes have in all cases fallen within the range that I provided. And it has been frequent enough that it has fallen in the upper range." Stallard Dep. 62:7-11 (attached hereto as Exhibit 5).

### III. GRACE'S PROPOSED ESTIMATION METHOD VIOLATES FUTURE CLAIMANTS' DUE PROCESS AND SEVENTH AMENDMENT RIGHTS

#### A. The Court Is Bound to Protect Future Claimants' Due Process Rights

The due process rights of absent future claimants must be protected in these proceedings. The Supreme Court has long recognized that the constitutional right to due process limits the ability of courts to rule on the merits of the claims of absent parties. *Hansberry v. Lee*, 311 U.S. 32, 43 (1940). Indeed, "[m]any of the [ ] requirements" of 524(g) are "specifically tailored to protect the due process rights of future claimants." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 n.45, 234 (3d Cir. 2004). The core purpose of § 524(g) is to protect the rights of future claimants who are not present to defend their rights. *See* 11 U.S.C. 524(g)(4)(B)(i). Congress was particularly "concerned that full consideration be accorded to the interests of future claimants, who, by definition, do not have their own voice." H.R. Rep. No. 103-835, at 40 (1994). Future claimants in this bankruptcy retain the due process right to have their claims judged on their individual merits and by a jury. Grace's methodology strips these rights.

#### B. Grace's Estimation Violates the Future Claimants' Due Process Rights

Despite the central importance of upholding future claimants' due process rights in this proceeding, Grace proposes an estimation methodology that violates these rights by unilaterally judging the merits of their claims based upon a sample of PIQ responses, a process which fails to properly adjudicate even those current claimants in the sample. Worse, Grace simply imposes those results on all future claims, no matter how distant in time and circumstance. This approach denies the fundamental due process right to a jury's determination of claims on the merits.

28

While Grace initially stated that its estimate would not be a claims-allowance process,[16] Grace now essentially asks this Court to use this estimation proceeding not for plan confirmation but, instead, for claims allowance. *See, e.g.*, Grace Mem. at 9 ("the benchmark is Grace's liability as a debtor; namely, what claims are allowable under § 502 of the Bankruptcy Code"). Before it switched estimation approaches, Grace had correctly recognized the due process rights that would be violated if this estimation were converted into an allowance process. Grace explained, "[u]nderlying BR 9014 [governing 'contested matters'] is the recognition that 'the fundamental requisites of due process must be afforded to all parties in a dispute.'"[17] Grace reminded this Court that 28 U.S.C. § 1411(a) and 11 U.S.C. § 157(b)(5) "have the practical effect of limiting the use to which estimation may be put in Chapter 11 cases, since, without the consent of an individual tort claimant, estimation for purposes of allowance of the claim in lieu of a jury trial is prohibited."[18] In a complete about-face, Grace's present motion ignores the fact that these fundamental due process concerns are trampled by its estimation approach.

Examination of the merits of individual claims for distribution or claim allowance implicates the due process rights of individual claimants, and such a process can be undertaken only by a district court. *See, e.g.*, 28 U.S.C. § 157(b)(5) (2007) ("district court shall order that personal injury and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose …."); 28 U.S.C. § 1411 ("Title 11 [does] not affect any right to trial by jury that an individual has

---

[16] "Pursuant to this Estimation Motion, the Debtors ask this Court to estimate the aggregate amount of certain classes of personal injury asbestos-related claims." Debtors' Mot. for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief, at ¶ 28, Dkt. No. 6899 (Nov. 13, 2004).

[17] W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues, at 15, Dkt. No. 2275 (June 21, 2002) (citing 10 COLLIER ON BANKRUPTCY ¶ 9014.05 at 9014-5 (15th ed. Rev. 1999).

[18] *Id.*

29

under applicable nonbankruptcy law with regard to personal injury or wrongful death tort claim"); *Federal Mogul*, 330 B.R. at 154 (individual claimants must "be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of fact a trial by jury"); *Matter of Poole Funeral Chapel, Inc.*, 63 B.R. 527, 532, 534 (Bankr. N.D. Ala. 1986) (bankruptcy court may estimate liability to determine plan feasibility, but only district court empowered to try cases for distribution purposes).

If the Grace trust is ultimately undervalued, it is the future claimants who are most likely to be left without recourse. Their due process and Seventh Amendment rights must be protected in this estimation in order to create a constitutionally valid trust. Because this protection cannot be afforded to claimants under Grace's estimation method, this Court should reject Grace's approach as unconstitutional and adopt the approach of Ms. Biggs and Dr. Peterson, in which the rights of future claimants are fully protected.

## IV. GRACE'S CHALLENGE TO THE FCR'S OTHER EXPERTS FAILS

### A. Professor Stallard's Testimony Satisfies *Daubert*

Although Grace claims to be making a *Daubert* challenge to Professor Eric Stallard upon whom Ms. Biggs relies for her claim runoffs,[19] Grace fails to identify any specific aspect of Professor Stallard's report that allegedly fails *Daubert* standards. Grace's omission is not surprising given Professor Stallard's preeminence as the author of the leading book on forecasting asbestos liability claims — "Forecasting Product Liability Claims Epidemiology and Modeling in the Manville Asbestos Case" — his role on Judge Weinstein's Rule 706 Panel in the *Manville* case.

---

[19] Professor Stallard's claim-runoffs project the number of future asbestos diseases based on the date of first exposure to asbestos products. Grace experienced later dates of first exposure than most other asbestos manufacturers and thus has a longer run-off period. The run-off period is the time between the date of first exposure and the onset of asbestos disease.

30