Exhibit 16

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.*, | ) | Case No. 01-1138 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## GRACE'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT OPINIONS IN CONNECTION WITH THE ESTIMATION OF ITS CURRENT AND FUTURE ASBESTOS PERSONAL INJURY LIABILITY

David M. Bernick, P.C.
Janet S. Baer
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI, STANG, ZIEHL &  JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

*Co-Counsel for the Debtors and Debtors in Possession*

December 7, 2007

- o Grace and other asbestos defendants "were affected by increases in the propensity to sue for meso that weren't foreseen."

  -- (Biggs Dep. at 244-45)

- No projection has been shown to be valid over more than seven years, nor should any be considered valid for a longer period of time.

  - o Peterson could not think of a scientific model that would reliably predict changes in these factors for ***more than a period of six or seven years***.

    -- (Peterson Dep. at 46-47)

  - o Peterson's forecast models were ***unable*** to predict behavioral changes in 2003 until there was data showing the change was ***actually*** occurring; to predict the change earlier would have been ***"speculative."***

    -- (Peterson Dep. at 58)

Again, the Court will have to decide whether these admissions can be squared with the judicial gatekeeping principles that were articulated by the Supreme Court years ago to keep junk science out of our courts, principles which provide that expert opinions must be the product of reliable scientific methods, rather than subjective judgment or *ipse dixit*.

In these respects the estimation case is simple. A well-defined series of big-picture issues dominate the case, and everyone, including the experts, knows what they are. It is Grace's hope and belief that the Court can address these issues early in the case to great effect, and Grace has therefore sought to present them for decision in the context of its *Daubert* motions.

Of course, the claimants' constant refrain is that the Court should simply blink away all of this – the science, the law, *Daubert* – because their method is consistent with a hallowed "tradition" of estimating liability in asbestos bankruptcies and that, as skeptically intoned in *Fiddler on the Roof*, this tradition must be kept alive without further scrutiny because it cannot withstand that scrutiny. This effort at "judge nullification" flies in the face of the systematic and

rule-driven approach that the Court has taken throughout this bankruptcy. The law should govern, not merely selected recent cases that must, like all cases, be scrutinized for their real value as precedent. It is fair to say that there is far less to these cases than meets the eye. Standing in contrast to prior non-asbestos mass-tort bankruptcies and the plain terms of the Bankruptcy Code, none of the three decisions relied upon by claimants (*Armstrong*, *Owens Corning*, and *Federal-Mogul*) either developed an appropriate record as Grace has done, or framed all the relevant issues as Grace has done, or involved liability disputed by the debtor as it is by Grace. Grace well knows that the Court will give careful consideration to these cases, as it will to the others that are brought to its attention, and the sooner that the totality of the relevant law is addressed and appropriate weight given to the statutes, rules, and cases at issue, the faster this case will be resolved.

Part I of this memorandum sets forth the legal architecture governing the estimation of Grace's asbestos personal-injury liability. This framework provides the necessary predicates for assessing the admissibility of the claimants' experts' opinions.

Part II explains how and why the claimants' experts' opinions are inadmissible. The first section shows how their opinions are precluded under the "fit" prong of Rule 702 and Rule 408 because they ***measure the wrong thing***: Grace's hypothetical cost to resolve cases in the state-court tort system rather than Grace's legal liability. The second section shows how these same opinions are barred under the reliability prong of Rule 702, as claimants' experts cannot show their measurements are performed using ***scientifically reliable*** methods.

Part III of the memorandum presents additional *Daubert* challenges to claimants' rebuttal estimation experts' opinions and various "non-estimation" expert opinions.

scientifically reliable evidence that the debtor's silicone caused their injuries. *In re Dow Corning Corp.*, 215 B.R. at 352.

As this Court is well aware, there are courts that have estimated a debtor's aggregate liability for personal-injury asbestos claims without deciding liability. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 124 (D. Del. 2006); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 134-135 (D. Del. 2005); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721-722 (D. Del. 2005), *In re Eagle-Picher*, 189 B.R. 681 (Bankr. S.D. Ohio 1995). The claimants assert that this Court should follow these cases. Claimants are wrong.

### A.    Courts that Substituted Settlement Practices for Actual Liability Did So in Violation of § 502(b) of the Bankruptcy Code.

In all of these cases, the estimations were being done for the same purpose as it is being done in this proceeding – to determine the debtor's liability for asbestos personal injury claims so as to allocate the debtor's value among its constituents. The courts in these cases referenced the estimation process contemplated by § 502(c), and in some cases, expressly asserted that they were engaging in that process (*e.g.*, estimation of contingent and unliquidated claims for purposes of allowance). *See*, *e.g.*, *Owens Corning*, 322 B.R. at 721-722; *see also Federal-Mogul*, 330 B.R. at 136. They even acknowledged that claims must be valued in accordance with state substantive law. *Armstrong,* 348 B.R. at 123; *Owens Corning*, 322 B.R. at 722; *Federal-Mogul*, 330 B.R. at 155.

However, the methodology these courts actually adopted did not decide the debtor's actual legal liability under a merits-based analysis applying state law, but rather assumed the validity of current and future claims based upon historical settlement practices, sometimes with some adjustment. *Armstrong*, 348 B.R. at 124 (both sides proposed methodology based on the debtor's historical settlements with some variations); *Owens Corning,* 322 B.R. at 722-23 (court

16

relied on historical settlements taking into consideration certain adjustments for probable changes in the tort system); *Federal-Mogul*, 330 B.R. at 157-158 (experts for competing sides both relying on historical settlement values).   This purported "estimation" methodology substituted the debtor's historical settlement decisions for estimation of legal liability on the merits.   This is simply not correct under the Bankruptcy Code.   Even where, in some cases, the courts make an "adjustment" for changes in the litigation environment that could decrease the historical settlement values, *see*, *e.g.*, *Armstrong,* 348 B.R. at 124, such an adjustment merely tweaks the results of a calculation still based on settlement history.   It does not represent an assessment of merit or liability.

> ### B.  The Cases Never Articulated a Sound Rationale for Abandoning Liability Standards.

In the same cases, the courts concluded that an estimation must be based on how the claims would fare in the state court "system" ***as if there were no bankruptcy case.***  *See*, *e.g*, *Armstrong*, 348 B.R. at 123 ("A court must therefore look at how a claim would have been valued in the state court system had the debtor never entered bankruptcy); *Owens Corning,* 322 B.R. at 722 ("claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy"); *Federal-Mogul*, 330 B.R. at 157 (determining what settlement figures would be "had they been resolved pre-petition").

These statements are contrary to the law governing the allowance and estimation of disputed claims and appear to be the result of over-reading two basic (and true) propositions: (1) state law governs the substance of claims in bankruptcy, and (2) claims are to be valued as of the petition date.   *See*, *e.g.*, *Owens Corning*, 322 B.R. at 722 ("This [the fact that claims are valued as of the petition date and governed by state substantive law] necessarily means that

claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.") (citations omitted).

The unsupportable (and unsupported) leap from these propositions to the "traditional" estimation approach is obvious. First, the fact that state **substantive** law governs the claims does not negate the applicability of federal **procedural** and **evidentiary** rules in determining claims allowance, or disallowance, or estimation any more than it does in a case removed to federal court on diversity grounds. Second, the idea that claims should be "valued as of the petition date" simply requires that the total current and future liability (measured by appropriate standards) should be present valued to the petition date. This basic "time value of money" concept makes perfect sense in the context of estimating liability for purposes of funding a § 524(g) trust because a debtor needs to provide for funding a trust today with amounts sufficient to cover claims that will be allowed at some future point in time. **Neither** proposition addresses – much less supports – the derogation of the rules of legal liability in favor of admission-by-settlement.

**C.    Liability Was Not Contested by the Debtor in the Cases Cited.**

These cases also stand in stark contrast to this estimation proceeding because the merits of the debtor's underlying liability was not at issue. In *Eagle-Picher,* for example, the court did estimate the amount of the debtor's liability for purposes of formulating a plan based largely on Eagle-Picher's settlement-payment history, but Eagle-Picher's underlying **liability** to asbestos claimants was not at issue. Indeed, the only attention the *Eagle-Picher* court gave to any issue related to liability was a passing reference to certain expert testimony dealing with the weight that ought to be given to certain claims based on issues of merit. 189 B.R. at 685.

18

VII.   **THE TWO BASIC VISIONS OF ESTIMATION AND THE CORE ISSUES TO BE DECIDED.**

The parties' competing approaches to estimation not only arrive at different estimates as to the number and aggregate value of existing claims and future demands; they set out to *measure two very different things* and make fundamentally different assumptions as to the *appropriate measure* of the value of the claims they identify.

   A.   **Claimants' Vision of Estimation Ignores the Bankruptcy Filing and Improperly Relies on Hypothetical Settlement Costs.**

The principal affirmative estimation experts for the PI Committee (Peterson) and the FCR (Biggs) both purport to estimate Grace's liability by attempting to predict what it would have *cost* Grace to resolve all existing and future asbestos claims via litigation in the tort system *had Grace never filed for bankruptcy.*

To claimants, estimates of this hypothetical cost are the sole and exclusive measure of Grace's liability.  (Peterson Rpt. at 9 (determining how Grace "would continue to receive and resolve claims within the U.S. Court system"); Biggs Supp. Rpt. at 6-7 (assuming "Grace's bankruptcy did not occur and that claims would have been handled through the tort system" and determining "the dollar amounts that Grace would be expected to pay to . . . resolve the pending and future asbestos personal injury claims against it" in the tort system))

Indeed, claimants' counsel made it clear at a recent hearing that their approach is to estimate tort system cost, not actual legal liability in a federal bankruptcy proceeding – or, put another way, they simply assume that "liability" does not mean anything other than cost, or, more precisely, price.  (*See*, *e.g.*, Oct. 25, 2007 Hr'g Tr. at 51 (Dkt. # 17280) ("[T]his proceeding is not to prove the liability [for] a claim . . . [but] to demonstrate how Grace monetized its liability in the aggregate, which is a demonstrated way for experts to predict on an actuarial basis what that liability would be . . . "); *id.* at 76 ("[E]stimation should be conducted without

consideration of the protections afforded to Grace through bankruptcy . . . . So we're going to go back now and have an exercise in looking ahead in this hypothetical world where Grace is not in bankruptcy . . . It never left the tort system, and we're going to have actuaries establish what the total tab is going to be from . . . April 2, 2001 until the very last person – victim of asbestos illness dies.")

With cost as the sole focus, past settlements are simply extrapolated through a series of grammar-school-level, arithmetic judgments to call for decades more of settlements in an assured-to-continue privatized business of claims bartering in the state courts.  The fact that Grace filed for bankruptcy is expressly assumed not to have occurred, and, thus, neither the bankruptcy nor any implications that flow from the application of bankruptcy law or procedures has any impact or effect on their estimates.

### B.    Grace's Vision of Estimation Is Based on Actual Legal Liability and Established Science.

Grace's approach to estimating its liability is fundamentally different.  It is not a measure of cost to resolve claims based on historical settlement amounts.  Relying on the evidence of record in this bankruptcy, Grace's experts deploy the *established, objective methods* of industrial hygiene and epidemiology to find the current claimants that have a reasonable prospect of proving that they developed an *asbestos-related disease caused by exposure to Grace products.* They then measure the value of those valid claims by determining the dollar amounts for which *factually similar claims* have been resolved in the past.  Finally, they carry these measures forward to account for future demands by using *established epidemiological models* to determine the incidence of future disease cause by Grace.

C.    **The Legal Issues to Be Resolved.**

The approaches to estimation proffered by the parties force the issues previewed above to

the fore.  Resolution of these issues is key to assessing the admissibility of the expert opinions.

      1.    **Can claimants use cost in place of adjudicated legal liability?**

      2.    **Can claimants use the privatized state-court "tort system" experience in place of bankruptcy law?**

      3.    **Can claimants use prior settlements to establish liability?**

      4.    **Do claimants measure liability using scientific methods?**

## PART II:  CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE

This section is organized around the two basic questions identified at the outset.

First, do the experts measure the right thing?  As outlined above, claimants' experts

measure cost, specifically the cost of settlement in the state-court tort system.  What they should

have measured – and what they instead ignore – is the available evidence relevant to the merits,

and thus the allowability, and thus Grace's likely liability for, the claims and future demands at

issue.  As a result claimants' experts' opinions:

- Are inadmissible because they do not satisfy the "fit" requirement of *Daubert* and Rule 702;

- Are inadmissible because they violate Grace's prior settlements as a matter of contract law; and

- Are inadmissible because they violate Rule 408 which prohibits the use of settlements to determine liability.

Second, do they employ a reliable, scientific methodology to estimate what they purport

to estimate (the cost to resolve claims in the tort system)?  No such method is used, and this

renders their opinions inadmissible under the "reliability" prong of Rule 702.

I.      **CLAIMANTS' AFFIRMATIVE ESTIMATION EXPERTS' OPINIONS ARE INADMISSIBLE BECAUSE THEY MEASURE THE WRONG THING.**

   A.      **What Claimants' Affirmative Estimation Experts Measure.**

   1.      **How claimants' affirmative estimation experts use Grace's prior settlements.**

What is critical is how claimants' experts make use of Grace's prior settlements.  Though they profess to be measuring only the cost of resolving cases, they are in fact using settlements, and settlement amounts, to decide for which (*i.e.*, for how many) existing and future claims Grace should be held liable.

PI Committee expert Peterson examines the number of claims made against Grace, the fraction of those claims that get paid – what he calls the "payment rate" – and the value of paid claims.  (Peterson Rpt. at ES-1)  Peterson expressly assumes that Grace's decision to settle a case, and the amount it paid, demonstrates its liability:

> Grace closed many claims without payment, ***presumably because it believed*** that the claimants had inadequate evidence of an asbestos-related disease, could not establish a Grace asbestos exposure, or that Grace had a legal defense that would keep a case from ever reaching a jury. . . .  Importantly, Grace paid more or less in settlement ***depending upon its perception of the strength of liability claims***, just as it paid more or less depending upon the strength of injury and damage claims.

(*Id*. at 10-11) (emphasis added)  The information claimants themselves have submitted to the Court via the POCs and PIQs was not used.  (*Id.* at 53 ("[W]e base our forecast on Grace's historic asbestos claims database, rather than on the . . . data generated by the PIQ and POC processes in this case."))

FCR expert Biggs estimates Grace's liability by "multiplying the known pending and projected future claims filings (both reduced for expected dismissals) by the expected average payment amounts that Grace would pay to claimants in each of the years in the projection."

The first consideration is relevance or "fit."  To satisfy the relevance prong, the expert testimony must "assist the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702. "Fit" requires that the expert's opinion be "sufficiently tied to the facts of the case [such] that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citations omitted); *see also id.* at 591-92; *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203 (M.D. Pa. 1996) ("[T]o be helpful, the proffered testimony must have a logical connection to a fact in issue – it must 'fit.'").

The proponent of expert testimony must establish the admissibility of the expert's evidence "by a preponderance of the evidence." *See Paoli II*, 35 F.3d at 744.  Finally, although born in the context of "scientific" opinions, the Supreme Court has emphasized that rigorous standards of admissibility laid down by *Daubert* apply "to all expert testimony." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

### 2. Claimants' affirmative estimation experts' opinions do not "fit."

By their own admission claimants' experts do not purport to estimate Grace's **liability** for existing claims and future demands.  Instead, they estimate the hypothetical **cost** to Grace of resolving these claims and future demands as if they were lawsuits in the tort system based on Grace's historical cost of resolving personal-injury asbestos cases in the tort system.  This effort does not measure Grace's liability on the merit of the claims and future demands at issue in federal-court bankruptcy litigation, and it therefore fails the "fit" requirement of Rule 702.

### D. Claimants' Estimation Experts' Opinions Violate the Terms of Grace's Prior Settlements.

As the Court has already found, the threshold issue regarding the use of past settlements as admissions of liability is whether such admissions were made in fact.  They were not.  The settlement agreements that Grace entered into with tort plaintiffs prior to the bankruptcy

expressly stated that Grace was **not** admitting liability by entering into the settlement. (*See* Peterson Dep. at 263 ("[V]irtually without exception they have a proviso that says there's no admission of liability by the defendant.")) As the Court has previously found, these settlements therefore cannot be read as admissions of liability. (*In re W.R. Grace & Co.*, *et al.*, Oct. 25, 2007 Hr'g Tr. at 90) ("If the settlement agreements say that no one is admitting any liability, nobody's going to tell me that the settlement process is an admission of liability. That's it. I'm not going to hear about it if that's the case.")

### E.    Claimants' Estimation Experts' Opinions Are Inadmissible Under Rule 408.

There is no question that, if this were a trial on the merits of one or more asbestos claims, no expert could proffer an opinion that Grace should be held liable for damages because Grace had previously settled a similar claim. It is no different here. There is no room for refuge in the notion that the claimants' experts avoid this problem because all they are doing is predicting the cost of resolving claims. Such an approach works only if one ignores whether the claims have merit, an issue the law plainly does not allow the claimants to sidestep.

### 1.    Federal Rule of Evidence 408.

Rule 408 prohibits evidence concerning the settlement of claims "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Fed. R. Evid. 408. In addition to barring evidence of offers and negotiations, it also bars evidence that a settlement has taken place. "While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto." Fed. R. Evid. 408 (Advisory Committee Notes). The prohibition extends beyond settlement activity in a particular case, as it also prohibits evidence that a litigant settled a related case. *Fiberglass Insulators, Inc. v. Dupuy*, 856

support her selection, though she also managed to capture the spike in claim filings. (Biggs Supp. Rpt. at 63-67; *see also* Biggs Dep., at 317)  Both Peterson and Biggs thus end up with analyses that heavily weight and emphasize data from the months preceding Grace's Chapter 11 filing, which saw sharp increases in both the number of filings against Grace and the dollar amounts paid to settle claims.  These selections, however, are arbitrary and artificial, without any analysis as to whether the time periods at issue can reliably serve as proxies for the future.

**3**        **Third, Biggs uses this percentage and applies it to her estimate of the future nationwide claims filings.**  The product is her estimate of the future number of claims to be filed against Grace.  In doing so, Biggs makes a number of increases in the historical percentages she sees based on her "judgment" that the upswing in claims prior to Grace's bankruptcy filing is more predictive than using a longer time period during which the number of claims against Grace actually decreased relative to the industry as a whole.  (Biggs Supp. Rpt. at 46-53; Biggs Dep. at 259-60, 265, 273 (admitting she had no basis for this assumption other than that certain law firms agreed not to file claims against Grace at certain times, which effect she did not quantify); *id.* at 313-17)  Biggs provides no basis other than her "judgment" for picking numbers that continue the pre-bankruptcy up-tick in claims against Grace for all her future forecast years. (Biggs Supp. Rpt. at 52-53; Biggs Dep. at 313-17)  She claims her assumptions are "reasonable" (Biggs Dep. at 160), but admits they cannot be tested (*id.*) and that she does not have the expertise to build a model that can predict claiming behavior into the future (*id.* at 118-19, 229).

### 6.    Claimants' experts' judgments and assumptions repeatedly have proven wrong.

Perhaps the simplest demonstration of the unreliability of plaintiffs' estimation methods is that, as far as we can tell, they simply do not work.

### (A)    Claimants' estimation experts failed to predict prior increases and decreases in filings.

Despite all the "experience" courts and experts supposedly have with the "traditional" method of estimation, no one has been able to successfully predict future trends in filings and settlements.

**Peterson.**  By his own admission, Peterson incorrectly predicted a drop-off in claims in 1990 (Peterson Dep. at 51-52), and failed to predict the spike in claims against Grace prior to 2001.  (*Id.* at 66)  Yet he now asks the Court to take on faith his prediction that claims will not drop off against Grace in the future.

**Biggs.**  Biggs likewise failed to predict the spike in claims in 1999 and 2000 (Biggs Dep. at 137) and now offers no basis to support her assertion that things will not change in the future, which, conveniently for the FCR, means continued increases in both the number of claims and settlement values.

### (B)    Claimants' experts' estimation models generate results inconsistent with objective trends in asbestos claims in recent years.

Claimants' models fail to explain observed trends in claims against other asbestos defendants subsequent to Grace's bankruptcy petition.  Because both claimants' experts divide the universe into pre-petition and post-petition claims (treating post-petition bankruptcy claims and future demands as if they were the same), many of the drivers of their assumptions play out in terms of the numbers of claims and values they assume for the years 2001 to the present.  We know, however, what has happened to other asbestos defendants during this period.  What that evidence shows is inconsistent with the forecasting presented by Peterson and Biggs, which essentially looks to Grace's recent pre-bankruptcy experience as the baseline, normal period for analysis.  As is turns out, that period was strikingly anomalous.  Claims against the Manville

Trust from 2003 to the present have declined precipitously, as have the number of claims paid and the amounts to resolve claims reported by companies in public filings, and the criteria for determining valid claims has tightened considerably.  (*See* Austern Dep. at 187)





### 7.    Claimants' experts do not reliably predict claiming and settlement values for an extended number of years.

Again, claimants' experts admit their methods do not produce reliable results. Though their models purport to forecast behaviors, costs, and ultimately liability for decades into the future – "until the very last person . . . dies," as their counsel put it (Oct. 25, 2007 Hr'g Tr. at 76 (Dkt #17280)), the experts themselves were more humble. Peterson (the most sanguine of the group) when asked if he had a reliable scientific model that could predict claims and claims-resolution behavior, admitted that he was unaware of any scientific model capable of predicting changes in the legal environment over more than seven years – quite a bit less than the life-time spanning estimates produced by Peterson and Biggs. (Peterson Dep. at 46-47)

### 8.    Claimants experts fail to account for information that indicates the very claiming behavior they attempt to model has produced large numbers of meritless claims.

It is bad enough that claimants' experts simply assume that the vast majority of claimants have allowable claims against Grace. It is downright absurd when they employ "behavioral"

models that fail to recognize some of the most telling behavioral evidence to be found:  that a significant portion of asbestos claims were driven by considerations other than merit.  Grace's experts offer the following conclusions, none of which has been materially rebutted by claimants:

- Dr. Daniel Henry's x-ray study of a proportional sample of 800 lung and other cancer claimants demonstrates that fewer than 8% of the claimants have radiographic evidence (a profusion score of 1/0 or greater) sufficient to attribute the claimants' malignancies to asbestos exposure.  This finding was in stark contrast to the findings of the claimants' x-ray readers, who found a 1/0 or greater in 82% of the claimants in the sample.

- Dr. David Weill's review of pulmonary function tests for 150 of the non-malignant claimants revealed that none of the tests complied with all American Thoracic Society requirements for lung function testing.

- Dr. Anderson's review of the PIQ responses and attachments shows that over 80% of the claimants did not mix or apply Grace's products, but rather were merely bystanders to Grace products or were unable or unwilling to provide any or sufficient information on the nature of their exposure to Grace products.  As established in Drs. Anderson and Lees analysis, bystander exposure to Grace products is capable only of causing extremely low, if any, exposure to asbestos.  And, as established in Drs. Moolgavkar's and Anderson's reports, exposure at these very low levels has not been demonstrated with any scientific certainty to cause asbestos-related disease.

- Dr. Parker and Dr. Haber's review of the practices of 24 doctors and at least 6 screening companies underlying non-malignant claims and finds these doctors' and screeners' diagnostic practices to be unreliable. This impacts at least 63% of the non-malignant claims at issue.

Discovery of doctors, both in this case and others, has further impugned the integrity of already questionable medical diagnoses underlying many pre-petition asbestos claims.  Grace focused much of its discovery effort on the doctors and screening companies that helped to generate the "evidence" that supports the pending claims against Grace.  While this effort has been impaired in part by objections (including unfounded privilege assertions) and the invocation of the Fifth Amendment privilege against self incrimination, some basic facts about the behaviors of asbestos claimants and their representatives have come to light:

- Lawyers and claimants are selectively omitting or concealing evidence that does not support their claims or that would raise questions about the reliability of the underlying medical diagnoses.

- Doctors who have participated in medical-legal screening processes do not follow accepted medical practices in rendering diagnoses. Doctors with litigation-based screening practices often do not perform differential diagnoses to rule out other, non-asbestos causes of disease, do not take their own occupational and exposure histories from claimants, and do not conduct physical examinations before diagnosing disease.

- Screening doctors and litigation-based B-readers frequently rely on clerical staff to translate their notes, generate their reports, and stamp their names to the reports, and just as frequently fail to review their reports themselves.

- Screening companies and law firms gave doctors instructions and/or criteria for their diagnoses and reports that the doctors duly followed.

- Claimants or their attorneys have shopped negative x-rays, searching for doctors who will provide positive findings in order to support claims.

Similarly, the contentious battles over law firm discovery have yielded further evidence that estimation methods predicated on the cost of resolving pre-bankruptcy claims are not based on "good grounds."  In particular, two overarching themes have been revealed through this discovery: First, claimants' law firms overwhelmingly conflated "work history" with "exposure history" – often admitting that they did not even determine whether individual claimants were "actually" exposed to Grace's asbestos containing products – let alone the duration, proximity and/or frequency of such exposures.  Second, deliberate and tailored interrogatories propounded by Grace have revealed that critical diagnosis evidence (including evidence tending to contradict the diagnoses advanced by claimants) continues to be secreted from Grace under the guise of the "consulting expert" privilege.  This continuing failure to produce (or the inexcusably late production of) such key medical records reflects patent violations of this Court's Consulting Expert Order and further undermines the reliability of claimants' experts' opinions.

It is common knowledge among those who have an interest in asbestos litigation that any data collected concerning claims and settlements over the past several years will be littered with bogus claims and payments that have no relation to the merits of anyone's claim. The fundamental cause of the asbestos litigation crisis in late 1990s and early 2000s was a flood of unimpaired claims. (Kazan Dep. at 38) These claims, on behalf of plaintiffs who were not "sick" by any ordinary definition of the word, were the result of screenings arranged by the asbestos plaintiffs' bar. (*Id.* at 24, 34-39) There was no increase in the incidence of disease, but an increase in the market for asbestos claims driven by lawyers' solicitations and entrepreneurial zeal. (*Id.* at 42-48, 66-67) To assume that claim-filing data and settlement rates and payments from this period can be used without even an ***inquiry*** into the underlying validity of the evidence behind these claims is beyond defense.

The point here is not to ask the Court to declare all of these criticisms valid, or to establish that they affirmatively preclude any possible assessment of liability (though they are valid and generally do preclude such findings). The point is that claimants' experts simply ignore this information and do not account for even the possibility that one or more of the claims at issue may not, in fact, be worth what the claimants' experts assume them to be worth. Of course, this is just another example of the pernicious nature of using the "what it would cost Grace to resolve claims in the tort system had it not filed for bankruptcy" approach to estimation. All consideration of the merits is conveniently avoided on the theory that such concerns are ultimately irrelevant. This fatally undermines any confidence that the Court might otherwise have that the claimants' estimation experts' approach meets the minimum standards of relevance (and reliability) mandated for expert opinions under Rule 702. There is no argument that can

justify the admission of opinion evidence that does not even attempt to account for data that undermines the assumptions and conclusions proffered by the these experts.

### 9.    Additional indicia of unreliability.

In addition to the deficiencies identified above, claimants' affirmative estimation experts' opinions also suffer from the following flaws:

- There is no way to test or replicate the assumptions used by Peterson and Biggs or the viability of their conclusions other than to wait and see if they prove to be correct.

- None of the methods used by these experts have been the subject of peer review.  (Peterson Dep. at 44-46; Biggs Dep. at 64-65, 74)

- There is no real way to measure the error rate of their models.  (*See* Biggs Dep. at 136-140)

- Finally, there are no standards governing the work these experts have done, and there is no "general acceptance" of the methodology they employ – which is distinct from the simple fact that similar work has been done before

These shortcoming underscore the fundamental problem with unreliable expert opinions in general and claimants' affirmative estimation experts' work in particular:  With no ability to check their assumptions and judgments against standards or replicate or verify their analysis, the only way to test viability of their conclusions is to wait and see if they prove to be correct.  This case deserves better.

### PART III: OTHER *DAUBERT* CHALLENGES

This Part outlines Grace's *Daubert* challenges to claimants' other experts.  These expert opinions are likely to be relevant only to the extent that claimants rely upon their opinions to challenge Grace's affirmative estimation case.  Grace therefore expects to address the issues identified here more fully in response to claimants' *Daubert* motions.  Grace also intends to file motions *in limine* that may raise some of these same issues and seek ruling regarding evidence to