# Exhibit 17

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. Grace & Co., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## GRACE'S MEMORANDUM IN OPPOSITION TO
## CLAIMANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY

David M. Bernick, P.C.
Janet S. Baer
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
PACHULSKI, STANG, ZIEHL &  JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

December 21, 2007

*Co-Counsel for the Debtors and Debtors in Possession*

A.    **Bankruptcy Law And Precedent Mandate An Assessment Of The Merits Of The Claims At Issue.**

As previously argued in Grace's Opening Brief (at 9-16), the benchmark in this estimation proceeding is Grace's liability as a debtor; namely, what claims are allowable under § 502 of the Bankruptcy Code. Indeed, "[c]laims that are unenforceable against the debtor or against property of the debtor under any agreement or by applicable law . . . are simply not allowable for purposes of a right to share in a distribution of the debtor's assets." 4 *Collier on Bankruptcy* ¶ 502.03[2][b][iii] at 502-25 (15th ed. rev. 1999). Furthermore, Grace can only be held liable under § 502(b) of the Bankruptcy Code for asbestos personal-injury claims that are enforceable against it under state substantive *law*, applying also the Federal Rules of Civil Procedure and the Federal Rules of Evidence to the allowance of any contested asbestos personal-injury claims.

These rules do not change because this is an estimation. And the robust factual record provided by the personal-injury POCs and PIQs authorized by the Court now permits a merits-based estimate of Grace's personal-injury liability that is consistent with § 502(b) of the Bankruptcy Code.

The *Dow Corning* case was discussed in Grace's Opening Brief, but should be consulted in further detail here because it is particularly instructive in understanding the application of state law and the Federal Rules of Evidence and Civil Procedure in determining a debtor's actual legal liability. There the debtor contested tort liability for thousands of breast-implant claims. Following extensive briefing concerning the proper method for estimating a disputed liability, the bankruptcy court decided that an estimation proceeding was not going to save time; instead, the court concluded that the parties should proceed directly to a full-blown claims-allowance process. *In re Dow Corning Corp.,* 211 B.R. 545, 573-574 (Bankr. E.D. Mich. 1997). The court

then explained that there were three possible paths upon which the allowance and liquidation of the mass-tort claims could proceed: "(1) settlement between the [parties]; (2) individualized adjudication of [the] tort claims; or (3) some form of collectivized adjudication." *Id.* at 576. Because of the delays associated with individualized adjudication of the tort claims in bankruptcy and the unlikelihood that the parties were going to reach a consensual settlement, the court favored the collective-litigation approach. *Id.* at 579. As the court explained, "actual liquidation via consolidation and bifurcation would prove to be the preferred option in this case if the case is not resolved consensually." *Id.* at 589.

**Most importantly**, the court made it clear that, in any causation trial that would result from the process, evidence would need to be admissible under Federal Rule of Evidence 702 and *Daubert*. *Id.* Hence, barring settlement, however the parties and the court in *Dow Corning* decided to undertake the claims-allowance process (via individual or collective adjudication), that process would be a federal-court proceeding governed by state substantive law as applied via the Federal Rules of Civil Procedure and Evidence. In fact, following issuance of Judge Spector's estimation opinion, Dow Corning incorporated the results of a Rule 706 Panel Report into a Consolidated Motion for Summary Judgment based upon causation and *Daubert*. This motion was pending at the time settlement was achieved.

The same rules necessarily govern estimation here, as estimation is simply a device by which the Court estimates or previews the aggregate result of the same full-blown litigation that the Court recommended in *Dow Corning*.

A similar merits-based approach to determining the debtor's liability within the parameters of a bankruptcy proceeding was outlined in *In re USG Corp.*, Case No. 01-2094 (JKF) (Bankr. D. Del. 2001). The *USG* court ordered the use of a claimant questionnaire for a

5

sample of the pending personal-injury claims very similar to (although somewhat more limited than) the questionnaire ordered in this case.  (*See* Oct. 17, 2005 Order Re: Personal Injury Claim Estimation, (*In re USC Corp.*))  The parties ultimately settled before conducting the estimation trial.  Until then, however, the case was proceeding on course to assess the underlying merit of the claims:  the debtors were gathering evidence bearing upon the extent of their legal liability for asbestos claims, and the court was expressly approving the necessary discovery.

As reviewed in Grace's Opening Brief (at 14), this is also the approach taken in *Robins* in connection with the estimation of Dalkon Shield claims.  *In re A.H. Robins Co.,* 880 F.2d 694, 700 (4th Cir. 1989) (affirming a district court's merits-based estimation of thousands of tort claims within the bankruptcy case).

**B.      In This *Bankruptcy* Case, the Law Does Not Allow Us to Somehow Pretend The *Bankruptcy* Case Was Never Filed.**

Fighting to the end any effort to squarely address the fundamental legal principles Grace has placed before the Court in this case, claimants predictably urge that Grace is required as a matter of law to measure its liability by calculating the costs Grace would have incurred in the state tort system if Grace had never filed for bankruptcy.  (PI Mot. at 13; FCR Mot. at 6)  As discussed in Grace's Opening Brief (*see* pages 16-18), claimants rely on *Owens Corning, Armstrong, and Federal-Mogul* to support this contention.  These cases should not be followed because they substitute settlement practices in the tort system for actual liability, in violation of § 502(b) of the Bankruptcy Code.  *In re Armstrong World Indus., Inc.,*  348 B.R. 111, 124 (D. Del. 2006) (both sides proposed methodology based on the debtor's historical settlements); *Owens-Corning v. Credit Suisse First Boston,* 322 B.R. 719, 722-23 (D. Del. 2005) (court relied on historical settlements taking into consideration certain adjustments for probable changes in

the tort system); *In re Federal-Mogul Global, Inc.,* 330 B.R. 133, 157-58 (D. Del. 2005) (experts

for competing sides both relying on historical settlement values.  Moreover:

- The ultimate merits of the debtors' liability in the claimants' cases was not contested, there was no data collected in these cases that allowed an assessment of the merit of the claims, the parties essentially agreed to the use of settlement history as a proxy for determining actual liability (differing only in how that history should be applied).  *See, e.g., In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 684-86 (Bankr. S.D. Ohio 1995); *Federal-Mogul,* 330 B.R. at 145-47; *Armstrong,* 348 B.R. at 123-124.

- The debtors, in some instances, supported or did not oppose the claimants' estimates.  *See, e.g., Federal-Mogul,* 330 B.R. at 135 n.2 (debtors did not appear at contested estimation proceeding between a PI committee and a PD committee); *Armstrong,* 348 B.R. at 123-24 (debtor adopting PI committee approach to estimation as a co-proponent to the plan); *Owens-Corning*, 322 B.R. at 721 (debtor did not argue for any particular estimate in contested estimation between PI committee and FCR on the one side, and banks and bondholders on the other).

- Relevant legal principles received only glancing consideration, or no consideration at all.  *See, e.g., Owens Corning*, 322 B.R. at 721-22; *Federal-Mogul,* 330 B.R. at 136, 155; *Armstrong,* 348 B.R. at 123 (all failing to consider the application of the Federal Rules of Civil Procedure or Evidence or *Daubert*).

- Evidence was barred for procedural reasons.  *See Owens Corning*, Case No. 00-3837 (Bankr. D. Del) (Memorandum and Order dated Nov. 22, 2004) (denying as untimely motion of Credit Suisse First Boston to obtain certain medical records and related discovery).

Focusing on the meager legal analysis in these cases, it is obvious that two legal

propositions were misused to bypass a careful construction of the legal foundations of estimation

and deployment of legal tests in conducting the estimation.  First, the unremarkable concept that

value should be determined "as of" the petition date was taken to require that the claims must be

analyzed as if the bankruptcy had never been filed, thereby obliterating the code provisions

governing contested proceedings such as estimation.  In *Owens Corning*, for example, the court

correctly observed that claims under § 502(b) of the Bankruptcy Code are to be valued on the

petition date.  *Owens Corning v. Credit Suisse First Boston,* 322 B.R. 719, 722 (D. Del. 2005).

"Value as of the petition date," however, does not mean that the court should ignore the bankruptcy. It simply means that the total liability for present and future claims should be reduced to present value as of the date of the bankruptcy petition. *See*, *e.g.*, *In re Loewen Group Int'l*, 274 B.R. 427, 434 (Bankr. D. Del. 2002) (§ 502(b) requires the amount of the claim to be determined as of the petition date and where a disputed claim has been asserted in respect to future payments due post-petition, the claim must be discounted to present value as of the petition date).

Second, the cases take the applicability of state substantive **law** to mean that the court should assume we are still in state **court**, indeed, **outside** the state courthouse in a state-based **settlement** negotiation process. Thus ignoring the bankruptcy filing **and** state substantive law violates § 502(b) of the Bankruptcy Code, which requires: (1) **federal court** application of (2) state **substantive law** (3) using the Federal **Rules of Civil Procedure** and **Evidence**. The court in *Owens Corning* thus simply got it wrong when it noted, in a cite relied on by the FCR (*see* FCR Mot. at 15), that "[a]ll cases which can survive summary disposition under state law have some potential value." *Owens Corning v. Credit Suisse First Boston,* No. 04-00905 (Bankr. No. 00-03837), 2005 U.S. Dist. LEXIS 10752, at *3 (D. Del. Apr. 13, 2005). Whether a claim can survive a state summary disposition is entirely irrelevant. The only relevant issue is whether there will be legal liability under state substantive law as applied via federal procedures and rules of evidence.

A simple hypothetical illustrates the absurdity of the claimants' position were it to be applied to this case. Imagine a situation where a claimant's sole evidence of causation is the opinion of an expert witness whose work does not meet the requirements of Rule 702. Assume further that this same expert's opinion would, nonetheless, be presented to the jury in a state-

court trial.  Obviously, there is the potential for liability in state court, but, *as a matter of law*, *no* possibility of liability in a *federal* proceeding.  Under the claimants' interpretation of the law, this claim would presumably command value in bankruptcy despite the fact that if the bankruptcy court (or the district court) were to conduct an allowance proceeding, the claim would be found to have *no value at all*.  This amounts to nothing short of an outright rejection of § 502(b) of the Bankruptcy Code, and tramples on all manner of rights held by Grace and other constituents in the process.

And the claimants' position is more absurd still.  It would assign value based not on the predicted outcome of  state-court litigation, but on the predicted outcome of settlement discussions, which are – by definition – even further removed from a merits adjudication in federal court.

### C.    It Has Been Plain for Years that Grace Does Not Seek To Disallow Claims.

Claimants reprise an argument that was rendered moot years ago:  that Grace improperly seeks to disallow claims.  There is simply no truth to this assertion.  It was at claimants' insistence that Grace long ago forewent any attempt to engage in a consolidated allowance process.  Instead, the decision was made to embark on a course of estimation – the whole point of which was to *avoid* the very issue claimants now seek to raise.

What claimants are really unhappy about is that, in an aggregate estimation of Grace's liability, claims that are not supported by appropriate evidence of legal liability are given no value for estimation purposes.  This, claimants argue, amounts to a claims-disallowance process. (PI Mot. at 13 n.3; FCR Mot. at 2, 10-11)

This is false on its face.  Grace is not asking the Court to disallow any claims or otherwise engage in a liquidation of individual personal-injury tort claims.  The purpose of the estimation is to determine Grace's aggregate liability for asbestos personal-injury claims and

allows a further finding as to the likely number of Grace-caused valid claims to come in the future.

As a matter of law **and** science, analysis of these issues **requires** the deployment of established scientific methodologies, and the application of those methods to the facts of the case. This is what Grace's experts have done.

**A.     State Substantive Law and *Daubert* Impose the Key Requirements for Proving Legal Liability.**

Though claimants spill much ink criticizing Grace's experts for not following what they say the "law" requires, they studiously avoid careful explanation of the actual legal standards that govern the validity of the claims to be estimated. This is because their true position is that claim values should not be determined by actual legal liability. The necessary explanation that they omit follows here.

**1.     The law requires proof of exposure to a specific defendant's product.**

Every state's law requires an asbestos plaintiff to prove exposure to the defendant's product. "A threshold requirement of the toxic tort actions for asbestos-related injury is the identification of the injury causing product and its manufacturer, coupled with proof of exposure, once a plaintiff establishes that the defendant's asbestos-containing product was used at the job site at the same time plaintiff was employed there." *Asbestos Injury Litigation*, 60 *Am. Jur. Trials* 73 § 42 (Feb. 2007). *In re TMI*, 67 F.3d 1103, 1118 (3d Cir. 1995) ("plaintiff must demonstrate exposure" to alleged cause); *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990) (holding exposure to be an element of claim for injuries from hazardous substance).

Thus, as an initial matter, claimants must provide evidence that they were actually exposed to asbestos attributable to Grace. *See In re TMI*, 67 F.3d at 1118 (requiring proof of

"exposure to radiation released during the TMI accident"); *Harris v. Owens-Corning Fiberglas Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996) (holding that plaintiff does not meet burden of showing cause "simply by establishing that he inhaled asbestos dust; rather, he must produce evidence tending to show that he inhaled asbestos produced by the ***defendant's*** product") (emphasis in original); *Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005) (finding summary judgment appropriate where plaintiff failed to provide evidence that he was exposed to any asbestos-containing product attributable to defendant); *see also Schmidt v. A-Best Prods. Co.*, 2004 WL 2676319, at *5 (Ohio App. Nov. 22, 2004) (same).

### 2.      The law requires proof of risk and causation.

Every jurisdiction also requires that there be actual causation.  It is axiomatic that "[p]roof of causation is a necessary element in a products liability action.  Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation."  *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003). *See also In re TMI*, 67 F.3d at 1118 (**"**In toxic tort litigation, however, causation is not a simple matter for the jury.  The plaintiff must establish by a preponderance of evidence the presence of the injury-causing substance, that he or she has been exposed to the substance, and ***that the exposure has resulted in certain injuries.***") (quoting *A Guide to Toxic Torts* (MB), § 10.01[2](a), at 10-5 (1995) (emphasis added)).

In the toxic tort context, as the *Restatement (Third) of Torts* explains, "[m]ost causation issues are resolved under the 'but-for' standard for factual cause. . . . The plaintiff must prove by a preponderance of the evidence that, but for defendant's tortious conduct with respect to the toxic substance, the plaintiff would not have suffered harm."  *Restatement (Third) of Torts: Liab. Physical Harm* § 28, cmt. *c(1)*.  In the asbestos context, "[t]he plaintiff must introduce direct

14

expert medical testimony that exposure to a defendant's asbestos-containing product was the cause of his or her asbestos-related disease.  Stated somewhat differently, it is incumbent upon plaintiff to produce expert medical testimony showing that 'but for' exposure to defendant's asbestos-containing product, he or she would not have contracted an asbestos-related disease." *Asbestos Injury Litigation*, 60 *Am. Jur. Trials* 73 § 44 (Feb. 2007).

It should go without saying, but exposure is not the same thing legally as causation. *In re TMI*, 67 F.3d at 1119 (the law "breaks up the causation and injury requirements into three elements, adding an "exposure" prong into the causation and injury inquiry"); *id.* (summary judgment may be entered on exposure, injury, *or* causation)**.** In the asbestos context, "the mere 'showing that the asbestos manufacturer's product was present somewhere at his place of work' is insufficient."  *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx. 371, 376 (6th Cir. 2001) (quoting *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989)); *see also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986) (under Maryland law, evidence of the use of three manufacturers' asbestos products in the plaintiff's workplace was insufficient to attribute liability for the plaintiff's injury); *Anchor Packing Co. v. Grimshaw*, 692 A.2d 5 (Md. Spec. App. 1997) (evidence that manufacturer's asbestos products were generally used in the plaintiff's workplace was insufficient alone to establish that the defendant's products caused the plaintiff's injury), *vacated on other grounds*, *Porter Hayden v. Bullinger*, 713 A.2d 962, 969 (1998)).  *Cf. Wendt v. Asbestos Corp.*, 983 F.2d 1071, 1992 WL 379433, at *3 (6th Cir. 1992) ("Under Ohio law, Mrs. Wendt must prove not only that Mr. Wendt's lung cancer was caused by asbestos exposure but that it was caused specifically by exposure to asbestos fibers sold by ACL."); *Lee v. Pittsurgh Corning Corp.*, 616 A.2d 1045 (Pa. Super. 1992).

We then get to the next, related (but separate) issue:  the rules governing the ***evidence*** of causation.  Saying that a plaintiff must establish causation under state substantive law, however, is a distinct issue from saying ***how*** a plaintiff must prove toxic-tort causation in a federal-court proceeding.  Put another way, state substantive law describes what a defendant can be held liable for (*e.g.*, causing injury via exposure to a product), but federal procedural rules – including *Daubert*'s requirement of legal relevance and scientific reliability – determine what evidence will suffice to establish that condition has been met (*e.g.*, did the defendant's product cause the injury).

*Daubert*, the Federal Rules of Evidence, and federal courts require in toxic-tort cases that a plaintiff prove by a preponderance of the evidence, that the substance at issue is both capable of causing the disease at issue, so-called general causation, and that the substance did in fact cause the plaintiff's disease, so-called specific causation.  *Soldo*, 244 F. Supp. 2d at 524-25 ("to meet her causation burden, plaintiff must first establish that Parlodel ***is capable of causing*** ICH (general causation).  She must then establish that, in her particular case, Parlodel ***did in fact cause*** her ICH (specific causation).").

General causation is, itself, an absolute prerequisite to showing causation.  "If plaintiff has not demonstrated sufficiently reliable evidence of ***general*** causation, her claims fail and there is no need to consider ***specific*** causation."  *See id.*; *see also Wade-Greaux v. Whitehall Labs, Inc.*, 874 F. Supp. 1441, 1485 (D.V.I. 1994), *aff'd without opinion*, 46 F.3d 1120 (3d Cir. 1994) ("To prove specific causation, plaintiff must ***first*** prove that the products at issue can cause [injury] and must ***then*** exclude other possible causes for the plaintiff's injury.").  As one court has noted, "Far from constituting some type of dubious 'shield' . . . , the requirement of general

causation as an aspect of a scientifically-reliable causation opinion is the very essence of *Daubert*." *Soldo*, 244 F. Supp. 2d at 525.

Under *Daubert*, whether a plaintiff is able to provide evidence of causation depends upon whether he or she can produce scientifically-reliable evidence that exposure to the agent can demonstrably ***increase the risk*** of disease in a population (general causation). The plaintiff must also show that his or her ***increased risk*** is such that the toxic agent is the likely cause of his or her disease (specific causation). Such proofs are impossible without ***quantification of exposure and assessment of any resulting increase in risk*** as determined by the application of the scientific discipline of epidemiology. *See* Fed. Jud. Ctr., *Reference Manual on Sci. Evid.* 401 (2d ed. 2000) (citing National Research Council, *Risk Assessment in the Federal Government: Managing the Process* (1983) ("The National Academy of Sciences defines four components of risk assessment: hazard identification, dose-response estimation, exposure assessment, and risk characterization.")); *see also In re W.R. Grace & Co.*, 355 B.R. 462, 486 (Bankr. D.Del. 2006) (same).

To pass *Daubert*'s reliability and relevance requirements, the result of any risk assessment (whether on a population basis for general causation or an individual basis for specific causation) must be a statistically significant increase in relative risk – generally at least by a factor of 2.0. This proposition is confirmed in innumerable authorities: "***The threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk of greater than 2.0***." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 333, 383-84 (2d ed. 2000) (citing cases); *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990) (requiring Bendectin plaintiffs to establish relative risk of limb reduction defects arising from epidemiological data of at least 2.0, which equates to more than a doubling of the

17

risk); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1320 (9th Cir.), *cert denied*, 516 U.S. 869 (1995) (requiring Bendectin plaintiffs to show that mothers' ingestion of the drug more than doubled the likelihood of birth defects); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996) (requiring breast-implant plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged injuries, which, in epidemiological terms, requires a relative risk of more than 2.0); *Manko v. United States*, 636 F. Supp. 1419, 1434 (W.D. Mo. 1986) (stating that a relative risk of 2.0 in an epidemiological study means that the disease more likely than not was caused by the event), *aff'd in relevant part*, 830 F.2d 831 (8th Cir. 1987); *Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1092 (D. Md. 1986) (stating that, in IUD litigation, a showing of causation by a preponderance of the evidence, in epidemiological terms, requires a relative risk of at least 2.0); *Cook v. United States*, 545 F. Supp. 306, 308 (N.D. Cal. 1982) (stating that in vaccine cases, when relative risk is greater than 2.0, there is a greater than 50% chance that the injury was caused by the vaccination).

Without evidence of a doubling of risk, there is no basis for scientifically reliable testimony that the toxic agent is capable of causing the disease at a general level, or, in the context of an individual risk assessment, caused the plaintiff's disease. *See, e.g., Ambrosini v. Upjohn Co.*, 1995 WL 637650 (D.D.C. 1995); *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981 (C.D. Cal. 1996); *Hall*, 947 F. Supp. 1387; *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217 (D. Colo. 1998).

In some cases, the doubling-of-risk requirement has been relaxed in degree, but not in kind, and even then only where there is additional scientifically reliable evidence of causation that, when considered with the epidemiology, allows for a finding of causation. *See* Mem. Op. re Summary Judgment Mots re ZAI Property Claims, *In re W.R. Grace & Co.*, No. 01-01139 at 33-

34 (Bankr. D. Del. Dec. 14, 2006) [Dkt. No. 14014] ("some courts have allowed slightly lower rates (*e.g.,* 1.75 or 1.5) when other factors such a genetics combine to raise the risk to 2.0") ("*ZAI* Opinion") *see also* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 333, 386 (2d ed. 2000); *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1030 (S.D.N.Y. 1993).  Here, however, claimants have **not** provided any scientifically valid basis upon which to lower the 2.0 relative-risk threshold.  The classic doubling-of-risk requirement therefore applies, and provides a working standard for relevant and admissible evidence of general causation in estimating the appropriate liability for existing and future asbestos personal-injury claims in this case.  *See*, *e.g.*, *ZAI* Opinion at 34 ("We have no such evidence on this record and no reason to lower the rate below 2.0.  Therefore, we accept Grace's position that Claimants must establish causation by a 2.0 relative risk rate.").

### 3.    State law regarding "substantial contributing factor" does not change the analysis.

Claimants argue that the "substantial factor" test for causation reverses the requirements of *Daubert* and abrogates the basic principles of causation under state law.  It does not. Moreover, no matter what the implications of the substantial-factor test are for what constitutes a legal cause under state law, it has no ultimate impact on **how** – with what **evidence** – a plaintiff must prove causation under the Federal Rules of Evidence.  Regardless of what "type" of causation one must prove, the proof must be scientifically reliable under *Daubert*.  In the toxic-tort context, that still means showing, via reliable epidemiological evidence, a doubling of risk as a result of exposure to a defendant's product.

As an initial matter, the "substantial factor" test does not properly expand the scope of legal causation under state law; if anything, properly applied, it limits it.

> [M]any courts have held that the "substantial factor" standard is a heightened one compared to the "but for" test.  For example, in

> *Zuchowiz v. United States*, Judge Guido Calabresi outlined "the substantial factor" test for the Second Circuit as follows: "(a) that the defendant's negligent act or omission was a but for cause of the injury, (b) that the negligence was causally linked to the harm, and (c) that the defendant's negligent act or omission was proximate to the resulting injury." . . . Clearly, in [this] jurisdiction, the "substantial factor" test requires an additional showing beyond "but for."

J. Rue, *Returning to the Roots of the Bramble Bush: The 'But For' Test Regains Primacy in Causal Analysis in the American Law Institute's Proposed Restatement (Third) of Torts*, 71 Fordham L. Rev. 2679, 2713-14 (2003); *Cf. Menne v. Celotex Corp.*, 861 F.2d 1453, 1461 (10th Cir. 1989) ("under the Nebraska concurrent cause cases, neither group causation nor reliance on a solitary substantial factor test has replaced the need for ***each*** liable defendant to be a but-for ***and*** substantial contributor to the indivisible injury.") (emphasis in original).

Some state courts have held otherwise, and, according to the American Law Institute, "employed the substantial factor test in ways, and in the pursuit of ends, utterly foreign to the original purpose of the rule." *Id.* at 2682. Indeed, "[i]t is not at all clear that the ALI intended the 'substantial factor' doctrine to offer courts the option of a reduced standard of causation. In fact, in coining the phrase 'substantial factor,' the drafters of the original Restatement seem to have been primarily concerned with protecting defendants from unlimited liability from the 'but for' results of their tortious acts." *Id.* at 2690. *See also* D. Gifford, *The Challenge to the Individual Causation Requirement in Mass Products Torts*, 62 Wash. & Lee L. Rev. 873, 874-75 (2005) ("With or without a requirement that the plaintiff prove that the injurer acted with fault in order to recover, tort law traditionally accepted the notion that a particular plaintiff must prove that a particular defendant's acts caused the plaintiff's injuries. Yet during the past quarter-century, this requirement has been challenged, particularly in mass products torts and in environmental cases. As early as 1987, legal philosopher Judith Jarvis Thomas observed, 'Fault

went first . . . [n]ow cause is going.'") (quoting Judith Jarvis Thompson, *The Decline of Cause*, 76 Geo. L. J. 137, 137 (1987)).

Regardless of which side one takes in this particular debate, however, it is undisputed, and indisputable, that in ***every*** jurisdiction there must still be a showing of causation, whether by a single cause or multiple causes, one of which was a "substantial factor" in causing the injury. In other words, a toxic tort plaintiff must still prove a "causal relation between a chemical compound and a set of symptoms or disease," and to do so via expert testimony based on reliable epidemiologic principles and studies. *In re W. R. Grace & Co.*, 355 B.R. at 482 (citing *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001)). Even under a substantial-factor regime, it remains "incumbent upon plaintiff to demonstrate by a preponderance of the evidence that exposure to each named defendant's asbestos-containing product was a substantial factor in causing or bringing about the alleged injury." *Asbestos Injury Litigation*, 60 *Am. Jur. Trials* 73 § 42 (Feb. 2007). Thus, a federal-court plaintiff must still prove causation, by providing scientifically reliable evidence of: exposure, increased risk sufficient to show that, more likely than not, the agent or agents at issue cause the injury, and that the defendant's contribution to the established increased risk was "substantial."

It is also true – and completely consonant with Grace's position – that courts assessing whether a defendant's contribution was "substantial" under state law typically employ the so-called "frequency, regularity, and proximity" test. One authority has categorized such showing as "proof of risk" including identification of defendant, defendant's asbestos-containing product, demonstrating exposure to the asbestos containing product, and establishing the duration of exposure. *Asbestos Injury Litigation*, 60 *Am. Jur. Trials* 73 § 41 (Feb. 2007). In fact, "[t]he vast majority of State and Federal courts considering asbestos cases have adopted the test as set forth

in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), the so-called

'frequency, regularity, and proximity test." *Wehmeier v. UNR Indus., Inc.*, 572 N.E.2d 320, 335-

36 (Ill. App. 1991) (citing cases).

> The *Lohrmann* court noted the test required a plaintiff to prove **more than a casual or minimum contact** with the product.  In *Lohrmann*, the court directed a verdict for four asbestos defendants after finding there was insufficient evidence of causation presented.  Plaintiffs' evidence established only that the defendants' product was at the workplace while plaintiff was employed there.  The court noted that applicable State law (Maryland) required evidence from which a jury could reasonably find that conduct of the defendant was a substantial factor in bringing about the result.

> *Id.* at 336 (citing *Lohrmann*, 782 F.2d at 1162).

> This test is entirely consistent with *Daubert*, the Federal Rules, and, ultimately, the

doubling-of-risk requirement.  As the Maryland Supreme Court explained:

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case.  The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace.  This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff.  Within that context, the factors to be evaluated include the **nature of the product**, the **frequency of its use**, the **proximity**, in distance and in time, of a plaintiff to use the product, and the **regularity** of the exposure of that plaintiff to the use of that product.  In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.

*Eagle-Picher,* 604 A.2d at 460 (emphasis added; citation omitted); *Johnson v. Owens-Corning*

*Fiberglass Corp.*, 729 N.E.2d 883, 887 (Ill. App. 2000) (to meet the burden of proving causation

in fact, "a plaintiff must show that the injured party was exposed to the defendant's asbestos

through proof that he regularly worked in an area where the defendant's asbestos was frequently

used and the injured party worked in sufficient proximity to this area so as to come into contact

with the defendant's product.  This test is often referred to as the 'frequency, regularity and

proximity' or 'substantial factor' test.").

Critically, the legal formulation of substantial factor ***does not change the scientific mandate under federal law Daubert*** that a causal association can only be shown in a toxic-tort case via a quantification of exposure and an epidemiological assessment of the resulting increase in risk.  *See e.g.*, *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d 986, 992 (D. Ariz. 2000) (applying 2.0 relative-risk threshold under federal law even though same standard would not be mandated under state law).  *Compare also*, *DeLuca*, 911 F.2d at 958-59 (requiring in case arising under New Jersey law that if Bendectin plaintiffs are to establish causation of limb-reduction defects via epidemiological data, they must show an increased relative risk of at least 2.0, which equates to more than a doubling of the risk), *with Landrigan v. Celotex Corp.*, 605 A.2d 1079, 1087 (N.J. 1992) (rejecting a 2.0 relative-risk threshold for the admission of epidemiological evidence).

Put simply, frequency, regularity, and proximity sufficient to prove cause must be established ***scientifically*** using ***scientific evidence***.  *See Jones v. John Crane, Inc.*, 143 Cal. App. 4th 990, 9998 (Cal. App. 2005) ("the critical question is whether a 'plaintiff's exposure to [a] defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate ***dose*** of asbestos the plaintiff or decedent inhaled or ingested; and hence to the ***risk*** of developing asbestos-related cancer.'").  Thus, Grace claimants must still have reliable, quantified evidence of ***exposure*** to Grace asbestos-containing products that, under established epidemiological models shows sufficient ***increased risk*** to have caused their disease.  Properly applied, the substantial factor test ***adds*** the requirement that Grace's contribution to any aggregate increase in risk they experienced was ***substantial***.  Even if one assumes, however, that the substantial factor test somehow relaxes the ***legal*** requirement for showing causation, they have not and cannot point to any precedent that holds the substantial-

factor test lowers the *scientific* requirement of showing a doubling of risk to establish any form of causation – substantial or otherwise.

The *same conclusion* – that proof of causation requires classic toxic-tort risk assessment – also is compelled by *consensus science*.  This is described immediately below.

> **B.      Established Law and Science Say that Epidemiology Is the Only Way to Go and Epidemiology Frames the Overall Task Here:  Determining Past and Future Grace-Caused Disease.**

Grace's estimation is grounded on – indeed driven by – basic epidemiology. Epidemiology focuses on disease (a required element of legal liability) and causation (another required element).  Epidemiology also uses the disease process to forecast the future (required here for Chapter 11 purposes).  Thus, epidemiology and epidemiology alone, provides the overall scientific framework for estimation of legal liability.  And legal liability reciprocally mandates epidemiology as a predicate for reliable evidence.  Fortunately, the epidemiology of asbestos-related disease is mature science.

> **1.      The Nicholson model.**

Dr. Irving Selikoff is universally recognized as one of the original scientists credited with epidemiological research firmly establishing the scientific link between asbestos exposure and disease, including cancer.  In this case, as in almost every asbestos case in the state-court system, the parties – including plaintiffs and their experts – discuss and rely upon Dr. Selikoff's scientific work, and that of his Mount Sinai colleagues.  (*See*, *e.g.*, Peterson Rpt. at 62)  Based upon their early epidemiological studies, Dr. Selikoff and his colleagues, including Dr. William Nicholson, helped OSHA and the EPA create the first dose-response models for asbestos exposure and disease.  EPA, *Airborne Asbestos Health Assessment Update* (1986); *see also* 51 F.R. 22612 (June 20, 1986) (numerous references to Dr. Nicholson at 22633-40); William J. Nicholson, *Environmental Protection Agency Health Effects Update,* OSHA Docket H033C #84-224 (June

Nicholson's conclusions, Dr. Peterson's conclusions are driven wholly by his "propensity to sue" rubric, and are therefore neither verifiable nor reproducible.   As Peterson himself admitted, "Most of the variation that occurs in asbestos claiming settlements is because of behavioral effects, not biological effects."  (Peterson Dep. at 76)  More shockingly, Dr. Peterson dismisses actual exposure data, actual medical condition, and actual causation as "personal factors" that have little to do with the liabilities he estimates.  (*Id.* at 171-72)  Dr. Peterson ultimately must concede that his focus is on "claiming behavior" rather than epidemiology.  (*Id.*)

The contrast between Grace's approach – driven by epidemiology – and Peterson's approach – driven by behavior, can be seen in the curves each analysis yields:





5.    **Step 5**:  **Projecting the number and nature of future Grace-caused disease claims.**

To estimate the amount of future mesothelioma and lung cancer cases that would arise, Dr. Florence relied on two epidemiological methods:  Nicholson, Perkel, and Selikoff (1982) and Peto, Henderson, and Pike (1981) (Nicholson, *Occupation, Exposure to Asbestos*; *Julian Peto, Brian E. Henderson, and Malcolm C. Pike*, *Trends in Mesothelioma Incidence in the United States and the Forecast Epidemic Due to Asbestos Exposure During World War II* (1981)*;* Florence Supp. Rpt. at 18).   To estimate the amount of Grace-caused other cancer and nonmalignancy claims, he used an "index series" to compare those disease trends to lung cancer and applied regression models.   (Florence Supp. Rpt. at 19)   He then calculated a median forecast based on 32 individual forecasts, incorporating two methods for calculating claims that would meet minimum criteria, two mesothelioma and lung cancer forecasting methods, four calibration periods, and two other cancer and nonmalignant forecasting methods.  (*Id.*)

6.    **Step 6**:  **Determining aggregate value.**

Finally, Florence determined the potential aggregate value of the existing and future claims by ascertaining settlement averages for those past claims that met the scientific criteria discussed above and applied them to the projected cases of Grace-caused disease.  (*See generally id.* at 15 *et seq.*)  Combining pending and future claim estimates, Florence estimated Grace liability to range from $200 million to $989 million through 2049, with a median of $468 million.  (*Id.* at 23)

## III.    CLAIMANTS HAVE NOT SHOWN (AND CANNOT SHOW) THAT GRACE'S ESTIMATION USES UNRELIABLE DATA OR UNRELIABLE METHODOLOGY.

Claimants' criticisms of particular aspects of Grace's experts' opinions can best be addressed by examining each under the foregoing legal and scientific framework.   The