THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: Docket No. 17685** |
| | ) | **1/28/07 Agenda Item No. 5** |

Hearing Date:  January 28, 2008 at 1 p.m.

## DEBTORS' OBJECTION TO THE MOTION OF THE CITY OF CHARLESTON, SOUTH CAROLINA FOR RELIEF FROM THE AUTOMATIC STAY

The Debtors object to the City's stay relief motion and request it be denied.  The City is

seeking to lift the stay in order to acquire the Debtors' Charleston, South Carolina property

through eminent domain proceedings.  Permitting the City to proceed would be of substantial

prejudice to the Debtors and their estates.  The Charleston property is an integral part of a

liability transfer transaction that the Debtors have been negotiating for over 8 months.  If the City

were permitted to proceed to obtain the Charleston property through eminent domain

---

[1]  The Debtors consist of the following 62 entities:  W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

proceedings, the liability transfer would be at risk, greatly prejudicing the Debtors far beyond the value the City is likely to pay for the property.

Pursuant to the liability transfer agreement being negotiated, the transferee will assume over $13.5 million in environmental and pollution legal liabilities for ten properties currently owned by the Debtors and also pay the Debtors over $4 million for such properties. The liability transfer transaction will include releases of, and indemnification to, the Debtors from a financially sound party and assure the environmental cleanup of all ten properties. The Charleston property that the City seeks to acquire through eminent domain proceedings is a valuable piece of property that helps drive the entire transaction. If the stay was lifted and the City was allowed to proceed with condemnation of the property, at a minimum, the liability transfer transaction would have to be renegotiated and repriced and, at worst, the potential transferee has indicated it might not proceed with the remaining transaction. As a result, the Debtors request the City's Motion be denied so that the Debtors are permitted to finalize and file for approval the liability transfer agreement which the Debtors anticipate filing in the next few weeks.

### Background

The Debtors own certain properties throughout the United States and Puerto Rico, most of which were former industrial sites, on which there exists some form of contamination that has given or may give rise to environmental remediation obligations (the "Properties"). Among the Properties, is the real property located within the limits of the city of Charleston (the "Charleston Property") where the Debtors formerly operated a mixed-fertilizer manufacturing and pesticide formulation plant. The Debtors have been investigating and remediating environmental contamination at the Charleston Property under a consent agreement between the Debtors and the South Carolina Department of Health and Environmental Control dated November 13, 1989

2

(amended June 19, 2003). The Debtors have continuing remediation obligations at the Charleston Property.

During the course of these chapter 11 cases, the Debtors determined that it would be in the best interest of the estates and their creditors if the Debtors could control and eliminate the ongoing environmental liabilities associated with the Properties by negotiating for the transfer of the environmental liabilities and Properties to a third party. In that regard, the Debtors conducted an extensive search for the appropriate party to which they could transfer the Properties and simultaneously have the responsibilities and liability associated with the remediation assumed. After months of searching and discussions with numerous potential transferees, in May 2007, the Debtors signed a letter of intent with the selected candidate (the "Transferee") to dispose of ten of the Properties, one of which is the Charleston Property which the City seeks to obtain.

The Debtors are now in the final stages of negotiation on a Liability Transfer Agreement with the Transferee (the "Agreement") whereby the Transferee will pay the Debtors approximately $4.4 million and assume ownership of the Properties and liability for the remediation necessary on such Properties. The parties expect to execute the Agreement and file a motion seeking approval of the Debtors' entry into the Agreement in the next few weeks (the "Settlement Motion").

As briefly outlined below and as will be further elaborated in the Settlement Motion, the negotiation of the Agreement has been very complex and lengthy due to: (i) the large number of properties involved, (ii) the extensive scope of the liabilities and obligations being assumed by the Transferee, (iii) the Debtors' desire to ensure that the Transferee had the financial

3

wherewithal to take on those obligations,[2] and (iv) the Debtors' desire to maximize the return on the Properties for the benefit of all of its creditors.

Specifically, as part of the Transferee's assumption of ownership, the Transferee has agreed to assume all environmental clean-up liability and pollution legal liability associated with the Properties, which includes among other things:

(i)     performing all clean-up of the Properties;

(ii)    paying for all such clean-up;

(iii)   complying with environmental laws and the requirements of various governmental authorities during such clean-up;

(iv)    assuming primary party responsibility for all of the assumed obligations associated with the Properties;

(v)     assuming the Debtors' existing pollution legal liabilities and resolving any related claims;

(vi)    assuming all liabilities related to, or arising out of, the development or operations and maintenance of, or use, activities or operations of the Properties after the closing of the transaction;

(vii)   providing the Debtors with a release for all such assumed liabilities;

(viii)  indemnifying the Debtors from any costs associated with the assumed liabilities; and

(ix)    providing the Debtors with copies of final reports related to the clean-up and any other notices during the clean-up process.

In order to provide assurances to the Debtors that the Transferee has the financial wherewithal to assume the above obligations, the Transferee has also agreed to establish a trust to fund such obligations.

---

[2]    Indeed, the Debtors filed an application to retain Deloitte Financial Advisory Services LLP ("Deloitte FAS"), which application the Court approved on November 26, 2007, so that Deloitte FAS could provide services to the Debtors relating to a due diligence investigation in connection with the Transferee and the disposition and settlement of certain environmental liabilities associated with the Properties.

4

The Charleston Property is a critical part of the Agreement. Among the ten Properties to be transferred, there are some Properties with positive value after allowing for the cost of remediation and some Properties with negative value. The Charleston Property is one of the Properties with positive net value and, in that respect, serves as an incentive for the Transferee to enter into the transaction and to assume the liability for the negative net worth properties. If the Charleston Property were removed from the Agreement at this point, the entire Agreement would have to be renegotiated, repriced and may, in fact, fail.

The Debtors have been aware of the City's desire to obtain the Charleston Property since at least the spring of 2007. At that time, the Debtors informed the City of their efforts regarding the Agreement, and offered to arrange a call with the potential Transferee. However, the City did not respond and the Debtors did not hear another word about the City's interest in the Charleston Property until they received the City's Motion. Upon receipt of the Motion, the Debtors discussed the status of the Agreement with the City and participated in a discussion with the City and the Transferee.

The Debtors and the Transferee communicated to the City the critical nature of the Charleston Property to the contemplated transaction, and indicated that it was vital for the Debtors to consummate the transaction and effect the transfer of all ten Properties and the receipt of the corresponding releases associated with that transaction. The Debtors suggested that the City and the Transferee speak directly to negotiate a purchase of the Charleston Property from the Transferee once the Debtors complete the liability transfer transaction with the Transferee. Given the currently anticipated timing of the transaction, the City will likely only have to wait a month or two, will not require relief from the automatic stay, and may negotiate directly with the Transferee for the purchase of the Charleston Property at a fair price. The City indicated it

5

would consider the Debtors' suggestion but has not agreed to withdraw or continue the Motion at this time.  Accordingly, the Debtors file this objection to the City's Motion (the "Objection") and request that the Bankruptcy Court deny the relief requested.

**Argument**

I.    **The Automatic Stay Prohibits the City from Proceeding by Eminent Domain.**

There is clear support in the case law for the proposition that the Bankruptcy Court exercises exclusive jurisdiction over the debtors' property, preempting the jurisdiction of the state courts by virtue of the Bankruptcy and Supremacy Clauses of the United States Constitution.  See In re Quality Supplier Gen. P'ship, 176 B.R. 135, 140 (Bankr. Md. 1994).  The automatic stay is one of the most fundamental protections provided to a debtor under the Bankruptcy Code.  See Midatlantic Nat. Bank v. New Jersey Dept. of Env'tal Protection, 474 U.S. 494,503 (1986).  In particular, the Third Circuit has held that the purpose of the automatic stay is to:

> prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtors' assets due to legal costs in defending proceedings against it; and, in general, *to avoid interference with the orderly liquidation or rehabilitation of the debtor.*

Bomzan v. Raymark Indus., Inc., 946 F.2d 103 1, 1036 (3rd Cir. 1991) (emphasis added); In re Rexene Prod. Co., 141 B.R. 574,576 (Bankr. D. Del. 1992).

The automatic stay is therefore applicable to enjoin the City's exercise of its power of eminent domain over the Debtors' Charleston Property.  See e.g., Matter of Chicago, Milwaukee, St. Paul and Pacific Ry. Co., 739 F.2d 1169, 1173-74 (7th Cir. 1984); In re PMI-DVW Real Estate Holdings, L.L.P., 240 B.R. 24, 30-31 (Bankr. D. Ariz. 1999) (stating that the government's eminent domain power is different than the police or regulatory power, and actions

6

to acquire property by eminent domain are not excepted from the automatic stay under § 362(b)(4)); In re PVI Assoc., 181 B.R. 210, 218 (Bankr. E.D. Pa. 1995).

## II.    The City has Failed to Meet the Standard for Relief from the Automatic Stay.

The City seeks relief from the automatic stay. In this context, two different standards have been used by Courts. Courts outside of Delaware have looked to whether the proposed eminent domain proceeding would infringe upon the purposes of the debtor's reorganization. Delaware courts, however, have not published any decisions on the standard for relief from the automatic stay in the eminent domain context. Instead, in the broad relief from stay context, Delaware courts have used a three-factor test to balance the prejudice to the debtor against the hardship to the party seeking the relief. The Debtors believe that this Court should apply the factors set forth by courts in this jurisdiction. However, under either standard, it is clear that the Debtors should prevail and the Bankruptcy Court should deny the City's Motion.

### A.    The Charleston Property is Clearly Essential to the Debtors' Reorganization Efforts and thus Relief from the Automatic Stay Should not be Granted.

Courts that have analyzed relief from the automatic stay specifically in the eminent domain context have looked to whether, in the first instance, the proposed proceeding would infringe upon the purposes of the reorganization and based upon that inquiry grant or deny relief from the stay. See Matter of Chicago, Milwaukee, St. Paul and Pacific Ry. Co., 738 F.2d at 212. See also In re Quality Supplier, 176 B.R. at 141 (stating that if a property is not necessary for debtor's effective reorganization, the state should be allowed to proceed with its condemnation).

The Charleston Property is clearly essential to the Debtors' reorganization efforts. The Debtors are close to executing the Agreement with the Transferee wherein the Debtors will dispose of ten properties that carry with them substantial current and future environmental obligations. The Transferee has agreed to pay the Debtors over $4 million and assume the

7

environmental clean-up and pollution legal liabilities for all the Properties as described in detail above, including establishing a trust to fund those obligations. By contrast, if the City was allowed to proceed with condemnation of the Charleston Property, the Debtors would not receive the benefit of *any* protection against environmental liabilities with respect to the Charleston Property. Furthermore, the Transferee has indicated to the Debtors that it considers the Charleston Property an essential part of the transaction, informing the Debtors that if the Charleston Property is not included in the package, at a minimum there will be substantial delay as the Agreement will have to be renegotiated and repriced and, potentially, the Transferee may no longer be willing to move forward with the Agreement. Thus, the Charleston Property is not, as the City attempts to portray it, a stand-alone, deserted property that the Debtors are indifferent to, but rather a valuable part of the Debtors' efforts to deal with and dispose of its significant outstanding liabilities on all ten of the Properties as part of the reorganization process.

B.    The City has also Failed to Satisfy the Delaware Courts' Standard for Relief from the Automatic Stay.

Delaware bankruptcy courts have only generally decided relief from stay motions and have not analyzed the issue in the eminent domain context. In Delaware, the courts have found that a movant must demonstrate sufficient cause to justify the lifting or modification of the automatic stay. Although the Bankruptcy Code does not define what constitutes cause, "courts generally consider the policies underlying the automatic stay [and] . . . the competing interests of the debtor and the movant." In re Continental Airlines, Inc., 152 B.R. 420,424 (D. Del. 1993). In general, the Delaware courts have considered the following three factors in balancing the competing interests of the parties:

(a)    the prejudice that would be suffered by the debtors should the stay be lifted;

(b)    the balance of the hardships facing the parties if the stay is lifted; and

8

(c)     the probable success on the merits if the stay is lifted.

Continental, 152 B.R. at 424.

> 1.     Allowing the City to Take the Property Through Eminent Domain Proceedings Would Greatly Prejudice the Debtors, their Estates and their Creditors.

As described above, the Charleston Property is an essential part of the Debtors' reorganization efforts. Pursuant to the Liability Transfer Agreement, the Transferee will assume over $13.5 million in environmental and pollution legal liability for the contaminated Debtor-owned Properties, and the Debtors will receive cash consideration of over $4 million and obtain release and indemnification for the clean up responsibility from a financially responsible party while also assuring the environmental clean up of those Properties. If the City were to acquire the Charleston Property from the Debtors through eminent domain, it would jeopardize the Agreement with the Transferee, and the Debtors would not receive the benefit of *any* protection against environmental liabilities with respect to the Charleston Property. Resolution of these outstanding liabilities is an integral part of the Debtors' attempts to resolve all of its outstanding liabilities as part of its restructuring.

> 2.     There is no Hardship to the City in Waiting to Proceed until after the Debtors have Consummated the Liability Transfer.

Denying the City's Motion and permitting the Debtors to proceed to consummate the liability transfer will not prejudice the City. As indicated above, the Debtors expect to consummate the Agreement within the next few weeks and seek its approval immediately thereafter. Once approved, the Debtors will have obtained the value of having disposed of the Properties and the liabilities associated with them and can be taken out of this picture. At that point, the City will be free to negotiate an agreement to purchase the Charleston Property directly

9

from the Transferee who has indicated it will be seeking to sell the Charleston Property, or proceed with eminent domain proceedings at that time.

Thus, the City will suffer no prejudice in having its Motion denied.

### 3.    Success on the Merits is Irrelevant.

In light of the fact that the City has not met the initial requirement of establishing sufficient cause to modify the automatic stay, the Court need not reach the issue of the probability of success on the merits. See Continental Airlines, Inc., 152 B.R. at 426 (probability of success weighed only after determining that balance of hardships weighed in favor of movant). The balance of hardships clearly weighs in favor of the Debtors. If the City were permitted to proceed against the Charleston Property, the Debtors face the real risk of losing the ability to maximize the value of the ten Properties and obtain release and indemnification for $13.5 million in liabilities. All the City faces by this Court's denial of the City's Motion, is the need to wait a short period of time before it can proceed with the Transferee to consummate a transaction to obtain the Charleston Property. The contest is not even close. The Charleston Property must be preserved for the Debtors' transaction.

10

## Conclusion

Simply put, the City has not carried its burden as to why its Motion to lift the stay should

be granted.  For the aforementioned reasons, the Debtors request that this Court deny the Motion.

Dated:  January 11, 2008

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lori Sinanyan
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

11