Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al., | Case No. 01-1139 (JKF) |
| Debtors | Jointly Administered |

### DECLARATION OF ELIZABETH L. ANDERSON

Elizabeth L. Anderson, under penalty of perjury declares as follows:

1. I am a Group Vice President and Principal Scientist of Exponent, Inc. I have a Ph.D. in organic chemistry and am a Fellow of the Academy of Toxicological Sciences. Formerly, I spent 14 years at the U.S. Environmental Protection Agency where I directed EPA's central risk assessment programs. I am past-President of the Society for Risk Analysis and am currently Editor-in-Chief of the journal, *Risk Analysis: An International Journal*, which is the leading peer-reviewed international journal on topics of risk assessment. My curriculum vita is attached.

2. I have reviewed Mr. P. J. Eric Stallard's Declaration of December 7, 2007 and conclude that his objections to my expert reports are without scientific merit, contrary to the basic scientific principles of risk analysis; and at odds with the well established use of these methods by public health agencies and other scientists engaged in the research and use of these sciences. Mr. Stallard states that the methods and procedures I used to reach conclusions about whether claimants in exposure categories B, D, and E have disease that can be attributed to Grace products are 'unscientific, unreliable, erroneous, and highly misleading.' He bases this opinion on what he labels "scientific principles," two in number, which he claims I violated. In what follows, I paraphrase each of the "scientific principles" and then demonstrate that they are either not applicable to the situation at

1

hand or have been distorted by Mr. Stallard to a degree that underscores his fundamental unfamiliarity with risk assessment methodology.

3. In my expert reports, I employ the basic scientific methodologies that have been peer reviewed and underlie the risk assessment approach used by EPA, OSHA , other government agencies, and other scientists engaged in research and the application of these sciences. As far as I know, Mr. Stallard, an actuary and not a risk assessor, has not evaluated the exposure and associated health risk posed by any toxic agent. On the other hand, my professional career beginning with my tenure at EPA starting in 1971 has centered on the development and application of risk assessment methods and processes. I have either personally conducted, directed, or reviewed thousands of risk assessments involving hundreds of toxic agents to which humans have been exposed in numerous and varied settings.

4. In his discussion of the first of his two so-called "scientific principles," Mr. Stallard commits fundamental errors that reflect his lack of understanding of how risk assessments are conducted by knowledgeable scientists and government agencies. Despite his statements to the contrary, it is appropriate to use an average exposure when assessing the risk from repeated, long-term exposures to a toxic agent. An individual's average cumulative exposure over the long-term will be determined by his or her average exposure; in this instance for screening purposes, I have allowed the individuals to be exposed for the highly unlikely duration of 45 years to the highest average exposure for all possible Grace products available at any particular time. Mr. Stallard also misleadingly compares the standard deviation of a distribution of exposures to the OSHA PEL, when the comparison should have been made with the mean or 90th percentile of the distribution.

5. Rather than relying upon a single parameter, the mean of the distribution, as I did in characterizing long term exposures to workers, Mr. Stallard believes that I should have made use of the full distribution of the measured concentration levels. He believes that this is necessary for "the accurate characterization of the distribution of risk-related

measurements in a heterogeneous population." To validate his argument that my method produces misleading or erroneous results, Mr. Stallard takes as an example a study cited by Dr. Richard Lee in his expert report of October 3, 2006. The study, of airborne asbestos levels in buildings that were collected to measure the exposure of workers engaged in routine maintenance and repair activities, was one of many that Dr. Peter Lees relied upon in arriving at his estimates of exposure to workers.

6. Mr. Stallard believes that the exposure values I used in my report were too low. However, the example he uses makes exactly the opposite point. The average exposure I used in my expert report, 0.047 f/cc is nearly five times higher than the mean of the distribution of his example, 0.01 f/ml. It is also more than twice as high as the concentrations to which 90 percent of the population will be exposed in the distribution that Mr. Stallard cites.

7. Mr. Stallard is in error when he asserts that my use of the population mean leads to misleading results. Taking the study at face value, I now demonstrate that rather than diminishing the value of my methodology it actually demonstrates its validity. Mr. Stallard and I both agree on the shape and parameters of the distribution of measured concentrations in the study. We strongly differ, however, on how to use these concentrations to estimate the workers' cumulative exposures. Mr. Stallard says that the distribution, per se, is applicable without modification to any worker. He treats the distribution as if it represents the distribution of long-term exposure levels when these data do not. This use of measured concentration data alone is an egregious error that completely ignores the fact that a worker exposed over an entire occupational lifetime, is exposed numerous times to levels that vary on a day-to-day basis. I assumed the workers were exposed every day for an entire working lifetime of 45 years, or 11,250 days assuming 250 days worked per year. It is without any scientific foundation to assume that this worker would be subject to precisely the same exposure every one of those 11,250 days. Dr. Lees computed average 8-hour TWAs from a number of exposure studies he evaluated. I used his mean in my analysis. I even assumed that the worker was exposed to the highest average level of asbestos from all the Grace products that were

3

available at a particular time. My use of these values is equivalent to assuming that, over the long term, on any given day the worker would be equally likely to experience any one of the individual results that underlie Dr. Lees' average values. Accordingly, when one assumes 11,250 iterations the only valid exposure level for this period is that of the daily values averaged over the entire 45-year time period. This is the way that EPA, OSHA, other government agencies, and scientists engaged in the sciences of exposure and risk analysis compute long-term, average exposures; namely one uses long term average concentrations for application to frequency and duration circumstances that define legitimate long term, upper limits of exposures for screening purposes.

8. A related example brings into sharp focus that the appropriate way to proceed in such a situation is by taking the lifetime average. A common problem in dealing with Superfund cleanups is estimating the risk to children who periodically play in contaminated soil and thus could be exposed to potentially harmful contaminants over durations and frequencies used in exposure assessment for screening purposes to establish upper bounds of exposure. The degree of a child's risk from the play area over these durations and with other upper bound defined parameters, depends upon the degree of his or her exposure to the measured concentration of contaminants in contacted soils, the estimation of which presents a situation very similar to the one we are facing. Suppose the geographical distribution of contamination across the site has been characterized by taking soil samples. In such cases the data are often distributed lognormally, heightening the similarity to the comparison we are undertaking. Mr. Stallard would estimate a child's exposure by assuming that the distribution of children exposed to various levels of the contaminant echoes the distribution of the soil contamination. That is, he would assume that each child returns to exactly the same spot in the contaminated plot of soil, regardless of how many times he engages in the play activity over the longer term. Of course, the common sense approach for situations involving repeated contact is to assume each child returns to different spots in the plot; over the long-term his or her exposure approaches the average of those visits. In fact, this is precisely what EPA recommends doing when estimating the exposure to children playing in contaminated soil (EPA. 1992. Supplemental to RAGS: Calculating the

Concentration Term. USEPA, Office of Solid Waste and Emergency Response. Publication 9285.7-D81). It should be noted that these methods have been used for many years and have been subjected to peer review. As a risk assessor, I have evaluated this type of situation numerous times, both in my own work and in reviewing the work of others; the person's exposure routinely is computed as the average of individual encounters over time. This approach if always used for screening purposes as I have established I my report. Mr. Stallard's suggestion that the assessment be done differently is without precedent and without scientific validation or peer review.

9. To verify that the mean exposure is indeed achieved after simulating repeated exposures, I asked a colleague to use a technique known as Monte-Carlo simulation, a method that simulates repeated random sampling from a distribution. A computer program was used to randomly sample from the lognormal distribution 11,250 times, to return individual values for each day of the 45 years exposed, and computed the average of the draws (each draw simulating a single exposure case). The exercise was repeated three times, each one employing a different random sample. As would be expected, each simulation produced an average value of 0.01, the mean of the underlying distribution. As a matter of fact, it can be shown by what is known as the Law of Large Numbers that if the sample size is large enough this will always be true regardless of the shape of the underlying distribution.

10. In his Declaration, Mr. Stallard compares the standard deviation, a statistical descriptor of the concentration data, with the OSHA PEL of 0.1 f/cc. He is mute about the much more meaningful comparison, that of the magnitude of the exposure to the OSHA PEL. The mean exposure of 0.01 f/ml and 90th percentile value of 0.02 f/ml, which as mentioned above are even lower than the exposures derived by Dr. Lees which I used in my report, are, respectively, one-tenth and one-fifth of the OSHA PEL, low values by any measure. In fact, Mr. Stallard's declaration appears to purposely avoid mentioning the low values at all, only showing it in the captions to his figures.

11. In his discussion of so-called "scientific principle 2," Mr. Stallard presents the proposition that I should have estimated the asbestos exposure levels for a subset of workers who have developed mesothelioma. He believes that I should have considered those claimants who have disease separately from those who are at risk of disease and presents in his declaration and reliance material a way of doing so. His argument fundamentally misunderstands the sciences of epidemiology, industrial hygiene, and risk assessment.

12. Mr. Stallard confuses what I explicitly stated I was doing with a misplaced notion of what he believes should have been done. The expressed purpose in my expert reports was to produce scientifically supportable estimates of the extreme upper bound amount of Grace asbestos-containing material a worker in exposure categories B, D, or E would be exposed to and after making these extremely conservative assumptions about the frequency and duration of exposure, to determine whether that exposure would be consistent with a claim that these exposures caused disease. It should be emphasized that my exposure assessment is for screening purposes and placed the estimates at the extreme upper bounds using not only the average concentration values but also the other highly unlikely frequency and duration assumptions to define upper bound exposures. The scientifically conservative way of doing this is by considering the potential maximum exposures of any individuals who may have been exposed to a Grace product, as I have done. The very essence of the entire matter is to determine whether people who claim to have of disease could have gotten that disease from exposure <u>to Grace products</u>. When conducting assessments to determine the risk posed by a toxic agent, EPA and OSHA proceed in precisely the same fashion.

13. In sum, Mr. Stallard's accusation that the methods and procedures I used in my reports are unscientific and erroneous is wide of the mark. To the contrary they are consistent with established risk assessment and statistical principles, in line with methods used by myself and other knowledgeable practitioners of risk assessment, and have been endorsed by public health agencies such as the EPA, subjected to repeated use and peer

review. Mr. Stallard, an actuary by education and practice, should be more cautious before intruding into a field outside of his area of expertise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 3, 2008.

*Elizabeth L. Anderson*

Elizabeth L. Anderson, Ph.D., ATS