# Exhibit 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : |  |
|  |  | **Chapter 11** |
| **W.R. GRACE & CO., et al.,** | : |  |
|  | : | **Case No. 01-1139 (JKF)** |
| **Debtors** |  |  |
|  | : | **Jointly Administered** |
|  | : |  |
| _____/ | : |  |

### DECLARATION OF P. J. ERIC STALLARD

I, P. J. Eric Stallard, under penalty of perjury declare as follows:

1.     I am a Research Professor in the Department of Sociology and Associate Director of the Center for Population Health and Aging at Duke University.

2.     My credentials are set forth in my December 7, 2007 Declaration.  I repeat here only those that are directly relevant to the issues that Grace raises in its opposition brief and that Dr. Anderson raised in her supporting declaration dated December January 3, 2008.

3.     In 1991 Federal Judge Jack B. Weinstein created the Rule 706 Panel to which I was appointed to advise him in the Manville Trust asbestos case.  In addition to my work on the Manville asbestos case, I have completed multiple consulting assignments with respect to the asbestos liabilities of seven other companies.

4.     My 2005 book, *Forecasting Product Liability Claims: Epidemiology and Modeling in the Manville Asbestos Case,* published by Springer-Verlag, covers the full range of epidemiological, demographic, and actuarial issues in asbestos-related disease and mortality.

5.    My research expertise includes modeling and forecasting for medical demography and health/LTC actuarial practice.  I have written more than 100 scientific articles that span a broad range of topics in medical demography and health actuarial practice.

6.    I am a Deputy Editor of the journal, *Demography*, the official peer-reviewed scientific publication of the Population Association of America, the premier journal in the field. Demography, the science of human populations, includes all aspects of the size, geographic distribution, and composition of human populations and changes in these characteristics over time.  The subfield of medical demography encompasses the application of demographic concepts, models, and techniques to the analysis of the risks of morbidity, disability, and mortality faced by individuals and populations, and of the dependence of the respective risks on fixed and varying characteristics of individuals and populations.

7.    An important aspect of the scientific study of human populations is that such populations are composed of individual members who exhibit substantial heterogeneity on virtually all risk-related and other characteristics that one could or might wish to measure. Included in such heterogeneous measures are the cumulative exposures to asbestos experienced by individual members of various selected cohorts of workers such as considered by Dr. Anderson in her expert reports dated June 11, 2007 and July 31, 2007.

8.    My expertise in modeling and forecasting for medical demography specifically includes expert knowledge of methods and procedures for the scientifically valid analysis of heterogeneous populations and for assessing the impact of heterogeneity in analyses where heterogeneity is ignored (possibly by choice or inadvertently).  The basis of this expertise is my extensive research and publication record in the field extending over the past 30 years, specifically including my role as one of the authors of the seminal paper in the field:  "The

2

impact of heterogeneity in individual frailty on the dynamics of mortality." *Demography* 16(3):439-454, 1979; by James W. Vaupel, Kenneth G. Manton, and Eric Stallard. To date, *Google Scholar* reports that this one paper has been cited 505 times. I have continued my work in this area both with my original collaborators and other collaborators, and independently. My most recent publication in this area was a 2007 paper at the North American Actuarial Journal: "Trajectories of morbidity, disability, and mortality among the U.S. elderly population: Evidence from the 1984–1999 NLTCS." *North American Actuarial Journal* 11(3):16–53, 2007, by Eric Stallard.

9.      My expertise in assessing the impact of heterogeneity of individual risk-related characteristics in analyses where such heterogeneity is ignored is specifically relevant because the issue under dispute is whether Dr. Anderson's treatment of the heterogeneity of cumulative asbestos exposures experienced by individual members of various selected cohorts of workers does or does not support the conclusions on page 9 of her expert report dated July 31, 2007. I have the necessary expertise to make such a determination. Dr. Anderson does not.

10.     In making this determination, I specifically considered, but rejected, the possibility that Dr. Anderson's treatment of heterogeneity might not have adversely impacted her analysis. My determination was and continues to be that her conclusions are not scientifically valid, are not reliable, are erroneous, and are highly misleading. The basis of this opinion was provided in the *Declaration of P. J. Eric Stallard* dated December 7, 2007.

11.     I have reviewed the *Declaration of Dr. Elizabeth L. Anderson* dated January 3, 2008, and I have reviewed the material relating to Dr. Anderson's analysis contained on pages 73–81 of *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony* dated December 21, 2007. There is nothing in that material that leads me to change

my opinion that Dr. Anderson's conclusions are unscientific, unreliable, erroneous, and highly misleading. As a consequence, I continue to hold the opinion that the methods and procedures used by Dr. Anderson were not scientifically valid for assessing the plausibility "… that disease in exposure categories B, D, or E can be attributed to exposure to any Grace asbestos-containing product …" and for assessing whether "… claimants reporting exposure solely in categories B, D, or E … had sufficient cumulative exposures from a Grace product to cause disease." (*See* page 9 of Dr. Anderson's July 31, 2007 report.)

12.    In the remainder of this *Declaration* I will respond on a point-by-point basis to Dr. Anderson's *Declaration* dated January 3, 2007.

13.    In her **Paragraph 1**, Dr. Anderson summarized her professional qualifications, noting that she holds a "Ph.D. in organic chemistry" and is "currently Editor-in-Chief of the journal, Risk Analysis: An International Journal, which is the leading peer-reviewed international journal on topics of risk assessment." I do not dispute that Dr. Anderson has had a long and distinguished career in her field, nor do I dispute that *Risk Analysis* is the leading peer-reviewed international journal on topics of risk assessment. Indeed, one of my early papers ("The economic impact of health policy interventions." *Risk Analysis* 3(4):265-275, 1983, by Kenneth G. Manton, Eric Stallard, and H. Dennis Tolley) was written to clearly present to readers of her journal a scientifically valid approach to modeling the heterogeneity of risks in a cohort.

14.    In her **Paragraph 2**, Dr. Anderson stated her conclusion that my objections "are without scientific merit, contrary to the basic scientific principles of risk analysis; and at odds with the well established use of these methods by public health agencies and other scientists

engaged in the research and use of these sciences." The remainder of her *Declaration* failed to support this conclusion.

15.　　In her **Paragraph 2**, Dr. Anderson also indicated her intention, with respect to the two scientific principles articulated in paragraph 9 of my prior *Declaration* (*Declaration of P. J. Eric Stallard* dated December 7, 2007), to "demonstrate that they are either not applicable to the situation at hand or have been distorted by Mr. Stallard to a degree that underscores his fundamental unfamiliarity with risk assessment methodology." The remainder of her *Declaration* also failed to accomplish this goal.

16.　　Dr. Anderson's comment regarding my "fundamental unfamiliarity with risk assessment methodology" appeared designed to shift the focus of the dispute from my area of expertise to hers, that is, from "demographic risk modeling" to "occupational/environmental risk assessment." In fact, there is some overlap in our respective areas of expertise but the dispute involves an aspect of her analysis that is squarely within my area of expertise and only tangentially within hers. I will discuss this point further below when I comment on her **Pargraph 7**.

17.　　In her **Paragraph 3**, Dr. Anderson stated: "In my expert reports, I employ the basic scientific methodologies that have been peer reviewed and underlie the risk assessment approach used by EPA, OSHA, other government agencies, and other scientists engaged in research and the application of these sciences." The question that she fails to address, however, is not whether she employed basic peer-reviewed scientific methodologies, but whether she employed them in a way that led to scientifically valid conclusions in this particular case. As I will show below, the answer is that she did not. EPA, OSHA, and other government agencies

did not use average exposures to disqualify claims of individuals suffering from asbestos-related diseases.

18.    In her **Paragraph 3**, Dr. Anderson continued: "As far as I know, Mr. Stallard, an actuary and not a risk assessor, has not evaluated the exposure and associated health risk posed by any toxic agent." This is true but irrelevant for the reasons indicated in paragraph 16 above. However, of direct relevance, I have conducted analyses of the population health consequences for malignant and non-malignant diseases of both asbestos exposure and tobacco consumption using demographic risk modeling techniques.

19.    In her **Paragraph 4**, Dr. Anderson stated: "In his discussion of the first of his two so-called "scientific principles," Mr. Stallard commits fundamental errors that reflect his lack of understanding of how risk assessments are conducted by knowledgeable scientists and government agencies." To the contrary, no errors were committed by me.

20.    In her **Paragraph 4**, Dr. Anderson continued: "Despite his statements to the contrary, it is appropriate to use an average exposure when assessing the risk from repeated, long-term exposures to a toxic agent." It is at this point that Dr. Anderson's rebuttal starts to fall apart. The statement itself indicates confusion between the average exposure for an individual and the average exposure for a cohort of individuals. Principle 1 of my prior *Declaration* referred to **the lack of** scientific validity in the use of the *cohort mean exposure* to characterize the exposures of *individual members* of that cohort. Dr. Anderson does not respond to this critique.

21.    In her **Paragraph 4**, Dr. Anderson stated: "An individual's average cumulative exposure over the long-term will be determined by his or her average exposure . . . ." This is precisely the point: an *individual's* average exposure depends on the *individual's* exposure over

time, which is different (substantially different, as discussed below) from the average exposure of a *cohort* of individuals. If Dr. Anderson understands this basic principle, she failed to apply it in her analysis.

22.    As noted in the preceding paragraph, in her **Paragraph 4**, Dr. Anderson purported to calculate an individual's "average cumulative exposure" without defining what she meant. As I understand the term "cumulative exposure," it refers to an exposure integral defined, for example, in equation (2–1) on page 7 of the EPA's 1992 Publication *Guidelines for Exposure Assessment* ("the EPA Guidelines"), which also notes that: "Integrated exposures are done typically for a single individual, a specific chemical, and a particular pathway of exposure route over a given time period." (Excerpts from the EPA Guidelines are attached hereto at Annex 1.) It follows trivially from calculus that an individual's cumulative exposure over a given time period is the length of the time period multiplied by the average exposure over the time period. However, no manipulation of the individual exposures yields an "average cumulative exposure." Dr. Anderson's lack of clarity on this fundamental point is telling in that it reveals that she is outside her "comfort zone."

23.    In her **Paragraph 4**, Dr. Anderson continued: "Mr. Stallard also misleadingly compares the standard deviation of a distribution of exposures to the OSHA PEL, when the comparison should have been made with the mean or 90th percentile of the distribution." The comparison is not at all misleading. The standard deviation of Dr. Lee's exposures is about half the current OSHA PEL, which means that it is very large and should alert any competent demographer that the impact of heterogeneity might be significant. Anyone with basic training in statistics would recognize that individuals whose exposures were just two standard deviations above the mean almost surely would exceed the OSHA PEL. (My calculations in this regard are

provided in my prior *Declaration* at paragraphs 12.)  Stated differently, assuming the accuracy of Dr. Lee's average exposures, the standard deviation is so large that the variability alone suggests substantial numbers of individual workers would exceed the OSHA PEL.  Dr. Anderson failed to account for such heterogeneity (i.e., the differences in individual exposures) in forming her conclusions and she continued in her new *Declaration* to fail to appreciate the significance of the heterogeneity indicated by the comparison I provided.  Indeed, Dr. Anderson did not even seek to determine the standard deviations associated with the averages she used.

24.     In her **Paragraph 5**, Dr. Anderson stated:  "To validate his argument that my method produces misleading or erroneous results, Mr. Stallard takes as an example a study cited by Dr. Richard Lee in his expert report of October 3, 2006.  The study, of airborne asbestos levels in buildings that were collected to measure the exposure of workers engaged in routine maintenance and repair activities, was one of many that Dr. Peter Lees relied upon in arriving at his estimates of exposure to workers."  Dr. Anderson critically failed to mention that my reliance on Dr. Richard Lee was necessary because both Dr. Anderson and Dr. Lees failed to report standard deviations.  I thus had to turn to the underlying reports of Dr. Richard Lee, who in his background material provided sufficient information to quantify the distribution of typical *annual* exposures.  I also calculated the variability associated with Dr. Lee's annual exposure numbers and found such substantial variability that a significant number of exposed workers in certain excluded PIQ categories (e.g., maintenance and repair workers) are likely to have exceeded Dr. Anderson's own benchmark exposure levels.  Dr. Anderson has yet to respond to this point.

25.     Dr. Richard Lee clearly indicated on page 21 of his October 3, 2006 report that the maintenance and repair workers in the cited study had "typical annual exposure levels

8

ranging from a median value of 0.002 f/cc per year to 0.02 f/cc per year at the 90th percentile."
My analysis was consistent with the definition on page 7 of "the EPA Guidelines" which
requires one to treat the "annual exposure levels" as cumulative exposures over a one-year
period; this is the interpretation to be applied to Figures 1 and 2 of my prior *Declaration.*

26.    In her **Paragraph 6**, Dr. Anderson stated:    "Mr. Stallard believes that the
exposure values I used in my report were too low.  However, the example he uses makes exactly
the opposite point."  Both statements are wrong.  I expressed no opinion regarding the average
exposure values used by Dr. Anderson in her report.  The opposite of no-opinion is still no-
opinion.  Moreover, I expressed no opinion concerning whether the exposure values cited by Dr.
Richard Lee were too low or too high.  I used these values because they were provided by one of
Grace's experts which led me to expect that they would not be challenged by Dr. Anderson.  I
did comment in paragraph 10 of my prior *Declaration* that Dr. Anderson "provided no estimates
of the variability of the distributions of asbestos exposure levels for the cohorts indicated in her
Table 1, nor did she identify the fact that such estimates were not presented."

27.    In her **Paragraph 6**, Dr. Anderson continued:  "The average exposure I used in
my expert report, 0.047 f/cc is nearly five times higher than the mean of the distribution of his
example, 0.01 f/ml."  Considering (1) that Dr. Anderson's average value was nearly five times
higher than the mean that I derived from Dr. Richard Lee's report, and (2) that my method of
accounting for heterogeneity in individual annual exposure values derived from Dr. Richard
Lee's report yielded sizeable fractions of diseased cases with exposures that exceeded Dr.
Anderson's benchmark values, it would be reasonable to expect that the fractions of diseased
cases in Dr. Anderson's job categories that exceed her benchmark values would be *substantially
higher* than the fractions that I derived from Dr. Richard Lee's report.  I did not quantify the

9

amount of the increase because Dr. Anderson did not provide quantitative estimates of the variability of her distributions of asbestos exposure levels. The method I used was described in paragraph 14 of my prior *Declaration* and was based on the same principles used in my 1979 *Demography* paper which means that the method has been peer-reviewed and is scientifically valid. I provided the complete set of computations in an Excel spreadsheet to Grace for their review along with a copy of the 1979 *Demography* paper.

28.    In her **Paragraph 7**, Dr. Anderson stated: "This use of measured concentration data alone is an egregious error that completely ignores the fact that a worker exposed over an entire occupational lifetime, is exposed numerous times to levels that vary on a day-to-day basis." As I noted above, my analysis was consistent with the definition on page 7 of "the EPA Guidelines" which requires one to treat the "annual exposure levels" as cumulative exposures over a one-year period. Nothing in this treatment precluded the component exposures from varying on a day-to-day basis.

29.    In her **Paragraph 7**, Dr. Anderson continued: "I assumed the workers were exposed every day for an entire working lifetime of 45 years, or 11,250 days assuming 250 days worked per year. It is without any scientific foundation to assume that this worker would be subject to precisely the same exposure every one of those 11,250 days." At this point in her declaration, Dr. Anderson for the first time introduced a set of assumptions that clarified her methodology, namely that the distribution of the lifetime exposures represented the distribution of the sums of sets of 11,250 independent and identically distributed daily exposures (the "independence assumption"). Indeed, Dr. Anderson conceded in her *Declaration* that her "use of these values is equivalent to assuming that, over the long term, on any given day the worker

10

would be equally likely to experience any one of the individual results that underlie Dr. Lees' average values."

30.    Grace reiterates this assumption on page 77 of *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony* dated December 21, 2007, where Grace suggests that a coin flipping experiment involving 11,250 flips of a coin is a "common sense example" of the claim that, for any selected individual, the "average exposure is truly representative of that individual's actual exposure over the long term."

31.    The coin flipping example is common in statistics. If the coin is unbiased (i.e., heads and tails are equally likely) then it does not matter to the outcome whether one coin is flipped 11,250 with the number of heads counted, or 11,250 different coins are flipped one time each with the number of heads counted. The results are statistically indistinguishable.

32.    Similarly, when Dr. Anderson states in her **Paragraph 7** that "...over the long term, on any given day the worker would be equally likely to experience any one of the individual results that underlie Dr. Lees' average values," she means that it does not matter to the outcome whether one worker's exposure is recorded over 11,250 days with the total exposure being the sum of the 11,250 daily exposures, or 11,250 different workers' exposures are recorded over one day with the total exposure being the sum of the 1-day exposures for the 11,250 different workers. In other words, Dr. Anderson assumes that there is no aspect of a worker's exposure on any given day that could be used to predict that worker's exposure on any subsequent day, in precisely the same way that the occurrence of a head on a given coin toss provides no information regarding the likelihood of the occurrence of a head on any subsequent coin toss.

33.    At the end of her **Paragraph 7**, Dr. Anderson asserted that the use of the independence assumption (and "coin flipping" example) as described above is scientifically valid because "[t]his is the way that EPA, OSHA, other government agencies, and scientists engaged in the sciences of exposure and risk analysis compute long-term, average exposures; namely one uses long term average concentrations for application to frequency and duration circumstances that define legitimate long term, upper limits of exposures for screening purposes."

34.    In fact, as I show below, the independence assumption is not scientifically valid and it is not consistent with accepted scientific practice for the purpose of rejecting *individual* claimants on the premise that they have insufficient exposures to asbestos to cause disease. Nor does EPA, OSHA, or any other government agency use average exposures to assess individual asbestos claims.

35.    Pages 71–72 of the EPA's 1992 Publication *Guidelines for Exposure Assessment* ("the EPA Guidelines") set forth accepted scientific practice under the heading "Short-Term Versus Long-Term Data for Population Exposures." (Excerpts from the EPA Guidelines are attached hereto at Annex 1.) Dr. Anderson is no doubt familiar with these Guidelines based on her extensive career at the EPA.

> "Short-term data can provide a snapshot of concentrations or exposures during that time, and an inference must be made about what that means for the longer term if the exposure assessment covers a long period. The assessor must determine how well the short-term data represent the longer period." (p. 71)

> "Even when short-term population data are statistically representative (i.e., they describe the shape of the distribution, the mean, and other statistics), *use of these short-term data to infer long-term exposures and risks must be done with caution.*" (p. 71) (emphasis added).

The requirement that the assessor must determine how well the short-term data represent the longer period is *not satisfied* by the simple assumption that the distribution of the lifetime

12

exposures represent the distribution of the sums of sets of 11,250 independent and identically distributed daily exposures. The requirement is that "[i]f short-term data are used for long-term exposure or dose estimates, the implications of this on the estimated exposures must be discussed in the assessment." (EPA Guidelines, Annex 1, page 72.)

Dr. Anderson's expert reports (June 11 and July 31, 2007) did not provide such discussion. Indeed, the first written statements regarding her independence assumption were not produced until December 21, 2007 in *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony*. Thus, Dr. Anderson's failure to provide the crucial assumptions of her model argues against her claim that she followed accepted scientific practice. Moreover, the EPA Guidelines specifically identify the *distribution* of the short-term data, citing "the mean, *and other statistics*," as relevant information, yet in her most recent *Declaration* Dr. Anderson still has not provided any quantitative estimates of the variability of her exposure distributions.

36.    As noted in paragraph 35, the independence assumption is crucial to Dr. Anderson's analysis. If this assumption is wrong then her analysis is wrong.

37.    My opinion that the independence assumption is wrong in the present case is based on the following three considerations:

      A. People are not like coins.  They are not interchangeable; people are heterogeneous.  As noted in paragraph 32 above, Dr. Anderson's independence assumption requires that there is no aspect of a worker's exposure on any given day that could be used to predict that worker's exposure on any subsequent day. This condition would be true if *every* worker changed his job and his place of residence *every day*. However, this flies in the face of the nature of a job as a long-term relationship between a worker and his employer. Workers do not change jobs every day, or even every year. Moreover, the exposures under consideration are occupational exposures so that a good predictor of a given worker's exposure on any subsequent day could be based on the mean of the distribution of his exposures on all previous days worked at his current job. The

existence of such a predictor contradicts the requirements of the independence assumption that no such predictor exists.

B.   The independence assumption is not reliable for the purposes of showing that the lifetime exposures converge to the long-term average. In her **Paragraph 9**, Dr. Anderson describes a Monte Carlo simulation with 11,250 sample draws based on a lognormal distribution with a mean of 0.01 f/ml but no indicated measure of variability. However, based on her comment in **Paragraph 7**, "Mr. Stallard and I both agree on the shape and parameters of the distribution of measured concentrations in the study," I can reasonably infer that she has set the coefficient of variation of that lognormal to the value 4.9228, as reported in paragraph 12 of my prior *Declaration*, but for the distribution of *annual* exposures, not of *daily* exposures. Under the independence assumption for the daily exposures, the coefficient of variation for the lifetime exposures is $4.9228/\sqrt{11,250}$, which is equal to 0.0464, or about 4.6%. This is small enough for Dr. Anderson to claim approximate convergence to the mean. However, the independence assumption for the daily exposures also implies a similar independence assumption for the annual exposures, under which the coefficient of variation for the lifetime exposures is $4.9228/\sqrt{45}$, which is equal to 0.7338, or about 74%. This value is not small enough for Dr. Anderson to claim approximate convergence to the mean. Indeed, using the Excel spreadsheet that I previously provided to Grace for their review, one can readily calculate that the 0.7338 coefficient of variation combines with Dr. Anderson's mean daily exposure value of 0.0473 f/cc to yield a lifetime distribution for which 46.5% of the diseased population would exceed her benchmark of 2.8 f/ml-yr. Thus, the first form of the independence assumption implies that the lifetime variability is effectively zero while the second form of the independence assumption, which derives from the first form, implies that the lifetime variability is non-zero and large enough to reverse Dr. Andersons conclusions regarding the likelihood that the worker's lifetime exposures would not exceed her benchmark. The fact that two implementations of the same independence assumption lead to contradictory conclusions proves that the independence assumption must be wrong. Given that it is wrong, it cannot and does not lead to reliable conclusions.

C.   The independence assumption is directly contradicted by a recent published peer-reviewed study of lifetime exposures among currently working maintenance and custodial workers: *See* Table 3 in "Asbestos exposure and radiological abnormalities among maintenance and custodian workers in buildings with friable asbestos-containing materials." *Int Arch Occup Environ Health* 77:307–312, 2004, by Mireille Matrat, *et al*. (The article is attached hereto at Annex 2.) After an average of 15.7 years employment, the mean cumulative exposure was 4 f/ml-yr, the coefficient of variation of cumulative exposure was 2.45, and the range of cumulative exposures was 0.0004 f/ml-yr to 72.9 f/ml-yr, with the upper value being more than 18 times the mean. These data provide clear evidence that there is no convergence of individual cumulative exposures to the overall mean for the occupation group. Different individuals have different exposures and these

14

differences persist over time, whether measured in days or years. It is the persistence of these differences that invalidates the independence assumption and reinforces the heterogeneous nature of workers both across and within Anderson's PIQ categories.

38.    In her **Paragraph 8**, Dr. Anderson, in reference to her "Superfund Site" example, stated: "Mr. Stallard would estimate a child's exposure by assuming that the distribution of children exposed to various levels of the contaminant echoes the distribution of the soil contamination. That is, he would assume that each child returns to exactly the same spot in the contaminated plot of soil, regardless of how many times he engages in the play activity over the longer term. Of course, the common sense approach for situations involving repeated contact is to assume each child returns to different spots in the plot; over the long-term his or her exposure approaches the average of those visits." Her hypothetical is irrelevant to the issues in this case. First, workers within an Anderson job category are not analogous to children who play randomly at a Superfund site. Rather, workers within an Anderson job category would be more like a group of children, each of whom has been assigned to play on a different three square foot area of the site and each of whom returns to that same three square feet every day. Alternatively, one might consider a group of children attending a classroom that sits directly on a Superfund site, with each child assigned to sit at his or her own desk which occupies a three square foot area to which the child returns each day. Over the course of a year, those children, like asbestos workers, would have very different exposure levels. Similarly, over the course of a lifetime, the relative differences for asbestos workers would persist and the absolute differences in cumulative exposures would get larger. Children who changed classrooms from one grade to the next could have exposures that were independent from one year to the next, though not from one day to the next.

15

39.    In her **Paragraph 8**, Dr. Anderson continued: "This approach [is] always used for screening purposes as I have established [in] my report. Mr. Stallard's suggestion that the assessment be done differently is without precedent and without scientific validation or peer review." I have already responded to this comment in paragraph 35 above. My recommendations are fully consistent with the EPA Guidelines and with the hundreds of articles in the peer-reviewed literature that address the errors that can occur when one ignores the effects of persistent individual differences in exposure levels, for example, by inappropriately and indiscriminately using the independence assumption and ignoring heterogeneity, as proposed by Dr. Anderson.

40.    In her **Paragraph 10**, Dr. Anderson stated: "Mr. Stallard's declaration appears to purposely avoid mentioning the low values at all, only showing it in the captions to his figures." I am puzzled by this comment and am not sure what point Dr. Anderson wished to make. Paragraph 12 of my prior *Declaration* mentioned the median value of 0.002 f/cc per year reported by Dr. Richard Lee. This value is 1/50th of the OSHA PEL. Above in paragraph 37.C, I cited the low value of the range of lifetime exposures in Matrat's study, 0.0004 f/ml-yr This value is 1/250th of the OSHA PEL. What Dr. Anderson appears to fail to understand is that populations with low average cumulative lifetime exposures can contain members whose lifetime cumulative exposures substantially exceed her chosen benchmarks, and that these high exposure individuals are the ones who are most likely to succumb to an asbestos-related disease. This heterogeneity is specifically what Dr. Anderson fails to consider in her analysis.

41.    In her **Paragraph 12**, Dr. Anderson stated: "Mr. Stallard confuses what I explicitly stated I was doing with a misplaced notion of what he believes should have been done." As noted in paragraph 35 above, the first written statements regarding her independence

16

assumption were not produced until December 21, 2007 in *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony*. Thus, it would be difficult to confuse what Dr. Anderson explicitly stated she was doing with anything because no such explicit statement existed.

42.    In her **Paragraph 12**, Dr. Anderson continued: "The very essence of the entire matter is to determine whether people who claim to have [a] disease could have gotten that disease from exposure to Grace products." I agree with that goal. My sole criticism of Dr. Anderson's procedure in this *Declaration* is that she made an indefensible assumption concerning the independence of individual workers' exposure levels over their working lifetime. I did not challenge any other assumption that she made because the failure of this one assumption was sufficient by itself to invalidate her conclusions on page 9 of her expert report dated July 31, 2007 regarding job categories B, D, and E.

43.    In her **Paragraph 12**, Dr. Anderson concluded: "When conducting assessments to determine the risk posed by a toxic agent, EPA and OSHA proceed in precisely the same fashion." Not true. Paragraph 35 above addresses the actual recommendations in the EPA guidelines and they require that one use caution in producing an appropriate assessment of the distribution of long-term exposures when using short-term exposure data as the basis of the assessment, as well as disclosing and discussing the nature of the assumptions and their limitations, including variability and other relevant statistics that would detail, *e.g.,* the differences between cohort average exposures and likely actual individual exposures.

44.    In her **Paragraph 13**, Dr. Anderson stated: "In sum, Mr. Stallard's accusation that the methods and procedures I used in my reports are unscientific and erroneous is wide of the mark. To the contrary they are consistent with established risk assessment and statistical

17

principles, in line with methods used by myself and other knowledgeable practitioners of risk assessment, and have been endorsed by public health agencies such as the EPA, subjected to repeated use and peer review." Neither of these statements held up under the detailed examination provided above.

45.    In her **Paragraph 13**, Dr. Anderson finished with: "Mr. Stallard, an actuary by education and practice, should be more cautious before intruding into a field outside of his area of expertise." Dr. Anderson failed to realize that the fundamental nature of the dispute involves methods and procedures for the scientifically valid analysis of heterogeneous populations and for assessing the impact of heterogeneity in analyses where heterogeneity is ignored. This is my area of expertise, not hers. She is the one who has intruded into my field and who has attempted to proceed without appropriate expert assistance and, as a consequence, has failed to respond to my critique. My opinion stands without modification: Dr. Anderson's conclusions are unscientific, unreliable, erroneous, and highly misleading.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 7, 2008.

P.J. Eric Stallard, A.S.A., M.A.A.A., F.C.A.