IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

Objection Deadline: February 8, 2008 at 4:00 p.m.
Hearing Date: February 25, 2008 at 1:00 p.m.

## MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE FOR THE ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO EXPEND PROPERTY TO ACQUIRE PREFERRED STOCK INTEREST IN CERATECH, INC.

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Grace") hereby submit this motion (the "Motion") for the entry of an order authorizing the Debtors to acquire from CeraTech, Inc. ("CeraTech") up to an aggregate of 125,000 shares (the "Shares") of a newly created Series C Convertible Redeemable Preferred Stock, par value $0.01 per share, of CeraTech for an aggregate purchase price of up to $5,000,000 in connection with the execution of a Stock Purchase Agreement and certain other ancillary agreements.

In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Jurisdiction**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper under 28 U.S.C. § 1408 and 1409.

2. The statutory predicates for this Motion are §§ 105(a) and 363(b) of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background and Description of the Proposed Transaction**

3. On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

*A.   CeraTech*

4. CeraTech has developed a means to make higher strength fast setting concrete using fly ash instead of Portland cement. This proprietary technology can create value by producing stronger concrete and takes advantage of the significant market trend for environmentally responsible building materials. The new product eliminates the use of Portland cement, which is one of the world's largest single sources of greenhouse gas emissions, and fly ash is a waste product from power plants. CeraTech filed provisional patents on its technology in January 2007 and is in the process of following up with a normal patent application. CeraTech will not disclose the details of its technology to Grace until after Grace makes its initial investment.

5.      Currently, most of CeraTech's concrete applications are related to concrete repair, with much of its sales going to the U.S. military. However, CeraTech has been actively marketing state departments of transportation for road and infrastructure applications, and expects significant incremental sales in 2008 from these efforts.

6.      CeraTech needs additional capital to penetrate its target markets more completely and realize the full potential of its technology. It wants a strategic partner that can help drive its technology into target markets, grow sales faster than CeraTech can do alone, and meet its short term capital requirements.

*B.     The Debtors' Strategic Intent*

7.      As part of the contemplated transaction, Grace and CeraTech will enter into an exclusive sales, marketing and distribution agreement (further described below) under which Grace will have exclusive rights to manufacture and sell products utilizing the technology in the manufactured concrete market in the United States and most of the rest of the world. Grace and CeraTech will share the gross profit earned on sales into the manufactured concrete market.

8.      Furthermore, if the market accepts and values CeraTech's technology as expected, Grace would like to acquire CeraTech and add the technology to the Grace portfolio. By entering into the current transaction, Grace will be in a very favorable position to successfully buy CeraTech at fair market value if the development of the technology and market proceeds as expected.

9.      Grace can leverage its channels of distribution (manufactured concrete first and possibly ready mix concrete in the future), its relationships, its brand, and its technical service and R&D capabilities to generate accelerated market penetration and sales growth for CeraTech's products. CeraTech's technology has the potential to add value in the concrete repair segment, in which CeraTech itself is already active, but more importantly in the

manufactured concrete segment (concrete block, pipes, vaults etc.). This technology would create value for manufactured concrete producers in the following ways:

    (i)    enable producers to:

        (A)    expand the potential uses for concrete block because they will be able to produce higher strength blocks with the new technology;

        (B)    produce high strength manufactured concrete products to order (currently these orders cannot be filled on demand because high strength concretes using Portland cement usually require lengthy cure times);

        (C)    produce all manufactured concrete products faster, store them for shorter periods of time, lower their kiln curing times, and lower their inventories; and

    (ii)    enable designers and construction specifiers to preferentially incorporate these products into buildings as "green" concrete because it contains no Portland cement (lower $CO_2$ release), and instead utilizes fly ash, which is a waste product from the burning of coal in electrical generating plants.

10. Grace estimates that the benefit of manufacturing fast set high strength concrete in the manufactured concrete market is approximately $5 to $10 per yard of concrete, with manufactured concrete making up 15% of the North American concrete market. Assuming total adoption of the technology, total potential value creation in the manufactured concrete market in North America would be greater than $500 million.

C.    *Summary of the Terms of Investment*

11. Grace and CeraTech will enter into a stock purchase agreement for the purchase of the Shares (the "Purchase Agreement") substantially in the form attached as <u>Exhibit A</u>. Upon execution of the Purchase Agreement, it will be filed by amendment of this Motion. The Purchase Agreement contemplates that Grace will also enter into several other ancillary

agreements.[2] The following sets forth a summary of the material terms and conditions of the Purchase Agreement.[3]

12. Under the terms of the Purchase Agreement, Grace will make an initial $3 million investment in CeraTech (the "Initial Investment") by purchasing 75,000 Shares (the "Initial Shares") at a purchase price of $40 per share. In addition, CeraTech has the option, exercisable at any time after October 31, 2008 through January 1, 2009, of asking Grace to make an additional $2 million investment (the "Additional Investment") by purchasing 50,000 additional Shares at a purchase price of $40 per share. Grace also has the option of making the Additional Investment of its own accord during the same period. If Grace declines to make the Additional Investment upon CeraTech's request, Grace will relinquish the rights outlined in paragraphs 17 and 18 below.

13. As regards liquidation, dividend and redemption rights, the Shares rank prior and senior to the Series A Preferred Stock, the Series B Preferred Stock, any other preferred stock, and the Common Stock of CeraTech. When declared at the discretion of CeraTech's board of directors, the Shares will pay cumulative preferential dividends at a compounded annual rate of 8% of the Series C Stated Value (initially $40 per share). The Shares may be converted at any time into shares of Common Stock on an initial one-share-for-one share basis, and have the same number of votes as the shares of Common Stock into which they are converted. The Initial Shares currently equate to 8.0% of the equity of CeraTech on a fully-converted basis. Assuming

---

[2] The parties are currently in final stages of negotiation on a Distribution Agreement (as defined in paragraph 15 below), a stockholders' agreement with the existing stockholders, and a registration rights agreement, and expect these ancillary agreements to be finalized and executed before the hearing on this Motion. Copies of these agreements will be made available upon written request to Debtors' counsel.

[3] To the extent of any inconsistency between the summary set forth herein and the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern.

no other issuance of CeraTech shares, the Additional Investment equates to an additional 5.4% equity stake on a fully-converted basis.

14. If CeraTech is liquidated, the Shares are entitled to a liquidation preference, which is a payment equal to the Series C Stated Value plus accrued and unpaid dividends, that would be made prior to any distributions to the Series A and Series B Preferred Stock and the Common Stock. In addition, the Shares have certain redemption and antidilution rights.

15. Grace will be entitled to designate one member of the CeraTech board of directors, which will have six members upon election of the Grace designee

16. In conjunction with the Purchase Agreement, Grace and CeraTech will also enter into an exclusive sales, marketing and distribution agreement (the "Distribution Agreement") under which Grace will have exclusive rights to manufacture and sell products utilizing the technology in the manufactured concrete market in the United States and most of the rest of the world. If Grace does not maintain certain minimum sales levels, its rights would become non-exclusive; and if it does not maintain other lower minimum sales levels, CeraTech can terminate the Distribution Agreement. Grace and CeraTech will share the gross profit earned on sales into the manufactured concrete market on a sliding scale based on sales volume under which Grace will retain between 50% and 66% of the total gross profit.

17. As part of the Distribution Agreement, Grace will provide up to 1,000 man-hours of certain technical, research and development, supply chain and process improvement services to CeraTech in 2008, and up to 250 hours of such services for each of the following five years. CeraTech shall define the projects on which Grace services will be required. Any intellectual property developed in performing these services will be owned by CeraTech. The parties also expect that Grace will perform additional research and development work based on the CeraTech

technology platform, with any intellectual property resulting from this work to be jointly owned by Grace and CeraTech. Until the later of (i) December 31, 2010 or (ii) one year following the termination or expiration of the Distribution Agreement, Grace and its affiliates will not manufacture, distribute, market or sell products of the type covered by the Distribution Agreement, or conduct research and development activities with respect to those products, except as provided or permitted in the Distribution Agreement.

18. In order to sell the company, CeraTech must either propose to Grace a transaction by which Grace would buy the company, or request that Grace propose such a transaction. If Grace expresses an interest, the parties will have an exclusive negotiation period in which to execute a definitive agreement. If Grace does not express interest in CeraTech's proposal or in proposing its own transaction, or if the exclusive negotiations do not produce a definitive agreement, CeraTech may sell the company to a third party, provided that except in the case where Grace does not propose its own transaction, the consideration in the third party transaction is equal to or greater than that proposed by Grace or CeraTech in the proposal and negotiation process.

19. If after 6 years, CeraTech has not been sold, then Grace and the holders of the Series A and Series B Preferred Stock will have the right to redeem their Preferred Stock at twice their respective Stated Values plus accrued and unpaid dividends.

### Relief Requested

20. By this Motion, the Debtors seek authority to invest in the Shares on substantially the terms set forth in the Purchase Agreement.

### Basis for Relief

21. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

7

22. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

23. A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by an articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

24. Under section 363(b) of the Bankruptcy Code, a debtor must establish that it has a valid business purpose for using the estate's property outside the ordinary course of business. See In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); see also Delaware & Hudson Ry. Co., 124 B.R. at 178-79, In re Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

25. Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abbotts Dairies, 788 F.2d at 145-47 (implicitly adopting the articulated business justification test of the Lionel standard and adding the "good faith" requirement); Delaware & Hudson Ry. Co., 124 B.R. at 176 (adopting Lionel in this district). The proposed transaction meets each of these requirements.

26. *Sound Business Reasons*. Grace is always working to obtain new proprietary technology for its concrete admixtures business in order to maintain and expand its market position. The investment in CeraTech provides an opportunity to acquire a potentially valuable additional proprietary technology that can be applied in the manufactured concrete market and possibly in the ready-mix concrete market as well.

27. Besides the value created by a technology that enables production of higher strength and quicker curing concrete, the technology also provides an attractive "green" dimension because greenhouse gas production is reduced and the technology utilizes a waste product from the burning of coal in power plants.

28. Accordingly, Grace believes that obtaining access to the new technology, plus the opportunity to buy CeraTech if the development of the product proceeds as planned, is a desirable addition to its business portfolio.

29. *Fair and Reasonable Consideration*. The proposed purchase price is economically attractive to the Debtors. The potential value creation for the technology in the

North American concrete market is more than $500 million, and Grace has great experience, expertise and ability in developing products for that market. Furthermore, if after having made the Initial Investment, Grace is not satisfied with the prospects for the technology, it can decline to make the Additional Investment. In addition, Grace will receive the benefit of exclusive distribution rights for products utilizing the technology, which will provide positive cash flow if market penetration proceeds as planned. By making the Initial Investment, Grace is also securing the first opportunity to purchase the business when CeraTech is ready to sell.

30. *Good Faith.* The Debtors and CeraTech have negotiated the terms of the proposed acquisition at arm's-length and in good faith. As outlined above, the Debtors believe that the terms of the proposed transaction are fair to the Debtors, their creditors, and their estates.

31. *Adequate and Sufficient Notice.* In satisfaction of the requirements of Rule 2002 of the Bankruptcy Rules, the Debtors intend to serve copies of this Motion in accordance with the process described in the "Notice" section below.

## Conclusion

32. In light of the foregoing, the Debtors have determined in their business judgment that the investment in CeraTech is fair and reasonable. The Debtors believe that the proposed transaction is in the best interest of their estates, grounded in sound business judgment and satisfies the "sound business judgment" test for the use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.

## Notice

33. Notice of this Motion has been given to: (i) the United States Trustee, (ii) counsel to the DIP lender, (iii) counsel to all official committees appointed by the United States Trustee, (iv) counsel for the Future Claimants' Representation, (v) counsel for CeraTech, and (vi) all those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P.

2002. In light of the nature of the requested relief, the Debtors submit that no further notice is required. The Debtors respectfully request that the Court enter an Order authorizing the Debtors to invest in CeraTech on substantially the terms and conditions described in this Motion.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, (i) authorizing the Debtors to invest in CeraTech on substantially the terms and conditions described in this Motion and the Purchase Agreement and (ii) granting such other and further relief as the Court deems just and proper.

Dated: January 18, 2008

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lori Sinanyan
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession