UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .   Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .   USX Tower – 54th Floor
                            .   600 Grant Street
                            .   Pittsburgh, PA 15219
             Debtors.  .
                            .   January 16, 2008
. . . . . . . . . . . . ..  9:40 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SALVATORE BIANCA, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                               ELLI LEIBSTEIN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For W.R. Grace:           Kirkland & Ellis LLP
                          By:  DAVID MENDELSON, ESQ.
                          6555 Fifteenth Street, N.W.
                          Washington, DC  20005



Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                                 WALTER SLOCOMBE, ESQ.
                                 ADAM VAN GRACK, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

                            Caplin & Drysdale, Chartered
                            By:  ELIHU INSELBUCH, ESQ.
                            375 Park Avenue, #3505
                            New York, NY  10152

For the Debtors:            ARPC
                            By:  AMY BROCKMAN, ESQ.

For W.R. Grace:             W.R. Grace
                            By:  JAY HUGHES, ESQ.
                                 RICHARD FINKE, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

For the Equity
Committee:                  Kramer Levin Naftalis & Frankel
                            By:  GREGORY HOROWITZ, ESQ.
                                 PEGGY Farber, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For the
Unsecured Creditors'        Stroock & Stroock & Lavan
Committee:                  By:  ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

for the Property
Damage Committee:           Bilzin Sumberg Baena Price &
                               Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For :                       Drinker Biddle & Reath LLP
                            By:  ROBERT K. MALONE, ESQ.
                            500 Campus Drive
                            Florham Park, NJ  07932-1047

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe LLP<br>By:  ROGER FRANKEL, ESQ.<br>     ANTONY KIM, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>     ANNIE WEISS, ESQ.<br>     GARRETT RASMUSSEN, ESQ.<br>     JOSHUA M. CUTLER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| | Orrick, Herrington & Sutcliffe LLP<br>By:  CATHARINE ZURBRUGG, ESQ.<br>666 Fifth Avenue<br>New York, NY  10103-0001 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Travelers: | STB<br>By:  STERLING MARSHALL, ESQ. |
| For the Debtor: | NERA Economic Consulting<br>By:  STEPHANIE PLANCICH<br>1166 Avenue of the Americas<br>28th Floor<br>New York, NY  10036 |
| For Serengeti: | By:  BILLAL SIKANDER |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Silver Point          Silver Point Capital
Capital:                  By:  JOHN KU

For Halcyon:              Halcyon
                          By:  JOHN GREENE

For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705

For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  BERNARD BAILOR, ESQ.
                               JAMES WEHNER, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

TELEPHONIC APPEARANCES:

For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  LEWIS KRUGER, ESQ.
                          180 Maiden Lane
                          New York, NY 10038

For Ad Hoc Committee:     Weil, Gotshal & Manges
                          By:  M. JARRAD WRIGHT, ESQ.
                          1300 Eye Street NW, Suite 900
                          Washington, D.C.  20005

For Official Committee    Dies & Hile LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701

For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                    By:  DAVID J. PARSONS, ESQ.
                               VAN J. HOOKER, ESQ.
                               SANDER L. ESSERMAN, ESQ.
                          2323 Bryan Street
                          Suite 2200
                          Dallas, TX  75201

For Fireman's Fund:       Stevens & Lee, P.C.
                          By:  JOHN DEMMY, ESQ.
                               DAVID R. BEANE, ESQ.
                          1105 North Market Street, 7th Fl.
                          Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

5

TELEPHONIC APPEARANCES (CONT'D):

For the Debtors:              Kirkland & Ellis, LLP
                              By:  THEODORE FREEDMAN, ESQ.
                              Citigroup Center, 153 East 53rd St.
                              New York, NY  10022

For the PD Committee:         Bilzin Sumberg Baena Price &
                                Axelrod LLP
                              By:  SCOTT BAENA, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131

For Owens-Illinois:           McCarter & English
                              By:  KATHARINE MAYER, ESQ.
                              Renaissance Centre, 405 N. King St.
                              Wilmington, DE  19801

For David T. Austern:         Piper Jaffray & Co.
                              By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN 37864

For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  MATTHEW RUSSELL, ESQ.
                                   ROBERT GUTTMANN, ESQ.
                                   MICHAEL DAVIS, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022

For the Future               Orrick, Herrington & Sutcliffe
Claimants                     LLP
Representatives:              By:  DEBRA FELDER, ESQ.
                                   JOSHUA CUTLER, ESQ.
                              Washington Harbour
                              3050 K Street, N.W.
                              Washington, D.C.  20007 For

For Federal Insurance        Cozen O'Connor
Company:                     By:  JEFFREY WAXMAN, ESQ.
                              Chase Manhattan Centre
                              1201 North Market Street
                              Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103


For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For W.R. Grace:                W.R. Grace
                               By: WILLIAM CORCORAN, ESQ.
                               7500 Grace Drive
                               Columbia, MD  21044

For W.R. Grace:                Kirkland & Ellis LLP
                               By:  ELLEN AHERN, ESQ.
                               200 East Randolph Drive
                               Chicago, IL  60601

For State of Montana           Womble Carlyle Sandridge & Rice
Department of                  By:  FRANCIS MONACO, ESQ.
Environmental Quality:         222 Delaware Avenue
                               Suite 1501
                               Wilmington, DE  19801

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186

For W.R. Grace:                Cohn Whitesell & Goldberg, LLP
                               By:  CHRISTOPHER M. CANDON, ESQ.
                               101 Arch Street
                               Boston, MA  02110

For CNA:                       Goodwin Procter, LLP
                               By:  BRIAN MUKHERJEE, ESQ.
                               Exchange Place
                               Boston, MA  02109-2881

TELEPHONIC APPEARANCES (CONT'D):

```
For Grace Certain          Montgomery, McCracken, Walker &
Cancer Claimants:               Rhoads LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801


For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806


For W.R. Grace:            Pachulski, Stang, Ziehl & Jones LLP
                           By:  TIMOTHY P. CAIRNS, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705


For the Asbestos           Caplin & Drysdale, Chartered
Creditors Committee:       By:  JEANNA RICKARDS, ESQ.
                                LESLIE KELLEHER, ESQ.
                           One Thomas Circle, NW
                           Washington, D.C.  20005


For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899


For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                           Wall Street Plaza
                           New York, NY  10005


For Pepsi:                 Butler Rubin Salfarelli & Boyd LLP
                           By:  KIRK T. HARTLEY, ESQ.
                           70 West Madison Street
                           Suite 1800
                           Chicago, IL  60602


For Official Committee     Duane Morris LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee      Brandi Law Firm
of Asbestos Property        By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:           44 Montgomery St., Suite 1050
                            San Francisco, CA  94104

For the State of CA,        Hahn & Hessen LLP
Dept. of Gen. Services:     By:  STEVEN J. MANDELSBERG, ESQ.
                            488 Madison Avenue, 14th Fl.
                            New York, NY  10022

For Baron & Budd,           Hogan Firm Attorneys at Law
et al.:                     By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801

For the PD Committee:       Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924

For Royal Insurance:        Wilson Elser Moskowitz Edelman
                              & Dicker LLP
                            By:  CATHERINE CHEN, ESQ.
                               150 East 42nd Street
                               New York, NY  10017

For David T. Austern:       Piper Jaffray & Co.
                            By:  JASON SOLGANICK

For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216

For London Market           Mendes & Mount, LLP
Companies:                  By:  ALEXANDER MUELLER, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019-6829

For Official Committee      LECG, LLC
of Asbestos Property        By:  ALAN MADIAN, ESQ.
Claimants:                       ELIZABETH DEVINE, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By: EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For Ivory Investment: | Ivory Investment<br>By: DHANANJAY PATWARDHAN |
| For Linden Advisors: | Linden Advisors, LP<br>By: CRAIG GILBERT |
| For O'Conner: | O'Conner<br>By: John R. Wollen |
| For King Street Capital Management, LLC: | King Street Capital Management, LLC<br>By: MITCHELL SOCKETT |
| For the Blackstone Group: | The Blackstone Group<br>By: JOHN O'CONNELL |
| For Dune Capital Mgmt: | Dune Capital Management<br>By: GUY BARON |
| For Anchorage Advisors: | Anchorage Advisors<br>By: JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By: ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By: JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By: PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By: BEAU HARBOUR |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By: MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By: STEPHANIE KWONG |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):


For Millennium Partners: Millennium Partners
                         By:  IGOR VOLSHTEYN

For Cetus Capital:       Cetus Capital
                         By:  GENTRY KLEIN

For Shareholder for      Tocqueville Asset Management
W.R. Grace & Co.         By:  PETER SHAWN

For Milbank Tweed        Milbank Tweed Hadley & McCloy
Hadley & McCloy:         By:  JEREMY HOLLEMBEAK, ESQ.
                         One Chase Manhattan Plaza
                         New York, NY  10005-1413

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

|  | PAGE |
|---|---|
| **WITNESSES FOR THE DEBTORS** | |
| HOWARD WILLIAM ORY | |
|     Direct Examination by Ms. Harding | 14 |
|     Voir Dire Examination by Mr. Finch | 26 |
|     Voir Dire Examination by Mr. Ansbro | 29 |
|     Continued Direct Examination by Ms. Harding | 37 |
|     Cross Examination by Mr. Finch | 73 |
|     Cross Examination by Mr. Ansbro | 112 |
|     Redirect Examination by Ms. Harding | 130 |
| | |
| DR. JOSEPH RODRICKS | |
|     Voir Dire Examination by Mr. Bernick | 146 |
|     Direct Examination by Mr. Bernick | 152 |
|     Cross Examination by Mr. Finch | 198 |
|     Cross Examination by Mr. Rasmussen | 235 |

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| GG-2036 | Chart | 41 | 42 |
| GG-2037 | Table | 46 | 47 |
| GG-2040 | Document | 47 | 48 |
| GG-2041 | Document | 49 | 51 |
| GG-2043 | Document | 58 | 59 |
| GG-2044 | Document | 59 | 60 |
| GG-2045 | Document | 60 | 61 |
| GG-2047 | Document | | 64 |
| GG-2048 | Document | 66 | 67 |
| GG-2050 | Document | | 73 |
| ACC-571 | CDC NIOSH Deaths | 97 | |
| Ex. 614 | NIOSH CDC Report | 98 | |
| GX-580 | Risk Assessment Guidelines of 1986 (EPA) | | 188 |

1  (Audio malfunction; speakers at microphones 2 and 3 difficult

2  to discern)

3            THE CLERK:  All rise.

4            THE COURT:  Good morning.  Please be seated.  This is

5  the continuation of the personal injury estimation trial in

6  W.R. Grace, 01-01139.  The participants I have listed by phone

7  are Jennifer Whitener, Jarrad Wright, Daniel Hogan, Katharine

8  Meyer, John O'Connell, John Phillips, Igor Volshteyn, John

9  Demmy, Gentry Klein, John Wollen, Terence Edward, David

10 Parsons, Matthew Russell, Steven Mandelsberg, James Rieger, Peg

11 Brickley, Darrell Scott, Alex Mueller, Natalie Ramsey, Lewis

12 Kruger, Jonathan Brownstein, Andrew Craig, David Mendelson,

13 Ellen Ahern, Dhananjay Patwardhan, Stephanie Kwong, Daniel

14 Speights, Marti Murray, Brian Mukherjee, Michael Davis, Van

15 Hooker, William Corcoran, Janet Baer, Jonathan Lewinsohn, Mark

16 Hurford, Walter Slocombe, Peter Lockwood, Elihu Inselbuch,

17 Jeanna Rickards, Bernard Bailor, Leslie Kelleher, Theodore

18 Freedman, Jeff Waxman, Guy Baron, Scott Baena, Jason Solganick,

19 Christopher Candon, Joshua Cutler, Shayne Spencer, Peter Shawn,

20 Tiffany Cobb, Theodore Tacconelli, Andrew Chan, Craig Gilbert,

21 Robert Horkovich, Elizabeth Devine, David Beane, Alan Madian,

22 Michael Lastowski, Sander Esserman, Timothy Cairns, Kirk

23 Hartley, Debra Felder, Catherine Chen, Jacob Cohn, James

24 Wehner, Beau Harbour, Edward Westbrook, Martin Dies, Francis

25 Monaco, Robert Guttmann, Mitchell Sockett and Jeremy

1 Hollembeak.  I'll take entries in Court.

2          MS. HARDING:  Barbara Harding, on behalf of the

3 debtors, Your Honor.

4          MR. BERNICK:  David Bernick for Grace.

5          MR. STANSBURY:  Brian Stansbury for Grace.

6          MR. McMILLAN:  Scott McMillan for Grace.

7          MR. FINCH:  Nathan Finch for the Asbestos Claimants'

8 Committee, Your Honor.

9          MR. INSELBUCH:  Elihu Inselbuch for the Asbestos

10 Committee.

11          MR. LOCKWOOD:  Peter Lockwood for the Asbestos

12 Committee.

13          MR. MULLADY:  Raymond Mullady for the Future

14 Claimants' Representative.

15          MR. ANSBRO:  Good morning, Your Honor.  John Ansbro,

16 also for the FCR.

17          MR. KRIEGER:  Good morning, Your Honor.  Arlene

18 Krieger from Stroock & Stroock & Lavan on behalf of the

19 Official Committee of Unsecured Creditors.

20          MR. HOROWITZ:  Good morning, Your Honor.  Gregory

21 Horowitz from Kramer, Levin, on behalf of the Official Equity

22 Committee.

23          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

24 on behalf of the Property Damage Committee.

25          THE COURT:  Excuse me one second.  Okay.  Thank you.

Ory - Direct/Harding                              14

1  Good morning.

2           MR. FRANKEL:  Good morning, Your Honor.  Roger

3  Frankel for the Future Claimants' Representative.

4           THE COURT:  Thank you.

5           MR. RASMUSSEN:  Good morning, Your Honor.  Garrett

6  Rasmussen for the Future Claimants' Representative.

7           MR. KIM:  Good morning, Your Honor.  Antony Kim for

8  the FCR.

9           THE COURT:  Anyone else entering an appearance?

10 Okay.  Ms. Harding?

11          MS. HARDING:  Thank you, Your Honor.  The debtors

12 would like to call Dr. Howard Ory, please.

13          THE COURT:  Dr. Ory?

14          THE CLERK:  Could you raise your right hand, please?

15      DR. HOWARD WILLIAM ORY, DEBTORS' WITNESS, SWORN

16          THE CLERK:  Please be seated.

17                   DIRECT EXAMINATION

18 BY MS. HARDING:

19 Q    Good morning, Dr. Ory.

20 A    Good morning.

21 Q    Could you state your name for the record, please?

22 A    Howard William Ory.

23 Q    And what is your (indiscernible)?

24 A    I'm an epidemiologist.

25 Q    Where have you spent the majority of your career working

                   **J&J COURT TRANSCRIBERS, INC.**

1  as an epidemiologist?

2  A    At the U.S. Centers for Disease Control in Atlanta.

3  Q    The CDC, is that commonly referred to?  The CDC?

4  A    Yes.

5  Q    Where did you receive a degree in epidemiology?

6  A    From the Harvard School of Public Health.

7  Q    Now, you are also a medical doctor, correct?

8  A    That's correct.

9  Q    Where did you receive your medical degree?

10  A    Tufts University Medical School.

11  Q    Are you board certified or licensed to practice medicine?

12  A    I'm board certified in preventive medicine and licensed to

13  practice medicine in Georgia.

14  Q    How did you come to be involved in this matter?

15  A    Um --

16  Q    If you recall?

17  A    Well, I received a phone call from you asking if it would

18  be possible, if I would consider looking into the issue of

19  whether or not I could make an estimate of how much asbestosis

20  occurred in the U.S.

21         MR. FINCH:  Your Honor, before he gets into the

22  substance of his testimony, she hasn't proffered him as an

23  expert.  I have some voir dire in his qualifications before she

24  proffers him as an expert.

25         THE COURT:  All right.

1          MS. HARDING:  I was intending to go through his

2    qualifications and training before I proffered him.

3          MR. FINCH:  Okay.  I thought she was going into the

4    substance of his opinion.

5          THE COURT:  All right.  Go ahead.

6    Q    The question I think I had asked you, Dr. Ory, is do you

7    recall why it if that you were contacted by me?

8    A    I believe it was because I did a -- performed a similar

9    function with regard to silicosis in a case before Judge

10   Jack.

11   Q    Okay.  Did you recall that I had seen your name in a

12   footnote of an opinion?

13   A    Yes.  I -- the analysis that I did was cited in her

14   opinion.

15   Q    Now, before we go into all of your qualifications and

16   training, I wanted to play for you, so you can listen, I'm

17   going to ask you a question about it, some statements were made

18   during oral argument on Monday in this case.  So, if we could

19   play that first clip?

20          THE COURT:  Is the screen --

21          THE CLERK:  It's on.  It's --

22                    (Audio played)

23   Q    Dr. Ory, do you have opinions regarding the rates of

24   asbestosis and the rates of mesothelioma in the United States?

25   A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FINCH:  Your Honor, he still hasn't been

2    qualified him as an expert.

3          MS. HARDING:  I'm not asking him to offer what his

4    opinions are yet.  I'm asking him to explain to the Court what

5    the substance and the subject matter of his opinions will be.

6    Q    And, Dr. Ory, is that the -- that kind of analysis that

7    you did in this case that -- that actually attempts to estimate

8    the incidence of asbestosis and mesothelioma currently and in

9    the future?  Is that right?

10   A    That is correct.

11   Q    Now, with respect to your qualifications to render

12   opinions on those issues, how long did you work at the CDC, Dr.

13   Ory?

14   A    23 years.

15   Q    What was your main work at the CDC?

16   A    Well, I'm an epidemiologist, and I did what

17   epidemiologists do at CDC.  I do disease surveillance, disease

18   causation, disease prevention.

19          MS. HARDING:  Put up Slide 2, please.

20   Q    You prepared a series of slides in this case, is that

21   right?

22   A    Correct.

23   Q    Do they accurately represent -- you've reviewed all of the

24   slides that we might put on the board today?

25   A    Yes, I have.

1  Q    Do they accurately represent the opinions that you've

2  reached in the case?

3  A    They do.

4  Q    And do you think they'll assist the Court in understanding

5  your testimony?

6  A    I hope so.

7  Q    Okay.  Just explain, essentially, what an epidemiologist

8  does.

9  A    Right.  Well, the first thing an epidemiologist has to do

10 is determine how many cases of something are occurring -- say,

11 in the United States, and to determine -- and verify that those

12 are actually real cases.  And then -- that's sort of the

13 enumerator.  And then the denominator is that those cases occur

14 in some population, so you estimate the incidence rate, say, of

15 a disease in a population.  And then, studying the distribution

16 and causes of human disease, a large part of what we do is

17 causal research, attempting to determine, for example, does

18 asbestosis -- does asbestos cause mesothelioma?  Does high

19 blood pressure cause heart attacks?

20 Q    Okay.  I'm going to walk over and just ask you -- with

21 respect to the top, count and verify the number of people with

22 various diseases, is that often referred to as surveillance?

23 A    That would be disease surveillance.

24 Q    So, in disease surveillance at CDC, did you often have to

25 verify cases before you could determine how much disease there

1  is?

2  A    Absolutely.  Very often we would be called and told

3  there's an epidemic occurring somewhere, and it's sort of the

4  first rule is you go out and you establish a case definition,

5  and then you count how many cases of the disease are actually

6  occurring.

7  Q    When you count how many cases of the disease are

8  occurring, how do you -- what kind of information do you use to

9  verify that there are cases of disease in a particular

10 population?

11 A    Well, you would use all sorts, but generally you would use

12 medical information, you would use medical charts, you would

13 use laboratory information, and so forth.

14 Q    In your 23 years at the CDC, did you or anyone else at the

15 CDC, any other scientists, have you ever used litigation claims

16 to verify the existence of disease?

17 A    I never did, and I don't recall ever seeing an example

18 like that.

19 Q    Now, Dr. Ory, how many scientific papers have you

20 authored?

21 A    More than 100.

22 Q    And do any of those papers involve asbestos?

23 A    No.

24 Q    Does the fact that none of the papers involve asbestos

25 render you to be somehow (indiscernible) to this Court about

1  the incidence of asbestosis and mesothelioma in the United

2  States?

3          MR. FINCH:  Objection, Your Honor.  That's a question

4  for the Court to determine.

5          THE COURT:  That is a question for the Court.  That's

6  an ultimate conclusion.  Sustained.

7  Q    Dr. Ory, in the course of your work at CDC, how often did

8  you encounter diseases that you were asked to investigate their

9  causes, their incidence, where you had not previously dealt

10 with that disease before?

11 A    Almost all the time.  For example, when I first came to

12 CDC I began to study the association of oral contraceptives and

13 cervical cancer.  Obviously I had no personal knowledge of oral

14 contraceptives, and cervical cancer, my training is in internal

15 medicine, so maybe I had seen a case or two of cervical cancer,

16 but it was not a disease that I knew intimately.  So, as we

17 always do, as any epidemiologist would have to do, I had to

18 learn the epidemiology of cervical cancer in order to study

19 that association.  The next thing I looked at was oral

20 contraceptives and blood clots.  And I certainly knew almost

21 nothing about the clotting system, and so I had to learn the

22 epidemiology related to blood clotting.  Likewise, when I

23 studied oral contraceptives and breast cancer, and ovarian

24 cancer, and uterine cancer, those are not the purview of an

25 internist.  Those are the purview of a gynecologist.  And so, I

1 had to learn all about the epidemiology of breast cancer,

2 ovarian cancer, and cervical cancer.  And so it is with every

3 disease I looked at.  When the director of CDC asked me to be

4 on the panel overseeing the study of Agent Orange that CDC

5 performed, I had to learn about Agent Orange.  When the

6 Director of CDC asked me to evaluate a report that the ATSDR

7 had written on TCE, I had to learn about TCE.

8 Q    Now, Dr. Ory, with respect to conducting your work as an

9 epidemiologist, count and verify the number of people with

10 diseases, estimate occurrence of disease, and compilations, the

11 study of (indiscernible) causes, are there standard

12 methodologies associated with the work of an epidemiologist in

13 those areas?

14 A    Yes, there are.  And -- there certainly are.

15 Q    And do you apply the same kind of methodology to the study

16 of each different disease in the same way, or in a different

17 way?

18 A    No.  They are more or less applied in the same way, just

19 altered to account for the particular disease you're dealing

20 with, but you're applying the same methods no matter what

21 disease you're studying.

22                        (Pause)

23 Q    (Indiscernible) summarize some of your work at the CDC.

24 I'm going to ask you just to (indiscernible) coordinate the

25 nationwide disease surveillance activity.  What was that?

1 A     Every week every county in the United States submits data

2 on disease occurrences, I think it's about 200 diseases, that

3 occur, and it goes up through the county, to the state, to CDC,

4 and it's collected and collated.  And for part of my time at

5 CDC I was in the unit that was responsible for coordinating

6 that surveillance activity.

7 Q     You also taught (indiscernible) CDC, is that right?

8 A     Yes.  At that same time, actually, I was -- for two or

9 three years was responsible for overseeing the training of all

10 incoming EIS officers, and generally through the rest of the

11 time I was at CDC I was often involved in (indiscernible)

12 continuing education courses for senior staff.

13 Q     Now, you mentioned that you published over 100 --

14 A     Yes.

15 Q     -- scientific articles (indiscernible)?

16 A     Yes.

17        THE CLERK:  Excuse me.  Could you switch to that

18 mike?  You're getting a little choppy.

19        THE COURT:  You have to take the levelier (phonetic)

20 off, or we're going to get --

21                        (Pause)

22 Q     Okay, Dr. Ory, I'm sorry.  I think I was about to ask you

23 about your publications.  Can you just generally broadly

24 characterize the types of publications and research that you

25 did that was published in peer review literature?

1  A    I published a lot of reports on causal epidemiology, that

2  is determining whether or not, say, oral contraceptives cause

3  breast cancer.  I published reports on surveillance-related

4  activities such as after we instituted surveillance at CDC to

5  determine the complications arising from hysterectomy and tubal

6  ligation I published on that subject.

7  Q    Are your publications typically types of epidemiological

8  studies, case control, or cohort, or that type of study?

9  A    Yes.  A lot of them are that.  Some of the work that I did

10 was quite similar to what I've been asked to do here.  And in

11 silica, where -- take information from one set of data and

12 estimate what might happen in another set of data, applying

13 that.  I would call that modeling.

14 Q    Okay.  Could you show 2033, please?  Now, this slide lists

15 some of your professional affiliations, and I think you've

16 already said that you're board certified in preventative

17 medicine, and you're also licensed to practice, is that in

18 Georgia?

19 A    That's correct.

20 Q    Okay.  And what is the society of epidemiologic research?

21 A    It's a society of epidemiologists.

22 Q    Okay.  So, it's other epidemiologists that are in that

23 society?

24 A    Yes.

25 Q    With respect to the American Epidemiologic Society, is

Ory - Direct/Harding                                    24

1  that a society that you can just join, or do you have to be

2  invited by the members of the society to join?

3  A    You have to be invited and elected.

4  Q    And the American College of Preventative Medicine, what

5  does that body do?

6  A    Well, they -- that's who certifies me in preventative

7  medicine, and they do other activities in terms of prevention,

8  trying to promote prevention in the United States.

9  Q    Have you regularly given lectures to some of these groups?

10 A    In the past, yes.

11 Q    Okay.  After you left the CDC, I think -- was that 1994?

12 A    Yes.  I left in '94.

13 Q    What did you do upon leaving CDC?

14 A    I went to work for the Prudential Center for Healthcare

15 Statistics.

16 Q    And what did you do for Prudential?

17 A    I evaluated healthcare delivery information to try and use

18 it to feed back and improve healthcare delivery.

19 Q    Okay.  And when you say healthcare delivery information,

20 what kind of information were you reviewing?

21 A    Well, for example, like looking at medical outcomes, and

22 seeing if they were good outcomes or bad outcomes, and trying

23 to look at, like, different physicians, and see who had the

24 better rates, the kind of standard things that HMOs do these

25 days.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  When you left Prudential, what did you do next?

2  A    Actually, while I was at Prudential I began -- I started

3  doing independent consulting in epidemiology.

4  Q    Okay.  And have you been doing that ever since?

5  A    Yes.

6  Q    Okay.  And has most of your consulting been in the area of

7  litigation?

8  A    Most of it has, yes.

9  Q    Okay.  Have you -- about how many times have you testified

10 in Court, approximately?

11 A    I -- don't hold me to this, but I'm saying 12, 15,

12 somewhere in that order of magnitude.

13 Q    Okay.  Were you involved in the -- actually, let me ask

14 you this -- generally what kind of subject matters have you

15 consulted on and offered testimony in Court on in the past?

16 A    I've consulted on breast implants, pharmaceuticals --

17 those are the two that jump to mind.

18 Q    Okay.  With respect to breast implants, were you involved

19 in the Rule 706 panel and litigation before Judge Pointer?

20 A    Yes, I was.

21 Q    Okay.  What was your role in that litigation?

22 A    I was the testifying epidemiologist for the defense.

23 Q    Okay.  What opinion, or conclusion did you reach that you

24 offered to that panel?

25 A    In short, that the -- based on a giant body of

1  epidemiologic evidence, there was no association between breast

2  implants and autoimmune diseases.

3  Q    Did the Rule 706 panel agree or disagree with your

4  conclusions?

5  A    They agreed.

6  Q    Dr. Ory, in the course of your consulting work have you

7  also continued to consult for the CDC?

8  A    Yes.  From time to time the director of CDC would call me

9  back to help with the -- on the issue of disease surveillance.

10          MS. HARDING:  Okay.  Your Honor, at this time I would

11  like to proffer Dr. Ory as an expert in the field of

12  epidemiology.

13          MR. FINCH:  Brief voir dire?

14          THE COURT:  All right.

15                    VOIR DIRE EXAMINATION

16  BY MR. FINCH:

17  Q    Good morning, Dr. Ory.  My name is Nathan Finch.  I

18  represent the Asbestos Personal Injury Claimants' Committee.

19  It's correct that you had never been recognized by a Court

20  anywhere as an expert on the subject matter of asbestos-related

21  diseases, correct?

22  A    That's correct.

23  Q    It's also correct that you have never treated a patient

24  with mesothelioma since you were in medical school in the

25  1960's, and that was one patient, right?

1  A    I may have seen patients with asbestosis and mesothelioma

2  in medical school and internship.

3  Q    But you haven't treated any of them since -- from then to

4  now?

5  A    That's correct.

6  Q    And you've never been asked to render a diagnosis as to --

7  or, an opinion as to the cause of a particular person's

8  mesothelioma or asbestosis, correct?

9  A    In Court, that's correct.

10  Q    And you've never -- you've never conducted a study on the

11  epidemiology, or survey on the epidemiology of asbestos-related

12  disease, correct?

13          THE COURT:  I'm sorry.  Would you repeat that for me?

14          MR. FINCH:  Yes.

15  Q    You have never personally conducted any studies on the

16  epidemiology of asbestos-related disease, correct?

17  A    That's correct.

18  Q    And you have never published your opinions about the

19  incidence of asbestosis in any kind of peer reviewed medical

20  journal, correct?

21  A    That's correct.

22  Q    You've never published any opinions about the incidence or

23  prevalence of any asbestos-related disease in any journal in

24  the world ever, correct?

25  A    That's correct.  As it relates to asbestos.

1  Q    As it relates to asbestos?

2  A    Yes.

3  Q    And you did not do a survey of all of the medical

4  literature that exists in the world that has statistics about

5  the incidence or prevalence of mesothelioma or asbestosis for

6  purposes of doing your work here, correct?

7  A    I've read an enormous amount of literature about

8  asbestosis and mesothelioma, and -- asbestos, mesothelioma, and

9  asbestosis.

10  Q    So, you've read everything -- all the literature that you

11  believe is relevant to this topic?

12        MS. HARDING:  Object to -- object, Your Honor, to

13  form.  It's overly broad.

14        THE COURT:  No, it's a fair question.  The doctor can

15  certainly answer --

16  A    I've read the literature that, to me, appears relevant to

17  this issue, yes.

18  Q    You read the insulator studies that Dr. Selikoff, and the

19  prevalence of asbestosis, and the incidence of mesothelioma,

20  and those studies?

21  A    Yes.

22  Q    The Mt. Sinai studies?

23  A    Yes.

24        MR. FINCH:  That's all the voir dire I have.

25        THE COURT:  Anyone else?

1          MR. ANSBRO:  A couple of questions, Your Honor.

2                    VOIR DIRE EXAMINATION

3  BY MR. ANSBRO:

4  Q    Good afternoon, Dr. Ory.

5  A    Good morning.

6  Q    Good morning.  Let's not get ahead of ourselves.

7          THE CLERK:  Your name again, please?

8          MR. ANSBRO:  John Ansbro for the FCR.

9  Q    Just following up on a couple of Mr. Finch's questions,

10 you've also not published any articles with respect to the

11 plausibility of asbestosis, have you, sir?

12 A    I don't know what you mean by the plausibility of

13 asbestosis.

14 Q    Plausible claims.  I anticipate that you're going to

15 testify here today, I've read in your report that you have

16 drawn opinions about the number of plausible cases of

17 asbestosis in the United States, correct?

18 A    I just would like to separate the two.  I am going to draw

19 opinions about the plausible cases.  I am not drawing an

20 opinion about how many claims there are.  I'm talking about how

21 many medical -- medically plausible cases, how many human

22 beings might actually have asbestosis, not how many people have

23 claims for asbestosis.

24 Q    You do, then -- we'll get to that in just a bit.  But with

25 respect to your opinions about the plausibility, medical

1    plausibility, you have not written any articles on that topic,

2    correct?

3    A      That's correct.

4    Q      And with respect to the literature that exists over the

5    past 20, 25 years on the topics of mesothelioma, epidemiology,

6    and mesothelioma, causation of mesothelioma, causation of

7    asbestosis, you have not been a reviewer, a peer reviewer of

8    any of those articles either, have you?

9    A      Could you hold that question?  Could we go back to the

10   previous question?  Could you ask the previous question again?

11   I want to expand my answer.

12   Q      The question about plausibility of asbestos?

13   A      Yes.

14   Q      Asbestosis?

15   A      Yes.  Could you just read the previous question?

16              MR. ANSBRO:  May we have it back?

17                          (Pause)

18   Q      Well, let me just -- my question was, if I'm recalling it

19   right, that you had not authored any --

20              MS. HARDING:  I think he just wants to hear the

21   question back.

22              THE WITNESS:  The previous question, not this one.

23              THE COURT:  All right.  You can't keep talking and

24   have the Court reporter go back.  So, either you have to be

25   quiet and let her go back and get the record, or else you have

1  to re-ask the question.  You can't do both.  So, pick one.

2          MR. ANSBRO:  May we go back to the question before I

3  turned to the mesothelioma?

4          THE COURT:  All right.

5                         (Pause)

6          MR. ANSBRO:  May I read what I've --

7          THE COURT:  No, sir.

8                         (Pause)

9                    (Audio played back)

10         MS. HARDING:  That's the video of Dr. Biggs.

11         UNIDENTIFIED ATTORNEY:  That's the Biggs again.

12         THE COURT:  I know.  Cathy, do you not know how to do

13  it?

14         THE CLERK:  It's just not working, Your Honor.

15         THE COURT:  Kevin, Cathy needs some help replaying a

16  piece of the tape.  Could you please come up?  She said the

17  system isn't functioning properly, and there are Court

18  reporters here who are taking the record, but I can't use them

19  because it's not the official transcript, so if you could

20  please come up for a second?  Thank you.

21                         (Pause)

22         THE COURT:  That was going back to nine o'clock

23  yesterday, Cathy, not today.

24         THE CLERK:  No.  It went back to nine o'clock

25  (indiscernible).

Ory - Voir Dire/Ansbro                                    32

1           THE COURT:  Okay.  Well, what was playing before was

2 Mr. Bernick.

3           THE CLERK:  I have the right date (indiscernible).

4           THE COURT:  All right.

5                         (Pause)

6           THE COURT:  Why don't we take a five minute recess?

7 It's apparently going to take a few minutes to get this done,

8 so we might as well get the system fixed.  All right.  Thank

9 you.

10                        (Recess)

11                     (Audiotape played)

12           THE COURT:  All right.  Cathy, can you stop this so I

13 can call the case back on the record?

14           THE CLERK:  Pardon me?

15           THE COURT:  You need to stop it so I can get the case

16 back on the record.  All right.  Is everyone back?

17           UNIDENTIFIED SPEAKER:  I believe so.  We're ready to

18 proceed, Your Honor.

19           MS. HARDING:  We're ready to proceed.

20           THE COURT:  All right, Cathy.  I think we can start

21 again, because it will come up quickly enough at this point.

22 Doctor and Mr. Ansbro, are you ready?

23           THE WITNESS:  I am.

24           THE COURT:  All right.  Okay, Cathy.

25           THE CLERK:  Do you want me to play it?

1        THE COURT:  Yes.  I want you to -- do you know where

2   the question is?  Do you have go to --

3                      (Audiotape played)

4        MR. ANSBRO:  We can stop there.

5        THE COURT:  Now, Cathy, can you stop, please, and go

6   to the -- go to where you can start recording again.  All

7   right, Doctor, now you can --

8                 CONTINUED VOIR DIRE EXAMINATION

9   BY MR. ANSBRO:

10  A    It was the question -- you asked that question, what was

11  the medical plausibility of asbestosis.  I didn't -- actually,

12  I don't understand what that question meant.

13  Q    I was asking you about whether you had published any

14  articles on the topic of the medical plausibility of the

15  incidence of asbestosis in the United States, let's say.

16  A    I still don't understand the question.

17  Q    What is it about my question that you don't understand?

18  A    Are you asking me if I published articles about the

19  incidence of asbestosis in the United States?

20  Q    We'll start with that one.  Sure.

21  A    I have not.

22  Q    Okay.  Now, with respect to what you characterize as the

23  medical plausibility of cases of asbestosis, which is the topic

24  of your report here, have you published any materials outside

25  of this case on this topic?

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    Well, let me --

2         MS. HARDING:  I'm just going to object to the

3  (indiscernible) term, medical plausibility.  I think that

4  there's a little bit of a disconnect.  I don't --

5         THE CLERK:  We're not picking you up.

6         MS. HARDING:  -- I think it mis-characterizes --

7         UNIDENTIFIED SPEAKER:  She's not -- you have to speak

8  into the mike.

9         THE COURT:  You have to speak into a microphone.

10        MS. HARDING:  I think it mis-characterizes the report

11 in terms of the use of medical plausibility.  I think he's --

12 plausibility of --

13        THE COURT:  The witness has already said he doesn't

14 know what you mean by medical plausibility, so the objection is

15 sustained.

16 Q    Dr. Ory, in your report you make reference to what you

17 characterize as medically plausible incidence of asbestosis,

18 yes?

19 A    Yes.

20 Q    What did you mean by that?

21 A    I mean a number of cases that could reasonably exist in

22 the United States, the number of actual cases of asbestosis

23 that could reasonably be held to exist in the United States.

24 Q    Okay.  And just so that we're clear, then, Doctor, so when

25 you -- when I use the term, and as you use the term medically

1 plausible, you're referring to a case that could reasonably

2 exist?  That's a real case that's been diagnosed and is --

3 that's asbestosis --

4 A    And I'm thinking here of sort of, like, when I count --

5 when I did a study of oral contraceptives and breast cancer, I

6 used the SEER data to tell me how many cases of breast cancer

7 existed in the United States as diagnosed and collected -- as

8 diagnosed by physicians and then collected by SEER and compiled

9 that way.

10 Q    Okay.  In this case, then -- let me -- when you use the

11 term medically plausible, then, are you suggesting that that's

12 something other than the patient actually has the disease by a

13 reliable diagnosis?

14 A    No.  That's what I'm suggesting, that the patient has the

15 disease by a reliable diagnosis by a physician.

16 Q    And am I correct in understanding that for cases that you

17 refer to as not medically plausible, in your view, is the case

18 that they do not have the disease, correct?

19         MS. HARDING:  Object --

20 A    All I'm talking about is how many cases -- I'm making an

21 estimate of the number of cases, as we've said before, that

22 could be diagnosed in a reliable fashion by a physician.  What

23 the other cases are, if there are cases above that, I don't

24 know what they are, but they don't fit my definition.  If there

25 are, for example, claims above that that suggests there are

1   more cases, I don't know what those might be.

2   Q    Understood.  Now, Doctor, I'm correct, am I not, that you

3   have not examined any of the current claimants in this case,

4   the claimants that have pre-petition lawsuits against Grace?

5   You have not undertaken any review of their medical records?

6   A    That's correct.

7   Q    And you have not reviewed the medical records that were

8   submitted in connection with the PIQ process, correct?

9   A    That's correct.

10  Q    With respect to the RAND claiming data, you make some

11  reference there to the RAND claiming information in your

12  report.  You have not undertaken a review of any of the medical

13  records of any of those claimants, have you?

14          MS. HARDING:  Your Honor, I'm going to object to this

15  line of questioning.  This is supposed to be a voir dire about

16  his qualifications to the analysis.

17          THE COURT:  You're getting into the merits.  That's

18  sustained.

19          MR. ANSBRO:  That's all I have, then, Your Honor.

20          THE COURT:  All right.  Anyone else?  Ms. Harding?

21          MS. HARDING:  Your Honor, I proffer the witness as an

22  expert in the field of epidemiology.  I don't know if there's

23  an objection.

24          THE COURT:  Anyone objecting?  There is no objection.

25  The witness will be permitted to offer an expert opinion in the

1  field of epidemiology.

2                    CONTINUED DIRECT EXAMINATION

3  BY MS. HARDING:

4  Q    Dr. Ory, you conducted several different analyses

5  concerning mesothelioma and asbestosis rates of incidence in

6  the United States in this matter.  Is that correct?

7  A    That's correct.

8  Q    I'd like to just walk up to the board and talk about the

9  first inquiry.  Okay?

10 A    Okay.

11             THE CLERK:  I'm sorry (indiscernible).

12 A    Before you begin, could I ask you a question?  There was a

13 line of questioning you started down before we were interrupted

14 by the qualification question.  Did you want to go back to

15 that?

16 Q    I frankly don't remember what it was.

17 A    About the opening statements yesterday.

18 Q    No, we already -- I --

19 A    Okay.  About the opening --

20 Q    I think I've already asked you that.

21 A    Okay.

22 Q    Yes.  For now.  I'm going to come back to that.  Thank you

23 --

24 A     Okay.

25 Q    -- Dr. Ory.  The first analysis that you looked at in this

Ory - Continued Direct/Harding                    38

1  case is you attempted to estimate the incidence of male

2  asbestosis that occurred in the U.S. from 1989 to 2001.  Is

3  that correct?

4  A     That's correct.

5  Q     How did you go about conducting that analysis?  What's the

6  first step that you took?

7  A     Well, the first step was attempting to look in the United

8  States to see if there was any information about the incidence

9  of asbestosis in the U.S., and I couldn't find any, and almost

10  anyone who has written on it said there are no reliable

11  information on that subject.

12  Q     Okay.  Was that the end of your inquiry?  Were you kind of

13  stuck?

14  A     No.  I began to think of an alternative way to do it.  I

15  know that there's excellent information in the United States on

16  mesothelioma incidence.  I know that mesothelioma incidence is

17  certainly a proxy for asbestos exposure.  That is the whole

18  guts of the Nicholson projection, for example, is based on that

19  fact.  And so, I know that asbestosis and mesothelioma are

20  caused by the same substance, and I figured there must be a way

21  to derive a ratio of asbestosis to mesothelioma.

22  Q     Okay.  The deriving ratios and calculating ratios, and

23  investigating studies, and looking for ratios, is that the work

24  of epidemiologists?

25  A     It's probably the bread and butter of epidemiology.  Every

1  study you read has a rate ratio in it.  Every occupational --

2  every occupational epidemiologic study probably uses an SMR,

3  which is called a standardized mortality ratio, so ratios are

4  ubiquitous in epidemiology.

5  Q    Is there any precedent in the scientific literature for

6  the creation of such a ratio between asbestosis and

7  mesothelioma?  The reason I ask that question is because you've

8  -- in your deposition you were asked questions about whether

9  what you did was novel.  And then I think you explained that,

10 yes, generally, it was.  But with respect to the idea and the

11 scientific credibility of doing it, is there any precedent for

12 that?

13 A    Again, as I mentioned earlier, the entire Nicholson

14 analysis is based on ratios.  Nicholson mostly didn't have

15 available exposure data, and so he made ratios of various

16 levels of mesothelioma rates in different occupational groups,

17 and used that to estimate the exposure.  So, in this field of

18 asbestos, and looking at future illness, there is considerable

19 precedent for doing this.

20 Q    Once you decided upon your methodology, what did you do

21 next?

22 A    I needed a database that had reliable, accurate, and

23 complete information on mesothelioma, and asbestosis, to create

24 such a ratio, and from previous work that I had done at the

25 CDC, I knew of the Boston Collaborative -- the BCDSP, the

1  Boston Collaborative Drug Surveillance Program, and I knew they

2  maintained a database that would probably have this kind of

3  information.

4  Q    Okay.  Could you tell the Court a little bit about -- is

5  it the GPRD?  Is that correct?

6  A    Right.  The --

7  Q    What kind of database is it?  What does it collect?

8  A    Right.

9  Q    What kind of information?  And where does it collect it

10 from?

11 A    Right.  The people in Boston work with the people in the

12 U.K.  In the U.K., the general practitioners are the

13 gatekeepers of healthcare, much like an HMO in this country, at

14 least for the National Health Service.  And so, they have

15 information on the entire medical treatment of all the people

16 in their practices.  And starting about 1989, this information

17 was computerized, and constantly validated, and massaged, and

18 made to be useful for epidemiology.  I think currently there's

19 some 500 epidemiologic studies published from the GPRD

20 database.  So, this is a highly reliable, accurate, complete,

21 validated data set in the U.K.

22 Q    Why was it particularly suited, or was it particularly

23 suited for your purpose?

24 A    Well, the main thing was after one phone call I determined

25 that, yes, they had information on both mesothelioma and

1  asbestosis in numbers sufficient enough to allow me to make a

2  fairly robust estimate.

3  Q    Okay.  So, did you use standard methods in creating this

4  -- the ratio between asbestosis and mesothelioma with respect

5  to the GPRD?

6  A    Very standard in the sense that I counted the cases of

7  mesothelioma -- the incident cases of asbestosis and I counted

8  the incident cases of mesothelioma, and divided the two numbers

9  and came up with a ratio.  That's pretty straightforward.

10  Q    Okay.

11           MS. HARDING:  Could you show 2036, please?

12  Q    Dr. Ory, could you take a look at this?  Is this the chart

13  that appears on -- 2036, is this an accurate representation of

14  the -- of your -- the conclusions and the final result of your

15  analysis of the GPRD for a ratio of asbestosis to mesothelioma?

16  A    Yes.  This looks like Table 1 in my report, and the main

17  part of it, really, is highlighted in yellow.  There were 751

18  incident cases of asbestosis in men, there were 794 incident

19  cases of mesothelioma in men in this time period.  That gives a

20  ratio of .95, and that -- and I then broke it down further by

21  age and time period, and the ratio didn't change at all.  I

22  made sure there was no confounding by age, or time trends.  The

23  unadjusted ratio and the adjusted ratio are both .95.

24  Q    What does the ratio of .95 to one, asbestosis to

25  mesothelioma, within this population, tell you?

1 A    I means, essentially, that in this population essentially

2 for every person diagnosed with mesothelioma, there will be

3 about one, or slightly less than one diagnosed with asbestosis.

4 Q    Slide 2036, I think I asked this already, but I want to

5 just double check.  It accurately reflects the conclusion that

6 you reached in the analysis that you did with respect to the

7 ratio of asbestosis to mesothelioma in the GPRD.  Is that

8 correct?

9 A    Yes.

10         MS. HARDING:  Okay.  Your Honor, the debtors would

11 move into Evidence GG-2036.

12         THE COURT:  It's admitted.

13         UNIDENTIFIED ATTORNEY:  No objection.

14         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

15 Q    Dr. Ory, in getting to the ultimate question here, which

16 was what is the incidence of asbestosis in the United States

17 from 1989 to 2001, what did you do next with respect to the

18 ratio that you had derived from the GPRD data?

19 A    Well, I looked to see if the mesothelioma incidence in the

20 U.K. was higher or lower than it is in the United States, and

21 determined that the incidence in the U.K. was almost two and a

22 quarter, two and a half times higher than that in the U.K.

23         THE COURT:  Wait.  I'm sorry.  Would you say that

24 again?

25         THE WITNESS:  My answer?

**J&J COURT TRANSCRIBERS, INC.**

1       THE COURT:  Yes, please.

2       THE WITNESS:   looked to see if the incidence of

3 mesothelioma in the United Kingdom and in the GPRD was higher

4 or lower than the incidence of mesothelioma in the United

5 States.

6       THE COURT:  Yes.

7 Q    Why did you do that?

8       THE COURT:  No, I understand that that.  I just

9 didn't know which was higher, the U.S. or the U.K.

10       THE WITNESS:  The U.K. is higher.

11       THE COURT:  All right.  Thank you.

12 Q    And why did you look for that, and what did the fact that

13 it was higher tell you?

14 A    I wanted to make sure that the ratio that I developed was

15 not an underestimate.  I wanted to make sure that the ratio

16 that I developed was at least equal to the ratio in the United

17 States, or an overestimate.  And since asbestosis and

18 mesothelioma -- asbestosis is more dose dependent mesothelioma,

19 so if the mesothelioma rates are higher, I know the asbestosis

20 rates are probably even higher than that, so my opinion is that

21 the .95 to one ratio that I have developed in the U.K., in

22 fact, over represents the ratio in the United States.

23 Q    It was suggested in your deposition, Dr. Ory, that the

24 GPRD data did not capture as many asbestosis cases that were

25 actually occurring in that population.  What is your opinion

1  with respect to that criticism?

2  A    Well, first of all, the GPRD, you know, is a large study.

3  It has -- it covers information on three million people.  And

4  secondly, I now have compared the proportion of asbestosis

5  cases that the GPRD collects relative to that proportion --

6  relative to the number in the U.K., and I know that the

7  proportion that the GPRD collects is higher.  I'm not saying

8  this very clearly.  The GP -- let me start again, please?

9  Q    Sure.  That's fine.  It's a difficult concept.

10  A    The GPRD represents about 3.7 percent -- the GPRD monitors

11  about 3.7 percent of the people in the United Kingdom.  If --

12  so, if the number of asbestosis cases that the GPRD collects is

13  higher than 3.7 percent of the cases in the U.K., then I know

14  that the GPRD is not under representing asbestosis.  And I have

15  made that comparison, and, in fact, the GPRD collects about

16  two-and-a-half times as many cases as you would expect

17  proportionately.

18  Q    Okay.

19  A    Sorry.  That was not --

20  Q    That's okay.  Once you were certain that the ratio from

21  the U.K. did not -- would not underestimate the number of

22  asbestosis cases in the United States, what did you do to

23  derive or calculate the incidence of asbestosis in the United

24  States?

25  A    As I said, we knew the mesothelioma data in the United

1  States is very good, so I used the SEER mesothelioma data,

2  derived an estimate of the total number of mesotheliomas

3  occurring in the United States between 1989 and 2001, and then

4  applied the -- and that number was about 29,000, and then I

5  applied the .95 to one ratio to that, and that yielded about

6  27,970, or about 28,000 cases of asbestosis.

7  Q    And what time period would that cover?

8  A    That's 1989 to 2001.

9  Q    Before I ask you a little bit more about the final

10 analysis, the SEER data, you mentioned the SEER data, that's

11 the data that you used to -- for the incidence of mesothelioma

12 in the United States, is that right?

13 A    That's correct.

14 Q    Okay.  Is that data set a reliable data set for this

15 purpose?

16 A    SEER data is considered the gold standard of cancer

17 surveillance in the United States.

18 Q    Have you read many of the expert reports in this case,

19 both from the debtors as well as from the future claimants and

20 the asbestos claimants?

21 A    Yes, I have.

22 Q    Okay.  Are you aware whether or not the -- all of the

23 experts in this case used the SEER data with respect to

24 mesothelioma?

25 A    All the experts do.  The ones I've read, and certainly

1  everyone who writes about this subject, and the literature also

2  uses SEER data.

3           MS. HARDING:  Could you put up 2037, please?

4  Q    Dr. Ory, if you'll look at this?  Is 2037, the table that

5  appears there, does that accurately reflect your final analysis

6  with respect to the mesothelioma -- I'm sorry -- the asbestosis

7  mesothelioma ratio and the incidence of asbestosis in the

8  United States from 1989 to 2001?

9  A    Yes, it does.

10          MS. HARDING:  Your Honor, we would move 2037 into

11 Evidence.

12          MR. ANSBRO:  No objection.

13          THE COURT:  It's admitted.

14          THE COURT:  Cathy, can you by any chance move that

15 piece of white paper?  I can't see the clock figures, so I

16 can't get an estimate of -- thank you -- of the slide numbers.

17 Thank you.  Of the clock counter.

18 Q    Dr. Ory, moving on to task two, and I'm going to pull this

19 up first and then I want to ask you some questions before we

20 start.  You were asked some questions in the voir dire exercise

21 about claims and cases, and I want to try to get the

22 terminology right before we start this discussion, because it

23 can get confusing, as you and I know from talking about this.

24 What is a case?  When you talk about a case, what are you

25 talking about?

1  A    I'm talking about a person who has asbestosis diagnosed by

2  a physician.

3  Q    Okay.  And when you talk about plausible number of cases,

4  that's exactly what you mean?  Is that right?

5  A    Yes.

6  Q    Okay.  What was your task, or what inquiry did you take to

7  -- with respect to number two here?

8  A    In trying to estimate the plausible number of individuals

9  with the disease asbestosis among the Grace claims, I used two

10  data sets.  I used what I referred to as the Grace historical

11  claims data, and you may give it a more proper name, and the

12  RAND report on individual claimants -- the RAND report on

13  individual claimants.  And putting those two -- using the

14  information from both those data sets, I was able to estimate

15  that there are approximately 380,000 claims for asbestosis in

16  1989 to 2001 among men.

17          MS. HARDING:  Could you put up 2040, please?

18  Q    Doctor, what does 2040 reflect?

19  A    2040 reflects, by time period, the number of claims filed,

20  and the number of cases that I consider that we're referring to

21  as plausible, medically diagnosed cases of asbestosis.  I'm

22  sorry.  I'm color blind.  You'll have to tell me what color the

23  bar on the right is.

24  Q    The bar on the right is orange, and the one on the left is

25  blue.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Blue.   Right.   The orange line represents the claims for

2  asbestosis, and the blue line represents plausible medical

3  cases.   And basically, if you look at the total, that's the

4  380,000 cases, and that's the 28,000 of people who could

5  plausibly have asbestosis, and that ratio is 14 to one.

6  There's 14 times more claims than there are plausible cases.

7  Or, you can flip that around, and it's 7.4 percent of the

8  claims could plausibly be medically plausible cases.   I'm

9  sorry.   I used the word twice.

10 Q    Dr. Ory, does this exhibit, 2040, accurately represent

11 your analysis of the plausible number of asbestosis cases in

12 the United States as compared to the number of claims for

13 asbestosis that have been made?

14 A    It does.

15       MS. HARDING:   Your Honor, we would move 2040 into

16 Evidence.

17       MR. FINCH:   No objection, Your Honor.

18       MR. ANSBRO:   No objection, Your Honor.

19       THE COURT:   It's admitted.

20 Q    Dr. Ory, did you then attempt to -- did you then actually

21 apply the same ratio to the claims in this bankruptcy matter?

22 A    Yes.   That's exactly what I did.

23 Q    And what did your analysis, what was the conclusion of

24 your analysis?

25 A    I think you have a slide.   Could you --

Ory - Continued Direct/Harding                    49

1  Q    Yes.   It's -- I'm sorry.   2041.

2  A    I was informed that there was 63,400 claims against Grace

3  where I -- I forgot -- the PIQ was, where the PIQ was filled

4  out.   And so, of those 63,400 claims, 7.4 percent of them is

5  4,800, so that would represent my best estimate of medically

6  plausible people who could plausibly have asbestosis.

7  Q    Okay.   With respect to the actual number of claims in the

8  bankruptcy against Grace, current claims in a bankruptcy

9  against Grace, you relied upon data that you were provided by

10 ARPC with respect to that number, correct?

11 A    That's correct.

12 Q    And you are not offering any opinion about whether that

13 number should be higher or lower, correct?

14 A    That's correct.

15 Q    Okay.   With respect to the ratio that should be applied to

16 the claims that had been filed against Grace, and that are

17 before the Court, do you have -- can you explain again, just

18 quickly, what that ratio would be?

19 A    That ratio is 7.4 percent.

20 Q    Okay.

21 A    That is the -- derived from the previous slide.   That's

22 the -- from 1989 to 2001, that's the 14 to one ratio, or seven

23 percent applied here.   I have had an afterthought that if you

24 go back to the previous slide you see that the -- in the time

25 period closest to where we are now, the ratio -- that ratio,

1 actually, is 20 to one, not 14 to one.  I could have applied

2 that ratio too.  It would, in some ways, make more sense.  But

3 again, being conservative on this issue, I just took the ratio

4 of that from the whole time period.

5 Q    Actually, I was going to ask you, did you do anything to

6 validate or confirm your conclusion that you had not

7 underestimated the plausible number of disease cases with

8 respect to Grace claims, and is that -- is that what you did?

9 A    That would be my answer to that question.

10 Q    Okay.  Can you explain one more time why it is that that

11 confirms, in your mind, as a scientist, that you have not

12 underestimated the number of plausible cases of disease in the

13 Grace claim population?

14 A    Well, if I took the estimate of 20 to one, I would -- that

15 was from the most recent time period, which is probably most

16 applicable to the cases still -- whatever the words are --

17 still in settlement, or -- I'm not sure what the right words

18 are -- pending, still pending.  So, if I took the ratio from

19 the most recent time period, which would probably be more

20 relevant, that would have been a five percent ratio, and I

21 would have applied five percent instead of seven percent, and

22 gotten a number below 4,800.  So, 4,800 is not a low estimate.

23 Q    With respect to Exhibit 2041, does it accurately reflect

24 your conclusion with respect to the plausible Grace asbestosis

25 claims compared to total Grace asbestosis claims with respect

Ory - Continued Direct/Harding                    51

1 to plausible numbers of disease cases?

2 A    It does.

3         MS. HARDING:  I would like to move 2041 into

4 Evidence, Your Honor.

5         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

6         MR. FINCH:  Your Honor, the chart says asbestos

7 claims, not asbestosis claims.

8         THE COURT:  Yes.  I believe the title needs to be

9 corrected, and I will understand that the title should say

10 Grace asbestosis claims compared to Grace asbestosis claims,

11 not asbestos claims.  With that correction is there nay

12 objection?

13        MR. FINCH:  No, Your Honor.  Just for -- I guess this

14 is Mr. Bernick's (indiscernible) rule, these are demonstrative

15 exhibits coming into Evidence.  I am not objecting to them

16 coming in for demonstrative purposes.  When my experts are on

17 the stand I'd tend to do a similar sort of thing.  So, what's

18 good for the goose is good for the gander, as long as the

19 expert confirms this is what his conclusions are.

20        THE CLERK:  Stay close to the microphone, please.

21        THE COURT:  Right now there is no objection to

22 Exhibit 2041.  It is admitted.

23        MS. HARDING:  Your Honor, just to clarify, I -- we're

24 moving to admit the demonstratives that Dr. Ory has confirmed

25 are the accurate results of his analysis, and not just

**J&J COURT TRANSCRIBERS, INC.**

Ory - Continued Direct/Harding                    52

1 everything.  Only the ones that reflect his analysis and the

2 underlying analysis and conclusions that he reached from his

3 analysis.

4            THE COURT:  Yes.

5            MR. FINCH:  With the understanding that they're being

6 offered for demonstrative purposes.

7            MS. HARDING:  No.  They're being moved into Evidence.

8            THE COURT:  Well then, they're summary charts,

9 because obviously that's all they can be is summary charts.

10            MS. HARDING:  Yes.

11            MR. FINCH:  With that understanding, there's no

12 objection.

13            THE COURT:  All right.

14 Q    Dr. Ory, before we move away from Exhibit 2041, I just

15 want to clarify something that I think may have caused a little

16 confusion earlier on.  When you were offering this testimony

17 and you've rendered your opinion, you are looking at how many

18 of the claims, based on your analysis of how many asbestosis

19 cases there actually are in the United States could have been

20 real disease cases.  You're not rendering an opinion about

21 whether or not the claim is otherwise valid in some way legally

22 with respect to exposure, or some other requirement of a legal

23 claim, correct?

24 A    That's correct.

25 Q    Dr. Ory, you were next --

1  A    Everything just went dark.

2  Q    -- conducted an analysis of the future incidence of

3  mesothelioma and asbestosis in the United States.  Is that

4  correct?

5  A    That's correct.

6  Q    Okay.  I'm going to --

7                    (Pause)

8  Q    Let's talk, first, about your analysis of the future

9  mesothelioma incidents in the United States.  How did you go

10 about conducting that analysis?

11 A    I looked at all the projections of -- all the projections

12 of mesothelioma -- future mesothelioma in the United States,

13 and then I compared them with what the actual SEER and now

14 SEER/CDC shows on the actual number of mesotheliomas occurring

15 in the United States.  So, for example, Dr. Nicholson, in 1992,

16 he -- I'm sorry -- 1982, he made a projection, and probably a

17 bell-shaped curve is familiar to everybody in the room.  And I

18 was impressed that in 1982 he made a projection that showed

19 there would be 3,000 cases -- wold peak at about 3,000 in the

20 United States in the year 2002.  And the curve had a particular

21 shape.  And when I looked at the actual SEER data, and compared

22 it to Dr. Nicholson's projection, I was struck that the shape

23 of the curve was very close to Dr. Nicholson's shape, and the

24 only difference was the amplitude.  Dr. Nicholson said the

25 curve would peek at 3,000 cases, it actually peaked around

Ory - Continued Direct/Harding                 54

1  2,500.  In other words, I compared his projection made in 1982

2  to the actual data that -- the projections that he made of the

3  number of cases that would occur in 2002, and I compared that

4  with the actual number of cases that occurred in 2002, and

5  noted they were about 500 apart, but that the shapes of the

6  curve were very similar.

7  Q    Could you possibly show us that?  You've drawn it for me

8  before, and it helps me understand it.  I think it might help

9  the Court if you could show what the Nicholson --

10  A    Right.

11  Q    -- projection was, and then what the real data show.

12  A    I'm sorry.  So, starting in the -- in 19 --

13            THE CLERK:  You need to use the hand mike.

14  A    So, in 1982, Nicholson (indiscernible), and basically --

15            THE CLERK:  I don't think we're picking you up.

16  A    (Indiscernible).

17            THE COURT:  I hear it, too, Cathy.  He must not be

18  coming through your system.

19            THE CLERK:  (Indiscernible).

20            THE COURT:  The deck.

21            THE COURT:  Doctor, I don't know whether this

22  microphone will stretch over to where you are going.  Will you

23  see whether -- it should pull up and out.

24                      (Pause)

25            THE COURT:  But you have to get rid of the handheld

**J&J COURT TRANSCRIBERS, INC.**

1  mike -- or it will cause the feedback.

2           THE WITNESS:  All right.  Does this help?

3           THE WITNESS:  Yes.

4  A        Okay.  So, in 1982, Nicholson made this projection,

5  and this is about 2002, up here, and Nicholson said the curve

6  for white males would peak at 3,000 mesothelioma cases in 2002,

7  and it would more or less have a shape like this.  Well, when

8  you look at the SEER data, you can compare this, and generally,

9  I'm smoothing this, generally the SEER data follows the shape

10 of the Nicholson curve, the only difference being in 2002 the

11 SEER data is just under 2,500.  So, I was very impressed by

12 this, that we have an accurate person who understood the

13 epidemiology of the relationship between asbestos exposure and

14 mesothelioma well enough to draw a curve that was this accurate

15 20 years into the future, and so, it seemed to me that there

16 really -- and it's published, and I can understand how he did

17 it, so it seemed to me this was the most appropriate projection

18 to use.  And I made a -- but I have to make a one-time

19 amplitude correction for this of about 20 percent, since it's

20 about 20 percent lower.  So, Nicholson -- the rest of

21 Nicholson's curve says there would be 55,000 more mesotheliomas

22 occurring, and if you correct that one time for 20 percent, you

23 would end up with this curve paralleling this curve, and being

24 20 percent lower, so you'd end up with 44,000 cases of

25 mesothelioma, taking into account this -- keeping everything

1 the same about Nicholson except making this one-time amplitude

2 correction.

3 Q    A couple of questions with respect to what you said.  You

4 mentioned the word smoothing of the curve.  And smoothing of

5 the curve, what you mean by that is you did the best fit for

6 the data, correct?

7 A    Actually, I just used a five-year moving average just to

8 -- so that the curve -- the real curve wouldn't look like a

9 picket fence, just so that, visually, when you look at it you

10 can just get a sense of the shape of the curve.

11 Q    And epidemiologists do that kind of exercise regularly,

12 correct?

13 A    Yes.

14 Q    Okay.  And there's a method for doing that, correct?

15 A    There are many methods.

16 Q    Okay.  And is -- would it be -- I'm going to have to

17 approach.

18                        (Pause)

19 Q    Would it be improper to take a curve and then extend it

20 out into the future without any data after having smoothed it a

21 certain way and making it go in a certain direction?  Do you

22 understand what I'm saying?

23 A    No, I don't.

24 Q    Let me see if I can figure out how to say this.  I'll ask

25 it --

1  A      Perhaps I could help?  The smoothing of the curve was just

2  simply for appearance's sake.  It has nothing to do with the

3  projection.  The projection only depends on the one-time

4  amplitude correction.

5  Q    Okay.  The smoothing of the curve had to do with the

6  actual data, the observed data in the SEER data set, correct?

7  A    That's correct.

8  Q    Okay.  And the smoothing had nothing to do with your

9  actual projection, which we'll talk about in a few minutes?

10  A    That's correct.

11  Q    Thank you.  Now, I want to ask you another question.  You

12  said you made a correction for the 20 percent over-prediction

13  by Dr. Nicholson, correct?

14  A    Yes.

15  Q    Before conducting your projection into the future?

16  A    That's correct.

17  Q    Okay.  Would it be appropriate, as an epidemiologist, to

18  see the SEER data, understand that it underestimates the

19  Nicholson projection, yet still use the Nicholson projection

20  without somehow at least correcting for that under --

21  overestimate?

22  A    I would think any time you make a model, you always want

23  to constrain it to reality, and I have a distinct advantage

24  that Nicholson didn't have, which is 20 years of SEER

25  experience, and it would be incorrect, probably, not to

Ory - Continued Direct/Harding                    58

1  constrain his projection to reality.

2  Q     Dr. Ory, Exhibit 2043 --

3         MS. HARDING:  Could you put that up, please?

4  A     Can we move this back so I can see the -- the conclusion

5  board there?

6                        (Pause)

7         MS. HARDING:  That's good.  Thank you.

8  Q     Dr. Ory, Exhibit 2043, could you explain what that

9  depicts?

10 A     That depicts sort of what I was trying to explain on the

11 board, that is, the top line, which I guess is blue, is

12 Nicholson's -- that's Nicholson's projection.  The left hand

13 side of the bottom line is the smoothed SEER data, and then

14 where it changes to open boxes, that is -- that's just applying

15 the Nicholson rate changes to the one time amplitude

16 correction, and showing what that curve would look like in the

17 future.

18 Q     Okay.

19 A     That's a -- what the projected mesotheliomas would look

20 like going into the future.

21 Q     This is your analysis of the SEER data using the Nicholson

22 projection methodology to come up with the total number of

23 mesothelioma cases into the future in the United States.  Is

24 that right?

25 A     That's correct.

1 Q    Okay.  Could you --

2            MR. FINCH:  Your Honor, by cases he means

3 mesothelioma incidences or deaths, not --

4            THE CLERK:  Speak into the mike, please.

5            THE WITNESS:  I mean incident cases of mesothelioma

6 as recorded by SEER and CDC.

7            MR. FINCH:  He's not talking about lawsuits or

8 claims?  I just wanted to make that clarification.

9            THE WITNESS:  Right.  I'm talking about men diagnosed

10 with mesothelioma.

11 Q    Dr. Ory --

12           MS. HARDING:  Your Honor, we would move Exhibit 2043

13 into Evidence as an accurate reflection of Dr. Ory's analysis

14 of the SEER data, and using the Nicholson projection into the

15 future.

16           MR. ANSBRO:  No objection, Your Honor.

17           MR. FINCH:  No objection.

18           THE COURT:  It's admitted.

19 Q    Dr. Ory, the next slide, which is 2044, does that

20 accurately reflect I think what you just told the Court, that

21 your analysis predicts that there will be 44,000 men developing

22 mesothelioma in the U.S. between 2003 and 2027?

23 A    That's correct.

24 Q    And that analysis takes account of your observations that

25 are -- I'm sorry -- of the observations that are collected, the

1  actual cases of disease that are collected in the United States

2  by the SEER data, is that right?

3  A    That takes the actual SEER -- number of SEER cases and

4  corrects the Nicholson projection using the actual number of

5  SEER cases.

6  Q    Okay.

7         MS. HARDING:  We've move 2044 into Evidence.

8         UNIDENTIFIED ATTORNEY:  No objection.

9         UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

10         THE COURT:  It's admitted.

11  Q    Dr. Ory, did you then conduct an analysis based on that

12  projection as to the asbestosis incidents in the United States

13  going forward?

14  A    Yes, I did.

15         MS. HADING:  2045, please.

16  Q    What was the result of that analysis?

17  A    I applied the .95 to one ratio to the 44,000 cases, and

18  came up with 42,000 cases of asbestosis that might be occurring

19  in men from 2003 to 2007.

20  Q    What is your -- did you do any test, or is there any

21  information that informs you as to whether or not that's likely

22  to be an over-prediction or an under-prediction?

23  A    Well, again, I believe it's really quite a large over-

24  prediction.

25  Q    And why is that?

1  A    Well, again, first of all, I think the -- because the

2  mesothelioma rates, and hence the asbestos exposure in the U.K.

3  is higher than in the U.S., I believe the ratio is higher, and

4  so that -- if we had a more accurate ratio, a lower ratio, I

5  would have estimated fewer cases.

6  Q    I'm sorry.  Were you done?

7  A    No.  Yes, I'm done.

8  Q    Okay.

9         MS. HARDING:  Your Honor, we move 2045 into Evidence

10  as Dr. Ory's -- an accurate summary of Dr. Ory's conclusion

11  with respect to his analysis of the maximum number of cases of

12  asbestosis in the United States going into the future.

13         MR. FINCH:  No objection, Your Honor.

14         MR. ANSBRO:  No objection.

15         THE COURT:  It's admitted.

16  Q    Dr. Ory, at the beginning of your testimony here, I played

17  an audio of counsel's opening argument that stated that

18  asbestos diseases are still on the upswing in the United

19  States.  Do you recall that?

20  A    Yes, I do.

21  Q    Have you formed an opinion on that issue on the basis of

22  your analysis of asbestosis and mesothelioma incidence in the

23  United States?

24  A    I have.

25  Q    I'd like to talk with you about -- I'm going to actually

Ory - Continued Direct/Harding                          62

1 write it down.

2                              (Pause)

3 Q    Dr. Ory, let's first talk about asbestosis in the United

4 States and the future course of asbestosis.  You've just

5 testified about your prediction about the course of that

6 disease.  The first thing that I want to ask you is did you do

7 anything else to validate, other than what you've said already,

8 to further validate that conclusion?

9 A    I did a number of things.

10 Q    Did you look to data in the U.K. first to validate that?

11 A    That's the first thing I did.

12 Q    What did you do?

13 A    I looked at the age specific -- the incidence of -- I

14 looked at ratios -- could you put up the slide?  It would be a

15 lot easier for me to explain this from the slide.  It's

16 complex.  I looked at the ratio in the GPRD data, and I looked

17 at asbestosis rates over time by age, 1989 to 2005, and so, for

18 example, on the leftmost set of bars you can see that the

19 number of cases of asbestosis was much lower, the incidence was

20 much lower in -- as we went forward in time, and you can see

21 that pattern in 30 to 54 year olds.  You can see that pattern

22 in 55 to 65 year olds.  It flattens out in 65 to 74 year olds.

23 And it goes up rather markedly in 75 year olds.  And --

24 Q    Well, I was just going to ask you why was that observation

25 in the data important to you?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Well, what it -- the -- what's happening in the youngest

2  people, they're the canaries in the mine here.  They are

3  telling us that over time the asbestosis rates are dropping in

4  the youngest people.  So, it sort of tells me that -- you know,

5  they can't start going up.  They are dropping.  And they're

6  dropping quite dramatically, up through age 65, so it says to

7  me that there's -- that this epidemic is a decaying -- there's

8  a decay curve to this epidemic, that's the downslope, and there

9  are no new cases coming to fill it up again, that this is an

10 epidemic that's going to end, because there are no young people

11 coming to fill in the slots of the people who are dying.

12 Q    Is that a method that is commonly used at CDC to

13 understand the progression of the disease within a population?

14 A    Absolutely.  You -- the pattern by age often gives you

15 important clues as to what's happening to the epidemic.

16 Q    Was there particular significance in this data in light of

17 the fact that it was actually from the United Kingdom?

18 A    Right.  Exactly.  Well, yes.  Let me tell you.  The U.K.,

19 of course, as we've already -- as I've already noted, has

20 higher asbestos exposure than the U.S., so in spite of that,

21 we're still seeing that there's no evidence of a coming wave of

22 asbestos cases, in fact, quite the opposite.  In spite of the

23 higher exposure, in spite of the higher mesothelioma rates.

24        MS. HARDING:  Your Honor, we would move 2047 into

25 Evidence.

1          MR. FINCH:  No objection, Your Honor.

2          MR. ANSBRO:  No objection.

3          THE COURT:  2047 is admitted.

4  Q    Now, Dr. Ory, with respect to the asbestosis rates in the

5  United States, as I understand your previous testimony you

6  don't have the same kind of good data on asbestosis in the

7  United States as you have in the United Kingdom.  Is that

8  correct?

9  A    There are no incident rates in the United States.  That's

10 correct.

11 Q    Is there any data at all that you can look at, or look to,

12 to get some idea, even though it may not be as accurate as the

13 data in the U.K., to understand asbestosis death rates in the

14 United States?

15 A    You can look at asbestosis death rates in the United

16 States.

17 Q    Okay.  What are the limitations of looking at asbestosis

18 death rates?

19 A    The death rates are not incident cases, and they certainly

20 measure, with respect to asbestos disease, what happened a long

21 time ago in terms of exposure, so it doesn't give us any

22 inclination of the formation of new cases.  What it tells us

23 more, I think, is that whether or not the epidemic is waxing or

24 waning.

25 Q    Okay.  Does it -- are there also limitations associated to

Ory - Continued Direct/Harding                65

1  how the information is collected?

2  A    Death certificates for any disease in the United States

3  are notoriously suspect.  they are not collected with the kind

4  of rigor that some other information is.  I mean, for example,

5  when you compare mesothelioma death rates to incident rates,

6  the death rates are generally three quarters to 80 percent.

7  So, on a very dramatic disease such as mesothelioma, you know,

8  you're not collecting the same information as incident cases.

9  Q    Okay.  And with respect to the disease of asbestosis in

10  the United States in particular, are there any particular

11  problems associated with the information from death

12  certificates on asbestosis?

13  A    Well, I mean, the whole reason that you can't conduct

14  surveillance on asbestosis is there's no agreed upon

15  surveillance definition, and so, what one person calls

16  asbestosis and mentions on a death certificate might not be

17  what another person calls asbestosis and mentions on a death

18  certificate.  So, it's sort of -- it gives you pause when you

19  look at that data.

20  Q    Is there anything -- other information that you've learned

21  in the course of your work on the silica cases, as well as on

22  these cases with respect to asbestosis claims and their ratio

23  to actual disease that also gives you pause with respect to

24  using death certificate data for asbestosis?

25  A    Well, I mean, the whole conclusion of my findings are that

1  there may be as many as 14 times -- given, say, that the -- the

2  medically plausible cases of asbestosis, there may be as many

3  as 14 times that many who have been told, perhaps from an x-ray

4  reading, that they have asbestosis when, in fact, they may not.

5  So, it's quite possible that because of the situation we find

6  ourselves in in the United States right now, that death

7  certificates for asbestosis are particularly difficult to

8  interpret.

9  Q     Dr. Ory, the -- counsel for the ACC said in their opening

10 statement that death rates from asbestosis are increasing, and

11 even looking at the death certificate data with all of its

12 limitations that you've just described, is that accurate?

13 A     No.  And I've prepared a slide to that effect.

14         MS. HARDING:  2048, please.

15 A     In this slide I took the age adjusted death rates per

16 million from asbestosis, that's any mention of asbestosis, and

17 I used the NIOSH NORMS web site to get this data.  It's readily

18 available.  And the age standardized death rates dropped from

19 17 consistently down to 15-and-a-half from 2000 to 2004, and

20 that certainly suggests to me that in five consecutive years

21 the death rates from asbestosis are declining.

22         MS. HARDING:  Your Honor, we would move in 2048 into

23 Evidence.

24         THE COURT:  Any objection?

25         MR. FINCH:  No objection, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ANSBRO:  No objection.

2          THE COURT:  It's admitted.

3   Q    Finally, Dr. Ory, I wanted to ask you about mesothelioma

4   incidents in the United States.  You've reviewed the SEER data.

5   You've talked about it here today.  What have you found in the

6   SEER data that leads you to the conclusion that the

7   mesothelioma rates are declining as well?  I'm not sure if I

8   said that correctly, but correct me if I didn't.

9   A    Well, again, SEER data is readily and easily available on

10  the web and there are actually two sort of ways of looking at

11  it.  If you put up the first slide showing the --

12  Q    2049?  Let's see if that's it.

13  A    That's it, yes.  In this slide I looked at the first and

14  last five years of SEER data and in the first five years of

15  SEER data you can see that people age 20 to 54 had accounted

16  for 28 percent of the mesotheliomas in that -- excuse me -- in

17  that time period, whereas those over 75 accounted for only 16

18  and a half percent.  As we move forward to the most recent

19  five-year time period, the people 20 to 54 now account for only

20  a third of what they used to account for.  And the older people

21  are accounting for almost half.

22          And this is sort of the same point that I was making

23  when we looked at the asbestos data in the GPRD.  Again,

24  there's no wave of young people coming to fill in the epidemic.

25  The epidemic has been, as Nicholson really described it, a

1  cohort of exposed people who have lived out their lives and

2  have, as they've grown older, gotten mesothelioma, and that's

3  what this shows.

4  Q    Before you -- I think you have one other slide you wanted

5  to talk about.  Before you get there I wanted to ask you about

6  actual numbers of mesothelioma because I think that was part of

7  the discussion on Monday was the numbers of people getting

8  mesothelioma, the actual incident cases that were still going

9  up.  Could you show what you found with respect to the actual

10  numbers of mesothelioma, actually -- I should probably -- Your

11  Honor, is it okay if Dr. Ory --

12        THE COURT:  Yes.

13  Q    Okay, thank you.  So you're going to show us what the data

14  show with respect to the numbers of mesothelioma cases in the

15  recent history.

16  A    I'll speak into the mic.  I'm just going to -- I'll draw

17  the numbers and I'll come back and state -- I couldn't remember

18  them.  I write them down.  These are numbers from my

19  projections of mesothelioma from SEER and CDC data to the whole

20  U.S.

21  Q    Okay, but with respect to the actual -- oh, from -- in

22  other words, these are actual cases of mesothelioma that have

23  been counted in the United States up until the most recent

24  period?

25  A    This is the same mechanism I used in Table 2, of the same

1  process I used in Table 2 of my report where I take the SEER

2  incidents rates and apply them to the U.S. population and

3  estimate the total number of mesotheliomas as we agreed was the

4  standard way that everybody does it.

5  Q    Okay, this comes then directly from the SEER data?

6  A    That's right, SEER data and U.S. population data.  So in

7  1990 there were about 2,080 --

8  Q    You're going to have to talk into the mic.

9  A    Oh, okay.

10 Q    Want to draw it first and then explain it?

11 A    Yes.  These are the actual number of mesothelioma cases

12 that have occurred in the United States as counted by SEER and

13 then the Center for Disease Control which has taken over and

14 includes the SEER data and captures almost 95 percent, 98

15 percent of the cases in the U.S.  So the curve was rising

16 pretty sharply from 2000 or so in 1990 to 2,200 in '95 and then

17 in 1999 it was 2,419.  It reached the peak between, in this

18 data, between 2000 and 2002, 2,452, 2,393, 2,453 and then in

19 the last two years it's dropped a bit, 2,370, 2,409.  In fact,

20 if you --

21        MR. FINCH:  Your Honor, is this in men or all cases?

22        THE WITNESS:  This is men.

23 Q    Dr. Ory, we should probably -- your analyses in this case

24 have been about men with mesothelioma, correct?

25 A    Always about men.

1  Q    And men with asbestosis, correct?

2  A    Right.  And so, for example, just to take the most recent

3  two years, if you take the average of what's occurred here,

4  that's 2,389 cases on average in those two years and if you

5  take these four years, 2,429 have occurred and that actually is

6  -- these two years are, in fact, 1.6 percent lower than these

7  four years.  So I don't think it would be proper to describe

8  this curve as rising.  It's plateaued and appears to be falling

9  to me.

10  Q    Dr. Ory, with respect -- before I ask you about kind of

11  what you understand about the numbers and the expected course

12  of them over time, the question about whether or not it's just

13  women, you --

14          THE COURT:  Wait, I'm sorry, what's just women?

15          MS. HARDING:  That Dr. Ory's analysis in this case

16  have all related to mesothelioma rates and incidents and

17  asbestosis rates and incidents of men in the United States.

18  Q    And, Dr. Ory, why would you conduct your analysis on men?

19  A    First because when I made my -- first when I made my --

20  well, whether you use claims data or the GPRD data or deaths

21  data, 95 to 96 percent of cases of asbestosis occur in men and

22  actually, according to Grace data anyhow, about 96 percent of

23  the claims are in men.  So clearly this is -- and we're talking

24  about an occupational cohort and it applies mainly to men.  And

25  Nicholson recognizes this because several places in his paper,

1 in his '82 paper, he points out that when he goes to -- that

2 he's projecting using male rates.

3 Q    Okay, did the -- first of all, you don't hold the opinion

4 that there aren't any women in the United States who could

5 develop mesothelioma or asbestosis as a result of asbestos

6 exposure, correct?

7 A    I do not hold that opinion, that's correct.

8 Q    Okay, it's fair to say, as I understand your testimony

9 that you -- if you had included women in any of the analyses

10 that you did, would it have changed your opinions and your

11 ultimate conclusions with respect to the data?

12 A    The only thing it would have done is it would have given

13 me a lower asbestos to meso ratio and so again, to be -- to

14 stack the deck against myself, I thought it was better to use

15 the higher ratio derived for men only.

16 Q    Okay, Dr. Ory, the last thing I want to ask you about is

17 on 2050 which is the last slide.  You talked just now about the

18 change that you described with respect to the actual number of

19 cases.  With respect to the incidents of mesothelioma, the rate

20 of mesothelioma, what change have you observed and what does it

21 tell you from the data?

22 A    This is really a profound slide.  When I saw this slide it

23 really reassured me that the thrust of my analysis is correct

24 because what this is saying is if you look at the right hand

25 bar, that among people of all ages over the ten-year period,

1  men of all ages over the period 1994 to 2003, the incidents

2  rate of new cases of mesothelioma has fallen almost between one

3  and a half and two percent per year.  That's overall, the bar

4  on the right.

5          And then, even more importantly, when you look at the

6  data in an age specific fashion as we've talked about several

7  times before, you see this enormous fall in 20 to 54 year-olds,

8  almost eight percent per year.  That means every year there are

9  eight percent fewer incident cases of mesothelioma in the

10 United States than there were the year before.

11         And from what we saw before in the previous slide, we

12 saw that in the beginning of this epidemic, the epidemic was --

13 the 20 to 54 year-olds were a large part of the epidemic.  And

14 here we see no evidence whatsoever that there could be a sort

15 of follow on epidemic.  In fact, we see exactly the opposite,

16 that the youngest group of people, the canaries in the mine, if

17 you will, are telling us that this epidemic is going away.  And

18 the 55 to 64 and 65 to 74 are also showing sharp decreases.

19 The only increase are in the  75 and above and that's

20 completely consistent with the concept of people who were

21 exposed a long time ago now manifesting with a long waiting

22 period their mesothelioma.

23         So as to me, I can't overemphasize that to me as an

24 epidemiologist this slide really assures me that I've been on

25 the right track.

1          MS. HARDING:  Your Honor, we would move -- I can't

2   read the exhibit number and I already put it away.

3          THE COURT:  2050.

4          MS. HARDING:  Thank you.  2050 into evidence.

5          MR. FINCH:  No objection, Your Honor.

6          MR. ANSBRO:  No objection.

7          THE COURT:  It's admitted.

8          MS. HARDING:  And, Your Honor, I tender the witness

9   to the claimants.

10          THE COURT:  Mr. Finch?

11          THE WITNESS:  Could I take a break?

12          THE COURT:  Yes, we'll take a five-minute recess.

13   All right, thank you.

14                    (Recess)

15          THE COURT:  All right, please be seated.  Doctor?

16   Mr. Finch?

17          MR. FINCH:  May I approach the witness, Your Honor?

18          THE COURT:  Yes.

19                  CROSS EXAMINATION

20   BY MR. FINCH:

21   Q    Dr. Ory, do you recognize ACC FCR Exhibit 1 as Dr.

22   Nicholson's paper that forms the basis of some of your

23   testimony here?

24   A    I do.

25   Q    And you regard this as a reliable source for projections

1  of asbestos-related mesothelioma and lung cancer?

2  A    Yes, at least mesothelioma.  I've really not examined it

3  for lung cancer.

4  Q    Okay, with respect to mesothelioma you regard it as

5  reliable?

6  A    Yes.

7  Q    And sound science?

8  A    Yes.

9  Q    And in the abstract Dr. Nicholson and other researchers at

10 Mount Sinai write that 18.8 million people had exposure in

11 excess of that equivalent to two months' employment in primary

12 manufacturing or as an insulator, greater than --

13         THE COURT:  Mr. Finch, I'm sorry, you're going way

14 too fast.

15         MR. FINCH:  sure.

16 Q    On the first page Dr. Nicholson writes that 18.8 million

17 people had exposure in excess of that equivalent to two months'

18 employment in primary manufacturing or as an insulator, greater

19 than two to three fiber years, correct?

20 A    Yes.

21 Q    And this entire paper is based on cumulative exposure to

22 asbestos, correct?

23 A    Yes.

24 Q    There's no company specific or product specific

25 epidemiology in this work, correct?

Ory - Cross/Finch                                          75

1  A    I believe that's correct.

2  Q    And isn't it the case there's no company specific product,

3  specific epidemiology in the medical literature?

4  A    In the published medical literature, that's probably

5  correct.  Well, there's probably aspects, for example, Alex

6  Walker published the estimate that he made for Manville, I

7  think, and I'm not sure actually as I sit here and think

8  whether that's just Manville or all cases so --

9  Q    As you sit here you can't think of any medical or

10 epidemiological literature has company specific exposures only?

11 A    Generally, that's probably true.

12 Q    Okay, could you turn to Page 300 of the Nicholson paper?

13 Excuse me, Page 296.  What Dr. Nicholson did is make estimates

14 of the population exposed to asbestos and apply that to that,

15 dose response rates to project the future, time course of

16 asbestos-related mesothelioma, correct?

17 A    I'm sorry, slow down?

18 Q    Sure.  What Dr. Nicholson did in this paper and his

19 colleagues did in this paper was to take -- make an estimate of

20 the total population of people occupationally exposed to

21 asbestos, apply to that assumptions about amount of exposure

22 and the dose response relationship that exists in the

23 epidemiological literature and project the future course of

24 asbestos-related mesothelioma in the United States?

25 A    That sounds about right, yes.

1  Q    Okay, and the population, the estimated population exposed

2  was all workers and included both men and women to the extent

3  there are women in the labor force, correct?

4  A    That's correct.

5  Q    And so you had shown up here the SEER data for

6  mesothelioma that's among men and that's taken from a

7  combination of SEER 13 data and the CDC, is that correct?

8  A    Yes, and SEER 9, yes.

9  Q    And SEER 9, okay.  SEER has published updated data from --

10 related to mesothelioma and something called the SEER 17

11 registry?

12 A    That's correct.

13 Q    Could you explain to me the difference between the SEER 13

14 registry and the SEER 17 registry?

15 A    The SEER 17 registry covers about 25 percent of the U.S.

16 population.  The SEER 13 registry covers about 13 percent of

17 the U.S. population.  And then that, of course, has all been

18 superseded by the CDC which now covers almost 100 percent of

19 the population.

20 Q    And the -- and what's the relationship between -- you were

21 showing some slides, some exhibits that has something called

22 the Norms data base.  What's the Norms data base?

23 A    The Norms data base is non-occupational-related mortality

24 data base which is also part of CDC.

25 Q    And that's the actual counts of deaths based on death

1  certificate data?

2  A    That's correct.

3  Q    Okay, and you regard the Norms data as informative in your

4  work here?

5  A    Well, as I said, I regard death certificate data as less

6  reliable than incidents data.

7  Q    So death certificate data will be less reliable than the

8  SEER incidents data, correct?

9  A    Than the SEER or CDC incidents data, yes.

10 Q    Okay, and the death certificate data, I believe you said

11 only capture about three-quarters to 80 percent of the

12 mesothelioma deaths, is that right?

13 A    Of the incident cases.  So if you look at any given, you

14 know, five-year period, maybe there'll, you know, be 10,000

15 incident cases of mesothelioma according to the CDC, United

16 States Cancer Surveillance and if you look at death

17 certificates for the same time there might be 7,500 or 8,000.

18        MR. FINCH:  Could I have Exhibits 2028 and 2033, if

19 we could show them both on the screen?  Your Honor, may I

20 please approach the bench and the witness?

21        THE COURT:  Yes.

22 Q    You said before in your direct testimony that you (1)

23 could go to the website for an answer for SEER and find the

24 SEER registries, correct?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you recognize what's been marked as ACC-2033 as the

2  SEER 13 registry for showing the age-adjusted meso rate for

3  males and females between 1995 and 2004?

4  A    Yes, that's what the title says, yes.

5  Q    And the ACC-FCR-2028 shows the mesothelioma rate for all

6  ages from the SEER 17 for the 2000 and 2004 time period?

7  A    That's right.

8  Q    And would you agree with me that using SEER 17 data the

9  age adjusted rate for men is 2.05?

10         THE COURT:  I'm sorry, Mr. Finch, I apologize, but I

11 didn't follow.  Would you restate your question for me?

12         MR. FINCH:  Yes.

13 Q    Would you agree with me that the age adjusted rate of

14 mesothelioma incidents for men in using the SEER 17 registry

15 data which is ACC-FCR Exhibit 2028 shows an age adjusted

16 incidents rate of 2.05?

17 A    Yes, for 2000 to 2004.

18 Q    And 2.05 is --

19         MS. HARDING:  If you could just direct where you're

20 pointing to on the thing.

21         MR. FINCH:  Sure, sure.  For Your Honor --

22 Q    (Inaudible), correct?

23 A    Yes.

24 Q    If you look at the same column for the SEER 13 registry,

25 the age adjusted rate for men is, for the 1995 to 2004 time

1 period, is 1.9179, right?

2 A    That's correct.

3 Q    And 2.05 is slightly higher than 1.91, correct?

4 A    That's correct.

5 Q    And the way you're getting to the calculations

6 (indiscernible)  age-adjusted rates broken down by age

7 (indiscernible) population to get to these --

8 A    Using the CDC data.

9 Q    So you didn't use the SEER 17 data.  You used the CDC

10 data?

11 A    That's correct.

12 Q    But you could do it using the SEER 17 data using estimates

13 of the U.S. population, correct?

14 A    I wouldn't do that because SEER 17 only has a quarter of

15 the U.S. population.  Why would I look at the quarter when I

16 have all of the U.S. population to look at?  I would regard the

17 CDC data as more accurate.

18 Q    CDC doesn't have data for --

19        UNIDENTIFIED SPEAKER:  Just use one mic.

20        MR. FINCH:  Sure.

21 Q    CDC doesn't have the data for 2006 or 2007, correct?

22 A    That's correct.

23 Q    And the incidents rate from the SEER data is a number of

24 cases per 100,000 of population, correct?

25 A    Or per million, whatever.

Ory - Cross/Finch                                    80

1  Q    Well, isn't it per --

2  A    I mean I'd have to look.  I always do it per million.  I

3  don't know how you did it.

4  Q    Well, if you look at the last page of Exhibit 2028, for

5  example --

6  A    Okay, yes, these are per 100,000.

7  Q    Yes.

8  A    Yeah.

9  Q    And the mesothelioma age-adjusted rate in women is about

10 one-fifth as it is for men, correct?

11 A    Yes, that's correct.

12 Q    And so if you added the mesotheliomas in women to the

13 mesotheliomas in men, you would come up with a count of

14 mesothelioma deaths that's about 20 percent higher than what

15 you show on the chart there, correct?

16 A    That's correct.

17 Q    So for 2004 there would be about 2,800 mesothelioma

18 deaths?

19 A    Mesothelioma incident cases.

20 Q    Okay, and so if someone said that there were 2,600 or

21 2,700 mesotheliomas a year in the United States now, they would

22 be -- it wouldn't be wrong?

23 A    Oh, I see, you mean if they're counting women?

24 Q    Yes.

25 A    Yes, if they're counting women.

Ory - Cross/Finch                          81

1  Q    And women do get asbestos-related mesothelioma, correct?

2  A    Yes, they do.

3  Q    Now you, in your estimates of asbestosis, you related the

4  incidents rate of asbestosis to the incidents rate of

5  mesothelioma, correct, or actually, vice versa?

6  A    I've related the incidents of asbestosis to mesothelioma,

7  correct.

8  Q    Okay, and the reason you did that is because those are

9  both asbestos-related diseases, right?  You didn't compare the

10 incidents rate of mesothelioma to the incidents rate of breast

11 cancer cases, for example?

12 A    That's correct.

13 Q    And the reason you did that is because there are no

14 confounding causes of asbestosis other than exposure to

15 asbestos, correct?

16 A    Asbestosis is only caused by asbestos exposure, that's

17 correct.

18 Q    Okay, and there is no epidemiologically-established cause

19 of mesothelioma in the United States other than asbestos

20 exposure, correct?

21 A    Well, that's an odd way to say it.  I would say a large

22 majority of mesothelioma cases in the United States are caused

23 by asbestosis but not all of them.

24 Q    There's nothing that has been shown to double the risk for

25 mesothelioma in the United States other than asbestos exposure,

1 correct?

2 A    That's true.

3 Q    Now --

4 A    I would just like to add -- let me add to that question.

5 You know, it just always comes up --

6         MR. FINCH:  Your Honor, there's not a question

7 pending.

8         THE WITNESS:  All right.

9         THE COURT:  The witness is entitled to explain his

10 answer if that's what he's going to do.  If you're going to

11 explain your answer --

12         THE WITNESS:  Right, yes.

13         THE COURT:  -- you may explain your answer.

14         THE WITNESS:  I mean there's no disease that I know

15 of that -- there's no cancer that I know of that has only a

16 single cause.  There's always, even in something like

17 mesothelioma where asbestosis causes a majority -- asbestos

18 causes a majority of cases, there has to be other causes

19 because -- just because we don't know them, it doesn't mean

20 they're not there.

21 Q    But there's nothing that has been scientifically

22 determined to double the risk of mesothelioma other than

23 asbestos?

24 A    That's correct.

25         THE COURT:  May I ask the witness a question please?

**J&J COURT TRANSCRIBERS, INC.**

1 Doctor, at one point you said meso cases caused by asbestosis,

2 in another you said by exposure to asbestos.  Did you mean by

3 asbestosis or did you mean by exposure to asbestos?

4          THE WITNESS:  I mean by exposure to asbestos.

5          THE COURT:  Thank you.

6 Q    In Dr. Nicholson's paper, in addition to showing

7 mesothelioma death rates, he also has projections of what he

8 calls excess lung cancers.  Do you see that in the paper when

9 you read it?

10 A    Yes.

11 Q    Could you define what's an excess lung cancer as Dr.

12 Nicholson used it?

13 A    Actually, it's a difficult thing to define because

14 obviously smoking is so strongly related to causing lung

15 cancer, I've always had some trouble understanding how one

16 determines excess deaths from asbestos-related lung cancer.

17 But I understand Nicholson did that in -- I understand he did

18 that.

19 Q    And he used the same basic methodology using the estimated

20 exposures and those response curves to project the excess lung

21 cancer deaths as he did for the mesotheliomas but using

22 different dose response because the dose response levels are

23 different, but the same approach.  You take the exposed

24 population, apply the dose response and project the future

25 deaths?

**J&J COURT TRANSCRIBERS, INC.**

1  A    That's true.  What I'm saying is I have trouble

2  understanding how you pick out the asbestos-related lung

3  cancers from the smoking-related lung cancers.  I understand

4  after he did that that yes, that he projected them forward.

5  Q    And you're aware that there's -- have you read medical

6  literature that states that there's a synergistic effect

7  between asbestos exposure and cigarette smoking on the

8  incidents of the lung cancer?

9  A    I am aware of that and I'm aware there's some, you know,

10  the exact level of synergy is certainly open to question.

11  Q    And by synergy, what that means is if you have a one out

12  of ten chance of getting lung cancer if you're -- or ten times

13  the background rate of getting lung cancer if you're a smoker

14  and double the background rate of getting lung cancer if you're

15  exposed to asbestos, when you combine the two, you have much

16  more than an additive effect.  It's much more than 12.  It's

17  more like 20 or 30, correct?

18  A    Some people use an additive;  some people use

19  multiplicative.  And some of the data here is more than

20  additive.  Some is multiplicative.  It's -- there's a lot of

21  data and it's hard for me to reach a consensus on it.

22  Q    Okay, would you agree with me there is a dispute in the

23  medical literature about whether or not asbestosis is a

24  necessary intermediary step to have asbestos-related lung

25  cancer?

1  A    Yes.

2  Q    So there are experts on both sides of that question?

3  There's medical literature on both sides of that question?

4  A    Yes.

5  Q    I think -- could you explain your understanding of what I

6  meant by asbestosis being a necessary intermediary for

7  asbestos-related lung cancer?

8  A    I'm sorry?

9  Q    Could you explain -- let me rephrase my question.  When I

10 asked a question about asbestosis being a necessary

11 intermediary for asbestos-related lung cancer, what I meant is

12 that some medical literature and medical experts take the view

13 that lung cancer can be attributed to asbestos exposure only if

14 the patient has asbestosis, correct?

15 A    Yes.

16 Q    Other medical experts and medical literature takes the

17 view that you can have lung cancer that is caused by asbestos

18 exposure even if there is no detectable asbestosis in the

19 patient, correct?

20 A    Yes.

21 Q    And there are experts on both sides of that question?

22 A    I've read papers on both sides.

23 Q    You've read papers and peer reviewed medical journals on

24 both sides of that question?

25 A    Yes.

1  Q    On Page 300 of Dr. Nicholson's paper, do you still have

2  that in front of you, --

3  A    Oh yes.

4  Q    --Dr. Ory?  The statement about asbestosis deaths about

5  the lower risk population --

6  A    Yes.

7  Q    -- that Dr. Nicholson puts in quotes, do you see that?

8  A    Yes.

9  Q    Of the 27.5 million individuals Dr. Nicholson and the

10  others at Mount Sinai estimated that 18.8 million of them had

11  asbestos exposures higher than two to three fiber years of

12  exposure, correct?

13  A    Yes.

14  Q    Can you explain to the Court what is meant by fiber year

15  of exposure?

16  A    If you work in an environment say that has one fiber per

17  cc concentration on a time-weighted average and you do that for

18  a year, you have one fiber year exposure.  If you do it for

19  three years, you have a three-fiber year exposure.

20  Q    And you helped -- you reviewed the slides that we were

21  showing today, correct?

22  A    I created most of them.

23  Q    You created most of them.  Turn on the elmo (phonetic)

24  please.  Do you recognize this as something you helped create

25  as well?

1  A    Yes.

2           THE COURT:  Could you identify it for the record

3  please?

4           MR. FINCH:  This is a slide that I was given by

5  counsel for the debtor yesterday.

6           THE COURT:  It doesn't have an exhibit number?

7           MR. FINCH:  It doesn't have an exhibit number.

8  Q    Doctor --

9           THE COURT:  Could you mark as --

10           MS. HARDING:  These are our draft slides that we

11  didn't use, but --

12           MR. BERNICK:  I would have a fundamental problem,

13  Your Honor -- this is David Bernick for Grace -- that we have

14  an arrangement that was specifically entered into to provide

15  notice to the other side regarding what might be used.  If

16  we're going to have cross examination with respect to these

17  draft slides, then I am no longer in any kind of agreement

18  whatsoever that we'll have an advance exchange of

19  demonstratives.

20           MR. FINCH:  Your Honor, there was never any --

21           MR. BERNICK:  Excuse me.  That is a complete breach

22  of an agreement made with counsel.  This is now the third time

23  in the last week that there have been express breaches of

24  agreements.  Our agreement to that is withdrawn.  We will not

25  submit any more unless Your Honor, of course, orders us to.

1  It's a wholly improper use of an accommodation to counsel.

2          MR. FINCH:  Your Honor, there was never any agreement

3  that you couldn't cross examine an expert based on the draft of

4  his demonstratives.  This was -- I'm perfectly happy to forego

5  the exchange of demonstratives.  There was never an agreement

6  with that.  It was an agreement that you get the draft

7  demonstratives.  This is a demonstrative that comes directly

8  out of Dr. Ory's report, the demonstrative, but the statements

9  come in his report and so I think it's perfectly fair on cross

10 examination of an opposing witness to ask him about statements

11 that were in his report that were reduced to graphical form in

12 an exhibit that he helped oversee.

13         UNIDENTIFIED SPEAKER:  I don't care.

14         MR. BERNICK:  And I would further add, Your Honor,

15 that under the stipulation that was entered into in this case

16 in connection with experts, there was to be no discovery with

17 respect to draft reports and this is totally in harmony with

18 exactly the same arrangement.  I'm happy not to have any

19 exchange of demonstratives.  That is fine with me.  This is

20 something I agreed to purely as an accommodation to counsel.

21         THE COURT:  I'm not sure exactly what the point is.

22 I mean the reason that drafts were not being exchanged is

23 because they were drafts.  They were not the final witness's

24 presentation.  That's why the finals were exchanged, so --

25         MR. FINCH:  Your Honor, this is not his report.  Q

1       Let's put it this way, Dr. Ory, do you have your report?

2   A    I do.

3   Q    Okay, could you turn to Page --

4           UNIDENTIFIED SPEAKER:  (Inaudible).

5   Q    Could you turn to Page 34 of your report?

6   A    Yes.

7   Q    Okay, the report has been marked, for purposes of

8   identification, as ACC FCR 561.  Could you show 561, Page 34?

9   There you write Nicholson considered low dose exposures to be

10  between two to three fiber years of cumulative lifetime

11  exposure, correct?

12  A    Yes.

13  Q    All right, he didn't actually call them low dose exposures

14  in the paper.  That's your terminology, correct?  He called

15  them lower in dose?

16  A    That's true.

17  Q    Okay now, would you agree with me -- you have a statement

18  there that if someone has mesothelioma, the odds are 50 to 1

19  that he developed it due to an exposure greater than two to

20  three fiber years, correct?

21  A    That's correct.

22  Q    And in the -- and you would agree with me that two to

23  three fiber years is what Dr. Nicholson considered -- an

24  epidemiologists consider as a high dose exposure for asbestos?

25          MS. HARDING:  Object to form.

1          THE WITNESS:  All he said there was this was a lower

2   risk population.

3   Q    Okay, but not a no risk population?

4   A    He called it a lower risk population.

5   Q    Okay, and so if someone has mesothelioma, would you agree

6   with me that it is more likely than not they were exposed to at

7   least two to three fiber years cumulative dose of asbestos?

8   A    If someone -- if you showed me -- it's the way you're

9   constructing your words.  If you showed me a person who has

10  mesothelioma and told me nothing more about the person, I would

11  say there's a 98 percent chance that that person had more than

12  a three-fiber year exposure to asbestosis.

13  Q    Three-fiber year exposure to asbestos?

14  A    I'm sorry, to asbestos.

15  Q    Cumulative exposure?

16  A    Cumulative exposure, three fiber years.

17  Q    You still have your report?  One of the papers you cite at

18  the back of your report is a paper written in 2004 by Bertram

19  Price and Adam Ware?

20  A    Yes.

21  Q    Okay, could I have ACC 560 please?

22          MR. FINCH:  Your Honor, may I approach the bench and

23  the witness?

24          THE COURT:  Yes.

25  Q    Dr. Ory, do you have the Price and Ware paper in front of

1  you which has been premarked for identification of ACC 560?

2  A    I do.

3  Q    Okay, the first paragraph in the third sentence, I don't

4  know if they're doctors but Misters or Doctors Price and Ware

5  write, "Mesothelioma projections also provide a foundation for

6  estimating the number of potential lawsuits from persons

7  claiming occupational exposure to asbestos or exposure

8  resulting from use of previously-manufactured

9  asbestos-containing products, do you see that?

10 A    Yes.

11 Q    One of the experts reports who you reviewed in this case

12 is Dr. Mark Peterson, correct?

13 A    Yes.

14         MR. FINCH:  Can I have Peterson's report taped up?

15 Let's put the whole report up, the whole report.  Your Honor,

16 may I approach the witness and the bench?

17         THE COURT:  Yes.  You don't need to keep asking, Mr.

18 Finch, when you need to show him an exhibit.

19         MR. FINCH:  Okay.

20         THE COURT:  Thank you.

21 Q    Now, you criticize Dr. Peterson's report about --

22 basically, your testimony here boils down to that whatever he

23 was projecting, it wasn't the number of medically-plausible

24 asbestosis cases, correct?

25 A    Yes.

Ory - Cross/Finch                                    92

1  Q    All right, and you're familiar with Dr. Peterson's report

2  because you had to review it in order to do your report,

3  correct?

4  A    Yes.

5  Q    Okay, could you turn to Page 76 in Dr. Peterson's report?

6  It's going to be that page.  Do you see that?

7  A    I'm getting there.  Just a moment, okay?  I'll get there

8  in a minute.

9                      (Pause)

10        THE WITNESS:   Okay, I'm sorry, Page 76?

11 Q    Page 76, do you have that in front of you?

12 A    All right, yes.

13 Q    Do you see Figure 24?

14 A    Yes.

15 Q    That's Dr. Peterson's projection of -- it has Dr.

16 Nicholson's meso forecast and then Dr. Peterson's projection of

17 mesothelioma claims against Grace, correct?

18 A    Yes.

19 Q    You didn't offer any opinion about whether the number of

20 mesothelioma claims he's projecting are medically plausible or

21 not, correct?

22 A    I offer no opinion about that.

23 Q    Okay, and Dr. Peterson is not projecting a flat line,

24 straight number of mesothelioma claims going out for the next

25 30 years, is he?

**J&J COURT TRANSCRIBERS, INC.**

1      MS. HARDING:  Your Honor, I'm just going to object
2 because the doctor has already testified that he's not offering
3 opinions about it so I don't know why he's going to ask him
4 about it.
5      MR. FINCH:  Your Honor, this is cross examination.
6 It goes to what he did and what he didn't do and his
7 credibility.  I have two more questions on this topic.
8      THE COURT:  I don't know how what Dr. Peterson did or
9 didn't do affects this witness's credibility.  That's not a
10 (indiscernible) question.
11      MS. HARDING:  And he also said he didn't suggest
12 claims so I don't know why he's asking him about Dr. Peterson's
13 claims.
14      MR. FINCH:  Okay, his report was submitted as a
15 rebuttal report to Dr. Peterson and Dr. Welch.  I don't know
16 why they put him on in their case in chief.  He was submitted
17 as a rebuttal -- he was submitted as a rebuttal expert so I
18 think it's fair for me to cross examine him based on what he
19 did and didn't do in his report.
20      MS. HARDING:  Your Honor, his report was submitted as
21 a rebuttal, that it was submitted with respect to certain
22 aspects of Dr. Peterson's report that had clearly to do with
23 diseased cases.  It had nothing to do with the projection of
24 claims.
25      THE COURT:  This witness has testified that he did

1 nothing to predict claims, that he was looking at predictions

2 of actual mesothelioma cases, medical cases that would be

3 diagnosed, not claims that could be filed.  He's been very

4 clear about that.

5        MR. FINCH:  Okay, but he said that Dr. Peterson's

6 projections of future asbestosis claims is medically

7 implausible.  The point I'm trying to make is that he doesn't

8 believe that Dr. Peterson's projections of mesothelioma claims

9 is medically implausible.

10       MS. HARDING:  He did not offer that testimony, Your

11 Honor.  He did not offer an opinion about Dr. Peterson's future

12 claims of asbestosis.

13       THE COURT:  You may ask him if he has an opinion on

14 that subject first.  Let's start with that.

15 Q    Okay, is it correct, Dr. Ory, that you don't have an

16 opinion about whether Dr. Peterson's --

17       THE COURT:  You have to state it affirmatively, Mr.

18 Finch, and find out if he does have an opinion.  You can't ask

19 him if he doesn't have an opinion.  How are we going to know --

20 Q    Dr. Ory, do you have any opinion at all about whether Dr.

21 Peterson's projections of mesothelioma claims are medically

22 plausible?

23 A    I believe in my report on the bottom of Page 3 and the top

24 of Page 5 I restrict my comments to Peterson about asbestosis.

25 Q    Okay.

1          MR. FINCH:  Your Honor, at what point would you

2   contemplate taking a lunch break?  I know I have another half

3   hour to go and I'm sure that Mr. Ansbro has questions as well.

4

5          THE COURT:  Well then this will be fine.  We'll take

6   an hour for lunch.  We'll reconvene at 1:25.

7          MR. BERNICK:  Could we get an estimate on cross

8   examination?  We have Mr. Rodricks -- Dr. Rodricks who's

9   waiting in the wings here.

10          MR. FINCH:  I have another half hour.  I'm not sure

11  what John has.

12          MR. ANSBRO:  I'd say up to 45 tops.

13          MR. BERNICK:  Forty-five tops, okay.  So we should be

14  able to get Rodricks' direct on at least.  I mean --

15          UNIDENTIFIED ATTORNEY:  We'll just deal with that on

16  the break.

17          MR. BERNICK:  Okay, that's fine, Your Honor.

18          THE COURT:  All right, we'll be in recess until 1:25.

19                         (Recess)

20          THE COURT:  Doctor, you're still under oath.  Mr.

21  Finch?

22  Q    Good afternoon, Dr. Ory.

23  A    Good afternoon.

24  Q    Turn on the elmo.  One of the slides that you showed in

25  your direct examination, Dr. Ory, this is the age-adjusted

**J&J COURT TRANSCRIBERS, INC.**

1 death rates from asbestosis?

2 A    That's correct.

3 Q    Okay, may I approach, Your Honor?

4         THE COURT:  Yes.

5 Q    Dr. Ory, do you recognize what has been marked as ACC 571

6 as something you brought with you to your deposition that

7 demonstrated where you got the figures for the age-adjusted

8 death rates?

9 A    That's correct.

10 Q    This is from the CDC NIOSH occupational deaths due to

11 asbestosis?

12 A    That's correct.

13         MR. FINCH:  Your Honor, I offer 571.

14         THE COURT:  Any objection?

15         MS. HARDING:  Just say what it is again, I'm sorry.

16         MR. FINCH:  Sure, this is what Dr. Ory brought to the

17 deposition, the CDC NIOSH government statistics of deaths from

18 asbestosis.  It derives the foundation for the death rates

19 shown in his chart, GG2048.

20         THE COURT:  He copies these numbers onto his chart.

21         MS. HARDING:  No, no, Your Honor, I was trying to

22 figure out -- at first I thought it was an extra page and I was

23 just trying to figure out -- if Dr. Ory has represented that

24 it's the entire part of his exhibit that he offered at the

25 deposition.  I don't have any objection.  That was me.  I'm not

Ory - Cross/Finch                                    97

1   sure if it was part of the exhibit.  That's my only question.

2              UNIDENTIFIED ATTORNEY:  I believe it was.

3              MS. HARDING:  He said it was an exhibit at the

4   deposition.  That's why I wasn't sure.  I thought his exhibit

5   was only one page, but it could have been two.

6              MR. FINCH:  Your Honor, it is the deposition exhibit,

7   the whole three-page document was a deposition exhibit.

8              MS. HARDING:  On that representation, we won't

9   object, Your Honor.

10             MR. FINCH:  Okay.

11             THE COURT:  It's admitted.

12  Q    All right now, the CDC and NIOSH also keep statistics for

13  the occupationally-related mesothelioma deaths, correct?

14  A    They keep statistics on mesothelioma deaths.

15             MR. FINCH:  Okay, and may I approach the witness,

16  Your Honor?

17             THE COURT:  Yes.

18             MR. FINCH:  Your Honor, Exhibit 614 --

19  Q    You have Exhibit 614 in front of you, Dr. Ory?

20  A    I do.

21  Q    And the first two pages are a certification from the

22  United States government that this is a true and accurate copy

23  of records collected and reported pursuant to official

24  government authorities?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And then the third page is a page that looks like this?

2  A    Yes.

3  Q    And that's the counts of mesothelioma death in the -- as

4  determined by NIOSH CDC from 1999 to 2004?

5  A    Right, for both sexes.

6  Q    Okay, and it shows 2,484 in 1999?

7  A    That's correct.

8  Q    Rising to 2,657 in 2004?

9  A    That's correct.

10 Q    So if someone read that and said U.S. government

11 statistics show that the mesothelioma count is actually going

12 up, it's been a flat a long time but it's still going up,

13 that's not accurate -- that is accurate based on this

14 government data, correct?

15 A    If they said deaths were going up.

16 Q    Mesothelioma deaths are actually going up?

17 A    Yes.

18 Q    Okay.

19 A    In men and women totaled.

20        MR. FINCH:  Your Honor, I would offer Exhibit 614.

21        MS. HARDING:  No objection, Your Honor.

22        THE COURT:  It's admitted.

23 Q    Now, do you still have 571 with you, Dr. Ory?

24 A    Let's see, the first one you gave me?

25 Q    That's the one that you brought with you to your

1  deposition.

2  A    Yes.

3  Q    Okay, the first page of that shows the death -- the

4  numbers of deaths and the death rate between 2000 and 2004,

5  right?

6  A    That's correct.

7  Q    Okay, and the third page is this page, shows the deaths

8  from asbestosis and the age-adjusted death rate for each year

9  between 1990 through 2004, correct?

10  A    That's correct.

11  Q    Okay, would you agree with me that the date that -- do you

12  have the understanding the date we're interested in is what was

13  Grace's asbestos liability on the day it went into bankruptcy?

14         MS. HARDING:  Objection.  I don't think the

15  foundation --

16  Q    Okay, would you agree with me that the deaths and the

17  age-adjusted death rates were rising between 1990 and 2000?

18  A    Yes.

19  Q    And that the age-adjusted death rates and the total

20  numbers of deaths between 2001 and 2004 are still higher than

21  they were in 1996, 1997, 1998 and 1999?

22  A    We're talking now about 571?

23  Q    That's right.

24  A    I would say that the age-adjusted death rate from 1990 to

25  '99 was trending slightly upwards, that's correct.  And what's

1  the second part of your question?

2  Q    And that it peaked around 2000?

3  A    The death rate?

4  Q    The death rate peaked around 2000?

5  A    Yes.

6  Q    And then the death rate has declined somewhat since 2000

7  but it's still higher in 2004 than it was in 1999?

8  A    That's correct.

9  Q    And that the numbers of deaths between 2000 and 2004

10  average around 1,410 a year, correct?

11  A    Yes.

12  Q    And that's not substantially lower than the numbers of

13  deaths in 2000, correct?

14  A    Well, I mean, yeah, the numbers of deaths are slightly

15  lower in 2003 and 4 say than in 2000 and 2001.

16  Q    Okay, and the -- Dr. Nicholson's projections of

17  mesothelioma deaths expected at the mesothelioma incidents the

18  United States would peak in the 2000 and 2004 time period,

19  correct?

20  A    Right.

21  Q    And it declined gradually thereafter, correct?

22  A    You're talking about mesothelioma deaths?

23  Q    Mesothelioma deaths.

24  A    Yes, he had them peaking around 2002.

25  Q    And then the curves that we showed in your demonstratives

1  showed that the shape of Dr. Nicholson's projections over the

2  next 20 some years is basically a long, slow decline for

3  mesothelioma?

4  A    Well, it declined slowly at first and then it picks up

5  speed.

6  Q    It picks up speed in --

7  A    Yes.

8  Q    -- twenty or thereabouts.

9  A    It picks up speed every five-year interval.

10 Q    Every five-year interval after 2002?

11 A    Right.

12 Q    But there's still -- he still is projecting 900 deaths

13 from mesothelioma in the year 2027?

14 A    Right, which I would say then marked down by 20 percent.

15 Q    Okay, if you're just looking for men, but if you're

16 looking for men and women, you wouldn't mark it down by 20

17 percent?

18 A    Well, he's only projecting men.

19 Q    He was projecting from a population that included men and

20 women using the death rates for men, correct?

21 A    It's very clear when I pointed it out in my deposition the

22 two or three places where he explicitly says he's projecting

23 men and, in fact, when he compares his own curve to SEER data,

24 he compares it to SEER males.  So it's very clear to me that

25 he's projecting men.

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Finch                                          102

1  Q    But as we both agreed before, there are deaths from

2  mesothelioma in women as well?

3  A    That's correct.

4  Q    Okay, could you explain to the Court the difference

5  between incidents and prevalence?

6  A    Yes and I'm wondering.  I have a slide to do that.

7  Q    Well, let me ask in a leading question manner so maybe we

8  could go a little bit faster.  Would you agree that incidents

9  is the number of new cases in a -- of disease in a given

10 population?

11 A    In a given time period, yes.

12 Q    In a given time period.  And prevalence is the number of

13 people who have the disease when you observe them at some point

14 in time.  It's not necessarily a number of new cases.  It's a

15 number of people either still alive or people who have died

16 from a disease at some point in time.

17 A    It's more like a cumulative number.

18 Q    Okay, and I take it that you are not claiming that you

19 have any expertise in projecting claims, correct?

20 A    That's correct.

21 Q    And so you don't have any opinion about whether for non

22 malignant disease it is better to use the prevalence of disease

23 in a population as compared to the incidents of disease in a

24 population?

25        MS. HARDING:  I'm just going to object to form of non

**J&J COURT TRANSCRIBERS, INC.**

1  malignant disease.

2          THE COURT:  I can't hear you.

3          MS. HARDING:  I'm sorry, Your Honor.  I'm going to

4  object to form with respect to non malignant disease in terms

5  of what Mr. Finch is talking about.

6  Q    Okay, let me rephrase that.  You don't have any opinion

7  that when someone is projecting the numbers of non malignant

8  claims, whether one should be looking at prevalence or

9  incidents?

10 A    When one is trying to predict new cases of disease, one

11 should use incidents.

12 Q    But the question was not new cases of disease.  The

13 question was new lawsuits.  You don't have an opinion --

14 A    I don't have an opinion about predicting new lawsuits,

15 period.

16 Q    Okay, so you don't have an opinion when you're predicting

17 -- when one is set to the task of predicting new lawsuits

18 whether the proper metric to use for purposes of that

19 prediction is to look at the incidents data for non malignant

20 claims or the prevalence of the disease in the population?

21 A    I don't have an opinion about how to predict claims.

22 Q    And that would include non malignant claims, correct?

23 A    All claims.

24 Q    Okay now, the mortality data that we have shows that for

25 mesothelioma people tend to die within a year or two of

                    **J&J COURT TRANSCRIBERS, INC.**

1  contracting the disease, correct?

2  A    That's correct.

3  Q    And for asbestosis, people generally do not die from that

4  disease, correct?

5  A    Not these days, no.

6  Q    And, in fact, isn't it the case that maybe only three

7  percent of the people who contract asbestosis ever die from it?

8  A    I don't know that for a fact?

9  Q    It's less than one in 20?

10  A    It depends when you're talking about.  I mean if you're

11  talking about the turn of the 1900's, almost everybody died

12  from it.  So it's a time-dependent statement.

13  Q    We're talking about --

14  A    For example, in the insulator cohort, half the people in

15  the insulator cohort were dead by 65 years of age.

16  Q    But they didn't all die from asbestosis?

17  A    That's true.

18  Q    Okay, when you talked about the insulator cohort, you are

19  referring, I take it, to the population studied by Dr.

20  Nicholson and Dr. Selikoff at the Mount Sinai studies?

21  A    Yes.

22          MR. FINCH:  Okay, could I have ACC FCR 2036?

23  Q    And you testified, I believe, when I was asking you

24  questions on voir dire that you had read what you regarded as

25  the relevant -- you had read a lot of literature about the

1  incidents and prevalence of asbestos-related disease, correct?

2  A    That's correct.

3           MR. FINCH:  May I approach, Your Honor?

4  Q    This is a publication that I'm sure you came across

5  relating to the predictors of mortality from asbestosis in the

6  North American insulator cohort?  You reviewed this paper as

7  part of your work here?

8  A    Yes, I'm familiar with it.

9  Q    Okay, if you could turn to Page 103, Table 2 has data

10  about asbestosis deaths in the population?

11  A    Yes.

12  Q    And that shows that whatever the sum of 25 plus 22 plus 19

13  are the people that died from asbestosis in this population as

14  of the date measured?

15  A    There are so many studies of this.  Let me check.  Let me

16  see if I can determine the date.

17  Q    This was the date as of 1991.

18  A    That's correct, okay.

19  Q    Okay, and so as of 1991 about 70 of them have died from

20  asbestosis?

21  A    Many more had died from asbestosis by that time.  My

22  recollection is, let's see, 66, 76 -- actually, by '86, 400 and

23  some odd had died from asbestosis.

24  Q    Where is that data presented in this?

25  A    It's not in here.  It's in Sideman and Selikoff.

1  Q    Okay, but this is looking at -- actually, this study is

2  dated 1991 but it's looking at how many have died by 1983,

3  correct?

4  A    By 1983 -- I'm saying I know that by 1986 over --

5  somewheres in the neighborhood of 400, almost 500 had died by

6  1986 so --

7  Q    Died from all causes or from --

8  A    No, from asbestosis.

9  Q    -- just from asbestosis.  Okay.  And if you look at the

10 numbers of people with asbestosis, there's well over 1,500 of

11 them with asbestosis, correct, as of the date of this study?

12 A    That's correct.

13 Q    And the mortality rate for asbestosis you would expect to

14 be lower in cohorts that were less heavily exposed than the

15 insulator population, correct?

16 A    That's probably true, yes.

17 Q    Okay, so for the insulators, maybe a third of the people

18 that had asbestosis eventually had died from it, correct?

19 A    I'm not quite sure if that's correct, but it's of that

20 order.

21 Q    Okay, but for populations like sheet metal workers or

22 other types of asbestos-exposed workers, the percentage of

23 people who die from asbestosis as compared to the percentage of

24 people who have asbestosis is much lower than that, right?

25 A    Well, you know, this is a carefully-studied cohort and the

1  problem when you switch to less carefully-studied cohorts is

2  you get into the problem of who really has asbestosis.  And,

3  you know, these numbers are based on careful followup of a

4  cohort.

5  Q    You were shown the sheet metal workers study in your

6  deposition, do you recall that?

7  A    That's correct.

8           MR. FINCH:  Can I have ACC 395?

9  Q    This is a population of sheet metal workers studied by the

10 National Sheet Metal Examination Group?

11 A    Yes.

12 Q    Includes David Michaels and Laura Welch as authors of the

13 study?

14 A    Yes.

15 Q    This is another study where there's been a long time

16 followup of the cohort under examination and they were examined

17 for medical screening purposes?

18 A    Not at all the same.  This is a cross sectional study.

19 They invited a number of people.  I think 40 percent of them

20 showed up and then many of those were not examined.  This is a

21 completely different situation than a carefully-followed

22 cohort.

23 Q    Would you agree with me that the mortality from asbestosis

24 depends on the cohort you're studying, correct?

25 A    The mortality from asbestosis depends on the exposure to

1  asbestosis -- to asbestos.

2  Q    One of the things that you relied upon is the 2004

3  American Thoracic Society statement on the diagnosis in an

4  issue management of non malignant diseases related to asbestos?

5  A    That's correct.

6              MR. FINCH:  Can I have that on the screen, 389?

7  Q    You are not a pulmonologist or a clinician, correct?

8  A    That's correct.

9  Q    And you didn't interview the British doctors who made up

10 the group that you studied about what diagnostic practices they

11 followed to diagnose asbestosis, correct?

12 A    That's correct.

13 Q    So you don't know whether they followed American Thoracic

14 Society guidelines or some other guidelines, correct?

15 A    That's correct.

16 Q    And the American Thoracic Society does not require lung

17 function decline in order to diagnose asbestosis, correct?

18 A    Yes.

19 Q    Now, could you turn to Page 702 in this document?  You

20 would agree with me that there are non malignant diseases

21 caused by exposure to asbestos in addition to asbestosis,

22 correct?

23 A    Yes.

24 Q    And the RAND data that you looked at didn't divide the

25 300,000 plus claims for disease, non malignant disease into

Ory - Cross/Finch                                    109

1    asbestosis or pleural disease or anything else?  They just

2    called them non malignant claims, correct?

3    A    The RAND data did not.  I did that by applying the Grace

4    historical claims that 81 percent figure for asbestosis to the

5    RAND data.

6    Q    Okay, you didn't review any of the Grace historical

7    claimants' medical records to see whether they had asbestosis

8    or pleural plax, for example, correct?

9    A    No, but if they said they had asbestosis and the claim was

10   settled for that, I took that to be asbestosis.

11   Q    Well, you didn't review any of the complaints to see

12   whether they said asbestosis or just non malignant disease,

13   correct?

14   A    Correct.

15   Q    You didn't talk to the Grace claims in putters to know

16   whether they typed in asbestosis for insurance purposes versus

17   non malignant disease versus pleural plax?  You don't know what

18   kind of criteria for how they typed in the disease?

19   A    These are claims that were settled and they were settled

20   for asbestosis.  I don't think it's a matter of entering the

21   data.  They were settled as asbestosis, weren't they?

22   Q    You don't have any independent knowledge of that fact, do

23   you?

24   A    No.

25   Q    Okay now, the 2004 American Thoracic Society -- would you

Ory - Cross/Finch                                110

1 also agree with me that in an asbestos-exposed cohort, some

2 percentage of population will contract asbestosis, probably a

3 larger percent of the population will contract pleural plax and

4 then a much smaller percentage will contract mesothelioma or

5 lung cancer?

6 A    Well again, that all depends on the dose, how well that

7 works out and where you are in time, but I will agree that the

8 people exposed to asbestosis can get pleural plax asbestosis

9 and mesothelioma.

10 Q    You would agree that people exposed to asbestos could get

11 pleural plax --

12 A    Did I say that again?

13 Q    -- and asbestosis and mesothelioma?

14 A    Right.  I'm sorry.

15 Q    And you would also agree based on -- I mean obviously it

16 depends on the cohort you're studying, the relative percentages

17 between the three, but generally speaking, far more people

18 contract pleural plax than mesothelioma, correct?

19 A    That's probably true.

20 Q    And the ratio between pleural plax and asbestosis depends

21 on the cohort you're studying, correct?

22 A    Probably, and then it probably depends on how they're

23 examined and depends on many things.

24 Q    Okay, at the bottom of Page 702 the American Thoracic

25 Society, the very last line states, "Pleural plax consistent

1   with asbestos exposure appear in chest films of 2.3 percent of

2   U.S. males, a percentage that has been -- and it skips over two

3   more pages -- remarkably stable, both for the general

4   population in the early 70's and the veterans in the 1990's."

5   Do you see that?

6   A    Yes.

7   Q    2.3 percent of United States males is over two million

8   people, correct?

9   A    Yes.

10  Q    And that's a picture of pleural plax?

11  A    No, it's like text.  If you represent it as that -- are

12  you showing me Figure 13?

13  Q    Figure 12.

14  A    Figure 12.

15  Q    Can you read the caption for Figure 12?

16  A    Gross appearance at autopsy of asbestos-associated pleural

17  plax overlaying the lateral thoracic wall.

18  Q    One final thing, Doctor, before I pass the witness.  You

19  would agree with me that the lengthy period for mesothelioma

20  can be as long as 60 years, correct?

21  A    Probably 50.

22  Q    And you've reviewed the expert claim projections from Dr.

23  Peterson in this case, correct?

24  A    Yes.

25  Q    And the numbers of future mesothelioma claims decline

1  after the year 2007, don't they?

2          MS. HARDING:  Objection again, Your Honor.  I think

3  that the witness has already said he hasn't offered any

4  opinions on Dr. Peterson's claims projections.

5          MR. FINCH:  He is offering opinions on the claims

6  projections.  He's offering opinions that the numbers of claims

7  that Dr. Peterson projects for non malignant disease are not

8  medically plausible.  That's sort of the sum and substance as I

9  understand his --

10         THE COURT:  But you just asked him about meso claims.

11         MR. FINCH:  He creates his non malignant disease by a

12  ratio to mesothelioma.

13         MS. HARDING:  He didn't ever talk about claims in

14  terms of future.  He didn't offer no testimony on Dr.

15  Peterson's estimates of future claims.  Today in the courtroom

16  he did not.

17         MR. FINCH:  Okay, with that, I'll pass the witness.

18         THE COURT:  Just a second please.  Okay, thank you.

19         MR. ANSBRO:  May I proceed, Your Honor?

20         THE COURT:  Yes, sir, thank you.

21                      CROSS EXAMINATION

22  BY MR. ANSBRO:

23  Q    Good afternoon, Dr. Ory.  At your deposition we agreed

24  that you're not familiar with the term severe asbestosis, is

25  that right?

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                            113

1  A    That's correct.

2  Q    And your analysis in this case does not seek to

3  distinguish cases of so-called severe asbestosis from less

4  severe asbestosis, correct?

5  A    Right, as we discussed in my deposition, asbestosis is

6  asbestosis.

7  Q    And you did not attempt to break out separately an

8  impaired asbestosis versus what's commonly referred to as an

9  unimpaired asbestosis, is that right?

10 A    Not in the GPRD, no.

11 Q    In your report you did not make any distinction between

12 those two?

13 A    That's correct.

14 Q    But correct that you did not make any inquiry to study

15 what are the distinctions in the levels of severity, the

16 medical distinctions?

17 A    Within the GPRD?

18 Q    Yes, sir.

19 A    That's correct.

20 Q    And nowhere else did you attempt to make inquiry about the

21 distinctions between the levels of seriousness of asbestosis?

22 A    Well, subsequent to the deposition you're presenting me

23 with information from the U.K. mesothelioma registry, I looked

24 at that and I looked at the U.K. mesothelioma -- I'm sorry, the

25 U.K. asbestosis compensation registry --

1          MR. FINCH:  Your Honor, I would object to the witness

2     offering testimony that was not in his report.

3          THE COURT:  He was asked what he looked at.  He's

4     just answering the question.  Overruled.  He was asked whether

5     he looked at -- whether he -- I'm sorry, I cannot restate the

6     question.  I did not write it down word for word.  The first

7     question regarded whether or not he inquired in the GPRD about

8     distinctions in the medical levels of severity regarding

9     asbestosis and he answered no, and whether he then looked at

10    the other data and his answer was -- he began to answer after

11    the deposition he did and he was answering the question.  You

12    may continue, Doctor.

13    Q    If you could look please at --

14         THE COURT:  He may continue the answer.

15    Q    Had you completed your answer, Doctor?

16    A    So after the deposition I looked at the U.K. mesothelioma

17    registry which you crossed me with and then I went back and

18    looked at the U.K. asbestosis compensation registry and I

19    learned that the U.K. asbestosis compensation registry requires

20    only a one percent disability to be registered and compensated.

21    So I have now a comparison of the U.K. compensation registry to

22    the ball U.K. mesotheliomas which would be -- people have at

23    least one percent disability so I have a ratio there, as well

24    as the ratio I have from the GPRD which makes no mention of

25    severity as we've agreed.

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                                115

1  Q    The GPRD information is input by physicians in the United

2  Kingdom, correct?

3  A    That's correct.

4  Q    Are they -- have you done an examination as to what

5  criteria they used before they determined whether something was

6  diagnosed and labeled as asbestosis put into their reports?

7  A    No, again, this is like the answer I gave about, you know,

8  how is breast cancer diagnosed in the United States and the

9  study I did of breast cancer.  I have to accept the treating

10  physician's diagnosis of breast cancer there, and in the U.K. I

11  have to accept the treating physician's diagnosis of

12  asbestosis.

13  Q    To be clear, you don't know on what basis or what criteria

14  or what scales the United Kingdom may look to or not look to

15  before they make a diagnosis of asbestosis?

16  A    That's correct.

17  Q    And with respect to the compensation values that you just

18  mentioned, is it correct to say that the physicians who input

19  diagnoses of asbestosis into the GPRD, that is uninfluenced by

20  these compensation tables to which you're referring?

21  A    I'm sorry, ask the question again?

22  Q    The compensation tables that you're talking about with

23  respect to mesothelioma and asbestosis, does that have any

24  impact insofar as you're aware as to how physicians diagnose

25  asbestosis?

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                          116

1  A    No, I think it's the other way around.  I think that

2  they're required to report mesothelioma deaths in asbestosis

3  cases to the registries.

4  Q    There's no a connection between those two, however?

5  A    That's the best answer I can give you.

6  Q    Turn to what's been previously marked as ACC FCR Exhibit

7  561.  This is your report.  I believe you have it up there,

8  Doctor.  I'd ask you to turn to Table Four Nine.  Excuse me, I

9  pointed you to the wrong --

10  A    You're talking about my rebuttal report?

11  Q    We'll get to that in just a moment.  I misspoke.  We want

12  to go now to Exhibit ACC FCR 462.

13  A    Which is?

14  Q    Which is the September 25th report on Grace's expert

15  Thomas Florence.

16  A    Actually, turn to Table --

17        MS. HARDING:  Objection, Your Honor.  I think that

18  counsel should ask Dr. Ory if he's reviewed --

19        MR. ANSBRO:  I will do that.

20        MS. HARDING:  -- it, presented it and offered

21  opinions on it.

22        MR. ANSBRO:  (Indiscernible) those foundational

23  questions.

24  Q    Have you read Dr. Florence's September 25th report before

25  today?

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                          117

1  A    No.

2  Q    Had you read his earlier report of June 18?

3  A    I'm not sure.  I may have read one report of his.  I'm not

4  sure which one it would have been.

5  Q    It's fair to say then you're not that familiar with it?

6  A    That's true.

7  Q    Let me ask you to turn please to Page 14, Table Four Nine.

8         MS. HARDING:  Your Honor, if he hasn't reviewed it, I

9  don't understand what the questioning would be about.

10        THE COURT:  We'll find out.

11  Q    You see at Table Four Nine, Doctor, there's a breakout

12  between these three categories of asbestosis, the first being

13  severe, the next one described as asbestosis and the last

14  unimpaired?

15  A    Yes, I see that.

16  Q    I think I know what the answer to this question is going

17  to be, but do you have any understanding as to why those three

18  categories are broken out separately --

19  A    I do not.

20  Q    -- by Grace's expert?

21  A    I do not.

22  Q    With respect to the distinction between these three types

23  of diseases, am I correct in understanding that you're not

24  saying that any of these categories of asbestosis is by

25  definition medically implausible, is that correct?

Ory - Cross/Ansbro                          118

1        MS. HARDING:  I'm just going to object again, Your

2   Honor, with respect to him asking about a statement in Dr.

3   Florence's report with respect those categories of diseases

4   when he hasn't had any input in the definition there and he

5   said he hadn't seen this particular report.  So I don't have an

6   objection to him talking to him about the categories of the

7   severity of disease but I don't understand the distinction.

8        THE COURT:  So far this witness has not articulated

9   that he agrees that there are categories of this disease so I

10  don't think you've got foundation for the question.

11  Q    Doctor, you see that the Grace's expert report lays these

12  three out?  Aside from this expert's report, are you familiar

13  with, in the literature, that it is commonly broken out by

14  severe asbestosis and asbestosis and unimpaired asbestosis?

15  A    From the standpoint of the epidemiologic analysis that I

16  did, I accepted the diagnosis of asbestosis as it was written.

17  It's sort of -- and as I told you in the deposition, the ICD

18  codes for asbestosis only recognize one asbestosis.  It's 501

19  in ICD Nine.  There's not 501.1, .2, .3 that says anything

20  else.  So as an epidemiologist studying asbestosis, I'm taking

21  the physician's diagnosis.  It's coded with a single code so

22  it's sort of -- I hate to use a legal word, but it's sort of

23  moot to me whether there are or are not categorizations because

24  I don't see them in the data that I analyze.

25  Q    Have you seen them generally in the literature and

1  background information that you've reviewed in connection with

2  this case?

3  A    I have seen asbestosis broken down into different

4  categories, yes.

5  Q    Those three categories often include, and sometimes more,

6  but at a minimum severe and then asbestosis and unimpaired

7  asbestosis, yes?

8  A    Probably.

9  Q    Of the descriptions, and broken down in those categories,

10  of all of those the three types of diseases that I've just

11  listed, they can be medically plausible, do you agree with

12  that?

13  A    I just feel like we're talking at angles here.  We talked

14  earlier this morning about to me what medically plausible

15  meant.  It meant that someone was diagnosed by a physician

16  using proper methods to have asbestosis whether that -- and I'm

17  saying that the GPRD physicians made the diagnosis of

18  asbestosis and I accept it that way.

19  Q    You would agree with me then that aside from the overall

20  definition that you're using, am I correct in understanding

21  that to the extent that those diagnoses embrace categories such

22  as these, you're not saying that those are medically

23  implausible?

24        MS. HARDING:  It's confusing, Your Honor.  I don't

25  understand.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I apologize, if you could restate the

2    question, I think that would be helpful.

3          MR. ANSBRO:  I'll withdraw the question, Your Honor.

4    Q    You can set that aside, Doctor.  With respect to the one

5    to one ratio that you derive as between mesothelioma and

6    asbestosis, is it true that no researcher or epidemiologist

7    before you has sought to establish that ratio, is that right?

8    A    That's probably correct although I noticed in reviewing

9    papers I saw Alec Walker did attempt to do such a thing but he

10   did it -- it wasn't an incidents ratio exactly the way I did.

11   It was more of a prevalence.

12   Q    Yours is the first that you're aware of?

13   A    Doing incidents, yes.

14   Q    Your work in this case has not been peer reviewed,

15   correct?

16   A    That's correct.  Let me rephrase that.  If what you're

17   talking about is the ratio, the one to one ratio, that's not

18   been peer reviewed.  But as we talked in my deposition, I

19   believe all the methods that I've used are standard methods.

20   Q    Well, you refer in your deposition to the Nicholson

21   epidemiology analysis?

22   A    Yes.

23   Q    My question is with respect to drawing the one to one

24   ratio as you have done it, drawing upon United Kingdom data and

25   then making a comparison with United States data, that is an

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                                  121

1  exercise that has not been done before, correct?

2  A    Drawing the one to one asbestosis to mesothelioma ratio

3  has not been done before.  But as I stated in my deposition,

4  Nicholson's, and as I stated earlier here, Nicholson's entire

5  method, the entire projection, that rather accurate projection

6  that he's made is totally based on ratios.

7  Q    The answer to my question is correct, right?  It's not

8  been done before, the one to one ratio that you have derived

9  here?

10 A    The one to one ratio has not been done.

11 Q    And your work has not been peer reviewed?

12 A    Insofar as it relates to the one to one, yes, that's

13 correct.

14 Q    Now, am I correct in understanding that some patients have

15 both of these diseases, mesothelioma and asbestosis?

16 A    That's correct.

17 Q    And I believe you testified at your deposition that you

18 weren't sure what percentage overall shared both those

19 diseases?

20 A    That's correct.

21 Q    Did you make an effort -- you made no effort to identify

22 that information before you did your report, correct?

23 A    That's not correct.  I told you that I did a sample and

24 determined that it would be in the low single digits based on

25 my sample.

Ory - Cross/Ansbro                                        122

1  Q    You excluded that sample from your analysis?

2  A    I did not.

3  Q    Made the allocation?

4  A    No.  Can I answer the question more fully?

5  Q    I'll tell you what, I'm going to -- in two topics from now

6  it'll come up again, we'll have an opportunity to talk about

7  that.

8  A    Okay.

9         MS. HARDING:  Your Honor, if the witness would like

10 to answer the question, I think he should be permitted.

11        THE COURT:  It's coming up later.  That's fine.

12        MS. HARDING:  That's fine, okay.

13        MR. ANSBRO:  Let's see Exhibit ACC FCR 1071 please.

14 Q    Exhibit ACC FCR 1071 is an article, Ultrastructural

15 Pathology is the publication.  This is an article lead authored

16 by Victor L. Roggli.  Title of the Article is, "Malignant

17 Mesothelioma and Occupational Exposure to Asbestos, a Clinical

18 Pathological Correlation of 1,445 Cases."  Have you seen this

19 article before, Doctor?

20 A    I have not.

21 Q    I ask you to turn please -- first, before we do that,

22 you're aware that in the literature there is a wide range of

23 ratios of asbestosis to mesothelioma in the literature?

24        THE COURT:  I'm sorry, I didn't hear you.  Would you

25 restate that please?

**J&J COURT TRANSCRIBERS, INC.**

Ory - Cross/Ansbro                    123

1   Q     In the literature, generally are you aware that there are

2   descriptions of wide ranges of the ratios as between asbestosis

3   and mesothelioma depending on job category, for example?

4   A     Oh, I would say it's much more dependent on -- the answer

5   is yes, and it's much more dependent on how early in the

6   epidemic the study was done because of the nature of the timing

7   of asbestosis to mesothelioma.  If you have a heavy dose,

8   you're going to get asbestosis early and you may die before you

9   even have a chance to express mesothelioma.  So, for example, I

10  looked at the three publications ten years apart of the

11  insulator cohort and in the first cohort the ratio of

12  asbestosis to mesothelioma is 30 to 1.  In the next two it's

13  basically one to one.  So in 1966 it was 30 to 1;  in '76 it

14  was one to one, and in '86 it was one to one.

15          And again, you have to be very careful about

16  distinguishing incidents and prevalence here as to whether

17  we're talking about an incident ratio or a prevalence ratio.

18  Q     I direct your attention to Page 55 of the abstract.  The

19  upper right hand corner tells us about what the study

20  addresses.  Third line down from the top sentence beginning,

21  "This study."  See that?  The introduction reads, "This study

22  reports findings in 1,445 cases of mesothelioma with known

23  exposure, 268 of these also had fiber burden analysis.  The

24  1,445 cases of mesothelioma were subclassified into 23

25  predominate occupational or exposure categories."  Do you see

1  that, Doctor?

2  A    Yes.

3  Q    If I could ask you to turn to Page 59?

4  A    Without reading this study and understanding his methods,

5  it's going to be very hard for me to comment on it.

6  Q    I won't ask you necessarily to comment on it, Doctor, just

7  to -- let's look at some of the information in here and ask you

8  whether or not you considered it in the course of deriving your

9  ratio.  At Table 6 on the far right-hand corner we see ratios

10 among the various industries and occupations of asbestosis to

11 mesothelioma.  Do you see that?

12 A    I'm sorry.  What are we looking at?

13 Q    Table 6 --

14 A    Uh-huh.

15 Q    -- Page 59.

16 A    Uh-huh.  Yes.

17 Q    Right-hand column.

18 A    Yes.

19 Q    As it goes down the right side it shows a variety of

20 ratios depending on the industry we're in or the occupation.

21 Now, the ratios are as between asbestosis and mesothelioma.

22 A    I see what you're pointing to.

23 Q    We see a broad range there.  Correct, Doctor?  For

24 example, the insulators in this study, the ratio of both those

25 diseases is 58 percent.

Ory - Cross/Ansbro                                125

1  A    I mean I really can't -- I can't even understand the

2  footnote that describes asbestosis C.  I really don't know what

3  I'm looking at here, and I have read a number of studies by Dr.

4  Rogli.  I find them very difficult to understand, and without

5  having adequate time to read and study this, I can't comment on

6  it.

7  Q    Let me refer you quickly then to the top of -- or to Page

8  60, if we could?  Lower one quarter of the page, the sentence

9  beginning, "Logistic," on the left side.

10        THE COURT:  You need to stay closer to the

11  microphone.  We can't pick you up.

12  Q    I just show you this one sentence, Doctor.  "Logistic

13  regression analysis demonstrated that although the category of

14  exposure was significantly associated with asbestos --

15  asbestosis, P less than .0001, close paren, there was no

16  pattern of one category or another that could be identified as

17  having either a high or a low prevalence of asbestosis.  Do you

18  see that?

19  A    Yes.

20  Q    Do you agree that that means the ratio of asbestosis to

21  mesothelioma varies greatly depending on occupational category

22  of exposure?

23  A    Well, first of all, the word prevalence is in there, and

24  I've told you I've done an incidence study.  And the second

25  thing is I would like to just read the first sentence of the

1  materials and methods.  It says, "The consultation files of one

2  of the authors, V.L.R., were reviewed for all cases of

3  mesothelioma."  And this is simply -- from an epidemiologic

4  point of view, this is a mishmash.

5          It's just a -- no, that's not an epidemiologic words,

6  but it's just a collection of cases.  We don't know where they

7  come from.  We don't know anything about them.  It's not the

8  kind of information from which I would be comfortable drawing

9  conclusions, probably even if I've read the paper, but having

10 not read the paper, I am just -- I'm willing to draw any

11 conclusions.

12 Q    But would you agree with me that this paper addresses

13 people who have the disease?  Yes?

14 A    I don't know what this paper addresses --

15 Q    All right.

16 A    -- because I haven't read it.

17 Q    Fair enough.  Now, I want to turn back to one of the

18 slides that was shown to you earlier by Grace's counsel.  It's

19 Number 2037.

20                         (Pause)

21          MR. ANSBRO:  It's a Grace slide, yes.

22          THE COURT:  Could we get Grace to put the slide up?

23 Two zero --

24          MR. ANSBRO:  I'll put it on the ELMO, Your Honor.

25          THE COURT:  Oh, on the ELMO?

1        MR. ANSBRO:  It's 2037.

2                        (Pause)

3  Q    Doctor, this is the table that shows the samples that you

4  reviewed, correct, of the UK data?

5  A    I'm sorry.  This is the table in which I applied the ratio

6  of asbestosis to mesothelioma -- to the mesothelioma cases in

7  the U.S. and project --

8  Q    Right.  My mistake.

9  A    -- asbestosis.

10        MR. ANSBRO:  Actually, Your Honor, let's now look at

11  Grace Slide 2036.

12  Q    This shows the breakout of the global resolution -- the

13  GPRD data into the two categories of the sample that you

14  analyzed.  Is that right?

15  A    That's correct.

16  Q    And, Doctor, am I correct that some of the patients that

17  were in your sample set had both diseases?

18  A    That's correct.

19  Q    Now, you've got the two diseases discreetly broken out.

20  Correct?

21  A    Yes.

22  Q    And so to be clear, the patients who had both diseases in

23  the sample are included here, you have categorized them in one

24  disease or another.  Correct?

25  A    Subsequent to this line of questioning on the deposition,

1 I looked into this matter exactly, and, in fact, both are --

2 there are 28 people who overlap, and they're in both groups.

3 Q    What did you go back to after the deposition to learn

4 that?

5 A    I went back to the GPRD and asked them to run me another

6 data set keeping both diseases on the same record, so if they

7 were present, I could count them.

8 Q    And so have you made that adjustment here?

9 A    If I make an adjustment, it would lower the ratio to .91.

10 Q    I want to talk now just about this exhibit which formed

11 the basis of your analysis.  At some point you wanted to know

12 that if someone had both of those two diseases, which would

13 they be more likely to claim in the lawsuit.  Correct?

14 A    I mentioned that in the -- yea, in the deposition.  Yes.

15 Q    And to get an answer to that question you asked Grace's

16 counsel.  Correct?

17 A    Yes.

18 Q    And as I understand your testimony from your deposition,

19 Kirkland and Ellis advised you that in a situation where a

20 patient had both diseases that person would be more likely to

21 claim for mesothelioma.

22 A    Yes.

23 Q    Okay, and on that basis, with respect to this table, were

24 those people who had both diseases, you put them into the

25 mesothelioma category.  Correct?

Ory - Cross/Ansbro                                    129

1  A    No, I have just corrected myself.  I said subsequent to

2  the deposition I went back and checked.  I put them in both

3  categories.  Had I only -- I put them in both categories.  This

4  -- as it stands here, the 28 people who share the diagnosis

5  show up in both groups.

6  Q    So that when you testified at your deposition that you

7  had, in fact, moved such a person into the mesothelioma

8  category, that was not correct?

9  A    In my deposition I said I wasn't certain.  I said that I

10 thought that's what I did.  In fact, that's not what I did.  I

11 did what I just told you I did.

12 Q    Turn to the Nicholson forecast as it has been adjusted by

13 KPMG in consultation with Dr. Nicholson.  That is a update of

14 his 1982 work that runs the projection of mesothelioma claims

15 out to 2049.  Do you understand that?

16 A    Which projection?  Which KPMG one?

17 Q    The piece authored by Vasquez.  Have you seen that?

18 A    I've seen the 1999 one -- 1991 one.

19 Q    You are aware that there has been a subsequent update to

20 the Nicholson '82 work that further projects mesothelioma

21 incidence beyond 2027?

22 A    I'm aware there has been a KPMG update, and I think there

23 have been two, actually.

24 Q    Okay.  You're aware that Nicholson was a consultant to at

25 least one of those exercises?

1  A    Yes.

2  Q    You have nevertheless chosen to not use that updated

3  Nicholson work.  Is that correct?

4  A    That's correct.  I've chosen to go with the one that's

5  published in the scientific literature.

6  Q    Are you saying that the later work by KPMG is not

7  scientific in some way or not reliable?

8  A    No, I said it wasn't -- to use your words, it wasn't

9  published and peer reviewed, so I stuck with Nicholson's '82

10 projection.

11         MR. ANSBRO:  That's all I have for the moment, Your

12 Honor.

13         MS. HARDING:  Your Honor, can I have about two or

14 three minutes just to gather my materials?

15         THE COURT:  Yes.  Let me find out is any -- is there

16 anyone else cross examining?

17                     (No verbal response)

18         THE COURT:  All right.  Why don't we take a five-

19 minute recess?  I'll think that will help.  And then we'll

20 reconvene on redirect.

21                     (Recess)

22         THE CLERK:  Please be seated.  Let the court come to

23 order.

24         THE COURT:  Doctor.  Ms. Harding.

25                     REDIRECT EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

1  BY MS. HARDING:

2  Q    Doctor, is there any study, any question, anything

3  presented to you today at all that changed your analysis or

4  ultimate conclusion with respect to the exhibits and analysis

5  that we talked about today in your direct examination?

6  A    There were none.

7           MS. HARDING:  Could you show me the first one,

8  please?

9           THE WITNESS:  I said there were none.

10           MS. HARDING:  No.  I'm sorry.  I was talking to T.J.

11           T.J.:  The first one?

12           MS. HARDING:  The first one admitted.

13           T.J.:  Okay.

14           MS. HARDING:  I'm sorry.  I'll give the number, 2036.

15  BY MS. HARDING:

16  Q    This is your creation of the asbestosis and mesothelioma

17  ratio.  Has anything that you were confronted with today

18  changed or altered your analysis or your alternate opinion

19  about the reliability of your ratio?

20           MR. ANSBRO:  Objection.  That's been asked and

21  answers.

22  A    No.

23           THE COURT:  Yes, that's sustained.  He's asked and

24  answered.  We're not going to run through these.  That's a

25  waste of everybody's time.  He testified quite clearly.  I

Ory - Redirect/Harding                          132

1   understood it.

2            MS. HARDING:  Okay.

3            THE COURT:  They've asked.  We don't need to do this.

4            MS. HARDING:  Fair enough, Your Honor.  I understand.

5   Q    Dr. Ory, with the exception of the article by Dr. Rogli,

6   had you reviewed in detail all of the material -- except for

7   the expert reports that you hadn't seen, had you reviewed the

8   studies that had been presented to you and you were asked

9   questions about?

10  A    Yes.

11  Q    Had you considered the information in those studies in

12  rendering your analysis and the methods that you used and your

13  conclusions?

14  A    Yes, I did.

15  Q    With respect to the study -- I believe it's a case series

16  or a series of case reports from Dr. Rogli, that I can't find

17  -- I'll ask you about that if I can find it.

18                        (Pause)

19  Q    You were asked a number of questions at the beginning of

20  your testimony about the inclusion or exclusion of women in

21  your analysis.  Correct?

22  A    That's correct.

23  Q    And you explained that -- as I understand your testimony,

24  you explained that it would not have been appropriate to

25  include women in your analysis, because Dr. Nicholson did not

1  include women in his analysis.  Correct?

2  A    Yes.

3  Q    And Mr. Finch asked you a series of -- asked you a couple

4  times, but there were women in his population.  Correct?

5  A    That's correct.

6  Q    Okay, and as I understand, is it -- is what's meant by

7  that that within a workforce at the -- during the time period

8  covered there might have been some women involved in working in

9  areas or occupations where they might have been exposed to

10  asbestos?

11  A    That's correct.

12  Q    Okay.  Dr. Nicholson recognized that.  Right?

13  A    Absolutely.  He discussed it.

14  Q    But when he -- when he conducted his study and derived

15  ratios and risks and all of the things that drive his study --

16  A    Right.

17  Q    -- he used male mortality ratios.  Correct?

18          MR. FINCH:  Object to the leading, Your Honor.

19          THE COURT:  That's sustained.

20  Q    Okay.  Did Dr. Nicholson use male mortality ratios -- male

21  mortality data?

22  A    Yes.

23          MR. FINCH:  Same objection.

24          MS. HARDING:  Did.  I said did -- did he.

25          THE COURT:  That doesn't make it non-leading.  That's

1  sustained.

2  Q    Doctor -- Dr. Ory, what did Dr. Nicholson do that is

3  relevant to the issue of whether you should, in using his

4  forecast, without correcting his entire work do when comparing

5  to mesothelioma incidence data?

6  A    Well, I stated clearly that Dr. Nicholson projected male

7  mesothelioma rates, and not only does he say he did that, but

8  further along in his analysis at one point he compares his --

9  he compares the data that he had so far to SEER -- and he

10 compared it to SEER male rates, so I'm quite certain that he

11 was projecting men.

12 Q    Just for clarification, Dr. Ory, I'm going to ask you --

13 I'm just going to show you Page 297 of Dr. Nicholson's paper.

14 A    Right.

15 Q    Is that the part of Dr. Nicholson's study that you're

16 referring to?

17 A    It doesn't look it, but let me --

18 Q    No?  Okay.

19                        (Pause)

20 A    Oh, I'm sorry.  The second paragraph --

21 Q    Yes, I'm sorry.  Yes.

22 A    -- where he says, "The number of mesothelioma is estimated

23 by this procedure as approximately 40 percent greater than

24 those that would've been estimated to occur nationwide using

25 data of the SEER Program for white males during 1978, personal

1  communication from SEER."

2  Q    So when Dr. Nicholson was comparing his own estimates in

3  his study and some of the work he had already done in it, he

4  used male mortality data to compare it to them from SEER.

5  Correct?

6  A    Absolutely.

7  Q    Now if you had included women in your analysis, how would

8  that have affected your ultimate conclusion?

9  A    I would've had a lower incidence ratio.

10  Q    Thank you, Dr. Ory.  The next question I have is with

11  respect to a study you were shown by Markowitz Morabia.

12  A    Yes.

13  Q    This study here.  I'll show you.  Do you know which one

14  I'm referring to?

15  A    Yes.

16  Q    Okay.  You've seen that study before.  Correct?

17  A    Yes.

18  Q    Did this study involve a co -- well, let me see this.

19  What were the death intervals that were involved in this study?

20         MR. FINCH:  Objection.  Lack of foundation.

21         THE COURT:  He said he's read the study.

22         MR. FINCH:  Is this the Rogli study?

23         MS. HARDING:  No.

24         MR. FINCH:  Markowitz study.  Oh.

25         THE COURT:  No, it's Markowitz.

1   A     It looks like there was a ten-year followup study.

2   Q     Okay, and what does that mean to you in connection or what

3   relevance does that have with respect to whether or not the

4   information in this study is relevant to the work that you did

5   in this case?

6   A     Well, I was very interested in the insulated cohort, and

7   that's why I looked at all three papers that -- four actually

8   if you include this one.  But there was done every ten years,

9   and I looked -- maybe there's one after that.  I hadn't found

10  it.  But I was very curious about how the insulated cohort

11  changed over time.

12  Q     Just because it was so helpful to me when you showed it to

13  me, could you show on the board what you saw when you looked at

14  the insulated cohort over time?

15  A     If I remember.

16  Q     There's a pen right up there.

17  A     Yes.

18  Q     You have to -- well, you have to write it first maybe?

19         MR. FINCH:  Objection, Your Honor.  This wasn't in

20  Dr. Ory's report.

21         THE COURT:  This is redirect.  This is fair.  He's

22  asked -- you asked -- somebody asked him about the Markowitz

23  study and certain parts of the mortality tables and also about

24  the insulator studies about which he testified on cross

25  examination and the three times that he used them in '76, '86,

Ory - Redirect/Harding                    137

1  and '66, and now he's following up.  This is proper redirect.

2              MR. FINCH:  Even though it's new --

3              MS. HARDING:  He didn't rely upon it in forming his

4  own analysis, but he knows about it, and he was asked questions

5  about it, and he's explaining why he -- why -- what he found in

6  it that he thought was important.

7              MR. FINCH:  Very well.

8              THE COURT:  Go ahead, sir.

9  A    Well, it's what I said in my testimony.  That in 1966 I

10 believe there were 339 cases of asbestosis and ten cases of

11 mesothelioma.  In the '76 followup -- and these numbers are

12 approximate -- there are 170 cases of asbestosis and

13 mesothelioma, and by '86 there were something like 480 -- about

14 460 cases of asbestosis and about 480 mesotheliomas.  So what

15 my point was on that was if you looked here, you would've seen

16 an asbestosis to mesothelioma ratio of 30 to 1, but it's these

17 two are one to one as the cohort went on, and the -- I imagine

18 the people who were very ill from asbestosis died, and that the

19 mesothelioma cases -- well, more of the -- look at the rise in

20 the meso -- strike the first comment.

21         The real difference is look at the rise in the meso

22 cases.  There's nothing biologic about the one-to-one ratio.

23 It just happens to depend on where you are in time.  I mean

24 that -- that's not well said.  The one-to-one ratio is based on

25 the biology that asbestos causes both asbestosis and

1  mesothelioma, but what that ration is is depend -- is very time

2  dependent on where you are in the asbestosis epidemic.

3  Q    Is that -- you explained the distinction early on about

4  why you looked for an incident approach as opposed to a

5  prevalence approach.  Is that why?

6  A    That's one of the reasons, yes.

7  Q    You were asked some questions about the low -- lower-

8  exposed group of workers in the Nicholson study.  Do you recall

9  those -- that line of questioning?

10 A    Yes.

11 Q    I'd like to --

12           MS. HARDING:  May I approach the witness, Your Honor?

13           THE COURT:  Yes.

14           MS. HARDING:  Thank you.

15                         (Pause)

16           MS. HARDING:  I'll wait until I have copies, Your

17 Honor.

18           THE COURT:  What's the exhibit number?

19           MS. HARDING:  It's the ACC FCR's 1097 exhibit.

20           THE COURT:  All right.  Thank you.

21                         (Pause)

22           THE COURT:  That was the witness' copy.

23 BY MS. HARDING:

24 Q    Have you seen this study before, Dr. Ory?

25 A    Oh, yes.

**J&J COURT TRANSCRIBERS, INC.**

Ory - Redirect/Harding                    139

1  Q    What is it?

2  A    This is a presentation of an early version -- earlier

3  version of Nicholson's model to Branberry (phonetic)

4  conference.  I think it was presented a year earlier.

5  Q    If you could turn to Page 106, please?

6  A    Yes.

7            THE COURT:  Could we get it up on the screen?

8            MS. HARDING:  I'm looking for that page, Your Honor.

9  I'm sorry.  Oh, there we go.

10           THE COURT:  And may I have a copy?

11                          (Pause)

12           THE COURT:  Thank you.

13  Q    Dr. Ory, what is the figure on Page 106, if you know?

14  A    Figure 7 is the estimated and projected numbers of

15  mesothelioma per year from 1940 through 1999 from the

16  occupational asbestos exposure.

17  Q    Okay, and what did this study tell you about the inclusion

18  of the lower -- if anything, about the inclusion of the lower

19  dose category of exposed people in the Nicholson report and his

20  estimations on mesothelioma?

21  A    Well, what's -- this is one of the most curious things in

22  all the work that I did that I noticed.  If you read Conclusion

23  1 here and -- which accurately reflects what the paper says, it

24  says from 1940 to 1979 13 million individuals had significant

25  potential asbestos exposure to work, and what's really striking

J&J COURT TRANSCRIBERS, INC.

Ory - Redirect/Harding                    140

1  is a similar figure appears in the Nicholson '82 paper, which

2  you can put up.  And it's the identical figure in spite of the

3  fact that Nicholson has doubled his population -- his exposed

4  population to 27 million.  And do you want to show -- could you

5  show that?

6          MS. HARDING:  I'm looking for it.  Sorry.  I

7  apologize.  I thought I had it with me.

8                         (Pause)

9          THE WITNESS:  You could just put the Nicholson slide

10 upon the ELMO from --

11         MS. HARDING:  I'm looking for that, Dr. Ory.

12 Q    Do you recall what page it's on?

13 A    It's towards the end.

14         UNIDENTIFIED SPEAKER:  Page 298.

15         MS. HARDING:  No, that's not it.

16         THE WITNESS:  No.  No.

17         MS. HARDING:  That's not it.

18         UNIDENTIFIED SPEAKER:  Two ninety-eight.

19         MS. HARDING:  Thank you.

20         THE WITNESS:  Right.

21                         (Pause)

22 Q    Is that the same figure?  Is that the figure you're

23 referring to?  This is from Nicholson's report --

24 A    Right.

25 Q    -- paper now.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Right.

2           THE COURT:  So you're looking at the ACC Exhibit 1

3  now, Page 298?  And --

4           MS. HARDING:  Yes, Your Honor.

5           THE COURT:  All right.  Thank you.

6           MS. HARDING:   Thank you.

7  A    And what's striking to me is this figure looks remarkably

8  similar to the figure presented the year before based on 13

9  million people.  This figure -- this paper that this figure

10 appears in is based on 27 million people, and yet the curve

11 doesn't seem to change.  So it would suggest to me that the 13

12 million people that were added didn't add very much in the way

13 of risk.  That it was the original 13 million people that

14 carried the risk.

15 Q    One last series of questions, Dr. Ory, just to make sure

16 the record's clear with respect to the issue of the data that

17 you used in -- with respect to the mesothelioma incidence in

18 the United States.  You were asked a series of questions about

19 the SEER data with respect to SEER 9 and SEER 17.  Is that

20 right?

21 A    Nine, 13, and 17.

22 Q    Nine, 13, and 17.  What's the -- could you maybe go to the

23 board and explain the distinction in the progression of the

24 SEER database?

25 A    SEER 9, which means it had 9 centers involved, it's just

1  -- started in '73, and it went until '89 I think.  I might be

2  wrong on that.  And it covered about 9 or so -- 9 and 10

3  percent of the population.  SEER 13 added more centers, and it

4  ran from -- well, actually, it runs -- they still produce the

5  data, so it runs from '73 on.  SEER 13, the additional centers

6  were added around 1991 or 2.  So let's say '91, and that

7  covered about 14 percent of the U.S. population.

8          SEER 17 added more centers, and it -- those centers

9  were added in 2000, and it covers about 25 percent of the U.S.

10 population.  At about the same time that was going on SEER and

11 CDC got together and they now publish something called the

12 USCS, the United States Cancer Surveillance, which now covers

13 98 percent of the U.S. population, and this runs from 1999.

14 The latest date is from 2004.

15         So the USCS includes all the SEER centers, plus it

16 goes out and gets the rest of the country.  So, you know, as

17 far as I'm concerned, from 1999 on, if SEER was the gold

18 standard, this is now the platinum standard.

19 Q    Thank you, Dr. Ory.  And you used the most -- the data

20 that had the most information in it -- the USCS data included

21 with the relevant SEER data in doing your analysis in this

22 case.  Correct?

23 A    Whenever possible from 1999 on, yes.  Whenever possible

24 from 1999 on.

25 Q    I'm sorry.  I want to -- I do want to go back to the

1 Branberry figure one more time -- the Branberry Nicholson.

2 This is the Nicholson figure.  Could you explain the

3 significance of that discovery -- you know, that finding that

4 when Dr. Nicholson added that many million workers who were on

5 the lower exposed end with respect to his projections of

6 mesothelioma?

7 A    Well --

8          MR. FINCH:  Objection.  Asked and answered.

9          THE COURT:  Well, it may be, but frankly, I'd like to

10 hear it anyway, so I'm going to overrule the objection for my

11 edification.  Go head.

12 A    If your study -- Nicholson's method says these 13 million

13 people carry all the risk, and he comes up with a curve that

14 seems to be quite the same as the curve we're all used to

15 seeing now that has 27 million people in it.  So I draw the

16 conclusion that the 13 million people that were added added a

17 vanishingly small amount of risk.  They must not have been very

18 exposed.

19 Q    And, Dr. Ory, could you --

20          MS. HARDING:  I'm sorry.  T.J. could you put up the

21 last slide of the direct examination, please?

22          THE COURT:  Excuse me.  May I ask?  I think what I'm

23 confused about about this testimony is the 13 or 14 million

24 people who were added are all the lower exposed people in the

25 Nicholson study?

Ory - Redirect/Harding                           144

1           THE WITNESS:  He doesn't say that explicitly.  I'm

2   drawing that conclusion, because how else can you add people

3   and not change the shape of the curve?

4           THE COURT:  All right.  Thank you.

5           MS. HARDING:  And perhaps this might help, Your

6   Honor, as well.

7   Q   Dr. Nicholson's estimates were based on risks relative to

8   insulators, and the -- for different categories of people

9   exposed, and the risk was lower as you went -- lower associated

10  with certain groups of people and higher with respect to other

11  groups of people.  Correct?

12          MR. FINCH:  Objection.  Leading.

13          THE COURT:  I -- this is a foundation question.

14          MS. HARDING:  Thank you, Your Honor.

15  A   The highest -- Nicholson -- as I said earlier, everything

16  was a ratio to Nicholson, and so he gave the risk and the

17  insulators to be one, and as people's exposure got lower, he

18  gave it as a fraction of that.  So like the lowest group got

19  one percent of the risk of the insulators.

20  Q   And as I understand it, I think is it fair to say that he

21  could not -- in other words, it's not possible in his model to

22  add people with lower -- with higher exposures in his model and

23  not get significantly more mesotheliomas.  Is that fair?

24  A   That would be my understanding.

25          MS. HARDING:  Did you -- do you have that last slide

**J&J COURT TRANSCRIBERS, INC.**

                               Ory - Redirect/Harding                    145

1  T.J.?  Thank you.

2  Q    I want to ask you, Dr. Ory, is the conclusion that you

3  drew from seeing those two curves from the earlier Nicholson

4  work in the Branberry report and the later Nicholson report, is

5  that supported or contradicted by the evidence that you -- that

6  we admitted in 2050?

7  A    Well, I think it's supported.  I mean this curve more than

8  any other exhibit that I've put up says to me that if you take

9  away asbestos exposure, you take away mesothelioma, and it

10 tells me it's been taken away in the young people.  Their risks

11 are plummeting.  And I guess the other really important thing

12 about this slide to me is it tells me there's no, whatever the

13 parlance is these days, no second wave or third wave, fourth

14 wave, because if there was a wave of people with enough

15 exposure to asbestos to be causing mesothelioma, we'd be seeing

16 it in the 20 to 54 year olds like we did in 1973 from the slide

17 that I showed.

18         MS. HARDING:  Thank you, Dr. Ory.  No further

19 questions.

20         THE COURT:  Any recross?

21         MR. FINCH:  No, Your Honor.

22         MR. ANSBRO:  Nothing further, Your Honor.

23         THE COURT:  You're excused, Doctor.  Thank you.  Mr.

24 Bernick.

25         MR. BERNICK:  Let's take the next witness?

                    **J&J COURT TRANSCRIBERS, INC.**

Rodricks - Voir Dire/Bernick                    146

1          THE COURT:  Yes.  Well, Mr. Bernick, I'm sorry.  Do
2  you need a recess to get ready?
3          MR. BERNICK:  No, I --
4          THE COURT:  If you do, that's fine.
5          MR. BERNICK:  If you'll excuse me one moment.
6          THE COURT:  No.  Okay.  That's fine.
7          MR. BERNICK:  I don't know -- I'm not sure of the
8  Court's -- yea, well, let's start out with it.  Dr. Rodricks is
9  going to take the stand.
10                         (Pause)
11          MR. BERNICK:  Due to the insecurity of my height,
12  Your Honor, I would like to look over the podium if you'll
13  indulge me.
14          THE COURT:  We need to get the witness sworn.  You
15  need to call him, please.
16          MR. BERNICK:  We call Dr. Rodricks to the stand.
17          THE CLERK:  Would your raise your right hand?
18       DR. JOSEPH RODRICKS, DEBTOR'S WITNESS, SWORN
19          THE CLERK:  Please be seated.
20          MR. BERNICK:  Good afternoon, Dr. Rodricks.
21          THE WITNESS:  Hello.
22                        VOIR DIRE
23  BY MR. BERNICK:
24  Q    Could you just tell us, in order to acquaint the Court
25  with what you're here about this afternoon, what it is that

                    **J&J COURT TRANSCRIBERS, INC.**

1 you've come here to talk with us about?

2 A    I've come to talk about the signs of risk assessment, its

3 application in the evaluation of causation of disease, and its

4 application in some regulatory public health context as well.

5 Q    In a few words -- and I know we'll have an opportunity to

6 go through more -- could you tell the Court what risk

7 assessment is?

8 A    Risk assessment is a rigorous scientific framework use to

9 evaluate research information, other complex scientific

10 information, to evaluate the likelihood that under certain

11 conditions people will be harmed by exposure to toxic agents.

12 Q    Do you  have a background in risk assessment, Dr.

13 Rodricks?

14 A    I do.

15 Q    Okay.  Let's begin with your education background.

16      MR. BERNICK:  And I'd like to show the Court Slide

17 GG-2002.

18 Q    Could you -- making reference to that demonstrative, could

19 you just go through briefly what you educational background is?

20 A    Briefly, I began life as a chemist out of MIT in 1960.  I

21 moved on to study at the University of Maryland.  I moved into

22 biochemistry for a PhD.  I did post-doctoral work in

23 biochemistry at the University of California, Berkeley as well.

24 Q    Okay.  Let's talk about your professional experience.

25      MR. BERNICK:  And if we could bring up GG-2003.

1  Q    Again, in your own words looking to the slide, give the

2  Court an overview of your own professional experience.

3  A    Yes.  I spent 15 years -- my first position after

4  finishing graduate work was a -- as a scientist at the U.S.

5  Food and Drug Administration for 15 years specializing in the

6  analysis of risks from substances regulated by FDA.  I built on

7  that basic scientific background, and during this time period

8  was a period when these new tools of risk assessment were

9  beginning to be used, and I was there pretty early in that

10  process.  So I worked on a whole wide range of products.  And

11  my last four years at FDA -- three and a half years at FDA I

12  was in the Office of the Commissioner of FDA as an Associate

13  Commissioner for what we called health affairs at the agency.

14  Q    Go ahead.

15  A    Well, I began, as I got into the risk assessment field,

16  working from the sciences of toxicology and epidemiology as the

17  basic sciences.  I got into the risk assessment field, and

18  beginning in the mid-70s -- I guess 1977 -- I was asked to

19  serve on a Committee of the National Academy of Sciences.  The

20  National Academy is a knowing governmental entity that does

21  expert consultation for the government on all kinds of matters,

22  and I have since served on more than 20 expert committees of

23  the Academy in that period looking at a very wide range of

24  issues related to hazardous substances and the risks they pose

25  to health.

1  Q    Okay.  Let's talk about Environ.

2  A    Environ's a firm I'm now with.  I've been there since

3  1982.  We're a 25-year-old consulting firm with offices around

4  the globe doing a very wide range of scientific consulting

5  again on matters of risk to health from substances in the

6  environment and the workplace, in consumer products.  It's

7  quite varied in context.  Some of it related to regulation of

8  those products.  Some of it related to issues of disease

9  causation.

10 Q    Okay, and finally Johns Hopkins.

11 A    I was -- in the mid-1990s I was asked to join the faculty

12 as a visiting professor at the school in Baltimore, and I teach

13 there a course in quantitative risk assessment methods.  It is

14 called public health.

15 Q    Let's turn to some of your publications.  I want to turn

16 to GG-2004.  What's the Red Book?

17 A    This is a shorthand term for a book which has a red cover,

18 but it's quite a prominent work in the field of risk

19 assessment.  There was a lot of turmoil in the science of risk

20 assessment during the 1970s.  Congress asked for a National

21 Academy of Science study in the early eighties of the whole

22 process by which we look at risks to health and the scientific

23 tools for doing that.  The Red Book -- I served on this

24 committee.  I reproduced a volume in 1983 from the National

25 Academy which has set the stage for almost everything that has

**J&J COURT TRANSCRIBERS, INC.**

1  followed by way of risk assessment in regulatory agencies and

2  many other institutions.  The framework for risk assessment

3  that we now use was originally formulated there.  So this is

4  quite similar work.  I was very both fortunate and pleased to

5  be on that committee.

6  Q    Have you also done some writing in work in connection with

7  risk assessment or its applications in toxic tort litigation?

8  A    I have.  I began in the eighties when I first got

9  introduced to this issue.  Most of my early work with risk

10 assessment was in the regulatory context, but increasingly

11 during the eighties issues of tort arose where there had to be

12 some scientific evaluation.  So I got interested in this and

13 began writing and thinking about the problem at that time.  So

14 I have a couple of early papers from the eighties that I think

15 I list there.  Yes, on the bottom.

16 Q    Okay.

17 A    And then I -- my thinking had advanced quite a ways by

18 1998, and that paper in '98 was I think a -- I hope a

19 substantial contribution to this field, but I -- it was a look

20 at the state of the science and its interaction with some of

21 the legal standards at that time.

22 Q    Continuing on to GG-2005, what do these publications

23 relate to?

24 A    This might be a bit redundant.  The same topics basically.

25 I have a book on the subject of risk assessment in general, the

1  one at the top, and I just recently -- in the second edition I

2  introduced a whole new chapter on the issue of causation and

3  tort.  It had not been in the first edition back in the early

4  ninties.  And this Journal of Law and Policy article evolved

5  from a seminar I gave at Brooklyn Law School -- seminar for

6  judges.  This is a bit redundant, but it's more on this topic,

7  which I've spent quite a bit of time looking at.

8  Q    Have you had any involvement in recent years in connection

9  with activities of the Federal Judicial Center?

10 A    I have.  I gave a talk to a gathering at Georgetown

11 University last summer on issues of the use of toxicology and

12 related information and analysis of causation.  I met one of

13 the editors of that journal there, and he invited me to sit on

14 an advisory panel.  There's a third edition coming out I guess.

15 I'm not sure when it'll come out.  We're just beginning to look

16 at a third edition of the manual, so I'm advisory.  I don't

17 think I'm asked to write anything but to advise on the content

18 of it, yes.

19 Q    Have you been asked, Dr. Rodricks, to testify today

20 regarding the specifics of risk assessment for asbestos in

21 particular?

22 A    Not for asbestos in particular, no.  I'm talking about the

23 general methods for evaluating causation using that framework.

24      MR. BERNICK:  Okay.  Your Honor, we would offer Dr.

25 Rodricks as an expert in risk assessment.

Rodricks - Direct/Bernick                152

1          THE COURT:  Any objection?  Any voir dire?

2          MR. MULLADY:  No, Your Honor, not from the future

3  claimants.

4          MR. FINCH:  No, Your Honor, as long as it's limited

5  to risk assessment generally and not risk assessment in the

6  asbestos context.

7          THE COURT:  He's --

8          MR. BERNICK:  I think all the questions will be posed

9  with respect to risk assessment generally, and we will later be

10  building on that in our case on what he's indicated.  We want

11  to establish the (indiscernible) cases (indiscernible).

12          THE COURT:  Dr. Rodricks, without objection, may

13  offer an expert opinion in the area of risk assessment.

14                    DIRECT EXAMINATION

15  BY MR. BERNICK:

16  Q    Let's talk for -- at the outset, Dr. Rodricks, about this.

17  Does risk assessment deal with causation of disease by

18  potentially toxic agents?

19  A    That's one of its applications, yes.

20  Q    Are you familiar in general terms with the basic evolution

21  of the criteria for causation by toxic agents?

22  A    The general evolution.  Yes, I am.

23  Q    Okay.  Do you have a --

24          MR. BERNICK:  We have a demonstrative that's been

25  prepared that would assist the Court in walking through that

1 basic evolution.  I would like to show the Court and counsel

2 GG-2006 as a demonstrative.

3          MR. FINCH:  Your Honor, I would object to this

4 demonstrative to the extent that it has anything about the

5 Federal Judicial Center manual on it.  This is a witness who

6 didn't write that.  That's a legal text.  I believe that it --

7 it's a legal authority no different than a brief for a case.  I

8 believe it fades the province of Your Honor for him to be

9 offering any testimony about the Federal Judicial Center manual

10 or to be giving testimony about what should or should not be

11 required in a court of law to establish causation.  I think

12 that's a legal opinion.  It's not something that's a proper

13 subject for a witness.

14          MR. BERNICK:  You don't mind if I -- that's really

15 not the purpose of the proffer at all.

16          THE COURT:  Well, may I see it, because since I don't

17 know what specifically you're referring to --

18          MR. BERNICK:  All it is at this point is an icon.  It

19 says, "Federal Judicial Center Manual."

20          THE COURT:  Right.  I will take your objection under

21 advisement when the witness explains what it's doing there, Mr.

22 Finch, because until I hear it, I'm not sure what the purpose

23 of this is, since it's demonstrative.  So I will give you a

24 ruling when I understand the nature of the objection in the

25 context of this document, because just seeing an icon there

1  does not necessarily tell me that it is an improper use of an

2  icon.  So I will rule on the objection when I hear what the

3  icon's purpose is.

4           MR. BERNICK:  Thank you.

5  BY MR. BERNICK:

6  Q    If you could begin at the left-hand side of the chart, and

7  I want to, first of all, focus on causation criteria where it

8  refers to Koch's Postulates.  In the period before 1964, were

9  there postulates called Koch's postulates that related to

10 causation?

11 A    Yes, these were the earliest attempts by scientist

12 physicians to set forth some criteria to understand -- lined to

13 understand when you apply them, aspects of disease causation.

14 They actually emerged in the late 19th century.

15 Q    Okay.  It says infectious disease model.  What does that

16 mean?

17 A    Well, they were based on what was then, when they were

18 developed, the key concerns about disease causation, and that

19 were -- those were related to infectious agents.  Tuberculosis

20 was one of the major issues at that time.  And the model was

21 based on the notion that one infectious causes one disease, and

22 it had some very simple criteria for establishing when you were

23 sure you could establish causation between an agent and a

24 particular infectious disease.  So that was a model which was

25 well received and stood for those classes of diseases -- acute

1  infectious diseases.  They stood a long time.

2  Q    Okay.  At this point in time, that's prior to 1964 and

3  going back into the thirties and forties, what was the status

4  of epidemiological review or research regarding toxic agents?

5  A    Well, there was a lot of interest in the subject of toxic

6  agents often focused on occupations or medicines where there

7  were reports of adverse events, but most of those were not

8  really studies.  They were reports by physicians.  We call them

9  case reports where they have an individual with a disease, and

10 they think they can sort of establish what might have caused

11 it, or they may have a series of diseases.  They're not

12 controlled studies, but they were the earliest attempts to

13 understand relationships between exposure and disease.

14 Q    As we go to the later period of time coming up, fifties

15 and 1960s, what, if anything, happened regarding the strength

16 of the observational studies?

17 A    They increased.  Some very inventive scientists in England

18 and in this country focusing primarily on smoking in the

19 1950s/early 1960s.  Also radiation.  Radiation, of course, was

20 a major issue during that same period, and some very inventive

21 scientists thought of new ways to observe populations that have

22 exposure, and you cannot create the exposure intentionally, but

23 you can observe where it's occurring and try to set up

24 something like a controlled study.  They're never perfectly

25 controlled.  You can't do that.  So these studies began to

Rodricks - Direct/Bernick                    156

1  emerge in the 1950s and sort of really advanced the field.

2  Q    Okay.  Now did a time come when as a result of the

3  increased strength of sophistication of this epidemiological --

4  did the time come when that had an impact on the scientific

5  community's assessment of when causation could be or how

6  causation could be proven?

7  A    Yes, it had a very strong impact.  The smoking studies in

8  particular.  I'm sorry.

9  Q    What was that impact, and when did it occur?

10 A    Well, there was a lot of controversy over those early

11 smoking studies, and whether a -- they established what are

12 called associations between smoking and certain diseases.  And,

13 actually, some of the early studies showed several diseases.

14 And so one of the issues that raised was whether the old idea

15 of the one agent/one disease idea held up anymore.  And a lot

16 of people said this is contrary to Koch's Postulates.  And

17 there are other issues, too.  These were now mostly chronic

18 diseases.  Some of them have other causes.

19        Remember with infectious there are no other causes of

20 tuberculosis except the agent, but all of these diseases that

21 emerge with smoking had other causes.  So that -- a group got

22 together under the surgeon general of the U.S. at that time

23 saying what do we make of all this kind of evidence, which

24 looks good, but we also know it's limited?  So they developed

25 and published in 1964 -- is a seminal.  That's why I put it

1    there -- the so-called Bradford Hill criteria that

2    epidemiologists still used today to evaluate scientific

3    epidemiology information to see whether it moves from

4    associations and studies, so real causation -- disease

5    causation.

6    Q    Does this chart or this demonstrative then go into, I

7    guess for want of a better phrase, the ripple effect of the

8    endorsement of new criteria for causation?

9    A    I tried to illustrate in the third column, yes.

10   Q    Okay.  And I know that once we get to that judicial

11   interface, I'm very controversial here, so let's begin with the

12   easy stuff.  First of all, what, if any, effect did the option

13   of the Bradford Hill criteria have on the scope of --

14             THE CLERK:  Can you use the mike?

15   Q    -- on the scope of epidemiological research?

16   A    It has strong effect, because now once these criteria

17   gained wide acceptance, the epidemiologist had to begin

18   thinking about designing studies to give information that could

19   be evaluated using those criteria if you had any hope of

20   establishing causation.  So the studies changed.  They came up

21   with different protocols for studies, different ways to look at

22   population retrospectively or prospectively, new ways to

23   measure exposure in those populations, and that's still

24   expanding.  It's become quite quantitative.  It has ways to go,

25   but it's really quite an advanced science now.

1  Q    When focused on regulatory approaches, is this an area in

2  which you now make reference -- is this an area where your own

3  activities had focused after I'll say after the 1960s and going

4  forward to the seventies and eighties that is the impact of

5  epidemiology on regulatory promotions?

6  A    Absolutely.  The regulators have a very wide mandate to

7  protect public health in a lot of different contexts, and we

8  knew and regulators knew well that all chemical substances --

9  I'm focusing on chemicals -- can be hazardous under some

10 conditions, and we also know that they're not hazardous under

11 other conditions, and we needed some good tools -- a good

12 framework to analyze whether under specific conditions the

13 toxic properties would express themselves, how likely it was,

14 and how like -- and then where that likelihood got to be very

15 small.  So this risk assessment model evolved during this

16 period, and it's still evolving, but it has now very, very wide

17 use in this sort of context.

18 Q    Okay.  All right.  The models -- and I -- we'll just focus

19 on this a little bit really as a marker.  There's been a lot of

20 discussion already in this trial about models.  Are all risk-

21 based models for regulatory purposes -- are they identical?

22 Are they identical in scope with scientific models, or are

23 there differences sometimes between regulatory risk models and

24 scientific risk models?

25 A    Well, they're all done within the same risk assessment

1  framework, but they're emphasizing different aspects of the

2  science.  The causation models tend to focus on -- should focus

3  on the real observed science.  Regulators will go beyond the

4  observed science in many cases and introduce assumptions for

5  public health protection.  So the same framework, the same data

6  sources apply, but then there are differences in application.

7  Q    More of that in a moment.  Today is there or is there not

8  a widely accepted framework for risk assessment within your

9  opinion?

10 A    There is a widely accepted framework for risk assessment,

11 yes, and it is very widely used.

12 Q    Now when we went through the history that you just

13 discussed, we focused on the development of epidemiology and

14 how epidemiology affected causation criteria which in turn had

15 impact on risk modeling.  Does epidemiology play a basic role

16 in risk assessment?

17 A    It is one of the fundamentals of risk assessment.  There

18 are other aspects of science, but it is a fundamental piece of

19 the risk assessment process.

20 Q    I'm showing you for illustrative purposes GG-2007.  Does

21 this set out in very broad terms -- does this set out the

22 elements of the risk assessment framework?

23 A    It does, and to be accurate about it, the framework itself

24 is on the right-hand side of the dotted line.  I put some

25 information on the left side of the dotted line that talks

Rodricks - Direct/Bernick                    160

1 about the sources of information.  The questions being posed,

2 if you like, and the analysis -- the evaluation occurs in the

3 steps that I've shown there on the right side of the dotted

4 line.

5 Q    What are the elements of the risk assessment framework

6 itself?

7 A    Well, first of all, the question which is on the -- I gave

8 one example here on the far left.  We're looking at in this

9 case a group of individuals.  They have a disease.  They claim

10 chemical exposure caused it.  The assessment framework -- if

11 you want to look at this question and evaluate it, you first

12 look at the underlying science, the epidemiology, even some

13 other sciences as well.  You look at exposure as you try to put

14 that all together, and the framework is a way to help you

15 organize and evaluate it.

16       So the first step under what I call -- those are the

17 terms used by scientists when they do the risk assessment, the

18 hazard identification, the dose response, how strong is the

19 evidence that the chemical causes the disease.  That would be

20 the first thing you'd want to look at.  In other words, we have

21 claims of disease where there's chemical.

22       If you found that there's no evidence the chemical

23 can cause the disease under any circumstances, then you might

24 stop your inquiry.  But if you begin to find evidence, you want

25 to see how strong it is.  Is it convincing?  And at the same

1  time you're also looking at this very, very important question,

2  the second one there called dose response.  That is how does

3  the rate of disease or the risk of disease change with dose?

4  Q    Let's focus then in more detail on epidemiology.

5           MR. BERNICK:  And I apologize, Your Honor.  Some of

6  this may already be well known to the Court, but I'd like to

7  make a record very, very briefly.

8  Q    Turning to Slide GG-2008, can you run for us through this

9  -- run through this for us briefly as an example that

10 illustrates how epidemiology works?

11 A    Well, it's a part example, but it's exactly what

12 epidemiologists try to do.  They look at people who have one

13 kind of exposure to an agent.  In this case I've shown smoking.

14 They try to then identify populations that do not have that

15 exposure and see if there are differences in disease rates in

16 the two.  That's basically it.  I -- in this case I've

17 emphasized that those studies -- individual studies of these

18 differences of disease rates are said to develop an association

19 or not between the exposure and the disease.  These studies by

20 themselves individually cannot establish causation, but only

21 whether the disease occurs more commonly in one population than

22 the other.  And if it's -- if that association exists, it's

23 called that.  The reason these are not association -- not

24 causal in a single study is that these are not perfectly

25 controlled studies.  The only way you get causation is with

Rodricks - Direct/Bernick                    162

1  perfect controls, and observation doesn't allow that.  So you

2  have associations.

3  Q    Okay.  Now the Bradford Hill criteria that were adopted in

4  1964/1965, do they help us tell when the body of data is

5  sufficiently strong to be able to say causation?

6  A    That's exactly their purpose, yes.

7  Q    Okay.  Showing you GG-2009, are these the Bradford Hill

8  criteria?

9  A    Yes, these are the key criteria that one would look at.

10 You begin by collecting all of the studies together.  You

11 wouldn't apply this to a single study.  We know the single

12 study would never be enough, so you don't even have to think

13 about that.  But once you accumulated a body of evidence, you

14 then begin looking at that body of evidence.  This is usually

15 done by expert groups, and you look at things like how strong

16 the association is.  You tend to see the same association over

17 and over again or not.  Is it clear that the exposure always

18 precedes the disease?  Is there what's called a biological

19 gradient -- does the risk -- this is very important, because it

20 is well established in toxicology and epidemiology that the

21 more exposure the greater the risk.  So if you don't see

22 increasing risk with increasing exposure or dose, that would

23 reduce the reliability that the -- the likelihood of a causal

24 relationship.  So these are applied routinely now to establish

25 causation or not from the associations.

1  Q    We'll now walk through how epidemiological studies read

2  out in terms of results, and for those purposes I want to give

3  you a hypothetical example about epidemiology relating to a

4  drug.

5         MR. BERNICK:  Showing -- let's show the Court GG-2012

6  for illustrative purposes.

7  Q    Where you have an epidemiological study relating to a

8  drug, what are the two groups from which data is gathered?

9  A    Well, you'd -- this chart references what might be called

10 a clinical trial, which is one kind of very controlled

11 epidemiology study, but you could do this without a clinical

12 trial.  But, basically, people taking the drug, people who do

13 not have a drug -- do not have that drug, and you look again

14 for differences in disease rates in the two populations.

15

16 Q    Okay.

17 A    We refer to that difference as a relative risk.  You're

18 looking at the risk of disease in one versus another.

19 Q    Okay.  So let's assume we have the drug group here -- and

20 we put a big D for the drug group and a big P for the placebo

21 group -- and we take a look at the incidence of particular

22 diseases.  Let's say Disease A in both groups -- in both

23 groups, and we're going to be looking for a relative risk.  The

24 Court has heard about relative risk.  What do the -- what does

25 relative risk reflect with regard to the results of an

1  epidemiological study of a drug?

2  A    It simply reflects the rate of the disease in one group

3  usually in a given period of time -- time is important --

4  versus the rate of disease -- same disease in the other group,

5  same period of time.

6  Q    If you have a relative risk of 1.0, what does that say

7  about the frequency of the Disease A and the two groups, that

8  is the drug group and the placebo group?

9  A    No difference in frequency.

10 Q    What if the drug group has 50 percent more?  That is

11 instead of -- let's assume that the placebo group has 100 cases

12 of Disease A and the drug group has 150 cases of Disease A,

13 what would the relative risk be?

14 A    Again, same time frame.  That would reduce to 1.5.

15 Q    Okay, and under those circumstances what would you say

16 about the -- whether Drug A carries with it -- based upon this

17 one study whether Drug A carries with it a risk of disease?

18 A    Well, one study is uusually not enough to establish

19 causation, but putting that aside, it would say by itself that

20 there's, as you put it, 50 percent more disease in one than the

21 other that suggests that there is a risk with the drug that's

22 -- that exceeds the background risk --

23 Q    Okay.

24 A    -- by 50 percent.

25 Q    Under those circumstances what would you say about cause?

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Direct/Bernick                    165

1  That is whether the Drug D can cause Disease A in some people.

2  A    In some people, you'd say -- this is well established, and

3  you've established the causation criteria, and this was

4  statistically significant.  You'd say that, yes, it would in

5  some people cause disease.

6  Q    What if it's 1.5, but it's not statistically significant?

7  A    It would remain an association -- well, I guess -- I'm

8  sorry.  It would not remain an association.  It would be -- you

9  could not say with any confidence -- not statistically

10 significant means you cannot with any confidence say it

11 differs from one.  That's basically what it means, and if that

12 were the case, then it would be imprudent to conclude any

13 causation or an effect there.   Imprudent is what I said.

14 Q    We've sometimes seen these confidence intervals where we

15 have a relative risk of one and a risk that -- or a relative

16 risk that reads out at say 1.5, so it's somewhere over here,

17 indicating on the chart, and we see a confidence interval

18 that's both -- it goes both above the point estimate and below

19 the point estimate.  What does the confidence interval stand

20 for?

21 A    Okay.  The -- you have a measured value which comes from

22 your study.  That's the circle.  The statistician is called in,

23 because we know there's error always in every measurement.  And

24 this is basically a way to estimate the possible error, and a

25 way to interpret the confidence interval is to say that within

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Direct/Bernick                    166

1  that interval we can be sure with high confidence that the true

2  value of the risk is somewhere in that interval, but we're not

3  sure what the true value is, but we're confident it's in that

4  interval.

5  Q    Okay.  If the confidence interval includes at either end

6  one is the relative risk, what does that tell you about

7  statistical significance?

8  A    If it overlaps on the bottom end, one, that would say for

9  this particular funding, given the error, we could not be

10 confident with any degree of scientific certitude that the

11 value, 1.5, was different from one.  In other words, you'd say

12 this is not a statistically significant finding.

13 Q    Let's now change our hypothetical.

14       MR. BERNICK:  Do we have a little eraser around here

15 someplace?

16                        (Pause)

17 Q    Let's change the hypothetical a little bit and now assume

18 that instead of having 100 cases of disease in the placebo

19 group and 150 in the drug group, we now have 200 cases -- make

20 it easier.  We have 210 cases of Disease A in the drug group

21 and only 100 in the placebo group.  And let's further assume

22 that this is replicated in high quality studies, so it's not

23 just one study.  It's a number of high quality studies.  Under

24 those circumstances, and it's statistically significant, what

25 would the relative risk be?

**J&J COURT TRANSCRIBERS, INC.**

1  A    It's the ratio again, so that would be reduced 2.1.

2  Q    Again under those circumstances what would you say about

3  cause?  That is does -- can Drug D in this group cause Disease

4  A?

5  A    Yes.  Given all the conditions you laid out, I would say

6  yes, it can cause.

7  Q    Okay.  I got that wrong.  Yes.  I want to ask you a series

8  of questions about the implications of this.  Are you familiar

9  with the term doubling dose?

10  A    I am.

11  Q    And what doubling dose mean?

12  A    Well, it means the dose of the causative agent that can be

13  shown through this kind of epidemiology data to double the

14  ordinary risk of the disease.  You have a -- all these diseases

15  have some background risk that we all have, and from the epi

16  data, if you have a finding like this, you would say that the

17  dose of this drug, whatever it was, was sufficient to double

18  the risk -- a little more double it, so you'd call that dose a

19  risk-doubling dose.

20  Q    Now I then want to ask you some questions about what the

21  implications of that result would be with respect to the

22  individuals who take the drug.  So I'm going to kind of blow

23  this box up big and assume that the group of people who took

24  that drug are all in the box, and let's say there are -- let's

25  say that there are 500 individuals who took the drug.  Does the

Rodricks - Direct/Bernick                    168

1   fact that you found or the study found an increased risk --

2   statistically significant increased risk of Disease A in this

3   population of 500 people -- does that or does that not have any

4   implications for those individuals?

5   A    It does.

6   Q    Can you tell us what the implications are for those

7   individuals?

8   A    The implications are the following.  That you would

9   conclude from the population itself, the finding of the study,

10  that the 210 cases you have here -- that more than half of

11  them, because we've doubled the risk now -- more than doubled

12  the risk.  More than have of those cases came from exposure to

13  the drug rather than from the background.  We don't know which

14  specific cases, but we know that more than half of them arose

15  from the drug.  We -- to get to your question about the

16  individual, what you would then say is that for each of the

17  individuals in that group you could claim that it is -- that

18  the disease they have is more likely to have come from the drug

19  than from whatever it is that caused their background risk.  In

20  other words, they have a greater than 50 percent chance that

21  the disease arose from the drug individually than from other

22  causes.

23  Q    So if we go through and we find out all 210 people who got

24  sick would that same statement apply, that it is more likely

25  than not drug related?

Rodricks - Direct/Bernick                    169

1  A    Yes.  No -- again we don't know with each individual, but
2  you can say probabilistically for the group as a whole --
3  individually as a whole, I should say, that each one of them
4  has a greater than 50 percent chance of having contracted the
5  disease because of the drug.
6  Q    Now, is there anything more that you could do by looking
7  at them, examining them?  These are all people taking the same
8  drug, same dose.  Is there anything more than an individual
9  examination of those people could tell you that would establish
10  which ones of those people got sick from the drug and which
11  ones of the people got sick, because the disease happens in the
12  general population?
13  A    It depends on the drug and the effect.  I mean it's
14  possible that in some cases there may be alternative causes for
15  individual people that are more explanatory than the drug.  So
16  that's another question that could be raised.  If you --
17  Q    Okay, so let me -- what you're saying is that there may be
18  an alternative cause for disease.  If the studies, however,
19  controlled for the alternative cause -- that is made sure that
20  either there was no alternative cause in either of the
21  populations, or it was there for both populations, if this were
22  controlled for in the studies, is there any way that an
23  individual examination of these 210 people could establish
24  which ones of them got sick from the drug and which ones of
25  them got sick because of background conditions?

Rodricks - Direct/Bernick                    170

1  A    Given your assumption that we could control for

2  alternative causes, no, they would be a population then very

3  much like the one studied.  And no -- the answer to the

4  question is no.

5  Q    Now to anticipate have you in your report -- you had did a

6  report in this case.  Did you not?

7  A    Yes.

8  Q    And in your report it says at Page 9 of the report, "The

9  assumptions and models used in regulatory risk assessments are

10 not known to apply to any actual individuals but are rather

11 generic in nature and apply only to certain hypothetical

12 individuals who share common characteristics regarding their

13 exposures and their potential sensitivities to asbestos."

14 Remember making that statement under the heading saying,

15 "Relevance of Regulatory Standards and Risk Assessments to

16 Evaluation of Disease Causation in Individuals?"

17 A    I do remember that statement, yes.

18 Q    And do you remember that in your deposition you were asked

19 about that sentence, and you said --

20       MR. FINCH:  Your Honor, I object to the -- he hasn't

21 been impeached of this.  It's --

22       THE COURT:  Sustained.

23       MR. FINCH:  -- proper.

24 Q    Let me ask you this question.  When it comes to the

25 regulatory risk models -- the regulatory risk models, can you

**J&J COURT TRANSCRIBERS, INC.**

1  use the regulatory risk models by themselves to make

2  assessments of whether disease occurred in an individual as a

3  result of an exposure?

4  A    No, the regulatory models which use the same general

5  framework and data sources have a different focus.  They also,

6  for reasons I think I will try to explain later, have built in

7  a number of assumptions that go beyond science that really get

8  into policy, and they're really not focused on individuals.

9  They are focused on populations only.

10 Q    When you talk about the scientific risk models, do they or

11 do they not have value in assessing whether people in the group

12 have gotten sick as a result of exposure?

13 A    Not only do they have value, they are essential.

14 Q    Okay.  Now, this doubling of risk, I want to come back to

15 that for half a moment.  If you do not have a doubling of risk

16 -- let's say -- let's go back to our hypothetical and say that

17 the increased risk was 1.5 or a 50 percent increase.  If in

18 its, you know, replicated consistent quality where you have a

19 relative risk of less than 2, can you still make the statement

20 that the disease in the group was more likely than not drug

21 related?

22 A    No, because less than half of the cases -- epidemiologists

23 sometimes call this the attributable fraction or risk.  But

24 less than half of the cases for any risk -- any relative risk

25 below 2 would've come from the drug.  So, therefore, for any

Rodricks - Direct/Bernick                             172

1  individual it would've been less than a 50 percent chance that

2  the disease came from the drug.

3  Q    That's not my question.  I want you to assume that the

4  legal standard for causation -- I want you to make the

5  assumption that the legal standard for causation, that is

6  whether an individual got sick as a result of a drug, is a more

7  likely than not standard.  I want you to make that assumption.

8  In your experience with risk assessment is there any way that

9  science has to establish whether a given toxic material or a

10 given drug more likely than not has caused disease?  Is there

11 any other way to do it other than to look for the doubling

12 dose?

13 A    Not to my knowledge.  You rely on the epidemiology data,

14 the dose response data, look at the doubling dose.  I know of

15 no other way to look at that question.

16 Q    Okay.  Has this been a subject that you specifically have

17 been involved in personally in your work for the Federal

18 Judicial Center?

19 A    It's one of the topics the manual -- there's actually a

20 scientific manual prepared to provide scientific understanding

21 to judges.  That's its purpose.  It's really not a legal

22 document, as far as I understand it.  It's full of scientific

23 chapters, and --

24 Q    Is the testimony that you're giving regarding relative

25 risk of 2 or more, is it consistent or inconsistent with what

Rodricks - Direct/Bernick                              173

1  that manual says?

2  A      That manual --

3              MR. FINCH:  Objection, Your Honor.  This is invading

4  the province of your court.  He is offering testimony that I

5  believe is intended to be later argued to demonstrate that the

6  case law or the Federal Judicial Center manual requires what he

7  is testifying to about risk assessment.  That is a question of

8  law, what is required to prove causation -- general causation,

9  which is all this is about, in a case, and I think it's not

10 proper for a expert witness to testify about a document that

11 was created as a reference manual for judges.

12             THE COURT:  Well --

13             MR. BERNICK:  That's not the -- if I could explain,

14 Your Honor.  That's not the proffer at all.  At some point

15 there has to be an intersection between science and law, and

16 all that I've done is to elicit that when it comes to their

17 legal requirement, I've given that to him.  This is what

18 science has to say, and I think he very properly pointed to the

19 Federal Center manual as being the effort of scientists to do

20 precisely that.  The manual doesn't dictate law, but the manual

21 captures the view of scientists about how to meet the legal

22 standards.

23             THE COURT:  Well, actually, it was the effort of the

24 Federal Judicial Center at the request of some judges for

25 information about how to evaluate cases and -- that come before

1  them that deal with certain types of scientific evidence, and

2  so it's neither.  Nonetheless, I understand what the purpose of

3  the manual is, and so I'm not sure where we're going with this.

4  It's --

5          MR. BERNICK:  I just want to establish that his

6  testimony is totally consistent with the manual.  That's all

7  that I'm --

8          MR. FINCH:  And that's part of my objection, Your

9  Honor.  His --

10          MR. BERNICK:  Well, but there's no other person who

11  can do that except for him.

12          THE COURT:  I think that's a function of this Court,

13  to determine whether his testimony and the manual are

14  consistent, but what's the relevance?  The manual is a

15  reference guide.  Whether the manual says A, B, or C is wholly

16  irrelevant to the evidence that's going to be presented here.

17  It's a guide for judges.

18          MR. BERNICK:  That's fine.  I don't want to belabor

19  it, Your Honor.  I think that the witness' testimony is people

20  who put together -- I mean you're talking about consensus

21  science.  He can talk about consensus science, and the manual

22  -- I think the witness' testimony is that whatever the original

23  motivation was for the Center to commission it, they've

24  solicited the input of scientists, and they --

25          THE COURT:  They have indeed.

Rodricks - Direct/Bernick                    175

1    MR. BERNICK:  -- it supports his credibility when he

2 offers testimony that doubling dose is it.  It supports his

3 credibility, because there are a bunch of other scientists who

4 apparently thought the same thing and helped put it in the

5 manual.  That's all the purpose of the proffer is.

6    THE COURT:  I understand what is available in the

7 manual.  I understand the witness' testimony.  I understand

8 that there is a guide that the Federal Judicial Center has

9 kindly put together to help judges who may not be informed

10 about these matters or who may be in formed about these

11 matters.  The reference manual is a reference manual, and I --

12 and it has that validity or that value I suppose within the

13 confines of the federal judiciary.  I don't think this question

14 really is relevant --

15    MR. BERNICK:  That's fine.

16    THE COURT:  -- to the area.

17    MR. BERNICK:  That's fine.

18 BY MR. BERNICK:

19 Q    I want to turn now to a different question which has to do

20 with variations in dose, and I want to talk about how

21 epidemiology deals not with a drug that's got a set dose but

22 with a toxic agent or potentially toxic agent as to which there

23 are variable doses or variable exposures.  Are you with me?

24 A    Yes.

25 Q    And I want to kind of go through a similar hypothetical

Rodricks - Direct/Bernick                        176

1  exercise.

2          MR. BERNICK:  And if we could show the Court GG-2011?

3  Q    I want to take the Court in your testimony through on the

4  strength of a series of assumed studies --

5          MR BERNICK:  And at this point T.J., you can take

6  this one down.

7          THE COURT:  With respect to the evidentiary question

8  that I reserved, Mr. Finch, at this point, based on the ruling

9  that I've just made, I don't see any problem with the

10 particular reference of the judicial manual on the chart that

11 the witness has prepared.  I think I understand that it is a

12 reference manual and nothing else, and so to that -- and I will

13 interpret the information on that chart -- the icon on the

14 chart to be for that purpose.

15         MR. FINCH:  That's fair.

16         MR. BERNICK:  That was his only purpose.

17         THE COURT:  All right.

18         THE WITNESS:  May I clarify one point?

19         MR. BERNICK:  At your peril of irritating the Court,

20 but go ahead.

21         THE WITNESS:  Well, it's just I think you might have

22 said that I had something to do with the existing manual, and I

23 did not.

24         MR. BERNICK:  Well, I didn't mean to suggest that.  I

25 meant what you referred to.

1              THE WITNESS:  Okay.  I'm advising on the future, but

2   I had nothing to do with the existing one.  I think that may

3   have leaked out but --

4              MR. BERNICK:  Yea, it --

5              THE WITNESS:  Okay.

6              MR. BERNICK:  It could've.

7              THE WITNESS:  Okay.  I'm sorry.

8   BY MR. BERNICK:

9   Q    On GG --

10             THE COURT:  The judges appreciate all help on all

11  scientific matters --

12             THE WITNESS:  All right.

13             THE COURT:  -- from anyone.

14             THE WITNESS:  All right.

15  Q    GG-2011.  I've asked you when we put this together to

16  assume the first study with a dose of 18, a risk of 3.5, and

17  that it's statistically significant.  That is the confidence

18  interval does not include one.  A second study that's got

19  greater exposure, a greater point estimate for risk, also

20  statistically significant; a third study, exposure that's much

21  lower at 6, a risk point estimate of 1.4 not statistically

22  significant; a fourth study that's got yet another dosage, also

23  statistically significant positive, and then other studies with

24  important limitations.  And I've tried to display them on this

25  chart, which is Exhibit --

1          MR. BERNICK:  Does anybody know the exhibit number?

2          UNIDENTIFIED SPEAKER:  Two 0 one one.

3          MR. BERNICK:  Two -- no, not 2011.

4          THE WITNESS:  Two 0 one one.

5          UNIDENTIFIED SPEAKER:  Five eighty-one.

6          MR. BERNICK:  Five eighty-one which is a magnetic

7   board that we're going to be peeling things off.

8   Q    So we have on the board the same hypothetical as GX-0581,

9   and we tried to reflect the same results now with a series of

10  plots.  Are you with me on my hypothetical trying to do this

11  promptly in order to get you out of here today and get us done

12  with this?

13  A    I'm completely with you, yes.

14  Q    Okay.  Now, I want to talk now about the question of dose

15  response.  In your experience in working with epidemiological

16  studies does this kind of -- I don't want to say represent a

17  typical, but is this an illustrative series of data points that

18  would help you explain what epidemiology does with dose

19  response?

20  A    It is.

21  Q    Okay.  Now, I see that all these data points are plotted

22  individually, and there's no line or no curve or anything about

23  that.  Is there such a thing now as scientific modeling of dose

24  response?

25  A    There is.  One -- a model is simply -- usually a

1 mathematical not a graphical, but you can do it graphically,

2 but better mathematically, a description of what you've

3 observed, to try to take what you've observed and construct a

4 mathematical picture, if you'd like, of what you've observed.

5 So that's called modeling.

6 Q    Okay.

7 A    It goes on all the time in science.

8 Q    Why did people in the field of risk assessment who aren't

9 focused just on regulation or prevention but are focused on

10 understanding the scientists -- science -- why do scientists do

11 risk modeling?

12 A    Because this relationship between exposure and disease is

13 critical to understanding disease causation.  It even has other

14 uses, but that's critical to this causation analysis, yes.

15 Q    It has been said in this court that once it's established

16 that an agent can cause disease, sometimes what's referred to

17 as generic causation, that that means that it's no longer

18 important to see whether it can cause disease under other --

19 under various circumstances.  I want you to assume that that's

20 been said.

21 A    Okay.

22       MR. FINCH:  Objection.  Lack of foundation.

23       MR. BERNICK:  Well, no, actually, assertion was made

24 here, but I'm asking him to make the assumption.

25 Q    I want you to assume the position has been taken that once

Rodricks - Direct/Bernick                    180

1 an agent has been established to be causes of disease under

2 certain circumstances, the only issue left is whether it caused

3 disease on an individual basis.  I want you to assume that that

4 statement's been made.  From a scientific point of view, is

5 that correct?

6 A    No, you've got to understand the dose response

7 relationship and where exposures fall on that relationship

8 Q    Just because --

9 A    -- for individuals or groups of individuals, yes.

10 Q    Let me put it to you again.  Just because it's been

11 established that an agent caused disease at high doses, does

12 that mean it's been scientific -- it is scientifically

13 established that it can cause disease at low doses?

14 A    Absolutely not.  No.  That's why risk assessment came into

15 being, because that mistake was being made a lot.  We needed a

16 framework, going back now 30 years to try to get better

17 quantitative understanding of how the dose affected the rate of

18 disease or the risk of disease.

19 Q    I want you to assume for illustrative purposes that a

20 model has been developed, and it finds a dose response

21 relationship, the curve that is the one now indicated --

22          UNIDENTIFIED SPEAKER:  Your Honor, may I stand up?

23          THE COURT:  Yes, sir.

24          UNIDENTIFIED SPEAKER:  I can't see --

25          MR. BERNICK:  Oh, I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1              UNIDENTIFIED SPEAKER:    -- from where I'm sitting.

2    Q    I want you to assume that the relationship that's now been

3    modeled as dose response relationship, as indicated on GX-0581,

4    now that we've peeled off the strip, again for illustrative

5    purposes does that assist you in explaining to the Court what

6    modeling does?

7    A    That's exactly what modeling does.    As I said, it's

8    usually expressed as a mathematical formula, but this graphic

9    presentation is perfectly adequate.    You're doing as best fit

10   you can to the data trying to make that curve explain the data

11   basically.

12   Q    Okay.  Now, we know that three of the studies -- Studies

13   1, 2, and 4 -- found positive statistically significant

14   associations, and we see that the curve is drawn through them.

15   And the title at the top is "Observations From Epidemiological

16   Studies."  I now want to go down to the last study that was

17   there, Study 3, which finds at lower dose a relative -- a point

18   estimate of 1.4 that is not statistically significant -- and so

19   the record is clear, the blue model line ends at that data

20   point, and that further, we have a couple studies, which are

21   the other studies with important limitations, that fall towards

22   the low end and are indicated also on the chart.  And I'm --

23   with all that kind of out there, I want to ask you what it

24   means to say that there is a zone of inference between the

25   observed positive studies on the one hand and the negative

Rodricks - Direct/Bernick                    182

1  study where there was not a statistically significant

2  association found on the other?  What does it mean to say that

3  that's a zone of inference?

4  A    Well, we've got some measurements in this zone, but we've

5  said they're not reliable, and then we have one at the low end

6  which is not different from the background.  So we've go

7  uncertainty in this area about the true shape of the model.  It

8  becomes less certain in what you see at the higher exposures.

9  So the statisticians who will be modeling there will admit that

10  this is -- they're making some inferences that -- to fill in

11  that model in that area.  It's not -- it depends on each

12  circumstance how certain that is, but it's less certain than

13  the higher area.

14  Q    When you're drawing the curve -- the dose response curve

15  down below the last points of a positive association into an

16  area where you don't have reliable studies showing a positive

17  association, statistically significant, is it wrong -- is it

18  scientifically wrong to draw that curve?

19  A    No, you've got to be very careful in delineating them.

20  Lay out all your assumptions for other people to look at, but

21  it's done all the time, yes.

22  Q    It's done all the time.

23  A    Yes.

24  Q    Is it proven scientifically that that relationship holds

25  in that area?  Recognizing it's not wrong to do it, I'm kind of

Rodricks - Direct/Bernick                     183

1  flipping the other way around.  Under the hypothetical that I

2  have given you is it proven that there is, in fact, a dose

3  response relationship in that zone?

4  A    It's not proven in anything like that same sense it's

5  proven for the higher range of observation.

6  Q    Now, I want to go even further into the unobserved range,

7  which is the area that is below your last study, which is a

8  negative study.  That is you didn't find an association.  It

9  says, "unobserved range."  What does that mean?

10 A    Well, it is a range in which we either have not studied --

11 where we have some studied but have not found any significant

12 finding.  But usually it means once you're below that low

13 point, it's a range that has not been studied.

14 Q    Can science tell us in this area where it's below the last

15 point of observation -- the last point of observation was

16 negative.  Can science tell us that there is a causal

17 relationship of any kind?  That is the agent being studied is

18 causal, below that last study in that unobserved range?

19 A    Can science tell us?  No.

20 Q    Can science tell us that?

21 A    No, and science remember is basically empirical.  You have

22 to have data and a model to describe the data, but once you get

23 beyond the data you are not in the realm of science.  You're in

24 the realm of hypothesis.

25 Q    Does the fact that there's not observation in that area --

1  does that rule out the possibility that there is a risk?

2  A    It rules out a significant risk, a large risk, certainly,

3  but it's possible that there may be some risk as you go below

4  this region.  We don't know where it ends.  We don't just have

5  knowledge there, but you -- we wouldn't assume that the risk

6  just ends at the point where you happen to measure.  But it's

7  certainly going to be small, and as I say, we really don't know

8  how it behaves, what the dose response looks like.

9  Q    Under the hypothetical that I've given you, which is at

10  the high or high dose end of that unobserved range, there is an

11  observation, and it's a negative one.  That is there's no an

12  association.  What does -- under my hypothetical what does the

13  available scientific evidence say about whether there is real

14  risk in this unobserved range?

15  A    If you interpreted this scientifically, you would say

16  there is no observation of excess risk at 1 point -- at the

17  dose -- the lowest dose that we have studied here, and it could

18  -- that no effects dose actually could be even higher as you go

19  up that curve.  We're not quite sure where the dividing line

20  is, but that certainly is a no -- we call it in toxicology or

21  epidemiology a no observed adverse effect dose.

22  Q    Now, I want to talk about regulators, and I want to talk

23  about regulators, because we said back at the outset, remember,

24  you made a distinction between risk assessment models that are

25  used by regulators and risk assessment models that are purely

1  scientific.  You made a statement they're not necessarily the

2  same.

3  A    Right.

4  Q    When you deal in the real world of talking to regulators,

5  will regulators necessarily consider this kind of data point

6  that is a negative study at an area of positive dose?  Will

7  they necessary consider that to be definitive?

8  A    Not necessarily.  They might.  If it were very well

9  established through many studies, they would find that

10 definitive.  They tend to err on the side of caution, and in

11 most cases they would say, well, there could be risk below this

12 area.  We have a public health protection mandate that makes us

13 want to look at where populations are exposed typically at very

14 low doses.

15 Q    So they might say --

16 A    So they make the assumption that, well, there might be

17 something going on here.

18 Q    They might say there is not a point at which science can

19 be considered sufficient to say no risk.

20 A    Correct.

21 Q    Okay, and have you written about that yourself?

22 A    Quite a bit, yes.

23 Q    Okay.  Let's now talk about what the regulators do.

24         MR. BERNICK:  And I'm going to move through this

25 quickly, Your Honor, in an effort to finish here.  I want to

1  show the Court Exhibit GG-2023.

2  Q    Could you use Exhibit -- would GG-2023, Dr. Rodricks,

3  assist you in explaining what regulators often do in this

4  unobserved range area?

5  A    I think it does.  Yes, I hope it does.

6  Q    Okay.  Could you tell the Court what that demonstrative

7  shows?

8  A    Well, regulators are concerned about very low risks, risks

9  that are well below the range of observation.  They might be

10  concerned about relative risks of let's say not 1.4 but 1.0004.

11  They interpret their legal mandates to be highly protective to

12  want to protect populations at very, very low levels of risk.

13  So they can't measure these.  These are below the range of

14  observation, so it's become practice to assume -- to apply so

15  called extrapolation models.  Extrapolation means you're going

16  from the data into the unknown.  And we don't know the truth

17  about how the dose response curve varies below that zone of

18  observation.  We just don't know.

19        So regulators look at the possible ways it might vary

20  and have selected routinely what I tried to show on this here

21  with the yellow line, where there's a straight line drawn from

22  the lowest observed -- or the lowest unobserved risk down to

23  zero risk.  And that line is chosen, because we have quite

24  convincing argument at least based on statistics that any real

25  risk that's down there in that zone would be -- it would be

1 very unlikely to be greater than that risk.  You can't prove

2 that absolutely, but with very high confidence we could say

3 that's going to put an upper limit on the risk.  It's not going

4 to be greater than that.  It could be a lot less, and I tried

5 to show with one of the lines that it could actually be zero.

6 It could drop rather quickly to zero risk.  We just don't know.

7 Q    Have agencies like the EPA been candid in expressing the

8 kinds of limitations that you have now articulated to the

9 Court?

10 A    I think they have.  I think the -- if you look at what

11 agencies say, they're pretty honest about what they're doing

12 here.  They do it for public health protection purposes.  I do

13 it every day for the same purpose but not for disease

14 causation.  These are very, very small risks, and they are

15 known risks.

16 Q    Are you familiar with the Risk Assessment Guidelines of

17 1986 as issued in August, 1987 by the EPA?

18 A    Yes.

19 Q    Is that a government study -- government-issued document

20 by the EPA?

21 A    The EPA describes how they do risk assessment and their

22 assumptions, yes.

23 Q    Is that a formal pronouncement of an authorized agency of

24 the United States?

25 A    It is.

1           MR. BERNICK:  We offer GX-580, which is the Risk

2    Assessment Guidelines of 1986 issued in August of 1987 by the

3    US EPA.

4           THE COURT:  Do you have it marked as an exhibit?

5           MR. BERNICK:  It's Exhibit -- yes, it is.  It's

6    Exhibit GX-580.

7           THE COURT:  Any objection?

8                   (No verbal response)

9           THE COURT:  It's admitted.

10          UNIDENTIFIED SPEAKER:  No objection from the Future

11   Claimants.

12          MR. BERNICK:  I'm sorry?

13          UNIDENTIFIED SPEAKER:  No objection.

14          MR. BERNICK:  Okay.

15          THE COURT:  It's admitted.

16

17   BY MR. BERNICK:

18   Q    I'm showing you GG-2024.  Is this a quote taken from the

19   EPA's pronouncement?

20   A    Yes, it's a direct quote.

21   Q    It says, "It should be emphasized that the linearized,

22   multi-stage procedure leads to a plausible upper limit to the

23   risk that is consistent with some proposed mechanism of

24   carcinogenesis.  Such an estimate, however, does not

25   necessarily give a realistic prediction of the risk.  The true

1 value of the risk is unknown and may be as low as zero."  Do

2 you see that?

3 A    I do.

4 Q    Is that consistent or inconsistent with your own testimony

5 about what regulators often do in risk assessment framework?

6 A    It's completely consistent.  The -- this technical term,

7 linearized multi-stage procedure, is just another name for that

8 straight line that I described.

9 Q    Let's now -- I want to take you through the last series of

10 questions about these data points, and then I want to close

11 with a few questions and turn you over to their tender mercies

12 at the other side of the courtroom.  If we go on the dose

13 response axis -- on the dose axis, under our hypothetical we go

14 from zero exposure all the way to the exposure associated with

15 that negative study.  Based upon science -- scientific data you

16 say that that dose actually carries with it any risk, based on

17 science?

18 A    The dose corresponding to the risk of 1.4?

19 Q    The dose -- yes, as --

20 A    I'm sorry.

21 Q    All doses that lead up to that data point of 1.4.  You say

22 that any risk has been demonstrated be associated with that

23 dose?

24 A    There's no demonstration of risk here.  That's -- there is

25 none.

1  Q    If we now go -- and we're on our curve -- to doses that

2  are greater -- doses that go all the way up to your positive

3  results, that curve looks nice and neat and solid, like there's

4  every little bit -- every -- like we went in with a microscope

5  -- every little bit more would carry with it some additional

6  risk.  Is it true, necessarily, that because you have a dose

7  response model, that every item of increment up that curve,

8  including in the observed areas, carries with it an increment

9  of risk?

10 A    No, you have to be very careful as you go up the curve to

11 see where you are.  You have to take into account if you --

12 like with the mathematician or bio-statistician would call the

13 imprecision of that curve.  Remember, it's built from a few

14 points with some inferences, and there's a confidence interval

15 actually on the whole curve that tells you something about what

16 I call the precision of that analysis.  It's not a real precise

17 curve, so it depends on the increment of dose whether or not it

18 becomes a statistically significant increment.

19 Q    Okay.  I'd like to show you GG-2017.  So, I want to ask

20 you a new hypothetical here.  So, we assume that there's an

21 exposure from some other source that puts a group along the

22 dose response curve as indicated in 2017 at a dose of 17, and I

23 want you to assume that at that dose there's data that says

24 that, yes, there is a positive statistically significant risk.

25 That's the beginning of the hypothetical, is we have a dose

1  from another source that carries with it real risk.

2      I now want to show you 2018 and in 2018 we've now added

3  more, we've gone from 17 to 22.   Can you tell from the way

4  that that chart is drawn, where we have another study 22, can

5  you tell whether or not that incremental dose has been

6  scientifically shown to present an observable increased risk?

7  A    I can tell, yes.  We're looking now -- we started with a

8  does of what we call what, 17 and now we're asking about the

9  increment up to 22 for this curve.

10 Q    Yes.

11 A    Is that a significant increase, you could --

12 Q    Is that an observed significant increase?

13 A    Oh, I'm sorry, it's not observed.

14 Q    Okay.  And why do you say it's not observed?

15 A    Well, we don't have an observation point at that point.

16 We have a model and the model would say, we could calculate an

17 increase but you also have too look at the confidence interval

18 on that model.

19 Q    Okay.  Given the model can you say it is the model tells

20 you that, in fact, there is an increase?

21 A    Not in fact.

22 Q    And tell the Court now, making reference to that chart,

23 why that is so.

24 A    The values predicted by the model with confidence

25 intervals, do not differ statistically.  So, that's a

1  reflection of how precise this curve is, if you like, so you

2  could say, yes, you could calculate that one risk is X and one

3  risk is somewhat above X but statistically they are

4  indistinguishable.

5  Q    So, if we go over to the chart over here, what you're

6  saying is that the model itself has confidence intervals.  That

7  within 95 percent confidence interval, the truth is somewhere

8  in between, but it may not be at exactly these points?

9  A    That's one way to put it, yes.

10 Q    And, if you go from the point at 17 to the point at 22,

11 what's the key feature of the confidence intervals that tells

12 you that that is not statistically significant?

13 A    Well, they overlap.  You remember the discussion earlier

14 of when it overlapped, the value of one or not, same idea here.

15 Do they overlap?  If they overlap then they're really not

16 distinguishable.

17 Q    Okay.  Now, what if you wanted to, I want to ask you,

18 let's go to 2019.  Let's look at 2019 and we've shifted further

19 up from 17 to 26.  Tell me now whether the model with its

20 confidence intervals tells you that there's been an observed

21 increased risk?

22 A    In this case, with this example, you are clearly in a

23 different zone and the confidence intervals do not overlap, so

24 you'd say here, that difference, that increase in dose gave

25 rise to a statistically significant increase in risk.

1  Q    Okay.

2  A    So, in this case you've reached that point.  You've sort

3  of overcome the imprecision in the model, the difference are

4  large enough that the imprecision doesn't matter that much.

5  Q    Okay.  We now want to go to the question, have you become

6  familiar, have you had exposure in your work to the term

7  substantial, that is a substantial contributing factor?

8  A    I have, yes, seen that term.

9         MR. FINCH:  Objection, Your Honor, to the extent he's

10 offering a legal opinion, or legal testimony of what it means

11 to be a substantial contributing factor.  I think it invades

12 the province of a court.

13        THE COURT:  So far the only question is, has he heard

14 the term and he said.

15 Q    Okay.  From a scientists point of view, do you have a way

16 of looking at does response relationships, do you as a

17 scientist have a meaning for the term substantial when it comes

18 to incremental risk associated with incremental dose?

19 A    Well, I use the term, for the risk doubling concept, that

20 to me, any risk doubling, would be a substantial increase in

21 risk.

22 Q    And, why do you use risk doubling as a benchmark for

23 substantial?

24 A    For the same reason I described earlier, that once you've

25 reached that point, you can say that most of the cases you

Rodricks - Direct/Bernick                194

1  observed in that population are due to the exposure not the

2  background.

3  Q    Last few questions.  Tell us whether or not you find that

4  risk assessment is as reliable method based upon your expertise

5  for determining causation by an agent for disease in groups of

6  people.  Is it a reliable method?

7  A    It is reliable and as far as I know, it's the only method

8  for doing that.

9  Q    Let's ask you the same question about dose.  Tell us what

10  your view is as to whether risk assessment is a reliable

11  scientific method for determining the dose at which an agent is

12  proven to cause disease in groups or individuals.

13  A    I believe it is, yes.

14  Q    Are you aware of any other method that reliably enables a

15  determination about whether a given toxic agent causes disease

16  in groups of people and the dose at which it does?

17  A    I am aware of no other method.

18  Q    Let's talk a little bit about acceptance.  Tell us whether

19  or not risk acceptance is accepted within the scientific

20  community for the purposes I've just asked about, that is

21  determining causation and dose of causation for groups of

22  people and individuals.

23       MR. FINCH:  Objection, lack of foundation.  He's

24  asking about the -- for determining causation in groups of

25  people, he's asking about it in the context of a tort case and

1  I don't think this witness is entitled to answer that.

2         MR. BERNICK:  Your Honor, I asked him no such

3  question.  I asked him as a scientist within his community of

4  sciences.  I mean, scientific causation.  That's my question.

5  As a scientist tell us whether or not risk assessment as you've

6  described it, is accepted within your scientific community as

7  being a reliable method for determining causation in groups and

8  individuals.

9         THE COURT:  I think he's competent to answer that

10  question and to offer an expert opinion about that.  The

11  objection is overruled.

12  Q    Yes, go ahead.

13  A    The answer is yes, for sure.  I would add one small

14  modification.  Some scientists who go through the process and

15  may not label that process risk assessment, but the steps of

16  the analysis that I showed in risk assessment they do follow.

17  So, I would say with that very minor twist, yes, the answer to

18  the question is definitely yes.

19  Q    Are you aware of any other scientific method that is

20  accepted as reliable for those purposes?

21  A    I'm aware of no other method.

22  Q    Let's talk about consensus.  Does the term scientific

23  consensus have meaning to you within your field of risk

24  assessment?

25  A    Yes.

Rodricks - Direct/Bernick                    196

1  Q    Okay.  And what does scientific consensus mean?

2  A    It means that, technically, it means that every scientist

3  accepts the method.  That's really the case with any scientific

4  principle, but it means a vast majority of scientists who work

5  in the area will accept the method, I think.

6  Q    Okay.  Is this, again, if I ask the question, the same

7  question, that is the use of risk assessment reliable for the

8  purposes of determining causation of a toxic agent, is there a

9  formal consensus that's been announced to that?

10  A    A formal one?

11  Q    Yes.

12  A    No, no, not that I know of.

13  Q    Okay.  Do you believe as an expert in the area that there

14  is essentially, not complete consensus, but substantial

15  consensus, in fact?

16  A    I do.  I do.

17          MR. BERNICK:  Okay.  I have no further questions.

18          THE COURT:  Mr. Finch?

19          MR. FINCH:  Can we take a short recess to reset this

20  courtroom?

21          THE COURT:  Yes.  Would you tell me just how long you

22  two think you will be on cross-exam?

23          MR. FINCH:  I'm probably an hour.

24          MR. RASMUSSEN:  And I'm probably half an hour.

25          THE COURT:  I do not think we will finish tonight.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I just really -- (indiscernible),

2  Court's decision, we really committed to Mr. Rodricks that we

3  would get him out today, if at all possible.

4          THE COURT:  I cannot keep staff her until seven

5  o'clock tonight.  I just can't do it.  And that's how long it

6  will take.

7          MR. BERNICK:  It would be six, Your Honor.

8          MR. FINCH:  It would be six, Your Honor.

9          THE COURT:  Well, we'll stay until six, but you folks

10 have to limit your examination and Mr. Bernick, that includes

11 you on redirect.

12         MR. FINCH:  Now wait a minute, wait a minute, Your

13 Honor.

14         THE COURT:  Until six.  If we're going to be done at

15 six, we are going to leave at six.

16         MR. FINCH:  That's fine, but if there is additional

17 topics that Mr. Rasmussen has --

18         THE COURT:  For us to leave at six, you have to limit

19 your examination, so that we can be finished at six, otherwise

20 you need to tell the witness so that he can make other

21 arrangements, so that he can be here again, another day.

22 That's what I'm saying.

23         MR. BERNICK:  I mean, this is an ongoing problem that

24 Your Honor (indiscernible) but we did get specific time

25 estimates.  The time estimate was given to us in advance for

1  cross-examination was between an hour and an hour and a half

2  for both cross-examinations.

3          THE COURT:  That's what you just heard.

4          MR. FINCH:  And that's what we just said, but we --

5          MR. BERNICK:  Well, there's always -- turns out to

6  be, just like they did with the cross of the last witness, it's

7  more than that and I'm obviously concerned, we go an hour and a

8  half and then it'll all be used up and we still have to bring

9  him back.

10          THE COURT:  Well, gentlemen if we continue to bicker

11  about how long it's going to take, you're going to cut into the

12  time that you have available.  In order to be finished tonight,

13  we are going to leave at six.  So, plan yourselves accordingly.

14  I hope, sir, that we will be able to excuse you.

15          THE WITNESS:  Thank you.

16          THE COURT:  Okay.  We're in recess for five minutes,

17  and literally five minutes.

18              (Short break in proceedings)

19          COURT CLERK:  Judge wants to come on.

20          THE COURT:  Please be seated.

21          COURT CLERK:  Please be seated.

22          THE COURT:  All right, Mr. Finch, go ahead.

23          MR. FINCH:  Nathan Finch for the Asbestos Claimants

24  Committee.

25              CROSS-EXAMINATION

              **J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Finch                     199

1  BY MR. FINCH:

2  Q    Good afternoon, Dr. Rodricks.

3  A    Hello.

4  Q    Could you turn on the ELMO please.  This is one of the

5  slides that Mr. Bernick showed you.  Is it correct that to do

6  this kind of an analysis you need an accurate measure, accurate

7  measure of the dose received?

8  A    Generally, yes.  Yes.

9  Q    You need a quantitative measure of the dose received?

10 A    Well, if you're asking, you want to know what the risk

11 might be at a given dose, you --

12 Q    Yes.

13 A    -- yeah, you should have a good idea of what that dose is,

14 yes.

15 Q    And, you also need an accurate identification of what the

16 background rate of disease is, or what the rate of disease

17 could be caused by their factors to make a risk assessment?

18 A    Well, in construction of this dose response created,

19 you've already taken that background into account.  So, the

20 dose response take the background into account already, and now

21 we're just asking the question for a given dose what calculated

22 risk would you find, what elevation.

23        MR. FINCH:  I don't know if Your Honor can hear but

24 it might be good if -- can you hear okay?

25        THE COURT:  I can -- are you having trouble hearing?

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Finch                                200

1          MR. FINCH:  It's hard to hear back here.

2          THE COURT:  All right.

3  Q    All right.  Here you have two different measures of dose

4  --

5                    (Microphones malfunctioning)

6          THE COURT:  I'm sorry there have to be two

7  microphones on somewhere.  (Indiscernible).

8                         (Pause)

9          THE COURT:  I'm sorry, Mr. Finch, go ahead.

10  Q    In this hypothetical you have two different observed

11  measurements of dose with 95 percent confidence intervals that

12  don't overlap, correct?

13  A    Correct.

14  Q    Okay.  And, you would say that that is a significant

15  increase in risk if the confidence intervals don't overlap,

16  correct?

17  A    Yes, that is a measurable increase, significant increase

18  in risk, at that point.

19  Q    You've mentioned the concept of relative risk.  There's

20  also a concept in epidemiology, a risk assessment called Odds

21  ratio, correct?

22  A    For a particular kind of study, yes, that's correct.

23  Q    And, would you agree that if the disease is relatively

24  rare in the general population, about 5 percent or less, the

25  Odds ratio is a good approximation of the relative risk, which

                    **J&J COURT TRANSCRIBERS, INC.**

1  means there -- excuse me, that the Odds ratio is a good

2  approximation of the relative risk?

3  A    Yeah.  The Odd ratio is used in something called case

4  control studies which are generally focusing on rare conditions

5  and they're calculated in a somewhat different way than

6  relative risk but, again, as you said for low risk they are

7  considered to be -- they are approximately the same measure,

8  yes.

9  Q    As relative risk.

10  A    Yes.

11  Q    Okay.  To save time, I was going to draw like Mr. Bernick,

12  but I'll use the ELMO.  He likes to draw.  All right.  I want

13  you to assume from my hypothetical that there's a carcinogen

14  where you have data points that shows at a dose of less than

15  0.5 units of measurement, the relative risk is 1.1 and the 95

16  percent confidence interval is 0.8 to 1.7.  At a dose which is

17  greater than 0.5, but less than 1, the relative risk is 4 and

18  the 95 percent confidence interval is 1.7 to 9.7.

19         THE COURT:  I'm sorry, I can't see the left column.

20  What is the second line, please?

21         MR. FINCH:  The second line is 1.0 greater than dose,

22  greater than 0.5.  Do you see that, Dr. Rodricks?

23         THE WITNESS:  I think I understand what you -- yes.

24  Q    Okay.  And the 95 percent confidence interval is 1.7 to

25  9.7.

Rodricks - Cross/Finch                              202

1  A    Right.

2  Q    And the third line you have does less than 10, greater

3  than 1 and the relative risk for that is 4.0 and the 95 percent

4  confidence interval is 2.2 to 7.2.  Do you see that?

5  A    I see it -- could you move the paper just a little bit?

6  Q    Which direction?

7  A    Well, because you're cutting off the confidence interval

8  there.  That's --

9  Q    There.

10 A    Okay. I think I see it.

11 Q    Okay.

12 A    Would you agree with me if that's what the data shows,

13 that would be a significant increase in risk if you went from

14 does 0.5 to a dose greater than 1?

15 A    So, you're starting with a dose at .5, is that the

16 premise?

17 Q    You're starting with a dose -- of a dose at less than .5,

18 the relative risk is 1.1.

19 A    Right.

20 Q    When you move the does greater than .5, but less than 1

21 the relative risk is 4.0 but you have a 95 percent confidence

22 interval of 1.7 to 9.7.

23 A    So, that would be a statistically significant increment in

24 the risk, yes.

25 Q    So, going from 0.5 to between -- less than 0.5 to between

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Finch                                    203

1  0.5 and 1 would be a statistically significant increase in the

2  risk.

3  A    In the datas that you've written here, yes.

4  Q    And, going from a dose of less than 0.5 to above 1, would

5  be substantially significant increase in the risk, correct?  It

6  would put all of the confidence intervals above the doubling

7  dose of 2.2, correct?

8  A    Well, you're almost correct.

9  Q    Okay.

10 A    Relative to the original .5, the increase going from 1 to

11 10 that range, you have a significant increase above the .5,

12 but not above the .5 to 1 range.  They're in the same range.

13 So, those are indistinguishable.

14 Q    Okay.  But the risk is certainly greater if you go from --

15 once you get above the 0.5 threshold.

16 A    Yes.

17 Q    Okay.  And would you agree that as a matter of statistics

18 it is possible, is it not, that two measurements which differ,

19 which have overlapping confidence intervals are still -- can be

20 significant, correct?

21         MR. BERNICK:  Objection to the form of the question.

22 as too ambiguous.

23         COURT CLERK:  Come to the mike.

24         THE COURT:  Sustained.

25         MR. BERNICK:  Objection to the form of the question.

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Finch                                204

1 He just set out a very detailed hypothetical and now, I don't

2 know if that has a reference to the hypothetical or something

3 else.

4         MR. FINCH:  No, I'm just asking as a matter of

5 statistics, the -- even if there is an overlapping confidence

6 interval at the 95 percent confidence interval, you can have

7 one dose that's higher than another.  And it may be

8 significant, it just may not fall within the statistically

9 significant.

10         MR. BERNICK:  I would object to the form of that

11 question.  I don't understand how can it be significant but not

12 statistically significant, and it's ambiguous.

13         THE COURT:  I apologize, but I don't understand the

14 question either.  Could you please rephrase it?

15         MR. FINCH:  All right.  I'll back up.

16 Q    There are -- this is a higher dose than this.

17         THE COURT:  That's not on (indiscernible), Mr. Finch.

18 Q    This is a higher dose than this, correct?

19 A    Yes, that's correct.

20         THE COURT:  Wait.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  For the record, you're going to have to

23 say what you're pointing at.

24 Q    I'm pointing to the chart that's been marked GX 05, GX

25 0581.  And, it shows a data point of 4.9 and 3.2 with a range

**J&J COURT TRANSCRIBERS, INC.**

1 of 3.9 to 5.8 versus 2.2 to 4.0.  That's what we're looking at.

2 A    That was my example, yes.

3 Q    Okay.  And the 4.9 dose is higher than the 3.2 dose,

4 correct?

5 A    Well, just the way you said it, those are not doses.  The

6 doses that give rise to those risks --

7 Q    The doses that you -- excuse me, the doses that give rise

8 to that risk, the 4.9 risk is higher than the 3.2 risk,

9 correct?

10 A    Yes.  That's he measured value from the study.

11 Q    And, each time you add to the dose, the sign of the risk,

12 meaning whether it's positive or negative, increases, correct?

13          MR. BERNICK:  Objection to the form of the question.

14 Are we talking about the point estimate, are we talking above

15 overall risk?

16          MR. FINCH:  I'm talking about the point estimate.

17          THE WITNESS:  So, you're asking, let's say we begin

18 at the dose that gives rise to the 3.2 on my chart?

19 Q    Yes.

20 A    And, now we're going to add to that?

21 Q    Yes.

22 A    What I tried to say is that you could calculate from the

23 blue line in the model that there is some increment but you

24 also have to consider the imprecision in that blue lien to see

25 whether that increment is statistically.  So, the increment all

Rodricks - Cross/Finch                                    206

1  the way -- in this particular example, all the way up to the

2  next measured point, none of those increments would be

3  statistically significant relative to the 3.2.  That was what I

4  tried to say.

5  Q    Okay.  But the additional increased in the dose are

6  additive to the risk for a dose response disease, correct?

7              MR. BERNICK:  Objection to the form of the question.

8              COURT CLERK:  Speak into the microphone.

9              MR. BERNICK:  Objection to the form of the question.

10  I don't know how that's different from the prior ones he just

11  answered.  What's the difference?

12             MR. FINCH:  The difference is that he was asking

13  about point estimates, now I'm asking about the overall curve.

14             MR. BERNICK:  Then what's -- Your Honor, I don't mean

15  to be obstructive, I don't know what the precise question being

16  put -- the overall curve what?

17             MR. FINCH:  The overall dose response curve.

18             THE COURT:  Would you restate the question, Mr.

19  Finch, please.

20             MR. FINCH:  Sure.

21  Q    Would you agree with me that for -- strike that.  I'll

22  rephrase the question when I get to the document.  May I

23  approach?

24             THE COURT:  Yes.  Thank you.

25  Q    And, Dr. Rodricks, this is an article which you wrote in

1  2006, correct?

2  A    It is, yes.

3  Q    Could you turn to Page 40.

4  A    Okay.  Yes.

5  Q    Would you agree with the statement that, and this is in

6  the first paragraph, about seven lines down, "Exposure analysis

7  which is a critical component of the valuation of causation may

8  be relatively straightforward in the case of certain products

9  but may become exceedingly complex if it involves

10 reconstructing exposures arising from contaminated

11 environments, especially where there is evidence that the

12 exposures have been ongoing for long periods of time.  Experts

13 in exposure violation come from many disciplines, chemistry,

14 chemical, environmental and engineering modeling of the

15 movement of chemicals through the air and water into the food

16 supply and industrial hygiene, and even a partial discussion of

17 the nature of their work would significantly distract from the

18 principle concerns of this paper.  For this presentation, it is

19 assumed that accurate medical diagnosis can be achieved and

20 that reasonably accurate estimate of plaintiffs exposures can

21 be derived."  Do you agree with that?

22 A    You're asking me to read what I wrote here?

23 Q    Yes.

24 A    Yes, I do.  I mean, what I said is, I'm not going to

25 discuss exposure assessment in any detail.  I was going to

1  focus on what I earlier described as the causation analysis,

2  the dose response analysis, but I'm just saying that you cannot

3  complete an assessment without some measure of the exposures as

4  well.

5          MR. BERNICK:  Your Honor, I'm happy to have this --

6          COURT CLERK:  Speak into the mike please.

7          MR. BERNICK:  Sorry.  I'm happy to have the

8  examination continue with this document, but there was

9  strenuous objection to our getting into any feature of his

10 interface with the tort system or tort lawsuits.  This article

11 is in the legal journal and it's all about it.

12         THE COURT:  Then on redirect you'll have a ball.

13 Q    On Page 42 you write, you're scribing in the article,

14 "Part 2 addresses how public health and regulatory scientists

15 evaluate the potentially adverse health consequences of

16 chemical exposures within a framework called risk assessment.

17 That same framework is useful for evaluating disease causation

18 in individuals but we shall see that some of the types of

19 scientific evidence used commonly in the regulatory context may

20 not be appropriate for evaluating causation in individuals."

21 Do you agree with that?

22 A    Yes.

23 Q    In Part 1, Page 42 you write that there is a -- this

24 common understanding has resulted from half a century of

25 scientific dialogue --

Rodricks - Cross/Finch                                          209

1  A    I'm sorry, could you tell me where we are?

2  Q    Yes.  Under the --

3  A    Oh, yes, I see.  Go ahead.

4  Q    Much of it guided by many expert reports on this topic

5  issued by various arms of the national academy since the early

6  1980's.  What you're talking about is scientific -- scientists

7  undertaking toxicological risk assessments in a regulatory

8  setting, correct?

9  A    In that case, yes, that's correct.

10  Q   Okay.  And that there's a common understanding among

11  scientists, although they may disagree about the particulars of

12  the way to conduct toxicological risk assessments in a

13  regulatory setting, right?

14  A    Correct.

15  Q    Okay, but then you write, "No such history of scientific

16  discourse has informed the risk assessment process as it

17  relates to disease causation in individuals and it is difficult

18  to discern anything remotely like a scientific consensus on how

19  different types of scientific evidence should be used in

20  assessments".   I take it you believe that to be true?

21  A    Yes.

22  Q    Then you state, what is presented here, and here this is

23  the paper you're talking about evaluating disease causation in

24  humans exposed to toxic substances and a framework for doing

25  that from a risk assessment perspective, right?  That's what

1 the paper is about.

2 A    Yes, it is, yes.

3 Q    Okay.  And when you say what is presented here might

4 represent the thinking of most scientists, but no scientists

5 writing on this topic would claim that it represents a

6 consensus or that there are no alternative approaches that

7 might have utility.  I take it you believe that to be true.

8 A    Yes.  Let me explain.  That has to do with the use of

9 different kinds of evidence within the risk assessment

10 framework.  I did say, and I think I testified, that the

11 framework itself, as a method, I do believe there is consensus

12 on.  I was talking about a slightly different topic here.

13 Q    On Page 45, you write, "Toxic responses are a function of

14 the magnitude of the dose and it is established with high

15 certainty that toxic responses do not appear until a so called

16 threshold dose is exceeded.  They increase in incident

17 severity, or both, as the dose increases above the threshold.

18 But we are protected from harm if the threshold dose is not

19 exceeded."  Do you agree with that?

20 A    Yes.

21 Q    Okay.  Then you write: "This threshold hypothesis well

22 documented although it is not possible to claim the hypothesis

23 holds for every chemical or type of toxicity.  In fact, as

24 shall be seen below, there is evidence it may be incorrect for

25 certain types of carcinogens."  Do you agree with that?

1  A    Yes, that's correct.

2  Q    Now, there is something called the World Health

3  Organization International Agency for Research on Cancer?

4  A    Yes.

5  Q    It's called IARC?

6  A    Correct.

7  Q    The IARC lists 95 substances, mixtures or occupations as

8  causally related to cancer, based on epidemiological data?

9  A    That sounds right, yes.  The latest listing.

10 Q    There are different categories of carcinogens, correct, or

11 classes?

12 A    Well, the categories of evidence.  Is that what you're

13 referring to?

14 Q    No.  The IARC divides, the I-A-R-C divides carcinogens

15 into various categories, correct?

16 A    Well, I just have to be sure what you're talking about.

17 There are different classes of chemicals but there are also

18 different classes of evidence.  So, you have to tell me which

19 of those you're referring to.

20 Q    The chemicals.

21 A    The chemicals.  Okay, yeah, they do.

22 Q    Okay.  Turn to Page 49 of your article.

23 A    Yes, I have it.

24 Q    Do you agree that the IARC, I-A-R-C list of carcinogens is

25 promulgated by one of the most authoritative scientific bodies

1  that evaluate carcinogenity?

2  A    Yes.  It's in that category.

3  Q    Asbestos is a category 1 carcinogen, correct?

4            MR. BERNICK:  Objection, goes beyond the scope.

5            MR. FINCH:  Your Honor, this is an article he wrote

6  that I can cross-examine him --

7            MR. BERNICK:  It makes no difference whether it's a

8  article he wrote, it's on a subject --

9            COURT CLERK:  Speak into the mike.

10           MR. BERNICK:  --  if it's on a subject that goes

11 beyond the scope of my direct examination, if they want to call

12 him adversely in their case, and try to make an expert on

13 asbestos they're more than welcome to do that, there may be an

14 issue about that but that's what they're doing now, is to

15 examine him on a subject that was not the subject of direct

16 examination.

17           THE COURT:  This is outside the scope of the direct

18 and so far, unless you're going to raise some credibility

19 issue, which I'm not sure what that is at the moment, based on

20 where you've gone so far, I think it is outside the scope.

21           MR. FINCH:  Okay.

22 Q    Would you agree with me that categories -- materials that

23 have been listed as category 1 or category 2 by IARC, one can

24 presume that general causation is established?

25           MR. BERNICK:  Objection.  Objection to the form of

1  the question of the word presume, but, again, this is just a

2  Trojan horse for exactly the same question, because he knows

3  that he's going to pick up in that the categorization of IARC

4  for asbestos.  So, what he's really asking this witness to do

5  is to vouch for the accuracy, I'm not sure how that came out,

6  is to vouch for the accuracy of IARC's categorization and his

7  characterization of asbestos.  I'm not --

8          MR. FINCH:  That -- I'm sorry.  That was not my --

9          MR. BERNICK:  That goes beyond -- well, I don't know

10  what else the proffer is.

11          MR. FINCH:  That was not my question.  My question --

12  this was, all of your testimony about risk assessment relates

13  to general causation in the first instance and into specific

14  causation, correct?

15          THE COURT:  And, in fact, you objected to his being

16  proffered as an expert when it came specifically to asbestos,

17  and now you're opening the door, Mr. Finch.

18          MR. FINCH:  I'm not asking him about asbestos.

19          THE COURT:  You are asking him about asbestos.  The

20  first question was, is asbestos a category 1 carcinogen and the

21  second question was, if I look at category 1 carcinogens, is

22  there a presumption that certain things will happen.  You are

23  definitely asking him about asbestos and you are outside the

24  scope of your own objection to this witness being able to

25  testify as to an expert opinion on that very subject.

Rodricks - Cross/Finch                                              214

1  Q      Leaving asbestos completely out of it, would you agree

2  with me that from a risk assessment perspective, if the

3  International Agency for the Research on Cancer has labeled

4  something as a category 1 carcinogen, that that is sufficient

5  to establish general causation?

6  A     I would agree with that.

7               MR. BERNICK:  Objection to the form.  Objection to

8  the form of the question, including the use of general -- it

9  really is the same thing all over again, Your Honor.  It's just

10  kind of a game here about what we're doing

11              MR. FINCH:  Your Honor, it's not the same thing all

12  over again.  Your Honor, I said take asbestos completely out of

13  it.

14              MR. BERNICK:  Well, then what's the purpose for the

15  proffer?

16              THE COURT:  Exactly.

17              MR. FINCH:  What's the purpose of the witness who is

18  not testifying -- he was talking about general causation and

19  specific causation, Your Honor.  I am getting -- this is a

20  fundamental question going to the question of, if something is

21  -- if this witness believes that something listed on the IARC

22  registry as a class 1 carcinogen, whether from a risk

23  assessment perspective general causation has been proven.

24              THE COURT:  All right.  That's within the field of

25  his expertise.  Overruled.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Well, okay, Your Honor.  I really think

2   that if he wants to try to tie this witness' testimony to IARC,

3   he would have to present the foundation that says that IARC's

4   classification bears upon the criteria that he used and they

5   haven't done that yet.

6          THE COURT:  He has not tied anything about IARC to

7   this case.  In fact, there has been an objection to this

8   witness saying anything about asbestos in the case.  The

9   witness was called to explain the risk assessment models which

10  he has done.  But, nonetheless, this question appears to be

11  within the scope of his expertise.  The objection is overruled,

12  would you state the question again so the witness can answer

13  it, please.

14  Q    Would you agree with me that if IARC, the International

15  Agency for Research on Cancer has classified something as a

16  category 1 carcinogen, in your opinion as a risk assessment

17  expert, that is sufficient to establish that the general

18  causation of that carcinogen?

19  A    Just to explain a little bit, generally, yes, yes.

20  Substances or other things get into category 1 when the IARC

21  committees look at the evidence, the way I described, they look

22  at the quality of the studies, they apply the Hill criteria and

23  make a judgment, then, based on the criteria about whether the

24  associations are causal.

25         I think it's generally reliable, but I think I would -- if

Rodricks - Cross/Finch                          216

1  you ask me about any specific agent, I would wan to look at it

2  separately to see if they've done it properly.  If I wanted to

3  make a serious inquiry.  But generally, I would assume that

4  they've done ir properly, but, again, serious inquiry on any

5  specific agent I'd want to look at the underlying data myself.

6  Q    Okay.  Could you turn to Page 57 in your article?

7  A    The first paragraph you write, "It is not possible to

8  determine, except in unusual circumstances, which actual and

9  individuals in a population are at the high end of sensitivity

10 and also at the high end of exposure."  Do you agree with that?

11 A    Again, we're talking about a population, that is correct.

12 Q    Okay.  All right.  Then on Page 58, under heading 3 you

13 talk about general and specific causation in actual

14 individuals.

15      THE COURT:  I'm sorry, what page, please?

16      MR. FINCH:  Page 58, of the same article.  Actually,

17 before we get there, on Page 57 you write, "a final point

18 regarding the regulatory risk assessments is that the so called

19 safe levels are derived from the epidemiological or

20 experimental toxicity data by the use of assumptions that have

21 the effect of placing those levels at a very small fraction of

22 the observed threshold levels, do you see that?

23 A    I'm sorry, I guess I don't.  Where are you?  On --

24 Q    I am --

25 A    Start with 57, sorry.

1  Q    57, I'm sorry.

2  A    And, again, could you just cite the final point?

3  Q    Yes.  You're writing a final point regarding the

4  regulatory risk assessments is that so called safe levels are

5  derived from the epidemiological or experimental -- you see

6  where I'm reading from.

7  A    Yes.

8  Q    Okay.  That was the subject of some of your direct

9  testimony today, correct?

10        MR. BERNICK:  Again, I object.  You -- you read half

11  a sentence that ends in a note.  I mean, is your intention to

12  ask just about the first part sentence, or the whole sentence?

13        MR. FINCH:  I will ask about the whole sentence.

14  Q    Mr. Bernick pointed out that it ends in footnote, correct?

15        MR. BERNICK:  Well, actually, even the end of the

16  sentence, you continue on.  By the use of assumptions that have

17  the effect of placing those levels, at a very small fraction of

18  the observed threshold levels, and then there is a footnote.

19  Q    Okay.  I take it you agree with the text, that's my

20  question Dr. Rodricks.

21  A    Yes.

22  Q    All right.  And in the footnote you write "Regulators

23  assume in the absence of evidence to the contrary, that

24  carcinogenic chemicals (indiscernible) mechanisms that disobey

25  the general threshold rule for toxicity, this does not

Rodricks - Cross/Finch                                            218

1  translate to the sometimes expressed view that any level of a

2  carcinogenic exposure can cause cancer.  Citing sources.

3  Instead, it means only that any exposures to carcinogens will

4  increase cancer risk and that the magnitude of the risk

5  increases with increasing exposures".  Did I read that

6  accurately?

7  A    Yes.  And that's what I described earlier.  That straight

8  line, if you recall the straight line extrapolation, the one

9  that was yellow, that assumes no threshold.  That assumes that

10 even the smallest dose will increase risk, that's an assumption

11 that regulators make for carcinogens, unless they have some

12 evidence that it's wrong.

13     My point here was that that no threshold idea is commonly

14 interpreted to mean any exposure that causes disease.  And that

15 is completely fallacious.

16 Q    Okay.

17 A    That's not what the no threshold idea means, at all.  So,

18 that's the point I was trying to make here.

19 Q    Okay.  All it means is that any exposures to carcinogens

20 will increase cancer risk and that the magnitude of the risk

21 increases with increasing exposures.

22 A    Right.  The assumption that -- the threshold assumption

23 leads to that picture, yes.

24 Q    Okay.  Now, on Pages 58 and 59, you have a framework for

25 evaluating general and specific causation.  Do you see that,

1 Dr. Rodricks?

2 A    Yes.

3 Q    Okay.  And you break it out into a series of Romanettes.

4 The first is, to what chemical was the plaintiff exposed, then

5 the second is, is there sufficient evidence in the scientific

6 literature to support a causal relationship between exposure to

7 the chemical and the specific type of injury or disease the

8 plaintiff has incurred.  That's general causation, correct?

9 A    It's usually called that, yes.

10 Q    Okay.  And so, if the answer to number 2 is no, that

11 usually ends the inquiry.  If the answer to number 2 is yes,

12 then the inquiry continues and that's where you get into the

13 area of specific causation, correct?

14 A    Yes.

15 Q    Okay.  Then Romanette 3 is, what is the likelihood that

16 someone having the plaintiff's characteristics, age, sex, race,

17 smoking habits, alcohol consumption rates, et cetera, would

18 have the specific injury or disease, in the absence of exposure

19 to the suspect chemical.   That's what is known as specific

20 causation, correct?

21 A    Well, it's one of the issues, but this is the dose

22 response relationship and what the background risk is and how

23 it would change as you increase dose.

24 Q    And, would you agree with me that that determination is

25 based on the individual facts and circumstances of the

1 plaintiff's situation, at least in part?

2          MR. BERNICK:  I'm sorry, just referring to Romanette

3 3, not the rest of the criteria later on for specific

4 causation?

5          MR. FINCH:  Yes, yes.

6          THE WITNESS:  Could you repeat the question, I'm

7 sorry.

8 Q    In order to answer the question that Romanette 3 poses,

9 you have to have data about the plaintiff's individual

10 characteristics and that data is going to be dependent on the

11 individual facts and circumstances of the plaintiff's

12 situation, correct?

13 A    Yes.  The point I was making is that if you were going to

14 take the dose response model and say where does a particular

15 exposure group sit on that curve, you'd want to be reasonably

16 sure that their characteristics match those of the population

17 that you studied to get the curve.  If they're different, I

18 think I answered a question about alternative causes for

19 specific individuals where you might have some other

20 explanation.  That's the point I was trying to make here, yes.

21 Q    Then you write, about halfway down in paragraph -- the

22 next paragraph, "Plaintiffs condition may be very rare in which

23 the likelihood of demonstrating specific causation inquiry 4,

24 increases."  Do you agree if the condition which the plaintiff

25 has is very rare, but there's general causation established

1 between the plaintiff's condition and exposure to a toxic

2 chemical that it is the likelihood of being able to demonstrate

3 specific causation increases?

4        MR. BERNICK:  At this pont it really is unfair and

5 incomplete.  We've gone through three Romanettes, we now have

6 an inquiry, Romanette 4, that Mr. Finch hasn't even put into

7 the equation and the specifically referred to in that sentence.

8 It's a very misleading question.

9        THE COURT:  I think from -- well, this -- I mean, the

10 doctor wrote the article, so he probably is able to ferret out

11 whether or not the question is misleading and if it is, to ask

12 that it be rephrased.  It seems to me that the Romanette 4 does

13 ask a specific question, and, let's see.  Romanette 4, I do not

14 believe is incorporated within your question.  The objection is

15 sustained.

16 Q    Okay.  Incorporating Romanette 4 within my question, do

17 you agree, Dr. Rodricks, that if the plaintiff's condition is

18 very rare, and he is exposed to a toxic chemical which is known

19 to cause that condition, the likelihood of being able to

20 demonstrate specific causation increases?

21 A    Only in the sense that it would take -- for rare

22 conditions it would generally take less exposure to double the

23 background risk than for, say, a very common.  Only in that

24 sense.

25 Q    On Page 60 and 61, you give a hypothetical example.  I'm

1 looking at the second paragraph on Page 60, and you write,

2 "Thus, for example, if a specific plaintiff's risk of

3 developing his or her specific disease, in the absence of

4 exposure to the suspect chemical is 1 in 1,000, examination of

5 the dose response data from epidemiological data can reveal the

6 magnitude of the dose necessary to increase risk by a factor of

7 1 in 1,000."  Did you write that?

8 A    Yes.

9 Q    Okay.  If the exposure experts can demonstrate that the

10 plaintiff incurred exposures leading to a dose of at least that

11 magnitude, what did you mean by that magnitude?

12 A    One in 1,000.

13 Q    Okay.  Then it can be concluded that exposure to the

14 suspect chemical increased plaintiff's disease risk to a level

15 of at least 2 in 1,000, which is 1 in 500, right?

16 A    Yes.

17 Q    Thus, it may be concluded that since the plaintiff

18 actually has the disease, then the risk has been realized and

19 it is more likely that it was caused by the chemical than by

20 whatever other factors caused the condition.  Is that your

21 view?

22 A    That's what I had testify to earlier, yes.

23 Q    Okay.  Next paragraph you write, "This sketch of how the

24 analysis of specific causation may proceed is meant to describe

25 the type of analysis necessary, the scientific method to be

Rodricks - Cross/Finch                                   223

1  used and is not intended to describe a strict set of inflexible

2  criteria (such as for example, a strict risk doubling

3  standard).  A degree of scientific judgment is necessarily

4  involved especially since the data required to conduct a

5  careful, quantitative evaluation of the plaintiff's exposures

6  and epidemiological dose response relationships are almost

7  never without uncertainty."  Do you agree with that?

8  A    Yes.

9  Q    The next page, Page 62, you have a heading called Limits

10 Improving Causation.

11 A    Yes.

12 Q    Do you have that section?

13 A    I do.

14 Q    The second paragraph, although the general process

15 described here for undertaking an evaluation, you write

16 "Although the general process described here for undertaking an

17 evaluation of general and specific causation may have broad

18 acceptance.  It seems clear that nothing approaching the

19 uniformity of scientific approaches that can be discerned in

20 the regulatory context, exists in connection with the

21 evaluation of individual exposures and responses.  The relative

22 weights given to different types of scientific information may

23 vary greatly among experts and there appears to have been

24 little substantive discussion of the problem of individual

25 disease causation in the scientific as against the legal

Rodricks - Cross/Finch                                         224

1   literature."  I take it you agree with that.

2   A    I do, in the sense that that takes away nothing from my

3   statement earlier that the general method of application here

4   is perfectly appropriate, it does have consensus.  There are

5   going to scientific quarrels over the underlying data, what the

6   best dose response might be.  So there you will run into,

7   perhaps, a lack of consensus, but the method to me is quite

8   clear.

9   Q    But there will be -- there could very well be lots of

10  disputes about what dose the plaintiff was exposed to, or what

11  dose is necessary is to have any increased risk of disease or

12  whether you can determine specific causation in a particular

13  case.  Those are always going to be subject of expert disputes

14  in an individual case.

15  A    For working within --

16             MR. BERNICK:  I'm sorry, excuse me.  Those are three

17  different questions.

18             THE COURT:  Yes, they are.

19  Q    Would you agree with me that there could be disputes in an

20  individual case about the amount of exposure the plaintiffs

21  cover, correct?

22  A    The general -- when working with risk assessment

23  methodology I described, is you look at the data and try to

24  build models.  Some scientists may come up with a slightly

25  different model, or it could be a substantially different

**J&J COURT TRANSCRIBERS, INC.**

1  model.  There will be those kinds of scientific debates.  I

2  don't know about this particular case, but in some cases that

3  happens.  That has nothing to do with method, the method here

4  is solid.  And so, I was focusing here on the possibility that

5  there could be a debate about some of the intricacies of this

6  application.

7          MR. FINCH:  May I approach the witness, Your Honor?

8          THE COURT:  Yes.

9  Q    Dr. Rodricks, do you have what's been marked Exhibit 589

10 in front of you?

11 A    Yes.

12 Q    This is an article that you wrote in 1997?

13 A    Published in 98, yes.

14 Q    Published in 1998?

15 A    Right.

16         MR. BERNICK:  Again, Your Honor, I can't help but

17 point out, the title of the article is Toxicological Risk

18 Assessments in the Courtroom.

19         MR. FINCH:  Your Honor, there are statements in the

20 article that go to his testimony here that have nothing to do

21 with trying to provide a legal framework.  There are statements

22 about science.

23         THE COURT:  Let's just -- Mr. Finch, we'll take

24 objections to questions as they come.

25         MR. FINCH:  Okay.  Well, he objected to -- I thought

Rodricks - Cross/Finch                                   226

1  he was objecting to the article.

2          THE COURT:  That was a statement, not an objection.

3  Let's go.

4  Q    Okay.  On Page 24 of this article, you write, in Romanette

5  6, "If the observed toxic response is carcinogenicity, a

6  different set of assumptions is adopted.  High dose cancer

7  studies at practicable size can detect excess lifetime cancer

8  risks no lower than about 1 in 10, where as public health goals

9  generally call for protective limits corresponding to very much

10 lower risks.  Extrapolation to the low dose, low risk range is

11 thus require if ay statement about risk is to be made."  Do you

12 agree with that?

13 A    Yes, that's what I said earlier in my testimony,

14 basically.

15 Q    And, in the United States a linear no threshold dose

16 response model has been traditionally used, although

17 alternative models, including threshold models have been

18 advocated for some substances, based on data concerning their

19 modes of biological action, correct?

20 A    That is correct and it's truer 10 years later than it was

21 then, yes.  A lot of certain threshold hypothesis now

22 (indiscernible), based on biological studies.

23 Q    Could you turn to Page 28.  The first full paragraph you

24 write "With respect to epidemiology findings it is important to

25 remember that population based epidemiology evidence can

Rodricks - Cross/Finch                                    227

1 establish only general causation, i.e., is the agent capable of

2 causing the disease and not specific causation, i.e., did the

3 agent cause disease in a given individual." I take it you

4 agree with that.

5 A    Yeah.  If you find that something causes disease, you just

6 can't assume that it always causes disease under every

7 circumstance.  That's why you need to proceed further.

8 Q    Would you agree with the proposition that if there is no

9 epidemiological evidence at all that shows that a given

10 substance can double the risk of disease, then in making a --

11 let me back up.  Here's my hypothetical.  You've got exposure

12 to substance A, which is a category 1 carcinogen listed by

13 IARC.

14 A    Okay.

15 Q    Then you have exposure to some substance B, as to which

16 there is no epidemiology at all that shows any doubling of the

17 risk at any dose.  As between the two, would it be sound

18 science to totally discount the possibility that substance 2

19 could have contributed to the plaintiff's disease?

20        MR. BERNICK:  Object to the form of the question

21 insofar as it references IARC.  That's number one.  And, number

22 two, I don't even understand the comparisons being drawn.

23 Totally disregard this doesn't have any meaning to it.  If we

24 could have a precise question put that's not designed to back

25 door the asbestos classification, maybe we could get an answer

1  to the question.

2          MR. FINCH: I didn't ask him about asbestos at all,

3  Your Honor.

4          THE COURT:   No, you didn't but you did ask about

5  something that is obviously known to contain asbestos on a

6  list, after having objected to this witness's qualification to

7  answer the question.  The objection is sustained.  Restate the

8  hypothetical.

9  Q    Okay.  Let me ask it this way.  Assume that there are more

10 than 10 studies that show for carcinogen A there's a doubling

11 of the risk of cancer.

12 A    I'm sorry, at a particular dose?

13 Q    At a particular dose.

14 A    Okay.

15 Q    And, assume that for substance B there is no

16 epidemiological evidence at all that shows that there is a

17 doubling of the risk of the same disease that is caused by

18 carcinogen A.  Do you have that hypothetical in your mind?

19 A    I guess what I don't understand is with substance B, is

20 there any evidence showing it's a carcinogen at all below a

21 doubling?

22 Q    There is no evidence at all showing that it doubles the

23 risk of disease.

24 A    Does it increase the risk at all of disease.  That's what

25 I don't understand.

1  Q    There's no evidence that it increases --

2  A    So, it's not a carcinogen.

3  Q    Correct.

4  A    Okay.

5  Q    There's no epidemiological evidence that suggests that it

6  is.  Some people have asserted that it is.

7  A    Okay.

8  Q    In that circumstance, would it be within sound science for

9  someone who presents the disease, for their medical

10 professional to totally discount the chances that the disease

11 was caused by substance B?  If they were exposed to substance A

12 and there was more than 10 epidemiological studies that show

13 that substance A can cause the disease and nothing that shows

14 that substance B can cause the disease.

15            MR. BERNICK:  Again, I --

16            THE COURT:  It's all right, Mr. Bernick, the witness

17 can answer this question.

18            THE WITNESS:  Well, in spite of --

19            THE COURT:  If you can understand it, you can answer

20 it.

21            MR. BERNICK:  Okay.

22            THE WITNESS:  I'd have to kind of restate it to be

23 sure -- I think you're saying we have a well established

24 carcinogen, we know the risk doubling dose, we know the clear

25 evidence of carcinogenicity, and there's some other substance

Rodricks - Cross/Finch                                        230

1  where we have no evidence of carcinogenicity, now, you're

2  saying if somebody -- well, I don't see how B is relevant to

3  any question.  Maybe I just don't understand it, I'm sorry.

4  Q    No, the question is, if someone in making a specific

5  causation determination decides that there is no way that

6  substance B could have possibly caused or contributed to this

7  person's cancer, that would be within the realm of sound risk

8  assessment science.

9  A    Given the facts you stated, yeah, you wouldn't say that B

10 had any risk of cancer, right.  Any known risk of cancer.

11 Q    On Page 29, under number 3, the bottom of the first

12 paragraph you write:  "It is nevertheless obvious that reaching

13 a scientific consensus on the methods to evaluate chemical dose

14 is not to be expected, especially when the objective is to

15 estimate doses to specific individuals and not to generic

16 populations.  Indeed, some experts offer the view that the

17 magnitude and duration of dose do not matter, especially for

18 carcinogens, the mere fact of exposure is sufficient to

19 conclude the presence of increased risk or in some cases actual

20 causation."  Did you write that?

21 A    I don't see where you're looking.  I mean, if you're

22 quoting me, I wrote it.  Now, the question is, I hope I

23 discounted that idea.

24 Q    You hope you what?

25 A    Discounted that idea as incorrect.  Could you tell me

1  where you're reading here?

2  Q    Yes, at the -- it's highlighted on the ELMO.

3           MR. BERNICK:  Give him the page, Page 29.

4  Q    Page 29, paragraph 3.

5  A    I'm just having -- I apologize.  Oh, okay, I'm sorry.

6  It's the first paragraph under --

7  Q    Yes.

8  A    Okay.

9           THE COURT:  This is talking specifically about levels

10 of lead in the blood?

11          MR. BERNICK:  Well, even more than that.  If you read

12 up further in the paragraph, it's about -- basically it's a

13 statement about a problem that experts who are toxicologists

14 have trying to be experts in dose reconstruction.  I don't --

15 Q    You're a toxicologist, correct?

16 A    Yes.

17 Q    All right.  Would you agree that there is not a scientific

18 consensus on the methods to evaluate chemical dose?

19          MR. BERNICK:  Your Honor, I would specifically and

20 vehemently object to that question.  It is totally misleading

21 because he's taking it out of context in an article that's all

22 about experts who are called in litigation.  This is an

23 improper use, it's not proper impeachment.

24          THE COURT:  It is an improper use of this article,

25 but I think if you'd heard the witness' answer, you probably

**J&J COURT TRANSCRIBERS, INC.**

1  wouldn't be objecting of vehemently.  Nonetheless, the

2  objection is sustained.

3  Q    All right.  Let's turn to Page 30.  Do you agree that most

4  toxicologists would not adopt the view that doses already

5  documented as toxics are the only doses likely to cause

6  toxicity?

7  A    Where are you at, I'm sorry?

8  Q    I'm just asking him in general, does he agree with the

9  proposition that most toxicologists would not adopt the view

10  that doses already documented as toxic are the only doses

11  likely to cause toxicity?

12  A    I'd be careful with the word cause here.  I wrote that,

13  but I was referring to what I was asked about earlier, that you

14  measure -- you fail to find effects, you believe that the

15  effects simply disappear at the point where you failed to find

16  them, and I think most would say, well, there's going to be

17  some risk of toxicity as you go below those doses, we don't

18  know what the shape of the dose response curve is, we don't

19  know how quickly they go to zero, but qualitatively we might

20  say there's some risk but I think it's going to be a very small

21  risk and I think I tried to say that earlier.  That's the point

22  I was trying to make here.

23       MR. FINCH:  May I consult with my colleagues for a

24  second?

25       THE COURT:  Yes, sir.

1                          (Pause)

2              MR. FINCH:  Your Honor, I would just offer at this

3    time the two articles, 589, and what's the other one?

4              UNIDENTIFIED MALE SPEAKER:  588.

5              THE COURT:  588.

6              MR. FINCH:  588.

7              THE COURT:  They're admitted?

8              MR. BERNICK:  No, well --

9              THE COURT:  They're the witness's articles.

10             MR. BERNICK:  They are the witness's articles but the

11   fact that the witness authored the articles doesn't make them

12   any more admissible as underlying materials for expert

13   testimony.  Underlying materials for expert testimony --

14             MR. FINCH:  I'm not offering --

15             MR. BERNICK:  Excuse me.  Are inadmissible.  The fact

16   that they're used on cross-examination and that he wrote them,

17   doesn't make them admissible.  I mean, they're only used for

18   impeachment purposes and then you quote them, use them for

19   impeachment purposes, the rest of the article doesn't come. in.

20             THE COURT:  Well, that is a fair statement and,

21   frankly, there wasn't much impeachment material, based on what

22   this witness testified to.  He was basically affirming what he

23   had testified to on examination.  So, I'm not sure what the

24   purpose is.  I would think, however, Mr, Bernick, based on the

25   fact that this Court cannot take 100 percent accurate notes,

Rodricks - Cross/Finch                                234

1  and at some point I know I'll get a transcript, but I don't

2  know when, I would at least like to have the pages referred to

3  by the witness.

4          MR. BERNICK:  I would -- Your Honor, and the only

5  reason I stand on what I think is an appropriate technical

6  objection is, I'm just very sensitive about establishing

7  precedence in the case that will then lead to people offering

8  all kinds of stuff in, just because it was used on

9  cross-examination.

10         THE COURT:  Well, and I agree.

11         MR. BERNICK:  I'm happy to have Your Honor have the

12  whole thing.

13         THE COURT:  I agree with the principle, if it's not

14  substantive evidence, but to the extent that somebody is going

15  to refer to it as a portion of cross-examination, I would like

16  a reference point to have it available, but I agree.

17         MR. FINCH:  With that amendment, then I would offer

18  for purposes of impeachment, the sections of the article that I

19  used with him on cross-examination, not the entire article.

20         THE COURT:  Well --

21         MR. BERNICK:  You don't offer -- again, they are not

22  offered separately.  They are used for impeachment, or they're

23  not and whatever you read out of them is the impeachment but,

24  again, I have no quarrel with the Court having, indeed, the

25  full document so that the Court doesn't have any confusion

**J&J COURT TRANSCRIBERS, INC.**

1  about what it is that was said on the record.

2          MR. FINCH:  That's my only concern, Your Honor.  I

3  just want the Court to be able to refer to the actual article

4  that I used, even if it doesn't substantively come into

5  evidence.

6          THE COURT:  That's what I would like to be able to

7  use the articles for, not as substantive evidence, but simply

8  to make sure that I do have a complete record because it's

9  going to be very difficult as we get through 18 days of this,

10 to keep track of what witnesses are referring to what.  So,

11 they will not be admitted into substantive evidence.  I am

12 going to maintain copies in the file so that I do have a record

13 of the specific portions that were referred to by any one in

14 this case and the witness.  All right.

15         MR. FINCH:  I'll pass the witness, Your Honor.

16         THE COURT:  All right.

17         MR. RASMUSSEN:  Good evening, Your Honor.

18         THE COURT:  Good evening.

19         MR. RASMUSSEN:  I'm Garret Rasmussen for the Future

20 Claimants.  My first time in the court, so I'm happy to meet

21 you.  And Dr. Rodricks, my first time to meet you as well.  I

22 think we'll probably have a lot to agree upon and my

23 cross-examination will not be a long one.

24                         CROSS-EXAMINATION

25 BY MR. RASMUSSEN:


                    **J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Rasmussen                    236

1  Q    I want to start out by asking you some questions about

2  risk assessment and the relevance of risk assessment to the

3  evaluation of disease in individuals.  So, risk assessment,

4  first of all, focuses on likelihood of adverse affects

5  occurring in exposed populations, correct?

6  A    It will vary, it can do that, yes, for sure.

7  Q    Right.  And a populations risk of a disease is not the

8  same thing as the risk to each and every individual in that

9  population, is it?

10 A    It's not identical, no.

11 Q    Correct.  A populations risk is only the same as every

12 individuals risk is all the individuals have identical

13 exposures and identical sensitivities to the particular toxin,

14 isn't that right?

15 A    Well, not exactly that.  We would say that if we're

16 talking about a group of individuals who experience exposures

17 similar to those where we have observation of excess risk, and

18 there's nothing that would distinguish them otherwise from the

19 studied groups, then what you find for the population ought to

20 apply to those individuals, but it applies in a probabilistic

21 way.  I think I described that with the drug example earlier.

22 That was my testimony and that's what I believe.

23 Q    Would you agree, Dr. Rodricks, that regulatory risk based

24 standards are not useful to evaluate disease causation in

25 particular individuals?

Rodricks - Cross/Rasmussen                    237

1  A    They are not designed to do that, they should not be used

2  for that purpose.

3        MR. BERNICK:  Regulatory -- counsel, the question is

4  regulatory risk levels?

5        MR. RASMUSSEN: Yes, yes.  Yes, it was.

6  Q    And, it's true isn't it, that the assumptions and models

7  used in regulatory risk assessment are not known to apply to

8  any actual individuals, correct?

9  A    They are not designed to work in that way.  They try to

10 focus on hypothetical, most sensitive individuals, whoever they

11 are, we don't know who they are, most highly exposed.  So, they

12 have a number of assumptions that would be very -- it would be

13 just wrong to apply to individuals, when you're dealing with

14 those assumptions.

15 Q    Okay.  So to assess the disease causation in an

16 individual, you would have to look at that specific individuals

17 exposure, isn't that right?

18 A    Yes.  Among other things, but yes.

19 Q    Yes, it's not enough just to look at a group cumulative

20 exposure, is it?

21 A    Well, you could do it on a group basis as well.  If you

22 have -- the important thing is the general causation and the

23 dose response relationship, but now we could look at some group

24 that has some range of exposures and that you could --

25 Q    But you couldn't do it --

                    **J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Rasmussen                    238

1          MR. BERNICK:  Excuse me, let him finish.

2          MR. RASMUSSEN:  Yes.  Keep going.

3          THE WITNESS:  What I'm saying is, you could do it.

4 Often cases arise where there's an individual or cases maybe

5 small groups of individuals, or large groups who have similar

6 exposures.  So, you could do it in all of those -- I'm sorry.

7 Go ahead.

8          MR. RASMUSSEN:  Finish, please finish.

9          THE WITNESS:  Well, you could to it in all of those

10 circumstances.

11 Q    Are you familiar with the concept of a heterogenous group?

12 A    Well, it has a couple of meanings.  Those variability in

13 the population, yes.

14 Q    So, if it is a heterogenous group with variability in the

15 population, then you can't use the group cumulative risk

16 exposure to make a prediction about an individual, could you?

17          MR. BERNICK:  Objection to the form of the question.

18 It's very ambiguous and it's got several elements to it.  If

19 you understand, go ahead and answer, but I --

20          MR. RASMUSSEN:  I think it's actually a very precise

21 questions and asked very precisely and I think the witness

22 understands it.

23          THE COURT:  Well, would you repeat it for me because

24 I only got half of it.  A heterogenous group with variability

25 in a population, that's how it started comma, cannot use and

Rodricks - Cross/Rasmussen                         239

1  that's where it lost it.

2  Q    Okay.  Cannot use a cumulative -- cannot use a risk

3  exposure calculated for a group, as opposed to for an

4  individual.  For a population as opposed to an individual.

5           MR. BERNICK:  That same -- it's even worse now.

6           MR. RASMUSSEN:  Well, we'll get back to that -- we'll

7  start with that general question and we'll get more precise as

8  we go on.

9           THE COURT:  If you understand this question, Doctor,

10  you can answer it.

11          THE WITNESS:  I thought I did but now I'm not sure,

12  so maybe it needs to be repeated.

13  Q    Okay.  Let me come about it a different way.

14  A    Okay.

15  Q    I mean, I'll just start asking about cumulative exposures

16  because I think I really want to get to the cumulative exposure

17  point.

18  A    Okay.

19  Q    The point that you did understand.  So, you would agree

20  that there's a positive relationship between cumulative

21  asbestos -- well, I don't want to use asbestos.  That's a word

22  I can't use.  You'd agree that there's a positive relationship

23  between cumulative exposure to a toxant and a risk of getting a

24  disease because of that exposure?

25          MR. BERNICK:  I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1           THE WITNESS:  That's the first premise?

2           MR. RASMUSSEN:  Yes, that's the first premise.

3           MR. BERNICK:  He's being asked to assume that as a

4   hypothetical?

5           MR. RASMUSSEN:  No, I'm asking him if he agrees with

6   that.

7           MR. BERNICK:  I don't know what he's agreeing with.

8           MR. RASMUSSEN:  Well, let's ask him.

9           MR. BERNICK:  What --

10          THE COURT:  The question is, does he agree that there

11  is a positive relationship between the cumulative exposure to a

12  toxant and the risk of getting a disease from that exposure,

13  but I'm not sure what the cumulative exposure means.  I'm

14  sorry.

15  Q    Okay.  The exposure -- the dosage is really what it means.

16  Q    Yes, yes.

17          THE COURT:  But you were talking about heterogenous

18  populations.  You've backed off that and now you're talking

19  about individuals with more than one --

20          MR. RASMUSSEN:  No, I'm doing it step by step.  I'm

21  going to get back to the heterogenous population, but I want to

22  first start out with the concept of what dosage means.

23  Q    Dosage -- and --

24          THE COURT:  So, now, you're now talking about an

25  individual with more than one exposure.  That's what you're

1 talking about dose, cumulative exposures?

2          MR. RASMUSSEN:  No, no, I don't want to talk about --

3 we're getting ahead of ourselves.  I'm going to go back and lay

4 the foundation.

5          THE COURT:  All right.

6 Q    Each individual, individuals in a group can have

7 different exposures to a toxant, correct?

8 A    There would be variability, yes.  Well, a group, when you

9 say a group, let's say who are all doing one kind of job

10 exposed to a chemical, there would be some variability on any

11 given day, right.

12 Q    Right.  And also there could be some variability

13 cumulatively over the course of a year if they were doing

14 different jobs, isn't that right?

15 A    If their jobs were -- quite different jobs with the same

16 chemical, let's say?

17 Q    Yes.

18 A    Sure.  Yes.  So, we'd want to classify, if there were

19 different jobs, you'd probably want to look at them separately.

20 Q    And sometimes even people doing the same job could have

21 different cumulative exposures, not just a daily exposure, but

22 cumulative, over the course of a year if, indeed, they do the

23 same job in a different way.

24          MR. BERNICK:  These are all hypothetical questions,

25 not grounded -- you're asking him to assume that?

1          THE COURT:  They are hypotheticals, yes.

2          MR. RASMUSSEN:  Correct.

3          THE WITNESS:  Yes, I don't know the answer to that.

4  I mean, that really gets to be, say, an industrial hygiene or

5  chemists question.

6  Q    I'm not asking you whether that could happen, but if it

7  did happen --

8  A    You're assuming that it does happen.

9  Q    Yes, yes.

10  A    Right.

11  Q    And, if it did happen, then the exposure of an individual

12  could differ from the exposure -- well, then the risk to the

13  individual could differ from the average risk to the group,

14  isn't that right?

15  A    Given your hypothetical --

16          MR. BERNICK:  I'm sorry.  The question is whether an

17  individual may be -- an individual's exposure may be different

18  from a calculated average, is that the question?

19          MR. RASMUSSEN: Yes, yes.

20          MR. BERNICK:  You're asking whether it can possibly

21  happen?

22          MR. RASMUSSEN: Whether it can happen in a group of

23  people, each doing the same job, because they're doing the same

24  job in a different way, over the course of a year, not just in

25  one day.

Rodricks - Cross/Rasmussen                 243

1        MR. BERNICK:  I think this really, again, falls

2  outside of his scope of expertise, but if he can answer it,

3  it's very vague.

4        THE WITNESS:  I don't really -- this really is beyond

5  my real experience.  I mean, I know there's variability from

6  day to day, I know that when I look at exposures as a risk

7  assessor, it's usually the long term exposure, either for a

8  certain group because that's usually the best measure of the

9  average exposure over a long period of time, if it's that long

10 term exposure that matters, and in most risk assessments that's

11 what matters.

12       There may be variability around that day to day for

13 individual to individual, but if you're looking at the group,

14 it's that long term average that is the best, most probable.

15 We're talking about what's most likely to be correct.  It's not

16 actually every single individual.  That's my point about going

17 from groups to individuals, we're not talking about absolute

18 prediction, we're talking about what's more likely than not, or

19 more probable than not.  I'm sorry, I kind of lectured, I

20 apologize.

21 Q    No, no, that's fine.  But the individuals in that group,

22 an individual in that group could have a cumulative exposure,

23 in other words a long term exposure over the course of a year

24 that differed from the average exposure of that group, over the

25 course of the year.

1            MR. BERNICK:  Your Honor, I just --

2            THE WITNESS:  You can't deny that, sure.

3            THE COURT:  If that weren't possible, we couldn't get

4  an average.

5            MR. RASMUSSEN:  Beg pardon?

6            THE COURT:  If that weren't possible, we couldn't get

7  an average.

8            MR. RASMUSSEN:  Right.  That's my point.

9            THE COURT:  Okay, so let's move on to something.

10           MR. RASMUSSEN:  So, some people would be higher than

11 the average and some would be below.

12           THE COURT:  So, let's move on.

13           MR. RASMUSSEN:  Okay.

14           MR. BERNICK:  (Indiscernible) what an average means.

15 Q    Relative risk.  In order to tell whether anyone in an

16 exposed group has sufficient cumulative exposure to a toxant to

17 achieve a risk doubling exposure, you would want to look at the

18 distribution of cumulative exposures in the group, wouldn't

19 you?

20 A    I'm sorry, could I -- I don't want to have the question

21 read back.  Could you just restate it, I'm sorry.

22 Q    Yes.  In order to -- with respect to relative risk, in

23 order to tell whether anyone in the exposed group, exposed

24 group to a toxant, had sufficient cumulative exposure to the

25 toxant to achieve a risk doubling exposure, you would want to

1  look at the distribution of cumulative exposures in that group,

2  correct, so you'd know whether some people are above the

3  average and some might be below.

4         MR. BERNICK:  Objection.  I think that is -- this is

5  only pursuing the same question which is the degree of

6  variability of exposures in a group.  And, again, I think it's

7  outside the scope of his expertise.  I know it's outside the

8  scope of my examination.  He's trying to use this individual to

9  create a predicate for a declaration that Dr. Stallard

10 introduced in this case, too late in the day, and this actually

11 violates yet again, yet again, the agreement that was reached,

12 that the testimony by declaration of Dr. Stallard would be used

13 solely for Daubert purposes and would never make its way into

14 this trial.  And now it's not only being done back door through

15 cross-examination of a witness, it's not even in the area.

16        THE COURT:  All right.  This witness has a good

17 understanding of his own expertise.  If he thinks this is

18 outside the area of his expertise, he has been very quick to

19 state that.  It seems to me that if this is outside the area of

20 his expertise, he will so state and otherwise, if he

21 understands the question, he may answer it.  Doctor, you may

22 answer this question if you understand it and feel that it is

23 within your expertise.

24        THE WITNESS:  Well, I'd like to hear it one more

25 time, though, because that discussion, I lost the question.

Rodricks - Cross/Rasmussen                    246

1  Q    Sure, okay.  In order to tell whether anyone in an exposed

2  group had sufficient -- any one person in the exposed group,

3  had sufficient exposure to a toxant to achieve the risk

4  doubling exposure, you would want to look at the distribution

5  of cumulative exposures in that group, wouldn't you?

6  A    You're talking about a single person --

7  Q    Yes, I am.

8  A    I don't see how a distribution helps you deal with a

9  single person.

10 Q    If you want to try to figure out the causation for an

11 individual, the range of where an individual might lie, if you

12 want to figure out the extent to which an individual might have

13 a cumulative exposure over the course of say a year, and you

14 had an average for the course of the year, you'd want to know

15 the variant, the variation in order to tell how high the

16 individual might be or how low the individual might be relative

17 to the average.

18        MR. BERNICK:  Determining that variation for what

19 purpose?

20        THE COURT:  That was not a question, that was a

21 statement.  There is no question before this witness.  He has

22 said he doesn't think that's a significant factor, that was his

23 answer.  Could we please get a question before the witness?

24        MR. RASMUSSEN:  Okay.

25        THE COURT:  The statements are not evidence and

1 they're stricken.

2          MR. RASMUSSEN:  Okay.  Let me ask the question again,

3 or ask a question, I'm sorry, Your Honor.

4 Q    In order to tell whether anyone in the exposed group had

5 sufficient cumulative exposure to a toxant to achieve a risk

6 doubling exposure --

7          THE COURT:  You've asked that question.  He's

8 answered it.

9          MR. RASMUSSEN:  Okay.  Did we get --

10 Q    Okay.  If we've got the answer then I'll move on.

11 A    Well, I'll answer again if it helps.  I mean, I think the

12 answer is no, that if you have a distribution the average --

13 you don't know where any individual is on the distribution,

14 they could be on the high end, or the low end, the average is

15 the best measure over a long period of time.  If you had to say

16 what is the most likely exposure for an individual in that

17 group, you'd say it's the average.  I'm quite sure that's

18 right.

19 Q    Well, if you knew the average cumulative exposure of the

20 group, you couldn't tell from that whether any particular

21 individual within a group would have sufficient cumulative

22 exposure to the toxant to contract a disease because of that

23 exposure, could you?

24          MR. BERNICK:  Objection.  Wouldn't -- well answer it

25 if you can.

Rodricks - Cross/Rasmussen                      248

1          THE WITNESS:  I'm working on what's probable.  The

2    average exposure for a group is te most probable exposure and

3    calculating the risk based on that exposure makes perfect sense

4    for the group and you would then say, probabilistically that is

5    the best estimate for any individual in that group.  The only

6    thing that would exclude that analysis was some other factor

7    about some individual which makes -- which says you have

8    evidence that that individual was somehow very different from

9    the rest.

10   Q    But there may be individuals in that group that will have

11   a cumulative exposure that is greater than the average, that's

12   my point.

13          MR. BERNICK:  Your Honor, we've been through that

14   like three times.

15          MR. RASMUSSEN:  Okay.  If that point is established

16   then I'll move on.  Do you agree with -- do we have agreement

17   on that?

18          THE WITNESS:  I suppose that could not be discounted,

19   but you're asking to do an assessment of the risk for the group

20   and what is most likely by way of exposure.  Unless you have

21   some other evidence, what is most likely is the average.

22   Q    But I'm asking for the individual.  I'm saying yes, that's

23   the average for the group, that's the most likely for an

24   individual in the group, but I'm asking you whether at the same

25   time there will be individuals in that group who will actually

Rodricks - Cross/Rasmussen                    249

1  have a cumulative exposure that is above the average.

2  A    Right.  And I'm saying it doesn't matter.

3        MR. BERNICK:  Objection, that calls -- I'm sorry.

4  That calls at this point, whether -- complete speculation.

5        THE COURT:  Counsel, Doctor, in order to get the

6  average, as a mathematical proposition what do you have to do?

7        THE WITNESS:  Well, you have a job, you have a

8  chemical, you send in an industrial hygienist, they measure

9  daily or weekly, they do this over a long period of time for

10 people working that job, they can measure the direct breathing

11 zone or just the general area and they make an average.  And

12 you'd say for that job, unless you had some clear evidence that

13 something was very different for some employee, you'd say for

14 that job the average exposure is what determines the employee's

15 risk, on a probabilistic, you can never be absolutely sure, but

16 on a probabilistic, what's most likely to be true, the average

17 is most likely to be true.

18       THE COURT:  And, sir, if a range of exposures for any

19 particular individual within that group, hypothetically, ranged

20 from 1 exposure in a given period to 100 exposures in that same

21 period, and you took an average and the average exposure was

22 50, is it a fairs statement that there would be some people who

23 had less than 50 exposures, and some people who had more than

24 50 exposures?

25       THE WITNESS:  There may be on any given measurement

**J&J COURT TRANSCRIBERS, INC.**

1 day.

2          THE COURT:  Yes.

3          THE WITNESS:  But on the long term, unless there were

4 some other circumstance that all ought to sort of balance out

5 and the --

6          THE COURT:  To the average.

7          THE WITNESS:  -- and the average is the best most

8 probable estimate of their exposure.  Yes.

9          THE COURT:  Thank you.

10 Q    But, it wouldn't balance out to the average over the long

11 term if the individual in the group were doing different jobs

12 within that job category, would they?

13 A    Well, that's a different matter, yes.

14 Q    Well, it's true, isn't it?  If they --

15          MR. BERNICK:  Objection, objection.  Your Honor, at

16 this point, I really think he's badgering a witness who has

17 gone as far as he can in answering the questions.

18          THE COURT:  That question has been asked and

19 answered.

20 Q    Suppose that the risk doubling dose for toxant is 2, just

21 as you have in your graph this afternoon, you can't tell

22 whether any particular individual within a group would have a

23 sufficient cumulative exposure to the toxant to contract a

24 disease simply knowing that the cumulative average was

25 sufficient to get you to a 1.9 relative risk, could you?

1           MR. BERNICK:  Objection.  This exact same question

2    was asked 15 minutes ago, and led down this whole path and I

3    really object, Your Honor, because this, again, is an effort to

4    use an analysis, now on cross-examination, that was

5    specifically agreed to be usable solely for Daubert purposes --

6           THE COURT:  Well, I don't know that.  It seems to me

7    that this whole line of questioning, this witness has been very

8    clear, we're going over ground that this witness is not

9    changing his opinion about.  Can we get to something new?

10          MR. RASMUSSEN:  I really would like the answer to

11   that question because I think, Your Honor, we'll find out later

12   in this trial that that question is a key question and that

13   other --

14          THE COURT:  Then if that is the key, you may

15   establish it in your case.  This witness has told you that he

16   is not measuring individual populations.  Now, you keep asking

17   him about individual populations.

18          MR. RASMUSSEN:  But I'm asking him about -- he's an

19   expert on risk assessment --

20          THE COURT:  Yes, he is.

21          MR. RASMUSSEN:  -- and his testimony is how you use

22   risk assessment and, indeed, he has a title in his report

23   called Relevance of Risk Assessment to a Valuation of Disease

24   Causation in Individuals.

25          THE COURT:   Yes, he does.

**J&J COURT TRANSCRIBERS, INC.**

1         MR. RASMUSSEN:  And I'm asking him about causation in

2    individuals based on risk assessment.  And I'm asking him about

3    the impropriety of using group, or at least the distinction,

4    maybe not the impropriety, the distinction between using a

5    group relative risk to apply it to an individual and I think --

6         THE COURT:  And he has been very consistent in

7    answering those questions.  You may ask one more question along

8    these lines.  Ask your question, again.  The doctor may answer

9    it, he is not changing his testimony about this.

10        MR. RASMUSSEN:  Okay.  One last question on this

11   line, it's a very important question.  I'd like to have an

12   answer, I think it's a fair question.

13   Q    Suppose the risk doubling dose for a toxin were 2 units,

14   which is what you testified about earlier this afternoon, and

15   the average cumulative lifetime exposure of a group were such

16   that the relative risk for the group was 1.9, which is below

17   the doubling dose standard, even though that's below the

18   doubling dose, you couldn't conclude that nobody in that group

19   had an exposure that could exceed the doubling dose and,

20   therefore, have causation, could you?

21   A    I can only -- it's the same answer I really gave to the

22   last exposure question.  If you're asking what is most likely,

23   the average exposure for the group is what's most likely for

24   any individual, most likely, it's not perfect, but most likely,

25   and you would say for a 1.9 increase that you do not meet the

Rodricks - Cross/Rasmussen                            253

1  more likely than not standard.

2  Q    My question wasn't whether it's more likely for the group,

3  it was whether knowing that the relative risk for the group is

4  1.9, you could not conclude from that knowledge that nobody in

5  the group exceeded the double dose of 2 units.

6  A    Well, I could not do that if you're seeking perfect

7  knowledge, right.  In other words, if it's only a matter of

8  absolute knowledge, then I can't.  I can talk about what's most

9  likely.

10 Q    But isn't it common sense as the Judge said, you have an

11 average and some people are going to be above the average and

12 some are going to be below the average?

13 A    Well, I don't agree.

14       MR. BERNICK:  There's been almost no common sense in

15 this line of examination.   Your Honor, we've been over this

16 now for 25 minutes.

17       THE COURT:  I believe the relevant test is, what is

18 the accepted scientific standard in the community within which

19 this witness is permitted to offer an expert opinion.  So, why

20 don't we get back to the test and ask your question within the

21 framework within which he is permitted to offer an expert

22 opinion.  If it's to a reasonable degree of scientific

23 certainty that you're trying to get him to answer a question,

24 then, perhaps that is the question that needs to be asked.

25 Q    Okay.  I'll do that.  Suppose the risk doubling dose for a

Rodricks - Cross/Rasmussen                    254

1  toxin were 2, and suppose the average cumulative lifetime

2  exposure of a group was such that the relative risk was 1.9,

3  could you conclude with a degree of scientific certainty and

4  reasonableness that a person, that nobody, that no person in

5  that group exceeded the relative risk doubling dose of 2?

6  A    You're assuming the 1.9 is well validated as the average

7  and are you asking me to conclude with absolute certainty that

8  there's no --

9  Q    No.  Reasonable scientific certainty was my question.

10 A    All I can answer is the most scientifically responsible

11 and certain answer is that the average is what affects the risk

12 for the group.  And I couldn't go -- and that the most likely

13 exposure and risk for every individual, the most likely is

14 reflected by the average.

15 Q    So, therefore --

16 A    I don't know what else to say.

17 Q    So, therefore, am I correct in concluding that you cannot

18 say that nobody in that group exceeded the relative -- the risk

19 doubling dose of 2.

20        MR. BERNICK:  Your Honor, this is really --

21        THE COURT:  It's sustained.  He has now told you

22 everything he is going to tell you.

23        MR. RASMUSSEN:  With all due respect, Your Honor, I

24 think he answered a different question.  If you read back the

25 question and read back the answer, you'll see he didn't answer

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Rasmussen                    255

1 the question, he answered a different question and talked about

2 the group.

3         MR. BERNICK:  With all due respect, this shows

4 disrespect for this witness and this process and I think we're

5 creating a very dangerous precedent in this case.

6         THE COURT:  Counsel, he has answered to the best of

7 his ability.  You can keep asking this question until the cows

8 come home, you're not going to get a different answer.  The

9 objection is sustained.  You have tried at least 15 ways to get

10 this answer -- this witness to give you a different answer,

11 he's not giving you a different answer, I'm sorry.  You've got

12 to live with the answer he's given you.

13         MR. RASMUSSEN:  Okay.  That actually brings on the

14 next question, it makes the next question even more

15 appropriate.

16 Q    Would you agree, sir, that risk assessors are, perhaps,

17 most delinquent in their failures adequately to convey the

18 uncertainties that accompany their evaluations?

19 A    I think I probably wrote that.

20 Q    So, you'd agree with it?

21 A    Yeah.

22 Q    And, you would agree that risk assessors should report the

23 range of uncertainty when a risk assessor reports her

24 conclusions wouldn't you?

25 A    I'm sorry, I didn't hear -- could you please repeat the

1  question?

2  Q    Yes.  You would agree that a risk assessor should report

3  the range of uncertainty when she reports her conclusions?

4  A    That's generally a good practice, but they should focus on

5  what is the best estimate for sure.  They may discuss the

6  uncertainty around that estimate, yes.

7  Q    And, would you agree, sir, that a risk assessor who uses

8  average cumulative exposures to draw conclusions about

9  individual exposures must report to be scientifically accurate

10  and scientifically reasonable, the variations from the average?

11  A    I think I answered that.  If we're interested in, what is

12  most likely a probable for the group, the average is the most

13  likely.  I don't know how else to say that.

14  Q    Should, or should not the risk assessor report the

15  variations in the context of that question?

16          MR. BERNICK:  Objection, variations in what?  Under

17  what circumstances?  Are you talking about statistical tests of

18  variations?  I mean, this, again, is completely unfair and,

19  Your Honor, I submit --

20

21          THE COURT:  Counsel, you simply have a disagreement

22  with this witness.  This witness thinks that you need to apply

23  the average, you don't think so, you're not going to get this

24  witness to change his mind, he's not changing his testimony,

25  could we please move on to something else?

Rodricks - Cross/Rasmussen                    257

1          MR. RASMUSSEN:  Yes.  It's my last question, Your

2 Honor and I'm not asking about the -- I'm not asking him to

3 change his mind about the average, but I'm asking him a

4 different question.  Whether somebody who is relying on the

5 average should report the variations from the average.

6          THE COURT:  And he's already told you that the

7 average is the most likely, he thinks that should be applied.

8 He's answered that question.

9          MR. RASMUSSEN:  But he hasn't answered the question

10 of whether it's scientifically reasonable and proper to report

11 the average without reporting the variations.

12          MR. BERNICK:  Who reporting?  Who reporting? Are we

13 talking about an industrial hygienist?

14          MR. RASMUSSEN:  I'm talking about a risk assessor, as

15 the question said, Mr. Bernick.

16          THE COURT:  All right.  Would you please repeat the

17 question?

18 Q    Would you agree that a risk assessor, risk assessor, who

19 uses average cumulative exposures to draw conclusions about

20 individual exposures, should report the variations from the

21 average in order to have a scientifically useful piece of work?

22          MR. BERNICK:  Variations in what?

23          MR. RASMUSSEN:  The exposures.

24          THE COURT:  Average cumulative exposures.  I believe

25 that's the same question that was asked before, but in the

1 event that I took inaccurate notes, I'll permit this question

2 to be asked again.  Sir, if you could answer this question.

3          THE WITNESS:  Okay.  I'll try it a slightly different

4 way.  You have a distribution, you want to assess the group

5 risk for one thing, the group, the best measure of the exposure

6 for that group, on the long term is the average.  So, whether

7 it is reported by the industrial hygienist or not, the risk

8 assessor would use the average as the most likely exposure for

9 the group.

10          If you had some data specific to an individual, which

11 said that individual for some reason is outside that

12 distribution or one end or the other, you could look at that

13 separately.  But I think you'd have to have data for the

14 individual, you couldn't just assume that that individual is at

15 one point or another.  Because you don't know where that

16 individual is on the distribution and it could be -- that's why

17 the average is the best, most probable estimate.

18 Q    For the group, but not for an individual --

19          MR. BERNICK:  Objection, objection.

20          THE WITNESS:  And it is for the individual, too.

21          MR. BERNICK:  Objection to the form of the question.

22          THE WITNESS:  I'm sorry.  It is for the individual

23 as well.

24 Q    Well, let me ask you one final question about the

25 individual.  You would agree that to assess risk to an

Rodricks - Cross/Rasmussen                    259

1 individual, one needs to deal with a known potential

2 variability in exposures, wouldn't you?

3        MR. BERNICK:  Objection to the form of the question.

4 I think we're in industrial hygiene again.  Your Honor, this is

5 going to be, right now, for the last half hour, we're

6 establishing a precedent for this case that's going to blow nay

7 notion of time limits --

8        THE COURT:  No, we're not because we're five minutes

9 over, so we're going to be leaving.  So, is this your last

10 question?  You told me --

11        MR. RASMUSSEN:  Yes, yes.

12        THE COURT:  -- all right, you may answer this

13 question.  This is the last question that the gentleman has for

14 you.

15        THE WITNESS:  You're asking about an individual where

16 we have some data and you're going to look at the data you have

17 over time, for the individual and there will be variable in the

18 day to day, you want to assess the risks for the individual,

19 the average exposure.  If cumulative long term exposure is what

20 matters, same answer, it's the average, even though there are

21 ups and downs from day to day, the risk determinant is the

22 average.

23 Q    But that's only true if they're doing the same job.

24        MR. BERNICK:  Objection.  We've now got another

25 question.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Sustained.

2          THE WITNESS:  Well, okay, you changed the going in

3    assumption.

4    Q     But it is only true if you're doing the same job.

5          MR. BERNICK:  This is discourteous to the Court.

6    This arguing --

7          MR. RASMUSSEN:  It's not a game, Mr. Bernick, we're

8    trying to get the truth.  It's an important issue.

9          THE COURT:  Pardon me, pardon me, gentlemen.  You

10   will speak to me, not to each other.

11         MR. RASMUSSEN:  Okay.  Your Honor, I respectfully

12   suggest that this is a very important question, it goes to an

13   issue that has caused the elimination of thousands of claims

14   from this case.

15         THE COURT:  This gentleman has answered every

16   question you've asked him, he has not varied in his approach,

17   he has been consistent that regardless of whether he's looking

18   at populations, at groups, or at individuals, he's going to

19   apply an average.  You have made no points other than that, and

20   that is the end of this discussion.  Do you have any questions,

21   other than this area, to ask this witness?

22         MR. RASMUSSEN:  No, that concludes my examination.

23         THE COURT:  All right.  Mr. Bernick, do you have

24   anything on redirect?

25         MR. BERNICK:  I have no questions of this witness.

1      THE COURT:  All right, you're excused sir, thank you.

2      THE WITNESS:  Thank you.

3      THE COURT:  We are adjourned until whenever we meet

4 again, at nine o'clock.

5      MR. BERNICK:  Thank you very much for staying late

6 and thanks to your court staff as well, Your Honor.

7                        *****

8                    **CERTIFICATION**

9      WE, TAMMY DeRISI, MARY POLITO, PATRICIA REPKO & ELAINE

10 HOWELL, court approved transcribers, certify that the foregoing

11 is a correct transcript from the official electronic sound

12 recording of the proceedings in the above-entitled matter and

13 to the best of our ability.

14

15 /s/ Tammy DeRisi

16 TAMMY DeRISI

17

18 /s/ Mary Polito

19 MARY POLITO

20

21 /s/ Patricia Repko

22 PATRICIA REPKO

23 /s/ Elaine Howell                Date: January 20, 2008

24 ELAINE HOWELL

25 J&J COURT TRANSCRIBERS, INC.


                    **J&J COURT TRANSCRIBERS, INC.**