UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    USX Tower - 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
            Debtors.   .
                            .    January 14, 2008
. . . . . . . . . . . . ..       8:50 a.m.

                    TRANSCRIPT OF TRIAL
            BEFORE HONORABLE JUDITH K. FITZGERALD
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                                 JANET BAER, ESQ.
                                 BRIAN STANSBURY, ESQ.
                                 RAINA JONES, ESQ.
                                 HENRY THOMPSON, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601


For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  100


For the ACC:                Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005


Audio Operator:             Cathy Younker


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

                    **J&J COURT TRANSCRIBERS, INC.**
                        **268 Evergreen Avenue**
                    **Hamilton, New Jersey 08619**
                    **E-mail:  jjcourt@optonline.net**

            **(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Debtors:          By:  SCOTT McMILLAN, ESQ.


For the Debtors:          ARPC
                          By:  AMY BROCKMAN, ESQ.


For W.R. Grace:           W.R. Grace
                          By:  MARK SHELNITZ, ESQ.
                               JAY HUGHES, ESQ.
                               WILLIAM CORCORAN, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21044

For the Committee:        Caplin & Drysdale, Chartered
                          By:  ELIHU INSELBUCH, ESQ.
                          375 Park Avenue, #3505
                          New York, NY  10152

For the Equity            Kramer Levin Naftalis & Frankel
Committee:                By:  GREGORY HOROWITZ, ESQ.
                          919 Third Avenue
                          New York, NY  10022


For the                   Stroock & Stroock & Lavan
Unsecured Creditors'      By:  KENNETH PASQUALE, ESQ.
Committee:                     ARLENE KRIEGER, ESQ.
                               180 Maiden Lane
                               New York, NY  10038-4982

For the Property
Damage Committee:         Bilzin Sumberg Baena Price &
                             Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

```
For the Ad Hoc            Dewey & LeBoeuf, LLP
Committee of Equity       By:  JENNIFER WHITENER, ESQ.
Sec. Holders:             125 West 55th Street
                          New York, NY  10019


For the FCR:              Orrick, Herrington & Sutcliffe
                            LLP
                          By:  ROGER FRANKEL, ESQ.
                               ANTHONY KIM, ESQ.
                               RAYMOND MULLADY, ESQ.
                               JOHN ANSBRO, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701


For Maryland Casualty:    Connelly Bove Lodge & Hutz, LLP
                          By:  JEFFREY WISLER, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Wilmington, DE  19899


For MCC:                  Eckert Seamans Cherin & Mellott, LLC
                          By:  EDWARD LONGOSZ, II, ESQ.
                          1747 Pennsylvania Avenue, N.W.
                          Suite 1200
                          Washington, D.C.  20006


For :                     STB
                          By:  STERLING MARSHALL, ESQ.




For Sealed Air:           Skadden, Arps, Slate, Meagher & Flom
                            LLP
                          By:  MARK CHEHI, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801


For Sealed Air:           NERA
                          By:  STEPHANIE PLAUCICH, ESQ.
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For W.R. Grace:          NERA
                         By:  ELENA ZAPRYANOVA, ESQ.


For Serengeti:           Vinson & Elkins LLP
                         By:  AMY BERMAN, ESQ.
                         Trammell Crow Center
                         2001 Ross Avenue, Suite 3700
                         Dallas, TX  75201

For Serengeti:           By:  BILLAL SIKANDER


For :                    Silver Point
                         By:  JOHN KI


For the Debtors:         Pachulski, Stang, Ziehl &Jones
                         By:  JAMES O'NEILL, ESQ.
                         919 North Market Street
                         17th Floor
                         Wilmington, DE  19899-8705

For W.R. Grace           Kirkland & Ellis
                         By:  SAL BIANCA, ESQ.
                         200 East Randolph Drive
                         Chicago, IL  60601

TELEPHONIC APPEARANCES:

For the Unsecured        Strook & Strook & Lavan
Creditors' Committee:    By:  LEWIS KRUGER, ESQ.
                         180 Maiden Lane
                         New York, NY 10038

For Ad Hoc Committee:    Weil, Gotshal & Manges
                         By:  M. JARRAD WRIGHT, ESQ.
                         1300 Eye Street NW, Suite 900
                         Washington, D.C.  20005

For Official Committee   Kramer Levin Naftalis & Frankel
of Equity Holders:        LLP
                         By:  PHILLIP BENTLEY, ESQ.
                         919 Third Avenue
                         New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee    Dies & Hile LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701


For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                    By:  DAVID J. PARSONS, ESQ.
                               VAN J. HOOKER, ESQ.
                               SANDER L. ESSERMAN, ESQ.
                          2323 Bryan Street
                          Suite 2200
                          Dallas, TX  75201



For Fireman's Fund:       Stevens & Lee, P.C.
                          By:  JOHN DEMMY, ESQ.
                               DAVID R. BEANE, ESQ.
                          1105 North Market Street, 7th Fl.
                          Wilmington, DE  19801


For the PD Committee:     Bilzin Sumberg Baena Price &
                           Axelrod LLP
                          By:  SCOTT BAENA, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


For Owens-Illinois:       McCarter & English
                          By:  KATHARINE MAYER, ESQ.
                          Renaissance Centre, 405 N. King St.
                          Wilmington, DE  19801


For David T. Austern:     Piper Jaffray & Co.
                          By:  JONATHAN BROWNSTEIN, ESQ.


For Asbestos Property     Scott Law Group
Damage Claimants:         By:  DARRELL SCOTT, ESQ.
                          1001 East Main Street, Suite 500
                          Sevierville, TN  37864
```

TELEPHONIC APPEARANCES (CONT'D):

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  MATTHEW RUSSELL, ESQ.
                                    ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022


For the FCR:                   Orrick, Herrington & Sutcliffe
                                 LLP
                               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007 For


For Federal Insurance          Cozen O'Connor
Company:                       By:  JEFFREY WAXMAN, ESQ.
                               Chase Manhattan Centre
                               1201 North Market Street
                               Wilmington, DE  19801


For Federal Insurance          Cozen O'Connor
Company:                       By:  JACOB C. COHN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103


For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054


For W.R. Grace:                Kirkland & Ellis LLP
                               By:  ELLEN AHERN, ESQ.
                               200 East Randolph Drive
                               Chicago, IL  60601


For W.R. Grace:                Kirkland & Ellis LLP
                               By:  DAVID MENDELSON, ESQ.
                               6555 Fifteenth Street, N.W.
                               Washington, DC  20005


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana            Womble Carlyle Sandridge & Rice
Department of                   By:  FRANCIS MONACO, ESQ.
Environmental Quality:          222 Delaware Avenue
                                Suite 1501
                                Wilmington, DE  19801

For Official Committee          Anderson Kill & Olick
of Asbestos Personal            By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:               1251 Avenue of the Americas
                                New York, NY  10020-1186

For W.R. Grace:                 Cohn Whitesell & Goldberg, LLP
                                By:  CHRISTOPHER M. CANDON, ESQ.
                                101 Arch Street
                                Boston, MA  02110

For CNA:                        Goodwin Procter, LLP
                                By:  DANIEL GLOSBAND, ESQ.
                                Exchange Place
                                Boston, MA  02109-2881

For Grace Certain               Montgomery, McCracken, Walker &
Cancer Claimants:                       Rhoads LLP
                                By:  NATALIE D. RAMSEY, ESQ.
                                300 Delaware Avenue, Ste. 750
                                Wilmington, DE  19801

For David T. Austern,           Phillips, Goldman & Spence, P.A.
the Future Claimants'           By:  JOHN C. PHILLIPS, ESQ.
Representative:                 1200 North Broom Street
                                Wilmington, DE  19806

For W.R. Grace:                 Pachulski, Stang,Ziehl & Jones LLP
                                By:  TIMOTHY P. CAIRNS, ESQ.
                                919 North Market Street
                                17th Floor
                                Wilmington, DE  19899-8705

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the ACC:              Caplin & Drysdale, Chartered
                          By:  WALTER SLOCOMBE, ESQ.
                               BERNARD BAILOR, ESQ.
                               JEANNA RICKARDS, ESQ.
                               JAMES WEHNER, ESQ.
                               LESLIE KELLEHER, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005


For the ACC:              Ferry Joseph & Pearce, P.A.
                          By:  THEODORE TACCONELLI, ESQ.
                          824 Market Street, Suite 19899
                          Wilmington, DE  19899


For Ford, Marrin,         Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer         Gleser
& Gleser:                 By:  SHAYNE SPENCER, ESQ.
                          Wall Street Plaza
                          New York, NY  10005


For Pepsi:                Butler Rubin Salfarelli & Boyd LLP
                          By:  KIRK T. HARTLEY, ESQ.
                          70 West Madison Street
                          Suite 1800
                          Chicago, IL  60602


For Official Committee    Duane Morris LLP
of Unsecured Creditors:   By:  MICHAEL LASTOWSKI, ESQ.
                          1100 North Market Street, Suite 1200
                          Wilmington, DE  19801-1246


For Official Committee    Brandi Law Firm
of Asbestos Property      By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:         44 Montgomery St., Suite 1050
                          San Francisco, CA  94104


For the State of CA,      Hahn & Hessen LLP
Dept. of Gen. Services:   By:  STEVEN J. MANDELSBERG, ESQ.
                          488 Madison Avenue, 14th Fl.
                          New York, NY  10022


For Baron & Budd,         Hogan Firm Attorneys at Law
et al.:                   By:  DANIEL K. HOGAN, ESQ.
                          1311 Delaware Avenue
                          Wilmington, DE  19801


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Royal Insurance:         Wilson Elser Moskowitz Edelman
                                & Dicker LLP
                             By:  CATHERINE CHEN, ESQ.
                                150 East 42nd Street
                                New York, NY  10017

For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK


For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For London Market            Mendes & Mount, LLP
Companies:                   By:  ALEXANDER MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019-6829

For Official Committee       LECG
of Asbestos Property         By:  ALAN MADIAN, ESQ.
Claimants:


For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property            Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401


For Ivory Investment:        Ivory Investment
                             By:  DHANANJAY PATWARDHAN


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Linden Advisors:        Linden Advisors, LP
                            By:  CRAIG GILBERT


For O'Conner:               O'Conner
                            By:  John R. Wollen


For Credit Suisse           Credit Suisse First Boston
First Boston:               By:  TIM McARDLE


For King Street             King Street Capital Management, LLC
Capital Management,         By:  MITCHELL SOCKETT
LLC:


For the Blackstone          The Blackstone Group
Group:                      By:  JOHN O'CONNELL


For Dune Capital Mgmt:      Dune Capital Management
                            By:  GUY BARON


For Anchorage Advisors:     Anchorage Advisors
                            By:  JONATHAN LEWINSOHN


For Lehman Brothers:        Lehman Brothers
                            By:  ANDREW CHAN


For Caxton Associates:      Caxton Associates, LLC
                            By:  JAMES RIEGER


For Dow Jones               Dow Jones News Wires
News Wires:                 By:  PEG BRICKLEY


For Citadel Investment      Citadel Investment Group
Group:                      By:  BEAU HARBOUR


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Durham Asset          Durham Asset Management
Management:               By:  JEFFREY A. ROSENKRANZ


For Murray Capital        Murray Capital Management, Inc.
Management                By:  MARTI MURRAY


For Korn Capital, LLC:    Korn Capital, LLC
                          By:  STEPHANIE KWONG


For Irwin H. Zandman:     Irwin H. Zandman
                          By:  IRWIN H. ZANDMAN

**J&J COURT TRANSCRIBERS, INC.**

1  (Audio malfunction - Attorneys on Microphones 2 and 3 difficult

2  to discern)

3                THE COURT:  Good morning.

4                THE CLERK:  All rise.

5                THE COURT:  Please be seated.  This is the matter of

6  W.R. Grace, 01-01139.  The participants I have listed by phone:

7  Dhananjay Patwardhan, Lewis Kruger, Jarrad Wright, Craig

8  Gilbert, Philip Bentley, Martin Dies, John Wollen, David

9  Parsons, Tim McArdle, John Demmy, Scott Baena, Katharine Mayer,

10 Jonathan Brownstein,  Mitchell Sockett, John O'Connell, Guy

11 Baron, Matthew Russell, Jonathan Lewinsohn, Darrell Scott,

12 Robert Guttmann, Elizabeth Devine, Debra Felder, Andrew Chan,

13 James Rieger, Peg Brickley, Jeff Waxman, Jacob Cohn, Andrew

14 Craig, Beau Harbour, Theodore Freedman, Ellen Ahern, David

15 Mendelson, Douglas Mannal, Janet Baer, Francis Monaco, Robert

16 Horkovich, Christopher Candon, Natalie Ramsey, Daniel Glosband,

17 David Beane, Jeffrey Rosenkranz, John Phillips, Timothy Cairns,

18 Bernard Bailor, Walter Slocombe, Theodore Tacconelli, Peter

19 Lockwood, Mark Hurford, William Corcoran, Jeanna Rickards,

20 Steven Eisman, Peter Shawn, Shayne Spencer, Kirk Hartley, Van

21 Hooker, Michael Lastowski, Joshua Cutler, Marti Murray, Terence

22 Edwards, Stephanie Kwong, Steven Mandelsberg, Daniel Hogan,

23 Irwin, Zandman, Daniel Speights, Catherine Chen, Jason

24 Solganick, Alex Mueller, Tiffany Cobb, James Wehner, Elihu

25 Inselbuch, Leslie Kelleher, Jennifer Whitener, Alan Madian,

1  Edward Westbook, Michael Davis, and Sander Esserman.  I'll take

2  entries in Court, please.  Good morning.

3          MR. BERNICK:  Good morning, Your Honor.  David

4  Bernick for Grace.

5          MS. HARDING:  Good morning, Your Honor.  Barbara

6  Harding for Grace.

7          MR. McMILLAN:  Good morning, Your Honor.  Scott

8  McMillan for Grace.

9          MR. FREEDMAN:  Theodore Freedman for Grace.

10          MR. LOCKWOOD:  Your Honor, Peter Lockwood for the

11  Asbestos Claimants' Committee.

12          MR. INSELBUCH:  Your Honor, Elihu Inselbuch for the

13  committee.

14          MR. FINCH:  Your Honor, Nathan Finch for the

15  committee.

16          MR. MULLADY:  Good morning, Your Honor.  Raymond

17  Mullady for the future claimants' representative.  I'd also

18  like to introduce Roger Frankel and Richard Wyland, who are

19  seated behind me.

20          MR. ANSBRO:  Good morning, Your Honor.  John Ansbro,

21  representing the future claimants' representative also.

22          MR. HOROWITZ:  Good morning, Your Honor.  Gregory

23  Horowitz for the equity committee.

24          MR. PASQUALE:  Good morning, Your Honor.  Ken

25  Pasquale from Stroock for the unsecured creditors' committee.

1          MS. KRIEGER:  Good morning, Your Honor.  Arlene

2    Krieger from Stroock on behalf of the unsecured creditors'

3    committee.

4          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer

5    on behalf of the property damage committee.

6          UNIDENTIFIED ATTORNEY:  Your Honor, with apologies, I

7    neglected to mention one member of our trial team, Mr. Kim.

8          THE COURT:  Good morning.

9          MR. KIM:  Good morning.

10          THE COURT:  Mr. Kim, representing the future claims

11    rep?  Okay.  Yes.  Ms. Baer?

12          MS. BAER:  Janet Baer on behalf of W.R. Grace.

13          THE COURT:  Anyone else entering appearances?  Okay.

14    Mr. Bernick?

15          MR. BERNICK:  Yes, Your Honor.  I think that there

16    are some -- I've been told to be careful because you have a new

17    system here, so I won't be able to use the portable mike.  I

18    think that will probably, you know, undercut my (indiscernible)

19    this morning.  But I guess the main event today is the -- are

20    the opening arguments and a Daubert argument with respect to

21    (indiscernible) away for now (indiscernible).  The opening

22    arguments and Daubert arguments with respect to the estimation

23    there are some -- there are a couple other matters that I hope

24    we'll have time to take up this afternoon, but I think that the

25    main business is the estimation and the Daubert arguments, and

J&J COURT TRANSCRIBERS, INC.

1   we ought to proceed with that.

2          I believe that we've reached  agreement among counsel

3   that the side of the room that stands for truth and justice

4   over here gets two hours, and then the other side of the room

5   that stands for truth and justice gets two hours, and then we

6   all will have an hour for rebuttal.  That's a half hour per

7   side, so -- I'll be going this morning for about two hours, and

8   I'd like to take a break I think halfway through that process

9   to catch my breath and to set up a couple of different things,

10  and then I'll finish up, and they'll go a half hour

11  (indiscernible) --

12          THE COURT:  That's fine.

13          MR. BERNICK:  I understand that the video system is

14  hooked up, so the next thing is --

15          THE CLERK:  You can't step away, sir.

16          MR. BERNICK:  Maybe just put on the screen, it will

17  be visible to Your Honor, and visible back on those screens,

18  and then all those (indiscernible).

19          Let me start out with some introductory remarks, Your

20  Honor.  I'm not going to go back, because of the long history

21  of the case.  We've done enough of that in this courtroom.  But

22  I want to make an observation that really lies at the heart of

23  the estimation issue that brings us here, which is that Your

24  Honor is going to hear about a very unusual bubble, a bubble

25  that drives the estimation that's being done by the plaintiffs

1 in this case, and that drives the estimation literally billions

2 of dollars worth of claims that have now been dealt with in the

3 course of bankruptcy, and also drives, therefore, literally

4 billions of dollars that have now been set up in a series of

5 trusts.

6 　　　　The bubble really began just before Grace went into

7 Chapter 11, and that was a bubble of claims.  It was a very

8 dramatic increase of claims.  It was an overwhelming increase

9 of claims.  It was an unmanageable increase of claims.  It was

10 an increase in claims that we know today had absolutely no

11 basis in medicine, and no basis in law.  But the fact of the

12 matter was that Grace and its various constituencies didn't

13 really have an alternative to try to deal with that problem.

14 The fact of the matter was that it couldn't be managed, and the

15 only recourse was, therefore, Chapter 11.  Sometime,

16 ironically, about the same time, there was another problem.

17 That was the stock market bubble.  And that also was --

18 (indiscernible) exuberant.  It was unmanageable.  It seemed

19 like it might go on forever.  Nobody knew what, ultimately,

20 would come of it.  But the time came when that bubble burst,

21 and people were in denial for a period of time, but eventually

22 they got up and about their business, and they went on to

23 create another (indiscernible) we'll call the real estate

24 bubble.  That's a story for a different day.

25 　　　　The claimants here, both the ACC and the FCR, have

**J&J COURT TRANSCRIBERS, INC.**

1  been in denial ever since 2001, when Grace went into Chapter

2  11.  And in the construct that they've adopted in this case

3  they have a bubble that's driven by that period of rampant

4  increase of claims that brought about this Chapter 11 that they

5  insist still exists today with respect to the most valuable

6  claims, the mesothelioma claims.  And indeed, according to

7  their models, will never pop that bubble that arose suddenly,

8  precipitously, will remain in effect for the entire life of the

9  asbestos litigation process.  It's a bubble that cannot burst.

10        Now, they insist that this bubble is there, that it

11  remains live (indiscernible), that it will continue unchanged.

12  And they go further.  They insist that it constitutes Grace's

13  legal liability.  They go so far as to say settlement history

14  equals legal liability.  And they even advance the proposition

15  that not only does settlement history equal legal liability,

16  and therefore you follow that bubble up (indiscernible), and it

17  never bursts, and you're liable for the whole thing, but if

18  Grace wants to emerge from Chapter 11 under 524(g), it will

19  never, ever, ever get the opportunity to actually contest the

20  aggregate liability, that we must swallow that settlement

21  history as if there were no other rule of law, and if we want

22  to litigate even the aggregate liability, how big is it, we

23  have no choice but to go through individual jury trial after

24  individual jury trial.  And they, of course, they then assert

25  we never get out of Chapter 11.  We never get out of Chapter

1  11.  Oh, but -- but if you want -- you can get out of Chapter

2  11 and just go back to the State Courts and --

3              THE CLERK:  (Indiscernible) the mike, please.

4              MR. BERNICK:  Go back to the State Court system that

5  is more satisfactory.  Bankruptcy means nothing.  It is simply

6  a shill in the State Court system.  The Code means nothing.  We

7  simply go back to the system.

8              There's a cynicism, Your Honor, that pervades this

9  case.  And let's just be blunt about it.  The cynicism is that

10 the Federal Courts don't really govern the bankruptcy of

11 asbestos.  They simply have to step to one side, allow the

12 evidence to come in about overwhelming the so-called liability

13 was in the State Court system, and that creates a unique law of

14 its own, a unique law for asbestos couched in a certain number

15 of cases where the issue was never completely litigated

16 (indiscernible) a unique law of asbestos, a law, ironically,

17 that would be of the Federal Court's creation, and therefore

18 would stand in derogation of the principle that states

19 (indiscernible) law controls.  That is the enterprise that they

20 want to pursue.

21             Now, I'd like to take a quick look at this core

22 problem, the bubble and what constitutes it before I go on to

23 then address it in a little bit more detail.  If we could get

24 Slide 2?

25             THE COURT:  Are you going to have hard copies, paper

1 copies --

2            MR. BERNICK:  yes.

3            THE COURT:  -- of these?  Okay.

4                     (Pause)

5            MR. BERNICK:  Here we have, on Slide 2, the actual

6 Court Grace historical filings.  And you can see how, in the

7 years 2000 and 2001, we get this bubble beginning, due to the

8 spike.  Let's turn to Slide 3.  This is the central measure

9 that is incorporated in the models that are used by the ACC and

10 FCR, the central measure on the basis of which they base their

11 projections of what the future would have brought if Grace

12 remained in the tort system.  And we can see how the

13 propensity, which we're going to talk about in a little bit,

14 sharply rises, again in that same period of time, 2000 and

15 2001, as the claims rise, because all the propensity is is a

16 relationship between the number of claims that are being filed

17 against the given company on the one hand, and on the other the

18 overall incidents of disease, in this case mesothelioma.  And I

19 will add, Your Honor, virtually all of the slides you'll see

20 today focus on mesothelioma.  There are some slides and some

21 presentations that deal with other claims, but this

22 presentation that I'm making focuses on the core issue of the

23 estimation of mesothelioma claims.  You can see how that

24 propensity skyrocketed during the same period of time.

25            How is the bubble preserved for all time?  They take

1  both Ms. Biggs and Dr. Peterson, take that spike that you see,

2  and after averaging for the last two years, which is why it

3  seems to drop some, they perpetuate that spike forever, all the

4  way out through the life of the model.  So, you get a

5  theoretical construct that basically says after you take 2000

6  and 2001 for Dr. Peterson, in 1999 through 2001 for Dr. Biggs,

7  and you average them, because that's the calibration period,

8  therefore you begin a little bit down here to reflect the

9  average.  Once you take that, there's no change.  Now, I say,

10 well, that must be an elaborate formula, or -- how do you get

11 that straight line?  And the answer is pretty simple.  The

12 straight line, that is the idea, and it continues on forever,

13 is basically born of an assumption, an untested assumption.

14 There's no science that says that.  There's no scientific model

15 that says that.  It's an assumption.  So, you get the on-going

16 permanent bubble.

17         Now, all of these individuals, both of these

18 individuals, those that stand in service of their knowledge,

19 all of them say we're doing science.  This is not a case in

20 which somebody is saying, oh, well, gee, we're not scientists,

21 therefore we shouldn't be held by the rules of science.  These

22 people want to take the stand and they want to pronounce

23 science to the Court, therefore, presumably they've got to

24 follow their rules.  Well, what kind of model is it, what kind

25 of science is it?  What flavor, or stripe, or brand operates

1   with such simplicity and (indiscernible)?  Is it data driven?

2   Well, there is data that deals with what's happened to the

3   spike of claims against various companies after 2001, two, and

4   three.  There's data.  It's not in their models.  It's not in

5   their propensity calculations.  There's data.  There's data

6   from actual companies that are out there.  We'd even present

7   them with the data.  This is not a data driven model.

8         And what, then, do they use as a substitute?  Well, I

9   asked Your Honor to think about how many times they've come

10  here before the Court and in their briefs have said we, as

11  experts, we are estimating what Grace would have seen in the

12  tort system if it had never filed for bankruptcy.  That's what

13  our benchmark is.  We said, you'd expect them, then, to figure

14  out comparable company, and look to a comparable company to see

15  what happened to a comparable company.  They don't do that

16  They don't do that.  What is it they do?  They use the

17  experience of bankruptcy trusts, the Manville Trust.  That

18  propensity curve is the only curve that they have, and that's

19  driven by the experience of the Manville Trust.

20        Now, is a Manville Trust like Grace would have been

21  but for the bankruptcy?  I don't think so.  Let's see the next

22  slide.  Let's talk about the Manville Trust.  It's a bankruptcy

23  trust.  It never litigates.  It pays not only for exposure to

24  Manville asbestos, it pays for exposure to any kind of

25  asbestos.  It is controlled ultimately by its beneficiaries for

1 claimants.  What would Grace be without a bankruptcy?  It

2 wouldn't be a bankruptcy trust.  It would be in the tort

3 system.  It would be litigated.  It would be paying presumably

4 for its own exposure, and it wouldn't be controlled by the

5 claimants.  How in the world do you have a scientist saying,

6 ah, my test is but for the bankruptcy I'm now going to look for

7 Manville.  That piece of information is so bizarre that even

8 the lawyers sitting here at this table a few weeks ago made fun

9 of us for focusing on the history of the Manville Trust because

10 they even realize that their own models depended vitally on the

11 Manville Trust.

12          But it gets worse.  Data driven.  Do they even stick

13 to the Manville data?  It turns out that they don't.  Let's go

14 to Slide 6.  This comes from Dr. Peterson's report.  Just Slide

15 6, please.  That's seven?  That's the one I want.  Just stay

16 there for a second.  You'll see at the upper right hand corner

17 of this slide that this is the Manville meso curve.  You see

18 that all of a sudden, after 2002, or thereabouts, it kind of

19 goes, boo, boo, and then, splat.  Well, that flat thing looks

20 kind of like one of those curves that goes on forever.  Is that

21 real?  It's not?  It's smooth.  It's smooth.  It's not a real

22 curve.  It's not driven by real data.  It's somebody's

23 calculation based upon the data.  It's just a (indiscernible).

24 Now, it's kind of nice for them, because if we go back -- go

25 back a couple slides before.  That one.  If you want to have

1  that bubble to go on forever, it would be kind of neat to have

2  the propensity curve that you used based on Manville remain

3  kind of flat.  That way that spike, that bubble, it goes on

4  forever.

5          Let's take a look at the Manville data itself on

6  meso.  Let's go forward one slide.  Next slide.  Next slide.

7  This is the actual mesothelioma filings for Manville.  You can

8  see how it goes up, just like some of the other companies do.

9  It peaks in '03, then in every year thereafter it's down, down,

10 down.  Now, what would happen if you didn't smooth that curve?

11 Well, what would happen is, go back to the slide before, that

12 would go up, then it would start to come down.  It wouldn't be

13 flat.  What would happen to the overall meso curve?  Go back to

14 the slide before that.  That wouldn't be flat anymore.  Maybe

15 it would be downward trended, like some of the companies,

16 indeed, a lot of the companies that were actually in the tort

17 system, it would be downward trended.  But that's not what they

18 do.  They end up with a smooth, flat curve.  Let's go

19 (indiscernible).  There we go.  There it is again.  Now, they

20 may say, oh, well, gee, people were just filing meso claims

21 here in '03 that they would otherwise have filed in '04.

22 Mesothelioma claims are filed almost immediately after

23 diagnosis.  It turns out that the big lump that came in '03

24 were actually older rather than newer mesothelioma claims.  And

25 in four, five, and six, and we understand it's continuing on

24

1 today.  Meso filings against the Manville Trust are now

2 declining.  Declining.

3          Now, this is a slide that's interesting, because this

4 is actually our expert's data here, talking about other

5 companies that have SEC filings, and showing what SEC filings

6 have done.  But this particular version here actually comes out

7 of one of the briefs.  This is something that one of the -- one

8 of the (indiscernible) briefs did (indiscernible) Dr.

9 Peterson's forecast really came down below those companies.

10 So, what did he tell you about it?  And the answer is yes, they

11 came down because they use an average calibration period, but

12 they then fix it, and this goes on flat forever, whereas the

13 actual curve of these other companies is coming down, down,

14 down.  As you get into '07, '08, '09, down, down, down.  And we

15 don't have -- we don't have an impregnable, iron-clad bubble

16 that lasts forever.  We have a bubble that was going down.  And

17 the Manville data itself is fully consistent with this.

18          What kind of flavor of science is this?  What kind of

19 science do we have where we have to smooth instead of just

20 presenting the data?  Is it real, or is it made up?  Is it

21 reliable?  Reliability is the key, Your Honor, because as Your

22 Honor is well familiar, and it's not disputed here, reliability

23 is the test of the scientific -- of the standard for the

24 admissibility of scientific evidence under <u>Daubert</u>.  How do we

25 test reliability?  Well, we test reliability one way by saying

1 does this model, does this approach, does it have predictive

2 value?  And that's an appropriate test because it is a test

3 that everybody agrees, their own experts agree, Dr. Staylor

4 agrees that one of the standards for judging the quality of

5 scientific work is this predictive value.  Biggs, measure of

6 predictiveness is an admirable goal.  Peterson, he agrees that

7 predictive value, that is the value of the model being

8 predictive, that that's an important test for your work.  With

9 that one test, that central test of reliability, is there any

10 evidence, any evidence in this case that this model, these

11 models are reliable in the sense that they're predictive?  Your

12 Honor will see that not only is there not any positive evidence

13 to speak of, that the evidence that's there all goes the

14 opposite way.

15          Let's take a look at historical predictions.  That

16 is, has this model been successful in predicting historic

17 trends?  Well, we can see that there were significant changes

18 in historic trends over time, in the '80's, the '90's, and then

19 most recently in the early 2000's, and Dr. Peterson admitted

20 that he did not predict a single one of those major moves.  And

21 he was so adamant in 2003 that there was really no change at

22 all until he was confronted with the data that he insisted

23 under oath in another case, it's all speculative, it's all

24 conjectural.  Even as the data in 2003 was already coming in

25 and saying it's happening, he still wouldn't accept it.  What's

1 predictive?  That was the easy answer in the past, but oh,

2 yeah, (indiscernible) predictive.  It's always been worse.

3 Well, that doesn't say that it's scientifically reliable.  It

4 just says that it didn't happen to come out a way, it's against

5 the interest of your client, until 2003, when it didn't come

6 out the other way, and there was massive over prediction of the

7 numbers of claims that would be coming in.  It is so bad, Your

8 Honor, this reliability point, that Dr. Peterson could not even

9 bring himself to say it, that his models had been shown, the

10 estimates had been shown to be predictive for more than five to

11 seven years.  Let's do Peterson 46 and 47.

12                         (Pause)

13           UNIDENTIFIED SPEAKER:  Peterson?

14           MR. BERNICK:  46, 47.  Maybe it's -- it could be --

15 yes.  Do you know of any scientific model that's been

16 demonstrated to reliably predict changes in the legal

17 environment?  Answer:  Over modest periods of time there have

18 been models of claiming and claim resolutions that had

19 reliability predicated -- predicted -- reliably predicted

20 subsequent changes.  Yes."  "Question:  Okay.  What's the

21 maximum period of time?"  Next page.  "Six, seven years."  He

22 could not even bring himself to say that there was

23 predictability for even ten years, to say nothing of the 40, 35

24 and 40 years covered by the models.  But then it turns out that

25 that statement was an older statement, because we then got

into, well, what was the basis for that statement?  And it
turns out that the basis of that statement was not this --
having established that the estimates were predictive of a
company still in the tort system, but rather they were
predictive of the experience of a bankruptcy trust, which, of
course, has a much different situation in established criteria.
It has pay outs that are all fixed in amount with -- subject to
some adjustments over time, a totally different beast from the
huge volatility that a litigant sees during the course of the
litigation process.  it turns out that there was only one
estimate, one estimate that he could even think of of a company
that he had done at a company still in the tort system where he
said it still had some predictive value.  And that was a
private estimate that he says that he did of W.R. Grace, never
been published, never been reviewed.

So, if we go to Peterson 80, we now see -- any others
beyond Grace.  (Indiscernible) any other forecast for a company
not (indiscernible) bankruptcy that's been shown to be accurate
for a period of five years or more?  Answer:  "I've done
forecasts for other companies, but I don't know whether or not
-- I haven't had a chance to look at the back up data, so I
can't answer that yes or no."  No record of predictability.
Only a record of unpredictability.

Why is it that it should be so difficult to predict
even a few years out?  The answer is very simple.  The

1 enterprise that the claimants and their experts have embarked
2 upon is empirically flawed.  Let me be clear about why that is
3 so.  These are models and estimates that don't have to measure
4 real liability.  They only attempt to measure claiming the
5 (indiscernible).  If it were real liability, they would have to
6 figure out, well, what disease was actually caused by the
7 company?  And the disease course would be a guide.  But they
8 specifically disavowed looking at real liability.  They are
9 only focused on claiming behavior, settlement behavior.
10 Settlement behavior has a variety of causes, like many human
11 behaviors, and in this case a particularly complex series of
12 causes because people settle and litigate in the context of a
13 system that's enormously complex, it's subject to the
14 vicissitudes of litigation, of the law, changes in
15 jurisdictions, a whole host of factors that have been well
16 identified.  That becomes very difficult, though, to determine
17 what is the impact that those factors have at any given time,
18 because at any given time they can change, and change there has
19 been.  That is why we get these enormous shifts, as you see in
20 claiming behavior, because there are factors that underpin
21 those changes, and those factors need to be understood before
22 you can make a prediction.  They have never studied the
23 underlying causes of the changes in behavior.  All that they
24 are doing is looking for trends.  And so, like anybody who
25 plays the stock market and looks for trends, unless you've got

1 the underlying causes, you're going to get burned, because as

2 soon as the status changes, and the causes change, and the

3 impact changes, your model no longer works.  And all of this

4 has now been admitted, very clearly.  I'm going to play a few

5 clips from Ms. Biggs' testimony so you can see the actual

6 admissions, and we'll just take them, first, with Biggs 3.

7                    (Audiotape played)

8          MR. BERNICK:  Can you turn it up?  Let me start over.

9                       (Pause)

10          THE COURT:  If we turn it up, we're probably going to

11 get feedback in the rest of the system.  Does anybody have any

12 difficulty hearing it?

13          MR. BERNICK:  Can you hear it, Judge?

14          THE COURT:  Oh, I can hear it fine.

15          MR. BERNICK:  Oh.  Okay.  Fine.

16                    (Audiotape played)

17          MR. BERNICK:  Next clip.  So, you've got to ask for

18 the factors, factors as caused.  Next clip.

19                    (Audiotape played)

20          MR. BERNICK:  There you go.  All that you have is

21 that line going straight across.  All of the factors are simply

22 predicted, in quotes, to remain the same.  There's no effort to

23 try to predict whether the factors are going to change, and

24 therefore the model is a static model, and it will, in fact, be

25 wrong if there is any change.  As we know, historically there

1  has always been change.  If there is any change to the

2  underlying causes.  And we therefore get to the question, the

3  ultimate <u>Daubert</u> question, is there a method, is there even a

4  method that could be used, or that they know about or have

5  used, to make the predictions of those future cases?  Is there

6  a method, a scientific method, if they're going to take that

7  line all the way out, what is the science that says that that

8  is real?  Let's play clip five.

9                          (Audiotape played)

10         MR. BERNICK:  Where is the scientific model?  If we

11  have the history that says change, change, change.  And this is

12  only there because this is an effort to predict behavior,

13  settlement litigation behavior.  If that's what the enterprise

14  is, and we know that there's change that is (indiscernible),

15  the only way to be able to make a prediction scientifically is

16  to look for the cause.  You'll hear that from all kinds of

17  witnesses on the stand.  That is the nature of economics.

18  Economics is a quantitative isolation of the causes and whether

19  they'll remain the same or whether they'll change.

20         Where is the analysis of the causes of what they want

21  to predict, which is whether there will increase, decrease,

22  constancy in claiming behavior?  There is no model.  And

23  instead, what you get are judgments, these neat lines that go

24  extrapolating forever, and carry with them billions and

25  billions of dollars.  And that is the toll of all this, Your

1 Honor.  This methodology -- if we can go to Slide 10?  This

2 methodology has driven a whole series of trusts.  Since 2003,

3 when the market began to change, we saw that Dr. Peterson

4 resisted, and resisted, (indiscernible) presented to the

5 Courts, for example, in Armstrong Industries, presented to the

6 Court vast estimates of liability.  Dr. Peterson, Dr. Peterson,

7 Dr. Peterson, billions, and billions, and billions of dollars,

8 all of it now driving the creation of trust worth somewhere in

9 the neighborhood of 25 billion dollars.  Where is the toll?

10 The toll is written all over that page.  All without real

11 contest on the underlying model.  In fact, I venture to say,

12 Your Honor, that the first time that you even observe that

13 model being questioned was on cross examination of Dr. Wyant

14 (phonetic) in the ADD case.  Under all other circumstances in

15 every single one of these cases nobody took issue with the idea

16 of a settlement driven model.  The settlement driven model has

17 never been questioned, never been questioned, with the

18 exception of this case.

19         The only other context in which there was an issue

20 raised was in Babcock & Wilcox in connection with the

21 fraudulent conveyance case, and that was a totally different

22 setting.  Why?  Because Babcock & Wilcox itself used settlement

23 history to fix and reserve its asbestos liability in the time

24 of the transactions that were at issue, and therefore -- and

25 presented to the Court the argument that those were reasonable

1  estimates.  Well, having -- we did this, having relied upon our

2  estimate as being reasonable, we couldn't then say, oh, well,

3  gee, now it's all irrelevant because there is no liability that

4  was pre-bankruptcy, in the tort system in connection with

5  fraudulent conveyance.  There was no necessity and there was no

6  analysis of 502(b).  There was no analysis of 502(b) in any of

7  those cases.  There was no alternative model in any of those

8  cases.  So, now finally we have accountability, Your Honor.  We

9  have accountability for the methodology that's being used to

10  drive those kinds of numbers.

11            I'm going to talk about three kinds of accountability

12  here today.  One is accountability to the real science.  There

13  is real science out there, established science out there on the

14  basis of which it is possible to make meaningful projections,

15  and that science is science that we rely upon for our model.

16  Number two, they should be accountable, the ACC and the FCR

17  should be accountable for their approach that -- how their

18  approach deviates from science.  And we'll explore in a little

19  more detail exactly how their model goes astray from science.

20  It has no scientific underpinning.  And finally, they should be

21  accountable to the law because the law clearly and specifically

22  forecloses the effort that they've undertaken here.  What they

23  seem to do here is to not only be in denial that the bubble has

24  changed, but they also deny the fundamental idea that the rules

25  of this Court should govern what Grace's liability is, not

1  simply their references to what they believe are the halcyon

2  days in the State Court system.  This is a federal proceeding

3  governed by federal law.  Effectively by pursuing their theory

4  there is no bankruptcy solution.  There is no bankruptcy

5  resolution for asbestos liabilities.  So, I'm going to focus

6  first on the science, next on their model, and finally I'm

7  going to talk a little bit about the law.

8            Beginning with the scientific part of the --

9            THE COURT:  Wait.  Give me one second, Mr. Bernick,

10 please.

11                        (Pause)

12           THE COURT:  Okay.  Thank you

13           MR. BERNICK:  Thank you, Your Honor.  Let's begin

14 with Slide 12.  Before we get to the details of the slide, I

15 wanted to just take a moment to visit on the history of the

16 science, because as it turns out, the science that's relevant

17 here, the foundation -- scientific foundation for actually

18 doing projections of future claims of the future disease, that

19 that scientific foundation has been out there literally for

20 decades.  If we go back 25 years ago, in a landmark study that

21 was done by Dr. Nicholson in 1982, at that time he published a

22 very famous study.  The study was built upon established

23 science, and that science was epidemiology.  And again, in

24 1982, epidemiology by then had become very well accepted.

25 Epidemiology had been used in the early days of asbestos.  It

1  had been used in the early days of radiation science as a

2  result of the bombing over Japan in World War 2, and the atomic

3  bomb survivor study.  And the most famous use of epidemiology

4  that put it on the map as a new model for causation, which

5  previously had been regarded as something that couldn't be

6  proven statistically, was in tobacco.  The studies that were

7  done of tobacco smokers in the '50's and '60's drove the

8  decision of the U.S. Government Public Health Service about the

9  wholly new definition of causation that could be satisfied with

10  epidemiology.  So, the use of epidemiology had already been

11  established in those other venues, and also specifically in

12  connection with asbestos.

13        Well, what is it that Dr. Nicholson decided to do?

14  He decided to try to measure what the future incidents of

15  mesothelioma were going to be across the country.  And what he

16  did was to rely upon very established principles of science and

17  epidemiology.  And those principles said that you first

18  determine who is sick, you then determine what their exposure

19  and dose is.  And then on the basis of that you can calculate

20  what their risk is.  That's what epidemiology does, look at

21  groups, figure out who is sick, and based upon exposure and

22  dose, which are the operative parameters that you're study is,

23  doesn't make a difference, determine whether there's excess

24  risk.  That had been done through the insulators, very famous

25  studies going back to the '50's and to the '60's with silica

1  study, so he had data.  He had epidemiological data that gave

2  him basic risk factors.

3        And in order to figure out the national disease

4  curve, he basically took a whole series of other occupations,

5  which are indicated in the lower lines (indiscernible) end of

6  this curve, and he adopted certain assumptions about exposure

7  and dose, comparing them to the insulators, and then the

8  associated risk, in order to build up that overall national

9  curve.  That's how the overall national curve was determined.

10 Now, with that curve he was predicting the future, how many new

11 cases of disease would happen after 1982.  He was doing it on

12 an industry-wide basis.  All companies, all asbestos products,

13 all occupations, covering 27.5 million people in 12 industries.

14 That's the scope of his study.

15        Well, he did the study, and after the study he had

16 the opportunity, as did many others, to see did that curve --

17 how predictive is it?  And he found out it was pretty

18 predictive.  That is, every year information would be gathered

19 about how many cases of mesothelioma had been diagnosed, and

20 every year, or every five years, or every couple of years you

21 could make a comparison.  And the curve turned out to be pretty

22 good, and it became a validated curve.  And so valid is it that

23 in the context of this case Dr. Peterson himself recognizes

24 that that is authoritative science.  And if we could take a

25 look at Page  37 of the transcript.  Peterson.  "What you're

1 saying is essentially Nicholson has done -- the Nicholson model

2 has held up over time, that as judged in light of its

3 predictive value it's been found to have high predictive

4 value?"  Answer:  "Yes."  "Would you agree with me that using

5 epidemiological knowledge, that when it comes to asbestos-

6 related illness, disease, it has been and is today possible to

7 predict the future to a reasonable degree of certainty?"

8 Answer:  "Yes."  So, we now have a very solid epidemiological

9 basis for then asking the next question.  The next question is

10 this.  Well, if Nicholson focused on the industry as a whole,

11 and products as a whole, what would be the answer if you look

12 not simply for all disease caused by asbestos nationally, but

13 you tried to tease out what disease was caused (indiscernible)

14 by -- by Grace asbestos?  How would you go about doing that?

15 Could you go about doing that using exactly the same essential

16 structure, not exactly the same calculation, but the same type

17 of approach, that is looking at diagnosis of disease, who is

18 sick, who was exposed to Grace's asbestos.  What was the

19 exposure and dose?  What are their risk -- what are their risk

20 components, and then isolating the group of people who, in

21 fact, have gotten sick as a result of Grace asbestos, and using

22 the same risk factors going forward you can predict the future

23 course of illness due to Grace asbestos.  That is exactly the

24 project that we undertook.

25          Let's take a look at Slide 12.  We took those same

1  basic parameters, exposure, dose, risk and diagnosis of

2  disease.  We then used, we deployed exactly the right and very

3  well established scientific disciplines, industrial hygiene,

4  epidemiology, and quantitative statistics, and medicine, and

5  here are the experts that we have brought to bear in connection

6  with this work.  Lee and Lees (phonetic), Mugavaker (phonetic)

7  and Anderson, Weill, and Henry Parker, all people who are

8  experts in these underlying disciplines.  Notably, there is not

9  a single expert in this case on the other side in any of these

10  disciplines who has sought and undertaken to perform the same

11  kind of analysis.  These people are all available, but you

12  don't see any of them saying, oh, well, gee, we have developed

13  a different epidemiological model, and here's the output.  They

14  quarrel with (indiscernible) from our analysis, they propose no

15  alternative model, no alternative estimate based upon an

16  alternative deployment of these established scientific

17  disciplines.  At the end of the day their whole model says

18  forget all of that stuff.  We've got a person named Dr.

19  Peterson who is a Ph.D. and a lawyer.  We've got a person named

20  Ms. Biggs, who has a background in statistics, I believe.  We

21  have Mr. Staylor, who has got a background in statistics.  We

22  don't have people who actually go through and construct this

23  kind of model because we're not engaging in that enterprise.

24        The next slide.  This flow chart that we've developed

25  is probably extremely difficult to ascertain from the expert

1  reports, but we've laid it out here.  And essentially what

2  we're doing is we're taking -- remember, we see the same

3  building blocks, exposure, dose, risk, and diagnosis of

4  disease.  So, we start out by taking a look at the kinds of

5  activities in which claimants against Grace as of April of '01,

6  the kinds of activities in which they engaged, in terms of did

7  they mix asbestos containing products, did they remove their

8  (indiscernible), did they install, they were at a site, or they

9  were in a space?  And, of course, the questionnaires asked for

10 this information flat out, and we know that almost nobody

11 filled out the questionnaires because they decided they didn't

12 want to.  So, what we had to do, and again focusing

13 specifically on mesothelioma, we actually read all the

14 mesothelioma files in order to find out, well, what is it that

15 they said they did with Grace asbestos?

16        Now, it will be said, oh, well, there's all kinds of

17 evidence that might be introduced with respect to what these

18 people actually did, that maybe we wouldn't have gotten until

19 the time of trial, and that's been a constant refrain.  There

20 are two answers to that, actually, three.  And we'll take them

21 up in more detail later.  But the key thing about what we did

22 with exposure, we did with exposure, is we relied upon the

23 claimants themselves to say what they did, and certainly the

24 claimants themselves ought to be able to say what they did.

25 That doesn't take time to evolve for trial.  That comes from

1 the claimant.  Now, the calculations based upon that, that's

2 more involved.  We rely upon them for the calculations.  We

3 relied upon them to simply talk about what it is that they did.

4 And they are the best sorts of information with respect to what

5 it is that they did.

6         We then took the next step.  We now need exposure and

7 dose.  Let's go back to that first slide.  We're going to fill

8 it in.  We're going to find out, okay, what's the exposure and

9 dose associated with these activities?  What, then, is the

10 maximum lifetime exposure?  And we assumed that these people,

11 and they said they did, we assumed that they did it for an

12 entire lifetime.  What, then, is the ultimate risk that comes

13 from the epidemiological studies?  Then we take a look at

14 diagnosis of disease, the medical screen, and we'll talk about

15 that.  And then we took both of the outputs in order to create

16 a grid of considerations that then applied to each claimant

17 pursuant to the P.I. cues.  So, we have exactly a by the book,

18 exposure, dose, risk assessment, screening process, using

19 exactly the same disciplines that have been at the core of

20 epidemiology, industrial hygiene, and diagnostic medicine for

21 years, and years, and years.

22         When we find out the exposure and dose -- next slide,

23 please.  That's Slide 13.  This table indicates down at the

24 bottom A through E, those are the exposure categories, what the

25 industrial hygienist did is to look at all of the available

1  industrial hygiene data to find out, well, what is -- what

2  would be the mean eight hour that is time weighted average air

3  concentration that these individuals would be exposed to?

4  Following an absolutely traditional analysis.  And what we can

5  see is that here's a figure from Nicholson.  Here's the

6  Nicholson construction trace 58 to 72, 73 to 79.  You can see

7  how high they were for construction as compared to these

8  people.  These people didn't have that kind of exposure.  And

9  it may well be that they had exposure later on.  But in any

10 event, these are people who were involved in construction

11 trades.  The application of this kind of product, in the

12 cutting and removal, etcetera, etcetera, being at the site, is

13 a lower level activity than many of the other construction

14 trades, which would have included people who were actually

15 working with insulation and other more toxic products.  So, the

16 industrial hygiene data was all illustratives down here.

17        If we focus on B, D, and E, see how small they are?

18 We're now going to zoom in on get bigger on B, D, and E.  We

19 can see that even there, this is now the OSHA permissible

20 exposure limit, .1.  These are trades that are below even the

21 (indiscernible).  This is what the data actually shows in all

22 cases.  So, this now gave us a rubric of data.  We now had to

23 apply it to create a lifetime dose.  That's the next step.

24 Next slide, please.

25        So, what did Dr. Anderson assume?  She'll be

1  testifying about this.  She assumed that all of the exposures

2  were only to Grace products.  Any exposure we had was to a

3  Grace product, as long as it's indicated there.  If you worked

4  with a non-Grace product any day of the -- 11,250 is lifetime

5  exposure, obviously that's very conservative, and if you worked

6  with any non-Grace product, that would take a day away from the

7  Grace exposure.  If you worked in an alternative occupation,

8  then the cumulative exposure associated with Grace products

9  actually declined.  So, these are the assumptions, extremely

10  conservative.  Next slide.

11          On the basis of these assumptions you then end up

12  with a certain number of 45 year, that is lifetime cumulative

13  exposures, assuming that constant exposure driven by the

14  industrial hygiene data, you can see, now, A is 17, B is 2.1, C

15  is 12, D is 1.3, and 1.5.  Now, when it comes to B, D, and E,

16  which are so low, we took a further look to see, well, how many

17  people actually, under the plaintiff population, the ones who

18  gave us enough data for us to determine how long they were

19  actually exposed, how many of them actually were exposed at

20  that level?  Are these numbers skewed by a few cases of higher

21  exposures?  And we found out that the latter was true.  This is

22  --

23          THE COURT:  Would you go back?  I'm sorry.  Go back

24  to the prior slide for a minute, please.

25                          (Pause)

1              THE COURT:  Okay.  Thank you.

2              MR. BERNICK:  Thank you, Your Honor.  And we found

3  out, as it turns out to be true, that you can actually take the

4  people who gave us enough information for us to actually find

5  out how long they actually did work with the product, that what

6  we find out is that the actual numbers for B, D, and E are not

7  as high as indicated on the prior slide, that overwhelmingly

8  they're below one fiber per millimeter a year.  So, it's below

9  one for it looks like about anywhere -- anywhere close to --

10 maybe 95 percent of the cases.  So, the numbers you saw on the

11 prior page are actually extremely conservative numbers.

12             What, then, does that enable us to do?  Well, now,

13 with those kinds of risks -- go back to the prior slide,

14 please.  With these kinds of lifetime exposures, what is the

15 risk that's associated with that?  That's the next step.  Very

16 traditional next step.  Risk assessment analysis used by the

17 federal government in a thousand different offices every hour

18 of every day of every year.

19             Let's go to the next slide.  What we've done here is

20 display the epidemiology, because epidemiology tells you about

21 risk.  And under the epidemiology, what you're always looking

22 for is a dose and a response.  So, here we have, on the

23 horizontal axis, we have the dose, the cumulative dose,

24 (indiscernible) units, and here we have response in the sense

25 of do you have an excess of disease in the population, which is

1   what the epidemiology look to.  That is, in each given dose we

2   have data that says that that dose, down here, here's what the

3   relative risk is, the relevant risk would be over on the

4   vertical column.  What we've done is, you see, we now have a

5   very nice dose response curve.  Gee, that's just terrific.  And

6   what that says is that there's actually a regularity in the

7   relationship between dose and response, exactly what you'd

8   expect with a well established potential carcinogen, based upon

9   epidemiological data.  But we see, in fact, that there are

10  limits to what you can observe.  We have a limit in the sense

11  of what the actual data points in the studies establish.  These

12  are mostly studies that took place at very, very high levels.

13  That's where the dose response relationship was well observed.

14  At lower doses the robustness of the data, that is, do you even

15  have data that shows that there's an increased risk, diminishes

16  significantly.  And when you get down here, that is we don't

17  know if we're seeing -- actually seeing something that is real,

18  and as you get down -- way down here, this is very interesting.

19  In this we actually have studies that looked for risks and

20  didn't find them, that is, that measured those actual doses and

21  said we do not see an excess.  So, you would say that at that

22  level a variety of different things might occur.  And we're

23  going to get to that in the next slide.  So, this is

24  observation.  This is now inference.  The data is not hard.

25  This you've got hard data that says you don't actually have a

1 risk.

2       What do we do about this low area, this inference --
3 inference, in a sense negative area?  The answer is that a lot
4 of very smart people spent their lives working on that very
5 question for the last 20, 25 years.  What do you do about
6 exposures that are in an area where there is not scientifically
7 observable relationships?  You don't find statistically
8 significant associations using reliable data?  What do you do
9 in that area?  And it's a real issue, because we have chemicals
10 that are present in the environment, and in the workplace.  And
11 radiation, you had people working in the (indiscernible), and
12 the power utility complex, all exposed to low levels.  You can
13 say, well, we don't want to have anything, and then the
14 operation would shut down.  So, people spent a long time
15 saying, well, where do we really think that the key lies here?
16 What should we do?  Go to the next slide, please.

17       And so, you have this kind of problem, the data here.
18 You then have a limitation.  What do you do in the zone of
19 interest?  Next slide, please.  The answer is that for public
20 health purposes, like the EPA, they develop models that have no
21 threshold, that go all the way down to zero dose and find, not
22 find, but state that they are assuming that there is a risk,
23 whereas the actual potential response is, that is what the
24 truth might be, could be beyond that line, or below that line,
25 it could be above that line, conceivably.  Actual responses,

1 though, are not known.  So, the models, which also have been
2 quoted for the proposition that, well, every little dose
3 carries with it risk.  Sure, that's true in a modeling health
4 protective sense.  It is not true in a scientific sense when
5 you get down to doses that are that low.
6      So, how does this, then, now relate back to our
7 problem?  Next slide.  The other sides' experts, all of them,
8 admit, Dr. Wadley (phonetic) admits, next slide, Dr. Hammar
9 (phonetic) admits, another one of their experts, next slide,
10 Dr. Lehman (phonetic), that's another one of their experts,
11 they all admit that there probably is a threshold, that is, it
12 really doesn't go all the way down to zero.  It kind of goes
13 along the bottom line, and then it pops up some.  So, it's a
14 threshold situation.  What they disagree about, they disagree
15 about how low that threshold goes.  So, Your Honor will see --
16 this is the next slide -- that there are different studies that
17 are being used.  We believe that we have all of the studies
18 that matter.  They also uniformly -- we have an area where risk
19 is not measurable, not detectable, not present.  They have a
20 few studies that, Your Honor, we would submit, even -- show the
21 next slide -- they even confess -- next slide -- that they have
22 limitations on what can actually ascertained from their data.
23 So, we have a series of limitations.  Number one, they don't
24 use actual industrial hygiene data.  For example, they report
25 as fiber millimeters per year, with quotes, indicating that

1  they actually haven't measured it.  They -- going down -- they

2  use job titles instead of having actual airborne asbestos

3  information, which you would need.  The results are generic.

4  They are unable to make distinctions of risks for different

5  fiber characteristics.  They can't render opinions with any

6  degree of scientific certainty.  The (indiscernible), in many

7  cases, say it would be assumed that the measured levels -- the

8  levels that are being used are assumed, not measured, and

9  therefore they have reliability issues.

10      But under any set of circumstances, we are talking

11 about a situation where everybody agrees that the fact that

12 there is a threshold, and where it is clear -- let's put up

13 that slide -- that we are talking about risks that are

14 extremely small.  Next slide, please.

15      So, what do we reach as a conclusion with regard to

16 these types of exposures?  With respect to B, D, and E, they

17 cannot be demonstrated in a scientifically sound manner that

18 these people had sufficient cumulative exposures to cause

19 disease.  Exposures have not been demonstrated scientifically

20 to contribute to a risk of disease, and therefore these claims

21 are being set aside.  They don't make it past the Daubert

22 standard that says it has to be scientifically demonstrable.

23 The (indiscernible) of the -- disciplines, the methodologies

24 established in this area say it is not scientifically

25 observable.  Do we say, however, that we consider whether they

1 might substantially contribute, or are we relying upon the

2 doubling of dose standard to say we're excluding these people?

3 And the answer is we are not excluding B, D, and E, based upon

4 the doubling of risk dose.  We are, in fact, considering

5 whether there is evidence that they would -- these exposures

6 were a substantial contributing factor.  That's what Dr.

7 Anderson does.  They have mis-characterized Dr. Anderson's

8 report, and her testimony to say otherwise.  Dr. Anderson

9 specifically considered whether the data showed substantial

10 contribution, and given the very minuscule levels of exposure

11 that we're talking about here, her conclusion was that it did

12 not -- there was not scientifically ascertainable evidence that

13 there was a substantial contribution.

14          Now, does that mean that there is no theoretical

15 risk?  Well, of course there's always a theoretical risk.  The

16 EPA model assumes theoretical risk.  The EPA model assumes that

17 every little bit that you add causes or has an effect.  But the

18 line is a policy statement, and the line is a guidance that is

19 stronger than the science.  The science doesn't take you down

20 to these very low levels, and show a positive increase of risk.

21 (Indiscernible) studies do not show you a positive increased

22 risk.  And even at higher levels, that last solid line that you

23 see doesn't say that as you get down, tiny, tiny, tiny, in each

24 fiber, that, in fact, there is a detectable increase in risk.

25 It doesn't say that.  It says that for purpose of establishing

48

1 a general relationship of dose and response, yeah, higher

2 levels of exposure have been shown to have higher levels of

3 risk.  It doesn't say that if we had .5, or one fiber

4 millimeter per year, that, in fact, you observed any increase

5 of risk.

6          Your Honor I will also observe that if you take those

7 -- let's go back a couple of slides.  Back more.  Dose.  Dose.

8 More.  Ah.  If you assume the models, you go all along that

9 curve and assume it's totally solid, it -- and you had studies

10 at each and every point along the way to measure, measure,

11 measure.  Let's assume that you had that.  And you assumed,

12 therefore, that every increment of exposure carried with it an

13 actual risk as opposed to a theoretical risk, you're talking

14 about risk contributions that are not substantial.  You're

15 talking about risk contributions that are minuscule risks,

16 risks that are of the order of magnitude of dying by drowning

17 in your lifetime.  Those are the kinds of risks that we're

18 talking about.  They are not -- the idea that any increase,

19 theoretically, in risk, means substantial contribution enjoys

20 no support in the law, and enjoys no support scientifically.

21 The data doesn't get you there.  There is no study that starts

22 here and then goes -- let's go a little (indiscernible) -- that

23 defines -- oh, yes, by God, we can see a risk.  That's not the

24 way the science works.

25          So, then, we then go to the -- let's go through a

couple more slides, back to where we were.  Beyond that.

Disease screens.  We're not going to spend as much time on

disease screens.  Your Honor is familiar with this.  These are

the screens that we used.  It would have to be a one slash

zero, and to have the circumstances, must be greater than --

has to be one slash zero or more, not greater than.  And it has

to be -- x-rays have to be done in compliance with the actual

standards that are set forth by the ILO.  The same thing with

the PFD.  And then we have a screen for (indiscernible) cancer.

We have taken out the screens that are litigation

screens as unreliable.  And why did we do that?  Let's go

through the next couple of slides.   The ILO, which talks about

how these x-rays are to be used, actually sets out a standard

for how they should be conducted.  So, we've (indiscernible)

Daubert, and reliable evidence, we go to a set standard that's

established by the ILO and NIOSH themselves about what must be

done in order to produce a reliable result.  And this says --

we'll take the next slide -- where you have a contested

proceeding, NIOSH recommends a minimum of two independent

classifications by appropriately selected readers with a third

classification if the first two disagree.  You have to have

three different readings, two of which got to be right.  And

they should be blinded.  They should be blinded.

So, what is it that we did?  Next slide, please.  We

did a study, the Henry study.  Remember, we asked for all those

1  x-rays.  And we sent them out to be re-read.  We sent them out

2  on a blinded basis, the number of readers was determined in

3  advance, not ad hoc.  We (indiscernible) with strong

4  credentials, and controlled inputs, that is, we sent -- the

5  plaintiffs' lawyers sent in the actual x-rays.  And then we

6  also did something else.  We used control films, so we could

7  see whether the readers were over-reading or under-reading in

8  some kind of biased fashion.  And we found out, in fact, that

9  they didn't.  So, what, then, happened?  What were the results?

10 If we take plaintiffs' alleging radiographic evidence of

11 asbestos related disease, we used x-rays, all of which came

12 from plaintiffs, who said that they were relying upon the x-ray

13 in order to establish that their lung cancer was asbestos-

14 related, that is to establish evidence of fibrosis.  In 82

15 percent of the cases, the claimants' readers made a finding of

16 one slash zero.  How many of those were establishable in

17 accordance with the standard?  Seven percent.  So, when you

18 actually comply with the standard, the data that's being

19 submitted, although it says 82 percent actually show an ILO

20 positive reading, we only had seven that are replicated in

21 accordance with the standards.  And we would note that 90

22 percent of those have a significant smoking history.  There

23 were a variety of things that could cause the finding on a B

24 Read.

25       Next slide.  We also, then, in the study, eliminated

1  those people -- took a look at how many of those people

2  actually were seen by doctors who are no longer accepted by the

3  trusts, or B Reads, or other doctors who we know by virtue of

4  their testimony and how they actually -- depositions were

5  taken, we know how they actually conducted the B Reads, and

6  they didn't do the B Reads in accordance with the standards by

7  their own admission.  So, we took those folks out, as well.

8        Next slide.  What then happens?  This is now -- the

9  flow chart has been filled out.  We have the A, B, E, D, and E,

10  the different exposure categories, the eight hour PWA's, the

11  maximum exposures over the lifetime, and therefore, then, using

12  our risk models, we said with respect to B, D, and E, they are

13  too low to have even scientifically observe the -- even

14  present, even to exist.  With respect to A and C, we say there

15  is a potential risk.  We don't enough to say that it's there,

16  but it's good enough for this case, so we let them through.

17  And then we then apply to the population the screens that we've

18  indicated.

19        What, then, comes out at the other end?  At the other

20  end, therefore, we have, using the same basic elements of risk

21  assessment, we go through those plaintiffs who have claims

22  pending as of the filing of bankruptcy.  We know that a certain

23  number of them did not actually complete the PIQ, or the proof

24  of claim.  Because they're -- if they haven't picked up a proof

25  of claim, they're not included under Bankruptcy Rules, and they

1  were excluded.  And then we applied the different criteria.

2  What we can see is a very modest number of people, 5,870 people

3  out of the group, actually satisfy these basic criteria.  It

4  then remains to do a projection of how many of those people

5  will have claims in the future, and that projection -- and

6  that's how many out of the claiming population are sick today,

7  how many will then be sick in the future.  And to do that we

8  use the National Meso Projection.  There were certain

9  modifications that were performed in the Nicholson curve that

10  will be explained to the Court, and that basically using that

11  epidemiological framework, we then traced out how many future

12  claims of people sick from Grace asbestos can be expected in

13  the future.

14        There was then one last step, and that's -- how to

15  calculate the value to give to those claims that pass through.

16  Now, there we're recognizing, for purposes of the analysis,

17  that we expect that there will be live (indiscernible).  So,

18  the remaining question is, well, what are the claims worth?

19  And to figure that out we went back to the tort system.  We're

20  not contesting the liability.  So, how does the tort system

21  value it?  There's been a lot of discussion that our case turns

22  on this number down here, that only six people really drive the

23  whole result.  That's false.  What we actually did is we

24  settled all of the claims, 285 claims were sampled out of the

25  number, these are all meso -- this is meso, meso, meso.  What

1  we found, we (indiscernible) to expect that the claims that met

2  the criteria that's the same criteria that we had applied to

3  the PIQ claims as a whole, we would expect that those that met

4  the criteria would be given a greater value because they had

5  stronger claims against Grace.  What we found out, though, was

6  that -- go back a slide, please.  What we found out was that

7  there wasn't a huge difference between those who met the

8  criteria and those who didn't meet the criteria.  You can see

9  that where we had data for 27 people with respect to whom we

10  could even figure out that we had enough data to be able to

11  imply the criteria, there was no statically significant

12  difference those who met the criteria and those who didn't meet

13  the criteria.  All the rest of the claims didn't give us

14  exposure -- sufficient exposure information, which is a huge

15  problem with respect to the plaintiff population as a whole.

16  So, these are the people who passed the screen.  These are the

17  people that gave us enough information to see whether they

18  passed the screen, but did not, and then, lo and behold, it

19  turns out that they were not statistically significant.   If

20  you take the whole number, 100 percent, the average would be

21  96.

22       But what do we do?  Next slide.  We found that there

23  was no statistically significant difference, the level of

24  exposure was not a driver of values, and therefore, it would

25  have been reasonable to use an average settlement value.  But

1 because it was increasing, that is the trend which you see on

2 the prior slide was increasing, albeit not statistically, we

3 used the top number, that is, the number for the claims that

4 did pass the criteria.  So, we could have used the average, 96.

5 We could have use the ones that didn't pass the criteria on the

6 theory that somehow the criteria were (indiscernible).  We used

7 the top value.  We assumed the absolute top number that was

8 found on average of the people that passed the criteria.  That

9 became the number that we used for purposes of the calculation.

10 Next slide, please.

11      Based upon meso, we then filled out, based on

12 historical relationships, what the other claims would be, and

13 we then went to go ahead and value the claims as a whole for

14 purposes of the analysis.

15      Now, a couple things should be noted with respect to

16 this analysis.  One is that we looked for value, obviously, in

17 the state settlements.  We did not simply focus on the six.  We

18 focused on the whole group.  They say, the other side says,

19 well, wait a minute.  If the criteria had been established, if

20 there's no select criteria, then claims the method criteria

21 would become much more valuable because they say it would be

22 certain that they would get paid.  Certainty of payment, the

23 idea that there is risk in the current -- and there's a

24 discount for risk.  We know that argument is false.  We know

25 the argument is false because today, or historically, in the

1 tort system, claims -- whether claims get stronger merit or

2 not, that is whether they were more certain or not to be paid,

3 did not have a lot of effect on the claim value.  This is

4 actually Dr. Peterson himself who states this, in

5 (indiscernible) at Page 170.  "So, now I want to ask you about

6 things that do contribute to the value of the tort system with

7 an individual claim.  I think you said that there are many

8 things that contribute, as we all know -- we all know that,

9 correct?"  Answer:  "Yes."  Next page.  "One of the things

10 would be jurisdiction, right?"  Answer:  "Yes.  It can have an

11 important effect."  "The lawyer?"  "Yes."  "And the merits of

12 the case."  "(Indiscernible) assume that the merits of the case

13 are stronger, more certainty of payment, and therefore the

14 value would be higher."  Just what they're saying.  Their

15 question, that is, their theory that says, oh, if these

16 criteria were there, they ought to be worth more money, assumes

17 that something to do with the merits of the claim actually

18 drives value.  But, in fact, they say, no, their own guys says

19 no.  He says, I can't quantify that.  And negotiations, of

20 course, (indiscernible) look at that, but merits is not a

21 variable that can be subject to economic analysis or the kind

22 of analysis that I do.  And, in fact, what he says is that when

23 you actually take a look at the claims, because there are

24 several in volume, merits just doesn't have much to do with it.

25 What about verdict (indiscernible)?  He says, verdict value?

1 The case goes to trial, otherwise verdict value doesn't have
2 any direct effect on the values that (indiscernible).  So,
3 their theory that says, oh, well, those claims would then
4 become the more meritorious, they became the more meritorious.
5 They'd be more certain.  Certainty of payment is not what goes
6 on in this case.  What goes on in the State Court system is,
7 and we talked about it, the (indiscernible) where clients get
8 paid on a negotiated basis, disease and jurisdiction make much
9 more difference than exposure criteria, than a particular
10 strength of a case against a particular defendant.

11          Now, I'll note one other thing.  We, in a sense, did
12 a favor in this estimate by going down this road.  What do I
13 mean by that?  There was an alternative.  There was an
14 alternative to using State Court values.  We could have talked
15 about the values of cases that are in the MDL, the federal MDL.
16 We didn't talk about that at all.  Well, why?  Because those
17 cases, they don't settle.  Why don't they settle?  Well, they
18 don't get litigated.  You don't litigate a case, nobody is
19 under pressure to settle it, why don't they get litigated in
20 Federal Court?  I wonder why.  I wonder why.  But we didn't
21 take that into consideration.  We just used the settlement
22 values in the State Court.

23          Now, there are a series of criticisms, and we'll come
24 back to these in a little bit more detail, probably on
25 rebuttal, but I want to go through a few of them, and close off

1  on the discussion with respect to the Grace model, and what
2  sciences (indiscernible).  Let's go to Slide 44.  They say the
3  PIQ data is unreliable.  Well, can't -- can't use it.  Can't
4  use it.  Accuracy of decoding is, in fact, unchallenged.  The
5  ACC and FCR say, well, what about the stay?  They say the data
6  are unreliable because the stay prevented these people from
7  filling out the claim forms.  On cross examination their own
8  experts admit that this is false.  Mr. Meyers testified on
9  cross examination that nothing stops these people from talking
10 about their own exposures.  The part of the case that depends
11 upon -- where they put together what the exposures were is a
12 part of the case over which they have control.  And these are
13 cases that are being worked up against other clients.  It's not
14 like they are sitting blind.  So, they can sit there and do --
15 they take their basic work history as a matter of input into
16 their firm. They know what the exposures are.  They don't have
17 any effect on the stay.  It doesn't effect them.  Did they take
18 discovery?  Of course they've taken discovery.
19        The next issue.  They attack -- this is the point
20 where they use the settlement values as only for six cases, and
21 our response is pretty simple.  The number of claims selected
22 as the basis for average was appropriate because
23 (indiscernible) all the data that was there.  Use of the
24 overall mesothelioma settlement averages would result in a
25 lower value.  And if we hadn't cherry picked this, they say,

1  the number would have gone down, not up.

2        Verdict criteria is not an appropriate alternative

3  because verdicts have no direct relationships to settlement.

4  Let's take a look at Peterson 173, 174.

5                          (Pause)

6        MR. BERNICK:  173, 174.  "So, you would agree that

7  the settlement process in mass asbestos litigation is not

8  necessarily driven by individual verdict value?"  Answer:  "It

9  can be.  There is an opportunity for it to be so, if either

10  defendant or the plaintiff chooses to do that, but most cases

11  are not resolved with those considerations.  No."  And it will

12  become clear why these cases don't go to trial.  First of all,

13  the verdict value doesn't necessarily mean that the money

14  changes hands.  There are a lot of other things involved.  Why

15  is it that so few cases to go trial?  You always hear from the

16  other side it's because well, the defendants just don't want to

17  try these cases.  And the answer is there's a lot of truth to

18  that, because the circumstances under which a trial takes place

19  are circumstances that are not desirable circumstances.

20  (Indiscernible) reasons.  If, in fact, the defendants --

21  they're the only ones that didn't want to go to trial, well,

22  these guys would take them to trial every day of the week,

23  because it means they get more money for their client.  So, the

24  fact that we don't have trials has to be looked at as a shared

25  agenda that they are better off, each and every one of their

1 clients, each and every one, is better off not going to trial,

2 because otherwise they would be ethically bound to take each

3 case to trial, and for that matter, to take fewer cases as a

4 firm, because otherwise they would be sacrificing the interests

5 of their client.  Under what circumstances could it be true,

6 under what circumstances could it be true that it's more

7 (indiscernible) of a client not to go to trial than to settle,

8 particularly if they are such believers in the idea of verdict

9 value?  The answer is their clients make much more money.

10 We'll get back to the question of what that says about the

11 system when we get to their model.  Why would their clients

12 make more money on settlements, the same settlements that they

13 seek to perpetuate here by keeping the cases away from trial?

14          Let's move to Slide 47, and then I'll be able to

15 finish up, and take a break, Your Honor, I'd appreciate it.

16 Issue -- Grace's model uses flawed exposure related

17 (indiscernible) criteria.  The response is that we use all

18 available historical data not just selected historical data.

19 Average exposure?  That's appropriate in light of the frequency

20 and duration of something, as accepted by the EPA.  What about

21 the benchmarks showing the actual -- the levels that we used?

22 That's based upon actual data.  Now, they'll say, well, but

23 wait a minute.  The tort system doesn't approve those criteria.

24 Where is the State Court case that says that that's

25 appropriate?  And the answer is we'll talk all about the law in

**J&J COURT TRANSCRIBERS, INC.**

1    a minute.   The State Court law of relevance is the substantive

2    requirement of causation, either (indiscernible) substantial

3    contributing factor, or the (indiscernible) the same.   It is

4    only in the Federal Courts that we look to the question of how

5    causation is established.   The like to quote the cases that

6    say, well, it's -- if the guy was there at the site, it's okay

7    in State Court.   Or, frequency, duration, and intensity, that's

8    all you need.   Those are (indiscernible) we'll deal with.

9    Modality or method of proof.   They're not the standard, they're

10   the language the standard is satisfied.   Is being at the site,

11   is that enough to make a prima facie case?   The Lorman

12   (phonetic) test, frequency, duration, and intensity, that's

13   another formulation.   But in Federal Court, under the Federal

14   Rules, under Daubert, you have to do it scientifically, and

15   it's not sufficient to say, well, the State Court

16   (indiscernible).   The State Court precedents don't say that

17   because Daubert may not apply in State Court.

18         Let's talk about the federal precedence of how to

19   prove cause under the Federal Rules of Evidence, precedence

20   would be in effect.   If we had a trial tomorrow, we'd be

21   applying to this Court federal evidentiary and procedural law

22   under the Federal Rules.

23         Let's finally go to a point that I would like to make

24   about this whole methodology that we use.   Next slide, please.

25   There's been much made of the fact, the alleged fact, that this

1  is all -- Mr. Bernick has got this, and that, and where has

2  this ever been done before?  And it's so outrageous.  It's so

3  outrageous.  And the answer is that not only is it not

4  outrageous, not only is it by the book, scientifically, but

5  it's actually very good precedent for doing exactly what it is

6  that's being done here, as the Dalkon Shield case.  Now,

7  there's other legal precedent, but to get to a level of

8  refinement in terms of methodologies and how they work, Dalkon

9  Shield.  Well, what about the use of a bar date?  That was done

10 in Dalkon Shield.  What about the use of the POC's?  Well,

11 obviously that's associated with (indiscernible).  This

12 terrible questionnaire that we had here, and we had to litigate

13 for the better part of two years, 14 pages, there was a 50-page

14 questionnaire in Dalkon Shield.  And then, how are the

15 estimates done?  They -- well, we don't really know what Judge

16 Merich (phonetic) did.  That's just -- that's a little bit less

17 than candid, Your Honor.  There was a whole range of estimates,

18 and we know that the estimate that was chosen, the estimate

19 that was actually used for purposes of the trust, was about

20 $2.5 million, and that was almost right on the money for Ms.

21 Robinovitz's estimate.  Hers was about $2.4 billion.

22         Now, what did she do?  Well, she excluded people who

23 didn't satisfy the bar date requirement.  She excluded people

24 who didn't consider -- didn't have evidence that they had used

25 the product.  And with respect to those that had, she had a

1 series of weighing factors that were used, applied, from

2 answers from the questionnaire.  In other words, it was a

3 merits based assessment, not simply a, well, what are you --

4 you settled before, you settled again.  Liability was very,

5 very much on the table.  Now, Mr. Florence was also present in

6 that case.  He came out with a different estimate.  He

7 originally came with a lower estimate, but then upped his

8 estimate.  And his analysis was similar except that he actually

9 based upon the answers that went into the merits, he filtered

10 out claims, just like he has done here, using the criteria.

11 Now his number was lower, and it wasn't accepted.  But the very

12 interesting thing is that when all the dust settled, at the end

13 of the day in that case, all of the claims that were lodged

14 against the trust in that case, be they litigated, settled

15 claims, were ultimately resolved for about $1.5 million, and

16 there was money left over, so they had an extra distribution to

17 the claimants beyond what they settled for or proved their

18 entitlement to.  The number was too high.  Too high.  It was

19 high.  And actually, Dr. Florence's number proved to be a more

20 correct analysis.

21          Now, maybe it will have turned out the same way, but

22 we're talking about a reliable methodology, and what we have

23 done here is straight down the road of science, and straight

24 down the road of precedent.  In those cases where there was a

25 truly contested, bottom's up procedure, every step of the way

1  in that procedure was contested, ultimately it went up to the

2  Fourth Circuit.  And at the end of the day, are there limits to

3  the Grace analysis?  Yes.  One of the most pronounced has been

4  the source of unbelievable time spent by the Court and by the

5  litigants is a very concerted effort to say, yes, Your Honor

6  has ordered that this be done, but no, we're just not going to

7  do it, to the point of people representing thousands, and tens

8  of thousands of plaintiffs simply not responding, or coming in,

9  law firm, after law firm, after law firm, saying can't have,

10  can't have, can't have, no one has ordered, I'm still not going

11  to give it to you.  And the questionnaire itself, massive non-

12  compliance, so that we had to get the underlying data from the

13  medical files themselves.

14         There are limitations.  That limitation is the

15  creature of their own creation.  But at the end of the day,

16  whatever limitations were produced by that effort, this is the

17  only show in town.  It is the only show.  It is the only

18  process that uses established science.  It is the only process

19  that uses established science that is embedded in everything

20  that we do today from a safety point of view.  All of the air

21  regulations, all of the chemical regulations, the exposure

22  regulations, in the workplace, much like (indiscernible), they

23  are all based upon the risk assessment which uses the tools of

24  dose, and risk, industrial hygiene.  This is it.  We don't go

25  sitting there today and say, oh, I guess we'll figure out

1  whether it's safe to work here or not based upon the theory

2  that one fiber of asbestos actually causes to real people

3  incremental risk.  That's not how this is conducted today, but

4  their analysis doesn't even get on the page.  They don't have a

5  single step of a merits based risk assessment analysis.  The

6  only world in which they bring to the Court here is the world

7  of asbestos deals, and asbestos deals don't apply to the rules.

8          Your Honor, if I could take a break?  I think I've

9  used up an hour and 25 minutes.  And I'll be able to finish the

10 rest within two hours.

11         THE COURT:  All right.  We'll take a ten minute

12 recess.

13                         (Recess)

14         THE COURT:  Please be seated.  Mr. Bernick?

15         MR. BERNICK:  May I proceed?  Thank you, Your Honor.

16 I'd like to turn, Your Honor, to the second question that I

17 posed at the outset.  We've gone through what we believe to be

18 the established -- the only reliable path that science points

19 out, and we explained how that path underpins -- drives the

20 estimation model, and the approach that Grace has used in the

21 case.  Now, I want to talk about how it is that the claimants'

22 estimation approach deviates from that path.  And what's

23 interesting is that the deviation from the path can be seen in

24 the context of the estimation model itself that they use.  And

25 to illustrate that I'd like to begin with Slide 50, please.

1          Slide 50 illustrates -- this is purely a chart that
2    we had in our briefs, and the lines are not in contrast to the
3    other lines that we're displaying here, which are, in fact,
4    data driven lines.  These were solely for illustrative
5    purposes, but they are important illustrative purposes.  The
6    deviation from the path of science takes place in the context
7    of their estimation model as reflected even in this basic
8    slide, because in the case of Peterson, and I'm going to deal
9    with Peterson first, and then with Ms. Biggs.  Science is the
10   top line.  That is a line that is derived from -- it is the
11   Nicholson (indiscernible), the case of (indiscernible).  So,
12   this is a line that's driven by science, dictated by science,
13   and yet, when it comes to actually dealing with their estimate,
14   we have a line of a different color, or stripe, and that's the
15   deviations right there, is that they begin with a disease curve
16   that they actually seek to do their analysis focused on a
17   claims or behavioral curve.  Now, why do they do that?  Well, I
18   guess the true answer to that is lost somewhere in the mists of
19   time, and probably is known only to Mr. Inselbuch, who is
20   gracing us with his presence here today.  But we can see what
21   the effect of it is.  The effect is twofold.  First, it enables
22   this Dr. Peterson to say I am using established science.  There
23   is a patina, literally, a green patina in the case of this
24   slide.  There's a patina of science that's conferred --
25   inferred by the use of that curve.  More importantly, it serves

1  to achieve a very basic blunt effect, which is to enable them

2  to generate these enormous numbers.  These cases are not driven

3  by the value of current claims.  I mean, value of current

4  claims is important, but it is largely dwarfed by the estimate

5  of future claims.  So, the ACC and the FCR lock hands here in

6  Court to develop estimates that are enormous, that they -- they

7  have a shared interest in that enterprise.  But in point of

8  fact, the current claimants have a relatively modest stake in

9  that exercise.  They get to vote.  They're the only ones who

10 can vote.  But they like to be able to vote on the basis of

11 being able to say, oh, well, gee, this doesn't provide

12 adequately for future claimants, so we're not going to vote in

13 favor.  What is it about the disease curve that enables this

14 argument to be made?  Well, it's apples and oranges.  Disease

15 and claims, they have almost nothing to do with one another.

16 Indeed, we have, in the sense that, I'm sure there are people,

17 unquestionably in the case of meso who are ill, but in the

18 sense of claims, the question of causation is not addressed by

19 the claims.  It's -- the causal link, the whole science

20 (indiscernible) does not obtain.  But once you have the claims

21 established at a higher level based on propensity, effectively

22 that disease curve becomes the backbone of the overall curve,

23 and therefore drives all of the volume of money and claims that

24 their estimate would call for in the curve.  So, once you get

25 strapped on to that curve up there, your propensity drops.

1  You're up there now.  And you can't change that propensity.

2  It's there forever.  You ride, and ride, and ride -- you ride,

3  and ride, and ride, going into the future, and all the space

4  under your feet is the money that you're going to pay, and your

5  roller coaster always stays flat.  That propensity curve always

6  stays flat.  It never comes down again.  So, that little

7  engraphment there of a disease curve is used to support the

8  shape of the claims curve as enormous economic (indiscernible).

9         Okay.  So, let's go through a little bit of the

10 details of this exercise that takes place.  First, you have

11 that basic curve.  Peterson.  Slide 51.  You next have the

12 question of propensity.  And all propensity is is a ratio

13 between the actual claims and the national trend.  It's purely

14 a ratio.  And as the -- the filings change, boy, that

15 propensity just changes, too, except, as we know, it turns out

16 the filings go down, and the propensity curve never changes

17 because it's locked in according to their model.  So, once you

18 actually go out of the system, you are locked into whatever

19 that arithmetic relationship happens to be.

20        Now, that simple ratio, just take the ratio itself,

21 propensity, that is who decides to sue whom.  Who decides to

22 sue Grace.  Who decides to sue another company.  Does it mean

23 that they are sick from Grace asbestos?  No.  There are experts

24 who will concede absolutely unequivocally that they don't know.

25 Does it mean that the propensity means that there is more merit

68

1  to the claims?  The answer to that is no.  Is propensity
2  stable?  Not necessarily.  We see massive instability here.
3  And historically it can go up and down, although by and large
4  propensity has gone up after 2003.  We know (indiscernible) it
5  has gone down.  Is it predictable?  No, it's not predictable.
6  If it were predictable, Dr. Peterson would have been able to
7  give very different testimony than what he gave.  He gave
8  testimony that said that as these trends have developed over
9  time, he didn't predict any of the big ones, which means that
10  his propensity model didn't predict any of the big ones.  So
11  propensity is not a scientific construct, it's not a sensitive
12  construct, it's not a data driven construct in the sense that
13  once it's fixed it always remains fixed.  It's not stable, it's
14  not predictable.  It is pure arithmetic but it provides the
15  excuse to hook debtor's filings, claims, natural trends which
16  go out over years and years and years.  Quite a tool.

17        Next step is calibrations like 51.  Calibration
18  raises the question well as of what time do you fix the
19  propensity to be used hereinafter for the rest of time?  Now it
20  seems like -- calibrations sounds like somebody is under with a
21  Swiss tool kind of making sure the lines go up just the right
22  way, like it is precise.  It is anything but precise.  It's
23  anything but objective.  All it is, is an opportunity for the
24  expert to look back over that history and say, hey you know
25  what which period of time do I want to use?  Now the fact that

1  period of time can be used, you can go back any number of

2  periods of time to use.  But what do you imagine they actually

3  -- what they actually do is particularly talking about

4  bankruptcy by and large claims always rise as you are getting

5  close to post-bankruptcy, lo and behold the calibration period

6  always turns out to be the highest theory of them all.

7          It is just inevitable in their calculus.  That in

8  fact is exactly what happens here.  I want to use the slide

9  that I think I -- if we can -- actually switch to the elmo.

10  I'll tell you what I'll hold it up.  Here it is.  There we go.

11          Now this is interesting because these are actually

12  the propensity curves, the historical propensity curves for

13  both Biggs and Peterson.  What is interesting is you can see

14  that according both to Peterson and to Biggs the period of the

15  mid-90s was actually extremely stable in terms of propensity.

16  So when you get that blip over here, statistically there is all

17  the sudden a relationship between this line here, earlier in 99

18  propensity and what we see thereafter.  This has got a very

19  strong positive slope afterwards.  This is basically flat for a

20  period of years.

21          Now what does Dr. Peterson believes.  Well you know

22  what I find '99 to 2001 just so darn probative I may use that.

23  So he takes that spike and makes it last forever.  What does

24  Ms. Biggs do? Well she goes back a little bit more.  She goes

25  back to '97.  But you can see '97 and '99 is flat so it's

1 really 2000 that dominates.  Does she have a statistical test

2 that she uses?  A test that applies?  No.  That's just her

3 judgment.

4        We actually had her testify it is purely her

5 judgment.  This is purely Peterson's suggestion.  So

6 calibration sounds like it's something precise and in fact it

7 is precise.  It's called selection bias.  They bias it in favor

8 of a period of time designed to produced inevitably because

9 it's just on the eve of bankruptcy a higher propensity than

10 period calling the future.

11        Let's take a look at Slide 51 off the elmo.  That's

12 it.  It was the one before that.  So what does this then

13 actually -- as you get the propensity up, that is as you have a

14 propensity now established they then use that, attach it and

15 now start to ride the curve.  So the propensity, using the

16 propensity curves for Peterson.  It goes up like this and it

17 goes across.  We use Manville for purposes of getting to that

18 curve and if you -- that curve once it reaches '06 which is

19 when we he now says it's a steady state, he has calibration

20 period which produces an average.  These two years average out

21 to here.  With that average it fell a little bit below the

22 peak.

23        So what does he do, he says well I'll get back up to

24 the peak.  You can see how between '01 and '06 he gets them

25 propensity all the way back up to here.  So now it's the same

1  propensity as it was on the eve of bankruptcy.  There is no way

2  of saying gotta keep that bubble going, just got to keep it

3  going.  So on the basis of that, you now have the -- you now

4  have the claiming.  These are claiming curves.  You now have

5  the claiming curve because propensity increased, now it remains

6  flat so the claims increase and then they follow, you can see

7  how the shape of the claiming curve follows the shape of the

8  deceased curve that produces that beautiful bubble.

9        We now have effectively a bubble that began in '99

10 then wooo just nice big bubble propensity will last and last

11 and last.  If you actually use the Grace propensity that was

12 the average that is where the calibration stood, totally

13 different estimate.  Huge volume claims of money lost.  If you

14 actually looked at the data from other companies which was what

15 Grace did, the propensity of those companies comes down and

16 then if you then assume that that holds, that is the end of

17 that.  It doesn't go down any further, just stays where it is.

18 Look at the big build up it should have at the point.

19        So depending on whether you want to boost that

20 propensity and maintain it or whether you want to go with where

21 Grace was and it's calibrated peak or if you want to see what's

22 happened to the tort system since makes a difference in

23 hundreds of things and billions of dollars.  Future propensity,

24 all this is driven not by Grace.  Just remember not by Grace,

25 not by her companies, it's driven by Johns Manville.  That's

1  what drives a whole cart of Dr. Peterson's analysis is the

2  Manville Trust, giving us a long bubble.

3          Next step, Slide 53.  I've got to move here.  Now

4  there is a question of all these claims that are being filed,

5  how many of them get paid and how many of them get dismissed.

6  This I call a game of pick a number.  These are the historical

7  payment rates and you see how they are quite high.  Peterson

8  decides well you know what, in Armstrong and USG I've decided

9  to post '01, the payment rate that is the number of claims

10 filed that were paid to drop to 40 percent.  So he used 40

11 percent for USG and Armstrong.  Did he have an analysis that

12 said that?  No.  Did he have any kind of statistical driver?

13 No.  Did he have a model?  No.  He picked 40 percent.

14          Well having picked 40 percent, does he not want to

15 pick 40 percent for Grace?  No.  Well I think Grace is a little

16 different.  Let's give them 15 percent.  So you now get this

17 payment rate just selected as a single number carries forward.

18 If you look at the payment rate of actual people in the tort

19 system post bankruptcy, it turns out the payment rate is

20 completely different.  What's the effect of this next slide?

21          Well if the Peterson payment -- oh, this is yet

22 another slide.  This is the payment rate again for other

23 companies confidential information and this is publicly filing

24 companies.  It's not a disease, it's not meso, now all a

25 disease because the publicly public filing is no break out

1  disease.  So this is all disease not just meso.  This shows how

2  deeply different the publicly reporting companies are that they

3  are parallel to the companies to which we have seen it.

4         This is kind of a footing exercise.  Companies to

5  which we have confidential information very similar to the

6  public companies.  Those confidential companies though also

7  have the meso data so we know they are not different here.

8  They are likely not different when it comes to meso.  So it

9  gives us confirmation that the meso specific number on the

10 slide was accurate.

11        What is the effectiveness of that slide?  Well these

12 are the filings predicting Grace meso and Grace -- sorry these

13 are filings predicted using the paid claim, I'm sorry.  So this

14 takes the number of paid claims to the top curve.  This is the

15 number of curves that Peterson says based upon his propensity

16 would actually be filed.  So the propensity number from before,

17 couple of charts ago, it's the same one.

18        Now take the percentage paid.  That's based upon the

19 dismissal rate from the just prior slide as we heard.  You look

20 puzzled.

21        THE COURT:  Yes, I lost you two slides ago.

22        MR. BERNICK:  We'll go back a couple of slides.

23 Propensity gives you the filing, the number of filings.  You

24 look on and that takes it forward.  We're now going to find out

25 how many of those filings were paid as a separate calculation.

1  You now have to adjust the number filed by the payment rate,

2  that is how many of them were dismissed without payment.

3          So that is now the next slide, is percentage paid.

4  The next slide he uses a payment rate which is 15 percent

5  payment.  A 15 percent dismissal rate based upon numbers from

6  USG as adjusted for this case.  We have data on the dismissal

7  rate from actual defendants in the system.  Their dismissal

8  rate is much higher and fewer claims are paid.  So it's a lower

9  curve.

10          We then take a look at the next slide at public

11  filings to see if they were the same or different from our

12  confidential companies.  They are not.  So that gives us

13  confirmation that our line is correct.  Next slide.

14          We now go back and put the two things together.  This

15  is the number of filings.  This is the number of actually paid

16  claims using his dismissal calculation.  This is the number of

17  paid claims using a different propensity that is our propensity

18  rate based upon actual defendants in the system and our

19  dismissal rate based upon actual defendants in the system.

20          So if you took and used instead of his propensity in

21  his favor, the actual propensity of defendants in the system,

22  the actual pay rate in the system, you can see that the overall

23  number of claims that are assumed to be paid going forward

24  drops from this level here all the way down to here.  That's a

25  little bit better.  We're trying to get it all on the same page

1  of what claims are actually being paid.

2           Next slide.  Now let's talk about settlement amounts.

3  Peterson begins with settlement amounts using a calibration

4  period that is again the highest settlement amounts you can

5  find are right there.  He gives right at that peak and if you

6  assume that it continued on with cost of living adjustment it

7  would go something like this, which would be beginning at the

8  highest peak.  If you use company confidential data, it turns

9  out the numbers actually are falling even for mesothelioma.

10          What does Peterson do?  He is not content with

11 beginning with the absolutely highest peak.  He has to come up

12 even further and he was a per claim settlement averages that

13 dramatically escalate over the next few years before they

14 steady out.  Now what is his source of information from that?

15 He has no source of information after 2001 actually based upon

16 companies that are in the tort system.  He simply decides that

17 he's going to use a different approach.  He uses multiple

18 regressions and the like in order to get extremely high

19 settlement rates.

20          What does this mean now in the aggregate?  Next

21 slide.  It means and if I can go over to the chart now, here.

22 Is this audible?  It means that he is basically doing the

23 following.  He's got the actual filings here, those are actual.

24 Based upon his propensity analysis which maintains the bubble,

25 he predicts this huge ongoing flow of claims going forward, the

1  big bubble.

2         He assumes that using his 15 percent payment number

3  that the percent paid as opposed to dismissed will ride that

4  bubble.  So he's now got everything under here is might.

5  Whereas if you actually took at the actual filings against

6  companies, not the trust, we can see that the propensity has

7  declined in a very significant fashion.  If we take a look at

8  the actual dismissal rate, not against the Manville Trust, but

9  the actual dismissal rate, that also is different.

10        So if you compare net net the difference between

11  Peterson's assumed paid claims and the paid claims that would

12  come from looking at actual companies in the tort system, there

13  is a huge difference there that is all claims all night and

14  that settlement.  And that he takes that settlement money and

15  he escalates it on a per settled claim basis so that you get

16  this huge, huge upward number.  A very, very dramatic effect.

17        Now this is how the system works.  This is the system

18  that has driven huge numbers of billions of dollars worth of

19  payments of trust.  What are the key elements?  Using the

20  national disease trend as an anchor for filings totally a

21  question of judgment.  There is no science to support that.

22  There is no nothing that supports that.  This is claim

23  behavior, specifically not measurement of disease caused by

24  Grace.  This is actual disease caused by asbestos on a

25  nationwide basis.  Is there any support to the judgment?  No.

1  Is it correct?  No, it's wrong.

2        Propensity.  The whole idea of propensity that is

3  purely a question of his judgment.  There is no science that

4  supports the use of propensity.  All it is, is an arithmetic

5  ratio.  To pick out the past propensity and actually apply it

6  here, is again wrong.  There is no reason why the propensity

7  should hold.  There is no science that says that it should

8  hold.

9        What about the calibration period?  The calibration

10  period is not -- does not enjoy the status of being the output

11  of any statistical mathematic or other model.  It's purely a

12  question of choice.  In this case he chose exactly the wrong

13  period, one mostly affected by the prospect of bankruptcy and a

14  whole bunch of other things that we're going to be talking

15  about.  And that's wrong.

16        Future propensity simply projected to be a

17  continuation of the past but now driven by the Manville

18  Bankruptcy.  That's a choice that he made and it's completely

19  and utterly contrary to the whole assumption made in his

20  analysis which is he is looking for the operation of the tort

21  system as applied to Grace.  Why didn't he go to other

22  companies as to which there is data in the system?  What about

23  the dismissal rate?  Again, purely a question of judgment.  He

24  just picked the 15 percent as opposed to the 40 percent he used

25  for USG and for Armstrong.  What about using the settlement

1  that I used?  Again purely a question of judgment and again the

2  data does not support it.

3      Every step of the way the architecture of this model

4  from beginning to end is pure and simple judgment.  That's why

5  there is no degree that is involved with this area, no

6  training, no certification of being an asbestos estimator.

7  This is a role which Dr. Peterson has grown up and proffered

8  but it's not a science.

9      What about Ms. Biggs?  Ms. Biggs is different but she

10 is for analysis no better.  She got into a business  to be a

11 little bit competitive.  Dr. Peterson after all it's not fair

12 he should enjoy such relationships and prosperity, lead a

13 company this big comes into play.

14                    (Audio malfunction)

15      This is what she says though.  She's developed an

16 alternative model that is very interesting because it has never

17 seen the light of day until this case.  No one has ever seen

18 her model until this case publicly and she says there internal

19 review that has never been subject to external review.  She

20 cites an article that makes kind of a general reference to a

21 basic approach.  It's none of the moves, none of the

22 calculations, none of the models and in fact originally the ST

23 objected to producing her model, even in this case.

24      While she uses propensity too, she does it a little

25 bit differently.  She uses propensity.  The propensity that she

1  uses is she compares five to an overall index of industry, an

2  overall industry (indiscernible).  Does propensity make more

3  sense there?  No.  It's still a simple ratio.  It's not a ratio

4  of how much people prefer to sue Grace as opposed to within the

5  industry as a whole.  Out of how many meso cases in the

6  industry as a whole, those people decide to make their penance

7  with Grace.

8          What about the calibration period?  Calibration

9  period remember she could have chosen any one of the years in

10 the ratio (indiscernible) the propensity to not change.  She

11 chose to use a '99 to '01 why there is no statistical formula,

12 no model, no nothing.  She simply chose it based upon her

13 judgment.

14         What does she do now in connection with the

15 propensity going forward?  Slide 62.  She's another smoother.

16 She uses Manville but she smooths just like Dr. Peterson does.

17 So what do you get?  You get a nice little flat line of

18 propensity goes and goes and goes.  The bubble all along stays

19 there.

20         But what is interesting about her is her analysis is

21 a little different.  Let's go to Slide 64.  To apply her

22 propensity we now see that her curve, that's her industry

23 benchmark.  It's not smooth like (indiscernible-cough).  It's

24 not a disease.  It's not a feature of epidemiology.  It's

25 literally something that she pieces together to represent the

1  overall industry rate.  How does she do it?  She uses a sample.

2  How does she actually get there?  She starts out using her

3  calibration period with rates ending up being right here in the

4  calibration period.  Her prediction using this therefore it is

5  important to begin way up high, way up high, but not

6  propensity.  Here it's used but that's to maintain a

7  relationship between Grace and the industry filing for

8  Fernando.

9       How is that put together, that overall curve that

10  drives the estimate just like (indiscernible) does?  It's kind

11  of like you are in the second grade finds some type of prints

12  of a new creature and it turns out to be the hoof part of a

13  couple of different insects.  But the first part of the

14  analysis it is a smooth Manville rate of '06.  Then she says

15  but between '06 and '09 because the smoothing only takes you to

16  '06, I'll just continue it to '09.  How does she just continue

17  it to '09?  I'll just fill it in to '09.

18       And then beginning in '09 she gets this decay, this

19  decay here.  That comes from Dr. Stallard (phonetic) who has

20  applied the rate to the Manville Trust as a whole.  So it

21  purports to be Manville but saying it's Manville doesn't really

22  mean very much because it starts on Grace but then turns to

23  Manville.  It turns to Manville smooth but then it's a poor

24  number from '06 to '09 and it is then Dr. Stallard's

25  (indiscernible).

1        In the interest of time here I'm going to talk a
2    little bit about the overall flaws in the system of how they
3    get to their impact.  Let's take a look at 69.  That's not 69.
4        Methodology.  What we have here is not a methodology
5    that is known to science.  It is not the analysis of causes of
6    behavior.  It's not the analysis of trends of disease.  It's
7    neither one.  It's surfing the trend literally.  You watch the
8    trend as it develops and you went along with your calibration
9    period, whatever that trend is you assume that the world is
10   never going to change.  The wave is never going to crest, the
11   bubble is never going to burst and this is all going to remain
12   the same.  That's the methodology.  No one thinks change.  She
13   doesn't deny it.  Then it's, oh I guess it's changed so I'll
14   look for the next trend.
15       Calibration.  They chose the highest point so that
16   the bubble never bursts.  Benchmarks of future propensity.
17   They say that they are looking for what Grace would be like in
18   the tort system, but in fact they adopt as their benchmark a
19   bankruptcy trust that hasn't been in the court system for years
20   and years and years and has controlled them for the benefit of
21   claimants by a group of people that is basically selected by
22   its lawyers.
23       Dismissal and payment rates.  Take a number, 40
24   percent made sense for Armstrong, 15 percent sounds better for
25   Grace.  And on the settlement amounts God knows you take the

82

1  peak and then you escalate it and you escalate it more and

2  there is this money forever coming out of the settlement

3  analysis.  That is not science.  What is the effect of it all?

4  The effect of it is pronounced.

5          I want to go back to this bubble and what it ends up

6  incorporating and I'm going to put a few things there.  What is

7  under this bubble?  What does it serve to perpetuate and

8  provide money for?  I got four items.

9          One is it is not driven by the merits and we know

10 that by the admission of their own experts.  So I'm not going

11 to cover that again.  We've got three other items that are

12 major interests.  One, is joint and several liability.  Joint

13 and several liability is a creature of the tort system and

14 applies in various states.  But it's not a creature that

15 applies in this case.  Indeed the plaintiff's have been candid

16 in this case to say that what is relevant here, and they said

17 this when they were resisting discovery, of all those exposures

18 they just said it's just several liability.

19         Well are any of these data data for several

20 liability?  Are they just carved out to be the Grace share

21 historically in the system?  The answer to that is no.  Because

22 in certain states, many states, there is joint and several

23 liability.  So while these folks or their clients go about it

24 to negotiate with clients like Grace and Grace is in the

25 system, a state with joint and several liability and Grace is

**J&J COURT TRANSCRIBERS, INC.**

1 faced with the prospect of picking up the Manville share.  The

2 Manville share is big and there insolvent so you can't go get

3 them.

4        Well what is Grace going to do?  Well maybe they will

5 be put upon in suggesting to them, you want to set up Grace for

6 my money, this price, because if you go to trial you may have

7 to pick up joint several liability of Johns Manville shares.

8 Of course, they are doing their job.  The clients of the ACC

9 and FCR must, must, seek exact money for joint liability not

10 simply several liability.

11        Junk Medicine.  Let's just do it.  A couple of quick

12 quotes on junk medicine.  Let's look at 77, Slide 77.  Dr.

13 Harron.  Tens of thousands of screens.  Flip to the next one.

14 Thirty thousand.  That slide.  Foster, thousands, tens of

15 thousands.  Next one.  Heath Mason, tens of thousands. Levine.

16 Levine is interesting.  He did not take the fifth. He filled

17 out at least 22,000 forms but he submitted to questioning on

18 written deposition.  He attested in that deposition none of my

19 reports I believe, no reform from any other B reader can or

20 should be remodified or considered as a clinical diagnosis on

21 asbestos related disease or any occupational dust disease.

22        Next slide.  Dr. Philip Lucas, 13,000 asbestos

23 related claims.  We were going to play the transcript but we

24 ran out of time.  He fails to rule on his own testimony there

25 are hundreds of other causes of diseases that can cause

1  interstitial conditions that would show up on a B read.  He

2  didn't intend to rule out any of those.  Why?  In his own

3  words, I'm just taking, he says you know what the people have

4  hired me to do this.  They weren't really interested in those

5  other conditions.  They were only interested in asbestos.

6          Finally Dr. Gaziano gave us 22,000 and he basically

7  says did he actually take the exposure history himself?  Did he

8  ever verify the reliability of the exposure history somebody

9  else took?  It was not his common practice.  Did he actually

10  use the standards in all of these?  No.  I didn't do that.  So

11  when it is getting perpetuated going forward, when you simply

12  carry forward the settlement history, we are paying again for

13  junk medicine.

14          But I'd like to close in talking about the answer to

15  the question that I posed a little while ago which is, why

16  would it be that we don't get taken to trial all if that's the

17  way that more money would be paid?  Why would that be?  And

18  that's where we get into the question of what else was behind

19  this --

20                    (Audio malfunction)

21          THE COURT:  Are the parties on the phone trying to be

22  heard?

23          UNIDENTIFIED SPEAKER:  Hello?

24          THE COURT:  Hello?  Brian are you there?

25                    (No audible response)

1          MR. BERNICK: I posed the question Your Honor.  What

2    was going on during this spike period at the time.  And the

3    claimant's experts were obtained to figure out some reason why

4    that spike was specific and had something to do with Grace.

5    They came up with theories that it was driven by Libby

6    liability.  Dr. Peterson testified he did a quasi experiment

7    that indicated that it was Libby.  What was the quasi

8    experiment?  He said well there is Libby publicity at the same

9    time there is a spike so the two things must be related.

10         That's a lot of science there.  So if they couldn't

11   demonstrate that, they couldn't demonstrate that there was

12   something unique.  It turns out that Dr. Peterson ultimately

13   had to admit, ultimately had to admit, that there was in fact a

14   general upward trend in propensity that is the same claimants.

15   Now there were claimants that were coming into the system for

16   meso but not very many.  The bulk of the spike means that more

17   of the same population is suing more companies.  That's why

18   Grace's propensity would all of a sudden jack knife because

19   more people with meso are suing it.

20         If it turns out that there is a jack knife against

21   other companies, that tends to confirm it.  Sure enough if you

22   look at Slide 72, you can see that there is a jack knife of

23   claims against people that have never been sued before.  All of

24   a sudden their propensity has gone up.  Next slide after that,

25   71.  This is Babcock and Locox, Owens Corning and Grace.  You

1 can see them all go up.  This says that everybody else's

2 propensity are -- a lot of the companies' propensities are

3 increasing.

4        So what does that tell you?  That tells you that

5 Grace is now seeing claims that were in prior years not have

6 been pressed against them.  That is more people are suing or

7 the same people are suing more companies.  You get confirmation

8 of that in Grace's propensity.  Take a look at it, it's Slide

9 73.

10       Slide 73 indicates the propensity of Manville in 2001

11 was 58 percent, 58 percent of all claimants sued Manville for

12 mesothelioma.  What about Grace?  Grace is 45 percent.  Now

13 Manville accepts the claims of anybody exposed to any asbestos.

14 That's it.  If you were exposed to asbestos, you get in.  If

15 Grace is coming close to Manville, what does that tell you?  It

16 tells you that Grace is being sued for a lot of other people's

17 asbestos.

18       Now we get to the kicker.  What happens to the

19 dismissal rates?  It may be that if all these claims are going

20 out and propensity is going up, if Grace is being sued by more

21 people and it got many more dismissals then they net out okay.

22 But if they are not able to manage their docket because they

23 are overwhelmed and their dismissal rate remains constant which

24 these folks have assumed, then what does that mean?

25       That means that Grace is paying more people than

1  that. It is being sued for other people's asbestos and it is

2  paying those people.  Now you then go back to the perspective

3  of the claimant.  The claimant is sitting there saying, hmm, do

4  I want to go to trial or do I want to settle?  If I go to

5  trial, I can only recover against the people who actually

6  exposed me to their asbestos.  Then the rules of liability

7  apply, joint and several liability apply, allocation applies.

8  I can only recover the total amount of my loss as determined

9  once.

10       But if I never go to trial, if I threaten people with

11  trial and they don't have the ability to deal with me because

12  they are overwhelmed I can go after A, B, C, D, E, F, multiple

13  times and I am better off.  The law firms are better off, the

14  claimants are better off.  That is exactly what that propensity

15  comparison tells the Court.  The truly devastating impact, tens

16  of billions of dollars have now been put in trust to

17  perpetuate.

18       This now brings me to Slide 85, 86 and 87.  Let's do

19  85.  Last chapters of law written in this case and that has

20  actually been an informative process because in this chapter

21  Your Honor has seen the evolution of the other side's position

22  from being first, oh we can't look at this issue. It's already

23  been settled.  To now having to explain in detail based upon

24  the code and the case law why it is that the system that they

25  perpetuated for so many years has any basis of the law.

1          As the briefs have evolved, the theories and the

2    struggle with what the provides and the cases provide are the

3    best evidence, but they can't find grounding in the legal

4    system.  This diagram sets out very simply the two issues and

5    the two answers that exist under the code and that they don't

6    have any proper response to.

7          Issue one, what should be estimated?  It should be

8    how should it be estimated?  Federal bankruptcy law effectively

9    serves as a choice of law on this.  It doesn't say here is how

10   you do estimation uniquely under federal law.  It doesn't say

11   what should be estimated in the sense of defining liability

12   under federal law.  It's not a creature of bankruptcy.  Federal

13   bankruptcy law points to two sources.

14         One is under the allowable claim section, 502B, it

15   points to state law.  It says state law still applies.  Not the

16   state tort system, state law, which is fault based liability.

17   That's where you go.  It's the travelers decision not the

18   supreme court.  This exact analysis following 502B, the state

19   law and contract law can say even though the fees were incurred

20   in the course of a federal bankruptcy proceeding, the

21   entitlement to fees is not the fees or indeed affected by the

22   factors of the proceeding, they are governed by state law.

23   That is what the Supreme Court decided following exactly what

24   502B says.

25         What is the choice of law with respect to how?

1  That's methodology.  That's the rules of evidence and the rules

2  of procedure based on our government.  Theory and the state,

3  but that's it, there's nothing else.  What did they do?  They

4  have some moves.  You say oh well it's not the state law, it's

5  the state court system.  It's not fault fees, it's a settlement

6  phase.  What state law says that the settlement governs five

7  million.  No state law says that.  That's basically encumbered

8  to create a federal body of law that displaces state law rather

9  than applies it.  It's one of the real ironies of the argument

10 is that they actually chase their tail and end up swallowing

11 it.

12       They end up saying state law governs, but then they

13 introduce a law of federal entitlement for liability based upon

14 something.  Nothing says under federal law it sure doesn't

15 exist under state law.  What does it end with?  Not so well.

16 Estimation.  Estimation takes place and estimation actually

17 alters the outcome of state law because in estimation you don't

18 look at the liability under state law.  You look to liability

19 under the state tort system.  Well since when did estimation as

20 a methodology alter 502B and state the state law doesn't

21 control.  It does no such thing.

22       Let me say now, if you want closure under 524G you've

23 got to say you have no choice really unless you want to get out

24 the bankruptcy system all together and let everything pass

25 through, you've got no choice but to settle.  Effectively that

1  means to get closure under 524G.  For it to mean anything

2  you've got to settle rather than litigate.  524G sets up no

3  sort of (indiscernible).  524G does not say that your only

4  alternatives are to settle up or go back to state court.  It

5  doesn't say any such thing.  524G says you can have a plan.  It

6  doesn't say what the trust does.  It doesn't say when the

7  litigation takes place.  It doesn't set out the rules of

8  litigation.  524G is not a new body of the federal law of

9  liability.

10       Finally we come to these asbestos cases.  Well the

11  asbestos cases really set the rules of the road.  And you know

12  the code be damned, let's take a look at the asbestos cases.

13  The asbestos case is very interesting.  That's the chart.  The

14  chart after that, last line.  The asbestos cases that they cite

15  are uniform, absolutely uniform.  They embark on a series of

16  different analysis and different theories.  But what is most

17  important about them is what they held.  What they held under

18  the facts and issues that were presented to them.

19       In none of those cases was anybody coming in and

20  saying we can test liability.  Let's build the liability up

21  based on the evidence and have an estimation that is driven by

22  the rules of state law and the federal rules of civil

23  procedure.  No one ever did that.  No one came in with an

24  alternative proposed methodology.  Not a single one.  Everybody

25  came in with a settlement history.  They tweaked it different

1 ways.  They adjusted it different ways.  They did not come in

2 with an alternative.  They didn't dispute liability and

3 therefore it wasn't even necessary for the Court to address the

4 filing to the issue.

5          So Your Honor, I would say that there is a very

6 simple answer to all those cases that doesn't do violence to

7 them at all.  The answer to those cases is they didn't reach

8 because they didn't have to reach.  The issue that is proposed

9 here.  That one picture there was requested, Your Honor.

10         THE COURT:  All right.

11         MR. BERNICK:  So what is interesting about those

12 cases is sure they are great.  They are making the proposition

13 that you can come in with a basic agreement.  It's a settlement

14 model.  All they are worried about is how to adjust the model.

15 The Court is not going to reach the issues that are addressed

16 in this case.  Those cases are not pressed because they don't

17 reach the issue that we have here.

18         THE COURT:  Well the debtor always has the option of

19 paying claims that might have been discharged.

20         MR. BERNICK:  I'm sorry?

21         THE COURT:  The debtor always has the option of

22 paying claims that might have been discharged.  And it can do

23 that through agreeing to pay into a 524G trust as well as it

24 could by agreeing to pay a creditor directly after a discharge.

25 Can't it?

**J&J COURT TRANSCRIBERS, INC.**

1           MR. BERNICK:  I would believe that that is correct.

2           THE COURT:  And I don't think 524G says anything

3 other than that.  So does the Court after noticing a hearing

4 may enter an injunction, may enter an order confirming a plan

5 and may issue in connection with such an order an injunction in

6 accordance with this subsection to supplement the injunctive

7 effect of a discharge under this section.  That's all 524G

8 essentially does is supplements the discharge.  So if the

9 debtor decides in a particular case that its settlement history

10 is an appropriate standard for what it is willing to pay into a

11 trust, then it has that option.  If it decides that it is

12 willing to pay claims that would otherwise be discharged, it

13 has that option.

14          MR. BERNICK:  Absolutely.

15          THE COURT:  All right.

16          MR. BERNICK:  I regret that I too a little bit too

17 much time, Your Honor, but I am done.  I will save whatever

18 time I have for a short rebuttal.

19          THE COURT:  All right.  Shall we take a lunch recess

20 now, gentlemen?  How much time would you -- oh committee.

21          MR. PASQUALE:  Can I have about 30 seconds?  Now is

22 probably a good time.

23          THE COURT:  Sure.

24          MR. PASQUALE:  Thank you, Your Honor.  Ken Pasquale

25 for the official creditors committee.  Your Honor, just for the

1 record since this is opening statement time, the creditors

2 committee fully supports the debtor's arguments and positions

3 and as a result we will not have an independent direct case in

4 chief.  We do reserve the right and the opportunity to cross

5 examine witnesses.  I don't see that we will need that

6 opportunity until later in the case with respect perhaps to Dr.

7 Peterson and Ms. Biggs.

8          THE COURT:  All right.

9          MR. PASQUALE:  We have one witness in rebuttal, but

10 again that will be much later in the process.

11          THE COURT:  All right.

12          MR. PASQUALE:  Thank you, Your Honor.

13          MR. HOROWITZ:  Your Honor, Greg Horowitz of Kramer

14 Levin for the equity committee.  I just want to say virtually

15 exactly the same thing Mr. Pasquale just did.  The equity

16 committee obviously fully supports the debtor's approach to

17 estimation and also supports and is joined in the debtor's

18 Dalbert motion.  I think as Your Honor can tell from the way

19 that the equity committee has conducted itself, we have no

20 desire to unduly prolonged proceedings.  In our view our

21 clients are paying for this so we'd want to keep it as short as

22 possible.

23          We likewise because our clients obviously have an

24 enormous interest in these proceedings reserve our right to

25 question witnesses and our sole witness Dr. Heckman whose

1  expert report we've put before the Court would be a rebuttal

2  witness.  We note that Dr. Heckman was not the subject of a

3  Dalbert challenge and so the equity committee never answered

4  any Dalbert motion that was made against us.

5            THE COURT:  All right.

6            MR. HOROWITZ:  That's it.  Thank you, Your Honor.

7            THE COURT:  Okay.  How long do you think it will take

8  you for lunch to get wherever you are going to go?  I mean to

9  get everyone out and back I think it usually takes about an

10 hour so I mean keep it as short as you like, but I think much

11 less than an hour doesn't work in this building very well.  An

12 hour, okay see you back at one o'clock then.  We are in recess

13 until one.

14                      (Lunch recess)

15           THE COURT:  Please be seated.  Who is next?

16           MR. LOCKWOOD:  I am Your Honor.  I will be right

17 there.

18           THE COURT:  Okay, Mr. Lockwood.

19           MR. LOCKWOOD:  Good afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MR. LOCKWOOD:  This is somewhat unusual combination

22 of occurrences here because unlike the normal situation where

23 you would have motions in limine/Dalbert type exercises

24 separate from opening statements, as Mr. Bernick has

25 demonstrated and as we agreed we are basically combining the

1 two.  You might ask yourself why is that?  It's sort of an odd

2 way to proceed.  Well I think the answer is that if you look at

3 the parties contentions concerning the portion of the Dalbert

4 briefs and arguments that dealt with the question of fit, it

5 becomes abundantly clear that the two sides here are presenting

6 the Court with two starkly different cases.

7          On the one hand you have Mr. Bernick presenting

8 Grace's so-called merits based estimation which as the Court

9 has just heard is really essentially a form of mass tort

10 litigation.  And on the other hand you have the ACC FCR

11 approach relying on the Owens Corning, Armstrong, Federal

12 Mogul.  You picture model which is essentially historical

13 estimation in the sense that you look at the debtor's previous

14 claims resolution history which is primarily settlements.  But

15 it includes as Dr. Peterson will tell you judgments as well as

16 the measure of the estimation.  And those two approaches are

17 reflected in, obviously, the experts that the parties are

18 proffering in support of and in rebuttal of those.

19          There is a certain category of ships passing in the

20 night about all of this.  In prior hearings in this case, we

21 referred to these different approaches as sort of involving

22 competing views of the methodology of estimation.  But in

23 reality the two approaches are based on profoundly different

24 views of what the legal issues are ultimately in front of this

25 Court.  And how those issues to the extent that they deal with

1 estimation are governed by both substantive and procedural law.

2        I think in order to sort of get our arms around what

3 is going on here with both the Dalbert and opening statement

4 portions of this, we need to have a certain amount of context.

5 What is this estimation that we're doing here after all?  I

6 mean why are we here?  There is no sort of tree standing

7 bankruptcy code provisions that says thou shalt have an

8 estimation.

9        Well in the present status of the case we find

10 ourselves in the situation in which we have both sides have

11 filed their own plans of reorganization here.  Grace's plan

12 reorganization is conditioned on the Court estimating its

13 present and future asbestos personal injury liability and no

14 more than $1.6 billion of which conveniently some $1 billion

15 would be provided by the Sealed Air Corporation, a predecessor

16 of Grace.  And the balance would be I believe Grace hopes

17 reimbursed by its insurers.  So effectively Grace can use other

18 people's money to resolve its asbestos problems.

19        The committee's plan of reorganization in contrast is

20 predicated on the Court estimating Grace's aggregate personal

21 injury liability as at least $4 billion.  And I overlooked

22 something about the Grace plan.  The $1.6 billion covers both

23 the aggregate personal liability and the aggregate property

24 damage liability.  And while -- and it also strangely sets up

25 two different classes of asbestos personal injury claimants who

1 would be treated both by going to a trust, but would vote

2 separately.

3        In any event, neither of these plans is currently

4 consensual.  Both of them provide the debtor with Section 524G

5 protection and both of them implicitly, and this is the

6 important part here, contemplate cramming down non-consenting

7 classes of claims or interests.

8        The debtor's plan and this estimation implicitly

9 contemplate cramming down the asbestos PI and PD claimants and

10 our plan implicitly contemplates cramming down the equity.

11 Under some circumstances it could even amount to cram down of

12 the unsecured creditor class although that's not presently what

13 the numbers are expected to work out to do.

14        Okay, what is therefore the bankruptcy code framework

15 for into which this estimation and the plans fit?  And we've

16 heard a lot about the code and how we have to conform to the

17 code from Mr. Bernick's presentation.  The bankruptcy code and

18 asbestos case provides basically two alternative methods of

19 proceeding.  And a third which I would call a theoretical

20 hybrid.

21        The first and sort of most common one is the creation

22 of a trust which accompanied by an injunction which would

23 effectively channel all of the present and future asbestos

24 personal injury claims to the trust, which would succeed to the

25 debtor's liability for those claims.  And those claims and the

1  future demands as they became claims in the future would be

2  resolved by the trust long after the bankruptcy case had been

3  concluded.

4       And in particular those plans do not generally and

5  indeed I think pretty much invariably envision any form of

6  allowance or disallowance process of asbestos personal injury

7  claims in the bankruptcy court itself.  The other alternative

8  which was actually illustrated by one of Mr. Bernick's charts

9  where he listed all the bankruptcies and the money and there

10 was one at the bottom that you may have noticed didn't have any

11 money by it with the name Dana Corporation, is to pass through

12 the asbestos personal injury liabilities and deal with them

13 later.  And that's exactly what the Dana plan, that chart,

14 proposes to do with the 88,000 claims that were pending against

15 Dana at the time they filed this petition.  And some

16 indeterminate and unestimated number  of future claims.

17      What I call the theoretical hybrid which I've never

18 actually seen anybody try and do is would address the problem

19 that you can't allow or disallow demands because they are not

20 claims.  That is all the bankruptcy court has jurisdiction to

21 deal with under the code is claims.  Theoretically if you

22 really believed what you were up to but you for whatever reason

23 didn't want to pass everything through you could set up some

24 sort of allowance, disallowance process to deal with the

25 present claims.  And simply just ignore the future claims and

1  not have a 524G trust.  That would get rid of your asbestos

2  liability to the extent that it was feasible to do that which

3  we'll talk about in a minute, that are your actual claim

4  creditors as of the date of bankruptcy.  And you would deal

5  with the futures as any debtor that has potential future

6  liabilities, warranties for example and things of that nature

7  that routinely don't get treated in bankruptcy, even if you

8  could theoretically argue that they might be a claim but they

9  get passed through.

10         Both of the plans here purport on their face to be

11  the 524G plan because they both purport to set up a trust and

12  have the trust resolve the claims and even though at the moment

13  they are not consensual.  So, okay, where does that -- so how

14  does the estimation fit into that?  What is it that we're doing

15  there?  well there is a number of provisions in the bankruptcy

16  code that either explicitly or implicitly deal with estimation.

17         The first one is Section 502C which provides with

18  respect to by its terms individual claims that it would take,

19  which the liquidation of which would unduly delay the

20  reorganization can be estimated for purposes of allowance.  So

21  502C is allowance mechanism.  Then, and this is why I used the

22  phrase implicitly earlier, in the definition of court

23  proceedings in Section 157B(2)(b) of Title 28, there are

24  references -- there are provisions that permit the bankruptcy

25  court to engage in the estimation of claims for the purpose of

1  confirming a plan.

2        But which go on to state that the bankruptcy court

3  does not have core jurisdiction for the estimation of

4  contingent or unliquidated personal injury tort or wrongful

5  death claims for purposes of distribution.  Then finally you've

6  got 524G(4)(b)(2) which requires the Court as part of the

7  confirmation of a 524G plan to determine that the funding of

8  the plan and the trust is fair and equitable to the holders of

9  demands in light of the amounts being contributed to the

10  Section 524G trust on behalf of the debtor.

11        There again there is some notion that the Court is

12  going to have to compare an aggregate amount the funding of the

13  trust with the aggregate claims that future demand holders can

14  make and make a determination that that is fair and equitable.

15  the 157B(2)(b) definition doesn't really tell you anything

16  about what estimation for purposes of plan confirmation is.  It

17  just sort of is a jurisdictional provision.  But the provisions

18  in Section 1129 themselves are presumably what is being

19  referred to.  And particularly in non-consensual plans the

20  relevant provisions that would or could contemplate some

21  aggregate estimation of the claims of a class as opposed to an

22  allowance process for individual claims include the two -- the

23  situations set forth in Section 1129B(2) of the code which deal

24  with cram downs.

25        Under 1129B(1) for example the Court with respect to

**J&J COURT TRANSCRIBERS, INC.**

1  a descending impaired class is required for cram down to

2  determine that that plan doesn't discriminate unfairly with

3  respect to that plan, which the case law has generally read to

4  me.  The class generally gets treated pro rata in the

5  distributions that are going to be made to claims in that class

6  compared with the other classes that it is contesting or being

7  treated in some way or another better.

8          The second requirement is under Section 1129B(2)

9  which is the fair and equitable requirement that has to be met.

10 That is basically you have two alternatives for satisfying fair

11 and equitable.  One is that each -- showing that each member of

12 the class will receive 100 percent of the allowed amount of his

13 or her claim.  Or under 1129B(2)(b) that no equity interest

14 holder is receiving or retaining any property under the plan

15 with respect to that interest.

16         There is a third category where you might conceivably

17 have an estimation and that would be under Section 1129A(11)

18 the feasibility requirement.  If the plan provided what I'll

19 call an uncapped 100 percent payment obligation for tort claims

20 where the feasibility of the reorganized debtor's ability to

21 pay those uncapped amounts could be a problem depending upon

22 what the potential amount of those claims was in comparison to

23 the assets available to pay them.  So there could be a contest

24 about that and the Court might well be required to again make a

25 judgment about the aggregate amount of these potential claims

1   to see whether the debtor's plan would in fact be feasible or

2   whether it would be amount to a Chapter 22 situation where the

3   debtor would turn around and be -- wind up being back in

4   bankruptcy because it was unable to pay those claims.

5         Okay, what sort of an estimation in the context of

6   this framework is Grace asking the Court to do here?  Most

7   recently and succinctly stated in its Dalbert reply brief.

8   It's a reply in support of its motion to exclude some of the

9   witnesses of the ACC and FCR.  And as you have heard again from

10   Mr. Bernick earlier today what Grace asserts, is that what is

11   being estimated here is its legal liability which it defines as

12   what Grace is obliged or alternatively "can be compelled" to

13   pay personal injury creditors as a Chapter 11 debtor.

14         That legal liability in turn Grace contends must be

15   determined under Section 502B of the code which as the Court is

16   well aware is the section governing the allowance of claims in

17   a bankruptcy case.  Based on this Section 502B argument Grace

18   then sort of effortlessly concludes that this Court must

19   estimate its aggregate liability for over 100,000 separate

20   pending asbestos claims en mass by using a combination of the

21   following mechanisms that Grace has caused to occur in this

22   bankruptcy.

23         The first mechanism was the creation of a claims bar

24   date which the Court will well remember the debate over and

25   which the Court ultimately agreed to do notwithstanding the

1  fact that as a general proposition you don't have bar dates in

2  524G plan context because there is no perk if you are not -- if

3  the trust is going to resolve the claims and not the bankruptcy

4  court.  The purpose of a bar date is generally in a bankruptcy

5  case to indemnify the claim so that they can then be allowed or

6  disallowed and that was not going to be the purpose for this.

7       Instead the purpose was to enable the Court to have

8  jurisdiction to award sanctions if it felt they were

9  appropriate against claimants who declined and failed to take

10  the second mechanism, or to accomplish a second mechanism which

11  Grace has in this bankruptcy which is the personal injury

12  questionnaire or PIQ.

13       That PIQ again after much debate in front of the

14  Court was set out and was for the expressed and stated purpose

15  by Grace and has been argued throughout Mr. Bernick's

16  presentation today and in his papers, for the purpose of

17  generating information that would supposedly provide the

18  necessary, in Grace's view, evidence that would tell the Court

19  whether the claim of the person filling out the questionnaire

20  was or was not valid.

21       The third mechanism that Grace is proposing in its

22  so-called merit based or legal liability estimation is that

23  Grace is submitting the testimony of a group of experts in

24  medicine, industrial hygiene and risk analysis.  To opine on

25  the legal inadequacy from the standpoint of their particular

1 disciplines, medicine, risk analysis, industrial hygiene of

2 tens of thousands of claims.  And the final step in this

3 process is the submission of the wrap it up testimony of an

4 expert Dr. Thomas Florence who jettisons as the record will

5 show, Your Honor, when we get to the actual evidence in this

6 case, who jettisons his customary methodology of doing

7 estimations to do what amounts to really a fairly simple

8 mathematical tally of all of the claims purportedly invalidated

9 by the experts, the previous group of experts.  And then it

10 takes the percentage of the surviving valid claims which is

11 needless to say very low and extrapolates that to the future to

12 allegedly demonstrate that the simpler, very low percentage of

13 claims in the future would be legally valid.

14         It should be noted that none of these witnesses

15 assuming that they could otherwise do it, which I don't believe

16 they could, none of these witnesses is a lawyer.  None of these

17 witnesses is going to tell the Court, assuming that the Court

18 will permit them to do so, what the actual legal requirements

19 are and how those legal requirements and the state courts where

20 these claims were filed and whose law the Court is obligated to

21 apply, how that law fits, if you will, with these opinions

22 about medicine, risk analysis, industrial hygiene.

23         The -- after having sort of put Dr. Florence on the

24 number and these other experts for the number and amounts of

25 the present and future claims and the validity, the validity of

1  those claims and sort of rejecting out of hand the expert

2  testimony from the ACC and FCR as not fitting because they

3  aren't opining as to the legal liability of Grace.  And the

4  basis of which their testimony is generally being rejected is a

5  combination of it relates to the tasks where the tort system

6  was broken, not is anymore but was broken, and to Rule 408

7  which we'll discuss later.

8          But having done all of that Grace then has to put a

9  dollar figure on these claims.  How does it do that?  Well it

10 gets Dr. Florence to value this reduced universe of legally

11 valid claims that he's come up with here by using the amounts

12 paid in settlements.  Not judgments where juries and courts can

13 determine the legal validity of the claim or the amount that

14 the defendant Grace could be legally obligated to pay for the

15 claim.  No settlements and more only settlements of six cases.

16 Now Mr. Bernick went through a long to do about how gee, if he

17 used more cases he could have come up with lower values.  So

18 they are really getting generous to us in using six cases as

19 the starting point for the valuation.  And as another one of

20 Mr. Bernick's charts demonstrated all the other values for all

21 the other claims are in Dr. Florence's methodology, while they

22 are not obtained by valuing those other claims by the

23 historical amounts, they are claimed by deriving the values as

24 ratios of the value, the settlement value of those other claims

25 to the settlement value of the six mesothelioma claims.

1    So everything, the entirety of this number that Dr.

2 Florence comes up with here is dependent upon the value.  (A)

3 the values on these six meso claims and (B) the proposition

4 that they can use those settlement values for that purpose,

5 notwithstanding their insistence that this is a merits based

6 analysis which presupposes that some courts and/or jury

7 somewhere is going to decide whether the claim is valid and

8 what it is worth.

9    Then where is Grace going to go with that number if

10 the Court accepts it?  Well as long as the Court comes up with

11 a number that is no more than the $1.6 billion for whatever the

12 PI portion of the combined PI PD number is, we don't -- since

13 we don't know yet what the PD number is the PI portion of that

14 is kind of a moving target.  But it's obviously somewhere south

15 of 1.4 billion because Grace has already settled a couple of

16 hundred million dollars worth of PD claims.

17    Grace is going to cram that down on the asbestos

18 classes.  And assuming that it can do that, the effect of it

19 would be to fund the 524G trust with the PI portion of the $1.6

20 billion, which the Court will have presumptively ruled as

21 Grace's legal liability for present and future claims.  Then

22 one of two things is going to happen with respect to the trust.

23 Either the trust agreement and the TDP will have to provide

24 that the values and the criteria which Grace has persuaded the

25 Court to accept as the basis for the legal liability

1 determination will have to be baked into the trust distribution

2 procedure so that the numbers will match.  In other words, the

3 trusts -- the Court's valuation will be the same as the trust's

4 obligation to pay claims.  That's one alternative.

5         The other alternative is that notwithstanding the

6 fact that the trust -- the Court found that Grace's legal

7 liability was $1.6 billion minus X, the trust will wind up

8 having an obligation to pay more than $1.6 billion minus X to

9 claimants when it resolves these claims over the many years

10 into the future that the trust will exist.  In which event, the

11 claimant's will not get 100 cents on the dollar.

12         Those are the two alternatives.  I personally can't

13 figure out any other way of doing it.  Since the Grace plan

14 proposes to pay all its non-asbestos creditors 100 cents on the

15 dollar plus post-petition interest and proposes that a

16 shareholder should retain their equity interests, the second

17 possibility which is that the trust might not pay 100 cents on

18 the dollar can't work.  Because it would violate the absolute

19 priority rule as well as potentially, depending upon how far

20 short it fell, potentially violate the unfair discrimination

21 provision code.

22         So the Court effectively can't confirm a plan that

23 would have that possibility in it.  So that means basically the

24 only option here is that the trust is going to have to be

25 legally required only to pay those claims that the Court has

1  supposedly determined are legally valid using its experts here

2  as the guidelines for that or the determinants for that.  And

3  only the amounts that Dr. Peterson -- excuse me, Dr. Florence

4  has put up as the per claim value.  Now admittedly those

5  amounts are average values so there could be some mechanism for

6  upper and under, but the average is going to have to be

7  maintained.

8          This analysis, if I am correct about it, puts the why

9  to Grace's constant attempts to assure the Court.  For example

10 in its opposition to our Dalbert motion at Pages 9 to 10 that,

11 "No individual claims will be disallowed  that in fact what is

12 going on here is in fact an estimation using Grace's approach

13 of claims for purposes of distribution because the trust will

14 have to pay only those amounts and only those claims that this

15 Court has determined are valid under its approach."  You can --

16 Mr. Bernick can talk all he wants to about oh, we're just

17 talking about an estimation of the aggregate liability, Judge.

18 But that's just not the way this plan and the bankruptcy code

19 are going to work here.

20          So the question then becomes what is the authority

21 for doing that?  And I find, I find it interesting that we

22 didn't hear anything about the case, in his oral presentation,

23 about the case that most closely resembles what he's trying to

24 do here.  I mean he blows off all the asbestos estimations as,

25 oh, those lawyers that contested the estimation in that case

1  they were all pretty stupid.  They are not clever like me.

2  They didn't realize that they can actually have a merit based

3  estimation and parade a whole bunch of experts in here and get

4  the Court to listen to the experts and conclude that all these

5  claims are bogus and worthless.

6          They went ahead and they said oh, well, we'll just

7  sign up with the incompetent Dr. Peterson and the inexperienced

8  Ms. Biggs and we'll have just one of these settlement based

9  estimations that are clearly, you know, violate Dalbert, the

10 infrastructure of the bankruptcy code and we'll just agree to

11 do that because hey it'd be too much work I guess to actually

12 have a merits based estimation.  Remember every one of those

13 estimations was contested by somebody, a creditor class who

14 felt they were being unfairly discriminated against.  Every one

15 of them had incentive to track what was the best way to produce

16 a --

17                    (Audio malfunction)

18          There is nothing that Grace has presented to this

19 Court that suggests that somehow the arguments that it's making

20 about bad doctors and exposure minimums and relative risk and

21 requirements at 2.0 and all that kind of stuff wouldn't apply

22 to the asbestos claims that were being estimated in those

23 cases.  So basically it's Mr. Bernick who is the only lawyer in

24 the country who has been smart enough to figure out that this

25 is the way to do it and these other cases are not the way to do

1 it.

2      Well okay, what's his authority for the fact that he

3 can do it?  Well in his papers he cited two cases Dow-Corning

4 (phonetic) which he litigated and A.H. Robinson, which is not

5 an asbestos case.  Well Dow-Corning is a particularly

6 interesting case and I really ask Your Honor to read it.  It's

7 very long but it is extremely informative on the issues that

8 we're talking here.

9      For openers, the parties in Dow-Corning, both sides

10 asked the Court to do a mass estimate of the best impact

11 claims.  Judge Spector said no, I'm not going to do that.  Why

12 did he say he was going to do it -- not going to do it?  Well

13 among other things he said that because the Dow-Corning plan

14 like the Grace plan here proposed to put a cap on the amount

15 that would go to fund the breast implant claims for disease.

16 The explanation scarring et cetera  those claims were not at

17 issue here.  Because it was going to cap that liability $2

18 billion, he concluded that that would be an estimation for

19 purposes of distribution because if the claims came in over

20 that amount of money they wouldn't get paid somehow.  Whether

21 it would be some claims that wouldn't get paid any or all

22 claims would get paid a percentage or whatever.  He said he

23 couldn't do that.

24      And he relied -- this was largely -- there were a

25 number of reasons why he couldn't do it.  One of them was that

1  only the district court could do it under 28 USC 157B(2)(B).

2  Another was that you have to have a jury trial on the issues

3  because it was an estimation for purposes of distribution under

4  28 USC 1411.  And another was ironically that he didn't need to

5  do an estimation because he can do an allowance process.  And

6  the only reason to do an estimation is if it is going to save

7  you time over doing an allowance and he concluded that he could

8  do an allowance.

9        Okay.  What -- how was he going to go about doing the

10 allowance?  Here he believed, and the parties appear to agree

11 although there was some dispute from the tort claimant's side,

12 that there was uniquely at least compared with asbestos

13 uniquely, a single overarching common issue that could be

14 litigated in <u>Dow-Corning.</u>  And that was what we call here a

15 general causation issue, namely did the silicone gel used in

16 breast implants was it capable of causing disease?  And if it

17 wasn't, as Mr. Bernick's client Dow-Corning was asserting

18 capable of causing a disease, then there were no claims,

19 period, for those diseases, which I said earlier was the guts

20 of the case.

21        Well the allowance never took place but Judge Spector

22 how he thought it should take place.  As he characterized it,

23 and I'm going to quote here, he was accepting the parties'

24 invitation to provide "serious recommendations intended to

25 nudge the parties toward an agreement on how this case can be

1 resolved fairly but expeditiously."  That's Page 570 -- 211

2 Bankruptcy Reporter at 574, Note 29.

3          Judge Spector at Pages 574 to 597 which is a lot of

4 pages so I'm not going to go through in detail, but basically

5 he concluded that he could do potentially have a Rule 42 common

6 issues trial on this general causation issue that would be

7 based on an omnibus motion that Dow-Corning had filed objecting

8 to all claims with respect to this silicone gel causing

9 disease.  That's a heck of an omnibus objection I might add.

10 I'm not sure in Delaware even with the Court's ability to have

11 omnibus objections that you could have a substantive omnibus

12 objection against 100,000 claims.  But be that as it may, Dow-

13 Corning had filed one, Judge Spector was prepared to look at

14 it, and he further thought there was a possibility because

15 Judge -- because Dow-Corning had filed a concurrent motion for

16 summary judgment that he would have jurisdiction to rule on

17 summary judgment on that day on that issue.

18          However, he went on to discuss at some length what

19 would have to happen if he couldn't grant summary judgment on

20 that motion which again I might add he never did.  He

21 identified a host of problems with what we have including the

22 need for multiple trials, the need for juries, the need for

23 individual determinations of specific causation and damages, ie

24 if he determined the general causation requirement favorably to

25 the plaintiffs then the issue would be would how much of dosage

1  or what have you, the same sort of specific causation issues

2  that are being addressed when we talk about, you know, do you

3  have enough asbestos in your lungs, do you have enough

4  exposure, et cetera, et cetera, to be a substantial

5  contributing factor to your disease.  Those are specific

6  causations because they are addressing the individual claim.

7          And at the end of the day he never resolved any of

8  that.  He just simply said I'm going to deny the estimation

9  motions.  I'm going to consider the debtor's motion for summary

10  judgment on its omnibus objections and conditionally if he

11  denied the causation -- the summary judgment motion on general

12  causation he was going to send his opinion to the district

13  court as a recommendation as to how that court should proceed

14  to litigate -- liquidate those claims.

15          Now if we apply the Dow-Corning decision to this case

16  what does it tell us?  Well it says first you can't use

17  estimation in the bankruptcy court which is where this

18  estimation proceeding is going on, can't use estimation to

19  impose the cap liability amount on a non-consenting class of

20  creditors in lieu of actual allowance or disallowance

21  procedures, which I might add Your Honor has repeatedly stated

22  that we are not allowing or disallowing claims.  You have no

23  intention to do that and Grace in its papers has agreed that we

24  are not allowing and disallowing claims.

25          Even if there was some mechanism for avoiding the

1  individual allowance, disallowance problems identified by Judge

2  Spector, this Court would at most have the power to rule

3  favorably to Grace on a summary judgment motion on an omnibus

4  objection to all asbestos claims on the ground that asbestos

5  doesn't cause disease.  Not surprisingly, we haven't seen that

6  motion because there is no dispute that asbestos causes

7  disease.  The dispute is if somebody -- does somebody have an

8  asbestos related disease and if they do, did exposure to a

9  Grace product constitute a substantially contributing factor to

10  the development of that disease?  Both of which are the do you

11  have a disease is individual to the plaintiff, and do you have

12  exposure to a Grace product in sufficient amounts to have

13  contributed to that, to substantially contributed to that

14  disease?

15        Again it looks at the individual work history of the

16  individual claimant.  So there is just no mechanism for

17  achieving even the theoretically possible result in this Court

18  that Judge Spector thought he might be able to achieve in _Dow-_

19  _Corning_.  So under _Dow-Corning_ if Grace actually wants to

20  litigate the merits of its liability for these claims in this

21  Court -- well first it can't do it in this Court.  It would

22  have to have the district court withdraw the reference because

23  as we've noted earlier this Court doesn't have the power to,

24  either through estimation or otherwise address the allowance of

25  personal injury claims.

1          Secondly, the district court would then have to

2    identify and determine the consolidate -- the so called common

3    issues and you would have to address what, if any, issues could

4    be addressed on summary judgment.  You have to empanel juries

5    for all claims not summarily adjudicated and you then have to

6    try the resulting cases including individual issues such as

7    specific causation and damages.

8          Needless to say that is not what this Court

9    contemplates doing.  And I would note in that connection that

10    the Rule 42 approach was (A) tried by Mr. Bernick in the

11    Babcock and Wilcox case or was proposed and after Judge Vance

12    inquired of Mr. Bernick how many cases over how many years was

13    she as the district judge who he persuaded to withdraw the

14    reference for this purpose going to have to spend on these

15    cases and they requested further briefing on that subject.

16    That was the last anybody heard about the 42 trial, case

17    settled.

18          Secondly, he also originally proposed to do it in

19    this case.  But for reasons which I suspect have something to

20    do with his realization that it simply wouldn't work in

21    anybody's lifetime in this Court or Judge Woolan or whoever had

22    the case at the time wasn't going to be very receptive to that,

23    he withdrew that proposal.  And instead he moved to have an

24    aggregate estimation.  But when he moved to have an aggregate

25    estimation, he made sure to move to have an aggregate "merits

1  based" estimation, notwithstanding the fact that that term

2  appears to have been invented by Mr. Bernick for purposes of

3  this case.

4        The only other case offered by Grace in support of

5  what it wants to do here is the one we heard about earlier

6  today which is the <u>A.H. Robins</u> case.  The Court can read the

7  A.H. Robins case for itself.  I submit to you that it is a

8  pretty slender read here.

9        First, the context of the case was in the fourth

10  circuit that the class of Dalcon Shield claimants whose claims

11  were being addressed in that estimation had voted 95 percent in

12  favor of that plan.  Notwithstanding the fact that the

13  disclosure statement expressly stated that the payments to

14  claimants under that plan were going to be limited to the

15  amount being contributed for that purpose by the debtor, some

16  $2.5 billion, that the estimation was inherently uncertain, and

17  that as a result it was possible that the claimants wouldn't

18  get their share of what that number was supposed to produce by

19  way of a recovery.

20        Indeed, the appeal was from a dissident group of

21  claimants and the actual grounds for appeal that they were

22  raising were 1129A(11) feasibility and 1129A(7) best interest.

23  And as for the feasibility objection since Robins was never

24  going to have to pay any more than the estimated amount and

25  since there was no dispute that it had the ability to pay the

1 estimated amount, the feasibility objection is sort of

2 ridiculous on its face.  Of course it was feasible.  I mean,

3 all it had to do was pay the money and walk away.  That was the

4 end of it.

5        There would be no subsequent claims against Robins

6 because they were being cut off, discharged.  As for the best

7 interest test, the opinion is absolutely opaque as to what the

8 estimation issue was related to best interest.  I mean, I can't

9 -- I don't know what it was.  It certainly however didn't seem

10 to -- none of the issues, none of the arguments seem to involve

11 what we've got here which is a situation in which you had some

12 multi-expert, multi-disciplinary, multi-expert case that was

13 going to determine A.H. Robins legal liability for Dalcon

14 Shield claims for all time and all purposes in an aggregate

15 mass tort litigation.  Instead what can be gleaned from the

16 opinion was there were a number of different experts much as

17 there are in asbestos cases who come in and testify that in

18 their opinion the aggregate amount of the liability based on

19 whatever criteria they chose to bring to that assignment is in

20 their judgment this horrible term that Mr. Bernick keeps

21 saying, their judgment X dollars and the district court chose

22 among them.

23        He came -- the district court came up with a number

24 which happens to conform to Francine Rabinowitz who is a

25 typical asbestos expert who comes in and uses the same

1  methodologies that Dr. Peterson and Dr. Biggs use usually and

2  yeah, she didn't -- she used the questionnaires to determine

3  that some of the claims weren't valid and beyond that who

4  knows.  But the bottom line is that number one, you can't tell

5  how it was done except to know it was done differently from

6  what Grace is doing here.  And secondly, it was a battle among

7  estimation experts, not among doctors and industrial hygienists

8  and what have you.

9           The final thing, I have to say is I would suggest

10  that Your Honor read Judge Spector's view of what happened in

11  A.H. Robins which appears at 211 Bankruptcy Reporter at 601 at

12  Note 60.  To put it mildly he had some questions about the

13  integrity of that entire process and how it played out.  In any

14  event, the -- what is going on here is in our judgment a

15  fundamentally illegitimate use of Dalbert in this sort of mass

16  aggregation context.

17           What is going on here is the experts are being asked

18  to testify about albeit in a sort of combined fashion about the

19  legal validity of whole classes of claims against Grace.  And

20  the -- as I've attempted to elaborate here the legal merits of

21  individual claims, even if they went into groups, is simply not

22  and cannot be an issue in this Court.

23           Secondly, the experts while it can give opinions

24  about medicine and risk analysis of law, excuse me, and

25  industrial hygiene they cannot come in here and usurp the

1   powers of the court or the jury in telling the Court whether

2   claims are legally valid or not.  But that is exactly what is

3   happening here because what you are being asked to take these

4   criteria that Grace is positing in here and do one of two

5   things with them through these experts.

6         One is since Dr. Florence simply zeros out everything

7   that they say isn't valid, that's a legal judgment.  Because

8   the questions of what is the evidence needed to support a

9   personal injury claim at the end of the day is something that a

10  judge determines or a jury or a combination of the two.  It's

11  not something -- and the expert can opine on the medicine and

12  the components of it.  But they can't say and I'm right and

13  this claim isn't any good and that is what they are doing.

14        The alternative is what Grace might be arguing, is

15  that no other expert in the world could have credible

16  difference of opinion on these subjects.  This is the Dalbert

17  angle.  Dalbert as you know doesn't decide the law.  I mean

18  Dalbert isn't a rule that says an expert that the trial judge

19  determines whether some expert's testimony is a correct

20  statement of law.  Dalbert is an issue about whether or not

21  expert testimony is admissible in the trial of a contested

22  issue of fact.  And if there is two sets of experts whose

23  testimony is both admissible then the trier of fact ultimately

24  decides on the basis of the particular case in front of it

25  which of those experts is more credible on the facts of that

1 case.

2          Grace seems to be suggesting at points in its

3 argument that because it -- the experts in-house are so

4 credible and so persuasive and so credentialed that no other

5 expert could possibly be admitted in the case, in an individual

6 case to controvert their finding, if you will, that a plaintiff

7 not meeting their criteria doesn't have a valid case.  And

8 again, that's not what this Court is here to do nor could it.

9          Even if in some way or another you could try and

10 argue that there was some basis for having this mass allowance

11 disallowance process done in this Court, the ACC and the FCR

12 aren't the parties that could do that.  As the <u>Kensington</u> case

13 in the third circuit clearly held, the ACC and the FCR do not

14 -- excuse me, not the ACC, official committees do not bind by

15 their actions individual members of their constituency.  And

16 while in the case, in that case the issue was whether they were

17 bound by failing to raise and objection or something and in

18 this case it is a different issue.  The principle is the same.

19          We can't -- I remember at one point in one of the

20 charts Mr. Bernick had he said the ACC and the FCR could have

21 taken discovery on all of these claims.  That was his response

22 to our argument that the personal injury questionnaires didn't

23 afford individual claimants the full panoply of protections

24 that they would normally have in a trial to get discovery

25 against the defendant.  For example, to find product ID

1  evidence that the product was used at their work site, even

2  though they themselves might not have personal knowledge of

3  that.

4         He said oh the ACC and FCR can take discovery about

5  that.  Wrong.  We are not -- we don't have the legal capacity

6  to litigate that issue, A.  And B, the notion that we're going

7  to try 100,000 individual claims on behalf of 100,000

8  individual claimants, even if they are put into baskets or

9  groups so that we don't have to try 100,000 separately we can

10 maybe only try, I don't know, I don't know what the number of

11 permutations and combinations are of medical evidence, exposure

12 evidence, risk analysis.  There's going to be a lot of

13 different issues being tried.

14        And at the end of the day, the notion is that those

15 trials would bind the individual claimants with respect to

16 their claims because their claims in this so called estimation

17 would not be funded by Grace in the 524G trust.

18        As a result the testimony of these experts in Grace

19 does not meet the Dalbert fit.  It's not that somehow or

20 another they are not competent to testify or that even the

21 subjects on which they propose to testify are not the subjects

22 that experts could testify about.  I mean obviously there is

23 disputes about individual aspects in the testimony.  But there

24 is a general proposition.  Nobody is here saying you can't have

25 expert testimony about medicine or industrial hygiene or risk

1  analysis.   That's done all the time in individual cases.

2           The lack of fit here arises from the fact that what

3  they are doing is telling the Court how the Court should

4  resolve the merits of these individual claims and that's not

5  what the whole Court is or can be here to do.   In contrast,

6  what sort of estimation are the ACC and the FCR asking the

7  Court to do?   We're not asking the Court to estimate anybody --

8  the merits of anybody's individual claims.   But under 28 USC

9  157B(2)(b) as I noted earlier this Court does have the ability

10  to estimate claims including PI claims for purposes of

11  confirmation.

12          The committee and the ACR -- excuse me, the committee

13  and the FCR's plan does contemplate a cram down on equity.   If

14  the Court using the estimation methodologies for estimating

15  aggregate claims against the debtor for purposes of confirming

16  the plan over the objections of other creditors who are

17  claiming unfair discrimination for example, were to determine

18  that through the testimony of our experts and the experts of

19  the debtor and the equity committee and the unsecured creditors

20  committee.   There's at least two other experts in here, Mr.

21  Dunbar, Dr. Dunbar and Dr. Chambers that have the same type of

22  approach to estimation.   And who make the same kinds of

23  judgments.   And there, there is just a dispute among those

24  experts as to how you arrive at the right number using these

25  approaches and what the right number should be.

1          But if the Court were to determine for example the

2     number of proposed in the committee's FCR joint plan was no

3     less than the amount of the estimated liability, then the

4     committee's plan would be confirmable.  And remember

5     exclusivity has been lifted in this case.  So there's two plans

6     out there and short of a consensual resolution which those two

7     plans become one plan, those -- both of them theoretically

8     would eventually have to be sent out for a vote and both of

9     them the Court would have to consider whether they can be

10    confirmed or not.

11         So from the committee's point of view the type of

12    estimation that we're seeking here or we're sponsoring, if you

13    will, does in fact have some utility under the bankruptcy code.

14    It is within the jurisdiction of this Court and can

15    appropriately be carried out.

16         While Mr. Finch, my partner and Mr. Mullady for the

17    futures rep is going to address the specific attacks that have

18    been made on Dr. Peterson and Ms. Biggs, I did want to make a

19    couple of points about that.  The -- since, as we mentioned

20    earlier, you not only have to potentially make a cram down

21    estimation on these plans but you also have to make a fair and

22    equitable determination under Section 524G that the trust is

23    being adequately funded.

24         There is, while 524G creates the opportunity to avoid

25    years if not decades of individual allowance and disallowance

1 procedures, and also gives you the ability to deal with future

2 demands which an allowance process would not, it also

3 contemplates by definition estimating large numbers of present

4 and future unliquidated claims whose validity and value must be

5 predicted under state law which can change and those

6 predictions of the numbers and values of future claims are by

7 definition not susceptible to scientific answers.

8        There's a lot of talk here of science.  There's a lot

9 of things bankruptcy courts do in the way of deciding issues

10 and under various code provisions that don't involve science.

11 I mean incumbent valuations which is the other part of

12 confirmation issue.  It's not science to have some experts up

13 here telling you what they think the company is worth.  And

14 indeed, Mr. Bernick's analogy earlier of the stock market.  In

15 fact when you value a company even though you don't -- to some

16 extent you are being the stock market.  You are being the

17 substitute for the stock market.  What is this company going to

18 be worth?

19        Everybody in the room knows that the minute the

20 company no matter what you valued it at, emerges from

21 bankruptcy and starts trading things are going to happen.  The

22 value of The stock even -- first they turn out that The market

23 differs and The value of The stock that The bankruptcy judge

24 valued at $10 a share turns out to trade at 8 or 12.  Secondly,

25 over a period of time a lot less than five to seven years, it

1  could be months, the values of that stock are going to

2  fluctuate because market conditions, economic conditions, the

3  competence of management, whatever.  You know going in that

4  that value is not going to be The same forever.  And The people

5  who do it use judgments, they don't use science.

6          And what 524G requires us to do here is a practical

7  matter is something really quite similar to that.  Because it's

8  a practical focus.  We know, the statute itself Section

9  524G(2)(b)(2) requires the bankruptcy court to determine that

10 "The actual amounts, numbers and timing of such future demands

11 cannot be determined."  Right there in The statute.

12         By Grace and The equity committee, by seeking to

13 exclude testimony from Dr. Peterson and Mr. Biggs -- and Ms.

14 Biggs on The ground that it is not scientific is based on

15 judgments and assumptions and is inherently uncertain and

16 susceptible to being proven erroneous by future events are

17 effectively trying to create standards for aggregate tort

18 liability estimations in Section 524G that would effectively

19 make them impossible to accomplish.

20         And the effect of making them impossible to

21 accomplish would basically mean to render nugatory Section 524G

22 and any other provisions that we've been through here that

23 would require some kind of aggregate estimation to compare a

24 class of unliquidated claims treatment versus classes of

25 liquidated claims.

1        The argument also ignores in its focus on science and
2  replicability and The challenge to The experts The fact that it
3  is undisputed in this case that outside of bankruptcy
4  corporations including Grace itself pre-petition, insurers and
5  others, investment bankers what have you, routinely use similar
6  methods to that used by Dr. Peterson and Ms. Biggs here for the
7  purpose of estimating company's present and future asbestos
8  liabilities for such purposes as trading in stock of those
9  companies, preparing financial statements for submission to the
10 SEC and the like.

11       This is not therefore the type of estimation which is
12 The made for litigation kind of expert opinion which is
13 frequently rejected by courts on The ground that it is not a
14 recognized discipline.

15       As for Grace's Rule 408 argument, it's never been
16 applied in any cases.  This is another example of Mr.
17 Bernick I guess being smarter than all The other lawyers around
18 that never thought about This one before.  The only case in
19 which it has ever even been discussed is another one of Mr.
20 Bernick's cases, Babcock and Wilcox in which Judge Brown
21 rejected The argument.  I mean he's got a lot of explanations
22 abut what else happened in The case.  The fact is The case
23 squarely holds Rule 408 doesn't bar estimation -- opinion
24 testimony by an expert like Dr. Peterson about a company
25 settlement history.

1          We've argued that in our papers The technical aspects
2     of why Rule 408 doesn't apply.  Mr. Bernick's response in his
3     reply brief is pretty -- is a series of bullet points that
4     don't really provide any significant authority to The contrary
5     for The proposition that you can -- you could even admit all
6     these settlements as long as you are not trying to prove
7     liability for The invalidity of a claim or its amount.  The
8     testimony here is not taking a particular settlement or group
9     of settlements from The past and saying Grace has legal
10    liability for these particular settlements in The future.  Or
11    Grace has even legal liability for a case very similar to these
12    cases in The future.

13          It is simply a method of trying to figure out how
14    much money Grace, outside of bankruptcy, post bankruptcy if you
15    will, would have to pay for these cases.  And Mr. Bernick spent
16    a lot of time talking about how conservative his experts are.
17    Well The fact of The matter is that This is an extremely
18    conservative assumption because as Mr. -- as The evidence will
19    show in This case The reason Grace settled cases, The reason
20    that virtually all asbestos defendants settled The vast
21    majority of cases against them, is that they have made a
22    determination that it is cheaper for them than to try The
23    cases.

24          Sure if they try The cases they will win a lot more
25    of them.  But The problem is that The ones they lose they get

1  killed.   And as Dr. Peterson has pointed out in one of his

2  reports, he actually substituted The sort of -- The litigation

3  history which is The only thing resembling an actual merits

4  based history that Grace has.   If you substituted that history

5  for The settlement based history as opposed to combining The

6  two wherein The judgments The verdicts get, because they are

7  such a small percentage, The effect of them is dramatically

8  reduced.   But if you substituted them you would wind up with

9  Grace paying very, a lot fewer cases, a lot more money.   And

10  The total Grace liability would be way, way higher than The

11  highest number that Dr. Peterson or Ms. Biggs has come up with

12  here.

13         There are also -- they've also tried to blow off The

14  notion that Rule 703 allows an expert to testify about things

15  that would be inadmissable as The basis for opinions.   They

16  cite some cases.   Read The cases, Judge, they don't support

17  that notion here.   And particularly what they don't support is

18  whether Mr. Bernick likes it or not, The estimation methodology

19  utilizing This type of analysis is routinely used by experts in

20  This field for This purpose.

21         Now at their conclusions -- but the fact is it is

22  used and testified in a lot of cases that it is used outside of

23  litigations as I said earlier and under those circumstances for

24  them to use the same type of factual basis, whether it's

25  admissible as we say, or in admissible, as they argue, is

1  simply not prohibited under Rule 408.

2      The final point which continues to frankly just sort

3  of amaze me is Grace's own use of settlements notwithstanding

4  Rule 408.  I mean at one point in their reply brief they refer

5  to our raising this issue as a, quote, schoolyard taunt, which

6  I kind of like that.  That's cute.  It's not a schoolyard

7  taunt.  It's basically saying Grace cannot ask this Court to

8  rule the same -- opposite directions on the same issue at the

9  same time.

10     If Grace is right, then Rule 408 prohibits reliance

11 by an expert on settlements for amount.  The rule itself

12 specifically talks about prohibiting use of them for purposes

13 of determining the amount.  You can't go into -- in front of a

14 jury in a personal injury case and say, oh, well, you know, we

15 had discussions about -- I admit there's liability here, but I

16 had discussions with the plaintiff's lawyer, and he was willing

17 to agree to pay -- take $10 for this case that he now says he

18 wants a million dollars for.  And the only dispute is about the

19 value of the case.  You can't do that.

20     So if Rule 408 means what he says it does, then Mr.

21 -- Dr. Florence's testimony is out the window, and the only

22 evidence that would be available that wouldn't violate Rule 408

23 is the judgment values, which I just pointed out a few minutes

24 ago would produce a number way bigger than what Grace says its

25 liability here is.

1              At the end of the day, Your Honor, all of these

2    problems that Grace asserts that the ACC and the FCR are

3    somehow creating for it in the position we're taking in this

4    bankruptcy and preventing Grace from sort of utilizing the

5    Bankruptcy Code in the way in which it was intended are of

6    Grace's making not ours.  Grace was the one that filed the

7    voluntary Chapter 11 proceeding.  Grace is the one that seeks

8    to get 524(g) protection against future claims that would

9    otherwise not be dischargeable in a Chapter 11 proceeding.

10   Grace is the one that has decided to attempt to use its Chapter

11   11 case as a vehicle for attempting to litigate the validity of

12   most of the asbestos PI claims against it.

13             If Grace's lawyers and experts are to be believed,

14   and Grace's asbestos personal injury liability is well under a

15   billion dollars, Grace can propose -- easily propose a plan

16   similar to the data plan which had 88,000 pending claims in

17   front of it and just passed through those claims to be

18   litigated.  And if the court system has been fixed through all

19   the tort reform that's out there and through all of these

20   expert witnesses that Grace could have brought to bear prior to

21   its Chapter 11 proceeding but elected not to use it except in

22   rare instances, but now they're going to come in and they're

23   going to say to the law -- the judges, federal judges, state

24   judges, whatever, you can't have a claim unless you meet these

25   criteria, then they can sell that to those judges and those

1  juries and the courts that have jurisdiction of those claims.

2        If you take what Grace is doing here at face value,

3  it never intended from the day it filed this case to use this

4  Chapter 11 proceeding for the normal purpose of restructuring

5  its business through arrangements with its creditors that the

6  Bankruptcy Code contemplates.  In violation instead of the

7  spirit if not the letter of the Third Circuit's decision in the

8  SGL Carbon case, Grace is simply attempting to convert the

9  bankruptcy -- its bankruptcy case into a form of aggregate mass

10 tort litigation that it couldn't accomplish outside of

11 bankruptcy, and in the process it's basically trying to

12 convince this Court that the normal rules in claims allowance

13 that allow the claimant to -- you know, you've got to have an

14 objection to the claim.

15        I mean here under the bar date, Your Honor, Grace has

16 never objected to these claims.  They're all deemed allowed

17 right now, because there's never been an objection filed.  All

18 the claims were filed under POCs and the bar date.  I mean,

19 obviously, they're not allowed, but I mean the whole notion of

20 a claim, an objection, a hearing, a right to defend yourself,

21 put your claim forward, a right to elect who your trial expert

22 is going to be as opposed to some guy who you might have gotten

23 some x-ray from while you were considering filing a lawsuit

24 against somebody, everything of that is just tossed out the

25 window, and it is simply not possible under the Bankruptcy

1  Code.  It's not a legitimate use of the Bankruptcy Code, and

2  I'm sure at the end of the day this Court will not countenance

3  it.

4          That said, I rather suspect that the Court is not

5  going to Daubertize any of the witnesses.  We've been through a

6  process in some other cases before Your Honor, and so while I'm

7  going to turn the podium over now to others to address some of

8  that, particularly given the fact that Mr. Bernick didn't spend

9  a lot of time on most of the witnesses, hopefully, we will be

10 able to avoid having too much further discussion on that

11 subject.  Thank you.

12         THE COURT:  Mr. Finch.

13         MR. FINCH:  Nathan Finch for the Asbestos Claimants

14 Committee.  Don't show any graphics unless I tell you to.

15         The -- let's talk about what's not disputed here.

16 There is well-established epidemiology for the projected future

17 course of mesothelioma.  Dr. Nicholson's projections, you heard

18 Mr. Bernick say that they were sound science.

19         Second, we know that 27 million Americans have been

20 occupationally expoed to asbestos.

21         Third, we know that Grace made asbestos-containing

22 products that were broadly used in a wide variety of places.

23 Their Monokote III, which is the asbestos spray on insulation

24 product, has been called one of the -- it become the dominant

25 fireproofing product in the country and was the focus of most

1 of the litigation.  They also made insulating cement and made

2 acoustical plaster, all of which had chrysotile asbestos that

3 was infected with Trimolite from the Canadian mines.  They

4 have --

5          UNIDENTIFIED SPEAKER:  Excuse me.  If you could just

6 lean a -- I can hardly hear.

7          MR. FINCH:  Sure.  Excuse me, Your Honor.  They have

8 admitted that -- testified -- their witnesses have testified

9 that Grace products have been identified by plaintiffs as being

10 on any kind of construction or industrial site.  It runs the

11 whole gamut except for possibly shipyards.  And, in fact, they

12 have actually lost some cases arising out of shipyards.

13          So you've got this huge toll of disease nationwide.

14 The United States government statistics show that the

15 mesothelioma incidence rate, what they actually count, is still

16 going up.  I mean it's basically been flat for a long time, but

17 it's still going up.  We've got, you know, 26/27 hundred

18 mesothelioma deaths in the United States now.  The death rate

19 from asbestosis is going up, and the number of people who die

20 from asbestosis is only a very small fraction of the people

21 actually ultimately who have the disease.

22          And so the question is how do you estimate that

23 liability on Grace's part.  And I'm going to first talk a

24 little bit about their methodology and explain why -- in

25 addition to the reasons Mr. Lockwood articulated, why it's just

1  not reliable and doesn't fit the law.  What Grace is ultimately

2  trying to do is take Daubert and turn it into a substantive

3  rule of decision under state law.  Forty-six states have

4  Daubert or a version of Daubert.  They call it Havner in Texas.

5  They call it High in Maryland.  But the point is the scientific

6  basis for getting an expert's report or expert's opinion in

7  front of a jury, there's a mechanism to challenge that or has

8  been for many, many years after 1993 and in some states before

9  that.

10       So what they're trying to do is they're trying to say

11  only if you believe our experts, are -- would any case

12  conceivably get to a jury, and that's making a factual

13  determination that -- it's going to depend on the facts and

14  circumstances of each of the 100,000 individual cases.  You

15  can't do it globally, and they're inconsistent with the law.

16  And a couple of the cases that we cited in our reply papers,

17  I'll just read you the quotes.

18       The first is the Rutherford case from California,

19  which the substantive rule in California says, "If plaintiff's

20  prove causation in asbestos-related cancer cases by

21  demonstrating that the plaintiff's exposure to the defendant's

22  asbestos-containing product in reasonable medical probability

23  was a substantial factor in contributing to the aggregate dose

24  of asbestos the plaintiff or decedent inhaled or ingested and,

25  hence, to the risk of developing asbestos-related cancer."

1    There's no requirement that there's a doubling of the risk for

2    each exposure or each particular product.

3        The <u>Berger vs. Amkin</u> (phonetic) case, which is a case

4    in New York by the judge who has all of the asbestos cases in

5    New York, who listened to the testimony of Dr. Mogavkar, one of

6    Grace's experts here, and a lot of other experts trying to

7    Daubertize the -- or New York state law equivalent -- the

8    expert testimony from plaintiff experts in braverker cases,

9    which is a lower exposure and a different type of exposure than

10   the types of exposure we're talking about here.  What the Court

11   wrote in that opinion, and this is at 818 New York South 2d

12   762, "Scientists and physicians use various means to establish

13   causation in particular situations, not the least of which are

14   toxicological and pathological studies and documented case

15   studies.  While epidemiology may be the gold standard, it can't

16   be the only standard in an area where caustion is both

17   particularistic and well established.  Federal courts have also

18   held that epidemiological evidence is not necessary to

19   establish causation.  It is not really important to have an

20   epidemiology study to determine whether the risk of cancer is

21   increased by asbestos exposure in every occupation."

22       That's what Grace is trying to do here.  The ACC and

23   the FCR are going to call on medical experts, Dr. Laura Welch,

24   who is an industrial medicine doctor and an epidemiologist

25   who's run the largest screening epidemiological study of sheet

1  metal workers, 17,000 workers over the past 20 years, Samuel

2  Hammar, a pathologist, a Dr. Rodwi (phonetic), another

3  pathologist, Arnold Brirody (phonetic), a cell biologist.  All

4  of them basically take issue with Grace's threshold idea that

5  you need to have -- that only people who have personally mixed

6  or personally installed asbestos could be possibly be exposed

7  to enough Grace asbestos to cause their disease.

8          The fact is each case turns on its own individual

9  facts.  The plaintiff in each of those cases would be able to

10  hire his or her own expert for the purposes of proving up a

11  case against Grace, and the medical literature -- there is

12  medical literature.  Grace discounts the studies relied upon by

13  the doctors that the ACC and the FCR will put on, but the fact

14  is they do show an excess risk or a doubling or quadrupling of

15  the risk with fiber exposures down to well below one fiber a

16  year of exposure.  And, you know, Grace can take issue with the

17  peer review medical literature, but that's a function of cross

18  examination that would come up in each individual case, and

19  Your Honor is not going to sit here and try 100,000 cases.

20          How much exposure and whether someone has an

21  asbestos-related disease turns on the facts and circumstances

22  of the case.  And in a mesothelioma case -- and most of what

23  I'm talking about here is mesothelioma, and it's real --

24  there's not a dispute about the disease.  It's just did the

25  defendant's asbestos contribute to the causation of the

1  disease?  And there's not -- it doesn't have to be that the

2  defendant's asbestos was the sole cause of the disease, or that

3  the defendant's asbestos doubled the risk, because it's

4  cumulative asbestos exposure which ultimately causes disease.

5  So that's their mix and install criteria for mesothelioma.

6        Another criteria they have is you have to have

7  radiologically diagnosable asbestosis in order to attribute

8  lung cancer to asbestos exposure.  And the consensus medical

9  view by the Helsinki criteria, which is a group of experts with

10  over 1,000 years studying asbestos-related disease, have said

11  that you can have asbestos-related lung cancer if you have

12  sufficient exposure, but you don't need to have radiologically

13  diagnosable asbestosis.  And, in fact, Grace's criteria don't

14  even permit someone to prove pathologically that they have

15  asbestosis, and I think Grace's experts would admit that if you

16  have asbestosis pathologically, it may not show up on an x-ray,

17  but you definitely have asbestosis.

18        And so even if you were to say that you need

19  underlying asbestos to attribute lung cancer to asbestos

20  exposure, which the medical literature says you don't need --

21  there's a lot of medical literature that says you don't need --

22  Grace's criteria rule out even the people who can prove it

23  pathologically.

24        The -- Mr. Bernick, quote, testified or talked about

25  various aspects of the tort system, and in the tort system --

1  what people did and didn't do in the tort system.  Whatever Mr.

2  Bernick says, whatever I say, whatever any of the lawyers say

3  up here is not evidence.  We're going to -- you're going to

4  hear evidence from Steve Snyder, who's -- who has represented

5  companies in the tort system for over 20 years, from Dan Meyer,

6  who's a claims adjuster who's settled over -- he or his group

7  have settled over 200,000 asbestos claims, from Peter Krause

8  and John Cooney, who represent primarily mesothelioma victims,

9  about what the standards are in the tort system, what Grace

10  required in order to settle cases.

11          Mr. Bernick would have you believe that Grace settled

12  any case that came in the door without regard to whether it

13  posed a risk to it.  In fact, for every case that Grace paid

14  money to -- and here I'd like to -- well, I'll pass on the

15  graphic.  Grace required proof of exposure to a Grace product

16  sufficient to satisfy it and proof of disease to satisfy it,

17  and it paid the plaintiff the amount of money that was

18  something less than what he would recover at trial.  Something

19  far less than what he would recover at trial, but both sides

20  are basically hedging their bets as to what might happen if

21  discover played out.

22          And the defense lawyers from Grace testified at

23  deposition, which is going to be their trial testimony -- since

24  they haven't been listed by witnesses, and we can't compel them

25  here by subpoena -- that the reason they chose to settle these

1  cases and the standards they used to settle these cases was the

2  best way to minimize the liability.

3       MR. BERNICK:  Yes, I'm remimded that the testimony

4  that Mr. Finch is reciting --

5       THE CLERK:  I'm not picking you up, sir.

6       MR. BERNICK:  I'm reminded that the testimony that

7  Mr. Finch is citing is testmiony that was taken I believe

8  subject to a confidentiality order, because it relates to

9  settlement materials, and I believe that that was one of the

10 conditions pursuant to which we agreed to allow that discovery

11 to take place.  So to the extent that Mr. Finch wants to get

12 into that, and I would I guess suggest that I believe that some

13 of this -- I'm not sure this is covered in the briefs, but to

14 the extent that Mr. Finch would want to get into it, I think

15 that we have an open court here, and I'm not sure that that

16 would be appropriate.  I really don't want to spend a huge

17 amount of time on this, but I am compelled to point out that I

18 believe those are the terms of the order.

19      THE COURT:  All right.

20      MR. FINCH:  I'll pass that.  That's the only

21 reference I'm going to have to this, Your Honor.  I'm not going

22 to show any of the documents.  Suffice it to say there's a lot

23 of them, and we'll put them into evidence at the appropriate

24 time.

25      We do have -- Grace did try some asbestos cases.  It

1 tried about 80 cases to judgment.  It won about two thirds of

2 them, but the ones that lost, the judgments were catastrophic

3 compared to settlement averages.

4      Let's talk about the Peterson and Biggs estimation

5 methodology.  The fact is that it is generally accepted in non

6 -- both in litigation and non-litigation settings.  One of the

7 things we attached to our brief was an expert report from Tom

8 Florence in the Vellumoid case where he testified in the

9 Federal-Mogul cases this summer about Vellumoid's asbestos

10 liabilities, about the asbestos liabilities of Pneumo Abex,

11 about other asbestos liabilities, and in each and every one of

12 those reports he said, and I quote, that, "His estimates were

13 based on generally accepted forecasting methods and pre-

14 petition filing trends."  And he goes on to describe, "The

15 forecasting processes incorporated the methods illustrated in

16 Nicholson and Perkel --" John, can we show this?

17      "The forecasting process incorporated the methods

18 illustrated in Nicholson, Perkel, and Selikoff, the courts have

19 accepted this or similar -- the same or similar methodologies

20 for forecasting future asbestos claims in numerous

21 proceedings."

22      And Dr. Peterson has studied asbestos litigation and

23 mast tort litigation for over 25 years.  He's a Trustee of the

24 Manville Trust.  He is a Trustee of the Fuller-Austin Trust.

25 He was a founding member of the Rand Institute for Civil

1  Justice.  He has been an expert for the courts in valuing

2  asbestos claims on four occasions.  He has about as much

3  experience in studying the tort system as anyone out there.

4      Ms. Biggs has worked for insurance companies and

5  estimated liabilities using methodologies somewhat different,

6  but the basic -- fundamentally it's the same as Dr. Peterson.

7      Dr. Florence has that expertise, has the ability to

8  estimate liability of asbestos companies.  In their briefs

9  Grace called Dr. Florence a statistician.  I think he might be

10  somewhat offended by that.  His -- he holds himself out and is

11  an expert in what's the liability of a company facing asbestos

12  claims.

13      And what Grace ignores in its _Daubert_ challenges on

14  Dr. Peterson and Ms. Biggs is there are many types of science

15  and there are many types of specialized language, and the Rule

16  702 doesn't mean you have to be able to run a laboratory

17  experiment.  You can have scientific, technical, or other

18  specialized knowledge to assist the trier of fact.

19      And, ultimately, the -- _Daubert_ boils down to does

20  the expert employ in the courtroom the same level of

21  intellectual rigor that characterizes the practice of an expert

22  in a relevant field?  And the answer to you, Your Honor, is

23  that is exactly what Dr. Peterson has does here, and that is

24  what Ms. Biggs has done here.  They use the same methodologies

25  here they do in non-litigation settings outside of court.

1           And why does the Nicholson methodology produce the

2   most reliable and the best estimates of a future liability of

3   an asbestos company?  Three things that haven't changed for 25

4   years -- although Mr. Bernick talks about changes in the legal

5   system, what he's -- what Dr. Peterson's testimony was is you

6   can't predict today what the law is going to be in a particular

7   jurisdiction tomorrow, whether the federal government is going

8   to pass the fair act tomorrow.  What we do know that over the

9   past -- ever since Borrell (phonetic) in 1973 that the law has

10  compensated mesothelioma claims and asbestos claims.  We do

11  know the asbestos-related epidemiology.  We know the future

12  time course of the asbestos-related cancers.  And, finally, we

13  know that the best evidence of what a company's likely to pay

14  to reduce the judgment and settle cases tomorrow is what it's

15  paying today, taking into account the most recent trends.  So

16  we have the disease curve.  Now --

17          THE COURT:  Would you say that last sentence for me

18  again?  I'm sorry.

19          MR. FINCH:  The best evidence of what a company is

20  going to pay to deal with asbestos liabilities tomorrow just is

21  what it is paying today taking into account the trends that

22  line up to where it is.  Just like the best estimate of what

23  you're going to have to spend on gasoline next week is what

24  you're paying this week not what you're paying ten years ago.

25  The best evidence going forward is you take the most recent

1 time and you project it forward based on what you know today

2 about the trends and what has happened since.

3          So what do we know about Dr. Peterson's methodology

4 and those trends?  Could I have Dr. Peterson's report, the page

5 showing the claiming history?

6          THE COURT:  Just a second, Mr. Finch.  They have this

7 on a screen that's not facing me, and I can't see it.  So hold

8 on one second, please.

9                    (Pause)

10          THE COURT:  Okay.  Thank you.

11          MR. FINCH:  I'll focus on the mesothelioma.  That's

12 Grace's history of how many mesothelioma claims it got.  Nobody

13 really disputes that.  It's a continuing upward trend.  Whether

14 you want to go back to 1980 or 1990 or 1995, it's a continuing

15 upward trend.  Mr. Bernick makes a big deal out of the

16 2000/2001 period, but, in fact, the trend was apparent long

17 before that, and it's continued to go up.

18          Well, we have also Dr. Peterson and Ms. Bigg's

19 knowledge about the litigation environment.  We have the Rand

20 report on asbestos litigation which has the total numbers of

21 claimants, various broken down by disease, and this -- you

22 know, Mr. Bernick said, oh, there aren't new claimants coming

23 in the system.  Well, he's just wrong about that.  You can see

24 from the 1990 all the way up through 2002 there's more

25 claimants coming into the system for mesothelioma.  So that's

1   the pattern for the data that we have.  And so Dr. Peterson and

2   Ms. Biggs, to a greater or lesser extent, say, okay, we don't

3   have data for Grace after 2001, but we know the trends are up.

4   We know there's an upper limit, which is in the Nicholson

5   disease curve, whatever percentage of that.  So there's nothing

6   that says that there's going to be a reversal of the trend in

7   Grace.

8          We do have data about the market generally, and the

9   reason people focus on the Manville Trust is, because

10  ultimately the Manville Trust gets 90 or 100 percent of the

11  asbestos claims.  And the Manville Trust data shows that even

12  if you leave out 2003 for the U.S. exposures for mesothelioma,

13  the numbers and claims the Manville Trust were getting between

14  2004 and 2006 are about 20 percent higher than the last three

15  years to which we would have Grace data, which is 1998 to 2000.

16  And so people use the Manville Trust as a benchmark in non-

17  litigation settings as well as litigation settings.

18          I mean Dr. Dunbar, in a presentation he made to a

19  bunch of financial analysts, looked at the Manville Trust as

20  sort of a proxy for the market.  Just like when you're valuing

21  a company, you look at the S&P 500 or the Dow Jones Industrial

22  Average as a proxy for the market.  Well, you look to the

23  Manville experience here.

24          And so Dr. Peterson, using his expertise and his

25  knowledge and the knowledge of the trends, takes that and

1 projects the future liability using Grace's historical values

2 taking into account the fact that just like its claim numbers

3 were going up the values were going up not just for Grace but

4 for many asbestos defendants.  And the -- you know, they say

5 they have confidential data that shows that claim values have

6 declined somewhat.

7 　　　　　One thing I would caution Your Honor is that in

8 viewing the evidence and listening to the testimony, they tend

9 to mix apples and oranges.  So they go back and forth from

10 mesothelioma only to all types of claims and all values.  It's

11 certainly the case that non-malignant claims have declined

12 substantially over the past three years, but the mesothelioma

13 values, there's no real evidence from any kind of publicly

14 available public source.  Companies don't break out their

15 mesothelioma settlements in their financial statements.

16 　　　　　The one thing we do know, if you turn to Page 29 of

17 Dr. Peterson's report, this shows Grace's history at the top.

18 Keep the whole page, John, the whole thing.  Grace's history at

19 the top, which shows increasing mesothelioma values, increasing

20 lung cancer values, and what Dr. Peterson regards as comparable

21 companies.  These are companies that were in the construction

22 industry that made construction-type products, USG, Turner, and

23 Newell.

24 　　　　　And if you look at the bottom, there's a company

25 called Union Carbide, which has become one of the dominant

1   asbestos defendants today.  And if you look at the dollars out

2   the door -- this is from Union Carbide's financial statements.

3   It's publicly available.  Dollars out the door, which is really

4   what we're trying to figure out here.  Look at the dollars out

5   the door Union Carbide was paying in 2001, which is $39

6   million, compared to the dollars out the door it's paying now,

7   which is about $120 million.  It's tripled, and there were some

8   years it was paying two or three hundred million dollars a

9   year.

10          So the idea that in the tort system companies are in

11  some kind of much better world I think is refuted by the

12  evidence and refuted by the testimony of the knowledgeable

13  witnesses, and I would urge Your Honor to listen to Dr.

14  Peterson's testimony, listen to Ms. Biggs' testimony, and focus

15  on the point that even under Grace's methodology they're

16  predicting what's going to happen over the next 40 or 50 years.

17  Sure, nobody can predict what the stock market's going to do

18  next week or next month or next year, but over the past 100

19  years the S&P 500 has gone up an average of 8 or 9 percent a

20  year.  If you're trying to do a forecast of the next 30 or 40

21  years, you look at the long-term trends, and it would be a

22  pretty good estimate to say I believe, all things being equal,

23  20 years from now that the whole market is going to be 20

24  percent higher -- I mean ten -- eight percent higher per year

25  going over 20 years than what it was today.  And so you start

1   with the most recent period, and you project forward.

2          And, finally, Your Honor, I'll wrap up my time, so

3   that Mr. Mullady can focus on some specific points relating to

4   Ms. Biggs.  Grace used the methodology to estimate asbestos

5   liabilities taking its past history in non-bankruptcy settings.

6          If you could put up the -- Tom Florence's -- excuse

7   me.  If you could -- could I have, John, please ACC-89?

8          This is the estimate that Dr. Florence did for 1997

9   for business planning purposes at the time of the Sealed Air

10  decision.  This will be an exhibit in the case.  If you back up

11  one page -- back up to the other one.  This is -- if you look

12  at the estimate of the indemnity arising from VI claims as

13  obtained I, that is the exact type of methodology.  You know,

14  leaving aside some individual tweaks that Dr. Peterson and Ms.

15  Biggs use and what Dr. Peterson -- what Dr. Florence himself

16  does and contacts other than this case where he's being asked

17  just to count up the numbers.

18         When Grace -- the management wanted to estimate the

19  liability for pending claims at the same time, which is BD-605,

20  same document, they had 104,000 pending claims.  This has been

21  shown in open court before, Ms. Baer.

22         MS. BAER:  There was one that flashed by that wasn't.

23         MR. FINCH:  Okay.  This chart was shown in open

24  court, Your Honor.  This chart was produced to the United

25  States government pursuant to a subpoena.  I don't think

1  there's any confidentiality left to that.

2          Grace had 100,000 cases pending in 1997.  At the

3  time, as you'll see from Dr. Peterson's estimates, Grace was

4  paying about a third as much in meso cases and half as much as

5  lung cancer cases, and yet they still estimated the liability

6  for pending cases at $325 million, which is almost as much as

7  what they're estimating for all their liability here under

8  their methodology.

9          And, finally, I will close, Your Honor, with two

10 thoughts.  Number one, if Grace believed that this methodology

11 is so unreliable.  Why does it -- and we -- in our briefs we

12 pointed this out to Your Honor.  As late as December, 2006 it

13 was inviting one of its insurance companies to go look at Dr.

14 Peterson's estimate of liability in order to get money from an

15 insurance company.  They said you can go get it.  We can copy

16 Dr. Peterson's report from Sealed Air, which estimated

17 liability north of $3 billion as of 1998.  We can copy the

18 report, or you can get it from the bankruptcy docket.  If Grace

19 thought -- this is Grace's in-house head of insurance.  If

20 Grace thought that its -- the Peterson methodology was so

21 unreliable, why does it use it to get insurance coverage, to

22 get money for its -- from its insurers?

23         The final thought, Your Honor, that I'll leave you

24 with is Dr. Florence's methodology that he uses here and

25 Grace's whole methodology basically identifies the cases where

                    **J&J COURT TRANSCRIBERS, INC.**

1 Grace's experts can see that the plaintiff has a disease that

2 could be caused solely by exposure to Grace asbestos.  When a

3 claim is found to be valid under tort law in our system of

4 justice, how much does a defendant pay?  The defendant doesn't

5 pay a settlement value.  The defendant pays what a jury

6 determines are the damages in the case.  And we have evidence

7 of what juries have determined are the damages in cases

8 involving Grace where there is liability.

9         And I -- we have demonstrated to you and we will

10 demonstrate to you that if you buy into everything else about

11 Grace's methodology, which we disagree with and think is wrong,

12 and contrary to the Bankruptcy Code, if you value what's left

13 by reference of the judgments, which is the only methodology

14 which is consistent with a merits-based estimation, the

15 liability is at least $12 billion.  And with that I will turn

16 the lectern over to Mr. Mullady and sit down.

17         THE COURT:  Why don't we take a ten-minute recess,

18 and then we'll start again, Mr. Mullady?

19         MR. MULLADY:  Good suggestion, Your Honor.  Thank

20 you.

21         THE COURT:  Okay.

22         MR. BERNICK:  Your Honor, for planning purposes,

23 about what do you have left on the clock (indiscernible).

24         UNIDENTIFIED SPEAKER:  We --

25         MR. BERNICK:  I think you started about --

```
 1                        (Recess)

 2              THE CLERK:  Please be seated.  Will the Court come to

 3  order?

 4              THE COURT:  Mr. Mullady.

 5              MR. MULLADY:  Thank you, Your Honor.  Good afternoon.

 6  If it please the Court, Ray Mullady for the Future Claimants

 7  Representative.

 8              THE COURT:  Just a minute, Mr. Mullday.  Moana, do

 9  you know how to turn that off?  Do you -- the fan off --

10              THE CLERK:  Just turn the --

11              THE COURT:  -- that button off?  I'm going to turn it

12  off, so we can hear you, Mr. Mullady, other -- and I apologize,

13  folks.  It'll probably get hot.  If some -- if you really start

14  to die, let me know, and I'll turn it back on, and we'll not

15  hear Mr. Mullady too well, but, hopefully, that won't change.

16  That should shut down in a few minutes.  Go ahead, Mr. Mullady.

17              MR. MULLADY:  Thank you, Your Honor.  Good afternoon.

18  Once again, Ray Mullady for the Future Claimants

19  Representative, who is Mr. David Austern, who is in the

20  courtroom today seated back there next to Mr. Frankel.  He may

21  have to get up and leave during my presentation.  It's not out

22  of disinterest, but not coincidentally in connection with his

23  duties as claims administrator for the Dow Corning Trust, he

24  has an obligation to attend to later.

25              MR. BERNICK:  Which that client is very grateful.
```

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MULLADY:  I'd like to begin, Your Honor, by

2    reminding the Court of the magnitude of Grace's liability to

3    future asbestos personal injury claimants.  By the consensus of

4    all of the individuals who have estimated Grace's liability in

5    this case, the future claims liability is over 80 percent of

6    the total liability.  Ms. Biggs has it at 90 percent.  Mr.

7    Peterson has it at 89 percent.  Even Dr. Florence, whose

8    estimate obviously is much lower, has it at 82 percent.  And

9    Grace in its SEC filings most recently, it's 10k for the period

10   ending 12/31, 2000, projected that 84 percent of the liability

11   would fall in the future years.

12          Thus, Your Honor, if Grace's liability for asbestos

13   personal injury claims is channeled to a Section 524(g) trust,

14   by everyone's consensus over 80 percent of the assets in the

15   trust will be used to pay future claimants.  For this reason,

16   the due process rights of future claimants who are absent

17   parties here are paramount.  The U.S. Supreme Court has long

18   recognized that constitutional due process limits a court's

19   ability to rule on the merits of the claims of absent parties.

20   And that case is -- the case cite is Hansbury vs. Lee at 311 US

21   32, a 1940 case.

22          Thus, Your Honor, the due process rights of future

23   claimants limits this Court's ability to estimate Grace's

24   liability in a way that would involve ruling on the merits of

25   future claims.  That's very important, yet this is what Grace's

1  estimation methodology contemplates.  The Bankruptcy Code also

2  insures that the rights of future claimants are protected in

3  cases involving a 524(g) trust, as the Court knows.  That

4  section provides that the trust, "will value and be in a

5  position to pay," present and future claims, "in substantially

6  the same manner."

7         So we've heard a lot about merits-based estimation,

8  but make no mistake Grace's estimation methodology does not

9  assess the actual merits of future claims.  Instead it

10 arbitrarily eliminates thousands of future claims and in the

11 process tramples the due process rights of claimants that we

12 just talked about.  Can we have Exhibit 4, Tom?

13        This is a chart from Grace's <u>Daubert</u> opposition brief

14 at Page 32.  The sliver of pending claims after Grace's

15 winnowing process is shown right down here.  They start with

16 pending claims here.  They eliminate those without a proof of

17 claim.  They further eliminate claims that do not meet their

18 exposure criteria, and this last one here, no asbestos-related

19 disease.  So what starts as a pending group here of claims,

20 becomes this tiny sliver here.  Exhibit 5, Tom, please.

21        After this winnowing process is completed, we have

22 the future estimate down here.  The Nicholson disease inputs

23 curve is up here.  The only way this delta gets as wide as it

24 is in the Grace estimation is if history is completely

25 disregarded and new criteria are imposed to screen out claims

1  that Grace traditionally paid pre-petition.  And that is the

2  vagary of the process that they are using here with respect to

3  future claimants.  So as to future claimants, the screening

4  process begins with the Grace PIQs, which were not completed by

5  future claimants, so the Court has no data on individual future

6  claims, only assumptions by Grace and their experts as to the

7  number of claims that will be filed, and a second assumption,

8  an unscientific prediction, about how many future claims will

9  be meritorious.

10        Now, we know that Dr. Florence allocates zero value

11  to thousands of future claims.  This is undisputed.  He does

12  this by failing to include large numbers of claimants in the

13  claim base that he uses for his future projections.  But, as we

14  will see, his exclusions are unfair and deny claimants --

15  excuse me -- future claimants their due process rights.

16  Exhibit 6, please.

17        Now, Your Honor, this is a demonstrative.  It's a

18  little bit playful.  I hope Your Honor will give me a little

19  creative license here.  But the concept is very, very serious,

20  and this is the best way I thought we could depict this.  What

21  we show here in this first cut is a hypothetical game board.

22  The players are current asbestos personal injury claimants.

23  The object of the game is to reach the 524(g) trust here and be

24  eligible for compensation.  Hypothetical future claimants are

25  shown here awaiting the outcome of the game, because under

1  Grace's estimation methodology their fate is dictated by the

2  ability of future claimants -- excuse me -- current claimants

3  to reach the finish line here.

4         So the first player begins and gets to the first

5  question did I file a POC, a proof of claim.  He did not, and

6  his claim is not paid.  The future claimants are affected by

7  this denial, because the exclusion of this player and many

8  other players who did not file a proof of claim or the many who

9  did file proofs of claim that Dr. Florence could simply not

10 match to the CMS database, they're all used to under estimate

11 the number of future claims.  This in turn results in fewer

12 assets being allocated to the 524(g) trust under Grace's

13 estimation, and note that the money bag has shrunk somewhat.

14        Our next player proceeds through the claim filter but

15 is asked whether he entered his claim in CMS before the

16 petition date.  He answers no, and he's denied payment.  The

17 524(g) trust shrinks even more.  Future claimants ask

18 themselves why the value of their claims suffers as a result.

19 They didn't have pre-petition claims.  They were not

20 responsible for Grace not timely entering claims into CMS.

21        The next player, he's asked whether his PIQ said that

22 he personally mixed or personally installed a Grace asbestos

23 product.  He answers no.  His claim is denied, and future

24 claimants ask the question why should we be affected.  We

25 didn't file a PIQ.  His PIQ said he didn't personally mix or

1  install.  We weren't sent PIQs.  We aren't bound by Grace's

2  exposure criteria by any court.  Even if in the future a 524(g)

3  trust is established, what are the odds that Grace's exposure

4  criteria will be used?  They're not the law that they state,

5  and the trust criteria will have to be negotiated between the

6  debtor and the personal injury claimants and the futures rep.

7  Next, please.

8          The next player gives the wrong answer to the

9  question whether he identified a Grace product in his PIQ

10  response.  He's sent to the do not pay category.  The trust

11  shrinks further.  Future claimants wonder why they are being

12  affected by the response of a claimant to a PIQ where the

13  claimant's case had not been fully developed at the time of the

14  Grace bankruptcy petition and where the automatic stay

15  prevented that claimant from taking any discovery against

16  Grace.

17          The next player is a pending claimant who did not

18  comply with Your Honor's x-ray order.  My goodness, we heard

19  enough about that order over the last two or three years.  His

20  claim is denied.  The trust shrinks further.  The future

21  claimants ask themselves why their recovery's been diluted.

22  They weren't subject to the Court's x-ray order.

23          When all is said and done, Your Honor, and, of

24  course, many claimants can pass through the various Grace

25  liability filters and make it to a position where they're

1 eligible for payment under the trust, but for every claimant

2 that doesn't make it, numbers of future claimants by

3 extrapolation for the Dr. Florence methodology will not receive

4 full compensation for their claims. And at the end of the day

5 the money that is not paid to the future claimants is returned

6 Grace shareholders. It moves over there. And what was once

7 the province of future claimants becomes the province of Grace

8 shareholders. This is the game that Grace is playing here, and

9 this is why we thought this demonstrative was a good way to

10 depict it.

11      The future claimants, Your Honor, will submit their

12 claims against the trust over the next 50 years. This Court is

13 bound to estimate Grace's liability by taking into account the

14 future and as yet unasserted claims against Grace, and those

15 claims must be treated fairly and equitably. As we just saw,

16 Dr. Florence's methodology does just the opposite.

17      Now, of course, Dr. Florence disclaims all

18 responsibility for the assumptions that underlie his

19 calculation of the number of pending and future claims. He

20 instead follows the lead of Dr. Elizabeth Anderson, who opines

21 that certain categories of claims, as we've heard, have

22 insufficient exposure to Grace products to have a plausible

23 claim against Grace.

24      Dr. Anderson eliminates all claimants except those

25 who personally mixed or personally installed Grace asbestos

**J&J COURT TRANSCRIBERS, INC.**

1  products, as we've heard.  Moreover, she does so in an

2  unscientific way, as I will discuss in a moment.

3        Now, Dr. Anderson in turn relies on Dr. Peter Lees,

4  who has computed the asbestos exposure rates for various

5  classes of Grace workers, but remarkably and unscientifically,

6  Dr. Lees does not even report the variations from the averages

7  that he calculates.  That's an important point.

8        Now, Dr. Anderson also relies on Dr. Mugavkar.  He's

9  the one who's collected the benchmark exposure levels to

10  asbestos that, according to Dr. Anderson, are then necessary to

11  attribute asbestos-related diseases to the exposure.  Now, we

12  submit we've argued in our Daubert papers that Dr. Anderson's

13  opinion that only workers who personally mixed or personally

14  installed Grace asbestos products could have been exposed to

15  sufficient levels of asbestos to cause disease.  We've argued

16  that that opinion is unreliable and inadmissible.

17        She arrives at this opinion by improperly assuming,

18  Your Honor, that the average asbestos exposure of cohorts in

19  each of the PIQ categories -- those categories that Mr. Bernick

20  referred to, A through F.  She assumes that the average

21  exposure of the cohorts in those categories is representative

22  of all workers in that category.  She does not account for

23  individual exposure levels at all.

24        So, for example, Dr. R.J. Lees underlying data shows

25  that the average exposure for a worker -- quote, worker -- is

1  much higher than the exposure for a, quote, helper, and that

2  only makes sense, because the worker is more directly working

3  with the product than the helper in the same job category.  Yet

4  Dr. Anderson uses the average of the workers and helpers, so

5  that, of course, dilutes the workers' exposure, and by doing

6  this what she does is she eliminates workers even though the

7  average exposures for the workers over 45 years exceed her

8  thresholds.

9          Now to make things worse, she ignores the fact that

10  not all workers in a category have average cumulative exposure.

11  Some have much higher than average cumulative exposures, but

12  she doesn't consider this, which is surprising.  If Grace is to

13  be believed that what they're doing here is determining the

14  merits of individual claims on a claim-by-claim basis, then she

15  should be considering these claimants individually and not

16  grouping them and using averages.

17          Now, Your Honor, this is a complicated area of the

18  case.  It requires some study.  We recommend that the Court

19  carefully read the declarations of Professor Eric Stallard that

20  are attached to the FCR's Daubert papers.  Professor Stallard's

21  an expert in demographic risk modeling.  In his declarations he

22  explains the importance of accounting for heterogeneity, which

23  is the differences in individual exposures, and he explains how

24  important it is to account for heterogeneity when studying the

25  exposures of individual members of a population, which is what

1 Grace purports to be doing here.  Instead, Dr. Anderson's

2 calculating average exposures and ignoring everyone above the

3 average.

4          Now, Professor Stallard also exposes as unscientific

5 and flawed Dr. Anderson's assumption that workers in the same

6 job categories will have, quote, independent exposures.  Now,

7 this is a different concept, but it's equally important.  So,

8 in other words, she assumes that each day that a worker in one

9 of her groups comes to work, and he has an equal chance of

10 doing any of the jobs in the work category as any other worker

11 just as every flip of a coin has an equal chance of coming up

12 heads as it does coming up tails.  That's the independence

13 assumption.  So under Dr. Anderson's assumption an exposed

14 worker has an equal chance of doing the job of a helper on any

15 given day, and that's just counterfactual.

16          Dr. Stallard explains why the independence assumption

17 is not scientifically valid, and it's not consistent with

18 accepted scientific practice for the purpose of rejecting

19 individual claims on the premise that they have insufficient

20 exposures to asbestos to cause disease.  Your Honor, this is

21 very important.  If Dr. Anderson's independence assumption is

22 wrong, then her exclusion of thousands of claimants is wrong,

23 and Dr. Florence's estimate is wildly inaccurate and

24 unreliable.

25          I'd like to talk about Ms. Biggs' methodology.  We

1  heard some commentary about it this morning, but let me tell

2  you a little bit about Ms. Biggs.  She'll be here to testify,

3  but it may not be until March.  She'll be testifying in our

4  case in chief.  Can we have that still, Exhibit 8?

5         This is Jenni Biggs.  She's a principal of Towers

6  Perrin.  It's a leading actuarial firm.  She leads the asbestos

7  practice of that firm's Tillinghast Division.  Her long list of

8  credentials includes having qualified the potential asbestos

9  liabilities for insurers, for reinsurers, for asbestos

10  defendants.  She's the co-author of the Tillinghast study

11  regarding the $200 billion asbestos universe that was published

12  in 2001.  She's chaired the American Academy of Actuaries mass

13  torts working group which created a public policy monograph on

14  the overview of asbestos issues and trends, which was

15  originally published back in Decmeber of '01 and was updated

16  just last summer in August.  And she's testified before the

17  Senate Committee on the Judiciary on Asbestos Issues.

18         Now, Grace's attack on her is that, you know, she's

19  unscientific.  She hasn't done peer review work.  There are no

20  standards governing her work.  It's not generally accepted.

21  All those charges are false, and we demonstrated this in our

22  papers, but I'd just like to mention a few reasons why those

23  are false assertions.

24         Her actuarial estimate bares all of the key hallmarks

25  of a reliable methodology that's admissible in federal trials.

1  It's based on published peer reviewed modeling concepts, and

2  you will hear about those.  It was prepared in strict

3  compliance with the standards of actuarial science.  It's

4  closely related to estimation methodologies that have been

5  accepted by courts in prior estimation proceedings, and it's

6  long been relied on in non-judicial settings by insurers,

7  reinsurers, and solvent asbestos defendants when setting

8  billions of dollars in asbestos reserves.  So unlike Dr.

9  Florence's methodology, which was created for litigation and

10 has never been used even by himself outside of litigation, Ms.

11 Biggs' work finds equal place outside the courtroom as it does

12 within, which is one of the criteria and key indicia of

13 reliability under the Paoli decision in the Third Circuit.

14         Can we have Exhibit 9, please?  There are standards

15 governing what actuaries do, very specific standards, very

16 exacting standards.  This is Casualty Actuarial Society

17 definition of what actuaries do.  They're known for their

18 scientific approach and demanding standards.

19         Can I have 10, please?  They apply their mathematical

20 expertise, and Ms. Biggs was a math major, and she has a degree

21 in mathematics.  Their mathematical expertise, their

22 statistical knowledge, their economic and financial analyses,

23 and problem solving skills to a wide range of business

24 problems.  They estimate the costs of uncertain future events.

25 That's what we're here to do.  We are here to estimate the cost

1  of uncertain future events.  To hear Grace discuss the subject,

2  that's not possible.  One can't do that and be scientific.

3  Actuaries would beg to disagree.

4          Can we have 11, please?  More importantly, Your

5  Honor, Ms. Biggs' work is governed by the Actuarial Standards

6  of Practice.  This is -- or ASOPs to use the acronym.

7  Actuarial Standard of Practice 12 provides that, "An actuary

8  should select risk characteristics that are capable of being

9  objectively determined and based on readily verifiable,

10 observable facts."  Ms. Biggs will testify that her estimation

11 methodology complies with these and other ASOPs.

12         Let's go to 13.  As we noted -- well, I haven't noted

13 it yet, so I'll note it for the first time, Ms. Biggs' estimate

14 of the liability in this case -- her best estimate is $3.8

15 billion discounted.  How did she arrive at that figure?  Grace

16 claims that he made a bunch of ad hoc judgments, and that her

17 estimate is the product of assertion and not scientific

18 analysis.  That's from their brief -- their reply brief at Page

19 32.

20         Well, let's review what she did.  She has a six-step

21 methodology following a peer reviewed actuarial model.  You

22 heard Mr. Bernick make reference to the peer reviewed basis for

23 the model this morning in his opening.  This is the peer

24 reviewed methodology she followed.  Step 1 was to compile basic

25 claims information, and she started with Grace's own CMS

historical data base, which Grace developed in the 1980s and
has used it throughout the years to track the hundreds of
thousands of personal injury claims.  This is actual historic
data.

Next, please.  What she first had to do was there
were all these disease categories in CMS.  She consolidated all
the non-malignant claims down to one category of non-malignant
which left her with seven categories of disease types.
Ultimately, that gets reduced to four, as we'll see in a
moment.

Next, please.  But what she found was that in CMS
there were many, many missing records.  For some claimants
social security numbers were missing.  For many, many claimants
disease information was missing.  So rather than be content
with less than a robust database to use at the juimping off
point for her estimatation, she went to the Manville database
and matched claimant by claimant, a very meticulous process of
bringing over the information that was not in CMS to fill out
the data on these claimants.  And along the way she made many
conservative assumptions and selections.  Grace refers to them
as ad hoc judgments.  She had to make judgments about how to do
this, and I think you'll hear that in many more cases than not
she took the most conservative judgment that would enure to
Grace's benefit and to her client.

To fill in some of these other holes, she looked at

1 the PIQ POC database and match further to that.  And at the end

2 of the process she came up with one complete data set of

3 claims.

4          Let's go to Step 2.  And that completed her

5 compilation of basic claims information.  The next step was to

6 estimate future claim filings.  This is a chart with respect to

7 mesothelioma future claim filings.  This graph shows the number

8 of mesothelioma claims that were filed along -- and on the

9 vertical axis the number and then the years in which they were

10 filed.  The upper line is Ms. Biggs' industry benchmark which

11 is based on research that -- and data from Tillinghast.  Mr.

12 Bernick said this morning that there's no company data in the

13 Biggs and Peterson models, and I think with respect to Biggs,

14 he was referring to this industry benchmark data.  Well, that's

15 just false.

16          The Biggs industry benchmark derives from corporate

17 defendant disclosures, from SEC filings, from Tillinghast

18 confidential client data, and various public information such

19 as the en banc database, which is itself a collection of data

20 gathered from courthouses all over the country on the number of

21 claims that are being filed, and that is truly representative

22 of what's happening to the industry.  So the industry benchmark

23 is a compilation of what's happening outside the world of

24 Grace.  She also looks at Grace's actual filings over a

25 historical period.

**J&J COURT TRANSCRIBERS, INC.**

1          Now note this shaded area here between 1997 and 2001.

2  Starting with roughly 1997, Grace had moratorium agreements

3  with various plaintiffs' firms.  Certain plaintiffs' firms in

4  exchange for group settlements were agreeing not to sue Grace

5  for a certain period of time.  This tended to dampen the number

6  of filings in the late 1990s, as you can see here.  And then,

7  of course, the claim filings go up in 2000, as Mr. Bernick

8  explained.

9          Next slide, please.  These are the moratorium

10 agreements that expired in 1999 that are highlighted in yellow.

11 You can see how many there were.  Where now these firms are

12 backing the business, theoretically at least, of suing Grace.

13 And so, of course, it stands to reason that once these

14 moratorium agreements end we see an upswing in claims against

15 Grace.

16          Mr. Bernick asked rhetorically why Ms. Biggs has

17 selected 1997 -- strike that.  Let's go to the next slide,

18 please.  There's a calibration period here that Ms. Biggs uses

19 for purposes of her estimate of future claim filings.  The

20 calibration period is '97 to 2001.  Mr. Bernick said it was an

21 arbitrary choice that she made to use those years, and it

22 reflects selection bias is what he said.  Well, that's not true

23 either.  She chose that period to account for the aberrations

24 in the annual ratios of claims that were filed due to the

25 moratorium agreements that Grace had with these plaintiffs'

1  firms which tended to understate claim filings in the late

2  nineties but then led to a surge of claim filings in 2000 and

3  2001.  So to correct for the annual aberrations she selected

4  shares based on the '97 to 2001 calibration period.

5           Interestingly, Your Honor, when she testifies here,

6  you can ask her if she had gone back to 1992 and used the

7  calibration period from '92 to 2001.  Let's go to the next

8  slide, please, Tom.  One more.  She calculates ultimately that

9  Grace had 58.4 percent of the total industry claim filing

10 experience.  In other words, more than half of the claims that

11 are being filed are included in Grace.  If she had used her

12 calibration period going back to 1992, it would -- Grace's

13 share would still be something north of 50 percent -- in the

14 low fifties somewhere.

15          Okay.  Let's go to the next slide, please.  Okay.

16 Let's go further.  I'm trying to get to the next step after

17 she's estimated the future claim filings showing Grace's share

18 in comparison to the industry benchmark and Grace actual.  One

19 more.  She has to look at -- she has to estimate the data first

20 exposure.  Well, she has to factor in the data first exposure

21 and use the decay rates that Mr. Bernick mentioned that were

22 given to her by Professor Stallard.  And but this series of

23 graphs shows -- and we'll go through these quickly, Tom -- is

24 that because Grace was introducing asbestos products later than

25 most other defendants and these years reflect when people are

1  being exposed to asbestos -- and you can see that the later the

2  exposure, the later the claims are being filed in time, and

3  that they don't run off until around 2059, according to Mr. --

4  Professor Stallard.

5         Next one, please.  This is their total industry, and

6  you can see the shape of the curve on the run off that Stallard

7  has calculated.

8         Next.  And this is Grace's share.  Note how this

9  difference between the green and the blue gets narrower as we

10  go forward in time.  And this is showing how Grace's later

11  dates of first exposure are producing claims against it in the

12  future for much longer than the rest of the industry.

13         Let's go to Step 3.  She's got to now estimate claim

14  dismissals.  Obviously, Grace isn't going to be expected to pay

15  every claim.  They didn't pay every claim in the past.  They're

16  not expected to pay every claim in the future.  Ms. Biggs

17  calculates dismissal rates for non-malignant and malignant

18  claims separately, and she does it by jurisdiction.  She uses

19  the jurisdiction's medical criteria.  She looks at judicial

20  legislative changes to such criteria and Grace's actual history

21  of claims resolution.  For malignant claims, she starts with

22  historical dismissal rates by disease and by jurisdiction.

23         Next.  And she assumes that the same dismissal rates

24  will apply in the future.  In other words, there's nothing in

25  the changes in the legal system that are going to cause Grace

1    to dismiss or not pay more malignant claims in the future than

2    they did in the past.  Now, it's a different story with non-

3    malignant claims.  In the past Grace was dismissing a small

4    percentage of those claims.  Ms. Biggs has calculated and

5    determined that in the future going forward Grace's dismissal

6    rate on non-malignant claims is going to be much higher.  For

7    example, in the State of Mississippi Ms. Biggs assumes that the

8    dismissal rate for non-malignant future claims will be 99

9    percent after 2004.  So that's Step 3.

10          Step 4 is to calculate the average payment values.

11    What she does here, as with her dismissal rates, she calculates

12    average payment -- value payments by disease type and

13    jurisdiction.  She starts with the historical values that Grace

14    was paying, and then she considers factors that are expected to

15    either increase or decrease those values over time.

16          Now, Mr. Bernick -- and, of course, these are shown

17    here on this chart, historical trends, increases in plaintiff

18    demands, and so forth.  Decreases, tort system changes, she's

19    factoring in the lack of a broken tort system and claimant

20    aging.  Now, Mr. Bernick displayed some charts this morning

21    showing mesothelioma claim values and how those have been

22    trending recently.  An example was the one at Page 57 of the

23    slide copies that Your Honor handed up -- were handed up to

24    Your Honor by Mr. Bernick.  That's the one that says Peterson

25    Mesothelioma Settlement Values.

1        One line of that chart shows the average settlement

2    value of confidential companies studied by Dr. Dunbar, and it

3    shows a downward trend over the last few years.  Well, but Ms.

4    Biggs has confidential client data as well.  If I can switch --

5    could I switch to the ELMO for a minute?  Is that possible?

6                        (Pause)

7            MR. MULLADY:  Okay.  This is a little bit hard to

8    read on the screen, Your Honor.  I apologize for that.  I'll

9    see if I can make it clearer.

10        The three different examples that are provided by Ms.

11   Biggs -- is that going to work?  Yea -- here, Example 1,

12   Example 2, Example 3, there's actual Grace, and then there is

13   selected Grace.  And what is this -- what does this -- what is

14   this telling us?  Well, it's telling us that of the

15   confidential company data Ms. Biggs studied what we see here is

16   far from falling off a ledge in terms of values the way Mr.

17   Bernick claims the data show.  There are some defendants here

18   that actually experienced increases recently.  This little

19   spike here and another one right here, those are upward

20   trending values for mesothelioma claims.

21        And Grace is down here.  Her assumption for Grace is

22   this green line, selected Grace here.  So I think you'll see

23   when she comes here that she's made very conservative judgments

24   about the values of mesothelioma claims.  It's consistent with

25   the data that she has, and, obviously, there's a little bit of

1  a dispute here between Dr. Dunbar and Ms. Biggs about what the

2  confidential company data is showing on mesothelioma values.

3  But there's no denying, from the chart that Mr. Finch showed

4  the Court this morning, that mesothelioma values have been

5  going up for some time.

6         The last step -- if we can go back to the regular

7  screen?  Take this down.  There are two more little steps in

8  her calculations.  Step 5 of her methodology --

9                          (Pause)

10        MR. MULLADY:  Step 5 is where she calculates the

11  future and pending claim liability.  She does this by year.

12  We're showing 2002 just as an example.  She takes the number of

13  claims estimated for that year.  She then eliminates claims

14  based on her calculated dismissal rates by disease type and by

15  jurisdiction.

16        Next, please.  And that leaves the claims on which

17  Grace would be liable to pay or the claims to pay.  And she

18  next averages or applies the average payment value that was

19  calculated for the year in question, and she multiplies the two

20  variables, the claims to pay by the average payment to get to

21  the total liability.

22        Next.  She does this for each and every year of

23  Grace's future liability, all the way to 2059.  We won't show

24  every year.

25        Next, please.  Resulting in -- no, I'm sorry.  We

1 have to go back just to -- we got a little ahead of ourselves.

2 Should have -- okay.  One more.  Is that it?  Okay.  That's

3 Step 5.

4         Step 6 is to calculate the cash flow.  Grace's total

5 liability showing here on an undiscounted basis of 8.9 billion.

6 And based on the general time value of money principal, Ms.

7 Biggs applied a 5.25 discount rate to all future cash flows for

8 each year.  This process yields -- and this is again showing it

9 year by year and how it works.  This process yields a total

10 discounted liability for all asbestos claims of $3.8 billion.

11         The $3.8 billion -- if we can go to the next slide --

12 is broken out in this table by four disease categories that Ms.

13 Biggs reduced her claim matching to as set forth in these

14 column headers.  And you'll note -- if we can bring up the next

15 image?  You'll note, Your Honor, that 68 percent of the total

16 discounted liability of Grace, some 2.6 billion of the $3.8

17 billion is for mesothelioma liability.  This is why Mr. Bernick

18 said this morning all of his slides focus on mesothelioma for

19 this reason right here.  That number alone, that $2.6 billion,

20 is five times higher than Dr. Florence's estimate for all

21 claims, for all disease categories combined.

22         That's the magnitude of the difference in the

23 estimated liability that Grace seeks to impose through its

24 methodology.  That difference overwhelmingly impacts the future

25 claimants.  Thank you, Your Honor.

1          THE COURT:  Mr. Bernick.

2                      (Pause)

3          MR. BERNICK:  Your Honor, I'm going to proceed in

4   reverse order and begin with the remarks that Mr. Mullady made

5   on behalf of the Futures Representative, and I'm just going to

6   go through the -- pretty much that sequence, but I want to make

7   sure that I return back to some of the legal questions that

8   Mr. --

9                      (Pause)

10         MR. BERNICK:  How about that?  Is that better?

11  Because I agree with Mr. -- Mr. Lockwood that, in fact, the

12  legal issues are very dominant issues and warrant the Court's

13  attention, because they drive an awful lot of what then appears

14  in the -- in the detail alone.

15         With respect to Ms. Biggs, the observation was made

16  that this is an analysis or a method that's not done for

17  litigation purposes like Mr. Florence's method is.  And, in

18  fact, we would submit, Your Honor, that the shoe is on the

19  other foot.  That Mr. Peterson's methodology, which, after all,

20  is actually prior in time to the Tillingnhast methodology and

21  set the model, in fact, was developed principally for

22  litigation purposes that isn't the context of disputes or

23  confirmations in court per claim.

24         Whereas, Dr. Florence's approach is not Dr.

25  Florence's approach.  That is a mistake that is made frequently

1  -- has been made frequently in the remarks here this afternoon.

2  Dr. Florence was the person who implemented the approach in

3  terms of looking at the data that satisfies the criteria that

4  were set by the scientists, which criteria are, in fact, the

5  criteria of science.  That is what hasn't been developed in the

6  courtroom.

7        There's a criteria of science that are dominant and

8  authoritative outside the courtroom and structures the entirety

9  of Grace's approach, whereas, if you look for those same

10  principles and criteria or the same analysis with respect to

11  the plaintiffs' estimation, it is not to be found.  Mr. Mullady

12  says that, well, gee, actuarial standards were designed to deal

13  with uncertain future events.  We would recognize that that's

14  true.  It just is a problem and a problem that's fundamental to

15  Ms. Biggs' analysis that in her case neither modeled nor

16  addressed future liability issues, that is legal liability

17  issues, nor was she qualified to develop such a model, nor does

18  she have a model, in fact, that even looks to the future events

19  that she purports to measure, which are not liability issues

20  but settlement activities in a way that follows the rule of

21  science.

22        The actuarial standard is read and is was very, very

23  clear.  It's general.  It gives broad permission.  The issue is

24  whether that method -- those standards, as applied in this

25  conduct -- context, meet the testing requirements of science.

1  She says she's -- she was attempting to be a scientist.  Dr.

2  Stallard says the same thing.  If you are going to measure

3  either settlements or future disease, you have to do so

4  scientifically.  The actuarials do not forgive you from

5  following science.  They permit you to follow science.

6          With respect to peer review, reference was made to

7  peer review, and again there has been no external peer review

8  of the model that you will hear about from Ms. Biggs.  The only

9  article that was made reference to is an older article.  The

10 older article -- if we could have the ELMO for just a second?

11 It's right here.  It's revealing, because when it comes to the

12 model that's being used -- it's hard to read here, but the

13 model that's being used simply uses selected annual severity

14 trends and trend severity, and it's basically arithmetic.  That

15 trend were -- nowhere considers under this article any of the

16 elements of her model, nowhere considers an industry benchmark,

17 nowhere considers epidemiological trends of any kind, nowhere

18 considers Manville, nowhere considers propensity.  All it does

19 is to look for a trend -- a very general trend.  This paper in

20 no way, shape, or form even reveals publicly what her model was

21 much less constitutes a peer review.

22          Mr. Mullady sought to correct the statement that I

23 made where I indicated that Ms. Biggs' were -- her propensity

24 were -- was not based upon public companies but rather the

25 Manville Trust.  Mr. Mullady says, well, the industry benchmark

1  did consider other companies.  Yes, it's true.  With respect to

2  the historical industry benchmark, that was based upon Manville

3  and other companies.  The key is what is the future trend, and

4  when it comes to the future trend, the future trend that drives

5  this curve that is at issue, that curve -- the shape of that

6  curve is purely and simply a function of the Manville trust

7  taken first as a smooth process then as a (indiscernible) then

8  as a decay process never before seen the light of day.

9         There was reference made to the moratorium agreement

10  by way of explaining why the propensity of rates may have

11  shifted.  Ms. Biggs did talk about that in her deposition and

12  report.  She did no quantitative analysis that demonstrate that

13  the dip that took place in propensity or the spike was in any

14  way, shape, or form actually a function of the moratorium

15  agreement experiment.  She simply said it and didn't do the

16  analysis.  Dr. Dunbar did do the analysis.  The analysis shows

17  that that theory is false.

18         With respect to the selection of 1997 as the period

19  for calibration, that was purely and simply her judgment.

20  There was no statistical testing.  She didn't pick it out in

21  order to put boundaries on moratoria.  She picked it out to out

22  balance in some rough fashion the fact that there was this huge

23  aberrational spike.  But, of course, it wasn't sufficient to do

24  that.  She says or Mr. Mullady says that the date of first

25  exposure analysis indicates that because Grace products were

1    later in exposure, the whole curve should be shifted all the

2    way out to 2049.  In fact, according to the Nicholson analysis,

3    which drives Dr. Peterson's work, the continuing resonance of

4    the alleged date of first refusal -- first exposure requirement

5    should end about 2027 not 2049.

6           There's reference made to confidentiality -- this

7    confidential client data.  It's true that we knew it was

8    confidential client data, but what's different about our

9    analysis is that the confidential client data has actually a

10   deploy of curves.  She looks at confidential client information

11   and then doesn't deploy the curves.  She uses rather the

12   propensity, which is based upon the Manville analysis.  And

13   further, our confidential client information is then confirmed

14   and verified by publicly available information from both the

15   SEC filings and the very prominently important solvent

16   continuing companies in the tort system.

17          That then brings me to Union Carbide.  There was a

18   statement that was made with respect to Union Carbide.  Yes,

19   Union Carbide was considered by Dr. Peterson, maybe even been

20   considered by Ms. Biggs, but only as of 2001 neither one of

21   these individuals had taken the most solvent company still in

22   the tort system and actually plotted what its experience is.

23   We had to bring that out on cross examination of their expert.

24   It turns out that the Carbide experience is going down.  The

25   bubble is -- the bubble has burst.

**J&J COURT TRANSCRIBERS, INC.**

1          Finally with respect to the analysis of Ms. Biggs, it

2    was pointed out at great length in connection with her -- at

3    great length it was pointed out by Mr. Mullady that somehow

4    there's a due process problem in any effort to some of the

5    assigned future values or future demands at zero value is a due

6    process problem, but yet his own expert by his own admission --

7    that's what the graphics indicated -- basically takes people

8    out of the equation, and there's a reason for it.  Due process

9    does not require that you over fund or give people rights that

10   they don't have, give them values that they don't have.  Due

11   process requires -- is a procedural requirement.  It doesn't

12   actually indicate that you must come up with a value in any

13   way, shape or form.

14          Talking about Ms. Andersion, a reference was made

15   that Ms. Anderson uses an average rather than an accounting or

16   individual variation than the concentrations that individual

17   workers might experience, and, in fact, Ms. Anderson did use an

18   arithmetic mean, and the real issue is did that introduce bias.

19   That is because she used an arithmetic method that contemplates

20   that there will be elements -- there will data on both sides,

21   but the mean is still representative if you have an appropriate

22   distribution.  The statement was made this is counterfactual.

23   That there are people who, in fact, have higher exposures and

24   lower exposures.  The interesting thing is that's a statement

25   that's made by Mr. Stallard not on the basis of anything.

1   There's not a single data point -- there's not a single

2   distribution analysis that's been done by the other side at

3   all.  This is simply a theory.  It's not counterfactual.  This

4   is, in fact, the way things are done.  They don't have data

5   that says otherwise.  In fact, the EPA actually and clearly

6   said that the average concentration is the most representative.

7   This is an EPA publication, 1992.  This is standard affairs,

8   standard approach.  The EPA uses it all the time.  Dr. Anderson

9   worked for the EPA.  It then turns out that, of course, Dr.

10  Stallard did not.

11          Finally with respect to remarks that were made by Mr.

12  Mullady.  He says that we assign no value to the future -- to

13  certain futures as if, of course, all futures must have some

14  value.  There's no requirement in the Code that all futures

15  must get some value.  The only requirement in the Code is that

16  futures be treated in the same fashion as the currents.  So

17  whatever the appropriate treatment is for the currents, that is

18  the entitlement of the futures.  They're not entitled to any

19  less, and they're not entitled to any more.

20          And that then brings me to the game board, and all

21  I've got to say about the game board is -- that's the wrong

22  board.  It's the wrong game.  That board describes nothing that

23  we're doing in this case.  We are not doing anything that says

24  with respect to futures you can't get this, you can't get that,

25  you must file this, you must file that.  That will be

determined by a plan.  The plan will spell that out within the

limits of the law.  In fact, the plan that's on file doesn't

actually hamstring the treatment of the futures in any way.

What it says is that futures will not be obliged to settle or

to litigate.  They will have an option.  Current claimants will

not be obliged to settle or litigate.  They will have an

option.  So no criteria are being imposed upon them in advance.

If they want to, just like the current claimants today, they

can litigate.  That is entirely within the purpose and intent

of the Code.

That then brings me to remarks that were made by Mr.

Finch, and I will be brief with respect to Mr. Finch, because I

do only have a couple minutes to talk about the law.  With

respect to Mr. Finch, he says, well, now, Dr. Peterson, we said

that there weren't more claimants, but, in fact, there were

more claimants coming into the system.  We never said that

there weren't more claimants.  What we said is that you can't

account for the increaed propensity against Grace by new people

coming into the system.  You can only count for them by having

-- that is magnitude in spike by the same number of existing

claimants actually proceeding against Grace and other companies

that they wouldn't have been proceeding before.  It's the whole

idea of the same basic number, maybe slightly increased,

increesing the number of people that they sue thereby driving

up the propensity of all the defendants.

1          Mr. Finch indicated, well, we used Johns Manville,

2  because Manville gets 90 to 100 percent of the cases.  That's

3  the whole problem.  They're treating Grace as if Grace is

4  liable for all of Manville's liability.  Manville accepts

5  liability for all products, not just Grace, for everybody.  So

6  by treating Grace the same way as Manville, we are treating --

7  they are treating Grace as if it's responsible for the asbestos

8  liability stemming from any exposure whatsoever.

9          Mr. Finch says, well, we did look at other -- Dr.

10  Peterson did look at other companies.  USG and Turner and

11  Newell as of 2001.  Well, that's intersting.  USG was on the

12  verge of bankruptcy in 2001.  Turner and Newell through

13  Federal-Mogul was on the bridge of bankruptcy in 2001.  What

14  about companies after 2001?  Dr. Peterson didn't consider a

15  single company after 2001.  All he considered was the Manville

16  Trust.

17          Union Carbide in 2001 -- Union Carbide was -- had

18  just been basically targeted by the plaintiffs' bar.  Their

19  propensity was skyrocketing.  What about Union Carbide in '03,

20  '04, and '05 when they got control of their litigation, and the

21  propensity against them fell like a stone?  Nowhere considered

22  by Dr. Peterson.

23          What about Grace?  Mr. Finch says, well, late in 2006

24  insurance executives at W.R. Grace actually sent the Peterson

25  report to the insurance companies, thereby indicating, oh,

1  well, I guess we're signing on to Dr. Peterson for purposes of

2  the insurance reserves.  That's completely false.

3       That memo, which we will show to the Court, actually

4  said in exactly the same breath here's so and so.  Here are

5  some of the Peterson reports.  You can follow on the rest of

6  the exhibits on bankruptcy filings along with all of the other

7  expert reports.  He's simply saying, you want this stuff?  It's

8  here.  You can take a look at it.  We want our money from you.

9  Yes, actually, it says, "I can copy the Peterson report

10 approximately (indiscernible), or you can find the report and

11 all other filings on the Grace bankruptcy on the Delaware

12 Bankruptcy Court's website."

13      That then brings me to Mr. Lockwood, and I think Mr.

14 Lockwood has raised some -- an interesting analysis of the law,

15 and I think actually the track that he traces through some of

16 the law, I would agree with a lot.  It's just that like their

17 model it deviates at just all the critical parts.  He indicates

18 that with respect to these companies, well, why -- you know,

19 it's just crazy.  Is this some bright idea?  No, the companies

20 have had different perspectives.  Armstrong World Industries

21 never set out on the road with these cases to define or resolve

22 through some definition what its liability was.  The company

23 made a deliberate decision at the very beginning of the case

24 just for peace and to get the case behind them in part because

25 they didn't believe that their liability picture was such that

1 it would make a difference (indiscernible) liability.  Owens-

2 Corning, same thing.  The -- Owens-Corning had done deals with

3 the claimants bar going back to the mid-1990s.  They were never

4 going to go into Chapter 11 to dispute liability.  Federal-

5 Mogul was so swamped with so many other liability problems, the

6 asbestos problem would've made a difference.

7        By contrast, USG and Grace -- USG and Grace are two

8 companies that were very robust companies, very solvent

9 companies, and very well high performing companies but for the

10 asbestos.  It is not surprise that USG and Grace then decided

11 to go forward and try to use the Chapter 11 to define and

12 resolve the liabilities.  USG emerged, Gob bless them, with

13 very, very significant equity after lots of protestations from

14 Dr. Peterson.  USG emerged following an effort to define its

15 liabilities, and we know Judge Wolin's opinion in connection

16 with (indiscernible).  Grace is going down the same road.

17        Mr. Lockwood then says, well, what then is the

18 authority that we have for this idea.  He cites Dow-Corning and

19 Dow-Corning actually provides a very instructive lesson that

20 I'll cover very briefly.  It is true that both sides there

21 asked for an estimation.  It is true that Judge Spector there

22 decided no, and that he decided no, because he felt that the

23 most appropriate way to deal with this issue was through actual

24 litigation of the allowance process.  He also did, in fact,

25 decide, as Mr. Lockwood indicates, that that litigation would

1  turn out common issues, and, therefore, it deployed a Rule 42.

2  And it's also true that he didn't decide that, but then it kind

3  of trailed off.  He just didn't do it, and that really misses

4  the picture of the key part of Dow-Corning, which is he decided

5  that that would be handled -- best handled by the District

6  Court, in part because the District Court was also handling the

7  Dow Chemical cases that had been transferred to the District

8  Court -- the shareholder cases.

9        Elsewhere in the MDL where proceedings were under way

10 against other (indiscernible) manufacturers, there was a 706

11 panel that had been empaneled.  So there was a likelihood that

12 at some the District Court sitting in connection with the Dow

13 Chemical cases would take up exactly the same issue, and for

14 that reason he felt it was appropriate to send the whole thing

15 upstairs, which he did.  And then the motions for sumamry

16 judgment based on Daubert were pending bofre the District

17 Court.  Indeed, I argued them to the District Court, and at

18 that time, because what the 706 panel did -- prices came down

19 in the marketplace.  There was a big push by the claimants to

20 reduce their demands, and the case resolved.  The plan also

21 wasn't struck.

22        So what do we see from Dow-Corning?  Number one, the

23 allowance and disallowance process focuses on the merits.

24 Number two, estimation focuses on the merits.  It doesn't focus

25 on anything else.  They're birds of the same kind of feathers.

1 Different procedures.  The same focus, which is the merits.

2 Mass tort is amenable to be handled pursuant to those kinds of

3 procedures.  Common issues work particularly on generic

4 causation, although there's nothing there that says it can't be

5 used for what I'll call common issues that affect the specific

6 causation.

7          So Dow-Corning takes us way down the road saying it's

8 the merits, merits, merits, whether it's estimation or

9 allowance.  It also helps, Dow-Corning indicates, that you

10 focus on the merits in order to get plan resolution, in order

11 to get consensus, because it helps focus the controversy and

12 what real liability is.

13          Dow-Corning also supplies the answer to the other

14 basic question that Mr. Lockwood raised.  That basic question

15 is, well, what are we doing here.  He says here there's no

16 agreement.  That's correct.  Here, because there's no

17 agreement, the question that we impose is what's the legal

18 liability.  That is what can we be obliged to pay?  Yes, that's

19 right.  And your answer to that -- that's our position.  I

20 didn't hear an answer to that.  He then says our view is that

21 502(b) governs, because that deals with allowance.  We said

22 yes, we believe that's right, because it tells us what the

23 standard is.  We didn't hear an answer to the 502(b) analysis.

24          He then says, well, there are a bunch of mechanisms

25 that we put in place, bar date, PIQ, experts.  Yes, those are

1 all mechanisms that are designed to focus on the merits,

2 traditional litigation.  Didn't hear any question about that

3 those are not the traditional methods that are used in

4 discovery and litigation.  The only criticism we heard is that

5 none of our experts is a lawyer.  Well, they don't have to be

6 lawyers.  We are the ones that are telling them here's the

7 issue.  It's then their job to find out the scientific answer

8 to that issue.  Dr. Florence doesn't have to be a lawyer, and

9 we don't have to bring in a whole set of lawyers like Mr.

10 Snyder ot tell us what the stsandard is that ought to govern

11 science, because we're all lawyers.  We're capable and the

12 Court's capable of understanding the standards of the law to

13 which the science must fit.

14          Where is Grace going with its number?  That was the

15 next question that was posed.  The answer is very simple.  Just

16 as Your Honor indicated, Grace is going with its number towards

17 the plan formulation -- plan formulation.  What plan?  Well, we

18 have a plan on file, but we've been candid that that plan could

19 be revised.  We hope that their plan would also be revised.

20 What will that plan call for?  We'll see.  That's not before

21 the Court here.

22          However, Mr. Lockwood, inviting scrutiny down the

23 road and kind of looking (indiscernible) and says, well, it's

24 clear right now.  There can only be two alternatives.  Either

25 the criteria are baked into the TDP of the trust, or if they're

1   not, more is paid, and the trust runs out of money.  He said I

2   can't think of another alternative.

3         There is another alternative.  You don't have to bake

4   the criteria into the TDP.  You can use the criteria in order

5   to have a TDP that says if people want to settle it on the

6   basis of those criteria and pricing, that's an option.  And if

7   people do not want to settle, they are still free to litigate

8   their claims.  And that's an option that is clearly out there.

9   You know what?  That's exactly what the Dow-Corning plan did.

10  It set out the criteria.  It says you can go in, you can buy

11  in, you can settle, or you can litigate.  Here's the case

12  management order.  It will all take place in Federal Court

13  pursuant to rules that are applicable in Federal Court.  That

14  was the one that was approved over objection.  That's the one

15  that's now in place, and I'm happy to tell the Court, as Mr.

16  Austern will be able to attest, that over, over, overwhelmingly

17  the Dow-Corning claimants are not opting for litigation.

18  They're opting for settlement, and the trust has been a

19  successful trust.

20        Will there be a cap?  There may be a cap.  If there

21  is a cap, the Code nowhere says we can't have a cap, but it

22  does say that we would have to raise that issue with the

23  District Court.  We are not raising that issue now.  We are

24  trying to get the estimate out, so we can get a plan.

25        Very, very quickly a couple of other points, and I'm

1  done.  <u>Daubert</u>.  Two uses of <u>Daubert</u>.  Mr. Lockwood says, well,

2  gee, what we using it for?  Number one, it is a threshold

3  requirement to have any of the testimony that comes in on

4  estimation satisfy <u>Daubert</u>.  Regardless of what the claims are,

5  you can't do the estimate unless the estimate is done

6  scientifically.  Obviously, it is our view that they don't

7  satisfy the requirements of <u>Daubert</u>, because they don't follow

8  in a reliable methodology.  They disagree.  That's issue one.

9        Issue two is, well, what would happen if the cases

10  were litigated pursuant to the requirements of <u>Daubert</u>?  That

11  is in a follow on litigation process in Federal Court, which

12  ones would survive?  Again, the totally legitimate use, but we

13  do not seek to preclude those claims on that basis.

14        What about Rule 408?  Again there was reference to

15  the <u>Babcock</u> case.  The holding of <u>Babcock</u> was that in taking a

16  look at what the past liability was at the time of an alleged

17  fraudulent conveyance you could use the co-temporaneous

18  assessments of settlement liability to determine what it was in

19  that contest is past liability.  You could use past

20  settlements.

21        Here we're talking about something else, which is

22  using past settlements to say here's what the future disputed

23  liability is.  That is not what happened in the <u>Babcock</u> case,

24  never spoke to it.  Indeed very specifically Judge Brown said

25  nothing that I'm doing in this opinion speaks to the question

1  of what kind of estimates or what kind of liability

2  determinations will be made at a later stage in this case.

3  There was an indication that somehow the Judge -- Judge Vance

4  rejected the position that we're arguing for here saying it

5  just wasn't feasible.  I don't know.  I was in that case, and

6  that's not what Judge Vance did.

7         All of those objections were made in advance.  Mr.

8  Inselbrook stood up and gave a passionate speech about how it

9  was infeasible, couldn't be done, and she decided through the

10 bar date anyhow, and she decided through the claim forms

11 anyhow.  What happened was we then litigated fraudulent

12 conveyance.  We didn't litigate the motions for summary

13 judgment.  Litigation for fraudulent conveyances took place.

14 We were fortunate in prevailing.  The company then wanted to

15 seek a resolution instead of seeking out how long it would take

16 in court.  The Judge never ruled on the pending motions, never

17 said that they were not viable, but the settlement process took

18 over.  In fact, I'm sure that Mr. Inselbrook would applaud.

19        Finally, asbestos -- asbestosis not necessary.  This

20 is a point made by Mr. Finch.  Asbestosis is not necessary, and

21 this is the point.  For those people, either have asbestosis by

22 radiograph or by pathology, it is true pathology is another way

23 to go.  We specifically looked to see if there were a lot of

24 pathology samples.  There are very, very few.  So

25 overwhelmingly the alternative is x-ray.  That's why we focused

1  on x-ray to determine whether the information that was coming

2  from the B readers was sufficiently reliable to be -- pass the

3  Daubert standard.

4          A statement that was made that Mr. Dunbar somehow

5  does estimation their way, Mr. Dunbar has on occasion done

6  estimation their way when the inputs that are available require

7  it.  But when the inputs are different, estimations can be done

8  in different ways depending upon the issues that are posed.

9  And Mr. Dunbar is fully on board with this case with how this

10 case is run.

11          Finally with respect to Rule 702, Mr. Finch says you

12 don't have to do science under 702.  Well, that's true.  If you

13 don't purport to be doing science, 702 doesn't apply.  They

14 purport to be doing science.  Every single one of their experts

15 says I am doing science, and when you purport to do science,

16 you've got to do it.

17          They say, well, these methods are used not only

18 inside the litigation process, but they're also used outside.

19 And it's true, that would be a consideration, but it's a

20 minimum consideration.  That is if you don't even live up to

21 the standards that you have outside with what you're doing

22 inside, you've got a problem.  But just because you bring into

23 the courtroom a purported method that you use outside doesn't

24 mean that it somehow satisfies the Daubert standard.

25 Otherwise, if it's junky outside, it qualifies inside.  So it

1  has to be at least as good.

2        In the same fashion acceptance is important.  It

3  should be accepted, but the mere fact of acceptance doesn't

4  make it right.  The key thing is what are the standards for

5  science outside and inside, the standards, and there the

6  standards articulated by their own experts focus on

7  predictability, focus on reliability, focus on being data

8  driven, and they flunk those standards.  Again, there is no

9  data in this case -- no testimony in this case that these

10 methodologies had been shown to have any predictive value with

11 respect to a company still in the tort system.  Thank you, Your

12 Honor, for indulging us here this afternoon.

13       THE COURT:  Mr. Lockwood.  Mr. Bernick, if you need

14 to leave, you may leave.  I know that the debtor still has

15 other people here, so you -- if you need to go --

16       MR. LOCKWOOD:  He's finished --

17       MR. BERNICK:  Well, I'm mindful of our time limits,

18 and I will --

19       MR. LOCKWOOD:  According to the agreement he's

20 finished anyway, Your Honor.  You've got a main and a reply and

21 then you're done, so --

22       MR. BERNICK:  But under the agreement they also used

23 up all of their time.

24       MR. LOCKWOOD:  We did not.  We have --

25       MR. BERNICK:  Well, I think that that's --

1          MR. LOCKWOOD:  -- at least 20 minutes left.

2          MR. BERNICK:  Well, now see this is another -- this

3 is a problem we're having, Your Honor.

4          THE COURT:  I think by my calculation you actually

5 have ten, Mr. Lockwood.

6          MR. LOCKWOOD:  Okay.  Well, I'll take less than ten.

7 First, Mr. Bernick said that -- he recited his agreement with

8 me that, yea, they were insisting that their legal liability be

9 determined, and yea, they were relying on 502(b), and he says

10 we didn't have an answer to that.  Either he wasn't listening,

11 or I guess maybe I didn't make myself clear.  We do have an

12 answer for that.  Those are the tests for the allowance or

13 disallowance of claims, and that's not what is going on here.

14 That's the answer.  Five 0 two (b) is irrelevant.  Legal

15 liability is not the issue.

16          When discussing the issue of what the purpose of this

17 estimation is all about, Mr. Bernick's explanation was it's

18 about, quote, plan formulation, close quote.  Apparently, his

19 idea is that the parties in this case can come to a bankruptcy

20 judge and put on an 18-day trial for the purpose of the judge

21 giving him hints about what they ought to put in their plan.

22 I'm not aware of anything in the Bankruptcy Code that suggests

23 that that is an appropriate subject for a contested matter.

24 They've got a plan.  They formulated the plan.  If they think

25 it's got defects in it, they can change the plan.  When we get

1  the confirmation, if the Court says their plan isn't

2  confirmable, they can withdraw it and put in a new plan that

3  is.  Ditto for us.  That's the way it works.  We don't go out

4  and ask people for advice -- bankruptcy courts for advisory

5  opinions about how we ought to go about drafting plans that

6  meet confirmation standards.

7          Apparently, he's so into advisory opinions that his

8  -- he wants to characterize Judge Brown's ruling on his 408

9  argument as an advisory opinion, because he says Judge Brown

10 wrote in his opinion that this -- I'm not deciding anything

11 anywhere about any matter that matters except for the purposes

12 of this case.  So, in other words, Rule 408, one ticket, one

13 ride.  That case only, can't be used for precedential effect

14 anywhere else, even though that's the only case that that has

15 been cited by the debtors in which anybody made a Rule 408

16 argument that remotely resembled the one that's being made

17 here, and it was rejected.

18          Finally, he -- it's kind of cute the way he does this

19 what we're here about is science not what we're here about is

20 something other than science, a practice that doesn't -- isn't

21 physics.  And what is his source for the notion that when we

22 estimate the future liabilities of the debtor pursuant to

23 524(g), that's an exercise in science?  Let's see authority for

24 that.  Well, Dr. Peterson said that what he did he thought was

25 science, and Ms. Biggs said that she's -- she thought what she

1 did was actuarial science, and, therefore, because they thought

2 what they were doing was science here, that means that it is

3 science.  It's pretty interesting that he's willing to take

4 their assertions on that point as gold and treat everything

5 else they have to say as dross.

6       The fact of the matter is Your Honor can figure out

7 perfectly well without the -- without testimony from either Mr.

8 -- Dr. Peterson or Ms. Biggs exactly what it is that's going on

9 here and trying to estimate the inherently unknowable.  It's an

10 estimation of something that's unknowable.  And with all due

11 respect to Dr. Peterson and Ms. Biggs and whatever bunch of

12 experts they may put up on their side, to say that that's an

13 exercise in science is ridiculous.  And, moreover, the -- by

14 that token, they haven't put on any expert of their own who has

15 testified that what they've done to exercise -- estimate their

16 liabilities is, quote, science.  What they've done is they put

17 on some people who say that their opinions on medicine and

18 industrial hygiene and risk analysis are some kind of science,

19 but those are only sort of pieces.

20       When it gets to Dr. Florence, I don't hear anything

21 about Dr. Florence talking about science.  And, moreover, even

22 if Dr. Florence did talk about science, at the end of the day,

23 as I said earlier in which Mr. Bernick has ignored, when he

24 says his experts aren't lawyers, but they don't have to be,

25 they're being asked collectively through Dr. Florence to tell

1 this Court what kind of a claim has legal validity, and that's

2 not science either.  Apart from the fact that it is an invasion

3 of the province of this Court to determine whether claims in a

4 proper setting under proper procedural protections for

5 allowance and disallowance do or do not meet the legal

6 standards for claim validity.  That's all I have, Your Honor.

7 Thank you.

8         THE COURT:  All right.

9         MR. FINCH:  Thank you very much, Your Honor, for

10 indulging us today.

11         THE COURT:  Okay.  We are -- Mr. Finch?

12         MR. FINCH:  No, we're --

13         THE COURT:  Okay.  We are adjourned until Wednesday

14 morning at 9:00.  Thank you.  Moana, will you hit that button

15 again, so it turns back on?  Okay.  Thank you.

16               * * * * *

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# **C E R T I F I C A T I O N**

        We, TAMMY DeRISI, LYNN SCHMITZ, and PATRICIA C.
REPKO, court approved transcribers, certify that the foregoing
is a correct transcript from the official electronic sound
recording of the proceedings in the above-entitled matter, and
to the best of our ability.


/s/ Tammy DeRisi                 DATE:  January 17, 2008
TAMMY DeRISI


/s/ Lynn Schmitz_____
LYNN SCHMITZ


/s/ Patricia C. Repko_____
PATRICIA C. REPKO

J&J COURT TRANSCRIBERS, INC.