UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .     Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .     USX Tower – 54th Floor
                            .     600 Grant Street
                            .     Pittsburgh, PA 15219
             Debtors.  .
                            .     January 22, 2008
. . . . . . . . . . . . . ..      9:07 a.m.



TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtors:        Kirkland & Ellis, LLP
                        By:  DAVID BERNICK, ESQ.
                             BARBARA HARDING, ESQ.
                             BRIAN STANSBURY, ESQ.
                             SALVATORE BIANCA, ESQ.
                             HENRY THOMPSON, ESQ.
                             SCOTT McMILLAN, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601



Audio Operator:         Janet Heller



Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

```
For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  NATHAN FINCH, ESQ.
                                 BERNARD BAILOR, ESQ.
                                 ADAM VanGRACK, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

                            Caplin & Drysdale, Chartered
                            By:  ELIHU INSELBUCH, ESQ.
                            375 Park Avenue, #3505
                            New York, NY  10152

For the
Unsecured Creditors'        Stroock & Stroock & Lavan
Committee:                  By:  ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

For the Property
Damage Committee:           Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Ad Hoc              Dewey & LeBoeuf, LLP
Committee of Equity         By:  JENNIFER WHITENER, ESQ.
Sec. Holders:               125 West 55th Street
                            New York, NY  10019

For the Future              Orrick, Herrington & Sutcliffe
Claimants                             LLP
Representatives:            By:  ROGER FRANKEL, ESQ.
                                 RAYMOND MULLADY, ESQ.
                                 JOHN ANSBRO, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

For Committee of            Campbell & Levine
Asbestos Personal           By:  MARK T. HURFORD, ESQ.
Injury Claimants:           800 North King Street
                            Suite 300
                            Wilmington, DE  19701
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Travelers:              STB
                            By:  STERLING MARSHALL, ESQ.

For Serengeti:              By:  BILLAL SIKANDER


For W.R. Grace:             W.R. Grace
                            By:  JAY HUGHES, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21004

For the Debtors:            Pachulski, Stang, Ziehl &Jones
                            By:  JAMES O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For Vinson & Elkins,        Vinson & Elkins LLP
LLP:                        By:  ARI BERMAN, ESQ.
                            Trammell Crow Center
                            2001 Ross Avenue, Suite 3700
                            Dallas, TX  75201

For DebtWire:               DebtWire
                            By:  SETH BRUMBY

For the Unsecured           Strook & Strook & Lavan
Creditors' Committee:       By:  LEWIS KRUGER, ESQ.
                            180 Maiden Lane
                            New York, NY 10038

For Ad Hoc Committee:       Weil, Gotshal & Manges
                            By:  M. JARRAD WRIGHT, ESQ.
                            1300 Eye Street NW, Suite 900
                            Washington, D.C.  20005

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee      Dies & Hile LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701


For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  DAVID J. PARSONS, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201


For Fireman's Fund:         Stevens & Lee, P.C.
                            By:  DAVID R. BEANE, ESQ.
                            1105 North Market Street, 7th Fl.
                            Wilmington, DE  19801


For the PD Committee:       Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131


For Owens-Illinois:         McCarter & English
                            By:  KATHARINE MAYER, ESQ.
                            Renaissance Centre, 405 N. King St.
                            Wilmington, DE  19801


For David T. Austern:       Piper Jaffray & Co.
                            By:  JONATHAN BROWNSTEIN, ESQ.


For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864


For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  MATTHEW RUSSELL, ESQ.
                                 ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

```
For the Future          Orrick, Herrington & Sutcliffe
Claimants                LLP
Representatives:        By:  DEBRA FELDER, ESQ.
                             JOSHUA CUTLER, ESQ.
                        Washington Harbour
                        3050 K Street, N.W.
                        Washington, D.C.  20007 For

For Federal Insurance   Cozen O'Connor
Company:                By:  JEFFREY WAXMAN, ESQ.
                        Chase Manhattan Centre
                        1201 North Market Street
                        Wilmington, DE  19801

For Federal Insurance   Cozen O'Connor
Company:                By:  JACOB C. COHN, ESQ.
                        1900 Market Street
                        Philadelphia, PA  19103

For Allstate Insurance: Cuyler Burk, LLP
                        By:  ANDREW CRAIG, ESQ.
                        Parsippany Corporate Center
                        Four Century Drive
                        Parsippany, NJ  07054

For W.R. Grace:         W.R. Grace
                        By: WILLIAM CORCORAN, ESQ.
                        7500 Grace Drive
                        Columbia, MD  21044

For W.R. Grace:         Kirkland & Ellis LLP
                        By:  ELLEN AHERN, ESQ.
                             JANET BAER, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601

For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022

For W.R. Grace:         Kirkland & Ellis LLP
                        By:  DAVID MENDELSON, ESQ.
                        6555 Fifteenth Street, N.W.
                        Washington, DC  20005
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana        Womble Carlyle Sandridge & Rice
Department of               By:  FRANCIS MONACO, ESQ.
Environmental Quality:      222 Delaware Avenue
                            Suite 1501
                            Wilmington, DE  19801

For Christopher M.          Cohn Whitesell & Goldberg, LLP
Candon:                     By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For W.R. Grace:             Pachulski, Stang, Ziehl & Jones LLP
                            By:  TIMOTHY P. CAIRNS, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  WALTER SLOCOMBE, ESQ.
                                 JEANNA RICKARDS, ESQ.
                                 PETER LOCKWOOD, ESQ.
                                 JAMES WEHNER, ESQ.
                                 LESLIE KELLEHER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                    By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza
                             New York, NY  10005


For Pepsi:                   Butler Rubin Salfarelli & Boyd LLP
                             By:  KIRK T. HARTLEY, ESQ.
                             70 West Madison Street
                             Suite 1800
                             Chicago, IL  60602


For Official Committee       Brandi Law Firm
of Asbestos Property         By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:            44 Montgomery St., Suite 1050
                             San Francisco, CA  94104


For the State of CA,         Hahn & Hessen LLP
Dept. of Gen. Services:      By:  STEVEN J. MANDELSBERG, ESQ.
                             488 Madison Avenue, 14th Fl.
                             New York, NY  10022


For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924


For David T. Austern:        Piper Jaffray & Co.
                             By:  JASON SOLGANICK


For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216


For London Market            Mendes & Mount, LLP
Companies:                   By:  ALEXANDER MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019-6829


For Official Committee       LECG
of Asbestos Property         By:  ALAN MADIAN, ESQ.
Claimants:                        ELIZABETH DEVINE, ESQ.


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For O'Conner: | O'Conner<br>By:  John R. Wollen |
| For the Blackstone Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By:  JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  BEAU HARBOUR |
| For Durham Asset Management: | Durham Asset Management<br>By:  JEFFREY A. ROSENKRANZ |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By:  STEPHANIE KWONG |
| For Irwin H. Zandman: | Irwin H. Zandman<br>By:  IRWIN H. ZANDMAN |

**INDEX**

| **WITNESSES** | **PAGE** |
|---|---|
| DR. DAVID WEILL | |
| Direct Examination by Mr. Bernick | 15 |
| Voir Dire by Mr. Bernick | 17 |
| Direct Examination by Mr. Bernick | 20 |
| Cross Examination by Mr. Finch | 99 |
| Cross Examination by Mr. Mullday | 126 |
| Redirect Examination by Mr. Bernick | 139 |
| Recross Examination by Mr. Finch | 153 |
| | |
| DANIEL HENRY | |
| Voir Dire Examination by Mr. McMillan | 159 |
| Direct Examination by Mr. McMillan | 166 |
| Cross Examination by Mr. Bailor | 201 |
| Cross Examination by Mr. Mullady | 216 |
| Redirect Examination by Mr. McMillan | 225 |
| Recross Examination by Mr. Bailor | 232 |

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| GX-0280 American Thoracic Society 1986 statement | -- | 45 |
| GX-0274 American Thoracic Society December 12, 2003 statement | -- | 45 |
| GX-0322/0323/0135 Standards of pulmonary function testing | -- | 91 |
| GX-425/426/427 Summaries of data | -- | 92 |
| GG-2155 GX7.1681352 | -- | 95 |
| GG-2156 8939695 | -- | 95 |
| GG-2092 Reproduction chart (Dr. Henry) | -- | 193 |
| GX-284 Protocol used in study (Dr. Henry) | -- | 193 |
| GX-285 Protocol used in study (Dr. Henry) | -- | 194 |
| GX-286 Data collected in study (Dr. Henry) | -- | 194 |
| GX-327 Data collected in study (Dr. Henry) | -- | 194 |
| GX-104 Data collected in study (Dr. Henry) | -- | 194 |
| GG-2094 Replication of a table | -- | 198 |
| GX-582 Data sets | -- | 198 |
| GX-583 Data sets | -- | 198 |

1          THE COURT:  This is the continuation of the personal

2 injury estimation trial in W.R. Grace, Bankruptcy Number 01-

3 1139.  The participants I have listed by phone, James Rieger,

4 Alan Madian, Lewis Kruger, Daniel Glosband, John Wollen,

5 Jonathan Brownstein, Daniel Speights, Sina Toussi, Kirk

6 Hartley, David Beane, Debra Felder, Janet Baer, Andrew Craig,

7 David Mendelson, Ellen Ahern, Jonathan Lewinsohn, John

8 O'Connell, Theodore Freedman, Mark Hurford, Jeanna Rickards,

9 Steven Mandelsberg, Jeff Waxman, Bernard Bailor, Peter

10 Lockwood, Elihu Inselbuch, Walter Slocombe, James Wehner,

11 Michael Davis, Terence Edwards, Edward Westbrook, Andrew Chan,

12 Joshua Cutler, Timothy Cairns, Jacob Cohn, William Corcoran,

13 John Phillips, Ari Berman, Seth Brumby, Katharine Mayer,

14 Christopher Candon, Alex Mueller, Tiffany Cobb, Scott Baena,

15 Jarrad Wright, David Parsons, Darrell Scott, Martin Dies,

16 Theodore Tacconnelli, Leslie Kelleher, Beau Harbour, Elizabeth

17 Devine, Jason Solganick, Matthew Russell, Robert Guttman,

18 Francis Monaco, and Shayne Spencer.

19          I'll take entries in court.  Good morning.

20          MR. BERNICK:  Good morning.  David Bernick for Grace.

21          MR. STANSBURY:  Brian Stansbury for Grace.

22          MS. HARDING:  Barbara Harding for Grace.

23          THE COURT:  Excuse me one second, please.  Okay.

24 Thank you.

25          MR. BIANCA:  Salvatore Bianca for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Good morning.

2           MR. FINCH:  Nathan Finch for the Asbestos Claimants

3  Committee.

4           MR. BAILOR:  Bernard Bailor for the Asbestos

5  Claimants Committee.

6           MR. INSELBUCH:  Elihu Inselbuch for the Committee.

7           MR. MULLADY:  Good morning, Your Honor.  Ray Mullady

8  for the Future Claimants Representative.

9           MR. ANSBRO:  John Ansbro, also for the Future

10 Claimants Representative.

11          THE COURT:  Good morning.

12          MS. KRIEGER:  Good morning, Your Honor.  Arlene

13 Krieger from Stroock and Stroock and Lavan on behalf of the

14 Official Committee of Unsecured Creditors.

15          THE COURT:  Good morning.

16          MR. HOROWITZ:  Good morning, Your Honor.  Greg

17 Horowitz from Kramer Levin on behalf of the Equity Committee.

18          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer,

19 Bilzin Sumberg on behalf of the Property Damage Committee.

20          MR. FRANKEL:  Good morning, Your Honor.  Roger

21 Frankel on behalf of the Future Claimants Representative.

22          THE COURT:  Folks, I have two housekeeping matters to

23 discuss with you before we begin.  One concerns the schedule

24 for tomorrow.  I have a family matter, which means that I have

25 to leave here at 5:00, so whatever schedule adjustments you

1  need tomorrow, we have to be finished at 5:00 tomorrow.

2         The second has to do with the schedule for March the

3  3rd and the 5th.  Something has come up.  I'm not going to be

4  able to be here those two days, so I propose to cancel the

5  trial on March the 3rd and the 5th and instead change the days

6  to May 13th and May 14th, if you're available those two days.

7  So could you please check.  I've done some readjustment to my

8  schedule, so we can fill those two days in if those two days

9  are satisfactory with you.  I understand that you may be asking

10 for some additional trial days.  I'm not sure if that's going

11 to be necessary or not.  Perhaps you can all talk and let me

12 know.  If you are -- if you do think you're going to need trial

13 days, frankly, I think we better discuss that soon, because I

14 have another matter that's also going to get heated up very

15 soon that's going to take some very lengthy trial days, and I'm

16 not going to be able to do them both at the same time.  So we

17 need -- I'm going to need some planning.

18         MR. BERNICK:  Fine.

19         THE COURT:  Okay.  Mr. Bernick.  Oh, sorry.

20         MR. MULLADY:  Your Honor, I have one procedural issue

21 to take up with the Court.

22         THE COURT:  Yes, Mr. Mullady.

23         MR. MULLADY:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MR. MULLADY:  Just a small procedural point that I

1  don't think will be controversial.  It's just a -- it's a

2  procedural request and suggestion for the Court that stems from

3  some moments we had last week during the examination of Dr.

4  Rodricks.  I think it's fair to say that counsel for both sides

5  made statements in the presence of the witness that we believe

6  should've been communicated at sidebar.  We propose that going

7  forward if counsel feel they need to make a statement or an

8  argument or an objection that's more than just to state the

9  objection and the grounds, that we ask the Court for a sidebar,

10  or that the witness be excused, so we can have the airing of

11  that discussion.

12        We don't seek a tactical advantage here.  We seek

13  really to just have a level playing field and to insure that we

14  have a process that has the integrity to it that, you know, we

15  think should be followed, which is that witnesses shouldn't be

16  educated by statements or pushed in one direction or another by

17  statements of counsel.  And, obviously, the Court has the

18  authority to institute a procedure like this under Federal Rule

19  of Evidence 611(a), which gives the Court discretion to -- in

20  fact, the obligation to control the method of examining a

21  witness and the preparation -- or the presentation of evidence.

22  Thank you.

23        THE COURT:  All right.  Is this controversial?

24        MR. BERNICK:  I -- it's never been raised with me,

25  Your Honor.  I just heard it for the first time this morning,

1  so I don't have any issue with -- if there -- if it's expected

2  there will be matters that require some significant discussion

3  approaching the Court at sidebar, I also don't believe that

4  this is, frankly, that big a deal, and I don't think that it

5  would make sense to have a rigid rule that says that if you say

6  more than objection, that calls for or objection to form, then

7  immediately we then have to have a sidebar conference, which I

8  think generally takes time to get organized and interrupt the

9  flow of the examination that way.

10        THE COURT:  All right.  I think I'll let it up to

11  counsel to ask if they think that something is going to require

12  a sidebar to ask for it.  I'm not going to do it if it's

13  simply, you know, an objection to the hearsay rule.  Frankly, I

14  think most of your witnesses, to the extent that they're

15  experts, have already been educated by counsel in the requests

16  that you've been making of them beforehand anyway.  They're not

17  new, most of them, to this process.  They either testified or

18  been involved in writing reports in many cases not just this

19  one.  So I doubt that they're very surprised by most of

20  counsel's opinions, but I'm not opposed to their request in an

21  appropriate circumstance.

22        MR. MULLADY:  Thank you, Your Honor.  And, obviously,

23  we're not -- the purpose of this request isn't to curb simple

24  objections of that nature, but I think if the Court were to go

25  back and read the transcript from last week -- and I'm sure

1 Your Honor recalls -- there was a lot more than that that was

2 said, and it was on both sides.  Again, this is not -- we're

3 not pointing fingers.  We're not on a high horse.  All we're

4 asking for is that if this sort of thing has to be aired, that

5 it be aired outside the presence of the witness.

6          THE COURT:  All right.  That's a fair request, and

7 I'll let it up to -- as I said, to both counsel to ask for it

8 when you think the circumstances -- on all sides that is -- to

9 ask for it when you think the circumstances are appropriate.

10          MR. MULLADY:  Thank you, Your Honor.

11          THE COURT:  Anything else before we begin?

12          MR. BERNICK:  May we proceed, Your Honor?

13          THE COURT:  Yes, sir.

14          MR. BERNICK:  We call as our next witness Dr. David

15 Weill.  Dr. Weill is here.  If you could take the stand?

16          THE CLERK:  Please stand and raise your right hand.

17           DR. DAVID WEILL, DEBTORS' WITNESS, SWORN

18          MR. BERNICK:  Good morning, Dr. Weill.

19                     DIRECT EXAMINATION

20 BY MR. BERNICK:

21 Q    Could you please just tell the Court at the outset what

22 the principal focus of your testimony will be here this

23 morning?

24 A    My principal focus is to speak about the attribution of

25 lung cancer by asbestos.

                    **J&J COURT TRANSCRIBERS, INC.**

1    MR. BERNICK:  Okay.  There was a chart that we showed

2 in opening here.  If we could call up GG-2121?

3 Q    Do you have that in front of your screen there, Dr. Weill?

4 A    I do.

5 Q    I explained to -- I presented to the Court what we

6 intended to do with respect to the -- what we called the

7 exposure filters part of the analysis, and I distinguished it

8 from what you see down in the bottom right-hand corner as the

9 disease filters part of the analysis.  What specific matters

10 will you be focused on here?

11 A    I'll be speaking about the disease matters.

12 Q    Okay.  Will you be offering -- will you also be addressing

13 today -- let me just ask a couple more specific points.  Will

14 you be addressing certain aspects of the diagnostic criteria

15 for asbestosis?

16 A    As they relate to the pulmonary function testing

17 specifically.

18 Q    Okay.  Apart from the pulmonary function test, will you be

19 addressing today the practices of the litigation screening

20 doctors?

21 A    No, I will not.

22    MR. BERNICK:  Thank you.  With the benefit of that,

23 Your Honor, we'd like to go through some of the witness'

24 background and qualifications if the Court and the witness can

25 be shown GG-2117?

1                            VOIR DIRE

2  BY MR. BERNICK:

3  Q    Looking at this demonstrative, Dr. Weill, could you please

4  just take the Court briefly through your educational background

5  and your medical training?

6  A    I received my undergraduate degree from Tulane University

7  in New Orleans in 1985.  I then went to Tulane Medical School

8  and graduated in 1990.

9  Q    Okay.

10  A    After residency training at the University of Texas

11  Southwestern I did my pulmonary and critical care fellowship in

12  the early nineties at the University of Colorado.

13  Q    Okay.

14  A    I also did an additional one-year fellowship in lung

15  transplantation.

16          MR. BERNICK:  Okay.  Let's show the witness and the

17  Court GG-2118.

18  Q    And again if you could simply continue on, Dr. Weill, and

19  review your further training as reflected in that

20  demonstrative?

21  A    My current position is Director of the Lung and Heart/Lung

22  Transplant at Stanford University.  I'm an Associate Professor

23  in the Division of Pulmonary and Critical Care Medicine.  I am

24  board certified in pulmonary medicine.

25  Q    On a day-to-day basis, Dr. Weill, could you tell the Court

**J&J COURT TRANSCRIBERS, INC.**

1  what it is that you do?

2  A    We have a varied practice where we're referred a large

3  number of patients with a variety of advanced and early stage

4  lung diseases that are amenable either to novel medical therapy

5  or surgical therapy.

6  Q    Okay, and what is it that you do in connection with that

7  practice?

8  A    I specifically diagnose patients, provide a second opinion

9  about some of the lung disease issues, and then recommend a

10  treatment scheme that could either be medical or surgical

11  depending on the patient's needs.

12  Q    Okay.  Let's focus on asbestos.  Do you have a background

13  in asbestos-related matters?

14  A    Yes.

15        MR. BERNICK:  I'd like to show the witness the next

16  demonstrative, which is 2119.

17  Q    And again using that as our menu, Dr. Weill, if you could

18  walk the Court through the background that's reflected on 2119?

19  A    I'm a NIOSH Certified B Reader which indicates proficiency

20  in interpreting x-rays for the pneumoconiosis.  I also

21  participated in a visiting professorship in China at the

22  National Institute of Occupational Medicine and Poison Control.

23  I've also provided testimony in a few different governmental

24  bodies, including twice in the United States Senate and once in

25  the Texas State Legislature.  And I've published in the medical

1  literature on a variety of end-stage lung diseases, including

2  specifically in transplantation, transplant medicine, asbestos-

3  related diseases, and lung cancer.

4  Q     Focusing on your experience in China and turning your

5  attention to Slide 2120, could you talk about what you did in

6  China and the relationship, if any, that that has to your

7  experience with asbestos?

8  A     I was interested in seeing a more varied patient group

9  that had been exposed to a variety of occupational substances

10 and went to China for approximately one month to consult with

11 the Chinese doctors who were interested in the same field.

12 Q     Okay, and what is it that you had an opportunity to do

13 there?

14 A     I saw patients that had a variety of occupational lung

15 diseases.  Most commonly asbestos-related diseases or silica-

16 related diseases and was able to not only see the patients

17 themselves but also review a large number of radiographs.

18 Q     Okay.  Have you had any activities in the area of

19 litigation?  Have you served as an expert in connection with

20 litigation?

21 A     Yes, I have.

22 Q     Could you just describe for the Court in general terms

23 what your litigation-related activities have comprised?

24 A     Over the last five to six years I've provided deposition

25 testimony and expert opinion regarding individual cases

Weill - Direct/Bernick                                    20

1  primarily.

2  Q    Okay.  Have you ever actually had the opportunity to

3  testify at trial, or is this your first -- your first testimony

4  in trial?

5  A    I've testified once in an occupational lung disease matter

6  at trial.

7            MR. BERNICK:  Okay.  Your Honor, we would proffer Dr.

8  Weill as an expert in pulmonary medicine.

9            THE COURT:  Any voir dire?

10            MR. MULLADY:  No, Your Honor.  No objection.

11            MR. FINCH:  No, Your Honor.

12                       DIRECT EXAMINATION

13  BY MR. BERNICK:

14  Q    Let's talk about the principal focus of your testimony --

15            THE COURT:  Would you like --

16            MR. BERNICK:  I'm sorry.  I'm trying to get through

17  this this morning, and it's bright and early.

18            THE COURT:  Without objection, the witness may offer

19  an expert opinion in the field of pulmonary medicine.  Okay.

20            MR. BERNICK:  Thank you, Your Honor.  I'm sorry.

21  BY MR. BERNICK:

22  Q    Let's talk about -- let's focus immediately on the primary

23  focal point of your testimony, which is the relationship

24  between lung cancer and asbestos exposure.  And I'd like to

25  just have you give a brief explanation of lung cancer to the

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                    21

1  Court showing you GG-2122.  Would this demonstrative assist you

2  in explaining particularly the locus of lung cancer?

3  A    Lung cancer exists within the lung parenchyma, which is

4  the lung meat itself.  It has many causes but is most commonly

5  causes by cigarette smoking around 90 percent of the time.  The

6  issue that I was asked to address is its attribution to

7  asbestos exposure, and we'll spend the majority of my time

8  talking about that today.

9  Q    Now, you indicated that lung cancer arises in the

10 parenchyma or the meat of the lung.  Is that consistent with

11 what's indicated as the yellow box on 2122?

12 A    Yes, it is.

13 Q    Okay, and are we going to talk, as we go forward today,

14 about anatomically distinct in different areas within the area

15 of the lung?

16 A    Yes.

17 Q    Okay.  Let's talk then about asbestos directing your

18 attention to Exhibit GG-2123.  Is this a parallel slide that

19 deals with asbestosis?

20 A    Yes.

21 Q    Okay.  Well, let me just take you through this a little

22 bit more deliberately.  First of all, location.  When we talk

23 about asbestos, what location in the lung are we talking about?

24 A    So when we're --

25          MR. FINCH:  Objection, form of the question.

1 Asbestosis.

2          MR. BERNICK:  I said asbestosis.  Didn't I?

3          MR. FINCH:  I thought you said asbestos.

4          MR. BERNICK:  Oh, I apologize.  Asbestosis.  Thank

5 you.

6 Q    What location are we talking about when we talk about the

7 location of asbestosis?

8 A    So like lung cancer, asbestosis is also a parenchyma lung

9 disease, meaning as the yellow box indicates, it's actually

10 existing in the meat of the lung.

11 Q    Okay, and parenchyma, what -- that's a longer term.  Just

12 what does that refer to?

13 A    It refers to the lung tissue itself.

14 Q    Okay.  It says fibrosis.  That asbestosis is a fibrosis.

15 What does fibrosis mean?

16 A    Scarring of the lung, quite literally, and a fibrotic

17 process is anything that scars a lung and is not specific to

18 asbestos-related diseases.

19 Q    Okay.  Now, are there other areas within the vicinity of

20 the lung that can also experience or sustain a fibrotic

21 condition as a result of asbestos exposure?

22 A    Yes, that's the covering of the lung or the pleura.

23 Q    Is that indicated also here on 2123?  That is the

24 difference between parenchyma and pleura.

25 A    The pleura in this slide would be the outside covering of

Weill - Direct/Bernick                    23

1  the lunch where the arrows are pointing.

2  Q    Okay.  Okay.  Now, let's go through -- do we have some

3  examples of x-rays showing what it is that you're looking for

4  when you're looking for asbestos, showing you 2124?

5            THE COURT:  I'm sorry.  Would you repeat the question

6  for me, please?

7            MR. BERNICK:  Yes.

8  Q    Showing you 2124 -- GG-2124, would that help you explain

9  to the Court the conditions that you observe in x-rays where

10  there is asbestosis present?

11  A    Sure.  On the left side of the panel you see a normal

12  lung, and what you're looking for are the aerated portions of

13  the lung which are black.  There's also white parts of the lung

14  in a normal situation which are blood vessels that are running

15  through the lung, and that's normal.  On the right side of the

16  panel you're seeing a lung that's affected by asbestosis.

17  Q    Okay.  In what -- and in particular, so the record is

18  clear, there's a part that's marked as -- with a circle saying

19  fibrosis.  What is it that's being seen through the x-ray in

20  that portion of the x-ray?

21  A    What you're looking at in the area that's circled, they're

22  small linear opacities, areas of the lung that are scarred by

23  asbestosis.

24  Q    You said opacities.  Does that have it's common meaning

25  that it's something that you have a hard time seeing through?

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                    24

1  A    Yes, it's white.  It shows up white in the lung.

2  Q    Okay.  Let's now talk about the relationship between these

3  two conditions that you've described, asbestosis and lung

4  cancer.  Can there be asbestosis without lung cancer?  Does

5  that condition arise?

6  A    Yes.

7  Q    Okay.  Are they different diseases?  That is is lung

8  cancer a different disease then asbestosis?

9  A    Yes.

10 Q    Okay.  What about the other way around?  Can you have lung

11 cancer without asbestosis?

12 A    Yes.

13 Q    Okay, and most common cause?

14 A    Cigarette smoking.

15 Q    Okay.  Now, I want to focus on the particular kind of lung

16 cancer that is asbestos related -- that is asbestos-related

17 lung cancer.  In your opinion, which we'll pursue, can you have

18 asbestos-related lung cancer in the absence of asbestosis?

19 A    No.

20 Q    Okay.  Do you have a slide that frames in more precise

21 terms that question.  That is --

22           MR. BERNICK:  Could we show GG-2125?

23 Q    And I'll ask you to simply go through with the Court how

24 this slide frames the issue that you've addressed.

25 A    What the essential question is, I believe, is whether or

**J&J COURT TRANSCRIBERS, INC.**

1  not asbestos exposure alone increases one's risk for developing

2  lung cancer, so in the absence of asbestosis.  And then the

3  second part of that analysis is whether or not asbestosis is a

4  necessary prerequisite to attribute asbestos exposure or lung

5  cancer to asbestos exposure.

6  Q    Okay.  Are there studies that have been done -- research

7  that has been done that bears upon that question?  That is

8  whether asbestos exposure alone without asbestosis causes lung

9  cancer?

10 A    Yes.

11 Q    Showing you 2126, does this provide a list of the kinds of

12 studies that you've examined that relate to this question?

13 A    Yes.

14 Q    Could you just explain to the Court the difference between

15 these studies and whether there are any differences in the

16 quality of -- let me take that back.  Whether some of the

17 studies are better and some of the studies are less good in

18 terms of speaking to the particular issue that you are here to

19 address?

20 A    Yeah, there are varying levels of evidence around this

21 question, as you might imagine, and even within these

22 categories there's different levels of evidence.  Some of the

23 scientific literature, even say in the longitudinal area, are

24 better than others.

25 Q    Okay.  Let's just go through what's the difference between

Weill - Direct/Bernick                    26

1  the longitudinal study and the case control study?

2  A    A longitudinal study is defined by an exposed cohort, and

3  that cohort is followed prospectively, and causal relationships

4  are then ascertained by following that cohort for a number of

5  years.

6  Q    Okay.  What about case control?  Doesn't case control

7  involve cohorts?

8  A    It does, and the co --

9  Q    So what's the difference then?

10 A    There is a difference in that the case control, as the

11 name implies, is defined by having a disease itself rather than

12 necessarily having an exposure itself.

13 Q    Okay.  What about time sequence?  In case control studies

14 do you have the ability to follow a group over time?

15 A    You don't, because the case itself is defining the cohort,

16 and so what you're left with is actually looking at the disease

17 that you're interested in studying, and sometimes looking

18 backwards to determine causal relationships, for instance.

19 Q    So it's like you begin at the end of the line with people

20 who are sick, and then working with that group you look to

21 antecedents?

22 A    Correct.

23 Q    Okay, or you look to factors?

24 A    That's right.

25 Q    Okay.  What about the autopsy studies?  What are -- what

Weill - Direct/Bernick                        27

1  do they involve, and why are they different from longitudinal

2  and case control studies?

3  A    Autopsy studies are studies that have lung tissue as its

4  very basis.  So they look at patients that have passed away,

5  lung tissue is examined, and causal relationships are attempted

6  to be determined by looking at that lung tissue and then

7  finding out more about the patients that passed away.

8  Q    Okay.  Now with respect to the longitudinal studies, let

9  me just ask you, how do these different kinds of studies stack

10 up in terms of which ones are, you know, more useful and more

11 productive to examine in order to address your questions, case

12 control, longitudinal, or autopsy?

13 A    Generally speaking, the longitudinal studies are the best,

14 although their quality varies within that subgroup.  But,

15 generally speaking, longitudinal studies are the best.

16 Q    Are there a lot of longitudinal groups that have been

17 examined over time that relate to this issue?

18 A    Unfortunately not.  They're very difficult to perform

19 because of their time course, how long it takes to get to the

20 answer, and very few research units are able to look at these

21 factors over a period of time and collect data on the cohort.

22 Q    Turning your attention to Slide GG-2127, what does this

23 slide now do with respect to the issue that you've addressed

24 here?

25 A    So in terms of the attribution of lung cancer, I've put on

**J&J COURT TRANSCRIBERS, INC.**

1  this slide longitudinal studies, case control studies, and

2  autopsy studies that I think address this issue.

3  Q    Okay, and then what you have is 1 and 2.  What are the

4  columns?  What do they refer to?

5  A    They refer to the initial question that I framed, the two

6  groups of thought regarding attribution of lung cancer to

7  asbestos.  Is asbestos exposure alone that's necessary, or is

8  it the presence of asbestosis?

9  Q    Okay.  Let's begin with the insulator studies.  How far

10 back do the insulator -- does the insulator group go in terms

11 of the group that was being studied?

12 A    Dr. Selikoff at the Mt. Sinai Group really developed this

13 cohort in the 1960s and followed it for a number of years

14 afterwards.

15 Q    Okay.  Now, you have under the question, "Does asbestosis

16 cause lung cancer?  Yes, but do the -- does asbestos exposure

17 alone cause lung cancer, question mark."  Could you explain to

18 the Court what you were able to learn and what you were not

19 able to learn from the insulator studies.

20 A    When you look at Dr. Selikoff's insulator studies, you do

21 see an increased rate of lung cancer.  However, what's

22 important about those studies is that he was not able to ferret

23 out who was just asbestos exposed alone versus who had

24 asbestosis.

25 Q    And why was that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    He did make that effort initially with a cohort to make

2  that distinction.

3  Q    Okay.  In other words, would it be fair to say -- was the

4  study originally designed -- was the insulator study originally

5  designed to address the specific issue that was of interest to

6  you?

7  A    No, it was not.

8  Q    Okay, and what in particular was missing from the design

9  that would've enabled that study to speak more directly to the

10  issue that you were interested in?

11  A    It was the lack of information regarding who has

12  asbestosis, the parenchymal lung disease, and who is just

13  asbestos exposed.

14  Q    Why then did you fill in the column under 2, "Does

15  asbestosis cause lung cancer?  Yes?"

16  A    If you follow Dr. Selikoff's work -- now we're up into the

17  late eighties -- there were publications coming out of that

18  group that tried to answer that question specifically in whom

19  radiographic and pathologic evidence was available.

20  Q    Okay, and what did that evidence tend to show?

21  A    The evidence showed that in 100 percent of the cases where

22  lung tissue was available, 100 percent of the lung cancer cases

23  had asbestosis by lung tissue.

24  Q    Okay.  Let's turn to the second study that you have or the

25  second group, the asbestos cement studies.  Could you describe,

1  first of all, who performed those studies and when they were

2  performed?

3  A    This was performed -- this study was performed by a group

4  of researchers at Tulane University beginning following the

5  cohort in the late sixties and following the cohort really

6  through their publication in the early 1990s.

7  Q    Now, Tulane sounds familiar.

8  A    Yes.

9  Q    That's where you went to school?

10 A    It is.

11 Q    One of the authors also has a familiar name, Weill.

12 A    Yes.

13 Q    Is there any relation?

14 A    He's my father.

15 Q    Okay, so if you could describe for us the workers who were

16 studied in this Tulane study, who were they?

17 A    They were a group of asbestos workers, 839 workers, who

18 had mixed asbestos exposure, meaning some to chrysotile-type

19 fibers and some to amphibole-type fibers.

20 Q    Okay, and then what happened during the course of the

21 study?  What did the study comprise?

22 A    The researchers were able to prospectively follow this

23 group in a longitudinal fashion where they had well-defined

24 exposure categories and radiographic information.

25 Q    Okay, and now you have the columns -- both columns filled

1  out in this case.  Under the column dealing with, "Does

2  asbestosis cause lung cancer," you have a yes, and now you've

3  also filled in the first column, "Does asbestos exposure cause

4  lung cancer," and you have it filled in no.  What was different

5  -- what, if anything, was different about this group in this

6  study that enabled you to answer the first question whereas the

7  insulator studies did not permit you to answer that question?

8  A    Because the insulator studies were never set up that way,

9  they were never able to answer the first question.  The

10  asbestos cement studies were specifically set up to answer that

11  question, is asbestosis a necessary prerequisite for lung

12  cancer development.

13  Q    Okay.  Are there a couple slides that would help you walk

14  through the actual data from those studies, give two slides

15  that have been prepared here?

16  A    Yes.

17  Q    Okay.  Showing you, first of all, 2129 -- that is GG-2129

18  -- could you describe for the Court -- first of all, is this

19  slide -- the data here, is it taken directly from the published

20  article itself?

21  A    Yes, it is.

22       MR. BERNICK:  Okay.  And, incidentally, the published

23  article, Your Honor, for the record is Exhibit 590.  That is

24  GX-0590.  We won't be offering it, because it's a learned

25  treatise, and it comes in in support of his opinion.  But, for

1 the record, this demonstrative --

2 Q    Is it correct, this demonstrative is based upon the

3 article?

4 A    Yes.

5 Q    Okay.  What is it that 2129 -- that is GG-2129 shows the

6 Court?

7 A    So on the horizontal axis of this graph there's cumulative

8 exposure in fiber years.  So that's a way that researchers,

9 when they're doing epidemiologic studies, can quantitate the

10 asbestos exposure.

11 Q    Okay.  What then would the data points that you have as

12 displayed in this graph tell you about the relationship between

13 exposure in fiber years and the relative risk for lung cancer?

14 A    So what it can tell you is that as the exposure --

15 cumulative exposure dose goes up, the risk of developing lung

16 cancer increases as well.

17 Q    Okay.  Is that a continuous relationship down to zero?

18 A    No, it's not.

19 Q    Well, then tell us what is it that happens when you get

20 down to lower exposures?

21 A    The shape of the relationship or the shape of the curve

22 becomes uncertain at the lower exposure levels.

23 Q    Okay.  Well, there's been discussion in connection with

24 the opening statements in this case regarding threshold models.

25 Actually, also in connection with the testimony that was

Weill - Direct/Bernick                    33

1  offered by Dr. Rodricks last week.  Do you have an

2  understanding of about what a threshold model is?

3  A    Yes.

4  Q    Okay.  Could you just explain to the Court what a

5  threshold model is?

6  A    A threshold in epidemiologic and occupational medicine is

7  the concept that a certain level of exposure is necessary to

8  attribute risk of developing whatever disease you're interested

9  in.

10 Q    Okay.  In where you have the threshold, do you -- are you

11 able to see increased risk all the way down to small exposures?

12 A    You're not, because you're not certain, as this slide

13 indicates, of the dose response relationship, i.e., what dose

14 gives you what response.

15 Q    Okay.

16 A    And you're uncertain at these lower exposure levels what

17 that response is.

18 Q    Okay.  Now, based upon this data -- that is that at higher

19 exposures there was an increased risk of lung cancer --

20 wouldn't that tend to suggest higher does lung cancer?  Going

21 back to your question, yes, there is a relationship between

22 asbestos exposure alone and lung cancer.

23 A    The researchers looked at that issue --

24 Q    Okay.

25 A    -- and what they found is is that it wasn't a distinction

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                          34

1  between dose that really mattered.  In other words, it wasn't

2  that every single increasing dose increased your risk for

3  developing cancer.  Instead, what they found is that the dose

4  was not the distinguishing factor.  The presence of

5  radiographic asbestosis was when we look at lung cancer risk.

6  Q    Turning your attention to Slide 2128, is this a further

7  slide that was taken from the Hughes and Weill study?

8  A    Yes.

9  Q    And what does this slide show, and how does it relate to

10 what you just said?

11 A    On the vertical axis again it's looking at risk and

12 standardized mortality rates, and on the horizontal axis,

13 you're looking at various abnormalities of x-rays.  So various

14 profusion categories, to use the ILO lingo.

15 Q    Okay, so if we go from the left to the right, we have the

16 first data area.  It says, "No abnormal less than 21 years."

17 What does that mean?

18 A    So there were no chest radiographic abnormalities in that

19 group, and these were people that worked less than 21 years --

20 Q    Okay.

21 A    -- in the cement industry.

22 Q    And did they have an increased risk of lung cancer?

23 A    No.

24 Q    Let's now talk about the people who worked for a long

25 time.  Would that mean that they have higher or lower

Weill - Direct/Bernick                          35

1   exposures?

2   A    Higher.

3   Q    Because the people that have higher exposures but who also

4   did not have radiographic abnormalities, is that the second

5   data point?

6   A    Yes.

7   Q    And what was found with respect to them?  Did the people

8   with higher exposures but no abnormalities, did they or did

9   they not have an increased risk of lung cancer?

10  A    No increased risk in that group.

11  Q    What about pleural?  That is people who have pleural

12  abnormalities.  First of all, are those people who have the

13  opacities in the meat of the lung that we were talking about,

14  or they are the ones who have a condition in the pleura?

15  A    Abnormalities of the pleura.

16  Q    Okay.  Was that found to be tied to lung cancer risk?

17  A    No.

18  Q    Now, we have small opacities.  What are we referring to

19  now?

20  A    In this instance we're referring to patients who have --

21  again to use the ILO lingo -- a zero slash one chest

22  radiograph.

23  Q    Okay.  Zero slash one, we're going to get to that, but is

24  that a strong indicator of there being opacities?

25  A    No, everyone really considers that a normal film.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Now, once we get to the people who have small

2  opacities with the one slash zero plus, who are those people?

3  That is what are we getting at when there's a reference to

4  small opacities with a one slash zero plus?

5  A    So those people clearly have radiographic evidence of

6  asbestosis.

7  Q    Okay, and with respect to the people who have radiographic

8  asbestosis -- evidence of asbestosis, what, if any, observation

9  did you make as to whether that was related to an increased

10  risk of lung cancer?

11  A    The researchers found that it did increase the lung cancer

12  risk over four times.

13  Q    Okay.  Showing you then Slide 2130 -- GC-2130, is there --

14  together with the statistical evidence, tell us whether there

15  is any theory -- mechanistic theory that would draw a

16  relationship between lung fibrosis and lung cancer.

17  A    Researchers have been interested in the fibrosis question

18  from a biochemical standpoint for some time, greater than 20

19  years.  The slide here really depicts a plausible hypothesis

20  for how lung cancer has as its prerequisite fibrosis, and I can

21  walk through the slide, if you'd like.

22  Q    Yeah, just -- if you'd just do that.  Spare us I guess.  A

23  little bit briefly.  It's here in the morning --

24  A    I understand.

25  Q    -- and I'm very confident that Dr. Mullady over there will

1  have detailed questions on this part of your examination.

2  A    Anybody that wants more information can see me afterwards.

3  Q    Okay.

4  A    The stimulus in this case is asbestos, and so what

5  asbestos does, as the slide depicts, is cause an inflammatory

6  process in the lung.  Most inflammatory processes, whatever

7  they're caused by, can be repaired in the lung, and that's why

8  every exposure and everything that happens to us doesn't cause

9  disease.  But what can happen when the defense strategies are

10  overwhelmed, these inflammatory processes can get unchecked and

11  out of control, and various mediators, including things like

12  growth factors and cytokines that I won't bore you with, cause

13  a lung injury pattern, and they have -- and fibrosis and lung

14  cancer have these mediators in common.  And so when we look at

15  the epidemiologic evidence, we're looking at the causal

16  association, which I think makes sense, but then this develops

17  the why part.  Why is lung cancer attribution -- why is

18  asbestosis a necessary prerequisite?  And I think what you get

19  from this model is a biologically plausible explanation that

20  they're common mediators that lead to both diseases.

21  Q    Okay.  Now is there anything else in the literature in

22  other areas besides asbestosis that would be consistent with

23  the model for fibrosis-related cancer that you've just

24  described?

25  A    Yes, there are.

1  Q    Okay.  Showing you 21 -- GG-2131, does this slide again

2  provide a list of those areas of research?

3  A    Yes, it does.

4  Q    Okay.  Can you just explain those entries briefly?

5  A    The literature on fibrotic lung disease has as one of its

6  components the concept that diffuse fibrosis of other causes

7  apart from asbestos exposure like idiopathic pulmonary

8  fibrosis, scleroderma, or sarcoidosis.  All are associated with

9  an elevated cancer risk.  And I think this was initially shown

10 probably most elegantly by Dr. Turner-Warwick and her group in

11 London 1980 when she looked at the cryptogenic fibrosing

12 alveolitis group, which in America we call IPF, idiopathic

13 pulmonary fibrosis.  And she found a fourteenfold increase in

14 lung cancer rates in those patients that had that condition.

15 Q    Okay, and what about Weill and McDonald?  Did they -- did

16 that paper also bear upon this?

17 A    It did.  It looked at an occupational-exposed group in

18 this case, workers that had silicosis, and their opinion was

19 that also -- the presence of silicosis increased the cancer

20 risk.

21 Q    Okay.  Turning back to our original question, Dr. Weill,

22 and Slide 2132, how do you ultimately answer the question about

23 whether asbestos exposure alone without asbestosis causes lung

24 cancer?

25 A    So based on what we've talked about so far, I've been able

Weill - Direct/Bernick                                    39

1  to conclude from my review of the literature and my

2  understanding of it, that asbestos exposure alone does not

3  increase the risk of developing lung cancer.

4  Q    Are you aware of any reliable scientific work that

5  specifically addresses this issue that is exposure alone versus

6  asbestosis -- and I want to focus on this -- produces reliable

7  data that is specific to this issue -- specific to this issue

8  which shows the contrary?  That is it's not asbestosis.  It's

9  asbestos exposure alone.

10  A    No.

11  Q    Are there other authors -- other authors of papers who

12  have expressed opinions on this subject that are consistent

13  with your own?

14  A    Yes.

15  Q    Showing you GG-2138, is this a list of some of the other

16  papers that reflect opinions that are consistent with your own?

17  A    Yes, it is.

18  Q    Now, I want to turn from the conclusion that you've

19  express to talking about a couple of other related issues.

20  First of all, have you or have you not considered the concept

21  of synergy as applied to this issue?

22  A    I have considered that.

23  Q    Okay, and do you have a slide that illustrates the concept

24  of synergy?

25  A    Yes.

1  Q    Showing you GG-2133, could you explain what 2133

2  delineates and why that would be relevant to the question of

3  whether asbestos alone can cause lung cancer -- asbestos

4  exposure alone can cause lung cancer?

5  A    This slide again depicts what was concluded from the

6  Selikoff insulator studies, and if you look at the left side of

7  the slide, it looks at the relationship between asbestos

8  exposure alone and cigarette smoking.  And Selikoff and his

9  group concluded that those two factors work synergistically to

10 increase the risk of lung cancer.

11 Q    Okay.  If that is true, that is if the synergy is between

12 asbestos exposure alone and smoking, what relationship, if any,

13 would that -- have that -- would that bear to your basis

14 question, which is whether asbestos exposure alone can cause

15 lung cancer?

16 A    It doesn't really answer that question, because again it

17 doesn't ferret out the patients or identify the patients

18 specifically who have reliable evidence of asbestos.

19 Q    Is there a slide, showing you GG-2134, which talks about

20 whether the Selikoff insulator studies support the idea that

21 asbestos exposure alone together with smoking but absent

22 asbestosis, whether that can cause lung cancer?

23 A    There is not an ability from the information in the

24 insulator studies to examine that specific question, and so, in

25 my opinion, they were not able to make the synergistic

1  relationship that this slide depicts.

2  Q    Okay.  Now again is that the same kind of limitation that

3  you described before as the limitation on being able to tease

4  out the asbestotics from the people who were simply exposed to

5  high levels?

6  A    That's right.

7  Q    Okay.  Likewise, going through to Slide 2135, when it came

8  to the Hughes-Weill study, did the Hughes-Weill study provide

9  specific information on this issue?

10 A    It did.

11 Q    And could you, using 2135, explain to the Court what

12 specific information was supplied by the Hughes-Weill study and

13 how it bore upon the question of whether -- of what the synergy

14 was?

15 A    So since all of the lung cancers in the asbestos cement

16 cohort existed in smokers, and the risk of developing lung

17 cancer due to asbestos exposure was confined to the

18 asbestotics, a synergistic relationship was able to be

19 demonstrated not between asbestos exposure alone in cigarette

20 smoking but instead asbestosis and cigarette smoking.

21 Q    Okay, and has that been illustrated in Slide GG-2136?

22 A    Yes, it is.

23 Q    Okay.  Now, the synergistic relationship between smoking

24 and asbestosis, would that or would that not be consistent with

25 the biological mechanism that you described to the Court?

Weill - Direct/Bernick                        42

1  A    It is consistent.

2  Q    Okay.  There's been reference here in this case to the

3  Helsinki criteria.  Are you familiar with the Helsinki

4  criteria?

5  A    Yes, I am.

6  Q    And have you considered the Helsinki criteria when it

7  comes to addressing the question of whether asbestos alone is

8  causally -- asbestos exposure alone is causally related to lung

9  cancer?

10  A    I have.

11  Q    And what consideration have you given to it?

12  A    The Helsinki criteria, as it's stated, is a consensus

13  opinion among people working in the field about, among other

14  things, the lung cancer/asbestos story.

15  Q    Okay, and what weight do you give that in your assessment

16  of the actual epidemiological data?

17  A    It's not an epidemiologic study itself.  It's an opinion

18  piece of people that have worked in the field came together to

19  discuss these issues.

20  Q    Okay.  Have you looked to see what some of the purposes

21  were that drove this consensus effort?

22  A    Yes.

23  Q    Showing you Slide 2137, does that reflect whether or not

24  compensation was one of the factors that was a goal in

25  connection with the Helsinki criteria?

1  A    Yes, it was.

2          MR. FINCH:  Objection.  Lack of foundation.  He

3  wasn't a member of the Helsinki criteria.  He doesn't know what

4  was in the -- this is a snippet of a multi-hundred-page

5  document.  The summary is a ten-page document.  I don't believe

6  he has the foundation to explain to the Court what was the goal

7  of the Helsinki.

8          MR. BERNICK:  Well --

9          THE COURT:  Mr. Bernick.

10          MR. BERNICK:  -- it's very simple.  I --

11  BY MR. BERNICK:

12  Q    Does this come from the Helsinki document?

13  A    Yes.

14  Q    Okay, and do the words say appropriate compensation?

15  A    Yes, they do.

16  Q    Are they the basis for the assessment that you made based

17  upon your expertise regarding what assessment or what weight to

18  give to the Helsinki criteria?

19  A    Yes.

20          MR. BERNICK:  Okay.

21          THE COURT:  All right.  Just a second.  Let me read

22  it.

23                    (Pause)

24          THE COURT:  All right.  This is the type of

25  information that an expert in his field would consider in

1  issuing an opinion.  So although the question as stated I agree

2  was objectionable, I believe at this point Mr. Bernick has

3  cured that objection by asking whether or not now this

4  information serves as a basis for this expert's opinion, and

5  now that objection has been cured.  Okay.

6            MR. BERNICK:  Thank you.

7  BY MR. BERNICK:

8  Q    Now, I want to turn a little bit now to talking about

9  making the transition from what you've told us about the

10 relationship between asbestosis and lung cancer and the work

11 that has been done specifically in connection with this

12 estimation.  And I want to go back to -- let me just ask you a

13 general introductory question.  Are there published criteria

14 for the diagnosis of asbestosis?

15 A    Yes, there are.

16 Q    Okay.  Who has published -- what group has published

17 criteria with respect to the diagnosis of asbestosis?

18 A    Primarily, the American Thoracic Society.

19 Q    Have you examined the history of the American Thoracic

20 Society publications to determine whether or not there has been

21 any change or evolution in those criteria?

22 A    I have.

23           MR. BERNICK:  Okay.  Your Honor, at this point we

24 would offer GX-0280 and 0274.

25           THE COURT:  Wait.  I'm sorry.  What are you offering?

1          MR. BERNICK:  Well, I -- I'll tell you we'll do it

2   the old-fashioned way.  I'm sorry.  These are in the binders.

3   They are GX-0280 and GX-0274.  And may I approach the witness?

4          THE COURT:  Yes.

5                    (Pause)

6   Q    Are you familiar with those documents, Dr. Weill?

7   A    Yes, these are the ATS statements.

8   Q    Okay, and is Exhibit GX-0280 the 1986 statement, and is

9   GX-0274 the December 12, 2003 statement?

10  A    Yes.

11  Q    And are these recognized statements within the field of

12  pulmonary medicine?

13  A    Yes.

14         MR. BERNICK:  We would offer them, Your Honor.

15         MR. FINCH:  No objection, Your Honor.  I think there

16  is duplicative exhibit labeling.  I mean the ACC and FCR have

17  also identified these as exhibits, so at an appropriate time

18  we'll give you the ACC and FCR number that is the same

19  document.  We have no objection to the admissibility of either

20  document.

21         MR. MULLADY:  No objection.

22         THE COURT:  All right.  GX-0280 and GX-0274 are

23  admitted.

24         MR. BERNICK:  Okay.

25  BY MR. BERNICK:


                    **J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                        46

1  Q    Now has there been any change in the diagnostic criteria
2  for asbestosis reflected in these documents?  That is from the
3  eighties until more current times.
4  A    There have been.
5  Q    Okay.  Could you just describe to the Court what has
6  happened to the diagnostic criteria for asbestosis that is of
7  relevance to your testimony here?
8  A    Some of the components are similar, but probably the most
9  distinct difference is with regards to the degree of
10  radiographic abnormality that each statement supports.
11         MR. BERNICK:  Okay.  I want to approach, if I can?
12  Do we have a marker?  And I'll just slide this over here.  Is
13  this all right, Your Honor?
14         THE COURT:  Yes.
15         MR. BERNICK:  Thank you.
16  Q    B-readers read what?
17  A    Radiographic -- x-rays from people that are exposed to
18  various dust-related diseases.
19  Q    Is there a classification or rating system that the B-
20  readers use in doing their evaluation?
21  A    There is.
22         MR. BERNICK:  Can we -- you know what you might do is
23  just -- do you have a clip -- a big clip?  I think if you put
24  it down further it might be a little bit easier, or not?  Okay.
25  Okay.  No.  Well, I'll just hold onto it.  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    The B-readers when they're doing x-rays, do they have a

2  rating system?

3  A    Yes.

4  Q    And what's the -- does it -- is it comprised basically of

5  two numbers with a slash in between?

6  A    Yes, but in terms of the profusion category, the

7  parenchymal abnormalities, yes.

8  Q    When it comes to parenchymal, we're now again in the meat

9  of the lung --

10 A    Right.

11 Q    -- and we're looking for abnormalities.

12 A    Correct.

13 Q    Okay, and you've made reference to opacities.  Is that

14 what we're looking for?

15 A    Yes.

16 Q    Okay, so we're looking at the x-ray, and we're saying do

17 we see opacities or not.

18 A    That's right.

19 Q    And is this a system that's designed to rate the degree to

20 which opacities are being found?

21 A    Yes.

22 Q    What's -- what are the numbers that -- what's the range of

23 numbers?

24 A    So there's 12 categories from zero slash zero all the way

25 to three slash three --

Weill - Direct/Bernick                                    48

1  Q    Okay.

2  A    -- with all the steps along the way.

3  Q    And the higher the number means more opacities.

4  A    That's right.

5  Q    What does the first number refer to versus the second

6  number?

7  A    The first number is to indicate what the reader has the

8  most confidence in in terms of the profusion category.

9  Q    Okay.  Now, under the ATS standards -- the earlier ATS

10  standards, was there or was there not a guidance or a

11  recommendation about the minimum finding of opacities that

12  would support a diagnosis of asbestosis?

13  A    There was.

14  Q    Okay, and what was it?

15  A    One slash one.

16  Q    Which means?

17  A    That the reader first considered the x-ray abnormal to the

18  degree of one, and that he did not or she did not consider any

19  other profusion category.

20  Q    Okay.  What was the change?  As we went forward with the

21  diagnostic criteria as recommended by the ATS, what changed?

22  A    The 2004 statement indicates that a profusion category of

23  one slash zero is sufficient to make the diagnosis.

24  Q    And that would be -- mean what?

25  A    That the reader had the most confidence in a profusion

Weill - Direct/Bernick                          49

1  category of one, would also consider that the x-ray was normal,

2  i.e., a profusion category of zero.

3  Q    Okay.  Now, I want to ask you a question that's very, very

4  specific here.  Is there any -- is the category -- there's only

5  one -- two lower categories, right, the zero slash one and the

6  zero slash zero.

7  A    Right.

8  Q    Are either of those categories or ratings considered to be

9  abnormal?

10  A    No, they're normal.

11  Q    Okay, so am I correct that under the new standard any

12  reliable B read which finds any changes in the parenchyma

13  equals asbestosis today?

14  A    That's right.

15  Q    So as long as there's any reliable radiographic evidence

16  showing changes of the parenchyma, bingo, asbestosis?

17  A    That's right.

18  Q    Okay.  I guess it doesn't really matter that much anymore.

19  Let's go back to GG-2139 and spend a minute walking through

20  what 2139 illustrates.  We have your same old icons.  We have

21  asbestos exposure alone.  We have asbestosis, which you say has

22  been tied to lung cancer.  That's the yes.  But it then says --

23  it then has asbestosis kind of growing as a category, and it

24  says today includes reliable radiographic evidence of any

25  asbestosis-related parenchymal lung change.  Is that or is that

1 not accurate?

2 A    Yes, it is.

3 Q    And given what the -- what's happened to the diagnostic

4 recommendations of the ATS, when you talk about asbestosis, are

5 you talking about a smaller group than was true historically,

6 the same group, or a broader group?

7 A    Likely a broader.

8 Q    Thank you.  In light of that, today does, quote,

9 asbestosis exclude anybody who has reliable radiographic

10 evidence of any parenchymal lung change?

11 A    Yes, it does.

12 Q    Who does it exclude?

13 A    It excludes anybody with a normal chest radiograph.

14 Q    Okay, so I think I've probably -- you didn't hear my

15 question or answer it the right way.  Does the diagnosis of

16 asbestosis exclude anybody with reliable radiographic evidence

17 that they do have a lung change?

18 A    No, it doesn't include anybody.

19 Q    Okay.  Let's turn then to the Henry study.  Are you

20 familiar with the Henry study?

21        MR. BERNICK:  And for the record, the Henry study,

22 Your Honor, is comprised with -- by a series of exhibits.

23 They'll be offered in through Dr. Henry.  They are GX-284, 285,

24 286, 317 --

25        THE COURT:  I'm sorry, Mr. Bernick, you're going too

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                          51

1  fast for me.

2           MR. BERNICK:  I'm sorry.

3           THE COURT:  Could you start the numbers again?

4           MR. BERNICK:  Yes, it's -- Henry is GX -- let me do

5  them in order, 104, 284, 285, 286, 317, and 582.

6           MR. FINCH:  Are you offering them now?

7           MR. BERNICK:  No, they'll be offered through Dr.

8  Henry.

9           THE CLERK:  Mr. Finch, please find a microphone.

10          MR. FINCH:  Sure.  My question is was he offering

11  them now.  And since he's not offering them now, I don't have

12  any basis to object now.

13          MR. BERNICK:  Okay.  Did you -- do you want me --

14          THE COURT:  I will ask something.  May I ask a

15  question, because I think I got off on a track somewhere, and

16  I've gone -- I got confused.  Doctor, do I understand your

17  testimony that the parenchymal changes can only be caused by an

18  exposure to dust -- to some dust product?

19          THE WITNESS:  If we're talking about the disease

20  asbestosis, yes.  Fibrotic lung conditions can happen due to a

21  variety of reasons.  There's over 150 causes.

22          THE COURT:  Okay, but you're testimony today is

23  related only to asbestos exposures.  Correct?

24          THE WITNESS:  Yes.

25          THE COURT:  So your testimony with respect to the

1   Thoracic -- American Thoracic Society changes is specific to

2   exposures to asbestos?

3                 THE WITNESS:  Yes.

4                 THE COURT:  Okay.  Thank you.

5   BY MR. BERNICK:

6   Q     And again, to be clear, so long as there is any reliable

7   evidence on B read that there's any change whatsoever to the

8   parenchyma, that would be -- that would support a diagnosis of

9   asbestosis.

10  A     That's correct.

11  Q     Okay.  Now, presumably, the diagnosing doctor would also

12  have to be told if the individual has worked with asbestos.

13  A     That's right.

14                MR. BERNICK:  Okay.

15                THE COURT:  Yes, that was my confusion, because I was

16  slinking -- I was missing the link between the diagnostic

17  change and I guess the work history.

18                MR. BERNICK:  Yeah.

19                THE COURT:  Okay.

20  BY MR. BERNICK:

21  Q     And this is a very important point, so that -- you have a

22  one slash zero, and there was a day -- in the earlier

23  asbestosis one one smaller group.  There?

24  A     Yes.

25  Q     We then have people who have one slash zero today, larger

Weill - Direct/Bernick                              53

1  group, and then we have people who have no -- have one slash

2  zero but no asbestos exposure.  They don't say that they're

3  exposed to asbestos.  Is your testimony that provided somebody

4  -- a patient comes in and says I worked with asbestos, so long

5  as they have this -- any evidence -- reliable evidence of any

6  change to the parenchyma on examination of x-ray therein?

7  A    Yes.

8  Q    Now did Dr. Henry study people who had submitted x-rays in

9  B reads in this case?

10 A    Yes.

11          MR. FINCH:  Objection.  Relevance.  May I state the

12 basis of --

13          THE CLERK:  You have to use a microphone.

14          MR. FINCH:  Sure.  May I state the basis of the

15 relevance objection, Your Honor?

16          THE COURT:  Yes, but before you go into this -- I'm

17 sorry.  My mind is still a little bit behind you folks, so

18 before you get into this I'd still like to follow up with where

19 I am.  Is this a presumption, Doctor, that the one slash zero

20 with the asbestos exposure is presumed to have asbestosis, or

21 is it simply taken as a statement of fact that if you have one

22 slash zero, you have asbestosis if you also had exposure to

23 asbestos?

24          THE WITNESS:  If you have one slash zero or above,

25 profusion category in the presence of an exposure that the

Weill - Direct/Bernick                    54

1  physician thinks elevates the risk of developing asbestosis,

2  then you've got the diagnosis.

3           THE COURT:  So there is a value judgment by the

4  physician that has to be added to this component.

5           THE WITNESS:  Absolutely.

6  BY MR. BERNICK:

7  Q    But is -- let me just -- and we're going to pursue that,

8  Your Honor, in detail when we get to -- is what the Court just

9  asked you about, Dr. Weill, an issue of differential diagnosis?

10 A    Right.

11 Q    Okay, so we have a one slash zero.  Is it fair to say that

12 the one slash zero could be due to asbestos but also could be

13 due to something that's not asbestos.

14 A    Yes.

15 Q    And a doctor doing a differential diagnosis, finds the one

16 slash zero, has to inquire about exposure.

17 A    That's right.

18 Q    Tell the Court whether or not there is variability in the

19 quality -- in the quality of information that a doctor can get

20 about exposure.

21 A    There's a wide variety in the quality of the information.

22 Some of the information comes from the patient himself, of

23 course, and that can vary from patient to patient.  Some of the

24 information comes from the epidemiologic studies that address

25 the exposures in a specific occupation, and that information

Weill - Direct/Bernick                    55

1  has to be considered strongly as well, because it gives you a

2  background for what that patient might have been exposed to.

3  Q    Okay.  Do you -- does a doctor necessarily have enough

4  information about exposure to compare that patient to the epi

5  studies?

6  A    No, often not.

7  Q    Now, let's get back to -- we're going to talk -- are we

8  talking a bit more about this as we get towards the end?

9  A    Yes.

10 Q    Okay, but when it comes -- and I think t his is the --

11 maybe I should've been clearer.  When it comes to the

12 radiograph itself, is the radiograph -- is the radiograph -- if

13 it's one plus zero or greater, does the radiograph exclude

14 anybody who's got any reliable evidence of changes in the

15 parenchyma?

16 A    No, it doesn't.

17 Q    Okay, so might there be exclusion based upon exposure

18 history?

19 A    Yes.

20 Q    Okay, but in terms of the radiograph itself, if you have

21 evidence of any change there in the parenchyma from the point

22 of view of that diagnostic tool, you're in?

23 A    Yes.

24      MR. BERNICK:  Okay.  Is that -- I don't know if

25 that --

1          THE COURT:  Yes, that helps.  Thank you.

2          THE WITNESS:  It's a very objective piece of

3  evidence.

4          MR. BERNICK:  Right.

5          THE COURT:  That helps.  Thank you.

6          MR. BERNICK:  Okay.

7  BY MR. BERNICK:

8  Q    Now, let's talk about Dr. Henry's study.  Did Dr. Henry's

9  study look to see who within the group that he sampled had

10 asbestosis by radiograph and who did not?

11 A    Yes, he did.

12          MR. FINCH:  Objection.  Relevance.  And I think this

13 may be an appropriate time to either take a sidebar or excuse

14 the witness.  I think I can state the basis of the objection

15 rather succinctly, but I don't want to influence the witness'

16 testimony or to have any debate of this matter in the presence

17 of the witness, so would --

18          MR. BERNICK:  Well, whatever --

19          MR. FINCH:  -- Your Honor --

20          MR. BERNICK:  I don't care.  I mean --

21          THE COURT:  All right.  Doctor, I'm going to ask you

22 to take a very short five-minute recess, if you wouldn't mind,

23 sir, please?

24          MR. BERNICK:  This is on your time now.  Right?

25          MR. FINCH:  This is on my time, Mr. Bernick.  Start

1 the stop watch right now.

2                THE COURT:  Just a minute.

3                          (Pause)

4                THE COURT:  All right, Mr. Finch.

5                MR. FINCH:  The ACC objects to the introduction into

6 evidence of any or all of the questionnaires, proof of claim

7 forms, x-ray materials, and any analysis or testimony based

8 upon them on relevance grounds, and we have two substantive

9 reasons.  First --

10               THE COURT:  Those in this case?

11               MR. FINCH:  First --

12               THE COURT:  You object to the proofs of claim and the

13 PIQs in this case?

14               MR. FINCH:  Your Honor, may I state the basis for the

15 objection?

16               THE COURT:  Yes, please.

17               MR. FINCH:  First, under the settled law of this

18 district, what is to be estimated here is the cost that Grace

19 would incur over time to resolve its asbestos personal injury

20 and death cases that are not resolved as of the petition -- the

21 time the bankruptcy petition was filed and which would

22 thereafter arise in the tort system going forward in the

23 future.  That estimation, pursuant to the same settled case law

24 -- and by that I'm referring to Owens-Corning and Armstrong,

25 Eagle Picher and Federal-Mogul -- is to be based on the cost

1  which Grace bore to resolve thousands of similar cases prior to

2  the petition date subject to modification to reflect any

3  obvious changes that have happened in the tort law -- in the

4  tort system.  If we are correct that this is the law, and if we

5  are correct that this is the method by which the Court must

6  estimate that liability, those costs, then the material in the

7  files of the unsettled claimants, the people who were -- had

8  claims that hadn't been settled as of the time Grace went into

9  bankruptcy developed and maintained in their files after the

10 petition date, has not relevance, since the evidence for the

11 cost of the liability is found in Grace's history of tens of

12 thousands of already resolved cases and not in the various

13 materials in the process of development in the unsettled cases.

14        We have a second basis for our relevance objection.

15 Even if, as the debtor argues, it is appropriate for the Court

16 to consider the so-called, quote, legal liability of claims

17 pending against Grace at the time the petition was filed, which

18 have not yet been settled or resolved, the material that may

19 have been collected from time to time in the files of the

20 claimants in a period during which litigation and prosecution

21 of their cases against Grace has been stayed is not relevant

22 proof of what would be developed by way of evidence by the same

23 claimants should their claims have actually proceeded to trial.

24 Indeed, there will be evidence that will be -- witnesses who

25 will testify to that very proposition.

1          The Court should be well aware that no court has set

2  a trial date for the trial of any asbestos personal injury

3  claim for either trial by allowance or trial by jury.  The

4  Court has never set a deadline to the -- require any personal

5  injury claimant to identify the testifying experts they would

6  rely on in trial, the industrial hygienists, the

7  epidemiologists, the toxic tort experts, in a case involving

8  Grace, nor could the Court do so under the estimation CMO,

9  since the August 29th, 2005 order that Your Honor entered

10  authorizing the estimation proceeding says it is a core

11  proceeding.  And I'll remind the Court that under 28 USC

12  Section 157(b)(2) a core proceeding cannot be something that is

13  the allowance or disallowance of individual claims for purposes

14  of distribution.

15          Third, the questionnaire does not ask any personal

16  injury claimant to identify the expert and fact witnesses that

17  will testify in a trial involving their case, nor does it

18  require the claimants to identify every document or piece of

19  evidence that they would introduce into evidence in a trial

20  involving Grace.  Therefore, whatever was in their file when

21  Grace served discovery on them, the interrogatories and the

22  document requests which are part of the questionnaire, and

23  that's what were produced in response to that, is what their

24  file showed at a moment in time in the bankruptcy and is not

25  evidence of what those very same claimants would prove in a

Weill - Direct/Bernick                60

1  trial involving Grace.  It would be as if that at the beginning

2  of the case we had served document requests and interrogatories

3  on W.R. Grace on April 2nd, 2001 and said produce what you have

4  to prove your estimation case when they haven't hired all the

5  experts they're going to be parading in front of you.

6          THE COURT:  They wouldn't be proving an estimation

7  case.

8          MR. FINCH:  They are arguing about the methodology

9  and the proof.  Your Honor, the point is it's an objection

10 based on lack of relevance for the grounds that I have stated,

11 and we would like a ruling on this to protect the record.

12         THE COURT:  It's overruled.  The evidence is clearly

13 relevant.  With respect to the numbers of claims that the

14 debtor will have to reconcile pre-petition going forward, there

15 has been a bar date, and whether or not a claimant has

16 satisfied the proof of claim information and the PIQ was ruled

17 by this Court to be appropriate discovery in support of that

18 proof of claim.  That, in fact, substantiates the proofs of

19 claim and the claims that, as of now, are the -- I'll call them

20 in quotes, and I do mean in quotes.  I'm not making a ruling --

21 the allowed claim base upon which the debtor has to reconcile

22 what the present claims are and whether or not it will have a

23 future claims base based upon the claims base that it now knows

24 it has to face from its pre-petition past.

25         So in terms of numbers of claims, that is a relevant

**J&J COURT TRANSCRIBERS, INC.**

1  universe.  This proof of claims database is it --

2          MR. FINCH:  But this --

3          THE COURT:  -- and if the claimant didn't file a

4  proof of claim against this estate, it's not going to be filed

5  in one against the trust.

6          MR. FINCH:  The -- but the -- there's a difference

7  between filing a proof of claim --

8          THE COURT:  Yes.

9          MR. FINCH:  -- in the bankruptcy, but -- and what

10  Grace is seeking to do here, which is to argue that the

11  materials produced in discovery in response to the

12  questionnaire tells you anything at all about Grace's legal

13  liability for those individual cases.

14          THE COURT:  I don't know what Grace is going to do

15  yet.  You're objecting to relevance to the question did Dr.

16  Henry look to see who had asbestos or not.  That's the

17  objection to relevance.  I don't even know who Dr. Henry is

18  yet.  There hasn't been any evidence as to who Dr. Henry is, so

19  this whole objection on the basis of this record as to

20  relevance at the moment, I have to overrule.  I have no idea

21  why this question as to whether Dr. Henry, whoever he is, on

22  the basis of this record looked to see who had asbestosis or

23  not isn't relevant.

24          MR. FINCH:  May I have a continuing objection on

25  relevance grounds to any analysis of the materials submitted

Weill - Direct/Bernick                    62

1  pursuant to the questionnaires?

2           THE COURT:  No, we don't even have -- I don't even

3  know what these documents are.  They haven't been offered.  I

4  haven't --

5           MR. FINCH:  Okay, then we'll --

6           THE COURT:  -- had them identified.

7           MR. FINCH:  Then we'll take them up on a document-by-

8  document basis but --

9           THE COURT:  We're going to have to until we get some

10 offer as to what the documents are, then I'll incorporate this

11 argument, Mr. Finch, and see where you want to go with it.  But

12 in terms of relevance as to the proof of claim -- proofs of

13 claim in this case, they are highly relevant to set what the

14 current base upon which Grace's number of claims will be

15 estimated is.

16          Now, in terms of liability, we're not there yet.  But

17 numbers of claims, they are very relevant, and the personal

18 injury questionnaire, that is discovery based upon those proofs

19 of claim, that has to have some relevant data.  Whether it will

20 be relevant in the connection in which a particular question is

21 offered, I don't know.  I can only examine that in light of the

22 evidence as it comes in.

23          MR. FINCH:  Thank you, Your Honor.

24          MR. BERNICK:  I do --

25          THE COURT:  Why don't we all take a five-minute

**J&J COURT TRANSCRIBERS, INC.**

1  recess, and then we'll --

2          MR. BERNICK:  Yes, what I --

3          THE COURT:  I'm sorry.

4          MR. BERNICK:  -- thought I would do while we're still

5  on the record -- I'm sorry, Your Honor -- is that I would

6  really -- I think I know what Mr. Finch is doing, which is that

7  he is making his record, and that's fine.  He wants to make his

8  record on his objection.  I would like to not have this

9  interfere with the witness continuing, so I would like to do is

10 to put squarely what the Henry study is.  That it is a study

11 that, in fact, does relate to materials submitted in connection

12 with the PIQs, so that Your Honor can, I'm presuming, rule then

13 with respect to this witness' ability to testify about the

14 Henry study.  And if -- at least we'll be done with that, so

15 that we don't have to go through this all as a hypothetical

16 exercise.  So as soon as he comes back, I will elicit that

17 testimony, and then maybe if Mr. Finch wants to make an

18 objection, he can make an objection, and we can go on.

19         I'm really concerned -- I mean this is all I think

20 much more efficiently handled -- if he wants to make an

21 objection, we don't need their whole brief all over again.  He

22 can simply say, well, you know, our position in this case is X,

23 Y, Z, Your Honor can rule, and we can get on with business.

24         MR. FINCH:  That's my intention, Your Honor.  I think

25 -- but I do have to protect the record, so that the District

Weill - Direct/Bernick                    64

1  Court or whatever court's ultimately going to review this --

2          THE COURT:  We protect the record at the appropriate

3  time not out of time, so that I can take it in the context.

4  When you make a relevance objection, I need it relevant to

5  something not to did Dr. Henry look to see whether or not there

6  was asbestosis.  Mr. Mullady.

7          MR. MULLADY:  Yes, Your Honor, just in the spirt of

8  Mr. Bernick's comment to keep the flow of the trial going and

9  not to have a continuous discussion about this, the FCR joins

10 the objection as stated by Mr. Finch on behalf of the ACC.

11 When the Henry evidence is admitted, we will simply object on

12 relevance grounds for the reasons Mr. Finch has articulated.  I

13 will not reiterate those reasons unless the Court wants me to.

14         THE COURT:  Well, with respect to the ACC and the

15 FCR, why don't I presume that if Mr. Mullady, you, or you, Mr.

16 Finch, or whoever trial counsel is for a particular witness,

17 makes an objection on behalf of either the ACC or the FCR, both

18 of you join in that objection, unless you tell me to the

19 contrary?

20         MR. MULLADY:  That's fine, Your Honor.

21         THE COURT:  Because your exhibits are joint, your

22 witnesses for the most part are joint.

23         MR. FINCH:  That's fine, Your Honor.

24         THE COURT:  Is that agreeable to both sides?

25         MR. MULLADY:  That's acceptable.

1          MR. FINCH:  That's acceptable.

2          THE COURT:  Fine.  So I will assume that it is a

3  joint objection from now on unless you tell me to the contrary.

4  If you tell me to the contrary, then I will obviously not

5  assume that it is a joint objection.

6          MR. FINCH:  Thank you, Your Honor.

7          MR. MULLADY:  Thank you, Your Honor.

8          THE COURT:  Now, Mr. Bernick, let's go back.  All

9  right.  The Henry study, tell me what your proffer is --

10         MR. BERNICK:  Yes, the Henry study --

11         THE COURT:  -- and let's do it by way of proffer.

12         MR. BERNICK:  Yeah, the Henry -- that's fine.  The

13  Henry study is, in fact -- Dr. Henry will testify next.  He

14  took the x-rays that were submitted pursuant to the Court's

15  order, and he extracted a sample of those x-rays.  These are x-

16  rays of people who have a claim for lung cancer.  The world is

17  lung cancer claimants.

18         In this case we took the x-rays that  those folks

19  provided.  Dr. Henry took a sample of those x-rays and reviewed

20  those x-rays to determine whether the ILO standards, that is

21  how to have a reliable read -- and there's a standard that

22  deals with that -- to see whether they were met.  That is could

23  you -- were these reads -- were these x-rays when read in

24  compliance with the standards, which requires, you know,

25  replicated readings, were they x-rays that properly showed a

1  rating of one slash zero or greater.  So Dr. Henry took the

2  recommendations of the ATS, applied them to this group, looked

3  for reliable B reads that met the one slash zero applying the

4  relevant ILO guidance on that question, and came up with the

5  result that in only seven percent of the lung cancer cases was

6  there a reliable that is replicable read of asbestosis defined

7  as the minimal criteria of one slash zero.

8        That seven percent was then used by Dr. Florence, and

9  it was used by Dr. Florence in two ways.  He limited the

10 estimate -- that is the claims that would clear that threshold

11 -- to seven percent of the claims where those people -- where

12 the people had submitted an x-ray.  Where they had not

13 submitted an x-ray, and they were supposed to -- that is they

14 had stated that -- that they were relying on the x-ray, those

15 were excluded.  And where the claimant did not say that they

16 were relying on the x-ray but didn't have anything else that

17 they submitted by way of radiographic evidence, the same seven

18 percent was applied to that group on the theory that, well, if

19 they had submitted an x-ray, or maybe they had pathology, they

20 had committed to being relying on x-rays.  So as a buffer seven

21 percent of those folks were allowed.  So, essentially, the

22 seven percent figure coming out of the Henry study was used in

23 the estimation to draw a line between asbestosis claims that

24 were properly supported by reliable radiographic evidence and

25 ones that were not.

1          THE COURT:  Okay.  Now you're objection now, Mr.

2   Finch.

3          MR. FINCH:  With that proffer, I think the Court can

4   consider my objection in a framework that it's tied not only to

5   Dr. Henry but also to Tom Florence in the overall estimate.

6          My first objection -- the basis of the objection is

7   relevance, and, as I said before, there are two grounds.

8   Number one, we believe the controlling case law says you

9   estimate based on the history of resolving cases in the past.

10  It's clear that prior to the time that Grace went into

11  bankruptcy it did not require lung cancer claimants to

12  demonstrate a one slash zero x-ray to prove a case against

13  Grace.

14         Secondly -- and that the settlement rules that Grace

15  -- that Grace had placed as a cost in monetizing the claims it

16  faced is the basis for what we think the Court has the ability

17  to estimate here.

18         But, secondly, even under Grace's theory, the

19  claimants have produced x-rays and other radiographic images,

20  which Grace hasn't reviewed in the Henry study in response to

21  the Court's order and Grace's discovery.  That in no way means

22  that those claimants, if their case went to trial, wouldn't, if

23  they're still alive -- although, frankly, not a whole lot of

24  them are alive -- wouldn't be able to go back and get another

25  x-ray or a high resolution CAT scan, which is a lot more

1 sensitive for identifying asbestos stuff or pathology or having

2 an expert come in and testify in their case that, in my

3 opinion, you don't need to have radiologically diagnosable

4 asbestosis in order to attribute the lung cancer to the

5 asbestos exposure.  That's a big debate in the medical

6 literature.  This -- Dr. Weill has one opinion on that score.

7 There are many, many other reputable experts, epidemiologists,

8 pathologists, the people who wrote the Helsinki criteria who

9 have thousands of peer reviewed medical articles to their name,

10 who have a very different opinion.

11           THE COURT:  Well --

12           MR. FINCH:  And so to the extent that Grace is using

13 this study --

14           THE COURT:  The problem with the x-ray submission is

15 that several times during the course of this case I ordered

16 that if there were going to be reliance on an x-ray study, that

17 it be produced now, beuase at some point in the process the

18 claimant -- the current claimant would have to produce an x-

19 ray.  And if it had to produce it to the trust, it could

20 produce it now, and if it hasn't been done, then I said that

21 the assumption for the purpose of this estimation trial would

22 be that it did not exist if it has not been produced.  I'm not

23 going to back off that ruling now.  That happened several

24 times.  The claimants have been given numerous opportunities to

25 produce the evidence of their disease either by x-ray or by

1  something else, and if they have chosen -- if they have chosen

2  to produce an x-ray, as they were given that opportunity, and

3  have not done it, then at this point they simply do not have

4  that option any longer.

5           MR. FINCH:  But the order said for the estimation

6  trial, which is an estimate of Grace's --

7           THE COURT:  Yes.

8           MR. FINCH:  -- aggregate liability to claimants not

9  any individual --

10          THE COURT:  Yes.

11          MR. FINCH:  -- claimants.  X-rays change over time.

12 People get sicker.  People die.  People might get pathology

13 when they didn't have pathology before.

14          THE COURT:  Yes.

15          MR. FINCH:  The point is, Your Honor, that by setting

16 a deadline in March of what you had in your files at this time

17 in a proceeding that everyone was told would (a) not result in

18 the allowance or disallowance of their individual claims, and

19 (b) was for the purpose of estimating Grace's aggregate

20 liability, tells you nothing about the cases would be worth

21 when, as, and if they were resolved by Grace or by a trust or

22 in the tort system, and so we --

23          THE COURT:  Well, certainly, it does, Mr. Finch,

24 because to the extent that somebody is going to get more sick,

25 they're either more sick now than they were when the case was

1 filed in 2001, and to the extent that they -- they're certainly

2 not going to get less sick than they were in 2001.  So, if

3 anything, they would be more sick than they were in 2001.

4          MR. FINCH:  And they may be more sick in 2008 --

5          THE COURT:  They may.

6          MR. FINCH:  -- or 2009 --

7          THE COURT:  They may.

8          MR. FINCH:  -- or 2010.

9          THE COURT:  They may.

10          MR. FINCH:  And that's why this -- that's the basis

11 for our relevance objection.  May I have a -- I think to

12 protect the record under Evidence Rule 103, all I need to do is

13 state the objection as to any testimony based on the

14 questionnaire analysis the first time it comes up and maybe do

15 it on a witness-by-witness basis.  There's sort of two aspects

16 of Dr. Weill's testimony.  One is this stuff.  The other is his

17 PFT statement.  Will the Court understand that when I stand up

18 and object on relevance grounds to that, so I don't have to go

19 through this entire spiel?  That's what I'm trying to avoid,

20 and I think Mr. Bernick has an interest --

21          THE COURT:  Yes.

22          MR. FINCH:  -- in trying to avoid that, too.

23          THE COURT:  If --

24          MR. FINCH:  As long as the record is clear that

25 that's the basis for our objection.

1    THE COURT:  First of all, with respect to the

2  objection concerning the controlling case law on how to resolve

3  claims, the purpose of this testimony is -- as I understand it,

4  is -- at the moment with this witness is not how to resolve

5  claims.  This witness is not resolving claims.  And so the

6  testimony is not being proffered for that point, and,

7  therefore, the relevance is not to that point.  So as to this

8  witness, the relevance objection is not relevant.  So it's

9  overruled.  You may re-raise that objection when and if a

10  different witness comes up and the proffer is to a different

11  point.  You are going to have to do it on a witness-by-witness

12  basis.

13    MR. FINCH:  Okay, on a witness-by-witness basis.  So

14  when Mr. -- Dr. Florence comes in and relates what this witness

15  or Dr. Henry testified to the resolution of claims --

16    THE COURT:  Yes.

17    MR. FINCH:  -- that is again when we'll raise the

18  relevance objection.

19    THE COURT:  Yes.

20    MR. FINCH:  But I do think we have to raise it on a

21  witness-by-witness basis.  This is the relevance objection to

22  this witness, and I'll stand on that objection.  I understand

23  it's been overruled.  Thank you, Your Honor.

24    MR. BERNICK:  If you --

25    MR. MULLADY:  One additional point of distinction for

Weill - Direct/Bernick                              72

1  the future claimants, Your Honor.  To the extent that there is

2  a relevancy objection here, that relevancy point is even one

3  step further removed from the future claimants.  The future

4  claimants haven't submitted any x-ray films for review by

5  Grace's experts, yet Dr. Florence's methodology assumes that

6  future claimants in the future will be unable to demonstrate

7  radiographic proof of asbestosis --

8           THE COURT:  I understand, but this isn't --

9           MR. MULLADY:  -- as an extrapolation from the current

10 claimants.

11          THE COURT:  -- Dr. Florence.  This isn't the time for

12 that.

13          MR. MULLADY:  Understood.

14          THE COURT:  Can we please get the objections with the

15 witness who is on the stand at the time the witness is

16 testifying?  This is a different witness for a different

17 purpose, and I'm not going to give you advanced rulings with a

18 witness who's not on the stand.  So let's get it in the context

19 with the witness who's on the stand.  If this is the purpose

20 for trying to get these sidebars, folks, we're not going to do

21 this anymore.

22          MR. MULLADY:  That's not the purpose, Your Honor.

23          THE COURT:  All right.  Then let's limit it to the

24 witness who's on the stand in the context of the witness'

25 testimony.  I'm not doing this any longer, folks.  This is

1  ridiculous.

2         MR. BERNICK:  Okay.

3         THE COURT:  We'll take a five-minute recess.  Mr.

4  Bernick.

5         MR. BERNICK:  No, I'm happy to adapt to the recess.

6         THE COURT:  Do it now.

7         MR. BERNICK:  I rather it be clear, so that Your

8  Honor understands where we're going, and we get clarity.  First

9  of all, all the objections that go to, well, our experts would

10  say X or Y or Z -- that all goes to the weight of the evidence.

11  It doesn't go to whether it's relevant.

12         Secondly, we are making very spare use of the

13  information that was received in connection with the proof of

14  claim and PIQ process, so that we're working with underlying

15  evidence that ain't going to change with time.  Where the

16  witness worked, he knows, and by and large the x-ray evidence,

17  we're not even relying on the B reads.  We're looking at the

18  actual x-rays themselves.  And, as Your Honor indicated, that's

19  not subject to what experts go out and get.  An x-ray is an x-

20  ray.

21         So we're really using very extremely, you know, kind

22  of bedrock hard information that we're getting out of the PIQ.

23  To be clear to the Court, this witness' evidence is providing

24  the foundation for the seven percent, what it is that it means.

25  And based upon that, Dr. Florence will apply the seven percent.

1 Grace is saying that the people who have submitted the PIQs do

2 not have in their x-rays a medical condition at the time of the

3 x-ray that would lead to liability.  It's not there.  And

4 because it's not there, the prospect of its ever being there --

5 you can never say never.  But for purposes of this estimation,

6 the only evidence in the record will be that these people did

7 not have radiographic x-ray that supported a diagnosis of

8 asbestosis.

9         And Your Honor has been fully consistent with this.

10 They're saying, oh, well, maybe way down the road there will be

11 more, but they're arguing that point in order to defend against

12 our estimate.  For purposes of this estimation, Your Honor has

13 indicated (a) they had to provide it, period, but (b) for

14 purposes of this estimation, that is the totality of the

15 record.  And so for them to argue that some day, some place the

16 record might be different, and, therefore, this is not

17 relevant, violates squarely the very words that they put in --

18 they suggested be in the order.

19         They're now saying, oh, we can now speculate that

20 there would be more evidence, or we can say the evidence you

21 have isn't any good, and that defeats the whole purpose of the

22 order, which is if you've got evidence, folks, in support of

23 your claim in these areas, you must submit it, otherwise, you

24 are barred from making the argument.  They're not making the

25 argument.

1         So, yes, we will make -- we're proffering this

2 testimony in support of the ultimate exclusion of these claims

3 for the purposes of the estimate.  Yes, it's totally consistent

4 with Your Honor's order.  Yes, it is relevant under the case

5 law, and if they want to dispute whether a one slash zero

6 really is necessary to diagnose asbestosis -- if they want to

7 dispute that and say you don't even need that -- apart from

8 pathology, you don't need anything but a history, that goes to

9 the weight of the evidence.  We don't think that's correct, but

10 that goes to the weight of the evidence.  So that's our --

11 that's the full extent of our proffer, Your Honor.

12         THE COURT:  All right.  We'll take a five-minute

13 recess.

14         MR. BERNICK:  Thank you, Your Honor.

15                         (Recess)

16         THE COURT:  I'm sorry.  Please be seated.

17         MR. BERNICK:  Is it okay to have Dr. Weill present?

18         THE COURT:  Yes.  Yes.

19         MR. BERNICK:  Okay.

20                         (Pause)

21         THE COURT:  All right, Mr. Bernick.  Dr. Weill.

22         MR. BERNICK:  Thank you.

23               DIRECT EXAMINATION CONTINUED

24 BY MR. BERNICK:

25 Q   Are you familiar with the work that Dr. Henry did?

**J&J COURT TRANSCRIBERS, INC.**

1  A     Yes.

2  Q     Okay.  Do you know what criteria Dr. Henry -- well, first

3  of all, tell the Court what materials -- that is what x-rays

4  Dr. Henry had reviewed during the course of his study.

5  A     He examined x-rays that were submitted for a cancer claim.

6  Q     In this case?

7  A     Yes.

8  Q     Okay.  Now are you familiar with the criteria that Dr.

9  Henry applied in the course of the study that he did?

10  A     Yes.

11  Q     Okay.  I want to show you GG-2140, and had Dr. Henry took

12  a sample?  Is that correct?

13  A     Yes, he did.

14  Q     And he analyzed that sample to determine what?

15  A     He analyzed the sample to determine the prevalence of

16  radiographic asbestosis in the cancer claimants.

17  Q     Okay.  This chart reflects that he -- reflects a seven

18  percent number over the asbestos box and a 93 percent number

19  over asbestos exposure alone.  Does that square with your

20  understanding of the conclusion that Dr. Henry reached in his

21  study?

22  A     Yes, it does.

23  Q     Now, Dr. Henry will be here to address the details of that

24  study, but for purposes of our discussion here, in concluding

25  that only seven percent of his sample had asbestosis, what

Weill - Direct/Bernick                    77

1  criteria -- precise criteria did Dr. Henry have used during the

2  course of his study?

3  A    Dr. Henry, as I understand it, used radiographic profusion

4  category greater than one slash zero to determine if somebody

5  had radiographic evidence of asbestosis.

6  Q    Greater than one slash zero or greater than or equal to?

7  A    Greater than or equal to.

8  Q    Okay.  What would then that say about the other 93 percent

9  of Dr. Henry's sample?  That is if only seven percent showed

10  asbestosis, what would 93 percent -- what would you be able to

11  say about the 93 percent?

12  A    That they had no reliable evidence of parenchymal lung

13  disease, in this case, asbestosis.

14  Q    Say no reliable evidence.  That is radiological evidence

15  or all evidence?

16  A    Radiologic evidence.

17  Q    Okay.  Let's be clear.  So are you aware of any -- as you

18  sit here today, based upon Dr. Henry's work, is there with

19  respect to this group of claimants any reliable radiological

20  evidence that their asbestos exposure, if they had asbestos

21  exposure has had any actual impact on their lung tissue?

22  A    No, there's no reliable evidence.

23          MR. FINCH:  Objection.  Relevance.  Same --

24          THE COURT:  Yes, overruled.  You may answer, Doctor.

25  A    No, there's no reliable evidence of that.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Now, apart from radiological evidence in the form

2  of the x-rays, is there other potential radiological evidence

3  that might be used?  That is are there other radiological

4  techniques that might be applied?

5  A    There are other types of changes in the lung that might be

6  attributable to asbestos exposure, namely, pleural changes.

7  Q    Okay.  Apart from pleural changes, which we're going to

8  get to, is there any other technique other than an x-ray that

9  would tell you whether there are radiological changes in the

10  meat of the lung?

11  A    No.

12  Q    Okay.  What about non-radiological evidence?  Is there

13  other non-radiological clinical evidence -- physical evidence

14  that could tell you that there were changes in the meat of the

15  lung?

16  A    You would need pathologic specimens to do that.

17  Q    Okay.  Did Dr. Henry's study relate to pathologic

18  evidence?

19  A    No, not at all.

20  Q    Okay.  Let's now go forward and take up the question of

21  other kinds of radiological evidence, and I want to direct you

22  to pleural changes.  Have you considered pleural changes in

23  relation to lung cancer?

24  A    Yes, I have.

25  Q    Showing you GG-2142, we've got a slide here that is the

Weill - Direct/Bernick                    79

1  same slide that is showing the seven percent asbestosis

2  evidence, the 93 percent where it's no reliable evidence of --

3  no reliable radiological evidence of lung changes, but then we

4  have a little box marked out for pleural changes.  Are pleural

5  changes changes to the lung?

6  A    No, they're the changes to the covering of the lung which

7  is called the pleura.

8  Q    Okay.  Let's talk about those a little bit more

9  specifically.  I want to show you GG-2143.  Does this slide

10 help you explain to the Court the phenomenon known as diffuse

11 pleural thickening?

12 A    Yes.

13 Q    Could you explain to the Court that phenomenon?

14 A    Diffuse pleural thickening is one of the benign asbestos-

15 related pleural diseases.  And diffuse pleural thickening, as

16 the name implies, is a very broad diffuse thickening of the

17 visceral pleura that does not involve the lung parenchyma

18 itself, and by definition, according to the most recent ILO

19 classification scheme put in place in 2000, involves blunting

20 of the costophrenic angle.  And I can explain that in more

21 detail, if you want.

22 Q    Okay.  First let's get our anatomy locations straightened

23 out.  You've talked about lung cancer and asbestosis as

24 effecting the meat of the lung.  Where we're talking about

25 pleural -- diffuse pleural thickening, where are we in the

1 anatomy?

2 A    So we're where the yellow box shows the arrows.  We're in

3 the covering part of the lung.

4 Q    And that's called the what?

5 A    Pleura.

6 Q    Okay.  Is that the same thing as the lung tissue, which is

7 subject to lung cancer and asbestosis?

8 A    No, it's distinct from that.

9 Q    Okay.  Is the condition known as visceral -- fibrosis of

10 the visceral pleura, is that asbestosis?

11 A    No, it's not.

12 Q    Is that lung cancer?

13 A    No, it's not.

14 Q    Is that a disease of the lung?

15 A    No, it's not.

16 Q    Does it reflect an impact of asbestos on the lung?

17 A    It reflects a change due to asbestos exposure.  It's a

18 marker --

19 Q    On the lung?

20 A    Not on the lung itself.

21 Q    Okay.  Now, let's talk about what the -- what that looks

22 like on radiograph.  Showing you GG-2144, does that help

23 illustrate what is seen on x-ray where diffuse pleural

24 thickening is present?

25 A    Yes, it does.

1  Q    Okay.  Could you explain to the Court what it is that this

2  shows?

3  A    So on the left side of the panel again we have a normal

4  chest radiograph, and on the right side of the slide what we

5  see is that the left lung -- and remember it's reversed.  The

6  left is right, and right is left.  The left lung shows blunting

7  of the costophrenic angle and thickening of the pleura and

8  would qualify that as diffuse pleural thickening.  And it's

9  shown as that white part that's outlined by the dashed red

10 line.

11 Q    Okay.  What about pleural plaques?

12 A    Yes, I did.

13 Q    Showing you GG-2145, is this a demonstrative that would

14 help you explain what pleural plaques are?

15 A    It is.

16 Q    Could you use demonstrative 2145 in explaining to the

17 Court briefly what pleural plaques are and how they fit in

18 here?

19 A    Sure.  Again, we're not talking about lung tissue here.

20 What we're talking about is the covering of the lung.  And

21 opposed to diffuse pleural thickening, pleural plaques are a

22 discreet thickening the pleura itself.  So a focal

23 circumscribed thickening of the lung pleura.

24 Q    Did pleural plaques reflect a condition of the lung

25 itself?

Weill - Direct/Bernick                    82

1  A    No.

2  Q    Did the pleural plaques reflect an impact of asbestos

3  exposure on the condition of the lung itself?

4  A    No.

5  Q    Does pleural plaques, are they even a disease?

6  A    No, they're markers of exposure.

7  Q    Okay.  Are they or are they not significantly associated

8  with the loss of lung function?

9  A    No, they're not.

10  Q    Are they or are they not an independent risk factor for

11  malignancy?

12  A    They're not.

13  Q    See radiograph 2146.  Would that help explain -- does that

14  help explain what a pleural plaques looks like?

15  A    Sure.  Again, normal left -- x-ray on the left side.

16  Right side of the slide shows a chest radiograph where there's

17  both right- and left-sided circumscribed pleural plaques, and

18  as the dash line indicates, there is an on-face pleural plaque,

19  meaning it's face on to the chest radiograph.

20  Q    Okay.  Turning to 2147, based upon consideration of

21  pleural changes, did you reach any conclusion as to whether

22  pleural changes constitute a risk factor for lung cancer?

23  A    Yes, I did.

24  Q    And what did you conclude?

25  A    That they do not increase the risk factor.

**J&J COURT TRANSCRIBERS, INC.**

Weill - Direct/Bernick                    83

1  Q    Now considering also pleural changes with respect to the

2  93 percent of the sample that Dr. Henry looked at concerning

3  these claimants, does it or does it not remain the case, in

4  your view, that there is no reliable radiographic evidence of

5  any impact on the lung itself of asbestos exposure with respect

6  to that 93 percent?

7  A    It does not affect it.

8  Q    Are you aware of any reliable scientific evidence in the

9  area of radiology that says that there would be such a change

10 given the results of his study --

11 A    No.

12 Q    -- assuming his study is accurate?

13 A    No, I'm not.

14 Q    Okay.  Now when the seven percent was applied -- are you

15 familiar with this fact?  That the seven percent number was

16 then applied in the course of the estimation that was done --

17 the estimate calculation that was done by Dr. Florence?

18 A    Yes, I am.

19 Q    Okay.  I want to show you -- well, first let me just ask

20 you in the following way.  We've talked about the fact that

21 there may be people who have other kinds of evidence to support

22 asbestosis, either pathology, slides, or are there other

23 techniques that are involved like CT scans and the like?

24 A    Yes, but not specific for asbestosis itself.

25 Q    Okay.  With respect to this seven percent, we have the

1  seven percent as applied to people who had x-rays submitted.

2  With respect to people who did not have -- who had no x-rays

3  but also know -- they didn't state that they relied on x-rays.

4  That they actually pathology as an example or a CT.  Would they

5  have fallen in the category of no x-rays but not relied upon x-

6  rays?

7        MR. FINCH:  Objection.  Lack of foundation.  He's

8  asking this witness to testify what Dr. Florence did.

9        MR. BERNICK:  Well, I'll ask him to assume that

10  that's exactly what Dr. Florence did.

11  Q    I want you to assume, Dr. Weill, that Dr. Florence not

12  only applied the seven percent to people who had submitted x-

13  rays but also let pass through his filter people who did not

14  have x-rays but had not said that they were relying on x-rays.

15  I want you to assume that seven percent of those also were

16  allowed in.  If that approach had been taken, would that have

17  provided room in the estimate for people who relied upon

18  pathology or other techology?

19        MR. FINCH:  Objection.  Lack of foundation.  This

20  isn't -- he's offering -- he's asking him to opine on what

21  people should be included or not included in the estimate not

22  on what this witness did.

23        MR. BERNICK:  Well, I'll put it more precisely.

24  Q    Would it have been appropriate if we wanted to capture

25  company -- Grace wanted to capture people who relied upon

1  pathology or other technology that is not x-rays and did not

2  say that they're relying on x-rays -- would using seven percent

3  across the board have been an appropriate way, from your point

4  of view as a doctor, to let those people pass through the

5  filter?

6  A    Yes, I think it would --

7          MR. FINCH:  Objection.  Lack of foundation.

8  Argumentative.  He is asking this witness to opine on what

9  people may or may not use to prove their claims, whether it's

10 pathology or not.  He's also asking this witness to basically

11 walk through a hypothetical that he had nothing to do with.

12         MR. BERNICK:  No, this doctor is being asked -- he is

13 asked whether there are other technologies that are available.

14 He said that there were.  I'm now asking if we want to have

15 people who do have evidence from pathology or from CTs -- if we

16 want them still to qualify, whether it would be appropriate to

17 have a -- them pass through in the same way as people who

18 would've qualified with a radiograph.  That's all that I'm

19 asking.

20         MR. FINCH:  Objection.  Lack of expertise to answer

21 that question.

22         THE COURT:  I think that's the problem.  I'm not

23 certain where this witness' qualifications come in that

24 estimation field.

25         MR. BERNICK:  Okay.  I'm not asking him to sign off

1  on the seven percent.  I'm asking whether it would be

2  appropriate if we wanted from a medical point of view to have

3  people pass a medical screening if they had appropriate

4  pathology evidence or an appropriate alternative technology

5  like CT, would it have been appropriate to make provisions for

6  them to pass through the screen if we wanted the screen to be

7  medically sound.

8             THE COURT:  Yes, but you're asking him specifically

9  about the seven percent --

10            MR. BERNICK:  Not -- forget --

11            THE COURT:  -- and I think that's the issue.

12            MR. BERNICK:  Forget the seven percent.

13            THE COURT:  Then restate the question.

14            MR. BERNICK:  Yeah, I'll restate the question.

15 BY MR. BERNICK:

16 Q    Would it have been appropriate if we wanted to have the

17 screen be medically sound to make room in the screen for people

18 who had other evidence in the form of either (a) pathology or

19 (b) an appropriate CT scan?

20 A    Yes.

21            MR. BERNICK:  That's my only real question, Your

22 Honor.

23                        (Pause)

24 Q    If Dr. Florence's estimate incorporated the seven percent

25 number from Dr. Henry's work and applied that to people who had

Weill - Direct/Bernick                    87

1  submitted x-rays, and if he also made a provision for people

2  who had evidence through pathology or through CT, would that

3  approach be consistent or inconsistent with your own view of

4  what constitutes medically reliable evidence of asbestos

5  relation for lung cancer?

6          MR. FINCH:  Objection.  Lack of expertise.  Lack of

7  foundation.  Misstates what Dr. Florence actually did.

8          MR. BERNICK:  Well, there -- first of all, there can

9  be no expertise, because we qualified him to be expert in

10 precisely this area.  He's already testified for an hour in

11 this area.  All we're doing is creating a nexus between what he

12 has testified to and what I'm asking him to assume is Dr.

13 Florence's approach.

14         THE COURT:  Well, you said if Dr. Florence

15 incorporated the seven percent estimate from the x-rays --

16         MR. BERNICK:  Right.

17         THE COURT:   -- and also made provision for people who

18 had evidence of pathology or CT scans but not necessarily the

19 seven percent, as I understand, is that consistent with this

20 witness' view of what's medically reliable evidence of lung

21 cancer?

22         MR. BERNICK:  What's medically reliable evidence of

23 the link between --

24         THE COURT:  Oh, the link.

25         MR. BERNICK:   -- lung cancer and asbestos exposure.

1        THE COURT:  I'm sorry.  And what's the -- and the

2  objection is that this witness isn't qualified to answer that

3  question?

4        MR. FINCH:  No, the objection is that it's -- it

5  misstates what Dr. Florence did, and he has a lack of

6  foundation to offer any opinions about whether what Dr.

7  Florence did is medically appropriate.

8        MR. BERNICK:  That is an entirely frivolous

9  objection.  Every day of the week you have testimony that's

10  elicited from an expert on the assumption of another expert

11  coming in and establishing something.  That's exactly what I'm

12  doing.

13        THE COURT:  I -- that objection is overruled.  I

14  think this witness is qualified to offer that opinion.

15  BY MR. BERNICK:

16  Q    Consistent or inconsistent?

17  A    Consistent.

18  Q    Thank you.  Let's talk about other cancer.  Have you

19  looked to see whether there is -- hang on for half a second.

20        MR. BERNICK:  I'm sorry, Your Honor.

21                      (Pause)

22        MR. BERNICK:  In the interest of time, I can move on

23  to the last topic, Your Honor.

24  Q    Let's talk a little bit about the diagnostic criteria for

25  asbestosis.  I think you testified previously, Dr. Weill, that

Weill - Direct/Bernick                          89

1  there are criteria, and they're set out as recommendations by

2  the American Thoracic Society?

3  A    Yes, I did.

4  Q    Okay.  I want to show you demonstrative GG-2151 and ask

5  you whether these are the elements that are either recommended

6  or recognized by the American Thoracic Society as important to

7  a differential diagnosis of non-malignant disease from

8  asbestos.

9  A    This is a fair depiction of that.

10 Q    Okay, so we have -- and again in the interest of time,

11 those that are recommended by the ATS include exposure history

12 and imaging, those that are recognized as having importance, or

13 physical exam, medical history and lung function tests?

14 A    yes.

15 Q    And then based upon that, the doctor is supposed to

16 conduct a differential diagnosis?

17 A    That's right.

18 Q    I want to ask you now for your opinion, whether in order

19 to perform a reliable diagnosis of asbestos-related illness of

20 the lung, whether compliance with the ATS recommendations is

21 required or not.

22 A    I think it is required.

23 Q    Okay.  Exposure history, what qualifies as an exposure

24 history under the ATS recommendations?

25 A    ATS recommends that a complete and thorough exposure

1  history is obtained.

2  Q    Okay.

3  A    It doesn't specify exactly how that's done, but it clearly

4  states that it should be done.

5  Q    I want to show you GG-2152 and ask whether this is an

6  excerpt of the language that the ATS document uses in talking

7  about the exposure history?

8  A    It is.

9  Q    Okay.  That refers to, "It's to be obtained, whatever

10  possible, directly from the patient that defines duration,

11  intensity, time of onset, setting of exposure experienced by

12  the patient.  Occupational title is not enough as the names of

13  many occupations and trades are uninformative."  Is that what

14  it says?

15  A    Yes.

16  Q    I want to come back to that one in a minute.  Let me ask

17  about lung function.  Are there standardized methodologies for

18  determining lung function?

19  A    There are.

20      MR. BERNICK:  And at this point, Your Honor, we would

21  show the witness Exhibits GX-0322, 0323, and 0135, and they're

22  in the binders, Your Honor.

23  Q    And let me ask you, Dr. Weill, are those exhibits -- do

24  they comprise the standards determining how pulmonary function

25  testing should be performed?

1  A    Yes.

2            MR. BERNICK:  We offer them.

3            THE COURT:  Any objection?

4            MR. FINCH:  No objection, Your Honor.

5            THE COURT:  They're admitted.

6  Q    Dr. Weill, did you perform a study in connection with this

7  case of pulmonary function results that were submitted by

8  claimants in connection with the PIQ process?

9  A    Yes, I did.

10 Q    I want to show you Exhibit GG-2153.  Does this

11 demonstrative go through the stages of the analysis that you

12 did?

13 A    Yes, it does.

14           MR. FINCH:  Objection.  Relevance.  I object to the

15 relevance of any testimony or analysis of the pulmonary

16 function tests submitted in response to the personal injury

17 questionnaire for the two grounds I stated previously.

18           THE COURT:  All right.  Overruled.

19 Q    Okay.  In your own words could you just tell us basically

20 what you did in order to perform your study regarding PFTs?

21 A    Sure.  Our first purpose was to determine the reliability

22 of the sample of PFTs that were submitted by a variety of law

23 firms in this bankruptcy matter.

24 Q    Okay.  Go ahead.

25 A    As our methods, we determined or defined a random sample

1  of these PFTs in non-malignant claims only.  We then developed

2  a flow sheet that had as its basis a protocol to develop an

3  assessment about whether or not patients were compliant with

4  ATS criteria, and we reviewed each PFT to evaluate compliance

5  in order to do this.  And our results were, just to get to the

6  conclusion, that none of the 150 PFTs that we analyzed met ATS

7  requirements for the three standard lung function measurements.

8  Q    I want to show you what we've marked as Exhibits GX-425,

9  GX-426, and GX-427 and ask you whether these documents are

10 summaries of the data that you obtained during the course of

11 your lung function study.

12 A    Yes, they are.

13         MR. BUCHBINDER:  We offer them as summaries, Your

14 Honor.

15         MR. FINCH:  Objection.  Relevance.

16         THE COURT:  Overruled for the same reason.  They'll

17 be accepted only as summaries.

18 Q    What did you find with respect to all the PFT studies or

19 PFT measures that you reviewed during the course of your work

20 from these different claimants?

21 A    The none of the 150 PFTs met all three ATS criteria.

22 Q    Is failure to -- does failure to meet the PFT criteria,

23 does that bear upon the scientific reliability of the results?

24 A    It does.

25 Q    Tell us how it bears upon the scientific reliability of

**J&J COURT TRANSCRIBERS, INC.**

1 the results?

2 A    The performance of pulmonary function tests is highly

3 technical, and in order for those tests to be repeatable and

4 accurate, they must be performed properly, and to do that the

5 ATS has developed these three documents that explain in a fair

6 amount of detail about exactly how that should be done.

7 Q    Okay.  In your view, based on the results of your work,

8 were any of the PFTs that you reviewed -- did any of them

9 constitute reliable medical evidence?

10 A    No.

11 Q    Do you have illustrations of two of the problems -- some

12 of the problems that were identified during the course of the

13 PFT studies?

14 A    I do.

15 Q    Showing you Exhibit 2154 and 2155 -- well, actually, let's

16 go through 2154 and 2155.  What is reflected on 2154 as an

17 illustrative?

18 A    And again these are just examples.  And so what this

19 example shows is the failure on spirometric analysis to meet

20 ATS criteria, and what the failure is is that during the

21 patient's effort -- during the spirometric effort, which in

22 this case is inspiratory and expiratory, the patient coughed,

23 and so it disrupts the measurement while the patient's

24 coughing.

25 Q    Okay.

1  A    And so to accept that spirogram is to accept information

2  that is not valid.

3  Q    If somebody wanted to, could they just redo the test?

4  A    Sure.

5  Q    Okay.  Showing you 2166, what's the problem illustrated on

6  2155?

7  A    So again this is -- as part of the spirometric evaluation

8  you do what is called the volume over time measurement where

9  time is on one axis, in this case the horizontal axis, and the

10 volume a patient expires is on the vertical access.  And what

11 the ATS criteria designate is that there should be three

12 efforts of at least six second duration when a patient blows

13 out and a plateau should be reached of at least one second.

14 Failure to meet that is a failure to meet one of the

15 spirometric requirements that the ATS puts forth.

16 Q    I want to show you Exhibits GX -- I apologize for the

17 length of the number here.  Your Honor it is GX7.1681352.  And

18 the second one is GX7.893695.  So the first one was 1681352,

19 second one is 8939695.  Can I show you these and particularly

20 the flagged pages that I've identified here?  Are these the PIQ

21 submissions for the two individuals whose PFTs you used for

22 illustrative purposes and Exhibits 2155, GG-2155 and GG-2154?

23 A    Yes, they are.

24          MR. BERNICK:  We offer them, Your Honor.

25          MR. FINCH:  Objection, relevance.

1          THE COURT:  Overruled.

2  Q    Why don't we come back to differential diagnosis, if we

3  can show 2156 and I want to come back to the discussion that we

4  had a few moments ago with the Court about the significance of

5  exposure history?  In differential diagnosis, could you tell us

6  what it is that the doctor in general terms does in

7  differential diagnosis?

8  A    What a physician is doing when generating a differential

9  diagnosis is considering all possible causes of whatever

10 objective evidence the patient presents.

11 Q    Okay.

12 A    And then, I'm sorry, just to expand a little bit on that.

13 Then there's a process that goes through the physician's mind

14 where he or she is excluding and ruling in possibilities

15 constantly.

16 Q    Okay, now you have here on 2156 that when it comes to

17 differential diagnosis we are talking conditions that are

18 asbestos related, you say other conditions mimic the

19 radiographic appearances of asbestosis and plural abnormalities

20 and other diseases cause restrictive impairment.  What are you

21 getting at when you make reference to those points?  What's the

22 relevance of that?

23 A    So even from an imaging and physiologic, that's the

24 pulmonary function test standpoint, there are diseases that

25 look exactly like the asbestos related diseases.  And so if we

Weill - Direct/Bernick                                96

1  were to go back to the x-rays that I flashed up earlier looking

2  at these asbestos related changes, one couldn't necessarily

3  determine that those were asbestos related.  If you took those

4  changes just in isolation.

5  Q    So showing you GG-2157, is this a list of some of the

6  conditions that as you say mimic the radiographic appearances

7  of asbestosis?

8  A    Yes.

9  Q    We see a whole variety of them there?

10  A    Yes.

11  Q    Turning to 2158, is this a similar list with respect to

12  conditions that mimic the radiographic appearance of diffused

13  plural thickening?

14  A    Yes, it is.

15  Q    And with respect to 2159, same thing with respect to

16  plural plaques?

17  A    Yes.

18  Q    Would it or would it not be fair, Dr. Weil, to say that in

19  all cases that is with respect to asbestosis, plural plaques

20  and diffused plural thickening that there are a wide variety of

21  other non-asbestos related conditions that can cause

22  radiographs that could be confused or similar to the

23  radiographs that are associated with those asbestos related

24  conditions?

25  A    That's a fair statement.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Now you've told us before that when it comes to

2  differential diagnosis, one of the tools that you have at your

3  disposal to determine whether a condition of the lung is

4  asbestos related or not, that is it might be one of these other

5  things, is to look for an exposure history.  Do you recall

6  that?

7  A    Yes.

8  Q    And again in order to bring us up to where we are in this

9  examination I think you also told us that the quality of the

10  exposure information obtained on patient history can be

11  variable.

12  A    That's right.

13  Q    I want to show you GG-2160 and ask whether this would

14  assist you in describing what some of the different kinds of

15  exposure information can comprise?

16  A    Yes.  On the left side of the slide, I've labeled what is

17  called anecdotal information.  And that information comes from

18  the patient himself and it varies from patient to patient.

19  Some patients give a very detailed information, others don't.

20  But it varies.  Now that information has to be compared to the

21  epidemiologic evidence that is available about exposure that's

22  much more carefully performed.

23       That evidence is usually occupation specific and

24  quantitative in nature.  And so it provides a level of evidence

25  that is very good.  And from a physician's standpoint it

1  provides a background or framework to think about that

2  individual patient's exposure.

3  Q    Okay.  Now let's focus on this for just a moment.  If you

4  have -- if you, as a doctor, have only anecdotal information

5  and it's general.  I saw some dust in the air, et cetera, et

6  cetera, does that mean that a differential diagnosis is just

7  impossible?

8  A    It's very difficult under those circumstances.

9  Q    Depending upon the level of detail associated with the

10 anecdotal information might still become at some point, based

11 on anecdotal information alone, to perform some kind of

12 differential diagnosis?

13 A    Yes.  You just have to do the best you could.

14 Q    I now want you to assume for purposes of my question that

15 the information that is obtained from the patient is of

16 sufficient specificity, that is as you showed in your prior

17 slide under the ATS, you know, intensity, duration, et cetera,

18 such that it can be matched up with the epidemiological

19 studies.  I want you to make that assumption.  What does that

20 do to the differential diagnosis?

21 A    Well it raises your level of evidence about the exposure

22 history and makes the evidence more firm that you have an

23 adequate exposure history to increase the risk of developing

24 asbestosis.

25 Q    Okay.  Now I then want to ask you whether -- in a sense,

1  the question I want to get you to is you know does it -- if

2  you've got the exposure data from the claimant that is here is

3  where I worked and how long I worked and you can fit it into

4  the epidemiological science, is there any way that a

5  differential diagnosis by an individual doctor somehow traps

6  the learning of epidemiology?

7  A    No, it doesn't.

8  Q    And why is that?

9  A    Because the epidemiology has been done on a larger group

10 of patients.  It's usually been done, if done properly, in a

11 quantitative dose fashion and so that the level of evidence and

12 the information you have about exposure is more precise.

13          MR. BERNICK:  I pass the witness, Your Honor.

14          THE WITNESS:  Your Honor, would it be possible to --

15          THE COURT:  Certainly.  We'll take a ten minute

16 recess.  I'm going to correct a note here that I need to

17 correct so please take your recess.

18                    (Recess)

19          THE COURT:  Everyone back?  Okay, Mr. Finch.  Doctor,

20 are you ready?  Okay.  Mr. Finch.

21          MR. FINCH:  Thank you, Your Honor.

22                 CROSS EXAMINATION

23 BY MR. FINCH:

24 Q    Good morning, Dr. Weil.  My name is Nathan Finch.  I am

25 counsel to the asbestos claimant's committee in the Grace

1  Bankruptcy.

2  A    Good morning.

3  Q    Is it true that you only have one publication related to

4  asbestos?

5  A    Yes.

6  Q    And that was a letter to the editor in response to the

7  2004 American Thoracic Society statement on the diagnosis and

8  initial management of asbestos related non-malignant diseases?

9  A    That's right.

10  Q    That was not a peer reviewed publication, correct?

11  A    It was reviewed by their editorial board.

12  Q    But it was not a statement -- it was not a study of

13  asbestos related diseases, correct?  It was a commentary on the

14  2004 ATS standards, right?

15  A    That's right.

16  Q    And you've never participated in any research regarding

17  asbestos, correct?

18  A    That's also correct.

19  Q    And when you have testified in occupational lung cases

20  it's been most commonly for defendants, correct?

21  A    That's correct.

22  Q    And somewhere between 20 to 25 percent of your income in

23  the past two years has been from matters in which you've been

24  working for W.R. Grace?

25  A    That's correct also.

1  Q    Now I have heard your testimony about differential

2  diagnosis and the importance of taking individual case

3  histories.  Would you agree that the question of whether or not

4  a particular exposure to an asbestos containing material has

5  played a role in an individual's development of an asbestos

6  related disease depends on the careful analysis of all the

7  facts and circumstances relating to that particular individual?

8  A    Yes.

9  Q    That's true for every asbestos disease?

10        MR. BERNICK:  Your Honor, I don't know who the

11  individual is over here but unless that was -- maybe it was --

12        THE COURT:  For my --

13        MR. BERNICK:  Oh, it's to you.  I apologize.  Just

14  saw a thumbs up and was wondering what was going on.

15        MR. FINCH:  Let the record reflect there was no

16  attempt to give a thumbs up to the witness.  It is a

17  technological issue as to which I'm probably incompetent to

18  handle myself.

19        THE COURT:  But for my edification, could you repeat

20  the last question please?  While that was going on, I too was a

21  bit distracted.

22  Q    Sure.  Okay, Dr. Weil, would you agree that the question

23  of whether or not a particular exposure to an asbestos

24  containing material played a role in an individual's

25  development of an asbestos related disease depends on a careful

1 analysis of all the facts and circumstances relating to that

2 particular individual?

3 A    Yes.

4 Q    That's true for every asbestos disease?

5 A    Yes.

6 Q    That's true for the each exposure?

7 A    Yes.

8 Q    And that's true for each individual's medical situation?

9 A    That's also true.

10 Q    Now the letter to the ATS you referred to in response to

11 one of my earlier questions, you were co-author of that letter

12 with a Dr. Hans Weill, correct?

13 A    That's right.

14 Q    And Mr. Bernick on direct exam elicited that you are Dr.

15 Hans Weill's son, correct?

16 A    That's right.

17 Q    And you were relying on some of his research for your

18 opinions here, correct?

19 A    I am.

20 Q    Is it fair to say that you and he are in general agreement

21 on issues relating to asbestos related medicine?

22 A    As long as you make that specification, yes.

23 Q    So you would agree with him that may asbestos disease

24 patients are exposed to asbestos from a variety of sources?

25         MR. BERNICK:  Objection.  If there's going to be

1   purported impeachment of the witness using testimony from his

2   father, that'd be a very interesting kind of impeachment.  But

3   I think that the fact that he agrees with his father's view or

4   Dr. Weill, Sr.'s views does not provide an adequate foundation

5   for then attempting to impeach him using Dr. Weill Sr.'s

6   testimony.

7          MR. FINCH:  I wasn't trying to impeach him, Your

8   Honor.  I was asking him does he agree that many asbestos

9   disease patients are exposed to asbestos from a variety of

10  sources.

11         MR. BERNICK:  The problem is that is now counsel's

12  testimony that that is Dr. Weill Sr.'s view and there is no

13  foundation for that.  If he wants to provide a copy and give

14  the witness an opportunity to review it, he can then-- there

15  can then be a record of the fact that Dr. Weill Sr. said that

16  on examination.  Otherwise, all this is is reading from some

17  other person's statement and saying do you agree with Dr.

18  Weill.  There's no record of evidence that Dr. Weill said that.

19         MR. FINCH:  Okay, may I approach the witness, Your

20  Honor?

21         THE COURT:  Yes.

22  Q   Let me ask the question this way.  Dr. Weill, leaving your

23  father completely out of it, would you agree that many asbestos

24  disease patients are exposed to asbestos from a variety of

25  sources?

1  A     I think some are and some aren't.

2  Q     But many are, correct?

3  A     I'm not really sure what you mean by many.  I think just

4  some are and some aren't.

5  Q     Would you agree that it's not possible to do an

6  epidemiological forecast just as the people who were exposed to

7  one particular company's asbestos product?

8            MR. BERNICK:  Objection.  Lack of foundation.  Also

9  goes beyond the scope of his examination.  He's now trying to

10 turn this witness into an epidemiologist with respect to a

11 different question that this witness never addressed.  I'm

12 sorry, this is an improper question.  This goes outside the

13 scope of the examination.  It attempts to turn this witness

14 into an expert on epidemiology concerning Grace specific

15 exposure.  He was never proffered for that purpose.  It goes

16 beyond the scope of direct and seeks to make him now the ACC's

17 witness.  This is totally improper.

18           THE COURT:  I don't think the witness is qualified on

19 epidemiology or forecasting.  He was qualified with respect to

20 certain issues concerning asbestos and lung diseases and I'm

21 not sure how this fits into that, Mr. Finch.  Do you want to

22 lay a foundation for me?

23           MR. FINCH:  Your Honor, he did testify about his use

24 of epidemiological studies.

25           THE COURT:  He did.

1          MR. FINCH:  In making a differential diagnosis.

2  Q    And would you agree with me, Dr. Weill, that the

3  epidemiological studies that you looked to in making a

4  differential diagnosis do not in general provide the names of

5  the products to which the people were exposed?

6  A    It does provide the type of exposure they had.  Sometimes

7  product specific, sometimes not.

8  Q    Can you point to any source in the epidemiological

9  literature that lists the names of the products to which the

10 workers were exposed?  The Selikoff studies don't name all the

11 products that were exposed --

12         MR. BERNICK:  That's two questions, which question?

13 Q    Okay.  You would agree with me that the Selikoff insulator

14 studies don't list the names of the products, correct?

15 A    They don't.

16 Q    And the Hans Weill and Hughes study of the cement workers

17 in New Orleans doesn't list all of the names of all of the

18 various asbestos products those people were exposed to,

19 correct?

20 A    That's also correct.

21 Q    And as you sit here today, isn't it the case that the vast

22 majority of the epidemiological literature doesn't name the

23 products?  They might name the types of products, but they

24 don't name the products which the workers were exposed to?

25         MR. BERNICK:  I think this is outside scope.  Let him

Weill - Cross/Finch                                106

1  answer it and move on.

2  A    By naming the product, you mean company name?

3  Q    Yes.

4  A    No, they do not.

5  Q    And so would you agree with me for that reason it's not

6  possible to do a product specific epidemiological assessment or

7  projection of disease?

8           MR. BERNICK:  That question is no different than the

9  question he asked five minutes ago and has the same defect.  He

10 is now making this witness into an expert in epidemiology and

11 seeking to elicit testimony in support of a proposition that

12 was not placed at issue on the direct examination.

13          MR. FINCH:  Your Honor, I stand by my question.  Can

14 I have a ruling?

15          THE COURT:  Well this witness -- this is well outside

16 the scope of this witness's testimony and I'm not sure, unless

17 there is something in his report that I don't recall reading,

18 Mr. Finch, so it may be there and I may have forgotten it.  I

19 don't recall that this witness offered an opinion on this type

20 of area.

21          MR. FINCH:  Okay.  I'll move on, Your Honor.  Thank

22 you.

23 Q    You have -- I believe I placed a copy of your first report

24 on the ledge in front of you.  Do you have that?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Dr. Weill.  And for purposes of identification we've

2  marked this as ACC-597.  I don't intend to offer it Your Honor,

3  but I do have some questions for the witness from it.  Do you

4  have your first report, ACC-597 in front of you, Dr. Weill?

5  A    Yes.

6  Q    Okay, could you turn to Page 19 of that report?

7  A    Got it.

8  Q    Okay.  At the last paragraph, is it correct that you wrote

9  while there is widespread agreement about the role of cigarette

10 smoking and causing lung cancer, the relationship between

11 asbestos exposures, asbestosis and lung cancer has been

12 intensely debated both in the academic and legal arenas.  The

13 opinions regarding this relationship can be divided into three

14 positions.  One exposure to asbestos of any amount increases

15 the lung cancer risk; two, exposure to asbestos of amounts

16 sufficient to cause asbestosis are necessary to attribute lung

17 cancer to exposure and three, asbestosis either rated

18 graphically evident or president on histologic material is

19 necessary to attribute lung cancer to asbestos exposure in an

20 individual case.  You wrote those words?

21 A    Yes.

22 Q    And so that's the debate in the medical literature,

23 correct?

24 A    Yes.

25 Q    Could we go to the powerpoints?  All right, one of the --

1 while we're waiting for that, one of the articles you cited in

2 your report, and I believe it's Reference 84 in your report, is

3 an article by Gustovson, correct?

4 A    Yes.

5 Q    Okay, now at Page 23 of your report, if you turn to Page

6 23 of your report, Dr. Weill?

7 A    Yes.

8 Q    You write, some studies have indicated there is a dose

9 response relationship between asbestos exposure and lung cancer

10 risk, even at low levels of exposure.  And that's reference 84,

11 right?

12 A    Right.

13 Q    That's the Gustovson study?

14 A    right.

15 Q    Okay.  Could you turn in your notebook to Exhibit 331?

16 A    I've got it.

17 Q    All right.  Exhibit 331 is the article by Per Gustovson

18 that you cited for the proposition that some experts believe

19 that there is a dose response relationship between asbestos

20 exposure and lung cancer risk even at low levels of exposure?

21 A    Yes.

22 Q    And that was an article that was published in the American

23 Journal of Epidemiology?

24 A    Yes.

25 Q    That's a peer reviewed medical journal?

1  A    It is.

2  Q    And what those researchers found in the middle of the

3  abstract is that lung cancer risk increased almost linearly

4  with cumulative dose of asbestos.  The risk at a cumulative

5  dose of four fiber years is 1.90, 95 percent confidence,

6  interval 1.32 to 2.74.  That's what they found, correct?

7  A    Yes.

8  Q    Now there is, if we go to the powerpoint, okay, so there

9  is lung cancer caused by asbestos three views.  One is what

10  I'll call the Gustovson view that lung cancer plus asbestos

11  exposure.  Second view is -- you are familiar with the Helsinki

12  criteria.  You talked about them a little bit on direct,

13  correct?

14  A    Yes.

15  Q    Those criteria were developed by a group of approximately

16  20 scientists who have expertise in asbestos related medical

17  issues, correct?

18  A    Yes.

19  Q    One of them was Dr. John Parker?

20  A    That's right.

21  Q    He's one of Grace's experts here?

22  A    As I understand it.

23  Q    One of them is Dr. Victor Rodley who is one of the FCR's

24  experts here?

25  A    Yes.

1 Q    And the authors of the Helsinki criteria had collectively

2 between them published hundreds of papers in the peer view

3 medical literature on asbestos related diseases, correct?

4 A    That's correct.

5 Q    In your book on Page 398 there is the summary title from

6 the -- excuse me, Exhibit 398.  Are you at Exhibit 398 Dr.

7 Weill?

8 A    Yes.

9 Q    John, can we get back to Exhibit 398?  That's the summary

10 page and the summary article from what is commonly known as the

11 Helsinki criteria, correct?

12 A    Yes.

13 Q    Okay.  And could you turn to Page 314 of that article?

14 And the authors of the Helsinki criteria concluded, did they

15 not, that relative risk is roughly doubled for cohorts exposed

16 to asbestos fibers at a cumulative exposure of 25 fiber years

17 and with an equivalent occupational history at which level

18 asbestosis may or may not be present or detectable?  Heavy

19 exposure in the absence of radiologically diagnosed asbestosis

20 is sufficient to increase the risk of lung cancer.  Cumulative

21 exposures below 25 fiber years are also associated with an

22 increased risk of lung cancer but to a less extent.  That's the

23 opinions of the authors of the Helsinki criteria, correct?

24 A    That's correct.

25 Q    Back to the slide show.  Now the third point of view is

1  the view that your father had and that you have which is that

2  in order to attribute lung cancer to asbestos exposure, you

3  have to have lung cancer and asbestosis, correct?

4  A    Yes.

5  Q    So if you have a patient with lung cancer and asbestosis,

6  you would attribute their lung cancer in whole or in part to

7  asbestos exposure?

8  A    That's right.

9  Q    Okay.  Now One way you confirm the presence of asbestosis

10 or can, and this is the way your father did it in the Hughes

11 Weill's study was by looking at x-rays of people, correct?

12 A    That's right.

13 Q    Another way  to confirm the presence of asbestosis is to

14 confirm it by pathology correct?

15 A    Also correct.

16         THE COURT:  Again, this is saying asbestos but you

17 mean asbestosis, correct?

18         MR. FINCH:  I mean asbestosis.  There's a typo in

19 Number 3, Your Honor.  I apologize for that.

20         THE COURT:  Okay.

21         MR. FINCH:  I'm not going to offer these.  These are

22 for demonstrative purposes.

23 Q    With that, you understood my question Dr. Weill?  The two

24 ways to confirm the presence of asbestosis.  One is you can

25 confirm the presence of asbestosis by looking at an x-ray,

Weill - Cross/Finch                          112

1  correct?

2  A    Correct.

3  Q    And the second way is to do it by pathology, correct?

4  A    That's correct.

5  Q    Now on direct examination Mr. Bernick showed you a list of

6  some studies.  One of them is something called the Kipen study.

7  Are you familiar with that?

8  A    Yes.

9  Q    All right.  Would you agree with me that the Kipen study

10 stands for the proposition that asbestosis can be present

11 pathologically even if an x-ray is completely normal?

12 A    Yes, I'd say that.

13 Q    And if you go to your book, Exhibit 623 in your book?

14 A    I've got it.

15 Q    Okay Exhibit 623, ACC FCR 623, that's what is commonly

16 known as the Kipen study that was published in the British

17 Journal of Industrial Medicine?

18 A    Yes.

19 Q    And what those authors found in the abstract and what they

20 found in their study is that these were 138 people where they

21 had a tissue specimen that people have died from lung cancer,

22 right?

23 A    Yes.

24 Q    And all of them had parenchymal fibrosis determined

25 pathologically even though 18 percent of that group had no

**J&J COURT TRANSCRIBERS, INC.**

Weill - Cross/Finch                         113

1 radiologic -- they had no radiographic evidence of parenchymal

2 fibrosis, right?

3 A    That's right.

4 Q    Okay.  Can you go back to the powerpoint?

5          THE COURT:  I'm sorry, would you say that again

6 please.

7 Q    What that means Dr. Weill is that --

8          THE COURT: No could you just restate the statement

9 for me.  I thought you said they died of it but they had no

10 evidence of it.  Is that what you said?

11          MR. FINCH:  NO, they died of lung cancer.

12 Q    That's correct, Dr. Weill?

13 A    They did.

14 Q    And they had pathology specimens on 138 of those people,

15 that's right?

16 A    Also right.

17 Q    Okay.  And for all 138 of those people when you looked at

18 the pathology -- pathology involves taking a specimen of tissue

19 and putting it under a microscope, right?

20 A    Right.

21 Q    When they looked at the pathology, all 138 of those people

22 had asbestosis, right?

23 A    Yes.

24 Q    Would you agree with me that if asbestosis is detected by

25 pathology, it's there?  There's no dispute whether it's

**J&J COURT TRANSCRIBERS, INC.**

1 asbestosis or not?

2 A    There might be a pathological dispute but not as a

3 clinician, a dispute with me.

4 Q    If you heard -- have you used the statement that pathology

5 is the gold standard for diagnosis asbestosis?

6 A    Certainly heard that, yes.

7 Q    Okay, and so what this found is that in 18 percent of

8 those people they had normal chest x-rays but they in fact had

9 asbestosis?

10 A    Right.

11 Q    Now back to the powerpoint.  So I believe you just said

12 pathology is the gold standard?

13 A    Yes.

14 Q    Okay.  I want you to assume that a person has lung cancer

15 and asbestosis that is confirmed by pathology but is not

16 detectable on an x-ray.  Make that assumption?

17 A    I can.

18 Q    You would attribute that person's lung cancer to the

19 asbestos exposure at least in whole or in part, correct?

20 A    That's correct.

21 Q    To say that lung cancer in this person could not be caused

22 by exposure to asbestos is medically wrong, isn't that right?

23 A    That's right.

24 Q    Now what is the American Thoracic Society?  We talked

25 about the document which was shown to you by Mr. Bernick which

1  is Grace Exhibit 274.  What is the American Thoracic Society?

2  A    It's a society of primarily chest physicians.

3  Q    And the publish statements about such things as what

4  criteria are necessary to run an appropriate lung function test

5  for example?

6  A    That's right.

7  Q    And you relied on those in doing your analysis for PFTs?

8  A    Right.

9  Q    And they also published statements about what diagnostic

10 criteria are necessary to diagnose asbestosis and other non-

11 malignant diseases, correct?

12 A    Yes.

13 Q    The -- could you turn in your book to ACC FCR 389.

14 A    I've got it.

15 Q    That's the same -- Your Honor, for the purposes of the

16 record that's the same document as Grace 274.

17        THE COURT:  All right.

18 Q    This is the American Thoracic Society statement regarding

19 the diagnosis and initial management of non-malignant diseases

20 related to asbestos, is that correct?

21 A    Yes.

22 Q    Okay.  The -- back to the powerpoint.  Would you agree

23 with me that the American Thoracic Society statement allows for

24 a diagnosis of asbestosis to be made with a 1/0 on the ILO

25 scale, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    In the proper exposure setting.

2  Q    In the proper exposure setting.  Adequate asbestos

3  exposure, correct?

4  A    Yes.

5  Q    Appropriate latency?

6  A    Yes.

7  Q    And latency is usually stated as more than 10 years,

8  correct?

9  A    Some state it more than 10 years, some say more than 20.

10  Q    Okay.  And the latency period for asbestosis can be 40 or

11  50 years in some cases, correct?

12  A    That's also correct.

13  Q    And then you exclude other causes, right?

14  A    Yes.

15  Q    Could you turn in the -- leave the powerpoint up, we'll

16  just go through the books.  Could you turn in your book to

17  Exhibit 389, the ATS statement to Page 696?

18  A    I've got it.

19  Q    Now one way to look for interstitial fibrosis in the meat

20  of the lung, as you put it, is to look at an x-ray, correct?

21  A    That's right.

22  Q    Another way to do it is to look at high resolution CT

23  scans, correct?

24  A    That's correct.

25  Q    HRCT.  And would you agree with me that the American

1 Thoracic Society is determined that HRCT is much more sensitive

2 in detection of asbestosis than plain chest radiographs?

3 A    That's what they concluded.

4 Q    Okay.  So what that means is that if you look at an HRCT

5 scan you are much more likely to see the changes, the

6 interstitial changes that can be asbestosis than if you just

7 look at an old x-ray, right?

8 A    I don't agree with that.  I think what you are more likely

9 to see are changes and I would stop there.

10 Q    Okay, so you disagree with the ATS about that?

11 A    I disagree and I don't think that they were trying to

12 imply that the HRCT scanning is absolutely specific for

13 asbestosis.  I agree with their statement regarding its

14 sensitivity.  It's a very sensitive clinical and refurbished

15 tool.

16 Q    Don't they also say at the top of Page 697 that HRCT is

17 more specific than plain chest radiographs excluding conditions

18 such as emphysema, thistle prominence, overlapping plural

19 disease, bronchiostasis which may confound radiographic

20 interpretation?

21 A    I agree with their statement that it's more specific when

22 excluding those diseases.  What I don't agree with is that it

23 is more specific in excluding other fibrodic lung disease.

24 Q    So you differ with them on that, correct?

25 A    No, I don't.  I actually agree with that statement.  But

1  those diseases that they list are not fibrodic lung diseases.

2  Those are diseases that look entirely different on HRCT

3  scanning.  So where I differ is that HRCT scanning as a tool is

4  unable to distinguish between the over 150 causes of fibrodic

5  lung disease.

6  Q    And you differ with the American Thoracic Study on that

7  particular aspect?

8  A    I don't.  What they are saying is that it is very specific

9  -- a very specific tool when you are talking about

10 differentiating between obstructive lung diseases that they

11 list here for instance and changes due to asbestosis, which are

12 very fibrodic lung disease.

13 Q    But would you agree with me that the American Thoracic

14 Society allows clinicians to use HRCT to diagnose asbestosis?

15 A    What I think the discussion really included in the

16 statement is that HRCT scanning is a very sensitive tool for

17 looking at lung disease.  That's what I took away from it.

18 Q    Okay, and -- but it is permissible to use an HRCT  to

19 diagnose asbestosis, correct?

20        MR. BERNICK:  Wait.  Permissible or consistent with

21 the guidelines that are before the witness?

22 Q    Would you agree with me that it's consistent with the

23 guidelines for a clinician to use HRCT to diagnose asbestosis?

24 A    It's in the guidelines.

25 Q    So it is consistent?

1  A    Yes.

2  Q    Would you also agree that the American Thoracic Society

3  does not require lung function impairment to diagnose

4  asbestosis?

5  A    That's correct.

6  Q    Would you agree that the American Thoracic Society does

7  not require more than one B reader to read an x-ray to diagnose

8  asbestosis?

9        MR. BERNICK:  Objection to the form of the question.

10  That assumes that the ATS standard addresses the issue.

11  Q    Do you agree with me that there is nothing in the ATS

12  standard that says you need more than one B reader to read an

13  x-ray to diagnose asbestosis?

14  A    I don't remember their weighing in on that subject one way

15  or the other.

16  Q    And I believe you agree that the proposition that the

17  American Thoracic Society allows doctors to use HRCT to detect

18  asbestosis?

19        THE COURT:  I'm sorry, would you repeat that?

20  Q    Would you agree with me that the American Thoracic Society

21  allows doctors to use HRCT to detect asbestosis?

22  A    Sure.

23  Q    Okay.  Now, let's talk briefly about --

24        THE COURT: I'm sorry, Mr. Finch.  May I ask a

25  question about the HRCT please?  Doctor, you just said that the

1  HRCT is a specific disease that helps you diagnose obstructive

2  lung diseases, but that's not what asbestosis is.

3            THE WITNESS:  Right.

4            MR. FINCH:  So I'm sorry, did you have a specific

5  question you wanted me to --

6            THE COURT:  Yes, So the ATS allows you to use that

7  function to diagnose a disease for which it is not intended to

8  be used?

9            THE WITNESS:  I'm sorry I didn't make that clear.

10 What I was really trying to point out is that the -- there is

11 two broad categories of lung disease both obstructive and

12 restrictive.  The HRCT being a very sensitive tool, meaning

13 it's trying to include everybody that has possible lung disease

14 fulfills that criteria.  It's very sensitive.  What -- while it

15 allows us to distinguish between different categories of the

16 disease, ones who are within one category of disease, i.e.

17 fibrosis in our discussion, it breaks down.  It's not able to

18 give us enough specificity to allow us to distinguish between

19 asbestosis and the other causes of fibrosis.

20           THE COURT:  So it's not specific within the

21 categories once you get to a category, restrictive versus

22 obstructive.

23           THE WITNESS:  That's correct.

24           THE COURT:  Okay, thank you.

25 Q    But it does allow clinicians to use HRCT to diagnosis

1 asbestosis, correct?

2 A    I think it suggests it as an aid in that process, yes.

3 Q    Okay.  Were you aware that in Dr. Henry's study they

4 ignored any HRCT images that came in with the sample of x-rays?

5 A    I can't speak specifically to how they handled HRCT

6 scanning in that study.

7 Q    Let's talk about the health effects of asbestosis.  One of

8 the things that was found in your father's study of the cement

9 workers is that people who had asbestosis were four times more

10 likely to die of lung cancer than people who did not, is that

11 correct?

12 A    That's correct.

13 Q    So that's one consequence if you are diagnosed with

14 asbestosis, you are four times more likely to die of -- to get

15 lung cancer, correct?

16 A    Yes.

17 Q    And most people who get lung cancer eventually die of it,

18 right?

19 A    That's right.

20 Q    Would you also agree with me that asbestosis is a chronic

21 condition?  There is no way to cure it.

22 A    That is also correct.

23 Q    Do you also agree with me that if you have asbestosis, you

24 are more susceptible to respiratory infections?

25 A    I'm not aware of any studies that look at asbestosis

Weill - Cross/Finch                              122

1  specifically although it's true of any chronic lung condition.

2  Q    So any kind of chronic interstitial fibrosis can make you

3  more susceptible to lung -- to infections?

4  A    I would agree with that.

5  Q    Okay.  Would you agree that asbestosis causes a lung

6  function decline in some people?

7  A    Yes.

8  Q    Would you agree with me that most people who get

9  asbestosis don't die from it?

10       MR. BERNICK:  Your Honor, I object to this line of

11  questioning.  I don't know what it has to do with the witness's

12  direct examination.

13       THE COURT:  He's an expert in -- he's been qualified

14  as an expert in this area.  I think this is clear that it's

15  cross examination.  It's overruled.

16  A    I'm sorry.  Could you repeat the question?

17  Q    Would you agree that most people who contract asbestosis

18  don't die from it?

19  A    It depends.  It really depends on the severity of the

20  disease.  So I can't give you a percentage in the broad

21  category of asbestosis how many die and how many don't.

22  Q    Would you agree that a person can have asbestosis without

23  knowing it?

24  A    Yes.

25  Q    And on the pulmonary function test scores, one of those

Weill - Cross/Finch                              123

1 measurements is force vital capacity?

2 A    Right.

3 Q    And that is expressed as a percentage of predicted value?

4 A    That's also right.

5 Q    So in order for someone to show up as abnormal on a

6 pulmonary function test for force vital capacity, FVC, you have

7 to be below 80 percent of predicted is one way they calculate

8 that, correct?

9 A    That's one way.

10 Q    Another way to calculate it is below the lower limits of

11 normal meaning two standard deviations from the mean, correct?

12 A    Also correct.

13 Q    Okay.  And so --

14         MR. BERNICK:  Your Honor, again this witness offered

15 testimony about how to perform the pulmonary lung function test

16 period.  He was not offered for purposes of getting into any

17 other aspects of lung function and how to deal with it.  Now it

18 may be that we could have him testify about that but that's not

19 -- his nickel is part of his case, not my case.

20         THE COURT:  But it's still cross examination and he's

21 still an expert in this area.

22         MR. BERNICK:  Sure, but what he can't go to cross

23 examination -- it can't be cross examination and go to his

24 credibility or use for impeachment unless he has said something

25 in his direct that is contradictory.  And he didn't address

Weill - Cross/Finch                           124

1  this in direct.

2         THE COURT:   Well he hasn't address this specifically

3  in his direct.  I'll give you a little leeway Mr. Finch, but

4  you are going pretty far afield on this testimony.

5         MR. FINCH:   I have two more questions about this

6  topic and then I'll move to one other topic and that'll be it.

7  Q    Would you agree with me in the measuring of lung function

8  decline, let's say a person starts out at 110 percent of

9  predicted.  Okay, let's say that they are a world class runner.

10 And their lung function declines from that to 85 percent of

11 predicted on forced vital capacity.  Understand that

12 hypothetical?

13 A    I do.

14 Q    That person is still going to show up as normal on a lung

15 function test?

16        MR. BERNICK:   Objection.  This is the same -- this is

17 a hypothetical that has no tie to anything in particular.

18 Again if he wants to do this he can do this as part of his

19 case, not this case.

20        THE COURT:   That's sustained.

21        MR. FINCH:   All right, Your Honor.  One other thing.

22 Q    In terms of the American Thoracic Society Mr. Bernick

23 asked you about the 1986 American Thoracic Society statement.

24 Do you recall some questions about that?

25 A    I do.

1  Q    Could you turn in your book to an exhibit that's been

2  marked ACC FCR 621?

3  A    I've got it.

4  Q    This was previously marked as Grace 280, Your Honor.  This

5  is the 1986 American Thoracic Society Statement?

6  A    Yes, it is.

7  Q    Could you turn on the elmo quickly?  Do you remember Mr.

8  Bernick showing you this list of -- zoom it out.  Right there.

9  Do you remember Mr. Bernick showed this list of conditions that

10  mimic the radiographic appearance of asbestosis?

11  A    Yes, I do.

12  Q    Could you turn in the American Thoracic Society 1986

13  guidelines on Page 367?

14  A    I've got it.

15  Q    The last paragraph above the summary.  It's Exhibit 621.

16  A    Yes.

17  Q    The last paragraph above the summary the American Thoracic

18  Society writes there are diseases unrelated to asbestos

19  exposure but with similar symptoms.  These may occur in some

20  persons with asbestos exposure.  However, given a clear history

21  of exposure to asbestos, a diffuse interstitial fibrosis can be

22  assumed to be due to the asbestos as other forms of

23  interstitial fibrosis are relatively uncommon.  Is that the

24  ATS's views?

25  A    Yes.

1  Q    And they haven't changed that view?

2  A    I don't think so, no.

3        MR. FITCH:  Your Honor, I pass the witness.  Thank

4  you, Dr. Weill.

5        THE WITNESS:  Thank you.

6        THE COURT:  Mr. Mullady.

7        MR. MULLADY:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9  BY MR. MULLADY:

10 Q    Good afternoon, Dr. Weill.

11 A    Good afternoon.

12 Q    Is the elmo still up?  Thank you very much.  On direct

13 examination, you discussed the Hughes Weill study on asbestos

14 as a precursor of asbestos related lung cancer.  Is that

15 correct?

16 A    Yes.

17 Q    We're showing the article on the elmo at this time,

18 correct?

19 A    Yes.

20        THE COURT: I'm sorry.  What's the exhibit Mr.

21 Mullady?

22        MR. MULLADY:  This is GX-590.

23        THE COURT:  Thank you.

24 Q    And you told us, Doctor, that this article provides a

25 biologically plausible hypothesis linking lung fibrosis and

**J&J COURT TRANSCRIBERS, INC.**

1  cancer as common mediators, correct?

2  A    Actually this article provided epidemiologic evidence.

3  Not so much biologic plausibility.

4  Q    Understood.

5        MR. BERNICK: If you could get a little close to the

6  mic, it would be easier for us to hear.

7  A    Sorry, I was mentioning that this article and my testimony

8  about it provided epidemiologic evidence regarding the

9  attribution question not so much the biologic plausibility

10 issue.

11 Q    Understood.  You showed us this slide illustrating your

12 hypothesis, GX-2130.  Do you recall this?

13 A    Yes.

14 Q    And the theory is essentially that asbestos is a lung

15 carcinogen because of its ability to cause lung fibrosis,

16 right?

17 A    Yes, in part, yes.

18 Q    And that theory is actually discussed in the Hughes Weill

19 article toward the end of the paper.  Do you recall that?

20 A    Yes.

21 Q    The study authors had this to say about the theory.  The

22 current study is the latest in emerging body of evidence

23 supporting the view that asbestos is a lung carcinogen because

24 of its ability to cause lung fibrosis.  Nevertheless, further

25 results and support of these findings is necessary before a

Weill - Cross/Mullady                              128

1 firm conclusion concerning such a mechanism can be reached.

2 Did I read that correctly?

3 A    You did.

4 Q    So it's only a hypothesis. Further study is needed,

5 correct?

6        MR. BERNICK:  Objection.  What is a hypothesis?

7 Objection to the form of the question.  I'm not sure everybody

8 understands or not.  What is the reference about what is the

9 hypothesis?

10 Q    I'm referring, Doctor, to the hypothesis that is discussed

11 in the article as opposed to your biologically plausible

12 hypothesis.

13        MR. BERNICK:  Again, I would then object.  He's

14 directed the witness to a particular paragraph dealing with a

15 particular feature that is being discussed in that article, not

16 the article as a whole.  If the reference is to the what is

17 discussed in that paragraph, I understand the question.

18        THE COURT:  Restate the question, Mr. Mullady,

19 specific as to what the hypothesis is you are referring to

20 please.

21 Q    Doctor, let's just take a step back.  You would agree that

22 the study authors here characterize their work as the latest in

23 an emerging body of evidence supporting the view that asbestos

24 is a lung carcinogen because of its ability to cause lung

25 fibrosis?

1  A    I don't think the -- I don't think the authors were

2  suggesting a biologic explanation for their findings.

3  Q    That wasn't my question.

4  A    I'm not sure what it is then.

5  Q    I'm simply asking you if the Hughes Weill authors stated

6  in their paper that their study which they refer to as the

7  current study was at that time the latest in an emerging body

8  of evidence supporting the view that asbestos is a lung

9  carcinogen because of its ability to cause lung fibrosis?

10 A    Yes.

11 Q    And they go on to say nevertheless further results in

12 support of these findings are necessary before a firm

13 conclusion concerning such a mechanism can be reached, correct?

14 A    That's what they conclude.

15 Q    Right.  So the mechanism that they are hypothesizing in

16 this article, you would agree that they were saying that that

17 is a hypothesis and that further study is needed to confirm it?

18 A    That's what they are saying, but remember this is over 15

19 years ago that this article was published.  So there's been

20 more recent work on the molecular aspects of this question.

21 Q    But it is still fair to say, isn't it Doctor, that to date

22 the medical and scientific community has not reached a firm

23 conclusion concerning the hypothesized mechanism?

24 A    The hypothesized mechanism?

25 Q    Correct.

Weill - Cross/Mullady                    130

1   A    I think what can be said is that since 1991 there's been

2   additional evidence and additional research that's proved

3   informative.  Now to say that it is completely worked out and

4   perfectly understood would be an overstatement.

5   Q    You testified that it's your opinion that you can't have

6   asbestos related lung cancer in the absence of asbestosis,

7   correct?  We talked about that?

8   A    Yes.

9   Q    In other words, you believed asbestos exposure alone does

10  not cause lung cancer, correct?

11  A    Yes.

12  Q    But asbestos exposure alone can certainly cause

13  asbestosis.  You don't disagree with that?

14  A    No, I do not.

15  Q    And asbestosis can cause lung cancer, correct?

16  A    Yes.

17  Q    And putting on the elmo here a slide that you used in your

18  direct.  This is 2130, GX-2130.

19          THE COURT:  I think it's 2139.

20          MR. MULLADY:  Oh, I'm sorry.

21  Q    2139, 39. And here you are indicating that as between

22  asbestosis and lung cancer there is a direct connection and you

23  put the word yes here for that reason, correct?

24  A    Yes.

25  Q    But we could also draw an arrow from asbestosis exposure

Weill - Cross/Mullady                    131

1  alone to asbestos -- excuse me, I'll restart this question

2  again.  We could also draw a line from asbestos exposure alone

3  to asbestosis and we could put yes next to that as well,

4  couldn't we?

5  A    You could put yes.  But you would also have to have a

6  pathway of course that says no.  Because not everybody that is

7  asbestos exposed is going to develop asbestosis.

8  Q    But with that caveat you would be comfortable making that

9  connection and using the word yes?

10 A    In that very narrow sense, yes.

11 Q    I want to ask you some questions about your testimony on

12 the taking of an exposure history.  I think you told us in your

13 report that the proper taking of a careful exposure history is

14 vital when diagnosing an asbestos related condition, correct?

15 A    Yes.

16 Q    Can we have 597 please?  I'm having your expert report

17 pulled up from October of 2006 where you discussed the history

18 that a clinician should take from a person presenting with a

19 possible asbestos related disease.  Do you recall that in your

20 report?

21 A    Yes.

22 Q    Okay, we have it on the screen.  At Page 52, excuse me,

23 yes 52 we can go there under exposure history.  You told us

24 that the history should not simply contain job titles and the

25 company name of where one worked but rather comprehensive

Weill - Cross/Mullady                    132

1  information about the chronology of workplace exposures,

2  frequency of exposures, type of respiratory protection used and

3  proximity to others using asbestos products in the work

4  environment, correct?

5  A    That's correct.

6  Q    Can we have 407 please?  This is the W.R. Grace asbestos

7  personal injury questionnaire that was given to claimants in

8  this case, Doctor.  I just want to refer you to Part 3 on Page

9  9 of this form which is where the claimants were asked to

10 provide evidence of their direct exposure to Grace asbestos

11 containing products.  It's a little bit small.  I hope you can

12 read it.

13 A    I'm sorry, where am I looking?

14 Q    Top of this Page 9, Part 3, direct exposure to Grace

15 containing asbestos -- Grace asbestos containing products.  Do

16 you see that?

17 A    Yes.

18 Q    And we see here that the Grace claimants were asked to

19 provide information in the nature of exposure column on the far

20 right of the chart and we're going to blow this up a little bit

21 so you can see it.  It's a little dark but I think you can make

22 out the words nature of exposure.  Do you see that?

23 A    I do.

24 Q    They were asked, if we can go back up to the top on the

25 instructions, they were asked to indicate the letters

1 corresponding to whether the claimant was in "any of the

2 following" during his exposure and the choices are listed in

3 Paragraphs A through E.  Do you see that?

4 A    Yes.

5 Q    Now --

6          MR. BERNICK:  Your Honor, this does go beyond the

7 scope of the direct examination and all I can say is the door

8 is now open to the witness testifying about the -- about what

9 actually happened in filling out these forms.  I'm happy to do

10 that but this goes beyond the scope. I feel obliged to say this

11 goes beyond the scope of direct examination and opens the door

12 to another area of inquiry that I intend to pursue.

13          MR. MULLADY:  I think Mr. Bernick is a little bit

14 ahead of himself.  I think when he sees what I'm doing with

15 this he might not have this concern.

16          THE COURT:  All right.

17 Q    Directing your attention to Paragraph, I think that's E, a

18 worker in a space -- a worker in a space where Grace asbestos

19 containing products were being installed, mixed, removed, or

20 cut by others.  Do you see that?

21 A    Yes.

22 Q    Now Doctor, given that one of the elements of an

23 appropriate history, exposure history, in your view is to

24 determine whether the worker was in, as you say, proximity to

25 others using asbestos products in the work environment.  Does

Weill - Cross/Mullady                    134

1  knowing that the worker was in a space where asbestos products

2  were being used, without more, give you a basis as a clinician

3  to conclude that the worker has an asbestos related disease?

4          MR. BERNICK:  Objection.  Is that the sole piece of

5  information in the hypothetical, just that?

6          MR. MULLADY:  Yes.

7  A    As I understand, you are asking if I would consider that

8  information as part of the whole?

9  Q    No.  I'm saying that if that's all you knew that the

10  worker worked in a space where Grace asbestos products were

11  being used by others, as a clinician would that be enough of an

12  appropriate exposure history to determine whether that worker

13  has an asbestos related disease?

14  A    It really depends on the exposure.  I don't think I can

15  make a generic comment about that.

16  Q    But would you agree that as a clinician trying to

17  determine if this individual, this hypothetical individual, has

18  an asbestos related disease you would want to know about the

19  size of the space or just how closely the patient worked to

20  asbestos?  Wouldn't you?

21          MR. BERNICK: Objection to the form of the question

22  and lacks foundation.

23          THE COURT:  Overruled.

24  Q    I think you answered it.  Can you repeat your answer?

25  A    I think that would be helpful information.

Weill - Cross/Mullady                    135

1  Q    You agree that clinicians should quantitate --

2  qualitatively figure out if the patient you are talking to has

3  enough exposure to increase the risk of disease because it's

4  impossible to accurately quantify the individual's exposure.

5  Is that correct?

6         MR. BERNICK:  That question is compound number one.

7  Number two, the second part of it exceeds at least based upon

8  the proffer so far, the scope of his expertise.

9         THE COURT:  Let me see if I got this correct because

10 if I did, I have to sustain this objection.  Do you want to

11 restate the question?

12        MR. MULLADY:  I'll withdraw the question and just

13 refer the witness to his deposition testimony.

14        THE COURT:  Okay.

15 Q    Do you recall giving deposition in this case, Doctor?

16 A    Yes, I do recall it.

17        MR. BERNICK:  Your Honor, the fact that he's given a

18 deposition is relevant if it's impeachment, the impeachment of

19 a statement.  What's the statement that's being impeached.

20        THE COURT:  That's sustained too.

21 Q    Do you agree, Doctor, that a clinician assessing whether a

22 patient has an asbestos related condition should qualitatively

23 determine if the patient has had enough exposure to asbestos to

24 increase the risk of disease?

25 A    To the extent that you are unable to do it quantitatively,

**J&J COURT TRANSCRIBERS, INC.**

Weill - Cross/Mullady                                  136

1  the answer is yes.

2  Q     And often as a clinician you are unable to quantify the

3  amount of asbestos and you must make that qualitative judgment,

4  is that correct?

5  A     In an individual case, that is true.

6  Q     You showed us a demonstrative, this is 2160, if we can

7  have the elmo back up please.  This demonstrative discussed the

8  components and methodology for generating a reliable diagnosis.

9  Do you recall this?

10 A     Yes.

11 Q     And this is where you put into two categories different

12 types of exposure evidence.  Some anecdotal and those which

13 would fall under the rubric of epidemiologic evidence, correct?

14 A     Yes.

15 Q     My question is with reference to the question on the PIQ

16 about whether the worker is or was in a space, would it be fair

17 to say that would be another type of anecdotal information that

18 would go over here?  I was in a space.  Would you agree with

19 that?

20 A     I would certainly agree with that.  What I'm unsure of is

21 that is the only information you have because I'm not familiar

22 with what studies are available regarding Grace exposure

23 quantitatively in a space.

24 Q     With that qualification, what I've written there that's

25 the appropriate place for it.  It's in the anecdotal category.

1          MR. BERNICK:  Objection.  First of all that doesn't

2     even properly quote Category E.  B, it takes it out of context

3     of the other questions that were asked with respect to it.  So

4     to the extent that that question purports to refer to the

5     questionnaire, it is misleading and it is incomplete.

6          THE COURT:  Well the question proffered to the

7     witness was not incomplete but the statement that was just

8     added to the chart does not reflect what was on the PIQ.  So to

9     the extent that you want something added to the chart that is

10    reflective of the PIQ right now I'll understand that to be the

11    shorthand explanation of what is on the PIQ.  But you are going

12    to have to write out what was on the PIQ.  If that is what you

13    are attempting to do.  The witness has said it's anecdotal

14    except he doesn't know whether there are any quantitative

15    studies to back up the data.  So I think the record is clear.

16         MR. MULLADY:  I don't think I need to rewrite it but

17    let me just ask the witness.

18    Q    You would consider it to be anecdotal if the worker said I

19    was in a space where Grace asbestos containing products were

20    being installed, mixed, removed or cut by others?

21         MR. BERNICK: And that is the only information that

22    was provided?

23         MR. MULLADY:  Correct.

24    A    If that's the only thing a patient says, it's anecdotal.

25    Q    Thank you.

1          MR. MULLADY:  That's all I have for the witness.

2    Thank you, Your Honor.

3          THE COURT:  All right.  Mr. Bernick, are you going to

4    have redirect?

5          MR. BERNICK:  I will.

6          THE COURT:  How long?

7          MR. BERNICK:  Probably around 15, 20 minutes max.

8          THE COURT:  Why don't you do it and then we'll take a

9    lunch break?

10         MR. BERNICK: If I could ask it's just going to take

11   time to get things together.  I know it will go more quickly if

12   we take a lunch break.

13         THE COURT:  All right.  We'll recess until 1:30

14         MR. BERNICK: Is there anybody else that has --

15         MR. FINCH:  Your Honor, does the rule on witnesses

16   apply in Delaware? I would ask that the witness not be allowed

17   to consult.

18         THE COURT:  Oh yes, Doctor, you are not allowed to

19   consult with counsel concerning your testimony during the lunch

20   recess.  All right.  We'll be in recess until 1:30.

21                        (Lunch Break)

22         THE COURT:  You are still under oath, Dr. Weill.  Mr.

23   Bernick.

24                    REDIRECT EXAMINATION

25   BY MR. BERNICK:


                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    If we could show TJ -- 2125.  If we took a look at this

2  fundamental slide that posed the issue that you framed for us,

3  Dr. Weill, which is does asbestos exposure alone without

4  asbestosis cause lung cancer. I want to deal with a couple of

5  the studies that were discussed with you on cross examination

6  to see how it is that they fit in.  In fact what I might do is

7  if I could switch over to the elmo a second and use a hard copy

8  of the same document.  So the question -- it should be on.  Is

9  there any reason why it's not?  No it looks to be on but I

10  don't get anything here.  Nothing like rebooting. Rebooting

11  solves all the problems in the world, right.

12        So where -- the two questions that you posed or the

13  question that you posed was is asbestos exposure alone tied to

14  lung cancer or must their be asbestosis or put differently,

15  without asbestosis that is with asbestos exposure alone do you

16  get lung cancer?  Is that a correct statement of the question?

17  A    That's correct.

18  Q    Now you talked about two basic studies.  There was the

19  Selikoff study or the insulators.  Where do I put the

20  insulators if I want to ask the question what did the

21  insulators tell me about?

22  A    So on this slide, this would be Category 1 that there is

23  only asbestos exposure alone.

24  Q    For the insulators?

25  A    For the insulators.

1  Q    But then what about when you get to the insulators as

2  updated by the Kipen work?

3  A    If you then follow the Kipen work and get pathologic

4  information as in Kipen you see that the asbestotics were at

5  higher risk in that cohort for lung cancer.

6  Q    Now once you know that from Kipen, where does the cohort

7  belong?  Does this cohort tell us about what happens for lung

8  cancer with asbestos alone?  Asbestos exposure alone or is this

9  a cohort that tells us about workers who have asbestosis as

10  well?

11  A    Once you have Kipen it's asbestosis.

12  Q    So we put the insulators over here.  But through the

13  insulators can you find out about asbestos exposure alone?

14  That is now with the benefit of Kipen, is there any way to go

15  back to the insulators and figure out if asbestos alone is

16  enough to get you there?

17  A    No.  There's no way to figure that out.

18  Q    Now let's talk about the Hughes Weill study.  Where does

19  the Hughes Weill study fit in?

20  A    That would be in the category that shows an arrow between

21  asbestosis and lung cancer.

22  Q    Okay.  And this is now the asbestos cement workers?

23  A    Yes.

24  Q    Okay.  Does that same study though also give us

25  information about asbestos exposure alone, that is without

1  asbestosis?

2  A    It does.

3  Q    And on the basis of the asbestos cement workers, is that

4  what then leads you to answer the question here yes and the

5  question that is asbestos alone no?

6  A    Correct.

7  Q    Now I want to ask you about a different study that was put

8  to you on cross examination which is the Per Gustovson study.

9  Are you familiar generally with this study?

10  A    Yes.

11  Q    And I've got a copy here in case you need to make

12  reference to it.  But in this study is there anywhere in this

13  study that there is sufficient specificity in the data to

14  enable us to answer the question of whether asbestosis is tied

15  to lung cancer?

16  A    No.

17        MR. FINCH:  Objection leading.

18  Q    You tell me if that study belongs number 2, number 1 or

19  actually someplace else.

20  A    No, it belongs in number 1.  It's an asbestos expose

21  cohort and that's the information you have in that study.

22  Q    On the basis of that study though can you tell whether

23  it's asbestos exposure alone or whether there is also

24  asbestosis?

25  A    No.

Weill - Redirect/Bernick                    142

1        MR. FINCH:  Objection, leading.

2  Q    Now if we have -- if this is a situation where there is

3  high asbestos exposure or just say asbestos exposure.  In that

4  case it's low.  Asbestos exposure and asbestosis, both at the

5  same time, but all that's being reported is the asbestos

6  exposure.  First of all, is that what's going on in that study?

7        MR. FINCH:  Objection.  Leading.

8        THE COURT:  It is leading Mr. Bernick.  You are going

9  to have to --

10        MR. BERNICK:  Well I'm just trying -- it's really

11  foundational to another question.

12  Q    I'll put it to you very simply.  Tell us whether or not

13  you can find out from that study whether or not the people in

14  that study also had asbestosis?

15  A    There's no information in that study on that point.

16  Q    On the basis of that study, is it possible to test or to

17  answer with specificity the question that you have posed here?

18  A    No.

19  Q    Is that study unique that way or is that also true of

20  other studies?

21  A    Also true of other studies.

22  Q    Now Mr. Mullady made a little diagram.  He said --

23        MR. MULLADY:  Objection to little.

24  Q    Okay, we'll blow it up real big.  GC-2140 and he said well

25  isn't it true that where you have asbestos exposure you have a

1  risk of asbestos?  And you do this one here and you say well

2  yeah, there are a certain number of people who have asbestos

3  exposure, get asbestosis and a certain number of people with

4  asbestosis on your theory get lung cancer.  You said that's

5  true.

6          Now does this idea that is because you can't get

7  asbestosis without asbestos and because with asbestos you may

8  get lung cancer, does that tell you the answer to the question

9  at all about whether asbestos exposure alone and the absence of

10 asbestosis contributes to or has associated with it a risk of

11 lung cancer?

12 A    No.

13 Q    Tell us why not?

14 A    Because remember as I pointed out in the response to that

15 question there is another arrow that has to lead off into the

16 no category.  In other words those that were asbestos exposed

17 but did not develop asbestosis.  So there is a yes and a no

18 leading from asbestos exposure alone.

19 Q    Therefore in order to answer this question, this direct

20 that is what about the people who have asbestos exposure as a

21 group, do they have an increased risk of lung cancer, that is

22 asbestos alone --

23          MR. FINCH:  Objection leading.

24          MR. MULLADY:  I didn't ask the question yet.

25 Q    I said in order to answer the question, tell us what you

Weill - Redirect/Bernick                    144

1  have to do?

2  A    Without the presence or the absence of asbestosis and

3  information on that you are not able to say.

4  Q    Now turning back to 2142 I want to tee up this question.

5  If we go back to the period of time when asbestosis the

6  criteria for asbestosis were narrower in the group of people

7  called true asbestotics were narrower, a narrower group of

8  people.  Was there or was there not in fact controversy based

9  upon science as to whether having that asbestosis, that

10 stricter asbestosis, was a prerequisite for getting lung cancer

11 due to asbestos?

12 A    There was some controversy on that point.

13 Q    Now that the definition of asbestosis has been expanded to

14 include as you've indicated anyone who demonstrates actual

15 physical evidence of any impact on the lung per se, with that

16 broad definition, tell me whether there is significant science

17 that says only thing that is clear is a history of exposure.

18 No objective evidence of impact on the lung and there is still

19 a risk of lung cancer.  Tell me is there a large body of

20 sciences out there that says that?

21          MR. FINCH: Objection.  Leading, compound.

22          THE COURT:  It is Mr. Bernick.

23 Q    In your own words, I want to frame the issue.  Now that

24 we're solely taking the people who cannot qualify for asbestos

25 because they have no objective measurements of any effect on

**J&J COURT TRANSCRIBERS, INC.**

1 the lung for asbestos.  Focusing on those people, tell me in

2 your own words the state of whether there is lots of science,

3 little science that actually links those kinds of people to

4 lung cancer.

5           MR. FINCH:  Objection.  Compound and leading.

6           MR. BERNICK:  No.

7           THE COURT:  It's not leading and it's not compound

8 enough.  This witness can answer the question.

9 A    I think the reliable scientific evidence demonstrates that

10 without the presence of asbestosis you cannot attribute lung

11 cancer to asbestos exposure.  So on the question of just the

12 asbestos exposed patients without information either pathologic

13 or radiographic, you can't say.  You just can't determine

14 whether or not you have an asbestos contributable lung cancer.

15 Q    Okay.  Are you aware of any kind of consensus statement

16 that says no, there really is science that robustly

17 demonstrates that relationship?  Have you heard of any such

18 consensus statement?

19           MR. FINCH:  Objection, leading.

20 A    No.

21           THE COURT:  No, it's are you aware. That's not

22 leading.

23 Q    Has any such study been pointed out to you here today?

24 A    No.

25 Q    Let's talk about HRCT.  HRCT I think you talked about as

1  being, and Mr. Finch I believe read to you some portions of the

2  2004 ATS statement with regard to the diagnosis of non-

3  malignant disease.  In the greater sensitivity, I would like to

4  see in fact if I can dig that out at some point.  But tell me

5  whether the -- today there is anything either an ATS

6  recommendation or some other document that sets out the grading

7  to follow in using an HRCT that runs parallel to the grading

8  that you have for x-rays into the ILO?

9  A    No, that's never been done.

10 Q    Is that -- I just want to direct your attention -- turning

11 to GX-0274 in evidence. I want to direct your attention to this

12 language where it says a proposal zoom -- a proposal has been

13 put forward for a classification system analogous to that of

14 the ILO system for plain chest radiograms.  But none has been

15 widely adopted.  Do you see that statement there in the more

16 current ATS statement?

17 A    Yes, I do.

18 Q    Absence such a grading system, is there a way to use HRCT

19 to do the kind of epidemiological study that was done of the

20 cement workers?

21 A    No, not in my opinion.

22 Q    What about pathology?  Is pathology something that was

23 available to be used to do the kind of epidemiological analysis

24 that was done of the asbestos cement workers?

25 A    No, it wasn't available.

1  Q    Based upon the currently available technology of the fact

2  that there is now currently available technology for HRCT but

3  with no classification system or pathology, does that in any

4  way diminish the significance or reliability of the findings

5  that were made in the asbestos cement study?

6  A    No.

7  Q    I want you to assume that there was a more sensitive

8  technique that was available to do the work that was done in

9  the asbestos cement study.  You know, more sensitive, could

10  pick up asbestos more readily and you could classify it and do

11  everything that you wanted to rate.  And that the result of

12  that was that more asbestosis was found in that study than was

13  picked up by the x-ray reads.  Would that necessarily -- would

14  that have had any necessary effect one way or another on the

15  outcome of that study?

16        MR. FINCH:  Objection.  Leading.

17  A    It likely would have had an effect --

18        MR. BERNICK:  Well wait.

19  Q    Would it have had an effect one way or another --

20        THE COURT:  No, overruled.

21  A    It likely would have had an effect but not in a

22  predictable way.

23  Q    And what do you mean by that?

24  A    Well, anytime you employ a more sensitive test to include

25  more people in the possibility of having disease, you're going

1  to change the dynamics of the study.  So when doing that you

2  can't really predict how the study is going to come out.

3  You've changed diagnostic tools, particularly one that's much

4  more sensitive, as in the case of HRCT, and you'll likely

5  change results in some unpredictable way.

6  Q    Well, but differently.  If radiograms, or reading x-rays,

7  is less precise, does that fact give a bias one way or another

8  in the outcome of the Asbestos Networker study?

9  A    No.

10 Q    If -- for Dr. Henry's study he looked at the x-rays and

11 weather -- which of the x-rays were found to comply with the

12 standards and which not.  In aid of that issue, would pathology

13 -- using pathology had fit into his study?

14 A    No.

15 Q    Mr. Mullady asked you a bunch of questions about this

16 particular language that appears as part of GX0590, which was

17 not in evidence but was referred to.  He said, "Do you see

18 where it says, 'The current study is the latest in the emerging

19 body of evidence supporting the view that asbestosis is a long

20 carcinogen because of its ability to cause lung fibrosis;

21 nevertheless, further results in support of these findings are

22 necessary before a firm conclusion concerning such a mechanism

23 can be found?'"  Do you remember being asked a whole bunch of

24 questions about that?

25 A    Yes, I do.

1 Q    Does that statement in some fashion diminish the analysis

2 of data that was set forth in this study?

3 A    No.  As I mentioned, this study speaks to the epidemiology

4 regarding causation.  The mechanism, or the biologic factors

5 taking place, is an entirely different question.

6 Q    I also want to go on and say -- do you see where he goes

7 on to say, "Finally, these data may provide further evidence to

8 support the common practice of attributing lung cancer to

9 exposure to asbestos only if asbestosis is also present.

10 Otherwise, these tumors are, in most instances, due to

11 cigarette smoking."  Do you see that statement?

12 A    Yes.

13 Q    Where you have asbestos exposure alone, no asbestosis --

14 I'm now pointing to G12140 -- and you have smoking, so asbestos

15 exposure alone and smoking and a case of lung cancer, tell me,

16 you know, just how -- tell me the significance of the presence

17 of smoking as an explanation for the lung cancer?

18 A    It would be very significant.

19 Q    How strong is that risk factor?

20 A    Cigarette smoke is a very strong carcinogen, and even with

21 say a 20 pack year cigarette smoking history, which would be

22 considered I think a moderate smoking history, the risk of

23 developing lung cancer is 20 fold versus those who don't smoke.

24 So it's a very strong carcinogen.

25 Q    You were asked a question about whether the ATS statement

1 made any requirement about having multiple B-reads.  Do you

2 recall that?

3 A    Yes, I do.

4 Q    Is there or is there not an independent requirement that

5 bears upon that question?

6 A    I'm not sure I understand the question.

7 Q    Is there a separate standard, a separate and independent

8 standard, that bears upon that question?

9 A    Yes, the NIOSH.

10 Q    And was that the basis of your testimony on direct?

11 A    Yes.

12 Q    Okay.  Finally, with regard to the questions that were

13 asked of you regarding exposure, I believe that Mr. Mullady

14 elicited testimony from you that when it comes to doing a

15 diagnosis, a careful analysis of all the facts that bear upon

16 the individual who's being diagnosed, that a careful analysis

17 is appropriate, and you agreed with him.  Do you recall that?

18 A    Yes.

19 Q    Okay.  Once you've done that careful analysis, that's once

20 the data is all there, does all of the data that may be

21 gathered carry equal weight?

22 A    Not necessarily, no.

23 Q    We showed -- or you showed the Court Exhibit 2160.  What

24 relevance, if any, did this document have in talking about once

25 you've got the individual data what weight to give to different

1 parts of it?

2 A    Well, I think what the epidemiologic studies allow us to

3 do is develop a framework to evaluate the individual patient,

4 and so the epidemiologic studies are important to develop that

5 framework when used in combination with the anecdotal

6 information.

7 Q    Okay.  And is all of the -- I mean -- I think Your Honor

8 probably already understands well where this is going, so I'll

9 skip over it, and it's probably somewhat unnecessary to get

10 into this as well, but relating -- pertaining to Exhibit

11 ACC/FCR407, which was the questionnaire -- remember that Mr.

12 Mullady wanted to ask you a bunch of questions about it.  I

13 just want you to focus on this whole page.  Only assume that

14 this question is being asked, and he asks you, "Well,

15 essentially is that kind of limited information?" And you

16 agreed with him that it was.  I now want you to look at the

17 rest of page where you have all these other categories, and

18 then for each job description you've got different job

19 descriptions, products, basis for identification, dates and

20 frequencies of exposure, occupation codes, industry codes, and

21 then a further column that's marked there relating to the kind

22 of exposure.  I ask you the same question.  Is this or is this

23 not the kind of information that you would want to have in

24 reaching an assessment about how important the exposure was?

25 A    It is the kind of information you'd want.

Weill - Redirect/Bernick/Recross/Finch            152

1  Q    I now further want you to assume that there's industrial

2  hygiene data that on the basis of these answers enables an

3  industrial hygienist to specify what the exposures are so that

4  you can compare them to the epidemiological studies.  With the

5  benefit of all of that information, what relevance is that --

6  what relevance, if any, does that have to performing a proper

7  differential diagnosis?

8  A    It's very relevant.

9       MR. MULLADY:  Objection, Your Honor.  Objection.  I

10 think we're now outside the scope of the cross.  I didn't ask

11 him about industrial hygiene --

12      MR. BERNICK:  Well, that's the whole point, is that

13 you excluded that from the question.

14      THE COURT:  It seems to me that this is fair with

15 respect to the issue of what the impact of the anecdotal data

16 compared to the epidemiological studies and the comparison of

17 the two, which seems to be the thrust of both the direct and

18 the redirect, so -- or the cross, pardon me -- so I'm going to

19 let a little leeway, but  --

20      MR. BERNICK:  It's the last --

21      THE COURT:  -- not too far, Mr. Bernick.

22      MR. BERNICK:  Yes.  Because I understand that Your

23 Honor probably well gets the drift of this.  I just want to

24 make sure that the record is clear.

25 Q    Where all of that is present, that is you have -- you have

1  the ability to know what the person did, what their jobs are

2  and the industrial hygiene data that is associated with that,

3  at that point is it satisfactory to simply aim for a

4  qualitative assessment, or do you want to aim for more?

5  A    You want to aim higher.

6  Q    Okay.  And if you can aim higher, what impact does that

7  have on the ability to conduct a meaningful differential

8  diagnosis, if any?

9  A    It just raises your certainty about the type of asbestos

10 exposure the worker got.

11             MR. BERNICK:  I have nothing further, Your Honor.

12             MR. FINCH:  Brief recross, Your Honor?

13             THE COURT:  Yes, sir.

14                         RECROSS EXAMINATION

15 BY MR. FINCH:

16 Q    Dr. Weill, do you still have the book that I gave you up

17 there?

18 A    Yeah.

19 Q    Okay.  Could you turn to the Hughes-Weill study?

20 A    Could you give me the number again?

21 Q    It's Exhibit Number 628.

22 A    I've got it.

23 Q    And in that study the dividing point for asbestosis was

24 1/0, correct?

25 A    That's right.

1  Q    So even though the ATS standard hadn't changed from 1/1 to

2  1/0, your father considered 1/0 sufficient to be asbestosis,

3  correct?

4  A    Yes.

5  Q    All right.  The Gustavsson study, that's Exhibit 331, Mr.

6  Bernick asked you some questions about that study on direct.

7  Do you recall that?

8  A    Yes.

9  Q    Could you turn to Page Ten Twenty of that study?  It is

10 Exhibit Number ACC-331.

11         MR. FINCH:  It's not in evidence, Your Honor.  I just

12 used it with him on cross examination --

13         THE COURT:  Okay.

14         MR. FINCH:  -- and Mr. Bernick had some questions

15 about this on redirect.

16         THE COURT:  Yes, sir.

17 Q    Do you have Page Ten Twenty in front of you --

18 A    Yes.

19 Q    -- Dr. Weill?

20 A    Yes.

21 Q    And that shows estimates of exposure for these various

22 people --

23 A    Yes.

24 Q    -- in the top column and the relative risk for nonsmokers

25 and then -- compared to various people who smoke?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    See that?

3  A    I do.

4  Q    And what this shows is that for people with fiber

5  exposures of between 1 and 2.49 fiber years, their relative

6  risk -- even if they were never smokers, their relative risk of

7  getting lung cancer was 2.7, correct?

8           MR. BERNICK:  I object.  Your question assumes that

9  there was even more than one person who fit that category.

10          THE WITNESS:  I think --

11          MR. BERNICK:  Do you know that that's so?

12  A    That's certainly what the table shows, and I can comment

13  further, though, regarding the confidence interval.

14  Q    The current smokers, or people who were exposed to

15  asbestos at greater than two and a half fiber years, shows 40

16  times the risk of -- excuse me -- confidence intervals of 4.6

17  to 40 as compared to 6.7 and 16.6 for unexposed people?

18  A    You're going to have to try again.

19  Q    Yes, sure.  In the current smokers, you've got people who

20  smoked from one to ten cigarettes a day.  People who were never

21  exposed to asbestos, the relative risk of dying is 10.5.  For

22  people who smoked greater than two and a half -- excuse me --

23  people who had more than two and a half fiber years of

24  exposure, the relative risk was 13.5, right?

25  A    I see that.

1 Q    Okay.  Would you agree with me that all of the exposures

2 shown on here, zero to .99, one to 2.49 and 2.5 are levels of

3 exposure unlikely to result in asbestosis?

4         MR. BERNICK:  Well, number one, the question is

5 falsely framed because it's not 2.5 --

6         MR. FINCH:  Your Honor, it's -- this is --

7         MR. BERNICK:  I'm sorry --

8         MR. FINCH:  -- seeking objection that is improper

9 under the rules.

10         MR. BERNICK:  Okay.  Object to form.  It misreads the

11 document.  If you're going to have a witness answer a question

12 concerning the document, it should be properly read.  2.5 is

13 greater than or equal to, it's not --

14         THE COURT:  The objection is that the statement does

15 not fairly -- the question does not fairly reflect the

16 information on the document, and that is sustained.

17 Q    Okay.  Would you agree with me that for fiber exposures of

18 one to 2.49, that's unlikely to result in asbestosis?

19         MR. BERNICK:  Objection; lack of foundation.

20 A    If the --

21         THE COURT:  Wait.  Wait, doctor.

22         THE WITNESS:  I'm sorry.

23         THE COURT:  This chart does not appear to relate to

24 asbestosis.  It's relative risk of lung cancer, not

25 specifically asbestosis.

**J&J COURT TRANSCRIBERS, INC.**

Weill - Recross/Finch                157

1        MR. FINCH:  That's my point, Your Honor.  My point is

2   that these people have an increased risk of lung cancer even at

3   levels of exposure far less than what one would expect to

4   contract asbestos.

5        MR. BERNICK:  You're --

6        THE COURT:  Well, I don't know.  The doctor was about

7   to explain some issues he has with respect to the confidence

8   intervals in looking at this chart.  Perhaps if you want him to

9   explain that answer, then maybe we can get to this question.

10  Otherwise, I'm not sure that that fairly reflects this issue.

11  A    First of all, the confidence intervals, so you mentioned

12  in the never smoking group the exposure categories that

13  included one as part of the confidence interval, and so from a

14  statistician's point of view that means that the increase in

15  relative risk may be or may not be due to chance.  So that's

16  one statistical point that I have to make.  Secondly, you had

17  questions regarding the likelihood of those exposure levels

18  causing asbestos or not, and that would depend a lot on fiber

19  type.

20  Q    Okay.  Well, you -- so you would agree with me the level

21  of exposure necessary to cause asbestosis depends on the

22  individual person's circumstances?

23       MR. BERNICK:  Your Honor, at this point, the witness

24  is now being made into a witness on what the epidemiology is of

25  asbestosis, and that's being done in order to derive an

1  inference from this article.  Fair -- if he wants to do it,

2  fine, but then I'm going to have a short unfortunately

3  re-redirect --

4             MR. FINCH:  No, that --

5             MR. BERNICK:  -- based upon this article because that

6  goes beyond the scope of anything that I've asked him.

7             MR. FINCH:  All right.  I'll --

8             THE COURT:  It does.

9             MR. FINCH:  I'll withdraw the question, Your Honor.

10            THE COURT:  This is recross, so you're limited to

11 what was asked on redirect, and this was not.

12            MR. FINCH:  Okay.  Fine, Your Honor.

13 Q    One final question on the Hughes-Weill study, pathology

14 was not available for those workers, but pathology was a tool

15 that was available to doctors in the 1990s to diagnose

16 asbestosis, correct?

17 A    That's correct.

18            MR. FINCH:  Okay.  Thank you.

19            MR. MULLADY:  I have nothing.

20            THE COURT:  Mr. Mullady?

21            MR. MULLADY:  No, thank you.

22            THE COURT:  Mr. Bernick?

23            MR. BERNICK:  No, thank you.

24            THE COURT:  Doctor, you're excused.  Thank you.

25            MR. FINCH:  Your Honor, my partner Mr. Bailor is

1 going to handle the cross examination of this witness.

2          UNIDENTIFIED ATTORNEY:  Here, you can just take my

3 seat.  Do you need to -- I'm going to bounce down the line

4 here.

5          MR. McMILLAN:  Good afternoon, Your Honor.  Scott

6 McMillan for W. R. Grace.  We would like to call our next

7 witness, Dr. Daniel Henry.

8          THE COURT:  Dr. Henry?

9          THE CLERK:  Stand and raise your right hand.

10          DANIEL HENRY, DEBTORS' WITNESS, SWORN

11              VOIR DIRE EXAMINATION

12 BY MR. McMILLAN:

13 Q    Good afternoon, Dr. Henry.  Could you please state your

14 full name for the record?

15 A    Daniel Henry.

16 Q    What is your occupation, Dr. Henry?

17 A    I'm a chest radiologist.

18 Q    And in general terms, what have you been asked to testify

19 about here today?

20 A    A study that I performed on a group of claimants that

21 espoused that they apparently suffered from a malignancy and

22 had radiographic evidence of asbestos exposure.

23          MR. BAILOR:  Your Honor, we would object on relevancy

24 grounds.

25          MR. McMILLAN:  Your Honor, the study that Dr. Henry

**J&J COURT TRANSCRIBERS, INC.**

1  did was based upon two orders that this Court entered in early

2  2007 ordering the claimants to turn over radiographic evidence

3  they had in support of their lung cancer and other cancer

4  claims explicitly for the purpose of allowing us to conduct an

5  analysis of that.  Indeed, if these are claimants who state

6  that they are relying upon this radiographic evidence in

7  support of their claim of lung or other cancer, it is entirely

8  within our purview to have our experts evaluate that

9  radiographic evidence and to present testimony to the Court on

10 the validity of that evidence.

11             THE COURT:  Well, I'm going to overrule the objection

12 for now.  I'm going to take all of this evidence under

13 advisement.  I am going to see -- as I indicated earlier in the

14 case, although I'm not sure I ever made rulings on the record,

15 that I am taking all expert opinions under advisement in the

16 case and I will rule on Daubert issues at the conclusion, and

17 so this witness, as all other witnesses, will be accepted --

18 the testimony will be accepted in that view.  Go ahead.

19             MR. McMILLAN:  Thank you.

20 Q    Dr. Henry, have you prepared any graphics in anticipation

21 of testifying today?

22 A    Yes, I have.

23 Q    Would it assist you in your presentation today to use

24 those graphics?

25 A    Yes, sir.

1          MR. BAILOR:  Counsel, may I have a copy of the

2    graphics?

3          MR. McMILLAN:  Oh, I'm sorry.  I meant to give those

4    out.

5          UNIDENTIFIED ATTORNEY:  Thanks very much.

6          MR. McMILLAN:  Could I have GG-2066, please?

7    Q    Dr. Henry, could you please tell us about your education

8    and medical training briefly?

9    A    I'm a graduate of the St. Louis University School of

10   Medicine.  After an internship, I completed my training in

11   radiology at the Medical College of Virginia, or Virginia

12   Commonwealth University, in 1975.

13   Q    Could you pull the microphone --

14         MR. BAILOR:  Excuse me.  Could we have the doctor

15   pull the microphone a little closer?  I'm having a little

16   trouble hearing him.

17         THE COURT:  We'll try.  Did you -- do you need that

18   repeated?  He was explaining his educational background.

19         MR. BAILOR:  I don't think we need that repeated.

20         THE COURT:  All right.  Thank you.

21   Q    Doctor, after you completed your residency, where did you

22   go to work?

23   A    I was -- joined the United States Air Force where I was

24   accorded the rank of major and assigned to Wilford Hall Medical

25   Center as a teaching instructor to teach radiology residents in

1  the U.S. Air Force.

2           MR. McMILLAN:  Could we have the next slide, please,

3  which is GG-2067.  Dr. Henry, after you left the Air Force,

4  where did you go to work?

5  A    I assumed a position at the -- in the department of

6  radiology at the Medical College of Virginia.

7  Q    And is that the institution at which you currently work

8  today?

9  A    Yes, sir.

10  Q    What is your current position at that institution?

11  A    I'm section chief of the section of thoracic imaging.

12  Q    And do you also hold any faculty appointments?

13  A    I'm associate professor of radiology and medicine in the

14  School of Medicine at VCU.

15  Q    Have you been employed at the VCU School of Medicine

16  continually since about 1977 till the present?

17  A    Yes, sir.

18  Q    Could you please tell us which professional organizations

19  you are a member of?

20  A    I'm a member of the Radiological Society of North America,

21  the Society of Thoracic Radiology, and I'm a member and fellow

22  in the American College of Radiology.

23  Q    What is the American College of Radiology?

24  A    It's an organization that's devoted to the education and

25  other benefits of its members in the process of radiology.

1 Q    Now, I see that you say that you are a member and fellow.

2 What does it take to become a fellow of the American College of

3 Radiology?

4 A    Well, it's somewhat of a secret process, but you're

5 usually elected to this post following some extraordinary

6 contribution to the welfare or benefit of the organization.

7 Q    Have you served on any committees or done other work for

8 the benefit of the American College of Radiology?

9 A    Yes.  I was invited to join the American College of

10 Radiology Committee on Pneumoconiosis in 1990, based upon my

11 activities as a B-reader and my teaching abilities.

12        MR. McMILLAN:  Could we turn to the next slide, GG-

13 2068, please?  I see you've got it up there.

14 Q    You used a term a moment ago which is "pneumoconiosis."

15 Could you please explain what pneumoconiosis is?

16 A    Pneumoconiosis is a medical term that is used to describe

17 the diseases related to the inhalation of organic or inorganic

18 dust.

19 Q    And is asbestos one of the dusts that can cause

20 pneumoconioses?

21 A    Yes, sir.

22 Q    I believe a moment ago you said that you were on a

23 committee or a task force that related to pneumoconiosis for

24 the ACR.  What did you do on that committee?

25 A    I was an instructor.  The American College of Radiology

**J&J COURT TRANSCRIBERS, INC.**

1  provides courses for those wishing to become certified as a

2  B-reader or re-certified as a B-reader.

3  Q    And have you done any other work besides serving on that

4  committee for the ACR?

5  A    Well, I -- currently I'm the chairman of that committee,

6  but I also advise NIOSH on their teaching efforts as it relates

7  to pneumoconiosis and other activities that relate to their

8  home-study syllabus, the exams themselves and so forth.

9  Q    What is NIOSH?

10 A    NIOSH is the National Institute of Occupational Safety and

11 Health.

12 Q    And what role do they play with regard to B-readers and

13 the B-reader course that you are teaching?

14 A    They currently administer the examination and they run

15 surveillance programs around the country for patients who

16 perhaps might be exposed and might have pneumoconiosis.

17 Q    Do you participate in any of those surveillance programs?

18 A    Yes, sir, I do.

19 Q    What do you do?

20 A    I interpret films for them.  I also review their teaching

21 materials.  Currently we have a project that is ongoing as we

22 transition from analog, or basically plastic chest x-rays, to

23 the digital arena, which is much more common in today's

24 healthcare field.

25 Q    So are you working with NIOSH in the transition to digital

Henry - Voir Dire/McMillan                    165

1  x-rays as they relate to the B-reader program and the

2  evaluation of pneumoconioses?

3  A    The B-reader program, the evaluation of potential

4  claimants, as well as the instructional process.

5  Q    Do you do any work for the Virginia Worker's Compensation

6  Commission?

7  A    Yes.

8  Q    What do you do?

9  A    We evaluate radiographs of individuals who bring claims to

10 the Commission.

11 Q    And is the work that you do for the Commission itself?

12 A    Yes, sir.

13 Q    Are you retained by any plaintiffs or defendants in front

14 of the Commission?

15 A    No, sir.

16 Q    Doctor, as part of your medical practice, do you have

17 experience with asbestos-related diseases?

18 A    Yes, I do.

19       MR. McMILLAN:  If we could have the next slide,

20 please, GG-2069.

21 Q    Could you tell us a little bit about your experience with

22 asbestos-related diseases?

23 A    My practice is dedicated entirely to thoracic imaging, or

24 chest radiology, and, in the course of the 30-year experience

25 that I've had, we encounter patients who had asbestos

**J&J COURT TRANSCRIBERS, INC.**

1  exposure.

2  Q    And I may not have asked you this previously.  Do you have

3  a certain specialty within the field of radiology?

4  A    Just thoracic imaging, or chest radiology.

5  Q    Do you have any educational duties or responsibilities

6  that relate to asbestos-related diseases?

7  A    Well, basically I'm an instructor or teacher to -- as a

8  physician in the school of medicine to radiology residents and

9  pulmonary fellows on all aspects of thoracic imaging, including

10  asbestos-related disorders.

11  Q    Have you ever published in peer reviewed literature

12  relating to pneumoconiosis or the ILO Classification System?

13  A    Yes.

14  Q    What have you published?

15  A    I was invited to write an article about five years ago on

16  the role of the ILO system and its current application in this

17  arena.

18       MR. McMILLAN:  Your Honor, at this point I would

19  tender Dr. Henry as an expert in thoracic radiology.

20       MR. BAILOR:  No objection, Your Honor.

21       THE COURT:  He may offer an expert opinion in the

22  field of thoracic radiology.

23       MR. McMILLAN:  Could we turn to GG-2070, please?

24  Q    Dr. Henry, does the chest x-ray play an important role in

25  thoracic radiology?

1  A    The chest radiograph is a ubiquitous study and it's, for

2  all intents and purposes, the currency of healthcare.  It's a

3  very commonly ordered examination, commonly performed.

4  Q    Is that one of the techniques or pieces of medical

5  evidence that you deal with on a daily basis?

6  A    Yes, sir.

7  Q    What role does the x-ray play in the diagnosis of

8  asbestos-related disease?

9  A    Certain entities which could afflict the lung itself, the

10  lung tissue itself, or the pleural surfaces, as well as

11  malignancies associated with asbestos could be depicted on a

12  chest x-ray.

13  Q    I want to talk to you briefly about the standards for

14  reviewing and classifying x-rays.

15        MR. McMILLAN:  If I could have the next slide, which

16  is GG-2071?

17  Q    Doctor, what is the International Labor Organization?

18  A    The ILO, or the International Labor Organization, is an

19  arm of the United Nations which promotes for many years, or has

20  promoted for many years, health and safety in the workplace.

21  Q    And has the ILO issued any guidelines on the

22  classification of chest radiographs?

23  A    Yes, sir.

24  Q    Could you explain what they've issued to us?

25  A    The ILO has produced written guidelines for probably four

1  or five decades which are used in the evaluation of

2  conventional chest radiographs for patients who may have been

3  exposed to various dust in the workplace.

4  Q    Are the ILO guidelines recognized internationally as a

5  standard to be used when classifying chest x-rays?

6  A    Yes, sir.

7  Q    What is the purpose of the classification system?

8  A    The purpose is to standardize the process of evaluation so

9  that it can be reproducible and reliable in terms of the

10 evaluation of various patients and in terms of the

11 communication from body, or one physician, to another.

12          MR. McMILLAN:  If I could have the next slide,

13 please?

14 Q    This is GG-2072.  Could you explain to us briefly how the

15 ILO classification system works, please?

16 A    Well, first of all, one must familiarize oneself with the

17 ILO guidelines, namely the process, as well as the group of

18 standard radiographs which come with the guidelines which

19 depict the pathology that is commonly seen with the various

20 inhalations of dust, and then once one does that one must take

21 the claimant or subject radiograph and compare it to the

22 standard and determine whether there is evidence of abnormality

23 or not and then, if so, abnormality being present, then to

24 quantify it through the process of the ILO system, including

25 the image quality, which is very important, the presence of

1 tissue abnormalities or parenchymal abnormalities, pleural

2 involvement and other possible abnormalities that may be

3 related to the pneumoconiotic process.

4 Q    Now, when you say that you grade the abnormalities, could

5 you explain to us, what do you mean by grading abnormalities?

6 A    Well, basically, the ILO process is a way of standardizing

7 the quantification of the abnormalities.

8        MR. McMILLAN:  If we could turn to the next slide?

9 Q    This is GG-2073.  Can you tell us what this is, Dr. Henry?

10 A    This is basically an evaluation form, or a pneumoconiosis

11 surveillance form that's piloted (sic) on the ILO form.

12 Q    Is the one that we have in GG-2073 the actual ILO form

13 that you used as part of your study?

14 A    Yes, sir.

15        MR. McMILLAN:  I want to quickly go through the

16 components of this, so if you could show the next slide.

17 Q    In GG-2074, we've blown up Section 1A of the ILO form.

18 What does this record, doctor?

19 A    This is the evaluation of the image quality, and you'll

20 see that on the far left-hand side, there are four categories,

21 one through three, and then U/R, which means it's an unreadable

22 study.

23 Q    Why is it important to grade the film quality?

24 A    Because the quality of the study will have a bearing on

25 the accuracy of the interpretation.

1  Q    And why is that?

2  A    Because the presence of artifacts, under or overexposure,

3  could conceal or enhance the detection of abnormalities.

4           MR. McMILLAN:  Could I have the next slide, please?

5  Q    This is GG-2075.  We've now highlighted Section 2A and B

6  which relate to parenchymal abnormalities.  What are

7  parenchymal abnormalities?

8  A    These are basically abnormalities of the lung tissue

9  itself which are presented as small opacities, which is

10 referred to in 2B.

11 Q    And how would you record that on the ILO form?

12 A    Well, as you can see, the -- 2B is divided into several

13 sections, and your first responsibility is to determine whether

14 the small opacities present are either rounded, which are

15 commonly associated with silica and coal workers

16 pneumoconiosis, or irregular or linear, more frequently

17 associated with asbestos exposure.

18 Q    What is an opacity?

19 A    An opacity is a small density which occurs on the x-ray

20 which is indicative of underlying pathology related to the

21 inhalation of dust.

22 Q    I see that under 2B there's a small C that says,

23 "profusion."  What is profusion?

24 A    Well, as you can see -- actually, we should start with the

25 prior diagram which is zones that each lung is divided into,

1  three zones, an upper, middle and lower zone on each side, left

2  and right, and then the person who classifies the study is

3  asked to then determine what the concentration or profusion of

4  the small opacities are within each individual zone and come up

5  with a summary of the entire profusion for the entire chest.

6  Q    I see that there are 12 boxes under profusion.  Can you

7  explain what you're doing when you're trying to select the

8  appropriate box?

9  A    Well, this is a scale.  You see in the upper left-hand

10  corner there is zero/naught, which means the study is

11  absolutely cold, normal.  There are no opacities.  And as you

12  go from left to right and then down the various columns, you'll

13  see that the numbers increase, and with the increasing numbers

14  that implies that you have a larger concentration of

15  abnormality of opacities.

16          MR. McMILLAN:  If we could turn to the next slide,

17  GG-2076?

18  Q    We've highlighted Sections 3A and B from the ILO form.  I

19  notice this refers to pleural abnormalities.  What are pleural

20  abnormalities?

21  A    Pleural abnormalities are basically the manifestations of

22  exposure which might impact the parietal pleura, or the lining

23  of the thoracic cavity itself, or the visceral pleura or the

24  lining that's around the lung.

25  Q    And just to be clear, Section 3 relates to the pleura,

1 where Section 2 relates to the parenchyma.  Just is broad-brush

2 terms, what's the difference?

3 A    Well, the difference is, is that Section 2 relates to the

4 lung tissue itself, and the -- Section 3 relates to the lining

5 of the thoracic cavity on -- in either hemithorax, left and

6 right, as well as the lining around the lung itself.  So, it's

7 distinctly different from the more internal parts of the lung

8 or the lung tissue itself.

9 Q    Now, I see in Section 3B that there's a space to record

10 information about pleural plaques.  What are pleural plaques?

11 A    Pleural plaques are basically areas of focal fibrosis with

12 -- usually within parietal pleura.

13 Q    And I see that you have, "In profile, face-on and

14 diaphragm."  What's the difference?

15 A    The difference is that in profile, there's a plaque that

16 appears along the lateral edges of the chest, which is visible,

17 there in profile, as opposed to a plaque which exists on the

18 front or the back of the chest, which on a frontal chest x-ray

19 would be seen face-on or "on fas" (phonetic).

20      MR. McMILLAN:  Can we move to the next slide, please,

21 GG-2077?

22 Q    We've now highlighted Sections 3C and 3D of the ILO form.

23 Could you explain what gets recorded here, please?

24 A    This again is a continuation of the evaluation of the

25 pleura, and it relates to the area of the lung called the

1 costophrenic angle, which is where the diaphragm, which

2 separates the chest cavity from the abdominal cavity, occurs,

3 and in the upright individual on a chest x-ray, shall we say,

4 it's the angle where the diaphragm meets the chest wall.

5 Q    Okay.  And what does it mean if that angle is blunted?

6 A    If that angle is blunted, then one would certainly have to

7 consider the presence of diffuse pleural thickening, the theory

8 being that diffuse pleural thickening generally arises

9 following a pleural effusion, which would occupy that angle,

10 and therefore if there was a residual of pleurator (phonetic)

11 thickening that angle would be blunted and therefore would be a

12 sign that there could be the presence of diffuse pleural

13 thickening.

14 Q    What is diffuse pleural thickening?

15 A    It again is a fibrotic process that occurs in the visceral

16 pleural, which is the lining of the lung itself, as opposed to

17 a plaque, which involves the parietal pleura, or the lining of

18 the chest wall.

19 Q    And what does it mean when the pleura is thickened?

20 A    It's an indicator of a fibrotic process in a particular

21 lining of the lung and that you want to be able, hopefully, to

22 distinguish that from a pleural plaque basically.

23 Q    And is blunting of the costophrenic angle one of the

24 features that you look at to try and differentiate between the

25 two?

1  A    By convention that the fact that pleural plaques rarely

2  ever involve the costophrenic angles, whereas diffuse pleural

3  thickening does, that's how we distinguish one from the other.

4        MR. McMILLAN:  Could I have the next slide, GG-2078,

5  please?

6  Q    You'll see here we've highlighted Sections 4A and 4B from

7  the ILO form.  Could you explain what gets recorded here,

8  please?

9  A    This is basically a shorthand that the reader would use to

10 connote the presence of other abnormalities.  If you note, on

11 the far right-hand line, on the line in the far right, there's

12 the abbreviation, "TB," which means if you thought there was

13 tuberculosis present, you would check that particular box.

14 Somewhere in the center there, there is the abbreviation, "EM,"

15 which stands for emphysema.  On the far left is another

16 abbreviation, "AA," which stands for atherosclerotic aorta,

17 which is another radiographic finding.  And in between are

18 several other abbreviations which connote the presence of

19 various findings which are sometimes associated with an

20 inhalational dust disorder.  Others are not, such as the

21 abbreviation of "CO," which simply means that the heart is

22 enlarged, which may be totally unrelated and probably is

23 unrelated to dust inhalation.

24 Q    Doctor --

25 A    So it's a shorthand to prevent a lot of handwriting

1 basically.

2 Q    Dr. Henry, the form that we've been looking at here, this

3 is the actual form that the independent B-readers you retain

4 used when evaluating x-rays in this case?

5 A    Yes, sir.

6 Q    And is this based on the ILO form that NIOSH uses when

7 they are certifying B-readers?

8 A    Yes, sir.

9      MR. McMILLAN:  I'd like to move on to the next slide,

10 please, which is GG-2079.

11 Q    Dr. Henry, what is the purpose of the ILO classification

12 system that we have just been reviewing?

13 A    Basically it's to provide a standardized process of

14 evaluation and quantification of the abnormalities present on a

15 chest radiograph and a person who may have been exposed to

16 inhalational dust.

17 Q    Has the ILO Classification System been adopted in the

18 U.S.?

19 A    Yes, sir.

20      MR. McMILLAN:  Could I have the next slide, please?

21 Q    How has it been adopted in the United States?  This is GG-

22 2080.

23 A    Following a mining tragedy in the late '60s, the federal

24 government mandated the U.S. Public Health Service develop a

25 system to evaluate chest radiographs of miners at that time who

Henry - Direct/McMillan                      176

1  might be exposed and -- in terms of a preventive measure and

2  for compensation, and so they realized that there were not --

3  there was not a group of readers out there, or people who were

4  familiar with this process.  So they commissioned the Public

5  Health Service to develop a process of teaching these

6  physicians the various methods of evaluating these studies.

7  Q    And did the Public Health Service -- how did they go about

8  teaching a group of physicians how to use the classification

9  system?

10  A    The Public Health Service at that time turned to the

11  American College of Radiology and asked them to become

12  instructors and to develop a course of instruction to better

13  promote the understanding of how the system would be utilized.

14  Q    And is that course that you currently today are a faculty

15  member for?

16  A    It's not quite the same course, but basically, yes.

17  Q    How many different faculty members are there today who

18  teach the asbestos-related portion of the ACR course for the

19  B-reader exam?

20  A    Those duties are split by myself and one other person.

21  Q    Did there come a point in time when the Public Health

22  Service turned over this classification program to NIOSH?

23  A    Whenever NIOSH became an entity, and I'm not -- I think

24  was in the early '70s, they handed off the ball to NIOSH,

25  Public Health handed it off to NIOSH and NIOSH then is

1 responsible and has been for the last several years.

2          MR. McMILLAN:  If we can go to the next slide,

3 please, GG-2081?

4 Q   We've talked a bit about B-readers, but could you just

5 explain what is the B-reader program?

6 A   The B-reader program is a program that the NIOSH -- that

7 NIOSH orchestrates and governs, and it relates to individuals,

8 physicians, licensed physicians, who wish to be certified for

9 the interpretation of pneumoconiosis studies using the ILO

10 system.

11 Q    And that is the purpose of the B-reader system?

12 A    Well, basically it's to hopefully guarantee a more

13 reliable and accurate interpretation of these studies.

14 Q    Is there an examination that is part of becoming a

15 B-reader?

16 A    Yes, sir.

17 Q    Can you tell me a little about that?

18 A    Anyone wishing -- or I should say a licensed physician

19 wishing to become a B-reader must take a six-hour examination,

20 which is comprised of classification of 125 studies.

21 Q    Is there a re-certification requirement?

22 A    Re-certification occurs every four years with a smaller

23 group of films.  Basically I think it's a three-hour test, and

24 you interpret or classify 50 studies.

25 Q    Is there a difference in the type of x-rays or studies

1 you're evaluating on re-certification from the initial exam?

2 A    Yes.

3 Q    What is the difference?

4 A    The initial study -- the certification study involves a

5 larger scale of more common abnormalities, and the

6 re-certification exam is a little more focused on the subtle

7 abnormalities that are sometimes -- sometimes encountered.

8 Q    How long have you been a B-reader?

9 A    Since 1985.

10 Q    How many times have you had to take the re-certification

11 exam?

12 A    Five times I believe.

13         MR. McMILLAN:  If we could go to the next slide,

14 please, which is GG-2082?

15 Q    Does NIOSH have a recommendation on whether or not the ILO

16 Classification System applies in contested matters?

17 A    Yes.  They have the Website, which you see presented here

18 which presents recommendations for a variety of settings where

19 the ILO system may be employed, contested proceedings being one

20 of them.

21 Q    So, in the first bullet we have here on the ILO system,

22 NIOSH recommends or states that it's necessary, to ensure

23 fairness and equity in contested proceedings, to use the ILO

24 Classification System.  Is that right?

25 A    That's correct.

1  Q    What does NIOSH recommend in terms of the number of

2  readers that should be used when doing classifications in a

3  contested matter?

4  A    They require -- or they suggest a minimum of two, and most

5  likely three, to determine if there is a lack of agreement.

6  Q    Does NIOSH have a recommendation about whether readers

7  should be blinded when reading in a contested matter?

8  A    Yes, sir.

9  Q    What's that recommendation?

10 A    Well, it is that they should be blinded to the exposure

11 history and the identity of the individual and any other

12 information which might bias their interpretation.

13 Q    Doctor, is it important when you are attempting to conduct

14 a reliable study to follow the ILO and NIOSH recommendations?

15 A    I believe so, yes.

16        MR. McMILLAN:   Could I have the next slide, please,

17 GG-2083?

18 Q    Why is it necessary?

19 A    Well, if you want to have an accurate and reliable

20 outcome, it's important to incorporate the standardized process

21 that's been accepted in the literature, including the ILO

22 guidelines and the suggestions and recommendations of NIOSH.

23 Q    Well, let's go through this.  Why is it important to blind

24 the readers when you're attempting to do a reliable study?

25 A    In order to prevent any bias that might creep in.

1  Q    Why is it necessary to use standard films when attempting

2  to do a reliable classification study?

3  A    Well, standard films are a critical part of the ILO

4  system, and it allows one to compare the claimant, or subject

5  radiograph, to a standard radiograph in order to develop a more

6  confident evaluation and classification of that particular

7  study.

8  Q    Why is it important to use three independent readers when

9  attempting to do a reliable classification study?

10 A    Again, from experience, I believe NIOSH has recognized,

11 and you find this repeated in the literature and many papers,

12 that the multiple readers I think provides a better sense of

13 reliability and accuracy than just a single reader.

14 Q    And finally, why is film quality important when attempting

15 to do a reliable classification study?

16 A    As I discussed earlier when we talked about film quality

17 on the B-reader form, it can alter the impression and the

18 interpretation of small opacities which may be very subtle and

19 could be obscured or could be enhanced by the various

20 techniques employed in conventional radiography.  So good film

21 quality is essential.

22 Q    Doctor, I want to switch topics briefly.  When conducting

23 reviews under the ILO system, what is a positive result for

24 asbestosis?

25         MR. McMILLAN:  Could I have the next slide, please?

1  A    Well, currently it's the determination that the small

2  opacities present reach a threshold greater than or equal to

3  1/0.

4  Q    Now, was that recommendation of the American Thoracic

5  Society in 2004?

6  A    Yes, sir.

7  Q    Prior to that date had the American Thoracic Society taken

8  a position on what level of profusion was necessary to diagnose

9  asbestosis?

10  A    Yes, sir.  In 1986, the guidelines, again from the ATS,

11  stipulated a threshold of 1/1.

12  Q    And when they changed it 2004, did they provide the

13  scientific evidence or rationale for that change?

14  A    In my opinion, no.

15  Q    Why is that?

16  A    Well, if you look at the fine print when they make this

17  recommendation, they say that there is no clear-cut distinction

18  between 0/1, which would be a negative study, and 1/0, which in

19  their eyes would be a positive study.  Secondly, there is no

20  1/0 standard.  This is a total arbitrary decision that the

21  reader makes on his or her own.  And third, it's a

22  determination that can be very much affected by film quality

23  and by the possibility of opacities from other sources

24  unrelated to dust exposure entering into the evaluation and

25  producing findings that would simulate the earliest findings of

1 an asbestos or another pneumoconiotic process.

2 Q    Now, you said a moment ago there's no 1/0 standard film.

3 Is there a 1/1 standard film?

4 A    Yes, sir, there is.

5 Q    Does that factor into why you believe it's more reliable

6 to use a 1/1 for diagnosing asbestosis?

7 A    Well, I'm falling back on the '86 guidelines, which I

8 think are valid, and also the presence of the 1/1 standard,

9 which then takes away the arbitrary determination of the

10 reader.

11 Q    You also said a moment ago that there are other conditions

12 that could mimic a 1/0.  What were you referring to?

13 A    Well, this is a controversial area.  However, there are

14 studies out there which suggest that there are individuals who

15 have had no dust exposure, other small opacities, primarily due

16 to smoking, which can simulate the earliest findings of

17 dust-related diseases.

18 Q    So are you saying -- what do you see as the utility of a

19 1/0 reading?

20 A    Well, I think it has a limited utility except in vary

21 unique circumstances.  I am very enthusiastic about the

22 earliest detection that we can possibly make of abnormality or

23 disease.  However, I think we have to recognize the limitations

24 of this particular process of using that standard for the

25 reasons I alluded to earlier.

1  Q    Doctor, what are medical screenings in the broad sense of

2  the term?

3  A    Medical screenings are tools used to evaluate the early

4  presentation of an abnormality or dysfunction in hopes of

5  promoting an intervention of some type that would then arrest

6  the process (indiscernible).

7  Q    I'm sorry?

8  A    That would arrest the process or possibly cure it.

9         MR. McMILLAN:  Could I see GG-2085, please?

10         THE COURT:  Wait, I'm sorry.  Medical screenings are

11  used to evaluate the early detection, and then I lost it.  I'm

12  sorry.

13         THE WITNESS:  Okay.  The early detection of a

14  pathologic process or dysfunction in terms of promoting an

15  intervention which might then arrest the process or possibly

16  cure it.

17  Q    What are some examples of medical screening?

18  A    Mammography is probably the commonest and most readily

19  recognized type of screening tool.

20  Q    And are these useful techniques in most circumstances?

21  A    I think there's been abundant literature which supports

22  it, yes.

23  Q    Have you had any personal experience with screenings in

24  the litigation context?

25  A    Yes, I have.

1  Q    What is that experience?

2  A    In the late '90s, I was contacted by a representative from

3  N & M Company and requested to evaluate and do B-reads, if you

4  will, on 300 chest radiographs.

5  Q    Did you review those radiographs?

6  A    I did.

7  Q    What did you find?

8  A    I found that they were for the most part negative.  I

9  found also that their film quality was poor and that the films

10 had already been pre-read.

11 Q    How did you know the films had already been pre-read?

12 A    There were notations on the jackets.

13 Q    And was their any indication of what the prior reading

14 was?

15 A    Yes, sir.

16 Q    And what was it?

17 A    They were positive.

18 Q    And did you agree or disagree with those prior findings?

19 A    I disagreed with the majority of the prior findings.

20 Q    Did you relay your reads to N & M?

21 A    Yes, sir, I did.

22 Q    What was their reaction?

23 A    There -- I --

24          MR. BAILOR:  Objection; hearsay.

25          THE COURT:  What he told somebody else is hearsay?

1           MR. BAILOR:  No, what they told him is hearsay.

2           THE COURT:  Oh, yes.  That is hearsay.

3           MR. McMILLAN:  Understood, Your Honor, but we are

4  offering it for the purpose of Dr. Henry's experience with a

5  litigation screening and how that impacted his understanding of

6  the reliability of those screenings.

7           THE COURT:  What's the difference?  It's still

8  hearsay.

9           MR. McMILLAN:  But I'm not offering it for the truth

10 of the matter.  I'm offering it for the impact it had on this

11 witness and his understanding of the reliability of these

12 litigation screens.

13          THE COURT:  I think I understand from his prior

14 testimony already what the impact would have been.  It's still

15 hearsay.  The objection is sustained.

16 Q   Based on your experience with N & M, did you have an

17 impression of the reliability of the prior reads that you saw

18 on those x-rays?

19 A   Well, they didn't agree with my interpretations.

20 Q   Doctor, have there been other studies of the reliability

21 of x-ray reads from litigation screenings?

22 A   Yes, sir, there have.

23 Q   Can you tell me a little about them?

24 A   There's a study in the late '90s from Penn State which

25 evaluated the Manville Trust, audited the radiographic

1  findings, and there was the so-called Gitlin study, which was

2  published in 2004, which evaluated the comparison of claimant

3  readings versus an independent panel.

4  Q    And in broad terms what did those two studies find?

5  A    They found significant disparity --

6  Q    Disparity --

7  A    -- between the original readings and the readings done by

8  an independent panel.

9  Q    And by "original readings" are you referring to readings

10 that came out of litigation screenings?

11 A    I presume that was the case, yes, sir.

12 Q    Around the time that those studies came out, were there

13 other factors that you, as a thoracic radiologist, became aware

14 of that caused you to question the reliability of

15 litigation-related x-ray readings?

16 A    Well, there were some legal proceedings in Texas, I

17 believe.  There were congressional hearings.  There was

18 somewhat of a general buzz, if you will, for a lack of a better

19 way to explain it, among by colleagues and other B-readers that

20 we knew there were some things that were occurring that we were

21 kind of concerned about.  There was an instance, I believe,

22 reported in one of the trade journals where a radiologist was

23 approached at a national meeting and offered money to sign a

24 blank B-reader form.  So there were things of that type which

25 created some sense of concern and caution on my part.

1  Q    Were you subsequently asked to conduct a study of the

2  reliability of the claimants' x-ray reads in this case?

3  A    Yes, sir.

4  Q    What were you asked to do?

5  A    Again, we were asked to evaluate or draw up a protocol to

6  evaluate the presence or absence of asbestosis or interstitial

7  fibrosis in a group of claimants who espoused that they had a

8  malignancy and then radiographic evidence of asbestos exposure.

9  Q    So, the group of claimants that you were looking at were

10  claimants who were alleging that they had radiographic evidence

11  of asbestos exposure to link their malignancy to asbestos?

12  A    Yes, sir.  My screen is gone here, by the way.

13  Q    Yes, that's okay.

14  A    All right.

15  Q    In accepting that project, what was your goal?

16  A    Well, based upon the issues that were in the literature

17  and some of the more ambient concerns I had about the process,

18  the B-reader process, and the fact that I had been engaged with

19  it for over 20 years, I wanted to design the most precise and

20  scientific process I possibly could in hopes of developing a

21  reliable result, regardless of what it was, in terms of the

22  study we were going to undertake.

23        MR. McMILLAN:  I'd like to skip ahead to GG-2087,

24  please.

25  Q    Doctor, could you walk us through the process you used

Henry - Direct/McMillan                    188

1  during your x-ray study?

2  A    Okay.  We began with 5,438 claimants that were identified

3  on the questionnaire, and that group was then reduced to

4  twenty-eight hundred and fifty-seven by various filters that

5  were added, such as the timing of when the chest radiographs

6  were obtained or submitted, various other demographic data and

7  compliance with -- I think there were some certifications that

8  had to be filed with the films and so forth.  So, we came down

9  to a study pool of twenty-eight hundred and fifty-seven

10  claimant studies.

11  Q    So, if I understand, the fifty-four hundred claimants were

12  the number in the PIQs that alleged they had radiographic

13  evidence to link their cancer to asbestos --

14  A    That's correct.

15  Q    -- and that you got it down to twenty-eight fifty-seven

16  based on various criteria?

17  A    That's correct.

18  Q    In addition, was -- did part of it depend on which

19  claimants actually submitted x-rays?

20  A    Well, there were claimants who claimed they were going to

21  submit x-rays which did not, so there were actually some

22  instances where there were no x-rays.

23  Q    And then once you had the twenty-eight fifty-seven

24  claimants, what did you do with that group?

25  A    Well, at this point we wanted to derive a sample, which

**J&J COURT TRANSCRIBERS, INC.**

1 would be representative, of approximately 500 examinations or

2 evaluations of the chest x-rays, and so we had a goal of

3 developing 500 in each category.  One category would be those

4 who had filed an x-ray with an accompanying B-reader form, and

5 the other group would be those that just simply filed x-rays

6 without B-reader forms, but would be representative of all law

7 firms which had submitted claims.  So we took 500 and we

8 divided by twenty-eight fifty-seven, and you come up with

9 approximately .175.  You multiply .175 by the number of x-rays

10 that were produced by a given firm.  And that's how we arrived

11 at the numbers that we did in the various pools.  If someone --

12 we had at least one from each firm, if you will.  If they

13 didn't have a larger number -- if they just had one study then

14 they were incorporated so every firm would be represented.

15 Q    And by "firm" you mean law firm who had claimants

16 submitting radiographic evidence?

17 A    Yes, sir.

18 Q    So once you had your two samples of roughly 500 claimants,

19 what did you do next?

20 A    Well, we had them interpreted by three independent

21 readers.

22 Q    And then what did you do with the results of those

23 interpretations?

24 A    We tabulated them.

25          MR. McMILLAN:  Let's skip to GG-2090.

1  Q    Dr. Henry, in devising the protocol for your x-ray study,

2  do you believe that you designed a reliable study protocol?

3  A    It was my goal to design and oversee the most stringent

4  and scientific process possible, given the limitations of what

5  we had of time and so forth.

6  Q    Can you tell us what you did in the design of your

7  protocol that was meant to maximize the reliability of your

8  study?

9  A    Well, we used three independent readers, three blind and

10 independent readers.  The readers were -- they didn't even know

11 who the other readers were.  We kept them separate.  They were

12 told not to talk to one another.  If they did encounter one

13 another, do not discuss any of the cases.  They were never told

14 for whom they were reading the studies.  They didn't know the

15 end goal of the project at all.  They were just asked to

16 provide B-readings.

17 Q    Did you determine the number of readers in advance of

18 conducting your study?

19 A    We did.  In accordance with NIOSH guidelines, we

20 determined up-front that we were going to use three readers and

21 then use a majority, or consensus, reading.

22 Q    How did you select the three readers for your study?

23 A    These individuals were persons known to me as academic

24 physicians who were B-readers of at least 20 years who I knew

25 were highly qualified.

1  Q    Who provided the x-rays that you used during your study?

2  A    All of the x-rays were provided by claimant law firms.

3  Q    And did you use control films as part of your analysis?

4  A    Yes, sir.  As an additional quality assurance measure, I

5  introduced, unknown to the readers, 47 control studies.

6         MR. McMILLAN:  I'd like to flip to the next slide,

7  please, which is GG-2091.

8  Q    What are control films, Dr. Henry?

9  A    Control films are those that we have incorporated, which

10  are both normal and abnormal, to determine the reading

11  tendencies of our readers.

12  Q    So I take it that you know in advance -- or you selected

13  the control films?

14  A    I did.

15  Q    And what was the purpose of inserting those control films?

16  A    Mainly to be certain that someone wasn't (indiscernible)

17  over-reading or under-reading the images.

18  Q    And did you then compare your three independent readers'

19  reads to what you knew to be the results for those control

20  films?

21  A    Yes, we did.

22  Q    And what did you find?

23  A    Well, they correctly identified the positive studies 86

24  percent of the time and the negative studies 88 percent of the

25  time.

Henry - Direct/McMillan                    192

1  Q    And what was your takeaway from that?

2  A    That there was very little under-reading or over-reading

3  tendency on the part of our readers.

4  Q    And did that give you confidence in the results of the

5  other readings that your B-readers were doing?

6  A    It would enhance it significantly, yes.

7            MR. McMILLAN:  I'd like to go to the next slide,

8  please, which is GG-2092.

9  Q    Dr. Henry, is GG-2092 a reproduction of a chart from your

10 expert report that summarizes the results of your x-ray study?

11 A    Yes, sir.

12 Q    Is this a complete and accurate portrayal of the results

13 from your x-ray study?

14 A    Yes, sir.

15           MR. McMILLAN:  Your Honor, I would move GG-2092 into

16 evidence.

17           MR. BAILOR:  Your Honor, we would object on the

18 relevance grounds previously stated.

19           THE COURT:  It's overruled on that basis.  It's

20 accepted as a summary.

21 Q    Doctor, before I ask you about this, I would like you to

22 just look in your binder for one moment, please, and do you see

23 the tabs for GX284 and GX285?

24 A    I do.

25 Q    If you could look at those briefly, can you tell me, are

**J&J COURT TRANSCRIBERS, INC.**

Henry - Direct/McMillan                           193

1  those the protocols that you used in conducting your x-ray

2  study?

3  A    Yes, sir, they are.

4  Q    Are they true and accurate copies of the protocols you

5  used in conducting your study?

6  A    Yes, sir.

7            MR. McMILLAN:  I would move GX284 and 285 into

8  evidence, Your Honor.

9            MR. BAILOR:  Objection; relevance.

10            THE COURT:  Same ruling; overruled on the same basis.

11  Q    And finally, doctor, would you look at GX286, GX327 and --

12            THE COURT:  Wait.  I'm sorry.  What was the first

13  one, 286?

14            MR. McMILLAN:  286.

15            THE COURT:  All right.

16            MR. McMILLAN:  GX327.

17            THE COURT:  All right.

18            MR. McMILLAN:  And GX104.

19                      (Pause)

20  Q    Do you see those, doctor?

21  A    Once again?

22  Q    GX286, 327 and 104.

23  A    I must be overlooking it, but I don't see 104 here.

24            THE COURT:  It's --

25  Q    Look at the very beginning.

1  A    Very beginning?  Okay.  Sorry.

2  Q    Have you seen them now?

3  A    I have, yes.

4  Q    Are those three exhibits copies of the data that you

5  collected as part of your B-reader study?

6  A    Yes, sir, they appear to be.

7  Q    And are they true and accurate compilations of the data

8  that you used to prepare the chart that we have in evidence as

9  GG-2092?

10 A    Yes, sir.

11        MR. McMILLAN:  I would move to enter Exhibits GX286,

12 GX327 and GX104 into evidence.

13        MR. BAILOR:  Continuing relevance objection.

14        THE COURT:  Same ruling.  They're admitted.

15 Q    Doctor, I want to turn to GG-2092, please.  And you said a

16 moment ago that these are the results of your x-ray study.  I'd

17 like to start on Line 1 with the ILO firm sample.  Can you

18 explain to us what the result of your x-ray study was for the

19 ILO firm sample?

20 A    We had 471 claimants who provided chest radiographs with

21 an ILO form, and our three independent readers identified 33

22 out of the 471 that had a profusion of small opacities that

23 were greater than or equal to 1/0, for a total of seven percent

24 of the total.

25 Q    How does that compare to the B-reads that had been

1  submitted by those claimants for the very same x-rays?

2  A    As you can see further on the first row there, or first

3  column, excuse me, not first row, out of 471 studies that were

4  evaluated, the claimant readers found that 383 of 471 had

5  findings of -- indicating a profusion of greater than or equal

6  to 1/0, or approximately 81 percent.

7  Q    What was the result that you found for the all firm

8  sample?

9  A    Well, as you can see, when we had 507 evaluations, a

10  positivity of 37, for a percentage of positivity of 7.3

11  percent.

12  Q    Is that consistent with the result that you found for the

13  ILO firm sample?

14  A    Well, it's very, very close, as you can see, 7.1 -- 7.01,

15  7.3 percent, very, very close.

16  Q    Doctor, when you got the results for the ILO firm sample

17  and saw that your independent readers found seven percent had a

18  1/0 or greater compared to over 80 percent for the ILO -- for

19  the readers from the claimants, what was your reaction?

20  A    Well, this was very unexpected.  We were -- I was

21  basically shocked to see this difference.

22  Q    And why is that?

23  A    I just didn't think there would be that much of

24  discrepancy.  I might have expected something -- some

25  discrepancy, but nothing of this magnitude.

1           MR. McMILLAN:  Well, let's look at the next slide for

2  a moment, please.

3  Q    This is GG-2093.  If we start on the left-most column,

4  doctor, what was the population that you were starting with,

5  the population of people who could potentially participate in

6  your study?

7  A    The purple column is the claimants alleging radiographic

8  evidence of asbestos exposure, basically.

9  Q    So all of the claimants who were potentially eligible were

10  people who were alleging they had radiographic evidence of

11  asbestos-related exposure to link their malignancy to asbestos?

12  A    That's my understanding, yes, sir.

13  Q    And then when a subset was selected that had their own

14  claimant B-reads, what was the result of their own claimants'

15  reads of those x-rays?

16  A    Well, they found in the samples that we previously

17  mentioned that they had an 81 percent positivity rate.

18  Q    And how does that compare to what your independent readers

19  found for those very same individuals?

20  A    Again, we had a positivity rate of approximately seven

21  percent across all categories.

22  Q    Now, the difference between 81 percent that their

23  claimants -- their claimant readers found and the seven percent

24  that your independent readers found, is that kind of difference

25  something that can be accounted for with inter-reader

1 variability?

2 A    I don't believe so.  I mean, inter-reader variability is

3 always a factor in any type of a comparison evaluation.

4 However, in my interpretation of the literature of a similar

5 type of study, I did not encounter or have not encountered to

6 this point anyway, anything of this magnitude that could be

7 explained by inter-reader variability.

8 Q    How you found any published article or any study where

9 people are looking at the same x-rays and found a difference of

10 over an order of magnitude in the positive rate due to

11 inter-reader variability?

12 A    Not to the best of my knowledge, no.

13 Q    Dr. Henry, following up on the results that we just looked

14 at, did you do an additional analysis that compared your

15 independent readers to specific claimant B-readers?

16 A    I'm sorry, I didn't understand your question.

17 Q    Did you follow-up the data that we just went through by

18 comparing your independent panel reads to specific physicians

19 who were claimant B-readers?

20 A    Yes, sir, we did.

21        MR. McMILLAN:  Can I see GG-2094?

22 Q    Doctor, is GG-2094 a replication of a table that appears

23 in your July 2007 expert report?

24 A    Yes, sir.

25 Q    Is this a true and accurate portrayal of the results of

1  your analysis comparing your panel of B-readers or your

2  independent B-readers to specific claimant B-readers?

3  A    Yes, sir.

4         MR. McMILLAN:  Your Honor, I would move this in

5  evidence.

6         MR. BAILOR:  Objection.  Relevance.

7         THE COURT:  Overruled on the same basis.

8  Q    And one last point before I get into it, Dr. Henry, if you

9  look in your binder, do you see GX-582 and GX-583?

10  A    Yes, I do.

11  Q    Are GX-582 and 583 the data sets that you relied on in

12  putting together the table that is GG-2094?

13  A    Yes, sir.

14  Q    And are those true, accurate, and complete versions of the

15  data sets that you used to create GG-2094?

16  A    They appear to be, yes.

17         MR. McMILLAN:  Your Honor, I would move them in

18  evidence.

19         MR. BAILOR:  Again, we object.

20         THE COURT:  Same ruling.  They're admitted.

21  Q    Doctor, if we look at GG-2094 for a moment, can you

22  explain what you did here?

23  A    Basically, we took any individual reader who had a minimum

24  of 15 interpretations and determined the percent of positivity,

25  and then compared it to our readers to determine what the

1  percentage of over-read was.

2  Q    Okay.  If we take an example -- if we take Phillip Lucas

3  about two-thirds of the way down, can you use that as an

4  example to explain exactly how this works?

5  A    Right.  Lucas read 20 studies.  Had a reading of -- all of

6  them were -- (indiscernible) all of them as positive for a 100

7  percent positivity rating which would then be 100 percent

8  over-read as compared to our readers who found all of them

9  negative.

10  Q    Okay.  So, he found them all positive and your panel found

11  them all negative?

12  A    Right.

13  Q    What about Jay Segarra (phonetic) near the bottom?  What

14  happened with Dr. Segarra?

15  A    As I recall, he had -- well, he had 17 interpretations,

16  one of which was negative and 16 were positive.  And so,

17  therefore, he had a positivity rate of approximately 94

18  percent.  And then, according to our readers, an over-read of

19  approximately 94 percent.

20  Q    Doctor, as a result of your x-ray study, both the table

21  that we looked at from -- that compared overall percentages of

22  greater than 1/0 -- greater than or equal to 1/0 from your

23  study compared to the claimant readers, as well as the study

24  looking at specific claimant physicians, did you reach any

25  conclusions?

1 A    Well, I think we did a very good study, number one.  I

2 think we followed the appropriate guidelines and produced a

3 high quality scientific study.

4 Q    Well, if I -- well, (indiscernible).  If I could look at

5 GG-2095, doctor, what are your conclusions with regard to the

6 quality of the study that you did?

7 A    Well, as I said, we followed accepted scientific methods.

8 We employed the appropriate number of B-readers, and we

9 determined that the percentage of abnormality, if you will, of

10 studies that were greater than or equal to 1/0 which is

11 approximately seven percent.

12 Q    What's the takeaway from your study?

13 A    Well, we had a very small number of patients who presented

14 with positive findings.

15 Q    And what does it mean to present a positive finding?

16 A    Well, basically that they reached a threshold of

17 abnormality that was predetermined as 1/0.

18 Q    So, is it fair to say that the patients who -- only seven

19 percent of your patients had greater than or equal to a 1/0,

20 correct?

21 A    That's correct.

22 Q    So, are those the only ones who can show that they have

23 radiographic evidence of asbestosis based on their chest x-ray?

24 A    Based upon their chest x-rays, yes, sir.

25 Q    And so, are they the -- those seven percent the only

1  individuals who can show that there is actual damage to the

2  lung tissue based upon their chest x-ray?

3  A    That could be one interpretation, yes, sir.

4  Q    Did you reach any conclusions with regard to the

5  reliability of the claimant readers?

6  A    Well, I think based upon the significant magnitude of

7  differences between the three independent readers and the

8  claimant readers, it would give me great pause regarding the

9  reliability of those readings.

10 Q    Did you reach any conclusions with regard to the

11 reliability of readings that come out of litigation screenings?

12 A    Again, I think it would give me great pause based upon my

13 own personal experience that there would be -- that they're not

14 accurate.

15 Q    And with regard to diagnoses of asbestos-related disease

16 that are based upon these claimant B-reads, do you have an

17 opinion about the reliability of those diagnoses?

18 A    If those diagnoses are predicated on the evaluation of the

19 claimant x-rays, then I think they would also be suspect.

20 Q    Thank you.

21         MR. McMILLAN:  I have no further questions at this

22 time.

23                    CROSS EXAMINATION

24 BY MR. BAILOR:

25 Q    Good afternoon, doctor.  How are you?

1   A    I'm fine.

2   Q    Doctor, your study was not any random study, was it?

3   A    It was a random setting.  These cases were selected

4   randomly from the pool.

5   Q    But, you divided the x-rays up into various pools designed

6   to get a certain specific number of law firms, is that not

7   correct?

8   A    We did a -- we had a target of a particular number of

9   cases to make a representative sample, but all of the cases

10  were randomly selected in both pools.

11  Q    Now, you mentioned that digital x-rays were becoming much

12  more common.  You excluded digital x-rays from your study, did

13  you not?

14  A    No, we did not exclude digital x-rays, we excluded

15  miniaturized x-rays.

16  Q    How about x-rays that were on CD-ROM?

17  A    No, sir.  We had no way of evaluating them.

18  Q    And you also did not include computer topography studies

19  or high resolution computed topography studies, did you?

20  A    I excluded them, yes, sir.

21  Q    Now, you said you discussed the subject of bias in the

22  selection of your readers and said one of the reasons why

23  multiple readers were recommended was to eliminate the

24  possibility of bias, is that correct?

25  A    That helps, but it's not the only reason you have three

1  readers.

2  Q    Now, you didn't follow the (indiscernible) recommendation

3  of selecting your readers from the largest available pool of

4  B-readers, did you?

5  A    I selected the B-readers from the largest pool that I

6  knew.

7  Q    And how many is that?

8  A    Fifty, 60, 70.  Something like that.

9  Q    And you selected academic B-readers?

10  A    I did.

11  Q    And now, what steps did you take to ensure that your

12  academic B-readers were not biased?

13  A    Well, the most important step was the blinding of the

14  readers to any knowledge of why we were doing the study, who

15  was sponsoring it, what the outcome might be and so forth.

16  Q    Now, Dr. Lee Syder was one of your readers, was he not?

17  A    He was.

18  Q    Were you aware of the fact that Dr. Lee Syder has

19  testified for defendants in 26 cases?

20  A    No, I was not.

21  Q    Dr. John Parker is one of your B-readers, is he not?

22  A    He certainly was.

23  Q    Yes.  And he's one of Grace's expert witnesses in this

24  estimation proceeding, is he not?

25  A    I believe he is.

1  Q    And he's also testified adversely to asbestos claimants

2  before the U.S. Senate.

3  A    Perhaps.  I don't know that.

4  Q    He testified on behalf of (indiscernible) insurance

5  companies, are you aware of that?

6  A    No, sir, I was not.

7  Q    Now, you testify that one of the reasons of the perfusion

8  study is to ascertain if there's radiographic evidence of

9  asbestos exposure, is that correct?

10  A    Say that again, I'm sorry?

11  Q    If I understood you correctly, one of the purposes of the

12  perfusion reading is to determine if there is radiographic

13  evidence of asbestos exposure, correct?

14  A    The perfusion --

15        MR. McMILLAN:  I'm going to object that this

16  characterizes the witness testimony who's looking for whether

17  or not there was perfusion.

18        UNIDENTIFIED SPEAKER:  We can't hear you.

19        MR. McMILLAN:  He was looking at whether or not

20  there's perfusion greater than 104 asbestosis.

21        THE COURT:  I think the witness was about to correct

22  the statement and can clearly answer on his own.  The

23  objection's overruled.

24  A    The perfusion deals with the presence or absence of

25  (indiscernible) tissue abnormalities, and they're very

1  non-specific.  And I think they should be distinguished form

2  radiographic findings such as pleural plaque or a calcification

3  which is much more specific in terms of attributing the

4  exposure to asbestos.

5  Q    Okay.  So, you would agree with me that pleural plaque

6  shows evidence of exposure to asbestos?

7  A    Most of the time.  There are other etiologies for pleural

8  plaques, but the vast majority of them are asbestos exposure.

9  Q    How many of your films showed evidence of pleural plaques?

10 A    It wasn't the focus of our study, and I have to recall

11 from memory, but I think it was in the vicinity of 20, 22

12 percent, something like that.

13 Q    So, 22 percent of the films did show evidence of

14 significant --

15 A    I'm guessing because it wasn't the focus of this

16 presentation, so I'm recalling from memory from several months

17 ago.

18 Q    Now, you discussed on your direct examination what you

19 called screening examinations.

20 A    Yes, sir.

21 Q    What is (indiscernible) recommendation as to the number of

22 readers who should be present on -- should be utilized for a

23 screening exam?

24 A    I don't know.

25       MR. BAILOR:  May I approach the witness?  I'm handing

1  the witness what's been marked as ACC/FCR/2041.

2           THE COURT:   Thank you.

3  Q    Is this the NIOSH standard that you were referring to when

4  you discussed the practice in contested proceedings?

5  A    Yes, sir, it is.

6  Q    This does not deal with screening examinations, does it?

7  A    No, I don't believe I said that, did I?

8  Q    No, this standard does not apply to screening examinations

9  at all?

10 A    I don't believe so, no.

11 Q    I will now hand you ACC/FCR/2040, another NIOSH study.

12 Doctor, can you identify what ACC/FCR/2040 is?

13 A    I believe this is a reprint from the NIOSH website

14 entitled "Chest radiography," and then subheading, "Recommended

15 practices for reliable classification of chest radiographs by

16 B-readers."

17 Q    Now, I would like to call your attention, doctor, down to

18 the heading, "Worker monitoring and surveillance."  Do you see

19 what I'm referring to there?

20 A    I see it there, yes, sir.

21 Q    And I would like to specifically invite your attention to

22 Paragraph 4 of that.  Now, when we talk about worker monitor

23 known surveillance, is that your understanding of what is known

24 as a screening examination?

25           MR. McMILLAN:   I'm going to object, Your Honor, to

Henry - Cross/Bailor                    207

1  the extent that there's a false characterization that

2  litigation screenings done to file claims is something other

3  than a contested matter.

4           MR. BAILOR:  There is no evidence, Your Honor, that

5  the initial screenings of these people were done necessarily to

6  file claims.  Some may have been, some may not have been.

7           THE COURT:  That's the case.  I don't think I have

8  any evidence about what the initial classification was for --

9  initial screening was for.

10          MR. BERNICK:  A point of fact, and I don't mean to

11 interrupt for Mr. McMillan is here, but -

12          MR. BAILOR:  Your Honor, I object --

13          THE COURT:  That's sustained, too.  You've got a

14 person who's making objections.  My understanding is that you

15 get one person making objections, you don't get a house.  So,

16 you can talk to counsel if you want.

17          MR. BERNICK:  Very well.

18          THE COURT:  Let me -- in any event, the objection is

19 overruled.  I don't believe I have any evidence with respect to

20 how initial x-rays were put together, beside which I believe

21 this witness is very confident to answer this question.  Go

22 ahead.

23 A    Your question again, sir?

24 Q    I would invite your attention, doctor, to Paragraph Number

25 4.  It says, "Number of readers and summary classifications.  A

**J&J COURT TRANSCRIBERS, INC.**

1  Symbol B-reader classification of an east chest radiograph is

2  generally sufficient.  Additional independent classifications

3  may be needed to ensure reliability within the program."  Does

4  that -- is that consistent with your understanding of what is

5  required when we have a worker monitoring a program as opposed

6  to a reading for a contested proceeding?

7  A    That's their documentation, yes, sir.  That's what they're

8  saying.

9  Q    And when they're doing worker monitoring, I would invite

10 your attention to Paragraph 5 with respect to blinding.  There

11 is says, if I read this correctly, "Blinding; in order to

12 facilitate disease detection in environments where individuals

13 are potentially at risk, blinded classification is not

14 desirable."  Did I read that correctly?

15 A    You did.

16 Q    Do you know why that is?

17 A    I wouldn't know why they would put that in there.

18 Q    Is it more important in a screening environment to detect

19 disease early?

20 A    It's always important to detect disease early.

21 Q    That's because the earlier you detect it --

22 A    Regardless of the circumstances.

23 Q    You have a little better shot at treating it, right?

24 A    Correct.

25 Q    Right.  So, if you want to have a bias in a monitoring

Henry - Cross/Bailor                                    209

1  program, it would be towards early detection, would it not?

2  A    I'm not sure you want a bias.  I'm not sure that's what

3  they're saying, that they want to introduce bias.

4  Q    Now, doctor, when you conducted your study, did you review

5  any medical histories of any of these claimants?

6  A    Myself?  No.

7  Q    Do you have any idea what their exposure histories were?

8  A    No, sir.

9  Q    Do you agree that a chest x-ray will not necessarily

10 detect all cases of asbestosis?

11 A    It is possible that in certain circumstances that would be

12 the case, yes, sir.

13 Q    And I believe you mentioned in your report that you have

14 been at studies where you have -- I'm sorry -- you've been in

15 conferences where you have observed very experienced qualified

16 B-readers argue vehemently over the classification of a film,

17 is that not correct?

18 A    Over the classification of a film is 1/0.

19 Q    Yes.

20 A    Not over other classifications, but that particular

21 threshold has been problematic for a very long time.

22 Q    So, there is a great deal of disagreement, is there not,

23 among the thoracic imaging community as to when a film is 1/0

24 or not?

25 A    I wouldn't say there's a great deal of disagreement in the

1  community.  I think everybody recognizes the difficulty and

2  some of the pitfalls in making that determination.  But, I

3  wouldn't say there was a great deal of disagreement.

4  Q    There was disagreement among your own readers as to

5  whether or not films were 1/0 or not, was there not?

6  A    Disagreement among our own readers is a healthy sign, I

7  believe.  It's a sign of their independent abilities.  If they

8  were all reading the same thing all the time, then one would be

9  suspect if there was something wrong.

10 Q    Do you know the number of times in your study when a --

11 one reader read the film as 1/0, whereas the other two

12 disagreed?

13 A    No, not off the top of my head, but that wouldn't surprise

14 me.

15 Q    Sixty-five cases sound too high?

16 A    No.  Again, you're going to have that when you read a

17 large number of studies with three readers.  You're going to

18 have some disagreements and we recognize that.  But, again, I

19 think that portrays the independent behavior of the readers as

20 a good sign that they are reading independently and not biased

21 or being influenced one by the other.  If they all read the

22 same things all the time, then I would be very suspect that

23 there was bias or there was some communication or something was

24 awry.

25 Q    All right.  How many -- are you aware of the number of

1  cases in your study where the three readers -- all three

2  disagreed on the classification of the film?

3  A    Not specifically, no.  But, I'm sure it happens.

4  Q    How about 73 times?

5  A    I'm not sure what you mean by disagreement.  I mean, can

6  you be more specific?

7  Q    All three had different perfusion readings for the film.

8  A    Well, that might be 0001010, which are all within two or

9  three minor categories.  So, disagreement of that scale is not

10 necessarily a bad thing.

11 Q    How many occasions did your readers agree on whether or

12 not the film was completely negative?

13             MR. McMILLAN:  Objection.

14 A    Are we talking now about the individual readers or are we

15 talking about the consensus reading here?  What are you

16 referring to?

17 Q    Well, let's start out with individual readings.

18 A    Well, we didn't conduct a study that actually looked at

19 that.  We conducted a study at the outset which determined that

20 we would accept the profusion and the reading for the study as

21 a majority reading.  So, we're not looking at individual

22 readers here.  We're looking at the majority reading and that's

23 what I reported on.

24 Q    All right.  Now, my question was, how many of your readers

25 found the films were completely negative?

1  A    I don't know.  I don't have that information off the tip

2  of my fingers.

3  Q    Did you dally it?

4         MR. McMILLAN:  I would object to the (indiscernible)

5  to what he means by completely negative.

6         THE COURT:  Yes, that's sustained.  I don't

7  understand the question either.

8         MR. BAILOR:  There is a question on the ILO form that

9  was on the screen earlier.  I forget the number of it.  But, it

10  asks the question of the reader, "Is the film completely

11  negative?"

12  Q    Is that not correct, doctor?

13  A    That's correct.

14  Q    All right.  Now, let's take the case of Dr. Parker.  How

15  many films did he find were completely negative?

16  A    I don't know.

17  Q    Would it surprise you to learn that he found 664 films

18  were not completely negative?

19  A    Well, that might be.  I don't know.

20  Q    And are you aware of the fact that Dr. Robert Tarver

21  (phonetic) found 581 films were not completely negative?

22  A    That's possible.

23  Q    And Dr. Syder found 500 films were not completely

24  negative?

25  A    Well, I think it should be kept in mind that there are

1 other things on that study which would indicate that the film

2 was abnormal other than a dust related abnormality.

3 Q    It could also include pleural plaques, could it not?

4 A    I think I eluded to the fact earlier that we already

5 covered that there was approximately a 20 percent detection of

6 pleural plaques.

7 Q    And some of the readers noted cancer?

8 A    I believe so.

9 Q    And these were, of course, films submitted in conjunction

10 with a claim for lung cancer, right?

11 A    The readers didn't know that.

12 Q    But, the films were submitted in connection with a claim

13 for lung cancer, correct?

14 A    That's true, but in some cases those patients developed

15 cancer after the time the study was performed, or they had had

16 surgery to remove that cancer.  So, that's --

17 Q    That's right.  And you also excluded from your study the

18 post-operative films where the lung cancer had already been

19 removed, hadn't you not?

20 A    We did that to prevent the confusion with post-operative

21 or post-therapy changes, yes.

22 Q    Do you agree with the American Thoracic Society's view

23 that high resolution computed topography is much more sensitive

24 than the detection of asbestosis than plain chest radiographs?

25 A    Yes.

1 Q    And you had no high resolution computer topography in your

2 study, is that correct?

3 A    We excluded them.

4 Q    Now, going back to NIOSH's practice in contested

5 proceedings, NIOSH recommends that there be agreement reached

6 up front on the study criteria, do they not?

7 A    I'm sorry.  I'm not sure I understand you.  Up front -- I

8 think it suggests that you determine the number of readers at

9 the outset.  Is that what you mean?

10 Q    Not quite.  Could I invite your attention back to

11 ACC/FCR/2041?

12 A    Yes, sir.

13 Q    I would like to invite your attention to Paragraph 3 on

14 the second page.  I'm sorry, Paragraph 4 on the second page at

15 that exhibit.  It says, "To avoid any implication of bias, it

16 is necessary to specify from the outset the number of readers

17 that will be used."  Did you discuss the number of readers with

18 the claimants?

19 A    With the claimants?  No, sir.

20 Q    Do the claimants have any role in constructing the design

21 of the study?

22 A    No, sir.

23 Q    Doctor, did you review any pulmonary function tests of any

24 of the claimants?

25 A    No, sir.

1  Q    Do you agree with me that in order to make an accurate

2  diagnosis of asbestos, you cannot make such a diagnosis solely

3  from the chest x-ray?

4           MR. McMILLAN:  I'm going to object to an accurate

5  diagnosis of asbestos.

6           THE COURT:  That's sustained.

7           MR. BAILOR:  I'm sorry?

8           THE COURT:  An accurate diagnosis of asbestos?

9           MR. BAILOR:  I'm getting it myself.

10 Q    Do you agree, doctor, that you cannot accurately diagnose

11 asbestosis based solely on a chest x-ray?

12 A    Certainly there are findings which would be consistent

13 with that diagnosis, but it is not a diagnostic study.

14 Q    And would you agree that in order to diagnose asbestosis

15 there should be a physical examination performed?

16 A    That's not within the realm of my expertise, sir.

17 Q    Do you know how many of these claimants actually, in fact,

18 have a asbestos-related condition?

19 A    No, sir, I don't.

20 Q    And how does this assist this Court in making an

21 estimation?

22 A    My responsibility, basically, was to evaluate the studies

23 that I was given to evaluate in terms of the presence or

24 absence of, in this case, an interstitial (indiscernible)

25 processor asbestosis which is what I've done.

Henry - Cross/Mullady                    216

1  Q    So, based on what -- you can provide no information at all

2  as to whether or not any one of these individuals has an

3  asbestos-related condition?

4  A    It's not within the purview of imaging to do that under

5  any circumstances.

6           MR. BAILOR:  Can I have a moment, Your Honor?

7           THE COURT:  Yes, sir.

8           MR. BAILOR:  No further questions, Your Honor.

9           THE COURT:  Mr. Mullady, how long will you be, Mr.

10 Mullady?

11          MR. MULLADY:  Ten, 15 minutes.

12          THE COURT:  Would you like a ten-minute break first,

13 doctor?  Do you want to keep going?  All right, Mr. Mullady, go

14 ahead.

15          MR. MULLADY:  I'm just pausing for a moment to let

16 Mr. Ryan get set up, Your Honor.

17          THE COURT:  All right.

18          MR. MULLADY:  The Court's indulgence.

19                    CROSS EXAMINATION

20 BY MR. MULLADY:

21 Q    Dr. Henry, good afternoon.

22 A    Good afternoon.

23 Q    I represent the interests of future claimants against

24 Grace.  Your study involved films submitted by current

25 claimants against Grace, obviously, correct?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Yes, sir.

2 Q    You're not here to opine that because only seven percent

3 of the films of current claimants were read by your readers as

4 having reliable radiologic evidence of asbestosis or damage to

5 lung tissue, that that means that only seven percent of future

6 claimants against Grace will have such evidence, are you?

7 A    I can only comment on the studies that I perform.

8 Q    You're not here to make any such extrapolation and you

9 haven't done so, is that correct?

10 A    No, sir.

11 Q    Now, you also have no opinion on how many of the 93

12 percent of current claimants whose films the Grace panel found

13 to be negative would have obtained a second x-ray had they

14 taken their cases to trial against Grace, correct?

15          MR. McMILLAN:  Objection.  That calls for

16 speculation, Your Honor.

17          THE COURT:  He's an expert.  That's what he does.

18 A    One more time, please?

19 Q    Sure.  Of the 93 percent of claimants --

20 A    Ninety-three percent who had negative findings by our

21 readers?

22 A    Yes.  You're not here to say, and you're not here to opine

23 that 93 percent of -- that that 93 percent would not have

24 obtained a second x-ray had they taken their cases to trial

25 against Grace?

1  A     I have no opinion about that.

2  Q     And you have no opinion about how many of those claimants

3  would've been able to obtain a positive x-ray had they

4  endeavored to obtain additional x-rays, is that fair?

5  A     No, I don't have an opinion on that, no.

6  Q     Okay.  Now --

7              MR. MULLADY:  Do we have the Elmo on?  If we could go

8  to that, please.

9  Q     Putting GG-2087 on the Elmo.  This is your slide depicting

10  the process used in the Henry study.  Do you recall this?

11  A     Yes, sir.

12  Q     You started with 5,438 claimants who alleged radiographic

13  evidence of asbestos-related disease, correct?

14  A     That's correct.

15  Q     But, of those 540038, only 2857 had submitted x-rays with

16  certification and demographic information, correct?

17  A     That's correct.

18  Q     So, only 2800 of the 5400 actually submitted films that

19  you could even review?

20  A     Well, there were more than that, but some didn't have

21  proper identification.  Some didn't have the proper

22  certifications.  Some didn't meet the deadlines prescribed by

23  the Court.

24  Q     Fair enough.  But, in any case, that's over half of the

25  claimant population that you study.  I represent to you it's

1  about 52 percent, is that -- sound right?

2  A    Of the original persons identified on the PIQs, yes.

3  Q    Right.  Now, you're not here to opine that 52 percent of

4  future claimants who will be claiming against Grace will have

5  no x-rays to support their claims?

6  A    No, sir, I'm not.

7  Q    Let me ask you some questions about opinions that I think

8  you are here to offer.  Do you agree that if a qualified

9  B-reader assessed a patient's chest x-ray with a profusion

10 rating of 1/0, that that would be a clinically significant

11 finding that the patient's malignancy may be attributable to

12 asbestos exposure?

13 A    That's not my area of expertise, sir.  I have no opinion

14 about that.

15 Q    Okay.  Do you have an opinion as to whether a clinician

16 holding an x-ray with a profusion rating of 1/0 should or

17 should not ignore that assessment just because another B-reader

18 disagrees?

19 A    In other words, the B-readers don't agree on the

20 profusion?  Is that what you're saying?

21 Q    Right.  Does that make the first profusion any less

22 clinically significant?

23 A    I would probably get a third reading.

24 Q    Do you agree that reasonable B-readers can disagree as to

25 whether a given x-ray should be assessed at an ILO rating of

1 1/0 or higher?

2 A    I think they can disagree at 1/0 at a higher level that's

3 less likely there would be disagreement.

4 Q    It's a question of fact, isn't it, whether a particular

5 x-ray should've been assessed at a 1/0 rating or higher?

6 A    I'm sorry?  I don't understand.

7 Q    It's a question of fact, isn't it?

8         MR. McMILLAN:  I'm going to object that he's asking

9 for a legal question of the witness.

10         THE COURT:  Sustained.

11 Q    Doctor, I'd like to ask you some questions about x-ray

12 quality which is a topic that you addressed in your expert

13 report.

14         MR. MULLADY:  If we could have ACC/FCR Exhibit 476,

15 please?  And we'll have to switch off the Elmo.

16 Q    You wrote on Page 14 of your October 2006 report on this

17 issue of x-ray quality, doctor, that "Film quality has plagued

18 the classification process for decades and is a factor in

19 reader variability."  Do you see that?

20 A    Yes, sir.

21 Q    Do you stand by that statement?

22 A    I do.

23 Q    Poor film quality can lead a reader to over or under read,

24 correct?

25 A    That's correct.

Henry - Cross/Mullady                    221

1  Q    Do you agree that it is harder to get a good quality x-ray

2  from a larger person?

3  A    You meaning larger, meaning BMI, meaning six-foot seven,

4  meaning --

5  Q    Well, let's take you to the place in your report where you

6  refer to this, Page 14, where you were discussing larger

7  individuals.  "Film quality in larger patients is always a

8  challenge," you wrote.  "Many workers who perform physical

9  labor are large people."  Did I read that correctly?

10 A    That's true.

11 Q    And that was your opinion at the time?

12 A    It is.

13 Q    I assume it still is.

14 A    It is.

15 Q    It's a major challenge to maintain -- excuse me.  Another

16 issue with obtaining a quality x-ray is whether the equipment

17 is properly maintained, is that correct?

18 A    That's correct.

19 Q    And I think you addressed this at Page 15 of your report

20 where you wrote that "It is a major challenge to maintain

21 equipment in a portable environment in sufficient working order

22 to obtain good quality x-rays."

23 A    That's true.

24 Q    Small facilities like private doctor's offices, factories,

25 and other non-healthcare facilities struggle with film quality,

1 isn't that correct?

2 A    That is true.

3 Q    Doctor, on the issue -- shifting gears here again -- on

4 the issue of the number of B-readers that is necessary or

5 recommended in contested proceedings, I want to go back to two

6 slides that you showed us.  And you prepared these slides

7 yourself as opposed to counsel, is that correct?

8 A    I'm sorry?

9 Q    These demonstratives that you used in your testimony, you

10 prepared these yourself, right?

11 A    I participate on their development, but I did not prepare

12 them.

13 Q    I see.  Well, I want to ask you about one statement on

14 2083, "X-rays should be classified by three independent

15 readers."  Do you agree with that statement?

16 A    Yes, sir.

17 Q    Under the NIOSH recommendations?

18 A    For contested reading, yes, sir.

19 Q    Is this a derivation of that statement, GG-2082?

20 A    That's from the same area of that report, yes.  Yes, sir.

21 Q    And this slide, unlike the prior slide, actually quotes

22 from the NIOSH publication, correct?

23 A    That's correct.

24 Q    And this slide states, "NIOSH recommends a minimum of two

25 independent classifications by appropriately selected readers

1  with a third classification if the first two disagree,"

2  correct?

3  A    That's correct.

4  Q    That's a little different than saying that x-rays should

5  be classified by three independent readers, isn't it, sir?

6  A    The bottom line is, that for practicality sake,

7  recognizing that the inter-reader variability, that there's

8  going to be a necessity to have a third reader.  And we may

9  have taken a little bit of license there, but the bottom line

10 is in finishing out that sentence, that a third reader would be

11 called in to determine if there was a disagreement.

12 Q    A little bit of license.

13            MR. MULLADY:  I have no further questions.  Thank

14 you.

15            THE COURT:  Doctor, please, can you explain from the

16 corpuses of your study for me, please, the significance of the

17 1/0 read?

18            THE WITNESS:  The significance?

19            THE COURT:  Yes.

20            THE WITNESS:  If a chest x-ray is determined to

21 demonstrate a profusion of 1/0, that is alleged to indicate the

22 earliest signs of an asbestos or another occupational lung

23 disease affecting the lung tissue.  It would be the earliest

24 stages of what is probably a fibrotic process.  However, it

25 should be kept in mind that this is a non-specific study that

1  many things present similar findings.  Many other things other

2  than asbestos produce a fibrotic reaction in the lung.  So,

3  while we find that 1/0 is a threshold that's been commonly

4  employed to say that somebody has the earliest signs of an

5  asbestos-related disorder in this venue, that it is, however,

6  not specific.

7          THE COURT:  And you used 1/0 as the test that you

8  were -- for your purposes for what reason?

9          THE WITNESS:  We use that because it was recommended

10  by the 2004 ATS guidelines which are currently, I guess, the

11  point of the realm.

12          THE COURT:  All right.  Thank you.  Anybody have any

13  questions as a result of the questions I've just asked this

14  witness?

15          MR. MULLADY:  No, Your Honor.

16          THE COURT:  Anything further?

17          MR. McMILLAN:  Brief redirect, Your Honor.

18          THE COURT:  Limited to the recross?

19          MR. McMILLAN:  Yes.

20          THE COURT:  Okay.  Or, I'm sorry.  This is redirect.

21  I apologize -- wrong witness.  I'm sorry.

22          MR. MULLADY:  Your Honor, if this is going to be more

23  than a few minutes could we take a short recess?

24          MR. McMILLAN:  I imagine it will be ten to 15

25  minutes, but I'm happy to do a short break.

Henry - Redirect/McMillan                    225

1          THE COURT:  Let's take a ten-minute recess.  We'll

2    take a ten-minute recess.

3          MR. MULLADY:  Thank you, Your Honor.

4          MR. McMILLAN:  Thank you, Your Honor.

5                    (Recess)

6          THE COURT:  Mr. McMillan.  Doctor, ready?  Okay.

7                  REDIRECT EXAMINATION

8    BY MR. MCMILLAN:

9    Q    Dr. Henry, do you recall being asked questions by Mr.

10   Bailor relating to the NIOSH standards that would apply to

11   worker surveillance classifications as compared to contested

12   matter classifications?

13   A    Yes, sir.

14   Q    And if you had a matter that was a worker screening and

15   the result of that screening was to be used to press a claim in

16   court for asbestos-related disease, which classification system

17   would apply to those types of screenings?

18         MR. BAILOR:  Objection.  Calls for a legal

19   conclusion.

20         MR. McMILLAN:  Your Honor, I think I'm asking the

21   exact same question as Mr. Bailor.

22         THE COURT:  Well, he may have, but if you ask the

23   same question then it's been asked and answered.  Otherwise,

24   the way you asked it, it calls for a legal conclusion.

25   Sustained.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. McMILLAN:    Okay.

2  Q    Dr. Henry, when you have a worker surveillance screen that

3  only calls for one classification, is that the type of matter

4  where the claim is then used in a contested proceeding?

5  A    It's possible.

6  Q    If the claim was a worker screening, but the intent was to

7  use the result of the worker screening to press in a contested

8  matter, would the contested matter classification guidelines

9  apply?

10 A    I would think so.  If you were going to move into that

11 venue, yes, then I think the contested guidelines would be

12 appropriate.

13 Q    And certainly when you conducted your study in this case,

14 this is a contested matter, right?

15 A    There's no question.

16 Q    So, what was the appropriate procedure for you to follow

17 when you were designing the guidelines for your study?

18 A    Well, we employed the contested reading guidelines of

19 multiple readers.

20 Q    Mr. Bailor also asked you a little bit about inter-reader

21 variability, and specifically about some of the variability in

22 the reads of your independent readers.  Do you recall that?

23 A    Yes, sir.

24 Q    I want to talk a moment about when you have readings at

25 1/1.  When you have readings at 1/1, would you expect more

1  agreement then when you have readings at 1/0?

2  A     Yes, sir, I would.

3  Q     And would you expect less variability among your

4  independent readers at 1/1?

5  A     Yes, I would.

6  Q     Would that be in part because there's a 1/1 standard?

7  A     In part, yes.

8  Q     And what would other reasons be why you would expect less

9  variability at 1/1?

10 A     I think there's a less arbitrary decision on the part of

11 the interpreter to arrive at a 1/1 classification.

12 Q     So, would you be more confident in results where you had

13 replicated 1/1 readings?

14 A     Personally, yes, I would.

15 Q     Now, would you expect there to be more variability at 1/0?

16 A     Yes, I would.

17 Q     And is that expected because of the understanding that

18 people who are B-readers have about inter-reader variability?

19 A     There is some -- probably some contribution from

20 inter-reader variability, but it plays to the concept of the

21 1/0 as being an arbitrary decision.  Since there is no 1/0

22 standard, you're almost inviting inter-reader variability.

23 Q     Is that one of the reasons that you use three B-readers?

24 A     Yes, sir.

25 Q     And the point of that is to minimize variability by having

1 multiple people look at the x-ray?

2 A    It's to address that fact, yes.

3 Q    And is it more critical, then, to follow the NIOSH

4 recommendations and ILO standards when you're looking at a film

5 that is a 1/0 where accuracy is even harder to attain?

6 A    Well, I don't know that it's more important.  I mean,

7 certainly it would seem appropriate to do so.  I think it's

8 appropriate to follow the guidelines at all levels, but I think

9 it would be most advantageous, or probably particularly

10 advantageous at low level of profusion.

11 Q    Let me phrase it a different way.  At low levels of

12 profusion, would failing to follow the guidelines have a higher

13 propensity to result in variable readings?

14 A    Which guidelines now?

15 Q    The ILO and NIOSH guidelines.

16 A    In terms of multiple readers?

17 Q    Well, I'm just saying if you add lower profusion levels,

18 if you fail to follow the guidelines, is it going to result in

19 greater variability?

20 A    Yes, I think it would.

21 Q    Doctor, Mr. Bailor asked you briefly about whether or not

22 you use CTs or HRCTs as part of your study.  I believe you said

23 you did not.

24 A    I did.

25 Q    Why is that?

1  A    Well, first of all, there are no standards for the

2  interpretation of a CT scan as it relates to the evaluation of

3  an occupational lung disease.  Some people use a slice

4  thickness of ten millimeters, some might use five, some might

5  use three.  It's hard to compare a standard CT done in, say,

6  five or three millimeters to a high resolution study which is

7  done at a one millimeter slice thickness.  So, you're all over

8  the map regarding what the technique employed might be.

9  Q    So, that is what -- you're saying there's no technique

10 standardization?

11 A    There is no technique standardization for either CT or

12 HRCT as it relates to the evaluation of industrial-related

13 disorder.  It's up to the individual, whatever is a prevalent

14 process at a particular institution or whatever.  Whether they

15 do them supine, that is with a patient laying on the back or

16 where they turn the patient over and do the prone which is

17 absolutely necessary, in my opinion, for patients in this

18 particular area.

19           So, recognizing the fact that there's no standardized

20 technique for the performance of these studies regarding slice

21 thickness, positioning, how much we're going to look at.  We're

22 going to look at the entire lung, the bottom of the lung, parts

23 of the lung, et cetera, it's an open book.  Secondly, to the

24 best of my knowledge, there is no agency out there that's

25 authorizing anybody to read HRCT or CT, and the same way that

1   there's an agency which stipulate the people have proficiency

2   in reading chest x-rays as B-readers.

3   Q    So, has the ILO and NIOSH or any other government agency

4   issued any standards for the technique to conduct CTs or HRCTs?

5   A    No.

6   Q    Has NIOSH, ILO or any other government agency issued any

7   standards for how to interpret CTs or HRCTs for pneumoconiosis?

8   A    No.

9   Q    You mentioned earlier the lack of standardization in the

10  technique.

11  A    Yes.

12  Q    Is there any problem with lack of standardization in the

13  interpretation of x-rays for -- or, sorry -- CTs or HRCTs for

14  pneumoconiosis?

15  A    Well, again, it relates to the technique.  The technique

16  would be integral to how that standard would be implemented in

17  terms of what part of the lung you were examining, whether you

18  were examining the patient in a particular position, how many

19  slices would you look at?  I mean, with the chest x-ray you

20  have one image and that's all you have to deal with, but with

21  the CT, you can have multiple images.  And so, the problem

22  might arise of, well, what if we finding on one image, but it's

23  not on the other image at a different level of the lung.  Is

24  that a significant finding, is it not?  And nobody really knows

25  the answer to that.

1           So, while I think CT is a very promising tool as HRCT

2 is, there are still a lot of significant challenges out there

3 regarding standardization, the protocol for the technique, the

4 interpretation and so forth that have yet to be resolved.

5 Q    Now, in terms of the study that you did, you were

6 examining chest x-rays that had been submitted by these

7 claimants, right?

8 A    That's correct.

9 Q    And you were comparing them to your independent read?

10 A    That's correct.

11 Q    So, the comparison of your reads to the claimant readers

12 reads, whether or not they were HRCTs, does that have any

13 impact on the validity of the comparison of your reads versus

14 the claimant reads on the exact same chest x-rays?

15 A    Well, our study was based on the comparison of the chest

16 radiographic readings.  It had nothing to do with CT or HRCT.

17 Q    One last point, doctor.  You were asked, I believe, by Mr.

18 Bailor about the box on the form to check whether or not the

19 x-ray was completely negative or not.

20 A    Correct.

21 Q    And I believe what you said is that there are other things

22 on the ILO form that do not relate to asbestos.

23 A    That's true.

24 Q    Was that what you said?  So, if someone checks the box

25 that says, "This is not completely negative," does that mean

Henry - Recross/Bailor                                    232

1  anything for whether or not the patient has an asbestos-related

2  abnormality?

3  A    No.

4  Q    In fact, the population that you were looking at is a

5  population of cancer claimants, right?

6  A    Correct.

7  Q    So, in general, what would your expectation be about the

8  level of abnormality in a population, all of whom had cancer,

9  many of whom had lung cancer?

10 A    Then I would expect the significant number of the studies

11 to be abnormal, and them to check that off as being abnormal.

12              MR. McMILLAN:   I have no further questions, Your

13 Honor.

14              MR. BAILOR:   Very briefly, Your Honor.

15                   RECROSS EXAMINATION

16 BY MR. BAILOR:

17 Q    Doctor, determining whether or not a chest x-ray is

18 negative or a positive, that is 1/0, or negative, that's really

19 a matter of opinion in many cases, isn't it?

20 A    It shouldn't be a matter of opinion.  I mean, it should be

21 that you function within the guidelines of the ILO system

22 utilizing the standard -- the radiographs.  So, it's more than

23 an opinion.  I mean, there should be some scientific process

24 going on that's based upon training and so forth.

25 Q    But, you have testified there is no standard for 1/0,

**J&J COURT TRANSCRIBERS, INC.**

1 correct?

2 A    There is no radiographic standard for 1/0, that's correct.

3 Q    And the radiologist has to make a decision and form an

4 opinion as to whether not that radiograph is 1/0?

5 A    Well --

6         MR. McMILLAN:  Objection.  Compound.

7         THE COURT:  No, that's not compound.  Overruled.

8 A    The process would be, typically, to put the, say, the

9 claimant chest x-ray up on a view box and to put the standards

10 next to it of what she would reconsider either normal or

11 abnormal.  In this case, 0/0 and 1/1, and then make a

12 determination based upon your skill or whatever as to whether

13 it did reach the level of 1/0.

14 Q    And your skill or whatever includes your judgment?

15 A    In that case, yes, sir.

16 Q    Okay.  Now, reading a CT and HRCT is a matter of judgment,

17 too, isn't it?

18 A    Yes, sir.

19 Q    And a radiologist reading a CT scan or a high resolution

20 computer topography can also have an opinion as to whether or

21 not it demonstrates asbestos-related disease, can he not?

22 A    Yes, sir.

23         MR. BAILOR:  No further questions, Your Honor.

24         THE COURT:  Mr. Mullady?

25         MR. MULLADY:  No questions.

1            THE COURT:  Any --

2            MR. McMILLAN:  No further questions, Your Honor.

3            THE COURT:  You're excused, doctor.  Thank you.

4            MR. BERNICK:  Your Honor, I believe that that is our

5    last live witness.  We have matters to present to the Court

6    tomorrow by deposition, and Ms. Harding, and perhaps Mr. Finch

7    and Mr. Mullady can describe that, but we are done with the

8    live witnesses that we have prepared for today and tomorrow.

9    The examinations were on schedule and fairly, you know, within

10   schedule so that we're moving along just fine, so that's not a

11   cause for concern.  I think that things are moving along just

12   fine.  But, tomorrow we will have prepared -- it's not prepared

13   now -- a package to present to the Court, and if it would be

14   appropriate and Your Honor wants to learn about it, I'm sure

15   that Ms. Harding can explain what's going to be happening so

16   that you're prepared.

17           THE COURT:  That might be helpful so we can, perhaps,

18   go through that now rather than in the morning.

19           MS. HARDING:  Good afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MS. HARDING:  We're currently scheduled to present by

22   deposition testimony, the testimony of eight doctors and

23   screeners who have created medical evidence that has been

24   offered by the -- some of the claimants in this case.  Per the

25   CMO, we have designed our portions of the transcript that we

1 want to play for the Court.  The other side has

2 counter-designated, and we have prepared binders for the Court

3 with all of the information, including our designations, their

4 designations, any objections that either party had, as well as

5 the exhibits that are implicated by the testimony and any --

6 and objections, if any, to those exhibits.

7 　　　　　So, those are prepared.  They're ready.  We'll give

8 those to you as soon as we conclude today.  In the meantime,

9 though, we've also -- that would -- if we played all of that,

10 if we did all of that tomorrow, all of the designations would

11 probably take the whole morning and a good part -- at least

12 part of the afternoon -- at least over four hours or so.

13 　　　　　We've met and conferred -- the ACC, the FCR, and the

14 debtors have met and conferred, and we have agreed to, if

15 it's -- if Your Honor wants to proceed this way so as to save

16 court time, we have agreed to just play portions of each

17 witness that we -- each side chooses.  So, for the debtors

18 we've chosen roughly a total of 45 minutes total from the

19 entire list of designations that we've made that we would play

20 for the Court.  And the ACC and the FCR plan to

21 counter-designate a similar amount of time tomorrow, and the

22 entire -- but the entire testimony that the Court would want to

23 consider at some point will be offered.

24 　　　　　So, that's the way we intend to proceed if that's the

25 way Your Honor would like us to proceed.  We were trying to

1 kind of keep it efficient and keep the court time down on that

2 issue.

3       THE COURT:  Well, here's the problem.  And I agreed

4 to let the parties in Federal-Mogul do that.  But, the trouble

5 is, at the end of the day I still have to go through it all,

6 and frankly, it's harder to do it in the office then it is to

7 do it in court because then, all I have are boxes of documents

8 and CD-ROM, and it's much more difficult to get the time to do

9 it there then it is to get the time to do it here.  So --

10 because things like this trial interfere.  Well, I mean

11 interfere with that case, I don't mean interfere with this

12 case, obviously.  You know, you need the time and I'm -- I

13 didn't mean character assertions by any means.  I just mean

14 that in trying to figure out how you're going to budget your

15 time, you have to budget the time.  And you can only do one

16 thing at a time.  So, I can either do Federal-Mogul or I can do

17 this, but I can't do both at the same time.

18       MS. HARDING:  I understand, Your Honor.

19       THE COURT:  All right.  So, I would say that if you

20 really want to get this case done in the most expeditious

21 fashion, much as I hate to say this because I can read a whole

22 lot faster than I can listen, it would probably be better to

23 just do it all in sequence tomorrow.

24       MS. HARDING:  That's what we'll do, Your Honor.

25       THE COURT:  I mean, and start with the witnesses.

1          MS. HARDING:  If that's what you'd like, that's what

2  we'll do.  Okay.

3          THE COURT:  So --

4          MR. BERNICK:  So, that would mean that Your Honor

5  would actually rule the objections.  How would you prefer,

6  then, that the matter be put before the Court?  Do we just have

7  people read and offer documents?

8          THE COURT:  Well, I haven't seen what you're going to

9  do, so I'm not sure.  These are all just deposition transcripts

10  with --

11          MR. BERNICK:  Yes.  They are marked up deposition

12  transcripts.  The only portion that has been -- well, I suppose

13  we could do the whole thing by video, but I think that the

14  videos have been focused on portions of the transcript.  You

15  say that Barb, but are you sure that you --

16          MS. HARDING:  We can do both.  We have video that we

17  could do either the snippets -- we can do the video of the

18  entire presentation where there is video available.  There's

19  one transcript where there's not video available.

20          THE COURT:  Videos take an awful long time.

21          MR. BERNICK:  Yes.  They take an awful long time.

22  And the difficulty, then, is you have to then make the

23  objection and, you know, before the thing rolls on, and then

24  the Court has got to rule.  So, what would be your -- we do

25  want to show some of the snippets of the people.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  And I would like to see some.  But,

2   I don't see why we have to do the whole thing by way of video,

3   especially if you get into some long argument in a deposition

4   that's basically not going to be relevant to what you're

5   arguing about here.

6          MR. BERNICK:  Then what I would propose, if this is

7   agreeable to everybody, is that in order to get through the

8   transcripts most quickly, we should begin at the beginning of

9   the transcripts and go through and basically take, you know,

10  Q's and A's, have it read, and Your Honor rule on the

11  objections.  The alternative is to proceed by counter -- by

12  designation and counter-designation in which case you're

13  flipping back and forth which is --

14         THE COURT:  Doesn't make sense.

15         MR. BERNICK:  It doesn't make any sense.  So -- I

16  mean, it's very -- I think that it's -- probably the fastest

17  way to get through is you literally begin at the beginning of

18  the deposition.  Somebody will be the reader.  It doesn't have

19  to be either side.  Somebody could be the reader -- designated

20  reader -- question and answer objections made, it comes in,

21  doesn't come in, and we just go through the transcripts in that

22  fashion.

23         THE COURT:  All right.  Well, with respect to the

24  objections, and this is why I'm asking, sometimes you make

25  objections for purposes of --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes, I know.

2          THE COURT:  -- discovery depositions that have

3 absolutely nothing to do with the trial objections.  So, are

4 you saying that every objection that you raised in the course

5 of these depositions are things that you're now going to raise

6 at trial?

7          MR. BERNICK:  No.  Well, that shouldn't be the case.

8 It should be the case that people have exercised in judgment

9 about what it is that you're going to be objecting to.  I do

10 think that it probably makes sense in light of the fact that

11 this is not going to be an (indiscernible) exercise, that it

12 probably makes sense for both sides to go through the

13 transcripts tonight and figure out what objections they really

14 want to press because I'm assuming that Your Honor will then

15 expect the objection to be made and ruled upon in court before

16 the reading continues.

17          MS. HARDING:  I think, and they can correct me if I'm

18 wrong, but I think that the -- I think they've already -- the

19 ACC and FCR have already identified the portions that they're

20 actually going to object to, and we don't have to worry about

21 the ones that are on the transcript.

22          MR. BERNICK:  No, that's not the point.  The point is

23 that if you read the transcript the objections are going to

24 come up as the transcript is read.  So, whoever's reading it,

25 it'll be marked and then they'll make an objection.  And all

1  that I think is that in order to save the Court's time, we

2  ought to make sure, as I understand Your Honor's suggestion to

3  us, we want to make sure that those objections are real

4  objections that warrant taking up the Court's time as the

5  transcript is being read.

6        THE COURT:  Well, I guess the question -- let me

7  phrase it this way.  Let's assume that the deposition starts on

8  Page 1 and goes to Page 20.  The first objection comes up on

9  Page 5, Line 5.

10       MR. BERNICK:  Right.

11       THE COURT:  And nobody really cares about that

12 objection anymore.  Then I would assume that Page 5, Line 5 is

13 no longer part of the designation that anybody has had in the

14 transcript because it's an objection that nobody cares about,

15 so it shouldn't be part of the designated portion any longer.

16       MR. BERNICK:  You mean the objection itself?

17       THE COURT:  Right.  Or -- right.  The objection

18 itself.  So, it should be stricken and then we don't have to

19 read it and it's not something that anybody has to worry about.

20 Has it been done that way?

21       MR. BERNICK:  No.

22       THE COURT:  Have the designations been done that way?

23       MS. HARDING:  No, they have not, Your Honor.

24       MR. BERNICK:  I suspect that the designations are

25 actually Q's and A's, and that there's then an objection noted

1 by way of bracketing the question and answer or whatever it is,

2 and I think that then what will -- what ought to be read is the

3 question.  If somebody has an objection to the question, it

4 gets stated in court, and then Your Honor rules and then the

5 answer comes in or it doesn't come in depending upon the

6 ruling.

7          But, I really do think that it makes sense for people

8 to go back tonight and -- I know I want to go back tonight and

9 make sure that the depositions are worth taking up, you know,

10 live court time to be pursued.

11          MR. FINCH:  Well, then, what happens -- I'm not sure

12 I understand.  It seems like there's two things --

13          THE COURT:  I can't hear you, Mr. Finch.

14          MR. FINCH:  I'm not sure I understand what's going

15 on.  They have videotaped depositions and then we have

16 transcripts.  And we have tried to be sparing both as to what

17 we objected to and as to what we counter-designated.  And what

18 I think they're saying is that you basically start at Page 1 of

19 the transcript and you'd have somebody read the portions that

20 have been designed from Page 1 to Page, you know, whatever the

21 end is.  You know, there -- whether it is their designation or

22 our counter-designation or whatever it is, and if an objection

23 comes up during that process that anybody cares about, you rule

24 on the objections right then and there.

25          What I'm not clear about is how the videotape relates

1 to that exercise.  And so, I guess I want some clarification

2 from counsel for the debtor as to how --

3          MR. BERNICK:  (Indiscernible) because we thought that

4 it was going to be played in court.  It would present some

5 element of duplication, and as a consequence, my own feeling is

6 that we ought to do is, we ought to go through the deposition

7 transcript, reading it in court as Mr. Finch indicates.  And

8 then at the conclusion of reading the deposition, if there are

9 particular -- there's particular little clips that show the

10 witness, you know, either in his or her finest or his or her

11 most embarrassing moments, provided that it's come in, the

12 Court can get a short viewing of the video clip.  Does that

13 make sense to the Court?

14          THE COURT:  Well, are any of the portions that we're

15 going to be shown in the depositions -- the video depositions,

16 portions that are objected to?  Because if the purpose is to

17 let me see the witnesses -- and frankly, I would like to see

18 the witnesses because it's a little easier when you're going

19 back six months later to put a face to the name and the

20 testimony, so I would like to see at least portions of them or

21 have maybe a clip of the video --

22          MR. BERNICK:  During the reading.

23          THE COURT:  -- just so there is -- yes.  Just submit

24 it so that --

25          MR. BERNICK:  We will try to do that.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- there is a recollection available

2  later.

3          MR. BERNICK:  I think we'll try to do that.  I'm not

4  sure how many objections there really are during --

5          MS. HARDING:  Well, we had selected video portions

6  that did not -- that were not -- they were not objected to by

7  the other side.

8          MR. BERNICK:  Okay.  Well, then we'll -- as we get to

9  them and the transcript --

10          THE COURT:  Just show --

11          MR. BERNICK:  -- we will just show them instead of

12  reading the transcript and we'll reflect what portion of the

13  transcript is appearing by video.  We'll play the video, and

14  then we'll move on.  If you all have -- if during your portions

15  and you want to show by video, you aren't as fortunate and

16  there are numerous well-taken objections.  Yes, I guess we'll

17  have to stop the video and get the ruling on the objections.

18  But, then the monkey's on our back to then object during the

19  course of the video being played and we'll just have to do that

20  if there are objections to your portion, that's all.

21          THE COURT:  All right.  It would seem if the

22  person -- if the purpose is to show the witness, then, a very

23  short snippet's going to do it, I think.

24          MR. BERNICK:  Yes.

25          THE COURT:  If the purpose is that you've got some

1  particular portion of what the witness looked like, how he or

2  she reacted, that you'd want me to see, then I may need it in a

3  context of the objection.  Typically speaking, I don't think I

4  need the witness there while the objection's going on.  That's

5  usually a legal ruling, so I don't know why I need to see the

6  witness during the objection which typically shouldn't involve

7  the witness anyway.

8         So, if that -- if the portions that involve the

9  objections can be done by deposition, and the portions that

10 involve non-objected to testimony can be done by video, I think

11 we might get through it a little quicker.  And if we can do

12 this at least for tomorrow and see how it goes, if it's really

13 too painful, then I may see if we can work something else out

14 in the future.  But, I know the experience that I'm having with

15 Federal-Mogul is that I'm sorry that I did what I did because

16 it's just too voluminous a record and it's just too difficult

17 to get through.

18         MR. BERNICK:  It's too easy, also, for the lawyers to

19 say, well, we just --

20         THE COURT:  Yes, here it is.

21         MR. BERNICK:  -- designate the whole thing, yes.

22         THE COURT:  Yes.  And that's another problem.  So,

23 at -- frankly, you ought to do the work.

24         MR. BERNICK:  Yes, right.  So -- but, I think it

25 might be also wise if our technical people got coordinated

1 after court here so that we maximize the chance that people's

2 video clips can be queued up very easily and we can kind of go

3 through and do it.

4          MS. HARDING:  Okay.  We'll work it out, Your Honor.

5 I think -- I mean, Nate, any other questions?  All right.

6          THE COURT:  All right.  So, is there anything you're

7 going to need back from me today still or no?

8          MS. HARDING:  No, Your Honor.  We'll just -- we'll

9 hand up the full binders with all the designations.  You can

10 have those today and then --

11          MR. FINCH:  Oh, actually, I would like to check those

12 before we --

13          THE COURT:  Hand them up.  Yes.

14          MR. FINCH:  -- submit them.

15          MS. HARDING:  Oh, absolutely.

16          THE COURT:  Okay.

17          MS. HARDING:  Okay.

18          THE COURT:  Now, based on the fact that we have to

19 end tomorrow, do you want -- and you're all here -- do you want

20 to start at eight-thirty or are you going to have enough work

21 to do that you still want to start at nine?  I know you're

22 coming from all over.

23          MR. BERNICK:  Well, Barb, I don't know -- do you

24 think how long it's going to take to read through all this

25 stuff?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HARDING:  I think based on the way that we've

2   wittled it down both sides, I think we'll be done by lunchtime,

3   Your Honor, no matter how we do it.

4          THE COURT:  Oh, all right.  So, do you want to start

5   at nine, then?

6          MR. BERNICK:  So, we have to get designated readers

7   with charming voices and -- we don't have a jury, so we don't

8   need to worry about --

9          THE COURT:  Yes, you may want to switch, too.  People

10  can sometimes get tired, so -- okay.  We'll be in recess till

11  nine o'clock, then.  Thank you.

12         MS. HARDING:  Thank you, Your Honor.

13         MR. BERNICK:  Thank you, Your Honor.

14                       * * * * *

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, Patricia Repko, Lynn Schmitz, Denise O'Donnell and Kathleen Betz, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Patricia Repko

PATRICIA REPKO


/s/ Lynn Schmitz

LYNN SCHMITZ


/s/ Denise O'Donnell

DENISE O'DONNELL


/s/ Kathleen Betz                    DATE:  January 25, 2008

KATHLEEN BETZ

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**