# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FEDERAL-MOGUL GLOBAL INC., | ) | |
| T&N LIMITED, et al.,[1] | ) | Case No. 01-10578 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**DECLARATION OF CLINTON B. FISHER REGARDING THE SETTLEMENT
OF ASBESTOS PROPERTY DAMAGE CLAIMS FILED BY SPEIGHTS &
RUNYAN**

---

[1] The U.S. Debtors are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC, Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T&N Industries Inc.

The U.K. Debtors are AE Dayton Services Limited, AE Group Machines Limited, AE Holdings Limited, AE International Limited, AE Limited, AE Piston Products Limited, AE Sales (Africa) Limited, Aeroplane & Motor Aluminium Castings Limited, Amber Supervision Limited, Ashburton Road Services Limited, Associated Engineering Group Limited, Awncast Limited, Bearings (North-Western) Limited, Brake Linings Limited, Colvan Rubber Co. Limited, Contact 100 Limited, Cosmid Limited, Cranhold Limited, Dealings Limited, Dumplington Services Limited, Duron Limited, E W Engineering Limited, Edmunds, Walker & Co. Limited, Engineering Components Limited, Federal-Mogul Acquisition Company Limited, Federal-Mogul Aftermarket UK Limited, Federal-Mogul Bradford Limited, Federal-Mogul Brake Systems Limited, Federal-Mogul Bridgwater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Export Services Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal-Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Federal-Mogul U.K. Limited, Ferodo Caernarfon Limited, Ferodo Limited, FHE Technology Limited, Fleetside Investments Limited, F-M UK Holding Limited, FP Diesel Limited, Friction Materials Limited, G.B. Tools & Components Exports Limited, Genthope Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, High Precision Equipment Limited, Inblot Limited, Instantwonder Limited, J.W. Roberts Limited, Kings Park Housing Limited, Lalton Limited, Lanoth Limited, Lanoth Precision Equipment Limited, Leeds Piston Ring & Engineering Co. Limited, M.T.A. (Kettering) Limited, Mantro Engineering Co. Limited, Mobile Distributing (Spares) Limited, Moores Plastic Units Limited, Newalls Insulation Company Limited, Ontall Limited, Payen (Europe) Limited, Pecal Limited, Presswork-Components Limited, Sintration Limited, Sourcelook Limited, Specialloid, Limited, STS (1996) Limited, TAF International Limited, T&N Holdings Limited, T&N International Limited, T&N Investments Limited, T&N Limited, T&N Materials Research Limited, T&N Piston Products Group Limited, T&N Properties Limited, T&N Shelf Eight Limited, T&N Shelf Eighteen Limited, T&N Shelf Fifteen Limited, T&N Shelf Five Limited, T&N Shelf Four Limited, T&N Shelf Fourteen Limited, T&N Shelf Nine Limited, T&N Shelf Nineteen Limited, T&N Shelf One Limited, T&N Shelf Seven Limited, T&N Shelf Six Limited, T&N Shelf Sixteen Limited, T&N Shelf Ten Limited, T&N Shelf Thirteen Limited, T&N Shelf Thirty Limited, T&N Shelf Thirty-One Limited, T&N Shelf Thirty-Three Limited, T&N Shelf Three Limited, T&N Shelf Twenty Limited, T&N Shelf Twenty-Eight Limited, T&N Shelf Twenty-Five Limited, T&N Shelf Twenty-Four Limited, T&N Shelf Twenty-Nine Limited, T&N Shelf Twenty-One Limited, T&N Shelf Twenty-Six Limited, T&N Shelf Twenty-Two Limited, T&N Shelf Two Limited, T&N Trade Marks Limited, T&N Welfare Trust Limited, TBA Belting Limited, TBA Belting (Residual) Limited, TBA Industrial Products Limited, Telford Rubber Processors Limited, Telford Technology Supplies Limited, The British Piston Ring Company Limited, The Washington Chemical Company Limited, Tinblo Limited, Touchdown Adhesive Products Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, Tynoda Limited, Vanwall Cars Limited, Wellworthy Limited, Wellworthy Property Developments Limited, and William C. Jones (Polymers) Limited. Unlike all the other U.K. Debtors, T&N Investments Limited is a Scottish rather than English company and has accordingly commenced administration proceedings in Scotland rather than England.

I, Clinton B. Fisher, declare as follows:

1. I am a partner in the law firm of Hanly Conroy Bierstein Sheridan Fisher & Hayes LLP ("Hanly Conroy"), which has offices at 112 Madison Avenue, New York, New York 10016. Hanly Conroy is Special Asbestos Litigation Counsel to Federal-Mogul Corporation ("Federal-Mogul"), a U.S. Debtor in these chapter 11 cases, and its affiliates, including T&N Limited ("T&N"), and T&N's subsidiaries, J.W. Roberts Limited ("Roberts") and TAF International Limited ("TAF"), which are U.K. Debtors in these chapter 11 cases, as well as various other U.K. Debtors.[2] The lawyers of Hanly Conroy served as national coordinating counsel for T&N, Roberts and TAF in the U.S. asbestos litigation for many years. I have personal knowledge of the history of the asbestos property damage litigation against the Debtors dating back to February 1985, including the defense of cases brought by the law firm of Speights & Runyan, and of the matters set forth in this Declaration.

2. I am authorized to submit this Declaration with respect to the analysis and evaluation of the asbestos property damage claims filed by Speights & Runyan against the Debtors in this case and the reasonableness of the $36.2 million settlement amount ultimately reached in the Settlement Agreement between the parties. I had primary responsibility for the analysis of the claims filed by Speights & Runyan (as well as other property damage claims) and was involved in the negotiation and drafting of the Settlement Agreement.

**The Speights & Runyan Claims**

3. Speights & Runyan originally filed 2,915 proofs of claim, eight with respect to two class actions (the Anderson Memorial Hospital ("Anderson") South Carolina class and the Anderson purported nationwide class) and 2,907 with respect to 660 non-duplicative sites. Following several years of negotiation, litigation and the

---

[2] See Footnote 1 for a list of the U.K. Debtors and U.S. Debtors in these chapter 11 cases.

2

voluntary withdrawal of claims by Speights & Runyan, 886 claims remained, eight with respect to the two class claims and 878 claims of individual claimants with respect to 221 different sites. Speights & Runyan asserted that the total damages associated with just the 221 sites was over $1 billion (the firm never asserted a specific demand for the class claims, but made it clear that it sought significant additional damages for the classes). The 221 sites break down as follows: 17 United States Limpet sites; 106 Canadian Limpet sites; and 98 United States Conspiracy sites. During the multi-year course of dealing with the Speights & Runyan claims, I examined the claims with respect to many of the sites, including all of the 123 Limpet-based sites, to test the validity of the allegations of product identification and product quantity. In addition, I am very familiar with the bases for Speights & Runyan's conspiracy claims, as such claims were historically asserted against T&N, including by Speights & Runyan.

4. <u>U.S. Limpet Claims</u>: Sprayed Limpet Asbestos ("Limpet") was a sprayed-on asbestos-containing product manufactured by T&N's subsidiary Roberts before 1970. It was the basis for the majority of the claims based on product identification that were made against T&N in the asbestos property damage litigation. Because Limpet had an unique product formula – it contained much more asbestos and a different type of asbestos than other spray-on products -- it was relatively easy to identify the product by constituent analysis. During the course of the asbestos litigation, T&N's national coordinating counsel compiled from a number of sources – including board minutes, product brochures, internal memoranda, and deposition testimony – a list of known Limpet application sites in the United States. All of Speights & Runyan's 17 U.S. Limpet sites appear in these historical records. Thus, assuming the sites still exist or the claimant could establish damages as a result of the former presence of the product, the Debtors would have no product identification defense to these claims.

5. Similarly, square footage information exists for most, though not all, of these sites. Speights & Runyan asserted that the quantity of Limpet in these 17 sites

3

totaled over 700,000 square feet and that the total damages associated with removal, testing and replacement of the product approached $50 million. While I believed that the Debtors would be able to establish that the total amount of Limpet in these 17 sites was less than that asserted by Speights & Runyan, and that the total per-square foot damage amount claimed by Speights & Runyan ($66.00) was somewhat excessive, I determined that the damages for these sites could readily amount to several million dollars, and perhaps as much as $10 million. Moreover, because these were ironclad product identification claims, the Debtors believed that they could likely be proved up under T&N's United Kingdom Scheme of Voluntary Arrangement, and thus obtain 25 cents on the dollar. Thus, Debtors valued the U.S. Limpet site claims for settlement purposes in the range of $500,000 to $2.5 million.

6. <u>Canadian Limpet Claims</u>: The Debtors' pre-bankruptcy litigation counsel had very little knowledge concerning Canadian Limpet applications, although we knew that such applications had occurred and believed that many had been performed because of T&N's substantial presence in Canada. In the course of preparing for the property damage bar date motion in these cases, my firm compiled a list of 27 known Canadian Limpet applications; Speights & Runyan represented four of these sites, with a total of over 1 million square feet of Limpet. In addition, I reviewed the constituent analysis reports supplied with the proofs of claim for most of the other 102 Canadian Limpet sites and confirmed that the vast majority contained a product consistent with Limpet. In addition, to test the claims of product identification, I selected a number of sites and received samples of product from Speights & Runyan. I then had these materials analyzed by a laboratory that I selected. Tests of all of these samples revealed that the product was consistent with Limpet. As a result of this review and because, as noted above, Limpet had a unique product formula, I was satisfied that Speights & Runyan would be able to establish the presence of Limpet in most if not all of the 106 Canadian Limpet sites.

4

7. With respect to the quantity of the material in these sites, Speights & Runyan alleged that a total of approximately 5.4 million square feet of Limpet was or had been present in these 106 sites. To test these allegations, I selected approximately 15 of the sites, for which Speights & Runyan supplied building plans and specifications. I reviewed these materials and in certain instances also had an expert review them to confirm the amount of Limpet that would have been applied in these sites according to the specifications and plans. Based on this review, it was my determination that Speights & Runyan could likely establish that the amount of Limpet present in the Canadian sites was as or close to what it alleged. Thus, both Limpet product identification and square footage as asserted by Speights & Runyan was confirmed by the Debtors.

8. Speights & Runyan asserted a $60.00 per-square foot damages figure for the Canadian Limpet sites, for total damages of about $324 million. Notwithstanding that Speights & Runyan had established product identification and quantification, the Debtors discounted this figure substantially, primarily because we believed that we had strong legal defenses to at least some if not many of the Canadian claims. Our view of the strength of our position as to some of these claims was demonstrated by the 20th Omnibus Objection, which the Debtors filed last summer with respect to 42 of the claims in four Canadian provinces based on the statute of limitations in those provinces. However, we were less sanguine about the strength of legal defenses in other provinces; this was especially so with respect to Quebec, where approximately 2 million square feet of Limpet was present. Accordingly, the Debtors placed a *maximum* value on the Canadian Limpet claims in the range of $80 million, less than 25 percent of the amount claimed by Speights & Runyan, and believed that a more likely number was significantly less than that amount. Again, however, because we viewed these claims as indefensible from a product identification standpoint, we recognized that those of the claims that could withstand, or arguably withstand, legal defenses would be able to establish their claims under the United Kingdom Scheme and receive 25 cents on the

dollar. Thus, Debtors valued these claims for settlement purposes in the range of $10 to $20 million.

9. In short, based on our analysis of the U.S. Limpet and Canadian Limpet claims, we believed that they had a potential value in the United Kingdom of approximately $11 to $22 million.

10. Conspiracy Claims: The claims of Speights & Runyan's 98 conspiracy sites – reduced from 413 as of the bar date -- rest on the theory that Debtors are liable not based on product identification, but based on T&N's historical "bad" and conspiratorial acts with respect to the concealment of knowledge concerning the health effects of asbestos, including from other asbestos manufacturers, some of which were themselves supplied raw asbestos fiber by T&N that was incorporated into their products. Thus, although these claimants do not claim to be able to identify Limpet or another of the Debtors' products in their sites, they would assert both that T&N's raw material fiber could be present in products in their sites and that, regardless, T&N is liable to them by virtue of its historical role in the manipulation and suppression of information concerning the health effects of asbestos. These allegations were made regularly against T&N during the asbestos litigation and there are numerous factual bases for them. While T&N mounted defenses to such allegations, and was only held liable for punitive damages once in pre-bankruptcy litigation (in 2001), such allegations were of concern, especially as additional evidence emerged about the historical role of several asbestos manufacturers, including T&N, and plaintiffs' counsel became more knowledgeable about this historical information. Indeed, in 2000, Oxford University Press published "Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard," by Geoffrey Tweedale, a business historian at Manchester University in Manchester, England. This 300-page, heavily-annotated book served as a roadmap to the historical knowledge and actions of T&N regarding the adverse health effects of asbestos. In short, although difficult to

quantify, the Debtors believed that Speights & Runyan's conspiracy claims had some real value.

11.   Many of Speights & Runyan's conspiracy claimants are public entities, such as hospitals, schools, churches and public buildings; as such, they are likely to be more sympathetic plaintiffs than private buildings or corporate plaintiffs. Moreover, the Debtors understood that many of these claimants had been clients of Speights & Runyan in previous asbestos property damage litigation, indicating both that the square footage of the asbestos products in their sites had been determined and that the claimants would be willing to proceed against the Debtors with less "traditional" claims such as conspiracy claims. Speights & Runyan's damages claims for these claimants totaled over $680 million. Again, while the Debtors discounted this figure substantially, we believed there was some risk that conspiracy claimants would be able to establish damages against the Debtors. In addition, although Speights & Runyan had withdrawn its conspiracy claims in California, based on the substantive law of that state prohibiting claims based on conspiracy alone, we believed that most if not all of the other jurisdictions where conspiracy claimants resided would permit such claims, if established. And, if such damages were established, there would be little way to limit them, since, if T&N were found to be liable under conspiracy based theories, then presumably it would be liable for all of the asbestos-containing products in the claimants' sites. In light of these considerations and variables, the Debtors valued these claims for settlement purposes in the range of $100 to $200 million; thus, at eight cents on the dollar (we did not believe that these claims had value under the United Kingdom Scheme), these claims were "worth" $8 to $16 million.

12.   Class Claims: Finally, the Debtors had to take into account Speights & Runyan's class claims, which, like the conspiracy claims, posed a number of unknown variables that made quantification very difficult. However, we believed had these claims had the potential to significantly expand the range of the Debtors' liability. In particular,

7

we focused on the South Carolina Anderson class, which had been certified against T&N in 2000. Speights & Runyan is, of course, a South Carolina-based firm that has litigated asbestos property damage cases since their inception. It had pursued the Anderson class litigation against T&N throughout the 1990s and was prepared for trial at the time of the Debtors' bankruptcy filing. Moreover, the scope of the class was unknown and potentially extremely large: the class consists of private, non-residential building owners throughout South Carolina whose buildings contain asbestos surface treatment. For all of these reasons, we valued the class claims in the same range as the conspiracy claims, or $100 to $200 million; at eight cents, therefore, these claims were "worth" $8 to $16 million.

13. In sum, the Debtors' analysis and evaluation of the Speights & Runyan claims produced a settlement valuation range of $27 to $54 million. The $36.2 million settlement, because it is closer to the lower end of that range, "reduces" the recovery of the claimants to amounts below what the Debtors believed they might have been able to obtain under the United Kingdom Scheme (25 cents on the dollar for the individual Limpet claimants) or in the U.S. (eight cents on the dollar for the conspiracy claimants and Anderson class members).

**Complexity and Expense of Litigation**

14. In addition to preparing a range of settlement value to place on the Speights & Runyan claims, which took account of the not inconsiderable risks that the claims could ultimately be allowed in an amount many times greater than the $36.2 million settlement amount, the Debtors of course had to take into account the likelihood of considerable expenditure of time and resources in pursuing any litigation against Speights & Runyan, as has occurred in the *W.R. Grace* cases. We believed that it was entirely conceivable that litigation costs of $5 to $10 million could be incurred fighting against the Speights & Runyan claims, with no guarantee that at the end of the day the amount of the claims would be significantly reduced. Indeed, it appeared to us that,

particularly in the case of the conspiracy claims, and possibly in the case of the class claims, there was a risk that protracted litigation could strengthen rather than weaken Speights & Runyan's position.

15. In conclusion, the settlement consideration agreed to be paid by the Debtors in the Settlement Agreement is not only fair, reasonable and appropriate with respect to the valuation of the Speights & Runyan claims as compared to other claimants, but the settlement provides for a guaranteed resolution without additional litigation expenses and risks to both the Debtors and the Speights & Runyan claimants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2007, at New York, New York.

_____

Clinton B. Fisher