UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    824 North Market Street
                              .    Wilmington, Delaware  19801
            Debtors.  .
                              .    January 28, 2008
. . . . . . . . . . . . ..    1:04 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Pachulski, Stang, Ziehl & Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705


For the Debtors:          Kirkland & Ellis, LLP
                          By:  ELLEN THERESE AHERN, ESQ.
                               DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601
                          (Telephonic Appearance by Ms. Harding,
                           Ms. Ahern, Mr. Bernick)


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022
                          (Telephonic Appearance)


Audio Operator:           Al Lugano

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtors:              Kirkland & Ellis, LLP
                             By:  LORI SINANYAN, ESQ.
                             777 South Figueroa Street
                             Los Angeles, CA  90017
                             (Telephonic Appearance)

For the Debtors:              Kirkland & Ellis, LLP
                             By:  AMANDA C. BASTA, ESQ.
                             655 15th Street, N.W.
                             Suite 1500
                             Washington, DC  20005
                             (Telephonic Appearance)

For the Debtors:              Reed Smith, LLP
                             By:  JAMES J. RESTIVO, JR., ESQ.
                             435 Sixth Avenue
                             Pittsburgh, PA  15219
                             (Telephonic Appearance)

For the U.S. Trustee:         Office of the U.S. Trustee
                             By:  DAVID M. KLAUDER, ESQ.
                             601 Walnut Street
                             Room 950W
                             Philadelphia, PA  19106

For W.R. Grace:               W.R. Grace
                             By:  MARK SHELNITZ, ESQ.
                                  JAY HUGHES, ESQ.
                                  WILLIAM CORCORAN, ESQ.
                                  WILLIAM SPARKS
                                  DAVID SIEGEL
                                  PAUL J. NORRIS
                             7500 Grace Drive
                             Columbia, MD  21044

For the Equity                Kramer Levin Naftalis & Frankel
Committee:                    By:  DOUGLAS MANNAL, ESQ.
                             1177 Avenue of the Americas
                             New York, NY 10036
                             (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For the Official                 Bilzin Sumberg Baena Price &
Committee of Asbestos              Axelrod LLP
Property Damage                  By:  MATTHEW KRAMER, ESQ.
Claimants:                            SCOTT BAENA, ESQ.
                                 200 South Biscayne Boulevard
                                 Suite 2500
                                 Miami, FL  33131
                                 (Telephonic Appearances)


For BNSF Railway:                Pepper Hamilton, LLP
                                 By:  ANNE MARIE AARONSON, ESQ.
                                 3000 Two Logan Square
                                 18th & Arch Streets
                                 Philadelphia, PA  19103
                                 (Telephonic Appearance)


For the Ad Hoc                   Dewey & LeBoeuf, LLP
Committee of Equity              By:  JENNIFER WHITENER, ESQ.
Sec. Holders:                    125 West 55th Street
                                 New York, NY  10019
                                 (Telephonic Appearance)


For the Future Claimant          Orrick, Herrington & Sutcliffe
Representative:                     LLP
                                 By:  RAYMOND G. MULLADY, ESQ.
                                      ROGER FRANKEL, ESQ.
                                      RICHARD H. WYRON, ESQ.
                                 Washington Harbour
                                 3050 K Street, N.W.
                                 Washington, D.C.  20007
                                 (Telephonic Appearances)


For the Future                   Orrick, Herrington & Sutcliffe
Claimants                           LLP
Representative:                  By:  DEBRA FELDER, ESQ.
                                 Washington Harbour
                                 3050 K Street, N.W.
                                 Washington, D.C.  20007 For
                                 (Telephonic Appearance)


For the Future                   Orrick, Herrington & Sutcliffe LLP
Claimants                        By:  JOHN ANSBRO, ESQ.
Representative:                  666 Fifth Avenue
                                 New York, NY  10103


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For the Official<br>Committee of Unsecured<br>Creditors: | Strook & Strook & Lavan<br>By:  LEWIS KRUGER, ESQ.<br>     ARLENE G. KRIEGER, ESQ.<br>180 Maiden Lane<br>New York, NY 10038<br>(Telephonic Appearance by Ms. Krieger) |
| For Official Committee<br>of Unsecured Creditors: | Duane Morris LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801 |
| For Various Claimants: | Hogan Firm Attorneys at Law<br>By:  DANIEL K. HOGAN, ESQ.<br>1311 Delaware Avenue<br>Wilmington, DE  19801 |
| For the City of<br>Charleston: | Connolly Bove Lodge & Hutz LLP<br>By:  CHRISTINA M. THOMPSON, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 |
| For the City of<br>Charleston: | Haynsworth Sinkler Boyd, P.A.<br>By:  TARA E. NAUFUL, ESQ.<br>1201 Main Street<br>Suite 2200<br>P.O. Box 11889<br>Columbia, SC  29211 |
| For Maryland Casualty: | Connolly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701<br>(Telephonic Appearance) |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

```
For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  DAVID J. PARSONS, ESQ.
                                 VAN J. HOOKER, ESQ.
                                 SANDER L. ESSERMAN, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201
                            (Telephonic Appearances)


For Fireman's Fund:         Stevens & Lee
                            By:  DAVID R. BEANE, ESQ.
                            111 North Sixth Street
                            P.O. Box 679
                            Reading, PA  19603
                            (Telephonic Appearance)


For David T. Austern:       Piper Jaffray & Co.
                            By:  JASON SOLGANICK
                                 JONATHAN L. BROWNSTEIN
                            (Telephonic Appearances)


For Official Committee      Scott Law Group
of Asbestos Property        By:  DARRELL SCOTT, ESQ.
Damage Claimants:           1001 East Main Street, Suite 500
                            Sevierville, TN  37864
                            (Telephonic Appearance)


For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022
                            (Telephonic Appearances)


For Federal Insurance       Cozen O'Connor
Company:                    By:  JEFFREY WAXMAN, ESQ.
                            Chase Manhattan Centre
                            1201 North Market Street
                            Wilmington, DE  19801


For Federal Insurance       Cozen O'Connor
Company:                    By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103
                            (Telephonic Appearance)
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Allstate Insurance:     Cuyler Burk, LLP
                            By:  ANDREW CRAIG, ESQ.
                            Parsippany Corporate Center
                            Four Century Drive
                            Parsippany, NJ  07054
                            (Telephonic Appearance)

For State of Montana        Womble Carlyle Sandridge & Rice
Department of               By:  FRANCIS MONACO, ESQ.
Environmental Quality:      222 Delaware Avenue
                            Suite 1501
                            Wilmington, DE  19801

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020
                            (Telephonic Appearance)

For Christopher M.          Cohn Whitesell & Goldberg, LLP
Candon:                     By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110
                            (Telephonic Appearance)

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109
                            (Telephonic Appearance)

For Travelers Indemnity     Simpson, Thacher & Bartlett, LLP
Insurance Co.:              By:  SUNG W. CHOI, ESQ.
                            425 Lexington Avenue
                            New York, NY  10017
                            (Telephonic Appearance)

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:                 Rhoads LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801
                            (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For David T. Austern,        Phillips, Goldman & Spence, P.A.
the Future Claimants'        By:  JOHN C. PHILLIPS, JR., ESQ.
Representative:              1200 North Broom Street
                            Wilmington, DE  19806
                            (Telephonic Appearance)


For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  NATHAN D. FINCH, ESQ.
                                 WALTER SLOCOMBE, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005
                            (Telephonic Appearance by Mr.
                             Slocombe)


For the Property            Ferry Joseph & Pearce, P.A.
Damage Commtittee:          By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899


For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                            Wall Street Plaza
                            New York, NY  10005
                            (Telephonic Appearance)


For Official Committee      Brandi Law Firm
of Asbestos Property        By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:           44 Montgomery St., Suite 1050
                            San Francisco, CA  94104
                            (Telephonic Appearance)


For Official Committee      Speights & Runyan
of Asbestos Property        By:  DANIEL SPEIGHTS, ESQ.
Damage Claimants:                MARION C. FAIREY, JR., ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924
                            (Telephonic Appearances)


For Royal Insurance:        Wilson Elser Moskowitz Edelman
                             & Dicker LLP
                            By:  CATHERINE CHEN, ESQ.
                            150 East 42nd Street
                            New York, NY  10017
                            (Telephonic Appearance)


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Scott Company:              Vorys, Sater, Seymour & Pease, LLP
                                By:  TIFFANY COBB, ESQ.
                                52 East Gay Street
                                Columbus, OH  43216
                                (Telephonic Appearance)

For London Market              Mendes & Mount, LLP
Companies:                     By:  ALEXANDER MUELLER, ESQ.
                                750 Seventh Avenue
                                New York, NY  10019-6829
                                (Telephonic Appearance)

For ZAI:                       Richardson, Patrick, Westbrook
                                & Brickman, LLC
                                By:  EDWARD J. WESTBROOK, ESQ.
                                1037 Chuck Dawley Boulevard
                                Building A
                                Mount Pleasant, SC  29464

For Official Committee         LECG
of Asbestos Property           By:  ALAN MADIAN
Claimants:                          ELIZABETH DEVINE
                                (Telephonic Appearances)

For Dune Capital Mgmt:         Dune Capital Management
                                By:  GUY BARON
                                (Telephonic Appearance)

For Citadel Investment         Citadel Investment Group
Group:                         By:  BEAU HARBOUR
                                (Telephonic Appearance)

For Murray Capital             Murray Capital Management, Inc.
Management                     By:  MARTI MURRAY
                                (Telephonic Appearance)

For DebtWire:                  DebtWire
                                By:  SETH BRUMBY
                                (Telephonic Appearance)

For Shareholder for            TOCQUEVILLE ASSET MANAGEMENT
W.R. Grace & Co.               For Peter Shawn
                                (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:

2          THE COURT:  Good afternoon.  Please be seated.  This

3   is the matter of W. R. Grace, 01-1139.  The participants by

4   phone Michael Davis, Shayne Spencer, Debra Felder, Seth Brumby,

5   Ann Marie Aaronson, James Restivo, Douglas Mannal, Catherine

6   Chen, Jacob Cohn, Guy Baron, Andrew Craig, David Beane, Janet

7   Baer, Barbara Harding, Terence Edwards, Robert Horkovich,

8   Walter Slocombe, David Siegel, Tiffany Cobb, Roger Frankel,

9   Daniel Glasband, Alan Madian, Jason Solganick, Natalie Ramsey,

10  Martin Dies, Sander Esserman, Van Hooker, Jennifer Whitener,

11  Mark Shelnitz, Theodore Freedman, John Phillips, Marti Murray,

12  Matthew Kramer, David Parsons, Darrell Scott, Alex Mueller,

13  William Sparks, Lori Sinanyan, David Bernick, Sung Choi,

14  Richard Wyron, Elizabeth Devine, Edward Westbrook Scott Baena,

15  Christopher Candon, Amanda Basta, Peter Shawn, Daniel Speights,

16  Marion Fairey, Beau Harbour, Arlene Krieger, Ellen Ahern,

17  Robert Gutmann, Jonathan Brownstein and Paul Norris and Robert

18  Horkovich.  I'll take entries in the court.  Good afternoon.

19          MS. BAER:  Good afternoon, Your Honor.  Janet Baer on

20  behalf of the debtor.

21          MR. O'NEILL:  Good afternoon, Your Honor.  James

22  O'Neill, Pachulski, Stang, Ziehl & Jones, on behalf of the

23  debtor.

24          MR. KRUGER:  Good afternoon, Your Honor.  Lewis

25  Kruger, Strook & Strook & Lavan, on behalf of the official

1  unsecured creditors committee.

2          MR. FINCH:  Good afternoon, Your Honor.  Nathan Finch

3  on behalf of the asbestos claimants' committee.

4          MR. HURFORD:  Good afternoon, Your Honor.  Mark

5  Hurford, Campbell & Levine, for the ACC.

6          MR. MULLADY:  Good afternoon, Your Honor.  Ray

7  Mullady for the FCR.

8          MR. ANSBRO:  John Ansbro for the FCR.

9          MR. TACCONELLI:  Good afternoon, Your Honor.

10  Theodore Tacconelli for the property damage committee.

11          THE COURT:  Ms. Baer?

12          MS. BAER:  Good afternoon, Your Honor.  Just a point

13  in terms of procedure.  I think Mr. O'Neill informed you the

14  very last matter on the agenda today, the lawyer discovery

15  matter with respect to estimation, David Bernick is planning on

16  handling that.  David's plane should have landed about five

17  minutes ago.  It was first canceled and then another one was

18  delayed.  So we'll run through the entire agenda and at that

19  point I would ask if we could take a break before the last

20  matter.  I'll find out where he is and whether he'll be dialing

21  in or he'll physically be here within a few minutes, and we'll

22  go that way.

23          THE COURT:  All right, that's fine.

24          MS. BAER:  Thank you.  Your Honor, on the agenda

25  today, Matters 1 and 2 are claims-related matters that are

1  being continued, and at the end of the agenda I'll hand up

2  orders that continue those two matters.

3          THE COURT:  Okay.

4          MS. BAER:  Agenda item Number 3, Your Honor, is with

5  respect to the debtors' application to retain Deloitte & Touche

6  for some additional services.  Your Honor entered that order

7  last week.

8          THE COURT:  Yes.

9          MS. BAER:  Your Honor, matter Number 4 is the

10 debtors' motion for approval of its settlement on environmental

11 claims with the United States.  Your Honor, the public comment

12 period has not yet passed.  The public -- the United States

13 published this in the Federal Register on January 11th, so the

14 public comment period will not comment until February 11th.  In

15 the meantime, we've also received some objections which we are

16 working through.  We're circulating a revised order right now,

17 and we may end up having to revise the settlement agreement to

18 deal really mostly with clarifying minor points.  So, Your

19 Honor, we would ask that that matter be continued for hearing

20 at the February 25th omnibus agenda.

21         THE COURT:  All right, that's fine.

22         MS. BAER:  Your Honor, that takes us to the first

23 contested matter of the day, which is the motion of the City of

24 Charleston, South Carolina, for relief from the stay so that

25 they can, in fact, proceed with eminent domain proceedings with

1   respect to a piece of property that the debtors own in

2   Charleston.  The debtors oppose that, believe that it would be

3   very much against the best interests of the estate, and I

4   believe counsel for South Carolina is here to address it.

5           THE COURT:  All right.  Good afternoon.

6           MS. THOMPSON:  Good afternoon, Your Honor.  Christina

7   Thompson from Connolly Bove Lodge & Hutz appearing today on

8   behalf of the City of Charleston, South Carolina.  Your Honor,

9   with me in the courtroom today is my co-counsel Tara Nauful.

10  She is from the law firm of Haynsworth Sinkler & Boyd in South

11  Carolina.  She's been admitted pro hac vice, and she will be

12  presenting the motion.

13          THE COURT:  All right, thank you.

14          MS. THOMPSON:  Thank you.

15          THE COURT:  Good afternoon.

16          MS. NAUFUL:  Good afternoon, Your Honor.  Your Honor,

17  Tara Nauful on behalf of the City of Charleston.  Your Honor,

18  the City has filed a motion to seek relief from the automatic

19  stay pursuant to 362(d) for cause, as set forth in the

20  pleadings that were filed with the Court.  The City seeks to

21  have the stay modified so we can proceed with either purchase

22  of this property that's located in the City of Charleston or

23  with condemnation pursuant to the condemnation procedures set

24  forth in the South Carolina Code.  Your Honor, before I launch

25  into it further, I have brought with me Ms. Colleen Carducci

1  who is the City's director of real estate and who's available

2  to answer questions from the Court or maybe testify.  I will

3  proceed unless the Court tells me otherwise.

4       Your Honor, as set forth in the motion, the City is

5  in the middle of the process of trying to redevelop a blighted

6  area in the Neck area of Charleston.  If the Court, again, is

7  interested or is inclined, I have a color map that illustrates

8  that the Neck area is an area in between two rivers, and the

9  City is seeking to redevelop what has been historically a

10 blighted area to increase the tax base, benefit the citizens of

11 both the City of Charleston, the County of Charleston and

12 ultimately the State of South Carolina.

13      Part of the goal of this is to increase the tax base

14 and increase the benefit to the City.  Another related factor

15 is to move the City's public works facility, which is known as

16 the "Milford Street property."  For about 40 years, the City

17 has operated its public works facility from the Milford Street

18 property.  Waste collection services -- trash compactors go

19 from there.  The fire department has got its fire training

20 facility there.  The Milford Street facility is right in the

21 middle of the area that the City is seeking to redevelop.

22      As part of this process, the City has undertaken a

23 multi-year, multimillion dollar investigation about what can be

24 done with the Milford Street facility.  Can it be moved?  Can

25 it be left to remain there and redevelop?  And the City has

1 come to the conclusion, based on the reports of numerous

2 studies, again millions of dollars, that the place where the

3 Milford Street facility needs to go is this property that's

4 owned by the debtor, W. R. Grace, in that same area, but not in

5 the side of the Neck area that's being redeveloped.

6        Your Honor, as early as 2005, the City approached the

7 debtor and attempted to work out a consensual purchase.  At

8 that time, the debtor was not willing, not interested, and I

9 believe the response was, we're in the middle of a remediation

10 for this property, it's got environmental issues, we just can't

11 talk to you about that now.  Last summer the City, as time

12 passed and no progress seemed to be made, the City again

13 approached the debtor and again expressed its interest to enter

14 into a consensual agreement to purchase this property, and the

15 City was told, we'll, we're working on some kind of a deal, we

16 just can't really do that right now.

17        The City is running out of time.  The proposal to

18 move the Milford Street facility is now four years old.  It's

19 being taxed.  The citizens of the City and of the County are

20 being adversely impacted by the fact that the City can't

21 provide the services it needs to.  The redevelopment plan is

22 being negatively impacted because the City can't make any

23 progress.  This led to the City filing this motion for relief

24 from stay.

25        As recently as Friday we have spoken with the debtor

1  and have spoken with its -- a prospective purchaser of the

2  property in an attempt to work out something and have

3  unfortunately not been able to accomplish anything, and which

4  is why we're here today.

5        THE COURT:  Well, as I understand the debtor's

6  response, and I have no -- obviously no personal knowledge and

7  I have heard no evidence, but I understand from the debtor's

8  response that the debtor has some deal in the offing that if it

9  goes through, and I don't know the status of that proposal

10 either, would not only benefit the estate in terms of dollars

11 for the property, but also would assist the debtor with respect

12 to multiple millions of dollars in additional remediation, and

13 I don't know what the City is able to do to remove this estate

14 from that liability.  This debtor has many different sources of

15 environmental responsibilities all over the country, and this

16 is only one of them.  So, what's the City attempting to do to

17 substitute itself for whatever deal the debtor is able to make?

18       MS. NAUFUL:  Your Honor, the City is interested in

19 approaching this from two ways -- either negotiating a purchase

20 with the debtor to purchase the property, and as part of that

21 purchase, necessarily the environmental concerns would have to

22 be addressed.  In the alternative, failing that, the City seeks

23 to condemn the property because the public need of the City, I

24 would submit, far outweighs any benefit to the estate or its

25 creditors.  The cost to the City to fix the Milford Street

1  facility was in 2004 in excess of $13 million.  Assuming that

2  the City would opt to go that route and acknowledging that the

3  cost would be more, that would negatively impact the related

4  TIF and redevelopment plan because the Milford Street facility

5  needs to be moved.

6       The City has done everything it can to find an

7  alternate spot, and, Your Honor, the Grace site in Charleston

8  is perfect -- perfect based on size, perfect on location.

9  There's not an existing business on there.  It's exactly what

10 the City needs.

11      I have spoken with counsel for the debtor and

12 understand the importance to them of this related transaction,

13 and the City had hoped to wait.  The problem that the City is

14 running into is it's continuing to have to wait.  As we stand

15 here today, no notice of sale, no contract has been filed with

16 the court.  I don't know when or if that's going to happen.

17 The contract wasn't attached to the debtor's objection.  In

18 fact, the prospective purchaser, the identity wasn't even

19 disclosed in the transaction.  And so the City has some

20 concerns that it might not be for a month, it might not be for

21 six months, it might not be for a year, and the City just can't

22 afford to wait that long.

23      The debtor has also set forth in its objection its

24 reasons, and I would like to address that in some respects.

25 The condemnation process -- and this is another reason why the

1  City needs to have relief now, it needs to go forward -- is not

2  instantaneous.  It takes time and it's lengthy and, if

3  contested, can last up to three or four years.  So, if stay

4  relief were granted today, Grace would still own the property

5  and could still continue with whatever transaction it wanted

6  to.  The City has to go through its negotiation process by

7  statute, and then failing that it has to go through the

8  condemnation process, which is filing a complaint, waiting for

9  objections, offering, that kind of thing.  So, the City could

10  have stay relief now and be four years from now before it

11  actually has title to the property.  So, for these reasons,

12  this is -- we believe that the City can have stay relief and

13  Grace can accomplish its objectives because condemnation is not

14  instantaneous.

15         THE COURT:  All right.  Thank you.  Ms. Baer?

16         MS. BAER:  Your Honor, you posed a question to the

17  City which I don't think was really answered because the answer

18  is not what the City really wanted to tell you.  The answer is

19  if they lift the stay and they take this property, they're not

20  going to do anything with the environmental liability.  We're

21  going to be stuck with it, and that's what we're trying to

22  avoid here, Your Honor.  We've been negotiating now for over a

23  year with many, many different entities to try to transfer a

24  significant number of our environmental liabilities to a

25  company that does this for a living.  We've investigated and

1 researched and actually had negotiations with several parties.

2 Back in May of 2006, we signed a letter of intent with a party

3 to go forward, and since that time we have been negotiating

4 with this one sole party, who the City knows of and has met

5 with via telephone twice already and has contacted via e-mail.

6          This party is interested in taking ten properties off

7 of our hands.  These ten contaminated properties, including the

8 Charleston property, have $13.5 million in estimated

9 environmental liability.  By this transaction, this entity

10 would pay Grace over $4 million for the ten properties plus

11 assume all of the environmental liability and indemnify Grace

12 for it.  Once they're in that position, yes, they will be

13 selling the properties and they could certainly sell it to the

14 City, but until they're in possession of the property, we're

15 stuck with the environmental liability.  Until that transaction

16 is signed, sealed and delivered and approved by Your Honor,

17 we're still stuck with the environmental liability.

18          The Charleston property is a winner.  It has value

19 over and above its environmental liability.  It being in the

20 portfolio makes it much more likely that we can sell the entire

21 portfolio, and then again without purchases the portfolio can

22 then negotiate with the City over the appropriate price, over

23 the appropriate access and the like for environmental concerns

24 that they will have the environmental liability, not the

25 debtor.

1        If the stay here is lifted, Your Honor, there will be

2   no assumption of the environmental liability by a third party.

3   There will be no indemnity of the environmental liability by a

4   third party.  We will lose a valuable piece of property that is

5   part of a portfolio that will allow us to get rid of all of

6   these problems.  And if we do lose this property through the

7   lifting of the stay and the condemnation proceedings, we

8   actually lose the possibility of doing the transaction

9   entirely.  The current purchaser who we've been negotiating

10  with, the current purchaser who has spoken with the City, has

11  indicated that if the Charleston property is not part of it the

12  deal would at a minimum have to be repriced, which will delay

13  us even more, and we've been negotiating with them and only

14  them since last May, and secondly they may walk from the deal,

15  and they have indicated that that's an option if they can't

16  work out the appropriate protections and the like.

17       We have met.  We've met with the City on two

18  occasions via telephone.  We have another teleconference with

19  the potential purchaser for next week.  There are two

20  significant issues.  One is price.  We and the potential

21  purchaser believe that the price being offered by the City is

22  significantly less than the property is worth.  That has to be

23  negotiated.  The second thing is we need to come to an

24  understanding with respect to the environmental remediation.

25  It's ongoing.  We need to be assured that the environmental

1  remediation is completed.  We need to know who's going to be

2  responsible for it, if it's the debtor or if it's the potential

3  purchaser.  All of these matters have to be addressed.

4         If the stay is lifted now, we are left somewhat

5  naked.  Since we don't have a signed contract with this

6  potential purchaser yet, it eliminates our options.  If the

7  stay is lifted and we can't work out something with the City,

8  they will begin their condemnation proceedings.  And although

9  we understand that it could be years before the litigation over

10 the price of the property is completed, it's our understanding

11 of the South Carolina Condemnation Statute that once 30 days

12 passes after they make an offer and if we do not accept that

13 offer, they actually do take charge of the property and we then

14 are left with a fight over the price and only the price.

15        And again, Your Honor, this is much more than an

16 individual transaction over one piece of property.  The debtor,

17 on behalf of the entire estate and for the benefit of its

18 creditors, is trying to get protection for environmental

19 liabilities on ten different properties, some of which have

20 significant liabilities, some of which aren't as bad and

21 actually are pretty valuable pieces of property.  Under these

22 circumstances, Your Honor, we would request that the City's

23 motion to lift stay be denied at this time.

24        And, Your Honor, one thing I should address in terms

25 of status of the deal with the potential purchaser, we thought

1  by the time we got to court here it would be signed.  We

2  received more comments to our current liability transfer

3  agreement last week.  We actually are negotiating with the

4  potential purchaser today to hopefully close the loop.  We

5  would anticipate having a signed deal with the potential

6  purchaser within the next two weeks and get the motion on file

7  as soon as possible.  So, it's not, at this point, six months

8  away unless the deal craters.  The deal is truly on the cusp of

9  being signed.  We certainly had hoped it would go quicker than

10 this, but we have been in negotiations and in due diligence

11 since May of 2006 to get it done, and it is very, very close,

12 and, again, so close that the potential purchaser has very much

13 been willing to sit down with the City, has done so and we have

14 another call set for next week to continue the negotiations.

15      THE COURT:  Well, if that's the circumstance, it

16 sounds as though some modest continuance of this motion may be

17 appropriate so that the debtor can perhaps get this deal on

18 paper, the City may know what the specifics of the deal are to

19 let the City have some additional time to talk both with the

20 debtor and the potential purchaser to see what's going on.

21 That may make more sense than attempting to give you some

22 ruling today.

23      MS. BAER:  From the debtor's perspective that's

24 certainly an alternative that is acceptable to us.  We can see

25 where we are a month from now, and hopefully we'll have a

1 signed contract that we can share with the City, but until I

2 have a signed contract I don't have the ability to share

3 something with the City.

4       MS. NAUFUL:  Your Honor, and the City's concern is

5 that we will arrive here in a month, and, while I've spoken

6 with Ms. Baer and understand that they're making efforts, the

7 delay every day is expensive to the City and expensive to the

8 taxpayers, and that is our concern.

9       THE COURT:  Well, I appreciate the fact that there is

10 some expense to the taxpayer, but I think at this point in time

11 that still may be the best alternative because this Court does

12 have to reconcile the fact that this estate at the moment has a

13 whole host of creditors, hundreds of thousands of them,

14 frankly, possibly more than the population of the State of

15 South Carolina, in fact, that may be subject to a distribution

16 in this case, hopefully.  So I do have to take a look at the

17 possibility that the debtor being able to rid itself of

18 liability for environmental resources is a significant issue

19 for the estate.  So I would like to try to push this off until

20 the February hearing with the proviso that the debtor is to do

21 its best efforts to get a signed and sealed deal of record

22 before that hearing, and if the debtor is not able to do that,

23 then I'm going to have to ask whether, in fact, there is a good

24 faith purchaser out there because that will be almost two years

25 from May of 2006 where the debtor is essentially exclusively

1  dealing with one entity to try to get this deal done, and that

2  is a long time, because February of 2008 from May of 2006 is a

3  long time.

4       MS. BAER:  Your Honor, excuse me.  It's May of 2007.

5  I may have misspoken.

6       THE COURT:  You said 2006.

7       MS. BAER:  I very much apologize.

8       THE COURT:  Okay.  So -- well, that's not nearly as

9  long as May of 2006, but, okay, it still seems to me that the

10 debtor should be trying very hard, and I'm sure the debtor is,

11 to try to get pen to paper at this point in time.  So with the

12 proviso that the debtor is to make its very best effort to get

13 something filed of record and share it with the City before

14 that next hearing so that the City understands who the

15 prospective purchaser would be and what the debtor's share of

16 the those proceeds and part of the deal would be in advance so

17 that you can have a meaningful discussion, I would like to be

18 able to continue it till February.  Hopefully, things may be a

19 little more firm by them, but if the City doesn't want to do

20 that then I'll give you a ruling today, but I think it may be

21 better.

22      MS. NAUFUL:  Your Honor, my client has advised me

23 that it will defer to the Court's judgment.

24      THE COURT:  Okay.  I think that would be advisable.

25 The next hearings are February the 25th, Monday, February 25th,

1 so why don't we continue it until 1:00 p.m. on February 25th.

2 I expect to see something filed of record by the debtor at

3 least by the Friday before that hearing so that even though it

4 may not be set for any type of full hearing, at least the City

5 will have the intervening weekend, if nothing else, to see what

6 this agreement is, to talk to the debtor and the prospective

7 purchaser, so that if nothing more we can have at least a

8 status conference at that time.  I don't expect to have the

9 debtor -- the debtor could actually be able to file something

10 even at this late date and get a sale hearing, for example, or

11 a settlement hearing set in time for that hearing, but I do

12 expect the debtor to make its best effort to get something

13 filed of record that will let the City know what the debtor's

14 plans are with respect to this parcel of property in advance of

15 that hearing, and then we'll take it at that hearing and see

16 what the next step is.

17        MS. NAUFUL:  Your Honor, just for clarification, not

18 being a -- being admitted pro hac, I have brought my client.

19 Would the Court require my client to come back at that time or

20 --

21        THE COURT:  No, it won't be -- there will not be an

22 evidentiary hearing, and, in fact, if your client wishes to

23 participate by phone so that they can either listen in or

24 speak, there is the CourtCall mechanism, and Ms. Baer or Mr.

25 O'Neill can explain to you how to participate in that process.

1  You just have to sign up at least two business days in advance

2  so that you can make those arrangements.

3          MS. NAUFUL:  Thank you, Your Honor.

4          THE COURT:  Okay.  In fact, you may do that too so

5  that you don't have to make the trip.  Okay.  So the day for

6  the debtor to file something regarding the sale would be

7  February 22nd.

8          MS. BAER:  Thank you, Your Honor.

9                  (Pause)

10         THE COURT:  Okay.

11         MS. BAER:  Your Honor, that takes us to agenda item

12 Number 6, which is an order on a rule to show cause with

13 respect to a very old pending adversary proceeding with respect

14 to ZAI.  Mr. Restivo is on the phone, and he is actually going

15 to address the next three matters on the agenda.

16         THE COURT:  Mr. Restivo?

17         MR. RESTIVO:  Good afternoon, Your Honor.  With

18 respect to item Number 6, last week Mr. Westbrook and I had a

19 long conversation, Mr. Westbrook being the special counsel for

20 ZAI.  I told Mr. Westbrook that the order relates to an

21 adversary proceeding filed I believe in November of 2001, which

22 was subsequently dismissed by this Court and then the dismissal

23 was subsequently vacated.  Mr. Westbrook reminded me that most

24 of that activity, or maybe all of it, occurred before the Court

25 named him special ZAI counsel.  I indicated to him, Your Honor,

1  that Your Honor set ZAI on the agenda for February 25.  I would

2  suggest to the Court, that we deal with ZAI in this order to

3  show cause at that time.  And lastly I alerted Mr. Westbrook

4  that in February at the omnibus (inaudible; interruption in

5  audio) entry (inaudible; interruption in audio) for ZAI claims

6  as the next order of business, and so it's the debtor's request

7  that we deal both with ZAI and item Number 6 at the February 25

8  omnibus.

9       THE COURT:  I'm sorry, Mr. Restivo, but you faded out

10 there for a minute, and so what is it that you -- the request

11 is to deal with what two items on the February 25th agenda?

12      MR. RESTIVO:  Item Number 6, your order to show cause

13 why the adversary proceeding should not be dismissed.  We move

14 that to February 25, and we deal with that in the context of

15 the court-ordered status conference on ZAI at which time the

16 debtor will advocate to Your Honor that the next order of

17 business be the setting of a bar date for ZAI claims, but we

18 will deal with that suggestion at the February 25 omnibus.

19      THE COURT:  All right.  Mr. Westbrook?  Mr. Westbrook

20 appearing?  Is anybody appearing for ZAI claimants?

21      MR. BAENA:  Your Honor, this is Scott Baena on behalf

22 of the property damage committee.  I didn't intend to appear on

23 this matter, but I am on the line.

24      MR. SCOTT:  Your Honor, this is Darrell Scott.  I'm

25 additional special counsel.  Can the Court hear me?

1          THE COURT:  Yes, I can.

2          MR. SCOTT:  Okay.  And I believe that Mr. Westbrook

3  is also on the line.

4          THE COURT:  All right.  Does anybody have an

5  objection to continuing these matters till February?

6          UNIDENTIFIED ATTORNEY:  ZAI counsel does not, Your

7  Honor.

8          THE COURT:  Mr. Baena?

9          MR. BAENA:  No, Your Honor.  I just would have one

10 question, and I guess it's best directed to Mr. Restivo, and

11 that is whether, as he puts it, their advocacy for a bar date

12 will be preceded by a motion.

13         THE COURT:  Mr. Restivo?

14         MR. RESTIVO:  I don't know that I've thought -- Mr.

15 Baena, I've thought that through.  If the parties or the Court

16 would like to see a motion in advance, we can do that.  Right

17 now it's set as a status conference, but we would not have a

18 problem filing a motion if people think that would move it

19 along quicker.

20         THE COURT:  Well, I think at some point in time if

21 the debtor -- if that's the route the debtor is going to want

22 to go, it will probably take a motion, but maybe a discussion

23 about it would not be a bad idea first.

24         MR. RESTIVO:  That would certainly be my preference,

25 Your Honor, and then after discussion we could file a motion.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Why don't we talk about it first, because

2    once a motion is filed it's going to put all the yellow flags

3    on the ground.  So let's just discuss it first.  Right now I've

4    got enough yellow flags on the ground with a couple of statute

5    of limitations issues that I have pending in the personal

6    injury case that's going on.  So, let's just talk about it and

7    see if we can come to a principled resolution without the

8    motion.  Okay?

9          MR. RESTIVO:  Yes, Your Honor.

10         THE COURT:  All right.

11         MR. HOGAN:  Your Honor, Daniel Hogan on behalf of the

12   Canadian ZAI claimants.

13         THE COURT:  Yes.

14         MR. HOGAN:  I just wanted to clarify that insofar as

15   you had asked if any other counsel was here on behalf of the

16   ZAI claimants.  And we're differentiated from Mr. Westbrook's

17   group in that we're the Canadian ZAI claimants.

18         THE COURT:  Yes.

19         MR. HOGAN:  So I just wanted to make that record.

20   Thank you.

21         THE COURT:  I guess, Mr. Restivo, actually that's a

22   good question.  Are you talking about bar dates for American

23   and Canadian, so that Mr. Hogan should make sure that he's

24   present next month too?

25         MR. RESTIVO:  I had in mind, Your Honor, a bar date

1  for American claims.  I would have to give further thought.  I,

2  frankly, did not think about the Canadian claims, so I don't

3  have an answer for that question, but when I think about it,

4  I'll make sure someone gets in touch with Mr. Hogan.

5            THE COURT:  All right.

6            MR. HOGAN:  Thank you.

7            THE COURT:  Okay.  Better be here.

8            MR. HOGAN:  I will.

9            THE COURT:  Okay.  Anything else on Item 6 for now?

10  All right, Item 6 is just continued till February then.

11            MR. RESTIVO:  Your Honor, Item 7, I think you're

12  going to hear the same suggestion.  Item 7 is the debtors'

13  motion to disallow and expunge the Allegheny Center duplicate

14  claims.  I've had a number of conversations with Mr. Speights.

15  Mr. Speights advised me that he was filing a motion, and indeed

16  he may have already filed it, to open or modify or alter or

17  amend or vacate the Court's original order expunging the

18  Allegheny Center claim.  In light of that, it seemed to make

19  sense, both to Mr. Speights and myself, that we argue the

20  debtors' motion to expunge and his motion to open or vacate or

21  amend all at one time so we don't have to do it twice, and so

22  our suggestion is that we argue both motions at the February 25

23  omnibus at one time.

24            THE COURT:  Mr. Speights?

25            MR. SPEIGHTS:  That is correct, Your Honor.  We did

1  file a motion for relief from order of dismissal today, and I

2  agree with Mr. Restivo.  I did point out to Mr. Restivo if in

3  response to my motion he raises some factual issue, then I

4  would have to preserve my right to try to clarify that fact

5  somehow, but I do not think that's going to be the case, and I

6  believe it can be disposed of at the February hearing.

7          THE COURT:  All right.  Well, then they'll both be

8  continued till the February hearing.  It looks as though the

9  February hearing date is going to be pretty full, because I

10  believe I put something on the February hearing in the personal

11  injury -- didn't I put an argument on something from the

12  personal injury trial?

13          MR. O'NEILL:  Your Honor, it might have been a

14  hearsay --

15          THE COURT:  The hearsay objection?

16          MR. O'NEILL:  It may be the hearsay.  I'm not sure.

17          THE COURT:  So, people better bring toothbrushes for

18  the February hearing.  It may be a long night.

19          MS. BAER:  Your Honor, also, because the deadlines

20  for the February hearing have already passed -- I think there's

21  going to be a response by the debtor to Mr. Speights' motion --

22  we need to get a time to do that since it will not be within

23  the normal calendar.

24          THE COURT:  Then maybe that one should simply be

25  pushed to March.  I'm a little concerned that you're -- I

1   really am worried that perhaps this is getting a little crowded

2   and this isn't all going to work in February, and I don't want

3   to you see making trips here, especially based on the fact that

4   the weather is likely not to be very good at that time of the

5   year, and then find out that we can't get through the agenda.

6   Mr. Restivo and Mr. Speights, what about pushing -- is there

7   any rush to this one?  Can it be put to March without any

8   problem, Item 7?

9            MR. SPEIGHTS:  Your Honor, this is Dan Speights.

10  That's fine with me.  I'm not sure what Mr. Restivo's position

11  is.

12           MR. RESTIVO:  Obviously, we're trying to get rid of

13  as many claims as quick as we can, but March is only another 30

14  days.  That's fine with us, Your Honor.

15           THE COURT:  Actually, it's only three -- I think it's

16  three weeks because it's actually March 17th.  So it's a short

17  time frame.

18           MR. RESTIVO:  That's fine, Your Honor.

19           THE COURT:  All right, okay.  Then I think Item 7

20  will be continued till March rather than February then,

21  gentlemen.  Thank you.

22           MR. RESTIVO:  Your Honor, item Number 8 is a status

23  conference on the Speights' motion to alter or amend the

24  Court's opinion.  With respect to that, one thing the Court

25  suggested, or directed, was that there be some effort to see

1  whether these three claims could be settled.  Mr. Speights and

2  I have exchanged offers and demands, and we are still in

3  discussions, and so both sides have complied with that

4  direction.

5         Secondly, Your Honor, I hope this simplifies this a

6  little bit, at the last argument there really were two issues

7  -- one, whether or not the authority was authentic and then,

8  secondly, the legal issue of whether or not notice of authority

9  was given consistent with the Court's September 23 order.  In

10  discussions with Mr. Speights, I have advised him that we will

11  waive our authenticity objection and ask the Court to rule

12  solely on the issue of the legal question, and he is already

13  obligated to file his brief on that issue by February 15.

14  Grace is obligated to reply by February 22nd.  And so that

15  argument at the February omnibus will now be limited to what

16  was called "the legal issue" the last time this was discussed

17  in court.

18         THE COURT:  All right.  Well, are you done with your

19  settlement negotiations or are you still talking?  Because if

20  you're still talking, it seems to me that what we ought to do

21  is simply push that one till March too to give you further

22  opportunity to discuss the matter, because I don't see any

23  point to having Mr. Speights come here both in February and

24  March.  We might as well put both of his matters on at the same

25  time, if, in fact, you're still discussing the situation.

1      MR. RESTIVO:  Your Honor, Mr. Speights talked to me

2  on Friday and gave me a new demand, so the ball is in my court

3  and I need to get back to him.  My strong view is if these

4  cases can be resolved, they ought to be able to be resolved by

5  the February omnibus, and if they can't be resolved it's not

6  going to matter how long we take, and so I think it would be

7  productive to the discussions we're having that each of us are

8  looking at an argument date.  If they're going to go away, I

9  think they'll go away by then, and if they're not going to go

10  away the argument moving to March isn't going to make any

11  difference.

12      MR. SPEIGHTS:  May I inquire, Your Honor, whether the

13  February argument is in Pittsburgh or in Wilmington?

14      THE COURT:  No, they're both in Wilmington, Mr.

15  Speights.

16      MS. BAER:  Your Honor, March may be in Pittsburgh.

17      THE COURT:  Oh.

18      MS. BAER:  We're just looking at it.  It looks like

19  March is in Pittsburgh.  February is definitely in Wilmington.

20      THE COURT:  March -- oh --

21      UNIDENTIFIED ATTORNEY:  I believe we were holding

22  that as a possibility, the information that we had -- I don't

23  know --

24      THE COURT:  Probably because March 17th is such a big

25  day in Pittsburgh, you know, with St. Patrick's Day.  I don't

1  know, folks.  I'm sorry.  I really don't know.  February -- Mr.

2  Speights, let me say this.  February definitely is in

3  Wilmington, and everyone's telling me that I've reserved

4  possibly having March in Pittsburgh, and the truth is that I

5  don't know.  I guess I'm going to have to go home and look at

6  the calendar and let you all know where March will be.

7         MR. SPEIGHTS:  Well, that's fine.  I was really

8  asking about February, Your Honor.  I agree with Mr. Restivo

9  that if we are going to be able to resolve these claims we

10  should be able to resolve them by February.  I can't represent

11  to you that we'd need more time to resolve three simple claims,

12  but I do appreciate Your Honor thinking of me, trying to save

13  me a trip having to travel twice on these matters.  So,

14  obviously I would prefer it being in March just for personal

15  convenience, but if we have to go forward in February I'll make

16  two trips.

17         THE COURT:  Well, it's -- from my point of view, Mr.

18  Speights, it doesn't make any sense to have you here February

19  26th and then three weeks later on March 17th.  It just doesn't

20  make sense to do that, especially when I know that February

21  26th is already going to be a pretty full day.  So, why don't I

22  do this.  If you want to keep the briefing schedule the same,

23  if that assists in pushing you to settlement, that's fine.  If

24  you want to push the briefing schedule on -- back a week,

25  that's all it would do literally, is push it back one week each

1   -- for each of you, then that's okay too.  You can let me know

2   which you prefer now, but I think the argument should be on the

3   March 17th date.  I just don't see any point to having you come

4   twice.

5           MR. SPEIGHTS:  Thank you, Your Honor.

6           THE COURT:  So, give me the dates that you prefer

7   folks.

8           MR. RESTIVO:  I think we ought to keep the current

9   briefing schedule because we've known that's been the briefing

10  schedule since the last omnibus, and then we'll simply argue

11  this on March 17 instead of February 25.

12          THE COURT:  All right, that's fine.

13          MR. RESTIVO:  I don't believe there's anything else

14  on today's agenda, Your Honor, for which I am responsible.

15          MR. SPEIGHTS:  Your Honor, I do believe there is one

16  thing that -- for which Mr. Restivo is the spokesperson.  At

17  the December omnibus hearing I made the suggestion that we have

18  a mediation between the debtors and Speights & Runyon on the

19  property damage claims, and Your Honor greatly encouraged us to

20  do that.  Subsequently, the debtor informed me that it would

21  not agree to mediation unless I made a demand for all my cases

22  in advance, and if they thought my demand was appropriate then

23  it would mediate.  And I advised the debtor that I didn't think

24  that was an appropriate way to proceed with mediation, by

25  making demands beforehand.  I'd be happy to tell a mediator my

1  demands.

2         More importantly, Your Honor, from my experience with

3  mediation before you in the Owens Corning case, you made it

4  plain that a debtor can't just insist on a demand for

5  everything, but it should be willing to discuss any of the

6  claimant's claims on an individual basis as well.  It shouldn't

7  always be a take it or leave it for all claims.

8         So, we reached an impasse pretty quickly after the

9  omnibus hearing, but I want to reiterate, Your Honor, that I'm

10 perfectly willing to enter into a mediation and agree to a

11 mediator with the debtors to try to see if we can resolve some

12 or all of these claims, and I'm perfectly willing to tell the

13 mediator my thoughts on it, and he may tell me I'm too high or

14 too low, and we'll go from there.  But unfortunately, another

15 four, five or six weeks has gone by and we have not made any

16 progress on that front, although because you ordered that we

17 discuss settlement on those three claims, we have had the good

18 experience of having a demand and an offer and a counter-demand

19 and a counteroffer and now are waiting on another round in

20 those negotiations.

21         THE COURT:  Mr. Restivo?

22         MR. RESTIVO:  Your Honor, the Court will recall that

23 I was caught a little bit by surprise by Mr. Speights'

24 statements.  I did indicate that I would need to talk to my

25 client and consider whether or not there was any prospect of

1  success in mediation.  Mr. Speights indicated that none of his

2  cases have settled.  He did not indicate that there haven't

3  been settlement discussions, simply that none of his cases have

4  settled, and he suggested a mediation as a process.

5          As the Court knows, I am a supporter of mediation in

6  these bankruptcies.  On occasion, I've requested it myself.

7  It's a matter of public record that Judge Agresti, in the

8  Refractories cases, was able to mediate multimillion dollar

9  complex issues.  Judge Diane Welsh was able to mediate similar

10 issues.  And so mediation will work under appropriate

11 circumstances, but in order to work the parties have to have a

12 desire to reach a resolution and have to have an understanding

13 of what the other side is looking for, and so, Your Honor,

14 after the last omnibus I told Mr. Speights that I was trying to

15 determine whether mediation made sense, and I twice asked him

16 to give me a demand, broken down into his California cases,

17 into the Pacific Freeholds case, into his Canadian cases,

18 Anderson Memorial Hospital and on the remaining 16 to 19 other

19 property damage claims he has.

20          I told him that in order to determine whether or not

21 a mediator can close the gaps between warring parties, one has

22 to at least appreciate what the gaps are.  Bot times he told me

23 he did not want to make either an overall demand on all of his

24 cases or a demand broken down into his groups of cases.  As a

25 result of that, I do not believe at this time mediation makes

1  any sense.  We don't even know what it is he's looking for, and

2  I have a little bit of a concern, indeed great concern, that

3  the Court has sub judice 55 cases out of Canada, about 90 out

4  of California.  I'm concerned that until the Court gives us

5  more guidance as to whether those claims are barred by the

6  statute of limitations, or the ultimate statute of limitations,

7  we are not going to be able to have any reasonable discussions.

8  Obviously, the Court could rule and either party can talk about

9  an appeal, but with that many cases sub judice -- I suspect Mr.

10 Speights wants full value for them; I suspect we don't think

11 they have any value at all -- that until we get further

12 guidance from the Court or until Mr. Speights at least makes

13 some reasonable demands on these cases, sending us off to

14 mediation is an effort which will not lead to a resolution.

15      It may be that Mr. Speights and I on the three cases

16 subject to his motion to alter will develop some rapport and

17 trust in each other.  I would like to think if we could move

18 one, two or three of those cases, we could talk about other

19 cases, then if we don't get anywhere maybe mediation, but, at

20 this point, mediation seems premature and doomed to failure.

21      MR. SPEIGHTS:  Your Honor, if I could just respond to

22 that briefly, I think you see the two sides very clearly.  The

23 same speech could be made with respect to any time two parties

24 are not able to reach settlement.  That's the reason we have

25 mediators who can bridge these differences.  That's the reason

1  we were so successful in the Mogul bankruptcy where we had the

2  same types of claims, many of the same parties, Canadian and

3  American, and reached a resolution through a lot of effort,

4  through mediation.  We've also done it in other cases before

5  Your Honor, and I just don't think it's appropriate for

6  mediation to put lines in the sand, and even if I complied and

7  gave them some demand they would turn around and say, no.

8  We've had a number of settlement conferences, as Mr. Restivo

9  recognizes, and it's because of these and a familiarity with

10  each other's position that we need a mediator.

11         But lastly, Your Honor, I want to emphasize that

12  there are a number of my claimants whose claims are not pending

13  before the Court.  There are a number of my claimants who are

14  not facing any particularized objection, other than the general

15  objections of hazard or constructive notice, and there's no

16  reason in the world that we could not be discussing, through

17  mediation, at least a resolution of some of our claims.  The

18  only way to solve a big problem is to break it down into small

19  problems sometimes, and I'm perfectly willing to deal with

20  everything, but I am perfectly willing to deal with a number of

21  significant claims which are not pending before the Court and

22  probably will not be pending before the Court for a long period

23  of time.  So, I think it's consistent with what Your Honor said

24  at the December hearing, and I'll leave it to Your Honor to

25  decide, but I think we could make some progress.

1          THE COURT:  Well, I can offer two comments.  One is

2     that I am not as close on getting to an -- an opinion out on

3     the Canadian side as I am on the California side.  Secondly is

4     if you're going to go to mediation I would think the time to do

5     it is before you get a definitive ruling from the Court rather

6     than after.  So, folks, from my point of view, mediation

7     wouldn't be such a bad idea, and maybe it wouldn't hurt you to

8     go if you've got some basis on which to settle.  I am generally

9     not offended if you can resolve issues.

10          If I think you're way -- you know, if I think you're

11    doing something illegal, you're going to hear from me.  If you

12    think you've got something that you're settling, and reasonable

13    minds can differ about something and most things in the law

14    reasonable minds can differ about, then, you know, you're

15    settling things, but after I give you a definitive ruling and

16    then you come back ask me to let you settle something that

17    violates what I've already given you a definitive ruling about,

18    it's going to be a lot harder.  So I think if you want to try

19    to settle something it would be a good idea to try to get

20    yourselves to mediators relatively soon, and I would strongly

21    urge you to do that.  I thought I had in December.  I'll do it

22    again.  Try to get yourselves to some mediation.  I don't see

23    why it would hurt.

24          With respect to the method by which you go about

25    making demands and counter-demands when you're going to

1  mediation, why don't you let the mediator decide how to do it,

2  and if the mediator wants it done a certain way then do it that

3  way, and there are all kinds of mediation styles.  Mediators

4  are not necessarily bound to one style versus the other, and,

5  you know, if you agree on a mediator then pick a mediator that

6  -- whose either style or opinion or whatever it is that you

7  both respect, and if the mediator says make your demands

8  up-front, then make them.  If the mediator says, no, talk to

9  me, talk to the mediator.  You're going to come down to a

10  bottom line one way or the other, so how you approach it is

11  really a matter of style.  It's not a matter of anything else,

12  and, frankly, I'd be quite surprised, given the number of cases

13  in which Mr. Speights has had claims and, Mr. Restivo, even

14  you've been involved tangentially, if you don't have an idea at

15  this point in time of what people are looking for, I would be

16  very, very surprised.  Plus, not to mention the fact that Mr.

17  Speights has a relationship with Grace and has probably been

18  talking -- or the businesspeople have been talking to the

19  businesspeople and so forth and so on for years.  So, you know,

20  it's not a magic issue, folks.  It's a numbers issue.  So, why

21  don't you talk and see if you can't get this resolved, rather

22  than tying each other up with litigation for years and years

23  and years.

24        MR. RESTIVO:  Your Honor, might the Court want to

25  suggest to Mr. Speights on the package of cases that he says

1  are not before the Court -- I believe those are the 16 to 19

2  cases that are not sub judice before the Court -- making a

3  demand on them?  We do not know what Mr. Speights' demand is,

4  either in total or on groups of cases or on those cases, and

5  the Court would be mistaken to think we have a sense, or I have

6  a sense, because we don't, and he's the plaintiff, and if

7  there's going to be a possibility of resolution, it just makes

8  sense that he ought to make a demand and then we can react to

9  that, at least limit it to the 16 to 19 cases not pending

10 before your court.

11      MR. SPEIGHTS:  Your Honor, I fully expect if we go

12 before a mediator, he's going to turn to me and say, what's

13 your demand, how do you break it out, what's your position, and

14 we will be there and resolve this matter or not resolve this

15 matter, you know, within a few days, because we are all going

16 to be there.  They want me to send them a demand on certain

17 cases and not others and we'll go just like we have for three

18 years back and forth and back and forth while Grace, I believe,

19 plays the four corners defense.  So, I just want to get in the

20 same room and either fish or cut bait.

21      THE COURT:  Well, I think what I just heard from Mr.

22 Restivo is that they'd be happy to get a demand from you on all

23 cases, Mr. Speights, but in any event it seems to me that if

24 you pick a mediator, a mediator is definitely going to want to

25 know what the bottom line numbers are, folks.  I mean, that's

1  the whole purpose of getting there.  So, at some point, yes,

2  you're going to have to come up with an out-of-pocket demand

3  request, and the debtor is going to have to react to it.  So, I

4  think getting to mediation would be good idea.  It's certainly

5  been successful in every other case, and so I'm not sure why it

6  would not be successful in this one, but if it isn't, it isn't.

7  At least giving it, you know, the good college try I don't

8  think would hurt at this point in time.  And I don't think it

9  has to be limited to the 16 to 19 cases that are not currently

10  waiting for an opinion from me.  I think it can go beyond that,

11  but certainly 16 to 19 is 16 t 19 that you don't have settled

12  yet, so that would -- oh, Mr. Bernick, hi.  I see you there.

13         MR. BERNICK:  Yes, I'm sorry to be late, Your Honor,

14  and I think that -- just a general observation that probably

15  also has some relationship to the balance of the case, I think

16  that there -- that Your Honor indicates that you're in the

17  process of working on these opinions.  I think that like any

18  other piece of litigation, resolution tends to become a more

19  tangible option the closer the people are to the end of the

20  day.

21         THE COURT:  Well, they're close.

22         MR. BERNICK:  Yes.  So, I think that there probably

23  was a little bit of concern that to the extent that this matter

24  went off for mediation that it might have the effect of

25  deferring or kind of suspending the litigation process, and I

1  think that it's important, to the extent that -- Your Honor I

2  know is swamped with many, many things, but to the extent that

3  any mediation or settlement process is on a parallel track and

4  that nobody is kind of relying upon it as a way to delay the

5  litigation process if there's no resolution, that's pretty

6  important.  So that I guess I understand Your Honor to say that

7  we should see if we can resolve these matters, but that in any

8  event the litigation process is the alternative that is out

9  there and Your Honor will get to the opinions when you have a

10 chance to do that.

11         THE COURT:  Yes.  The opinions are being worked on by

12 my law clerks.  They are -- at least the California, not the

13 Canadian, the California and one other is in draft form, and

14 when I have an actual opportunity to sit down with my law

15 clerks, which may not happen for a while, but -- they need some

16 work.  They're not ready for publication, but they're getting

17 there.  So, yes, there is a finite window within which those

18 opinions are going to come out, so unless you folks tell me

19 that you are close enough in a mediation process and ask me to

20 hold up, they are going to continue to be worked on, and if an

21 order comes out before you've settled, then that's the way it's

22 going to be.  So, I would strongly suggest that you should get

23 to mediation and do it now.

24         MR. SPEIGHTS:  And, Your Honor, just -- I want to

25 bring this to the end.  I know that other people are waiting on

1  matters, and I agree with what you're saying.  I just want to

2  point out that in December when I stood up that I said I was

3  not asking to stay the proceedings and I was ready to go to

4  mediation.  My only concern is we could have already had the

5  mediation by this hearing today, and I would ask that you

6  encourage us to have mediation before the next omnibus hearing,

7  not to stop you from making any rulings, but just so we are not

8  before you a month or two or three from now and we're still

9  talking about whether we are going to mediate.  I am prepared

10 to go to mediation immediately, and I hope the debtors are too.

11         THE COURT:  Mr. Bernick, I'm looking at you because

12 you're here and Mr. Restivo isn't and it's a little difficult

13 to look at a microphone, so I'll just look at you and ask this

14 question, and if he -- you know, if I'm looking at the wrong

15 person, you can defer to Mr. Restivo.  Is the debtor willing to

16 go to mediation on these property damage issues?  If so, I

17 would like them -- I would like it to get started, so --

18         MR. RESTIVO:  Your Honor, Jim Restivo speaking from

19 the microphone.

20         THE COURT:  All right.

21         MR. RESTIVO:  It would seem to me, Your Honor, that

22 we ought to give an opportunity to one-on-one discussions on

23 three little cases.  I appreciate three little cases isn't the

24 whole panoply of what Mr. Speights has, but we have three

25 identifiable cases.  We at least have exchanged offers and

1  demands.  We may be able to resolve it.  We may not be able to

2  resolve it.  I'm concerned that if we can't move three little

3  cases, we're going to make things worse by trying to get a

4  mediator to resolve the rest.  And so my suggestion would be

5  let Mr. Speights and I first see if we can make some progress

6  and reach some success on three cases.  We know what's

7  involved.  We know where they are.  We know the square footage.

8  We know the defenses.  We know the claim.  And if we can't make

9  progress on three where we know everything, both sides ought to

10 take that into account as to whether or not going into a

11 mediation makes any sense at the present time.

12           MR. SPEIGHTS:  Your Honor, I could not disagree more.

13 I'm happy to continue the three.  Of course, Grace will always

14 (indiscernible) on those three because there have already been

15 -- there have been unique attacks on those three claims

16 (indiscernible; interruption in audio) others, but every claim

17 is entitled to its position in this bankruptcy.  For example,

18 with my co-counsel, Tom (indiscernible; interruption in audio)

19 my law firm represents a building owner (indiscernible;

20 interruption in audio) had a pretrial case involving

21 (indiscernible) substantial to others, there's no reason in the

22 world that (indiscernible; interruption in audio) couldn't be

23 part of discussions on mediation.  To hold off and say all of

24 my claims are hostage to three claims which Your Honor has

25 asked us to mediate with -- dealing with two states I think,

1  dealing with their authority objection, to hold everything else

2  hostage is a not well disguised effort on Grace's part to delay

3  any mediation till after you rule.  I'm not trying to hold up

4  the rulings.  I think it's obvious Grace is trying to delay the

5  mediation process from going forward, and I would -- Your Honor

6  has told them in the strongest terms that you (indiscernible;

7  interruption in audio) a mediation, but apparently absent an

8  order they are not going to mediation.

9       THE COURT:  Well, all right.  My suggestion is the

10  following.  Yes, I think you should make some progress on the

11  three claims.  They really are unique in the sense that the

12  issues that you're facing are totally different from the

13  issues, especially on the 16 to 19 as to which there is no

14  current court proceeding in any event.  So, I don't see why any

15  rulings, anything that's sub judice at the moment, should

16  affect the rulings on the -- or a mediation on the 16 to 19.

17  Those should be following a totally different track because

18  there is nothing currently happening with respect to those.

19       As to the ones that are currently before me, I've

20  already suggested -- you know, mediation has a salutary benefit

21  in that if you settle there are no appeals.  It terminates

22  whatever litigation is going to going to go on and on and on

23  and on and on and on in this case forever until perhaps my

24  granddaughter will be the judge who has to continue this, and

25  your grandchildren will be the parties who will still be

1  litigating.  So, you know, at a point in time, folks, some

2  finite end would be desirable on everybody's part.  Why don't

3  you go to mediation and see if, in fact, a mediator can't help

4  you get a resolution to some of this so that this company that

5  hopefully has a business reorganization purpose in mind can get

6  back to its core business and out of this asbestos litigation

7  track.  So, please, let's move in that direction.

8         Most of the issues that have come before this Court

9  in the past year and a half have not been business-related

10  issues for the most part.  They're all tied up in this asbestos

11  litigation.  This company needs to get out of bankruptcy, so

12  let's start doing the things that take it to get out of

13  bankruptcy, back into the business world, pay the people who

14  need to get paid and go about its business and off of the

15  asbestos track.  One way to start that process is to see if you

16  can settle the claims.  So, go to mediation, and it's no longer

17  a request.  It's an order.  Get to mediation.

18         MR. SPEIGHTS:  Thank you, Your Honor.

19         THE COURT:  Okay.  What's next, Ms. Baer?  Mr.

20  Bernick.

21         MR. BERNICK:  I think Item 9 is.  I appreciate Your

22  Honor's indulging my late arrival.  Southwest has the

23  reputation for being the most on-time air carrier in the

24  country, but they happen to pick out the flight to Philadelphia

25  this morning for a two-hour delay, so I then moved airports and

1 didn't do too much better at O'Hare, so I just feel fortunate

2 to be here.

3           I do want to, in response to what the Court just

4 indicated, underscore that in a very global sense Grace is and

5 the businesspeople are unbelievably anxious to get out of

6 Chapter 11.

7           THE COURT:  I'm sure.

8           MR. BERNICK:  They want -- the businesspeople want

9 this more than anyone can possibly imagine.  The difficulty

10 comes that we have a variety of constituencies and very, very

11 different views on what the liabilities are, and that's really

12 why we're here.  And even with respect to that Grace is -- at

13 an appropriate time I can become a little bit more detailed

14 about it, but Grace has been very, very active in trying to get

15 discussions going.  There are discussions that are underway,

16 global discussions to try to get this whole case resolved, and

17 yet at the same time there really isn't anything like the

18 parallel process that creates the inevitability of ultimate

19 rulings by the Court as this case proceeds to keep people

20 focused on that task.

21           So, there's nothing that's happening here.  People

22 are not kind of rubbing their hands with glee as we come into

23 court every day and litigate these issues.  It's a very arduous

24 process for everybody, and that is not the company's

25 perspective.  The company's perspective is to get the case

1  resolved in a way that's satisfactory to all constituencies.

2       I'm here really to take up the issue of discovery of

3  the lawyers and the lawyers' testimony, and it's a status

4  report, and I just want to update the Court on where things

5  have gone since the last time that this issue was addressed and

6  to make a proposal that I hope would -- make a proposal that I

7  hope would have the effect of streamlining the handling of

8  what's become a very knotty issue.

9       The last time, I think was before the turn of the

10  year, the Court suggested that in order to provide more focus

11  to the issue that a disclosure be made about exactly what these

12  witnesses were going to say, and we're dealing with Messrs.

13  Cooney, Kraus and Ted -- I guess it's Ted Goldberg.  That

14  disclosure has been filed, and it has advanced the cause at

15  least to the extent that we now actually have a bi-witness

16  description of the series of topics.  Unfortunately, with the

17  passage of time and the evolution of proceedings here in this

18  case, the substance of what these people are going to address,

19  of course, has expanded and will work its way into various

20  nooks and crannies, but at least we have it in black and white,

21  and I want to review a little bit about what the problem is,

22  not spend a huge amount of time on it, but give the Court a

23  flavor and then make a proposal.

24       The essential -- the disclosure reveals that in

25  essence what is planned for these individuals is for the ACC

1  effectively to put in a case within the case.  That is to say

2  these witnesses are going to be called -- if you look at the

3  topics, it essentially reads like one of their briefs.  They're

4  going to say this, they're going to say this, they're going to

5  say this, they're going to say this.  It is in essence their

6  position in the case.  So effectively what they're doing is

7  they're calling one of their colleagues, or more than one of

8  their colleagues, to stand up and say I swear it's all right,

9  and you can cross examine me in certain ways and other ways not

10  because it's privileged, but I'm here to say that what Mr.

11  Finch and Mr. Mullady will very ably say on their own is all

12  correct as I'm sitting here under oath.

13          So effectively we have what I think are properly

14  denominated as uber witnesses.  They are fact witnesses, they

15  are expert witnesses and they're also lawyers who are

16  advocating a position all rolled into one, and none of them are

17  really anxious, at least given the topics that have been

18  revealed, to comply with the rules.

19          I'll give just four illustrations very briefly, and I

20  think Your Honor will have a flavor of what's now happened.

21  One of the areas of testimony -- and this has been discussed

22  before, but the disclosure makes it quite clear exactly what

23  the purpose of the proffer is.  It's been the position of the

24  ACC and FCR in this case that the only issue to be resolved by

25  the Court is the cost of resolution.  Of course, we take issue

1 with that.  We believe that liability is the issue.  But the
2 proffer that we have from -- for these witnesses makes clear
3 that they're not only going to address the settlements from the
4 point of view of this was Grace's historical settlement pattern
5 and practice and here's what it costs, they want to get into
6 the underlying reasons for the settlement and their sense of
7 what it took to be able to settle and why, which turns the
8 settlement, which has been admissible in any event under Rule
9 408, turns the settlement into evidence that they would seek to
10 rely upon for purposes of making the argument that even if
11 Grace is right and the issue is liability, that Grace
12 effectively was admitting liability.  That is that these
13 criteria were criteria that were adopted effectively as proxies
14 for liability.

15 So what do we have?  We have the first -- one of the
16 descriptions says what criteria Grace told plaintiffs they had
17 to meet to be paid a settlement in mesothelioma and lung cancer
18 cases.  Well, the criteria for settlement they will say are
19 exposure, causation.  There are proxies for those things and
20 therefore to the extent we propose those they were really --
21 they were kind of in short form addressing an intent to settle
22 out cases that really had value that were meritorious cases.
23 There's no other reason, no other reason, for asking for the
24 underlying criteria other than to evince Grace's intent in
25 resolving the cases.  Then it goes on to say why type of

1 evidence was supplied to meet these criteria.  Well, why type

2 of evidence was supplied, supplied by people who settled,

3 they're not parties to the court, they are not parties to the

4 case, and, therefore, any evidence that they would have

5 provided is all hearsay.  None of these lawyers can testify to

6 it in fact.  They can only testify to it as basically hearsay,

7 as admitted for the purpose of establishing that these criteria

8 were met, that is the truth of the matter being submitted.  So

9 that's hearsay.

10        So we have a 408 violation in multiple ways.  We have

11 a hearsay violation.  And this is the one that really sticks in

12 the company's craw a little bit, and when in the

13 discovery/trial preparation process the evidence was available,

14 thereby suggesting that, well, the evidence really didn't come

15 through until, you know, further on in the settlement or in the

16 trial process, i.e., it was not available before then.  Well

17 that is the very area in which we were at pains to explore with

18 the Court exactly what was available to the law firms and when,

19 because it's our view that the only exposure facts that we rely

20 upon for purposes of our model are exposure facts that were in

21 the possession of the claimant himself.  That is, what was your

22 job, where did you work, were you exposed to Grace asbestos?

23        We're not relying upon exposure facts -- any other

24 exposure facts other than what is in the knowledge of the

25 claimant, and in order to illustrate that, we remember I

**J&J COURT TRANSCRIBERS, INC.**

1  specifically and vigorously sought discovery of things like the

2  intake forms that all these law firms use to establish that

3  they won.  All the law firms knew the exposure information that

4  is germane to this case.  They fought that tooth and nail.  I

5  sought depositions.  The depositions were not allowed.  We

6  sought interrogatories.  The interrogatories were originally

7  proposed by me, but the answers were far from complete and

8  never, ever, ever with one exception, that was the Brayton

9  Purcell firm and Ms. Ramsey, was a single intake form produced,

10  and even then it was redacted.

11          So this is an area, that is the availability of

12  information to the law firms, that's what it is, available,

13  that we specifically sought discovery of.  It was foreclosed.

14  And this is again -- it runs very much -- and Your Honor has

15  said, we're done with the questionnaires, we're done with that

16  whole process.  This pretends that none of that occurred, and

17  that's just one.

18          Then you get another one.  This is different.  This

19  is a, you know, kind of the growing nature of the proffer.

20  This is how the settlement values paid by Grace in mesothelioma

21  cases compared in size to plaintiffs' judgments in the

22  jurisdictions in which the witnesses -- in which the witnesses

23  represented asbestos plaintiffs.

24          THE COURT:  I'm sorry, say that --

25          MR. BERNICK:  That's really kind of -- it's my

1  mistake.  How the settlement values paid by Grace in

2  mesothelioma cases compared in size to plaintiffs' judgment in

3  the jurisdiction in which the lawyers represent asbestos

4  claimants.  That is, how the settlements with Grace compared to

5  the meso judgments in the same jurisdictions in which the

6  lawyers practiced.  So they would like to say that Grace got a

7  great deal because the settlements that were reached in those

8  jurisdictions were much lower than the plaintiff judgments,

9  verdict values.

10          That is precisely an area of testimony, expert

11  testimony by Mark Peterson.  That is one of the key points that

12  he makes in his report, and that will be an area for expert

13  testimony because it is an area for expert testimony.  It's not

14  a simple comparison.  Grace pays a settlement, a judgment, it

15  could be a judgment that has joint and several liability and

16  has an aggregate value that is apples and oranges compared to

17  Grace paying a smaller amount of money.  So the whole question

18  of the relationship between a Grace settlement and a

19  plaintiff's judgment for mesothelioma in the same jurisdiction

20  is a matter for expert analysis.  It requires expert analysis.

21  Their own expert is doing it, but at least when their expert

22  does it we get the underlying data upon which he relies.  Here

23  we're not getting the underlying data upon which these people

24  relied, and you'd have to know to make an apples and apples

25  comparison all kinds of information about the nature of the

1 plaintiff's judgment, who was in the case, what were the prior

2 settlements, all kinds of things that would be germane to the

3 simple comparison that they would suggest to the Court should

4 be made.

5        This is an area that is a naked effort to an end run

6 around the whole process of expert discovery that's been

7 developed in these -- this case.  They can't bring in a lawyer

8 effectively to say, well, based upon my experience, this is the

9 way that it is, thereby essentially supplementing what Dr.

10 Peterson has done, particularly in an area where, again, we

11 have not had the discovery.  We don't know what was behind all

12 these other plaintiffs' judgments.  Maybe they do because they

13 represented all these people, but we don't know what it was.

14 The information has not been provided to us.

15        There's a third one, whether the jurisdictions in

16 which the lawyers represent asbestos plaintiffs require

17 mesothelioma victims to prove that they personally mixed or

18 personally installed an asbestos-containing product in order to

19 get past a motion for summary judgment.  I don't know why they

20 continue to believe that the motion for summary judgment is

21 somehow the benchmark of liability, but, whatever it is, the

22 opinion or the testimony that's sought here is plainly expert

23 testimony, whether the jurisdictions require this kind of

24 proof.  Well, that's plain and simply a question of what the

25 courts in those jurisdictions require, which is the subject of

1  expert testimony.  It's not fact testimony.  It's expert

2  testimony, and, again, it is improper.  They've got experts --

3  Dr. -- Lawyer Shapo, who's an expert lawyer.  He abided by the

4  usual rules.  He's tendered a report.  None of these people

5  have tendered reports.

6        The last one is remarkable again because it's just --

7  it's so nakedly an effort to turn these people into experts.

8  It says, "The all-in value of a meso case settled in 2007 is

9  higher than the all-in value of a meso case settled in 2001."

10  Well, the whole question of what's happened to the meso values

11  since 2001 is the subject of every single estimator's expert's

12  report.  They all deal with the trend of meso values.  So now

13  all of a sudden we're going to get people who never submitted

14  an expert report come in and say, well, I can tell you based

15  upon my own experience, X or Y or Z.  Again, it's plain and

16  simple expert testimony and, again, in an area where we don't

17  have the information.  How do we know what the all-in value of

18  a meso case in 2007?  Even their own experts, their own

19  experts, talk about the meso value that is being paid by trusts

20  and the like.  It's not the all-in meso value.  It's the meso

21  value paid by a certain company or a certain trust.  Now they

22  want to talk about the all-in meso value.  Well, maybe they

23  know it and their clients know it because they're the ones who

24  represent the client that gets all the money.  It's never been

25  disclosed to us.  We have no idea of what it is, and the all-in

1  value of 2001, it's the same thing, well, value for what claims

2  paid by whom and who are all the different participants?

3  Where's the analysis that backs all that up?  So, it's just

4  really a naked effort to replace the -- or to back these people

5  and these experts.  It's totally improper.

6          Now, I'm sensitive to the fact that the Court doesn't

7  like to address broad issues, or even, for that matter, narrow

8  issues without having a pretty precise record, and therefore,

9  you know, perhaps the simplest way to tee this up would be to

10 file a motion in limine where we would seek to bar this

11 testimony based upon the disclosures and say --

12          UNIDENTIFIED ATTORNEY:  Place them in a memo.  How

13 about that?

14          MR. BERNICK:  How about that?  I don't -- somebody.

15 So that would probably be the most cost efficient way in which

16 to do it, but I'm, again, sensitive to the fact that the Court

17 generally likes to have a pretty thorough record.  So -- and

18 this gets to the proposal, how to get this issued framed so

19 that Your Honor can rule on it, we don't waste a huge amount of

20 time, but there is a very, very specific precise record and we

21 don't get bogged down in -- remember, the last time they took

22 the position that issues of privilege would have to be

23 resolved, you know, in the far-flung areas of the United States

24 where the subpoena was served and presumably all the different

25 clients whose privileges were at issue would come in and

1 complaint about it, we would never get out of Dodge.

2        So, my proposal is that they've got three lawyer

3 witnesses.  They should pick one.  We don't need three

4 different people who are going to say effectively the same

5 thing.  I imagine it'll be Peter Kraus because, at least

6 according to Dr. Peterson, he gets the highest jury verdicts

7 and, therefore, I guess will make the nicest presentation, but

8 if it's going to be Kraus, if it's going to be Cooney, if it's

9 going to be Goldberg, it doesn't make any difference to us.

10 They should just pick one.  We'll make a document request of

11 that individual and his firm and make -- lawyers themselves,

12 clearly going to submit it to the jurisdiction of the court.

13 We don't have to go serve subpoenas wherever they -- you know,

14 wherever their office might be.  We can make a document

15 request.  It'll be very specific.  We'll ask to have it --

16 we'll ask to have it returnable within say ten days, and what I

17 would suggest at the end of the hearing is that Your Honor tell

18 them to make their choice within ten days of one of these three

19 people.  We'll give him a document request within a week, and

20 then they'll respond in ten days.

21        If they're going to assert a privilege they can then

22 assert a privilege, and my suggestion with respect to the

23 adjudication of that privilege will -- may come as a surprise.

24 I don't think we should adjudicate it, that --

25        THE COURT:  What privilege is going to be asserted if

1  somebody is going to be testifying as a fact witness?

2       MR. BERNICK:  Well, presumably, based upon what was

3  said before, they'll be asserting a privilege over files and

4  documents that relate to the claims about which they're

5  testifying.

6       THE COURT:  Well, then they're not going to testify

7  about any claims.  How can you testify and assert a privilege?

8       MR. BERNICK:  Yes.  Well, that's -- I'm going to get

9  to that in a minute.

10       THE COURT:  Well, you don't need to get -- I don't --

11       MR. BERNICK:  No, but what I would like to do is, is

12  in a sense to frame that issue precisely but without involving

13  the Court in making some determination about privilege that

14  they will then say, oh, well, you know, that impinges upon, you

15  know the rights of my clients, et cetera, et cetera.  The way

16  to have it done is that we make the document request.  They

17  assert the privilege and then effectively we'll take the

18  deposition.  We'll then go ahead and take the deposition of the

19  lawyer, and then we can present the whole thing to the Court as

20  a package.  That is, we'll have the deposition with whatever

21  information it is that we have.  We'll have the document

22  request and their assertion of privilege, and the Court then

23  can address all of these issues in the concrete context of

24  their sworn testimony and the position that they're taking with

25  respect to privilege.  We will, of course, in that package say

1  that the fact that they're asserting a privilege then bars them

2  from offering testimony as to which we can't cross examine

3  because we don't have the information.  But rather than having

4  a skirmish, particularly a skirmish someplace else, a skirmish

5  where we have to resolve privilege issues, if they're going to

6  assert the privilege, I don't know how we can get an

7  adjudication of that privilege on the merits unless their

8  clients are involved.  They don't have the ability to waive

9  their clients' privilege.  It's their clients' privilege.

10          So, if they're going to assert the privilege, fine.

11  Then we won't get the discovery, we won't get the information,

12  but that will simply be a fact that the Court can consider in

13  deciding whether it's permissible for them to offer the

14  testimony.  In other words, the tail here -- the dog is the

15  testimony.  The tail is the privilege.  The privilege is being

16  used to say, oh, well, you can't ask that, but we can still say

17  this.  Well, no, no.  The question is, what should you be

18  permitted to say in the first instance if, in fact, you're

19  going to be precluding discovery by asserting the privilege.

20          So, our proposal would be give them a week.  They can

21  make up their minds which one they want.  We'll then serve a

22  document request.  They can objection to it, serve -- you know,

23  assert privileges, whatever, and then we'll go ahead and take

24  the deposition, and then we will, on the basis of the

25  deposition, then make a motion before the Court that's based on

1  a fairly complete record, it'll be whatever it is that they say

2  in the deposition, and then we'll also have the privilege

3  assertions, and then the issue can be framed for a more precise

4  determination by the Court.  And I'd like to figure out some

5  easier way to do it.

6          I don't -- I don't think that this kind of testimony

7  has been allowed where there has been an objection in these

8  estimation cases.  My understanding is in the Fed-Mogul case,

9  there was an objection and ultimately Mr. Coleman's testimony

10  was stricken.  I believe that a bunch of lawyers testified in

11  Armstrong, but I don't think that there was any objection that

12  was made to their testimony.  Here there is most definitely an

13  objection for, you know, a whole host of reasons, and I'd like

14  to say, you know, now that we have the discovery, I'll give

15  Your Honor a brief and then maybe we can resolve the whole

16  thing.  I'm prepared to do that, but I just want to make sure

17  that because they're very focused on their record here that

18  Your Honor has whatever record you believe is appropriate, and

19  we're prepared to go ahead and take the deposition, but it's

20  not going to be I think a very fruitful task.

21          THE COURT:  All right.  Mr. Finch?

22          MR. FINCH:  May I approach the bench, Your Honor?

23          THE COURT:  Sure.  Thank you.

24          MR. FINCH:  I have placed before Your Honor the

25  witness disclosure for the asbestos claimants' committee, and

1  in there there's fairly detailed descriptions of what each of

2  plaintiff lawyer witnesses would be asked to testify to at the

3  estimation hearing.

4        Before I focus Your Honor in on that, I want to take

5  a step back set the stage as to how this came up and where --

6  how we got to this point.  Grace has an estimation methodology

7  that very much have criteria in it, criteria that say you have

8  to prove X, Y and Z to have a "valid claim."  When they get to

9  the end of their estimation methodology, they value that valid

10  claim by a settlement value.  So, what they're saying is our

11  expert -- their expert is saying that if you meet these

12  criteria, you will be paid a settlement value of X amount.  The

13  plaintiff lawyer testimony, as well as the testimony of Steven

14  Snyder, is designed to rebut that presumption, to rebut that

15  assertion that if you met these criteria you will be paid that

16  amount because we have to demonstrate to Your Honor that Grace

17  has changed the rules.

18        The rules of the tort system and the rules that it

19  followed before it went into bankruptcy said if you met these

20  criteria, totally different criteria than what they're

21  advocating now, you will be paid a settlement value of Y

22  amount.  And so if you look at -- look at Page 4 of the

23  document -- of the witness disclosure that I put in front of

24  Your Honor, this is the testimony of John Cooney.  John Cooney

25  is a lawyer based in Chicago.  He represents one of the

1  individuals who is a member of the asbestos claimants'

2  committee.  Mr. Cooney is not a member of the asbestos

3  claimants' committee.  Mr. Cooney is not a party to this

4  bankruptcy.  He represents claimants who are -- who have filed

5  claims against Grace, but he's not a party under any sense of

6  the word.  I don't know how Mr. Bernick thinks he can serve a

7  document demand on someone who is not a party.  But just to

8  focus on the substance of what Mr. Cooney would testify to, Mr.

9  Cooney is being called by ACC and the FCR to testify about his

10 firm's public dealings with Grace in settlement negotiations,

11 discovery and trials.  The ACC and FCR will not ask lawyers to

12 answer any questions that would invade a privilege or the Work

13 Product Doctrine or about their internal reasons why they

14 settled cases with Grace.

15         Specifically, Mr. Cooney is expected to testify about

16 the following subject matters:  the general process he followed

17 in settling cases, what criteria Grace told the plaintiffs they

18 had to meet to be paid a settlement in mesothelioma cases, what

19 type of evidence was supplied to meet these criteria and when

20 in the discovery trial preparation process this evidence was

21 available.  None of that is privileged.  This is Grace told me

22 I had to give it an affidavit from a coworker describing

23 exposure or I had to give it a pathology report or I had to

24 give it X or I had to give it Y.

25         What Grace told the plaintiffs is not privileged.

**J&J COURT TRANSCRIBERS, INC.**

1 What the plaintiffs told Grace is not privileged.  There's no

2 privilege that covers that.  So, the -- so there's no bar to

3 them coming in and testifying to the facts that they know of

4 what their dealings were with Grace.

5        Mr. Bernick suggested that -- you know, a lot of

6 various grounds why this testimony would not be admissible.  My

7 suggestion for him is he should file a motion in limine on the

8 schedule that the Court provided.  The motions in limine say

9 that seven days before witness testimony is supposed to go on

10 the stand you file a motion in limine, we respond to the motion

11 in limine.

12        As the Court may recall, this issue has been teed up

13 before.  We identified Mr. Kraus and Mr. Goldberg as lawyers --

14 fact witnesses who would be testifying at the estimation

15 hearing back in February of 2006.  Grace could have served

16 document requests on them and taken their deposition for two

17 years.  It didn't do that.  Once the -- once we got to August

18 when the final expert reports were up and we were sliding in a

19 schedule where we had to do 60 expert depositions in about a

20 three month period of time, we offered dates for Mr. Cooney and

21 Mr. Kraus and Mr. Goldberg to testify.  Grace said no thank

22 you, we want to get documents from these people.  They put

23 document demands, subpoenas, on their law firms.  Their law

24 firms are based in Chicago, in the case of Mr. Cooney, and

25 Dallas, Texas, in the case of Mr. Kraus.  The Federal Rules of

1 Civil Procedure have a procedure by which one should follow if

2 you need to get documents to cross examine a witness.  All the

3 documents that I might use or Mr. Mullady might use in putting

4 either -- any of these witnesses on the stand Grace has.  We've

5 exchanged our exhibit lists.  We've exchanged our trial

6 exhibits.  Any potential document that one of these witnesses

7 might talk about at trial has already been provided to Grace.

8 Grace has them.  What they want to do is try to invade the

9 privilege of these gentlemen's clients when I am not asking

10 them privileged information at all.  I am asking them to

11 testify about the facts of the their public dealings with

12 Grace.

13         If Grace has specific document requests it wants to

14 enforce, it knows how to do that.  It -- at the last hearing

15 this was addressed, which was in November of last year, Your

16 Honor quite correctly suggested to Mr. Bernick, told Mr.

17 Bernick, "With respect to the documents though, I think Mr.

18 Inselbuch's correct.  If you're going to have a document fight,

19 I think you're going to have to do that in the court in which

20 the document subpoena was issued.  That's where the documents

21 are."

22         The witnesses are fact witnesses.  they are not

23 parties.  They are -- their law firms are subject to subpoena

24 discovery in the jurisdiction in which they live, and so if Mr.

25 Bernick want's to get their documents he can go move to enforce

1   the subpoenas there.  If he believes that some aspect of their

2   testimony is foreclosed, he can file a motion in limine in the

3   schedule provided in the case management order that we

4   negotiated with Your Honor, discussed with Your Honor, the same

5   time this lawyer discovery issue came up.

6           And finally, Your Honor, the -- you know, the idea

7   that, oh, I should have to pick which of these -- you know,

8   only one of the three gentlemen to testify, maybe I will pick

9   two out of three of them, but I haven't decided which of the

10  three.  I mean, one of the things you go through discovery for

11  is you see how the witnesses do in their depositions and then

12  you can decide which witness you put on.  He's -- we've offered

13  these people for deposition before.  He didn't take them up on

14  it.

15          The fact is that there are areas that he thinks that

16  are foreclosed by their failure to respond to discovery.  He

17  can file a motion in limine and we can respond to that.  But

18  there are many, many areas that are not privilege, that don't

19  avail you to privilege.  He can testify to the practices and

20  the facts of what -- what the business and litigation was with

21  Grace, just like in a deal case, in a legal malpractice case,

22  lawyers can come in and testify these are the procedures were

23  followed to negotiate a merger in Delaware.  Now, it may be

24  that a lawyer can't come in and say -- and tell a Court what is

25  Delaware merger law because that would invade the province of

1  the Court, but there is legions of case law, some of which we

2  cited in our response to Mr. Bernick's <u>Daubert</u> brief when he

3  raised this issue with respect to Mr. Snyder, who is a defense

4  lawyer who is one of our experts, that lawyers can testify to

5  the facts of what they do and the practice of what they do.

6  That doesn't invade, you know, the rule that a lawyer can't

7  tell the Judge what the law -- these people are telling the

8  Court what they do in the jurisdictions in which they practice,

9  which is very different than trying to say, I am, you know,

10  West's <u>Federal Reporter</u>, I am here to tell you what the law is.

11          So I think all of the bases that he has raised here I

12  think are groundless, but (b) they should be made in a properly

13  noticed and properly filed motion in limine, and (c) the

14  procedure he is asking Your Court to adopt runs afoul of the

15  Federal Rules of Civil Procedure.  Proper procedure would be to

16  get the documents from the locations in which the -- which they

17  are located from the parties which own them, which are the law

18  firms, not these individuals, and the proper mechanism to do

19  that is through a subpoena, not through a document demand.

20  There's no vehicle for a document demand addressed to a

21  non-party.  There's no vehicle to require an opposing party to

22  limit its case before discovery is completed.

23          So, with all that in mind, Your Honor, I think that

24  the proper way to proceed here, indeed the only proper way to

25  proceed, is for him to file a motion in limine seven days

1  before these witnesses will testify.  That's not going to be

2  till probably the end of March or the first of April, given the

3  debtor's still got some of its case to put on.

4          You know, we'll be filing witness disclosures at the

5  end -- you know, each -- the beginning of each period as to

6  what we think our case is going to be, and so he can file his

7  motion in limine then, but it's not proper for him to attempt

8  to foreclose my ability to put on my case by demanding that I

9  give him one witness instead of three and saying that the

10 witnesses have to subject to document demands, when that -- the

11 Federal Rules of Civil Procedure don't permit that, and

12 arguing, you know, attempting to argue in advance why all this

13 evidence is inadmissible when I think in large part, or in

14 toto, it is admissible, once the Court sees what the witnesses

15 are going to be testifying to.

16         And I urge Your Honor to read the witness disclosure

17 for Mr. Cooney and Mr. Goldberg and Mr. Kraus because, you

18 know, at the last hearing where this was raised, the Court

19 ordered us to provide a very detailed description.  I don't

20 think a lot of this stuff is very controverted.  I don't think

21 Grace really, at the end of the day, disputes what criteria the

22 witness -- the plaintiffs are required to meet in order to get

23 settlements.  I don't think Grace really disputes what evidence

24 was used to prove that and when that evidence was proffered to

25 Grace.  I don't think Grace really disputes what evidence Grace

1 collected or asked to be collected versus what it kept in, you

2 know, in files around the country.  I don't think that there's

3 a lot of dispute about this, but Mr. Bernick rightly

4 understands that it's fatal to his case, and so he's trying

5 anything he can to foreclose this testimony.

6        So, for all those reasons, Your Honor, I think it's

7 improper for him to tee it up this way.  The proper way to do

8 it is to do a motion in limine, filed pursuant to the CMO which

9 governs the case from here on out.  And with that I will turn

10 the podium over to Mr. Mullady.

11        MR. MULLADY:  Good afternoon, Your Honor.

12        THE COURT:  Good afternoon.

13        MR. MULLADY:  I think what we're hearing a little bit

14 more today, and it's a recurring them that's been heard in this

15 courtroom as well as in Pittsburgh, is, again, the differences

16 in the methodologies the parties are employing.  What I'm

17 hearing Mr. Bernick saying is that when this evidence that's

18 been proffered is viewed to fit within the perspective of how

19 we, Grace, believe the estimation should be conducted and

20 decided, that there are fundamental problems with the

21 admissibility of the testimony for that purpose, i.e., to prove

22 liability.

23        Now, but just as there is no rule that requires us to

24 present testimony that fits Grace's theory of the estimation

25 method, it just -- in the same sense there is no rule that

1  would all the Court to exclude our evidence because we didn't

2  fit into their theory, and that's particularly evident in the

3  case of the criteria.  I heard Mr. Bernick say that there's no

4  reason for the criteria to be introduced through these lawyer

5  witnesses except to evince Grace's intent as to whether the

6  cases have liability.

7         Well, that's not correct.  We wouldn't be offering

8  the testimony for that purpose.  We'd be offering it to show

9  how Grace monetized its potential liability in the tort system,

10 and that is the best indicator, we say, of how Grace would have

11 monetized its liability in the future, adjusted for changes in

12 the legal environment that have occurred since Grace petitioned

13 for bankruptcy.  So we're once again in this discussion of the

14 two ships that are passing in the night, a -- you must prove

15 liability pursuant to our criteria theory versus a we want to

16 show how Grace would have monetized its liability going forward

17 as if the bankruptcy had never occurred, adjusted for changes

18 in the tort system since the petition date.  Those two

19 propositions never have to coincide with respect to how the

20 evidence is presented before Your Honor.  Your Honor is quite

21 capable of sorting the evidence and understanding the purpose

22 for which it's offered, and the parties shouldn't be forced to

23 present testimony and evidence that fits the other side's very

24 different methodology.  Thank you.

25         THE COURT:  All right.  Well, there is a case

1  management order that talks about the motions in limine.  I'm

2  not sure why this one should not follow that track.  Are you

3  suggesting it's going to take longer to get the evidence

4  together to argue the motion in limine?

5          MR. BERNICK:  No.  Our proposal is not simply --

6  doesn't relate simply to the timing of the motion in limine.

7  It relates to (a) their choosing one.

8          THE COURT:  I'm sorry, it relates to what?

9          MR. BERNICK:  Their choosing a horse to test -- to

10 use to test this for purposes of the motion in limine, and then

11 number two, the -- it seems to me that while, yes, we could do

12 this by motion in limine and follow the case management order,

13 the reason that they're really proposing that is that they

14 believe that, well, let's just let the guy testify and then

15 there will be a record and then you can make your objections,

16 Mr. Bernick, later on, and then the Court can rule later on,

17 and that's just not right.  We have known about this issue.

18 This is an issue that can be developed earlier.  Indeed, they

19 were the ones who proposed that motions in limine actually be

20 filed at an earlier date so that they wouldn't be on the eve of

21 the appearance of the witness.

22          So, this is a situation where there's a tie between

23 discovery that needs to be done, and we have to decide how that

24 discovery should be done, and the timing of the motion in

25 limine so that Your Honor has not only an adequate opportunity

**J&J COURT TRANSCRIBERS, INC.**

1 to take the matter up, but so that we can then figure out
2 whether we then have to go and take the depositions of two more
3 people and have yet two more motions in limine.  Your Honor, we
4 would be happy to file a motion in limine right now.  I believe
5 that our case on this is very, very strong.  We can file a
6 motion in limine in two weeks.  There's nothing in the order
7 that precludes us from doing so, and that way Your Honor would
8 have the matter in a very timely fashion.  But we do think it
9 makes sense to at least take one deposition so that that motion
10 in limine really has a lot of focus and specificity, hence our
11 proposal.

12        Now, the only thing that's been said against our
13 proposal are two things.  One -- well, actually three things.
14 Number one, they say, well, they shouldn't have to choose a
15 witness.  They can see how they do in the deposition.  I'm
16 sorry, we're not here to indulge trial strategy here.  They
17 know these people extremely well.  Mr. Kraus has been here.
18 Mr. Clooney has been here.  They are experienced trial lawyers.
19 This is not -- we don't have time to sit there -- sit there and
20 say, well, you know, how did he do in the deposition.

21        And then the second point that's been made is that we
22 have to proceed by way of subpoena to get the documents.  I'm
23 not sure how that really cuts, other than we had to begin
24 earlier, but that's just not true.  These individuals have
25 signed 2019 statements.  They are people who are before the

1  Court.  They've been required to submit to discovery in this

2  case already.  This is another situation in which they can be

3  required to submit to discovery because they're appearing as

4  witnesses before Your Honor.  Of course they can be subject to

5  discovery.  If they then want to refuse to answer it because

6  there are privilege issues that are important, we've not

7  suggested that Your Honor even resolve those issues.  Let them

8  rest with the privilege assertions that they're making.  So,

9  (a) it should happen soon, (b) it should happen with the

10 benefit of a deposition, (c) we should use a document request.

11 It seems to me that that is absolutely the most sound

12 procedure.

13        With respect to the other arguments that they make,

14 they are, frankly, specious arguments.  Mr. Mullady and Mr.

15 Finch both say that, oh, well, the purpose of this is not to

16 establish liability, the purpose is to show that the rules have

17 changed, so, therefore, the amounts that were historical

18 amounts wouldn't be amounts in the future.  If that's their

19 theory, that theory was announced by Dr. Mark Peterson in an

20 expert report.  That's an opinion that basically goes to the

21 analysis of how the tort system works and tort system dynamics,

22 and he spoke to it.  He's an expert in the case, and he told us

23 what it's based on.  Our problem here is not that somehow we're

24 worried or concerned about their theory of the case.  We are

25 highly confident, as we have expressed to Your Honor, that

1  their theory of the case can nowhere be squared with the

2  Bankruptcy Code.  Our problem is we want to know in advance, in

3  accordance with the rules, the basis of expert opinion.  This

4  is plain and simple expert opinion.  Their articulation of the

5  issue doesn't change the fact that it's expert opinion.  If the

6  rules of the marketplace change, the price would be different.

7  Well, we disagree.  We responded with expert reports to Dr.

8  Peterson because he was their designated expert on that issue.

9  We just don't want them to get up to the stand and announce

10 their testimony without the benefit of our having had what we

11 were entitled to under the expert procedure in this case.

12 That's one of the fundamental problems here.

13        So, the deposition would establish that (a) they

14 haven't given us the information that they're relying upon, and

15 (b) we would also establish that it's not proffered for the

16 simple purpose of the change in marketplace dynamics that they

17 say, and that's really evident when you take a look at Mr.

18 Finch's citation to the description of Mr. Cooney's testimony.

19 If all that we were here for was to establish that Grace

20 settled case for money -- that Grace settled cases for money

21 and that here were the tests of whether a case got settled or

22 not and that's it, he's right.  We don't believe it's relevant,

23 but it certainly wouldn't be controversial.  We could establish

24 that through Mr. Hughes.  They could establish it through Mr.

25 Hughes, who is the guy who handled litigation for Grace.  But

1 that's not what they really want to say.  They really want to

2 say that Grace acknowledged and conceded that those were

3 appropriate criteria.  Well, Mr. Hughes would say, absolutely

4 not, we wanted to have the benefit of a full litigation record,

5 we wanted to have the benefit of being able to litigate these

6 cases one-by-one, and we were coerced into this settlement

7 arrangement.

8        Now, I wonder if we're going to get access to Mr.

9 Cooney's files or Mr. Kraus's files to find out what their own

10 internal files said about whether Grace was over a barrel or

11 not, that is whether Grace was happy to acknowledge its

12 liability in those cases or not, but we're not going to get

13 that discovery.  So, it's specious.  The purpose of this

14 proffer is (a) to make these people into expert witnesses

15 through their own anecdotal testimony about the same matters

16 that are covered by Dr. Peterson, and (b) to do so without

17 divulging the internal information that they have that would

18 bear upon cross examination, and (c) for the explicit purpose

19 of arguing that Grace acceded to all of this and thereby, well,

20 it's hung by its own petard, these were the rules that it

21 agreed should supplant liability.  Not so.  And again, we're

22 not going to get discovery of that either.

23        All these matters can be framed, Your Honor, on

24 paper.  They don't implicate somehow, you know, the same issue

25 that has surfaced in Pittsburgh, that well, you know, should

1  our evidence be admissible to prove our theory or is it -- it's

2  none of that.  It's all plain and simple -- whether we're

3  getting expert testimony masked as the testimony of fact

4  witnesses and whether we'll end up getting stymied and

5  frustrated on the ability to get the underlying information.

6          So, all these things can be said in a brief with the

7  benefit of a record, rather than going through the same thing.

8  We've had the same argument about three or four times before.

9  And we've made a very concrete proposal for how to get a good

10 record created.  If Your Honor feels that this is amenable to

11 resolution without a deposition so that we can then get that

12 determination before we have to proceed with any discovery,

13 we're happy to do it that way.  I made a proffer that I thought

14 was one that the Court would find better from the point of view

15 of helping to frame the issues.  So, again, we would ask that

16 they pick a witness in seven days.  We'll serve the document

17 request within a week after that.  We'd then ask that they

18 respond in 14 days, and then we'll take the deposition, and

19 once the deposition is done we'll file a brief with the Court.

20         THE COURT:  Well, I have some concerns about what the

21 scope of these alleged fact witnesses' testimony is going to

22 be.  I think some of it's going to stray far afield of Rule

23 408.  Whether it's going to violate the Hearsay Rule or not,

24 frankly, at this point I can't tell from the proffer.  I just

25 can't tell from the proffer.  I do think that it's going to run

1 afoul of Rule 408 because it does seem to me that in many

2 instances the whole and sole purpose of attempting to get into

3 some of this information is potentially to prove that the

4 settlement is a criteria of liability, and I don't think you're

5 going to get that far under Rule 408.  The one thing that Rule

6 408 is not going to let you do is prove that a settlement that

7 specifically says that no one is acknowledging liability was

8 used for liability purposes, and when you start asking what

9 criteria that Grace told the plaintiffs they had to meet, what

10 evidence was supplied to meet it, I don't know about when in

11 the discovery or trial preparation it was -- the evidence was

12 available, what that's going to be material to in terms of a --

13 of Grace pre-petition, I'm not sure, but -- so, I don't know

14 about that particular factor right now.  But the first two seem

15 to be clearly intended to get to whether or not there is some

16 criteria that looks to be a liability inducing factor.  Then --

17           MR. BERNICK:  Well, we can go -- if Your Honor wants,

18 I've got a little handy-dandy thing that I had ready to go

19 here.  This is -- we can go through this if you'd like.  I,

20 again, thought that the better way to do this --

21           THE COURT:  Well, I'm only trying to get to this at

22 the moment, Mr. Bernick, to see, you know, how much of an issue

23 this is going to be and where in the process it should come up,

24 whether seven days in advance under the case management order

25 is going to be enough, because if, in fact, a record such as a

1  deposition to see (a) whether a privilege assertion of some

2  type is going to be made, because at the moment I'm not seeing

3  what type of questions are coming up that are going to generate

4  a privilege question.  If, in fact, a document request is made

5  to back up some of this information and there is a privilege

6  assertion, then I agree we're going to have to take a look at

7  whether or not the witness can testify, but, at the moment, I'm

8  not seeing what type of question is going to be asked that

9  generates a privilege question, but the problem I see is that

10 the underlying evidence anyway still appears to get to the

11 question of liability.

12      MR. BERNICK:  Well, Your Honor, I think -- we

13 actually continue on with that same thing.  When in the

14 discovery/trial preparation process this evidence was

15 available, that is the whole question of how these law firms

16 work to get information on exposure, and that is the area where

17 we specifically inquired in connection with the questionnaire

18 process to find out about the intake forms.

19      THE COURT:  Well, but that's a different issue from

20 whether or not Grace used a process of settling to admit its

21 liability --

22      MR. BERNICK:  Well --

23      THE COURT:  -- which is the issue for Rule 408.

24      MR. BERNICK:  Fine.  There's another one that makes

25 it -- I think that's what they're getting at with available,

1  but there's another one that makes it clear.  They said -- here

2  it is -- "What additional steps claimants represented by the

3  lawyer would take to prepare for trial in which Grace was an

4  asbestos defendant and that the lawyer's clients have not taken

5  or have been prevented taking because of Grace's bankruptcy."

6  That's that whole question about whether they were somehow

7  stymied in their effort to get information that we asked for in

8  the questionnaires because of the Grace bankruptcy and that the

9  bankruptcy was holding things up.  That specifically we asked

10 to find out about, and we were foreclosed from doing it.

11        So, again, I'm happy to go through, and rather than

12 do it right now, we can file a brief about this and go through

13 it systematically, but I did want to afford the Court the

14 opportunity to be working with a record that was more complete,

15 and I certainly don't believe we should be waiting until seven

16 days before the testimony because whatever Your Honor

17 determines on this is going to have a -- you know, a very

18 significant impact.  We can't certainly wait for that before we

19 take the deposition.  We'd have to take all three depositions

20 now and go through this process.

21        We also don't know how Your Honor is going to look at

22 privilege.  Maybe we'd have to go and serve the subpoenas and

23 then have them take the position that we've got to serve them

24 in far-flung jurisdictions.  None that makes any sense.  We

25 should just have a streamlined process -- a dep, a document

1  request and a brief -- rather than perpetuating this fiction

2  that somehow --

3          THE COURT:  Well --

4          MR. BERNICK:  -- we've got to go and subpoena a bunch

5  of law firms for all their files.

6          THE COURT:  Well, I have to say, Mr. Finch and Mr.

7  Mullady, some of what is here in terms of what the witnesses,

8  the three fact attorney witnesses, are to testify about does

9  seem to me to start to invade the question of whether or not

10  this is not an expert opinion, and, for example, the all in all

11  -- the all-in value of a meso case settled in 2007 is higher

12  than one settled in 2001, you know, just as a blanket statement

13  and how you're going to measure that, I don't know how that's

14  evidence for a fact witness.  I really don't.  And if you're

15  going to say of your cases then at that point in time you're

16  definitely going to have to produce some documents to back that

17  up, because that could be a summary statement that a witness

18  could testify to, but if the debtor wants to see the documents

19  to back it up, that witness is going to have to produce those

20  documents, and I don't care whether it's by subpoena or by

21  document production or request or whatever.  But once somebody

22  is going to testify that the value is or isn't higher, I don't

23  know what the answer is going to be, there are going to have to

24  be documents and math calculations that will back it up.

25          And whether or not that's even the subject for fact

**J&J COURT TRANSCRIBERS, INC.**

1 witness testimony, at this point I'm not determining, but if it

2 is the subject of fact witness testimony there has to be some

3 basis for that fact.  So there has to be some evidence upon

4 which that fact is stated because you just don't pick a number

5 out of the air.  So, there are some problems with the fact

6 witness testimony.  It seems to me that starting this process

7 early would probably be a good one.

8        Now, in terms of choosing one witness, I don't think

9 the ACC and FCR are bound to pick one of three by way of a

10 trial witness.  I thought what Mr. Bernick was suggesting is

11 that if you want to do -- I would assume the ruling is going to

12 be the same because the proffer is basically the same in terms

13 of what the three witnesses are going to testify to.  So,

14 unless there is some reason why you think that the ruling would

15 be different because there would be some materially different

16 answer coming out of a witness, what I thought Mr. Bernick was

17 suggesting was pick one, make it "a test case" so that you

18 don't have to go through the same process for all three.

19        If you're unhappy with that, then I guess the process

20 should just go through for all three witnesses, and we can take

21 them individually.  If you think they really are substantially

22 similar enough that it should just be one and the ruling would

23 apply to all three, then I think it can be done that way.  I

24 leave that to you.  They're your witnesses and --

25        MR. BERNICK:  Yes.  The difficulty is, Your Honor,

1  that --

2         THE COURT:  Mr. Bernick --

3         MR. BERNICK:  Yes, I'm sorry.

4         THE COURT:  -- let Mr. Finch decide.  It's their

5  witness because --

6         MR. FINCH:  Your Honor, I don't have a problem taking

7  one of them as a test case for a deposition.  The problem that

8  I have is that there is no authority to serve document demands

9  on a non-party.  Whatever documents they have are owned by

10 their law firms in Texas and in Chicago, and so if he wants to

11 file a motion in limine and go take the deposition --

12        THE COURT:  This isn't discovery.  This is trial.  If

13 a witness is going to proffer himself as a fact witness and

14 say, you know -- the first question out of the stand, what's

15 the all-in value?  Do you have documents to back it up?  Yes.

16 Produce them.  You mean I can't order a witness who's going to

17 be on the stand in front of me to back up the documents on

18 cross examination?

19        MR. FINCH:  But Mr. Bernick --

20        THE COURT:  Yes, I can, and yes, I will.

21        MR. FINCH:  Mr. Bernick's document demands go far

22 beyond the basis for the testimony.  They can certainly testify

23 about what Grace told them, and I respectfully urge Your Honor

24 to -- let me back up.  Rule 408 does not cover this situation.

25 Rule 408 talks about liability for the claim, the claim that

1  was settled, not -- or the claim that is at issue in this

2  bankruptcy is the aggregate size of Grace's asbestos liability.

3  The settlements that they made with other parties that aren't

4  the ACC and the FCR at different points in time are not the

5  claim at issue in the bankruptcy.  Rule 408 --

6           THE COURT:  But you're having a witness testify about

7  claims that he settled for particular people.  Those claims

8  that he settled for particular people are covered by Rule 408.

9           MR. FINCH:  In the lawsuit between that person and

10 Grace.  They aren't covered by Rule 408 for --

11          THE COURT:  Rule 408 doesn't say that.  It says that

12 a settlement is not admissible on the subject of liability, and

13 therefore when you try to have that witness testify to the

14 purpose of liability and whether was deemed liable somehow

15 because it settled that case and you try to get this witness to

16 say I settled and therefore Grace is liable --

17          MR. FINCH:  Your Honor --

18          THE COURT:  -- it's not going to work, Mr. Finch.

19          MR. FINCH:  -- the governing case law is not -- it is

20 the financial cost to Grace to monetize its liability in the

21 tort system, as Mr. Mullady --

22          THE COURT:  There is more.  That's only one

23 component.  You don't get to the financial liability until you

24 get to the number of claims.

25          MR. FINCH:  And the -- but by the same token, if Rule

1  408 bars the admissibility of us putting on testimony as to the

2  settlement criteria, it also bars Grace's expert from

3  testifying about the settlement values.  All of his --

4            THE COURT:  It may.

5            MR. FINCH:  All of his values are settlement values,

6  and --

7            THE COURT:  It may.  We're not there yet.

8            MR. FINCH:  Well, we'll be there in March, and I

9  respectfully urge Your Honor to read Rule 408 and read the

10  <u>Babcock</u> case, because it says compromise in furnishing or

11  offering to furnish, accepting or authorizing or promising to

12  accept a valuable consideration in compromising or attempting

13  to compromise the claim.

14            THE COURT:  Yes.

15            MR. FINCH:  The claim is the claim at issue in the

16  lawsuit in which you're seeking to introduce evidence of the

17  claim.

18            THE COURT:  You are seeking to introduce evidence of

19  the claim.

20            MR. FINCH:  We are not -- we're not seeking to

21  introduce --

22            THE COURT:  Then these witnesses aren't relevant at

23  all.

24            MR. FINCH:  We believe that they are relevant, Your

25  Honor, because they show that over many thousands of

1  transactions over a very long period of time Grace said if you

2  prove X, Y and Z, we will pay you W, and --

3          THE COURT:  So?

4          MR. FINCH:  -- and the estimate of the liability, in

5  our view, is what would Grace have continued to pay to monetize

6  that liability going forward in the future had it not gone into

7  bankruptcy, and those criteria -- Rule 408 talks about the

8  claim at issue in the litigation.  I'm not trying to put on

9  evidence of my conversations with Mr. Bernick about settling

10 the Grace bankruptcy or one of my --

11         THE COURT:  Right.

12         MR. FINCH:  -- or one of the ACC members

13 conversations with the CFO of Grace about settling the whole

14 bankruptcy.  Rule 408 would bar that.  Rule 408 doesn't bar

15 settlements that are unrelated to the dispute at issue.  I

16 think Your Honor --

17         THE COURT:  But they are clearly related to the suit

18 at issue.  You're attempting to base your whole concept of what

19 Grace's liability for all present and future claims should be

20 on Grace's past settlement history, therefore you can only do

21 it by attempting to show what Grace's past settlement history

22 is --

23         MR. FINCH:  Your --

24         THE COURT:  -- therefore clearly relevant.  It's the

25 predicate upon which the entire base is made.

1          MR. FINCH:  Yes, it's relevant and Rule 408 doesn't

2 bar it.  That's my point.  It doesn't bar it.  It would only

3 bar the admission of evidence if I tried to put on statements

4 that Grace made to me to settle the whole bankruptcy case.  It

5 doesn't bar evidence of prior settlements of parties who are

6 not the ACC and the FCR.  Those settlement agreements --

7          THE COURT:  It doesn't bar those evidence as to the

8 numbers.  It bars the specifics of the settlements when it gets

9 to the question of liability.  It's admissible for some

10 purposes.  It's not admissible for all purposes.  And I think

11 the problem -- and I may be misreading the way you intend to

12 use this witness -- these witnesses' proffers, but it looks as

13 though from the statements that you've got that what you're

14 attempting to do is essentially say that Grace acknowledges

15 that there was some measure of liability on its behalf or it

16 wouldn't have settled cases --

17          MR. FINCH:  No.

18          THE COURT:  -- and that's specifically what you can't

19 do.

20          MR. FINCH:  Your Honor, first of all, I think you can

21 do it because it's a different case than the one at issue.  In

22 insurance bad faith litigation oftentimes parties put on

23 evidence of prior settlements between the insurance company and

24 similarly situated parties.

25          THE COURT:  That's a material issue.  Bad faith

1  settlement litigation -- bad faith and settling puts that very

2  issue at issue in the trial.

3          MR. FINCH:  But that's -- but not --

4          THE COURT:  That's the reason you can bring it in.

5          MR. FINCH:  -- not the issue -- let me back up.

6          THE COURT:  I mean, when would you ever want to bring

7  in the issue of a settlement -- well, you could in a specific

8  trial want to bring in the issue of a settlement of --

9          MR. FINCH:  Of past settlements, of past settlements

10 of that insurance company to show that in this case they acted

11 in bad faith.

12         THE COURT:  Well, sure.  That --

13         MR. FINCH:  That's no different than what we're

14 trying to do.  We're trying to -- Your Honor, the problem is

15 that we respectfully disagree with your analysis of Rule 408,

16 and also we suggest that if Your Honor hears that analysis

17 Grace's entire case is inadmissible as well, because it boils

18 down to settlement values too.

19         THE COURT:  But here's the point, though.  Even the

20 ACC is attempting to get settlement values in.  I don't think

21 it's the issue of settlement value, but I'm not there yet.  I'm

22 not making a ruling.

23         MR. FINCH:  No, Your Honor, we're not.  We

24 strenuously --

25         THE COURT:  It's the liability aspect that is not

1  admissible.

2         MR. FINCH:  We strenuously disagree with Grace's

3  ability to use settlement values.  Rule 408 talks about --

4         THE COURT:  You disagree with Grace's ability to

5  apply settlement values to the limitation of the calculation of

6  claims that Grace wants.  That's the problem.

7         MR. FINCH:  But also --

8         THE COURT:  It's not the settlement.  That -- you may

9  disagree with the calculation itself too.

10         MR. FINCH:  But also Rule 408 says, "Evidence of the

11  following is not admissible on behalf of any party when offered

12  to prove liability for, invalidity of, or amount."  Grace is

13  using settlement values to prove amount.

14         THE COURT:  Well, then maybe that's the case and

15  maybe it'll be barred too, but aside from that fact, if that's

16  the case and you don't want to go there, then what case is the

17  ACC going to be giving me?

18         MR. FINCH:  We will be --

19         THE COURT:  If you can't prove it for liability and

20  you can't use it for amount, what do I have?

21         MR. FINCH:  You have judgment history, Your Honor.

22         THE COURT:  Fine, then bring it on.

23         MR. FINCH:  Well, we would be happy to value the

24  liability by what remains as judgments.

25         THE COURT:  Okay, that's fine.  But if that's the

1  case, boy, and so far nobody's got a single witness that I'm

2  aware of in this case, so --

3         MR. FINCH:  Dr. Peterson talked very extensively

4  about Grace's judgment history and the liability of what Grace

5  would be if you assumed --

6         THE COURT:  Well, then the trial is going to be real

7  short.  Let's bring on Dr. Peterson and we can all go home.

8         MR. FINCH:  Well, if Grace will stipulate that the

9  values of the valid claims are the judgments, that's -- in our

10  view, you can take Dr. Florence's analysis and apply math to

11  it, using -- instead of using his settlement value, using the

12  judgment averages, and you take Dr. Peterson's analysis and you

13  can decide which of those is a more credible analysis, that's

14  the -- that's fine.  That's the way to get the case done in a

15  week.

16         THE COURT:  We don't need a week.  We could probably

17  to two days, one for Dr. Peterson, one for Dr. Florence, and

18  we're done.  We can go home.

19         MR. FINCH:  Should we schedule that for next month,

20  Your Honor?

21         THE COURT:  I have some problems.  I have some

22  problems with the use to which you want to put these witnesses.

23  I really do think that it's pushing the envelope.  It seems to

24  me that it's trying some instances to mix up the components of

25  the fact and the expert witness analysis.  I am convinced that

1   once these witnesses are on the stand, if they are going to

2   submit to the jurisdiction of this Court by proffering

3   themselves as witness, whether pursuant to subpoena or

4   voluntarily, and they have documents that are useful on cross

5   examination, I can order them to produce them, and, if

6   requested, I will order them to produce them because that's a

7   relevant and material issue concerning cross examination.  So

8   you need to advise them of that fact because that's something

9   they need to know.  And if there is going to be a privilege

10  assertion as to documents then we've got a whole host of

11  problems to deal with because if they refuse to testify on

12  cross, I'm not going to hear their testimony on direct.  How

13  can I?

14          MR. FINCH:  Well --

15          THE COURT:  I can't very well, under the Rules of

16  Evidence in the federal system, permit somebody to testify who

17  is not subject to cross examination.  So, folks --

18          MR. FINCH:  Your Honor --

19          THE COURT:  -- you've got a problem if it's going to

20  shake out that way.

21          MR. FINCH:  Your Honor, a witness can come in and

22  testify to Fact X, which is not privileged.

23          THE COURT:  Yes.

24          MR. FINCH:  That does not make every privileged fact

25  he knows subject to discovery.  A witness can come in and --

1  let's say that there was a merger dispute --

2          THE COURT:  Certainly.

3          MR. FINCH:  -- and Exxon and Texaco were -- back up

4  -- Texaco and Pennzoil were going to merge and the lawyers from

5  Texaco came in and testified about what the lawyers for

6  Pennzoil were telling them in the -- in that case.  They could

7  certainly be cross examined as to what they said to the lawyers

8  for Pennzoil, but they could not be required to waive the

9  attorney/client privilege of the Texaco Corporation.  So, if

10 Mr. Cooney comes in and says this is what Grace told me, this

11 is what Grace said I had to do, this is what materials I

12 provided to Grace, that doesn't make everything that he may

13 also know that's privileged suddenly not privileged or the

14 appropriate subject of cross examination any more than if a

15 Texaco lawyer were to come in and say this is what Pennzoil

16 told me, these are the documents I gave Pennzoil as we were

17 working up the deal --

18         THE COURT:  If you ask him a question that says the

19 all-in value of a mesothelioma case settled in 2007 is higher

20 than the all-in value of mesothelioma case settled in 2001, the

21 first question is going to be how do you know, and --

22         MR. FINCH:  Sure, for that particular question, if

23 there --

24         THE COURT:  Exactly, and that's going to open up

25 every file in the man's possession, custody or control, every

1  file, because otherwise he's going to have no basis for

2  expressing that fact, Mr. Finch.  That's -- now, we all know

3  that.

4             MR. FINCH:  I -- for that question --

5             THE COURT:  Okay.

6             MR. FINCH:  -- it may be correct, but for -- there

7  are certainly other topics, and I guess what I am suggesting

8  that Your Honor do is that we tee this up on a motion in limine

9  basis.  It doesn't have to be seven days before the testimony.

10  Basically 14 days from now Grace files its motion in limine,

11  unless it insists on having a deposition first, in which case

12  they can go take the deposition.  I still don't see how it gets

13  the documents of the firm without going through the subpoena

14  route and enforcing the subpoena.

15             THE COURT:  I don't see how it does either until a

16  witness testifies, but once that witness testifies those

17  documents are going to be fair game, and if they're not

18  produced in advance, then you're going to have a major trial

19  delay and a Judge who's going to be asking, and exactly why

20  have these documents not been produced in advanced when this

21  witness has been known to you to testify, you've known the

22  scope of the subject matter, and we've had this discussion on

23  this record today.

24             MR. BERNICK:  You know -- can I make a suggestion?

25  Why don't we take five minutes and see if we can

1  (indiscernible; not speaking into microphone).

2        THE COURT:  That's fine.  I had something else I

3  wanted to raise quickly.  Maybe not.  That's fine.  We'll take

4  a five-minute recess.

5        MR. BERNICK:  Thank you.

6                    (Recess)

7        THE CLERK:  All rise.

8        THE COURT:  Please be seated.

9        MR. FINCH:  Your Honor, I think we have --

10       THE COURT:  Okay, Mr. Finch.

11       MR. FINCH:  Nathan Finch for the asbestos claimants'

12  committee.  Your Honor, I think we have agreed on a approach to

13  tee this up, although we obviously have not agreed upon the

14  resolution of it.  The approach is that by next Wednesday I

15  will -- Mr. Mullady and I will identify one of the three

16  plaintiff lawyer witnesses who will sit for a deposition.  This

17  in no way forecloses our ability to call the other two at trial

18  if they're permitted to testify.  Mr. Bernick will serve a

19  document demand on that person in his personal capacity, which

20  that lawyer will address as he sees fit.  The deposition will

21  take place, subject to the witness's schedule, sometime before

22  the end of February.  I just don't know the exact.  And then

23  Mr. Bernick will file a motion in limine within seven days

24  after the deposition is over?

25       MR. BERNICK:  That will be fine.  Yes, seven days --

1          MR. FINCH:  Seven days, and we would have ten

2   business days to respond.

3          THE COURT:  Well, are you going to -- just for my

4   edification, can -- going to need the transcripts before you --

5   of the deposition before you can --

6          MR. BERNICK:  Yes.  Seven days that we -- but we'll

7   get the transcript --

8          MR. FINCH:  We usually get a transcript the next day.

9          THE COURT:  All right.

10          MR. BERNICK:  We may need ten --

11          MR. FINCH:  We'll work it out.  And then the issue

12   would be argued at some point during the trial when we're in

13   Pittsburgh.

14          THE COURT:  All right.  Why don't I say ten days

15   after the deposition for the motion in limine and ten days to

16   respond.  That way I think you should have the transcripts and

17   everything back.  It shouldn't be an issue.

18          MR. FINCH:  And so --

19          THE COURT:  Then when I get -- you're going to do

20   briefs with the motion and the responses, correct?

21          MR. FINCH:  Yes, they would file a brief and then we

22   would respond to the brief.

23          THE COURT:  And then you can file a completion of

24   briefing with me so I know when it's done.  Otherwise I won't

25   have a clue that all this is happening.  Mr. Bernick?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That's fine.

2          MR. FINCH:  And then what we suggest, Your Honor, is

3   that, you know, at some point when we're in Pittsburgh for the

4   estimation hearing, we'll devote a portion of, you know, a

5   morning or whatever to arguing it.

6          THE COURT:  All right.  That's fine.

7          MR. FINCH:  And then, you know, we'll proceed in that

8   fashion.

9          MR. BERNICK:  There's only one thing to add.  Just

10  the document request that we're going to serve, we understand

11  that the witnesses obviously are -- they can decide to do

12  whatever they want with it, but we do want to know in advance

13  of the commencement of the deposition what they're prepared to

14  produce and what they're not prepared to produce so that we

15  don't walk into the deposition and learn for the first time

16  what those draws (sic) are.  So, prior to the deposition, it

17  doesn't have to be a long time prior to the deposition, but in

18  advance of the deposition we need something at least in writing

19  that goes through the categories and its responses.

20         MR. FINCH:  That's fine, Your Honor, although

21  obviously that response will have to be made by the witness's

22  counsel, and I don't have authority to speak for them on

23  document production issues, but I'm sure Ms. Ramsey, in the

24  case of Mr. Cooney or Mr. Kraus, will be able to -- I'm

25  speaking for her even though she's not here, but --

1          THE COURT:  So, you'll just work with them to try get

2  that done.

3          MR. FINCH:  I'll work with them to get that done.

4          THE COURT:  Okay.  That's fine.

5          MR. FINCH:  I will suggest to them that they should

6  do that, Your Honor.

7          THE COURT:  That's fine.  All right.  My only

8  suggestion would be that in the event that this completion of

9  briefing comes in close to an omnibus date -- you may have more

10  time on an omnibus date.  We could put it on that too.  So you

11  could just let me know whenever --

12          MR. BERNICK:  Yes, that would certainly be desirable

13  because --

14          THE COURT:  I think --

15          MR. BERNICK:  -- trial time is trial time, but we'll

16  check the schedule and see when it is.

17          THE COURT:  Okay.

18          MR. BERNICK:  But I -- we're fine with the

19  description that Mr. Finch gave.

20          THE COURT:  All right.  Ms. Baer?

21          MS. BAER:  Your Honor, just one final matter.  We

22  wanted to remind the Court, if you hadn't noticed, that Judge

23  Buckwalter had issued a memorandum opinion and order with

24  respect to the Libby and BNSF temporary stay appeal.

25          THE COURT:  Yes, I did, and frankly I was a little

1 surprised because I -- that one I guess I let slip through the

2 cracks because I honestly thought I wasn't supposed to be doing

3 anything with that one, and so when I got this order that said

4 I'm supposed to issue something by April I thought, uh-oh,

5 because I thought I wasn't -- I didn't think I was supposed to

6 be doing anything with that one, so I guess I'm going to have

7 to pull the papers because I really thought that one was one

8 that I didn't have to worry about, so now I realize I do.

9           MS. BAER:  Yes.  Unfortunately you entered the

10 temporary stay pending a ruling on the actual underlying

11 request for an injunction, and that's what we're waiting for.

12           THE COURT:  Okay.  I thought that, and somehow or

13 other I got myself mixed up with this one, and I apologize for

14 that.  I thought that the motion for relief from stay had been

15 withdrawn and that the preliminary injunction was held up

16 pending something that was happening by the railroad and that I

17 was waiting to hear what was happening with respect to the

18 railroad, which I never did, and so I'm just -- I'm really

19 mixed up about it all.  So I need to simply pull the papers and

20 find out what was going on, because I really thought that I was

21 waiting for parties to tell me that it was time for me to do

22 something, and I'm -- I'm confused, so --

23           MS. BAER:  Your Honor, if you'd like we can certainly

24 put together a little memo for you on what the status is so you

25 kind of know where things are at.  I think the one thing you

1  thought about was the railroad had some outstanding discovery,

2  and that was sort of going on its own merry way, and frankly

3  they never pursued it in the State Court, but in the meantime

4  we were still waiting for both the underlying injunction ruling

5  from you, as well as our motion for reconsideration on Montana,

6  which you had also taken under advisement at the same time.

7           THE COURT:  Yes, I did, and I thought -- I knew that

8  they were all tied together in one ball, but I really thought I

9  was waiting for somebody to tell me that I was supposed to do

10  something, and so I didn't.  But Mr. Monaco is here.  Maybe --

11  I know it was your underlying motion, Mr. Monaco.  I remember

12  that much.

13           MR. MONACO:  That is correct, Your Honor.  The motion

14  for stay has been withdrawn, but we were waiting for Your Honor

15  to issue a ruling on the motion for reconsideration of the

16  denial -- for the opinion denying the preliminary injunction,

17  correct.

18           MS. BAER:  That was on Montana, and then there's the

19  Burlington Northern request for preliminary injunction that

20  we're also waiting for a ruling on.  That you had never ruled

21  on at all.

22           THE COURT:  And that's what I thought was -- I

23  thought that the two were somehow now tied together and that I

24  was waiting for something from Burlington to tell me that it

25  was now ready for me to issue a ruling and that when Burlington

1  was ready, it was all ready.  I'm really mixed up.

2          MS. BAER:  There's nothing pending with Burlington.

3          THE COURT:  Okay.  Yes, if somebody could put

4  together, you know, just a like date by -- this is the status,

5  that would probably really be helpful.  I did have my staff

6  last Friday start going back through the -- copy papers again,

7  but I just haven't had a chance to look at them yet, so --

8          MS. BAER:  Your Honor, I'll put something together,

9  share it with Mr. Monaco and share it with counsel for

10  Burlington.

11          THE COURT:  Okay.  That would probably be helpful --

12          MS. BAER:  And Libby.

13          THE COURT:  -- just so I make sure I'm not missing

14  another piece.

15          UNIDENTIFIED ATTORNEY:  And Libby.

16          MS. BAER:  And Libby and Dan Cohen, who is Libby's

17  counsel.

18          THE COURT:  Yes, definitely with Libby.

19          MS. BAER:  Yes.

20          THE COURT:  Yes.

21          MS. BAER:  Okay.  We'll do so.

22          THE COURT:  Okay.  Yes, thanks.  And I apologize.  I

23  really and truly thought that that was one that I didn't have

24  to worry about, so I didn't.

25          MS. BAER:  I can understand why.

1              THE COURT:  Okay.

2              MS. BAER:  Thank you.

3              THE COURT:  Oh, the adversaries.  That prompted me to

4    realize that there are two other adversaries out there that

5    maybe I better check on too.  The adversary with National

6    Union, which is --

7              MS. BAER:  That's been resolved.

8              THE COURT:  Okay.  It's still pending.  It's still

9    not dismissed of record, the Adversary 02-1657.

10             MS. BAER:  Okay.  The order that approved the

11   settlement indicated that the adversary was to be dismissed.

12   We can certainly do a separate order.

13             THE COURT:  Okay.  I think that would be helpful

14   because I wasn't clear whether the payments were supposed to be

15   made first, and if they have been we don't have any indication

16   of that, so it might be better just to have some pleading that

17   indicates that it can be closed.

18             MS. BAER:  Okay.  We'll do so.

19             THE COURT:  And --

20             MS. BAER:  The payments were all made, by the way.

21             THE COURT:  Okay.  The other one is that Lewis

22   adversary that's really old, 01 -- I think this 8870.  It might

23   be 8810.

24             MS. BAER:  That's the one that was on the agenda

25   today that's been continued to February.  That's the old ZAI

1  adversary.

2            THE COURT:  Okay.

3            MS. BAER:  And you had entered the rule to show cause

4  on that.

5            THE COURT:  Cause on that one.  All right.  That was

6  set for today.  So that's been taken --

7            MS. BAER:  Right.

8            THE COURT:  All right.  Those are the only two that I

9  am aware of, except for the claims issues that I know I have

10 under advisement.  If I've forgotten anything else, please let

11 me know.  I'm not doing it intentionally.  It's just that I

12 honestly thought Burlington I was waiting for something and

13 obviously not.  Okay.

14           UNIDENTIFIED ATTORNEY:  We're all amazed that you

15 keep track of whatever it is that --

16           THE COURT:  Well, I don't know how I got mixed up on

17 that one, but I did, so now that I've had my wrist slapped I'll

18 make sure to take a look at it.  All right folks, thank you.

19           MS. BAER:  Thank you.

20           THE COURT:  We're adjourned.

21           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

22                          *  *  *  *  *

23

24

25

# C E R T I F I C A T I O N

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Denise M. O'Donnell                DATE:   February 4, 2008

DENISE M. O'DONNELL

**J&J COURT TRANSCRIBERS, INC.**