# **EXHIBIT 6**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .   Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .   USX Tower - 54th Floor
                            .   600 Grant Street
                            .   Pittsburgh, PA 15219
            Debtors.  .
                            .   January 16, 2008
. . . . . . . . . . . . ..   9:40 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SALVATORE BIANCA, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                               ELLI LEIBSTEIN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For W.R. Grace:           Kirkland & Ellis LLP
                          By:  DAVID MENDELSON, ESQ.
                          6555 Fifteenth Street, N.W.
                          Washington, DC  20005



Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
           produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:          Caplin & Drysdale, Chartered
                              By:  PETER LOCKWOOD, ESQ.
                                   NATHAN FINCH, ESQ.
                                   WALTER SLOCOMBE, ESQ.
                                   ADAM VAN GRACK, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005

                              Caplin & Drysdale, Chartered
                              By:  ELIHU INSELBUCH, ESQ.
                              375 Park Avenue, #3505
                              New York, NY  10152

For the Debtors:              ARPC
                              By:  AMY BROCKMAN, ESQ.

For W.R. Grace:               W.R. Grace
                              By:  JAY HUGHES, ESQ.
                                   RICHARD FINKE, ESQ.
                              7500 Grace Drive
                              Columbia, MD  21044

For the Equity                Kramer Levin Naftalis & Frankel
Committee:                    By:  GREGORY HOROWITZ, ESQ.
                                   PEGGY Farber, ESQ.
                              919 Third Avenue
                              New York, NY  10022

For the                       Stroock & Stroock & Lavan
Unsecured Creditors'          By:  ARLENE KRIEGER, ESQ.
Committee:                    180 Maiden Lane
                              New York, NY  10038-4982

for the Property
Damage Committee:             Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                              By:  MATTHEW KRAMER, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131

For :                         Drinker Biddle & Reath LLP
                              By:  ROBERT K. MALONE, ESQ.
                              500 Campus Drive
                              Florham Park, NJ  07932-1047

**J&J COURT TRANSCRIBERS, INC.**

```
APPEARANCES (CONT'D):

For the Ad Hoc            Dewey & LeBoeuf, LLP
Committee of Equity       By:  JENNIFER WHITENER, ESQ.
Sec. Holders:             125 West 55th Street
                          New York, NY  10019


For the Future            Orrick, Herrington & Sutcliffe LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               ANTONY KIM, ESQ.
                               RAYMOND MULLADY, ESQ.
                               JOHN ANSBRO, ESQ.
                               ANNIE WEISS, ESQ.
                               GARRETT RASMUSSEN, ESQ.
                               JOSHUA M. CUTLER, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


                          Orrick, Herrington & Sutcliffe LLP
                          By:  CATHARINE ZURBRUGG, ESQ.
                          666 Fifth Avenue
                          New York, NY  10103-0001

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701


For Maryland Casualty:    Connelly Bove Lodge & Hutz, LLP
                          By:  JEFFREY WISLER, ESQ.
                          The Nemours Building
                          1007 North Orange Street
                          Wilmington, DE  19899


For Travelers:            STB
                          By:  STERLING MARSHALL, ESQ.


For the Debtor:           NERA Economic Consulting
                          By:  STEPHANIE PLANCICH
                          1166 Avenue of the Americas
                          28th Floor
                          New York, NY  10036


For Serengeti:            By:  BILLAL SIKANDER
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Silver Point          Silver Point Capital
Capital:                  By:  JOHN KU

For Halcyon:              Halcyon
                          By:  JOHN GREENE

For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705

For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  BERNARD BAILOR, ESQ.
                               JAMES WEHNER, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

TELEPHONIC APPEARANCES:

For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  LEWIS KRUGER, ESQ.
                          180 Maiden Lane
                          New York, NY 10038

For Ad Hoc Committee:     Weil, Gotshal & Manges
                          By:  M. JARRAD WRIGHT, ESQ.
                          1300 Eye Street NW, Suite 900
                          Washington, D.C.  20005

For Official Committee    Dies & Hile LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701

For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                    By:  DAVID J. PARSONS, ESQ.
                               VAN J. HOOKER, ESQ.
                               SANDER L. ESSERMAN, ESQ.
                          2323 Bryan Street
                          Suite 2200
                          Dallas, TX  75201

For Fireman's Fund:       Stevens & Lee, P.C.
                          By:  JOHN DEMMY, ESQ.
                               DAVID R. BEANE, ESQ.
                          1105 North Market Street, 7th Fl.
                          Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

For the PD Committee:     Bilzin Sumberg Baena Price &
                            Axelrod LLP
                          By:  SCOTT BAENA, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131

For Owens-Illinois:       McCarter & English
                          By:  KATHARINE MAYER, ESQ.
                          Renaissance Centre, 405 N. King St.
                          Wilmington, DE  19801

For David T. Austern:     Piper Jaffray & Co.
                          By:  JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property     Scott Law Group
Damage Claimants:         By:  DARRELL SCOTT, ESQ.
                          1001 East Main Street, Suite 500
                          Sevierville, TN 37864

For National Union Fire   Zeichner Ellman & Krause, LLP
Insurance Co.:            By:  MATTHEW RUSSELL, ESQ.
                                ROBERT GUTTMANN, ESQ.
                                MICHAEL DAVIS, ESQ.
                          575 Lexington Avenue
                          New York, NY  10022

For the Future           Orrick, Herrington & Sutcliffe
Claimants                  LLP
Representatives:         By:  DEBRA FELDER, ESQ.
                               JOSHUA CUTLER, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007 For

For Federal Insurance    Cozen O'Connor
Company:                 By:  JEFFREY WAXMAN, ESQ.
                          Chase Manhattan Centre
                          1201 North Market Street
                          Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Federal Insurance        Cozen O'Connor
Company:                     By:  JACOB C. COHN, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103


For Allstate Insurance:      Cuyler Burk, LLP
                             By:  ANDREW CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054


For W.R. Grace:              W.R. Grace
                             By: WILLIAM CORCORAN, ESQ.
                             7500 Grace Drive
                             Columbia, MD  21044


For W.R. Grace:              Kirkland & Ellis LLP
                             By:  ELLEN AHERN, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601


For State of Montana         Womble Carlyle Sandridge & Rice
Department of                By:  FRANCIS MONACO, ESQ.
Environmental Quality:       222 Delaware Avenue
                             Suite 1501
                             Wilmington, DE  19801


For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186


For W.R. Grace:              Cohn Whitesell & Goldberg, LLP
                             By:  CHRISTOPHER M. CANDON, ESQ.
                             101 Arch Street
                             Boston, MA  02110


For CNA:                     Goodwin Procter, LLP
                             By:  BRIAN MUKHERJEE, ESQ.
                             Exchange Place
                             Boston, MA  02109-2881


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Grace Certain          Montgomery, McCracken, Walker &
Cancer Claimants:               Rhoads LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801

For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

For W.R. Grace:            Pachulski, Stang, Ziehl & Jones LLP
                           By:  TIMOTHY P. CAIRNS, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

For the Asbestos           Caplin & Drysdale, Chartered
Creditors Committee:       By:  JEANNA RICKARDS, ESQ.
                                LESLIE KELLEHER, ESQ.
                           One Thomas Circle, NW
                           Washington, D.C.  20005

For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Pepsi:                 Butler Rubin Salfarelli & Boyd LLP
                           By:  KIRK T. HARTLEY, ESQ.
                           70 West Madison Street
                           Suite 1800
                           Chicago, IL  60602

For Official Committee     Duane Morris LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee    Brandi Law Firm
of Asbestos Property      By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:         44 Montgomery St., Suite 1050
                          San Francisco, CA  94104

For the State of CA,      Hahn & Hessen LLP
Dept. of Gen. Services:   By:  STEVEN J. MANDELSBERG, ESQ.
                          488 Madison Avenue, 14th Fl.
                          New York, NY  10022

For Baron & Budd,         Hogan Firm Attorneys at Law
et al.:                   By:  DANIEL K. HOGAN, ESQ.
                          1311 Delaware Avenue
                          Wilmington, DE  19801

For the PD Committee:     Speights & Runyan
                          By:  DANIEL SPEIGHTS, ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924

For Royal Insurance:      Wilson Elser Moskowitz Edelman
                             & Dicker LLP
                          By:  CATHERINE CHEN, ESQ.
                               150 East 42nd Street
                               New York, NY  10017

For David T. Austern:     Piper Jaffray & Co.
                          By:  JASON SOLGANICK

For Scott Company:        Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216

For London Market         Mendes & Mount, LLP
Companies:                By:  ALEXANDER MUELLER, ESQ.
                          750 Seventh Avenue
                          New York, NY  10019-6829

For Official Committee    LECG, LLC
of Asbestos Property      By:  ALAN MADIAN, ESQ.
Claimants:                     ELIZABETH DEVINE, ESQ.
```

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Official Committee of Asbestos Property Claimants: | Richardson Patrick Westbrook & Brickman, P.C.<br>By:  EDWARD J. WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For Ivory Investment: | Ivory Investment<br>By:  DHANANJAY PATWARDHAN |
| For Linden Advisors: | Linden Advisors, LP<br>By:  CRAIG GILBERT |
| For O'Conner: | O'Conner<br>By:  John R. Wollen |
| For King Street Capital Management, LLC: | King Street Capital Management, LLC<br>By:  MITCHELL SOCKETT |
| For the Blackstone Group: | The Blackstone Group<br>By:  JOHN O'CONNELL |
| For Dune Capital Mgmt: | Dune Capital Management<br>By:  GUY BARON |
| For Anchorage Advisors: | Anchorage Advisors<br>By:  JONATHAN LEWINSOHN |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Caxton Associates: | Caxton Associates, LLC<br>By:  JAMES RIEGER |
| For Dow Jones News Wires: | Dow Jones News Wires<br>By:  PEG BRICKLEY |
| For Citadel Investment Group: | Citadel Investment Group<br>By:  BEAU HARBOUR |
| For Murray Capital Management | Murray Capital Management, Inc.<br>By:  MARTI MURRAY |
| For Korn Capital, LLC: | Korn Capital, LLC<br>By:  STEPHANIE KWONG |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):


For Millennium Partners:  Millennium Partners
                          By:  IGOR VOLSHTEYN

For Cetus Capital:        Cetus Capital
                          By:  GENTRY KLEIN

For Shareholder for       Tocqueville Asset Management
W.R. Grace & Co.          By:  PETER SHAWN

For Milbank Tweed         Milbank Tweed Hadley & McCloy
Hadley & McCloy:          By:  JEREMY HOLLEMBEAK, ESQ.
                          One Chase Manhattan Plaza
                          New York, NY  10005-1413

## I N D E X

                                                          **PAGE**

**WITNESSES FOR THE DEBTORS**
HOWARD WILLIAM ORY
     Direct Examination by Ms. Harding               14
     Voir Dire Examination by Mr. Finch              26
     Voir Dire Examination by Mr. Ansbro             29
     Continued Direct Examination by Ms. Harding     37
     Cross Examination by Mr. Finch                  73
     Cross Examination by Mr. Ansbro                112
     Redirect Examination by Ms. Harding            130

DR. JOSEPH RODRICKS
     Voir Dire Examination by Mr. Bernick           146
     Direct Examination by Mr. Bernick              152
     Cross Examination by Mr. Finch                 198
     Cross Examination by Mr. Rasmussen             235


| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| GG-2036 | Chart | 41 | 42 |
| GG-2037 | Table | 46 | 47 |
| GG-2040 | Document | 47 | 48 |
| GG-2041 | Document | 49 | 51 |
| GG-2043 | Document | 58 | 59 |
| GG-2044 | Document | 59 | 60 |
| GG-2045 | Document | 60 | 61 |
| GG-2047 | Document | | 64 |
| GG-2048 | Document | 66 | 67 |
| GG-2050 | Document | | 73 |
| ACC-571 | CDC NIOSH Deaths | 97 | |
| Ex. 614 | NIOSH CDC Report | 98 | |
| GX-580 | Risk Assessment Guidelines of 1986 (EPA) | | 188 |

1  about what it is that was said on the record.

2          MR. FINCH:  That's my only concern, Your Honor.  I

3  just want the Court to be able to refer to the actual article

4  that I used, even if it doesn't substantively come into

5  evidence.

6          THE COURT:  That's what I would like to be able to

7  use the articles for, not as substantive evidence, but simply

8  to make sure that I do have a complete record because it's

9  going to be very difficult as we get through 18 days of this,

10 to keep track of what witnesses are referring to what.  So,

11 they will not be admitted into substantive evidence.  I am

12 going to maintain copies in the file so that I do have a record

13 of the specific portions that were referred to by any one in

14 this case and the witness.  All right.

15         MR. FINCH:  I'll pass the witness, Your Honor.

16         THE COURT:  All right.

17         MR. RASMUSSEN:  Good evening, Your Honor.

18         THE COURT:  Good evening.

19         MR. RASMUSSEN:  I'm Garret Rasmussen for the Future

20 Claimants.  My first time in the court, so I'm happy to meet

21 you.  And Dr. Rodricks, my first time to meet you as well.  I

22 think we'll probably have a lot to agree upon and my

23 cross-examination will not be a long one.

24                         CROSS-EXAMINATION

25 BY MR. RASMUSSEN:


                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    I want to start out by asking you some questions about

2  risk assessment and the relevance of risk assessment to the

3  evaluation of disease in individuals.  So, risk assessment,

4  first of all, focuses on likelihood of adverse affects

5  occurring in exposed populations, correct?

6  A    It will vary, it can do that, yes, for sure.

7  Q    Right.  And a populations risk of a disease is not the

8  same thing as the risk to each and every individual in that

9  population, is it?

10  A    It's not identical, no.

11  Q    Correct.  A populations risk is only the same as every

12  individuals risk is all the individuals have identical

13  exposures and identical sensitivities to the particular toxin,

14  isn't that right?

15  A    Well, not exactly that.  We would say that if we're

16  talking about a group of individuals who experience exposures

17  similar to those where we have observation of excess risk, and

18  there's nothing that would distinguish them otherwise from the

19  studied groups, then what you find for the population ought to

20  apply to those individuals, but it applies in a probabilistic

21  way.  I think I described that with the drug example earlier.

22  That was my testimony and that's what I believe.

23  Q    Would you agree, Dr. Rodricks, that regulatory risk based

24  standards are not useful to evaluate disease causation in

25  particular individuals?

Rodricks - Cross/Rasmussen                    237

1  A    They are not designed to do that, they should not be used

2  for that purpose.

3          MR. BERNICK:  Regulatory -- counsel, the question is

4  regulatory risk levels?

5          MR. RASMUSSEN: Yes, yes.  Yes, it was.

6  Q    And, it's true isn't it, that the assumptions and models

7  used in regulatory risk assessment are not known to apply to

8  any actual individuals, correct?

9  A    They are not designed to work in that way.  They try to

10  focus on hypothetical, most sensitive individuals, whoever they

11  are, we don't know who they are, most highly exposed.  So, they

12  have a number of assumptions that would be very -- it would be

13  just wrong to apply to individuals, when you're dealing with

14  those assumptions.

15  Q    Okay.  So to assess the disease causation in an

16  individual, you would have to look at that specific individuals

17  exposure, isn't that right?

18  A    Yes.  Among other things, but yes.

19  Q    Yes, it's not enough just to look at a group cumulative

20  exposure, is it?

21  A    Well, you could do it on a group basis as well.  If you

22  have -- the important thing is the general causation and the

23  dose response relationship, but now we could look at some group

24  that has some range of exposures and that you could --

25  Q    But you couldn't do it --

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Rasmussen                    238

1           MR. BERNICK:  Excuse me, let him finish.

2           MR. RASMUSSEN:  Yes.  Keep going.

3           THE WITNESS:  What I'm saying is, you could do it.

4  Often cases arise where there's an individual or cases maybe

5  small groups of individuals, or large groups who have similar

6  exposures.  So, you could do it in all of those -- I'm sorry.

7  Go ahead.

8           MR. RASMUSSEN:  Finish, please finish.

9           THE WITNESS:  Well, you could to it in all of those

10  circumstances.

11  Q    Are you familiar with the concept of a heterogenous group?

12  A    Well, it has a couple of meanings.  Those variability in

13  the population, yes.

14  Q    So, if it is a heterogenous group with variability in the

15  population, then you can't use the group cumulative risk

16  exposure to make a prediction about an individual, could you?

17           MR. BERNICK:  Objection to the form of the question.

18  It's very ambiguous and it's got several elements to it.   If

19  you understand, go ahead and answer, but I --

20           MR. RASMUSSEN:   I think it's actually a very precise

21  questions and asked very precisely and I think the witness

22  understands it.

23           THE COURT:  Well, would you repeat it for me because

24  I only got half of it.  A heterogenous group with variability

25  in a population, that's how it started comma, cannot use and

1  that's where it lost it.

2  Q    Okay.  Cannot use a cumulative -- cannot use a risk

3  exposure calculated for a group, as opposed to for an

4  individual.  For a population as opposed to an individual.

5            MR. BERNICK:  That same -- it's even worse now.

6            MR. RASMUSSEN:  Well, we'll get back to that -- we'll

7  start with that general question and we'll get more precise as

8  we go on.

9            THE COURT:  If you understand this question, Doctor,

10  you can answer it.

11            THE WITNESS:  I thought I did but now I'm not sure,

12  so maybe it needs to be repeated.

13  Q    Okay.  Let me come about it a different way.

14  A    Okay.

15  Q    I mean, I'll just start asking about cumulative exposures

16  because I think I really want to get to the cumulative exposure

17  point.

18  A    Okay.

19  Q    The point that you did understand.  So, you would agree

20  that there's a positive relationship between cumulative

21  asbestos -- well, I don't want to use asbestos.  That's a word

22  I can't use.  You'd agree that there's a positive relationship

23  between cumulative exposure to a toxant and a risk of getting a

24  disease because of that exposure?

25            MR. BERNICK:  I'm sorry.

Rodricks - Cross/Rasmussen                     240

1          THE WITNESS:  That's the first premise?

2          MR. RASMUSSEN:  Yes, that's the first premise.

3          MR. BERNICK:  He's being asked to assume that as a

4    hypothetical?

5          MR. RASMUSSEN:  No, I'm asking him if he agrees with

6    that.

7          MR. BERNICK:  I don't know what he's agreeing with.

8          MR. RASMUSSEN:  Well, let's ask him.

9          MR. BERNICK:  What --

10          THE COURT:  The question is, does he agree that there

11   is a positive relationship between the cumulative exposure to a

12   toxant and the risk of getting a disease from that exposure,

13   but I'm not sure what the cumulative exposure means.  I'm

14   sorry.

15   Q    Okay.  The exposure -- the dosage is really what it means.

16   Q    Yes, yes.

17          THE COURT:  But you were talking about heterogenous

18   populations.  You've backed off that and now you're talking

19   about individuals with more than one --

20          MR. RASMUSSEN:  No, I'm doing it step by step.  I'm

21   going to get back to the heterogenous population, but I want to

22   first start out with the concept of what dosage means.

23   Q    Dosage -- and --

24          THE COURT:  So, now, you're now talking about an

25   individual with more than one exposure.  That's what you're

1 talking about dose, cumulative exposures?

2          MR. RASMUSSEN:  No, no, I don't want to talk about --

3 we're getting ahead of ourselves.  I'm going to go back and lay

4 the foundation.

5          THE COURT:  All right.

6 Q    Each individual, individuals in a group can have

7 different exposures to a toxant, correct?

8 A    There would be variability, yes.  Well, a group, when you

9 say a group, let's say who are all doing one kind of job

10 exposed to a chemical, there would be some variability on any

11 given day, right.

12 Q    Right.  And also there could be some variability

13 cumulatively over the course of a year if they were doing

14 different jobs, isn't that right?

15 A    If their jobs were -- quite different jobs with the same

16 chemical, let's say?

17 Q    Yes.

18 A    Sure.  Yes.  So, we'd want to classify, if there were

19 different jobs, you'd probably want to look at them separately.

20 Q    And sometimes even people doing the same job could have

21 different cumulative exposures, not just a daily exposure, but

22 cumulative, over the course of a year if, indeed, they do the

23 same job in a different way.

24          MR. BERNICK:  These are all hypothetical questions,

25 not grounded -- you're asking him to assume that?

1          THE COURT:  They are hypotheticals, yes.

2          MR. RASMUSSEN:  Correct.

3          THE WITNESS:  Yes, I don't know the answer to that.

4   I mean, that really gets to be, say, an industrial hygiene or

5   chemists question.

6   Q    I'm not asking you whether that could happen, but if it

7   did happen --

8   A    You're assuming that it does happen.

9   Q    Yes, yes.

10  A    Right.

11  Q    And, if it did happen, then the exposure of an individual

12  could differ from the exposure -- well, then the risk to the

13  individual could differ from the average risk to the group,

14  isn't that right?

15  A    Given your hypothetical --

16         MR. BERNICK:  I'm sorry.  The question is whether an

17  individual may be -- an individual's exposure may be different

18  from a calculated average, is that the question?

19         MR. RASMUSSEN: Yes, yes.

20         MR. BERNICK:  You're asking whether it can possibly

21  happen?

22         MR. RASMUSSEN: Whether it can happen in a group of

23  people, each doing the same job, because they're doing the same

24  job in a different way, over the course of a year, not just in

25  one day.

1          MR. BERNICK:  I think this really, again, falls

2    outside of his scope of expertise, but if he can answer it,

3    it's very vague.

4          THE WITNESS:  I don't really -- this really is beyond

5    my real experience.  I mean, I know there's variability from

6    day to day, I know that when I look at exposures as a risk

7    assessor, it's usually the long term exposure, either for a

8    certain group because that's usually the best measure of the

9    average exposure over a long period of time, if it's that long

10   term exposure that matters, and in most risk assessments that's

11   what matters.

12         There may be variability around that day to day for

13   individual to individual, but if you're looking at the group,

14   it's that long term average that is the best, most probable.

15   We're talking about what's most likely to be correct.  It's not

16   actually every single individual.  That's my point about going

17   from groups to individuals, we're not talking about absolute

18   prediction, we're talking about what's more likely than not, or

19   more probable than not.  I'm sorry, I kind of lectured, I

20   apologize.

21   Q    No, no, that's fine.  But the individuals in that group,

22   an individual in that group could have a cumulative exposure,

23   in other words a long term exposure over the course of a year

24   that differed from the average exposure of that group, over the

25   course of the year.

1          MR. BERNICK:  Your Honor, I just --

2          THE WITNESS:  You can't deny that, sure.

3          THE COURT:  If that weren't possible, we couldn't get

4    an average.

5          MR. RASMUSSEN:  Beg pardon?

6          THE COURT:  If that weren't possible, we couldn't get

7    an average.

8          MR. RASMUSSEN:  Right.  That's my point.

9          THE COURT:  Okay, so let's move on to something.

10         MR. RASMUSSEN:  So, some people would be higher than

11   the average and some would be below.

12         THE COURT:  So, let's move on.

13         MR. RASMUSSEN:  Okay.

14         MR. BERNICK:  (Indiscernible) what an average means.

15   Q    Relative risk.  In order to tell whether anyone in an

16   exposed group has sufficient cumulative exposure to a toxant to

17   achieve a risk doubling exposure, you would want to look at the

18   distribution of cumulative exposures in the group, wouldn't

19   you?

20   A    I'm sorry, could I -- I don't want to have the question

21   read back.  Could you just restate it, I'm sorry.

22   Q    Yes.  In order to -- with respect to relative risk, in

23   order to tell whether anyone in the exposed group, exposed

24   group to a toxant, had sufficient cumulative exposure to the

25   toxant to achieve a risk doubling exposure, you would want to

1  look at the distribution of cumulative exposures in that group,

2  correct, so you'd know whether some people are above the

3  average and some might be below.

4        MR. BERNICK:  Objection.  I think that is -- this is

5  only pursuing the same question which is the degree of

6  variability of exposures in a group.  And, again, I think it's

7  outside the scope of his expertise.  I know it's outside the

8  scope of my examination.  He's trying to use this individual to

9  create a predicate for a declaration that Dr. Stallard

10  introduced in this case, too late in the day, and this actually

11  violates yet again, yet again, the agreement that was reached,

12  that the testimony by declaration of Dr. Stallard would be used

13  solely for Daubert purposes and would never make its way into

14  this trial.  And now it's not only being done back door through

15  cross-examination of a witness, it's not even in the area.

16        THE COURT:  All right.  This witness has a good

17  understanding of his own expertise.  If he thinks this is

18  outside the area of his expertise, he has been very quick to

19  state that.  It seems to me that if this is outside the area of

20  his expertise, he will so state and otherwise, if he

21  understands the question, he may answer it.  Doctor, you may

22  answer this question if you understand it and feel that it is

23  within your expertise.

24        THE WITNESS:  Well, I'd like to hear it one more

25  time, though, because that discussion, I lost the question.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Sure, okay.  In order to tell whether anyone in an exposed

2 group had sufficient -- any one person in the exposed group,

3 had sufficient exposure to a toxant to achieve the risk

4 doubling exposure, you would want to look at the distribution

5 of cumulative exposures in that group, wouldn't you?

6 A    You're talking about a single person --

7 Q    Yes, I am.

8 A    I don't see how a distribution helps you deal with a

9 single person.

10 Q    If you want to try to figure out the causation for an

11 individual, the range of where an individual might lie, if you

12 want to figure out the extent to which an individual might have

13 a cumulative exposure over the course of say a year, and you

14 had an average for the course of the year, you'd want to know

15 the variant, the variation in order to tell how high the

16 individual might be or how low the individual might be relative

17 to the average.

18         MR. BERNICK:  Determining that variation for what

19 purpose?

20         THE COURT:  That was not a question, that was a

21 statement.  There is no question before this witness.  He has

22 said he doesn't think that's a significant factor, that was his

23 answer.  Could we please get a question before the witness?

24         MR. RASMUSSEN:  Okay.

25         THE COURT:  The statements are not evidence and

1  they're stricken.

2          MR. RASMUSSEN:  Okay.  Let me ask the question again,

3  or ask a question, I'm sorry, Your Honor.

4  Q    In order to tell whether anyone in the exposed group had

5  sufficient cumulative exposure to a toxant to achieve a risk

6  doubling exposure --

7          THE COURT:  You've asked that question.  He's

8  answered it.

9          MR. RASMUSSEN:  Okay.  Did we get --

10 Q    Okay.  If we've got the answer then I'll move on.

11 A    Well, I'll answer again if it helps.  I mean, I think the

12 answer is no, that if you have a distribution the average --

13 you don't know where any individual is on the distribution,

14 they could be on the high end, or the low end, the average is

15 the best measure over a long period of time.  If you had to say

16 what is the most likely exposure for an individual in that

17 group, you'd say it's the average.  I'm quite sure that's

18 right.

19 Q    Well, if you knew the average cumulative exposure of the

20 group, you couldn't tell from that whether any particular

21 individual within a group would have sufficient cumulative

22 exposure to the toxant to contract a disease because of that

23 exposure, could you?

24         MR. BERNICK:  Objection.  Wouldn't -- well answer it

25 if you can.

**J&J COURT TRANSCRIBERS, INC.**

Rodricks - Cross/Rasmussen                     248

1        THE WITNESS:  I'm working on what's probable.  The

2 average exposure for a group is te most probable exposure and

3 calculating the risk based on that exposure makes perfect sense

4 for the group and you would then say, probabilistically that is

5 the best estimate for any individual in that group.  The only

6 thing that would exclude that analysis was some other factor

7 about some individual which makes -- which says you have

8 evidence that that individual was somehow very different from

9 the rest.

10 Q   But there may be individuals in that group that will have

11 a cumulative exposure that is greater than the average, that's

12 my point.

13        MR. BERNICK:  Your Honor, we've been through that

14 like three times.

15        MR. RASMUSSEN:  Okay.  If that point is established

16 then I'll move on.  Do you agree with -- do we have agreement

17 on that?

18        THE WITNESS:  I suppose that could not be discounted,

19 but you're asking to do an assessment of the risk for the group

20 and what is most likely by way of exposure.  Unless you have

21 some other evidence, what is most likely is the average.

22 Q   But I'm asking for the individual.  I'm saying yes, that's

23 the average for the group, that's the most likely for an

24 individual in the group, but I'm asking you whether at the same

25 time there will be individuals in that group who will actually

Rodricks - Cross/Rasmussen                    249

1  have a cumulative exposure that is above the average.

2  A    Right.  And I'm saying it doesn't matter.

3        MR. BERNICK:  Objection, that calls -- I'm sorry.

4  That calls at this point, whether -- complete speculation.

5        THE COURT:  Counsel, Doctor, in order to get the

6  average, as a mathematical proposition what do you have to do?

7        THE WITNESS:  Well, you have a job, you have a

8  chemical, you send in an industrial hygienist, they measure

9  daily or weekly, they do this over a long period of time for

10 people working that job, they can measure the direct breathing

11 zone or just the general area and they make an average.  And

12 you'd say for that job, unless you had some clear evidence that

13 something was very different for some employee, you'd say for

14 that job the average exposure is what determines the employee's

15 risk, on a probabilistic, you can never be absolutely sure, but

16 on a probabilistic, what's most likely to be true, the average

17 is most likely to be true.

18       THE COURT:  And, sir, if a range of exposures for any

19 particular individual within that group, hypothetically, ranged

20 from 1 exposure in a given period to 100 exposures in that same

21 period, and you took an average and the average exposure was

22 50, is it a fairs statement that there would be some people who

23 had less than 50 exposures, and some people who had more than

24 50 exposures?

25       THE WITNESS:  There may be on any given measurement

Rodricks - Cross/Rasmussen                          250

1  day.

2          THE COURT:  Yes.

3          THE WITNESS:  But on the long term, unless there were

4  some other circumstance that all ought to sort of balance out

5  and the --

6          THE COURT:  To the average.

7          THE WITNESS:  -- and the average is the best most

8  probable estimate of their exposure.  Yes.

9          THE COURT:  Thank you.

10 Q    But, it wouldn't balance out to the average over the long

11 term if the individual in the group were doing different jobs

12 within that job category, would they?

13 A    Well, that's a different matter, yes.

14 Q    Well, it's true, isn't it?  If they --

15         MR. BERNICK:  Objection, objection.  Your Honor, at

16 this point, I really think he's badgering a witness who has

17 gone as far as he can in answering the questions.

18         THE COURT:  That question has been asked and

19 answered.

20 Q    Suppose that the risk doubling dose for toxant is 2, just

21 as you have in your graph this afternoon, you can't tell

22 whether any particular individual within a group would have a

23 sufficient cumulative exposure to the toxant to contract a

24 disease simply knowing that the cumulative average was

25 sufficient to get you to a 1.9 relative risk, could you?

1        MR. BERNICK:  Objection.  This exact same question

2   was asked 15 minutes ago, and led down this whole path and I

3   really object, Your Honor, because this, again, is an effort to

4   use an analysis, now on cross-examination, that was

5   specifically agreed to be usable solely for Daubert purposes --

6        THE COURT:  Well, I don't know that.  It seems to me

7   that this whole line of questioning, this witness has been very

8   clear, we're going over ground that this witness is not

9   changing his opinion about.  Can we get to something new?

10        MR. RASMUSSEN:  I really would like the answer to

11   that question because I think, Your Honor, we'll find out later

12   in this trial that that question is a key question and that

13   other --

14        THE COURT:  Then if that is the key, you may

15   establish it in your case.  This witness has told you that he

16   is not measuring individual populations.  Now, you keep asking

17   him about individual populations.

18        MR. RASMUSSEN:  But I'm asking him about -- he's an

19   expert on risk assessment --

20        THE COURT:  Yes, he is.

21        MR. RASMUSSEN:  -- and his testimony is how you use

22   risk assessment and, indeed, he has a title in his report

23   called Relevance of Risk Assessment to a Valuation of Disease

24   Causation in Individuals.

25        THE COURT:   Yes, he does.

1          MR. RASMUSSEN:  And I'm asking him about causation in

2    individuals based on risk assessment.  And I'm asking him about

3    the impropriety of using group, or at least the distinction,

4    maybe not the impropriety, the distinction between using a

5    group relative risk to apply it to an individual and I think --

6          THE COURT:  And he has been very consistent in

7    answering those questions.  You may ask one more question along

8    these lines.  Ask your question, again.  The doctor may answer

9    it, he is not changing his testimony about this.

10          MR. RASMUSSEN:  Okay.  One last question on this

11   line, it's a very important question.  I'd like to have an

12   answer, I think it's a fair question.

13   Q    Suppose the risk doubling dose for a toxin were 2 units,

14   which is what you testified about earlier this afternoon, and

15   the average cumulative lifetime exposure of a group were such

16   that the relative risk for the group was 1.9, which is below

17   the doubling dose standard, even though that's below the

18   doubling dose, you couldn't conclude that nobody in that group

19   had an exposure that could exceed the doubling dose and,

20   therefore, have causation, could you?

21   A    I can only -- it's the same answer I really gave to the

22   last exposure question.  If you're asking what is most likely,

23   the average exposure for the group is what's most likely for

24   any individual, most likely, it's not perfect, but most likely,

25   and you would say for a 1.9 increase that you do not meet the

1 more likely than not standard.

2 Q    My question wasn't whether it's more likely for the group,

3 it was whether knowing that the relative risk for the group is

4 1.9, you could not conclude from that knowledge that nobody in

5 the group exceeded the double dose of 2 units.

6 A    Well, I could not do that if you're seeking perfect

7 knowledge, right.  In other words, if it's only a matter of

8 absolute knowledge, then I can't.  I can talk about what's most

9 likely.

10 Q    But isn't it common sense as the Judge said, you have an

11 average and some people are going to be above the average and

12 some are going to be below the average?

13 A    Well, I don't agree.

14        MR. BERNICK:  There's been almost no common sense in

15 this line of examination.   Your Honor, we've been over this

16 now for 25 minutes.

17        THE COURT:  I believe the relevant test is, what is

18 the accepted scientific standard in the community within which

19 this witness is permitted to offer an expert opinion.  So, why

20 don't we get back to the test and ask your question within the

21 framework within which he is permitted to offer an expert

22 opinion.  If it's to a reasonable degree of scientific

23 certainty that you're trying to get him to answer a question,

24 then, perhaps that is the question that needs to be asked.

25 Q    Okay.  I'll do that.  Suppose the risk doubling dose for a

Rodricks - Cross/Rasmussen                254

1 toxin were 2, and suppose the average cumulative lifetime

2 exposure of a group was such that the relative risk was 1.9,

3 could you conclude with a degree of scientific certainty and

4 reasonableness that a person, that nobody, that no person in

5 that group exceeded the relative risk doubling dose of 2?

6 A    You're assuming the 1.9 is well validated as the average

7 and are you asking me to conclude with absolute certainty that

8 there's no --

9 Q    No.  Reasonable scientific certainty was my question.

10 A    All I can answer is the most scientifically responsible

11 and certain answer is that the average is what affects the risk

12 for the group.  And I couldn't go -- and that the most likely

13 exposure and risk for every individual, the most likely is

14 reflected by the average.

15 Q    So, therefore --

16 A    I don't know what else to say.

17 Q    So, therefore, am I correct in concluding that you cannot

18 say that nobody in that group exceeded the relative -- the risk

19 doubling dose of 2.

20        MR. BERNICK:  Your Honor, this is really --

21        THE COURT:  It's sustained.  He has now told you

22 everything he is going to tell you.

23        MR. RASMUSSEN:  With all due respect, Your Honor, I

24 think he answered a different question.  If you read back the

25 question and read back the answer, you'll see he didn't answer

1 the question, he answered a different question and talked about

2 the group.

3          MR. BERNICK:  With all due respect, this shows

4 disrespect for this witness and this process and I think we're

5 creating a very dangerous precedent in this case.

6          THE COURT:  Counsel, he has answered to the best of

7 his ability.  You can keep asking this question until the cows

8 come home, you're not going to get a different answer.  The

9 objection is sustained.  You have tried at least 15 ways to get

10 this answer -- this witness to give you a different answer,

11 he's not giving you a different answer, I'm sorry.  You've got

12 to live with the answer he's given you.

13          MR. RASMUSSEN:  Okay.  That actually brings on the

14 next question, it makes the next question even more

15 appropriate.

16 Q    Would you agree, sir, that risk assessors are, perhaps,

17 most delinquent in their failures adequately to convey the

18 uncertainties that accompany their evaluations?

19 A    I think I probably wrote that.

20 Q    So, you'd agree with it?

21 A    Yeah.

22 Q    And, you would agree that risk assessors should report the

23 range of uncertainty when a risk assessor reports her

24 conclusions wouldn't you?

25 A    I'm sorry, I didn't hear -- could you please repeat the

1 question?

2 Q    Yes.  You would agree that a risk assessor should report

3 the range of uncertainty when she reports her conclusions?

4 A    That's generally a good practice, but they should focus on

5 what is the best estimate for sure.  They may discuss the

6 uncertainty around that estimate, yes.

7 Q    And, would you agree, sir, that a risk assessor who uses

8 average cumulative exposures to draw conclusions about

9 individual exposures must report to be scientifically accurate

10 and scientifically reasonable, the variations from the average?

11 A    I think I answered that.  If we're interested in, what is

12 most likely a probable for the group, the average is the most

13 likely.  I don't know how else to say that.

14 Q    Should, or should not the risk assessor report the

15 variations in the context of that question?

16          MR. BERNICK:  Objection, variations in what?  Under

17 what circumstances?  Are you talking about statistical tests of

18 variations?  I mean, this, again, is completely unfair and,

19 Your Honor, I submit --

20

21          THE COURT:  Counsel, you simply have a disagreement

22 with this witness.  This witness thinks that you need to apply

23 the average, you don't think so, you're not going to get this

24 witness to change his mind, he's not changing his testimony,

25 could we please move on to something else?

1            MR. RASMUSSEN:  Yes.  It's my last question, Your

2   Honor and I'm not asking about the -- I'm not asking him to

3   change his mind about the average, but I'm asking him a

4   different question.  Whether somebody who is relying on the

5   average should report the variations from the average.

6            THE COURT:  And he's already told you that the

7   average is the most likely, he thinks that should be applied.

8   He's answered that question.

9            MR. RASMUSSEN:  But he hasn't answered the question

10  of whether it's scientifically reasonable and proper to report

11  the average without reporting the variations.

12           MR. BERNICK:  Who reporting?  Who reporting? Are we

13  talking about an industrial hygienist?

14           MR. RASMUSSEN:  I'm talking about a risk assessor, as

15  the question said, Mr. Bernick.

16           THE COURT:  All right.  Would you please repeat the

17  question?

18  Q    Would you agree that a risk assessor, risk assessor, who

19  uses average cumulative exposures to draw conclusions about

20  individual exposures, should report the variations from the

21  average in order to have a scientifically useful piece of work?

22           MR. BERNICK:  Variations in what?

23           MR. RASMUSSEN:  The exposures.

24           THE COURT:  Average cumulative exposures.  I believe

25  that's the same question that was asked before, but in the

Rodricks - Cross/Rasmussen                     258

1  event that I took inaccurate notes, I'll permit this question

2  to be asked again.  Sir, if you could answer this question.

3          THE WITNESS:  Okay.  I'll try it a slightly different

4  way.  You have a distribution, you want to assess the group

5  risk for one thing, the group, the best measure of the exposure

6  for that group, on the long term is the average.  So, whether

7  it is reported by the industrial hygienist or not, the risk

8  assessor would use the average as the most likely exposure for

9  the group.

10         If you had some data specific to an individual, which

11 said that individual for some reason is outside that

12 distribution or one end or the other, you could look at that

13 separately.  But I think you'd have to have data for the

14 individual, you couldn't just assume that that individual is at

15 one point or another.  Because you don't know where that

16 individual is on the distribution and it could be -- that's why

17 the average is the best, most probable estimate.

18 Q    For the group, but not for an individual --

19         MR. BERNICK:  Objection, objection.

20         THE WITNESS:  And it is for the individual, too.

21         MR. BERNICK:  Objection to the form of the question.

22         THE WITNESS:  I'm sorry.   It is for the individual

23 as well.

24 Q    Well, let me ask you one final question about the

25 individual.  You would agree that to assess risk to an

1 individual, one needs to deal with a known potential

2 variability in exposures, wouldn't you?

3          MR. BERNICK:  Objection to the form of the question.

4 I think we're in industrial hygiene again.  Your Honor, this is

5 going to be, right now, for the last half hour, we're

6 establishing a precedent for this case that's going to blow nay

7 notion of time limits --

8          THE COURT:  No, we're not because we're five minutes

9 over, so we're going to be leaving.  So, is this your last

10 question?  You told me --

11          MR. RASMUSSEN:  Yes, yes.

12          THE COURT:  -- all right, you may answer this

13 question.  This is the last question that the gentleman has for

14 you.

15          THE WITNESS:  You're asking about an individual where

16 we have some data and you're going to look at the data you have

17 over time, for the individual and there will be variable in the

18 day to day, you want to assess the risks for the individual,

19 the average exposure.  If cumulative long term exposure is what

20 matters, same answer, it's the average, even though there are

21 ups and downs from day to day, the risk determinant is the

22 average.

23 Q    But that's only true if they're doing the same job.

24          MR. BERNICK:  Objection.  We've now got another

25 question.

Rodricks - Cross/Rasmussen                    260

1            THE COURT:  Sustained.

2            THE WITNESS:  Well, okay, you changed the going in

3    assumption.

4    Q    But it is only true if you're doing the same job.

5            MR. BERNICK:  This is discourteous to the Court.

6    This arguing --

7            MR. RASMUSSEN:  It's not a game, Mr. Bernick, we're

8    trying to get the truth.  It's an important issue.

9            THE COURT:  Pardon me, pardon me, gentlemen.  You

10   will speak to me, not to each other.

11           MR. RASMUSSEN:  Okay.  Your Honor, I respectfully

12   suggest that this is a very important question, it goes to an

13   issue that has caused the elimination of thousands of claims

14   from this case.

15           THE COURT:  This gentleman has answered every

16   question you've asked him, he has not varied in his approach,

17   he has been consistent that regardless of whether he's looking

18   at populations, at groups, or at individuals, he's going to

19   apply an average.  You have made no points other than that, and

20   that is the end of this discussion.  Do you have any questions,

21   other than this area, to ask this witness?

22           MR. RASMUSSEN:  No, that concludes my examination.

23           THE COURT:  All right.  Mr. Bernick, do you have

24   anything on redirect?

25           MR. BERNICK:  I have no questions of this witness.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right, you're excused sir, thank you.

2          THE WITNESS:  Thank you.

3          THE COURT:  We are adjourned until whenever we meet

4   again, at nine o'clock.

5          MR. BERNICK:  Thank you very much for staying late

6   and thanks to your court staff as well, Your Honor.

7                          *****

8                     **CERTIFICATION**

9      WE, TAMMY DeRISI, MARY POLITO, PATRICIA REPKO & ELAINE

10  HOWELL, court approved transcribers, certify that the foregoing

11  is a correct transcript from the official electronic sound

12  recording of the proceedings in the above-entitled matter and

13  to the best of our ability.

14

15  /s/ Tammy DeRisi

16  TAMMY DeRISI

17

18  /s/ Mary Polito

19  MARY POLITO

20

21  /s/ Patricia Repko

22  PATRICIA REPKO

23  /s/ Elaine Howell                    Date: January 20, 2008

24  ELAINE HOWELL

25  J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**