# **EXHIBIT 2**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                          :

                                                :    **Chapter 11**

**W.R. GRACE & CO., et al.,**                   :

                                                :    **Case No. 01-1139 (JKF)**

**Debtors**

                                                :    **Jointly Administered**

                                                :

_____/

## DECLARATION OF P. J. ERIC STALLARD

I, P. J. Eric Stallard, under penalty of perjury declare as follows:

1.      I am a Research Professor in the Department of Sociology and Associate Director of the Center for Population Health and Aging at Duke University.

2.      I am a Fellow of the Conference of Consulting Actuaries, an Associate of the Society of Actuaries, and a Member of the American Academy of Actuaries, where I have served on the Board of Directors. I am also Chairperson of the Academy's Federal Long-Term Care Task Force, and I serve on the Academy's Health Practice Council, Social Insurance Committee, State Health Committee, and State LTC Task Force. During 2006–2007, I served on the Social Security Advisory Board's 2007 Technical Panel on Assumptions and Methods.

3.      Currently, I am Senior Investigator on two research projects from the U.S. National Institutes of Health/National Institute on Aging covering the areas of health, disability, LTC, and mortality. In addition, I serve as Principal Investigator on two LTC research grants, one from the Veterans Health Administration and the other from Wyeth Pharmaceuticals. Previously, I served as Principal Investigator on LTC research grants from the Society of

Actuaries, the Bayer Corporation, General Electric Capital Assurance Co., the National Council

on the Aging, and the U.S. National Institutes of Health/National Institute on Aging.

      4.      My research expertise includes modeling and forecasting for medical demography

and health/LTC actuarial practice.  I was a 1996 winner of the National Institute on Aging James

A. Shannon Director's Award for my research proposal *Forecasting Models for Acute and Long-*

*Term Care.*  In 1999, the Society of Actuaries awarded me first prize for my paper *Retirement*

*and health:  Estimates and projections of acute and long-term care needs and expenditures of*

*the U.S. elderly population*, presented at the Retirement Needs Framework Conference.  The

paper was included in the conference monograph published by the Society of Actuaries in

January 2000.  My 1984 book, *Recent Trends in Mortality Analysis*, published by Academic

Press, provided in-depth and comprehensive models for the analysis of underlying and multiple

cause mortality data.  I have written more than 100 scientific articles that span a broad range of

topics in medical demography and health actuarial practice.

      5.      In 1991 Federal Judge Jack B. Weinstein created the Rule 706 Panel to which I

was appointed to advise him in the Manville Trust asbestos case.  In addition to my work on the

Manville asbestos case, I have completed multiple consulting assignments with respect to the

asbestos liabilities of seven other companies.

      6.      My 2005 book, *Forecasting Product Liability Claims:  Epidemiology and*

*Modeling in the Manville Asbestos Case,* published by Springer-Verlag, covers the full range of

epidemiological, demographic, and actuarial issues in asbestos-related disease and mortality.

      7.      I have reviewed the expert reports submitted by Dr. Elizabeth L. Anderson in this

case, and I have reviewed her deposition in this case.  Based on my review, I have reached the

conclusions set forth in paragraphs 8–19 of this declaration.

8.     The methods and procedures used by Dr. Anderson were not scientifically valid for assessing the plausibility "… that disease in exposure categories B, D, or E can be attributed to exposure to any Grace asbestos-containing product …" and for assessing whether "… claimants reporting exposure solely in categories B, D, or E … had sufficient cumulative exposures from a Grace product to cause disease." (*See* page 9 of Dr. Anderson's July 31, 2007 report.)  Consequently, Dr. Anderson's conclusions are unscientific, unreliable, erroneous, and highly misleading.

9.     My opinion is based on two related scientific principles, each of which is well-known and fully accepted in the peer-reviewed scientific literature:

a.   *Principle 1 (Regarding the Mean)*:  It is not scientifically valid to use an estimate of a single parameter such as the *mean* of a distribution of asbestos exposure levels for a given cohort of workers to characterize the entire set of workers.  Instead, the *full distribution* of the asbestos exposure levels should be estimated from relevant data and the results used to estimate the fraction of exposure levels in that cohort exceeding each specified threshold value.  This principle is fundamental to the accurate characterization of the distribution of risk-related measurements in a heterogeneous population, e.g., a cohort of workers with individual members who differ in their levels of exposure to asbestos, as is the case here.[1]

b.   *Principle 2 (Regarding Systematic Selection)*:  It is not scientifically valid to use the distribution of asbestos exposure levels for a given cohort of workers as an estimate of the distribution of asbestos exposure levels for the *subset* of that cohort of workers who develop an asbestos-related disease.  Instead, the latter distribution should be estimated directly from data on the *subset* of that cohort of workers who develop an asbestos-related disease or, if such data are not available, from a mathematical model of the selection process.  This principle also is fundamental to the modeling of systematic risk differentials in heterogeneous populations.

10.    Dr. Anderson violated both of these principles by basing all of her calculations (and hence conclusions) on the mean values for the asbestos exposure levels for each given

---

[1] Dr. Peter S.J. Lees, upon whom Dr. Anderson relies, affirmed that the worker cohorts are heterogeneous, and he specified the mathematical form of their exposure distribution as being log-normal, a potentially highly-skewed distribution for which the distribution of the natural logarithms of the exposure levels appears as a symmetric bell-shaped curve.

cohort of workers reported in Table 1 of her July 31, 2007 report.[2] Indeed, Dr. Anderson's July 31, 2007 report provided no estimates of the variability of the distributions of asbestos exposure levels for the cohorts indicated in her Table 1, nor did she identify the fact that such estimates were not presented.

11.    The fact that Dr. Anderson's report violated Principles 1 and 2 means that her conclusions are not supported by her analysis in a scientifically valid manner. Were she to "correct" her analysis by removing the violations of Principles 1 and 2, she would have been compelled by science to reach different conclusions.

12.    In order to assess the implications of violations of Principle 1, it is necessary to deal with the limitations imposed by the fact that Dr. Lees did not provide any information on the variability of either the 8-hour TWAs or the implied annual average exposures. However, Grace expert Dr. Richard J. Lee[3] did note that one study had found "typical annual exposure levels ranging from a median value of 0.002 f/cc per year to 0.02 f/cc per year at the 90[th] percentile" – which is a very significant range-- for maintenance and repair workers. Using these data, I computed the standard deviation of this distribution to be 0.0495 f/cc, which rounds to 0.05 f/cc, which is half of the current OSHA PEL of 0.1 f/cc. I also calculated the spread of the distribution – the coefficient of variation – to be 4.9228, a value that indicates a highly-skewed distribution of exposures.

13.    The spread of the distribution is *so large that it is almost certain that some number of the population of exposed workers will be subjected to exposure levels that exceed Dr.*

_____

[2] It is relevant to emphasize that the values in Dr. Anderson's Table 1 are not the mean exposure levels among claimants belonging to different cohorts of workers. Neither Dr. Anderson nor Dr. Lees reported any direct measures of exposure levels among claimants nor was such information requested in the PIQ forms used to gather exposure information for this case. Had such information been gathered and found to be reliable, and used by Dr. Anderson in forming her Table 1, then her methods and procedures would no longer be in violation of Principle 2 above. However, they would still be in violation of Principle 1

[3] *See* page 21 of Dr. Lee's Expert Report dated October 3, 2006.

*Anderson's two benchmarks of 2.8 and 3.2 f/cc-yr* by a significant amount. Yet Dr. Anderson

excludes all maintenance and repair workers based on her unscientific misuse of a mean number.

14.    In order to assess the implications of violations of Principle 2, I created a

mathematical model of the process under which members of the at-risk population succumb to

asbestos-related disease. Following standard assumptions, I assumed (as does Dr. Anderson)

that the risk of succumbing to an asbestos-related disease increases linearly with the dose for all

levels of exposure. I also assumed that there is no threshold level below which the risk is zero.[4]

The results of the linear no-threshold model are presented below:



**Figure 1 – Right-Cumulative Distribution of Annual Exposure Levels in the At-Risk and Diseased Populations Assuming that the Mean Exposure is 0.01 f/cc in the At-Risk Population**

---

[4] Both Dr. Anderson (pages 6–9 in her October 3, 2006 report, ) and Dr. Moolgavkar (pages 6–7 in his October 3, 2006 report) indicated that there may in fact be such a threshold and I modified the selection model to consider that possibility in another set of calculations. Those calculations showed that the no-threshold assumption is conservative in its estimates of the exceedance percentages of the diseased population.

15.    The most striking result in this graph is the huge difference between the exposure levels of the diseased population compared to the at-risk population. For example, whereas only *1.5%* of the at-risk population exceeded the OSHA PEL value of 0.1 f/cc, *33.9%* of the diseased population exceeded that same value. Indeed the median value for the diseased population was 0.0482 f/cc, more than *24 times higher* than the median value for the at-risk population.

16.    To further explore the implications of violations of Principle 2, I redrew Figure 1 with the x-axis extended on the right to 1.5 f/cc and displayed the results in Figure 2. One can see from Figure 2 that 10% of the diseased population had exposure levels greater than or equal to 0.42 f/cc and 2.9% had exposure levels greater than or equal to 1.0 f/cc.

**Figure 2 – Right-Cumulative Distribution of Annual Exposure Levels in the At-Risk and Diseased Populations Assuming that the Mean Exposure is 0.01 f/cc in the At-Risk Population**



17.    Significantly, these exposure levels were achieved in *just one year*. Figure 3 displays the same results under the assumption that the at-risk population consisted of persons

6

who continued to work in the same job under constant exposure levels over an entire 45-year

career, as Dr. Anderson assumed in her report.  For this calculation, I multiplied each annual

exposure level in Figure 2 by 45 (years) to produce the corresponding cumulative exposure level

in Figure 3.[5]

Figure 3 – Right-Cumulative Distribution of Cumulative Exposure Levels After 45 Years in the
At-Risk and Diseased Populations Assuming that the Mean Annual Exposure is 0.01 f/cc in
the At-Risk Population



18.    Figure 3 shows that 10% of the diseased population diagnosed at 45 years and

beyond would have exposure levels greater than or equal to 19.0 f/cc-yr and 2.9% would have

exposure levels greater than or equal to 45.0 f/cc-yr.  Indeed, 44.2% of the diseased population

diagnosed at 45 years and beyond would have exposure levels greater than or equal to Dr.

---

[5] Comparison of the values in row 2 column B of Table 1 with row 3 column B of Table 4 of Dr. Anderson's July 31, 2007 report shows that the conversion from annual exposure levels to cumulative lifetime exposures uses a multiplier of 45 (years), consistent with Dr. Anderson's assumption that the maximum working lifetime is 45 years.

Anderson's benchmark of 2.8 f/cc-yr, with 41.2% exceeding Dr. Anderson's benchmark of 3.2 f/cc-yr.[6]

19.    In sum, Dr. Anderson's violation of Principle 2 could incorrectly exclude as much as 44.2% of the diseased population under the benchmarks proposed by Dr. Anderson herself. Thus, there is absolutely no scientific basis for Dr. Anderson's exclusion of the claimants in categories B, D, and E.

20.    I have also reviewed the expert reports submitted by Dr. B. Thomas Florence in this case, and I have reviewed his deposition in this case. I submitted a rebuttal report on September 25, 2007 where I stated the following opinion:

> The data used by Florence to estimate the average values of historical settlement amounts paid to claimants who could meet the evidentiary criteria specified by Grace were inadequate for that purpose. Specifically, the statistical sampling methods used by Florence yielded sample sizes that were inadequate for the purpose of generating reliable estimates of the average values among the targeted population consisting of all claimants who could have met the evidentiary criteria specified by Grace.

21.    This opinion was based on Dr. Florence's use of only 21 mesothelioma claims and 7 lung cancer claims to estimate the historical average settlement amounts. These sample sizes are far too small for reliable estimation of average values.

22.    Despite this obvious flaw in his June 18, 2007 expert report, Dr. Florence's September 25, 2007 supplemental report *reduced*, rather than increased, the number of mesothelioma claims from 21 to 6 claims, making his revised estimates of historical average mesothelioma settlement amounts even more unreliable. Moreover, he calculated the settlement amounts for all other diseases as proportions of his mesothelioma estimates, thereby making all of his historical average settlement amounts unreliable.

---

[6] The above results were obtained under the assumption that the mean annual exposure in the at-risk population over the 45-year working life was 0.01 f/cc. However, Table 1 in Dr. Anderson's July 31, 2007 report shows that the mean annual exposure in row 2 of category B was 0.0473 f/cc. Thus, the numbers are even higher than I report.

23.    The inadequacies of his supplemental report are documented in Figure 4 with

plots of the actual settlement amounts for the 6 mesothelioma claims used in his analysis, along

with horizontal lines showing mean value and the upper and lower bounds of the 95%

confidence interval for the mean value.



Figure 4 – Settlement Amounts for Mesothelioma Claims that Meet Grace's Evidentiary
Criteria

24.    The 6 values range from $9,981 to $446,516, with a mean of $155,240.  The

highest value is 44.7 times the lowest value, and 2.88 times the mean.  The 95% confidence

interval for the mean ranges from $25,173 to $285,306.  The upper bound is 11.3 times the lower

bound, and 1.84 times the mean.  Because of Dr. Florence's assumption that all other disease

costs are proportional to the mesothelioma costs, these uncertainty factors apply to all historical

average settlement amounts estimated by him, making his entire set of cost estimates

extraordinarily unreliable.

9

25.    My rebuttal report dated September 25, 2007 identified a sample size of 1,082 claims as the generally accepted standard for full credibility in actuarial practice.  This standard is 180.3 times larger than Dr. Florence's sample size of 6 claims.  The 1,082-standard is designed to yield error tolerances (i.e., relative errors) of ±5% on actuarial estimates such that the estimated value is within ±5% of the true value "most of the time," where the operational definition of the phrase "most of the time" is based on a 90% confidence interval.

26.    The equivalent error tolerance for full credibility for a 95% confidence interval is ±6%.  The error tolerance based on the 95% confidence interval in Figure 4 is ±84%, which is 14 times larger than the error tolerance for full credibility.

27.    Based on the above comparisons, I conclude that Dr. Florence's error rates are so far in excess of the error rates that are generally accepted in actuarial practice that his estimates of average historical settlement amounts have virtually no credibility, they are not believable, and they cannot be relied upon.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 7, 2007.

P.J. Eric Stallard, A.S.A., M.A.A.A., F.C.A.

10