# **<u>EXHIBIT 5</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| **In re:** | | |
| | : | **Chapter 11** |
| **W.R. GRACE & CO., et al.,** | : | |
| | : | **Case No. 01-1139 (JKF)** |
| **Debtors** | : | |
| | : | **Jointly Administered** |
| | : | |
| _____/ | : | |

## DECLARATION OF P. J. ERIC STALLARD

I, P. J. Eric Stallard, under penalty of perjury declare as follows:

1.     I am a Research Professor in the Department of Sociology and Associate Director of the Center for Population Health and Aging at Duke University.

2.     My credentials are set forth in my December 7, 2007 Declaration.  I repeat here only those that are directly relevant to the issues that Grace raises in its opposition brief and that Dr. Anderson raised in her supporting declaration dated December January 3, 2008.

3.     In 1991 Federal Judge Jack B. Weinstein created the Rule 706 Panel to which I was appointed to advise him in the Manville Trust asbestos case.  In addition to my work on the Manville asbestos case, I have completed multiple consulting assignments with respect to the asbestos liabilities of seven other companies.

4.     My 2005 book, _Forecasting Product Liability Claims:  Epidemiology and Modeling in the Manville Asbestos Case,_ published by Springer-Verlag, covers the full range of epidemiological, demographic, and actuarial issues in asbestos-related disease and mortality.

5.     My research expertise includes modeling and forecasting for medical demography and health/LTC actuarial practice.  I have written more than 100 scientific articles that span a broad range of topics in medical demography and health actuarial practice.

6.     I am a Deputy Editor of the journal, *Demography*, the official peer-reviewed scientific publication of the Population Association of America, the premier journal in the field. Demography, the science of human populations, includes all aspects of the size, geographic distribution, and composition of human populations and changes in these characteristics over time.   The subfield of medical demography encompasses the application of demographic concepts, models, and techniques to the analysis of the risks of morbidity, disability, and mortality faced by individuals and populations, and of the dependence of the respective risks on fixed and varying characteristics of individuals and populations.

7.     An important aspect of the scientific study of human populations is that such populations are composed of individual members who exhibit substantial heterogeneity on virtually all risk-related and other characteristics that one could or might wish to measure. Included in such heterogeneous measures are the cumulative exposures to asbestos experienced by individual members of various selected cohorts of workers such as considered by Dr. Anderson in her expert reports dated June 11, 2007 and July 31, 2007.

8.     My expertise in modeling and forecasting for medical demography specifically includes expert knowledge of methods and procedures for the scientifically valid analysis of heterogeneous populations and for assessing the impact of heterogeneity in analyses where heterogeneity is ignored (possibly by choice or inadvertently).  The basis of this expertise is my extensive research and publication record in the field extending over the past 30 years, specifically including my role as one of the authors of the seminal paper in the field:  "The

2

impact of heterogeneity in individual frailty on the dynamics of mortality." *Demography* 16(3):439-454, 1979; by James W. Vaupel, Kenneth G. Manton, and Eric Stallard. To date, *Google Scholar* reports that this one paper has been cited 505 times. I have continued my work in this area both with my original collaborators and other collaborators, and independently. My most recent publication in this area was a 2007 paper at the North American Actuarial Journal: "Trajectories of morbidity, disability, and mortality among the U.S. elderly population: Evidence from the 1984–1999 NLTCS." *North American Actuarial Journal* 11(3):16–53, 2007, by Eric Stallard.

9.      My expertise in assessing the impact of heterogeneity of individual risk-related characteristics in analyses where such heterogeneity is ignored is specifically relevant because the issue under dispute is whether Dr. Anderson's treatment of the heterogeneity of cumulative asbestos exposures experienced by individual members of various selected cohorts of workers does or does not support the conclusions on page 9 of her expert report dated July 31, 2007. I have the necessary expertise to make such a determination. Dr. Anderson does not.

10.      In making this determination, I specifically considered, but rejected, the possibility that Dr. Anderson's treatment of heterogeneity might not have adversely impacted her analysis. My determination was and continues to be that her conclusions are not scientifically valid, are not reliable, are erroneous, and are highly misleading. The basis of this opinion was provided in the *Declaration of P. J. Eric Stallard* dated December 7, 2007.

11.      I have reviewed the *Declaration of Dr. Elizabeth L. Anderson* dated January 3, 2008, and I have reviewed the material relating to Dr. Anderson's analysis contained on pages 73–81 of *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony* dated December 21, 2007. There is nothing in that material that leads me to change

my opinion that Dr. Anderson's conclusions are unscientific, unreliable, erroneous, and highly misleading. As a consequence, I continue to hold the opinion that the methods and procedures used by Dr. Anderson were not scientifically valid for assessing the plausibility "... that disease in exposure categories B, D, or E can be attributed to exposure to any Grace asbestos-containing product ..." and for assessing whether "... claimants reporting exposure solely in categories B, D, or E ... had sufficient cumulative exposures from a Grace product to cause disease." (*See* page 9 of Dr. Anderson's July 31, 2007 report.)

12.    In the remainder of this *Declaration* I will respond on a point-by-point basis to Dr. Anderson's *Declaration* dated January 3, 2007.

13.    In her **Paragraph 1**, Dr. Anderson summarized her professional qualifications, noting that she holds a "Ph.D. in organic chemistry" and is "currently Editor-in-Chief of the journal, Risk Analysis: An International Journal, which is the leading peer-reviewed international journal on topics of risk assessment." I do not dispute that Dr. Anderson has had a long and distinguished career in her field, nor do I dispute that *Risk Analysis* is the leading peer-reviewed international journal on topics of risk assessment. Indeed, one of my early papers ("The economic impact of health policy interventions." *Risk Analysis* 3(4):265-275, 1983, by Kenneth G. Manton, Eric Stallard, and H. Dennis Tolley) was written to clearly present to readers of her journal a scientifically valid approach to modeling the heterogeneity of risks in a cohort.

14.    In her **Paragraph 2**, Dr. Anderson stated her conclusion that my objections "are without scientific merit, contrary to the basic scientific principles of risk analysis; and at odds with the well established use of these methods by public health agencies and other scientists

engaged in the research and use of these sciences." The remainder of her *Declaration* failed to support this conclusion.

15.     In her **Paragraph 2**, Dr. Anderson also indicated her intention, with respect to the two scientific principles articulated in paragraph 9 of my prior *Declaration* (*Declaration of P. J. Eric Stallard* dated December 7, 2007), to "demonstrate that they are either not applicable to the situation at hand or have been distorted by Mr. Stallard to a degree that underscores his fundamental unfamiliarity with risk assessment methodology." The remainder of her *Declaration* also failed to accomplish this goal.

16.     Dr. Anderson's comment regarding my "fundamental unfamiliarity with risk assessment methodology" appeared designed to shift the focus of the dispute from my area of expertise to hers, that is, from "demographic risk modeling" to "occupational/environmental risk assessment." In fact, there is some overlap in our respective areas of expertise but the dispute involves an aspect of her analysis that is squarely within my area of expertise and only tangentially within hers. I will discuss this point further below when I comment on her **Pargraph 7**.

17.     In her **Paragraph 3**, Dr. Anderson stated: "In my expert reports, I employ the basic scientific methodologies that have been peer reviewed and underlie the risk assessment approach used by EPA, OSHA, other government agencies, and other scientists engaged in research and the application of these sciences." The question that she fails to address, however, is not whether she employed basic peer-reviewed scientific methodologies, but whether she employed them in a way that led to scientifically valid conclusions in this particular case. As I will show below, the answer is that she did not. EPA, OSHA, and other government agencies

did not use average exposures to disqualify claims of individuals suffering from asbestos-related diseases.

18.     In her **Paragraph 3**, Dr. Anderson continued:  "As far as I know, Mr. Stallard, an actuary and not a risk assessor, has not evaluated the exposure and associated health risk posed by any toxic agent."  This is true but irrelevant for the reasons indicated in paragraph 16 above. However, of direct relevance, I have conducted analyses of the population health consequences for malignant and non-malignant diseases of both asbestos exposure and tobacco consumption using demographic risk modeling techniques.

19.     In her **Paragraph 4**, Dr. Anderson stated:  "In his discussion of the first of his two so-called "scientific principles," Mr. Stallard commits fundamental errors that reflect his lack of understanding of how risk assessments are conducted by knowledgeable scientists and government agencies."  To the contrary, no errors were committed by me.

20.     In her **Paragraph 4**, Dr. Anderson continued:  "Despite his statements to the contrary, it is appropriate to use an average exposure when assessing the risk from repeated, long-term exposures to a toxic agent."  It is at this point that Dr. Anderson's rebuttal starts to fall apart.  The statement itself indicates confusion between the average exposure for an individual and the average exposure for a cohort of individuals.  Principle 1 of my prior *Declaration* referred to **the lack of** scientific validity in the use of the *cohort mean exposure* to characterize the exposures of *individual members* of that cohort.  Dr. Anderson does not respond to this critique.

21.     In her **Paragraph 4**, Dr. Anderson stated:  "An individual's average cumulative exposure over the long-term will be determined by his or her average exposure . . . ."  This is precisely the point:  an *individual's* average exposure depends on the *individual's* exposure over

time, which is different (substantially different, as discussed below) from the average exposure of a *cohort* of individuals. If Dr. Anderson understands this basic principle, she failed to apply it in her analysis.

22.    As noted in the preceding paragraph, in her **Paragraph 4**, Dr. Anderson purported to calculate an individual's "average cumulative exposure" without defining what she meant. As I understand the term "cumulative exposure," it refers to an exposure integral defined, for example, in equation (2–1) on page 7 of the EPA's 1992 Publication *Guidelines for Exposure Assessment* ("the EPA Guidelines"), which also notes that: "Integrated exposures are done typically for a single individual, a specific chemical, and a particular pathway of exposure route over a given time period." (Excerpts from the EPA Guidelines are attached hereto at Annex 1.) It follows trivially from calculus that an individual's cumulative exposure over a given time period is the length of the time period multiplied by the average exposure over the time period. However, no manipulation of the individual exposures yields an "average cumulative exposure." Dr. Anderson's lack of clarity on this fundamental point is telling in that it reveals that she is outside her "comfort zone."

23.    In her **Paragraph 4**, Dr. Anderson continued: "Mr. Stallard also misleadingly compares the standard deviation of a distribution of exposures to the OSHA PEL, when the comparison should have been made with the mean or 90th percentile of the distribution." The comparison is not at all misleading. The standard deviation of Dr. Lee's exposures is about half the current OSHA PEL, which means that it is very large and should alert any competent demographer that the impact of heterogeneity might be significant. Anyone with basic training in statistics would recognize that individuals whose exposures were just two standard deviations above the mean almost surely would exceed the OSHA PEL. (My calculations in this regard are

7

provided in my prior *Declaration* at paragraphs 12.)  Stated differently, assuming the accuracy of Dr. Lee's average exposures, the standard deviation is so large that the variability alone suggests substantial numbers of individual workers would exceed the OSHA PEL.  Dr. Anderson failed to account for such heterogeneity (i.e., the differences in individual exposures) in forming her conclusions and she continued in her new *Declaration* to fail to appreciate the significance of the heterogeneity indicated by the comparison I provided.  Indeed, Dr. Anderson did not even seek to determine the standard deviations associated with the averages she used.

24.     In her **Paragraph 5**, Dr. Anderson stated:  "To validate his argument that my method produces misleading or erroneous results, Mr. Stallard takes as an example a study cited by Dr. Richard Lee in his expert report of October 3, 2006.  The study, of airborne asbestos levels in buildings that were collected to measure the exposure of workers engaged in routine maintenance and repair activities, was one of many that Dr. Peter Lees relied upon in arriving at his estimates of exposure to workers."  Dr. Anderson critically failed to mention that my reliance on Dr. Richard Lee was necessary because both Dr. Anderson and Dr. Lees failed to report standard deviations.  I thus had to turn to the underlying reports of Dr. Richard Lee, who in his background material provided sufficient information to quantify the distribution of typical *annual* exposures.  I also calculated the variability associated with Dr. Lee's annual exposure numbers and found such substantial variability that a significant number of exposed workers in certain excluded PIQ categories (e.g., maintenance and repair workers) are likely to have exceeded Dr. Anderson's own benchmark exposure levels.  Dr. Anderson has yet to respond to this point.

25.     Dr. Richard Lee clearly indicated on page 21 of his October 3, 2006 report that the maintenance and repair workers in the cited study had "typical annual exposure levels

ranging from a median value of 0.002 f/cc per year to 0.02 f/cc per year at the 90th percentile."
My analysis was consistent with the definition on page 7 of "the EPA Guidelines" which
requires one to treat the "annual exposure levels" as cumulative exposures over a one-year
period; this is the interpretation to be applied to Figures 1 and 2 of my prior *Declaration*.

26.    In her **Paragraph 6**, Dr. Anderson stated:  "Mr. Stallard believes that the
exposure values I used in my report were too low.  However, the example he uses makes exactly
the opposite point."  Both statements are wrong.  I expressed no opinion regarding the average
exposure values used by Dr. Anderson in her report.  The opposite of no-opinion is still no-
opinion.  Moreover, I expressed no opinion concerning whether the exposure values cited by Dr.
Richard Lee were too low or too high.  I used these values because they were provided by one of
Grace's experts which led me to expect that they would not be challenged by Dr. Anderson.  I
did comment in paragraph 10 of my prior *Declaration* that Dr. Anderson "provided no estimates
of the variability of the distributions of asbestos exposure levels for the cohorts indicated in her
Table 1, nor did she identify the fact that such estimates were not presented."

27.    In her **Paragraph 6**, Dr. Anderson continued:  "The average exposure I used in
my expert report, 0.047 f/cc is nearly five times higher than the mean of the distribution of his
example, 0.01 f/ml."  Considering (1) that Dr. Anderson's average value was nearly five times
higher than the mean that I derived from Dr. Richard Lee's report, and (2) that my method of
accounting for heterogeneity in individual annual exposure values derived from Dr. Richard
Lee's report yielded sizeable fractions of diseased cases with exposures that exceeded Dr.
Anderson's benchmark values, it would be reasonable to expect that the fractions of diseased
cases in Dr. Anderson's job categories that exceed her benchmark values would be *substantially
higher* than the fractions that I derived from Dr. Richard Lee's report.  I did not quantify the

amount of the increase because Dr. Anderson did not provide quantitative estimates of the variability of her distributions of asbestos exposure levels. The method I used was described in paragraph 14 of my prior *Declaration* and was based on the same principles used in my 1979 *Demography* paper which means that the method has been peer-reviewed and is scientifically valid. I provided the complete set of computations in an Excel spreadsheet to Grace for their review along with a copy of the 1979 *Demography* paper.

28.    In her **Paragraph 7**, Dr. Anderson stated: "This use of measured concentration data alone is an egregious error that completely ignores the fact that a worker exposed over an entire occupational lifetime, is exposed numerous times to levels that vary on a day-to-day basis." As I noted above, my analysis was consistent with the definition on page 7 of "the EPA Guidelines" which requires one to treat the "annual exposure levels" as cumulative exposures over a one-year period. Nothing in this treatment precluded the component exposures from varying on a day-to-day basis.

29.    In her **Paragraph 7**, Dr. Anderson continued: "I assumed the workers were exposed every day for an entire working lifetime of 45 years, or 11,250 days assuming 250 days worked per year. It is without any scientific foundation to assume that this worker would be subject to precisely the same exposure every one of those 11,250 days." At this point in her declaration, Dr. Anderson for the first time introduced a set of assumptions that clarified her methodology, namely that the distribution of the lifetime exposures represented the distribution of the sums of sets of 11,250 independent and identically distributed daily exposures (the "independence assumption"). Indeed, Dr. Anderson conceded in her *Declaration* that her "use of these values is equivalent to assuming that, over the long term, on any given day the worker

would be equally likely to experience any one of the individual results that underlie Dr. Lees' average values."

30.    Grace reiterates this assumption on page 77 of *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony* dated December 21, 2007, where Grace suggests that a coin flipping experiment involving 11,250 flips of a coin is a "common sense example" of the claim that, for any selected individual, the "average exposure is truly representative of that individual's actual exposure over the long term."

31.    The coin flipping example is common in statistics.  If the coin is unbiased (i.e., heads and tails are equally likely) then it does not matter to the outcome whether one coin is flipped 11,250 with the number of heads counted, or 11,250 different coins are flipped one time each with the number of heads counted.  The results are statistically indistinguishable.

32.    Similarly, when Dr. Anderson states in her **Paragraph 7** that "…over the long term, on any given day the worker would be equally likely to experience any one of the individual results that underlie Dr. Lees' average values," she means that it does not matter to the outcome whether one worker's exposure is recorded over 11,250 days with the total exposure being the sum of the 11,250 daily exposures, or 11,250 different workers' exposures are recorded over one day with the total exposure being the sum of the 1-day exposures for the 11,250 different workers.  In other words, Dr. Anderson assumes that there is no aspect of a worker's exposure on any given day that could be used to predict that worker's exposure on any subsequent day, in precisely the same way that the occurrence of a head on a given coin toss provides no information regarding the likelihood of the occurrence of a head on any subsequent coin toss.

33.    At the end of her **Paragraph 7**, Dr. Anderson asserted that the use of the independence assumption (and "coin flipping" example) as described above is scientifically valid because "[t]his is the way that EPA, OSHA, other government agencies, and scientists engaged in the sciences of exposure and risk analysis compute long-term, average exposures; namely one uses long term average concentrations for application to frequency and duration circumstances that define legitimate long term, upper limits of exposures for screening purposes."

34.    In fact, as I show below, the independence assumption is not scientifically valid and it is not consistent with accepted scientific practice for the purpose of rejecting *individual* claimants on the premise that they have insufficient exposures to asbestos to cause disease.  Nor does EPA, OSHA, or any other government agency use average exposures to assess individual asbestos claims.

35.    Pages 71–72 of the EPA's 1992 Publication *Guidelines for Exposure Assessment* ("the EPA Guidelines") set forth accepted scientific practice under the heading "Short-Term Versus Long-Term Data for Population Exposures."   (Excerpts from the EPA Guidelines are attached hereto at Annex 1.)  Dr. Anderson is no doubt familiar with these Guidelines based on her extensive career at the EPA.

> "Short-term data can provide a snapshot of concentrations or exposures during that time, and an inference must be made about what that means for the longer term if the exposure assessment covers a long period.   The assessor must determine how well the short-term data represent the longer period." (p. 71)

> "Even when short-term population data are statistically representative (i.e., they describe the shape of the distribution, the mean, and other statistics), *use of these short-term data to infer long-term exposures and risks must be done with caution.*" (p. 71) (emphasis added).

The requirement that the assessor must determine how well the short-term data represent the longer period is *not satisfied* by the simple assumption that the distribution of the lifetime

12

exposures represent the distribution of the sums of sets of 11,250 independent and identically distributed daily exposures.  The requirement is that "[i]f short-term data are used for long-term exposure or dose estimates, the implications of this on the estimated exposures must be discussed in the assessment." (EPA Guidelines, Annex 1, page 72.)

Dr. Anderson's expert reports (June 11 and July 31, 2007) did not provide such discussion.  Indeed, the first written statements regarding her independence assumption were not produced until December 21, 2007 in *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony*.  Thus, Dr. Anderson's failure to provide the crucial assumptions of her model argues against her claim that she followed accepted scientific practice.  Moreover, the EPA Guidelines specifically identify the *distribution* of the short-term data, citing "the mean, *and other statistics*," as relevant information, yet in her most recent *Declaration* Dr. Anderson still has not provided any quantitative estimates of the variability of her exposure distributions.

36.    As noted in paragraph 35, the independence assumption is crucial to Dr. Anderson's analysis.  If this assumption is wrong then her analysis is wrong.

37.    My opinion that the independence assumption is wrong in the present case is based on the following three considerations:

> A. People are not like coins.  They are not interchangeable; people are heterogeneous.  As noted in paragraph 32 above, Dr. Anderson's independence assumption requires that there is no aspect of a worker's exposure on any given day that could be used to predict that worker's exposure on any subsequent day.  This condition would be true if *every* worker changed his job and his place of residence *every day*.  However, this flies in the face of the nature of a job as a long-term relationship between a worker and his employer.  Workers do not change jobs every day, or even every year.  Moreover, the exposures under consideration are occupational exposures so that a good predictor of a given worker's exposure on any subsequent day could be based on the mean of the distribution of his exposures on all previous days worked at his current job.  The

existence of such a predictor contradicts the requirements of the independence assumption that no such predictor exists.

B. The independence assumption is not reliable for the purposes of showing that the lifetime exposures converge to the long-term average. In her **Paragraph 9**, Dr. Anderson describes a Monte Carlo simulation with 11,250 sample draws based on a lognormal distribution with a mean of 0.01 f/ml but no indicated measure of variability. However, based on her comment in **Paragraph 7**, "Mr. Stallard and I both agree on the shape and parameters of the distribution of measured concentrations in the study," I can reasonably infer that she has set the coefficient of variation of that lognormal to the value 4.9228, as reported in paragraph 12 of my prior *Declaration*, but for the distribution of *annual* exposures, not of *daily* exposures. Under the independence assumption for the daily exposures, the coefficient of variation for the lifetime exposures is $4.9228/\sqrt{11,250}$, which is equal to 0.0464, or about 4.6%. This is small enough for Dr. Anderson to claim approximate convergence to the mean. However, the independence assumption for the daily exposures also implies a similar independence assumption for the annual exposures, under which the coefficient of variation for the lifetime exposures is $4.9228/\sqrt{45}$, which is equal to 0.7338, or about 74%. This value is not small enough for Dr. Anderson to claim approximate convergence to the mean. Indeed, using the Excel spreadsheet that I previously provided to Grace for their review, one can readily calculate that the 0.7338 coefficient of variation combines with Dr. Anderson's mean daily exposure value of 0.0473 f/cc to yield a lifetime distribution for which 46.5% of the diseased population would exceed her benchmark of 2.8 f/ml-yr. Thus, the first form of the independence assumption implies that the lifetime variability is effectively zero while the second form of the independence assumption, which derives from the first form, implies that the lifetime variability is non-zero and large enough to reverse Dr. Andersons conclusions regarding the likelihood that the worker's lifetime exposures would not exceed her benchmark. The fact that two implementations of the same independence assumption lead to contradictory conclusions proves that the independence assumption must be wrong. Given that it is wrong, it cannot and does not lead to reliable conclusions.

C. The independence assumption is directly contradicted by a recent published peer-reviewed study of lifetime exposures among currently working maintenance and custodial workers: *See* Table 3 in "Asbestos exposure and radiological abnormalities among maintenance and custodian workers in buildings with friable asbestos-containing materials." *Int Arch Occup Environ Health* 77:307–312, 2004, by Mireille Matrat, *et al.* (The article is attached hereto at Annex 2.) After an average of 15.7 years employment, the mean cumulative exposure was 4 f/ml-yr, the coefficient of variation of cumulative exposure was 2.45, and the range of cumulative exposures was 0.0004 f/ml-yr to 72.9 f/ml-yr, with the upper value being more than 18 times the mean. These data provide clear evidence that there is no convergence of individual cumulative exposures to the overall mean for the occupation group. Different individuals have different exposures and these

differences persist over time, whether measured in days or years.  It is the persistence of these differences that invalidates the independence assumption and reinforces the heterogeneous nature of workers both across and within Anderson's PIQ categories.

38.    In her **Paragraph 8**, Dr. Anderson, in reference to her "Superfund Site" example, stated:  "Mr. Stallard would estimate a child's exposure by assuming that the distribution of children exposed to various levels of the contaminant echoes the distribution of the soil contamination.  That is, he would assume that each child returns to exactly the same spot in the contaminated plot of soil, regardless of how many times he engages in the play activity over the longer term.  Of course, the common sense approach for situations involving repeated contact is to assume each child returns to different spots in the plot; over the long-term his or her exposure approaches the average of those visits."  Her hypothetical is irrelevant to the issues in this case.  First, workers within an Anderson job category are not analogous to children who play randomly at a Superfund site.  Rather, workers within an Anderson job category would be more like a group of children, each of whom has been assigned to play on a different three square foot area of the site and each of whom returns to that same three square feet every day.  Alternatively, one might consider a group of children attending a classroom that sits directly on a Superfund site, with each child assigned to sit at his or her own desk which occupies a three square foot area to which the child returns each day.  Over the course of a year, those children, like asbestos workers, would have very different exposure levels.  Similarly, over the course of a lifetime, the relative differences for asbestos workers would persist and the absolute differences in cumulative exposures would get larger.  Children who changed classrooms from one grade to the next could have exposures that were independent from one year to the next, though not from one day to the next.

15

39.    In her **Paragraph 8**, Dr. Anderson continued: "This approach [is] always used for screening purposes as I have established [in] my report. Mr. Stallard's suggestion that the assessment be done differently is without precedent and without scientific validation or peer review." I have already responded to this comment in paragraph 35 above. My recommendations are fully consistent with the EPA Guidelines and with the hundreds of articles in the peer-reviewed literature that address the errors that can occur when one ignores the effects of persistent individual differences in exposure levels, for example, by inappropriately and indiscriminately using the independence assumption and ignoring heterogeneity, as proposed by Dr. Anderson.

40.    In her **Paragraph 10**, Dr. Anderson stated: "Mr. Stallard's declaration appears to purposely avoid mentioning the low values at all, only showing it in the captions to his figures." I am puzzled by this comment and am not sure what point Dr. Anderson wished to make. Paragraph 12 of my prior *Declaration* mentioned the median value of 0.002 f/cc per year reported by Dr. Richard Lee. This value is $1/50^{th}$ of the OSHA PEL. Above in paragraph 37.C, I cited the low value of the range of lifetime exposures in Matrat's study, 0.0004 f/ml-yr This value is $1/250^{th}$ of the OSHA PEL. What Dr. Anderson appears to fail to understand is that populations with low average cumulative lifetime exposures can contain members whose lifetime cumulative exposures substantially exceed her chosen benchmarks, and that these high exposure individuals are the ones who are most likely to succumb to an asbestos-related disease. This heterogeneity is specifically what Dr. Anderson fails to consider in her analysis.

41.    In her **Paragraph 12**, Dr. Anderson stated: "Mr. Stallard confuses what I explicitly stated I was doing with a misplaced notion of what he believes should have been done." As noted in paragraph 35 above, the first written statements regarding her independence

assumption were not produced until December 21, 2007 in *Grace's Memorandum in Opposition to Claimants' Motions to Exclude Expert Testimony.* Thus, it would be difficult to confuse what Dr. Anderson explicitly stated she was doing with anything because no such explicit statement existed.

42.     In her **Paragraph 12**, Dr. Anderson continued: "The very essence of the entire matter is to determine whether people who claim to have [a] disease could have gotten that disease from exposure to Grace products." I agree with that goal. My sole criticism of Dr. Anderson's procedure in this *Declaration* is that she made an indefensible assumption concerning the independence of individual workers' exposure levels over their working lifetime. I did not challenge any other assumption that she made because the failure of this one assumption was sufficient by itself to invalidate her conclusions on page 9 of her expert report dated July 31, 2007 regarding job categories B, D, and E.

43.     In her **Paragraph 12**, Dr. Anderson concluded: "When conducting assessments to determine the risk posed by a toxic agent, EPA and OSHA proceed in precisely the same fashion." Not true. Paragraph 35 above addresses the actual recommendations in the EPA guidelines and they require that one use caution in producing an appropriate assessment of the distribution of long-term exposures when using short-term exposure data as the basis of the assessment, as well as disclosing and discussing the nature of the assumptions and their limitations, including variability and other relevant statistics that would detail, *e.g.,* the differences between cohort average exposures and likely actual individual exposures.

44.     In her **Paragraph 13**, Dr. Anderson stated: "In sum, Mr. Stallard's accusation that the methods and procedures I used in my reports are unscientific and erroneous is wide of the mark. To the contrary they are consistent with established risk assessment and statistical

principles, in line with methods used by myself and other knowledgeable practitioners of risk assessment, and have been endorsed by public health agencies such as the EPA, subjected to repeated use and peer review." Neither of these statements held up under the detailed examination provided above.

45.    In her **Paragraph 13**, Dr. Anderson finished with: "Mr. Stallard, an actuary by education and practice, should be more cautious before intruding into a field outside of his area of expertise." Dr. Anderson failed to realize that the fundamental nature of the dispute involves methods and procedures for the scientifically valid analysis of heterogeneous populations and for assessing the impact of heterogeneity in analyses where heterogeneity is ignored. This is my area of expertise, not hers. She is the one who has intruded into my field and who has attempted to proceed without appropriate expert assistance and, as a consequence, has failed to respond to my critique.    My opinion stands without modification: Dr. Anderson's conclusions are unscientific, unreliable, erroneous, and highly misleading.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 7, 2008.

P.J. Eric Stallard, A.S.A., M.A.A.A., F.C.A.

18

# ANNEX - 1

United States
Environmental Protection
Agency

Office of Research and
Development
Washington DC 20460

EPA/600/Z-92/001
May 1992



# Guidelines for Exposure Assessment



RISK ASSESSMENT FORUM

EPA/600/Z-92/001
May 1992

# Guidelines for
# Exposure Assessment

Published on May 29, 1992, Federal Register 57(104):22888-22938

These guidelines replace the previously issued final Guidelines for
Estimating Exposures (September 24, 1986), Federal Register
51(185):34042-34054, and the Proposed Guidelines for Exposure-Related
Measurements (December 2, 1988), Federal Register 53(232):48830-
48853.

Risk Assessment Forum
U.S. Environmental Protection Agency
Washington, DC

 *Printed on Recycled Paper*

medium enters. In this process, mass transfer occurs by bulk flow, and the amount of the chemical itself crossing the boundary can be described as a chemical intake rate. The chemical intake rate is the amount of chemical crossing the outer boundary per unit time, and is the product of the exposure concentration times the ingestion or inhalation rate. Ingestion and inhalation rates are the amount of the carrier medium crossing the boundary per unit time, such as $m^3$ air breathed/hour, kg food ingested/day, or liters of water consumed/day. Ingestion or inhalation rates typically are not constant over time, but often can be observed to vary within known limits.[5]

The second process by which a chemical can cross the boundary from outside to inside the body is uptake. Uptake involves absorption of the chemical through the skin or other exposed tissue such as the eye. Although the chemical is often contained in a carrier medium, the medium itself typically is not absorbed at the same rate as the chemical, so estimates of the amount of the chemical crossing the boundary cannot be made in the same way as for intake (see Section 2.1.3). Dermal absorption is an example of direct uptake across the outer boundary of the body.[6] A chemical uptake rate is the amount of chemical absorbed per unit time. In this process, mass transfer occurs by diffusion, so uptake can depend on the concentration gradient across the boundary, permeability of the barrier, and other factors. Chemical uptake rates can be expressed as a function of the exposure concentration, permeability coefficient, and surface area exposed, or as a flux (see Section 2.1.4).

The conceptual process of contact, then entry and absorption, can be used to derive the equations for exposure and dose for all routes of exposure.

## 2.1.1. Exposure

The condition of a chemical contacting the outer boundary of a human is exposure. Most of the time, the chemical is contained in air, water, soil, a product, or a transport or carrier medium; the chemical concentration at the point of contact is the exposure concentration. Exposure over a period of time can be represented by a time-dependent profile of the exposure concentration. The area under the curve of this profile is the magnitude of the exposure, in concentration-time units (Lioy, 1990; NRC, 1990):

---

[5]Ingestion of food or water is an intermittent rather than continuous process, and can be expressed as (amount of medium per event) × (events per unit clock or calendar time) [the frequency of contact]; (e.g., 250 mL of water/glass of water ingested × 8 glasses of water ingested/day).

[6]Uptake through the lung, gastrointestinal tract, or other internal barriers also can occur following intake through ingestion or inhalation.

$$E = \int_{t_1}^{t_2} C(t)\ dt \qquad (2\text{-}1)$$

where E is the magnitude of exposure, C(t) is the exposure concentration as a function of time, and t is time, $t_2 - t_1$ being the exposure duration (ED). If ED is a continuous period of time (e.g., a day, week, year, etc.), then C(t) may be zero during part of this time.[7] Integrated exposures are done typically for a single individual, a specific chemical, and a particular pathway or exposure route over a given time period.[8]

The integrated exposures for a number of different individuals (a population or population segment, for example), may then be displayed in a histogram or curve (usually, with integrated exposure increasing along the abscissa or x-axis, and the number of individuals at that integrated exposure increasing along the ordinate or y-axis). This histogram or curve is a presentation of an exposure distribution for that population or population segment. The utility of both individual exposure profiles and population exposure distributions is discussed in Section 2.3.

## 2.1.2.  Applied Dose and Potential Dose

Applied dose is the amount of a chemical at the absorption barrier (skin, lung, gastrointestinal tract) available for absorption. It is useful to know the applied dose if a relationship can be established between applied dose and internal dose, a relationship that can sometimes be established experimentally. Usually, it is very difficult to measure the applied dose directly, as many of the absorption barriers are internal to the human and are not localized in such a way to make measurement easy. An approximation of applied dose can be made, however, using the concept of potential dose[9] (Lioy, 1990; NRC, 1990).

---

[7]*Contact time* (CT) is that part of the exposure duration where C(t) does not equal zero; that is, the actual time periods (events, episodes) during which actual exposure is taking place. The *exposure duration* as defined here, on the other hand, is a time interval of interest for assessment purposes during which exposure occurs, either continuously or intermittently.

[8]An *exposure pathway* is the course a chemical takes from *its* source to the person being contacted. An *exposure route* is the particular means of entry into the body, e.g., inhalation, ingestion, or dermal absorption.

[9]*Potential dose* is the potential amount of the chemical that could be absorbed if it were 100% bioavailable. Note, however, that this does not imply that 100% bioavailability or 100% absorption is assumed when using potential dose. The equations and discussion in this chapter use potential dose as a measurable quantity that can then be converted to applied or absorbed dose by the use of the appropriate factors. Potential dose is a general term referring to any of the exposure routes. The terms respiratory dose, oral dose, or dermal dose are sometimes used to refer to the route-specific potential doses.

could also be used to fill data gaps. In any case, the strength and character of the relationship between the chemical and the surrogate must be explained.

- Professional judgment can be used. The utility of this option depends on the confidence placed in the estimate. Expert opinion based on years of observation of similar circumstances usually carries more weight than anecdotal information. The assessor must discuss the implications of these estimates in the uncertainty analysis.

## 5.3. CALCULATING EXPOSURE AND DOSE

Depending on the approach used to quantify exposure and dose, various types of data will have been assembled. In calculating exposures and doses from these data, the assessor needs to direct attention specifically to certain aspects of the data. These aspects include the use of short-term data for long-term projections, the role of personal monitoring data, and the particular way the data might be used to construct scenarios. Each of these aspects is covered in turn below.

### 5.3.1. Short-Term Versus Long-Term Data for Population Exposures

Short-term data, for the purposes of this discussion, are data representing a short period of time measured (or modeled) relative to the time period covered in the exposure assessment. For example, a 3-day sampling period would produce short-term data if the exposure assessment covered a period of several years to a lifetime. The same 3-day sampling period would not be considered short-term if the assessment covered, say, a few days to a week.

Short-term data can provide a snapshot of concentrations or exposures during that time, and an inference must be made about what that means for the longer term if the exposure assessment covers a long period. The assessor must determine how well the short-term data represent the longer period.

Even when short-term population data are statistically representative (i.e., they describe the shape of the distribution, the mean, and other statistics), use of these short-term data to infer long-term exposures and risks must be done with caution. Using short-term data to estimate long-term exposures has a tendency to underestimate the number of people exposed, but to overestimate the exposure levels to the upper end of the distribution, even though the mean will

71

remain the same.[30]  Both concentration variation at a single point and population mobility will drive the estimates of the levels of exposure for the upper tail of the distribution toward the mean.  If short-term data are used for long-term exposure or dose estimates, the implications of this on the estimated exposures must be discussed in the assessment.  Likewise, use of long-term monitoring data for specific short-term assessments can miss significant variations due to short-term conditions or activities.  Long-term data should be used cautiously when estimating short-term exposures or doses, and the implications should be discussed in the assessment.

## 5.3.2. Using Point-of-Contact Data to Calculate Exposure and Dose

Point-of-contact exposure assessments are often done with the intent of protecting the individuals, often in an occupational setting.  When exposures are being evaluated to determine whether they exceed an action level or other benchmark, point-of-contact measurements are the most relevant data.

Typically, point-of-contact measurement data reflect exposures over periods of minutes to perhaps a week or so.  For individuals whose exposures have been measured, these data may be used directly as an indication of their exposure during the sampling period, provided they are of adequate quality, measure the appropriate chemical, and actually measure exposure while it occurs.  This is the only case in which measurement data may be used directly as exposure data.

When using point-of-contact measurements, even with statistically based data, several inferences still must be made to calculate exposure or dose:

- Inferences must be made to apply short-term measurements of exposure to long-term estimates of exposure; these are subject to the cautions outlined in Section 5.3.1.
- Inferences must be made about the representativeness of the individual or persons sampled for the individual or population segment for which the assessment is done.
- Inferences must be made about the factors converting measured exposure to potential or internal dose for use in a risk assessment.

---

[30]Consider, for example, a hypothetical set of 100 rooms (microenvironments) where the concentration of a particular pollutant is zero in 50 of them, and ranges stepwise from 1 to 50 (nominal concentration units) in the remainder.  If one person were in each room, short-term "snapshot" monitoring would show that 50 people were unexposed and the others were exposed to concentrations ranging from 1 to 50.  If the concentration in each room remained constant and people were allowed to visit any room at random, long-term monitoring would indicate that all 100 were exposed to a mean concentration of 12.75.  The short-term data would tend to overestimate concentration and underestimate the number of persons exposed if applied to long-term exposures.  If only average values were available, the long-term data would tend to underestimate concentration and overestimate the number exposed if applied to short-term exposures.  Because populations are not randomly mobile or static, the exposure assessor should determine what effect this has on the exposure estimate.

72

# ANNEX - 2

Int Arch Occup Environ Health (2004) 77: 307–312
DOI 10.1007/s00420-004-0520-7

ORIGINAL ARTICLE

Mireille Matrat · Jean-Claude Pairon
Ann-Gaëlle Paolillo · Nathalie Joly · Yuriko Iwatsubo
Ewa Orlowski · Marc Letourneux · Jacques Ameille

# Asbestos exposure and radiological abnormalities among maintenance and custodian workers in buildings with friable asbestos-containing materials

Received: 22 September 2003 / Accepted: 15 March 2004 / Published online: 27 May 2004
© Springer-Verlag 2004

**Abstract** *Objectives:* Few studies have been carried out to evaluate the respiratory effects of asbestos exposure of custodian and maintenance workers. *Methods:* By a multicentre cross-sectional study, 277 custodian and maintenance employees working in buildings with friable asbestos-containing materials and 87 unexposed subjects were studied for radiological abnormalities by use of the International Labour Office (ILO) classification of radiographs of pneumoconiosis, in relation to parameters of asbestos exposure. *Results:* The cumulative asbestos exposure index was generally low (fewer than 5 fibres/ml × years in 82.3% of exposed workers). On multivariate analysis, pleural thickening was significantly related to latency since onset of exposure to asbestos in exposed workers, after adjustment for age, body mass index and tobacco smoking. *Conclusions:* Asbestos exposure of custodian and maintenance employees in buildings with friable asbestos-containing materials might be associated with an excess of pleural thickening on chest X-rays.

**Keywords** Occupational exposure · Chest X-ray · Pleural thickening · Pneumoconiosis

M. Matrat · J.-C. Pairon · A.-G. Paolillo · N. Joly
Institut Interuniversitaire de Médecine du Travail de Paris-Ile de France, Paris, France

M. Matrat · J.-C. Pairon
Service de Pneumologie et de Pathologie Professionnelle,
Centre Hospitalier Intercommunal, Créteil, France

M. Matrat · J.-C. Pairon · Y. Iwatsubo · E. Orlowski
INSERM E03.37, Faculté de Médecine de Créteil, Créteil, France

A.-G. Paolillo · N. Joly · J. Ameille (✉)
Unité de Pathologie Professionnelle et de Santé au Travail,
Hôpital Raymond Poincaré, 104 boulevard Raymond Poincaré,
92380 Garches, France
E-mail: jacques.ameille@rpc.ap-hop-paris.fr
Tel.: +33-1-47107754
Fax: +33-1-47107768

M. Letourneux
Service de Pathologie Professionnelle,
CHU Côte de Nacre, Caen, France

## Introduction

Friable asbestos-containing materials (ACMs) were used extensively in the 1960s and 1970s in public, residential, and commercial buildings, and were sprayed onto structural beams to prevent building collapse in the event of fire, or on other surface materials such as acoustic insulation and thermal insulation applied around steam pipes and boilers. The US Environmental Protection Agency has estimated that approximately 733,000 (20%) of all government, residential and private non-residential buildings in the USA contained some type of friable ACMs (US Environmental Protection Agency 1984). In France, the proportion of buildings containing friable ACMs might be around 5% (personal communication).

Custodian and maintenance workers might disturb or damage ACMs in the course or their work and might thereby experience peak exposure episodes. With appropriate working methods, the level of asbestos exposure of maintenance and custodian workers rarely exceeds the permissible exposure limit (Price et al. 1992; Corn et al. 1994; Mlynarek et al. 1996). Unfortunately, these appropriate working methods have only been used more recently, and it has been shown that without adequate controls, exposures can exceed 10 fibres/ml (f/ml) during some types of removal and repair work (Health Effects Institute-Asbestos Research 1991). However, such episodes are poorly characterized, and few studies have been devoted to the investigation of ACM-related health effects among custodian and maintenance workers in buildings with friable ACMs. High prevalences of pleural and/or parenchymal radiological abnormalities have been reported in school custodians and maintenance workers (Oliver et al. 1991;

308

Balmes et al. 1991; Levin and Selikoff 1991; Anderson et al. 1992; Cordier et al. 1987; Pierre et al. 1995), but those studies have major methodological limitations.

The objectives of the present multicentre cross-sectional study were to evaluate the cumulative exposure to asbestos of custodian and maintenance workers in buildings with friable ACMs and to investigate the radiological abnormalities in those subjects, in relation to parameters of asbestos exposure.

## Subjects and methods

### Subjects

Exposed subjects ($E^+$ group) were maintenance and custodian employees working in buildings with friable ACMs. They were recruited from nine centres in the Paris area, Caen, and Lyon, at which all current maintenance and custodian were invited to participate, on a voluntary basis, regardless of length of employment.

Control subjects were workers in a public hospital, with no known occupational exposure to asbestos (C group).

### Methods

All subjects were interviewed by occupational physicians.

#### Evaluation of asbestos exposure

We used a standardized questionnaire to collect information on work history. For each subject, all job periods were recorded. For each job period outside buildings with ACMs the subjects were asked questions about direct and indirect asbestos exposure and to exclude subjects with known or likely exposure to asbestos in other activities, such as brake repair, insulation, construction, shipyard, and other asbestos-exposed trades.

In the exposed group, a detailed list of specific maintenance or custodian ACM-related tasks was documented for each subject: repair or maintenance of air-conditioning, ventilation or heating apparatus close to friable ACM; electrical installation or repair, plumbing, painting, cable pulling close to friable ACM; adjustment of doors and windows in rooms containing friable asbestos; maintenance of asbestos-insulated pipes or boilers; drilling of asbestos-insulated surfaces; use of asbestos protection for welding activities; dry sweeping of fireproof dust; dry sweeping after intervention on ACMs.

The duration (number of years) and frequency (number of days per year, number of hours per day) were determined for each task. In the absence of available information on airborne asbestos levels in this study, an estimation of intensity of exposure derived from the French Evalutil database was assigned to each elementary task on ACMs (Orlowski et al. 1997). The Evalutil database has been implemented to characterize the exposures of end-users of ACMs (outside the asbestos industry). It is based on a review of the scientific literature and technical reports, supplemented by industrial hygiene data collected since 1987 by six French laboratories that measure fibre concentration in the work environment. The estimated intensity of exposure is summarized in Table 1 for the various elementary tasks. Weighting factors were attributed according to frequency of exposure. For each job period, an elementary exposure index was calculated as the product of frequency, intensity and duration of exposure. When the subject reported intervention on flocks of unknown composition, the level of exposure attributed was half that calculated for asbestos flock. The sum of elementary exposure indices calculated for each job period constituted the cumulative asbestos exposure index throughout the given subject's working life. This cumulative exposure index is expressed in terms of fibres/ml-years, inside quotation marks ("f/ml × years"), to indicate that it is based on estimations of parameters and not on measurement of airborne asbestos levels.

Finally, for each patient in the exposed group, asbestos exposure was characterized by three parameters: latency (time elapsed since onset of exposure), duration and cumulative exposure index (CEI) in "fibre/ml × years".

#### Tobacco consumption and body mass index

Detailed information was obtained on tobacco consumption, and subjects were categorized into three groups: current smokers, former smokers, and non-smokers. Total tobacco consumption was expressed in pack-years.

**Table 1** Estimated intensity of asbestos exposure for elementary tasks recorded in the questionnaire

| Task | Estimated intensity of exposure (in f/ml) |
| --- | --- |
| Dry sweeping after intervention on ACMs | 10 |
| Intervention on friable-asbestos heat-insulators, drilling of friable ACMs | 5 |
| Performing any of the following tasks close to asbestos flock: repair or maintenance of air-conditioning ventilation, heating device; setting-up or maintenance of electrical device; setting up of doors or windows; cable pulling; plumbing; painting | 1 |
| Dry sweeping of building having uncovered asbestos flock | 0.5 |
| Use of asbestos protection for welding | 0.1 |

Height and weight were measured to calculate body mass index (BMI) (BMI = weight in kilogrammes/ height in centimetres squared).

*Chest radiographs*

Postero-anterior chest radiographs were taken at the subject's maximum inspiration and were classified independently by three experienced readers (J.A., J.C.P. and M.L.), according to the International Labour Office (ILO) 1980 classification of the radiographs of pneumoconioses (ILO 1980). The radiographs were read in random order without the reader's knowledge of exposure and potential confounding factors.

In case of disagreement between the three readers concerning the profusion of small opacities, the median reading was used for analysis. If two of the three readers agreed on profusion of small opacities, this interpretation was used for analysis.

Pleural thickening was considered to be present when recorded by at least two readers. Pleural thickening associated with homolateral obliteration of the costophrenic angle was classified as diffuse pleural thickening. Pleural thickening without obliteration of the costophrenic angle was classified as circumscribed pleural thickening.

Statistical analysis

The groups were compared according to gender, age, tobacco consumption, BMI and radiological abnormalities, by the $\chi^2$ test or Student's *t*-test. Among the exposed subjects, we categorized the quantitative exposure parameters, using the following cut-off points: latency < 15 years, 15–22 years, > 22 years; duration of exposure ≤ 10 years, 11-20 years, > 20 years; cumulative exposure < 0.25 "f/ml × years", 0.25–1.49 "f/ml × years", ≥1.5 "f/ml × years". The cut-off points for duration, cumulative exposure and latency were chosen to achieve similar sample size in each subgroup. The first cut-off point for latency (15 years) was chosen because it is generally considered that no asbestos-related pleural thickening occurs before this time has elapsed. The relationship between exposure parameters and the presence of radiological abnormalities was examined by logistic regression analysis, with age, BMI and cumulative tobacco consumption being taken into account. SAS software was used for calculations.

**Results**

Three hundred and thirty-six exposed subjects, representing 80% of eligible subjects, and 95 controls participated in the study. Because of previous asbestos exposure in other activities in the E$^+$ group ($n = 48$ subjects), and because of poor-quality chest X-rays

(quality scored as 4 on the ILO classification by at least two readers in 11 exposed subjects and eight controls), only 277 subjects of the E$^+$ group and 87 controls were included in the study. The main characteristics of these workers are summarized in Table 2.

Asbestos exposure parameters in the E$^+$ group are summarized in Table 3. The majority (82.3%) of exposed workers had a low CEI, i.e. fewer than 5 "f/ml × years". Duration of exposure exceeded 10 years in 66.8% of E$^+$ subjects, and 66.1% had a latency greater than 15 years.

No difference in the prevalence of radiological abnormalities (either small opacities with profusion ≥ 1/ 0 or pleural thickening) was observed between the E$^+$ group and controls (Table 4). Examination of radiological abnormalities of maintenance and custodian workers, according to parameters of asbestos exposure, revealed that pleural thickening, particularly circumscribed pleural thickening, was significantly associated with latency since onset of exposure but not with duration or cumulative exposure (Table 5). In contrast, profusion of small opacities was not associated with any of the parameters of asbestos exposure.

Logistic regression analysis revealed that latency since onset of exposure and BMI were significantly associated with pleural thickening (any pleural thickening

**Table 2** Characteristics of the subjects

| Characteristic | E$^+$ group ($n=277$) | C group ($n=87$) | $P$ |
|---|---|---|---|
| Age in years (mean ± SD) | 44.1 ± 7.5 | 47.1 ± 5.8 | 0.001 |
| Gender (% male) | 98.20 | 100 | 0.21 |
| Smoking | | | 0.26 |
| Non-smokers (%) | 34 | 28.70 | |
| Former smokers (%) | 33 | 28.70 | |
| Current smokers (%) | 33 | 42.60 | |
| Pack-years (mean ± SD) | 18.8 ± 13.5 | 18.1 ± 12.5 | 0.8 |
| BMI (mean ± SD) | 25.6 ± 3.3 | 25.5 ± 3 | 0.78 |

**Table 3** Description of asbestos exposure in maintenance and custodian workers (E$^+$ group)

| Exposure | | |
|---|---|---|
| Duration (years) | | |
| Mean ± SD [range] | 15.7 ± 8.3 | [0.5–35] |
| ≤ 10 | 92 | 33.20% |
| 11–20 | 100 | 36.10% |
| > 20 | 85 | 30.70% |
| Latency since onset of exposure (years) | | |
| Mean ± SD [range] | 18.4 ± 8.4 | [1–48] |
| ≤ 15 | 94 | 33.90% |
| 16–22 | 90 | 32.50% |
| > 22 | 93 | 33.60% |
| Cumulative exposure index ("f/ml × years") | | |
| Mean ± SD [range] | 4 ± 9.8 | [0.0004–72.9] |
| < 0.25 | 97 | 35% |
| 0.25–1.49 | 92 | 33.20% |
| ≥1.5 | 88 | 31.80% |

310

**Table 4** Prevalence of radiological abnormalities (ILO classification). Values presented are medians of results of three independent readers

| Abnormality | E⁺ group (n=277) | C group (n=87) | P |
|---|---|---|---|
| Profusion of small opacities[a] | | | |
| 0/0 | 205 (74%) | 54 (62.1%) | 0.26 |
| 0/1 | 56 (20.2%) | 25 (28.7%) | |
| 1/0 | 14 (5.1%) | 7 (8%) | |
| >1/0 | 2 (0.7%) | 1 (1.2%) | |
| Pleural thickening | | | |
| Any thickening | 40 (14.4%) | 11 (12.6%) | 0.67 |
| Circumscribed pleural thickening | 37 (13.4%) | 9 (10.3%) | 0.46 |
| Diffuse pleural thickening[b] | 3 (1.1%) | 2 (2.3%) | 0.75 |

[a] $P$ is indicated for comparison of prevalence of opacities with profusion $\geq 1/0$

[b] Defined as pleural thickening with homolateral obliteration of the costophrenic angle

or circumscribed pleural thickening), while a similar tendency (although not significant) was observed for duration and age (Table 6). In contrast, profusion of small opacities was not associated with any of the parameters of asbestos exposure on logistic regression analysis. Profusion of small opacities was associated with BMI, but was not significantly associated with age or tobacco smoking.

## Discussion

Subjects included in this study were generally young (mean age: 44.1 years in E⁺ group and 47.1 years in C group, with 75.4% and 70.1% under the age of 50 years in each group, respectively). The participation rate of exposed workers was considered to be satisfactory, as approximately 80% of workers participated. However, some selection effects might be expected. We do not have any information on age, gender and smoking habits among the non-participants, therefore they could not be compared with the participants. Individual evaluation of asbestos exposure was fairly difficult, because of several, sporadic and brief periods of exposure for each worker, and some subjects might have forgotten certain interventions on ACMs. Moreover, no direct metrology measurement was available, making it difficult for us to attribute a single level of exposure to each task. CEI values should, therefore, be considered cautiously, and are only very approximate due to the heterogeneity of situations encountered, as it was impossible for subjects to be recruited from a single centre. Despite large discrepancies in estimated CEIs, most of the exposed subjects had fairly low levels of cumulative exposure, but some workers probably had high levels of cumulative exposure.

No significant difference was observed between the E⁺ and C groups for the prevalence of small opacities in this series. Prevalence of small opacities was independent of asbestos exposure parameters (duration, latency, CEI) in the exposed groups. Profusion of small opacities

**Table 5** Radiological abnormalities (median of results of three independent readers) according to parameters of asbestos exposure and tobacco smoking in the exposed group (NS non-smokers, CS current smokers, FS former smokers)

| Abnormality | | Duration (years) | | | | Latency (years) | | | | Cumulative exposure index ("f/ml × years") | | | | Tobacco smoking | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ≤10 | 11–20 | >20 | P | ≤15 | 16–22 | >22 | P | <0.25 | 0.25–1.49 | ≥1.50 | P | NS | CS + FS | P |
| Small opacities profusion ≥1/0 | n | 3 | 9 | 4 | 0.21 | 7 | 5 | 4 | 0.65 | 5 | 5 | 6 | 0.87 | 3 | 13 | 0.18 |
| | (%) | (3.3) | (9.0) | (4.7) | | (7.5) | (5.6) | (4.3) | | (5.1) | (5.4) | (6.8) | | (3.2) | (7.1) | |
| Pleural thickening (any) | n | 10 | 13 | 17 | 0.2 | 5 | 12 | 23 | 0.0008 | 12 | 11 | 17 | 0.29 | 7 | 33 | 0.02 |
| | (%) | (10.9) | (13.0) | (20.0) | | (5.3) | (13.3) | (24.7) | | (12.4) | (12.0) | (19.3) | | (7.5) | (18.1) | |
| Circumscribed pleural thickening | n | 10 | 12 | 15 | 0.36 | 5 | 11 | 21 | 0.002 | 12 | 10 | 15 | 0.45 | 7 | 30 | 0.04 |
| | (%) | (10.9) | (12.0) | (17.7) | | (5.3) | (12.2) | (22.6) | | (12.4) | (10.9) | (17.1) | | (7.5) | (16.5) | |
| Diffuse pleural thickening | n | 0 | 1 | 2 | 0.22* | 0 | 1 | 2 | 0.10* | 0 | 1 | 2 | 0.24* | 0 | 3 | 0.29* |
| | (%) | 0 | (1.0) | (2.4) | | 0 | (1.1) | (2.2) | | 0 | (1.1) | (2.3) | | 0 | (1.7) | |

*Fisher's exact test: duration ≤20 years vs >20 years; latency ≤22 years vs >22 years; CEI ≤1.49 "f/ml × years" vs ≥1.5"f/ml × years"

Table 6 Radiological abnormalities. Study of determinants by multivariate logistic regression analysis in the exposed group. Values are adjusted odds ratio. Values in square brackets are 95% confidence intervals. *FS* former smokers, *CS* current smokers, *NS* non-smokers

| Parameter | | Small opacities (profusion ≥1/0) | | | Any pleural thickening | | |
|---|---|---|---|---|---|---|---|
| | | Model A[a] | Model B | Model C | Model A | Model B | Model C |
| Duration of asbestos exposure (years) | < 10 | | 1 | | | 1 | |
| | 11–20 | | 1.18 [0.60–2.36] | | | 1.09 [0.44–2.69] | |
| | > 20 | | 1.21 [0.60–2.63] | | | 1.38 [0.52–3.67] | |
| Latency[b] (years) | ≤ 15 | 1 | | | 1 | | |
| | 16–22 | 0.62 [0.18–2.15] | | | 3.04 [0.96–9.64] | | |
| | > 22 | 0.37 [0.09–1.55] | | | 6.14 [1.76–21.49] | | |
| CEI ("f/ml × years") | < 0.25 | | | 1 | | | 1 |
| | 0.25–1.49 | | | 1.0 [0.27–3.67] | | | 0.76 [0.30–1.88] |
| | ≥1.5 | | | 1.24 [0.34–4.51] | | | 1.24 [0.52–2.95] |
| Age (years) | < 40 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 40–49 | 1.31 [0.34–5.13] | 1.30 [0.61–2.75] | 0.89 [0.24–3.23] | 0.54 [0.17–1.66] | 1.10 [0.40–3.01] | 1.22 [0.47–3.17] |
| | ≥50 | 2.12 [0.44–10.27] | 1.56 [0.64–3.82] | 1.19 [0.28–5.06] | 0.82 [0.24–2.82] | 1.91 [0.61–5.9] | 2.24 [0.80–6.27] |
| BMI | | 1.06 [0.91–1.27] | 1.13 [1.04–1.23] | 1.05 [0.90–1.22] | 1.12 [1.01–1.24] | 1.13 [1.01–1.25] | 1.13 [1.02–1.25] |
| Tobacco smoking (FS + CS versus NS) | | 0.95 [0.31–2.86] | 1.20 [0.67–2.15] | 0.91 [0.30–2.79] | 0.94 [0.44–2.03] | 0.94 [0.44–2.00] | 0.93 [0.43–2.00] |

[a]Variables included in the model were latency since onset of exposure, age, BMI and tobacco smoking for model A; duration of exposure, age, BMI and tobacco smoking for model B; CEI, age, BMI and tobacco smoking for model C
[b]Latency since onset of asbestos exposure

Table 7 Summary of the main results of previous studies on radiological abnormalities in maintenance and/or custodian workers (*PA* postero-anterior chest radiographs)

| | Oliver et al. (1991) | Balmes et al. (1991) | Levin and Selikoff (1991) | Anderson et al. (1992) |
|---|---|---|---|---|
| Number included | 120 | 673 | 660 | 457 |
| Number with no previous asbestos exposure | 57 | 422<br>315 with duration ≥10 years | 247 | 90 Without previous activity |
| Type of radiographs | PA + lateral + two oblique views | PA + two oblique views | PA + lateral ± two oblique views | PA |
| Radiological abnormalities | | | | |
| Circumscribed pleural thickening | 21% | 4.1% | 7% | 4.6% |
| Small opacities with profusion ≥1/0 | 0% | 5.7% | 17% | 1.1% |
| Circumscribed pleural thickening + small opacities | 0% | 1.6% | 3% | 0.7% |

suggestive of asbestosis has been reported for higher levels of exposure (generally higher than 25 f/ml × years) (Doll and Peto 1985). Cumulative asbestos exposures were, therefore, probably insufficient for asbestosis to induced in this study. In addition to parameters of cumulative asbestos exposure, small opacities have also been associated with age, obesity and tobacco smoking (ILO 1980; Dick et al. 1992; Weiss 1991). A significant link was observed in this study between BMI and an excess of small opacities on regression analysis. A similar, although non-significant, trend was observed for age.

Although no significant difference was observed between the E[+] group and controls for the frequency of pleural thickening, the main finding of this study was the link between pleural thickening (any pleural thickening or circumscribed pleural thickening) and latency among exposed workers, after age, BMI and tobacco smoking had been taken into account in logistic regression. This argument supports the relationship between asbestos exposure during maintenance and custodian activities in buildings with friable ACMs and the development of

pleural thickening. Specific attention should be paid to pleural thickening, as it can be observed for low levels of cumulative asbestos exposure. Some low dose (and unknown) environmental asbestos exposure might explain why some control subjects exhibited pleural thickening in this series. Pleural thickening is known to be observed after an adequate latency period in asbestos-exposed workers (Jarvholm 1992). It might also be due to subpleural fat pads (Ameille and Brochard 1998). Some researchers have previously used oblique views to improve the sensitivity of detection of pleural abnormalities (Oliver et al. 1991; Balmes et al. 1991; Levin and Selikoff 1991). However, it is known that the use of oblique views increases the false-positive rate and intrareader and inter-reader variability (Ameille et al. 1993). Previous studies have demonstrated an association between prevalence of pleural thickening and BMI (Cordier et al. 1987; Pierre et al. 1995). The results of this study were, therefore, adjusted for BMI to facilitate interpretation of pleural thickening with respect to asbestos exposure parameters. Unfortunately,

no CT scan was available in this study, based on routine standard chest X-rays.

Radiological abnormalities in maintenance and custodian workers have been poorly documented to date (Oliver et al. 1991; Balmes et al. 1991; Levin and Selikoff 1991; Anderson et al. 1992). Previous studies were performed in the USA, but with no data on industrial hygiene or CT results. None of those studies included control groups, and only one took BMI into account (Oliver et al. 1991). The main results of those studies are summarized in Table 7. The frequency of radiological abnormalities varied considerably from one study to another. In line with our results, a relationship was observed between latency and frequency of radiological abnormalities in three out of four studies. A relationship between duration of activity and frequency of radiological abnormalities was also generally observed, but duration of activity was not significantly related to radiological abnormalities on logistic regression analysis in our study, for either parenchymal or pleural abnormalities. Tobacco smoking has been inconsistently associated with various radiological abnormalities in previous studies on maintenance and custodian workers. Balmes et al. (1991) reported a relationship between smoking and profusion of small opacities, while no relationship was observed by Anderson et al. (1992). Although pleural thickening was more frequent in current and former smoker than in non-smoking exposed subjects, no significant relationship was observed between tobacco smoking and parenchymal or pleural abnormalities in our study.

The effects of asbestos exposure on custodian and maintenance workers in buildings with friable ACMs have been poorly documented. Most of these workers probably have low cumulative exposure to asbestos. Interpretation of asbestos-related radiological abnormalities in studies that used standard X-rays and the ILO classification requires an adequate design, including a control population and multivariate analysis to take into account confounding factors such as BMI, age and tobacco smoking. In this study, we found that latency since onset of exposure in this type of intermittent activity is associated with radiological pleural thickening on chest X-ray, but not with small opacities, after taking confounding factors into account. An asbestos-related causality might, therefore, be suspected, and specific surveillance programmes should be proposed to such occupational groups, including CT evaluation to improve the sensitivity and specificity of detection of asbestos-related pleural diseases.

**Acknowledgments** This study was funded by the Ministère de l'Emploi et de la Solidarité (Paris, France). We would like to thank, for their contribution to this study, Dr. M.C. Bayeux, Dr. P. Cadilhac, Dr. A. Calastreng, Dr. C. Delallée, Dr. Y. Fouache, Dr. E. Doucet, Dr. C. Gauberty, Dr. B. Guidez, Dr. M. Habrard, Dr. M. Hébrard, Dr. N. Joly, Dr. M.F. Marquignon, Dr. E. Pouget, Dr. S. Redin, Dr. M.C. Tardieu, Mrs S. Chammings, Mrs E. Gussé.

## References

Ameille J, Brochard P (1998) Du bon usage de la classification internationale du BIT des radiographies de pneumoconioses en santé au travail. Arch Mal Prof 59:562–568

Ameille J, Brochard P, Bréchot JM, Pascano T, Chérin A, Raix A, Fredy M, Bignon J (1993) Pleural thickening: a comparison of oblique chest radiographs and high-resolution computed tomography in subjects exposed to low levels of asbestos pollution. Int Arch Environ Health 64:545–548

Anderson HA, Hanrahan LP, Higgins DN, Sarow PG (1992) A radiographic survey of public school building maintenance and custodial employees. Environ Res 59:159–166

Balmes JR, Daponte A, Cone JE (1991) Asbestos-related disease in custodial and building maintenance workers from a large municipal school district. Ann N Y Acad Sci 643:530–549

Cordier S, Lazar P, Brochard P, Bignon J, Ameille J, Proteau J (1987) Epidemiologic investigation of respiratory effects related to asbestos inside insulated buildings. Arch Environ Health 42:303–309

Corn M, McArthur B, Dellarco M (1994) Asbestos exposures of building maintenance personnel. Appl Occup Environ Hyg 9:845–852

Dick JA, Morgan WKC, Muir DFC, Reger RB, Sargent N (1992) The significance of irregular opacities on the chest roentgenogram. Chest 102:251–260

Doll R, Peto J (1985) Effects on health of exposure to asbestos. HMSO, London

Health Effects Institute-Asbestos Research (HEI-AR) (1991) Asbestos in public and commercial buildings: a literature review and synthesis of current knowledge. Cambridge, Mass

International Labour Office (ILO) (1980) Guidelines for the use of the ILO international classification of radiographs of pneumoconioses. International Labour Office Occupational Safety and Health Series no. 22. Geneva, Switzerland

Jarvholm B (1992) Pleural plaques and exposure to asbestos: a mathematical model. Int J Epidemiol 21:1180–1184

Levin SM, Selikoff IJ (1991) Radiological abnormalities and asbestos exposure among custodians of the New York City Board of Education. Ann N Y Acad Sci 643:530–539

Mlynarek S, Corn M, Blake C (1996) Asbestos exposure of building maintenance personnel. Regul Toxicol Pharmacol 23:213–224

Oliver LC, Sprince NL, Greene R (1991) Asbestos-related disease in public schools custodians. Am J Ind Med 19:303–316

Orlowski E, Créau Y, Gauducheau E, Certin JF, Laforest JC, Raffaelli C, Hébrard F, Brochard P (1997) EVALUTIL: base de données pour l'évaluation des expositions à l'amiante des utilisateurs de matériaux en contenant. Cah Notes Doc INRS 166:5–16

Pierre N, Iwatsubo Y, Ameille J, Cordier S, Mandereau L, Raix A, Freddy M, Delage A, Bignon J, Brochard P (1995) Etude longitudinale des anomalies radiologiques chez des sujets travaillant dans des locaux floqués à l'amiante. Rev Epidemiol Sante Publique 43:432–443

Price B, Crump KS, Baird EC (1992) Airborne asbestos levels in buildings: maintenance workers and occupant exposures. J Expo Anal Environ Epidemiol 2:357–374

US Environmental Protection Agency (1984) Asbestos in buildings. A national survey of asbestos-containing friable materials (EPA 560 15 84-006). Environmental Protection Agency, Washington, DC

Weiss W (1991) Cigarette smoking and small irregular opacities. Br J Ind Med 48:841–844