# EXHIBIT A

# CERATECH, INC.

## SERIES C PREFERRED STOCK PURCHASE AGREEMENT

THIS SERIES C PREFERRED STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of January __, 2008 (the "Effective Date") by and between CeraTech, Inc., a Delaware corporation (the "Company"), and W.R. Grace & Co. – Conn., a Connecticut corporation (the "Investor").

**WHEREAS:** The Company proposes to issue and sell to the Investor, and the Investor proposes to purchase and acquire from the Company, an aggregate of up to One Hundred Twenty-Five Thousand (125,000) shares (the "Shares") of a newly created Series C Convertible Redeemable Preferred Stock, par value $0.01 per share, of the Company (the "Series C Preferred Stock"), for a purchase price per share of $40.00 (the "Purchase Price Per Share"), in an equity financing transaction (together with the transactions contemplated hereby, the "Financing");

**WHEREAS:** In connection with the Financing, the Board of Directors of the Company has authorized the issuance and sale of the Shares and has approved and adopted a Third Amended and Restated Certificate of Incorporation of the Company, in the form attached hereto as Exhibit A (the "Amended and Restated Charter"), providing for the rights, preferences and privileges of the Series C Preferred Stock; and

**WHEREAS:** In connection with the Financing, the Investor and the Company propose to enter into an Exclusive Sales, Marketing and Distribution Agreement in the form attached hereto as Exhibit B (the "Distribution Agreement") and a Supply Agreement in the form attached hereto as Exhibit C (the "Supply Agreement").

**NOW, THEREFORE**, in consideration of the mutual promises, agreements and covenants herein contained, the Investor agrees with the Company as follows:

1.      Purchase and Sale Of Shares.

1.1      Sale of the Shares.  At the Initial Closing (as defined below), the Company shall issue and sell to the Investor, and the Investor shall purchase and acquire from the Company, Seventy-Five Thousand (75,000) of the Shares (the "Initial Closing Shares") at a purchase price per share equal to the Purchase Price Per Share, for an aggregate purchase price of Three Million Dollars ($3,000,000) (the "Initial Closing Purchase Price").  At the Second Closing, the Company shall issue and sell to the Investor, and the Investor shall purchase and acquire from the Company, the remaining Fifty Thousand (50,000) of the Shares (the "Second Closing Shares") at a purchase price per share equal to the Purchase Price Per Share, for an aggregate purchase price of Two Million Dollars ($2,000,000) (the "Second Closing Purchase Price").

1.2      Closings; Deliveries.

(a)      Initial Closing.  The initial closing of the purchase and sale of the Shares under this Agreement (the "Initial Closing") shall be held at 10:00 a.m. E.S.T. at the

va-226176

offices of Morrison & Foerster LLP, 1650 Tysons Boulevard, 4th Floor, McLean, Virginia 22102 on the date that is two (2) business days after the satisfaction or waiver of the conditions to the Initial Closing set forth in Sections 5 and 6 (the "<u>Initial Closing Date</u>").

(b)     <u>Initial Closing Deliveries</u>. At the Initial Closing (i) the Investor shall (A) deliver to the Company the Initial Closing Purchase Price by wire transfer of immediately available funds to an account designated by the Company, (B) execute and deliver to the Company the Fourth Amendment to the Registration Rights Agreement in the form attached hereto as <u>Exhibit D</u> (the "<u>Amendment to the Registration Rights Agreement</u>"), relating to the Company's Registration Rights Agreement, dated as of June 26, 2001, as amended, modified or supplemented from time to time (the "<u>Registration Rights Agreement</u>"), and (C) execute and deliver to the Company the Third Amended and Restated Stockholders Agreement in the form attached hereto as <u>Exhibit E</u> (the "<u>Amended and Restated Stockholders Agreement</u>"), which shall amend and restate the Company's Second Amended and Restated Stockholders Agreement, dated as of July 1, 2005 (the "<u>Existing Stockholders Agreement</u>"), (D) execute and deliver to the Company the Distribution Agreement, and (E) execute and deliver to the Company the Supply Agreement; and (ii) the Company shall execute and deliver to the Investor the Amendment to the Registration Rights Agreement, the Amended and Restated Stockholders Agreement, the Distribution Agreement and the Supply Agreement.

(c)     <u>Second Closing; Deliveries</u>. At any time after October 31, 2008 and through January 1, 2009, the Company may request, by written notice to the Investor, that the closing of the issuance and sale of the Second Closing Shares (the "<u>Second Closing</u>", and together with the Initial Closing, the "<u>Closings</u>" and each a "<u>Closing</u>") occur. In such event, the Second Closing shall occur no later than January 11, 2009 unless on or prior to December 31, 2008, the Investor shall deliver written notice to the Company (a "<u>Closing Refusal Notice</u>") stating that it does not intend to consummate the Second Closing. At any time after October 31, 2008 and through January 1, 2009, provided the Investor has not previously delivered a Closing Refusal Notice or otherwise failed to consummate the Second Closing when required to do so, the Investor may request, by written notice to the Company, that the Company consummate the Second Closing. In such event, the Second Closing shall occur no later than January 11, 2009. The Second Closing shall be held at the offices of Morrison & Foerster LLP, 1650 Tysons Boulevard, 4th Floor, McLean, Virginia 22102. At the Second Closing, the Investor shall deliver the Second Closing Purchase Price for the Second Closing Shares to the Company by wire transfer of immediately available funds to an account designated by the Company.

(d)     <u>Certificates</u>. At each Closing, the Company shall issue and deliver to the Investor a certificate for the number of Shares purchased at such Closing by the Investor, registered in the name of the Investor.

1.3     <u>Use of Proceeds</u>. The Company will use the proceeds from the sale of the Shares as working capital and for general corporate purposes.

2.     <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Investor as of the date hereof as follows:

2.1     Organization and Standing.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and corporate authority to own, operate and lease its assets and properties, to carry on its business as currently conducted and to carry out the transactions contemplated hereby.  The Company is qualified to conduct business in any other jurisdiction in which the nature of the business conducted by, or the character of the assets owned, leased or otherwise held by, the Company makes such qualification necessary, except jurisdictions where the failure to be so qualified would not have a Material Adverse Effect on the Company.

2.2     Subsidiaries. The Company has no subsidiaries and has no equity investment or other interest in, nor has the Company made advances or loans to, any corporation, association, partnership, limited liability company, joint venture or other entity, other than credit extended or travel advances made in the ordinary course of business.

2.3     Certificate of Incorporation and Bylaws.  The Company has made available to the Investor a true and complete copy of the certificate of incorporation of the Company, as currently in effect, certified as of a recent date by the Secretary of State of the State of Delaware, and a true and complete copy of the bylaws of Company, as currently in effect, certified by its corporate secretary.

2.4     Capital Structure of the Company.  The authorized capital stock of the Company consists solely of:

(a)     1,200,000 shares of Common Stock, par value $0.01 per share ("Common Stock"), of which (i) 202,947 shares are issued and outstanding, (ii) 410,190 shares are reserved for issuance upon conversion of outstanding shares of Series A Convertible Redeemable Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock") and Series B Convertible Redeemable Preferred Stock, par value $0.01 per share (the "Series B Preferred Stock"), (iii) 100,000 shares are reserved for issuance pursuant to the Company's Stock Incentive Plan (of which 64,000 have been issued and are included in clause (i) above), (iv) 50,135 shares are reserved for issuance upon conversion of Warrants to purchase shares of Common Stock (the "Warrants") issued in pursuant to the Convertible Note and Warrant Purchase Agreement, dated as of June 17, 2007, by and between the Company and the Investors named therein (the "Bridge Note Purchase Agreement"), (v) up to 200,000 shares are reserved for issuance upon conversion of shares of Series B Preferred Stock issuable upon conversion of convertible promissory notes (the "Notes") issued pursuant to the Bridge Note Purchase Agreement and the Convertible Note Purchase Agreement, dated as of March 27, 2007, by and between the Company and Ceratech Asia Pacific Holdings Ltd., a Hong Kong company ("APH") and (vi) 110,863 are authorized but unissued and unreserved;

(b)     622,314 shares of Preferred Stock, par value $0.01 per share, of which (i) 289,900 are designated Series A Preferred Stock, 278,390 of which are issued and outstanding and (ii) 372,414 are designated Series B Preferred Stock, 131,800 of which are issued and outstanding and up to 200,000 of which are reserved for issuance upon conversion of the Notes; and

(c)     Upon the filing of the Amended and Restated Charter immediately prior to the Initial Closing, there shall be authorized 125,000 shares of Series C Preferred Stock, none of which shall be issued and outstanding, and an additional 125,000 shares of Common Stock shall be reserved for issuance upon conversion of the Shares.

Attached hereto as Schedule 2.4 is a true and complete list of the stockholders and all other security holders of the Company, showing the number of shares of Common Stock or other securities of the Company held by each such person (and, in the case of Notes, the number of shares of Series B Preferred Stock issuable upon conversion thereof as of the initial maturity date thereof, assuming no defaults under such Notes). All issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and nonassessable and free of any preemptive rights, other than as set forth in the Stockholders Agreement (which preemptive rights have been or, subject to the condition set forth in Section 5.2 hereof, will be, waived in full). All outstanding shares of capital stock of the Company have been offered, sold, and issued in compliance with all applicable federal and state securities laws. Except as set forth in this Section 2.4, no shares of capital stock of the Company have been reserved for any purpose. Except for shares of the Series A Preferred Stock, the Series B Preferred Stock and the Series C Preferred Stock described above, except for the Notes and Warrants, and except for options outstanding under the Stock Incentive Plan (all of which are set forth on Schedule 2.4), there are no outstanding securities convertible into or exchangeable or exercisable for the capital stock or other securities of the Company, or warrants, options or rights to purchase or to subscribe for any shares of such stock or other securities of the Company. There are no outstanding contracts affecting or relating to the voting, issuance, purchase, redemption, repurchase, transfer or registration for sale under the Securities Act of 1933, as amended (the "Securities Act") of any securities of the Company, except as contemplated hereunder or under the Existing Stockholders Agreement or the Registration Rights Agreement.

2.5     No Material Adverse Change. Since September 30, 2007 and through the date hereof, to the Knowledge of the Company, there has not occurred any Material Adverse Effect. For the purposes of this Agreement, "Material Adverse Effect" means any change, effect or event that is materially adverse to the business, assets, properties, results of operations, condition (financial or otherwise) of the Company, excluding in each case, any change, effect or event arising or resulting from (i) events, facts or circumstances relating to the economy in general or to the Company's industry in general (to the extent such events, facts or circumstances relating to the Company's industry do not materially and disproportionately affect the Company), (ii) an outbreak or escalation of hostilities involving the United States, or any act of God or natural disaster, or (iii) the announcement, execution or delivery of this Agreement or the or the Transaction Documents (as defined below) the consummation of the transaction contemplated hereby or thereby, or the identity of the Investor. The term "Knowledge" means (i) the actual knowledge of the Chief Executive Officer, the Chief Financial Officer or the Chief Technology Officer of the Company, or (ii) the knowledge that the Chief Executive Officer, the Chief Financial Officer or the Chief Technology Officer reasonably would have obtained in the normal conduct of his duties.

2.6     Authorization. Subject to obtaining the approvals described in Section 5 hereof (the "Transaction Approvals"), the Company has all requisite corporate power and

authority to enter into this Agreement, the Amended and Restated Stockholders Agreement, the Amended Registration Rights Agreement, the Distribution Agreement, the Supply Agreement and any other all other certificates, documents, agreements and instruments delivered to the Investor under or in connection with this Agreement (the "Transaction Documents") and to carry out its obligations hereunder and thereunder. Subject to obtaining the Transaction Approvals, the execution, delivery and performance of this Agreement and the other Transaction Documents by the Company have been duly authorized by all necessary corporate action. Except for the Requisite Stockholder Approval and the other Transaction Approvals, no other corporate action is necessary for the Company to enter into this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby and thereby. This Agreement and, when executed and delivered, the other Transaction Documents, constitute the Company's valid and legally binding obligations, enforceable against the Company in accordance with their respective terms subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law) (collectively "Bankruptcy Laws and Equitable Principles"). The issuance of the shares of Series C Preferred Stock to be purchased by the Investor in the Financing has been duly authorized by all requisite corporate action of the Company and, upon delivery to the Investor of certificates therefor against payment in accordance with the terms and conditions of this Agreement, such shares of Series C Preferred Stock (i) will be validly issued, fully paid and nonassessable, (ii) will have the rights, preferences and privileges described in the Company's Amended and Restated Charter, (iii) will be free and clear of preemptive rights, (iv) subject to and assuming the accuracy of the Investor's representations and warranties contained herein, will be issued in compliance with the Securities Act and any applicable state securities laws and the rules and regulations promulgated thereunder, and (v) will be free and clear of liens or encumbrances, other than liens or encumbrances created by or through the Investor and the liens or encumbrances imposed under this Agreement and the other Transaction Documents. The issuance of the shares of Common Stock issuable upon the conversion of the Shares (the "Conversion Shares") has been duly authorized by all requisite corporate action and such Conversion Shares have been reserved for issuance upon conversion of the Shares and, when issued upon conversion of such Shares in accordance with the Amended and Restated Charter, will be (i) validly issued, fully paid and nonassessable, (ii) free and clear of preemptive rights, (iii) issued in compliance with the Securities Act and any applicable state securities laws and the rules and regulations promulgated thereunder and (iv) free and clear of liens or encumbrances, other than liens or encumbrances created by or through the Investor and the liens or encumbrances imposed under this Agreement and the other Transaction Documents.

        2.7    Financial Statements. The Company has prepared and made available to the Investor the 2004, 2005 and 2006 audited financial statements of the Company, and an unaudited balance sheet of the Company dated as of September 30, 2007 (the "Balance Sheet") and an unaudited statement of income for the nine (9) month period ended September 30, 2007 (collectively, the "Financial Statements"). All of the Financial Statements, including, without limitation, the notes thereto (if any): (i) are in accordance with the books and records of the Company in all material respects, (ii) present fairly in all material respects the consolidated financial position of the Company as of the respective dates and the results of operations and cash flow for the respective periods indicated, and (iii) have been prepared in accordance with

generally accepted accounting principles ("GAAP") applied on a basis consistent with prior accounting periods except, in the case of unaudited Financial Statements, for the absence of footnotes and customary year-end adjustments. To the Knowledge of the Company, the Company did not have, as of September 30, 2007, any liabilities of any type with in the aggregate exceeded $50,000 whether absolute or contingent, which were not fully reflected on the Balance Sheet and, since September 30, 2007, the Company has not incurred or otherwise become subject to any such liabilities or obligations except in the ordinary course of business, except for transaction expenses and liabilities incurred in connection with the transactions contemplated hereby and liabilities the subject matter of which is covered by the other representations and warranties.

2.8     Litigation.  Except as set forth on Schedule 2.8, there are no actions, suits, claims, arbitrations, proceedings or investigations pending or, to the Knowledge of the Company, threatened against or involving the Company, or its business or assets, or the transactions contemplated by this Agreement before or by any court, arbitrator or governmental authority, domestic or foreign. The Company is not operating under, subject to or in default with respect to any order, award, writ, injunction, decree or judgment of any court, arbitrator or governmental authority.

2.9     Transactions with Related Parties.  Except as set forth on Schedule 2.9, except for the Transaction Documents, and except for the agreements that are to be amended by the Transaction Documents, neither any present or former officer, director or stockholder of the Company, nor any Affiliates (as defined below) of the officers, directors or stockholders, are currently a party to any transaction with the Company, including, without limitation, any agreement providing for the employment of, furnishing of services by, rental of assets from or to, or otherwise requiring payments to, any of the officers, directors, stockholders or affiliates, but excluding in all cases, with respect to such person's employment with the Company, the payment of compensation, reimbursement of expenses, stock option plans and agreements and providing of employee benefits in the ordinary course of business and in accordance with the Company's policies relating thereto. For purposes hereof, "Affiliate" means, with respect to a person, a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such person.

2.10    Property and Assets.  Except as set forth on Schedule 2.10, the Company has good title to all of its material properties and assets, including all properties and assets reflected in the Balance Sheet, except those disposed of since September 30, 2007 in the ordinary course of business, and none of such properties or assets is subject to any mortgage, pledge, lien, security interest, lease, charge or encumbrance other than those the material terms of which are described in the Balance Sheet and other than (i) liens for taxes not yet due and payable, (ii) mechanics, materialmen and warehouse liens for rights not yet due and payable and (iii) other liens, not material in nature or amount, that do not materially impair the value or use of the assets subject to such liens.

2.11    Patents and Trademarks.      Set forth on Schedule 2.11 is a true and complete list of (i) all patents, patent applications, registered trademarks and service marks, trademark and service mark applications, (ii) unregistered trademarks, trade names and service

marks material to the Company's business as currently conducted, and (iii) registered copyrights and material licenses of third party intellectual property rights presently owned or held by the Company (other than commercial off-the-shelf software licenses). The Company owns, licenses or has a valid right to use all intellectual property material to the conduct of its business as conducted on the date hereof. To the Company's Knowledge, the Company's use of the foregoing patents, trademarks, service marks, trade names, copyrights, proprietary rights, trade secrets and licenses or rights to the foregoing in the business conducted by the Company do not cause the Company to infringe or violate any of the patents, trademarks, service marks, trade names, copyrights, licenses, or other proprietary rights of any other person or entity. The Company does not have Knowledge that any employee is obligated under any contract (including any license, covenant or commitment of any nature), or subject to any judgment decree or order of any court or administrative agency, in each case that would materially interfere with such employee's ability to promote the interests of the Company or would conflict in any material respect with the Company's business as currently conducted. To the best of the Company's Knowledge, no prior employer of any employee of the Company has any right to or interest in any inventions, improvements, discoveries or other information (in each case which is material to the Company's business) assigned to the Company or required to be assigned to the Company by such employee pursuant to any nondisclosure and assignment of invention agreements.

      2.12   <u>Insurance</u>.    The Company maintains valid policies of workers' compensation insurance and of insurance with respect to its properties and business of the kinds and in the amounts not less than is customarily obtained by companies of similarly established reputation and similar size engaged in the same or similar business and similarly situated, including, without limitation, insurance against loss, damage, fire, theft, public liability, and other risks against which such companies customarily insure.

      2.13   <u>Material Contracts and Obligations</u>.  Schedule 2.13 lists each contract of the Company that: (a)(1) has a term of more than 12 months or cannot be cancelled by the Company without payment, premium, or penalty of more than $20,000 upon notice of 90 days or less, or (2) under which the Company is obligated to make expenditures or has a right to receive receipts of more than $50,000 in the next 12 months; (b) pursuant to which any person serves as an employee (other than employee offer letters providing for at will employment), independent contractor or third-party consultant of the Company and that is presently in effect and pursuant to which the Company has continuing payment or performance obligations; (c) pertaining to any stock option, stock purchase and similar plans and arrangements; or (d) pertaining to distribution and sales representative or agency arrangements (each, a "<u>Material Contract</u>"). Each of the Material Contracts is in full force and effect and is valid and enforceable by and against the Company in accordance with its terms. There is no default by the Company, or to the Company's Knowledge, by any other party thereto and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default by any party thereunder.

      2.14   <u>Compliance with Laws</u>. The Company has complied in all material respects with all laws, regulations and orders that are applicable to its current business and has all material permits and licenses required thereby. No notice from any governmental authority has been delivered to or served upon or, to the Company's Knowledge, threatened to be

delivered to or served upon, the Company claiming a material violation by the Company or any affiliate of the Company of any law, regulation or order. To the Company's Knowledge, none of the employees of the Company is in material violation of any term of any employment contract, patent or other proprietary information disclosure agreement or any other contract or agreement relating to the employment of such employee by the Company.

     2.15    Employees.    All employees and consultants of the Company and all persons whose activities require access to confidential or proprietary information of the Company, have executed and delivered agreements containing nondisclosure provisions, and all employees and consultants of the Company and all persons whose activities with respect to the Company may reasonably be expected to result in the creation of inventions or other material intellectual property have executed assignment of inventions agreements with the Company, and in each case all of such agreements are in full force and effect. To the Company's Knowledge, all Company employees are legally authorized to work in the United States. To the Company's Knowledge, the Company has completed and retained the necessary employment verification paperwork required under the Immigration Reform and Control Act of 1986 ("IRCA") for its employees.

     2.16    Taxes. The amount shown on the Balance Sheet as provision for taxes is sufficient in all material respect for payment of all accrued and unpaid Federal, state, county, local and foreign taxes for the period then ended and all prior periods. The Company has filed or has obtained presently effective extensions with respect to all Federal, state, county, local and foreign tax returns which are required to be filed by it on or prior to the date hereof, such returns are true and correct and all taxes shown thereon to be due have been timely paid with exceptions not material to the Company. The Company's Federal income tax returns have not been audited by the Internal Revenue Service, and no controversy with respect to taxes of any type is pending or, to the Company's Knowledge, threatened.

     2.17    Books and Records. The minute books of the Company contain complete and accurate records of all meetings and other corporate actions of its stockholders and its Board of Directors and committees thereof. The stock ledger of the Company is complete and reflects all issuances, transfers, repurchases and cancellations of shares of capital stock of the Company..

     2.18    Qualified Offering. Assuming the accuracy of the representations and warranties of the Investor contained in this Agreement and any other agreements entered into in connection with the Financing, and assuming no change in applicable law as in effect on the date hereof, the offer, sale and issuance of the Shares issued in the Financing and the Conversion Shares (collectively, the "Securities") will be exempt from the registration requirements of the Securities Act, and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws. Neither the Company nor any agent on its behalf will take any action hereafter that would bring the sale of the Securities within the registration provisions of the Securities Act or any state securities law.

2.19    Consents. Except for the execution and filing of the Amended and Restated Charter, and except for filings under Regulation D promulgated under the Securities Act to be made after each issuance and sale of Shares, no governmental orders, permissions, consents, approvals or authorizations are required to be obtained by the Company and no registrations or declarations are required to be filed by the Company in connection with the execution and delivery of this Agreement and the issuance of the Shares or the Conversion Shares.

2.20    Disclosure. To the Company's Knowledge, the representations and warranties contained herein (read together with the schedules hereto), taken collectively as a whole, do not misstate any material fact or omit to state any material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

3.    Representations and Warranties of the Investor. The Investor hereby represents and warrants to the Company as follows:

3.1    Authorization. Subject to entry of an order in form acceptable to the Company in its commercially reasonable discretion from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in *In re: W.R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JFK) (Jointly Administered), in the Bankruptcy Court ("Bankruptcy Proceeding") approving this Agreement and the other Transaction Documents in the Bankruptcy Proceeding (the "Order") and its becoming a final, non-appealable order (the "Final Order"), this Agreement and, when executed and delivered, the other Transaction Documents, constitute the Investor's valid and legally binding obligations, enforceable against the Investor in accordance with their respective terms (subject, after the entry of a confirmation order in the Bankruptcy Proceeding relating to the Investor, to Bankruptcy Laws and Equitable Principles). Subject to entry of the Order and its becoming a Final Order, the Investor has full power and authority to enter into this Agreement and the other Transaction Documents.

3.2    Purchase for Own Account. The Shares are being acquired by the Investor for investment for the Investor's own account, not as a nominee or agent or on behalf of any other persons or entities, and not with a view to the public resale or distribution thereof within the meaning of the Securities Act, and the Investor has no present intention of selling, granting any participation or interest in, or otherwise distributing the same.

3.3    Disclosure of Information. The Investor has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the Shares. In making its purchase hereunder, the Investor is not relying on any representations or statements of the Company other than as contained herein. The Investor further has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the purchase of the Shares and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify any information furnished to the Investor or to which the Investor had access.

     3.4    <u>Investment Experience</u>. The Investor understands that the purchase of the Shares involves substantial risk. The Investor acknowledges that the Investor is able to fend for itself, can bear the economic risk of the loss of the Investor's entire investment in the Shares and has such knowledge and experience in financial or business matters that the Investor is capable of evaluating the merits and risks of this investment in the Shares and protecting its own interests in connection with this investment.

     3.5    <u>Accredited Investor Status</u>. The Investor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act. The Investor understands that the Company is relying upon the Investor's representations and warranties herein in qualifying the issuance and sale of the Shares to the Investor for an exemption from the registration requirements of applicable Federal and state securities laws.

     3.6    <u>Restricted Securities</u>. The Investor understands that the Shares are characterized as "restricted securities" under the Securities Act in as much as they are being acquired from the Company in a transaction not involving a public offering and that, in addition to any restrictions on transfer provided hereunder, pursuant to the Securities Act such securities may be resold without registration under the Securities Act only in certain limited circumstances. In this connection, the Investor represents that it is familiar with Rule 144 as promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. The Investor understands that the Company is under no obligation to register the Securities except as provided in the Registration Rights Agreement. The Investor understands that no public market now exists for the Securities and that it is uncertain whether a public market will ever exist for the Securities.

     3.7    <u>Consents and Approvals</u>. Except for the Final Order, no governmental orders, permissions, consents, approvals or authorizations are required to be obtained and no registrations or declarations are required to be filed in connection with the execution and delivery of this Agreement, the other Transaction Documents, the purchase of the Shares, and the performance of the Investor's obligations hereunder and under the other Transaction Documents.

    4.    <u>Covenants</u>.

     4.1    <u>Conversion of Notes</u>. The Company shall use its commercially reasonable efforts to obtain the consent of all holders of the Notes (other than APH) to convert their Notes, effective at the Initial Closing, into shares of Series B Preferred Stock in accordance with the terms and conditions of such Notes.

     4.2    <u>Approval of Bankruptcy Court</u>. On or prior to the date hereof, the Investor has filed a motion for the entry of the Order. From and after the date hereof, the Investor shall use its reasonable best efforts to obtain the Final Order as soon as practicable, and the Company shall provide all reasonable cooperation with such efforts. From and after the date hereof, the Investor shall keep the Company reasonably informed as to the status of the Order and the Investor's efforts to obtain the Order (and it becoming a Final Order). The Investor shall, at its sole cost and expense, provide the Company, promptly after the filing or entry thereof, of any material filing or order made in the Bankruptcy Proceeding in relation to or that

affects this Agreement, the other Transaction Documents or the transactions contemplated hereby and thereby, and the Investor shall notify the Company as soon as possible of (and if applicable provide the Company as soon as practicable with copies of) any motion, filing, ruling, order, action or other event or circumstance of which the Investor becomes aware or receives notice arising from the Bankruptcy Proceeding or under applicable bankruptcy laws that would reasonably be expected to hinder, prevent, impair, prohibit, delay, or otherwise adversely affect, in any material respect, the entry of a Final Order, the purchase of the Shares or Investor's ability to perform all of its obligations under this Agreement or any other Transaction Document, or to consummate the transactions contemplated hereby or thereby in a timely manner.

        4.3    <u>Amended and Restated Charter</u>. Upon obtaining the Requisite Stockholder Approval (as defined below), and immediately prior to the Initial Closing, the Company shall file the Amended and Restated Charter with the Secretary of State of the State of Delaware.

        4.4    <u>Disclosure Schedules</u>. From time to time prior to the Closing, between the date hereof and the Closing, the Company may amend, supplement or revise the Company's Schedules with respect to any matter, which disclosure shall be effective for all purposes under this Agreement (other than for purposes of the condition set forth in Section 6.8).

        5.    <u>Conditions to the Company's Obligations at the Initial Closing</u>. The obligations of the Company to consummate the Initial Closing are subject to the fulfillment on or before the Initial Closing of each of the following conditions:

        5.1    <u>Approval of Bankruptcy Court</u>. The Investor shall have obtained the Order, which shall have become the Final Order and which shall remain in full force and effect.

        5.2    <u>Amended and Restated Stockholders Agreement</u>. The Investor, Investor Stockholders (as defined in the Existing Stockholders Agreement) holding a majority of the outstanding shares of Series A Preferred Stock and Series B Preferred Stock, and Existing Stockholders (as defined in the Existing Stockholders Agreement) holding a majority of the outstanding shares of Common Stock shall have executed and delivered the Amended and Restated Stockholders Agreement.

        5.3    <u>Amendment to the Registration Rights Agreement</u>. The Investor and the Initiating Holders (as defined in the Registration Rights Agreement) shall have executed and delivered the Amendment to the Registration Rights Agreement.

        5.4    <u>Stockholder Approval</u>. The holders of a majority of the issued and outstanding shares of Series A Preferred Stock (including fractional shares), on an as if converted basis, in the aggregate, consenting or voting as a separate class, the holders of a majority of the issued and outstanding shares of Series B Preferred Stock (including fractional shares), on an as if converted basis, in the aggregate, consenting or voting as a separate class, the holders of a majority of the issued and outstanding shares of Common Stock, consenting or voting as a single class, and the holders of a majority of the issued and outstanding capital stock of the Company, voting together as a single class on an as-converted basis, shall have approved

by vote at a meeting or consent given in writing the Financing, the transactions contemplated thereby and the Amended and Restated Charter (the "<u>Requisite Stockholder Approval</u>").

     5.5   <u>Distribution Agreement, Supply Agreement</u>. The Investor shall have executed and delivered to the Company the Distribution Agreement and the Supply Agreement, each of which shall be in full force and effect.

     5.6   <u>Amended and Restated Charter</u>. The Amended and Restated Charter shall have been duly accepted for filing by the Secretary of State of the State of Delaware and shall be in full force and effect.

     5.7   <u>Representations and Warranties</u>. The representations and warranties of the Investor set forth in this Agreement shall be true and correct as of the Initial Closing Date, as if made as of such time (except as permitted or contemplated by this Agreement and except to the extent such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct do not, individually or in the aggregate, have a material adverse effect on the Investor or its ability to consummate the transaction contemplated hereby (including by reason of material impediment or delay).

     5.8   <u>Covenants</u>. The Investor shall have performed and complied with all of its covenants hereunder in all material respects through the Initial Closing..

   6.   <u>Conditions to the Investor's Obligations at the Initial Closing</u>. The obligations of the Investor to consummate the Initial Closing are subject to the fulfillment on or before the Initial Closing of each of the following conditions:

     6.1   <u>Approval of Bankruptcy Court</u>. The Investor shall have obtained the Order, which shall remain in full force and effect.

     6.2   <u>Amended and Restated Stockholders Agreement</u>. The Company, Investor Stockholders (as defined in the Existing Stockholders Agreement) holding a majority of the outstanding shares of Series A Preferred Stock and Series B Preferred Stock, and Existing Stockholders (as defined in the Existing Stockholders Agreement) holding a majority of the outstanding shares of Common Stock shall have executed and delivered the Amended and Restated Stockholders Agreement..

     6.3   <u>Amendment to the Registration Rights Agreement</u>. The Company and the Initiating Holders (as defined in the Registration Rights Agreement) shall have executed and delivered the Amendment to the Registration Rights Agreement.

     6.4   <u>Distribution Agreement, Supply Agreement</u>. The Company shall have executed and delivered the Distribution Agreement and the Supply Agreement, each of which shall be in full force and effect.

     6.5   <u>Stockholder Approval</u>. The Requisite Stockholder Approval shall have been obtained.

va-226176                              12

6.6     Amended and Restated Charter.  The Amended and Restated Charter shall have been duly accepted for filing by the Secretary of State of the State of Delaware and shall be in full force and effect.

6.7     Legal Opinion.  The Investor shall have received the legal opinion of the Morrison & Foerster LLP, special counsel to the Company, dated the Initial Closing Date, as to the matters set forth on Schedule 6.3 hereto.

6.8     Representations and Warranties.  The representations and warranties of the Company set forth in this Agreement shall be true and correct as of the Initial Closing Date, as if made as of such time (except as permitted or contemplated by this Agreement and except to the extent such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of that date), except where the failure of such representations and warranties to be so true and correct do not, individually or in the aggregate, have a Material Adverse Effect.

6.9     Covenants.  The Company shall have performed and complied with all of its covenants hereunder in all material respects through the Initial Closing.

6.10     Notes.  The holders of Notes (other than APH) having an aggregate outstanding principal amount equal to 80% of the aggregate outstanding principal amount of all Notes (excluding any Notes held by APH) shall have irrevocably converted their Notes into shares of Series B Preferred Stock effective upon the Closing.

6.11     Certificate.  The Company shall have delivered to the Investor a certificate signed by the Chief Executive Officer, the President or a Vice President of the Company on behalf of the Company certifying that the conditions set forth in Section 6.8 and 6.9 have been satisfied as of the Initial Closing Date.

6.12     Modification of Confidentiality Agreement.  The Company shall have delivered to the Investor an agreement in form and substance reasonably satisfactory to the Investor by which the Company permits Woodcock Washburn LLP to disclose to the Investor any information that is subject to the Nondisclosure Agreement dated December 14, 2007, by and between the Company and Woodcock Washburn LLP.

6.13     Election of Director.  The Investor's Series C Designee (as defined in the Amended and Restated Stockholders Agreement) shall have been elected to the Board of Directors of the Company, effective upon the Initial Closing.

7.     Certain Agreements.

7.1     Restrictions on Transferability.  The Securities shall be transferable only as provided in the Amended and Restated Stockholders Agreement and the Registration Rights Agreement (as amended by the Amendment to the Registration Rights Agreement).

7.2     Restrictive Legend.  The certificates evidencing the (i) Shares, (ii) the Conversion Shares and (iii) any other securities issued in respect of any Conversion Shares upon

any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall be stamped or otherwise imprinted with a legend in substantially the following form (in addition to any legend required under applicable state securities laws and under the Stockholders Agreement):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR TRANSFERRED UNLESS (A) A REGISTRATION STATEMENT COVERING THE SECURITIES IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) THE TRANSACTION IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND, IF CERATECH, INC. REQUESTS, AN OPINION SATISFACTORY TO CERATECH, INC. TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

> THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO (I) A SERIES C PREFERRED STOCK PURCHASE AGREEMENT BY AND BETWEEN CERATECH, INC. AND THE HOLDER HEREOF, (II) A THIRD AMENDED AND RESTATED STOCKHOLDERS AGREEMENT, DATED AS OF FEBRUARY ___, 2008 (AS AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME) BY AND AMONG CERATECH, INC. AND CERTAIN OF ITS STOCKHOLDER, AND (III) A REGISTRATION RIGHTS AGREEMENT, DATED AS OF JUNE 26, 2001 (AS AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME), BY AND AMONG CERATECH, INC. AND CERTAIN OF ITS STOCKHOLDERS. A COPY OF SUCH PURCHASE AGREEMENT, STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY CERATECH, INC. TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

The Investor consents to the Company making a notation on its records and giving instructions to any transfer agent of the Securities in order to implement the restrictions on transfer set forth in Sections 7.1 and 7.2.

8.  Termination.

8.1  Termination Events. This Agreement may be terminated and the Financing may be abandoned at any time prior to the Initial Closing Date:

(a)  By mutual written consent of the Company and the Investor; or

(b)  By either the Company or the Investor if the Initial Closing shall not have occurred on or before March 1, 2008 (the "Outside Date"); provided, that the right to

terminate this Agreement under this Section 8.1(b) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Financing to have been consummated on or prior to the Outside Date.

      8.2    Effect of Termination. In the event of the termination of this Agreement pursuant to Section 8.1, (i) the Financing shall be abandoned; (ii) the provisions of Section 9 (other than Section 9.1) and this Section 8 shall survive such termination shall remain in full force and effect; and (iii) each party shall remain liable for any breach of this Agreement prior to its termination.

    9.   Miscellaneous.

      9.1    Survival of Warranties. All representations and warranties and covenants of the Investor and the Company contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and will in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Company or the Investor, as the case may be. The Investor acknowledges that it is only relying upon the representations and warranties expressly set forth Section 2 hereof in making its investment and is not relying upon any other representations, statements, information or warranties not contained therein. No other representations and warranties of any kind or nature have been made by the Company, its affiliates or any other person acting on their behalf, whether expressed or implied, including, but not limited to, any relating to the future financial condition, results of operations, merchantability, habitability, workmanship, profitability, fitness for a particular purpose or any assets or liabilities of the Company, and any such representations and warranties are specifically disclaimed by the Company.

      9.2    Successors and Assigns. The terms and conditions of this Agreement will inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. Neither party shall assign this Agreement without the prior written consent of the other (not to be unreasonably withheld); provided that, after the Initial Closing, the Investor may assign its rights under this Agreement without the Company's consent to the acquirer of all or substantially all of the business and assets of the Investor's concrete admixture business (including the portion of such business represented by this Agreement, the Shares and the other Transaction Documents), but only if (i) this Agreement, all other Transaction Documents, all Shares, and, in each case, all of the Investors rights thereunder, are simultaneously assigned to such acquirer, (ii) such acquirer agrees by written instrument to assume all of the Investor's obligations hereunder and (iii) the Investor provides reasonable prior written notice to the Company of such assignment.

      9.3    Governing Law. This Agreement will be governed by and construed under the internal laws of the State of Delaware as applied to agreements among Delaware residents entered into and to be performed entirely within Delaware, without reference to principles of conflict of laws or choice of laws.

9.4     Counterparts. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

9.5     Headings. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs, exhibits and schedules will, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto, all of which exhibits and schedules are incorporated herein by this reference.

9.6     Notices. All notices, requests, consents and other communications hereunder to any party will be deemed to be sufficient if contained in a written instrument delivered in person, delivered by recognized express courier at sender's expense, delivered by facsimile transmission, or delivered by first class registered or certified mail, return receipt requested, postage prepaid, to the recipient party at the address set forth below, or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. All such notices, requests, consents and other communications will be deemed to have been received on the date of delivery. The initial addresses referred to above are as follows:

If to the Company:

CeraTech, Inc.
1500 N. Beauregard Street
Suite 320
Alexandria, Virginia  22311
Facsimile:  (703) 894-1068
Attn:  Chief Executive Officer

If to the Investor:

W.R. Grace & Co. – Conn.
7500 Grace Drive
Columbia, Maryland 21044
Facsimile:  (410) 531-4783
Attention:  Corporate Secretary

9.7     No Finder's Fees. Each party represents that it neither is nor will be obligated for any finder's or broker's fee or commission in connection with this transaction. Each party agrees to indemnify, defend and hold harmless the other party from and against any and all claims asserted against such party for any such fees or commissions by any persons purporting to act or to have acted for or on behalf of the indemnifying party.

9.8    Amendments and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Investor.

9.9    Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision(s) will be excluded from this Agreement and the balance of the Agreement will be interpreted as if such provision(s) were so excluded and will be enforceable in accordance with its terms; provided that this Section 9.9 shall not apply if the provisions held to be unenforceable are individually or collectively part of the material substance of this Agreement.

9.10    Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between the parties with respect to the subject matter hereof.

9.11    Further Assurances.  From and after the date of this Agreement, upon the request of the Investor or the Company, the Company and the Investor will execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement.

9.12    Expenses.  Each party hereto shall pay its own expenses incident to this Agreement and the transactions contemplated hereunder, including all legal and accounting fees and disbursements.

*[Signatures Next Page]*

IN WITNESS WHEREOF, the parties hereto have duly executed, or caused to be duly executed on their behalf, this Agreement as of the date first above written.

**COMPANY:**

**CERATECH, INC.**

By: _____

Jon Hyman, Chief Executive Officer

**INVESTOR:**

**W.R. GRACE & CO. – CONN.**

By: _____

Name: _____

Title: _____

*(Signature Page to Series C Preferred Stock Purchase Agreement)*

**EXHIBIT A**

**THIRD AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**EXHIBIT B**

**DISTRIBUTION AGREEMENT**

# EXHIBIT C

## SUPPLY AGREEMENT

2

## EXHIBIT D

## AMENDMENT TO THE REGISTRATION RIGHTS AGREEMENT

# EXHIBIT E

## THIRD AMENDED AND RESTATED STOCKHOLDERS AGREEMENT

va-226176

## SCHEDULE 6.7

### COMPANY LEGAL OPINION

The Company is a corporation validly existing and in good standing under the laws of the State of Delaware.

The Company has the corporate power and authority to execute and deliver and to perform and observe its obligations under the Agreement. The Agreement has been duly authorized, executed and delivered by the Company, and constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

The authorized capital stock of the Company consists of 1,000,000 shares of Common Stock and 787,214 shares of Preferred Stock, of which 289,900 shares have been designated Series A Preferred Stock, 372,314 shares have been designated Series B Preferred Stock and 125,000 shares have been designated Series C Preferred Stock. Without giving effect to the transactions contemplated by the Agreement (including the conversion of the Notes), based solely on the Corporate Records, to our knowledge there are issued and outstanding 202,947 shares of Common Stock, 278,390 shares of Series A Preferred Stock, 131,800 shares of Series B Preferred Stock and no shares of Series C Preferred Stock. The Shares to be received by the Investor pursuant to the Agreement have been duly authorized and, upon issuance and delivery against payment therefor in accordance with the terms of the Agreement, will be validly issued, fully paid and nonassessable. The Common Stock issuable upon the conversion of the Shares has been duly authorized for issuance and validly reserved by all necessary corporate action of the Company and, when issued in accordance with the Amended and Restated Charter, will be duly authorized, validly issued, fully paid and nonassessable. Except as set forth in the Agreement and the Amended and Restated Stockholders Agreement there are no pre-emptive rights contained in the Charter or Bylaws or, to our knowledge, in any agreement to which the Company is a party, to subscribe for, purchase or acquire from the Company any shares of its capital stock.

The execution, delivery and performance of the Agreement by the Company and the issuance of the Shares as contemplated by the Agreement do not violate any provision of the Amended and Restated Charter or Bylaws of the Company.

Assuming the filing of a Form D in accordance with Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and assuming the accuracy of the representations and warranties of the Investor in the Agreement, the offer and sale of the Shares pursuant to the terms of the Agreement are exempt from registration under the Securities Act