EXHIBIT A

SETTLEMENT AGREEMENT

# LIABILITY TRANSFER AGREEMENT

This Liability Transfer Agreement (this "**Agreement**") is made and entered into as of February 22, 2008, by and between W. R. Grace & Co. – Conn., a Connecticut corporation, ("**Grace**"), Guanica-Caribe Land Development Corporation, a Delaware corporation, ("**Guanica-Caribe**"), both located at 7500 Grace Drive, Columbia, MD 21044, and Remedium Group, Inc., a Delaware corporation located at 6401 Poplar Avenue, Suite 301, Memphis, TN 38119 ("**Remedium**") (collectively, the "**Transferor Parties**"), and Environmental Liability Transfer, Inc., a Missouri corporation, ("**ELT**") and Commercial Development Company, Inc., a Missouri corporation, ("**CDC**"), and the Affiliates of ELT and/or CDC listed on the attached **Exhibit A** (collectively with ELT and CDC, the "**Transferee Parties**") (Transferor Parties and Transferee Parties are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**").

**WHEREAS,** Grace and Guanica-Caribe own certain real property at ten locations, more particularly described on the attached **Exhibit B**, together with easements and other rights appurtenant to such real property and any buildings and improvements on such real property; and equipment and personal property located in, on, or about such real property, all as more particularly described on the attached **Exhibit B** (each a "**Property**" and all collectively, the "**Properties**").

**WHEREAS,** the Properties are former industrial properties where environmental conditions have given rise or may give rise to legal obligations on the part of Transferor Parties related to such conditions.

**WHEREAS,** Transferee Parties wish to assume, all Environmental Clean-Up Liability and Pollution Legal Liability, as hereinafter defined, associated with the Properties, and in connection with such assumption, Transferor Parties wish to transfer the Properties to the Transferee Parties.

**NOW, THEREFORE,** in consideration of the terms and conditions of this Agreement, and the mutual promises and covenants herein, the Parties hereby agree as follows:

1.    **DEFINITIONS.**

1.1    **General.**

All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated herein. Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears. Except as otherwise expressly provided, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation." The word "person" as used herein shall include all individuals, partnerships, corporations, or any other entities whatsoever.

1.2    **Defined Terms.**

In addition to the capitalized terms defined above, as used in this Agreement, the following capitalized terms shall have the following meanings:

**"Affiliate"** of any person shall mean any other person which, directly or indirectly, controls or is controlled by or is under common control with such person; and "control" shall mean the power to direct or cause the direction of the management or policies of another person, whether directly or indirectly, and whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

**"Assignable Contracts"** shall mean the Contracts listed in the attached **Exhibit B**.

**"Assignment and Assumption of Licenses and Permits"** has the meaning given in Section 4.3(d).

**"Assignment of Contracts"** has the meaning given in Section 4.3(b).

**"Assumed Obligations"** has the meaning given in Section 2.1.

**"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**"Bodily Injury"** means physical injury, sickness, disease, mental anguish or emotional distress sustained by any person, including death resulting therefrom.

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability Act and any analogous state laws, as amended from time to time.

**"Clean-Up"** means all activities necessary to investigate and remediate Pre-Existing Pollution Conditions at the Properties to comply with Environmental Laws and any requirements of Governmental Authorities, including: obtaining access; investigation, sampling and study; engineering, design and planning; permitting; removal or remedial actions including removal, transportation, disposal, treatment (including in-situ treatment), management, stabilization, containment or neutralization of Pollutants, monitoring, closure, operation and maintenance, repair, and replacement; wetland mitigation related to remedial action; record keeping and reporting; and public participation and community involvement.

**"Clean-Up Costs"** means all costs incurred for Clean-Up or required to be incurred to effect Clean-Up. Clean-Up Costs shall include study and investigation costs, planning costs, consultant costs, remediation costs, transportation and disposal costs, legal fees, permit fees and costs, filing fees, monitoring costs, Governmental Authority oversight costs or costs to retain any licensed professionals for review and oversight in lieu of or on behalf of the Governmental Authority pursuant to Environmental Laws.

**"Closing"** has the meaning given in Section 4.1.

**"Closing Date"** has the meaning given in Section 4.1.

**"Contracts"** means service contracts, supply contracts, maintenance contracts, management contracts, leasing agreements, leases, and other contracts affecting the Properties.

**"Costs"** has the meaning given in Section 5.1.

**"Deed Restrictions"** has the meaning given in Section 6.3.

**"Due Diligence Period"** means that period of time between the effective date of the Letter of Intent between Grace and Remedium and Transferee Parties, dated May 7, 2007, and the date on which Transferor Parties make motion to the Bankruptcy Court for approval of this Agreement.

**"Effective Date"** has the meaning given in Section 12.

**"Environmental Clean-Up Liability"** means any obligation to perform, or any liability relating to, Clean-Up.

**"Environmental Laws"** means any federal, state, or local laws (including statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders or decrees, directives, permits, licenses or approvals, and all common law) that are now or become in the future applicable to Pollution Conditions and/or the Clean-up thereof.

**"EPA"** means the United States Environmental Protection Agency.

**"Excluded Matters"** means those items for which Transferee Parties have no responsibility under this Agreement solely as specifically set forth in Section 2.2.

**"Governmental Authority"** means any federal, state, or local governmental regulatory or administrative agency, commission, department, board, or other governmental subdivision, court, tribunal, arbitral body or other governmental authority or other subdivision, department or branch of any of the foregoing.

**"Liabilities"** means any and all risks, claims, demands, actions, liabilities, obligations, responsibilities, duties, damages, costs, fines, debts, dues, losses, penalties and expenses of any nature whatsoever, including consultants', experts' and attorneys' fees and other costs of investigation, remediation, prosecution and settlement of any legal, administrative, arbitral or other action, suit, proceeding or other matter.

**"Licenses and Permits"** means any and all licenses, permits, authorizations, approvals, decrees, and orders relating to the use, operation, maintenance and/or Clean-Up of or otherwise relating to the Properties.

**"Monetary Liens"** has the meaning given in Section 4.3(c).

**"Natural Resource Damages"** means: (1) physical injury to, destruction of, or loss of land, fish, wildlife, biota, air, water, groundwater, habitat, wetlands, drinking water supplies; (2) physical injury to, destruction of, or loss of other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Conservation and Management Act (16 U.S.C. Section 1801 et seq.)), any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe; and (3) the cost, charges and expenses for assessment associated with any items identified in (1) and (2) herein.

**"New Pollution Conditions"** means Pollution Conditions that arise on or after the Closing Date and do not constitute Pre-Existing Pollution Conditions.

**"Off-Site Locations"** means the real property that is not part of the Properties and that Transferee Parties require access to in order to complete their obligations hereunder.

**"Operational Claims"** has the meaning given in Section 2.2(d).

**"Past Unpaid Costs"** has the meaning given in Section 2.2(b).

**"Permitted Title Exceptions"** has the meaning given in Section 4.5(b).

**"Pollutants"** means any solid, liquid, gaseous or thermal irritant, waste or contaminant, or substance, material or waste that are now or come to be defined by or regulated under any Environmental Law, including soot, acids, alkalis, or toxic chemicals, solid waste, medical waste and waste material, and/or by-products or progeny thereof. Pollutants include all of the following: hazardous wastes or constituents (as defined in Section 1004 of the federal Resource Conservation and Recovery Act); hazardous substances (as defined in CERCLA); substances, materials and wastes that are now or become listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by EPA (40 CFR Part 302), and amendments thereto, as hazardous substances; substances, materials and wastes designated as "hazardous substance" pursuant to Section 311 of the Clean Water Act, or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); oil or petroleum products; chemical liquids or solid, liquid, or gaseous products; polychlorinated biphenyls ("PCBs"); asbestos or asbestos-containing material. Pollutants also include any substances, materials and wastes that are or become defined as a solid waste or toxic or hazardous substance, material, pollutant or contaminant under any existing or future ordinances or regulations or under any existing or future reported decision of a federal, state, or local court of the states in which the Properties are located and any substances, materials and wastes, the presence of which requires or may require investigation or remediation under any existing or future statutory or common law theory, all as amended, replaced or succeeded.

**"Pollution Conditions"** means, with respect to the Properties, the presence, disposal, discharge, dispersal, release, escape or migration, including the direct discharge of Pollutants on the Properties from a facility located on the Properties designed to treat the Pollutants, of any Pollutants at, on, above, under, within, or naturally migrating or naturally migrated from the Properties or any portion thereof, including into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided that the terms "migration" and "migrating" shall not include any pre-Closing transportation and disposal of Pollutants at an off-site location outside of the Properties.

**"Pollution Legal Liability"** means the Liabilities resulting from any Pre-Existing Pollution Conditions, including third-party Bodily Injury and Property Damage, other than Environmental Clean-up Liability.

**"Pre-Existing Pollution Condition"** means Pollution Conditions existing or present prior to the Closing Date, including continuing releases or migration of any Pollution Conditions existing as of the Closing Date, which Pollution Conditions are either (i) known and disclosed by Transferor Parties to Transferee Parties or (ii) not known to Transferor Parties before the Closing.

**"Property Damage"** means (i) physical injury to (including contamination of) or destruction of real or personal property, including any resulting loss of use or diminution in value; (ii) loss of use or diminished value of real or personal property that has not been physically injured or destroyed; or (iii) nuisance, trespass, wrongful eviction or wrongful entry affecting property and caused by Pollution Conditions.

**"Right of Access"** has the meaning given in Section 6.6.

"**Right of Reentry**" has the meaning given in Section 6.4.

**"Title Commitment"** has the meaning given in Section 4.5(b).

**"Title Company"** is the Chicago Title Insurance Company.

**"Transaction Documents"** means this Agreement, the Trust Agreement and all other agreements, deeds, instruments and documents whose execution and/or delivery are contemplated by this Agreement.

**"Transferee Parties' Covenants, Representations and Warranties"** has the meaning given in Section 9.

**"Transferor Parties' Covenants, Representations and Warranties"** has the meaning given in Section 8.

**"Transferor Parties' Knowledge"** means the actual knowledge of the following officers and employees of the Transferor Parties:  Paul G. Bucens, William M. Corcoran, Lydia B. Duff, Vicki B. Finkelstein, Maryellen C. Johns, Robert J. Medler, and M. Mitch Obradovic.

**"Trust"** means the trust established pursuant to and governed by the Trust Agreement.

**"Trust Agreement"** means the trust agreement between the Parties and the trustee set forth in **Exhibit C** hereto.

## 2.    ASSUMPTION OF LIABILITIES; EXCLUDED MATTERS; ADDITIONAL COVENANTS.

2.1    **Assumption of Liabilities.**  On the terms and conditions set forth herein, on Closing Date, Transferee Parties jointly and severally shall assume, pay and be responsible for the following (collectively, the **"Assumed Obligations"**):

(a)    all Liabilities which may now exist or hereafter arise directly or indirectly from, out of, or in connection with

(i)    Environmental Clean-Up Liability;

(ii)    the Properties, including any Liabilities arising under the Licenses and Permits, Assignable Contracts or Environmental Laws;

(iii)    Pre-Existing Pollution Conditions;

(iv)    Pollution Legal Liabilities, including third party Bodily Injury claims and third party Property Damage claims associated with, caused by, or arising from Pollution Conditions, except for any such third party Bodily Injury claims and third party

Property Damage claims associated with, caused by, or arising from Pollution Conditions that are known to the Transferor Parties and not disclosed to the Transferee Parties during the Due Diligence Period; and

(v)    New Pollution Conditions (A) caused by Transferee Parties or any of its employees, contractors, subcontractors, agents or representatives or (B) arising from, relating to or associated with the Properties;

(b)    all Liabilities related to, or arising out of, the development or operations and maintenance of, or use, activities or operations of the Properties after the Closing Date; and

(c)    all Liabilities arising after the Closing Date respecting compliance with any and all applicable federal, state, or local law or regulation, judicial or governmental order, or agreements affecting the Properties (including any obligations to provide financial assurance), or governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge, cleanup, removal or disposal of any actual, alleged or suspected Pollutants, including costs associated with the off-site disposal of Pollutants post-Closing.

Notwithstanding anything which may be construed to the contrary herein, the Assumed Obligations shall not include, and the foregoing transfer and assumption of liabilities shall not apply to, any Excluded Matters.

2.2    **Excluded Matters**.  Notwithstanding anything in this Agreement to the contrary, the following matters are **"Excluded Matters"**:

(a)    worker health claims (including but not limited to claims or damages for workers' compensation, personal injury, disease or death) by current or former employees of Transferor Parties and/or current or former employees of any predecessors-in-interest to Transferor Parties arising or resulting from pre-Closing injury or exposure;

(b)    any past unpaid costs, fines and/or expenses incurred prior to the Effective Date by Transferor Parties or any predecessors-in-interest to Transferor Parties (the "**Past Unpaid Costs**"), including but not limited to any oversight costs or expenses incurred by or owed to any Governmental Authority;

(c)    Natural Resource Damages claims arising or resulting from events or conditions that occurred or existed solely and exclusively prior to the Closing Date;

(d)    any other claims by third parties arising or resulting from, or alleged to have arisen or resulting from, Pollution Conditions or operation of the Properties by Transferor Parties or any predecessors-in-interest to Transferor Parties prior to the Closing Date (the **"Operational Claims"**), to the extent any such Operational Claims are known to Transferor Parties and not disclosed to Transferee Parties during the Due Diligence Period;

(e)    any claims identified as Excluded Matters in **Exhibit D**;

(f)    any liability arising out of or relating to products of Transferor Parties to the extent manufactured or sold prior to the Closing Date except where such liability arises from Pollution Conditions related to the manufacturing or handling of the products;

(g)    any liability for taxes that (A) arise as a result of Transferor Parties' operation of their business or ownership of the Properties prior to the Closing Date, (B) will arise as a result of the sale of the Properties pursuant to this Agreement and (C) are deferred taxes of any nature;

(h)    under any contract not assumed by Transferee Parties, any liability arising out of or relating to Transferor Parties' credit facilities or any security interest related thereto;

(i)    any liability under the employee plans or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Transferor Parties' employees or former employees or both;

(j)    any liability under any employment, severance, retention or termination agreement with any employee of Transferor Parties or any of their Affiliates or related persons;

(k)    any liability of Transferor Parties to any shareholder of Transferor Parties or Affiliates;

(l)    any liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Transferor Parties;

(m)    any liability to distribute to any of Transferor Parties' shareholders or otherwise apply all or any part of the consideration received hereunder;

(n)    any liability unrelated in any way to Pollution Conditions arising out of or resulting from Transferor Parties' compliance or noncompliance with any legal requirement or order of any Governmental Authority;

(o)    any liability of Transferor Parties for breach of this Agreement or any other document executed in connection with the contemplated transaction; and

(p)    any liability related in any way to asbestos claims against the Transferor Parties, whether arising before or after Closing except for any Pollution Legal Liability for Environmental Clean-Up Liability arising from, out of or in connection with asbestos or asbestos containing materials installed or applied in or on to any building or structure at any of the Properties.

Notwithstanding the foregoing and without limiting any other provisions in this Agreement, the following shall not be Excluded Matters:  (i) claims arising from activities or exposure on the Properties after Closing, including any Bodily Injury or Property Damage caused by or arising from continuing releases of Pollution Conditions that exist as of the Closing Date; and/or (ii) claims arising from, relating to or that are triggered by Pollutants disturbed by Transferee Parties, its successors or assigns or their employees, consultants or other agents or representatives.

2.3    **Other Covenants and Agreements.**  In connection with their assumption of the Assumed Obligations, Transferee Parties covenant and agree to perform at their sole cost and expense the following actions:

(a) to perform the Clean-up in accordance with generally accepted professional standards of care and diligence normally practiced by nationally recognized firms performing similar work;

(b) to pay all Clean-up Costs;

(c) to comply with Environmental Law and the requirements of Governmental Authorities with regard to the Clean-Up, including all Licenses and Permits, whether or not transferred, assigned or assumed;

(d) to execute any documentation reasonably requested by Transferor Parties and/or Governmental Authorities so that Governmental Authorities will accept Transferee Parties as the primary party responsible for the Assumed Obligations;

(e) to assume Transferor Parties' Pollution Legal Liability and resolve any related claims; and

(f) to provide copies of (i) final reports related to Clean-Up submitted to Governmental Authorities, (ii) any notice from a Governmental Authority alleging any form of non-performance of Clean-Up, and (iii) any notice from any person of an Excluded Matter.

2.4 **Cooperation.** Each of the Transferor Parties shall inform the Transferee Parties, and each of the Transferee Parties shall inform the Transferor Parties, of all substantive contacts between Governmental Agencies and itself relating to the Properties which could reasonably be expected to have an adverse impact on the other Parties.

2.5 **Access to Off-Site Locations.** To the extent Transferee Parties anticipate that they may require access to Off-Site Locations in order to perform the Assumed Obligations, Transferee Parties may notify Transferor Parties prior to the Closing Date. Transferor Parties shall reasonably cooperate with Transferee Parties, prior to the Closing Date, to the extent Transferor Parties are able, and without expenditure of any costs by Transferor Parties or delay of Closing, to seek to obtain access agreements from current owners of such Off-Site Locations. However, the failure to obtain such access agreements shall not be a condition to Transferee Parties' obligation to proceed to Closing.

3. **PAYMENT; TRANSFER OF PROPERTIES; USE OF TRUST FUNDS.**

3.1 **Payment to Grace.** ELT shall pay to Grace at Closing the sum of Two Million Five Hundred Thousand Dollars ($2,500,000).

3.2 **Transfer of Properties.** Pursuant to the terms and conditions set forth in this Agreement, Transferor Parties shall transfer, assign and set over the Properties at Closing to Transferee Parties.

3.3 **Initial Payment into Trust.** After Closing and within one hundred and eighty (180) days of the Effective Date, ELT shall transfer into the Trust the sum of Two Million Five Hundred Thousand Dollars ($2,500,000).

3.4    **Allocation of Sale Proceeds.**  Upon sale of any Property, except for the Property located in Charleston, South Carolina, the sale of which is governed by Section 3.5, the sale proceeds (i.e., sale price less closing costs) shall be allocated as follows:

(a)    Forty percent (40%) of the sale proceeds shall be paid to Grace by wire transfer on the date of closing until the sum received by Grace, including the payment set forth in Section 3.1, totals Four Million, Three Hundred Fifty-Nine Thousand Dollars ($4,359,000).

(b)    Thirty-five percent (35%) of the sale proceeds shall be deposited into the Trust until the conditions set forth in Section 3.5(a) are satisfied; thereafter, seventy-five percent (75%) of the sale proceed shall be deposited into the Trust. Deposits to the Trust shall cease when the sum of Trust deposits totals Eleven Million Dollars ($11 Million) ("Total Trust Deposits").

(c)    Twenty-five percent (25%) of sale proceeds shall be retained by Transferee Parties until the cumulative payments and funding required by Section 3.5(a) and (b) are satisfied. Thereafter, one-hundred percent (100%) of sale proceeds shall be retained by Transferee Parties.

3.5    **Proceeds from Sale of Charleston, South Carolina Property.**  The sale proceeds from the sale of the Property located in Charleston, South Carolina ("Charleston Property") shall be allocated as follows:

(a)    Transferee Parties may elect to use Two Million Five Hundred Thousand Dollars ($2,500,000) from the sale proceeds from the Charleston Property to satisfy Section 3.3.

(b)    If Transferee Parties make the election in Section 3.5(a), the next Five Hundred Thousand Dollars ($500,000), or portion thereof, in sale proceeds shall be allocated in accordance with Section 3.5.

(c)    If Transferee Parties do not make the election in Section 3.5(a), Three Million Dollars ($3,000,000) of the sale proceeds, or the entire sale proceeds if the sale proceeds are less than Three Million Dollars ($3,000,000), shall be allocated in accordance with Section 3.4.

(d)    Sale proceeds in excess of Three Million Dollars shall be shared equally between Transferor Parties and Transferee Parties with no requirement that any of these monies be deposited into the Trust, and Transferor Parties' share shall not be attributed to the total sum payable to Grace under Section 3.4(a).

ELT may transfer Environmental Clean-Up Liability or Pollution Legal Liability for said property, provided the value of the assumption of liability (which value is to be agreed upon by the Parties, or by an independent third party to be selected by the Parties) is added to the sale proceeds, the total amount is allocated pursuant to this section, and the Total Trust Deposits are reduced by the value of such assumption.

3.6    **Release of Mortgages.**  Transferor Parties shall release the Mortgages, as defined in Paragraph 4.4(f), upon request by ELT at the time of sale by ELT of the respective Property, if the proceeds of such sale are distributed in accordance with Paragraph 3.4 hereof.

3.7    **Use of Trust Funds.**  All deposits into the Trust shall be governed by the Trust Agreement and used solely in connection with Environmental Clean-Up Liability and, at the election of Transferee Parties, up to Four Hundred Thousand Dollars ($400,000) in premium for

purchase of a Pollution Legal Liability insurance policy for insuring one or more of the Properties and on which Grace and Remedium are identified as additional named insureds.

4.    **CLOSING.**

4.1    **Place and Closing Date.**  The consummation of the transactions contemplated in and by this Agreement (the **"Closing"**) shall take place in the offices of the Title Company on the date which is fifteen (15) days after the Effective Date (the **"Closing Date"**), or such other place or date as the Parties may mutually agree in writing signed by each.

4.2    **Possession.**  At Closing, Transferor Parties shall deliver or cause to be delivered possession of the Properties to Transferee Parties free and clear of all Contracts, other than the Assignable Contracts.

4.3    **Transferor Parties' Obligations at Closing.**  At Closing, Transferor Parties shall deliver or cause to be delivered to Transferee Parties, and Transferee Parties shall accept, the following items, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Transferor Parties, Transferee Parties and the Title Company and, where appropriate, shall be duly executed and acknowledged by Transferor Parties and in recordable form:

(a)    **Deeds.**  Either a general or special warranty deed, whichever is customary in the jurisdiction of each Property, conveying to the Transferee Party identified in Exhibit A for such Property all of the appropriate Transferor Party's right, title and interest in and to such Property, subject only to the Permitted Title Exceptions, Deed Restrictions, Right of Reentry, and Owensboro Right of First Refusal (as identified in **Exhibit B**).

(b)    **Assignment of Contracts.**  Two counterparts of an assignment to Transferee Parties of all Transferor Parties' or their subsidiaries' rights, interests and obligations under the Assignable Contracts and an agreement by Transferee Parties to assume, perform, discharge, fulfill and observe all of Transferor Parties' or their subsidiaries' covenants, conditions and obligations under the Assignable Contracts (the "**Assignment of Contracts**").

(c)    **Releases.**  Written releases of any and all assessments, liens, security interests, mortgages or deeds of trust and other encumbrances securing the payment of money affecting the Properties which were not caused by Transferee Parties or their Affiliates ("**Monetary Liens**"), as shown by the Title Commitment updated to Closing.

(d)    **Assignment and Assumption of Licenses and Permits.**  An assignment to the appropriate Transferee Parties of all of Transferor Parties' or their subsidiaries' right, title and interest in the Licenses and Permits, to the extent assignable, and an agreement by Transferee Parties to assume, perform, discharge, fulfill and observe all of the obligations, terms, covenants, provisions and conditions under the Licenses and Permits, whether or not transferred or assigned (the "**Assignment and Assumption of Licenses and Permits**").  At Closing and if necessary thereafter, the Parties shall execute all applicable documents, and cooperate with each other to take all other actions, necessary to effect the transfer, assignment and assumption of the Licenses and Permits.

(e)    **Title Insurance Affidavit.**  An affidavit and indemnity sufficient in form and substance to cause the Title Company to delete any exception for mechanics', materialmen's and similar liens from Transferee Parties' owner's policy of title insurance.

**(f)**    **Non-Foreign Person Affidavit.**  An affidavit of each Transferor Party in form and substance reasonably satisfactory to Transferee Parties setting forth such Transferor Party's United States taxpayer identification number and certifying that such Transferor Party is not a foreign person as that term is used and defined in Section 1445 of the United States Internal Revenue Code.

**(g)**    **Bring-Down Certificate.**  Execute and deliver to Transferee Parties a certificate certifying that the representations and warranties made by Transferor Parties in this Agreement remain true and correct and complete as of the Closing Date as though made on and as of the Closing Date, and that all covenants and agreements of this Agreement required to be performed by the Transferor Parties on or before the Closing Date have been performed.

**(h)**    **Miscellaneous.**  Any other documents reasonably required by this Agreement or the Title Company to be delivered by Transferor Parties or their subsidiaries or necessary to implement and effectuate the Closing hereunder.

4.4    **Transferee Parties' Obligations at Closing.**  At Closing, Transferee Parties shall, in addition to any other obligations of Transferee Parties as set forth in this Agreement:

**(a)**    **Miscellaneous.**  Deliver any other documents reasonably required by this Agreement or the Title Company to be delivered by Transferee Parties. or necessary to implement and effectuate the Closing hereunder, including a closing statement and documents, consents and approvals from Transferee Parties, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Transferor Parties and the Title Company and, where appropriate, shall be duly executed and acknowledged by Transferee Parties and in recordable form.

**(b)**    **Assignment of Contracts.**  Execute and deliver to Transferor Parties the Assignment of Contracts.

**(c)**    **Assignment and Assumption of Licenses and Permits.**  Execute and deliver to Transferor Parties the Assignment and Assumption of Licenses and Permits.

**(d)**    **Bring-Down Certificate.**  Execute and deliver to Transferor Parties (i) a certificate signed by a principal of each Transferee Party certifying that the representations and warranties made by such Transferee Party in this Agreement remain true and correct and complete as of the Closing Date as though made on and as of the Closing Date, and that all covenants and agreements of this Agreement required to be performed by such Transferee Party on or before the Closing Date have been performed and (ii) a resolution (adopted in accordance with the procedures of the operating agreement governing such Transferee Party) that authorizes the transactions contemplated by this Agreement and certifies to the signatures and incumbency of the principal signing the Transaction Documents on behalf of such Transferee Party, in form and substance to the satisfaction of the Transferor Parties.

**(e)**    **Payment to Transferor Parties.**  Payment to Grace pursuant to Section 3.1, in immediately available funds by wire transfer to an account specified by Transferor Parties by notice to Transferee Parties at least three business days prior to the Closing Date.

**(f)**    **Mortgages.**  Execute and deliver to Transferor Parties mortgages or deeds of trust with respect to the Atlanta, Fort Pierce, and Woburn Properties by the respective

Transferee Parties thereof in form and substance reasonably satisfactory to Transferor Parties and Transferee Parties, securing Transferee Parties' obligations under this Agreement.

4.5     **Other Matters**.

(a)     **Taxes**.  At or before the Closing, Grace shall pay all ad valorem taxes assessed with respect to the real property and personal property and equipment comprising the Properties for the calendar years prior to the then current tax period.  If taxes have not yet been paid for such tax period for any of the Properties, Grace shall pay to ELT at Closing, on account of the ad valorem taxes assessed with respect to the affected Properties and attributable to the period from the beginning of such tax period to the Closing Date, a prorated sum equal to the total such taxes for such tax period multiplied by a fraction whose numerator is the number of day from the beginning of such tax period to the Closing Date, and whose denominator is the total number of days in such tax period.  If taxes have been paid for such tax period for any of the Properties, ELT shall pay to Grace at Closing, on account of the ad valorem taxes assessed with respect to the affected Properties and attributable to the period from the Closing Date to the end of such tax period, a prorated sum equal·to the total such taxes for such tax period multiplied by a fraction whose numerator is the number of days from the Closing Date through the end of such tax period, and whose denominator is the total number of days in such tax period.  If the final tax bills for the tax are not available at the Closing, such prorated payment shall be calculated based on the most current and reliable information available (such as a preliminary tax bill for 2008 or the final tax bill for 2007), and such calculation shall be reapportioned among the Parties based upon such final bill.  Such reapportionment shall occur within one year of the Closing Date.

(b)     **Title and Survey.**  Transferor Parties have provided Transferee Parties with surveys of all of the Properties in Transferor Parties' possession except for the Property located in Waterloo, New York, the receipt of which Transferee Parties waive.  Transferor Parties, at their sole cost and expense, have obtained a commitment for title insurance with respect to each of the Properties (collectively, the **"Title Commitment"**), and have provided the Title Commitment and true and correct copies of all exception documents named therein for the Properties to Transferee Parties.  Transferee Parties do not object to any exceptions to title as set forth in the Title Commitment, and these exceptions shall be **"Permitted Title Exceptions"** hereunder.  Transferee Parties may, but are not obligated to, obtain a new or updated title commitment and/or survey at Transferee Parties' sole cost and expense; provided, that if any additional exceptions show up in addition to the Permitted Title Exceptions, Transferor Parties will cure such exceptions prior to Closing.  Transferee Parties shall obtain any desired title insurance at their own cost and shall take title to the Properties subject to the Permitted Title Exceptions.

(c)     **Expenses.**  At the Closing, (i) Grace shall be responsible to pay for all expenses in connection with the payment of any Monetary Liens and any recording costs to release any Monetary Liens, any transfer tax, deed stamp tax or the like, Grace's attorneys' fees, and any cost charged by the Title Company to prepare the Title Commitment, the closing fees charged by the Title Company, and the recording fee for the deeds, and (ii) Transferee Parties shall be responsible to pay for the premium for the Transferee Parties' owner's policy of title insurance (including endorsements thereto), Transferee Parties' attorneys' fees and Transferee Parties' expenses for tests and inspections.

(d)     **Fees and Costs.**  All utility charges, assessments, annual permit or inspection fees, and all other expenses normal to the operation and maintenance of the Properties due and payable with respect to the Properties will be prorated as of the Closing Date.  All

charges and payments made or received with respect to any of the Licenses and Permits shall be prorated as of the Closing Date.

(e)  **Rental.**  Rents (including any items of additional rent, such as real estate taxes) collected by Grace for the month in which Closing occurs shall be prorated as of the Closing Date.  Any rents billed but unpaid for any period prior to Closing shall be paid or credited to Grace.  Any rents billed and paid for any period after Closing shall be paid or credited to Transferee Parties except as set forth in **Exhibit B**.  Transferee Parties shall reasonably cooperate with Grace to collect any past due rents.

(f)  **Miscellaneous.**  Any closing costs or expenses not specifically addressed in this Section 4.5 or elsewhere in this Agreement shall be allocated or prorated between Grace and ELT in accordance with local conveyancing customs and practices.

5.  **RELEASE AND INDEMNIFICATION.**

5.1  **Costs.**  As used in this Agreement, "**Costs**" means all Liabilities, claims (including claims by (a) adjacent or non-adjacent property owners or any other third party for contribution, Bodily Injury or Property Damage or (b) any Governmental Authority, including the EPA or state environmental agencies and any successor agencies), demands, actions, administrative proceedings (whether formal or informal proceedings, including any citation, directive, order or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties (including the cost of any Clean-Up required under any federal, state or local laws, ordinances or regulations, or under any existing or future reported decision of a federal, state or local court), liabilities (including sums paid in settlements of claims), compensation, debts, costs and expenses (including without limitation attorneys' fees and expenses, consultants fees, and expert fees), that arise directly or indirectly from, out of, or in connection with:

(i)  the Assumed Obligations;

(ii)  any actual, alleged or suspected Pre-Existing Pollution Conditions or New Pollution Conditions, or

(iii)  any activities, acts or omissions, including performance or failure to perform the Assumed Obligations, breach of this Agreement or non-compliance with laws, of or by Transferee Parties, or Transferee Parties' employees, officers, consultants, contractors, subcontractors or other agents or representatives, whether prior to or after the Closing Date, including mechanics' liens, damage to the Properties, or injury or death or damage to persons or property.

5.2  **Release by Transferee Parties.**  Transferee Parties jointly and severally, for themselves and their respective Affiliates, members, directors, officers, shareholders, managers, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns, do hereby completely and irrevocably release and forever discharge Transferor Parties and Transferor Parties' Affiliates, and their respective managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and the respective heirs, successors and assigns of any of the foregoing (collectively with Transferor Parties, the "**Transferor Group**") from any and all past, current, future and contingent Costs of any and every kind and nature, whether currently known or unknown, including any Costs arising under CERCLA, excepting only the Excluded Matters and

obligations of Transferor Parties under this Agreement, including any claims sounding in tort, negligence, contract, environmental, statutory or equitable liability or otherwise, relating to the Properties, including actual, alleged or suspected Pollution Conditions and Costs resulting from or by reason of any conduct, cause or course of action whatsoever which has been done or omitted by Transferor Parties. The foregoing release and discharge includes all known, unknown, unforeseen, unanticipated and unexpected Costs and the consequences thereof, as well as any now in existence.

5.3    **Indemnification by Transferee Parties.** Transferee Parties jointly and severally shall be responsible for, and shall indemnify, protect, defend and hold harmless Transferor Parties (and Transferor Parties' Affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns (collectively with Transferor Parties, the **"Transferor Indemnitees"**)) from and against any and all Costs. The foregoing indemnification shall not apply to any Excluded Matters.

5.4    **Indemnification by Transferor Parties for Excluded Matters.** Transferor Parties jointly and severally shall be responsible for, and shall indemnify, protect, defend and hold harmless Transferee Parties (and Transferee Parties' Affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns (collectively with Transferee Parties, the **"Transferee Group"**)) from and against any and all Liabilities arising from or out of or resulting from any of the Excluded Matters, Liabilities arising from or out of or resulting from claims, demands, actions, administrative proceedings (whether formal or informal proceedings, including any citation, directive, order or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties, liabilities (including sums paid in settlements of claims), compensation, debts, costs and expenses (including attorneys' fees and expenses, consultants fees, and expert fees), to the extent that they arise directly or indirectly from, out of, or in connection with the Excluded Matters.

6.    **PROPERTIES AND DEED RESTRICTIONS**.

6.1    Transferee Parties acknowledge that during the Due Diligence Period they had access to environmental and real estate records for the Properties and the right to enter the Properties to make such independent investigation of the Properties as Transferee Parties deemed appropriate in connection with Transferee Parties' acquisition and intended use of the Properties.

6.2    Except as specifically set forth in this Agreement, the Properties are being acquired by Transferee Parties on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis. TRANSFEREE PARTIES ACKNOWLEDGE AND AGREE THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE TRANSFER PROVIDED FOR HEREIN IS MADE WITHOUT ANY WARRANTY BY TRANSFEROR PARTIES AS TO THE NATURE OR QUALITY OF THE PROPERTIES, INCLUDING LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION; THE PRESENCE OR SUSPECTED PRESENCE OF HAZARDOUS WASTE OR SUBSTANCES ON, ABOUT, OR UNDER THE PROPERTIES OR THE IMPROVEMENTS; THE PRIOR HISTORY OF OR ACTIVITIES ON THE PROPERTIES; THE TRUTH ACCURACY OR COMPLETENESS OF THE PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF TRANSFEROR PARTIES TO TRANSFEREE PARTIES;

THE DEVELOPMENT POTENTIAL OF THE PROPERTIES, INCLUDING HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE; THE QUALITY OF LABOR AND/OR MATERIALS INCLUDED IN ANY OF THE IMPROVEMENTS; VALUATION OF THE PROPERTIES; UTILITIES; THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTIES; THE TAX CONSEQUENCES OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT; OR ANY OTHER MATTER OR THING REGARDING THE PROPERTIES.

6.3    The deed for each Property shall include the following conditions running with the land prohibiting one or more of the following ("**Deed Restrictions**"):

6.3.1    Sale, lease, rental or use of the Properties for the treatment, storage or disposal of hazardous waste;

6.3.2    Any use prohibited from time to time by Governmental Authorities relating to the Clean-up; and

6.3.3    Any use set forth as a Deed Restriction in **Exhibit B**.

6.4    The deed shall reserve to the Transferor Parties of the respective Properties (or any successors or assigns) the right, but not the obligation, to reenter and terminate the estate granted to Transferee Parties (or any successor in title or interest to the Transferee Parties), without obligation to reimburse Transferee Parties (or any such successor) for any improvements made or other costs incurred, upon the occurrence of either of the following events:  (i) a Governmental Authority has notified any Transferee Party or Transferor Party, or any other entity, of Transferee Parties', or their successors' or assigns', failure to perform Clean-Up, and Transferee Parties or their successors or assigns fail to proceed with Clean-Up to the satisfaction of the Governmental Authority, provided, that Transferee Parties or their successors or assigns shall have the right to challenge such Governmental Authority, and if Transferee Parties or their successors or assigns challenge the Governmental Authority in writing within thirty (30) days of receipt of notification from the Governmental Authority of any such failure, Transferor Parties' Right of Reentry shall not begin until the Governmental Authority prevails in a final non-appealable judgment in such dispute or Transferee Parties abandon such dispute or cease to actively pursue it; or (ii) any of the Properties or any portion thereof is sold, leased, rented, or used for a purpose that has been prohibited by a Governmental Authority or any of the foregoing Deed Restrictions (the **"Right of Reentry"**).

6.5    In the event that Transferor Parties or their successors or assigns believe the Right of Reentry can be exercised:

6.5.1    Transferor Parties shall notify Transferee Parties of same in writing.

6.5.2    Commencing not later than thirty (30) days after receipt of such notice, the Parties shall attempt to resolve the matter between themselves.

6.5.3    If the Parties are unable to resolve the matter between them, Transferee Parties and Transferor Parties shall submit the question of whether the event does in fact qualify as one or more conditions of Section 6.4 to a court of competent jurisdiction for declaratory judgment.

6.5.4    If the court determines that the event does in fact qualify as one or more conditions of Section 6.4, Transferee shall have thirty (30) days from the

date of the final, nonappealable judgment to cure the violation if such violation can be cured within a 30 day period or such longer time if necessary to cure using Transferee Parties' commercially reasonable efforts, provided Transferee Parties commence cure promptly and prosecute such cure to completion diligently and completely.

6.5.5    If Transferee Parties fail to cure the violation within the cure period, as set forth in the preceding subparagraph, Transferor Parties shall have the right to enforce the Right of Reentry.

6.6    Transferee Parties hereby grant access to inspect the Properties and/or perform Clean-Up to Transferor Parties and their successors and assigns to any of the Properties at which a Governmental Authority has notified Transferee Parties, Transferor Parties, or any other entity of Transferee Parties', or their successors' or assigns', failure to perform Clean-Up, provided, that Transferee Parties or their successors or assigns shall have the right to challenge such Governmental Authority, and if Transferee Parties or their successors or assigns challenge the Governmental Authority in writing within thirty (30) days of receipt of notification from the Governmental Authority of any such failure, Transferor Parties' right to access shall not begin until the Governmental Authority prevails in a final non-appealable judgment in such dispute or Transferee Parties abandon such dispute or cease to actively pursue it (the **"Right of Access"**).

6.7    In any future transfer of any of the Properties, Transferee Parties shall include the Deed Restrictions and Right of Access as provided for herein and shall contractually require such Deed Restrictions and Right of Access to be included in all future deeds. Transferee Parties agree to inform their Affiliates, tenants, successors in title and/or interest, and assigns of their duties thereunder and to require them to bind their subtenants, successors in title and/or interest and assigns accordingly in the language of the successive deeds.

7.    **REMEDIES.**

7.1    **Pre-Closing Default by Transferor Parties.**  In the event that Transferor Parties default in performance of their material obligations under this Agreement prior to Closing, and Transferor Parties fail to cure such default by the Closing Date or fail to consummate this Agreement for any reason except because of Transferee Parties' breaches or defaults or because any of Transferor Parties' conditions to Closing have not been met, Transferee Parties shall be entitled as their sole and exclusive remedies to (i) bring suit for specific performance or (ii) terminate this Agreement.

7.2    **Pre-Closing Default by Transferee Parties.**  In the event that Transferee Parties default in performance of their material obligations under this Agreement prior to Closing and fail to cure such default by the Closing Date or fail to consummate this Agreement for any reason except because of Transferor Parties' breaches or defaults or because any of Transferee Parties' conditions to Closing have not been met, Transferor Parties shall be entitled as their sole and exclusive remedies to (i) bring suit for specific performance or (ii) terminate this Agreement.

7.3    **Post-Closing Default.**  In the event that either the Transferor Parties or the Transferee Parties shall default in the performance of any of their material obligations under the terms of this Agreement after Closing:

7.3.1    The non-defaulting Parties shall notify the defaulting Parties of same in writing.

7.3.2   If the defaulting Party acknowledges default, the defaulting Party shall have thirty (30) days from the date of the notice to cure the default or such longer time if necessary to cure the default provided the defaulting Party commences cure promptly within the thirty (30) day period and prosecutes such cure to completion diligently and completely.

7.3.3   If the defaulting Party denies default or fails to cure the default, the nondefaulting Party may seek to enforce this Agreement by specific performance and shall have the right to cure the default and/or seek damages in addition to all other rights and remedies available at law or in equity.

8.    **COVENANTS, REPRESENTATIONS, AND WARRANTIES OF TRANSFEROR PARTIES.** Transferor Parties covenant, represent and warrant to Transferee Parties as specified in this Section 8 (**"Transferor Parties' Covenants, Representations and Warranties"**). The representations and warranties shall be considered made as of the date of this Agreement and again as of Closing; provided, however, if Transferor Parties obtain knowledge or notice after the date of this Agreement that any such representation or warranty is untrue or misleading in any material respect, Transferor Parties shall have the right to amend such representation or warranty by giving written notice of such fact or facts to Transferee Parties; whereupon Transferee Parties shall have the right, within five business days after receiving such notice from Transferor Parties, to request Transferor Parties to undertake such actions as are necessary to make the representation or warranty true and correct in all material respects. If Transferor Parties are unable to do so within thirty (30) days (or such other time as the Parties agree in writing), Transferee Parties may terminate this Agreement by written notice to Transferor Parties. If Transferee Parties deliver such notice, then this Agreement shall terminate without liability to any of the Parties and shall have no further force or effect. Transferor Parties' Covenants, Representations and Warranties and Transferor Parties' liability for breach thereof shall survive the Closing for a period of one (1) year and shall not be merged into any deed or other document given at Closing.

8.1    From the Effective Date until Closing, Transferor Parties shall not execute any leases or contracts, or amendments or modifications to any such agreements, affecting the Properties which shall be binding on the Properties or Transferee Parties after Closing without the prior written consent of Transferee Parties.

8.2    From the Effective Date until Closing, Transferor Parties shall maintain the Properties in substantially the same condition existing as of the Effective Date, ordinary wear and tear and casualty excepted, and shall pay on a timely basis all bills and discharge all of Transferor Parties' obligations arising from ownership, operation, management, repair and maintenance of the Properties as payments become due.

8.3    Grace is a corporation, duly organized and in good standing under the laws of the State of Connecticut, and Grace has the corporate power and authority to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Grace has been authorized to do so.

8.4    Guanica-Caribe is a corporation, duly organized and in good standing under the laws of the State of Delaware, and Guanica-Caribe has the corporate power and authority to enter

into and perform this Agreement, and the person who executes this Agreement on behalf of Guanica-Caribe has been authorized to do so.

8.5    Remedium is a corporation, duly organized and in good standing under the laws of the State of Delaware, and Remedium has the corporate power and authority to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Remedium has been authorized to do so.

8.6    Transferor Parties' compliance with or fulfillment of the terms and conditions of this Agreement will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of Transferor Parties' organizational documents or any contract or agreement to which any of Transferor Parties is a party or by which any of Transferor Parties are otherwise bound.

8.7    Grace, Guanica-Caribe and Remedium are debtors in *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court, and their performance of their obligations hereunder requires the approval of the Bankruptcy Court.

8.8    Except as set forth in the documents made available to Transferee Parties by Transferor Parties during the Due Diligence Period, and except as otherwise disclosed in writing by Transferor Parties to Transferee Parties or set forth on **Schedule 8.8**, to Transferor Parties' Knowledge, (a) there are no violations or alleged violations of any federal, state or local law that affect the Properties, and (b) Transferor Parties have not received notice of, and are not aware of, any pending or threatened litigation, suit, administrative proceeding or eminent domain action affecting the Properties or the sale thereof by Transferor Parties.

8.9    To the best of Transferor Parties' Knowledge, except as set forth on **Schedule 8.9**, Transferor Parties hold good and marketable record title to their respective Properties.

8.10    Except for the Permitted Title Exceptions and as set forth in the Assignable Contracts, or as set forth in **Schedule 8.10**, there shall be no tenancies or occupancies affecting the Properties as of Closing.

8.11    As of Closing, except for the Assignable Contracts and any Permitted Title Exceptions, there shall be no Contracts affecting the Properties which will be binding on the Properties after Closing.

8.12    Except as set forth on **Schedule 8.12 or on Exhibit B**, there are, and as of Closing there shall be, no unrecorded Contracts, including rights of first refusal and/or options to purchase, to which Transferor Parties are a party pertaining to or affecting title to, or the sale of, the Properties, or any parts thereof.

8.13    All material environmental reports, assessments, or studies with respect to the Properties in Transferor Parties' possession or control have been made available to Transferee Parties.

8.14    Except as set forth on **Schedule 8.14**, the real estate taxes or assessments for the Properties are not the subject of pending tax appeals.

8.15    Except as set forth in **Schedule 8.15,** any and all charges for material and labor provided to, incorporated in, or affecting the Properties within the twelve (12) months immediately preceding the Effective Date have been paid in full by Transferor Parties, and Transferor Parties have paid or will pay prior to the Closing, in the ordinary course of Transferor Parties' business, all bills and other payments due in connection with the ownership, operation, construction, repair, and maintenance of the Properties.


9.    <u>**COVENANTS, REPRESENTATIONS AND WARRANTIES OF TRANSFEREE PARTIES.**</u>  Transferee Parties covenant, represent and warrant to Transferor Parties as specified in this Section 9 ("**Transferee Parties' Covenants, Representations and Warranties**").  The representations and warranties shall be considered made as of the date of this Agreement and again as of Closing; provided, however, if Transferee Parties obtain knowledge or notice after the date Transferee Parties execute this Agreement of any fact or facts which would make any representation or warranty untrue or misleading in any material respect, Transferee Parties shall have the right to amend such representation and warranty by giving written notice of such fact or facts to Transferor Parties; provided, further, that Transferor Parties shall have the right, within five business days after receiving such notice from Transferee Parties, to terminate this Agreement by written notice to Transferee Parties.  If Transferor Parties deliver such notice of termination to Transferee Parties, then this Agreement shall terminate without liability to either Party and shall have no further force or effect.  Transferee Parties' Covenants, Representations and Warranties and Transferee Parties' liability for breach thereof shall survive Closing for a period of one (1) year and shall not be merged into any deed or other document given at Closing.

9.1    Except as specifically set forth in Transferor Parties' Covenants, Representations and Warranties, Transferee Parties are relying on their own investigation and inspection of the Properties, the Title Commitment, any other reports, inspections or studies obtained by Transferee Parties, all to the extent conducted by Transferee Parties in Transferee Parties' judgment, and the relevant Transferee Parties shall take title to each of the Properties in its AS IS, WHERE IS condition, as of the Closing, based solely on such investigation and inspection. Except as expressly set forth in this Agreement, Transferee Parties understand and agree that Transferor Parties are not making and have not at any time made any warranties or representations of any kind or character, express or implied, with respect to the Properties. Transferee Parties will not rely on, and Transferor Parties are not liable for or bound by, any expressed or implied warranties, guaranties, statements, representations or information pertaining to the Properties except as set forth herein.

9.2    Each of ELT and CDC is a corporation, duly organized and in good standing under the laws of the State of Missouri, and has the authority and capacity to enter into and perform the Transaction Documents to which it is a party, and the person who executes each such Transaction Document on its behalf has been or will be authorized to do so at the time of its execution.

9.3    Each of the other Transferee Parties set forth on **Exhibit A** is a limited liability company, duly organized and in good standing under the laws of the jurisdiction as its jurisdiction of organization, and has the authority and capacity to enter into and perform the Transaction Documents to which it is a party, and the person who executes such Transaction Documents on its behalf has been or will be authorized to do so at the time of its execution.  The limited liability companies listed on **Exhibit A** are all Affiliates of ELT and/or CDC.

9.4     The compliance with or fulfillment of the terms and conditions of each of the Transaction Documents to which it is a party by each of the Transferee Parties will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of its organizational documents or any contract or agreement to which it is a party or by which it is otherwise bound.

9.5     To its knowledge, all information provided by Transferee Parties to Transferor Parties, including information in ELT's proposal, which is attached hereto as **Exhibit E**, and information made available to Transferor Parties during the Due Diligence Period, including information and documents regarding Transferee Parties' financial status, is true, complete, and accurate and does not fail to state any fact which would make the information misleading or inaccurate.

9.6     Transferee Parties shall neither encumber nor cause any liens to be created against the Properties in any way, nor record this Agreement or a memorandum hereof, prior to Closing.

9.7     Each of Transferee Parties is, and after giving effect to the transaction contemplated by this Agreement, will be, solvent and is not subject to any voluntary or involuntary proceedings in bankruptcy, reorganization, dissolution or liquidation or to any assignment for the benefit of creditors, and no trustee, receiver or liquidator has been appointed for any of the Transferee Parties or any of their assets or properties.

9.8     Transferee Parties have satisfied themselves as to the nature and location of the Properties and as to the general and local conditions, particularly those bearing upon (i) Pollution Conditions, (ii) Clean-Up requirements, (iii) remediation and disposal requirements, (iv) security requirements, (v) handling and storage of materials, (vi) water, (vii) electric power, (viii) roads, (ix) condition of the ground, (x) the character, quality and quantity of surface and subsurface materials and conditions to be encountered; (xi) applicable laws, including Environmental Laws and the potential for changes to same, and (xii) the presence of threatened or endangered species, archaeological resources, and sensitive ecologic and cultural receptors.

9.9     Transferee Parties have reviewed all records of Transferor Parties and any Governmental Authority concerning the Properties that they deem necessary, and are familiar with the Pollutants, natural resources, and all other relevant conditions at the Properties.  Transferee Parties acknowledge that the Properties were formerly used as industrial facilities and Pollution Conditions exist on each Property.  Transferee Parties shall assume the risk of all conditions at the Properties, excepting for the Excluded Matters.  Transferee Parties shall assume and fully perform and complete all Assumed Obligations for the Properties.

9.10     Transferee Parties have the qualifications, expertise, and experience needed to assume and accomplish all of the Assumed Obligations at the Properties consistent with this Agreement.  Transferee Parties shall perform or otherwise supervise the Assumed Obligations in compliance with this Agreement and all applicable federal, state, or local laws, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives, including Environmental Laws, and the standard of care and diligence normally practiced by nationally recognized firms performing services of a similar nature.

9.11     Transferee Parties hold or will obtain all licenses, permits, franchises, approvals, and consents required for the performance of their obligations under this Agreement and for the ownership and operation of the Properties by the Transferee Parties.

9.12    Transferee Parties have the financial resources to execute the Clean-up, and Transferee Parties agree to use such resources as necessary to implement the Clean-up.

9.13    No litigation has been served upon Transferee Parties, nor, to Transferee Parties' knowledge, has been filed or threatened in writing which could now or in the future affect Transferee Parties' ability to consummate the transaction contemplated by this Agreement.

## 10.    CASUALTY AND EMINENT DOMAIN.

10.1    **Casualty.**  Risk of loss of the Properties shall be borne by Transferor Parties until Closing.  If one or more of the Properties is damaged, altered or destroyed by earthquake, flood, stormwater, sinkhole formation or other such disaster, after the Effective Date and prior to the Closing, Transferor Parties shall immediately notify Transferee Parties in writing of such damage, alteration or destruction and an estimate of the amount and terms of any insurance proceeds available, if any.  If such loss occurs at any Property other than the Property located in Atlanta, GA, Closing shall proceed and Transferee Parties shall be entitled to all insurance proceeds, if any, payable to Transferor Parties under all policies insuring the affected Property.  If such loss occurs at the Property located in Atlanta, GA, upon receiving such notice from Transferor Parties, (i) Transferee Parties may elect either:  (i) to proceed with the Closing and be entitled to all insurance proceeds, if any, payable to Transferor Parties under all policies insuring the Property; or (ii) to initiate renegotiation of the Contract Price solely to account for the loss at the Property located in Atlanta.  Transferee Parties shall give written notice of their election to Transferor Parties within five (5) business days after Transferee Parties receive Transferor Parties' notice of such damage, alteration or destruction and the estimate of the amount of insurance proceeds available.  If Transferee Parties elect to renegotiate the Contract Price, such renegotiation shall be conducted promptly.  If the Parties are unable to agree upon a renegotiated amount within thirty (30) days after such notice of election to renegotiate is given, or such other time as agreed to by the Parties in writing, either Party may elect to delete the Property located in Atlanta from the transaction and proceed with the Closing with an associated decrease of $789,000 in the amount payable under Section 3.4(a) by Transferee Parties.  In any event of casualty, Closing will be extended as necessary to permit such notices to be given, elections to be made, and/or renegotiation to take place.

10.2    **Eminent Domain.**  In the event prior to Closing any portion of one or more of the Properties other than the Property located in Charleston, South Carolina, which sale is governed by Section 3.5, is taken by eminent domain or becomes the subject of eminent domain proceedings threatened by written notice to Transferor Parties or commenced, Transferor Parties shall immediately notify Transferee Parties in writing thereof and provide Transferee Parties with copies of any written communication from any condemning authority.  If such proceedings occur or are threatened, Transferee Parties may elect either: (i) to initiate renegotiation of the Contract Price solely to account for the condemnation of the affected Property with such renegotiation conducted promptly, or (ii) to  proceed with the Closing and be entitled to all payments received from the condemning authority.  Transferee Parties shall give written notice of their election to Transferor Parties within five (5) business days after Transferee Parties receive Transferor Parties' notice of such condemnation proceedings.   If Transferee Parties elect to receive payments from the condemning authority, Transferor Parties shall include Transferee Parties in all negotiations, discussions, or other dispute resolution with the condemning authority including but not limited to those regarding the fair market value of the affected Property.  In the event of a condemnation or taking (i) if the transfer to the condemning authority takes place prior to Closing hereunder, the remainder of the affected Property and all other Properties shall be conveyed to

52657

21

the Transferee Parties at Closing hereunder; (ii) if the transfer to the condemning authority has not taken place prior to Closing, the entire affected Property and all other Properties shall be conveyed to the Transferee Parties at Closing hereunder; (iii) if Transferor Parties have received payment for such condemnation or taking prior to Closing hereunder, the amount of such payment shall be paid over to Transferee Parties at Closing; (iv) if Transferor Parties have not received such payment at the time of Closing, Transferor Parties shall assign to Transferee Parties all claims and rights to, or arising out of, such taking, including the right to conduct any litigation in respect of such condemnation. If Transferee Parties elect to renegotiate the Contract Price and the parties are unable to agree upon a renegotiated amount within thirty (30) days after such notice of the election to renegotiate is given, or such other time as agreed to by the Parties in writing, either Party may elect to terminate this Agreement by written notice to the other.  In any event of eminent domain or condemnation, in which the Agreement is not terminated, Closing will be extended, as necessary, in order to permit such notices to be given, elections to be made, and/or renegotiation to take place.

11.    **CLOSING CONDITIONS.**

11.1    Transferee Parties' obligation to consummate the Closing under this Agreement shall be conditioned upon the satisfaction in all material respects of each and all of the following on or before the Closing Date:

11.1.1 Transferee Parties shall have received from Transferor Parties the title commitments committing to insure that (i) fee simple title is vested in Transferor Parties; (ii) title is good and merchantable of record; and (iii) title is free of all liens, encumbrances, easements, restrictions, claims of title, leases, adverse possession, condemnation, and other matters except the Permitted Title Exceptions, Deed Restrictions, Right of Reentry, and Owensboro Right of First Refusal.

11.1.2 Transferee Parties shall have obtained the surveys from Transferor Parties, at Transferor Parties' expense, showing and certifying for each Property except for the Property located in Waterloo, New York, for which Transferee Parties agree no survey is required, to the effect that (i) the boundary lines of the Property close; (ii) no improvements to the Property encroach upon adjoining property and no improvements to adjoining property encroach upon the Property except as set forth on **Exhibit B**; (iii) the boundaries of the Property, as shown on such survey, are consistent with its boundaries as indicated by the description attached as **Exhibit B** to this Agreement; and (iv) the Property has access to a public right of way, either directly or by means of a recorded easement.  Transferee Parties acknowledge that the surveys delivered by Transferor Parties as of the date hereof satisfy this condition, except for those matters relating to Fort Pierce, Florida and Joplin, Missouri identified on **Exhibit B** under the heading of "Encroachments and Other Survey Matters" which require modification of the survey and/or title commitment as indicated on said **Exhibit B.**

11.1.3 There shall not be in effect any moratoria or similar impediments to receipt of any development approvals or issuance of permits by any governmental authority exercising authority over the Properties.

Airborne, United States Postal Service, United Parcel Service or other national overnight courier service with confirmation of receipt requested; (b) transmitted by e-mail to the applicable e-mail address indicated below followed with mailing by first class United States Postal Service or followed by mailing via overnight courier such as Federal Express, Airborne, United Parcel Service, United States Postal Service or other national overnight courier service with confirmation of receipt requested; (c) deposited for prepaid overnight delivery with an overnight courier such as Federal Express, Airborne, United Parcel Service, United States Postal Service or other national overnight courier service with confirmation of receipt requested; or (d) two (2) business days following being deposited in the U. S. mail, postage prepaid, by regular and certified mail, return receipt requested, and such notices are addressed to the following addresses:

If to Grace or
Guanica-Caribe:

William M. Corcoran
Vice President, Public and Regulatory Affairs
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
410-531-4203 (Phone)/410-531-4233 (Fax)
William.Corcoran@grace.com (E-mail)

And to

W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
ATTENTION: Corporate Secretary

If to Remedium:

M. Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119
(901) 820-2065 (Phone)/901-820-2061 (Fax)
Mitch.Obradovic@grace.com (E-Mail)

If to ELT:

Environmental Liability Transfer, Inc.
Attn:  President
1650 Des Peres Road, Suite 306
St. Louis, Missouri 63131
314-835-1515, (Phone)/ 314-835-1616 (Fax)
Rjostes@eltransfer.com  (E-Mail)

If to CDC:

Commercial Development Company, Inc.
Attn:  General Counsel
1650 Des Peres Road, Suite 303
St. Louis, MO 63131
314-835-1515 (Phone)/314-835-1616 (Fax)
MikeM@cdcco.com  (E-mail)

Notice to any Affiliate of ELT and/or CDC listed on the attached **Exhibit A** shall be deemed to be effectively made by notice to ELT or CDC.  The Parties may change their respective addresses

and/or fax numbers for the receipt of notices hereunder by giving notice thereof to the other Parties in accordance herewith.

14. **ASSIGNMENT; TRANSFER OF PROPERTIES TO AFFILIATES.**

14.1    Transferee Parties shall not assign their rights, interests, and obligations under this Agreement without the prior, written authorization of Transferor Parties.  Such authorization may be denied by Transferor Parties in their sole discretion, except Transferor Parties shall not unreasonably withhold such authorization if Transferee Parties are seeking to assign their rights, interests, and obligations under this Agreement to an Affiliate of Transferee Parties; provided that it will be a condition of any such assignment that the assignee agree, by an agreement satisfactory in form and substance to the Transferor Parties, to be bound by this Agreement and to be deemed a Transferee Party for all purposes of this Agreement.  No assignment shall amend, modify, negate or otherwise impair the terms of and Transferor Parties' rights under the assumption of liability set forth in Section 2.1, the indemnification set forth in Section 5.3, or the release set forth in Section 5.2.  Any attempted assignment in violation of the preceding provisions of this Section 14.1 shall be void and of no effect.

14.2    Transferor Parties shall not assign their rights, interest, and obligations under this Agreement without the prior, written authorization of Transferee Parties.  Such authorization may be denied by Transferee Parties in their sole discretion, except Transferee Parties shall not unreasonably withhold such authorization if Transferor Parties are seeking to assign their rights, interests, and obligations under this Agreement to an Affiliate of Transferor Parties. Any attempted assignment in violation of this Section 14.2 shall be void and of no effect.

14.3    Any Affiliate of any of the Transferee Parties to which any of the Properties is transferred in whole or part shall be required to sign documentation satisfactory in form and substance to the Transferor Parties by which such transferee agrees to become an additional Transferee Party for all purposes of this Agreement.  Any attempted transfer in violation of the preceding provisions of this Section 14.3 shall be void and of no effect.

15. **MISCELLANEOUS.**

15.1    **Binding Effect.**  This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective heirs, legal representatives, executors, administrators, successors and permitted assigns.

15.2    **Waiver**.  No waiver of any provision of this Agreement shall be effective unless such waiver is in writing and signed by the Party against whom enforcement of the same is sought.  Failure to enforce any provision of this Agreement or to require at any time performance of any provision hereof shall not be construed to be a waiver of such provision, or to affect the validity of this Agreement or the right of any Party to enforce each and every provision in accordance with the terms hereof.  No waiver of any provision of this Agreement shall affect the right of the Parties thereafter to enforce such provision or to exercise any right or remedy available to them in the event of any other default involving such provision or any other provision.  Making payment or performing pursuant to this Agreement during the existence of a dispute shall not be deemed to be and shall not constitute a waiver of any claims or defenses of the Party so paying or performing.

15.3    **Exhibits/Headings/Time Periods.**  Any reference herein to any exhibits, addenda or attachments refers to the applicable exhibit, addendum or attachment that is attached to this Agreement, and all such exhibits, addenda or attachments shall constitute a part of this Agreement and are expressly made a part hereof.  Headings as to the contents of particular exhibits, articles or sections of this Agreement are for convenience only and are in no way to be construed as part of this Agreement or as a limitations of the scope of the particular exhibits, articles, and sections to which they refer.  If any date, time period or deadline hereunder falls on a weekend, a state or federal holiday, or any other day on which Title Company or the governmental office for the recordation of the deed is not open for business, then such date shall be extended to the next occurring business day.

15.4    **Counterparts.**  This Agreement may be executed in any number of counterparts each of which may be executed by one or more of the Parties.  Each of such counterparts shall, for all purposes, be deemed to be an original.  Facsimile signatures shall have the same force and effect as executed originals.  All such counterparts taken together shall comprise a single agreement.

15.5    **Governing Law.**  This Agreement shall be governed by, and construed in accordance with the law of the State of Delaware, without regard to its conflicts of laws rules or principles.

15.6    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties, and there are no other covenants, agreements, promises, terms and provisions, conditions, undertakings or understandings, either oral or written, between them concerning the Properties other than those herein set forth.  No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon the Parties unless in writing and signed by all the Parties.

15.7    **Broker's Commissions.**  The Parties hereby represent and warrant to each other that, in connection with this Agreement, no third-party broker or finder has been engaged or consulted by such Party or through such Party's actions (or claiming through such Party) or is entitled to commission as a consequence of this transaction, except Cushman & Wakefield, who shall be paid a commission at Closing by the Transferor Parties solely with respect to the Woburn Property.  Each Party hereby indemnifies, defends and holds the other Parties harmless from and against any and all claims of other brokers, finders, or the like, and against the claims of all other third parties claiming any right to commission or compensation by or through the acts of such Party or such Party's partners, agents, or Affiliates in connection with this Agreement.

15.8    **Notice of Competing Bid.**  Transferor Parties shall provide notice to Transferee Parties of the receipt by Transferor Parties of any proposal or offer from any party with respect to a transaction that is substantially equivalent to the transaction contemplated by this Agreement or that otherwise constitutes a competing, substitute or alternative transaction (a "**Competing Bid**").

15.9    **Expense Reimbursement.**  Subject to approval of the Bankruptcy Court, if a Competing Bid is submitted and approved by order of the Bankruptcy Court and Transferee Parties are not in breach under this Agreement, Transferee Parties' reasonable out-of-pocket costs and expenses shall be reimbursed (inclusive of Transferee Parties' reasonable attorneys' fees and costs).  For each cost with respect to which Transferee Parties seek reimbursement, Transferee Parties shall identify (1) the payee, (2) the date incurred, (3) the amount, (4) a

description of the expense incurred sufficient to reasonably enable the identification of the nature and purpose of the cost and its relation to the subject transaction, and (5) proof of payment. The expense reimbursement shall be payable within thirty (30) days after the later of the date of closing of the sale to a third party or receipt of documentation from Transferee Parties documenting costs sought to be reimbursed.

15.10 **Survival**. Except as otherwise explicitly provided in this Agreement, the representations, warranties and covenants set forth in this Agreement shall survive the Closing and shall not be merged into the deed or any document given at the Closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**W. R. GRACE & CO. – CONN.**
**a Connecticut corporation**

By: _____
Name: WILLIAM M. CORCORAN
Title: VICE PRESIDENT

**GUANICA-CARIBE LAND**
**DEVELOPMENT CORPORATION**
**a Delaware corporation**

By: _____
Name: MARK A. SHELNITZ
Title: Vice President AND ASSISTANT
                                    SECRETARY

**REMEDIUM GROUP, INC.**
**a Delaware corporation**

By: _____
Name: WILLIAM M. CORCORAN
Title: PRESIDENT

**ENVIRONMENTAL LIABILITY TRANSFER, INC.**
**a Missouri corporation**

By: _____
Name:
Principal

**COMMERCIAL DEVELOPMENT COMPANY, INC.**
**a Missouri corporation**

By: _____
Name:
Principal

**AUTOMATED SYSTEMS GROUP, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:
Principal

**ELT-MARIETTA, OHIO, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:
Principal

description of the expense incurred sufficient to reasonably enable the identification of the nature and purpose of the cost and its relation to the subject transaction, and (5) proof of payment. The expense reimbursement shall be payable within thirty (30) days after the later of the date of closing of the sale to a third party or receipt of documentation from Transferee Parties documenting costs sought to be reimbursed.

15.10 **Survival**.    Except as otherwise explicitly provided in this Agreement, the representations, warranties and covenants set forth in this Agreement shall survive the Closing and shall not be merged into the deed or any document given at the Closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**W. R. GRACE & CO. – CONN.**
**a Connecticut corporation**

By:_____
Name:
Title:

**GUANICA-CARIBE LAND**
**DEVELOPMENT CORPORATION**
**a Delaware corporation**

By:
_____
Name:
Title:

**REMEDIUM GROUP, INC.**
**a Delaware corporation**

By:
_____
Name:
Title:

**ENVIRONMENTAL LIABILITY TRANSFER, INC.**
**a Missouri corporation**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

**COMMERCIAL DEVELOPMENT COMPANY, INC.**
**a Missouri corporation**

By: _____
Name:    THOMAS E. ROBERTS
Principal    PRESIDENT

**AUTOMATED SYSTEMS GROUP, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

**ELT-MARIETTA, OHIO, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

52657                                                                27

**HAGERSTOWN, L.L.C.**
a Missouri limited liability company

By: _____
Name:     THOMAS E. ROBERTS
Principal          MEMBER

**ILLINOIS COAL MINE, LLC**
a Missouri limited liability company

By: _____
Name:     THOMAS E. ROBERTS
Principal          MEMBER

**TRADESMAN, L.L.C.**
a Missouri limited liability company

By: _____
Name:     THOMAS E. ROBERTS
Principal          MEMBER

**WEST VIRGINIA COAL MINE, LLC**
a Missouri limited liability company

By: _____
Name:     THOMAS E. ROBERTS
Principal          MEMBER

52657

28

## EXHIBIT A

Affiliates of ELT and/or CDC

Automated Systems Group, L.L.C.
Commercial Development Company, Inc.
Environmental Liability Transfer, Inc.
ELT-Marietta, Ohio, L.L.C.
Hagerstown, L.L.C.
Illinois Coal Mine, LLC
Tradesman, L.L.C.
West Virginia Coal Mine, LLC

## EXHIBIT B

### Properties

Exhibits B-1 through B-10:

| | |
|---|---|
| B-1 | Atlanta, GA |
| B-2 | Charleston, SC |
| B-3 | Fort Pierce, FL |
| B-4 | Guanica, PR |
| B-5 | Joplin, MO |
| B-6 | Memphis, TN |
| B-7 | Owensboro, KY |
| B-8 | Travelers Rest, SC |
| B-9 | Waterloo, NY |
| B-10 | Woburn, MA |

Each exhibit includes :

Legal Description, including name of owner;
Schedule of Equipment and Personal Property;
Schedule of Permitted Title Exceptions;
Deed Restrictions;
Schedule of Assignable Contracts;
Schedule of Licenses and Permits;
Schedule of Monetary Liens.

## EXHIBIT B-1 - Atlanta, GA

Current Owner of Site:  W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property*:
1) 2 manufacturing buildings (about 150,000 square feet total)
   a) solvent and water based production areas – mix tanks, storage tanks, kettles, drum mixers, pumps, associated piping, conveyors, electrical controls, storage racks, scales, and other miscellaneous manufacturing equipment
   b) lab equipment and furniture – small air powered mixer, miscellaneous testing equipment
   c) waste water treatment equipment including equalization tank
   d) electric boiler and air compressors
   e) miscellaneous office furniture and equipment including kitchen furniture and appliances
   f) maintenance – miscellaneous parts, powered floor sweeper and drill press
2) above-ground solvent tank farm and piping with rack
3) silos, baghouses, and additional above-ground tank farm
4) covered outside warehouse area
5) drum racks
6) truck load rack
7) propane tank
8) multi-phase extraction and treatment system (extraction wells, vacuum pump, oil water separator/holding tank, air stripper, two 500-pound carbon units in a trailer type enclosure)
9) groundwater monitoring wells
10) Shed – Empty
11) Fire and security alarm systems – fire pumps, monitors, sprinklers, and halon system

* Two large transformers outside the solvent building are owned by Georgia Power.

Schedule of Permitted Title Exceptions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts: (Subject to discussions with ELT)
1) 3/7/06 Master Service Agreement - ATC Associates Inc.

Access Agreements:
1) 5/17/05 Fulton County

Schedule of Orders and Permits:  Attached

Monetary Liens:  None

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:  None

**ATLANTA, GA**

**CHICAGO TITLE INSURANCE COMPANY**
**COMMITMENT FOR TITLE INSURANCE**

**SCHEDULE A**

1.   Commitment No. 07-V216                          Effective Date: **June 15, 2007**

2.   Policy or Policies to be issued:

   (a)   ALTA OWNER'S POLICY                      **$ TBD**

        Proposed Insured:        **TBD**

   (b)   ALTA LOAN POLICY                         **$TBD__**

        Proposed Insured:        **TBD**

3.   Title to the fee simple estate or interest in the land described or referred to in this Commitment is at the effective date hereof vested in:

   **W. R. Grace & Co. - Conn., successor by merger to W.R. Grace & Co., a Connecticut corporation pursuant to Certificate of Merger dated May 25, 1988**

4.   The land referred to in this Commitment is located in the County of **Fulton**, State of Georgia, and described as follows:

   All that tract or parcel of land lying and being in Land Lots 86 & 87, 14th FF District, Fulton County, Georgia and being more particularly described on Exhibit "A" attached hereto.

Countersigned in Atlanta, Georgia

McLAIN & MERRITT, P.C.

By:_____
   C. Edward Goodgame, Vice President
   Authorized Agent

This Commitment is invalid unless Schedules A and B are assembled as one document with the cover, containing the insuring provisions, exclusions, conditions and stipulations.

**ATLANTA, GA**

## LEGAL DESCRIPTION

*TRACT 1*

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 86 AND 87 OF THE 14TH FF DISTRICT, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE SOUTHEASTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD (100' RIGHT–OF–WAY) AND THE NORTHWESTERLY RIGHT–OF–WAY OF PHILLIP LEE DRIVE (100' RIGHT–OF–WAY); THENCE ALONG THE SAID SOUTHEASTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD 90.49 FEET LONG A CURVE TO THE RIGHT HAVING A RADIUS OF 669.25 FEET AND A CHORD BEARING NORTH 42 DEGREES 43 MINUTES 29 SECONDS EAST, 90.42 FEET;
THENCE CONTINUING NORTH 46 DEGREES 35 MINUTES 54 SECONDS EAST, 623.26 FEET TO THE SOUTHWESTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD;
THENCE 788.00 FEET ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 783.80 FEET AND A CHORD BEARING SOUTH 10 DEGREES 46 MINUTES 46 SECONDS EAST, 753.52 FEET;
THENCE CONTINUING SOUTH 40 DEGREES 20 MINUTES 08 SECONDS EAST, 246.80 FEET TO A #4 REBAR, FOUND;
THENCE DEPARTING THE SAID SOUTHWESTERLY RIGHT–OF–WAY SOUTH 52 DEGREES 55 MINUTES 28 SECONDS WEST, 388.56 FEET TO A ½" IRON PIPE, FOUND;
THENCE ALONG THE NORTHEASTERLY RIGHT–OF–WAY OF PHILLIP LEE ROAD NORTH 37 DEGREES 05 MINUTES 00 SECONDS WEST, 837.25 FEET TO THE POINT OF BEGINNING.
CONTAINING 8.75 ACRES OF LAND, MORE OR LESS.

*TRACT 2*

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 86 OF THE 14TH FF DISTRICT, FULTON COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING FROM THE INTERSECTION OF THE SOUTHEASTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD (100' RIGHT–OF–WAY) AND THE NORTHWESTERLY RIGHT–OF–WAY OF PHILLIP LEE DRIVE (100' RIGHT–OF–WAY); THENCE ALONG THE SAID SOUTHEASTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD 90.49 FEET LONG A CURVE TO THE RIGHT HAVING A RADIUS OF 669.25 FEET AND A CHORD BEARING NORTH 42 DEGREES 43 MINUTES 29 SECONDS EAST, 90.42 FEET;
THENCE DEPARTING SAID SOUTHEASTERLY RIGHT–OF–WAY NORTH 43 DEGREES 24 MINUTES 06 SECONDS WEST, 100.00 FEET TO THE NORTHWESTERLY ATLANTIC COAST LINE RAILROAD RIGHT–OF–WAY, ALSO BEING THE POINT OF BEGINNING;

FROM SAID POINT OF BEGINNING, THENCE 4.71 FEET ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 769.25 FEET AND A CHORD BEARING SOUTH 46 DEGREES 25 MINUTES 23 SECONDS WEST, 4.71 FEET TO THE POINT OF BEGINNING;
THENCE DEPARTING THE SAID NORHTWESTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD NORTH 36 DEGREES 51 MINUTES 17 W, 522.01 FEET TO THE TOP OF BANK OF THE CHATTAHOOCHEE RIVER;
THENCE CONTINUING ALONG THE TOP OF BANK OF THE CHATTAHOOCHEE RIVER 336.21 FEET HAVING A CHORD NORTH 49 DEGREES 52 MINUTES 37 SECONDS EAST, 333.40 FEET;
THENCE SOUTH 36 DEGREES 51 MINUTES 17 SECONDS EAST, 502.80 FEET TO A #4 REBAR, FOUND IN THE SAID NORTHWESTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD;
THENCE ALONG THE SAID NORTHWESTERLY RIGHT–OF–WAY LINE OF THE ATLANTIC COAST LINE RAILROAD SOUTH 46 DEGREES 35 MINUTES 54 SECONDS WEST, 330.34 FEET TO THE POINT OF BEGINNING.
CONTAINING 3.92 ACRES OF LAND, MORE OR LESS.

## CHICAGO TITLE INSURANCE COMPANY
## COMMITMENT FOR TITLE INSURANCE

### SCHEDULE B – Section 2

Part II, Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

9.  Restrictive Covenants recorded in Deed Book 4395, Page 227, Fulton County, Georgia Records, but omitting any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

10. Indemnification Agreement by and between W.R. Grace & Co. - Conn./Dewey & Almy Division and Fulton County dated January 16, 1996 and filed January 23, 1996 in Deed Book 20505, Page 299, Fulton County, Georgia Records.

12. Sewer Easement in favor of City of Atlanta dated June 15, 1972 and filed July 31, 1972 in Deed Book 5626, Page 336, Fulton County, Georgia records.

13. Easement in favor of Georgia Power company dated May 14, 1969 and filed June 19, 1969 in Deed Book 5081, page 49, Fulton County, Georgia records.

14. Permit for Anchors, Guy Poles and Wires to Georgia Power Company dated September 8, 1965 and filed October 21, 1965 in Deed Book 4500, page 395, Fulton County, Georgia Records.

15. Easement to Georgia Power Company dated September 8, 1965 and filed October 26, 1965 in Deed Book 4500, Page 405, Fulton County, Georgia Records.

16. Clarification or Modification of Easement to American Telephone and Telegraph Company dated April 1, 1965 and filed April 12, 1965 in Deed book 4399, Page 513, Fulton county, Georgia Records.

17. Clarification, Modification and partial Release of Easement to Southern Bell Telephone and Telegraph dated April 1, 1965 and filed April 12, 1965 in Deed book 4399, Page 516, Fulton County, Georgia Records.

18. Matters appearing on Plat recorded in Plat Book 82, Page 16, Fulton County, Georgia, but omitting any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

21. Rights of upper and lower riparian landowners in and to the waters of the branch, creek or river crossing and/or forming a boundary of the captioned property, and the natural flow thereof, free from diminution or pollution.

## Liability Transfer Project
## List of Orders and Permits for Transfer to ELT

### Atlanta, GA

| Site Name and Location | 5225 Phillip Lee Drive Atlanta, GA | 5225 Phillip Lee Drive Atlanta, GA |
|---|---|---|
| Name of Order/Type of Permit | Not Applicable. Corrective Action Plan required by regulation - 40 CFR 280.66 | Wastewater Discharge Permit |
| ID Number | Not Applicable | U-62206.100 |
| Expiration Date | Not Applicable | June 30, 2011 |
| Regulatory Information | USEPA Region IV Steven Burton Underground Storage Tank Section 61 Forsyth Street, S.W. Atlanta, GA 30303-9464 404-562-9466 | Fulton County Department of Public Works David Cross Water Quality Manager 1030 Marietta Highway Roswell, GA 30075 770-640-3061 x111 |
| Notice Requirements | None | Permit Part XI. Wastewater discharge permits are issued to a specific user for a specific operation and are not assignable to another user or transferable to any other location without prior written approval of the County.<br><br>Sale by a user obligates the purchaser to seek prior written approval of the County for continued discharge to the sewer system. |

## EXHIBIT B-2 - Charleston, SC

Current Owner of Site:  W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:
1) Groundwater Monitoring Wells

Schedule of Permitted Title Exceptions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts: (Subject to discussions with ELT)
1) 6/7/05 Master Services Agreement - RMT, Inc.
2) 7/3/06 Remediation Agreement - Shamrock Environmental Corporation

Access Agreements:
1) 3/12/04 North Charleston Sewer District
2) 3/13/04 Crosby's Seafood
3) 3/22/04 Salmons Dredging Corporation
4) 6/29/04 Tekna Investments, Inc.
5) 8/6/04 Charleston Constructors, Inc.
6) 4/30/06 CSX Transportation, Inc.

Schedule of Orders and Permits:  Attached

Monetary Liens:  None

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:
1) The City of Charleston has expressed intent to acquire property by eminent domain if property is not voluntarily conveyed to them.  To that end, the City of Charleston filed a Motion for Relief from the Automatic Stay dated 12/21/07 to permit the City to proceed with an eminent domain action.  Grace filed an objection to the Motion on 1/11/08.
2) Remedium is currently in settlement discussions with RMT, Inc. (environmental contractor) for cost recovery related to wetlands remediation work performed at the Charleston site in late 2006/early 2007.

STATE OF SOUTH CAROLINA  )
          ) **DECLARATION OF COVENANTS**
COUNTY OF CHARLESTON  )  **AND RESTRICTIONS**

   THIS DECLARATION OF COVENANTS AND RESTRICTIONS ("Declaration") is made and entered into this ____ day of February 2008, by W.R. Grace & Co.-Conn., a Connecticut corporation (hereinafter referred to as "GRACE").

**RECITALS**

   WHEREAS, GRACE is the owner of certain real property in Charleston County, South Carolina, more particularly described in Exhibit A attached hereto and incorporated herein by reference ("Property"); and

   WHEREAS, the Property is the subject of Administrative Consent Agreement 89-34-SW,S as amended by a 2003 Amendment both entered into by the South Carolina Department of Health and Environmental Control (the "Department") and GRACE, pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, et seq., and the South Carolina Hazardous Waste Management Act ("HWMA"), S.C. Code Ann. § 44-56-200; and

   WHEREAS, GRACE implemented remediation pursuant to the Department's November 2002 Record of Decision for the Site Remedy; and

   WHEREAS, after completion of the Remedy, contaminants in excess of allowable concentrations for unrestricted use remain at the Property; and

   WHEREAS, the Department has determined that the Property may be used for certain purposes without further remediation when certain restrictions are placed on development and use of the Property; and

   WHEREAS, GRACE has agreed to impose restrictions on the manner in which the Property may be developed (said restrictions to run with the land and inure to the benefit of and be enforceable by the Department and its successor agencies).

   NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS that GRACE hereby declares and covenants on behalf of itself and its successors and assigns that the Property described in Exhibit A shall be held, mortgaged, transferred, sold, conveyed, leased, occupied, and used subject to the following restrictions, which shall touch and concern and run with the title of the Property.

  1. GRACE hereby covenants for itself and its successors and assigns that the Property shall not be used for the following purposes:  residential, agricultural, child day care facilities, schools, or elderly care facilities.

2.    GRACE hereby covenants for itself and its successors and assigns that groundwater beneath the Property may not be withdrawn or used without prior approval from the Department or its successor agency.

3.    GRACE hereby covenants for itself and its successors and assigns that soil at the Property shall not be excavated, graded, or removed without prior approval from the Department or its successor agency.

4.    GRACE hereby covenants for itself and its successors and assigns that the groundwater monitoring network shall be maintained in accordance with the Remedy under an approved long-term monitoring plan and all on-site monitoring wells shall not be destroyed or abandoned without the express written approval of the Department.

5.    GRACE hereby covenants for itself and its successors and assigns that the Department or its successor agency, and all other parties performing response actions under the Department's oversight, shall be and hereby are provided an easement for reasonable access to inspect the Property, to oversee the activities conducted on the Property, or to take samples as may be necessary to enforce this Declaration.

6.    The covenants and restrictions set forth herein shall run with the title to the Property and shall be binding upon GRACE, its successors and assigns. GRACE and its successors and assigns shall include the following notice on all deeds, mortgages, plats, or any legal instruments used to convey any interest in the Property (failure to comply with this paragraph does not impair the validity or enforceability of these covenants):

> NOTICE: This Property is subject to Declaration of Covenants and Restrictions recorded at _____ and any subsequent Amendments.

7.    GRACE, its successors and assigns, and any Grantee of all or any portion of the Property as of May 1 of any year, annually on or before May 31, shall submit to the Department a statement that the terms of this Declaration were maintained, including a description of any exceptions to such maintenance, during the preceding calendar year. Such statement shall be addressed to:

> Site Assessment and Remediation Division
> South Carolina Department of Health & Environmental Control
> 2600 Bull Street
> Columbia, SC 29201

8.    This Declaration shall remain in place until such time as the Department has made a written determination that the covenants and restrictions set forth herein are no

SCDHEC/W.R. Grace & Co.-Conn. Site
Declaration of Covenants and Restrictions
BL&WM Site File # 20111

2

longer necessary. This Declaration shall not be amended without the written consent of the Department or its successor agency.

9.    This Declaration only applies to the Property expressly identified in Exhibit A and does not impair the Department's authority with respect to the Property or other real property under the control of GRACE.

10.   The obligation under this Declaration shall be assigned to any Grantee of Grace and its successors or assigns upon the recording of a deed to such Grantee in the Registrar of Mense Office of Charleston County, South Carolina.

IN WITNESS WHEREOF, GRACE has caused this instrument to be executed as of the date first above written.

WITNESSES:                              **W.R. GRACE & CO.-CONN.**
                                        A Connecticut Corporation


_____                 By: _____

_____                 _____
                                              (Name and Title)


STATE OF _____ )
                        )               **ACKNOWLEDGEMENT**
COUNTY OF _____ )


    I, _____ (Notary Public), do hereby certify that
_____, an authorized representative of the W.R. Grace & Co.-Conn., personally appeared before me this day and acknowledged the due execution of the foregoing instrument, on behalf of the corporation.

Witness my hand and official seal this ____ day of February 2008.


                                        _____

                                        Notary Public for: _____

                                        My Commission Expires: _____

SCDHEC/W.R. Grace & Co.-Conn. Site
Declaration of Covenants and Restrictions
BL&WM Site File # 20111

IN WITNESS WHEREOF, the Department has caused this Declaration to be executed as of the date first above-written.

WITNESSES:

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL**

By: _____

_____

    Robert W. King, Jr., P.E.
    Deputy Commissioner
    Environmental Quality Control

_____

STATE OF SOUTH CAROLINA    )
                           )    **ACKNOWLEDGEMENT**

COUNTY OF RICHLAND       )

I, _____ (Notary Public), do hereby certify that, Robert W. King, Jr., P.E., Deputy Commissioner, Environmental Quality Control of the South Carolina Department of Health & Environmental Control, personally appeared before me this day and acknowledged the due execution of the foregoing instrument, on behalf of the corporation.

Witness my hand and official seal this ____ day of February 2008.

_____

Notary Public for: _____

My Commission Expires: _____

SCDHEC/W.R. Grace & Co.-Conn. Site
Declaration of Covenants and Restrictions
BL&WM Site File # 20111

4

# Exhibit A

LEGAL DESCRIPTION
TRACT A

ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND SITUATE, LYING AND BEING IN THE CITY OF CHARLESTON, CHARLESTON COUNTY, SOUTH CAROLINA DESIGNATED AS TRACT A ON AN ALTA/ACSM LAND TITLE SURVEY BY THOMAS V. BESSENT, PLS DATED SEPTEMBER 21, 2007 MORE PARTICULARLY DESCRIBED WITH RESPECT TO SAID SURVEY AS FOLLOWS:

BEGINNING AT A 5/8" REBAR AT THE INTERSECTION OF THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD AND THE NORTHERLY RIGHT—OF—WAY LINE OF HERBERT STREET (S—10—132), BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;

THENCE WESTERLY ALONG SAID NORTHERLY RIGHT—OF—WAY S70°09'03"W. 894.69' TO A 5/8" REBAR AT THE SOUTHEASTERLY CORNER OF PROPERTY OF J. ROY GIBSON; THENCE ALONG SAID PROPERTY N15°25'57"W 331.00' TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY S72°08'43"W 252.28 TO A 3/4" IRON PIPE; THENCE ALONG THE EASTERLY RIGHT—OF—WAY LINE OF HARMON STREET (S—10—293) THE FOLLOWING THREE COURSES AND DISTANCES; N 15°58'17" W 110.19' TO A RAILROAD SPIKE; S73°59'34"W 19.96' TO A RAILROAD SPIKE; N15°53'46"W 362.78' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF CHARLESTON CONSTRUCTORS INC. N69°08'45"E 272.42 TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY N24°47'39"W 136.84' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF C AND A RENTALS LLC N68°43'44"E 353.25' TO A 1" IRON PIPE; THENCE ALONG THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD S47°05'00"E 1081.79' TO A 5/8" REBAR BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;

CONTAINED WITHIN SAID BOUNDS 16.466 ACRES.

SCDHEC/W.R. Grace & Co.-Conn. Site
Declaration of Covenants and Restrictions
BL&WM Site File # 20111

**CHARLESTON, SC**

**A.L.T.A. COMMITMENT**
**CHICAGO TITLE INSURANCE COMPANY**
**3700 Forest Drive, Suite 201, Columbia, SC 29204**
**Issued By: Dodds & Hennessy**
**1 North Adgers Wharf**
**Charleston, SC  29401**
**(843) 577-3025**


**SCHEDULE A**


Office File Number RE 13094

| Commitment Number | Effective Date | Loan Amount $TBD |
|---|---|---|
| | July 17, 2007 | |
| RE 13094 | at 4:00 p.m. | Owners Amount $TBD |


1.    Policy or Policies to be issued:
      ALTA LOAN POLICY, Form (10-17-92)
      Proposed Insured:

      TBD

      ALTA OWNER'S POLICY, Form Commercial
      Proposed Insured:

      TBD

2.    The estate or interest in the land described or referred to in this Commitment and covered herein is a fee simple, and title thereto is at the effective date hereof vested in:

      W. R. Grace & Co. - Conn., a Connecticut corporation f/k/a W.R. Grace & Co.

3.    The Land is described as follows:

      All that certain piece, parcel or tract of land, situate, lying and being in the City of Charleston, County of Charleston, State of South Carolina, shown and designated as TMS 464-02-00-051, WR Grace and Co, 16.464 Acres, on a plat entitled, "PLAT SHOWING THE BOUNDARY SURVEY OF A 16.464 ACRE PARCEL OWNED BY WR GRACE AND COMPANY LOCATED IN THE CITY OF CHARLESTON CHARLESTON COUNTY, SOUTH CAROLINA," by Engineering, Surveying, & Planning, Inc dated February 5, 1991, revised February 13, 1992 and recorded in Plat Book CG at Page 177 in the RMC Office for Charleston County.  Said tract having such size, shape, dimensions, buttings and boundings as will by reference to said plat more fully appear.


Note: This Commitment consists of insert pages labeled in Schedule A, Schedule B-Section 1, and Schedule B-Section 2. This Commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.

F. 1895

CHARLESTON, SC

LEGAL DESCRIPTION
TRACT A

ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND SITUATE, LYING AND BEING IN THE CITY OF CHARLESTON, CHARLESTON COUNTY, SOUTH CAROLINA DESIGNATED AS TRACT A ON AN ALTA/ACSM LAND TITLE SURVEY BY THOMAS V. BESSENT, PLS DATED SEPTEMBER 21, 2007 MORE PARTICULARLY DESCRIBED WITH RESPECT TO SAID SURVEY AS FOLLOWS:

BEGINNING AT A 5/8" REBAR AT THE INTERSECTION OF THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD AND THE NORTHERLY RIGHT—OF—WAY LINE OF HERBERT STREET (S—10—132), BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;

THENCE WESTERLY ALONG SAID NORTHERLY RIGHT—OF—WAY S70°09'03"W 894.69' TO A 5/8" REBAR AT THE SOUTHEASTERLY CORNER OF PROPERTY OF J. ROY GIBSON; THENCE ALONG SAID PROPERTY N15°25'57"W 331.00' TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY S72°08'43"W 252.28 TO A 3/4" IRON PIPE; THENCE ALONG THE EASTERLY RIGHT—OF—WAY LINE OF HARMON STREET (S—10—293) THE FOLLOWING THREE COURSES AND DISTANCES; N 15°58'17" W 110.19' TO A RAILROAD SPIKE; S73°59'34"W 19.96' TO A RAILROAD SPIKE; N15°53'46"W 362.78' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF CHARLESTON CONSTRUCTORS INC. N69°08'45"E 272.42 TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY N24°47'39"W 136.84' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF C AND A RENTALS LLC N68°43'44"E 353.25' TO A 1" IRON PIPE; THENCE ALONG THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD S47°05'00"E 1081.79' TO A 5/8" REBAR BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;

CONTAINED WITHIN SAID BOUNDS 16.466 ACRES.

CHARLESTON, SC

## A.L.T.A. COMMITMENT
## CHICAGO TITLE INSURANCE COMPANY
## SCHEDULE B - Section 2

**Commitment Number RE 13094**

**Special Exceptions**

(a)    Taxes and assessments for the year 2007, and subsequent years, which are a lien but are not yet due and payable.

(b)    Easement to the Commissioners of Public Works of the City of Charleston appearing of record in Book F30, page 326, aforesaid records.

(c)    A right of easement to construct and maintain a ditch or drain to Charleston County appearing of record in Book C45, page 370, aforesaid records and shown on plat appearing of record in Plat Book CG, page 177 as 700' x 10' Drainage Easement

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Charleston, SC - Page 1 of 2

| Site Name and Location | 1820 Harmon Street<br>Charleston, SC | 1820 Harmon Street<br>Charleston, SC | 1820 Harmon Street<br>Charleston, SC |
|---|---|---|---|
| Name of Order/Type of Permit | Administrative Consent Decree | Amendment to Administrative Consent Agreement | Approval to Place into Operation |
| ID Number | 89-34-SW/S | 89-34-SW/S | 19044/W |
| Expiration Date | Not Applicable | Not Applicable | Not Applicable. (System to be closed out 180 days after ending operations or terminated approvals.) |
| Regulatory Information | SC Department of Health and Environmental Control<br>Ms. Judy L. Canova, P.G.<br>Bureau of Land and Waste Management<br>2600 Bull Street<br>Columbia, SC 29201<br>803-896-4046 | SC Department of Health and Environmental Control<br>Ms. Judy L. Canova, P.G.<br>Bureau of Land and Waste Management<br>2600 Bull Street<br>Columbia, SC 29201<br>803-896-4046 | SC Department of Health and Environmental Control<br>Mr. Harvey Wilkins, PE<br>Environmental Quality Control<br>1362 McMillan Avenue, Suite 300<br>Charleston, SC 29405<br>843-740-1590 |
| Notice Requirements | None | None | None |

Liability Transfer Project
List of Orders and Permits for Transfer to ELT

## Charleston, SC - Page 2 of 2

| Site Name and Location | 1820 Harmon Street Charleston, SC | 1820 Harmon Street Charleston, SC | 1820 Harmon Street Charleston, SC |
|---|---|---|---|
| Name of Order/Type of Permit | Pretreatment Permit | Department of the Army Permit (Wetlands Permit) | Critical Area/Water Quality Certification/Coastal Zone Consistency Permit |
| ID Number | Permit #2101 | Permit #2005-1R-130 | Permit #2005-1R-130-P |
| Expiration Date | December 31, 2007 | June 30, 2011 | May 4, 2011 |
| Regulatory Information | North Charleston Sewer District Ms. Kelly Singer Industrial Pretreatment Supervisor P. O. Box 63009 North Charleston, SC 29419 843-764-3072 | Department of the Army - Charleston District Corps of Engineers Ms. Tina Hadden, Chief - Regulatory Division 69-A Hagood Avenue Charleston, SC 29403-5107 [Robin Socha: 843-329-8167] | SC Department of Health and Environmental Control Office of Coastal Resource Management Mr. Curtis M. Joyner, Manager - Critical Area Permitting 1362 McMillan Avenue, Suite 400 Charleston, SC 29405 843-747-4323 ext 115 |
| Notice Requirements | Part III, E.  In the event of any change in control or ownership of the facilities from which the authorized discharges emanate, the Permittee shall notify the succeeding owner or controller of the existence of this permit by letter, a copy of which shall be forwarded to the District.  This permit is transferable only | General Condition #4.  If you sell the property associated with this permit, you must obtain the signature of the new owner in the space provided and forward a copy of the permit to this office to validate the transfer of this authorization. | General Condition #8.  That this permit may not be transferred to a third party without prior written notice to the OCRM, either by the transferee's written agreement to comply with all terms and conditions of this permit or by the transferred subscribing to this permit and thereby agreeing to comply. |

## EXHIBIT B-3 - Ft. Pierce, FL

Current Owner of Site:  W. R. Grace & Co. - Conn.

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:
   1)  Groundwater Monitoring Wells

Schedule of Permitted Title Exceptions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:    See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts: (Subject to discussions with ELT)
   1)  8/1/05 Global Master Services Agreement - URS Corporation

Access Agreements:
   1)  12/19/03 Nick and Veronica Pantelidis
   2)  1/8/04 B. K. Dorsey
   3)  4/13/06 Terpening Holdings, LLC

Schedule of Orders and Permits:  Attached

Monetary Liens:  None

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:  None

Encroachments and Other Survey Matters:
   1)  Legal description currently not plattable per survey note #9.  New legal
       description will need to be drafted in accordance with survey, which Chicago
       Title will need to insure.  As of 2/21/08, this is still pending.
   2)  Resolution needed as to ownership of triangular parcel of land at intersection of
       U.S. Highway No. 1 and Naco Road.  Survey shows parcel being part of Grace
       property; title commitment does not.

**FT. PIERCE, FL**

# Chicago Title Insurance Company

## COMMITMENT FOR TITLE INSURANCE
### SCHEDULE A

Agent Order/File No.:    Title No.: 430703201

Rev 10/3/07

1. Effective Date: 07/12/2007 at 08:00 AM

2. Policy or Policies to be issued:

   (a) ALTA Owner Policy (10-17-92) with Florida Modifications

   Policy Amount: $ TBD

   Proposed Insured: To be determined

3. The estate or interest in the land described or referred to in this Commitment and covered herein is:

   Fee Simple

4. Title to the estate or interest in said land is at the effective date hereof vested in:

   W.R. Grace & Co. – Conn, a Connecticut corporation, formerly known as W.R. Grace & Co.

5. The land referred to in the Commitment is described as follows:

   SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

ALTA Commitment -1966

**FT. PIERCE, FL**

Title No.:  430703201

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

PARCEL A:

That part of the Northeast quarter of the Southeast quarter of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, bounded as follows:

On the East by the west right of way line of the Florida East Coast Railway Company; on the West by the West boundary of the Northeast quarter of the Southeast quarter of said Section 33; on the North by a line parallel to and 91.4 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of said Section 33; on the South by a line parallel to and 424.6 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of Section 33.

PARCEL B:

Parcel 1:

To locate point of beginning, commence on the West bank of the Indian River at a stake marking the Northeast corner of the South 1/3 of Lot 1 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida; from this stake run due South 2 chains and 9 links and set a stake; thence run West parallel with the land line to the West line of the Dixie Highway so-called, which is the point of beginning of the tract herein described; thence continue on said line from the point of beginning to a point which is 22 chains and 50 links West of the second stake mentioned in this description; run thence North 2 chains 9 links to a stake; run thence West to the subdivision line between the East and West halves of Section 33, run thence South along said subdivision line to the center of Section 33; run thence East 20 chains more or less to the line dividing Lots 3 and 4 of Section 33; run thence South parallel with the land lines to a point due West of the Southwest corner of the land formerly owned by John L. Howard; being the Southwest corner of the Howard fence; also being the Southwest corner of the land described as Lot 1 and the North 2 acres of Lot 2 in Section 34, Township 34 South, Range 40 East; proceed thence South 2 chains 9 links; run thence East parallel with the land lines to the West line of the Dixie Highway so-called; thence Northerly along the West boundary line of the Dixie Highway to the point of beginning;

EXCEPTING, from the foregoing Parcel B Parcel 1 description the following three parcels, to-wit:

A. That parcel conveyed from the Robbins & Graham Company to the Indian River Guano Company, said conveyance being recorded in Deed Book 97, page 327, in the office of the Clerk of the Circuit Court of St. Lucie County, Florida, more particularly described as follows:
Starting at a rock monument at the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East; run thence South on the lot line dividing Government Lots 3 and 4 of said section, a distance of 91.4 feet to an Iron Pipe Monument which is the point of beginning of the tract of land hereby conveyed. From said point of beginning, continue South along said lot line a distance of 333.2 feet to a rock monument on the South line of a certain tract of land described in a deed from F.D. Reynolds et al, to East Coast Lumber and Supply Company, which deed is recorded in Deed Book 80, page 12, of the Public Records of St. Lucie County, Florida; thence run east along the south line of the tract of land conveyed by said deed a distance of 1009 feet to a pipe monument, which is the Southeast corner of the tract of land conveyed by said deed from Reynolds to East Coast Lumber and Supply Company and which point is located on the west line of the right of way of the Old Dixie Highway and now known as State Road #140; thence run northerly along the west line of said State Road #140 a distance of 355.4 feet to a pipe monument; thence run west parallel with the lot line to the point of beginning.

B. That parcel conveyed from East Coast Lumber and Supply Company to Antonio M. Peres, et ux, said conveyance being recorded in Deed Book 136, page 261, of the Public Records of St. Lucie County, Florida, as amended by that conveyance from the aforesaid grantor to the aforesaid grantees, said amended conveyance being recorded in Deed Book 149, page 3, of the Public Records of St. Lucie County, Florida, said amended conveyance being more particularly described as follows: From a conquina rock at Northwest corner of the NW

1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run north on the quarter line for a distance of 1735.9 feet from coquina rock, run thence East for a distance of 588 feet to center line of the present New Dixie Highway, being 66 feet wide and known as State Road #5 (formerly #4) and U.S. Highway #1, run thence southeasterly with the center line of said present Dixie Highway for a distance of 1832.8 feet to a point which is the center of said present Dixie Highway, said point being 109.8 feet west of the northwest corner of the NE 1/4 of SE 1/4 of said Section 33, Township 34 South, Range 40 East, run thence West 1204.2 feet to the point of beginning.

C. That parcel conveyed from East Coast Lumber and Supply Company, to G. Bloodworth, J. Logan Bloodworth, G. Ernest Bloodworth, partners, operating and doing business as Cherokee Products Company, said conveyance being recorded in Deed Book 117, page 150, of the Public Records of St. Lucie County, Florida, said land being described as follows:

From a coquina rock at NW corner of NW 1/4 of SE 1/4 run north on 1/4 line for a distance of 1735.9 feet to coquina rock; run thence east for a distance of 588.0 feet to center line of new Dixie Highway for point of beginning; from point of beginning run east 433.3 feet to a monument, run thence 137.95 feet to a coquina rock, run thence east 591.5 feet to a concrete monument, which is 33 feet west of center line of Old Dixie Highway, run thence in a southeasterly direction paralleling the center line of Old Dixie Highway and being 33 feet west of center for a distance of 984.0 feet to a point, thence run north 89 degrees 30 minutes west 950.0 feet to center of New Dixie Highway, run thence in a northwesterly direction with center line of New Dixie Highway for a distance of 1127.8 feet to point of beginning.

Parcel 2:

From the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run South 91.4 feet to a pipe; run thence South 89 degrees and 30 minutes East for a distance of 901.8 feet to a point in the center of the Old Dixie Highway for the point of beginning. From this point of beginning run North 19 degrees and 38 minutes west following the center of Old Dixie Highway for a distance of 800 feet to a point; run thence South 89 degrees and 30 minutes east for a distance of 96 feet to the west line of the right of way of the Florida East Coast Railway; run thence South 20 degrees and 14 minutes East along the west line of the right of way of the said Florida East Coast Railway 803.5 feet to a point; run thence North 89 degrees and 30 minutes west for a distance of 105.4 feet to the point of beginning; said land lying and being in St. Lucie County, Florida.

LESS AND EXCEPTING from the foregoing Parcel B Parcel 2 description the following 2 parcels, to-wit:

A. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company, on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way), on the North by a Westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:
Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.
On the South by a line that is 60 feet south of and parallel to the aforementioned North line.

B. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company; on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way); on the South by a westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:  Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, Public Records of St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly

ALTA Commitment -1966

along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.

On the North by a line that is 202.06 feet North (as measured along the West right of way line of the Florida East Coast Railway) of the South line and that is 201.62 feet North (as measured along the East right of way line of Old Dixie Highway) on the South line.

**Ft. Pierce, FL**

**Schedule B – Part II**

2.  Standard Exceptions

    F.  Any claim that any portion of said lands are sovereign lands of the State of Florida, including submerged, filled or artificially exposed lands accreted to such lands.

    G.  Taxes and assessments for the year 2008 and subsequent years.

5.  Reservations in favor of the State of Florida as contained in deed recorded in Deed Book 99, page 275, as modified by Quit Claim Deed recorded in Deed Book 173, page 335.

6.  Easement(s) granted to American Telephone and Telegraph Company, recorded in Deed Book 135, page 347, of the Public Records of St. Lucie County, Florida.  Note:  Per survey, easement does not affect subject property.

7.  Right of way for US1, A1A and Naco Road.

8.  Crossing Transfer Agreement recorded in Official Records Book 551, page 1675.

# Liability Transfer Project
## List of Orders and Permits for Transfer to ELT

### Fort Pierce, FL

| | |
|---|---|
| Site Name and Location | 2540 Old Dixie Highway<br>Ft. Pierce, FL |
| Name of Order/Type of Permit | Consent Order under Florida Administrative Code Rule 17-103.110 |
| ID Number | 85-0015 |
| Expiration Date | Not Applicable |
| Regulatory Information | Florida Department of Environmental Protection<br>Southeast District<br>Mr. Hubert Philoctete - Engineer III<br>400 N. Congress Avenue, Suite 200<br>West Palm Beach, FL  33401<br>561-681-6726 |
| Notice Requirements | None |

## EXHIBIT B-4 - Guanica, Puerto Rico

Current Owner of Site:  Guanica-Caribe Land Development Corporation

Legal Description of Property:  See Title Commitment, Schedule A

Buildings and Improvements; Equipment and Personal Property:    None

Schedule of Permitted Title Exceptions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Deed Restrictions:   See Title Commitment, Schedule B, Section 2 (Excerpt)

Assignable Contracts:   (Subject to discussions with ELT)      None

Access Agreements:  None

Schedule of Orders and Permits:  Attached

Monetary Liens:  None.

Right of First Refusal or Option to Purchase:  None

Violations of Law; Pending or Threatened Litigation or Eminent Domain:  None

**GUANICA, PUERTO RICO**



CHICAGO TITLE INSURANCE COMPANY
ALTA COMMITMENT
Commitment Number 72106-6162

**Schedule A**

1.  Date of Commitment:    July 19, 2007

2.  Policy to be issued:    Owners Policy (ALTA Policy (10/17/92))
    Proposed Insured:    TBD
    Policy Amount:    TBD

3.  The estate or interest in the land described herein and which will be covered by the policy or policies is fee simple, and title thereto is at the effective date hereof vested in Guánica-Caribe Land Development Corporation, acquired by means of deed number 1 dated April 23, 1999 before Notary Vanessa Aymerich Conde.

4.  The land referred to in the Commitment is located at the Carenero Ward of the Municipality of Guánica, Puerto Rico, identified for purposes of recordation as Parcel Number 428, recorded at folio 207, volume 15 of Guánica, Registry of Property of Puerto Rico, Section of San Germán.

**GUANICA, PUERTO RICO**

4.  The land referred to in the Commitment is located at the Carenero Ward of the Municipality of Guánica, Puerto Rico, identified for purposes of recordation as Parcel Number 428, recorded at folio 207, volume 15 of Guánica, Registry of Property of Puerto Rico, Section of San Germán.

## LEGAL DESCRIPTION PARCEL NO. 428

BEGINNING AT POINT 1 LOCATED AT THE CORNER OF THE PROPERTY; THENCE N49°56'23"E, IN A DISTANCE OF 91.87M TO POINT 2, IN BOUNDARY WITH P.R.I.D.C.O.; THENCE S71°03'06"E, IN A DISTANCE OF 548.53M TO POINT 3, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S03°35'39"W, IN A DISTANCE OF 197.24M TO POINT 4, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N86°24'21"W, IN A DISTANCE OF 67.68M TO POINT 5, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 62.20M TO POINT 6, IN BOUNDARY WITH P.R.E.P.A.; THENCE S86°24'21"E, IN A DISTANCE OF 67.68M TO POINT 7, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 258.73M TO POINT 8,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S83°17'19"W, IN A DISTANCE OF 649.10M TO POINT 9,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N13°20'07"E, IN A DISTANCE OF 102.27M TO POINT 10,IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE S82°40'36"W, IN A DISTANCE OF 99.23M TO POINT 11, IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE N13°04'32"E, IN A DISTANCE OF 20.61M TO POINT 12, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°17'38"E, IN A DISTANCE OF 16.65M TO POINT 13, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N15°46'05"E, IN A DISTANCE OF 20.03M TO POINT 14, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°56'19"E, IN A DISTANCE OF 19.33M TO POINT 15, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°25'40"E, IN A DISTANCE OF 42.02M TO POINT 16, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°44'37"E, IN A DISTANCE OF 29.95M TO POINT 17, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°23'39"E, IN A DISTANCE OF 33.09M TO POINT 18, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°11'09"E, IN A DISTANCE OF 34.23M TO POINT 19,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°59'50"E, IN A DISTANCE OF 15.24M TO POINT 20, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°57'54"E, IN A DISTANCE OF 22.77M TO POINT 21, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°50'56"E, IN A DISTANCE OF 42.36M TO POINT 22, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°08'55"E, IN A DISTANCE OF 11.55M TO POINT 23, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'13"E, IN A DISTANCE OF 35.11M TO POINT 24, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'08"E, IN A DISTANCE OF 44.92M TO POINT 25, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°33'45"E, IN A DISTANCE OF 39.61M TO POINT 26, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°58'28"E, IN A DISTANCE OF 31.63M TO POINT 27, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°27'28"E, IN A DISTANCE OF 39.03M TO POINT 28, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°31'19"E, IN A DISTANCE OF 33.35M TO POINT 29, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°49'04"E, IN A DISTANCE OF 26.27M TO POINT 30, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N10°22'19"E, IN A DISTANCE OF 20.95M TO POINT 31, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N03°55'08"E, IN A DISTANCE OF 34.59M TO POINT 32,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N02°25'47"W, IN A DISTANCE OF 20.56M TO POINT 33, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N06°17'03"W, IN A DISTANCE OF 15.21M TO POINT 1,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; WICH IS THE POINT OF BEGINNING, HAVING AN AREA OF 418348.5403 SQ. MTS. 106.4393 CUERDAS

FOLIO CIENTO TREINTA Y CINCO                    (135)

------------*NUMBER TWENTY FOUR (24)*------------

------------*DEED OF RECTIFICATION,*------------
------*SEGREGATION, PURCHASE AND SALE*--------
--------*AND CONSTITUTION OF EASEMENTS*------

----In the municipality of San Juan, Commonwealth of Puerto Rico, this twenty (20th) day of November, two thousand three (2003). ----------------------

--------------------*BEFORE ME* ------------------

----ROBERTO JOSE TORRES ANTOMMATTEI, Attorney-at-Law and Notary Public in and for the Commonwealth of Puerto Rico, with residence in Yauco, Puerto Rico, and an office at fifty two (52) Mattei Lluberas Street in the Municipality of Yauco, Puerto Rico. ------------------------------------

-------------------- *APPEAR* --------------------

----AS PARTY OF THE FIRST PART:  *GUANICA-CARIBE LAND DEVELOPMENT CORPORATION* (hereinafter "Seller"), whose employer identification number is 65-0504444, a corporation organized under the laws of the State of Delaware, represented herein by its attorney in fact, JOSE LUIS NIETO MINGO, of legal age, married to Gloria I. Colón, attorney at law and resident of Guaynabo, Puerto Rico, who states that he is duly authorized to execute this deed on behalf and in representation of Seller pursuant to Deed number Thirty-One (31) of Protocolization of Power of Attorney, executed in San Juan, Puerto Rico on November nineteenth (19th), two thousand three (2003) before Attorney and Notary Public Doira Díaz Rivera.------------

---AS PARTY OF THE SECOND PART:  *OCHOA FERTILIZER CO., INC.,* (hereinafter "Purchaser"), employer identification number 66-0268804, a corporation organized under the laws of the Commonwealth of



ROBERTO J. TORRES ANTOMMATTEI

ABOGADO-NOTARIO

FOLIO CIENTO TREINTA Y SEIS                    (136)

2

Puerto Rico, represented herein by its President, AUGUSTO RAFAEL PALMER ARRACHE, who is of legal age, married to Ivonne Ferrer Picart, executive and resident of Yauco, Puerto Rico, and who states that he is duly authorized to execute this deed on behalf and in representation of Purchaser pursuant to Certificate of Corporate Resolution subscribed by its Secretary Gilberto Lozada Ramírez, before the undersigned Notary. ------------------------

---I, the Notary, certify that I personally know the appearing persons, and through their statements, I certify as to their age, status, profession and residence, and they assure me that they have, and in my judgment they do have, the necessary legal capacity to execute this instrument, wherefore, the appearing parties, freely and of their own will and accord ---------

--------------------STATE --------------------

---FIRST: The Property. Seller is the owner in fee simple (pleno dominio) of a parcel of land (hereinafter the "Main Parcel"), described in the San Germán Section of the Registry of Property of Puerto Rico (hereinafter the "Registry"), as follows: -------------------------------------



-----"RUSTIC: Parcel of land located in the Carenero Ward of Guánica, Puerto Rico, consisting of one hundred eight point zero seven two four (108.0724) cuerdas, equivalent to four hundred twenty-four thousand seven hundred sixty point six four six three (424,760.6463) square meters; composed of three (3) parcels physically separated from each other, except that number one (#1) and number two (#2) are connected by an aqueduct servitude and these parcels shall be utilized for the development of an industry with a common administration center and interdependent of each other, and they are described separately as follows: -------------------------------------

---ONE: RUSTIC: Parcel of land located in the Carenero Ward of the Municipality of Guánica, Puerto Rico, consisting of one hundred six point

FOLIO CIENTO TREINTA Y SIETE                    (137)

3

two one eight eight (106.2188) cuerdas, equivalent
to four hundred seventeen thousand four hundred
eighty-five    point    two    seven    six    three
(417,485.2763) square meters.  Bounded on the
North, by the main parcel from which it is
segregated belonging to the Land Authority of
Puerto Rico and in part by that portion of the
main parcel which is the parcel of two (2) cuerdas
three hundred eighty-eight (388) hundredths of a
cuerda, to be sold by the Land Authority to the
Puerto Rico Industrial Development Company; on the
South and East, with land of the Insular Forest
Reservation of the Commonwealth of Puerto Rico,
Puerto Rico Electric Power Authority and a parcel
segregated from this parcel owned by Guanica-
Caribe Land Development Corporation; and on the
West, with State Highway number three hundred
thirty-three (#333). ---------------------------

---TWO:  RUSTIC:  Parcel of land located in the
Carenero ward of the Municipality of Guánica,
Puerto Rico, with a surface area of one (1)
cuerda, equivalent to thirty-nine (39) miliareas,
bounded on the North, South, East and West, by
land of the main parcel from which it is
segregated belonging to the Land Authority of
Puerto Rico.  The main irrigation canal which
forms part of the irrigation system of the main
parcel from which this parcel is segregated
crosses this parcel.  The geometric description of
this parcel of land is as follows:  Starting from
Point number one (#1), a market on the Northeast
corner of the parcel,  South forty-five (45)
degrees, nineteen (19) minutes East, sixty-two
point sixty-nine (62.69) meters bounded by land of
the Land Authority of Puerto Rico to Point number
two (#2); a marker on the Southeast corner of the
parcel; from here South forty-four (44) degrees
forty-one (41) minutes East sixty-two (62) meters
sixty-nine (69) centimeters bounded by land of the
Land Authority of Puerto Rico to point number
three (#3), marker on the Southwest corner of the
parcel; from here North forty-five (45) degrees,
nineteen (19) minutes West sixty-two point sixty-
nine (62.69) meters bounded by land of the Land
Authority of Puerto Rico to Point number four
(#4), a marker on the Northwest corner of the
parcel, from here North forty-four (44) degrees,
forty-one (41) minutes East sixty-two point sixty-
nine (62.69) meters bounded by the twelve point
zero zero (12.00) meters wide road belonging to
the Central Guánica to Point number one (#1) which
was the starting point of this description. -----

---THREE:  RUSTIC:  Parcel of land located in the
Carenero Ward of the Municipality of Guánica,
Puerto Rico, with an area of eight thousand five
hundred thirty-six (8,536) ten thousandths of a
cuerda, equivalent to thirty-three (33) areas,
forty-four (44) centiareas, ninety-eight (98)
hundredths miliares, and bounded on the North by a
road leading to State Highway number three hundred
thirty-three (#333), on the South by lands of
Puerto Rico Ports Authority, on the East by State
Highway number three hundred thirty-three (#333),
kilometer one (1), hectometer nine (9), and on the



ROBERTO J. TORRES ANTONMATTE.

ABOGADO-NOTARIO