Exhibit "1"

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Objection Deadline: TBD** |
| | ) | **Hearing Date: TBD** |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING LIABILITY TRANSFER AGREEMENT FOR CERTAIN ENVIRONMENTAL LIABILITIES AND PROPERTIES

The Debtors respectfully move this Court (the "Motion") for the entry of an order authorizing a liability transfer of certain environmental liabilities and properties as outlined in the attached Agreement (as defined below), pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and granting the Debtors authority to consummate the transactions contemplated in the Agreement. In support of the Motion, the Debtors respectfully state as follows:

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Jurisdiction

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for this Motion are sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## Background

3.     The Debtors own certain former industrial properties that are not in active use and that carry certain remedial obligations and liabilities arising from environmental contamination. By this Motion, the Debtors seek to enter into an agreement to dispose of ten such properties, namely those located in:  Charleston, SC; Owensboro, KY; Guanica, Puerto Rico; Woburn, MA; Waterloo, NY; Atlanta, GA; Memphis, TN; Fort Pierce, FL; Joplin, MO; and Travelers Rest, SC (collectively, the "Properties").  The Properties range in size from 5 to 180 acres with varying degrees of environmental contamination.

4.     In order to remove such liabilities from the Debtors' estates and establish a clean slate for moving forward, the Debtors have worked to identify an entity that is prepared and suitably qualified to take on the liabilities associated with the Properties.

5.     The Debtors began an extensive search and evaluation process in September 2006.  Ten national environmental liability transfer companies were contacted and asked to provide statements of interest; responses were received from seven.  The Debtors interviewed six of the interested candidates and requested a bid for the Properties.  Only four bids were received in January 2007.  After review and analysis, the Debtors invited three of the companies to participate in an additional interview for further discussion and clarification concerning

components of the bids. Only two companies participated in the interview process which took place in late February and early March, 2007.

6.      After this extensive process, in March 2007, the Debtors selected Environmental Liability Transfer, Inc. (ELT) as the preferred partner for this transaction based on cost, financial viability, and expertise in similar environmental liability transfer projects. The parties entered into a non-binding letter of intent in May 2007, since which time each of the parties has been conducting due diligence investigations and negotiating the terms of a final liability transfer agreement. The Debtors conducted an extensive due diligence of ELT, including its financial wherewithal to assume the liabilities associated with the Properties.[2]    Additionally, ELT conducted extensive due diligence regarding the environmental conditions at the Properties to be transferred.

7.      On February 22, 2008, the Debtors, ELT, and ELT's parent company, Commercial Development Corporation (CDC)[3] (collectively, the "Parties") entered into the liability transfer agreement (the "Agreement") attached hereto as Exhibit A that is the subject of this Motion.

### The Agreement

8.      The significant terms of the Agreement, which the Parties have entered into and which is expressly subject to this Court's approval, are as follows:[4]

---

[2]    Indeed, the Debtors filed an application to retain Deloitte Financial Advisory Services LLP ("Deloitte FAS"), which application the Court approved on November 26, 2007, so that Deloitte FAS could provide services to the Debtors relating to a due diligence investigation in connection with the Transferee Parties and the disposition and settlement of certain environmental liabilities associated with the Properties.

[3]    ELT is beneficially owned by two individuals. ELT and CDC collectively oversee the development and operation of each affiliate.

[4]    The summary of the terms of the Agreement set forth herein is provided solely for the convenience of the Court and parties in interest. Nothing in this Motion is intended to modify or otherwise alter the terms of the Agreement. To the extent there is any conflict between the summary set forth herein and the Agreement, the Agreement shall govern. A diagram of the terms of the Agreement is also included as Exhibit B hereto.

a.  <u>Assumption of Environmental Liabilities and Title Transfer</u>:  The Agreement provides that the Debtors will transfer all of the environmental liabilities associated with the Properties to be held in perpetuity by ELT or its affiliates (collectively, the "Transferee Parties").  To effect this transfer, the Debtors will transfer ownership of the properties to the Transferee Parties.  Under the Agreement, all of the Debtors' environmental remedial liabilities at the Properties (including all environmental issues known, unknown, above grade, at grade, below grade, onsite, and/or offsite whether the contamination occurred in the past, present, or future) and Pollution Legal Liabilities[5] will be transferred to Transferee Parties in perpetuity.

b.  <u>Transaction Price</u>:  The Agreement calls for $2.5 million to be paid by ELT to the Debtors upon closing.  Additionally, 40% of the sale proceeds from the sale of any of the Properties (except for Charleston, South Carolina which is treated as described below) shall be allocated to the Debtors such that the total consideration received by the Debtors for the Properties equals $4.359 million.

c.  <u>Trust</u>:  The Agreement also calls for the establishment of a trust (the "Trust") to secure performance of ELT's obligations under the Agreement.  ELT shall be obligated to make an initial transfer to the Trust in the amount of $2.5 million within 180 days of effective date of the Agreement.  Additionally, a portion of the sale proceeds from the sale of any of the Properties (except for Charleston, South Carolina which is treated as described below) shall be

---

[5]    Terms not defined herein shall have the meaning ascribed to them in the Agreement.

allocated to the Trust (as specified in the Agreement) such that deposits to the Trust will total $11 million. Use of the funds in the Trust will be governed by the terms of the Trust Agreement which provides for distribution of funds to reimburse expenditures or Clean-Up Costs and premiums for Pollution Legal Liability.

d. Proceeds from sale of Charleston, South Carolina: The sale proceeds from the sale of the Charleston, South Carolina Property shall be allocated as follows: (i) if the Transferee Parties elect to use $2.5 million from the sale proceeds of Charleston, South Carolina to fund the Trust, the next $500,000 (or portion thereof) in sale proceeds shall be allocated as follows: 40% to the Debtors, 35% to the Trust, and 25% to the Transferee Parties, or (ii) the Transferee Parties will allocate $3 million of the sale proceeds (or less if the sale is for less than $3 million) as follows: 40% to the Debtors, 35% to the Trust, and 25% to the Transferee Parties. Sale proceeds in excess of $3 million shall be shared equally between the Debtors and the Transferee Parties with no requirement than any of these monies be deposited into the Trust.

e. Mortgages: At Closing, Transferee Parties will grant mortgages on three properties -- Atlanta, GA; Fort Pierce, FL; and Woburn, MA. If proceeds of sales are allocated as provided for in the Agreement, the Debtors shall release the mortgages, upon request by ELT, at the time of sale by ELT of the respective Properties.

f. Right of Reentry: Pursuant to the terms of Agreement, the Debtors retain a right of re-entry onto the Properties under certain specified circumstances

such as the failure of the Transferee Parties to perform remedial work or the use of property in violation of deed restrictions.

g.  Assignment of Licenses, Permits and Contracts:  Pursuant to the terms of the Agreement, the Debtors agree to transfer and assign to the Transferee Parties all of their interests in any permits, licenses and contracts related to the use, operation, maintenance and/or clean-up of the Properties.

h.  Releases:  The Transferee Parties, for themselves and certain other specified parties, completely and irrevocably release and forever discharge the Debtors and their affiliates from any and all past, current, future and contingent Costs of any and every kind and nature, whether currently known or unknown, excepting only the Excluded Matters and the obligations of the Debtors under the Agreement.

i.  Indemnification:  The Transferee Parties jointly and severally shall be responsible for, and shall indemnify, the Debtors and their affiliates from and against any and all Costs, excepting only the Excluded Matters.

**Relief Requested**

9.      By this Motion, the Debtors respectfully seek the entry of an order, pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Debtors' execution of the Agreement and Trust Agreement; (ii) granting the Debtors authority to consummate the transactions contemplated in the Agreement; and (iii) granting such other relief as may be appropriate.

### Basis for Relief

### Sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a)

10.     This Court has the statutory authority to authorize and approve the Agreement, pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 9019.

11.     Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

12.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...."  11 U.S.C. §363(b)(1).  This Court may authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith.  In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see also In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by some "articulated business justification"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

13.     Bankruptcy Rule 9019(a) provides in pertinent part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. Pro. 9019(a).  Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (citations omitted). Indeed, compromises are favored in bankruptcy since they minimize litigation and expedite the administration of a bankruptcy case. See In re Martin, 91 F.3d at 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy, 9019.03[1] (15th ed. 1993)); see also In re Key3Media Group, Inc., 2006 WL 2842462, at *3 (D. Del. 2006).

14.    Before approving a settlement under Bankruptcy Rule 9019, however, a court must determine that the proposed settlement is in the best interests of the debtor's estate. See Martin, 91 F.3d at 394; In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (citation omitted). To reach this determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. See Martin, 91 F.3d at 393. Settlements should be rejected only if they fall "below the lowest point in the range of reasonableness." Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

15.    The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Martin, 91 F.3d at 393; see also In re Nutraquest, Inc., 434 F.3d 639, 644-45 (3d Cir. 2006).

16.    It is also well-settled that a proposed settlement need not be the best result that the debtor could have achieved, but only must fall "within the reasonable range of litigation possibilities." Key3Media Group, 2006 WL 2842462, at *3; In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citing In re Penn Cent. Transp. Co., 596 F.2d

1102, 1114 (3d Cir. 1979)). Under this test, a proponent must simply demonstrate that a proposed settlement does not fall "below the lowest point in the range of reasonableness." World Health Alternatives, 344 B.R. at 296 (citations omitted); see also In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).

### Application of Standards for Approval of a Settlement to the Facts of This Case

17.     The Debtors have determined that entry into the Agreement is in the best interests of the Debtors and their estates and serves a public interest. The Agreement was the product of a rigorous negotiation process and is fair and reasonable.

18.     The Agreement cost-effectively resolves significant environmental liabilities of the Debtor. This Court's approval of the Agreement will eliminate over $12.5 million in environmental liabilities of the Debtors in perpetuity and transfer ownership of the Properties. Furthermore, this Agreement allows the Debtors to avoid potential additional or increased obligations. It will minimize the potential for any future claim concerning the Debtors' responsibility for remediation or other environmental liability with respect to the Properties.

19.     Finally, approval of the Agreement benefits the public. Approval of the Agreement will support the remediation of the Properties. The Agreement provides assurance to the creditors that environmental liabilities associated with the Properties are or will be fully addressed and therefore serves the public interest.

20.     Any result other than this Agreement would not comprehensively resolve the Debtors' liabilities, would likely be more costly and not as efficient, and would take several months if not years to negotiate.

21.     For the above reasons, the Debtors believe that the Agreement represents a reasonable approach to eliminating liability and thus supports the goals of reorganization. Therefore, the Court should approve the Agreement.

**Conclusion**

22.     The Agreement is fair and equitable and in the best interests of the Debtors, their

estates, and their creditors, and also in the public interest.  In addition, the Debtors reasonably

believe that the relief requested in this Motion will aid in the expeditious resolution of these

Chapter 11 Cases.  Accordingly, the Debtors have demonstrated a sound business justification

and public interest for the execution and consummation of the Agreement.

**Notice**

23.     Notice of this Motion has been given to:  (i) the office of the United States

Trustee, (ii) counsel to the DIP Lender, (iii) counsel to The Chase Manhattan Bank as agent for

the Debtors' prepetition lenders, (iv) counsel to each of the official committees appointed in

these Chapter 11 Cases, (v) counsel to the Future Claimants' Representative; (vi) those parties

that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002;

(vii) counsel to the United States; (viii) counsel to the City of Charleston, South Carolina, and

(ix) ELT and CDC.  In light of the nature of the relief requested, the Debtors submit that no

further notice is required.

24.     In light of the nature of the relief requested, the Debtors submit that no further

notice is required.

**No Prior Request**

25.     No prior motion or application for the relief requested herein has been made to

this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached as Exhibit C hereto, (i) approving the Debtors' execution of the

Agreement attached as Exhibit A hereto; (ii) approving the Debtors' execution of the Trust

Agreement; (iii) authorizing the Debtors to consummate the transactions contemplated thereby,

and (iv) granting such other relief as may be just or proper.

Dated:  February 22, 2008          KIRKLAND & ELLIS LLP
                                    David M. Bernick, P.C.
                                    Janet S. Baer
                                    Lori Sinanyan
                                    200 East Randolph Drive
                                    Chicago, Illinois  60601
                                    (312) 861-2000

                                    and

                                    PACHULSKI STANG ZIEHL & JONES LLP


                                    _____
                                    Laura Davis Jones (Bar No. 2436)
                                    James E. O'Neill (Bar No. 4042)
                                    Timothy P. Cairns (Bar No. 4228)
                                    919 North Market Street, 17th Floor
                                    P.O. Box 8705
                                    Wilmington, Delaware  19899-8705
                                    (302) 652-4100

                                    Co-Counsel for the Debtors and Debtors in Possession

EXHIBIT A

SETTLEMENT AGREEMENT

# LIABILITY TRANSFER AGREEMENT

This Liability Transfer Agreement (this "**Agreement**") is made and entered into as of February 22, 2008, by and between W. R. Grace & Co. – Conn., a Connecticut corporation, ("**Grace**"), Guanica-Caribe Land Development Corporation, a Delaware corporation, ("**Guanica-Caribe**"), both located at 7500 Grace Drive, Columbia, MD 21044, and Remedium Group, Inc., a Delaware corporation located at 6401 Poplar Avenue, Suite 301, Memphis, TN 38119 ("**Remedium**") (collectively, the "**Transferor Parties**"), and Environmental Liability Transfer, Inc., a Missouri corporation, ("**ELT**") and Commercial Development Company, Inc., a Missouri corporation, ("**CDC**"), and the Affiliates of ELT and/or CDC listed on the attached **Exhibit A** (collectively with ELT and CDC, the "**Transferee Parties**") (Transferor Parties and Transferee Parties are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**").

**WHEREAS**, Grace and Guanica-Caribe own certain real property at ten locations, more particularly described on the attached **Exhibit B**, together with easements and other rights appurtenant to such real property and any buildings and improvements on such real property; and equipment and personal property located in, on, or about such real property, all as more particularly described on the attached **Exhibit B** (each a "**Property**" and all collectively, the "**Properties**").

**WHEREAS**, the Properties are former industrial properties where environmental conditions have given rise or may give rise to legal obligations on the part of Transferor Parties related to such conditions.

**WHEREAS**, Transferee Parties wish to assume, all Environmental Clean-Up Liability and Pollution Legal Liability, as hereinafter defined, associated with the Properties, and in connection with such assumption, Transferor Parties wish to transfer the Properties to the Transferee Parties.

**NOW, THEREFORE**, in consideration of the terms and conditions of this Agreement, and the mutual promises and covenants herein, the Parties hereby agree as follows:

1. **DEFINITIONS.**

1.1 **General.**

All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated herein. Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears. Except as otherwise expressly provided, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the phrase "without limitation." The word "person" as used herein shall include all individuals, partnerships, corporations, or any other entities whatsoever.

1.2 **Defined Terms.**

In addition to the capitalized terms defined above, as used in this Agreement, the following capitalized terms shall have the following meanings:

**"Affiliate"** of any person shall mean any other person which, directly or indirectly, controls or is controlled by or is under common control with such person; and "control" shall mean the power to direct or cause the direction of the management or policies of another person, whether directly or indirectly, and whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

**"Assignable Contracts"** shall mean the Contracts listed in the attached **Exhibit B**.

**"Assignment and Assumption of Licenses and Permits"** has the meaning given in Section 4.3(d).

**"Assignment of Contracts"** has the meaning given in Section 4.3(b).

**"Assumed Obligations"** has the meaning given in Section 2.1.

**"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**"Bodily Injury"** means physical injury, sickness, disease, mental anguish or emotional distress sustained by any person, including death resulting therefrom.

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability Act and any analogous state laws, as amended from time to time.

**"Clean-Up"** means all activities necessary to investigate and remediate Pre-Existing Pollution Conditions at the Properties to comply with Environmental Laws and any requirements of Governmental Authorities, including: obtaining access; investigation, sampling and study; engineering, design and planning; permitting; removal or remedial actions including removal, transportation, disposal, treatment (including in-situ treatment), management, stabilization, containment or neutralization of Pollutants, monitoring, closure, operation and maintenance, repair, and replacement; wetland mitigation related to remedial action; record keeping and reporting; and public participation and community involvement.

**"Clean-Up Costs"** means all costs incurred for Clean-Up or required to be incurred to effect Clean-Up.  Clean-Up Costs shall include study and investigation costs, planning costs, consultant costs, remediation costs, transportation and disposal costs, legal fees, permit fees and costs, filing fees, monitoring costs, Governmental Authority oversight costs or costs to retain any licensed professionals for review and oversight in lieu of or on behalf of the Governmental Authority pursuant to Environmental Laws.

**"Closing"** has the meaning given in Section 4.1.

**"Closing Date"** has the meaning given in Section 4.1.

**"Contracts"** means service contracts, supply contracts, maintenance contracts, management contracts, leasing agreements, leases, and other contracts affecting the Properties.

52657                                                    2

"**Costs**" has the meaning given in Section 5.1.

"**Deed Restrictions**" has the meaning given in Section 6.3.

"**Due Diligence Period**" means that period of time between the effective date of the Letter of Intent between Grace and Remedium and Transferee Parties, dated May 7, 2007, and the date on which Transferor Parties make motion to the Bankruptcy Court for approval of this Agreement.

"**Effective Date**" has the meaning given in Section 12.

"**Environmental Clean-Up Liability**" means any obligation to perform, or any liability relating to, Clean-Up.

"**Environmental Laws**" means any federal, state, or local laws (including statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders or decrees, directives, permits, licenses or approvals, and all common law) that are now or become in the future applicable to Pollution Conditions and/or the Clean-up thereof.

"**EPA**" means the United States Environmental Protection Agency.

"**Excluded Matters**" means those items for which Transferee Parties have no responsibility under this Agreement solely as specifically set forth in Section 2.2.

"**Governmental Authority**" means any federal, state, or local governmental regulatory or administrative agency, commission, department, board, or other governmental subdivision, court, tribunal, arbitral body or other governmental authority or other subdivision, department or branch of any of the foregoing.

"**Liabilities**" means any and all risks, claims, demands, actions, liabilities, obligations, responsibilities, duties, damages, costs, fines, debts, dues, losses, penalties and expenses of any nature whatsoever, including consultants', experts' and attorneys' fees and other costs of investigation, remediation, prosecution and settlement of any legal, administrative, arbitral or other action, suit, proceeding or other matter.

"**Licenses and Permits**" means any and all licenses, permits, authorizations, approvals, decrees, and orders relating to the use, operation, maintenance and/or Clean-Up of or otherwise relating to the Properties.

"**Monetary Liens**" has the meaning given in Section 4.3(c).

"**Natural Resource Damages**" means: (1) physical injury to, destruction of, or loss of land, fish, wildlife, biota, air, water, groundwater, habitat, wetlands, drinking water supplies; (2) physical injury to, destruction of, or loss of other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Conservation and Management Act (16 U.S.C. Section 1801 et seq.)), any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe; and (3) the cost, charges and expenses for assessment associated with any items identified in (1) and (2) herein.

3

**"New Pollution Conditions"** means Pollution Conditions that arise on or after the Closing Date and do not constitute Pre-Existing Pollution Conditions.

**"Off-Site Locations"** means the real property that is not part of the Properties and that Transferee Parties require access to in order to complete their obligations hereunder.

**"Operational Claims"** has the meaning given in Section 2.2(d).

**"Past Unpaid Costs"** has the meaning given in Section 2.2(b).

**"Permitted Title Exceptions"** has the meaning given in Section 4.5(b).

**"Pollutants"** means any solid, liquid, gaseous or thermal irritant, waste or contaminant, or substance, material or waste that are now or come to be defined by or regulated under any Environmental Law, including soot, acids, alkalis, or toxic chemicals, solid waste, medical waste and waste material, and/or by-products or progeny thereof. Pollutants include all of the following: hazardous wastes or constituents (as defined in Section 1004 of the federal Resource Conservation and Recovery Act); hazardous substances (as defined in CERCLA); substances, materials and wastes that are now or become listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by EPA (40 CFR Part 302), and amendments thereto, as hazardous substances; substances, materials and wastes designated as "hazardous substance" pursuant to Section 311 of the Clean Water Act, or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); oil or petroleum products; chemical liquids or solid, liquid, or gaseous products; polychlorinated biphenyls ("PCBs"); asbestos or asbestos-containing material. Pollutants also include any substances, materials and wastes that are or become defined as a solid waste or toxic or hazardous substance, material, pollutant or contaminant under any existing or future ordinances or regulations or under any existing or future reported decision of a federal, state, or local court of the states in which the Properties are located and any substances, materials and wastes, the presence of which requires or may require investigation or remediation under any existing or future statutory or common law theory, all as amended, replaced or succeeded.

**"Pollution Conditions"** means, with respect to the Properties, the presence, disposal, discharge, dispersal, release, escape or migration, including the direct discharge of Pollutants on the Properties from a facility located on the Properties designed to treat the Pollutants, of any Pollutants at, on, above, under, within, or naturally migrating or naturally migrated from the Properties or any portion thereof, including into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided that the terms "migration" and "migrating" shall not include any pre-Closing transportation and disposal of Pollutants at an off-site location outside of the Properties.

**"Pollution Legal Liability"** means the Liabilities resulting from any Pre-Existing Pollution Conditions, including third-party Bodily Injury and Property Damage, other than Environmental Clean-up Liability.

**"Pre-Existing Pollution Condition"** means Pollution Conditions existing or present prior to the Closing Date, including continuing releases or migration of any Pollution Conditions existing as of the Closing Date, which Pollution Conditions are either (i) known and disclosed by Transferor Parties to Transferee Parties or (ii) not known to Transferor Parties before the Closing.

**"Property Damage"** means (i) physical injury to (including contamination of) or destruction of real or personal property, including any resulting loss of use or diminution in value; (ii) loss of use or diminished value of real or personal property that has not been physically injured or destroyed; or (iii) nuisance, trespass, wrongful eviction or wrongful entry affecting property and caused by Pollution Conditions.

**"Right of Access"** has the meaning given in Section 6.6.

**"Right of Reentry"** has the meaning given in Section 6.4.

**"Title Commitment"** has the meaning given in Section 4.5(b).

**"Title Company"** is the Chicago Title Insurance Company.

**"Transaction Documents"** means this Agreement, the Trust Agreement and all other agreements, deeds, instruments and documents whose execution and/or delivery are contemplated by this Agreement.

**"Transferee Parties' Covenants, Representations and Warranties"** has the meaning given in Section 9.

**"Transferor Parties' Covenants, Representations and Warranties"** has the meaning given in Section 8.

**"Transferor Parties' Knowledge"** means the actual knowledge of the following officers and employees of the Transferor Parties: Paul G. Bucens, William M. Corcoran, Lydia B. Duff, Vicki B. Finkelstein, Maryellen C. Johns, Robert J. Medler, and M. Mitch Obradovic.

**"Trust"** means the trust established pursuant to and governed by the Trust Agreement.

**"Trust Agreement"** means the trust agreement between the Parties and the trustee set forth in **Exhibit C** hereto.

## 2.    ASSUMPTION OF LIABILITIES; EXCLUDED MATTERS; ADDITIONAL COVENANTS.

2.1    **Assumption of Liabilities.**  On the terms and conditions set forth herein, on Closing Date, Transferee Parties jointly and severally shall assume, pay and be responsible for the following (collectively, the **"Assumed Obligations"**):

(a)    all Liabilities which may now exist or hereafter arise directly or indirectly from, out of, or in connection with

(i)    Environmental Clean-Up Liability;

(ii)    the Properties, including any Liabilities arising under the Licenses and Permits, Assignable Contracts or Environmental Laws;

(iii)    Pre-Existing Pollution Conditions;

(iv)    Pollution Legal Liabilities, including third party Bodily Injury claims and third party Property Damage claims associated with, caused by, or arising from Pollution Conditions, except for any such third party Bodily Injury claims and third party

Property Damage claims associated with, caused by, or arising from Pollution Conditions that are known to the Transferor Parties and not disclosed to the Transferee Parties during the Due Diligence Period; and

(v)     New Pollution Conditions (A) caused by Transferee Parties or any of its employees, contractors, subcontractors, agents or representatives or (B) arising from, relating to or associated with the Properties;

(b)     all Liabilities related to, or arising out of, the development or operations and maintenance of, or use, activities or operations of the Properties after the Closing Date; and

(c)     all Liabilities arising after the Closing Date respecting compliance with any and all applicable federal, state, or local law or regulation, judicial or governmental order, or agreements affecting the Properties (including any obligations to provide financial assurance), or governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge, cleanup, removal or disposal of any actual, alleged or suspected Pollutants, including costs associated with the off-site disposal of Pollutants post-Closing.

Notwithstanding anything which may be construed to the contrary herein, the Assumed Obligations shall not include, and the foregoing transfer and assumption of liabilities shall not apply to, any Excluded Matters.

2.2     **Excluded Matters.**  Notwithstanding anything in this Agreement to the contrary, the following matters are **"Excluded Matters":**

(a)     worker health claims (including but not limited to claims or damages for workers' compensation, personal injury, disease or death) by current or former employees of Transferor Parties and/or current or former employees of any predecessors-in-interest to Transferor Parties arising or resulting from pre-Closing injury or exposure;

(b)     any past unpaid costs, fines and/or expenses incurred prior to the Effective Date by Transferor Parties or any predecessors-in-interest to Transferor Parties (the **"Past Unpaid Costs"**), including but not limited to any oversight costs or expenses incurred by or owed to any Governmental Authority;

(c)     Natural Resource Damages claims arising or resulting from events or conditions that occurred or existed solely and exclusively prior to the Closing Date;

(d)     any other claims by third parties arising or resulting from, or alleged to have arisen or resulting from, Pollution Conditions or operation of the Properties by Transferor Parties or any predecessors-in-interest to Transferor Parties prior to the Closing Date (the **"Operational Claims"**), to the extent any such Operational Claims are known to Transferor Parties and not disclosed to Transferee Parties during the Due Diligence Period;

(e)     any claims identified as Excluded Matters in **Exhibit D**;

(f)     any liability arising out of or relating to products of Transferor Parties to the extent manufactured or sold prior to the Closing Date except where such liability arises from Pollution Conditions related to the manufacturing or handling of the products;

(g)    any liability for taxes that (A) arise as a result of Transferor Parties' operation of their business or ownership of the Properties prior to the Closing Date, (B) will arise as a result of the sale of the Properties pursuant to this Agreement and (C) are deferred taxes of any nature;

(h)    under any contract not assumed by Transferee Parties, any liability arising out of or relating to Transferor Parties' credit facilities or any security interest related thereto;

(i)    any liability under the employee plans or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Transferor Parties' employees or former employees or both;

(j)    any liability under any employment, severance, retention or termination agreement with any employee of Transferor Parties or any of their Affiliates or related persons;

(k)    any liability of Transferor Parties to any shareholder of Transferor Parties or Affiliates;

(l)    any liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Transferor Parties;

(m)    any liability to distribute to any of Transferor Parties' shareholders or otherwise apply all or any part of the consideration received hereunder;

(n)    any liability unrelated in any way to Pollution Conditions arising out of or resulting from Transferor Parties' compliance or noncompliance with any legal requirement or order of any Governmental Authority;

(o)    any liability of Transferor Parties for breach of this Agreement or any other document executed in connection with the contemplated transaction; and

(p)    any liability related in any way to asbestos claims against the Transferor Parties, whether arising before or after Closing except for any Pollution Legal Liability for Environmental Clean-Up Liability arising from, out of or in connection with asbestos or asbestos containing materials installed or applied in or on to any building or structure at any of the Properties.

Notwithstanding the foregoing and without limiting any other provisions in this Agreement, the following shall not be Excluded Matters: (i) claims arising from activities or exposure on the Properties after Closing, including any Bodily Injury or Property Damage caused by or arising from continuing releases of Pollution Conditions that exist as of the Closing Date; and/or (ii) claims arising from, relating to or that are triggered by Pollutants disturbed by Transferee Parties, its successors or assigns or their employees, consultants or other agents or representatives.

    2.3    **Other Covenants and Agreements.**  In connection with their assumption of the Assumed Obligations, Transferee Parties covenant and agree to perform at their sole cost and expense the following actions:

7

(a)    to perform the Clean-up in accordance with generally accepted professional standards of care and diligence normally practiced by nationally recognized firms performing similar work;

(b)    to pay all Clean-up Costs;

(c)    to comply with Environmental Law and the requirements of Governmental Authorities with regard to the Clean-Up, including all Licenses and Permits, whether or not transferred, assigned or assumed;

(d)    to execute any documentation reasonably requested by Transferor Parties and/or Governmental Authorities so that Governmental Authorities will accept Transferee Parties as the primary party responsible for the Assumed Obligations;

(e)    to assume Transferor Parties' Pollution Legal Liability and resolve any related claims; and

(f)    to provide copies of (i) final reports related to Clean-Up submitted to Governmental Authorities, (ii) any notice from a Governmental Authority alleging any form of non-performance of Clean-Up, and (iii) any notice from any person of an Excluded Matter.

2.4    **Cooperation**.  Each of the Transferor Parties shall inform the Transferee Parties, and each of the Transferee Parties shall inform the Transferor Parties, of all substantive contacts between Governmental Agencies and itself relating to the Properties which could reasonably be expected to have an adverse impact on the other Parties.

2.5    **Access to Off-Site Locations**.  To the extent Transferee Parties anticipate that they may require access to Off-Site Locations in order to perform the Assumed Obligations, Transferee Parties may notify Transferor Parties prior to the Closing Date.  Transferor Parties shall reasonably cooperate with Transferee Parties, prior to the Closing Date, to the extent Transferor Parties are able, and without expenditure of any costs by Transferor Parties or delay of Closing, to seek to obtain access agreements from current owners of such Off-Site Locations. However, the failure to obtain such access agreements shall not be a condition to Transferee Parties' obligation to proceed to Closing.

3.    **PAYMENT; TRANSFER OF PROPERTIES; USE OF TRUST FUNDS.**

3.1    **Payment to Grace.**  ELT shall pay to Grace at Closing the sum of Two Million Five Hundred Thousand Dollars ($2,500,000).

3.2    **Transfer of Properties.**  Pursuant to the terms and conditions set forth in this Agreement, Transferor Parties shall transfer, assign and set over the Properties at Closing to Transferee Parties.

3.3    **Initial Payment into Trust.**  After Closing and within one hundred and eighty (180) days of the Effective Date, ELT shall transfer into the Trust the sum of Two Million Five Hundred Thousand Dollars ($2,500,000).

3.4     **Allocation of Sale Proceeds.**  Upon sale of any Property, except for the Property located in Charleston, South Carolina, the sale of which is governed by Section 3.5, the sale proceeds (i.e., sale price less closing costs) shall be allocated as follows:

(a)     Forty percent (40%) of the sale proceeds shall be paid to Grace by wire transfer on the date of closing until the sum received by Grace, including the payment set forth in Section 3.1, totals Four Million, Three Hundred Fifty-Nine Thousand Dollars ($4,359,000).

(b)     Thirty-five percent (35%) of the sale proceeds shall be deposited into the Trust until the conditions set forth in Section 3.5(a) are satisfied; thereafter, seventy-five percent (75%) of the sale proceed shall be deposited into the Trust.  Deposits to the Trust shall cease when the sum of Trust deposits totals Eleven Million Dollars ($11 Million) ("Total Trust Deposits").

(c)     Twenty-five percent (25%) of sale proceeds shall be retained by Transferee Parties until the cumulative payments and funding required by Section 3.5(a) and (b) are satisfied. Thereafter, one-hundred percent (100%) of sale proceeds shall be retained by Transferee Parties.

3.5     **Proceeds from Sale of Charleston, South Carolina Property.**  The sale proceeds from the sale of the Property located in Charleston, South Carolina ("Charleston Property") shall be allocated as follows:

(a)     Transferee Parties may elect to use Two Million Five Hundred Thousand Dollars ($2,500,000) from the sale proceeds from the Charleston Property to satisfy Section 3.3.

(b)     If Transferee Parties make the election in Section 3.5(a), the next Five Hundred Thousand Dollars ($500,000), or portion thereof, in sale proceeds shall be allocated in accordance with Section 3.5.

(c)     If Transferee Parties do not make the election in Section 3.5(a), Three Million Dollars ($3,000,000) of the sale proceeds, or the entire sale proceeds if the sale proceeds are less than Three Million Dollars ($3,000,000), shall be allocated in accordance with Section 3.4.

(d)     Sale proceeds in excess of Three Million Dollars shall be shared equally between Transferor Parties and Transferee Parties with no requirement that any of these monies be deposited into the Trust, and Transferor Parties' share shall not be attributed to the total sum payable to Grace under Section 3.4(a).

ELT may transfer Environmental Clean-Up Liability or Pollution Legal Liability for said property, provided the value of the assumption of liability (which value is to be agreed upon by the Parties, or by an independent third party to be selected by the Parties) is added to the sale proceeds, the total amount is allocated pursuant to this section, and the Total Trust Deposits are reduced by the value of such assumption.

3.6     **Release of Mortgages.**  Transferor Parties shall release the Mortgages, as defined in Paragraph 4.4(f), upon request by ELT at the time of sale by ELT of the respective Property, if the proceeds of such sale are distributed in accordance with Paragraph 3.4 hereof.

3.7     **Use of Trust Funds.**  All deposits into the Trust shall be governed by the Trust Agreement and used solely in connection with Environmental Clean-Up Liability and, at the election of Transferee Parties, up to Four Hundred Thousand Dollars ($400,000) in premium for

purchase of a Pollution Legal Liability insurance policy for insuring one or more of the Properties and on which Grace and Remedium are identified as additional named insureds.

### 4.    CLOSING.

4.1    **Place and Closing Date.**  The consummation of the transactions contemplated in and by this Agreement (the "**Closing**") shall take place in the offices of the Title Company on the date which is fifteen (15) days after the Effective Date (the "**Closing Date**"), or such other place or date as the Parties may mutually agree in writing signed by each.

4.2    **Possession.**  At Closing, Transferor Parties shall deliver or cause to be delivered possession of the Properties to Transferee Parties free and clear of all Contracts, other than the Assignable Contracts.

4.3    **Transferor Parties' Obligations at Closing.**  At Closing, Transferor Parties shall deliver or cause to be delivered to Transferee Parties, and Transferee Parties shall accept, the following items, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Transferor Parties, Transferee Parties and the Title Company and, where appropriate, shall be duly executed and acknowledged by Transferor Parties and in recordable form:

(a)    **Deeds.**  Either a general or special warranty deed, whichever is customary in the jurisdiction of each Property, conveying to the Transferee Party identified in Exhibit A for such Property all of the appropriate Transferor Party's right, title and interest in and to such Property, subject only to the Permitted Title Exceptions, Deed Restrictions, Right of Reentry, and Owensboro Right of First Refusal (as identified in **Exhibit B**).

(b)    **Assignment of Contracts.**  Two counterparts of an assignment to Transferee Parties of all Transferor Parties' or their subsidiaries' rights, interests and obligations under the Assignable Contracts and an agreement by Transferee Parties to assume, perform, discharge, fulfill and observe all of Transferor Parties' or their subsidiaries' covenants, conditions and obligations under the Assignable Contracts (the "**Assignment of Contracts**").

(c)    **Releases.**  Written releases of any and all assessments, liens, security interests, mortgages or deeds of trust and other encumbrances securing the payment of money affecting the Properties which were not caused by Transferee Parties or their Affiliates ("**Monetary Liens**"), as shown by the Title Commitment updated to Closing.

(d)    **Assignment and Assumption of Licenses and Permits.**  An assignment to the appropriate Transferee Parties of all of Transferor Parties' or their subsidiaries' right, title and interest in the Licenses and Permits, to the extent assignable, and an agreement by Transferee Parties to assume, perform, discharge, fulfill and observe all of the obligations, terms, covenants, provisions and conditions under the Licenses and Permits, whether or not transferred or assigned (the "**Assignment and Assumption of Licenses and Permits**").  At Closing and if necessary thereafter, the Parties shall execute all applicable documents, and cooperate with each other to take all other actions, necessary to effect the transfer, assignment and assumption of the Licenses and Permits.

(e)    **Title Insurance Affidavit.**  An affidavit and indemnity sufficient in form and substance to cause the Title Company to delete any exception for mechanics', materialmen's and similar liens from Transferee Parties' owner's policy of title insurance.

**(f)**    **Non-Foreign Person Affidavit.** An affidavit of each Transferor Party in form and substance reasonably satisfactory to Transferee Parties setting forth such Transferor Party's United States taxpayer identification number and certifying that such Transferor Party is not a foreign person as that term is used and defined in Section 1445 of the United States Internal Revenue Code.

**(g)**    **Bring-Down Certificate.** Execute and deliver to Transferee Parties a certificate certifying that the representations and warranties made by Transferor Parties in this Agreement remain true and correct and complete as of the Closing Date as though made on and as of the Closing Date, and that all covenants and agreements of this Agreement required to be performed by the Transferor Parties on or before the Closing Date have been performed.

**(h)**    **Miscellaneous.** Any other documents reasonably required by this Agreement or the Title Company to be delivered by Transferor Parties or their subsidiaries or necessary to implement and effectuate the Closing hereunder.

4.4    **Transferee Parties' Obligations at Closing.** At Closing, Transferee Parties shall, in addition to any other obligations of Transferee Parties as set forth in this Agreement:

**(a)**    **Miscellaneous.** Deliver any other documents reasonably required by this Agreement or the Title Company to be delivered by Transferee Parties. or necessary to implement and effectuate the Closing hereunder, including a closing statement and documents, consents and approvals from Transferee Parties, all of which shall be in form and substance consistent with the terms and conditions of this Agreement and otherwise reasonably acceptable to Transferor Parties and the Title Company and, where appropriate, shall be duly executed and acknowledged by Transferee Parties and in recordable form.

**(b)**    **Assignment of Contracts.** Execute and deliver to Transferor Parties the Assignment of Contracts.

**(c)**    **Assignment and Assumption of Licenses and Permits.** Execute and deliver to Transferor Parties the Assignment and Assumption of Licenses and Permits.

**(d)**    **Bring-Down Certificate.** Execute and deliver to Transferor Parties (i) a certificate signed by a principal of each Transferee Party certifying that the representations and warranties made by such Transferee Party in this Agreement remain true and correct and complete as of the Closing Date as though made on and as of the Closing Date, and that all covenants and agreements of this Agreement required to be performed by such Transferee Party on or before the Closing Date have been performed and (ii) a resolution (adopted in accordance with the procedures of the operating agreement governing such Transferee Party) that authorizes the transactions contemplated by this Agreement and certifies to the signatures and incumbency of the principal signing the Transaction Documents on behalf of such Transferee Party, in form and substance to the satisfaction of the Transferor Parties.

**(e)**    **Payment to Transferor Parties.** Payment to Grace pursuant to Section 3.1, in immediately available funds by wire transfer to an account specified by Transferor Parties by notice to Transferee Parties at least three business days prior to the Closing Date.

**(f)**    **Mortgages.** Execute and deliver to Transferor Parties mortgages or deeds of trust with respect to the Atlanta, Fort Pierce, and Wobum Properties by the respective

Transferee Parties thereof in form and substance reasonably satisfactory to Transferor Parties and Transferee Parties, securing Transferee Parties' obligations under this Agreement.

4.5 **Other Matters.**

**(a)    Taxes.** At or before the Closing, Grace shall pay all ad valorem taxes assessed with respect to the real property and personal property and equipment comprising the Properties for the calendar years prior to the then current tax period. If taxes have not yet been paid for such tax period for any of the Properties, Grace shall pay to ELT at Closing, on account of the ad valorem taxes assessed with respect to the affected Properties and attributable to the period from the beginning of such tax period to the Closing Date, a prorated sum equal to the total such taxes for such tax period multiplied by a fraction whose numerator is the number of day from the beginning of such tax period to the Closing Date, and whose denominator is the total number of days in such tax period. If taxes have been paid for such tax period for any of the Properties, ELT shall pay to Grace at Closing, on account of the ad valorem taxes assessed with respect to the affected Properties and attributable to the period from the Closing Date to the end of such tax period, a prorated sum equal to the total such taxes for such tax period multiplied by a fraction whose numerator is the number of days from the Closing Date through the end of such tax period, and whose denominator is the total number of days in such tax period. If the final tax bills for the tax are not available at the Closing, such prorated payment shall be calculated based on the most current and reliable information available (such as a preliminary tax bill for 2008 or the final tax bill for 2007), and such calculation shall be reapportioned among the Parties based upon such final bill. Such reapportionment shall occur within one year of the Closing Date.

**(b)    Title and Survey.** Transferor Parties have provided Transferee Parties with surveys of all of the Properties in Transferor Parties' possession except for the Property located in Waterloo, New York, the receipt of which Transferee Parties waive. Transferor Parties, at their sole cost and expense, have obtained a commitment for title insurance with respect to each of the Properties (collectively, the **"Title Commitment"**), and have provided the Title Commitment and true and correct copies of all exception documents named therein for the Properties to Transferee Parties. Transferee Parties do not object to any exceptions to title as set forth in the Title Commitment, and these exceptions shall be **"Permitted Title Exceptions"** hereunder. Transferee Parties may, but are not obligated to, obtain a new or updated title commitment and/or survey at Transferee Parties' sole cost and expense; provided, that if any additional exceptions show up in addition to the Permitted Title Exceptions, Transferor Parties will cure such exceptions prior to Closing. Transferee Parties shall obtain any desired title insurance at their own cost and shall take title to the Properties subject to the Permitted Title Exceptions.

**(c)    Expenses.** At the Closing, (i) Grace shall be responsible to pay for all expenses in connection with the payment of any Monetary Liens and any recording costs to release any Monetary Liens, any transfer tax, deed stamp tax or the like, Grace's attorneys' fees, and any cost charged by the Title Company to prepare the Title Commitment, the closing fees charged by the Title Company, and the recording fee for the deeds, and (ii) Transferee Parties shall be responsible to pay for the premium for the Transferee Parties' owner's policy of title insurance (including endorsements thereto), Transferee Parties' attorneys' fees and Transferee Parties' expenses for tests and inspections.

**(d)    Fees and Costs.** All utility charges, assessments, annual permit or inspection fees, and all other expenses normal to the operation and maintenance of the Properties due and payable with respect to the Properties will be prorated as of the Closing Date. All

charges and payments made or received with respect to any of the Licenses and Permits shall be prorated as of the Closing Date.

        **(e)**    **Rental.**  Rents (including any items of additional rent, such as real estate taxes) collected by Grace for the month in which Closing occurs shall be prorated as of the Closing Date. Any rents billed but unpaid for any period prior to Closing shall be paid or credited to Grace. Any rents billed and paid for any period after Closing shall be paid or credited to Transferee Parties except as set forth in **Exhibit B.**  Transferee Parties shall reasonably cooperate with Grace to collect any past due rents.

        **(f)**    **Miscellaneous.**  Any closing costs or expenses not specifically addressed in this Section 4.5 or elsewhere in this Agreement shall be allocated or prorated between Grace and ELT in accordance with local conveyancing customs and practices.

## 5.    RELEASE AND INDEMNIFICATION.

    5.1    **Costs.**  As used in this Agreement, "**Costs**" means all Liabilities, claims (including claims by (a) adjacent or non-adjacent property owners or any other third party for contribution, Bodily Injury or Property Damage or (b) any Governmental Authority, including the EPA or state environmental agencies and any successor agencies), demands, actions, administrative proceedings (whether formal or informal proceedings, including any citation, directive, order or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties (including the cost of any Clean-Up required under any federal, state or local laws, ordinances or regulations, or under any existing or future reported decision of a federal, state or local court), liabilities (including sums paid in settlements of claims), compensation, debts, costs and expenses (including without limitation attorneys' fees and expenses, consultants fees, and expert fees), that arise directly or indirectly from, out of, or in connection with:

        (i)    the Assumed Obligations;

        (ii)    any actual, alleged or suspected Pre-Existing Pollution Conditions or New Pollution Conditions, or

        (iii)    any activities, acts or omissions, including performance or failure to perform the Assumed Obligations, breach of this Agreement or non-compliance with laws, of or by Transferee Parties, or Transferee Parties' employees, officers, consultants, contractors, subcontractors or other agents or representatives, whether prior to or after the Closing Date, including mechanics' liens, damage to the Properties, or injury or death or damage to persons or property.

    5.2    **Release by Transferee Parties.**  Transferee Parties jointly and severally, for themselves and their respective Affiliates, members, directors, officers, shareholders, managers, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns, do hereby completely and irrevocably release and forever discharge Transferor Parties and Transferor Parties' Affiliates, and their respective managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and the respective heirs, successors and assigns of any of the foregoing (collectively with Transferor Parties, the **"Transferor Group"**) from any and all past, current, future and contingent Costs of any and every kind and nature, whether currently known or unknown, including any Costs arising under CERCLA, excepting only the Excluded Matters and

obligations of Transferor Parties under this Agreement, including any claims sounding in tort, negligence, contract, environmental, statutory or equitable liability or otherwise, relating to the Properties, including actual, alleged or suspected Pollution Conditions and Costs resulting from or by reason of any conduct, cause or course of action whatsoever which has been done or omitted by Transferor Parties. The foregoing release and discharge includes all known, unknown, unforeseen, unanticipated and unexpected Costs and the consequences thereof, as well as any now in existence.

     5.3    **Indemnification by Transferee Parties.** Transferee Parties jointly and severally shall be responsible for, and shall indemnify, protect, defend and hold harmless Transferor Parties (and Transferor Parties' Affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns (collectively with Transferor Parties, the **"Transferor Indemnitees"**)) from and against any and all Costs. The foregoing indemnification shall not apply to any Excluded Matters.

     5.4    **Indemnification by Transferor Parties for Excluded Matters.** Transferor Parties jointly and severally shall be responsible for, and shall indemnify, protect, defend and hold harmless Transferee Parties (and Transferee Parties' Affiliates, managers, members, directors, officers, shareholders, employees, trustees, beneficiaries, agents, attorneys, representatives and contractors, and their respective successors and assigns (collectively with Transferee Parties, the **"Transferee Group"**)) from and against any and all Liabilities arising from or out of or resulting from any of the Excluded Matters, Liabilities arising from or out of or resulting from claims, demands, actions, administrative proceedings (whether formal or informal proceedings, including any citation, directive, order or investigation), judgments, losses, damages, punitive damages, penalties, fines, stipulated penalties, liabilities (including sums paid in settlements of claims), compensation, debts, costs and expenses (including attorneys' fees and expenses, consultants fees, and expert fees), to the extent that they arise directly or indirectly from, out of, or in connection with the Excluded Matters.

### 6.    **PROPERTIES AND DEED RESTRICTIONS.**

     6.1    Transferee Parties acknowledge that during the Due Diligence Period they had access to environmental and real estate records for the Properties and the right to enter the Properties to make such independent investigation of the Properties as Transferee Parties deemed appropriate in connection with Transferee Parties' acquisition and intended use of the Properties.

     6.2    Except as specifically set forth in this Agreement, the Properties are being acquired by Transferee Parties on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis. TRANSFEREE PARTIES ACKNOWLEDGE AND AGREE THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE TRANSFER PROVIDED FOR HEREIN IS MADE WITHOUT ANY WARRANTY BY TRANSFEROR PARTIES AS TO THE NATURE OR QUALITY OF THE PROPERTIES, INCLUDING LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION; THE PRESENCE OR SUSPECTED PRESENCE OF HAZARDOUS WASTE OR SUBSTANCES ON, ABOUT, OR UNDER THE PROPERTIES OR THE IMPROVEMENTS; THE PRIOR HISTORY OF OR ACTIVITIES ON THE PROPERTIES; THE TRUTH ACCURACY OR COMPLETENESS OF THE PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF TRANSFEROR PARTIES TO TRANSFEREE PARTIES;

     **14**

THE DEVELOPMENT POTENTIAL OF THE PROPERTIES, INCLUDING HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE; THE QUALITY OF LABOR AND/OR MATERIALS INCLUDED IN ANY OF THE IMPROVEMENTS; VALUATION OF THE PROPERTIES; UTILITIES; THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTIES; THE TAX CONSEQUENCES OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT; OR ANY OTHER MATTER OR THING REGARDING THE PROPERTIES.

6.3     The deed for each Property shall include the following conditions running with the land prohibiting one or more of the following ("**Deed Restrictions**"):

> 6.3.1   Sale, lease, rental or use of the Properties for the treatment, storage or disposal of hazardous waste;

> 6.3.2   Any use prohibited from time to time by Governmental Authorities relating to the Clean-up; and

> 6.3.3   Any use set forth as a Deed Restriction in **Exhibit B**.

6.4     The deed shall reserve to the Transferor Parties of the respective Properties (or any successors or assigns) the right, but not the obligation, to reenter and terminate the estate granted to Transferee Parties (or any successor in title or interest to the Transferee Parties), without obligation to reimburse Transferee Parties (or any such successor) for any improvements made or other costs incurred, upon the occurrence of either of the following events:   (i) a Governmental Authority has notified any Transferee Party or Transferor Party, or any other entity, of Transferee Parties', or their successors' or assigns', failure to perform Clean-Up, and Transferee Parties or their successors or assigns fail to proceed with Clean-Up to the satisfaction of the Governmental Authority, provided, that Transferee Parties or their successors or assigns shall have the right to challenge such Governmental Authority, and if Transferee Parties or their successors or assigns challenge the Governmental Authority in writing within thirty (30) days of receipt of notification from the Governmental Authority of any such failure, Transferor Parties' Right of Reentry shall not begin until the Governmental Authority prevails in a final non-appealable judgment in such dispute or Transferee Parties abandon such dispute or cease to actively pursue it; or (ii) any of the Properties or any portion thereof is sold, leased, rented, or used for a purpose that has been prohibited by a Governmental Authority or any of the foregoing Deed Restrictions (the **"Right of Reentry"**).

6.5     In the event that Transferor Parties or their successors or assigns believe the Right of Reentry can be exercised:

> 6.5.1   Transferor Parties shall notify Transferee Parties of same in writing.

> 6.5.2   Commencing not later than thirty (30) days after receipt of such notice, the Parties shall attempt to resolve the matter between themselves.

> 6.5.3   If the Parties are unable to resolve the matter between them, Transferee Parties and Transferor Parties shall submit the question of whether the event does in fact qualify as one or more conditions of Section 6.4 to a court of competent jurisdiction for declaratory judgment.

> 6.5.4   If the court determines that the event does in fact qualify as one or more conditions of Section 6.4, Transferee shall have thirty (30) days from the

date of the final, nonappealable judgment to cure the violation if such violation can be cured within a 30 day period or such longer time if necessary to cure using Transferee Parties' commercially reasonable efforts, provided Transferee Parties commence cure promptly and prosecute such cure to completion diligently and completely.

6.5.5   If Transferee Parties fail to cure the violation within the cure period, as set forth in the preceding subparagraph, Transferor Parties shall have the right to enforce the Right of Reentry.

6.6     Transferee Parties hereby grant access to inspect the Properties and/or perform Clean-Up to Transferor Parties and their successors and assigns to any of the Properties at which a Governmental Authority has notified Transferee Parties, Transferor Parties, or any other entity of Transferee Parties', or their successors' or assigns', failure to perform Clean-Up, provided, that Transferee Parties or their successors or assigns shall have the right to challenge such Governmental Authority, and if Transferee Parties or their successors or assigns challenge the Governmental Authority in writing within thirty (30) days of receipt of notification from the Governmental Authority of any such failure, Transferor Parties' right to access shall not begin until the Governmental Authority prevails in a final non-appealable judgment in such dispute or Transferee Parties abandon such dispute or cease to actively pursue it (the **"Right of Access"**).

6.7     In any future transfer of any of the Properties, Transferee Parties shall include the Deed Restrictions and Right of Access as provided for herein and shall contractually require such Deed Restrictions and Right of Access to be included in all future deeds. Transferee Parties agree to inform their Affiliates, tenants, successors in title and/or interest, and assigns of their duties thereunder and to require them to bind their subtenants, successors in title and/or interest and assigns accordingly in the language of the successive deeds.

7.      **REMEDIES.**

7.1     **Pre-Closing Default by Transferor Parties.**  In the event that Transferor Parties default in performance of their material obligations under this Agreement prior to Closing, and Transferor Parties fail to cure such default by the Closing Date or fail to consummate this Agreement for any reason except because of Transferee Parties' breaches or defaults or because any of Transferor Parties' conditions to Closing have not been met, Transferee Parties shall be entitled as their sole and exclusive remedies to (i) bring suit for specific performance or (ii) terminate this Agreement.

7.2     **Pre-Closing Default by Transferee Parties.**  In the event that Transferee Parties default in performance of their material obligations under this Agreement prior to Closing and fail to cure such default by the Closing Date or fail to consummate this Agreement for any reason except because of Transferor Parties' breaches or defaults or because any of Transferee Parties' conditions to Closing have not been met, Transferor Parties shall be entitled as their sole and exclusive remedies to (i) bring suit for specific performance or (ii) terminate this Agreement.

7.3     **Post-Closing Default.**  In the event that either the Transferor Parties or the Transferee Parties shall default in the performance of any of their material obligations under the terms of this Agreement after Closing:

7.3.1   The non-defaulting Parties shall notify the defaulting Parties of same in writing.

7.3.2   If the defaulting Party acknowledges default, the defaulting Party shall have thirty (30) days from the date of the notice to cure the default or such longer time if necessary to cure the default provided the defaulting Party commences cure promptly within the thirty (30) day period and prosecutes such cure to completion diligently and completely.

7.3.3   If the defaulting Party denies default or fails to cure the default, the nondefaulting Party may seek to enforce this Agreement by specific performance and shall have the right to cure the default and/or seek damages in addition to all other rights and remedies available at law or in equity.

8.    **COVENANTS, REPRESENTATIONS, AND WARRANTIES OF TRANSFEROR PARTIES.** Transferor Parties covenant, represent and warrant to Transferee Parties as specified in this Section 8 (**"Transferor Parties' Covenants, Representations and Warranties"**).  The representations and warranties shall be considered made as of the date of this Agreement and again as of Closing; provided, however, if Transferor Parties obtain knowledge or notice after the date of this Agreement that any such representation or warranty is untrue or misleading in any material respect, Transferor Parties shall have the right to amend such representation or warranty by giving written notice of such fact or facts to Transferee Parties; whereupon Transferee Parties shall have the right, within five business days after receiving such notice from Transferor Parties, to request Transferor Parties to undertake such actions as are necessary to make the representation or warranty true and correct in all material respects.  If Transferor Parties are unable to do so within thirty (30) days (or such other time as the Parties agree in writing), Transferee Parties may terminate this Agreement by written notice to Transferor Parties.  If Transferee Parties deliver such notice, then this Agreement shall terminate without liability to any of the Parties and shall have no further force or effect.   Transferor Parties' Covenants, Representations and Warranties and Transferor Parties' liability for breach thereof shall survive the Closing for a period of one (1) year and shall not be merged into any deed or other document given at Closing.

8.1    From the Effective Date until Closing, Transferor Parties shall not execute any leases or contracts, or amendments or modifications to any such agreements, affecting the Properties which shall be binding on the Properties or Transferee Parties after Closing without the prior written consent of Transferee Parties.

8.2    From the Effective Date until Closing, Transferor Parties shall maintain the Properties in substantially the same condition existing as of the Effective Date, ordinary wear and tear and casualty excepted, and shall pay on a timely basis all bills and discharge all of Transferor Parties' obligations arising from ownership, operation, management, repair and maintenance of the Properties as payments become due.

8.3    Grace is a corporation, duly organized and in good standing under the laws of the State of Connecticut, and Grace has the corporate power and authority to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Grace has been authorized to do so.

8.4    Guanica-Caribe is a corporation, duly organized and in good standing under the laws of the State of Delaware, and Guanica-Caribe has the corporate power and authority to enter

into and perform this Agreement, and the person who executes this Agreement on behalf of Guanica-Caribe has been authorized to do so.

8.5     Remedium is a corporation, duly organized and in good standing under the laws of the State of Delaware, and Remedium has the corporate power and authority to enter into and perform this Agreement, and the person who executes this Agreement on behalf of Remedium has been authorized to do so.

8.6     Transferor Parties' compliance with or fulfillment of the terms and conditions of this Agreement will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of Transferor Parties' organizational documents or any contract or agreement to which any of Transferor Parties is a party or by which any of Transferor Parties are otherwise bound.

8.7     Grace, Guanica-Caribe and Remedium are debtors in *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court, and their performance of their obligations hereunder requires the approval of the Bankruptcy Court.

8.8     Except as set forth in the documents made available to Transferee Parties by Transferor Parties during the Due Diligence Period, and except as otherwise disclosed in writing by Transferor Parties to Transferee Parties or set forth on **Schedule 8.8**, to Transferor Parties' Knowledge, (a) there are no violations or alleged violations of any federal, state or local law that affect the Properties, and (b) Transferor Parties have not received notice of, and are not aware of, any pending or threatened litigation, suit, administrative proceeding or eminent domain action affecting the Properties or the sale thereof by Transferor Parties.

8.9     To the best of Transferor Parties' Knowledge, except as set forth on **Schedule 8.9**, Transferor Parties hold good and marketable record title to their respective Properties.

8.10     Except for the Permitted Title Exceptions and as set forth in the Assignable Contracts, or as set forth in **Schedule 8.10**, there shall be no tenancies or occupancies affecting the Properties as of Closing.

8.11     As of Closing, except for the Assignable Contracts and any Permitted Title Exceptions, there shall be no Contracts affecting the Properties which will be binding on the Properties after Closing.

8.12     Except as set forth on **Schedule 8.12 or on Exhibit B**, there are, and as of Closing there shall be, no unrecorded Contracts, including rights of first refusal and/or options to purchase, to which Transferor Parties are a party pertaining to or affecting title to, or the sale of, the Properties, or any parts thereof.

8.13     All material environmental reports, assessments, or studies with respect to the Properties in Transferor Parties' possession or control have been made available to Transferee Parties.

8.14     Except as set forth on **Schedule 8.14**, the real estate taxes or assessments for the Properties are not the subject of pending tax appeals.

8.15    Except as set forth in **Schedule 8.15,** any and all charges for material and labor provided to, incorporated in, or affecting the Properties within the twelve (12) months immediately preceding the Effective Date have been paid in full by Transferor Parties, and Transferor Parties have paid or will pay prior to the Closing, in the ordinary course of Transferor Parties' business, all bills and other payments due in connection with the ownership, operation, construction, repair, and maintenance of the Properties.

9.    **COVENANTS, REPRESENTATIONS AND WARRANTIES OF TRANSFEREE PARTIES.** Transferee Parties covenant, represent and warrant to Transferor Parties as specified in this Section 9 ("**Transferee Parties' Covenants, Representations and Warranties**"). The representations and warranties shall be considered made as of the date of this Agreement and again as of Closing; provided, however, if Transferee Parties obtain knowledge or notice after the date Transferee Parties execute this Agreement of any fact or facts which would make any representation or warranty untrue or misleading in any material respect, Transferee Parties shall have the right to amend such representation and warranty by giving written notice of such fact or facts to Transferor Parties; provided, further, that Transferor Parties shall have the right, within five business days after receiving such notice from Transferee Parties, to terminate this Agreement by written notice to Transferee Parties. If Transferor Parties deliver such notice of termination to Transferee Parties, then this Agreement shall terminate without liability to either Party and shall have no further force or effect. Transferee Parties' Covenants, Representations and Warranties and Transferee Parties' liability for breach thereof shall survive Closing for a period of one (1) year and shall not be merged into any deed or other document given at Closing.

9.1    Except as specifically set forth in Transferor Parties' Covenants, Representations and Warranties, Transferee Parties are relying on their own investigation and inspection of the Properties, the Title Commitment, any other reports, inspections or studies obtained by Transferee Parties, all to the extent conducted by Transferee Parties in Transferee Parties' judgment, and the relevant Transferee Parties shall take title to each of the Properties in its AS IS, WHERE IS condition, as of the Closing, based solely on such investigation and inspection. Except as expressly set forth in this Agreement, Transferee Parties understand and agree that Transferor Parties are not making and have not at any time made any warranties or representations of any kind or character, express or implied, with respect to the Properties. Transferee Parties will not rely on, and Transferor Parties are not liable for or bound by, any expressed or implied warranties, guaranties, statements, representations or information pertaining to the Properties except as set forth herein.

9.2    Each of ELT and CDC is a corporation, duly organized and in good standing under the laws of the State of Missouri, and has the authority and capacity to enter into and perform the Transaction Documents to which it is a party, and the person who executes each such Transaction Document on its behalf has been or will be authorized to do so at the time of its execution.

9.3    Each of the other Transferee Parties set forth on **Exhibit A** is a limited liability company, duly organized and in good standing under the laws of the jurisdiction as its jurisdiction of organization, and has the authority and capacity to enter into and perform the Transaction Documents to which it is a party, and the person who executes such Transaction Documents on its behalf has been or will be authorized to do so at the time of its execution. The limited liability companies listed on **Exhibit A** are all Affiliates of ELT and/or CDC.

9.4     The compliance with or fulfillment of the terms and conditions of each of the Transaction Documents to which it is a party by each of the Transferee Parties will not conflict with, violate, constitute a default under, or result in a breach of the terms, conditions, or provisions of any of its organizational documents or any contract or agreement to which it is a party or by which it is otherwise bound.

9.5     To its knowledge, all information provided by Transferee Parties to Transferor Parties, including information in ELT's proposal, which is attached hereto as **Exhibit E**, and information made available to Transferor Parties during the Due Diligence Period, including information and documents regarding Transferee Parties' financial status, is true, complete, and accurate and does not fail to state any fact which would make the information misleading or inaccurate.

9.6     Transferee Parties shall neither encumber nor cause any liens to be created against the Properties in any way, nor record this Agreement or a memorandum hereof, prior to Closing.

9.7     Each of Transferee Parties is, and after giving effect to the transaction contemplated by this Agreement, will be, solvent and is not subject to any voluntary or involuntary proceedings in bankruptcy, reorganization, dissolution or liquidation or to any assignment for the benefit of creditors, and no trustee, receiver or liquidator has been appointed for any of the Transferee Parties or any of their assets or properties.

9.8     Transferee Parties have satisfied themselves as to the nature and location of the Properties and as to the general and local conditions, particularly those bearing upon (i) Pollution Conditions, (ii) Clean-Up requirements, (iii) remediation and disposal requirements, (iv) security requirements, (v) handling and storage of materials, (vi) water, (vii) electric power, (viii) roads, (ix) condition of the ground, (x) the character, quality and quantity of surface and subsurface materials and conditions to be encountered; (xi) applicable laws, including Environmental Laws and the potential for changes to same, and (xii) the presence of threatened or endangered species, archaeological resources, and sensitive ecologic and cultural receptors.

9.9     Transferee Parties have reviewed all records of Transferor Parties and any Governmental Authority concerning the Properties that they deem necessary, and are familiar with the Pollutants, natural resources, and all other relevant conditions at the Properties. Transferee Parties acknowledge that the Properties were formerly used as industrial facilities and Pollution Conditions exist on each Property. Transferee Parties shall assume the risk of all conditions at the Properties, excepting for the Excluded Matters. Transferee Parties shall assume and fully perform and complete all Assumed Obligations for the Properties.

9.10     Transferee Parties have the qualifications, expertise, and experience needed to assume and accomplish all of the Assumed Obligations at the Properties consistent with this Agreement. Transferee Parties shall perform or otherwise supervise the Assumed Obligations in compliance with this Agreement and all applicable federal, state, or local laws, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives, including Environmental Laws, and the standard of care and diligence normally practiced by nationally recognized firms performing services of a similar nature.

9.11     Transferee Parties hold or will obtain all licenses, permits, franchises, approvals, and consents required for the performance of their obligations under this Agreement and for the ownership and operation of the Properties by the Transferee Parties.

9.12    Transferee Parties have the financial resources to execute the Clean-up, and Transferee Parties agree to use such resources as necessary to implement the Clean-up.

9.13    No litigation has been served upon Transferee Parties, nor, to Transferee Parties' knowledge, has been filed or threatened in writing which could now or in the future affect Transferee Parties' ability to consummate the transaction contemplated by this Agreement.

## 10.    CASUALTY AND EMINENT DOMAIN.

10.1    **Casualty.** Risk of loss of the Properties shall be borne by Transferor Parties until Closing. If one or more of the Properties is damaged, altered or destroyed by earthquake, flood, stormwater, sinkhole formation or other such disaster, after the Effective Date and prior to the Closing, Transferor Parties shall immediately notify Transferee Parties in writing of such damage, alteration or destruction and an estimate of the amount and terms of any insurance proceeds available, if any. If such loss occurs at any Property other than the Property located in Atlanta, GA, Closing shall proceed and Transferee Parties shall be entitled to all insurance proceeds, if any, payable to Transferor Parties under all policies insuring the affected Property. If such loss occurs at the Property located in Atlanta, GA, upon receiving such notice from Transferor Parties, (i) Transferee Parties may elect either:  (i) to proceed with the Closing and be entitled to all insurance proceeds, if any, payable to Transferor Parties under all policies insuring the Property; or (ii) to initiate renegotiation of the Contract Price solely to account for the loss at the Property located in Atlanta. Transferee Parties shall give written notice of their election to Transferor Parties within five (5) business days after Transferee Parties receive Transferor Parties' notice of such damage, alteration or destruction and the estimate of the amount of insurance proceeds available. If Transferee Parties elect to renegotiate the Contract Price, such renegotiation shall be conducted promptly. If the Parties are unable to agree upon a renegotiated amount within thirty (30) days after such notice of election to renegotiate is given, or such other time as agreed to by the Parties in writing, either Party may elect to delete the Property located in Atlanta from the transaction and proceed with the Closing with an associated decrease of $789,000 in the amount payable under Section 3.4(a) by Transferee Parties.  In any event of casualty, Closing will be extended as necessary to permit such notices to be given, elections to be made, and/or renegotiation to take place.

10.2    **Eminent Domain.** In the event prior to Closing any portion of one or more of the Properties other than the Property located in Charleston, South Carolina, which sale is governed by Section 3.5, is taken by eminent domain or becomes the subject of eminent domain proceedings threatened by written notice to Transferor Parties or commenced, Transferor Parties shall immediately notify Transferee Parties in writing thereof and provide Transferee Parties with copies of any written communication from any condemning authority. If such proceedings occur or are threatened, Transferee Parties may elect either:  (i) to initiate renegotiation of the Contract Price solely to account for the condemnation of the affected Property with such renegotiation conducted promptly, or (ii) to  proceed with the Closing and be entitled to all payments received from the condemning authority.  Transferee Parties shall give written notice of their election to Transferor Parties within five (5) business days after Transferee Parties receive Transferor Parties' notice of such condemnation proceedings.   If Transferee Parties elect to receive payments from the condemning authority, Transferor Parties shall include Transferee Parties in all negotiations, discussions, or other dispute resolution with the condemning authority including but not limited to those regarding the fair market value of the affected Property.  In the event of a condemnation or taking (i) if the transfer to the condemning authority takes place prior to Closing hereunder, the remainder of the affected Property and all other Properties shall be conveyed to

the Transferee Parties at Closing hereunder; (ii) if the transfer to the condemning authority has not taken place prior to Closing, the entire affected Property and all other Properties shall be conveyed to the Transferee Parties at Closing hereunder; (iii) if Transferor Parties have received payment for such condemnation or taking prior to Closing hereunder, the amount of such payment shall be paid over to Transferee Parties at Closing; (iv) if Transferor Parties have not received such payment at the time of Closing, Transferor Parties shall assign to Transferee Parties all claims and rights to, or arising out of, such taking, including the right to conduct any litigation in respect of such condemnation. If Transferee Parties elect to renegotiate the Contract Price and the parties are unable to agree upon a renegotiated amount within thirty (30) days after such notice of the election to renegotiate is given, or such other time as agreed to by the Parties in writing, either Party may elect to terminate this Agreement by written notice to the other. In any event of eminent domain or condemnation, in which the Agreement is not terminated, Closing will be extended, as necessary, in order to permit such notices to be given, elections to be made, and/or renegotiation to take place.

## 11.    **CLOSING CONDITIONS.**

11.1    Transferee Parties' obligation to consummate the Closing under this Agreement shall be conditioned upon the satisfaction in all material respects of each and all of the following on or before the Closing Date:

11.1.1    Transferee Parties shall have received from Transferor Parties the title commitments committing to insure that (i) fee simple title is vested in Transferor Parties; (ii) title is good and merchantable of record; and (iii) title is free of all liens, encumbrances, easements, restrictions, claims of title, leases, adverse possession, condemnation, and other matters except the Permitted Title Exceptions, Deed Restrictions, Right of Reentry, and Owensboro Right of First Refusal.

11.1.2    Transferee Parties shall have obtained the surveys from Transferor Parties, at Transferor Parties' expense, showing and certifying for each Property except for the Property located in Waterloo, New York, for which Transferee Parties agree no survey is required, to the effect that (i) the boundary lines of the Property close; (ii) no improvements to the Property encroach upon adjoining property and no improvements to adjoining property encroach upon the Property except as set forth on **Exhibit B**; (iii) the boundaries of the Property, as shown on such survey, are consistent with its boundaries as indicated by the description attached as **Exhibit B** to this Agreement; and (iv) the Property has access to a public right of way, either directly or by means of a recorded easement. Transferee Parties acknowledge that the surveys delivered by Transferor Parties as of the date hereof satisfy this condition, except for those matters relating to Fort Pierce, Florida and Joplin, Missouri identified on **Exhibit B** under the heading of "Encroachments and Other Survey Matters" which require modification of the survey and/or title commitment as indicated on said **Exhibit B.**

11.1.3    There shall not be in effect any moratoria or similar impediments to receipt of any development approvals or issuance of permits by any governmental authority exercising authority over the Properties.

11.1.4 Transferor Parties shall be able to convey to Transferee Parties title to the Properties as provided by this Agreement without violating any applicable law governing the subdivision of land and the Properties shall constitute one or more separately subdivided lots or parcels.

11.1.5 All of the documents and other items required to be delivered by Transferor Parties to Transferee Parties at the Closing as provided by this Agreement shall have been delivered in form and substance reasonably satisfactory to Transferee Parties.

11.1.6 Transferor Parties shall have complied with, fulfilled, and performed, in each case in all material respects, each of the covenants, terms, and conditions to be complied with, fulfilled, or performed by Transferor Parties under this Agreement.

11.1.7 All of the representations and warranties made by Transferor Parties in this Agreement shall be true in all material respects as of the Closing Date.

11.2   Transferor Parties' obligation to consummate the Closing under this Agreement shall be conditioned upon the satisfaction in all material respects of each and all of the following on or before the Closing Date:

11.2.1 All of the documents and other items required to be delivered by Transferee Parties to Transferor Parties at the Closing as provided by this Agreement shall have been delivered in form and substance reasonably satisfactory to Transferor Parties.

11.2.2 Transferee Parties shall have complied with, fulfilled, and performed, in each case in all material respects, each of the covenants, terms, and conditions to be complied with, fulfilled, or performed by Transferee Parties under this Agreement.

11.2.3 All of the representations and warranties made by Transferee Parties in this Agreement shall be true in all material respects as of the Closing Date.

11.2.4 This Agreement shall have been approved by order of the Bankruptcy Court.

12.   **EFFECTIVE DATE.** This Agreement will have no effect unless approved by order of the Bankruptcy Court, and the **"Effective Date"** shall be the date on which the Bankruptcy Court enters an order approving this Agreement. If this Agreement is not approved by the Bankruptcy Court within one hundred eighty (180) days after the motion for approval of this Agreement is filed with the Bankruptcy Court, either the Transferor Parties or the Transferee Parties may terminate this Agreement by writing to the others, whereupon this Agreement shall be deemed null and void.

13.   **NOTICES.**   Any notice, request, approval, demand, instruction or other communication to be given to Parties hereunder, except those required to be delivered at Closing, shall be in writing, and shall be conclusively deemed to be delivered when personally delivered or when (a) transmitted by fax to the applicable fax number indicated below followed with mailing by regular United States mail or followed by mailing via overnight courier such as Federal Express,

Airborne, United States Postal Service, United Parcel Service or other national overnight courier service with confirmation of receipt requested; (b) transmitted by e-mail to the applicable e-mail address indicated below followed with mailing by first class United States Postal Service or followed by mailing via overnight courier such as Federal Express, Airborne, United Parcel Service, United States Postal Service or other national overnight courier service with confirmation of receipt requested; (c) deposited for prepaid overnight delivery with an overnight courier such as Federal Express, Airborne, United Parcel Service, United States Postal Service or other national overnight courier service with confirmation of receipt requested; or (d) two (2) business days following being deposited in the U. S. mail, postage prepaid, by regular and certified mail, return receipt requested, and such notices are addressed to the following addresses:

If to Grace or
Guanica-Caribe:      William M. Corcoran
Vice President, Public and Regulatory Affairs
W. R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
410-531-4203 (Phone)/410-531-4233 (Fax)
William.Corcoran@grace.com (E-mail)

And to
W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
ATTENTION: Corporate Secretary

If to Remedium:      M. Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119
(901) 820-2065 (Phone)/901-820-2061 (Fax)
Mitch.Obradovic@grace.com (E-Mail)

If to ELT:      Environmental Liability Transfer, Inc.
Attn:  President
1650 Des Peres Road, Suite 306
St. Louis, Missouri 63131
314-835-1515, (Phone)/ 314-835-1616 (Fax)
Rjostes@eltransfer.com  (E-Mail)

If to CDC:      Commercial Development Company, Inc.
Attn:  General Counsel
1650 Des Peres Road, Suite 303
St. Louis, MO 63131
314-835-1515 (Phone)/314-835-1616 (Fax)
MikeM@cdcco.com  (E-mail)

Notice to any Affiliate of ELT and/or CDC listed on the attached **Exhibit A** shall be deemed to be effectively made by notice to **ELT** or **CDC**.  The Parties may change their respective addresses

and/or fax numbers for the receipt of notices hereunder by giving notice thereof to the other Parties in accordance herewith.

## 14.    **ASSIGNMENT; TRANSFER OF PROPERTIES TO AFFILIATES.**

14.1    Transferee Parties shall not assign their rights, interests, and obligations under this Agreement without the prior, written authorization of Transferor Parties. Such authorization may be denied by Transferor Parties in their sole discretion, except Transferor Parties shall not unreasonably withhold such authorization if Transferee Parties are seeking to assign their rights, interests, and obligations under this Agreement to an Affiliate of Transferee Parties; provided that it will be a condition of any such assignment that the assignee agree, by an agreement satisfactory in form and substance to the Transferor Parties, to be bound by this Agreement and to be deemed a Transferee Party for all purposes of this Agreement. No assignment shall amend, modify, negate or otherwise impair the terms of and Transferor Parties' rights under the assumption of liability set forth in Section 2.1, the indemnification set forth in Section 5.3, or the release set forth in Section 5.2. Any attempted assignment in violation of the preceding provisions of this Section 14.1 shall be void and of no effect.

14.2    Transferor Parties shall not assign their rights, interest, and obligations under this Agreement without the prior, written authorization of Transferee Parties. Such authorization may be denied by Transferee Parties in their sole discretion, except Transferee Parties shall not unreasonably withhold such authorization if Transferor Parties are seeking to assign their rights, interests, and obligations under this Agreement to an Affiliate of Transferor Parties. Any attempted assignment in violation of this Section 14.2 shall be void and of no effect.

14.3    Any Affiliate of any of the Transferee Parties to which any of the Properties is transferred in whole or part shall be required to sign documentation satisfactory in form and substance to the Transferor Parties by which such transferee agrees to become an additional Transferee Party for all purposes of this Agreement. Any attempted transfer in violation of the preceding provisions of this Section 14.3 shall be void and of no effect.

## 15.    **MISCELLANEOUS.**

15.1    **Binding Effect.** This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective heirs, legal representatives, executors, administrators, successors and permitted assigns.

15.2    **Waiver.** No waiver of any provision of this Agreement shall be effective unless such waiver is in writing and signed by the Party against whom enforcement of the same is sought. Failure to enforce any provision of this Agreement or to require at any time performance of any provision hereof shall not be construed to be a waiver of such provision, or to affect the validity of this Agreement or the right of any Party to enforce each and every provision in accordance with the terms hereof. No waiver of any provision of this Agreement shall affect the right of the Parties thereafter to enforce such provision or to exercise any right or remedy available to them in the event of any other default involving such provision or any other provision. Making payment or performing pursuant to this Agreement during the existence of a dispute shall not be deemed to be and shall not constitute a waiver of any claims or defenses of the Party so paying or performing.

15.3    **Exhibits/Headings/Time Periods.**  Any reference herein to any exhibits, addenda or attachments refers to the applicable exhibit, addendum or attachment that is attached to this Agreement, and all such exhibits, addenda or attachments shall constitute a part of this Agreement and are expressly made a part hereof.  Headings as to the contents of particular exhibits, articles or sections of this Agreement are for convenience only and are in no way to be construed as part of this Agreement or as a limitations of the scope of the particular exhibits, articles, and sections to which they refer.  If any date, time period or deadline hereunder falls on a weekend, a state or federal holiday, or any other day on which Title Company or the governmental office for the recordation of the deed is not open for business, then such date shall be extended to the next occurring business day.

15.4    **Counterparts.**  This Agreement may be executed in any number of counterparts each of which may be executed by one or more of the Parties.  Each of such counterparts shall, for all purposes, be deemed to be an original.  Facsimile signatures shall have the same force and effect as executed originals.  All such counterparts taken together shall comprise a single agreement.

15.5    **Governing Law.**    This Agreement shall be governed by, and construed in accordance with the law of the State of Delaware, without regard to its conflicts of laws rules or principles.

15.6    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties, and there are no other covenants, agreements, promises, terms and provisions, conditions, undertakings or understandings, either oral or written, between them concerning the Properties other than those herein set forth.  No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon the Parties unless in writing and signed by all the Parties.

15.7    **Broker's Commissions.**  The Parties hereby represent and warrant to each other that, in connection with this Agreement, no third-party broker or finder has been engaged or consulted by such Party or through such Party's actions (or claiming through such Party) or is entitled to commission as a consequence of this transaction, except Cushman & Wakefield, who shall be paid a commission at Closing by the Transferor Parties solely with respect to the Woburn Property.    Each Party hereby indemnifies, defends and holds the other Parties harmless from and against any and all claims of other brokers, finders, or the like, and against the claims of all other third parties claiming any right to commission or compensation by or through the acts of such Party or such Party's partners, agents, or Affiliates in connection with this Agreement.

15.8    **Notice of Competing Bid.**  Transferor Parties shall provide notice to Transferee Parties of the receipt by Transferor Parties of any proposal or offer from any party with respect to a transaction that is substantially equivalent to the transaction contemplated by this Agreement or that otherwise constitutes a competing, substitute or alternative transaction (a "**Competing Bid**").

15.9    **Expense Reimbursement.**  Subject to approval of the Bankruptcy Court, if a Competing Bid is submitted and approved by order of the Bankruptcy Court and Transferee Parties are not in breach under this Agreement, Transferee Parties' reasonable out-of-pocket costs and expenses shall be reimbursed (inclusive of Transferee Parties' reasonable attorneys' fees and costs).  For each cost with respect to which Transferee Parties seek reimbursement, Transferee Parties shall identify (1) the payee, (2) the date incurred, (3) the amount, (4) a

description of the expense incurred sufficient to reasonably enable the identification of the nature and purpose of the cost and its relation to the subject transaction, and (5) proof of payment. The expense reimbursement shall be payable within thirty (30) days after the later of the date of closing of the sale to a third party or receipt of documentation from Transferee Parties documenting costs sought to be reimbursed.

15.10 **Survival**.   Except as otherwise explicitly provided in this Agreement, the representations, warranties and covenants set forth in this Agreement shall survive the Closing and shall not be merged into the deed or any document given at the Closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**W. R. GRACE & CO. – CONN.**
**a Connecticut corporation**

By: _____
Name: WILLIAM M. CORCORAN
Title: VICE PRESIDENT

**GUANICA-CARIBE LAND**
**DEVELOPMENT CORPORATION**
**a Delaware corporation**

By: _____
Name: MARK A. SHELNITZ
Title: Vice President AND ASSISTANT
                                    SECRETARY

**REMEDIUM GROUP, INC.**
**a Delaware corporation**

By: _____
Name: WILLIAM M. CORCORAN
Title: PRESIDENT

**ENVIRONMENTAL LIABILITY TRANSFER, INC.**
**a Missouri corporation**

By: _____
Name:
Principal

**COMMERCIAL DEVELOPMENT COMPANY, INC.**
**a Missouri corporation**

By: _____
Name:
Principal

**AUTOMATED SYSTEMS GROUP, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:
Principal

**ELT-MARIETTA, OHIO, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:
Principal

52657

27

description of the expense incurred sufficient to reasonably enable the identification of the nature and purpose of the cost and its relation to the subject transaction, and (5) proof of payment. The expense reimbursement shall be payable within thirty (30) days after the later of the date of closing of the sale to a third party or receipt of documentation from Transferee Parties documenting costs sought to be reimbursed.

15.10 **Survival.** Except as otherwise explicitly provided in this Agreement, the representations, warranties and covenants set forth in this Agreement shall survive the Closing and shall not be merged into the deed or any document given at the Closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**W. R. GRACE & CO. – CONN.**
**a Connecticut corporation**

By:_____
Name:
Title:

**GUANICA-CARIBE LAND**
**DEVELOPMENT CORPORATION**
**a Delaware corporation**

By:

_____
Name:
Title:

**REMEDIUM GROUP, INC.**
**a Delaware corporation**

By:

_____
Name:
Title:

**ENVIRONMENTAL LIABILITY TRANSFER, INC.**
**a Missouri corporation**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

**COMMERCIAL DEVELOPMENT COMPANY, INC.**
**a Missouri corporation**

By: _____
Name:    THOMAS E. ROBERTS
~~Principal~~    PRESIDENT

**AUTOMATED SYSTEMS GROUP, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

**ELT-MARIETTA, OHIO, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:    THOMAS E. ROBERTS
Principal    MEMBER

**HAGERSTOWN, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:      THOMAS E. ROBERTS
Principal          MEMBER

**ILLINOIS COAL MINE, LLC**
**a Missouri limited liability company**

By: _____
Name:      THOMAS E. ROBERTS
Principal          MEMBER

**TRADESMAN, L.L.C.**
**a Missouri limited liability company**

By: _____
Name:      THOMAS E. ROBERTS
Principal          MEMBER

**WEST VIRGINIA COAL MINE, LLC**
**a Missouri limited liability company**

By: _____
Name:      THOMAS E. ROBERTS
Principal          MEMBER