CHARLESTON, SC

LEGAL DESCRIPTION
TRACT A

      ALL THAT CERTAIN PIECE, PARCEL OR TRACT OF LAND SITUATE, LYING AND BEING IN THE CITY OF CHARLESTON, CHARLESTON COUNTY, SOUTH CAROLINA DESIGNATED AS TRACT A ON AN ALTA/ACSM LAND TITLE SURVEY BY THOMAS V. BESSENT, PLS DATED SEPTEMBER 21, 2007 MORE PARTICULARLY DESCRIBED WITH RESPECT TO SAID SURVEY AS FOLLOWS:

      BEGINNING AT A 5/8" REBAR AT THE INTERSECTION OF THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD AND THE NORTHERLY RIGHT—OF—WAY LINE OF HERBERT STREET (S—10—132), BEING THE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE WESTERLY ALONG SAID NORTHERLY RIGHT—OF—WAY S70°09'03"W 894.69' TO A 5/8" REBAR AT THE SOUTHEASTERLY CORNER OF PROPERTY OF J. ROY GIBSON; THENCE ALONG SAID PROPERTY N15°25'57"W 331.00' TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY S72°08'43"W 252.28 TO A 3/4" IRON PIPE; THENCE ALONG THE EASTERLY RIGHT—OF—WAY LINE OF HARMON STREET (S—10—293) THE FOLLOWING THREE COURSES AND DISTANCES; N 15°58'17" W 110.19' TO A RAILROAD SPIKE; S73°59'34"W 19.96' TO A RAILROAD SPIKE; N15°53'46"W 362.78' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF CHARLESTON CONSTRUCTORS INC. N69°08'45"E 272.42 TO A 5/8" REBAR; THENCE CONTINUING ALONG SAID PROPERTY N24°47'39"W 136.84' TO A 5/8" REBAR; THENCE ALONG PROPERTY OF C AND A RENTALS LLC N68°43'44"E 353.25' TO A 1" IRON PIPE; THENCE ALONG THE SOUTHWESTERLY RIGHT—OF—WAY LINE OF SEABOARD COASTLINE RAILROAD S47°05'00"E 1081.79' TO A 5/8" REBAR BEING THE POINT OF BEGINNING OF THIS DESCRIPTION;

      CONTAINED WITHIN SAID BOUNDS 16.466 ACRES.

Title No.:  430703201

**FT. PIERCE, FL**

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

PARCEL A:

That part of the Northeast quarter of the Southeast quarter of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, bounded as follows:

On the East by the west right of way line of the Florida East Coast Railway Company; on the West by the West boundary of the Northeast quarter of the Southeast quarter of said Section 33; on the North by a line parallel to and 91.4 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of said Section 33; on the South by a line parallel to and 424.6 feet southerly from, measured at right angles, the North line of the Northeast quarter of the Southeast quarter of Section 33.

PARCEL B:

Parcel 1:

To locate point of beginning, commence on the West bank of the Indian River at a stake marking the Northeast corner of the South 1/3 of Lot 1 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida; from this stake run due South 2 chains and 9 links and set a stake; thence run West parallel with the land line to the West line of the Dixie Highway so-called, which is the point of beginning of the tract herein described; thence continue on said line from the point of beginning to a point which is 22 chains and 50 links West of the second stake mentioned in this description; run thence North 2 chains 9 links to a stake; run thence West to the subdivision line between the East and West halves of Section 33, run thence South along said subdivision line to the center of Section 33; run thence East 20 chains more or less to the line dividing Lots 3 and 4 of Section 33; run thence South parallel with the land lines to a point due West of the Southwest corner of the land formerly owned by John L. Howard; being the Southwest corner of the Howard fence; also being the Southwest corner of the land described as Lot 1 and the North 2 acres of Lot 2 in Section 34, Township 34 South, Range 40 East; proceed thence South 2 chains 9 links; run thence East parallel with the land lines to the West line of the Dixie Highway so-called; thence Northerly along the West boundary line of the Dixie Highway to the point of beginning;

EXCEPTING, from the foregoing Parcel B Parcel 1 description the following three parcels, to-wit:

A.  That parcel conveyed from the Robbins & Graham Company to the Indian River Guano Company, said conveyance being recorded in Deed Book 97, page 327, in the office of the Clerk of the Circuit Court of St. Lucie County, Florida, more particularly described as follows:
Starting at a rock monument at the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East; run thence South on the lot line dividing Government Lots 3 and 4 of said section, a distance of 91.4 feet to an Iron Pipe Monument which is the point of beginning of the tract of land hereby conveyed.  From said point of beginning, continue South along said lot line a distance of 333.2 feet to a rock monument on the South line of a certain tract of land described in a deed from F.D. Reynolds et al, to East Coast Lumber and Supply Company, which deed is recorded in Deed Book 80, page 12, of the Public Records of St. Lucie County, Florida; thence run east along the south line of the tract of land conveyed by said deed a distance of 1009 feet to a pipe monument, which is the Southeast corner of the tract of land conveyed by said deed from Reynolds to East Coast Lumber and Supply Company and which point is located on the west line of the right of way of the Old Dixie Highway and now known as State Road #140; thence run northerly along the west line of said State Road #140 a distance of 355.4 feet to a pipe monument; thence run west parallel with the lot line to the point of beginning.

B.  That parcel conveyed from East Coast Lumber and Supply Company to Antonio M. Peres, et ux, said conveyance being recorded in Deed Book 136, page 261, of the Public Records of St. Lucie County, Florida, as amended by that conveyance from the aforesaid grantor to the aforesaid grantees, said amended conveyance being recorded in Deed Book 149, page 3, of the Public Records of St. Lucie County, Florida, said amended conveyance being more particularly described as follows:  From a conquina rock at Northwest corner of the NW

ALTA Commitment -1966

1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run north on the quarter line for a distance of 1735.9 feet from coquina rock, run thence East for a distance of 588 feet to center line of the present New Dixie Highway, being 66 feet wide and known as State Road #5 (formerly #4) and U.S. Highway #1, run thence southeasterly with the center line of said present Dixie Highway for a distance of 1832.8 feet to a point which is the center of said present Dixie Highway, said point being 109.8 feet west of the northwest corner of the NE 1/4 of SE 1/4 of said Section 33, Township 34 South, Range 40 East, run thence West 1204.2 feet to the point of beginning.

C. That parcel conveyed from East Coast Lumber and Supply Company, to G. Bloodworth, J. Logan Bloodworth, G. Ernest Bloodworth, partners, operating and doing business as Cherokee Products Company, said conveyance being recorded in Deed Book 117, page 150, of the Public Records of St. Lucie County, Florida, said land being described as follows:
From a coquina rock at NW corner of NW 1/4 of SE 1/4 run north on 1/4 line for a distance of 1735.9 feet to coquina rock; run thence east for a distance of 588.0 feet to center line of new Dixie Highway for point of beginning; from point of beginning run east 433.3 feet to a monument, run thence 137.95 feet to a coquina rock, run thence east 591.5 feet to a concrete monument, which is 33 feet west of center line of Old Dixie Highway, run thence in a southeasterly direction paralleling the center line of Old Dixie Highway and being 33 feet west of center for a distance of 984.0 feet to a point, thence run north 89 degrees 30 minutes west 950.0 feet to center of New Dixie Highway, run thence in a northwesterly direction with center line of New Dixie Highway for a distance of 1127.8 feet to point of beginning.

Parcel 2:

From the Northwest corner of the NE 1/4 of the SE 1/4 of Section 33, Township 34 South, Range 40 East, run South 91.4 feet to a pipe; run thence South 89 degrees and 30 minutes East for a distance of 901.8 feet to a point in the center of the Old Dixie Highway for the point of beginning. From this point of beginning run North 19 degrees and 38 minutes west following the center of Old Dixie Highway for a distance of 800 feet to a point; run thence South 89 degrees and 30 minutes east for a distance of 96 feet to the west line of the right of way of the Florida East Coast Railway; run thence South 20 degrees and 14 minutes East along the west line of the right of way of the said Florida East Coast Railway 803.5 feet to a point; run thence North 89 degrees and 30 minutes west for a distance of 105.4 feet to the point of beginning; said land lying and being in St. Lucie County, Florida.

LESS AND EXCEPTING from the foregoing Parcel B Parcel 2 description the following 2 parcels, to-wit:

A. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company, on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way), on the North by a Westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:
Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.
On the South by a line that is 60 feet south of and parallel to the aforementioned North line.

B. That part of the Southeast quarter of the Northeast quarter of Section 33, Township 34 South, Range 40 East, bounded as follows:

On the East by the West right-of-way line of the Florida East Coast Railway Company; on the West by the East right-of-way line of Old Dixie Highway (a 30 foot right-of-way); on the South by a westerly extension of that line being the north line of that parcel described as Parcel III, as recorded in Official Records Book 638, page 2486, of the Public Records of St. Lucie County, Florida, being more particularly described as follows: Commencing at the Southeast corner of the Northeast 1/4 of Section 33, Township 34 South, Range 40 East, Public Records of St. Lucie County, Florida, run thence North along the East section line 500 feet, more or less, to the South line of property formerly owned by Maule Industries; turn thence and run West along said South line 425 feet, more or less, to the East line of the Florida East Coast Railway Company right-of-way; turn thence and run Southerly

along said right-of-way line 530 feet, more or less, to the South line of the Northeast 1/4 of said Section 33; thence turn and run East along said South line to the Point of Beginning.

On the North by a line that is 202.06 feet North (as measured along the West right of way line of the Florida East Coast Railway) of the South line and that is 201.62 feet North (as measured along the East right of way line of Old Dixie Highway) on the South line.

**GUANICA, PUERTO RICO**

The land referred to in the Commitment is located at the Carenero Ward of the Municipality of Guánica, Puerto Rico, identified for purposes of recordation as Parcel Number 428, recorded at folio 207, volume 15 of Guánica, Registry of Property of Puerto Rico, Section of San Germán.

## LEGAL DESCRIPTION PARCEL NO. 428

BEGINNING AT POINT 1 LOCATED AT THE CORNER OF THE PROPERTY; THENCE N49°56'23"E, IN A DISTANCE OF 91.87M TO POINT 2, IN BOUNDARY WITH P.R.I.D.C.O.; THENCE S71°03'06"E, IN A DISTANCE OF 548.53M TO POINT 3, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S03°35'39"W, IN A DISTANCE OF 197.24M TO POINT 4, IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N86°24'21"W, IN A DISTANCE OF 67.68M TO POINT 5, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 62.20M TO POINT 6, IN BOUNDARY WITH P.R.E.P.A.; THENCE S88°24'21"E, IN A DISTANCE OF 67.68M TO POINT 7, IN BOUNDARY WITH P.R.E.P.A.; THENCE S03°35'39"W, IN A DISTANCE OF 258.73M TO POINT 8,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE S83°17'19"W, IN A DISTANCE OF 649.10M TO POINT 9,IN BOUNDARY WITH INSULAR FOREST RESERVATION OF THE COMMONWEALTH OF PUERTO RICO; THENCE N13°20'07"E, IN A DISTANCE OF 102.27M TO POINT 10,IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE S82°40'36"W, IN A DISTANCE OF 99.23M TO POINT 11, IN BOUNDARY WITH GUANICA CARIBE LAND DEVELOPMENT CORP.; THENCE N13°04'32"E, IN A DISTANCE OF 20.61M TO POINT 12, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°17'38"E, IN A DISTANCE OF 16.65M TO POINT 13, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N15°46'05"E, IN A DISTANCE OF 20.03M TO POINT 14, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°56'19"E, IN A DISTANCE OF 19.33M TO POINT 15, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°25'40"E, IN A DISTANCE OF 42.02M TO POINT 16, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°44'37"E, IN A DISTANCE OF 29.95M TO POINT 17, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°23'39"E, IN A DISTANCE OF 33.09M TO POINT 18, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°11'09"E, IN A DISTANCE OF 34.23M TO POINT 19,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°59'50"E, IN A DISTANCE OF 15.24M TO POINT 20, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°57'54"E, IN A DISTANCE OF 22.77M TO POINT 21, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N16°50'56"E, IN A DISTANCE OF 42.36M TO POINT 22, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°08'55"E, IN A DISTANCE OF 11.55M TO POINT 23, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'13"E, IN A DISTANCE OF 35.11M TO POINT 24, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°48'08"E, IN A DISTANCE OF 44.92M TO POINT 25, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°33'45"E, IN A DISTANCE OF 39.61M TO POINT 26, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°58'28"E, IN A DISTANCE OF 31.63M TO POINT 27, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°27'28"E, IN A DISTANCE OF 39.03M TO POINT 28, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N17°31'19"E, IN A DISTANCE OF 33.35M TO POINT 29, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N14°49'04"E, IN A DISTANCE OF 26.27M TO POINT 30, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N10°22'19"E, IN A DISTANCE OF 20.95M TO POINT 31, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N03°55'08"E, IN A DISTANCE OF 34.59M TO POINT 32,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N02°25'47"W, IN A DISTANCE OF 20.56M TO POINT 33, IN BOUNDARY WITH STATE ROAD P.R. NO. 333; THENCE N08°17'03"W, IN A DISTANCE OF 15.21M TO POINT 1,IN BOUNDARY WITH STATE ROAD P.R. NO. 333; WICH IS THE POINT OF BEGINNING, HAVING AN AREA OF 418348.5403 SQ. MTS. 106.4393 CUERDAS

JOPLIN, MO

Issued By:
**Chicago Title Insurance Company**

Schedule A (continued)

Order No: | 020072997

5. THE LAND REFERRED TO IN THIS COMMITMENT IS DESCRIBED AS FOLLOWS (continued):

A tract of land in the North half of the fractional Section 2, Township 27 North, Range 32 West, Jasper County, Missouri, being more particularly described as follows:

Commencing at an iron pin found at the NW corner of Section 2, Township 27 North, Range 32 West, Jasper County, Missouri; thence North 88 degrees 52 minutes 43 seconds East, 1309.54 feet along the North line of Section 2; thence South 00 degrees 23 minutes 28 seconds East, 30.00 feet to a 5/8 inch iron pin set on the North right of way line of a county road at the point of beginning; thence South 00 degrees 23 minutes 28 seconds East, 2526.90 feet to a 5/8 inch iron pin set on the East/West half section line of said section 2; thence North 89 degrees 15 minutes 56 seconds East 2639.57 feet to a 1/2 inch iron pin found at the Southeast corner of the Southeast corner of the West half of Lot One in the Northeast Quarter of Fractional Section 2; thence North 00 degrees 18 minutes 37 seconds West; 1114.44 feet along the East line of the West half of Lot One in the Northeast Quarter of Fractional Section 2 to a 1 1/4 rod; thence North 88 degrees 54 minutes 07 seconds East, 208.71 feet to a set 5/8 inch iron pin; thence North 00 degrees 12 minutes 11 seconds West, 208.71 feet to a found 1/2 inch iron pin on the South line of Lot 2 in the Northeast Quarter of Fractional Section 2; thence North 89 degrees 17 minutes 41 seconds East, 416.80 feet along the South line of said Lot 2 to a set 5/8 inch iron pin; thence North 00 degrees 39 minutes 58 seconds West, 626.19 feet to a set 5/8 inch iron pin; thence North 88 degrees 52 minutes 43 seconds East, 652.94 feet to a 5/8 inch iron pin set on the West right of way line of State Highway "AA"; thence 385.73 feet along the West right of way line of State Highway "AA" on a curve to the left with a radius of 1869.86 feet, a central angle of 11 degrees 49 minutes 09 seconds and a long chord distance of 385.04 feet on a bearing of North 04 degrees 13 minutes 21 seconds West to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 115.60 feet to a set 5/8 inch iron pin; thence South 00 degrees 26 minutes 44 seconds East, 9.00 feet to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 348.00 feet to a set 5/8 inch iron pin; thence North 00 degrees 26 minutes 44 seconds West, 9.00 feet to a set 5/8 inch iron pin; thence South 88 degrees 52 minutes 43 seconds West, 143.33 feet to a set 5/8 inch iron pin; thence North 00 degrees 23 minutes 21 seconds West, 214.00 feet to a 5/8 inch iron pin sest on the South right of way line of a county road; thence South 88 degrees 52 minutes 43 seconds West, 438.00 feet along said right of way to a set 5/8 inch iron pin; thence South 00 degrees 23 minutes 21 seconds East, 596.33 feet to a set 5/8 inch iron pin; thence South 89 degrees 01 minutes 12 seconds West, 194.72 feet to a set 5/8 inch iron pin; thence North 00 degrees 19 minutes 40 seconds West, 595.86 feet to a 5/8 inch iron pin set on the South right of way line of a county road; thence South 88 degrees 52 minutes 43 seconds West, 2652.73 feet along said right of way to the point of beginning, EXCEPT the Missouri Pacific Railroad right of way, and EXCEPT commencing at an iron pin found at the Northwest corner of said Section 2, thence North 88 degrees 52 minutes 43 seconds East, 3921.89 feet along the North line of Section 2, thence South 01 degrees 07 minutes 17 seconds East, 30.00 feet to an iron pin set on the South right of way line of a county road and true point of beginning, thence North 88 degrees 52 minutes 43 seconds East, 40.00 feet along said right of way to an iron pin found at the Northeast corner of the tract, thence South 00 degrees 19 minutes 40 seconds East, 595.86 feet to an iron pin found at the Southeast corner of the tract, thence South 89 degrees 01 minutes 12 seconds West, 40.00 feet to an iron pin set at the Southwest corner of the tract, thence North 00 degrees 19 minutes 40 seconds West, 595.76 feet to the point of beginning.

PROPERTY DESCRIPTION

BEING A SURVEY OF PART OF THE W.R. GRACE & CO. — CONN. PROPERTY
AS RECORDED IN BOOK 5879, PAGE 362 AT THE SHELBY COUNTY
REGISTER'S OFFICE, LOCATED IN SHELBY COUNTY, TENNESSEE AND BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE ARCADIAN FERTILIZER,
L.P. PROPERTY (INSTRUMENT CV—2812), SAID POINT ALSO LIES ON THE
EAST LINE OF OLD MILLINGTON ROAD (60.00 FOOT WIDE PUBLIC RIGHT—OF—
WAY), SAID POINT BEING S19°51'16"W A DISTANCE OF 113.13 FEET
FROM A FOUND IRON PIN AT AN ANGLE POINT ON THE WEST LINE OF THE
SAID ARCADIAN FERTILIZER, L.P. PROPERTY, SAID POINT OF BEGINNING
HAVING A TENNESSEE STATE PLANE COORDINATE OF (N 368278.4240 — E
784168.7474); THENCE S80°11'43"E ALONG A SOUTH LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 634.47 FEET TO A
FOUND ION PIN; THENCE N57°00'54"E AND CONTINUING ALONG A SOUTH
LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF
1004.02 FEET TO A POINT; THENCE S80°44'39"E AND CONTINUING
ALONG A SOUTH LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY
A DISTANCE OF 121.09 FEET TO A POINT; THENCE S9°37'18"W AND
CONTINUING ALONG A SOUTH LINE OF THE SAID ARCADIAN FERTILIZER,
L.P. PROPERTY A DISTANCE OF 642.67 FEET TO A POINT; THENCE
S78°55'12"E AND CONTINUING ALONG A SOUTH LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 113.25 FEET TO A
POINT FOUND IRON PIN; THENCE N10°53'01"E AND CONTINUING ALONG A
SOUTH LINE OF THE SAID ARCADIAN FERTILIZER, L.P. PROPERTY A
DISTANCE OF 51.53 FEET TO A FOUND IRON PIN; THENCE S80°12'56"E
AND CONTINUING ALONG A SOUTH LINE OF THE SAID ARCADIAN
FERTILIZER, L.P. PROPERTY A DISTANCE OF 834.69 FEET TO A FOUND
IRON PIN AT THE SOUTHEAST CORNER OF THE SAID ARCADIAN FERTILIZER,
L.P. PROPERTY; THENCE N8°10'34"E ALONG A EAST LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 869.06 FEET TO A
FOUND IRON PIN; THENCE S80°53'50"E ALONG A EAST LINE OF THE
SAID ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 114.47 FEET
TO A POINT; THENCE N6°54'31"E ALONG A EAST LINE OF THE SAID
ARCADIAN FERTILIZER, L.P. PROPERTY A DISTANCE OF 1069.08 FEET TO
THE NORTHEAST CORNER OF THE SAID ARCADIAN FERTILIZER, L.P.
PROPERTY (N 369854.3035 — E 786956.8820), SAID POINT LIES ON THE
SOUTH LINE OF THE ANNA E. HAYES PROPERTY (PROBATE COURT BOOK 212,
PAGE 330); THENCE S81°16'39"E ALONG THE SOUTH LINE OF THE SAID
HAYES PROPERTY AND ALONG THE SOUTH LINE OF THE MEMPHIS
INTERNATIONAL MOTORSPORTS PARK, INC. PROPERTY (INSTRUMENT Y8—
5194) A DISTANCE OF 2610.19 FEET TO FOUND CONCRETE MONUMENT (N
369458.4672 — E 789536.8870); THENCE S10°22'47"W A DISTANCE OF
165.50 FEET TO A FOUND IRON PIN ON THE NORTHWEST RIGHT—OF—WAY
LINE OF THE ILLINOIS CENTRAL RAILROAD (100.00 FEET NORTHWEST OF
THE CENTERLINE OF THE EASTERN MOST TRACK); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 1499.12 FEET TO A FOUND IRON PIN; THENCE
N40°26'00"W A DISTANCE OF 50.00 FEET TO A POINT ON THE
NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(150.00 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 975.41 FEET TO A POINT; THENCE
S79°56'02"E A DISTANCE OF 64.80 FEET TO A POINT ON THE
NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(100.00 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 1548.26 FEET TO A FOUND IRON PIN; THENCE
S40°26'00"E A DISTANCE OF 17.50 FEET TO A POINT ON THE
NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL RAILROAD
(82.50 FEET NORTHWEST OF SAID CENTERLINE); THENCE S49°34'00"W
ALONG THE NORTHWEST RIGHT—OF—WAY LINE OF THE ILLINOIS CENTRAL
RAILROAD A DISTANCE OF 60.00 FEET TO A POINT (N 366661.1447 — E
786442.1264), SAID POINT BEING THE NORTHEAST CORNER OF THE
RICHARD C. ROWE AND DONNA M. ROWE PROPERTY (INSTRUMENT AZ—6686);
THENCE N79°57'40"W ALONG THE NORTH LINE OF THE SAID ROWE
PROPERTY A DISTANCE OF 2598.79 FEET TO THE NORTHWEST CORNER OF
THE SAID ROWE PROPERTY, SAID POINT ALSO LIES ON THE EAST LINE OF
SAID OLD MILLINGTON ROAD (N 367114.1513 — E 783883.1253); THENCE
N1°02'16"E ALONG THE EAST LINE OF OLD MILLINGTON ROAD A
DISTANCE OF 265.47 FEET TO A FOUND IRON PIN AT A POINT OF
CURVATURE; THENCE CONTINUING ALONG THE EAST LINE OF OLD
MILLINGTON ROAD ALONG A 770.00 FOOT RADIUS CURVE TO THE RIGHT AN
ARC DISTANCE OF 252.88 FEET (CHORD N10°26'46"E 251.74 FEET) TO
A FOUND IRON PIN AT THE POINT OF TANGENCY; THENCE N19°51'16"E
AND CONTINUING ALONG THE EAST LINE OF OLD MILLINGTON ROAD A
DISTANCE OF 692.43 FEET TO THE POINT OF BEGINNING AND CONTAINING
7,917,431 SQUARE FEET, OR 181.759 ACRES.

**OWENSBORO, KY**

RECORD BOUNDARY DESCRIPTION
PER D.B. 722, PG. 745;
P.B. 21, PG. 307 AND 308

TRACT 1 - 9.109 ACRES MORE OR LESS

Being a 9.109 acre, more or less, tract located within the bounds of a 142.94 acre, more or less, tract conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky corporation, by deed dated April 18, 1956, and of record in Deed Book 274, Page 203 and said tract recorded in Plat Book 21, Page 307 and 308 all in the Office of the County Court Clerk of Daviess County, Kentucky and more particularly described as follows:

BEGINNING at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes East along the North right-of-way line of US Highway 60 a distance of 1764.41 feet and North 66 degrees 01 minutes 23 seconds West a distance of 1388.3 feet from the SE corner of the WR Grace 142.94ñ acre tract as recorded in Deed Book 274, Page 203 (at the North right-of-way line of US Highway 60) on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Page 254-259; thence North 66 degrees 01 minutes 23 seconds West a distance of 494.33 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence South 25 degrees 29 minutes 26 seconds West a distance of 139.68 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 25 minutes 06 seconds West a distance of 261.60 feet (measured) to a 5/8-inch rebar with LS Cap 2566 at the top of the bank of the Ohio River; thence, continuing North 64 degrees 25 minutes 06 seconds West a distance of 155.00 feet(calculated) to the low water mark of the Ohio River as referenced in Deed Book 274, Page 203; thence, North 24 degrees 30 minutes 00 seconds East along the low water mark of the Ohio River as referenced in Deed Book 274, Page 203 a distance of 495.73 feet; thence, South 63 degrees 15 minutes 44 seconds East a distance of 106.00 feet (calculated) to a 5/8-inch rebar with LS Cap 2566 being at the top of the bank of the Ohio River; thence, continuing South 63 degrees 15 minutes 44 seconds East a distance of 356.73 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 25 degrees 17 minutes 05 seconds East a distance of 188.91 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 61 degrees 51 minutes 18 seconds East a distance of 10.92 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 26 degrees 19 minutes 22 seconds West a distance of 187.62 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 64 degrees 18 minutes 51 seconds East a distance of 210.14 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, North 26 degrees 40 minutes 14 seconds East a distance of 106.68 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 64 degrees 50 minutes 44 seconds East a distance of 185.92 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 01 degrees 14 minutes 52 seconds West a distance of 96.93 feet (measured) to a 5/8-inch rebar with LS Cap 2566; thence, South 26 degrees 22 minutes 14 seconds West a distance of 353.03 feet (measured) to THE PLACE OF BEGINNING containing 9.109 acres more or less.

OWENSBORO, KY

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

LOT 2 - 8.72 ACRES

More or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR
Grace & Company, a Connecticut Corporation, by Owensboro-Daviess County Industrial
Foundation, Inc., a Kentucky Corp., by deed dated April 18, 1958 and/or recorded in Deed Book
274, Page 203 as recorded in the Office of the County Court Clerk of Daviess County, Kentucky
and being more particularly described as follows:

Beginning at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds
East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page
191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 15 seconds West a distance of
411.14 feet from the SE corner of the WR Grace's 142.94fi acre tract as recorded in Deed Book
274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR
Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Pages 254-
259) being common to the SW corner of Tract 3 as recorded in minor subdivision Plat Book 23,
Page 170-171; thence, North 27 degrees 57 minutes 06 seconds East and along the common line
of said Tract 3 a distance of 1,071.87 feet to a point in Parcel 10D as recorded in Deed Book
623, Page 860 and at a point of a temporary right-of-way as recorded in Deed Book 276, Page 6;
thence, South 64 degrees 10 minutes 56 seconds East along said right-of-way and easement a
distance of 298.90 feet to a point on the north Kentucky DOT right-of-way line as recorded in
Deed Book 623, Page 860; thence, South 25 degrees 46 minutes 26 seconds West (measured)
and South 28 degrees 27 minutes 53 seconds West (record) a distance of 10.90 feet along said
Kentucky DOT right-of-way line; thence, South 64 degrees 13 minutes 34 seconds East
(measured) a distance of 15.00 feet along said Kentucky DOT right-of-way line; thence, South
23 degrees 17 minutes 04 seconds West (measured) and South 25 degrees 58 minutes 31 seconds
West (record) a distance of 230.22 feet (record and measured) along Kentucky DOT right-of-
way line; thence, South 23 degrees 19 minutes 12 seconds West (measured) and South 26
degrees 00 minutes 39 seconds West (record) a distance of 350.32 feet (record and measured)
along said Kentucky DOT right-of-way line; thence, South 25 degrees 46 minutes 26 seconds
West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of
100.00 feet (record and measured) along said Kentucky DOT right-of-way line; thence, South 23
degrees 29 minutes 00 seconds West (measured) and South 26 degrees 10 minutes 27 seconds
West (record) a distance of 250.20 feet (record and measured) along said Kentucky DOT right-
of-way line; thence, South 25 degrees 46 minutes 26 seconds West (measured) and South 28
degrees 27 minutes 53 seconds West (record) a distance of 130.01 feet along said Kentucky DOT
right-of-way line to a point at the NE corner of a 51.49 acre tract; thence, North 64 degrees
12 minutes 15 seconds West a distance of 369.74 feet along the north line of a 51.49 acre
tract to the PLACE OF BEGINNING containing 8.72 acres more or less.

RECORD BOUNDARY DESCRIPTION
PER P.B. 23, PG. 335 AND 336

**OWENSBORO, KY**

LOT 5 – 54.33 ACRES

Being a 54.33 acre tract more or less located within the bounds of a 142.92 acre tract, more or less, conveyed to WR Grace & Company, a Connecticut corporation, by Owensboro-Daviess County Industrial Foundation, Inc., a Kentucky corp., by Deed dated April 18, 1958 and/or recorded in Deed Book 274, Page 203 as recorded in the office of the County Court Clerk of Daviess County, Kentucky and being more particularly described as follows:

Commencing at a 5/8-inch rebar with LS Cap 2566 being North 24 degrees 15 minutes 00 seconds East along the north right-of-way line of US Highway 60 as conveyed in Deed Book 340, Page 191 a distance of 1,067.91 feet and North 64 degrees 12 minutes 15 seconds West a distance of 411.14 feet from the SE corner of the WR Grace's 142.94ñ acre tract as recorded in Deed Book 274, Page 203 (at the north right-of-way line of US Highway 60 on the common line of WR Grace and Owensboro Sand and Gravel Company as recorded in Deed Book 467, Pages 254-259) being common to the SE corner of Tract 3 as recorded in Minor Subdivision Plat Book 23, Page 170-171; thence, North 27 degrees 57 minutes 06 seconds East along the easterly line of said Lot Number 3 a distance of 1,071.87 feet; thence, South 64 degrees 10 minutes 59 seconds East a distance of 298.90 feet to a point on the northeasterly right-of-way line of Kentucky DOT right-of-way take as recorded in Deed Book 623, Page 860; thence, North 25 degrees 46 minutes 26 seconds East continuing along said Kentucky DOT right-of-way line a distance of 82.00 feet to the PLACE OF BEGINNING; thence, North 71 degrees 08 minutes 14 seconds West and along the common line of Lot 4 a distance of 181.63 feet; thence, North 64 degrees 29 minutes 59 seconds West a distance of 630.06 feet along the common line of said Lot 4 to a point on a curve being concave to the southwest through a central angle of 94 degrees 31 minutes 02 seconds with a radius of 58.49 feet through a chord bearing of North 72 degrees 37 minutes 57 seconds West with a chord distance of 85.91 feet with a arc length of 96.49 feet along the common line of said Lot 4; thence, North 64 degrees 58 minutes 58 seconds West a distance of 349.63 feet along the common line of said Lot 4 to a curve being concave to the southwest with a central angle of 45 degrees 07 minutes 26 seconds with a radius of 78.11 feet through a chord bearing of North 87 degrees 32 minutes 41 seconds West with a chord distance of 59.94 feet along the common line of said Lot 4; thence, South 65 degrees 44 minutes 51 seconds West a distance of 70.41 feet to a point on the common line of Lot 1 as recorded in Plat Book 21, Page 307-308; thence, North 01 degrees 14 minutes 52 seconds East a distance of 68.97 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 50 minutes 44 seconds West a distance of 185.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 26 degrees 40 minutes 14 seconds West a distance of 106.68 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 64 degrees 18 minutes 51 seconds West a distance of 210.14 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 26 degrees 19 minutes 22 seconds East a distance of 187.62 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 61 degrees 51 minutes 51 seconds West a distance of 10.92 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, South 25 degrees 17 minutes 05 seconds West a distance of 188.91 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, North 63 degrees 15 minutes 44 seconds West a distance of 356.73 feet along the common line of said Lot 1 to a 5/8-inch rebar with LS Cap 2566; thence, continuing North 63 degrees 15 minutes 44 seconds West a distance of 106.00 feet more or less along the common line of said Lot 1 to the low water mark on the Ohio River; thence, leaving said common line of Lot 1, North 25 degrees 49 minutes 18 seconds East along the low water mark of the Ohio River a distance of 415.62 feet; thence, North 20 degrees 05 minutes 00 seconds East along the low water mark of the Ohio River a distance of 753.00 feet; thence, North 21 degrees 45 minutes 00 seconds East along the low water mark of the Ohio River a distance of 272.74 feet to its point of intersection with the extended centerline of Yellow Creek; thence, North 85 degrees 46 minutes 28 seconds East a distance of 325.94 feet along the meanderings of Yellow Creek; thence, South 70 degrees 03 minutes 14 seconds East a distance of 114.10 feet along the meanderings of Yellow Creek; thence, South 35 degrees 24 minutes 35 seconds East a distance of 80.47 feet along the meanderings of Yellow Creek; thence, South 02 degrees 58 minutes 40 seconds West a distance of 242.83 feet along the meanderings of Yellow Creek; thence, South 24 degrees 57 minutes 05 seconds East a distance of 198.02 feet along the meanderings of Yellow creek; thence, South 53 degrees 07 minutes 13 seconds East a distance of 161.62 feet along the meanderings of Yellow Creek; thence, South 72 degrees 22 minutes 17 seconds East a distance of 389.77 feet along the meanderings of Yellow Creek; thence, South 00 degrees 26 minutes 49 seconds West a distance of 97.73 feet along the meanderings of Yellow Creek; thence, South 40 degrees 30 minutes 00 seconds East a distance of 110.00 feet; thence South 78 degrees 10 minutes 54 seconds East a distance of 269.53 feet along the meanderings of Yellow Creek; thence, South 35 degrees 17 minutes 41 seconds East a distance of 77.14 feet along the meanderings of Yellow Creek; thence, South 16 degrees 27 minutes 00 seconds East a distance of 169.27 feet along the meanderings of Yellow Creek; thence, South 30 degrees 00 minutes 00 seconds West a distance of 98.00 feet along the meanderings of Yellow Creek; thence, South 50 degrees 27 minutes 01 seconds West a distance of 187.31 feet along the meanderings of Yellow Creek; thence, South 23 degrees 39 minutes 44 seconds West a distance of 66.62 feet along the meanderings of Yellow Creek; thence, South 33 degrees 50 minutes 32 seconds East a distance of 150.39 feet along the meanderings of Yellow Creek; thence, South 22 degrees 50 minutes 35 seconds East a distance of 92.18 feet; thence, South 05 degrees 45 minutes 06 seconds East a distance of 72.08 feet along the meanderings of Yellow Creek; thence, South 66 degrees 27 minutes 37 seconds East a distance of 162.44 feet along the meanderings of Yellow Creek; thence North 67 degrees 50 minutes 28 seconds East a distance of 244.36 feet along the meanderings of Yellow Creek to a point on the northeasterly right-of-way of Kentucky DOT right-of-way line; thence, South 25 degrees 24 minutes 13 seconds West (measured) and South 28 degrees 05 minutes 44 seconds West (record) a distance of 175.83 feet (measured); thence, South 25 degrees 40 minutes 55 seconds West (measured) and South 28 degrees 22 minutes 26 seconds West (record) along said Kentucky DOT right-of-way line a distance of 72.33 feet; thence, South 25 degrees 49 minutes 26 seconds West (measured) and South 28 degrees 27 minutes 53 seconds West (record) a distance of 254.28 feet (measured) to the PLACE OF BEGINNING containing 54.33 acres more or less.

**TRAVELERS REST, SC**

PROPERTY DESCRIPTION
TRACT A

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a nail (found) being located approximately 179' from the intersection with Roe Ford Road, said nail also being located on the southernmost right of way of White Horse Road (a.k.a. U.S. Highway 25), thence along said right-of-way N 34 17 58 E for 992.60 feet to a 1/2" rebar (set), thence N 55 41 47 W for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 280.00 feet to a 1/2" rebar (set), thence S 55 41 47 E for 5.00 feet to a 1/2" rebar (set), thence N 34 18 13 E for 264.37 feet to a 1/2" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Randolph R. Mathena S 09 56 41 E for 534.83 feet to a 1/2" rebar (set), thence N 81 33 19 E for 324.54 feet to a 2" open top iron pin (found), thence N 43 16 03 E for 218.80 feet to a 1/2" rebar (set), thence leaving said joint property line and continuing along a joint property line with Lyla Addis Haggard, Et Al S 52 39 07 E for 514.98 feet to a 2" open top iron pin (found), thence leaving said joint property line and continuing along a joint property line with Howard B. Addis, Et Al S 18 33 45 W for 357.98 feet to a 2" open top iron pin (found), thence S 48 29 23 E for 361.59 feet to a 3/4" crimp top iron pin (found) being located on the northernmost right-of-way of Roe Ford Road, thence along said right-of-way S 80 47 35 W for 906.81 feet to a 1/2" rebar (set), thence S 80 45 44 W for 789.10 feet to a 1/2" rebar (set), thence along a curve to the right having a length of 65.11 feet, a radius of 750.96 feet and a chord bearing and distance of S 81 57 02 W for 65.09 feet to a 1/2" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Furman University N 39 54 57 W for 71.18 feet to a concrete monument (found), thence N 51 34 35 W for 270.07 feet to a nail (found) being the point of beginning.  Said tract contains 34.686 acres.

PROPERTY DESCRIPTION
TRACT B

All that certain piece, parcel or tract of land lying and being situate in the State of South Carolina, County of Greenville, near Travelers Rest and being described more particularly below to wit:

Beginning at a 5/8" rebar (found) being located approximately 1278 feet from the intersection with White Horse Road (a.k.a. U.S. Highway 25) said rebar also being located on the southernmost right-of-way of Roe Ford Road, thence along said right-of-way N 80 47 35 E for 984.94 feet to a 5/8" rebar (set), thence leaving said right-of-way and continuing along a joint property line with Furman University Foundation I S 66 22 15 E for 23.04 feet to a concrete monument (found), thence leaving said joint property line and continuing along a joint property line with Edgefield Subdivision S 43 13 58 W for 495.77 feet to a 5/8" rebar (set), thence S 36 03 35 W for 363.69 feet to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University S 84 00 00 W for 436.38 feet (passing through a 2" open top iron pin (found) at 414.13 feet) to a 5/8" rebar (set), thence leaving said joint property line and continuing along a joint property line with Furman University Foundation I N 03 36 32 E for 171.24 feet to a 5/8" rebar (set), thence N 02 19 42 E for 100.27 feet to a 5/8" rebar (bent) (found), thence N 04 10 42 W for 282.14 feet to a 5/8" rebar (found) being the point of beginning. Said tract contains 9.050 acres.

| *Issued By:* | |
|---|---|
| TICOR TITLE INSURANCE COMPANY | Schedule A  (cont'd) |

No:— 5507-25077

The land referred to in this Commitment is described as follows:

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Waterloo, County of Seneca, State of New York, being part of Lot 91 of the old Township of Junius, described as follows:

Beginning at a point in the apparent centerline of Brewer Road at the southwest corner of lands owned by Julius and Emilie Jahns and running thence South 82 degrees 51 minutes East along the fence line a distance of 631.3 feet to an iron pipe; thence North 6 degrees 33 minutes East a distance of 272.2 feet to an iron pipe; thence North 83 degrees 31 minutes 15 seconds West a distance of 759.2 feet to a point in the apparent centerline of Brewer Road; thence South 21 degrees 53 minutes 30 seconds West along the apparent centerline of Brewer Road a distance of 272.2 feet to the point of beginning and containing 4.888 acres of land.

**WOBURN, MA**

| Issued By: | | |
|---|---|---|
| CHICAGO TITLE INSURANCE COMPANY | | Schedule A  (cont'd) |

COMMITMENT FOR TITLE INSURANCE
ALTA Standard Form (1966)                                    No:        2751-25235

The land referred to in this Commitment is described as follows:

A certain parcel of land with the buildings and partially completed buildings thereon situated in Woburn, in said County of Middlesex, being shown on plan entitled "Plan of Land, Woburn, Mass." dated May 11, 1957, by Harry R. Feldman, Inc., engineers, recorded with theh Middlesex South District Registry of Deeds, Book 8957, Page 65, and being further bounded and describing as shown on said planas follows:

WESTERLY            by said Washington Street, by three bounds totaling five hun dred sixty-eight and 36/100 (568.36) feet;

NORTHERLY           by land now or formerly of Carlson, one thousand forty-six and 75/100 (1046.74) feet;

NORTHEASTERLY       by land of owners unknown, two hundred thirty-two (232) feet;

SOUTHEASTERLY       by land of owners unknown, two hundred eighty-six and 97/100 (286.97) feet;

NORTHEASTERLY       by land of owners unknown, one hundred two (102) feet, said line being through the center line of a brook; and

SOUTHERLY           by land now or formerly of Anderson, by two bounds totaling nine hundred and eighty-three 10/100 (983.10) feet.

EXCEPTING from the foregoing, the following parcel as conveyed to William S. Cummings by Deed recorded with said Registry of Deeds in Book 12113, Page 232:

Traingular parcel of land in Woburn, Middlesx County, Massachusetts, bounded and described as follows:

EASTERLY            by land of William S. Cummings and Joyce M. Cummings one hundred two (102.00) feet, N 23° 35' 33" W;

SOUTHWESTERLY       one hundred twenty-eight and 32/100 (128.32) feet, S 87° 37' 58" E;

SOUTHWESTERLY       eight and 24/100 (8.24) feet S 87° 59' 29" E; and

NORTHWESTERLY       one hundred twenty-nine and 88/100 (129.88) feet, by land of W. R. Grace & Co.

the foregoing parcel is a portion of land of Grantor in Woburn, Middlesex south, Massachusetts shown on an

ACAG 5/66        SHS                                          SAS    08/10/07    10:09:09

**WOBURN, MA**

Issued By:

**CHICAGO TITLE INSURANCE COMPANY**    Schedule A   (cont'd)

COMMITMENT FOR TITLE INSURANCE
ALTA Standard Form (1966)

No:    2751-25235

The land referred to in this Commitment is described as follows:

unrecorded plan of land on Washington St. in Woburn, Mass., dated August 24, 1971, surveyed for William S. Cummings, Dana F. Perkins & Sons, Inc., Civil Engineers and Surveyors, Reading, Mass. and marked on said plan "parcel to be acquired from W. R. Grace & Co."

NOTE: As hereinafter used "recorded" shall mean "recorded with the Middlesex South District Registry of Deeds."

ACA3 6/86          SHS                                    SAS    08/10/07    10:09:09

Attachment B

Rate Schedule for de maximis

*de maximis, inc.*

## PROFESSIONAL SERVICES RATE SCHEDULE
## JANUARY 1, 2008

**FUND ADMINISTRATION**

| | |
|---|---|
| Fund Administrator/Trustee | $ 150.00 |
| Fund Officer | $ 115.00 |
| Accountant | $ 100.00 |
| Account Support | $ 60.00 |

**SUPPORT SERVICES**

| | |
|---|---|
| Records Coordinator/Administrative Support | $ 50.00 - 65.00 |
| Word Processing Support | $ 45.00 - 52.00 |

**PERSONNEL CHARGES**

· Management and technical personnel time charges will be invoiced according to the Rate Schedule above.

· Personnel time charges for direct project support activities such as report typing and reproduction are invoiced according to the Rate Schedule above. Charges include indirect support staff, text processing, equipment, computer connect charges, and nominal communication charges.

· All time is rounded to the nearest one-half hour.

**TRAVEL AND LIVING EXPENSES**

· Travel and living expenses are charged at cost plus 10%.

**OTHER CHARGES AND REIMBURSABLE EXPENSES**

· All project-related purchases will be invoiced at cost plus 10%, including materials, subcontractor costs, fees, equipment purchased, and other costs incurred specifically for the project.

· A miscellaneous charge equal to 5% of professional services billed will be added to cover routine project-related telephone usage, postage, and photocopying.

· Non-routine project-related charges such as overnight mailings, outside copying charges, and teleconferences will be invoiced at cost plus 3%.

□ A nominal fee for document retention and preservation will be charged to each project on a yearly basis as necessary to cover the cost of such activity.

Fees are subject to change on an annual basis. Any change will be subject to written approval from the client.

Payment terms are 30 days from invoice date. de maximis reserves the right to charge a finance fee of 1% per month on the unpaid balance for payments beyond 30 days.

## <u>EXHIBIT D</u>

List of Claims Identified as Excluded Matters

1.  (Bankruptcy proofs of claim insofar as they do not cover Assumed Obligations)

2.  (Liability associated with corporate standing and back taxes for Guanica Caribe)

## EXHIBIT D - Excluded Matters

1) Waterloo, NY (Brewer Road Landfill) - Cost recovery lawsuit captioned W. R. Grace & Co. - Conn. v. Zotos International, Inc. Civil Action #98-CV-0838.

2) Woburn, MA - Lawsuit captioned W. R. Grace & Co. - Conn. v. Cummings Properties, LLC, Civil Action No. MISC 317002, regarding Cummings' claim that it has acquired a portion of Grace-owned property by adverse possession. Lawsuit dismissed without prejudice in October 2007. Tolling Agreement signed 10/17/07 provides that either Grace or Cummings may re-institute lawsuit in future.

3) Charleston, SC - Remedium is currently in settlement discussions with RMT, Inc. (environmental contractor) for cost recovery related to wetlands remediation work performed at the Charleston site in late 2006/early 2007.

4) Owensboro, KY - Grace's obligations under 9/14/05 Assignment, Assumption and Consent Agreement by and among W. R. Grace & Co. – Conn.; Owensboro Specialty Polymers, LLC; and Daramic, LLC.

5) Bankruptcy Proofs of Claim:

| Proof of Claim # | Claimant | Site |
|---|---|---|
| 372 | Pumping Systems Inc. | Atlanta, GA |
| 1641 | Richard C. and Donna M. Rowe | Memphis, TN |
| 2450 | McMaster-Carr Supply | Atlanta, GA |
| 4242 | Cummings Properties LLC | Woburn, MA |
| 9634 | United States of America | Woburn, MA |
| 12791 | Tennessee Department of Environment and Conservation | Memphis, TN |
| 12849 | Massachusetts Department of Environmental Protection | Woburn, MA |
| 13934 | Hampshire Chemical Corp. | Owensboro, KY |
| 14037 | Richard C. and Donna M. Rowe | Memphis, TN |
| 14736 | South Carolina Department of Health & Environmental Control | Charleston, SC |
| 15180 | Missouri Department of Natural Resources | Joplin, MO |
| 15181 | Missouri Department of Natural Resources | Joplin, MO |
| 15182 | Missouri Department of Natural Resources | Joplin, MO |
| 73850 | Peterson Lumber Co. Inc. | Travelers Rest, SC |
| 73942 | Martha Stokes | Travelers Rest, SC |
| 113024 | Forrest Oil Co. | Travelers Rest, SC |

**EXHIBIT E**

**ELT Proposal**

See attachment



**VIA ELECTRONIC COPY**                                        January 15, 2007

Mr. M. Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Ave., Suite 301
Memphis, TN 38119-4840

**RE: W.R. Grace & Co. – Property and Liability Transfer Project**

Dear Mr. Obradovic:

    Environmental Liability Transfer, Inc. ("ELT") is pleased to present its offer in response to your November 10, 2006 Request for Proposal concerning the W.R. Grace ("WRG") Property and Liability Transfer Project. ELT is offering to acquire the base portfolio consisting of nine sites and to assume all associated remedial obligations concerning the Sites. The sites in the base portfolio are located in Atlanta, GA; Charleston, SC; Fort Pierce, FL; Guanica, PR; Joplin, MO; Memphis, TN; Owensboro, KY; Travelers Rest, SC; and Waterloo, NY ("Sites"). ELT may be interested in the two additional sites, Acton & Woburn, Massachusetts, at a later date but is not currently submitting a bid for those sites. The assumption of WRG's environmental remedial liabilities will exhaustively include all remedial issues that are known, unknown, above grade, at grade, below grade, onsite, offsite (but originating onsite and migrating offsite) whether the issues occurred or were caused to occur in the past, present or future. In addition, collectively ELT along with its sister company Commercial Development Company, Inc. ("CDC"), will broadly and indefinitely indemnify WRG from any future environmental remedial liability associated with the Sites. ELT will assist WRG in designing a comprehensive insurance package for the Sites (optional, not a requisite of ELT), insurance premium expenditures, if any, shall be borne by WRG. Any and all insurance policies should name WRG as the named insured and ELT as an additional insured. If requested, ELT will seek quotes from multiple "A" Rated or better AM Best Rated environmental insurance companies such as, AIG Environmental, XL Environmental, ACE and Zurich North America. This current proposal from ELT does not include the assumption of any potential Natural Resource Damages ("NRD") or third party property or bodily injury claims, which currently exist or arise prior to closing, due to past or present operations.

ELT has taken into consideration the positive fair market value of the real estate identified in the base portfolio and the liabilities of these sites to determine its bid. ELT feels it has addressed all WRG's instructions to bidders as laid out in the November 10, 2006 request for proposals and is pleased to submit a positive value offer to WRG to acquire the Sites and assume all associated remedial obligations associated with the Sites.

1. **ELT's Offer:** ELT is pleased to tender the following offer to WRG as it concerns the Sites designated within the bid package. This letter of intent ("LOI") constitutes the response of ELT to the November 10, 2006 request for proposal in this matter. This confirms ELT's intent to negotiate a definitive Environmental Liability Transfer & Assumption - Real Estate Sale and Purchase Agreement relating to all environmental remedial obligations and real estate concerning the Sites. The following terms and conditions are intended to be a guide in drafting a definitive agreement and should not be construed to preclude other provisions that are consistent with the terms specified below. This LOI in and of itself is not a binding agreement.

2. **Basic Transaction:** ELT or its assign will enter into a transaction with WRG whereby ELT will assume all environmental remedial liabilities associated with the Sites (excluding NRD and Third Party Claims as specified above). Further, ELT, its assign and CDC will collectively indemnify WRG from any and all environmental remediation liabilities whether known or unknown, at grade, below grade, above grade, onsite or offsite (but which originated onsite and migrated offsite) - whether the remedial liabilities were caused to occur in the past, present or future. ELT will not, however, assume responsibility for any environmental liabilities that are known to WRG but not disclosed to ELT. In addition, ELT will assist WRG in designing an acceptable comprehensive environmental insurance package. Finally, ELT will take title to the Sites at closing. The total consideration called for in this LOI reflects a combination of ELT's positive valuation of the real estate combined with the negative value of the liabilities to be indefinitely assumed.

3. **Insurance Coverage:** If required, ELT will assist WRG in designing a comprehensive environmental insurance package which may include Pollution and Legal Liability ("PLL") and Cost Cap Cleanup ("CCC") components. Any and all insurance policies shall name WRG as the named insured and ELT as an additional insured. Any and all insurance premium expenditures shall be borne by WRG. ELT has not approached the insurance market concerning this potential transaction and would not do so until such time that WRG affirms in writing its intentions to accept ELT's offer. ELT's staff has successfully negotiated numerous policies similar in scope to what is anticipated herein.

4. **Total Consideration:** The total consideration to be paid by ELT to WRG upon closing is: **$109,000.**

5. **Bid Form:**

### W.R. Grace & Co.
### Property and Liability Transfer Project

| Property Locations | Bid Price ($) |
|---|---|
| 9 Sites<br>(Atlanta, GA; Charleston, SC; Fort Pierce, FL; Guanica, PR; Joplin, MO; Memphis, TN; Owensboro, KY; Travelers Rest, SC; and Waterloo, NY) | $109,000 |
| Acton, MA | ELT has chosen not to bid on the Acton, MA site at this time. |
| Woburn, MA | ELT has chosen not to bid on the Woburn, MA site at this time. |
| **Total** | **$109,000** |

6. **Environmental Due Diligence**: Upon being selected as the successful bidder ELT is prepared to move directly to the development of a definitive Liability Transfer & Assumption – Real Estate Sale and Purchase Agreement. In addition, ELT is prepared to approach the insurance markets to aid WRG in designing an acceptable insurance package concerning the Sites. Simultaneously, ELT will be conducting its final environmental due diligence. Anticipated due diligence will include a more detailed review of documentation, reports and studies, site inspections, interaction with WRG's current consultants and discussions with the various regulatory agencies. ELT estimates a time requirement for additional environmental due diligence of 60-90 days.

7. **Real Estate Due Diligence**: ELT has nearly completed its real estate due diligence, although ELT would like to verify the information provided was true and accurate. Any additional real estate due diligence would take place concurrently with any additional environmental due diligence.

8. **Consent Orders**: ELT is willing to enter into consent orders with state and/or federal regulatory agencies on any or all of the Sites, if required.

9. **Legal Entity:** ELT will form a Limited Liability Corporation ("LLC") for each of the Sites in the base portfolio. The LLCs will be take title to the Sites and assume their associated liabilities. The individual LLCs will be owned by ELT. Each LLC will be backed by corporate guarantees from both ELT and CDC.

### Assets and Liabilities

Environmental Liability Transfer, Inc. is a privately held corporation and therefore safeguards its financial information, but ELT will share its financial information upon being selected as the successful bidder for the project. At such time all appropriate information will be supplied.

ELT can share with you a thumbnail view of its financial status as of year end 2005. At year end 2005, ELT and its affiliated companies held assets valued in excess of $300,000,000, with liabilities of approximately $115,000,000 and revenues in excess of $35,000,000.

Over the past 20 years, ELT and its sister company, Commercial Development Company, (CDC) have assumed nearly $750,000,000 in perceived environmental liabilities from Corporate America. To date, ELT and CDC have been able to bring closure to over 99% of the liabilities they have assumed.

10. **Closing Costs:** Any and all closing costs including but not limited to title fee/costs, transfer taxes, mortgage taxes and survey costs, shall be paid by WRG.

11. **Financial Assurance:** ELT will provide WRG with corporate guarantees and full indemnification from any and all environmental remedial liabilities associated with the Sites. Any and all environmental remedial obligations are being transferred to ELT in perpetuity.

### Corporate Guarantee

Collectively, ELT and CDC will provide Corporate Guarantees to the LLCs holding the properties and the assumed liabilities.

### Indemnification

ELT, CDC and the LLCs will broadly and indefinitely indemnify WRG against any future environmental remediation liabilities whether known or unknown, including at grade, below grade or above grade, onsite or offsite. This indemnification extends beyond the term of any insurance policy (if any).

### Environmental Insurance

Any environmental insurance policies acquired by WRG for this transaction will further enhance any indemnification provided by ELT, CDC and the LLCs.

The assumption of WRG's environmental remedial liabilities will exhaustively include all remedial issues that are known, unknown, above grade, at grade, below grade, onsite, offsite (but originating onsite and migrating offsite) whether the issues occurred or were caused to occur in the past, present or future. As indicated earlier this proposal does not include the assumption of any potential Natural Resource Damages ("NRD") or third party property or bodily injury claims, which currently exist or arise prior to closing, due to past or present operations.

12. **Funding of Remedial Obligations:** ELT's bid for the Sites is one that is considered a Positive Value Transaction. Positive Value Transactions are transactions in which the value of the real estate is greater than that of the environmental liabilities. Positive Value Transactions typically do not call for upfront funding for the remedial obligations. ELT will utilize its own funds to address the remedial obligations for the sites. The value of the real estate may be collateralized to aid in the funding of the remedial obligations.

13. **Alternative Proposals:** ELT has discussed with members of WRG's team the concept of Sale/Leasebacks of other real estate assets where WRG has ongoing operations. The addition of any such properties could increase the amount of ELT's offer substantially.

14. **Confidentiality:** Each party agrees to keep confidential this LOI and the underlying documents shared between the parties in pursuing this transaction.

ELT has successfully completed dozens of complex projects similar in scope to the one proposed herein. We also understand that a proposal may not completely convey our intentions in a clear and concise manner. Consequently, we would welcome the opportunity to visit you and to fully answer any questions that you may have regarding this proposal.

Very truly yours,

ENVIRONMENTAL LIABILITY TRANSFER, INC.

*Mark A. Hinds*

Vice President - New Business Development

Agreed and Accepted this ___ day of January, 2007

Name:_____

Title:_____

1650 Des Peres Road    Suite 306    St. Louis, MO 63131    Phone (314) 775-0500    Fax (314) 775-0503
www.ELTransfer.com



## Risk Transfer Project Experience

Below is a partial combined list of Risk Transfer Experience for Environmental Liability Transfer, Inc. Members of our project team were directly involved in the successful completion of these projects and will be bringing that experience to W.R. Grace & Company for this transaction.

### 2.7 Million Square Foot Manufacturing Facility – York, PA



**Caterpillar Corporation – York, Pennsylvania**

This 2.7 million square foot facility was acquired under a combination Sale – Leaseback – Environmental Liability Transfer transaction. Caterpillar Corporation received in excess of $30,000,000 and entered into a long-term leaseback of a portion of the facility. In addition to the economic considerations received, Caterpillar effectively transferred all environmental liability at the site both known and unknown. After considerable remedial activities the site has been brought to Pennsylvania Act II closure. While the details of the environmental contamination onsite remain confidential, the assessed value of the liability transfer itself exceeded $10,000,000.

**15 Acre Truck Terminal, Greensboro, NC**



### S&W Motorline – Greensboro, North Carolina

The acquisition of this 15 acre truck terminal was a positive cash transaction for the seller as well as a complete environmental liability transfer. After acquisition the site was leased to a third party while remedial activity was performed. Removal of 250 underground drums was performed along with hydrocarbon remediation of the surrounding soil saturated with a multitude of contaminants. After remedial closure was obtained the site was sold to a private investment group. The environmental liability transfer was valued at $4,000,000.

**202,000 Square Foot Manufacturing Facility – Branford, CT**



### Sanvick Millford Corporation – Branford, CT

Located upon 9 acres, this 202,000 square foot facility possessed 97 monitoring wells onsite. The environmental liability transfer transaction covered all conditions both known and unknown – above and below grade. The environmental issues included chlorinated solvents along with soil and groundwater impacted by heavy metals released from a plating process. The environmental liability transfer value was in excess of $8,000,000.

### 1.1 Million Square Foot Manufacturing Facility – Euclid, OH



**General Motors Corporation – Euclid, Ohio**

Acquired from General Motors, this Fisher Body facility consists of 64 acres of ground and 1,100,000 square feet of building structure. A significant environmental liability transfer plan was introduced into the acquisition economics resulting in a net positive cash transaction for General Motors. The environmental liability transfer value was in excess of $4,500,000.

### 1.8 Million Square Foot Aluminum Smelter – Mead, WA



**Kaiser Aluminum – Mead, Washington**

Acquired out of bankruptcy, this 1.8 million square foot aluminum smelter located on 450 acres in Mead Washington possesses a superfund site on its grounds. The Kaiser Bankruptcy Trust received in excess of $7,000,000 for the facility, its equipment and land while effectively transferring all environmental liabilities. Currently the site is undergoing remedial activity commensurate with a smelter decommissioning. Future plans for the site include demolition of all structures followed by commercial, retail and residential redevelopment. This project will be nominated for a Phoenix award as it fully demonstrates ELT's ability to turn environmental blight into a vibrant reuse. The environmental liability transfer value was in excess of $40,000,000.

**740,000 Square Foot Manufacturing Facility, Muncie, IN**



### ABB / Westinghouse - Muncie, IN

Acquired from ABB, this facility manufactured large capacity transformers for both Westinghouse and ABB. The environmental liability transfer included an onsite landfill, PCB's in the soil and groundwater as well as, free-floating petroleum impaction. The remedial work is ongoing. The environmental liability transfer value was in excess of $10,000,000.

**13 Site Chemical Manufacturing Portfolio**
(Hammond, IN Site Pictured Below)



### Millennium Chemicals – 13 Site North American Portfolio

A combination of sites throughout North America that total over 1,000,000 square feet under roof and approximately 130 acres of land. Environmental issues range from below grade heavy metal impaction of soil and groundwater to asbestos and underground tank removal. Working in concert with regulators from multiple States, -11 of the 13 sites have reached closure. The environmental liability transfer value was in excess of $150,000,000.

**619,000 Square Foot Manufacturing Facility – Euclid, OH**



## PMX Corporation – Euclid, OH

A 619,000 square foot facility located on 78 acres was formerly utilized for the production of copper. The liability transfer covered all impaction including an onsite landfill, heavy metals in the groundwater and soil, fugitive dust and asbestos-impregnated building materials. The environmental liability transfer value was in excess of $10,000,000.

**400,000 Square Foot Manufacturing Facility – Evansville, IN**



## Kraft General Foods – Evansville, IN

As part of the sites' risk management program and remedial plan approximately 142,000 square feet of structure was razed. Substantial asbestos and PCP remediation was implemented as well as the removal of nine underground storage tanks and the associated contaminated soil. The environmental liability transfer value was in excess of $8,500,000

**240,000 Square Foot Manufacturing Facility – Port Clinton, OH**



### Uniroyal Corporation – Port Clinton, OH

Working with Uniroyal Corporation, the "Debtor In Possession," this facility was purchased through the Bankruptcy Courts. Included in the acquisition was a complete environmental liability transfer covering all issues onsite and offsite. The property possessed an onsite landfill, unexploded ordnance, chlorinated impacted soil and groundwater and considerable above ground storage tanks. The environmental liability transfer value of this transaction was in excess of $6,500,000.

**550,000 Square Foot Manufacturing Facility – Cheshire, CT**



### Textron Corporation – Cheshire, CT

Inserting the environmental liability transfer program allowed this 550,000 square foot facility to be sold to a "risk averse" major retailer. The site possessed PCB contamination, asbestos contamination, required PCB transformer removal, PCB wood block removal, and significant below grade contamination abatement. The environmental liability transfer value contained in this transaction exceeded $6,500,000.

**700,000 Square Foot Manufacturing Facility – Danville, IL**



### General Motors Corporation – Danville, IL

This 700,000 square foot General Motors foundry located upon 101 acres and complete with all production equipment was acquired in concert with an environmental liability transfer. After abatement, the facility was sold to a local manufacturing concern which in turn received complete indemnification against environmental liability. The environmental liability transfer value contained within the original transaction with General Motors Corporation exceeded $2,000,000.

**207,000 Square Foot Manufacturing Facility – Sioux City, IA**



### General Motors Corporation – Sioux City, IA

Located upon 27 acres, this 207,000 square foot facility was acquired from General Motors Corporation in concert with an environmental liability transfer program. Various environmental issues were abated and currently the facility is being leased to a national distribution company. The environmental liability transfer value encapsulated within this transaction was in excess of $2,500,000.

**2 Brick Plants Totaling 1,177 Acres and 650,000 Square Feet**



### ANH Refractories – Mexico & Farber, Missouri

Working with the "Debtor in Possession" through the bankruptcy court, these facilities were purchased from ANH Refractories in January 2006. Totaling over 650,000 square feet of buildings on nearly 1,200 acres, these two industrial plants were utilized for manufacturing bricks. ANH was able to divest of these underutilized facilities as well as transfer their environmental liabilities associated with the sites. The environmental liability transfer value of this transaction was in excess of $2,500,000.

**2,000,000 Square Foot Manufacturing Facility – Minneapolis, MN**



### BAE Systems – Minneapolis, Minnesota

ELT acquired this 2,000,000 square foot office and industrial complex on 113 acres in Minneapolis, Minnesota from BAE Systems. This was a great solution for BAE who was not utilizing the entire facility. It was an opportunity for them to sell the property and leaseback only the portions that they needed for their operations as well as transferring certain environmental liabilities associated with the site. Terms and conditions of this transaction are confidential.

**1.1 Million Square Foot Manufacturing Facility – Lafayette, LA**



### Fruit Of The Loom – Lafayette, LA

A 1,000,000 square foot facility located upon 61 acres was acquired from Fruit Of The Loom through the Federal Bankruptcy Courts. Working in concert with the Trustees, an environmental liability transfer program was instituted covering all known and unknown, - above and below grade issues. The final transaction brought positive value to the trustee and associated creditors. The environmental liability transfer value was in excess of $800,000.

**500,000 Square Foot Brewery – Frankenmuth, MI**



### G. Heileman Brewery – Frankenmuth, MI

This facility was acquired through the Federal Bankruptcy courts. Working closely with City planners, a remedial plan was implemented that included 75% demolition of the Historical site. Asbestos impregnated building materials, PCB in the ground soil and water and other caustics were abated. The environmental liability transfer value was in excess of $4,500,000.

450,000 Square Foot Brewery – Belleville, IL (Before)



## G. Heileman Brewery – Bellville, IL

The 27 acre facility was capable of producing 800,000 barrels of beer annually and was also utilized for wine production. As part of the remedial plan, 68% of the buildings were demolished while performing asbestos and PCB remediation as well as, below grade hydrocarbon cleanup due to underground storage tank removal. Fifteen acres were sold to an adjacent nursing home and approximately 180,000 square feet of structure was retained for future warehouse and distribution use. The site was a winner of a Phoenix award. The environmental liability transfer value contained in this transaction was in excess of $6,500,000.

450,000 Square Foot Brewery – Belleville, IL (After)



1650 Des Peres Road   Suite 306   St. Louis, MO 63131   Phone (314) 775-0500   Fax (314) 775-0503
www.ELTransfer.com

### 16.5 Acre Redevelopment Site – Atlanta, GA



**Viacom / Westinghouse – Atlanta, GA**
ELT acquired this 100,000 square foot facility on 16.5 acres located at 1600 Ellsworth Industrial Boulevard in Atlanta, Georgia from Viacom / Westinghouse. ELT will remove asbestos and demolish the building and remediate soil and groundwater contamination. The site will then be rezoned for a mixed-use redevelopment project. Terms and conditions of this transaction are confidential.

### No Photo Available

**EPS, LLC - Marietta, Ohio**
This closed industrial landfill was acquired in a liability buyout with EPS, LLC. EPS effectively transferred the title to the real estate and all environmental liabilities at the site - both known and unknown to ELT. EPS was pleased to remove this liability from their balance sheet which gave them the freedom to focus on their core business activities. The site has received closure from the State of Ohio Environmental Protection Agency (OH EPA). ELT purchased an environmental insurance policy and will continue to be responsible for the care and maintenance of the landfill. The environmental liability transfer value was in excess of $500,000.

**62,500 Square Foot Foundry – St. Louis, MO (Before)**



**Carondelet Foundry – St. Louis, MO**

This foundry with structure covering 7 acres of land was acquired through an environmental liability transfer program which required 100% demolition in order to institute the agreed upon remedial program. The environmental liability transfer value was in excess of $3,000,000. See the "after" photo.

**62,500 Square Foot Foundry – St. Louis, MO (After)**



**145 Acre – 680,000 Square Foot Cement Factory – St. Louis, MO (before)**



### Alpha Portland Cement – St. Louis, MO

In order to implement the remedial strategy, 680,000 square feet of concrete and steel manufacturing buildings were demolished on this 145 acre site. Asbestos, PCB transformers and heavy metals received remediation. After completion of the remedial plan the site was redeveloped into an industrial complex housing several nationally recognized concerns. The environmental liability transfer value pertaining to this project was in excess of $5,000,000. See the following "after" photos.

**145 Acre – 680,000 Square Feet Cement Factory – St. Louis, MO (Current)**



### 170 Acre Quarry – San Antonio, TX



**Hanson America Quarry – San Antonio, TX**

This idle, 170 acre quarry was acquired from Hanson America. Indiscriminate dumping of trash, machinery and industrial waste which included storage tanks up to 10,000 gallons in size, drums and asbestos containing machinery along with unauthorized dumping of byproduct from brick manufacture, tar plume and other hazards were present. The environmental liability transfer value was in excess of $2,500,000.

### 2 Former Coal Mine Sites Totaling More Than 4,000 Acres
### West Virginia & Illinois




**Peabody Energy – West Virginia & Illinois**

ELT acquired the liabilities of two former coal-mining operations from Peabody Energy, the largest coal company in the United States. The sites are located in West Virginia and Illinois. The mining activities include nearly 4,000 surface acres and the mineral rights to over 25,000 subsurface acres. ELT acquired the real estate as well as the liabilities associated with the sites, including the acid mine drainage water treatment facility. Operation of the water treatment facility will continue in perpetuity. Terms and conditions of these transactions are confidential.

## Corporate Qualifications

Environmental Liability Transfer, Inc., (ELT) is a comprehensive environmental liability acquisition company providing its clients complete and final environmental liability transference. Combining superlative expertise within the practices of environmental law, environmental insurance, environmental engineering, corporate indemnification and commercial redevelopment, ELT offers unparalleled economic solutions for absolute environmental liability transfer and removal.

ELT is a member of the Commercial Development Company, Inc. (CDC) family of businesses. CDC is a leading North American real estate development firm specializing in the development, acquisition and redevelopment of major commercial and industrial sites. Since 1985 CDC has acquired over twenty two million square feet under roof. As a byproduct of its pursuits, CDC has also acquired, indemnified and alleviated over three quarters of a billion dollars of environmental liabilities. In response to the increasing corporate demand for environmental liability transference, CDC has launched its affiliate, Environmental Liability Transfer, Inc. In full concert with the expertise and financial backing of CDC, Environmental Liability Transfer, Inc., stands ready to acquire and provide complete removal of environmental liability.

### Liability Acquisition Strategy
ELT possesses the unique ability to acquire both contractual and statutory liability while providing insured finite capital solutions for highly variable environmental concerns. In addition to fee based environmental liability transference, ELT actively purchases commercial and/or industrial facilities, portfolios and land sites throughout North America. In doing so ELT's clients often discover that their environmental liabilities can be transferred while receiving a positive net payment in return.

### Liability & Asset Evaluation
ELT's liability and asset evaluation process addresses all aspects of the proposed transaction including the qualification and quantification of known and unknown environmental conditions both onsite and offsite, real estate attributes, suitable risk management strategies, real estate development and/or redevelopment potential and future exit strategies, if applicable. ELT has continually refined its proprietary evaluation process and is positioned intellectually and financially to pursue multiple transactions quickly and cost effectively.

### Risk Management
As it pertains to Brownfield and Superfund sites, effective management of environmental and financial risk is essential. ELT evaluates the property condition, the potential transaction structure and the liability concerns of both itself and its client. Risk management factors include the selection of remedy, assumption of regulatory requirements, legal structure, insurance and indemnification.

This innovative and proven approach to risk management has effectively limited risk to highly risk-averse corporate land owners and provides a highly efficient, cost effective, vehicle for environmental liability transfer.



March 8, 2007

Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119

**RE: W.R. Grace & Co. – Property and Liability Transfer Project**

Mitch:

Thank you for the opportunity to visit and submit ELT's proposal last week. A post meeting action item for ELT was to provide a breakdown of ELT's estimated environmental costs per site. They are as follows:

| Site | ELT Liability | WRG Liability |
|------|--------------|---------------|
| Fort Pierce, FL | $ 1,690,000.00 | $ 1,590,000.00 |
| Memphis, TN | $ 758,000.00 | $ 740,000.00 |
| Atlanta, GA | $ 211,000.00 | $ 95,000.00 |
| Guanica, PR | $ 580,000.00 | $ 206,580.00 |
| Owensboro, KY | $ 474,000.00 | $ 459,000.00 |
| Travelers Rest, SC | $ 537,000.00 | $ 22,000.00 |
| Waterloo, NY | $ 1,580,000.00 | $ 1,200,000.00 |
| Joplin, MO | $ 462,000.00 | $ 342,000.00 |
| Charleston, SC | $ 1,525,000.00 | $ 1,824,000.00 |
| Subtotal: | $ 7,817,000.00 | |
| **Contingency** | **15%** | |
| **Group 1 Total** | **$ 9,200,000.00** | **$ 6,478,580.00** |
| | | |
| Woburn, MA | $ 1,539,000.00 | $ 1,489,000.00 |
| **Contingency** | **15%** | |
| **Group 2 Total** | **$1,800,000** | **$1,489,000** |
| | | |
| Acton, MA | $23 – $28 million | $19,546,000.00 |
| **Contingency** | **15%** | |
| **Group 3 Total** | **$26.5 – $32 million** | **$19,546,000.00** |
| | | |
| **Grand Total** | **$37.5 – $43.0 million** | **$27,513,580.00** |

It has also been requested of ELT to provide details concerning the structure of its corporate guarantee. To that end, we have instructed our counsel to provide ELT's standard contract language in such matters for your review. It will follow via a separate e-mail.

Finally, at the request of WR Grace, ELT is prepared to amend its previously submitted proposal to include both the Woburn MA, and Acton MA, properties. To do so, we are prepared to provide three separate concepts for your consideration.

Base Concept (Previously Submitted 1/15/07)

ELT acquires real estate and environmental liabilities associates with the: Fort Pierce, FL – Memphis, TN – Atlanta, GA – Guanica, PR – Owensboro, KY – Travelers Rest, SC – Waterloo, NY – Joplin, MO – Charleston, SC sites. ELT will pay W.R. Grace a sum of $109,000. All other provisions of the previously submitted proposal would remain the same.

Concept Number Two:

In addition to the sites specified in its January 15, 2007 proposal ELT also accepts the Woburn and Acton, MA properties. W.R. Grace pays ELT a sum of $14,850,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. ELT will agree to split all proceeds over the amount of $2,400,000 received from the eventual sale of the Woburn site with W.R. Grace on a 50% / 50% basis. All other provisions of the previously submitted proposal would remain the same.

Concept Number Three:

In addition to the sites specified in its January 15, 2007 proposal ELT also accepts the Woburn and Acton, MA properties. W.R. Grace pays ELT a sum of $12,050,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. ELT would not share revenues from the eventual sale of the Woburn site. All other provisions of the previously submitted proposal would remain the same.

Please accept the new concepts as options available to W.R. Grace. We look forward to more discussion in which we can further clarify our offering.

Very truly yours,

Environmental Liability Transfer, Inc.

Mark A. Hinds

Mark Hinds
Vice President – New Business Development



March 12, 2007

Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis, TN 38119

**RE: W.R. Grace & Co. – Property and Liability Transfer Project**

Mitch:

Per your request, Environmental Liability Transfer, Inc. (ELT) is willing to share with W.R. Grace a breakdown of ELT's estimated environmental costs per site along with its approximate real estate valuations. The values are shown in the table below.

| Site | ELT Liability | Real Estate Values |
|------|--------------|-------------------|
| Fort Pierce, FL | $ 1,690,000 | $5,000,000 |
| Memphis, TN | $ 758,000 | $500,000 |
| Atlanta, GA | $ 211,000 | $1,000,000 |
| Guanica, PR | $ 580,000 | $500,000 |
| Owensboro, KY | $ 474,000 | $625,000 |
| Travelers Rest, SC | $ 537,000 | $800,000 |
| Waterloo, NY | $ 1,580,000 | $0.00 |
| Joplin, MO | $ 462,000 | $200,000 |
| Charleston, SC | $ 1,525,000 | $3,000,000 |
| Subtotal: | $ 7,817,000 | |
| **Contingency** | **15%** | |
| **Group 1 Total** | **$ 9,200,000** | **$11,625,000** |
| | | |
| Woburn, MA | $ 1,539,000 | $7,100,000 |
| **Contingency** | **15%** | |
| **Group 2 Total** | **$1,800,000** | **$7,100,000** |
| | | |
| Acton, MA | $23 – $28 million | $15,000,000 |
| **Contingency** | **15%** | |
| **Group 3 Total** | **$26.5 – $32 million** | **$15,000,000** |

ELT's steering committee has reviewed W.R. Grace's request to remove the Woburn, MA real estate from the portfolio while continuing to include the assumption of its associated environmental liabilities. ELT has determined that it is not feasible to assume responsibility for the environmental liability at Woburn without having control of the associated real estate. ELT understands that W.R. Grace has an interest in disposing of all sites together. To accommodate W.R. Grace, ELT will increase its offer for the Woburn, MA site from $2,400,000 to $4,000,000. Combined with the assumption of an estimated $1,800,000 in environmental liabilities ELT's total offer for the Woburn site is just under $6,000,000.

ELT's bid for Group 1 is based upon the mitigation of risk over the nine site portfolio. Conversely, the removal of any site(s) from Group 1 may lead to a reduction in purchase price greater than what is reflected within the individual site evaluations provided above.

ELT is providing W.R. Grace three distinct offerings; an offer for Group 1, an offer for Group 2 and an offer for Group 3. W.R. Grace may elect to choose one, all, or any combination of the offerings to follow:

### Group 1 Bid (Previously Submitted 1/15/07)

ELT acquires real estate and environmental liabilities associated with the sites ELT refers to as Group 1: Fort Pierce, FL – Memphis, TN – Atlanta, GA – Guanica, PR – Owensboro, KY – Travelers Rest, SC – Waterloo, NY – Joplin, MO – Charleston, SC sites. ELT will pay W.R. Grace a sum of $109,000. All other provisions of the previously submitted proposal would remain the same.

### Group 2 Bid: Woburn, MA

ELT acquires real estate and environmental liabilities associated with the Woburn site. ELT will pay W.R. Grace a sum of $4,000,000. All other provisions of the previously submitted proposal would remain the same.

### Group 3 Bid: Acton, MA

ELT acquires the Acton, MA property including its associated environmental liabilities, W.R. Grace pays ELT a sum of $12,000,000 at closing to be placed in escrow and utilized specifically for site(s) cleanup. All other provisions of the previously submitted proposal would remain the same.

Once again, we appreciate the opportunity to bid on this important project. Please do not hesitate to call me with any questions that you may have regarding this submission.

Very truly yours,

Environmental Liability Transfer, Inc.

Mark A. Hinds

Mark Hinds
Vice President – New Business Development

**W.R. Grace & Co.**                                    6                                    May 7, 2007

**Exhibit B**

**List of Properties for Potential Sale/Transfer**



Acton, MA
Charleston, SC
Owensboro, KY
Guanica, Puerto Rico
Waterloo, NY
Atlanta, GA
Memphis, TN
Fort Pierce, FL
Joplin, MO
Travelers Rest, SC
Woburn, MA

Schedule 8.9

The City of Charleston, South Carolina, has filed a motion with the Bankruptcy Court requesting relief from the court's automatic stay in order to allow the City to acquire the Transferor Parties' property located in Charleston.  This action may affect Transferor Parties' title to this property.

34

EXHIBIT B

DIAGRAM OF TRANSACTION

*Diagram of Liability Transfer Agreement Terms*
*February 22, 2008*



Grace transfers to ELT ten (10) Properties and associated Environmental Clean Up Liabilities and PLL

ELT pays $2.5mm;
ELT indemnifies;
ELT provides mortgages on 3 properties (Woburn, Fort Pierce, Atlanta);
ELT transfers 40% of proceeds of sales to Grace up to $4.3mm total payment

Allocate proceeds 25% to ELT until Trust fully funded, then 100%

Property Sales, ex Charleston

Allocate proceeds of sales to Trust, Grace & ELT

$2.5 mm in 180 days.
Proceeds of sales to Trust (according to allocation: 35%, then 75% to $11mm )

Funding remediation costs and premium for PLL

Trust will fund costs of remediation if ELT defaults

Allocate proceeds of condemnation <$3mm to Trust, Grace, & ELT

Allocate 50% above $3mm to ELT

Charleston Sale

Allocate 50% above $3mm to Grace

EXHIBIT C

PROPOSED ORDER

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## ORDER AUTHORIZING LIABILITY TRANSFER AGREEMENT

Upon consideration of the *"Motion of the Debtors for Entry of an Order Authorizing Liability Transfer Agreement for Certain Environmental Liabilities and Properties"* (the "Motion"); and due and proper notice of the Motion having been given; and it appearing that the relief requested in the Motion is in the best interests of the Debtors,[2] their estates and creditors, is hereby

ORDERED that the Motion is granted; and it is further

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or the Agreement.

ORDERED that the Debtors are authorized to enter into the Agreement attached hereto as Exhibit 1; and it is further

ORDERED that the Debtors are authorized to enter into the Trust Agreement; and it is further

ORDERED that the Debtors are authorized to perform their respective obligations under the Agreement; and it is further

ORDERED that the Debtors are authorized to transfer the Properties to Transferee; and it is further

ORDERED that the Debtors are authorized to take whatever other actions may be necessary to consummate the transactions contemplated by the Agreement; and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order; and it is further

ORDERED that this Order is effective immediately upon its entry.

Dated: _____ ___, 2008

_____
Honorable Judith K. Fitzgerald
U. S. Bankruptcy Judge