UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
W. R. GRACE & CO., *et al.,*        .    Case No. 01-01139(JKF)
                                    .    (Jointly Administered)
                                    .
                                    .    February 25, 2008
                                    .    1:00 p.m.
          Debtors.                  .    (Wilmington)
                                    .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          (Whereupon at 2:18 p.m. the electronic recording started

2      after court was already in session:)

3          THE COURT: ...Kramer, Debra Felder, David Bernick,

4      Ellen Ahern, Christopher Candon, Van Hooker, Michael Davis,

5      Robert Guttmann, David Parsons, Douglas Mannal, Sander

6      Esserman, Jacob Cohn, Walter Slocombe, Tiffany Cobb, Kirk

7      Hartley, Christina Kang, Robert Horkovich, David Beane, Guy

8      Baron, John Phillips, Natalie Ramsey, Ari Berman, Jason

9      Solganick, Catherine Chen, Andrew Chan, Jonathan Brownstein,

10     Shayne Spencer, Sung Choi, Janet Baer, Elizabeth Devine,

11     Theodore Freedman, Barbara Harding, Amanda Basta, Douglas

12     Cameron, Edward Westbrook, Jennifer Whitener, Daniel Chandra,

13     Andrew Craig, and David Siegel.  Am I missing a page?  Mine,

14     I don't have a cover sheet for Grace, so I'm not sure that

15     I'm not missing.  I had that one.  Okay.  May I just borrow

16     yours for a second?  Continuing.  Laurie Sinanyan, Peter

17     Shawn, Alex Mueller, Beau Harbour, John Ku, Darrell Scott,

18     Daniel Speights, and Martin Dies.  Here you go.  Thank you.

19     I'll take entries in court.  Thank you.

20          MR. BERNICK: Good afternoon, Your Honor.  David

21     Bernick for Grace.

22          MS. BAER: Good afternoon.  Janet Baer for Grace.

23          MS. BASTA: Good afternoon, Your Honor.  Amanda

24     Basta for Grace.

25          MR. O'NEILL: And James O'Neill for Grace also, Your

1    Honor.  Good afternoon.

2            MR. FINCH: Good afternoon, Your Honor.  Nathan

3    Finch for the ACC.

4            MR. MULLADY: Hello, Your Honor.  Ray Mullady for

5    the FCR.

6            MR. ANSBRO: John Ansbro also for the FCR.

7            MR. BAENA: May it please the Court.  Good

8    afternoon, Judge.  Scott Baena on behalf of the Committee. .

9    .(microphone not recording).

10            MR. HURFORD: Good afternoon, Your Honor.  Mark

11    Hurford, Campbell & Levine for the ACC.

12            MR. WESTBROOK: Hello, Your Honor.  Ed Westbrook, in

13    person, for the ZAI Claimants.

14            MR. SCOTT: Good afternoon, Your Honor.  Darrell

15    Scott, also in person and present.

16            MR. PASQUALE: Good afternoon, Your Honor.  Ken

17    Pasquale.  Strook & Strook & Lavan for the Unsecured

18    Creditors Committee.

19            MR. WYRON: Good afternoon, Your Honor.  Richard

20    Wyron of Orrick, also for the FCR.

21            THE COURT: Good afternoon.

22            MS. NAUFUL: Good afternoon.  Your Honor, Tara

23    Nauful for the City of Charleston.

24            MS. FARBER: Good afternoon, Your Honor.  Peggy

25    Farber from Kramer Levin for the Official Equity Committee.

1        MR. TACCONELLI: Good afternoon, Your Honor.

2   Theodore Tacconelli for the Property Damage Committee.

3        THE COURT: Ms. Baer.

4        MS. BAER: Yes.

5        THE COURT: I have a question that I don't want to

6   forget to ask.  Because I have an opinion in draft form.

7   Wait until I get here.  But I'm, want to make sure that I

8   have to issue it.  The New Jersey Department of Environmental

9   Action - -

10        MS. BAER: It was on my list, too, today.

11        THE COURT: Okay.  Has it been closed?

12        MS. BAER: No.  Your Honor, we're still waiting for

13   an opinion from you on the injunction issue, or whether or

14   not the automatic stay applies.  The, the matter that also

15   was pending was the bar date.  You ruled.  That's up on

16   appeal before the District Court.  But the injunction issue

17   is still before you.

18        THE COURT: That's not the question.  We were

19   checking the State Court docket, because I needed a case

20   number, and it appeared that the State Court action had been

21   dismissed.

22        MS. BAER: We removed the State Court action to

23   federal District Court, and it remains stayed at the Federal

24   District Court level in New Jersey.

25        THE COURT: Okay.  Then I need a case number.

1          MS. BAER: I can get that for you.

2          THE COURT: Somewhere.  And a case caption.

3          MS. BAER: I may actually have it, after we switch

4    sides here, I'll, I'll look.  I may have it.  If not, we'll

5    get it for you right away.

6          THE COURT: All right.  Let me make a note.  And

7    yes, it did look as though perhaps the issue was the removal.

8    But I couldn't track what had happened to the cases.  It

9    looked as though it had simply been dismissed with prejudice,

10   and closed.

11         MS. BAER: It, I think what probably happened is the

12   State Court dismissed the case after we removed it.  But it

13   is still pending in the Federal District Court.  And it's

14   stayed pending your ruling on the automatic stay injunction.

15         THE COURT: All right.  Okay, Ms. Baer.  Thank you.

16         MS. BAER: Your Honor, with respect to the agenda.

17   Items 1 through 3 on the agenda are claims related matters

18   that are being continued.  They're all in the process of

19   being resolved one way or another.  Agenda item no. 4 on the

20   agenda, Your Honor, you entered an order on that already.

21   And that moves us to agenda item no. 5.  Your Honor, on

22   agenda item no. 5, that was the motion of the Debtors to

23   approve its investment in Ceratech, Inc.  Your Honor actually

24   issued the order last Thursday approving it, however we

25   jumped the gun a little, because the, a document that was

1   attached to the order was actually not the final signed

2   purchase agreement.  I have today, Your Honor, an amended

3   order that has a copy of the, the final signed purchase

4   agreement, and I also have a red line for Your Honor that

5   shows the very minor changes between the one that was

6   attached to the order signed, and now the one attached to the

7   amended order.  I have shared that with the Creditors

8   Committees.  I don't believe they have any objections.  If

9   they do, they, they can speak up.  In addition to that, on

10  Friday we were asked by Ceratech if we would file, under

11  seal, the ancillary documents that go with the transaction.

12  We had never anticipated filing those.  They are business

13  records, business related, confidential transactions.  But

14  Ceratech indicated that they would be more comfortable if we

15  would file them under seal.  So Your Honor, I would ask today

16  for permission to file those under seal, and I have a draft

17  order that gives us that permission if you're so inclined to

18  do so.

19        THE COURT: Is anyone going to object to the Debtor

20  filing some business related documents concerning the sale

21  under seal?  All right.  There's no objection, so yes, I will

22  sign that.  Has everyone seen the amended order?

23        MS. BAER: Your Honor, the Creditors Committees did,

24  did get copies of the amended order.

25        THE COURT: Does anyone have an objection to the

1    order amending the order that approved the investment?  All

2    right.  Then I'll take that too.

3              MS. BAER: Thank you, Your Honor.

4              THE COURT: Just a second.  Okay.  This is actually

5    the first order I signed today.  What's the date?

6              MS. BAER: Today is the 25th.

7              THE COURT: Thank you.

8              MS. BAER:  February 25th.

9              THE COURT: All right.  The order that authorizes

10   the Debtor to engage in the transaction is signed.  And the

11   order that approves the filing of certain documents under

12   seal is signed.  So you may accomplish that later.

13             MS. BAER: Your Honor, I think the way we do that is

14   we actually place a copy of the order on top of the envelope.

15   So could I have a second copy - -

16             THE COURT: Yes.

17             MS. BAER:  - - of the order signed, and then we can

18   just submit it?

19             THE COURT: Yes.

20             MS. BAER: Thank you, Your Honor.

21             THE COURT: All right.

22             MS. BAER: That takes us to agenda item no. 5.

23             THE COURT: That was - -

24             MS. BAER: That's it.

25             THE COURT: Right.

1          MS. BAER: Okay.  That takes us to agenda item no.

2    6.  Your Honor, that was the Debtors' motion to authorize the

3    Remedium closing agreement, and I understand you filed, you

4    signed that order this morning.  I saw it on the docket this

5    morning.

6          THE COURT: Yes.

7          MS. BAER: Number 7, Your Honor, is the Debtors'

8    motion to approve the multi-site settlement agreement with

9    the United States Environmental Protection and Department of

10   Justice.  Your Honor, we have agreed with the EPA to continue

11   this matter to March 17th.  They received one public comment

12   that we're working on resolving.  We, in the meantime,

13   received a couple more suggestions for some revised language

14   that will accommodate some of the objections that were

15   raised.  We're very close, but need just a little additional

16   time for the EPA to approve.  So we ask that that can get

17   continued to March 17th.

18         THE COURT: All right.  It's continued.

19         MS. BAER: Your Honor, that takes us to agenda item

20   no. 8, which is the motion of the City of Charleston for

21   relief from the automatic stay.  When we were here last time,

22   Your Honor, we argued this, and at that time, Your Honor

23   indicated that we needed to get on file by Friday of last

24   week our agreement with ELT for a liability transfer that

25   includes this property.  We did, in fact, file, sign and file

1  that agreement on Friday along with the motion for its

2  approval.  We have not set a hearing date on the motion, Your

3  Honor, and we would ask that Your Honor set the earliest

4  hearing possible to hear that, as that will essentially

5  resolve our issues with the properties, and also then

6  Charleston can be in the position to go forward with whatever

7  they would be doing.  Your Honor, the way the situation is is

8  if we do the ELT deal, the Charleston transaction will, will

9  go on in its merry way.  The good news, however, is if Your

10  Honor lifted the stay and gave the property to Charleston

11  now, we would get no indemnity.  We may get no protections

12  with respect to environmental liabilities.  However, if the

13  ELT deal is approved, and they take over the properties,

14  there is a financial arrangement in the agreement that deals

15  with the Charleston property, whether we sell it by agreement

16  with the city, or whether the city takes it by eminent

17  domain.  But the tremendous advantage to Grace is that ELT

18  remains responsible for the property.  They give us an

19  indemnity for the environmental cleanup, and they either take

20  on the responsibility of the environmental cleanup, or if

21  they work something out with Charleston and Charleston takes

22  some responsibility, that's between the two of them, but

23  Grace is out of the picture.  It also takes Grace out of the

24  picture with respect to any litigation that might take place

25  over the price of the property.  Grace has been negotiating

1   with Charleston.  They shared a tremendous amount of

2   information.  We shared comparables in terms of price,

3   Charleston gave us an appraisal.  We believe that the

4   Charleston number, based on their appraisal is low.  We

5   believe the property is worth more.  We have now engaged an

6   appraiser.  In three weeks we should have an appraisal from

7   our appraiser that gives us a better idea of what we think is

8   the fair market value of the property.  And then we can,

9   again, proceed on with Charleston, or if in the middle of all

10  of this ELT takes ownership, ELT can proceed on with

11  Charleston.  Under these circumstances, Your Honor, we

12  believe it's in the best interest of the estates if we

13  continue the Charleston lift stay motion, and in the meantime

14  set a hearing on the ELT motion for liability transfer that

15  takes all ten properties, including Charleston, and hopefully

16  that can get resolved, and therefore take the Debtor out of

17  the whole issue of the Charleston property.

18        THE COURT: Okay.  One second, please.  And when do

19  you want to try to get that set?  Are you going to be able to

20  shorten notice to get it done for March 17th?

21        MS. BAER: Your Honor, from the Debtors'

22  perspective, we have actually noticed out the motion already,

23  but not the hearing date and the objection deadline.  I think

24  the concern is the objection deadline.  I've spoken with

25  counsel for the unsecureds, counsel for the FCR and the ACC,

1    they all have the same concern, which is the objection

2    deadline for the March 17th hearing is actually next Friday.

3    And that is just, just not enough time for them.  That's only

4    five days.  Whether we could play with those dates to give

5    them enough time, and yet make the March 17th hearing, I don't

6    know.  Again, we would - -

7        THE COURT: What's - - pardon me.  I'm sorry for

8    interrupting.  You have lots of personal injury litigation

9    going on in Pittsburgh in the month of March.  Do any of

10   those dates fit so that an objection deadline is more

11   reasonable?

12       MS. BAER: Your Honor, without looking at Mr.

13   Bernick, I can tell you he would not be happy with me if we

14   took up his trial time.  Because I think the next date, Your

15   Honor, is March 24th on the PI hearing.  I frankly don't

16   anticipate we'll have objections once the Creditors

17   Committees have the time to do the due diligence with respect

18   to the ELT deal.  I'm wondering if there might be an hour

19   sometime between March 17th and April 21st, which is the next

20   hearing, omnibus hearing, to set the matter.

21       THE COURT: Would you like Saturday at midnight,

22   Monday at noon?  One of those days, possibly.

23       MR. BERNICK: I, I'm actually pretty confident that

24   we're going to be so efficient on this trial that we'll have

25   an hour or something here or there.

1            THE COURT: Well - -

2            MR. BERNICK: It's hard to predict, though, a

3    precise date so that counsel can be here.  But maybe if we

4    - -

5            MS. BAER: And that's in Pittsburgh.

6            MR. BERNICK: - - talk a little bit, we can figure

7    it out.

8            MS. BAER: Yeah.

9            THE COURT: Let my clerk look and see what we can do

10   by way of a date.  But let me hear from the city's counsel

11   first with respect to the sale proposal overall.  Okay.  Good

12   afternoon.

13           MS. NAUFUL: Your Honor, again Tara Nauful for the

14   city of Charleston.  The city was pleased to receive the

15   pleadings on Friday.  While nothing would make me happier for

16   the Court to modify the stay today, I understand that that's

17   not going to happen, and we join in Debtors' counsel's

18   request that if, as soon as this could be heard, we would be

19   pleased to have that happen.  I would also ask that in the

20   unlikely event, or in the event that the transaction with ELT

21   is not approved, I would ask that the Court either grant my

22   motion to have the stay modified, or schedule a, an

23   evidentiary hearing so we can proceed forward with that

24   issue.

25           THE COURT: Can I reserve that ruling until the sale

1   hearing, because I'm a little reluctant to provide another

2   evidentiary hearing date when I think if no one, especially

3   if no one objects, the sale will undoubtedly go through.  It

4   seems as though, from the Debtors' estates' perspective, it's

5   probably a pretty good deal.

6            MS. NAUFUL: Yes, Your Honor.

7            THE COURT: Okay.

8            MS. NAUFUL: That, that would be fine.

9            THE COURT: All right.  You may appear for that

10  hearing, whenever it is, by phone if you like.

11           MS. NAUFUL: Thank you, Your Honor.  If my client is

12  comfortable with that, I will.

13           THE COURT: All right.

14           MS. NAUFUL: Otherwise I may see you in Pittsburgh.

15           THE COURT: Okay.  Let me get back to the issue of

16  the hearing date after my clerk has a chance to check the

17  calendar in Pittsburgh.  And then we'll work on that date.

18  Does anybody have a preference for a hearing date, other than

19  to make sure you have an adequate time for objections.

20           UNIDENTIFIED SPEAKER: (Microphone not recording.)

21           THE COURT: Hello?  Is the CourtCall operator on,

22  please?

23           COURTCALL OPERATOR: Yes.  This is the operator.

24           THE COURT: I'm sorry.  We're getting someone

25  speaking to someone else, not participating in the court

1    proceeding.  Are you able to identify who that is and mute

2    that call?

3              COURTCALL OPERATOR: Yes.  I did find the line, and

4    I will mute it now.

5              THE COURT: Thank you.

6              COURTCALL OPERATOR: You're welcome.

7              THE COURT: Okay.  I take it that wasn't a relevant

8    response, so okay.  Then we'll just, oh, I'll get back to

9    this as soon as my clerk can give me some dates.

10             MS. BAER: And then, Your Honor, should we continue

11   the Charleston motion perhaps to the April 21st hearing, then?

12             THE COURT: Ah - -

13             MS. BAER: Or at least - -

14             THE COURT:  - - either that or to the sale hearing

15   date.

16             MS. BAER: Right.

17             THE COURT: I think that may make more sense.

18   Because if, in fact, the sale is approved, I would assume at

19   that point it would be moot?

20             MS. BAER: It would - -

21             THE COURT: Or would you want - -

22             MS. BAER: It would be.

23             MS. NAUFUL: It would be moot, Your Honor.

24             THE COURT: Okay.  So let's continue it to the sale

25   hearing date.  And I'll get back to that date, as I said, as

1   soon as I can.  Okay.

2           MS. BAER: Thank you, Your Honor.

3           MS. NAUFUL: Thank you, Your Honor.

4           MS. BAER: Agenda item no. 9, Your Honor, is

5   actually off calendar.  We put that on on an abundance of

6   caution, because we didn't have a hearing date.  We now

7   understand that this motion of the FCR is to be taken off the

8   calendar, and will be revisited once we go further down the

9   road with respect to what's happening on the Speights claims.

10          THE COURT: All right.  That's fine.

11          MS. BAER: Your Honor, agenda items 10 and 11 relate

12  to ZAI.  Agenda item no. 10 is actually a, a status

13  conference with respect to a pending adversary proceeding

14  that was filed by ZAI claimants in 2001.  What happened, Your

15  Honor, is that matter the Debtors actually had moved to

16  dismiss.  We'd also moved for a bar date on ZAI at the time.

17  One thing led to another, and we ultimately ended up in the

18  Science trial proceedings, and this adversary proceeding was

19  put on hold, and still remains on hold as we discuss how to

20  proceed now that the Science trial is over, and the ruling is

21  issued.  I think it makes sense to talk about that in the

22  context of ZAI's status that Mr. Bernick's going to address.

23          THE COURT: All right.  All right.  Mr. Bernick.

24          MR. WESTBROOK: Simply, Your Honor, to save time so

25  Mr. Bernick can focus his argument on something else, we have

1   no objection to reinstating the dismissal of the Lewis

2   adversary which was about prejudice that you entered on April

3   22nd, 2002, and take that off the docket.

4           THE COURT: Okay.  I'm sorry.  Which, which agenda

5   are we addressing?  Item 10?

6           MR. WESTBROOK: This is item 10, Your Honor.

7           THE COURT: All right.

8           MR. WESTBROOK: The Lewis adversary.

9           THE COURT: So you're agreeing to dismissal without

10  prejudice?

11          MR. WESTBROOK: Yes, Your Honor.  That's what you

12  had entered.

13          THE COURT: Yes I did.

14          MR. WESTBROOK: And we agree to that.

15          THE COURT: All right.  Is there any problem, by

16  anybody, with simply having that dismissal without prejudice

17  entered?  Okay.

18          MS. BAER: No, Your Honor.

19          THE COURT: So what type of an order do I need,

20  then?

21          MS. BAER: I guess we can give you another form

22  order like the one you actually had before dismissing with

23  prejudice.

24          THE COURT: Without, without prejudice.

25          MS. BAER: Without prejudice.  Sorry.

1          THE COURT: Okay.  That's fine.  Mr. Bernick.

2          MR. BERNICK: Yeah.  I guess that brings us to the

3     status conference with respect to ZAI and I know that this

4     matter has been put over a few times in the past so we could

5     see where the case was developing.  And I think that, from

6     the Debtors' point of view, the time has come to try to move

7     this area of the case forward.

8          THE COURT: May I interrupt you, Mr. Bernick?

9          MR. BERNICK: Sure.

10         THE COURT: I think I may have some dates for the

11    other.

12         MR. BERNICK: Okay.  Sure.

13         THE COURT: And then if counsel wishes to leave,

14    that may help.  Mona, the problem, these are both dates that

15    I'm teaching.  You can't find anything else?  These are, the

16    first dates that she can find are in April.  April 10th.  So

17    I'm not sure that that's - -

18         MR. BERNICK: I don't know if - - I think that maybe

19    the simplest way to do that is that as we get a little bit

20    closer to the trial days, we can see when there might be some

21    daylight, and then we'll just put it on our list of things to

22    make sure that we talk about.

23         THE COURT: We have to give notice.  It's a sale.

24         MR. BERNICK: Oh.  What, what, how much notice is

25    - -

1          THE COURT: I think you have to have 20 or 25 days.

2    I never know that.  I have to look them up all the time.

3          MS. BAER: Your Honor - -

4          THE COURT: I don't do them.

5          MS. BAER: - - it's a liability transfer, so it's

6    not technically a sale.  So it's not, it's not - -

7          THE COURT: Oh.

8          MS. BAER: It's not done on sale procedures.  But

9    clearly we do have to give some notice of the hearing.

10          THE COURT: What are you calling it?  A settlement?

11          MS. BAER: Yeah.  It's a settlement and a use of

12    proceeds of the estate.

13          THE COURT: So you need 20 days notice - -

14          MS. BAER: Yeah.

15          THE COURT:  - - on a 9019 - - well, I guess 15.

16    Delaware Rules are 15?

17          MS. BAER: Right.

18          MR. BERNICK: I would probably think - - well, I

19    just, I don't want to talk without having the opportunity to

20    speak a little bit with opposing counsel, but I think that

21    even that gives us a few days to try to work this out.  To

22    figure out a space during the trial.  That, you know, I guess

23    my own feeling is at the end of the day, there, we could take

24    almost any day to the day and figure out how to work it in.

25    Doesn't sound to me like it's going to be a very long

1  discussion in any event.

2         THE COURT: Well I think what we could do is start

3  at 8:30 some morning.

4         MR. BERNICK: Sure.

5         THE COURT: And, because you're there for, generally

6  three days in a row.  So let's say the second day we could

7  start at 8:30 - -

8         MR. BERNICK: That's fine.

9         THE COURT: - - put this hearing on at that time.

10  You'll all be there.  It won't cost any additional expense

11  for the majority of folks to be there.  There will be some

12  problem for anybody just interested in the sale, if they're

13  coming.  If they're participating by phone, the only bad

14  thing about that would be anybody coming from the west coast,

15  that will be awfully early in the morning.  Will there be

16  anybody involved from the west coast?

17         MS. BAER: No, Your Honor.

18         THE COURT: No?  Okay.  So why don't we just pick a

19  date?  Tell me which date's convenient.  So that you have

20  sufficient notice.

21         MR. BERNICK: Sure.  Well I think the first date we

22  have is March 24.  Which would mean that the second day is

23  March 25.  So let's put it down for 8:30 on March 25.  And

24  - -

25         THE COURT: Double check, Mona, please.  I just want

1    to double check.

2            MR. BERNICK: Sure.

3            THE COURT: Okay.  So that, this, the relief from

4    stay motion - - I'm back to item no. 8 - - and the sale

5    hearing, I'm calling it a sale.  What did you call it?  A

6    settlement hearing?

7            MS. BAER: Liability transfer.

8            THE COURT: Liability transfer hearing.  Will be

9    held in Pittsburgh on March 25th at 8:30 a.m. eastern time.

10   And anyone who chooses to participate by Courtcall may.

11   Okay.  Anyone who's not interested in anything else on the

12   agenda is free to leave.  Thank you Mr. Bernick.

13           MS. BAER: Your Honor - -

14           THE COURT: Oh.

15           MS. BAER:  - - we're going to need an objection

16   deadline.

17           THE COURT: Oh, I'm sorry.  Yes you will.  Well I

18   need the pleadings at least, I would say, a calendar week

19   plus the preceding Friday.  Mona do you have a calendar up?

20           MS. BAER: I think that Friday is March 14th.

21           THE COURT: Okay.  March 14th.  How's that?

22           MR. WYRON: Your Honor, Richard Wyron for the

23   Futures Rep.  That works as long as the Debtor would be in a

24   position to share with us certain due diligence they have

25   done, which would avoid the necessity for any of the being

1    redone.  So assuming we can get to that point, the 14th would

2    work fine, I believe.

3         MS. BAER: Your Honor, I've already spoken with the

4    FCR and the ACC and indicated to them that we are happy to

5    set up a call as soon as they would like to talk about the

6    due diligence, and share whatever information we can.

7         THE COURT: Okay.  Actually, I mean, for a sale, I'm

8    really not sure I need that much time for the objections

9    anyway.  So why don't we say instead of March 14th, Monday

10   would be the 17th.  Why don't we say the 19th?  I think that

11   would help you some, somewhat.  And that should give me

12   sufficient time as well.

13        MR. WYRON: That's fine, Your Honor.  Thank you.

14        THE COURT: Anybody object to March 19th?  Okay.

15   Thank you.  Thank you Mr. Bernick.  Okay.

16        MR. BERNICK: Okay.

17        THE COURT: We're back on item 11.  I'm sorry.

18        MR. BERNICK: So an old matter that we now think is

19   appropriate to move forward.  And our basic proposal goes

20   back to, I think, where this matter began lo those many years

21   ago in the spring of 2002.  Your Honor will recall at that

22   time there was a very active discussion.  A lot of people

23   participating in what should happen with respect to the

24   litigation of the ZAI claims.  And I think that the two

25   competing proposals that were before Your Honor as of March

1    2002 were on the one hand, the Debtors' proposal to have a, a

2    notice and bar date, and on the other hand the proposal of

3    people representing the ZAI claimants to have a class action

4    proceeding.  And in fact, they had filed the, the class

5    action cases, and those were, in turn, the subject of a

6    motion to dismiss.  And I do remember that after a very

7    vigorous argument, Your Honor observed, that in the context

8    where everybody agreed that there had to be some kind of

9    notice.  There was disagreement about the content of that

10   notice.  And there was disagreement about what process would

11   then follow after the notice.  Would it be, would it be a bar

12   date and individual claim litigation?  Or would it be a class

13   action type of litigation?  Your Honor injected your own

14   concept and idea that said before we go down the road to deal

15   with all those issues, there really is a prior issue that

16   needs to be addressed.  And that prior issue was whether

17   there really is, in fact, a problem with the product.

18   Because if there were not a problem with the product, that

19   would have a significant impact, not only on the content of

20   any notice that was provided, but would also have a

21   significant effect on Your Honor's consideration of what

22   process to follow after the notice took place.  So a fence

23   was born.  The idea at the Science trial.  And a lot of

24   consideration given to how the issue should be framed, as

25   well as how it should be litigated.  The able services of Mr.

1    Westbrook were employed to litigate that issue on behalf of

2    the ZAI claimants.  And as Your Honor obviously is well

3    familiar, ultimately Your Honor issued an opinion finding

4    that there was not an unreasonable risk associated with the

5    product, and that brings us to where we are here today.  So I

6    believe that Mr. Westbrook from time to time has made

7    proposals of further litigation associated with other issues

8    that may be related to the decision that Your Honor has made

9    with respect to risk.  But from the Debtors' point of view,

10   that would not really advance the cause.  That would continue

11   the litigation process.  Maybe at some point there will have

12   to be that kind of litigation.  But the first order of

13   business really does remain to go back to where we were in

14   '02, and pick up with the scheme of finding out who these

15   claimants actually are, and then involving them in the

16   process either of litigation, or what we hope will take

17   place, which is that there will be a plan process.  So we

18   think that now that Your Honor has ruled with respect to the

19   Science issue, that the process of crafting a notice will no

20   longer, should no longer be that contentious.  And we're

21   prepared to set up a very prompt schedule for our moving for

22   a notice and bar date program with respect to the ZAI claims.

23   We would have the benefit of Your Honor's decision with

24   respect to the content of the notice.  And we would, further,

25   propose that there be a bar date, not in fact a class action

1    process.  The purpose for doing all of that is to, first of

2    all, identify who it is that really is going to pursue a

3    claim.  That is one of the big unknowns in this process.

4    There's been a lot of speculation about that.  But the

5    speculation is really unhelpful with respect to moving the

6    case forward to resolution.  We just ought to find out.  So

7    we would be able to identify, based upon who submits a timely

8    claim, how many claimants there are.  And we would further be

9    able, what we hope is to then be able to give them notice of

10   a consensual plan, if there's a consensual plan, but if

11   there's not a consensual plan, to give them notice of

12   alternative plans that are before the Court so that they can

13   come and participate, and object, if that's what they feel is

14   appropriate.  And that would be our proposal for how to move

15   forward.  I know Your Honor didn't want to take further

16   papers before having an informal discussion, but that's where

17   the Debtor is going.  With respect to class certification,

18   Your Honor also deferred that issue back in the spring of

19   2002.  And in fact, there were numerous discussions that took

20   place at succeeding omnibus hearings thereafter where Your

21   Honor again underscored the priority of the Science issue,

22   and the fact that the class certification may or may not have

23   to be taken up at some point, but it wasn't necessary to take

24   it up now.  The Debtors' views with respect to class

25   certification haven't changed.  Indeed they've been

1    underscored by Your Honor's determination.  But under any set

2    of circumstances, under the rules, Rule 23 doesn't get

3    brought, doesn't, can't be brought to bear until there's a

4    contested matter, and until therefore, there are claims as to

5    which there is an objection.  We're not going to have a

6    contest with respect to which there can be class

7    certification.  And that's very clear under the American

8    Reserve decision, and under the, and under the rules.  So

9    after the bar date passes, and people come forward with their

10   claims, if it is still the determination of the ZAI claimants

11   that they would prefer to proceed by way of class, that can

12   get taken up.  But the, but the prior stage under the rules

13   is to have a notice and bar date program so that the actual

14   claimants can be before the Court.  And that would be, Your

15   Honor, Grace's proposal.  We're prepared to file a motion for

16   setting a notice program and bar date within the next 21

17   days.  I know that Your Honor, we are very busy, and you are

18   very busy, but this is a matter that is not of minor

19   consequence.  We should get it kind of on a track where it

20   can be wrapped in with the rest of the case.

21           THE COURT: Okay.  Mr. Westbrook.

22           MR. WESTBROOK: Good afternoon, Your Honor.  Your

23   Honor, I listened with interest to Mr. Bernick.  And I

24   actually agree with something he said today, and I'll get to

25   that in just a minute.  I did want to mention to you that Mr.

1    Scott has come from Washington state today, Your Honor.  He

2    may want to add a few comments about some of this, this

3    status.  We're having a discussion today, an informal

4    discussion, and it's on the, on the agenda as a status

5    conference, so I wanted to step back just a second.  I'm

6    going to engage Mr. Bernick on the process he wants to talk

7    about.  But it occurred to me that we are in this case now

8    approaching the 7th year anniversary.  I took a look to see

9    that when this case was filed, gasoline was $1.60 a gallon,

10   so it's been a long time that we've been at this.  And a

11   bankruptcy that's gone on for about 25 hundred days deserves

12   some rest, and I want the Court to know that we have not been

13   idle in trying to get the ZAI matter into a position to be

14   resolved.  I know Mr. Bernick is aware of that.  Hasn't been

15   directly involved, but he's aware of that.  We recognize,

16   Your Honor, that ZAI is the tail on the dog.  The dog is

17   sitting over here, my friends on the personal injury side.

18   Until personal injury can be resolved, the case can't be

19   resolved.  That doesn't mean that ZAI can't be resolved, and

20   be put in a position where we can get it resolved.  I have

21   settled many cases with Grace.  Worked with Mr. Restivo,

22   who's on the phone, on many cases.  Litigated with Mr.

23   Bernick.  And I want to tell the Court, in general context,

24   that we have made significant progress in getting a framework

25   for resolution.  The devil is in the details, but we have, in

1    our view, made significant progress in getting some

2    resolution.  I'm going to come back to that in just a few

3    minutes, Your Honor, because we made need some assistance

4    from the Court in that respect.  But I believe that if the

5    personal injury issues get resolved that ZAI will not stand

6    in the way of resolving this bankruptcy.  But let me address,

7    for a few minutes, Mr. Bernick's point, Your Honor, that it's

8    now a bar date.  Your Honor, Mr. Bernick was not involved in

9    the ZAI process.  He's been busy with many, many other

10   things.  Mr. Restivo was.  And as the Court knows, in your

11   ZAI opinion, you laid out the next steps.  And you said, Now

12   that we have determined, speaking for the Court - - and you

13   know, Your Honor, I'll preface this by saying we respectfully

14   disagree with the Court's conclusion.  But I'm going to

15   proceed that the Court has ruled, and for the time being that

16   is the law of the land.  The Court said, Now that I've

17   determined that there's not enough reasonable risk of harm,

18   the next thing we need to go on is say, how does that finding

19   translate into what claims may remain.  Because they

20   recognize that the claimants have a number of claims.  So we

21   need to know what claims remain.  Because the Court said in

22   its opinion, my ruling may be fatal.  And if Your Honor is

23   correct, we hope not, but if you're correct, there will be no

24   need for a bar date.  There'd be no claims.  So Your Honor

25   logically said the next step is to see what claims remain.

1    Let's find out which of those claims may be viable.  And you

2    also said, and then if claims remain, let's see if they

3    should be treated as a class action.  Will a class action

4    assist the bankruptcy process here, or is it some kind of an

5    impediment?  So those are the issues outlined by the Court.

6    Now the last time we were here, Your Honor, for a ZAI status

7    conference on where we go next, Mr. Restivo, who was involved

8    in ZAI, spoke for Grace.  And he said that Grace's position

9    was that before we, quote, "litigate our brains out over

10   whether there should be a bar date and a proof of claim form,

11   that we should look at what claims remain."  He suggested a

12   briefing date so that we could brief what claims, under state

13   law, would remain.  We agreed that that would be an

14   appropriate way to proceed, and we, both sides asked for some

15   time to discuss the other matters.  And I will tell Your

16   Honor, without getting specific, that we have been busy on

17   other matters, as well as a lot of other people in this

18   courtroom.  So how do we get an answer, Your Honor, to what

19   the Court said, and what Grace, through Mr. Restivo, said the

20   last time was the next step, and we agreed was the next step.

21   That before you go out with a bar date, you try to tell

22   people to file a claim.  You have to have some idea if there

23   are claims, and if there are, what types of claims might they

24   have.  Your Honor, as we suggested at the last status

25   conference, we believe a way to jump over a lot of that issue

1    to get a definitive answer is to utilize a process that the

2    Federal Courts are utilizing around the country, and that is

3    certify these issues to some state appellate courts.  We

4    could pick a few, Grace could pick a few, and let's get some

5    answers on whether there are ZAI claims under the facts that

6    we've developed in the record.  The Court is busy with the PI

7    estimation.  We wouldn't have to dump this on the Court.  Of

8    course we could ask the Court to figure that out, but I don't

9    think that's the way to go and the time situation we've got

10   with the Court.  So our proposal on that, Your Honor, is that

11   we do exactly what we talked about doing the last status

12   conference, and not this new idea that Grace has had to jump

13   over all of that, forget about the Science trial now, and

14   let's just go back to 2002.  We're moving along, we think we

15   can get those answers.  And Mr. Bernick also says class

16   certification might be appropriate at some time, but we don't

17   think it's appropriate right now.  Your Honor, I was a little

18   surprised to hear Mr. Bernick say that, when we said, well

19   you can file the class action after the bar date, because I

20   read the transcript of his argument in the Anderson case

21   where he was arguing that a class action filed after the bar

22   date was too late, because it would interfere with the bar

23   date process, and the claimants who had come in, and it would

24   be a collateral attack on the bar date, etcetera.  So I don't

25   know how a class motion filed afer the bar date can be too

1    late, but a class motion filed before the bar date would be

2    too early.  I think that's the right time to do it.  And Your

3    Honor, in the <u>Sacred Heart Hospital</u> case, which a number of

4    people have cited in a number of proceedings, Eastern

5    District of Pennsylvania, which is 177 Bankruptcy at 16, the

6    Court said, quote, about class motions in bankruptcy, quote,

7    "Timing is also significant.  The most propitious time for

8    filing a motion for class recognition is before a bar date is

9    established.  Since the bar date is effectively uprooted, in

10   part, by the extension of the bar date for a favored class of

11   creditors."  So we think that our class motion, and Your

12   Honor, in agreeing to the dismissal without prejudice of the

13   Lewis case, we certainly recognize that the Lewis case put us

14   on record very early in this case, Your Honor, as wishing to

15   proceed by class certification.  We're not a johnny come

16   lately, as Your Honor has heard about some of the other class

17   certification motions that have been involved.  So we have

18   been trying, for six years, Your Honor, to get the class

19   issue up.  What will the class decision before the bar date

20   accomplish?  Why don't we just do what Mr. Bernick says?

21   Send out the notice.  Let's see who comes in.  We'll have the

22   universe of people.  Well as the 7th Circuit said in the

23   American Reserve case, the class representative is the agent

24   for the missing.  There are going to be many, many missing

25   claimants.  Your Honor I think that there will be no dispute

1    that the number of ZAI installations is in the thousands.  We

2    believe it's probably close to a million or more.  But

3    there's many thousands and thousands of unknown and unknowing

4    people out there.  If we have class certification beforehand,

5    and if Your Honor decides to address the matter from the

6    class prospect, we have the class representative who has

7    notice.  It greatly affects the scope of the notice, the

8    expense of the notice, the complexity of the notice, and also

9    serves as a due process backstop for challenges to the notice

10   later on.  So we think they're very good practical reasons to

11   have the class certification before the bar date.  We avoid

12   the issues that have come up with the Anderson case, Your

13   Honor, that we're making collateral attacks on the bar date,

14   or that the bar date notice is res judicata when you attack

15   the adequacy of notice.  If you go ahead first, as the Court

16   laid out.  See if we have claims, number one.  Two, let's see

17   if those claims can be taken care of by class certification.

18   If we proceed that way, Your Honor - - and I don't propose

19   that we take a long time to do this.  I propose we get

20   together with Grace, we have a very tight briefing schedule

21   on getting together on some states where we can get

22   certifications to the appellate courts.  Let them choose

23   some, we'll choose some.  Let's get an idea what the Courts

24   are saying.  I don't propose we take a long time to get the

25   class certification motions up.  I know Your Honor is busy.

1    When you can fit that in your schedule, we'll be ready to go.

2    But Your Honor, we think a bar date at this point would be

3    part of the problem, not part of the solution.  A bar date is

4    going to bring into this courtroom not folks represented by

5    Ed Westbrook - - not that we're any great shakes, but at

6    least you have a devil to talk to - - the devil that you

7    don't know are going to be homeowners, the ones who file

8    claims.  And we think a lot of people will just be

9    overwhelmed by getting a notice like this, if they have a 5

10   or $10 thousand claim, which is the average of the ZAI

11   claims.  But they're going to, the Court's going to have a

12   situation where you have to deal with homeowners.  Mr.

13   Bernick and Grace, obviously, they would prefer to do that.

14   They can file omnibus objections and crush those claims as

15   they come in.  But we think the orderly administration of

16   justice deserves that we go back and do what Your Honor said

17   we were going to do, what we asked to be done, and that we're

18   able to move ahead with the class device.  Let me come back

19   to where I started, Your Honor, because I wanted to give you

20   the status.  I said we have made progress.  We have what I

21   believe is a proper framework for resolution.  The devil is

22   in the details.  We believe, Your Honor, and I have seen Your

23   Honor first cajole, and then suggest, and then order parties

24   to mediation.  We believe that if we were to get an

25   independent, knowledgeable third party involved, that that

1    person, he or she, might be able to crack some heads, might

2    be able to say, Westbrook, You're crazy.  What you think is

3    crazy.  These people are not here, etcetera.  Or Mr. Bernick

4    or Mr. Restivo, listen to this.  Or Mr. Grace listen to this.

5    That if we had a short period to attempt some mediation, we

6    think it might, might produce something that could get us

7    somewhere.  I'm not talking about a long time.  Thirty or

8    sixty days to take a look at it.  I know the Court has got

9    the asbestos property damage traditional people moving toward

10   a mediation.  I'm not even opposed to looking at if they get

11   a mediator who's mutually acceptable, on the next day after

12   he or she hears their situation, we go down there, and we

13   talk to the, to the mediator.  But I think, Your Honor,

14   before we launch even into my idea of state certification,

15   class certification, or certainly into Mr. Bernick's idea of

16   bar date notice, with all the issues that that's going to

17   bring up about due process, adequacy, who you notify, and

18   what you notify them about, etcetera, that this deserves, as

19   we approach the 7th anniversary of this case, this deserves a

20   look to see if we can't crack some heads and put this thing

21   to bed.

22            THE COURT: All right.  Well rumor had it, at some

23   point in this case, that there was some resolution.  But I

24   don't know between whom and what parties, and what the

25   mechanism of the resolution was.  So was there some

1    resolution?

2              MR. WESTBROOK: Yes, Your Honor.  Back in the days,

3    days of yore, we had a resolution where we had a resolution

4    with the PI side that when they got their deal set with

5    Grace, we were going to get a number based on what they got.

6    Mr. Bernick objected.  Vociferously said, you can't base your

7    settlement on what PI got, and that's, that's, that cleared

8    that deal, frankly.  And for good, for good and proper

9    reasons, I'm sure in Mr. Bernick's mind he cleared the deal.

10   But that's, and that's life.  But we're looking now at a, a

11   different framework.  And Your Honor, we had discussions with

12   Grace, discussions with PI, discussions with the futures.

13   They all know what we're about.  It's no secret.  We're not

14   hiding any ball.  And we'd like to try to get some help if

15   the Court's so inclined, to try to see if we can get it

16   resolved.  If not, in a case that's gone 7 years, I don't

17   think 60 days would kill us.

18              THE COURT: Mr. Scott.

19              MR. SCOTT: Good afternoon, Your Honor.

20              THE COURT: Good afternoon.

21              MR. SCOTT: I appreciate the opportunity to address

22   the Court.  I'm mindful of, that it's, the Court's had a long

23   day, and I will be as compact as I can.  This is an important

24   time, though, to reflect on where we are.  I am in full

25   agreement with Grace that this is the time to move the case

1    forward.  I'm not sure that a way to do that is by starting

2    over again, or by going in reverse.  And a good way for the

3    Court to sense how to move forward is to figure out where,

4    where are we now.  I am not a bankruptcy counsel, nor aspire

5    to be one.  I'm not an asbestos counsel.  My career is, and

6    most of the people who've been prosecuting Zonolite claims

7    are not part of the plaintiffs' asbestos bar at all.  My own

8    practice is in the area of deceptive business practices in a

9    class action setting or mass tort, and particularly where

10   equitable and injunctive remedies are the sensible thing to

11   do.  And one thought, very briefly, about the Barbanti class

12   action, because it reflects on the three points I want to

13   make.  One having to do with the class, one having to do with

14   this issue of who are they, let's have a bar date notice, and

15   then last the Science trial.  The Barbanti action, as this

16   Court knows, was filed, and after about nine months,

17   certified as a class action in the state of Washington.  I

18   stand before the Court not only as co-counsel with Mr.

19   Westbrook on the Science trial, but as class counsel who had

20   responsibilities for the state of Washington, which I take

21   very seriously.  And with two representatives, one of whom,

22   at the request of Grace.  Mr. Bush.  They were designated as

23   agents to look out for the interests of that class.  The

24   class action was an equitable class action.  It sought

25   notification, so that people knew the product was

1    contaminated, education, so they didn't senselessly disturb

2    it and cause unnecessary expenses, and remediation.

3    Notification, education, remediation.  Remediation only when

4    necessary, and if necessary.  So that, if I'm not in the

5    business of handing out checks, the Court recognized the

6    importance of certifying that as a class action, both because

7    an equitable remedy was potentially the right solution, and

8    because the community was a community of homeowners.

9    Homeowners who are not simply unknown, they were unknowing.

10   That's why the Court certified it as a 23(b)(2) class action,

11   non-opt out.  Because our scientific surveys at that time

12   proved, people don't know if they have Zonolite, wouldn't

13   recognize it if they ran into it, and they encounter it in

14   unexpected ways, and had been told for half a century it's an

15   innocent, harmless product.  All right.  Now that, that

16   impacts the three issues I want to talk about.  One, class

17   recognition, two, let's have a bar date notice, find out who

18   they are, and lastly the Science trial issue.  Class

19   recognition, there's actually two issues here.  One is a

20   motion for the Court for recognition under Bankruptcy Rule

21   9014, recognition of a class action that has already been

22   certified by a senior judge after many months of work, and

23   with designated class representatives who have actually been

24   engaged in this bankruptcy for the last seven years.

25   Recognition of a pre-existing class.  So Mr. Bernick says,

1    well you can't address class until there's a contested claim

2    process.  I'm sure the Court recalls that it was Grace who

3    filed a proof of claim for my two class representatives, and

4    then contested the claim.  And that triggered the Science

5    trial.  We have, my two class representatives, having spent

6    the last several years defending themselves and not yet a

7    class, because the Court wanted to put that off.  So if were

8    that true, if it would be right for addressing that question

9    of class certification, recognition of a class.  And then

10   there's a separate question as to whether or not this Court

11   ought to be certifying classes.  Which is really a separate

12   issue.  The second question, we ought to have a bar date to

13   find out who these people are.  A bar date notice will

14   certainly play an important role in creating some finality.

15   As it relates to Zonolite. And I am not trying to draw

16   attention to due process problems.  Because Mr. Bernick

17   characterized this as the content of the notice.  The problem

18   is the content of the notice.  The problem wasn't the content

19   or the adequacy of the notice.  The problem was the

20   effectiveness of the notice.  Meaning will a bar date really

21   do anything to advance the bankruptcy, or would a bar date

22   notice only bring within the bankruptcy people who knew, or

23   should know, that they have a claim and file proofs of claim,

24   and left out 90% of the actual Zonolite claimants.  It, it's

25   through class certification, and appointment of a

1    representative, that unknowing claimants become represented,

2    and become part of the bankruptcy process.  So a, a proof of

3    claim process will certainly generate some claims.  It will

4    not generate claims from unknowing consumers, and that's most

5    people.  And unless those unknowing people, in my view, are

6    represented, which goes back to the class certification

7    issue, then you could have a notice program that's due

8    process bullet-proof, but as a, as a practical bankruptcy

9    matter was an ineffective notice, because it didn't help the

10   Court to get its arms around actual creditors, and resolve

11   this Debtors' problems as between not only Zonolite, but all

12   the other legitimate creditors.  So I look forward to

13   addressing this issue.  But there shouldn't be a pretense

14   that the problem is let's find out who they are, a bar date

15   notice will let us know.  The last thing I'll say on this

16   issue is this.  It is wrong, and wrong headed, to say that it

17   is not possible to, to determine Grace's potential

18   liabilities unless you have a bar date.  Their, we, Grace has

19   produced very fine information with regard to production of

20   Zonolite.  And it is a very simple process to make estimates

21   of the numbers of homes that would have been fitted with

22   Zonolite.  And, and it is also not difficult, because we've

23   had experts do it, look at statistical data on home

24   demolitions, how, the frequency with which homes are taken

25   out of the housing stock, and make, and bracket the number of

1   existing, existing homes, as of 2005, that would contain

2   Zonolite.  Within a, in a reasonable nature.  We don't know

3   the names, we don't know the addresses, but the scope.  It is

4   ascertainable, and isn't ascertainable by a bar date notice.

5   The last thing I want to say has, relates to the Science

6   trial.  I'm not sure that that's over.  I have a, a couple

7   clients, and also some responsibilities as an appointed

8   counsel.  We have a pre-trial order that is a very important

9   one.  It is non-final.  We weren't successful in seeking

10  interlocutory appeal.  It, I think this Court, as Mr.

11  Westbrook said, ought to take, ought to use that as a tool to

12  move this case forward.  It would be procedurally confounding

13  if that was held in limbo, particularly as it relates to the

14  claimants who are in mid-course on their proofs of claim.

15  And, so as this Court thinks about how to move this case

16  forward - -

17          THE COURT: I'm sorry.  It would be confounding the

18  whole what in limbo?

19          MR. SCOTT: The whole Zonolite process.  We have,

20  the individuals they designated as claimants, who's claims

21  they contested, were the representatives in the class.

22          THE COURT: Right.

23          MR. SCOTT: Well, okay.  Now from what we, what is

24  is that we have learned from the Science trial?  What claims

25  - - because the Court was trying to find out not only, was

1    trying to educate itself about Zonolite, and understand

2    legally what it might involve.  Unless this Court tackles

3    that question of what, what claims, given the Court's factual

4    rulings, what claims exist, the Court can't answer the

5    question, is it appropriate to address those claims on a

6    class basis.

7         THE COURT: Right.  That's what I said in my

8    opinion.

9         MR. SCOTT: That's right.  And the representatives

10   who are seeking to be representatives of the class, are the

11   people who's claims are being contested.  Now if we just sort

12   of pretend like the Science trial is at an end, and turn to a

13   proof of claim process, I, I'm not sure how that advances

14   anything.  It, it is, it's a place holder.

15        THE COURT: I thought the Science trial was

16   necessary for a number of reasons, but primarily it had to do

17   with crafting what information was going to go in any kind of

18   a notice.  Whether it was a class action notice, a bar date

19   notice, a plan.  However parties who might have some access

20   to Zonolite where what they were going to be told with

21   respect to the danger that they face.  That was the problem.

22        MR. SCOTT: That was an important part.  Correct.

23        THE COURT: That was an important part.  And that's

24   what I was trying to ascertain.  If it was something where

25   every time they take a step in their house they are at major

1    risk, then that was one issue.  If it's not that level, then

2    there's a different issue.  And that's what I was initially

3    trying to figure out.  I did my best to go through the

4    evidence that was presented, and come to a resolution of that

5    issue.  From that evidence, I concluded that, at least if

6    left in place, Zonolite doesn't provide any risk of harm any

7    different from anybody being out in the general environment,

8    essentially.

9            MR. SCOTT: Um-hum.

10           THE COURT: So to the extent that there is need to

11   provide some notice, and I don't think anybody disagrees that

12   there's need to provide some notice, what I did not want to

13   do was to frighten possibly 150 million people who might be

14   living in these homes, saying that, you know, you're in

15   immediate danger of death, when in fact, they're not.  And

16   that was what I was attempting to find out.  I have satisfied

17   myself that they are not in any imminent danger of death.

18   So, or of serious risk of harm, or whatever other words you

19   want to put on this particular issue.  So that opinion, I

20   think, should set the base for some kind of a notice, however

21   this notice issue is going to go out.

22           MR. SCOTT: Sure.

23           THE COURT: That was my primary, primary goal at

24   that point in time.

25           MR. SCOTT: Um-hum.

1          THE COURT: If there is some benefit to trying to

2    get to a mediation to help determine the number of claims

3    that are out there, because all parties need to know that

4    information, both - - and I think at this point it shouldn't

5    be an issue of future claims, it should be current claims,

6    because Zonolite is no longer in production.  It's in houses.

7    It could be a matter, I suppose, where somebody sells a house

8    and somebody moves into that house.  So maybe there's an

9    issue of, in that sense, of future exposure.  I don't know.

10   But nonetheless, the Zonolite quantity of claims is known,

11   because it's in the number of houses that are, exist.  And

12   it's not going to be put into more houses.  Because it's not

13   being manufactured or distributed anymore.  So there's a

14   finite quantity of homes that ought to be able to be

15   ascertained, somehow.  I mean, actuaries, statisticians, they

16   do this kind of stuff.

17          MR. SCOTT: Um-hum.

18          THE COURT: There ought to be somebody out there who

19   can figure out a reasonable number of claims.  That ought to

20   set a base for figuring out how much it's going to cost this

21   estate to resolve those claims however it's going to be

22   resolved.  Now there are lots of ways that you folks can come

23   up with some way to attempt to resolve the issue at, at a

24   point, but I think the next step is you need to know what the

25   number of claims is that everybody is going to face.

1          MR. SCOTT: Um-hum.

2          THE COURT: And that's what I was trying to say in

3    the opinion.  I think you have to take this in a logical

4    step.  Now how you want to get there, that's what today's

5    status conference is supposed to be about.  If mediation will

6    help, fine.  I'm all for whatever, whatever will help move

7    this case so that Grace can get back in its business and you

8    folks can go about your lives.  It would be wonderful.

9          MR. SCOTT: And all I'm trying to suggest on this

10   last issue is in addition to this educating the Court on the

11   nature of the notice itself, it would be helpful in educating

12   the Court on the nature of the claims that would exist in

13   view of the Court's ruling, and the appropriateness of how it

14   is best appropriate to manage those claims in bankruptcy.

15   And that's what I'm saying.  Look hard at the legal claims

16   that would exist given the Court's rulings, and then ask

17   questions what's the most efficient, sensible way of tackling

18   those claims.

19          THE COURT: For resolution purposes.

20          MR. SCOTT: For - -

21          THE COURT: You mean.

22          MR. SCOTT: Absolutely.  And that, I think, is a

23   prerequisite to, it's certainly wise to do that before you

24   issue a bar date notice.

25          MR. BERNICK: Your Honor, I, I really think that

1    this is very reminiscent of where we were in 2002.  But I

2    think that people aren't really coming to grips with the

3    brass tacks of how it is that, at least as I understand it,

4    the bankruptcy process moves along towards getting to

5    resolution.  They somehow believe that setting a bar date is

6    some big bad thing, and you don't do that until you do an

7    awful lot of other things.  The fact of the matter is that if

8    you don't have a bar date, and you don't know who is a

9    claimant, you can't really take any of these other steps.

10   And I'll just go through all three steps that have been

11   proposed to the Court.  Because none of them are really

12   possible until you find out who it is that's a claimant

13   before the Court.  There's a suggestion of Mr. Westbrook's,

14   and he had, at one point, a very impressive chart that had

15   this mapped out, of going out and finding out answers to all

16   kinds of other litigation questions.  That, that is, and I

17   don't mean to be pejorative here, I think it's literally

18   true.  That's litigation of the air.  You can't go out and

19   simply certify a bunch of issues to a bunch of state courts

20   all over the country.  You have to have a claim and a

21   claimant.  And the claim and the claimant then becomes the

22   predicate for whatever it is that takes place.  In fact, we

23   recognized that, and Your Honor recognized that back in '02

24   by saying, well, why can't you get some claims on file.  So

25   we, that is the Debtor, made claims on behalf of people who

1    already had sued us.  And there was actually a motion to

2    strike those claims that was filed by the other side.  But

3    the fact of the matter is, you couldn't have litigation of

4    anything until you had a claimant.  So who now are the

5    claimants with respect to whose claims we're going to go

6    certify this issue to Supreme Courts all across the country?

7    How's that certification going to take place?  And how long

8    is it going to take place?  Can Your Honor make the

9    certification, or does it have to go to the District Court to

10   make a certification?  So we've got a District Court process,

11   and even have to go to the Court of appeals - -

12            THE COURT: Well - -

13            MR. BERNICK:  - - before it gets sent out - -

14            THE COURT: - - there's a problem with that anyway

15   in that if the same issue is certified in different courts,

16   you're probably going to get different results, because it's

17   probably based on a state law issue.  And I don't think with

18   the massive claims that are anticipated here, that that's

19   probably the best resolution.  This, this cries out not for

20   class certification in the Rule 23 sense, this cries out for

21   class treatment in the plan confirmation sense.

22            MR. BERNICK: Exactly - -

23            THE COURT: ZAI needs to be a class of creditors.

24   You folks need to negotiate a plan treatment for ZAI.

25            MR. BERNICK: That, that - -

1          THE COURT: That's what you need to do.

2          MR. BERNICK: That is exactly what it is that we

3   want to accomplish.  But in order to be able to accomplish

4   this, and this takes me down through the other two ideas.

5   Let me talk about a mediator and a settlement.  The mediation

6   process with respect to ZAI is a very different kettle of

7   fish from the mediation process with respect to a traditional

8   personal injury case or a traditional property damage claims.

9   There's a tremendous history of resolving those.  They're one

10  by one.  They got individual clients.  Here is it a very,

11  very different kettle of fish.  You have something as to

12  which liability has never been found.  We don't have really

13  specific clients, with the exception of a handful of clients.

14  And there is no metric.  But one thing is for very sure.  And

15  that is that statements that there are tens of millions of

16  households out there, and they know that to some kind of

17  mortal certainty because they have somebody that goes and

18  runs the calculation, that is exactly why you can't mediate

19  anything.  You can't mediate it, because you don't have a

20  known population of claimants.  That population of claimants

21  is totally knowable.  For all the reasons that Your Honor

22  indicated, it's out there.  The only question is knowing it.

23  And the way that you know it, under the rules, and the way

24  that it's been done with respect to traditional property, is

25  no different.  You send out a notice.  So we send out a

1    notice.  And it doesn't have to be, the standards for that

2    notice are no different than the standards for notice for any

3    other purpose.  Notice is notice is due process is what's

4    required.  So you send out a notice, and then people who are

5    living in those homes can go up to their attics, and we had,

6    in our notice you had a little photograph of what the thing

7    looks like, and we had a whole process of here's how you

8    determine how whether you've got it, and those people then

9    come into court.  That's how it's done.  It's not an

10   imposition.  It's not some kind of punishment.  It's a way of

11   finding out who the population is.  Who are the currents.

12   And with respect to those currents, would we like to settle

13   the case?  We'd like to settle the case.  Absolutely.  As Mr.

14   Westbrook indicates, there have been very active discussions

15   of that process.  But appointing a mediator to then listen to

16   the same basic disagreement that's always been there, which

17   is not only whether there's liability, which is still not,

18   which the determination, obviously, that Your Honor has made

19   is not accepted there, and we understand that.  But how many

20   people are we talking about?  You can't, you can't, it's a

21   pointless exercise.  They'll always say, well, it's 10

22   million.  We'll always say, no, we don't think it's 10

23   million at all.  After this period of time.  We can't

24   speculate about that, and we shouldn't speculate about that.

25   Because the rules say the way you find out is you go send the

1  notice out, just like we have in all of the other contexts.

2  It's not punishment.  It's a way of brining people into

3  court.

4           THE COURT: Well even if the class cert, even if a

5  class were certified, we'd still have to do a notice, and

6  people would still have to file claims.

7           MR. BERNICK: That's the, that, that is, that's the

8  - -

9           THE COURT: I mean, whether you do it as a bar date

10 notice or do it as a class certification notice, the format

11 may be a little different, but you're going to get to the

12 same result.

13          MR. BERNICK: Well, but the, this is, let me now

14 talk then about class.  Because class, I think, does not help

15 the process, it impedes the process, but under any

16 circumstances, it just can't be done until you have a notice

17 and bar date.  And this is just basic, basic stuff.  First of

18 all, can you simply, as Mr., as counsel points out, can you

19 simply recognize an existing class under 9014?  I'm sorry.

20 That just doesn't work.  There has to be, for claimants to be

21 before this Court, they have to make a claim.  You can't

22 simply say, well, I recognize that so and so judge has

23 decided that this class is certified out in Washington state,

24 I'm not in any way demeaning or questioning the capability of

25 that Court, but the fact of the matter is, that is a case

1   that's pending in Washington state.  It's not pending here.

2   And the only way that the case can be pending here for

3   purposes of being part of this plan is to actually get a

4   claim filed here so that people are present before the Court.

5   So then the question is can the claim be a class claim?

6   Because that's what it would have to be.  To be a class

7   claim, under Rule 9014, there must be a contested matter.

8   Rule 23 only becomes applicable, and it is still

9   discretionary, under the rules once there is a contested

10  matter.  To get a contested matter, you have to have a claim,

11  and an objection.  The claim objection creates a contested

12  matter.  Rule 23 then becomes available.  Now Mr. Westbrook

13  very ably points out, he says, well, geeze, you know, what

14  happened to poor Mr. Speights and his Anderson Memorial

15  claims.  It's a totally different kettle of fish.  Anderson

16  Memorial was, was way after the bar date had been set.  All

17  kind of water under the dam, and all of a sudden this issue

18  emerges.  And yes, to certify class under those circumstances

19  would have created the due process problem.  Your Honor has

20  this under submission, because it effectively, it would

21  revive claims that had been barred, because they wouldn't be

22  filed by the bar date.  If you take a look at the cases,

23  including <u>American Reserve</u>, and including the, the <u>First</u>

24  <u>Equity</u> case, what happens in the proper procedure is that you

25  file a claim by the bar date, then you move to have that

1    claim be treated as a class claim.  And if the Court then

2    finds that under Rule 23 it should proceed as a class action,

3    it becomes a class claim.  That is how it is done.  So the

4    idea of doing class first is contrary to the Code, contrary

5    to the rules.  You've got to get the claim on file, then 9014

6    applies.  So if you want to do a class determination, if you

7    want to, the first step, nonetheless is that, and then Your

8    Honor can determine.  Remember what happened in connection

9    with the Anderson Memorial claim.  It turns out that once the

10   bar date came about, and the claims were filed, there wasn't

11   anything left of the Anderson Memorial class.  I mean, there

12   was one claim that was left in the, that was the Anderson

13   Memorial claim in South Carolina.  And then the purported

14   national class was never certified.  And I don't want to

15   argue the whole thing all over again, but the information

16   that came out of the bar date process was highly material to

17   the Rule 23 determination.  Now Mr. Westbrook says, well,

18   geeze, you know, there's a lot of merit, and he really kind

19   of got into the merits of Rule 23.  He, and able counsel also

20   pointed out, oh, well, this, you need to give these people

21   notice, They need to be educated.  After all, Barbanti was an

22   injunction class.  It was an education class.  Well the fact

23   of the matter is that you don't need (b)(2) in the context of

24   bankruptcy.  (B)(2) is an non-opt out class, because you

25   don't want to have a defendant who is being sued for

1    injunctive relief subject to conflicting determinations.  You

2    therefore would have to have it non-opt out, everybody's got

3    to be in the same court.  Well here, everybody is in the same

4    court.  So you're not going to have different competing

5    orders.  So the whole idea of a (b)(2) class makes zero sense

6    in the context of bankruptcy.  What about classes providing

7    notice?  Well there's going to be notice either way.

8    Whatever these folks are going to get told about the product

9    that may or may not be in their homes, is going to get told

10   whether it's noticed for purposes of a bar date, or noticed

11   for purposes of class.  So the whole idea of class providing

12   notice to unknowing people, people who don't know what's

13   going on, they're going to get it, and they don't need (b)(2)

14   to get it.  And then there are the negatives.  And there are

15   major negatives.  The fact of the matter is that if you have

16   an opt out class, as Your Honor has properly recognized, if

17   you were to grant that class and say it's certified, you

18   still have to give the people an opportunity to opt out.

19   Well then you're back to the same old thing all over again,

20   which is you've then got to provide notice so that people can

21   make a decision.  But then the effect of the opt out is that

22   if people don't opt out, they're presumed to be still in.

23   And we then get this whole problem of people who are out

24   there, who haven't filed by the bar date, or people who are,

25   are out there that are theorized to be there in the tens of

1   millions.  And because of the opt out rules, they have to

2   take no affirmative action to remain in the class.  So if you

3   have an opt out class that gets certified without the benefit

4   of a bar date, then you postpone until the date in which they

5   actually make a claim against some kind of pot the date to

6   find out who's in and who's out.  Or who is there at all.  So

7   the whole idea of defining the population can only take place

8   in an effective fashion if you set the bar date and make

9   people show up.  Now the other problem, of course, is that

10  then think about the other negatives.  What's it going to

11  advance if the Court were to certify a class, what's the

12  first thing that's going to happen?  There's going to be an

13  interlocutory appeal.  To find out if the certification

14  holds.  Because under the rules, interlocutory appeals are,

15  are, not, are specifically provided for in the rules.  So

16  this thing can go up to the 3rd Circuit.  And then so we're

17  going to have - - now I just want to think about this.  We're

18  sending issues out to different state Supreme Courts all over

19  the country on the basis of what claims to determine what so

20  that we can then have a class action that then has an

21  interlocutory appeal that takes it up to the 3rd Circuit.  So

22  we've got 3rd Circuit interlocutory appeal of class action,

23  we've got issues spinning out all over the country, and what

24  does it all, it doesn't accomplish anything.  We should get

25  the people in court.  Hopefully we will have a plan to

1   present to them.  We will know who they are.  We can give

2   them notice.  If they then want to file for class

3   certification, they can.  I don't think it's going to do any

4   good to the case.  If they then want to have a mediator, they

5   can ask, because we will at least then know who it is that

6   we're talking about.  My own feeling is that by the time we

7   go through this process of setting a bar date and getting the

8   notice out, we will then have, in place, a platform, a

9   foundation to do whatever it is that the Court wants.  And

10  maybe what happens in the process is that we get one piece of

11  information that is so key.  Who are these people.  And on

12  the basis of this, we can then decide where Your Honor should

13  go.  So we would again ask for the opportunity to move for a,

14  a bar date and notice process.

15         THE COURT: Well, let me ask what the Debtors

16  intention at this point is.  If, if a notice process goes out

17  that says something like, if you have ZAI in your home, file

18  a proof of claim.  And here's the claim form.  And it's

19  really simple.  You know, file this piece of paper, that's

20  it.  That's all you need to do.  You don't have to allege

21  damages.  You don't have to allege personal injury.  You

22  don't have to allege anything.  All you have to do is allege

23  ZAI in your home.  And whatever the proof is that is going to

24  be required to show that you do, in fact, have ZAI in your

25  home.

1          MR. BERNICK: Yeah.

2          THE COURT: Okay.  But not, no proof of damage.  No

3     proof of personal injury.  Nothing.  Just, just ZAI and a

4     proof of claim form, and here's my proof that it's ZAI.

5          MR. BERNICK: Yeah.  This is, Your Honor, that's,

6     that's a very good question.  And we actually proposed the

7     proof of claim.  And it is not like the proof of claim that

8     we use for a traditional PD, and not like the proof of claim

9     that we use for PI.  It is a very small amendment to Form 10.

10    So it basically says, do you have it.  There are things that

11    you have to do to get, so we know that you've got ZAI there.

12    I think there are a couple of questions about where it is in

13    your home, or something like that.  But like two or three

14    questions.  But it's all on one piece of paper.  It doesn't

15    get into damages.  It doesn't get into anything.  There's

16    some information there that's sought, but it's very, very

17    minimal.  So that, that's it.  It is, it is - -

18         THE COURT: So you're, are you looking - - and I

19    guess I have to address this to Mr. Westbrook and Mr. Scott,

20    and perhaps the Committee.  I'm not really sure how this is

21    going to play out.  Is the issue, if we're going to be

22    looking at some form of not necessarily a monetary

23    distribution to each person, but something else, like

24    perhaps, you know, a distribution of remediation is

25    necessary, are you going to need to know how much ZAI is

1    there in terms of square footage?  You know, how much of your

2    house has ZAI in it?  Where is it in your house, and how is

3    it placed, and how many square feet?  I mean, what is it that

4    the information is going to need to divulge?  Because it

5    seems to me that if we make this process simple, then you're

6    going to develop the universe of people who think they have

7    ZAI in their home, and can come up with something that says,

8    this is why I think I have it.  And then, most of these

9    people, in fact, I bet, I'm willing to bet at this point,

10   probably all of these people are not actually suffering any

11   personal injury as a result of it, because if they are,

12   they'd be in the PI class.  So to the extent that this is a

13   property damage issue, you're going to deal with it like a

14   property damage claim in some fashion, somewhere.

15          MR. BERNICK:  Your Honor - -

16          THE COURT: I don't know how, but some fashion,

17   somewhere.  So what do you need to know?

18          MR. BERNICK: Before they speak, and I don't want to

19   get in between the answer to the question, but I suspect, and

20   Mr. Westbrook can correct me if I'm wrong, I think that that

21   really kind of does get into some of the discussions that

22   are, are taking place.  So it's going to be difficult for us,

23   I know, to comment on it.  I don't know - -

24          THE COURT: Well, I'm asking because it seems to me

25   that this, the answer to this question may inform what type

1    of notice, and whether or not it should be done by some kind

2    of class, or some kind of proof of claim, bar date notice.

3        MR. BERNICK: Well, I'll let Mr. Westbrook talk.  I

4    have an observation about that.

5        THE COURT: And I'm not trying to interfere with

6    your settlement discussions.  I'm trying to get to what's

7    going to make sense to get the universe of claims known, and

8    then once this universe of claims is known, let you try to

9    figure out how to resolve them.  That's what I'm trying to

10   get to.

11       MR. WESTBROOK: Your Honor, we do have, and

12   consistent with what Mr. Bernick has said, we do have some

13   reliable information, I believe, on how much ZAI is sold and

14   the average installation size in a home.  The division tells

15   us about how many homes there were at one time with ZAI.

16   There are then numbers that can be run on demolitions and

17   removals, etcetera, over the years when nobody realized that

18   there was a problem.  Houses have been taken down.  So we, we

19   are, we do have information, and I think there is a

20   difference in opinion about what that information shows, but

21   that's again experts on both sides can differ, and maybe

22   somebody, you know, hearing the matter outside this courtroom

23   can say, well I think this is more reasonable Ed, or David I

24   think this is more reasonable, you need to look at this.  So

25   I think we do have information that can work toward that

1    point.  But Your Honor, I do want to get back to this point,

2    which is Mr. Bernick's statement.  He says, who are these

3    people, and we'll know it when they respond to the proof of

4    claim form.  We believe that's not correct.  The cases that

5    have looked at this issue on class certification say that

6    when you have modest claims where the cost of investigation

7    and prosecution is going to be significant compared to the

8    claims themselves, the chances are that a large number of

9    people who are legitimate claimants will not respond to a

10   proof of claim form, and that is why to effectuate the

11   bankruptcy policy, which is to bring all creditors, people

12   who may be creditors in.  The bankruptcy policy is not to get

13   W. R. Grace, as I understand it, out of this bankruptcy

14   spending as little money as possible.  It is to get the pot,

15   and then to equitably divide the pot.  And I just wanted - -

16        THE COURT: Well it's equitably divide the pot among

17   the creditors who are entitled to get the distributions.

18        MR. WESTBROOK: Correct, Your Honor.

19        THE COURT: And they have to prove that they're

20   entitled to get the distribution.  So they have to do it at

21   one place or another.  And that's the point we keep, keep

22   trying not to focus on.  We either have to do it now, or we

23   have to do it later, but we have to do it sometime.

24        MR. WESTBROOK: Well that's why the courts look at

25   the class action device, because in the case of small claims,

1    and certainly unknown claimants, the courts have said, and

2    class action has become a much more favored device in the

3    bankruptcy, certainly since Judge Easterbrook had his

4    landmark opinion in the <u>American Reserve</u> case, where he said,

5    if, as we think - - speaking for himself, Judge Posner, and a

6    District Judge, so we have three pretty good minds - - if, as

7    we think, the cost of information lead many legitimate

8    claimants not to file on their own, then the class devise is

9    superior.  In either case, the Bankruptcy Court learns who is

10   interested in recovery.  Similarly, Your Honor, the 11th

11   Circuit in the <u>Charter</u> case said this - -

12         THE COURT: I understand that.  My, I have a really

13   simple question.  What information do you need?  That's what

14   I'm trying to figure out.  In order to define the universe,

15   and figure out how to settle the claims, what information do

16   you need?

17         MR. WESTBROOK: In 30 to 60 days, with experts on

18   both sides working on the same data, they could probably

19   reach agreement within a few thousand homes as to how many

20   homes are probably out there with Zonolite

21         THE COURT: So you need to know the number of homes

22   with Zonolite.

23         MR. WESTBROOK: That, and that is the number, yeah.

24   The number of homes that still exist with Zonolite.  Yes,

25   Your Honor.

1        THE COURT: And that's all you need to know.

2        MR. WESTBROOK: Well, we know the - - you know,

3   you're not going to know for a particular home the exact

4   square footage, but you have an average installation done by

5   the number of bags sold, the coverage per bag, and you know

6   the average size.

7        THE COURT: Okay.  So, I'm just not, hypothetically,

8   because I'm just making this out of whole cloth, okay.

9   Hypothetically, there are 10 thousand homes that still exist

10  with ZAI.  Okay?  And now I know that because I've gone

11  through the mediation process, and that's the number

12  everybody's agreed to.  So I've got 10 thousand homes with

13  ZAI.  Now what do I do?

14       MR. WESTBROOK: If you want to resolve the case?

15       THE COURT: Yes.

16       MR. WESTBROOK: You say, well we know the average

17  cost of remediation from data that we've gotten is so much a

18  square foot.

19       THE COURT: Okay.  And what is that average cost?

20       MR. WESTBROOK: It can be - - do you want the

21  number, Your Honor?

22       THE COURT: Yes.

23       MR. WESTBROOK: Let's say for today that it's $5 a

24  square foot.

25       THE COURT: Is that a real number, or - -

1      MR. WESTBROOK: I think that's in the ballpark, Your

2  Honor.  But I haven't looked at that particular number in a

3  while.

4      THE COURT: Okay.

5      MR. WESTBROOK: All right.  So then you apply that

6  to the average installation times the number of

7  installations, and you have a number.  But then you have to

8  discount that number for the pace of expected removals.  And

9  for that, the experts have data on the pace of remodeling and

10 renovation where I think on Your Honor's order, remodeling

11 and renovation is the most likely time that you're going to

12 have extreme fiber release.  There are construction data on

13 the pace of remodeling and renovation.  So you look at that,

14 and you see by the years going down the road how many claims

15 are then likely to, if you want to say ripen, or manifest

16 themselves.  How many of those would be per year.

17     THE COURT: Okay.

18     MR. WESTBROOK: And then from that, you take that

19 and multiply that by the number of homes, and you discount

20 those numbers to present value.  That would tell you, if

21 Grace paid 100¢ on the dollar, what it would pay for those

22 remediations.  And then of course the bargaining begins.  You

23 know, they say they want to pay 2¢ on the dollar, and we want

24 98¢.

25     THE COURT: Okay.  So from your perspective, and

1    from Grace's perspective, apparently - - from Grace's

2    perspective, I don't know that it's the number of homes, it's

3    the number of claimants who are going to file claims.  But

4    I'll assume that for the moment, you're talking the same

5    things, just in different language.  So you both need to know

6    the number of claimants.  That's the first thing.  Who's

7    going to file claims.  Because even though what you're

8    telling me is you need to know the number of homes that are

9    out there, that doesn't mean that everybody who has a home

10   with ZAI is going to file a claim.  Or, at some point, even

11   if there's a class certification, be represented by the

12   class.

13          MR. WESTBROOK: Well if they are within the class

14   definition, that's the big difference, Your Honor.  If

15   they're within the class definition, then they're included in

16   the, quote, "settlement", unquote.  If they're not within

17   the, if there's no class, and they haven't encountered

18   renovation or demolition, so their claims haven't ripened or

19   manifested themselves, then they have no incentive to come in

20   and make a claim, and under Your Honor's order, they may not

21   have a claim right now.  And they can't be barred.

22          THE COURT: But why would they, why would they have

23   no incentive to come in a make claim if the notice is clear

24   that if you don't present a claim then when the Debtor or the

25   Committee, or whoever, files a plan, and it's confirmed, you

1    won't share in whatever distribution goes out to people who

2    have claims.

3         MR. WESTBROOK: Well Your Honor, theoretically the

4    notice, the notice can say that you should file a claim, but

5    if under state law from which the authority derives, if under

6    state law there is no claim until, for instance, it's

7    discovered under the accrual rule, then you don't have a

8    claim that can be discharged in the bankruptcy.

9         THE COURT: No, the issue that's, the issue I

10   thought we just agreed was if we sent out a notice that says,

11   if you own a home that has ZAI in it, file this claim.

12   Because otherwise, you're not, at some point, going to share

13   in this distribution.  The Debtor is trying to estimate what

14   it needs to put aside to resolve your claim.  So we need to

15   know if you have a claim.  So forget accrual rules.  I don't

16   care whether it's done by class certification, by notice, by,

17   I don't care what form, what label you choose to put on it.

18   I want to try to figure out who the universe of people are so

19   that both, everybody who's entitled to be paid can be paid,

20   whether it's now or ten years from now.  And the Debtor knows

21   what the universe is, so the Debtor knows how much money has

22   to come out of its pocket in order to resolve the claims.

23   Which I think is what everybody else is trying to figure out

24   here.  So that's what I'm asking.  You say you need to know

25   the number of homes.  You can estimate the square foot,

1  footage, you can estimate the remediation cost, and then the

2  bargaining can start.

3          MR. WESTBROOK: Correct, Your Honor.

4          THE COURT: Mr. Bernick, I think you're saying

5  essentially the same thing.

6          MR. BERNICK: If only.  In a lot of ways, we are.

7  In the sense that we have to get to a claimant population.

8  There's no, there's no, if, whether it's a class litigation,

9  a class settlement, bar date, whatever, nobody gets dollars

10 unless they show up and they say, we are entitled to dollars.

11         THE COURT: Right.

12         MR. BERNICK: So that's what it ultimately turns on.

13 And then the question is, well how do you get there?  And the

14 problem is that first of all, if you embark upon a process

15 where you don't actually have those people come into the

16 door, even if you could calculate their number with

17 certainty, you still have got a problem, because you don't

18 know who is going to vote.  We need the people to give notice

19 so that we know that they can come in and cast a vote.

20         THE COURT: Well the class agent, if it's a class

21 certification, would vote, but that doesn't solve the

22 problem.

23         MR. BERNICK: Well that doesn't solve the problem.

24 And the second thing is that we don't know this information

25 with certainty, and we can't begin to even approximate it,

1    with any degree at all – - all these, this whole idea that

2    we're going to have experts, that's been out there for, ever

3    since this case began.  It was on the basis of that that at

4    the beginning of the case, instead of saying that they were

5    tail, Mr. Lockwood was fond of saying they're the 800 pound

6    gorilla in the room.  And the reason that that was so was not

7    necessarily that their claims really had validity, it was

8    that they could say, oh, well there are 10 million of them.

9            THE COURT: Well - -

10           MR. BERNICK: And if there are 10 million of them,

11   at $5 a - -

12           THE COURT: Can we go back to the basics?  Otherwise

13   we're not going to get - -

14           MR. BERNICK: Well but - -

15           THE COURT:  - - through today, and frankly I'm

16   getting really tired.  I've been listening to arguments since

17   8:30 this morning, and I really need to focus on the basics.

18           MR. BERNICK: Well, I'm sorry, Your Honor.

19           THE COURT: Okay.

20           MR. BERNICK: The, so - -

21           THE COURT: What is it that the Debtor - -

22           MR. BERNICK: We need - -

23           THE COURT:  - - needs to know.

24           MR. BERNICK: We need to know who is a claimant.

25   And we cannot determine that by simply having experts come in

1    and provide estimates of how much got sold, how much per

2    home, how many are still likely out there.  That is totally

3    and utterly based upon speculation.  That's another way of

4    saying if you sold X amount of asbestos, total, well you must

5    have built so many buildings, and you must, therefore, have

6    caused a certain number of injuries.

7            THE COURT: I - -

8            MR. BERNICK: It's a statistical model, Your Honor.

9            THE COURT: I understand your perspective and the

10    problem.  Let's just focus on the basics.  My question is

11    what do you need to know?  You need to know the number of

12    claimants, who is a claimant.  What else do you need to know?

13            MR. BERNICK: I think that if we need to know who

14    the claimants are, and I think that. . .(microphone not

15    recording). . .we asked on the form, literally, the address,

16    approximate date it was constructed, ZAI was installed.  Is

17    the building used for residential, commercial, or other

18    purposes?  And then it just says, check, check here if you

19    seek funds to have the ZAI removed.  If you seek

20    reimbursement for already completed removal, compensation for

21    diminution in value, other damages.  They're just checkmarks.

22    The amount of the claim, and then any documents that they

23    actually have in their control.  That's it.  It's all on one

24    piece of paper.  And with this, I mean, really the most

25    important part of this is people actually show up and can

1   demonstrate that they've got ZAI in their homes.  That's,

2   that's the big deal.  This other stuff is important, but the

3   big deal is literally what is on this piece of paper.  That's

4   it.  Which they would have to do, as Your Honor has

5   recognized, if they are going to get a recovery anyhow.  You

6   don't just - - yes.

7            THE COURT: Okay.  So I take it it's important to

8   both sides to know whether if somebody is identifying an

9   address that has ZAI in it, whether it has already been

10  remediated, whether it is to be remediated, because the proof

11  of claim form says, are you claiming that you've already

12  remediated, essentially, because it's saying are you claiming

13  damages for remediation already done or to be done.  So you

14  want to know that information?

15           MR. BERNICK: Yeah.  That's what we need.

16           THE COURT: All right.  And then is there a place

17  for a claim amount to be stated?

18           MR. BERNICK: Yes, just - -

19           THE COURT: Or does - -

20           MR. BERNICK: It just says, literally - - can I just

21  hand this up to the Court?

22           THE COURT: Yes, please.  Thank you.  All right.  It

23  does say total amount of ZAI claim in US currency.  I guess

24  the question is, is that relevant?

25           MR. BERNICK: I, I think that, I think that it, it

1    may be relevant in the sense that if somebody actually has

2    done the remediation, that they're able to supply that

3    information.  If they haven't done the remediation, and it's

4    just a number, it probably isn't very relevant.  It's not

5    very probative of very much.

6            THE COURT: Well, and that's what I'm concerned

7    about.  What I don't want to see happen is information on a

8    proof of claim form that is then going to generate massive

9    numbers of objections because somebody will put here, for

10   example, I claim $10 million as the amount of my ZAI claim,

11   because I have ZAI in my attic and I haven't remediated.  So

12   - -

13           MR. BERNICK: That's fine.

14           THE COURT: So - -

15           MR. BERNICK: I mean, Your Honor, we, we can easily

16   do without that, provided that if they have remediation, they

17   provide us with, you know, whatever bills they have that this

18   - - the purpose of this, Your Honor, to be clear, in

19   connection with the PIQ's, personal injury PIQ's, we are very

20   focused on a lot of very detailed information, and in

21   connection with the property damage PIQ's, we were as well,

22   or PDQ's, we were as well, and we actually used that

23   information to, to seek to disallow claims.  The exercise

24   here, for this purpose, is in fact to give us information on

25   the basis of which we can understand more of the claiming

1    population.  Would I completely dismiss the idea of ever

2    using it for any purpose in litigation?  No.  But it doesn't

3    require nearly the same level of detail as where you're

4    dealing with a commercial property that's got all kinds of

5    remediation costs.

6              THE COURT: Well, it would seem to me that if, you

7    know, if all parties want some indication of what the actual

8    remediation costs were, that in fact, if somebody's saying,

9    we removed it already, and they want to support what that

10   claim is, they could state what the amount of that claim is

11   and attach the supporting documents if they have them.  But

12   otherwise, if it's something that's to be done in the future,

13   frankly, I think it's going to be irrelevant.

14             MR. BERNICK: I agree.  I agree.  The purpose of

15   this form is to find out what information they already have.

16   And we're happy, we're happy to, to say that.  This is not

17   the same kind of process that we had to go through with the

18   traditional PD claims.

19             THE COURT: Mr. Westbrook and Mr. Scott, it seems to

20   me the type of information that you're looking for is

21   essentially the same type of information that's on this form.

22   Now it, this may be a little bit more extensive - - Mona,

23   would you give this back to Mr. Bernick, please?  So I'm not

24   sure what we're really arguing about.  Because it seems to me

25   that you ought to get some kind of notice out.  We ought to

1    get some kind of notice coming back in.  And then I ought to

2    send you to somebody who can lock you in a room with your

3    toothbrushes until you can get the rest of this resolved.

4              MR. WESTBROOK: Your Honor, since we're here on a

5    status conference today, what we would like to do, Your

6    Honor, is if the Court is considering a bar date notice, that

7    we be permitted to brief to the Court the utility and

8    efficiency of entertaining the class action issue before it

9    goes out.  Because once it goes out, you know, you can't

10   unscramble those eggs.  And we'll do it simultaneously with

11   whatever schedule we have on the bar date.  With respect to

12   what information we need, Your Honor, we have provided

13   information to Grace to identify what we believe is the

14   universe of installations, and the information on the

15   remodeling, removal, and on demolitions.  Grace has not

16   retained an expert on that.  That's what I was getting to,

17   Your Honor, and Your Honor was alluding to.  You want to know

18   what the universe of claims is, not who sees a particular

19   notice in a newspaper and responds.  That's all you're going

20   to know when responses come back into that, because these are

21   largely unknown creditors who will not be individually

22   notified, and many of whom, a vast majority of whom, are

23   probably never going to see a newspaper article, a newspaper

24   notice somewhere, and we'd like to brief to the Court that

25   those are the circumstances in which numerous courts have

1    said the court shall take a careful look at the class action

2    device before we get into - -

3            THE COURT: Okay.  But Mr. Westbrook I've already

4    said, I don't, right here, sitting here right now, for

5    purposes of this discussion and status conference only, I'm

6    not making rulings.  I don't care what the format is.  So

7    let's say it goes out as a class certification notice.  The

8    reality is those same people are still not known, they're

9    still only going to get the same publication notice, they're

10   still not going to read the same newspapers that they weren't

11   going to read if the Debtor put the notice in, instead of the

12   class certification notice that went out.  So you've got

13   exactly the same issues.

14           MR. WESTBROOK: Except, Your Honor, under our

15   proposal, which I won't discuss in any more detail, under our

16   proposal, of which I requested mediation, we have a way to

17   protect Grace, so it won't be paying for people who don't

18   have claims, and a way to protect those folks who never see

19   this advertisement in the newspaper, and resolve this problem

20   for Grace and for ZAI.  And that's why I thought it would be

21   of some benefit.  Grace doesn't want to mediate.  Unless the

22   Court orders them to, it can't mediate.  But if Grace doesn't

23   want to mediate, but we thought it would be of some benefit

24   to take a look at that, that avenue.  Because they're sending

25   out a notice to people who have $10 thousand claims in

1    Pocatello, Idaho, and asking them to send back a form.  First

2    of all, they go to a lawyer to answer that, and what's that

3    going to do?  Lawyers aren't going to touch a claim for five

4    or $10 thousand, Your Honor.  These people are going to be

5    cast out there, and we're going to have problems with what

6    does the response mean?

7            THE COURT: But we have exactly the same problem

8    with the class certification.  All right.  Hypothetically I

9    have now certified a nationwide class of ZAI homeowners.

10   Okay?  You represent that class.  And now you come in and

11   say, okay, Judge, here's the notice I want to send out.

12   You're going to do publication, because you don't have a clue

13   who all of these ZAI homeowners are any more than the Debtor

14   does.  So we're going to go out in exactly the same

15   publications.  You know, you're going to use the veterans

16   journals, you're going to use the USA Todays, you're going to

17   use all of the things that the typical homeowner, that you

18   think the typical homeowner, based on your experts, is going

19   to reach.

20           MR. WESTBROOK: Vermiculite Life, magazines like

21   that.

22           THE COURT: Exactly.  They all read those.  Okay.

23   And maybe in the, you know, maybe in certain areas you'll

24   provide actual notice.  You know, maybe you'll stuff

25   mailboxes.  I don't know.  Maybe that will happen.  So there

1    may be some combination of notices that will go out as there

2    is in every case.  But you're going to have exactly the same

3    problem.  And so now, and let's assume for purposes of this

4    discussion that it is a non-opt out class, because I don't

5    really see, for bankruptcy purposes how you can have an opt

6    out class at the moment, so let's just assume it's a non-opt

7    out class.

8              MR. WESTBROOK: Right.

9              THE COURT:  So now you have a class of creditors

10   that you are representing that's basically the equivalent of

11   a class in the plan, that you represent, but it's not a

12   futures class, because it's a current class.  You've got

13   unknown, current creditors that you represent.  You've got

14   all this due process concern, legitimately, that you've got

15   to satisfy.  You go out with your publication notice.  You

16   issue the same type of form, basically, that Mr. Bernick just

17   passed up, that tells people that they've got to file that

18   information with your claims agent, because they do, in order

19   to share in the distribution.  The only difference is now

20   maybe you're going to say, and oh by the way, the Judge has

21   approved a settlement that says that if you file a notice

22   that says your home was built from, you know, 1963 to 1950

23   you're entitled to 25¢ per square foot, and if it was built

24   from 1963 to 1970, you're entitled to 28¢ per square foot.

25   Whatever it's going to say.  And you'll get back your

1  universe of claims, the same as the Debtor would, and they'll

2  be paid their same distribution by the claims agent.  What's

3  different?

4          MR. WESTBROOK: Well Your Honor, what's different

5  is, of course, in the class action if people don't respond to

6  that notice, they're in the class.  They don't get a payment

7  yet.  But the nature of ZAI, Your Honor, is not that all

8  these people will come in en mass looking for their 8¢ on the

9  dollar.  The nature of ZAI is it is discovered by people as

10 they remodel, as they renovate.  A class action settlement,

11 theoretically, could provide for a facility that has people

12 two years, three years, five years down the road, the problem

13 manifests itself, then they contact the claims agent and get,

14 get some payment.  Grace is out of it.

15         THE COURT: But a trust could do the same thing in a

16 plan.  I mean, you know - -

17         MR. WESTBROOK: Your Honor - -

18         THE COURT:  - - you could set up a claims agent and

19 a plan to do the same thing.

20         MR. WESTBROOK: Your Honor, a trust, a trust could

21 do that, except Mr. Bernick's idea is that if people don't

22 send in that form, they're out for good.  They never ever can

23 make a claim.  Under our proposal, in the class, we take on

24 that responsibility.  The class settlement takes care of

25 those people in futuro, as their claims ripen.  Grace still

1    is done, but claimants who may not, in Pocatello, Idaho, see

2    Vermiculite Life, but three years from now the contractor

3    hits into the ceiling, and it comes pouring in his head, and

4    says, you've got that vermiculite stuff there.  What about

5    it?  He says, well contact these people.  There's a remedy

6    for those folks.

7              MR. BERNICK: Your Honor, if I could just - - stay

8    here - -

9              MR. WESTBROOK: No, no.

10             MR. BERNICK: No, no.  Just stay here.  Stay here.

11             MR. WESTBROOK: I'm happy to stay here.

12             MR. BERNICK: We're coming down to the, to the nub.

13   The, the kind of thing that Mr. Westbrook is talking about is

14   that you don't find out who the claimants are, and the

15   immediate benefit of that for the purposes of class

16   settlement leverage is they're able to argue big numbers.  So

17   if we get them the big numbers. . .(microphone not

18   recording), I actually believe that would be totally contrary

19   to the interest of resolution, because Grace is not going to

20   sit there and accept a big number on the basis of a typical

21   extrapolation.  This is just not real.  So that's the

22   immediate impact.  The second impact is you can't do anything

23   that he's talking about using Rule 23.  There's no such thing

24   as a non-opt out class under Rule 23.  Where you're talking

25   about money going out the door.  It just doesn't exist.

1    (B)(2), which is for injunctive relief, is not really

2    available because the whole purpose of that is to avoid

3    inconsistent results.  The idea that you can have a

4    settlement class that can do all this, that also is no good

5    anymore.  In Ampkim (phonetic) & Ortiz, the Supreme Court

6    specifically said, you can't have a settlement class where

7    you don't have a litigation class.  It's the whole idea that

8    you need class action in order to accomplish this, which

9    essentially this is a fluid fund recovery.  Big pot of money.

10   We don't know who's going to come in.  They'll come in, and

11   as they come we'll pay them out.  Is not accomplishable under

12   Rule 23.  It just cannot be done.  Ampkim & Ortiz completely

13   destroyed the idea of settlement classes that are not, that

14   are not certifiable under litigation class rules.  So can you

15   do it in the context of a plan?  Your Honor is absolutely

16   correct.  In the context of a plan, you can accomplish more.

17   You can have fluid recovery in the context of a plan.  But

18   for a plan, you can't pay out the money until you have a

19   claimant.  You can't do it.  You just, you're depriving the

20   estate of funds that are available to other constituencies

21   under the Code.  So while it's nice to think about going back

22   to the pre Ampkim & Ortiz days, where you could do all this

23   imaginative stuff through settlement class actions, and you

24   have fluid recovery, those days are gone.  And not only are

25   they gone for good reason of the law, here they would be

1    completely antithetical to resolving the case.  The fastest

2    way to get this case resolved is to eliminate the speculation

3    of how many claimants there are.  Let's just find out.  And

4    while it may be true that some people don't actually get the

5    notice, and their claims are therefore not recognized, that

6    is the unfortunate fact of how the, how the Code works.  If

7    you want to get money from an estate, you have to come

8    forward, and have them come forward now instead of later.

9            THE COURT: But these are all pre-petition claims.

10    I mean, that's the thing.  I recognize that people may not

11    always appreciate that they have a claim, but that's no

12    different in this case from any other case.  That's no

13    different, for example, in - - well, I was going to say in

14    Dow Corning, but that's a little different, because most

15    people in Dow Corning knew that they had a claim.  That was a

16    different circumstance.  It's difficult outside the mass tort

17    context, probably, to figure out something that's equivalent

18    to this.  But, you know, it's, I guess it's like buying a

19    house, and discovery a latent defect later.  I mean, that

20    doesn't mean that you don't have a claim at some point in

21    time, period.  You have the claim.

22            MR. BERNICK: And we effectively adopted their

23    notice program in our proposal for the ZAI notice program.

24    We basically said, okay, you know, we'll go do all those

25    different things.  So the full extent- -

1          THE COURT: Well - -

2          MR. BERNICK:  - - of notice under due process is

3   going to be there.

4          THE COURT: All right.  I'm going to, I'm going to

5   hate myself when I raise this word, but I'm going to raise it

6   anyway, because this is a status conference, and I'm, like

7   you, I've beaten this horse to the point where it's almost

8   dead.  But this will make it dead.  What about the

9   possibility of sending out some sort of a notice for - -

10  nobody has any tomatoes, right?  I want to clarify that on

11  this record first.

12         MR. BERNICK: Well, we're not going to tell you - -

13         THE COURT: For purposes of trying to figure out

14  what a cap, and I will use the word cap, for a plan funding

15  ought to be for the ZAI claims, I will view this as the

16  equivalent of estimation, without having to estimate any

17  claims.  But nonetheless, it can serve, if we find out what

18  the universe of filed claims are, as the basis to negotiate

19  whatever this pot will have to be for purposes of the plan.

20  Then to satisfy the ZAI claimants, this notice form will

21  simply be, unless anybody else, I guess, objects, ignored.

22  And the plan distribution procedures will have to be

23  negotiated by the parties, but people can file their claims

24  against this plan distribution procedure like they would

25  under a TDP, essentially.  The Debtor can be basically out of

1    the mix.  Whoever is the designated agent for this class can

2    take over the responsibility for handling those claims.  They

3    can work the way a TDP would work, but when that entity runs

4    out of money, if it does, that's it.

5            MR. BERNICK: Yeah, you know, Your Honor, the,

6    that's a very interesting proposal.  I think we would like to

7    think about it.  I know that Mr. Westbrook would like to

8    think about it.  But that certainly accomplishes a very

9    important first phase.  Obviously, under those circumstances,

10   there is a key thing that we would be giving up.

11           THE COURT: Yes.

12           MR. BERNICK: And that is - -

13           THE COURT: So would they.

14           MR. BERNICK: Well I don't really know.  If they can

15   file their claims at any time against the plan, then what

16   happens if we can't reach resolution, and we then still have

17   the problem of what to do with these claims - -

18           THE COURT: Oh, well the, I mean, this, whatever

19   this negotiated agreement is would be off.  I mean, the

20   purpose for getting this bar date notice out now would be so

21   that all of you can find out what the universe of known

22   claims is.  Who are going to file claims now.

23           MR. BERNICK: Well I think it's a very fair

24   proposal.  I think we'd have to think about that and - - I

25   mean, it certainly, it is right exactly in the sense where

1    the Debtor is.  The Debtor believes that if we can find out

2    this population of claimants, it is a very important step to

3    try and reach a consensual resolution.  We, that's what we

4    want.  So, but we'd have to think about it, and maybe we can

5    have a discussion with Mr. Westbrook and Mr. Scott and see

6    what - -

7          MR. WESTBROOK: Your Honor, I'm glad to do that with

8    Mr. Bernick.  And it may be helpful if the Court is so

9    inclined to do that, that whatever, whatever person is going

10   to review this information, that we also, and I think Grace

11   obviously have a chance to, also give that person the data on

12   the sales and the installation, so there's some indication

13   about how many people are likely out there, but didn't send

14   the notice back in.  So that we can have that data in the mix

15   as well.

16          THE COURT: Well, this is only a first step.  You

17   folks have to negotiate the plan.  I don't do plan

18   negotiations.  I rule on the plans.  All I'm saying is I, we

19   need to get a notice out.  And I'm trying to figure out a way

20   where you folks can get onto the same page for getting out a

21   notice that alerts people that they may have a claim, that

22   they need to file it, but without the prejudicial impact that

23   the ZAI lawyers are concerned about, but getting the Debtor

24   the information it needs, which is really how much money do I

25   have to come up with to fund this plan.  I mean, that's

1    really what the Debtor needs to know.  And if it's a pot

2    plan, then the Debtor doesn't have an interest in who's going

3    to get that pot, once that pot has been negotiated and agreed

4    on.  I don't know what the other constituents are going to

5    say, but nonetheless, I think you all need to talk to see if

6    some notice provision can be worked out, so that you can all

7    know what the ZAI claimant pool is going to be.  This is only

8    a status conference.  I'm not making any rulings.  I'm only

9    throwing something out to see whether or not maybe it can get

10   you past go.

11        MR. WESTBROOK: Your Honor, we will discuss it with

12   Mr. Bernick.  I know it's late, you have other things on the

13   agenda.  I'm going to sit down.

14        THE COURT: All right.  I only heard from those

15   folks.  Mr. Baena, does the Property Damage Committee want to

16   weigh in on - -

17        MR. BAENA: (Microphone not recording.)  Scott Baena

18   on behalf of the Property Damage Committee.  Judge, we're

19   happy to participate in that kind of a dialog.  It is a

20   thorny question.  I appreciate the Court's struggle with a

21   solution.  Somebody's going to be disappointed, I'm sure.

22        THE COURT: Yeah.

23        MR. BAENA: But the conversation is worth having.

24        THE COURT: All right.

25        MR. BAENA: I will say, as a matter of law, though,

1    just for the record, the cases - -

2            MR. BERNICK: I was going to compliment him on his

3    time.

4            MR. BAENA: The cases to which Mr. Bernick alludes

5    as to having required the filing of proof of claim as an

6    antecedent to a class proof of claim process, that just

7    didn't cut.  In American Reserve, the issue was framed by a

8    class proof of claim that was filed.  Thank you.

9            THE COURT: Okay.  Any of the other committees want

10   to weigh in?  Or the FCR?  Okay.  I will expect to get

11   something from you folks that attempts to articulate a

12   process.  If you cannot agree, then both of you file whatever

13   motions you choose to file, and, okay, and tee it up for

14   April.  There's no point teeing it up for March, it's too

15   soon.

16           MR. BERNICK: Okay.  Thank you, Your Honor.

17           THE COURT: All right.

18           MR. WESTBROOK: Excuse me, Your Honor.  May I be

19   excused at this point?

20           THE COURT: Yes, sir.

21           MR. WESTBROOK: Thank you.

22           THE COURT: Anybody who is not interested in the

23   rest of the agenda is free to go.  All right.  Next.

24           MR. BERNICK: I thought that that was going to be

25   the shorter one for today.

1          THE COURT: So did I.

2          MR. BERNICK: I know the hour is late, but the

3    matter is, that we have to take up here, is very important.

4    The immediate cause of, or the immediate agenda item has to

5    do with this declaration of Dr. Stallard.  But Dr. Stallard's

6    declaration has morphed into something that is now of major

7    consequence to the case, and I think it, we really have to

8    deal with it in a decisive fashion.  That's all, and again, I

9    apologize for going through the little bit of history, but

10   the history, at this point, is, is has increased in

11   importance, because of the increasing importance of Dr.

12   Stallard's famous declarations.  You remember, Your Honor,

13   that last year there was an awful lot of discussion about a

14   pre-trial schedule.  And in that discussion I know Your Honor

15   will recall that every time we talked about the schedule, as

16   soon as dates came up there was levitation on this side of

17   the courtroom, because they wanted to come to this trial in a

18   prompt fashion.  So the pre-trial orders were very, very

19   heavily discussed and negotiated, and in fact litigated.  And

20   I'm going to put up here the operative provision that we're

21   going to be talking about here.  The pre-trial orders

22   ultimately called for there to be really two stages of

23   reports.  There were four - - first of all, breaking out

24   between estimation experts and non-estimation experts, and

25   then with respect to both, there was an initial round of

1    reports, and there was to be a supplemental round of reports.

2    And as we see in the pre-trial order that was ultimately

3    entered, experts who will testify, etcetera, etcetera, may

4    file supplemental or rebuttal reports.  So after all the

5    reports were first exchanged, then everybody got the

6    opportunity to have a supplemental or rebuttal report.  And

7    this all was to take place before the depositions.  So that

8    you'd have both reports, you'd have the reliance materials,

9    and then you'd take the depositions.  And the depositions as

10   called out, all had to be completed before the Daubert

11   motions were filed, and that all had to be completed before

12   the trial started.  So that was the basic sequence.  And I do

13   remember that as we got into the some of the more difficult

14   controversies over the, the pose, the prospect of additional

15   facts coming out, as for example, the discovery relating to

16   the lawyers.  That counsel for the FCR was particularly

17   vigilant in saying that of course none of this, no further

18   discovery should affect the due dates and completeness of

19   these reports.  And specifically on August the 1st, Mr.

20   Mullady said, I only have one other point – – and this is at

21   page 71 - - the assumption is here is that we're not going to

22   see any of this, the fruits of this additional discovery

23   worked into the Debtors' estimation reports.  I frankly think

24   we are going to see that, and my concern is that after we get

25   done with this exercise, there's going to be a request made

1    to the Court to file yet another supplemental expert report.

2    And that one, the one we have now is not really the report.

3    There's going to be one after this, and one after that, we're

4    never going to try the case.  And of course that was - - and

5    Your Honor immediately said, We're going to try the case.

6    Don't worry about it, Mr. Mullady.  We are going to try the

7    case.  And I'm going like this, okay.  I know we're going to

8    go try the case.  So not only was this process agreed, but it

9    was, it was agreed, really, under very significant pressure,

10   and under continuing pressure from the FCR to stand by.  So

11   what happened.  Well, Dr. Stallard took full advantage of the

12   rebuttal process.  And he filed a supplemental report, and he

13   indicated in the supplemental report that he had read Dr.

14   Anderson's report, the and report of many other people.  He

15   responded in his supplemental report as he saw fit.  And in

16   an extensive, extensive fashion.  Point after point that was

17   supplemental and rebuttal.  And then he was done.  His report

18   was submitted.  The supplemental report was submitted.  There

19   was no further supplementation that was made by Dr. Stallard.

20   I then took his deposition.  And it's a very technical area.

21   I spent a long time preparing for Dr. Stallard's deposition,

22   and I took his deposition relying upon both reports, and on

23   his reliance materials, and with the benefit of a great deal

24   of consulting with my own experts.  Discovery then closed,

25   roughly on schedule.  Not a peep from Dr. Stallard.  There

1   was nothing before the deposition, there was nothing after

2   the deposition.  Everything was quiet.  Daubert work

3   unfolded.  And there was still not a peep from Dr. Stallard.

4   And then the first shoe dropped.  And I'm going to talk not

5   about one shoe dropping, but two shoes, three shoes now have

6   dropped as this issue has remained pending out there, it's

7   continued to mushroom.  We got the first declaration.  Now

8   they say in their papers, that the first declaration, this is

9   at page 3, was, they suggest that it actually was in response

10  to Dr. Anderson's deposition on November 2.  So that, oh, it

11  really wasn't quite so late.  But in point of fact, that's a

12  false suggestion.  It's just outright false.  I have the

13  declaration here.  There's a reference to Dr. Anderson's

14  deposition at paragraph 7.  It says, I simply have reviewed

15  the report, and I've reviewed her deposition.  You then take

16  a look at all of the declarations that follow, not a single

17  one of them is key to the deposition.  They're all key to Dr.

18  Anderson's reports.  Which have been out there for either

19  months, or in the case of the first report, for more than a

20  year.  So what happened with this first declaration was not

21  prompted by the deposition.  The first declaration was simply

22  out and out a declaration that was a response to the reports,

23  and therefore was plainly out of time, under the order, no

24  questions to ask, plainly out of time.  Now I raised this

25  issue very promptly.  I brought it to the Court's attention,

1    I think, on the 18th of December.  And I said, we're going to

2    be filing a motion immediately, and Your Honor said, that's

3    fine.  And Your Honor called for expedited briefing.  So we

4    filed the motion the next day, but Mr. Mullady and I had,

5    during a different era of the case, talked about trying to

6    resolve this matter through a stipulation.  My mistake.  The

7    stipulation resulted from a series of telephone calls.  And

8    the stipulation was discussed.  The essence of it was that

9    the declaration would only be usable for Daubert purposes.

10   And in fact, I actually came up with that idea as a way of

11   trying to not to have Your Honor focus on discovery issues

12   which we know very well that Your Honor would like to see

13   resolved.  I volunteered the solution.  And most of the

14   discussion, then, focused on well if it's just for Daubert

15   purposes, what can be, what can be done with the declaration?

16   How can it be used?  And we had a great deal of discussion

17   about what parts of the declaration would stand and be usable

18   at trial.  But we also discussed the impact of this on the

19   briefing.  Because remember, I said on the 18th of December

20   with this report, I don't even think we can get, we can get

21   done our briefing that was scheduled to take place

22   immediately.  So Mr. Mullady was very focused to make sure

23   that we would file our brief on December the 21st, because it

24   was due days later.  And I said, I agree.  We'll stand by the

25   briefing schedule, and we will still submit out brief on

1    time.  And I then further said, we will include in our brief

2    what we think will be our expert's response to the Stallard

3    declaration, because we've already been talking with her.

4    We'll put it in the brief.  But then, to get the declaration

5    that's responsive in, we're going to need to do that a little

6    bit later.  So we agreed to keep with the briefing schedule,

7    and said we'll, all we'll do is a declaration and the

8    declaration will be submitted as all. . .(microphone not

9    recording) on January the 3rd.  And Mr. Mullady was very

10   concerned.  He said, well wait a minute.  Are you going to do

11   anything more than the declarations?  I don't want you guys

12   doing another brief.  And I said, fine.  We will simply file

13   a responsive declaration for Daubert purposes, and all we

14   will do is to file it with the Court and simply make

15   reference to the parts of the brief that it relates to.

16   Fine.  So basically the outcome of all of this was only for

17   Daubert purposes, the briefing schedule would hold, and we

18   were locked in, under my agreement, we were locked in to

19   maintain the briefing schedule.  And having no further

20   opportunity to respond to Dr. Stallard.  Our brief on the 21st

21   was going to be it.  So we stuck by all of that.  No

22   provision was made, no provision was made for any further

23   declaration to be filed.  If there were, don't, whoever would

24   believe that our, that my client and our representation would

25   say, oh, yeah.  Go file another declaration.  We don't get

1    any discovery, we don't get a chance to respond.  You just go

2    file your declaration.  No way!  No way!  The suggestion that

3    somehow this allowed for them to do a responsive declaration

4    all over again is an outrageous suggestion.  It's a

5    suggestion that says, oh well, it doesn't make any difference

6    if you ever get an opportunity to respond.  We'll put new

7    material out there, and you guys can't respond.  Too bad.

8    It's an outrageous suggestion.  Well, we did get hosed.  We

9    got hosed once, twice, now, almost three different times,

10   because a new declaration was filed on January the 7th.

11   Eighteen pages long.  It's a declaration with respect to we

12   have no opportunity for any discovery whatsoever.  No

13   opportunity for any response whatsoever.  And it's taking

14   place literally on the eve not only of the trial, but of the

15   Daubert hearings in particular.  Now we sought to get that

16   struck.  And we were I think ham handed about it, because we

17   asked that the briefing be accelerated, and then that result

18   is that Your Honor would have had to hear it at the same time

19   as the argument.  So we take responsibility.  We were at

20   fault with that.  And Your Honor said, no it's not going to

21   be an expedited process.  So fine.  So we then re-filed the

22   papers.  And therefore, there was no initial determination.

23   And it's now very apparent that with a response of somebody

24   who's representing the FCR was to kind of scratch their chin

25   and say, well, so far so good.  Now what can we do?  I got an

1    idea.  Let's get the Stallard declaration placed at issue in

2    the estimation trial itself.  You know, that would be

3    terrific.  It would do two things.  First, it would create a

4    predicate and a foundation for Dr. Stallard's second

5    declaration.  And then it would basically say, gee, you know,

6    now it's an issue in the estimation trial itself, we don't

7    need to be bound by this Daubert stipulation anymore.  Now

8    that sounds like kind of an outrageous suggestion that they

9    would sit there and think about that, but that's exactly what

10   they did.  And that's not only exactly what they thought

11   about, that's exactly what they sought to accomplish.

12   There's only one problem.  They couldn't place it into issue

13   through me.  We weren't going to put it at issue, we never

14   did put it at issue.  So what is it that they did?  They

15   called, their cross examination of Dr. Rodricks (phonetic),

16   they started to embark on this long examination that related

17   to what?  Well, it was a little bit, little bit, but all of a

18   sudden became plain that it was an examination that was

19   basically designed to pursue the Stallard declaration.  And I

20   objected at page 245.  I said, This is only pursuing, again

21   it's outside the scope of his expertise.  I know it's outside

22   the scope of my examination.  He's trying to use this

23   individual to create a predicate for a declaration that Dr.

24   Stallard introduced into this case too late in the day.  And

25   this actually violates, yet again, yet again, the agreement

1    that was that the testimony by declaration of Dr. Stallard

2    would be used solely for Daubert purposes, and would never

3    make its way into this trial.  And now it's not only being

4    done through a back, back door through cross examination of

5    the witness, it's not even in the area, really, meaning his

6    area.  Well that's a, that was my prediction at the time.

7    Guess what?  That's exactly what they've done.  They now say

8    in their brief, The foundation of Dr. Stallard's reply

9    critiqued at Dr. Anderson's deposition is already in the

10   trial record.  And they cite their examination of Dr. Joseph

11   Rodricks, which they introduced into the trial.  I didn't put

12   it at issue, they put it at issue.  I objected to it.  So

13   they're scratching their chins and saying, gosh, you know,

14   now that we kind of squeaked by the beginning of the trial,

15   let's try to taint the trial process itself with this issue

16   that they want to get injected, and then claim that somehow

17   it's already in the record.  Well, I'm sorry, they put it in

18   the record.  I didn't put it in the record.  And this fact

19   confirms that these folks are not operating in good faith.

20   This is a bad faith move.  Make no bones about it.  It's a

21   back door, bad faith move.  But it gets worse.  There's yet a

22   third step that's coming into this process.  Why are they so

23   focused on this now?  What do they really want to get out of

24   it?  Well what they want to get out of it is very, very broad

25   and deep.  What they now really want to get out of this is a

1    determination that not only is the whole deal, the

2    stipulation on the Daubert issue off, they now want to use

3    this as a foundation for making an even broader assertion,

4    which is that none of their experts should be bound by the

5    four corners of their reports, and their depositions.  Now I

6    have it right in their own words.  This is a letter from the

7    Orrick firm.  To the extent that the parties agreed - - first

8    of all, they repeat.  As you know, the Stallard declaration

9    in support of the FCR's Daubert motion was prompted by

10   deposition testimony.  False.  That declaration was totally

11   keyed to the reports.  Not to the testimony.  And they say,

12   okay, well, but now it's at issue.  It says, to the extent

13   that the parties agreed to limit certain expert testimony for

14   Daubert purposes, such limitation no longer is necessary or

15   appropriate.  Yeah, you gave your word.  Yeah, you objected.

16   We objected.  But you know what?  We kind of wangled it

17   through Dr. Rodricks, so all that stuff that we told you and

18   that we entered into a stipulation about, forget about it.

19   It's out.  It's now at issue in the case.  But they go

20   further still.  What do they now say?  They now propose, and

21   they actually want to tee it up on motion, but they decided

22   that it would be too obvious, so they wanted to begin, start

23   small with Stallard.  What they now want to say is, look we

24   want to have the opportunity to have our experts comment not

25   only on the reports, as well as the post report depositions,

1    but anything, anything that deals with trial testimony and

2    the exhibits and demonstratives used in their testimony,

3    provided, however, that this area stay within their

4    expertise, and do not testify to new opinions that are the

5    product of new work.  So what they're, now they're saying,

6    well, you know what?  We should really not be bound to say,

7    oh well, it's, it's not in the report.  If something happens

8    in the trial, anybody, regardless of whether it is in their

9    report or in their deposition, can offer a new opinion, so

10   long as its not based upon, quote, "new work".  That's where

11   they're going with all of this.  So the proposition that's

12   now before the Court is that Dr. Stallard is really the

13   beginning of a broader argument that says that that whole

14   process that we went through with the expert reports and the

15   depositions, it is out the door, because once there's

16   testimony by anybody, any expert can comment.  Indeed, they

17   even go so far as to make the ridiculous proposal that when

18   they put on their case, they should anticipate our rebuttal

19   case and rebut our rebuttal case before it's even there.  Now

20   unfortunately, fortunately the rules were designed to deal

21   with this problem specifically.  And they, they, for some

22   reason, there's not a single part of their papers in this

23   matter that even address the Federal Rules of Civil

24   Procedure.  The Federal Rules of Civil Procedure.  Those

25   rules were amended in 1993.  And in 1993, and the advisory

1   notes illustrate or, and explain the reason for this very

2   clearly.  Rule 26(a)(2)(b) says, The expert reports must be

3   complete, and they must be detailed.  No kind of, well here's

4   where I'm going.  This is it.  And in the depositions, also

5   then, to the extent that they're taken, have to be complete.

6   But the key, the key thing is the reports have to be

7   complete.  And then, if there is something that happens, that

8   changes the expert report or the deposition, (e)(1) of the

9   Rule requires that the other side be notified of the change.

10  And in a timely fashion.  Rule 37 then comes along and tells

11  us what happens in the event that that process is not

12  followed.  If a party, this is (c)(1), fails to provide,

13  37(c)(1), fails to provide information or identify a witness

14  as required by Rule 26 (a) or (e), the party is not allowed

15  to use that information or witness to supply evidence on

16  motion at a hearing or at trial, unless the failure was

17  substantially justified or is. . ..  And then the very

18  sanctions that are available to the Court are spelled out.

19  And it is very important that the advisory notes say. . .this

20  provision provides a self executing sanction for failure to

21  make disclosure required by 26(a) without the need for a

22  motion under (a)(2), under (a)(2)(a).  Paragraph 1 prevents a

23  party from using as evidence any witness or information that

24  has, without substantial justification, has not ben disclosed

25  by Rules 26(a) and 26(b)(1).  This automatic sanction

1    provides strong inducement for disclosure of material that

2    disclosing parties expect to use as evidence, whether at

3    trial, at a hearing, or on motions. . .under Rule 56.  So it

4    is very apparent under 1993 revisions to the Rules that you

5    make a complete disclosure, and that you don't make the

6    disclosure unless it's justifiable or harmless.  Harmless.

7    It's out.  Now there is no justification that can be offered,

8    because this is plainly and clearly a simple violation of the

9    rules.  They failed to submit any kind of material such as

10   they've now included, in the supplemental Stallard report,

11   even though Stallard had full cognizance of the Anderson

12   results before that.  So is it, then, harmless?  Well that is

13   their burden to demonstrate that it's harmless.  From our

14   point of view this is happening right in the middle of trial.

15   They are using this to cross examine our witnesses with

16   respect to new declaration materials we've already committed

17   to our case.  We've committed to our theories.  And now it's

18   plain that they want to toss out stipulations, that's

19   harmful.  They want to now have their own experts basically

20   walk away from their expert reports, that's harmful.  The

21   whole idea of the Rule is to give us the opportunity for

22   discovery.  We are being harmed.  We have already been harmed

23   when they cross examine our witnesses with respect to matters

24   that were not properly the subject of discovery.  Now they

25   have a couple of cases that they've cited.  And their effort

1   to find cases that support them out of the 3rd Circuit is, is

2   frankly pitiful.  The in re: <u>Paoli Railroad</u> case that they

3   cite.  The Rules were revised in 1993, the Paoli decision,

4   out of the Court of Appeals was 1994 with respect to a trial,

5   trial court determinations that were made even before the

6   Rules were revised.  So what does <u>Paoli Railroad</u> have to do

7   with anything?  Then they've got the <u>Hill</u> case out of the 3rd

8   Circuit.  And <u>Hill</u> is basically a situation where an expert

9   supplemented, or really kind of embellished his opinion based

10  upon new factual testimony from the key, one of the parties

11  in the case.  And the Court never even addressed in the

12  context of this 26(a) requirements or 37(e), 37(c) sanctions.

13  You can't find a word of the discussion of any of the issues

14  that we're dealing with here, in terms of the legal

15  requirements of the rules in the <u>Hill</u> case.  There is a case

16  that's actually right on point, and that's the <u>Johnson versus</u>

17  <u>Vanguard Manufacturing</u> case where the 3rd Circuit squarely

18  deals with this issue, but unfortunately makes a decision of,

19  in a case that's not citable as precedential value.  But it,

20  you know, it falls very much into the mode of a case that

21  would basically be decided as a routine matter, because the

22  rules could not be clearer that you are supposed to make the

23  disclosures in a timely fashion.  So Your Honor, they're,

24  this process is a test.  It's a test because if they can get

25  away with this, we are going to find out that Mr., Mr.

1    Mullady's letter from Orrick talking about what their experts

2    are going to do going forward, and their proposals to have

3    people testify beyond what is in their reports, it's going to

4    take over this case.  And they were going to raise that

5    today, but they decided, well, let's just see how far we get

6    with the Stallard issue before we get to the main issue.  I'm

7    happy to focus on the Stallard issue.  And what I think is so

8    critical is that the rules that were set down in the pre-

9    trial order, which mirrored the rules, the rules that are

10   provided by the civil rules so clearly be enforced and that

11   most particularly that counsel keep their word.  That

12   stipulation means something.  I entered into it in good faith

13   in order to avoid litigating this whole matter before Your

14   Honor, and now I'm being made to regret the fact that we

15   entered into any kind of agreement at all.  You can't conduct

16   a trial that way.  So we would ask that the stipulation,

17   we're still prepared to stand by the stipulation.  We could

18   ask, I believe, as an appropriate sanction, that Stallard's

19   declaration not be usable for any purpose.  But we're

20   prepared to stand by the stipulation.  They should adopt,

21   they should stand by the stipulation as well.  Thank you.

22          THE COURT: Mr. Mullady.

23          MR. MULLADY: Good afternoon, Your Honor.  Your

24   Honor, I'd like to begin by going back over some of the

25   procedural history that led to Grace's motion that Mr.

1    Bernick did not cover, or at least cover fully and more

2    completely, and there are some important pieces of that that

3    the Court needs to understand and appreciate.  And let me

4    begin by going back to December 7, 2007.  We simultaneously

5    exchanged, on that date, Daubert motions to preclude expert

6    testimony.  Now we appended, as an exhibit to our Daubert

7    motion, a declaration from Professor Eric Stallard

8    demonstrating that certain opinions and conclusions in the

9    reports and the deposition testimony of Dr. Anderson are

10   scientifically unreliable.  And there wasn't any complaint

11   from the other side about that.  At least not right away.

12   Because it was entirely proper and consistent with Federal

13   Rule 104, Federal Rule of Evidence 104(a), that we would

14   submit a declaration from an expert as part of our Daubert

15   motion challenging the qualifications of the opposing expert.

16   Rule 104(a) provides that preliminary questions of the

17   qualification of a person to be a witness, or the

18   admissibility of evidence, including expert testimony shall

19   be determined by the Court, and that the Court is not bound

20   by the rules of evidence in this regard, except with respect

21   to privileges.  So it's well settled 3rd Circuit authority

22   that we could have supported our Daubert motion with an

23   affidavit, a document, or a hearsay statement.  And that does

24   come from the Paoli case, which is still a viable part of 3rd

25   Circuit law, notwithstanding the amendment of the rule.  And

1    we could have done it, really, with anything that the Court

2    could have taken into consideration in your discretion.

3    Whether admissible or not.  And that includes an affidavit

4    from an expert.  And there's nothing in the CMO that

5    prohibited us, Mr. Bernick cited some language from the third

6    amended case management order.  There's nothing in that order

7    that speaks to what can be appended to a Daubert motion.  So

8    the first declaration by Professor Stallard was entirely

9    within the rules of the game, as laid out by the Court, and

10   we followed here.  And haven't broken any rules.  And I'll

11   get to the reasons why we haven't broken any rules as I go

12   on.  And I'll address the <u>Paoli</u> case more at a later point in

13   my argument.  But back to the time line.  Grace moved to

14   strike the Stallard declaration on December the 19th.  It's

15   objection was that, was the assertion that it contained new

16   work that wasn't disclosed in Stallard's expert reports.

17   Well, rather than get into a fight about that, because there

18   were some, there was some new analysis in that report.  And

19   we don't dispute that.  Again, we think it was appropriate,

20   and it was proper, and not prohibited by the CMO, and

21   certainly permitted by Rule 104.  So rather than get into a

22   discussion about that, we negotiated the stipulation, on

23   December 19, providing that Dr. Stallard's deposition, or Mr.

24   Stallard's deposition would be used for Daubert purposes

25   only.  And we stipulated also that Grace could file a

1   responsive declaration to the Stallard declaration from Dr.

2   Anderson for Daubert purposes.  Now at this point in time,

3   this is important for the Court to know, December 19th, a

4   round of Daubert briefing remained.  Reply briefs under the

5   Daubert briefing schedule were due January 7th.  I was careful

6   in the stipulation not to agree to any limitation on our

7   ability to fully reply to Grace's Daubert motion.  And the

8   Court will see that the stipulation says nothing about what

9   the FCR and the ACC can put into or attach to our Daubert

10  reply briefs.  In fact, as we were negotiating the

11  stipulation, Mr. Bernick asked me if he could file Dr.

12  Anderson's responsive declaration on January 4th.  That would

13  have been the Friday before the reply briefs were due.  In an

14  email to him I said, and I'll put it up on the Elmo for the

15  Court to see.

16          MR. BERNICK: Was this attached to the briefs?

17          MR. MULLADY: No.  Neither was my letter.

18          MR. BERNICK: Then, Your Honor, I would, I would

19  object to this.  It wasn't attached to the briefs.  I've

20  received no notice.  There are all kinds of emails that we

21  linked to this.  Let Mr. Mullady say what he said over the

22  telephone to me - -

23          THE COURT: All right.

24          MR. BERNICK: - - that's what I've put at issue.

25          THE COURT: Okay.  Fair enough.

1    MR. MULLADY: Your Honor, to be fair, the meet and

2    confer letter isn't part of this motion either.  It has

3    nothing to do with this motion.  But I'll get to that in a

4    minute.  The, what he said, in sum and substance, was that,

5    okay.  We need to have a responsive affidavit from Dr.

6    Anderson for Daubert only January 4th, okay.  And I said - -

7    MR. BERNICK: Now he's just reading.  There are all

8    kinds of emails that took place.  This is again exactly the

9    same kind of - - why couldn't he just give it to me, and then

10    I could have dug up the other emails that deal with it?

11    THE COURT: I don't know.  Do you want to read it?

12    MR. BERNICK: No, no.  Go ahead.  This is just more

13    of the same.

14    MR. MULLADY: Well, it's important, Your Honor.

15    Because Mr. Bernick was on notice, from my conversations with

16    him, and I won't read them.  He was on notice that it was our

17    intention to respond to whatever Dr. Anderson said in her

18    opposition declaration in our reply brief.  I made that

19    clear.  And I asked for an extra day.  I didn't want that

20    declaration to hit my desk, as is the custom with filings

21    from the Debtor, at 7 o'clock on Friday night, and then have

22    to deal with it over the weekend.  I wanted to be able to

23    confer with Professor Stallard on Friday.  So I asked him,

24    can you get it to me on Thursday night, January 3rd, so I have

25    one business day to deal with this?  He said, yes.  And

1    that's why January 3 was the date on which that declaration

2    was filed.

3         MR. BERNICK: With that statement, I'd like to see

4    the email, because. . .(microphone not recording).

5         MR. MULLADY: So that's how we got to the January 3rd

6    date for the submission of that declaration.  So Your Honor,

7    it's a little bit surprising to me to hear this great shock,

8    outrage, and surprise by the Debtors' counsel that we would

9    have responded to Dr. Anderson's declaration with another

10   declaration from Professor Stallard in our reply brief.  They

11   say in their motion, the FCR is just trying to get the last

12   word.  Well, under the CMO, as part of the Daubert briefing

13   process, we did get the last word on our Daubert motion.  We

14   get the reply brief.  So we did want the last word on that,

15   and we took it.  And that's what that declaration of

16   Professor Stallard is designed to do.  It doesn't add any new

17   work or material.  It is simply a point by point response to

18   her declaration.  Now if Grace had wanted to negotiate a

19   limitation on our reply brief, they could have done so.  I

20   doubt we would have agreed, but the subject never came up,

21   and it never worked its way into the December 19 stipulation.

22   So we filed our Daubert reply brief, and as part of that we

23   submitted the second Professor Stallard declaration.  At this

24   point in time, we're a week away from the Daubert arguments,

25   which are to begin at 9 o'clock in the morning on Monday,

1    January 14th, in Pittsburgh.  Now, despite having the Stallard

2    declaration on January 7th, Grace waited until Friday night,

3    January 11th at 7:38 p.m., less than 72 hours before the

4    hearing, to file its motion to strike.  That motion was filed

5    without a motion to shorten time, or a proposed order, and as

6    the Court knows, you dismissed that motion to strike.  It was

7    re-filed on the 14th with argument requested today, February

8    25th.  And subsequently, of course, the arguments ensued.  If

9    the Court recalls, I made it a point in my Daubert arguments

10   in Pittsburgh that the Court should pay particular attention

11   to Professor Stallard's declarations because the issues were

12   very important.  And we went from there.  And we went into

13   evidentiary submissions on the 16th, and Mr. Rodricks was on

14   the stand, and without reference to Professor Stallard, or

15   any direct references to his declaration, he was cross

16   examined on a matter that was within his area of expertise.

17   He was a professed risk assessment expert, as is Dr.

18   Anderson.  My partner, Garret Anderson cross examined him on

19   basic concept of, concepts of risk assessment, and the issue

20   of heterogeneity, how individual workers differ from one to

21   the next, and whether you should take that into account, and

22   so forth and so on.  All permissible, proper lines of cross

23   examination of a risk assessment expert.  It was Mr. Bernick

24   who stood up in court and said that this was all about a

25   declaration that Professor Stallard has submitted for Daubert

1   purposes.  That didn't come from Mr. Rasmussen's mouth or

2   mine.  It came from Mr. Bernick.  We were just cross

3   examining a witness within his area of expertise.  Now Your

4   Honor, the motion, this motion is in some extent, to some

5   extent mooted by events in that we have gone down this road,

6   we fully argued the Daubert motions, we've now introduced

7   into the trial record, as our papers say, some of these

8   concepts.  But I'm not going to stand before you and say that

9   because of that the stipulation should be thrown out, we

10  should walk away from the agreement we made.  I have asked

11  for none of that.  The letter that Mr. Bernick showed the

12  Court a short glimpse of, was actually a long letter in which

13  we were attempting, in good faith, to come to some resolution

14  of what has been for us, the ACC and the FCR, looking down

15  the road to how this case is going to proceed, something of a

16  nettlesome issue in terms of we had simultaneous exchanges of

17  expert reports.  Dr. Florence, for example, gave us an expert

18  report on September 25th in which his estimate changed on the

19  basis of new assumptions and new data.  We simultaneously

20  submitted our expert reports on the same day that we got his,

21  his second report.  And by consequence neither Ms. Biggs nor

22  Dr. Peterson directly took on the, the changes that occurred

23  from Dr. Florence's first report to his second in their

24  reports, because they hadn't seen it yet.  There was a

25  simultaneous exchange.  So the whole purpose of this letter

1   was to say, look, this isn't a traditional case where we have

2   a plaintiff and a defendant.  The plaintiff goes first.  He

3   puts on his case.  We go on, put our case.  And then you get

4   rebuttal.  We each have a case here.  We each have a plan

5   before the Court.  A plan of reorganization before the Court

6   that has, that has a number that presupposes that the

7   liability for personal injury will be a certain amount.  How

8   do we go about trying this case?  Well Grace's attitude is,

9   it's our motion, we put our case on, you put your case on,

10  and we get rebuttal.  And our response it, or our view is,

11  why do you only get rebuttal?  Why don't we get rebuttal to

12  your case?  Now, isn't this really two separate cases with

13  each side getting rebuttal?  So the whole purpose of this

14  letter that they take great offense to was, the message was

15  let's meet and confer on this, because we have this issue of

16  how simultaneously exchanged expert reports get worked out in

17  the reality of cross examination and presentations of

18  evidence, where each side is going to want to have each

19  expert fully respond to the other side's position without

20  having witnesses be called back multiple times in an

21  inefficient manner to have rebuttal and surrebuttal and all

22  of this.  So that's really what that was about.  At the same

23  time, we raised the question of this, whether this

24  stipulation that cabins the Stallard work for Daubert

25  purposes is really now something that, that needs to be

1    cabined.  Because we are going to address the Stallard thesis

2    with all of Grace's experts who profess to be risk assessment

3    experts.  Whether or not Professor Stallard's name ever gets

4    introduced in a question.  It's perfectly appropriate for us

5    to do that.  We have, in this respect he's acting as a

6    consulting expert for us.  He's going to help us frame

7    questions.  So it's coming.  So the question is do we just,

8    do we have this artificial cabining or do we remove it?  And

9    that's what the letter was about.  There's this great

10   sinister implication that this is all about us trying to

11   upset apple carts.  We're actually trying to get this trial

12   done in the way that's the most efficient way possible, where

13   everybody has fully protected their side.  And has their say.

14   That's all this is about.  I know it's late.  I just want to

15   make a few other points, because this is a serious matter.

16   There is a sanctions motion.  The stipulation, Grace says

17   that the express - - and I want to put this on the Elmo,

18   because I don't want to paraphrase it.  It's that important.

19   First. . .(microphone not recording) the express purpose of

20   the December 19th, stipulation was to prohibit Mr. Stallard

21   from further analyzing and critiquing Dr. Elizabeth

22   Anderson's report.  Now, well let's take a look at the

23   stipulation and see what it says.  I submit to the Court that

24   the express purpose of the stipulation is set forth in

25   paragraphs 5 and 6.  The Stallard declaration can be used by

1   the FCR and the ACC for Daubert purposes only.  The Stallard

2   declaration and the substance of it, including all work. . .

3   is not usable for any purpose of the trial and the estimation

4   proceeding except that. . .asked whether he believes the

5   opinions in his expert report regarding the statistical

6   sample. . .by Dr. Florence, etcetera.  And this is the matter

7   that relates to Dr. Florence and not to Professor Stallard.

8           MR. BERNICK: But, again, can we just read the next

9   sentence to the Court?  It has nothing to do with the issue

10  that we're talking about.  Nothing.

11          MR. MULLADY: I'll read the rest of the paragraph.

12  We asked whether he believes the opinions in his expert

13  report regarding the statistical sampling methods used by Dr.

14  Florence to yield sample sizes apply to the new sample sizes

15  provided in Dr. Florence's September 25, 2007 report and

16  explain his answer by reference to his prior work.  And this

17  relates solely to the opinions in paragraphs 20 to 27 of the

18  Stallard declaration, not the first 19 paragraphs of the

19  declaration related to the work of Dr. Anderson.  Well that's

20  a far cry, Your Honor, from saying that the express purpose

21  of this was to prevent Dr. Stallard from further analyzing or

22  critiquing Dr. Anderson's expert report.  This doesn't say

23  that.  And in a case where they're moving for sanctions, I

24  think it's significant that they're making a representation

25  about a stipulation saying something expressly when it

1    expressly does not.  Your Honor, but this motion, and this

2    motion only relates to the issue of whether the Stallard

3    declaration should or should not be usable for Daubert

4    purposes.  That's all we're here to decide today.  All the

5    issues in that meet and confer letter notwithstanding, that

6    meet and confer process did not result in an agreement.  We

7    still may have discussions about that.  It's not before the

8    Court.  What is before the Court is a motion to strike a

9    declaration that we submitted as part of our Daubert

10   briefing.  And that motion fails on the merits very quickly.

11   There was no violation of the stipulation.  It doesn't put

12   any limitations on what we can say in our reply brief.  It

13   doesn't restrict our ability to submit a second declaration.

14   It doesn't expressly prohibit or even implicitly prohibit

15   what we've done.  The CMO, as I mentioned, describes a three

16   step process of initial motion opposition and reply for

17   Daubert motion practice.  We appropriate - -

18         THE COURT: Were all these declarations submitted

19   within the time period of that CMO?

20         MR. MULLADY: Yes, Your Honor.

21         MR. BERNICK: I'm sorry.  I missed Your Honor's

22   question.

23         MR. MULLADY: She asked if both were - -

24         THE COURT: I asked whether the declarations were

25   all submitted within the time frame set up for the Daubert

1    stipulations, Daubert declarations within the time frame set

2    up by the CMO.

3              MR. BERNICK: I don't - -

4              MR. MULLADY: Yes, the first - -

5              MR. BERNICK: They were in the briefs, the Daubert

6    briefs.

7              THE COURT: Yes.

8              MR. MULLADY: Exactly.

9              MR. BERNICK: That's - - they were not, they were

10   not submitted in time for any of the reports or the

11   deposition discovery.

12             THE COURT: Right you - -

13             MR. MULLADY: Well these were - -

14             THE COURT: Mr. Bernick's point, I guess, is that

15   all expert reports should have been done and closed.

16             MR. BERNICK: Absolutely.

17             MR. MULLADY: Right.

18             THE COURT: There shouldn't have been anything more

19   submitted with Daubert motions.  Your point is that Rule 104

20   says you can submit extra things, and so the CMO didn't need

21   to cover it.

22             MR. MULLADY: That's correct.  This isn't, these

23   weren't expert reports.  And, and - -

24             THE COURT: So the point is whether or not the order

25   that I issued that you folks negotiated is clear on this

1    point.

2          MR. MULLADY: It was clear.

3          THE COURT: Well my understanding of that order was

4    that expert reports were expert reports and they were going

5    to be done.  And the purpose for the Daubert reports was that

6    people, or motions was that people were going to be filing

7    motions that they felt that it was necessary with respect to

8    the expert reports that were of record.  So I didn't expect

9    to be getting yet another round of expert reports that

10   criticized the expert reports that were already of record.  I

11   thought that was the purpose of the expert reports, the

12   rebuttal reports, the response reports, the require reports,

13   the supplemental reports, and the depositions that were

14   taking place.  I mean, how many expert reports can a person

15   have in one case?

16         MR. MULLADY: Well Your Honor, we didn't read it

17   that way, and I don't think that's a fair construction of

18   what these, the CMO said.  And the case law certainly allows

19   for the submission of expert affidavits and materials in

20   support of Daubert motions.

21         THE COURT: Well - -

22         MR. MULLADY: The Paoli case - -

23         THE COURT:  - - it does, except that I don't know

24   what the case management orders were that accompanied those

25   cases.  And that's the issue.  Because, you know, I don't

1   even know if there were case management orders that

2   accompanied those cases.  What I do know is that I was

3   attempting to resolve all of these issues ad infinitum, ad

4   nauseam before we got to this level, and I thought that you

5   folks had come up with an agreement as to how it was going to

6   happen.  And here we are, in the middle of trial, still

7   arguing about the submission of expert reports.  Now frankly

8   it's kind of appalling.

9           MR. MULLADY: Your Honor, I will work with Mr.

10  Bernick to try to work through this issue so we don't have

11  any more episodes of this.  I can tell you that what, what

12  has brought us to court today is that in the opposition

13  declaration of Dr. Anderson, she did reveal an assumption, a

14  very critical assumption underlying all of her work, that was

15  never disclosed before, and that's this idea of an

16  independence assumption.  And I focused on this a little bit

17  a trial in my opening statement, and I don't want to get into

18  the substance of that right now except to say that if, you

19  know, Mr. Bernick cited Rule 26(a)(2)(b), the expert reports

20  must be complete and must be detailed.  Well this is a very

21  critical, fundamental assumption that she made that was not

22  revealed until we got this opposing declaration.  And that's

23  why Dr. Stallard's, in large part why his, his second

24  declaration is so long and detailed.  He had to take that

25  apart and really address it, and analyze it.  You know, I

1   don't think Mr. Bernick would be advocating for a self

2   executing sanction for his own experts having not told us

3   about the fact that she thinks people are like coins, and

4   that what one worker does on a particular day tells you

5   nothing at all about what he's going to do the next day,

6   because like a coin, every time he's flipped he can come up

7   working a different job.  That's what she's done.  And that's

8   what he addressed in his response.  So you know, I don't

9   think, I think what we're here today about is whether to

10  strike this declaration for Daubert purposes.  I think it

11  makes no sense to do that.  The Court, this is a bench trial.

12  These are highly compensated, very sophisticated experts on

13  both sides of the case who can take care of themselves - -

14          THE COURT: Yes.  Obviously.

15          MR. MULLADY:  - - on cross examination.

16          THE COURT: And it's also a little distressing that

17  they spend so much time criticizing each other.  It would be

18  very helpful just to get their information, in report form,

19  and not have them calling each other names.  Frankly, that's

20  also appalling.

21          MR. MULLADY: That's all I have, Your Honor.  Thank

22  you.

23          THE COURT: Mr. Finch.

24          MR. FINCH: Nathan Finch for the ACC.  Your Honor,

25  maybe it's because it's late and I'm tired, but I have a very

1    simple way of looking at this.  And if this is, this motion

2    is about a series of briefs.  And the briefs are not - -

3          MR. BERNICK: I'd like to just note an objection for

4    the record.  We specifically, we specifically have no motion

5    pending with respect to the ACC.

6          MR. FINCH: Well, if that's the case, then I'll sit

7    down.

8          THE COURT: Okay.

9          MR. BERNICK: Your Honor, I just have a few, a few

10   points.  First of all, with respect to Paoli, and I guess it

11   kind of goes through Stallard 1, 2, 3.  Stallard 1 was the

12   first declaration, and Mr. Mullady insists, well this is all

13   okay, because after all this is Rule 104(a), it's a

14   preliminary determination made by the Court, and the Court

15   can use all kinds of things, even things that are not in

16   evidence.  That is an apple to the orange.  That says what

17   the Court can consider in terms of evidence or non-evidence

18   in Rule 104(a).  Rule 104(a) is a rule of evidence.  It does

19   not displace the Rules of Civil Procedure.  It doesn't

20   displace the discovery rules.  The whole idea of the

21   discovery rules is that people have an opportunity for

22   confrontation and cross examination.  So whether it is

23   evidence or non-evidence, it has to be revealed in connection

24   with discovery.  So to say that 104(a) permits non-evidence

25   has nothing to do with whether discovery is permissible with

1   respect to what somebody's going to say in Rule 104(a).  So

2   Rule 104(a) has got zero to do with this case.  In the pre-

3   trial order in this case, it was specifically contemplated

4   that everybody who was going to say anything in connection

5   with any expert matter, including Daubert measures, was all

6   supposed to be done.  That's what they violated.  They

7   violated the discovery rules, they violated the pre-trial

8   order.  Got nothing to do with Rule 104(a).  Now Paoli,

9   Paoli.  Paoli actually says, and if we had more time, I'd

10  show Your Honor the language, it says, you know what?  We're

11  sitting here, and yes it's true this is 104(a), but you know

12  what?  Professor Berger (phonetic), who wrote a law review

13  article, says that even if it's 104(a), there should be full

14  discovery.  And you know what the 3rd Circuit said?   It says,

15  we agree.  We think that that's what should occur.  But

16  because the trial court didn't know that that was going to be

17  the 3rd Circuit's view, the 3rd Circuit, in that case, decided

18  not to disturb what was a discretionary determination by the

19  trial court.  Paoli says exactly the opposite of what Mr.

20  Mullady has said here today.  Then we get to Stallard 2,

21  which is the second declaration, and the famous stipulation.

22  Now he says the stipulation says nothing.  And you know, I

23  guess there was an innocent explanation coming into this

24  proceeding that that was simply an omission.  We now have Mr.

25  Mullady admitting that it was not simply an omission, it was

1  deliberate.  Because he says he put me on notice of the fact

2  that there was going to be another declaration from Mr.

3  Stallard with this email.  Where I said I wanted to have - -

4          MR. MULLADY: Your Honor, objection.  He - -

5          MR. BERNICK: Well he read - -

6          MR. MULLADY:  - - wouldn't let me show this email.

7          MR. BERNICK: He read from it.

8          MR. MULLADY: And now he's using it.

9          MR. BERNICK: I'll be happy to read, I'll read from

10 it happily.  He says, oh well gee, I put Mr. Bernick on

11 notice.  Well, what happened was that I sent an email to him

12 from David Bernick to Raymond Mullady, Jr. and Jan Baer.

13         MR. MULLADY: Objection, Your Honor.  You wouldn't

14 let me do this.

15         THE COURT: I - -

16         MR. BERNICK: To the contrary.  He went ahead and

17 did it.

18         THE COURT: I didn't let you read from it, but I did

19 let him tell me what it was about.  Just tell me what it's

20 about, so - -

21         MR. BERNICK: Okay.  Well he says - -

22         THE COURT:  - - I can get past this.

23         MR. BERNICK: I asked for an opportunity to have a

24 responsive affidavit, he said fine.  I said, is January 4

25 okay?  He then says, well, I'll tell you what.  Give it to me

1   on January the 3rd, because that way I'll have a full business

2   day before reply briefs are due to address it.  There's not a

3   word of there being a responsive declaration.  Not a word.

4   And yes, he needed the time to address it, but we were

5   addressing it in our brief.  Yes, he gets the last word in a

6   reply brief, and he's asking for more time to do that, so I

7   said fine.  And he took, again, my accommodation of the

8   request for more time to say that somehow I was on notice

9   that not only was he going to file a reply brief, he was

10  going to file another declaration?  That tells me that the

11  omission here was not simply an omission, it was strategic.

12  He gets the last word in briefs, he does not get the last

13  word by reopening discovery yet again.  Then we get to

14  Stallard 3, which is the trial process.  He says, well on

15  January the 16th in cross examination of Dr. Rodricks, there

16  was no reference to the Stallard declaration.  Precisely.

17  That was the whole point.  Is they wanted to inject this

18  issue without raising the Stallard declaration.  And so I

19  flagged it to the Court, and I said, this goes beyond scope.

20  They were happy to have this all proceed so that unilaterally

21  they could decide that they could make a matter of issue in

22  the record of this case without seeking the Court's

23  permission.  Why?  Well - -

24          THE COURT: So the problem is, am I getting the

25  picture that the problem is that the first place that this

1    issue of homogeneity came up is in the Stallard declaration?

2    The Debtor had no notice that the issue was going to be

3    raised by the, by the FCR before the Stallard declarations

4    that came up in the Daubert motions?

5            MR. BERNICK: Well, it is, that is correct.  That is

6    to say certainly from Dr. Stallard.  Dr. Stallard's reports,

7    and I have reread them, contain not a word, not one word

8    about heterogeneity.  I took his deposition.  I read his

9    reports.  I read his reliance material.  There's not one

10   word.  Now they did raise the issue with Ms. Anderson in her

11   deposition.  They raised the issue.  They said, well, gee, is

12   it, you know, why doesn't he keep the same job?  And she

13   says, it's highly unlikely.  So it's not as if somehow this

14   was all a brand new issue.  She actually revealed this in the

15   context of her deposition, but, but there was no information

16   from Dr. Stallard, there was no indication, there was not a

17   breath that they were going to go down this road.  And if

18   they had, well we would have had the opportunity, I would

19   have had the opportunity to cross examine Dr. Stallard on the

20   fact that he's a psychology guy, he's not an epidemiologist,

21   and all kinds of other good things.

22           THE COURT: So maybe what I need to do to get past

23   this is to give you an opportunity to cross examine Dr.

24   Stallard.

25           MR. BERNICK: I'm sorry, Your Honor.  It does,

1   here's what, here's what happens.  They now have Dr.

2   Stallard.  They've now introduced a new issue in the case.

3          THE COURT: No, I don't know that they have.

4          MR. BERNICK: Well, yes - -

5          THE COURT: They introduced a Daubert issue.

6   Because this stipulation says they can only use this for

7   purposes of Daubert, and it limits what it's to be used for,

8   except for the Florence, Dr. Florence issue, which is agreed

9   can be used in the trial itself.  They aren't going to use

10  Dr. Stallard's information in the declarations in the trial.

11  They've agreed they won't.  Now the issue, that's what I'm

12  trying to get to.  If, in fact, the issue of the homogeneity

13  was not raised until the Daubert motions were filed, then I

14  think there's some prejudice.  If the issue of homogeneity

15  came up in some other context earlier on, then I think what

16  you need is an opportunity to cross examine Dr. Stallard for

17  whatever purpose.

18         MR. BERNICK: It never came up.  They, they attempt

19  now to say, oh well, gee, it's somewhere buried in her

20  materials.  They had access to her materials.  They had

21  access to Dr. Anderson.  It's not part of Dr. Anderson's

22  analysis.  Basically what Dr. Anderson does, it's Dr. Lee

23  (phonetic) who's got all the data on industrial hygiene.

24         THE COURT: Right.

25         MR. BERNICK: And he comes up with a mean or an

1   average.  She uses the mean or average.  They want to attack

2   her because she uses the mean or the average.  That's their

3   issue.  It's not her issue.  It's not part of, it's not part

4   of her analysis.  It's not part of Dr. Lee's analysis.  They

5   all did it according to. . .(microphone not recording)

6   through the EPA and they use averages.  This is their issue,

7   and their issue alone.  And they've decided that they want to

8   inject it at a very late date through Dr. Stallard.  That,

9   that's how this whole thing came about.  And, and it, and

10  with with respect to reports, and her declaration relates to

11  reports that were before them months, and months, and months

12  ago.  So with respect to even Daubert, it is their Daubert

13  issue.  It is not our Daubert issue.  And it was raised late,

14  and we had no notice of it.  And Your Honor, this is, this

15  is, he basically acknowledged essentially all, I think, of

16  what we have laid out.  And he also acknowledged that this is

17  really, again, a stalking horse for what is, he says, a

18  nettlesome issue.  It's not nettlesome.  That's kind of like,

19  ooh, that's a little irritant.  Which is, gee, you know, in

20  the expert reports, you know, some of the supplemental

21  reports were ships crossing in the night.  That is that they

22  were introducing new things, because they were supplemental,

23  and people didn't necessarily get the opportunity to respond

24  to one another.  Well that issue was imbedded in the pre-

25  trial materials.  In the pre-trial order.  It said,

1    everyone's going to have supplemental reports.  That

2    nettlesome issue, if they wanted to raise it, the right way

3    to raise it would have been at the time that we negotiated

4    the pre-trial order.  And that again is just, it's a, it's a

5    straw man proposal.  Why?  Because they never raised it.

6    They let everything go forward, waited until it's all done,

7    and now when they're on the eve of trial, they've basically

8    decided, you know what?  We kind of like it better if our

9    experts got another crack at this.  And that's not a

10   nettlesome issue.  That's the whole question of whether the

11   discovery process works.  Whether you follow Rule 26, whether

12   you follow Rule 37.  They can't do that.  They can't walk

13   away from their agreement, and they can't walk away from the

14   pre-trial order and the rules in the middle of the trial.  So

15   I think that what's appropriate, Your Honor, is we're happy

16   to stick with the first declaration that Mr. Stallard gave.

17   And we don't think it's right, but we agreed to it.  We're

18   happy to stick with Dr. Anderson's response.  This all goes

19   solely to Daubert, so we stick by the stipulation.  The

20   second declaration, Your Honor, should be stricken.  It was

21   not agreed, it is out of order, and obviously now we know

22   from the email that there was a very careful effort to kind

23   of leave room there without telling me.  And basically to

24   take personal advantage of me and my willingness to say,

25   okay, I'll give it to you a day earlier, to somehow then

1    argue that I was on notice.  That's just, that's just wrong.

2    I just, and I'm very, I'm very obviously irate about this.

3    I'm very disappointed that certainly when it comes time for

4    trial people have got to be candid with one another.  You

5    can't have telephone calls and emails exchanged on, on

6    handheld devices, and then always be worried about, well, gee

7    if I did this oh, are they going to argue that by omission

8    I've agreed to something else.  So the second declaration

9    should be stricken.  It's really just totally beyond the pale

10   of Rule 37.  And then this whole notion that somehow experts

11   are going to walk away from their reports, Your Honor, the

12   issue is not here before us today.  They haven't actually

13   made that proposal, but we can't ignore the elephant in the

14   room.  He's written that he wants out of the stipulation.

15   He's written, he's said today, I want to cross examine every

16   single one of their experts on the basis of what my expert

17   has now told me.  I'm sorry, the rules don't work that way.

18   The cross examination is defined by the scope of direct.  You

19   can't make a case as to which you did not allow discovery by

20   turning out people into their witnesses who articulate an

21   issue that they never raised before in the case.  And yet,

22   that's exactly what Mr. Mullady said.  He says, well, we

23   still intend to go ahead and do it.  Kind of like, it doesn't

24   make any difference whether we're out of order or not, Your

25   Honor, we're still - - you can't conduct a trial that way.

1    You've got to stick to the rules.  And maybe this time, if

2    they try it again, well that's fine.  I'll object and say,

3    this goes beyond scope.  And then the issue is not just

4    expertise.  The issue is are they trying to say to Your

5    Honor, Your Honor's orders don't make a difference.  And that

6    is part of the reason that we're here today.  And we can't

7    ignore it.  So we would ask that the second declaration be

8    stricken, and that the terms of the stipulation be enforced.

9          THE COURT: One of the documents, but I don't know

10   if I have it with me, had an order attached to it that was a

11   scheduling order that laid out the dates.  And that's what

12   I'm still a little confused about.  Laid out the dates by

13   which the, I'm not sure if it's the briefs or the

14   declarations had to be submitted.

15         MR. BERNICK: (Microphone not recording.)  Yeah.

16   Here they are.

17         THE COURT: Could you put them up, please?

18         MR. BERNICK: This is the first one, this is the

19   third.

20         THE COURT: No.  I'm looking for the, I don't think

21   that's the one I'm looking for.  I'm looking for the Daubert.

22         MR. BERNICK: Then it's this one here.

23         THE COURT: That's the one I was looking for.

24         MR. BERNICK: This is December the 7th, December 21,

25   and January the 7th.  When the first declaration was submitted

1    - -

2            THE COURT: Okay.  So that's talking about the

3    briefs, because - -

4            MR. BERNICK: Right.

5            THE COURT:  - - it specifies the page limitations

6    for the briefs.

7            MR. BERNICK: Correct.  Correct.

8            THE COURT: All right.  Well, affidavits, my

9    experience, and supporting supplemental materials don't go

10   with the brief, they go with the motions.  Their evidentiary

11   support could go with the motions.  They don't go with the

12   briefs.

13           MR. BERNICK: And Your Honor, again, I know that

14   you're - - I know that Your Honor indicated that you were

15   focused on that second order.  But really the whole, the

16   whole force and intendment of the discovery sequence was that

17   you had all the expert reports, then you had the deps, and

18   after that was all done, then you would have the Daubert

19   motions.  And - -

20           THE COURT: Well that was my understanding of how

21   this process was going to work.  That everything would be

22   finished, they parties would trial the Daubert motions.  We

23   initially were going to do, in fact did do, the arguments on

24   the Daubert motions on the first day of trial.  And the

25   purpose was to make sure that everybody had an adequate

1    opportunity to see - -

2            MR. BERNICK: Yes.

3            THE COURT:  - - all of the expert reports in

4    advance so that you could raise whatever - -

5            MR. BERNICK: Yeah.

6            THE COURT:  - - motions you felt were appropriate.

7            MR. BERNICK: Yeah.  And then, and then to add to

8    that, you know, that first declaration was, we think, out of

9    line, but because at least with that one, it was submitted on

10   December the 7th, we had the opportunity to have Dr. Anderson

11   respond, that was something that we could catch.  But the

12   second declaration came in with the response brief, and that

13   we had no opportunity to respond to.  In fact, Mr. Mullady

14   assured, through my conversation with him, that we wouldn't

15   seek to have any further declaration that would be

16   responsive, or we wouldn't seek to have a further reply.  So

17   that right there is not just a brief.  It's a brief with a

18   new submission on the record.  He says, oh well, it doesn't,

19   it's no new work.  Well, if it's no new work, then why was it

20   there at all?  And that's the problem.  Is that, it's not,

21   it's not consistent - - my stipulation didn't amend, for one

22   moment, the rule, the rules of the pre-trial order and the

23   rules of discovery.  And yet, they're now saying, oh well,

24   yeah, because it was - - I mean, they don't even say that the

25   stipulation did that.  Because it was silent, and then he

1  made a telephone call to me and got this email, that somehow

2  I was on notice.  That's, in a day that, where we've been

3  talking a lot about notice, that's not notice.  That was,

4  that was a fast move.  But the answer to Your Honor's

5  question is that the second declaration came in on January

6  the 7th.  And that is now a week before trial.  We're

7  preparing for our arguments.  That's the last thing that Mr.

8  Mullady was saying was appropriate back in '07 when we

9  developed the schedule and he was saying, I want it all done.

10  Mr. Finch was saying, I want it all done.  Sorry.  I'll

11  withdraw that.  Mr. Mullady was saying, I want it all done in

12  time.  That's not the way to conduct a trial.

13        THE COURT: Okay.  Mr. Mullady.

14        MR. MULLADY: Your Honor, the most important thing I

15  want to say to the Court right now is that we respect your

16  orders.  We have not violated any of your orders.  We have

17  not walked away from any agreements.  We have not proposed to

18  walk away from any agreements.  The meet and confer letter

19  was meant to be a discussion piece between counsel.

20        THE COURT: All right.  I accept it as that.

21        MR. MULLADY: I didn't anticipate that that would be

22  revealed to the Court.

23        THE COURT: That's fine.  I'm accepting that the

24  meet and confer letter was a proposal.  I am discounting

25  everything in the meet and confer letter.  But I am concerned

1    about the late filing of the Stallard declaration.

2          MR. MULLADY: As far as the filing of the Stallard

3    declaration, we would disagree with the Court's

4    characterization of that as a late filing.  The, the CMO that

5    we just looked at providing the dates for Daubert motion

6    submission specifically provides that, or contemplates with

7    the footnote 1, that, that there would be exhibits and

8    information that would be appended to these motions.  And in

9    fact - -

10          THE COURT: Well sure.  They'd have to have the

11    portions of the - -

12          MR. BERNICK: Right.

13          THE COURT:  - - of the exhibits that are objected

14    to.

15          MR. MULLADY: And there's all sorts of stuff

16    appended to these motions.  There's - -

17          THE COURT: Exactly.  There would have to be what

18    you're objecting to so I'd know.

19          MR. MULLADY: Right.  And there's no, and Your

20    Honor, there's no limitation, in lots of, in lots of cases,

21    in Daubert proceedings, the experts who have been fully

22    deposed, and fully given reports, then come in with

23    declarations.  I would be surprised if Mr. Bernick hasn't

24    been involved in a case where that's happened.

25          THE COURT: So have I, Mr. Mullady.  But it's, but

1    it's been in one of two circumstances.  Either there hasn't

2    been a case management order that set a deadline for expert

3    discovery and this type of a procedure, or there has been

4    something built in that provided for it.  And that's my

5    concern.  You know, the Daubert motion practice, I don't know

6    whether it's done.  I know that there are going to be

7    objections that are continuing.  I don't know whether that

8    includes the Daubert practice or not.  I just don't remember.

9    Under this management process.  But one thing I, I cannot,

10   and I don't think the parties can do is continue to have

11   rolling expert reports that are coming in as objections to

12   evidentiary submissions come up.  That's not the purpose of

13   how a trial is going to go.  I mean, this case management

14   order said, here's a discovery schedule.  Do your fact

15   witnesses by now, do your expert witnesses by now.  Get it

16   all done so you can file your motions.  If you're going to

17   have Daubert motions, then get them teed up so I can make a

18   decision.  I don't, I just don't see how the additional

19   supplemental materials that keep coming in can fit into that

20   process.

21            MR. MULLADY: Well there is, there is, Your Honor,

22   I'll end by saying this.  There is not going to be any

23   continuing process in this regard.  If the Court denies the

24   Debtors' motion, which we believe the Court should, because

25   it does not have merit, the Stallard declarations will stand

1    for Daubert purposes only.  As the witnesses come up, if, if

2    direct examination is limited to areas that the Court feels

3    we can't go into because we're bringing new material or new

4    matter before the witness that's not addressed in the

5    witness's testimony, then an objection will be sustained.

6    And we will not push it.  We have an obligation to represent

7    our client zealously, and we intend to do that.  But we will

8    not, we will take the Court's cue early on in this, in this

9    regard.  So it's not going to be a snowballing or never

10   ending process here.  Secondly, Your Honor, just a couple of

11   3rd Circuit case cites that I think the Court should be

12   familiar with.  <u>Hurley versus Atlantic City Police Department</u>

13   - -

14             THE COURT: I'm sorry.  Curly?

15             MR. MULLADY: Hurley.

16             THE COURT: Oh.

17             MR. MULLADY: As in, with an h.  174 Federal 3rd, 95,

18   3rd Circuit, 1999.  And <u>Hill versus Radiri F. Lice GMBH</u>

19   <u>Rostock</u> (phonetic), I'm sure I'm mispronouncing that, 435

20   Federal 3rd, 404, a 2006 3rd Circuit case.  These cases aren't

21   cited in my brief, and I don't want to be unfair to Mr.

22   Bernick by making representations about what they say or what

23   they don't say, but they do deal generally with this subject,

24   and I would encourage the Court to read those cases.  Because

25   I, I don't think the - - well, the law in this circuit is not

1   as confining on what experts can say at trial as opposed to

2   what they've said in their expert reports as has been

3   portrayed in Grace's presentation.  And finally, Your Honor,

4   although the meet and confer letter is not part of this

5   process, we did offer to make Professor Stallard available

6   for deposition, and that offer of further deposition was not

7   only not rejected, it wasn't even acknowledged.  And we have

8   not heard a word about that.  And you know, at this point,

9   we're prepared to live with our stipulation, tear up the meet

10  and confer letter, and see Your Honor on March 24th.  But we

11  think for Daubert record purposes, everything that's before

12  the Court on Daubert should remain.  Thank you.

13        MR. BERNICK: I have a proposal, Your Honor.  The

14  taking of Stallard's deposition simply exacerbates the

15  problem.  Then we'll have the deposition, and I'll have to

16  live with everything in the deposition, and I will, will

17  have, it will continue to snowball.  And that, that's not

18  right.  I shouldn't face that burden.  My client shouldn't

19  face that burden in trial.  I think it's very plain.  The

20  second Stallard declaration was not in harmony with A, the

21  pre-trial order, but certainly that stipulation.  And while I

22  think that what Mr. Mullady is most concerned about is that

23  there not be an order from this Court finding that there's

24  been bad faith, and I know Your Honor is very reluctant to

25  issue those kinds of orders, the rules basically are, as Rule

1    37 indicates, it's automatic.  And it's really their burden

2    to demonstrate harmlessness, and they really can't do it in

3    the middle of trial.  And I believe that, the finding,

4    therefore, doesn't need to be a bad faith finding.  It should

5    be a finding under Rule 37.  That said, I think that maybe a

6    good solution here, and I put it to Mr. Mullady, is whether

7    it, particularly because he says there's not new material in

8    that second declaration, I disagree.  Is why doesn't David

9    Austern, the Futures Representative, simply withdraw that

10   second declaration.  And we can then stick by the terms of

11   the stipulation.  We will withdraw our request for any kind

12   of sanction.  And that is our effort to avoid putting Your

13   Honor into a position where it may appear that there's been a

14   finding of bad faith with respect to Mr. Austern, which I

15   know that nobody really wants, and doesn't really advantage

16   us here in the case.  So that would be my suggestion to Mr.

17   Mullady for how to resolve this matter, and get back on

18   track.

19        MR. MULLADY: Your Honor, with all due respect,

20   that's not a resolution of this matter that's, would be

21   satisfactory to my client.  The sanctions motion is

22   frivolous.  The, he's just asking that we roll over on his

23   motion, and agree to have this declaration stricken.  There

24   was no bad faith here, there was no violation of Rule 37.

25   The fact of the matter is that Dr. Anderson's deposition

1    revealed this new material, we, we tested her on it.  She

2    puts a declaration in that reveals another, another basis for

3    it.  Dr. Stallard responds to the independence assumption

4    that's raised.  And his response is solely to that.  And now

5    the purpose of this is to keep the Court in the dark about

6    that issue.

7              THE COURT: Well - -

8              MR. MULLADY: It's very important issue, Your Honor.

9              THE COURT: Mr. Stallard's declaration goes beyond

10   just the, responding to the coin toss assumption.  I mean, it

11   goes on, and on, and on, and on.  It responds to virtually

12   every point that Dr. Anderson made, and some of her points

13   were duplicative of what went on before.  Now, I don't know

14   whether there's no new information.  I mean if that's the

15   FCR's representation, okay.  I can't, as I sit here, I can't

16   recall which points are in which declarations.  I just don't

17   know that as I sit here now.  If in fact, there are no, there

18   is no new information in it, then it probably can be

19   withdrawn.  You've already got the information in there

20   somewhere.  If in fact there is - -

21             MR. MULLADY: No.

22             THE COURT:  - - new information in it - -

23             MR. MULLADY: No, it - - there's new information in

24   the sense that he's countering the information she's

25   providing in her declaration.  Part of which is information

1    that had never been raised before.  Not in her report, and

2    not in her deposition.

3            THE COURT: Which declaration?

4            MR. MULLADY: Well -  -

5            THE COURT: Her declaration in response to his first

6    - -

7            MR. MULLADY: Her, her - -

8            THE COURT:  - - declaration?  Well that's the whole

9    problem.  I mean had he not filed the first declaration, we

10   wouldn't even be here.  So if I just strike them all, then I

11   don't have to worry about any of them.

12           MR. MULLADY: Well, if he had not filed the first

13   declaration, we would not have discovered that Dr. Anderson

14   has a critical assumption underlying her opinions that she

15   failed to disclose in her report.  So - -

16           THE COURT: Well, I mean, I don't, I didn't read her

17   report as indicating that in her view she thought that this

18   coin toss assumption was a critical assumption.  She seems to

19   think that it's something that's so standard that anybody

20   reading - -

21           MR. BERNICK: Absolutely.

22           THE COURT:  - - her report would have understood

23   that that's the way it was going to be made, because it's

24   always been done that way.  That's how I read her report.

25   And I haven't heard this, the testimony yet, but that's what

1    I got out her declaration.

2             MR. MULLADY: And the Monte Carlo simulation?

3             THE COURT: Well - -

4             MR. BERNICK: But the Monte Carlo simulation, again,

5    is a response - - you know, Your Honor - -

6             THE COURT: The - -

7             MR. BERNICK:  - - this is, this is their - -

8             THE COURT: Pardon me, Mr. Bernick.

9             MR. BERNICK: I'm sorry.

10            THE COURT: The Monte Carlo simulation I don't

11   frankly even know what that was in response to.  I mean, I

12   just don't.  But in terms of the coin flip assumption, that's

13   not an unusual thing.  Experts in the risk assessment area

14   testify about that all the time.  I mean, she's not, she's

15   not alone in testifying about that.  And she's just not.  So

16   I don't think that that's such a critical issue that it needs

17   a whole. . .of, of subsidiary litigation that's going to

18   cause problems for anybody's case.  Now Mr. Stallard,

19   obviously, has a different view.  Their expertise is in

20   different areas.  How he approaches this case is entirely

21   different.  His approach is much more in line with the FCR's

22   approach to the case.  Dr. Anderson's is entirely in line

23   with how the Debtor is approaching the case.  You two, if

24   anybody took a look at this record, they would not know that

25   you're trying the same case.  It's been that way since the

1 beginning, through all of the discovery, it's going to be

2 that way until the end.  So, you know, there's nothing I can

3 do to reconcile these positions, folks.  You've got different

4 view points.  And at the end of the day, I'm going to have to

5 figure out whether one of them or the other of them makes any

6 sense, and if not, throw them both out the window and tell

7 you to start all over.

8          MR. MULLADY: And all, and Your Honor, all we're

9 saying is that the Court has all this Daubert material in

10 front of you, you can read all of it.  It's for Daubert

11 purposes only.  You're going to make a ruling one way or the

12 other on whether these experts are permitted to testify or

13 not.

14          THE COURT: I - -

15          MR. MULLADY: They are in fact testifying - -

16          THE COURT: I am going to let them testify, and I am

17 going to - - not Mr. Stallard to the extent that it's outside

18 the stipulation.  Am I going to let them testify?  Yes.  They

19 are clearly recognized experts in their field, and I will

20 take under advisement the weight to be accorded to all of

21 their testimony based on their own testimony and the cross

22 examination, and the assumptions, and the validity, and how

23 it matches up to the other evidence in the case.  But am I

24 going to let them testify?  Yes.  I am.

25          MR. MULLADY: And Your Honor, to strike - -

1          MR. BERNICK: Just so that's not - - just so that is

2    not misconstrued.  Our position, what they're trying to get

3    Your Honor to is that they can testify even if the opinions

4    are not in their reports.

5          THE COURT: No, no, no.  That's not the point.  The

6    question is for the Daubert motion practice, so far, have I

7    taken, I have not, I'm not through all of the Daubert

8    motions.

9          MR. BERNICK: Right.

10          THE COURT: Those that I am through - - so I don't

11    want to, I'm not ruling person by person yet.  Okay.  So

12    please understand, I'm not ruling person by person.  To the

13    extent that I'm through those Daubert motions, and to the

14    extent that I've heard the witnesses on the stand so far, I

15    haven't seen anything that convinces me that these are not

16    experts in their field.  Are, are some of them going to be

17    more or less credible?  Of course.  That's what judges do.

18    They assess credibility.  Are some of them going to have more

19    weight or less weight attributed to their opinions?  Of

20    course.  That's what judges do.  But that's the whole purpose

21    of an evidentiary trial.  So am I likely to let all of them

22    testify?  So far, yes.  I haven't seen one yet that I am

23    likely not to permit to testify.  I can't say that it won't

24    happen, but so far I haven't seen that happen.  But that it

25    not to say that I am going to give the same weight to

1    everybody's opinion, that I will not consider the cross

2    examination, and that I will not consider some of the

3    assumptions that the experts are making either valid,

4    invalid, tested, untested, I will consider all that when I

5    get the whole volume of evidence before me.

6           MR. MULLADY: And Your Honor, you will do that, and

7    all we're saying is that to strike this declaration now, with

8    the intended consequence of then going back into the record

9    and finding places where I argued on that declaration, again,

10   because Grace didn't get its motion on file to be heard

11   before we had argument, there is, there is a prejudicial

12   effect to us in the Court striking it.  We, our position is,

13   this is a bench trial, Your Honor has these two competing

14   declarations, you can take them for whatever their weight

15   that you will accord them.

16          THE COURT: Well - -

17          MR. MULLADY: There's no reason to strike it, Your

18   Honor.

19          THE COURT: I see no reason to strike the first one.

20   You've agreed not to.  And that it can be used for Daubert

21   purposes.  I see no reason to strike Dr. Anderson's, because

22   you agreed that it could be filed.  In response to the

23   second.  The issue, at this point is the second Stallard

24   declaration, and whether it adds anything.  And folks, you

25   know, I, the process has to end.  It just has to end.

1          MR. MULLADY: Well it can end, it can end, Your

2    Honor, with the denial of Grace's motion, because the record,

3    the Daubert record is complete.  The affidavits are there.

4    They're self explanatory.  The second one is just a rebuttal

5    of hers.  It goes point by point, paragraph by paragraph.  He

6    explains why the independence assumption is wrong.  And

7    that's it.  The Court can take that evidence and either

8    accord it weight or not accord it weight.  Striking it

9    creates a whole set of issues that - -

10          THE COURT: Well taking the independence assumption

11    for Daubert purposes doesn't mean that I'm not going to

12    permit her to testify.  I am going to permit her to testify,

13    and then take into consideration the fact that she has made

14    an independence assumption, and judge it in light of all the

15    other testimony, and her own opinions, and the process that

16    she's gone through, in analyzing the weight to be attributed

17    to her testimony.

18          MR. MULLADY: Understood.

19          THE COURT: So whether I strike his deposition or

20    not, is limited in its use, which is to challenge her

21    expertise or process, I suppose, is really a better word.

22          MR. MULLADY: Well, and again, Your Honor, I just

23    think the Court's doing yourself a disservice by striking it,

24    because it, it's highly technical information that comes at

25    her opinion from a perspective of his area of expertise.

1   It's not an area of expertise that I have, or the Court has,

2   or that Mr. Bernick has.  It's a very narrow defined area of

3   expertise that Professor Stallard brings to the table.  And I

4   just think the Court would be doing itself a disservice by

5   not considering that evidence.

6           THE COURT: Well what I think I just indicated is

7   that whether or not I strike it, I think that the opinion

8   that I have come to in having read all of this is that I will

9   still permit Dr. Anderson to testify.  I will consider the

10  weight to be accorded to her evidence, and her testimony,

11  based on the assumptions that I'm sure you will identify as

12  she testifies.

13          MR. BERNICK: And to say the hidden assumption, and

14  all the rest of that, that's their language.  There's no

15  hidden assumption.  She followed a procedure that's a very

16  well established procedure.  The assumption is their attack

17  on their word.  But Your Honor, I'm really, again, just, I

18  just find it remarkable that Mr. Mullady is coming up and

19  saying, yeah, well everything's going to be okay, although

20  we're not really promising to do anything different.

21  Everything's going to be okay.  But just don't strike this

22  declaration, because I really just, just don't strike this

23  declaration.  It would be a disservice.  And the fact of the

24  matter is that that declaration was plainly out of order, and

25  we haven't had, we never had a time to respond to it.  So

1    when he says it's so critical to keep it in the record, it's

2    critical to keep it in the record under the circumstances

3    where it was filed at the end of the day, way too late, and

4    where we didn't have an opportunity to respond, and the case

5    commenced.

6              THE COURT: Well - -

7              MR. BERNICK: And I - -

8              THE COURT: Mr. Bernick, let me stop this.  Because

9    frankly I'm heard, I've heard it to the point where I don't

10   want to hear it anymore.

11             MR. BERNICK: Okay.

12             THE COURT: I am not going to strike the

13   declaration.  If you want an opportunity to respond to it, I

14   will give you that opportunity.  Because I interpret the case

15   management order as having closed expert discovery before

16   Daubert motions were filed.  And so although I agree that the

17   FCR gets the final word in the briefs, and I will provide you

18   with an opportunity to respond, whatever, I've lost track of

19   where we are - -

20             MR. BERNICK: A sur reply.

21             THE COURT:  - - in the briefing process.  To

22   whatever Mr. Bernick files, not by way of an evidentiary

23   submission, but by way of an argument, I will permit you to

24   file some counter affidavit with respect to the second and

25   third Stallard - -

1           MR. BERNICK: Second Stallard - -

2           THE COURT:  - - the second Stallard declaration.

3    You may then file a brief in, that lays out whatever issues

4    you believe to be appropriate.  I have already ruled,

5    however, that I am going to permit Dr. Anderson to testify.

6    And so I don't think that I need anything in the Daubert

7    motion that will convince me otherwise.  If you believe it's

8    appropriate, or necessary, to have Dr. Anderson at this stage

9    lay something else out, that meets the terms of the Stallard

10   declaration, you may do so.

11          MR. BERNICK: I - -

12          THE COURT: How much time do you want?

13          MR. BERNICK: I, 14 days.  And I, I appreciate that,

14   Your Honor.  I guess I appreciate that, and we'll go forward

15   on that basis.  I really am just very focused on, obviously,

16   on the process here, and just making sure we just don't have

17   this happen again.  I'm just really worried - -

18          THE COURT: It is my - - let me clarify.  To the

19   extent that it was unclear before, it is clarified now.

20   There are to be no further expert reports, declarations,

21   affidavits, whatever, of whatever nature without leave of

22   this Court first.

23          MR. BERNICK: Thank you.

24          MR. MULLADY: Yes, Your Honor.

25          THE COURT: By anybody.

 1          MR. MULLADY: Yes, ma'am.

 2          MR. BERNICK: Thank you, Your Honor.

 3          THE COURT: With respect to the personal injury

 4     estimation trial.  All right.  Now, the Debtor may file a

 5     declaration rebutting the second Stallard declaration within

 6     14 days.  How much time do you want to file a brief, if you

 7     choose to do it?

 8          MR. MULLADY: Well, we're - - I guess it doesn't

 9     matter that much that we're running up against the resumption

10     of trial.  Ten days?

11          THE COURT: And the FCR may file a brief within ten

12     days thereafter.  And the Debtor is then to put this back

13     onto the next omnibus agenda, just to make sure I haven't

14     changed my mind about anything that I've ruled as a result of

15     this information.  My preliminary ruling, I'm not going to do

16     an order until I get the supplemental declaration and the

17     brief.  My preliminary ruling is Dr. Anderson will be

18     permitted to testify.  I will not strike the Stallard

19     deposition.  I will not make a finding of bad faith, because

20     I am going to cure whatever problem there is by giving the

21     Debtor an opportunity to submit a supplemental declaration.

22     And the FCR and opportunity to brief.  So I think that will

23     satisfy Rule 26 and Rule 37.  But I don't want to see this

24     happen again.

25          MR. BERNICK: Thank you, Your Honor.

1          MR. MULLADY: Thank you, Your Honor.  Thank you for

2     your time.

3          THE COURT: All right.  We're adjourned.

4       (Whereupon at 5:27 p.m. the hearing in this matter was

5     concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19     the United States Courts, certify that the foregoing is a

20     correct transcript from the electronic sound recording of the

21     proceedings in the above entitled matter.

22

23     _/s/Jennifer Ryan Enslen_                    ___03/03/08___
       Jennifer Ryan Enslen
24     43 Bay Boulevard
       Newark, DE 19702
25     (302)836-1905