THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Related Docket Nos. 17586, 17695, 17779** |
| | ) | |

**Hearing Date: March 24, 2008 at 9:00 a.m. (prevailing Eastern time)**
**Objection Deadline: March 21, 2008 at 12:00 p.m. (prevailing Eastern time)**

## DEBTORS' MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN M. SNYDER

Debtors request that the Court exclude the expert reports and testimony submitted on

behalf of the Official Committee of Personal Injury Claimants (the "ACC") by Stephen M.

Snyder, an attorney and self-professed "expert in mass torts," who opines that Grace's pre-

bankruptcy litigation strategy was the "correct choice" based upon his general observations from

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

the representation of other asbestos defendants and his "understanding of how ... people behave." (9/25/07 Snyder Rebuttal Rpt. at p. 4) (2/15/08 Snyder Dep., relevant pages attached as Exhibit A, at 25:17-20.)

Mr. Snyder is one of several "experts" that the ACC presents as part of its "what it would cost Grace to resolve claims in the tort system had it not filed for bankruptcy" approach to estimation. Besides suffering from the same fundamental problems as those other "experts" -- namely that this approach does not attempt to apply the Federal Rules of Evidence or substantive state law to the estimation of pending and future asbestos claims, and is expressly prohibited under Rule 408's admonition against using past settlements as a basis for establishing liability[2] -- Mr. Snyder's testimony also has additional substantive flaws that shatter its very foundation and bar its use in these proceedings.

*First*, Mr. Snyder's opinions are not based on *any* reliable, verifiable methodology that would allow the Court to determine how and why he reaches his opinions, or to test objectively whether those opinions are accurate. (Snyder Dep. at 18:24-19:3) Indeed, Mr. Snyder admits that he has not "tried to throw an academic construct around any of this." (*Id.* at 27:7-8) He instead relies upon his understandings of "the practical outcomes in the litigation" to support his personal, subjective "conclusions about things that are economically attractive and things that are not economically attractive." (*Id.* at 27:6, 20:9-12.) Because Mr. Snyder relies only upon the thoughts in his head, he has not -- and could not -- provide sufficient data or other reliance materials to support his conclusions. Thus, we are merely left with Mr. Snyder's speculative "say so." This Court and other courts have made it clear that such *ipse dixit* testimony is not

---

[2] For brevity, the Debtors do not repeat their arguments concerning Rule 408's prohibition against using evidence of Grace's pre-bankruptcy settlements to establish liability in this proceeding. *See* Dkt. Nos. 17586, 17695, 17779.

admissible as expert testimony under Rule 702 and *Daubert*. *In re Federal Mogul Global, Inc.*, Case No. 01-10578 (JKF) (Bankr. D. Del.), 6/20/07 Tr. relevant pages attached as <u>Exhibit B</u>, at 106-107, 118; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

*Second*, Mr. Snyder's opinions that Grace's pre-bankruptcy settlement strategy was the "correct choice" rests on his own subjective, personal views as a lawyer-advocate as to ultimate legal conclusions in this case. Mr. Snyder might have been a fine alternative choice to represent the ACC as trial counsel in this case, but his arguments and legal opinions do not aid this Court in interpreting the facts of this estimation and, therefore, are not properly the subject of expert testimony. *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994).

Moreover, even if Mr. Snyder's testimony was otherwise admissible (which it is not), the Court should still exclude his testimony as cumulative and even more deficient than the "overlap[ping]" testimony proffered by Dr. Peterson on behalf of the ACC. (Snyder Dep. at 33:3.) Unlike Dr. Peterson, who at least attempts to utilize a scientific methodology -- albeit a flawed methodology -- Mr. Snyder *lacks any* scientific methodology to support his conclusions. Thus, Snyder's testimony is not only cumulative of Dr. Peterson's testimony, but, importantly, it is also further down the chain in terms of its reliability and its probative value.

The ACC cannot salvage Mr. Snyder's testimony by re-labeling it as "fact" testimony. Mr. Snyder's testimony concerns opinions that are not admissible under Rule 701's limited admissibility of lay opinion testimony and prohibition of this sort of re-labeling. Further, because Mr. Snyder never represented Grace in its asbestos defense and lacks any personal knowledge of how or why Grace did or did not settle its pre-bankruptcy cases (leaving aside for now any Rule 408 problems posed by such opinions), Mr. Snyder lacks proper foundation for

3

testifying as a fact witness concerning Grace's pre-bankruptcy methods of resolving asbestos claims. Mr. Snyder's experience representing other asbestos defendants in limited jurisdictions is likewise insufficient to support his views concerning the nationwide litigation landscape.

Therefore, Grace respectfully requests that the Court exclude Mr. Snyder's testimony as inadmissible under the requirements of Rules 702 & 408 and *Daubert* and exclude any fact testimony as well.

## LEGAL STANDARD

Rule 702 was amended in 2000 in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), where the Supreme Court directed federal trial courts to serve as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, **but reliable**." *Daubert*, 509 U.S. at 589 (emphasis added); *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) ("[W]e have recognized that [the district court] has no discretion to avoid performing the gatekeeping function."). The proponent of the expert testimony bears the burden of showing that all of the requirements of Rule 702 and *Daubert* are satisfied. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000). Therefore, this Court serves as a "gatekeeper," charged with the responsibility for excluding Mr. Snyder's "expert" testimony unless and until it has been established as both relevant and reliable.

## I.    Mr. Snyder's Testimony Must Be Based Upon Identifiable and Replicable Methods and Procedures of Science.

To be reliable, an expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation," and the expert must have "good grounds" for his or her belief. *Daubert*, 509 U.S. at 590; *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (same). Before an expert's methodology can qualify as reliable, there must be an actual, identifiable methodology. *See Oddi*, 234 F.3d at 156

4

(upholding exclusion of an expert where "Oddi could not establish the existence of Noettl's methodology and research let alone the adequacy of it."). The Third Circuit has stated that if an opinion lacks an identifiable methodology, then it cannot be tested by the *Daubert* standards, and it is inadmissible:

> Since Noettl conducted no tests and failed to attempt to calculate any of the forces on Oddi or the truck during this accident, he used little, if any, methodology beyond his own intuition. There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for Noettl's assumptions about the forces that caused Oddi's horrific injuries. Similarly, no standards control his analysis, and no 'gatekeeper' can assess the relationship of Noettl's method to other methods known to be reliable and the non-judicial uses to which it has been put. Clearly, the district court did not abuse its discretion in excluding Noettle's proffered expert testimony.

*Oddi*, 234 F.3d at 158; *see also McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) ("We have said before, and reiterate, that 'an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'").

At bottom, an expert's testimony must be more than subjective belief or unsupported speculation. *See In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999) ("We note that in order for expert testimony to be reliable, and therefore admissible, it must be based on the methods and procedures of science rather than ***subjective belief*** or speculation.") (emphasis added); *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 323 (3d Cir. 2003) ("As for his proffered testimony on the specific substance of such warnings, particularly the age requirement, Bruton offered no support for his beliefs. His proffered opinions on these matters were unreliable, and the District Court properly restricted such testimony."); *see also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (upholding exclusion of expert opinion that "was nothing more than speculation").

Accordingly, an expert's "untestable say-so" is not sufficient. *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005); *see also General Elec. Co. v. Joiner*, 522 U.S.

136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Oddi*, 234 F.3d at 158 ("Noettl's *ipse dixit* does not withstand *Daubert's* scrutiny."); *see also Huey v. UPS*, 165 F.3d 1084, 1087 (7th Cir. 1999) (if an expert offers "only an ultimate conclusion with no analysis" the opinion "is meaningless"). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

## II.    Mr. Snyder's Testimony Must "Fit" And Cannot Consist Of Lawyer Advocacy.

In addition to being the product of a reliable scientific methodology, expert testimony must also concern topics that assist the trier of fact and "fit" the rubric of "expert" testimony. Testimony that presents legal conclusions does not "assist the trier of fact" and is not admissible as expert testimony under Rule 702. *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Haderern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Trust Agreement*, 812 F.Supp. 1376, 1378 (E.D. Pa. 1992) ("An expert may not opine legal conclusions drawn by applying the law to the facts."). In this respect, courts have specifically concluded that Rule 702 cannot be used as a tool for circumventing the adversarial process by packaging lawyer advocacy under the guise of "expert opinion." *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (excluding expert where "the Court does not perceive McFaddin's report as an 'expert report' at all, but rather as written advocacy by a lawyer, akin to a supplemental brief on the facts presented by another attorney representing plaintiffs.").

6

What is more, "[e]xpert witnesses are not 'permitted to testify ... regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *AstraZeneca LP v. Tap Pharm Prods., Inc.*, 444 F. Supp.2d 278, 293 (D.Del. 2006), *quoting Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp.2d 431, 443 (D.Del. 2004); *see also Gouner v. Sears, Roebuck & Co.*, No. 95-2738, 1996 WL 304266, at *1 (E.D. La. June 6, 1996) ("According to the plaintiff, his proposed expert. . . 'has given his expert opinion on the motive, system and probable intent of the defendants in doing what they did'. The Court concludes that this is not the appropriate subject of expert opinion."); *Securities and Exch. Comm'n v. Lipson*, 46 F. Supp.2d 758, 763 (N.D. Ill. 1998) (holding that expert's training and experience as accountant did not "specially equip him to divine what [the defendant] truly believed" about reliability of financial reports and that any opinions offered in that regard were "at worst, rank speculation [and] at best, they are credibility choices that are within the province of the jury"); *In re Baycol Prods. Litig.*, MDL No. 1431, 2007 WL 4794163, at *35 (D. Minn. July 16, 2007) ("Bayer's motives as to how it proceeded with evaluating Baycol's toxicity, and its reactions to its toxicologists's warnings are issues that can be decided by the jury, without expert assistance.").

Instead, "[t]he question of intent is a classic jury question and not one for experts..." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) (excluding expert testimony concerning corporate intent), *citing Voilas v. General Motors Corp.*, 73 F. Supp.2d 452, 464 (D.N.J. 1999).

The Court recently applied these standards to exclude near-identical testimony in another asbestos-related bankruptcy case. *In re Federal Mogul Global, Inc.*, Case No. 01-10578 (JKF) (Bankr. D. Del.) ("*Federal Mogul*"), the Court excluded the testimony of a Peter Coleman, an

outside attorney to CNA, who was presented by CNA to apply his approximately thirty years of legal experience in the asbestos field to opine about the comparative payments that insurance companies would have to make under the TDP's at issue in that case versus the general tort system. (Ex. B, *Federal Mogul*, 6/20/2007 Trial Tr., at 109:20-110:3)

In *Federal Mogul*, Mr. Coleman offered testimony and opinions that are nearly identical to what Mr. Snyder's seeks to offer here:

- Familiarity with Trust TDPs and plan documents (*id.*, at 91);

- Materials from a David Austern seminar (that Coleman himself did not attend) relating to Johns Manville (*id.*);

- Application of his personal experience, including his experience in the tort system; (*id.*, 91-93)

- The entrepreneurial model of asbestos claims making (*id.*, at 52); and

- Role of insurers in payments of claims under the plan (*id.* at 52-53).

And, like Mr. Snyder seeks to do here, Mr. Coleman did not present any hard data or projections. The Court struck Mr. Coleman's testimony because, "[h]is opinions are nothing more than his subjective beliefs. He are unsupported evaluation, and his conclusions were not generated by a reliability methodology." (*Id.* at 117:3-8.) In reaching this conclusion, the Court focused on the lack of reliability in his methodology, namely the lack of any scientific process that could be replicated. More specifically, the Court stated:

> The type of analysis that Mr. Coleman provided to this Court can't be replicated, because everything he talked about is what he's done in his mind. Yes, he's looked at medical criteria, but it's in his mind. Yes, he's done an exposure analysis, but it's in his mind. Yes, he's looked at the Manville statistics, and there are printed statistics. So, someone else can look at those statistics, but how he's factored that into this analysis is in his mind. There is not a process that can be replicated in any sense. And yes, he has experience, but that experience, to the extent that it weighs into this analysis that he has provided to the Court, is not either capable of replication. (*Id.* at 106:25 - 107:16.)

*** 

The, I believe, <u>Oddi</u> case talks about the fact that an intuitive inquiry is simply not sufficient for an expert to make an -- to proffer an opinion, that the expert has to set forth some information specifically about the data that has been used and that something more than a haphazard intuitive inquiry is required.   Here that's essentially what we have.   Not that Mr. Coleman's approach is haphazard.   He certainly had a principled approach to what he did, but that principled approach is not based on anything that can be stated of record.   We don't know what data he looked at.   (*Id.* 116:8-116:18.)

These exact problems are present in Mr. Snyder's reports and testimony, which lack any reliable methodology or underlying data, and instead serves to provide bald conclusions concerning why Grace engaged in its pre-bankruptcy litigation strategy, the appropriateness of Grace's pre-bankruptcy litigation strategy, and the status of the legal system.   Such *ipse dixit* testimony lacks any sort of "scientific method" and concern topics that are not properly the subject of expert testimony.   Therefore, Mr. Snyder's testimony is not reliable or appropriate and must be excluded.

## LEGAL ARGUMENT

I.    **Mr. Snyder is the Classic *Ipse Dixit* Witness, Issuing Opinions That Lack Any Objective Or Verifiable Methodology.**

Mr. Snyder has submitted two expert reports in this estimation proceeding on behalf of the ACC: an initial report[3] and a rebuttal report.   According to his reports, Mr. Snyder is currently a partner with the Snyder, Miller & Orton law firm and associated with the defunct law firm of Brobeck, Phleger & Harrison LLP.   (10/3/06 Snyder Rpt. at 3.)   Mr. Snyder has practiced law in the state of California since 1972.   Since the early 1980's, Mr. Snyder's practice has been

---

[3] Unlike Mr. Snyder's 9/25/07 rebuttal report, which was filed under Seal, Snyder's initial report was not filed with the Court.   For the Court's reference, Debtors have attached a copy of that report as Exhibit C to this Motion.

composed primarily of defense work in asbestos-related litigation. (*Id.*) Mr. Snyder has never represented Grace. (Snyder Dep. at 36:12)

Mr. Snyder uses his observations from his "vigorous" and "creative" representation of *other parties* in asbestos matters to opine that companies in Grace's position prior to the filing of its bankruptcy case were better off settling cases rather than trying them to verdict. He even goes so far as to assert that it was in the interest of defendants to settle claims before doing *any* investigation into their merits, describing such settlements as "opportunities to economize." (9/25/07 Snyder Rpt. at 64.) Because his personal view is that Grace got a good deal in its pre-petition settlements, Snyder opines that Grace's asbestos liability in this bankruptcy case should be determined based on those same settlements.

Mr. Snyder reaches this conclusion without having ever reviewed any individual case files or addressing the merits of any specific Grace claims. (Snyder Dep. at 56, 66, 75.) ("I didn't look at individual claim files.") Mr. Snyder also admits that his reports do not identify which Grace Personal Injury Questionnaires he reviewed; and that he has made no effort to collect any data from those questionnaires. (*Id.* at 63-64.) Similarly, with respect to pre-petition claims that Grace settled, Mr. Snyder agreed that he has made no inquiry to determine whether the evidence was "actually sufficient to establish disease diagnosis and disease causation." (*Id.* at 166-67.) In fact, Mr. Snyder admits that "a significant number" of the pre-petition cases that Grace and other defendants settled involved meritless claims in which the plaintiffs "would not have prevailed at trial." (*Id.* at 138.)

Given that Mr. Snyder concedes that Grace settled a significant number of the pre-petition claims that lacked merit, and that he further admits that he has done nothing to assess the validity of the pending or pre-petition claims against Grace, what basis could he possible have

for asserting that Grace's settlement history affords a reliable and verifiable basis for extrapolating Grace's liability for those unresolved claims that are pending in this bankruptcy case?

The answer of course is nothing. Mr. Snyder freely admits that he has not "tried to throw an academic construct around any of this." (*Id.* at 27:7-8) When asked to identify a single objective standard that could be used to judge or verify his conclusions, Mr. Snyder could think of none. (*Id.* at 26-27, 29-30.) He also admits that there is no place where anyone can find his method "spelled out as a method." (*Id.* at 26:13-16) Instead, Snyder's "method" is really just "to state my conclusions about things":

> Q.   So you do believe that there is a method that you have applied in connection with your work in this case?
>
> A.   It's--it's nothing more or less than an understanding of the profit and loss and balance sheet consequences of different choices that people make.
>
> Q.   But you do believe that there's a method that you've applied in your report?
>
> A.   I think it's a familiar method. Yes.
>
> Q.   Is there anyplace where we can go and find that method set out as an approach or as a method?
>
> A.   No. I haven't described it other than to state my conclusions about things that are economically attractive and things that are not economically attractive.

(*Id.* at 19-20.)

Mr. Snyder identifies only one "tool" that he uses in reaching his opinions -- his supposed "understanding" of "why people do what they do." (Snyder Dep. at 25.) But this "tool" is not something that anyone else can pick up and use objectively to replicate or verify Snyder's opinions, because the "tool" is literally in Mr. Snyder's head. It consists of nothing more than his subjective, personal "understanding of how those people [in the tort system] behave." (*Id.* at

11

25.) Sweepingly, the "people" Mr. Snyder claims to "understand" are the entire universe of lawyers, judges, "quasi-clients" and medical practitioners involved in asbestos tort claims:

> Q.      So you're holding yourself out as an expert in how they [lawyers, judges, quasi-clients and medical practitioners] behave?
>
> Mr. Finch:  Object to form.
>
> The Witness:  I think it's part of my--part of what I bring to the table expressing opinions on how the tort system operates is why people do what they do.
>
> Q.      But my question is really pretty simple.  You're holding yourself out as an expert in how economically the players that you've listed behave in the tort system; correct?
>
> A.      I think what I'm holding myself out as is an expert in mass torts, and one of the tools I use in reaching conclusions is an understanding of how those people behave.

(*Id.* at 25.)

Moreover, not only does Mr. Snyder fail to use any scientific method to support his conclusions concerning the behavior and motives of others, *he is not qualified to do so.*  Mr. Snyder states that his opinions concern "economic consequences of various decisions" and are based upon "basic accounting and bookkeeping and a smattering of economics." (Snyder Dep. at 19-20)  Mr. Snyder is not an economist; nor is he an accountant.  (Snyder Dep. at 20-21.)  Instead, like the many individuals that regularly appear in Court on behalf of the parties to this estimation proceeding, Mr. Snyder is *a trial attorney* who has worked for *other* asbestos defendants, asbestos settlement trusts, and more recently asbestos claimants in bankruptcy cases.  The only difference that Mr. Snyder identifies between himself and other experienced asbestos attorneys is his own self-promoting opinion that he has "pushed maybe the limits of the litigation a little bit more vigorously and hopefully with a little more creativity than some others." (*Id.* at 192:25 - 193:3.)

When pressed to explain why his experience should count for anything more than the experience of any other lawyer with 10-20 years of asbestos litigation experience, Snyder had no response other than to claim to have more "moss on my back":

> Q.    What about, is your expertise different when it comes to asbestos mass tort than the expertise of scores of other lawyers who have been involved in asbestos for 10-20 years?
>
> A.    I just have a lot *more moss on my back I think*. I don't think I'm anything, you know, that it is--that's quantitatively or at least--what would you say--I'm no great leap of, you know, brilliance. I've just been around a long time and have seen a lot of things.

(*Id*. at 192) (emphasis added.) This "moss on my back" response is not isolated, it was exactly what Snyder cited as the basis for his testimony in his expert reports:

> My perspective is mainly a practical one and is based on widely available information I acquired through having been a participant in the litigation in a variety of capacities - defense lawyer for many asbestos defendants; national counsel for significant defendants (Fibreboard and, after 1996, Owens Corning), co-architect of one of the early global class action settlement attempts, counsel to asbestos defendants who have sought and obtained resolution of their asbestos liabilities through bankruptcy, insurance coverage counsel for a number of asbestos defendants, and trustee of two trusts established under section 524(g) of the bankruptcy code." (9/25/07 Rpt. at 3.)

Having "moss on [your] back" or "push[ing] maybe the limits of litigation a little bit more" are not proper bases for qualifying expert testimony under Rule 702 or *Daubert*. Instead, Rule 702 and *Daubert* require the ACC to establish that Mr. Snyder's conclusions are based upon a replicable and reliable scientific method. Mr. Snyder admits that his opinions are not based upon any such methods and, therefore, we are left only with his "*ipse dixit*[,] [which] does not withstand *Daubert's* scrutiny." *Oddi*, 234 F.3d at 158; see also *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

II.     **Mr. Snyder Provides No Reliance Materials to Support His Opinions.**

Mr. Snyder does not rely upon Grace claims, PIQ's, or otherwise "systematically use some method to accumulate data." (Snyder Dep. at 18-19.) Mr. Snyder instead relies only upon his "serious and sober thought to what works and what doesn't work in this litigation." (*Id.* at 30) Mr. Snyder agrees that the process leading up to his opinions cannot be found in any expert reliance materials, but rather is just "something that's in [his] mind:"

> Q.     The facts that you're dealing with, the motivations and the wellsprings of those motivations, are those facts gathered pursuant to any methodology in your report?
>
> A.     Those facts are based upon--I'm trying to count now. Give me a minute-- 26-27 years experience just doing it.
>
> Q.     And we can't find that experience recorded as a part of your reliance materials, it's something that's in your mind; correct?
>
> Mr. Finch:  Object to form.
>
> A.     Well, I think it's etched on my face as well as my mind. It has a lot to do with my--you know, the size of belt I have to buy. It's a matter of , you know, what my blood pressure reading is at any given time.
>
> (*Id.* at 34-35.)

Mr. Snyder's thoughts do not afford the Court or parties to this estimation any opportunity to understand -- and, if need be, explore and challenge -- the bases for Mr. Snyder's conclusions. Thus, Mr. Snyder's lack of reliance materials serves as another independent basis for excluding his expert testimony under Rule 701 and *Daubert*.

III.    **Mr. Snyder's Testimony Constitutes Legal Conclusions that Do Not "Fit" The Requirements of Expert Testimony.**

Mr. Snyder's opinions concerning the proper value of Grace's asbestos PI claims are ultimately legal conclusions. Mr. Snyder's legal conclusions, however, offer nothing that a judge or any lawyer could not do and, therefore, his testimony will not assist the trier of fact and

is not properly the subject of expert testimony. *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994). Mr. Snyder's testimony should instead be presented by the ACC under its true guise -- lawyer advocacy.

Besides rendering legal conclusions that invade the province of this Court, Mr. Snyder also improperly opines on Grace's and others' motives for reaching decisions concerning asbestos claims. (Snyder Dep. at 24-25) However, "[e]xpert witnesses are not 'permitted to testify ... regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred." *AstraZeneca LP*, 444 F. Supp. at 293. Instead, "[t]he question of intent is a classic jury question and not one for experts…" *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods.*, 2000 WL 876900, at *9. Thus, the very core of Mr. Snyder's opinions legally could not be the subject of expert testimony.

## IV. Mr. Snyder's Testimony is Cumulative and Even More Deficient Than Similar Testimony Being Through Dr. Peterson.

To the extent the Court determines that any portion of Mr. Snyder's testimony or report is admissible, the Court should still exclude it under Rule 403 as being cumulative and even more deficient than the similar testimony that has been proffered by Dr. Peterson.

Rule 403 grants the Court the authority to exclude otherwise relevant evidence if it would result in undue delay or constitutes a "needless presentation of cumulative evidence." Fed. R. Evid. 403. Courts routinely apply Rule 403 to exclude expert testimony that is cumulative and fails to offer any additional probative value. *See, e.g., Babcock & Wilcox Ebensburg Power, Inc. v. Zurich Am. Ins. Co.*, Civ. A. No. 3:02-299J, 2005 WL 6045698, at *1 (W.D. Pa. Sept. 8, 2005).

Like Mr. Snyder's reports and proffered testimony, Dr. Peterson's report focuses on the history of mass torts, with a particular emphasis on Grace. Mr. Snyder agrees that he likewise

15

"talk[s] about the history of mass tort and [he] talk[s] about what [he] see[s] as the enduring trends in the behavior of the players, given the limitations of the environment in which they are operating." (Snyder Dep. at 32:9-24.)   Mr. Snyder further agrees that there "is an overlap" between his testimony and the testimony proffered by Dr. Peterson.  (*Id.* at 33:3.)

While Mr. Snyder and Dr. Peterson both speak to the history of mass tort litigation, Dr. Peterson goes further and at least attempts to employ a scientific method.  In this respect, Dr. Peterson examines the number of claims resolved, the number of projected future claims, and the amount such claims will be resolved for ultimately.  (Snyder Dep. at 33)   In reaching his conclusion, he then applies the so-called "Nicholson method" to estimate future asbestos claims. (11/01/07 Peterson Dep., relevant pages attached as Exhibit D, at 24-25, 28-29; see also 06/07 Peterson Rpt.)  Specifically, his method tries to forecast what Grace would have had to paid if it had been forced to continue maneuvering through the tort system, by estimating the value of Grace's asbestos claims, as opposed to Grace' estimated settlement liability.  (Peterson Dep. at 180-81).  Grace does not believe that Dr. Peterson's method has merit, and Grace is confident that this will become evident as the estimation proceedings move along.  However, at least Dr. Peterson employs *some methodology*, rather than throwing out bald conclusions like Mr. Snyder.

The only addition to Dr. Peterson that Snyder identifies in his testimony is that he purports to "talk more in terms of the motivation of the people involved in claiming behavior." (Snyder Dep. at 33:9-12.)  As is discussed above, an expert *cannot testify to the motives an intent of other parties*.  And, in any event, Mr. Snyder lacks any proper basis for opining on the motivations underlying others' actions.  He is not an economist; he is not an accountant; and he is not a behavioral scientist.  (Snyder Dep. at 20-21)  He admits that his views on motivation are not based upon any scientific methods, but rather the "26-27 years experience just doing it" for

16

other asbestos defendants.    (Snyder Dep. 35:1-3); *see also* (Snyder Dep. 26:13-27:8)  Thus,

besides lacking the requisite underlying methodology, Mr. Snyder's only professed incremental

value over Dr. Peterson is not properly the subject of expert testimony, and is outside the scope

of Mr. Snyder's potential expertise.  4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000) (A

court should "exclude proffered expert testimony if the subject of the testimony lies outside the

witness's area of expertise."); *see also Frost v. Teco Barge Line, Inc.*, No. 04-cv-752-DRH,

2007 WL 420152 (S.D. Ill. Feb. 5, 2007) (excluding occupational therapist's opinion concerning

whether injured plaintiff would rather pursue disability benefits than return to work.).

V.    **The ACC Cannot Salvage Snyder's Testimony By Rebranding it as "Fact"
      Testimony.**

In an apparent attempt to avoid the same results as *Federal Mogul* -- where the Court

excluded the lawyer-testimony of Mr. Coleman -- the ACC has designated Mr. Snyder as both an

expert witness and a fact witness.  Mr. Snyder's proposed testimony is no more admissible as

fact testimony than it was as expert testimony.

A.    **Mr. Snyder's Testimony Does Not Satisfy Rule 701's Limited Admissibility
      For Lay Opinions Testimony.**

Mr. Snyder's testimony concerning the relative values of claims in the tort system and the

economic attractiveness of Grace's actions consists of nothing more than his opinions and

speculative conclusions.  Opinion testimony is generally not admissible as fact testimony.

*United States v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982) (citations omitted).  Rule 701 (Opinion

Testimony by Lay Witnesses) provides a limited exception to this rule, providing as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of
> opinions or inferences is limited to those opinions or inferences which are (a)
> *rationally based on the perception* of the witness, and (b) *helpful* to a clear
> understanding of the witness' testimony or the *determination of a fact in issue,*

*and* (c) *not based on scientific, technical, or other specialized knowledge* within the scope of Rule 702. Fed. R. Evid. 701 (emphasis added).

Mr. Snyder's opinions do not satisfy 701(a), because they are not "predicated upon concrete facts within [his] own observation and recollection-that is facts perceived from [his] own senses," but rather represent "opinions or conclusions drawn from such facts." *Skeet*, 665 F.2d at 985. Rule 701(b) is also not satisfied, because Mr. Snyder's opinions would not serve as a means for allowing the Court to better understand Mr. Snyder's other admissible fact testimony (indeed, Mr. Snyder proffers not such testimony), but rather would serve as the end in and of itself. Finally, Mr. Snyder's opinions do not fall within Rule 701(c)'s province, because they are inherently based upon "technical" or "specialized knowledge" relating to the workings of the legal system and the resulting values of claims. The ACC has implicitly admitted this by designating him as a Rule 702 expert, and Mr. Snyder stated as much during his deposition. (Snyder Dep. at 40:18-41:7) ("And I think they [Owens Corning] had a concern that I wouldn't be allowed to express those opinions unless I was qualified as an expert, so they did -- this is what they did [designating Mr. Snyder as an expert witness in *Owens Corning*]".).

Moreover, the Advisory Committee notes to the 2000 Amendment of Rule 701 explain that the addition in 2000 of section (c) was intended to precluded the exact "re-labeling" at issue here. They state that 701(c) was added to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing" thereby avoiding the requirement of disclosing expert witnesses. This is exactly what the ACC seeks to do by labeling Mr. Snyder as both an "expert" and a fact witness.

### B.    Testimony that Goes to the Ultimate Issues of The Proceeding Is Likewise Inadmissible as Fact Testimony.

Testimony as to the operation of the legal system, what the law requires, and the application of law to fact is inadmissible under Rule 704 (Opinion on Ultimate Issue) regardless

18

of whether the witness is offering expert or lay opinion.  Mr. Snyder will testify that Grace's pre-bankruptcy claims were worth less than the amounts for which it settled and, therefore, Grace's claims here should be valued above those pre-bankruptcy settlements.  Thus, Mr. Snyder's testimony would concern the ultimate issue in this estimation (namely the value of Grace's asbestos PI claims and future demands) and invade the province of the Court.  *See, e.g., Doe v. Ward*, 282 F. Supp.2d 323, 328 (W.D. Pa. 2003) (Lay opinion testimony is not permissible when speaking to "a question reserved for the court.").

### C.    Mr. Snyder's Testimony Lacks Proper Foundation.

Mr. Snyder's testimony lacks proper foundation and is based on inadmissible and unreliable materials.  Mr. Snyder has never represented Grace; has never had occasion to conduct a comprehensive review of Grace's pre-bankruptcy case files; and has not reviewed the PIQs that have been submitted in this case.   Therefore, Mr. Snyder lacks personal knowledge of concerning the substantive merits of Grace' pre-bankruptcy claims or the motives behind Grace's litigation decisions.  *Gage v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 365 F. Supp.2d 919, 937 (N.D. Ill. 2005) (excluding testimony because the proffered expert had "never been disclosed as an expert witness and would be an improper fact witness because she ha[d] no personal knowledge of the events of her testimony, only second-hand knowledge received from the 60 interviews she conducted while preparing the report."); *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (same).  Mr. Snyder likewise does not possess the requisite personal knowledge to testify generally about the tort system.  Mr. Snyder represented only a handful of defendants (most notably Owens Corning) and has not litigated in every U.S. jurisdiction, nor is there any indication that their experiences in asbestos personal injury litigation are representative of all such cases tried in the jurisdictions where they do practice.  Accordingly, any information

19

he may have necessarily comes from his review of documents, conversations with others, or other forms of inadmissible hearsay.

### D.   Mr. Snyder's Testimony is Distinguishable From His Testimony in Owens Corning.

The ACC may point to Mr. Snyder's testimony as a fact witness in *Owens Corning* as a basis for allowing his fact or expert testimony here.  In the *Owens Corning* estimation, Mr. Snyder testified on behalf of the debtors concerning his experiences representing Owens Corning and Fibreboard.  Elihu Inselbach, counsel to the ACC in this case and also to the PI committee in Owens Corning, described Mr. Snyder's role in *Owens Corning* as follows:

> The debtor's counsel will put on ... three very experienced defense lawyers [Stephen M. Snyder, Clyde Leff, and Bruce Tucker] who spent many years defending Owens Corning, Fibreboard, or both, developing a strategy to deal with the claims against these companies, and they will be able to testify to Your Honor about the reality of the claims ... and how they were resolved." (*Owens Corning*, 1/13/05 Hrg. Tr at 14 attached as Exhibit E.)

Because Mr. Snyder had represented Owens Corning in its pre-bankruptcy litigation and settlements, Mr. Snyder possessed firsthand personal knowledge of matters concerning Owens Corning's pre-bankruptcy litigation and was presented for the very purpose of describing his experiences in that role:

> [B]ased upon what I remember, they [Owens Corning] wanted somebody to describe OC's experience, in the brief period of time that I represented them, developing the NSP.  I think it was not ruled out that I would be asked questions about, you know, as an expert to give opinions on whether that was an appropriate response to the challenges that OC faced at the time. (Snyder Dep. at 40:18-25.)

The same is not true here.  Mr. Snyder freely admits that he lacks similar personal knowledge of Grace:

> Well, I've never represented Grace.  It's not a -- I don't have any, other than what's been provided me, any insights into, you know, material that would otherwise be confidential.  I did not spend years as some people like Jay Hughes working for Grace. (Snyder Dep. at 36:12-17.)

20

Tellingly, there were no objections to Mr. Snyder's testimony in Owens Corning, so the court never specifically considered the issue of whether his testimony would withstand any challenges. That is not the case here, where Grace has raised strenuous objections to Mr. Snyder's testimony being admitted as either an expert or fact witness. Therefore, Mr. Snyder's testimony in *Owens Corning* cannot be used to justify the admissibility of his testimony here.

## **Conclusion**

Under *Daubert* and Rule 702, this Court serves as a gatekeeper to exclude any "expert" testimony that is not both relevant and reliable. The testimony proffered by Snyder does not satisfy either of these gatekeeping requirements. Further, Mr. Snyder's opinions and knowledge derived from hearsay cannot be recast as "fact" testimony. Therefore, the Debtors respectfully request that the Court enter an order, substantially in the form of the proposed order attached hereto as Exhibit D, finding (i) that the Snyder reports are not based upon reliable methodology and concern legal conclusions that are not properly included in expert reports or testimony; and (ii) excluding his reports and expert and fact testimony.

Respectfully Submitted:

Dated: March ___, 2008

> KIRKLAND & ELLIS LLP
> David M. Bernick, P.C.
> Janet S. Baer
>  200 East Randolph Drive
> Chicago, Illinois 60601
> (312) 861-2000
>
> and

91100-001\DOCS_DE:136063.1

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

22