# Exhibit A

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------

CHAPTER 11

IN RE:
W.R. GRACE & CO., et al.,

            Debtors.

Case No. 01-1139(JFK)
Jointly Administered

-------------------------------

VIDEOTAPED DEPOSITION OF
Stephen M. Snyder, Esquire
February 15, 2008
Washington, D.C.
Lead: David M. Bernick, Esquire
Firm: Kirkland & Ellis

JANE ROSE REPORTING
Josett F. Whalen, RMR-CRR, Court Reporter
Joey Thrower, Legal Videographer

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 18

1           BY MR. BERNICK:

2           Q.  Well, I'm talking -- let me again be

3      more precise.

4           I don't see any spreadsheets where you

5      accumulate data.  Correct?

6           A.  Well, to be specific, I look at filing

7      trends and the waxing and waning of what some

8      people call surges and I -- I believe I can tie

9      those to phenomena that are taking place in the

10     tort system and at that -- in that context

11     that's an analysis of data.  You could lay that

12     out on a spreadsheet if you wanted to.

13          I also look at, you know, varied values

14     over time.  I don't analyze them rigorously with

15     mathematical tools, but I apply them to what I

16     see going on in the tort system.

17          Q.  Well, again I want to cut it a little

18     bit finer.  I understand you don't do

19     regressions.  I understand you don't have

20     substantial accumulations of quantitative data.

21          But I'm really trying to get at

22     something that's not that much --

23          A.  Okay.

24          Q.  -- in the sense that I don't see

25     anywhere in your report where you systematically

US District Court - Delaware          FINAL - February 15, 2008
Chapter 11 - W.R. Grace               Stephen Snyder, Esquire

Page 19

1      use some method to accumulate data.  Is that
2      correct?
3          A.  I think that's fair to say.
4          Q.  And I don't see anywhere in your
5      report where you make a systematic effort to
6      apply a method to analyzing the facts that you
7      have.
8          A.  Well, I don't necessarily agree with
9      that.
10             I mean, it's -- it's not a method that
11     I describe in the report, but it's -- you know,
12     it's a historical method.  It's a method that
13     tries to understand the economics of the law
14     practice as it applies in the mass tort context
15     and to reach conclusions about the behavior of
16     the lawyers and the parties, given what I
17     believe to be the economic consequences of
18     various decisions, whether it has to do with the
19     expense of litigation or the amount that's
20     recovered.
21         Q.  So you do believe that there is a
22     method that you have applied in connection with
23     your work in this case?
24         A.  It's -- it's nothing more or less than
25     an understanding of the profit and loss and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 20

1    balance sheet consequences of different choices
2    that people make.
3        Q.  But you do believe that there's a
4    method that you've applied in your report.
5        A.  I think it's a familiar method.  Yes.
6        Q.  Is there anyplace where we can go and
7    find that method set out as an approach or as a
8    method?
9        A.  No.  I haven't described it other than
10   to state my conclusions about things that are
11   economically attractive and things that are not
12   economically attractive.
13       Q.  Is there anyplace where your method
14   that you've applied in your report is taught?
15       A.  I think it's, you know, basic
16   accounting and bookkeeping and a smattering of
17   economics.  There's nothing that you wouldn't
18   get in the first two years of undergraduate
19   school.
20       Q.  But there's -- you're not an economist,
21   are you?
22       A.  No.
23       Q.  You're not an accountant, are you?
24       A.  No.
25       Q.  So we know that we can go to a school

US District Court - Delaware          FINAL - February 15, 2008
Chapter 11 - W.R. Grace               Stephen Snyder, Esquire

Page 21

1    and find the methods of economics taught and we

2    know that we can go to a school and find the

3    methods of accounting taught, and you're not an

4    expert in either of those methods or areas;

5    correct?

6        A.  No.  Those are just basic, fundamental

7    tools that we all use in evaluating whether

8    we're going to do A or we're going to do B.

9        Q.  So if we go to The New York Times and

10   find somebody who's commenting on what's

11   happening on the litigation scene, is there

12   anything about what they do in the course of

13   pronouncing on their observations that is

14   different from what you do in the course of

15   pronouncing on your observations in your field

16   of practice?

17       MR. FINCH:  Objection.  Form.

18   Hypothetical.

19       THE WITNESS:  I think I lost you about

20   halfway through that question.

21       BY MR. BERNICK:

22       Q.  Well, really any lawyer who practices

23   in a given area of law or litigation, take

24   litigation in particular, can always make

25   observations on what's happening in their

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 24

1    **ordinary commercial lawyer will have with**

2    **respect to his or her area of commercial**

3    **practice.**

4        A.  I think I understand, based upon

5    experience with dealing with the players in the

6    mass torts area, what kinds of things motivate

7    them and what kinds of things demotivate them,

8    and those things usually are economic in

9    nature, and I can reach my conclusion by

10   employment of very simple accounting tools.

11       I think what I bring to it is my

12   experience and understanding of not only the

13   individuals but what kinds of -- what motivates

14   them.

15       **Q.  And the individuals that you're**

16   **referring to are who?**

17       A.  Are the -- are the various players in

18   this litigation.

19       **Q.  And the various players in this**

20   **litigation are lawyers.**

21       A.  Lawyers.

22       **Q.  Judges.**

23       A.  Judges.

24       Clients.

25       People who are quasi clients I would

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 25

1    suppose I would say.

2         Medical practitioners.

3         Q.  So you're holding yourself out as an

4    expert in how they behave?

5         MR. FINCH:  Object to form.

6         THE WITNESS:  I think it's part of

7    my -- part of what I bring to the table

8    expressing opinions on how the tort system

9    operates is why people do what they do.

10        BY MR. BERNICK:

11        Q.  But my question is really pretty

12   simple.

13        You're holding yourself out as an

14   expert in how economically the players that

15   you've listed behave in the tort system;

16   correct?

17        A.  I think what I'm holding myself out as

18   is an expert in mass torts, and one of the

19   tools I use in reaching conclusions is an

20   understanding of how those people behave.

21        Q.  But the people who ultimately

22   negotiate the transactions in which you say

23   that you are an expert, those people are

24   lawyers; right?

25        A.  Some of them are lawyers.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 26

1      Q.  Well, the key negotiators are lawyers;
2   correct?
3         MR. FINCH:  Object to form.
4         THE WITNESS:  They're among those who
5   negotiate.  Yes.
6         BY MR. BERNICK:
7      Q.  Well, when push comes to shove and a
8   settlement is reached, it's reached between
9   lawyers -- lawyers have clients, but it's the
10   lawyers who do the negotiating; correct?
11      A.  I think judges have a lot to do with
12   settlements.
13      Q.  Is there anywhere at all that we can
14   find your method that you apply in this case,
15   your method spelled out as a method?
16      A.  I don't think so.
17      Q.  Are you aware of -- strike that.
18         Are there any objective standards on
19   the basis of which the quality of your work as
20   an expert can be judged?
21      A.  You know, I -- if you would define
22   what kind of standards you're talking about, I
23   might be able to answer that.
24         But you know, what I have is a resume
25   of what I've done, the things that I've

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 27

1    accomplished, and some of the things I've failed

2    to accomplish in my practice, all of which has

3    brought me up against a lot of the big issues in

4    this litigation.

5         And as I say in my report, you know, I

6    talk about the practical outcomes in the

7    litigation. I haven't tried to throw an

8    academic construct around any of this.

9         Q.  My question is, are there -- can you

10   tell me a single objective standard on the basis

11   of which your work can be judged?

12        A.  Give me the standard and I'll tell you

13   whether it applies.

14        Q.  I'm just asking you for any standard.

15        MR. FINCH:  Object to form.

16        BY MR. BERNICK:

17        Q.  Any objective standard on the basis of

18   which the quality of your work can be judged.

19        This is the third time I'm asking.

20   Just give me one standard.

21        A.  Well, you know, things that I have

22   done. I think I was instrumental in the very

23   first mandatory class global settlement in the

24   asbestos litigation.

25        Q.  Which failed on appeal; correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 29

1    plaintiffs; correct?
2        A.  Bill Griffin and I negotiated with the
3    plaintiffs.
4        Q.  I see.
5            So that was -- that's a result that you
6    tally up on your list of many successes.
7        A.  Yes.
8            I give a lot of credit to Bill Griffin
9    for doing that.
10       Q.  Now, have there been no other
11   mandatory non-opt-out settlements in mass tort?
12       A.  There were some state court attempts in
13   the east that I was aware of, but I wasn't
14   involved in those.  But in asbestos, no.
15       Q.  So again, what's the objective
16   standard that you're -- you're then saying that
17   an objective standard on the basis of which we
18   can judge the quality of your work is that you
19   were involved in a partly successful mandatory
20   class settlement in asbestos.
21       A.  I think the way I would put it was, in
22   a litigation that has delivered very few
23   results to clients, I, perhaps to some degree
24   like you, tried to fashion a resolution that
25   actually worked for a client rather than simply

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 30

1    produced a lot of money that then went down the

2    drain someplace, and I believe that at least in

3    part I accomplished that goal.

4        Q.  Okay.

5        A.  And I'm not sure that that's happened

6    other than that occasion.

7        Q.  Any other objective standard that

8    against which we can judge the quality of your

9    work?

10       A.  Well, you know, I would say that the

11   standard that we're talking about here is have

12   you tried to understand the tort system and

13   tried to be creative in approaching it with

14   solutions, attempted things, stretched yourself

15   so that you were really testing the limits of

16   what we've been talking about, the motivations

17   of the players, the scarcity of resources and

18   funds, and has that made you give serious and

19   sober thought to what works and what doesn't

20   work in this litigation.

21           And I don't know how objective a

22   standard that is, Mr. Bernick, but it's kind of

23   what I like to think I try to do.

24       Q.  You're familiar, are you not, with the

25   term "anecdotal" as applied to conclusions that

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 32

1    along that continuum.

2        Q.  It would be fair to say that the

3    substance of your work in this case is based on

4    anecdotal analysis.

5        MR. FINCH:  Object to form.

6        THE WITNESS:  No.  I don't think that's

7    true.

8        BY MR. BERNICK:

9        Q.  Dr. Peterson, I took his deposition a

10   few months ago it seems -- I guess it's

11   probably not -- yeah, I guess maybe it was now

12   a few months ago.  And Dr. Peterson's report is

13   focused on the history of mass tort, with a

14   particular emphasis on Grace, and the likely

15   future of mass tort as it would have played out

16   if Grace had stayed in the tort system.

17       Would it be fair to say that the

18   subject of your report overlaps substantially

19   with the subject of Dr. Peterson's report?

20       A.  Well, I certainly talk about the

21   history of mass tort and I talk about what I see

22   as the enduring trends in the behavior of the

23   players, given the limitations of the

24   environment in which they are operating.

25       Q.  So again, would the answer to my

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

Page 33

1    question be yes, there's a substantial overlap

2    in subject matter --

3        A.   There is an overlap.

4        Q.   Okay.  Dr. Peterson, when he talks

5    about the subject matter of his work, talks

6    about claiming behavior and resolution

7    behavior.

8            Is that also the focus of your work?

9        A.   I think he measures claiming behavior.

10   I describe -- I think I talk more in terms of

11   the motivation of the people involved in

12   claiming behavior.

13       Q.   Okay.  Now, when it comes to

14   motivation, Dr. Peterson -- strike that.

15           Dr. Peterson, in describing and

16   analyzing claiming and resolution behavior,

17   works with data, that is, how many claims were

18   filed, what they were resolved for and how many

19   are projected to be filed in the future and what

20   they'll be resolved for.

21           You're familiar with that; correct?

22       A.   I've seen his reports.

23       Q.   Now, when you say that -- you don't

24   believe that Dr. Peterson focuses on

25   motivation?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 34

1    A.   I think Dr. Peterson applies a

2    methodology to try to quantify the consequences

3    of motivation.

4         I don't think Dr. Peterson has ever

5    settled an asbestos case.

6         I don't think he's ever taken a client

7    through bankruptcy.

8         I don't think he's ever counseled a

9    client, you know, tried to put together an

10   understanding of the litigation to come up with

11   a solution for a client.

12   **Q.   So you believe that your work is**

13   **incremental to his in the sense that you are**

14   **more familiar with the motivations of the**

15   **players.**

16   A.   I think I'm more familiar with the

17   wellsprings of the motivation and the kinds of

18   things that people respond to on sort of on the

19   ground.  I think his -- he and others like him,

20   like Dr. Florence, focus more on the, you know,

21   predicting the outcomes over time.

22   **Q.   The facts that you're dealing with, the**

23   **motivations and the wellsprings of those**

24   **motivations, are those facts gathered pursuant**

25   **to any methodology in your report?**

US District Court - Delaware          FINAL - February 15, 2008
Chapter 11 - W.R. Grace               Stephen Snyder, Esquire

Page 35

1      A.   Those facts are based upon -- I'm
2   trying to count now.  Give me a minute --
3   26-27 years experience just doing it.
4      Q.  And we can't find that experience
5   recorded as a part of your reliance materials,
6   it's something that's in your mind; correct?
7      MR. FINCH:  Object to form.
8      THE WITNESS:  Well, I think it's
9   etched on my face as well as my mind.  It has a
10  lot to do with my -- you know, the size of belt
11  I have to buy.  It's a matter of, you know,
12  what my blood pressure reading is at any given
13  time.
14      BY MR. BERNICK:
15      Q.  Well, you can medicate that.
16      So let's go on to something else.
17      I notice that you've been proffered as
18  an expert both in -- strike that.
19      You've been proffered both to testify
20  about factual matters and also as an expert;
21  right?  Is that your understanding?
22      A.  That's what I've been told.  Yes.
23      Q.  Now, was that also true in the
24  Owens Corning case?
25      A.  Yes.  I think that was true.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 36

1      **Q.  And would it be fair to say that the**
2   **relationship between your factual experience**
3   **and your expertise -- and your expert opinions**
4   **in the Owens Corning case is certainly similar**
5   **to the relationship that your factual testimony**
6   **and your expert opinions has with respect to**
7   **Grace; correct?**
8      A.  In some ways, yes, but in other ways,
9   no.
10     **Q.  Okay.  Why don't you just explain that**
11  **answer if you could.**
12     A.  Well, I've never represented Grace.
13  It's not a -- I don't have any, other than
14  what's been provided me, any insights into, you
15  know, material that would otherwise be
16  confidential.  I did not spend years as some
17  people like Jay Hughes working for Grace.  I've
18  been familiar with Grace for a long time as a
19  codefendant and as an opponent in some
20  instances.
21      But in the case of Owens Corning, for a
22  while I was one of their attorneys, so that was
23  different.
24     **Q.  But in the Owens Corning case I thought**
25  **you told me that you were accepted as an expert**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 40

1    describe what are essentially certain areas of
2    factual testimony that you expect to give?
3        A.  Yes.
4        Q.  And then on the second page you then
5    go on to say, to the extent that your testimony
6    can be characterized as an opinion, you then --
7        A.  As expert.
8        Q.  As expert opinion and the "opinion" is
9    in quotes --
10       A.  No.  "Expert" is in quotes.
11       Q.  "Expert" is in quotes.  Even better.
12           What did you mean when you said what
13   you did on the second page that says to the
14   extent that your testimony can be characterized
15   as expert opinion it's got the following basis?
16           Why did you put "expert" in quotes?
17       A.  Because I believe that if you -- based
18   upon what I remember, they wanted somebody to
19   describe OC's experience, in the brief period of
20   time that I represented them, developing the
21   NSP.  I think it was not ruled out that I would
22   be asked questions about, you know, as an expert
23   to give opinions on whether that was an
24   appropriate response to the challenges that OC
25   faced at the time.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 41

1          Honestly I believe -- that's as much as

2     I can remember about what I was asked to do

3     there.

4          And I think they had a concern that I

5     wouldn't be allowed to express those opinions

6     unless I was qualified as an expert, so they

7     did -- this is what they did (indicating).

8        Q.  Did you write this disclosure?

9        A.  I participated in it.  I didn't -- I

10    didn't understand what they as -- I think this

11    was Roger Podesta at the Debevoise firm.  He was

12    the one who knew what he wanted from his

13    witnesses.  I didn't know what was needed or

14    wanted, so I followed an outline of areas that

15    he wanted me to express either my experience on

16    or my opinions on, so to that extent I cowrote

17    it with him.

18        Q.  Was it your language here that appears

19    at the top of page 2, "to the extent that my

20    testimony opinions can be characterized as

21    'expert' opinion"?

22        A.  I can't remember.

23        Q.  Let's talk a little bit about your

24    relationship with some of the players that

25    you've described.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 56

1          I wanted to see all of the -- all of

2     the documents that Grace had that had to do with

3     how it managed the defense of the cases.

4          I wanted to see all of the reports

5     written by other experts.  I looked at those.

6          That's generally it.

7          Q.  Okay.  When you said you wanted to see

8     all of the documents that related to how Grace

9     conducted the defense of the cases, I'm assuming

10    you didn't ask to see all of the trial and

11    settlement files.

12         MR. FINCH:  You mean all

13    200,000 individual claim files.

14         MR. BERNICK:  Right.

15         THE WITNESS:  No.  I didn't look at

16    individual claim files.

17         BY MR. BERNICK:

18         Q.  So when you say that you wanted to see

19    all the documents that related to or reflected

20    the defense of the case, was there more focus

21    that you gave to that?

22         A.  Well, I -- you know, first of all, I

23    didn't get all this at once.  I got it over

24    time.

25         But I reached a conclusion reading the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 63

1    didn't -- I read some transcripts about what

2    they were and some arguments about what was

3    supposed to be in it, and I needed to understand

4    what kind of information these things were

5    asking for, and so I just wanted to get a sample

6    of them.

7        Q.  We don't see any analysis in your

8    report of the content of the PIQs.  Is that

9    correct?

10       A.  No.

11       Q.  Is that correct or not?

12       A.  I think -- I think there is.

13       Q.  I can't determine from your report

14   whose PIQs you reviewed.

15       A.  Neither can I.

16       Q.  Yeah.  Well, that's my point --

17       A.  Yeah.

18       Q.  -- is that I don't see anything in

19   your report to reflect -- I don't see anything

20   in your report that reflects the content of the

21   PIQ files that you reviewed.  Is that correct?

22       A.  I don't know if I refer to any PIQ

23   files in the report.

24       Q.  I don't see any data that you've

25   gathered from the PIQ files either.  Is that

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 64

1    correct?

2        A.  I don't think I collected data from

3    them.

4        Q.  I don't see any files in your reliance

5    materials or in your citations that came from

6    the plaintiffs' law firms.  Is that correct?

7        A.  I wouldn't know.

8        Q.  Did you make any request to see what

9    was in the files of the plaintiffs' law firms

10    with respect to claims against -- claimants who

11    had prosecuted claims against Grace?

12        A.  I don't believe I did.

13        Q.  Have you ever in the course of your

14    work reviewed the content of claimant files that

15    come from the law firms that represent the

16    claimants?

17        A.  Yes.

18        Q.  When did you do that?

19        A.  In connection with settlements.

20        Q.  Well, that's -- those are what the

21    plaintiffs' lawyers decided to give you; right?

22        A.  Well, sometimes they would give us

23    their file.

24        Q.  Well, but again, that would be a

25    decision that they made.  You don't really know

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 66

1      A.  Yes.
2          Q.  And that includes not only
3      observations and conclusions that you make
4      about information in the claim files maintained
5      by the defendants but also information in the
6      claim files maintained by the plaintiffs;
7      correct?
8          A.  Yes.
9          Q.  And yet we can't find in any of your
10     reliance materials or in any of the citations
11     in your report a reference to any claim file
12     that was maintained by a law firm as opposed to
13     the defendant; correct?
14         A.  Not Grace, no.
15         Q.  Well, not any.  I can't find anywhere
16     in your report or in any of the reliance
17     materials a single actual reference to an
18     actual claim file maintained by a plaintiff's
19     firm.  Is that correct?
20         A.  I didn't need to see those files.
21         Q.  You may or may not have needed, but
22     the court and we will determine that I suppose.
23     I don't find a reference to it, is my --
24         A.  I don't think I made a reference.  I
25     think I already said that.

Page 75

1    the plaintiffs' law firms actually have from

2    the claimant himself in their files at any

3    given point in time, in order to determine

4    that, we'd actually have to look in the files;

5    correct?

6        MR. FINCH:  Object to form.

7        THE WITNESS:  Either that or look at

8    the depositions of the plaintiffs.

9        BY MR. BERNICK:

10   Q.  Okay.  And as we sit here today,

11   there's nothing in your reports that provides

12   actual factual evidence of what was in the law

13   firm files for the people who sued Grace at any

14   particular point in time; correct?

15       MR. FINCH:  Object to form.

16       THE WITNESS:  I don't cite to any -- I

17   don't base my report on a specific review of any

18   plaintiffs' files in the Grace case.

19       BY MR. BERNICK:

20   Q.  And you don't tell us about the

21   content of any of those files in the Grace

22   case.

23   A.  I didn't look at those files.

24   Q.  And you don't know what's in those

25   files; correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 138

1    report, totally beside the point.
2        Q.  I didn't ask you whether it was beside
3    the point.
4            I asked you whether anybody at the time
5    said that Mr. Rodewig is wrong and he's
6    testifying falsely when he says that all those
7    cases were being paid --
8        A.  I never expressed the view that he was
9    testifying falsely.
10       Q.  Did you ever express the view to the
11   company that it was just not true that
12   Owens Corning was paying in thousands and
13   thousands of cases where there was no
14   legitimate case of exposure to an Owens Corning
15   product?
16       A.  I think everybody in the litigation
17   understood, as did I, that given that the way
18   information was developed and the way
19   settlement values were set, there was going to
20   be a significant number of cases that got
21   settlement money that would not have prevailed
22   at trial.
23       Q.  Well, not only would not have prevailed
24   at trial --
25           MR. FINCH:  Let's take a break.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 166

1        Would it be fair to say that you have
2   assumed that Mr. Hughes in agreeing to the
3   settlements was satisfied with whatever evidence
4   of medical diagnosis and medical causation from
5   Grace product was supplied in connection with
6   the settlements?
7        A.  Yes.  With the caveat that he
8   understood that the settlements he entered into
9   and the ones I studied carefully had a
10  substantial number of cases that, had they gone
11  to trial, would not have succeeded against Grace
12  and that he was willing for mainly cost and
13  efficiency reasons to settle those cases if the
14  price was right.
15       Q.  Would it be fair to say that you've
16  made no independent inquiry to determine
17  whether the evidence of disease diagnosis and
18  causation by Grace product was sufficient to
19  establish causation in any of those cases?
20       A.  Could I ask her to read it back or do
21  you want to --
22       Q.  I'll just put it again.
23       A.  Okay.
24       Q.  Would it be fair to say that you've
25  not made any inquiry, in the context of your

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 167

1    report and reliance materials, you've not made

2    any inquiry to determine whether the evidence

3    that was there to support any claimant

4    against -- any claim against Grace was actually

5    sufficient to establish disease diagnosis and

6    disease causation?

7        A.  With the possible exception of the

8    cases that went to verdict, that's correct.

9        Q.  Okay.  And is it also true that --

10   well, let me just ask you.

11       In your report -- well, do you make

12   any assessment of what portion of the money

13   that Grace paid was paid for joint liability as

14   opposed to several liability?

15       A.  I don't think anybody makes that

16   assessment.

17       Q.  Did you make any assessment of what

18   portion of the money that Grace paid was paid

19   for by reason of a punitive damages threat

20   versus compensatory?

21       A.  No.

22       Q.  Did you make any assessment of what

23   portion of the amount of money that Grace paid,

24   again in the context of your report and your

25   reliance materials, was paid as a result of the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 192

1    no cure for it.  There's no asbestos disease

2    that can be cured.

3         I mean, that is different than what

4    you see in other litigations.

5         Q.  What about, is your expertise

6    different when it comes to asbestos mass tort

7    than the expertise of scores of other lawyers

8    who have been involved in asbestos for

9    10-20 years?

10        A.  I just have a lot more moss on my back

11   I think.  I don't think I'm anything, you know,

12   that it is -- that's quantitatively or at

13   least -- what would you say -- I'm no great

14   leap of, you know, brilliance.  I've just been

15   around a long time and have seen a lot of

16   things.

17        Q.  And in that respect, is your expertise

18   or your experience different in kind from many,

19   many other asbestos lawyers who had been around

20   at least for a period of several years in

21   dealing with the situation?

22        A.  In some respects I tried to say earlier

23   I think I've tried a few more things than other

24   people have, but basically we all go back to the

25   fundamentals, and so probably no, except that I

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - February 15, 2008
Stephen Snyder, Esquire

Page 193

1    pushed maybe the limits of the litigation a

2    little bit more vigorously and hopefully with a

3    little more creativity than some others.

4        Q.  Well, I guess everybody aspires to

5    that.  Right?

6        A.  Yeah, that's right.

7        Q.  Grace saw a spike in claims in the

8    year 2000; right?

9        A.  That's what I -- right.

10       Q.  Big (indicating)?

11       A.  Yes.

12       Q.  I asked Dr. Peterson whether he was

13   aware of -- whether he could say that that

14   increase in claims was attributable in some

15   fashion to the publicity or litigation at Libby,

16   and he said no.

17       Do you have a different view?

18       A.  No.  I don't think I disagree with

19   that.

20       Q.  It's also true that there were certain

21   moratoria that Grace had entered into for a

22   period of time and that some of those moratoria

23   were coming off.

24       A.  Uh-huh.

25       Q.  I don't see anywhere in your report