# Exhibit B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-10578(JKF)
                                .
                                .
  FEDERAL MOGUL GLOBAL, INC.,   . USX Tower - 54th Floor
                                . 600 Grant Street
                                . Pittsburgh, PA 15219
            Debtor.             .
                                . June 20, 2007
. . . . . . . . . . . . . . . . . 9:03 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:              Pachulski, Stang, Ziehl, Young,
                              Jones & Weintraub, P.C.
                             By:  JAMES E. O'NEILL, ESQ.
                             919 North Market Street
                             17th Floor
                             P.O. Box 8705
                             Wilmington, DE   19899

                             Sidley Austin Brown & Wood, LLP
                             By:  KEVIN LANTRY, ESQ.
                                  GUY S. NEAL, ESQ.
                                  JESSICA KNOWLES, ESQ.
                                  JAMES CONLAN, ESQ.
                                  KENNETH P. KANSA, ESQ.
                             Bank One Plaza
                             10 South Dearborn Street
                             Chicago, IL 60607

Proceedings recorded by electronic sound recording, transcript
         produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

1 and things like that those are cases that the tort system, the
2 civil justice is not processing at this point in time.
3 Q    So do I take it from your answer that the defense costs
4 that Mr. Lockwood posited to you would not be a consideration
5 in resolving those claims.
6 A    In the tort system that's correct.
7 Q    Mr. Lockwood also asked you on cross examination about
8 establishing precedent.  Did you understand what he meant by
9 that, establishing precedent with respect to these unimpaired
10 claims?
11 A    I understood it to mean that if you start selling them
12 you're going to settle in for a long period of time and kind of
13 the scenario we saw during the 1990's that led to the
14 bankruptcies of Owens Corning, Fiberboard, Pittsburgh, Corning,
15 you name it.
16 Q    So is this what you were referring to in your report when
17 you refer to the entrepreneurial model of claims making?
18 A    Yes.  The litigation for profit screening is its kind of
19 phrase.  Yes.
20 Q    And what impact does that have in your opinion on the
21 exposure of the defendants and their insurers?
22 A    Well, the TDP document as it's currently structured would
23 allow for the resolution at the level Mr. Lockwood mentioned of
24 $1000 a claim for virtually anybody who could claim to have
25 Pneumo Abex exposure and had certain minor changes in their

Coleman - Redirect/Christian                           53

1  lungs as proffered by anyone of the expert witnesses.  So the

2  number of claims that are in the projections of the future

3  claims representatives are nearly 122,000 of those disease

4  Level 1 over the history of the Trust and that comes out to

5  $122 million.

6  Q    So $122 million you mean it would not be resolved -- dealt

7  with in the tort system today.

8  A    As the tort system is currently dealing with cases.

9  That's correct.  Generally.

10 Q    Is that what you were referring to as well on cross

11 examination when you talked about the materials presented by

12 David Austern with respect to the Manville claims making?

13 A    Yes.  The Manville -- what Mr. Lockwood and I were

14 discussing the Manville claiming history over the last several

15 shows an alteration from mainly claims that were

16 nonmalignancies.  Again, ones generated in these screenings.

17 Two, what we're actually seeing -- closer to what we're seeing

18 in the tort system was a more significant percentage of the

19 claims that are being submitted being malignancy or severe lung

20 cancer. those types of things.

21 Q    So yesterday when Mr. Lockwood examined you about global

22 settlements at the CCR that might have paid these claims years

23 ago would you agree that that kind of settlement that you

24 talked about with Mr. Lockwood would not occur today?

25        MR. LOCKWOOD:  Objection, Your Honor.  I can't

1          MR. BRUNSTAD:  I'd be happy to, Your Honor.  If Mr.

2   Neal's inviting that, that would be great.

3          MR. NEAL:  Your Honor --

4          MR. GOLDBLATT:  Your Honor, I object.

5          MR. NEAL:  Why is there no difference, Your Honor?

6   Because there's no methodology.  Putting aside a witness's

7   experience, be it ten years, be it twenty years, be it thirty

8   years, experience alone is insufficient, and the case law

9   supports us on that, and I'll give the Court a couple of

10  citations.

11          Here is the opinion boiled down to its essence, TDP

12  is bad; tort system good.  Despite his general experience,

13  though, Mr. Coleman has not established that either the methods

14  or the findings in his report qualify as expert testimony.

15  There is no methodology, no empirical analysis, no intellectual

16  rigor, nothing that Rule 702 requires.

17          By his own admission, and we heard it again on

18  redirect, by his own admission, his review of materials has

19  been limited, and his conclusions are based merely on his

20  familiarity with the TDP's, the plan documents, seminar

21  materials that -- of a seminar he didn't attend, but received

22  relating to Johns Manville, and the application of his personal

23  experience.

24          His own opinion is based on nothing more than the

25  general experience and review of the documents here, the

1 documents that are at issue, the plan documents.  Insufficient

2 as a matter of law.

3          Let me just go through my list, Your Honor, of what

4 we heard and what we didn't hear on the redirect.  Mr. Coleman

5 never qualified as an expert in any court on the matters that

6 he opines on here.  Mr. Coleman never authored peer-reviewed

7 articles or analyses on the matters on which he wants to opine

8 here.  Mr. Coleman has done no comparison of the TDP's to the

9 tort system other than applying his personal experience.  Mr.

10 Coleman testifies he has no peers that he knows of who have

11 conducted such an analysis.  Mr. Coleman has applied no

12 methodology.  It is neither appended to his expert report, it

13 is not appended to his declaration, which is in lieu of his

14 direct, and it was not articulated in any degree of specificity

15 on cross or redirect here today.

16          There is no data.  There's no projections.  There is

17 nothing that we can test, Your Honor, to establish that the

18 TDP's in this case somehow make it more expensive for the

19 insurers in the future.

20          In contrast we have Tom Florence, doesn't opine on

21 the same issues, but I'm just drawing a comparison with respect

22 to data with respect to the quantification and crunching of the

23 numbers analysis and projections.  We don't have that with

24 Coleman.

25          Here's what we have with Mr. Coleman.  All we know is

1  he read the TDP's and other plan documents, he's read the

2  summary materials relating to Manville and he applied thirty

3  years of experience.  That's speculative, that's unreliable,

4  that's not subject to any empirical analysis or challenge by

5  anybody.  We are merely presumed to have to accept his opinion

6  as is.

7         Briefly on the case law, Your Honor, and then I'll

8  close.  The Third Circuit in <u>Oddi</u>, O-d-d-I, v. <u>Ford Motor</u>

9  <u>Company</u>, 234 F.3d, 136, year --

10        THE COURT:  I'm sorry, give me the cite again?

11        MR. NEAL:  Sure, Your Honor.  <u>Oddi v. Ford Motor</u>

12  <u>Company</u>, Oddi, O-d-d-I v. Ford Motor Company, 234 F.3d 136,

13  2000 opinion.  Rejects expert testimony based primarily on the

14  expert's own training and experience as an engineer.  Lacking

15  in that case was any quantification or analysis.

16        The District Court of Delaware in 2004.  This one

17  will be difficult to pronounce.  It is <u>Izume Products Company</u>,

18  I-z-u-m-e Products Company v. <u>Konin Klijke, Philips</u>

19  <u>Electronics, NV</u>.  Konin Klijke or Klock, K-o-n-i-n, K-l-i-j-k-

20  e, where the Court provides an expert opinion is reliable if it

21  is, quote, "based on methods and procedures of science rather

22  than on subjective belief or unsupported speculation."  And

23  that court cites <u>In Re: Paoli</u> P-a-o-l-I, 35 F.3d 742.  And it

24  goes on to provide that the expert must have, quote, "good

25  grounds for his or her belief."

1  to the standing argument, and Mr. Coleman is offered as your

2  witness on that score, that he ought to be heard by this Court.

3  So, that's my preliminary view.

4          There is obviously some bias with respect to the fact

5  that CNA is his largest client.  And the Court does have to

6  factor that into the weight to be afforded his testimony.  I

7  think everybody considers that.

8          MR. CHRISTIAN:  That's perfectly appropriate.

9          THE COURT:  And I believe that in fact all of the

10 other aspects that have come out in cross examination and on

11 direct, such as the fact that his -- that CNA is his largest

12 client, are factors that this Court can consider with respect

13 to the weight.  That's my preliminary view.

14         I am going to take a look at the cases.  I am still

15 concerned about the methodology issue.  I truly am concerned

16 about the methodology.

17         MR. CHRISTIAN:  Right.

18         THE COURT:  I agree that Mr. Coleman has recited,

19 both on the stand and in his declaration, the process that he

20 went through, but I'm not sure that that is the type of

21 methodology that <u>Daubert</u> and <u>Cumo Tire</u> expect can be

22 replicated.  And that is the reliability standard that both

23 <u>Daubert</u> and its subsequent progeny talk about.  The want to see

24 something that someone else could duplicate.

25         The type of analysis that Mr. Coleman provided to

107

1  this Court can't be replicated, because everything he talked

2  about is what he's done in his mind.  Yes, he's looked at

3  medical criteria, but it's in his mind.  Yes, he's done an

4  exposure analysis, but it's in his mind.  Yes, he's looked at

5  the Manville statistics, and there are printed statistics.  So,

6  someone else can look at those statistics, but how he's

7  factored that into this analysis is in his mind.

8         There is not a process that can be replicated in any

9  sense.  And yes, he has experience, but that experience, to the

10  extent that it weighs into this analysis that he has provided

11  to the Court, is not either capable of replication.  Does he

12  have specialized knowledge?  Yes, he does seem to have

13  specialized knowledge, and I need to take a look at the cases

14  to see how those two factors, his specialized knowledge on the

15  one hand, but the fact that nothing he's testified to can be

16  replicated on the other, can be balanced.

17         MR. CHRISTIAN:  Your Honor, and all I'd say to that

18  point, because I think Your Honor has grasped one of the issues

19  that are -- is presented by this motion to strike very clearly.

20  We believe the Cumo Tire says the kind of analysis of peer

21  review and replication that you're talking about is

22  inapplicable to this kind of experiential and knowledge-based

23  testimony.

24         As Your Honor observed, he clearly has the knowledge

25  and experience.  And I would say this as well.  I think it can

1  non-scientific testimony.  And that's where <u>Cumo Tire</u> comes in.

2  I'll just say that, you know, perhaps he doesn't think much of

3  Mr. Lockwood's analysis of those things, or perhaps Mr.

4  Lockwood wouldn't qualify as an expert on these things, but as

5  a matter of fact, if they'd chosen to, they could have done the

6  same analysis.

7          They could have brought in medical doctors to say

8  that Peter Coleman's all washed up about his medical analysis,

9  but they chose not to offer a rebuttal expert.

10          THE COURT:  But --

11          MR. LOCKWOOD:  Your Honor, the --

12          THE COURT:  I think that's the issue, and I -- Mr.

13  Christian, and so before I go look at the cases I want to make

14  sure I articulate what I -- my concern is.

15          MR. CHRISTIAN:  Um-hmm.

16          THE COURT:  I don't think anybody's challenging the

17  fact that in looking at a settlement someone would look at the

18  medical criteria, the exposure data and so forth.  I don't hear

19  a challenge to that fact.

20          The problem here is that what Mr. Coleman has sais is

21  that in his review of the TDP's, the specific TDP in this case,

22  which he has not compared to any other TDP, somehow or other

23  causes the insurance companies -- will cause the insurance

24  companies to have to pay more money than they will have to pay

25  in a tort system because, he views the fact that the TDP's have

110

1 a different type of administrative process, a different type of

2 exposure criteria and a different type of medical criteria in

3 some instances but not in all.

4          But in those instances they're not articulated in all

5 particulars. So, there is -- it's very difficult to go through

6 this declaration. In fact, I'll try it again, but my first run

7 through in this declaration did not enable me to go through and

8 say, "Okay, he says, for example, the meso criteria are the

9 same in the TDP system, so that's not where the issue is."

10          All right, the, you know, Level 6 is the same in the

11 TDP and the tort system, so that's not where the issue is.

12          MR. CHRISTIAN: Right.

13          THE COURT: I cannot -- I cannot replicate his

14 analysis, even in looking at the declaration. I can't figure

15 out from this declaration --

16          MR. CHRISTIAN: Let me give you an example, if I

17 might, Your Honor.

18          He says, for example, in his declaration, that a ten-

19 year latency period is not consistent with the tort system,

20 right?

21          THE COURT: He does say that.

22          MR. CHRISTIAN: The plan proponents could have some

23 in and told Your Honor that's wrong. Here's example after

24 example of where a ten-year latency period was applied. They

25 didn't do that.

1  TDP's, no experience with trusts, and in fact, that he had not

2  used any comparison with any other trusts to find out what that

3  data would have been for insurance companies in the past or in

4  the present dealing with whether or not there in fact were

5  economic losses to insurance companies from dealing with any

6  other trusts or TDP's period.  So, I have no data upon which he

7  made his comparison.

8         The, I believe, Oddi case talks about the fact that

9  an intuitive inquiry is simply not sufficient for an expert to

10  make an -- to proffer an opinion, that the expert has to set

11  forth some information specifically about the data that has

12  been used and that something more than a haphazard intuitive

13  inquiry is required.

14         Here that's essentially what we have.  Not that Mr.

15  Coleman's approach is haphazard.  He certainly had a principled

16  approach to what he did, but that principled approach is not

17  based on anything that can be stated of record.  We don't know

18  what data he looked at.

19         There are -- because he's looking at an economic

20  injury -- things that could have been done and stated to

21  actually assess what an economic analysis would be.  People can

22  forecast economic losses.  He did not attempt to do that.  He

23  simply said that the range of loss would be between the tens

24  and hundreds of millions of dollars without attempting to

25  analyze in any way whether there was a specific economic

117

1  injury.  And as a result there is simply no data on which the

2  Court can assess the reliability of what he did.

3          His opinions are nothing more than his subjective

4  beliefs.  They are unsupported evaluation, and his conclusions

5  were not generated by a reliability methodology.  As a result,

6  I find that they -- that his opinion must be stricken and he is

7  not, I think, qualified in this instance to offer an expert

8  opinion on the subject matter for which he was called.

9          So, the motion is granted.

10         MR. ALVAREZ:  Your Honor, Fred Alvarez from Mumick

11 and Leek.  Before we go on, just as a housekeeping matter.

12         THE COURT:  Yes, sir.

13         MR. ALVAREZ:  We have one of our experts who

14 unfortunately is only available today.  I've approached Mr.

15 Neal to talk about whether we can go out of order.  Apparently

16 their side's not interested in doing that.  He has -- Justice

17 Stein is the expert, Your Honor.  He had a mediation yesterday

18 where he was the mediator.  He's tied up tomorrow.  He's only

19 available today.

20         I think we're not going to finish tomorrow,

21 unfortunately.  If that's the case, we can bring him back when

22 we resume, but I just don't want his unavailability to preclude

23 him from coming back later.

24         THE COURT:  All right, is there a reason we can't

25 take Justice Stein out of order?

1          MR. GUY:  Your Honor, we have accommodated the

2    insureds on a witness that was supposedly unavailable today who

3    turned out to be available today.  And as a result all of our

4    witnesses were pushed back, all of which have their own busy

5    schedules, all of which have been waiting.  The plan supporters

6    are entitled to put their case on.  If we're not done by

7    Thursday, we hope to be done by Thursday, they can bring him

8    back.

9          Mr. Stein -- Justice Stein, I'm sorry, has the same

10   issues that Mr. Coleman had.  They were raised in the motion in

11   limine, and I don't want to take any thunder away from Mr.

12   Neal, but we've spent hours and hours and hours with Mr.

13   Coleman.  We respect that, but the ultimate conclusion of the

14   Court, which is absolutely right, is his testimony should be

15   stricken.

16          We'd like to get our case on.  Then they can present

17   their experts, if they --

18          THE COURT:  Mr. Alvarez, we will not finish tomorrow.

19   Then we'll re-open the record at some point in the future to

20   let you present Justice Stein.

21          MR. ALVAREZ:  Thank you, Your Honor.

22          MR. LOCKWOOD:  Your Honor, before you make that

23   determination, could I just suggest that we reserve -- excuse

24   me.

25          Before we make that consideration -- determination,

**J&J COURT TRANSCRIBERS, INC.**