# Exhibit C

# W. R. Grace Bankruptcy
## Report of Stephen M. Snyder

### Summary:

I understand that I will likely be called as a witness at the hearing on asbestos estimation. I intend to offer testimony about various aspects of the claims Grace faced and the defenses it and other defendants asserted in asbestos litigation, including the following:

(1)    How and when plaintiffs proved exposure and asbestos product identification in the litigation process and the exposure evidence typically required by Grace and other defendants in evaluation and settling of claims;

(2)    The nature of the evidence plaintiffs would introduce at trial on liability issues;

(3)    The chrysotile defense and why it is generally not a successful defense, even for companies who allegedly have "pure" chrysotile products;

(4)    The difficulties defendants face in defending mesothelioma cases, the limited nature of the defenses (including causation defenses) available in cancer claim cases and the results of same;

(5)    The defenses raised in non-malignant claim cases and the results of same, including lack of impairment, lack of disease, suspect or weak medical evidence, and the results of trials of asbestosis or so-called pleural plaque cases;

(6)    The medical evidence asbestos defendants would require before settling a non-malignant claim;

(7)    The risks Grace or any asbestos defendant faced in trying cases;

(8)    That W.R. Grace's ("Grace") experience in the asbestos litigation over the period (from before 1982 through 2000) it received and defended asbestos personal injury and death ("BI") claims was consistent with that of many defendants whose asbestos containing products, like Grace's, were widely distributed and used in commercial and industrial applications;

(9)     That, taken as a whole, the asbestos BI liabilities Grace resolved in settlement or otherwise short of trial—and those that it saw threatened in the future as new claims arose—reflected actual liabilities for disease caused by exposure to Grace products that would have accrued had the BI claims embodying those liabilities proceeded to trial;

(10)    That in the absence of its Chapter 11 filing in April 2001 Grace would have continued to face and accrue liabilities typical of a defendant of its general defense profile and that there are factors unique to Grace that would support the conclusion that Grace's liability exposure actually would have increased as compared to other such defendants;

(11)    That Grace benefitted substantially from the settlement programs its counsel put in place for it, particularly after 1995. Had Grace (like others, such as Owens Corning, before it had) adopted an aggressive trial strategy by refusing to settle cases unless there was undisputable evidence of product identification or exposure to the asbestos in Grace products and undisputable evidence of the presence of an asbestos-related disease (although in mesothelioma cases the fact of disease was less often disputed) the likely result would have been a tremendous increase in the number and size of jury verdicts against Grace, and ultimately in its case settlement averages and overall asbestos liability; and

(12)    That a view that has become popular in some circles that the volume of asbestos BI cases so stressed the tort system starting in the 1990's and thereafter that the system, taken as a whole, grossly overvalued the liabilities represented by claims in the tort system assumes, without support in my opinion, that a fully robust tort system with expanded capacity able to accommodate all the cases filed would have lessened the overall liability threat to and expense burden on Grace and other defendants like it.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Background and Qualifications:

I am an attorney at law and, since 1972, I have been licensed to practice in all California state and federal courts. I am a partner in the law firm of Snyder Miller & Orton LLP, which has its offices at 111 Sutter Street, San Francisco, CA, 94104.

Exhibit A to this declaration outlines my basic biographical, educational, employment and professional background and history, including the approximately 30 years I practiced law in San Francisco with the law firm of Brobeck, Phleger & Harrison, LLP ("Brobeck"). In addition to my partnership in Snyder Miller & Orton LLP, I currently remain associated with Brobeck, Phleger & Harrison as the chair of its Liquidation Committee. My present hourly fee for representing clients or for consulting or testifying as an expert is $600.

Throughout my entire career at Brobeck, starting in 1972, my practice always included to some degree defense of injury or death claims brought against Brobeck clients. Initially this was limited to maritime litigation including injury or death claims of seamen or longshoremen under the Jones Act or general maritime law. Before the end of the 1970s my practice broadened to include, among other things, defense of asbestos claims on behalf of a traditional asbestos defendant, Fibreboard Corporation (a Bay Area building products corporation which manufactured and distributed—in the West and Southwest—a line of high temperature industrial insulation products that, in the period between the late 1930s and early 1970s, contained some asbestos).

By the early 1980s, my practice became composed mainly of asbestos litigation defense work. In the years since then I have represented the following defendants in asbestos related litigation:

ACandS, Inc., Armstrong World Industries, Carey Canada Inc., Celotex Corporation, CertainTeed Corporation, Dana Corporation, Eagle-Picher Industries, Inc., Fibreboard Corporation, Flexitallic Gasket Company, Inc., Flintkote Company, GAF, Hopeman Brothers, Keene Corporation, Maremont Corporation, National Gypsum Company, Nation Service Industries, Inc., Nosroc Corporation, Nuclear & Environmental Protection, Inc., Nuturn Corporation, Owens Corning Fiberglas Corporation, Owens-Illinois, Pfizer, Inc., Pittsburgh

Corning Corporation, H. K. Porter Company, Inc., Quigley Inc., Rock Wool Manufacturing, Shook & Fletcher Insulation Company, Thorpe Insulation Company, C. E. Thurston & Sons, Turner & Newall, Unijax, Inc., Union Carbide Corporation, Union Carbide Agricultural Products Co., Inc., United States Gypsum Company, Westinghouse Corporation, Mac Arthur Co., Western Mac Arthur Co., Western Asbestos Corporation.

None of the information or opinions in this report is based on confidential communications with, or confidential information of, any of the above-listed asbestos defendants or any other of my clients.

In the period before 1986, my work for Fibreboard in the asbestos litigation involved serving as one of its national counsel in litigation directly managed by Fireman's Fund Insurance Company as lead carrier for various Fibreboard casualty insurance carriers. These carriers were defending Fibreboard claims under reservations of rights to deny coverage. Most of these carriers, including Fireman's Fund, also were in litigation with Fibreboard over this coverage in complex litigation pending in California state courts which the California Supreme Court had consolidated for all purposes (with a large number of other, similar cases) before San Francisco Superior Court Judge Ira Brown. (*Asbestos Insurance Coverage Case,* Judicial Council Coordinated Proceeding No. 1072 (California Superior Court, County of San Francisco.)). My responsibilities for Fibreboard during this period included working with other Fibreboard lawyers to monitor these insurer settlement practices as well as (a) to defend Fibreboard directly in connection with claims for punitive damages, (b) to defend Fibreboard in so-called plantworker cases (i.e., claims brought directly against Fibreboard by its former employees, each of which necessarily also included a claim to avoid the bar imposed by state workers compensation statutes), and (c) to represent Fibreboard in connection with negotiations leading to the formation, in June of 1985, of the Asbestos Claims Facility ("ACF").

The ACF was created out of the settlement between 37 asbestos "producer-defendants" and some of their insurers who had been antagonists in the asbestos insurance coverage litigation consolidated before Judge Brown in California. In the ACF, defendants

Snyder
Miller
& Orton
LLP

shared liability costs and defense resources according to predetermined formulas. The insurers, many of whom had unlimited defense obligations, benefited from the efficiency and economy this produced. For example, after the ACF began operating, the number of law firms representing these 37 defendants in asbestos cases across the country was reduced 95% from over 1200 to 60. Also, the ACF provided unparalleled opportunities to settle, in groups, large numbers of cases on behalf of multiple defendants (creating what came to be called a "one-stop shopping" discount). In the period roughly 1986-1989, within which the ACF operated, I acted as the ACF liaison counsel in Northern California, coordinating the work of three law firms defending the 37 ACF producer defendants in over 5,000 cases. I also served on the Asbestos Defense Steering Committee of the San Francisco Superior Court which, at that time, was creating general orders to manage the increasing volume of asbestos cases. The ACF defendants in Northern California tried over 100 asbestos cases to Northern California juries and were successful in obtaining court rulings and general orders that substantially diminished the proportions, compared to other U.S. jurisdictions, of marginal asbestos disease cases compared to serious (e.g., cancer) cases. Since then, of major asbestos jurisdictions, California has continued to have a case mix in which malignancy and more serious non-malignancy cases are more predominant. One result of this is that in recent years a large number of asbestos malignancies have been tried to jury verdicts in Northern California courts.

ACF defendants represented a range of asbestos defendant types, from "traditional" defendants whose products were used to insulate high-temperature, pipe-and-boiler industrial, power or marine equipment to defendants who, like Grace, mined asbestos, relied in some instances on the so-called "chrysotile defense," or whose products (including spray-on insulation products) were used mainly in commercial and construction applications.

Brobeck represented Fibreboard on the ACF board of directors. I continued to represent Fibreboard in its punitive damages defense, served on several ACF committees, and, finally, represented Fibreboard in connection with the dissolution of the ACF and the establishment of several multi-defendant nationwide counsel sharing regimes after the ACF.

In the period after 1989, in addition to representing several other asbestos defendants regionally, I served as Fibreboard's National Asbestos Litigation Coordinating Counsel for all purposes. As such I was ultimately responsible to Fibreboard for selecting all its counsel, managing the cost of defense and indemnity, and all trial and settlement decisions in hundreds of thousands of cases pending across the U.S. During this period, I also represented Fibreboard Corporation on the Defense Steering Committee of MDL 875, The Federal Court Asbestos Case Consolidation then pending before Judge Weiner in Philadelphia. After the ACF, Fibreboard had very limited resources for, and no insurer willing to manage and assume, the defense of its asbestos cases. With hundreds of Fibreboard cases set for trial each week, Fibreboard was required to resolve or try several thousand cases each quarter within its very limited resources. As a consequence, Fibreboard was required to (and relied on me and the lawyers I supervised to) devise systems to:

- monitor and track information at minimal cost for resolution of hundreds of thousands of cases pending against it across the country;
- negotiate and implement tens of thousands of settlements on terms where plaintiffs deferred all or portions of settlement payments on receipt of Fibreboard of proceeds, if any, from its coverage litigation against two remaining insurers;
- try cases Fibreboard could not settle.

In the course of representing Fibreboard after 1988, among other things, I represented Fibreboard in the design and negotiation of processing protocols and valuing matrices for settlement of over 40,000 asbestos cases and, ultimately, the trust distribution process for Fibreboard's 1993 multi-billion dollar "global" settlement between and among Fibreboard, its remaining insurers, and representatives of all present and future asbestos claims against Fibreboard. *Ortiz v. Fibreboard,* 527 U.S. 815(1999). I also studied (and

Snyder
Miller
& Orton
LLP.

6

dealt with consequences to Fibreboard and other clients) settlement protocols and matrices established by other defendants or their successor trustees.

In about 1994 I was retained as one of the counsel to Western Mac Arthur Co. and Mac Arthur Co. (collectively Western), subsidiary and parent companies, respectively, which by then each had been sued in thousands of asbestos injury and death claims. My responsibilities, and those of the other professionals at Brobeck who worked on this engagement, for the Western included not only defense of asbestos claims but, as had been the case of Fibreboard, pursuit of disputed insurance coverage needed to resolve asbestos claims and design and implementation of a strategy to resolve globally Western's coverage claims and the present and anticipated future asbestos claims against it.

Western was not a traditional asbestos defendant like Fibreboard. Fibreboard had been a so-called pipe and boiler insulation manufacturer defendant. Western, by contrast, was a distributor and applicator of asbestos containing insulation. Until the Johns-Manville Corporation ("J-M") went into bankruptcy in August, 1982, Western and its predecessor, Western Asbestos, had exclusive rights to distribute and install J-M products in Northern California and, as a result, had also been the largest exclusive distributors in the United States of insulation products of J-M. Until 1982, therefore, J-M and its insurers had absorbed most, if not all, liabilities associated with exposures to its asbestos containing products. After 1982, with J-M immunized from the rigors of the tort system by the automatic stay of its bankruptcy, plaintiffs allegedly injured by exposure to J-M products focused their attention in the tort system on other manufacturing defendants whose products they had been exposed to and on distributors and applicators, such as Western, of J-M products.

After almost a decade of effort, my representation of Western concluded in 2004 upon the consummation of Western's pre-negotiated plan of reorganization in Chapter 11 proceedings held in the United States Bankruptcy Court for the Northern District of California. On behalf of Western I negotiated the global settlement with insurers and representatives of plaintiffs which was the basis for the plan that was proposed and, as amended, ultimately approved by the Bankruptcy and District Courts in 2004. I was released from further

Snyder
Miller
& Orton
LLP

7

representation of Western by client waivers and order of the Bankruptcy Court to serve as one of the three trustees of the 524g trust (the "Western Trust") created by the Western bankruptcy plan to accept responsibility for preservation and distribution of the assets Western and its insurers contributed to the trust and for distribution of those assets in accordance with the plan, including its trust distribution procedures and matrix. I have remained a trustee since the trust was created on April 22, 2004. I now serve as its managing trustee. My responsibilities as managing trustee have required substantial effort since Western's plan was consummated implementing and administering the Western Trust trust distribution procedures and matrix.

In 1997, I again was retained in the asbestos litigation by Owens Corning, a former member of the ACF, this time as one of its national counsel after Owens Corning acquired my client Fibreboard Corporation in a cash merger. Owens Corning had emerged from the ACF in 1988 as probably the most prominent target for claimants in the asbestos litigation. Thereafter through the mid-1990s, Owens Corning spent hundreds of millions of dollars implementing defense strategies to reduce its liability profile in the asbestos litigation. Owens Corning's public disclosures in the early 1990s reported that in a single year alone the company spent about $150 million on its defense effort that combined efforts to settle large numbers of claims with providing assistance to plaintiffs' lawyers identifying evidence against other companies that plaintiffs might sue to deflect liability away from Owens Corning. Toward the end of this period, and before the cash merger with Fibreboard, Owens Corning reversed course, attempting to cut spending drastically, and stiffened its defense posture in the litigation by committing to take to trial all cases not meeting strict settlement criteria set by Owens Corning. The end result was that by 1997 Owens Corning was reporting hundreds of millions of dollars in asbestos BI judgments against it and appeals from many of of those judgments were near completion.

In the period after 1997 Owens Corning initiated its National Settlement Program which sought to settle all pending adverse judgments and put into place settlement regimes for present and future claims that held out some hope for regaining a measure of control over

8

Snyder
Miller
& Orton
LLP

the company's huge open claim backlog and its advancing trial docket. That period ended in October 2000 after Owens Corning concluded that it could not achieve a solution of its asbestos litigation problem outside bankruptcy.

On March 23, 2006, my appointment as sole Trustee of the J.T. Thorpe Settlement Trust was approved by Judge Theodore C. Albert of the United States Bankruptcy Court, Central District of California, Los Angeles Division. Like Western Mac Arthur, J. T. Thorpe was for many years a California-based refractory installer and repairer, work which involved handling and insulating materials that were resistant to very high temperatures.

Together, the Western and J.T. Thorpe trusts hold assets in excess of $1.4 billion to pay present and future asbestos BI claimants. The two trusts share claims processing staff and facilities headquartered in Reno, Nevada.

As a result of my efforts defending the asbestos defendants listed above for over 20 years, including my work during the 1990s and continuing through the early part of this decade defending Fibreboard, Western MacArthur and later Owens Corning, I have become personally informed and knowledgeable about the litigation, trial and settlement approaches of these and many other asbestos defendants, including W.R. Grace. These approaches ranged from a settlement only approach followed by companies like B&W at one extreme to "scorched earth" aggressive trial approach attempted for a time by Owens Corning about the mid-1990s at the other. Among other things, over the years I have discussed litigation issues with Grace lawyers and have followed, along with other defendants, Grace's conduct of its defense, including its trial and other wins and losses in the asbestos trade and national press.

My trustee responsibilities with the Western and J.T.Thorpe trust also have required that I continue to follow developments in the asbestos litigation.

**Data Considered and Disclosures:**

In reaching the opinions and conclusions set forth in this Report, I have considered and relied upon my over 25 years of direct involvement with the asbestos litigation as

Snyder
Miller
& Orton
LLP

9

detailed above, the facts, data and materials described in this report, and on the following

materials provided to me by counsel for the Asbestos Claimants Committee:

  1. The 7/19/02 deposition of J.W. Hughes and exhibits.

  2. The 7/18/02 deposition of John V. Port and exhibits.

  3. The 7/13/02 deposition of Thomas Florence and exhibits.

  4. The 6/20/02 deposition of Daniel Rourke and exhibits.

  5. The 9/19/02 deposition of David Siegel and exhibits.

  6. The 7/30/02 deposition of Robert Beber and exhibits.

  7. W.R. Grace Interrogatories Responses.

Within the last 15 years I have:

- Given depositions relating to asbestos litigation matters in the pending Owens

Corning bankruptcy proceedings,* in *Fibreboard v. Plant Insulation,* in *Ahearn v. Fibreboard,**

in Fibreboard's California litigation against a number of tobacco manufacturers, in the

Western's chapter 11 proceedings, and *in the JT Thorpe chapter 11 proceedings;*[1]

- Participated in or presented to panels in symposia on complex and mass tort issues

to the National Judicial Center (Effects of Complex Litigation on Individuals and Firms), the

Federal Judicial Center (Committee on Rules), DRI, in classes at the University of Texas,

Hastings College of Law and Stanford Law School.

**Opinions:**

It is my opinion to a reasonable degree of certainty that:

- Grace's experience in the asbestos litigation over the period (from before 1982

through 2000) it received and defended asbestos personal injury and death ("BI") claims

was consistent with that of many defendants whose asbestos containing products, like

Grace's, were widely distributed and used in commercial and industrial applications;

- Taken as a whole, the asbestos BI liabilities Grace resolved in settlement or

otherwise short of trial—and those that it saw threatened in the future as new claims arose—

---

[1] * denotes that testimony was given in the capacity as an expert.

Report of Stephen M. Snyder

Snyder
Miller
& Orton
LLP

1  reflected actual liabilities for disease caused by exposure to Grace products that would have

2  accrued had the BI claims embodying those liabilities proceeded to trial;

3      - In the absence of its Chapter 11 filing in April 2001 Grace would have continued to

4  face and accrue liabilities typical of a defendant of its general defense profile and there are

5  factors unique to Grace that would support the conclusion that Grace's liability exposure

6  actually would have increased as compared to other such defendants;

7      - Grace benefited substantially from the settlement programs its counsel put in place

8  for it, particularly after 1995. Had Grace (like others such as Owens Corning) adopted an

9  aggressive trial strategy by refusing to settle cases unless there was undisputable trial

10 quality evidence of product identification or exposure to the asbestos in Grace products and

11 of the presence of an asbestos-related disease (although in mesothelioma cases the fact of

12 disease was less often disputed) the likely result would have been a tremendous increase in

13 the number and size of jury verdicts against Grace, and ultimately in its case settlement

14 averages and overall asbestos liability; and

15     - A view that has become popular in some circles that the volume of asbestos BI

16 cases so stressed the tort system starting in the 1990's and thereafter that the system, taken

17 as a whole, grossly overvalued the liabilities represented by claims in the tort system

18 assumes, without support in my opinion, that a fully robust tort system with expanded

19 capacity able to accommodate all the cases filed would have lessened the overall liability

20 threat to and expense burden on Grace and other defendants like it.

21     My reasons for these opinions anchor in the history of the asbestos litigation itself and

22 include:

23     Most agree that the asbestos litigation commenced in earnest sometime in the 1970's

24 after the medical effects of heavy wartime shipyard asbestos exposures first became

25 manifest in a large scale in the workforce. There also seems to be little dispute that tens of

26 millions of American workers had been exposed extensively to asbestos in their occupations

27 from before the mid-20th century through most of the remainder of that century and that

28 these exposures produced patterns of mortality and morbidity that extend well into the 21st

presenting unprecedented challenges for any system put in place to account for and adjust claims flowing from these injuries.

The decision of the Fifth Circuit Court of Appeals in *Borel v. Fibreboard Corporation,* 493 F.2d 1076 (5th Cir. 1973), cert, denied 419 US 869 (1974) often is cited as marking the start of the rapid expansion of the asbestos litigation as a vehicle to prosecute injury and death claims of the millions of persons who had these occupational exposures to asbestos. Criticisms abound of the way that the tort system has operated since *Borel* to reach conclusions about who should pay whom, and how much, for the consequences to public health of the ubiquitous industrial uses of asbestos. *Ortiz v. Fibreboard,* 527 U.S. 815, 821 [FN1] (1999); *Amchem Products, Inc.,* v. *Windsor,* 521 U.S. 591, 598 (1997) citing Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3 (March 1991); Rand Studies, Costs of Asbestos Litigation, 1983, and Variations In Asbestos Litigation Compensation and Expenses, June 1984. The Rand Studies particularly have sought to quantify how the tort system, stressed as it has been by such a large volume of claims, failed deserving victims facing death or serious disability.

Over the years individual defendants understandably have focused more on the "who should pay" rather than on the "how much should be paid overall" part of this issue. Until 1982, the few defendants regularly sued in asbestos cases relied on J-M, the industry giant, to take the lead in the defense effort and pay the largest share of settlements in these cases. After J-M sought bankruptcy protection in August, 1982, its former competitors, suppliers, distributors and industrial consumers—all of whom remained defendants—were left to their own devices to absorb the Manville joint and several liability share and to cope with the cost and complexity of the defense effort in an environment where the number of claims being filed grew geometrically each year. When J-M sought Chapter 11 protection in 1982 there were about 20,000 cases pending against it and the score of co-defendants regularly being sued in these cases. Now, hundreds of thousands of cases pend variously against thousands of defendants and tens of thousands of new claims are brought each year.

Snyder
Miller
& Orton
LLP

With often forty or fifty defendants being sued in a typical asbestos case, and with thousands of claims being brought against multiple defendants in different courts across the country each year, problems of simply accounting for the cases themselves, let alone collecting pertinent information and evaluating and resolving them individually, for an individual defendant have been overwhelming. If each and every defendant separately obtained and evaluated—and stored—a copy of pertinent medical and employment records and attended one or two depositions in each case, it would generate costs each year that would cause the litigation to collapse of its own weight. These same circumstances made the litigation unmanageable by any individual court or defendant or, for that matter any single plaintiffs' firm, to rationalize the litigation across the nation (e.g., to contain costs, to prefer compensation for those seriously ill over those having no symptoms, to avoid win/loss lottery-type results in cases where the same information as to liability, medicine, state of the art, and exposure is being presented to different juries over and over, often with remarkably different results).

A variety of defense efforts to improve manageability (in particular, to share costs and information) followed the J-M Chapter 11 filing. Some of these bore fruit: "cost containment" defense committees cropped up in some jurisdictions; elsewhere, the courts standardized discovery at the local level so that the litigants could depend on a constant flow of more or less reliable information on pertinent issues in a standardized format with the filing of each case. Defense groups such as the ACF and, in the wake of its demise, the CCR and other inter-defendant sharing arrangements took this a step further through formalized organizations that jointly employed counsel, shared defense and indemnity costs per agreed formulas, and employed staffs to manage costs, gather and evaluate information, negotiate and process settlements, and supervise trial counsel.

One of the consequences not intended by defendants of adding efficiency and containing costs was a startling increase in the volume of cases that quickly absorbed all the new capacity that these new efficiencies had created in the tort system. The same systems that allowed defendants and courts to contain costs and accommodate the volume of claims

13

Report of Stephen M. Snyder

also allowed plaintiffs firms, without increasing *their* costs, to accept and prosecute claims for greater and greater numbers of new clients.  Streamlining the tort system made it economic to bring cases that just shortly before would have been seen as having doubtful merit. Otherwise valid but less valuable claims that plaintiffs lawyers once might have rejected because of the cost of prosecuting them to conclusion now could be brought economically in this new system with its improved efficiency.  To paraphrase one scholar, because there were many such cases waiting in the wings the asbestos litigation had "elasticity." (See, Francis E. McGovern, *The Defensive Use of Federal Class Actions in Mass Torts*, 39 ARIZ.L.REV. 595, 606 (1997).)  Jurisdictions in New York, Pennsylvania, Maryland, and California accelerated their dockets.  Courts in Baltimore, West Virginia, Texas and Mississippi fashioned mass consolidations or class actions of thousands of cases to clear backlogs of cases—and make room for more new ones.

Moreover, no matter the efficiency of the system used and the volume of cases it could accommodate, the pretrial information available—and relied upon in settlement—often changed when cases neared trial.  In preparation for trial the plaintiff invariably would spend additional money and resources to update years-old information.  Since the diseases involved were progressive and the trends in medical testimony and product identification information invariably favored plaintiffs, the result at trial too often was that the case got worse for the defense.  The lesson for the defense was too clear: make do with the pretrial information available and settle early.  Many defendants who failed to settle early and who therefore found themselves absorbing the remaining joint and several liability burden at trial learned that lesson the hard way.

The pattern of Grace's evolution as a defendant in the asbestos BI litigation was consistent with that experienced by other defendants, with the important proviso that Grace, like Owens Corning, was a national, not a regional, defendant. Early on Grace was also considered to be a "peripheral" defendant, like many other defendants (many of whom were ACF members). Initially Grace was more notable as a potential "property damage" defendant because its asbestos containing products (like those of U. S. Gypsum and National Gypsum)

14

Snyder
Miller
& Orton
LLP

had been used in construction of so many commercial and institutional buildings (e.g., the towers of the World Trade Center) that might require expensive abatement procedures to rid them of alleged asbestos safety hazards without risking the health of the abatement workers themselves. But the same product identification information that was developed early in the property damage litigation destined Grace for prominence in the BI litigation once the resources of the "first tier" defendants had been exhausted and claimants began pressing in earnest on alternative, such as commercial construction product, defendants and as disease from later year construction exposures began to manifest in worker populations.

I believe Grace's asbestos liabilities were managed by competent counsel who took Grace down one of several reasonable alternative paths available to manage Grace's liabilities under the uncertain conditions of the 1980s and 1990s. One of Grace's own descriptions of its asbestos containing products and its involvement in the asbestos litigation as of November, 1998 states, in part (Bates stamp # 109-0197; Hughes deposition, 8/21/02, Exh. 20):

> "In 1963 W. R. Grace & Co. acquired the Zonolite Co., a manufacturer of building products headquartered in Chicago, Illinois. Zonolite's principal products were an asbestos containing fireproofing material (MK-3) and various asbestos containing acoustical plasters. The fireproofing material was spray applied to the steel superstructure of multi-story buildings. The acoustical plasters were spray applied to the ceilings of rooms such as auditoriums, classrooms, gymnasium, etc. MK-3 was used for its fire retardant properties; the acoustical plasters were used as sound absorbent materials. Vermiculite was the main component of MK-3 and the acoustical plasters. MK-3 also contained approximately 12% asbestos and the acoustical plasters contained up to approximately 19% asbestos.
>
> "Zonolite operated two vermiculite mines—one in Libby, Montana and the other in Enoree, South Carolina. Grace continued the operation of these mines after acquiring Zonolite in 1963. The vermiculite ore in Libby contained small amounts of tremolite, a form of asbestos. The tremolite in the vermiculite from the Libby mine was removed in a milling process except for trace amounts. Zonolite and Grace purchased chrysotile asbestos from others for use in the manufacture of MK-3 and acoustical plasters. Neither Zonolite nor Grace mined, processed or sold asbestos.
>
> "In 1969 studies were initiated in various jurisdictions questioning the safety of asbestos containing materials and their spray application. Between 1970 and 1973 several cities banned the spray application of asbestos containing materials. In July 1973 the U.S. EPA issued a similar ban. Grace

Snyder
Miller
& Orton
LLP

15

continued to sell vermiculite products from the Libby mine until the mine was closed in 1990 since the tremolite content was not sufficient to subject such products to the EPA ban.

\*      \*      \*      \*

"It has been established that exposure to chrysotile asbestos in large doses over an extended period of time can cause serious bodily injury. A number of former manufacturers of asbestos containing materials and sellers of processed asbestos had known for many years of the harmful effects of asbestos. Many of those companies participated in studies confirming those conclusions but hid the results. Neither Grace nor Zonolite was a party to those undertakings.

"As of September 30, 1998, Grace was a defendant in approximately 45,900 asbestos-related lawsuits involving approximately 97,100 claims for personal injury. Through September 30, 1998, approximately 13,500 asbestos personal injury lawsuits involving 30,400 claims were dismissed without payment of any damages or settlement amounts (primarily on the basis that Grace products were not involved), and approximately 41,900 lawsuits involving 104,900 claims were disposed of (through settlements and judgments) for a total of $336.4 million."

Grace consultants, ARPC, in January 2001 reported (Bates stamp # 91-0427; Hughes deposition, 8/21/02, Exh. 11) that Grace had experienced the following pattern of historical BI filings against it from 1982 through and including 2000:

| Year of Receipt | Total Claims | | Year of Receipt | Total Claims |
|---|---|---|---|---|
| 1982 | 64 | | 1992 | 19416 |
| 1983 | 316 | | 1993 | 19573 |
| 1984 | 578 | | 1994 | 22595 |
| 1985 | 898 | | 1995 | 34021 |
| 1986 | 2065 | | 1996 | 41056 |
| 1987 | 4060 | | 1997 | 28038 |
| 1988 | 7817 | | 1998 | 22920 |
| 1989 | 7454 | | 1999 | 25465 |
| 1990 | 9028 | | 2000 | 44866 |
| 1991 | 16824 | | Total | 307054 |

As volumes of filings against it began to grow and as case settlement values demanded of all defendants escalated in the 1990s, Grace—like other defendants who formerly occupied "peripheral tier" status in the litigation—sought to stabilize and solidify as much of Grace's early favorable niche in the litigation with large group settlements that froze settlement values,

16

Report of Stephen M. Snyder

Snyder
Miller
& Orton
LLP

deferred filing of new claims against Grace, and generally discouraged plaintiffs firms in threatening jurisdictions from focusing their time and resources on developing further the liability case against Grace. In some cases, of course, these large group settlements occurred in jurisdictions where Grace faced increased filings and demands in the wake of significant BI trial losses that occurred mainly in the mid to latter half of the 1990s. Attachment 1 (entitled "Exhibit 2" from *W.R. Grace & Co.-Conn.'s Response to Plaintiffs' Third Request for Production of Documents and Plaintiffs' Second [sic-Third] Set of Interrogatories;* dated 9/10/02) is a chart of a Grace interrogatory response listing and summarizing certain aspects of those mass settlements. Attachment 2 (see, Hughes deposition, 7/19/02, Exh. 2) is a list—another Grace interrogatory response—purporting to report Grace BI settlements after judgments from and after the late 1980's.

Grace's trial results were not unusual for a defendant that had enjoyed an early "peripheral" role in the litigation. It included many "wins", often in non-malignancy cases, but also some spectacular losses in malignancy and even some non-malignancy cases. For many of the same reasons as applied to Fibreboard, Western, and Thorpe as outlined above, Grace faced a discouraging risk calculus that led to the inevitable conclusion that even if it won the majority of the cases it tried, it still would risk ruin because of the sheer volume of cases coming onto court dockets and the daunting spectre of escalating verdict values—particularly in cancer cases but even in non-malignancy cases—and the uncontrollable costs associated with any regime in which it undertook to prepare every case filed against it as if for trial.

Grace's matrix mass settlement agreements were consistent with the types of agreements many defendants faced with increasing settlement demand values and claims volumes were seeking to obtain with the more significant national asbestos plaintiffs lawyers in the period of and shortly after the 1990's. For example, the Grace agreements typically contained provisions (that were sensible and reasonable under the circumstances) that:

1. sought to control "leakage" (i.e., migration of more valuable and threatening claims out of the limitations of the agreement back onto trial dockets) by requiring, as

17

Snyder
Miller
& Orton
LLP

permitted by professional ethics, all claims in a given jurisdiction or a given firm (or, if the firm split up or dissolved, claims formerly handled by that firm) be included in the settlement;

2. sought, through claims documentation and, in some cases, neutral ADR provisions, to limit settlement payments to claimants with evidence of occupational exposure to Grace asbestos-containing products and a medical diagnosis of one of several asbestos-related diseases;

3. sought to control monetary and case flow volumes by limiting the number of claims to be liquidated or amounts of money to be paid by Grace under the agreement for specified periods;

4. sought to "freeze" settlement values in the face of inflationary forces and ever-tightening squeeze of the joint and several liability system operating in the asbestos litigation system by imposing static matrix settlement values on large numbers of cases, in many instances filed over a number of years, and even, in some instances, extending to claims yet to be filed;

5. through new filing moratoria sought to prevent—or at least forestall—the growing phenomenon in the asbestos litigation whereby any mechanism that successfully resolved a large number of claims otherwise backed-up in the system would be followed soon by a new, even larger wave (sometimes called a "spike") of filings.

In my view these large group settlements were reasonable defense measures appropriate to the circumstances and substantially benefited Grace within the limits of what was possible in this litigation at the time these agreements operated.

These settlements also were particularly important to Grace—as distinguished from some other defendants with litigation profiles otherwise similar to Grace—at this time because of circumstances that substantially increased the likelihood that Grace would become a major target defendant in the next phase of the litigation. For example, Grace was not just a manufacturer of products that incorporated into its products asbestos fibers purchased from others. Grace was itself a miner of asbestos <u>and</u> of other minerals (e.g.,

18

Snyder
Miller
& Orton
LLP

vermiculite) which in certain instances were contaminated with asbestos fibers. Asbestos miners figure prominently in the asbestos litigation because of the widely held belief that most miners knew about the dangers of asbestos earlier than other industrial sectors and yet failed to take preventative steps or make needed disclosures as their "products" trickled through the chain of distribution. The contaminant fibers (tremolite) found in vermiculite taken from Grace's Libby, Montana mine were not of the chrysotile type found in most asbestos applications but were amphibole fibers thought by some to be more dangerous when inhaled or ingested. The revelations about Grace's vermiculite mining in Libby, Montana—because of the incidence of disease detected in and around Libby and elsewhere where Libby-mined vermiculite was transported and processed—were sensationalized in the press after allegations were made that Grace had, indeed, conducted animal studies that had yielded positive results which allegedly were not disclosed to the EPA or others, that that Grace had concealed the actual asbestos content in Grace's vermiculite, and that Federal criminal indictments naming Grace had been brought. Equally sensational were disclosures that Libby Vermiculite being distributed for insulation use was not just going into commercial, industrial, and institutional buildings. It was going to hundreds of thousands of ordinary consumers as home attic insulation.

The joint and several liability system is one where the plaintiff makes the ultimate decision which of several potentially responsible parties to pursue for a full recovery. Not surprisingly plaintiffs customarily seek out the path of least resistance to their goal. Grace's status as an asbestos miner and the widely publicized *allegations* regarding its conduct in Libby and relating to Libby mined vermiculite, without more and regardless of their truth, increased substantially the likelihood that plaintiffs would have chosen Grace as a front line defendant in the asbestos litigation had it not sought the protections of Chapter 11. Partly this would be so because of the sensational and widely publicized nature of the Libby facts and allegations. But it also was true because of their unique particulars. By the late 1960s to early 1970s most insulation manufacturers had put as much distance as possible between themselves and the production and distribution of products containing asbestos. Many of

Snyder
Miller
& Orton
LLP

these had actually begun placing warning labels on their insulation products by the mid-1960s. The major state-of-the-art and culpable knowledge courtroom battles that occurred early in the asbestos litigation revolved around whether (especially in cases involving minimal exposure) these defendants knew or should have known (e.g., by 1966) that their products were capable of causing cancer. By contrast, the facts about Grace and Libby seemed to paint a picture of a traditional miner of asbestos and a long-time asbestos insulation and other product manufacturer continuing to distribute to ordinary consumers as well as to other manufactures asbestos-containing materials well into the 1990s (i.e., well beyond the reach or protections of any state-of-the art defense known to or relied upon by defendants in this litigation). From the perspective of a knowledgeable asbestos advocate— either for plaintiffs or even for co-defendants seeking to deflect responsibility onto other defendants—these facts, if provable at trial, themselves would make Grace a prime front line defendant candidate.

Quite apart from these unique circumstances, by the late 1990s Grace along with all other defendants still out of bankruptcy at the time had to face up to the prospect that much of the money they had just spent resolving large groups claims would be reinvested by the trial bar to finance prosecution of the next, larger wave of claims.

Grace received over 44,000 new claims in 2000, almost five times the number of new claims it had received ten years earlier in 1990 and more than a 75% increase over the 25,465 claims received the year previous. Regardless whether 2000 was a "catch up" year or spike produced by release of cases backlogged against earlier Grace settlement moratoriums, this increase was a significant indicator that Grace could expect to receive large volumes of claims notwithstanding the earlier good work of its managers to stay the tide of increased filings. This conclusion is fortified by the fact that other defendants were experiencing substantial increases in claims volumes during this same period.

From the deposition transcripts I have reviewed it is apparent that Grace joined some other defendants in casting the blame for this avalanche of liability on the insufficiency and inadequacies of the tort system and on the chicanery of unscrupulous lawyers and doctors

taking advantage of a system so overwhelmed, it was claimed, that it had lost its ability to discriminate good cases from bad ones. Among other things, these complaints gave rise to assertions such as the following:

  i)     If the overwhelmed tort system was limited just to resolving the claims of the dead and of those with terminal disease or disease that involved measurable impairment then defendants, such as Grace, would be able to survive the litigation because it only would be paying to resolve a much smaller number of claims.

  ii)    If the overwhelmed tort system just had the capacity to deal with all claims individually, in traditional fashion, so that defendants could put on their defenses properly, on a case-by-case basis, then defendants like Grace would be able to survive the litigation by asserting those defenses to drive out bad claims.

As sympathetic as any long-time defense lawyer might be with these complaints, I am of the view that they fail to deal satisfactorily with the following significant and unavoidable facts:

  1)     Tens of millions of American workers were occupationally exposed to asbestos in their workplaces through most of the 20th century. Neither government regulators, the World Health Organization, nor many of the jurors that hear these cases seem prepared to conclude that there is a minimum safe threshold exposure to asbestos for exposed workers. Said another way, a substantial number of these tens of millions of exposed workers have or will have claims of sufficient merit to convince juries to award damages.

  2)     Some jurisdictions have, in fact, adopted priorities that at least give trial preference to cases involving dying or seriously diseased and impaired plaintiffs. Examples include California courts which do so as a matter of statute and rule and New York State Supreme Courts in Manhattan which did so as a matter of judicial management. In both instances, these priority regimes have produced in recent years some of the highest verdict values in the United States for cases involving asbestos death and serious asbestos disease cases. Ten years ago a $5 million dollar verdict in a living mesothelioma case was considered

Snyder
Miller
& Orton
LLP

Report of Stephen M. Snyder

to be a large verdict in Northern California. Now juries in Northern California return verdicts in excess of $25 and $30 million in such cases. These developments actually have increased, rather than relieved, pressure from the litigation on front line defendants and seem to suggest that the real losers in a tort system swamped by large numbers of marginal disease claims are not the front line defendants who can leverage crowded docket backlogs into mass settlement deals for negotiated rates but plaintiffs with terminal asbestos disease who cannot get access to judicial and professional resources needed to realize on the true value a jury arguably would place on their claim if it were adequately presented.

3) The need to set priorities or impose preferences as in New York and California would go away, of course, if the capacity of the judicial system were expanded to accommodate all asbestos cases of whatever type. I am not aware of any examples where that has been done. However, I am aware of many situations where juries have returned substantial verdicts for occupationally exposed plaintiffs suffering little or no impairment on the strength of evidence that these diseases are progressive in nature and that the plaintiff's disease and exposure has increased his risk of death or disability from cancer in one form or another. The lesson from even a hit-and-miss record for these types of cases is that at least at some level so-called "non-impairment" cases have verdict potential and, therefore, settlement value in the tort system. I do not believe that any rational defendant wishing to limit its exposure to liability in this system would strongly advocate spending public money to increase the capacity of the tort system to allow for individual preparation and adjudication of each of these so-called "non-impairment" claims. Said another way, I have not seen the evidence that proves that Grace would not prefer the mass settlement deals that it made in the last 10 years to the overall result that would be achieved if the tort system were expanded to adjudicate all these claims in traditional fashion.

Date: September 15, 2006

By: _Stephen M. Snyder_
Stephen M. Snyder

Snyder
Miller
& Orton
LLP

22

*Exhibit A*

**Stephen M. Snyder, Esq.**
*Snyder Miller & Orton LLP*
111 Sutter Street, Suite 1950
San Francisco, CA 94104
Telephone: 415-962-4400
Facsimile: 415-962-4401
ssnyder@smollp.com

Born: December 3, 1942, Long Beach, California

*Education*
J.D., with distinction, Cornell Law School, 1972
Note Editor, *Cornell Law Review*
Order of the Coif
M.P.A., Cornell University, 1971
B.A. with high honors, University of California at Santa Barbara, 1965

*Admitted*
Admissions to practice: United States Supreme Court, all California State and Federal courts; the United States Tax Court; the United States Claims Court; and the United States Court of Appeals for the Fifth Circuit

*Bar and Professional Associations*
American Bar Association; State Bar of California (#54598); Bar Association of San Francisco; Fifth Circuit Bar Association

*Professional Employment*
Snyder Miller & Orton LLP -- Partner, December 2003 to present
Morgan, Lewis & Bockius, LLP -- Of Counsel, February 2003 to December 2003
Brobeck, Phleger & Harrison, LLP, 1972-1975; 1977-2003; Chair of the Firm, 1996-1998; Head of Products Liability, Environmental and Insurance Coverage Litigation Groups, 1994-1996; Litigation Group Leader, 1991-1994; Partner, 1979 to February 2003; Associate, 1972-1975; 1977-1979

*Other Positions, Posts and Affiliations*
Assistant Professor of Law, Northwestern University of Law, 1975 to 1977; Chair, Liquidation Committee, Brobeck, Phleger & Harrison, LLP, February 2003 to present; Managing Trustee, Western Asbestos Settlement Trust, April 2004 to present; Trustee, J.T. Thorpe Settlement Trust, 2006 to present.

*Military Service*
United States Marine Corps Reserve, active duty: 1965-1968

*Community Service*
Board Member: Bar Association of San Francisco, 1998-2000; San Francisco Embarcadero YMCA, 1995 to present (Chair 2003 - 2005); Board member The Danny Foundation for nursery product safety, 1986 to 2005; Trustee, Dominican School of Philosophy and Theology of the Graduate Theological Union, 1996-2002

*Lecturing History*
Teaching Committee, Federal Practice Program, Northern District of California; Member, Teaching and Demonstrating Faculty, National Institute of Trial Advocacy; National Advanced, Regional Advanced and Teacher Training Programs, Hastings College of the Law; Trial Advocacy programs, Stanford Law School; Assistant Professor of Law, Northwestern University of Law, 1975- 1977

## EXHIBIT 2

### Grace Response To  Plaintiffs' Third Set of Interrogatories to W. R. Grace - Dated Aug 12, 2002 - Interrogatory No 3

| Plaintiffs' Asbestos Personal Injury Law Firm | Date Moratorium Agreement Entered Into During January 1, 1998 to March 31, 1998 | Number of Claims or Cases Subject to Agreement | Moratorium Time Period | Number of New Claims Filed Against Grace by Plaintiffs' Personal Injury Law Firm During Each Calendar Year After Moratorium Period Expired | | | TOTAL BY LAW FIRM |
|---|---|---|---|---|---|---|---|
| | | | | 1999 | 2000 | 2001 (up to 2/7/01) | |
| Baron & Budd, P C, 3102 Oak Lawn Ave, Ste 1100, Dallas, TX 75219 | December 1, 1997 | 9,854 | December 1, 1997 to November 30, 1999 | 854 | 3,978 | 988 | 5,820 |
| Goldberg, Persky, Jennings & White, P C, 1030 Fifth Ave, 3rd Flr, Pittsburgh, PA, 15219 | October 16, 1997 | 6,124 | October 16, 1997 to December 31, 1999 | 21 | 140 | 380 | 841 |
| Nix Nix Law Firm, 205 Linda Dr, Dangerfield TX 75638 | December 31, 1998 | 3,671 | December 31, 1998 to December 31, 1999 | 0 | 2 | 67 | 69 |
| Provost & Umphrey, L L P, 490 Park St, Beaumont, TX 77701 - TX cases and Non-TX cases | December 31, 1998 | 5,955 | December 31, 1998 to December 31, 1999 | 248 | 271 | 0 | 519 |
| Williams & Bailey, L L P, 8441 Gulf Freeway, Ste 600, Houston, TX 77017 | November 30, 1998 | 14,720 | November 30, 1998 to December 31, 1999 | 485 | 598 | 135 | 1,218 |

ATTACHMENT 1

Grace Response To  Plaintiffs' Third Set of Interrogatories to W. R. Grace - Dated Aug. 12, 2002 - Interrogatory No. 2

| Plaintiffs' Asbestos Personal Injury Law Firm | Date Mass Settlement Entered Into | Actual Number of Claims or Cases Paid | Actual Dollars Paid by Grace to Plaintiffs' Asbestos Personal Injury Law Firm | Number of Claims or Cases Resolved by Agreement |
|---|---|---|---|---|
| Nix - Nix Law Firm, 205 Linda Dr., Dangerfield, TX 75638 | December 31, 1996 | 3,671 | $9,800,600 | 3,671 |
| Norris, Morris, Salcaliaños & Phelps, 201 Hardy St., Hattiesburg, MS 38401 | January 14, 2000 | included in above Morris Sakalarios et al  amount | included in above Morris Sakalarios et al  amount | |
| Provost & Umphrey, L.L.P, 490 Park St., Beaumont, TX 77701 - TX cases and Non-TX cases | December 31, 1996 | 5,855 | $14,432,300 | 5,855 |
| Reaud, Morgan, & Quinn, Inc., 801 Laurel Ave., Beaumont, TX 77701 - AL & TX cases | September 21, 2000 | 7,152 | $53,367,504 | 8,249 |
| Robles - Louis S. Robles, P.A., One Bayfront Plaza, 100 South Biscayne Blvd., Miami, FL 33131, Mellon Bank, 1399 SW 1 Ave., Miami, FL 33130 | April 5, 2000 (Mellon Bank Assignment - Apr. 17, 2000 & Aug. 28, 2000) | 1,397 | $7,611,695 | 5,292 |
| Scruggs, Millette, Bozeman & Dent, 734 Delmas Ave., Pascagoula, MS 39568, Cumbest, Cumbest, Hunter & McCormick, P.O. Box Drawer 1287, Pascagoula, MS 39568, Benton, Esq., Paul T., P.O. Box 1341 Biloxi, MS 39533, Lewis & Lewis, 519 First St., Clarksdale, MS 38614, Rhoden, Lacy, Downey & Colbert, P.O. Box 18845, Jackson, MS 39203 | January 28, 1999 | 2,482 | $3,810,350 | 2,482 |
| Taylor & Cire, One Allen Center, 500 Dallas, Ste 3400, Houston, TX 77002, Cox and Cox, LLP, 4500 Six Forks Rd., Ste 720., P.O. Box 10666, Raleigh, NC 27619 | Nov./Dec. 1999 | 4,143 | $10,124,400 | 4,143 |

Grace Response To  Plaintiffs' Third Set of Interrogatories to W  R  Grace - Dated Aug  12,  2002 - Interrogatory No  2

| Plaintiffs' Asbestos Personal Injury Law Firm | Date Mass Settlement Entered Into | Actual Number of Claims or Cases Paid | Actual Dollars Paid by Grace to Plaintiffs' Asbestos Personal Injury Law Firm | Number of Claims or Cases Resolved by Agreement |
|---|---|---|---|---|
| Weitz & Luxenberg, P C , West Fulton St, NY, NY 10038 | 1997 (incl  1992-1997 claims, actual sqt  8/14/92) | 5,820 | $18,282,500 | 5,820 |
| Williams & Bailey, L L P , 8441 Gulf Freeway, Ste 600, Houston, TX 77017 | November 30, 1996 | 14,720 | $27,769,280 | 14,720 |



## Asbestos Bodily Injury Cases with a Judgement Settlement

| | Case Id | Party Full Name | Plaintiff Vendor | Vendor City | Vendor State | Court Name | Court State | Docket Number | Disposed Date | Disposed Amount | Illness | Illness 2 | Illness 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | 83-00271 | Bill D. Webb | Sish & Fales | Barnwell | SC | United States District Court/Southern District/Ohio | OH | C2832211 | 4/28/1989 | $0.00 | ASB | | |
| (2) | 85-01659 | Melvin Ozman | Brayton Purcell | Novato | CA | Superior Court of Solano County California | CA | | 11/17/1988 | $0.00 | ASR | | |
| (3) | 85-01683 | John J. Mahl | Thornton & Early | Boston | MA | United States District Court/New Hampshire | NH | C86448L | 11/17/1988 | $0.00 | MES | | |
| (4) | 86-02644 | Joseph Cunius | Greitzer & Locks | Philadelphia | PA | United States District Court/Middle District/Pennsylvania | PA | | 10/4/1990 | $0.00 | ASB | | |
| (5) | 86-02818 | James E. Jones | Segal, Isenberg, Sales, Stewart & Cutler | Louisville | KY | Circuit Court of Jefferson County Kentucky | KY | | 2/9/1990 | $0.00 | ASR | | |
| (6) | 86-03133 | Arvid O. Lewison | Craft, Thompson & Boechler, P.C. | Fargo | ND | District Court of Cass County North Dakota | ND | A388185 | 4/23/1990 | $0.00 | MES | | |
| (7) | 86-04141 | Paul R. Gudek | Goldberg, Persky, Jennings & White | Saginaw | MI | Court of Common Pleas of Allegheny County Pennsylvania | PA | | 4/18/1994 | $0.00 | ASB | | |
| (8) | 87-04683 | Robert VanBalen | Brayton Purcell | Novato | CA | Superior Court of Solano County California | CA | 86105 | 11/1/1991 | $0.00 | OTC | | |
| (9) | 87-06626 | Thomas Waters | Colson, Hicks, et al. | Coral Gables | FL | District Court of Appeals for Third District of Florida | FL | 902010 | 10/28/1994 | $879,072.25 | ASB | | |
| (10) | 87-08011 | Clovis E. Daniel | Greitzer & Locks | Philadelphia | PA | Supreme Court of New York County New York | NY | 1439195 | 3/28/1993 | $0.00 | LNG | | |
| (11) | 87-06082 | Giovanni S. Santoro | Weitz & Luxenberg P.C. | New York | NY | Supreme Court of New York County New York | NY | 898188 | 3/18/1993 | $0.00 | ASR | | |
| (12) | 87-06746 | Russell M. Snyder | The Law Firm of Hal Pitkow | Titusville | NJ | United States District Court/Middle District/Pennsylvania | PA | 878300 | 10/26/1989 | $0.00 | ASR | | |
| (13) | 87-07791 | Robert VanBalen | Brayton Purcell | Novato | CA | Superior Court of Solano County California | CA | 87890 | 11/1/1991 | $0.00 | LNG | | |
| (14) | 88-00097 | David H. Powell | Law Offices of Peter G. Angelos | Baltimore | MD | Circuit Court of Washington County Maryland | MD | 18503 | 10/31/1990 | $0.00 | LNG | | |
| (15) | 88-09159 | Calvin L. Haines | Law Offices of Peter G. Angelos | Baltimore | MD | Circuit Court of Washington County Maryland | MD | 18506 | 10/31/1990 | $0.00 | ASR | | |
| (16) | 88-12016 | Francis G. Adelsberger | Law Offices of Peter G. Angelos | Baltimore | MD | Circuit Court of Washington County Maryland | MD | 18516 | 10/31/1990 | $0.00 | OTC | | |
| (17) | 88-12173 | Earle R. Lewis | Law Offices of Peter G. Angelos | Baltimore | MD | Superior Court of the District Of Columbia Washington DC | DC | 86CA3230 | 4/24/1992 | $0.00 | ASR | | |
| (18) | 88-12640 | John C. Burdock | Law Offices of Peter G. Angelos | Baltimore | MD | Circuit Court of Washington County Maryland | MD | 18518 | 10/31/1990 | $0.00 | OTC | | |
| (19) | 88-12749 | Richard Greenlee | Attorneys at Law | Little Rock | AR | United States District Court/Eastern District/Arkansas | AR | | 7/10/1989 | $0.00 | ASB | | |
| (20) | 88-12769 | Herman L. Blakeley | James Madison | | | United States District Court/Western District/Louisiana | LA | 881324 | 1/28/1990 | $0.00 | UNK | | |
| (21) | 88-14564 | Donald E. Seelover | Shepard Hoffman Law Office | Baltimore | MD | United States District Court/Middle District/Pennsylvania | PA | 1CV880843 | 6/18/1993 | $291,284.19 | | | |
| (22) | 88-14602 | Raymond W. Lensbaugh | Paul Reich & Myers P.C. | Philadelphia | PA | United States District Court/Middle District/Pennsylvania | PA | 888438 | 8/2/1991 | $0.00 | PLT | | |
| (23) | 88-14642 | Homer H. Roberts | Evans Feist | | | United States District Court/Western District/Louisiana | LA | 881321 | 7/28/1990 | $0.00 | | | |
| (24) | 88-14643 | Kennie L. Thompson | Evans Feist | | | United States District Court/Western District/Louisiana | LA | 881184 | 7/28/1990 | $0.00 | | | |
| (25) | 89-01183 | Joseph Perry | Tichey, Haft, Kopil Fanning & Sasso | Newton | PA | Court of Common Pleas of Bucks County Pennsylvania | PA | 8890418122 | 4/21/1992 | $0.00 | ASB | | |
| (26) | 89-19731 | Lawrence O. Wilson | Rotko Creshoff | | | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 5140 | 3/8/1994 | $0.00 | ASB | | |
| (27) | 90-02931 | James L. Bessman | Davenport Evans | | | United States District Court/South Dakota | SD | CIV903001 | [illegible] | $332,000.00 | MES | | |
| (28) | 90-03465 | Steve Zagar | Walter L. Floyd, Inc. | St. Louis | MO | United States District Court/Eastern District/Missouri | MO | 90018104 | 2/1/1991 | $0.00 | ASB | | |
| (29) | 90-03477 | Franklin Mauls | Brookman Rosenberg Brown & Sandler | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 1994 | 10/7/1994 | $0.00 | PLC | | |
| (30) | 90-06266 | Harry M. Kinsey | Thomas J. Young | Indianapolis | IN | United States District Court/Southern District/Indiana | IN | IP901382C | 1/30/1995 | $0.00 | MES | | |
| (31) | 90-06613 | Billy L. Barber | Lansdale & Kneip | Tucson | AZ | Superior Court of Pima County Arizona | AZ | 282436 | 6/23/1991 | $0.00 | MES | | |
| (32) | 90-07367 | Peter Gravina | David M. Lipman, P.A. | Miami | FL | United States District Court/Southern District/Florida | FL | 901815 | 2/19/1991 | $0.00 | ASR | | |
| (33) | 90-07707 | Alois H. Hoell | Law Offices of Michael P. Cascino | Chicago | IL | Circuit Court of Sheboygan County Wisconsin | WI | 90CV0667 | 3/17/1992 | $0.00 | ASB | PLT | |
| (34) | 90-08688 | Peter Roe | Pozzi, Wilson, Atchison | Portland | OR | United States District Court/Oregon | OR | 901183PA | 6/9/1996 | $0.00 | ASR | | |
| (35) | 91-00825 | Loretta Beragda | David M. Lipman, P.A. | Miami | FL | District Court of Appeals for Third District of Florida | FL | 9101959 | 6/8/1994 | $0.00 | MES | | |
| (36) | 91-02353 | Graham C. Lacey | Robles & Gonzalez, P.A. | Miami | FL | Circuit Court of Hillsborough County Florida | FL | 8820134H | 3/1/1992 | $0.00 | MES | ASR | PLT |
| (37) | 91-02366 | Joseph J. Diaz | Robles & Gonzalez, P.A. | Miami | FL | Circuit Court of Hillsborough County Florida | FL | 8819883F | 11/1/1991 | $0.00 | MES | ASR | PLT |
| (38) | 92-01569 | Arthur J. Dougherty, Jr | Robles & Gonzalez, P.A. | Miami | FL | Circuit Court of Hillsborough County Florida | FL | 921712 | [illegible] | [illegible] | ASR | [illegible] | |
| (39) | 92-01709 | Lewis Jewell | Provost & Umphrey | Beaumont | TX | District Court of Harris County Texas | TX | 9209804 | 4/20/1994 | $0.00 | | | |
| (40) | 92-04577 | Edward Harashe | Ness Motley Loadholt Richardson & Poole P.A. | Charleston | SC | United States Circuit Court of Appeals/[illegible] | MO | 91474 | 3/9/1993 | $2,409,320.00 | | | |
| (41) | 92-05747 | Earl Pyke | Ferraro & Associates, P.A. | Miami | FL | District Court of Appeals for Third District of Florida | FL | | 12/8/1995 | $38,455.00 | ASB | | |
| (42) | 92-06813 | Sidney Morse | Robles & Gonzalez, P.A. | Miami | FL | District Court of Appeals for Third District of Florida | FL | 932341 | 8/9/1993 | $0.00 | ASR | | |
| (43) | 92-01518 | David Talackine | Robles & Gonzalez, P.A. | Miami | FL | Circuit Court of Dade County Florida | FL | 9223338 | 3/18/1999 | $0.00 | LNG | | |
| (44) | 92-06832 | Hutch Wilson | Robles & Gonzalez, P.A. | Miami | FL | Circuit Court of Broward County Florida | FL | 9228834 | 3/18/1995 | $0.00 | ASR | | |
| (45) | 93-00940 | Thomas Cardenas | Williams & Trine, P.C. | Boulder | CO | District Court of Boulder County Colorado | CO | 93CV582 | 12/7/1995 | $0.00 | MES | | |
| (46) | 93-08350 | Murray Taylor | Paul Reich & Myers P.C. | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 970 | 10/16/1995 | $0.00 | ASR | | |
| (47) | 93-10308 | Tyers Raymond Isbell | Reaud Morgan & Quinn | Beaumont | TX | District Court of Orange County Texas | TX | A930553C | 4/15/2001 | $60,000.00 | MES | | |
| (48) | 93-11388 | Franklin J. Ovesny | Silber Pearlman | Dallas | TX | District Court of Galveston County Texas | TX | [illegible] | [illegible] | $400,000.00 | MES | | |
| (49) | 94-00013 | Jimmie L. Bales | Silber Pearlman | Dallas | TX | District Court of Galveston County Texas | TX | 93CV1471 | 4/5/1995 | $1,200,000.00 | MES | | |
| (50) | 94-02427 | Elby L. Williams | Baron & Budd | Dallas | TX | District Court of Dallas County Texas | TX | 9403887 | 8/29/1995 | $1,378,372.80 | MES | | |
| (51) | 94-02437 | James B. Norsworthy | Baron & Budd | Dallas | TX | District Court of Dallas County Texas | TX | 9403897 | 8/29/1995 | $1,035,368.00 | ASB | | |
| (52) | 94-02746 | James C. Chaney | Baron & Budd | Dallas | TX | District Court of Dallas County Texas | TX | 944833 | 8/29/1995 | $1,240,000.00 | MES | | |
| (53) | 94-02853 | Louis Digeambeardino | Greitzer & Locks | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 3327 | 1/8/1998 | $100,000.00 | ASB | | |
| (54) | 94-03736 | A. B. Tuck | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (55) | 94-03756 | Benjamin S. Holder | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (56) | 94-03746 | Dannie McCovery | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (57) | 94-03755 | Earl D. Zahnd | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (58) | 94-03756 | Frank Hurst | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (59) | 94-03765 | Henry L. Barnett | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | LNG | | |
| (60) | 94-03765 | Herman Caudle | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (61) | 94-03735 | Hershel R. Pounders | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (62) | 94-03755 | Hubert W. Blankenship | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (63) | 94-03766 | Joseph M. Loggins | Baron & Budd | Dallas | TX | District Court of Nueces County Texas | TX | 943959A | 1/27/1998 | $0.00 | ASB | | |
| (64) | 94-07292 | Andrew C. Shepler | Greitzer & Locks | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 1610 | 1/8/1998 | $848,000.00 | ASB | | |
| (65) | 95-01281 | Aaron C. Edwards | Reaud Morgan & Quinn | Beaumont | TX | District Court of Jefferson County Texas | TX | B150656 | 3/2/2000 | $9,855,000.00 | | | |
| (66) | 95-01281 | Edward E. Storey | Reaud Morgan & Quinn | Beaumont | TX | District Court of Jefferson County Texas | TX | B150656 | 3/2/2000 | $1,255,000.00 | | | |
| (67) | 95-01281 | James T. Beam | Reaud Morgan & Quinn | Beaumont | TX | District Court of Jefferson County Texas | TX | B150656 | 3/2/2000 | $1,255,000.00 | | | |
| (68) | 95-01281 | Jessie J. Williamson | Reaud Morgan & Quinn | Beaumont | TX | District Court of Jefferson County Texas | TX | B150656 | 3/2/2000 | [illegible] | | | |
| (69) | 95-01281 | John M. Thomas | Reaud Morgan & Quinn | Beaumont | TX | District Court of Jefferson County Texas | TX | B150656 | 3/2/2000 | $5,107,812.78 | | | |
| (70) | 95-02772 | Merlin Rise | Brookman Rosenberg Brown & Sandler | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 9504961 | 9/11/1997 | $0.00 | ASR | | |
| (71) | 95-09397 | Patrick Boyle | Sieben Polk LaVerdiere Jones & Hawn | Hastings | MN | District Court of Hennepin County Minnesota | MN | | 6/14/1996 | $300,000.00 | MES | | |
| (72) | 96-10340 | Lester L. Skramstad | McGarvey Heberling Sullivan & McGarvey | Kalispell | MT | District Court of Lincoln County Montana | MT | DV98137 | 2/12/1998 | $550,000.00 | ASB | | |
| (73) | 96-00181 | George W. Robertson | Paul Reich & Myers P.C. | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 95121774 | 6/23/1997 | $0.00 | LNG | | |
| (74) | 96-00288 | Edward D. Bauerwine | Paul Reich & Myers P.C. | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 95122058 | 6/23/1997 | $0.00 | ASR | | |
| (75) | 96-06346 | Braxton Colley | Ness Motley Loadholt Richardson & Poole | Barnwell | SC | Circuit Court of St. Louis City County Missouri | MO | [illegible] | 6/27/1998 | $3,600,000.00 | MES | | |
| (76) | 96-06834 | Craig Baker | George W. Howard III | Philadelphia | PA | Court of Common Pleas of Philadelphia County Pennsylvania | PA | 9608000088 | 2/18/1998 | [illegible] | MES | | |
| (77) | 98-08306 | Margaret Vatland | McGarvey Heberling Sullivan & McGarvey | Kalispell | MT | District Court of Lincoln County Montana | MT | DV96170 | 12/30/1996 | $280,000.00 | ASB | | |
| (78) | 98-02685 | Kenneth R. Finstad | McGarvey Heberling Sullivan & McGarvey | Kalispell | MT | District Court of Lincoln County Montana | MT | DV96139 | 3/17/1998 | $413,000.00 | ASB | | |
| (79) | 99-05760 | Robert W. Gabbard | Cascino Vaughan Law Offices | Chicago | IL | United States District Court/Central District/Illinois | IL | 962140 | 2/17/2000 | $0.00 | ASR | | |

Δπ EXHIBIT 2
Deponent Hughes
Date____ Rptr____
www.depobook.com

ATTACHMENT 2