IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Objection Deadline: April 1, 2008 at 9:00 a.m.** |
| | | **Hearing Date: March 28, 2008 at 12:00 noon** |
| | | **Re: Docket No. 17550** |

## DEBTORS' MOTION IN LIMINE TO EXCLUDE TESTIMONY
## FROM CLAIMANTS' WITNESS PETER KRAUS

Peter Kraus should be barred from testifying at trial. After strenuously objecting to

disclosure of the testimony it intended to offer in the estimation, on December 21, 2007, as

ordered by this Court, the ACC provided a detailed recitation of the topics to which its "lawyer

fact witnesses" -- including Peter Kraus and others -- are expected to testify. (*See* 12/21/07

Official Comm. of Asbestos Personal Injury Claimants List of the Witnesses That It Intends to

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a
Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc.,
W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-
Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company

Call at the Hearing for the Estimation of Asbestos Personal Injury Liabilities ("PI Wit. Disclosure") [Dkt. No.17692]) (Ex. A)  Document requests and a discovery deposition of Mr. Kraus now have taken place.  The results are unsurprising -- privilege objections and instructions have turned his evidence into Swiss cheese.  What is left are general "expert" pontifications passing as factual testimony, the materiality of which to any issue before the Court is obscure and of which meaningful cross-examination is impossible.

## **BACKGROUND**

In September 2007, the ACC announced that it will call lawyers such as Peter Kraus as part of its case-in-chief.  Upon receipt of this information, Grace issued subpoenas seeking documents related to the topics it believe may be the subject of the lawyer-witnesses' testimony and depositions.  Specifically, Grace's document requests sought:  documents relating to the witnesses' anticipated testimony; documents relating to the witnesses' law firms' settlements with Grace; documents relating to the witnesses' law firms methods for obtaining product identification and exposure evidence; and documents relating to the methods used by the plaintiffs' law firms to complete the Grace PIQ, including the methods used to develop product identification and exposure evidence.  (*See generally* Subpoena Issued to Peter Kraus) (Ex. J) Kraus -- like the other lawyer witnesses -- objected to the documents requests and refused to produce any document on the grounds that the subpoena sought documents protected from discovery by the attorney-client privilege and work product doctrines.  (*See generally* Subpoena Responses and Objections of Kraus) (Ex. L)[2]

---

[2]  At the same time as it issued subpoenas to the lawyer-witnesses, Grace served parallel document requests on the ACC.  (*See* Debtors' First Request for Production of Documents.)  The ACC also lodged a generic privilege objection and refused to provide any documents other than those documents that *Grace* had produced during the litigation, those documents provided by the claimants in response to the PIQs, and documents relied on by the ACC's experts.  (*See* ACC Gen. Obj. 5 and Resp. to Request Nos. 1-5, 17, 18.)

As the Court is well aware, the subpoenas Grace served as a result of the ACC's witness disclosure were not the first attempt by Grace to obtain information relating to these topics. Rather, Grace made numerous efforts to obtain discovery relating to these issues, using a variety of discovery mechanisms. At every turn, however, Grace's attempts to obtain such discovery were blocked by the lawyers' and their law firms' privilege assertions. For instance, in May 2007, Grace served Rule 30(b)(6) deposition notices on the Waters & Kraus firm (as well as other lawyer witness' firms) concerning the manner in which those firms responded to the Grace PIQs, including how information relating to product identification and the claimants' exposures to Grace and non-Grace asbestos-containing products were ascertained. Notably, no firm produced a witness, instead moving to quash on the grounds that "the depositions implicate the attorney-client privilege and work product doctrine." (6/7/07 MMWR Firms Mot. for Prot. Order at 2; 6/4/07 Cooney and Conway Mot. for Prot. Order at 4 ("Clearly the testimony Grace is seeking, namely an attorney's research, investigation and mental impressions regarding a client's case would fall with the scope of … privileged and protected matter, and any Court wherefrom a subpoena issued would likely grant a motion to quash."); *see also* Resps. to Grace's Second Set of Irogs. (refusing to answer *each* and *every* question on grounds of privilege and work product).)

As a result of the repeated blanket privilege objections and refusal to provide discovery relating to the anticipated testimony, it became necessary for Grace to seek the Court's intervention. In November 2007, Grace requested, and the Court required, that the ACC provide a detailed description of the topics for which it intended to offer the witnesses.

When the ACC finally provided witness disclosures, it was evident that, despite the refusal of both the ACC and the individual witnesses to provide documents relating to the

lawyers' settlements with Grace, and their methods of obtaining product identification, medical

and exposure evidence, *the ACC now purports to offer Peter Kraus to testify as to precisely the*

*same topics.*

The disclosure for Peter Kraus indicates that the ACC intends to have this witness testify

as to the following areas:

- The general process followed by the lawyer, his firm(s) and Grace in negotiating asbestos personal injury settlements;
- What criteria Grace told plaintiffs they had to meet to be paid a settlement in mesothelioma and lung cancer cases, what type of evidence was supplied to meet these criteria, and when in the discovery/trial preparation process this evidence was available;
- "How the settlement values paid by Grace in mesothelioma cases compared in size to plaintiff judgments in the jurisdictions in which Mr. Kraus represents asbestos plaintiffs";
- "The type of evidence that was identified and used in trials in which Grace was a defendant to prove asbestos exposure and causation from Grace products or operations and when in the discovery/trial preparation process such evidence was typically available";
- "What additional steps claimants represented by Mr. Kraus would usually take to prepare for a trial in which Grace was an asbestos defendant that Mr. Kraus's clients have not taken or have been prevented from taking because of Grace's bankruptcy";
- "Whether the jurisdictions in which Mr. Kraus represents asbestos plaintiffs require mesothelioma victims to prove that they personally mixed or personally installed an asbestos containing product in order to get past a motion for summary judgment";
- "The various types of industries and occupations in which Mr. Kraus's clients worked and for which Grace paid their claims;"
- "The names and types of asbestos containing products manufactured by Grace that Mr. Kraus's clients most frequently identified in discovery or affidavits as being a source of their asbestos exposure."

In addition, the ACC also has stated that Mr. Kraus will testify as to "what exhibits Mr. Kraus

would use (or place on a trial exhibit list for expected use) in asbestos personal injury trials to

demonstrate that Grace knew of the dangers of asbestos yet failed to provide adequate warnings

of its hazards to those who came into contact with it." (PI Wit. Disclosure at 14-15.

[Dkt.17692]) (Ex. A)

At his March 4 deposition, Mr. Kraus refused or was foreclosed from providing

testimony on the very topics that the ACC had disclosed for his testimony based on privilege

objections:

- Internal documents about how settlement criteria was adopted and applied against Grace  (Kraus Dep. at 35, 56-57) (Ex. B)
- Existence of Baron & Budd material reflecting "from an internal perspective what the objectives and process were" re settlement (*Id.* at 159-60)
- Documentation of how joint & several liability, punitive damages and consolidation would impact the settlement process  (*Id.* at 162-63)
- Decision making process for which cases went to trial and which were settled at Baron & Budd (*Id.* at 177, 178-79)
- Whether Baron & Budd pressed cases against Grace to trial as a retaliatory move for Grace seeking certain discovery  (*Id.* at 188-89, 208-09, 211-12)
- Kraus' own agreement with that strategy of retaliation (*Id.* at 194-95)
- Why Waters & Kraus settled asbestos claims against Grace (*Id.* at 213-18)
- Kraus' own thought process in resolving claims against Grace from 1999-2001 (*Id.* at 221-22)
- Internal memoranda on how the PIQs were filled out were not produced (*Id.* at 98-99)
- Whether witnesses were asked about product ID during intake interview (*Id.* at 70)
- Internal firm client memoranda on exposure histories not produced (*Id.* at 71, 77-78)
- Internal firm documentation of substance to which a claimant was exposed and the sources for that information (*Id.* at 96-97)
- How subsequent information related to claimant exposure was captured after initial claimant intake interview.  (*Id.* at 97)
- Preparing clients for answering interrogatories or depositions questions at Water & Kraus (*Id.* at 111-12)
- Intake procedure and deposition preparation at Waters & Kraus vs. Baron & Budd (*Id.* at 122)·
- Contents of Baron & Budd database (*Id.* at 127)
- Content and variation on Baron & Budd intake forms (*Id.* at 128)

- What internal documents Baron & Budd had in its possession addressing exposure of its clients to Grace products (*Id.* at 133-34)
- Kraus' views on the adequacy or questionable nature of client exposure histories while at Baron & Budd. (*Id.* at 223)

The disclosures and deposition testimony make clear that the ACC's intended use of lawyer witnesses such as Mr. Kraus violates both the applicable Rules of Evidence and the prior rulings of this Court. Indeed, Kraus' disclosure and his March 4 testimony demonstrate that the testimony the ACC intends to present violates the following evidentiary and procedural rules:

- **Testimony Inadmissible Under Rule 408:** Kraus intends to offer testimony as to Grace's prior settlement history and criteria. Such testimony is barred by Rule 408.

- **Undisclosed and Improper Expert Testimony:** Kraus intends to offer testimony as to various aspects of the state tort system, including the evidence required to meet summary judgment standards, as well as foundationless commentary as to aspects of Grace's conduct, including the failure to warn of the potential hazards of asbestos exposure. Such testimony amounts to expert testimony, which the ACC has failed to disclose pursuant to the relevant scheduling orders in this case. Further, even had such testimony been properly and timely disclosed, it would be inadmissible under Federal Rule of Evidence 704 and long-standing precedent in this Circuit. Finally, the witness has no foundation to provide such expert testimony; Kraus represents less than 1% of the current claimants at issue. Accordingly, the anecdotal testimony is a matter of subjective belief and is unsupported by "reliable methodology."

- **Impermissible Efforts to Limit the Impact of PIQ Responses:** Kraus intends to offer testimony as to what medical, product identification, and exposure evidence he or his firm would have gathered were their cases being prepared for trial as opposed to the evidence available at the time the PIQ responses were prepared. First, he is speculating that additional evidence is available and that PIQ responses are, therefore, incomplete contrary to the Court's instruction. Second, the general assertion Kraus makes that PIQ responses have been infected by an absence of evidence -- an argument that the ACC and FCR have made on many occasions -- is just wrong.

- **Testimony Relating to Topics Where Privilege Assertions Were Made and Grace Discovery Was Foreclosed:** Kraus intends to testify as to the methods by which they obtain product identification and exposure evidence for their clients. Such topics were covered directly by the subpoenas for documents and deposition served by Grace. Kraus has objected to providing such documents and testimony on privilege grounds and have refused to provide such testimony.

- **Irrelevant and Prejudicial Testimony:** Kraus intends to offer testimony as to "what exhibits [he] would use (or place on a trial exhibit list for expected use) . . . to

demonstrate that Grace knew of the dangers of asbestos and yet failed to provide adequate warnings." (*See* PI Wit. Disclosure at 14-15) (Ex. A). Such testimony is irrelevant. Neither the Claimants nor Grace factor Grace's conduct into their estimation models. As such, the testimony is not relevant to any contested issue in the case and cannot be admitted under Fed. R. Evid. 401. With no tie to any contested issue, Kraus's intended testimony has no purpose other than to prejudice the Court. *See Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187-88 (3rd Cir. 1990). Further, even if the testimony were to have some limited relevance -- which it does not -- the risk of prejudice far outweighs any probative value such testimony might have. Moreover, the anticipated testimony is largely without foundation, premised primarily on speculation and hearsay.

When the improper and inadmissible areas are stripped from the ACC's disclosures, it is clear that there is not a single permissible area on which this witness can offer testimony. Accordingly, the Court should not permit Mr. Kraus to testify.

## ARGUMENT

## I. TESTIMONY RELATED TO SETTLEMENTS BETWEEN GRACE AND PLAINTIFFS' FIRMS IS INADMISSIBLE UNDER FED. R. EVID. 408

As is evident from the ACC's witness disclosures and Peter Kraus' deposition testimony, much of the testimony it seeks to elicit from Mr. Kraus at trial centers on Grace's conduct in settlement negotiations and the type of evidence required by Grace when it settled previous claims. It is now apparent that the ACC intends to use such evidence to argue that the quantum of evidence required by Grace in its previous settlements is sufficient to demonstrate that Grace was *liable* for a given set of claims, and should be the standard for the amount of evidence required from current and future claimants to demonstrate Grace's *liability* for future claims. Such testimony is improper and, therefore, inadmissible under Rule 408.

First and foremost, this Court has indicated that the ACC will be barred from presenting evidence, testimony or argument that settlement agreements (or the evidence supporting them) can be used as evidence of liability in connection with the estimation, provided that the settlement agreements have standard liability disclaimers.

7

> ***If the settlement agreements say that no one is admitting any liability***, nobody's
> going to tell me that the settlement process is an admission of liability. That's it,
> I'm not going to hear about it if that's the case.

(10/25/07 Hr'g Tr. at 90 (Ex. C); *see also* 12/5/06 Hr'g Tr. at 61 ("Of course you're settling

because you think you have some exposure in the tort system. But that doesn't mean that you

were legally liable …. The legal liability aspects in the past are sort of irrelevant, aren't they to

the current claims and the pending future claims?") (Ex. D).) Grace's settlement agreements

with plaintiffs' firms have the standard disclaimer of liability that this Court has ruled is a bar to

the introduction of such settlements as evidence of liability. (1/28/08 Hr'g Tr. at 77-78 (Ex. E);

*see also, e.g.,* 5/2000 Goldberg Persky Settlement Agreement (ACC/FCR 813) at 10-11 (Ex. F)).

Second, the settlement agreements Grace entered into themselves prohibit the use of the

settlement agreements and any statements relating to the settlement *for any purpose* (other than

in an action to enforce the agreements itself):

> [Goldberg Persky Jennings & White] and the Settling Plaintiffs ***acknowledge that***
> ***W.R. Grace has denied and continues to deny any liability or wrongdoing*** and is
> willing to enter this Agreement solely to avoid the delay, expense, inconvenience
> and uncertainty of further litigation. Neither this Agreement, nor any exhibit,
> document or instrument delivered hereunder, ***nor any statement, transaction or***
> ***proceeding in connection with the negotiation, execution or implementation*** of
> this Agreement, shall be (i) deemed to be or constructed as an admission by any
> part of any fact, matter, proposition, or merit or lack of merit, of any claim or
> defense or (ii) ***referred to or used in any manner or for any purpose in any***
> ***pending or future action or proceeding,*** except one to enforce this Agreement.

*(Id.)* Accordingly, it would violate the terms of the settlement agreements themselves if the

ACC was allowed to introduce -- through these witnesses, or any others -- evidence of the

settlements, or testimony relating to those settlements (including discussions of the negotiations,

criteria, or supporting evidence requirements).

Third, Rule 408 prohibits evidence concerning the settlement of claims "when offered to

prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."

Fed. R. of Evid. 408.  Moreover, Rule 408 not only bars the introduction of evidence relating to a

settlement as evidence of a party's liability for that claim, but also bars its introduction as

evidence of liability for related claims.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling-*

*Delaware Co.*, 998 F.2d 1224, 1246-47 (3rd Cir. 1993) (affirming that evidence of settlement of

prior antitrust suits against defendant was barred by Rule 408); *Lo Bosco v. Kure Eng'g*, 891 F.

Supp. 1035, 1038 (D.N.J. 1995) ("*[W]here cases are related*, the better view is that Rule 408

may exclude settlement proposals in one from admission into evidence in another.") (emphasis

added).[3]

    In addition to violating Rule 408 on its face, allowing the admission of such testimony

(and the associated ACC argument) would undermine Rule 408's fundamental purpose, which is

to encourage settlement.  *See Fid. & Deposit Co. of Maryland v. Hudson United Bank*, 493 F.

Supp. 434, 445 (D.N.J. 1980) (quoting *McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 635

n.5 (3rd Cir. 1977), *rev'd on other grounds*, 653 F.2d 766 (3rd Cir. 1981).  The allowance of

such testimony also ignores the fact that parties settle cases for a variety of reasons, many of

which have nothing to do with liability.  *Fid. and Deposit Co.*, 493 F. Supp. at 445 ("[I]t is often

more advantageous, economical and desirable for a party to buy his peace than to go through

litigation even when his chances of prevailing are great.") (quotation omitted).  Rule 408 thus

embodies a judgment that evidence of prior settlements is generally both irrelevant and

---

[3]    *In re Babcock and Wilcox*, 274 B.R. 230, 256 (Bankr. E.D. La. 2002) (holding that a "plaintiff in a tort case
against a particular defendant cannot establish liability in that case by using evidence of attempts to settle that
case, or evidence of verdicts that other plaintiffs have won *against the defendant in other cases*") (emphasis
added); *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 655 (4th Cir. 1988) (settlement of a *different cause
of action* excluded when it related to the same litigation) (emphasis added); *Playboy Enters. v. Chuckleberry
Pub., Inc.*, 486 F. Supp. 414, 423 n.10 (S.D.N.Y. 1980) ("To consider the terms [of a previous settlement with a
different party] would be improper and unjustified.  It is well-established that statements made for purposes of
settlement negotiations are inadmissible, and Rule 408 of the Federal Rules of Evidence extends the exclusion
to completed compromises when offered against the compromiser.")

prejudicial, and clearly establishes that prior settlements cannot be used to establish liability on a claim.

Thus, pursuant to the Court's prior rulings and the settlement agreements own terms, testimony, documentary evidence, and argument regarding the existence of the settlements, the evidence required by Grace pursuant to the settlement agreements are facially-improper, as would be any attempt to require Grace to conform to a certain standards with respect to which claims are paid and under what terms on a going forward basis.

Accordingly, the testimony the ACC seeks to elicit from Mr. Kraus related to settlements is clearly improper under Rule 408 and should be excluded.

## II.   MR. KRAUS' TESTIMONY IS IMPROPER, UNDISCLOSED EXPERT TESTIMONY

Under the guise of fact-witness testimony, the ACC purports to use Mr. Kraus to testify as to topics including: a comparison of mesothelioma settlement values to mesothelioma verdict values; the quantum of evidence necessary to survive summary judgment in a variety of jurisdictions; and a comparison of mesothelioma settlement values over time. Based on the testimony of Mr. Kraus (together with other witnesses), the ACC will ask the Court to draw conclusions as to the operation of the tort system (which is a fiction) as a whole.

In addition, the ACC intends to use Mr. Kraus to present evidence that Grace knew of the risks associated with asbestos exposure and failed to warn persons who came into contact with its asbestos-containing products. (*See* PI Wit. Disclosure at 14-15) (Ex. A). This type of conduct testimony is typically the purview of expert witnesses. In fact, the ACC at one point had disclosed Dr. Barry Castleman as an "expert" witness and submitted an expert report on W.R. Grace's historical conduct in light of what was known about the health effects of asbestos

exposure. (*See* 10/12/07 Castleman Dep. at 70; *see also* 10/03/06 Castleman Expert Rpt.)[4]  The

ACC has since dropped Dr. Castleman from its witness list. (*See* Disclosure) (Ex.A).  It appears

as though the ACC intends to proffer Mr. Kraus' testimony in place of that offered by Dr.

Castleman.

Both the systemic analyses of various aspects of the tort system and of Grace's conduct

are not the proper purview of fact testimony, but, rather are subjects of expert testimony.  In its

opening statement, the ACC admitted that it believes such testimony is expert in nature.  Indeed,

it ridiculed Grace for not offering such expert testimony, stating:

> It should be note[d] that none of these witnesses ... is a lawyer.  None of these
> witnesses is going to tell the court ... what the ***actual legal requirements are*** and
> how those legal requirements and the state courts, where these claims were filed
> and whose law the court is obligated to apply, how that law fits, if you will, with
> these opinions about medicine, risk analysis, industrial hygiene.

(1/14/08 Trial Tr. at 104) (emphasis added) (Ex. G); *see also* Kraus Dep. at 107-09, 123-24,

255-56) (Ex. B)  The ACC contrasted this "deficiency" in Grace's case with its own anticipated

testimony, stating:

> [Y]ou will hear evidence from ... Peter Krause [sic] . . . who represent[s]
> primarily mesothelioma victims ***about what the standards are in the tort system.***
> What Grace required in order to settle cases.

(1/14/08 Tr. Trans at 138) (emphasis added) (Ex. G).

---

4   Grace notes that Dr. Castleman's methodology was fundamentally flawed, which would have rendered his
opinions inadmissible had the ACC chosen to offer him to speak to these issues.  For example, Dr. Castleman's
incomplete, inaccurate and selective reliance on historical documents renders his testimony inadmissible.  It is
well-established that where and expert "picks and chooses" materials advantageous only to his side's claims, the
expert's opinions are not based on "good grounds" and are inadmissible under *Daubert. See, e.g., In re Paoli
R.R. Yard PCB Litig.*, 35 F.3d 717, 755-56 & 761-62 (3rd Cir. 1994) (expert's reliance on only plaintiff-slanted
self-reported symptoms without consideration of alternative cause equates to an "unreliable source of
information"); *Microvote*, 320 F.3d at 448 (expert's testimony barred because it was based on selective
sampling of materials from counsel); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D. N.J. 2004)
("preselected excerpts" of materials "spoonfed" to expert by plaintiff's counsel led to "highly filtered version of
events" deemed unacceptable under *Daubert* analysis).

Testimony concerning any of the topics identified by the ACC for Mr. Kraus is improper.
First, the ACC failed to disclose such testimony under the schedule and in conformity with the
terms of this Court's Case Management Orders. Second, even if timely disclosed, testimony
about what the law is and what evidence is required to meet legal standards is improper and
inadmissible under Federal Rule of Evidence 704. Third, as Kraus, represents only roughly 400
claimants -- far less than 1% of current claimants -- his anecdotal testimony is, at best, based on
subjective belief, and, therefore, is not the product of a reliable methodology.

Nor may the ACC insulate Mr. Kraus' opinions from scrutiny by calling it "fact"
testimony. First, it is no more permissible for a lay witness to opine as to what the law is or the
proper application of legal standards than it is for an expert to offer such opinions. Second, the
proposed testimony is without proper foundation, speculative, and based on inadmissible
hearsay.

### A.    Peter Kraus Was Not Disclosed in Conformity with the CMO Requirements

Under the relevant Case Management Orders entered in this case, the parties to the
estimation were required to preliminarily identify their expert witnesses to the Court on
December 19, 2005, and to provide the Court with the list of experts from whom it intended to
proffer expert reports on August 21, 2006. (*See* 8/29/05 Case Management Order ("CMO") for
the Estimation of Asbestos Personal Injury Liabilities at ¶ 6 [Dkt. No. 9301]; 7/24/06 Amended
CMO at 4 [Dkt. No. 12858].)

Once identified, non-estimation experts were to submit their initial reports on October 3,
2006 and any supplemental or rebuttal reports on July 31, 2007. At no time, did the ACC
identify Mr. Kraus as an expert on state tort law, failure to warn, or any of the myriad other
subjects at issue in their proffered testimony. Nor did the ACC produce expert reports that

detailed Kraus' expected testimony or the methods by which he reached his opinions relating to these matters.

The failure to file such a report is impermissible under Fed. R. Civ. P. 26(a) and its bankruptcy counterpart, Fed. R. Bankr. P. 7026(a).  Rule 26(a) requires that a party wishing to call an expert witness at trial provide the opposing party with an expert report that contains a complete statement of *all* opinions to be expressed by the expert, the data considered by the witness in forming his opinions, and the methods by which the expert arrived at his conclusions. The ACC's failure to provide expert reports from Mr. Kraus relating to these topics, and, more importantly, its failure to provide the underlying data and information that forms the basis for Mr. Kraus' opinions, is impermissible and -- without more -- requires exclusion of the proposed testimony. *See Johnson v. Vanguard Mfg., Inc.*, 34 Fed. Appx. 858, 859 (3d Cir. 2002) ("A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless.")

### B.    The Operation of the Tort System and Tort Law Standards Are Improper Subjects of Expert Testimony

Even if timely disclosed, the testimony the ACC intends to present through Peter Kraus is improper.  The ACC admits that its intent in proffering Mr. Kraus is to elicit testimony about what the relevant standards in the "tort system" (as if such a monolithic entity exists-- which it does not) are. (*See* 1/14/08 Trial Tr. at 142, 190) (Ex. G)  Such testimony is plainly impermissible.  In the Third Circuit, experts are not permitted to opine as to "what the law required" or to "testify as to the governing law." *See Casper v. SMG*, 389 F. Supp.2d 618 (D.N.J. 2005).  As the court in *Casper* observed:

> The rule prohibiting experts from providing their legal opinions or conclusions is so well established that it is often deemed a basic premise or assumption of evidence law - a kind of axiomatic principle.  In fact, every circuit has explicitly

held that experts may not invade the court's province by testifying on issues of law.

*Id.* (internal citations and quotation marks omitted); *see also Green Machine Corp. v. Zurich American Ins. Group.*, 2001 WL 1003217 (E.D. Pa. Aug. 24, 2001) (prohibiting expert testimony as to ambiguity of contract provision).

Further, "[a]n expert may not opine [as to] legal conclusions drawn by applying the law to the facts [o]f a case." *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992); *Casper*, 389 F. Supp. 2d at 621 (finding expert was not permitted to testify as to whether evidence in record met legal standards). Here, the testimony that the ACC intends to offer -- *e.g.*, whether the presentation of certain evidence is sufficient to meet state law summary judgment standards (when the proper evidentiary rules are applied) -- is directed at the central issue that this Court must decide in this case. One main purpose of the estimation is for the Court to determine whether, under state substantive law (as applied using the Federal Rules of Civil Procedure and Evidence to govern the admissibility of evidence), Grace may be found legally-liable for the current claims. Based on that ***legal*** determination the Court will determine how many claims in the future it believes Grace will be legally-liable for, and will assign value to the current and future claims for which it expects Grace's legal liability will be established. By offering testimony that a particular quantum of evidence meets state law standards, Mr. Kraus is, in essence, instructing the Court as to how to make the very same determination. Such testimony is clearly improper and must be excluded.[5]

---

[5] The cases from this Circuit cited by the ACC on the subject of lawyer witnesses in its *Daubert* opposition are not to the contrary. Indeed, in those cases, the courts allowed testimony from lawyers as to the customs and practices in a particular industry (like the securities trading industry). However, the courts drew a clear line when the same witnesses attempted to testify as to what the relevant law was, its meaning, or application of the law to the facts of the particular case. *See, e.g., Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 218 (3rd Cir. 2006) (excluding testimony from lawyer who purported to opine as to whether plaintiff "complied with legal duties that arose under the federal securities law"); *id.* ("Key to our determination was that the expert did

**C.      Even If The ACC Had Properly Disclosed Mr. Kraus As An Expert, The Testimony They Intend to Offer Is Anecdotal, Subjective Testimony Inadmissible Under This Court's Prior Decisions.**

In total, Mr. Kraus represent only 414 of the 87,767 claimants who submitted POCs and who match to the Grace CMS database. (*See also* Kraus Dep. at 214-15) (Ex. B)  In other words, this witness accounts for less than 1% of the current claims at issue.  The ACC does not even attempt to argue that Mr. Kraus' testimony purports to relate to every jurisdiction in the United States where asbestos-related tort claims are litigated (or even to every case in those jurisdictions where the witness practices), yet it will ask this Court to draw conclusions based on the tort system as a whole based on these few anecdotes.  Such testimony is inherently unreliable and this Court must exercise its gate-keeping function and not permit such evidence.  *See* Fed. R. Civ. P. 702; *Daubert; Kumho Tire.*

The testimony the ACC seeks to offer here is akin to the testimony that this Court properly excluded in connection with the *Federal Mogul* estimation.  In *Federal Mogul,* CNA offered a lawyer to testify as an expert witness regarding, *inter alia*, the comparative payments insurance companies would be required to make under the proposed TDPs, including the witness's tort system experience.  (*See Federal Mogul* 6/20/07 Hr'g Tr. at 12-83 (Ex. H).)  At the conclusion of his testimony, the Federal Mogul ACC (also represented by Caplin & Drysdale, counsel for the ACC here) moved to strike the lawyer's testimony on the grounds that it violated *Daubert* and *Kumho Tire* principles.

This Court struck the testimony on the grounds that the witness's testimony was based solely on anecdotal experience and as such amounted to "nothing more than [the witness's]

---

not give his opinion as to *what was required under the law.*") (emphasis added); *Cantor v. Perleman,* 2006 WL 3462596 (D. Del. Nov. 30, 2006) ("Testimony [by the proffered expert] as to a breach of fiduciary duty will not be admitted.").

subjective beliefs." (*Id.* at 117.) Accordingly, the Court found that the witness's testimony was simply "unsupported evaluation, and his conclusions were not generated by a reliability methodology." (*Id.*) Peter Kraus' testimony is no different.

### D.     Even If The Offered Testimony Is Fact Testimony, It Is Inadmissible.

Perhaps in an attempt to "backdoor" these impermissible expert opinions, the ACC has disclosed the testimony of Mr. Kraus as *fact testimony.* However, the proposed testimony is no more admissible as fact testimony as it is as expert testimony.

First, testimony as to the operation of the legal system, what the law requires, and the application of law to fact invades Rule 704 regardless of whether the witness is offering expert or lay opinion. *See, e.g., Doe v. Ward*, 282 F.Supp.2d 323, 328 (W.D. Pa. 2003) (Lay opinion testimony is not permissible when speaking to "a question reserved for the court."). Second, the testimony that the ACC intends to offer through Mr. Kraus is impermissible in that it lacks foundation and is based on inadmissible evidence. Mr. Kraus has not litigated in every jurisdiction in the United States, nor is there any indication that his experience in asbestos personal injury litigation are representative of all such cases tried in the jurisdictions where they do practice. Indeed, Mr. Kraus has never tried any case against Grace to verdict in any jurisdiction. (Kraus Dep. at 121) (Ex. B)  What is more, to the extent that his testimony verges on the manner in which cases similar to those they have tried will be treated by courts in either their home jurisdictions or in other jurisdictions, it is pure speculation. Finally, any testimony as to what happened that does not directly relate to what Mr. Kraus did, such as statements of witnesses, the contents of most documents, and commentary and decisions by the courts are pure hearsay, and, thus, inadmissible.

Given the lack of admissible evidentiary predicates for his testimony, to the extent that any of what Peter Kraus may offer is admissible, the limited anecdotal evidence that will be

presented has very little probative value as opposed to its potential to prejudice this Court by painting an unrepresentative, biased, and inaccurate picture of the state of the tort system and Grace's corporate conduct that it must be excluded. *See* Fed. R. Evid. 403.

## III.  THE ACC'S INTENDED TESTIMONY CONSTITUTES AN IMPERMISSIBLE EFFORT TO LIMIT THE IMPACT OF THE PIQ RESPONSES.

### A.  The Testimony That the ACC Intends to Present From Mr. Kraus Constitutes Nothing More Than Pure Speculation That Additional Evidence Exists And That PIQ Responses Are, Therefore, Incomplete.

The ACC states that it intends to use the testimony of Mr. Kraus to demonstrate "when in the discovery/trial preparation process [certain exposure evidence] was typically available" and "what additional steps claimants ... would usually take to prepare for a trial in which Grace was an asbestos defendant that [the witness's] clients have not taken or have been prevented from taking because of Grace's bankruptcy status." (*See* PI Wit. Disclosure at 6) (Ex. A) The ACC intends to use Peter Kraus' testimony in an effort to excuse the claimants' law firms' overwhelming failure to provide the medical and exposure evidence requested in the PIQs. (*See* 10/25/07 Hr'g Tr. at 87 ("[Mr. Finch]:  I'm going to ask them ... when evidence was available in the litigation process, when they gave it to Grace.  I might ask them questions about the questionnaires they submitted in this case.")) (Ex. C)  Inherently, this position suggests that additional information exists that would be responsive to the PIQ questions.  There is absolutely no evidence anywhere in the record that this is so.  Any implication in Mr. Kraus' testimony that such evidence exists is rank speculation entirely lacking in foundation and should not be permitted by this Court.

Furthermore, the Court has barred the ACC from presenting argument or evidence as to what additional information would have been supplied or available beyond that contained in the PIQs had law firms prepared the individual cases for trial:

And to the extent that somebody wants to supplement answers to questionnaires, they're not going to be doing it in that evidentiary hearing. If they didn't have -- if they couldn't put it in writing on the questionnaires, they certainly are not going to be giving me additional information .... I'm afraid he's not. He's not going to be explaining [why certain information was not provided in response to the questionnaires.] [The evidence is] either in writing in those questionnaires or it's not there. I think I made those rulings clear early on. What's in is available for the fact and expert witnesses, and, otherwise, for purposes of this estimation hearing, *it doesn't exist*. And that's the end of it. We are not getting into those questionnaires again, period. *End of story.*

(10/25/07 Hr'g Tr. at 92-93)(emphasis added) (Ex. C); *see also* 1/22/08 Trial Tr. at 62 (" . . . And the personal injury questionnaire that is discovery based upon those proofs of claim, that has to have some relevant data.") (Ex. I).)

### B.     The General Assertion That PIQ Responses Have Been Infected By An Absence of Evidence Due To Lack Of Access Related to the Bankruptcy Stay Is False.

The oft-repeated refrain that claimants were unable to muster evidence in answering the PIQ was not borne out in Peter Kraus' testimony.  Indeed, it was squarely disavowed.  Mr. Kraus plainly testified that *claimants were not prevented from obtaining discovery* from any potential source of underlying information related to exposure histories due to the bankruptcy stay.  (Kraus Dep. at 245-46) (Ex. B)  More specifically, Kraus testified that there was no bar obtaining exposure information from:

- *the claimants him or herself* (Kraus Dep. at 242 ("[T]he stay does not prevent me from communicating with my clients, that's correct."));

- *people who worked with the claimant* (*id.* at 242 ("I would be able to do that . . ."))

- *Grace documents* (*id.* at 241 (Kraus has no evidence that the stay in the bankruptcy case prevented him or his firm from getting access to Grace historical records or litigation files); *see also id.* at 235-39);

- *third-party records related to Grace products* (*id.* at 243-44 (" . . . I could initiate such discovery . . . in the Grace bankruptcy, it might be legally feasible for my clients to initiate third-party discovery."); and

- *litigation against other defendants*. (*Id.* at 246-47 (testifying that his clients continued to litigate against other defendants despite the bankruptcy stay as to Grace)).

Accordingly, in light of the Court's clear and unequivocal rulings, testimony relating to at what point in the discovery process exposure evidence would be available or the reasons for the lawyers' failure to provide exposure evidence in response to the PIQ must be excluded. Even more telling, Mr. Kraus' testimony affirmatively suggests that -- despite ACC protestations to the contrary -- the bankruptcy stay did not foreclose claimants from providing full and complete PIQ responses.

## IV.    THE WITNESSES HAVE REFUSED TO PROVIDE DOCUMENTS OR TESTIMONY ON THESE TOPICS AND THE ACC SHOULD BE ESTOPPED FROM ELICITING SUCH TESTIMONY AT TRIAL

Many of the topics of Kraus' testimony were topics squarely addressed in the document subpoenas and other document requests served in advance of the deposition.  Grace sought documents relating to the following topics:

- *Documents relating to settlements with Grace,* including *criteria for settlement*, evaluations or assessments relating to settlement offers, *evaluations of sufficiency of medical or exposure evidence for purpose of settlement*;

- *Documents relating to the review, analysis or evaluations of asbestos personal injury claims* filed against Grace including documents, relating to the processes by which defendants were named, *product ID was determines and* medical evidence of disease/injury was obtained;

- *Documents relating to the method by which responses to the W.R. Grace PIQs were made*, including the selection of documents to be attached to the PIQs, and *documents relating to the manner in which the Claimants'* exposure histories were determined.

(Kraus Subpoena at Rqts. 3, 7 and 8 (Ex. J); *see also* Kraus 2/08 Doc. Rqt. Nos. 1-8 (Ex. K).)

Kraus refused to produce documents in response to the subpoena in part on the basis of the attorney-client privilege and work product doctrine.  (*See* Kraus Subpoena Resp. at 2 (Ex. L))

Likewise, while very limited categories of documents were produced in response to Grace's

February 2008 document requests, privilege and work product objections were raised throughout

the response. (*See* Kraus 2/08 Doc. Rqt. Resp. at 5-16 (Ex. M)) This on-going refusal to allow

Grace access to documents underlying the subjects of his testimony based on privilege assertions

was confirmed by Mr. Kraus at his deposition. (*See, e.g.,* Kraus Dep. at 63 (documents that refer

to or discuss topics contained in Grace's discovery responses about how the PIQs were filled out

were not produced); (*id.* at 133-34) (inquiry into what internal documents Baron & Budd had in

its possession addressing exposure of its clients to Grace products foreclosed by privilege

objection and instruction not to answer)) (Ex. B)

　　　　The refusal to produce documents or discovery based on an assertion of privilege should

determine the scope of any testimony.  Peter Kraus asserts privilege as to documents on these

topics, confirms this refusal to produce records based on privilege at his deposition (*see, e.g.,*

Kraus Dep. at 63, 133-34) (Ex. B) and, in fact, was instructed at his deposition well over 40

separate times not to answer questions based on privilege objections. (*See further* above list of

areas where Kraus was foreclosed from providing testimony at his deposition or instructed not to

answer at pp. 4-5 herein)

　　　　But according to the ACC witness disclosure, nevertheless, the ACC intends to proffer

Mr. Kraus' testimony *on those very same topics* without objection.  Either the subject of the

testimony or documents request discovery are privilege or they are not.  The assertion of

privilege cannot be selectively invoked to avoid Grace's discovery efforts, but then ignored

entirely when the time comes to testify orally at trial on the same subject. After all, as articulated

by counsel for Mr. Kraus, the rationale for refusing to produce documents on privilege grounds

applies to equal force with respect to testimony as to the same topics. (*See* 10/25/07 Hr'g Tr. at

54-55 ("The privilege at issue here belongs not to Mr. Kraus[] but to his clients.  Mr. Kraus[]

does not have the discretion or the authority to waive any privilege. It is his ethical and legal duty to preserve the privilege. Mr. Kraus[] is a proposed non-party witness who has himself not put anything at issue.")) (Ex. C) That the privilege belongs to Mr. Kraus' clients and that it would bar his testimony on subjects at issue in the witness disclosure was borne out in spades at his deposition when he was repeatedly instructed not to answer on that very basis. (*See generally* Kraus 3/4/08 deposition transcript)

The topics of the document requests and the deposition questions were directly and inextricably related to the vast majority of the Kraus disclosed testimonial subjects: what exposure evidence was gathered in order to provide in support of settlement; information relating to settlement values; what Grace products and locations were identified by law firms during the course of their trial preparation; when and by what means exposure evidence was gathered, what occurred during settlement negotiations with Grace; how product identification and exposure evidence was gathered when responding to the PIQ.

The ACC attempts to put these issues beyond the reach of Grace's discovery by stating that "[t]he ACC and FCR will not ask the lawyers [such as Mr. Kraus] to answer any questions that would invade a privilege or the work product doctrine, or about their internal reasons why they settled cases with Grace" are disingenuous at best. As demonstrated above, the disclosed testimonial topics directly implicate process employed by these attorneys in litigating and settling asbestos personal injury cases both against Grace and against other defendants. Accordingly, by agreeing to appear before the Court to provide such testimony, Mr. Kraus, opens himself up to such discovery. *See In re AT & T Access Charge Litig.*, 2006 WL 2587607 (D.N.J. Sept. 8, 20060 ("A party who asserts a claim that 'in fairness requires examination of protected communications thereby waives the attorney-client privilege as to those communications);

*Novartis Pharms. Corp. v. Eon Labs. Mfg., Inc.*, 206 F.R.D. 396, 397 (D. Del. 2002) (finding

waiver of attorney-client privilege and work product immunity). Conversely, if the witnesses

continue to refuse to provide document and deposition discovery that would hinder Grace's

cross-examination of these issues, they must be barred from presenting such testimony at trial.

*See, e.g.*, *SEC v. Grossman*, 887 F. Supp. 649, 660 (S.D.N.Y. 1995) (party prohibited from

relying on exculpatory evidence "on the very issues for which they have declined to provide

discovery for several years" in opposition to summary judgment motion).

## V.    TESTIMONY AS TO GRACE'S CONDUCT IS IRRELEVANT AND -- THEREFORE -- PREJUDICIAL

As described above, the ACC has stated its intent to proffer testimony from Peter Kraus

relating to Grace's conduct -- specifically, to Grace's knowledge of the risks associated with

asbestos exposure and its failure to warn those who came into contact with Grace' asbestos-

containing products. (*See* PI Wit. Disclosure at 14-15) (Ex. A). Such testimony must be

excluded because it is irrelevant and its admission would serve no purpose other than to

prejudice the Court.

It is axiomatic that "[e]vidence which is not relevant is not admissible." Fed. R. Evid.

402. The Rules define "relevant evidence" as "evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence relating to

Grace's conduct do not bear on any question at issue in this estimation proceeding, and are thus,

irrelevant. Neither Grace's nor the Claimants' estimation models take Grace's conduct into

account in assessing: (1) Grace's legal liability for current claims; (2) the projection of the

number of legally-valid future claims that Grace will have to pay in the future; (3) the value of

legally-valid current or future claims. Grace's conduct -- and more specifically, any alleged

failure to warn -- has no bearing on any of these questions.[6]

Even if conduct evidence were admissible, any minimal probative value that could be argued from conduct evidence would be substantially outweighed by the unfair prejudice that necessarily would result from such evidence. *Bhaya,* 922 F.2d at 187-88; *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343-44 (3rd Cir. 2002) ("Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. That is, evidence may be excluded if its probative value is not worth the problems that it's admission may cause, e.g., unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence …. The balancing test in Rule 403 ensures that [fact finders] are not presented with evidence that is far less probative than it is prejudicial.")

Third Circuit law clearly supports such a conclusion:

> Evidence that a party committed wrongs other than those at issue in a case often creates a danger of "unfair prejudice" because such evidence may influence a [fact-finder] to return a verdict based on a desire to punish for other wrongs. Here, the testimony indicating that Westinghouse management was willing to engage in conduct that might violate the "labor laws of the contract" or might be "illegal" in some unspecified way created just such a danger. As the trial judge aptly put it, "[th]e jury probably was left with the impression that [Westinghouse's] managers were a lawless bunch. The jury might well have been influenced to return a verdict against Westinghouse simply because the jury

---

[6] To the extent that Grace's historical conduct is relevant to asses any possible punitive damages claim, bankruptcy courts have routinely disallowed punitive damages. *See In re Dow Corning Corp.* 244, B.R. 721 (Bankr. E.D. Mich. 1999), *rev'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002); *Jim Walter Holmes, Inc. v. Adams (In re Hillsborough Holdings Corp.)*, 146 B.R. 1015, 1022 (Bankr. M.D. Fla. 1992); *In re Celotex Corp.*, 128 B.R. 478, 484 n.12 (Bankr. M.D. Fla. 1991); *In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996); *In re Apex Oil Co.*, 118 B.R. 683, 699 (Bankr. E.D. Mo. 1990); *In re Allegheny Int'l Inc.*, 106 B.R. 75, 79 (Bankr. W.D. Pa. 1989); *In re A.H. Robins Co. , Inc.*, 89 B.R. 555, 563-64 (E.D. Va. 1988) ("[t]his Court would not be fulfilling its duties in the oversight of this bankruptcy if it were to allow a windfall claim to certain creditors that could jeopardize the full compensation of claims to all others. For these reasons, the Court finds it imperative to disallow all punitive damages claims in this bankruptcy"); *In re Johns-Manville Corp.*, 68 B.R. 618, 627-28(Bankr. S,D,N,Y, 1986) ("[i]ndeed, it is well within the equitable power granted by § 105 of the [Bankruptcy Code] to preclude … recovery of punitive damages in this reorganization").

testimony." Thus, the testimony at issue here presented a textbook example of unfair prejudice.

*Bhaya*, 922 F.2d at 188. Evidence of Grace's conduct is nothing more than an attempt to poison the well and create bias against Grace. Under Fed. R. of Evid. 403, Mr. Kraus' testimony as to failure to warn must be excluded.

## CONCLUSION

The ACC and FCR purport to offer Peter Kraus to testify as to "public dealings with Grace in settlement negotiations, discovery, and trials." Such testimony is improper as it violates both the applicable Rules of Evidence and the prior rulings of this Court. The testimony violates Rules 403 and 408 of the Federal Rules of Evidence, constitutes undisclosed and inadmissible expert opinion, violates the Court's prohibition on collateral attacks on the PIQ process, and is

*[remainder of page intentionally left blank]*

without any proper evidentiary foundation. For these reasons, and the reasons set forth in this

motion, Grace respectfully requests that this Court exclude the testimony of Peter Kraus from the

estimation trial.

Dated: March 17, 2008

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Ellen Therese Ahern
Scott A. McMillin
200 East Randolph Drive
Chicago, Illinois 60601
Telephone (312) 861-2000
Facsimile  (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Amanda C. Basta
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone (202) 879-5000
Facsimile  (202) 879-5200

and

PACHULSKI STANG ZIEHL & JONES LLP

James E. O'Neill (with permission)
Rachael L. Werkheiser
(Bar No. 3753)

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession