# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et. al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

## OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS LIST OF THE WITNESSES THAT IT INTENDS TO CALL AT THE HEARING FOR THE ESTIMATION OF ASBESTOS PERSONAL INJURY LIABILITIES

Pursuant to the operative version of the Court's Case Management Order (the "CMO") for the Estimation of Asbestos Personal Injury Liabilities, the Official Committee of Asbestos Personal Injury Claimants ("ACC") hereby identifies the following witnesses that the ACC expects to call during its case in chief at the Asbestos PI Estimation Hearing. The identification of any individual on this list does not necessarily mean that the ACC will in fact offer testimony from that particular witness. However, this list is intended to be a good faith effort to identify those persons who the ACC will actually call as a witness at trial.

The following witnesses are listed in alphabetical order, first the fact witnesses, then the experts.

| FACT WITNESSES |
|:---:|
| David T. Austern |
| Robert Beber (by deposition) |
| Braxton Colley (by prior testimony) |
| John D. Cooney, Esq. |
| Theodore (Ted) Goldberg. Esq. |
| Robert Horkovich, Esq. |
| Jay Hughes (by deposition) |

| FACT WITNESSES (Cont.) |
| --- |
| Peter A. Kraus, Esq. |
| Daniel P. Myer |
| John V. Port (by deposition) |
| Jeffrey Posner (by deposition) |
| Dayton Louis Prouty, Jr. (by deposition) |
| Dan Rourke (by deposition) |
| David Siegal (by deposition) |
| Stephen Snyder |
| Erby Williams (by prior testimony) |
| Records Custodian from W.R. Grace (only as necessary) |
| 30(b)(6) witness from RUST Consulting (by deposition) |
| 30(b)(6) witness from BMC (by deposition) |

| EXPERT WITNESSES |
| --- |
| Arnold R. Brody, Ph.D. |
| Samuel P. Hammar, M.D., F.C.C.P. |
| Steve M. Hays, P.E., C.I.H. |
| Richard A. Lemen, M.D. |
| William E. Longo, Ph.D. |
| Daniel P. Myer |
| Mark A. Peterson, Esq., Ph.D. |
| Steven Snyder, Esq. |
| Laura S. Welch, M.D. |

A summary description of each fact witness' testimony is set forth below, which as required by the CMO, is more detailed for fact witnesses John Cooney, Theodore Goldberg, Peter Kraus and Stephen Snyder.  For the expert witnesses, a description of the qualifications

2

and area of expertise of the witness is provided; the subject matter of each expert witness'

expected testimony is set forth in their respective expert reports in this matter.

## FACT WITNESSES

1.   <u>David T. Austern</u>: Mr. Austern is the Future Claims Representative in the Grace

bankruptcy case.  He will testify about matters related to Grace's asbestos liability and his

assessment of that liability in his capacity as the FCR in this case.  He will also testify about

matters responsive to questions posed to him by counsel for the FCR.

2.   <u>Robert Beber</u> (by deposition):  Mr. Beber was W.R. Grace ("Grace")'s General

Counsel through the end of 1998.  He currently resides in Florida, where he serves as a non-

employee consultant to the company.  Mr. Beber testified about the settlement criteria and

evidence Grace required asbestos personal injury plaintiffs to meet before offering to settle

their cases, the risks Grace faced in taking asbestos personal injury cases to trial (both

generally and in specific cases), the costs associated with settling asbestos personal injury

cases, Grace's litigation strategy, settlement agreements between Grace and large numbers of

asbestos personal injury plaintiffs, including certain of those agreements which contained

"moratoria periods;" and the methodology and data used by Grace in estimating its liability for

present and future asbestos and personal injury claims for business planning, SEC reporting

and Sealed Air transaction purposes.

The ACC will likely designate some or all of Mr. Beber's deposition testimony taken in

this proceeding and the Sealed Air proceeding for use at the Estimation Hearing.

3.   <u>Braxton Colley (by prior testimony)</u>:  Mr. Colley is a deceased mesothelioma

victim whose case against Grace went to trial in September, 1998, and which resulted in a

3

verdict in his favor of over $4 million, which Grace settled on appeal for $3.68 million.  Mr.

Colley was a lab technician for McDonnell-Douglas Corporation who testified about the

circumstances surrounding his exposure to asbestos, and the impact mesothelioma had upon his

life.

    4.   John D. Cooney, Esq.:  Mr. Cooney is a partner in the Chicago law firm of

Cooney & Conway.  He has represented individual personal injury plaintiffs in asbestos

litigation for over 20 years.  His practice focuses primarily on the representation of

mesothelioma and lung cancer victims.

      Mr. Cooney is being called by the ACC and FCR to testify about his firm's public

dealings with Grace in settlement negotiations, discovery and trials.  The ACC and FCR will

not ask the lawyers to answer any questions that would invade a privilege or the work product

doctrine, or about their internal reasons why they settled cases with Grace.  Specifically, Mr.

Cooney is expected to testify about the following subject matters:

      The general process followed by Mr. Cooney or lawyers from his firm and Grace

in negotiating the settlement of asbestos personal injury cases.

      What criteria Grace told the plaintiffs they had to meet to be paid a settlement in

mesothelioma cases, what type of evidence was supplied to meet these criteria, and when in the

discovery/trial preparation process this evidence was available.  In general, Grace would offer

to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had

mesothelioma and b) he had some evidence of exposure to Grace asbestos containing products.

The exposure evidence supplied in support of a settlement varied depending on the case but

would typically include any or all of the following:  a) an affidavit or other sworn statement

from the claimant attesting to the fact that he worked with Grace asbestos containing products

b) an affidavit or other sworn statement from a co-worker attesting to the fact that the claimant worked with Grace asbestos containing products c) an affidavit from the claimant or a co-worker that the claimant worked at a place where prior cases or discovery had shown that Grace asbestos-containing products were present or d) discovery materials such as sworn interrogatory answers or deposition testimony from the claimant or co-worker documenting exposure to asbestos from a Grace product.  In general, Grace did not require the plaintiff to demonstrate that he personally mixed or personally installed an asbestos containing product in order for Grace to make a settlement offer in mesothelioma cases.

What criteria Grace told the plaintiffs they had to meet to be paid a settlement in lung cancer cases, and what types of evidence was supplied to meet these criteria, and when such evidence was available.  In general, Grace would offer to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had lung cancer which a doctor would opine was caused by asbestos exposure and b) he had some evidence of exposure to Grace asbestos containing products.  The exposure evidence varied depending on the case but would include any of the following:  a) an affidavit from the claimant attesting to the fact that he worked with Grace asbestos containing products b) an affidavit or other sworn statement from a co-worker attesting to the fact that the claimant worked with Grace asbestos containing products c) an affidavit from the claimant or a co-worker that the claimant worked at a place where prior cases or discovery had shown that Grace asbestos-containing products were present or d) discovery materials such as sworn interrogatory answers or deposition testimony from the claimant or co-worker documenting exposure to asbestos from a Grace product. Generally, Grace did not require the plaintiff to demonstrate that he also had a diagnosis of asbestosis (in addition to the lung cancer) in order for Grace to make a settlement offer in a

lung cancer case, nor did Grace require the plaintiff to demonstrate that he personally mixed or personally installed an asbestos product in order to make a settlement offer in lung cancer cases.

In settling an asbestos personal injury case Grace typically would not require the plaintiff to provide it with all documents that existed that had been produced in discovery or prior cases related to exposure to the asbestos in Grace products.

How the settlement values paid by Grace in mesothelioma cases compared in size to plaintiff judgments in the jurisdictions in which Mr. Cooney represents asbestos plaintiffs.

The type of evidence that was identified and used in trials in which Grace was a defendant to prove asbestos exposure and causation from Grace products or operations and when in the discovery/trial preparation process such evidence was typically available. This evidence varied depending upon the case, but included any of the following: co-worker testimony about the use of Grace products at a place and time where the plaintiff was working; invoices from Grace or third parties demonstrating the presence of asbestos products at a location; testimony from the plaintiff (if living); deposition or prior trial testimony from the plaintiff or co-workers concerning asbestos exposures; testimony from expert witness industrial hygienists concerning the plaintiff's asbestos exposure and from expert witness medical doctors or epidemiologists concerning whether or not such exposures could cause the asbestos-related disease at issue.

What additional steps claimants represented by Mr. Cooney would usually take to prepare for a trial in which Grace was an asbestos defendant that Mr. Cooney's clients have not taken or have been prevented from taking because of Grace's bankruptcy status.

Whether the jurisdictions in which Mr. Cooney represents asbestos plaintiffs require mesothelioma victims to prove that they personally mixed or personally installed an asbestos containing product in order to get past a motion for summary judgment.

The various types of industries and occupations in which Mr. Cooney's clients worked and for which Grace paid their claims.

The names and types of asbestos containing products manufactured by Grace that Mr. Cooney's clients most frequently identified in discovery or affidavits as being a source of their asbestos exposure. Monokote 3; Monokote spray on insulation; Zonolite Hi Temp Insulating Cement Zonolite Acoustical Plaster/Plastic were usually the most frequently identified Grace products.

The "all in value" of a mesothelioma case settled in 2007 is higher than the "all in value" of a mesothelioma case settled in 2001.

5.   <u>Theodore (Ted) Goldberg</u>:  Mr. Goldberg is a partner in the Pittsburgh law firm of Goldberg, Persky, Jennings & White, P.C.  He has represented individual plaintiffs in asbestos litigation for over 20 years.

Mr. Goldberg is being called by the ACC and FCR to testify about his firm's public dealings with Grace in settlement negotiations, discovery and trials.  The ACC and FCR will not ask the lawyers to answer any questions that would invade a privilege or the work product doctrine, or about their internal reasons why they settled cases with Grace. Specifically, Mr. Goldberg is expected to testify about the following subject matters:

The general process followed by Mr. Goldberg or lawyers from his firm and Grace in negotiating the settlement of asbestos personal injury cases.

7

What criteria Grace told the plaintiffs they had to meet to be paid a settlement in mesothelioma cases, what type of evidence was supplied to meet these criteria, and when in the discovery/trial preparation process this evidence was available. In general, Grace would offer to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had mesothelioma and b) he had some evidence of exposure to Grace asbestos containing products. The exposure evidence supplied in support of a settlement varied depending on the case but would typically include any or all of the following: a) an affidavit or other sworn statement from the claimant attesting to the fact that he worked with Grace asbestos containing products; b) an affidavit or other sworn statement from a co-worker attesting to the fact that the claimant worked with Grace asbestos containing products; c) an affidavit from the claimant or a co-worker that the claimant worked at a place where prior cases or discovery had shown that Grace asbestos-containing products were present; or d) discovery materials such as sworn interrogatory answers or deposition testimony from the claimant or co-worker documenting exposure to asbestos from a Grace product. In general, Grace did not require the plaintiff to demonstrate that he personally mixed or personally installed an asbestos containing product in order for Grace to make a settlement offer in mesothelioma cases.

What criteria Grace told the plaintiffs they had to meet to be paid a settlement in lung cancer cases, and what types of evidence was supplied to meet these criteria, and when such evidence was available. In general, Grace would offer to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had lung cancer which a doctor would opine was caused by asbestos exposure and b) he had some evidence of exposure to Grace asbestos containing products. The exposure evidence varied depending on the case but would include any of the following: a) an affidavit from the claimant attesting to the fact that he

8

worked with Grace asbestos containing products; b) an affidavit or other sworn statement from

a co-worker attesting to the fact that the claimant worked with Grace asbestos containing

products; c) an affidavit from the claimant or a co-worker that the claimant worked at a place

where prior cases or discovery had shown that Grace asbestos-containing products were

present; or d) discovery materials such as sworn interrogatory answers or deposition testimony

from the claimant or co-worker documenting exposure to asbestos from a Grace product.

Generally, Grace did not require the plaintiff to demonstrate that he also had a diagnosis of

asbestosis (in addition to the lung cancer) in order for Grace to make a settlement offer in a

lung cancer case, nor did Grace require the plaintiff to demonstrate that he personally mixed or

personally installed an asbestos product in order to make a settlement offer in lung cancer

cases.

In settling an asbestos personal injury case Grace typically would not require the

plaintiff to provide it with all documents that existed that had been produced in discovery or

prior cases related to exposure to the asbestos in Grace products.

How the settlement values paid by Grace in mesothelioma cases compared in size

to judgments returned in favor of plaintiffs following trials in mesothelioma cases in the

jurisdictions in which Mr. Goldberg represents asbestos plaintiffs.

The type of evidence that was identified and used in trials in which Grace was a

defendant to prove asbestos exposure and causation from Grace products or operations, and

when in the discovery/trial preparation process such evidence was typically available. This

evidence varied depending upon the case, but included any of the following: co-worker

testimony about the use of Grace products at a place and time where the plaintiff was working;

invoices from Grace or third parties demonstrating the presence of asbestos products at a

location; testimony from the plaintiff (if living); deposition or prior trial testimony from the plaintiff or co-workers concerning asbestos exposures; testimony from expert witness industrial hygienists concerning the plaintiff's asbestos exposure and from expert witness medical doctors or epidemiologists concerning whether or not such exposures could cause the asbestos-related disease at issue.

What additional steps claimants represented by Mr. Goldberg would previously take to prepare for a trial in which Grace was an asbestos defendant that Mr. Goldberg's clients have not taken or have been prevented from taking because of Grace's bankruptcy status.

Whether the jurisdictions in which Mr. Goldberg represents asbestos plaintiffs require mesothelioma victims to prove that they personally mixed or personally installed an asbestos containing product in order to get past a motion for summary judgment.

The various types of industries and occupations in which Mr. Goldberg's clients worked and for which Grace paid their claims.

The names and types of asbestos containing products manufactured by Grace that Mr. Goldberg's clients most frequently identified in discovery or affidavits as being a source of their asbestos exposure.  Monokote 3; Monokote spray on insulation; Zonolite Hi Temp Insulating Cement Zonolite Acoustical Plaster/Plastic were usually the most frequently identified products.

6.  <u>Robert Horkovich, Esq.</u>:  Mr. Horkovich is outside insurance counsel for the Grace ACC.  He will be called, if necessary, as a witness only if Grace calls Jeff Posner to testify at trial, or if Grace disputes the authenticity of the document attached to Mr. Horkovich's Declaration dated September 21, 2007.  The subject matter of Mr. Horkovich's

testimony would relate to statements made to him by Mr. Posner or documents provided to the Grace ACC by Mr. Posner or Grace concerning Grace's efforts to collect the proceeds of insurance policies which provide coverage for asbestos liabilities.

7.  Jay Hughes (by deposition): Jay Hughes is Grace's in-house counsel in charge of managing its asbestos personal injury litigation and the defense and settlement of asbestos personal injury claims. He has been a Grace employee since the mid-1980's and continues to work for the company. He currently resides in Boston. Mr. Hughes testified about the settlement criteria and evidence Grace required asbestos personal injury plaintiffs to meet before offering to settle their cases, the risks Grace faced in taking asbestos personal injury cases to trial (both generally and in specific cases), the costs associated with settling asbestos personal injury cases, Grace's litigation strategy, settlement agreements between Grace and large numbers of asbestos personal injury plaintiffs, including certain of those agreements which contained "moratoria periods;" and the methodology and data used by Grace in estimating its liability for present and future asbestos and personal injury claims for business planning purposes.

The ACC will likely designate some or all of Mr. Hughes' deposition testimony taken in this proceeding as well as his testimony in the Sealed Air proceeding for use at the Estimation Hearing.

8.  Peter A. Kraus: Mr. Kraus is a partner in the Dallas law firm of Waters & Kraus, LLP. He has represented individual plaintiffs in asbestos litigation for over 20 years. His practice focuses primarily on the representation of mesothelioma and lung cancer victims.

Mr. Kraus is being called by the ACC and FCR to testify about his firm's public dealings with Grace in settlement negotiations, discovery and trials. The ACC and FCR will

11

not ask the lawyers to answer any questions that would invade a privilege or the work product

doctrine, or about their internal reasons why they settled cases with Grace. Specifically, Mr.

Kraus is expected to testify about the following subject matters:

The general process followed by Mr. Kraus or lawyers from his firm or his prior

firm, Baron & Budd, and Grace in negotiating the settlement of asbestos personal injury cases.

What criteria Grace told the plaintiffs they had to meet to be paid a settlement in

mesothelioma cases, what type of evidence was supplied to meet these criteria, and when in the

discovery/trial preparation process this evidence was available. In general, Grace would offer

to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had

mesothelioma and b) he had some evidence of exposure to Grace asbestos containing products.

The exposure evidence supplied in support of a settlement varied depending on the case but

would typically include any or all of the following: a) an affidavit or other sworn statement

from the claimant attesting to the fact that he worked with Grace asbestos containing products;

b) an affidavit or other sworn statement from a co-worker attesting to the fact that the claimant

worked with Grace asbestos containing products; c) an affidavit from the claimant or a co-

worker that the claimant worked at a place where prior cases or discovery had shown that

Grace asbestos-containing products were present; or d) discovery materials such as sworn

interrogatory answers or deposition testimony from the claimant or co-worker documenting

exposure to asbestos from a Grace product. In general, Grace did not require the plaintiff to

demonstrate that he personally mixed or personally installed an asbestos containing product in

order for Grace to make a settlement offer in mesothelioma cases.

What criteria Grace told the plaintiffs they had to meet to be paid a settlement in

lung cancer cases, what types of evidence was supplied to meet these criteria, and when such

evidence was available. In general, Grace would offer to pay a settlement if the plaintiff could demonstrate to Grace's satisfaction that a) he had lung cancer which a doctor would opine was caused by asbestos exposure and b) he had some evidence of exposure to Grace asbestos containing products. The exposure evidence varied depending on the case but would include any of the following: a) an affidavit from the claimant attesting to the fact that he worked with Grace asbestos containing products; b) an affidavit or other sworn statement from a co-worker attesting to the fact that the claimant worked with Grace asbestos containing products; c) an affidavit from the claimant or a co-worker that the claimant worked at a place where prior cases or discovery had shown that Grace asbestos-containing products were present; or d) discovery materials such as sworn interrogatory answers or deposition testimony from the claimant or co-worker documenting exposure to asbestos from a Grace product. Generally, Grace did not require the plaintiff to demonstrate that he also had a diagnosis of asbestosis (in addition to the lung cancer) in order for Grace to make a settlement offer in a lung cancer case, nor did Grace require the plaintiff to demonstrate that he personally mixed or personally installed an asbestos product in order to make a settlement offer in lung cancer cases.

In settling an asbestos personal injury case Grace typically would not require the plaintiff to provide it with all documents that existed that had been produced in discovery or prior cases related to exposure to the asbestos in Grace products.

How the settlement values paid by Grace in mesothelioma cases compared in size to judgments returned in favor of plaintiffs following trials in mesothelioma cases in the jurisdictions in which Mr. Kraus represents asbestos plaintiffs.

The type of evidence that was identified and used in trials in which Grace was a defendant to prove asbestos exposure and causation from Grace products or operations and

13

when in the discovery/trial preparation process such evidence was typically available. This evidence varied depending upon the case, but included any of the following: co-worker testimony about the use of Grace products at a place and time where the plaintiff was working; invoices from Grace or third parties demonstrating the presence of asbestos products at a location; testimony from the plaintiff (if living); deposition or prior trial testimony from the plaintiff or co-workers concerning asbestos exposures; testimony from expert witness industrial hygienists concerning the plaintiff's asbestos exposure and from expert witness medical doctors or epidemiologists concerning whether or not such exposures could cause the asbestos-related disease at issue.

What additional steps claimants represented by Mr. Kraus would previously take to prepare for a trial in which Grace was an asbestos defendant that Mr. Kraus's clients have not taken or have been prevented from taking due to Grace's bankruptcy status.

Whether the jurisdictions in which Mr. Kraus represents asbestos plaintiffs require mesothelioma victims to prove that they personally mixed or personally installed an asbestos containing product in order to get past a motion for summary judgment.

The various types of industries and occupations in which Mr. Kraus's clients worked and for which Grace paid their claims.

The names and types of asbestos containing products manufactured by Grace that Mr. Kraus's clients most frequently identified in discovery or affidavits as being a source of their asbestos exposure were usually the following: Monokote 3; Monokote spray on insulation; Zonolite Hi Temp Insulating Cement Zonolite Acoustical Plaster/Plastic.

What exhibits Mr. Kraus would use (or place on a trial exhibit list for expected use) in asbestos personal injury trials to demonstrate that Grace knew of the dangers of

asbestos yet failed to provide adequate warnings of its hazards to those who came into contact with it.

Whether the "all in value" of a mesothelioma case settled in 2007 is higher than the "all in value" of a mesothelioma case settled in 2001.

9. Daniel P. Myer: Dan Myer is an expert witness for the Grace ACC who is one of the principal asbestos personal injury claims settlement negotiators for Union Carbide. Mr. Myer has worked for both solvent asbestos defendants and bankruptcy trusts in the negotiation, settlement and evaluation of asbestos personal injury claims for over 25 years. He has personally been involved in (either directly or in a supervisory capacity) the negotiation or resolution of over 200,000 asbestos personal injury claims throughout the course of his career. Since 2001, he has settled asbestos claims (primarily mesothelioma claims) for Union Carbide and other solvent defendants, as well as for asbestos bankruptcy trusts. Mr. Myer's claims management company, Verus Claims Services, has provided claims management services for a number of active tort defendants, including Certainteed Corporation, Foseco, National Service Industries, and Union Carbide Corporation. In this capacity Mr. Myer and his staff have been actively involved in developing settlement strategies in individual states for different tort defendants, evaluating asbestos personal injury cases and negotiating settlements of trial listed cases in nearly every jurisdiction with an active trial docket on behalf of different tort defendants involved in the asbestos litigation.

In addition to providing claims management services for a number of tort defendants, Verus also serves as claims administrator for the Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust, Plibrico Asbestos Trust, ARTRA Asbestos Trust, Porter Hayden Asbestos Bodily Injury Trust, Combustion Engineering Asbestos Bodily Injury Trust,

A-Best Asbestos Personal Injury Trust, ABB-Lummus Asbestos Bodily Injury Trust, and A&I

Corporation Asbestos Bodily Injury Trust.

Mr. Myer has been recognized by courts or arbitration panels as an expert in the areas

of an expert witness in the area of asbestos claims management, reasonableness of asbestos

claim settlement values, and the reasonableness of the methodology of decisions on asbestos

claim settlements. He will testify about the matters in his expert witness report and will also

testify as a percipient fact witness with knowledge of the settlement values in mesothelioma

cases in which he has been involved. The following pages of his report relate factual

knowledge: 6-11.

10. John V. Port (by deposition): John Port is an employee or former employee of

Grace's financial department who testified in the Sealed Air proceedings about Grace's record-

keeping practices and with certain documents in its files. Mr. Port's testimony will be offered

in this proceeding if necessary to authenticate or lay the foundation for the admissibility of

particular documents.

11. Jeffrey Posner (by deposition): Mr. Posner is W.R. Grace's principal outside

consultant for the purpose of obtaining proceeds from policies available to pay asbestos

personal injury claims. He is a former employee of W.R. Grace who left the company in 1999

to form his own consulting firm. He has continued to work for Grace and other asbestos

defendants since that time. He currently resides in Florida. The subject matter of Mr.

Posner's testimony relates to Grace's efforts to collect the proceeds of insurance policies which

provide coverage for asbestos liabilities and statements made by Grace or documents provided

by Grace to its insurers or the Grace ACC in connection with those efforts.

12. Dayton Louis Prouty, Jr. (by video deposition):  Mr. Prouty is a deceased

mesothelioma victim who was a veterinarian.  In his personal injury case against Grace, he

testified about his exposure to Grace asbestos while working as a teenager in a Grace facility

and about the horrible and debilitating effects that mesothelioma had upon his life.  He died on

November 29, 2000; his case was settled by W.R. Grace shortly before it went into

bankruptcy.

13. Dan Rourke (by deposition):  Dan Rourke is a consultant to ARPC who worked as

a consultant to Grace both at the time of the 1997-1998 Sealed Air transaction and up through

early 2001, and provided services related to Grace's efforts to estimate the number and value

of future asbestos personal injury claims.  He resides in New York.  Grace designated Mr.

Rourke as its 30(b)(6) witness in the Sealed Air proceedings on topics related to Grace's

aggregate liability for asbestos personal injury claims.  The ACC will likely designate some or

all of Mr. Rourke's testimony taken in the Sealed Air proceeding for use at the Estimation

Hearing.

14. David Siegal (by deposition):  David Siegal was Grace's General Counsel from

1999 to 2005, and is currently a consultant to the company.  He resides in Vermont.  Mr.

Siegal testified about the settlement criteria and evidence Grace required asbestos personal

injury plaintiffs to meet before offering to settle their cases, the risks Grace faced in taking

asbestos personal injury cases to trial (both generally and in specific cases), the costs

associated with settling asbestos personal injury cases, Grace's litigation strategy, settlement

agreements between Grace and large numbers of asbestos personal injury plaintiffs, including

certain of those agreements which contained "moratoria periods," the methodology and data

used by Grace in estimating its liability for present and future asbestos and personal injury claims for business planning, and SEC reporting purposes.

The ACC will likely designate some or all of Mr. Siegal's testimony taken in this proceeding and the Sealed Air proceeding for use at the Estimation Hearing.

15. Stephen Snyder: Stephen Snyder is a lawyer who has specialized in defending asbestos personal injury claims for over 25 years. He was the primary outside defense counsel for Fibreboard, Owens Corning and many other asbestos defendants. Mr. Snyder has prepared two expert reports for the Grace ACC and will testify about the matters stated in those reports. In addition, to the extent his testimony is based on personal knowledge as a percipient fact witness to asbestos litigation, Mr. Snyder will testify about Grace and various other asbestos defendants' historical practices in litigating and defending asbestos personal injury claims; comparison of said practices to the practices of other asbestos defendants; the nature of the "chrysotile defense" and how it is raised by defendants and litigated by plaintiffs in asbestos personal injury trials; the effectiveness of the chrysotile defense in trials and settlement negotiations; how and in what stage of the litigation process plaintiffs typically establish exposure or "product ID" with respect to a particular defendant; how exposure evidence is presented at trial and the type of evidence admitted on such an issue; the role of pulmonary function tests in asbestos litigation; the lung cancer/asbestosis defense as it is used in asbestos litigation; how a defendant takes into account the identity and credibility of the doctors whose reports are offered by the plaintiff in the settlement process; the typical size of verdicts or post-verdict judgments as compared to settlement averages for asbestos defendants; and what factors affect the settlement criteria and settlement values paid by an asbestos defendant. In addition, the following pages of Mr. Snyder's September 2006 expert report are factual in nature: 1, 3-

18

9, 11-15, 18-19, 21-22, as well as the following pages of his September 2007 expert report: 5-7, 10-17, parts of pp. 19-20, 22, p.23 fn 29, 24, 29, 31-32, 33-36, 37-38, 41-44, 60-61, 63-66.

16.  Erby Williams (by prior testimony):  Erby Williams is a deceased mesothelioma victim whose case against Grace was tried in May of 1998, resulting in a verdict of $3,979,272.60.  Mr. Williams' testimony concerned the circumstances surrounding his exposure to asbestos and the effect of mesothelioma on his life.

17.  Records Custodian from W.R. Grace:  Such a witness will be called by the ACC if necessary to authenticate or establish a business records foundation for documents.

18.  30(b)(6) witness from RUST Consulting:  Jeffrey Dahl is a senior vice president at RUST Consulting, the claims administration firm involved in the preparation and processing of the Personal Injury Questionnaire and other estimation materials in this proceeding.  Mr. Dahl was designated the 30(b)(6) witness for RUST Consulting.  The ACC will likely designate a portion of Mr. Dahl's testimony taken in this proceeding for use at the Estimation Hearing.

19.  30(b)(6) witness from BMC Group:  Stephanie Kjontvedt is a senior project manager at BMC Group, a bankruptcy administration firm involved in mailing of the Personal Injury Questionnaires and other estimation materials in this proceeding.  Ms. Kjontvedt was designated the 30(b)(6) witness for BMC Group.  The ACC will likely designate a portion of Ms. Kjontvedt's testimony taken in this proceeding for use at the Estimation Hearing.

## EXPERT WITNESSES

1.  Arnold R. Brody, Ph.D.:  Arnold Brody received a Bachelor of Science degree in Zoology in 1965.  This degree focused on animal biology and natural systems, and prepared Dr. Brody to complete the requirements for a Master of Science degree in Functional

Vertebrate Anatomy. Here, he focused on how the muscles, bones, nerves and other organized tissues of humans and other vertebrate species fit and function together in a comparative way. Dr. Brody then completed his graduate work with a doctorate in cell biology and a specialty in ultrastructural cytology, which is the study of cells using electron microscopy. Inasmuch as every disease has a "target cell" from which that disease develops, cell biologists appropriately trained can focus on the fundamental biochemical and molecular mechanisms that control the disease process of interest.

After three years of post-doctoral work, Dr. Brody was prepared to accept his initial faculty position in 1972, as an Assistant Professor in the Department of Pathology at the University of Vermont School of Medicine. Under the tutelage of Dr. John Craighead, a preeminent pulmonary pathologist at that time, Dr. Brody became conversant with diseases of the lung and began developing his own research program and publishing his findings in the peer-reviewed medical literature. In 1974, Dr. Brody was invited to spend several months working in the laboratory of Dr. Chris Wagner who in 1960 had established the link between asbestos exposure and the development of mesothelioma. Dr. Brody was invited because of his expertise in using light and electron microscopes to study human and animal lungs and his developing interest in asbestos diseases. In 1978, Dr. Brody accepted a position as head of The Pulmonary Pathology Laboratory at the National Institute of Environmental Health Sciences (NIEHS). There he began to ask fundamental questions about the basic mechanisms through which inhaled asbestos fibers cause lung injury, lung scarring, cell proliferation and damage to DNA. During his 15 years of tenure at the NIEHS, he published more than 80 peer-reviewed papers and 30 invited reviews, and he rose through the ranks to the highest level a government staff scientist can achieve. Dr. Brody's work defined the deposition patterns of

inhaled asbestos in the lungs, how this pattern dictates the generation of lung damage and how the inhaled fibers injure cell membranes and cause the consequent disease. His papers also describe studies on the lungs of individuals exposed to asbestos in the workplace so that fiber numbers and types could be ascertained.

In 1993, Dr. Brody accepted a position as a full professor in the Pathology Department of the Tulane University Medical School in New Orleans. He continued his work on the fundamentals of asbestos-induced diseases, now moving more toward the molecular mechanisms, meaning the genetic level of disease causation. He showed that inhalation of asbestos fibers rapidly up-regulated the expression of a series of genes that control cell growth. His laboratory demonstrated that p53, a well known tumor suppressor gene, is rapidly activated by exposure to asbestos, and if experimental animals have the gene knocked out that codes for tumor necrosis factor alpha, the mice are protected from the fibroproliferative events induced by asbestos exposure. During his time at Tulane, he was the first or senior author on over 50 peer-reviewed publications and 20 invited reviews and book chapters during his time at Tulane. In 1999, Dr. Brody was promoted to Vice Chairman of the Pathology Department, but continued his pace of publishing peer-reviewed science. In addition, all of Dr. Brody's research has been supported solely by the National Institutes of Heath ("NIH") through its competitive grant awards. Only about 10-20% of the thousands of applications submitted by professors across the country are funded each year by the NIH. His work was funded without interruption during his tenure at Tulane and continues to be today. This recognition by his peers is manifested not only by the grant awards, service on NIH committees and peer-reviewed papers, but also by regular invitations to speak before a variety of scientific audiences around the world. In 2005, Hurricane Katrina forced the closing of Tulane

University for an extended time. During this period, Dr. Brody was invited by colleagues to continue his work on an interim basis at North Carolina State University. Since Tulane was recovering slowly, and essentially everything in Dr. Brody's laboratory was lost, he accepted a position as Professor in the Department of Molecular Biomedical Sciences at NC State, effective September, 2006. This is where he currently operates a basic science laboratory funded by the NIH. His work continues to focus on the molecular aspects of asbestos-induced lung diseases with new emphasis on stem cells and expression of genes at sites of lung injury. Dr. Brody currently is serving on the Program Committee for the International Conference of the American Thoracic Society to be held in 2008. He just finished serving on three separate Study Sections that the NIH convened to review new grant applications in 2007.

Dr. Brody's expertise allows him to offer opinions on lung pathobiology in general and in particular the cellular and molecular mechanisms through which inhaled asbestos fibers cause asbestosis, pleural plaques, lung cancer and mesothelioma.

Dr. Brody has been recognized by courts around the country as an expert on the subject matter of cell biology and the cellular and molecular mechanisms through which inhaled asbestos fibers cause asbestos-related lung diseases. His opinions in this case and expected areas of testimony are set forth in his expert witness report dated September 13, 2006.

2.    Samuel P. Hammar, M.D., F.C.C.P.: Dr. Samuel Hammar graduated from the University of Washington Medical School in 1969, and was board certified in both anatomic and clinical pathology in 1975. From 1977 until 1979, Dr. Hammar held the position of Chairman of the Pathology Section of the Lung Cancer Study Group, a group aimed at determining the best ways to treat lung cancer and mesothelioma. As Chairman, Dr. Hammar

22

was charged with determining that the diagnosis of each individual case was correct, and that the tumors were correctly staged.

Dr. Hammar has researched and published extensively in the field of asbestos-related disease. He has written chapters for numerous books concerning mesothelioma and asbestos-induced diseases, and has published many articles in peer-reviewed journals regarding asbestos-related lung disease. For example, Dr. Hammar is the co-editor of a textbook on the pathology of the lungs and chest cavity, *Pulmonary Pathology*, and of *Pulmonary Pathology Tumors*, a textbook that deals with the various neoplasms of the lung and chest cavity, and of a book titled *Asbestos: Risk Assessment, Epidemiology and Health Effects*. Dr. Hammar authored two chapters of *Pulmonary Pathology* – Chapter 32, dealing with common lung neoplasms, and Chapter 34, about pleural diseases, primarily mesothelioma. He also co-authored Chapter 28 in *Pulmonary Pathology*, titled *Asbestos*, and a book published by the International Mesothelioma Panel titled *Pathology of Malignant Mesothelioma*. Recently, Dr. Hammar contributed to a book published by the IARC Press titled *Pathology and Genetics of Tumors of the Lung, Pleura, Thymus and Heart*.

Dr. Hammar has participated in numerous studies of mesothelioma. He has served as the pathologist for the CARET (Carotene and Retinoic Acid Efficacy Trial), a study aimed at determining whether anti-oxidant vitamins prevented or reduced the incidence of lung cancer and/or mesothelioma in individuals who were exposed to asbestos and/or cigarette smoke, and was a member of the WHO Committee, a group that wrote a book published in 1999 on the current classification of lung cancer and mesothelioma.

Currently, Dr. Hammar is the Director of Diagnostics Specialties Laboratory in Bremerton, Washington, and a Clinical Professor of Pathology and Environmental Sciences at

the University of Washington Medical Center. He is a member of both the United States/Canadian Mesothelioma Panel and the International Mesothelioma Panel. As a pathologist in Bremerton, Washington, Dr. Hammar evaluates asbestos induced lung disease on a regular basis. Bremerton is the home of the Puget Sound Naval Shipyard, and is a small city in which a significant portion of the population has been exposed to asbestos. Each year, Dr. Hammar sees approximately 10-20 new mesothelioma cases, 20-30 cases of asbestos-induced lung disease, and about 20 cases of primary lung cancer related to asbestos.

Dr. Hammar has been recognized as an expert on the subject of asbestos-related disease by courts around the country. His opinions in this case and expected areas of testimony are further set forth in his expert witness reports dated September 13, 2006 and July 30, 2007.

3.    Steve M. Hays, P.E., C.I.H.: Steve Hays is a professional engineer and a certified industrial hygienist. Mr. Hays earned a Bachelor of Engineering/Chemical Engineering Degree from Vanderbilt University in 1973, where his studies included various chemistry courses, fluid dynamics related to the behavior of gases (asbestos behavior in air is controlled by the behavior of the air), thermodynamics (air movement is influenced by thermal conditions), mathematics (including statistics), physics, and basic engineering principles common to all engineering disciplines. Mr. Hays was first licensed as a professional engineer (PE) in Tennessee in 1978. Since that time, he has been certified as a professional engineer in Alabama, New Mexico, Arkansas, Florida, Illinois, Virginia, California, and Ohio. Mr. Hays was certified as an Industrial Hygienist by the American Board of Industrial Hygiene in 1990.

Since 1981, Mr. Hays has been involved in environmental management and abatement design at over 10,000 facilities nationwide. Currently, he is a partner and Chairman of the Board of Gobbell Hays Partners, Inc., a consulting firm that provides services regarding

24

environmental and built hazards to businesses nationwide. Understanding buildings and their systems is a primary responsibility for Mr. Hays, because knowledge regarding buildings and building systems is fundamental to competently and comprehensively knowing how to deal with asbestos-containing products which are present in built environments.

Mr. Hays also serves as a seminar faculty member at Georgia Technical Research Institute, and at The Environmental Institute. He has given hundreds of lectures at asbestos training courses offered by Georgia Tech, The Environmental Institute, Texas A & M, and other organizations. Topics on which he has lectured include air sampling, dust sampling, asbestos management planning, asbestos inspections, buildings and building systems, and asbestos abatement design. He also regularly lectures on environmental-health and asbestos-related topics at colleges nationwide.

Throughout his career, Mr. Hays has been extremely active in environmental health professional organizations and government entities. In 1987, he was a member of a committee appointed by the Environmental Protection Agency ("EPA") to advise the agency on writing regulations pursuant to the Asbestos Hazard Emergency Response Act (AHERA). In that role, Mr. Hays successfully urged the EPA to include subject matter about buildings and building systems in the required training for certain asbestos abatement disciplines. Those requirements remain in effect to this day. He is currently a member of the EPA Policy Dialogue Committee, a group which advises the EPA on the future regulation of asbestos containing materials in public and commercial buildings, and has peer reviewed numerous EPA documents and publications, including Managing Asbestos In Place (the "Green Book"). This past year, Mr. Hays served as a peer reviewer for the EPA Alternative Asbestos Control Method (AACM), which is being tested by the agency as a possible alternative to the current

25

demolition of asbestos-containing structures which must be done under regulations of the

National Emission Standard for Hazardous Air Pollutants (NESHAP).

Mr. Hays is also a past President and Secretary of the Environmental Information

Association, and has held several positions on the National Asbestos Council ("NAC"),

including Secretary and member of the Board, and has chaired numerous NAC committees,

including Awards and Sponsorship, Professional Registration, and ad-hoc committees formed

to study professional practice guidelines and liaison memberships. He has also held several

positions with the National Institute of Building Sciences, including Chair of the Board of

Directors, member of the Indoor Air Quality Task Force, Chair of the Asbestos Project

Committee, and member of the Task Force Steering Committee for preparation of asbestos

abatement guideline specifications.

Mr. Hays has studied asbestos-containing products in many different ways and settings.

These studies include well controlled simulations of work practices to determine (1) exposure

to airborne asbestos when asbestos-containing products are disturbed and (2) exposure to

airborne asbestos when asbestos-containing settled surface dusts are disturbed. He has also

studied methods for reducing airborne exposure during work practices and methods for safely

removing asbestos surface contamination. Some of these studies have been funded by lawyers

and/or clients involved in litigation, and some studies have had no litigation component.

Mr. Hays has provided consultation services regarding The World Trade Center. The

first consultation was in the early 1990s after the bomb exploded in the parking decks. Other

consultations were focused on the management in place of the asbestos-containing products

existing in the towers. After the 2001 collapse of the towers, the EPA used a book about

26

asbestos-containing settled dust coauthored by Mr. Hays as a resource for the ensuing cleanup efforts, and the agency cited the book in its reports.

Mr. Hays has received several awards and honors in recognition of his environmental health work, including the Indoor Environment Quality Committee Past Chair Recognition of Excellence Award, which he received in May 2006. He has published and lectured extensively on asbestos, and has given numerous presentations focused on asbestos.

Mr. Hays' background in the chemical industry, coupled with his certification as an industrial hygienist, and his knowledge of building systems, provides him a unique expertise regarding asbestos. He has been recognized by courts on numerous occasions as an industrial hygiene expert on all the topics addressed in his report. His opinions in this case and expected areas of testimony are further set forth in his expert witness reports dated June 8, 2007, and July 30, 2007.

4.    <u>Richard A. Lemen, M.D.</u>: Dr. Lemen is a retired Assistant Surgeon General, Rear Admiral, United States Public Health Service ("USPHS"), and Deputy Director of the National Institute for Occupational Safety and Health ("NIOSH"), and Centers for Disease Control and Prevention ("CDC"). Throughout his lengthy career, he has focused on issues related to occupational safety and health, and has held numerous positions in the field. Since he retired from USPHS in 1996, he has been a private consultant in occupational safety and health.

Dr. Lemen received a B.A. in Zoology and Chemistry from Central Methodist College in 1967. He then attended the University of Missouri, where he worked toward an M.S.P.H. in Epidemiology, which he received in 1970. After earning his M.S.P.H., Dr. Lemen attended epidemiology seminars. From 1976 through 1978, Dr. Lemen performed graduate

27

studies in Occupational Medicine, Epidemiology, and Toxicology at the University of Illinois. In 1992, he earned a Ph. D. in Epidemiology from the University of Cincinnati. He attended a Consortium for Public Health involving University of California, Berkley, University of California, Los Angeles, and San Diego State University in 1994 and 1995.

Dr. Lemen was an Industrial Hygienist and Epidemiologist for the Field Studies Branch of BOSH, NIOSH, USPHS, from 1970 through 1971. In that position, he was responsible for directing field teams conducting occupational surveys of the asbestos and beryllium industries in the United States. He often participated in the medical field team and was responsible for pulmonary function testing of asbestos workers and for obtaining individual medical and occupational histories. The medical team visited asbestos manufacturing plants. The findings of these investigations culminated in the 1st and 2nd criteria documents produced by NIOSH for Occupational Health Standards under the Occupational Safety and Health Act of 1970.

From 1971 through 1973, Dr. Lemen was an Epidemiologist in the Biometry Branch of DFSCI, NIOSH, CDC, USPHS. In this position, he was responsible for conducting retrospective cohort studies on workers who had been exposed to substances such as asbestos. Dr. Lemen published several scientific publications as a result of these studies.

During the time period between 1974 and 1976, Dr. Lemen was the Chief of the Biometry Branch of DFSCI, NIOSH, CDC, and USPHS. From 1978 through 1980, Dr. Lemen held the position of Assistant Chief, IWSB of the Industry Wide Studies Branch of DSHEFS, NIOSH, CDC, USPHS. His major responsibility in both of these positions was to provide administrative and scientific guidance direction for bio-statistical, epidemiological, and industrial hygiene analyses of ongoing industry-wide standards within the Division.

28

From 1980 to 1981, Dr. Lemen was the Director of the Division of Criteria

Documentation and Standards Development and Division of Technical Services of NIOSH,

CDC, USPHS. In this position, he was responsible for providing recommendations to the

Director of NIOSH for the development of criteria for the congressionally mandated purpose

of recommending safety and health standards. From 1981 through 1988, Dr. Lemen was the

Director of the Division of Standards Development and Technology Transfer of NIOSH, CDC,

USPHS. In this position, his duties included developing, from existing scientific and technical

documents, the criteria for recommending occupational safety and health standards for the

Occupational Safety and Health Administration of the Department of Labor, developing the

recommended health standards under the Federal Mine Safety and Health Act of 1969 and its

1977 amendments, coordinating NIOSH testimony for hearings on proposed standards,

assisting the NIOSH Director with developing research for recommending standards, and

preparing and revising the legislatively mandated toxic substances list. He directed a team

effort in the scientific assessment of occupational safety and health standards. He also served

on several committees during this time – he was Chairman of the DHHS Committee on Health

Effects of Ingested Asbestos, and Chairman of the OSHA/NIOSH Task Force on Review of

Occupational Exposure to Asbestos.

From 1988 through 1991, Dr. Lemen was the Assistant Director for NIOSH in

Washington, D.C., and for the CDC Washington, D.C. Office. NIOSH had an annual budget

of $85 million and approximately 815 positions. As the Assistant Director of NIOSH, Dr.

Lemen represented and acted for the Director of NIOSH in contacts with high level officials in

the Office of the Secretary of the Department of Health and Human Services, the Office of the

Assistant Secretary for Health, as well as other Departmental Offices in both formal and

informal policy matters. He was the NIOSH liaison to state, city, and county health and labor agencies. He served as a principal member of the NIOSH Director's senior management team, using his epidemiology and occupational medicine training combined with broad knowledge of public health and occupational safety and health to participate in the development of Institute-wide policies, program priorities, organizational management, and resource allocation and deployment. He was responsible for assuring the proper development of proposed testimony for congressional hearings on issues affecting NIOSH. He also interpreted to Congress the implications of pending legislation or regulations pertaining to occupational safety and health issues. As the Assistant Director of the CDC Washington, D.C., Office, Dr. Lemen served as the alternate agency representative to the Office of the Surgeon General, USPHS.

From 1991 through 1996, Dr. Lemen was the Assistant Surgeon General of USPHS and the Deputy Director for NIOSH, CDC, and USPHS. He was also the Acting Director of NIOSH from 1993 through 1994. As the Deputy Director, Dr. Lemen shared responsibility with the Director for planning, developing, evaluating, and managing the Institute. He provided advice and assistance to the Director on scientific policies, activities, and operations in the overall management of the Institute, and served as an expert-adviser on the implications of state and local level health and safety requirements. He also assisted the Director with maintaining liaisons with other governmental organizations to forward NIOSH goals, and working to obtain their cooperation. As Acting Director, Dr. Lemen represented the Director on various committees and scientific matters with full authority to speak on the Institute's behalf. He also had direct responsibility for the Institute's extramural grants program, international health activities, and Board of Scientific Counselors. The Institute had a budget of $133,000,000, and a staff of 951.

Dr. Lemen served as the Senior Science Advisor of The Center to Protect Worker's Rights from 1996 through 1997. In 1997, he became the President of The Risk Advisers, Ltd., a consulting firm that is engaged in the analysis of risks associated with occupational and environmental exposures. He continues to hold this position, and is also an Adjunct Professor in the Department of Environmental and Occupation Health at the Rollins School of Public Health, Emory University, Atlanta, Georgia, where he teaches occupational and environmental health, and is on the adjunct faculty as an Associate Professor at the Kettering Laboratory of the University of Cincinnati School of Medicine.

Dr. Lemen has received numerous awards and recognition for his professional accomplishments, including The Surgeon General's Exemplary Service Medal in 1993, the Alice Hamilton Science Award for Occupational Safety and Health, NIOSH (the Highest Science award of NIOSH) in 1993, and the James P. Keogh Award for Outstanding Service in Occupation Safety and Health, National Institute for Occupational Safety and Health, in 2000.

For over 35 years, Dr. Lemen has been involved intimately with asbestos-related research. On behalf of NIOSH, he presented testimony to Congress regarding asbestos-related diseases numerous times from the time period beginning in 1979 through 1993. He has also presented regarding occupational safety and health numerous times, and has specifically presented testimony regarding asbestos-related diseases to the Department of Labor, and at meetings of associations and organizations.

Dr. Lemen has written and published extensively on the subject of asbestos-related disease and industrial hygiene and has been recognized by courts around the country as an expert on asbestos-related epidemiology issues. His opinions in this case and expected areas of testimony are further set forth in his expert witness report dated September 6, 2006.

31

5.   <u>William E. Longo, Ph.D.</u>: Dr. Longo has earned several degrees from the University of Florida - a Bachelor of Science degree in Microbiology, a Masters of Science in Engineering, and a Doctorial of Philosophy in Material Science and Engineering. After earning his Ph. D., Dr. Longo remained at the University of Florida to conduct research. In 1985, he became a visiting Assistant Professor in the Material Science & Engineering Department. During his time at the University, Dr. Longo's research included the characterization of cancer drug targeting molecules by electron microscopy. He holds a patent for the synthesis of protein microspheres for the drug targeting applications as an outgrowth of that research.

In 1983, Dr. Longo founded Micro Analytical Laboratories, Inc. ("MAL"), which became one of the first commercial labs in the country to provide Transmission Electron Microscopy (TEM) analysis of asbestos-containing air, bulk and dust samples. He left MAL in 1987 to become the President of Materials Analytical Services, Inc. ("MAS"), headquartered in Atlanta, Georgia, which became MAS, LLC in 2007.

MAS specializes in the characterization of materials for the environmental, industrial hygiene and building & construction products industries. Currently, about 10% of MAS's staff has their Ph.D.'s in a wide range of scientific disciplines. MAS's technical group includes certified industrial hygienists, geologists, biologists, microbiologists, electron & optical microscopist, environmental chemists and material scientists. MAS has provided laboratory analysis and consulting services to a wide range of private, public, and government entities, including W.R. Grace itself, NASA, the Center for Disease Control, NBC, the University of Tokyo, IBM, FAA, GSA, NATO, the National Institutes of Health, Celotex, Intel, and the EPA. MAS has extensive experience in the analysis of bulk samples of asbestos for purposes

32

of performing micro-analytical product identification, and has performed this analysis on thousands of bulk samples of asbestos containing fireproofing and acoustical material ("Surface treatment ACM"), for a wide variety of companies. Several bankruptcy trusts have selected MAS as an Approved Laboratory. MAS has also provided product identification analysis for Hawaii, Texas, Utah, New York, New York City, Boston, the Port Authority of New York, and the Port Authority of New Jersey.

Dr. Longo and MAS have provided consulting and analytical services to several former asbestos manufacturers, including Grace's Construction Products Division. The work Dr. Longo and MAS performed for Grace was done pursuant to Grace's request that MAS analyze air samples collected by Grace during the spraying of fireproofing products for tremolite/actinolite airborne fiber levels. This work was not performed in connection with any litigation, or for any litigation purpose. Grace asked that MAS determine whether the tremolite/actinolite contamination in the vermiculite would be airborne during the spraying process, and requested that all the air samples be analyzed by the indirect method. MAS found tremolite/actinolite asbestos fibers.

Dr. Longo has been qualified as an expert in both State and Federal court as a material scientist, an electron microscopist, and an industrial hygienist. He has served as a member of the Environmental Protection Agency ("EPA") Peer Review Group, a group of five members who peer reviewed the EPA's findings in their ongoing asbestos research with regard to asbestos in building issues. The Peer Review Group provided the EPA with guidance for their continuing asbestos research, and with insight regarding new issues that needed to be addressed. Dr. Longo was also previously a member of an EPA panel that drafted the micro-

33

vacuum ("Microvac") asbestos dust method in 1989 that measured asbestos surface contamination.

In addition, Dr. Longo has served as both Chairman and Vice Chairman of the TEM Analytical Committee for the National Asbestos Council ("NAC"). He is the primary author of the American Society for Testing and Materials (ASTM) D-5755-95 Dust Sampling Method for the Quantification of Asbestos Surface Contamination ("ASTM D-5755 Dust Sample Method"), which was approved and promulgated as an ASTM standard method in 1995. He was presented an Award of Appreciation by the D-22 Committee on Sampling and Analysis of Atmospheres for his leadership role in developing the ASTM dust method. He has also published his research concerning asbestos-containing products and the fiber release during their normal use pertaining to installation, disturbance and removal during normal maintenance activities in a building in several peer reviewed publications. One such article focused on the the measurement of asbestos fiber levels during the disturbance of W.R. Grace Monokote-3 dust while pulling cable above ceiling tiles.

The majority of Dr. Longo's product identification consulting work has been done in the context of litigation, and has involved the materials characterization of unknown surface treatment ACM. Typically, in order to characterize an unknown surface treatment ACM, Dr. Longo analyzes a bulk sample of ACM with a variety of analytical techniques to determine the constituent ingredients and their proportionality, and then compares the sample to the manufactures' known product formulas, as well as to information regarding application techniques. In order to perform product identification analysis for this case, Dr. Longo was provided all of Grace's asbestos-containing construction product formulations as well as ingredient information, including the source of their chrysotile asbestos. His opinions in this

34

case and expected areas of testimony are further set forth in his expert witness reports dated

September 15, 2006, and July 24, 2007.

6.    Daniel P. Myer:  See description on page 15 above.

7.    Mark A. Peterson, Esq., Ph.D.:  For over twenty-five years, Dr. Peterson has

studied, written about, and participated as a special master and expert in asbestos litigation and

other mass tort litigation.  He is a lawyer, a graduate of Harvard Law School, and a

recognized scholar on asbestos and other mass tort litigation.  He has a doctorate in social

psychology from the University of California, Los Angeles.  For over twenty years, he

conducted research on asbestos and other mass tort litigation as a founding member of the

RAND Corporation's Institute for Civil Justice.  He has published many scholarly, peer-

reviewed, articles on asbestos litigation, mass torts, and workers compensation, including

articles on: how asbestos and other mass tort claims arise, how the values of asbestos bodily

injury claims are determined by medical and legal issues, evaluations of claims facilities used

for paying asbestos and other mass tort claims, and other subjects related to asbestos litigation.

He has taught courses on mass torts at UCLA Law School and the RAND Graduate Institute.

His resume is attached as Exhibit 1 to his expert witness report.

Dr. Peterson is an expert on claim values, claims procedures, and estimations of

liabilities for fifteen asbestos trusts.  He is a trustee of two asbestos claims settlement trusts --

the Manville Trust and the Fuller Austin Settlement Trust, and a director of TSI, a nonprofit

corporation that administers the trust distribution procedures for seven asbestos trusts.  He has

worked as an expert on asbestos litigation for judges, defendants, insurance companies,

actuarial firms, other businesses, law firms, and claimants' committees in bankruptcy.

Dr. Peterson has worked for four U.S. District and Bankruptcy Courts as the Court's expert on how asbestos claims are determined to have value, on asbestos claims procedures and trusts and other matters. As the Special Adviser to U.S. District Court Judge Jack B. Weinstein and U.S. Bankruptcy Court Judge Burton Lifland, he helped the courts and parties to restructure the Manville Trust, establishing the Manville Trust Distribution Procedures that became a model used in subsequent bankruptcy cases and by later-created trusts to process, allow, and pay the hundreds of thousands of asbestos claims that they have received so far.

Dr. Peterson has been an expert in more than twenty other bankruptcies and class actions in different cases working for parties with divergent interests: asbestos claimants' committees, defendant asbestos companies, insurance companies, and court-appointed representatives for future claimants. In each of these cases he has provided descriptions and quantitative forecasts of pending and future asbestos bodily injury claims using the standard forecasting methods that he describes and uses in this case. He has testified in court more than twenty times about his forecasts of asbestos liabilities. His forecasts and analyses have been accepted and used as the court's basis for findings of aggregate asbestos liabilities in the bankruptcy proceedings of Eagle-Picher, National Gypsum, Babcock and Wilcox (confirmation hearing), Turner & Newall, Western Asbestos, Armstrong, API, C. E. Thurston, H. K. Porter, E. J. Bartel, Raymark, and J. T. Thorpe.

Dr. Peterson has been recognized by courts as an expert on all areas that he addresses in his reports, and the descriptions and analyses in his report come from his scholarship and work as an expert on asbestos litigation. Dr. Peterson has estimated Grace's liability for pending and future asbestos personal injury claims and has provided rebuttal opinions to

36

Grace's estimates as more fully set forth in his expert reports in this matter dated June 18, 2007 and September 25, 2007.

      8.   Steven Snyder, Esq.: See description on page 18 above.

      9.   Laura S. Welch, M.D.: Dr. Welch is a physician with board certification in both Occupational and Environmental Medicine and Internal Medicine. She received her medical degree from the State University of New York at Stony Brook, and has held faculty positions at the Schools of Medicine at Albert Einstein, Yale, and George Washington Universities.

      Dr. Welch has extensive experience in the diagnosis, epidemiology and treatment of asbestos-related diseases. She has been in occupational medicine practice for over 20 years, and a substantial part of her practice has always been devoted to examination, diagnosis, and treatment of workers exposed to asbestos.

      Currently, Dr. Welch is medical director at the Center for Construction Research and Training ("CPWR"), a research institute devoted to improving health and safety in the construction industry. Because of her expertise in medical programs for asbestos-exposed workers, between 2002 and 2005 Dr. Welch participated in a working group with representatives from labor, industry, and insurance companies to develop medical criteria for Senate Bill 1125, a bill that if enacted would have established a national trust fund for compensation of asbestos-related disease in the United States.

      Dr. Welch has many years of experience in medical surveillance programs for asbestos, and research studies of the health effects of asbestos.

- Since 1987 Dr. Welch has been the medical advisor to the Sheet Metal Occupational Health Institute Trust ("SMOHIT"), a joint labor-management organization within the sheet metal industry established to provide medical examinations for sheet metal workers exposed to asbestos and other respiratory hazards. To date, SMOHIT has provided medical examinations to over 20,000 sheet metal workers, and is now the

37

largest epidemiological database of asbestos-exposed workers in the country. She
has published several papers describing the patterns of disease among sheet metal
workers based on this program.

- She currently serves as medical director for a Department of Energy-funded medical
screening program to provide medical examinations for former construction workers
at a number of former atomic weapons production facilities. In each of these
programs Dr. Welch has designed procedures for detection of asbestos-related
disease, and designed algorithms for the examining physicians to use in
interpretation of the results. She has been an author on several papers describing
the patterns of disease among DOE construction workers based on this program

- Dr. Welch has been active in efforts to improve validity and reliability of x-ray
reading to detect asbestos-related disease in the United States; this work included
publication of a paper on variability between readers' classification of x-rays using
the International Labor Organization Guide to Classification of Pneumoconiosis,
based on an analysis of results from these screening programs.

Dr. Welch has peer-reviewed numerous publications that are directly related to asbestos

exposure and asbestos-related diseases; her publications, as well as presentations and abstracts,

are listed on her curriculum vitae.

Dr. Welch will offer expert testimony on the diagnosis, epidemiology, causation, and

prognosis of asbestos-related diseases, as described more fully in her expert reports in this

case, dated September 2006, June 2007, and July 2007. She will also offer rebuttal testimony

to Grace's experts on these topics. Dr. Welch has been repeatedly recognized by state and

federal courts as an expert on the diagnosis, epidemiology, causation and prognosis of asbestos

diseases.

The ACC reserves the right to call in its direct case any witness identified on any other party's witness disclosure list. The ACC further reserves the right to call any witness needed solely for impeachment or rebuttal purposes. If any other party refuses to stipulate to the authenticity of any of the ACC's trial exhibits, or that an exhibit which qualifies as a business record within the meaning of Federal Rule of Evidence 803(6) is in fact a business record, the ACC reserves the right to call an appropriate custodian of records to lay a foundation to establish the authenticity and admissibility of a particular document.

Dated: December 21, 2007                    Respectfully submitted,


CAMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Marla Rosoff Eskin (DE No. 2989)
Mark T. Hurford (DE No. 3299)
800 N. King Street
Suite 300
Wilmington, DE 19801
Tel: (302) 426-1900
Fax: (302) 426-9947

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152
Tel: (212) 319-7125
Fax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
One Thomas Circle, NW
Washington, DC 20005
Tel: (202) 862-5000
Fax: (202) 429-3301

*Counsel to the Asbestos Personal
Injury Creditors Committee*

39