# Exhibit B

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                      Peter Kraus, Esquire

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - -

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

    Debtors.

Case No. 01-1139 (JFK)

Jointly Administered

- - - - - - - - - - - - - - - - - -

DEPOSITION OF

Peter a. Kraus, Esquire

March 4, 2008

Washington, D.C.

Lead:  David M. Bernick, Esquire

Firm:  Kirkland & Ellis

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                Peter Kraus, Esquire

Page 2

A P P E A R A N C E S

ON BEHALF OF W.R. GRACE:

    DAVID M. BERNICK, ESQ.

    Kirkland & Ellis, LLP

    200 East Randolph Drive

    Chicago, Illinois 60601

    and

    AMANDA C. BASTA, ESQ.

    Kirkland & Ellis, LLP

    655 Fifteenth Street, Northwest

    Washington, D.C. 20005


ON BEHALF OF THE OFFICIAL COMMITEE OF ASBESTOS

PERSONAL INJURY CLAIMANTS:

    NATHAN D. FINCH, ESQ.

    Caplin & Drysdale, Chartered

    One Thomas Circle, Northwest

    Washington, D.C. 20005


ON BEHALF OF THE FUTURE PERSONAL INJURY

CLAIMANTS REPRESENTATIVE:

    RAYMOND G. MULLADY, JR., ESQ.

    Orrick, Herrington & Sutcliffe, LLP

    1512 15th Street, Northwest

    Washington, D.C. 20005

US District Court - Delaware        FINAL - March 4, 2008
Chapter 11 - W.R. Grace        Peter Kraus, Esquire

Page 3

A P P E A R A N C E S (continued)

ON BEHALF OF THE OFFICIAL COMMITTEE OF GENERAL
UNSECURED CREDITORS:

    ARLENE G. KRIEGER, ESQ.

    Stroock & Stroock & Lavan, LLP

    180 Maiden Lane

    New York, New York 10038

ON BEHALF OF THE DEPONENT:

    NATALIE D. RAMSEY, ESQ.

    Montgomery, McCracken,

    Walker & Rhoads, LLP

    123 South Broad Street

    Philadelphia, Pennsylvania 19109

ON BEHALF OF BARON & BUDD:

    SANDY ESSERMAN, ESQ. (via phone)

    Stutzman, Bromberg, Esserman & Plifka

    2323 Bryan Street

    Dallas, Texas 75201

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                    Peter Kraus, Esquire

Page 4

A P P E A R A N C E S (continued)


ALSO PRESENT (via phone):

Robert Greenburg, Esquire

Allen Rich, Esquire



JANE ROSE REPORTING

     Brenda Smonskey, Court Reporter

     74 Fifth Avenue

     New York, New York  10011

     Phone:  1-800-825-3341

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                          Peter Kraus, Esquire

Page 5

I N D E X

DEPOSITION OF PETER A. KRAUS

MARCH 4, 2008

| EXAMINATION | PAGE |
|---|---|
| BY MR. BERNICK | 6 |
| BY MR. FINCH | 270 |
| BY MR. BERNICK | 285 |

| EXHIBITS MARKED | PAGE |
|---|---|
| Kraus Exhibit 1 | 17 |
| Kraus Exhibit 2 | 138 |

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 6

1          P R O C E E D I N G S
2              -  -  -  -  -
3     Whereupon,
4              PETER A. KRAUS
5     was called as a witness and, having first been
6     duly sworn, was examined and testified as
7     follows:
8              EXAMINATION
9        BY MR. BERNICK:
10       Q.  Good morning, Mr. Kraus.
11           Please state your full name for the
12    record.
13       A.  Peter Andrew Kraus.
14       Q.  In preparation for your deposition
15    today or in anticipation of your deposition here
16    today, did you review any documents?
17       A.  Yes.
18       Q.  Which documents did you review?
19       A.  I reviewed the W.R. Grace liability
20    outline.  I reviewed certain of the historic
21    Grace documents utilized by plaintiffs' lawyers
22    in the asbestos litigation.
23           I reviewed a sheet with 10 rules for a
24    deponent, a one-page sheet.  And I reviewed the
25    PowerPoint I presented to Judge Fitzgerald in

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                          Peter Kraus, Esquire

Page 7

1      Pittsburgh earlier in this case.

2          **Q.  That you tried to present?**

3          A.  Tried to present, presented some of.

4          **Q.  Because of this obstructionist lawyer**

5      **in the room?**

6          A.  Who got in the way.

7          **Q.  Anything else you reviewed in**

8      **anticipation of your deposition?**

9          A.  Not that I recall.  That's incorrect.

10     A memo from my partner about the production of

11     documents pursuant to the questionnaires.

12         MR. BERNICK:  Has that last memo been

13     produced, Natalie?

14         MS. RAMSEY:  It has not.

15         MR. BERNICK:  Are you expecting it to

16     be produced at some point in time?

17         MS. RAMSEY:  No.  It's work product.

18         BY MR. BERNICK:

19         **Q.  Who is the author of that document?**

20         A.  Leslie McLean.

21         **Q.  What is the date of it?**

22         A.  I don't know.

23         **Q.  Roughly?**

24         A.  Roughly this week.

25         **Q.  That's pretty good.  Did she prepare**

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 8

1    **that in anticipation of your deposition?**

2        A.   I assume so but don't know for sure.

3        **Q.   Did she prepare it at your request?**

4        A.   No.

5        **Q.   Did you make a request of Ms. McLean at**

6    **some point prior to this deposition that she**

7    **review with you the procedures that were**

8    **followed in connection with the PIQ?**

9        A.   No.

10        **Q.   I'm asking whether this is something**

11    **that she may well have written anticipating that**

12    **you were going to ask her about what went into**

13    **the PIQ.**

14        A.   She knew I was giving my deposition.

15        **Q.   Right.**

16        A.   She knew that a likely area of inquiry

17    was our response to the questionnaires, and I

18    think she prepared a memorandum about some of

19    the procedures that we followed in responding to

20    the questionnaires.

21        **Q.   Did you talk with Ms. McLean about this**

22    **memo?**

23        A.   No, I did not have a conversation with

24    her about it.

25        **Q.   So she just sent it to you by e-mail or**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 9

1    gave it to you in some other fashion?

2        A.   She gave me -- yes, she left it for me

3    before I left for Washington for this

4    deposition.  She sent it to me.

5        Q.   Having read the memo, did you make any

6    contact with anybody else at your firm to

7    discuss your deposition in any way, shape or

8    form?

9        A.   I called Ms. McLean yesterday during

10   the time I spent with Ms. Ramsey before the

11   deposition.

12       Q.   And what was the substance of your

13   conversation with Ms. McLean on that occasion?

14       MS. RAMSEY:  Objection as to privilege,

15   calls for attorney-client privilege.

16       MR. BERNICK:  Are you instructing him

17   not to answer?

18       MS. RAMSEY:  I instruct him not to

19   answer.

20       BY MR. BERNICK:

21       Q.   Is there any further work or -- strike

22   that.

23       Is there anything that you asked

24   Ms. McLean to do as a consequence of having read

25   the memo that she prepared for you?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 10

1      A.  No.
2        **Q.  Any other materials that you reviewed**
3    **in anticipation of your deposition apart from**
4    **what you described as the liability outline and**
5    **some historical documents that plaintiffs'**
6    **lawyers have used in connection with the Grace**
7    **litigation, the 10 rules for a deposition, the**
8    **PowerPoint that you began to show Judge**
9    **Fitzgerald and the memo from your partner,**
10   **Ms. McLean?**
11     A.  I reviewed your document requests to
12   Waters & Kraus and our responses and objections
13   to them.
14       **Q.  And that was the document request that**
15   **was made in anticipation of your deposition here**
16   **today?**
17     A.  Yes, that's my understanding.
18       **Q.  The 10 rules for deponents, what is**
19   **that document?**
20     A.  It is a one-page list of suggestions
21   for a deponent.
22       **Q.  Have you ever been deposed before?**
23     A.  No.
24       **Q.  Oh.  Well, welcome to the process.**
25     A.  How about that?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 11

1          MR. MULLADY:  That's why he needed the
2     rules.
3          BY MR. BERNICK:
4          **Q.  I will tell you I'm part of that club,**
5     **if you want to refer to it.**
6          MR. FINCH:  So am I.
7          THE WITNESS:  The ones who have or
8     haven't been?
9          MR. FINCH:  I have never been deposed.
10     My goal in life is to go through life without
11     ever being deposed.
12          BY MR. BERNICK:
13          **Q.  Have you ever given any kind of sworn**
14     **testimony?**
15          A.   Not that I recall.
16          **Q.  Never called at trial as a witness?**
17          A.   No, not that I recall.
18          **Q.  The document request that was directed**
19     **to you, do you recall that it was directed**
20     **actually to you as opposed to Waters & Kraus?**
21          A.   I would have to review the request to
22     recall specifically how you directed it.
23          **Q.  Did you do anything to gather documents**
24     **or cause to be gathered documents that were**
25     **responsive to the document request that was made**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 12

1      in anticipation of your deposition?

2          A.  Yes.

3          **Q.  What did you do?**

4          A.   I discussed the request with my lawyer

5      and with Ms. McLean.  We determined which

6      requests we had responsive documents for that we

7      were obligated to produce, and I directed that

8      the documents that needed to be produced be

9      produced.

10         **Q.  Did you review the objections and**

11     **responses before those were sent on to Grace?**

12         A.  Yes.

13         **Q.  And you are comfortable with the**

14     **accuracy of those objections and responses?**

15         A.  So far as I know, yes.

16         **Q.  Am I correct that you intend to stand**

17     **on the objections that were made to the document**

18     **requests?**

19         A.  Yes.  The requests, as I recall them,

20     not having them in front of me, contain or seek

21     a great deal of attorney-client and work product

22     privilege material, which as a lawyer I felt was

23     clearly outside the bounds of what should be

24     produced in litigation.

25         **Q.  It is a very simple question.  It was**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 13

1    **just whether you intend to stand on the**
2    **objections that were made in connection with**
3    **your response to the document request.**
4        A.  As I recall, all of the requests and
5    the objections, I think they are all appropriate
6    so far as I can recall.
7        **Q.  Peter, very simple.  I want to know**
8    **whether you still stand on them.  They were made**
9    **a few days ago or whatever.**
10        **I want to know if you are standing on**
11    **them or if there are any you are going to**
12    **withdraw.  This was dated February 25 of 2008.**
13        **Are there any objections or assertions**
14    **of privilege that you are withdrawing as**
15    **reflected in the objections and responses**
16    **themselves?**
17        A.  In that 16-page document, I think they
18    were all appropriate, and I'm standing on them.
19        MS. RAMSEY:  Can I just put on the
20    record that this morning we delivered two
21    additional documents that Mr. Kraus identified
22    yesterday as responsive to the requests that we
23    had not previously produced and then made a
24    supplemental production of those documents this
25    morning to Ms. Basta.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 14

1          BY MR. BERNICK:

2          **Q.  Why did you produce those two**

3      **additional documents?**

4          A.   When I met with Ms. Ramsey, we realized

5      that there was a class of documents that you

6      requested that we determined was appropriate to

7      produce that had not previously been produced,

8      and I directed that we provide you with

9      exemplars of those documents.

10         **Q.  Okay.  Am I correct, Mr. Kraus, that**

11     **you are not appearing here today as a**

12     **representative of Waters & Kraus?**

13         A.   I'm not -- I'm appearing here because I

14     was told my deposition is being taken.  I don't

15     know what capacity I'm appearing in, quite

16     frankly.

17         **Q.  That's fairly important.  Are you**

18     **appearing here on behalf of the clients whom you**

19     **represent in claims against Grace?**

20         A.   I'm clearly not doing that.

21         **Q.  That's why I'm asking you these**

22     **questions about the capacity in which you are**

23     **appearing.  Are you appearing here as a**

24     **representative of Baron & Budd?**

25         A.   No.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 15

1      **Q.   Are you appearing here as a**
2      **representative of Waters & Kraus or are you**
3      **appearing here personally, Mr. Kraus?**
4          MR. FINCH:  Objection to the extent it
5      calls for a legal conclusion.
6          MR. BERNICK:  I think the witness is
7      clearly capable of giving me the legal answer to
8      that.
9          MR. FINCH:  The objection stands.
10         THE WITNESS:  Why don't I tell you what
11     my understanding of my role is.
12         BY MR. BERNICK:
13     **Q.  Sure.**
14         A.   Hopefully that will be responsive to
15     your question.
16     **Q.  Sure.**
17         A.   Mr. Finch asked me on behalf of the
18     Asbestos Creditors Committee to appear as a fact
19     witness about the conduct of litigation against
20     W.R. Grace prior to the Chapter 11 filing.
21         **Q.   I understand that.  But the reason I**
22     **ask the question is that you could come here and**
23     **testify about what it is that you personally**
24     **know or you could testify beyond what you**
25     **personally know to what is known by your firm.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 16

1    **I'm asking you about the respect in**
2    **which you are appearing here.  Are you here to**
3    **testify about what your firm knows or are you**
4    **here to testify about what you personally know?**
5    A.  I'm here to testify about what I
6    personally know rather than as a representative
7    of Waters & Kraus or any other organization.
8    **Q.   Fair enough.  There have been some**
9    **statements that are made in the documents that**
10   **were submitted by the ACC and the FCR that your**
11   **testimony is going to relate to matters that are**
12   **public.  Are you familiar with that?**
13   A.  Yes.
14   **Q.   Are you only going to testify here and**
15   **at trial with respect to matters that are**
16   **public?**
17   A.  I guess that would depend on what
18   questions I'm asked.
19   **Q.   You don't have any understanding of**
20   **that one way or another?**
21   A.   No, I really don't know what questions
22   Mr. Finch or any other lawyer intends to ask me.
23       I'm going to testify to public matters.
24   And if they are nonpublic matters that I'm asked
25   about that it is appropriate for me to testify

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 17

1    to, I will testify about nonpublic matters as

2    well.

3        Q.  That's fine.

4            MR. BERNICK:  Can we mark this as Kraus

5    1.

6            (Kraus Exhibit 1 identified.)

7        BY MR. BERNICK:

8        Q.  I'm showing you Kraus Exhibit 1, which

9    are objections and responses of --

10           MR. FINCH:  Do you have an extra copy?

11           MS. BASTA:  Yes.

12       BY MR. BERNICK:

13       Q.  I have shown you what we have marked as

14   Exhibit 1, Mr. Kraus.  It is called "Objections

15   and Responses of Peter Kraus."

16           Do you recognize this document as the

17   response that you made to the document request

18   that was propounded by Grace in connection with

19   this deposition?

20       A.  Yes.

21       Q.  And I believe you said that you

22   personally reviewed this to make sure that it

23   accurately captured the responses that you

24   wanted to make in connection with this

25   deposition.  Correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 18

1     A.   Yes.

2      **Q.   Let me go through a few of these**

3    **things.   I notice that there are objections that**

4    **have been made to a number if not all of these**

5    **requests, and in some cases there is an**

6    **agreement to produce documents and in some cases**

7    **there is not.**

8       **I really want to pursue that a little**

9    **bit.   We will just go through each of the**

10    **requests.   There are only eight of them.**

11       **My question to you is going to be the**

12    **same in every instance, which is whether the**

13    **response to the request reflects your decision**

14    **that you are not prepared to testify with**

15    **respect to certain matters.**

16       **In other words, we made a document**

17    **request, and in the response to the document**

18    **request you have asserted objections, including**

19    **privileges, and I want to know to what extent**

20    **you would make the same objections and decline**

21    **in the same way to offer testimony in the same**

22    **areas as the document requests.**

23     A.   I'm not sure I understand your

24    question.

25       Are you asking me whether the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 19

1   objections relate to beyond the subject matter

2   of my testimony?

3       Q.  No.  I'm asking really whether your

4   objections which are made to document requests

5   reflect objections and not the refusal but the

6   decision not to testify with respect to the same

7   subject matters the document requests.

8       In other words, we asked for documents,

9   but I'm asking you whether you would make the

10  same objection and take the same position with

11  respect to testimony if I were to ask you

12  questions.

13      MS. RAMSEY:  Objection to the form of

14  the question.

15      BY MR. BERNICK:

16      Q.  Very simple.  Let's give you an

17  example.  Look at an easy one, which is request

18  number 8.

19      That asks for all documents that

20  essentially reflect on an annual basis the

21  amounts that your firm earned during the five

22  years prior to Grace's Chapter 11 filings as a

23  result of representing asbestos personal injury

24  claimants in claims against Grace.  Are you with

25  me on that?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 20

1          A.  Yes.

2          **Q.  I see that here there are a bunch of**

3   **objections, and there's no undertaking to**

4   **produce any documents.  Right?**

5          A.  Yes.

6          **Q.  All I'm asking you is whether in the**

7   **same fashion as you have said you are not going**

8   **to produce documents, does that also mean that**

9   **you are not prepared to offer testimony on the**

10  **subject matter reflected in request 8?**

11         A.  Well, with respect to request 8, the

12  amount of money I made, my firm made during the

13  five years prior to W.R. Grace's filing is not a

14  subject of my testimony.

15              So with respect to number 8, yes, that

16  is beyond the scope of my testimony.

17         **Q.  If I were to ask you questions with**

18  **respect to that subject matter, would you**

19  **respond to them or take the position that you**

20  **are not going to respond to them?**

21         A.  I guess it would depend on the

22  question.

23         **Q.  Well, I will just ask you the question.**

24              **How much money did your firm earn as a**

25  **result of representing asbestos personal injury**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 21

1  **claimants in claims against Grace in 2000?**

2      A.   I don't know.  But I would also ask you

3  to clarify your question.

4          Are you talking about how much we got

5  in gross fees or how much --

6      **Q.  Gross fees.**

7      A.   -- we profited after paying all the

8  associates and nonequity and rent and

9  everything?

10     **Q.  Gross fees.**

11     A.   I really don't have any idea.  I

12  haven't reviewed those numbers in many years.  I

13  don't know.

14     **Q.   Would you be prepared to provide that**

15  **information to us upon reviewing your records?**

16     A.   That information exists somewhere with

17  our accountants, I'm sure.  If I were ordered to

18  produce it, I'm sure that that information

19  exists.

20     **Q.  I know that if you are ordered to**

21  **produce it, you would consider complying with**

22  **the order.**

23         **I'm just asking you whether you are**

24  **prepared to agree to provide that information**

25  **without a court order.**

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                      Peter Kraus, Esquire

Page 22

1          MR. FINCH:  What is the information?

2    The amount of money his firm earned during the

3    five years prior to Grace's case?

4          MR. BERNICK:  Let's go off the record

5    for a second.

6          (Discussion off the record.)

7          BY MR. BERNICK:

8      **Q.   I think you understand where I'm going**

9    **now.  We have had a short off-the-record**

10   **conversation in order to facilitate the**

11   **deposition.**

12        **I will simply go through each of the**

13   **requests, Mr. Kraus, and ask to what extent the**

14   **answer to the request reflects a position that**

15   **you will not answer absent a court order**

16   **questions that I pose with respect to the same**

17   **subject matter.**

18        **If we take a look at request number 1,**

19   **this deals with all documents relating to the**

20   **adoption of or changes to the settlement**

21   **criteria.**

22        **I'm not going to review the rest of the**

23   **request in those words because it will be a**

24   **matter of record.  And I see that in the**

25   **response to the request number 1, there are a**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 23

1    **series of objections, but then there is an**
2    **undertaking that Mr. Kraus will produce copies**
3    **of settlement agreements for those who settled**
4    **claims for meso and lung cancer for the period**
5    **April 2, 1996 to April 2, 2001.**
6        **Do you see that response?**
7        MS. RAMSEY:  Mr. Bernick, before we go
8    further, because we had an off-the-record
9    conversation, I want to make sure I have put
10   what I said to you on the record, which is by
11   answering these questions, Mr. Kraus is not
12   waiving any objections that have been raised to
13   production of the underlying documents.
14       MR. BERNICK:  I understand that.
15       BY MR. BERNICK:
16       **Q.   You see the response to request number**
17   **1?**
18       A.   I do.
19       **Q.   So you understand I'm sure the request**
20   **number 1 asks for many materials beyond the**
21   **actual settlement agreements.  Right?**
22       A.   It appears to me all documents relating
23   to the adoption of, impact of or changes to the
24   settlement criteria for settlements entered into
25   between claimants you represent in Grace,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 24

1    including but not limited to how the criteria
2    were developed and adopted and/or any
3    discussions relating to their basis, purpose,
4    fairness or impact on claim filings or
5    settlements.
6         The document request as drawn,
7    Mr. Bernick, could include all of the thoughts
8    and mental impressions of Waters & Kraus
9    attorneys in the course of litigation of all
10   individual claimants who have lawsuits against
11   Grace.
12        So our internal memoranda about the
13   strength of the evidence in a case and which
14   defendants we have stronger claims against
15   versus others would all be work product that we
16   would not produce.
17        So yes, I understand that you requested
18   more broadly documents than the settlement
19   agreements that we entered into with Grace, and
20   we raised objections to that.
21      **Q.   I appreciate the statement.**
22          **The request, the words of the request**
23   **are in the record because they are part of an**
24   **exhibit that's in the record.  Your objection**
25   **and response are in the record.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 25

1    **So I am not asking you what arguments**
2    **you would make or anything.  I'm simply asking**
3    **whether you are prepared to -- I'm simply asking**
4    **whether request number 1 was broader than the**
5    **undertaking that is made in the response.**
6        A.   It appears to be considerably broader
7    than the response and would seek documents
8    beyond those that we produced that we have
9    withheld because of privilege and burden.
10       **Q.   So my question is do you intend with**
11   **respect to the subject matter of request number**
12   **1 to offer testimony that goes beyond the four**
13   **corners of the settlement agreements that you**
14   **are prepared to produce and have produced in**
15   **response to request number 1?**
16       MR. FINCH:  Object to the form, lack of
17   foundation.
18       THE WITNESS:  If I'm asked questions
19   beyond that by any lawyer in this case, I will
20   respond to them, unless instructed not to.
21       BY MR. BERNICK:
22       **Q.   Again, I understand that.  My question,**
23   **though, really gets to whether you are prepared**
24   **if I ask you questions today with respect to the**
25   **subject matter of request number 1 if you will**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 26

1    **object and not answer questions that go beyond**

2    **the four corners of the settlement agreements.**

3        A.   No.  I will answer questions beyond

4    that, so long as they are not specific questions

5    violating an attorney-client privilege or a work

6    product privilege.

7            I think that I can answer generally

8    with respect to this criteria that you seek

9    documents on without violating a privilege.  So

10   yes, I will answer questions beyond the

11   settlement agreements.

12       **Q.   With respect to what the subject matter**

13   **of request 1 is, which, as you have indicated,**

14   **is broad, we have your agreement to produce**

15   **settlement agreements.  But then there are a lot**

16   **of other documents that would be picked up by**

17   **request number 1.  Right?**

18       A.   Reading it most broadly, I would have

19   to review every file of every one of the

20   hundreds of W.R. Grace claims that we

21   represented in that five-year period and look

22   for any memoranda which would be internal work

23   product about the value of the case and why we

24   would arrive at a valuation or a recommendation

25   to a client to take a certain settlement.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 27

1       So yes, I think there is a great deal
2   of material there, in addition to the public
3   litigation files, the discovery, the depositions
4   and the pleadings in those cases, which would
5   have gone into determining what the value of
6   settlements was in each of those cases.
7       **Q.   And many of those documents that are**
8   **picked up by request number 1 would not be**
9   **privileged.  Correct?**
10      A.   The nonprivileged documents have been
11  produced.  We produced the litigation files in
12  the litigation.
13      Grace has them.  They have all the
14  pleadings.  They have all the depositions.  They
15  have all the discovery responses.
16      So the only additional documents beyond
17  the litigation documents that are responsive and
18  not subject to the objections would be the
19  settlement agreements.
20      **Q.   So everything else other than the**
21  **litigation files and the settlement agreements**
22  **you are taking the position are privileged?**
23      A.   Well, any of the internal memoranda
24  that go into why we would value a claim a
25  certain way or discussions with the client about

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                         Peter Kraus, Esquire

Page 28

1    why we would value a claim a certain way are
2    privileged.  So yes.
3        Q.  I'm not asking whether there is
4    anything else.  All that we have from you in
5    response to request 1 are the settlement
6    agreements and the litigation files.
7            I'm asking whether all of the other
8    materials that are encompassed by request number
9    1 are materials that you regard as being
10   privileged.
11       A.   To the extent there are other
12   materials, they would be privileged, yes.
13       Q.   And, therefore, beyond the four corners
14   of the settlement agreements and the litigation
15   files, would it be fair to say that you are not
16   prepared to testify regarding the matters
17   encompassed in request number 1?
18           MS. RAMSEY:  Objection, form.
19           MR. FINCH:  Objection, form.
20           BY MR. BERNICK:
21       Q.  I'm just asking you.
22       A.   I'm prepared to tell you how I would go
23   about generally valuing claims against Grace in
24   the litigation during the five years before
25   that.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 29

1          Q.   You would be prepared to talk to me

2     about how the settlement criteria were adopted,

3     what their impact was?

4          A.   To the extent there is criteria.  I'm

5     not sure what you mean by the term "criteria."

6          But yes, how we generally would come to

7     valuing a claim against Grace, yes, I'm happy to

8     talk about how I would negotiate settlements

9     with Grace and arrive at values.

10          Q.   You are happy to talk about how you

11     would value the claims against Grace?

12          A.   Sure.

13          Q.   And you are happy to tell me and do you

14     intend to testify regarding how those settlement

15     criteria came to be adopted?

16          A.   I'm struggling with the term

17     "criteria."  I'm not sure I understand that in

18     this context.

19          Q.   Requirements for settlement.

20          A.   Yes.

21          Q.   You are prepared to also talk about the

22     basis, purpose and fairness of the requirements

23     for settlement and their impact on claims

24     filings?

25          A.   The basis of settlements, the purpose

US District Court - Delaware                     FINAL - March 4, 2008
Chapter 11 - W.R. Grace                          Peter Kraus, Esquire

Page 30

1    of settlements, yes.  I can talk about that.

2         I'm not sure I understand how fairness

3    is used in this.  Fair to who?  I don't really

4    understand.  If you can tell me how fairness is

5    used here, I'm happy to let you know whether or

6    not I can talk about that.

7         I don't have any opinions or thoughts

8    about how the settlement criteria as you have

9    used this term impacted claims filings.

10        Settlements, yes, I would be able to

11   testify about the basis and purpose of whatever

12   criteria were.  The basis we came up with for

13   settlements impacted the settlements.  The

14   values either went up or down based on that.

15        **Q.  You understand that the ACC and the FCR**

16   **have stated that they want you to testify with**

17   **respect to the settlement criteria.  Correct?**

18        A.  Yes.

19        **Q.  You understand that the ACC and FCR**

20   **want you to testify regarding what role Grace**

21   **played in the adoption of those settlement**

22   **criteria.  Correct?**

23        MR. FINCH:  Objection to form.

24        MR. MULLADY:  Objection to form.

25        THE WITNESS:  I don't know that.  Is

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                       Peter Kraus, Esquire

Page 31

1      that in an area of testimony I'm designated for?

2            BY MR. BERNICK:

3            **Q.  It says "what criteria Grace told the**

4      **plaintiffs they had to meet to be paid."**

5            A.  Yes.

6            **Q.  You would agree with me that the ACC**

7      **and the FCR have stated their intent to ask you**

8      **questions regarding how the settlement criteria**

9      **came to be and how they were applied.  Right?**

10           A.  How settlements were arrived at.

11           **Q.   They actually use the word "criteria,"**

12     **what type of evidence was applied to meet these**

13     **criteria.**

14           **You would agree that the ACC and the**

15     **FCR have stated their intent to ask you**

16     **questions about how the criteria for settlements**

17     **came about and how they were applied.  Correct?**

18           A.  Apparently so.

19           **Q.  Likewise, how you valued cases and how**

20     **Grace valued cases.  Correct?**

21           A.   I don't know how Grace valued them.

22     But I can give you my understanding based on

23     conversations with Grace lawyers.

24           **Q.  And you understand that that's one of**

25     **the areas that the ACC and the FCR intend to**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 32

1       **pursue with you.  Correct?**

2           A.  I do understand.

3               MR. FINCH:  Object to form.

4               BY MR. BERNICK:

5           **Q.   You are prepared to answer questions in**

6       **that subject matter area.  Correct?**

7           A.  Yes.

8           **Q.   You recognize so -- let me just ask.**

9       **There are probably, as you have indicated, huge**

10      **numbers of documents that you have internally in**

11      **your firm that would relate to that area.**

12      **Correct?**

13              MR. FINCH:  Object to form.

14              MS. RAMSEY:  Objection to form.

15              THE WITNESS:  I don't know if there are

16      huge numbers.  There are hundreds of files.

17              And to determine whether our internal

18      memoranda or communications with the clients are

19      responsive would require that we pull all of the

20      e-mail and all of the correspondence for all of

21      the hundreds of clients and read all of them and

22      determine whether they are responsive and then

23      determine whether or not they are privileged,

24      which in every instance with a client or

25      internal discussion about the valuation of a

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 33

1      case they would be.

2            BY MR. BERNICK:

3         **Q.  If we were just talking about**

4      **Waters & Kraus and then the cases in which you**

5      **had personal knowledge and involvement in**

6      **settlement, there would probably be hundreds of**

7      **documents that would be internal documents at**

8      **Waters & Kraus that would relate to the subject**

9      **matter that we have been talking about, which is**

10     **how the settlement criteria came about and how**

11     **they were applied.  Right?**

12           MS. RAMSEY:  Object to form.

13           THE WITNESS:  I don't think that is

14     correct.  I don't think there would be hundreds

15     of documents related specifically to the issue

16     of settlement criteria with W.R. Grace.  There

17     may not be -- as you broadly described it, there

18     may not be any additional documents.

19           BY MR. BERNICK:

20        **Q.  Well, we don't know.  Right?**

21        A.  We do know that there are not -- I can

22     tell you there are not any additional memoranda

23     that generally are responsive to this without

24     respect to a specific client's case.  There are

25     not responsive documents beyond that.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 34

1          Q.   Fine.  Bear with me.  I don't mean to
2     exclude those.
3              You would agree with me that when it
4     comes to this area, which is how the settlement
5     criteria were adopted and how they were applied
6     and how cases were valued at Waters & Kraus that
7     you have personal knowledge of, you would agree
8     with me that there are privilege documents in
9     the files of Waters & Kraus that relate to those
10    matters.  Correct?
11             MR. FINCH:  Object to form.
12             THE WITNESS:  Not how criteria
13    generally were developed, no.
14             There are, I'm sure, documents that
15    would technically be responsive to this request
16    in some of the hundreds of client files that we
17    had and litigated against W.R. Grace in those
18    five years, some memoranda about "in this case
19    the evidence is particularly strong and we
20    should push W.R. Grace to push more in this
21    case" because the exposure evidence is great or
22    the medical evidence is great in individual
23    cases.  But not generally, no.
24             To the extent you are asking whether
25    generally we are withholding based on privilege

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 35

1    or burden documents relating to establishing

2    settlement criteria with Grace, no, we are not

3    withholding any documents on that basis.

4         BY MR. BERNICK:

5         **Q.   Okay.  That's fine.  But you are**

6    **withholding documents that relate to this**

7    **subject matter area, that is, how settlement**

8    **criteria were adopted and applied with respect**

9    **to claims against Grace.**

10        MR. FINCH:  Object to form.

11        MS. RAMSEY:  Object to form.

12        THE WITNESS:  I would say yes, there

13   are responsive documents in the files of

14   individual cases, internal memoranda relating to

15   the valuation of those claims against Grace that

16   have been withheld pursuant to these objections.

17        BY MR. BERNICK:

18        **Q.   And there would be additional such**

19   **files at Baron & Budd dealing with the cases you**

20   **were involved with at Baron & Budd.  Correct?**

21        A.   Probably so.

22        **Q.   Would you agree with me that those**

23   **documents are all of the documents that you are**

24   **not prepared to share with us in connection with**

25   **your testimony?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 36

1        A.   I don't have any access or ability to

2    access any client files at Baron & Budd.

3        **Q.   With respect to the files that are at**

4    **Waters & Kraus, would you agree with me that you**

5    **are not prepared to produce those documents so I**

6    **can examine you on them.  Correct?**

7        A.   Documents that have been withheld

8    because of privilege we are not prepared to

9    produce, individual client files, yes.

10        **Q.   Again, just to put an edge on it, it is**

11    **pretty obvious what I'm asking you about.**

12            **The documents that you are prepared to**

13    **produce that relate to the subject matter of**

14    **request number 1 are nonprivileged documents,**

15    **but you are prepared to offer testimony with**

16    **regard to the subject matter that is the subject**

17    **matter of request number 1 that goes beyond what**

18    **appears in the nonprivileged documents.**

19    **Correct?**

20            MR. FINCH:  Object to form.

21            THE WITNESS:  Yes, it goes beyond what

22    appears in nonprivileged or privileged

23    documents.

24            My knowledge is not limited by the

25    existence of documents is what I'm trying to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 37

1    tell you.

2         BY MR. BERNICK:

3         **Q.   Your testimony will go beyond what**

4    **appears in the public documents that you have**

5    **provided to us.  Correct?**

6         MR. FINCH:  Objection; form, lack of

7    foundation.

8         MS. RAMSEY:  Objection to form.

9         BY MR. BERNICK:

10        **Q.   You are not going to confine the**

11   **testimony on the subject matter of request**

12   **number 1 to publicly available documents.**

13   **Right?**

14        MS. RAMSEY:  Object to form.

15        THE WITNESS:  My testimony is not based

16   on documents at all.

17        BY MR. BERNICK:

18        **Q.   But your testimony is based upon**

19   **experience, is it not?**

20        A.   It is based upon my experience.  I will

21   testify based on my experience to the areas I

22   understand I have been listed to testify.

23        **Q.   There are many documents that relate to**

24   **your experience that you are not prepared to**

25   **make available because you believe they are**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 38

1     **privileged.  Correct?**

2           A.   My experience is as a lawyer, and as

3     you know, Mr. Bernick, a great deal of what we

4     do is privileged with respect to our internal

5     files and our communications with our clients.

6                So yes, to the extent that some of the

7     areas that I'm going to testify on will touch on

8     my representation of specific clients who have

9     specific confidential attorney-client

10    communications and work product in their files,

11    yes, I'm going to testify generally on that

12    subject matter without violating the privileges

13    I owe to my clients.

14         **Q.   And you recognize that in so doing, you**

15    **will be able to rely upon experiences as to**

16    **which I cannot cross-examine you based upon all**

17    **the files that are available to you.  Correct?**

18               MS. RAMSEY:  Object to form.

19               MR. FINCH:  Object to form.

20               THE WITNESS:  I don't understand that,

21    no.

22               BY MR. BERNICK:

23         **Q.   Not every lawyer, yourself included,**

24    **offers testimony about how they settle cases.**

25    **Correct?**

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                         Peter Kraus, Esquire

Page 39

1          A.  That's true.

2              Q.  You are going to offer testimony on how

3      you settle cases.  That's a subject matter you

4      are going to talk about?

5          A.  Yes.

6              MR. FINCH:  Object to form.

7              BY MR. BERNICK:

8              Q.  With respect to that subject matter,

9      you are only making available certain materials

10     for me to use on cross-examination, and you are

11     not making available other materials that you

12     have in your files that relate to the same

13     subject matter.  Correct?

14             MS. RAMSEY:  Object to form.

15             MR. FINCH:  Join.

16             THE WITNESS:  To the extent that there

17     are privileged materials in individual client

18     files that would be responsive to this request,

19     I agree that we are not making those available.

20     They are not the basis of my testimony with

21     respect to the subject matter of request number

22     1.

23             BY MR. BERNICK:

24             Q.  But I have no ability to determine that

25     because I don't know what the documents are.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 40

1      **Correct?**
2              MR. FINCH:  Object to form, foundation.
3              MS. RAMSEY:  Join.
4              THE WITNESS:  I don't know.
5              BY MR. BERNICK:
6          **Q.   Realistically, Mr. Kraus, you know that**
7      **that's true.**
8              **I don't have any ability to determine**
9      **whether the documents that you have in your**
10     **files that relate to your experience would be**
11     **helpful or not in cross-examination because you**
12     **are not prepared to make them available for any**
13     **purpose.  Correct?**
14             MR. FINCH:  Object to form and
15     foundation.
16             MS. RAMSEY:  Object to form.
17             THE WITNESS:  I would agree that you
18     cannot determine whether documents that have
19     been withheld would help you cross-examine me.
20             BY MR. BERNICK:
21         **Q.   If we go to request number 2, this says**
22     **-- and I will read it for the record in order to**
23     **save us both the agony of repeating it back and**
24     **forth.**
25             **This says, "All documents relating to,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 41

1    referring to or discussing what factors
2    contributed to the increased propensity of
3    asbestos personal injury claim filings between
4    1999 and 2001, A, against Grace and, B, against
5    other asbestos defendants."
6        Do you see that?
7        A.   Yes.
8        Q.   And I think that in response to this
9    request there are a series of objections, and
10   again, there is no undertaking to produce any
11   documents.  Is that correct?
12       A.   I don't have any responsive documents
13   to request number 2.
14       Q.   You don't have documents that discuss
15   or relate to what caused the increased number of
16   claim filings against Grace in 1999 and 2001?
17       A.   No.  Well, let me correct that.  There
18   may be some materials that I would have received
19   in the course of being a member of the Asbestos
20   Creditors Committee in a bankruptcy related to
21   Professor Peterson's calculations.
22       But other than things that Grace would
23   have in the public domain, I don't have any
24   responsive documents.
25       Q.   Let's be sure about that because then

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 42

1    it would be simpler to say "I don't have any
2    responsive documents."
3        A.   I actually told Ms. Ramsey yesterday
4    that we should have so responded to the
5    question.
6        Q.  Let's make sure that is accurate.
7        A.   Can you give me some examples of other
8    documents you would think that I might have and
9    I can tell you whether I'm missing something?
10       Q.  Let's just make sure.  It is true, is
11   it not -- you understand the word "propensity,"
12   don't you?
13       A.   Yes.
14       Q.   That is that an increasing proportion
15   of people who are sick decide to sue a given
16   defendant.  Right?
17       A.   That's one definition of it, yes.
18       Q.   That's the definition that you are
19   accustomed to using.  Correct?
20       MS. RAMSEY:  Objection to form.
21       THE WITNESS:  In this context and in a
22   bankruptcy and claims, yes.
23       BY MR. BERNICK:
24       Q.   And when you read request number 2,
25   that's how you understood the word "propensity"

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 43

1    **as it appears in request number 2.  Correct?**
2         MS. RAMSEY:  Objection.
3         THE WITNESS:  Yes, it appears to be how
4    you used it.
5         BY MR. BERNICK:
6     **Q.  It is true, is it not, that the meso**
7    **claims filed by Waters & Kraus in the period**
8    **1999 to 2001, that those meso claims increased**
9    **and, indeed, increased dramatically?**
10        MR. FINCH:  Object to form and
11   foundation.
12        MS. RAMSEY:  Objection.
13        THE WITNESS:  That would probably be
14   true.
15        BY MR. BERNICK:
16    **Q.   So Waters & Kraus's propensity to sue**
17   **Grace on meso claims increased from 1999 through**
18   **2001.  True?**
19        MR. FINCH:  Object to form, foundation.
20        THE WITNESS:  Not exactly.  What I
21   would say in response is to the extent that you
22   are asking whether of all the mesothelioma
23   claimants and lung cancer claimants we
24   represented, if we sued Grace in more of them.
25   The answer is no.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 44

1            We grew dramatically as a firm.  We

2      were founded on January 1, 1999, and the Waters

3      law firm was very small, and we grew

4      substantially in that period of time to Grace's

5      bankruptcy.  And many more people referred us

6      cases for litigation, and many of those cases

7      involved W.R. Grace.

8            BY MR. BERNICK:

9        **Q.   So you understand -- I want to have you**

10     **bear that answer in mind because I will come**

11     **back to it.**

12           **As propensity is measured, which is the**

13     **ratio between the claims filed and the total**

14     **number of meso cases that are out there, you**

15     **would agree with me -- in other words, ratio --**

16       A.   Claims filed in entire litigation.

17       **Q.   Yes, correct.  There are a certain**

18     **number of meso diagnoses that are rendered in**

19     **any given period of time.  Right?**

20           **Would you agree with me that the**

21     **Waters & Kraus share of incident mesothelioma**

22     **cases, mesothelioma cases diagnosed, that share**

23     **increased dramatically from 1999 through 2001?**

24       MS. RAMSEY:  Object to form.

25       MR. FINCH:  Objection to form and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 45

1    foundation.

2         THE WITNESS:  There was an increasing

3    propensity of mesothelioma claimants to hire

4    Waters & Kraus during that period of time.

5         BY MR. BERNICK:

6         **Q.  That is your explanation.**

7         A.   That's the answer.

8         **Q.   But the point is that an observer would**

9    **say that the propensity of Waters & Kraus to**

10   **file meso claims against Grace as measured**

11   **against the total number of meso claimants that**

12   **existed, that propensity, that ratio increased**

13   **during this period of time?**

14        MS. RAMSEY:  Object to form.

15        THE WITNESS:  As I understand

16   propensity, that would be what percentage of all

17   mesothelioma claimants decided to file Grace,

18   and the answer is that is no, it did not

19   increase.

20        BY MR. BERNICK:

21        **Q.  I'm talking about meso claimants that**

22   **you represented.  You have a big --**

23        A.   A percentage of meso claimants that I

24   represented that sued Grace did not increase

25   during that period of time.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 46

1    **Q.   That will be my next question.  I don't**
2    **know -- I think there is still a little**
3    **miscommunication.**
4         **Your market share of meso cases against**
5    **Grace increased from 1999 to 2001.  Correct?**
6         MS. RAMSEY:  Objection to form.
7         MR. FINCH:  Objection to form.
8         THE WITNESS:  No, I don't know what you
9    mean by "market share."  The number of meso
10   claims we represented increased during that
11   period of time because we were doing a good job
12   for our clients.
13        BY MR. BERNICK:
14        **Q.   I'm 100 percent sure that you were.**
15   **The number of meso claims that you brought**
16   **against Grace doubled and then more than doubled**
17   **during the period of time 1999 to 2001.**
18   **Correct?**
19        MS. RAMSEY:  Object to form.
20        BY MR. BERNICK:
21        **Q.   Your rate of filing more than doubled**
22   **against Grace?**
23        A.   The rate of filing against all
24   defendants more than doubled.  I would assume
25   that would be true with respect to Grace.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 47

1          Q.  You said that the reason for that is

2     that your firm was growing and you were doing a

3     great job.  Right?

4          MS. RAMSEY:  Object to form.

5          THE WITNESS:  We were getting many more

6     cases referred to us by other lawyers.  And we

7     were growing, yes.

8          BY MR. BERNICK:

9          Q.  If I were to say, well, an alternative

10    is that you were just deciding to target Grace

11    more than other defendants, that was what I

12    think accounted for your increasing number of

13    claims against Grace, you would disagree with

14    that?

15         A.  That would definitely not be true.

16         Q.  And all I'm now asking is in request

17    number 2, are there any documents at your firm

18    that would relate to the question of why your

19    filings against Grace were increasing during

20    this period of time.

21         A.  Not that I am aware of, no.

22         Q.  So there is no document that you had at

23    your firm which would tend to establish that the

24    reason for the growth of claims against Grace

25    was simply the growth of your firm versus other

US District Court - Delaware                 FINAL - March 4, 2008
Chapter 11 - W.R. Grace                      Peter Kraus, Esquire

Page 48

1    factors?  There are no documents that you have
2    internally that address that question?
3        A.   I'm unaware of any documents that
4    discuss the growth of our firm generally.
5        Q.   What about documents that relate to
6    that?  I would urge you, Mr. Kraus -- I think
7    that there clearly are.  Let me suggest a few.
8            You have a certain number of meso
9    claimants that come into your firm as clients or
10   did during the period 1999 to 2001.  Correct?
11       A.   Yes.
12       Q.   Those claimants file lawsuits
13   against -- with your assistance file lawsuits
14   against a wide variety of defendants, maybe as
15   many as dozens of different defendants.
16   Correct?
17       A.   In some instances, yes.
18       Q.   And you have said that the number of
19   meso clients that you got at your firm during
20   this period of time increased because you were
21   good.  Right?
22           MS. RAMSEY:  Object to form.
23           THE WITNESS:  I don't know why it
24   increased.  But people sent us cases.  And I
25   like to think, yes, we do a good job for our

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 49

1    clients.

2        BY MR. BERNICK:

3        Q.   You say there wasn't any change or

4    shift in the proportion of cases where you named

5    Grace as a defendant.  Right?

6        A.   Not any significant shift that I

7    recall.

8        Q.   If I were thinking that no, you decided

9    to target Grace, I might be able to find out the

10   answer to whether that was true or not by seeing

11   the the frequency with which your client sued

12   Grace versus the frequency with which they sued

13   other defendants that would relate to that

14   question, wouldn't it?

15       A.   No.

16       Q.   Certainly if I found out that all of a

17   sudden you were naming 50 percent more and 50

18   percent more cases you were now naming Grace as

19   opposed to other defendants, that would

20   certainly relate to that question, wouldn't it?

21       MR. FINCH:  Object to form.

22       THE WITNESS:  I guess conceivably it

23   could.

24       BY MR. BERNICK:

25       Q.   Don't you have documents internally

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 50

1    that show or reflect the frequency with which

2    your clients named Grace as a defendant versus

3    the frequency with which they named other

4    companies as defendants?

5        Your documents would reflect that.

6    Right?

7        A.   I don't think such documents exist

8    where you could go back and look at the lawsuits

9    that were filed during that period of time and

10   count up the number of times you sued Grace and

11   the number of times you sued all defendants and

12   come up with a number.  But there are not

13   documents that exist like that.

14       Q.   But I wouldn't be able to get all those

15   files, would I?

16       A.   All what files?

17       Q.   All the files of -- I would never be

18   able -- unless I asked your firm to tell me, I

19   would never be able to know all the claims that

20   you filed against other defendants in any given

21   period of time.  Correct?

22       A.   I think all that information is

23   publicly available.

24       Q.   I have to go around all over the

25   country and search the dockets of all asbestos

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 51

1    **litigation to figure out the relationship**

2    **between or the proportion of cases that you had**

3    **where you named Grace as a defendant during 1999**

4    **to 2001 versus other defendants.  Right?**

5           MS. RAMSEY:  Object to form.

6           MR. FINCH:  Object to form.

7           THE WITNESS:  That would be one way to

8    do it.

9           BY MR. BERNICK:

10          **Q.   That's the only way to do it.  Right?**

11          A.   No.  You could contact the other

12   defendants.

13          **Q.   I will send out a letter to 100 other**

14   **defendants at least and say "please let me know**

15   **all cases in which Waters & Kraus sued your firm**

16   **from 1999 to 2001"?**

17          MS. RAMSEY:  Object to form.

18          THE WITNESS:  You would take the

19   complaints that we filed against W.R. Grace and

20   you would contact the defendants or, if they are

21   in bankruptcy, the bankruptcy trusts and obtain

22   that information.

23          BY MR. BERNICK:

24          **Q.   But I wouldn't even know that I'm**

25   **contacting all the right defendants unless I**

Page 52

1    **happened to have a complaint that named them**
2    **all.  Right?**
3        A.   Yes, it is conceivable that there is a
4    defendant that we have sued in a lawsuit that
5    Grace was not a party to.
6        **Q.   And let me just ask you something else.**
7    **What about settlement amounts?**
8            **If my idea was that you were picking on**
9    **Grace for whatever reason in exacting higher**
10    **dollar settlements for the same role as other**
11    **defendants, is there any way that I could**
12    **measure the values of Grace settlements as**
13    **compared to the values of your settlements**
14    **against other defendants during the period of**
15    **time 1999 to '01?**
16        MR. FINCH:  Object to form.
17        MS. RAMSEY:  Object to form.
18        BY MR. BERNICK:
19        **Q.   Do you understand what I'm getting at?**
20        A.   Well, the first premise of your
21    question was targeting Grace for the same
22    conduct as other defendants.
23            By its nature, the conduct of
24    W.R. Grace was different than any other
25    defendant in any given case.  But leaving that

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 53

1    issue aside, the individual settlement amounts

2    are typically confidential by agreement with the

3    defendant, including W.R. Grace.  And so, those

4    would be subject to confidentiality.

5        Now, we did produce and do produce in

6    every case a list of the settled defendants and

7    responses to answers to interrogatories as the

8    case approaches trial and the total value of

9    those settlements.

10        So you couldn't get the individual

11    settlement amounts, but you could get from the

12    interrogatory responses the aggregate settlement

13    dollars from all of the defendants who settled.

14    And, indeed, I think we provided that to you in

15    responses to the PIQs.

16    **Q.  I'm obviously not focused simply on the**

17    **aggregate.  I want to know what Grace's share**

18    **was as compared to the share paid by other**

19    **defendants.**

20        **I can't figure that out and, therefore,**

21    **I can't figure out to what extent your firm was**

22    **exacting higher dollar amounts for Grace based**

23    **upon any information that's available to me, can**

24    **I?**

25        MS. RAMSEY:  Object to form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 54

1          THE WITNESS:  That's not correct.  You
2     can determine the average settlement value of
3     the settling defendants and compare it to the
4     settlements that Grace had.
5          BY MR. BERNICK:
6          **Q.  I can only determine the aggregate**
7     **settlement value for other defendants on an**
8     **aggregate basis, not on an individual basis?**
9          A.   Then you would divide the aggregate by
10    the total number of settling defendants and you
11    would have an average settlement value.
12         **Q.  I want to know whether Grace is being**
13    **singled out.**
14         **The only way I can determine whether**
15    **Grace is being singled out is to compare the**
16    **settlement amounts paid by Grace to your firm**
17    **versus the settlement amounts paid by other**
18    **individual manufacturers.  Right?**
19         MS. RAMSEY:  Object to form.
20         MR. FINCH:  Object to form.
21         THE WITNESS:  No, I don't agree.
22         BY MR. BERNICK:
23         **Q.  How else do I have to know whether the**
24    **demands that you are making on Grace are higher**
25    **than the demands that you are making on other**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 55

1        companies other than to know what the demands on
2        other companies are and you don't give them to
3        us.  Right?
4             MS. RAMSEY:  Object to form.
5             THE WITNESS:  The demands or the
6        settlements?
7             BY MR. BERNICK:
8         Q.  Either one.  You don't give either the
9        demands or the settlements for any other
10       specific company so that I can see if you are
11       picking on Grace.  Correct?
12            MR. FINCH:  Object to form.
13            THE WITNESS:  In which cases?
14            BY MR. BERNICK:
15        Q.  In any cases.
16        A.  Well, there are -- with respect to the
17       issue of how the settlements of other defendants
18       relate to W.R. Grace, they don't relate because
19       they are based on the individual facts of the
20       case and the individual strength of the evidence
21       against Grace, and there are settlements that
22       would be lower than Grace's settlements and
23       settlements that would be higher than Grace's
24       settlements.
25            You are certainly able to look at the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 56

1    Grace settlements versus the average settlement

2    paid to other defendants.

3        There are many ways you could determine

4    whether you are being singled out, as you put

5    it.  That's not a term that we use in the

6    litigation.

7        **Q.   But from what you have just said, you**

8    **intend in fact to testify that the amounts that**

9    **Grace paid were due to a series of factors.  The**

10   **amount the other defendants paid were due to a**

11   **series of factors.  Correct?**

12       A.   In any individual case, yes.

13       **Q.   And yet, I have no way of testing that**

14   **by reference to any documents because the**

15   **documents that relate to settlement amounts in**

16   **the settlement negotiation process for other**

17   **defendants are not being made available to us.**

18   **Correct?**

19       MS. RAMSEY:  Object to form.

20       MR. FINCH:  Objection to form.

21       THE WITNESS:  The only documents that

22   are responsive would be the individual

23   settlement agreements subject to confidentiality

24   orders.

25       And again, the aggregate total and the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 57

1    number of settling defendants is available.  So
2    you can certainly compare in any given case what
3    Grace paid to the average settlement obtained
4    against all the other defendants.
5         BY MR. BERNICK:
6         **Q.  That's just an average.  It doesn't**
7    **tell me what any other individual defendant**
8    **paid, and therefore to that extent, I can't test**
9    **your testimony that individual factors drove**
10   **different individual settlements for different**
11   **individual clients.  Right?**
12        MR. FINCH:  Objection, form,
13   argumentative.
14        MS. RAMSEY:  Objection to form.
15        THE WITNESS:  That's not correct.  My
16   settlement history with Grace reflects that.
17        BY MR. BERNICK:
18        **Q.  If I want to compare your settlement**
19   **history, how you settled with Grace, the factors**
20   **that you used with how you settled with other**
21   **defendants specifically and the factors that you**
22   **used, I have no way to make that comparison**
23   **based upon information that you have supplied.**
24   **Correct?**
25        MR. FINCH:  Object to form, asked and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 58

1    answered.

2        MS. RAMSEY:  Join.

3        THE WITNESS:  Well, that would assume

4    that that information exists in documents.

5        I'm prepared to testify about that, and

6    in most instances my evaluation process -- in

7    every instance my evaluation process of the case

8    is based on my knowledge and experience as an

9    attorney and not any documents.

10       BY MR. BERNICK:

11       **Q.   But it is reflected in the documents.**

12   **Right?**

13       MR. FINCH:  Object to form, foundation.

14       MS. RAMSEY:  Object to form.

15       BY MR. BERNICK:

16       **Q.   The way that you settled individual**

17   **cases with other defendants is reflected in**

18   **documents.  Correct?**

19       A.   The amount of that settlement and a

20   release reflecting the terms of that settlement

21   are reflected in individual settlement

22   documents.  The process for arriving at that

23   number is not reflected in that or any other

24   document.

25       **Q.   So it's your testimony that with**

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                    Peter Kraus, Esquire

Page 59

1    **respect to any given settlement that you reach**
2    **for any given case and any given defendant, that**
3    **process that you follow is not reflected or**
4    **described in any document within your firm's**
5    **files?**
6        A.  No, that's not true.
7        **Q.   That's my whole point, is that the**
8    **process that you file in settling cases with**
9    **Grace, that is, how you reached your**
10   **determinations based upon your experience and**
11   **the process that you follow in doing the same**
12   **thing with respect to other defendants is**
13   **reflected in documents within your firm.**
14   **Correct?**
15       MR. FINCH:  Object to form.
16       THE WITNESS:  The process --
17       BY MR. BERNICK:
18       **Q.  How you did it.**
19       A.   As a general matter, no.  There may be
20   documents, again, internal memoranda, work
21   product, about the relative strength or weakness
22   of the proof against a given defendant and why
23   we should ask for more or less against that
24   defendant, yes.
25       **Q.  Again, this is an area where you are**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 60

1    prepared to offer testimony based upon your
2    experience but you are not prepared to make
3    available documents on the basis of which I may
4    be able to test your testimony.  Correct?
5         MR. FINCH:  Objection to form,
6    foundation.
7         MS. RAMSEY:  Objection, form,
8    foundation.
9         BY MR. BERNICK:
10        Q.   It is a very simple -- you make this
11   argument, Mr. Kraus, all the time in the course
12   of your work about getting access to materials
13   that you need in order to test testimony.
14        All I'm asking you is exactly the same
15   question in connection with your testimony here,
16   whether when it comes to how you determine
17   settlement amounts for Grace versus other
18   defendants, whether that is an area where you
19   intend to testify based upon your experience,
20   but I am not getting access to documents that I
21   may use in order to test your testimony on
22   cross-examination.
23        MR. FINCH:  Objection to form,
24   foundation, argumentative.
25        MS. RAMSEY:  Objection.

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                         Peter Kraus, Esquire

Page 61

1           BY MR. BERNICK:
2           **Q.  Is that true?**
3           A.  No, that's not true.  Any internal
4   memoranda that we created about the relative
5   strength or weakness of the evidence was based
6   on the evidence in the individual case, which
7   you have.
8           You have all the interrogatory
9   responses.  You have all the medical reports.
10  You have all the deposition testimony.  That was
11  the basis of valuing the claims, Mr. Bernick.
12          **Q.   It may have been the basis for valuing**
13  **the claims according to what you are saying now,**
14  **but I have no way to test whether in fact it was**
15  **because I don't have the internal firm memos**
16  **that reflect what you actually did in weighing**
17  **the evidence.  Correct?**
18          MR. FINCH:  Objection; form,
19  foundation, argumentative.
20          MS. RAMSEY:  Join.
21          THE WITNESS:  I would agree that you do
22  not have the internal firm memos describing our
23  mental impressions about the evidence, yes.
24          BY MR. BERNICK:
25          **Q.  Okay.  On document request number 3, it**

Page 62

1    says -- referring to Waters & Kraus's

2    responses -- "The first, second and third set of

3    interrogatories, collectively the discovery

4    responses, attached as Exhibit 1, all documents

5    referring to or discussing any topics contained

6    in the discovery responses."

7        Do you see that?

8    A.  Yes.

9        Q.   And that's again -- the subject matter

10    of that one is responses to discovery requests

11    that basically related to the PIQ process.

12    Right?

13    A.   I would have to -- do you have the

14    discovery?

15        I'm not meaning to be difficult.  I

16    frankly can't recall specifically what those

17    are.  If you can show me, I will be happy to

18    look at them.

19        Q.  Let me see if can I do it even faster,

20    which is refresh your recollection.

21        You recall that the first two sets of

22    interrogatories relate to B reads that were

23    being withheld, and the third set was much

24    broader and essentially related not only to B

25    reads but to how you went about collecting

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 63

1    **materials for use in the PIQs?**

2        A.   Generally speaking, I recall that,

3    though I have not looked at that discovery in

4    some time.

5        **Q.   So in request number 3, it basically**

6    **says all documents that refer to or discuss any**

7    **topics contained in the discovery responses**

8    **which would be any topics relating to how the**

9    **PIQs were filled out, in essence?**

10       A.   Yes.  If that is what -- if that is the

11   topic in the discovery responses referenced in

12   request 3, yes, I understand that, and we did

13   not produce documents which are internal

14   processes and mental impressions about how to

15   respond to those.  That's true.

16       **Q.   In your testimony, proposed testimony,**

17   **at least as described by the ACC and the FCR,**

18   **one of the topics that you apparently are going**

19   **to address is how the bankruptcy process limited**

20   **your ability to gather materials as you would**

21   **have gathered them in preparing a case for**

22   **trial.  Do you recall that?**

23       A.   That's true.

24       **Q.   And to the extent that you testified in**

25   **that area and you are essentially saying, are**

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                     Peter Kraus, Esquire

Page 64

1    **you not, it will be your testimony that in**
2    **connection with the filling out the PIQs for**
3    **your Grace claimants, that you didn't have**
4    **available to you the same level or extent of**
5    **evidence that you would have had if Grace hadn't**
6    **filed for bankruptcy.  Correct?**
7         MR. FINCH:  Objection to form and
8    foundation.
9         MS. RAMSEY:  Join.
10        THE WITNESS:  Yes, there is evidence
11   that was not available to us from Grace, and
12   additionally we did not engage in the process of
13   preparing a litigation claim against Grace when
14   we answered the PIQs.
15        BY MR. BERNICK:
16   **Q.   And, therefore, the essence of your**
17   **testimony will be because Grace was in**
18   **bankruptcy, the information available to fill**
19   **out the PIQs was not as robust or as broad as it**
20   **would have been if Grace hadn't been in**
21   **bankruptcy.  Fair?**
22        MS. RAMSEY:  Object to form.
23        THE WITNESS:  None of Grace's
24   documents, files, witness statements or other
25   information about product ID was available to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 65

1    me.  And additionally, we did not go out and do

2    additional discovery outside of what was in

3    these files to determine whether there was

4    additional evidence of Grace exposure.

5         BY MR. BERNICK:

6         **Q.   Now, I have asked you in request number**

7    **3 for all documents that refer to or discuss how**

8    **you filled out -- what process you went through**

9    **to filling out the PIQs.**

10        **If it were my position that the process**

11   **that you went through in filling out the PIQs**

12   **gave you all of the same kind of information**

13   **that you would have had relating to exposure to**

14   **Grace products, that is, that the process that**

15   **you followed gave you access to all of the same**

16   **information regarding exposure to Grace products**

17   **that you would have had in connection with**

18   **litigation outside of the bankruptcy, I can't**

19   **determine whether there was any difference**

20   **between the PIQ process and the litigation**

21   **process because I don't have access to how it is**

22   **that you fill out the PIQs.  Right?**

23        MR. FINCH:  Objection to form,

24   argumentative.  You referenced request 3 in your

25   question.  Are you talking about request 4?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 66

1          MR. BERNICK:  It is really both.

2          MR. FINCH:  Requests 3 and 4.  You are

3    amending the question to say request 3 and four.

4    My objection is form, foundation and

5    argumentative.

6          MS. RAMSEY:  I object to the extent

7    that the question calls for work product

8    information -- information subject to the work

9    product privilege.

10          MR. BERNICK:  I understand that.

11          BY MR. BERNICK:

12     **Q.   That's my whole point, is that if I**

13    **wanted to test Mr. Kraus whether the information**

14    **that was available to your firm in filling out**

15    **the PIQ was different from the information able**

16    **to your firm in prosecuting claims outside of**

17    **bankruptcy on the issue of exposure to Grace**

18    **products, if I wanted to test that, I would have**

19    **to know how you filled out the PIQ, right, what**

20    **information your firm went to?**

21     A.   No.

22          MS. RAMSEY:  Object to form.

23          BY MR. BERNICK:

24     **Q.   You are saying -- let me put it this**

25    **way.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 67

1        In your proposed testimony, you address
2    the question -- at least as I see your proposed
3    testimony and the testimony that the ACC and the
4    FCR had indicated that you will offer, you are
5    going to address the question of what
6    information was available to your firm regarding
7    exposure to Grace products with respect to your
8    clients.  Right?
9        MS. RAMSEY:  Object to form.
10       THE WITNESS:  If asked, I will.
11       BY MR. BERNICK:
12       Q.   Well, the proposed testimony actually
13    says that.  "What criteria Grace told the
14    claimants they had to meet to be paid a
15    settlement in meso cases, what type of evidence
16    was supplied to meet these criteria and when in
17    the discovery/trial preparation process this
18    evidence was available."
19        That's what they say they want to ask
20    you about.
21       A.   Okay.
22       Q.   When it comes to availability of
23    information regarding exposure, I take it your
24    testimony is that there was less information
25    available to you regarding exposure to Grace

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 68

1    **products for claimants who filled out the PIQs**

2    **than there was available to you for claimants**

3    **who were pursuing claims against other company**

4    **exposures.  Correct?**

5         MS. RAMSEY:  Object to form.

6         MR. FINCH:  Join.

7         THE WITNESS:  Yes, that is part of what

8    I would expect to be asked about.

9         BY MR. BERNICK:

10        **Q.   If I wanted to know what information**

11   **was available to your firm in connection with**

12   **filling out the PIQs for the Grace claimants, I**

13   **would have to access to your internal files**

14   **about exposure evidence.  Correct, with respect**

15   **to Grace products?**

16        MS. RAMSEY:  Object to form.

17        THE WITNESS:  No.

18        BY MR. BERNICK:

19        **Q.  How else would I know what was**

20   **available to your firm?**

21        A.  You could ask me.  You could look at

22   the evidence that we produced in response to the

23   PIQs.  You could pursue many different areas of

24   inquiry to determine what was available.

25        **Q.  Okay.  If we work with the first two**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 69

1    that you gave me before you smiled on the third
2    one.  Sure, we could ask you.  But we would have
3    no ability to cross-examine you regarding your
4    testimony with respect to what was available to
5    your firm without getting access to your
6    internal files.  Right?
7         MR. FINCH:  Object to form, foundation.
8         MS. RAMSEY:  Join.
9         THE WITNESS:  No, because none of the
10   internal work product memoranda address what is
11   available to our firm.
12        BY MR. BERNICK:
13      Q.   Well, it is not just internal work
14   product memoranda.  Maybe it is.  When clients
15   come to your firm, do you get access to
16   interviews with those clients?
17        MS. RAMSEY:  Object to the extent that
18   it calls for attorney-client privilege and
19   direct not to answer.
20        THE WITNESS:  I'm sorry?
21        MS. RAMSEY:  Direct not to answer to
22   the extent it calls for anything beyond a yes or
23   no answer.
24        THE WITNESS:  Yes, we are able to
25   interview our clients, yes.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 70

1          BY MR. BERNICK:

2          **Q.  Do they fill out kind of intake forms**

3     **where they describe what their work history is?**

4          A.  Yes, in many instances.

5          **Q.  And in those intake forms where they**

6     **describe their work history, do they indicate**

7     **what products -- are they asked to indicate what**

8     **asbestos products they were exposed to,**

9     **including the brand names?**

10         MS. RAMSEY:  Objection; calls for work

11    product information.

12         MR. BERNICK:  Are you going to instruct

13    him not to answer that, Natalie?  He can answer

14    that yes or no.

15         THE WITNESS:  Can I answer?

16         MS. RAMSEY:  You can answer yes or no.

17         THE WITNESS:  In some instances,

18    product information may be in the initial intake

19    forms.

20         BY MR. BERNICK:

21         **Q.  Is the answer with that qualification**

22    **yes?**

23         A.  In some instances, yes.

24         **Q.  Now --**

25         A.  Not as a normal matter, no.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 71

1          Q.  You are saying that, but I don't have

2     the ability when you just gave the testimony

3     that you did to test whether that's true or not

4     because you haven't given us access to those

5     documents.  Correct?

6          MR. FINCH:  Object to form, foundation.

7          MS. RAMSEY:  Join.

8          MR. FINCH:  I withdraw foundation.

9          BY MR. BERNICK:

10         Q.  Have you or have you not given us

11    access to your firm's internal documents that

12    reflect forms that are filled out by your

13    clients regarding exposure histories?

14         A.  We have not produced our internal

15    client memoranda, that's correct.

16         Q.  And will you follow Ms. Ramsey's

17    instruction if I were to ask you to tell me

18    exactly what questions you have asked people

19    about exposure to Grace products internally?

20         A.  I'm sorry?

21         Q.  I will ask you the questions.  What

22    questions do you ask clients that come to your

23    firm or potential clients that come to your firm

24    regarding their exposure histories?

25         A.  As a general matter, without respect to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 72

1    any specific client or communication with any
2    specific client, we ask them to describe in
3    detail their work history and all of their
4    potential exposures to asbestos, and we discuss
5    with them and ask them about what
6    asbestos-containing products that they recall
7    working with or around.
8        We ask them where they worked and what
9    years they worked and what jobs they did and
10   what the conditions were at those jobs.  And we
11   prepare a work history which becomes part of
12   their discovery responses based on those
13   interviews with the clients.
14       **Q.   Either before or during the interview,**
15   **is the potential client given a form to review**
16   **or to fill out?**
17       A.   In some instances before an interview,
18   and in some instances after an interview the
19   client is given an intake form to fill out,
20   which typically provides a lot of the
21   information responsive to the defendants'
22   interrogatories in litigation.
23       **Q.   And that form, that intake form, is it**
24   **questions that just leave a blank, that is, what**
25   **jobs did you hold, what were you exposed to,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 73

1    what products, what product names?  Or does it
2    take the form of giving them alternatives to
3    check off?
4          MS. RAMSEY:  Object to form.
5          THE WITNESS:  Alternatives to check off
6    with respect to products, you are asking?
7          BY MR. BERNICK:
8      Q.   Alternatives to fill out with respect
9    to whether they were exposed to asbestos,
10   alternatives to fill out with respect to what
11   kind of asbestos products.
12          I'm really just asking whether these
13   forms provide alternatives for them to check off
14   or are they more open-ended questions where they
15   are just given a blank to fill in?
16     A.   Speaking from my own personal
17   experience, our intake forms have blanks and
18   they solicit very basic information about the
19   jobs and the job sites, maybe not discuss
20   products.
21     Q.   Are they given the opportunity, though,
22   are they asked what products -- do you recall --
23   or what products were you exposed to?
24     A.   Yes.  There is an interview process
25   with clients and with potential witnesses for

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 74

1    clients in which the client is asked in detail

2    about what products they were exposed to, both

3    types and brands.

4        **Q.   And then after that interview is done,**

5    **does the client have the ability then to fill**

6    **out the intake form?**

7        A.   The intake form is -- it depends on the

8    case.  The intake form may be filled out before

9    or after, depending on the nature of how the

10   client comes to the firm.

11        To give you an example, if you would

12   like an example, if I get a call from a lawyer

13   who represents an individual who has been

14   diagnosed with mesothelioma to ask us whether we

15   would be interested in associating with the

16   case, in many instances a lawyer from my firm

17   will interview that client about the nature of

18   their exposure before there is any intake form

19   filled out.

20        If it appears a case that we could

21   handle, we might then say "fill out a form."

22       **Q.   And is there one form that's basically**

23   **used for everybody that comes through?**

24       A.   There is one intake form that we use,

25   an intake packet that we use to obtain basic

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                   Peter Kraus, Esquire

Page 75

1    information about the case, yes.
2        **Q.  Is there any document that's used or**
3    **set of materials that are used to refresh a**
4    **claimant's recollection of what products they**
5    **might have been exposed to?**
6        A.   There have been instances in the last
7    nine years where we have --
8        **Q.  I'm focused on Grace and the period '99**
9    **to '01.**
10       A.   In the period '99 to '01, there were
11   probably instances where clients were shown
12   pictures of asbestos-containing products and
13   asked whether they recalled those pictures.
14       **Q.   When clients or potential clients were**
15   **interviewed at Waters & Kraus between '99 and**
16   **'01 with respect to Grace, was there a set of**
17   **written procedures that the interviewing lawyers**
18   **or staff people followed that is a way to do the**
19   **interviews, kind of an interview packet?**
20       A.   There was various work product that
21   existed at different points in time for lawyers
22   who were interviewing clients.  There was no
23   specific packet as you describe it, no.
24       MR. FINCH:  Can we take a break when we
25   get to an appropriate time?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 76

1          MR. BERNICK:  In just a couple minutes.

2          BY MR. BERNICK:

3          **Q.  What about at Baron & Budd?**

4          A.   The same answer.

5          There were different materials at

6     different periods of time that were used by

7     lawyers interviewing clients.

8          **Q.   Have any of those materials been made**

9     **available to Grace?**

10          A.  I don't know.

11          **Q.  Well, are you prepared to make them**

12     **available to Grace?**

13          A.   Are you asking about Baron & Budd or

14     Waters & Kraus?

15          **Q.  Either one.**

16          A.   With respect to what Baron & Budd used

17     to meet with clients in the intake process, I

18     wasn't involved in the intake process at

19     Baron & Budd.  So I don't know what was used or

20     whether it has been produced.

21          With respect to Waters & Kraus, any

22     work product that attorneys would have used in

23     interviewing clients from '99 to 2001, to the

24     extent that it exists and is identifiable, would

25     be work product and not subject to production in

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 77

1    my understanding of the work product rules.

2    **Q.  Would the same thing be true of any**

3    **interviews that were conducted with respect to**

4    **people who are now claimants against Grace and**

5    **filled out PIQs?**

6    A.  I am certain that there are people who

7    are claimants against Grace who filled out PIQs

8    who were interviewed during the '99 to 2001

9    period.  So yes.

10    **Q.  And it is also true that some of the**

11    **people who are claimants against Grace and**

12    **filled out PIQs were interviewed after 2001.**

13    **Correct?**

14    A.  I can't remember what is the universe

15    of people who filled out Grace PIQs.

16    **Q.  Anybody who had a claim pending against**

17    **Grace as of the date of the filing of**

18    **bankruptcy, which is April of '01?**

19    A.  If they had a claim pending against

20    Grace, they would have been interviewed prior to

21    their filing about their product ID if they had

22    a claim pending as of the date of bankruptcy.

23    **Q.  And you have not made available and**

24    **will not make available the interview package or**

25    **the interview materials for those folks.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 78

1    **Correct?**

2        MS. RAMSEY:  Object to form.

3        BY MR. BERNICK:

4    **Q.  Just tell me if you will or not.**

5        MS. RAMSEY:  They are being withheld on

6    the basis of work product privilege.

7        BY MR. BERNICK:

8    **Q.  Are you prepared to make them**

9    **available?**

10        A.  I stand on the objection of my attorney

11    with respect to that.

12        MR. BERNICK:  Let's take a break.

13        (Recess.)

14        BY MR. BERNICK:

15    **Q.  In connection with your work at**

16    **Waters & Kraus on cases involving Grace, were**

17    **claimants interviewed again in connection with**

18    **their appearance for depositions?**

19        A.  Yes.

20    **Q.  Was there any kind of form that was**

21    **used in that process?**

22        A.  I'm sure that different lawyers used

23    different outlines to prepare their witnesses.

24    But there was no form that all lawyers used that

25    was the one and only piece of work product.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 79

1          **Q.   What about apart from the lawyers?**
2     **What about paralegals?  Were paralegals involved**
3     **in interviewing witnesses in connection with**
4     **their deposition appearances?**
5          A.   Not in the deposition preparation
6     process at Waters & Kraus.
7          **Q.   What about at Baron & Budd?**
8          A.   Paralegals were involved in the
9     deposition preparation process at Baron & Budd.
10          **Q.   After a deposition was done at**
11     **Waters & Kraus, was there any kind of further**
12     **form that was filled out by the claimant?**
13          A.   By the claimant?
14          **Q.   Yes.**
15          A.   With respect to what?
16          **Q.   What they testified about.**
17          A.   No, not with respect to the testimony.
18     Claimants filled out forms all the time in the
19     course of a lawsuit, claim forms and the like.
20          But no, there was no form a claimant
21     filled out following their deposition.
22          **Q.   In the deposition preparation process,**
23     **were there materials that were used to refresh**
24     **the witness's recollection?**
25          **By that I mean kind of a package of**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 80

1    **materials that were used to refresh witness**
2    **recollections about products.**
3          MS. RAMSEY:  Object on the basis of
4    work product privilege.
5          But you can answer yes or no.
6          THE WITNESS:  There may have been in
7    some instances but not as a matter of firm
8    policy.
9          BY MR. BERNICK:
10        **Q.  In what instances were packages of**
11   **materials used to refresh witness recollection**
12   **in connection with depositions?**
13        MS. RAMSEY:  Objection on the basis of
14   work product privilege.
15        Can we take a break and confer about
16   the privilege and its application to this
17   answer?
18        MR. BERNICK:  It seems to me that if
19   you want to assert the privilege, you should.  I
20   am hesitant to have the witness confer with you
21   before he answers a question.
22        THE WITNESS:  Okay.  Since I was not
23   present for every deposition of every
24   Waters & Kraus client who sued Grace -- we had
25   many lawyers -- I don't have personal knowledge

Page 81

1     about what all of them saw in preparing for

2     their deposition.

3          I can say as a general matter they

4     would have reviewed their work histories which

5     were portions of their answers to

6     interrogatories.

7          They may have reviewed other materials,

8     some of which may have been memoranda, but I

9     couldn't tell you with personal knowledge of

10    that occurring.

11         BY MR. BERNICK:

12    **Q.   What about picture book products?  Were**

13    **those used in connection with witness**

14    **preparation for depositions?**

15    A.   There may have been instances where

16    witnesses saw pictures or collections of

17    pictures, but not as a general matter.

18    **Q.   The answers to interrogatories, let's**

19    **just kind of go back over that a little bit.**

20    **A lawsuit is filed, and my**

21    **understanding is there is kind of a standard set**

22    **of interrogatories that were answered at the**

23    **beginning of a lawsuit down in Texas.**

24    A.   Yes, depending on the jurisdiction.

25    They varied from jurisdiction to jurisdiction.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 82

1        **Q.   And those interrogatories would include**
2    **work history, would they not?**
3        A.   Yes.
4        **Q.   How were those interrogatory answers**
5    **put together?**
6        A.   Clients were interviewed.  The intake
7    form, the information, the basic information in
8    the intake form was utilized.
9            A paralegal synthesized that
10   information.  A client -- in some instances a
11   paralegal would interview the client about the
12   products that they were exposed to and prepare a
13   work history based on that interview.
14       **Q.   The output of that process would be**
15   **reflected in the interrogatory answers?**
16       A.   That's correct.  Now, at some point in
17   time or differing points in time those
18   interrogatories were supplemented with the
19   results of co-worker investigations as well.
20       **Q.   And according to your process -- strike**
21   **that.  With respect to the -- strike that.**
22           **The interrogatory answers, after they**
23   **were prepared, that is, typed up, were they**
24   **always shown back to the client to get the**
25   **client's sign-off on the accuracy of the**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 83

1    answers?

2        A.   That was the firm procedure, yes, and

3    should have happened in every instance.

4        Q.   Now, let's assume -- strike that.

5            In talking about exposure history, you

6    have what the claimant tells you.  That's one

7    input.  Right?

8        A.   Yes.

9        Q.   You also have information from Grace's

10   files about where they shipped product, what

11   sites they shipped product to?

12       A.   In some instances, if they produced

13   that information.  They did not typically

14   produce that information without it being

15   compelled.

16       Q.   Well, the firm had available to it

17   information about where product was sold and

18   shipped.  Correct?

19       MS. RAMSEY:  Objection to form.

20       MR. FINCH:  Objection to form.

21       THE WITNESS:  In some instances.

22       BY MR. BERNICK:

23       Q.   Let's assume that a claimant says "I

24   worked at X job site," and you have from your

25   own knowledge of the firm information that Grace

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 84

1    **product was shipped to that job site.  Would**
2    **that be reflected in the interrogatory answer?**
3         MS. RAMSEY:  Object to form.
4         THE WITNESS:  Typically yes, if the
5    information we had was such that we had a good
6    faith belief that the client was exposed to the
7    products reflected in that information.
8         BY MR. BERNICK:
9      **Q.  Was the client ever asked to verify**
10   **that?**
11        **Let me take a step back.  You do the**
12   **interview with the client.  You find out that**
13   **they worked at a series of different job sites.**
14   **You know from your own files that Grace product**
15   **was shipped there at some point in time.**
16        **Was the client ever told that there was**
17   **a product for a given company at a site that**
18   **they were at?**
19        **At what point did the client come to**
20   **know the information that you had that said**
21   **Grace product was there when you were there --**
22        MR. FINCH:  Objection, form.
23        MS. RAMSEY:  Objection to form.
24        BY MR. BERNICK:
25     **Q.  -- if at all?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 85

1      A.   It would depend on the individual case

2    when the client came to know that information.

3          Q.   That would be in the interrogatory

4    answer, wouldn't it?

5          MS. RAMSEY:  Object to form.

6          THE WITNESS:  Yes, that would be the

7    latest period of time where they would come to

8    know that information, although in some

9    instances if that information -- the client may

10   not learn that information.

11         If we compelled from Grace information

12   about their product being at a site where the

13   plaintiff was and being used around the

14   plaintiff and we supplemented that information

15   in discovery, in many jurisdictions the client

16   didn't have to verify that and that wasn't the

17   client's personal knowledge.

18         In some instances the client may not

19   have actually learned that we had developed that

20   information.

21         BY MR. BERNICK:

22         Q.   But whatever information was available

23   to the firm from any source had to be put into

24   interrogatory answers, information about product

25   exposure.  Correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 86

1          MS. RAMSEY:  Object to form.

2          THE WITNESS:  If we intended to rely on

3     that evidence in the lawsuit, it would have to

4     be supplemented, in accordance with the rules,

5     to the other side.

6          BY MR. BERNICK:

7        **Q.  If you didn't intend to rely on it, you**

8     **didn't have to make the disclosure?**

9          MS. RAMSEY:  Object as to form.  I

10    don't understand the question.

11         BY MR. BERNICK:

12       **Q.  Very simple.  Weren't you obligated to**

13    **supplement interrogatory answers with any**

14    **information that you had about products to which**

15    **your clients were exposed?**

16       A.  Yes.

17       **Q.  Okay.  And certainly by the time the**

18    **witness -- strike that.**

19         **The witness now or client appears for a**

20    **deposition.  Was it the firm's routine practice**

21    **to have each of the clients review the**

22    **interrogatory answers that previously had been**

23    **submitted for that client?**

24       A.  Portions of those were I'm sure

25    utilized in the preparation of the client for

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 87

1   their deposition.

2      **Q.   That whole process, that is, the**
3   **process of preparing your clients for testimony,**
4   **including what they were shown, is that**
5   **reflected in any firm documents that you have in**
6   **the case of Grace?**

7      A.  No.

8      **Q.   By the time a client's deposition is**
9   **taken, was it firm policy to make sure that each**
10  **client was familiar with what the firm had**
11  **learned about their exposure history?**

12     A.  No.

13     **Q.   Was that not done or it just wasn't a**
14  **matter of firm policy?**

15     A.  It wasn't a matter of firm policy.  The
16  client was not told everything the firm learned
17  about every aspect of asbestos litigation.

18     **Q.   Let me reformulate the question.**
19        **There is no art to this thing.  I'm**
20  **just getting at a central fact, which is you**
21  **have a client who is going to be giving a**
22  **deposition and you know that in the deposition**
23  **they are going to be asked about what they were**
24  **exposed to.  Right?**

25     A.  Right.

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                     Peter Kraus, Esquire

Page 88

1      Q.   That is obviously a matter of enormous
2   consequence to whatever defendant they
3   identified.  Right?
4      A.   Yes, I accept that.
5      Q.   And that's not some secret.  That's a
6   pretty fundamental dimension of the litigation
7   process.
8      A.   Correct.
9      Q.   So the client at Waters & Kraus -- the
10   case against Grace comes in to be prepared for
11   the deposition.  And you have told us that they
12   had the opportunity to review the interrogatory
13   answers, although you said there is no hard and
14   fast rule to that effect.  Fair?
15      A.   The entire interrogatory answers.
16   Certainly the work history which reflected what
17   the client recalled about their exposure would
18   always be a subject of the preparation.
19      Q.   Okay.  But the interrogatories also
20   would contain information that the firm had
21   learned through its own efforts to identify
22   products that were there at the job site.
23   Correct?
24      MS. RAMSEY:  Objection.
25      THE WITNESS:  They may or may not,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 89

1  depending on when the deposition was taken in
2  the lawsuit process and whether or not that
3  information had been obtained, marshalled and
4  supplemented in the discovery.
5       BY MR. BERNICK:
6       **Q.  But certainly as of the time the**
7  **deposition was taken, any information regarding**
8  **product exposure that had been obtained would be**
9  **in the interrogatory answers.  Correct?**
10      MS. RAMSEY:  Objection to form.
11      THE WITNESS:  It may or may not.  It
12  would depend on the case, where you were in the
13  litigation process and whether that information
14  had been supplemented.
15      BY MR. BERNICK:
16      **Q.  But I'm trying to -- I thought you had**
17  **to supplement the interrogatory answers with**
18  **whatever it is that you knew about product**
19  **exposure.**
20      A.  You do.  But it is a timing issue in
21  terms of when the supplementation takes place
22  versus when the deposition takes place, and it
23  would vary from case to case is what I'm trying
24  to tell you, Mr. Bernick.  There is no hard and
25  fast rule.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 90

1        **Q.   If the firm knew that a given client**
2    **worked at a job site where you had records**
3    **suggesting or providing some evidence that Grace**
4    **or some other product was present at the job**
5    **site, you are saying that that fact wouldn't be**
6    **disclosed to your clients before the depositions**
7    **took place?**
8             MS. RAMSEY:  Objection to form.
9             THE WITNESS:  It may or it may not,
10   depending on the case and the nature of the
11   evidence.
12            As a hypothetical matter, if we
13   obtained from Grace or some other source in
14   discovery a bunch of invoices showing that their
15   product was used at a site, in all likelihood we
16   may go back to a client who had not previously
17   identified a Grace product and say "look at
18   this, do you recall these products," and they
19   would say yes or no.
20            If you said yes, you would supplement
21   their work history to reflect the additional
22   testimony that the client would give based on
23   those records.
24            But if we had identified a witness at
25   that site who remembered additional products

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 91

1    that the client did not, that may not be shared

2    with the client before his deposition because

3    the client's there to testify about what the

4    client knows, not about what other witnesses

5    know.

6         BY MR. BERNICK:

7         **Q.   But don't you have an obligation**

8    **presenting your client to testify at a**

9    **deposition to assure, an obligation to the**

10   **client that their testimony is truthful but is**

11   **also the strongest testimony that they can give**

12   **with respect to their case?**

13        MR. FINCH:  Object to form.

14        MS. RAMSEY:  Object to form.

15        THE WITNESS:  I have all the

16   obligations that any lawyer has with respect to

17   my client.

18        BY MR. BERNICK:

19        **Q.   Is that one of the obligations when you**

20   **are representing your client vigorously is to**

21   **make sure that they tell the truth but that in**

22   **telling the truth, they bring to bear the best**

23   **testimony that they can?**

24        MR. FINCH:  Object to form; compound.

25        MS. RAMSEY:  Object to form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 92

1          THE WITNESS:  I would agree that it is

2    their obligation to tell the truth and my

3    obligation to sponsor the truth.

4          BY MR. BERNICK:

5      **Q.   And to bring to bear in that process**

6    **any information that would assist them in the**

7    **prosecution of their case.  Correct?**

8          MR. FINCH:  Object to form.

9          MS. RAMSEY:  Object to form.

10         THE WITNESS:  I have to zealously

11   represent them.  I agree with that.

12         I guess what I'm having trouble with is

13   the notion that somehow they sponsor the

14   knowledge of all their co-workers, which they

15   don't.

16         BY MR. BERNICK:

17     **Q.   I'm not suggesting that.  I'm**

18   **suggesting that by the time you have any of your**

19   **clients give a deposition, you have made sure to**

20   **try to refresh their recollection with regard to**

21   **product ID.**

22         **This is again during the period of time**

23   **with respect to Grace claimants.  This is with**

24   **respect to Grace claimants.**

25         **You make sure to refresh their**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 93

1       recollection regarding product ID with anything

2       that you had at your firm's disposal that would

3       help.  Right?

4               MR. FINCH:  Object to form.

5               MS. RAMSEY:  Object to form.

6               THE WITNESS:  As a general proposition,

7       I would agree with that, that I would share with

8       my client any evidence that would help refresh

9       his recollection about what he might have been

10      exposed to in general, if I had that

11      information.

12              BY MR. BERNICK:

13          Q.  If you had the information, that would

14      include his or her work history.  Correct?

15          A.  Correct.

16          Q.  It would also include, if you had

17      co-workers who said that yes, there was Grace

18      product there.  You would utilize that

19      information.  Correct?

20          A.  Not typically.

21          Q.  Why wouldn't you?

22              If you had a product that was a

23      significant product at a site that they worked

24      at for years and they didn't remember that but

25      you have a co-worker that says "oh, yes, there

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 94

1    **was Grace product there for years and years and**

2    **everybody was exposed to it," you wouldn't try**

3    **to refresh your client's recollection with that**

4    **information?**

5    A.   There may have been instances where a

6    hypothetical client was told that many

7    individuals had identified this product at their

8    site when his work history was prepared.

9    But if he didn't recall it truthfully

10    himself, it would not be on his work history,

11    and we subsequently wouldn't try to get him to

12    sponsor the testimony of a co-worker who

13    remembered more products than he did.

14    **Q.   Not whether you would try to get him to**

15    **sponsor it.  But if there was new information**

16    **that says that Grace product is at a site, you**

17    **wouldn't try prior to the deposition to bring**

18    **that to your client's attention to see if they**

19    **remember it?**

20    MS. RAMSEY:  Object to form.

21    THE WITNESS:  If we had obtained new

22    information after we interviewed the client and

23    prepared his work history and prior to his

24    deposition, would we share that information to

25    see whether it refreshed his recollection?

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace               Peter Kraus, Esquire

Page 95

1          I'm sure that occurred in some

2     instances, yes.  But it would typically not

3     occur that we would say, "Co-worker John Doe

4     remembered Grace products, so do you remember

5     Grace products?"  That would typically not

6     happen.

7          BY MR. BERNICK:

8       **Q.   Again, you would be sure to show them**

9     **the work history part of the interrogatories?**

10         A.   Typically speaking, that was firm

11    policy to review with the client their prior

12    sworn answers to interrogatories with respect to

13    their work history.

14      **Q.   The work history documents -- with**

15    **respect to each client at Waters & Kraus, was**

16    **there a document that was maintained with**

17    **respect to each claimant's file that was called**

18    **the work history?**

19         MS. RAMSEY:  Objection to form and

20    objection on the basis of work product and

21    instruct the witness not to answer.

22         THE WITNESS:  There is a work history

23    that's not internal memoranda that were

24    discovery responses.

25         BY MR. BERNICK:

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 96

1      **Q.   That's part of my question.**

2          **Was there a work history -- we have**

3      **seen the work history that was part of the**

4      **discovery responses that's been attached to**

5      **interrogatory answers.**

6      A.   Right.

7      **Q.   Was there another document that the**

8      **firm had internally that reflected the same or**

9      **similar subject matter, which is evidence**

10     **regarding what the client was exposed to during**

11     **the different jobs?**

12     A.   Internal document?

13     **Q.   Yes.**

14         MS. RAMSEY:  I will object on the basis

15     of work product privilege to the extent that it

16     is called for by that.  But you can answer yes

17     or no.

18         THE WITNESS:  Yes, typically.

19         BY MR. BERNICK:

20     **Q.   That internal document, when it**

21     **existed, was that based solely on what the**

22     **witness said and recalled or did it also reflect**

23     **other inputs?**

24         MS. RAMSEY:  Objection; work product

25     privilege, direct the witness not to answer that

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 97

1    question.

2        BY MR. BERNICK:

3        **Q.  The internal document that related to**

4    **work history, was that ever shown to the client?**

5        A.   Not that I'm aware of.  It would not

6    have been firm policy to prepare a witness to

7    testify with the firm's internal memoranda, any

8    draft of the work history or prior memoranda

9    used in preparing the work history.

10        **Q.  What about subsequently, that is, after**

11    **the work history -- after the client has been**

12    **interviewed and the initial work history is put**

13    **together, if there is new information that comes**

14    **to light, either from Grace or other sources**

15    **regarding products to which the client was**

16    **exposed or places of exposure, was that**

17    **information put into the internal work product**

18    **document that related to the history of**

19    **exposures?**

20        MS. RAMSEY:  Objection; direct the

21    client not to answer on the basis of the work

22    product privilege.

23        BY MR. BERNICK:

24        **Q.  Okay.  Whatever internal documents were**

25    **prepared at your firm regarding the exposure**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 98

1    **history of people who made claims against Grace,**

2    **was that document used in filling out the PIQs?**

3          MR. FINCH:  Can I have that question

4    read back, please.

5    (Whereupon, the record was read back as follows:

6    "Question:  Okay.  Whatever internal documents

7    were prepared at your firm regarding the

8    exposure history of people who made claims

9    against Grace, was that document used in filling

10   out the PIQs?")

11         THE WITNESS:  No.

12         BY MR. BERNICK:

13     **Q.   Is there any way that I can verify that**

14   **other than by asking you?**

15     A.   I don't think even if you looked at

16   every privilege document in the firm that it

17   would allow you to verify what we looked at in

18   answering the PIQs.

19     **Q.   My question, though, is a little bit**

20   **different from that.**

21         **My question is are there documents at**

22   **the firm that would tell me how the PIQs were**

23   **filled out?**

24     A.   There are documents that relate to that

25   topic.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 99

1    **Q.   And have all those documents been made**
2    **available to Grace?**
3       A.   No.  Our internal memoranda with
4    respect to the procedures we followed in
5    preparing those have not been produced.  They
6    are work product.
7    **Q.   I want to go back a little bit and**
8    **maybe more than a little bit in time.**
9          **One of the areas where the ACC and the**
10   **FCR have indicated that they intend to have you**
11   **testify is described as types of industries and**
12   **occupations for people who made claims against**
13   **Grace that you all represented.**
14         **I have not seen any compilation or**
15   **summary produced by you or your firm that would**
16   **tell me the types of industries and occupations**
17   **for Grace claimants.  Is there such a thing?**
18      A.   Other than the Grace litigation
19   documents that we have produced that we obtained
20   from Grace originally, I'm not aware of any such
21   compilation.
22   **Q.   Is it true that about 50 percent of the**
23   **claimants that you represent who had claims**
24   **pending against Grace as of the time the Chapter**
25   **11 was filed -- strike that.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 100

1    **Is it true that about 50 percent of the**
2    **Waters & Kraus clients who filled out the PIQs**
3    **to make it easier were shipyard workers?**
4    A.   I don't know that.  I would have to go
5    review that.  I haven't done that analysis.
6    **Q.   Does that sound about right?**
7    A.   It wouldn't surprise me, but I don't
8    have any way of verifying that.
9    **Q.   I want to talk a little bit about your**
10   **personal background as I have it from the**
11   **Waters & Kraus Web site that is very impressive.**
12   A.   Thank you.
13   **Q.   It says that you graduated from Duke in**
14   **1982 and the University of Texas Law School at**
15   **Austin in 1985.  Is that right?**
16   A.   That's correct.
17   **Q.   And that you were admitted to the bar**
18   **for the state of Virginia upon graduation in**
19   **1985 and then in Texas in '92.**
20   A.   That's correct.
21   **Q.   So what did you do after you passed the**
22   **bar?**
23   A.   I took a job with a firm in Alexandria,
24   Virginia called Thomas & Fiske doing commercial
25   litigation.  After a trip around the world for

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 101

1        seven weeks, I went to work there.

2            **Q.  What kind of business did that firm do?**

3            A.   It was -- I did commercial litigation.

4        The firm had more broad services than that.

5            **Q.  Did you do plaintiffs work or defense**

6        **work or both?**

7            A.   Since my clients were companies, it

8        depended whether they were suing or being sued.

9        It may be both.

10           **Q.  Did you do any personal injury work**

11       **when you worked at that firm?**

12           A.   No.

13           **Q.  How long did you spend at that firm?**

14           A.   That firm merged with another firm and

15       became Hazel, Thomas, Fiske, Beckhorn & Haines

16       and then became Hazel & Thomas.  And I was there

17       at those entities for a total of five years,

18       approximately.

19           **Q.  Until about 1990?**

20           A.   Yes, the end of '90, beginning of '91.

21           **Q.  Did your practice remain essentially as**

22       **you already described?**

23           A.   It changed a little bit over time.  I

24       moved to the Washington office of that firm and

25       did bankruptcy litigation for my last 12 to 15

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 102

1    months, and then shortly before I left I worked

2    for a partner in the Baltimore office doing an

3    internal investigation of a medical products

4    company.

5        **Q.  Which company?**

6    A.  Cordis.

7        **Q.  This was the pacemaker leads?**

8    A.  Yes, and pacemakers.

9       As I understood it or as I recall, they

10   had a shareholder strike suit letter and they

11   were doing an internal investigation of the

12   allegations in the letter.

13      **Q.  In 1990-1991, where did you go next?**

14   A.  I went to work for Baron & Budd.

15      **Q.  Where?**

16   A.  Dallas, Texas.

17      **Q.  So you moved to Texas, took the bar?**

18   A.  I waived in to the Texas bar.

19      **Q.  How did you come to make that move?**

20   A.  A friend of mine from law school here

21   who is working here in Washington with me moved

22   back to Texas and got involved in asbestos

23   litigation on the defense side, and I was

24   telling him that I was dissatisfied with the

25   amount of trial work I was doing, and he

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 103

1   suggested that I speak with Baron & Budd, who
2   was on the other side of many of his cases.
3       **Q.  Who did you talk with at Baron & Budd?**
4       A.   Initially I went home to Dallas where I
5   was from over the Easter holiday and I briefly
6   met Russell Budd.
7           I went back to Washington, and early in
8   the summer of 1990, Fred Baron came and had
9   breakfast with me, and they invited me for an
10  office visit late that summer and offered me a
11  job.
12      **Q.  So you went down to Baron & Budd**
13  **beginning when?**
14      A.   The fall of 1990, late, probably
15  October, November 1990, somewhere in that range.
16      **Q.   This says you weren't admitted to the**
17  **Texas bar until '92.  What accounts for that?**
18      A.   I started the waive-in process at some
19  point in '91, and I spent most of 1991
20  practicing law in Alabama in the asbestos
21  litigation in Alabama.
22          So I began that process, and it was
23  completed just after New Year's '92, as I
24  recall.
25      **Q.  When you were hired on at Baron & Budd,**