US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 104

1      were you a partner?

2          A.  No.

3          Q.  Did you become a partner at some point

4      in time?

5          A.  I did.

6          Q.  When was that?

7          A.  As I recall, '93.

8          Q.  And you left at the end of 1998?

9          A.  Correct.

10          Q.  Fred Baron was the leader of

11      Baron & Budd during the entire period of time

12      that you were there.  Right?

13          MS. RAMSEY:  Object to form.

14          THE WITNESS:  He was the lead partner.

15      He and Russell Budd ran the firm predominantly

16      during the time I was there.

17          BY MR. BERNICK:

18          Q.  And there's a lot that's been written

19      about Fred Baron.  True?

20          A.  True.

21          Q.  It's said that he was one of the most

22      powerful -- he was the most powerful plaintiff

23      lawyer in Texas.  Correct?

24          A.  I don't know what you are referring to.

25          MR. FINCH:  Object to form.

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                       Peter Kraus, Esquire

Page 105

1          BY MR. BERNICK:

2          **Q.  Was Fred Baron one of the most powerful**

3    **plaintiffs' lawyers in Texas during the period**

4    **of time that you were there?**

5          MR. FINCH:  Objection, foundation.

6          MS. RAMSEY:  Objection.

7          BY MR. BERNICK:

8          **Q.  He was your partner, right?**

9          A.  He was a powerful, respected

10   plaintiffs' lawyer at one of the biggest

11   plaintiffs' firms in the state.

12         **Q.  In fact --**

13         A.  Founding partner of one of the biggest

14   plaintiffs' firms in the state.  I guess in that

15   respect, yes.

16         **Q.  In fact, during the period of time you**

17   **were at Baron & Budd, it was the biggest**

18   **plaintiffs' firm in the state.  Correct?**

19         A.  I would think that's correct.

20         **Q.  And it was the richest plaintiffs'**

21   **firm in the state of Texas.  Correct?**

22         A.  That I don't know.  Actually, I don't

23   think it was.

24         **Q.  And Fred Baron was an exceedingly well**

25   **politically connected lawyer in the state of**

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 106

1      **Texas, was he not?**

2          A.   He was and is active in politics,

3      probably more so now than then.

4          **Q.   But at the time you were there, he was**

5      **one of the most politically connected lawyers in**

6      **the state of Texas.  Correct?**

7          MR. FINCH:  Object to form.

8          MS. RAMSEY:  Join.

9          THE WITNESS:  I can't -- he had

10     relationships with politicians.  I can't say

11     relatively speaking whether he was more or less

12     politically connected than other lawyers in the

13     state.

14         BY MR. BERNICK:

15         **Q.   It is not some big secret.  If you**

16     **asked him back during the period of time that**

17     **you were there, he would tell you that he was**

18     **the most politically connected and powerful**

19     **lawyer in the state of Texas.  Right?**

20         MS. RAMSEY:  Object to form.

21         THE WITNESS:  He certainly never told

22     me that.  And I would be surprised if he would

23     have so identified himself.

24         BY MR. BERNICK:

25         **Q.   How many cases a year roughly, asbestos**

Page 107

1     **cases a year did Baron & Budd file during the**

2     **period of time that you were there?**

3          A.   It varied widely over those eight

4     years.

5          **Q.  So say 1995.**

6          A.   I don't know.

7          **Q.   Tell me the variation.  Did it grow**

8     **over time?**

9          A.   I would say as a general rule the

10    number of cases that the firm was handling from

11    1990 to '98 went up.

12          But how the filings varied from year to

13    year I really couldn't tell you.  I wasn't

14    involved in the intake process.  I was more

15    involved in the back end of the case process,

16    the outtake.

17          **Q.   But certainly you had a familiarity**

18    **with the number of cases that the firm handled**

19    **in general terms?**

20          A.   I had a general understanding of how

21    many cases that were pending at any given time.

22          **Q.   And just tell me generally how many**

23    **cases were pending at any given time.**

24          A.   Probably during that period of time

25    they started that decade in the low thousands

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 108

1    and probably went up to 7-, 8,000 cases that
2    were pending nationwide.
3        **Q.   And to be able to handle that number of**
4    **cases, you need a very substantial organization.**
5    **Correct?**
6        A.   It was a very large organization, yes.
7        **Q.   Just tell me the elements of the**
8    **organization.**
9        **How many lawyers were there,**
10   **paralegals, medical types?  Just give me a**
11   **bird's eye view of Baron & Budd in the mid-'90s**
12   **when you were there in terms of its size.**
13       A.   There were probably -- when I joined
14   the firm, there were 15 lawyers.  When I left
15   the firm, there were probably 60 or 70 lawyers,
16   somewhere in that range, 50 to 70, somewhere in
17   there.
18       There were several hundred nonlawyer
19   employees of the firm.  There were paralegals
20   that answered discovery, paralegals that did the
21   medical workup, paralegals involved in product
22   identification.
23       That's the asbestos part of the firm.
24   The firm had a very substantial general toxic
25   tort practice as well.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 109

1      **Q.   Baron & Budd also had an affiliation**
2      **with Silber Pearlman, did it not?**
3           A.   Not when I was there.
4           **Q.   That was later on?**
5           A.   That was later on.
6           **Q.   What is the other one?  What is the --**
7      **LeBlanc & Waddell.**
8           A.   That was after I left.  Both those
9      relationships occurred after I left the firm.
10          **Q.   You have up to several thousand cases**
11     **and they are brought against how many defendants**
12     **were being sued in those cases, roughly?**
13          A.   Anywhere from 20 to 40 on average I
14     would guess depending on when it was.
15          **Q.   Is that in each case sued or is that in**
16     **the aggregate sued?**
17          **I'm really asking how many different**
18     **defendants in all of the litigation that**
19     **Baron & Budd was handling were there?**
20          MR. FINCH:  Object to form.
21          THE WITNESS:  I don't know the answer
22     to that.
23          The answer I gave you was the average
24     number of cases filed in an average case as it
25     changed over time, as additional defendants were

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 110

1    identified through the litigation or discovery

2    process based on the facts of the individual

3    cases.  Different defendants were sued in

4    different kinds of cases.

5        BY MR. BERNICK:

6        **Q.   Roughly how many different defendants**

7    **did Baron & Budd track and sue in their various**

8    **asbestos cases during the '90s?**

9        **Was it 100, 200, 300?  What would it**

10   **be?**

11       A.   I would say -- in any one of those

12   thousands of cases, how many total defendants

13   were sued?

14       **Q.   Yes.**

15       A.   Somewhere between 50 and 75 different

16   companies were defendants in Baron & Budd

17   lawsuits during that period of time.

18       **Q.   Now, in order to process that many --**

19   **it sounds like kind of a heartless term.**

20       **In order to be able to prosecute**

21   **successfully asbestos claims on behalf of**

22   **thousands of clients against 50 to 75 different**

23   **defendant manufacturers, did Baron & Budd have**

24   **procedures that were followed in the prosecution**

25   **of these different asbestos claims?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 111

1    A.  Yes.

2        **Q.  And did you become familiar with those**

3    **procedures?**

4    A.  Many of them.  Not all of them.

5        **Q.  I asked you a bunch of questions about**

6    **the intake of clients at Waters & Kraus, getting**

7    **information from those clients, filling out**

8    **interrogatory answers, preparing clients for**

9    **depositions.**

10       **I think you told me in different**

11   **answers sometimes forms were used, but I don't**

12   **think you told me at any time that there was a**

13   **set of written procedures that was followed**

14   **firmwide at Waters & Kraus.  Is that correct?**

15   A.  About preparing clients for

16   depositions?

17       **Q.  About preparing clients at any part in**

18   **that process, that is, how to interview them,**

19   **how to prepare a work history, how to answer**

20   **interrogatories, how to prepare for depositions.**

21       **Were there written procedures for any**

22   **of that at Waters & Kraus?**

23       MS. RAMSEY:  Objection; direct the

24   witness not to answer on the basis of work

25   product privilege.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 112

1          THE WITNESS:  I will accept my
2    counsel's response.
3          BY MR. BERNICK:
4      **Q.  You are going to accept her instruction**
5    **on that?**
6      A.  Yes.
7      **Q.  What about at Baron & Budd, were there**
8    **written procedures regarding how clients would**
9    **be handled and interviewed on intake?**
10          MR. FINCH:  Objection, lack of
11    foundation.
12          MS. RAMSEY:  I would also like to raise
13    a question as to whether or not, since this is
14    Baron & Budd's work product privilege, a
15    representative to Baron & Budd ought to be
16    involved in this deposition.
17          MR. BERNICK:  I have all kinds of
18    questions about Baron & Budd.  I have lots of
19    questions about Baron & Budd.
20          MS. RAMSEY:  Then I would suggest that
21    we take a five-minute break and let me see if an
22    attorney for Baron & Budd would like to get on
23    the telephone.
24          MR. BERNICK:  That's fine.
25          (Recess.)

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 113

1          MS. RAMSEY:  I have spoken with counsel

2     for Baron & Budd, and I have been informed that

3     Baron & Budd asserts its work product privilege

4     with respect to its internal processes and that

5     as a result, it is not waiving those.

6          And, therefore, I am directing

7     Mr. Kraus not to testify as to any of the

8     internal practices, processes or other work

9     product of the law firm of Baron & Budd.

10          MR. BERNICK:  Why can't the

11     Baron & Budd people be on the telephone to

12     assert their own privilege?  Who did you talk

13     to?

14          MS. RAMSEY:  I talked to Van Hooker at

15     Mr. Esserman's office.

16          MR. BERNICK:  Do you have this

17     authority to answer or to object?  I don't think

18     you really do.

19          So I think if they want to assert --

20          MS. RAMSEY:  It is the law firm's

21     privilege, and the law firm is not waiving it.

22     And, therefore, Mr. Kraus may not so testify

23     without breaching the privilege.

24          MR. BERNICK:  What is his number?  Why

25     don't we just dial him up.  We will get him on

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                              Peter Kraus, Esquire

Page 114

1    the phone and have him do whatever he is going

2    to do.

3              (Pause.)

4              MR. BERNICK:  Sandy, we are calling you

5    from the deposition --

6              (Pause.)

7              (Discussion off the record.)

8              MR. BERNICK:  Several efforts have now

9    been made to patch in someone who represents

10   Baron & Budd, and those efforts have not been

11   successful.

12             I want Amanda to send an e-mail to

13   Esserman indicating that this deposition is

14   proceeding.

15             Ms. Ramsey has indicated a position

16   from Baron & Budd on the record here.  I don't

17   think, with all complete and due respect to

18   Ms. Ramsey, that she has the ability to

19   represent Baron & Budd in connection with this

20   deposition.

21             Therefore, if they want to protect

22   their position, I believe they have to

23   participate in the process.

24             I do know that they have received

25   notice of the fact that Baron & Budd is to be

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 115

1   discussed through the filing that was made by

2   the ACC and the FCR describing the proposed

3   areas of testimony to be covered by Mr. Kraus.

4          It is their election not to attend this

5   deposition, and I don't believe that they can

6   have a proxy, assert privilege, and I don't

7   believe that they can have a proxy, instruct the

8   witness not to answer.

9          Indeed, I don't think that Ms. Ramsey

10   has the authority to instruct the witness not to

11   answer a question that relates to a privilege

12   that runs to a different firm.

13          I don't believe, Ms. Ramsey, you have

14   ever appeared as counsel for Baron & Budd in

15   this case.

16          Am I wrong about that?

17          MS. RAMSEY:  You are not wrong about

18   that, and I am not appearing as their counsel

19   today.

20          MR. BERNICK:  So I think, Mr. Kraus, if

21   you want to not answer questions on the basis of

22   a privilege that attaches to Baron & Budd with

23   respect to their clients, I suppose it is your

24   prerogative not to do that.

25          But I don't think you can be acting on

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 116

1  the instruction of counsel because counsel is
2  not here.
3        So that's just a decision that you are
4  going to have to take.  But I have a bunch of
5  questions to ask you.
6        I will try not to prolong the process
7  in light of the fact that you are not likely to
8  answer them.  I will ask the questions.
9        Therefore, Baron & Budd will have a
10 record of what it is they have to make some
11 decisions about.
12       MS. RAMSEY:  My position is that I am
13 here as counsel for Mr. Kraus.  And as
14 Mr. Kraus's counsel, I have an obligation to
15 ensure that he not violate the privileges either
16 of his clients or of any obligation that he owes
17 to any other institution with which he has been
18 affiliated.
19       And, therefore, I am going to continue
20 to instruct him -- and we can decide later
21 whether or not that is the appropriate thing for
22 me to do -- not to reveal any information that
23 would require disclosure of work product of
24 either the Baron & Budd law firm or of his own
25 law firm, Waters & Kraus.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 117

1        MR. BERNICK:  I don't think that work
2    product is an appropriate grounds for any
3    instruction anyhow.
4        It is a privilege that doesn't belong
5    to the client.  I don't think there is any basis
6    for instruction on the basis of work product.
7        With respect to the attorney-client
8    privilege, again, I don't know that Baron & Budd
9    is in any different position than Mr. Kraus is
10   with respect to that issue.
11       He will have to make a determination on
12   what it is that he will regard as being
13   privileged.
14       But I don't think that your
15   instruction, Ms. Ramsey, has any bearing
16   whatsoever on privileges that apply to
17   Baron & Budd and their clients.  I just don't
18   think that you have that authority.
19       Mr. Kraus, to the extent that he wants
20   to protect what he believes those privileges
21   are, can try to do so.  I don't think that's
22   action on the advice of counsel.
23       In any event, I will ask you some
24   questions.  We will take them up.
25       BY MR. BERNICK:

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 118

1          **Q.   While you were at Baron & Budd,**
2    **Mr. Kraus, how many asbestos trials did you --**
3    **strike that.**
4               **While you were at Baron & Budd, with**
5    **respect to how many asbestos personal injury**
6    **trials did you act as trial counsel?**
7         A.   I probably at least started trial on
8    more than 50.
9          **Q.   Okay.  And with respect to how many**
10   **trials while you were at Baron & Budd did the**
11   **case go to verdict?**
12        A.   Where I was trial counsel?
13        **Q.   Yes.**
14        A.   Probably around 15.
15        **Q.   Did any of them involve W.R. Grace?**
16        A.   Many of the 50 involved W.R. Grace.  I
17   started trial against W.R. Grace a number of
18   times.
19             None of the cases in which I was one of
20   the lead trial counsel went to verdict against
21   Grace, although the firm went to verdict against
22   Grace while I was there.
23        **Q.   The firm went to verdict against Grace**
24   **twice while you were there.  Correct?**
25        A.   I think that's correct.

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 119

1          **Q.   And in one case, there were plaintiffs'**
2     **verdicts, and in the other set of cases, they**
3     **were all defense verdicts.  Correct?**
4          A.   I remember the plaintiffs' verdicts.
5             Can you refresh my recollection about
6     the defense verdict, the jurisdiction and the
7     client name?
8          **Q.   Is it called Nueces County?**
9          A.   Nueces County.  Yes.  I do think Grace
10    got a defense verdict in that case.
11         **Q.   There were two sets of cases that went**
12    **to trial against Grace, two verdict while you**
13    **were at Baron & Budd.**
14            **One set of cases was tried in Dallas**
15    **County and resulted in plaintiffs' verdicts.**
16    **Correct?**
17         A.   Yes.
18         **Q.   The other set of cases went to trial in**
19    **Nueces County and resulted in defense verdicts.**
20    **Correct?**
21         A.   I think that's right.  I probably
22    blocked out the defense one.  I frankly don't
23    remember the defense one.
24            I remember the plaintiff one very well,
25    in all honesty.  Can you give me the case name

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                          Peter Kraus, Esquire

Page 120

1    of the Nueces County case?

2        Q.  We can probably in a little bit.  I got

3    the list of --

4        MR. FINCH:  ACC/FCR, Hughes Deposition

5    Exhibit 144 or 144A.

6        MR. BERNICK:  Now he is backsliding

7    again.

8        BY MR. BERNICK:

9        Q.  I think it was the Cheney case that

10   went to trial in Dallas.

11       A.  I remember the Norsworthy Group is what

12   it was called, as I recall the Dallas case.

13   There were three plaintiffs in it.

14       Q.  I don't recall the Nueces County

15   plaintiff, although we can get that.

16       Do you now recall there were other

17   cases at about the same time that went to trial

18   and led to defense verdicts while you were at

19   Baron & Budd?

20       A.  You know, I don't really remember it.

21       I was involved in the Dallas trial.  I

22   did all the pretrial work in the Dallas trial.

23       Q.  Who tried the Dallas case?

24       A.  The lawyers in front of the jury were

25   Lisa Blue and Mike Keski.  And I handled the

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 121

1    pretrial matters and many of the legal issues

2    outside the presence of the jury.

3        **Q.  Have you ever tried a case against**

4    **Grace to verdict?**

5        A.  Not to verdict personally.

6        **Q.  While you were at Waters & Kraus, did**

7    **you ever start a trial against Grace?**

8        A.  Yes.

9        **Q.  How many times?**

10       A.  I don't recall.  Many times.

11       **Q.  Do you remember the Nueces County**

12   **plaintiffs were Tuck, Holder, McCovery, Zahnd,**

13   **Barnett, Pounders, Blankenship, Caudle and**

14   **Loggins?**

15       A.  I really don't remember that group.

16       **Q.  When did you first start to work on**

17   **Grace cases?**

18       A.  1990.

19       **Q.  When you worked on Grace cases while**

20   **you were at Baron & Budd, did you become**

21   **familiar with Baron & Budd's intake procedures?**

22       A.   Not specifically as to Grace cases.

23          I had a general familiarity with

24   Baron & Budd's intake procedures as to all

25   asbestos cases, but it was very general.  I

Page 122

1    wasn't involved in the intake process.
2        **Q.  Did Baron & Budd have a different**
3    **intake procedure for claims against Grace versus**
4    **claims against other defendants?**
5        MS. RAMSEY:  I will object on the basis
6    of work product and direct Mr. Kraus not to
7    answer.
8        BY MR. BERNICK:
9        **Q.  What about deposition preparation?**
10       MS. RAMSEY:  Same objection.
11       BY MR. BERNICK:
12       **Q.  Did you have knowledge of how**
13   **witnesses -- strike that.**
14       **Do you have knowledge about how**
15   **claimants represented by Baron & Budd prepared**
16   **witnesses for depositions during the period of**
17   **time that you were there?  I'm talking about**
18   **cases involving Grace.**
19       A.  Yes, I do have some knowledge of that
20   topic generally in asbestos cases, including
21   cases in which Grace was one of the defendants.
22       **Q.  In fact, did you prepare plaintiffs**
23   **against Grace for their depositions while you**
24   **were at Baron & Budd?**
25       A.  I prepared plaintiffs for deposition

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 123

1    while at Baron & Budd in which Grace was one of
2    the defendants.
3        I guess the point is there was nothing
4    specific about Grace being a defendant that made
5    that deposition preparation any different than
6    any other case.
7        **Q.   Did you during the course of your**
8    **work -- let me just ask.**
9        **Roughly how many different asbestos**
10   **claimants did you represent in depositions while**
11   **you were at Baron & Budd where Grace was a**
12   **defendant?**
13       A.   Most of the cases in which I was
14   counsel of record for the plaintiff involved
15   W.R. Grace.
16       I can't give you an exact number of how
17   many clients I either defended at deposition or
18   took a direct examination of to preserve their
19   testimony.  Probably between 50 and 100.
20       **Q.   You said that in most of the cases that**
21   **Baron & Budd had Grace was a defendant.  Can you**
22   **give me a percentage?**
23       A.   I would say my answer was in most of
24   the cases in which I was counsel for the
25   plaintiff at the deposition, Grace was a

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 124

1   defendant.

2       **Q.  So give me a percentage.**

3       A.  I would say probably nine out of 10

4   cases Grace was sued.

5       **Q.  What about when you were at Waters**

6   **& Kraus?  What percentage of the cases while you**

7   **were at Waters & Kraus was Grace named as a**

8   **defendant?**

9       A.  Probably the same.  Probably nine out

10  of 10 cases.

11      **Q.  How many other companies were there, if**

12  **any, who were named as a defendant in nine out**

13  **of 10 cases while you were at Waters & Kraus**

14  **from '99 to '01?**

15      A.  I would say probably 50 to 75 percent

16  of the defendants that were sued in those cases

17  at that time were sued in nine out of 10

18  lawsuits.

19      **Q.  Just to be clear, with respect to cases**

20  **that Waters & Kraus handled from '99 to '01,**

21  **there are about 50 companies.**

22      A.  No.  50 percent of the companies.

23      **Q.  With respect to about 50 percent of the**

24  **companies that were being sued, they tended to**

25  **be sued in nine out of 10 cases that you all**

US District Court - Delaware        FINAL - March 4, 2008
Chapter 11 - W.R. Grace           Peter Kraus, Esquire

Page 125

1   **had.**

2      A.  I would say that's right.  It might

3   have been more than that.  It might have been up

4   to 70, 75 percent.

5        There were a group of defendants that

6   were more ubiquitously seen in the litigation in

7   that their products were implicated by the

8   clients' exposures that were sued in almost all

9   of the cases except for odd cases here and there

10   that didn't involve those exposures.

11        Then there would be a smaller group of

12   defendants that would be implicated that would

13   be more specialty products implicated by a given

14   client's exposure.

15        Grace was one of the more ubiquitous

16   ones implicated by most of the exposure patterns

17   that my clients exhibited.

18      **Q.  How many companies were there during**

19   **the period of time '99 to '01, how many in terms**

20   **of number that were sued in nine out of 10**

21   **cases?**

22      A.  Probably about 15.

23      **Q.  Which companies were they?**

24      A.  Owens Corning, Fiberboard, Pittsburgh

25   Corning, Grace, General Electric, Westinghouse,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 126

1    United States Gypsum, National Gypsum.

2         The refractory defendants were sued

3    pretty broadly,, I don't know quite nine out of

4    10.  I would say six or seven out of 10,

5    Harbison-Walker, NARCO, Kaiser.

6         AP Green was sued in probably nine out

7    of 10 cases.  Owens Illinois was sued in nine

8    out of 10 pre '58 cases, pre '58 exposure, or

9    exposure began before '58.

10        There were more, I'm sure.  I need to

11   look at -- I need to reference complaints or

12   lists of defendants in order to do that.

13   **Q.  With respect to the -- when you**

14   **prepared claimants for their depositions at**

15   **Baron & Budd and you talk about cases brought**

16   **against Grace while you were at Baron & Budd,**

17   **did you or did you not become familiar with the**

18   **files for those claimants?**

19       A.  Portions of the files, yes.

20   **Q.  What portions of the file did you**

21   **become familiar with when you had prepared the**

22   **clients for their depositions?**

23        MS. RAMSEY:  Objection; work product

24   privilege, instruction not to answer.

25        BY MR. BERNICK:

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                    Peter Kraus, Esquire

Page 127

1          **Q.  Are you going to follow the**
2     **instruction?**
3          A.  Yes.
4          **Q.  We have been told that in this case**
5     **there is a database that Baron & Budd has with**
6     **respect to claimants.**
7               **Did you become knowledgeable while you**
8     **were at Baron & Budd about their database?**
9          MS. RAMSEY:  Objection -- I withdraw
10    the objection.
11         THE WITNESS:  Yes.
12         BY MR. BERNICK:
13         **Q.  How did you become familiar with it?**
14         A.  I used it.
15         **Q.  Okay.  And what was on the database?**
16         MS. RAMSEY:  Objection; instruction not
17    to answer, work product privilege.
18         MR. BERNICK:  Is he going to call in?
19    Then he needs to know how to call in.
20         Off the record.
21         (Discussion off the record.)
22         BY MR. BERNICK:
23         **Q.  Did I ask you what was in the database,**
24    **and you instructed him not to answer that?**
25         MS. RAMSEY:  That's correct.  That was

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 128

1      the last question.

2           BY MR. BERNICK:

3           **Q.  What portions of the database did you**

4      **review in connection with preparing claimants**

5      **against Grace for their depositions while you**

6      **were at Baron & Budd?**

7           MS. RAMSEY:  Same objection, same

8      instruction.

9           BY MR. BERNICK:

10          **Q.  Did you become familiar with whether**

11     **Baron & Budd had clients who were suing Grace**

12     **fill out intake forms?**

13          A.   Many of them filled out forms in

14     connection with the intake process.

15          **Q.  Was it all the same form?  Was there a**

16     **standard form that was used by Baron & Budd**

17     **while you were there?**

18          MS. RAMSEY:  Objection; same objection

19     and instruction not to answer.

20          BY MR. BERNICK:

21          **Q.  Did you become familiar with the**

22     **interrogatory answers that people who filed**

23     **lawsuits against Grace submitted while you were**

24     **at Baron & Budd?**

25          MS. RAMSEY:  Did you become familiar?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 129

1          THE WITNESS:  Yes, I did.

2          BY MR. BERNICK:

3          **Q.  Did you become familiar with how those**

4    **interrogatory answers were put together?**

5          A.   Generally, yes.  I may not have been

6    specifically familiar -- I'm answering this

7    question with reference to clients that I

8    personally was preparing for deposition.

9          Was that your intention or are you

10   talking more generally?

11         **Q.  I'm talking about your personal**

12   **knowledge, Mr. Kraus.**

13         A.   In those instances when I prepared a

14   client for deposition, I would review the

15   interrogatory answers.

16         I may or may not have had personal

17   information about how those interrogatory

18   answers were compiled.  I would not have done

19   them myself and likely would not have spoken to

20   the paralegals involved in that process.

21         **Q.  Let me try to short-circuit this in a**

22   **certain way.**

23         **You said that you defended or took**

24   **somewhere like 50 depositions while you were at**

25   **Baron & Budd of clients of Baron & Budd.**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 130

1      **Correct?**
2          A.  50 to 100 I think was my testimony.
3          **Q.  And you said that Grace was sued in**
4      **approximately nine out of the 10 cases that you**
5      **were involved in.  Right?**
6          A.  That would be correct.
7          **Q.  If we talk about your personal**
8      **involvement, you were personally involved in the**
9      **depositions of somewhere between 45 and 90**
10     **clients.  Right?**
11         A.  Involving W.R. Grace?
12         **Q.  Yes.**
13         A.  I would say that's probably accurate.
14         **Q.  And during the course of -- that was a**
15     **significant portion of your practice.  Fair?**
16         A.  In the early years.  I didn't do much
17     client deposition work in the later years.  I
18     mostly supervised and tried cases.
19         **Q.  And in connection with your work in**
20     **later years -- during those earlier years when**
21     **you were preparing for and then involved in the**
22     **depositions of the claimants, I take it that you**
23     **became familiar with how the firm got**
24     **information regarding their exposure history.**
25         A.  Yes.  I generally was familiar with how

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 131

1    the firm did it overall, and I would have
2    differing levels of specific information on a
3    given case.
4         Sometimes I would get handed a file and
5    say "go prepare this client for deposition and
6    defend them" and may not know anything about the
7    history of the case.  And other times I may have
8    had more involvement in the case.
9         **Q.   But it was your obligation when you**
10   **were at Baron & Budd to make sure that the**
11   **clients that you presented for their depositions**
12   **were as thoroughly prepared as you could make**
13   **them.  Correct?**
14        MS. RAMSEY:  Objection to form.
15        THE WITNESS:  I had the same
16   obligations as a lawyer at Baron & Budd as I
17   have at Waters & Kraus, yes.
18        BY MR. BERNICK:
19        **Q.   In that regard, you want to make sure**
20   **that your client -- while you were at**
21   **Baron & Budd suing Grace, that your client was**
22   **thoroughly prepared on the question of product**
23   **ID and exposure.  Correct?**
24        MS. RAMSEY:  Objection to form.
25        THE WITNESS:  Yes, among other areas of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 132

1  testimony.

2      BY MR. BERNICK:

3      **Q.  I take it that in that regard, you had**

4  **become familiar with the firm's -- strike that.**

5      **I take it in that regard you knew and**

6  **were very familiar with the information that was**

7  **available to Baron & Budd regarding the exposure**

8  **of Baron & Budd clients to Grace product.**

9  **Correct?**

10      MS. RAMSEY:  Objection to form.

11      THE WITNESS:  Yes.

12      BY MR. BERNICK:

13      **Q.   And is it true that when it comes to**

14  **that subject, that is, the availability of**

15  **information to Baron & Budd with regard to**

16  **claimants against Grace with respect to that**

17  **subject matter and focusing on exposure in**

18  **particular, is it true that there are a variety**

19  **of documents that you saw that related to the**

20  **exposure of those Baron & Budd clients to**

21  **asbestos?**

22      A.   Are you talking the specific clients

23  that I defended or generally the Baron & Budd

24  clients?

25      **Q.  All my questions with respect to**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 133

1    **Baron & Budd, all of them are focused on your**
2    **personal knowledge and involvement with respect**
3    **to claims brought against Grace while you were**
4    **at Baron & Budd.**
5        **Let's be totally clear that's what I'm**
6    **asking you about.  Are you with me on that?**
7      A.   Yes.
8        **Q.   Is it true that as a consequence of the**
9    **work that you did with respect to the**
10   **depositions that you were involved with, that**
11   **you became familiar with what information was**
12   **available to Baron & Budd with regard to**
13   **exposures of those particular clients to Grace**
14   **products?**
15       MS. RAMSEY:  Objection to form.
16       THE WITNESS:  Of those particular
17   clients and more generally to Baron & Budd
18   clients, yes.
19       BY MR. BERNICK:
20       **Q.   What internal documents did you come**
21   **into contact with while you were at**
22   **Baron & Budd?  What internal documents -- I'm**
23   **not talking about Grace originated the documents**
24   **or public documents.**
25       **What internal documents did you come to**

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 134

1    **know about while you were at Baron & Budd that**
2    **related to or reflected information that**
3    **Baron & Budd had available to it regarding**
4    **exposure of their clients to Grace products?**
5         MS. RAMSEY:  Instruct the witness not
6    to answer on the basis of the work product
7    privilege.
8         BY MR. BERNICK:
9         **Q.   Were there in fact internal documents**
10   **that you did become familiar with which related**
11   **to that subject, that is, what information**
12   **Baron & Budd had available to it regarding**
13   **exposure of those clients to Grace product?**
14        A.   Were there such documents?
15        **Q.   Yes, internal documents.**
16        A.   I don't recall any specific to Grace,
17   no.  I'm sure there were some internal memoranda
18   that may have referenced many products,
19   including Grace.
20        **Q.   That's what I'm talking about.  I want**
21   **to know again -- ACC/FCR testimony says that you**
22   **are going to talk about what information was**
23   **available to Baron & Budd and to Waters & Kraus**
24   **regarding exposure to Grace product as**
25   **litigation proceeded in any given case.**

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                Peter Kraus, Esquire

Page 135

1              **So I asked you a bunch of questions**
2       **about Waters & Kraus.  I'm now asking you the**
3       **same questions about Baron & Budd.**
4              **So I want to know -- you have already**
5       **told me --**
6           A.   What information or just what --
7           **Q.   What kinds of documents existed**
8       **internally at Baron & Budd that reflected the**
9       **information available to it with regard to the**
10      **exposure of the clients that you represented in**
11      **lawsuits against Grace?**
12             MS. RAMSEY:  Can we hold that question
13      and let it be repeated with Mr. Esserman on the
14      line.
15             (Pause.)
16             MR. ESSERMAN:  Sandy Esserman.
17             MR. BERNICK:  Sandy, we thought we
18      would make your day more interesting.
19             MR. ESSERMAN:  You are always making my
20      days interesting.
21             MR. BERNICK:  We are sitting here, a
22      nice cozy crowd.  People know that there are
23      cookies in the next room.  So they are getting a
24      little antsy about that.
25             But we are here taking the deposition

Page 136

1    of Mr. Peter Kraus, who has been a very
2    cooperative witness this morning, except that he
3    has been instructed in the clearest possible
4    terms when he can't answer questions that
5    implicate privileges during the period of time
6    that he has been at Waters & Kraus.
7         So we have gone through those
8    questions.  And now I am basically asking the
9    same kinds of questions with respect to the
10    period of time that he was at Baron & Budd.
11         Ms. Ramsey has acquitted herself again,
12    with the greatest distinction, in passing on
13    your law firm's instruction that he not answer
14    questions concerning internal work product of
15    Baron & Budd.
16         But we have all shared varying degrees
17    of consternation over the fact that Ms. Ramsey
18    does not represent Baron & Budd.  We know by
19    contrast that you most ably do represent
20    Baron & Budd.
21         So we thought we would include you in
22    this deposition process so that if there are
23    instructions to be given, they can be given to
24    Mr. Kraus by somebody who has the authority to
25    speak for Baron & Budd.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 137

1       So that's kind of where we are at.

2       MR. ESSERMAN:  Okay.  This is sort of

3   the first time I have heard about it when I got

4   an e-mail today from Amanda.

5       MS. RAMSEY:  May we go off the record

6   for a moment so I can fill Sandy in on the

7   background, just two minutes off the record or

8   on the record?

9       MR. BERNICK:  I would like to make a

10  statement, first of all, in response to that and

11  then we can go off the record.

12      Sandy, I think you received, and if

13  not, you should have received the statement of

14  the Official Committee of Asbestos Personal

15  Injury Claimants regarding witnesses that it

16  intends to call at the estimation, and in

17  particular that contains at item 8, Peter Kraus.

18      And at item 8 there is a specific

19  reference to the fact that Mr. Kraus or lawyers

20  from his firm, that he will talk about the

21  general process that he or lawyers from his firm

22  or his prior firm, Baron & Budd, followed in the

23  settlement of asbestos personal injury cases.

24      So I had that notice.  And so I think

25  that there has been -- the service list went to

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                     Peter Kraus, Esquire

Page 138

1     about everybody in the world.  I'm assuming that

2     your firm got notice of this filing as well.

3          MR. ESSERMAN:  I was certainly -- if

4     Mr. Kraus was going to be a witness as to the

5     privilege involving Baron & Budd, that's a

6     different issue depending on what you are

7     getting into.

8          I will be happy to participate over the

9     phone.  I still question the notice procedures.

10          But be that as it may, I'm here and

11    able to participate.  I probably would like to

12    talk to the committee counsel off the record and

13    in private before the deposition would continue,

14    and I would request a 10-minute recess.

15         (Kraus Exhibit 2 identified.)

16          MR. BERNICK:  That's fine.  For the

17    record, Exhibit 1 -- it is not Exhibit 1.  We

18    will make it Exhibit 2 to the deposition.  That

19    will be the document that I just referred to.

20    And Exhibit 2 at pages 11 and 12 and 13 describe

21    his testimony.

22          The attachments to this exhibit include

23    a service list, and the service list includes

24    you.  So are you saying you didn't have notice

25    of the fact that the deposition was going to

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                      Peter Kraus, Esquire

Page 139

1       cover Baron & Budd?
2             MR. ESSERMAN:  I do not recall seeing
3       anything.  But to the extent you said the notice
4       includes me, I certainly take your word for
5       that.
6             MR. BERNICK:  It also I think includes
7       Baron & Budd itself.  At least it should because
8       they are on the list.
9             I guess at some point I will probably
10      find Allen Rich's name.
11            MR. ESSERMAN:  Allen Rich left
12      Baron & Budd four or five months ago.
13            MR. BERNICK:  Oh.  Is there somebody
14      else who has taken his place in connection with
15      this case?
16            MR. ESSERMAN:  I don't know.  Perhaps
17      Natalie Duncan or Steve Baron.
18            MR. BERNICK:  Steve Baron is reflected
19      as being a recipient of this notice as well.
20            I just want to make sure.  I'm not
21      meaning to be critical.
22            But your suggestion that somehow there
23      was not notice I think is wrong, and if you
24      believe that there is some reason why you didn't
25      get notice, I would like to hear about it.  I

US District Court - Delaware            FINAL - March 4, 2008
Chapter 11 - W.R. Grace                 Peter Kraus, Esquire

Page 140

1    don't think that statement is correct.

2           MR. ESSERMAN:  What I think I said was

3    I certainly -- I don't recall receiving any

4    notice of this.

5           I do recall Peter Kraus's name being

6    listed.  To the extent you are going to get into

7    privileges of Baron & Budd, I am here, we are

8    here, and I would like to talk to committee

9    counsel.

10          MR. BERNICK:  Russell Budd also is

11   another recipient of this.

12          Be that as it may, how would you like

13   to proceed?  Do you want to call Nate

14   separately?

15          MR. ESSERMAN:  Is Nate in the room now?

16          MR. FINCH:  Yes.

17          MR. BERNICK:  Nate and Ray are both

18   here, as is Natalie.

19          MR. ESSERMAN:  I have to transfer into

20   a different elevator, and I'm going to lose you.

21   So I will call back.

22          (Whereupon, at 12:45 p.m., the

23   deposition was recessed, to be reconvened at

24   1:14 p.m. this same day.)

25

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 141

1         AFTERNOON SESSION       (1:14 p.m.)
2    Whereupon,
3         PETER A. KRAUS
4    resumed the stand and, having been previously
5    duly sworn, was examined and testified further
6    as follows:
7         MR. BERNICK:  Everybody is now here.
8         If anybody has any statements made for
9    the record, now is the time to do it, although
10   I'm not encouraging anybody, and we will do our
11   best to finish up the deposition.
12        MR. ESSERMAN:  This is Sandy Esserman.
13        I have consulted with my client, and my
14   client's general corporate counsel, Bob
15   Greenberg, would like to participate in this
16   deposition.
17        I have e-mailed him the number, and he
18   is evidently on a plane and is going to be
19   available at 3:00 p.m. Eastern.
20        What I have been asked to request is
21   that the issues that may involve an internal
22   corporate privilege of Baron & Budd be postponed
23   in what is being requested of the deponent to
24   that point in time, at which time he can join.
25        MR. BERNICK:  Well, let me see.  I

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 142

1      don't see how we can do that because the
2      entirety of the rest of the deposition, with the
3      exception of a small area which would probably
4      take about 20 minutes, involves both
5      Baron & Budd and Waters & Kraus.
6          MR. ESSERMAN:  Because it may involve
7      Waters & Kraus or Baron & Budd, it may not
8      necessarily impinge on any privilege.
9          MR. BERNICK:  I know it is going to
10     because it relates to matters as to which at
11     least Waters & Kraus has already claimed
12     privilege.
13         MR. ESSERMAN:  Okay.  Well, I can just
14     make the request.  I can't do anything else.
15         MR. BERNICK:  I would be happy to
16     accommodate it, except we now have two different
17     lawyers who have represented Baron & Budd in
18     connection with this case on the phone and a
19     third individual who has never appeared in this
20     case for any purpose, to my knowledge, in any
21     event, who is unavailable.
22         And I can't wait until 3:00.  This
23     deposition is very much likely to be over by
24     3:00.
25         MR. ESSERMAN:  I have conveyed the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 143

1    request.  That's all I can do.

2        If you feel you have to proceed,

3    proceed.  I don't control the witness or the

4    deposition or the questioner or the respondent.

5        BY MR. BERNICK:

6    **Q.  I think where we left off, Mr. --**

7        MR. RICH:  If we are on the record now,

8    I think I should make an appearance, then, as

9    long as we are going back on the record, if you

10   don't mind.

11       MR. BERNICK:  I thought you already had

12   done that.

13       MR. RICH:  My name is Allen Rich, and I

14   am appearing on behalf of Baron & Budd.

15       I can e-mail the court reporter my

16   contact information or I can give it now on the

17   phone.

18       MR. BERNICK:  Why don't you do it

19   later.

20       MR. RICH:  If the court reporter

21   supplies me her e-mail address, I will e-mail my

22   contact to her or him.

23       MR. BERNICK:  If you want, you can

24   e-mail it to me and I will send it to her.

25       MR. RICH:  Okay.

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                     Peter Kraus, Esquire

---

Page 144

1              EXAMINATION (Continued)
2         BY MR. BERNICK:
3              Q.  I appreciate the compliments about our
4         lunch here in Washington, D.C.  We aim to
5         accommodate where we can.
6              A.  It was quite good.
7              Q.  For those on the phone, Mr. Kraus was
8         even offered a beer and I guess somewhat
9         prudently declined.  He actually did that.
10              I would like to go on and ask you --
11         and I will go back, Sandy, to a question that
12         was put to the witness before you got on, and
13         there was an instruction or I guess an
14         instruction not to answer the question.
15              I want to make sure we are all reading
16         off the same page.
17              Mr. Kraus, I apologize for that.
18              The focal point for my questions is the
19         period of time when Mr. Kraus was at
20         Baron & Budd and was working himself on cases
21         that were being brought against Grace.  That's
22         my focal point.
23              And my questions are, until I say
24         otherwise, limited to what it is that Mr. Kraus
25         personally was involved with and became aware

---

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 145

1    of.
2         The particular question was with
3    respect to what kind of information was
4    available to you at Baron & Budd regarding the
5    exposure of your clients to Grace asbestos or
6    Grace products.
7         What documents existed internally at
8    Baron & Budd that would relate to that subject,
9    that is, what was available to Baron & Budd
10   about exposure to Grace products?
11        MR. ESSERMAN:  In general, I will
12   object to the form of the question.
13        In general or in specific with regard a
14   client, a particular client?
15        BY MR. BERNICK:
16     Q.  I will put it again in an effort to
17   make it clearer still.
18        I want to pursue the subject of what
19   information was available to Baron & Budd
20   regarding the exposure of the clients that
21   Mr. Kraus represented in lawsuits being brought
22   against Grace.
23        The question is what internal
24   documents, if any, that Baron & Budd had that
25   would relate to the availability of such

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 146

1       **exposure information.**
2            MR. ESSERMAN:  I would like to object
3       to the question on the basis of work product
4       privilege.
5            I think that that is internal work
6       product of Baron & Budd with regard to that, and
7       would instruct the witness not to answer.
8            MR. BERNICK:  All I really want at this
9       point is for Mr. Kraus to identify the kind
10      kinds of documents that existed at least when he
11      was at Baron & Budd internally that would relate
12      to the availability of exposure information.
13           I think the witness -- even if there
14      isn't a work product objection, we are entitled
15      to have the predicates for that objection, and
16      that would entail the identification of the
17      kinds of documents we are talking about.
18           MR. ESSERMAN:  I don't think it would
19      be the kinds of documents.  I think you can ask
20      him whether or not in fact such documents may
21      have existed.
22           But I think if you are talking about
23      the kinds of documents that would identify Grace
24      exposure, that in itself would be a disclosure
25      that would violate a privilege.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 147

1    MR. BERNICK:  Sandy, seriously, if you
2    have a privilege log, you would have to say it
3    was a letter or memo.  You would have to
4    identify the date, authors, recipients.
5        Clearly we are entitled to that
6    information.  Are you going to stand on that
7    objection?
8        MR. ESSERMAN:  I think I have to stand
9    on that objection.
10       BY MR. BERNICK:
11   **Q.   Okay.  Mr. Kraus, so that we are clear,**
12   **on the subject, that is, what information**
13   **regarding exposure to Grace products was**
14   **available to you when you were working on claims**
15   **against Grace at Baron & Budd, were there**
16   **internal documents at Baron & Budd that would**
17   **relate to the availability of that information?**
18       A.  Yes, there were documents that related
19   to that, as I said earlier.
20       **Q.   And I want you just to identify for me,**
21   **without disclosing the content of those**
22   **documents, the kind of documents that existed at**
23   **Baron & Budd that would be responsive to my**
24   **question.**
25       MR. ESSERMAN:  I think that affects the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 148

1      privilege.  The kind of documents that
2      Baron & Budd may use internally to prepare a
3      case as against W.R. Grace is internal work
4      product.
5          BY MR. BERNICK:
6          **Q.  Were there intake forms that**
7      **Baron & Budd used that you became familiar with**
8      **in the course of your work on claims against**
9      **Grace?**
10         A.   There were intake forms that were
11     utilized at Baron & Budd, none of which were
12     specific as to Grace.
13         **Q.   But would those forms be forms that**
14     **would be filled out with information that would**
15     **reflect or relate to exposure to Grace product**
16     **or anybody else's product?**
17         A.   I wasn't really involved in the intake
18     process at Baron & Budd and don't specifically
19     recall what kinds of product ID information was
20     on any intake forms at Baron & Budd.
21         **Q.   That's fair enough.**
22             **What about with respect to the**
23     **preparation for depositions?  In connection with**
24     **preparing for depositions of people who were**
25     **suing Grace while you were at Baron & Budd, were**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 149

1    **there internal documents that you became**
2    **familiar with that reflected claimants' exposure**
3    **to Grace product?**
4        A.  A specific claimant's exposure?
5        **Q.  Yes.  That is information that was**
6    **claimant specific regarding exposure to Grace**
7    **products or other products.**
8        A.  I don't recall any internal firm work
9    product that I would receive on a given
10   plaintiff when I went out to prepare him for
11   deposition, with the caveat that these 50 to 100
12   depositions I was involved in were in the 1990
13   to 1993 time frames.
14       We are talking about 15 to 18 years
15   ago, when I was sitting depositions at
16   Baron & Budd.
17       I don't recall case-specific work
18   product.  I recall file materials, taking file
19   materials with me.  But I don't really have a
20   recollection of work product.
21       **Q.  What file materials did you take with**
22   **you when you prepared people for their**
23   **depositions in Grace cases?**
24       MR. ESSERMAN:  I will object to that as
25   attorney-client privilege.  It is clearly

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 150

1    privileged.
2         BY MR. BERNICK:
3         **Q.  You referred to a database that**
4    **Baron & Budd had regarding the asbestos**
5    **litigation.  Do you recall that?**
6         A.  No.  I referred to a database that
7    Baron & Budd had for all of its clients in any
8    litigation.
9         **Q.   And did that database contain**
10   **information that was available to Baron & Budd**
11   **regarding the exposure history of its claims**
12   **against Grace, its claimants against Grace?**
13        A.  It did not when I was there.
14        **Q.   So in that database, we would not go**
15   **there to find -- where would you go to find the**
16   **exposure history of a person that you were**
17   **representing when you were at Baron & Budd?**
18        A.  The file.
19        **Q.   But there's an instruction not to**
20   **answer the question about the contents of the**
21   **file.**
22        **Is there some particular document that**
23   **showed what information was available to**
24   **Baron & Budd regarding exposure history when you**
25   **were litigating claims against Grace?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 151

1      A.  On any given case?

2      **Q.  On any given case.**

3      A.  The work histories that were part of

4  the interrogatories.

5          As we approached trial and we had to

6  group up for trial, we might prepare a memo

7  summarizing what the information was in terms of

8  product ID generally, that there was or wasn't.

9      **Q.  And what basis, what documents or**

10  **sources of information were used in preparing**

11  **the interrogatory answers?**

12          MR. ESSERMAN:  I will object to that as

13  attorney work product.

14          BY MR. BERNICK:

15      **Q.  Were there in fact documents reflecting**

16  **the availability of information regarding**

17  **exposure to Grace product, that is, what**

18  **information was available to Baron & Budd and**

19  **when it became available?**

20          **Was there such information within the**

21  **file apart from what was in the interrogatory**

22  **answer?**

23      A.  There may have been in some cases, but

24  I'm not familiar with any general firm procedure

25  creating such a document.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 152

1      Q.   I didn't ask about general firm
2   procedure.
3          I asked whether there were internal
4   documents that would reflect what information
5   regarding exposure was available and when it
6   became available other than the interrogatory
7   answers.
8      A.   I just recall the interrogatory
9   answers.
10     Q.   That's fine.  Let's be very concrete
11   and blunt about it.
12          It is said in the description of what
13   you are to testify about that you will discuss
14   information, the evidence that became available
15   both to Waters & Kraus and to Baron & Budd
16   regarding the exposure history of people who
17   made claims against Grace.  I think we have
18   already been through that.
19          My question to you is if we wanted to
20   know exactly what information was available to
21   Baron & Budd regarding exposure history and when
22   it became available during the litigation
23   process, is there anywhere that we can go to
24   find out that information other than the
25   internal files of Baron & Budd?

Page 153

1      A.  For any given case or for --

2      **Q.  For generally any given case.**

3      A.  How and when you found out the exposure

4  history in any given case depended on when the

5  case was investigated and what steps were taken

6  to investigate it.

7      **Q.  Is there any way that I can determine**

8  **those facts with respect to litigation that**

9  **Baron & Budd brought against Grace?**

10      **Is there any way that I can determine**

11  **those facts, that is, those steps and when they**

12  **were taken, without having access to the**

13  **internal files of Baron & Budd?**

14      A.  When meetings took place with clients

15  and witnesses.

16      **Q.  And what was said in those meetings and**

17  **the information that was gathered?**

18      MR. ESSERMAN:  That would be

19  attorney-client privilege and work product

20  privilege.  I will object.

21      MR. BERNICK:  Are you going to instruct

22  him not to answer?

23      MR. ESSERMAN:  Yes.

24      BY MR. BERNICK:

25      **Q.  I want to talk to you a little bit**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 154

1    about the criteria that were used in settling

2    cases against Grace while you were at

3    Baron & Budd.

4         Is it true that the criteria that were

5    used in settling cases, that is, the

6    requirements that had to be met if a case was to

7    be settled, that those requirements or criteria

8    were a matter of negotiation between

9    Baron & Budd and Grace?

10    A.   Sometimes they were and sometimes they

11   weren't.  It depended on the settlement.

12        Q.   And are there internal documents at

13   Baron & Budd that would reflect how those

14   negotiations occurred when they occurred?

15    A.   I don't know if such documents exist or

16   not.

17        I know that I would have kept notes of

18   negotiations at the time that I conducted them

19   for some period of time thereafter, maybe to

20   refer back to in subsequent negotiations.  But

21   after a period of time, those notes are

22   irrelevant and they would be discarded.

23        I have no idea what is in the files of

24   Baron & Budd now.

25        Q.  Would you agree with me that the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 155

1    negotiation of settlements -- strike that --
2    that the settlement process for asbestos
3    personal injury claims is a negotiated process?
4        A.   Yes.  You negotiate settlements just
5    like any other case.
6        Q.   Would you agree with me that during the
7    period of time when you were representing people
8    suing Grace, that the settlement negotiations
9    there involved different kinds of leverage?
10       A.   Different from what?
11       Q.   Different in the sense that there was
12   more than one source of leverage, there are a
13   variety of points of leverage in those
14   negotiations.
15       A.   I would say that's probably true with
16   any negotiation of any lawsuit and would be true
17   with the Grace settlement as well.
18       Q.   And it would be true that when you
19   settled cases either at Baron & Budd or at
20   Waters & Kraus with Grace, that one of the
21   sources of leverage that affected the
22   negotiations was the jury pool that would be
23   drawn from if the case went to trial?
24       A.   That could be a source of leverage
25   either way.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 156

1           If it was in a county where the juries
2    were typically good for plaintiffs, that would
3    be a source of leverage for the plaintiff.  If
4    it was in a county where the juries were
5    generally defense oriented, it would be a source
6    of leverage for Grace.
7        **Q.  Would it also be true that to the**
8    **extent that the plaintiffs had the ability to**
9    **control the forum in which to bring the lawsuit,**
10   **that they would pick the jurisdictions where the**
11   **jury pool was perceived to be favorable to a**
12   **plaintiff?**
13       A.   In general, a plaintiff's attorney, any
14   attorney has an obligation to file a lawsuit for
15   their client in the most favorable venue that
16   the law would allow for the case to proceed.
17       **Q.   And isn't it true that at least prior**
18   **to 1997, the venue rules in Texas permitted**
19   **out-of-state residents to file lawsuits in**
20   **Texas?**
21       A.   Some out-of-state lawsuits, yes.
22       **Q.   And would it be fair to say that prior**
23   **to 1997, the plaintiff in Texas also had the**
24   **ability to pick the most favorable jurisdiction**
25   **within Texas in which to bring the suit?**

Page 157

1      A.   Well, the plaintiff always gets to
2   choose the venue, and so the plaintiff could
3   choose whatever venue was legal to file the case
4   where the venue was proper.
5          There were a variety of factors that
6   went into the selection of venues, including
7   whether it was perceived as being a plaintiff
8   friendly or defense friendly or somewhat neutral
9   venue.
10     **Q.   Prior to 1997, is it true -- let me be**
11  **more specific.**
12         **Between 1993 and 1997, was it true that**
13  **the defendant in cases brought in Texas did not**
14  **have the ability to affect the jurisdiction in**
15  **which the case was prosecuted?**
16     A.   In terms of being able to transfer
17  venue?
18     **Q.  Yes.**
19     A.   There were some bases for the transfer
20  of venue that were available to the defendants
21  during those periods, those years, though I
22  don't recall many cases being transferred on the
23  defendant's motion.
24     **Q.   So it would be fair to say that during**
25  **the period 1993 to 1997, with rare exceptions,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 158

1    **cases that you were involved in were filed and**
2    **prosecuted in the jurisdictions within Texas**
3    **that were felt to be most favorable to your**
4    **clients?**
5        A.   No, I would not say that that was the
6    overriding concern.
7        **Q.   I didn't ask whether it was a concern.**
8    **I asked whether that in fact was true.**
9        A.   No.
10        **Q.   That is, with rare exceptions, the**
11    **cases were prosecuted in the jurisdictions that**
12    **were felt to be most favorable to your clients.**
13        A.   No, that's not true.
14        **Q.   So you picked jurisdictions that were**
15    **perceived to be not so favorable to your**
16    **clients?**
17        A.   By favorable, I'm assuming -- and maybe
18    I shouldn't assume this -- that you are assuming
19    where the jury pool is considered very favorable
20    for the plaintiffs.
21        **Q.   Dallas County was not considered to be**
22    **favorable for the plaintiffs?**
23        A.   I would say Dallas County was
24    considered to be an average conservative big
25    city jury pool.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 159

1         I think that when you ask a plaintiff
2    lawyer what the favorable jurisdictions are,
3    they typically would say the jurisdictions in
4    the Valley or Orange or Beaumont and places like
5    that.
6         **Q.  A lot of cases were also filed in those**
7    **jurisdictions.  True?**
8         A.  Some.  Some were.
9         **Q.   Another source of leverage when it came**
10   **to the settlement negotiation process --**
11   **incidentally, beyond your notes that you would**
12   **take about the negotiation process while you**
13   **were at Baron & Budd, were there other documents**
14   **that were generated and maintained by**
15   **Baron & Budd that would reflect from an internal**
16   **perspective what the objectives and process were**
17   **in the settlement process?**
18        A.  I'm sorry?  The objectives --
19        **Q.  And process were in the settlement**
20   **process.**
21        A.   I don't remember any such documents.
22   I'm sure my objective was always to get as much
23   money as possible for my clients.  That's my
24   obligation.
25        **Q.  But the only documents that would**

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 160

1     **reflect that process would be your notes?**

2          MR. ESSERMAN:  I'm going to object on

3     the basis of attorney-client work product.  I

4     think you can ask him -- I think you have asked

5     him as much as you can.

6          BY MR. BERNICK:

7          **Q.  Are you going to accept that**

8     **instruction?**

9          A.   If I'm being instructed not to answer.

10         MR. ESSERMAN:  Yes.

11         THE WITNESS:  Then I will follow that

12    instruction.

13         BY MR. BERNICK:

14         **Q.   Was another source of leverage in the**

15    **settlement process the volume of cases that were**

16    **being brought to trial by a given firm against a**

17    **given defendant?**

18         A.   That could be a source of leverage

19    either way depending on the strength of the

20    cases.

21         **Q.   But certainly a strong case would**

22    **provide leverage to the plaintiff.  Correct?**

23         A.   Right.  And a lot of weak cases would

24    provide leverage for Grace.

25         **Q.   Fine.  Beyond whether an individual**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 161

1  **case is strong or weak, is it also true that the**
2  **number of cases being brought to trial is a**
3  **source of leverage in the settlement process?**
4      A.   Again, it would be a source either way.
5  If there were a number of bad cases coming to
6  trial, Grace would have the plaintiff lawyer on
7  their knees.
8      **Q.   It is also true that if you have a huge**
9  **number of cases that are even weak, that can**
10 **create logistical issues for a defendant.  Can**
11 **it not?**
12     A.   It can create logistical issues for the
13 defendant or the plaintiff.
14     Both sides have to have lawyers there
15 and both sides have to be ready if there are a
16 lot of cases that are up for trial.
17     **Q.   You are saying that the volume of cases**
18 **itself is neutral as to plaintiff or defendant?**
19     A.   In terms of leverage for settlement
20 purposes?
21     **Q.   Yes.**
22     A.   The volume of cases that are -- yes, I
23 do think it is neutral.  I am able to put more
24 leverage on a defendant when I have one good
25 case than lots of bad cases.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 162

1      **Q.   Joint and several liability, is that a**
2    **factor in the settlement process?**
3          A.   Yes.  I would say joint and several
4    liability is one of the factors that lawyers on
5    either side consider when evaluating the value
6    of a claim --
7          **Q.   What about punitive --**
8          A.   -- in asbestos litigation.
9          **Q.   What about punitive damages?**
10         A.   That is a factor that comes into play
11   both ways too.
12         **Q.   What about if there are punitive**
13   **damages, it can only favor or provide leverage**
14   **for the plaintiff.  Right?**
15         A.   The lack of punitive damages would
16   provide leverage for a defendant.  So yes, the
17   availability of punitive damages and whether or
18   not they are limited would be a leverage factor.
19         **Q.   What about consolidation, the**
20   **consolidation of cases for trial?  Weak cases**
21   **consolidated with strong cases, does that**
22   **provide leverage for the settlement of the weak**
23   **cases?**
24         A.   I have seen that work both ways.  I
25   have seen weak cases get more than I thought

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 163

1    they were worth, and I have seen weak cases get
2    less than I thought they were worth as a result
3    of being consolidated at trial with strong
4    cases.
5        **Q.  I see.  Are there documents that relate**
6    **to your assessment of that that are present or**
7    **were present in the files of Baron & Budd while**
8    **you were there?**
9        A.   Just jury verdicts that were obtained
10    when I was there.
11        **Q.   So the only thing in the files of**
12    **Baron & Budd while you were there that would**
13    **relate to these factors of leverage are jury**
14    **verdicts?**
15        MR. ESSERMAN:  Again instruct the
16    witness not to answer.  It is work product.
17        MR. FINCH:  Can he answer yes or no?
18        MR. BERNICK:  You have to make a
19    decision.
20        Sandy, are you instructing him not to
21    answer the question?
22        MR. ESSERMAN:  Yes.
23        THE WITNESS:  I will leave that to
24    Mr. Esserman and Mr. Finch to decide.  I will
25    not answer if that's where we are.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 164

1          BY MR. BERNICK:
2          **Q.  Let me ask you a question --**
3          MR. FINCH:  Sandy, can he answer that
4    question yes or no, were there any documents
5    beyond the verdict form?
6          MR. BERNICK:  If you want to have a
7    side bar conversation not on my time about whose
8    instruction is going to control, that's great.
9          I'm conducting the deposition, and
10   there is only one person who is going to
11   instruct the witness, and that ought to be done
12   and whatever it is ought to hold.
13         I believe the instruction has already
14   been given.
15         BY MR. BERNICK:
16         **Q.  With respect, Mr. Kraus, to cases where**
17   **a single plaintiff has sued many different**
18   **defendants, and I will first of all focus on**
19   **Waters & Kraus, and then I will ask you about**
20   **Baron & Budd, cases filed by one claimant**
21   **against, say, 10 defendants, and the goal in the**
22   **process is to maximize the total amount of money**
23   **that will make its way into the plaintiff's**
24   **pocket.**
25         **Under the Texas rules, if the case goes**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 165

1    **to trial with all defendants, what effectively**

2    **is the total amount of money that can be**

3    **collected by the plaintiff in that case?**

4         A.   The amount of the total compensatory

5    verdict plus any punitive awards against any of

6    those 10 defendants.

7         **Q.   During the period 1999 to '01, was**

8    **there joint and several liability under those**

9    **circumstances in the state of Texas?**

10        A.   If I recall correctly, in toxic injury

11   cases during that period of time, if a defendant

12   was found by a jury to be more than 15 percent

13   of the total, then there was joint and several

14   liability, such, of course, to offset for any --

15   to credit for any prior settlements.

16             And if the defendant was found to be 15

17   percent or less at fault, there was only several

18   liability.

19        **Q.   So if a case went to trial prior to**

20   **2001 in Texas without any settlements, that is,**

21   **went to trial against all defendants, the**

22   **maximum the plaintiff could recover was the**

23   **verdict less any effect of there being**

24   **noncollectability for one of the defendants**

25   **subject to joint and several liability kicking**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 166

1    **in if one of the defendants was found to be more**
2    **than 15 percent responsible?**
3        MR. FINCH:  Objection to form.
4        THE WITNESS:  I don't understand your
5    question, the portion about noncollectability.
6        BY MR. BERNICK:
7        **Q.  Let's assume the plaintiff went to**
8    **trial and some part -- there was a defendant who**
9    **wasn't worth the verdict, didn't have enough**
10   **money to pay or just didn't pay.**
11       A.   In other words, you took a verdict and
12   they declared bankruptcy?
13       **Q.   That's right.**
14       MR. FINCH:  Object to form.
15       THE WITNESS:  That would depend if the
16   defendant that you were collecting against was
17   found to be liable for -- again, this is all
18   under Texas law.
19       Many of the cases, as you pointed out,
20   filed in Texas in the '90s involved an exposure
21   in other states where judges applied the
22   substantive laws of those states, and they
23   varied with the 50 states.
24       BY MR. BERNICK:
25       **Q.  Let me make it easier.  Let's assume**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 167

1    for purposes of this question -- let me ask you
2    prior to 2001, a case was brought into your
3    office, either Baron & Budd or Waters & Kraus,
4    and was prosecuted anywhere in the country.
5        Would it be fair to say that the
6    maximum amount that could be recovered was the
7    amount of the verdict?
8        A.   If you didn't settle with any of the
9    defendants?
10       Q.   Correct.
11       A.   If you did not settle with any of the
12   defendants, the maximum you could get would be
13   the verdict, including any punitive damages
14   awarded.
15       Q.   If you settled with the defendants,
16   with any of the defendants, is it true that your
17   clients then had the opportunity to recover more
18   than the ultimate verdict?
19       A.   Yes.  If you settled with nine
20   defendants and went to verdict against one and
21   that defendant got a defense verdict or you got
22   an extremely low verdict less than a settlement,
23   it was possible that you could recover more than
24   the verdict.
25       Q.   Even if the last defendant got hit with

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                      Peter Kraus, Esquire

Page 168

1   **a verdict.  Once you start to settle cases prior**
2   **to 2001 in multidefendant cases, your client**
3   **developed the ability to recover more than could**
4   **be recovered in the form of a verdict.  Correct?**
5          MR. FINCH:  Object to the form.
6          THE WITNESS:  That's always been true.
7   It is true today.
8          If you settle a case with 10 defendants
9   for $2 million and you go to verdict against the
10  eleventh verdict and get a $100,000 verdict, you
11  have gotten considerably more.  That is true
12  then and is true now.
13         BY MR. BERNICK:
14     **Q.   It doesn't depend on that last**
15  **defendant.**
16         **If you had a choice about whether to**
17  **try the case against all defendants or to settle**
18  **the case against all defendants or some of the**
19  **defendants, it was only in the event of settling**
20  **at least some of the claims that you had the**
21  **ability to get more than the total verdict would**
22  **otherwise have been.  Right?**
23         MR. FINCH:  Objection; hypothetical,
24  form.
25         MS. RAMSEY:  Objection to form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 169

1          THE WITNESS:  Let me think if that's
2    always true.  There is certainly the ability to
3    get more going to trial against all 10 than
4    settling for a smaller number.
5          And you are asking me -- and I think
6    the reverse is also true.  There is the ability
7    to settle for a greater number than the verdict
8    ultimately was either way.
9          BY MR. BERNICK:
10         **Q.   Is there anywhere where it is publicly**
11   **available the totality of money that has been**
12   **received by any of the claimants that you**
13   **represented against Grace from all defendants?**
14         A.   From all publicly available --
15         **Q.   I will rephrase the question so we are**
16   **clear.**
17         **Is there any way for us to determine**
18   **today from publicly available sources or from**
19   **anything that you have given us the total amount**
20   **of money paid to any of the claimants that you**
21   **represented against Grace from any source, that**
22   **is, all sources of funds to the claimant?**
23         A.   To this moment in time today?
24         **Q.  Yes.**
25         A.   I don't think there is any public

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 170

1    source of information that sets forth all of the
2    money that all of my clients who have a claim
3    against Grace have received via the litigation
4    and/or any bankruptcy trusts all combined.  I
5    don't think that is publicly available.
6         **Q.   For all the moneys that were paid by**
7    **Grace in settlement, is there anything that we**
8    **have access to that would tell us what portion**
9    **of the moneys that Grace paid were actually due**
10   **to the threat of punitive damages for any**
11   **particular plaintiff?**
12        A.   You would have to ask your client that.
13   I don't have that information.
14            I don't know what if any moneys they
15   paid me to settle cases in which I was counsel
16   where that was a concern for them.
17        **Q.   What about from your point of view?  Is**
18   **there anywhere you have determined of the**
19   **settlements reached for claimants against Grace**
20   **the portion of those settlements due to punitive**
21   **damages as a threat?**
22        A.   I would say that my personal experience
23   is that punitive damages are rarely awarded and
24   even more rarely collected, and my assumption is
25   that the vast majority of the money that I

Page 171

1    receive from my clients has to do with resolving

2    their compensatory damage claims.

3    **Q.  Was that your experience prior to 2001?**

4    A.  It has been my experience throughout

5    the litigation, that punitive damages are very

6    rarely awarded and even more rarely collected.

7    **Q.  Is there any way that we can test your**

8    **statement that there was very little -- strike**

9    **that.**

10    **Is there any way that we can test your**

11    **testimony -- I won't get to that.**

12    **Is there any documentation with respect**

13    **to claims that you prosecuted against Grace, is**

14    **there any internal documentation that reflected**

15    **the role of punitive damages in determining your**

16    **settlement demands or negotiations with respect**

17    **to claims against Grace?**

18    MS. RAMSEY:  Objection; direct the

19    witness not to answer on the basis of work

20    product privilege.

21    MR. BERNICK:  What about with respect

22    to Baron & Budd, Sandy?

23    MR. ESSERMAN:  Same objection.

24    THE WITNESS:  Just the existence, not

25    what it is?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 172

1          MR. BERNICK:  Yes.

2          MS. RAMSEY:  Same instruction.

3          THE WITNESS:  I'm going to disregard

4    and say no, there is no such document that I'm

5    aware of.

6          BY MR. BERNICK:

7      **Q.  But we couldn't test that unless we had**

8    **access to the documents.  Correct?**

9      A.   What documents?  I'm telling you I'm

10   unaware of any such document.

11         I don't know what documents that you

12   would want access to to test that there are no

13   such documents.

14     **Q.  But you have no way of determining, you**

15   **have no way of demonstrating with respect to any**

16   **of the settlements what portion if any of those**

17   **settlements was due to the threat of punitive**

18   **damages?**

19         MR. FINCH:  Object to form,

20   mischaracterizes prior testimony.

21         MS. RAMSEY:  Join.

22         THE WITNESS:  Grace made the

23   determination what sum of money if any to pay

24   for punitive damage risk.

25         I have no way of knowing what went into

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 173

1    Grace's thought process in determining how much
2    to pay me in any given case.
3        BY MR. BERNICK:
4        **Q.  Does the term "target defendant" have**
5    **meaning to you?**
6        A.  I have heard that term.
7        **Q.  From your point of view, what does the**
8    **term "target defendant" mean?**
9        A.  At various points in the litigation for
10   a variety of reasons, defendants we have
11   emphasized our claim against -- we have focused
12   our efforts on our claims against various
13   defendants.
14       **Q.  You say "we have focused."  What do you**
15   **mean by "we have focused"?**
16       A.  The law firms that I have been a member
17   of that handled asbestos litigation.
18       **Q.  And the thinking in focusing claims on**
19   **a given defendant, was that something that was**
20   **discussed internally at Baron & Budd?**
21       MR. FINCH:  Object to form.
22       BY MR. BERNICK:
23       **Q.  Which defendants to target, was that a**
24   **subject of discussion internally at**
25   **Baron & Budd?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 174

1      A.   In preparing for trial at any firm I

2   have practiced, who you are likely to be in

3   trial against would be a subject of your trial

4   preparation, yes.

5      **Q.   But are there also reasons such as**

6   **solvency, that is, how much money a defendant**

7   **has, that will bear upon whether that defendant**

8   **should be targeted?**

9      A.   Are you asking me whether solvency was

10   a reason why defendants were, quote, "targeted,"

11   to use your term?

12      **Q.   Yes.**

13      A.   Not that I recall.

14      **Q.   As opposed to insolvency.**

15      A.   Well, if firms were insolvent, they

16   were bankrupt and they weren't in the

17   litigation.

18      **Q.   So you never considered the prospect of**

19   **bankruptcy to be a reason to either file or not**

20   **file claims against a given company?**

21      A.   When a defendant filed for bankruptcy,

22   I would stop suing them pursuant to the stay.

23      **Q.   But prior to that time, you gave**

24   **absolutely no consideration to whether the**

25   **defendant would or would not be good for the**

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                    Peter Kraus, Esquire

Page 175

1    **money?**
2          MS. RAMSEY:  Object to form.
3          THE WITNESS:  The risk of bankruptcy
4    was a topic of discussion at Waters & Kraus and
5    at Baron & Budd, not with respect to who to sue
6    or who to go to verdict against, but with
7    respect to collecting settlements that had been
8    negotiated.
9          BY MR. BERNICK:
10         **Q.   Again, if we wanted to be able to find**
11   **out what it was that led Baron & Budd or**
12   **Waters & Kraus to target a given defendant, the**
13   **only way we could learn that, that is, the**
14   **decision to target or not to target, would be to**
15   **get access to Baron & Budd and Waters & Kraus**
16   **files.  Right?**
17         MR. FINCH:  Object to the form,
18   argumentative.
19         MS. RAMSEY:  Object to form.
20         THE WITNESS:  No.
21         BY MR. BERNICK:
22         **Q.   What publicly available information**
23   **could we go to that would actually reflect the**
24   **internal decisionmaking about whether to target**
25   **W.R. Grace?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 176

1          MS. RAMSEY:  Object to form.

2          THE WITNESS:  You could ask lawyers who

3     were involved in that litigation.

4          BY MR. BERNICK:

5       **Q.   But if we want to know a decision that**

6     **was taken by plaintiffs' lawyers, we would have**

7     **to ask plaintiffs' lawyers, right?**

8       A.   Correct.

9       **Q.   If we wanted to ask you that question**

10    **and then know the documents that related to your**

11    **answer, we would be talking again about internal**

12    **Waters & Kraus or Baron & Budd documents.**

13    **Correct?**

14         MR. FINCH:  Object to form.

15         MS. RAMSEY:  Join.

16         THE WITNESS:  If there were such

17    hypothetical documents that I or any lawyer at

18    Baron & Budd or Waters & Kraus relied on to make

19    that decision and if those documents were

20    privileged.

21         BY MR. BERNICK:

22      **Q.   Let's talk about a very concrete**

23    **decision that was made.**

24         **There was a decision that was made in**

25    **late 1997 to press forward to trial against**

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 177

1      **W.R. Grace and not to settle those cases.**

2      **Correct?**

3            MS. RAMSEY:  Object to form.

4            THE WITNESS:  Yes.

5            BY MR. BERNICK:

6         **Q.   Which cases did Baron & Budd decide to**

7      **press forward to trial in late 1997 and not**

8      **settle?**

9            MR. ESSERMAN:  I will object.  That's

10     work product and attorney-client privilege.

11           MR. BERNICK:  Are you instructing him

12     not to answer the question?

13           MR. ESSERMAN:  Yes.

14           MR. BERNICK:  Are you instructing him

15     not to answer the question, Natalie?

16           MS. RAMSEY:  The question related to

17     Baron & Budd.  So no, I'm not.

18           MR. FINCH:  What was the question

19     again?

20           BY MR. BERNICK:

21        **Q.   The question was with respect to what**

22     **cases was there a decision not to settle them**

23     **and to press them forward to trial in the back**

24     **end of 1997.**

25           MR. FINCH:  Okay.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 178

1          MR. BERNICK:  That's what you

2    instructed on, wasn't it, Sandy?

3          MR. ESSERMAN:  Correct.

4          MR. BERNICK:  Are you going to accept

5    the instruction?

6          THE WITNESS:  I guess I am bound to

7    accept the instruction of the Baron & Budd

8    lawyer.

9          We have already talked about what cases

10   went to trial in 1997.  I'm assuming those are

11   the cases.

12         BY MR. BERNICK:

13     **Q.   With respect to the cases that went to**

14   **trial in 1997, there was the trial group in**

15   **Dallas and the trial group in --**

16         MR. FINCH:  Allen, help us out.

17         MR. RICH:  Nueces County.

18         THE WITNESS:  That's sounding a little

19   more familiar.

20         BY MR. BERNICK:

21     **Q.   The decisionmaking with respect to**

22   **those cases was that they would not be settled,**

23   **that you all had decided to take those cases to**

24   **trial.  Correct?**

25         MS. RAMSEY:  Objection to form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 179

1           MR. ESSERMAN:  I will object to any
2    internal decisionmaking process or discussions
3    as to which cases to take to trial and which
4    cases not to take to trial as work product of
5    Baron & Budd, and I would instruct the witness
6    not to respond.
7           BY MR. BERNICK:
8       **Q.   During that period of time at the end**
9    **of 1997, there was a huge controversial matter**
10   **that affected Baron & Budd, was there not?**
11      A.   There was such a matter, yes.
12      **Q.   What was that matter?**
13      A.   It had to do with the inadvertent
14   disclosure of a deposition preparation
15   memorandum prepared by a paralegal at
16   Baron & Budd and given to some of the clients
17   that she was involved in preparing for
18   deposition.
19      **Q.   And is it true that after that memo was**
20   **disclosed, that there were efforts by some of**
21   **the companies, some of the defendant companies**
22   **to obtain discovery with regard to that memo?**
23      A.   Yes.
24      **Q.   And which companies attempted to obtain**
25   **discovery with regard to that memo?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 180

1     A.   I recall W.R. Grace and Borg-Warner and
2   one other.  There were three.  I think Raymark
3   or Rabestos or whatever the Rabestos entity was
4   at that time.
5         I recall those being the three that
6   took the lead on that issue.  There were others
7   who joined and took a lesser role.
8     **Q.   And the reaction of Baron & Budd to the**
9   **disclosure of the memo and the criticisms that**
10  **flowed from the disclosure of that memo, the**
11  **reaction of Baron & Budd was to wage what was**
12  **essentially a war to --**
13        MR. ESSERMAN:  I will object to the
14  question and instruct the witness not to answer
15  that.
16        BY MR. BERNICK:
17    **Q.   Okay.  Is it true that Fred Baron was**
18  **the best lawyer that you have ever met,**
19  **Mr. Kraus?**
20    A.   I have said that about Fred Baron, that
21  the job he did on the Ahearn and Georgene cases
22  was the best sustained job of lawyering on a
23  single case that I have ever seen.
24    **Q.   And is it also true that you have said**
25  **and you have said with sincerity that Fred Baron**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 181

1   **is a real street fighter when he's in a battle?**

2       A.  I think you are quoting from a Dallas

3   Observer article.  I think that quote probably

4   was accurate.

5       **Q.  And not only did you say that but you**

6   **said "I saw that."  Right?**

7       A.  Saw what?

8       **Q.  That he is a real street fighter when**

9   **he is in a battle.**

10      A.  I probably said that.  If it is in the

11  article, I'm sure I told the reporter that.

12  This is many years ago.

13      **Q.  In fact, where you had seen him as a**

14  **real street fighter in a battle was at least in**

15  **part his response to the disclosure of the**

16  **paralegal's memo in the fall of 1997.  Correct?**

17      A.  I don't recall that.  He had a very

18  limited involvement in that.  He didn't do

19  asbestos litigation at that time.

20      **Q.  But the claims that were being made in**

21  **connection with that memo were claims that**

22  **affected his firm, correct?**

23      A.  True.

24      **Q.  Isn't it true that what you observed**

25  **about him, that he is a real street fighter when**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 182

1    **he is in a battle, was in part a reference to**

2    **how he, Fred Baron, reacted to the criticism**

3    **that came against his firm in late 1997 when**

4    **this memo came to light?**

5        A.  I don't recall if that specific

6    reference related more to that or the Ahearn and

7    Georgene cases.  The topic of the article was

8    the memo, as I recall, deposition preparation.

9        **Q.  That's correct.  And what you observed**

10   **of him in the fall of 1997 and repeated to the**

11   **reporter from the Observer was that Fred Baron**

12   **was a street fighter, and you had seen him be a**

13   **street fighter in connection with the issue that**

14   **was raised about the memos.  Right?**

15       MS. RAMSEY:  Objection, form.

16       BY MR. BERNICK:

17       **Q.  If it is not correct, tell me.**

18       A.  I'm not disputing I said it.  I truly

19   cannot recall whether the context of me making

20   that remark was the battle over the deposition

21   memo or more generally his performance in

22   Georgene and Ahearn and other litigation matters

23   I had seen him.

24       I just can't remember the context I

25   made that remark in.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 183

1      **Q.   Did he make it personal, his battle in**
2  **the case of Ahearn and Georgene?**
3      A.   There were times that case got very
4  personal, yes.
5      **Q.   Did you have a sense in dealing with**
6  **Ahearn and Georgene that he made that a personal**
7  **battle against other people?**
8      A.   It got pretty personal from time to
9  time, yes.
10      **Q.   He certainly made it personal when it**
11  **came to the people who were seeking discovery**
12  **against Baron & Budd in late 1997 over the memo,**
13  **did he not?**
14      A.   Well, I think all of us who were
15  partners there took it very personally that we
16  were being accused of some very terrible things
17  by lawyers.
18      **Q.   Focus on my question.  I'm not talking**
19  **about -- I'm only asking -- not about you.  I'm**
20  **asking about Fred Baron.**
21          **When it came to the criticisms that**
22  **were surrounding the release of this memo in**
23  **late 1997, isn't it a fact that he took it**
24  **personally and personally went after the**
25  **companies that were seeking discovery with**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 184

1      respect to the memo?

2           MR. ESSERMAN:  Object to the form.

3           MS. RAMSEY:  Join.

4           MR. FINCH:  Object to the form.

5           THE WITNESS:  I don't know how Fred

6      took it.  I took it personally.

7           BY MR. BERNICK:

8      **Q.   Fred said publicly that he was going to**

9      **retaliate against the companies that were**

10     **conducting discovery.  Right?**

11          A.  I don't recall that.

12     **Q.   You don't recall that at all?**

13          A.  I don't dispute he may have said that.

14     I don't have a specific recollection of him

15     making public statements that he was going to

16     retaliate.

17     **Q.   He certainly retaliated against you in**

18     **connection with the proposed FAIR Act.  Correct?**

19          MS. RAMSEY:  Objection to form.

20          THE WITNESS:  He had very strong

21     opinions about me being on the other side of him

22     in the FAIR Act -- not the FAIR Act but the

23     predecessor to the FAIR Act.

24          BY MR. BERNICK:

25     **Q.   Could you answer the question, please,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 185

1    **Mr. Kraus.**

2          **He retaliated against you personally in**

3    **connection with your efforts on behalf of the**

4    **predecessor to the FAIR Act.  Correct?**

5          MR. ESSERMAN:  Object to the form.

6          THE WITNESS:  I don't know that he

7    retaliated.  He said very strong things against

8    me and about me and to me about me taking the

9    opposite side from him in the legislation.

10         BY MR. BERNICK:

11         **Q.   In effect, he also decided not to send**

12   **you referrals as a result of the position that**

13   **you took in connection with the legislation.**

14   **Correct?**

15         MS. RAMSEY:  Object to form.

16         THE WITNESS:  I don't think

17   Baron & Budd ever referred me a case before or

18   after I took that legislative position.

19         BY MR. BERNICK:

20         **Q.   Didn't you actually tell people that**

21   **your role in connection with the FAIR Act was**

22   **affecting your referrals by the specific**

23   **reference to Fred Baron?**

24         A.   No, not the FAIR Act and not referrals

25   from Baron & Budd.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 186

1          I'm sure that there are -- I know that

2    there are people who would not refer me cases

3    because I did lobby Congress for legislation for

4    a criteria bill, a national criteria bill in

5    2001 and '02.

6          **Q.   Part of that was the result of**

7    **influence by Fred Baron.  That's why you talked**

8    **about it to the Dallas Observer.  Correct?**

9          A.   I think I probably said Fred made

10    public statements and statements to others in

11    the bar against me that undoubtedly affected my

12    referral business.

13          **Q.   Didn't Fred Baron also publicly in the**

14    **end of 1997 make public statements attacking**

15    **individuals who were seeking to find out how his**

16    **firm did business?**

17          A.   I'm sure he stated publicly that

18    efforts to invade his attorney-client privilege

19    were inappropriate.

20          **Q.   I didn't ask you that.  I asked you**

21    **whether he attacked people who wanted to find**

22    **out what the story was in connection with that**

23    **memo.**

24          MR. FINCH:  Objection to form.

25          MR. ESSERMAN:  I will object to the

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                           Peter Kraus, Esquire

Page 187

1    form.

2         THE WITNESS:  I don't know whether

3    "attack" would be the appropriate word.  But he

4    certainly spoke out publicly against their

5    efforts.

6         BY MR. BERNICK:

7      **Q.  Isn't it true that Baron & Budd takes**

8    **the position even today that any public use of**

9    **the document that is the briefing memo is a**

10   **breach of Baron & Budd's privilege and there**

11   **will be retaliation against any attorney who**

12   **uses it?**

13        MR. FINCH:  Objection to the form, lack

14   of foundation.

15        MR. ESSERMAN:  Object to form.

16        BY MR. BERNICK:

17     **Q.  Hasn't that statement been made by Fred**

18   **Baron to the media's asbestos litigation**

19   **reporter?**

20     A.  I don't recall the retaliation point.

21   I do know that the firm maintains the privilege

22   on the document and asserts it whenever it is

23   raised or used.

24     **Q.  I'm not talking about asserting a**

25   **privilege.  All kinds of privileges get asserted**

US District Court - Delaware          FINAL - March 4, 2008
Chapter 11 - W.R. Grace                    Peter Kraus, Esquire

Page 188

1      **all the time.**

2            **I'm talking about the position that**

3      **Baron & Budd has expressed, Fred Baron, is that**

4      **anybody who uses the briefing document was**

5      **somebody that they will retaliate against.**

6            MR. FINCH:  Object to the form, lack of

7      foundation.

8            THE WITNESS:  I don't know.

9            BY MR. BERNICK:

10           **Q.   You have never heard Fred Baron state**

11     **that?**

12           A.   I don't recall that.  I may have heard

13     him say that.  You are talking 11 years ago.

14           I don't dispute that he did say that.

15     I just don't have a specific recollection of it,

16     Mr. Bernick.

17           **Q.   You do dispute that he said publicly**

18     **that action would be taken against firms that**

19     **sought discovery with regard to the briefing**

20     **document in the back end of 1997.**

21           MS. RAMSEY:  Object to form.

22           THE WITNESS:  I don't dispute that.  I

23     think that the review of Texas law that we did

24     at the time suggested that firms that used a

25     privileged document and refused to return it and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 189

1    obtained a litigation advantage were subject to
2    disqualification.
3          BY MR. BERNICK:
4       **Q.   That's different from retaliating by**
5    **taking cases to trial instead of settling them.**
6    **Correct?**
7          MR. FINCH:  Object to form.
8          THE WITNESS:  Disqualifying a lawyer,
9    taking away his clients is as bad a thing as you
10   can do.
11         BY MR. BERNICK:
12      **Q.   I said whether it is different.**
13      A.   It is different.
14      **Q.   In fact, what happened at the end of**
15   **1997 is that Baron & Budd specifically decided**
16   **to take cases against Grace to trial and not**
17   **settle them in retaliation for Grace's seeking**
18   **discovery with respect to --**
19         MR. ESSERMAN:  I will object to the
20   question.  The motives and internal thought
21   process of Baron & Budd is not discoverable.
22         MR. BERNICK:  Are you going to instruct
23   him not to answer the question?
24         MR. ESSERMAN:  Absolutely.
25         BY MR. BERNICK:

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 190

1      Q.   Isn't it true that in the back end of
2   1997, ultimately after the trials were over,
3   Grace entered into a settlement agreement with
4   Baron & Budd with respect to an inventory of
5   cases?
6      A.   Yes, I do recall that.
7      Q.   Isn't it true that one of the
8   conditions that was exacted from Grace --
9   actually, two conditions were sought of Grace in
10   connection with that settlement process relating
11   to the briefing memo.
12         One was to fire an in-house lawyer for
13   Grace, and the other was to agree to drop all
14   discovery relating to the briefing memo.  Isn't
15   it true that those were two requirements that
16   were sought by Baron & Budd in connection with
17   the settlement process?
18      A.   I don't recall the firing of an
19   in-house lawyer.  I don't recall that at all.
20      Q.   Do you recall that as a condition for
21   doing -- do you recall that the request was to
22   fire one of the outside lawyers for W.R. Grace
23   who was involved in the discovery effort who
24   represented Grace?
25      A.   Robert Thaxton represented Grace.

US District Court - Delaware                    FINAL - March 4, 2008
Chapter 11 - W.R. Grace                         Peter Kraus, Esquire

Page 191

1          I'm pretty certain that I recall that

2    we would have asked Grace not to use Thaxton as

3    counsel against us anymore in that he has

4    accused us of suborning perjury, something we

5    felt very strongly about that we did not do and

6    subsequently three appellate courts found there

7    was no evidence that we had done.

8          **Q.   Are you representing on the record that**

9    **there were three appellate courts that made that**

10   **finding?**

11         A.   Three appellate courts granted mandamus

12   and reversed trial courts that granted relief at

13   Grace's request with respect to the memo,

14   discovery relief.

15         **Q.   You are saying those appellate courts**

16   **actually made findings that there was no**

17   **evidence to support the claim?**

18         A.   They certainly made findings that there

19   was no evidence suggesting that the crime fraud

20   exception to the attorney-client privilege

21   presented a basis for invading the privilege at

22   Baron & Budd.

23         **Q.   That's different from what you just**

24   **said a few minutes ago, isn't it?**

25         MR. FINCH:  Object to the form.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 192

1          THE WITNESS:  I would have to review
2     the opinions in detail to see which issues were
3     presented in which mandamus 10 years ago.
4          My general recollection and
5     understanding was that the three appellate
6     courts vindicated the positions that
7     Baron & Budd was taking with respect to the
8     memo.
9          BY MR. BERNICK:
10         **Q.  Is it true, then, that one of the**
11    **conditions for entering into a settlement of the**
12    **cases that were tried at the end of 1997, one of**
13    **the conditions was that Grace drop its efforts**
14    **to conduct discovery into the briefing memo?**
15         A.   I think that was a term of the
16    settlement, but I would have to review the
17    settlement to refresh my recollection.
18         **Q.  So again, as you recall, at the end of**
19    **1997, A, there was a very significant**
20    **controversy surrounding the way that**
21    **Baron & Budd conducted its cases with respect to**
22    **coaching witnesses.  Correct?**
23         MR. FINCH:  Object to form.
24         MS. RAMSEY:  Object to form.
25         MR. ESSERMAN:  I'm going to object to

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                        Peter Kraus, Esquire

Page 193

1    the form.

2        THE WITNESS:  There was a controversy

3    about a specific memorandum.

4        I don't think -- I think the term

5    "coaching witnesses" is pejorative.

6    Baron & Budd prepared its witnesses for

7    deposition just like any lawyer prepares their

8    witnesses for deposition.

9        BY MR. BERNICK:

10       **Q.   The fact that you disagreed with the**

11   **use of the word was the whole issue.  The issue**

12   **that had been raised is whether Baron & Budd**

13   **didn't simply prepare witnesses but coached**

14   **them.  That was the issue, correct?**

15       A.   The Grace lawyer and other lawyers were

16   accusing Baron & Budd, as I understand and

17   recall it, accusing Baron & Budd of telling

18   their witnesses to testify falsely based on a

19   memorandum that was disclosed.

20       **Q.   And public statements were then made by**

21   **Baron & Budd and Fred Baron in particular**

22   **denying that those allegations were true.**

23   **Correct?**

24       A.   I'm sure that's correct.

25       **Q.   And is it true that that whole denial,**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 194

1    **the accusations and denial, were a very hot**

2    **topic in the press in Dallas?**

3        A.   It was a hot topic in the press in

4    Dallas and in the legal press nationally.

5        **Q.   And isn't it true that after it -- it**

6    **was after that issue arose that Fred Baron said**

7    **publicly that he would retaliate against those**

8    **who conducted discovery relating to the briefing**

9    **memo.  Correct?**

10       MR. FINCH:  Objection, lack of

11   foundation.

12       THE WITNESS:  No, I don't think it was

13   relating to those who were conducting discovery

14   against the brief -- about the memo.

15       It was the relief sought was more

16   broad.  The relief was to shut down Baron & Budd

17   and to stop the prosecution of the cases, to

18   invade the attorney-client privilege, to prevent

19   Baron & Budd from communicating with their

20   clients, to take an extraordinary array of

21   actions to essentially wipe Baron & Budd out as

22   an existing entity.

23       So I think Fred did make some pretty

24   strong statements that it was inappropriate and

25   he intended to fight back vigorously against

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 195

1    those extraordinary acts.

2         BY MR. BERNICK:

3         **Q.  Did you feel that his statements**

4    **publicly about the nature of the charges, that**

5    **those statements were correct?**

6         A.  Which statements?

7         **Q.  That the accusations that grew out of**

8    **that memorandum were false.**

9         MS. RAMSEY:  Object to form.

10        THE WITNESS:  Yes, I did feel that the

11   accusations that arose out of that memorandum

12   were false.

13        BY MR. BERNICK:

14        **Q.  And did you agree with the steps that**

15   **Baron & Budd took in reacting to that memo and**

16   **the accusations that grew out of it?**

17        MR. ESSERMAN:  I will object to any

18   internal discussions as to work product with

19   regard to Baron & Budd.

20        MR. BERNICK:  Are you instructing him

21   not to answer the question?

22        MR. ESSERMAN:  Yes.

23        BY MR. BERNICK:

24        **Q.  In fact, isn't it true that**

25   **Baron & Budd decided to try the cases against**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 196

1  **Grace that went to trial at the end of 1997 in**
2  **part as a result of the fact that Grace had**
3  **sought to conduct discovery with regard to that**
4  **memo?**
5      MR. ESSERMAN:  I will object to the
6  question and instruct the witness not to answer.
7  That's attorney-client work product privilege.
8      BY MR. BERNICK:
9      **Q.   Had Baron & Budd ever before insisted**
10  **as a condition of settlement that a defendant**
11  **fire their outside counsel?**
12      MR. ESSERMAN:  I will object to that.
13  That's attorney-client privilege and work
14  product privilege.
15      MR. BERNICK:  Are you instructing him
16  not to answer?
17      MR. ESSERMAN:  And instruct him not to
18  answer.
19      BY MR. BERNICK:
20      **Q.   Were you personally involved in the**
21  **negotiations surrounding the resolution of the**
22  **cases that went to trial against Grace in late**
23  **1997?**
24      MR. FINCH:  Talking about the cases
25  that went to verdict or the group settlement,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 197

1    subsequent group settlement?

2         BY MR. BERNICK:

3         **Q.  As I understand it, those cases, there**

4    **were cases that went to verdict and then there**

5    **was the resolution of those cases that resulted**

6    **in adverse verdict and an inventory deal made**

7    **going forward essentially for the next year.**

8         MS. RAMSEY:  Objection to form.

9         THE WITNESS:  Yes.  I was involved in

10   the settlement negotiation with W.R. Grace after

11   the verdict for the resolution.

12        BY MR. BERNICK:

13        **Q.   Did you personally tell Grace people**

14   **that Bob Thaxton should be fired if Grace wanted**

15   **to settle the cases?**

16        A.   I don't specifically recall that, but

17   it would not surprise me if I had said that.

18        I felt then and feel now very strongly

19   about him standing up in court and accusing me

20   of suborning perjury, something I did not and

21   would not do.

22        **Q.  Did he accuse you personally of**

23   **suborning perjury?**

24        A.   He accused the firm that I was partner

25   in on the cases I was working on of suborning

Page 198

1    perjury.

2         **Q.  Did he accuse you of suborning perjury?**

3         A.  By extension, yes.

4         **Q.  I didn't ask by extension.**

5         A.  Did he say I personally had told a

6    witness to lie?  I don't specifically recall him

7    doing that.

8         **Q.  Did you recall him stating that you**

9    **were involved in the events that were at issue**

10   **concerning that memo?**

11        A.  I guess it depends how you would define

12   "involved."

13        **Q.  He never said that you read the memo,**

14   **did he?**

15        A.  He did not -- I don't recall him making

16   any personal allegations against me in open

17   court with respect to my role in the affair.

18        **Q.  Do you know that he made personal**

19   **allegations with respect to your role in the**

20   **affair outside of court?**

21        A.  No.

22        **Q.  So when you say that you felt strongly**

23   **that Bob Thaxton was out of line, you weren't**

24   **talking about something that he did to you; you**

25   **were talking about something that you felt that**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 199

1    **he was doing to Baron & Budd.  Correct?**

2         MS. RAMSEY:  Objection to form.

3         MR. FINCH:  Object to form.

4         THE WITNESS:  Yes, the firm of which I

5    was a partner on the cases in which I was

6    counsel.

7         BY MR. BERNICK:

8         **Q.   Baron & Budd conducted an internal**

9    **investigation using counsel, did it not, into**

10   **the circumstances surrounding that memo?**

11        MR. ESSERMAN:  I will object to the

12   question.  The internal processes of

13   Baron & Budd are clearly protected work product,

14   attorney-client, and instruct him not to answer.

15        MR. BERNICK:  Sandy, Fred boasted about

16   it to the Dallas Observer.

17        MR. ESSERMAN:  If you want to ask him

18   about the Dallas Observer and what the Dallas

19   Observer said, that's fine.

20        BY MR. BERNICK:

21        **Q.   Are you familiar with the report that**

22   **Fred Baron made to the press that there had been**

23   **an internal investigation using counsel into the**

24   **circumstances surrounding the briefing memo?**

25        A.  Yes.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 200

1    **Q.   Now, that investigation obviously was**
2    **designed to find out whether that memo was**
3    **simply an isolated event with respect to an**
4    **isolated individual or whether it reflected on**
5    **the overall conduct of Baron & Budd.  Right?**
6        MR. ESSERMAN:  I will object as to what
7    Baron & Budd instructed its attorneys to find
8    out about the internal investigation.
9        MR. BERNICK:  Sandy, read the
10   newspapers.  It was in the Dallas Observer.
11       MR. ESSERMAN:  If you want to quote a
12   newspaper article, that's fine.
13       MR. BERNICK:  I'm not obliged to do
14   that.  You are obliged to make an objection
15   whether something that is confidential is
16   preserved.
17       MR. ESSERMAN:  The way you asked the
18   question I think would invade on a confidential
19   matter.
20       You asked about what the instructions
21   were between Baron & Budd and its internal
22   counsel regarding the purpose of the
23   investigation.
24       BY MR. BERNICK:
25   **Q.  The report that was made in fact by**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 201

1    Fred Baron to the Dallas Observer was that, A,
2    there had been an internal investigation using
3    counsel; B, that it had focused on whether the
4    memo was an isolated incident; and, C, that the
5    outcome of that investigation was that the memo
6    was an isolated incident.
7         That's what Baron & Budd said to the
8    press at the time.  Correct?
9    A.   That's correct.
10    Q.   Did you believe that that was true?
11    A.   I did.
12    Q.   Did you of your own knowledge know
13    whether it was true?
14    A.   Yes, generally.  I didn't conduct the
15    investigation with the people who conducted it.
16    I didn't interview all of the participants as
17    part of that.
18         But yes, in my personal experience, the
19    things I knew were consistent with the results
20    of that investigation.
21    Q.   Did you know what the results of the
22    investigation were?
23    A.   As reported there, yes.
24    Q.   So you saw the report or whatever it
25    was that came out of the investigation?

US District Court - Delaware                FINAL - March 4, 2008
Chapter 11 - W.R. Grace                        Peter Kraus, Esquire

Page 202

1          A.   I don't remember what work product I
2     saw.  It was over 10 years ago.  I do know I was
3     made aware of the results of the investigation.
4          **Q.   When you were made aware of the results**
5     **of the investigation, did you see a report or**
6     **did somebody simply tell you what the result**
7     **was?**
8          A.   I honestly don't recall seeing any
9     written report.
10         **Q.   And it was important enough to you**
11    **based upon -- that's why I take it that you**
12    **basically relied upon --**
13         A.   I may have seen it.  I simply can't
14    recall right now whether I did.  I saw a great
15    deal written about that.
16         **Q.   But it makes a big difference if you**
17    **saw the report or you are just trusting somebody**
18    **else's say-so, wouldn't it?**
19         MR. FINCH:  Object to the form.
20         THE WITNESS:  No.  I would have trusted
21    Fred Baron or Russell Budd if they read the
22    report to tell me the truth and the lawyers.  I
23    spoke to the outside counsel.
24         BY MR. BERNICK:
25         **Q.   Did they interview you?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 203

1       A.   I'm sure they did interview me in the

2    course of that process.

3       **Q.   Did they personally tell you the**

4    **results of their investigation?**

5       MR. ESSERMAN:  I will object to any

6    conversation as between Peter Kraus and the

7    attorneys for the firm would be protected.

8       BY MR. BERNICK:

9       **Q.   Let me just ask you.  I take it that**

10   **you decided within your judgment that it was**

11   **appropriate for you to tell Grace that Bob**

12   **Thaxton should be fired for asking for discovery**

13   **into the circumstances surrounding that memo.**

14      MS. RAMSEY:  Object to form.

15      MR. FINCH:  Objection to form.

16      THE WITNESS:  Not for that, no.  But I

17   did believe that his actions overall in

18   attempting to shut down our cases and invade our

19   attorney-client privilege based on that one memo

20   and the record that it generated were absolutely

21   inappropriate for any counsel in the litigation,

22   and he deserved not to represent anybody in the

23   litigation, in my view.

24      BY MR. BERNICK:

25      **Q.   So you were in a position where**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 204

1    **Baron & Budd had leverage over Grace in**
2    **connection with the settlement process.**
3    **Correct?**
4        MR. FINCH:  Object to form.
5        MR. ESSERMAN:  Object to the form of
6    the question.
7        BY MR. BERNICK:
8        **Q.   You are sitting there with a verdict in**
9    **your client's favor.  Grace wanted to resolve**
10   **those cases.**
11       **Grace had a very strong economic**
12   **incentive to reach closure with Baron & Budd**
13   **over the tried cases.  Correct?**
14       A.   I don't know what their incentive was,
15   to tell you the truth.
16       MR. FINCH:  Object to form.
17       BY MR. BERNICK:
18       **Q.   You don't think they had a strong**
19   **incentive to resolve those cases?**
20       MS. RAMSEY:  Objection to form.
21       MR. FINCH:  Objection to form.
22       THE WITNESS:  They clearly wanted to
23   resolve the cases because they engaged us in
24   settlement negotiations and ultimately agreed to
25   pay a number which we believed fairly

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 205

1 represented their liability that we recommended
2 that those clients take.
3      BY MR. BERNICK:
4      **Q.   And you felt it was appropriate to use**
5 **those negotiations in order to exact a toll on**
6 **Mr. Thaxton personally.  Correct?**
7      MS. RAMSEY:  Object to form.
8      MR. FINCH:  Object to form.
9      MR. ESSERMAN:  I will object to that.
10      BY MR. BERNICK:
11      **Q.   That's what you did, didn't you?  What**
12 **you asked Grace to do had a personal impact on**
13 **Robert Thaxton.  Correct?**
14      A.   I recall Mr. Hughes advising us that he
15 made the decision to fire Mr. Thaxton as counsel
16 in advance of that.
17      **Q.   I didn't ask you that.  I asked whether**
18 **you made the decision to inject into the**
19 **negotiations with Grace something that related**
20 **personally to Mr. Thaxton.**
21      MS. RAMSEY:  Objection to form.
22      MR. FINCH:  Objection to form.
23      THE WITNESS:  I don't recall whether I
24 made that decision or someone else at
25 Baron & Budd made that decision.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 206

1          BY MR. BERNICK:

2          **Q.  Who was it?**

3          MS. RAMSEY:  Object to form.

4          THE WITNESS:  I don't recall.  I don't

5    think I would have had the authority to make

6    that a term of the settlement.

7          And as I recall, I don't think it was a

8    term of the settlement because Thaxton had

9    already been fired by Grace at the time we got

10   down the road in settlement negotiation.

11         BY MR. BERNICK:

12         **Q.  I see.  But you felt -- you did convey**

13   **the firm's decision to ask that Thaxton be**

14   **fired.  Correct?**

15         A.  I don't remember if I conveyed it or

16   Russell Budd conveyed it or we both did or I

17   just expressed that opinion to Jay Hughes that I

18   thought that his actions were inappropriate and

19   he shouldn't be counsel.

20         I certainly expressed that opinion to

21   Jay Hughes.  Whether it was in the context of

22   making it a condition of the settlement

23   negotiations and Jay Hughes saying "he is

24   already gone" I don't know.

25         **Q.  You also decided to make the specific**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - March 4, 2008
Peter Kraus, Esquire

Page 207

1    request, indeed, demand of Grace that it drop
2    all the requests for discovery with regard to
3    the briefing memo?
4         MS. RAMSEY:  Object to form.
5         THE WITNESS:  I think there was a
6    stand-down in discovery both ways.
7         BY MR. BERNICK:
8         Q.  Come on, Mr. Kraus.  If you didn't, you
9    didn't.
10        I'm just asking as a factual matter did
11   you make a demand of Grace in connection with
12   the negotiation process that Grace drop any
13   discovery with regard to the briefing document?
14        A.   All I recall is that there was a mutual
15   agreement to stand down on discovery going both
16   ways.
17        Who made which demand that led to that
18   ultimate agreement I simply don't recall,
19   Mr. Bernick.
20        Q.  But the agreement went way beyond the
21   settlement of these cases.  The agreement said
22   that Grace would not pursue discovery in any
23   case with regard to the briefing document.
24   Correct?
25        A.   I would have to refer to the agreement.

JANE ROSE REPORTING