# Exhibit G

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower - 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
             Debtors.  .
                              .    January 14, 2008
. . . . . . . . . . . . ..    8:50 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  100

For the ACC:              Caplin & Drysdale, Chartered
                          By:  PETER LOCKWOOD, ESQ.
                               NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No.  (609) 587-3599**

1    fact that as a general proposition you don't have bar dates in

2    524G plan context because there is no perk if you are not -- if

3    the trust is going to resolve the claims and not the bankruptcy

4    court.   The purpose of a bar date is generally in a bankruptcy

5    case to indemnify the claim so that they can then be allowed or

6    disallowed and that was not going to be the purpose for this.

7         Instead the purpose was to enable the Court to have

8    jurisdiction to award sanctions if it felt they were

9    appropriate against claimants who declined and failed to take

10   the second mechanism, or to accomplish a second mechanism which

11   Grace has in this bankruptcy which is the personal injury

12   questionnaire or PIQ.

13        That PIQ again after much debate in front of the

14   Court was set out and was for the expressed and stated purpose

15   by Grace and has been argued throughout Mr. Bernick's

16   presentation today and in his papers, for the purpose of

17   generating information that would supposedly provide the

18   necessary, in Grace's view, evidence that would tell the Court

19   whether the claim of the person filling out the questionnaire

20   was or was not valid.

21        The third mechanism that Grace is proposing in its

22   so-called merit based or legal liability estimation is that

23   Grace is submitting the testimony of a group of experts in

24   medicine, industrial hygiene and risk analysis.   To opine on

25   the legal inadequacy from the standpoint of their particular

1  disciplines, medicine, risk analysis, industrial hygiene of

2  tens of thousands of claims.  And the final step in this

3  process is the submission of the wrap it up testimony of an

4  expert Dr. Thomas Florence who jettisons as the record will

5  show, Your Honor, when we get to the actual evidence in this

6  case, who jettisons his customary methodology of doing

7  estimations to do what amounts to really a fairly simple

8  mathematical tally of all of the claims purportedly invalidated

9  by the experts, the previous group of experts.  And then it

10  takes the percentage of the surviving valid claims which is

11  needless to say very low and extrapolates that to the future to

12  allegedly demonstrate that the simpler, very low percentage of

13  claims in the future would be legally valid.

14          It should be noted that none of these witnesses

15  assuming that they could otherwise do it, which I don't believe

16  they could, none of these witnesses is a lawyer.  None of these

17  witnesses is going to tell the Court, assuming that the Court

18  will permit them to do so, what the actual legal requirements

19  are and how those legal requirements and the state courts where

20  these claims were filed and whose law the Court is obligated to

21  apply, how that law fits, if you will, with these opinions

22  about medicine, risk analysis, industrial hygiene.

23          The -- after having sort of put Dr. Florence on the

24  number and these other experts for the number and amounts of

25  the present and future claims and the validity, the validity of

1  those claims and sort of rejecting out of hand the expert

2  testimony from the ACC and FCR as not fitting because they

3  aren't opining as to the legal liability of Grace.  And the

4  basis of which their testimony is generally being rejected is a

5  combination of it relates to the tasks where the tort system

6  was broken, not is anymore but was broken, and to Rule 408

7  which we'll discuss later.

8          But having done all of that Grace then has to put a

9  dollar figure on these claims.  How does it do that?  Well it

10  gets Dr. Florence to value this reduced universe of legally

11  valid claims that he's come up with here by using the amounts

12  paid in settlements.  Not judgments where juries and courts can

13  determine the legal validity of the claim or the amount that

14  the defendant Grace could be legally obligated to pay for the

15  claim.  No settlements and more only settlements of six cases.

16  Now Mr. Bernick went through a long to do about how gee, if he

17  used more cases he could have come up with lower values.  So

18  they are really getting generous to us in using six cases as

19  the starting point for the valuation.  And as another one of

20  Mr. Bernick's charts demonstrated all the other values for all

21  the other claims are in Dr. Florence's methodology, while they

22  are not obtained by valuing those other claims by the

23  historical amounts, they are claimed by deriving the values as

24  ratios of the value, the settlement value of those other claims

25  to the settlement value of the six mesothelioma claims.

**J&J COURT TRANSCRIBERS, INC.**

1  disease?  And there's not -- it doesn't have to be that the

2  defendant's asbestos was the sole cause of the disease, or that

3  the defendant's asbestos doubled the risk, because it's

4  cumulative asbestos exposure which ultimately causes disease.

5  So that's their mix and install criteria for mesothelioma.

6            Another criteria they have is you have to have

7  radiologically diagnosable asbestosis in order to attribute

8  lung cancer to asbestos exposure.  And the consensus medical

9  view by the Helsinki criteria, which is a group of experts with

10  over 1,000 years studying asbestos-related disease, have said

11  that you can have asbestos-related lung cancer if you have

12  sufficient exposure, but you don't need to have radiologically

13  diagnosable asbestosis.  And, in fact, Grace's criteria don't

14  even permit someone to prove pathologically that they have

15  asbestosis, and I think Grace's experts would admit that if you

16  have asbestosis pathologically, it may not show up on an x-ray,

17  but you definitely have asbestosis.

18            And so even if you were to say that you need

19  underlying asbestos to attribute lung cancer to asbestos

20  exposure, which the medical literature says you don't need --

21  there's a lot of medical literature that says you don't need --

22  Grace's criteria rule out even the people who can prove it

23  pathologically.

24            The -- Mr. Bernick, quote, testified or talked about

25  various aspects of the tort system, and in the tort system --

**J&J COURT TRANSCRIBERS, INC.**

1  what people did and didn't do in the tort system.  Whatever Mr.
2  Bernick says, whatever I say, whatever any of the lawyers say
3  up here is not evidence.  We're going to -- you're going to
4  hear evidence from Steve Snyder, who's -- who has represented
5  companies in the tort system for over 20 years, from Dan Meyer,
6  who's a claims adjuster who's settled over -- he or his group
7  have settled over 200,000 asbestos claims, from Peter Krause
8  and John Cooney, who represent primarily mesothelioma victims,
9  about what the standards are in the tort system, what Grace
10 required in order to settle cases.

11      Mr. Bernick would have you believe that Grace settled
12 any case that came in the door without regard to whether it
13 posed a risk to it.  In fact, for every case that Grace paid
14 money to -- and here I'd like to -- well, I'll pass on the
15 graphic.  Grace required proof of exposure to a Grace product
16 sufficient to satisfy it and proof of disease to satisfy it,
17 and it paid the plaintiff the amount of money that was
18 something less than what he would recover at trial.  Something
19 far less than what he would recover at trial, but both sides
20 are basically hedging their bets as to what might happen if
21 discover played out.

22      And the defense lawyers from Grace testified at
23 deposition, which is going to be their trial testimony -- since
24 they haven't been listed by witnesses, and we can't compel them
25 here by subpoena -- that the reason they chose to settle these

1  cases and the standards they used to settle these cases was the

2  best way to minimize the liability.

3          MR. BERNICK:  Yes, I'm remimded that the testimony

4  that Mr. Finch is reciting --

5          THE CLERK:  I'm not picking you up, sir.

6          MR. BERNICK:  I'm reminded that the testimony that

7  Mr. Finch is citing is testmiony that was taken I believe

8  subject to a confidentiality order, because it relates to

9  settlement materials, and I believe that that was one of the

10  conditions pursuant to which we agreed to allow that discovery

11  to take place.  So to the extent that Mr. Finch wants to get

12  into that, and I would I guess suggest that I believe that some

13  of this -- I'm not sure this is covered in the briefs, but to

14  the extent that Mr. Finch would want to get into it, I think

15  that we have an open court here, and I'm not sure that that

16  would be appropriate.  I really don't want to spend a huge

17  amount of time on this, but I am compelled to point out that I

18  believe those are the terms of the order.

19          THE COURT:  All right.

20          MR. FINCH:  I'll pass that.  That's the only

21  reference I'm going to have to this, Your Honor.  I'm not going

22  to show any of the documents.  Suffice it to say there's a lot

23  of them, and we'll put them into evidence at the appropriate

24  time.

25          We do have -- Grace did try some asbestos cases.  It

**J&J COURT TRANSCRIBERS, INC.**

1  Justice.  He has been an expert for the courts in valuing

2  asbestos claims on four occasions.  He has about as much

3  experience in studying the tort system as anyone out there.

4       Ms. Biggs has worked for insurance companies and

5  estimated liabilities using methodologies somewhat different,

6  but the basic -- fundamentally it's the same as Dr. Peterson.

7       Dr. Florence has that expertise, has the ability to

8  estimate liability of asbestos companies.  In their briefs

9  Grace called Dr. Florence a statistician.  I think he might be

10 somewhat offended by that.  His -- he holds himself out and is

11 an expert in what's the liability of a company facing asbestos

12 claims.

13       And what Grace ignores in its <u>Daubert</u> challenges on

14 Dr. Peterson and Ms. Biggs is there are many types of science

15 and there are many types of specialized language, and the Rule

16 702 doesn't mean you have to be able to run a laboratory

17 experiment.  You can have scientific, technical, or other

18 specialized knowledge to assist the trier of fact.

19       And, ultimately, the -- <u>Daubert</u> boils down to does

20 the expert employ in the courtroom the same level of

21 intellectual rigor that characterizes the practice of an expert

22 in a relevant field?  And the answer to you, Your Honor, is

23 that is exactly what Dr. Peterson has does here, and that is

24 what Ms. Biggs has done here.  They use the same methodologies

25 here they do in non-litigation settings outside of court.

1       And why does the Nicholson methodology produce the

2  most reliable and the best estimates of a future liability of

3  an asbestos company?  Three things that haven't changed for 25

4  years -- although Mr. Bernick talks about changes in the legal

5  system, what he's -- what Dr. Peterson's testimony was is you

6  can't predict today what the law is going to be in a particular

7  jurisdiction tomorrow, whether the federal government is going

8  to pass the fair act tomorrow.  What we do know that over the

9  past -- ever since Borrell (phonetic) in 1973 that the law has

10 compensated mesothelioma claims and asbestos claims.  We do

11 know the asbestos-related epidemiology.  We know the future

12 time course of the asbestos-related cancers.  And, finally, we

13 know that the best evidence of what a company's likely to pay

14 to reduce the judgment and settle cases tomorrow is what it's

15 paying today, taking into account the most recent trends.  So

16 we have the disease curve.  Now --

17       THE COURT:  Would you say that last sentence for me

18 again?  I'm sorry.

19       MR. FINCH:  The best evidence of what a company is

20 going to pay to deal with asbestos liabilities tomorrow just is

21 what it is paying today taking into account the trends that

22 line up to where it is.  Just like the best estimate of what

23 you're going to have to spend on gasoline next week is what

24 you're paying this week not what you're paying ten years ago.

25 The best evidence going forward is you take the most recent

143

1  time and you project it forward based on what you know today

2  about the trends and what has happened since.

3       So what do we know about Dr. Peterson's methodology

4  and those trends?  Could I have Dr. Peterson's report, the page

5  showing the claiming history?

6       THE COURT:  Just a second, Mr. Finch.  They have this

7  on a screen that's not facing me, and I can't see it.  So hold

8  on one second, please.

9            (Pause)

10      THE COURT:  Okay.  Thank you.

11      MR. FINCH:  I'll focus on the mesothelioma.  That's

12 Grace's history of how many mesothelioma claims it got.  Nobody

13 really disputes that.  It's a continuing upward trend.  Whether

14 you want to go back to 1980 or 1990 or 1995, it's a continuing

15 upward trend.  Mr. Bernick makes a big deal out of the

16 2000/2001 period, but, in fact, the trend was apparent long

17 before that, and it's continued to go up.

18      Well, we have also Dr. Peterson and Ms. Bigg's

19 knowledge about the litigation environment.  We have the Rand

20 report on asbestos litigation which has the total numbers of

21 claimants, various broken down by disease, and this -- you

22 know, Mr. Bernick said, oh, there aren't new claimants coming

23 in the system.  Well, he's just wrong about that.  You can see

24 from the 1990 all the way up through 2002 there's more

25 claimants coming into the system for mesothelioma.  So that's

1    on x-ray to determine whether the information that was coming

2    from the B readers was sufficiently reliable to be -- pass the

3    Daubert standard.

4         A statement that was made that Mr. Dunbar somehow

5    does estimation their way, Mr. Dunbar has on occasion done

6    estimation their way when the inputs that are available require

7    it.  But when the inputs are different, estimations can be done

8    in different ways depending upon the issues that are posed.

9    And Mr. Dunbar is fully on board with this case with how this

10   case is run.

11        Finally with respect to Rule 702, Mr. Finch says you

12   don't have to do science under 702.  Well, that's true.  If you

13   don't purport to be doing science, 702 doesn't apply.  They

14   purport to be doing science.  Every single one of their experts

15   says I am doing science, and when you purport to do science,

16   you've got to do it.

17        They say, well, these methods are used not only

18   inside the litigation process, but they're also used outside.

19   And it's true, that would be a consideration, but it's a

20   minimum consideration.  That is if you don't even live up to

21   the standards that you have outside with what you're doing

22   inside, you've got a problem.  But just because you bring into

23   the courtroom a purported method that you use outside doesn't

24   mean that it somehow satisfies the Daubert standard.

25   Otherwise, if it's junky outside, it qualifies inside.  So it

1  has to be at least as good.

2        In the same fashion acceptance is important.  It

3  should be accepted, but the mere fact of acceptance doesn't

4  make it right.  The key thing is what are the standards for

5  science outside and inside, the standards, and there the

6  standards articulated by their own experts focus on

7  predictability, focus on reliability, focus on being data

8  driven, and they flunk those standards.  Again, there is no

9  data in this case -- no testimony in this case that these

10 methodologies had been shown to have any predictive value with

11 respect to a company still in the tort system.  Thank you, Your

12 Honor, for indulging us here this afternoon.

13       THE COURT:  Mr. Lockwood.  Mr. Bernick, if you need

14 to leave, you may leave.  I know that the debtor still has

15 other people here, so you -- if you need to go --

16       MR. LOCKWOOD:  He's finished --

17       MR. BERNICK:  Well, I'm mindful of our time limits,

18 and I will --

19       MR. LOCKWOOD:  According to the agreement he's

20 finished anyway, Your Honor.  You've got a main and a reply and

21 then you're done, so --

22       MR. BERNICK:  But under the agreement they also used

23 up all of their time.

24       MR. LOCKWOOD:  We did not.  We have --

25       MR. BERNICK:  Well, I think that that's --

1          MR. LOCKWOOD:  -- at least 20 minutes left.

2          MR. BERNICK:  Well, now see this is another -- this

3   is a problem we're having, Your Honor.

4          THE COURT:  I think by my calculation you actually

5   have ten, Mr. Lockwood.

6          MR. LOCKWOOD:  Okay.  Well, I'll take less than ten.

7   First, Mr. Bernick said that -- he recited his agreement with

8   me that, yea, they were insisting that their legal liability be

9   determined, and yea, they were relying on 502(b), and he says

10  we didn't have an answer to that.  Either he wasn't listening,

11  or I guess maybe I didn't make myself clear.  We do have an

12  answer for that.  Those are the tests for the allowance or

13  disallowance of claims, and that's not what is going on here.

14  That's the answer.  Five 0 two (b) is irrelevant.  Legal

15  liability is not the issue.

16          When discussing the issue of what the purpose of this

17  estimation is all about, Mr. Bernick's explanation was it's

18  about, quote, plan formulation, close quote.  Apparently, his

19  idea is that the parties in this case can come to a bankruptcy

20  judge and put on an 18-day trial for the purpose of the judge

21  giving him hints about what they ought to put in their plan.

22  I'm not aware of anything in the Bankruptcy Code that suggests

23  that that is an appropriate subject for a contested matter.

24  They've got a plan.  They formulated the plan.  If they think

25  it's got defects in it, they can change the plan.  When we get