# Exhibit H

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-10578(JKF)
                                .
                                .
FEDERAL MOGUL GLOBAL, INC.,     . USX Tower - 54th Floor
                                . 600 Grant Street
                                . Pittsburgh, PA 15219
        Debtor.                 .
                                . June 20, 2007
. . . . . . . . . . . . . . . . 9:03 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:                 Pachulski, Stang, Ziehl, Young,
                                 Jones & Weintraub, P.C.
                                By:  JAMES E. O'NEILL, ESQ.
                                919 North Market Street
                                17th Floor
                                P.O. Box 8705
                                Wilmington, DE  19899

                                Sidley Austin Brown & Wood, LLP
                                By:  KEVIN LANTRY, ESQ.
                                     GUY S. NEAL, ESQ.
                                     JESSICA KNOWLES, ESQ.
                                     JAMES CONLAN, ESQ.
                                     KENNETH P. KANSA, ESQ.
                                Bank One Plaza
                                10 South Dearborn Street
                                Chicago, IL 60607

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

1          MR. GRANBERRY:  Yes, ma'am.  This is the declaration

2 of Steven L. Shackelford, one of the attorneys for the Everett

3 and Little/Scruggs objectors.  The declaration contains

4 background facts concerning the filing of the Everett lawsuit

5 in the U.S. District Court for the Southern District of

6 Mississippi, and the filing of the Thurston Little lawsuit in

7 state court in Mississippi.  These are all background facts

8 that are reflected in the objections filed by these parties.

9          THE COURT:  Does anyone have any questions on cross

10 examination for Mr. Shackelford?  Any cross examination?  No

11 one?  All right.  I will accept the declaration, and Mr.

12 Shackelford is -- oh, does anyone intend to call Mr.

13 Shackelford in your own case?  No one does?  Mr. Shackelford is

14 excused.

15          MR. GRANBERRY:  Thank you, Your Honor.

16          MR. SHACKELFORD:  Thank you, Your Honor.

17          THE COURT:  Any other housekeeping matters before we

18 resume cross examination?  Okay.  Mr. Lockwood.

19          MR. LOCKWOOD:  Your Honor, we'd like to recall Mr.

20 Peter Coleman to the stand, please.

21          THE COURT:  Mr. Coleman.  You're still under oath,

22 Mr. Coleman.

23 PETER COLEMAN, PREVIOUSLY SWORN

24                    CONTINUED CROSS EXAMINATION

25 BY MR. LOCKWOOD:

1  Q     Good morning, Mr. Coleman.

2  A     Good morning, Mr. Lockwood.

3  Q     Before we proceed with your examination, do you have a

4  copy of the -- what we sometimes refer to as the Pneumo

5  addendum to the plan of reorganization with you today?

6  A     Yes, I do.

7  Q     And is that copy the one that you reviewed in preparation

8  for the declaration that you've rendered in this case?

9  A     Yes, it is, although I did also see the June revisions.

10  But, yes.

11            MR. LOCKWOOD:  Your Honor, could I approach the

12  witness and ask him to show me the copy for a moment?

13            THE COURT:  Certainly.

14                         (Pause)

15  BY MR. LOCKWOOD:

16  Q     The documents you showed me are the trust agreement and

17  Pneumo TDP, correct?

18  A     Correct.

19  Q     Do you have a copy of the actual addendum, the plan

20  addendum itself which sets out the provisions of what I'll call

21  Plan A in addition to those documents, or do you not have that

22  with you?

23  A     The only other one I have with me is the disclosure

24  statement.

25  Q     Okay.

1       MR. CHRISTIAN:   Your Honor, for point of

2  clarification I think he has the supplemental disclosure

3  statement related to Plan A.   If that's helpful to you.

4  Q    Mr. Coleman, since we broke yesterday, have you discussed

5  any of the matters set out in your declaration or the testimony

6  that you gave yesterday with any person?

7  A    No, I haven't.

8  Q    And have you reviewed any documents since yesterday?

9  A    No, I haven't.   Other than to hand these to you.

10 Q    Excuse me?

11 A    Other than to hand these to you.

12 Q    Correct.   Before we go back into where we were yesterday I

13 have one set of questions that I wanted to ask you about your

14 yesterday's testimony.   You mentioned having reviewed some

15 materials or statements by David Austern of Manville Trust in

16 the year 2006 yesterday in your testimony.   Do you recall that?

17 A    Yes.

18 Q    Could you tell me what exactly it was that you reviewed?

19 A    They were copies of handouts from Mr. Austern at a seminar

20 in late 2006 showing the claiming frequency against the

21 Manville Trust over a certain period of time during its

22 original -- during its inception then before it had 2002 TDP

23 and then its filings post to 2002 TDP and also how much its

24 payments were for disease categories.

25 Q    And what, if any, statements or conclusions in your

1 declaration reflect any of the information or conclusions that

2 you drew from that material?

3 A     Only insofar as Manville's claiming experience is

4 consistent of what I've seen in the tort system in that over

5 the last several years we've seen less filings from

6 nonmalignancies than we had in the previous decade or decade

7 and a half before that, and that going forward, at least, I'm

8 assuming we can anticipate we see more malignancies as a higher

9 percentage of the filings and the cases that we would be

10 resolving in the tort system.

11 Q     So you felt that the results that the Manville Trust had

12 been experiencing in recent years was in some way or another

13 consistent with your understanding of how the tort system was

14 operating during the same period of time?

15 A     It's consistent with what I've been seeing in the cases

16 that are coming up for trial and the filings that I've been

17 seeing for other defendants.

18 Q     Did you have any -- did you arrive at any conclusions

19 concerning the resolution history, if you will, of the Manville

20 Trust based on that information?

21 A     I'm not sure I understand what you mean by --

22 Q     Well, you said, I believe, that experience of the Manville

23 Trust was in someway or another consistent with the tort system

24 during the same period of time.  I'm trying to distinguish

25 whether you were limiting that testimony simply to the claims

1  coming into the trust or whether you included the trust's

2  resolution of the claims that were coming into it during the

3  same period.

4  A    Yes.  That basically what was being experienced by the

5  Manville Trust was from resolving large numbers of

6  nonmalignancy claims as a percentage of the cases that it was

7  dealing with to a switch to resolving a much more significant

8  percentage of the overall cases being malignancy cases which is

9  consistent with what the tort system is now dealing with.

10 Q    So it was your conclusion I take it then that the Manville

11 Trust by itself was not encouraging some sort of

12 disproportionate number of nonmalignancy filings?

13 A    Actually it was my conclusion that the future claims

14 representatives' projections for the number of claims he or she

15 believed the Federal Mogul Pneumo Abex Trust would be handling

16 in a different ratio than what the Manville Trust was

17 apparently handling.  The Manville Trust was indicating that it

18 was handling somewhere in a ratio of 50/50 malignancy to

19 nonmalignancy while the Pneumo Abex projections show about

20 90/10 nonmalignancy to malignancy.

21 Q    I'm asking you whether or not the application of the

22 Manville Trust TDP to the claims -- the nonmalignancy claims

23 that were being filed with it whether you had any understanding

24 that there was any connection there between the TDP and the

25 number of filings as you understood it from the materials you

Coleman - Continued Cross/Lockwood                    16

1  got from Mr. Austern.

2  A    It's my belief that Judge Jack's ruling in Corpus Christi

3  had the major impact what we're seeing in filings.

4  Q    You took that a way despite -- wasn't the filings reduced

5  in the periods prior to the time Judge Jack's opinion was

6  issued?

7  A    The filings were high before Judge Jack's opinion.  After

8  Judge Jack's opinion we've seen a lot less litigation.

9  Q    I'm asking you, the Manville data that you looked at, is

10 it not true that for the year 2005, for example, prior to Judge

11 Jack's opinion, there was a marked reduction in nonmalignancy

12 filings experienced by the Manville Trust?

13 A    There was a reduction.  How marked it was I don't remember

14 right now.

15 Q    So you can't tell us whether there was more of a reduction

16 in 2006 after the opinion than there was in 2005 before it?

17 A    If I looked at the numbers again I could.

18 Q    But you don't recall.  Correct?

19 A    Right now?  No.  Without looking at the sheet.

20 Q    And you've never made any effort to compare the Manville

21 Trust TDP with Pneumo TDP I take it?

22 A    I didn't sit down and compare it.  I have seen the

23 Manville TDP and it's somewhat similar.

24 Q    I'm going to hand you a document.

25            MR. LOCKWOOD:  Your Honor, may I approach the

**J&J COURT TRANSCRIBERS, INC.**

1 witness?  Your Honor, for the convenience of the Court I have a

2 miniaturize version I'm handing -- for the record, I've handed

3 the witness Exhibit 1.1.4 to the plan reorganization which is

4 the Pneumo addendum as we refer to it.  And for the Court's

5 convenience to follow the questioning I would hand the Court a

6 miniaturize version of that document.

7              THE COURT:  All right.

8 BY MR. LOCKWOOD:

9 Q    When we broke yesterday, Mr. Coleman, I had asked you a

10 question about whether or not you had -- you recall that there

11 were provisions in the addendum to the plan dealing with the

12 Pneumo claims involving what are sometimes referred to as the

13 Cooper Insurance pursuit rights.  Do you recall that?

14 A    Yes, I do.

15 Q    And I believe you said you had some vague recollection of

16 that, but that you didn't recall with specificity?

17 A    That'd be correct.

18 Q    And your counsel objected at that point that you didn't

19 have it in front of you.  I'd like you to look at Exhibit 1.1.4

20 there and which I will represent to you is a copy of the

21 addendum, and ask you whether or not looking at that refreshes

22 your recollection or confirms your recollection that you have

23 in fact reviewed that document in addition to the documents

24 that we talked about at the beginning of today?

25 A    Yes.  I believe I reviewed this quickly.

1  Q    Would you turn in that document to Section 1.1.61.

2  A    Insurance pursuit rights?

3  Q    Yes, sir.  Did you look at that section of the document

4  when you were reviewing it in preparation for your declaration,

5  sir?

6  A    I think as I indicated I reviewed this with a particular

7  context of the TDP.  Yes.  I did see it.

8  Q    Okay.  And are -- and that contains the definition of what

9  are called insurance pursuit rights.  Correct?

10  A    Yes.

11  Q    And do you understand that under the addendum and those

12  insurance pursuit rights as they relate to both Pneumo Abex and

13  the trust to be formed, if it is formed, are to be assigned to

14  Cooper Industries pursuant to the provisions of this addendum?

15  You won't get that from looking at the definition.  The

16  question is, apart from that do you understand that?

17  A    As I said, it's been a while since I read through the

18  entire agreement.  So I don't recall right now.

19  Q    Well, let me ask you to turn to Exhibit A1.1.97 to this

20  addendum.  It's after the addendum and then there's a few other

21  exhibits that precede it.  It's a document entitled Pneumo

22  Insurance Agreement.  And it should be attached to the addendum

23  itself.

24  A    Does it have a tab on the side?

25  Q    Actually, that's not my copy.  Let me come over and look

1  if you would.

2  A    Okay.  I see a 95, but not a 97.

3                         (Pause)

4         THE COURT:  This copy has it, Mr. Lockwood, if you

5  need the witness to refer to it.

6                         (Pause)

7  BY MR. LOCKWOOD:

8  Q    Have you seen that document before?

9  A    I'm not sure that I have.

10 Q    Well, looking at it as you sit here today do you see on

11 the first page and carrying over to the second a heading called

12 assignment of insurance pursuit rights to Cooper LLC?

13 A    I see that heading.  Yes.

14 Q    And there are three paragraphs A, B, and C underneath

15 that?

16 A    I see that.  Yes.

17 Q    Just as a predicate for some further questions could you

18 briefly take a look at that and -- those three paragraphs and

19 familiarize yourself with their general content?

20 A    I can do that.  Yes.

21                         (Pause)

22 A    I've read through it.

23 Q    Do you understand that that document assigns to Cooper

24 Industries all the insurance pursuit rights as we just looked

25 in the definition previously with respect to Pneumo Abex and

1  the Trust in the event that the Trust -- this Plan A is

2  approved by the Court and the Trust becomes effective?

3        MR. CHRISTIAN:  Objection on several grounds, Your

4  Honor.  First of all, Mr. Lockwood's question calls for a legal

5  conclusion with respect to assignment.  Number two, he's asked

6  the witness if he was familiar with this section of the plan.

7  The witness testified that he wasn't sure that he was familiar

8  with it or had reviewed it, and now he's asking him questions

9  about it.  To the extent that's even relevant to his direct

10 testimony within the scope of his direct examination the

11 witness ought to have an opportunity to review the entire

12 document rather than the parts that Mr. Lockwood's asked him to

13 read here today.

14       THE COURT:  Well, if you want to take the time and

15 have the witness review the entire document that's fine.  We'll

16 recess the trial and he can review the entire document.  But

17 we'll continue with another witness and he may review the

18 entire document.  But it is clearly relevant to his opinion as

19 to whether -- to how this plan functions and whether or not

20 Plan A versus Plan B affect the insurers' rights.

21       MR. CHRISTIAN:  Your Honor, I still have my legal

22 conclusion objection.

23       THE COURT:  It doesn't -- I don't think he's asking

24 for a legal conclusion.  He's asking whether the witness

1 understand that this plan purports to make an assignment.  And

2 that's, I think, within this witness' confidence.  You've

3 purported him to be an expert with respect to the effect of

4 Plan A.  So if he can't make an opinion about that then I'm not

5 sure how he's going to make an expert opinion as to what Plan A

6 does.

7 　　　　MR. CHRISTIAN:  Your Honor, according to Mr.

8 Lockwood's opening statement the affect of the assignment is

9 governed by the legal conclusions contained in the insurance

10 neutrality provisions of the plan.  And according to Mr.

11 Lockwood's opening statement the effect of the assignment will

12 be determined in another proceeding as a matter of law.

13 　　　　THE COURT:  And according to your opening statement

14 that's exactly to the contrary and this is your witness to

15 prove your case and he's cross examining.  This isn't his

16 witness, this is your witness.

17 　　　　MR. CHRISTIAN:  I understand, Your Honor.

18 　　　　THE COURT:  This is clearly relevant.  And this

19 witness purported to be an expert for the very purpose of

20 addressing whether or not these insurance rights affect the --

21 the transfer of insurance rights affect the insurers is clearly

22 within this witness' confidence.  This is a proper line of

23 cross examination.

24 　　　　MR. CHRISTIAN:  Your Honor, I understand your ruling.

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                    22

1   Thank you.

2           THE COURT:  Do you need an opportunity to review the

3   entire document, Mr. Coleman?  If you do I will recess your

4   testimony and give you an opportunity to take a look at the

5   document.

6           MR. LOCKWOOD:  Your Honor, before he answers that can

7   I just make it clear the limited scope of my question that

8   might --

9           THE COURT:  Yes.

10          MR. LOCKWOOD:  -- help him answer that?  Mr. Coleman,

11  all I'm trying to explore with you is the record of your

12  understanding of what the assignment that's involved her that

13  your declaration indicates would indicate increase the risk to

14  these insurers consist of.  So if you need to read the entire

15  addendum for the purpose of addressing that then I guess you'll

16  tell us so.  But for the purpose here I'm just trying to lay a

17  foundation of this is the assignment and do you understand what

18  it is?  So you can answer the Court's question.

19          THE WITNESS:  I don't think I need to read the whole

20  thing.  Nor that it would help.

21          THE COURT:  All right.  Then you can proceed, Mr.

22  Lockwood.  The objection's overruled.

23  BY MR. LOCKWOOD:

24  Q    Under the assignment language that you have before you,

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                 23

1  Mr. Coleman, isn't it a fact that once the Trust -- well, let

2  me back up and just lay a little bit of foundation from

3  yesterday.  When we talked yesterday you acknowledged that the

4  Trust was going to be funded by money coming from Cooper

5  Industries.  Right?

6  A    In part, that's correct.

7  Q    And that the Trust was also -- had some assignment of some

8  insurance rights, is your understanding.

9  A    That's my understanding or at least potential.

10  Q    And your testimony -- the purpose of your testimony here

11  is to express your opinions about the effect on the insurers

12  that arises out of the assignment of the insurance rights to

13  the Trust as opposed to their not being assigned by the

14  insured.  Correct?

15  A    I understand my testimony to be the difference between

16  what the claims -- how the claims would be handled in the tort

17  system and how the claims would be handled under the TDP.

18  Q    Okay.  Now --

19  A    Which indirectly is affected by what you're talking about.

20  Q    And so just so you understand where we're going in all of

21  this what I'm trying to do -- get your testimony on is exactly

22  how the TDP come to be involved in the presentation of claims

23  to the insurers whose risk you're testifying is being increased

24  by that.  Do you understand that?

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                24

1  A    I understand what you said.

2  Q    Now, under these provisions that we're looking at here

3  once the Trust is up and running and paying claims it's not

4  going to be the Trust that is going to be in charge of seeking

5  reimbursement for amounts paid by -- for those claims by the

6  Trust, isn't that correct?

7  A    As I understand this, yes.

8  Q    In fact, it's going to be Cooper Industries.  Correct?

9  A    Cooper.  Correct.

10  Q    And just as a matter of commonsense and your understanding

11  of how these things work Cooper Industries will have to decide

12  post the effective date of this plan how it wants to go about

13  presenting claims to the insurers for reimbursement, won't it?

14  A    Not being a coverage counsel I wouldn't know what my

15  common senses, but I would agree with what -- it sounds what

16  you're saying may seem to make sense.

17  Q    Well, you testified earlier in your previous -- in your

18  experience with other settlement entities such as the CCR and

19  then the Owens Corning that you've worked with that when claims

20  get resolved they're paid by either or both of the insured or

21  the insurer.  Right?  Do you remember that testimony?

22  A    Yes.  I remember the testimony.

23  Q    And in that process don't the insured and the insurer have

24  interactions in your experience as to how the payment by the

Coleman - Continued Cross/Lockwood                    25

1  insurer, if any, will be made and --

2  A    Yes.  There's a lot of difference relationships.  But,

3  yes, there obviously is interaction between the insured and the

4  insurer.

5  Q    So Cooper and its lawyers will have to be making decisions

6  in the future about how to go about dealing with these Pneumo

7  insurers in an effort to obtain funds for the reimbursement of

8  claims paid by the Trust, won't they?

9  A    Well, the money gets put in.  Yes.

10 Q    And as you sit here today you have no idea how that

11 decision-making process will work or what its outcome will be.

12 Isn't that right?

13 A    No, you're right.  I couldn't tell you.

14 Q    And let's -- I'm going to ask you some sort of

15 hypothetical questions because we're dealing with events that

16 are going to take place in the future.  Assume for the purpose

17 of these hypotheticals that the Trust has paid a number of

18 claims for various diseases ranging from Level 1 to

19 mesothelioma.  Okay?

20 A    Okay.

21 Q    And that it's paid for those claims various amounts

22 ranging from the schedule value in the Pneumo TDP to results of

23 individual review of those claims under the TDP.

24 A    Okay.

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                    26

1  Q    Now, one of the things that Cooper can do in an effort to

2  obtain reimbursement is to decide which of these various trust

3  claims it will see reimbursement from insurers for and which it

4  may not.  Isn't that correct?

5        MR. CHRISTIAN:  Objection.  Is this still part of Mr.

6  Lockwood's hypothetical or --

7        MR. LOCKWOOD:  Yes.

8        MR. CHRISTIAN:  -- is this his testimony?

9        MR. LOCKWOOD:  This is hypothetical.  I'm asking him

10 in his experience of the settlement process and the way

11 insurers are involved with that isn't that the way it would

12 work in his expectation?

13 A    My experience is that almost every claim would be looked

14 for for reimbursement.

15 Q    But if a insured thought that there was a possibility for

16 whatever reason that the insurer would be unwilling to

17 reimburse it for a claim and that the cost of fighting with the

18 insurer about that reimbursement exceeded the likely

19 reimbursement amount couldn't that insured decide not to ask

20 the insurer for reimbursement for that claim?

21 A    I would think so.  Yes.

22 Q    And focusing particularly on your testimony concerning

23 Level 1 claims, those are claims that would be paid $1000.

24 Right?

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                27

1  A    That's correct.   Expedited review.

2  Q    And let's assume you, sir, were advising the CNA who was

3  being asked to pay Level 1 claims resolved by the Trust.   What

4  would your advice to CNA be with respect to the payment of

5  those claims?

6            MR. CHRISTIAN:   Your Honor, I have no objection to

7  him answering this as long as this is part of Mr. Lockwood's

8  hypothetical.

9            MR. LOCKWOOD:   It's hypothetical.

10            MR. CHRISTIAN:   Very well.

11  A    I believe most of the Level 1 claims would not currently

12  be paid in the tort system.   And basically that the medical and

13  exposure criteria would not be consistent with what you would

14  have to pay for a case in the tort system.   So I would

15  recommend they don't pay.

16  Q    So you would advise in that hypothetical scenario CNA to

17  decline payment for those claims.   Correct?

18  A    Well, the first thing I'd recommend is they get a coverage

19  counsel who has better grasp of what some of the issues are

20  than I would.   But as far as whether the case would be one that

21  would be paid in the tort system that I'd advise that they

22  wouldn't pay.

23  Q    Well, let's assume that CNA has in its insurance policies

24  a provision that says that it has the right to consent to the

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                    28

1  settlement of claims by its insured if it's going to be asked

2  to pay for them.  Are you familiar, by the way, with that sort

3  of provision?

4  A    Concept?  Yes.

5  Q    You're familiar with that.  So let's assume CNA's got that

6  and it hasn't consented to the Trust payment of these Level 1

7  claims.  Okay?

8  A    Okay.

9  Q    And so you've been informed by coverage counsel for CNA

10 that it has the right to, since it didn't consent to the TDP to

11 decline to pay claims that were resolved pursuant to the TDP.

12 Can you accept that?

13 A    I hear where you're coming from.  Yes.

14 Q    So under those circumstances hypothetically you would

15 advise CNA to exercise its right under the consent to

16 settlement provision not to pay Level 1 claims.  Correct?

17        MR. CHRISTIAN:  Your Honor, objection.  The way that

18 question's formed cause for a legal conclusion.  If Mr.

19 Lockwood was to rephrase it that's fine.

20        MR. LOCKWOOD:  Your Honor, I'm asking him simply to

21 -- I mean --

22        MR. CHRISTIAN:  He's asking for a conclusion about

23 the meaning of the consent to settlement clause in an insurance

24 contract.  Not only is that a legal conclusion the witness has

**J&J COURT TRANSCRIBERS, INC.**

1  already testified he's not an insurance coverage expert.

2          THE COURT:  No.  He's asking him as outside counsel

3  to CNA who he's already testified is his biggest client whether

4  he would advise CNA under these hypothetical circumstances to

5  pay a claim, and whether that would affect CNA's rights under

6  or actual economic rights which is what CNA has proffered him

7  as a witness about.  This is clearly within the scope of his

8  declaration.

9          MR. CHRISTIAN:  Right.  Your Honor, I think it's just

10  a formulation question.  The issue is that Mr. Lockwood couched

11  it in terms of a conclusion about the legal affect of the

12  consent to settlement provision in the contract.

13          MR. LOCKWOOD:  Your Honor, just for clarity I'm

14  asking him to assume that CNA coverage counsel which he said in

15  his previous answer he would need to consult has advised him

16  that under the consent to settlement rights CNA has the right

17  to decline to pay that claim because they didn't consent to

18  settlement.  That's an assumption built into the question.  I'm

19  not asking whether he agrees with the assumption.  But based on

20  that assumption would he as the settlement counsel for CNA

21  advise CNA based on his testimony in his declaration about

22  these claims not to pay them.

23          THE COURT:  The objection --

24          MR. CHRISTIAN:  I don't have a problem with that

**J&J COURT TRANSCRIBERS, INC.**

1 question as clarified by Mr. Lockwood.

2        THE COURT:  All right.

3 A    Okay.  As I understand the question yes, I believe these

4 are cases that would not be dealt with in the tort system as is

5 currently constructed by and large.

6 Q    With all due respect, Mr. Coleman, I'm not asking you for

7 your opinion about whether they would or wouldn't be

8 compensable in the tort system.  I'm asking you whether or not

9 in your role as it's been described in the declaration and your

10 testimony you would advise CNA that this claim shouldn't be

11 paid because it doesn't -- it isn't worthy of receiving a

12 settlement payment from CNA of $1000 based on the criteria that

13 were applied by the Trust pursuant to the TDP in deciding to

14 pay the claim $1000.

15 A    That's correct.  Yes.  I think we're saying the same

16 thing.

17 Q    Now, let's assume further that after -- that CNA follows

18 your advice and declines to pay the $1000 to that claim.

19 Cooper Industries at that point, hypothetically, would have the

20 choice between trying to go into court and argue that under

21 whatever the set of facts was and applicable state law CNA was

22 nevertheless obligated to pay that claim or alternative Cooper

23 could decide to acquiesce in CNA's decision not to pay that

24 claim.  Correct?

25 A    I believe so.  Yes.

1  Q    And if CNA -- if Cooper acquiesced in CNA's decision not

2  to pay that claim then CNA would, by hypothesis not have

3  experienced any economic effect from the trust payment of that

4  claim.  Correct?

5  A    If it didn't pay the claim then it wouldn't have any

6  economic effect other than the time and effort of rejecting the

7  claim.  That's correct.

8  Q    And the time and effort of reviewing claims to determine

9  whether they be paid or not is something that happens

10 constantly between insurers and insured.  Isn't that right?

11 A    Yes.

12 Q    Let's assume that -- well, strike that.  In determining,

13 in your experience -- you've represented insureds before,

14 right?

15 A    I'm sorry?

16 Q    You have represented insureds before.  Correct?

17 A    Oh, yes.  That's how I started out.

18 Q    So you've got some experience in observing how insureds

19 behave vis-a-vis insurers as well as how insurers behave vis-a-

20 vis insureds.  Correct?

21 A    A little bit.  Although again, when I represented insureds

22 it wasn't in the coverage issue, it was in the courtroom in the

23 asbestos case.

24 Q    But as part of that working with your fellows in the

25 Brobeck firm, et cetera you had regular conversations with them

1  about their interactions with insurance companies?

2  A    Oh, sure.  Brobeck sued CNA in the Fiberboard case.  Yes.

3  Q    Right.  And indeed didn't the Fiberboard versus Ahern case

4  result from a contentious history between Continental Casualty

5  Company among others and Fiberboard Corporation?

6  A    Yes.

7  Q    And wasn't that an effort to have what could be described

8  as a global settlement of Fiberboard's asbestos claims against

9  it?

10  A    Yes.  It was a settlement very similar to the Georgine.

11  Q    And initially Continental Casualty among others refused to

12  go along with that idea, didn't it?

13  A    Correct.

14  Q    And there was extensive threats of litigation, litigation

15  negotiations, et cetera involving that proposed settlement,

16  wasn't there?

17  A    Correct.

18  Q    And ultimately there was actually an agreement reached

19  between Continental Casualty Company now part of CNA and

20  Fiberboard Corporation concerning that matter, wasn't there?

21  A    Well, Continental among others, Chubb and a few other

22  areas were involved.

23  Q    Now, in that sort of situation where you've got a dispute

24  among an insured and insurer about whether some kind of group

25  settlement should or shouldn't be made, are the insureds, not

Coleman - Continued Cross/Lockwood                    33

1   the insurers now, the insureds taking into account things like

2   the cost of defending cases?

3   A    As part of what the overall cost would be.  Surely.

4   Because it's their money.  Yes.

5   Q    And so an insured, for example, faced with a claim that it

6   could resolve for $1000 would normally as part of its

7   determination of how it wanted to either litigate or settle

8   that case take into account the comparison between the thousand

9   dollars it would pay to settle the case and how much it might

10  cost to defend it?

11  A    Yes.  In addition to taking into account how many of those

12  thousand dollar claims you're going to have.  A thousand on its

13  own is one thing.  A thousand times a hundred thousand is

14  something else.

15  Q    So one of the factors that an insured would take into

16  account is whether or not it would create some sort of a day

17  facto precedent if it paid a thousand dollar for a case in

18  terms of encouraging other people to try and get a thousand

19  dollar for similar cases?

20  A    Sure.  There's always the concern about a cost doing

21  business becoming the business.

22  Q    So in our hypothetical scenario in which Cooper has

23  presented to CNA a thousand dollar claim from the Trust and CNA

24  has declined to pay it presumably one of the things that Cooper

25  at that point would be considering in terms of whether to

1 engage in litigation with CNA about that is to what the impact

2 on other thousand dollar claims would be on the outcome of that

3 litigation?

4 A    I think your consideration is probably done on both sides.

5 CNA when the claim is submitted the first time if it's one

6 $1000 claim that's one thing.  If it's a hundred thousand of

7 them that's different.  And I think the same consideration is

8 given by Cooper.  It's an economic issue as to what's the best

9 way to handle it.

10 Q    So Cooper might then decide notwithstanding it was only a

11 thousand dollar claim to litigate with CNA over that claim to

12 see if it could establish a precedent that CNA was actually

13 obligated to pay such claims?

14 A    Obviously that's one of the things that they could

15 consider.  Yes.

16 Q    And if, hypothetically CNA -- excuse me, Cooper were to

17 litigate such a claim there could be at least two different

18 outcomes of that litigation?  One being that Cooper would win,

19 and one being that Cooper would lose.  Correct

20 A    Well, at least those two outcomes.  Right.

21 Q    And you're not here to testify as part of your declaration

22 what the outcome of that hypothetical litigation over Level 1

23 claims is going to be, are you?

24 A    No.

25 Q    That would be decided sometime in the future by some

1  court.  Right?

2  A    Hypothetically, yes.

3  Q    Well, are you -- you say you reviewed the addendum.  In

4  preparing for your testimony here you talked about increasing

5  the risk of insurers.  Do you remember we went through that

6  paragraph in your declaration and you testified that that was a

7  principal subject of why you were testifying at all was that

8  the TDP's would increase the risk to insurers.

9  A    Correct.

10 Q    So other than the possibility of disputes with Cooper over

11 whether the U.S. -- excuse me, the Pneumo TDP's are or are not

12 binding on CNA if CNA were to win those disputes how would the

13 risk to CNA have been increased by the existence of the TDP's?

14 A    Well, if CNA doesn't have any coverage obligation it

15 doesn't have to pay on any of the claims, obviously it wouldn't

16 have any financial impact.  And whatever happens on the TDP"

17 would be whoever has to pay for it.

18 Q    Are you familiar -- I'm going to ask you to look over at

19 the board there.  Do you see on the upper left board there's a

20 blow up of something called Plan A settlement insurance

21 neutrality provision and there's sort of a third of the way

22 down it says 4.6 insurance neutrality.  Have you read that

23 provision before?

24 A    That provision?

25 Q    Yes, sir.

Coleman - Continued Cross/Lockwood                    36

1  A    I don't know that I have.

2  Q    Well, apart from whether you've read it, are you aware

3  that there is a provision that, at least some people argue

4  allows insurers complete freedom to deny coverage for claims

5  resolved under the Pneumo TDP and to litigate the validity of

6  that denial in cases in the future in state and federal courts

7  that have jurisdiction over that sort of dispute?

8  A    Yes, I'm aware of the concept.

9  Q    So going back to a previous answer then you wouldn't

10 challenge the notion that at least if that provision operates

11 the way I just described it CNA would in fact have the

12 opportunity to prove that it had no obligation to pay either

13 Level 1 claims or any other kind of claim resolved under the

14 Pneumo TDP's by the Trust.   Correct?

15 A    As to the later decision I understand what you're saying.

16 As I understand the insurance neutrality it also wouldn't give

17 CNA an opportunity to come back in and make comments on the TDP

18 at the point in time it was found to have an obligation which I

19 think is part of what we may be talking about as well.   In

20 other words, it's too late at that point in time to say okay,

21 now we have an obligation to pay, but we want to change the

22 TDP.

23 Q    Well, outside of this bankruptcy arena an insured could

24 decide without talking to its insurer whether or not it wanted

25 to settle a case out of its own pocket --

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Continued Cross/Lockwood                37

1  A    Oh, sure.  I agree.

2  Q    -- and take the risk that that settlement it couldn't

3  collect out of its insurer at some later date.  Right?

4  A    Yes.

5  Q    So the notion that an insured doesn't necessarily have to

6  cooperate in order -- with its insured to settle a case is not

7  some sort of absolute proposition.  It's a condition to

8  coverage.  Right?

9  A    As I understand it.

10  Q    So at the end of the day what we're really talking about

11  here then is the risk to CNA and other insurers is that some

12  coverage court might disagree with you that claims resolved

13  under the TDP should be paid by insurers.  Isn't that it?

14  A    I'm not sure if it's me, but they would disagree with the

15  concept that CNA has an obligation to pay.  Yes.

16  Q    Well, other than the risk that some coverage -- if you

17  assume again, hypothetically, that this insurance neutrality

18  provision protects all the insurer's rights to deny coverage on

19  claims, if you assume that, then isn't the risk that you've

20  identified in your declaration the risk that a coverage court

21  will disagree with the conclusions you've expressed in your

22  declaration about the legitimacy or value of claims resolved

23  under the Pneumo TDP?

24  A    I guess that's right.

25        MR. LOCKWOOD:  No further question, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Anyone else on cross examination?

2    Redirect?

3          MR. HARTLEY:  Thank you, Your Honor.  Your Honor,

4    Kirk Hartley for PepsiAmerica's.  I have some questions.  I

5    don't know whether they would be considered cross, redirect,

6    whatever.

7          THE COURT:  I think you should go before Mr. --

8          MR. HARTLEY:  That was kind of my sense.  Thank you.

9                        (Pause)

10          THE COURT:  Mr. Coleman, I see Mr. Hartley is going

11   to use the chart and I just need to remind you that the caption

12   of this chart has been stricken.

13          THE WITNESS:  Okay.  Thank you, Your Honor.

14          THE COURT:  So please ignore the caption.

15          THE WITNESS:  Okay.  Your Honor.

16          UNIDENTIFIED ATTORNEY:  Thank you, Judge.

17          MR. HARTLEY:  I was even going to try and remember to

18   mention that.

19                   CROSS EXAMINATION

20   BY MR. HARTLEY:

21   Q    Mr. Coleman, my name is Kirk Hartley.  I represent

22   PepsiAmerica's.  Is it your understanding that PepsiAmerica's

23   is the successor to IS THAT CORRECT? Industries, one of the

24   insureds on the CNA policies?

25   A    I remember in reading through this.  That sounds right.

1 Q    Is it your understanding that there is a coverage in place

2 agreement between CNA, PepsiAmerica's, Pneumo Abex and Cooper

3 Industries?

4 A    I was told that at some point in time.

5 Q    I'd like to talk with you about some of the specific

6 underlying claims here by category.

7              MR. HARTLEY:  Is the mobile mike around?

8              THE COURT:  It's on.

9              MR. HARTLEY:  Can people hear?

10             THE COURT:  I can hear.  Can people in the back hear?

11 Yes.  Okay.  Thank you.

12 BY MR. HARTLEY:

13 Q    Mr. Coleman, the presentation of Plan A that's been made

14 to us is that Railroad products claims that arise from Abex

15 Corporation, Aircraft products claims that arise from Abex

16 Corporation, and Industrial pump claims that arise from old

17 Abex Corporation are not going to be a part of the claims that

18 are being channeled to the Trust even though they arise from

19 Abex Corporation.

20             THE COURT:  Judge, this is Allen Arffa for Pneumo

21 Abex.  I do have an objection to this line of examination.  As

22 I understand it this witness was called as an expert for one of

23 the insurance companies, submitted a declaration as to whether

24 insurance companies were paying more or less than the Plan A

25 versus the tort system.  It was not recalled by Mr. Hartley.

Coleman - Cross/Hartley                    40

1  This does not appear to be cross examination directed to his

2  declaration.  This appears to be Mr. Hartley attempting to use

3  this individual as a witness for his own purposes.  So I would

4  object to it being outside the scope of what I understood to be

5  the witness' role here.

6         THE COURT:  Well, I don't know where he's going yet,

7  but I think he's correct that these claims are going to remain

8  in the court system.  So we'll find out where he's going.  I'll

9  give you a little leeway.  And Mr. Hartley if you could connect

10 up what this witness is going to testify about, please.

11        MR. HARTLEY;  Yes, Judge.  To make it clear, Mr.

12 Lockwood has just very effectively testified to the uncertainty

13 that's going to exist --

14        THE COURT:  Mr. Lockwood hasn't testified.  He was on

15 cross examination.

16        MR. HARTLEY:  There was humor in -- humor was

17 intended, Judge.  The point is in all this discussion about the

18 future the person they don't keep talking about is

19 PepsiAmerica's or the entity which is caught in the middle here

20 while all these hypotheticals are being litigated.  So it's

21 very relevant to all the questions Mr. Lockwood asked and I

22 want to try and follow up on that.

23        THE COURT:  Go ahead.

24 BY MR. HARTLEY:

25 Q    I want to make sure we're together again.  Railroad

1  products claim, aircraft products claim, industrial pump claims

2  and automotive friction products claims filed prior to August

3  29, 1998 are not being channeled to the Trust under Plan A.  Is

4  that your understanding or can you accept that for present

5  purposes?

6  A    I can accept hat.

7  Q    And then on the converse side what we are told is that

8  they are channeling to the Trust post-August 28, 1988

9  automotive claims.  All right.

10 A    1998?  Yes.

11 Q    Yes.  And then last there's a category of claims that

12 there will be some testimony about that we have referred to as

13 mixed claims.  Meaning that an underlying plaintiff has said I

14 was exposed to railroad brake shoes containing asbestos that

15 were made by Abex, and I was exposed to automotive friction

16 products made by Abex Corporation.  And as a result of that I

17 have mesothelioma, lung cancer, pick a disease.  And so that's

18 one claimant who is making a claim that triggers one or more of

19 these categories.  And in fact I think the evidence will show

20 that there are people who have said I was an aircraft mechanic,

21 an automotive mechanic and changed brake shoes at home from

22 time to time.  The so-called shade tree mechanic.

23 A    I understand the concept.

24 Q    Well, staying with all of these Mr. Lockwood gave you a

25 bunch of hypotheticals about what will be happening in the

1  future.  Are you able to tell me with certainty today -- let me

2  rephrase that.  CNA is going to be concerned, is it not, about

3  whether the payments it makes to channel claims reduce the

4  policy limits or indemnity.  Correct?

5  A    Correct.

6  Q    And if they reduce the policy limits by paying claims

7  channeled to the Trust that would leave fewer limits available

8  for these other not channeled claims.  Correct?

9  A    The ones in the tort system.  Correct.

10 Q    And if there are mixed claims we end up in a situation

11 where a single individual might be making an automotive claim

12 to the Trust, might collect on that then come back in the tort

13 system in say Madison County and make a railroad claim for the

14 same injury.  Correct?

15        MR. LOCKWOOD:  Objection to form, Your Honor.  Is he

16 asking whether the witness agrees that what he has just stated

17 is a fact or is he presenting this as a hypothetical question?

18        MR. HARTLEY:  It's a hypothetical.

19        MR. LOCKWOOD:  Thank you.

20        MR. HARTLEY:  I'm sorry.

21 BY MR. HARTLEY:

22 Q    You understand that's a hypothetical?

23 A    I understand it's hypothetical.  I guess it could happen,

24 but I would assume if the individual has been compensated for

25 the disease they shouldn't get compensated twice for the same

Coleman - Cross/Hartley                    43

1  disease.

2  Q    All right.  So in that hypothetical the concern of CNA is

3  that if the claimant has been paid by the Trust, say $400,000

4  for mesothelioma it would be CNA's view that he shouldn't get

5  paid again in the tort system if he brings a quote, railroad

6  claim in the tort system.  Correct?

7           MR. LOCKWOOD:  Objection, Your Honor.  He's asking

8  the witness what CNA would in fact do.  This is no longer a

9  hypothetical.

10 Q    Would that be -- let me amend the question.  Would that be

11 something that would be of concern to you as a claims manager?

12 A    I'm not a claims manager, but yes, that would be a concern

13 if I were a claims manager.

14 Q    All right.  And sir, have you encountered a Chapter 11

15 Trust to this point in which some of the claims against one

16 company are channeled to the Trust and others of the claims

17 remain out in the tort system?

18           MR. LOCKWOOD:  Objection.  Lack of foundation.

19           THE COURT:  That's sustained.

20 Q    Have you been involved in dealing with claims submitted

21 from Trusts that were created by Chapter 11, sir?

22           MR. LOCKWOOD:  You said claims submitted from Trusts.

23 Did you mean that, Mr. Hartley?

24           THE COURT:  To.  You mean to the Trust.

25           MR. HARTLEY:  Well, I was trying to refer to claims

**J&J COURT TRANSCRIBERS, INC.**

Coleman - Cross/Hartley                    44

1  that the Trust then sends on to the insurance companies.

2            THE COURT:  Okay.

3            MR. HARTLEY:  However we should characterize that.

4            THE COURT:  All right.

5  A    I've read TDP's but I have not been involved.

6  Q    All right.  Fair enough.  Mr. Lockwood was talking with

7  you about future litigation.  Is CNA concerned about the -- or

8  would you be concerned about the cost of that coverage

9  litigation?

10 A    I know it can be extensive from past history.

11 Q    And spending money on insurance coverage litigation would

12 reduce the profitability of CNA.  Correct?

13           MR. LOCKWOOD:  Objection.  Lack of foundation.  He's

14 not test --

15           THE COURT:  Sustained.

16 Q    In your experience will insurance companies resolve claims

17 with less than all of the claimants to insurance policy

18 proceeds?  In other words, to put that in a specific context if

19 there's a desire to have an insurer pay for these claims that

20 are not channeled and those claims that are channeled and there

21 are a few mixed claims out there, have you seen a situation in

22 which an insurer would be willing to settle these claims in the

23 aggregate, a CIP agreement and exclude those claims?

24           THE COURT:  I think for the record it should be clear

25 that what you're asking the witness is whether they would be

Coleman - Cross/Hartley                                45

1  settle the claims that are channeled -- the automotive friction

2  product claims, but not the railroad and other claims that

3  would not be in the trial.

4          MR. HARTLEY:  Yes.  Thank you.  My pointing doesn't

5  show up on the record.  Thank you, Judge.

6  A    Well, the specifics of that hypothetical I'm not aware of.

7  But I am aware of situations where carriers will settle cases

8  that they think they have coverage and others where they don't

9  think they have coverage in order to make the issue go up.

10  That's the same concept.

11  Q    And as a general rule they would prefer to settle all

12  issues as one time as opposed to leaving issues open?

13  A    Oh, yes.

14          MR. LOCKWOOD:  Objection.  Lack of foundation about

15  they.

16          MR. HARTLEY:  Insurance companies that you have

17  worked with.

18  A    Yes.

19  Q    Let's explore that.  Different insurance companies behave

20  in different ways.  Correct?

21  A    Yes.

22  Q    Some have an aggressive policy of not paying claims and

23  being very forceful about asserting their rights and others are

24  less aggressive.  Correct?  In your experience.

25  A    Correct.

Coleman - Cross/Hartley                    46

1  Q    All right.  You can't tell us with certainty what the

2  positions of the different insurance companies will be over the

3  next five or ten years as claims are submitted from the Trust

4  to insurance companies.  Correct?

5  A    Correct.  No, I can't.

6  Q    And in your experience the expectation would be that

7  that's going to create uncertainty as to what claims will and

8  will not be paid that arise from Abex Corporation or from the

9  Trust.  Correct?

10         MR. LOCKWOOD:  Objection.  Lack of foundation to that

11 question.  That's not a hypothetical anymore.

12 Q    Well, let's consider that a hypothetical.  Assume that

13 over the next five to ten years there are thousands of claims

14 being submitted from the Pneumo Abex Trust seeking payment, and

15 that there are also claims being submitted by Abex for railroad

16 products or aircraft products or industrial pumps or mixed

17 claims that are not channeled to the Trust.  In that instance

18 it's unclear what different insurers will or will not do in

19 your experience.  Correct?

20 A    I think that's correct.

21 Q    And in that period of time isn't it likely that there will

22 not be payment of the claims that have been submitted for

23 railroad products and industrial pumps and mixed while the

24 insurers try and figure out what's happened.

25         MR. LOCKWOOD:  Objection.  No longer a hypothetical.

1      MR. HARTLEY:  It was intended as a hypothetical.  I

2 can put the word in if you would like.

3      THE COURT:  Okay.  Hypothetically speaking I suppose

4 it's within this witness' confidence.  It's overruled as a

5 hypothetical.  You may answer, Mr. Coleman.

6 A    Yes, I believe that would be a possibility.

7 Q    Have you encountered situations in the past where one

8 insured --

9      MR. HARTLEY:  Your Honor, may I approach the witness?

10     THE COURT:  Yes.

11     MR. HARTLEY:  I've handed the witness the declaration

12 of Diane Schumacher that was submitted in this case on June 4.

13 Q    Sir, I'd like to refer you tp Paragraphs 33 and 34.  And

14 if you take a moment to read those.  Thirty-three and 34.

15                    (Pause)

16 Q    Mr. --

17     MR. GUY:  Your Honor, before Mr. Hartley proceeds --

18 I'm sorry to interrupt, Mr. Hartley.

19     MR. HARTLEY:  Go ahead.

20     UNIDENTIFIED ATTORNEY:  We have evidentiary objection

21 to these paragraphs of Ms. Schumacher's declaration.  She's not

22 yet been called, Your Honor.  I guess I don't have any

23 objection to Mr. Hartley examining Mr. Coleman based on his

24 reading of Ms. Schumacher's Paragraph 33 and 34.  But I want to

25 preserve our objection and just make clear that those aren't in

Coleman - Cross/Hartley                                48

1  evidence.

2           MR. HARTLEY:  Right.  And all of this would be

3  conditional whether the Court does or doesn't admit it.

4           THE COURT:  All right.  Just a minute.  Mr. Guy.

5           UNIDENTIFIED ATTORNEY:  Jonathan Guy for Cooper, Your

6  Honor.  Mr. Christian may not have been on the conversation,

7  but we have had discussions.  I don't believe this is a

8  paragraph anybody seriously objects to.  It just refers back to

9  the plan.  Thank you, Your Honor.  But we'll deal with it when

10 Ms. Schumacher is put forth.

11          THE COURT:  Again, I'm not privy at this point to

12 what you have and haven't stipulated to.  So I don't know

13 whether these are or are not paragraphs that are going to be

14 excised.  You may proceed, Mr. Hartley, at this point.

15          MR. HARTLEY:  Thank you, Judge.

16 BY MR. HARTLEY:

17 Q   Mr. Coleman, in Paragraph 33 and 34 of the declaration of

18 Ms. Schumacher that may or may not be admitted, she refers to

19 the fact that insurance pursuit rights are being assigned to

20 Cooper by Pneumo.  Do you see those references?

21 A   Yes, I do.

22 Q   Are those the types of assignments that are of concern?

23          MR. LOCKWOOD:  Objection.  The question lacks any

24 context at all of concern to whom, for what purpose?

25          MR. HARTLEY:  During the earlier examination, Judge,

1  there was a discussion of having -- even during open argument

2  there was a discussion about whether or not assignments are

3  being made as a part of Plan A.  And I think it was suggested

4  that there are no assignments being made as a part of Plan A.

5  And yet we see here Ms. Schumacher declaring that in fact

6  insurance rights are being assigned and transferred under Plan

7  A.  And therefore he was asked about assignments by Mr.

8  Lockwood, I believe.

9          MR. LOCKWOOD:  Your Honor, as I understood the

10 declaration and as I understood my cross there was no

11 questioning of the witnesses as to whether or not he was -- had

12 some views on the scope of the assignments or the nature of the

13 assignments or what was or wasn't.  He was asked to look at the

14 plan provisions which is summarized in Paragraph 33.  But I'm

15 not aware that he's being tendered by CNA or any other insurer

16 as some sort of expert on what the plan means when it has

17 language in it.

18          THE COURT:  Okay.  I think the problem is that the

19 question is too general.  I agree with Mr. Lockwood's

20 objection.  I don't understand the question in terms of the --

21 of concern.  I don't know what of concern means in the context

22 of your question to whom -- of concern in what context and to

23 whom?

24          MR. HARTLEY:  Well, perhaps Mr. Lockwood can help me.

25 But as I recall the question was was CNA concerned about

1   whether there were assignments of rights that was a part of

2   Plan A?

3               MR. LOCKWOOD:  Your Honor, the question had --

4               MR. HARTLEY:  Your Honor, what he just objected, and

5   maybe this is just a clarification, because folks were being in

6   artful.  Mr. Coleman is an expert witness.  He is not a

7   30(b)(6) representative or any other kind of representative of

8   CNA.  So CNA's position be advocated by its lawyers and so I

9   just would ask that counsel be careful in their questioning in

10  that regard.

11              MR. LOCKWOOD:  But the other thing is that the

12  testimony that Mr. Hartley refers to, Your Honor, I believe the

13  record will reflect was his testimony the assignment would

14  increase the risk to the insurers, not whether or not there was

15  an assignment and if so exactly what was being assigned and how

16  was it being assigned, et cetera.  And I think he is -- so this

17  of concern language is not something that's either in the

18  declaration or was in any of my questions or his answers.

19              THE COURT:  All right.  I have sustained the

20  objection.  I think you need to rephrase the question, Mr.

21  Hartley.

22              MR. ROSEN:  Your Honor, this is not even a

23  housekeeping matter, but Mr. Hartley's mike is interfering with

24  the other mike and causing an echo for all the other speakers.

25              THE COURT:  Okay.  Thank you.

1            MR. HARTLEY:  Judge, I think on such a mottled record

2  I'll just withdraw the question and get Ms. Schumacher and

3  others to explain what's being assigned and not assigned.

4            THE COURT:  All right.

5            MR. HARTLEY:  Thanks very much.

6            THE COURT:  Were you finished with your examination,

7  Mr. Hartley?

8            MR. HARTLEY:  Yes.

9            THE COURT:  Okay.  Anyone else on cross examination?

10  All right.  Now, Mr. Christian, on redirect.

11            MR. CHRISTIAN:  Thank you, Your Honor.

12                       REDIRECT EXAMINATION

13  BY MR. CHRISTIAN:

14  Q    Mr. Coleman, during cross examination by Mr. Lockwood you

15  answered one of his questions about disease Level 1 claims by

16  saying something to the effect that they would not be dealt

17  with in the tort system.  What did you mean by that phrase?

18  A    What I meant by that phrase was most of these cases would

19  not come up for trial, they would not make any case management

20  order.  Currently in the tort system, the civil justice system

21  the cases that are either coming up for trial or which are

22  being dealt with and settled for resolve are malignancy cases

23  or severe asbestosis or individuals that have an exigency.  And

24  disease Level 1 wouldn't meet any of those criteria.  And under

25  certain state laws and case management orders, inactive dockets

1  and things like that those are cases that the tort system, the

2  civil justice is not processing at this point in time.

3  Q    So do I take it from your answer that the defense costs

4  that Mr. Lockwood posited to you would not be a consideration

5  in resolving those claims.

6  A    In the tort system that's correct.

7  Q    Mr. Lockwood also asked you on cross examination about

8  establishing precedent.  Did you understand what he meant by

9  that, establishing precedent with respect to these unimpaired

10 claims?

11 A    I understood it to mean that if you start selling them

12 you're going to settle in for a long period of time and kind of

13 the scenario we saw during the 1990's that led to the

14 bankruptcies of Owens Corning, Fiberboard, Pittsburgh, Corning,

15 you name it.

16 Q    So is this what you were referring to in your report when

17 you refer to the entrepreneurial model of claims making?

18 A    Yes.  The litigation for profit screening is its kind of

19 phrase.  Yes.

20 Q    And what impact does that have in your opinion on the

21 exposure of the defendants and their insurers?

22 A    Well, the TDP document as it's currently structured would

23 allow for the resolution at the level Mr. Lockwood mentioned of

24 $1000 a claim for virtually anybody who could claim to have

25 Pneumo Abex exposure and had certain minor changes in their

Coleman - Redirect/Christian                         53

1   lungs as proffered by anyone of the expert witnesses.  So the

2   number of claims that are in the projections of the future

3   claims representatives are nearly 122,000 of those disease

4   Level 1 over the history of the Trust and that comes out to

5   $122 million.

6   Q    So $122 million you mean it would not be resolved -- dealt

7   with in the tort system today.

8   A    As the tort system is currently dealing with cases.

9   That's correct.  Generally.

10  Q    Is that what you were referring to as well on cross

11  examination when you talked about the materials presented by

12  David Austern with respect to the Manville claims making?

13  A    Yes.  The Manville -- what Mr. Lockwood and I were

14  discussing the Manville claiming history over the last several

15  shows an alteration from mainly claims that were

16  nonmalignancies.  Again, ones generated in these screenings.

17  Two, what we're actually seeing -- closer to what we're seeing

18  in the tort system was a more significant percentage of the

19  claims that are being submitted being malignancy or severe lung

20  cancer. those types of things.

21  Q    So yesterday when Mr. Lockwood examined you about global

22  settlements at the CCR that might have paid these claims years

23  ago would you agree that that kind of settlement that you

24  talked about with Mr. Lockwood would not occur today?

25            MR. LOCKWOOD:  Objection, Your Honor.  I can't

1  imagine what the witness would have a basis for saying that no

2  defendant under any circumstances today would make that kind of

3  a settlement.  I mean, he may have opinions about whether it

4  would be a good idea or something like that, but to flatly to

5  assert that no defendant would make such a settlement is simply

6  beyond any scope --

7           THE COURT:  You have to lay a foundation for this,

8  Mr. Christian.

9           MR. CHRISTIAN:  Very well, Your Honor.  I appreciate

10 that.

11 BY MR. CHRISTIAN:

12 Q    You recall yesterday, Mr. Coleman, that Mr. Lockwood

13 examined you about CCR and settlements years ago at the CCR?

14 A    Yes, I do.

15 Q    And you've talked with him about global settlements.  Do

16 you recall that testimony yesterday?

17 A    Yes, I do.

18 Q    And I think he asked you something to the effect that were

19 you aware of global settlements at the CCR that were more

20 lenient than the TDP's?  Do you recall that?

21 A    Yes.  The discussion.

22 Q    And you answered that you were aware of a couple that may

23 indeed may have been more lenient than these TDP's.  Is that

24 correct?

25 A    Yes.

Coleman - Redirect/Christian                    55

1  Q    Have you seen any settlements like those in your

2  experience since that time period years ago?

3  A    Probably the best way to answer this is during the 1990's

4  the defendants in the litigation embarked on a course where

5  they attempted to maybe -- the phrase would be settle your way

6  out of a litigation.  I think most people believe that the peak

7  had occurred and that if you resolved large numbers of cases

8  you'd be able to move on.  Then the litigation screenings just

9  continued and continued.  And the filings went from more

10  manageable numbers which were high at the time to maybe from

11  20,000 in some years we now experience 100,000.  So the efforts

12  to try to settle out of the litigation basically led to

13  litigation screenings and increased litigation.  So the

14  structure of the litigation shifted and now -- I don't disagree

15  with Mr. Lockwood's objection.  There are some defendants out

16  there that with the situation would make that decision that

17  they continue to settle or some defendants that are still

18  paying on old agreements that they reached years ago.  But by

19  and large defendants in the litigation now are resolving what

20  they attempt to call meritorious cases or dealing with these

21  types of cases in a different way in the agreement such as

22  trying not to pay the unimpair nonmalignancy.

23  Q    And it's your view as I understand your prior testimony

24  that it was those settlement strategies years ago that lead to

25  a number of the Chapter 11 bankruptcies that we've seen

Coleman - Redirect/Christian                      56

1  involving asbestos related exposure.

2          MR. LOCKWOOD:   Objection, Your Honor.   I don't

3  believe there's any -- I don't believe there's any foundation

4  for that question.   And I don't believe that his declaration

5  even addresses whether or not Chapter 11 bankruptcies are not

6  the product of that.   And I can't imagine how he's an ex --

7          THE COURT:   Well, it may not.   His earlier testimony

8  did say that.   He just a few minutes ago made that statement

9  with respect to Owens Corning, Fiberboard and Pittsburgh claim.

10         MR. CHRISTIAN:   And I think Your Honor can take

11 judicial notice of that fact based on the cases before you.

12         MR. LOCKWOOD:   Well, that's fine if Your Honor, wants

13 to take --

14         THE COURT:   No, I'm not taking judicial notice of the

15 cause of bankruptcy petition,

16         MR. LOCKWOOD:   My objection is from two bankruptcies

17 Owens Corning/Pittsburgh Corning to all bankruptcies is

18 dramatic scope increasing the scope of this witness' testimony

19 for which there is no foundation that this witness has any

20 knowledge to make that statement.

21         THE COURT:   You need to lay a foundation.

22         MR. CHRISTIAN:   I'll withdraw the question, Your

23 Honor.   I believe the witness has already testified.

24 BY MR. CHRISTIAN:

25 Q   We've been talking about disease level 1 under the DTP.

1 Some of the analysis that we've just been discussing applies

2 well to disease level two?

3 A    Yes.  There are jurisdictions in the United States that

4 are dealing with cases that would fall under the disease Level

5 2.  But not a lot of them.  But there are disease level -- what

6 are deemed here disease Level 2 cases that could at least get

7 me into a court on a tort system.

8 Q    Do you recall the value being placed on disease Level 2

9 cases under this TDP?

10 A    Under the expedited review it was $1100 on the average.  I

11 think it's $1400, something like that.

12 Q    You mentioned earlier in answer to at least one of the

13 prior questions exposure.  So when you say exposure what are

14 you referring to?

15 A    When I talk about exposure I talk about exposure to the

16 Pneumo Abex product as opposed to exposure to asbestos in

17 general.  So what I looked for in these criteria was how they

18 dealt with actual exposure to a Pneumo Abex product as opposed

19 to exposure to asbestos in general.  They are two different

20 issues.

21 Q    What is different about the Abex product versus Asbestos

22 in general that --

23        MR. LOCKWOOD:  Your Honor, I object to this line of

24 questioning.  I did not go in on cross examination to the

25 specifics of Mr. Coleman's opinions about these matters.

1  Mentioning the word exposure in a hypothetical question does

2  not open the door to a detailed examination to sort of flesh

3  out the general conclusions expressed in the declaration by now

4  deciding that you're going to put on a sort of redirect

5  examination to go into all of the details that you didn't put

6  in in your opening declaration which I didn't examine the

7  witness on.

8          THE COURT:  Yes, this is outside the scope, Mr.

9  Christian.

10          MR. CHRISTIAN:  Your Honor, Mr. Hartley cross

11  examined Mr. Coleman about automotive friction product claims.

12  railroad product claims, aircraft product claims, industrial

13  pump claims.

14          THE COURT:  He did.

15          MR. CHRISTIAN:  And I think I'm entitled to examine

16  Mr. Coleman about the kind of exposures that he is talking

17  about when he's answering those questions.

18          THE COURT:  I think it's somewhat self-explanatory

19  that an automotive friction product claim is not the same as a

20  railroad product claim, is not the same as an aircraft product

21  claim, is not the same as whatever the brake pump industrial

22  pump product claim.  I don't think explanation from an expert

23  witness is necessary on that.

24          MR. CHRISTIAN:  Your Honor, I'm sorry, I can't

25  understand what Your Honor is saying because there is a --

1  maybe a microphone, portable microphone is on or something.

2  We're getting an echo.

3          THE COURT:  The portable mike, is it turned off?

4  We'll see if we can get the feedback reduced.  What I was

5  saying was I believe that the nature of the products is self-

6  explanatory, that it doesn't take an expert to define the

7  difference between an automotive friction product, a railroad

8  product, an aircraft product, and an industrial pump product

9  claim.  But that wasn't the question.  What you were asking was

10  the difference between a Pneumo Abex product and a general

11  asbestos exposure claim.  That was your question, not to go

12  into detail about the difference in Pneumo Abex products.

13          MR. CHRISTIAN:  Well, let me ask this question if I

14  might, Your Honor.

15  BY MR. CHRISTIAN:

16  Q    Mr. Coleman, how are the products that Mr. Hartley asked

17  you about different?

18          THE COURT:  If he knows.

19  Q    If you know.

20  A    Well, automotive friction products are, I imagine, tend to

21  be brake linings, clutches, things like that.  Pump claims tend

22  to be gaskets.  There are different types of materials

23  generally, and most of these are what are considered low dose

24  exposure products and they differ from --

25  Q    What do you mean by the phrase low dose exposure?

Coleman - Redirect/Christian                              60

1          MR. LOCKWOOD:  Objection, Your Honor.  This is just a

2    back door way of attempting to go into a lot of testimony

3    elaborating on his declaration about his opinions about what

4    types of exposure are necessary.

5          MR. CHRISTIAN:  Your Honor, this goes directly to

6    disease Level 1 claims.  Mr. Coleman's not only testified in

7    his declaration about, but also been cross examined about the

8    fact that in the tort system those claims would not be dealt

9    with.  And the reasons those claims would not be dealt with are

10   the proper scope of redirect examination when they are exactly

11   -- when that answer was elicited by Mr. Lockwood during cross

12   examination.

13            THE COURT:  He's testified that --

14            MR. LOCKWOOD:  Your Honor --

15            THE COURT:  -- they would not be dealt with because

16   they're put on inactive court dockets.  If there's some further

17   explanation you may ask him what the further explanation is.

18            MR. LOCKWOOD:  Your Honor --

19            THE COURT:  That is what he's testified to.

20            MR. LOCKWOOD:  Your Honor --

21            MR. CHRISTIAN:  I'll adopt Your Honor's --

22            MR. LOCKWOOD:  Your Honor, excuse me.  I accepted

23   that the witness didn't think Level 1 claims were compensable.

24   And then I asked hypotheticals about them.  I didn't attempt to

25   ask him why he thought they would be noncompensable and elicit

Coleman - Redirect/Christian                61

1  a lot of detail testimony to allow him to elaborate on the

2  generalities expressed in his declaration.  What Mr. Christian

3  is now attempting to do is to say in effect that because I

4  asked him to -- as part of a hypothetical to accept the

5  proposition that he would advise somebody not to pay them now

6  we're going to be exploring all of the different reasons why he

7  would ask somebody or tell somebody not to pay them, and I

8  didn't get into that.  And what we're going to have here is a

9  lengthy examination in which Mr. Christian is going to try and

10 get his witness to explain in detail matters that were not put

11 in his declaration and which I did not cross examine him on and

12 I think that's objectionable.

13           MR. CHRISTIAN:  I think, Your Honor, that Mr.

14 Lockwood's trying to have his cake and eat it, too.  He wants

15 to ask all sorts of hypotheticals, but forbid the witness from

16 answering on redirect why he gave the answers that he did on

17 those hypotheticals.

18           MR. LOCKWOOD:  Your Honor, I didn't challenge his

19 opinions in the hypotheticals.  I accepted for purposes of the

20 hypothetical that he wouldn't -- that he would say don't pay

21 the claims.

22           THE COURT:  Yes.

23           MR. LOCKWOOD:  I didn't ask him why.

24           THE COURT:  You have.  But this is redirect and

25 you've opened the door and he is entitled to raise some issues

1  with respect to the witness' opinion.  He's being proffered as

2  an expert.  However, he is not being proffered as a fact

3  witness.

4         MR. CHRISTIAN:  I understand.

5         MR. LOCKWOOD:  Your Honor, what door?  I didn't open

6  any door.  I was very careful not to ask the witness why he

7  through Level 1 claims were noncompensable.  I did that on

8  purpose.  And now what Mr. Christian is attempting to do is

9  that because I built in to a hypothetical the witness' general

10 testimony, which I accepted for purposes of hypothetical that

11 these claims weren't compensable that he's now arguing that

12 I've opened the door simply by agreeing with the witness that

13 they're not compensable.  For him to elicit further testimony

14 that wasn't in his declaration as to why they aren't

15 compensable and I don't think that's a fair characterization of

16 opening doors that would allow him to do that.

17        THE COURT:  He has not been proffered as a fact

18 witness.

19        MR. CHRISTIAN:  That's true, Your Honor.

20        THE COURT:  So the facts are at this point in time, I

21 believe, are not relevant.

22        MR. CHRISTIAN:  Right.  And I'm not --

23        THE COURT:  His fact -- his factual contentions at

24 this point are not relevant.

25        MR. CHRISTIAN:  And, Your Honor, I'm not asking him

1 that question.  He stated in his declaration that disease Level

2 1 claims would not be dealt with in the tort system.  He said

3 that on cross examination.  He said that was true in his

4 declaration with respect to most disease Level 2 claims.  I

5 think we're entitled to ask him why he gave the answers he did

6 in response to Mr. Lockwood's question.

7           THE COURT:  And he's already answered that question

8 for you on your redirect.  He stated that they are put on

9 inactive dockets.  He has answered that question.  It's been

10 asked and answered.  Please move on.

11 BY MR. CHRISTIAN:

12 Q    Mr. Coleman, is that the only reason?

13 A    In addition to the fact that some states have legislative

14 enactments which prohibit them from being dealt with.  And in

15 other locations there are case management orders of the judges.

16 So it's a combination of inactive docket case management

17 orders, state statutes, and the fact that cases aren't being

18 followed any more.

19 Q    Very well.  Thank you.  With respect to these claims we've

20 already discussed the fact, and you've already testified about

21 the fact that defense costs would not be a consideration when

22 you talk about claims that would not be -- to use your phrase

23 -- dealt with in the tort system.  So given that premise would

24 cost of litigation be a consideration that you would apply

25 based on your knowledge and experience to resolving those

1  claims on a global basis?

2  A    Yes.

3  Q    Can you explain that answer?

4  A    Well, just as Mr. Lockwood was saying the insured would

5  have to consider how much it would have to pay to deal with the

6  claims.  So too would the carriers have to consider how much

7  they have to pay to defend against the submission of the claim.

8  So it's kind of a cost of doing business.

9  Q    So if we accept your premise that there are, I think you

10  testified, over $100 million in claims that would be paid the

11  presumptive values under these TDP's that would not be dealt

12  with in the tort system, to use your phrase, does that mean

13  that the money potentially sought in subsequent litigation from

14  the carriers would greater?

15  A    I guess it could be.

16  Q    It should be.

17          MR. LOCKWOOD:  Objection to form.  I don't even

18  understand the question.

19  Q    Mr. Coleman, did you understand the question?

20  A    I thought I did.

21          MR. LOCKWOOD:  Greater than what?

22          THE COURT:  Pardon me.  I apologize.  But I think I

23  need to ask a clarifying question because I got lost.

24          MR. CHRISTIAN:  Of course, Your Honor.

25          THE COURT:  Mr. Coleman, what I'm hearing from you, I

1  believe, is that there are claims that have been filed in a

2  pending litigation that simply are not being addressed by the

3  courts at this time.

4           THE WITNESS:  That is correct.

5           THE COURT:  That is not to say that the courts will

6  never address those claims.  It's just to say that they're not

7  addressed now.

8           THE WITNESS:  In part, Your Honor.  Obviously the

9  ones that are under state statute that are not allowed to file,

10  they can't.  But you're right, the ones that are on inactive

11  dockets they're not being dealt with currently.  And that is

12  right.  They could be dealt with at some future point.

13           THE COURT:  All right.  So your testimony as I

14  understand it is that the issue for the insurance carriers is

15  that if the -- and hypothetically -- if the claims are paid

16  under the TDP and if Cooper decides to submit those claims, the

17  Level 1 claims to CNA, and if the insurers decide not to pay

18  those claims, and if Cooper sued then the insurance carriers

19  may face the situation in which they may have to -- if they

20  lose the litigation they may have to pay the claims sooner than

21  they would in the tort system.

22           THE WITNESS:  That's part.  Yes, Your Honor.

23           THE COURT:  Okay.  Thank you.

24                        (Pause)

25           MR. CHRISTIAN:  I'm sorry, Your Honor.

1  Q    Mr. Hartley asked you on cross examination about a

2  coverage in place agreement.  Do you recall that?

3  A    I recall that, yes.

4  Q    You're familiar with coverage in place agreements from

5  your knowledge and experience.

6  A    Yes.

7  Q    Is it your understanding that under a coverage in

8  placement agreement claims are simply submitted for payments in

9  accordance with that agreement?

10            MR. LOCKWOOD:  Objection.  Lack of foundation as to

11  the scope of his knowledge about the vast variety of things

12  that could be called coverage in place agreements which he has

13  lumped into a single question that appears to cover all of

14  them.

15            THE COURT:  There are a variety of coverage in place

16  agreements, Mr. Christian.

17            MR. CHRISTIAN:  Very well.  I'll withdraw the

18  question.

19  BY MR. CHRISTIAN:

20  Q    Mr. Lockwood asked you the question, and I'm not quoting

21  him here, but to the effect that of the impact on CNA if it

22  wins subsequent coverage litigation.  Do you remember that line

23  of questioning?

24  A    Yes.

25  Q    And you said that CNA wins the coverage litigation, it

Coleman - Redirect/Christian                    67

1  wouldn't have to pay for the claims, right?

2  A    Right.

3  Q    Would CNA in that event have to pay for the coverage

4  litigation?

5  A    I would assume so, yes.

6  Q    And in your experience that can be quite expensive.

7  A    It can be, yes.

8  Q    To the tune of millions, and perhaps many millions of

9  dollars, correct?

10         MR. LOCKWOOD:  Objection.  Lack of foundation.

11         MR. CHRISTIAN:  It's based on his experience.  Mr.

12  Lockwood's the one who suggested on cross examination that he

13  had familiarity with such matters.

14         THE COURT:  That's with --

15         MR. LOCKWOOD:  It's still a foundation as to whether

16  he knows enough about coverage litigation to make statements

17  about how much it costs.  I mean he may.  He just hasn't laid a

18  foundation for that.

19         My question certainly didn't.

20         MR. CHRISTIAN:  Very well, Your Honor.

21  BY MR. CHRISTIAN:

22  Q    Mr. Coleman, you've been around coverage litigation over

23  many decades; am I correct about that?

24  A    Yes.  Yes, yes.

25  Q    You were around coverage litigation with respect to

1  fiberboard; am I correct?

2  A    Yes, fiberboard at CNA, yes.

3  Q    Yeah.  Mr. Lockwood examined you about that on cross

4  examination, correct?

5  A    Correct.  That's where Mr. Lockwood and I first met.

6  Q    And that's not your only experience with coverage

7  litigation; am I correct?

8  A    That's correct.

9  Q    Okay.

10 A    Wellington was the resolution of a coverage litigation in

11 part.

12 Q    And what was your exposure to Wellington?

13 A    Well, I worked at the asbestos claims facility, so the

14 entire structure of the asbestos claims facility was a

15 resolution of certain coverage issues with certain carriers and

16 certain producers of asbestos-containing products.

17 Q    And did you also encounter coverage litigation while you

18 were working at the CCR?

19 A    Well, CCR was kind of a continuation of the ACF with a

20 different cast of characters.

21 Q    Okay, so based on that knowledge and experience, is it

22 your understanding that coverage litigation can be expensive?

23 A    Very much so.

24 Q    It can cost millions of dollars.

25 A    It can cost tens of millions of dollars.

1  Q    Tens of millions of dollars even if the carrier wins.

2  A    Even if you win.

3  Q    Thank you.

4       And based on that experience and exposure to coverage

5  litigation, is it your sense that the settlement, if there's a

6  settlement, of such litigation is dependent on the demand that

7  starts the litigation -- the size of the demand, pardon me,

8  that starts the litigation.

9       MR. LOCKWOOD:  Objection.  As compared with the

10 merits of the litigation?  It's only a function of -- the

11 hypothetical -- or is this a factual question, a hypothetical

12 question, and you're ignoring the merits.

13      MR. CHRISTIAN:  Well, let me adopt Mr. Lockwood's

14 style and rephrase the question.

15 BY MR. CHRISTIAN:

16 Q    Let me give you a hypothetical.

17      Assume for a moment that the claimant -- and by the

18 claimant I mean the entity seeking coverage -- has a 50 percent

19 chance of success in the litigation on the merits.

20      Does the size of the demand affect, in your experience,

21 the amount paid in settlement of that litigation, if it

22 settles?

23 A    Yes, I think that's one of the factors that -- it's going

24 to be a significant factor in how much the other side's willing

25 to take or give.

1 Q    So, to continue the hypothetical, if the demand's $100

2 million and there's a 50 percent chance of success of the

3 merits, you'd expect to pay less than if the demand's a billion

4 dollars and there's a 50 percent chance on the merits.

5 A    Yes, unless the demand was just ludicrous to start with,

6 and then you'd kind of discount it.

7 Q    Fair enough.  Now, I'd like to turn now, Mr. Coleman, away

8 a little bit from some of the subjects that Mr. Lockwood

9 examined you on cross examination and talk a little bit about

10 your approach to this and similar cases in offering the

11 testimony here today.

12          MR. CHRISTIAN:  And, Your Honor, this goes to the

13 issue that we talked about yesterday in terms of the motion in

14 limine that was filed.

15 BY MR. CHRISTIAN:

16 Q    When -- Mr. Coleman, when you received the Pneumo TDP and

17 the trust agreement in this case, what sort of approach did you

18 take to reviewing those documents?

19 A    What I did was I kind of read through quickly the general

20 underlying documents to get some background and context for

21 what was going on and then read in detail the TDP's,

22 highlighted it, made notes, those types of things as to what it

23 was, and I made notes to myself as to how that would compare

24 with what the tort system was actually doing in the way we

25 would be handling case and the way my experience was.  So --

Coleman - Redirect/Christian                    71

1   Q    Okay, so as part of that detailed review and note-taking

2   that you just described, did you compare the medical criteria

3   in the TDP to the tort system?

4   A    Basically in my mind, yes, but as to the way cases are

5   being handled, both the medical criteria, the exposure criteria

6   and the administration criteria -- well, not necessarily the

7   criteria -- administrative procedures that are in here as

8   compared to what I had experienced, for instance with the -- as

9   the fiberboard interim claims handler.

10  Q    Can you describe -- focusing specifically for a minute on

11  the medical criteria that you mentioned, can you describe what

12  you're referring to when you talk about medical criteria that

13  you reviewed in the TDP?

14  A    Sure.  I looked at how the TDP defined its medical

15  criteria, and the way the TDP works is they have different

16  disease levels, as we discussed earlier, of seven through one.

17  They have some general overwriting criteria, such as a latency

18  requirement.  Asbestos-related disease has a latency connected

19  with it.  So, I looked at what the latency was and how it was

20  structured.

21       For instance, in this agreement the latency agreement is

22  tied to asbestos exposure, as to the latency actually being

23  tied to exposure to Pneumo Abex.

24            MR. LOCKWOOD:  Your Honor, I object to this.  The

25  witness -- this is supposed to be somehow or another relating a

**J&J COURT TRANSCRIBERS, INC.**

1  to motion in limine.  It's not supposed to be a regurgitation

2  of what the witness concluded when he read documents.

3         Nobody to my knowledge has said he's unqualified to

4  testify 'cause he didn't read the Pneumo TDP.  We'll accept

5  that he read the Pneumo TDP.  We'll accept that he read every

6  word in the Pneumo TDP.  And therefore, I think we don't need a

7  lot of back door efforts to get him to expand again on his

8  declaration by reciting various particulars about the TDP

9  that's not in it.

10         MR. CHRISTIAN:  Your Honor, I have several responses.

11  First of all, what I didn't hear Mr. Lockwood say is that he'll

12  concede that Mr. Coleman's an expert.  And Your Honor --

13         MR. LOCKWOOD:  Your Honor, I said yesterday --

14         MR. CHRISTIAN:  If I may finish my response to Mr.

15  Lockwood before he rejoins.

16         First of all, I did not hear Mr. Lockwood say that he

17  concedes that Mr. Coleman is an expert.  Your Honor raised

18  questions about the methodology that Mr. Coleman used.  I'm

19  trying to get him to explain that to the Court.  And

20  furthermore, his declaration specifically makes statements with

21  respect to the examples that he's now giving, so while perhaps

22  it would be sufficient for the Court to read the declaration,

23  because the Court's raised questions about it I'd like him to

24  explain his methodology and it's hardly --

25         THE COURT:  Well, I have read the declaration.

Coleman - Redirect/Christian                           73

1          MR. LOCKWOOD:  Your Honor, we'll stipulate that his

2    methodology --

3          THE COURT:  I have read the declaration, and to the

4    extent that what he's testifying about now is laid out, I have

5    read that.

6          MR. CHRISTIAN:  Very well, Your Honor.

7          THE COURT:  And I do understand that process.  I

8    don't think that's what I was raising with respect to go there.

9    I was raising whether or not this is the type of methodology

10   that an expert in this field --

11         MR. CHRISTIAN:  Very well.

12         THE COURT:  -- would use.  Mr. Lockwood?

13         MR. LOCKWOOD:  I would just say we will stipulate

14   that the witness read the Pneumo TDP and understood what it

15   says.  We'll stipulate to that.  We don't need for him to have

16   Mr. Christian start having him recite its provisions and adding

17   extraneous comments about his views on the provisions that

18   aren't in his declaration.

19         MR. CHRISTIAN:  Well, they are in his declaration,

20   but in any event, Your Honor --

21         MR. LOCKWOOD:  Well, if they are in his declaration,

22   we don't need him to read them, and I object.

23         THE COURT:  All right, okay, gentlemen.  Mr.

24   Christian.

25         MR. CHRISTIAN:  Let me ask him a few more questions.

1 BY MR. CHRISTIAN:

2 Q    Mr. Coleman, if you feel you need to give an example,

3 subject to the Court's ruling, to explain your answer feel free

4 to do that, but otherwise short answers that explain what you

5 did are fine by me.

6          MR. LOCKWOOD:  I object to the counsel telling the

7 witness how he can go about answering questions.

8          MR. CHRISTIAN:  Mr. Lockwood wants the witness not to

9 give long answers, and now he's saying that he objects to us

10 suggesting that the witness give short answers.

11          So, I don't know quite what to do, Your Honor.

12          THE COURT:  You're on direct, sir.  So, if you can

13 simply answer your counsel's question in the shortest way

14 possible, I think that may expedite the process.

15          THE WITNESS:  Yes, Your Honor.

16          MR. CHRISTIAN:  Thank you, Your Honor.

17 BY MR. CHRISTIAN:

18 Q    We talked about medical criteria.  We won't go into any

19 more detail about that.

20          You also mentioned the phrase exposure criteria.  Can you

21 explain how you looked at the exposure criteria?

22 A    Yes.  Again, the disease levels each have a reference in

23 them to what exposure would be required to satisfy the

24 presumptive criteria for that particular disease level.

25          There are two sections.  One deals with what they call

Coleman - Redirect/Christian                                    75

1  Pneumo Abex exposure and one which deals with significant

2  occupational exposure.  So, I read through those sections,

3  compared them to what my experience has been, both with

4  phrasing similar to that and to the wording that's in those.

5       For instance, significant occupational exposure uses the

6  phrase "close proximity" and uses regular bases to define what

7  those are going to mean, to be.  But that's what I tried to do,

8  was to read through them and try to extrapolate how they would

9  actually be applied when someone submitted a claim.

10 Q    I understand.  You also mentioned administrative

11 procedures.

12 A    Yes.

13 Q    What are you referring to when you say administrative

14 procedures?

15 A    Well, the TDP has a whole section on it, but throughout

16 the entire TDP they indicate that if the trustees wish to do

17 certain actions they have to consent or consult with either the

18 future claims -- both usually the future claims representative

19 and the TAC in order to make certain changes or revisions to

20 the way procedures are going with -- I think one exception,

21 which is at the two-year anniversary they can make certain

22 changes without the consultations.

23      I looked through what the procedure is and what the

24 control measures would be under the TDP as opposed to, for

25 instance, my history with the Fiberboard Interim Claims

1  Committee which was made up of representatives of all the

2  interests and how that actually worked in practice.

3  Q    I understand.  Have you done these kinds of comparisons

4  before with respect to similar documents?

5  A    Yes.

6  Q    Can you identify some of the examples of where you've done

7  a similar comparison?

8  A    Well, I was asked to do them at Babcock and Wilcox.

9  Q    And you did them in that case?

10  A    And I did them in that case.

11  Q    Have you done them in other cases that you can disclose

12  without disclosing confidential information?

13  A    I've also looked at Congoleum.

14  Q    And you employed the same methodology in each of those

15  cases in reviewing those documents that you employed here.

16  A    Yes, sir.

17  Q    And have you done that on numbers of other occasions as

18  well?

19  A    Yes.

20  Q    Dozens of other occasions?

21  A    Perhaps.  I don't have recollection at this point.

22  Q    Well, I don't mean to test your memory.  Have you done a

23  similar analysis with respect to group settlements that were

24  not TDP's in bankruptcy?

25  A    In bankruptcy?

1  Q    That were not TDP's --

2  A    Were not in bankruptcy?

3  Q    -- in bankruptcy?

4  A    I've done hundreds of settlements with Fiberboard and

5  various plaintiffs' counsel throughout the United States, and

6  been involved in one since coming with CNA and working with CNA

7  and a number of different insureds and different plaintiffs'

8  law firms throughout the country on what are either considered,

9  as we talked about, large settlements or group settlements with

10 ten, fifteen, twenty people.

11 Q    And you mentioned on cross examination familiarity with

12 Manville as well.  Am I correct about that?

13 A    Yeah, I'm old enough to remember when Manville was in the

14 litigation.

15 Q    And did you compare in your own mind some of the ways in

16 which the Manville trust slash TDP's handled claims versus the

17 claims in this case?

18 A    Yes, in addition to looking at the statistics and things

19 we talked about earlier from Mr. Austin.

20 Q    In all of your work over I guess it's almost three

21 decades, I'm sorry to bring that up.

22 A    Almost.

23 Q    Have you encountered others who perform this kind of

24 analysis or who work on these kinds of TDP's slash group

25 settlements?

Coleman - Redirect/Christian                                    78

1  A    No, there were a lot of individuals I dealt with over the

2  years at the CCR who have done a lot of group settlements.

3  Q    Um-hmm.

4  A    I don't know --

5  Q    Well, let's take those individuals for a moment.  When

6  those individuals review group settlements or TDP-like

7  documents, would they adopt the same process that you just

8  described with respect to medical exposure, with respect to --

9  medical criteria, with respect to exposure criteria, with

10 respect to administrative procedures that you described?

11          MR. LOCKWOOD:  Objection, Your Honor.  What un-named,

12 unknown individuals would do in contacts other than litigation,

13 this is supposed to be testimony about the qualifications as an

14 expert.  Expert implies that you're testifying in court and

15 that you're -- and that there's some methodology that courts

16 accept for this process.

17          That question is so general, so vague and so without

18 context that I think asking for an answer is virtually

19 impossible, but certainly objectionable.

20          MR. CHRISTIAN:  A couple of responses, Your Honor.

21 First of all, I think Mr. Lockwood mis-states the law, but we

22 can deal with that later.  Second of all, if Mr. Lockwood wants

23 to ask the witness on recross specific questions to either

24 challenge, undermine or further explain the testimony, he's

25 welcome to do that.

Coleman - Redirect/Christian                    79

1          THE COURT:  I don't know that this witness has the

2   foundation to be able to substantiate specifically what these

3   other unnamed individuals do.  If you want to lay a foundation

4   --

5          MR. CHRISTIAN:  Very well, Your Honor.

6          THE COURT:  -- for how he knows and who they are and

7   -- so that there is some -- a possibility, because at this

8   point they're not named in his report.

9          MR. CHRISTIAN:  I understand, Your Honor.

10          THE COURT:  And that is part of the problem with this

11   in quote "peer review process" which I understand your

12   argument, but nonetheless, there is no such peer review

13   process.  And I don't know who these alleged peers who are not

14   named are.

15          So, if you want to lay a foundation I'll let you

16   pursue it.

17          MR. CHRISTIAN:  Very well, Your Honor.

18          THE COURT:  But not without a foundation.

19          MR. CHRISTIAN:  I appreciate that, Your Honor.

20   BY MR. CHRISTIAN:

21   Q    Mr. Coleman, I think you were talking about the ACF and

22   the CCR.  Am I right about that?

23   A    Yes.

24   Q    Did you have peers who would perform a similar analysis at

25   the ACF?

1 A    Individuals that would do group settlements, yes.  I don't

2 know if anybody else has reviewed TDP's, but I know there are

3 individuals at the CCR that were responsible to do group

4 settlements.

5 Q    You said at the CCR.  At the ACF as well?

6 A    The ACF didn't do so much group settlements.  In the ACF

7 days it was more dealing with cases when they came up for

8 trial.  We did a few --

9 Q    So -- oh, excuse me.  I didn't mean to cut you off.

10 A    That's okay.

11 Q    Go ahead and finish your answer.

12 A    As I say, we did a few group settlements, like the Jenkins

13 settlement, in the early days in Texas, but CCR did a lot more

14 group settlements than the ACF did.

15 Q    Okay.  Are you able to recall the names of the individuals

16 at the CCR who might have done that kind of analysis?

17          MR. LOCKWOOD:  Objection, Your Honor.  As I

18 understood it, he was trying to qualify this -- these other

19 people as people who compared the tort system to TDP's.  To the

20 best of my knowledge there's been no foundation that there were

21 any TDP's when the ACF was in existence, which was 1982 to

22 1985.

23          MR. CHRISTIAN:  Your Honor -- excuse me, Mr.

24 Lockwood.  Are you done?  I'm sorry.

25          MR. LOCKWOOD:  Yeah, I object that there's a lack of

Coleman - Redirect/Christian                    81

1  foundation for what you're attempting to qualify this witness

2  as, as somebody who can compare TDP --

3              MR. CHRISTIAN:  I thought you were done.  I'm sorry.

4              THE COURT:  The witness has stated that the

5  individuals at the CCR reviewed group settlements but not

6  TDP's.

7              MR. CHRISTIAN:  Right.

8              THE COURT:  And I think that's correct.  His

9  testimony compares the two.  I believe his testimony is that

10 there were no other individuals he knows of who did the TDP's.

11 BY MR. CHRISTIAN:

12 Q    Is that your testimony?

13 A    That's correct.  I don't know anyone else who has reviewed

14 TDP's --

15 Q    Well, let me ask you this.

16 A    -- in this context.

17 Q    In this context.  Let me ask you this question.

18      Some of your direct testimony and some of the examination

19 that you had subsequently related as well to your comparison --

20 your experience, pardon me, with other large group settlements.

21 Am I correct?

22 A    That's correct.

23 Q    You base some of your analysis on your experience with

24 large group settlements?

25 A    Correct.

1  Q    Other than TDP's?

2  A    Other than TDP's, yes.

3  Q    Okay.  Do you recall the names of -- let me take this in

4  pieces so that the record's clear.

5       First of all, are you aware of peers who conduct analysis

6  of TDP's, other than yourself?

7  A    I am not aware of anybody.

8  Q    Okay.  Are you aware of peers who have conducted analysis

9  of large group settlements in the asbestos context other than

10 yourself?

11 A    Oh, yes.

12 Q    Can you recall the names of some of those individuals?

13 A    Well, back in the CCR days it would have been Bill Jacobi,

14 Dan Myer, Rich Caravetta, John Gall, pretty much any of the

15 directing members of the CCR claims staff.

16 Q    Um-hmm.  Are you familiar with the process they would go

17 through, the methodology they would use in order to analyze

18 large group settlement structures?

19 A    Relatively similar to what I've done.  You look at the

20 medical criteria.  You put together and you work with

21 plaintiff's counsel to put together the medical criteria.  Same

22 thing for the exposure criteria and how you are then going to

23 process the claim.

24      In those days the processing was generally done by the CCR

25 or whatever entity was paying the claim.

1  Q    Is the analysis that you and these other individuals would

2  perform with respect to medical criteria and exposure criteria

3  and administrative procedures something that anyone could do?

4  A    Probably not anyone, but you need a background in

5  litigation and the diseases themselves.

6  Q    Right, so you're saying -- let's take that in two pieces.

7  You need a background in the litigation.  Can you explain what

8  you mean by a background in the litigation?

9       Do I have background in the asbestos tort litigation to do

10 that?

11 A    Well, to me it would be the underlying litigation, the one

12 in the courtroom, differentiating whether the individual has

13 the mesothelioma as a result of asbestos exposure or not, as

14 opposed to bankruptcy and coverage and those types of issues

15 where my background is much weaker.

16 Q    Okay.  So, we just talked about the litigation background.

17 You mentioned also the medical background, the diseases?

18 A    Right.

19 Q    Can you talk about what you meant by having that kind of

20 background?

21 A    Well, you need to know what disease entities asbestos can

22 cause and then what the causal relationship would be, and then

23 how those things could be proven up and what types of

24 documentation you would want to require in order to document

25 those claims.

1 Q    With the Court's indulgence, I'd like to ask you for just

2 one example of what you're talking about when you say the

3 medical documentation.

4 A    Well, for instance, if you have a mesothelioma claim,

5 you'd like to have immunohistochemical staining, you'd like to

6 have -- for asbestosis claims you'd like to have the pulmonary

7 function steady test results, the chest x-ray results, the ILO

8 results, the report from the medical doctor, and then read

9 them, review them and make whatever decisions in -- you have to

10 set up certain -- in doing the group settlement, you set up

11 whatever the criteria are that you're going to have that are

12 acceptable, not unlike what the TDP does, and then you -- if

13 they meet those criteria, that's what you're going to go ahead

14 and pay.

15 Q    All right.

16          MR. CHRISTIAN:   Your Honor, I don't have any other

17 questions at this time.

18          THE COURT:   Any recross?

19               RECROSS EXAMINATION

20 BY MR. LOCKWOOD:

21 Q    You testified in redirect, Mr. Coleman, that insurers

22 would take defense costs into account, just like insureds

23 would, in determining how to treat a claim.

24 A    I believe so, yes.

25 Q    And you were asked as a hypothetical to assume that a 50

1 injury.  And as a result there is simply no data on which the

2 Court can assess the reliability of what he did.

3          His opinions are nothing more than his subjective

4 beliefs.  They are unsupported evaluation, and his conclusions

5 were not generated by a reliability methodology.  As a result,

6 I find that they -- that his opinion must be stricken and he is

7 not, I think, qualified in this instance to offer an expert

8 opinion on the subject matter for which he was called.

9          So, the motion is granted.

10          MR. ALVAREZ:  Your Honor, Fred Alvarez from Mumick

11 and Leek.  Before we go on, just as a housekeeping matter.

12          THE COURT:  Yes, sir.

13          MR. ALVAREZ:  We have one of our experts who

14 unfortunately is only available today.  I've approached Mr.

15 Neal to talk about whether we can go out of order.  Apparently

16 their side's not interested in doing that.  He has -- Justice

17 Stein is the expert, Your Honor.  He had a mediation yesterday

18 where he was the mediator.  He's tied up tomorrow.  He's only

19 available today.

20          I think we're not going to finish tomorrow,

21 unfortunately.  If that's the case, we can bring him back when

22 we resume, but I just don't want his unavailability to preclude

23 him from coming back later.

24          THE COURT:  All right, is there a reason we can't

25 take Justice Stein out of order?