# EXHIBIT A

Darrell Scott Declaration in Support of ZAI Claimants' Motion for Order to Show
Cause Why Expert Witnesses Should Not be Appointed

BINDER DEVELOPMENT PROGRAM

This memo is a general discussion of some aspects of the Binder Development Program. It covers the areas of background, binder objectives, trials and testing.

I.  BACKGROUND

The current OSHA Standard requires product labeling where a manufacturing plant is found to have employee exposures to airborne fiber concentrations in excess of the current toler- ance level. Following an OSHA inspection in January, 1976 of the Omaha expanding plant we are now under citation for not labeling our product. We have until December 30, 1976 to either bring the Omaha plant fiber concentrations below the tolerance level, show why we should not label the product, or commence labeling of product.

It is believed that product labeling would have a serious, adverse, and irreversible effect upon customer acceptance of our products. The current OSHA Standard specifies that OSHA will accept the addition of a binder as being one method of removing the product labeling requirement. It is understood that OSHA will also accept data from air sampling of represent- ative product usage if that data shows user exposures below current tolerance levels. It is possible that binder modifi- cations might be made part of the standard formula for some products, irrespective of OSHA labeling requirements.

II. OBJECTIVES

Accordingly, the overall objective of the binder program is to have working binders and the equipment for their application on hand and usable with Libby products which may need them before the end of this year. Initial Libby product focus will be on Masonry Fill followed by straight #2 (attic fill, profes- sional horticultural, and industrial). Beyond this very general objective, it is possible to list a number of more specific, working objectives in binder development. The following list of objectives is idealized; all may not be attainable, some may prove mutually exclusive.

1.  Binder must be sufficiently effective in use to put airborne fiber concentrations under the tolerance level in representa- tive jobsite conditions.

2. Binder and its delivery system should pose no appreciable equipment complexity for the expanding plant, and successful binder application should be relatively insensitive to mis-settings of equipment controls. Ideally, the delivery equipment would either already exist (asphalt/silicone sprays for MF) or be simple to add.

3. Binder itself not be a carcinogen or pose other hazards such as flammability, either by itself or in its foreseeable storage, handling, application to the product, and use of the product.

4. Binder(s) not appreciably interfere with free pouring and dispersion.

5. Product with binder have a shelf life of not less than three months before decline in binder's effectiveness (if any decline).

6. Product with binder be non-reactive with kraft or polyethylene packaging or with water.

7. Least cost -- a current increase of less than 10¢ ber bag, applied. If this objective cannot be met, the least cost working binder must still be developed.

8. Binder(s) should not be "esoteric", preferably would not be subject to wide price swings, be locally available, and be stable in storage.

9. Binder(s) not have adverse effect on water repellency where required (such as masonry fill) or on water mixability where required (such as Zonolite Concrete or Monokote).

10. Binder used for horticultural applications should not interact with other soil ingredients.

III. TRIALS

Trials are to start in Trenton with Masonry Fill. Trenton was picked for large size, variety of furnace types, Libby ore usage and proximity to Cambridge. Plant costs related to trials will be charged to their development account. Masonry Fill was selected as the first product because it is already made with binders and plants have application equipment installed.

It is anticipated that the plant trials sequence will approximate the following:

1. **Standards Establishment**

   a. Adjustment to standard operating conditions per current product formula.
   b. One pound sample taken of ore concentrate going to furnace for subsequent Cambridge quantitative analysis.
   c. Representative employee air sampling for fiber count or other contaminant while standard product is running.
   d. Representative engineering air sampling for fiber count or other contaminant may also be done if there are points of interaction.
   e. Bagging off of marked standard samples for subsequent Cambridge quantitative analysis and air sampling analysis (approximately 10 bags).

2. **Trial**

   a. Trial formula with binder is believed "make-able", preferably has already been tried on a small scale. (Trial formulas previously communicated to plant manager.)
   b. Adjustment of operating conditions to trial formula.
   c. When process appears stabilized at trial formula,
   d. Repeat employee air sampling,
   e. Repeat engineering air sampling, if any. (Note: These samples will be marked "experimental" to prevent confusion with samples representative of a plant running standard product formulas.)
   f. Bagging off of marked experimental samples for subsequent Cambrdige air sampling analysis (approximately 10 bags).

3. Proceed with subsequent trials of other trial formulas, if any (repeat #2 above).

4. At end of trials on this combination of product and equipment:

   a. Resume operating conditions to current product formula.
   b. One pound sample of ore taken.

5. **Assumptions**

   a. At this point, it is assumed plant and equipment are back at normal.
   b. It is also assumed that all the product run and bagged during trials which was not destined to be shipped to Cambridge is usable for the intended product application. If so, it will be put into inventory for subsequent sale through normal channels but to only one job site or customer.
   c. Plant will make copy of applicable invoice and mail to Cambridge.
   d. Cambridge will follow-up with customer to see whether comments are volunteered.

IV.  TESTING

This section concerns the Cambridge testing of ore concentrate, standard formula product, and trial formula products samples taken under Section III, TRIALS, above.

The one pound ore concentrate samples will be saved for possible quantitative analysis, as needed, so as to determine tremolite content of the Libby ore at that plant used on the day of trials, if necessary.  Variations in ore concentrate tremolite content might affect expanded product release of fibers.  These samples are taken to facilitate comparisons between trials taken on different dates if necessary.  Two samples are taken to address the possibility that ore concentrate use during a trial might have bridged the "dividing line" between two different carloads in the silo.  These samples would also add to our general knowledge concerning variables of tremolite content in Libby ore.  It is noted that we are concerned not with total tremolite, but non-asbestos tremolite, asbestiform non-airborne tremolite, and asbestiform tremolite which could be airborne.

The one pound sample of expanded product, under current formula, will similarly be saved for possible quantitative analysis. There are two intents.  First, to add to our general knowledge of tremolite content in expanded product compared directly to the ore concentrate from which it was made.  Second, to again facilitate comparisons between different trials taken on different dates, same as intent of ore concentrate samples.

The employee (and engineering) air samples would be for two purposes.  First, making sure the trial formulas do not adversely affect plant working environment in some unforseen way.  Second, assuming that the binder usage lowers airborne fiber concentration in the plant, to obtain a preliminary indication of how much.  It is conceivable that binder utilization might serve as back-up for dust pick-ups.

The air sampling of standard formula product and trial product is for purposes of assessing the concentrations of airborne fibers released when the product is dumped or poured.  Air sampling to date of product use, both actual or jobsite and simulated, has served to indicate which products may pose problems under some conditions.  A problem, however, with job site testing is that the test conditions can vary a great deal.  It would be unfortunate to draw conclusions about various binders' effectiveness versus standard formula if the data reflected much influence from varying test conditions.

Accordingly, a test facility will be set up here in Cambridge so as to test all trial (and standard formula for comparison) material under-relatively controlled conditions. Test facility fiber counts will not necessarily duplicate fiber counts on any specific job site. However, we now know representative ranges of fiber counts on job site for some products. It is assumed that a trial formulation with binder which performed favorably versus standard formula in the test facility would be expected to do so in the field, too. Once one binder formulation has been found which yielded the order of magnitude improvement sought in the test facility, that would be verified on job site.

1.  The characteristics of the test facility would be as follows:

    a.  inside and enclosed, little draft, "closable"
    b.  minimum floor area approximately 250 sq. ft.
    c.  minimum bay height 8 to 12 feet
    d.  adjacent storage area for bagged goods

2.  General equipment would include:

    a.  elevated hopper capable of holding a minimum of 5 bags
    b.  step ladder
    c.  an adjustable discharge duct which would be adjusted
        to approximately 1 to 3 cu. ft./minute rate
    d.  unrestricted drop of 4 to 5 feet into
    e.  movable dumpster beneath with provision to pour used
        material into disposal bags
    f.  cannister type shop vacuum approved for fiber retention
    g.  ideally, a means of exhaust fan ventilation of test
        facility after test

3.  Test equipment would include:

    a.  two air pumps mounted on pipe stands approximately one
        foot from material stream set about 180° from each other
    b.  one pump mounted on a pipe stand approximately 3 feet
        from material stream set at midpoint from other two
        pumps and down-wind (if there is any)
    c.  the intent would be to have no air currents in test
        facility but there probably will be

4.  Test procedure (with personnel wearing NIOSH approved res-
    pirators in area of test facility)

    a.  vacuum facility with cannister in it
    b.  wait five minutes
    c.  take one 15 minute background air sample at remote pipe
        stand 3-b (above)
    d.  load hopper from bags attempting to minimize dust creation

e.  activate 3 pumps, commence material discharge, leave
    test facility and close door

f.  at end of material discharge, terminate above 3 samples

g.  take one 15 minute air sample at remote pipe stand,
    (door closed)

h.  terminating above sample, leave door open and activate
    exhaust fan until visible dust gone

i.  dispose of test material and vacuum test facility,
    retaining other half (5 bags) of trial material until
    after fiber counts have been taken

V.  ANALYSIS OF SAMPLES

1.  Ore Samples

    a.  All samples will be examined by X-ray diffraction to
        determine presence or absence of tremolite.

    b.  If appropriate interest and time develops, the X-ray
        diffraction pattern will be examined more closely and
        a quantitative determination of total tremolite will
        be made.

2.  Expanded Samples

    Same as 1 above.

3.  Air Samples

    All will be tested by the NIOSH approved procedure for the
    analysis of airborne fibers.

R. H. Locke
5/17/76
(revised to H. A. Brown comments 5/11/76 and H. C. Duecker comments
5/12/76)



One copy
of red
flagged
document