# EXHIBIT C

Darrell Scott Declaration in Support of ZAI Claimants' Motion for Order to Show Cause Why Expert Witnesses Should Not be Appointed

BARBANTI vs. W.R. GRACE, DEPO. OF MORTON CORN, PH.D., 9-15-00

*Page 1 to Page 194*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

AKF Reporters, Inc.
436 Boulevard of the Allies
Pittsburgh, PA 15219-1314
Phone: 1-888-253-3376
FAX: 1-412-261-2537

Case 01-01139-AMC    Doc 18327-4    Filed 03/18/08    Page 3 of 4

BSA  BARBANTI vs. W.R. GRACE, DEPO. OF MORTON CORN, PH.D., 9-15-00  XMAX(2/2)

### Page 5

(1) Pittsburgh, Pennsylvania. I don't recall that
(2) zip code.
(3) Q. And how long did you live there?
(4) A. I lived there for 17 1/2 years.
(5) Q. Dr. Corn, you have been identified as an expert
(6) witness in the case of Barbanti versus
(7) W.R. Grace, and we're here to take your
(8) deposition. Is that your understanding?
(9) A. Yes.
(10) Q. And you've been identified as an expert witness
(11) on the issue of certification of that class
(12) action. Is that also your understanding?
(13) A. Yes.
(14) Q. And I'm going to take your deposition
(15) concerning the issues you've raised on
(16) certification.
(17)     MR. CAMERON: I would suggest that he
(18) has an affidavit which covers more than
(19) certification. If you're going to limit your
(20) questions just to that relating to
(21) certification, that's fine. But you do that as
(22) you choose.
(23)     MR. TURKEWITZ: Is Dr. Corn's
(24) affidavit also relating to other issues besides
(25) certification?

### Page 6

(1)     MR. CAMERON: It will probably, and
(2) maybe a supplemental affidavit to the extent
(3) additional work is done. The declaration will
(4) probably be used for any brief we file in
(5) response to the motion for preliminary
(6) injunction. Obviously that hasn't been filed
(7) yet, but there are issues that will relate to
(8) that brief when it's filed.
(9)     MR. TURKEWITZ: Okay. We would
(10) certainly reserve our right to address that
(11) with Dr. Corn.
(12)     MR. CAMERON: If what you're going to
(13) do today is just focus on class certification,
(14) that's fine. I'm saying his affidavit is
(15) there, and our position will be is that you
(16) should question him on -- I mean his affidavit
(17) is his affidavit.
(18)     MR. TURKEWITZ: I appreciate you
(19) bringing that to our attention, that his
(20) affidavit also relates to the preliminary
(21) injunction issue, and we'll proceed from there.
(22) BY MR. TURKEWITZ:
(23) Q. Dr. Corn, when were you first contacted
(24) regarding this case?
(25) A. I believe it was early June.

### Page 7

(1) Q. Early June 2000?
(2) A. Yes.
(3) Q. This past June. And who were you contacted by?
(4) A. I received a telephone call from Mr. Finke.
(5) Q. What did Mr. Finke tell you?
(6) A. I think the best thing is to refer to those
(7) notes that I made from that telephone call. I
(8) don't know where the materials are.
(9) Q. We requested that you bring your entire file
(10) with you. Have you done so?
(11) A. It is here, it's just not on the table. Pardon
(12) me, it was early July. I correct my former
(13) statement. Because this is dated.
(14) Q. Can I see that, please?
(15) A. Yes.
(16) Q. It's dated July 5th?
(17) A. That's correct. That was the first contact. I
(18) mistakenly said early June.
(19) Q. Let's go ahead and make this an exhibit, if you
(20) don't mind, Corn Deposition Exhibit 1.
(21)     Dr. Corn, how long did your
(22) conversation take place?
(23) A. I can't answer that specifically. It was not a
(24) long conversation.
(25) Q. Were you asked to consult as an expert witness

### Page 8

(1) in this case at that point, at that time?
(2) A. I think I was alerted to performing two
(3) possible tasks. I don't know if the question
(4) of my serving as an expert witness arose. My
(5) recollection is there were two areas where I
(6) was being asked, in a preliminary manner, with
(7) more details to follow, to perform certain
(8) tasks. But I can't recall the issue of expert
(9) witness arising at that time.
(10) Q. And what two possible tasks were discussed?
(11) A. The first was that I should look over the
(12) protocol used that I had developed a decade
(13) earlier, for sampling buildings for evaluating
(14) airborne concentrations of asbestos, together
(15) with survey methods for evaluating relevant
(16) factors of the premises. I had worked up such
(17) a protocol that was used by contractors in
(18) building litigation. The question was, was
(19) that applicable, if surveys and sampling were
(20) to be performed in homes where attic insulation
(21) had been raised as a possible concern. That
(22) was the first.
(23)     And the second was if access could be
(24) arranged, as I recall the phone call, there was
(25) no home specified, and no access arranged, for

Case 01-01139-AMC   Doc 18327-4   Filed 03/18/08   Page 4 of 4

BSA    BARBANTI vs. W.R. GRACE, DEPO. OF MORTON CORN, PH.D., 9-15-00    XMAX(3/9)

### Page 33

(1) of activities that may lead to exposure,
(2) results of bulk sampling of the material, or
(3) any information regarding the content of the
(4) material. A lot of these things were unknown
(5) to me at the time I went to the premises.
(6) Q. When you were first contacted by Mr. Finke, had
(7) you had any -- had you heard or had any
(8) information about the asbestos vermiculite
(9) issue?
(10) A. No, I had not heard of the issue.
(11) Q. And had you ever heard of the product called
(12) Zonolite attic insulation?
(13) A. No. I certainly had heard of vermiculite, but
(14) I had not heard of Zonolite.
(15) Q. Were you also provided videotapes prior to your
(16) inspection?
(17) A. No.
(18) Q. Videotapes of simulated testing?
(19) A. No, not prior to the inspection. I had been --
(20) I did have the statement of -- just before I
(21) left I received Mr. Hurst's and Mr. Hatfield's
(22) materials.
(23) Q. Their affidavits?
(24) A. Their affidavits.
(25) Q. Included in those affidavits are videotapes.

### Page 34

(1) Did you --
(2) A. I don't think I got the videotape at that time.
(3) Q. But you saw the test results?
(4) A. Yes, I think I did. I didn't look too closely
(5) at that before I left, but I got that. I read
(6) the affidavit. I didn't go through -- I think
(7) it was an issue of time before the first
(8) inspection. I don't think I went through their
(9) actual results too closely. But I read the
(10) affidavits.
(11) Q. And what was your impression when you first
(12) read the affidavits of Mr. Hatfield and
(13) Mr. Hurst?
(14) A. Part of that, I did not dismiss this as a
(15) de minimus concern out of hand. And I
(16) expressed that view, if I'm going on these
(17) inspections, I must tell you this could be an
(18) issue. I'm going with an open mind. And I
(19) informed Mr. Finke, and I guess Mr. Bitterman,
(20) of that, and Mr. Hoyle. I clearly stated, as
(21) far as I'm concerned, this is where I was when
(22) I first started looking at the building issue,
(23) and I'm looking at this in a fresh manner.
(24) Q. Was there anything in the information that you
(25) had received, both the homeowner affidavits and

### Page 35

(1) the affidavits of Mr. Hurst and Mr. Hatfield
(2) that concerned you, or that was a potential
(3) concern?
(4) A. Sufficient to place me -- or to lead me not to
(5) place this in the same category, until I had
(6) been to these locations, as the building
(7) concerns for occupants of buildings, that I
(8) felt we had resolved, and was now part of the
(9) traditional wisdom. I was not yet ready to
(10) relegate the concerns raised for homeowners to
(11) that category. I think I said this is new to
(12) me, there's sufficient things raised here, I'm
(13) going into this as a new issue, as far as I'm
(14) concerned.
(15) Q. I'm not sure if I understand your answer. Did
(16) you have any concerns whatsoever upon reading
(17) the affidavits of the homeowners and the
(18) affidavits of Mr. Hatfield and Mr. Hurst, and
(19) if so, what were those concerns?
(20) A. Yes, I had sufficient concerns to not reach the
(21) conclusion I'm dealing with another
(22) manifestation of commercial building and school
(23) occupant exposure, which had been resolved.
(24) Q. What specifically were those concerns that you
(25) had?

### Page 36

(1) A. That homes were sufficiently different, in my
(2) mind, from buildings, to look at -- I didn't
(3) know that much about attics, other than my own
(4) experience of living in homes, and I had to
(5) look freshly at the issues raised.
(6) Q. Well, I understand your response is basically
(7) going to the issue of what you felt you needed
(8) to do, and how you needed to look at it, but my
(9) question is more specific.
(10)    MR. CAMERON: I object, you ask the
(11) question, you don't tell the witness the way he
(12) answered it. You ask the question. Ask the
(13) question you want to ask, because you've asked
(14) it, and I think he's answered it, but ask it
(15) again.
(16) Q. I feel, Dr. Corn, that my question is more
(17) specific. And that is specifically what
(18) concerns were raised by your review of the
(19) affidavits that you received?
(20) A. The concerns are all related to exposure,
(21) that's what I do. And both the Hurst, the
(22) Hatfield statements, my lack of familiarity
(23) with this product, the use of this product, the
(24) nature of attics, and the utilization of
(25) attics, were all part of why I was not yet