UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
             Debtors.  .
                          .    March 17, 2008
. . . . . . . . . . . . ..    1:11 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               JANET BAER, ESQ.
                               JAMES RESTIVO, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (cont'd)

For the Asbestos           Caplin & Drysdale, Chartered
Creditors Committee:       By:  ELIHU INSELBUCH, ESQ.
                           375 Park Avenue, #3505
                           New York, NY  10152

For the Future            Orrick, Herrington & Sutcliffe
Claimants                              LLP
Representatives:          By:  RAYMOND MULLADY, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. HURFORD, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701

For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131

For Allegheny
Associates:               By:  BUD FAIREY, ESQ.

TELEPHONIC APPEARANCES:

For the Ad Hoc            Dewey & LeBoeuf, LLP
Committee of Equity       By:  JENNIFER WHITENER, ESQ.
Sec. Holders:             125 West 55th Street
                          New York, NY  10019

For the Future            Orrick, Herrington & Sutcliffe
Claimants                              LLP
Representatives:          By:  ROGER FRANKEL, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

For Serengeti:            Vinson & Elkins LLP
                          By:  ARI BERMAN, ESQ.
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX  75201

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES: (cont'd)

```
For Silver Point
Capital:                     Silver Point Capital
                             By:  JOHN KU

For the Debtors:             Pachulski, Stang, Ziehl &Jones
                             By:  JAMES O'NEILL, ESQ.
                             919 North Market Street
                             17th Floor
                             Wilmington, DE  19899-8705

For the                      Stroock & Stroock & Lavan
Unsecured Creditors'         By:  ARLENE KRIEGER, ESQ.
Committee:                   180 Maiden Lane
                             New York, NY  10038-4982

For the Property
Damage Committee:            Bilzin Sumberg Baena Price &
                                Axelrod LLP
                             By:  JAY SAKALO, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For the Unsecured           Strook & Strook & Lavan
Creditors' Committee:       By:  LEWIS KRUGER, ESQ.
                            180 Maiden Lane
                            New York, NY 10038

For Official Committee      Kramer Levin Naftalis & Frankel
of Equity Holders:            LLP
                            By:  DOUGLAS H. MANNAL, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For Official Committee      Dies & Hile LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                      By:  DAVID J. PARSONS, ESQ.
                                 VAN J. HOOKER, ESQ.
                                 SANDER L. ESSERMAN, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, TX  75201
```

TELEPHONIC APPEARANCES: (cont'd)

For Fireman's Fund:          Stevens & Lee, P.C.
                             By:  JOHN DEMMY, ESQ.
                                  DAVID R. BEANE, ESQ.
                             1105 North Market Street, 7th Fl.
                             Wilmington, DE  19801

For Buisum Asset             Buisum Asset Management
                             By:  STEPHAN LUMIERE, ESQ.

For Owens-Illinois:          McCarter & English
                             By:  NORISS E. COSGROVE, ESQ.
                             Renaissance Centre, 405 N. King St.
                             Wilmington, DE  19801

For David T. Austern:        Orrick, Herrington & Sutcliffe, LLP
                             By:  ROGER FRANKEL, ESQ.
                                  RICHARD H. WYRON

For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                                  ELIZABETH DEVINE, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

For the U.S. Trustee:        Department of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  ROBERT GUTTMANN, ESQ.
                                  MICHAEL DAVIS, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future              Orrick, Herrington & Sutcliffe
Claimants                    LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                  JOSHUA CUTLER, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007 For

For Federal Insurance        Cozen O'Connor
Company:                     By:  JEFFREY WAXMAN, ESQ.
                             Chase Manhattan Centre
                             1201 North Market Street
                             Wilmington, DE  19801

TELEPHONIC APPEARANCES: (cont'd)

| | |
|---|---|
| For Federal Insurance Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For W.R. Grace: | W.R. Grace<br>By:  DAVID SIEGEL, ESQ.<br>      MARK SHELNITZ, ESQ.<br>      PAUL J. NORRIS, ESQ. |
| For W.R. Grace: | Kirkland & Ellis LLP<br>By:  ELLEN AHERN, ESQ.<br>      BARBARA HARDING, ESQ.<br>      AMANDA BASTA, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For W.R. Grace: | Perkins, Coie, LLP<br>By:  JOHN KAPLAN, ESQ. |
| For W.R. Grace: | Cohn Whitesell & Goldberg, LLP<br>By:  CHRISTOPHER M. CANDON, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For W.R. Grace: | Pachulski, Stang,Ziehl & Jones LLP<br>By:  RACHEL WERKHEISER, ESQ.<br>      JAMES O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For W. R. Grace: | Tocqueville Asset Management<br>By:  PETER SHAWN, ESQ. |
| For State of Montana Department of Environmental Quality: | Womble Carlyle Sandridge & Rice<br>By:  FRANCIS MONACO, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

TELEPHONIC APPEARANCES: (cont'd)

```
For State of Montana        Christensen, Moore, Cockrell
Department of               By:  DALE R. COCKRELL, ESQ.
Environmental Quality:

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:                Rhoads LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                                 NOEL C. BURNHAM, ESQ.
                                 LEONARD A. BUSBY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  WALTER SLOCOMBE, ESQ.
                                 RITA TOBIN, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the Asbestos            Ferry Joseph & Pearce, P.A.
Creditors Committee:        By:  THEODORE TACCONELLI, ESQ.
                            824 Market Street, Suite 19899
                            Wilmington, DE  19899

For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser
& Gleser:                   By:  SHAYNE SPENCER, ESQ.
                            Wall Street Plaza
                            New York, NY  10005

For Lester Levy:            Wolf, Popper, LLP
                            By:  LESTER LEVY, ESQ.

For Official Committee      Duane Morris LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801-1246
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES: (cont'd)

| | |
|---|---|
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Brandi Law Firm<br>By:  TERENCE D. EDWARDS, ESQ.<br>44 Montgomery St., Suite 1050<br>San Francisco, CA  94104 |
| | Pryor, Cashman, LLP<br>By:  RICHARD LEVY, ESQ. |
| For the State of CA,<br>Dept. of Gen. Services: | Hahn & Hessen LLP<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue, 14th Fl.<br>New York, NY  10022 |
| For BNSF Railway Co. | Pepper, Hamilton, LLP<br>By:  ANNE MARIE AAROSON, ESQ. |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Royal Insurance: | Wilson Elser Moskowitz Edelman<br>  & Dicker LLP<br>By:  CATHERINE CHEN, ESQ.<br>     150 East 42nd Street<br>     New York, NY  10017 |
| For David T. Austern: | Piper Jaffray & Co.<br>By:  JASON SOLGANICK |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Axicon Partners: | Axicon Partners<br>By:  ROBERT SCOTT, ESQ. |
| For Everest Reinsurance<br>Company: | Crowell & Moring, LLP<br>By:  LESLIE A. DAVIS, ESQ.<br>     MARK PLEVIN, ESQ. |
| | Marks, O'Neill, O'Brien & Courtney<br>By:  MICHAEL J. JOYCE, ESQ.<br>     BRIAN L. KASPRZAK, ESQ. |
| For Linden Advisors: | Linden Advisors, LP<br>By:  CRAIG GILBERT |
| For One Beacon<br>America Insurance: | Drinker, Biddle & Reath<br>By:  DAVID PRIMACK, ESQ. |

TELEPHONIC APPEARANCES (cont'd):

For Warren H. Smith:          Warren H. Smith & Associates, P.C.
                             By:  WARREN H. SMITH

For the Blackstone           The Blackstone Group
Group:                       By:  JOHN O'CONNELL

For Dune Capital Mgmt:       Dune Capital Management
                             By:  GUY BARON

For Halcyon Asset            Halycon Asset Management
Management:                  By:  JOHN GREENE

For Lehman Brothers:         Lehman Brothers
                             By:  ANDREW CHAN

For ZAI Claimants:           Sullivan, Hazeltine, Allinson, LLC.
                             By:  WILLIAM SULLIVAN, ESQ.

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

For Citadel Investment       Citadel Investment Group
Group:                       By:  BEAU HARBOUR

For Murray Capital           Murray Capital Management, Inc.
Management                   By:  MARTI MURRAY

For Irwin H. Zandman:        Irwin H. Zandman
                             By:  IRWIN H. ZANDMAN

1          THE COURT:  The next matter is W.R. Grace, 01-1139.

2    The participants I have listed by phone Noriss Cosgrove, Rita

3    Robin, Robert Horkovich, Theodore Tacconelli, Sung Choi, Ellen

4    Ahern, Marti Murray, John Phillips, Amanda Basta, Shayne

5    Spencer, Seth Brumby, John Kaplan, Andrew Chan, Beau Harbour,

6    Francis Monaco, Barbara Harding, Robert Guttmann, Noel Burnham,

7    Leonard Busby, Douglas Mannal, Tiffany Cobb, Michael Davis,

8    Rachel Werkheiser, Christina Kang, John Ku, Catherine Chen, Ari

9    Berman, Andrew Craig, Christopher Candon, Mark Shelnitz, Paul

10   Norris, Stephan Lumiere, Jeff Waxman, Lewis Kruger, Daniel

11   Speights, David Klauder, Roger Frankel, Elizabeth Devine,.

12   Leslie Davis, Lester Levy, Michael Joyce, Anne Marie Aaronson,

13   Daniel Glosband, Walter Slocombe, David Parsons, Debra Felder,

14   Darrell Scott, Robert Scott, Jacob Cohn, Richard Levy, Terence

15   Edwards, Martin Dies, Jason Solganick, David Siegel, Guy Baron,

16   Van Hooker, Irwin Zandman, Theodore Freedman, Michael

17   Lastowski, John Demmy, David Primack, James O'Neill, Peg

18   Brickley, Richard Wyron. Mark Plevin, Brian Kasprzak, Warren

19   Smith, John Greene, William Sullivan, Peter Shawn, Jay Sakalo,

20   Sander Esserman, Craig Gilbert, Dale Cockrell, Natalie Ramsey,

21   David Bernick, Janet Baer, Jennifer Whitener, John O'Connell,

22   David Beane, Arlene Krieger.

23          Folks on the phone, would you please put your mute

24   buttons on until you're ready to speak so that we don't hear

25   the crackling noise that's going on as you're moving papers and

1  pens nearby, please.  I'll take entries in court.

2          MR. BERNICK:  Good afternoon, Your Honor, David

3  Bernick for Grace.

4          MS. BAER:  Good afternoon, Your Honor, Janet Baer for

5  Grace.

6          MR. RESTIVO:  Good afternoon, Your Honor, James

7  Restivo for Grace.

8          MR. FINCH:  Good afternoon, Your Honor, Nathan Finch

9  for the Asbestos Claims Committee.

10          MR. INSELBUCH:  Good afternoon, Your Honor, Elihu

11  Inselbuch for the Committee.

12          MR. MULLADY:  Good afternoon, Your Honor, and Happy

13  St. Patrick's Day, Ray Mullady for the FCR.

14          MR. HURFORD:  Good afternoon, Your Honor, Mark

15  Hurford, Campbell & Levine for the Asbestos Claimants'

16  Committee.

17          MR. KRAMER:  Good afternoon, Your Honor, Matt Kramer

18  for the Property Damage Committee.

19          MR. FAIREY:  Good afternoon, Your Honor, Bud Fairey

20  for Allegheny Associates.

21          THE COURT:  Ms. Baer.

22          MS. BAER:  Good afternoon, Your Honor.  Your Honor,

23  Items 1 and 2 on the agenda are being continued to the next

24  omnibus hearing, and at the end I'll hand up orders that

25  continue those two claims related matters.  We are still trying

1 to settle both of those.  Item Number 3 was the quarterly fee

2 applications, and Your Honor has already entered the order on

3 that.  Item Number 4 is the motion of CSX to lift the automatic

4 stay.  We have agreed with CSX that the deadline is extended to

5 the fourth of April for objections.  The matter is being set

6 over for April 21st.  We are trying to resolve that matter,

7 Your Honor, and hope to do so.  And it's just sort of a

8 complicated accounting issue.

9        Your Honor, Agenda Items Number 5 is the pension

10 motion which you've already entered.  Agenda Item Number 6 was

11 the credit agreement motion which you've already entered.  And

12 that takes us to Agenda Item Number 7 which is our renewed

13 request to extend a debtor-in-possession financing.

14        Your Honor, last week we submitted a revised

15 certificate of counsel and order slightly modifying the terms

16 of the order.  Since that time, Your Honor, we have yet to

17 receive the full amount of the $250 million financing that we

18 were asking for.  Throughout this case we've had $250 million

19 in credit.  Given the tightening of the credit industry right

20 now all of the lenders thus far have not voted to participate

21 in the loan again.  As a result we have, Your Honor, amended

22 the amendment to account for the current amount of commitment

23 we have and the right of the debtor if additional commitment

24 becomes available by some of the lenders to then enter into

25 agreements with them to effectively add them to the debtor-in-

1  possession financing once again to take it up to the $250

2  million.

3          Your Honor, on Friday I submitted a revised order and

4  a revised amendment to the credit agreement along with a red

5  line to all of the creditors' committees showing them the

6  changes that would be made in order to reflect this new

7  arrangement.  And I have a copy of that to hand up to the

8  Court.  The changes, Your Honor, are to put in place a

9  mechanism so that instead of just giving us the authority for

10 $250 million in credit you give us the authority for what we

11 have a mechanism for and there's a mechanism to get additional

12 financing under essentially the same terms if and when it

13 becomes available.  And, Your Honor, if I could I'll hand up

14 the amended order along with the red line so you can see the

15 changes.

16         THE COURT:  All right.

17         MS. BAER:  The order's been amended to reflect the

18 fact that there is a new sixth, a different amendment attached

19 to it, and then the clean one is there and then behind that is

20 the redline which shows the changes to reflect this mechanism.

21                         (Pause)

22         THE COURT:  Okay.  Committees' had an opportunity to

23 look.  Any FCR to see these changes?

24         MR. MULLADY:  We have, Your Honor.

25         THE COURT:  Any objections?

1          UNIDENTIFIED ATTORNEY:  No, Your Honor.

2          MS. BAER:  We also, Your Honor, on Friday consulted

3   with and talked to the committees' financial advisors to make

4   them aware of the situation.

5          THE COURT:  All right.  Okay.  That order is entered.

6          MS. BAER:  Thank you, Your Honor.  Agenda Item Number

7   8, Your Honor, is the debtors' motion to approve the EPA multi-

8   site settlement agreement.  EPA's counsel was unable to make it

9   today, had a couple of issues he still wanted to address with

10  respect to some public comments.  So we're asking that that

11  matter be put over to the agenda for April 21st.

12         THE COURT:  All right.

13         MS. BAER:  Your Honor, that takes us to Agenda Item

14  Number 9 which relates to the admissibility of the personal

15  injury questionnaires and proofs of claim and Mr. Bernick's

16  going to address that matter for the debtor.

17                         (Pause)

18         MR. BERNICK:  Your Honor, I want to address the

19  question of whether the questionnaires are in fact admissible

20  as evidence as admissions under the Rules.  And I think that

21  the arguments in the briefs break down to two major questions

22  the second of which has got a couple subparts.  But before I

23  begin to address the technical arguments that have been raised

24  I want to talk a little bit about why this issue is important.

25  Because I think when we started out dealing with the question

1  of whether the questionnaire should come in I think there was a

2  question in Your Honor's mind about what was -- in a sense what

3  was the big deal?  The experts would rely upon these materials

4  to the extent that it was appropriate given their various

5  disciplines, and on the basis of being able to rely upon the

6  materials under Rule 702 and 703.  They could then offer

7  opinions, and it's really the opinions that we're dealing with

8  here.

9        This is a case that involves class battle of the

10 experts.  And I that probably the simplest answer to that is I

11 think emerged as some of the proceedings then ensured over the

12 course of the next day or so is that while it is a debate among

13 the experts the experts don't debate in a vacuum.  They have to

14 be accountable to a factual record.  Otherwise we really

15 wouldn't need anything in cases that involved expert testimony

16 other than the expert testimony.  But of course there are other

17 sources.  There are sources of the facts themselves.

18       The experts cannot get into evidence that must come

19 into evidence through some other means and those facts can

20 provide a very important test as to whether the expert's

21 opinions really are grounded in fact.  And it's the classic

22 dynamic that we have with respect to expert testimony.

23       These questionnaires provide at least in the debtor's

24 view, and we believe the Court will ultimately agree, evidence

25 that is the only evidence of the most important facts which is

1  what is the nature of the claims that are pending against the

2  estate.  The direct source of that evidence comes from the

3  claimants themselves and therefore this evidence really is of

4  the essence when it comes to being able to assess to what

5  extent the expert opinion is being offered on both sides are

6  true to the facts of the case.  So this is a matter of very,

7  very high importance.  It's not simply a question of technical

8  issues.  It's a question of what are the facts that lie at the

9  core of the case?

10          And to the extent that these questionnaires do not

11 come in there will not be -- they won't be part of the factual

12 record in the case, and the experts' opinions won't be

13 reviewable and testable against the basic record in the case.

14 So this is a matter of very, very significant importance.

15          When it comes to the technical issue of admissibility

16 it's somewhat remarkable about how many different ways of

17 trying to slice this have been determined in the opposing

18 briefs, whereas I think our position was and remains a very,

19 very simple position which is that the claimants became parties

20 to the case when they filed their proofs of claim.  They are

21 parties to the case.  The nature of the claims that they have

22 are directly implicated in this estimation and they have made

23 statements.  And because they are statements that relate

24 directly to the core of the estimation they come in as

25 admissions of a party.  Nothing in a sense could be simpler.

1            There's a lot of exercise that then has unfolded

2    because essentially what both the ACC and the FCRC to do is to

3    explore what are very, very technical features of the

4    bankruptcy code and argue that given those features the

5    bankruptcy code they proposition it would be completely

6    noncontroversial in an ordinary case all of a sudden becomes

7    very contorted.  They bring to bear what they regard as the

8    unique status of the representatives here and seek to separate

9    the position or capacities of the representatives here from

10   their constituencies.  They argue that really the

11   constituencies are not opponents really at all.

12           And the effect of all of this is to read back in for

13   the Federal Rules of Evidence which are incredibly simple on

14   this score.  A lot of unbelievably technical bankruptcy

15   arguments that all stand in service of kind of let's have the

16   Court be blind to -- unable to receive the evidence that really

17   is of the essence because it pertains to the claims of these

18   very people.  And I don't think that they in those efforts

19   succeed.  But I'm prepared to address all those technicalities.

20   And I just have a little diagram here that I want to use for

21   that purpose.

22           We brought centrally to the fore the fact that the

23   case here in which is at issue is the bankruptcy case itself.

24   And that's something that we raise as Your Honor will recall in

25   oral argument and we're very clear that that really does become

1   the touchstone.  And there's no question but that the PI

2   claimants are parties to the bankruptcy case.  That is not

3   contested here.  So the arguments that are then made are that

4   the Court should treat as separate matters, separate cases for

5   purposes of determining whether the PI claimants are parties,

6   what are called proceedings in the bankruptcy.

7           And that distinction is not a distinction that can be

8   found anywhere in the rules of evidence.  It doesn't exist.

9   That is also a distinction that actually flies in the face of

10  the very rules that govern in the bankruptcy case.  But there's

11  nowhere in the code that the claimants can find evidence for

12  the proposition or find a statement that somehow a contested

13  matter is a different case from the bankruptcy case.  To the

14  contrary, it's not.

15          Now, with respect to an adversary proceeding the

16  adversary proceeding is not said to be separate from the

17  bankruptcy case and therefore were we to face this situation I

18  believe that the same conclusion would be reached which is that

19  parties to the bankruptcy case are also parties to an adversary

20  proceeding.  But we don't have to reach that issue because

21  we're not dealing with an adversary proceeding.  In the context

22  of an adversary proceeding we would have a complaint.  And the

23  complaint would state who the plaintiff is and who the

24  defendants are.  And the ordinary rules of pleading would then

25  govern who are the other parties to the adversary.  In the

1  sense if you had an adversary proceeding it might be a somewhat

2  closer question.  The FCR suggests that we do have an adversary

3  proceeding here, but we don't.  We don't have a complaint, we

4  don't have an answer, we don't have pleadings for a matter that

5  is separately docketed.  This is a contested matter as the ACC

6  acknowledges and in part the FCR in different parts of their

7  brief acknowledge.

8         So we don't have a separate complaint.  We have a

9  proceeding within the bankruptcy case.  And the record on the

10  contested proceeding includes the bankruptcy case to the extent

11  that it bears upon the bankruptcy case and there are a lot of

12  precedence that have come out and essentially said that.

13  There's language in deed in the Federal Mogul decision itself

14  that deals with that question.  So to the extent that the

15  claimants are parties to the bankruptcy case they are parties

16  to the contested proceeding that is nested within the

17  bankruptcy case.

18         Now, does this mean, for example, an unsecured

19  creditor who made a statement that directly supported the ACC's

20  position or the FCR's position does that mean that that would

21  come in, too?  Absolutely.  If we had a group of creditors that

22  had acknowledged at some historical the validity and value of

23  the personal injury claims I am highly confident that it would

24  be offered as an admission of a party to the bankruptcy case

25  who is also a party to the contested matter, because there's a

1 party to the bankruptcy case.  So creditors who actually come

2 before the Court are parties to the case and have made

3 admissions.  Their admissions would be equally well admissions

4 for purposes of the bankruptcy case.

5          Now, we could rest on that ground alone.  I think it

6 would be very clear that as a pure matter of applying the rules

7 of evidence they are parties, they're parties under the code,

8 they're parties to the contested matter.  But we have a series

9 of what I call cost factors here that make it particularly

10 apparent in this case.

11                              (Pause)

12          MR. BERNICK:  In this case while none of the personal

13 injury claimants have sought to participate in the estimation

14 proceeding by appearing through counsel in the context of this

15 trial -- and I'll set aside the many hours that we spent having

16 the representatives, the claimants here in connection with

17 discovery matters.  That is their choice, but it doesn't change

18 the fact.  Their choice doesn't abrogate somehow their role as

19 being parties.  They can't say well, we're not here and we

20 insist that we shouldn't have to be here, and we insist that we

21 shouldn't be bound and thereby nullify their status in the

22 case.

23          It's not up to a party to say when he wants or she

24 wants to be a party and when she doesn't want to be a party.

25 You're a party or you're not under law not because you've made

1 a choice.  And, of course, the choice that was made here is a

2 little bit -- is in a sense obviously a little bit more than

3 simply pristine.  It's strategic, because the claimants aren't

4 here therefore they insist that certain things can't be done to

5 them.  But then the ACC and the FCR insisted well, they're

6 different parties so what the claims do doesn't pertain to

7 them.  So it's kind of like a little shell game.

8        And as a technical matter these folks are parties,

9 and it's not a matter that is their election.  And the

10 circumstances of this case are really unique in bringing home

11 exactly how centrally involved they are and how clearly they

12 are parties.  First of all, first plus factor is that they were

13 made parties, that is, that they were given the opportunity and

14 then the mandate to participate in the case or have their

15 claims be barred specifically for purposes of the estimation.

16        Originally they weren't parties there was no bar

17 date.  And then Your Honor, decided and we made a motion that

18 said if you are going to be a claimant at all here you've got

19 to file a proof of claim and then you've got to file the PIQ.

20 So they were made parties to the case, they made themselves

21 parties to the case under circumstances which were specifically

22 for purposes of the estimation.  That was the whole idea.

23        Secondly, these are not matters that are somehow only

24 tangentially tied to the interest of these claimants.  These

25 are matters that relate specifically to their claims.  The

1  estimation is an estimation of their claims.  And that

2  estimation will have ramifications with respect to their

3  claims.  It's not allowance or disallowance, but it bears upon

4  how their claims are going to be treated in this case,

5  administered and treated in this case.  In a sense the

6  estimation is an estimation that relates to the core of why it

7  is that they are here.

8           Number three, as evidence of the intimacy of their

9  involvement in the estimation matter Your Honor could not have

10 been clear at the time that the instructions were given to fill

11 out the PIQ and the bar date was adopted.  Your Honor, we have

12 the quotes that are set forth in our brief said very

13 specifically you, that is, talking to the ACC, ought to make

14 clear to your clients and your constituency that they got to

15 submit this information because they are going to be bound by

16 the result.  How does that mean something other than that they

17 are parties to the case?  So they're going to be bound by the

18 result is exactly why we're here.  And in fact when the notice

19 went out that said there's a bar date, you've got to submit

20 your claim by the bar date the notice makes specific reference

21 to the need to fill out the claim form or give folks an

22 alternative which was to be -- to make reference to or to rely

23 upon the PIQ.

24           So from beginning to end the estimation relates

25 totally to their interest and totally to their interest in

1 connection with the prosecution of their claims.  And all that

2 we are dealing with here is whether folks can say that well,

3 gee, because I have decided not to participate the rules of

4 evidence therefore do not apply to me.  And we would say that

5 the answer to that is no.

6       Now, an argument has been made that 9014(a) which

7 deals with contested matters, it discusses the fact of there

8 being a need to give notice to and serve the party or the

9 people against whom relief has been sought, supplies a de facto

10 test of who is a party within the meaning of the rules such

11 that if you don't seek relief specifically against somebody

12 they are not a party.  I think that is a gross over reading of

13 the provision of the rule.

14       But whatever may be an inference to be derived from

15 that language it's clearly met here.  To the extent that there

16 is anybody who is an actual opponent to the estimation that is

17 an opponent with an interest to the estimation they are people

18 who represent the interest of current and future personal

19 injury claimants.  So whatever kind of derived requirement

20 might be read into 9014 it is obviously and thoroughly met

21 here.

22       Let me turn then to the arguments that are driven by

23 Rule 801 of the Federal Rules of Evidence.  Two issues have

24 been raised.  One is whether the claimants are a party opponent

25 within the meaning of the rule on admissions.  And the answer

1  is clearly yes.  The only -- the word opponent as it appears in

2  the Federal Rules of Evidence was not geared to the difference

3  between a bankruptcy committee and its constituency.  It was

4  geared to the Rules of Evidence as used in all kinds of

5  proceedings.

6          And the purpose of specifying that an admission must

7  be with respect to a party opponent is to guard against -- it's

8  to assure that the only admissions that we're talking about are

9  admissions that are not simply self-serving statements of

10  somebody who's not an opponent.  You cannot refer to the

11  statement of somebody who is a party and is on your side of the

12  case and seek t get that self-serving statement in.  It must be

13  of somebody who has an interest and is against yours.

14          And it is because the statement is made by somebody

15  who has an adverse interest that has some of the indicators of

16  reliability which a self-serving statement would not have.  To

17  read that as being somehow, you know, bankruptcy driven and

18  that must be an actual party as in an adversary I think is

19  ridiculous.  The rule is a rule that goes back for hundreds of

20  years and is not confined to those circumstances.

21          Which then brings us to the last issue that arises

22  under the rule which is the use to be made of the admissions.

23  This is not an issue of admissibility.  This is an issue of

24  use.  And the argument that's been made is that we shouldn't be

25  able -- and the FCR in particular makes this argument -- we

1 shouldn't be able to have these complaints or these

2 questionnaires admissible against the interest of the ACC or

3 the FCR because they are, quote, different parties.  And you

4 can only use the admission against the party who made the

5 statement.

6          And so now we get back into the usual world that

7 somehow these representatives are not actually the same party,

8 they are a different party from the folks that they purport to

9 represent.  Again, there's no precedent, there's nothing that

10 says that that's true under the rules.  The only cases that

11 have been cited stand for a very different proposition which is

12 that the representatives don't have an obligation that runs

13 individually to members of their constituency.  And therefore

14 the representative cannot bind each individual member of the

15 constituency.

16          So, for example, if Mr. Inselbuch says something wise

17 here this afternoon that's not binding on any individual person

18 who is an ACC claimant.  But that is not the proposition that's

19 at issue here.  It's exactly the other way around.  It is

20 whether the representative is bound by what his or her

21 constituency says.  And in deed in the case where we're talking

22 about evidence that goes across the entire constituency is not

23 specifically binding with respect to any individual.

24          This is precisely the type of matter where above all

25 things the representative must be guided by what his own group

1  or constituency has to say.  The question here is whether the

2  ACC and the FCR can say well, I don't care what every single

3  one of my constituency has said under oath on a stack of

4  Bibles, I don't care, because I can say something that's

5  completely different.  It's not binding on me, it can't even be

6  used against me.  That's a totally ridiculous proposition.  Of

7  course they're bound by, of course they have to work with, they

8  have to confront the evidence of what comes from their own

9  constituency.

10        It's not a question of whether they combine their

11  constituency, it's a question of what their constituency says

12  is usable against a position that they take is exactly the

13  opposite.  Otherwise we'd have a ridiculous set of

14  circumstances.  And the same thing also applies to the FCR.

15  Indeed, it's not even clear that the FCR -- the idea that the

16  FCR can say you know what, I have a position that's completely

17  different from the position of all of the current claimants.  I

18  am here representing the Futures.  Well, we can understand that

19  there can be conflicts of interest.  We can certainly

20  understand that.

21        But nonetheless the matters that current claimants

22  admit are a key source of evidence of what the future claims

23  will be like.  It may be that the future claims could be

24  different.  But the evidence of what the current claims are

25  like certainly comes in and is germane to the proposition of

1   what the future claimants are like.  FCR can't pick and select

2   which evidence to even be admissible against it.  It comes from

3   the same constituency that is represented by the ACC that is

4   personal injury claimants and future demand holders.  They have

5   common characteristics.  So that's an issue that may go to

6   weight, but doesn't go to admissibility.

7           So for all those reasons, Your Honor, we really think

8   that the matter is as simple as who is a party to the

9   bankruptcy case.  And in this case to the extent that the Court

10  looks at the circumstances surrounding the issue to see if

11  there are any nuances that might cut against that basic

12  proposition all the circumstances come out exactly the opposite

13  way which is that we are here specifically to determine the

14  nature of the claims that the personal injury claimants have.

15  And the best, indeed, the only source of that evidence is them.

16  And that's why they were brought into this matter and why they

17  were required to fill out the PIQ's.  Thank you.

18          MR. FINCH:  May I have a moment to get the podium and

19  set up, Your Honor?

20          THE COURT:  Yes.

21          MR. FINCH:  And may I have a moment to step up to the

22  white board?

23                      (Pause)

24          MR. FINCH:  Your Honor, I heard Mr. Bernick make two

25  basic arguments in favor of the admissibility of the

1  questionnaires.  The first one is that they're important to his

2  case, and the second that the questionnaire responses are not

3  hearsay because the individual claimants are parties to the

4  estimation case.

5          As to the first argument there's no exception in the

6  Federal Rules of Evidence to the importance of evidence as to

7  make it admissible.  There's no exception to the hearsay rule

8  from importance.  Just because something is important it

9  doesn't mean that it comes into evidence.  So I think that's a

10  red herring.

11          On the question of the 801(d)(2) whether the claim --

12  individual claimants are parties to the bankruptcy makes them

13  automatically parties to every contested matter within the

14  bankruptcy I think there's absolutely no support for that

15  either under Rule 9014 which Mr. Bernick tends to denigrate, or

16  under the evidence rules.  The evidence rules are designed for

17  parties who are in a case.  Party A versus Party B.

18          This case, this estimation proceeding was brought on

19  by a motion that the debtor filed as to which it gave notice to

20  the ACC, the FCR, the US Trustee and a Rule 2002 list which is

21  anybody who signs up and says I want to get notice of what's

22  going on in the bankruptcy.  The parties who responded to that

23  motion, and have appeared throughout the estimation are the ACC

24  and the FCR and the official committees for the unsecured

25  creditors and the equity committee.  After the equity committee

1 was appointed.

2         The only time individual claimants have come before

3 Your Honor represented by counsel is in the context of

4 discovery.  They objected to the discovery served on them in

5 the form of the questionnaire, they objected to certain aspects

6 of -- for their follow up discovery.  They objected to

7 discovery from the debtor, they were on various motions to

8 compel.  I don't need to remind Your Honor of the years of that

9 litigation.

10         The fundamental issue, Your Honor, is there are ten

11 different contested matters in a bankruptcy case.  Let's say a

12 debtor has ten different breach of contract cases pending

13 against it when it goes into bankruptcy and it objects to all

14 ten.  And you're having a contested matter or you're having a

15 trial on whether the allowability of the contract holder with

16 the tenth claim, does claimant ten have a valid claim?  Clearly

17 the parties that had contracts one through nine are not parties

18 to the contested matter between the debtor and creditor Number

19 10.  That's just a fundamental tenant of the bankruptcy -- the

20 way the bankruptcy code works and just because you're a party

21 to the bankruptcy doesn't make you a party to every contested

22 matter in the bankruptcy.

23         This is a contested matter to deal with the aggregate

24 size of Grace's asbestos liability.  Nobody disputes that in

25 some sense the aggregate amount of liability, the findings by

1 Your Honor, binding to the extent that they are under the

2 bankruptcy code.  Whatever that may be.  But it doesn't mean

3 that any individual claimants' claim is allowed or disallowed.

4 And for their purposes the thing that matters is the value of

5 their claim.  You are not individually allowing or disallowing

6 or trying to judgement 100,000 asbestos personal injury claims.

7      And Mr. Bernick in the course of his argument said

8 our position is very simple.  It was and remains that the

9 claimants are parties to the bankruptcy and that they're

10 parties to the estimation.  I wrote that in quotes on there

11 because I heard that and it captured my mind.  And it's

12 fundamentally inconsistent with the position the debtors have

13 taken earlier and throughout the case.  May I approach the

14 bench, Your Honor?

15      MR. BERNICK:  Is that the material that was in your

16 brief?

17      MR. FINCH:  No.  The material that's in the back of

18 the report.

19      MR. BERNICK:  Yeah.  Then I would object to the use

20 of this.  If it wasn't in the brief we had no prior notice of

21 it.

22      MR. FINCH:  Your Honor, the notice is to

23 demonstrative exhibits.  I've never heard that there was a rule

24 that I cannot use material from the court's dockets, state

25 pleadings filed in this case by the debtor and by others as

1  part of my argument.  There's never been a rule that says that

2  the party can't, between the time he files his brief and the

3  time he makes his argument search the docket and find

4  additional material.

5          THE COURT:  What are you handing up?  I'm sorry.

6          MR. FINCH:  This is -- Your Honor, in the summer of

7  2006 the Simmons, Cooper law firm filed a motion to amend the

8  CMO to take discovery from the debtor.  There are three

9  documents in your pile.  The first -- do you have the --

10 there's the motion to amend the case management order.  Do you

11 have that?

12         THE COURT:  Yes.

13         MR. FINCH:  Okay.  They filed that motion.  The

14 debtor filed a pleading called corrected with a footnote

15 objection to motion to amend case management order for the

16 estimation of asbestos personal injury claims.  Do you have

17 that document in front of you?  It should be the second one.

18 It's got a blue tabby.

19         THE COURT:  Yes.

20         MR. FINCH:  Could you turn to Page 4 of that

21 document?

22         MR. BERNICK:  Your Honor, again, this is the problem

23 --

24         MR. FINCH:  Your Honor, the --

25         THE COURT:  I just want to find out what I'm being

1  handed, first.  Okay.  So this is a response?  The corrected

2  objection is a response?

3          MR. FINCH:  This is a response filed by the debtor.

4          THE COURT:  All right.

5          MR. FINCH:  And in that response the debtor clearly

6  says the claimants are not parties to the estimation.

7          MR. BERNICK:  Your Honor --

8          MR. FINCH:  On Page 5.

9          MR. BERNICK:  If Mr. Finch could just relax for a

10  minute.  We have an objection.  I think Your Honor's asked for

11  the identification of these materials which is fine.  If we're

12  going to have argument on it, you know, I guess that will -- if

13  Your Honor so rules we have.  I have an objection.  The rule

14  has been and I've learned the rule over many hearings.  The

15  materials that are to be used at the hearing we get notice of.

16  I now have where I guess almost 260 pages, 300 pages of

17  transcript and two briefs that were literally just given to me.

18  Your Honor, can't possibly digest it all.  I can't digest it

19  all.  It's objectionable.  The question I really have is why is

20  it even necessary?  If Mr. Finch wants to make a point he can

21  make a point.  But I just don't think it's appropriate to --

22          THE COURT:  What's the third document that I'm being

23  handed up?

24          MR. FINCH:  The third document is a transcript from

25  the hearing where Mr. Bernick made certain statements about the

1  status of the parties, the claimants to the estimation.  The

2  only point I'm trying to make, Your Honor, is that in resisting

3  discovery aimed at the debtor by individual claimants the

4  debtor took the position that the claimants are not parties to

5  the estimation and they were not permitted to get that

6  discovery.  And Your Honor did not allow them to get that

7  discovery.  Mr. Bernick even questioned whether the individual

8  claimants had standing to participate in the estimation

9  hearing.

10        THE COURT:  Okay.  Was this before or after we had a

11 proof of claim bar date?

12        MR. FINCH:  It was the summer that the Court had

13 already ordered a proof of claim bar date.  If you turn in the

14 transcript to Page 180, 181 --

15        MR. BERNICK:  Your Honor, again, this is really, you

16 know, if he wants to do this then from now on we'll just revoke

17 the old rule.

18        THE COURT:  I just want to know at this point in time

19 what time frame we're looking at.  Did I have a proof of claim

20 bar date?

21        MR. FINCH:  You had scheduled a proof of claim bar

22 date.  The bar date had not yet occurred.

23        THE COURT:  Okay.  If the bar date had not yet

24 occurred it seems to me once we set a bar date it was pretty

25 clear that at that point in time we were doing a bar date for

1  purposes of estimation.  So, you know, whether or not what

2  happened before and after a bar date have the same relevance,

3  Mr. Finch, I think is somewhat questionable.

4       MR. FINCH:  But the point, Your Honor, is that the

5  parties at the time this was argued knew there was a bar date.

6  The debtor argued that the claimants will file their claims in

7  response to the bar date and then argued notwithstanding that

8  the bar date, all that does is the claimants file a proof of

9  claim form.  A contested matter doesn't ensue from a bar date

10 unless and until the debtor objects to the claim.  The debtor

11 hasn't objected to anybody's individual claim.  There's no

12 contested matter before Your Honor involving any individual

13 claimant.

14       Mr. Bernick made the argument that the claimants are

15 not parties to the estimation hearing even though he knew that

16 they were going to be filing proof of claim forms, even though

17 there was no objection to that, there's still been no objection

18 to the proof of claim forms.  The claimants are not parties to

19 the estimation.  And he argued that and he was successful in

20 that and I think either as a law of the case or judicial

21 estoppel he is precluded from arguing they're anything other

22 than nonparties now.

23       They are clearly not before Your Honor in the sense

24 that a party in lawsuit A that has a lawsuit against the debtor

25 the matters relevant to that lawsuit are before Your Honor.

1  That's not what's before you.  And so --

2         THE COURT:  They are not parties in the sense that

3  there are plaintiffs and defendants and that they are either a

4  plaintiff or a defendant.  And I think Mr. Bernick has

5  recognized that in making the analogy to the fact that this is

6  not an adversary proceeding, that it is a matter coming up in

7  the bankruptcy case.  I think you're both in agreement on that

8  score.  And I agree with both of you on that.

9         MR. FINCH:  But, Your Honor, because this is a

10  particular contested matter and the parties to that contested

11  matter are not the individual claimants therefore the

12  statements of the individual claimants are hearsay.  And if Mr.

13  Bernick had wanted to convert then into something admissible he

14  could have taken discovery in a form that does.  But they are

15  not parties to the contested matter that Your Honor is hearing

16  evidence on as we're going along and therefore there's no other

17  exception to hearsay rule that applies, and therefore the

18  questionnaire responses and the attachments to the

19  questionnaire are inadmissible in this proceeding.  Thank you,

20  Your Honor.

21         MR. BERNICK:  I'd note, Your Honor, for the record

22  I'm told that the actual bar date for the pending claims was

23  not until November 15 of 2006.  All of these proceedings took

24  place before that bar date had passed.

25         THE COURT:  Yes.  The transcript that was handed up

1  was August 21st of 2006.  Mr. Mullady.

2         MR. BERNICK:  Yes.  In fact, the -- I thought the

3  order for that bar date had not even been entered.

4         THE COURT:  So this is even prior to the order for

5  the bar date?

6         MR. BERNICK:  That's correct.

7         THE COURT:  All right.

8         MR. BERNICK:  The order for the bar date was August

9  24, 2006.  This hearing took place on August 21.

10        MR. FINCH:  Your Honor, I would just note that the

11 pleadings leading up to the bar date were on file well before

12 this hearing.  And the reason the claimants represented by the

13 Simmons, Cooper firm made the motion is they asked for

14 discovery so they could respond to the questionnaire and the

15 bar date.  And Your Honor, didn't let them do that discovery on

16 the debtor's argument that the claimants aren't parties to the

17 estimation.  That's what Mr. Bernick argued then.

18       THE COURT:  Okay.  One second, please.

19                         (Pause)

20       THE COURT:  Okay.  Thank you.  Mr. Mullady.

21       MR. MULLADY:  Good afternoon, Your Honor.  Your

22 Honor, you have been consistent on this issue of whether the

23 claimants are parties to the estimation proceeding.  When this

24 issue was first raised in court on January 23rd and I handed a

25 copy of the transcript to Mr. Bernick at page 21 Ms. Harding

1  was before Your Honor, and she said at Page 21, Line 8, "Your

2  Honor, as I think we discussed before with the Court the

3  claimants in this case are parties.  They have filed proof of

4  claim forms and they are parties to the case, to the

5  estimation.  They're under the control of the ACC.  They

6  represent them.  If we don't" -- and then Your Honor

7  interjected, "They clearly don't represent the parties here."

8          And Ms. Harding said well, and then Your Honor,

9  continued.  The parties, the individual claimants are not

10 parties to the estimation.  Some of their information is

11 clearly relevant and it is the kind of information that experts

12 may use in the course of their work in terms of estimating the

13 liability.  But that doesn't mean that the substantive work

14 itself is admissible. As a document upon which this court has

15 any basis to admit the substantive evidence.  And you again a

16 couple of lines later said those parties -- these claimants are

17 not parties to the estimation.

18          I think your instincts have been correct on this all

19 along, Your Honor, and we've heard nothing here this morning

20 that should change that outcome.  On the issue of the usage to

21 which the evidence could put if the claimants were parties,

22 which they're not I heard Mr. Bernick say that the ACC and the

23 FCR are the representatives of the current claimants.  Well, of

24 course, the FCR is not the representative of any current

25 claimant.  The FCR represents the interest of future claimants.

1          Mr. Bernick also said that evidence of what the

2    current claims are like is relevant to what future claims may

3    be like.  Well, that may all be -- that may be true, but that

4    is an analysis that can be done through expert opinion.  I can

5    cross examine Grace's experts on the bases for which they

6    contend that a current claim and current claim metrics, if you

7    will, are representative of what future claims are likely to be

8    or not be.

9          But I cannot cross examine the PIQ responses of a

10   claimant who is not present who has other made statements in

11   that PIQ or admissions about the quality of his or her claim in

12   that PIQ.  That is not something that I am able to cross

13   examine as a representative for future claimants.  And that's

14   precisely the reason why this evidence cannot come in at all.

15   And if it can come in it's precisely why Weinstein's rule -- on

16   Rule 801 of his exposition of Rule 801 is perfectly pertinent

17   to this situation.

18         Weinstein said, and speaking of Rule 801(d)(2), it is

19   generally held that a party's statements may not be admitted

20   under this rule against another party on the same side of the

21   litigation as the declarant party.

22         And for those reasons, Your Honor, we submit that the

23   evidence is not admissible because the claimants are not

24   parties.  And even if it is it cannot be binding on the FCR.

25   Thank you.

1           THE COURT:  Wait.  I'm sorry.  How did that

2   exposition relate?  I lost that.

3           MR. MULLADY:  Well, this goes not to the issue of the

4   admissibility of the evidence at all --

5           THE COURT:  Oh, because you can't cross examine the

6   party because of the declarants not here.

7           MR. MULLADY:  Right.  Well, no.  Let me take it from

8   the beginning.  We've argued in our brief that even if the

9   claimants were parties to the adversary proceeding or of -- or

10  this estimation within the meaning of 801 their out of court

11  statements are not admissible against the FCR in this or any

12  other proece4dding.  And that's because Courts have

13  consistently held that Rule 801(b)(2) limits the admission of a

14  party such that it may only be admitted and introduced against

15  the party admissible for the admission.

16          THE COURT:  Oh, I see.

17          MR. MULLADY:  It's not admissible against a co-

18  defendant or another party that was not responsible for that

19  admission.  I'm sorry.

20          THE COURT:  I missed the point that you were trying

21  to make.

22          MR. MULLADY:  Thank you, Judge.

23          MR. BERNICK:  Your Honor, I just had one short point.

24  I don't know if there's anybody else that wants --

25          THE COURT:  One second, please.

1                          (Pause)

2          THE COURT:  Yes.  I'm sorry.  Anyone else before Mr.

3   Bernick?  Okay, Mr. Bernick.

4          MR. BERNICK:  Just very, very briefly.  I believe

5   that Your Honor -- you obviously did make the statement that

6   Mr. Mullady quoted from that transcript.  That was before I

7   argued and then Your Honor asked at my argument asked for

8   briefs.  And I believe after that indeed you subsequently

9   admitted was the PIQ's.  But be that as it may Your Honor asked

10  for briefs --

11         THE COURT:  I did what?

12         MR. BERNICK:  I believe that you admitted one of the

13  PIQ's in connection with some of the testimony.  I may be

14  mistaken about that.  But be that as it may the reason that you

15  asked for briefs was to get this issue actually presented to

16  the Court for a decision.  So it's kind of -- I don't think

17  it's consistent with the process that Your Honor has set up to

18  somehow suggest that Your Honor already has decided the matter.

19  If you had decided the matter we wouldn't be having briefs here

20  today.

21         Let me deal with the substantive point that Mr.

22  Mullady made.  He said well, you know, the FCR doesn't

23  represent anybody who currently is known or indeed for that

24  matter knowable and the FCR's position will be staked out by

25  experts.  Well, it's true.  In this case all the positions with

1  respect to estimation are staked out by experts.  But the FCR's

2  position in this case indeed under 524(g) the FCR doesn't vote,

3  the FCR is there to state a position and to protect interests.

4  The people who vote are the currents.  And the currents are

5  taken to be -- their vote is taken to be indicative and to

6  preserve the interests of future claimants as well.

7          But when it comes to the expert testimony the matter

8  is even more pointed.  Sure, everybody's got an expert, but

9  everybody's expert has to look to actual factual information.

10 We don't have factual information about the future.  That's the

11 whole problem.  All that we have is factual information abut

12 the current claims and past claims.  And the FCR's experts in

13 this case are no different from anybody's experts when it comes

14 to the fact that they rely for the factual foundation for their

15 opinions on what actually is taking place with respect to

16 current and past claimants.

17         Ms. Biggs is no different than Dr. Peterson.  She

18 takes a look at what is happening with claims today and what

19 has happened to claims in the past.  So does Dr. Peterson, so

20 do our experts.  So that kind of makes our point which is that

21 the foundation for the expert testimony must relate to the

22 currents.  That's why this information must come in.  If no

23 information came in from the currents at all then there

24 wouldn't be anything to talk about.

25         What they're seeking to do is to exclude the

1  information that we want from the currents in exchange for the

2  information that they derive from people who have settled in

3  the past and indeed it's not even clear that they'll offer any

4  of that matter in.  They would rather have their experts

5  testify about it.  But the factual material for all the

6  analysis relates to matters that are either current and past.

7  And the FCR's experts are no different from anybody's in that

8  respect.

9       MR. FINCH:  Just briefly, Your Honor.  The ACC's

10  expert and the FCR's experts don't rely on the current

11  unsettled claimants to project the liability.  They rely on

12  Grace's past history of resolving history.  And what that past

13  data shows up for the cases have been worked up and settled,

14  not what is open and pending and subject to the stay for the

15  past seven years in the bankruptcy.  That's the only point.

16       And finally, Your Honor, the debtor did take the

17  position that the claimants are not parties to the estimation

18  matter, and I think that they got a ruling from your court in

19  reliance on that statement.  I think only fundamental fairness

20  dictates that you continue that throughout.  There are no

21  individual claims who are parties to the estimation.  The

22  estimation was brought on by the motion by the debtor filed and

23  served on the ACC, the FCR and the other official committees.

24  Thank you.

25       MR. BERNICK:  Those statements were made months

1 before the folks became parties to the proceeding by filing

2 their POC's.

3        THE COURT:  Well, I don't see that the claimants are

4 directly parties to the estimation process, but I think they

5 are bound by the results of the estimation.  When I say they're

6 not parties I mean it in the sense that this is not an

7 allowance or disallowance process.  But certainly to the extent

8 they have interest that are involved, because this estimation

9 process will essentially put a cap on what the debtors will

10 have to fund by way of their liabilities to fund the current

11 and future claims into a trust.

12        And so they do have interest that are involved.  And

13 in that sense they are in the bankruptcy sense parties.  They

14 have an interest that will be affected by the outcome of this

15 proceeding even though they are not here litigating their

16 individual claim.  So I think the use of the word party

17 probably has had different meanings at different parts of this

18 case.  And maybe unfortunately maybe we need a new lingo in the

19 bankruptcy world to distinguish party from party.  I don't know

20 because that's the only word we use at this point in time.

21        The difficulty with putting the PIQ's in, I think, is

22 the fact that the claimants themselves are not here to testify.

23 It does seem however that these documents represent admissions

24 of the direct claimants who are involved in the case.  They

25 filed proofs of claim, they are under oath, they have every

1  indicia of reliability, they in fact were -- they being the

2  claimants themselves were notified several times by the Court

3  that this was it.

4        If they were going to assert that they had a claim

5  they had to participate in the process now rather than later.

6  They were not going to be given another chance later to submit

7  proof of what their claim would be, that this was it for

8  purposes of this estimation process.  That this was the

9  evidence that all parties would have to rely on.

10        Having said that it seems to me that that is the

11  nature of the evidence that experts used to calculate the

12  estimation of liability and in that sense in quotes damages,

13  the number that the debtor will have to fund to put into a

14  trust.  And that's what I mean by damages.  The calculation of

15  what the debtors' liability will be to fund a trust.  I have

16  not in any of these cases actually seen a witness who has come

17  in and testified as to the direct injury that the plaintiff has

18  suffered in calculating the estimation.  It's always been an

19  estimate that's done by experts.

20        I think in this context for personal injury work that

21  is the nature of this beast.  You're not looking at any

22  specific individual claim.  You're looking at the aggregate of

23  what the debtors' liability will be to a trust that's going to

24  be formed for purposes of calculating in global terms what the

25  current and future propensity for illness is going to be.

1        As a result, although I think these PIQ's and proofs

2    of claim are directly relevant, and I think the debtors'

3    experts can make every use of them as can other parties, I

4    don't see that they themselves are substantive evidence to be

5    used as admissions by party opponents.  I don't think the

6    individual claimants are party opponents in the estimation

7    process.  This is not an allowance or disallowance process.

8        I do not think that they are substantive evidence in

9    the sense that the debtor is attempting to use them as the

10   direct factual underpinning although I believe that the experts

11   certainly can make use of them as the underlying facts on which

12   their calculations are based.  Because it is clearly the type

13   of evidence that an expert would use in calculating the

14   estimations for this purpose.  So to the extent that the

15   experts would testify that yes, this is the kind of evidence on

16   which I would rely it's under oath, it has every indicia of

17   reliability.  I think it can be used.

18       To that extent I think that the documentation itself

19   can be used as the underpinning for the expert calculation.

20   But to say that it can be admitted as the substantive evidence

21   without the party here for cross examination I don't think it

22   can be used in that sense.

23       MR. BERNICK:  Well, here's the way -- I appreciate

24   that, Your Honor.  I mean, here's the practical problem that we

25   face.  If we wanted to cure that probably relatively simple to

1 say and very difficult to execute which is that we could get

2 the people who are the signatories for all those questionnaires

3 and we could hail them into this court, they're all parties to

4 this case.  We could say, you know, get your plane tickets,

5 come out, you've got to be here in court.  You're also -- to

6 this court's jurisdiction.

7          And then we could have thousands upon thousands of

8 family representatives come here and attest to the fact that

9 yes, it's mine in which case it's no longer hearsay.  It comes

10 in because it comes in under the other statement that is other

11 clause of 801 which is non hearsay.  So as a practical matter

12 we could do all of that, and nobody wants to do all of that.

13          The area where I think it has spice, Your Honor, is

14 that there are particular questionnaires that will be

15 particularly illustrative of problems.  Indeed there may be --

16 even be an issue about how certain questionnaires have been

17 read.  And to the extent that there's an issue between two

18 experts on how to read a questionnaire or what the

19 questionnaire stands for the concern that I have is that the

20 document is not even in evidence.  So this Court and indeed a

21 court of appeals would not have this document in the rec -- I

22 mean, literally in the record to be able to assess whether the

23 expert testimony was true to the underlying information or not.

24 It wouldn't be part of the record in the case.  That's problem

25 one.

1              Problem two is that obviously we're not going to

2    submit all of the questionnaires, but we are going to have

3    aggregated testimony about the data that has literally been

4    derived from the questionnaires.  And it'll be presented by way

5    of summary, Rule 1006 summaries.  The expert reports are filled

6    with summaries.  Summaries generally have to be summaries of

7    evidence.  They have to be summaries that are correct summaries

8    of the evidence.  So then we face the problem about whether a

9    summary can come in under Rule 1006 when the underlying

10   material is not otherwise admissible because Your Honor has

11   determined it's not an admission, it is hearsay.

12             And then we're into the situation well, under what

13   rule does the expert's summary come in?  And again, the expert

14   may be able to rely upon that summary under Rule 702 because

15   it's the kind of information that is customarily relied on.  It

16   can be brought to the Court's attention.  But again, I'm not

17   sure if it's actual evidence in the case.  And that's why we

18   really get into this problem.  We're not seeking -- and why I

19   say the matter's important.  We're not seeking to --

20             THE COURT:  Wait.  I'm not certain why it is not in

21   quotes evidence in the case.  It is a proof of claim that is

22   uncontested, no one has raised an objection to it, it's filed

23   of record in the case, it's clearly a document that is

24   uncontested, that is prima facie evidence of the document in

25   the case.

1              MR. BERNICK:  And we have no issue.  We have no issue

2    with any of that, and that we don't need this ruling.  What I

3    want to obviate is the argument that because it doesn't come in

4    as an admission and it's hearsay, that's what they'll say is

5    it's hearsay, that the document really can't become part of

6    matter of record of the case and we can't have summaries of it

7    which I think would be an absurd proposition, but I see it

8    coming.  And that, I think, would be intolerable.  I don't

9    think you could have that.

10             So if it comes in as a statement of a party or as an

11   attestation of a party to the bankruptcy case and then the

12   bankruptcy case as in Federal Mogul becomes part of the record

13   of the contested proceeding we have no quarrel with that.  If

14   Your Honor's concern is that because it's an admission here we

15   will seek to use it as an admission or somebody will seek to

16   use it as an admission in some proceeding for allowance or

17   disallowance we're happy to stipulate that it won't be useable

18   for that purpose.

19             It's not proffered for and not received for that

20   purpose.  It's received solely for purposes of the estimate.

21   It may be that it becomes admissible in some subsequent

22   allowance or disallowance proceeding under the rules, but

23   that's not an issue that we're crossing and we're prepared to

24   disavow that any use of a document in this case was done for

25   that purpose and will have that kind of effect.

1          But we have to have some way of having it being a

2    record to the case.   And the case filings, their experts want

3    to use the old case files.   What about all the statements in

4    the old case files?

5          THE COURT:   Same problem.

6          MR. BERNICK:   They're also completely inadmissible,

7    and all the summaries --

8          THE COURT:   It's going to be the same problem.

9          MR. BERNICK:   -- all the summaries are completely

10   inadmissible.

11         THE COURT:   It will be the same problem.

12         MR. BERNICK:   So I really -- and with respect to the

13   old case filings you have the additional problem which is you

14   have settlements.

15         THE COURT:   That will be an even worse problem.

16         MR. BERNICK:   So I guess what I'm looking for is that

17   if Your Honor were to determine maybe as a way of resolving

18   this that they are admissible in the bankruptcy case itself and

19   that the Court -- as the Court did in Federal Mogul can take

20   judicial notice of the record in the bankruptcy case itself and

21   in that respect those materials will be in evidence here and

22   then will not be deemed admissions for purposes of allowance

23   and disallowance.   I think we get to where we want to go.   But

24   we have to have it be evidence that's useable.

25         MR. FINCH:   Your Honor, the questionnaires cannot

1  come in -- as I understand your ruling it cannot come in for

2  their truth because they are hearsay and their not admissions

3  of a party opponent.  Mr. Bernick is concerned about a record.

4  He can put the questionnaires in for the purpose of proving

5  what they say.  And then there's some dispute between the

6  experts about what a questionnaire, group of questionnaires

7  says.  The questionnaire is in for -- the questionnaire says X

8  but it's not in for its truth.

9        And you can cross examine the expert about what he

10 thinks the questionnaire says or what he doesn't think the

11 questionnaire says or she thinks it says or doesn't think it

12 says, and that's the proper way to handle this.  That's the,

13 you know, documents can come in for many purposes some of which

14 are for their truth, some of which are for not.  If he wants

15 that -- the simplest way to cure the problem is to put a

16 questionnaire in not for its truth.

17        THE COURT:  Well, I can clearly take judicial notice

18 of the case file part of which includes the proof of claim

19 docket.  And to that extent the information is part of the case

20 file.  Taking judicial notice does not incorporate taking

21 account of the truth or not truth of the information in that

22 file.  It simply is an acknowledgment of the fact that there is

23 a document of record in the file.  And to that extent I can

24 certainly take -- I can acknowledge that the proofs of claim

25 have been filed and the PIQ's are part of the case file, and

1  that they are filed under oath, to the extent that they are.

2  Because they are.  And --

3       MR. BERNICK:  But, Your Honor, then they are, I mean,

4  the distinction Mr. Finch drew is a distinction that is only

5  meaningful to the extent that a statement is offered not for

6  its truth, but for the purpose of establishing some other facts

7  such that an action was taken or that it had some kind of

8  impact.  That is not what we're doing here.  These are

9  statements that are under oath and are being offered precisely

10 for their truth.  And I think that when I say judicial notice,

11 judicial notice means it comes into evidence.

12       It comes into evidence for whatever purpose Your

13 Honor deems appropriate.  But taking judicial notice is not

14 limited to the fact that there are pieces of paper and words on

15 a page.  Judicial notice is important because it goes to the

16 substance of what is taken notice of.  You can take notice of

17 pieces of paper, you can also take notice of the fact that they

18 represent statements of claimants that were signed under oath

19 in our prima facie exactly as Your Honor indicated.

20       THE COURT:  That's right.  I can.  I can take

21 judicial notice of exactly what the legal consequences of

22 filing a proof of claim under oath are.  And those right now as

23 I understand it there are no objections filed to the proofs of

24 claim that are of record.  As far as I know there are none

25 except for the couple that the debtors filed the proofs of

1 claim for and then objected to with respect to the ZAI issues,

2 but that's not what we're talking about now.  So I guess I

3 should put that caveat of record.

4        But other than those which are not at issue right now

5 those are property damage not personal injury proofs of claim

6 in the first place, there are none.  So to the extent that

7 there are proofs of claim for personal injury filed of record

8 under oath that are not objected to those are prima facie

9 evidence according to the law of what the claim says.  And I

10 can take judicial notice of all of that.

11        MR. BERNICK:  What the claim is.

12        THE COURT:  Yes.  What it is.

13        MR. BERNICK:  According to the claim.  Yes.  I don't

14 have a problem with that and we can proceed on that basis.

15        THE COURT:  All right.  I think this issue is

16 resolved.

17        MR. BERNICK:  Your Honor, I think the next thing is a

18 status report with respect to the estimation matter.  And on

19 that, Your Honor, I just have a brief point to raise.  And I

20 know that we're going to get issues raised about whether it

21 should be discussed and -- chance to address that in about 120

22 seconds.  Because I don't intend to argue the matter without

23 your having the opportunity to say that it shouldn't be argued.

24 Mr. Finch, and I think, Mr. Mullady take issue with my raising

25 this at all.  And I want to explain why it is that I'm doing it

1  and then Your Honor can hear from Mr. Finch and Mr. Mullady and

2  decide whether we're going to -- and Mr. Inselbuch if he wants

3  to, and we'll decide whether we're going to address this this

4  afternoon.

5           THE COURT:  Wait.  I'm sorry.  Is this on the

6  adversary?

7           MR. BERNICK:  Yes.  There's that status report on the

8  estimation trial.  And this is a matter that relates to the

9  estimation trial.

10          THE COURT:  Oh.  All right.  I thought --

11          MR. BERNICK:  And that's Item 10, I think, on the

12  agenda.

13          THE COURT:  Okay.

14          MR. BERNICK:  The issue really is what to do with the

15  proposed testimony that is to be offered by lawyers.  And the

16  reason that I want to talk about this today is that we have

17  taken -- we've -- pursuant to the discussions we had before the

18  Court before we propounded document requests that are kind of

19  more or less informal document requests.  Maybe formal, I don't

20  know, to Mr. Krause who was designated by the ACC to be the

21  test case of the lawyers that are testifying as fact witnesses.

22  There were three of those.  Mr. Cooney, Mr. Krause and somebody

23  from Goldberg, Pursey.  So Mr. Krause is the person who is

24  proffered for this deposition and then Mr. Snyder is both a

25  fact witness and an expert witness.  We took his deposition as

1  an expert witness.

2          The depositions were taken relatively recently.  I

3  know that the position of the ACC is that any motions to be

4  filed with respect to the lawyer depositions were to be filed

5  ten days after the transcript became available.  I'm not sure

6  it's worth getting back into the scheduling debate.  Both

7  motions were filed today.  I think actually the Snyder motion

8  may have been filed last week.  But the motion with respect to

9  Mr. Krause was filed today.  So we comply with that

10 requirement.  We know that the ACC and the FCR will clearly

11 respond to the motion and then we'll reply, et cetera, et

12 cetera.

13         And I'm not here to argue the motion.  I'm here to

14 flag a fundamental problem that we have and urge that the Court

15 take up at some point before we get to the point where, you

16 know, the trial's started up again and the thing kind of lags

17 and it gets carried forward.  The question about what to do

18 with this whole area.  And the same fashion that Your Honor

19 wanted to have a discussion about ZAI, kind of in a more

20 informal basis before people filed a bunch of motions.

21         I think that it might be worthwhile to have a few

22 minutes of discussion today on what should happen with respect

23 to the -- these deponents.  And I'm prepared to talk about that

24 further except that I've used up my 120 seconds, and I know

25 that Mr. Finch will want to argue that I shouldn't be able to

1  say anything more.

2          MR. FINCH:   Your Honor, may I approach the bench?

3                        (Pause)

4          MR. FINCH:   Your Honor, the subject of lawyer

5  witnesses and lawyer discovery as you know has come up several

6  times.   The most recent of which was at the January 28th, 2008

7  omnibus hearing.   And following that argument on that or

8  discussion of that Your Honor said very clear briefing

9  schedules for how this would proceed.   We would make Mr. Krause

10 and -- we would pick one of the witnesses.   We've narrowed it

11 down to Mr. Krause and he's the only witness -- lawyer witness

12 we're going to call that's a plaintiff's lawyer.   We're not

13 going to call Mr. Cooney or Mr. Goldberg.   And Mr. Snyder.

14         We were to make those gentlemen available for

15 deposition by the end of February.   They were both deposed.

16 And then ten business days after -- Your Honor set a schedule

17 that ten business days after the transcript became available

18 the debtor would file a motion in limine with respect to those

19 gentlemen's testimony, and the ACC and the FCR would have ten

20 business days to respond, and then someone would file a notice

21 of completion of briefing.   There was no opportunity for reply,

22 and it'll be offered -- it would be argued at the estimation

23 hearing at sometime during the estimation hearing.   And the

24 document I handed to you is the transcript of the January 28th

25 hearing which, do you have the document in front of you, Your

1  Honor?

2          THE COURT:  Yes.

3          MR. FINCH:  On Pages 94 through 96 describes the

4  process by which this issue would be teed up and resolved.  Mr.

5  Bernick has -- he filed a motion with respect to Mr. Snyder

6  after the close of business on Friday evening.  I've not seen

7  the motion that he filed with -- in respect to Mr. Krause.  He

8  must have filed it today while I was traveling to Pittsburgh.

9  We think it's fundamentally unfair to have any argument about

10 these matters now.  It's basically attempting to preview.  That

11 argument's unfair to the Court, it's unfair to the parties.

12 This was not even on the agenda until Friday afternoon when

13 they added a line item within the PI status conference to refer

14 to Mr. Krause and Mr. Snyder.

15         We now have Mr. Bernick's motions, we'll respond to

16 Mr. -- the one relating to Mr. Snyder ten business days from

17 the 14th of March which makes it the 28th of March.  We'll file

18 the response to Mr. Krause's motion ten business days from

19 today which is the 31st of March.  Neither one of these

20 gentlemen is going to be coming to the stand until at the

21 earliest April 8th or 9th so we can argue it at some point

22 during the estimation hearing.  I'm not prepared to go forward

23 with argument today, it's fundamentally unfair.  And we will

24 respond to Mr. Bernick's briefs in accordance with the schedule

25 that Your Honor ordered us to follow.  Thank you.

1          MR. MULLADY:  I join those comments.  Thank you.

2          MR. BERNICK:  Your Honor, I understand what Mr. Finch

3  has said, but I don't think that there is any real secret here.

4  The fundamental problem and I don't think we can wait.  And I

5  think if Your Honor will give me a couple minutes, I'm not

6  going to be very long, really I'm going to go back to exactly

7  what we discussed before Your Honor the last time which is

8  these huge problems with privilege.  And Mr. Finch was at the

9  deposition, he was fully participating.

10          MR. FINCH:  Your Honor, can we have ruling on whether

11  this is proper or not?  I think this is fundamentally improper

12  and unfair.

13          THE COURT:  I don't even know what the issues are

14  because I haven't seen the motions.  Obviously I wasn't at the

15  depositions.  I understand that there will be a privilege

16  concern if it's lawyer witnesses, but frankly I think we ought

17  to do it on the schedule that was addressed because otherwise I

18  don't know how anybody can respond to the arguments when they

19  haven't seen the motions.

20          MR. BERNICK:  But here's the problem, Your Honor,

21  this is a very practical one.  The idea they can't respond.

22  This is the same issue that everybody's known about.  We've

23  argued about it repeatedly.  Mr. Finch sat through the

24  deposition.  And the reason we can't wait is that by the time

25  this thing actually comes up given the schedule that Mr. Finch

1  has indicated we filed our brief today.  Ten business days

2  would put us essentially two weeks from today which would be, I

3  don't know what that is.  That's actually the first few days of

4  April.

5           MR. FINCH;  March 31st.

6           MR. BERNICK:  Yes.  So and then he's going to appear

7  on April the 8th.  Well, that's a week later which means that

8  nothing can really happen before his appearance.  And if

9  nothing happens before his appearance I envision exactly what

10  Your Honor, indicated before is happening.  Which is that he's

11  going to take the stand unless Your Honor has determined in

12  advance that he can't.  And if he takes the stand what Your

13  Honor has said before is that you're going to direct him to

14  produce certain things.  And if he doesn't produce them then

15  the testimony is not going to stand.  Because, remember, they

16  wanted us down to Texas to get process over him.

17           And the problem with that scenario, Your Honor, is

18  that we have to engage in an enormous level of preparation for

19  his testimony, and we then are at risk of what actually it is

20  that he produces and how the thing plays out on the stand.

21  This matter should not be left to a give and take that takes

22  place a couple days before he testifies or when he's on the

23  stand.  It's way too important.  And we're talking about not

24  just -- there were over 40 different instructions not to answer

25  questions.  There were almost no document requests that were

1 not objected to on the grounds of privilege.  So --

2          MR. FINCH:  He's now arguing the motion.

3          MR. BERNICK:  I'm pointing out --

4          MR. FINCH:  I think this is improper and unfair.

5          MR. BERNICK:  Your Honor, they want to cram this down

6 by not providing an adequate opportunity for this Court to

7 consider it, and what I'm saying is they shouldn't have that

8 opportunity.  It should be taken up on a more timely basis.

9 And the fact, the fact that they got this general schedule in

10 place doesn't trump this Court's power to take it up on a more

11 timely basis.  That's all that I'm saying.

12          THE COURT:  Well, if I don't have an adequate

13 opportunity then you folks will be spending June and July and

14 August and September or wherever with me.  So that's how it's

15 going to be.

16          MR. FINCH:  Your Honor, thank you.  We'll respond in

17 writing on the 31st.

18          MR. BERNICK:  Well, Your Honor, again, it's amazing

19 how anxious that these folks are to avoid having this thing

20 heard in a timely fashion.  Why don't we tee it up to be heard

21 next week?

22          THE COURT:  Well, I don't know.  Can it be teed up to

23 be heard next week?

24          MR. FINCH:  Your Honor, we should have an opportunity

25 to write briefs.  We are in the middle of trial preparation, we

1 have the rest of their case, we're beginning our case probably

2 on April 1st.  Mr. Bernick has known about Mr. Krause's

3 identity since February of 2006.  If he had such a big concern

4 he could have tried to get the documents in and filed a motion

5 in limine in -- whenever to keep him from testifying.  Os this

6 is not me forcing him to hurry up and wait.  This is the

7 schedule he agreed to.  Your Honor, put us under this schedule.

8          The way it would normally work is that, you know,

9 they filed a motion in limine, we respond to the motion in

10 limine, on the morning of April 7th or the 8th or whenever the

11 matter comes ripe we have a short argument about it, 20 or 30

12 minutes per side, and then Mr. Krause can either testify to the

13 extent limited by the rulings in the motion in limine or if you

14 have to hear the questioning you can hear the questioning.  But

15 the point, Your Honor, is that you had an order about when

16 things would happen in this case.  You had an order about when

17 this would be briefed.  We will respond within a time frame of

18 Your Honor's orders and it will come up in the ordinary course

19 in the estimation hearing.  Thank you.

20          MR. BERNICK:  If we actually pursue this as a motion

21 in limine Ms. Bostick tells me that it's actually one calendar

22 week to file a response.  If that's so they should file it --

23 if Your Honor would then -- we should have a response by next

24 Monday.  We can take it up next week.  But we have to make the

25 time for it.  It's easy for them to say just let it ride

1  because then there's the momentum of the pressure of time, just

2  let something happen.  This will be a complete mess.  It will

3  be exactly -- it'll be returned to the days of your when we

4  have lost of people in court arguing all about this thing and

5  privileges of clients.

6          There were three different lawyers that got on the

7  telephone from Barron and Budd during the course of Mr.

8  Krause's deposition and they couldn't even agree amongst

9  themselves to say nothing with Mr. Finch about what objectors

10  should be made to Mr. Krause's testimony.

11          MR. FINCH:  Your Honor, this again is arguing the

12  motion.  We will respond ten business days from when the two

13  motions are filed.

14          MR. BERNICK:  It's a motion in limine.  It should be

15  within one calendar week.

16          MR. FINCH:  No, no.  Your Honor --

17          THE COURT:  I set a schedule, I believe.

18          MR. FINCH:  Your Honor, the motion in limine response

19  -- may I be heard, Your Honor?  The motion in limine was in the

20  December 5th, 2007 case management order.  There was schedule

21  for motions in limine.  That schedule was modified on January

22  28th, 2008 with respect to the lawyer witnesses.

23          MR. BERNICK:  Where does it say that?

24          MR. FINCH:  On January 28th, 2000 --

25          THE COURT:  I said, on Page 95, "Why don't I say ten

1 days after the deposition for the motion in limine and ten days

2 to respond.  Then you should have the transcripts and

3 everything back so it shouldn't be an issue."  So it's ten

4 days.

5          MR. FINCH:  And it was ten business days --

6          MR. BERNICK:  Again, it's just remarkable to me that

7 they're so scared of this issue they can't just submit a simple

8 brief.

9          THE COURT:  Well, regardless that's what the schedule

10 was, that's the order that we're going to stick to.  I hope

11 it's not a mess.  If it's going to be a mess somebody should

12 have told me that back then so that I didn't create a mess.

13          MR. BERNICK:  Respectfully, Your Honor, we raised

14 this specific issue, this specific issue and repeatedly.  We

15 raised it in December.  We raised it in January.  This is

16 exactly what we predicted would happen.

17          THE COURT:  Well, Mr. Bernick, I made a ruling in

18 January.  Everybody said fine, fine, fine.  There's a

19 transcript full of fine, fine fines in here.  Somebody should

20 have said no, not fine.  Nobody said no, not fine.  So that was

21 the ruling, that's the way it's going to be.  And if it's a

22 mess then next time say no, not fine, and I'll try to do a

23 better schedule.  That's how we're going to do it.  And if it

24 turns out that we're still trying this case in June, which I

25 certainly hope not, or July or August all of you who have

1  vacations change them.  You're going to be with me.  That's

2  just the way it's going to be, folks.

3          MR. BERNICK:  Your Honor, there might be a way -- I

4  guess what we'd like to do then if their brief is they want the

5  full ten business days to do the brief I guess we're just going

6  to have to try to figure out then when during the trial this is

7  going to be taken up.

8          THE COURT:  Yes.

9          MR. BERNICK:  And, let's see, ten business days would

10 be Monday the --

11         THE COURT:  I didn't say business days.  I said ten

12 days.  Ten days to respond.  There's nothing about business on

13 Page 95.  It's ten days.

14         MR. BERNICK:  Okay.

15         MR. FINCH:  Your Honor, at the top of 95, it is.

16         THE COURT:  It's ten days.  Paragraph, "All right.

17 Why don't I say ten days after the deposition for the motion in

18 limine.  You've got ten days.

19         MR. BERNICK:  Okay.  So I guess that would put us

20 when, in March?  March 27th?  So maybe if we could look for --

21 well, we'll talk with Mr. Finch and Mr. Mullady and try to

22 figure out -- I think that's towards the very end of our case.

23 And it may be that there'll be some leftover time on one of

24 those days before their case starts, perhaps, or just at the

25 start of their case.

1          THE COURT:  So it looks like March 28th, I think, is

2 the date that they have to be -- that their brief or responses

3 have to be filed.  So the next date after that that you're

4 here, that's a Friday.

5          MR. BERNICK:  Right.  I think we're there the next

6 Monday and Tuesday.  Or Monday?

7          UNIDENTIFIED SPEAKER:  Monday.

8          MR. BERNICK:  Monday and Tuesday.

9          UNIDENTIFIED SPEAKER:  The 31st and the 1st.

10          MR. BERNICK:  Yeah.  So maybe one of those two days.

11          MR. FINCH:  That's fine.

12          MR. BERNICK:  Yeah, and I -- but that's --

13          THE COURT:  Well, the 31st, I would prefer, if

14 possible, to have the 1st because depending on when you file

15 them on the 28th I may not even see them over the weekend.  I

16 hope you can get them filed in time that I can read the things

17 over the weekend.

18          MR. FINCH:  Your Honor, we'll file them by noon on

19 the 28th.  We'll file the response both to Mr. Krause and to

20 Mr. Snyder on the 28th.  And I suggest what we do is -- the

21 debtor has told us that Mr. -- excuse me, Dr. Florence is not

22 available until March 31st to testify in any event.  And I

23 think he's their last live witness.  Is that right, David?

24          MR. BERNICK:  That's correct.

25          MR. FINCH:  Okay.  So I expect that his direct and

1 his cross will take the entirety or at least most of the day on

2 the 31st.  What I would suggest we do is the first order of

3 business on the 1st since that's their last witness would be

4 the argument of this and then we would start our case in the

5 late morning or the afternoon of the 1st.

6           MR. BERNICK:  That's fine.

7           THE COURT:  All right.  Well, why don't we say that

8 we will take this argument after the debtor rests?

9           MR. FINCH:  Okay.  That's fine.  And I'm

10 anticipating, Your Honor, we each filed our schedule of

11 expected order of witnesses.  I'm anticipating the debtor will

12 rest on the 31st and we'll begin our case on the 1st.  That's

13 what I've told my witnesses in terms of prepping and scheduling

14 stuff.  And I don't see any reason why this would interfere

15 with that.

16           MR. BERNICK:  Very well.  That's all that I have.

17           THE COURT:  All right.  Let me make a note, please.

18                     (Pause)

19           THE COURT:  Mr. Mullady.

20           MR. MULLADY:  Yes, Your Honor.  Just as a point of

21 information for the Court just to let the Court know what the

22 outcome was of Your Honor's ruling at the last omnibus that

23 Grace be permitted to file a surreply declaration for Dr.

24 Elizabeth Anderson and thereafter the FCR would be permitted to

25 submit additional briefing.  No surreply declaration was

1  submitted and therefore no additional briefing has been

2  submitted.

3       There is one loose end on this and it's a matter I'll

4  work with the debtors to resolve.  And that is our request for

5  production of the reliance material --

6       MR. BERNICK:  Your Honor, I would object.  I would

7  object.

8       MR. MULLADY:  Excuse me.

9       MR. BERNICK:  I would object to this.  This is, you

10  know, I had no notice of this.  This has been a subject of

11  discussion with Ms. Harding.  Ms. Harding is not here.  There

12  was no notice given that this would even be raised today.  So,

13  I mean, that's a little bit of --

14       THE COURT:  Look, if you folks are talking discovery

15  issues as to which you haven't had colloquy then you should be

16  talking to each other before you talk to me.  That's what the

17  rules require.  So have you had your colloquy?

18       MR. MULLADY:  We exchanged letter, Your Honor, and I

19  was merely informing the Court that this is something that's

20  likely going to go to motion practice, and that will be

21  forthcoming.  That's all.

22       THE COURT:  Okay.

23       MR. MULLADY:  Thank you.

24       THE COURT:  Mr. Restivo.

25       MR. FINCH:  Your Honor, there was one other PI issue,

1 but I don't know if the debtor wants to take this up or not.

2 Can I have one minute with Mr. Bernick?

3          THE COURT:  Yes.

4                    (Pause)

5          MR. BERNICK:  Your Honor, Mr. Finch properly points

6 out we've had some dialogue about -- our first witness we

7 decided to change, and we're going to be calling Dr. Lees first

8 which then means that our first witnesses next week will be --

9 witnesses next week will be three instead of four.  And I've

10 heard kind of rumblings from witnesses about coming out on

11 Easter Sunday.  So we've flooded the idea with our colleagues

12 on the other side of the room about not having trial on Monday

13 and simply picking up with Tuesday and Wednesday of next week.

14 And I want to alert the Court to that idea.  We're trying to

15 make sure that it works out so that somebody's testimony

16 doesn't get cut in two on Wednesday.  But would Your Honor have

17 an objection if we did not proceed on Monday?

18          THE COURT:  Folks, it's your trial time.  I've got

19 the days reserved for you.  If you want to shorten your trial

20 days it's up to you.

21          MR. BERNICK:  Okay.  We  may also think -- we can

22 think about --

23          THE COURT:  What I'm not going to do is keep my staff

24 here.  Folks.  What I'm not going to do is keep my staff here

25 until all hours of the night to accommodate your shortening

1  your days.

2          MR. BERNICK:  Yes, I understand that.

3          THE COURT:  I'm not doing that.

4          MR. BERNICK:  And we understand that.  Well, we'll

5  let the Court know, I think, probably either probably tomorrow

6  about what we've come up with.  We're sensitive to that, Your

7  Honor.

8          THE COURT:  Okay.  Mr. Restivo.

9          MR. RESTIVO:  I love following bodily injury, Your

10 Honor.  We're now on matters relating to asbestos PD claims and

11 I would like to start with a status report or maybe even

12 possibly exchanging status report, Your Honor.  With respect to

13 ZAI, Your Honor, if the Court agrees Mr. Westbrook and I have

14 agreed on a filing schedule which accommodates both sides and

15 allows for argument at the April omnibus on April 21.  We've

16 had -- we're asking the Court to allow us to make some minor

17 adjustments to the schedule because of some other things some

18 other folks have planned.  And so we would like on Tuesday,

19 which is next Tuesday, March 18th Grace would --

20         THE COURT:  That's tomorrow.

21         MR. RESTIVO:  Yes.  Tomorrow.  Tomorrow, Your Honor,

22 we will file our ZAI bar notice papers, and Messrs, Westbrook

23 and Scott will file their class action related and some other

24 related papers.  I think under the Court's schedule those need

25 to be filed today.  And if it's okay with the Court we've given

1   each other an extra day.

2        On Wednesday, April 9 both sides will file responses

3   to the other side's pleadings.  I believe that was moved from

4   what would have been April 4 due to a vacation in there.  And

5   then on Monday, April 14 both sides may need not file replies

6   to the other side's response and then we would still have

7   argument on Monday, April 21.  That changes the Court's

8   schedule a little bit, but it would really accommodate the

9   needs of the parties.

10       THE COURT:  Just a second.  How full is your April

11  omnibus calendar going to be?

12       MS. BAER:  If things go correctly we have three

13  environmental matters up which is unusual.  Nonasbestos things

14  that will take some time because there's going to be some

15  public comment.  But that could get kicked to May depending

16  upon how many public comments come in.

17       MR. RESTIVO:  To the extent possible we would like to

18  keep our April date for ZAI.  If possible.

19       THE COURT:  Mona, do you have the schedule for the

20  22nd as opposed to the 21st in April?  Did we have a plan

21  confirmation hearing?  We may be able to do it on the 22nd

22  rather than the 21st, Mr. Restivo.  Let me check and see what

23  that's all about.

24                     (Pause)

25       THE COURT:  Would that just be you and Mr. Westbrook,

1 not the entire panoply of everybody involved in Grace?

2          MR. RESTIVO:  Mr. Scott, Mr. Bernick, but not anyone

3 else.  And not traditional property damage.

4          THE COURT:  And Mr. Bernick, if you chose you could

5 do it by phone?  Or would you be --

6          MR. BERNICK:  I think I'm going to be doing the --

7          THE COURT:  Argument?

8          MR. BERNICK:  On most of that stuff.  Mr. Restivo

9 will as well, but I think the lion's share of it will fall to

10 me.  I don't even have my calendar here, frankly, Your Honor.

11 But I've no problem with trying to schedule it then and I'll

12 know as soon as I get back to the office or after I leave here

13 what my calendar is.

14          MS. BAER:  Your Honor, with respect to the 21st the

15 three environmental matters, they won't take up the kind of

16 space that the asbestos things do.  I mean, I truly don't think

17 they'll take more than an hour, total.  And those are the

18 three.  I can't think of anything of any significance on the

19 agenda other than the three environmental matters.

20          THE COURT:  Okay.  Have we been starting Grace at

21 one?  I just don't recall with the change in the schedule.  At

22 one?

23          MS. BAER:  Yes.

24          MR. BERNICK:  I think frankly, Your Honor, that we

25 should be able to do it on the 21st, because it sounds like

1 some of the environmental matters may slip anyhow.  If the 22nd

2 is available and I can let the Court know before the end of the

3 day today.  And if that makes sense, do it on the 22nd.

4        THE COURT:  Well, what I'm -- I'm wondering whether

5 we could just start perhaps at noon.  But I'm going to have to

6 check.  Pardon me just a minute, Mr. Restivo.

7                    (Pause)

8        THE COURT:  All right.  Mr. Restivo, we could start

9 at noon on April 21st for arguments.

10        MR. RESTIVO:  Thank you, Your Honor.

11        THE COURT:  That time, just so you know, Mr. Restivo,

12 there are a number of adversary rules to show cause in a

13 different case that are set at 11:30.  I have a feeling they're

14 all going to go off, but that time might be flexible by a few

15 minutes.

16                (Judge and Clerk confer)

17        MR. BERNICK:  That's going to be -- Flynnco

18 (phonetic) is now going to be on the 22nd?

19        THE COURT:  It's been scheduled for the 22nd for the

20 disclosure statement, but that's what had us confused because

21 the calendar still shows it for the 21st, but it shouldn't be

22 on the --

23        MR. BERNICK:  That now tells me that I am available

24 on the 22nd, because I was going to have to be there.

25        THE COURT:  It also has Combustion scheduled for

1  something on the -- okay.

2             MR. BERNICK:  No role in that --

3             THE COURT:  All right.

4             MR. RESTIVO:  So, that's the status report, Your

5  Honor, on ZAI.  With respect to traditional property damage

6  claims as of today, we have 175 property damage claims

7  remaining, down from somewhat over 600 when we started the

8  property damage claims adjudications and settlements.  Of those

9  175, Your Honor, on April 9, 2007, we argued what are now 99

10 California claims, two Arkansas claims, and four New York

11 claims.  The numbers were a little bit different when we argued

12 them.  On September 10, 2007, we argued what are now 54

13 Canadian claims, so that of the approximately 175 remaining

14 property damage claims, approximately 161 claims are sub-

15 judiciary before this Court.

16             The remaining claims include two -- the remaining 15,

17 16 claims include two Allegheny Center claims we're going to

18 address shortly, and then a balance of 12 or 13 claims which

19 are not subject to any motions.

20             At the January 28th omnibus, Your Honor, the Court

21 indicated that you and your staff had a draft ruling on

22 California and on one other set of claims, you may have said

23 Arkansas, you indicated that the Court and staff were close to

24 issuing those rulings, but they weren't ready for prime time

25 yet.  We know that the Court is going to get heavily involved

1 in bodily injury proceedings beginning next week, and so we

2 were wondering if we diplomatically could ask the Court for a

3 status report on where --

4       THE COURT:  I got sidetracked based on the fact that

5 I got put under a time pressure by a District Judge because I

6 had forgotten about a matter that actually I didn't know I

7 could adjudicate because it was on appeal and I didn't think I

8 could adjudicate it, and then I was apparently mistaken, and

9 the District Court thought that I was adjudicating it, so I am

10 now adjudicating it.  And I also have a Federal Mogul issue,

11 which I am in the process of getting out.  And I was also

12 working on a certain Pittsburgh matter that took a very, very

13 long time, but which is now on the back burner because the

14 parties have informed me that they are settling.  And so, these

15 kind of got put on the back burner.  But they will be shortly

16 reinstated into a front burner position.

17       Oh, and yes, I also had a certain New Jersey

18 environmental issue that was ready to go out, but then a

19 certain opinion got issued by the District Court which meant

20 that that one also got scrapped and revisited -- not scrapped

21 totally, but revisited.  So, we've done a bit of work, which

22 has come to no fruition, and so, we're kind of reinventing

23 wheels.

24       MR. RESTIVO:  It sounds like we're probably not

25 likely to see those two opinions before you get involved in

1 bodily injury next Monday?

2          THE COURT:  I think that's likely.

3          MR. RESTIVO:  Okay.  Turning to the agenda, Your

4 Honor, Item Number 13 I would like to deal with before Item --

5          THE COURT:  Pardon me, Mr. Restivo.

6                    (Pause)

7          THE COURT:  I'm sorry, Mr. Restivo.  Go ahead.

8          MR. RESTIVO:  I'd like to deal with Item Number 13

9 before Items 11 and 12 because Item Number 13 involves a

10 procedural aspect, a substantive aspect.  Set today on Item 13

11 is the argument on the motion to alter or amend the Court's

12 order with respect to three claims.  In order to have that

13 argument, I think it's necessary to deal with a motion filed by

14 Speights & Runyan to extend the time for argument.  That motion

15 involves me almost exclusively, although the merits, the

16 substance of the actual motion would be argued by Mr. Bernick,

17 but it seems we have to deal first with a motion that -- that's

18 not argued.

19          Your Honor, argument on this has been set, I believe,

20 since November.  I believe the briefing schedule has been set

21 since November.  The only thing that occurred at that omnibus

22 hearing is given how much was on the February omnibus, the

23 Court, sua sponte, moved the argument on this from February to

24 March.  Independent of that, the Court must have indicated that

25 the parties should talk about these three claims.  I believe

1 it's fair to say there was some disagreement as to whether the

2 parties should talk about whether there would be one argument

3 or two arguments, and which one would be argued first versus

4 should the parties see if they can't resolve the claims.

5      At some point -- and I really was just minding my own

6 business, I got a call from Mr. Speights saying that there was

7 an obligation on the part of Grace to discuss these cases.  I

8 said let me see if I can get authority on these three cases,

9 we'll discuss them.  I went and I did that.  And it was agreed

10 that Mr. Speights and I would discuss the three cases.  He made

11 demands.  He made offers.  I responded with demands.  At some

12 point he indicated that he only wanted to talk about one

13 building.  We would see how that one building went, and then

14 maybe we'd talk about the other two, and at that point, Your

15 Honor, I told him based upon the arguments I had heard him

16 make, and what the Court ruled that I guess you're right, the

17 only way we're going to move this is to let you talk to a

18 mediator, and I'll talk to a mediator.  And I told him that's

19 what seemed to be the next step.

20      There was no hard feelings about that.  Indeed, with

21 respect to his February 15 brief he asked me if I wouldn't mind

22 getting him an extension.  I think he could have gotten it

23 directly.  It wouldn't have been a problem.  But I said

24 absolutely.  I gave an extension.  I got him a ten-day

25 extension.  After that he advised me that what he was going to

1  be filing really wasn't the brief that -- not per the schedule,

2  but instead he would file a motion to extend because I had

3  indicated that I didn't want to make an offer on one case.  And

4  at that point I indicated that I probably would not view that

5  as a good progressive development.  We filed an answer.  I did

6  make him an offer on another case so that he couldn't complain

7  about it, but the long and the short of it is, while he have

8  resolved one case, and while we were talking about the other

9  two, I believe it was always understood, and Mr. Speights

10  specifically said he wasn't attempting to hold up any

11  arguments, to delay the issuing of any rulings to buy time by

12  way of either settlement discussions or mediation, and

13  therefore this argument has been set since at least November.

14  I did start my brief by saying no good deed goes unpunished.  I

15  think it would be a shame if, as a result of efforts to work

16  with Mr. Speights, he secures yet another delay on arguments

17  we've been trying to have for months and months.  And so the

18  issue is whether or not we can substantively argue on the three

19  cases which are now two cases.

20          And lastly, I should add the Court will recall that

21  there were two aspects to the argument -- whether or not the

22  documents were authentic, and then whether or not showing you

23  had authority, you did that in time.  I dropped the first to

24  make it more simpler to have argument, and so I think there

25  ought to be argument today, and Mr. Bernick ought to make it,

1  and we ought to get to the end of these things that have been

2  pending now for months, and so, that's the first issue.  I

3  believe Mr. Speights was announced as being on the phone, or

4  Mr. Fairey is here, but we would like to argue the merits today

5  as scheduled in November.

6          THE COURT:  Mr. Speights?

7          MR. SPEIGHTS:  May it please the Court.  Your Honor,

8  I want to address the motion to extend, and I have two or three

9  technical positions that I may return to, but I just want to go

10  jump through all of the hoops, and go to the essence of the

11  matter that caused me to file a motion to extend.  Your Honor

12  told us in August, and Your Honor told us again in November, to

13  discuss these three claims, which we have argued on various

14  occasions.  You strongly encouraged us to try to resolve these

15  three claims separate and apart from other issues surrounding

16  the balance of our -- my claims, and the whole issue of a

17  mediation to resolve those, which I hope Mr. Restivo will

18  address separately at some point during this hearing.

19          But these three claims have taken up an enormous

20  amount of time already because of Grace's argument that the

21  authentication, or the authority was not authentic, a matter

22  which has now been resolved by Grace finally withdrawing that

23  objection.  So, in November you told us that you wanted us to

24  brief the legal issue that Mr. Bernick raised back in August

25  about compliance with a 2005 order, but before we did that to

1  try to settle these three cases.  So, we have proceeded to try

2  to settle them.  At the February hearing, Your Honor, or maybe

3  it's the January hearing.  I might be confused.  When the issue

4  of mediation came up for everything else, and Your Honor

5  finally ordered Grace to mediate, Your Honor was very clear

6  that we ought to continue to try to resolve these three cases.

7  However, after that hearing Grace refused to talk to me anymore

8  about these three even though there were demands and offers

9  outstanding on all three of the buildings.  And that's what led

10  me to file this motion, Your Honor.  And I'm sorry if I hurt

11  Mr. Restivo's feelings, but I'm glad I did it because lo and

12  behold, within days after filing the motion to extend and

13  pointing out that Grace no longer would talk to me, we settled

14  the Jamison case.  So, one out of three is gone, and if nothing

15  else, we ought to all celebrate that Grace and Speights &

16  Runyan have now resolved one claim and maybe that's a sign of

17  things to come.

18        In addition, we have Children's Hospital of

19  Pittsburgh.  I don't think it's appropriate to go into all the

20  discussions, the settlement discussions, and I tried to stay

21  away from that in my brief.  I have a different recollection of

22  some matters, but that's neither here nor there.  The bottom

23  line is, as late as Thursday or Friday of last week, I told Mr.

24  Restivo that I was going to take his latest figure to my

25  client, but my client's general counsel in Pittsburgh was on

1  vacation last week, and I would not be able to get back to him

2  until today.  It's in the form of -- and again, I'm not trying

3  to get into the settlement discussions, but it's in the form of

4  a take it or leave it recommendation, so there's no further jaw

5  boning on the figure.  And during the argument between Mr.

6  Bernick and Mr. Finch, I got a telephone call from the

7  Pittsburgh hospital, which I think, yes, it's extraordinarily

8  close to a resolution of that, and I hoped to talk to Mr.

9  Restivo within an hour after he leaves the hearing, or within

10  five minutes, and hopefully can raise our batting average from

11  .333 to .666.

12       That leaves Bay Shore.  I have made a demand -- oh,

13  excuse me -- they are -- there is a figure from both of us on

14  Bay Shore.  There are recommendations on Bay Shore.  And I now

15  believe, now that Grace is talking to me again, as a result of

16  filing this motion, I think there's a reasonable chance we can

17  resolve Bay Shore, and I would tell you that if we don't

18  resolve it in the next week it will never be resolved.

19       So, Your Honor, I filed a motion to extend so they

20  would talk to me.  They have been talking to me.  And I would

21  ask that, Your Honor, let us finish the talk, and if we don't

22  resolve it in a week, then Your Honor can hear us in April.  I

23  will be there.  Now, we do have to both file the brief that

24  Your Honor ordered us to file in November, which is the brief

25  on the new issue, the so-called legal issue that Mr. Bernick

1  got Your Honor to add to your order back in August or

2  September, and which has never been fully briefed for Your

3  Honor, and I don't mind any kind of expedited briefing schedule

4  on that so the matter can be placed on the April calendar.

5         Now, Your Honor, that's the bottom line.  That's the

6  essence of where I am.  I will say that technically, and I

7  don't want to be a technical lawyer today, but technically the

8  motion to extend should not even be up to date because under

9  Your Honor's case management order it was filed on February 25,

10  I believe, and that under your case management order unless

11  somebody asks for an expedited hearing it shouldn't have been

12  up to date.  Again, I'm happy to hear it today.  I just don't

13  think that there's any basis to go to the merits today in light

14  of the fact that I filed a motion to extend.

15        The second thing I would point out to Your Honor, my

16  second technical position is that under Local Rule 9006-2, the

17  filing of the motion to extend automatically stayed the period

18  to file the brief.  Neither side has filed a brief, and only

19  after Your Honor rules on the motion to extend will Your Honor

20  be in a position then to say when these briefs are due on the

21  issue of -- the legal issue that was added to the case at Mr.

22  Bernick's request back in August or September.

23        Leaving that all aside, Your Honor, and I'm sorry we

24  have to take so long again on this matter, we resolved one out

25  of the three.  I believe by sunset tomorrow we will resolve two

1  out of three.  And I believe there's a good chance within a
2  week we'll resolve three out of three.  And again, it's because
3  I filed a motion to extend that Grace started talking to me
4  again.  Thank you, Your Honor.
5      THE COURT:  Mr. Restivo, I don't know the reason
6  Grace and Speights are talking, but I like the percentages --
7      MR. RESTIVO:  Well --
8      THE COURT:  -- and if the Pirates could do this well
9  we'd be --
10     MR. RESTIVO:  Your Honor, I would like to respond to
11 that, Your Honor.  Okay?  It was after I filed my response that
12 Mr. Speights decided that maybe he would talk about all three
13 and not limit the discussions to one building.  And so, I don't
14 know who gets credit for that.  And secondly, he is technically
15 correct.  What we ought to be doing now is arguing the merits
16 of the motion that's on the agenda.  I didn't think it was fair
17 to do that until we first addressed his motion to extend, but
18 again, as someone once said, you know, no good deed goes
19 unpunished.  I don't have a problem based upon what Mr.
20 Speights just said -- I think I heard what I heard, and I think
21 I know what he's going to tell me on Children's Hospital, that
22 we be given the rest of this week.  I would like, if we can't
23 resolve Children's Hospital or the other one, to have a date
24 certain now for him to file his brief so we don't keep delaying
25 and delaying.

1          THE COURT:  All right.  I think this is what should

2    happen.  In the event that both Children's Hospital and Bay

3    Shore are not settled by -- let's say March the 26th.  That's

4    Wednesday of next week --

5          MR. RESTIVO: By this Friday, Your Honor.  We ought to

6    be able to do it, or we're not going to do it.  And I don't

7    think Mr. Speights would disagree with that.

8          THE COURT:  Mr. Speights?

9          MR. SPEIGHTS:  I have no hesitation about Children's

10   Hospital by this Friday.  Bay Shore, it's funny, about ten

11   minutes ago I got an e-mail from Bay Shore, they're looking for

12   some materials.  So, I would prefer next Friday.  But if -- it

13   can be next Wednesday.  But if it has to be Friday, it's

14   Friday.  I'm not -- I agree it should be heard, and heard in

15   April.

16         THE COURT:  All right.  Children's Hospital by

17   Friday, March 21st.  Bay Shore by Wednesday, March 26th.  If

18   that doesn't happen, if those dates are not met, then by April

19   the 11th both briefs are to be filed, so both of you file your

20   briefs at the same time, no replies, no responses, that's it.

21   You both know this issue.  It should be a simple matter.

22   Argument will be on April 21st at the omnibus hearing.  That

23   will be plenty of time for you to get the briefs into the final

24   agenda -- oh, I'm sorry.  I can't do April 11th.  Pardon me.

25   It has to be April 9th so that you can get them into the

1 binders by April 11th.  So, the briefs will be due April 9th.

2 That's time --

3          MR. SPEIGHTS:  Thank you, Your Honor.

4          THE COURT:  -- time to get them into the binders for

5 April 11th.

6          MR. SPEIGHTS:  And, Your Honor, the other matter I

7 had, I -- I just want to make sure Mr. Restivo is going to

8 address it, but I would be addressing it from our side if there

9 needs to be any response, would be the status of the mediation

10 of the balance of the Speights & Runyan claims.

11          MR. RESTIVO:  I'm going to address that right now,

12 Mr. Speights.

13          MR. SPEIGHTS:  Thank you, Mr. Restivo.

14          MR. RESTIVO:  Continuing my status report, Your

15 Honor, the Court directed the parties to go to mediation with

16 respect to the Speights & Runyan claims, or with respect to the

17 Speights & Runyan claims that are remaining.  Mr. Speights and

18 I have had a number of conversations.  We have exchanged a lot

19 of information.  We started out with five possibilities.  I

20 suggested five that he suggested.  We winnowed that down to

21 four names.  We determined in the last week that two of the

22 proposed mediators are available to mediate for us.  I need to

23 check on the other two to see if they're available.  I believe

24 we will be able to agree consensually on a mediator this week.

25 If we can't agree this week, we would like to contact the

 1  Court's chambers, give the Court the two, three, or four names,

 2  and say to Your Honor pick one, and we'll go.  Again, I think

 3  this week we'll be able to land on one of the four.  But if

 4  we're not, and if it's okay with the Court, we would call you

 5  to say here are the three people, or four people, I don't think

 6  the names will be unfamiliar to the Court, and we'll ask you

 7  to, you know, call the jump ball.

 8           THE COURT:  Mr. Speights?

 9           MR. SPEIGHTS:  Mr. Restivo has accurately stated

10  where we are, Your Honor.

11           THE COURT:  All right.  You agree with that process?

12           MR. SPEIGHTS:  Yes, Your Honor.

13           THE COURT:  Okay.  That's fine.

14           MR. RESTIVO:  That moves us, Your Honor, to Items 11

15  and 12 on the agenda.  Items 11 and 12 deal with motions

16  relating to Allegheny Center.  They are separate motions, but I

17  think they go together, and I'm going to address them together.

18           MR. BERNICK:  Your Honor, if I could, I'm sorry to

19  interrupt.  Would it be all right if I excused myself here?

20  I've caucused and my folks across the room don't have anything

21  else that they intend to raise, and I have a flight overseas

22  that I'd like to be able to catch.

23           THE COURT:  Yes.  Certainly --

24           UNIDENTIFIED ATTORNEY:  May we also be excused, Your

25  Honor?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  If you're not interested in the rest of

2   the agenda, yes.

3          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

4          MR. BERNICK:  Thank you, Your Honor.

5          THE COURT:  Go ahead, Mr. Restivo.

6          MR. RESTIVO:  As the Court may recall, on February

7   16th, 2007, we moved for summary judgment on a number of claims

8   including Claim Number 9778.  Claim Number 9778 was a claim of

9   Allegheny Center Associates in which claim they admitted they

10  had removed asbestos from their buildings in the 1980's.  We

11  filed that motion.  There was no response to the debtor's

12  motion by or on behalf of Allegheny Center Associates.  No one

13  appeared on their behalf on April 9,2007, and the Court

14  expunged Claim 9778 as barred by the applicable statute of

15  limitations.

16          On November 9, Your Honor, we filed a motion to

17  disallow and expunge two claims filed by Speights & Runyan for

18  buildings called One Allegheny Center and Two Allegheny Center.

19  Those had different claim numbers.  They were Claim Numbers

20  11036 and 11037.  And we contended that because those were

21  claims for the same building that was Claim Number 9778, which

22  had been expunged, those two had to be expunged as duplicates,

23  or as res judicata.

24          On November 30, 2007, Speights & Runyan filed a

25  response to our motion.  In that response I believe they

1   conceded that Claims 11036 and 11037 are, in fact, duplicates

2   of Claim 9778.  They raised several arguments why Claim 9778

3   should not have been dismissed, but they didn't make any

4   arguments at that omnibus as to why duplicate claims 11036 and

5   037 shouldn't be disallowed and expunged.  At the next omnibus

6   hearing on December 17, 2007, we attempted to argue our motion.

7   In fact, we ended up discussing our motion.  Mr. Speights was

8   successful in delaying argument at that time.  During the

9   discussion Your Honor noted that once a claim is expunged it's

10  expunged, and you can't resurrect it by filing a new claim.

11  The Court also noted that this appeared to be a pretty simple

12  matter.  There was a motion for summary judgment.  The building

13  admitted removals of asbestos in the 1980's.  The motion was

14  unopposed.  It was granted.  And you can't breathe new life

15  into a claim by giving it a different number.

16          Your Honor also noted that the judgment was final.

17  There had been no appeal and no motion to vacate the judgment

18  had been filed.  Having heard that last statement, Your Honor,

19  on January 28th Mr. Speights filed a motion for relief from the

20  final order expunging Claim Number 9778.  That motion was filed

21  over eight months after entry of the order dismissing the

22  claim.  With respect to our motion to dismiss Claim Numbers

23  11036 and 11037, that motion should be granted.  Those two

24  claims should be expunged as duplicates.  The Court may then

25  take under consideration of whether or not to open the order on

1  9778, but there's no good reason to have three claims which are

2  all the same.

3          Dealing with the motion for relief from dismissal,

4  Speights & Runyan seeks relief from the Court's April 9 order

5  making basically two arguments.  First they say the Court

6  should set aside its final order because we did not comply with

7  the Federal Rules of Civil Procedure in service.  Second, they

8  claim that the order should be lifted due to the excusable

9  neglect of claimant or claimant's counsel.  I'll deal with each

10  of them very briefly.

11          With respect to improper service, Your Honor, there

12  is no dispute that Allegheny Center received our papers.  There

13  is no dispute that Speights & Runyan received our papers.

14  There is no dispute that Speights & Runyan was counsel to

15  Allegheny Center because Exhibit 2 in their moving papers is a

16  March 25, 2003 authorization authorizing Speights & Runyan to

17  act on their behalf.  That leaves Speights & Runyan with a

18  single argument, which says some California law firm answered

19  some interrogatories in this case some time ago, and that

20  California law firm didn't receive these papers.

21          On Friday, Mr. Speights filed an affidavit from an

22  attorney from that law firm, Brian D. Huban, or Huban.  That

23  affidavit says that Mr. Huban did not receive our motion.  That

24  affidavit doesn't surprise us.  We didn't send it to him.  What

25  he doesn't say in that affidavit is that his firm was

1  representing Allegheny Center on February 16, 2007, because we

2  know Speights & Runyan was.  He doesn't say that he had an

3  entry of appearance on file in this Court.  We don't think he

4  did.  He doesn't say that he was monitoring the docket to

5  determine if there were papers relating to his client, and so

6  his affidavit, from a legal standpoint, is irrelevant under the

7  Federal Rules.  Where there are multiple attorneys representing

8  a claimant, you must serve all parties, but you must not serve

9  multiple attorneys representing one party.  The <u>Buchanan</u> case

10 in our brief, the <u>Schooner</u> (phonetic) case out of the Virgin

11 Islands is to that effect.  Clearly there's no due process

12 concerns.  Allegheny Center and counsel for Allegheny Center

13 received the motion well in advance of the time to respond, and

14 so lack of service clearly is not a grounds for opening the

15 judgment.

16      We move quickly to excusable neglect.  Speights &

17 Runyan's contention is judgment should be opened because of

18 excusable neglect.  As this Court has recently noted in the

19 <u>GIT</u> decision, not all neglect warrants opening a final

20 judgment.  Neglect must be excusable.  And with respect to

21 Allegheny Center, the excuse is that the in-house attorney in

22 charge of the claim left employment shortly after receiving the

23 papers and didn't do anything with them.  There's a suggestion

24 that his successor might have been guilty of excusable neglect

25 by not looking through his predecessor's papers to see if there

1  was something that needed to be done.  That is not excusable

2  neglect.  We've cited case after case in our brief, including

3  cases that say if you moved your corporate offices, let alone

4  one person moving, that's not excusable neglect, and therefore

5  Allegheny Center has not shown excusable neglect.

6       In order to make the argument I now have to move to

7  the Speights & Runyan law.  I guess if the Speights & Runyan

8  law firm could prove excusable neglect maybe that would be a

9  grounds of opening the judgment, therefore I have to say that

10  as to that law firm there was neglect which was not excusable.

11  Basically what they say is we didn't know Allegheny Center was

12  our client.  They filed and they had an authorization from

13  2003.  Under Rule 11, you know, Rule 11 is basically a federal

14  know thy client rule.

15       It's undisputed that Speights & Runyan must have

16  filed the duplicate Allegheny Center claims in this Court

17  without conferring with their client to learn, one, their

18  client already filed a claim; two, their client had removed

19  asbestos from those buildings in the 1980's; and three, their

20  client had conceded in what their client found that they had

21  removed asbestos in the buildings in the 1980's.  And so,

22  Speights & Runyan received our summary judgment motion.  They

23  answered it on behalf of other clients.  They didn't answer on

24  behalf of Allegheny Center.  And to say that it's excusable

25  neglect not to know who our own client is is not consistent

1  with the case law we have cited to the Court.

2         Therefore, Your Honor, Claims -- the duplicate claims

3  11036 and 11037 should be expunged because they're duplicate of

4  the expunged final claim 9778.  Claim Number 9778 should not be

5  opened because service was appropriate under the law, and

6  because under the law there is no neglect of Allegheny Center

7  or its counsel that is excusable.  Thank you, Your Honor.

8         MR. FAIREY:  May it please the Court, Your Honor.

9         THE COURT:  Mr. Fairey?

10        MR. FAIREY:  The issue before the Court today is a

11  simple issue, and that is should the order expunging Claim

12  Number 9778 that was entered basically as a default, somebody

13  not showing up, should that also cause Claim 11036, 11037 to be

14  dismissed, as well, with 11036 and 11037 being claims that have

15  been vigorously litigated throughout this whole process.  I'm

16  tempted to start in with the -- correct some of the record of

17  some of the things Mr. Restivo said, but let me back up and

18  give this argument a little bit of context.

19        If Your Honor recalls, this came up at the December

20  omnibus hearing, which Mr. Speights came and he argued this

21  issue.  He indicated that -- and our papers showed this, that

22  Grace had not teed this up correctly.  They were trying to have

23  Claim 11036 and 11037 dismissed on grounds that had never been

24  objected to.  We argued that.  We pointed out problems with the

25  order related to 9778 at the time, and argument proceeded on

1  that basis.  And at the end the Court commented and raised

2  concerns.  The order on 9778 was a final order.  And if it's

3  duplicate it's duplicate, and somebody needed to do something

4  to show why the original order should be addressed.

5          So, January we call our client.  Did you know you had

6  filed two claims?  They did not know that they had filed two

7  claims.  The gentleman who did that left over two years ago.

8  They had filed their own claim.  I don't think that's disputed

9  by anybody.  It was brought to our attention, and Mr. Restivo,

10 despite what he just argued, at the last hearing indicated he

11 didn't believe that we knew, and they claim they didn't know

12 that these were duplicate claims.

13         There were three claims pending in this bankruptcy.

14 Our two claims had specific claim numbers.  The claim that had

15 been individually filed by Allegheny Center had a different

16 claim number.  The claim that had been filed by Allegheny

17 Center was subject to the second omnibus objection.  None of

18 the Speights & Runyan claims were objected to in the second

19 omnibus objection.  When that objection came in apparently they

20 hired California counsel to represent them in that matter to

21 respond to the second omnibus objection.  There was

22 correspondence with Kirkland & Ellis.  There was a confirming

23 e-mail that said here's the information, confirm that I

24 represent these people, and confirm that you will withdraw the

25 second omnibus objection.  We proceed -- then the case

1  proceeds.

2         But in any event, our client in the deposition -- I

3  mean, the affidavit of Mr. Messini (phonetic), clearly states

4  he didn't know that there was another claim out there.  He

5  thought -- when he came into it, he thought there was one claim

6  in the bankruptcy.  He wasn't sure why there were two.  And the

7  person who had handled that had been long gone.  But in any

8  event, we get his affidavit.  He investigates.  He initially

9  says I don't know about a motion for summary judgment.  I've

10  never seen it.  I don't have any record of it.  We represent

11  that to Mr. Restivo.  Then he calls me back and says, you know,

12  there was somebody else who is not a lawyer, as Mr. Restivo

13  said, who was responsible for getting mail on this.  And he

14  left on or about the same time that this motion was supposedly

15  filed.  And he went in and he checked somewhere in his area and

16  found, sure enough, I believe, the unopened motion for summary

17  judgment, which he then opened.  But that had no -- he had no

18  knowledge of that on behalf of his claimant.

19         So, taking that, we filed a motion on their behalf

20  with their -- at their request to reopen the order on 9778, the

21  claim that they had filed originally.  Grace's response to that

22  was, number one, Speights & Runyan is negligent because we

23  don't know who our own client is, number two, the California

24  lawyer is negligent because he didn't check the docket, and

25  number three, none of that matters because the claimant

1  actually got it themselves.

2        After we got Grace's response we went and called the

3  California lawyer.  Were you served with this motion?  There's

4  no evidence of it in the docket.  He checked his files.  He had

5  no memory of it.  He hadn't withdrawn from the case.  And he

6  had appeared formally in the case not from answering discovery,

7  but from filing that's on the docket and cited in the brief.

8  He filed a formal response on behalf of Client Claim 9778 to

9  the 15th omnibus objection.  And, of course, those are the

10 substantive claim objections that spawned all this litigation

11 to start with.

12       Mr. Restivo talked about some undisputed facts.  I

13 want to talk about some undisputed facts that relate to this

14 situation.  First of all, again, as Mr. Restivo said, and I

15 think everybody agrees, neither the debtors nor Speights &

16 Runyan, nor even the claimant themselves, knew about this

17 duplicate claim situation until it was brought to our attention

18 by Mr. Restivo last October.  It's undisputed that Grace did

19 not serve the California lawyer, who was the only lawyer who

20 had appeared on behalf of Claim Number 9778 with the motion for

21 summary judgment.  It's undisputed that Grace didn't serve the

22 California lawyer or Allegheny Center itself with a copy of

23 this Court's 2007 scheduling order, or 2006 scheduling order

24 that brought -- the intent was to put all of the parties -- all

25 the property damage claimants on notice that this claims

1   objection process and the estimation process would be going

2   forward.  And there were two separate orders entered on that,

3   and specifically in that order the Court ordered the debtors to

4   serve counsel for every claimant and/or if there's no counsel

5   then serve the claimant themselves.

6          So, we have -- and apart from all that, to give this

7   a little context, that scheduling order created -- the process

8   that we've been going through since late 2006 with the

9   disclosure of expert witnesses, exhibit lists, the opportunity

10  to conduct discovery, identification of witnesses, etcetera,

11  etcetera, etcetera, and the opportunity for the debtors and the

12  parties to file motions for summary judgment.

13         THE COURT:  I think I'm confused about the time

14  frame, so pardon me for a minute.  I thought that 9778 was

15  expunged as part of the second omnibus.

16         MR. FAIREY:  That's not correct.

17         THE COURT:  Okay.

18         MR. FAIREY:  It was expunged on a motion for summary

19  judgment filed subject to the 15th omnibus objection in the

20  Court's August and then October scheduling orders that set the

21  three trial dates.  We had the science issue, and then we had

22  product identification and statute of limitations, and the

23  hazard that led to the big motions day last April.

24         THE COURT:  All right.

25         MR. FAIREY:  So -- and of course -- we -- Speights &

1  Runyan is served with all these papers.  We're counsel for lots

2  of people, obviously, in the case.  But we don't have any

3  record of 9778.  If the Court looks at the docket, indeed, if

4  the Court looks at the actual papers filed by the debtor here,

5  they don't refer to One Allegheny Center, Two Allegheny Center,

6  frankly, in anywhere except in the certificate of service.  The

7  actual motions say Claim Number 9778, and then in parentheses

8  says Allegheny Center Associates.

9          So, the reference to one of -- the one claim number

10  is the only reference that anybody would have had with respect

11  to these motions.  But in any event --

12          THE COURT:  But Allegheny Center Associates was

13  served?

14          MR. FAIREY:  Well, they had a copy of it.  Yes,

15  ma'am, that's correct.

16          THE COURT:  Okay.

17          MR. FAIREY:  They did get a copy of the actual motion

18  for summary judgment that they had in somebody's office that

19  they did not discover until I asked them, you know, did you

20  receive this?  Look for it.  Where is it?

21          THE COURT:  All right.  So, they were served?  They

22  just didn't know what to do with it, perhaps, but they were

23  served?

24          MR. FAIREY:  They were served, but they were served

25  after they had appeared through counsel, through the California

1 counsel, Mr. Huban, who responded initially to the 15th Omnibus

2 Objection.  So, the point of all this is, and it's undisputed,

3 that the counsel who actually filed the response to Claim 9778

4 wasn't served with the motion for summary judgment on Claim

5 9778.

6        THE COURT:  Well, if he appeared, why didn't he get

7 the electronic notice?

8        MR. FAIREY:  I don't know the answer to that, Your

9 Honor, but he -- he checked his filed.  He had no record of

10 having received it at all.  There's no certificate of service

11 indicating he was served.  I think I heard Mr. Restivo just say

12 as he was up here that they don't have a record of having

13 served him with a copy of the summary judgment motion on 9778.

14        MR. RESTIVO:  I would represent, Your Honor, I don't

15 believe that individual was on any service list, and he

16 certainly was not on the service list we used when we

17 effectuated service.  We don't believe he filed an entry of

18 appearance, but we do know he doesn't appear to be on any

19 service list.

20        THE COURT:  Well, he -- the debtor concedes that he

21 was not served, so --

22        MR. RESTIVO:  We do, Your Honor.

23        THE COURT:  Okay.  So, I guess the issue is if he, in

24 fact, entered an appearance, then he has to be on an electronic

25 notice list, because otherwise -- and so, he should have gotten

J&J COURT TRANSCRIBERS, INC.

1  electronic notice of the entry of the summary judgment because

2  everybody who files something in this case, because it's an

3  electronic notice case, should be getting service, so even if

4  he didn't get the service from the debtor, even if, then he

5  should have gotten the electronic notice.  So, where is he

6  appearing?  I mean, where is this notice that he re-filed

7  something?

8              MR. FAIREY:  Which --

9              THE COURT:  You said he filed a -- he filed a

10 response to the objection --

11             MR. FAIREY:  He did, Your Honor.  He did.  And it's

12 Docket Number -- I'll give you the exact docket number it is.

13                        (Pause)

14             MR. FAIREY:  Your Honor, I apologize.  I do have that

15 reference.

16                        (Pause)

17             MR. FAIREY:  Your Honor, it's in the docket --

18             THE COURT:  Mr. Fairey, you know, I need a break

19 anyway --

20             MR. FAIREY:  Okay.

21             THE COURT:  -- so how about if we take about a ten

22 minute recess --

23             MR. FAIREY:  Sure.

24             THE COURT:  -- and I'll let you find it.

25             MR. FAIREY:  Absolutely.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  All right.  We'll take a ten

2  minute recess.

3                     (Recess)

4          THE COURT:  Please be seated.  Okay.  Mr. Fairey, I

5  went back through some of the pleadings, and frankly, what your

6  argument is saying doesn't comport with what's in the

7  pleadings, so let me show you what I've said, and then maybe we

8  can get this straightened out.  I am looking at the debtor's

9  motion to disallow and expunge the claims, which is at Docket

10  Number 17328.  And attached to that is Exhibit A, which is a

11  copy of Proof of Claim Number 9778.

12          MR. FAIREY:  Right.

13          THE COURT:  Okay.  That document says, at Bates stamp

14  1024035 -- well, I'm saying Bates -- I guess it's a page

15  number.

16          MR. FAIREY:  Right.  Signed by Mr. Reynovich

17  (phonetic).

18          THE COURT:  Correct.

19          MR. FAIREY:  Yes, ma'am.

20          THE COURT:  That it is filed on behalf of Allegheny

21  Center Associates.  On the next page it identifies One and Two

22  Allegheny Center, Allegheny Center, Pittsburgh, Pennsylvania.

23  It says that this claimant first learned about this presence of

24  asbestos in the property of Grace product for which it's making

25  the claim from Speights & Runyan and from debtor's schedules in

1  Question 19 and in Question Number 21.  It's signed by -- well,

2  Mr. Reynovich.  The signature is not really very legible, but

3  it looks like L with a big R, and a y, and some letter at the

4  end.  And it says Allegheny Center Associates counsel.  It's

5  dated March 26th, 2003, which is the day after your firm

6  allegedly had the authority to file on behalf of this claimant.

7         Then, in looking at Document Number 17903, which is

8  Allegheny Center Associates' motion for relief from the order

9  of dismissal filed on behalf of your firm --

10         MR. FAIREY:  Yes, Your Honor.

11         THE COURT:  -- at Paragraph 2, it says unbeknown to

12  Speights & Runyan, Allegheny Center Associates apparently filed

13  a proof of claim for these same buildings on March 26th, 2003.

14  This claim was assigned Claim Number 9778 by the debtor's

15  claims processing agent, Rust Consulting.  The proof of claim

16  was apparently signed by Andrew Reynovich as in-house counsel

17  for Allegheny Center Associates.  Mr. Reynovich listed his

18  mailing address in the proof of claim form as Allegheny Center

19  Associates Mall Management Office, Pittsburgh, PA, 15212, which

20  is the correct address for Allegheny.  The claim form completed

21  by Mr. Reynovich attached no documentation.  So, there's

22  nothing signed with respect to this proof of claim by

23  California counsel.

24         MR. FAIREY:  Not with the proof of claim, Your Honor.

25         THE COURT:  Wait --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FAIREY:  But the California counsel came in

2     later, and I've got the docket number for you.

3          THE COURT:  Okay.

4          MR. FAIREY:  It's 10523, and it's docket number --

5     response to Allegheny Center Associates to debtor's 15th

6     omnibus objection to asbestos property damage claims.

7          THE COURT:  Okay.  But this is an objection to this

8     claim.  They served the entity who filed this proof of claim --

9          MR. FAIREY:  They did, and --

10         THE COURT:  -- who is counsel for it.  That's their

11    obligation.  Why would they serve some other attorney who files

12    a different response to a different objection?

13         MR. FAIREY:  An attorney appeared on behalf of

14    Allegheny Center --

15         THE COURT:  Yes.

16         MR. FAIREY:  -- and filed legal responses and

17    negotiated with Kirkland & Ellis on their behalf.  Just -- Mr.

18    Reynovich, I suppose, was in-house counsel.  He said that.  But

19    the pleading, the operative pleading that initiated this whole

20    contested matter with Allegheny Center, the 15th omnibus

21    objection, was signed by Mr. Brian Huban --

22         THE COURT:  Okay.  So, he filed a response to --

23         MR. FAIREY:  To the --

24         THE COURT:  -- 15th omnibus?

25         MR. FAIREY:  To the 15th omnibus --

1          THE COURT:  Okay.

2          MR. FAIREY:  -- thus appearing on Allegheny's -- on

3    behalf of that claim number.

4          THE COURT:  Well, if that's the case, then why didn't

5    he get the electronic filing notice?

6          MR. FAIREY:  I don't know the answer to that, Your

7    Honor.  I know he didn't get it, and he said so in his

8    affidavit.  It may that it's because he is from California.  He

9    doesn't have local counsel.

10          THE COURT:  That -- well then, if that's the case,

11   that's not excusable neglect either, because --

12          MR. FAIREY:  But then --

13          THE COURT:  -- there's certainly a case management

14   order.

15          MR. FAIREY:  Then the question is did he get service

16   of what?  Of the motion for summary judgment --

17          THE COURT:  Yes.  Or of the notice.

18          MR. FAIREY:  -- electronically?

19          THE COURT:  You're saying he got nothing that would

20   clue him in as to the process by which this proof of -- the

21   objection to the proof of claims of the property damages going

22   forward.  But if he filed a response to the 15th omnibus, then

23   he did have notice of how the 15th omnibus -- of the fact that

24   the 15th omnibus is filed, and if he filed a response, it

25   should be on the electronic notice system if he filed it

1 properly.  And if he didn't, then he isn't paying attention to

2 the case management orders.

3      MR. FAIREY:  And I don't know an answer to all of

4 that, Your Honor.  I do know -- I know where Mr. Huban is, and

5 I could certainly ask him these questions.  But I did want to

6 point out, even if someone wee following the docket on this

7 particular issue, and from the time Your Honor entered the

8 first scheduling order regarding the claims objection process

9 that you required the debtors to serve on counsel for the

10 claimants until the order that was actually entered disallowing

11 Claim Number 9778, I think that was a five or six-month period,

12 there were 2,010 docket entries in the case.

13      THE COURT:  Yes.  It's a big case.

14      MR. FAIREY:  It is a big case.  And he's -- again --

15      THE COURT:  That's why he should have had local

16 counsel, paid attention to the case management order, filed

17 appropriately, and made sure he did what the Court orders

18 required him to do.

19      MR. FAIREY:  And I have not gone back to look to see

20 if he was served with a copy of the case management order for

21 the 15th omnibus objection.  I frankly don't know --

22      THE COURT:  Probably he wasn't.

23      MR. FAIREY:  I don't know the answer to those

24 questions, but I do know that he was listed as counsel of

25 record, and he wasn't served -- it wasn't indicated on the

1  certificate of service that he was served by the debtors, and I
2  believe they're saying they didn't serve him.  And what they
3  have tried to do is they'd try to get around that three ways.
4  And I do think it's important, Your Honor, to go back to the
5  scheduling order, because I'm sure you remember there was a big
6  brouhaha about the scheduling order and who had to appear, who
7  would be bound by the rulings of the Court.  And the purpose of
8  the notice that was put in the order, serve counsel and
9  claimants, would be -- was to make sure that everybody had
10  proper notice.  Mr. Huban and Allegheny say they didn't get
11  that.

12          THE COURT:  Well, Allegheny clearly did get it
13  because they found the notice.

14          MR. FAIREY:  They did not get the notice -- that they
15  found the motion for summary judgment.  They still -- there's
16  no record of them ever having received the scheduling order,
17  the one that says we're going to have a claims objection
18  process.  There will be a discovery period.  There will be a
19  time to exchange exhibit lists.  There will be a time to
20  exchange expert witnesses.  You will have a certain time to do
21  summary judgment motions, and there will be a summary judgment
22  hearing on April 9th.  Or -- I think it was moved one time, but
23  I can't remember what the original date was.  That process, and
24  that's a big deal, getting a scheduling order that says you're
25  in this case, you're a claimant, these are all the things that

1  are getting ready to happen, and you need to be aware of that.

2  They missed that.  There's no record that they received it.

3  There's no record --

4        THE COURT:  Well, there is -- now, their burden is to

5  substantiate that they didn't get it, as long as the debtor has

6  certificate of service that says they were served, and I do

7  have proof that it was sent to Allegheny Center --

8        MR. FAIREY:  It was sent, as Mr. Omenici (phonetic)

9  says, the address the debtor used did not match the address on

10  the claim form.  The address on the claim form that you just

11  read to me, Your Honor, is the correct address.  That's not the

12  one the debtors used, and Mr. -- it's their burden to show they

13  don't have it.

14        THE COURT:  What address did --

15        MR. FAIREY:  They don't have it, and the certificate

16  of service that the debtors used sends it to the wrong address.

17        THE COURT:  What address did the debtor send it to?

18        MR. FAIREY:  The address -- the debtor sent it to the

19  building, One Allegheny Center and Two Allegheny Center.

20        THE COURT:  Instead of?

21        MR. FAIREY:  Instead of the mall management office,

22  Allegheny Center Associates Mall Management Office.

23        THE COURT:  That's the same building.

24        MR. RESTIVO:  It's the same building, Your Honor, and

25  the affidavit makes it clear that they got it.

1          MR. FAIREY:  They got the motion for summary

2    judgment.  We're talking now -- I thought we were talking about

3    the scheduling order.

4          THE COURT:  But if they got the summary judgment

5    motion addressed to the same place in the same building, why

6    wouldn't they have gotten the motion -- the other orders

7    addressed to the same building in the same place?  I mean, you

8    know, Pittsburgh is not a huge place.  Everybody who is from

9    Pittsburgh knows where One Allegheny Center is and Two

10   Allegheny Center.  It's like knowing where the U.S. Steel

11   Building is.  Nobody puts 600 Grant Street.  You put the U.S.

12   Steel Building, or U.S.X. Tower, or whatever.  Everybody knows.

13   People are still calling buildings by -- you know, the Frick

14   Building is still called the Frick Building,  Glosser Brothers

15   is still called Glosser Brothers.  People know the same

16   building names from 25 years ago.

17         MR. FAIREY:  I understand that, Your Honor.

18         THE COURT:  Okay.

19         MR. FAIREY:  And I understand -- and they did get the

20   motion for summary judgment.  I mean, that's admitted.  They

21   weren't aware of it, but they did get it.  But the point I

22   think I'm trying to make here on behalf of these claimants,

23   there was a big deal happening in this Court with the

24   scheduling order and all the activity.  They had filed a claim,

25   I think everybody concedes we didn't know they had filed their

1  own claim.  The man who had filed his own claim was gone from

2  the company.  They had been represented by a lawyer from

3  California who had appeared on their behalf, at least for the

4  15th omnibus objection who should have gotten notice of this.

5  All of this was going on --

6          THE COURT:  And who should have been monitoring the

7  docket because he did apparently enter an appearance.  And who

8  should have gotten electronic filing if he had done things

9  correctly, and therefore should have had the notices, even if

10  he didn't get service.  So, none of which is explained.

11          MR. FAIREY:  Well -- and I don't have an answer for

12  Your Honor on those issues.

13          THE COURT:  Well --

14          MR. FAIREY:  I don't, except I will say this.  We

15  have another claimant that I represent that hired us after they

16  had filed their own claim form in the case, and I do monitor

17  the filings that relate to that.  As Your Honor probably knows,

18  it is the Olympus property claim, the New York case.  And I

19  still get calls from my client every time something is filed in

20  the case because his lawyer who originally filed the thing is

21  getting served.  And I've written several letters trying to get

22  that cleared up, but that continues to happen.  So, this is a

23  big case.  There are lots of claimants, Your Honor.  There is

24  lots of activity on this docket.  I don't know if Mr. Huban

25  needed -- you know, frankly, I don't know if he needed local

1  counsel, should have had local counsel.  He probably should

2  have.  But --

3       THE COURT:  Well, my clerk just handed me a note that

4  Mr. Huban is on the list for receiving electronic notice

5  because of a response he filed.  So, that's -- he's on the

6  list.  Whether he received it or not, I don't know, but he's on

7  the list, so why he didn't receive it when he's on the list is

8  a question.  He should have gotten it automatically.  So, why

9  his affidavit doesn't address why he didn't get electronic

10 notice when he's on the list is another question.

11      MR. FAIREY:  It certainly is, and I'd be happy to go

12 ask Mr. Huban that, and perhaps maybe we could, I don't know,

13 get him on the phone and take his deposition, and get all of

14 these questions answered.  I understand where Your Honor is

15 coming from with that.  But with the electronic --

16      THE COURT:  Where I'm coming from with it is, I just

17 wrote an opinion about an issue that's very similar to this.

18 It was in a Western District of Pennsylvania case which just

19 got affirmed by the District Court here in Western Pennsylvania

20 in one of the asbestos cases on a similar type of situation,

21 not quite identical, because of different changes in law firm

22 addresses.  But it seems to me that this issue of filing

23 something, not monitoring the docket, saying that you're not

24 getting notice when you're on an electronic filing list, and

25 therefore I don't understand why you're not getting notice, not

1  getting local counsel when you're required to, none of that is

2  excusable neglect.  So, I don't see any basis for, at this

3  point, reopening 9778, unless there is something more that you

4  can tell me than you've told me so far.

5          MR. FAIREY:  Well, what I can tell you is this, and I

6  can tell you more -- certainly in more detail because I was

7  sitting in this courtroom on April 9th when Your Honor said

8  Claim 9778, Allegheny Center Associates, is anybody here for

9  that claim?  Because Your Honor had done that several times

10 during the course of that day, you said a claim number and

11 said, is anybody here?  There were many, I guess, or some

12 defaults that day, people who didn't come.  I had my list of

13 claims, and I checked, and I recall checking.  And because it

14 was nine -- you know, 9778 was the claim number, okay, we don't

15 have -- our firm had no record of 9778.  We didn't have any

16 record of having filed 9778, or being associated with 9778.

17 Now, is that sufficient notice to have Claim 9778, which we had

18 no record of, to say Allegheny Center Associates -- the claims

19 we filed were for One Allegheny Center and Two Allegheny

20 Center.

21         THE COURT:  Don't you have a client?  I mean, you had

22 a client who hired you.

23         MR. FAIREY:  We did --

24         THE COURT:  The fact that -- does that mean that your

25 client fired you as soon as they hired you?  I mean, you've got

1  a -- your client and you have a duty to communicate with each

2  other.

3       MR. FAIREY:  That's absolutely right, and I'm not --

4  I'd have no answer for why a separate claim was filed by Mr.

5  Reynovich.  I do know that we filed and sent him a copy of the

6  claim we filed.  Maybe he assumed, well, I'll just forget about

7  that one.  I don't know what he thought.  But the bottom line

8  is, the motion was filed.  All of these things had happened.

9  We were here monitoring -- Your Honor knows full well --

10      THE COURT:  You've been here.

11      MR. FAIREY:  We've been here.  We've been arguing and

12  litigating all these issues.  And if there was any question

13  that we would let this one slip by for whatever reason, that

14  just didn't happen.  I mean, we were here litigating.  And we

15  filed discovery, and we filed pleadings on behalf of this

16  building, albeit under the other two claim numbers.  And even

17  the debtors didn't discover the duplicate nature of these

18  claims until way later in the game.

19      So, I guess the bottom line is, had it dawned on us,

20  or had we made that connection, or had we been able to figure

21  out that issue on April 9th, and we had stood up to Your Honor

22  then and said, wait a minute, Your Honor, we're not familiar

23  with that claim number, but, you know, let us look at that.

24  Having not filed a response to the motion for summary judgment,

25  although we had filed a response on behalf of many other

1 claimants with the same legal issue, you know, would Your Honor

2 -- that day I said no, it's too late, you're sorry, we're going

3 to -- nobody has responded, we're going to expunge the claim,

4 or would have said, well, okay, why didn't you -- I'm sure you

5 would have said why didn't you respond?  Or, why are you just

6 figuring this out now?  And we could have addressed that then.

7 But neither the debtors nor us understood the nature of this

8 problem until -- in October.  And we responded initially to the

9 motion to expunge the way we did.  Your Honor said, well, I

10 think you have a problem because the order is a final order.

11 And so, we investigated that.  And now we come to Your Honor

12 saying, well, we think there's some problems with the initial

13 order.

14         I certainly think there's a problem with the

15 suggestion that service upon Speights & Runyan for Claim 9778

16 is not -- is good service by the debtor.  We had no record of

17 it.  We had no way to understand that that was our claim, that

18 it was a duplicate with the two claims we had filed.  And even

19 going beyond that.  Your Honor knows, we've been here

20 responding to these claims.  We've litigated on behalf of these

21 people.  And I think if the debtors would have realized it when

22 we asked in discovery, state the basis of your reason for

23 saying Claim Number 110036, Two Allegheny Center, and 11037,

24 One Allegheny Center, are barred by the statute of limitations,

25 we would have gotten a reference to this other claim form,

1  9778.  Instead, we got --

2          MR. RESTIVO:  Objection, Your Honor.  The claim forms

3  are before the Court.  Unlike Allegheny Center Associates,

4  Speights & Runyan didn't answer the question when did you know,

5  and when did you remove with a date.  We couldn't raise a

6  statute of limitations defense because they didn't answer fully

7  the way their client did.

8          MR. FAIREY:  Your Honor, Mr. Reynovich, even in the

9  one he filled out, if you look at it he -- the question is,

10 when did you remove asbestos from your building?  And he says,

11 1990 for asbestos for asbestos removal, 1990 for asbestos

12 removal.  Okay?  Subsequently, documents -- documents that

13 we've provided through our claims numbers in support of this

14 claim don't bear out the fact that asbestos fireproofing

15 manufactured by Grace was removed in the 1980's.  That is a

16 question of fact.  And we can get into the merits of the

17 statute of limitation defense.  But I don't see --

18         THE COURT:  There's no point -- that claim is

19 expunged.  That -- you know -- the reason typically that

20 general counsel hire outside counsel and don't file these

21 claims on their own is because they generally want other

22 counsel to be the entity that files the proofs of claim.  Mr.

23 Reynovich, for whatever reason, chose to file this claim on his

24 own.  And, oh, by the way, his proof of claim also says it was

25 removed in 2001, too.  He put three dates on, not just two

1 dates.

2          MR. FAIREY:  He did.  And he also referred -- he said

3 we're looking for documents, and we're looking --

4          THE COURT:  He said he was looking for documents --

5          MR. FAIREY:  Right.

6          THE COURT:  -- but then he -- he -- I don't know that

7 Mr. Reynovich personally, I don't mean to assert that, but

8 somebody at Allegheny Center was served with the proof of

9 claim.  His signature was not legible, and the section of the

10 proof of claim form itself that said tell me who your counsel

11 was was left blank, the one he filled out, it's blank.  So,

12 there is no way to know who he is, except for his illegible

13 signature on that proof of claim form.  The debtor, I think,

14 complied with attempting to serve whoever it could serve to the

15 best of its ability with respect to that proof of claim form,

16 knowing what it knew as to that proof of claim form.

17          To the extent that California counsel filed

18 something, it's on a list for getting e-notice.  I don't know

19 why it didn't get e-notice if, in fact, it didn't get e-notice.

20 There's no explanation for why it didn't.  It certainly should

21 have.  To the extent that it doesn't have local counsel,

22 there's no excuse for that.  That's certainly not excusable

23 neglect.  It's certainly neglectful.  I don't know whether Mr.

24 Huban has been admitted pro hac in the case.  If that's the

25 situation, then maybe that might explain it.  But if that's the

1 case, then he certainly should have gotten notice.  I don't --

2 I can't tell you whether I've signed that kind of an order.  I

3 just don't know.

4        There is apparently notice of an entry of an order on

5 the electronic filing that says that this notice of an entry of

6 an order regarding 9778 went to Mr. Huban.  My clerk just found

7 it.  So, there is that entry that now says that he received

8 that notice.  So, he says he didn't get it, but there's notice

9 of that entry on the docket, so he's alleged on the docket that

10 he received that electronic filing notice.  So, I now have no

11 explanation for why he didn't get it when there's that entry on

12 the docket.  He may not have gotten a paper copy from the

13 debtors, but apparently he got the electronic notice.  So,

14 there is that entry on the docket, as well.  So, he apparently

15 got it.  The client got it.  I don't see any basis for opening

16 9778.  That claim has been expunged.

17        What doesn't seem to me to be so clear at this point,

18 because I do think you have a problem.  When there is one claim

19 that's been expunged I don't know how you resurrect it by

20 filing a separate claim, but there does seem to be some lack of

21 communication that is not explained on this record between how

22 Allegheny Center could file its own and then at the same time

23 hire outside counsel who goes about filing two separate claims.

24 There is no explanation for why I've got three claims that

25 represent two buildings, one claim representing two buildings,

1  and then two separate claims each representing the same

2  buildings.

3      MR. FAIREY:  That's correct.  And filing two

4  buildings on one claim was not in compliance with the proof of

5  claim instructions, either.

6      THE COURT:  I -- that I agree with.  I understand

7  that, as well.  That also doesn't seem to be correct.  And had

8  there been a motion by the debtors to, you know, file -- to

9  expunge one set of these claims as duplicative, that motion

10  would have been granted easily.

11      MR. FAIREY:  Absolutely, Your Honor.

12      THE COURT:  Not -- and 9778 would have been expunged,

13  as well, based on the statute of limitations issues.  But the

14  problem you've got with 11036 and 11037 is that the information

15  on 9778 says that there was removal in the 1980's, and the

16  1990's, and 2001.  Now, the 2001 issue, I don't know whether or

17  not that's inside, outside the statute of limitations.  I don't

18  know.  But the 1980's issue, and even the 1990's issue, you've

19  got real problems with that, because there is clearly a notice

20  problem.

21      MR. FAIREY:  I understand what you're saying, Your

22  Honor.  With respect to the asbestos, though, and I can cite

23  you chapter and verse.  I think we've already done it, and

24  Speights & Runyan's response is the issue is not did they --

25  for statute of limitations purposes I would submit the issue is

1 not whether or not they knew they had some asbestos product in

2 their building.

3        THE COURT:  Oh, he says Zonolite.  It's very clear.

4 It says Zonolite.  It's not some asbestos product.  It's a

5 Grace asbestos product.

6        MR. FAIREY:  Yes, which he said he learned was a

7 Grace product in 2003.  He didn't know it was a Grace product

8 until 2003.  He also says -- he doesn't specify which asbestos

9 removal occurred, and the question doesn't ask with that

10 specificity.  There's a later question that asks with

11 specificity when was a Grace product disturbed, in which he

12 says "See Answer Number 10."

13        THE COURT:  Well, it says, "For what alleged

14 asbestos-containing products are you making a claim?"  And he

15 checks Monocote 3 fireproofing insulation and Zonolite.  And

16 then he says, "When did you first learn that it was Grace's

17 product?"  And it says, "2003, from Speights & Runyan and

18 debtor's schedules."  He says the property was constructed in

19 the '60's and '70's, and purchased by the claimant in 1981.

20 So, he couldn't have learned before 1981.  He says the asbestos

21 removal was in the '80's, '90's, and 2001.  Clearly, he's aware

22 of Monocote, and Zonolite, and Grace products because --

23        MR. FAIREY:  Again, Your Honor, the records -- the

24 back-up documents would reflect, and I don't know the answer to

25 this, I'm not Mr. Reynovich, but the back-up documents would

1  reflect and suggest that the asbestos removal that occurred in

2  1989 was thermal system insulation, not fireproofing

3  insulation.  And I don't believe -- I understand the questions

4  on the claim form, but I think if you look at it as a whole it

5  is at best ambiguous as to whether or not he includes Grace

6  fireproofing in what he is talking about happened in the

7  1980's.

8            THE COURT:  Well, I don't know, because --

9            MR. RESTIVO:  Your Honor, if you look --

10            THE COURT:  -- Question 36 also says, "How did you

11  first learn of the presence of asbestos on your property?"  And

12  he says, "Examination."  I'm sorry, Mr. Restivo --

13            MR. RESTIVO:  If you looked at the same answers on

14  the Speights & Runyan forms instead of that specific

15  information, what you will see over and over again is various

16  renovations at various times.  It's an answer designed to

17  preclude anyone moving for summary judgment.  Allegheny Center,

18  at least honest -- answered with factual honesty, and that's

19  why we were able to move.

20            MR. FAIREY:  Your Honor, that's disingenuous.

21  Speights & Runyan has supplemented their claims with tens of

22  thousands of documents from each of these individual buildings

23  with very specific information about all of this stuff.

24            THE COURT:  Well, I think the -- I still think the

25  problem is the legal consequence of having the first filed

1 because this was the first filed of the claims by, I'm not

2 sure, a couple of days.

3           MR. FAIREY:  By two days, Your Honor, I believe.

4           THE COURT:  Okay.  Expunged.  Which apparently is

5 more -- the more specific claim filed by general counsel.  The

6 issue that I have is it does appear that no one, not the

7 debtor, not Speights & Runyan, and apparently not even

8 Allegheny Center knew that both its general counsel and its

9 outside counsel had filed these duplicative claims.

10          MR. RESTIVO:  Your Honor, could I address that?

11          THE COURT:  Yes.

12          MR. RESTIVO:  Because I'm not -- the part I would

13 like to address is when we moved for summary judgment we moved

14 for summary judgment on Claim Number 9778, Allegheny Center

15 Associates.  It's not correct that Speights & Runyan or anyone

16 else would simply see a claim number.  They would see a claim

17 number and Allegheny Center Associates.  Attached as Exhibit 2,

18 if I might approach the bench, is the authorization by this

19 client, after all, you represent clients, not buildings, of

20 Speights & Runyan to act on their behalf.  And if you look at

21 the acknowledged and agreed by Mr. Reynovich's illegible

22 signature, you will see who the client is.

23          THE COURT:  I'm sorry.  And this is attached to Claim

24 9778?

25          MR. FAIREY:  Your Honor, it's Exhibit 2 to our brief.

1        MR. RESTIVO:  Your Honor, this is attached as Exhibit

2   2 to the brief.  And you will see that Mr. Reynovich signs on

3   behalf of the client, Allegheny Center Associates.  It's true,

4   he references Allegheny Center I and Allegheny Center II, but

5   the authorization, the client of Speights & Runyan, per that

6   form, in 2003, is Allegheny Center Associates.  When we served

7   Speights & Runyan with a motion for summary judgment on

8   Allegheny Center Associates, it is true we don't know Speights

9   & Runyan represents them.  But it's Speights & Runyan's client,

10  not our client.  And under Rule 11 they had more than enough

11  notice, including three attorneys here in Court when Allegheny

12  Center Associates is their client per their own form, they have

13  to say it's our client, wait a minute.  They didn't.  There's

14  no reason they didn't.  And that is not excusable neglect under

15  the law.

16        MR. FAIREY:  Your Honor, two things.  First of all,

17  that is a giant leap that Mr. Restivo just made, a giant leap.

18  The -- I mean, the documents speak for themselves.  We filed

19  claims, we were assigned claim numbers by the claims agent.  We

20  were here in January of 2006, Your Honor, on a bunch of other

21  duplicate claims where there was an issue about having filed

22  amended claims and they had issued new claim numbers for them.

23  And Your Honor raised some dissatisfaction with the claims

24  agent then, and ordered us to sit down and resolve this, to go

25  through this.  Speights & Runyan, nor the claimants, for that

1  matter, have access to all the proof of claim forms.  We can't

2  sit there and go through all the proof of claim forms from one

3  to 13,000, or whatever the numbering system was --

4        MR. RESTIVO:  The proof of claim forms in our motion

5  were attached to the motion.  They were served upon Speights &

6  Runyan.  We would not have moved for summary judgment on this

7  building without showing the Court the evidence as to the date

8  of removals, and that was attached --

9        THE COURT:  They were attached --

10       MR. RESTIVO:  -- to the motion.

11       THE COURT:  They were attached to the motion --

12       MR. FAIREY:  They were attached, Your Honor, but they

13  specifically referenced a claim number that wasn't our claim

14  number.  We had been litigating the other two claim numbers on

15  behalf of them.  We didn't have any reason to go back and say

16  we'd better check all the other claim numbers and see if they

17  refer to our clients.  The other thing about that, Your Honor

18  --

19       THE COURT: You wouldn't check a proof of claim number

20  that has your client's name and the same buildings attached,

21  and cross reference it to something that you filed?

22       MR. FAIREY:  Your Honor, we were responding to

23  hundreds of motions for summary judgment over a four-week

24  period.

25       THE COURT:  Well, I know that, but I just can't

1 believe you wouldn't cross check when you get the same client

2 and the same building names.

3      MR. FAIREY:  The -- we cross checked the claim

4 numbers, which we had been cross checking, and checking, and

5 double checking with the defendants since the beginning, our

6 claim numbers, and had been litigating that issue with them.

7 And Your Honor had ordered to weed through the duplicates.  All

8 of that, Your Honor, plus if the debtors intended and should

9 have expected for us to accept service on Allegheny Center

10 Associates, why would they serve Speights & Runyan and then

11 serve Allegheny Center Associates itself?

12      THE COURT:  No.  Look, let me clarify one thing.  I

13 don't think that with respect to Claim Number 9778 that

14 Speights & Runyan was acting on behalf of Allegheny Center

15 Associates.  I think who was acting on behalf of Allegheny

16 Center Associates was Andrew Reynovich, and he was served.

17      To the extent that with respect to that claim that

18 Mr. Huban -- I'm sorry -- I don't know how he -- Huban -- was

19 acting on behalf of Allegheny Center Associates because he

20 filed this response at the docket number that you put of record

21 earlier.  He was on the electronic notice list, and he is

22 listed as having received electronic service of the order.  And

23 as a result, he should have received electronic service of the

24 order.  To the extent he didn't, there's no explanation as to

25 why he didn't.  To the extent that he filed a response, he had

1  a duty to monitor the docket.  To the extent that he didn't,

2  there's no explanation as to why he didn't.  The fact that

3  there are 2,010 pleadings between when he got onto the docket

4  and when he got off the docket, that's just the way life is in

5  a big case.  It's just the way it is.  And that's one reason

6  why you get local counsel.  To the extent he didn't get local

7  counsel, there's no explanation as to why he didn't get local

8  counsel.  To the extent he didn't comply with the case

9  management order, there's no explanation as to why he didn't

10  comply with the case management order.  None of which is

11  excusable.  Is it neglectful?  Yes.  Is it excusable?  No.

12            MR. FAIREY:  Just one more thing, Your Honor, and I

13  -- all I -- I don't have the docket.  I just printed off the

14  docket sheet, and there's no reference -- there's no reference

15  on the motion for summary judgment, the thing that he would

16  have had to see and respond to, to not be in default.  There's

17  no reference on that document to Allegheny Center Associates or

18  Claim 9778.

19            THE COURT:  To what?  I'm sorry, Mr. Fairey.

20            MR. FAIREY:  To the docket entry for the debtor's

21  motion for summary judgment.

22            THE COURT:  There's no reference on the docket entry

23  to --

24            MR. FAIREY:  There's no reference on the docket entry

25  here to Allegheny Center Associates of Claim Number 9778.  And

1  even if you looked at the heading -- well, I mean --

2          THE COURT:  Because it's an omnibus.

3          MR. FAIREY:  And I have the notice of motion here.  I

4  mean --

5          THE COURT:  Yes, I know.  It's very long.

6          MR. FAIREY:  Well, actually, this one is short.  It's

7  seven pages.  But the reference to -- no, that's the wrong one.

8  I think it was less than ten pages, but the reference to

9  Allegheny Center was on the second or third page?

10         THE COURT:  Well, it -- that's the reason why the

11 omnibus orders normally restrict the number, but it's also the

12 reason why, in this case, I said you have to do it all at once.

13         MR. FAIREY:  Right.  And it appeared on Page 2, so it

14 wasn't even on the heading page of the thing that was filed.

15         THE COURT:  That's the way it is in a big case.  You

16 know?  You're expected, when you're in a big case, and people

17 are doing omnibus orders, to look at the headings and to read

18 to find out whether or not your client's involved in these

19 things.  And if -- otherwise, if you don't want to do it you

20 get local counsel.

21         MR. FAIREY:  Your Honor --

22         THE COURT:  I don't see a basis to open up 9778.  I

23 just don't see it.  What I am still concerned about is whether

24 or not that precludes litigation on 11036 and 37.  And normally

25 I would say yes.  Under these circumstances I'm a little

1  hesitant to say yes because it appears to me that nobody

2  understood that these were the same buildings in such a time

3  frame that it would actually provide some form of real due

4  process to the buildings and the clients behind the buildings

5  under these circumstances.  If the debtor knew it, the debtor

6  didn't timely notify the parties that it was a duplicative

7  claim, and if the building knew it, it certainly didn't advise

8  either set of counsel that that was the case.

9       So, something went haywire somewhere, and that seems

10  to me to be what excusable neglect is all about, not somebody

11  simply not doing what they're supposed to, but something that

12  really is odd in the system for which there is no explanation.

13  And this seems to me to be that circumstance.  The problem I

14  have is the legal consequence of having expunged a claim for

15  which the statute of limitation clearly seems to bar the claim

16  and as to which there is a final order that I see no basis to

17  reopen, and I don't see a basis to open 9778.  And I don't know

18  the effect, I don't know the legal effect of that on the two

19  new claims.

20       It seems to me that _Pioneer_ probably says that had I

21  been faced with all of the issues at one time, as opposed to

22  piecemeal, what I would have done is the following.  I would

23  have said 9778 should go away, it should never have been --

24  well, let me say this.  I would have said that one set of the

25  claims should have gone away.  Which one I don't know.  9778,

1 to the extent that it has more fulsome information, is probably

2 the better claim.  But in terms of duplicate claims, I would

3 have expunged one set of those claims.

4          To the extent that 9778 doesn't comply with the order

5 because it has two buildings in it, I probably would have said

6 redo them both in two sets, incorporate the information from

7 9778 into 110367 and 11037, and re-file them as two sets, and

8 get rid of 9778.  I probably would have ordered amended 11036

9 and 11037 to comport with the information in 9778.  And then I

10 would have given the debtor an opportunity to move on statute

11 of limitations grounds on 11036 and 11037, because frankly, I

12 don't know how you've got a prayer on 11036 and 11037 based on

13 the information that's in 9778.

14          MR. FAIREY:  I understand that, Your Honor, and I

15 understand we have to live with that information, even if we go

16 forward on 11036 and 11037.  But I think there are many legal

17 precedents that -- and again, the claim form, it provides some

18 information, but it's ambiguous information.  It's not

19 necessarily always the relevant information as to what -- and

20 the facts are what the facts are, and if this had been teed up

21 on 11036 and 11037, even with reference to the old claim form,

22 we could have argued that at summary judgment, and we could

23 still argue that at summary judgment, and address that issue

24 for Your Honor.  I understand Your Honor's hesitancy, but

25 that's another -- that's another ball of wax is the statute of

1  limitations.

2          THE COURT:  All right.  My clerk has also discovered

3  that Mr. Huban got electronic notice of the motion for summary

4  judgment and -- I can't read her writing, so I'm sorry, I don't

5  know what the next word is.

6                          (Pause)

7          THE COURT:  Oh, yes.  Mr. Loizides as local counsel

8  got it, but that was for Speights & Runyan.  So, there are

9  several e-notices that Mr. Huban did apparently receive.  As a

10 result, I have no basis to reopen 9778, and in fact, I'm a

11 little concerned about the nature of the affidavit that I now

12 have of record.  Not just a little.  Very concerned.  Let's

13 make that very concerned.

14         This is where I think I am, Mr. Restivo.  I think I

15 am not reopening anything to do with 9778.  That's a final

16 order.  I see no basis to reopen it.  I think what I am going

17 to do, however, is let the litigation on 11036 and seven go

18 forward, but I am going to require that to the extent that

19 there is information in 9778 that appears to permit a statute

20 of limitations objection on 11036 and seven to go forward, I'm

21 going to permit it.

22         I do think there is something that's just -- I said

23 before haywire here -- and it appears to me that that is the

24 nature of the excusable neglect.  I don't usually find that

25 kind of a process -- I don't usually think that there is

1  excusable neglect in letting something go but it appears here

2  that there is just something that went wrong, and I don't know

3  what it is.  I can't specifically articulate it.  It appears

4  that it was a lack of direct communication between Mr.

5  Reynovich and the Speights & Runyan firm.  And that, I think,

6  is what the nature of excusable neglect is.  Mr. Reynovich

7  apparently never informed anybody that he was filing this own

8  proof of claim.  That appears to have been an error of

9  monumental proportions on behalf of Mr. Reynovich when he had

10 already retained Speights & Runyan for the purpose of filing

11 this proof of claim form, and then filed one on his own the

12 very next day, before Speights & Runyan could get their own

13 together.  Nonetheless, to the extent that he has information

14 that is relevant and seems to lead to a statute of limitations

15 defense, it appears to me that the debtor has to have the

16 opportunity to be able to pursue that defense with respect to

17 11036 and 37.  So, I'm not reopening 9778.  I am continuing on

18 the basis of the summary judgment to have expunged it based on

19 statute of limitations grounds, and to the extent that it is

20 duplicative of 11036 and 37.  I am keeping 9778 as expunged.

21      So, whatever the consequences are, which I'm not

22 adjudicating now, for 11036 and 37, those consequences will

23 follow.  I don't know what those consequences will be.  I think

24 it's going to take some discovery.

25      MR. FAIREY:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. RESTIVO:  Your Honor, I understand the Court's

2     ruling, but in our motion to expunge as duplicates we did brief

3     what we thought the legal result had to be if, in fact, these

4     claims were, which they are, the same buildings that have been

5     expunged.  That means you would be denying our motion?

6          THE COURT:  I am denying -- you've raised,

7     essentially, res judicata grounds because of the statute of

8     limitations issue.  What I am hearing from counsel for -- what

9     I"m hearing from Mr. Fairey is that discovery has shown on

10    their side, which you obviously haven't had a chance to do, on

11    their side, that the information in 9778 is simply not

12    accurate, that the dates may be accurate, but the content of

13    the information itself in terms of what type of asbestos was

14    discovered is not correct, and therefore, where it says that

15    asbestos was removed in the 1980's, that does not mean that it

16    was Grace asbestos, either fireproofing or Zonolite that was

17    removed at that time.

18         What I think I'm saying is I'm going to let Grace do

19    some discovery to find that out.  If it turns out that, in

20    fact, it was a Grace product, then I'm going to reconsider this

21    issue and I'll determine that, in fact, it was a res judicata

22    issue.  But I think there's a question of fact, and I think

23    there's enough of an excusable neglect for having filed these

24    duplicative claims in the series in which they were filed of

25    record to get into the discovery in that issue.  So, I'm going

1  to withhold a decision on the legal consequences to let the

2  debtor look at the facts and see where they go, but I am not

3  going to reopen 9778 for any purpose.

4          MR. RESTIVO:  Okay.  Your Honor, I have two

5  responses, just so the record is clear.  First off, I think

6  counsel, and now perhaps the Court, has stated a legal standard

7  that we don't believe is the applicable standard.  We believe

8  the applicable standard, and we have to litigate it we will, is

9  inquiry notice.  It doesn't have to be the same product, all

10 you have to do is be on inquiry notice you have asbestos

11 containing materials in your building.  You may not know it's a

12 Grace product, but you're on inquiry notice to find out.  We

13 will brief that.

14         THE COURT:  Well, that -- no, I don't know that I

15 need a brief on that issue.  I think maybe you're correct.

16         MR. RESTIVO:  Secondly, Your Honor, I assume, from

17 what the Court is saying, we're not going to -- they are not

18 going to be able to raise, with respect to these two duplicate

19 claims, that you did not raise whatever the letter is for a

20 statute of limitations defense and therefore you can't raise a

21 statute of limitations defense no matter what information we

22 give you.

23         MR. FAIREY:  No, Your Honor.

24         THE COURT:  The debtor's statute of limitations

25 defense as to these two buildings is preserved.

1       MR. FAIREY:  We agree with that, Your Honor.  I mean,

2 you've already said what he put in 9778 is what's in there, and

3 that's evidence, so -- I would agree with that.

4       THE COURT:  But I think you're correct as to the

5 legal standard.  I think it is inquiry notice, and so, if they

6 had inquiry notice in 1980 about asbestos in the building, I

7 think you're correct.

8       MR. FAIREY:  Your Honor, there are two other issues

9 that go along with that.  I don't want to get into that, but I

10 -- we can address that when we brief this issue for Your Honor.

11 But that is an issue that is actually before Your Honor on

12 other summary judgment motions, number one.  And number two, we

13 have tolling issues and fraudulent concealment issues to deal

14 with, as well.

15       THE COURT:  Well, it depends on the state law.  But

16 for this one we're talking Pennsylvania law, aren't we?

17       MR. FAIREY:  Actually, we're talking Delaware law.

18       THE COURT:  Oh.

19       MR. FAIREY:  The debtors argue Delaware.  So --

20       THE COURT:  Well, that's --

21       MR. FAIREY:  And we briefed it that way --

22       THE COURT:  But that's even better.

23       MR. RESTIVO:  With all due respect, we are talking

24 the shorter of Delaware or Pennsylvania law.

25       MR. FAIREY:  Which they contend is Delaware.

1          THE COURT:  Well, then if it's Delaware, it's an

2   inquiry notice.  Probably if it's Pennsylvania it's an inquiry

3   notice anyway.

4          MR. FAIREY:  Well, in Delaware it is inquiry notice

5   upon injury.  And the question is what is the injury?  And

6   that's what we've briefed in the other cases, too, and

7   certainly we'll --

8          THE COURT:  Okay.

9          MR. FAIREY:  -- we'll address that with Your Honor

10  now.

11         THE COURT:  All right.  To make it very clear.  I do

12  not want to hear, as to these two buildings, that the debtor

13  has any procedural problem whatsoever raising the statute of

14  limitations.  Do not raise it.  I will sanction your firm if

15  you raise that issue.  Is that clear?

16         MR. FAIREY:  Yes, Your Honor.  Absolutely.

17         THE COURT:  All right.  In any event, it's preserved

18  because they've raised it with 9778, and I'm carrying that over

19  into this for the reason that I've expressed earlier.  All

20  right.  So, what do we do next with respect to this?

21         MR. FAIREY:  I would suggest we get together and

22  talk, and put together some kind of management order to deal

23  with the discovery and tee this thing up so it can be heard.

24         MR. RESTIVO:  Well, I guess we have to talk.  He is

25  making reference to pieces of historical paper.  I would

**J&J COURT TRANSCRIBERS, INC.**

1  represent to you none of them have been provided to Grace under

2  these two claim numbers.  My first request would give us all

3  the pieces of paper.  We may not have to take any depositions

4  or anything.  Let us see anything you have relating to removal,

5  surveys, whatever of asbestos in that building, and we'll

6  probably be able to prepare a motion for summary judgment

7  without discovery.  If we need a deposition, we'll tell you.

8          MR. FAIREY:  That's fair enough.

9          MR. RESTIVO:  And you do that within the next two

10  weeks, and we'll prepare a motion.

11          MR. FAIREY:  And I -- the next two weeks is the

12  issue, but I think if me and Mr. Restivo have a chance to talk,

13  we can put together an acceptable schedule.

14          THE COURT:  All right.  I would like, then, I guess,

15  from the debtor, with respect to Items 11 and 12, an order that

16  refuses to reopen 9778, preserves all objections to the claims

17  of 11036 and 11037, including the statute of limitations, and

18  opens discovery as to those two claims.  And then you folks can

19  put together whatever --

20          MR. RESTIVO:  And defers ruling, for now, on our

21  motion to expunge these two claims as res judicata, or

22  duplicate until a later time?

23          THE COURT:  Correct.  And then you folks can put

24  together a scheduling order to --

25          MR. FAIREY:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  -- to re-raise whatever issues you need.

2        MR. FAIREY:  We will do that.

3        THE COURT:  Meanwhile, perhaps you can add this to

4   your settlement discussions, since you're up to .667, then

5   perhaps you can add this to the mix.

6        MR. FAIREY:  Thank you, Your Honor.

7        THE COURT:  Okay.  Ms. Baer?

8        MS. BAER:  Your Honor, I believe that concludes the

9   agenda for today.

10        THE COURT:  All right.  Thank you.  We're adjourned.

11                    * * * * *

### C E R T I F I C A T I O N

        We, KIMBERLY UPSHUR and TAMMY DeRISI, court approved

transcribers, certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter.


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Tammy DeRisi                    Date:  March 25, 2008

TAMMY DeRISI

J&J COURT TRANSCRIBERS, INC.



                    **J&J COURT TRANSCRIBERS, INC.**