UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
            Debtors.  .
                          .    March 25, 2008
. . . . . . . . . . . ..        9:09 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (Contd'):

```
For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

                            Caplin & Drysdale, Chartered
                            By:  ELIHU INSELBUCH, ESQ.
                            375 Park Avenue, #3505
                            New York, NY  10152

For the Debtors:            ARPC
                            By:  AMY BROCKMAN, ESQ.

For W.R. Grace:             W.R. Grace
                            By:  MARK SHELNITZ, ESQ.
                                 JAY HUGHES, ESQ.
                                 WILLIAM CORCORAN, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

For the Equity              Kramer Levin Naftalis & Frankel
Committee:                  By:  GREGORY HOROWITZ, ESQ.
                            919 Third Avenue
                            New York, NY  10022

For the                     Stroock & Stroock & Lavan
Unsecured Creditors'        By:  KENNETH PASQUALE, ESQ.
Committee:                       ARLENE KRIEGER, ESQ.
                            180 Maiden Lane
                            New York, NY  10038-4982

For the Property
Damage Committee:           Bilzin Sumberg Baena Price &
                              Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Contd')

| | |
|---|---|
| For the Ad Hoc<br>Committee of Equity<br>Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe<br>  LLP<br>By:  ROGER FRANKEL, ESQ.<br>     ANTHONY KIM, ESQ.<br>     RAYMOND MULLADY, ESQ.<br>     JOHN ANSBRO, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Connelly Bove Lodge & Hutz, LLP<br>By:  JEFFREY WISLER, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19899 |
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| | STB<br>By:  STERLING MARSHALL, ESQ. |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br>  LLP<br>By:  MARK CHEHI, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (Contd'):

For Sealed Air:            NERA Economic Counsulting
                           By:  STEPHANIE PLANCICH
                           1166 Avenue of the Americas
                           28th Floor
                           New York, NY  10036

For W.R. Grace:            NERA
                           By:  ELENA ZAPRYANOVA
                                LINDA SHEN

For Serengeti:             Vinson & Elkins, LLP
                           By:  AMY BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201

For Serengeti:             By:  BILLAL SIKANDER

For Silver Point
Capital:                   Silver Point Capital
                           By:  JOHN KU

For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

TELEPHONIC APPEARANCES:

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  LEWIS KRUGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

For Ad Hoc Committee:      Weil, Gotshal & Manges
                           By:  M. JARRAD WRIGHT, ESQ.
                           1300 Eye Street NW, Suite 900
                           Washington, D.C.  20005

For Official Committee     Kramer Levin Naftalis & Frankel, LLP
Equity Holders:            By:  PHILLIP BENTLEY, ESQ.
                           919 Third Avenue
                           New York, NY  10022


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For Official Committee        Dies & Hile, LLP
of Asbestos Property          By:  MARTIN DIES, ESQ.
Damage Claimants:             1601 Rio Grande, Suite 330
                              Austin, TX  78701


For Various Claimant          Stutzman, Bromberg, Esserman & Plifka
Firms:                        By:  DAVID J. PARSONS, ESQ.
                                   VAN J. HOOKER, ESQ.
                                   SANDER L. ESSERMAN, ESQ.
                              2323 Bryan Street
                              Suite 2200
                              Dallas, TX  75201



For Fireman's Fund:           Stevens & Lee, P.C.
                              By:  JOHN DEMMY, ESQ.
                                   DAVID R. BEANE, ESQ.
                              1105 North Market Street, 7th Fl.
                              Wilmington, DE  19801


For the PD Committee:         Bilzin Sumberg Baena Price &
                                Axelrod, LLP
                              By:  SCOTT BAENA, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, FL  33131


For Owens-Illinois:           McCarter & English
                              By:  KATHARINE MAYER, ESQ.
                              Renaissance Centre, 405 N. King St.
                              Wilmington, DE  19801


For David T. Austern:         Piper Jaffray & Co.
                              By:  JONATHAN BROWNSTEIN, ESQ.


For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864

TELEPHONIC APPEARANCES (Contd'):

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  MATTHEW RUSSELL, ESQ.
                                  ROBERT GUTTMANN, ESQ.
                                  MICHAEL DAVIS, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future              Orrick, Herrington & Sutcliffe,LLP
Claimants                   By:  DEBRA FELDER, ESQ.
Representatives:                 JOSHUA CUTLER, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007

For Federal Insurance       Cozen O'Connor
Company:                    By:  JEFFREY WAXMAN, ESQ.
                            Chase Manhattan Centre
                            1201 North Market Street
                            Wilmington, DE  19801

For Federal Insurance       Cozen O'Connor
Company:                    By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103

For Allstate Insurance:     Cuyler Burk, LLP
                            By:  ANDREW CRAIG, ESQ.
                            Parsippany Corporate Center
                            Four Century Drive
                            Parsippany, NJ  07054

For W.R. Grace:             W.R. Grace
                            By: WILLIAM CORCORAN, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

                            Kirkland & Ellis, LLP
                            By:  ELLEN AHERN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

                            Kirkland & Ellis, LLP
                            By:  DAVID MENDELSON, ESQ.
                            6555 Fifteenth Street, N.W.
                            Washington, DC  20005


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For State of Montana        Womble Carlyle Sandridge & Rice
Department of               By:  FRANCIS MONACO, ESQ.
Environmental Quality:      222 Delaware Avenue
                            Suite 1501
                            Wilmington, DE  19801

For Official Committee      Anderson Kill & Olick
of Asbestos Personal        By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:           1251 Avenue of the Americas
                            New York, NY  10020-1186

For W.R. Grace:             Cohn Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For CNA:                    Goodwin Procter, LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

For Grace Certain           Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                            By:  NATALIE D. RAMSEY, ESQ.
                            300 Delaware Avenue, Ste. 750
                            Wilmington, DE  19801

For David T. Austern,       Phillips, Goldman & Spence, P.A.
the Future Claimants'       By:  JOHN C. PHILLIPS, ESQ.
Representative:             1200 North Broom Street
                            Wilmington, DE  19806

For W.R. Grace:             Pachulski, Stang,Ziehl & Jones, LLP
                            By:  TIMOTHY P. CAIRNS, ESQ.
                            919 North Market Street
                            17th Floor
                            Wilmington, DE  19899-8705

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  WALTER SLOCOMBE, ESQ.
                                 BERNARD BAILOR, ESQ.
                                 JEANNA RICKARDS, ESQ.
                                 JAMES WEHNER, ESQ.
                                 LESLIE KELLEHER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For the Asbestos                Ferry Joseph & Pearce, P.A.
Creditors Commtittee:           By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 19899
                                Wilmington, DE  19899


For Ford, Marrin,               Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer                 Gleser
& Gleser:                       By:  SHAYNE SPENCER, ESQ.
                                Wall Street Plaza
                                New York, NY  10005


For Pepsi:                      Butler Rubin Salfarelli & Boyd, LLP
                                By:  KIRK T. HARTLEY, ESQ.
                                70 West Madison Street
                                Suite 1800
                                Chicago, IL  60602


For Official Committee          Duane Morris, LLP
of Unsecured Creditors:         By:  MICHAEL LASTOWSKI, ESQ.
                                1100 North Market Street, Suite 1200
                                Wilmington, DE  19801-1246


For Official Committee          Brandi Law Firm
of Asbestos Property            By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:               44 Montgomery St., Suite 1050
                                San Francisco, CA  94104


For the State of CA,            Hahn & Hessen, LLP
Dept. of Gen. Services:         By:  STEVEN J. MANDELSBERG, ESQ.
                                488 Madison Avenue, 14th Fl.
                                New York, NY  10022


For Baron & Budd,               Hogan Firm Attorneys at Law
et al.:                         By:  DANIEL K. HOGAN, ESQ.
                                1311 Delaware Avenue
                                Wilmington, DE  19801


For the PD Committee:           Speights & Runyan
                                By:  DANIEL SPEIGHTS, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For Royal Insurance:          Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                              By:  CATHERINE CHEN, ESQ.
                              150 East 42nd Street
                              New York, NY  10017

For David T. Austern:         Piper Jaffray & Co.
                              By:  JASON SOLGANICK

For Scott Company:            Vorys, Sater, Seymour & Pease, LLP
                              By:  TIFFANY COBB, ESQ.
                              52 East Gay Street
                              Columbus, OH  43216

For London Market             Mendes & Mount, LLP
Companies:                    By:  ALEXANDER MUELLER, ESQ.
                              750 Seventh Avenue
                              New York, NY  10019-6829

For Official Committee        LECG
of Asbestos Property          By:  ALAN MADIAN, ESQ.
Claimants:

For Official Committee        Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

For Ivory Investment:         Ivory Investment
                              By:  DHANANJAY PATWARDHAN

For Linden Advisors:          Linden Advisors, LP
                              By:  CRAIG GILBERT

For O'Conner:                 O'Conner
                              By:  John R. Wollen

For Credit Suisse             Credit Suisse First Boston
First Boston:                 By:  TIM McARDLE

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Contd'):

For King Street            King Street Capital Management, LLC
Capital Management,        By:  MITCHELL SOCKETT
LLC:

For the Blackstone         The Blackstone Group
Group:                     By:  JOHN O'CONNELL

For Dune Capital Mgmt:     Dune Capital Management
                           By:  GUY BARON

For Anchorage Advisors:    Anchorage Advisors
                           By:  JONATHAN LEWINSOHN

For Lehman Brothers:       Lehman Brothers
                           By:  ANDREW CHAN

For Caxton Associates:     Caxton Associates, LLC
                           By:  JAMES RIEGER

For Dow Jones              Dow Jones News Wires
News Wires:                By:  PEG BRICKLEY

For Citadel Investment     Citadel Investment Group
Group:                     By:  BEAU HARBOUR

For Durham Asset           Durham Asset Management
Management:                By:  JEFFREY A. ROSENKRANZ

For Murray Capital         Murray Capital Management, Inc.
Management                 By:  MARTI MURRAY

For Korn Capital, LLC:     Korn Capital, LLC
                           By:  STEPHANIE KWONG

For Irwin H. Zandman:      Irwin H. Zandman
                           By:  IRWIN H. ZANDMAN

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

| WITNESS | PAGE |
|---|---|
| SURESH MOOLGAVKAR | |
| Direct Examination by Ms. Harding | 14 |
| Voir Dire Examination by Mr. Finch | 23 |
| Continued Direct Examination by Ms. Harding | 26 |
| Cross Examination by Mr. Finch | 82 |
| Cross Examination by Mr. Ansbro | 163 |
| Redirect Examination by Ms. Harding | 177 |
| Recross Examination by Mr. Finch | 199 |
| Recross Examination by Mr. Ansbro | 203 |

| EXHIBITS | | ID. | EVD. |
|---|---|---|---|
| GG-2244 | Summary | -- | 79 |
| GG-2246 | Summary | -- | 80 |
| GG-2249 | Summary | -- | 81 |
| GG-2258 | Summary | -- | 81 |
| GG-2262 | Summary | -- | 82 |
| GG-2094A | Henry X-ray study | -- | 209 |
| GG-2179 | Rule 106 Summary | -- | 210 |
| GG-2180 | Rule 106 Summary | -- | 210 |
| GG-2187 | Rule 106 Summary | -- | 212 |
| GG-2188 | Rule 106 Summary | -- | 212 |
| GG-2189 | Rule 106 Summary | -- | 212 |
| GG-2190 | Rule 106 Summary | -- | 212 |
| GG-2191 | Rule 106 Summary | -- | 212 |
| GG-2192 | Rule 106 Summary | -- | 212 |
| ACC/FCR-2086-1 | Dr. Peto's Formula (Line 2) | --- | 155 |
| ACC/FCR-2086-2 | Solved for lifetime risk of mesothelioma | --- | 155 |
| ACC/FCR-2086-3 | Solved for fiber concentration | --- | 156 |
| ACC/FCR-2086-4 | Solved for doubling-dose | 156 | 156 |
| ACC/FCR-2086-6 | Formula for variables | --- | 157 |
| ACC/FCR-2086-8 | Second half of document | 161 | 161 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.  This is a continuation of

2 the evidentiary hearing on the personal injury estimation trial

3 in W.R. Grace 01-1139.  Participants by phone, Andrew Chan,

4 Beau Harbour, James Wehner, Francis Monaco, Andrew Hain, David

5 Turetsky -- Turetsky, I'm sorry, Jonathan Alden, Alan Madian,

6 John Green, David Parsons, Debra Felder, Andrew Craig, William

7 Wagner, Matthew Kramer, Daniel Speights, James Rieger, Alex

8 Mueller, Lewis Kruger, David Beane, Ari Berman, Shayne Spencer,

9 Guy Baron, Walter Slocombe, Bernard Bailor, Elihu Inselbuch,

10 Jeanna Rickards, Peter Lockwood, Mark Hurford, Leslie Kelleher,

11 Michael Lastowski, Christima Kang, Robert Horkovich, Catherine

12 Chen, Janet Baer, John Phillips, Marti Murray, Jason Solganick,

13 Brian Mukherjee, John Ku, Tiffany Cobb, Nathan Soucy, Theodore

14 Tacconelli, Matthew Daiker, William Corcoran, Michael Scott,

15 Matt Doheny, Michael Davis, Jonathan Brownstein, Darrell Scott,

16 Elizabeth Devine, Scott Baena, Timothy Cairns, Martin Dies, Jay

17 Sakolo, Edward Westbrook, Natalie Ramsey, Kim Christensen, Ken

18 Pasquale, Peter Shawn, Katharine Mayer, William Sparks, Terence

19 Edwards and Christina Skubic.

20          Have any parties changed in court this morning

21 entries from yesterday?  All right, we'll just proceed --

22          MS. HARDING:  Well, actually, Your Honor --

23          MR. STANSBURY:  Brian Stansbury for W. R. Grace.

24          THE COURT:  Anyone else changed?  I'm sorry.  I can't

25 see anybody behind you.

1        MS. HARDING:  Scott McMillan is not here at counsel

2   table for Grace, Your Honor.

3        THE COURT:  Anyone else?  Okay.  Thank you.  Ms.

4   Harding?  Oh, actually we've got a court reporter change and

5   she may not know you, so maybe I better have you enter

6   appearances.  Cathy, we do need to do that.  I'm sorry.  I

7   apologize.  We do need to enter appearances.  One second

8   please, let me get -- thank you, go ahead.

9        MS. HARDING:  Barbara Harding on behalf of Grace.

10       MR. BERNICK:  David Bernick on behalf of Grace.

11       MR. STANSBURY:  Brian Stansbury on behalf of Grace.

12       MR. FINCH:  Nathan Finch on behalf of the ACC.

13       MR. BAILOR:  Bernard Bailor on behalf of the ACC.

14       MR. INSELBUCH:  Elliot Inselbuch on behalf of the

15  ACC.

16       MR. MULLADY:  Ray Mullady for the FCR.

17       MR. ANSBRO:  Good morning, Your Honor, John Ansbro

18  for the FCR.

19       MR. HOROWITZ:  Good morning, Your Honor, Greg

20  Horowitz on behalf of the equity committee.  I will be on the

21  posters today.

22       MS. KRIEGER:  Good morning, Your Honor.  Arlene

23  Krieger from the Official Committee of Unsecured Creditors.

24       MR. KRAMER:  Good morning, Your Honor.  Matt Kramer

25  on behalf of the Property Damage Committee.

1          MR. FRANKEL:  Good morning.  Roger Frankel on behalf

2  of the FCR.

3          THE COURT:  Is that it?  Okay, Ms. Harding.

4          MS. HARDING:  Good morning, Your Honor.  Grace would

5  call Dr. Suresh Moolgavkar to the stand please.

6          THE COURT:  All right.  Will you please spell that

7  for the record please, Dr. Moolgavkar's name?

8          MS. HARDING:  Yes, Suresh, S-u-r-e-s-h, Moolgavkar,

9  M-o-o-l-g-a-v-k-a-r.

10          THE COURT:  Thank you.

11 S U R E S H   M O O L G A V K A R, WITNESS, SWORN

12                   DIRECT EXAMINATION

13 BY MS. HARDING:

14 Q    Good morning, Mr. Moolgavkar.

15 A    Good morning.

16 Q    Pull the mic down a little bit more.  Could you state your

17 name for the record please?

18 A    Yes, my name is Suresh Moolgavkar.

19 Q    Dr. Moolgavkar, what is your profession?

20 A    I am an epidemiologist.

21 Q    How long have you been an epidemiologist?

22 A    For something over 30 years.

23 Q    Did you prepare any slides to assist you with your

24 testimony today?

25 A    Yes, I did.

1 Q    Did you prepare a slide on your professional credentials?

2 A    Yes, I did.

3        MS. HARDING:  Could we see G-2230 please?

4 Q    Where have you spent the majority of your professional

5 life?

6 A    The majority of my professional life has been spent in

7 Seattle at the Fred Hutchinson Cancer Research Center and the

8 University of Washington.

9 Q    What were your academic -- what is your academic

10 appointment at the University of Washington?

11 A    I'm a professor in the Department of Epidemiology and

12 adjunct professor in the Department of Biostatistics and an

13 adjunct professor in the Department of Applied Mathematics.

14 Q    And what is your position at the Fred Hutchinson Research

15 Center?

16 A    I'm a member of the Fred Hutchinson Cancer Research Center

17 which is a title that is equivalent to that of full professor

18 at an academic institution.

19 Q    And what is your current status at both University of

20 Washington and the Fred Hutchinson Cancer Research Institute?

21 A    Currently I am on leave of absence from both the Fred

22 Hutchinson Cancer Research Center and the University of

23 Washington while I have -- from the 1st of April 2007.

24 Q    Okay, so for approximately the past year?

25 A    Yes.

1  Q    I know that -- I understand that in biostatistics and

2  quantitative epidemiology there is a model called the

3  Moolgavkar Benson Knudson model, the MBK model, is that

4  correct?

5  A    That's correct.

6  Q    Is the Moolgavkar that's referred to in that model, is

7  that you?

8  A    Yes, it is.

9  Q    What is your -- if we could go to 2231 please.  What is

10 your -- you said you are on a leave of absence.  What is your

11 current professional status?

12 A    Currently I work for Exponent which is a large

13 international consulting company.  I am the Director of the

14 Center for Epidemiology, Biostatistics and Computational

15 Biology, and I'm also a corporate vice president.

16 Q    Prior to joining Exponent last year had you worked as a

17 consultant with Exponent in the past?

18 A    Yes.  Prior to joining Exponent full time on April 1, 2007

19 I was a consultant.  I used to do consulting on the side and

20 some of that consulting I did through Exponent.

21 Q    What kind of consulting work does Exponent do at the

22 center that you direct?  And -- I'm sorry, go ahead.

23 A    Yes, I direct the Center for Epidemiology, Biostatistics

24 and Computational Biology.  And as the name suggests we do work

25 in epidemiology, biostatistics and computational biology.  So

1  the work involves work both for industry and some work for

2  government.  It involves the conduct of epidemiological studies

3  and biostatistical analysis.  It also involves some consulting

4  work of the type I'm doing here today; litigation support and

5  so on.  But, it involves working with environmental issues such

6  as air pollution and things, and work of that nature.

7       Q    2232 please.  In addition to your work at The

8  University of Washington, The Fred Hutchinson Cancer Research

9  Center, have you had other academic appointments, as well?

10 A    Yes, I've been on the faculties of The John Hopkins

11 University, Indiana University, The University of Pennsylvania

12 and The Fox Chase Cancer Center.  By way of explanation The

13 University of Pennsylvania and The Fox Chase Cancer Center have

14 very close collaborations and affiliation agreements.  Both are

15 located in Philadelphia.  And then --

16 Q    Is that the same type of arrangement that The Fred

17 Hutchinson Center has with The University of Washington?

18 A    Pretty similar, yes.  And so for the last 24 years I have

19 been with The Fred Hutchinson Cancer Research Center and The

20 University of Washington.

21 Q    Okay.  How many years did you spend at The Fox Chase

22 Cancer Center and The University of Pennsylvania?

23 A    I was there for seven years.

24 Q    I think you've already talked about your title at

25 University of Washington.

1    Q    2233 please.  Dr. Moolgavkar, have you been invited

2  to appear on various panels around the world with respect to

3  the issue of biostatistics and epidemiology?

4  A    Yes.  I've been on various panels and working groups.  I

5  have been on several panels for IARC which is the International

6  Agency for Research on Cancer.  That is the cancer research arm

7  of the World Health Organization.  I was a member of the

8  working group on the monograph for tobacco smoking.  I was a

9  member of the working group and senior editor of the monograph

10 on quantitative estimation and prediction of human cancer risk.

11   Q    Slide 2233.  Does it list many of the panels that

12 you've appeared on?

13 A    Yes, it does.

14 Q    Okay.  You didn't want to put it in a slide, but I

15 understand that you've also received several awards for your

16 work in the field of quantitative epidemiology, is that right?

17 A    That's correct.

18 Q    Could you tell us what the founders award was?

19 A    The founders award was given to me by the Chemical

20 Industry Institute of Toxicology Centers for Health Research in

21 North Carolina for my work on developing the MBK model.

22 Q    And previously I understand there were other eminent

23 scientists that have received that award?

24 A    Yes.  That award was also given to Dr. Henry Peto who was

25 the director of the McCardel Lab at the University of

1 Wisconsin.  It was given to my colleague Alfred Kinutsin.  It

2 has also been given to Sir Richard Gall an eminent

3 epidemiologist.

4 Q    Have you also been an editor for several important peer

5 review journals?

6 A    Yes.  I have served on the editorial board to several

7 journals.

8        Q    Okay.  Sorry, 2234.  Does this list some of the

9 journals on which you have been an editor?

10 A    Yes.  I am currently an associate editor of "Risk

11 Analysis."  I'm on the editorial board of "Inhalation

12 Toxicology" and on the editorial board of "Biology Direct."  I

13 served for about half a dozen years as an associate editor of

14 "Genetic Epidemiology."  And I am the senior editor for three

15 volumes, three books that is on epidemiology biostatistics and

16 risk assessment.

17 Q    Actually that was my next question.  I wanted to ask you

18 about the books.  So you have been an editor on several books

19 as well?

20 A    Yes.

21 Q    What is the role of an editor of a volume or a book of the

22 type that you work, you described there?

23 A    These books actually were articles that arose from a

24 meeting, a week long meeting that I had organized on the topics

25 of epidemiology, biostatistics and risk assessment.  And the

1  role of the editor there is to invite the speakers and to

2  solicit chapter contributions from them, to see that they are

3  properly being reviewed and then to either accept or reject

4  those articles for publication in the book.

5  Q    With respect to the books that you've edited, you said

6  you organized the panels, who asked you to do that?

7  A    Well the organizers of the conference asked me to do that

8  and most of these conferences were, I believe they were funded

9  at least in part by the Department of Energy.  And so this was

10 more than 10 years ago so I don't recall all the details, but

11 the funding came from the Department of Energy I believe.

12    Q    Could you go to 2236 please?  Does 2236 list the

13 journals in which your publications have appeared?

14 A    Yes, that is correct.

15 Q    And about how many published -- how many papers have you

16 published in the field of biostatistics and quantitative

17 epidemiology?

18 A    I've published approximately 150 papers in those fields.

19 About 26 of them directly involve cohort or case control

20 studies and 18 involve analysis of registered data.

21 Q    Now, Dr. Moolgavkar, I know I have heard you previously

22 say I am not an expert on asbestos, what do you mean by that?

23 A    What I mean by that is that I am not an expert on the

24 mineralogy or the chemical properties of asbestos.  I'm not an

25 expert on the electron microscopy of asbestos.  I'm not an

1 industrial hygienist.  I don't know how to measure asbestos

2 fibers.  But, I do consider myself an epidemiology (sic) in the

3 area of asbestos epidemiology.

4 Q    I think you meant expert.

5 A    I do consider myself an expert in the area of asbestos

6 epidemiology, yes.

7 Q    Have you listed on Slide 2237 your experience in the area

8 of fiber carcinogenosis?

9 A    Yes, I have.

10 Q    Could you just briefly talk a little bit about -- you've

11 got several papers on fiber carcinogenosis, what do those

12 generally relate to?

13 A    Well, one of the topics of interest to me over the years

14 has been how biopersistence -- that means how long fibers

15 persist in the body -- how that is related to the toxicity of

16 the fiber.  So these are five papers that I wrote on the

17 subject of biopersistence.  Basically the central theme of

18 these papers is the role of biopersistence and fiber length in

19 determining the toxicity of the fibers.

20 Q    Okay.  You were also an invited expert by WHO at a

21 workshop.  What is WHO?

22 A    That's the World Health Organization.

23 Q    And what was the discussion topic at that workshop?

24 A    Well, it was a workshop on mechanisms of fiber

25 carcinogenosis.  So some of the basic biological properties of

1 fibers and how they are toxic.  The mechanism by which they are

2 toxic were discussed, as well as an assessment of substitutes

3 for chrysotile asbestos to see whether there are -- whether the

4 manmade fibers are less or more important or less or more toxic

5 than chrysotile.

6 •    Q    And were you also invited by the Chrysotile Institute

7      to give a -- to participate in a panel there, as well?

8 A    That is correct.

9 Q    Okay, and was that related to the same issue you just

10 discussed?

11 A    Yes, it was.  I basically discussed the epidemiology of

12 asbestos and cancer and also some of my own work on fiber

13 biopersistence.

14 Q    It says here that you have an extensive review of the

15 asbestos literature.  About -- if you can quantify it -- about

16 how many publications in the field of epidemiology have you

17 read relating to asbestos and carcinogensis?

18 A    I would say scores or hundreds of papers in asbestos

19 epidemiology.

20         MS. HARDING:  Could you put up 2238, please?

21 Q    Dr. Moolgavkar, how would you characterize your primary

22 scientific research and investigative work at The Fred

23 Hutchinson Cancer Research Center?

24 A    I would say that if there is one central theme in my

25 research is the understanding of the relationship between

Moolgavkar - Direct                          23

1  fundamental biological processes occurring in the cell and the

2  epidemiology of human cancer.  That I would say is my central

3  interest.  So I'm interested in seeing how events occurring at

4  the level of the cell such as mutations and pertubations of

5  cell proliferation affect cancer rates in human populations.

6  Q    And have you also developed models and methods for

7  understanding cancer risk?

8  A    Yes.  As a part of that process of understanding the link

9  between cell biology and cancer I have developed mathematical

10 models that I've used for the analysis of epidemiological data

11 in human populations.  So that involves the development of the

12 appropriate statistical tools and the computational tools for

13 doing such analysis.

14 Q    And what is the IARC monograph that is up on the slide

15 here?

16 A    Well this is a monograph in which I was a senior editor

17 and dealt with the topic of quantitative estimation in

18 prediction of human cancer risk.

19        MS. HARDING:  Your Honor, at this time I move that

20 Dr. Moolgavkar be accepted as an expert in the field of

21 biostatistics and quantitative epidemiology.

22        MR. FINCH:  Voir Dire, Your Honor?

23        THE COURT:  Yes.

24                      VOIR DIRE EXAMINATION

25 BY MR. FINCH:

1 Q    Good morning, Mr. Moolgavkar.

2 A    Good morning.

3 Q    My name is Nathan Finch.  I represent the Asbestos

4 Claimants Committee in this case.  You are not licensed to

5 practice medicine, are you, sir?

6 A    No, I'm not.

7 Q    You are not board certified in any medical speciality,

8 correct?

9 A    That's correct.

10 Q    You have a PhD in mathematics, correct?

11 A    That's correct.

12 Q    You don't have a professional degree in epidemiology,

13 correct?

14 A    No.  I have post doctorate training, but no professional

15 degree.

16 Q    You have never conducted any studies in asbestos

17 epidemiology, have you?

18 A    No, I'm not.

19        THE COURT:  I'm sorry.  He has not done what?  I

20 apologize.

21        MR. FINCH:  He has never conducted any study in

22 asbestos epidemiology.

23 Q    You haven't done that.

24 A    That's correct.

25 Q    You've never designed an epidemiological study looking at

1  asbestos as a cause of disease, correct?

2  A    That's correct.

3  Q    None of your publications relate to asbestos as a cause of

4  mesothelioma, correct?

5  A    No, not mesothelioma.

6  Q    None of your publications relate to asbestos fibers, isn't

7  that also correct?

8  A    Well, there is at least one publication that compares the

9  biopersistence of asbestos fibers and its toxicity with the

10  other manmade fibers.

11  Q    But, it doesn't compare that specifically with reference

12  to mesothelioma, correct?

13  A    No, with reference to lung cancer.

14  Q    You have never diagnosed anyone with mesothelioma?

15  A    That's correct.

16  Q    And the first time you started to do any work with respect

17  to asbestos as a cause of disease was around 2000 or 2001?

18  A    Well I knew the general literature before then, but I got

19  involved more deeply in it around 2000 or so.

20  Q    And you first got involved more deeply in it when you were

21  hired by W.R. Grace Company in an EPA cleanup action, correct?

22  A    That's right, yes.

23  Q    And over the past five or six years you worked for

24  something called Exponent and the vast majority of your work

25  related to asbestos as a consultant for automobile companies,

1 correct?

2 A    That is not correct.  I have not worked for Exponent for

3 the past five or six years.

4 Q    Okay, you worked for Exponent for the past few years --

5 three years, correct?

6 A    No that's not correct either.  I worked for Exponent.

7 I've been -- I was a consultant to Exponent for a few months

8 before I joined it full-time which was on April 1 of 2007.

9 Q    Is it correct that since 2001 you have worked primarily as

10 a consultant for car companies and W.R. Grace in asbestos

11 matters?

12 A    Yes, that would be correct.

13          MR. FINCH:  Your Honor, we have a <u>Daubert</u> motion with

14 respect to Dr. Moolgavkar to the extent that he is offering any

15 opinion, a threshold opinion, that some level of exposure to

16 asbestos cannot cause mesothelioma.  We believe that is outside

17 of mainstream science and we have filed <u>Daubert</u> papers with

18 respect to that.  I don't think he's qualified to offer an

19 opinion that any level of asbestos exposure cannot cause

20 mesothelioma.

21               CONTINUED DIRECT EXAMINATION

22 BY MS. HARDING:

23 Q    Dr. Moolgavkar, how long have you been a professor of

24 epidemiology?

25 A    For more than 30 years.

1           MS. HARDING:  And I'd like to -- may I approach, Your

2  Honor?

3           THE COURT:  Yes.

4  Q    I'd just like to point you to this first exhibit that we

5  haven't actually talked about yet.  It's called the scientific

6  method.  Do you see that?

7  A    Yes, I do.

8           MR. FINCH:  Your Honor, you haven't ruled on the

9  Daubert motion.

10          THE COURT:  She's cross examining with respect to

11 voir dire.

12 Q    And, Dr. Moolgavkar, what are the methods that

13 epidemiologists use to understand risk of disease regardless of

14 the disease and regardless of the potential carcinogen?

15 A    Well, I think the two most important elements in coming to

16 any epidemiological conclusions is first the development of a

17 hypothesis and then the design and the conduct of property

18 controlled epidemiological studies.  That is absolutely

19 fundamental.  It's the central theme in drawing any conclusions

20 from epidemiological research, and it cuts across all kinds of

21 exposures whether it is asbestos, or radiation or arsenic.  The

22 same basic epidemiologic methods are used to study and

23 investigate the issue of the association between the

24 environmental agent and the disease in question.

25 Q    And have you spent the last 30 years of your life

Moolgavkar - Direct                                          28

1 investigating potential carcinogens in the environment?

2 A    Not only have I spent the last 30 years of my life

3 investigating carcinogens in the environment, a lot of my focus

4 has been on developing models and methods for low dose risk

5 extrapolation.  So that I'm very familiar with all the methods

6 that are used to investigate risks at low exposure to

7 environmental agents.

8         MS. HARDING:  Your Honor, I again move for Dr.

9 Moolgavkar to be accepted as an expert in the field of

10 biostatistics and quantitative epidemiology.

11         THE COURT:  Well I think he is qualified to express

12 an opinion in those areas, whether or not that area encompasses

13 expressing an opinion with respect to whether or not a person

14 can develop mesothelioma based upon a particular level of

15 exposure, I don't know yet.  So I think within the broad

16 parameter of his expertise he's certainly qualified in the

17 field of biostatistics and epidemiology.  There is, I think, no

18 question with respect to that.  Whether we get to the ultimate

19 conclusion I think remains to be seen.

20         So at this point I don't know.  I haven't heard

21 enough to know.  Raise the objection again when the opinion is

22 offered and by then I will have heard the testimony and I will

23 be prepared to rule.  But with respect to the gentleman's

24 qualifications, he's clearly qualified to offer opinions within

25 the field of his expertise.

1           MR. FINCH:  Thank you, Your Honor.

2   BY MS. HARDING:

3   Q    Dr. Moolgavkar --

4           MS. HARDING:  I'm sorry, could you put up 2239

5   please?

6   Q    Could you describe what you were -- you summarize what you

7   were asked in this case?

8   A    Yes.  First I was asked to review the epidemiological data

9   on asbestos and human disease and to identify the diseases that

10  have been demonstrated by scientifically rigorous methods to be

11  associated with or caused by asbestos exposure.

12          I was also asked to look at dose response

13  relationships for asbestos associated diseases and to draw

14  conclusions regarding the effects of asbestos exposures at

15  various doses in humans, and finally to note what these dose

16  response models might have to say for asbestos related doses

17  below the range of observations in epidemiological studies.

18  Q    I have actually listed those three things here on this

19  sheet here so we can just kind of keep track.

20          MR. FINCH:  Your Honor, can I see that?

21          THE COURT:  Yes, certainly.

22          MS. HARDING:  It's the same thing as the study -- as

23  the slide.

24          MR. FINCH:  Oh.  Okay.

25          MS. HARDING:  I just don't want to have to keep

1 coming back to the slide.

2        MR. FINCH:  Oh.

3        MS. HARDING:  I just wanted to write it here so we

4 know what we're going to talk about.

5        MR. FINCH:  Oh, all right.

6 Q    With respect to those three questions, Dr. Moolgavkar, or

7 those inquiries, and let's focus first on the first one, the

8 review of epidemiological data identified diseases demonstrated

9 scientifically to be caused by asbestos exposure.  How does the

10 field of epidemiology, or how do epidemiologists, scientists,

11 answer that question and the other questions that you been

12 asked to address today?

13 A    Yes.  As I said earlier the first step in the scientific

14 method is to formulate a hypothesis and then to design properly

15 controlled studies to investigate that hypothesis.  In

16 epidemiology generally one positive study only suggests that

17 the disease might be associated with the exposure.  The study

18 needs to be repeated several times and if consistent results

19 are obtained in all the studies then you might conclude that

20 the disease is causally associated with the exposure.

21        One corollary of that is that the totality of the

22 epidemiological evidence must be taken into account when

23 drawing any conclusions regarding the association of an

24 exposure with the disease.

25 Q    Dr. Moolgavkar, will your testimony here today be limited

Moolgavkar - Direct                              31

1  to opinions based upon a reasonable degree of scientific

2  certainty based upon scientific methods that you have employed

3  throughout your life in all of your areas of investigation?

4  A    Yes.  Insofar as any conclusions regarding the association

5  of asbestos to disease in the range of observations is

6  concerned that opinion will be offered with reasonable degree

7  of scientific certainty.  But there are areas of exposure

8  called putative exposure or presumed exposure with no

9  observations at all in the epidemiological literature.  And in

10 that case mathematical modeling or extrapolation procedures

11 have been used, and here the findings are much less certain.

12 Q    Now, when you say no epidemiological observations at all,

13 by that do you mean no particular study or no reliable body of

14 epidemiological data to allow you to reach a conclusion?

15 A    Well, there is no reliable body of data on exposures that

16 might allow you to come to conclusions regarding an exposure

17 response relationship at very low exposure levels.

18 Q    Now, with respect to the very first question here, the

19 review of the epidemiological data and the identification of

20 diseases demonstrated to be caused by asbestos, what have

21 numerous case control and cohort studies investigated that

22 question concerning asbestos exposure in cancers?

23 A    Yes, they have.

24 Q    And what have those studies found?

25        MS. HARDING:  Could you put up 2240 please?

1  A    Yes.  I think there is little doubt epidemiological

2  studies have shown that asbestos increases the risk of

3  mesothelioma and lung cancer at sufficiently high doses.  I

4  don't think there is any question about that.

5  Q    What about other cancers?

6  A    Well, there is some concern about other cancers, as well.

7  And there is an indication there was a recent study by The

8  Institute of Medicine that concluded that the range of cancer

9  was probably caused by asbestos exposure.

10            MS. HARDING:  Okay.  Could you put up 2241 please?

11  A    Yes.  This is a summary of The Institute of Medicine

12  study.

13  Q    Does this Slide 2241 reflect the results of The Institute

14  of Medicine's review of the epidemiological data concerning

15  asbestos exposures and other cancers?

16  A    Yes, it does.

17  Q    Okay.  What did they find with laryngeal cancer?

18  A    Well with respect laryngeal cancer they found that the

19  evidence was sufficient to conclude that asbestos was causally

20  associated with laryngeal cancer.

21  Q    Okay.  And do you generally accept that opinion?

22  A    Well, there are other strong risk factors for laryngeal

23  cancer, namely smoking and alcohol, and in my opinion the

24  evidence still falls short of being sufficient, but I would be

25  willing to accept that laryngeal cancer is caused by asbestos

1  exposure.

2  Q    What type of epidemiological data were reviewed by the IOM

3  when they investigated these other cancers?  They have

4  laryngeal cancer, pharyngeal cancer, stomach cancer, colorectal

5  cancer and esophageal cancer, correct?

6  A    Yes.

7  Q    What was the data that the -- what was the epidemiological

8  data that The Institute of Medicine reviewed?

9  A    Yes, they reviewed the epidemiological data both what are

10 called cohort and case control studies to come to these

11 conclusions.

12 Q    With respect to pharyngeal, stomach, colorectal and

13 esophageal cancers, the IOM concluded that the evidence was

14 suggestive of inadequate, is that correct?

15 A    Well for esophageal cancer it was inadequate, but for the

16 other three that you mentioned pharyngeal, stomach, colorectal

17 there was suggestive evidence that The Institute of Medicine

18 Committee decided that there wasn't sufficient evidence to

19 conclude a causal relationship.

20 Q    Okay.  And in connection with those cancers, what types of

21 studies were reviewed by the IOM?

22 A    The same types of studies that they reviewed for laryngeal

23 cancer; cohort and the case control studies.

24 Q    And indeed with respect to each of those other cancers

25 where the IOM found that there was insufficient evidence and

1  that the evidence was inadequate, does that mean that there

2  were no studies that they reviewed where the investigators

3  found a statistically significant positive association between

4  those cancers and asbestos exposure?

5  A    Not necessarily.  What the committee made the decision on,

6  they based that decision on the totality of epidemiological

7  evidence of each one of these cancer sites.

8  Q    Indeed, if you were to go out into the literature or into

9  the world into hospitals or anywhere, you would find people,

10 individuals, who are -- who have pharyngeal, stomach,

11 colorectal cancer and esophageal cancer who have been exposed

12 to asbestos, correct?

13 A    That's correct.

14 Q    And indeed you might even have case reports that people

15 that have those cancers have been exposed to large amounts of

16 asbestos indeed or low amounts, correct?

17           MR. FINCH:  Object to the leading, Your Honor.

18           THE COURT:  It is leading.

19 Q    Dr. Moolgavkar, would there -- would you find in the

20 population or in the literature potentially case reports or

21 cases of disease in those areas where individuals have been

22 exposed to asbestos?

23 A    Yes.

24           MR. FINCH:  Objection, leading, Your Honor.

25           THE COURT:  It's still leading.

1  Q    Are there case reports involving asbestos exposure and

2  pharyngeal, stomach, colorectal, esophageal cancer?

3  A    Yes, there are.

4  Q    Okay.  And, doctor, on the steps in the scientific method

5  where do case reports falls in the scientific method, in

6  scientists' understanding of this issue; carcinogensis?

7  A    I would say in the very first step.  The case reports are

8  observations that might lead to the development of a

9  hypothesis.

10  Q    Are they ever, ever considered design -- a controlled

11  study?

12  A    No.

13  Q    Okay.  Dr. Moolgavkar, simply because the IOM found that

14  there was sufficient evidence that laryngeal cancer can be

15  caused by asbestos, does that mean that it can be caused by any

16  level of asbestos exposure?

17              MR. FINCH:  Objection, leading.

18              THE COURT:  It's leading.

19  Q    Dr. Moolgavkar, did the IOM, Institute of Medicine, when

20  it found that laryngeal cancer, that there was sufficient

21  evidence for the presence or absence of a causal relationship

22  to asbestos, did they address the issue of the levels of

23  exposure that could cause that disease?

24              MR. FINCH:  Objection, leading.

25              THE COURT:  Ms. Harding, it is leading.  You are

1  asking him every question that can be answered yes or no rather

2  than letting him answer the question.  You are assuming an

3  answer and asking him a question that can be answered yes or

4  no.  So why don't we get to the point where he's answering the

5  questions?

6  Q    What did the IOM report with respect to the levels of

7  asbestos exposure that are sufficient to cause laryngeal

8  cancer?

9  A    Well the IOM did not have any specific levels of exposure

10 to asbestos that would cause laryngeal cancer, but these

11 cancers are found in cohorts with very high levels of exposure.

12 Q    Dr. Moolgavkar, I'd like to move now to the second

13 question that you were asked to address which relates to the

14 quantifying the levels of asbestos exposure observed at

15 epidemiologically caused disease?

16 A    Yes.

17 Q    In this litigation do you have an understanding of the

18 relevance of the quantification of asbestos exposures that have

19 been demonstrated reliably to cause risk?

20 A    Yes.

21         MR. FINCH:  Lack of foundation and leading.

22         THE COURT:  This is a foundation question so it's

23 clearly appropriate, but I missed part of it.  Would you

24 restate it for me please?

25         MS. HARDING:  Actually I'm going to ask an earlier

J&J COURT TRANSCRIBERS, INC.

1 question first.

2 Q    From a public health or regulatory perspective, why is it

3 important to understand the -- or, is it important to

4 understand the levels of asbestos exposure that have been

5 demonstrated to cause risk, and if so, why?

6 A    Yes, it's important to understand the levels of any

7 environmental agents that have been demonstrated to cause risk

8 because after all one of the goals of environmental

9 epidemiology is to protect the public against environmental

10 agents.  And so, it is important to understand what the risk

11 might be to agents that occur commonly in the environment and

12 to which people might be exposed to.  So for to understand that

13 it is not sufficient to understand what the exposure does at

14 high doses.  It is also important to try and understand what it

15 does at low doses.

16 Q    In this litigation do you have an understanding of the

17 relevance of the quantification of asbestos exposures that have

18 been demonstrated reliably to cause risk?

19         MR. FINCH:  Objection to the extent she's asking

20 what's relevant and not relevant in the context of litigation.

21         THE COURT:  I can't hear you, Mr. Finch.

22         MR. FINCH:  Objection to the extent she's asking

23 what's relevant and not relevant in the context of this

24 litigation.  He can offer opinions about epidemiology but not

25 what's relevant to this case.

Moolgavkar - Direct                          38

1          THE COURT:  She's only asked him whether he has an

2    understanding of the relevance.  That objection is overruled.

3    A    Yes.  My understanding is that the --

4          THE COURT:  You can only answer yes or no to this

5    question, doctor.  I'm sorry.

6    A    Okay.

7    Q    What is your understanding, Dr. Moolgavkar?

8    A    My understanding is that claims have been filed against

9    Grace by claimants who allege exposure to Grace products at

10   various concentrations.  And therefore clearly the

11   understanding of what these levels of exposure how they might

12   be associated with the diseases that asbestos is known to cause

13   at high doses is clearly important.

14   Q    Do you have an understanding that Dr. Anderson, Dr. Betty

15   Anderson -- do you know Dr. Betty Anderson?

16   A    Yes, I know Dr. Betty Anderson.

17   Q    Okay.  How do you know Dr. Anderson?

18   A    Well she is also a member of the Exponent staff.

19   Q    Do you have an understanding that Dr. Anderson has relied

20   upon some of your estimates and analysis for understanding

21   potential risk of exposure to asbestos and disease?

22   A    Yes.

23   Q    And what is that understanding?

24   A    My understanding is that she has taken some of the

25   calculations that I have done and used them in her own work.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And, Dr. Moolgavkar, I'd like to talk about those analysis

2  and those estimates now, okay.   And you and I together

3  prepared a board to discuss the various aspects of those

4  analysis, is that reflected in front of you there?  I can't

5  read the number from here -- GG-2262?

6  A    Yes.

7  Q    Okay.  Let's --

8            THE COURT:  Ms. Harding, is there a binder that has

9  all these exhibits in them somewhere?

10            MS. HARDING:  Yes, Your Honor.  I'm sorry.  I did not

11  know that you hadn't received it.  I apologize.  Sorry.

12            THE COURT:  Thank you.

13            MR. FINCH:  Robert, 2262 is not in my binder.  Do you

14  have an extra copy of it so I can --

15            MS. HARDING:  I'm sure we do somewhere.  I'm sorry.

16  Q    Okay, Dr. Moolgavkar, first I'd like to talk about we're

17  in this area here about quantifying the levels of asbestos

18  exposure observed epidemiologically to risk.  And I want to

19  talk first about lung cancer.  And are there -- who are the

20  primary researchers who have investigated the dose response

21  relationship between lung cancer and asbestos exposure?

22  A    Well, I would say that since the early to mid-1980s there

23  have been three very important publications that have appeared

24  since that time.  One is the "Nicholson Study" which was done

25  for the Environmental Protection Agency and I believe that

1  appeared in 1986.  A second extremely important publication

2  appeared in 2000, that is a paper by Hodgson & Darnton which in

3  some ways is one of the most important papers to have appeared

4  in the study of the dose response relationship between asbestos

5  and mesothelioma and lung cancer.

6          And the third study that appeared in 2003, it was a

7  study commissioned by the EPA and was authored by Berman and

8  Crump.

9  Q    Have you prepared a slide that describes -- that lists the

10 studies that have been relied upon by the EPA and Hodgson &

11 Darnton to investigate the dose response relationship between

12 lung cancer and asbestos exposure?

13 A    Yes, I have.

14          MS. HARDING:  Okay.  Could you show us 2246 please?

15 Q    Are these the studies, Dr. Moolgavkar?

16 A    Yes.  In the left-hand column you have all the studies

17 that were looked at by Hodgson & Darnton.  These are all cohort

18 studies.  There are no case control studies in this group of

19 studies.  And the studies marked in red were the ones that

20 Nicholson and the EPA considered in 1986.

21 Q    Okay.  And what have these studies found with respect to

22 levels of asbestos exposure?

23 A    Well, first of all, these are cohort studies and Hodgson &

24 Darnton report the average cumulative exposure in these

25 cohorts.  The first thing that one notes is that the exposures

1  are extremely high.  The cohort with the lowest exposure, that

2  is the Sweden Cement Manufacturers cohort had a cumulative

3  exposure level of about 13 fiber per mil years.  So that's a

4  pretty high exposure.

5            The other cohorts had extremely high exposures.  So

6  that's the first thing one can say.  And a corollary of that

7  observation is that any kind of a dose response relationship

8  that can be actually investigated in the range of observations

9  can only be investigated in this high dose cohort.  So, there

10 is no direct information on exposure response or dose response

11 relationships below this level of cumulative exposure.

12 Q    Dr. Moolgavkar, going up to the board here to 2262 there

13 is a circle here at 15.  How does that relate to the testimony

14 you just provided?

15 A    That circle at 15 is the approximate lowest observed

16 average exposure in the cohorts or in the studies that have

17 been used to characterize the dose response relationship both

18 for lung cancer and mesothelioma.

19 Q    Can you tell us if there is -- is there a reliable body of

20 epidemiological data supporting the conclusion that there is

21 significant risk at levels below that in the literature?

22 A    There is no body of data that supports a significant risk

23 below that level of exposure.

24 Q    When you say there is no body of data, are you saying that

25 there are no epidemiological studies out there that don't

1  report a statistically significant risk at a lower level?

2  A    No, I'm not saying that.  I should be more precise.  There

3  might be individual studies that indicate a significant risk,

4  but if you look at the totality of evidence there is no

5  evidence of an increased risk below that level of exposure.

6  Q    You said, I think a little bit earlier, that the studies

7  that are used by these investigators to understand dose

8  response or cohort studies.  Why are they cohort studies?

9  A    Well the EPA, Hodgson and Darnton and Berman and Crump all

10 have criteria for using studies for the dose response analysis.

11 These criteria have to do with the -- basically with the

12 availability of reasonable to good exposure information on

13 asbestos exposures.  And these were the studies that they

14 selected that met their criteria.

15         These are cohort studies.  One of the characteristics

16 of these studies is these are occupational cohorts so they are

17 workers who are exposed to asbestos in a pretty controlled

18 environment.  Their exposures can be more precisely measured

19 than the exposures, for example, in case control studies where

20 workers might move from one job to another.  So I think that

21 was one of the reasons that they chose these cohort studies.

22 Exposures were available so that an exposure response

23 relationship could be performed.

24 Q    With respect -- I know this slide is difficult to read,

25 it's small.  But, in looking at the cohorts that were studied

1 and the asbestos in the workplace there, what type of work

2 environments are represented by these cohorts?

3 A    Many of them are mining and milling cohorts in which

4 asbestos was mined or milled.  There are textile cohorts, there

5 are cement workers cohorts and so on.  Many of these cohorts

6 are cohorts in which there was fairly clear indication of

7 exposure primarily to asbestos and not to other kinds of

8 fibers.

9 Q    Now I'd like to move onto the discussion, still in this

10 section here quantifying the levels of asbestos exposure

11 observed epidemiologically to cause disease and ask you about

12 mesothelioma.   Similar to lung cancer, what types of studies

13 are used to investigate the dose response relationship between

14 mesothelioma and asbestos exposure?

15 A    The investigation of the dose response relationship for

16 mesothelioma and asbestos exposure has also been done primarily

17 in cohort studies.  There have been some attempts to look at

18 dose response relationships in case control studies.  But in my

19 opinion they fall short because of a number of methodological

20 problems.

21        MS. HARDING:  Is this GG-2246?  You already have that

22 up there?  Okay.

23 Q    Is this the same list of studies that you -- that were

24 used by the researchers in the lung cancer context?

25 A    Yes, these are the same studies that were used by the

1  researchers in the lung cancer context.  But this is -- these

2  are the -- the cohorts in red here are the mesothelioma cohorts

3  that were studied by the EPA.  So the EPA looked at more lung

4  cancer cohorts than mesothelioma cohorts.

5  Q    So the only distinction in substance with respect to 2246

6  as opposed to I think it's 2244 was the highlighting of the

7  studies that the EPA used in their dose response model?

8  A    That's correct.

9         THE COURT:  Wait, I'm sorry.  I'm confused.  2246 --

10 I thought the reds were the studies that the EPA used with

11 respect to lung cancer, but that's not correct, that's the

12 studies used with respect to meso?

13        MS. HARDING:  Yes, if you go back to 2244, Your

14 Honor.  There we go.  The title you will see has lung cancer.

15        THE COURT:  All right.  We've only seen 2246, 2244

16 wasn't up before.

17        MS. HARDING:  I'm sorry.  I put up the wrong slide

18 then.

19        THE COURT:  All right.  Wait til I go back and get my

20 notes corrected.

21 Q    Dr. Moolgavkar, we were talking about lung cancer studies

22 and I thought it was 2244 because there was so much red, but

23 2244 is the slide that describes the cohort studies that have

24 been used by the EPA and Hodgson & Darnton to investigate lung

25 cancer, is that right?

1  A    That's correct.

2  Q    And the red, what does the red describe?

3  A    In this slide, the red describes the subset of these

4  studies that were used by the EPA in 1986.

5          THE COURT:  All right, so 2244 is lung cancer, but

6  the red still indicates what the EPA used.  2246 is meso and

7  the red indicates what the EPA was looking at.

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  Okay, thank you.

10          MS. HARDING:  Just to be clear, Your Honor, 2244 are

11  the studies used by Hodgson & Darnton.

12          THE COURT:  Correct.

13          MS. HARDING:  And the red --

14          THE COURT:  Is what the EPA also looked at.

15          MS. HARDING:  Is what the EPA also used, yes.

16          THE COURT:  It's the same set of studies only 2244 is

17  lung cancer, 2246 is meso.  It's just that before it was only

18  2246 that was up and it should have been 2244.

19          MS. HARDING:  That's right, Your Honor.

20          THE COURT:  Okay.  I got it.  Thank you.

21  Q    Okay.  So going back to 2246 please, to mesothelioma.  And

22  the red highlighted slides on 2246, Dr. Moolgavkar, what do

23  they represent just so that the record is clear?

24  A    Yes, those represent the studies that were used in 1986 by

25  EPA to come up with risk estimates for mesothelioma.

1  Q    Okay.  And what conclusions can be drawn from this body of

2  epidemiological, if any -- this body of epidemiological

3  evidence and a dose response relationship of mesothelioma and

4  asbestos exposure?

5  A    Well, what this data clearly shows is that high levels of

6  exposure to asbestos are associated with the occurrence of

7  mesothelioma.  It also shows quite clearly that the different

8  kinds of asbestos fibers have different potencies so that the

9  amphiboles are a lot more potent than chrysotile in causing

10 mesothelioma.  And there is some evidence that that's true also

11 for lung cancer.

12 Q    Is there with respect to mesothelioma, a reliable body of

13 epidemiological evidence that supports the conclusion that

14 there is significant risk of mesothelioma of asbestos exposures

15 below that level of 15 that you've indicated on the chart?

16 A    There is not.

17 Q    Now some of the experts on -- that have appeared for the

18 written reports for the ACC have, you know, oh my goodness, Dr.

19 Moolgavkar, how could you say that?  How could you say that

20 that's the case?  There are -- there is evidence of exposure

21 lower than that demonstrating a significant risk of

22 mesothelioma.  What's your response?

23         MR. FINCH:  Objection, leading.

24         THE COURT:  No, that was not a leading question.  She

25 was stating the question saying that the ACC was saying that

1  there is evidence of exposure below that level and what is his

2  response.   That is not leading.   Go ahead, doctor, you may

3  answer.

4  A    I believe that the studies on which those conclusions are

5  based are fatally flawed and do not support those conclusions.

6  Q    Now I want to ask you another question, a similar

7  question, a related question.   I think I'll go up here.

8           MS. HARDING:  Can you see, Your Honor?

9           THE COURT:  Yes.

10          MS. HARDING:  Can you all see?

11 Q    I want to ask you about something that's what I think is

12 referred to as incremental dose.   And if you were talking about

13 asbestos exposures three fiber years and six fiber years or

14 asbestos exposures at 15 fiber years or 18 fiber years and

15 asbestos exposures at 100 fiber years or 103 fiber years.

16          Is there a body of reliable epidemiological evidence

17 that demonstrates that there is a statistically different risk

18 between exposures, asbestos exposures, at the level of three as

19 opposed to the level of six?

20 A    No.   There is absolutely no evidence, no direct evidence

21 to suggest.   No epidemiological studies that show a

22 significantly increased risk at those small differences in

23 exposure levels that you have indicated in this black board.

24 Q    Regardless of where the exposure level is?

25 A    Regardless of where the exposure level is.   It is entirely

1  possible theoretically that small increments in dose lead to

2  increments in risk.   But, this increment in risk would be so

3  small that it would be undetectable in any epidemiological

4  study.

5  Q    Why is that?

6  A    Because of the -- I think basically for two reasons.   One

7  is the difficulties in measuring exposures precisely so because

8  of the difficulties of exposure measurement error, and secondly

9  because of the heterogeneity of human populations.   I think any

10 difference, even if there is one, would be completely buried in

11 the noise.

12 Q    In the noise.   What do you mean when you say that?

13 A    In the background noise, the statistical fluctuations that

14 you get in disease frequency in any epidemiological study.

15 Q    Now the next slide, 2247, I think I understood that to be

16 a summary of your opinions with respect to low exposures of

17 mesothelioma.   Is there any -- does that summarize your

18 opinions or is there anything else that you wanted to say about

19 that?

20 A    No, that pretty much summarizes my -- it pretty much

21 summarizes my conclusions.   I say that most inferences at lower

22 exposures are based on mathematical extrapolation which I'm

23 going to discuss later in this testimony.   As I've said

24 earlier, epidemiological studies that claim to report risks at

25 low exposure levels have very serious limitations and the

Moolgavkar - Direct                                  49

1  contention that every exposure above background contributes

2  significantly to risk is simply not scientifically defensible.

3  Q    Okay, with respect to --

4         THE COURT:  Wait.  Could you stop there for a minute

5  please?

6                        (Pause)

7         THE COURT:  All right, thank you.

8  BY MS. HARDING:

9  Q    Dr. Moolgavkar, with respect to the last statement you

10 just made, could you explain what you mean by that?  Is that

11 what you were just talking about when I asked you the questions

12 about the doses there, or is that something different?

13 A    No, that's part of it.  There are some risks that are so

14 trivial that they would never be picked up in any

15 epidemiological study.  So I can give examples.  If somebody

16 smoked say two packs a day of Marlboro's for 20 years and

17 developed lung cancer but just happened to borrow a Pall Mall

18 from a friend one day and -- a Pall Mall cigarette contributed

19 significantly to his lung cancer risk.  It's a similar

20 situation.

21 Q    I'd like to ask you now about the second bullet you have

22 up there, the studies purporting to report risks at low levels

23 of exposure.  Did you prepare a slide to discuss that issue?

24 A    I have a slide for that, yes.

25 Q    That's GG-2248, is that right?

1  A    Yes.

2  Q    What -- are these the studies that the others have

3  suggested demonstrate that there is increased risk for

4  mesothelioma at lower levels?

5  A    Yeah.  These are the case control studies that have been

6  widely used to suggest that there is a strong dose response

7  relationship for mesothelioma at low levels of exposure.  And

8  so these are four case control studies and they all have

9  basically pretty serious limitations.  First of all, none of

10 them have any reliable industrial hygiene estimates of exposure

11 and that is actually recognized by the authors of the papers

12 themselves.  So, for example, "Iwatsubo", et al., every time

13 they report a fiber per mil a year cumulative exposure, they do

14 it quotes.  And at several places in the paper they say they

15 never had any direct measurements, that their measurements were

16 reconstructed by industrial hygienists who also did not have

17 any direct measurements of the products they were looking at.

18        The second limitation is that these studies, even if

19 they attempt to reconstruct asbestos exposures, have absolutely

20 no information on what type of fiber these individuals might

21 have been exposed to or what mixture of fibers they might have

22 been exposed to.  And other than that, they also have some

23 serious methodological limitations insofar as these statistical

24 analyses are concerned.  And so I simply don't find that the

25 findings or the conclusions of these studies are credible.

1        And finally, the last study by Roland Natale

2   (phonetic) which is often quoted is not a full study, at all.

3   It's just an abstract, and I'm unable to evaluate that study

4   because I have not been able to find a full text of that study.

5   Q    With respect to the Category 2 that you have up there, the

6   -- meet the criteria for inclusion of the EPA, Hodgson and

7   Darnton, and Berman and Crump for inclusion in their studies to

8   investigate dose response?

9   A    Yes.

10  Q    Okay.  Would these studies, or studies like them, have

11  been able to meet that criteria that are included in those

12  studies?

13  A    Well, they were clearly not included.  Obviously, none of

14  these studies were available to Nicholson in 1986 but certainly

15  Iwatsubo was available to Hodgson and Darnton in 2000.  And all

16  these, Hans and Natale (phonetic) would have been available to

17  Hodgson and Darnton, as well.  All three studies would have

18  been available to Berman and Crump in 2003, but were not

19  included.

20  Q    Why -- aside from the fact that some of them weren't

21  available, are there reasons why they wouldn't have been

22  included?

23  A    Well, I think --

24        MR. FINCH:  Lack of foundation.  He didn't author the

25  Hodgson and Darnton or Berman and Crump before the EPA 1986

1 risk assessment.  I don't think he can testify as to what those

2 individuals thought about why they included a study or didn't

3 include a study.

4         THE COURT:  Well, that's true.  I think he cannot

5 testify as to why someone else may not have included them, but

6 he can specify what the criteria were.

7 BY MS. HARDING:

8 Q    Did the EPA, Hodgson and Darnton and Berman and Crump

9 discuss criteria for studies that they included in their

10 analysis?

11 A    Yes.  As I said earlier in my testimony, they do have

12 criteria and those criteria have to do with the quality of the

13 exposure assessment.  And they don't say specifically why these

14 studies were not included, but it seems to me that these

15 studies don't meet those criteria.

16 Q    Okay.  And why don't they meet the criteria?

17 A    As I've said, because they themselves, the authors

18 themselves recognized the limitations of their exposure

19 assessments.  They have no direct measurements of exposure.

20 Q    So based on the EPA, Hodgson and Darnton and Berman and

21 Crump, is there a scientific method for determining risk at

22 varying levels of asbestos exposure?

23 A    Yes.  There is -- different dose response models have been

24 developed.  For lung cancer they use more or less the same

25 models, the EPA, Hodgson and Darnton and Berman and Crump use

1  very similar models for lung cancer.  But, for mesothelioma,

2  Hodgson and Darnton use models that are very different from the

3  EPA and the Berman and Crump model.

4  Q    And would these -- has that method been deployed in

5  studies such as the ones that are on this table to quantify a

6  level of statistical significant risk below that 15 that you

7  have on your chart?

8        THE COURT:  I'm sorry, Ms. Harding, I don't know what

9  method we're talking about.  There are several methods.  I

10  don't know which one we're talking about.

11  BY MS. HARDING:

12  Q    Okay.  Berman and Crump, Hodgson and Darnton and EPA all

13  investigated the issue of dose response from asbestos exposure

14  and disease, correct, is that right?

15  A    That's correct.

16  Q    And in terms of understanding exposures below the 15 that

17  you've indicated on the chart here, are there reliable

18  epidemiological studies that have been done like the ones that

19  are on the charts and used by Berman and Crump, the EPA, and

20  Hodgson and Darnton to find significant risk below the level

21  that you have on the chart?

22  A    No.

23  Q    Now, Dr. Moolgavkar, I want to ask you about another

24  benchmark you have here on this chart.  It says auto mechanic

25  exposure and then over here it says risk not observed and I'd

1  like to ask you about that.  First of all, what -- when you say

2  -- what does the 2.8 represent first, let's start there?

3  A    Well, the 2.8 represents -- is a number taken, is a figure

4  taken from a recent paper, an industrial hygiene paper that

5  suggests or says, that concludes that 95 percent of the auto

6  mechanics were exposed to less than 2.8 fiber per mil years of

7  cumulative chrysotile exposure while working in that

8  profession.

9  Q    And why is the auto mechanic exposure important in your

10 analysis here?

11 A    Well, there has been a great deal of concern that

12 automobile mechanics may be at increased risk of asbestos

13 induced disease like mesothelioma and lung cancer because they

14 deal on a daily basis with friction products like brakes and

15 gaskets and so on that contain small amounts of chrysotile

16 asbestos.  So, there has been this concern that NIOSH has had

17 and other agencies have had since the 1980s, at least.  And so

18 as a result of this there have been multiple epidemiological

19 studies of mesothelioma to see specifically whether automobile

20 mechanics are at an increased risk of either mesothelioma or

21 lung cancer.  And none of those studies has ever shown any

22 evidence of any increased risk.  And I think I have a slide for

23 that.

24        MS. HARDING:  Could you show 2249 please?

25 A    Yes, these are just the case control studies of risk of

1 mesothelioma among auto mechanics.  And here I have ten case

2 control studies and, Your Honor, the blue dot represents what

3 is called a relative risk.  A relative risk of one means that

4 there is no increase in risk.  And the vertical lines through

5 the blue dots represent the so-called 95 percent confidence

6 interval.  And if one of the ends of the confidence interval

7 crosses that red line at one, it means that none of these

8 estimates are statistically significant.

9         So the interpretation of this slide is that there

10 were ten case control studies of the auto mechanics that were

11 conducted and none of these studies found a statistically

12 significant risk different from one.  So all the risks are

13 basically one, so no increase or decrease in risk.

14 Q    Dr. Moolgavkar, now you said those are case control

15 studies.  How can you use them for dose response information?

16 A    Well, there is no direct dose response information in

17 these studies.  They --

18 Q    Then, let me ask you a question before you go on.  Are you

19 using the auto mechanic case control studies for the

20 information on dose for auto mechanics?

21 A    Well, I'm not using these case control studies directly,

22 but there is one fairly unique feature of work as an automobile

23 mechanic and that is, namely there is pretty homogeneous

24 exposure.  They're exposed to friction products in the garages

25 where they work.  This is quite different from say construction

1  work where a construction worker might move from one area to

2  another and he might be -- he or she might be exposed to

3  different kinds of asbestos fibers at different concentrations

4  in different areas.  So this is a pretty unique situation, but

5  here you can study the job, namely auto mechanics, arrive at a

6  conclusion regarding the risk and then use industrial hygiene

7  studies done by others to see what the levels of exposure might

8  have been.  And this is precisely what I've presented on this

9  graph here, on this -- the 2.8 represents the result of

10 recently published industrial hygiene study for auto mechanics.

11 Q    Aside from the recently published industrial hygiene study

12 with respect to exposure of auto mechanics, have there been

13 numerous, or are there other industrial hygiene studies

14 relating to auto mechanic exposure in the published literature?

15 A    Yes, there are numerous studies in the published

16 literature and I only have a nodding acquaintance with them

17 because I'm not an industrial hygienist.

18 Q    Okay, and so the data that's used to characterize exposure

19 is not the data from the case control studies, it's data from

20 the industrial hygiene studies, is that right?

21 A    That is correct.

22 Q    I do want to ask you one other benchmark that you have on

23 the slide here -- I'm sorry, on the board -- which is on 2262

24 which relates to the asbestosis and at 25.  Can you tell me

25 what that represents please?

1  A    Yeah, the asbestosis is the most serious non-malignant
2  condition that is associated with asbestos exposure and I think
3  it's widely recognized.  I think I have a slide to show this.
4  It's widely recognized that below 25 fiber per mil years
5  asbestosis cannot occur.
6  Q    Could you show 2251?
7  A    So I think there's little disagreement on this point that
8  asbestosis does not occur below an exposure of about 25 fiber
9  per mil years.
10  Q    And what are the sources listed on this slide that support
11  that opinion?
12  A    This is the -- three government bodies.  There's the
13  Ontario Royal Commission 1984, Doll and Peto which also
14  undertook this work I think under commission from the UK
15  government, and our own EPA that came to the same conclusion.
16  Q    Now, we've been talking about the dose response
17  relationships of asbestos exposure and mesothelioma and lung
18  cancer that have been observed in the epidemiological data, is
19  that right?
20  A    That's correct.
21  Q    Now I'd like to move onto the last inquiry here and talk
22  about your investigation of the exposure response relationships
23  for asbestos related disease both in the range of observation
24  and in the model derived range of observations.  I want to talk
25  about the modeling that's been done with respect to asbestos

1  exposure and disease.  Okay?

2  A    Model derived range of extrapolation you mean?

3  Q    Yes, okay.  Are there methods that have been developed to

4  estimate risk at lower levels of asbestos exposure than those

5  actually observed in the epidemiological data?

6  A    Yes.  One uses basically mathematical models, mathematical

7  and statistical models to fit the data in the range of

8  observations and then those models are used to extrapolate down

9  to levels where there are no observations.

10  Q    And, Dr. Moolgavkar, is that type of modeling the kind of

11  modeling that you have been working with most of your

12  professional career?

13  A    Yes, that is exactly the kind of modeling that I have been

14  doing for 30 years.

15           MS. HARDING:  Could you put up 2252 please?

16  Q    And just to be clear, we've moved now from risk that's

17  been observed epidemiologically with the body of

18  epidemiological data to support it, is that right?

19  A    That's correct.

20  Q    To the model derived range of extrapolation, is that

21  right?

22  A    Yes.

23  Q    Okay.  And are you familiar with this slide?

24  A    Yes.  This slide was in one of my reports and it's a

25  schematic that simply shows the process of low dose

extrapolation.  So what you have shaded in dark gray on the

right-hand side of this chart is the range of doses in the --

that are observed.  So in this range you have some range of

exposures of doses and you have some observations that is the

response or the disease data, the frequency of disease

occurrence, for example.  And what you can do is fit a

mathematical model to those points and then make some decision

as to how that risk is to be extrapolated down to the range

where there are no observations, at all.

And so there is a range of possible responses and it

is generally considered that the linear extrapolation down into

the unobserved range is the most protective, is conservative,

and the most protective of public health.  We have no idea that

it is correct, and the further away you get from the

observations, the more uncertain the results.  But that -- for

public health protection, that linearity often assumed by

agencies that are charged with protecting the public health,

but that doesn't mean that that is the correct model to use.

In fact, we don't know what the correct model is in that range.

Q    Are there different models that have been developed to fit

the data in the observed range to understand risk in the lower

range?

A    Yes, there are indeed different models that have been

developed that fit the data equally well in the observed range

but might actually diverge quite widely in the range of

1  extrapolation.

2          MS. HARDING:  Could you put up 2258 please?

3  Q     Does this slide try to summarize what you believe to be

4  the important factors that the Court needs to understand -- to

5  understand modeling in the unobserved range?

6  A     Yeah, I believe so and I --

7  Q     Could we -- let's walk through each one then.

8  A     Yes.

9  Q     The first one says mathematical models are used to

10 investigate dose response relationships both in the range of

11 observation and the range of extrapolation.  I think that just

12 described that process, right?

13 A     Yeah.  Well, I like this quote from the statistician

14 G.E.P. Box who said essentially all models are wrong but some

15 models are useful and I think that's the way in which models

16 should be treated.  Mathematical models are used to investigate

17 dose response relationships and one has to understand that this

18 is both in the range of observation and in the range of

19 extrapolation.  Now, both in the range of observation and in

20 the range of extrapolations, different models yield different

21 answers.  So sometimes one is able to choose a model that fits

22 the data better in the range of observations.  One would use

23 that model then.  But different models can yield different

24 answers in both ranges and what is important to realize is that

25 the further from the range of observations one gets, the more

1   discrepant the models might become and the less certain the

2   results.

3   Q     I'm sorry, did I interrupt you?

4   A     Yes, I was just going to go through all the points.

5   Q     Well, I was just going to ask you about the next bullet

6   even in the range of observations prediction of monotone

7   increase in risk is based on models, what does that mean?

8   A     Even in the range of observations as I showed on the

9   previous slide, if we could go back to that for just a minute,

10  you can see that in the range of observations you have those

11  circles that represent the responses and some of them lie above

12  and some of them lie below the line that has been fit to it.

13  So the model suggests that there is a monotone increasing dose

14  response relationship; that is, as the dose increases, the

15  response increases, also.  That is the model that fits the data

16  -- how it would directly -- the data can fluctuate on both

17  sides of that line.

18          Could we go back to that slide?  Thank you.  So this

19  is what I mean.  Even in the range of observations, prediction

20  of monotone increase in risk is based on models.  And there

21  really is no direct observation that small increases in

22  exposure lead to increase in risk.  And I said earlier this

23  just reiterates a point I made earlier that one would not be

24  able to design an epidemiological study that would be able to

25  tease apart a small increase in risk.

1 Q    Let's talk now about the models that have been -- that are

2 available and used in connection with asbestos exposure.

3          MS. HARDING:  Could you show 2254 please?

4 Q    And are these -- does this slide reflect the models that

5 are available in the area of asbestos exposure and lung cancer

6 and mesothelioma?

7 A    Yes, there are two distinctly different types of models

8 used for lung cancer and mesothelioma.  For lung cancer, most

9 lung cancers can be analyzed in the cohorts in the observable

10 range of data.  And one of the targets of estimation in cohort

11 studies is the relative risk.  So the relative risk is directly

12 estimated from the cohort studies.  So what the models can do

13 is that they can directly model the relative risk and so the

14 kind of model that is used is called a linear access relative

15 risk model for lung cancer.

16          Now for mesothelioma, this is not so easy because

17 mesothelioma is a rare cancer and relative risks are not

18 estimated from cohort studies.  You cannot estimate relative

19 risks from cohort studies simply because the background risks

20 are so small.  So one has to do mesothelioma modeling in a

21 different way.  One has to use what are called absolute risk

22 models and there are two that are generally available.  There's

23 the Peto model which the EPA used in 1986.  This was not a

24 fiber type specific model.  Namely, they threw in all kinds of

25 asbestos types, fiber types together in that model in 1986.

1  And then there's the Berman and Crump model in 2003 which made

2  a distinction between chrysotile asbestos and amphiboles.  So

3  these are both versions of what I would call the Peto model.

4            The second kind of model was developed by --

5            THE COURT:  Sorry, doctor, the Berman and Crump made

6  a distinction between amphibole and what?

7            THE WITNESS:  And chrysotile.

8            THE COURT:  Okay, the two asbestos fibers?

9            THE WITNESS:  Yes.

10           THE COURT:  Thank you.  Was it specific to asbestos

11  fibers, that study?

12           THE WITNESS:  Specific to asbestos fibers.

13           THE COURT:  Okay, thank you.

14  A    Hodgson and Darnton developed a model based on average

15  cumulative exposures in cohorts and their model is of a

16  completely different type.  It's not the Peto model.  It's a

17  completely different type of model.

18  Q    Okay now, with respect to your analysis in this case --

19  but before we get there, let me ask you this.  What does the

20  term "doubling-dose" refer to, have you heard that term and

21  what does it mean?

22  A    The doubling-dose to me indicates the dose at which the

23  relative risk is equal to two.  Namely, that's the dose at

24  which you increase -- at which the exposure -- the probability

25  of developing the disease in the exposed population against the

Moolgavkar - Direct                    64

1  unexposed population is two.  That is also the demarcating line

2  if you will between -- about which it is more likely than not

3  that a disease can be attributed to the specific exposure that

4  you're thinking about.

5  Q    Are there methods available in the scientific literature

6  for calculating the doubling-dose observed or extrapolated in

7  the models?

8  A    There's one -- one would use models of this type to

9  calculate the doubling-dose.  For lung cancer one would use the

10 relative risk model.  For mesothelioma one has to use a two

11 step process which I think I have a slide for that.

12 Q    You do.  We're going to get there, I'm asking you about

13 lung cancer first.  But have you calculated the doubling-dose

14 estimates for asbestos, both using the models, both in

15 mesothelioma and lung cancer in this case?

16 A    Yes, I have.

17 Q    Okay, let's discuss those estimates.

18        MS. HARDING:  And if you could show 2255 please.

19 A    Okay, so as I said earlier, estimation of doubling-dose,

20 the dose for which relative risk equals to two for lung cancer

21 and mesothelioma depends upon the use of mathematical models.

22 There's other critical difference in that for lung cancer the

23 doubling-dose is directly estimated because the relative risk

24 is directly estimated in cohort studies.  For mesothelioma you

25 need a two-step process.  The doubling-dose for mesothelioma

1 then involves applying what is called an absolute risk model

2 and what this model does is calculate or estimate for you the

3 total number of mesotheliomas that you would get for a specific

4 asbestos exposure, but that is the numerator.  But, you need a

5 denominator; namely, what is the background risk without

6 exposure to asbestos?  So the second step needs some

7 assumptions regarding the background lifetime probability of

8 developing mesothelioma.

9         Now when you have both these pieces in place, then

10 you can take the numerator, divide by the numerator -- by the

11 denominator and come up with an estimate of the doubling-dose.

12 Q    And is there information that allows you, sometimes at

13 least, to estimate doubling-dose information for different

14 fiber types?

15 A    Yes, the -- both the Berman and Crump version of the Peto

16 model and the Hodgson and Darnton formulas allow you to use --

17 make distinction by fiber type.  I prefer the Berman and Crump

18 formulation.  I prefer to use the Peto model.

19 Q    Okay, let's talk first about the relevant -- your relevant

20 doubling-dose estimates for lung cancer, okay?

21 A    Yes.

22         MS. HARDING:  And could you show 2256 please?

23 Q    I understand this to be the results of your estimates for

24 doubling-dose.  But, before I ask you about that, did you use

25 the standard methods that are available in quantitative

1  epidemiology and biostatistics for calculating the

2  doubling-dose of asbestos exposure and lung cancer?

3  A    Yes.  Yes, I did.  These are fairly standard methods.  For

4  lung cancer the so-called linear relative risk model has been

5  used for many, many years and I have laid out the details of

6  how this calculation is done in my reports.  But, what I come

7  up with are the following two estimates of doubling-dose.  For

8  EPA in 1986 which looked at mixed fibers, the doubling-dose

9  estimate is about 100 fiber per mil years.  For Libby miners,

10 based on an estimate of the potency for lung cancer reported in

11 McDonalds' 2004 paper, I estimate the doubling-dose to be about

12 278 fiber per mil years.

13 Q    With respect to the first number, the EPA 1986

14 doubling-dose number, what fibers are being -- what kinds of

15 asbestos fibers are being modeled there with respect to

16 doubling-dose?

17 A    I believe that the EPA -- the cohorts chosen by EPA were

18 rather heavy on amphibole asbestos exposure.

19 Q    Did they have mixed fiber environments?

20 A    Mixed fiber environment, but heavy on the amphiboles.

21 Q    Okay, did they include both chrysitolite and amosite

22 cohorts?

23 A    Some of them had chrysitolite also -- amosite and

24 chrysitolite.

25 Q    Dr. Moolgavkar, what is the relevance of trying to

1  calculate the doubling-dose information for different fiber

2  types of asbestos?

3  A    Well, I would say it's a lot more important for

4  mesothelioma than for lung cancer.  But, as I said earlier,

5  there is some indication that for lung cancer the amphiboles

6  are maybe five to ten times more potent than chrysotile in

7  causing risk -- in increasing the risk of lung cancer.  For

8  mesothelioma it's a lot more important because the generally

9  reported figure in Hodgson and Darnton is that hemocyte is

10 about 100 times more potent than chrysotile and that

11 chrysitolite is something like 500 times more potent than

12 chrysotile.

13 Q    Let's move then to mesothelioma and talk about your -- the

14 doubling-dose estimates that you made with respect to

15 mesothelioma.  Now, before we actually get to the results of

16 your estimates, you indicated earlier that it's more difficult

17 to estimate the doubling-dose for mesothelioma, and could you

18 explain why that's so?

19 A    Well, as I said, it's more difficult because it's a

20 two-step process.  You cannot investigate the relative risk

21 directly so what you need to do is to use an absolute risk

22 model that gives you the number of mesotheliomas for some kind

23 of asbestos exposure.

24        MS. HARDING:  Could you show 2257 please?

25 A    So the absolute risk model that I like to use is Peto's

1  formula which was used both by EPA in 1986 and by Berman and

2  Crump in 2003 and this is the basic form of this mathematical

3  expression.  I Sub-M is the incidence of mesothelioma at Dime

4  D where D is the duration of exposure to asbestos.  F is the

5  fiber concentration given to you in fibers per milliliter or

6  cubic centimeter.  K Sub-M is a constant that depends upon

7  fiber type.  So it's a constant that depends upon whether

8  you're dealing with chrysotile, or chrysitolite or amosite.

9  And D is the duration of exposure in years.

10         So, what one has to note from this formula, a couple

11  of things.  One, in terms of F, the fiber concentration, the

12  incidence is linear.  If you increase the fiber concentration

13  from say one fiber per cc to two fibers per cc while keeping

14  the duration constant, you will double the risk of

15  mesothelioma.  However, there is a strong non-linearity in

16  duration of exposure.  So let's ignore that -- pretend for the

17  moment that thaat creates a little bit of difficulty in

18  understanding.  That's the latency or the lag period in that

19  formula.  However, let's look at if duration of exposure is 11

20  years and you increase that to 12 instead of 11, then your risk

21  of mesothelioma will go up, not to twice the amount but will go

22  up eight fold because of that cubic term that duration of

23  exposure is multiplied by.

24  Q    Have you prepared a slide to help explain the appropriate

25  method for modeling doubling-dose for mesothelioma?

Moolgavkar - Direct                          69

1  A    Yes, I have a -- I think I have a slide that shows --

2  Q    Yes, 2258.

3         MS. HARDING:  Could you show 2258 please?

4  A    Yeah, this shows what happens with the Peto formula.  And

5  what you can see on the right-hand side of the panel on the

6  left you see that pretty sharp, straight line.  That is how the

7  risk increases with fiber concentration.

8  Q    I'm actually going to walk over to make sure we're talking

9  about the right thing.  This line here?

10  A    That line --

11  Q    Is that the line you're talking about there?

12  A    Yes.

13  Q    Okay, and what does that line -- why is that line

14  important, what does that tell you about modeling doubling-dose

15  for mesothelioma?

16  A    That line shows how the incidence of mesothelioma

17  increases with the concentration of fibers.  Now --

18  Q    And how would you describe that?

19  A    That's linear.  It's a straight line.  Now, if you look at

20  the other axis and see that curved line going up steeply,

21  that's how the incidence increases with duration of exposure.

22  So it's very clear that duration of exposure is much more

23  powerful in determining risk than in intensity of exposure.  I

24  have a simple example up there in that Post-it type note, so if

25  you look at an exposure of four fibers per cc for ten years so

1  that's a cumulative exposure of 40 fibers per cc years, that

2  yields an incidence of mesothelioma of 40 cases per million per

3  year.  Now, if on the other hand, you look at 148 fibers per cc

4  for three years, this is, of course, an extremely high exposure

5  concentration, 148 fibers per cc for three years, that yields

6  also the same risk.  It's also 40 cases per million per year.

7  And on the -- what you can see is the first scenario represents

8  a cumulative exposure of 40 fibers per cc years.  The next

9  scenario, the second one represents a cumulative exposure which

10 is ten times larger and yet they both yield the same risk.

11         What this is saying is that it is inappropriate -- to

12 treat the risk of mesothelioma has been linear in cumulative

13 exposure.  It is linear in concentration.  It is non-linear in

14 duration.  And because cumulative exposure consists of both

15 concentration, is made up of both concentration and duration of

16 exposure, cumulative -- the risk of mesothelioma is not linear

17 with cumulative exposure.

18 Q    I want to just make one clarification point.  I pointed to

19 this line over here as describing the line -- the linear line

20 that describes the response for concentration of asbestos, is

21 that right?

22 A    Yes.

23 Q    And it's also probably better reflected on this second

24 graph right here, is that right?

25 A    Yes.

1 Q    Okay.  Now, with all of those methodological

2 considerations in place, did you then calculate the

3 doubling-dose for mesothelioma and asbestos exposure?

4 A    Yes, I did.

5         MS. HARDING:  Okay.  Could you show 2260 please?

6 A    Yes.  So, I present three estimates of doubling-dose here

7 assuming a 45-year duration of exposure.  So the duration of

8 exposure is chosen to be the one that OSHA usually considers.

9 For mixed fibers, the case of them is reported in Nicholson's

10 EPA document.  That's the constant that one requires to use the

11 Peto formula and that is reported to be ten to the minus eight.

12 And using that K Sub-M and assuming a 45-year exposure

13 duration, the cumulative exposure that leads to the doubling of

14 risk is 3.2 fiber per mil years.

15 Q    Dr. Moolgavkar, if you had used a lesser cumulative

16 exposure in your calculation, would that have lowered the

17 doubling-dose that you found?

18 A    I don't understand the question.

19 Q    Okay, all right, maybe I didn't understand.  But, the

20 duration of exposure you discussed earlier, you said that it

21 was important.  It was more important than concentration.

22 A    Right.

23 Q    Okay, and so I'm just trying to understand -- or actually,

24 maybe -- let's -- I'll move on.  The Libby Miners -- what was

25 the doubling-dose for Libby miners?

1  A    Okay.  For the Libby miners now I have to use another

2  assumption made by EPA in 1986 because for the Libby miners,

3  K Sub-M is not available.  Nobody has really derived a K Sub-M

4  for tremolite fibers or the Libby-type fibers.  But one of the

5  assumptions made in EPA 1986 is that there is a fixed ratio

6  between the potency factor for lung cancer and the potency

7  factor for mesothelioma.  And so we have the potency factor

8  K Sub-L from the McDonald 2004 study which has found .0036.

9  We use the EPA assumption that K Sub-M is K Sub-L divided by

10 ten to the sixth and come up with the estimate of K Sub-M for

11 Libby fibers which is found .36 times ten to the minus eight.

12 So then using that K Sub-M, the cumulative exposure is 8.9

13 fiber per mil years.

14 Q    Okay.  And, again, you used cumulative exposure in that

15 estimate, as well?

16 A    Well, there's cumulative exposure, but assuming 45 years

17 of exposure.  Okay?  So the exposure concentration would be 8.9

18 divided by 45.

19 Q    Okay, now I understand.  With respect to chrysotile, did

20 you calculate a doubling-dose for asbestos?

21 A    Yes, the chrysotile doubling-dose comes from Berman and

22 Crump 2003 who present a separate K Sub-M which is what we need

23 for chrysotile and that is reported to be 0.04 times ten to the

24 minus eight.  And with that K Sub-M, the cumulative exposure

25 that doubles dose, again, assuming a 45-year exposure duration,

1 is 79 fiber per mil years.

2 Q    I'm going to walk over to the board, Dr. Moolgavkar.  I

3 just want to make sure that we've reflected the calculation for

4 Libby miners for lung cancer and the doubling-dose is reflected

5 here on the green circle at 278, is that correct?

6 A    That's correct.

7 Q    Okay.  And the lung cancer doubling-dose for the mixed

8 fibers is represented here at the 100 level, is that right?

9 A    That's correct.

10 Q    And the 79 that's reflected here in blue, reflects --

11 relates to mesothelioma, is that correct?

12 A    That's correct.

13 Q    And that's the doubling-dose for mesothelioma chrysotile

14 fibers, is that right?

15 A    Yes.

16 Q    And going down to the 8.9 in the blue, that's the relative

17 -- the doubling-dose for Libby miners that you've estimated,

18 correct?

19 A    That's correct.

20 Q    And then finally the 3.2, that's also for mesothelioma and

21 that reflects the doubling-dose for mixed fibers, is that

22 right?

23 A    That is correct.

24 Q    I want to ask you about -- I think you've already talked

25 about this but I want to make sure the record is clear.  With

1  respect -- what's the difference between the doubling-dose

2  calculations of 8.9 and 3.2 down here below the 15 as opposed

3  to the doubling-dose calculations that are up here on the

4  right-hand side of the chart, way above the 15?

5  A    Well, actually, there -- for mesothelioma there isn't any

6  difference because they're all based on Peto's formula.

7  There's no direct observation there.  For lung cancer, of

8  course there's a difference because the doubling doses for lung

9  cancer are smack bang in the middle of the range of

10 observations and relative risk is directly observed and that's

11 what's modeled.  So that's the difference.

12 Q    Let me see if I can get this right.  I'm not sure I will.

13 But when you talk about the use of the Peto formula to derive

14 the doubling doses for mesothelioma and you say that's not in

15 the observed range, is that because you have to make inferences

16 below the observed range in the Peto model before you can

17 double the dose, is that correct?

18            MR. FINCH:  Objection.  Leading.

19            THE COURT:  It is leading.

20 BY MS. HARDING:

21 Q    Could you explain why the doubling-dose for mesothelioma

22 is also a calculation that is not based on observed data but

23 even though the results for some of it are up here in the range

24 of what you called observed data?

25 A    Yes, and it's very simply because of one of the problems I

1 mentioned.  Mesothelioma is a very rare disease and therefore,

2 relative risk cannot be directly estimated even in the

3 observable range.  So one has to use a model to even -- and an

4 assumption regarding the background lifetime probability of

5 mesothelioma before one can make any -- before one can estimate

6 the doubling-dose.

7 Q    I have one further question.  I want you to assume that

8 with respect to a particular asbestos fiber -- actually, I'll

9 step over here -- with respect to a particular asbestos fiber

10 exposure that you have information indicating that 99 percent

11 of the fibers are chrysotile and one percent of the fibers are

12 amphibole, what doubling-dose information for mesothelioma

13 would be appropriate to compare that asbestos exposure to?

14         MR. FINCH:  Objection, Your Honor.  This wasn't in

15 the Dr. Moolgavkar's report.

16         THE COURT:  This is just a hypothetical at this point

17 I think to illustrate how to use the information I believe.  So

18 it's proper.  You may answer, doctor.

19 A    Well, if you said 99 percent chrysotile and one percent in

20 amphibole-like tremolite, I would say that would change the

21 doubling-dose from 79 to approximately 40.

22 Q    Okay.  And what is that based on?

23 A    That's based on the fact that tremolite appears to be

24 about 100 times more potent than chrysotile in causing

25 mesothelioma.

1  Q    Why does that, what you've just said, lead to the number

2  40 that you just answered?

3  A    Oh, because basically saying that you have 99 fibers of

4  chrysotile and one fiber of tremolite is like assuming you have

5  200 fibers of chrysotile so you have basically halved the

6  doubling-dose by increasing the potency.

7            MS. HARDING:  Your Honor, could we take a five-minute

8  break so we could just discuss any other further questions

9  asked?

10            THE COURT:  Yes.

11            MS. HARDING:  Okay.

12            THE COURT:  In fact, we'll take a ten-minute recess

13  and then reconvene.

14                    (Recess)

15            THE COURT:  Please be seated.  Doctor, are you ready?

16            THE WITNESS:  Yes.

17            MS. HARDING:  Thank you, Your Honor.

18  BY MS. HARDING:

19  Q    Dr. Moolgavkar, I'm sorry, I have just a couple of more

20  questions and then just some housekeeping with respect to some

21  of your exhibits.  The last thing I want to ask you relates

22  back to what we were just talking about, the doubling of doses

23  in the observed and unobserved brain in the use of models to

24  extrapolate at lower does.

25  A    Yes.

1 Q    And I want to ask you about a statement from Hodgson and

2 Darnton which is one of the publications you've relied upon,

3 correct?

4 A    Yes.

5          MS. HARDING:  Could I see the ELMO, please?

6          We're getting copies, Your Honor.  We have copies.  Q

7     This is the Hodgson and Darnton paper that you've

8 discussed today and relied upon?

9          THE COURT:  I don't think it's on yet.

10 A    I don't see it.

11     Q    Oh, it's not on yet.

12          THE COURT:  Mr. Finch said it's in the book.

13          MS. HARDING:  Right, but Dr. Moolgavkar doesn't have

14 the book so --

15          THE COURT:  Oh, I'm sorry.

16          MS. HARDING:  May I approach the witness, Your Honor?

17          THE COURT:  Sure.

18 Q    Dr. Moolgavkar, is this the Hodgson and Darnton study that

19 you've discussed today?

20 A    Yes, it is.

21 Q    Okay.  I'd like you to turn to -- I have to locate it

22 here.  I've lost my tab.  You'll have to give me a second.  I

23 apologize.  There we go.  Page 583 please.  And I'd like to ask

24 you about the -- the first where I'm pointing, do you see where

25 I'm pointing, Dr. Moolgavkar?

**J&J COURT TRANSCRIBERS, INC.**

Moolgavkar - Direct                      78

1  A    Yes.

2  Q    Okay.  And this is a statement from Hodgson and Darnton

3  where they say that taking this evidence together, we do not

4  believe there is a good case for assuming any threshold for

5  mesothelioma risk, do you see that?

6  A    I see that, yes.

7  Q    Okay.  And do you understand what Hodgson and Darnton

8  meant by that statement?

9  A    Yes, I believe I do.

10  Q    Would you explain that please?

11  A    I think that it is impossible to establish either the

12  existence or the non-existence of a threshold based on

13  epidemiological data.  That is just a statistical fact and so

14  when Hodgson and Darnton say that arguments regarding

15  thresholds which I think they say someplace, are logical

16  nonsense, that is what they mean.  It is not possible to assert

17  either the existence or the non-existence of a threshold based

18  simply on epidemiological data.

19  Q    Do any of the doubling-dose calculations that you've

20  performed in this case rely upon the existence of a threshold

21  for mesothelioma in calculating them?

22  A    No, they do not.

23  Q    Going down to the bottom of Page 583, this statement here

24  that says, "The second kind of uncertainty relates to the

25  question whether the relationship between exposure and outcome

1 seen in the observed range continues to hold outside that

2 range.  This kind of uncertainty cannot be quantified

3 statistically.  Quantitatively, one can reasonably argue that

4 the agreement would be better for exposures close to the

5 observed range but with increasing distance from the observed

6 range, our confidence that we know what to expect decreases."

7 Is that a statement with which you agree or disagree?

8 A    Well, I agree with that statement completely.  And, in

9 fact, I made it in my direct testimony when I said that the

10 further away you get from the observed range, the less certain

11 your results.

12 Q    Okay.  I want to go back, Dr. Moolgavkar, just for what I

13 call housekeeping.  We talked about certain exhibits that I'd

14 like to move into evidence as summaries of your opinions and

15 testimony and the data that you relied upon.  Starting first

16 with 2244 -- GG-2244.

17 A    Yes.

18 Q    Is that an accurate summary of the average cumulative

19 exposures of asbestos exposed cohorts used to investigate risks

20 of lung cancer?

21 A    Yes, it is.

22        MS. HARDING:  Okay, I move into evidence GG-2244,

23 Your Honor.

24        MR. FINCH:  No objection.

25        THE COURT:  It's admitted.

**J&J COURT TRANSCRIBERS, INC.**

1              UNIDENTIFIED ATTORNEY:  No objections, Your Honor.

2  BY MS. HARDING:

3  Q    Dr. Moolgavkar, looking at GG-2246, is that an accurate

4  summary of the average cumulative exposures of asbestos exposed

5  cohorts used to investigate risk of mesothelioma as you

6  testified to today?

7  A    Yes.

8              MS. HARDING:  I move into evidence, Your Honor,

9  GG-2246.

10             MR. FINCH:  No objection.

11             UNIDENTIFIED ATTORNEY:  Same for the FCR.

12             THE COURT:  It's admitted.

13 BY MS. HARDING:

14 Q    Looking at GG-2249, Dr. Moolgavkar --

15 A    Yes.

16 Q    -- is this an accurate depiction of the studies that you

17 relied upon in reaching your conclusion that low level asbestos

18 exposure in auto mechanics has not observed risk?

19 A    Well, these are the case control studies that I relied on,

20 yes.

21 Q    Is that an accurate summary, portrayal of the results of

22 the case control studies that you relied upon?

23 A    Yes.

24             UNIDENTIFIED ATTORNEY:  Is there an objection?

25             MS. HARDING:  Is there an objection?

1          UNIDENTIFIED ATTORNEY:  No objection.

2          MS. HARDING:  Oh, I didn't offer it.  I'm sorry.  I

3   move into evidence, Your Honor, GG-2249.

4          MR. FINCH:  No objection, Your Honor.

5          UNIDENTIFIED ATTORNEY:  No objection.

6          THE COURT:  It's admitted.

7   BY MS. HARDING:

8   Q    Dr. Moolgavkar, you also discussed the non-linear and

9   linear aspects of the Peto model in your testimony?

10  A    Yes.

11  Q    And is GG-2258 an accurate representation of the linear

12  and non-linear aspects of the Peto model as you've testified to

13  today?

14  A    Yes.

15         MS. HARDING:  I move into evidence GG-2258.

16         MR. ANSPRO:  Just to clarify, as calculated by this

17  witness.  This represents your work.

18         THE WITNESS:  Yes, it does.

19         MR. FINCH:  No objection.

20         UNIDENTIFIED ATTORNEY:  No objection.

21         THE COURT:  It's admitted.

22  BY MS. HARDING:

23  Q    And finally, Dr. Moolgavkar, GG--2262 which is the board

24  that we've been discussing during your testimony today.

25  A    Yes.

Moolgavkar - Direct                        82

1  Q    Is that an accurate depiction of the cumulative exposure

2  estimates from important end points for asbestos exposure in

3  mesothelioma, cancer and asbestosis?

4  A    Yes.

5           MS. HARDING:  I move into evidence GG-2262.

6           MR. FINCH:  No objection.

7           UNIDENTIFIED ATTORNEY:  As calculated and presented

8  in his report, this is his summary, correct?

9           THE WITNESS:  Yes.

10           UNIDENTIFIED ATTORNEY:  And no objection.

11           THE COURT:  It's admitted.

12           MS. HARDING:  Your Honor, I tender the witness.  I'm

13  done.

14           THE COURT:  Mr. --

15           MR. FINCH:  Your Honor, may I have a minute to get

16  organized here?

17           THE COURT:  Yes, sir.

18                         (Pause)

19           MR. FINCH:  Your Honor, may I approach the bench and

20  the witness?

21           THE COURT:  Yes, sir.

22                    CROSS EXAMINATION

23  BY MR. FINCH:

24  Q    Good morning again, Dr. Moolgavkar.  Nathan Finch for the

25  Asbestos Claimant's Committee.

J&J COURT TRANSCRIBERS, INC.

1  A    Good morning.

2  Q    It's your opinion, is it not, that there are only two

3  causes of mesothelioma in the United States that have been

4  epidemiologically established, is that correct?

5  A    Yes.

6  Q    You believe that there's an epidemiological evidence

7  establishing that radiation causes mesothelioma?

8  A    Yes.

9  Q    And you also believe that, like the rest of the world,

10 that there is epidemiological evidence establishing that

11 asbestos exposure causes mesothelioma?

12 A    Yes.

13 Q    All right.  I want to talk about the radiation exposure.

14 You have in front of you a book called Dr. Moolgavkar Expert

15 Witness Reports, do you see that?

16 A    Yes, I do.

17        MR. FINCH:  And what I have done, Your Honor, is I

18 put -- he's had five reports in this case, and I put them in

19 the notebook behind the tab I think in chronological order,

20 although two of them are on the same date, Report 1, Report 2,

21 Report 3, Report 4 and Report 5.

22 Q    Could you turn in your book, Dr. Moolgavkar, to Report 2

23 at Page 10 and this is ACC-538.  The bottom of the -- are you

24 there, Dr. Moolgavkar?

25 A    Yes, I am here.

1  Q    The bottom of the first paragraph, the carry-over

2  paragraph.

3  A    Yes.

4  Q    You write, "There is emerging evidence also that

5  mesothelioma can occur following radiation therapy for cancer,"

6  and you cite three medical articles, "Toward et al.", "Travis,

7  et al.", "Teta, et al."

8  A    Yes.

9  Q    My partner, Mr. Baylor, showed you each of those three

10 articles in your deposition, do you recall that?

11 A    Yes.

12 Q    And is it correct that none of those three articles have

13 any information about whether the subjects were exposed to

14 asbestos?

15 A    That is correct, but asbestos would not be expected to be

16 a confounder in these cases.

17 Q    Well, the article don't know whether or not the people

18 were exposed to asbestos, correct?

19 A    That is correct, but you need to adjust for potential

20 confounder, not for just any risk factor for disease when you

21 do these studies.

22 Q    Could you turn in your book to -- this is -- and there's

23 also a notebook that I've put in front of you, Dr. Moolgavkar,

24 cross examination articles.  It's the second notebook I put up

25 there on the ledge.

1  Q    Yes.

2           THE COURT:  Doctor, if it helps, that tray pulls out.

3           THE WITNESS:  Thank you.

4           THE COURT:  Not a lot, but some.

5           THE WITNESS:  But, the chair doesn't.

6           THE COURT:  It doesn't move?

7  Q    Could you turn in that book to ACC/FCR-549?

8  A    Yes.

9  Q    This is the Teta article, correct?

10  A    Yes.

11  Q    Ms. Teta is one of your colleagues at Exponent?

12  A    That's correct.

13  Q    On Page 1436 of the article, underneath the table, the

14  authors write, "This finding was expected because mesothelioma

15  is a rare disease and it is estimated that greater than 85

16  percent of mesothelioma diagnoses are attributed to past

17  exposure to asbestos."

18  A    Yes.

19  Q    And they cite to a U.S. Government report, the Agency for

20  Toxic Substances and Disease Registry?

21  A    That's correct.

22  Q    And you don't dispute that over 85 percent of the

23  mesothelioma diagnoses in the United States are attributed to

24  asbestos exposure?

25  A    I do dispute that.

1  Q    Well, the -- they reported that here, correct?

2  A    They reported it, but I dispute it.

3  Q    So you dispute the Agency for Toxic Substances Disease

4  Registry's analysis that 85 percent of cases of mesothelioma in

5  the United States have been attributed to asbestos exposure?

6  A    Well, I dispute that figure, yes.  I dispute their

7  analysis.  I mean, I don't dispute a lot of things that ATSTR

8  has done, but that particular figure, I do dispute.

9  Q    Okay.  Now, you've cited to The Institute of Medicine --

10  A    Yes.

11  Q    -- study on other cancers, correct?

12  A    That's correct.

13  Q    All right.  I handed you a copy of the book called,

14  Asbestos Selected Cancers, right?

15  A    Yes.

16  Q    And this is put out by The Institute of Medicine in 2006?

17  A    Yes.

18         MR. FINCH:  John, it's at ACC/FCR-2048.

19  Q    Could you turn to Page 83, sir?

20  A    Yes.

21  Q    The Institute of Medicine lists the risk factors for

22  development of malignant mesothelioma?

23  A    Yes.

24  Q    And they list as established exposure to asbestos fibers,

25  exposure to erionite fibers and exposure to talc or vermiculite

1 contaminated with asbestos fibers, is that correct?

2 A    That's correct.

3 Q    Erionite fibers are only at issue in Turkey, right?

4 A    Yes.

5 Q    And they list as hypothesized but not established

6 radiation therapy, correct?

7 A    That's what they do, yes.

8 Q    And they cite to something called Sporn and Roggli,

9 correct?

10 A    Yes.

11 Q    Victor Roggli is one of the experts for the ACC and the

12 FCR in this case, is he not?

13 A    Yes, he is.

14 Q    The Institute of Medicine doesn't cite you with respect to

15 what is an established cause of mesothelioma, do they, sir?

16 A    Well, I haven't written an article on that.

17 Q    Now, one of the things you testified to on direct in

18 support of your opinion about the level of asbestos exposure

19 necessary to cause mesothelioma is studies relating to brake

20 workers, do you recall that testimony?

21 A    Yes.

22 Q    Could you turn in your book of Dr. Moolgavkar Reports to

23 Report 2 at Page 4, at the top.

24 A    Okay.

25 Q    There you have, some exposure studies suggest that brake

1 workers are exposed on average time weighted to .04 fiber

2 milliliters of chrysotile fibers greater than five microns in

3 length?

4 A    Yes.

5 Q    Then you have a footnote that says -- cites to a recent

6 paper by Findley that reports a medium cumulative exposure of

7 between 0.16 and 0.41 fiber milliliter years in the 1970s among

8 U.S. automobile mechanics involved in brake repair, correct?

9 A    Yes.

10 Q    So, the average exposure among brake mechanics in the

11 United States was somewhere between .16 and .41 fiber years

12 according to that article?

13 A    No, no, that's the median.

14 Q    That's the median.

15 A    Yes.  That probably may not be the average at all.  The

16 average could be much higher.

17 Q    The average could be lower, too, could it not?

18 A    It could be lower.  You know, I'm in a strange bind here.

19 I'm not an industrial hygienist, and I'm simply reporting

20 numbers found in the literature.  In the past I've been

21 criticized for reporting that brake workers were exposed to too

22 little asbestos and now it seems to me that the criticism is

23 coming from the other direction.

24 Q    In that same report, Report 2, Page 20, you cite to -- the

25 very bottom, to an article by Otto Wong, "Malignant

1 Mesothelioma and Asbestos Exposure among Auto Mechanics."

2 A    Yes.

3 Q    I take it you've read that article?

4 A    Yes, I've read it.

5 Q    Okay.  Could you turn in your book of Moolgavkar exhibits,

6 not your reports but the other book.  But, for the rest of this

7 exam I'll call your report book, your report book and the other

8 book the exhibit book, can we agree on that?

9 A    Sure.  Are you going to put it up?

10 Q    I'm going to show it up.

11 A    Okay.

12 Q    It's Exhibit ACC/2072.  That's the Wong article, Dr.

13 Moolgavkar?

14 A    Yes, it is.

15 Q    Okay.  Could you turn to Page 174 in that article?

16       THE COURT:  Mr. Finch, if you just have it put up, I

17 think it'll save everybody time.  We're all looking at it on

18 the screen.

19       MR. FINCH:  Okay.

20 Q    The right-hand column, second paragraph, the author

21 writes, "Specificity in both exposures and disease in points is

22 one of the most criteria in causation assessment.  If the

23 subject matter is exposure to asbestos from friction products

24 among auto mechanics we must base our evaluation on studies of

25 auto mechanics and not on other occupations.  For example, it

1  is not valid to apply the results of studies of insulators, or

2  shipyard workers to auto mechanics because workers in these

3  vastly different occupations are exposed to different types of

4  asbestos as well as the different concentration levels of

5  asbestos.  In the studies reviewed above, mesothelioma risk not

6  only of all garage mechanics, but also those specifically

7  engaged in brake repairs was assessed".  Do you agree with

8  that?

9  A    Do I agree with what?

10 Q    That if the subject matter is exposure to asbestos from

11 friction products among auto mechanics, you should base your

12 evaluation on studies of auto mechanics not on other

13 occupations.

14 A    No, that's -- yes, that appears to be self-evident.

15 Q    Okay.  Grace did not make brakes, correct?

16 A    Not to the best of my knowledge.

17 Q    Okay.  In the next paragraph, Dr. Wong writes, "Exposure

18 response relationship is yet another important causation

19 criteria.  Fiber measurement studies have indicated that garage

20 mechanics are exposed to extremely low levels of asbestos as a

21 result of the thermal transfer formation of asbestos fibers

22 during the braking process.  The asbestos fibers in brake

23 linings are entirely chrysotile fibers in a bonded or

24 encapsulated state.  During braking a temperature in excess of

25 700 to 800 degrees Celsius is reached and the chrysotile fibers

1  break down into fosterite and anhydrous magnesium silicate,

2  which is non-fibrous."  You see that?

3  A    Yes, I do.

4  Q    And you have testified previously, have you not, that the

5  asbestos fibers from brakes become a heat modified form of

6  asbestos?

7  A    Yes, I have.

8  Q    And, you've testified previously, have you not, that the

9  body reacts differently to a heat modified form of asbestos,

10 the body does know that it's a heat modified form of asbestos?

11 A    There is some limited evidence to suggest that the

12 biological potency of heat modified chrysotile is less than

13 that of regular chrysotile, yes.

14 Q    And the Grace products that contain asbestos are not

15 modified by heat in the mixing or the application process, are

16 they?

17 A    I have no idea how Grace products are used.

18 Q    And you haven't studied the fiber content of Grace

19 products to determine whether they're tremolite or chrysotile

20 or to the extent to which the Canadian commercially added

21 asbestos has tremolite in it?

22 A    That's correct.

23 Q    Tremolite is an amphibole?

24 A    Yes.

25 Q    And amphiboles are a hundred times more potent for causing

1 mesothelioma than chrysotile?

2 A    Yes.

3 Q    Now, in 1998 the World Health Organization put out a

4 monograph specifically related to chrysotile asbestos, did it

5 not?

6 A    Yes, I believe so.

7 Q    In the Redweld beside you, there are some exhibits that

8 are too fat to fit in either of the notebooks.  Could you pull

9 out ACC/FCR-643?

10         THE COURT:  Are you putting it up?

11         MR. FINCH:  Yes.  Unfortunately, my copy of this is

12 not page-numbered, so we may just have to --

13 Q    First of all, Dr. Moolgavkar, do you recognize this as

14 Environmental Health Criteria 203, chrysotile asbestos, put out

15 by the World Health Organization?

16 A    Yes, I've seen this some time ago.  I haven't looked at it

17 recently.

18 Q    Okay.  Could you turn to Section 1.6, it's about 12 pages

19 into the document?

20 A    May I wait for you to pull it up?

21 Q    May I move over here to show John where you are?  The

22 World Health Organization stated that commercial grades of

23 chrysotile have been associated with an increased risk of

24 pneumoconiosis, lung cancer and mesothelioma in numerous

25 epidemiological studies of exposed workers.  You don't dispute

1  that, do you?

2  A     No, I don't.

3          MR. FINCH:  Could you go to the very bottom of

4  Section 1.6, John, right above Section 1.7.

5  Q     And the World Health Organization also determined, did it

6  not, that it should be recognized that although the

7  epidemiological studies of chrysotile exposed workers have been

8  primarily limited to the mining and milling and manufacturing

9  sector, there is evidence based on the historical pattern of

10  disease associated with exposure to mixed fiber types in

11  western countries, that the risks are likely to be greater

12  among workers in construction and possibly other user

13  industries.  Did I read that right?

14  A     Yes, you did.

15          Q     And in Section 10 --

16          MR. FINCH:  Okay.  Can I have the ELMO?

17  Q     It may be faster for you to refer to Section 10 in the

18  --

19  A     Section?

20  Q     Section 10.  Conclusions and recommendations for the

21  protection of human health.  Isn't it correct that the World

22  Health Organization determined that exposure to chrysotile

23  asbestos poses increased risk for asbestosis, lung cancer and

24  mesothelioma in a (indiscernible - cough) manner, no threshold

25  has been identified for carcinogenic risks?

1  A    Yes.

2  Q    And that's still the position of the World Health

3  Organization, correct?

4  A    Well, that's still my position, too.  I don't think any

5  threshold has been demonstrated.

6  Q    So, you're not saying that an exposure below 15 fiber

7  years can't be attributed -- a mesothelioma with an exposure

8  below 15 fiber years cannot be attributed to asbestos?

9            MS. HARDING:  I object to foundation.  I think that

10  misstates his testimony with respect to attributed to asbestos.

11  You asked him about a threshold.

12  Q    You're not offering an opinion that if -- or are you, are

13  you offering an opinion that no asbestos exposure below 15

14  fiber years can cause mesothelioma?

15  A    I have not offered that opinion.

16  Q    Okay.  And you're also not offering an opinion that no

17  asbestos exposure below 3.2 fiber years can cause mesothelioma,

18  are you?

19  A    I have not offered that opinion.

20  Q    And you're not offering the opinion that no asbestos

21  exposure below one fiber year can cause mesothelioma?

22  A    I have not offered that opinion.

23  Q    You haven't offered the opinion that no asbestos exposure

24  below 0.5 fiber years is insufficient to cause mesothelioma?

25  A    I concede that I do not recognize the existence or

1 non-existence of a threshold.

2 Q    Okay.  Now, would you agree that there is a debate between

3 medical practitioners concerning the extent to which chrysotile

4 asbestos can cause mesothelioma?

5 A    Well, I'm not sure that a debate among medical

6 practitioners is too relevant.  If you ask me about a debate

7 among epidemiologists, yes, I think that is relevant.

8 Q    Well, there's also a debate among epidemiologists as to

9 whether chrysotile -- the difference -- whether chrysotile

10 causes mesothelioma.

11 A    Yes, there is still ongoing debate on that issue.

12 Q    You're familiar with Dr. William Nicholson, correct?

13 A    I'm familiar with his work, yes.

14 Q    Okay.  He was —- he did some projections in 1982 of the

15 projected incidents of mesothelioma in the United States,

16 correct?

17 A    I believe it was projected mortality, but --

18 Q    Projected mortality from mesothelioma and lung cancer,

19 from asbestos causes?

20 A    Yes.

21 Q    And he also did the work for the EPA in 1986 in the risk

22 assessment document that you rely on in part, correct?

23 A    Yes.  That's correct, yes.

24 Q    Okay.  Could you turn to ACC/649 in your binder?  This is

25 a paper published by Dr. Nicholson shortly before he died,

1 correct?

2 A    It's a paper published by Dr. Nicholson, whether it was

3 published shortly before he died, I don't know.

4 Q    Okay.  It was published in January of 2001.  This is an

5 article you are familiar with, correct?

6 A    I have seen it, yes.

7 Q    Okay.  And Dr. Nicholson looks at the insulator cohort

8 that he and Dr. Selikoff studied over many years and makes some

9 analysis of the time course of disease in that cohort, correct?

10 In this paper?

11 A    Well, I'd like to see what you're referring to, if I may.

12 Q    Sure.  Page 60, "Analysis utilizing the time course of

13 mesothelioma risk."

14 A    I don't believe I have that paper in my folder, but I can

15 follow along on the ELMO.

16 Q    You don't have ACC Exhibit 649 in your folder?  It would

17 be in the second notebook.

18 A    Oh, in the notebook.

19 Q    In the notebook.  I'm sorry, Dr. Moolgavkar, it would be

20 in the second notebook.

21 A    Okay.  I can follow along on the ELMO.

22 Q    Okay.  Are you there?

23 A    Yes.

24 Q    Okay.  At Pages 60 and 61, he describes the time course of

25 mesothelioma risk --

1  A    Yes.  That's --

2  Q    -- in his cohort?

3  A    Yes.  He's basically using the Peto formula.

4  Q    Yes.  And he notes on Page 61 that prior to 1937 the

5  insulator cohort was exposed only to chrysotile?

6  A    Yes.

7  Q    And from the incidents of disease in that cohort, he

8  concludes, does he not, that the -- and this is at the bottom

9  of Page 61, right-hand column -- "As can be seen, the time

10 course of mesothelioma risk is totally incompatible with an

11 exposure pattern that begins in the late 1930s.  Indeed, the 95

12 percent confidence limits on three of the four data points do

13 not intercept the expected distribution for amosite exposure.

14 Barring unknown exposures to amphiboles prior to 1935, the data

15 presents strong evidence that chrysotile is a substantial,

16 indeed the dominate contributor to the mesothelioma risk

17 experienced by this group of insulation workers."  That's his

18 conclusion correct?

19 A    That is correct.

20 Q    And Dr. Nicholson has published many articles relating to

21 mesothelioma and the risk of asbestos -- risk of mesothelioma

22 caused by asbestos in peer-reviewed medical journals, correct?

23 A    That's correct.  Mr. Finch, one paper does not a debate

24 settle.  There is still ongoing --

25        MR. FINCH:  There's no question pending, Your Honor.

1          THE COURT:  Okay.

2   Q    Would you turn in your exhibit binder to ACC/FCR-646.

3   This is a paper published in <u>The British Journal of Industrial</u>

4   <u>Medicine</u> in 1965 by Muriel Newhouse, Dr. Moolgavkar?

5   A    I see it.

6   Q    You're familiar with this paper?

7   A    Yes, I have seen this paper.

8   Q    And in this -- this was presented at a big conference in

9   the United States in 1965, correct?

10  A    I don't know where it was presented.

11  Q    Dr. Newhouse and Dr. Thompson found mesothelioma that they

12  attributed to asbestos to people whose only known exposure was

13  living within half a mile of an asbestos factory, correct?

14  A    Would you please point that section out to me on the ELMO?

15  Q    Sure.

16  A    I believe that's correct, but I'd like to see it.

17  Q    It's on Page 264; "Neighborhood Exposures of

18  Mesothelioma," the second column.  "At the present site there

19  were eight patients of mesothelioma living within a half mile

20  radius of the factory."  And the authors of this paper

21  concluded that just living in the neighborhood, that it was

22  that exposure that caused their mesothelioma, correct?

23  A    Well --

24          MS. HARDING:  Nate, can you point to the language so

25  we can look for it, please?

1 Q    Well, Dr. Moolgavkar, you've testified about this paper

2 previously, correct?

3 A    I've been asked about this paper, I've testified, yes.

4 Q    And you've testified, have you not --

5        MS. HARDING:  I'm just -- I was just trying to find

6 where -- for my purposes where you were asking him a question

7 about, that's all.

8        MR. FINCH:  I was asking the question about

9 neighborhood exposures on Pages 264, 265 and now I'm asking him

10 about his prior testimony about this paper.

11        MR. BERNICK:  There's no language that said what he

12 said.

13 Q    Well, your interpretation of this study, Dr. Moolgavkar,

14 is that the authors concluded that the neighborhood exposure

15 contributed to the mesothelioma?

16 A    I'd have to look at the entire paper again.  I mean, if

17 that is what I testified at the time, I probably believed that

18 at the time.  I must have believed that at the time.

19 Q    Okay.  Now, the IARC put out a monograph on the evaluation

20 of carcinogenic risks to humans dealing specifically with

21 asbestos in -- the most recent one is 1987, correct?

22 A    It put out a monograph, I believe it was 1987.  I don't

23 know that for a fact.

24 Q    Okay.  Could you look in your exhibit binder, at Exhibit

25 2034?

1  A    Okay.

2  Q    And asbestos is classified as a Group 1 carcinogen by

3  IARC, is that correct?

4  A    I would classify it as a Group 1 carcinogen, as well.

5  Q    And could you explain to the Court what a Group 1

6  carcinogen is?

7  A    Known to cause cancer in humans.

8  Q    Okay.  Could you turn to the fourth page under Section A

9  of Exhibit 2034?  First of all, Dr. Moolgavkar, you recognize

10 Exhibit 2034 as the IARC statement on the carcinogenity of

11 asbestos?

12 A    I'm sorry, I don't understand the question.

13 Q    Do you recognize the document 2034 as The World Health

14 Organization International Agency for Research on Cancer, the

15 statement on the cancer risk of asbestos?

16 A    If that's what it says on the document, yes.

17 Q    Okay.  Could you --

18           THE COURT:  Isn't this 2024, pardon me.

19           MR. FINCH:  2034.

20           THE COURT:  Okay, I'm sorry.

21           MR. FINCH:  2034.

22 Q    The IARC states in the second paragraph, "Environmental

23 exposure, either in the houses of asbestos workers, or in the

24 neighborhood of asbestos mines or factories, has been noted in

25 some of the cases..." and they cite to numerous references,

1 correct?

2 A    Yes.  I don't know how many of these are proper

3 epidemiological studies.  They do have references here.

4 Q    And they also state, "That it has been estimated that a

5 third of the mesotheliomas occurring in the United States may

6 be due to non-occupational exposure."  And they cite someone

7 named Interline for that proposition.

8 A    Yes.

9 Q    You don't have any -- strike that question.  You certainly

10 haven't done any kind of analysis here to determine what

11 percentage of mesotheliomas in the United States are due to

12 non-occupational exposures to asbestos, have you?

13 A    That's an extremely difficult analysis to do, and any

14 results must be taken with a pinch of salt.

15         MR. FINCH:  May I have the ELMO, John?

16 Q    Dr. Moolgavkar, in your direct testimony you were asked

17 about a paper by Iwatsubo, et al.?

18 A    Yes.

19 Q    Okay.  This is -- could you turn in your book to

20 ACC/FCR-287?  It's in the exhibit binder.

21         MS. HARDING:  I'm sorry, what number in the book?

22         MR. FINCH:  287.

23         MS. HARDING:  Thank you.

24         MR. FINCH:  John, can you put up 287?

25                    (Pause)

1                 THE COURT:  Mr. Finch?

2  Q     Are you ready, Dr. Moolgavkar?

3  A     Yes.

4  Q     All right.  This is the Iwatsubo paper you were referring

5  to, correct?

6  A     That's correct.

7  Q     And that was published in the <u>American Journal of</u>

8  <u>Epidemiology</u>, correct?

9  A     Also correct.

10  Q     And that's a peer-reviewed journal that is probably one of

11  the most prestigious journals in the world relating to

12  epidemiology, correct?

13  A     Well, yes, probably.

14  Q     Okay.  And what this study shows is that it's a case

15  control study where an expert panel of industrial hygienists

16  attempted to estimate the asbestos exposures of the cases and

17  the controls, correct?

18  A     "Attempted" is the right word here.

19  Q     And they used their knowledge of the industrial hygiene

20  literature and their knowledge of the jobs that the people were

21  working on to make those retrospective estimates, correct?

22  A     I believe so, yes.

23  Q     Okay.  And on Page 139 they calculated some relative risks

24  of asbestos exposure at different fiber years of exposure,

25  correct?  At the bottom of Page 139, under cumulative exposure.

1  A    Well, yes, they didn't actually compute these relative

2  risks at fiber per mil years of exposure.  They computed these

3  relative risks at fiber per mil years of exposure within

4  quotation marks.

5  Q    I understand within quotation marks, and you have some

6  difficulties with that, but this is what the expert panel of

7  industrial hygienists estimated was the historical exposure of

8  this group of people, correct?

9  A    Yes, that's what they attempted to do.

10 Q    Okay.  And for people who were exposed to asbestos at a

11 level intermittently, between half a fiber year and one fiber

12 year, there was four time the risk of getting mesothelioma with

13 a confidence interval of 1.9 to 9.7, correct -- excuse me --

14 1.7 to 9.7?

15 A    That's what it says here, yes.

16 Q    Okay.  And for people with continuous exposure to asbestos

17 of between a half a fiber year and one fiber year, the relative

18 risk was 4.6, correct?

19 A    Yes.

20 Q    And would you turn to the previous page, bottom left-hand

21 paragraph?  The authors of this study write, do they not, "As

22 recently stated in a International Agency for Research on

23 Cancer meeting on retrospective assessment of occupational

24 exposure and epidemiology, the validity of expert judgment

25 which relies upon both the knowledge and the experience of

1 industrial hygienists has rarely been evaluated.  Indeed, when

2 no objective method of measuring exposure is available, their

3 judgment is most often considered the gold standard."  You're

4 not an industrial -- do you agree with that?

5 A    I'm not in a position to agree or disagree.  As you were

6 about to say, I'm not an industrial hygienist, but it's clear

7 that they admit in this paper that their exposure estimates

8 were extremely soft.

9 Q    Okay.

10 A    They used five industrial hygienists, I understand.  I

11 don't see any report of how consistent the estimates were among

12 these five industrial hygienists.  It may be there, but I

13 haven't found it.

14 Q    Okay.  They also state at Page 140, do they not, in the

15 second column, second full paragraph down, last sentence, "That

16 even in cohort studies, however, precise measurement of

17 exposure is difficult"?

18 A    Yeah, I believe it's a different problem, however, but I'm

19 not going to opine as an expert on that issue.  The cohort

20 studies I referred to were considered good enough by the EPA,

21 by Nicholson, by Hodgson & Darnton and by Berman & Crump.

22 Q    Okay.  Do you know if Nicholson and Selikoff had any

23 contemporaneous measurements of exposure at all for any of the

24 insulator population they studied?

25 A    No, I don't.

1  Q    Now, another paper you have criticized is -- back on the

2  Iwatsubo paper -- the French doctors and epidemiologists who

3  published this in <u>The American Journal of Epidemiology</u> don't

4  testify for plaintiffs in asbestos litigation, do they?

5  A    I have no idea whether they do or do not.

6            MS. HARDING:  I object to foundation.

7            THE COURT:  He's answered, he doesn't know.

8  Q    Would you turn in your book to ACC/FCR-422?  This is the

9  Rodelsperger paper?

10 A    Yes.

11 Q    That was published in <u>The American Journal of Industrial</u>

12 <u>Medicine</u>?

13 A    Yes.

14 Q    It's another peer-reviewed medical journal?

15 A    Yes.

16 Q    And, again, they used expert base exposure index to

17 estimate asbestos exposure retrospectively?

18 A    Yes.

19 Q    Okay.  Would you turn to Page 269, Table 7?  And what this

20 paper reports is that for people who were exposed to between 0

21 and 0.15 fiber years of asbestos, they had a 7.9 times the risk

22 of dying from mesothelioma, in the cases as compared to the

23 controls, correct?

24 A    That's what it reports.  Would you like me to explain my

25 problems with this paper or do you want me to simply answer yes

1  or no to your questions?

2  Q    You can explain your problems with it on redirect.

3  A    Okay.

4  Q    The paper also concludes that this doesn't provide

5  evidence that manmade vitreous fibers cause mesothelioma,

6  correct?

7  A    You'd have to point that out to me.

8  Q    Okay.

9  A    I've read the paper but some time ago.

10 Q    Page 273, left-hand column, top of the page.  They write,

11 "Therefore, in agreement with other studies there is

12 insufficient evidence to establish a causal relationship

13 between the exposure to MMVF and mesothelioma."

14 A    Yes.  Insufficient evidence.

15 Q    Okay.  MMVF is manmade vitreous fibers, correct?

16 A    Yes.

17 Q    All right.  And then at the bottom of that section they

18 say, "Yet as for chrysotile it cannot be excluded that these

19 fibers may have caused a tumor even if they are not present in

20 the lung tissue when it's diagnosed."  You see that?

21 A    Yes.

22 Q    What they're saying is that the fibers of either

23 chrysotile or MMVF can start the cancer process and may not

24 persist in the body to be detected upon autopsy, correct?

25 A    Yes.

1  Q    Now, the conclusions at the very bottom, the authors write

2  -- last two sentences of the paper. "These results confirm the

3  distinct dose response relationship with the interview study,

4  even in an accumulative exposure below one fiber year.  They

5  clearly support the outcome of the French mesothelioma case

6  control study."  That's what they concluded, correct?

7  A    May I point out that Dr. Rodelsperger had previously

8  concluded that brake mechanics are not at any increased risk of

9  mesothelioma?

10 Q    He concluded that in 1993, this paper is in 2001, correct?

11 A    Yes.

12 Q    Now, just so we're clear, up to now all my questions have

13 been about asbestos and mesothelioma and until I say otherwise,

14 you should assume that all my questions are about mesothelioma

15 and not the other asbestos diseases.  I think that's been clear

16 from the record and what I've done with you, but do you

17 understand that, have you understood my questions in that

18 context?

19 A    Yes.

20 Q    Could you turn in your notebook to ACC/FCR-289?

21 A    Yes.

22 Q    This is the Hodgson and Darnton paper on which you

23 partially rely for your opinions here?

24 A    Yes.

25 Q    Okay.  The authors of this paper make some statements

1  about the exposure and risk estimates, the exposure data that

2  they are relying upon in this, correct?

3  A    Yes.

4  Q    Could you turn to Page 567, under exposure specific risk

5  estimates?  They write, "It is generally assumed that the most

6  reliable guide to dose specific risk is provided by exposure

7  analyses using estimates of individual exposure.  This is

8  clearly the case when these individual exposure values can be

9  accurately determined.  However, this assumption is very much

10 not the case in the studies in this review.  Not only are there

11 inevitable problems of extrapolating earlier exposures on the

12 basis of more recent measurements, there are also problems of

13 converting the most usual historic measurements in terms of

14 particle counts to the more relevant measure of fiber counts.

15 Direct fiber counting only became generally used in the 1970s."

16 You see that?

17 A    Yes.

18 Q    And then on Page 597, they go through the cohorts

19 one-by-one in the right-hand column, fourth bullet down,

20 they've got the cohort of U.S. Canada insulators.  You see

21 that?

22 A    Yes.

23 Q    That's the Nicholson Selikoff insulator cohort used in the

24 1986 EPA study, correct?

25 A    Yes.

1  Q    And they say here, "The basis for the mean exposure in the

2  U.S. Canadian insulator cohort drawn from previous reviews is

3  very uncertain.  It is not based on averaging known or

4  estimated individual exposures.  It is plausible that

5  conditions may not have changed greatly over the relevant

6  period."  You see that?

7  A    Yes.

8            MS. HARDING:  Nate, where are you reading from?

9            MR. FINCH:  I was reading from Page 597.

10           MS. HARDING:  Thanks.

11  Q    Could you turn to Page 573?  This has a chart showing the

12  risk of lung cancer at various exposure cohorts.  You see that?

13  A    Yes.

14  Q    And that shows a wide band around the risks, some of the

15  cohorts, the 95 percent confidence intervals range from well

16  over 10 fiber milliliter years down to .01 correct?

17  A    That is not correct.

18  Q    Well, do you know what the range of exposure is in each of

19  those cohorts?

20  A    Mr. Finch, I think you're misunderstanding this figure

21  here.  It seems to me the Y axis is R Sub-L.  It's a measure of

22  risk.

23  Q    Relative risk of lung cancer.

24  A    It's not -- okay.  It's the relative excess risk that they

25  look at, but so, I think you misstated that question.  It's --

1  Q    Okay.  Then I'll withdraw the question.  You would agree

2  with me that each of the populations studied have a range of

3  exposures within them, correct?

4  A    Yes.

5  Q    And some of the ranges are well below -- the low end of

6  some of those ranges is well below 15 fiber years?

7  A    That's correct.

8  Q    And at Page 583, top of the right-hand column, the authors

9  write, talking about all of the observations, "All these

10 observations suggest that the relatively brief exposures may

11 carry a low, but non-zero risk of causing mesothelioma."  You

12 agree with that?

13 A    I can see that, yes.

14 Q    Do you agree with that?

15 A    I don't have enough evidence to support that statement.

16 Q    Okay.  You don't agree with it, and you don't disagree

17 with it?

18 A    Right.

19 Q    Okay.  On Page 584, they state that, in the left-hand

20 column, "A lifetime risk of one in a hundred thousand

21 corresponds to an annual risk well below one in a million which

22 HSC has suggested as a guideline for the boundary between the

23 broadly acceptable and tolerable regions of fatal risk to an

24 individual."  You see that?

25 A    Yes.

1  Q    And so what the HSC is, is the British government, right?

2  A    I assume so, yes.

3  Q    And what they're saying is that that's sort of the

4  boundary between what's an acceptable risk and what is not an

5  acceptable risk for exposures for death, correct?

6  A    Well, that's their opinion regarding acceptable risks,

7  yes.

8  Q    Okay.  And then on Page 585, there's a table for

9  mesothelioma and lung cancer risk, or risk summaries for

10  cumulative exposure of one fiber years?

11  A    Yes, I see that.

12  Q    And for amosite, the best estimate is about 90 deaths per

13  100,000 exposed?

14  A    Yes.

15  Q    That's 90 times what the HSC describes as an acceptable

16  boundary?

17         MS. HARDING:  Your Honor, I object to the relevance

18  of the regulatory standard in Britain for acceptable risk.

19         THE COURT:  Do we have any cases in Britain?

20         MR. FINCH:  I'll move on, Your Honor.

21  Q    The 90 deaths per 100,000 exposed is far in -- strike

22  that.  You are familiar with Dr. Nicholson's 1982 paper on the

23  projected population at risk for mesothelioma and lung cancer?

24  A    Yes, I am.

25  Q    Okay.  In the Redweld, Dr. Moolgavkar, there is a, I

Moolgavkar - Cross/Finch                    112

1  believe, a copy of that paper which has been marked

2  ACC/FCR Exhibit Number 1.

3  A    Yes, I have that.

4  Q    Okay.  And in this paper, Dr. Nicholson, at Page 287 has,

5  "The risk of asbestos cancer relative to insulation work after

6  25 years of exposure"?  See that?

7  A    Yes.

8  Q    Okay.  And so, for insulation work, that's the reference

9  population, that's the population as to which Dr. Nicholson has

10 estimates of exposure, correct?

11 A    That's correct.

12 Q    Okay.  And on the previous page he estimates that the

13 insulator exposure at an estimated fiber concentration of 15

14 while they're working, times however long they're working, and

15 that's based on some work he did in 1981.  You see that on

16 Table 15?

17 A    Yes.

18 Q    Okay.  Then for the next page, 287, for construction

19 trades, except insulators, he doesn't have any estimates of

20 exposure for construction trades, correct?

21 A    That's correct.

22 Q    He doesn't rely on any -- even though he may have

23 mentioned some exposure data related to construction workers,

24 he doesn't rely on that exposure data in the paper in

25 estimating the relative risk of mesothelioma, correct?

Moolgavkar - Cross/Finch                    113

1  A    That's correct.

2  Q    What, instead, he relies on is the number of mesothelioma

3  cases comparing the construction trades to the general

4  population as compared to the insulators?

5  A    Yes.

6        MR. FINCH:  Your Honor, may I inquire about your

7  plans for lunch?  I have a substantial additional amount to do.

8  Probably at least another hour.

9        THE COURT:  How long are you going to -- who is cross

10 examining for the FCR?

11       MR. ANSBORO:  I am, Your Honor.

12       THE COURT:  How long are you going to be?

13       MR. ANSBORO:  I would estimate 30 minutes at the

14 most.

15       THE COURT:  And redirect?

16       MS. HARDING:  Fifteen to 30 minutes, Your Honor,

17 depending on --

18       THE COURT:  All right.  So, about two hours.

19       MR. FINCH:  This is a good topical -- this is a good

20 stopping point because I'm moving to a new topic.  I can

21 continue, but I don't know if the witness would like a break

22 now or not.

23       THE COURT:  Well, this is probably a good place to

24 break.  Why don't we take a recess.   Can you all get down and

25 back in 45 minutes, or is that impossible in this building,

1  it's tough, I know, with the elevators.  No?

2            MR. FINCH:  An hour would probably be better.

3            THE COURT:  An hour?  All right.  We'll recess for

4  one hour.  We'll reconvene at 1:20.

5            MR. FINCH:  Thank you, Your Honor.

6            MS. HARDING:  Thank you, Your Honor.

7                      (Luncheon recess)

8            THE COURT:  Would you be seated?  Dr. Moolgavkar.

9  You're still under oath, doctor.

10            THE WITNESS:  Yes, ma'am.

11            THE COURT:  Mr. Finch.

12                (Pause - adjusting microphones)

13            THE COURT:  Okay, Mr. Finch, go ahead while they're

14  working through this.

15                  CONTINUED CROSS EXAMINATION

16  BY MR. FINCH:

17     Q    Nathan Finch for the Asbestos Claimants Committee.

18  Good afternoon, Dr. Moolgavkar.

19  A    Good afternoon.

20            MR. FINCH:  Just for the record, I didn't hear or

21  have anyone tell me anything that Mr. Bernick may have said in

22  the microphones.  I don't have any knowledge of what he would

23  have said to Ms. Harding.

24            MR. BERNICK:  I was being facetious.

25  Q    Dr. Moolgavkar, do you still have the books of exhibits in

Moolgavkar - Cross/Finch                    115

1  front of you, your expert witness reports and the other book

2  called ACC/FCR exhibits?

3  A    Yes.

4  Q    Would you turn to what has been previously marked in this

5  case as ACC/FCR-398?

6  A    Yes.

7  Q    And, again, unless I tell you otherwise, my questions are

8  going to focus on mesothelioma, okay, Dr. Moolgavkar?

9  A    Yes.

10 Q    You recognize ACC-398 as the summary document that are

11 sometimes called the Helsinki criteria for the asbestos,

12 asbestosis and cancer, the Helsinki criteria for diagnosis and

13 attribution?

14 A    Yes.

15 Q    And this summary document is actually the cover document

16 to a much larger document which has many, many citations to the

17 peer-reviewed literature, correct?

18 A    Yes.

19 Q    And this was an invited conference in 1997 on experts

20 related to asbestos disease from multiple disciplines, correct?

21 A    Yes.

22 Q    They had epidemiologists, correct?

23 A    Well, I'd have to look at the list of invitees before I

24 comment on that.

25 Q    Okay.  They had pathologists?

Moolgavkar - Cross/Finch                116

1  A    Yes.  That is correct.

2  Q    They had -- John Dement was one of the invitees, correct?

3  A    I don't have the list in front of me.

4  Q    If you turn to the last page, 316, the list of

5  participants begins on Page 315 and carries over to 316.

6  A    Yes, I see John Dement.

7  Q    He's an epidemiologist that did some of the studies, or at

8  least one of the studies that was included in the Hodgson and

9  Darnton?

10  A    The South Carolina cohort, yes.

11  Q    It includes Gunnar Hillerdal from Sweden?

12  A    Yes.

13  Q    It includes Klaus Rodelsperger, whose paper we just looked

14  at today?

15  A    Yes.

16  Q    It includes a Jonathan Parker?

17  A    I don't know him.

18  Q    Victor Roggli, you know Dr. Roggli?

19  A    He's not an epidemiologist.

20  Q    I know he's not an epidemiologist, he's a pathologist,

21  correct?

22  A    Yes.

23  Q    And Dr. Parker is an occupational medicine doctor,

24  correct?

25  A    I don't know him.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Could you turn to Page 313?

2  A    Yes.

3  Q    Under mesothelioma.  The authors of the Helsinki criteria

4  write, "A lung fiber count exceeding the background range for

5  the laboratory in question or the presence of radiographic or

6  pathological evidence of asbestos-related tissue injury, e.g.,

7  asbestosis or pleuroplax, or histopatologic evidence of

8  abnormal asbestos content, e.g., asbestos bodies in the

9  histologic sections of the lung should be sufficient to relate

10 a case of pleuro-mesothelioma to asbestos exposure on a

11 probability basis."  Do you agree with that, or disagree with

12 that?

13 A    Oh, I disagree with that, totally.

14 Q    Okay.  "In the absence of such markers a history of

15 significant occupational domestic or environmental exposure to

16 asbestos will suffice for attribution".  Do you agree with that

17 or disagree with that?

18 A    You're still talking about mesothelioma here, right?

19 Q    Mesothelioma.

20 A    No, I disagree.

21 Q    Okay.  The bullet points below that, "The great majority

22 of mesotheliomas are due to asbestos exposure."  Do you agree

23 with that, or disagree with that?

24 A    Well, I think it depends on whether you're talking about

25 men or women.  It depends on whether you're talking about

1 pleuro-mesothelioma or peritoneal mesothelioma.  I have to

2 disagree with that statement the way it is made here.

3 Q    What about the statement about 80 percent of mesothelioma

4 patients have had some occupational exposure to asbestos and,

5 therefore, a careful occupational and environmental history

6 should be taken?

7 A    I have no way to check the veracity of that first

8 statement, which is a fact in quotes, but that a careful

9 occupational and environmental history should be taken, that

10 certainly -- I would agree with that.

11 Q    Okay.  What about the bullet point an occupational history

12 of brief or low level exposure should be considered sufficient

13 for mesothelioma to be designated as occupationally related?

14 A    I disagree.

15 Q    You disagree with that.  Were you aware that Dr. John

16 Parker is one of the experts for W.R. Grace in this case?

17 A    I told you I don't know Mr. John Parker.

18 Q    Okay.  So, if he testified that in his view a vanishingly

19 trivially small exposure to asbestos could cause mesothelioma,

20 I take it you would disagree with him, too?

21 A    Yes, I would.

22 Q    Sticking with the Helsinki criteria, Page 314.  And this

23 is the only set of questions I'm going to ask you about lung

24 cancer for right now.  The Helsinki criteria also have

25 diagnostic criteria for lung cancer as well as mesothelioma,

1 correct?

2 A     Diagnostic criteria?

3 Q     Diagnostic and -- excuse me, attribution criteria.

4 A     Okay.  Yes.

5 Q     At the bottom of Page 314, left-hand column, they write,

6 "For example, relative risk is roughly double for cohorts

7 exposed to asbestos fiber at a cumulative exposure of 25 fiber

8 years, are within equivalent occupational history, at which

9 level asbestosis may or may not be present or detectable."  Do

10 you agree with that or disagree with that?

11 A     That's a compound statement.  I actually -- I'd like to

12 take that apart.

13 Q     Okay.  Let me ask it in two different questions.  Do you

14 agree that relative risk is roughly doubled -- of lung cancer

15 is roughly double for cohorts exposed to asbestos fiber at a

16 cumulatively exposure level of 25 fiber years?

17 A     No, I don't agree.  I showed you my estimates of doubling

18 doses earlier.

19 Q     You show your calculations of doubling-dose?

20 A     Yes.

21 Q     And according to the 20 authors of the Helsinki criteria,

22 25 fiber years is sufficient to double the risk of lung cancer,

23 correct?

24 A     Mr. Finch, you keep on showing me papers from 1965,

25 Newhouse and Thompson, the early 1980s, 1997.  Why don't we

1 talk about the contemporary literature?  This Helsinki criteria

2 document was produced before Hodgson and Darnton and before

3 Berman and Crump, 2003.  So, let's keep at least the sequence

4 of events clear.

5 Q    It's correct, is it not, that Berman and Crump hasn't been

6 adopted as the official position of any governmental agency,

7 correct?

8 A    That is correct, but it is also true that it has undergone

9 pretty tough peer review.

10 Q    The Helsinki criteria -- let me back up.  The Helsinki

11 criteria, as far as you know, have not been repudiated by the

12 authors.

13 A    No.  The authors reached consensus, but I'm afraid that

14 the obtaining of consensus depends very much on who is invited

15 to these meetings.

16 Q    We've been talking about the medical literature and now I

17 want to focus you in on your calculations of the doubling-dose

18 for mesothelioma.  We're back to mesothelioma questions.

19 A    Okay.

20         MR. FINCH:  Okay.  Can I have the slide show?

21 Q    You recognize that as Dr. Peto's formula for mesothelioma

22 risk, correct?

23         THE COURT:  What exhibit is this, please?

24         MR. FINCH:  It's not an exhibit, it's just on the --

25 it's just a demonstrative, Your Honor.  I could mark it as an

1 exhibit.

2           THE COURT:  Well, I thought he had one that was an

3 exhibit.  I guess it was similar but not the same.  It's just

4 going to be difficult to refer to anything later, if you need

5 me to look at something if I don't have a copy of it somewhere.

6           MR. FINCH:  I can mark it for demonstrative purposes

7 at the end, if that would --

8           THE COURT:  That would be helpful, please.

9           MR. FINCH:  Okay, but for time being --

10          UNIDENTIFIED SPEAKER:  Your Honor, if I could make a

11 suggestion.  Why don't we just give it a number now, otherwise

12 --

13          THE COURT:  Yes, we will give it a number now and get

14 a copy of it later.

15          MR. FINCH:  Okay.

16          THE COURT:  So, if you could --

17          MR. FINCH:  Okay, let's -- what's the next in the

18 series, Dave?  All right.  This will be for purposes of

19 identification Exhibit 2086.

20          THE COURT:  All right.

21          MR. FINCH:  ACC-2086.

22          THE COURT:  Thank you.

23 Q   All right.  Just so we know where this comes from, Dr.

24 Moolgavkar, you have in your second report, at Page 7, you set

25 forth the formula developed by Dr. Peto, correct?

1  A    Right.

2  Q    Okay.  And what I've shown on this slide here is that

3  formula which shows the Peto formula for mesothelioma risk,

4  correct?

5  A    Yes.

6  Q    Okay.  And the various variables, RM is the mortality rate

7  for mesothelioma, the F is the exposure concentration in fiber

8  milliliters, correct?

9  A    Yes.

10 Q    T is the years after the start of exposure, correct?

11 A    Yes.

12 Q    D is the duration of exposure, correct?

13 A    Yes.

14 Q    And, KM is an asbestos fiber potency factor, correct?

15 A    Correct.

16 Q    And this formula is the formula that was used in the 1986

17 EPA risk assessment paper, correct?

18 A    Yeah, the Nicholson paper.

19 Q    And you regard it as a scientifically valid way to

20 estimate mesothelioma risk.

21 A    Yes.

22 Q    Okay.  Now --

23 A    I mean, it's one accepted mathematical formula for

24 mesothelioma risk.

25 Q    Okay.  And the other is the Hodgson and Darnton?

1  A    Yes.

2  Q    All right.  Now, the next slide.  Now, what that formula

3  tells you is the probability that any particular time to

4  compute the total probability of mesothelioma, the risk has to

5  be summed over the number of years in which you're interested,

6  correct?

7  A    Right.

8  Q    And so, to calculate a lifetime risk of mesothelioma, the

9  equation is integrated between the limits of time, T, between

10 10 and 55 correct?

11 A    Yes.

12 Q    And integration is just a -- it's been a long time since

13 I've had calculus, but could you describe for the Court what

14 integration is?

15 A    Well, it's just a way of summing up over small intervals.

16 Q    It's a way of summing up the areas under a curve?

17 A    Right.

18 Q    Okay.  And, then you set, in your calculations, you set T

19 at 45 because that's the interval between 10 and 55, correct?

20 A    That's correct.

21 Q    Okay.  And then to find the doubling-dose, what you did is

22 you set the lifetime risk of meso, you call that P, to twice

23 the background rate of mesothelioma, so P equals two times

24 background rate times 45 to the fourth, times of potency

25 factor, times the fibers divided by four, correct?

1  A    Well, it should not be the background rate of

2  mesothelioma, it should be the lifetime probability of

3  spontaneous mesothelioma.

4  Q    Okay.  The lifetime probability.  For purposes of this set

5  of slides, if we could say BGR equals lifetime probability for

6  mesothelioma?

7  A    Yes.

8  Q    Okay.  And so, if you want to figure out what the

9  doubling-dose is, you have to solve that equation for the fiber

10 -- concentration, F, correct?

11 A    That's correct.

12 Q    And that's what you did in your calculations, the results

13 of which are shown at the back of your second report?

14 A    Correct.

15 Q    Okay.  So, doing the math here, if you've got P equals 2

16 times BGR, which is actually the lifetime probability of

17 mesothelioma, you multiply a four on each side that gets you to

18 four times two, times BGR equals 45 to the fourth, times the

19 potency factor times the fiber, correct?

20 A    Yeah, fiber concentration.

21 Q    Okay.  And then to solve for the fiber concentration all

22 you do is you take the four times the two, times the background

23 rate and divide it by 45 to the fourth, times the potency

24 factor, correct?

25 A    Yes.

1          THE COURT:  I hope nobody is going to expect anybody

2    to make any sense out of this record when they read it.  You

3    better have the exhibits available.

4          MR. FINCH:  I will offer the demonstrative for Your

5    Honor.

6          THE COURT:  All right.

7    Q    The -- so since you wanted to find the doubling-dose for

8    cumulative exposure, you set the cumulative exposure to 45

9    years, and that results in a doubling-dose formula of four

10   times two times the lifetime probability of mesothelioma

11   divided by 45 cubed, times the potency factor, is that correct?

12   A    The -- would you go back to the previous one?

13                        (Pause)

14   A    Yes, okay.  That's correct.

15   Q    Okay.  So the formula for the doubling-dose is a

16   mathematical formula, which is four times two times the

17   lifetime rate -- background rate of meso, divided by 45 cubed

18   time the potency factor, right?

19   A    Yeah.

20         THE COURT:  Except it's not the background rate.

21   It's the lifetime probability of spontaneous meso.

22         Q    Yes, it's the lifetime probability of -- your

23   calculation of the lifetime probability of spontaneous

24   mesothelioma.

25         MS. HARDING:  Object to form.  It lacks foundation.

1    You said it was your calculation of the lifetime --

2            MR. FINCH:   Okay.

3    Q    Dr. Moolgavkar, the BGR is not background rate of

4    mesothelioma, it's the -- it is an input that you derive from

5    Price and Ware, correct?

6    A    That's correct.

7    Q    And it's the lifetime -- the estimated lifetime risk of

8    developing mesothelioma from spontaneous causes, correct?

9    A    That's correct.

10   Q    All right.  And then this is how you reach your

11   doubling-dose of 3.2 fiber years for mesothelioma, correct?

12   A    Yes.

13   Q    Okay.  Now, if there is a -- would you agree with me that

14   if the lifetime rate is 3.6 times ten to the minus four is

15   approximately equivalent to four cases per million people per

16   year, that if you cut the number of cases per million people

17   per year in half that the lifetime rate would approximately be

18   cut in half, as well?

19   A    Well, I think you're confusing two different concepts

20   here.  I don't know where you got this figure, four per million

21   per year is equivalent to 3.6 times ten to the minus four

22   lifetime probability.  I don't know where that came from.

23   Q    Okay.  You have relied in coming up with the background

24   rate --

25   A    Okay, maybe I can help you here.  You can't take that age

1  adjusted rate in Price and Ware and convert that directly to a
2  lifetime probability.  So maybe we can avoid this whole
3  sequence of questions.
4  Q    Okay.  Let me take the Price and Ware article.  Could you
5  turn in your book to ACC/FCR-560?  Do you recognize that as the
6  Price and Ware article from which you derive your lifetime
7  background risk for mesothelioma?
8  A    Yes, I do.
9  Q    All right.  The -- Page 111, they write, in the bottom
10 left-hand column, "If all female cases of mesothelioma were
11 unrelated to asbestos exposure -- "
12 A    Yes.
13 Q    " -- our analysis indicates that the lifetime background
14 rate -- risk would be 3.6 times ten to the minus fourth, and
15 the current annual risk would be approximately four per
16 million."
17 A    Yes.  Those are two separate statements of fact, but the
18 four per million adjusted risk does not necessarily translate
19 into 3.6 times ten to the minus four lifetime probability.
20 Q    It's -- it -- but there's a mathematical relationship
21 between the two, correct?
22 A    Not an obvious and clear one.
23 Q    Would you agree with me that if the annual risk for
24 mesothelioma is cut in half for all the periods you're
25 interested in, that the lifetime risk would be cut in half as

1  well?

2  A    It depends on what lifetime risk you're looking at.  This

3  lifetime risk is for cohorts of women; that is, women born at

4  different periods of time, whereas the incidence rate of

5  mesothelioma is being computed for single periods, or single

6  years.  So it's not a clear-cut relationship here.  So to try

7  and explain this a little further, what you're interested in is

8  the following.  You want to take an individual born at a

9  certain period of time, let's say in the year 2000.  You want

10 to follow that individual over his or her entire lifetime.  You

11 can decide maybe the lifetime is 75 or 80 years.  And you want

12 to compute the probability that that individual would get

13 mesothelioma.  That's the lifetime background probability of

14 mesothelioma.

15         On the other hand, if in the year 2000 you look at

16 the incidence rate of mesothelioma in the entire population,

17 you're looking at people of all different ages in the year

18 2000.  They're born at different periods of time.  They may

19 have different risks of spontaneous mesothelioma, and,

20 therefore, you cannot use this to translate -- it cannot be

21 easily translated one number into another.

22 Q    It can't be easily translated, but would you agree with me

23 generally that if you cut the annual background risk of

24 mesothelioma in half for all the cohorts you studied, it's

25 going to have -- it's going to reduce the lifetime rate?

1 A    Yes, that I'll grant you.

2 Q    Okay.  So it would reduce it somewhat.  You just don't

3 know how much.

4 A    Exactly.

5 Q    Okay.  Now, would you agree with me, Price and Ware say if

6 all female cases of mesothelioma were unrelated to asbestos

7 exposure, their analysis indicates that the lifetime background

8 risk would be 3.6 times ten to the minus fourth, correct?

9 A    That's correct.

10 Q    All right.  If half of the female cases of mesothelioma

11 were asbestos-related, then the lifetime background risk would

12 be half of that, correct?

13 A    Approximately that, yes.

14 Q    Okay.  And if three-quarters of the female cases of

15 mesothelioma were related to asbestos, then the lifetime

16 background risk would be one-quarter of 3.6 times ten to the

17 minus fourth?

18 A    Yes, but I should point out that I have made a number of

19 conservative assumptions in this calculation which I would be

20 happy to discuss with you now or take up at redirect.

21 Q    Take them up at redirect, please.  Now, you relied on

22 Price and Ware's 2004 paper, correct?

23 A    Yes.

24 Q    Okay.  Now, are you aware that Dr. Price -- and this is a

25 paper talking about the incidence of mesothelioma trends in the

1  United States, correct?

2  A    Yes.

3  Q    And in this paper Dr. Price opines that the peak period

4  for mesothelioma in the United States is the 2000/2004 time

5  period, correct?

6  A    I'd like to see that statement.

7  Q    If you look at the graphic, Figure 2 on Page 109.

8  A    Yes.

9  Q    You see that the -- his projected time course of

10  mesothelioma peaks about the year 2000 to 2004 for males?

11  A    Yeah, I can eyeball that.  Yes.

12  Q    Okay.  So -- and he shows data on the -- I take it you

13  don't dispute -- or you don't dispute one way or the other that

14  the peak period for the mesothelioma incidence in the United

15  States was in the time period 2000/2004?

16  A    No.  Thereabouts.

17  Q    Okay.  Now, are you aware that Dr. Price wrote a paper on

18  mesothelioma incidence in 1997?

19  A    I have a vague recollection of that.

20  Q    Could you turn to ACC/FCR-2029?  This is Dr. Price's 1997

21  analysis of current trends in the United States mesothelioma

22  incidence.

23  A    Yes.

24  Q    And on Page 211 he writes, bottom right-hand, "The results

25  of the analysis show the downward direction of mesothelioma

1 incidence in the United States."  See that?

2 A    Yes.

3 Q    And he's got a graphic on Page 213.  That graphic plots

4 the mesothelioma incidence in the United States.

5 A    Yes.

6 Q    And so Dr. Price is opining that that incidence of

7 mesothelioma shows a declining trend.

8 A    Well, I don't see any declining trend for males.

9 Q    Not one for females either.

10 A    No, it shows more or less a flat pattern for females.

11 Q    But, for males it's certainly not declining in 1997,

12 correct?

13 A    That's correct.

14 Q    And that didn't cause you to go back and question Dr.

15 Price's work?

16 A    Mr. Finch, this is in The American Journal of

17 Epidemiology, one of the best journals in the world is what you

18 told me just a couple of hours ago.  No, I would certainly

19 question his work.  I would question his conclusions.  And you

20 know that when I was asked in deposition whether I agreed with

21 everything that Dr. Price said, I clearly indicated that there

22 were a couple of paragraphs that I disagreed with strongly.

23 Q    Okay.  Let's go back to your calculations.  You have --

24         THE COURT:  Pardon me.  Could you put that exhibit

25 back up please, just the one immediately before, for me?  I

1   can't see what the description of the bottom line is, but is it

2   the year?

3           MR. FINCH:  The year.

4           THE COURT:  Okay.  Well, doesn't he say it peaked in

5   2000 to 2004?  This ends in 1995.

6           MR. FINCH:  My point is in 1997, Your Honor, he said

7   it had peaked before that and that the --

8           THE COURT:  I thought you said he said it peaked

9   between 2000 and 2004.

10          MR. FINCH:  Let me back up.

11  Q    Dr. Moolgavkar, in the 2004 paper, Dr. Price estimated

12  that mesothelioma incidence in the U.S. peaked in the 2000/2004

13  time frame, right?

14  A    Yes.

15  Q    Okay.  And in 1997, he wrote a paper where he said based

16  on data he had since 1992, mesothelioma incidence was

17  declining, right?

18  A    I'd have to go back and read this paper carefully to see

19  exactly what Dr. Price was saying.  I can't believe that such

20  an obvious discrepancy between his conclusion and this figure

21  could have passed the referee and the readers of this paper.

22  Q    Okay.

23  A    So, I agree that if I take your statement at face value

24  this figure does not make sense.  But, he went back in 2004,

25  did another paper and the details of that appear to be quite

1  correct.

2  Q    Okay.  What the 1997 paper -- this is -- we're looking at

3  a 1997 paper.  There were two different papers of Price and --

4  A    Right.  So I concede the point --

5  Q    -- Price, and this is the 1997 work?

6  A    I concede the point in the '97 paper.

7         MR. FINCH:  Okay.  May I move on, Your Honor?

8         THE COURT:  Yes, sir.  I understand now.  Thank you.

9  Q    All right.  Now, your doubling-dose is 3.2 fiber years,

10 and would you agree with me that under precepts of basic

11 algebra if they're all positive integers, if the -- positive

12 numbers, if you cut the lifetime background risk of

13 mesothelioma in half, it's going to cut your doubling-dose in

14 half?

15 A    Let me point out that you are first of all pointing to

16 only one of my estimates of doubling-dose.  This is a

17 doubling-dose that is heavily dominated by chrysotilite fibers,

18 okay.  So let me say that first.  And then I agree with your

19 algebra.  If you cut the background rates by half, the

20 doubling-dose also decreases by half.

21 Q    And -- so that would make your doubling-dose 1.6 fiber

22 years if the background rate was not -- was -- if 50 percent of

23 the mesothelioma in women was attributable to asbestos?

24 A    As I said, it would have to be constant across cohorts.

25 The age-adjusted incidence does not translate readily into

1  lifetime probability.

2  Q    But, if you cut --

3  A    But, I grant you the point.  There would be a decrease.

4  Q    And similarly, if you -- if 75 percent of the mesothelioma

5  in women was attributed to asbestos exposure, you would concede

6  that that would lower the lifetime risk from -- excuse me --

7  that would lower your doubling-dose from 3.2 to 0.8, correct?

8  A    Yes.

9  Q    Now, you, in your various reports, reported that the

10 background incidence of mesothelioma was in the range of one

11 case per million per year to four cases per million per year,

12 correct?

13 A    I believe I've said two to four.  That's what I currently

14 -- that's the opinion I hold currently.

15 Q    And you recognize that there are researchers in the

16 literature who hold the opinion that the incidence of

17 mesothelioma in those not exposed to asbestos is of the order

18 of one per million per year?

19 A    I'm aware of that, yes.

20 Q    And you're aware that -- were you aware that Julian Peto

21 holds that view?

22 A    No, that I wasn't aware of.

23         MR. FINCH:  Could we have ACC/FCR-2085?

24 Q    You would recognize Dr. Peto as an expert in epidemiology,

25 correct?

1  A    Yeah, definitely.

2  Q    This is an article, Peto, Henderson and Pike, "Trends in

3  Mesothelioma Incidence in the United States," and they write,

4  "The incidence of mesothelioma in those not exposed to asbestos

5  is in the order of one per million per annum."

6           THE COURT:  Mr. Finch, you're fading out when you --

7           MR. FINCH:  Yes, sure.

8  Q    "The incidence of mesothelioma in those not exposed to

9  asbestos is of the order of one per million per annum."  See

10 that?

11 A    Okay.  Yeah, I certainly see that, but with all due

12 respect to Mr. -- to Dr. Peto, to Brian Henderson -- you know,

13 the others, Malcolm Pike, these are all epidemiologists who are

14 well known to me -- I would like to know how -- when they wrote

15 this paper.  I'm not sure when this paper appeared.  When did

16 it appear?

17          UNIDENTIFIED ATTORNEY:  Yes.  What is the date?

18 Q    I believe the paper appeared in the mid-1980s.

19 A    Okay.

20          UNIDENTIFIED ATTORNEY:  1981 --

21          MS. HARDING:  I think that's -- I think it's 1981.

22 A    So, we are going back to 1981 when good registry data was

23 not available, and they probably made a guess like everybody

24 else did, and so I'd like to know how they came up with that

25 figure before I agree with it.  I respect all three

1 individuals, but I'm not sure how they came up with that

2 figure, because they didn't have the data at that time to come

3 up with this.

4 Q    Now, you quote -- in your second report, you have a

5 statement that -- on Page 11 of your second report, "In

6 epidemiologic studies of mesothelioma, at least 20 to 30

7 percent of the cases have no evidence of exposure to asbestos,

8 citing Spertus, et al., 1995."  Recall that?

9         THE COURT:  Mr. Finch, I'm sorry.  You said that so

10 fast I just can't --

11        MR. FINCH:  Sorry.  I'm sorry, Your Honor.

12        THE COURT:  I can't get it when you talk that fast.

13        MR. FINCH:  Okay.

14        THE COURT:  I'm sorry.

15 Q    On Page 11 of your second -- of your first report, excuse

16 me, first report --

17        THE COURT:  What exhibit, please?

18        MR. FINCH:  Exhibit 537.

19        THE COURT:  Okay.

20 Q    You write, "In epidemiologic studies of mesothelioma, at

21 least 20 to 30 percent of cases have no evidence of exposure to

22 asbestos," and one of the people you cite is a Spertus article

23 from 1995?

24 A    Yes.  In fact, Spertus states, as I recall, that between

25 13 percent and a hundred percent of cases report no exposure,

1 depending on which study you look at.

2 Q    Okay.  Could you turn to Exhibit 2057 in your exhibit

3 book?

4 A    Yes.

5 Q    This is the Spertus article you're citing, "Malignant

6 Mesothelioma, Attributable Risks of Asbestos Exposure"?

7 A    Yes.

8 Q    And here they identify potential cases of mesothelioma

9 from the New York State Health Department, and Los Angeles

10 County and the Veterans Administration?

11 A    That's correct.

12 Q    Would you turn to Page 807?

13          UNIDENTIFIED ATTORNEY:  What's the number --

14          THE COURT:  2057.

15          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

16 Q    See Table 2 there --

17 A    Yes.

18 Q    -- Dr. Moolgavkar?

19 A    Yes.

20 Q    All right.  Now, cases are the people with mesothelioma

21 and controls are people without mesothelioma, correct?

22 A    That's correct.

23 Q    And the overall reported exposure to asbestos -- the

24 potential reported exposure to asbestos is almost 90 percent,

25 correct?

1  A    In this particular case-control study, yes.

2  Q    Okay.  And then --

3  A    But, I might point out to you that in controls, it's just

4  16.9 percent.

5  Q    In -- on Page 809, bottom right paragraph --

6  A    Excuse me.  Could we go back to that once again, please?

7           UNIDENTIFIED ATTORNEY:  What was the page number?

8           MR. FINCH:  I'd like to go to Page 809.

9           THE COURT:  No, the witness is asking if he could see

10 the Table 2.

11          MR. FINCH:  Oh, the previous page was 807.

12 A    Let's look at that.  Frequency and percentage of cases in

13 controls with reported exposure to asbestos, ever exposed to

14 asbestos cases, 129, 62 percent.  So I'm not sure where you get

15 your 90 percent from.

16 Q    Would you -- will you agree with me that with the way they

17 did this survey, they first ask the people, were you exposed to

18 asbestos, and then they ask them if they did a series of jobs

19 where there was likely to be exposure to asbestos?

20 A    Yes.  So you're combining those two categories.

21 Q    Yes.

22 A    Let's be very clear about that then, that you're looking

23 at not only people who were exposed to asbestos but who think

24 they might have been exposed to asbestos.

25 Q    Would you agree with me that people can be exposed to

1 asbestos and not know it?

2 A    Yes, of course.

3 Q    And --

4         MS. HARDING:  Your Honor, I'm just going to object

5 because Mr. Finch represented 90 percent.  So it's just unclear

6 on the record what exactly that is.

7         MR. FINCH:  It's the number at the bottom that --

8 Q    All right, overall reported exposure to asbestos,

9 potential was almost 90 percent, correct, Dr. Moolgavkar?

10 A    Well, potential is not actual, and those who actually

11 remembered exposure to asbestos, at any time ever exposed to

12 asbestos, is only 62 percent.

13 Q    Okay.  But would you agree with me that just because

14 somebody doesn't remember they were exposed to asbestos doesn't

15 mean that they weren't exposed to asbestos?

16 A    No, I agree with you on that, but I will not interpret

17 this 90 percent, as you were trying to suggest, as the number

18 of mesothelioma cases that were exposed to asbestos.  That is

19 the wrong interpretation.

20 Q    The authors of this paper reported also, did they not,

21 that over 50 percent of the female cases reported some exposure

22 to asbestos --

23 A    Okay --

24 Q    -- on page 809?

25 A    Yeah.  Well, if we cut to the chase here, this is one --

1 this is the only paper that has properly computed or estimated

2 attributable risk, and they conclude that among females, 23

3 percent of pleural and peritoneal mesotheliomas combined are

4 attributable to asbestos exposure.

5 Q    And their 95 percent confidence interval with that was

6 between three and 72 percent, correct?

7 A    Yes, but we take the best value, the maximum likelihood

8 value.

9 Q    Could you turn in your book to ACC-2054?  Are you familiar

10 with this paper by Leigh, "Malignant Mesothelioma in

11 Australia"?

12 A    Yes, I am.

13 Q    Here, in the abstract -- excuse me -- in the -- I guess in

14 the abstract, under "Results," they write, "In 88 percent male,

15 90 percent female, 61 percent of cases, a history of asbestos

16 exposure was obtained"?

17 A    Well, the first comment I would like -- yes, that's what

18 they do conclude, but the first comment I would like to make

19 here is that the attributable fraction, or the etiologic

20 fraction or the number of cases attributable to a specific

21 exposure, depends very much on the population that you're

22 studying, and it is well-known that the Australian population

23 is exposed to much more asbestos than the population in

24 America.  So you can't translate those results to the United

25 States.

1  Q    Doesn't this paper also report that even in the group with

2  no known history of exposure 81 percent had fiber counts of

3  asbestos exposure in their lung --

4            THE COURT:  Mr. Finch, what's the relevance?  Are we

5  going to have claims from Australia?

6            MR. FINCH:  No, Your Honor.  The point -- the

7  relevance is that people can be -- can be exposed to asbestos

8  and not know it and report that there is no asbestos exposure

9  and that on examination of the tissue in their lungs there is

10 significant excess asbestos fibers.

11 Q    You would agree with that, would you not, Dr. Moolgavkar?

12 A    May I answer that, Your Honor?

13           THE COURT:  I hope you would, sir.

14 A    Well, I would agree that you would find asbestos fibers in

15 the lung without any previous history of asbestos exposure in

16 an occupation, but we are all exposed to asbestos in the

17 environment, and in the urban environment there's a lot more

18 asbestos than in the rural environment.  I guess if you examine

19 the lungs of anybody in this room today, you'd find asbestos

20 fibers.

21 Q    But you would find --

22 A    So, I'm not sure what you're trying to say.

23 Q    -- far less asbestos -- if asbestos -- if more than --

24 would you -- well, you're not a pathologist are you, Dr.

25 Moolgavkar?

1  A    I'm not a pathologist.  I'm just using my common sense

2  here.

3  Q    You don't have any opinion as to what level of asbestos

4  fibers in the lung indicate an exposure to asbestos well in

5  excess of the background that we all breathe?

6         MS. HARDING:  Your Honor, I'm just going to object to

7  the continuing line of questioning.  He's not a pathologist.

8  He's -- I don't know why he's asking about fiber burdens in the

9  lung, but --

10         THE COURT:  He wants to get into the history of

11  exposure in every country in the world.  You know, I don't know

12  what the relevance is, Mr. Finch.

13         MR. FINCH:  I'll move on, Your Honor.

14  Q    Dr. Moolgavkar, the other -- back to the slide show.  The

15  other factor in your doubling-dose calculation is the potency

16  factor, correct?

17  A    That's the K Sub-M?

18  Q    Yes, K Sub-M --

19  A    That's --

20  Q    -- for mesothelioma.

21  A    That's correct.

22  Q    And in the Redweld in front of you there should be the

23  "1986 Airborne Asbestos Health Assessment Update."

24  A    Yes.

25  Q    And you derive your K Sub-M, your potency factor for the

1  all fibers from that document, correct?

2              THE COURT:  What's the exhibit, please?

3              MR. FINCH:  It's Exhibit ACC/FCR-298.

4              THE COURT:  All right.

5  A    Yes, I believe this is the document, but it's so big I'm

6  going to have -- you know, it's going to take me some time to

7  find it.

8  Q    I might be able to point you to that.

9  A    Because it's the consensus estimate based on all four

10 cohorts that I'm interested in.

11 Q    Okay.  There are -- Page 90, those are the four cohorts

12 from which the various K Sub-M is calculated.

13 A    Okay.  Are you saying that it's not ten to the minus

14 eight, is that what you're saying?

15 Q    No, I agree with you it's ten to the minus eight.

16 A    Okay --

17 Q    But there were four -- and as you put on one of your

18 slides in direct, there were four cohort studies that the EPA

19 relied on to estimate the risk of mesothelioma, correct?

20 A    Correct.

21 Q    For the mesothelioma, and --

22 A    Yes.

23 Q    -- would you agree with me that on Page 3-30 that lists

24 those four cohort studies and an estimated K Sub-M for each of

25 them?

1  A    Yes.

2  Q    Okay.  So, you've got the insulation workers for Selikoff,

3  et al.  There the K Sub-M is 1.5 times ten to the minus eight?

4  A    Yes.

5  Q    Okay.  And would you agree with me as a matter of

6  mathematics, if you increase the K Sub-M, you decrease the

7  doubling-dose?

8  A    Well, I know exactly where you're going with this, Mr.

9  Finch.  You can take this range of K Sub-M values and you would

10 get different estimates of doubling-dose.  I agree with that

11 completely.  All I'm saying is that I took the one single

12 consensus estimate presented in this document, which according

13 --

14 Q    Okay --

15 A    -- which in Nicholson's judgment was the best estimate.

16 Q    Okay.  And the consensus was one times ten to the minus

17 eight, which happens to be the same K Sub-M for the textile

18 workers, and that refers to a Peto 1980?

19 A    Yes.

20 Q    All right.  That's the textile products manufacturer in

21 Rochedale, England?

22 A    Yes.

23 Q    Would you turn to Page 56?

24 A    Yes.

25 Q    This is a textile products manufacturing, Rochedale -- go

1  to the bottom of the page, John -- textile products

2  manufacturing, Rochedale, England, and this is the Peto study

3  they're talking about?

4  A    Yes.

5  Q    And they classify this as chrysotile?

6  A    Well, it's not chrysotile.  We know that.

7  Q    We know that 97 percent of their fiber was chrysotile.

8  A    Well, we know that given the different potencies of the

9  amphibole and the chrysotile, it's not correct to call this a

10  chrysotile cohort, and you know --

11 Q    Well, the --

12 A    -- you know, Mr. Finch, that in Hodgson & Darnton this is

13 not called a chrysotile cohort, and --

14 Q    In --

15 A    So to pull up this old reference and call it a chrysotile

16 cohort I think is unfair.

17 Q    Well, in any event, the EPA -- vast majority of the fiber

18 was chrysotile, correct?

19 A    That's why I called it a mixed fiber estimate.

20 Q    Okay.  So it's a mixed fiber estimate.  Don't they also

21 say that before 1951 there's no measurements of dust

22 concentration?

23 A    Yes.  If you're getting back into exposure issues, what I

24 said in my direct was that the exposure of information, if it

25 was good enough for the EPA, if it was good enough for Berman

1  and Crump and if it was good enough for Hodgson & Darnton, it's

2  good enough for me to draw my conclusions.

3  Q    Okay.  On Page 95 doesn't the -- Page 95 of the EPA

4  document, bottom of the page, the EPA talks about the 95

5  percent confidence limits on the estimated value of K Sub-L and

6  K Sub-M?

7  A    Yes.

8              UNIDENTIFIED ATTORNEY:  What exhibit are we --

9              MR. FINCH:  The same exhibit.  The same -- it's the

10  -- 298.

11             UNIDENTIFIED ATTORNEY:  Page 95?

12  Q    Page 95, bottom right-hand corner.  EPA writes, "While it

13  is not possible to estimate the 95 percent confidence limit

14  directly, a factor of five would appear to be reasonable for

15  the average value of K Sub-M and a factor of 20 on its

16  application to any unknown exposure circumstance."  Do you see

17  that?

18  A    Yes, and I agree that there are a great many uncertainties

19  in the estimates that I've presented here.  What I have tried

20  to do is present the best estimate based on what's called the

21  central, or the best estimate of the parameters available in

22  the literature, and I'm willing to concede that there are a

23  great many uncertainties that illustrates the point that I'm

24  trying to make, that we know very little about what is going on

25  in the low dose region, 15 fibers per mil years.

1  Q    Okay.  And the EPA says that there could be a factor of 20

2  for the K Sub-M, correct?

3  A    There's a great deal of uncertainty, yes.

4  Q    So, K Sub-M could be 20 times bigger or 20 times smaller,

5  correct?

6  A    Yes.

7  Q    And if K Sub-M is, in fact, 20 times bigger, then your

8  doubling-dose estimate would be 20 times smaller, right?

9  A    Yes.  I might also point out, Mr. Finch, that I have used

10 K Sub-Ms from more recent literature, like Berman and Crump,

11 which have less uncertainty attached to them.

12 Q    Do you agree that the contribution to risk of mesothelioma

13 made by any specific exposure will depend on how that exposure

14 fits into the general pattern of exposure to asbestos for that

15 individual?  Do you agree with that?

16 A    Well, if the exposure you're talking about is large

17 enough, I would agree with that.  If the exposure is low, I

18 don't know that it would contribute anything.  But if you want

19 me to assume that it contributes something to the risk, then I

20 would be able to answer your question.

21 Q    Would you also agree that whether or not a given asbestos

22 exposure contributed to the risk of mesothelioma turns on the

23 individual facts and circumstances of an individual person's

24 history?

25 A    I'm sorry, I don't understand what that means.

1 Q    Would you agree with me that in order to determine whether

2 a given asbestos exposure caused or contributed to causing

3 mesothelioma in a person, you'd have to look at the individual

4 facts and circumstances specific to that person, correct?

5 A    Well --

6             MS. HARDING:  I object to foundation, but --

7             THE COURT:  You've spent a long time arguing that

8 this is beyond this witness's expertise, but if you want an

9 answer --

10            MR. FINCH:  Okay.  I'll withdraw it.  Let me ask a

11 different question.

12 Q    You wrote in your third report that, "While such detailed

13 exposure information is not usually available, at the very

14 least the total exposure and the type and dimensions of the

15 asbestos fiber to which exposure occurred, discussed in more

16 detail below, need to be considered."  Do you agree with that?

17 A    Yes.

18 Q    To determine whether or not there is a risk of developing

19 disease.

20            THE COURT:  Mr. Finch, I'm sorry.  Can you put this

21 in a context?

22            MR. FINCH:  Sure.

23 Q    Could you open your report book to Moolgavkar Report 3?

24            THE COURT:  This is Exhibit 539 you're going to now?

25            MR. FINCH:  Yes, Your Honor.

1          THE COURT:  What page, please?

2          MR. FINCH:  Yes, Your Honor.

3  Q    And on Page 6 you have your dose response curves, correct?

4  A    Yes.

5  Q    And then carrying over to Page 7, you write, "The only way

6  to determine whether a specific exposure to asbestos was a

7  factor in causing a claimant's disease is to conduct an

8  explicit evaluation of the role of that asbestos exposure in

9  causing the disease relative to the risk of developing the

10 disease spontaneously and the additional risks imposed by other

11 exposures, including other asbestos exposures."  I take it you

12 agree with that?

13 A    Yes.

14 Q    Okay.  And then you write, "Such an evaluation involves

15 estimating the additional risk imposed by the exposure at issue

16 after taking into account the probability of the disease -- "

17 oh, I guess it's a typo.  You repeated the same -- you didn't

18 mean to repeat the exact same sentence twice, did you, Dr.

19 Moolgavkar?

20 A    That's somewhat inelegant, I guess, but --

21 Q    Okay.  The next sentence you say, "Then the contribution

22 to risk made by any specific exposure would depend on how that

23 exposure fits into the general pattern of exposure to asbestos

24 for that individual.  While such detailed information is not

25 usually available, at the very least the total exposure and the

1  type and dimensions of the asbestos fibers to which exposure

2  occurred, discussed in more detail below, need to be

3  considered."  That's your opinion?

4  A    Yes.

5  Q    And you're talking about the total exposure to all sources

6  of asbestos, right?

7  A    That's correct.

8           MR. FINCH:  Your Honor, I pass the witness.

9           THE COURT:  Just a second, please.

10                        (Pause)

11          THE COURT:  Okay.  Thank you.  Mr. Ansbro?

12          MR. ANSBRO:  Can I have just a moment, Your Honor?

13          THE COURT:  Yes, sir.

14                        (Pause)

15          UNIDENTIFIED ATTORNEY:  I think we have to give due

16  credit to Mr. Finch for staying exactly on the button.  Sorry.

17          MR. FINCH:  May I offer into evidence for

18  demonstrative purposes only the exhibit that I used with Dr.

19  Moolgavkar.

20          MS. HARDING:  Well, Your Honor, my only objection is

21  that the witness did not agree -- I mean, he agreed with -- the

22  witness did not agree with the changes that were made to his

23  doubling-dose and that there's any reason or -- to make those

24  changes.  So, I don't know what --

25          MR. FINCH:  He agreed with the mathematics, Your

1  Honor.

2            THE COURT:  Yes, I'm trying to look to the exhibit,

3  because this record is going to make absolutely no sense to me

4  when I try to -- because I can't type math formulas on this

5  computer.  I don't have formula -- I don't have a typewriter

6  that lets me do math formulas.  So my notes and this transcript

7  are not going to show math formulas in any kind of sense that

8  will make sense.  I need that exhibit in order to make my notes

9  make sense.

10           MR. FINCH:  Your Honor, I'm offering it solely for

11 the purpose of showing the math formulas and not for whether he

12 agreed or disagreed with -- had any -- the record is what the

13 record is about what he said, but this is to show the math

14 formulas that I used with him.

15           MR. BERNICK:  But --

16           THE COURT:  Yes, whether they're relevant or not I

17 don't know.

18           MR. BERNICK:  Your Honor, the only concern that I

19 have and the only reason I'm interrupting is I think this goes

20 to other matters.

21           MR. INSELBUCH:  How many lawyers?  One lawyer.

22           MR. BERNICK:  Mr. Inselbuch, you can address the

23 Court at the appropriate time.  The -- these demonstratives, so

24 called, are being used on cross examination.  They're not being

25 used on direct examination.  I have no quarrel with the idea

1  that Your Honor is going to need to see them in order to really

2  remember anything of what happened.  The difficulty is that if

3  they come before Your Honor in any way, shape or form that says

4  that they're, you know, of the record, that is that they're

5  actually part of Your Honor's consideration, then we get into a

6  precedent that really has no restraint.  Because we have no

7  witness adopting those demonstratives for any purpose --

8  they're totally different from the demonstratives on direct.

9  Each one goes -- has got a foundation.  So we now have a cross

10 examination of a lawyer who basically uses these demonstratives

11 as cross examination outline, and they're endorsed by no

12 witness.

13             THE COURT:  No --

14             MR. BERNICK:  They're simply Mr. Finch's argument.

15             THE COURT:  I don't think that's correct.  Maybe we'd

16 better lay the foundation with this witness.  I thought that

17 Dr. Moolgavkar had agreed that the mathematical formulas, as

18 reflected on the demonstrative exhibit, were taken from his

19 report and were reflected correctly on the exhibit.

20             MR. BERNICK:  Initially that was true.  In the first

21 couple slides, all that Mr. Finch did was take the Peto formula

22 and move it around in order to solve for concentration.

23             THE COURT:  Right.

24             MR. BERNICK:  That was one thing.  Those are

25 argumentative, et cetera, et cetera, but the witness did

Moolgavkar - Cross/Finch                    153

1  acknowledge that.  It's when all the calculations started that

2  says I now want you to talk about, well, what if the background

3  -- the calculation of background rate the witness did not

4  endorse.  The adjustment to the background rate the witness did

5  not endorse, not only in terms of whether it was substantively

6  correct, but even the math.

7              THE COURT:  That -- I think that's correct.  I

8  believe the first couple of slides -- maybe we're going to have

9  to mark each --

10              UNIDENTIFIED ATTORNEY:  No, no --

11              THE COURT:  -- page individually.  We're going to

12  mark each page individually.  You're going to ask the witness

13  whether he does or doesn't agree with each page individually as

14  the calculations that you've put on so I know whether I can use

15  them with respect to his testimony as substantive evidence.  If

16  it's just your argument, I cannot accept it in that respect.

17  You can put a witness on to get them adopted, but not through

18  this witness.

19  BY MR. FINCH:

20  Q    Dr. Moolgavkar, do you agree --

21              THE COURT:  Let's start -- let's get them up one at a

22  time.

23              UNIDENTIFIED ATTORNEY:  Use the Elmo?

24              UNIDENTIFIED ATTORNEY:  Elmo.

25              MR. FINCH:  Elmo.  Can I use the Elmo?


J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Yes, certainly.

2          MR. FINCH:  All right.  Why don't we call this

3  ACC/FCR-2086-1.

4          THE COURT:  All right.

5  Q    Do you agree with -- that that's Dr. Peto's formula and

6  you agree with the math on that slide, correct, Dr. Moolgavkar?

7  A    Yes.  However, I used only the second line.  I did not use

8  the first and the third line of the formula.  And I used only

9  the second line.  That's relevant to the rest of your

10 calculations anyway, so, I mean, I don't know what the legality

11 of this is, but it was only the second line that I used.

12         MR. FINCH:  Your Honor, I would offer 2086-1 for the

13 purpose of demonstrating the formulas.

14         THE COURT:  All right.  I will accept 2086-1 and

15 consider only line 2.  Let me make a note, please.

16 Q    It would also include the definitions at the bottom,

17 correct --

18         THE COURT:  And the definitions.

19 Q    -- Dr. Moolgavkar?

20 A    Yes.

21         MR. BERNICK:  It's actually not the Moolgavkar

22 formulas.  This is the Peto formula.

23         MR. FINCH:  It's the Peto --

24         THE COURT:  I understand.

25 Q    It's the Peto formula as set forth in Dr. Moolgavkar's

1    report, correct?

2              THE COURT:  Yes, I understand that.

3    Q    Correct, Dr. Moolgavkar?

4    A    Yes.

5              THE COURT:  All right.  Next?

6    Q    2086-2 --

7              THE COURT:  Mark it, please.

8    A    Yeah, that's -- that's fine.

9    Q    2086-2 is -- shows the math of how you solve for -- for

10   the lifetime risk of mesothelioma, correct?

11   A    Yeah.

12             MR. FINCH:  I'm offering 2086-2.

13             THE COURT:  I'll accept it as a demonstrative.

14   Q    2086-3 shows how you solve for the fiber concentration?

15   A    That's correct.

16   Q    That's correct.

17             MS. HARDING:  Wait.  Your Honor, I believe Dr.

18   Moolgavkar testified that the BGR there is not -- is supposed

19   to be background rate.

20   Q    The BGR is lifetime risk of mesothelioma?

21   A    Yes.

22   Q    Okay.  So if I make this -- 2086-3, instead of BGR I just

23   put BGR equals lifetime risk?

24   A    Lifetime background risk.

25             MR. FINCH:  I would offer that, Your Honor.

Moolgavkar - Cross/Finch                    156

1          THE COURT:  I'll take that as a demonstrative.

2  Q    2086-4, again with the correction that BGR is lifetime

3  background risk of mesothelioma --

4          THE COURT:  Mark it, please.

5  Q    That, Dr. Moolgavkar --

6          UNIDENTIFIED ATTORNEY:  2086.

7  Q    -- shows how you solve for the doubling-dose?

8  A    Yes.

9          MR. FINCH:  I offer that for demonstrative purposes,

10 Your Honor.

11         MS. HARDING:  Again, I think you should not make the

12 BGR.

13         UNIDENTIFIED ATTORNEY:  Well, no (indiscernible).

14         MS. HARDING:  All right.  It's in the first one I

15 guess.  That's fine.

16 Q    2086-6.

17         THE COURT:  I think you're five.

18         MR. FINCH:  No, I skipped five.  I never showed him

19 five.

20         THE COURT:  Okay.

21 Q    2086-6, that just takes -- that's your formula and that is

22 the information that comes out of your September -- I mean your

23 June 11, 2007, report that shows what the variables are,

24 correct, Dr. Moolgavkar?

25 A    Yes.

1          MR. FINCH:  I offer that for demonstrative purposes,

2  Your Honor.

3          THE COURT:  And again, the BGR definition is changing

4  again?

5          MR. FINCH:  The BGR definition is the same as it was

6  before.

7          UNIDENTIFIED ATTORNEY:  2086, is there a dash --

8          THE COURT:  All right.  I'll take it for background.

9          MR. FINCH:  Dash 6.

10          UNIDENTIFIED ATTORNEY:  Dash 6.

11          THE COURT:  I'm sorry, for demonstrative.

12          MR. FINCH:  Dash 6, 2086-6 --

13          THE COURT:  2086-6 is accepted --

14          UNIDENTIFIED ATTORNEY:  Better write it on there.

15          UNIDENTIFIED ATTORNEY:  Better write it.

16          THE COURT:  -- as a demonstrative.

17  Q   All right.  2086-7, Dr. Moolgavkar, the math is correct,

18  correct?

19  A   Um --

20          MS. HARDING:  I object to the -- there is no

21  foundation for that question.  He's already told you that the

22  math is not correct, and you can't just simply reduce it the

23  way that you've done.

24          MR. FINCH:  He didn't testify the math is not

25  correct.

1  Q    The lifetime background risk of mesothelioma used in your

2  formula is .00036, correct, Dr. Moolgavkar?

3  A    That's correct.

4  Q    All right.  If -- and that equates to a doubling-dose of

5  3.2 fiber years, correct?

6  A    That's correct.

7  Q    If you divide the lifetime background risk of mesothelioma

8  by two, that results in .00018.  That's correct, is it not?

9  A    That's correct.

10  Q    And if you do that, then the doubling-dose is also cut in

11  half, correct?

12  A    Correct.

13  Q    So the mathematics on this slide are absolutely correct?

14  A    Correct.

15          MS. HARDING:  Well, except, Your Honor, first of all,

16  lifetime background rate should be reflected appropriately

17  there.  That's the first thing.  But I just -- I think it's

18  important -- I recall that Dr. Moolgavkar talked about the --

19  that the background rate and the lifetime background risk do

20  not --

21          THE COURT:  Equate --

22          MS. HARDING:  -- automatically reduce in that way.

23          THE COURT:  That's correct.  Then this --

24          MR. FINCH:  I'm not talking about rate at all.  I'm

25  talking about lifetime background risk.

1    THE COURT:  Yes, but I believe what the doctor said

2 is that you have to make a big assumption in this regard, which

3 you would not let him identify.  You said he had to do it on

4 redirect.  But his point was that you cannot assume that across

5 the whole cohort that the risk will change unilaterally, and,

6 as a result, you cannot make the equation that it will be a 50

7 percent reduction in the formula simply because you change

8 those factors.  He agreed that there would be a decrease in the

9 risk, but not that it would be 50 percent.  Did I

10 misunderstand, doctor?

11    THE WITNESS:  Actually, Your Honor, in this he is

12 making the assumption that the lifetime background probability

13 is cut in half, and if he makes that assumption then the math

14 on this slide is correct.

15    THE COURT:  So, you agree with the math?

16    THE WITNESS:  I agree with the math.

17    THE COURT:  Do you agree with the assumption?

18    THE WITNESS:  Well, it is an assumption.  I -- and I

19 don't know where it comes from, but it's an assumption, and if

20 the assumption is correct, the math is correct.

21    MR. BERNICK:  Your Honor, again, for purposes of this

22 trial, we're now establishing -- this is David Bernick -- we're

23 now establishing a precedent that the witness -- that the cross

24 examining attorney can ask the witness to do something -- we

25 can have him pull out a calculator and make a gagillion

1  assumptions, and the basis of that -- counsel's argument comes

2  before the Court in the form of a demonstrative.  When the

3  witness says I don't know that that assumption is true, then

4  the math doesn't really mean anything other than it's counsel's

5  argument.

6           THE COURT:  Yes, that's the problem I have.  I have

7  no problem with the first half of this slide -- with the first

8  half of the slide because the witness has adopted that as his

9  calculation.  The second half he doesn't have any problem with

10  the math, but it doesn't relate to anything because he has no

11  testimony on the record that indicates that the assumption is

12  true.

13          MR. FINCH:  Well, the 3.6 times ten to the minus

14  fourth comes from Price and Ware assuming that all female cases

15  are background risk cases --

16          THE COURT:  And he has --

17          MS. HARDING:  He's already closed his cross

18  examination.

19          THE COURT:  He has, and the witness has challenged

20  your assumption on that Price and Ware article saying they are

21  two independent statements, that they are not tied together in

22  the same fashion that you wanted him to tie them together, and

23  he's testified very clearly about that, that they are not --

24  they are not married at the hip.  So, you're not -- he has

25  agreed that there is a decrease.  He has not agreed that the

1 decrease is a 50 percent decrease simply because you change a

2 factor 50 -- by 50 percent.

3          MR. FINCH:  You would agree, though, if he would

4 agree with the math, though, that if you divide the background

5 risk in two --

6          THE COURT:  He does, but that's your argument --

7 that's your argument.  That's not his evidence.  I will accept

8 the first half.  Strike out the second half, and I will take

9 the rest of this exhibit as a demonstrative.  You may argue the

10 second half.  It's your argument, but it is not the witness's

11 testimony.

12 Q    2086-8.

13 A    Well, it seems to me that the same objection applies to

14 this now.

15 Q    You agree with the -- rate should be risk, correct?

16 A    I agree with the math, but, I mean, you've just been

17 through all this --

18          UNIDENTIFIED ATTORNEY:  It's the same thing --

19 A    -- on the previous slide.

20          THE COURT:  All right.  Now, I'm sorry.  I've

21 forgotten what this one was.  I --

22          MR. FINCH:  Same thing.

23          MS. HARDING:  It's the same thing, just with a

24 different assumption, now a 75 percent assumption.

25          THE COURT:  Oh, this is the 75 percent.  Okay.  The

J&J COURT TRANSCRIBERS, INC.

1 witness did testify that if you changed the assumption to 75

2 percent, his .02 would change to .08.  He agreed with the math,

3 but he did not -- you had nothing in the testimony that

4 indicated that he would agree with the assumption.  So that's

5 the problem.  So, 2086 is argumentative.  I will not take 2086,

6 but you can argue it.

7           UNIDENTIFIED ATTORNEY:  2086-8.

8           THE COURT:  Oh, I'm sorry.  Thank you.  2086-8 I will

9 not accept as a demonstrative.

10          MR. FINCH:  Fine.  So, Your Honor may I hand up

11 2086-1, 2, 3, 4, 6, and the first half of 2086-7?

12          THE COURT:  Yes.

13          MR. FINCH:  And since this is the only copy of that,

14 would it be possible to get copies from the Court at an

15 appropriate time?

16          THE COURT:  Yes, I can do -- I can do that.  I'm not

17 sure they're going to be in color.  Do they need to be color?

18          MR. BERNICK:  They don't need -- we would accept --

19 if Your Honor would accept it, we'd accept -- we accept that if

20 counsel wants to make copies and then furnish the original to

21 the Court that the copies can be furnished at some other time

22 -- you know, later today.

23          THE COURT:  All right, that's fine.

24          MR. FINCH:  Okay, if that's acceptable to --

25          THE COURT:  Does anybody else need these for purposes

                    J&J COURT TRANSCRIBERS, INC.

1 of the witness anyway today?  Okay.  All right, Mr. Finch,

2 thank you.

3          MR. FINCH:  Thank you, Your Honor.

4                     CROSS EXAMINATION

5 BY MR. ANSBRO:

6 Q    Good afternoon, Dr. Moolgavkar.

7 A    Good afternoon.

8 Q    John Ansbro.  We met at your deposition.

9 A    Yes.

10 Q    My examination will be brief.  I first want to ask you

11 some questions about your -- focus back on your doubling-dose

12 calculation.  The range, in your view, of the incidence, the

13 bankground incidence, of mesothelioma as you state in your

14 report is between two and four incidents per year, correct?

15 A    That's correct.

16          THE COURT:  Two and four per year per what

17 population?

18          MR. ANSBRO:  The --

19          THE WITNESS:  Per million.

20 Q    Say it again, I didn't --

21 A    Per million.

22 Q    Per million.  And we discussed in your deposition that you

23 consider that to be a reasonable range, do you recall that?

24 A    Yes.  Yes, if you are looking at the entire lifetime, that

25 is if you are looking over all ages, from birth up to say age

1  80 or 90.

2  Q    Okay.  Now, you also testified, and I just want to confirm

3  with you here today, that in your view as many -- as much -- as

4  many as -- as much as 50 percent of mesotheliomas in women

5  could be asbestos-related.  Do you recall testifying to that,

6  sir?

7           MS. HARDING:  I don't think there's a foundation for

8  that, Your Honor.

9           UNIDENTIFIED ATTORNEY:  There's no --

10          THE COURT:  I believe his earlier testimony

11 recognized an article in which that statistic was stated, and

12 then the witness had a different view, about 23 percent if I

13 recall.  Maybe -- better ask the witness.  My recollection may

14 not be accurate, Mr. Ansbro.

15 Q    Is it your view -- am I correct in understanding that as

16 much as 50 percent of mesothelioma incidents in women could be

17 caused by exposure to asbestos?

18 A    Yes, that was a -- that is a conservative estimate in the

19 sense that I think that's probably the upper limit.

20 Q    Now, when you calculated your doubling-dose of 3.2 fibers,

21 you used in that calculation, as I understand it, the high

22 range of the Price and Ware lifetime estimate, correct?

23 A    I used the high range reported in the abstract.  However,

24 I consider it to be conservative because we are really

25 interested in the lifetime risk conditional upon surviving up

Moolgavkar - Cross/Ansbro                     165

1  to age 20 or 30; that is, we are only interested in the

2  lifetime risk of individuals who have already survived or lived

3  up to the age of 20 or 30, and that lifetime risk is actually

4  higher because cancer rates go up with age.  So, I consider

5  that to be a reasonably conservative assumption.

6  Q    But that -- in the Price and Ware article, that is their

7  high range, that's the top end of their range.

8  A    Top, but they look at the entire lifetime probability, and

9  I'm saying that one should compute the probability conditional

10 on living up to age 20.  Let me give you an example.  If you

11 ask -- when a child is born and you ask, what is the lifetime

12 probability that that child will develop colon cancer, you come

13 up with some number.  I don't know what it is, maybe seven or

14 eight percent.  But, you ask an individual who is age 70, who

15 has already survived up to age 70, and what is the probability

16 of colon cancer in his or her lifetime?  Much higher, right?

17 That's because it's conditioned on having survived until age

18 70.  So that's the idea.

19 Q    All right.

20       THE COURT:  Pardon me.  May I see if I understand

21 this?  You're saying, doctor, that the starting point for the

22 cancer risk if you're already age 20 is a higher threshold than

23 if you're zero or one when the risk starts, because even though

24 you're going to live a longer time, your risk of getting cancer

25 of any type increases with age?

Moolgavkar - Cross/Ansbro                166

1          THE WITNESS:  Right, but the fact that you already

2    lived up to age 20 means that -- this is a concept called

3    conditional probability.  So, as I said in my example, if you

4    ask somebody -- if you ask about somebody who is just born,

5    what is the probability that that individual will get cancer of

6    any type, let's say colon cancer, it may be seven or eight

7    percent by the time they reach age 80 or 85 or before they die.

8    But, if you ask somebody who is already survived up to age 70

9    what is the probability that that individual will develop

10   cancer before he or she dies, that's much larger.  So, that's

11   the idea.

12         THE COURT:  I understand the idea.  What I'm not sure

13   is how that translated into your -- into the question that Mr.

14   Ansbro was asking, which is how that factored into your

15   doubling-dose.

16         THE WITNESS:  Right.  What I'm saying is that the

17   lifetime probability that is reported in Price and Ware is the

18   entire lifetime probability starting at age zero.

19         THE COURT:  All right.

20         THE WITNESS:  What we are interested here is in Grace

21   workers who we expected to be exposed age 20 onward.

22         THE COURT:  I see.

23         THE WITNESS:  Yeah.

24         THE COURT:  Okay.  Thank you.

25   BY MR. ANSBRO:

1  Q    Just going to shift gears, ask you from a different

2  perspective some questions about, again, your doubling-dose

3  calculation.  At Table 2, in Appendix 2 of your report --

4             MR. ANSBRO:  Tom, if we could take a look at that,

5  this is ACC/FCR-538 -- the ELMO off, is it?

6             MS. HARDING:  I'm sorry, John.  What number?

7             MR. ANSBRO:  This is ACC/FCR-538.  It's Report

8  Number 2.

9             MS. HARDING:  Thank you.

10 Q    Dr. Moolgavkar, this is in your smaller binder that Mr.

11 Finch distributed earlier.

12 A    Yeah.  I prefer to see it on my screen if it comes up.

13 Q    I'm going to ask you some questions because I'm not clear

14 yet on one aspect of this.  Your report sets forth at the top

15 what you describe as the estimate of the cumulative exposures

16 to asbestos required to double the risk of mesothelioma,

17 correct?

18 A    Yes.

19 Q    That is what we're seeing on the top line there, where --

20 K Sub-M, that's the potency derived from the EPA numbers?

21 A    Yes.

22 Q    Then over on the right we have the results of your

23 calculation applying the Peto method?

24 A    Yes.

25 Q    Now, you sent an e-mail in response to some requests from

Moolgavkar - Cross/Ansbro                    168

1 Mr. Bailor.  If I could put this on the ELMO and show this to

2 you.  This was in response --

3           THE COURT:  Cathy, you're going to have to switch it.

4 It shows on the double screens, but not on the single screens

5 one at a time.  Yes, that's right, thank you.

6 Q    Are you able to see that, doctor?

7 A    Yes.

8           MR. ANSBRO:  Is Your Honor able to see that?

9           THE COURT:  Yes.

10 Q    Now, this is an e-mail message that you wrote explaining

11 the computations that are necessary to arrive at the cumulative

12 exposures that you presented in Table 2, is that a fair summary

13 of the e-mail?

14 A    Yes, yes.

15 Q    In the second paragraph, I'm going to be reading from this

16 portion, you write that, "The probability of mesothelioma can

17 be derived by elementary calculus to be P equal to 4 raised to

18 -- 45, to the power of four, times K Sub-M times F divided by

19 four, where P is the cumulative probability."  See where I've

20 read that, doctor, down here?

21 A    Yes.

22           UNIDENTIFIED ATTORNEY:  If you could just zoom in a

23 little bit, it'd make it easier for everybody to -- I'm sorry.

24 Q    All right, doctor.  So what I've focused on is where

25 you've written over here that, "For the exposure scenario

1  described in my report," you go on to say, "the probability of

2  mesothelioma can be derived by elementary calculus to be P

3  equals 45 to the fourth power times K Sub-M times F, and all of

4  that divided by four, where the cumulative probability -- "

5          UNIDENTIFIED ATTORNEY:  Where P is the cumulative

6  probability.

7  Q    " -- where P is the cumulative probability, for this to be

8  the background risk, background, BGR, set P equal to two times

9  the background," and the "this" that's referred to there is the

10 cumulative probability, right?

11 A    Yes.

12 Q    So, you set the background equal to the female

13 mesothelioma rate which, as I understand it, is the one you

14 derived from Price and Ware, correct?

15 A    The female background risk, the background risk.

16 Q    All right.  You clarified that earlier, the lifetime

17 background risk?

18 A    Right.

19 Q    That was a 3.6 times ten to the minus four, correct?

20 A    Correct.

21 Q    And then you solve for the cumulative exposure, using CE

22 equal to F times 45, you see that down here, is that correct?

23 A    Right.

24 Q    And F in that equation is the exposure concentration, the

25 fiber exposure concentration itself?

1  A    Correct.

2  Q    Yes?

3  A    Yes.

4  Q    So, if we look back then at the first row of your report

5  for potency value as we saw, you calculate that the incidence

6  of asbestos-related mesothelioma would be twice the background

7  incidence at an exposure of 3.25 fibers per year, correct?

8  A    Let me -- I don't have that report up in front of me here.

9         MR. BERNICK:  Can you see it, Dr. Moolgavkar?  Can

10 you see what you need to be able to read?

11        THE COURT:  Not yet.

12        THE WITNESS:  Not yet.

13        THE COURT:  She has to turn the ELMO on.

14        MR. ANSBRO:  I was referring to -- back to Appendix

15 2, Page 23.

16        UNIDENTIFIED ATTORNEY:  It's not fully displayed

17 there.  It's cut off in part.

18 Q    Is there something else you need to see on that page,

19 doctor?

20 A    No, I just want to see where you're reading.

21 Q    I wasn't reading from the report.  I was framing a

22 question.

23 A    Yes, go ahead.

24 Q    Do you want me to repeat the question?

25 A    Please.

1          MS. HARDING:  Can you put it --

2          MR. ANSBRO:  It's simply this.  It's just summing it

3 up.

4 Q    So, at the first row in Table 2, with that potency rate of

5 ten -- of one times ten raised to the minus eight power, you

6 calculate that the incidence of asbestos-related mesothelioma

7 will be twice the background incidence at an exposure of 3.2

8 fibers per milliliter year.

9 A    Yes.

10 Q    Doctor, am I correct that the total incidence of

11 mesothelioma for all sources would be three times the

12 background incidence?

13          THE COURT:  I'm sorry, would you say that again?  The

14 total --

15 Q    Am I correct that the total incidence of mesothelioma from

16 all sources would be three times the background incidence?

17          MS. HARDING:  Under what scenario?  I'm -- I just --

18 Q    Under the calculation that you've done.

19 A    No, I -- I'm sorry, I don't understand that.  I don't see

20 how you get that.  I'm trying to understand the origin of that

21 question.  I don't understand it.

22 Q    Well, the origin of the question is this.  In your e-mail,

23 you describe how you've set P equal to two times the

24 background.

25 A    Right.

1  Q     Where did that two times the background multiplier come

2  from?

3  A     Ah, okay.  That comes from the fact that we want to find

4  the doubling-dose so we want to find the cumulative exposure at

5  which the background probability is doubled.  So it just comes

6  from that.

7  Q     Let me ask you then.  As your -- by setting that am I not

8  correct though then, doctor, that by setting it P equal to 2

9  times the background that, in fact, at the 3.2 fiber years,

10 that represents not a doubling of the background risk, but a

11 tripling of the background risk?

12 A     No, it doesn't.

13 Q     Why not?

14 A     Well, I think I'll try to understand the question you're

15 asking me and answer it.  The Peto formula, you see, is a

16 formula for cohorts exposed to asbestos and it includes the

17 background.  So when you use the Peto formula, it's telling you

18 what the total probability or the total rate of mesothelioma

19 is in that cohort, including the background.  I think that's

20 where the confusion comes from, am I right?

21 A     Well, that's your explanation.  The application of setting

22 -- or with the method of setting P equal to two times the

23 background, has that been done in other peer-reviewed papers

24 that you have seen?

25 A     Well, it is such a simple calculation involving only a

1 first course in calculus that I don't think any

2 self-respecting journal would accept it as a peer-reviewed

3 calculation or paper.

4 Q    But my question was have you seen that done -- you

5 mentioned earlier that the EPA uses the Peto model, did they

6 set P equal to two times the background?

7 A    No.  I have not seen that done and I was trying to explain

8 to you why I don't think I've seen that done.

9 Q    And just Berman and Crump you mentioned also, they didn't

10 do it that way either, did they?

11 A    No, none of them is interested in the doubling-dose.

12 Q    Let me show you -- I have a demonstrative.  It's been

13 marked for identification.

14        MR. ANSBRO:  I'm just going to put this on the ELMO,

15 Your Honor, as FCD as future claimants' demonstrative.

16        THE COURT:  Cathy --

17        MR. ANSBRO:  One of two.

18        MS. HARDING:  Your Honor, it's the same thing all

19 over again and he's -- the witness has just described, quite

20 clearly, why the line of questioning is not relevant and not

21 correct.  And at this late date in the afternoon for the

22 witness to say, I object to this line of questioning --

23        THE COURT:  Yes.  We just went over this with the

24 ACC, I think.  It looks to be --

25        MR. ANSBRO:  Well, Your Honor, I think this one is a

1  little bit different.

2           THE COURT:  All right.

3           MS. HARDING:  I agree that the calculation is

4  different, Your Honor, but the witness has just testified that

5  for the reason why you set it the way he set it -- he's offered

6  no impeachment to suggest that he's wrong and nothing to

7  suggest that he hasn't done it correctly, and now he wants to

8  do another calculation.  I just think at this late date -- I

9  mean, we're already over their estimates of their cross

10 examination.  I still have to do redirect.  And I think it's a

11 waste of time, Your Honor.

12          MR. ANSBRO:  It's not a waste of time, Your Honor.

13 I'll be brief with this.  What we're going to ask the witness

14 is if we change the potency here -- which as I understand is a

15 constant -- will the doctor agree that as the Peto model is

16 applied, that these results will obtain.

17          THE COURT:  Go ahead.

18          MR. ANSBRO:  The discussion earlier with the ACC

19 counsel was with respect to changing the background -- the

20 lifetime background rate.

21          THE COURT:  Go ahead.

22          MS. HARDING:  Your Honor --

23          THE WITNESS:  We actually also had a discussion

24 regarding potency.

25          THE COURT:  We did, but this is cross examination.

1  Go ahead, but let's narrow the focus a little so at least we

2  stick to potency of products that are available with respect to

3  Grace issues about claims that we will have in this case in the

4  United States or Canada, please.

5          MR. ANSBRO:  We'll be brief, Your Honor.

6  Q    Doctor, if you could just quickly look at this then.  My

7  question simply is this.  As you decrease the potency --

8  A    First, the formula is wrong.

9  Q    The formula above is wrong?

10 A    Is wrong.  It's got 45 to the third power rather than the

11 fourth power.

12 Q    All right.  That was there for demonstrative purposes.

13 If we change the potency, for example, if we cut it in half, if

14 I understand the way you've applied the Peto model here, and we

15 have 1.6 fiber years, that would give us one times the

16 background rate, which would be the background rate, yes?

17 A    No.  I don't understand this slide at all, I'm sorry.  If

18 you cut the potency one times the background rate will be the

19 background rate?  No, I don't understand this.

20 Q    If K Sub-M, the value of that was cut in half, would it

21 not have similarly a 50 percent reduction in the background --

22 in the potency risk?

23 A    Sorry?

24 Q    The relative risk. Yeah.

25 A    I need to --

1                        (Pause)

2   Q    The cumulative exposure --

3            MR. ANSBOR:  Thanks for that.

4   Q    -- if we change the cumulative exposure -- I've been using

5   potency.  I've been using the wrong term.  If you cut the

6   cumulative exposure in half and then cut it in half again, do

7   you agree that the results would follow with respect to the

8   background rate?

9            THE COURT:  What results?

10  Q    So, for example, if we go -- if our cumulative exposure

11  shrinks from 3.2 to 1.6, that would give us, as you've applied

12  the Peto model, one times the background rate which would be

13  the background rate.

14  A    I'm sorry, I just don't understand this.

15           MR. ANSBRO:  Well, I'll tell you what, Your Honor,

16  I'll end at that point.  My calculus and analysis of these

17  matters is a little bit dated.  We'll leave that as it is.

18  Pass witness.

19           THE COURT:  All right.

20           MR. ANSBRO:  I pass the witness.

21           MS. HARDING:  Your Honor, could I have a short --

22           THE COURT:  We'll take a ten-minute recess and then

23  start redirect.

24           MS. HARDING:  Thank you, Your Honor.

25           THE COURT:  Yes.  Thank you.

 1                    (Recess)

 2              THE COURT:  Please be seated.  Doctor?

 3              MS. HARDING:  I'm sorry, Your Honor.

 4              THE COURT:  That's all right.  Ms. Harding, are you

 5  ready?

 6              MS. HARDING:  Yes.

 7              THE COURT:  All right.

 8                    REDIRECT EXAMINATION

 9  BY MS. HARDING:

10  Q    Dr. Moolgavkar, I'd first like to talk to you about

11  authoritative pronouncements.  Do you understand what I'm

12  talking about?

13  A    Do you mean documents like the Helsinki criteria?

14  Q    Yes.  The first thing I want to ask you about is the World

15  Health Organization.  What is the World Health Organization?

16  A    Well, it's an organization, organized, I think, under the

17  auspices of the United Nations headquartered in Geneva and its

18  mandate is to be concerned with global health.

19  Q    And you were shown a statement from The World Health

20  Organization.  Do you recall seeing the statement?  It's

21  asbestos -- increased risk for asbestosis versus lung cancer

22  and mesothelioma --

23              THE COURT:  Ms. Harding, I'm sorry, but it's very

24  late and you folks just have to slow down.  I can't even hear

25  that fast let alone type that fast.  Okay?

1          MS. HARDING:  I'm sorry.  I'm trying to get through

2    it quickly.

3    A    And could you blow that up, is that possible?

4    Q    I don't think I can blow it up.  Exposure to chrysotile

5    asbestos poses an increased risk for asbestosis, lung cancer

6    and mesothelioma in a dose-dependent manner.  No threshold has

7    been identified if a person has been at risk.  Do you recall

8    being asked about that statement?

9    A    Yes.

10   Q    And it's your testimony, as I understood it, here you did

11   not disagree with that statement, correct?

12   A    That is correct.

13        Q    Okay.  You were also asked that whether there's a

14   debate in the scientific community about that very statement,

15   correct?

16   A    Yes.

17   Q    Do any of the opinions that you've expressed here today

18   depend any way upon resolving the debate about chrysotile

19   asbestos as described in the (indiscernible)?

20   A    No, they do not.

21   Q    Now, there was another statement in this same document

22   which I'd like to ask you about.  And it's E, with no page

23   number.  But it says, "More epidemiological data are needed

24   concerning cancer risks for populations exposed to fiber levels

25   below 1 fiber milliliter as well as continued surveillance of

1  asbestos exposed populations." Do you agree with that

2  statement?

3  A    Yes, I do.

4  Q    Is that statement consistent with your testimony here

5  today?

6  A    Yes, it absolutely is.

7  Q    Why is it consistent?

8  A    Well, because none of my calculations depend on any

9  assumption of thresholds or any assumptions regarding safe

10 levels for asbestos.  And I think in the absence of any

11 information at low levels, any direct information at low levels

12 of exposure, I think it important to continue work in that area

13 to see if any risks can positively be identified.

14 Q    I want to talk a little bit more about -- I think there

15 was another question about more opinion about whether radiation

16 is capable of causing mesothelioma.  Do you recall that

17 discussion?

18 A    Yes, I do.

19 Q    And what is your opinion with regard to radiation?

20 A    Well, first of all, is I find it strange that The

21 Institute of Medicine report that says that radiation is a

22 hypothesized cause of mesothelioma.  It references either a

23 book chapter or a paper by Dr. Roggli which was published in

24 2004.  So, that the report is not current or up-to-date with

25 respect to its review of the literature on radiation and

1  mesothelioma.  There have been several papers -- there are

2  several papers that have appeared after 2004.  In fact, I

3  believe all the papers referenced in my reports appeared after

4  2004 and those papers, I think, clearly indicate that radiation

5  therapy is a risk factor for mesothelioma.

6  Q    What types of studies did you rely upon in forming that

7  opinion?

8  A    Well, these were properly conducted epidemiological

9  studies.  They were primarily studies of individuals who had

10  cancer sometime and were then treated for that primary tumor

11  with high dose radiation.  And the price that they paid for

12  that was the development of secondary cancers because radiation

13  is a known carcinogen.  It's like a double-edge sword.  It

14  kills the cancer that you currently have, but it also sets the

15  stage for cancer in the future.  And that's how they found the

16  increased risk of mesothelioma.

17  Q    Doctor, you were asked about whether the studies

18  controlled for the confounding of asbestos exposure threat, do

19  you recall that?

20  A    That's correct.

21          THE COURT:  I'm sorry.  Ms. Harding, I can't hear

22  you.  I'm sorry.

23          MS. HARDING:  I don't think it's working.  I'll move

24  it.

25  Q    Dr. Moolgavkar, you were asked whether the studies

1  controlled for the confounding that might be associated with

2  asbestos exposure and you asked if -- you said they didn't and

3  you asked if counsel wanted an explanation as to why that

4  wasn't necessary in these types of studies.  Would you like to

5  explain that, please?

6  A     Well, in epidemiological studies it is necessary to

7  control for another risk factor that might affect your

8  conclusions if it is what is called a confounder.  In other

9  words, if you believe that it is likely that the exposure that

10 you're investigating -- in this case radiation -- is in some

11 way correlated with another exposure-like asbestos.  So if you

12 have reason to believe that people who received radiation

13 therapy might also have been exposed to asbestos, it would be

14 important to control for asbestos exposure.  But when people go

15 in for treatment for their primary cancers, one would not

16 expect that the people who get radiation therapy have been

17 exposed to asbestos.  There's no reason to believe that there

18 would be a selection of people who were exposed to asbestos for

19 radiation therapy.  So, there's no need to correct for that

20 confounder.

21 Q     The way that concept has always kind of been explained to

22 me and I've kind of understood it, is that as an epidemiologist

23 there are times when you can assume an equal distribution of an

24 important other exposure in both your cases and controls, is

25 that the same concept?

1 A    Well, these are not case-control studies, but it is the

2 same concept that there's no reason to believe that there is

3 not an equal distribution of people with asbestos exposure

4 among the patients who received radiation or who received some

5 other kind of treatment.

6 Q    Okay.  Now, more importantly, the question I want to ask

7 you is, you did not discuss your opinion regarding radiation

8 mesothelioma today, correct, in your direct testimony, correct?

9 A    That's correct.

10 Q    Okay.  Was -- or is your opinion regarding causation of

11 mesothelioma by radiation, does it somehow -- is it necessary

12 for radiation to be a cause of -- an established cause of

13 mesothelioma for any of the opinions that you've rendered here

14 today?

15 A    No.

16 Q    Okay.  If it were determined that it were not a cause of

17 mesothelioma, would that change your opinions here today?

18 A    No.

19         MS. HARDING:  Your Honor, may I walk over to the

20 board for a second?

21         THE COURT:  Sure.

22         MS. HARDING:  Thank you.  Actually, I'll stay right

23 here.

24 Q    We don't have the scientific method board up anymore, but

25 you recall the board we had up discussing the scientific

1  method?

2  A    Yes.

3  Q    Okay.  Is it fair to say that epidemiologists look at

4  associations of disease and exposures, is that --

5  A    That's what each individual study does, look for

6  associations between exposure and disease, yes.

7  Q    Okay.  The question of the understanding of a dose

8  response relationship with a potential carcinogen and disease,

9  is that the same thing as finding an association or not an

10 association in an epidemiological study?

11 A    Well, no.  The two are related but distinct concepts.  In

12 many epidemiological studies you can -- you seek only

13 associations because good information on dose may not be

14 available.  So there you look only for associations.

15         In other epidemiological studies when good

16 information on dose is available then, of course, the goal of

17 the epidemiological study should be not only to find an

18 association, but to examine the dose response relationship.

19 Q    Okay.  To render valid scientific conclusions regarding

20 dose response relationships with disease, is objective

21 quantifiable exposure measurement data necessary?

22 A    Yeah.  It's a prerequisite.

23 Q    Okay.  And is it also a prerequisite that you have to have

24 studies -- a controlled study?

25 A    Yes.  I'm not exactly sure what you mean by a controlled

1  study, but it's important to have a properly designed study and

2  if it's a case-controller or cohort study, I guess it could be

3  a controlled study.

4  Q    Okay.  Is there any scientific method available to be able

5  to render reliable scientific conclusions about dose response

6  without those two fundamental pieces of epidemiological data?

7  A    I don't think so.

8  Q    And have the methods that you have used to render your

9  opinions on dose response today follow the accepted methods in

10 your field?

11 A    Yes.  I have used the standard models.  I've used the

12 linear excess relative risk model for lung cancer and I've used

13 the widely-accepted Peto model for mesothelioma.  So I would

14 say yes, absolutely.

15 Q    Now, I'd like to talk briefly, if I can, about some of the

16 papers that you were asked about today.  First, I want to show

17 you one of the -- I think these are a series of papers that

18 were shown to you to suggest that these were somehow important

19 reliable evidence about dose response relationships in

20 mesothelioma and I'd like to ask you a few questions.  This is

21 the mesothelioma, pleural, peritoneum --

22           THE COURT:  Can't hear you, Ms. Harding.

23           MS. HARDING:  This is ACC/FCR-646, Your Honor,

24 mesothelioma of plural and peritoneum following exposure to

25 asbestos in the London area.

1 Q    Dr. Moolgavkar, you have seen this paper before, correct?

2 A    Yes.

3 Q    Okay.  It's true this is a case series?

4 A    Well, this is kind of like an epidemiological sort of way

5 of mesothelioma of the pleura and peritoneum in the London

6 area.  There are no controls.  And this paper was written in

7 1965 when really the principles of epidemiological studies were

8 also not properly understood.

9 Q    Harking back to the methods we just discussed for

10 understanding dose response relationships and risk of

11 mesothelioma, would this paper that we just discussed be a

12 paper that would provide reliable information on that issue?

13 A    No.  There's no information on exposure in that paper.

14 Q    I'd like to ask you about the paper by Dr. Rodelsperger.

15 You actually have prepared some slides to discuss the

16 Rodelsperger paper, correct?

17 A    I believe, yes, both the Rotsewil and Rodelsperger.

18 Q    Would those slides --

19        MS. HARDING:  This is referring, Your Honor, to --

20 actually I do not have the ACC.  I don't have the exhibit

21 number on my copy.  Do you know the exhibit number, Nate?

22        MR. FINCH:  No --

23    Q    It's the paper, "Asbestos and Manmade Vitreous Fibers

24 As Risk Factors For Diffuse, Malignant Mesothelioma; Results

25 From A German Hospital Base Case-Control Study."  Do you recall

1  being asked questions about this paper?

2  A    Yes, I do.

3  Q    Okay.  And do you recall asking whether counsel would like

4  you to explain why you would not rely upon this paper for --

5            THE COURT:  It's Exhibit ACC-422.

6            MS. HARDING:  Thank you, Your Honor.

7  Q    -- for reliable scientific conclusions about dose

8  response?

9  A    Yes.

10 Q    Okay.  I'm going to show you -- could you put a --

11 actually it doesn't have a number; 62?

12 Q    Now, Dr. Moolgavkar, you've already testified about the

13 second part of that.  Could you explain the concern you

14 expressed in the first bullet point there, please?

15           THE COURT:  Well, what are you looking at now?

16           MS. HARDING:  The first bullet point --

17           THE COURT:  On?

18           MS. HARDING:  -- the Rodelsperger -- I'm sorry -- on

19 the slide, Your Honor.

20           THE COURT:  Yes, but what exhibit is this?

21           MS. HARDING:  It's the number you just gave me.

22           THE COURT:  Oh, 422.  Okay.  Thank you.

23           MS. HARDING:  Yes, thank you.

24 A    Yes.  One of the things in the Rodelsperger paper is that

25 if you look at the results, they are highly sensitive to the

1 assumptions made.  As, for example, the choice of cut points

2 for categorical exposures.  The results are also sensitive to

3 the choice of controls that they use for doing the case-control

4 analysis.  And what they reported is that ignoring matching in

5 the analysis, it started out as a matched case-control study

6 and appropriately it should be analyzed as a matched

7 case-control study.  However, they tried to undo the matching

8 and do some of the analysis and that led to considerable bias.

9 That indicates to me that these results are not robust and that

10 they are subject to considerable bias depending upon the

11 assumptions that are made.

12        MS. HARDING:  Could you put up Number 61, please?

13 A    Yeah.  These are the other limitations of the paper.  They

14 do not use actual industrial hygiene data to quantify exposure.

15 They had, I believe, two experts who did the industrial hygiene

16 estimation and there was only limited -- I don't think there

17 was very good agreement between the experts regarding the

18 exposure estimates.  They did not try to distinguish between

19 fiber type and they admit that they don't know what fiber type

20 they're looking at.  And they did a lung fiber burden analysis

21 in an older study and in this they reported that there was only

22 modest correlation between exposure estimates and lung burden

23 for amphibole, but there was no correlation at all for

24 chrysotile.

25        So the relevance of this study for chrysotile

1  asbestos exposure is seriously in doubt.  And for the other

2  reasons that I mentioned, I don't think I will take the results

3  of the study as indicating a dose response relationship at low

4  exposures.  What I would do, however, is consider this paper as

5  an intriguing observation which should lead to further

6  investigations of the same type but with better exposure

7  estimates.

8  Q    Dr. Moolgavkar, you were also asked about the Iwatsubu

9  paper, and I'm just going to show you -- I think you prepared a

10  slide for this one, too, 59?

11  A    Yes.  And here, as I was saying during the cross, they do

12  not use actual industrial hygiene data to quantify exposures

13  and throughout the paper they made these sorts of

14  qualifications.  Because no measurements available on asbestos

15  levels were available, all estimations of exposure parameters

16  were based on the experts subjectively; that is

17  semi-quantification to which we subsequently assigned waiting

18  factors.  So they had to assign waiting factors.  So they come

19  up with some sort of a probabilistic exposure.

20        This index of cumulative exposure was expressed in

21  terms of fiber per mil years inside quotation marks.  So even

22  the authors don't feel that they can -- and there are other

23  statements of that nature throughout the paper that I will not

24  read out.

25  Q    With respect to the last bullet there about using matched

1  pairs design.  How does that impact your analysis of this

2  study?

3  A    Well, the thing is they used the matched pairs design

4  which means that for every case they had one control that they

5  selected.  But it is my recollection now -- I don't have the

6  paper in front of me -- that for a certain number of cases,

7  they were not able to identify appropriate controls.  So,

8  therefore, in order to use all the cases, they broke the

9  matched pairs design and analyzed the study as an unmatched

10 design and that can lead to really serious bias in the

11 estimates of the parameters.  And I said that in Rodelsperger's

12 paper, when they broke the matching they saw a huge difference

13 in their risk estimates, and that just indicates how serious

14 the bias can be when the matching is broken in a matched

15 case-control study.

16 Q    With respect to the studies that you were presented with

17 and studies like this that attempt to subjectively -- wholly

18 subjectively quantify asbestos exposures at very low levels,

19 can you reliably or objectively verify the judgments made about

20 those exposures in those kinds of studies?

21 A    Well, that's outside my field of expertise, I am afraid.

22 I'm not an industrial hygienist so I will not like to give you

23 an opinion on that.

24 Q    Okay.  With respect to understanding dose response

25 relationships with risk in disease though, is the subjectivity

1  associated with those subjects and the lack of any objective

2  data, is it or is it not one of the reasons why researchers

3  like you and other researchers at EPA and Hodgson and Darnton

4  don't include those kinds of studies in understanding dose

5  response relationships?

6           UNIDENTIFIED SPEAKER:  Objection; leading.

7           THE COURT:  It's leading.

8  Q    Dr. Moolgavkar, can you explain why researchers like

9  yourself and the EPA and Hodgson and Darnton and Berman and

10 Crump do not include studies such as the ones we've just

11 discussed, Iwatsubu, Rodelsperger and other studies like that

12 in their scientific quantification and estimation of dose

13 response and disease?

14          MR. FINCH:  Objection; lack of foundation,

15 speculation.

16          THE COURT:  No.  I think he's already testified that

17 they haven't got that and I believe the record will stand to

18 that.  So I think there is a foundation.  I believe he said on

19 cross exam that he would explain his reasons for disagreement

20 with the study and that was deferred till redirect and this is

21 the time.  So overruled.

22 A    Yes.  Because there is simply not good enough exposure

23 information that you can trust.  I would not trust this kind of

24 exposure information.

25 Q    With respect to the questions that you were asked about

Moolgavkar - Redirect                    191

1  the auto mechanic exposure and your analysis of risks not

2  observed with respect to auto mechanics, too, I'm talking

3  about --

4  A    Yes.

5  Q    I actually want to ask you a question about something that

6  I don't have in front of me so give me one second, please.

7                    (Pause)

8            MS. HARDING:  Your Honor, I'm going to just come

9  right back to that when I get it.

10 Q    I want to ask you about the -- quickly about the Helsinki

11 criteria.  You were asked about ACC/FCR-398.  And I want to --

12 do you recall being asked questions about the Helsinki

13 criteria?

14 A    Yes, I do.

15 Q    Okay.  Could I direct your attention to Page 311?  And

16 looking at the second full paragraph, do you understand that

17 the Helsinki criteria also had as one of its purposes the

18 setting of criteria for compensation?

19 A    Yes, I was aware of that.

20 Q    Can you show where that is on the -- I'll read the

21 paragraph.  "Such developments enhance awareness of health

22 hazards imposed by asbestos lead to practical prevention and

23 appropriate compensation and also provide an opportunity to

24 carry out international comparisons."

25 A    Yes.


                J&J COURT TRANSCRIBERS, INC.

1 Q    Okay.  Dr. Moolgavkar, you were asked questions about the

2 article by Dr. Spertus, which I think -- I don't have the ACC's

3 number -- "Malignant Mesothelioma Attributable Risk of Asbestos

4 Exposure."

5 A    Yes.

6 Q    Do you recall being asked questions about that?

7 A    Yes.  Yes.

8 Q    You relied upon this article in forming some of the

9 opinions that you have in this case, correct?

10 A    Well, only to the extent that I think it's the only paper

11 that correctly makes an estimation of the attributable risk of

12 asbestos exposure.  What most papers do is they count up the

13 number of mesothelioma cases that were exposed to asbestos, but

14 that is not the appropriate way to do an attributable risk

15 calculation.  And Spertus, to my knowledge, is the only

16 case-controlled study that has done the correct analysis to

17 obtain an attributable risk.

18 Q    And what was the attributable risk for women reported in

19 the Spertus study, Dr. Moolgavkar?

20 A    For pleural and peritoneal mesotheliomas combined, it was

21 23 percent.

22 Q    Okay.  Attributable risk is different than background

23 rates, is that correct?

24 A    Yes.  It's the fraction of cases that could be

25 attributable to the exposure of interest.

1  Q    Okay.  Does the finding of Spertus, which is the only --

2  as you've testified -- the only study that attempts to

3  calculate the attributable risk of mesothelioma, how does that

4  impact your opinion?

5  A    Well, one has to be cautious in translating any estimates

6  of attributable risk from the population in which the study was

7  carried out doing the other population.  However, it suggests

8  that perhaps 20, maybe between 20 and 30 percent, of

9  mesothelioma among women might be attributable to asbestos

10  exposure.  And that again in turn influences my views on what

11  the background rates of mesothelioma might be based on the

12  analysis of Price and Ware.

13  Q    One quick question about the analysis of Price and Ware.

14  I think you've been through that.  I think -- the calculation

15  of the background rates in women were I think you said four per

16  million?

17  A    Well, it was -- he calculated the age adjusted rates in

18  women to be about four per million, but I think it fluctuated

19  between three and four per million.

20  Q    And what were the rates if you were only looking at women

21  who were 20 years or over?

22  A    Then they estimated a rate of about five per million.

23  Q    And why is that?  Does that further inform your opinion

24  about the estimation of background rates?

25  A    Well, that leads me to conclude that an estimate of

1  between two and four per million in the -- for the rate of

2  spontaneous mesothelioma is conservative in the age group that

3  we are concerned with in this case.

4  Q    Let me see if I can --

5                          (Pause)

6  Q    Dr. Moolgavkar, I'd like to show you a fact sheet from

7  National Cancer Institute, "Asbestos Exposure Questions and

8  Answers."  And it does not have -- I don't see a date on it.

9  Have you --

10            MR. FINCH:  Objection, Your Honor, beyond the scope

11  of cross.

12            THE COURT:  I don't know if it is or not yet, I

13  haven't heard a question.

14            MS. HARDING:  Well, Your Honor, Dr. Moolgavkar was

15  asked several questions about his opinions regarding auto

16  mechanics and this relates directly to that.

17            THE COURT:  Is there an exhibit?

18            MS. HARDING:  It's not an exhibit so I'll just have

19  to make it -- oh, there we go, 700; GX-700.  May I approach the

20  witness, Your Honor?

21            THE COURT:  Yes.

22  Q    Have you seen this document before, Dr. Moolgavkar?

23  A    Yes, I have.

24  Q    And what is the National Cancer Institute?

25  A    Well, it's the branch of the National Institute of Health

1 | that deals with cancer research and treatment.

2 |       MS. HARDING:  Your Honor, I've given you my copy of

3 | the --

4 |       THE COURT:  Oh.

5 |       MS. HARDING:  -- quote I'm looking for.

6 |       THE COURT:  Here, take it.

7 |       MS. HARDING:  I'm sorry, Your Honor.

8 | Q    Dr. Moolgavkar, could you turn to Page 3 of that document,

9 | please?

10 | A    Yes.

11 | Q    And do you see the paragraph beginning -- Paragraph 4 --

12 | "Who is at risk of an asbestos-related disease?"

13 | A    Yes.

14 | Q    And do you see the -- going down into the second paragraph

15 | where it says, "However, recent studies do not support an

16 | increased risk of lung cancer, mesothelioma, among auto

17 | mechanics exposed to asbestos through brake repair."  Do you

18 | see that?

19 | A    I do.

20 | Q    Okay.  In presenting your various opinions in your

21 | reports, your opinion regarding auto mechanics was just one

22 | opinion of many analyses and opinions, correct?

23 | A    Yes.

24 | Q    Okay.  What is the -- what's the significance of that

25 | finding to you as it relates to your opinions regarding dose

1 response relationships with asbestos exposure and mesothelioma

2 and lung cancer?

3 A    Well, despite the fact that a lot of the asbestos in brake

4 linings is turned into -- converted into forsterite during the

5 braking process because of high heat, the results from the

6 industrial hygiene studies have reported there is still

7 measurable amount of chrysotile and those are the results from

8 the latest study I presented earlier today on this chart to the

9 left.  And I think the significance of this is the following.

10 That there are multiple well-conducted epidemiological studies.

11 I showed only the case-control studies that are in addition and

12 other studies that I use as supportive evidence.

13       So these well-conducted epidemiological studies, not

14 one single one of them has found an elevated risk of

15 mesothelioma or lung cancer for auto mechanics.  And that is

16 strongly suggested that -- which says that welcome

17 epidemiological studies of low levels of chrysotile asbestos

18 have failed to find an increased risk associated with that

19 exposure.

20 Q    So is the part that's most significant to you what the

21 actual levels of exposure are, or the fact that there is some

22 exposure there and the studies are not observing risk?

23 A    Well, I don't know exactly what the automobile mechanics

24 are exposed to.  All I can say is that there is some level of

25 exposure below which welcome that the studies have failed to

1 find an increased risk.

2        MS. HARDING:  I'm almost done, Your Honor, I promise.

3 Q    You were asked a bunch of questions about your

4 doubling-dose calculations relating to the 3.2 doubling-dose

5 from mesothelioma for mixed fibers.  Do you recall the series

6 of questions?

7 A    Yes.

8 Q    You were asked to make adjustments based on statements of

9 counsel, correct?

10 A    Yes.

11 Q    Do you agree or disagree that your calculations as done

12 according to the methods that you explained in your reports and

13 in your testimony today, should be adjusted based upon any of

14 the questions that you were asked by counsel today during your

15 cross examination?

16 A    No, I don't think so.  I freely admit that there's a great

17 deal of uncertainty in all these calculations because we really

18 don't know what is going on in the low dose region.  Having

19 said that, I'm using the best estimates available to me and I'm

20 making all kinds of conservative assumptions in the calculation

21 of the doubling-dose.  And so I would not really modify any of

22 my calculations based on what happened today.

23 Q    One other thing.  You mentioned that in your response,

24 from the responses you said that the 3.2 doubling-dose

25 calculation includes chrysitolite and what's the significance

1  of that?

2  A    Well, because chrysitolite is a very strong carcinogen and

3  is much more potent than chrysotile in causing mesothelioma.  I

4  think the reason that the doubling-dose for the mixed fibers is

5  as low as it is, 3.2, is because there's a lot of chrysitolite

6  in that calculation.

7            MS. HARDING:  Your Honor, give me one second, please.

8                      (Pause)

9  Q    Last question, Dr. Moolgavkar.  You were read a statement

10 from your report on Page 7 of your June 11th, 2007 report.  I'm

11 just going to show that to you again and read it.  "The only

12 way to determine whether a specific exposure to asbestos was a

13 factor in causing a claim disease is to conduct an explicit

14 evaluation of the role of that asbestos exposure and causing

15 the disease relative to the risk of developing the disease

16 spontaneously in the additional risks imposed by other

17 exposures, including other asbestos exposures."  Do you recall

18 that --

19 A    Yes.

20 Q    -- that statement and the line of questioning?  Does that

21 statement regarding individuals and understanding their

22 exposures, from your report, limit in any way the validity of

23 your testimony regarding low dose risk of mesothelioma or lung

24 cancer?

25 A    No.

1              MS. HARDING:  I'm done, Your Honor.

2              Thank you, Dr. Moolgavkar.

3              MR. FINCH:  Brief recross, Your Honor?

4              THE COURT:  Yes.

5                      RECROSS EXAMINATION

6    BY MR. FINCH:

7    Q    Dr. Moolgavkar, do you still have the 1986 EPA air-born

8    asbestos health assessment?

9    A    Yes.

10   Q    Could you -- it's Exhibit ACC/FCR-298.  You were asked

11   some questions on redirect by Ms. Harding about the all fibers

12   potency factor, correct?

13   A    Yes.

14   Q    Okay.  Could you turn to Page 90, and that's the chart of

15   the four studies, correct?

16   A    That's correct.

17   Q    And the insulation workers, the potency factor as

18   estimated by the EPA is a higher potency factor than the all

19   fibers, correct?

20   A    That's correct.

21   Q    And the insulation workers' potency factor, the insulation

22   workers were exposed only to chrysotile and amosite and not

23   chrysitolite, correct?

24   A    That's correct.

25   Q    Price and Ware, you were asked a couple of questions about

1  Price and Ware's background risk.  Could you turn to

2  ACC/FCR-560 in your exhibit binder?

3          MR. FINCH:  Would you put that up, John?

4  Q    Page 111.  Next to last paragraph.  All right.  Price and

5  Ware state that if all female cases of mesothelioma were

6  unrelated to asbestos exposure, their analysis indicates that

7  the lifetime background risk could be 3.6 times ten to the

8  minus fourth, correct?

9  A    Yes.

10 Q    And then they say these background levels would be upper

11 bounds if a portion of female cases of mesothelioma were due to

12 occupational, domestic, or unique high-level environmental

13 exposures, correct?

14         MS. HARDING:  Your Honor, I think it's the same

15 questions he asked him on cross.

16         MR. FINCH:  No, I didn't ask about this sentence on

17 cross.

18         MS. HARDING:  That sentence was up there during your

19 cross examination.

20         MR. FINCH:  It was on the screen, but I didn't ask

21 him a question about it.

22 Q    Isn't it true, Dr. Moolgavkar, that the background risk

23 levels would be upper bounds if a portion of the female cases

24 of mesothelioma were due to occupational, domestic, or unique

25 high environmental exposures?

1  A    Well, it would -- there would be upper bounds, but as I

2  said, I'm interested in women over the age of 20 and if that

3  were applied I think the two would sort of cancel out.

4  Q    Also, don't the authors say that the background rates for

5  females may not apply directly to males because of the

6  differences in the percentages of pleural and peritoneal

7  mesothelioma?

8  A    Oh, yeah, that's always possible.  All I can do, Mr.

9  Finch, is use the best available information.

10  Q    Okay.  You were asked some questions --

11  A    And that's the best information available to me.

12  Q    You were asked some questions about an exhibit that Ms.

13  Harding showed you.  It's been marked Grace Exhibit 700,

14  Asbestos Exposure Questions and Answers.

15  A    Yes.

16  Q    Do you still have that document?

17  A    I do.

18        MR. FINCH:  John, do you have Grace exhibits on the

19  -- okay -- the ELMO?

20  Q    This has a statement about the risks of workers exposed to

21  asbestos and she focused you on automobile mechanics, correct?

22  A    Yes.

23  Q    Okay.  The very next paragraph they write, "Those involved

24  in the rescue, recovery and clean-up at the site of the

25  September 11th, 2001 attacks on the World Trade Center, New

1 York City -- "

2         MS. HARDING:  Your Honor, this --

3 Q    " -- are another group of risks developing in

4 asbestos-related disease."

5         MS. HARDING:  Your Honor, I'm just going to object.

6 It's beyond the scope.

7         THE COURT:  It certainly is.

8         MR. FINCH:  They asked him about this --

9         THE COURT:  Because of auto workers.  Do you want to

10 open up a whole new can of worms and start another hour worth

11 of testimony?  Are we going to have claims in this case that

12 was filed somehow or other related to the World Trade Center?

13         MR. FINCH:  We very well might.

14 Q    Were you aware, Dr. Moolgavkar, that the World Trade

15 Center had Grace asbestos in it?

16         MS. HARDING:  Your Honor, this is way beyond the

17 scope.

18         THE COURT:  Yes, it is.  You can recall him.

19         MR. FINCH:  Well, there's no foundation for it.

20         THE COURT:  You can recall him in your case.  If you

21 want to get into this, you can recall him in your case.  This

22 is way beyond the scope of redirect.  This is recross on

23 redirect.  This issue was not raised on recross.

24         MR. FINCH:  Thank you, Your Honor.

25         MR. ANSBRO:  Very brief.

Moolgavkar - Recross/Ansbro                    203

1          THE COURT:  As long as it's not about something that

2  wasn't raised on recross.

3          MR. ANSBRO:  On redirect.

4          THE COURT:  On redirect.  Thank you.

5                    RECROSS EXAMINATION

6  BY MR. ANSBRO:

7  Q    You were asked about the reliability of the Peto model and

8  the calculation that you've used here on redirect and you

9  described that it's reliable and for that reason you've used it

10 and you believe you used it accurately.  Let me just -- I want

11 to go back to your e-mail which is marked for identification as

12 ACC-FCR --

13         MS. HARDING:  Your Honor, I think this goes way

14 beyond the scope.  I asked him about his method.

15         THE COURT:  Let me get a question first, please.

16         MS. HARDING:  Okay.

17         THE COURT:  Go ahead.

18 Q    Mr. Moolgavkar --

19         THE COURT:  I'm sorry, what's the exhibit?  I

20 apologize, I didn't get the exhibit number.

21         MR. ANSBRO:  It's ACC/FCR -- for identification --

22 3014.

23         THE COURT:  All right, thank you.

24 Q    Directing your attention, doctor, to the Peto formula

25 that's laid out here.  You write that Mr. Bailor has correctly

1 pointed out the formula, do you see that?

2 A    Yes.

3 Q    Where is the background component of that formula?

4         MS. HARDING:  Your Honor, this is -- we went way over

5 this in their cross examination and all I asked him was about

6 the method that he used and was it reliable.

7         MR. ANSBRO:  This is the method that he used and he

8 testified on redirect that it was reliable, and for that reason

9 he felt comfortable having it form the basis for his various

10 calculations here.  That's where this goes.  This gets

11 underneath that.  The issue -- the door was opened on redirect.

12 I just have four or five questions, Your Honor.

13         THE COURT:  I don't know why you didn't ask this.

14 This exhibit was not pointed out on redirect.  You went over

15 this on your cross examination.  It wasn't raised on redirect.

16         MR. ANSBRO:  The Peto formula.  I'm not going to be

17 going into other aspects of this demonstrative, I'm just

18 focusing on the Peto formula and it's the Peto formula that was

19 raised on redirect.

20         THE COURT:  It was also raised on direct and on cross

21 examination by everybody.

22         MR. ANSBRO:  Right.

23         THE COURT:  Right.

24         MR. ANSBRO:  And now I'm --

25         THE COURT:  You're doing it again, which isn't the

1 purpose --

2        MR. ANSBRO:  I'm doing cross again because it was

3 followed up on in redirect.

4        MS. HARDING:  Your Honor --

5        THE COURT:  If it's going to the reliability, which

6 was the question on redirect, you can pursue it.

7 Q    My question, Doctor, is where is the background component

8 in the formula that's set out in your e-mail?

9        MS. HARDING:  Your Honor, how does that relate to

10 reliability?

11        THE COURT:  I'll find out.  The doctor can answer

12 that question.

13 A    Well, the Peto formula was developed in groups of workers

14 who were exposed to asbestos and developed mesothelioma.  So

15 clearly among this group of workers, some spontaneous incidents

16 of mesothelioma would also have occurred.  So the Peto formula

17 is a formula that captures the entire mesothelioma experience

18 of workers exposed to asbestos.  So it includes also the number

19 of mesothelioma cases that would arise spontaneously in that

20 group of workers.

21 Q    But my question was where in the formula as it's set forth

22 in your e-mail is that imbedded?

23        MS. HARDING:  Your Honor, now it's going way beyond

24 the scope of redirect.  We did not get into the calculations.

25 They had three hours plus to answer all these questions.

                    J&J COURT TRANSCRIBERS, INC.

1          THE COURT:  Ms. Harding, they did.  It will take the

2   doctor longer to explain this than it will to argue about it.

3          MS. HARDING:  Yes.

4          THE COURT:  Doctor, if you're able to point out how

5   it's accounted for in the formula, would you, please?

6   A    Well, it's just implicit in the formula.  There isn't a

7   separate term for background.  There is not a separate term for

8   background.

9   Q    If I wanted to take the background out of this formula

10  then, how would I adjust the calculation?

11         MS. HARDING:  All right.  Now, it's going beyond the

12  question of reliability in asking him to do further things and

13  more calculations and I think that's beyond the scope.

14         THE COURT:  That is beyond the scope of redirect but,

15  frankly, if that's part of your formula, doctor, I'd like to

16  hear how you did it.

17  A    Okay.  Well, you don't remove the background from the Peto

18  formula, you simply count up the number of mesotheliomas that

19  you get for any level of exposure and then you have to depend

20  on some computation of the background rates.  As I said, it's a

21  two-step process.

22  Q    I'm missing you then.  That computation of background

23  rates, where -- which of the values in the Peto formula is that

24  -- embraces that?

25  A    Well, as I told you, that does not come from the Peto

1  formula, that comes from Price and Ware.

2  Q    Looking at the Peto formula then, if you set F -- F is the

3  exposure concentration?  If we set F to zero, that would be no

4  exposure.

5  A    That is correct.

6  Q    Then am I correct that on the other side of the equation,

7  the risk of mortality, that would also be zero, yes?

8  A    Correct.

9        MS. HARDING:  Your Honor, I'm just going to object to

10  this continuing line of questioning.  I think all of these

11  questions have been asked -- all these questions on cross.

12        THE COURT:  This is going well beyond the scope of

13  redirect.

14  Q    Your answer was yes to that, doctor?

15        THE COURT:  It's going beyond the scope.

16  Q    Your answer to my last question was yes?

17        MS. HARDING:  He didn't answer it.

18        THE COURT:  Pardon me.  It's going beyond the scope.

19        MR. ANSBRO:  All right.  I'll rest, Your Honor.

20        THE COURT:  Ms. Harding?

21        MS. HARDING:  Nothing further, Your Honor.

22        THE COURT:  You're excused, doctor.  Thank you.

23        THE WITNESS:  Thank you.

24        THE COURT:  Do you need --

25        MR. FINCH:  Your Honor, may I hand up the

208

1 demonstratives that we marked now?

2          THE COURT:  Yes, sir.  Are you going to be recalling

3 Dr. Moolgavkar in your case?

4          MR. FINCH:  No.  No, Your Honor.  Thank you, Dr.

5 Moolgavkar.

6          THE COURT:  All right.  You're excused.  Thank you

7 very much.

8                    (Pause)

9          THE COURT:  All right.  About the exhibits, the

10 286 -- 2086 exhibits that I admitted for demonstrative purposes

11 this morning.  All right, Ms. Harding -- Mr. Bernick.

12          MR. BERNICK:  I think that the only other business

13 that we have to conduct today are some summaries that I think

14 we've agreed -- I know that we've agreed with the other side

15 are not objected to and we'd like to offer them into evidence

16 at this point.  Our next live witness is Dr. Anderson, who will

17 be available first thing tomorrow morning.  We expect to finish

18 her testimony well in advance of the close of day tomorrow,

19 though I'd like to address that briefly with the Court because

20 I would like to do that.

21          So, unless the Court would like to do something else,

22 we just have a few of these demonstratives -- I'm sorry,

23 summaries -- to offer into evidence and I'd like to show them

24 at the same time, is that appropriate now?

25          THE COURT:  That's fine.  Sure.

1          MR. BERNICK:  I'm showing Your Honor exhibit

2   GG-2094A.  If we could put that up.  I think we have to switch

3   to the other system.

4          Yes, Your Honor.  This is -- GG-2094A is entitled the

5   Henry X-ray Study and this became the series of claimant E

6   readers who have been listed.  And then the number of readings

7   -- the number of readings that have a profusion score greater

8   than or equal to 1/0.  And then based upon the study, the

9   percentage of readings that occurred and then the percentage

10  that were over-read.

11         This we're offering -- and I believe that there's no

12  objection from the ACC or the FCR -- it's being offered as a

13  Rule 1006 summary.

14         MR. FINCH:  Correct.  No objection.

15         MR. ANSBRO:  No objection, Your Honor.

16         THE COURT:  Okay.  What does over-read mean?

17         MR. BERNICK:  Over-read means that according to Dr.

18  Henry's study they reached a conclusion that was different from

19  the conclusion -- these people reached a conclusion that was

20  different from the conclusion that was reached by the panel of

21  independent B readers.

22         THE COURT:  All right.

23         MR. BERNICK:  The next document is GG-2179, also

24  offered --

25         THE COURT:  Pardon me, one second.

1          MR. BERNICK:  Also offered as a Rule 1006 summary,

2    2179.

3          THE COURT:  All right, thank you.

4          MR. BERNICK:  We offer that.

5          MR. FINCH:  No objection.

6          MR. ANSBRO:  No objection.

7          THE COURT:  All right.  One second.

8          All right.  It's admitted.  Thank you.

9          MR. BERNICK:  Yeah.  This is an exhibit that's simply

10   in the -- and the source of the exhibit is indicated in the

11   note that appears at the bottom of the exhibit.  This simply

12   reflects the trusts.  They have ceased accepting reports and

13   underlying evidence from some or all of the doctors that are

14   then identified.

15          We then have GG-2180, which we would offer as a

16   summary under Rule 1006.

17          MR. MULLADY:  No objection for both of us.

18          MR. BERNICK:  Okay.

19          THE COURT:  All right.  It's admitted.

20          MR. BERNICK:  I know you're always very careful to

21   make sure that the ACC doesn't speak for the FCR.

22          This is a list of the screeners that have been

23   suspended by the trusts, the screening companies, and it lists

24   the trusts that are involved and the screeners that are

25   involved.  And again, the source is indicated at the foot of

1  the document.

2          We then have exhibit GG-2187, 88 and 89 and these

3  again are based upon Rule 1006 summaries and we would offer

4  those as well.

5          MR. FINCH:  No objection, Your Honor.  But under the

6  rule of completeness, the ACC would offer Grace Exhibit 155

7  which is -- this is a summary chart that based on answers to

8  sworn deposition questions by the Manville Trust in response to

9  a subpoena, the Manville Trust has certified this is a business

10  record.  It was produced in this litigation.  The entire

11  subpoena response is about ten or 12 pages.  This is only a

12  portion of the information.  We would offer GX-155, which I

13  believe is the exhibit from which this information comes.  I

14  recognize the data.  I'm not 100 percent sure about the exhibit

15  number.  It's what's set at the bottom of the screen.  Under

16  the rule of completeness, I would offer the entire exhibit

17  which has been certified as a business record of the Manville

18  Trust and sworn to under oath.

19          MR. BERNICK:  Yeah.  I don't -- the purpose of this

20  exercise is to offer Rule 1006 summary.  Under those

21  circumstances, it's unnecessary for the underlying document to

22  come in.  I had no notice as I sat here today -- as I sit here

23  today -- that there was to be a tender of an additional

24  document on the basis of completeness.  I'm not aware of any

25  objection that was made to this on the basis of incompleteness.

1  I'd be happy to consider the tender over the break between now

2  and tomorrow morning and determine whether I have a problem

3  with it.  But I simply have not read through the document from

4  that point of view.

5          THE COURT:  All right.  Why don't you take a look at

6  it tonight and see what you think.  But for now, because these

7  are summaries, I take it there's no objection to the summaries.

8          MR. FINCH:  No, there's no objection to the summary,

9  Your Honor.

10          THE COURT:  All right. GG-2187, 2188 and 2189 -- oh,

11  I'm sorry.  I take it the FCR agrees with this, as well?

12          MR. MULLADY:  No objection, Your Honor.

13          THE COURT:  All right.  Admitted.  And tomorrow

14  morning you can advise me with respect to GX-155.  And let me

15  make a note, please.

16          Why don't you just re-offer it again tomorrow after

17  you've had an opportunity to take a look at this.

18          MR. BERNICK:  Then we have exhibits GG-2190 through

19  2192.  These are again Rule 1006 summaries and we would offer

20  them as such.

21          MR. FINCH:  No objection.

22          MR. MULLADY:  No objection from the FCR.

23          MR. BERNICK:  Your Honor, I think that we have a

24  separate notebook that's available for the Court that has all

25  these documents.

1          THE COURT:  Wait, I'm sorry.  You've taken these down
2  too soon.

3          MR. BERNICK:  Yeah, let me give you -- would you like
4  the numbers again, Your Honor?

5          THE COURT:  No, I've got the numbers, I just need to
6  see what they are.

7          MR. BERNICK:  Okay.  This is -- I think you have the
8  last set.

9          THE COURT:  What's 2192, please?

10          MR. BERNICK:  Yeah.

11          THE COURT:  All right.  2190 through 2192 were
12  admitted.

13          MR. BERNICK:  And I think that concludes our business
14  today if you want to tender that to the Court.

15          THE COURT:  All right.

16          MR. BERNICK:  As I said, we're prepared to resume
17  again in the morning.

18          THE COURT:  Thank you.

19          MR. BERNICK:  We had planned also tomorrow -- I think
20  we have some more summaries and we'll see whether they're
21  objected to or not.  Mr. Mullady has graciously offered, as
22  always, to see if we can work out the objections that they may
23  have.  So we'll endeavor to do that tonight.

24          And I think if we do have time, we'd also be prepared
25  to take up the Rule 408 motion in limine and Your Honor knows

1  that's been very extensively briefed, but there are two new

2  briefs that were submitted; one the motion and one our response

3  to it, that I believe are in the docket of the Court.  That

4  is --

5              THE COURT:  The last week you mean.

6              MR. BERNICK:  Yes, that's correct.

7              THE COURT:  Yes.  Yes, I have those.  I thought you

8  meant something more.

9              MR. BERNICK:  No.

10             THE COURT:  Okay.  Yes, I have those briefs.

11             MR. BERNICK:  Thank you.

12             THE COURT:  I have the motion with some citations and

13 I have a separate brief.

14             MR. BERNICK:  Yes.

15             THE COURT:  Okay.  All right.  Anyone else have any

16 additional matters to address this afternoon?

17             UNIDENTIFIED SPEAKER:  No, ma'am.

18             MR. BERNICK:  The only thing that I'd add is I know

19 nobody wants to let the witness go before they get their last

20 questions in, but this practice of having the examinations go

21 beyond the scope of the crosses and redirects, it's going to be

22 a continuing problem and it really is something that makes it

23 very difficult to schedule witnesses.  And, you know, I think

24 there's a sauce rule, which is that if they're going to do it

25 and Your Honor is going to -- we're going to want to do it as

1  well.  And I think if we want to try to stick to the schedule,

2  it's pretty important that people endeavor to stay within the

3  scope of the examination that they're responding to.  And I'm

4  sure that we'll be tempted to be guilty of the same sin, but I

5  think that we rather -- rather than having contests with the

6  Court at the end of the day, I just really think that we've got

7  to get on with the case.

8          THE COURT:  No one has ever given me a schedule that

9  says how long any party is going to take with any particular

10 witness.  So I have to date not been involved in that process.

11 If you would like me to get involved, I will be more than happy

12 to say this is how long each of you will have with each

13 particular witness.  But I haven't been asked to do that.

14         MR. BERNICK:  And I think at this point, in point of

15 fact, while it went over with respect to the witness yesterday,

16 Dr. Leigh is fairly considerably -- I know that Mr. Finch

17 finished on the minute within the time that he had been

18 allotted and I don't think we had a huge problem here.  But it

19 is -- there has been a problem and I just think that -- all I'm

20 really urging is that if Your Honor is going to -- if Your

21 Honor is going to adhere, at some point as we go through the

22 trial as I think as time passes you will, to the rule that you

23 can't exceed the scope of the prior examination, well, we would

24 ask that be fairly literally enforced now so that down the road

25 as things become tight on time, it doesn't have an imbalanced

1  effect on our cross examination, which I suspect is going to be

2  fairly long because their list of witnesses is very long.

3          THE COURT:  I think I have made rulings on every

4  objection that's been raised.

5          MR. BERNICK:  Yes, you have.

6          THE COURT:  I have nothing more to say on the issue.

7          Okay.  We're adjourned until nine o'clock tomorrow

8  morning.

9          COUNSEL:  Good night, Your Honor.

10          THE COURT:  Thank you.

11                          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, LYNN SCHMITZ, MARY POLITO, ELAINE HOWELL, DENISE O'DONNELL and PATRICIA A. KONTURA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Lynn Schmitz
LYNN SCHMITZ


/s/ Mary Polito
MARY POLITO


/s/ Elaine Howell
ELAINE HOWELL


/s/ Denise O'Donnell
DENISE O'DONNELL


/s/ Patricia A. Kontura
PATRICIA A. KONTURA
J&J COURT TRANSCRIBERS, INC.      DATE:  March 27, 2008


**J&J COURT TRANSCRIBERS, INC.**