UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    USX Tower - 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
           Debtors.  .
                            .    March 31, 2008
. . . . . . . . . . . ..    8:44 a.m.


TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:           Kirkland & Ellis, LLP
                           By:  DAVID BERNICK, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  GREGORY HOROWITZ, ESQ.
                           919 Third Avenue
                           New York, NY  10022

For the                    Stroock & Stroock & Lavan
Unsecured Creditors'       By:  KENNETH PASQUALE, ESQ.
Committee:                 180 Maiden Lane
                           New York, NY  10038-4982


Audio Operator:            Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

                            Caplin & Drysdale, Chartered
                            By:  ELIHU INSELBUCH, ESQ.
                            375 Park Avenue, #3505
                            New York, NY  10152

For the Future             Orrick, Herrington & Sutcliffe
Claimants                     LLP
Representatives:           By:  RAYMOND MULLADY, ESQ.
                                JOHN ANSBRO, ESQ.
                                ROGER FRANKEL, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

TELEPHONIC APPEARANCES:

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Deutsche Bank:         Deutsche Bank
                           By:  MATT DOHENY
                           60 Wall Street
                           New York, NY 10005

For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

For London Market Co.:     Mendes & Mount
                           By:  ALEXANDER MUELLER, ESQ.
                           750 Seventh Avenue
                           New York, NY 10019

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana          Womble Carlyle Sandridge & Rice
Department of                 By:  FRANCIS MONACO, ESQ.
Environmental Quality:        222 Delaware Avenue
                              Suite 1501
                              Wilmington, DE  19801

For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  ROBERT GUTTMANN, ESQ.
                                   MATTHEW RUSSELL, ESQ.
                                   MICHAEL DAVIS, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022

For Caxton Associates:        Caxton Associates, LLC
                              By:  JAMES RIEGER, ESQ.

For the Asbestos              Ferry Joseph & Pearce, P.A.
Creditors Committee:          By:  THEODORE TACCONELLI, ESQ.
                              824 Market Street, Suite 19899
                              Wilmington, DE  19899

For the Asbestos              Caplin & Drysdale, Chartered
Creditors Committee:          By:  WALTER SLOCOMBE, ESQ.
                                   BERNARD BAILOR, ESQ.
                                   JEANNA RICKARDS, ESQ.
                                   JAMES WEHNER, ESQ.
                                   LESLIE KELLEHER, ESQ.
                                   PETER LOCKWOOD, ESQ.
                              One Thomas Circle, NW
                              Washington, D.C.  20005

For Vinson & Elkins:          Vinson & Elkins, LLP
                              By:  ARI BERMAN, ESQ.
                              Trammell Crow Center
                              2001 Ross Avenue, Suite 3700
                              Dallas, TX  75201

For Dune Capital Mgmt:        Dune Capital Management
                              By:  GUY BARON

For Grace Certain             Montgomery, McCracken, Walker &
Cancer Claimants:                 Rhoads, LLP
                              By:  NATALIE D. RAMSEY, ESQ.
                              300 Delaware Avenue, Ste. 750
                              Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Royal Insurance:          Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                              By:  CATHERINE CHEN, ESQ.
                                   150 East 42nd Street
                                   New York, NY  10017

For Official Committee        Duane Morris, LLP
of Unsecured Creditors:       By:  MICHAEL LASTOWSKI, ESQ.
                              1100 North Market Street, Suite 1200
                              Wilmington, DE  19801-1246

For DebtWire:                 DebtWire
                              By:  SETH BRUMBY

For the Debtors:              Kirkland & Ellis, LLP
                              By:  JANET BAER, ESQ.
                              200 East Randolph Drive
                              Chicago, IL  60601

For Owens-Illinois:           McCarter & English
                              By:  DANIEL SILVER, ESQ.
                              Renaissance Centre, 405 N. King St.
                              Wilmington, DE  19801

For the Scotts Company:       Vorys, Sater, Seymour & Pease
                              By:  MATTHEW DAIKER, ESQ.
                              52 East Gay Street
                              Columbus, OH 43216

For Murray Capital            Murray Capital Management, Inc.
Management                    By:  MARTI MURRAY

For David T. Austern,         Phillips, Goldman & Spence, P.A.
the Future Claimants'         By:  JOHN C. PHILLIPS, ESQ.
Representative:               1200 North Broom Street
                              Wilmington, DE  19806

For Official Committee        Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                    By:  EDWARD J. WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, SC  29401

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For the Future          Orrick, Herrington & Sutcliffe,
Claimants                 LLP
Representatives:        By:  DEBRA FELDER, ESQ.
                        Washington Harbour
                        3050 K Street, N.W.
                        Washington, D.C.  20007 For

For David T. Austern:   Piper Jaffray & Co.
                        By:  JASON SOLGANICK

For Official Committee  Anderson Kill & Olick
of Asbestos Personal    By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:       1251 Avenue of the Americas
                        New York, NY  10020-1186

For Rajeev Narang:      Old Lane Law Office
                        By:  RAJEEV NARANG

For Various Claimant    Stutzman, Bromberg, Esserman & Plifka
Firms:                  By:  DAVID J. PARSONS, ESQ.
                        2323 Bryan Street
                        Suite 2200
                        Dallas, TX  75201

For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022

For WR Grace
Shareholder:            Tocqueville Asset Management
                        By:  PETER SHAWN

For Official Committee  Dies & Hile, LLP
of Asbestos Property    By:  MARTIN DIES, ESQ.
Damage Claimants:       1601 Rio Grande, Suite 330
                        Austin, TX  78701

                        Bilzin, Sumberg, Baena, Price &
                         Axelrod
                        By:  MATTHEW KRAMER, ESQ.
                             SCOTT L. BAENA, ESQ.
                             JAY SAKALO, ESQ.
                        Wachovia Building, 200 South Biscayne
                         Boulevard
                        Miami, FL 33131
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

                         LECG
                         By:  ALAN MADIAN
                              ELIZABETH DEVINE, ESQ.

For Fireman's Fund:      Stevens & Lee, P.C.
                         By:  DAVID R. BEANE, ESQ.
                         1105 North Market Street, 7th Fl.
                         Wilmington, DE  19801

For Asbestos Claimants:  Brayton Purcell
                         By:  CHRISTINA SKUBIC, ESQ.
                         222 Rush Landing Road
                         Novato, CA 94948

For Travelers Indemnity: Simpson, Thacher & Bartlett
                         By:  SUNG W. CHOI, ESQ.
                         425 Lexington Avenue
                         New York, NY 10017

For Sealed Air:          Skadden, Arps, Slate, Meagher & Flom,
                            LLP
                         By: DAVID TURETSKY, ESQ.
                         One Rodney Square
                         Wilmington, DE  19801

For Asbestos Property    Scott Law Group
Damage Claimants:        By:  DARRELL SCOTT, ESQ.
                         1001 East Main Street, Suite 500
                         Sevierville, TN  37864

For the PD Committee:    Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

For Citadel Investment   Citadel Investment Group
Group:                   By:  BEAU HARBOUR

For Committee of         Campbell & Levine
Asbestos Personal        By:  MARK T. HURFORD, ESQ.
Injury Claimants:        800 North King Street
                         Suite 300
                         Wilmington, DE  19701

For the State of CA,     Hahn & Hessen, LLP
Dept. of Gen. Services:  By:  CHRISTINA J. KANG, ESQ.
                         488 Madison Avenue, 14th Fl.
                         New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee     Brandi Law Firm
of Asbestos Property       By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:          44 Montgomery St., Suite 1050
                           San Francisco, CA  94104

For Allstate Insurance:    Cuyler Burk, LLP
                           By:  ANDREW CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For King Street Capital    King Street Capital Management
Management:                By:  KIM CHRISTENSEN

For CNA:                   Goodwin Procter, LLP
                           By:  BRIAN MUKHERJEE

Capital:                   Silver Point Capital
                           By:  JOHN KU

For Lehman Brothers:       Lehman Brothers
                           By:  ANDREW CHAN

For David T. Austern:      Piper Jaffray & Co.
                           By:  JONATHAN BROWNSTEIN, ESQ.

For W.R. Grace:            Cohn Whitesell & Goldberg, LLP
                           By:  CHRISTOPHER M. CANDON, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  LEWIS KRUGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

**WITNESSES**                                                                 **PAGE**
B. THOMAS FLORENCE
   Direct Examination by Mr. Bernick                                          42
   Voir Dire Examination by Mr. Finch                                        48
   Voir Dire Examination by Mr. Mullady                                      54
   Continued Direct Examination by Mr. Bernick                               55
   Cross Examination by Mr. Finch                                           118
   Cross Examination by Mr. Mullady                                         227
   Redirect Examination by Mr. Bernick                                      250
   Recross Examination by Mr. Finch                                         265


**EXHIBITS**                                              **ID.**        **EVD.**
2316, 2317, 2318, 2321, 2322, 2324, 2325,
2331, 2336, 2338, 2341, 2301, 2327,
2328, 2329       Summaries                                                 118
ACC-109          Florence Report, May 1997            160
ACC-175          Letter                               163
ACC-469          Dr. Florence's work papers                               199
ACC-472          Halpain File                                             200
ACC-2062         Document                                                 199
ACC-FCR-3024 - Extraction from Reliance Material                          267

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  This is the continuation of the personal

2    injury estimation trial in W.R. Grace, 01-1139.  The

3    participants by phone are Shayne Spencer, Matt Doheny, James

4    O'Neill, Alex Mueller, Francis Monaco, Robert Guttmann, James

5    Rieger, Theodore Tacconelli, James Wehner, Jeanna Rickards,

6    Elihu Inselbuch, but I see him here, Walter Slocombe, Leslie

7    Kelleher, Peter Lockwood, Matthew Russell, Ari Berman, Guy

8    Baron, Natalie Ramsey, Catherine Chen, Michael Lastowski, Seth

9    Brumby, Janet Baer, Daniel Silver, Matthew Daiker, Marti

10   Murray, John Phillips, Edward Westbrook, Debra Felder, Jason

11   Solganick, Robert Horkovich, Rajeev Narang, David Parsons,

12   Theodore Freedman, Peter Shawn, Martin Dies, David Beane,

13   Matthew Kramer, Christina Skubic, Alan Madian, Elizabeth

14   Devine, Sung Choi, David Turetsky, Darrell Scott, Daniel

15   Speights, Beau Harbour, Bernard Bailor, Mark Hurford, Michael

16   Davis, Christina Kang, Terence Edwards, Andrew Craig, Kim

17   Christensen, Brian Mukherjee, John Ku, Andrew Chan, Jonathan

18   Brownstein, Scott Baena, Jay Sakalo, Lewis Kruger, and

19   Christopher Candon.

20           I'll take entries in court, please.  Good morning.

21           MR. BERNICK:  Good morning, David Bernick for Grace.

22           MR. HOROWITZ:  Gregory Horowitz for the Equity

23   Committee.

24           MR. PASQUALE:  Ken Pasquale for the Unsecured

25   Creditors Committee.

1          MR. FINCH:  Nathan Finch for the Asbestos Claims

2  Committee.

3          MR. INSELBUCH:  Elihu Inselbuch for the Asbestos

4  Creditors Committee.

5          MR. MULLADY:  Raymond Mullady for the FCR.

6          MR. ANSBRO:  Good morning, Your Honor, John Ansbro

7  for the FCR.

8          THE COURT:  Wait.  Sorry.  Okay.  Thank you.  Good

9  morning.

10          MR. FRANKEL:  Good morning, Your Honor, Roger Frankel

11  for the FCR.

12          THE COURT:  Okay.  Start with the arguments.

13          MR. BERNICK:  Good morning, Your Honor.  I think the

14  first order of business is the argument with respect to the

15  Rule 408 motion that was filed by the ACC and the FCR.  So I

16  guess they'll be --

17          MR. INSELBUCH:  Do you want me to go first?

18          MR. BERNICK:  By all means.

19                         (Pause)

20          THE COURT:  Good morning.

21          MR. INSELBUCH:  Good morning, Your Honor.  Elihu

22  Inselbuch for the Asbestos Creditors Committee.  As you are

23  aware the 408 issue has been the subject of motions in limine

24  that have been filed before Your Honor earlier.  We made this

25  motion because in the course of Dr. Florence's testimony today

1  we anticipate that a 408 issue will come up.  And we raise the

2  issue again now only to seek Your Honor's confirmation that

3  whatever your ruling will be with respect to 408 it will apply

4  equally to the witnesses that we present and the witnesses that

5  the debtor presents; as a matter of what's sauce for the goose

6  is sauce for the gander.

7          Now, to begin, I would ask that the Court remember

8  why we're here in the first place.  This is not a contest where

9  we are trying to establish liability for any claim at all nor

10  for claims in the aggregate.  This is an estimation in the aid

11  of plan confirmation in order to determine what amount of funds

12  needs to be set aside to fund a trust which by definition has

13  liabilities that can't be specifically determined, because

14  that's the language of the bankruptcy code.

15          In order to be fair not only to those claimants who

16  would come before that trust to seek compensation ultimately

17  for their claims, but also to all the other constituencies in

18  this bankruptcy, because if we were to over fund that trust we

19  would be taking the money from other constituencies.  If we're

20  to under fund that trust we would be unfair to the claimants

21  who would have to come to receive their compensation from that

22  court -- from that trust.

23          And, in fact, as Your Honor said on December 5th,

24  2006 at Page 58, "It seems to me that the estimation is to do

25  two things.  It's to try to figure out how many claims of a

1    particular type are currently pending, and to use that and

2    whatever other information the experts will use to extrapolate

3    out what the demands against the debtor will be in the future."

4    So it's to look at in absolute terms a number of claims that

5    are likely to be filed.  And my eminent colleague said that's

6    correct.  The Court went on to say, "Okay.  Then it is to

7    figure out what the value of those claims is so that we know

8    what the debtor has to put into a fund in order to pay those

9    claims."

10           So I don't think that there's any real question that

11   the estimation is not here to determine liability.  Now, Grace

12   in doing it's calculation of what that estimation should show

13   has put together a presentation which says what we must look at

14   -- what the Court should look at is the cases that were pending

15   and unresolved as of the date of the bankruptcy and look at

16   those and put them -- what we call, we Grace, call liability

17   filters and determine which of those claims would satisfy our

18   liability filters and then use that number of claims as

19   basically part of the formula from which they then would

20   develop how many claims there ultimately will be.

21           Interestingly enough once they do that they would

22   value all of the claims based upon value amounts, settlement

23   amounts that come from the settlement history.  We on the other

24   hand, although you haven't seen the presentation as yet, but of

25   course Your Honor has been inundated, shall I say, with expert

1  reports and other materials telling you what this case will

2  ultimately show, do the calculation in a different way, in a

3  way that's been done in all the other cases where we have also

4  presented the need for estimating 524(g) trust values by

5  looking at the settlement history not to determine what the

6  liability was, because in fact in 98 percent of all the cases

7  or more this debtor never went to judgment.  It resolved its

8  claims.  It resolved its claims.  In effect it bought its peace

9  from these claims.  Some of them I'm sure it thought it had

10 good defenses.  Some of it, it had lesser defenses to.  But its

11 way of solving its problem was to resolve those claims for

12 money and make them go away.

13         Our concept of how we estimate the future, what would

14 have occurred had there not been a bankruptcy is to say we look

15 at what they did in the past, we make whatever adjustments need

16 to be made for changes in the system that we were in and then

17 we say this will be replicated going forward.  And that's why

18 we look at these materials, and that's what they're for.

19         Now, when you estimate things normally you would look

20 to comparable things.  The Court is familiar with estimation.

21 I mean, oftentimes you have to estimate the value of a plot of

22 real estate.  Well, you look for a comparable piece of real

23 estate, look at what it sold for and then you would -- and if

24 you looked at a few comparables you satisfy yourself that

25 somewhere in that mix of values you'll have a fair estimate for

1  the property in question.

2         When my kids were small we used to have a jar we put

3  coins in.  And when the jar was full and we had to empty it out

4  and we had to go to the bank we would all guess how much money

5  would come out of this jar of coins.  And, you know, after

6  awhile the guesses got pretty good.  Because if you look at the

7  same jar and fill it with coins over time and if you remember

8  how many coins were in the jar you can come up with a pretty

9  good estimate.  The problem we have here is we don't have

10  another Grace or something to look to, and I doubt very much

11  that the Court would accept evidence of what the estimates were

12  for other defendants in the tort system, because all of those

13  situations are different.

14         There is no comparable like that to look at.  The

15  closest thing we can come to is what have they done prior to

16  the bankruptcy, and that's what we would propose to resolve.

17  Now, I would like to take a minute to look at the text of 408

18  with the Court.  Could I have the ELMO?  I'm not sure I know

19  how to work this either.  Do I have to do something here?

20         UNIDENTIFIED SPEAKER:  Power.

21         MR. INSELBUCH:  Power.  Did I do it?

22         UNIDENTIFIED SPEAKER:  You did.

23         MR. INSELBUCH:  Thank you.  Now, how do I get --

24         UNIDENTIFIED SPEAKER:  Minus.

25         MR. INSELBUCH:  Minus?  That is Rule 408.  And what

1  does it talk about, Your Honor?  It talks about compromise and

2  offers to compromise.  And I think the words in this rule to

3  focus on for our purposes are first when does the rule operate?

4  It doesn't operate all the time.  The evidence that it talks

5  about is not admissible when offered to prove liability for

6  invalidity of or amount of a claim.  And what is the evidence

7  that you can't use?  Basically showing that you offered money

8  to settle a claim or that you talked about offering to settle a

9  claim, but what claim is it?  It's the claim.  The claim.

10          And what was the purpose of the rule?  The purpose of

11 the rule is to reflect the policy that our system would like

12 people to resolve their controversies and encourage them to

13 have settlement negotiations.

14          THE COURT:  Could I send you to the back room and

15 lock you in until you settled this case?

16          MR. INSELBUCH:  You've done it before.

17          THE COURT:  I'd like to try it again.

18          MR. INSELBUCH:  Well, could I finish my argument

19 first?

20          THE COURT:  All right.

21          MR. INSELBUCH:  And then send me with Mr. Bernick.

22          MR. BERNICK:  No, wait a minute, just you.

23          MR. INSELBUCH:  I'm not sure it would help if I went

24 by myself though, Judge.

25          THE COURT:  Okay.

1          MR. INSELBUCH:  It's to encourage people to do that

2  and relieve them of the problem that they would be confronted

3  with if the negotiations failed of then having somebody come on

4  the witness stand and say, he must be liable for this claim, or

5  the amount of this claim must be at least so and so amount

6  because that's what he offered me in the back room.  But,

7  that's, as I said, not what we're doing here.  We've filed lots

8  of briefs.  Everybody's filed a lot of briefs which cited a lot

9  of cases.  I will leave it to the Court to read the cases

10  should the Court find that necessary, but I think you'll find

11  that the cases fall into several groups.

12          First, there are a bunch of cases that simply say

13  what I just said, that the purpose of this rule is to encourage

14  settlement discussion so that when you get to litigating a

15  claim where settlement failed you can't use what people have

16  said in the discussions to prove the liability for or the

17  amount of the claim.  That's a whole bunch of cases.  They go

18  back into the 19th century.

19          There are a small handful of cases that deal with a

20  situation where it's not the claim but an identical claim

21  that's being discussed or litigated.  For example --

22          THE COURT:  Excuse me.  Mr. Inselbuch, pardon me just

23  one minute.

24          MR. INSELBUCH:  Sure.

25          THE COURT:  I need to take a phone call.  Excuse me.

1  Take about five minutes.

2                    (Five minute recess)

3          THE COURT:  ... for interrupting your argument.  I

4  lost you with the cases that deal with the situation that talk

5  about it's not the claim.

6          MR. INSELBUCH:  Sure.  We were talking about how the

7  cases fall into groups.  The first group merely says pretty

8  much what I said.  It tells you what the rule says.  It says it

9  applies to the case the people were negotiating.  Then there

10  are some cases that deal with identical situations.  I guess

11  the classic would be you have an automobile accident and you

12  have two people in one car and one person in the other car and

13  the one person is the defendant, the two plaintiffs sue.  He

14  settles with one of the plaintiffs and the other plaintiff now

15  would like to use that settlement as an admission of liability.

16  And the courts probably won't allow them to do that either

17  because that's the identical claim and it would violate the

18  policy.  He wouldn't be able to settle with anybody if you

19  permitted that in.

20          And there are a number of cases that say also what I

21  say about the rule that if you offer the material for a

22  different purpose than to show liability or the amount of the

23  claim in a particular case they'll let it in.  For example,

24  there's this wonderful Hutsmith v. The Commission of Internal

25  Revenue case that's cited where the issue was the value of

1  timber taken from a particular forest.  And there were two

2  taxpayers.  They both took the timber from the same forest yet

3  the IRS had some expert estimator who came up with very

4  different numbers.  And the different numbers were shown or

5  were admitted by the Court to show bias on the part of the

6  estimator.  And that's of course exactly what I'm saying where

7  you're going to show some other purpose to be shown for the

8  evidence than the rules plainly permits it.

9           And, in fact, I think the Court recognizes once again

10 on December 5th that we were not -- this evidence was not being

11 offered for liability, but for some other purpose.  At Page 41

12 and 42 of the transcript -- this is December 5th, 2006, Your

13 Honor.  Mr. Bernick had been arguing that Rule 408 could not be

14 clearer.  This applies to this without any question.  The Court

15 said, "But I think the settlement history has a different

16 purpose regardless of liability.  I don't take a settlement to,

17 especially one that says which most of the ones I've seen in

18 other cases if not this case say that there's no admission of

19 liability."  And that's certainly the case, Your Honor.

20          "So I'm certainly not going to deem it to be an

21 admission of liability.  But I think it does have some value

22 with respect to whether or not the debtor is willing to settle

23 claims, and if so at what levels for whatever purpose the

24 debtor chooses to settle those claims."  My learned colleague

25 said, "But that is only -- that is not germane in this

1  proceeding."  And the Court said, "Well, sure it is.  From the

2  asbestos creditors committee side it is because the standard, I

3  think, is pretty clear that the Court has to look to what would

4  be the likely outcome of the claims in the tort system if no

5  bankruptcy had been filed."

6           Now, there is one case at least that is directly on

7  point.  And that is Judge Brown's decision in the <u>Babcock &</u>

8  <u>Wilcox</u> case in New Orleans where Mr. Bernick and I were

9  adversaries once before.  And Mr. Bernick made the same

10 argument there that 408 precluded the use of settlement history

11 to estimate the asbestos liability.  Now, there we weren't

12 estimating for the purpose of a plan.  It was a fraudulent

13 conveyance piece of the bankruptcy and we were estimating what

14 was the reasonable liability.  The reasonable estimate of the

15 liability or not the liability of the amount of the asbestos

16 claims present and future as of a particular date when a

17 transfer was made.  That's what we were doing.  And we said

18 well, the way you look at that is the same way you look at it

19 in all these other cases.  You look at what the history was and

20 you project it forward as of that date because you've got to

21 estimate the presence and the futures.

22          And <u>Babcock & Wilcox</u> through Mr. Bernick said no, you

23 can't do that, 408 precludes that.  And Judge Brown said, and

24 this is a 274 Bankruptcy Reporter on Page 256.  "Finally,

25 defendant's argument that 408 of the Federal Rules of Evidence

1 prevents the Court from considering B&W's prior settlement

2 history and protocol is also without merit.  Rule 408 prohibits

3 use in trial of evidence of a settlement, 'To prove liability

4 for an invalid or invalidity of the claim or its amount;'

5 with a footnote.  Rules 408 applies to the use of evidence of

6 compromise to prove the validity or invalidity of the claim

7 that is the subject of the compromise.  And clearly here, the

8 claims that are the subject of this compromise are the closed

9 claims.  We're not estimating those claims here today.  They

10 have been resolved.  Thus a particular plaintiff in a tort case

11 against a particular defendant cannot establish liability in

12 that case by using evidence of attempts to settle that case,

13 et cetera."

14 　　　　And what he went on to say is, "Consequently the

15 Court in determining whether B&W's future estimation of tort

16 liabilities was reasonable can consider both settlements by B&W

17 and other case histories against other asbestos defendants as

18 part of the grounds for its decision.  To do otherwise would

19 close one's eyes to the realties that existed in 1998;" Judge

20 Brown.  And, of course, we've had several estimations.  We've

21 had Armstrong, Federal Mogul, Owens Corning Fiberboard before

22 Judges Fulham, Rodriguez and Robreno, all Third Circuit

23 District Judges, and they have all done it this way.

24 　　　　Mr. Bernick will say well, nobody argued about it.

25 Nobody raised 408.  Well, maybe that's for the very good reason

1  that people did not perceive it to be a valid objection.  But

2  in any event that's the way we did it.  Finally, on 408 at the

3  end of its brief Grace argues that they should be permitted to

4  use some proof out of the settlement history, but the asbestos

5  creditors committee and the FCR should not be.  And that's

6  really why we raise this immediately today before Mr.

7  Florence's testimony -- Dr. Florence's testimony.

8           Now, why do they want to do that?  Well, they want to

9  value their estimate of what they call liability based upon the

10 settlement history.  As it turns out as you'll hear based on

11 six mesothelioma settlements.  And why do they want to do that?

12 Well, it makes the numbers much, much smaller, doesn't it, if

13 we do it based on a settlement history rather than on the

14 judgment history.  If they based their estimate doing it their

15 way on the judgment history we wouldn't need to have these

16 hearings because the number would be so large and we would

17 agree to it.

18           But that case is interesting, because they cite you

19 to a place in the Federal Court, a Second Series at Page 912.

20 They cite you to Page 581 with a citation to the Second

21 Circuit.  I would ask you to --

22           THE COURT:  Wait, I'm sorry.  I didn't get the cite.

23 I'm sorry.

24           MR. INSELBUCH:  The citation is 912 F.2d, initial

25 Page is 563.  The page that they cite to is 581 and they quote

1    at that page.  And they cite it to the Second Circuit in 1990.

2    And I'd like the Court to open this book to Page 581.  May I

3    hand it up?

4              THE COURT:  Thank you.

5              MR. INSELBUCH:  What you will see when you turn to

6    that page is the material that is cited to is not from the

7    Second Circuit, but from an appendix to the Second Circuit's

8    opinion which is a magistrate's decision which was ultimately

9    affirmed.  And frankly in that case what the Magistrate had

10   before him was at the foot of a consent decree that the

11   American Society of Composers, Authors and Publishers has been

12   operating under for, I think, since 1940 is a rate making

13   process, licenses for the performance of musical compositions.

14   People who use lots of music want a blanket license to use that

15   music.  And the dispute was with something called Show Time the

16   movie channel.  And they wanted to show what a settlement offer

17   which had been made by ASCAP to license HBO had been to prove

18   what their license would be worth, or should have been or would

19   have been a fair thing evidentiary.

20             Now, the magistrate let that in, ironically, and then

21   decided it had no probative value.  But in any event all I'm

22   saying is there are lots of cases that say well, for a

23   different purpose we can see it and that's what we're doing

24   here because it certainly wasn't there to show that HBO had

25   liability.  But, I just would point out that I was struck by

1  the citation because it would lead one to believe that it was

2  language from the Second Circuit, which it is not.

3        Finally, in passing, we remark that even if there

4  were any validity to the argument about Rule 408, experts who

5  have historically done these processes in this way rely on the

6  evidence or the materials that they rely on irrespective of

7  whether the materials can come into evidence.  That's the

8  learning of Rule 703.  And since this is material that these

9  experts including Dr. Florence, when you hear from Dr. Florence

10 what he's done over the past 20 years in this field would rely

11 on in doing an estimate then they can rely on it irrespective

12 of whether it satisfies other rules of evidence.

13        Now, the argument is made that oh, you can't trump

14 408 with 703.  Well, you're not trumping any rule with 703

15 because the fact that the expert can rely on it doesn't bring

16 it into evidence for purposes of 408.  Now the Court has

17 authority under 703 to do whatever the Court feels is necessary

18 to make use of the material fair in the circumstances.  But 703

19 is an entirely different approach to the issues that are in

20 question.  And I would close by just arguing to the Court that

21 what is sauce for the goose is sauce for the gander.  If we are

22 not to be permitted to show -- to use the enormous history of

23 how Grace went about resolving its disputes over personal

24 injury claims in the past to show how they would most likely

25 have come out in the future then for sure Grace cannot be

1 permitted to use the settlement values that come out of that

2 same pile of material for purpose of showing what they say is

3 their liability.  Thank you.

4          THE COURT:  Mr. Ansbro.

5          MR. ANSBRO:  Thank you, Your Honor.  I'll be brief.

6 I realize our side's time is short at this point.  Your Honor,

7 I just would really rate from the perspective of the future

8 claimants' representative as Mr. Elihu Inselbuch has pointed

9 out we're not here in this estimation hearing to prove

10 liability.  And in fact the FCR's estimation expert Jennifer

11 Bigg does not, contrary to Grace's arguments, use Grace's

12 settlement data to prove liability.  Ms. Biggs, as you will

13 hear and have read in her expert report gives her best estimate

14 as to the anticipated liabilities that Grace would be expected

15 to face, that Grace would be expected to face in the tort

16 system.

17          Consistent with all of the prior precedent in

18 contested asbestos bankruptcies and asbestos estimations the

19 tort system is the basis upon which the estimation proceeds.

20 And so Ms. Biggs, by estimating the anticipated liabilities is

21 estimating the dollar amounts that Grace would be expected to

22 pay to claimants in order to monetize and resolve the pending

23 and future asbestos personal injury claims against it.  It is

24 for that purpose that she uses the settlements here.  She's not

25 proving liability.  She doesn't assume legal fault or liability

1  by virtue of that information.  Thank you, Your Honor.

2          THE COURT:  All right.  Thank you.  Mr. Bernick.

3          MR. BERNICK:  Yes, Your Honor.  I'd like to begin

4  with what I think really is a central argument that's being

5  made here at the outset that's more or less a play on words

6  rather than a substantive analysis.  Both the ACC and the FCR

7  have urged strenuously over time that the purpose of this

8  proceeding is not a "determination of liability."  And that is

9  correct.  We are not ruling or the Court is not being asked to

10  rule on the liability of Grace with respect to any individual

11  claimant.  But, that's not to say that liability is irrelevant

12  to this proceeding.  It is not to say that liability is not the

13  touchstone of this proceeding.  It is.

14          This is an estimation of liability.  It's not an

15  estimation of any other thing.  It is an estimation of what

16  Grace's obligation to pay will be.  An obligation to pay under

17  the rules comes down to allowability, and allowability is

18  determined on the basis of actual legal liability under state

19  law.  So the touchstone of the estimation is in fact liability.

20  They can't get around it.  This is something that we briefed in

21  the trial briefs that were submitted at the beginning of the

22  case, and it remains so today.  It is their preference rather

23  than to estimate the liability by reference to actual facts of

24  liability to use the settlements as a proxy as they have done

25  in the past.  That is their decision.

1          But then they have to wrestle with whether it

2    comports with the rules.  If in fact the prior settlements are

3    not being used as evidence of liability then they are

4    irrelevant to the standard that brings us here today which is

5    allowability under the rules.  If they are seeking to proffer

6    the prior settlement as settlements of liability therefore

7    their position is germane to the issue under the rules, then

8    they have to abide by Rule 408.  It's just that simple.  You

9    can't have settlements be introduced for purposes other than

10   liability still be found to be relevant or they're educed for

11   purposes of liability and not have to comply with Rule 408.

12   Rule 408 actually deals with the issue of liability.  So,

13   that's the first problem is, is there something that because

14   this is an estimation takes this issue outside of Rule 408 and

15   the answer is no there is not.

16          We then come to two basic problems.  Problem number

17   one is factual.  And there's no amount of argument about the

18   law or indeed argument about Rule 408, or 702, or 703 or

19   anything else that can alter the facts.  And the underlying

20   facts here are that the settlements that were reached by their

21   terms said that they were not admissions of liability and could

22   not be used for that purpose, and all of the parties to the

23   settlements so stipulated.

24          Now, on the basis of what principle of law can a fact

25   which doesn't exist be made to exist by virtue of any kind of

1 argument?  There is absolutely no evidence before the Court

2 other than what we introduced in our brief, and we'd be happy

3 to give the Court summaries of all of the settlements that are

4 out there that we can lay our hands on if that's what the Court

5 wants.  The only evidence before the Court is that the

6 settlements specifically disclaim admissions of liability.

7 Well, what principle of law now turns them factually into

8 admissions of liability?  Absolutely none has been cited.

9 Now, we could agree that they are.  In other cases

10 folks have agreed that they are.  But, that is an agreement

11 that essentially is now a new agreement that changes the

12 historical fact.  We've not made any such agreement.  We're

13 prepared to have this historical fact the rest, or what it was

14 at the time, which is that it was not an admission of

15 liability.  They have no answer to that proposition whatsoever.

16 It is an end of the matter.

17 To the extent that the Court gets into the rule all

18 that the rule constitutes is essentially a belt and suspenders

19 saying that now also as a matter of law if the prior

20 settlements in fact were admissions of liability as a matter of

21 law they cannot be introduced for that purpose.  That's what

22 Rule 408 says.  It executes a principle of legal public

23 policies that says that they're not admissible.

24 The only argument that is made with respect to the

25 rule in this application is Mr. Inselbuch ably put that box

1   around "the", the claim as if to say Rule 408 only governs the

2   disposition -- the evidence relating to the claim actually

3   litigated in the case which would have the effect of meaning

4   that it is only where negotiations between the parties in the

5   case at bar break down that Rule 408 then precludes the use of

6   those settlement negotiations in a subsequent trial on the

7   merit; that is to say, Rule 408 is really confined to

8   precluding offers of settlement and settlement negotiations as

9   opposed to completed settlements, because if there were

10  completed settlements the case wouldn't exist.

11           That interpretation of Rule 408 has been specifically

12  -- was specifically addressed by the advisory committee itself

13  in the 1970 proposed rules.  In 1970 the advisory committee in

14  its notes specifically addressed that question and stated,

15  "While the rule is ordinarily phrased in terms of offers of

16  compromise it is apparent that a similar attitude must be taken

17  with respect to completed compromises when offered against a

18  party thereto.  The latter situation will not of course

19  ordinarily occur except when a party to the present litigation

20  is compromised with a third person."  Plain as day.  That is

21  also the rule that was articulated and adopted by the Third

22  Circuit in the Petrusi case in 1993 where the Court

23  specifically held that prior anti-trust actions would not be

24  admissible, and that rule of law in the Third Circuit remained

25  sound.

1            Mr. Inselbuch, my learned colleague, cites the

2   Huntspeth case as if the Huntspeth case helps their position.

3   It does not.  That's a Ninth Circuit case where Rule 408 was

4   held to bar third party compromises.  The net result if the

5   rule were otherwise would be really the rule would have almost

6   no utility and particularly in toxic court cases where the same

7   defendant is present on multiple occasions and if the defendant

8   enters into a settlement with respect to one plaintiff that

9   settlement would then be used forever.  And we know that that

10  doesn't happen.  It doesn't even happen in asbestos cases.  The

11  prior settlements are introduced as evidence of liability.

12           So there's no way that consistent with the language

13  and the rule or the policy of the rule, the rule can be read to

14  be so limited and so useless.  There's a citation to Armstrong

15  and other cases.  Mr. Inselbuch properly concedes that those

16  are cases that didn't raise the issue.  In the Babcock case the

17  issue was raised, and I want to come back to the Babcock case

18  because it's instructive with respect to the second issue

19  that's before the Court which is the debtors' use of settlement

20  history.

21           In the Babcock case essentially the fact was whether

22  the settlement -- whether the estimate that had been made by

23  Babcock & Wilcox historically was a reasonable settlement or

24  not.  That was the issue in the case.  And while we did argue a

25  broader legal proposition, the Court in the very language that

1  Mr. Inselbuch cites came back to the proposition that the fact

2  at issue was a liability estimate where the debtor itself used

3  settlement.  So if you wanted and had to resolve the question

4  of whether the debtor's estimate was reasonable you had to be

5  talking about the settlements.  There was no way to avoid it.

6         And very, very importantly, and this is a fact that

7  Mr. Inselbuch didn't touch on, but Judge Brown was at pains in

8  his opinion and it actually rebounded to the benefit of the

9  claimants because otherwise they would have been stuck with

10  that opinion in connection with plan negotiations said that

11  when we get to things like estimation, i.e., we're here today

12  talking about estimates, the rules can be completely different.

13  So that's a fraudulent conveyance case.  It doesn't really have

14  anything to do with why it is we're here today.

15         As to the idea that 702 and 703 somehow create a

16  carve-out from Rule 408, there is nothing and anything to do

17  with 702, 703 that somehow design to trump or create an

18  exception to Rule 408.  And indeed they proceed on the basis of

19  completely different jurisprudential considerations.  408 is an

20  issue about whether certain evidence should be admissible

21  because to admit it would violate or create a problem with

22  legal public policy.  Rule 702, 703 has nothing to do with it.

23  It has to do with the quality of reliability that must attach

24  to evidence before it can be used as a foundation for expert

25  opinion.

1          So I'd like to talk a little bit then about the

2     second part of this equation.   And Mr. Inselbuch's citation to

3     the sauce for the goose, sauce for the gander rule is in

4     certain parts of the mid-Atlantic is referred to the saucy

5     rule.   I don't know if there's a southern version for that.   I

6     tried a case where everybody referred to it as the saucy rule.

7     But really the rule that we have to deal with here is not a

8     rule of sauce, it's a rule of swords and shields.   And let me

9     get into the good stuff.

10          We have a settlement that took place between Grace as

11     a defendant and Plaintiff A in some prior litigation.   The

12     policy -- Rule 408 is designed to give protection to the

13     participants in this process and it does so by saying that Rule

14     408 essentially creates a shield -- that's my little shield --

15     both for Grace and for the plaintiff in that case such that

16     whatever they do can't be used as admission.   Now, here the

17     stipulations in the settlement is so stated.   But that's the

18     policy of Rule 408.

19          We now move forward to the present case.   Grace is

20     now present here and we have a bunch of folks who are here as

21     Claimants 1 through N.   What is important about the people here

22     is that they don't participate in the sauce rule.   The sauce

23     rule or the shield's rule protects those people who were

24     involved in an actual settlement that is being placed at issue

25     in an evidentiary way.   These people, there are four things

1 that relate to them; (1) is that they were not parties to the

2 settlement, (2) is that they are not protected by the policy of

3 Rule 408.  None of these people actually were involved in the

4 settlements at all.  They are totally different parties.  And

5 because they're different parties there's nothing about these

6 prior settlements which we are using for purposes of their

7 dollar value, there's nothing about their negotiations or their

8 interests in the negotiation process that is in any way, shape

9 or form compromised.  They are not parties, they are not

10 protected by the policy, they were never involved.

11          And that is clear and that is also the force of the

12 Show Time decision out of the Second Circuit which was -- we do

13 cite the magistrate's opinion and the magistrate's opinion is

14 in fact appended to a Second Circuit decision that upholds the

15 determination that was reached.

16          But the process doesn't even start here -- stop here.

17 This is also not a situation where anybody wants to litigate

18 the settlements on the merits insofar as their dollar amount is

19 concerned.  The claimants here aren't coming in and saying, oh,

20 we want to prove up that all of these -- all of our claims in

21 terms of their dollar value are really worth X dollars because

22 of, you know, compensatory loss, you know, emotional -- all of

23 the soft damages aspect of their claim.  They're not seeking to

24 litigate on the merits.

25          The whole purpose of Rule 408 is to protect

1  litigation on the merits so that if either side to this

2  controversy wanted to actually litigate damages on the merits

3  and either party were a party to the prior determinations based

4  upon settlement, well, then Rule 408 would not allow you to

5  displace litigation on the merits with litigation which used

6  instead the settlement value.  That's not taking place here.

7  There's no evidence that we will hear from the claimants here

8  with respect to the class of claims that we're dealing with

9  that says, oh, here's what their real value is based upon a

10  merits analysis.

11        And obviously this then brings us to the last

12  situation.  This is not a situation where 408 is being used as

13  a shield.  Everybody, everybody in this case agrees that the

14  dollar amounts assigned to the claims should be driven by

15  settlement history.  In that respect this is exactly like the

16  <u>Babcock</u> case.  In the <u>Babcock</u> case everybody agreed that the

17  issue was whether the estimate that had been reached by <u>Babcock</u>

18  was a reasonable estimate and it used settlement information.

19        Likewise with respect to dollars here that is the

20  claim value these are all situations on both sides, all the

21  parties here are saying we all agree that the settlement

22  history should be the benchmark.  So we don't have anybody who

23  wants to litigate on the merits.  Everybody wants to litigate

24  on the basis of the settlements.  And what is it that the other

25  side now comes in and says?  They come in and say well, we

1  really don't like what Grace is doing on the liability side.

2  We really don't like that.  And even though we agree with what

3  they're doing on the damages side, we would rather toss out the

4  entire enterprise and wipe out all of Grace's evidence on

5  liability by saying oh, well, they can't use the damages part

6  of the equation.  That's effectively what they're saying.

7          If we weren't going with our approach on liability;

8  that is, liability determined on the merits, they wouldn't be

9  making a peep about the use of the settlement dollars for

10  valuation purposes.  It is only by way of reprisal that they

11  are here saying that we can't use the settlement dollars.

12          Well, one thing is quite clear which is that Rule 408

13  is not a sword.  It is a shield.  It is protective.  These

14  people aren't entitled to protection, only Grace is.  They are

15  certainly not entitled to use this as a sword by way of

16  creating a threat against Grace's damages case in order to

17  obtain the result that they seek which is to throw out Grace's

18  liability case.  This is a perversion of Rule 408.  It's got

19  nothing to do with its protective policies, they don't enjoy

20  those policies.  It's got nothing to do with their wanting to

21  litigate on the merits.  They don't want to litigate on the

22  merits with respect to any issue in the case.  This all has to

23  do with what they call the sauce rule, but it's really a sword

24  rule.  And that rule cannot be found within the confines of

25  Rule 408.

1          THE COURT:  Mr. Inselbuch.

2          MR. INSELBUCH:  Mr. Bernick began by talking about

3 allowability of claims.  And I would go back and remind the

4 Court that we're not here in an allowance proceeding.  No claim

5 will come out of this estimation allowed.  We couldn't begin to

6 allow future claims.  We can't be allowing either Mr. A's claim

7 or Mr. B's claim because at least for the future claims we

8 don't even know who they are.  And in fact if we were in that

9 mode, if we were actually going to litigate the legal liability

10 with respect to any of those claims, with all due respect to

11 this Court, we would have to be in the District Court because

12 every one of these claimants would be entitled to a jury trial.

13          I'm puzzled by what Mr. Bernick was writing over

14 there.  I wonder whether he would also argue that if you had

15 another litigant, if they were not in bankruptcy, if they were

16 in the tort system and they had all of this pile of settlements

17 in the past and some new litigant came in to try a case against

18 Grace that litigant isn't entitled apparently to the policies

19 of 408.  That litigant didn't settle anything.  That litigant

20 wasn't party to the settlement.  Could they offer the

21 settlement values from other cases against that litigant?  I

22 think not.  I think it wouldn't be probative.

23          We're not here saying that they can't use settlement

24 values because they're using a merits based argument.  We're

25 saying simply that if all of that information that resides in

1  that history which we submit is the best evidence of what would

2  happen in the future with all of the unknown cases that might

3  arise in the future, if we can't use that then they shouldn't

4  be able to either, irrespective of what their theory is.  The

5  rule is unitary.  It doesn't talk about liability separately

6  from value.  It talks about them together.  You can't use one,

7  you can't use the other.  You can use one, you can use both.

8  And we're not here to prove liability at all.  They know that,

9  we know that.  We're here to estimate what amount of money

10  needs to be set aside in order to properly fund the trust which

11  by definition we can't tell what the liability is.  Thank you.

12          THE COURT:  Mr. Ansbro.

13          MR. ANSBRO:  Your Honor, if I may, maybe just inject

14  a different point of view here and perhaps put what Grace's --

15  put Grace's motion into context here.  Your Honor is aware that

16  these two sides are presenting diametrically different

17  methodologies here.  We're in the tort system.  We're using the

18  term liability to couch costs of these settlements.  Grace has

19  taken a completely different view.  The motion -- and in that

20  context, Your Honor, as Mr. Inselbuch has pointed out Your

21  Honor has said that you will allow both sides to present their

22  cases fully and then Your Honor will take on board all of the

23  evidence that's presented and determine what's really going on

24  here.  Is it liability according to Grace's theory or liability

25  according to the claimant's theory?

1          What this motion does is try to cut the legs out from

2   under the claimant's case altogether.  If you were to grant

3   this motion we would essentially have no expert opinions to

4   offer to Your Honor.  That would leave Your Honor with only one

5   choice, as to how to fund or to make an estimation that would

6   fund this trust.  We submit, Your Honor, with left with only

7   one it would severely under trust -- under fund the trust.

8          A different way to look at this is if we had brought

9   a motion in limine, we've already brought these motions by way

10  of Daubert, but the same arguments could be made from our side

11  based upon the tort system; that is to say, we could have

12  brought motions in limine seeking to bar Dr. Anderson's

13  opinions about causation and about thresholds that she adopted

14  from Dr. Moolgavkar.  None of the threshold and the criteria

15  applied by Grace's experts exist in the tort system.  They

16  aren't the law.  They are Grace's theory here in this case.

17         And Your Honor has allowed Grace to present its case

18  in full when a motion by us would have been grounded in tort

19  law which exists in 50 states to say what they are proposing

20  here isn't the law, it has no place, it's not a fit here.

21  That's our Daubert argument.  This is nothing more than the

22  same thing they are doing by way of motion in limine.  It's

23  inappropriate, Your Honor should hear both cases in full, make

24  a determination on that basis.

25         MR. BERNICK:  Your Honor, I just have a very brief

1  comment which is that I literally am totally perplexed by the

2  argument that just got made.  I think that I don't have

3  anything to say further in response to Mr. Inselbuch's

4  argument, but Mr. Ansbro just got up and said, geez, you know,

5  why don't you let everything come in and then consider these

6  matters.  And we've stated our position, we've objected to

7  their evidence on the grounds of Rule 408.  We did so in the

8  briefs that we filed at the outset.  We didn't make the motions

9  before the Court here today.

10        The motion that was made before the Court here today,

11  as I read it, is by the ACC and the FCR.  It was Mr. Ansbro and

12  his client and Mr. Inselbuch and his client that wanted Your

13  Honor to go forward and rule on these matters today presumably

14  with the view of cutting the legs out from under our case.  So

15  we are content to have these matters, the 408 matter be before

16  the Court.  We've made the -- we've stated our position both in

17  response to this motion but previously in the trial papers.  We

18  will object to their use of settlement data.  We are the only

19  ones who are entitled to do that.  They are not entitled to do

20  that.  We'll make that objection.

21        I expect that Your Honor will let all of that

22  evidence in and consider the matter at the end of the case.  So

23  if the purpose in this was to simply say, oh, we object, well,

24  that's fine, but they didn't just do that.  They moved in

25  limine to prevent our evidence from going forward.  And it's

1  not just the ACC that did it, it's Mr. Austern and Mr. Ansbro

2  who did it, as well.  So we're happy to have the arguments out

3  before the Court.  We don't think it's even close.  But we're

4  also happy to proceed with the case and have both sides put

5  their evidence in and then Your Honor make a determination at

6  the end of the day with the benefit of a full record about how

7  these rules are going to be applied.

8          THE COURT:  All right.  Well, I think consistent with

9  everything else that I've been doing I am going to allow the

10  evidence to go forward and make the determinations at the end

11  of the case.  It appears to me that based on the theories that

12  both of you -- both sides are constructing and you're obviously

13  correct, Mr. Inselbuch, the ACC and FCR haven't started their

14  cases yet, and so what I know about the structure of the case

15  is what I've been able to read from the expert reports and the

16  arguments and opening statements and so forth.  So I have some

17  conception of what you intend to do, but in terms of evidence

18  obviously I haven't heard it yet.

19          It does seem to me however that the settlement and

20  history construction both that the debtor intends to present

21  and that the ACC and FCR tend to present, although somewhat

22  different in scope, nonetheless are both relevant to your

23  respective cases.  So in terms of relevance I think the

24  evidence is relevant.  Whether it is admissible under Rule 408

25  certainly the other judges who have done estimations in the

1  Delaware cases have found it to be so, as did the original case

2  -- I think the original case anyway, one of the original cases,

3  Eagle Picher, that took a look at this issue.

4        Eagle Picher also, I think that's the appropriate

5  case, goes so far as to say that settlement histories with

6  respect to the non-debtor involved though are not relevant

7  unless there is some very good evidence that ties both the

8  product, the work history and so forth to the same type of

9  industry that the debtor itself was in.  So there are some uses

10 of settlement histories that may or may not be appropriate

11 within the context of the given trial.

12       It's a little difficult sitting as a trial judge with

13 three District Court Judges who have looked at the same issue

14 in the same district having allowed this evidence to come in to

15 say that it's not admissible for the theory of the case that

16 the ACC and the FCR want to use it in.  But, I'm not sure that

17 the Rule 408 issue was addressed by those courts.  It may be

18 because no one thought that it was relevant.  It may be because

19 no one challenged the use of the settlement histories for the

20 purposes for which they were being argued in that case -- those

21 cases; plural.

22       Nonetheless, for now I am going to let both sides

23 present it.  I am going to decide at the end of the cases,

24 plural, what the relevance and admissibility of the evidence

25 will be because as I've said earlier I want to get the case

1  done, and I will take it all under advisement at the end.  We

2  don't have a jury here and I think I can separate it all out

3  when I have an opportunity to consider it at the end.

4          MR. INSELBUCH:  I have just a brief question.  Do you

5  envision then that we would make, when necessary, brief

6  protective objections --

7          THE COURT:  Yes.  Please.

8          MR. INSELBUCH:  Thank you.

9          THE COURT:  Okay.  Mr. Bernick.

10          MR. BERNICK:  Do they have to be repeated?  I mean,

11  virtually every question --

12          THE COURT:  Just raise them the first time in the

13  record where they appear, and then just indicate that you've

14  got a continuing objection so that when I get to that point in

15  the record I know that that's where the objection comes up.

16          MR. INSELBUCH:  Understood, Your Honor.

17          THE COURT:  With respect to any witness for whom you

18  intend to raise the objection.

19          MR. INSELBUCH:  Understood.

20          MR. BERNICK:  Grace calls Dr. Tom Florence as its

21  next witness.

22           B. THOMAS FLORENCE, GRACE'S WITNESS, SWORN

23          COURT DEPUTY:  Please be seated.

24          THE COURT:  Mr. Inselbuch, is this your volume or is

25  it --

Florence - Direct                              42

1            MR. INSELBUCH:  Yes, it is, Your Honor.

2            THE COURT:  May I return it, please so I don't

3   forget.

4            MR. INSELBUCH:  Thank you.

5                         (Pause)

6            MR. BERNICK:  May I proceed, Your Honor?

7            THE COURT:  Yes.

8            MR. BERNICK:  Has the witness been sworn?

9            THE COURT:  Yes.

10           MR. BERNICK:  Okay.

11                    DIRECT EXAMINATION

12   BY MR. BERNICK:

13   Q    Good morning, Dr. Florence.  Could you please tell us how

14   long you've been doing claims estimation, roughly?

15   A    I think that the first piece of work I did for claims

16   estimation was for the Ace Robbins Company, probably mid-80s.

17   Q    Okay.  Ace Robbins didn't involve asbestos, did it?

18   A    It did not.

19   Q    What was the nature of the litigation that gave rise to

20   that estimation process?

21   A    Well, there was a couple.  One is -- I think the very

22   first project I did for Robbins was they were still a solvent

23   defendant in the tort system and we were asked to estimate

24   liability as it related to contingent liability for their

25   financial statements.  Subsequent to that Robbins filed for

1  bankruptcy.  And I also worked for Robbins in the bankruptcy

2  process.

3  Q    Was the litigation -- the underlying litigation, was the

4  focus of it the Dalkon Shields claims?

5  A    It was.

6  Q    Yes.  You may want to --

7  A    IUD.

8  Q    I'm getting a little bit of raspiness.  You may want to --

9  A    That may be my voice.

10 Q    A fine voice, but I think you may be just a tad too close

11 to the microphone.  Could you describe -- I want to get a

12 little bit more into the experience that you had with

13 estimations.  But, could you describe your educational

14 background.  At this point I'd like to show Exhibit 2302 for

15 demonstrative purposes.

16 A    Yes.  I have a Bachelor of Business Administration from

17 University of Kentucky.  I have an MA and PhD from Michigan

18 State University.

19 Q    Okay.  And I see that you have recorded here the basic

20 periods of your professional experience, could you just go

21 through those and describe what it is that you did in those --

22 what those different entities are and what it is that they were

23 focused on?

24 A    From 1970 -- roughly 1978 to 1994 I was a vice president

25 with RPC, Resource Planning Corporation.  It was a research and

1  consulting firm headquartered in Washington, DC.  The work I

2  did there was primarily social research of some sort.  Some

3  operations were -- some for the FTC for clients that were in

4  litigation, some for the federal government.  In 1994 ARPC --

5  I'm sorry -- RPC was purchased by KPMG; Peat Marwick.  I went

6  to KPMG as a principal.  While at KPMG I was a principal with

7  the firm and also was the national director of their litigation

8  practice.  The work there was primarily the same type of work

9  that I did at RPC.  I was there for three years.  When I left

10  KPMG, I went out and was one of the founding members of ARPC

11  which is a research and consulting firm.  Since 1997 I've been

12  the president of ARPC.

13  Q    Okay.  You mentioned that you did -- were involved in

14  estimations relating to Dalkon Shields beginning in the

15  mid-1980s, could you tell us what, if any, other estimations

16  that you've done that are not focused on asbestos?

17       MR. BERNICK:  And let's show 2303 for that purpose.

18  A    Well, I mentioned the Dalkon Shields.  We also did -- have

19  done estimates of the timing and the value of claims related to

20  breast implants.  We did a study for the -- Judge Pointer in

21  the court for Baxter/3M class action, I believe it was.

22       THE COURT:  Pardon me, doctor.  Could you push the

23  microphone down below your mouth?  I think that may help a

24  little.  We're still getting the feedback.  Try that.

25       THE WITNESS:  Okay.  Is that better?

1          THE COURT:  No.

2          THE WITNESS:  Then maybe I have to raise my voice.

3          THE COURT:  No.  I think it's the microphone.

4          MR. BERNICK:  Yeah.  Though I have to say you're the

5   first one where we've had this problem.  Go ahead.

6          THE COURT:  I'm sorry.  For Judge Pointer, would you

7   pick up again what you did with Judge Pointer, please?

8   A    Yes.  We were asked by the Court to estimate the value of

9   the claims related to implants produced by Bristol Baxter or 3M

10  Corporation.  And the purpose of that I think the Court was

11  trying to determine the feasibility of a settlement proposal.

12  Q    Okay.  I see that we actually have what I'll generously

13  characterize as a typo on this line because non-asbestos does

14  include asbestos.  Could you give us, with the exclusion of

15  that, and we'll submit a conforming slide, just give us a brief

16  overview of some of the other non-asbestos tort estimates that

17  you've done.

18  A    We worked for the Special Master in <u>Albuterol</u> class action

19  case.  We were asked to estimate the value and timing of the

20  claims in that <u>Albuterol</u> case.

21  Q    Okay.

22  A    In the <u>TCE</u> case we worked for the -- it was actually a

23  bankruptcy case involving Met-Coil.  We were asked to estimate

24  the value of the claims that arose out of exposure to TCE.  In

25  <u>Love Canal</u> we were hired by the -- we actually worked for the

1 insurance carriers in attempting to estimate the volume and

2 value of environmental claims coming out of Love Canal.  And in

3 the Pedicle Screw case we were asked to determine the

4 feasibility of conducting an estimate of the number of claims

5 arising out of the Pedicle Screw litigation.

6 Q    Let's turn to asbestos.  Have you or have you not been

7 involved in working with trusts whose focus has been to pay

8 claims relating to asbestos?

9 A    I have.

10 Q    Okay.  In what capacities have you done work in connection

11 with asbestos trusts?

12 A    Well, we've served as consultants to trusts on operational

13 issues.  We've served as consultants to trusts on estimation

14 issues.  And we've actually -- I've actually served as an

15 interim administrator in some of the trusts.

16 Q    Okay.  Just in order to move through these quickly, let's

17 show you 2304.  Does this list the trusts with respect to which

18 you've acted as an executive director?

19 A    Yeah.  These are the trusts that I'm currently serving as

20 the executive director for.

21 Q    Okay.  Tell us whether or not estimates of liability,

22 claims estimates, I should say -- tell us whether claims

23 estimates have been done in connection with trust operations.

24 A    Yes.  Claims estimates are normally done in relation to

25 trust operations.

1  Q    I'm showing you 2305.  Does this indicate estimates for

2  asbestos trusts that you've been involved in?

3  A    It does.  Yes.

4  Q    Have you also been involved in doing estimates for

5  bankruptcy cases?

6  A    I have.

7  Q    I'm showing you 2306.  Does this indicate retentions, and

8  then also within the retentions, bankruptcy cases where you

9  have testified regarding estimation?

10 A    It does.  The clients with a T are those where I

11 testified.

12 Q    I'm showing you 2307 --

13          THE COURT:  Wait.  You're going too fast for me.  I'm

14 sorry.

15          MR. BERNICK:  That's all right.

16                         (Pause)

17          THE COURT:  Okay.  Thank you.

18          MR. BERNICK:  Thank you.

19 Q    What about for companies that are not in bankruptcy, but

20 are still in the tort system?  Tell the Court whether or not

21 you've done estimates of claims, asbestos claims, in connection

22 with companies that are still in the tort system?

23 A    We have.  I have.

24 Q    I'm showing you 2307.  Does, this indicate those companies

25 for whom you have done estimates while they are still in the

1  tort system, including those that are confidential so that you

2  can't indicate them by name?

3  A    Yeah, it does.

4           MR. BERNICK:  Your Honor, we would proffer Dr.

5  Florence as an expert in claims estimation.

6           MR. FINCH:  Voir dire, Your Honor?

7           THE COURT:  Yes, sir.

8           MR. FINCH:  May I approach the witness, Your Honor?

9           THE COURT:  Yes, sir.

10          MR. BERNICK:  How long is this going to be?  I don't

11 want to stand up --

12          MR. FINCH:  Five minutes, ten minutes, tops.

13          MR. BERNICK:  Ten minutes?  I'll sit down.

14                     VOIR DIRE EXAMINATION

15 BY MR. FINCH:

16 Q    Nathan Finch for the Asbestos Creditors' Committee.  Dr.

17 Florence, we have met before, correct?

18 A    Yes.

19 Q    Many times?

20 A    Yes.

21 Q    You're not a doctor, medical doctor?

22 A    I am not.

23 Q    You're not an epidemiologist?

24 A    I am not.

25 Q    You are not a lawyer?

1  A    I am not.

2  Q    You're not an industrial hygienist?

3  A    I am not.

4  Q    You are not an insurance claims adjuster?

5  A    I am not.

6  Q    You are not a statistician?

7  A    I know statistics, but I don't have a formal degree out of

8  statistics.

9  Q    I asked you in your deposition what is your field of

10 expertise, and what you told me was at this point you're a

11 liability estimator, or a forecaster, correct?

12 A    I think -- yes.  Most of the work I do is estimation work.

13 Q    Could you turn in your book to what's behind Tab 2?

14        THE COURT:  I'm sorry.  I --

15        MR. FINCH:  Sorry.  May I -- sorry, Your Honor.

16 John, could you show on the screen ACC-462?

17 Q    Dr. Florence, do you recognize ACC --

18        UNIDENTIFIED SPEAKER:  Turn off the ELMO.

19        UNIDENTIFIED SPEAKER:  You're going to switch?

20        UNIDENTIFIED SPEAKER:  How did I know that?

21        UNIDENTIFIED SPEAKER:  You're a quick study.

22                    (Pause)

23 Q    This is the second expert report you did in this case, Dr.

24 Florence?

25 A    It appears to be.  Yes.

1  Q    And the second report is -- was intended to replace the

2  first report, correct?

3  A    It was.

4  Q    Okay.  Could you turn to the last text page, Page 24?  And

5  this lists the things you are relying on for purposes of

6  forming your opinions in this case?

7  A    Page 24?

8  Q    Yes.  In reaching the opinions and conclusions that are

9  set forth in this report, you list various things, items of

10 data, reports, articles, et cetera, do you see that?

11 A    Yes.

12 Q    Okay.  So, the -- one of the things you're relying on for

13 your opinions is your knowledge of asbestos claims forecasting,

14 correct?

15 A    Correct.

16 Q    And you developed that knowledge in your work as

17 estimating -- in estimating asbestos claims, for example, in

18 the Babcock case, correct?

19 A    I estimated claims in the Babcock case, correct.

20 Q    And as part of that, that's how you developed your

21 knowledge and how to do it, you're relying on your past

22 experience in estimating claims for your work here, correct?

23 A    I assume -- yes, some of my work is a function of

24 experience I've gained over the years.

25 Q    And you gained that experience in the Armstrong case, for

1 example?

2      MR. BERNICK:  Your Honor, I object.  What aspect of

3 his expertise does this go to?  If he is getting into what it

4 is that he's done in this case, that's a different matter.

5 This is -- should be focused on his expertise --

6      MR. FINCH:  Okay.  Let me tie it up, Your Honor.

7      MR. BERNICK:  I really want to know if there's --

8 maybe -- if there's an objection here?

9      THE COURT:  I don't know.  He said he'll tie it up.

10 Let's see.

11 Q    Could you turn to Page 1 of your report?  That report.

12 That report.  And you say, in the second paragraph -- by "we"

13 you're referring to you, or the companies your work for,

14 correct, the companies that you've owned; ARPC or RPC?

15 A    ARPC.

16 Q    Okay.  We have estimated current and future

17 asbestos-related health claims and liabilities in connection

18 with <u>Babcock & Wilcox</u>, <u>48 Insulations</u>, <u>Eagle Picher Industries</u>,

19 and it goes on through a fairly long list, do you see that?

20 A    I do.

21 Q    Okay.  And you're relying on the experience and knowledge

22 you've gained in doing those estimations, at least in part, for

23 your expertise, correct?

24 A    Sure.  I am what I am today, I guess, as a function of

25 what I've worked on.  Correct.

1 Q    Okay.  Now, in this particular estimation, you were given

2 a series of assumed criteria, correct, that's shown on Page 2

3 to your report --

4         MR. BERNICK:  I object at this point, Your Honor.  We

5 all know where this is going.  This goes to cross examination

6 on what he actually did in this case.  It does not go to his

7 qualifications.  Indeed, all that counsel has done is to

8 establish and reiterate some of the very same qualifications

9 that I brought out in connection with my examination.

10         MR. FINCH:  Your Honor, may I make -- the line of

11 questions is three more questions, and I have an objection to

12 the proffer.

13 Q    Dr. Florence, is it correct that the assumptions shown on

14 the screen on Page 2, you have never applied those assumptions,

15 those specific assumptions, to any of the other estimates of

16 asbestos claims and costs that you've done before?

17 A    These particular assumptions?

18 Q    Yes.

19 A    On some of these we have.  For example, in doing trust

20 forecasts we would apply assumptions having to do with ILO and

21 PFT scores.  I mean, those would be criteria that are part of

22 the trust criteria that would go into the estimation.

23 Q    But these specific criteria, one of them would include the

24 -- for example, the worker has to personally mix or personally

25 install a Grace asbestos-containing product.  You've never

1 applied in any other case a criteria that the worker has to

2 personally mix and personally install a Grace product in order

3 to make your estimates, correct?

4 A    Certainly not with regard to Grace, no.

5 Q    And you certainly haven't applied a mix or install

6 criteria anywhere else either, have you?

7 A    Well, mix or install would be a subset of criteria that

8 we've applied other places.  Again, there are trusts that have

9 exposure requirements where mix and install would be one of the

10 factors that would qualify for the --

11 Q    But they're not exclusive factors, correct?

12 A    They would not be exclusive factors.  Correct.

13 Q    So, people could qualify if they even if they didn't mix

14 or install in the trusts for Owens-Corning, and Armstrong, and

15 USG, for example?

16        MR. BERNICK:  Objection.  Again, we have a

17 foundational issue.

18        THE COURT:  That's sustained.  This is going beyond

19 expertise --

20        MR. FINCH:  Okay.

21        THE COURT:  -- to the specifics of what he did here.

22        MR. FINCH:  All right.  Then, Your Honor, I will just

23 -- I'll object for -- to Dr. Florence's qualifications to do

24 the estimate that he did here on the ground that he is using a

25 set of criteria here that he has not -- well, actually -- does

1  Mr. Mullady have any voir dire?

2         MR. MULLADY:  One question.

3         MR. FINCH:  Okay.  I'll let Mr. Mullady have voir

4  dire, and then I'll make my --

5         THE COURT:  Mr. Mullady?

6                VOIR DIRE EXAMINATION

7  BY MR. MULLADY:

8  Q    Just one question, Dr. Florence, and I'll ask it from

9  here.  I'm Ray Mullady.  I represent the FCR.  Good morning.

10 A    Good morning.

11 Q    Are you an actuary, sir?

12 A    I am not.

13 Q    Thank you, sir.

14        THE COURT:  All right.  Mr. Finch?

15        MR. FINCH:  We object to Dr. Florence's

16 qualifications to do the estimate that he is doing here on the

17 grounds that he has not done an estimate applying these

18 criteria in toto anywhere else in his past experience.

19        MR. MULLADY:  The FCR joins the objection.

20        THE COURT:  All right.  That's overruled.  The

21 specific criteria used don't go to his qualifications to use

22 particular criteria.  It may go to the weight to be attributed

23 to the valuation done, but it doesn't have anything to do with

24 his qualifications to address the issue.  So, the objection is

25 overruled.  Dr. Florence may -- is qualified to express an

1  expert opinion in the area of claims estimation.

2             MR. BERNICK:  Thank you, Your Honor.

3                 CONTINUED DIRECT EXAMINATION

4  BY MR. BERNICK:

5  Q    Dr. Florence, I want to create a little bit of groundwork

6  before we go to the Grace estimation specifically.  And just

7  let me ask you this.  Could you just describe in the most

8  general terms what the basic elements of estimation are?

9  A    Well, normally they are -- can I address claims

10 estimation?

11 Q    Sure.  Yes.  That's what I'm getting at.

12 A    Normally estimation would involve looking at a set of

13 historical experiences, historical data, for example, and

14 organizing that data in a way that could be analyzed, and then

15 applying to that data a set of assumptions or criteria, and

16 I'll -- for the lack of a better term, I'll say assumptions,

17 and then, based on those assumptions, extending that data to

18 the estimation itself, so making a calculation which would

19 provide the estimation.

20 Q    Okay.  Is estimation of claims always done in exactly the

21 same way?

22 A    I think the conventional approach, it's always done that

23 way.  Right.

24 Q    Okay.  Done the way that you've just described?

25 A    Correct.

1  Q    Okay.  But getting beyond just the basic steps that you

2  outline, at the detail level is estimation always done in

3  exactly the same way?

4  A    You mean the calculations themselves?

5  Q    Yes.  The assumptions that are used, the data that's

6  analyzed, and the calculations that are analyzed?

7  A    Absolutely not.

8            MR. FINCH:  Objection.  Compound.

9            UNIDENTIFIED ATTORNEY:  And leading.

10            MR. FINCH:  And leading.

11            THE COURT:  Well --

12            MR. BERNICK:  You're --

13            THE COURT:  -- it's not -- I think the witness was

14  asking for clarification.  To the extent that it was clarifying

15  -- it may be leading, but it was clarifying, that's all right.

16  To the extent that it's compound, it is compound.

17            MR. BERNICK:  I'll be happy to break it up and

18  proceed accordingly.

19  Q    Tell us whether or not the estimations always work with

20  exactly the same kind of data?

21  A    No, they don't.

22  Q    Tell us whether or not the estimations work with exactly

23  the same assumptions.

24  A    They don't.

25  Q    Tell us whether or not the estimations work with exactly

1  the same calculations of current and future claims.

2  A     They don't.

3  Q     Thank you.  Let's talk about two particular types of

4  estimation that you've done in the past.  I believe in

5  connection with your qualification questions that we just posed

6  to you, you said that you had done estimates for -- in

7  connection with trusts, do you recall that?

8  A     I do.

9  Q     And you also talked about doing estimates in connection

10 with companies that were still not in bankruptcy, they were

11 still in the tort system, do you recall that?

12 A     I do.

13 Q     I'd like to review a little bit about the elements that

14 characterize -- or the elements that characterize those

15 different types of estimation.  If we can show 2310.  Would

16 this demonstrative assist you -- I think we're going to have to

17 switch back to the PowerPoint, please -- would this

18 demonstrative assist you in explaining to the Court the basic

19 elements that are involved in estimation for funding trusts on

20 the one hand, and estimation of future tort system costs on the

21 other?

22 A     Well, in the trust situation frequently you're faced with

23 -- starting with data, you're faced with historical claims

24 information.  And that claims information would reflect the

25 nature of the claims, the details regarding those claims, the

1  status of the claims, the outcome of the claims.  So, there's

2  normally a database of some sort, usually electronic, that

3  characterizes the historical experience.

4  Q    Let me stop you here.  What is the basic purpose?  Where

5  do you want to get to at the end of the day when you do the

6  estimation for trust funding purposes?  What are you trying to

7  accomplish?

8  A    You're actually trying to estimate the volume, the timing,

9  and the cost of current and future asbestos claims against the

10  trust.

11  Q    And why is that important to the operation of the trust?

12  A    Most trusts, or all trusts, I guess, have limited

13  resources.  And normally the trustees are charged with

14  evaluating the liability of the trust against the assets of the

15  trust, and calculating a ratio to determine what percentage of

16  the liability that the trust has, do they have assets to

17  actually pay?

18  Q    Okay.

19  A    And so the normal focus of these forecasts for trusts is

20  to forecast the liability, compare that to the assets that the

21  trust has and determine what percentage of the liability or the

22  cost does the trust have the ability to pay.

23  Q    Okay.  So -- I interrupted you.  You said you have a data

24  component, which is a claims history on your chart.  You then

25  talk about a TDP.  What is a TDP, and how is it relevant to

1 estimating in connection with funding a trust?

2 A    Well, TDP is -- stands for trust distribution procedures.

3 They are normally procedures that have been approved by the

4 Court.  From the standpoint of a trust, we always look at them

5 as the bible, that this is the charter of the trust.  And in

6 that TDP it establishes the criteria by which claims are to be

7 evaluated, how claims are to be filed, how claims are to be

8 valued, how claims are to be treated if there is a dispute over

9 the value of the claim.  It really -- it's intended to cover

10 the entire gambit.  But, the most important for estimation is

11 probably the claims evaluation criteria, and the valuation

12 criteria.

13 Q    Okay.  Now, you've got claims history.  You then have the

14 TDP.  If you have a trust, is the TDP, in a sense that it's a

15 bible, is it something that is handed down at the beginning of

16 the trust that you have to follow?

17 A    It is.

18 Q    Okay.  So, what you said, if you've got the claims

19 history, and you've got the TDPs, how do you then get to the

20 point of actually working with pending claims and future

21 claims?  How does that proceed?

22 A    Well, pending claims, normally what you look at is how

23 many of the pending claims would be qualified under the

24 criteria that are specified in the TDP.  That allows you then

25 to have a pretty good picture of both historical claims that

1  have been evaluated and paid, as well as pending claims that

2  have not yet been evaluated and paid.  It gives you a full

3  history of the claims history of the trust, so it basically

4  says these are the claims that have been paid.  These are the

5  claims that met certain criteria.  Then using that as a base,

6  under the assumption that there is a similarity between these

7  -- the patterns that we're looking at and the epidemiology, for

8  example, in asbestos, their forecasts are usually done using

9  that pending claim and closed claim group as a base to forecast

10  how many claims you're likely to get in the future.

11  Q    Okay.  And that's where you have -- on 2310, you bring to

12  bear an epidemiological model?

13  A    Correct.

14  Q    Okay.  You've got both Peto and Nicholson.  Are there two

15  different models that you deploy?

16  A    There are two that we use.  Right.

17  Q    Okay.  Now, I want to switch to talking about estimates

18  that are done of a company that's still in the tort system and

19  wants to know what its expected future costs are.  Again, could

20  you go through, just in your own words, the basic sequence of,

21  or elements of the estimation process there?  What's the same

22  and what's different?

23  A    Sure.  Well, the data are the same.  In essence it's --

24  you're beginning with a history of the claims that were filed

25  and evaluated in the tort system, and the outcome of those

1 evaluations.  So, the first stage, although the data may be

2 different in terms of the specific data, what the -- generally

3 what -- the scope and what's included is probably the same for

4 tort system estimates and trust estimates.

5 Q    Okay.  Do you have TDPs, though, where the defendant is --

6 defendant doesn't have TDPs, I mean, it's the simple fact of

7 the matter, right?

8 A    You don't.  Correct.

9 Q    Okay.  So, what is it that's used in place of TDPs in

10 figuring out what the stream of payments is going to be?  If

11 you don't have the bible, do you have something else in its

12 place?

13 A    Well, you usually have a couple things.  One is if the --

14 if it's a claim in the tort system, you may have the outcome of

15 the application of some criteria.  In other words, the

16 defendant may use some criteria in evaluating the claim, either

17 evaluating its -- whether it's a compensable claim or not, or

18 its value.  But, the defendant may use some criteria.

19 Sometimes you don't know those specific criteria, so really all

20 you're able to look at is, well, whatever those criteria are is

21 kind of a black box.  What is the outcome of applying those

22 criteria?  For example, what percentage of the claims might be

23 paid, and what percentage of the claims might be rejected for

24 payment?

25            The other thing you have, I think, that may be

1 different with a tort system estimate is, at least in the ones

2 that we've done, occasionally there are assumptions that are

3 applicable to a particular forecast, or a particular

4 estimation.  For example, when we first look at the claims

5 information from a tort defendant, we will look for patterns in

6 that information.  And there may be questions that arise after

7 that analysis.  We usually will go back to the defendant and

8 say, are there assumptions that we should apply in doing this

9 analysis, and making this estimate?  For example, there have

10 been situations where we've been told to assume that because of

11 a particular agreement it's been negotiated by the defendant

12 and plaintiffs there will be no more cases from Region X, or

13 State Y, or because of some legislative impact there may be no

14 cases in the future from Jurisdiction D.  So, there are those

15 kind of assumptions that may arise, and that's usually

16 something we do on the front end of the estimation, is to talk

17 to the defendant about those assumptions.

18 Q    Okay.  Do you still get to the point, then, of ultimately

19 framing that type of historical information and those

20 assumptions into an input to a model?

21 A    We do -- we usually, much like I described with the trust,

22 we come up with a claims history that includes both pending and

23 closed claims, and use that as an indicant of what future

24 claims may look like, and lay that against an epidemiological

25 model of some sort.

1  Q    Mr. Finch got up and said, are you an expert as a lawyer?

2  Do you remember that?

3  A    I do.

4  Q    And your answer was no.  And he also asked you were you an

5  expert as an epidemiologist.  Do you remember that?

6  A    I do.

7  Q    And your answer there was no.  And yet, I'll go to it,

8  when it comes to settlement practices, do you hold yourself out

9  as being an expert in how lawyers, for various reasons, reach

10  agreements with regard to settlements?  Is that an area of your

11  expertise?

12  A    No.

13  Q    Are you an expert in how lawyers negotiate, based upon the

14  merits of claims, or legal issues surrounding those claimants?

15  Are you an expert in how lawyers negotiate TDPs?

16  A    No.

17  Q    Are you an expert when it comes to the epidemiology -- are

18  you an expert epidemiologist?

19  A    No.

20  Q    When it comes to all of these different features that are

21  inputs to the model, such as the TDPs, the settlement

22  practices, and the epidemiological models, do you actually

23  verify the merits of the epidemiology or the merits of the

24  settlement practices yourself?

25  A    No, I don't.

1  Q    What -- how is it that they become incorporated into your

2  work?

3  A    Well, use the tort system example I just gave you that --

4  we'll be talking about with the defense -- the defendant about

5  them, assumptions going forward.  Frequently we will meet with

6  counsel for the defendant and say is there anything that we

7  should assume about cases in this particular jurisdiction or

8  with this particular criteria?  We're not lawyers, but we'll

9  rely on their judgment as to what should be assumed going

10 forward.

11 Q    Okay.  Let's talk about the next slide, which is 2311.  I

12 framed those -- I've put a big box around the drivers of

13 payment fashioned as an input in the models, and I've said

14 they're assumptions.  Is that essentially what you've told us?

15 A    Yes, they are.  In a general sense they are assumptions,

16 correct.

17 Q    Now, let me just ask you, you have said that you actually

18 go talk with people, and you've become familiar, and you've got

19 a lot of experience.  Tell me whether or not these -- can you

20 just assume anything?  You just make the wildest assumption

21 that's possibly -- for example, could a tort defendant come to

22 you and say, Dr. Florence, I want you to assume the claims will

23 drop to zero within five years?  Is that an assumption that you

24 would find to be the kind of assumption that is customarily in

25 -- customary and reliable for an estimator in your field?

1  A    It would not be a customary assumption, no.

2  Q    Okay.  The kinds of assumptions that you've talked about

3  making in connection with future trust funding and future tort

4  system costs, tell the Court whether or not they are the kinds

5  of assumptions that are customary and are customarily used as

6  reliable for estimation purposes in connection with your field?

7  A    I'm sorry.  The assumptions I've been asked to make in

8  this --

9  Q    With respect to so far, you know, trust funding, and

10 future tort system, we've boxed those as assumptions.  Are

11 those assumptions that are customary -- are customarily found

12 to be reliable for estimation purposes by people who do

13 estimation such as yourself?

14 A    Well, certainly the epidemiological assumptions are

15 customary, and are conventional.  The way, as you've labeled it

16 here, fashioned as input the methods for doing that are

17 relative, conventional and customary.  And then the claims data

18 are relative, conventional and customary.  The criteria that

19 are applied are normally, in the ones that I have done, are

20 conventional and customary criteria, yes.

21 Q    Okay.  Are they the kind -- to say, though, when you say

22 that they're conventional, you say that they've been done

23 previously; that is, TDPs and settlement practices, right?

24 A    Correct.

25 Q    Okay.  Now, apart from whether they are common, are they

1  the kind of -- and I'm asking this really for -- in a sense for

2  a legal reason, but it's still very important that you answer

3  it straight up based upon your expertise.  Are they the kinds

4  of drivers, are they the kinds of assumptions that are the type

5  that are found to be reliable for estimation purposes by people

6  in your field?  I'm not simply asking whether you do them all

7  the time, but whether they are the type -- the kind that are

8  found to be reliable?

9  A    Yes, they are.

10 Q    Okay.  And I want to talk about this case, and I want to

11 talk about -- take you to Slide 2312.  Would 2312 help you

12 explain, in a sense, the corresponding elements of the

13 estimations done here?

14 A    Yes.

15 Q    Okay.  If you could just go through those with the Court,

16 and then we'll go back over and ask you a few questions.

17 A    Well, in terms of the data, we began with data that was

18 supplied by the -- by Grace, having to do with its claims

19 history.

20 Q    Okay.

21 A    And those were data that conventionally -- they were very

22 conventional.  They looked like the same type of data we had

23 gotten from other defendants with regard to the claims that had

24 been filed and the disposition of those claims, and the details

25 about the claims.  In addition to the claims history, we had

1 information about -- from the personal injury questionnaire in

2 the bankruptcy case, this bankruptcy case, which was

3 information that was related to primarily the pending claims,

4 those claims that were pending at time of bankruptcy.  So, that

5 provided additional information to the information that we had

6 from the company.

7 Q    Well, of course we know that the PIQ has not been used in

8 any other case, at least to your knowledge?

9 A    To my knowledge it has not.  Right.

10 Q    What if we go beyond asbestos, are there cases in which

11 questionnaires, including detailed questionnaires, have been

12 used to gather data for estimation purposes outside of

13 asbestos?

14 A    In the Dalkon Shield case that I referred to there was a

15 proof of claim form that was quite extensive that sought to

16 gather additional information beyond what the company had.

17 Q    Okay.  The next step, you talk about drivers of payment.

18 What were the nature of the criteria, what kinds of criteria

19 were supplied to you in the case of the Grace estimation?

20 A    Well, we were supplied with information about the bar

21 date, and the filing of POC proofs of claim form by the bar

22 date, who filed that information, when it was filed.  We were

23 supplied with information -- with certain criteria on which to

24 evaluate the claims.  Those criteria covered both the exposure

25 and medical evaluation of claims.

1  Q    Let me stop you there.  With respect to those kind of

2  criteria, that is dose criteria -- or exposure criteria, and

3  diagnostic or medical criteria, apart from the details of the

4  criteria, are the TDPs, and indeed, settlement practices, did

5  they often include exposure and medical criteria, as well?

6  A    Correct.  The TDPs normally include exposure and medical

7  criteria.

8  Q    Okay.  Claims data, what's -- in terms of requirements for

9  payment, when you say that those dealt in part with claims

10  data, what did that mean?

11  A    Well, what we now have as a result of the data that we --

12  I discussed earlier, we now have information about whether the

13  claimant, in effect, meets criteria that we were provided,

14  gives us an opportunity to analyze whether claims can meet

15  those criteria or not.

16  Q    Okay.  We also have, again, fashioned -- let me just kind

17  of try to cut to the chase -- having looked for the drivers of

18  payment, do you, in this case, have, in a sense, a parallel

19  process for translating that into inputs to a model?

20  A    Yes.

21  Q    Okay.  Now, all the things that we've talked about, let's

22  show 2313, I've got down 2313.  I've got those marked as

23  assumptions.  In this case, too, have you regarded these as

24  assumptions, or have you made some effort independently to

25  verify the accuracy -- or I should say the merit of the

1 criteria that you've applied?

2 A    No.  I've accepted these as assumptions.

3 Q    Now, we know that in this case, as Mr. Finch brought out,

4 that the particular requirements for payment and the particular

5 data haven't been used in connection with prior asbestos

6 estimations, would you agree with that?

7 A    I would.

8 Q    Okay.  And so, if we talk about what is "traditional" for

9 asbestos cases, would you agree with what I think is Mr.

10 Finch's suggestion that they're not the traditional ones?

11 A    Well, I think they are some of the criteria that are --

12 overlap what's -- what are "traditional" criteria, and there

13 are some that aren't.

14 Q    Let me ask you, in connection with the Dalkon Shield case,

15 non-asbestos case, were exposure data and criteria considered

16 in connection with that estimate?

17         MR. FINCH:  Objection.  Relevance as to why a Dalkon

18 Shield IUD is relevant to an asbestos case?

19         MR. BERNICK:  It's foundational.

20         THE COURT:  All right.  I'll accept it subject to it

21 connecting up.

22         MR. BERNICK:  I'll connect it up in just a moment.

23         THE COURT:  All right.

24 A    Well, exposure in the sense of -- in the case of the IUD,

25 exposure in the sense of use, was the device used, and was the

1 claimant exposed in that sense.

2 Q    What about diagnostic criteria and data, tell us whether

3 or not they were an input to the Dalkon Shield's estimation?

4 A    They were.  There were levels of diagnostic criteria that

5 functioned to place a claimant in a disease category, or that

6 also placed a claimant in the category of being compensable or

7 non-compensable.

8 Q    Okay.  Now, what I want to know then is in terms of

9 whether the kinds of criteria -- the kinds of criteria that you

10 are working with here as assumptions, are they the kinds of

11 criteria that estimators such as yourself find to be and

12 consider to be reliable for estimation purposes?

13        MR. FINCH:  Objection.  Vague, over-broad.

14        THE COURT:  I'm sorry.  I apologize, but I didn't get

15 the question.  Could you repeat it?

16        MR. BERNICK:  It's a very simple question, and I

17 think we answered it with respect to the prior two.  I just

18 wanted to get it with respect to this one.

19 Q    Tell us whether or not the criteria, the kinds of criteria

20 that were used here in this case, are those kinds of criteria

21 the kinds that are considered to be reliable for estimation

22 purposes by people within your field?

23        MR. FINCH:  Objection.  Over-broad.

24        THE COURT:  All right.  He's already answered that

25 question, I believe.

1          MR. BERNICK:  He answered it with respect to the

2   prior two.  I just want to make sure that we got it with

3   respect to this one, as well.

4          THE COURT:  It is very broad, though.  I mean, you're

5   asking about all criteria.

6          MR. BERNICK:  In this particular case.

7          THE COURT:  Yes, but I'm not sure -- do we know what

8   all criteria are?

9          MR. BERNICK:  Well, we're going to -- yes, that's

10  true.  It's general.  I'd like to take his answer and then

11  we'll go through them, specifically.

12         THE COURT:  All right.

13  A    By their nature these are the same types of criteria that

14  have been used in the other cases that I've discussed.

15  Q    Thank you.  Let's go through now and talk about the actual

16  flow of how this worked; that is, how the estimation worked.

17  And first of all, I want to get a point of reference in terms

18  of time frame.  In order to get a baseline -- you've talked

19  about a baseline for purposes of the estimate in these

20  different cases -- in other to get a baseline, where did you go

21  in the Grace historical data to get a baseline analysis done?

22  A    Well, we assumed that the -- the cutoff point was, in

23  essence, the time that Grace filed for bankruptcy.

24  Q    Okay.

25  A    And therefore, our history would be that period prior to

1  the bankruptcy filing.

2  Q    Okay.  Showing you 2314.  Does this demonstrative focus on

3  the baseline as of April 2001 when Grace filed, and then the

4  use of that baseline for purposes of projection going forward?

5  A    Yes.  We were -- in essence what we're focusing on here is

6  to determine of the pending claims, whether those claims meet

7  criteria or not.

8  Q    Okay.

9  A    And then using those pending claims in combination with

10  Grace's other history to try to determine or try to estimate

11  what the number of future claims that would meet those

12  criteria.

13  Q    Now, we're going to have a board here, 2301.  Do we have a

14  broad board that kind of lays out the different steps that

15  were followed in connection with your estimation?

16  A    We do, I guess.

17  Q    Okay.  What was the very first step?  If you want to begin

18  with your baseline analysis, what was the first step of the

19  work, what first work was done?

20  A    Well, after we had the claims data and had the claims

21  data, what I will call cleaned, or organized in a fashion that

22  would allow analysis, the first comparison was to determine

23  which of the cases were pending, which of the cases were not

24  pending, and then compare that to the cases for which we had

25  proofs of claim forms, POCs.

1  Q    So, POC analysis?

2  A    Correct.

3  Q    Okay.  Who did the POC analysis?

4  A    Well, we did the analysis.  It was the comparison of the

5  records that were filed for -- the proofs of claim that were

6  filed with the historical records.

7  Q    Okay.  Showing you 2315, would this assist you in

8  describing to the Court the process that you followed in

9  determining what claims that were pending as of the time the

10 bankruptcy was filed also were the subject in a proof of claim?

11 A    Sure.  Yes, it would help.

12 Q    Could you just use that to explain the process?

13 A    We began this process with about 112,000 pending claims.

14 Those were claims that were pending at the time the company

15 filed for bankruptcy in April of '01.  We then had a computer

16 file, or a listing of those claims that were non-settled proofs

17 of claim.  They were claims -- proofs of claim that were filed

18 by claimants that had not settled with Grace.  So, our first

19 step was to match the pending claims with those POCs to

20 determine which of the pending claimants actually filed a proof

21 of claim form.

22 Q    Okay.  And what was the final result; that is, how many

23 matches were found?

24 A    Of the 112,000 there were roughly 84,000 that matched --

25 that had a POC -- that filed a POC.

1  Q    Now, tell us whether or not the degree of match, or the

2  kind of match was the same in all cases.  Is that unclear?

3  A    I -- I'm not sure I --

4         MR. FINCH:  Objection.  Form.

5  A    I'm not sure I understand the question.

6  Q    Well, tell us whether the tests that -- tell us what tests

7  were used in connection with determining whether there was a

8  match or not.

9  A    Oh.  Well, the exercise of trying to match claims was a

10 pretty extensive exercise.  First we tend to try to match

11 claims based on the name of the claimant, the social security

12 number, allowing for the possibility that there might have been

13 data entry errors by the firm that received the proofs of

14 claim, or there might have been data entry errors in the

15 historical database.  Various combinations were used to try to

16 -- combinations of information were used to try to match

17 claimants, primarily name, social security number, law firm in

18 some instances.  Any data we could obtain that would allow us

19 to identify this pending claimant, this is their POC.

20 Q    Okay.  Were all the matches that you ended up with the

21 same in terms of what the basis for the match was?

22 A    They weren't.  There were some that were very clear

23 matches.  Thomas Florence with the last four digits of the

24 Social Security Number 2140, those were easy matches.  Those

25 were definite matches.  There were some that the name might be

1 slightly different.  For example, the E is dropped off

2 Florence, but the last four digits of the social security

3 number are the same, and the first part of the name is the

4 same.  So, those are not perfect matches, but what we would

5 call probable matches.

6        And then there's a group of claims that I guess you

7 could label as -- they were less clear a match, but there was

8 enough information to suggest that the claim -- it was a

9 possible match.  So, there were really -- there was a gradient

10 of matches from historical data to POC.

11 Q    Now, does 2316 provide a summary of the number of matches

12 that fall into those different categories?

13 A    It does.

14 Q    Okay.  Now, for purposes of the remainder of the analysis,

15 did you exclude any of the matches because they were only

16 probable?

17 A    No.

18 Q    For purposes of going forward in the analysis that you

19 did, did you exclude any matches because they were only

20 possible?

21 A    Well, we -- when it came to doing some of the analyses, a

22 possible match could include a match where there is one person

23 that's in the pending data.  For example, John Smith is in the

24 pending data.  And there are three John Smiths with POCs.  And

25 we can't distinguish which of those three -- we know there's a

1  match, we think there's a match, but we can't distinguish which

2  of those three is the match.  So, in some instances when we

3  were doing the basic analysis we would have to exclude the

4  possible matches.  But when we wound up the analysis, when the

5  analysis was complete, we actually put those matches back in

6  and calculate the ultimate result, including possible matches.

7  Q    Thank you.  Now, on the basis of the matching, could you

8  -- did you also determine the kind of disease that each one of

9  those pending claimants had?

10 A    We did.

11 Q    Okay.  Was it possible in all cases to simply go to the

12 POC or to the pending database, was it possible in all cases to

13 do that, and simply read off the disease?

14 A    It was not.  No.

15 Q    Okay.  Is that an uncommon problem in your field?

16 A    Well, we don't normally have POC data, but it's not

17 uncommon for claims in the historic data to have either missing

18 or ambiguous statement of disease.

19 Q    Okay.  Showing you 2317, does this chart assist you in

20 explaining to the Court how it is that you took all of the

21 pending matched claims and placed them by disease?

22 A    Yes.  The actual process of doing that was a little more

23 complicated than the chart illustrates.  We started with the

24 disease that was either specified on the -- in the historic

25 database, or on the POC, if there was one specified on the POC.

1  Q    That's from in the "known" column?

2  A    That would be the known column.

3  Q    Okay.  And then there -- basically, the numbers that we

4  have there could tell you the number of people who are known to

5  have meso, lung cancer, and the like?

6  A    Yes, but we also looked other places for -- to determine

7  whether it was known.  So, we also looked at places such as

8  that if a person had filed a PIQ, a personal injury

9  questionnaire, we looked to see if there was a specification of

10 disease on there.  We also went to the attachments.  In some

11 instances attachments were provided on the personal injury

12 questionnaire.  So, if the claimant -- if we still didn't have

13 a disease for a given claimant, we would look on the personal

14 injury questionnaire.  If, at that point, we still couldn't

15 determine the disease for the claimant, we actually used the

16 Manville Trust database.  It's a database of claims that have

17 been filed against the Manville Trust.  And we tried to

18 determine could we tell that claimant's disease as it was filed

19 against the Manville Trust?  That gave us a -- it actually gave

20 us the first column there.  So, whatever we could determine

21 from those sources we considered known diseases.

22 Q    Okay.  What then, is the allocation of the unknowns, what

23 does that refer to?

24 A    Well, that still left us with some claimants for which we

25 could not determine their disease.  We couldn't determine from

1  any of the sources I mentioned earlier.  So, what we did was we

2  actually went back in Grace's history.  We had all this

3  historic data from prior work we've done with Grace.  And we

4  asked the question, well, what percentage of the claims that

5  were filed historically that began as unknown, where did they

6  end up?  Did an unknown most likely end up as a mesothelioma

7  claim, or as a lung cancer claim, or as an other cancer claim?

8  So, we calculated what we call a transition matrix, which was

9  -- or a percentage of unknown claims and where they normally

10  end up once you know the disease.  So, for that remaining group

11  of claims where we still didn't know the disease, we used

12  Grace's history for what percentage of unknown claims end up as

13  mesothelioma, lung cancer, other cancer, et cetera.

14  Q    Is that methodology a methodology that was developed just

15  for purposes of this case?

16  A    No.  It's a methodology that we've used when the data are

17  available in a number of cases.

18  Q    Thank you.  Based upon that analysis, I take it in order

19  to get the total number that is known and allocated unknowns,

20  that's a matter of addition?

21  A    It is.

22  Q    Does 2317 accurately summarize the categories and the

23  numbers of claims in the categories of disease for the Grace

24  case that resulted from your analysis?

25  A    It does.  That's the -- and that should total, going back

1 to the matching of pending claims with POCs, that should total

2 the 83,000, et cetera.

3 Q    Mr. Inselbuch, my learned colleague, has a calculator, so

4 I'm sure that if that's not true I'll learn about it during the

5 course of cross examination.  Do you want to turn to the next

6 page of the analysis?  You told us before that you had criteria

7 that you looked at here, and I want to peel away this part of

8 the chart and ask you what kinds of criteria, just generally,

9 were then applied to the claims data, and who was involved in

10 it?  And we'll go through them in more detail, but give the

11 Court an overview of --

12          MR. FINCH:  Your Honor, I have to stand up so I can

13 see the --

14          THE COURT:  Certainly.  Yes.

15 Q    It's the last thing in your chart.  It's the last page.

16 You can see the whole thing all at once.  It's 2301.  Do you

17 have that there at the back?

18          UNIDENTIFIED ATTORNEY:  The suspense is --

19          MR. BERNICK:  2301.  Yes.  Mullady wants to wait

20 until it's all done.

21 Q    What kinds of criteria were used here, and who was

22 involved in applying -- developing and applying those criteria?

23 A    Well, the criteria really fell into two basic categories.

24 They were either criteria that dealt with exposure or criteria

25 that dealt with the disease diagnosis.

1  Q    Okay.  Now, the Court has heard from Dr. Anderson.  Did

2  you actually develop any of the exposure and dose criteria, or

3  were you relying on Dr. Anderson?

4  A    I relied on Dr. Anderson.

5  Q    She also has told us that when she got to the end of her

6  chart she had people in her organization review the various

7  claims to determine whether they went into Category A or

8  Category C.  Did you independently do that review, or did you

9  rely upon what Exponent had done?

10  A    No, I relied on what Exponent did.

11  Q    When it comes to diagnosis of disease, we heard from Dr.

12  Weill about the standards for B-reading and the PFT standards.

13  Did you do anything to verify the standards that were used for

14  B-reads and for PFTs, or again, did you rely upon those as

15  assumptions that you were taking from other experts?

16  A    I relied on those from Dr. Weill.

17  Q    The same thing with respect to Dr. Henry?

18  A    Correct.

19  Q    And in terms of analyzing the claims data in this area, we

20  have that that wasn't Exponent, but it was Celotex, does that

21  square with your own understanding?

22  A    The -- yeah.  The Celotex trust reviewed an attachment

23  sample, or a sample of attachments, and some closed claims, and

24  based on that review coded that information, and we relied on

25  Celotex's coding of that information.

1  Q    Okay.  And then you're kind of in the -- I guess it's kind

2  of the hub of the wheel.  Was it your job at ARPC to take all

3  these inputs and marry them into the model going forward?

4  A    It was, to take that data and marry it into an overall

5  estimate.

6  Q    Let's begin with the medical data, and in order to get to

7  the medical data or the medical criteria, could you tell us

8  whether or not the medical criteria were the same for each one

9  of the diseases, or were different?

10 A    The medical criteria were different.

11 Q    Okay.  I want to go to a somewhat complicated chart --

12 but, Your Honor, it is necessary -- which is 2318, and ask you

13 whether this chart would assist you in describing how the

14 medical data were applied?

15 A    It would.  Yes.

16 Q    You say that with kind of a wry smile.  Let's start with

17 the kind of top line, first.  Could you just describe, in your

18 own terms, what the basic medical criteria were for

19 mesothelioma?  What did it take for a mesothelioma claim to

20 qualify as being a mesothelioma claim, medically?

21 A    Well, with mesothelioma claims we began with the -- again,

22 with the claims that were pending and those claims that had a

23 proof of claim form filed and those claims that filed a

24 personal injury questionnaire.  And the reason the personal

25 injury questionnaire was important is to determine what the

1  disease claim was.  So, in that instance if the claimant

2  specified either in the pending information, the POC, or the

3  personal information questionnaire, the personal injury

4  questionnaire, specified a diagnosis of mesothelioma, that

5  mesothelioma diagnosis was accepted and that yielded, of all

6  the pendings that filed a POC and had a POC with the necessary

7  statement of mesothelioma, tat was roughly 1596 claims.

8  Q    Okay.  So, basically if it said mesothelioma, if you had a

9  diagnosis, accepted at face value?

10  A    Correct.

11  Q    Okay.  Now, just to be sure, so that we anticipate

12  potential confusion, I want to go back to the prior slide.  I

13  hope it's the prior one.  We saw that your knowns were 1972 and

14  your unknowns were 454, and the total number that you had

15  recorded was 2400.  Why is that number different from the 1500

16  number that you just told us about?

17  A    Because we had to look at the information regarding the

18  diagnosis, or the claim diagnosis on the personal injury

19  questionnaire.  So, of the 2426, roughly 1596 had personal

20  injury questionnaires that we could analyze.

21  Q    Okay.  And do those questionnaires, then, enable you to

22  perform the rest of the screen?  In order to get to exposure,

23  do you need to have that population, or can you work with the

24  broader population?

25  A    I need to look at that population to determine whether, in

1  fact, they have a mesothelioma allegation.

2  Q    Okay.  Now, let's go to the next category.  Let's flip

3  back to 2318.  And I want to ask about lung cancer now.  And

4  the first question I want to ask about lung cancer is just not

5  how you got to the number at the end here, but just the

6  criteria -- the medical criteria themselves.  For someone to

7  count as a lung cancer, what were the medical requirements?

8  A    That the ILO had to be a 1/0 or greater, and reproducible.

9  Q    Okay.  So, the ILO is -- the Court has already heard about

10  this, but to refresh the Court, the ILO is a rating applied to

11  an X-ray?

12  A    Correct.

13  A    Okay.  And it had to be 1/0 or greater, but then you say

14  it had to be replicated, what does replicated mean, as you

15  understood it?

16  A    It has to be reproducible, or more than one reading of the

17  X-ray would come up with that reading.

18  Q    Okay.  Now, this says Henry.  Could you tell us what, if

19  any, reliance was placed upon the Henry X-ray study about which

20  the Court has learned from Dr. Weill?

21  A    Well, where we got information on the number of claims

22  that would meet that criteria were based on the Henry X-ray

23  study.

24  Q    Okay.  Now, it says here that you started with all pending

25  claims.  You then looked to any kind of POC match, and then you

Florence - Direct                                    84

1  got to a 312 number as being certified X-rays plus PIQ data.

2  Explain in your own words what this step was that worked from

3  the -- any POC match to then this particular set of parameters?

4  A    Based on the sample that Dr. Henry took, which was a

5  sample of certified X-rays, non-meso X-rays, that were not

6  meso.  If we look at those, that group of claims, the ones that

7  were lung cancer claims that had a certified X-ray were roughly

8  312 claims.

9  Q    Okay.  Now, you have the 312 going through the replication

10 process coming up with a 32 number.  What did that mean, where

11 did you get the 32 number and replication?

12 A    So, of those 312 claims that had a POC and were part of

13 the study and had lung cancer, or lung cancer claims, Dr. Henry

14 was able to replicate 32 of those 312.

15 Q    Okay.  Now, we have a line that comes down from the 312

16 and says that the 312 is then looked at to see whether each

17 existing ILO is greater than 1/0, and there are 175 of them.

18 Was that, again, a number that you relied upon Dr. Henry for?

19 A    It was.

20 Q    Okay.  And what was the -- do you know -- can you tell the

21 Court what you understood to be the purpose of looking for

22 whether there was an existing ILO of greater than 1/0?

23 A    We were really looking at did the claim rely on an

24 existing ILO, and was there an allegation that the claim relied

25 on an existing ILO of greater than -- greater than or equal to

1  1/0.  So, of that 312 claims there were roughly 175 where there

2  was that reliance, and that ILO did exist.

3  Q    And then you looked to see whether those could be

4  replicated?

5  A    I did.

6  Q    And the 15 was what?

7  A    Of that 175, 15 were replicable by Dr. Henry.

8  Q    Okay.  And then you have an 8.6 number.  What does the 8.6

9  percent refer to?

10  A    That's the 15 divided by 175, so of the people that had an

11  existing ILO of 1/0 or greater, 15 were found to be qualified,

12  or 8.6 percent.

13  Q    Okay.  Just to -- and we're going to come back, I know, to

14  this, so I'll -- in a little bit.  We have people who say have

15  lung cancer and say it's due to asbestos, and say they're

16  relying on X-rays and an existing ILO.  Let me ask you, did all

17  people who had a claim for lung cancer say that they were

18  relying on X-rays and an ILO?

19  A    No.

20  Q    I'll put them down as other evidence.  Did all of the

21  people who said that they were relying on X-rays supply the

22  X-rays?

23  A    No.

24  Q    Were there people who didn't supply the X-rays, but

25  certified that they had been destroyed or lost?

1  A    There were.

2  Q    So, we have people who supplied them, people who had a

3  certification, and people who did not have a certification or

4  the X-ray?

5  A    Correct.

6  Q    The 8.5 percent, which particular category does that

7  relate to; the ones, or the twos which are certification of

8  destruction, the threes, which are neither one, or the fours,

9  which are other evidence, where does the 8.6 percent belong?

10 A    Well, it's the certified X-rays where ILOs were alleged,

11 or relied upon.

12 Q    And we'll come back to that one in a minute.  Let's go

13 down to other cancers.  Could you tell us what criteria --

14 medical criteria was applied with respect to other cancers?

15 A    The other medical criteria that was applied was whether

16 the other cancer was a laryngeal cancer.

17 Q    Was that a criteria that you developed?

18 A    It was not.

19 Q    Okay.  So, that was another criteria that you assumed from

20 an expert?

21 A    Correct.

22 Q    Okay.  How was that criteria then applied to determine how

23 many laryngeal cancers could be isolated?

24 A    Well, again, we started with the -- we have to look at the

25 PIQs in order to determine what the alleged injury is.  So, we

1  started -- first, if you look at the example here -- we started

2  with an initial sample that we took of attachments to the PIQ.

3  As you remember, not all of the PIQs were completely filled

4  out.  Attachments were included with some of the PIQs.  In

5  order to do -- to manage those attachments in a way that was

6  rigorous, we actually drew a sample of claims early on in the

7  process, and used those claims and tracked them all the way

8  through the attachment process.  So, in other words, these were

9  an initial claim sample of 5250.  There were 5,250 claims that

10  we initially sampled.  Then there's a certain proportion of

11  those claims that had a POC.

12  Q    Okay.

13  A    And then we looked at the -- of that proportion of claims

14  that had a POC, the number that had alleged that they had other

15  cancer of any sort.

16  Q    Okay.  That's the 133?

17  A    That's correct.

18  Q    Okay.  And what's the 105?

19  A    Well, we allowed the possibility that -- let me back up.

20  There were certain of those claims that we couldn't determine

21  what type of other cancer they were alleging.  So, of the 133,

22  there were really only 105 of them that had an other cancer

23  type that was listed where we could determine whether it was

24  laryngeal or non-laryngeal cancer.

25  Q    Okay.  And then what's the 17 that comes out?

1  A    Of that 105, there were 17 that alleged laryngeal cancer.

2  Q    Okay.  Then you have another segment which now works not

3  with the initial sample but all pending claims, was that the

4  same kind of process, or was it a little bit easier in that

5  case?

6  A    We moved on all pending claims that had a proof of claim

7  form filed, and in the personal injury questionnaire they

8  checked the box that indicated that they had laryngeal cancer.

9  Q    Okay.  And there were 98 of those?

10 A    There were 98 of those.

11 Q    And in order to get to the 115 laryngeals that we have at

12 the end of the slide, again, is a question of addition?

13 A    It's merely a question of adding them together, yes.

14 Q    Let's talk about non-malignant.  Just walk us through

15 non-malignant, but before, again, we get to the details of how

16 the data was analyzed, what were the basic criteria that were

17 used for non-malignant claims?

18 A    The non-malignant claim criteria were generally that the

19 ILO supporting the claim, the X-ray reading, had to come from a

20 reliable physician, and that the determination as to whether

21 the non-malignant claim was a severe asbestosis claim, or an

22 asbestosis claim, or an unimpaired claim had to meet certain

23 pulmonary function test criteria.

24 Q    Okay.  And who actually was the source of the analysis of

25 the pulmonary function tests?

1  A    That was Dr. Weill.

2  Q    And you relied upon him for that purpose?

3  A    I did.  Yes.

4  Q    Now, with the benefit of that general statement about the

5  criteria, take us through the general sequence -- the actual

6  sequence followed in analyzing the claims?

7  Q    Well, we began, again, with this sample, this attachment

8  sample of 5250 total claims.  Of those that had a proof of

9  claim form filed, there were 2568 that had sufficient

10 information on which to evaluate whether the doctor was a

11 reliable physician or not.  And based on the evaluation, it was

12 determined that 686 were from a physician that was reliable.

13 Q    Now, let me take a step out.  Did you make the

14 determination about what physicians were reliable and which

15 ones were not?

16 A    I did not.

17 Q    Okay.  So, that was an assumption that you made?

18 A    It was a criteria that was provided to us; an assumption

19 that I made.

20 Q    And what kinds of information were supplied -- what were

21 the sources, I should say, of the list of the doctors that were

22 felt not to be -- that you were told to assume were not

23 reliable?

24 A    We were provided the list by Grace and Grace counsel.

25 Q    Okay.

1        MR. BERNICK:  And, Your Honor, there will be

2   independent evidence that's already been submitted as to what

3   that -- as to what the list is.

4   Q    Do you have a summary showing 2321 of the doctors who were

5   -- you were asked to assume were not reliable and the number of

6   claims as to which they had submitted diagnoses?

7   A    This is the list of doctors who were given, yes.

8   Q    And does 2321 accurately summarize the input that these

9   different doctors had with respect to numbers of matched proofs

10  of claim?

11  A    This illustrates the number of matched proofs of claim

12  with personal injury questionnaires.

13  Q    Okay.  Now I want to get to the next question which is

14  focused specifically on lung cancer and showing you 2341.  You

15  told us that the 8.6 percent number that came out of Dr.

16  Henry's study actually related to claimants who said that they

17  relied upon X-rays, produced an existing ILO that was done

18  replicated, do you recall that?

19  A    I do.

20  Q    Does that mean that your analysis then gave no weight to

21  people who were relying on X-rays but couldn't find them and

22  certified that they were destroyed or lost?  Did you give them

23  no weight?

24  A    No, we said that if they were certified as lost or

25  couldn't be found they were assumed to pass at the same rate as

1  those that we were able to analyze.

2  Q    What about people who said that they were relying  upon

3  evidence other than an X-ray, did you exclude them from the

4  analysis?

5  A    No.  Those were assumed to pass at the same rate that the

6  people with X-rays passed.

7  Q    What about people who said that they were relying on

8  X-rays, but then neither supplied them nor provided the

9  certification that they were lost or destroyed, what did you do

10 with those folks?

11 A    Those folks were excluded.

12 Q    And on what grounds?

13 A    That there was no X-ray evidence and so if the rule was

14 that there was a reproducible X-ray required, there was no way

15 to make that real.

16 Q    Okay.  I want to go back for a moment to the slide that

17 you had 2318 and you said in a couple of different places, both

18 with respect to other cancers and non-malignants that there was

19 a screen done first of all to determine whether there was

20 sufficient data to even analyze for laryngeal or analyze for

21 non-malignant.  Do you recall that?

22 A    I do.

23 Q    What about the people that had said they had the disease

24 or fell into one of these categories, but where there was

25 insufficient data on the basis of which to determine whether

1  their claims met the criteria or not, how did you deal with

2  them, the insufficient data people?

3  A    So you're saying the people that -- of the work, for

4  example using other cancer?

5  Q    Yes.

6  A    That group of 133 minus the 105.

7  Q    That's correct.  That is, the people who didn't have the

8  sufficient data, how were they factored in, if at all?

9  A    We said that the group that did not respond would, in

10 essence, in one of our estimates would qualify at the same

11 weight as those that did respond whether it was sufficient

12 information.

13 Q    Do you have a demonstrative in 2323 that illustrates the

14 basic approach that was taken with respect to people who --

15 where there was not sufficient data?

16 A    Yes.

17 Q    Could you just walk the Court through what was done to

18 account for the people -- the two different methods that were

19 used to account for the people who did not provide sufficient

20 data?

21 A    Well if you look under the data category you see that

22 there is a group of people that did not provide sufficient

23 information for which to evaluate the claim, on one or more of

24 these criteria.  And then there was a group where the

25 information was there that was necessary to evaluate the claim.

1  If you look at the bottom of that chart, there was a certain

2  group of claimants that met the criteria and a certain group of

3  claimants that did not meet the criteria.  So for what we've

4  called Method 1, we said well that's one measure of how many

5  people would meet these criteria.

6  Q    So, these are met or did not meet, and if you did not meet

7  or if you didn't have sufficient data you just tell me how were

8  they counted?

9  A    So we would basically say that the group that met the

10 criteria is the only group that would meet the criteria.  So

11 non-sufficient to evaluate plus it did not meet, would fall

12 into the eliminate -- an eliminated category.

13 Q    What about Method 2, what was done in Method 2?

14 A    In Method we basically said we thought as an upper bound

15 we should look at the possibility that the people that did not

16 respond, what would happen if they looked like the people that

17 did respond.  In other words, those people that had sufficient

18 information to evaluate, what if the people that did not

19 provide information were able to qualify at the same rate?

20 Q    So you take the ratio of qualified versus not qualified

21 and now apply it to the insufficient data group?

22 A    That's correct.

23 Q    And then you have to then add the two together?

24 A    We use both methods, correct.

25 Q    Now as your analysis continued going forward did you carry

1  that through the analysis; that is, including both cases the

2  Method 1 approach and the Method 2 approach.

3  A    We did.  Wherever there was a criteria that was applied,

4  where it was possible to do that, we estimated both the number

5  of claimants that met the criteria clearly and then estimated

6  the number of claimants that if they had, even though they

7  provided insufficient information, if they had qualified at the

8  same rate as those that provided information what number of

9  claimants that would imply.  So there was a Method 1 and 2 that

10  we've used throughout the analysis.

11  Q    Does 2324 reflect the application of that method to other

12  cancer?

13  A    It does.

14  Q    And does 2325 do the same thing for non-malignant disease?

15  Showing 2325.

16  A    It does, yes.

17  Q    Okay.

18  A    For the medical -- these medical criteria, correct.

19  Q    Showing you 2322, does this now reflect the total number

20  of claims that emerge once you've got your knowns plus your

21  allocation of unknowns and then apply the medical criteria

22  according to the two different methods where it's appropriate,

23  does 2322 summarize the total number of matched POC claims that

24  pass the medical criteria tests?

25  A    It does.

1  Q    And does this accurately reflect that?

2  A    It does, yes.

3         MR. BERNICK:  Let's go to the exposure criteria which

4  will then take us to total currents and maybe that would be an

5  appropriate time for a break, Your Honor.  I don't know.

6         THE COURT:  Give me a second please.

7                    (Pause)

8         THE COURT:  Okay, thank you.

9  Q    Let's now talk about the exposure criteria.  Do we have a

10 similar slide that relates to the exposure?  Well let's begin.

11 To do the exposure analysis, were you able to work with the

12 total number of claims in each disease category matched to

13 POCs, or did you work with some other group?

14 A    Well, since a claimant has to meet both the medical

15 criteria and the exposure criteria, then we really had to look

16 at for exposure purposes that subset of people that meet the

17 criteria in order for it to be -- in order for it not to run

18 into problems with estimating these probabilities.

19 Q    2326, tell us whether or not this reflects the groups of

20 claims that were then evaluated for exposure, the exposure

21 criteria?

22 A    It does.  It represents the groups that were evaluated.

23 In fact I think if you notice it, these are the same numbers

24 that appear on 2318.

25 Q    The right-hand column?

1  A    The final column of 2318.  Those are people that met those

2  criteria.

3  Q    Showing you 2327, does this chart reflect how the exposure

4  categories were applied?

5  A    It does.

6  Q    Could you walk us through the different steps that were

7  involved in applying the exposure categories from Dr.

8  Anderson's work?

9  A    If you notice each -- there are four segments to the chart

10 for each disease type and you see "Group Reviewed" is the first

11 column so for mesothelioma there were 1596 claims that met the

12 medical criteria that were reviewed, and all of these were

13 reviewed by Exponent.

14 Q    Okay.  Now it says sufficient data.  Were there sufficient

15 data to do an exposure review with respect to all 1596 mesos?

16 A    No, there wasn't.  So there's only a group of these and in

17 the case of mesos there were only 534 claims where there was

18 sufficient data to do an evaluation of whether the exposure

19 criteria were met.

20 Q    Do we see the same basic analysis done for lung cancer,

21 other cancers and non-malignants?

22 A    That's correct.

23 Q    Now, you then say who actually did the exposure review;

24 you've got Exponent and you've got the criteria.  They had to

25 be As or Cs and the Court has already heard more than enough

Florence - Direct                                    97

1  about those.  Again were these assumptions that you made; that

2  is, you assumed the accuracy of the Exponent data and you

3  assumed the application that they properly applied the exposure

4  categories?

5  A    We did, yes.

6  Q    Okay.  Now tell us what we see in the last two columns

7  under "Claims that pass".

8  A    Well if you look under -- the last two columns this

9  concept that I described earlier of Method 1 and Method 2.  So

10 that is, what's the rate at which people qualify of those that

11 provided -- of those that we could judge?  And then also what's

12 the rate at which people qualified for those that provided

13 information?  So what you see here is the number of people of

14 the claims that can be evaluated, the 534 that had sufficient

15 information, 102 were found to pass the criteria that is judged

16 by Exponent, and that 102 is roughly 6.4 percent of the 1596

17 claims that were evaluated.

18       In Method 2 remember we said that, when we

19 calculating a rate those claims, that only those claims had

20 sufficient information and apply that rate to all the claims.

21 And so in Method 2 what you see there is, it is the 102 claims

22 that met the criteria divided by 534 claims; that is, the

23 number of meso claims that had sufficient information.  That

24 gives you a rate of 19.1 percent for Method 2.

25 Q    Does 2327 accurately summarize the data and the pass rates

1  that emerged from the exposure review?

2  A    It does, yes.

3  Q    Now we are -- you've pointed out that this review is done

4  only of certain groups.  How did you get from this analysis

5  back to all of the people who passed the medical review -- all

6  the people that passed the medical review as opposed to the

7  people in the sample who passed the medical review?  How did

8  you translate the results to the groups as a whole?

9  A    We used the rates that you see there in parenthesis for

10 Method 1 and Method 2, and applied those to the full group.

11 Q    So showing you 2328, does this now reflect the application

12 of those rates in order to calculate the numbers of people

13 within each group who qualified under both the medical and the

14 exposure criteria?

15 A    That's correct.  So, those are the rates multiplied by the

16 number of people in each of those groups.

17 Q    And you'd use again both methods?

18 A    We used both methods, correct.

19 Q    Then what is the -- what is in the column that is

20 reflected as overall median, what are those numbers?

21 A    That just provides the median value between the two

22 methods, between Method 1 and Method 2.

23 Q    Does this now bring us in your analysis to the numbers of

24 claims, matched claims, pending as of the time that Grace filed

25 for Chapter 11 that meet both the exposure and the medical

1  criteria?

2  A    It does, yes.

3  Q    And turning now to 2301 --

4       MR. BERNICK:  Ray, this is -- you like these moments.

5  Q    Do we then have the information that appears as the

6  pending claims?

7       MR. BERNICK:  We may have a mistake here  That's both

8  criteria?  Oh, yeah, well, that's right.  But, I didn't show

9  that.  I've got the one that's on the board -- 310 -- no,

10 that's right.  310, 367 for the lung cancers.  No, that's not

11 right.  Is that just exposure?

12      UNIDENTIFIED ATTORNEY:  Yes, exposure.

13      MR. BERNICK:  No, this is just exposure.  Then this

14 one then has to be a mistake.  I've got the board that's just

15 got the pendings.  Give us a moment.

16      THE WITNESS:  Would this be a good time to take a

17 break, Your Honor?  I could use it.

18      THE COURT:  Yes.  All right.  We'll take a ten minute

19 recess.

20                         (Recess)

21      THE COURT:  All right.  Could you put that back up,

22 please?  Mr. Bernick?

23      MR. BERNICK:  Yes, thank you, Your Honor.

24 BY MR. BERNICK:

25 Q    Dr. Florence, I want to take you back to an error that was

1  my own.  We summarized 2328 and I was -- I misled myself by

2  looking at the 310 number for meso and described in my question

3  to you that this chart summarized the results of both criteria.

4  And I see now that it only describes the results of the

5  application of the exposure criteria, is that correct?

6  A    That's correct.

7  Q    Let's now get to the chart that I then skipped over in my

8  haste to reveal from the board.  Let's go to 2329 and my

9  question to you is whether this now shows us the summary --

10  accurately summarizes the number of pending claims in each of

11  the disease categories meeting all of the criteria including a

12  reflection of the use of the Method 1 and Method 2?

13  A    It does.  It summarizes the results of applying those

14  rates to the group of individuals that filed proofs of claim.

15  Q    Now if we take the two numbers for each of the disease

16  categories as reflected in 2329 and we calculate a median, does

17  that then get us to the column under pending claims for Exhibit

18  2301?

19  A    It does.  Yes.

20  Q    Let's then take the next step and talk about the valuation

21  of these claims.  When it comes to determining the valuation of

22  the claims that meet both criteria, where did you go in order

23  to obtain information relating to value?

24  A    We went back to the closed claim data base and the sample

25  we selected from that data base.

1 Q   Okay.  Let's talk about -- well let me just ask you a

2 general question.  When you went back to the closed claims data

3 base and you looked at the closed claims data base, what

4 comparison, if any, did you make with the claims in the closed

5 claim data base and the claims that had been sorted out through

6 the application of the criteria --

7        MR. INSELBUCH:  Objection Your Honor.  This is where

8 we would enter our protective objection and ask for a continued

9 objection to anything that he has to say about this data base

10 and the settlements in that data base.

11        THE COURT:  All right.  The objection is noted and as

12 I indicated overruled so that we can get through this.  But I

13 will make official rulings after I get to the end of all of the

14 evidence in the entire case.

15        MR. INSELBUCH:  Thank you, Your Honor.

16        MR. MULLADY:  I want to join the objection.

17        THE COURT:  All right.  One second please.  Okay, now

18 the objection is made, but I need the question restated.  I

19 only got half of it.

20        MR. BERNICK:  It wasn't a great question anyhow, but

21 we'll put it again.

22 Q   You now want to get values, you said you go to closed

23 claims.  Could you just go to any closed claims or was there

24 some other process that was involved in looking to particular

25 closed claims?

1  A    We wanted to go to closed claims that met the criteria.

2  So those would be claims that had been previously settled or

3  closed by Grace that met the criteria we're looking at.

4  Q    Showing you 2330, does this reflect the -- with respect to

5  the settled meso claims, the results of reviewing those meso

6  claims both for the exposure and the medical or diagnostic

7  criteria?

8  A    It does.

9  Q    So you say of this 285 settled meso claims, six met the

10  criteria, 21 did not meet and with respect to 258 there was

11  insufficient information?

12  A    Yes.  This is related to mesothelioma.

13  Q    Right.

14  A    And as you recall the only criteria dealing with

15  mesothelioma was whether the mesothelioma claimant met the

16  exposure criteria.  So these claims, these settled claims were

17  reviewed by Exponent, as I understand, using the same

18  methodology to determine whether in fact they had sufficient

19  information to be judged to meet the exposure criteria on

20  whether they had insufficient information.  And so, this

21  categorization is really the categorization by Exponent of

22  those closed claims.

23  Q    Fine.  Now, you have different averages for the six that

24  met 155,000, for the 21 that did not meet about 127,000 and for

25  the 92 or -- the 258 where the information was not sufficient,

1  $92,649 average per claim, where did those numbers come from?

2  A    That comes directly out of the claims data base provided

3  by Grace.  These represents the -- represents the positive

4  amounts paid by Grace in those cases.

5  Q    Okay.  What observations, if any, did you have with regard

6  to these numbers; that is, the 92,000, the 127 and the 155?

7  A    Well, yeah, this was a difficult analysis I think because

8  one dollar value that is not illustrated here is the average

9  for that entire group of settled claims which I think was about

10 $96,000.

11 Q    Okay.

12 A    When we looked at this, the first thing we did was looking

13 at the six cases that met, there was a feeling that that was a

14 relatively small number of cases, but we wanted to see if in

15 fact that value was somehow statistically different from either

16 the overall average or these other averages.  So that 155,000

17 we tested using statistical tests to determine whether

18 statistically it was different than the 127,000, the 92,000 and

19 the 96,000 that I mentioned.

20 Q    And what did you determine?

21 A    That it was not statistically different.  So in other

22 words you would expect this kind of variation totally due to

23 sampling error, and the error in the process.  So one of the

24 approaches we entertained was to value these cases at the

25 overall average, the $96,000.

1  Q    Okay.  Why did you -- let me just before I -- I'm going to

2  ask you why you didn't, but let me just ask you another

3  question.  Did you make any observations as to whether varying

4  evidence of exposure made a difference to claims value; that

5  is, better evidence of exposure, the higher values, lower or

6  poorer evidence of exposure to Grace product led to lower

7  values?

8          MR. FINCH:  Objection, lack of foundation as to --

9  and to form as to better or less evidence of exposure.

10         MR. BERNICK:  I'll rephrase it.

11 Q    First of all, was there evidence regarding exposure that

12 was presented to you as a result of this process; that is, with

13 respect to these claims?

14 A    Yes.  We had the determination by Exponent of which of

15 these 285 claims met the exposure requirement and which didn't

16 and which had sufficient information to even judge the exposure

17 requirement.

18 Q    What conclusion did you reach as to whether proof of

19 exposure to Grace product made a difference or did not make a

20 difference with respect to claim value for mesothelioma claims?

21         MR. FINCH:  Objection as to form.  By proof of

22 exposure to Grace product, is he talking about mixing,

23 installing, or any proof at all of exposure to Grace product?

24         MR. BERNICK:  Your Honor, with all due respect I just

25 created a foundation.  The foundation was the Exponent review.

1 The Exponent review has now been put into the record by two

2 different witnesses and it was on the basis of the Exponent

3 review that I asked him the question.

4          THE COURT:  Well if we're basing it on Categories A

5 and C since that seemed to be what he testified about earlier,

6 is that the case?

7          MR. BERNICK:  Yes, well that is what he testified.

8          THE COURT:  Fine.  Overruled.

9 A    I'm sorry.  Could I hear the question again?

10 Q    Yes, the question is now -- we'll try it again.  Could you

11 tell us what, if any, observations you have made as to the

12 impact of proof of exposure to Grace product as that proof was

13 presented to you through Exponent, what difference, if any, it

14 made to settlement value?

15 A    Well this slide itself shows one conclusion which was that

16 where the information was unfortunately non-existent, the

17 claims average that was 258 claims they averaged $92,000.

18 Where the claims information was available but did not meet the

19 AC criteria, the average was $127,000.  And in those six claims

20 where the information was available and they did meet the AC

21 criteria, the average was 155,000.  So one conclusion was that

22 there was -- there did seem to be some trend, but when we

23 tested the statistical significance of that trend we basically

24 said -- we were able to determine that there really was no

25 statistically significant basis for distinguishing between

1 92,000 and 155,000.

2 Q    Okay.  I see from the slide that ultimately the 155 was

3 selected then for use?

4 A    It was.

5 Q    Okay.  How then did you get to the valuations for the

6 other categories, the other disease categories as lung cancer,

7 other cancers, non-malignant disease?

8 A    Well, we didn't have the same type of data on lung

9 cancers, other cancers and non-malignant disease on the closed

10 population as we did on the meso group.  So we had to derive

11 some additional method of trying to value that group of claims.

12 Q    And what was that method?

13 A    What we did was we looked at the TDPs, trust distribution

14 procedures, that have been promulgated in bankruptcies over the

15 last, I guess it was probably two years and we looked at the

16 relationship of those values to mesothelioma value.  For

17 example, if looking across all these TDPs there is a pattern

18 that would indicate lung cancers tend to be valued at a lesser

19 percentage than mesos and that percentage tends to be -- I

20 don't remember the exact number, but let's say 62 percent.  And

21 other cancers in those TDPs tend to be valued at some

22 percentage of meso and let's say that number tends to be 32

23 percent.

24        So we use that pattern that existed in the trust

25 distribution procedures of other bankrupts to set the values

1  for the claims other than mesothelioma.  So using the 155,000

2  as the average for mesothelioma we said the other values would

3  follow this pattern, the pattern that we saw in the other TDPs.

4  Q    Is what you've just said now accurately summarized in

5  Exhibit 2331?

6  A    It is.

7  Q    Okay.  If we then want to take that out to the ultimate

8  valuation of all of the pending claims, I'm assuming that

9  that's a question of multiplication?

10 A    It's purely arithmetic at that point, yes.

11 Q    Okay.  Showing you the other -- the last -- the next two

12 columns on 2301; that is, claim value, are the numbers that

13 appear here the same values per claim that you've just

14 described in Exhibit 2331?

15 A    They are.  The non-malignant claims are in a little

16 different order, but the same value, same numbers.

17 Q    Okay.  And if we then express the pending claims times

18 claim value, do we get then the total pending claim values for

19 meso, lung cancer, other cancers and non-malignant that are

20 reflected in the total pending values expressed in millions, so

21 the total would be 81 million for total pending?

22 A    That's correct.  With remembering that that pending claim

23 column is the median value between Method 1 and Method 2.

24 Q    Okay.  Now peeling one more thing off the top, are we now

25 going to want to go talk about future claims, is that the next

1  step in the process?

2  A    It is.

3  Q    Okay.  Was the first step of being able to project future

4  claims against Grace -- what was the first step involved in

5  that process?

6  A    It was to characterize the historical population of claims

7  against Grace whether they be pending or resolved as claims

8  that would or would not meet these criteria.

9  Q    Okay.  So let's begin with mesos.  What population of

10  mesos did you work with in creating your baseline for the

11  future projection, showing you 2333?

12  A    Well, we started with the pending cases which we've

13  already talked about.

14  Q    That's the 310?

15  A    That's the 310, correct.

16  Q    We see that right on the board there?

17  A    Right.

18  Q    Okay.  Then what was the next component?

19  A    We went back to the resolved claims and said if those

20  claims had met the criteria at the same rate that the claims

21  that were pending met the criteria, then there would be 688

22  resolved claims that would meet the criteria.

23  Q    Now, you have 998 total meet criteria from 1980 to 2000,

24  what does that represent?

25  A    That's just the sum of the pending claims and the resolved

1  claims.  So, it gives you the full historical data base in

2  terms of mesos that would meet the criteria.

3  Q    Now earlier in the day you talked about the necessity of

4  creating an input to your futures model.  How -- can you tell

5  us how it is that on the basis of defining this population of

6  meso claimants you were able to create an input to the model?

7  A    Well, that tells us for historical claims and for year

8  periods within that historical period for each year how many

9  claims were filed in that year that would have met the criteria

10 that were specified to us.

11 Q    So what then is the -- now knowing the total number of

12 claims by year that met the criteria, what's the next step in

13 creating your calculation of futures?

14 A    We look back to -- first we go to the most recent history

15 under the belief, and I think the belief that is shared by most

16 forecasters, that most recent history is probably the best

17 indicant of what is going to happen in the future.  We go to

18 that most recent historical period and we look at how many

19 claims were filed there that met that criteria.  And in that

20 period we look at we normally call a calibration period, that's

21 the period of interest to us.

22 Q    Showing you 2334, does this illustrate the calibration

23 period that you use which is 1996 to 2000?

24 A    Right.  We actually used a number of calibration periods

25 that ranged from '96 to 2000.  So we actually used a five-year

1 calibration period.  One was a five-year calibration period

2 that ranged from '96 to 2000; '96, '97, '98 '99, 2000 all the

3 way down to 1999 and 2000.  So there's groups of years that

4 we're looking at.  And the idea here is you don't -- it's

5 possible in doing an analysis like this, that one year or

6 another year might be anomalous in some way.  So by combining

7 years you hope to minimize the effect of any anomaly.

8 Q    Showing you 2235, does this reflect the varying

9 calibrations that you did and the varying calibration periods

10 that you used in connection with the process of building your

11 model for future meso claims?

12 A    Right.  And when I say building my model we actually are

13 building multiple models here.  We're building a model for each

14 calibration period.  So we're saying what if the future looked

15 like the period '96 through 2000?  What if the future looked

16 like the period '97 to 2000, '98 to 2000, '99 to 2000?

17 Q    Okay.  In order to go forward from these calibrations to

18 the future, how do you fill in the mesothelioma trend based

19 upon these varying calibrations?

20 A    Well, the trend is reasonably captured in the calibration

21 periods.  So, in other words, by picking alternative

22 calibration periods if there is a trend it will be captured.

23 Q    My mistake.  How do you extend that trend out into the

24 future in years beyond 2000 using your model?

25 A    I think that's when we really look to the epidemiological

1 models that I think were referred to earlier, and those are

2 generally models by either -- that were either developed by

3 Nicholson or a model developed by Peto.  So we really look at

4 two different models.

5 Q    Okay.  I'm showing you 2337, does this describe in just

6 general terms the two different models?

7 A    Yes, it describes the -- it certainly describes the

8 Nicholson KP&G model.  I'm sorry.  I'm on the wrong slide.

9 Q    I switched them on you.

10 A    Yes, it talks about -- there's really two models;

11 Nicholson and Peto.

12 Q    Okay.  Now, if we go back to the calibration periods I

13 think that you've said that you run more than one model and

14 more than one calibration period.

15 A    We do.

16 Q    Showing you 2336, does this illustrate just what we talked

17 about; that is using different calibration periods and then

18 running different models for each of the calibration periods in

19 order to project out the Grace specific mesothelioma future

20 trend?

21 A    That's correct.  What you are really looking at, and this

22 is -- this curve at the top is the, what we call the Nicholson

23 KP&G curve, it's the curve that was originally developed by Dr.

24 Nicholson as enhanced by work from KP&G.  For a given

25 calibration period, you are looking at what's the ratio of

1  qualified claims in that calibration period to the number of

2  claims that Dr. Nicholson and KP&G estimated would be filed

3  during that period due to occupational exposure to any

4  asbestos.

5  Q    Okay.  And so now what are you doing with respect to

6  Grace?

7  A    I'm sorry?

8  Q    You said that that is occupational exposure as a whole,

9  what are we doing with respect to the Grace projections?

10  A    Well, for each calibration period we're looking at what

11  proportion of the total forecasted occupational exposures were

12  exposures that resulted from claims filed against Grace that

13  met these criteria.  And so that ratio then uses the curve as

14  you see it going past 2000 and it assumes that same ratio going

15  forward.  So, it provides us with an estimate of if these

16  claims track this epidemiological curve and there were the same

17  proportions we've historically determined in the calibration

18  period met the criteria, this is what the forecast would look

19  like.

20  Q    Now, you said you assumed that ratio remains constant.  Is

21  that an assumption or is that something that you verified that

22  is for the next 30 or 40 years is going to remain the same?

23  A    That's really an assumption.

24  Q    Okay.  Based upon those analyses, does 2338 list the

25  different calibration periods, the different estimation methods

1 and the different net present values for future mesothelioma

2 claims for Grace?

3 A    It does.  So if you look down the left-hand column you see

4 the forecasting method is either Nicholson or Peto.  The

5 calibration period you notice the differences there from '96 to

6 2000, '97 to 2000.  And then for each of these -- so we have a

7 different forecast for each calibration period and each method

8 and that provides us, for mesothelioma, with eight forecasts.

9 Right?

10 Q    Okay.

11 A    Then you'll notice that that forecast is done on the

12 Method 1 data.  So in other words assuming that the people that

13 responded to the information and qualified are the only people

14 that would qualify and then using Method 2 data, it's under the

15 assumption that people that didn't respond and didn't provide

16 sufficient data would qualify at the same rate as the people

17 that responded and had sufficient information.  So this shows

18 you the variation, at least for mesothelioma, of all of those

19 forecasts.

20 Q    Okay.  If we then want to sum up; that is, both pendings

21 and futures on an NPV basis, I want to show you 2340 and ask

22 you whether this is an accurate summary of the NPV values for

23 pendings, futures and then pendings and futures for each of the

24 different categories using each of the Method 1, Method 2 and

25 then stated as median values and millions of dollars.

1  A     This is really a table of the kind of medians of medians.

2  That line there on Method 1, just to make it clear, we're

3  pricing the present and future claims as if they were qualified

4  under the assumptions of Method 1.  The pending claims are

5  worth, I think we valued earlier the present value at $24

6  million.

7           The futures is actually multiple forecasts because we

8  were looking at Method 1 using these alternative methods,

9  right, and alternative calibration periods.  So that 128 is

10  really a median of multiple forecasts.  So when you add those

11  together it gives you 152 million, and then the bottom line

12  there is a median of medians.  It's just a midpoint of all

13  those midpoints.

14  Q     Does this now give us the last two columns of 2301 which

15  are the valuations for futures on a median basis and then the

16  valuations for pendings and futures NPV on a median basis

17  resulting in a total of $468 million NPV?

18  A     NPV on a median basis, correct.

19  Q     Okay.  Dr. Florence, after -- I take it that a tremendous

20  amount of work has gone into this process and we've seen that,

21  I mean, is that true?

22  A     Yes, I would agree with that.

23  Q     Okay.  And we see that different techniques have been used

24  depending upon the availability of the data?

25  A     Yes.

1 Q    Based upon the assumptions that you've made in this

2 process and based upon the methods that you have deployed, are

3 you aware of any other more reliable way to estimate Grace's

4 current and future asbestos liability than the one that you

5 have chosen to present here?

6 A    Assuming that liability is based on these criteria.

7 Q    Yes.

8 A    I have no better -- this is the best way I could come up

9 with, yes.  I know of no better way.

10        MR. BERNICK:  Your Honor, we will offer in certain of

11 the demonstratives as summaries.  I will provide a list of

12 those to counsel before the lunch break.  I am assuming that we

13 will probably take a lunch break now, is that appropriate?

14        THE COURT:  Yes, that's fine.

15        MR. BERNICK:  And then we'll make the formal proffer

16 after we come back from lunch and then I'll pass the witness to

17 opposing counsel.

18        THE COURT:  All right.  We'll be in recess until

19 1:05.

20        MR. BERNICK:  Thank you.

21                         (Lunch recess)

22        THE COURT:  Please be seated.  Dr. Florence, just a

23 reminder that you are still under oath.  And, Mr. Bernick, you

24 were going to offer some exhibits.

25        MR. BERNICK:  Thank you, your Honor.  TJ, if you

1 could show 233.  We're offering in as summaries the following.

2 This list has been provided to counsel for the ACC and the FCR

3 2316 through 18, 2321, 22, 24, 25, 27 through 29, 31, 36, 38

4 and 40, along with 2301.  If Your Honor would like me to go

5 back over those, I can.

6          THE COURT:  I have them.

7          MR. BERNICK:  Okay.  I understand from Mr. Finch that

8 he has a concern with the slope of 2336, that is the Nicholson

9 KPMG curve.  It appears to come down rather precipitously.  And

10 I am told, and will represent to the Court, that that is an

11 accurate slope given the scale from 2000 going forward.  It's

12 all very compressed but it is different, the scale is different

13 than before 2000.  There was more space before 2000.  So when

14 you see it kind of going over the edge like a roller coaster,

15 that is simply a function of the different scale on the

16 horizontal access before and after 2000, but it is otherwise

17 accurate after 2000.

18          MR. FINCH:  My objection, Your Honor, is that as

19 depicted one would draw the conclusion that the scale to the

20 right of the year 2000 is the same as the scale to the left of

21 the year 2000 in terms of years and that is absolutely not the

22 case, which leads to a projection of the Nicholson incidents

23 curve that appears to drop off rapidly after the year 2000 when

24 in fact it is a very, very gradual decline.

25          THE COURT:  Well isn't that curve in several of his

1  reports that are in exhibits both in the debtor's and the ACC's

2  and the FCR's exhibits?

3          MR. FINCH:  Not in Dr. Florence's -- that curve

4  doesn't appear in any of Dr. Florence's reports, Your Honor.

5  It occurs in Dr. Nicholson's -- excuse me, in Dr. Peterson's

6  report.  My objection is just solely to the scale on the right

7  side of the line.  If it's clear from the record that the scale

8  on the right side of the line is much more compressed than the

9  scale of years on the left side of the line, then I don't have

10  an objection to the exhibit.

11          THE COURT:  Okay.  All I want to make sure, I thought

12  that in Dr. Nicholson's reports themselves that his own curves

13  were reported and that his reports are in evidence before me

14  somewhere.  I thought his 1982, '86 reports were --

15          MR. BERNICK:  In fairness to Mr. Finch, the Nicholson

16  KPMG curve is an adjustment or a modification of the Nicholson

17  curve, so that is Nicholson KPMG.

18          THE COURT:  I see, okay.

19          MR. BERNICK:  So we would be happy if Mr. Finch wants

20  to provide for the Court in evidence the KPMG curve itself, you

21  know, on a broader scale, but --

22          MR. FINCH:  We will put that into evidence with Dr.

23  Peterson's testimony, Your Honor.

24          THE COURT:  All right.  I will -- I understand that

25  the scale to the right of the 2000 year axis is not the same

1   scale as to the left of that axis.  I've made a note and that

2   this -- that the curve is in that sense a steeper curve than

3   would otherwise be the situation and that you will put a

4   representation of the curve itself as another exhibit.  Let me

5   just make a note.

6          MR. BERNICK:  Okay.  And I believe that that then

7   takes care of the sole objection to the exhibits, the summaries

8   that I've listed, and we would offer those into evidence as

9   summaries.

10         MR. FINCH:  No objection to the rest of them, Your

11  Honor.

12         THE COURT:  All right, so Exhibit -- so I'm admitting

13  Exhibit 2336 with that explanation and --

14         MR. MULLADY:  For the record, Your Honor, no

15  objection by the FCR joining the comments of the ACC's counsel

16  with respect to 2236.

17         THE COURT:  2336.

18         MR. MULLADY:  2336, excuse me.

19         THE COURT:  Okay, thank you, same ruling.  All right

20  and exhibits 2316, 17, 18, 21 and 22, 24, 25, 27, 28, 29, 31,

21  36, 38, 40 and 2301 are all admitted.

22         MR. BERNICK:  Thank you, Your Honor.  And with that,

23  we would pass the witness.

24         THE COURT:  All right.  Give me one second, Mr.

25  Finch.

1                          (Pause)

2              THE COURT:  Okay, thank you.

3              MR. FINCH:  Ready to proceed.  Nathan Finch for the

4   Asbestos Claimants Committee.

5                      CROSS EXAMINATION

6   BY MR. FINCH:

7   Q    Good afternoon, Dr. Florence.

8   A    Good afternoon.

9   Q    Dr. Florence, just --

10             MR. FINCH:  Could you put the ELMO back on please?  Q

11       Since what lawyers say is not evidence, you would agree

12  with me, would you not, sir, that the timescale to the right of

13  the year 2000 is much more compressed than the timescale to the

14  left of the year 2000?

15  A    I would agree, yes.

16             THE COURT:  Just for the record, you are talking

17  about Exhibit GG-2336.

18             MR. FINCH:  Yes, GG-2236 -- 2336.

19  Q    Correct?

20  A    I would agree, yes.

21  Q    Do you still have your notebook of the two reports that I

22  handed to you when I was voir diring you?

23  A    I do.

24  Q    Could you open that notebook to your second report?

25             MR. FINCH:  What's the ACC exhibit number?

1           THE COURT:  462.

2 Q    462.  462, Page 2, do you have those?

3 A    I do.

4           MR. FINCH:  Can we switch?  Excuse me, could we

5 switch off the ELMO to the -- John?

6 Q    Okay.  You were asked to assume that the only claimants

7 whose claim -- the only claimants whose claims met the

8 following criteria would be able to sustain their burden of

9 proof that their claims against Grace are valid and therefore

10 that their claims should be valued as a part of the estimation

11 process, is that correct?

12 A    That's correct.

13 Q    And focusing on the nature of the minimum exposure

14 criteria and focusing on mesothelioma claims, you assumed that

15 the only valid mesothelioma claims that you gave value to were

16 from workers who personally mixed Grace asbestos containing

17 products and workers who personally installed Grace asbestos

18 containing products, correct?

19 A    That's correct.

20 Q    And on the questionnaires the mixer is Category A and the

21 installer is Category C?

22 A    I believe that is correct, yes.

23 Q    You didn't make any assessment of the validity of that

24 assumption, did you sir?

25 A    I did not, no.

1  Q    You made no independent judgment as to whether any of

2  these assumptions as to what claims would be compensable or

3  valid assumptions or invalid assumptions, correct?

4  A    Correct.  The assumptions were provided to me.

5  Q    You didn't have any input to them?

6  A    Correct.

7  Q    You weren't consulted about them?

8  A    Correct.

9  Q    You don't have any opinion one way or the other as to

10 whether these criteria are valid assumptions for a Court to

11 adopt in estimating Grace's asbestos liability?

12 A    Correct.

13 Q    You don't have any opinion as to whether these criteria

14 could successfully have been applied by Grace if it had not

15 gone into bankruptcy?

16 A    I have no opinion.

17 Q    And you don't have any opinion about whether people who do

18 not meet these criteria could successfully prosecute a claim to

19 judgment in the tort system, do you?

20         THE COURT:  I'm sorry, Mr. Finch, would you repeat

21 that please?

22 Q    Yes.  You don't have any opinion about whether people who

23 do not meet the criteria you were asked to assume could

24 successfully prosecute a claim to judgment in their favor

25 against Grace in the tort system?

1  A    I have no opinion, correct.

2  Q    Okay.  With respect to the mesothelioma criteria of

3  personally mixed and personally installed, that was one of the

4  criteria you were asked to assume, correct?

5  A    It was, yes.

6  Q    As part of your work in this case you reviewed some

7  deposition transcripts of Grace's in-house lawyers, correct?

8  A    I read them some time ago, quite long ago.

9  Q    Okay.  You would agree with me that historically Grace

10 paid mesothelioma claims that did not meet the mix or install

11 criteria?

12         MR. BERNICK:  Objection to -- objection to the

13 question on grounds of lack of foundation, number one, and to

14 the extent that this is based upon the testimony of Grace

15 employees.  I further object that it violates the stipulation.

16 They are not reliance materials and he's offered no opinion.

17         THE COURT:  I can't hear you, Mr. Bernick.  I'm

18 sorry.

19         MR. BERNICK:  I object on grounds of lack of

20 foundation, and further object to the extent that he is being

21 asked about the deposition testimony of Grace employees that

22 goes beyond the scope of his direct examination.  He's offered

23 no opinion regarding that.  And it also violates the terms of

24 the stipulation which say that unless something is actually

25 relied upon in connection with the opinion that's offered it's

1  not subject to discovery merely because it was reviewed.

2  Q    Dr. Florence, can you turn to your second report, Pages

3  1-1 and 1-2 at the very back?

4  A    I-1?

5          MR. BERNICK:   I-1?

6  Q    I-1.   It's about the fourth page from the end of the

7  document.

8  A    Yes.

9  Q    This says --

10          MR. FINCH:   Keep going, John.   It's Exhibit 1.

11          THE COURT:   Appendix 1?

12          MR. FINCH:   It's Exhibit 1.   It's after Appendix J,

13  Appendix K, Appendix L and then it becomes -- there's an

14  Exhibit 1 and there's an Exhibit 2.

15          THE COURT:   You are talking Page 2-1 not I-1?

16          MR. FINCH:   I'm talking Page 1-1, Exhibit 1-1.

17  A    It's an exhibit, not an appendix.

18  Q    It's an exhibit.   Do you have the exhibit in front of you,

19  Dr. Florence?

20  A    I do.

21  Q    And at the top it says Exhibit 1, Documents Relied Upon?

22  A    Yes.

23  Q    And listed in the documents relied upon, Number 10 is the

24  testimony of Robert Beber taken February 21, 2007.   Number 11

25  is the testimony of Jay Hughes taken February 22, 2007.   Number

Florence - Cross/Finch                    124

1  20 is the testimony of Robert Beber taken July 30th, 2002.

2  Number 21 is the testimony of David Siegel taken September 19,

3  2002?

4  A    Yes.

5  Q    And Number 18 is the testimony of Jay Hughes taken July

6  19th, 2002?

7  A    Yes.

8  Q    And you have done work in estimating asbestos claims and

9  the costs of those claims for the W.R. Grace company for more

10 than ten years, correct?

11         MR. BERNICK:  At this point, Your Honor, first of all

12 the work that he did for Grace in connection with their reserve

13 estimate has not been before the Court in connection with this

14 witness' testimony.  Secondly, while it is true that these

15 documents were listed as reliance materials he was specifically

16 asked about this in his deposition and clarified that he simply

17 was asked to read them and doesn't really know why and that

18 they were not used.  So, they are not reliance materials.

19         MR. FINCH:  Your Honor, Dr. Florence testified that

20 he -- on my voir dire that he was relying on all of his past

21 experience in estimating asbestos liabilities for here.  Mr.

22 Bernick asked him specifically about estimates for defendants

23 done in the tort system and included on that list is W.R.

24 Grace.

25         I would submit to you that the reliability of an

1  expert's work and the credibility of an expert's work is always

2  within the scope of direct examination.  Mr. Bernick asked him

3  about the work he did for Grace on direct exam and I think I am

4  perfectly entitled to cross examine Dr. Florence about his

5  prior work in the Grace case and in other cases.

6         The expert stipulation doesn't bar this.  The

7  stipulation Mr. Bernick has referred to has nothing to do with

8  this.  And, in fact, during a hearing on May 2nd, 2007 I

9  specifically raised this issue with the Court.  I made very

10  clear that I never agreed that I couldn't use Grace's past work

11  that Florence did to impeach him or to impeach the company.

12  That is critical to the ACC's ability to impeach him at trial.

13  I never agreed to that and later in the transcript Mr. Bernick

14  says, "We're not taking the position you can't impeach Dr.

15  Florence with prior testimony, prior contrary testimony as Dr.

16  Peterson was impeached in the <u>Babcock & Wilcox</u> case based upon

17  his prior sworn testimony in that case."

18         And later on in the same transcript I say, "I can

19  impeach the company.  The company is the one who is presenting

20  an estimate of liability.  I am certainly entitled to show how

21  they did it in the past."  And the Court responded, "Sure, you

22  can show how they did it in the past, but that is, as I

23  understand it, was the scope of the depositions in the past."

24         So I think his methodology that he used in the past

25  for Grace is certainly relevant to the estimate that you are

1 being asked to accept here.  It's no different than in a real

2 estate valuation case.  If a real estate expert, an appraiser,

3 had a long history of valuing Black Acre by comparables in the

4 same neighborhood and then he comes into Court and says this

5 time I'm basing the value of Black Acre on astrology.  You

6 could certainly go back and impeach him with his prior work.

7 And it's not covered by the expert stipulation.

8        MR. BERNICK:  Your Honor, (a) there is no impeachment

9 at least as of this point in time, there is no impeachment

10 whatsoever, (b) it is -- we had a stipulation, the stipulation

11 governed this particular situation.  There are all kinds of

12 materials I could have used to impeach Dr. Peterson and their

13 other experts, but because they didn't rely upon them, I'm not

14 permitted to do that.

15        What they want, they want to establish that the

16 company has taken an inconsistent position.  They can certainly

17 seek to establish that through their own witnesses and witness

18 for the company if the company appears here.  But, the whole

19 purpose of the stipulation was to control the cross examination

20 and the discovery to those matters that the expert actually

21 chose to rely upon.  This expert has specifically disclaimed in

22 his deposition using the prior testimony for purposes of his

23 work in this case.  The only testimony that he's now offered is

24 that his experience is that they want the basis for his work.

25 Well, of course that is always true.

1          The purpose of the stipulation was to limit the scope

2    of discovery in cross examination.  We have abided by it.  They

3    should abide by it.  And if they want to make their own record

4    about their views of our approach, they can do so through their

5    own witness.  But, you can't take a witness that I've put on

6    the stand who has talked about a specific opinion based upon

7    specific work.  And I'll say for all purposes this witness is

8    going to be open to "cross examination" that's all designed to

9    explore their model.  The model -- their model, is not before

10   the Court.  His model is.

11         MR. FINCH:  Your Honor, the stipulation says that

12   simultaneous with the service of the expert reports, the

13   experts produce their reliance material.  The only things that

14   are outside of the scope of permissible discovery are any notes

15   or other writings taken or prepared by or for an expert witness

16   in connection with this matter, including correspondence or

17   memos to and from, the notes of correspondence with the

18   expert's assistants and/or clerical support path, one or more

19   other expert witnesses or non-testifying expert, consultants,

20   or one or more attorneys for the party offering the testimony

21   of such expert witness, unless the expert witness is relying

22   upon those notes or other writings in connection with the

23   expert's witnesses opinions, draft reports, any/all

24   communications between the expert and the expert's staff,

25   unless the expert is relying upon those communications, the

1 software constituting or underlying any computer model, and any

2 confidential information disclosed to the expert in a prior

3 engagement by another client or entity.

4        This -- his prior work, both for Grace and others,

5 don't fall into any of those categories.  And to the extent

6 they -- they just don't.  And these questions were put to Dr.

7 Florence at his deposition about his prior work for Grace and

8 his prior work in other cases and I submit to you it's highly

9 relevant and highly informative to the Court, and not within

10 the purview of the expert stipulation, his prior work.

11        THE COURT:  It seems to me that the particular

12 question that -- we've gotten so far afield of what the

13 particular question was at this point.  The question was that

14 he had estimated claims and costs of those claims for the

15 debtor for more than ten years.  And then there was an

16 objection.  I mean, to the extent that the objection is, you

17 know, whether he has estimated claims for the debtor for more

18 than ten years, I don't see that that's an objectionable

19 question.  To the extent that after that we're going to get

20 into work that -- and what it is that he has done for the

21 debtor, to the extent that you're going to ask him questions

22 about the reserve work and what that has -- what relevance that

23 may have to do with the debtor, I don't know if what happened

24 ten years ago and what's reserved for financial statements is

25 at issue.

1          This is not a fraudulent conveyance trial.  This is

2   an estimation trial for what the debtor has to put into this

3   trust to get through this particular -- or some other entity if

4   the debtor is not the successful plan proponent -- has to get

5   into this trust in order to get this case through confirmation.

6   So what may have been relevant in an estimation trial on

7   fraudulent conveyance issues and estimations for liability

8   depending on what the debtor did with particular financial data

9   and that type of a trial may not be relevant here at all.

10  Nonetheless, this witness can surely answer whether he has

11  worked for Grace estimating tort claims for the last ten years.

12  That objection is overruled.  Dr. Florence, you may answer that

13  question.

14  BY MR. FINCH:

15  A    Yeah.  We've done work for Grace -- I say we -- the firm

16  has done for Grace since about 1995.

17  Q    And the work you have done for Grace was to estimate the

18  cost that Grace would bear -- prior to the time that Grace went

19  into bankruptcy, each of the times you've worked for Grace, you

20  were estimating the cost that Grace would bear to resolve

21  asbestos personal injury claims while it continued in the tort

22  system, correct?

23  A    I believe so.  We were asked on most of those occasions,

24  except for, I think, the last engagement in 2000, to estimate

25  the volume and the timing and the value of claims, both pending

1  and future, that would be filed against Grace, assuming they

2  stayed in the tort system.

3  Q    And in the 2000 engagement, you estimated the number of

4  claims but not the value, correct?

5  A    That's my recollection.  Yes.

6  Q    Okay.  And the work you did for Grace in 1997, do you know

7  what purpose they used that work for?

8  A    I don't.

9  Q    Do you know that they used your estimates -- do you know,

10 one way the other, whether they used your estimates to evaluate

11 their solvency for purposes of spinning off the Sealed Air

12 packaging business?

13 A    I don't know precisely how they used my work.

14 Q    In all the times you did work for Grace in the past, was

15 -- strike that.  I'll do it in a more specific basis.  In fact,

16 would you agree that there is no TDP that you're aware of that,

17 for the mesothelioma criteria, restricts payment only to people

18 who personally mix or personally install asbestos containing

19 products?

20 A    That is --

21      MR. BERNICK:  A TDP in existence in connection with

22 the trust?

23      MR. FINCH:  Yes.

24 A    I think I answered that earlier, about -- I think it is

25 non-explicitly, only as a subset of some other criteria.  At

Florence - Cross/Finch                    131

1  least my recollection is of the TDP's I've worked with.

2  Q    Isn't it true that there is -- is there any TDP that you

3  are aware of that has, for the mesothelioma criteria, that

4  restricts payment only to the people who personally mix or

5  personally install asbestos containing products?

6  A    I think I said no.  I mean, is that explicit, only those

7  two?  No.

8  Q    So -- okay.  So the TDP's for mesothelioma allow valid

9  claims from people even though they don't personally mix or

10  personally install asbestos containing products?

11         MR. BERNICK:  Objection to the form of the question.

12  Invalid.

13         THE COURT:  Sustained.

14  BY MR. FINCH:

15  Q    And isn't it correct that you're not aware of any solvent

16  defendant in the tort system that restricts payments in

17  mesothelioma cases solely to people who can demonstrate that

18  they've personally mixed or personally installed an asbestos

19  containing product?

20         MR. BERNICK:  Objection.  A) lack of foundation.  B)

21  that most certainly violates the terms of the stipulation and,

22  not only that, but implicates potentially confidential

23  information that this witness may have because he does

24  consulting for those other clients.

25         MR. FINCH:  Your Honor, I asked him exactly that

1 question in his deposition so, to the extent -- I wasn't asking

2 about confidential information.  The question is, does he know

3 one way or the other, not what the criteria are, but does he

4 know of any solvent defendant that restricts payment in

5 mesothelioma cases solely to people who can demonstrate that

6 they personally mixed or personally installed an asbestos

7 containing product.

8         MR. BERNICK:  And the answer to that question is it's

9 plainly barred by the stipulation because to explain or deal

10 with his answer, we would then have to go into materials that

11 he has not relied upon in order to demonstrate what it was that

12 he was talking about, and that was the whole purpose of the

13 stipulation, is to avoid that inquiry.

14         MR. FINCH:  Your Honor, in the deposition, he

15 answered that he knows of none.

16         MR. BERNICK:  It makes no difference what it is in

17 his deposition.  It's not -- we should not be opening the door

18 to an improper line of inquiry at this trial.

19         THE COURT:  The deposition testimony, I think, at

20 this point, is not necessarily the question.  You know, if you

21 wish to try to introduce his deposition testimony, that's a

22 different line of inquiry that you may have the opportunity to

23 do.  But while he's here, I think the issue is whether or not,

24 at this point, there is some privilege.  I don't see that there

25 is a privilege that's been asserted.  I'm not aware of whether

1  that's going to violate the confidential sources.  At the

2  moment, it's a yes or no answer.  I don't see how that's going

3  to violate confidential information.

4           MR. BERNICK:  Because, Your Honor, in order for us to

5  deal with that testimony that he's now said no, we would then

6  have to unpack what kind of clients it is that he has and what

7  the basis for his knowledge is in order to explore how broad or

8  how limited it might be because they will take -- they could

9  argue on the basis of this answer that, gee, it's not there,

10  there's no evidence of it, whereas, in fact, the basis for his

11  testimony is much more limited.  I can't go down that road

12  because I can't ask him to breach his confidences and I don't

13  have -- shouldn't have to deal with that inference because the

14  question itself is improper under the stipulation.  Dr.

15  Peterson has all kinds of information that we've not been able

16  to get into because it's covered by this stipulation.  Ms.

17  Biggs has got all kinds of information that we can't get into

18  because it's covered by the stipulation.  We should not have to

19  deal with this line of examination.  Mr. Finch can't sit there

20  and pick where he wants to stand by the stipulation and where

21  he doesn't want to.

22           THE COURT:  All right.  How is this covered by the

23  stipulation?

24           MR. BERNICK:  Because it's an inquiry into matters

25  that are part of his experience that he is not relying upon for

1 purposes of his testimony.

2          THE COURT:  Of making his estimate with respect to --

3          MR. BERNICK:  That's correct.

4          THE COURT:  -- Grace's part?

5          MR. FINCH:  Your Honor, I -- the stipulation does not

6 preclude you from cross examining an expert about stuff he

7 didn't rely upon.  All it says is you can't discover five

8 limited categories of things.  And the five limited categories

9 of things are what I read to Your Honor earlier.  It does not

10 -- it is not -- it does not preclude me from cross examining

11 him about stuff he's relied upon in other places and he's not

12 relying upon here.  I mean, that's what you do with an expert;

13 you cross examine him about the stuff you think he should have

14 relied upon but didn't.

15          MR. BERNICK:  That's correct.  And ordinarily the

16 rules provide for broad cross examination of reliance materials

17 as well as things that have been reviewed but not relied upon.

18 That is not the rule that we've adopted in this case.

19          MR. FINCH:  It is.

20          THE COURT:  Somebody is going to have to show me the

21 stipulation.  I'm sorry.

22          MR. FINCH:  Your Honor, I'll move on and I'll pack it

23 up in a few minutes.

24          THE WITNESS:  Can I have water, please?

25          MR. FINCH:  It's right here.

1          THE WITNESS:  Thank you.

2          THE COURT:  Let me read it, please.

3          MR. FINCH:  Sure.

4                    (Pause)

5          THE COURT:  All right.  Well, the only part of this

6  stipulation that I can see that would apply is 5, "Any

7  confidential information disclosed to the expert in a prior

8  engagement by another client or entity if, in fact, this would

9  be information that was disclosed by another client or entity."

10  So -- and I can't tell that from the question specifically.  So

11  I guess, Mr. Finch, first of all, what we're going to have to

12  establish is whether or not he -- I suppose we can get as far

13  as saying whether he is or is not aware of any solvent

14  defendant who makes this restriction.  But then the next

15  question is going to have to be, as a follow-up, you know,

16  whether the basis for that information is confidential

17  information.  And if it is, that's going to end this inquiry.

18          MR. BERNICK:  Right.

19          MR. FINCH:  That's fine.  My question, as posed, is

20  is he or is he not aware of any solvent defendant that

21  restricts payment in mesothelioma cases to people -- to only

22  those people who personally mix or personally install asbestos

23  containing product.

24          THE COURT:  And regardless of the outcome, the next

25  question is whether the basis for his information is based on

1 confidential information and whether he is or is not so aware.

2 If it's based on information that is confidential, that ends

3 the inquiry.

4          MR. FINCH:  I understand, Your Honor.

5          THE COURT:  So at that point in time, if it's based

6 on confidential information, I will be striking the testimony.

7          MR. BERNICK:  Yeah.  Well, the other -- I'm sorry,

8 Your Honor.  I think that the other way of doing it is simply

9 ask whether the question potentially implicates confidential

10 information.

11          THE COURT:  That's --

12          MR. BERNICK:  If it does, that's the end of it.

13          THE COURT:  That's true too.

14          MR. BERNICK:  But the other thing is that I would

15 hasten to point out to the Court, the little three, or whatever

16 it is, Romanette iii, picks up any materials that have been

17 furnished, any oral or written communication between an expert

18 witness and dah, dah, dah, dah, one or more attorneys for the

19 party offering the testimony of such witnesses.  So any

20 materials, be they oral or written, that have come from Grace's

21 counsel -- I would imagine that includes all of this testimony

22 -- that also is picked up by Romanette iii, unless the expert

23 witness is relying upon it.

24          THE COURT:  All right.  So I think if you

25 substantiate the basis first for where information is coming

1  from, Mr. Finch, we would probably be in safer grounds.

2  BY MR. FINCH:

3  Q    Dr. Florence, your reliance materials that you produced in

4  this case, would you agree me that experts' work needs to be --

5  in order to be reliable, it needs to be replicable?

6  A    I would think so.  Sure.

7  Q    And so in order for the ACC and FCR experts to replicate

8  your work, you produced a lot of back-up materials, correct?

9  A    I did.  Yes.

10 Q    And you included within the back-up materials the stuff

11 you relied on, were the deposition transcripts that I showed

12 you in Exhibit 1, correct?

13        MR. BERNICK:  I object to the -- that's a compound

14 and misleading question.  He produced the reliance materials

15 presuming that, because it was produced as reliance materials,

16 it then is responsive or is linked to the prior question which

17 asks about reproducibility.  This is just -- Your Honor, this

18 is playing around.  We ought to just get to the core of the

19 issue and have him find out, you know, how he got these

20 deposition transcripts.

21        MR. FINCH:  Your Honor, I'll move on.  The deposition

22 transcripts were relied upon by Dr. Florence.  They said -- he

23 wouldn't have had to produce them if he wasn't relying on them.

24 BY MR. FINCH:

25 Q    Dr. Florence, sticking with your first report --

1              (Pause)

2  Q    All right.  Dr. Florence, without relying on any

3  confidential material from any source whatsoever, are you aware

4  of a single defendant in the tort system that restricts payment

5  in mesothelioma cases solely to people who can demonstrate that

6  they personally mixed or personally installed an asbestos

7  containing product?

8              MR. BERNICK:  Again, Your Honor, that presumes that

9  he, a) can set that to one side; b) we would then find out what

10 he had to set to one side; and, c) to the extent that it's

11 Grace, Grace's materials are independently protected by little

12 Romanette iii of the stipulation.

13             THE COURT:  No.  The question was, any solvent

14 defendant in the tort system.  I think we can assume that Grace

15 is, a) not a solvent defendant --

16             MR. BERNICK:  No.

17             THE COURT:  -- and, b) not in the tort system at the

18 moment.

19             MR. BERNICK:  But that's not true. It's the materials

20 that were provided that is the -- this witness was provided

21 with materials during the -- that relate back to the period of

22 time in which Grace was in the tort system.

23             THE COURT:  Wait.  Are we talking currently?

24             MR. BERNICK:  Yes.

25             THE COURT:  The question was are you aware,

1 currently, of any solvent defendant in the tort system.

2          MR. BERNICK:  Today?  Yes.

3          THE COURT:  Yes.  That's the question.

4          MR. BERNICK:  If that --

5 BY MR. FINCH:

6 Q    Without relying on any confidential information, Dr.

7 Florence, are you aware of solvent defendant in the tort system

8 that restricts its payments in mesothelioma cases just to

9 people who personally mix or personally install an asbestos

10 product?

11          THE COURT:  You may answer that.

12 BY MR. FINCH:

13 A    I think, as I said in my deposition, I'm not really an

14 expert on what all the solvent defendants do in terms of the

15 negotiation posture but I think an answer, I'm not aware of

16 any, though I'm not aware of a lot in that regard.

17 Q    Okay.  Now, sticking with your expert report, the lung

18 cancer criteria --

19          THE COURT:  The second one or the first one?

20          MR. FINCH:  The second.

21          THE COURT:  All right.

22          MR. FINCH:  The second one.  The one dated September

23 25, 2007.

24          THE COURT:  Okay.  Thank you.

25 BY MR. FINCH:

1  Q    The minimum causation criteria for lung cancer is number

2  three on Page 2, correct, Dr. Florence?

3  A    Correct.

4  Q    It says, "Minimum causation criteria for lung cancer

5  claims of diagnosis of asbestos based on the B-reader report of

6  a reliable B-reader, and a reproducible ILO score of 1/0 or

7  greater," correct?

8  A    That's correct.

9  Q    Isn't it true that Grace's assumed criteria do not allow

10  for the possibility that the claimant could have a qualifying

11  lung cancer claim based on pathology as opposed to X-rays?

12  A    With regard to our estimate?

13  Q    Yes.

14  A    No, they could.  In fact, I was rereading my deposition

15  and I think I must have misunderstood your question then.  What

16  we did, and I think what this handwritten chart covered, was if

17  a claimant said they were relying on pathology evidence, then

18  we assumed that that evidence -- though it was not specifically

19  reviewed, we assumed that that evidence would qualify at the

20  same rate that the X-ray evidence would have qualified.

21  Q    Okay.

22  A    So, to that extent, the pathology evidence would have been

23  accepted.

24          MR. FINCH:  Can I have the ELMO, please?

25                      (Pause)

1 BY MR. FINCH:

2 Q    So you assumed that, for people who were relying on

3 pathology, they would only qualify at the same rate as the

4 people who were relying on X-rays, the 8.6 percent rate,

5 correct?

6         MR. BERNICK:  Objection to the form of the question.

7 The little header that you have there doesn't say anything

8 about pathology.  If you want to display that document, I think

9 the witness' -- the question to the witness should change.

10        MR. FINCH:  Your Honor, he just testified that the

11 people who qualified based on pathology would qualify at the

12 same rate as the people who qualified for X-rays.

13 BY MR. FINCH:

14 Q    Isn't that right, Dr. Florence?

15        MR. BERNICK:  That's not the point, Your Honor.  The

16 category is -- the 8.6 percent is applied to the category, not

17 to the pathology specifically.

18 BY MR. FINCH:

19 Q    Dr. Florence, what percentage of people who were relying

20 on pathology did you assume would qualify?

21 A    We assumed that, meeting the other criteria, that if the

22 reliance was on a pathology report, they would be qualified at

23 the same rate, the 8.6 percent, as the individuals that had

24 X-ray proof.

25 Q    So is it correct that --

1  A    Reproducible X-ray proof.

2  Q    So you were assuming that only 8.6 percent of the people

3  who said their lung cancer was related to asbestos based on

4  pathology would qualify?

5  A    That's correct.

6  Q    Did you hear Dr. Weill's testimony that pathology was the

7  gold standard for diagnosing asbestosis?

8  A    I did not -- was not present for Dr. Weill's testimony.

9  Q    Are you aware that if something is diagnosed based on

10 pathology, there is no dispute that the asbestosis is present?

11 A    I was not present for Dr. Weill's testimony.  Correct.

12 Q    Who told you to use the 8.6 percent for the people who

13 were relying on pathology?

14 A    I think that was a judgment that we made.

15 Q    I take it you didn't discuss that with Dr. Weill or any of

16 the medical experts?

17 A    I did not discuss it with Dr. Weill.

18 Q    To the extent that there are differences in the criteria

19 that Grace required before making payments on a claim prior to

20 the time it went into bankruptcy and the criteria that you've

21 been asked to apply now, you made no attempt to reconcile the

22 two in your report, correct?

23      MR. BERNICK:  Can I have the question read back,

24 please?

25      MR. FINCH:  There's no read-back.  I'll just repeat

1  the question.

2  Q    To the extent that there were differences in the criteria

3  that Grace used to pay claims before it went into bankruptcy

4  and the specified assumptions you were asked to assume here,

5  you made no attempt to reconcile the two in your report,

6  correct?

7  A    That's correct.  Our job was to estimate the number of

8  claims that would meet the criteria and what those claims'

9  value might be.

10  Q    And you haven't done any analysis as to whether Grace paid

11  any historically settled claims using the specified criteria

12  that you've been asked to assume here as a prerequisite to

13  payment, have you?

14          THE COURT:  I'm sorry.  I apologize, Mr. Finch.

15          MR. FINCH:  Sure.

16          THE COURT:  I need this one -- did no analysis to see

17  --

18  BY MR. FINCH:

19  Q    You have done no analysis of whether Grace used the

20  specified criteria that you're applying here as a prerequisite

21  to paying money to resolve claims in the tort system?

22  A    I have done no analysis of Grace's methods for paying

23  claims in the tort system.  In other words, what analysis they

24  may have done on those claims did not fall within the scope of

25  what I was asked to do.

1  Q    Okay.  And it's correct that you did not attempt to

2  estimate the liability for pending and future asbestos claims

3  that Grace would face if it had continued in the tort system

4  after April 2001, correct?

5  A    I was not asked to estimate if they had continued in the

6  tort system.  That was not an assumption.  Correct.

7  Q    And you don't have any opinion as to what Grace's

8  liability for pending and future asbestos personal injury

9  claims as of April 2001 would be if it hadn't gone into

10 bankruptcy?

11 A    I haven't done that analysis.  No, I don't have an

12 opinion.

13          MR. FINCH:  Can I have the ELMO?

14                    (Pause)

15 BY MR. FINCH:

16 Q    Okay.  You were asked some questions by Mr. Bernick about

17 the data that you rely on in two different situations.  Do you

18 recall this graphic?

19          MR. FINCH:  And, for the record, it's GG-2310.

20 BY MR. FINCH:

21 A    I do.

22 Q    Okay.  First of all, the first one, Future Trust Funding,

23 isn't it correct that what you used the TDP analysis for is not

24 to determine the amount of funding that goes into the trust but

25 to determine the payment percentage that the trust would pay

Florence - Cross/Finch                                    145

1 out on claims, given the relationship between its assets and

2 projected liabilities?

3 A    Correct.  I think that's what I tried to say.  I may not

4 have said it very artfully.

5 Q    Okay.  So if we struck Funding from this and instead put

6 Future Trust estimated payment percentage, that would be

7 accurate, correct?

8 A    I believe so.  Yes.

9 Q    Okay.  Now, for trusts --

10 A    I'm sorry.  The only clarification would be this graphic

11 has two options that have Trust and Tort.  And I guess -- I'm

12 not quite sure where bankruptcy would fall so --

13 Q    Okay.  But for --

14 A    It could fall under trust; it could fall under -- I don't

15 know.  I guess it can't fall under tort so --

16 Q    You've done two types of estimates historically in your

17 career.  One is to estimate the future tort system costs of

18 some asbestos defendant, correct?

19 A    We've estimated tort system costs.  Correct.

20 Q    Right.  And you didn't do that work here in this case,

21 this estimation case?

22 A    That's correct.  We didn't.

23        MR. BERNICK:  I'm sorry.  The question presumes, by

24 tort system, this has been used in a very general kind of way,

25 a return to the state court administered tort system.  That's a

1 clear question.

2 BY MR. FINCH:

3 Q    By tort system, I mean that Grace would continue to

4 resolve the cases in whatever form it found itself in for

5 litigating asbestos personal injury claims, whether it's state

6 courts or federal courts, wherever the cases were pending at

7 the time it went into bankruptcy.

8         MR. BERNICK:  Objection.  That's a misleading

9 question that lacks foundation.

10         THE COURT:  I am not certain what that question

11 means.

12 BY MR. FINCH:

13 Q    Dr. Florence, what do you mean by future tort system

14 costs?

15 A    That would be the cost that a defendant might incur by

16 settling or litigating claims in the tort system --

17 Q    And what do you mean --

18 A    -- in the future.

19 Q    What do you mean by the tort system?

20 A    In the court system.

21 Q    In the courts in which the cases historically are pending,

22 correct?

23 A    In the court system, whatever that may be; federal, state,

24 city.  I make no distinction.

25 Q    Okay.  Now, for the future trust projections, what you're

1  doing is trying to estimate the cost that a trust would incur

2  to resolve claims over time in the future, correct?

3  A    I'm usually trying to estimate -- right -- the volume, the

4  timing, and the cost of resolution of claims against the trust.

5  Q    Okay.  And here you have drivers of payments, you have

6  claims data, and you have criteria.  The TDP criteria, that's

7  not an assumption, that's the rules that the trust says, we

8  will pay these claims and not pay those claims, correct?

9  A    Correct.  The TDP usually specifies, obviously sometimes

10  with verbiage, what should be paid and what shouldn't be paid.

11  Q    Okay.

12  A    And so those are the criteria.

13  Q    Okay.  And the claims data under the TDP, once a trust has

14  had its doors open for a couple of years, you have empirical

15  data as to how many claims got filed against the trust and how

16  many of them got paid by the trust, correct?

17  A    We do.  We would have data on, in essence, the equivalent

18  of claims history for the trust.

19  Q    Okay.  And so you would have empirical data as to the

20  claims history and empirical data as to the criteria where a

21  trust has been in operation for some period of time and you

22  would use that to project the future liability of the trust,

23  correct?

24  A    Correct.

25  Q    Okay.  And for trusts that just open their doors, the ones

1 that -- say, the Federal Mogul Trust, if it opens its doors in

2 three months or something, the TDP criteria are -- they're not

3 an assumption; they're a given?  I mean, they are -- there is

4 empirical data as to what the TDP are, correct?

5 A    The TDP are assumptions.

6 Q    Well, they're not assumptions?  They are criteria that the

7 trust will follow?  You have those criteria, correct?

8 A    That's right.  Those are specified.

9 Q    Okay.  And then where do you get the claims history for a

10 trust that hasn't yet started operation yet?

11 A    Well, for a trust that's just opening its doors, you try

12 to get it from the claims history up until that time.

13 Q    The claims history of the company prior to the time it

14 went into bankruptcy?

15 A    Correct.

16 Q    Okay.  For future tort system costs, you have claims data.

17 What does that refer to?

18 A    Which one?  Trust or --

19 Q    Future tort system costs claims data.  What does that

20 refer to, Dr. Florence?

21 A    That would be the history of the defendant in the tort

22 system as reflected in the information about the claimants and

23 the status of those claims and the outcome of the claims.

24 Q    And that's empirical data, correct?

25 A    It is.

1  Q    That's not an assumption, correct?

2  A    The data is an empirical base.  Correct.

3  Q    Okay.  And then you have the criteria that the defendant

4  actually applied to resolve claims in the tort system, correct?

5  A    Sometimes you do and sometimes you don't.  Sometimes it's

6  a black box process and sometimes it's more clear than others.

7  Q    Okay.  But -- I think I wrote this down -- sometimes you

8  know what the criteria are; i.e., we will pay mesothelioma

9  claims if they meet the following criteria, and they have that

10 in a settlement agreement and sometimes you don't know that and

11 you can see the outcome of what applying those criteria would

12 do, correct?

13         MR. BERNICK:  I object to the form of the question.

14 Also, I think the question assumes that those are the only two

15 alternatives.

16 BY MR. FINCH:

17 Q    What did you mean, Dr. Florence, about the outcome of

18 applying the criteria where it was a black box to you?

19 A    There may be instances where you don't know -- either you

20 don't know the specific criteria that was used against -- in

21 evaluating a specific claim or a group of claims.  And in that

22 instance, all you know is this group of claims had these

23 characteristics and they were paid or not paid a particular

24 amount of money.  I mean, so it's -- in essence, you may not

25 know specifically what the criteria were in judging those

1 claims but you know that they were closed or closed for some

2 amount of money.

3 Q    Okay.  So you know what percentage of them got paid, for

4 example?  You can tell that, right?

5 A    Well, sure.  You can find out what percentage of claims

6 are paid but I guess the distinction I was trying to draw is

7 there may be groups of claims, segments of claims, in this

8 claims history, some of which you know the criteria for, some

9 of which you don't know the criteria for, some of which all you

10 know is the outcome of the claim.

11 Q    But for all of them, whether you know the criteria or not,

12 you have empirical data as to the outcome of the company's

13 application of whatever criteria it was using to resolve

14 claims, correct?

15         MR. BERNICK:  Objection.  Lack of foundation.  This

16 is a very abstract --

17         MR. FINCH:  He just testified to it on direct, Your

18 Honor.

19         THE COURT:  Yes.  Overruled.

20         MR. BERNICK:  No, that's not what he testified to --

21         THE COURT:  I think that's clear enough.

22         MR. BERNICK:  -- but go ahead.

23         THE COURT:  You may answer, Dr. Florence.

24 BY MR. FINCH:

25 A    I'm sorry.

1          THE COURT:  Whether you have empirical data for the

2  outcomes of all the claims.

3  BY MR. FINCH:

4  A    You usually have -- you usually have data on what the

5  status of the claim is and, if the claim is closed, you usually

6  have data on whether it was closed for money or -- and, if so,

7  how much, or whether it was not closed for money.

8  Q    And from that, you can calculate what percentage

9  historically of claims the defendant paid money to resolve,

10 correct?

11 A    You could.  You could calculate a simple percentage.

12 Right.

13 Q    And that's -- and you can calculate what the average value

14 of the claims that got paid, received from that defendant,

15 correct?

16 A    Sure.

17 Q    And those two parameters, the percentage of claims that

18 get paid and the value paid to those claims, that's empirical

19 data that you can analyze?  It's not an assumption, correct?

20 A    Well, with regard to criteria, I guess you're making the

21 underlying assumption that there was commonality in the

22 criteria that was used, whatever they were.

23 Q    And generally speaking, in estimating the future tort

24 system costs of a defendant, you assume going forward there

25 will be -- they will apply the same criteria they had

1  historically, correct?

2           MR. BERNICK:  I'm sorry.  Was the question you will

3  assume?

4  BY MR. FINCH:

5  Q    That you -- in making a forecast for a tort system

6  defendant, you look to the past history of what percentage of

7  claims they paid and how much they paid them for, correct?

8  A    That's one of the things you look at.  Sure.

9  Q    And then, to estimate the liability going forward, you

10  project that cost by using the empirical data you have as to

11  the historically closed claims as the basis for making the

12  forecast?

13  A    Well, I think I agree, with the understanding that that

14  may not be true for all of the claims.  In other words, in the

15  tort system, we've frequently been in situations where, as an

16  assumption, the client may say, we have this going on for this

17  attorney, or we have this agreement in this jurisdiction, and

18  therefore it's -- the simple average calculation of what we

19  paid for the last six months or the last six years in this

20  state is not applicable.  Or we have a settlement agreement

21  with the Florence firm and the Florence firm specifies these

22  criteria in this amount of money.  So I guess in answer to your

23  question, in general, you look to the history and then the

24  criteria.  Some of those criteria are explicit, like the ones

25  I've given you.  Some of the criteria are kind of black box and

1 all you know is some criteria was applied and I know the result

2 of those criteria.

3 Q    And you rely on the company's historical experience in the

4 tort system for making an estimate of what its liability would

5 be in the tort system because it's an empirical demonstration

6 of what has actually happened with that company, correct?

7            MR. BERNICK:  Objection to the form or the question.

8 Actually happened to that company in what regard?

9            MR. FINCH:  In the tort system.

10            MR. BERNICK:  Well, that's the same problem.  It's

11 the same problem.

12            THE COURT:  That is the same problem.

13            MR. BERNICK:  And at this point, Your Honor, I think

14 that there have been 25 minutes worth of questions all dealing

15 with the methodology that he's already testified to on direct

16 examination.

17            THE COURT:  That's proper cross examination.  If they

18 want to spend 25 minutes on methodology, they're permitted to

19 do it.  But I do believe that there is a problem with the

20 question the way it was asked.  Please rephrase the question.

21 BY MR. FINCH:

22 Q    Isn't it true, Dr. Florence, that you rely on the

23 company's historical experience in the tort system for making

24 an estimate of what its future liability would be in the tort

25 system because the historical experience is an empirical

1  demonstration of what actually happened with respect to that

2  company?

3        MR. BERNICK:  It's the exact same question that he

4  asked two minutes ago and it's still defective.

5        MR. FINCH:  It's not the same question, Your Honor.

6        THE COURT:  Well, it changed to, isn't it true, so

7  it's not the exact same question but I think the purpose is the

8  same.  But I think that there are a lot of assumptions that I

9  haven't heard this witness testify to.  He is an expert but I

10 think you have to get him to agree with the assumption.  I

11 haven't heard him testify to all of the assumptions that you

12 have put into this question.

13 BY MR. FINCH:

14 Q    When you are -- these are the places where you have

15 testified as an expert on estimating asbestos liabilities, Dr.

16 Florence?

17 A    That's correct.

18 Q    In Babcock and Wilcox, you estimated the company's

19 liability for asbestos claims twice, correct?

20 A    I did.

21 Q    And in each case, you relied on the company's past history

22 as -- in terms of the percentage of claims paid and the value

23 of the claims that were paid in making your projections,

24 correct?

25 A    Correct.  We were asked to assume that, in both instances,

1 that the company would have been in the tort system, would not

2 have been in bankruptcy and would be settling claims in the

3 tort system.

4 Q    Okay.  And other than that one assumption --

5 A    And we used --

6 Q    -- that the company would --

7         MR. BERNICK:  Could the witness please finish his

8 answer?

9         MR. FINCH:  Sure.

10 BY MR. FINCH:

11 A    We used the historic experience up until that time as a

12 reflection of that base that I was talking about earlier, that

13 base experience up to the time that we were asked to make the

14 forecast.

15 Q    And other than the one assumption that you were to assume

16 that the company would still be in the tort system, you were

17 not told any other assumptions to apply to estimate the

18 liability, correct?

19         MR. BERNICK:  In which case?

20         MR. FINCH:  <u>Babcock</u>.

21         MR. BERNICK:  Fraudulent conveyance or --

22         MR. FINCH:  Yes.

23         MR. BERNICK:  -- information?

24         MR. FINCH:  Both.

25         THE COURT:  Well, let's take them one at a time.

1           MR. FINCH:  Okay.

2  BY MR. FINCH:

3  Q    Let's take the fraudulent conveyance case.

4                      (Pause)

5  A    I'm sorry, Mr. Finch.  I don't -- I can't recall whether

6  we were given additional assumptions in either one of those.

7  Q    In Armstrong -- you testified in the Armstrong

8  confirmation hearing about two years ago, correct?

9  A    I did.

10 Q    And there your estimate of the liability was based on the

11 company's past history of resolving cases in the tort system?

12 A    It was based on the assumption that the company would have

13 remained in the tort system and not filed for bankruptcy.

14           MR. FINCH:  One moment, Your Honor.

15                      (Pause)

16           MR. FINCH:  May I approach the witness, Your Honor?

17           THE COURT:  Yes.  Mr. Finch, may I ask the witness to

18 clarify something for me, please?  Dr. Florence, the question

19 you're being asked is whether you were making -- you were

20 testifying based on the assumption that the company's past

21 history of resolving claims in the tort system.  The question

22 you're answering is that you were told to assume the company

23 would remain in the tort system.  Are they the same thing?

24           THE WITNESS:  (No audible response).

25           THE COURT:  I just want to make sure that you're --

1 that in answering this, that you're either -- that you're

2 saying yes.  I'm not sure if you're saying yes and then going

3 on or if you're saying no and going on.  So I just would like

4 to know whether the question and the answer are the same.

5          THE WITNESS:  Maybe I should hear the question again

6 to make sure I'm answering the right question.

7          THE COURT:  All right.  Thank you.  Would you repeat

8 that question for me, Mr. Finch?

9          MR. FINCH:  Which one?

10          THE COURT:  Either one.  The question was, when he

11 testified in AWI at the confirmation hearing, he was told to

12 estimate liability based on the assumption of the company's

13 past history of resolving cases in the tort system.  Exactly

14 how you phrased it, I can't say, but the witness did not answer

15 using the same words you did.  I want to make sure that the

16 answer and the question are the same, if they are.

17          MR. FINCH:  Okay.

18 BY MR. FINCH:

19 Q    Dr. Florence, do you have the Armstrong report in front of

20 you?

21 A    I do.

22 Q    Okay.  And in that case, you estimated what Armstrong's

23 liability would be as of the bankruptcy petition date, correct?

24 A    Correct, if they remain in the tort system.

25 Q    If they remain in the tort system.  And with that

1 assumption, if they remain in the tort system, you estimated

2 their liability to be north of $4 billion, correct?

3 A    I did.

4 Q    Okay.  Is it correct that the way in which you estimated

5 Armstrong's liability for pending and future asbestos claims

6 was to estimate -- the future claims were valued using the

7 average settlement value incurred by Armstrong to resolve

8 claims in 1999 to 2000, on Page 2?

9         MR. BERNICK:  Your Honor, I -- if he's now being

10 asked what he was told to do, I really don't know what in the

11 world relevance that --

12         MR. FINCH:  Let me pick that up.

13 BY MR. FINCH:

14 Q    Dr. Florence, were you --

15         MR. BERNICK:  Excuse me.  Is the question withdrawn?

16         MR. FINCH:  The question is withdrawn.

17 BY MR. FINCH:

18 Q    Dr. Florence, other than the assumption that Armstrong did

19 not go into bankruptcy, were you told by your client how to go

20 about estimating the liability?

21 A    I may have been given assumptions about the case load.  In

22 other words, there were questions about -- that we may have had

23 about the historic filings and, as I mentioned before, patterns

24 we might have seen in the historic filings, trying to

25 understand that.  And if a client said this was a result of a

1  moratorium, this was a result of a settlement agreement, those

2  would be assumptions that we would have accepted going forward.

3  Q    But you don't know -- you don't recall being given any of

4  those assumptions by --

5  A    I don't remember in Armstrong's case.

6  Q    And, in Armstrong, you used the company's past history to

7  project the liability?

8  A    Correct.  I used their past historic experience, right, in

9  the tort system.

10  Q    And your client in that case was the future claimant's

11  representative, correct?

12  A    It was.  But I guess -- that's not what I'm being asked to

13  do here.  I'm being asked to estimate the claims that are

14  qualified under certain criteria so I guess that's where I'm

15  having trouble.  I --

16  Q    You don't have any empirical evidence that Grace ever

17  resolved a single asbestos claim using the criteria you've been

18  asked to assume here, correct?

19  A    I don't know what criteria Grace may have used

20  historically.  I think I testified to that earlier.

21  Q    In Armstrong though, you had empirical evidence as to the

22  outcome of the criteria that whatever criteria Armstrong

23  applied historically, correct?

24          THE COURT:  I'm sorry.  Would you -- for me, would

25  you repeat that?

1          MR. FINCH:  Sure.

2    BY MR. FINCH:

3    Q    In Armstrong, you had -- Armstrong had a set of criteria

4    that it applied historically to resolve cases, right, Dr.

5    Florence?

6    A    I assume they did.

7    Q    Okay.  And you had empirical evidence of the outcome of

8    their application of those criteria, correct?

9    A    I had the -- I had historical experience or empirical data

10   on the outcome of their settlement or their tort system

11   experience, presumably using some criteria.  I don't know what

12   those criteria were or how they may have changed over time.

13   Q    And you estimated the liability -- when you estimated the

14   liability, you assumed that Armstrong would continue to apply

15   in the future the same criteria it applied historically,

16   correct?

17   A    By necessity, since we didn't know other than if there

18   were some pockets that we knew about, the assumptions that I

19   was saying about.

20          MR. BERNICK:  I have to object at this point.  There

21   is a clear lack of foundation with respect to Armstrong in

22   particular.  We've got the witness talking about a case where

23   he has just said he doesn't recall exactly what went into that

24   case and particularly, as Mr. Finch well knows, on the last

25   question, what he's now asked the witness to verify is an

1  impossibility.  Again, Your Honor, I don't know --

2          THE COURT:  Okay.  That objection is simply overruled

3  because the witness basically has already answered the

4  question, saying that he was using the information that was

5  given to him and has no other information about criteria.

6  BY MR. FINCH:

7  Q    All right.  In your report at Page 1 in this case --

8          THE COURT:  This is Exhibit 462?

9          MR. FINCH:  Exhibit 462.

10 BY MR. FINCH:

11 Q    In May of 1997, ARPC was again asked to estimate the

12 volume, cost and timing of pending and future claims for

13 asbestos related injuries filed against Grace?  Do you see

14 that, Dr. Florence?

15 A    I do.

16 Q    And you write later, "As before, the estimate was based

17 solely on Grace's tort system experience"?

18 A    Yes.

19                      (Pause)

20          MR. FINCH:  Your Honor, may I approach the witness?

21          THE COURT:  Yes.

22                      (Pause)

23          MR. FINCH:  175, Dave.  May I approach the witness,

24 Your Honor?

25 BY MR. FINCH:

1 Q   Dr. Florence, I have put what has been marked ACC-109 in

2 front of you.

3          MR. BERNICK:  Do you have an extra copy of that made?

4          MR. FINCH:  We have an extra copy.

5 BY MR. FINCH:

6 Q   Dr. Florence, do you recognize ACC-109?  Beginning on the

7 second page is a report you prepared for Grace in May of 1997?

8          THE COURT:  This isn't in the binder.  This report --

9          MR. FINCH:  Oh.  May I have another copy, Dave?

10          THE COURT:  The AWI report wasn't either, if you're

11 marking it.  Thank you.

12          MR. FINCH:  We could also have the ACC --

13          THE COURT:  Thank you.

14 BY MR. FINCH:

15 Q   Dr. Florence, do you recognize ACC-109 as the report you

16 prepared for Grace in May of 1997?

17 A   This looks like a -- it looks like our report that was

18 prepared in '97.

19 Q   And you -- the scope of your engagement in 1997 was to

20 estimate Grace's liability for pending and future asbestos

21 claims?

22 A   I think so.  Let me just look at -- I didn't prepare this

23 report.  This was prepared by one of my associates.

24                    (Pause)

25 A   Yes.  This looks like a report of an estimate of pending

1  and open claims and a forecast of claims to be filed against

2  Grace.

3  Q    Okay.  Could you turn to the page that's marked 79-0534?

4  A    Yeah.

5         MR. BERNICK:  Your Honor, I would object to this.

6  Again, it's beyond -- it's precluded by the stipulation.  This

7  is an exhibit to the Beber (phonetic) deposition and also to

8  the Poser deposition.  It actually is a document produced from

9  Grace's files.  If it came to the attention of this witness, it

10 did so from Grace and therefore is picked up by the

11 stipulation.

12        MR. FINCH:  Your Honor, this -- Dr. Florence and his

13 partner -- let me lay a foundation.

14 BY MR. FINCH:

15 Q    Dr. Florence, Dan Rorke (phonetic) works for AR -- at the

16 time this report was written, you and Dr. Rorke both worked for

17 KPMG?

18 A    We did.  Right.

19 Q    And you were asked by W.R. Grace to prepare forecasts of

20 the volume and timing of future claims for asbestos related

21 injuries expected to be filed against Grace and the costs

22 associated with disposal of those claims?

23 A    KPMG?  Yes.

24 Q    Yes.  And you prepared this report?  It didn't come from

25 you -- to you from Grace in the first instance?  You prepared

1  it and gave it to Grace, correct?

2  A    I didn't prepare this report but KPMG prepared the report.

3  Q    KPMG prepared the report and KPMG was authorized to do the

4  work on behalf of Grace, correct?

5  A    KPMG was retained by Grace to do the work.  Yes.

6  Q    And there was a letter that you prepared that went to

7  Wachtell Lipton that summarizes the results of this report,

8  correct?

9  A    I don't recall the letter but --

10         MR. FINCH:  John, can we show ACC-175, the last page?

11  Next to the last page.  Sorry.

12  BY MR. FINCH:

13  Q    Is that your signature on Page 25-1634, Dr. Florence?

14  A    It is.

15  Q    And could you turn to Page 24-1632?

16         MR. BERNICK:  I don't have this document.

17         MR. FINCH:  The only copy I have is with me.  I'm

18  just going to use this document on the screen.  Can you see it

19  on the screen?

20         MR. BERNICK:  No, not particularly but go ahead.

21  We'll see how far we get.

22         THE COURT:  No one can see it on the screen.

23         MR. FINCH:  Can you blow it up, John?  Make it

24  bigger?  The first one, estimating bodily injury liability.

25  Can you see that, Your Honor?

1              THE COURT:  Yes.

2              MR. FINCH:  Okay.

3  BY MR. FINCH:

4  Q    You write in this -- do you know Mr. Wilensky (phonetic),

5  Dr. Florence?

6  A    I'm sorry.  Which Wilensky?  Is this the addressee to the

7  letter?

8  Q    Yes.

9  A    I met him.  Yes.

10 Q    He's a lawyer for -- he was a lawyer acting for W.R. Grace

11 in 1997, correct?

12 A    I met him.  Yes.

13 Q    Okay.  Now, what this -- what you write here is, "The

14 estimate of indemnity arising from BI claims is obtained by" --

15 and then you describe the steps that you follow, one, two,

16 three, four, correct?

17 A    Correct.

18 Q    Okay.

19 A    I see that.

20 Q    The -- now, computing indemnity for an injury category is

21 the product of three factors.  The sum of the number of pending

22 claims --

23             MR. BERNICK:  Objection.  I would object.  I would

24 object to this document being read.  I object to the witness

25 being confronted with this document.  I object to the witness

1  being confronted with the document this is ancillary to.

2  Paragraph Romanette iii of the stipulation specifically

3  precludes any oral or written communication between an expert

4  witness, i.e., Dr. Florence, and the expert's witness

5  assistants or more than -- or one or more attorneys for the

6  party offering the testimony.  The attorneys in this case are

7  the Wachtell Lipton firm.  They are counsel for Grace.  The

8  underlying document is a document communicated between Mr.

9  Florence's firm and Grace and counsel for Grace.  All of them

10 are specifically picked up in the stipulation and they are

11 specifically barred.  And I will note that when it comes to Dr.

12 Peterson, I took his deposition.  It turns out he did earlier

13 analyses of Grace back in the 1990's and I didn't see those.

14 Why?  Because they were not relied upon in connection with this

15 case.

16       And I will further add we are now over an hour into

17 the examination, an hour and fifteen minutes of the

18 examination.  We were given a total estimate of two and a half

19 hours for the cross examination of this witness.  And all

20 that's happened so far is that Mr. Finch has wanted to pursue

21 his case through this witness.  He's got other people that can

22 pursue it.  It's not proper examination for this afternoon.

23       MR. FINCH:  Your Honor, the estimates of cross were

24 dependent upon lack of -- it was on the assumption there

25 wouldn't be a lot of time on speaking objections and colloquy

1  with the Court.  This is not picked up by the expert

2  stipulation.  This document was produced to the United States

3  Government.  It's a no sense confidential and I'm establishing

4  that when Dr. Florence estimated Grace's liability in the past,

5  he used a methodology very similar to that used by Dr. Peterson

6  and Dr. Biggs.  And I believe that is highly relevant.  It's

7  not precluded by the stipulation.

8          THE COURT:  Wait.  This letter between an expert

9  witness and counsel was submitted to the Federal Government and

10  that's how it came into the ACC's possession?

11          MR. FINCH:  It came into the ACC -- it was produced

12  in discovery to the ACC.  It was turned over to the Federal

13  Government in response to a subpoena.  There is no

14  confidentiality whatsoever left with respect to this document.

15          MR. BERNICK:  Your Honor, what happened was, it was

16  turned over in connection with the _Sealed Air_ litigation.  It

17  was turned over pursuant to a protective order.  The Federal

18  Government then subpoenaed documents from Grace, including

19  these documents, and they were turned over to the Federal

20  Government in connection with their subpoena and the ACC and

21  the FCR now take the position that that was a waiver.  Mr.

22  Finch specifically told me before he used such a document he

23  would alert us and that's why we don't have any copies --

24          MR. FINCH:  I would --

25          MR. BERNICK:  Excuse me -- we don't have copies of

1 this document here this afternoon.  This is yet another

2 dimension of why it is foreclosed under the stipulation.  It is

3 a communication under Romanette iii between the witness, the

4 expert, and Grace through its counsel, that is not relied upon

5 in connection in connection with this.

6          MR. FINCH:  Your Honor, I would offer ACC-175 and

7 ACC-109.

8          THE COURT:  At this point, I have no foundation for

9 any of these documents.  I don't -- I mean, this witness

10 specifically has indicated that although he worked for KPMG

11 with respect to 109 -- I don't even know what 175 is yet.  I

12 don't think the witness has said anything about it except a

13 part of it, I think, includes a letter that he signed.  I

14 apologize if there's something more.  He did say he signed a

15 letter.

16          MR. FINCH:  Let me lay a foundation.

17 BY MR. FINCH:

18 Q   Dr. Florence, you did work in 1997 that resulted in an

19 estimate of Grace's asbestos liability, correct?

20          THE COURT:  For what purpose, Mr. Finch?

21          MR. FINCH:  For purposes of projecting the future

22 costs of asbestos claims in the tort system.

23 BY MR. FINCH:

24 Q   Correct?

25          MR. BERNICK:  Well, actually, the witness can testify

1  he knows -- Mr. Finch well knows this was done specifically for

2  the <u>Sealed Air</u> transaction.   That's what it was done for.

3          THE COURT:  That, I think, is the problem.  I mean,

4  if one thing is clear in <u>Babcock and Wilcox</u> and some of the

5  other cases, the estimates of liability done for particular

6  purposes are not necessarily based on the same evidence or

7  subject to the same standards as estimates done for other

8  purposes.  Could we get to the purpose for which this one is

9  done?  If you want to ask this witness specifically what he's

10  done in the past to estimate liabilities, why don't you do it?

11  Why do we need to get into the documents that are not

12  themselves the evidence of this witness's testimony anyway and

13  avoid the problems with respect to the confidential nature of

14  these potential documents and the issues with respect to the

15  stipulation?  We don't need to be creating all these issues

16  when you can ask the witness a direct question.

17          MR. FINCH:  Your Honor, that's fine, but these

18  documents are, in my view, 801(d)2 admissions of W.R. Grace as

19  to a methodology for estimating the cost of future asbestos

20  claims.

21          THE COURT:  For purposes of filing something on,

22  what, a 10K with respect to the fraudulent conveyance

23  litigation?  For what purpose?

24          MR. FINCH:  For purposes of analyzing the total size

25  of their aggregate asbestos liability as a particular point in

1  time.  It is our view of the case law that the amount that you

2  have to estimate is what the liability would be if the company

3  had not gone into bankruptcy.  That's the liability that's

4  channeled to the trust.

5           THE COURT:  That wasn't in 1997.

6           MR. FINCH:  The liability in 1997, though, the

7  methodology they followed in 1997, is relevant to the question

8  of whether the methodology they are asking you to accept now is

9  reliable or relevant.

10          THE COURT:  Ask him what methodology he used for that

11 purpose.

12          MR. FINCH:  Okay.

13          THE COURT:  Why do we need to get into issues with

14 respect to possible breaches of the stipulation and the

15 confidential nature of documents when you've got the witness on

16 the stand who apparently did some of the work?  Ask him what

17 methodology he used.

18 BY MR. FINCH:

19 Q    Dr. Florence, did you do some of the work with respect to

20 the 1997 estimate of Grace's liability?

21 A    I don't believe I did.  No.

22 Q    You oversaw the work, correct?

23 A    I probably reviewed the report before it went out.

24 Q    And that estimate of the liability was based solely on

25 Grace's experience in the tort system, correct, as you say in

1   your report here, on Page 1?

2           THE COURT:  Which report?

3           MR. FINCH:  His report that he is -- for the

4   estimation.  462.

5           THE COURT:  Okay.

6   BY MR. FINCH:

7   A    I'm sorry.  I'm lost, guys.

8   Q    Page -- Exhibit 462.  You have that in your notebook.

9   Page 1.

10          THE COURT:  It's Tab No. 2, Dr. Florence.

11  BY MR. FINCH:

12  A    I do have 462.

13  Q    And ARPC estimated the total pending and future liability

14  of Grace as of May 1997 and, as before, the estimate was based

15  solely on Grace's tort system experience?  Do you agree with

16  that?

17  A    Correct.  The firm did that.

18  Q    And in December 2000, ARPC was also asked by Grace to

19  estimate the number of future asbestos personal injury claims

20  and -- is that correct?

21  A    The last paragraph there?

22  Q    Yes.

23  A    Correct.

24  Q    And based on Grace's claims data as of December 2000, you

25  estimated there would be approximately 320,000 asbestos

1 personal injury claims filed against Grace from 2001 to 2039,

2 correct?

3 A    That's correct.

4 Q    And, again, as with all of ARPC's pre-petition estimates

5 on behalf of Grace, the estimate was based solely on Grace's

6 tort system experience, correct?

7 A    Correct.

8 Q    And you prepared -- strike that.  The Delaware Claims

9 Facility is an entity that you are familiar with, correct?

10 A    Correct.

11 Q    For purposes of your first report in this case, you had

12 the Delaware Claims Facility review a sample of questionnaires,

13 correct?

14 A    Grace contracted with the Delaware Claims Processing

15 Facility which was, at the time, the Celotex trust.

16 Q    Okay.  Is it correct that your firm selected the sample of

17 the closed claims that the Delaware Claims Facility would

18 review?

19 A    That's correct.

20 Q    And as part of your back-up materials in this case, you

21 identified the list of the closed claims that they reviewed,

22 that you asked them to pull?

23 A    I assume we did.  I assume that's the list.  I mean, I

24 don't -- I wasn't aware of what was sent in on the --

25 Q    You created a sample and then you produced, as part of

1 your back-up material, the list of the closed claim sample as

2 well as pictures of all of the files that the Delaware Claims

3 Facility reviewed, correct?

4 A    Okay.  I mean, I didn't produce that so I -- someone in my

5 office did.

6 Q    You don't doubt that someone in your office produced that?

7 A    No, I don't.

8 Q    The review of the questionnaires with respect to the --

9 first of all, the Celotex trust is an entity that's in the

10 business of reviewing asbestos claims submitted to trusts,

11 correct?

12 A    Correct.

13 Q    And as part of that, they review medical and exposure

14 information for purposes of claim settlement, correct?

15 A    Correct.  We're talking about Celotex or the --

16 Q    Celotex.  Celotex.

17 A    Yeah.

18 Q    And they have familiarity with reviewing medical and

19 exposure information for purposes of seeing if they meet the

20 criteria to be applied, correct?

21 A    Well, they have familiarity with reviewing medical records

22 and legal documents for purposes of collecting that type of

23 information.

24 Q    You don't know one way or another whether Exponent is in

25 the business of reviewing asbestos exposure and medical

Florence - Cross/Finch                        174

1  documents for purposes of deciding whether to pay or deny

2  asbestos personal injury claims?

3  A     I don't.

4  Q     You never relied on Exponent for purposes of reviewing

5  asbestos personal injury claims information prior to this case,

6  correct?

7  A     That's correct.

8                          (Pause)

9  Q     Would you turn to your report in this case, 462 at Page

10  15?  Do you have that, Dr. Florence?

11  A     I do.

12  Q     This is your counts of the -- or your estimates of the

13  number of pending claims against Grace as of the petition date,

14  at the top line?

15  A     This is the number of pending claims that had proofs of

16  claim filed.

17  Q     And for lung cancer claims, there were 5510 lung cancer

18  claims that filed a proof of claim form that you could match

19  back to the historical database, is that correct?

20  A     There are 5510 pending claimants that we could find a POC

21  for.

22  Q     Okay.  And of that 5510 using the criteria that you were

23  asked to apply here, only 59 lung cancer claimants have valid

24  claims, is that correct?

25             MR. BERNICK:  I'm sorry, could I have that question

1  read back?  I -- Nate, can you just restate it?

2  Q    Of the 5510 lung cancer claims that were pending on the

3  bankruptcy petition date that you could find had filed a proof

4  of claim form, using the criteria that Grace asked you to apply

5  here, only 59 of them have valid claims?

6  A    Fifty-nine of them would meet those criteria.

7  Q    Fifty-nine of them would meet that criteria.  That's about

8  one percent?

9  A    Yes.

10 Q    And with respect to the mesothelioma only about 20 percent

11 of them, 19 percent of them would be valid, is that right, for

12 pending mesothelioma?

13 A    Something like that, yes.  It's 463 of 2426.

14             MR. FINCH:  Can I have the ELMO?

15             UNIDENTIFIED SPEAKER:  Yes.

16 Q    This is a chart that Mr. Bernick showed you, GG2315.  Do

17 you see that chart, Dr. Florence?

18 A    I do.

19 Q    Now, you've got a box here, not filed as of 4/01.  What

20 does that refer to?

21 A    Those were proofs of claim that were filed or were

22 submitted that did not have a pending claim.  They had not been

23 filed with Grace prior to 4/01.

24 Q    They were not filed in the sense you couldn't match them

25 back to the historical database, correct?

1  A    Well, some we know were not filed in the sense that they

2  had dates -- filing dates that were subsequent to 4/01.

3  Q    What do you mean by filing dates?

4  A    There were dates indicated that the case was filed after

5  4/01.

6  Q    Well, nobody could file a case against Grace after 4/01,

7  correct?

8  A    I agree.

9  Q    But, they -- are you talking about dates that indicated

10 they had filed the case against other people after 4/01 or

11 dates that were --

12 A    There were dates that indicate they had filed against

13 Grace after 4/01.

14 Q    So, there were some number of people that -- couldn't that

15 be an artifact of the database, meaning that people could have

16 filed a lawsuit against Grace prior to April of 2001 and it

17 wasn't entered in the database until some months later.

18 A    I think we retained a filing date.  We also had diagnosis

19 dates that were subsequent to 4/01.  So, it seemed strange that

20 a case could be diagnosed after the -- and filed before but

21 diagnosed after the 4/01 date.

22 Q    Well, the diagnosis date was a diagnosis date that was in

23 the questionnaires, correct?

24 A    No, there would be -- we would have to have some other

25 data other than the POC to determine the diagnosis date,

1  correct.

2  Q    And you don't know whether the diagnosis date that the

3  claimants were using for the questionnaire was just the most

4  recent diagnosis date or the first diagnosis date, do you?

5         MR. BERNICK:  Objection to this line of questioning.

6  The question is presumably whether the case -- the complaint

7  was filed as of the date of the Grace filing.  What does that

8  have to do with diagnosis dates or what's filed on the

9  questionnaire?

10  Q    Dr. Florence, how many people filed non-settle proof of

11  claim forms that indicated that they had a claim against W.R.

12  Grace that you didn't consider for purposes of your analysis

13  because they fell into this box, not filed as of 4/01?

14         MR. BERNICK:  Objection to the form of the question,

15  didn't consider.

16         THE COURT:  Do you want to clarify didn't consider?

17  Q    Didn't include as part of your base of pending claims.

18  A    There were a number of claims for which -- we tried to

19  match the pending cases against the POCs.  There were a number

20  of claims that we could not match a pending case to a POC.  Of

21  those POCs, there were a number of POCs that were cases that

22  were POCs for settled claims, liquidated claims, claims filed

23  after the bankruptcy date, and claims we had never seen before

24  anywhere, so claims that didn't seem to have any relation to

25  Grace's historic experience.

1  Q    Is it correct that over 100,000 people filed a proof of

2  claim form for a pending unsettled personal injury claim?

3           MR. BERNICK:  Objection to the form of the question.

4  Pending in what sense?

5  Q    Over 100,000 people filed a proof of claim form alleging

6  that they had a claim against Grace that wasn't settled prior

7  to petition date, correct?

8           THE COURT:  I'm sorry, I thought the evidence was

9  that there were approximately 84,000 or 87.  Are you suggesting

10  there were more?

11           MR. BERNICK:  Yes.

12           THE COURT:  Okay, I'm sorry.  I apologize.

13  A    You're saying how many proofs of claim were filed?

14  Q    For asbestos personal injury claims.

15  A    It seems to me there were somewhere around 130,000 filed

16  or something like that.

17  Q    Okay.  And of that number how many were settled?

18  A    I don't remember the exact number but the majority of them

19  were pending.

20  Q    So, over 100,000 proof of claim forms were filed for

21  pending unsettled --

22  A    No, no, no, I said the majority of them were pending.  Of

23  the proof of claim forms that were filed, the majority of them

24  were pending.  The next largest category I believe were settled

25  or liquidated claims.  And then the next largest category as

1  you go down the list probably were claims that we had no

2  identification for anywhere in the system.  There was no record

3  that the claim had been filed prior to the petition date.

4  Q    But, that was -- that number of claims was -- the question

5  is, how many fell into that bucket, people that filed a proof

6  of claim form alleging an asbestos personal injury claim

7  against Grace that had not yet been settled which you could not

8  match back to the historic database?

9  A    I think when we looked at the whole -- we looked at all of

10 the claims, both the ones that were pending, settled,

11 liquidated, dismissed, that there were about 25, maybe 25,

12 28,000 claims, 25, 30,000 claims, somewhere in there.  Not

13 claims, but proofs of claim that did not match to a case that

14 was anywhere in the historic database.

15 Q    Okay.  So --

16 A    Of that group, as I recall, the largest number of -- the

17 largest amount in that group were claims that actually

18 indicated somewhere in their claim filing that the case arose

19 subsequent to the petition date.  And then there was some of

20 that group that we just -- there was no way to tie them to a

21 claim at all.

22 Q    Okay.  If I wanted to put a number on this box right here,

23 it would be over 20,000 proofs of claim, right?

24 A    Mr. Finch, I don't remember the number precisely.

25         THE COURT:  Excuse me.  Dr. Florence, you're saying

1 that the largest number were claims that they say arose after

2 the petition date, meaning that from your point of view would

3 have been counted in the futures category?

4          THE WITNESS:  That's correct.

5          THE COURT:  Okay, thank you.

6 Q    And you -- strike that.

7          MR. FINCH:  Your Honor, this would be a good time to

8 take the afternoon recess if you're --

9          THE COURT:  All right, we'll take a ten-minute

10 recess.

11          MR. BERNICK:  Can we get an estimate from counsel

12 about the duration of this cross examination and who else is

13 going to ask questions and --

14          THE COURT:  Yes.  Mr. Finch, how long will you be?

15          MR. FINCH:  Twenty more minutes for me.

16          THE COURT:  All right.  And the FCR?

17          MR. MULLADY:  Your Honor, I believe I'll be able to

18 finish within our allotted two and a half hours.  By my clock

19 we started at 1:15.  Without a break, we would have until 3:45.

20 If Mr. Finch goes another 20 minutes, I think I can get under

21 that 3:45.

22          THE COURT:  All right.

23          MR. MULLADY:  Plus whatever time we take on this

24 break.

25          THE COURT:  Ten minutes.  All right.  We'll be in

1  recess.  Thank you.

2                     (Recess)

3          THE COURT:  Please be seated.  Mr. Finch?

4          MR. FINCH:  Yes, Your Honor.

5          THE COURT:  Dr. Florence, ready?

6          THE WITNESS:  Yes.

7  Q    Dr. Florence, could you turn in your estimation report,

8  ACC Exhibit 462, to Page 15?

9  A    Yes.

10          MR. FINCH:  Can we just have the trial director?

11  Q    You've got a section here, Value of Mesothelioma Claims,

12  correct?

13  A    Yes.

14  Q    And the first -- the second paragraph under that section,

15  you say, "Because ARPC estimated pending claims, it met the

16  assumed evidentiary criteria.  ARPC first example to settle

17  mesothelioma claims in the closed claim sample, it met the same

18  criteria of the ones that provided the necessary information

19  based on the expert review of exposure information."  What's

20  that referring to?

21  A    The closed claim sample?

22  Q    Yes.  What's the closed claim sample?

23  A    It's a sample we drew of closed claims.

24  Q    And of that there were 350 mesothelioma claims that fell

25  into the closed claims sample?

1  A    That's correct.

2  Q    Okay.  And you write -- what range -- what time period did

3  you use for the purposes of the values in your forecast?

4  A    I'm sorry, what time period?

5  Q    What time period for -- you came -- you used values from

6  some period of time to do your estimate, correct?

7  A    Correct.

8  Q    And what was the time period for the values that you used?

9  A    As I recall, it was closed claims sample coverage claims

10 that were filed and served between '98 and 2001, as I recall.

11 Q    Okay.  And then what is the reference to, "The range from

12 April 1999 to April 2001 was selected as being most recent and

13 therefore most reflective of future events"?  What does that

14 refer to?

15 A    We took those cases in that range for the value

16 calculation because they were most recent cases.

17 Q    Okay.  So, for the purposes of calculating the value that

18 you would use to apply to all pending and future "valid"

19 asbestos personal injury claims for mesothelioma, you used the

20 April 1999 to April 2001 time period to draw the sample from?

21 A    For the calculation of the values.

22 Q    Okay.  And why did you do that?

23 A    Because they were the most recent settlements.

24 Q    And why are the most recent settlements used?

25 A    They seem more applicable than old settlements for

1  forecasting what will be paid tomorrow or --

2  Q    Sort of like if you're trying to budget how much you'll

3  pay for groceries next week, what you paid for groceries last

4  week is more relevant than what you might have paid for

5  groceries three years ago?

6  A    That's probably true, right.

7  Q    And is it true that with respect to the number of future

8  valid claims that you project you are assuming that the same

9  evidentiary and exposure criteria that you were asked to assume

10 for the present claims would continue forward forever into the

11 future, correct?

12 A    Right, that -- my task was to estimate pending and future

13 claims that would meet those criteria.  That's what I did.

14 Q    And so, the criteria that you assume that would apply the

15 exposure and medical criteria that you were asked to assume

16 would apply throughout the history -- throughout the entire

17 future claims forecast, correct?

18 A    Correct, the criteria would be the same.

19 Q    There's nothing in your criteria that takes into account

20 the identity of the plaintiff's lawyer, correct?

21 A    That's correct.

22 Q    There's nothing in your criteria that takes into account

23 the state in which the case is pending, correct?

24      MR. BERNICK:  I'm sorry.  These are criteria for

25 which claims get paid --

1          MR. FINCH:  Yes, for which --

2          MR. BERNICK:  -- or the criteria for price?

3          MR. FINCH:  For which claims get paid.

4    A    That was not one of the criteria I was given, correct.

5    Q    The criteria you were asked to assume for which claims get

6    paid don't take into account any variations in state law, do

7    they?

8    A    I wasn't given criteria that included state variations, if

9    that's what you're saying, no.

10   Q    The criteria that you were asked to assume for purposes of

11   validity don't include any analysis of the impact of trial

12   dates?

13         MR. BERNICK:  Are you talking about a specific

14   analysis?

15         MR. FINCH:  At all.

16   Q    There's no criteria for when the plaintiff would get a

17   trial date in your analysis, correct?

18         MR. BERNICK:  Again, are you talking about which

19   claims get paid or the pricing?

20         MR. FINCH:  Which claims get paid.

21   A    I'm sorry, could I hear that again?

22   Q    The criteria you were asked to assume don't have any

23   criteria that at all analyzes or is related to whether or not

24   the claimant has a trial date?

25   A    That's correct.  The criteria did not include anything to

1  do with trial dates.

2  Q    And the criteria don't have anything to do with the number

3  of fact witnesses that the plaintiff might call to testify in a

4  trial, do they?

5  A    It does not, no.

6  Q    And the criteria don't have anything to do with the

7  identity of the plaintiff's doctor with respect to mesothelioma

8  claims, correct?

9  A    Correct, there's no issue with doctor reliability or

10  reproducibility with regard to mesothelioma.

11  Q    And the criteria don't take into account the cost that

12  Grace might incur to defend the case, do they?

13  A    There are no criteria having to do with costs.

14  Q    Okay.  Now, in the closed claim file review, you drew the

15  sample of the 350 closed mesothelioma cases, right?

16  A    We drew a sample of -- yes, it was like 2800 and some odd

17  closed claims.  I -- let me get to -- the appendix, I think

18  describes it.  Yes, 2889 total claims.

19  Q    And of that there were 350 that were meso claims?

20  A    There were around 350 that were meso claims.

21  Q    Okay.  And as part of your backup materials, you produced

22  the list of the closed meso claims as well as the files, right?

23  A    Okay.

24  Q    And you asked Grace to give you all the information that

25  it had about each of those cases to go in those files to be

1 reviewed by either the Celotex people or Exponent, correct?

2 A    We asked for the case file on those cases that were

3 sampled.

4 Q    In fact, you asked Grace to give you everything that it

5 had.  You didn't restrict it just to everything in your file.

6 Your request was to give you all the information that was

7 available on those cases, correct?

8 A    I believe that was the request, yes.

9        MR. FINCH:  Your Honor, may I approach the witness?

10        THE COURT:  Yes.

11 Q    Dr. Florence, do you recognize ACC-469 as your work papers

12 from which you derive the value of 155,000 for the six claims

13 that met the criteria?

14 A    These aren't my work papers but I assume they're the work

15 papers of the firm because there are six claims and they total

16 the 155,240.

17 Q    Okay.  And this has -- let's just make sure we understand

18 what the categories are.  Injury obviously means mesothelioma.

19 These are the six meso cases?

20 A    Yes, injury is meso.

21 Q    These are the six mesothelioma cases that --

22        MR. FINCH:  Can I have the ELMO, please?

23 Q    -- that Exponent identified as having satisfied the mixer

24 and installer criteria?

25 A    They are.

1  Q    And then the value associated with those is called

2  disposition amount, correct?

3  A    On my copy, it's Disp I and F.  Is that what you're

4  saying?

5  Q    Yes, disp amount.  That's just like 197,000, that's

6  $197,000, right?

7  A    Oh, I'm sorry.

8  Q    Are you with me?

9  A    I am.

10 Q    Okay.  So, the disposition amount is the settlement amount

11 for that claim and the disp inflation is after you imply an

12 inflation factor?

13 A    That's correct.

14 Q    Okay.  So, if a case was settled in 2001, you wouldn't

15 apply an inflation factor.  If it was settled in 1999, you

16 would apply one, right?

17 A    That's correct.

18 Q    Okay.  So, for the disposition amount 197,000, the

19 inflation -- because that case was settled in 2000, the value

20 you're using for the purpose of your forecast is 201,000,

21 right?

22 A    Correct.

23 Q    Okay.

24 A    To bring it up to $2,001.

25 Q    And then you can see from the second and third pages of --

1  and fourth and fifth pages of the exhibit all the ones that

2  Exponent found had insufficient information?

3  A    Yes.

4  Q    Okay.  And you can cross reference that back to the

5  database to find those people, correct?

6  A    Yes, the unique identifier doesn't seem to be on this

7  printout, but I assume there's a way to link them back.

8  Q    Okay.  Could you look at ACC-2062?

9         MR. FINCH:  And, John, could you also put up Florence

10 Report, Page 15, split the screen?  Your Honor, what I'm doing

11 here is I'm showing ACC-2062.

12 Q    ACC-2062 came out of your work papers, too, Dr. Florence,

13 and this has the Rust ID number for each of those closed

14 mesothelioma claims, do you see that?

15 A    Okay, yes.

16 Q    So, you got the same six that met the A or C exposure

17 number?  They were mixers or installers?

18                      (Pause)

19        MR. FINCH:  Your Honor, I'll deal with it.  I'm

20 sorry, I'm very parched.

21 Q    Dr. Florence, I think the question pending was the -- you

22 have the six people at the top where they could determine from

23 the exposure category that they were mixers or installers,

24 right?

25 A    I'm sorry, we're on 2062?

1  Q    2062, second page.

2  A    Certainly it seems to be.  The category group is A/C.

3  Q    Okay.  And in your report you have six people that

4  Exponent found to be mixers or installers, right?

5  A    That's correct.

6  Q    And then in your report you say that there were 12 with

7  insufficient information, and we agreed at your deposition that

8  was actually a typo.  It should be 21, correct?

9  A    I think it was, yes.

10  Q    I think actually Mr. Bernick might have showed a slide.

11         MR. FINCH:  Could I have the ELMO again?

12  Q    Ignoring my handwriting, the six people that met the

13  criteria which -- and the criteria we're talking about is were

14  they a mixer or an installer, right?

15  A    Correct.

16  Q    And then there's 21 that didn't meet the criteria?

17  A    Correct.

18  Q    Okay.  And then there's 258 with insufficient information,

19  right?

20  A    Correct.

21  Q    Okay.  Now, one of the ones on this list with insufficient

22  information, I'd like you to go down to -- it's in the H's, the

23  number 408478.

24  A    I'm sorry, which list am I on?

25  Q    On 2062, ACC-2062.  Can I switch back to the -- sorry

1  about the switching back and forth.

2  A    On Page 3?

3  Q    Yes, on Page 3, there's a reference to a guy named Donald

4  Halpain.

5  A    I see it.

6  Q    Okay.  And so, that's one that Exponent coded as

7  insufficient information, right?

8  A    I believe so, yes.  I assume that --

9        MR. FINCH:  Your Honor, may I approach?

10 A    Yes, I'm assuming these are Exponent's codes, yes.

11 Q    Okay.  Well, certainly he was in the closed claim sample.

12 He didn't end up among the six A and Cs at the top, right?

13 A    Correct.

14 Q    Okay.

15       MR. FINCH:  Your Honor, may I approach the witness?

16       THE COURT:  Yes.

17       MR. FINCH:  Could you split the screen now, John,

18 between ACC-472 and ACC-2062?

19 Q    Dr. Florence, ACC-472 is the Halpain file.  You recall I

20 showed you this in your deposition?

21 A    Okay.

22 Q    Let's just tie it in.  You've got Halpain on ACC-2062,

23 which is your backup information that shows he was coded as an

24 insufficient information.  They couldn't tell whether he was a

25 mixer or installer, right?

1  A    Correct.

2  Q    All right.  And his -- the number the Rust uses for him or

3  whoever put that number is 408478.  Are you with me, Dr.

4  Florence?

5  A    Hold on.  I am.

6  Q    Okay.  Now, ACC-472 has a reference to Donald Wayne

7  Halpain, 408478.

8       MR. FINCH:  That's this document, Your Honor, the

9  fatter document.

10      THE COURT:  I have it.

11      MR. FINCH:  You have it?

12 Q    And, Dr. Florence, you see on Page 256 of the Halpain

13 file, the middle paragraph?

14      MR. FINCH:  John, it's the about the fifth page back.

15 Yes.  In the middle paragraph, could you blow that -- could you

16 enlarge that, please?

17 Q    That indicates that Mr. Halpain's claim was paid $2

18 million?

19 A    It certainly seems to, yes.

20 Q    Okay.  Could you turn to the last page of the document?

21      THE COURT:  Well, pardon me.  I'm sorry, where are

22 you looking, Page 256?

23      MR. FINCH:  256, in the middle paragraph it says,

24 "Whereas Steven Halpain and Thomas Halpain individually..."

25 blah, blah, blah.  About ten lines down, it says, "Therefrom,

1  under the statutes and laws of the State of Texas or any other

2  jurisdiction for a total consideration of two million and zero,

3  zero dollars and other good and valuable consideration."

4  Q    Do you see that, Dr. Florence?

5  A    I do.

6  Q    And this $2 million settlement was the largest settlement

7  in the closed claim sample, isn't that right?

8  A    I don't know, that --

9  Q    Well, could you look at ACC-469? All right. Well, let me

10 -- you don't know one way or the other whether it was the

11 biggest settlement in the sample, right? But, you would agree

12 it's a $2 million settlement, right?

13 A    I agree that the release is for $2 million, yes.

14 Q    Okay. Now, could you go back to ACC-472? That's the

15 Halpain document. That's the Halpain file that the -- and this

16 is the file that both Celotex Trust people and the Exponent

17 people would have looked at, right?

18 A    I'm sorry, what --

19 Q    Strike that. Strike that.

20 A    I don't know that -- who looked at what here.

21 Q    ACC-472 is the Halpain file, right?

22 A    Okay.

23 Q    Okay. Could you go to the last page?

24 A    All right.

25 Q    Now, under the criteria that Grace gave you, a

1  mesothelioma claim was treated as valid in the closed claim

2  sample if the claimant personally mixed or personally installed

3  a Grace's asbestos containing product?

4  A    That's correct.

5  Q    Okay.  The last page of the Halpain file shows the removal

6  of certain documents on ground of privilege.  Do you see that?

7  A    I see that, yes.

8  Q    And you talked to the company about the privilege

9  materials and about what they were?

10 A    We just asked about them.

11 Q    And what they told you was that virtually all of these in

12 talking to the company was that these were cover letters, not

13 that they were, you know, here as a case summary and deposition

14 report kind of thing?

15 A    That's correct.

16 Q    Would you agree with me the deposition of Mr. Halpain

17 would have been a type of document that would indicate whether

18 he mixed or installed a Grace asbestos product?

19 A    I don't know.

20 Q    You see this refers to a document dated the 30th of June

21 and it says, "Attaching status of case, 6/9/00 letter from Jay

22 Hughes from John Muir Day and deposition report."  Do you see

23 that?

24 A    I do.

25          MR. FINCH:  May I approach, Your Honor?

1            THE COURT:  (No verbal response).

2  Q    Dr. Florence, could you read the section, Product

3  Identification in the record?

4            THE COURT:  Where are you, please?

5            MR. FINCH:  I'm at page -- strike that, strike that,

6  strike that.  Page Boca 856 -- excuse me, Boca 854.

7  Q    Do you have that?

8            THE COURT:  On exhibit what?

9            MR. FINCH:  Exhibit ACC-34.

10 Q    Do you have it, Dr. Florence?

11 A    I do.

12 Q    It's talking about Mr. Halpain?

13 A    I do.

14 Q    It says on virtually all of these projects, his job

15 included mixing plaster and taking it to the plasterers.  The

16 only brand of plaster he recalled was Zonolite.  He described

17 going to the railroad station and uploading it by the truck

18 load.  Zonolite was by far the most common product mentioned by

19 Mr. Halpain.  That's what Mr. Halpain testified to according to

20 this?

21 A    According to this, yes.

22 Q    So, Halpain --

23           MR. FINCH:  Can I go to the ELMO, please?

24 Q    All of the values you used in your estimate are a function

25 of the six mesothelioma cases, right, a mathematical function?

1  A    Correct.

2  Q    Okay.  So, if -- and it's just a matter of pure I don't

3  know if it's algebra or calculus, but if you were to say double

4  all the values used in your forecast, the total liability would

5  double, correct?

6  A    Yes, probably.

7  Q    Okay.

8  A    It's the same -- you're just going up 100 percent.

9  Q    Okay.

10        MR. FINCH:  Can we turn to the slide show?  And don't

11 worry, Your Honor, this time I actually marked these with some

12 separate documents.  So, if they come into evidence or for

13 demonstrative purposes, I won't have to scribble on them with a

14 blue marker.

15        THE COURT:  All right.

16 Q    Do you recognize that that's the table out of your

17 supplemental report showing the values you used in your

18 forecast for pending and future claims, Dr. Florence?

19 A    Yes.

20 Q    This is marked for Identification ACC-2099.1  Then the six

21 settlements used to calculate your mesothelioma average, the

22 mixers or installers, they averaged 155,240 a case, right?

23 A    They did.

24 Q    Okay.  And if you -- would you agree with me that if you

25 added in the Halpain case, which is the 404478 case, then you

1  -- because he was a mixer, you get to -- the total amount of

2  money for those seven cases would be $2 million plus 155,240

3  times six, correct?

4  A    You mean arithmetically --

5  Q    Arithmetically.

6  A    -- is that correct, yes.

7  Q    And then you would have seven cases to divide from and you

8  would have a new mesothelioma average for the people that met

9  the mixer and installer criteria $418,000, correct?

10 A    If it was pure arithmetic it would be correct, yes.

11 Q    And if you carry that pure arithmetic through, the lung

12 cancer value you used in your forecast was about 30 percent of

13 the mesothelioma value, right, 30.7 percent?

14 A    I think those -- yes, the percentages are in the table.

15 Q    Okay.  And so, instead of the mesothelioma value for the

16 historically closed valid mixers and installers was $418,000

17 instead of the $155,000, then your new lung cancer value would

18 be $128,000, right?

19       MR. BERNICK:  This is the same exercise that we went

20 through in connection with the efforts to have recalculations

21 of the risk factors that were associated with Dr. Moolgavkar's

22 testimony I think and Dr. Anderson's testimony.  Mr. Finch can

23 go ahead and do the math but it doesn't mean anything unless

24 the witness signs onto the proposition these calculations are

25 appropriate.  All he's doing is he's adding another number into

1  the average, and this is -- we're now going to have a

2  demonstrative that simply is a function of Mr. Finch's math.

3  So, it seems to me --

4         THE COURT:  Well, this one is a little bit difference

5  because in this instance, there was a document that indicates

6  that in fact somebody was left out who could have been put in

7  based on the review of the claims.  Now, this witness didn't --

8  as I understand it didn't do that review of the claims.  He

9  simply accepted the evidence of somebody else's review of the

10 claims.  Nonetheless, there is now a document that indicates

11 that that claims review did not include something that with the

12 deposition shows that it could have been in.  And so, there is,

13 I think, a basis on the record for showing that these map

14 numbers could change.  And if the witness agrees with the

15 calculations, Mr. Finch is going to have to tie it up with

16 another witness to show that it's appropriate.  But,

17 nonetheless, as to the math calc, I think this is the

18 appropriate witness.

19        MR. BERNICK:  I think it's -- I would suggest, Your

20 Honor, that it is -- would be the other way around.  That is to

21 say, if he wants to have another witness do the calculation and

22 say, that's the calculation I would have done, then he can go

23 ahead and do that.  But, to do it in cross examination of this

24 witness where all it is that he's doing the math, and the

25 witness has not said that this is an appropriate calculation to

1  begin with is not appropriate through this witness.  And that

2  is exactly the rule that came out of the <u>Anderson</u> process is

3  that it doesn't make any difference if the math is correct.

4  The question is whether -- the question that he could simply

5  ask the witness is, what would you do with this one result?

6  How would that affect the calculus?  And that is basically what

7  you would expect of any of it.  How does this affect your

8  analysis?  And Mr. Finch hasn't asked that question.  I don't

9  know what the witness' answer will be candidly.  But, he hasn't

10  asked that question and, therefore, there is no foundation for

11  his now doing a calculation is that it bears upon the witness'

12  testimony.

13        MR. FINCH:  Your Honor, there is a foundation for

14  doing the calculation.  This is the value that he calculated

15  using the assumptions that Grace gave him and using the values

16  associated with those six historical settled cases.  I have, I

17  think, demonstrated that this Mr. Halpain was someone who

18  clearly should have been included by whoever reviewed the file.

19  Grace for whatever reason pulled that document out of the file.

20  And so, I think it's entirely appropriate to show the financial

21  impact on his forecast switching that one case from

22  insufficient information to valid information would be.  I

23  could have Dr. Peterson do the calculation, but it's his

24  forecast.  Dr. Peterson is not testifying as to his forecast.

25  I think I'm entitled to demonstrate the financial impact of

1  that one variable change.

2          MR. BERNICK:  Well, again, if --

3          THE COURT:  This witness has testified that he agrees

4  with the proposition that if the numbers change the math

5  changes.  I don't think frankly I need a witness to tell me

6  that.  I think I can assume -- I can take judicial notice that

7  if the numbers change and you do a math calculation with

8  different numbers, that the answer will change.  I think all of

9  us have gone through more than second grade and can probably

10 agree with that foundational premise.  So, I don't think I need

11 a witness for that purpose.  Nonetheless, this witness has so

12 testified.

13         Mr. Finch, I think you need to lay the foundation as

14 to whether or not this witness would do this calculation.  If

15 he would do this calculation based on the new evidence, then I

16 think you've laid the foundation.  The evidence in terms of the

17 fact that Mr. Halpain may have fit within that category is here

18 whether this witness accepts it or not.  I don't know whether

19 this witness will accept it or not.

20         MR. FINCH:  All right.

21 BY MR. FINCH:

22 Q    Dr. Florence, if they had -- if Exponent had come back to

23 you and instead of there being six cases that met the criteria,

24 the worksheet said seven cases that met the criteria, you would

25 have used what they gave you, right?

1  A    No.

2           MR. BERNICK:  First of all, I'm going to object

3  because, Your Honor, this is actually --

4           MR. FINCH:  Withdrawn.  The question is withdrawn.

5  Your Honor, at this point, I would offer ACC-34, ACC-472 --

6           THE COURT:  Wait, we can only do them one at a time.

7  I know we're going to have objections.  Let's just do them one

8  at a time.  ACC-34 --

9           MR. FINCH:  Let me do the ones that there may not be

10 objections to.  ACC-469, which is Dr. Florence's work papers

11 that show the six mesothelioma settlement.

12          MR. BERNICK:  I have no objection as to that.

13          MR. FINCH:  ACC --

14          THE COURT:  Wait a minute, please.

15          MR. FINCH:  Sorry.

16          THE COURT:  It's admitted.

17          MR. FINCH:  ACC-2062, which shows the same group of

18 closed mesothelioma claims but this time with the Rust ID

19 number.

20          MR. BERNICK:  That's 2062?

21          MR. FINCH:  Correct.

22          MR. BERNICK:  Yes, that's okay, yes.

23          THE COURT:  Admitted.

24          MR. FINCH:  I would like to offer --

25          THE COURT:  I don't have 2062, by the way.

1          MR. INSELBUCH:  I'll give it to you.

2          MR. FINCH:  I apologize, Your Honor.  I thought I had

3  it clipped to that.

4          THE COURT:  Oh, I'm sorry, maybe you do.  I

5  apologize, Mr. Inselbuch.  I do have it.  It was clipped and I

6  didn't see it.  I'm sorry.

7          MR. FINCH:  It was hiding, Your Honor.  I'm sorry for

8  not separating it.

9          THE COURT:  Okay, I have it.

10          MR. FINCH:  ACC-472, which is the --

11          THE COURT:  Halpain.

12          MR. FINCH:  -- Halpain file.

13          MR. BERNICK:  With respect to the Halpain file --

14          THE COURT:  You need to use the microphone, Mr.

15  Bernick.

16          MR. BERNICK:  Yes, I'm sorry.  With respect to the

17  Halpain file, if it's represented that this is, in fact, the

18  total PIQ file, I don't have a problem with that.

19          MR. FINCH:  It's the total settled claim file that

20  was provided to, as I understand it, to Celotex and Exponent

21  that came from Dr. Florence's backup.  There's a pretty big

22  hard drive of backup materials.  This is the that file.

23          MR. BERNICK:  I'm sorry, I don't understand.  This is

24  the totality of the file that was produced as the closed claims

25  file?

1          MR. FINCH:  Yes.

2          MR. BERNICK:  If that's the representation, then I

3  don't have a problem with it.

4          THE COURT:  It's admitted.

5          MR. FINCH:  I'd like to offer Page 15 and only Page

6  15 of Dr. Florence's September 25th, 2007 expert report,

7  ACC-462.

8          MR. BERNICK:  I would object to that.  He can use it

9  for impeachment purposes, but it doesn't come in unless the

10 whole document come in.  And it's improper for -- to have it

11 come in isolation because the rest -- this is a calculation.

12 It's in the midst of a lot of text that talks about exactly how

13 he was proceeding.  So, if he wants the document, he should get

14 the whole document in.

15         MR. FINCH:  Your Honor, I think it is -- I'll

16 withdraw 462.

17         THE COURT:  All right.

18         MR. FINCH:  I want to offer ACC-FCR-34.

19         MR. BERNICK:  That we would object to at this time

20 unless there's a further foundation for what actually occurred

21 in connection with this letter.  This letter, Your Honor, is a

22 letter that was written in anticipation of a trial.  I believe

23 that the trial took place.  I believe that the trial resulted

24 in verdicts against Grace and then the case was settled.  I

25 believe so.  I'm not sure.  If that's true, then to take this

1 document in isolation and argue about what its significance is

2 is really very misleading because we're talking about a verdict

3 result as opposed to a settlement result.  So, if Mr. Finch --

4 I mean, I hold this in abeyance. I intend to pursue this in my

5 examination anyhow and I'm prepared to establish a foundation

6 for this document.  Thus far, the witness -- Mr. Finch has not

7 established a foundation through this witness.

8 　　　　　MR. FINCH:  Your Honor, Grace has admitted the

9 document is authentic in it's -- in the stipulation process we

10 went to with respect to the exhibits.  This is clearly

11 admission of W.R. Grace.  They can't use a document as both a

12 shield -- they can't use a privilege as both a shield and a

13 sword.  They want to use --

14 　　　　　MR. BERNICK:  Unless it's privileged.

15 　　　　　MR. FINCH:  Excuse me, Mr. Bernick.  They want to use

16 this -- the attorney-client privilege as a basis for causing

17 the Exponent reviewers and the Court and Dr. Florence to assume

18 that there wasn't any evidence this person was a mixer when, in

19 fact, there is and there was.  And so, I would offer ACC-34.

20 And as to the statement whether the case was tried and then

21 settled, that's immaterial to the question of whether he was a

22 mixer or an installer.  And I'm not sure that it was correct.

23 In fact, I am fairly confident that this case wasn't tried.

24 And if I can lay my hands on -- okay.  But, in any event, we

25 offer the document, Your Honor.

1            THE COURT:  I think the document --

2            MR. BERNICK:  I'm sorry, Your Honor, just so I can be

3 clear.  This is not established as an admission of Grace.  This

4 is a document written by counsel for Grace, and it's written by

5 counsel for Grace reflecting statements made out of court by

6 somebody who is not present before the Court.  Therefore, it's

7 hearsay.

8            THE COURT:  Well, actually the attachment isn't even

9 a statement written by Grace.  It's simply the cover letter is

10 a transmittal, as I understand it, of a letter by Grace's

11 counsel.  There is in the document attached to it an indication

12 that Mr. Halpain was an installer or worked with Grace

13 directly, worked with Grace's products.  Whether that

14 information is true, not true, so forth, I don't think at this

15 point in time has been tested.  Nonetheless, based on the

16 review process that Grace has testified -- has had its

17 witnesses testify to, it seems to me that this information

18 would have been sufficient had it been provided to someone for

19 someone to take a look to say that this person was a mixer at

20 least of Zonolite products.

21            It's pretty clearly listed that way in this document

22 and this would have been the type of information that a Grace

23 witness would have taken count of.  Under those circumstances,

24 it seems to me that for that limited purpose and only that

25 purpose, this document is admissible.  For settlement

1 discussions and what led to the settlement, at this point in

2 time I don't have any information about that and I don't think

3 it's admissible for that purpose.  But, I think as to whether

4 or not there is evidence to indicate that Mr. Halpain would

5 have fit in the Category A or C, there is information in this

6 file that indicates that he would have fit into one of those

7 categories.  So, I'm going to admit it for that limited purpose

8 and that purpose only.  Let me make a note.

9          MR. FINCH:  Thank you, Your Honor.

10          MR. BERNICK:  Excuse me, Your Honor.  First, there's

11 a statement that's been made that the document itself was

12 withheld, and there's no record evidence that the document

13 itself was withheld.  The transmittal letters were what was

14 represented to be withheld.  Counsel has simply asserted that

15 because it does not appear in the closed claims file, it was

16 not produced and that is not necessarily so.  And Mr. Finch,

17 before he makes that kind of claim, ought to have some basis

18 for it.

19          Secondly, with respect to what this document says,

20 again it is a -- it is totally a hearsay document.  This is a

21 document where a lawyer purports to reflect the -- what may or

22 may not be the deposition testimony.  He has a deposition

23 taken.  If he said these things and it's properly summarized,

24 then so be it.  But, even if it were a deposition, it would

25 still be hearsay.  And there's ambiguity as to what it is

1 that's being said.  All we know at this time is that it was not

2 included in the closed claim file review.

3        If the document is admitted for the purposes of

4 showing the fact that it was not included in the closed claims

5 file review, we would not have objection to it.  But, what

6 we're now doing is in the context of this cross examination

7 injecting into this record a document that has not undergone

8 any kind of review by any kind of expert to determine whether

9 it's accurate, whether it's germane to this analysis at all.

10 Mr. Finch is simply asserting based upon his argument that it

11 is.  We don't know that yet.

12        THE COURT:  I said he's going to have to subject it

13 to some further examination to determine whether, in fact, this

14 document does have that type of probative evidence.  But, he

15 has, I believe, substantiated from this witness the fact that

16 this witness has accepted the information provided by other

17 witnesses who have explained the closed claims review process.

18 This document seems to indicate that there is sufficient

19 evidence, at least of record, that indicates that, you know,

20 based on the process that has been explained to me on this

21 witness stand, would have led somebody to at least question

22 whether or not this person should have fit within Category A or

23 C.

24        MR. BERNICK:  I agree with that, but at this point in

25 time, we don't know whether they actually belonged in Category

1 A or C either.

2          MR. FINCH:  Your Honor --

3          MR. BERNICK:  We just don't know because nobody has

4 done the review of the product.  Nobody has done any kind of

5 review to determine to what extent this is an actual exposure.

6          THE COURT:  I haven't heard from anybody that anybody

7 ever did any review of the closed claims files to see that any

8 of the settlements actually involved a real Grace product and

9 that Grace settled with respect only to real Grace products

10 after going back and actually checking to see that, in fact, it

11 was a real --

12          MR. BERNICK:  That is the criteria.  That is --

13          MR. FINCH:  Your Honor.

14          THE COURT:  I have not heard that.  If that's it,

15 produce a witness to tell me that because that is not my

16 assumption that somebody went back and checked to make sure

17 that a claimant actually worked with a Grace product.  I

18 understood the witness to say that if there was an assertion in

19 the file that somebody, in fact, worked with a Grace product

20 that that assertion was accepted in the closed claims file.

21          MR. BERNICK:  If it's the right kind of -- well, the

22 closed claims are a little bit different.  This is --

23          THE COURT:  That's what this is.

24          MR. BERNICK:  I understand that, but I think Your

25 Honor is recalling the testimony with respect to the PIQs.

1          MR. FINCH:  Your Honor, may I --

2          MR. BERNICK:  In the PIQs if there was mention of a

3 Grace product, then that was enough to get you there.  I don't

4 know whether this Grace product is one of them, that it's a

5 product that contains asbestos or not.

6          THE COURT:  Zonolite Aggregate Plaster?

7          MR. BERNICK:  Well, but see it's plaster that's used

8 in the construction of schools and gas stations.  This is not

9 high temperature cement.

10          MR. FINCH:  Your Honor?

11          MR. BERNICK:  I don't know enough to be able to say,

12 but the inference that's being drawn here is that it's an A or

13 C exposure to Grace asbestos containing product.  Now, maybe it

14 is, but there's no foundation for that analysis.  So, Mr. Finch

15 has come in here with a document.  He's making a suggestion.

16 But, I don't believe that this document right now has

17 sufficient foundation to be accepted for purposes of the

18 proffer.  Now, if he can get that foundation through this

19 witness, he hasn't so far.

20          MR. FINCH:  Your Honor?

21          MR. BERNICK:  This is what foundation is all about.

22          MR. FINCH:  Your Honor, they -- the people who

23 reviewed the files for Exponent, there was -- if it said in the

24 file that they were a mixer or installer of a Grace asbestos

25 product, then they wouldn't look behind that and they would

1  code it as such.

2            THE COURT:  That's what my understanding of the

3  testimony is.

4            MR. FINCH:  But, that's --

5            THE COURT:  If I'm incorrect, then I --

6            MR. BERNICK:  Your Honor --

7            MR. FINCH:  It's not a Grace asbestos --

8            THE COURT:  Pardon me.  Pardon me.

9            MR. BERNICK:  It has to be a Grace asbestos

10  containing product.

11            THE COURT:  Yes.  And my understanding was that if

12  something in the file indicated that a person worked for Grace

13  at a plant at which a Grace asbestos containing product was

14  used at the relevant time period and that indication was in the

15  file, that they accepted that.  Now, if you're telling me --

16  because I don't know the dates and the plants.  I'm sure you

17  do, Mr. Bernick.  So, if you're telling me that my

18  understanding of this particular document is incorrect and that

19  there is insufficient evidence in this file to show that this

20  gentleman worked at a Grace plant where there was an asbestos

21  containing product and, therefore, there is a question of fact

22  with respect to this document, then I will withhold this review

23  until there can be a connection made.

24            MR. BERNICK:  That's what I'm suggesting.  Actually,

25  what it is, Your Honor, it's not a Grace --

1           MR. FINCH:  Your Honor, you have ruled.

2           MR. BERNICK:  Excuse me.

3           THE COURT:  Pardon me.  I have not, Mr. Finch.  Mr.

4    Bernick?

5           MR. BERNICK:  Yes, I -- it's not -- it says he's

6    working at the Bethlehem Steel Warehouse.  It's a shopping

7    center and a bunch of other things, chamber of commerce.  So,

8    these are basically construction projects.  And apparently he's

9    working for his stepfather as a general contractor.  And I

10   don't know whether the product that he refers to at this time

11   -- this is 48 to 54.  He says Zonolite Plaster.  I don't know

12   if that's Zonolite Plaster that contained asbestos or not.  I

13   just don't know.  And because of that I do believe it's

14   necessary to pin that down and determine whether under the

15   criteria -- the real question is under the criteria that were

16   being applied by Exponent this would have been counted as an A

17   or a C.

18          THE COURT:  All right.

19          MR. BERNICK:  If it would have been, then I can't

20   fight that.

21          THE COURT:  You may take a very limited either

22   interrogatory -- written interrogatory deposition or limited

23   deposition of someone from Exponent to connect up this

24   document.  I will not admit it until I have some connection of

25   this document.  I do not know as a matter of fact whether it

1  was or was not accepted and for what reason.

2          MR. FINCH:  Your Honor, the point is that Exponent

3  was not provided with this document.  The document --

4          THE COURT:  I don't know that either.  I mean, I do

5  have an indication that the last letter on this -- in the --

6  I've lost the document, I'm sorry -- ACC-472 indicates that

7  deposition documents were withheld.  That is clearly stated.

8  Mr. Bernick, as I understand it, is suggesting that because the

9  letter is here, that does not mean that the documents were

10 withheld.  So, gentlemen, I need to find out whether that is

11 the case.

12          MR. FINCH:  Your Honor, Dr. Florence --

13          MR. BERNICK:  I just don't --

14          THE COURT:  Mr. Bernick, it's his turn.

15          MR. BERNICK:  I'm sorry.

16          MR. FINCH:  Dr. Florence produced the actual files

17 that were sent to the Celotex Trust and to Exponent to review.

18 The entirety of the file was the ACC-472, the Halpain file --

19          THE COURT:  All right, without the deposition.

20          MR. FINCH:  -- without this document in it.  This

21 document says the -- "Grace made a product called Zonolite

22 Acoustical Plaster.  The only brand of plaster product Mr.

23 Halpain recalled was Zonolite.  He described going to the

24 railroad and uploading it by the truckload.  And on virtually

25 all of these projects, his job included mixing plaster and

1  taking it to the plasterers." That is an admission of a

2  counsel of Grace, an 801(d)(2) admission. Grace's counsel was

3  hired to defend in the case. That's his statement of what this

4  guy was doing. And for purposes of the Exponent review,

5  whether he was a mixer was highly relevant. And the -- in fact

6  --

7              THE COURT: This is only a transmittal letter.

8              MR. FINCH: But, the --

9              THE COURT: I cannot see anything in this cover

10 letter that is an admission of fact. It is a transmittal that

11 says there's a settlement demand and what they're looking for

12 --

13             MR. FINCH: No, but --

14             THE COURT: -- or else they're going to go to trial.

15 There is no admission of fact in this cover letter.

16             MR. FINCH: Not in the cover letter. Look at what

17 the last page of the document says.

18             THE COURT: Which document?

19             MR. FINCH: The Halpain file, 472.

20             THE COURT: It says that they -- that "Re: The

21 status of the case and attaching copy of 6/9/00 letter to Jay

22 Hughes from John Muir," May or Day, I think it says, "and

23 deposition report."

24             MR. FINCH: Right. And the point is they didn't give

25 Exponent the deposition. The deposition is clearly not

1 privileged.  The first --

2           THE COURT:  The deposition isn't what you're

3 offering.

4           MR. FINCH:  But, I'm offering --

5           THE COURT:  I don't have that either.

6           MR. FINCH:  I'm offering the June 9th, 2000 letter,

7 which is not a transmittal letter.  It's a summary of a

8 deposition.  It's a case summary.  It goes through -- the June

9 9th, 2000 letter is referred to twice in 472.  It's referred to

10 on the last page and the next to the last page.  It's a letter

11 to Grace's in-house counsel from Grace's outside counsel

12 reporting on what the plaintiff testified to in the deposition.

13          THE COURT:  Oh, I'm sorry.  Mr. Muir, you're saying,

14 is Grace's counsel.

15          MR. FINCH:  Yes.

16          THE COURT:  Not the counsel for the plaintiff.

17          MR. FINCH:  Correct.  He's Grace's counsel.

18          THE COURT:  Oh.

19          MR. FINCH:  It's an admission by Grace.  And what the

20 plaintiff testified to --

21 "Q   Do you recall any brand names of plaster that we used?"

22          UNIDENTIFIED SPEAKER:  Microphone.

23 "A   We used Zonolite mostly."

24          UNIDENTIFIED SPEAKER:  Microphone.

25          MR. BERNICK:  Speak into the mike.

1  "A   We used Zonolite mostly."

2            THE COURT:  What are you reading from?

3            MR. FINCH:  I'm reading from the deposition that --

4            THE COURT:  No, you can't do this, Mr. Finch.  It's

5  not in evidence.  You haven't proffered it.  I've got an

6  objection on the record.  You can't keep expanding what you're

7  doing.

8            MR. FINCH:  Okay.  The point, Your Honor, is that

9  Grace's counsel said this is what the guy was.  He was a mixer

10 of a Grace asbestos containing product.  That's an admission of

11 Grace and --

12           MR. BERNICK:  He didn't say that.

13           MR. FINCH:  -- we offer Exhibit 34.

14           MR. BERNICK:  He didn't say that.  Look, the fact of

15 the matter is -- and what's happening is everybody is

16 speculating.  And until we pin this down, that's all it's ever

17 going to be is speculation.  Yes, it is a letter from Grace's

18 counsel.  I acknowledge that.  Yes, it went to Grace.  I

19 acknowledge that as well.  The Halpain files appears to suggest

20 in the attachment that the covering letter, as well as the

21 attachment, were withheld, in which case I wonder where it is

22 that Mr. Finch got the attachment.  But, be that as it may,

23 it's clear that if all that is true, it wasn't reviewed by

24 Exponent, which is the issue that we're here to talk about.

25           So, then the question becomes, what is it that this

1  document actually says?  Is the Zonolite Plaster the kind that

2  was used for the purpose that's described in the summary?  Was

3  that a Zonolite Plaster that contained asbestos or not?  I

4  don't know the answer to that question.  Assuming that it did,

5  what is the significance of this in terms of the actual

6  analysis that Dr. Florence did which will get us back to the

7  verdict, I'm afraid, Your Honor.  That still remains to be

8  determined.  But, for counsel to say it must come in on the

9  basis of his inference, that violates the rules relating to

10 foundation.  We can get the foundation.  If it's admissible,

11 Your Honor, it's admissible.  We'll deal with it.  We'll ask

12 Mr. Florence questions about the circumstances, and then we'll

13 go on.  It's not like the world has all of a sudden come to a

14 stop until Mr. Finch can convince Your Honor that his

15 interpretation of the document is correct.

16          THE COURT:  The only -- at this point, the only

17 relevance I can see to this document is the fact that it

18 appears to contain some information, whether it's relevant or

19 not, because I don't know if it contains information about a

20 Grace asbestos product under the debtor's theory of the case.

21 So, the relevance seems to be that the document was not

22 provided to Exponent in order to facilitate its review to see

23 whether or not this should have been included within the

24 designation of an A or C category.  But, the document itself,

25 based on what's before me now, is not something that I can

1  adjudge.

2         The cover letter does say there are some documents

3  from the asbestos property damage litigation which supports his

4  claims.  But, it also says that the CCR has taken the lead and

5  there are other defendants in the case.  So, at this point,

6  from looking at the document, I have no idea what the specific

7  relevance is.  You need to connect this up.  I will withhold

8  the admission of this document subject to letting you connect

9  it up.

10         MR. BERNICK:  That's fine.  I think we'll be able to

11  establish some further significance of this with Dr. Florence

12  if Mr. Finch will simply ask him the question about whether

13  this factors into his analysis or whether he can say.  But,

14  we'll certainly be able to try to pin down whether this product

15  ID is a product ID that tells us it's an asbestos containing

16  product.  And if it is and it should have been included in the

17  review, you know, we'll then deal with the question of what

18  impact it would have had on the review.

19         MR. FINCH:  I rather suspect it was an asbestos

20  containing product or Grace wouldn't have paid $2 million to

21  resolve the claim.

22         MR. BERNICK:  All right, that is Mr. --

23         THE COURT:  That is or is not the case.  People

24  settle cases, especially when this one looks like it's a high

25  profile case.  The cover letter has all sorts of reasons why

1  this may have been something that Grace wanted to settle.

2  Plaintiff is 63, he has twin minor sons, and so forth, et

3  cetera.  Mr. Finch, people settle cases for all kinds of

4  reasons that have nothing to do with liability, as we know.

5  That's one reason we had a 408 argument earlier today.

6  Nonetheless, it may be relevant.  You've got an opportunity to

7  substantiate the relevance.  You need to connect it up.

8          MR. FINCH:  Thank you, Your Honor.  I would also

9  offer at this time ACC-466.  That's Dr. Florence's report in

10 Armstrong.

11         MR. BERNICK:  The whole report?

12         MR. FINCH:  The whole report.

13         MR. BERNICK:  Yes, we would object to that.  That is

14 work that's been done in connection with another case.  And as

15 it has been done for -- in connection with work for another

16 case, it is precluded by the stipulation.  Furthermore, I don't

17 think he's established that it has any particular relevance.

18 So, we would object to the admission of that document.

19         THE COURT:  What is the relevance, Mr. Finch?

20         MR. FINCH:  The relevance shows that the methodology

21 that he used to estimate the cost of future asbestos claims is

22 the same methodology that is put forward by the ACC and the FCR

23 here.  It is relevant to impeach the methodology he is using in

24 this case, and it is also -- it demonstrates the unreliability

25 of what he's doing in this case.

1          MR. BERNICK:  If they will stipulate, Your Honor,

2    that this represents the -- as Mr. Finch just said, if they

3    will stipulate that this document represents the methodology

4    that the ACC and FCR believes should be used in this case, we

5    will agree to the admission of the document for purposes of

6    that proffer.

7          MR. FINCH:  Come on.  This is ridiculous.

8          MR. BERNICK:  No, no, Your Honor.

9          MR. FINCH:  Well, that --

10          MR. BERNICK:  What is the --

11          THE COURT:  Let me rule.  I do not believe that the

12    document itself is admissible for that purpose.  It is evidence

13    -- or you use it for impeachment purposes.  Dr. Florence

14    testified with respect to the methodology he used.  That does

15    not make the document itself admissible evidence for that

16    purpose.  I am going to keep it as a demonstrative exhibit

17    simply so that when I am connecting all this up together at the

18    end of the case, I have it available simply to refresh

19    recollection as to what was going on.  But, it is not

20    substantive evidence that is relevant in this case, but it is

21    certainly corroborative of the fact that the witness has

22    explained the methodology that he used in the Armstrong case,

23    which is somewhat different from the methodology he has used

24    here.

25          MR. FINCH:  Radically different, Your Honor.

1  Finally, I would offer ACC-175 and ACC --

2          THE COURT:  Pardon me.  Let me make a note, please,

3  before you get there.

4          MR. FINCH:  -- 171 and 109, the same --

5          MR. BERNICK:  What are those?

6          MR. FINCH:  -- the same objection applies to both.

7          MR. BERNICK:  What are those?

8                          (Pause)

9          MR. FINCH:  Are you ready, Your Honor?

10          THE COURT:  No, not yet.  Okay, now I am.  Please.

11          MR. FINCH:  I'm offering ACC-175 and 109 as

12  admissions of W.R. Grace under 801(d)(2).

13          MR. BERNICK:  What's 175?

14          MR. FINCH:  The letter from Dr. Florence to Mark

15  Wilensky.

16          MR. BERNICK:  We object to -- we object to 109.

17  Where's the letter?  Can I have the letter?  And we object to

18  the letter 175, as well, on the grounds they violate the

19  stipulation.  They're -- communications between Grace and the

20  expert and Grace's counsel regarding the Grace case.  They're

21  specifically foreclosed by the stipulation.  We are not

22  permitted to understand and be able to conduct discovery with

23  respect to Dr. Peterson's prior work on Grace, again pursuant

24  to the stipulation.  So, the stipulation holds and it shouldn't

25  be violated here.  And it doesn't make a difference if these

1 documents are relevant.  Although we would question the

2 relevance of these documents, the stipulation should control.

3          MR. FINCH:  Your Honor, first of all, I didn't hear

4 any response to my assertion that these are -- well, strike

5 that.  We believe the stipulation doesn't apply to this.  Mr.

6 Mullady will address that point.

7          THE COURT:  Well, first of all, let's take them one

8 at a time because I have 109, but I don't have 175 in front of

9 me.  So, what is 175, because I can't seem to find it and I

10 thought I had them all.

11          MR. FINCH:  175 is -- may I approach, Your Honor?

12          THE COURT:  Yes, please.  I don't -- thank you.

13          MR. FINCH:  175 is a letter authored by Dr. Florence

14 in which he describes work he did for Grace in 1997 to estimate

15 the cost of currently pending and future bodily injury claims

16 related to Grace's production of insulating materials

17 containing asbestos, fireproofing and acoustical plaster.  And

18 it describes the methodology used in that and his estimate.  We

19 believe that this is an admission of a party opponent in the

20 sense that it's an 801(d)(2) admission in the same way that if

21 a bookkeeper were hired in a tax case to calculate a taxpayer's

22 income and the taxpayer -- the bookkeeper said the income is

23 $300,000, and then in a tax prosecution, the taxpayer has a

24 Form 1040 that says that his income is only $50,000, I'm

25 certain that the bookkeeper's documents would come in to

1  evidence as admissions of an agent of a party acting within the

2  scope of the agency.  That's Point Number 1.

3        Point Number 2, the stipulation was a discovery

4  stipulation.  It had nothing to do with cross examination at

5  trial.  It had nothing to do with material that was not related

6  to the expert's work in this case.  The intent of the

7  stipulation was to keep you from getting behind, notes back and

8  forth between Dr. Florence and his staff, or notes between

9  Kirkland & Ellis and Dr. Florence for the purpose of preparing

10 him to testify in this estimation case.  Not to put an absolute

11 bar as to any and all work that he has done in the past which

12 became publicly available.  The Sealed Air work became publicly

13 available in a variety of ways.  They didn't keep it just

14 within Grace, they gave it to <u>Sealed Air</u>.  They gave it to the

15 FCR's expert Eric Stout at the time.

16       So I don't think there's any confidentiality

17 associated with this.  It's not within the ambit of the expert

18 stipulation.

19       The exact same set of arguments would apply to

20 ACC-FCR-109.  Again, they're 801(d)(2) admissions.  They're not

21 within the scope of the expert's stipulation.  And they are not

22 confidential.  Both of these documents were provided to <u>Sealed</u>

23 <u>Air</u>.  They were provided to the FCR's expert Eric Stout at the

24 time of these transactions.  They were produced to the United

25 States government by my firm when the government served me with

1  a subpoena, without any objection by Grace.  Grace has --

2          THE COURT:  Well, wait.  With respect to 109, this

3  witness indicated he had never seen it.  That it was prepared

4  by KPMG but not by him.  I don't see a foundation through this

5  witness for 109.  So let's stop with 109 right there.

6          With respect to 175, this witness did indicate that

7  this was a letter that he had written, but I still did never

8  hear from you and I asked you to lay the foundation for what it

9  was.  You said you would, then you went on to another line of

10  questioning.  You never went back to it.  I still don't know

11  what this document is or for what purpose it was created.

12          My concern -- the objection, I think, was that at the

13  time this document was created in connection with the Sealed

14  Air litigation and for that purpose and I don't know what it's

15  for.

16          MR. FINCH:  It was not created for the purposes of

17  the Sealed Air litigation, it was created for purposes of the

18  Sealed Air transaction, business planning purposes.

19          THE COURT:  Oh, a transaction.  Okay.

20          MR. FINCH:  It was for business planning purposes.

21  And we submit, Your Honor, there's no difference between

22  business planning purposes for purposes of deciding whether

23  you're solvent in order to transfer assets and business

24  planning purposes for purposes of determining the value of

25  money that goes into a trust.  Both of -- we believe the same

1  methodology should apply to both and it's apparent on the face

2  of the document what the document is for.  You don't need --

3  the only foundation I needed to lay was that he was working for

4  Grace at the time and that this is his letter which he

5  established.  Once he does that, I think it's an 801(d)(2)

6  admission.  That's the foundation.  The foundation is he made

7  the statement.  It's an 801(d)(2) admission.  It comes into

8  evidence pursuant to that.

9          MR. BERNICK:  Your Honor, is this really --

10         MR. FINCH:  It's not --

11         MR. BERNICK:  -- it's so many words and it doesn't

12  address the core issues.  Number one core issue is not

13  relevance.   Although there is a relevance problem, that is not

14  the basis in which the document should not come in.  It should

15  not come in because indeed it did relate to privileged matters

16  that were analyzed in connection with the Sealed Air

17  transaction.  Any transaction that's analyzed for purposes of

18  whether it creates an insolvency problem has to be informed by

19  estimates of liability.  Those estimates of liability, while

20  they are done for business purposes, are themselves still

21  confidential.  That issue has been litigated again and again

22  and again and again.  Otherwise, you'd have counsel's work

23  product displayed for the world just because that work product

24  was consulted in connection with establishing a reserve.

25         He then says well, that confidentiality or that

1  privilege was breached when it was turned over in the <u>Sealed</u>

2  <u>Air</u> litigation.  It most certainly was not.  The <u>Sealed Air</u>

3  litigation was fraudulent conveyance litigation.  A protective

4  order was entered early on in that litigation to protect from

5  disclosure precisely these kinds of documents which would

6  otherwise be privileged.

7         He then says it was produced to the U.S. government

8  pursuant to subpoena.  Where I come from if you produce a

9  document in response to a subpoena, you are not waiving.  It is

10  something that is compelled by a process of the government.

11  All that goes to say that this remains a privileged

12  communication.

13         Then there is the stipulation.  And as much as Mr.

14  Finch may want to say that this is relevant and it's just so

15  important that we have it, et cetera, et cetera, it

16  specifically forecloses disclosure and discovery; "and

17  discovery of any oral or written communication between the

18  expert witness and counsel for the party unless it's relied

19  upon."  That's Romanette iii.  "Any oral or written

20  communication between an expert witness..." -- da, da, da, da

21  -- "or one or more attorneys for the party offering the

22  testimony of such witness."  That is attorney -- Wachtell

23  Lipton -- for the party offering testimony, that's W.R. Grace.

24  This is absolutely and completely foreclosed by the

25  stipulation.

1         Now, I'd have to say, Your Honor, I say all of that,

2   this document does not make that much of a difference.  The

3   witness has already testified that he did estimates of

4   companies still in the tort system using tort system values

5   because that's what he was asked to assume.  All that this

6   document does is to establish the same fact.  However, I'm very

7   reluctant to waive our rights of privilege and to waive our

8   rights based upon the stipulation because the next thing that's

9   going to happen is that we'll have five more documents where

10  there's the insistence that it's highly relevant and highly

11  germane and these things don't matter.  You've got to stick by

12  the rules.  He elicited the testimony.  These documents add

13  nothing to the equation beyond what he's already testified to.

14  And we are now very late in the day and I'm now concerned about

15  finishing this witness today and it seems to me that we've just

16  got to get to the end of this process.

17        THE COURT:  With respect to finishing, we're going to

18  leave today at 5:15.  I have something that I must be at at six

19  o'clock and I have to be on my way out of this building at

20  5:15.  So we will be done today at 5:15.

21        Mr. Finch, I do not believe that this document has

22  been shown not to be anything other than privileged and

23  confidential.  I do not believe that producing the document

24  pursuant to a subpoena breaches the privilege of the entity

25  raising that privilege.  I don't know how it came into the

1 possession of the ACC.  If it did so pursuant to the <u>Sealed Air</u>

2 litigation pursuant to a confidentiality stipulation or a

3 protective order issued by Judge Wolin in that litigation, then

4 it is not subject to being admitted in this proceeding for that

5 purpose.

6      So even though this witness has admitted that it is

7 his document, his testimony is clear as to how he has done

8 different types of analyses under different circumstances, it

9 would be cumulative and there is no need on this record to

10 create that type of an issue when his testimony is clear.

11      So I am sustaining the objection to the documents.

12      MR. FINCH:  Okay.  May I make one statement for the

13 record with respect to that?

14      THE COURT:  Yes.

15      MR. FINCH:  On September 22nd, 2006 Grace wrote me a

16 letter -- Barbara Harding -- in which she stated:  "After

17 comparing your chart of previously-produced documents" --

18 referring to the <u>Sealed Air</u> documents -- "with our chart of

19 potentially privileged documents, Grace has concluded that it

20 will no longer seek to assert privilege over the <u>Sealed Air</u>

21 documents in the chart you provided."  This document was on the

22 chart that he provided.

23      THE COURT:  Well, then --

24      MR. BERNICK:  If it was, then why didn't we go

25 through that to begin with and avoid this.

1          THE COURT:  I don't know.

2          MR. BERNICK:  And I told Mr. Finch specifically

3   before we started if it's already covered --

4          THE COURT:  You know, folks, I'm going to amend the

5   pretrial stipulation.  I want to know as to every exhibit

6   starting next week that you folks are offering in advance of

7   the day that the document is going to be offered for your case

8   in chief what the objections are going to be in writing along

9   with your witness narratives.  This is ridiculous.

10         MR. FINCH:  They have provided their objections, Your

11  Honor, and we provided ours.

12         THE COURT:  I have not seen these documents let alone

13  objections to these documents.  They are not included in the

14  binders.  They're handed up to the witness for the first time

15  in court.  I've not seen them.

16         MR. FINCH:  Your Honor, I'll pass the witness to Mr.

17  Mullady.

18         MR. BERNICK:  Can we have an estimate from Mr.

19  Mullady on how long his examination is going to take?

20         THE COURT:  I am back to this document, 175.  Has the

21  debtor waived the privilege?  If so --

22         MR. BERNICK:  We'll let Your Honor know tomorrow

23  morning.  I specifically asked Mr. Finch to go through this and

24  he decided rather to show the documents to the Court.  I will

25  let the Court know tomorrow morning.

1            THE COURT:  All right.

2            MR. BERNICK:  And could we have an estimate from Mr.

3  Mullady on how long he'll be?  We're now two and a half hours

4  into their examination.  Their estimate was two and a half

5  hours.

6            MR. MULLADY:  Your Honor, I believe we're still well

7  within our two and a half hours given the extended colloquy.

8            THE COURT:  I don't know where we are.  Could we just

9  go, Mr. Mullady?  Thank you.

10            MR. MULLADY:  I will try to complete -- I will try to

11  do this in 25 minutes.  That which I had planned to do in 45, I

12  will try to do in 25.

13  CROSS EXAMINATION

14  BY MR. MULLADY:

15  Q    Good afternoon, Dr. Florence.

16  A    Good afternoon.

17  Q    Are we having any fun yet?

18  A    If I could grab five minutes, I'd have a lot more fun.

19            THE COURT:  All right, sir.  You have a five-minute

20  recess.  Thank you.

21                          (Recess)

22  Q    Good afternoon, Dr. Florence.

23  A    Good afternoon.

24  Q    Since I represent the FCR, I'd like to focus my questions

25  on future claims.

1  A    Sure.

2  Q    I have on the screen here ACC-FCR Exhibit 462, your

3  supplemental report where I placed two tables side by side and

4  would ask you if you would confirm that your median forecast

5  for the estimated present value of future claims is $387

6  million in Table 5.5, correct?

7  A    The future claims it would meet the evidentiary criteria,

8  the present value, that's correct.

9  Q    Your estimate as shown in Table 6-3 of the estimated

10 present value of pending and future claims that met or will be

11 able to meet the evidentiary criteria is $468 million, correct?

12 A    That's correct.

13          THE COURT:  I'm sorry, I apologize.  What's Table 3?

14          MR. MULLADY:  Table 6-3 --

15          THE COURT:  Yes.

16          MR. MULLADY:  -- in ACC-FCR-462 is showing the

17 estimated present value of pending and future claims that met

18 the criteria in millions, 468.

19          THE COURT:  Okay.  Thank you.

20 Q    Now, would you agree with me, Dr. Florence, that 387 is

21 approximately 82.7 percent of 468?

22 A    True.  I assume you've done the math.

23 Q    I've done the math.

24 A    Yes.

25 Q    You'll accept my math.  So for purposes of -- you would

1  agree with me then that the percentage of the total estimate

2  that you've calculated for Grace of future claims is about 83

3  percent?

4  A    Right.  In terms of these medians, the median estimates

5  according to your calculations are 83 percent for futures,

6  right.

7         MR. MULLADY:  Okay.  Could we have ACC-FCR-3023,

8  please?

9  Q    We've had a lot of discussion about your assumptions.  I

10 don't want to go back through all those again.  But as I read

11 your report, I see certain assumptions that you made in

12 estimating future claims and I want to go through these one at

13 a time and see if you agree with them.

14         As I understand your analysis, you've assumed that

15 Grace's exposure and medical criteria are valid, correct?

16 A    I made no assumptions about the validity of any of the

17 criteria that were provided to me.

18 Q    Fair enough.  You didn't test these assumptions to

19 determine whether they were valid or not, is that correct?

20 A    The assumptions basically were that claims that didn't

21 meet these criteria wouldn't meet their burden of proof in the

22 court, and I'm not quite sure how I would test that.  And I

23 guess I -- other than asking the Court, there's no test for

24 those assumptions it seems to me.

25 Q    All right.  Well, would you agree with me then if we

1 placed next to number one here that you did not test these

2 assumptions?

3          MR. BERNICK:  Actually, let's put his full testimony

4 which is no, that he didn't make that assumption.  Further, he

5 didn't believe that it was testable.  That's what he said.

6 Q    Did you hear my question, sir?

7          MR. BERNICK:  Object to the form of the question.

8 This is a pre-prepared slide.  If the witness doesn't testify

9 in accordance with the pre-prepared slide, we don't just go

10 back to the pre-prepared slide, we ought to have his testimony.

11          THE COURT:  Yes.  I think the form of the question

12 does not fairly track what the witness testified to, Mr.

13 Mullady.  Sustained.

14 Q    Dr. Florence, did you test the validity to suitability for

15 estimation purposes, if you will, of Grace's exposure and

16 medical criteria?

17          MR. BERNICK:  Object.  That was two different

18 questions; test versus the suitability.

19          THE COURT:  That's true.  Sustained.

20 Q    I'll rephrase the question.

21          Dr. Florence, did you attempt to validate in any way

22 whether Grace's exposure and medical criteria were appropriate

23 for the purposes of doing your estimation?

24 A    The criteria I was provided with were very clear so that

25 you should assume that these criteria will be necessary for

1  claimants to satisfy their burden of proof and the Court.  And

2  so I don't know how I test that.  I mean there's no validity

3  test for that, it's an assumption.

4  Q    All right.  You would agree with me that you did nothing

5  to test that assumption, can we agree on that?

6  A    I could not test the assumption.  I'll agree with you on

7  that.

8  Q    That is fair.  Your second assumption, as I read your

9  report, is that future claimants will meet the criteria in the

10 same proportion as current claimants meet the criteria.  That's

11 part of your analysis, correct?

12 A    Yes.  Based on our comparison of the -- both the closed

13 claims and the open claims and the similarity in meeting the

14 criteria between those two, we assume that the proportion of

15 claims that would meet the criteria would be the same going

16 forward as it was today.

17 Q    Now, that is not something that you can test either,

18 correct?  That's just an assumption and it's not a testable

19 assumption, fair?

20 A    The future is the only verification for that, I guess.

21 Q    Okay.  So would you agree with me if we put on this chart

22 next to two that this is not a testable hypothesis?

23         MR. BERNICK:  Well, he actually said yes and then he

24 said it wasn't testable.

25         THE COURT:  Well, I think the first one also has to

1  say not testable, Mr. Mullady, to be fair to what the witness

2  said.  He said he could not test, not that he did not test.

3              MR. MULLADY:  Okay.  The same thing, Your Honor.

4              Can we switch to the ELMO, please?

5  Q    I think where we are, Dr. Florence, is that we're in

6  agreement that assumptions one and two are not testable, is

7  that correct?

8  A    Correct.  That's not testable.

9  Q    I read assumption three from your materials -- well,

10 strike that.

11             You also assume in estimating future claims liability

12 of Grace that average settlement values for the six

13 mesothelioma claims -- from the closed claims set -- are

14 predictive of all future mesothelioma claim values.

15 A    Yes.  We used the average value for those six cases that

16 met the criteria, at least in the report and in my testimony

17 today, for purposes of valuing the future meso claims with the

18 exception that we also have in them an inflation factor that

19 would affect the value of the claims going forward in the

20 future.

21 Q    And the fourth assumption on my chart here, the Court can

22 use Grace's criteria other than tort system criteria.  That's

23 also something you're assuming for purposes of your analysis,

24 correct?

25 A    No.  I'm not presumptuously telling the Court that they

1  can do anything.  All I'm saying is that I accepted these --

2  these criteria were given to me as assumptions and I was asked

3  to estimate how many claims will meet these criteria in the

4  present and in the future and what would the value of those

5  claims be.  And that's what I tried to do.  So --

6  Q    That's fair.  Let me go back to number three for a moment.

7  Have you done anything to test whether the average settlement

8  values for the six mesothelioma claims that you identified are,

9  in fact, or will be predictive of all future meso claim values?

10 A    Yeah.  Yes, I have.

11 Q    What did you do?

12 A    Well, I think is I tried to testify when we were going

13 through this, when we came to the issue of valuation of claims

14 that met the criteria going forward, we used the categorization

15 of the claims that were based on Exponent's review of the

16 closed claim sample and the claims fell into four categories.

17 Claims that were tested regardless of whether they passed or

18 failed the criteria -- and the average for that group of claims

19 was about $96,000.  Then there were a group of claims that

20 provided no information in order to be judged whether they met

21 the criteria -- I'm sorry, let me go to that section.

22 Q    Doctor, for the sake of expediency, if you're just

23 repeating what you said on direct, I don't really need that to

24 be repeated.

25 A    Well, I just want to make sure I was clear.

1  Q    I think you were.

2  A    Because you've asked me about these six and we did test

3  these six and the test was to test whether these six, the value

4  for these six, were statistically different from the overall

5  value of the case, which was $96,000.  And I want to emphasize

6  this because there's been a lot of discussion over the last

7  hour about just this kind of thing.

8         What the statistical test said is that you could

9  expect this kind of difference, not due to the criteria, but

10  due to the fact that you're using six cases.  And so, you know,

11  from a pure statistical standpoint, a statistician would look

12  at this answer and say the appropriate value to apply to cases

13  that meet the criteria is $96,000.  Okay.  So what I did is I

14  looked at the categories by which the criteria were met.  They

15  seem to be going in the -- trending in the right direction

16  logically, and when I looked at the six cases there were no

17  outlier cases in that group of cases.  They were representative

18  of the other cases.

19  Q    I understand.

20  A    So we chose to use the 155.  But the 155 is not something

21  that should be carved in stone in the sense of this is the

22  answer and the only answer.  Probably the most appropriate

23  answer is what the average value of these cases was; the

24  average value of the 258.

25  Q    Yes.  And you found, as we see in GG-2232 on the ELMO,

1  that there was no statistically significant difference and that

2  the strength of exposure was not a driver of values, correct?

3  And that's what you said on direct.

4  A    That's correct.

5  Q    But, Dr. Florence, you wouldn't expect to see a

6  statistically significant relationship between historical

7  settlements where the exposure criteria were met as opposed to

8  not met because Grace didn't require claimants to satisfy the

9  A and C exposure to be paid before bankruptcy, did they?

10 A    These are only claims that meet A and C.

11 Q    I understand that.

12 A    So I'm only looking at those claims.

13 Q    But those claims, sir, you would agree, were not settled

14 on those criteria, were they?

15 A    I don't know what criteria were used to settle the claims.

16 Q    Well, you don't have any information -- I didn't hear you

17 testify on direct that you knew that Grace paid those

18 settlements and paid those settlement amounts because the

19 plaintiff had adduced evidence that he was a mixer and

20 installer of Grace products.  I didn't hear you say that.

21 A    That's right.  I said I don't know anything about what

22 criteria they used in settling their claims.

23 Q    What was Grace's -- when you applied your criteria, as I

24 understand it, only 6 percent -- about 6 percent of

25 mesothelioma claims using Method 1 qualify for payment

1 according to your analysis, is that correct?

2 A    Well, I think that's about right.

3 Q    And you're aware, sir, that prior to bankruptcy Grace was

4 historically closing with payments some 60 to 70 percent of its

5 mesothelioma claims.  Are you aware of that?

6        MR. BERNICK:  Objection.  Relevance.  He's testified

7 repeatedly that he didn't do a reconciliation of pre-imposed

8 bankruptcy practices.  So now we've got a question of the

9 witness that I can't only imagine is designed to adduce through

10 this witness what they're going to talk about through their own

11 witnesses if it's a true fact.

12        THE COURT:  Well, regardless of what they're going to

13 do, this question is only very simple.  Is he aware of a

14 particular fact?  He's testified that he's worked for Grace for

15 over ten years.  He may or may not be aware of the fact.  It's

16 a simple yes or no.  Overruled.

17 A    I'm sorry.  Could I hear the question again?

18 Q    Sure.  Dr. Florence, are you aware of what percentage of

19 cases -- claims -- Grace was closing with payment -- meso

20 claims -- prior to filing for bankruptcy in April of 2001?

21 A    Not off the top of my head, no.

22 Q    You know it's more than 50 percent of the claims, don't

23 you, sir?

24 A    Not off the top of my head.

25 Q    From your prior work?

1  A    Not off the top of my head.

2  Q    All right.

3  A    I don't carry -- I can't carry that around with me, I'm

4  sorry.

5  Q    Let me ask you to assume hypothetically that Grace was

6  closing with payment 60 to 70 percent of mesothelioma claims

7  before petition for bankruptcy.  With that hypothetical in

8  place, do you think that if plaintiffs' attorneys had known

9  that Grace was only settling 6 percent of mesothelioma claims

10 at that time and they had clients with A/C type exposure, are

11 you telling this Court that those plaintiffs' attorneys would

12 have accepted an average settlement of $155,000?

13         MR. BERNICK:  Objection.  This is, a), it's totally

14 argumentative.  B) --

15         THE COURT:  Sustained.

16 Q    You would agree, Doctor, that this $155,000 represents no

17 more and no less than the amount of money that the plaintiffs'

18 attorneys in these six cases accepted for their settlements on

19 average with Grace, correct?

20         MR. BERNICK:  Objection.  a), it's argumentative.

21 B), there's no foundation for it.

22         THE COURT:  I'm sorry, Mr. Mullady, I didn't get the

23 beginning of the question.

24 Q    All you know, Dr. Florence, is that these cases -- these

25 mesothelioma cases were settled for $155,000 on average, these

1  six.  That's all you know.

2  A    And I know they meet the criteria that were given to me

3  and that's why I'm looking at the six.

4  Q    Okay.  Let me go back to your total estimate for a moment

5  and just ask you about 2340.  It's the pendings and futures NPV

6  slide where you show your forecast and then you say it's an

7  NPV.  My question, sir, is NPV as of what date?

8  A    I'm sorry, I need to go to my report.

9           I think it's the 2001 date, but hold on.

10                        (Pause)

11           Yeah, that's in 2001 dollars.

12  Q    April 2, 2001, was that the date you were using -- or it's

13  just 2001 dollars?

14  A    Just 2001 dollars.

15  Q    Thank you.  Now, Dr. Florence, am I correct in

16  understanding that your estimate of the number of future

17  claims, the number of future claims, depends on the base number

18  of present claims?

19  A    Correct.  To some degree it's a function of the number of

20  claims that meet the criteria today or -- right.

21  Q    Correct.

22  A    Present -- I'm sorry, present -- it depends on the number

23  of historically pending and resolved claims as of the

24  bankruptcy date.

25  Q    Would you agree that increasing or decreasing the number

1 of valid pending claims, i.e., claims that meet the criteria,

2 by a certain percentage will affect the number of valid, i.e.,

3 claims meeting the criteria, future claims by roughly the same

4 percentage?

5 A    I hate to be stupid about this, but there's a lot of

6 moving parts here and so I'm not sure it's a pure linear

7 relationship.

8 Q    Let's take a look at something on your report that sheds

9 some light on this.  This is ACC-FCR-3022.  Okay.  This is a

10 demonstrative we've prepared that shows side-by-side Tables

11 4-5 and Table 5-3 from your supplemental report, ACC-FCR-462.

12 Table 4-5 shows your calculated number of pending claims that

13 met the exposure criteria using your two methods, correct?

14 A    Correct.

15 Q    One method is based on claims providing exposure data and

16 the other method is based on claims providing exposure data and

17 assuming the same proportion for those not providing exposure

18 data, correct?

19 A    Correct.

20 Q    Now, Table 5-3 shows your estimated number of future

21 claims that will be able to meet the criteria under those same

22 two methods, right?

23 A    That's correct.

24 Q    Now, looking at mesothelioma only, the 156 pending claims

25 that met the criteria yields 196 -- excuse me -- pending claims

1 yields 196 future claims that will meet the criteria under your

2 first method, is that correct?

3 A    No, that's --

4         MR. BERNICK:  Objection to the form of the question.

5         Go ahead.

6 A    -- 1,196 futures.

7 Q    I misspoke.  I meant 1196.

8 A    Right.

9 Q    Okay.  And under your second method -- and that's about a

10 seven to one ratio?  I did the math.

11        MR. BERNICK:  Your Honor, I don't know how or who

12 prepared this document, but he had the witness assume that it's

13 an apples and apples comparison and the type and the title of

14 the tables shows that it's not an apples and apples comparison.

15 I don't know if counsel noticed this.  The first one deals with

16 just exposure.  The second one deals both with medical and

17 exposure.  So it's not an apples and apples comparison.

18        MR. MULLADY:  Well, that may be the case and, Your

19 Honor, to expedite this where I'm going is that the

20 percentages, there's about a seven to one ratio in both the

21 present and the future for mesothelioma claims and it seemed

22 like a very odd coincidence to us unless there is a straight

23 mathematical relationship here.  And that's all I'm trying to

24 establish.

25        MR. BERNICK:  Well, but the predicate for the

1  question is wrong and there's probably a reason why.  It

2  doesn't make a difference for mesothelioma but will with

3  respect to the balance.  But the predicate for the question,

4  you're showing the witness and saying it's the same and it's

5  not.  One is exposure and the other is medical and exposure.

6  Q    Dr. Florence, is there any medical criteria for

7  mesothelioma in your analysis?

8           MR. BERNICK:  It's true with respect -- go ahead.

9  A    Not with respect to meso.

10 Q    Okay.

11 A    Other than -- but for the other --

12           MR. BERNICK:  For the others --

13 A    -- table -- the other --

14 Q    Okay.  Well, let's just keep this on mesothelioma then.  I

15 know my predicate question was broader than that.  But for

16 purposes of mesothelioma will you agree that there is -- that

17 the mathematics follow through such that by increasing or

18 decreasing the number of valid pending meso claims by a certain

19 percentage, that will affect the number of valid future meso

20 claims by roughly the same percentage.

21 A    No.  I mean unless I -- unless I just accept your

22 calculation.

23 Q    What would you need to do to verify the proposition that

24 I've stated?

25 A    What you're saying is the ratio of 156 to 1196 is the same

1  as the ratio of 463 to --

2  Q    3499.

3  A    -- 3439 -- 3499?

4  Q    Yes.

5  A    And so if that ratio was the same -- you're asking me if

6  that ratio is the same?

7  Q    If that ratio is the same, does that mean that if we

8  increase the number of present meso claims that meet the

9  criteria by any percentage, that that same percentage change is

10 going to be seen in future mesothelioma claims in terms of

11 those that are valid?

12 A    Okay.  I mean to expedite things there would be an

13 increase.  I don't know that it's a linear increase.  I won't

14 argue with you about there being an increase.

15 Q    Very well.  You said a few minutes ago in response to one

16 of my other questions that -- you mentioned burden of proof and

17 I think that comes from your report where you said on Page 6 at

18 the bottom of Section 4 of your report -- I'll try to pull it

19 up for you but I'm going to go ahead just because we're pressed

20 for time -- "Grace asked ARPC to assume that only the claimants

21 whose claims met specific criteria will be able to sustain

22 their burden of proof that the claims against Grace are valid

23 and therefore compensable."  Is that what you wrote?

24 A    I did.

25 Q    Okay.  And I asked you at deposition, burden of proof,

1 where?  Do you remember what you said?

2 A    I said I assumed the Court.  I mean this is Grace's

3 language.  I mean I tried to be as accurate as possible as to

4 what they asked me to do.  So.

5 Q    And that is exactly what you said in deposition, you

6 assumed burden of proof in the Court.  And then I asked you --

7 well, I'll ask you again, what is your understanding of -- let

8 me skip to this question.  You are not opining, as I read your

9 report, that had Grace remained in the tort system only those

10 claimants who met the criteria would be able to sustain their

11 burden of proof in court against Grace, correct?

12 A    Correct.  I said nothing about Grace remaining in the tort

13 system.

14 Q    And there are no trust criteria in place in the W.R. Grace

15 Chapter 11 bankruptcy yet, correct?

16 A    I don't know whether there are or not.

17 Q    I'll represent to you that there are not.

18 A    Okay.

19 Q    With that representation, you couldn't have been saying in

20 your report -- and I don't hear you saying now -- that only the

21 claimants whose claims meet Grace's criteria will have a

22 compensable claim against the future trust here, correct?

23          MR. BERNICK:  Objection.  It calls for a legal

24 conclusion.

25          THE COURT:  I think it does call for a legal

1 conclusion.

2        MR. MULLADY:  I just want to know if this is an

3 opinion the witness is offering.

4 Q    You're not offering that opinion as I hear your testimony.

5 A    I certainly don't want to offer a legal opinion, no.

6 Q    Thank you.  I want to ask you about the calibration

7 periods that you used to estimate the number of claims, number

8 of future claims.

9        MR. MULLADY:  Can we have ACC-FCR-462 again, Table

10 5-3?

11 Q    This is the same table I think we were looking at a few

12 minutes ago.  It shows the estimated number of future claims

13 that will be able to meet the evidentiary criteria.  It

14 represents your median forecast of the number of future claims

15 which you based on 32 individual forecasts, right?

16 A    Correct.

17 Q    And those 32 forecasts were the product of two methods for

18 calculating the number of claims that would meet the criteria

19 as we discussed, correct?  Right?

20 A    Correct.

21 Q    Two alternative meso and lung cancer forecast methods,

22 Nicholson and Peto.

23 A    Correct.

24 Q    Four calibration periods which --

25 A    Correct.

1 Q    -- you talked about on direct.  And two methods for

2 estimating the other cancers and non-malignancies and those

3 methods were ratio and regression, correct?

4 A    Correct.

5 Q    All right.  Now, the calibration period, that is selected

6 to be the historical period that is expected to be most

7 reflective of future events, correct?

8 A    Correct.

9 Q    The four calibration periods you used were 1996 to 2000,

10 '98 to '00, '98 -- excuse me -- 1996 to 2000, 1998 to 2000,

11 1999 to 2000 and there was one other and I have a typo.  Do you

12 remember what it was?

13 A    I think it's six through -- it's right above it.  '96 to

14 2000; '97, '98, to 2000; '99 to 2000.  There's four periods.

15 Q    All right.  Thank you.  And you showed us an exhibit --

16       MR. BERNICK:  Your Honor, at this point it is way

17 late and this witness is going to be having to come back and

18 it's not his fault, it's the fault of a very, very poor

19 estimate about cross examination time and I'm going to get

20 squeezed on my redirect as a result of it.  This is really --

21 we have relied on these estimates from the get-go and every

22 single time -- because there are two examiners -- every single

23 time they grossly exceed their estimate.  Every time.  There

24 hasn't been one done on time.

25       MR. MULLADY:  Your Honor, I'm going as quickly as I

1  can.

2            THE COURT:  How much longer do you have, Mr. Mullady?

3            MR. MULLADY:  Can I have five more minutes to finish

4  up with this witness?

5            THE COURT:  Yes.

6            MR. MULLADY:  Can I have ACC-FCR-3024, please?

7  Q    And you said, by the way, on direct, Dr. Florence, that

8  you want to use the most recent history and that's the best

9  indicator for future trends, correct?

10  A    Correct.

11  Q    All right.  Now, I'm showing you this exhibit.  This is a

12  file from ARPC's reliance materials for your report.

13            MR. MULLADY:  For the record, Your Honor, this is

14  from the hard drive of the reliance materials accompanying the

15  September report from a directory named Discovery for

16  Supplemental Report\Forecast and the file name is

17  Forecast_Scenarios_Combined.XLS.  I believe, Dr. Florence, it's

18  essentially the same type of data you presented in a slide this

19  morning showing that when you use your different methods your

20  calibration periods yield a future claims prediction.  Your

21  slide showed it reduced to net present value.  This one is just

22  straight from your reliance material and just shows the number

23  -- the nominal number, okay?

24            Would you agree with me that these figures here as we

25  go from the 1996 to 2000 calibration period up to the 1999 to

1 | 2000 calibration period they increase in each and every -- with

2 | each and every different calibration period that's applied and

3 | they do so for both the Peto and Nicholson forecast?

4 | A    Yes, they seem to.

5 | Q    And in each of these methods we see here that the future

6 | claims increase as you move to more recent years in the

7 | calibration period, right?

8 | A    Yes.

9 | Q    So these data show that the propensity to sue Grace was

10 | increasing over this five-year period, 1996 to 2000, right?

11 | A    No.  It has nothing to do with the propensity to sue I

12 | don't think.

13 | Q    It doesn't?

14 | A    No.

15 | Q    Well, doesn't it show that more claims are being filed as

16 | we get closer to 2000?

17 | A    What this shows is I'm estimating claims that meet the

18 | criteria.  And what this says is if I use the current claims

19 | that meet the criteria and I use those as a base, and I make

20 | forecasts based on three -- I'm sorry -- four calibration

21 | periods, '96, '97, '98 and '99, and I get different forecasts

22 | for the number of people that will bring a claim -- prosecute a

23 | claim -- and meet those criteria.  I'm not sure that I've said

24 | anything about propensity to sue or anything like that.  That

25 | really doesn't come into my calculations.

1  Q    You're trying to find the best indicator of future trends,

2  that's how you're selecting your calibration period, correct?

3           MR. BERNICK:  Objection to the form of the question.

4  A    I'm trying to do two things when I sought the calibration

5  period.  I'm trying to select that period that gives me as much

6  data as I can get and I believe is reflective of -- most likely

7  to be reflective of the future.  What we routinely do in

8  selecting calibration periods is select them over a five-year

9  period unless there is something in that five-year period that

10 would cause us to, for example, in the fifth year, in this

11 instance 1996, unless there was something there that looked

12 like it was out of place with the trend.  When I look at the

13 actual claim filings that qualify historically to be used in

14 this -- as the calibration period, they are very stable over

15 this period.  The filings may not be stable, but the claims

16 that meet the criteria are very stable over that period.

17 Q    The filings may not be stable and you would agree, Doctor,

18 that none of these calibration periods include the year 2001,

19 correct?

20 A    There isn't a year 2001.  There were three months of

21 filings right before the bankruptcy.

22 Q    None of these calibration periods include the three months

23 in 2001 before the bankruptcy, do they?

24 A    Absolutely not.  We would never include it.

25 Q    And didn't Grace receive over 500 mesothelioma claims in

1 the first quarter of 2001?

2 A    I don't know what Grace received in the first quarter.

3 Q    In Section 4.4.1 of your report in a discussion on a

4 different subject I see that you used a calibration period that

5 did include -- let's go to that, please.

6        MR. MULLADY:  And this is my last question, Your

7 Honor.

8 Q    4.4.1 of ACC-FCR-462.  This relates to the analysis you

9 made when calculating settlement averages to value pending meso

10 claims.  And I think you say here that -- this is in the

11 section, "Value of mesothelioma claims," you write -- "to value

12 the estimated pending mesothelioma claims ARPC analyzed Grace's

13 historical settlement data."  And then we drop down here.

14 "You're looking at a range from April 1999 to April 2001 was

15 selected as being the most recent and therefore the most

16 reflective of future events without over-weighting any single

17 time period."  Did I read that correctly?

18 A    Correct.

19 Q    So you considered April data in the first three months of

20 April 2001 when looking for values from mesothelioma claims for

21 purposes of your valuation part of your analysis, but you

22 didn't include the first three months of 2001 for your

23 calibration period for calculating the number of future claims,

24 is that correct?

25 A    That's correct because to not include 2001 for the

1 calculation of the averages would throw us into a situation

2 where we have so few cases the averages weren't calculable.

3          MR. MULLADY:  I pass the witness.

4          MR. BERNICK:  The reason I'm searching for boxes is I

5 can't quite see because my glasses are not prescription.  I

6 apologize, but if I could look at this quickly for a moment.

7                    REDIRECT EXAMINATION

8 BY MR. BERNICK:

9 Q    Dr. Florence --

10         MR. BERNICK:  T.J., could we show, please --

11 actually, I'll just do the whole thing on the ELMO.  So if you

12 do the ELMO we'll be all set.

13 Q    -- counsel just asked you --

14                      (Pause)

15 Q    -- counsel just asked you some questions about the

16 calibration period and I'm showing you 2336 and let me just ask

17 you, in the period of time was there anything special that was

18 done in determining what kinds of calibration periods to look

19 for with respect to the Grace case?  That is did you do some

20 kind of Grace-specific approach to selecting various

21 calibration periods?

22 A    No.  No, we did nothing unusual in Grace.  What we

23 normally do is we look at the period starting from the most

24 recent period, which in Grace's case was the end of 2000, and

25 look back.  What we try to do is get as much information as we

1 can, as much data as we can into a calibration period because

2 it makes the forecast -- more comfort in the forecast.  We try

3 to get as much data as we can until -- if you go back so far

4 there's a point at which it looks like that year is somehow

5 unrepresentative of the years going forward.  In other words,

6 it's a different look in terms of filings, or in terms of

7 claims qualified in this instance.  And that's where we will

8 usually cut off our calibration periods.

9 Q    What if you're talking about a year that's the most recent

10 year?  What if it turned out that given the calibration period

11 1999 to 2000, it was just way high?  Does that mean it's

12 discarded?

13 A    No.

14 Q    What do you do if it's high more recently as opposed to

15 way back when?

16 A    We'll just make sure that in case that's an anomalous

17 year, we'll try to make the calibration period long enough so

18 that if it is anomalous it's being averaged out over a longer

19 period of time.

20 Q    Now, when you finally select that -- when you do the

21 calibrations, do you select one calibration period as being the

22 calibration period that's going to drive all of your

23 calculations?

24 A    No.  No, we're saying we think these four periods seem

25 reasonable calibration periods but one period is no better than

1 another.

2 Q    And when you now have all the different calibration

3 periods and all the different model runs, do you take the

4 highest, the lowest, the median?  How do you then stack up all

5 these different runs that are done based upon different

6 calibration periods?

7 A    Well, it's hard to show 32 estimates in the report or on a

8 slide.  So what we normally do is pick the mid-point of those

9 estimates when we're presenting.

10 Q    Okay.

11 A    But the estimates themselves are available in our report.

12 Q    Mr. Finch asked you a bunch of questions essentially

13 focused on the question of whether the -- for purposes of doing

14 an estimate of future tort system costs, whether there was

15 empirical data for some of the assumptions here versus what he

16 was suggesting was the absence of empirical data for the

17 assumptions that were being made in this particular case.  Do

18 you recall those questions?

19 A    Generally, yes.

20 Q    Okay.  Well, when it comes to a settlement practice that's

21 used for estimating future tort system costs and you talk with

22 the client, I believe you told us that sometimes the client

23 will tell you, well, we have this kind of settlement package,

24 or that kind of settlement package.  Do you know whether that

25 settlement package actually is going to continue to be in place

1 over any period of time?

2 A    Usually we'll try to find out if this is a standing

3 settlement agreement or if the moratorium, for example, I think

4 is another example I mentioned, is somehow time limited, we'll

5 try to determine that period of time.

6 Q    But there's no time -- if the client simply says this is

7 how we are settling cases and going to continue to settle

8 cases, is there any way to prove that up empirically?

9 A    Not that I know of.

10 Q    What about the fundamental fact that as you go forward in

11 time -- I think you've told us that on the basis of the

12 settlement practices and the historical claims, you developed a

13 ratio that's then used for your model.  Do you recall that?

14 A    A ratio or an exposed population --

15 Q    An exposed population.

16 A    -- depending on the method.

17 Q    The assumption that that's going to continue for the life

18 of the model, is there any way that that is provable

19 empirically?

20 A    Only time will tell.

21 Q    Are there situations in which the client actually in

22 asking you to focus on a cost of future tort system claims, the

23 clients actually ask you to make assumptions that you know are

24 counter-factual?

25 A    Well, we -- let me think.

1 Q    From time to time.

2 A    Pardon me?

3 Q    From time to time does the client actually ask you to make

4 some assumptions that are not necessarily factual?

5 A    Well, not that we're able to determine.

6 Q    Okay.  Let's talk about the Armstrong case.  You were

7 shown ACC-FCR Exhibit 466 which is an estimate that was done

8 for the Armstrong case.  And do you remember being asked about

9 the Armstrong projection?

10 A    I do.

11 Q    And do you remember that in the Armstrong, Armstrong was a

12 member of the CCR, the Center for Claims Resolution, during the

13 period of its tort claim history?

14 A    Correct.

15 Q    Now, did a time come when CCR was disbanded?

16 A    That's correct.

17 Q    Roughly in about 2001?

18 A    I don't remember the exact date.

19 Q    Well, when it came to Armstrong, was there any way that

20 the CCR -- did they ask you to assume that the CCR historical

21 values should be used for the future, or how was that handled

22 in Armstrong, do you remember?

23 A    In the estimate of --

24 Q    Futures.

25 A    -- futures?  I think the only data that we had were the

1 historic data from the CCR.  So.

2 Q    And in the historic data you knew -- well, you knew that

3 it couldn't be actually the same as the future so you had to

4 make some assumptions.

5 A    Right.

6 Q    In the <u>Babcock and Wilcox</u> case, wasn't it the case that

7 everybody assumed that historical values should be used for the

8 future?

9 A    I believe so, yes.

10 Q    Was the same thing true in Armstrong?  Was there anybody

11 in the Armstrong case who was proposing something other than

12 the traditional approach?

13 A    No, I don't believe so.

14 Q    What about Owens Corning?

15 A    I wasn't in the Owens Corning case.

16        MR. FINCH:  Objection.  Lack of foundation.

17 Q    You were asked questions about what the future will bring.

18        MR. BERNICK:  Do we have the futures little thing

19 that he had?  Could you find the futures chart?

20 Q    You were asked some questions about the use of pathology.

21 Do you recall that?

22 A    Yes.

23 Q    And that you said that you used the 8.6 percent passage

24 rate that was determined by the Dr. Henry study for those

25 people who said that they were relying on X-rays and submitted

1 existing ILO's.  Do you recall that?

2 A    That's correct.

3            MR. FINCH:  Objection.  Leading.

4            MR. BERNICK:  It's foundational.  I want to get to

5 the point --

6            THE COURT:  Overruled.

7            MR. BERNICK:  -- of what we're doing here.

8 Q    And then it was brought out by Mr. Finch that there were

9 people who didn't rely upon X-rays but relied upon pathology

10 and you said well, they were included in the category where we

11 also applied the 8.6.

12 A    Correct.

13 Q    Just to give the Court some sense of magnitude and

14 perspective.  What was the -- do you recall what the total

15 number of lung cancer claims was that occupied that category of

16 saying that they had other evidence?  Do you remember roughly

17 what it was?

18            MR. FINCH:  Objection.  Not in his report.

19 A    I just don't remember off the top of my head.

20 Q    Do you remember the total number of claims as to which

21 pathology was even supplied?

22 A    I think that was a fairly small number.

23 Q    Roughly about --

24            MR. FINCH:  Objection.  This wasn't in his report,

25 Your Honor.

1          MR. BERNICK:  They got backup data left, right and

2    center.  It was absolutely in the backup data.

3          THE COURT:  I'm going to overrule this just so we can

4    get through it.  I'm really not sure at this point what

5    difference it's going to make.  But go ahead.

6          MR. BERNICK:  It would make a difference, Your Honor,

7    because they suggested that pathology was a big deal, that

8    people had path slides.  But 8.6 percent was applied to that

9    whole category and if the category was as we believe it was

10   2000, then about 8.6 percent would be about 200 and that's the

11   number of pathology samples that were submitted.

12   Q    Do you recall whether about 200 people had lung cancer

13   and --

14         MR. FINCH:  Objection.

15         THE COURT:  Sustained.

16   Q    Do you have any recollection as to the numbers?

17   A    It was, as I said before, it was fairly low.  Probably

18   less than 200.

19         MR. FINCH:  Just to pick a number.

20   Q    Well, now you opened the door and you opened the door in

21   the area where all the information has been provided.  I'd like

22   to talk for a moment about the proof of claim form.  And with

23   respect to the proof of claims, you were shown 2315, do you

24   recall that?

25   A    I do.

1  Q    Okay.  Now, you were asked questions, I believe, about the

2  category of proofs of claim where a POC was filed but it didn't

3  match, it didn't match to the data base and therefore it fell

4  into this top category.  Do you remember that?

5  A    I do.

6  Q    Now, counsel for the futures claimants representative

7  submitted some interrogatory answers that were answered by

8  Grace during -- in his cross examination notebook and it

9  reflected that approximately -- that the total number of POC's

10 that did not match was about 13,000.  Is that roughly

11 consistent with your recollection?

12 A    That's about right, yes.

13 Q    And it also goes onto say that there are really just a

14 handful of firms who populate this 14,000 discrepancy -- not a

15 discrepancy, but people who submitted proofs of claim and there

16 wasn't an entry in the data base and it turns out that Kelley

17 and Ferraro had 51 percent of the total.  They had 7,500 POC's,

18 51 percent; 3,700 post-dated.  Then 738, another one.  Five law

19 firms did 76.9.  Based upon the fact as recited there that

20 there were a very small number of firms that had these huge

21 volumes of POC's, is there any significance to you that there

22 are a number of claims, there was a POC but it did not, in

23 fact, match the data base?

24 A    No.  We did -- it was a six-month effort to match POC's to

25 pending claims and that's two people working with computers and

1 by hand to match every last claim.

2 Q    I want to ask you a couple questions about slide 3023 and

3 then we'll go to the last questions that I have which relate to

4 our calculation of meso settlement value.  Mr. Mullady

5 suggested to you that in your analysis, the future claimants

6 will meet the criteria -- you assumed that they'll meet the

7 criteria in the same proportion as currents meet the criteria.

8 Do you see that?

9 A    I do.

10 Q    Is it any different if you're analyzing not according to

11 the Grace procedures but if you're analyzing in the tort system

12 context, that is, what will the future bring, would you have

13 any different approach from the approach that you've used here

14 with respect to whether the proportion that you have in the

15 present carries forward to the future?

16 A    Well, the principle -- I mean certainly the approach would

17 be different -- I mean I've got different data and different

18 criteria here.

19 Q    Different data.

20 A    But the principle is of most, virtually all of these

21 forecasts is that the past, and most likely the recent past,

22 is a predictor of what will happen in the future.  And without

23 some indication of a trend in the recent past or something that

24 would call a question into the forecast, you're basically

25 assuming that history will repeat itself.  So those ratios

1  should be the same and there's no different for a tort system

2  forecast or for this forecast.

3  Q    Now, the third one Mr. Mullady asked about, was average

4  settlement values for six meso claims are predictive of all

5  future meso claims and that plus the now famous Halpain file,

6  bring me to my last line of questioning.

7          Mr. Mullady's characterization was that you've

8  assumed that the average settlement values for six meso claims

9  are predictive of all future meso claim values.  Going back to

10 your chart which is 2330, were you saying in this chart that

11 these three claims, these six claims, were actually predictive

12 of what the numbers would be in the future?  Actually

13 predictive.

14 A    No.  We were setting a value to those claims that were

15 qualified.

16 Q    Okay.  And if you actually -- I believe what you said was

17 that if you wanted to take the data that you had for this group

18 of claims as a whole, you could, but then you'd have actually a

19 lower number.

20         MR. FINCH:  Objection.  Leading.

21 Q    Well, just let me ask you whether we're on the same page

22 because I'm going to tee up the Halpain case.

23 A    Yes.

24 Q    Okay.  Now, is there --

25         MR. MULLADY:  Is that --

1          THE COURT:  It is leading but he's testified to this,

2   Mr. Mullady, so it's also cumulative.  I think we're just

3   setting the stage for where we're going.  So I'm going to

4   accept it as cumulative.

5          MR. BERNICK:  Okay.

6   Q    Now, with respect to the Halpain case, in the Halpain case

7   -- if I can find this, clipped back over here.  We know from

8   the claim -- closed claims file you have your six meso claims

9   here that comprise the set.  You've got a series of claims that

10  vary in value and we know that in Halpain it is at least said

11  that Halpain settled for approximately $2 million.  If I can

12  find a pen.  We have Halpain now blows off the top at $2

13  million.  And I want you to assume, as reflected in the Halpain

14  file, that Halpain settlement documents were actually signed as

15  recently -- between March 5 of 2001, according to ACC-FCR-469,

16  page ending in 237, and they're actually signed by Grace as

17  recently as March 10 of 2001 which is less than three weeks

18  before Grace declared Chapter 11, that Grace facing a trial

19  decided to settle this case and go into Chapter 11 without

20  having a case that was either going to verdict immediately or

21  was actually pending.  But those --

22         MR. FINCH:  Objection.  Lack of foundation.

23         MR. BERNICK:  No, I'm going to ask him to assume that

24  is absolutely the case.  That indeed when these papers were

25  inked, Grace's board was meeting to consider the details of a

1  Chapter 11 case and under those circumstances they decided to

2  settle and they settled for $2 million.

3  Q    I want you to assume that.  I now want to go back to these

4  six cases which created your 155 and the analysis that you had

5  done saying we'll use the 155 even though the rest of the data

6  would take us to a lower average.  And I'm now going to give

7  you the opportunity that none of these counsel gave you and I

8  don't know what your answer is because we haven't talked about

9  this.  What, if any, impact would that Halpain settlement on

10 the eve of Grace's Chapter 11 at that value have on the

11 assessment that you reached about the appropriate number to use

12 for purposes of your estimate going forward?

13            MR. MULLADY:  Objection to the form of the question.

14 Incomplete hypothetical.  Lacks foundation.  Misleading.

15            THE COURT:  Well, okay.  I think it doesn't --

16            MR. MULLADY:  Argumentative.

17            THE COURT:  Well, it's not argumentative, it's a

18 hypothetical.  I don't know about the lack of foundation,

19 however.  This witness has been asked to assume that his

20 calculations would change if the $2 million were added to this

21 criteria which is what Mr. Finch was asking him to do but Mr.

22 Finch had made the calculation not this witness.  So, I think

23 it's -- I don't think there's a lack of foundation.  I think

24 the foundation is substantiated.  What was the rest?

25            MR. BERNICK:  Well, to be clear.  The foundation that

1  I'm giving the witness in the hypothetical comes right from the

2  file that they just put into evidence.  The dates are there;

3  March 5, 2001, March 10.  The date of Grace's Chapter 11 is

4  April 5 of 2001 which is less than three weeks later.  And I'll

5  represent to the Court that Grace was actively planning the

6  bankruptcy, indeed had announced such publicly at the time.  So

7  my hypothetical doesn't lack foundation.  What I'm asking the

8  witness to do though, to be clear, is to say now that he has

9  this data point, what does he do with the data point?  What

10 does he do with it?  How does it figure into the analysis?

11          THE COURT:  The objection is overruled.  I believe

12 this is the same information that Mr. Finch was getting to with

13 the sole exception that Mr. Finch was preparing the

14 calculations rather than the witness.  Now the witness is being

15 asked what effect that would have, if any, on his calculations.

16          MR. BERNICK:  That's correct.

17          THE COURT:  You can answer, Doctor.

18 A    Well, one thing that -- one effect it would not have would

19 be the addition of a $2 million claim to six claims in the

20 calculation of a different average.

21 Q    And why is that?

22 A    As I said when we were trying to determine what was a

23 reasonable value to assign to these claims, and looking at

24 claims that had the information -- that didn't have the

25 information and that met the criteria, we were left with six

1 claims.  What we saw in our tests is that -- well, it was

2 really an equivalence between 155 and 96, as strange as that

3 sounds for non-statisticians, it was the same number.  We

4 couldn't distinguish.  In other words, claims that met the

5 criteria could just as well have been worth $96,000 as 155.

6 If this result had been presented to me that the six was seven,

7 and one of those seven was a $2 million claim, to accept a

8 sample of seven with an extreme outlier like $2 million in it

9 and then to call that seven cases representative of the

10 historic settlements that meet this criteria, seems crazy.  I

11 mean it's clearly a statistical outlier.  It clearly -- it's

12 probably four or five standard deviations from the mean of

13 settlement values.  So on the statistical basis alone I

14 wouldn't use it.

15        Secondly, I've been doing kind of the modeling of

16 settlement values with a lot of defendants.  What are the

17 factors that drive settlement values?  And in all of those

18 models that we've -- statistical models that we've done,

19 criteria like this seldom show up as being the factors that

20 drive the settlement value.  So the exposure criteria, people

21 that meet stronger exposure criteria and people that meet

22 stronger medical criteria, not that they don't have an effect,

23 but they are not the main drivers of settlement value.  So I

24 would have been surprised also just from a personal basis to

25 see this value be as high as 55 or much higher than 55.  So

Florence - Redirect/Bernick                    266

1  there's no way that -- if I was forced to judge with a $2

2  million case in seven cases, I'd say then I would pick the

3  overall average as the best indicant of what the cases are

4  worth going forward.

5           MR. BERNICK:  Okay.  Thank you very much, Dr.

6  Florence.  I have nothing further at this time.

7           MR. FINCH:  Two minutes recross?

8           THE COURT:  Yes, sir.

9           MR. FINCH:  ELMO, please.

10                    RECROSS EXAMINATION

11  BY MR. FINCH:

12  Q    Dr. Florence, you would agree that the $9,000 mesothelioma

13  settlement in this population of six is an outlier, too, right?

14  A    No, it's not.  We looked to see if it was a statistical

15  outlier and the $9,900 settlement is not a statistical outlier.

16  Q    It's ten times lower than Grace's average mesothelioma

17  settlement.

18  A    But in the settlement values for -- in the meso settlement

19  values it is not an outlier.

20  Q    It's ten times smaller than Grace's average meso

21  settlement value, correct?  It's one-tenth the size of the

22  typical mesothelioma settlement value.

23  A    I don't know the typical mesothelioma settlement value.

24  Q    You testified -- I thought you testified on direct that of

25  the entire population of closed claims you looked at, the

1 average settlement value was 96,000.

2 A    That's right.  That's right.

3 Q    And so 9,800 is about 10 percent of that, right?

4 A    And it is not -- it's not mediations from the mean

5 settlement value for Grace.

6 Q    But it's one-tenth --

7 A    It still falls well within the distribution of settlement

8 values for Grace.

9 Q    Isn't it true that for all settlement values it's a skewed

10 distribution?

11 A    Sure.

12 Q    There's a lot of --

13 A    There's a lot more at the top end than -- a longer tail on

14 the top end than the bottom.

15 Q    And there's a lot of big settlement averages but there's a

16 small number of them but it skews the distribution, right?

17 A    The distribution is skewed of settlement values, correct.

18 Q    Now, you were asked a question about the CCR -- about the

19 Armstrong testimony and the CCR.  The assumption whether it was

20 counter-factual to assume that the CCR would continue to exist.

21 Do you recall that question by Mr. Bernick?

22 A    I think.  Counter-factual to assume that the CCR would

23 exist?

24 Q    Yes.  That was -- in the Armstrong case the CCR stopped

25 existing at a particular time and you used Armstrong's

1 historical settlement averages to project its liability going

2 forward, correct?

3 A    Correct.

4 Q    And the reason you did that, even though it was no longer

5 in the CCR, the reason you didn't make any adjustments to your

6 estimates, either to the number of future claims or the values

7 of those claims to take into account the fact that Armstrong

8 wouldn't be in the CCR is because you assumed that Armstrong

9 had managed those cases well historically and they would

10 continue to manage them with equal competence and do it equally

11 well going forward, right?

12 A    I think so.  Yeah.

13 Q    Here isn't it the case you're assuming that Grace would do

14 radically better than what its history would suggest?

15 A    I'm making no assumption about how Grace will do in the

16 future.  I'm calculating the number of claims that will meet

17 certain criteria and the number of claims that won't meet those

18 criteria, both now and going forward.

19          MR. FINCH:  Thank you, Your Honor.  Nothing more.

20          THE COURT:  Mr. Mullady?

21          MR. MULLADY:  Nothing more from me, Your Honor, other

22 than to offer a document into evidence that I did not offer at

23 the end of my examination.  It's ACC-FCR-3024.

24          MR. BERNICK:  What is that?

25          MR. MULLADY:  This is the extraction from the

1 reliance material showing --

2          MR. BERNICK:  It's the nominal value as opposed to

3 the NPV's?

4          MR. MULLADY:  Correct.

5          MR. BERNICK:  Yeah.  I have no objection to that.

6          THE COURT:  It's admitted -- oh, I'm sorry.  I take

7 it you don't have it.  It's admitted.

8          MR. BERNICK:  We have no further questions either,

9 Your Honor.

10          THE COURT:  All right.  You're excused Dr. Florence.

11          THE WITNESS:  Thank you, Judge.

12          THE COURT:  Thank you.

13          All right.  We're in adjournment until nine o'clock

14 tomorrow morning.

15          COUNSEL:  Thank you, Your Honor.

16                    *  *  *  *  *

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

We, KIMBERLY UPSHUR, TAMMY DeRISI, LYNN SCHMITZ, CEIL ASHBOCK, CARLA OAKLEY and PATRICIA A. KONTURA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Lynn Schmitz

LYNN SCHMITZ


/s/ Ceil Ashbock

CEIL ASHBOCK


/s/ Carla Oakley

CARLA OAKLEY


/s/ Patricia A. Kontura

PATRICIA A. KONTURA

J&J COURT TRANSCRIBERS, INC.                April 2, 2008